LATHAM & WATKINS LLP
  David J. Schindler (Bar No. 130490)
   *david.schindler@lw.com*
  Manuel A. Abascal (Bar No. 171301)
   *manny.abascal@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234;
Facsimile: +1.213.891.8763

*Attorneys for United Defendants*

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
ROSS M. CUFF
JACK D. ROSS (CBN 265883)
HUNTER B. THOMSON (CBN 330533)
Assistant United States Attorneys
300 N. Los Angeles Street, Room 7516
Los Angeles, California 90012
Tel: (213) 894-6379; Fax: (213) 894-7819
Email: *hunter.thomson@usdoj.gov*

*Attorneys for the United States of America*

[Additional Counsel Listed on Next Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>Plaintiff,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC. *et al.*,<br><br>Defendants. | CASE NO. 2:16-cv-08697-FMO-PVCx<br><br>**JOINT EVIDENTIARY APPENDIX**<br><br>**VOLUME 7 OF 14**<br>**EXHIBITS D-49 THROUGH D-66**<br>**PAGES 1220 THROUGH 2103**<br><br>Hon. Fernando M. Olguin<br><br>Hearing Date: September 5, 2024<br>Hearing Time: 10:00 a.m.<br>Courtroom: 6D |

1  LATHAM & WATKINS LLP
    Daniel Meron (appearing *pro hac vice*)
2       daniel.meron@lw.com
    Abid R. Qureshi (appearing *pro hac vice*)
3       abid.qureshi@lw.com
  555 Eleventh Street, NW, Suite 1000
4  Washington, DC 20004-1304
  Telephone: +1.202.637.2200
5  Facsimile: +1.202.637.2201

6  BARTLIT BECK LLP
    Philip S. Beck (appearing *pro hac vice*)
7       *philip.beck@bartlitbeck.com*
    Sean W. Gallagher (appearing *pro hac vice*)
8       *sean.gallagher@bartlitbeck.com*
    Cindy L. Sobel (appearing *pro hac vice*)
9       *cindy.sobel@bartlitbeck.com*
    Nicolas Martinez (appearing *pro hac vice*)
10      *nicolas.martinez@bartlitbeck.com*
    Benjamin R. Montague (appearing *pro hac vice*)
11      *benjamin.montague@bartlitbeck.com*
  54 W. Hubbard Street, Suite 300
12 Chicago, Illinois 60654-8174
  Telephone: +1.312.494.4400
13 Facsimile: +1.312.494.4440

14 BARTLIT BECK LLP
    Andrew C. Baak (appearing *pro hac vice*)
15      *andrew.baak@bartlitbeck.com*
    Jameson R. Jones (appearing *pro hac vice*)
16      *jameson.jones@bartlitbeck.com*
  1801 Wewatta Street, Suite 1200
17 Denver, Colorado 80202-6318
  Telephone: +1.303.592.3100
18 Facsimile: +1.303.592.3140

19 *Attorneys for United Defendants*

20
  JAMIE ANN YAVELBERG
21 ROBERT McAULIFFE
  EDWARD CROOKE
22 LINDA McMAHON
  JESSICA E. KRIEG
23 AMY L. LIKOFF
  GREGORY A. MASON
24 MARTHA N. GLOVER
  WENDY ZUPAC
25 Attorneys, Civil Division, U.S. Department of Justice
       P.O. Box 261, Ben Franklin Station
26       Washington, D.C. 20044
       Tel: (202) 307-0486; Fax: (202) 307-3852
27       Email:  robert.mcauliffe@usdoj.gov
  TRINI E. ROSS
28 United States Attorney

DAVID CORIELL
Assistant United States Attorney
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5830; Fax: (716) 551-3052
        Email:  david.coriell@usdoj.gov

*Attorneys for the United States of America*

**EXHIBIT D-49 INTENTIONALLY BLANK**

**EXHIBIT D-50 INTENTIONALLY BLANK**

**EXHIBIT D-51 INTENTIONALLY BLANK**

**EXHIBIT D-52**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA ex rel.

BENJAMIN POEHLING,

     Plaintiffs,

v.

UNITEDHEALTH GROUP, INC., et al.,

     Defendants


EXPERT REPORT OF JEAN ACEVEDO

SEPTEMBER 29, 2023

Amended April 5, 2024

1224

## I.    QUALIFICATIONS

1.    I am a Certified Professional Coder ("CPC") and Certified ENT Coder ("CENTC," i.e., coding focused on ear, nose, and throat conditions), and have been so designated since 1999 and 2008, respectively, through the American Academy of Professional Coders ("AAPC").[1]  I achieved AAPC Fellow status in January 2017, which indicates that I have been recognized for my professional achievements in coding and continuous adherence to the ethical and professional standards of the AAPC.[2]  I have also held the Certified in Healthcare Compliance ("CHC") certification from the Health Care Compliance Association ("HCCA") since 2002.[3]  Additionally, I have been a health care risk manager since 1989 (currently inactive).

2.    I have experience in all areas of medical coding and reimbursement, particularly with Current Procedural Terminology ("CPT"), Healthcare Common Procedure Coding System ("HCPCS"), the International Classification of Diseases, Ninth and Tenth Revisions, Clinical Modification (ICD-9-CM and ICD-10-CM)[4] diagnosis coding,[5] and third-party payer billing and payment rules, including the Centers for Medicare and Medicaid Services ("CMS") Medicare Advantage risk adjustment program.

3.    From 2007 through 2022, I developed and taught the regulatory and compliance modules of the Certificate in Medical Business Management program at Florida Atlantic University's School of Business.

4.    For the past twenty-three years, I have maintained an active healthcare consulting practice as the founder and senior consultant of Acevedo Consulting Incorporated ("ACI").  ACI assists clients in the healthcare industry in all areas concerning reimbursement, including coding

---

[1] *Coding Certifications*, AAPC, https://www.aapc.com/certifications?tag=coding (last visited Sept. 29, 2023).

[2] *AAPC Fellow Application Process*, AAPC, https://www.aapc.com/recognition/aapc-fellow.aspx (last visited Sept. 29, 2023) ("Fellows are highly experienced in their position within the business of healthcare.  This status indicates your professional achievement and continuous adherence to the ethical and professional standards of AAPC.  Fellowship is earned through hard work, written demonstration of your professional expertise, and regular commitment to dedicated leadership in the healthcare community.").

[3] *Certified in Healthcare Compliance (CHC)*, HCCA, https://www.hcca-info.org/certification/become-certified/chc (last visited Sept. 29, 2023).

[4] For purposes of this report, I use the term "ICD-9" to refer to "ICD-9-CM" and "ICD-10" to refer to "ICD-10-CM," respectively.  Furthermore, I use the term "ICD" to refer both to ICD-9 and ICD-10.

[5] *See ICD-10, ICD-10-CM, & ICD-10-PCS*, University of Kansas Medical Center, https://guides.library.kumc.edu/icd10 (last visited Sept. 29, 2023).

and medical records review.  The firm's clients span the gamut of the United States' healthcare system, from large Medicare Advantage Organizations ("MAOs") to small private health insurers, small physician practices to large healthcare systems, and the federal government.

5.      I have provided education on ICD coding rules to large and small physician organizations, Accountable Care Organizations ("ACOs"), and a national MAO.  I have also advised physician practice groups on accuracy and compliance with the coding and Medicare Advantage risk adjustment rules on a proactive basis as well as assisting them through risk adjustment audits by any one of the Medicare contractors.  I have had a longstanding contract with a large Program of All-Inclusive Care for the Elderly ("PACE") to provide documentation and education on ICD-10 coding, and to provide monthly quality reviews and feedback on the accuracy and completeness of the providers' documentation.

6.      A copy of my Curriculum Vitae, including a list of all publications I have authored, is attached as **Appendix A**.  A list of my prior testimony is attached as **Appendix B**.

## II.      COMPENSATION

7.      My contract with the United States Department of Justice is on an hourly basis.  For my work on this case, I am being compensated at my standard billing rate of $325.00 per hour for guidance and development of my report.  My rate for testifying at a deposition or appearing at any proceeding is $468.75 per hour.  My compensation is not contingent on the content of my opinions or the outcome of this matter.

## III.      SCOPE OF ASSIGNMENT

8.      I have been engaged by the Plaintiffs to provide expert testimony in this matter.  Specifically, I have been asked to provide background on medical record coding, including ICD-9 and ICD-10 diagnosis coding, and its relationship to the Hierarchical Condition Categories ("HCCs") used in the Medicare Advantage risk adjustment program.  I have also been asked to provide expert testimony on the following topics: (1) the documentation standards required in risk adjustment coding; (2) the standards and guidelines governing medical record coding; and (3) industry best practices for achieving accurate and complete coding in the Medicare Advantage context.  The relevant time period for my report covers dates of service in 2008 through 2016.

9.      I reserve the right to supplement or revise my opinions should additional information become available.

## IV.    BASIS FOR OPINIONS

10.     I have reviewed publicly-available materials for the relevant time period, including the ICD-9 official Coding Guidelines applicable during the 2008–2014 dates-of-service years and the ICD-10 official Coding Guidelines applicable during the 2015–2016 dates-of-service years; the CMS 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("2008 Participant Guide"); the CMS Medicare Managed Care Manual, Chapter 7 – Risk Adjustment; and various publications regarding coding. I have also reviewed deposition transcripts from this case. A complete list of the materials that I have relied upon as a basis for my opinions rendered in this report is attached as **Appendix C**.

## V.    BACKGROUND

### A. Introduction to Medical Record Coding

11.     When an individual goes to a doctor's office, an urgent care center, hospital, or other health care facility, the physician or other provider documents one or more of the following in the patient's medical record: the patient's complaint and related history, a physical examination, and the assessment/impression and plan. In determining whether to pay for a healthcare service, the patient's insurance company or other payer generally requires information on what was done to the patient (i.e., the medical service provided), and why. There are industry-standard medical "codes" used to report "what was done" and "why" on claims made to insurance companies. These codes ensure that all healthcare providers are speaking the same language when submitting a claim for payment.

12.     While the American Medical Association has created Current Procedural Terminology ("CPT") codes to describe "what was done" (e.g., an office visit, an ultrasound, a blood draw, etc.), ICD diagnosis codes tell the insurer "why"—i.e., what health condition the medical service addresses. ICD diagnosis codes designate diseases, symptoms, abnormal findings, and other elements of the patient's diagnosis. For example, when a physician sees a patient for a new patient office visit, the CPT code may be 99204, which represents the service provided. If the medical record appropriately documents that the patient exhibits symptoms of

4

diabetes and that blood tests confirm that the patient has diabetes mellitus, the proper ICD-10-CM code is E11.9, which represents the diagnosis.

13.    When insurance payment is on a "fee-for-service" basis, the physician is paid based on the specific CPT code submitted for the office visit, and the payment amount is the same regardless of how sick the patient is.  Continuing the example from paragraph 12, the physician would be paid based on CPT code 99204 (new patient office visit), regardless of the patient's confirmed diabetes mellitus diagnosis (E11.9).  The ICD code does not impact the payment.

14.    By contrast, in the Medicare Advantage program discussed further below, the reported ICD codes are relevant because payment is on a "risk adjusted" basis.  This means that CMS pays MAOs a monthly amount per beneficiary based on the risk profile of that beneficiary.  Generally, the sicker a beneficiary is, the higher the payment.  The risk adjustment system sets the monthly payment amount by estimating the healthcare expenditures a patient is likely to require in a given year, based in part on the health status of the patient, which in turn is based on the Hierarchical Condition Categories ("HCCs") reported for that patient.  As explained below, ICD codes underlie HCCs, and therefore, may impact payment in this system.

### B.  ICD-9 and ICD-10 Coding

15.    The International Classification of Diseases is a medical classification system maintained by the World Health Organization ("WHO") and used worldwide for health management and clinical purposes.  WHO issues new revisions of the ICD periodically.

16.    At the beginning of the relevant time period, ICD-9 was the operative classification system.  There were approximately 14,000 ICD-9 diagnosis codes.  When the United States Department of Health and Human Services switched to ICD-10 in 2015, that number rose to almost 70,000, because ICD-10 allows for greater specificity and more granularity in describing a patient's condition, variants of that condition, or complications present with certain conditions. [6]

---

[6] *International Classification of Diseases, (ICD-10-CM/PCS) Transition - Background*, Centers for Disease Control and Prevention, https://www.cdc.gov/nchs/icd/icd10cm_pcs_background.htm (last visited Sept. 29, 2023).

1228

17.     Depending on the date-of-service year in the relevant time period, the authoritative source for diagnosis coding is the ICD-9 or ICD-10 Coding Guidelines published by the Centers for Disease Control and Prevention (CDC).[7]  There are a number of additional sources that explain coding rules and guidelines that must be followed for proper reporting of diagnoses.  These additional sources include coding guidelines, manuals, and training published by CMS.[8]  Organizations such as hospitals and MAOs also subscribe to the American Hospital Association's "Coding Clinic," another recognized source for ICD-9 and ICD-10 guidance.

18.     There are two recognized organizations that certify professional coders, the AAPC and American Health Information Management Association ("AHIMA").  The main credential provided by the AAPC is the CPC (Certified Professional Coder) and the main credential provided by AHIMA is the CCS (Clinical Coding Specialist).[9]

19.     Coding certification from either the AAPC or AHIMA requires following the AAPC and AHIMA's guidelines for ethical coding.[10]

### C.  ICD Coding and Reporting Process

20.     In the Medicare Advantage context, both ICD and CMS have set out rules on the provider documentation (and content of that documentation) needed to assign and report particular ICD codes on insurance claims.  Historically, before this process became electronic, physicians handwrote notes in patient charts, the billing staff looked up the applicable diagnosis code(s) supported by notes in patient charts in an ICD code book, and then the staff would report the assigned ICD codes on a claim submitted for payment.

21.     With the adoption of electronic medical records (EMRs) beginning in 2011, it has become increasingly common for physicians to select the ICD-9 or ICD-10 code(s) as they

---

[7] *International Classification of Diseases, Tenth Revision, Clinical Modification (ICD-10-CM)*, Centers for Disease Control and Prevention, https://www.cdc.gov/nchs/icd/icd-10-cm.htm (last visited Sept. 29, 2023); *ICD-9-CM Addenda, Conversion Table, and Guidelines*, Centers for Disease Control and Prevention, https://www.cdc.gov/nchs/icd/icd9cm_addenda_guidelines.htm (last visited Sept. 29, 2023).
[8] *See, e.g.*, *ICD-10 Resources*, Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare/coding-billing/icd-10-codes/icd-10-resources (last visited Sept. 29, 2023).
[9] *See Certified Professional Coder (CPC) Certification*, AAPC, https://www.aapc.com/certifications/cpc (last visited Sept. 29, 2023); *Certified Coding Specialist (CCS)*, AHIMA, https://www.ahima.org/certification-careers/certification-exams/ccs/ (last visited Sept. 29, 2023).
[10] *See Code of Ethics*, AAPC, https://www.aapc.com/about-us/code-of-ethics (last visited Sept. 29, 2023); *Ethics*, AHIMA, https://www.ahima.org/who-we-are/governance/ethics/ (last visited Sept. 29, 2023).

complete their notes in the EMR system.  This is especially true in an outpatient office or clinic setting.  As a physician starts to type "diabetes" in the section of the note where diagnoses are listed, the EMR presents a list of possible ICD codes.  For example, if the patient has Type 2 diabetes mellitus without complications, the physician should select E11.9 as the corresponding ICD-10 code.  Billing staff may verify that the physician selected the correct code(s) and then include them on an insurance claim.  In hospital settings, which tend to have more resources than the typical outpatient provider's office, dedicated coders may look at the appropriate sections of medical charts and, following the applicable payer rules for the type of medical facility, report diagnosis codes on the insurance claim.

### D.  Medicare Advantage Program

22.      The federal government's Medicare program provides health insurance for people ages 65 or older as well as younger individuals with certain disabilities.[11]  Medicare beneficiaries have the option to enroll in "Traditional Medicare" or "Medicare Advantage."  Medicare Advantage beneficiaries enroll in plans administered by private insurance companies known as "Medicare Advantage Organizations," or "MAOs."[12]

23.      CMS enters into annual contracts with MAOs that participate in the Medicare Advantage program and imposes numerous requirements on the MAOs pursuant to statutes, regulations, guidance materials, and through the contracts.[13]

### *Risk Scores Under the CMS-HCC Risk Adjustment Model*

24.      In the Medicare Advantage program, CMS pays MAOs a monthly premium for each beneficiary enrolled in the MAOs' plans.[14]  The amount of payment depends in part on the beneficiary's "risk score," which is calculated using the CMS Hierarchical Condition Category ("HCC") Risk Adjustment Model.[15]

25.      Each beneficiary's risk score is newly calculated each payment year based on health conditions documented in the beneficiary's medical records during the prior year (referred

---

[11] 42 U.S.C. § 426 *et seq.*; 42 C.F.R. § 406.5; 42 C.F.R. §§ 406.10–406.13.
[12] 42 U.S.C. § 1395w *et seq.*; 42 C.F.R. § 422 *et seq.*
[13] 42 U.S.C. § 1395w *et seq.*; 42 C.F.R. § 422 *et seq.*
[14] 42 U.S.C. § 1395w-23(a)(1)(A); 42 C.F.R. § 422 *et seq.*
[15] 42 U.S.C. § 1395w-23(a)(1)(C); 42 C.F.R. §§ 422.300–422.308.

1230

to as the "service year" or "date-of-service" ("DOS") year). For example, a beneficiary's risk score for payment year 2016 is based on conditions documented in that beneficiary's medical records during encounters that took place in 2015, but that risk score would not reflect conditions documented in that beneficiary's medical records during encounters in 2014 or in 2016.

26.     The purpose of these individualized risk scores is to capture anticipated differences in the costs of coverage for beneficiaries given differences in their health status and demographic background.[16] Thus, the risk score is calculated based on both the health status of the beneficiary and demographic factors (e.g., a patent's gender and age, disability status, institutional status).[17]

### *Hierarchical Condition Categories (HCCs)*

27.     The health status component of the risk score is based on the HCCs or Hierarchical Condition Categories reported for the beneficiary. CMS groups ICD-9/ICD-10 diagnosis codes with other clinically similar diagnosis codes.[18] These diagnosis code groupings are in turn grouped into "condition categories."[19] Similar "condition categories" are organized hierarchically based on severity of the condition and cost implications, such that the most severe and costly condition category is at the "top" of the hierarchy.[20] Once hierarchically organized, these condition categories become HCCs.

28.     This hierarchical organization ensures a beneficiary's risk score will incorporate only the HCC that represents the most severe and costly manifestation of a disease documented in a given year. For example, if claims data shows a patient has both diabetes without complications (ICD-10 code E11.9, HCC 19), and diabetes with acute complications (ICD-10 code E11.8, HCC 18), only HCC 18 is used in computing the patient's risk score, as it is the more severe form of diabetes.

---

[16] *See* Medicare Managed Care Manual, Ch. 7, § 20 (June 7, 2013) ("Risk adjustment allows CMS to pay plans for the risk of the beneficiaries they enroll, instead of an average amount for Medicare beneficiaries. By risk adjusting plan payments, CMS is able to make appropriate and accurate payments for enrollees with differences in expected costs . . . . Risk scores measure individual beneficiaries' relative risk and risk scores are used to adjust payments for each beneficiary's expected expenditures.").

[17] *See id.* § 70 ("Risk scores are used to adjust payments and bids based on the health status (diagnostic data) and demographic characteristics (such as age and gender) of an enrollee.").

[18] *Id.* § 70.1.

[19] *Id.*

[20] *Id.*

29.     Each year, CMS determines the groupings of diagnosis codes that "map" to a given HCC.[21]  If a beneficiary has a condition corresponding to a diagnosis code that maps to an HCC, that HCC will be incorporated into the calculation of the beneficiary's risk score.  For example, under the current CMS-HCC Risk Adjustment Model, of the approximately 70,000 total ICD-10 codes, over 9,700 of those codes map to one or more of the 86 HCCs in the model.[22]

30.     Multiple ICD codes can map to the same HCC.  ICD-10 codes each contain up to 7 characters.  Although slight variations in the last characters in the code string leads to distinct ICD-10 codes, these distinct ICD-10 codes may still map to the same HCC.  For example:

a.  E11.10 (Type 2 diabetes mellitus with ketoacidosis without coma) and E11.11 (Type 2 diabetes mellitus with ketoacidosis with coma) both map to HCC 17 (diabetes with acute complications).

b.  M35.00 (Sjögren syndrome, unspecified) and M35.3 (Polymalgia rheumatica) both map to HCC 40 (Rheumatoid arthritis and inflammatory connective tissue disease).

31.     However, certain diagnosis codes indicating historical conditions or potential risk for future conditions may be documented in the patient's medical record and assigned an ICD code, but they would not map to an HCC.  For example:

a.  If an individual is diagnosed with thyroid cancer, it is appropriate to assign the ICD-10 code C73 (malignant neoplasm of the thyroid gland).  After the thyroid is removed, if the patient is asymptomatic and no further treatment is being provided, then Z85.850 (personal history of malignant neoplasm of thyroid) is the proper ICD-10 code to report.

b.  If a patient's blood sugar has been elevated on lab tests, but there is not enough information to diagnose the patient with diabetes mellitus, the proper code to report in this situation is a code for abnormal glucose (R73.09), rather than E11.9 (diabetes mellitus without complications).

---

[21] Not all ICD-9/ICD-10 diagnosis codes map to an HCC included in the CMS-HCC Risk Adjustment Model, and therefore not all ICD-9/ICD-10 diagnosis codes affect risk adjustment payments.
[22] Amerigroup, *CMS-HCC Risk Adjustment Model (V24), ICD-10-CM to CMS-HCC Crosswalk*, https://provider.amerigroup.com/dam/publicdocuments/ALL_CARE_CMSHCCRAModel_mrdcoding_tips.pdf (last visited Sept. 29, 2023).

1232

32.     Where a patient has several diseases corresponding to several HCCs, the risk adjustment model allows those multiple HCCs to be assigned and accounted for in the risk score. The number of HCCs reported and the severity of the HCCs tend to increase the risk score. Thus, a 72-year-old male with COPD, diabetes mellitus, and coronary artery disease would have a higher risk score than a 72-year-old male with diabetes mellitus only.

### *Medical Record Documentation to Support HCCs Under CMS Rules*

33.     During the relevant time period, CMS had specific rules governing the submission of diagnosis codes for inclusion in the HCC risk adjustment model.  HCC coding requires clinical support in medical record documentation.

34.     As explained in the 2008 Participant Guide, CMS requires that diagnosis codes submitted for risk adjustment result from a face-to-face encounter between a beneficiary and a provider of a qualifying physician specialty.[23]  In addition, the medical record for a particular encounter used as the basis for submission of a diagnosis code must be signed and include the provider's credentials.[24]

35.     In addition, both the ICD guidelines and CMS specify that all conditions reported should be based on documentation showing that conditions exist at the time of the encounter/visit and "require or affect patient care, treatment or management."[25]

36.     Importantly, regulations and official CMS publications require all diagnosis codes submitted by MAOs to be documented in the medical record, and ICD Coding Guidelines must be followed for coding and reporting.[26]  For example, the Medicare Managed Care Manual, Chapter 7 states that MAOs must:

---

[23] 2008 Participant Guide, § 7.2.4.2; *see also id.* Table 3H (setting forth acceptable physician specialties, which include physicians and other qualified healthcare providers, such as nurse practitioners and physician assistants).

[24] *Id.* § 7.2.4.2 ("For purposes of risk adjustment data submission and validation, the MA organizations must ensure that the provider of service for face-to-face encounters is appropriately identified on medical records via their signature and physician specialty credentials.").

[25] ICD-9, § IV.K (effective Oct. 1, 2011), https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf; ICD-10, § IV.J (updated Apr. 1, 2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf; *see also* 2008 Participant Guide, § 6.4.1.

[26] *See, e.g.*, 45 C.F.R. § 162.1002(a)(1)(i), (b)(1), (c)(2)(i) (establishing the ICD, including the ICD Guidelines, as the national standard for diagnosis coding); 42 C.F.R. § 422.310(d)(1) ("MA organizations

Ensure the accuracy and integrity of risk adjustment data submitted to CMS. ***All diagnosis codes submitted must be documented in the medical record*** and must be documented as a result of a face-to-face visit. The diagnosis must be coded according to International Classification of Diseases, (ICD) Clinical Modification Guidelines for Coding and Reporting.[27]

In addition, the 2008 Participant Guide states:

Standard ICD-9-CM coding practices support the CMS-HCC model. ***In all cases, the documentation must support the code selected and substantiate that the proper coding guidelines were followed***.[28]

## OPINIONS

### a. Diagnosis Codes Submitted for Risk Adjustment Must Be Supported By Documentation in the Medical Record Meeting CMS Requirements.

37.    The principal requirement for assigning and reporting diagnosis codes in the Medicare Advantage risk adjustment model is that the codes are supported by appropriate medical record documentation.[29]

38.    As referenced above, the medical record cannot merely contain a list of the patient's conditions without supporting documentation showing that the conditions "require or affect patient care, treatment or management."[30] In the absence of such documentation, the coder cannot assign codes for listed conditions. In my experience, such documentation may include physician notes on disease progression or stabilization, patient response to the treatment, and whether test results were reviewed by the physician.

39.    In sum, the diagnosis codes that MAOs submit to CMS for risk adjustment purposes must be (1) based on a face-to-face encounter; (2) by a qualified provider (either a physician or other qualified healthcare provider); (3) documented in the medical record; and (4) coded in compliance with the ICD Guidelines.[31]

---

must submit data that conform to CMS' requirements for data equivalent to Medicare fee-for-service data, when appropriate, and to all relevant national standards.").

[27] Medicare Managed Care Manual, Ch. 7, § 40 (emphasis added).

[28] 2008 Participant Guide, § 6.4 (emphasis added).

[29] *See* Medicare Managed Care Manual, Ch. 7, § 40; 2008 Participant Guide, § 6.4.

[30] ICD-9, § IV.K (effective Oct. 1, 2011), https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf; ICD-10, § IV.J (updated Apr. 1, 2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf; *see also* 2008 Participant Guide, § 6.4.1.

[31] 2008 Participant Guide, § 7.2.4.2.

**b. Coding is Governed by Objective Standards and Guidelines.**

40.    It is my opinion that, if a coder is knowledgeable of the official ICD and CMS coding rules discussed above, he or she should be able to identify an objectively correct ICD code or set of ICD codes that can be reported based on a particular medical record and thus there should be little variance in code assignment among coders.

41.    The coding rules are by design clear, consistent, and specific.  They offer detailed instructions on what codes should be assigned based on features of a patient's condition and what is documented in the medical record.  If qualified coders properly follow these rules, they are able to identify appropriate ICD codes and rule out inappropriate codes.

### *Coding is a Methodical Step-By-Step Process.*

42.    To begin, coders must follow a methodical step-by-step process in arriving at a code assignment under the ICD guidelines.  The "Alphabetical Index" and "Tabular List" in both the ICD-9 and ICD-10 set out these directions.

43.    The Alphabetical Index lists conditions and subvariants of conditions in alphabetical order.  At the first step of coding, a coder looks up in the Alphabetical Index a condition he or she identifies that meets the medical record documentation requirements.

44.    This Index supplies the initial ICD code string for that condition.  For example, for Parkinson's disease with dementia a coder would look up "Parkinsonism," under which there are sub-listings of around twenty variations of "Parkinsonism," including with "dementia."[32]

---

[32]ICD-10-CM Index to Diseases and Injuries, *available at* https://ftp.cdc.gov/pub/Health_Statistics/NCHS/Publications/ICD10CM/2022/ (Table and Index zip.zip) (last visited April 5, 2024).

**Parkinsonism (idiopathic) (primary)** G20
- with neurogenic orthostatic hypotension (symptomatic) G90.3
- arteriosclerotic G21.4
- dementia G31.83 *[F02.80]*
- - with behavioral disturbance G31.83 *[F02.81]*
- due to
- - drugs NEC G21.19
- - - neuroleptic G21.11
- medication-induced NEC G21.19
- neuroleptic induced G21.11
- postencephalitic G21.3
- secondary G21.9
- - due to
- - - arteriosclerosis G21.4
- - - drugs NEC G21.19
- - - - neuroleptic G21.11
- - - encephalitis G21.3
- - - external agents NEC G21.2
- - - syphilis A52.19
- - specified NEC G21.8
- syphilitic A52.19
- treatment-induced NEC G21.19
- vascular G21.4

The index directs the coder that "Parkinson's with Dementia without behavioral disturbance"
may be coded with the ICD code strings "G20" (Parkinsonism) and "F02.80."

Next, the coder must consult the "Tabular List" for further step-by-step instructions on
the requirements to assign a code.[33]  In this case, the Tabular List entry for "G20" (Parkinson's
disease) instructs the coder to: Use additional code to identify: dementia with behavioral
disturbance (F02.81) dementia without behavioral disturbance (F02.80).  Therefore, the proper
codes for Parkinson's with dementia without behavioral disturbance are G20 and F02.80.

---

[33] ICD-10-CM Tabular List of Diseases and Injuries, *available at*
https://ftp.cdc.gov/pub/Health_Statistics/NCHS/Publications/ICD10CM/2022/ (Table and Index zip.zip)
(last visited April 5, 2024).

1236

**G20 Parkinson's disease**
    Hemiparkinsonism
    Idiopathic Parkinsonism or Parkinson's disease
    Paralysis agitans
    Parkinsonism or Parkinson's disease NOS
    Primary Parkinsonism or Parkinson's disease

    **Use additional** code to identify:
            dementia with behavioral disturbance (F02.81)
            dementia without behavioral disturbance (F02.80)

    **Excludes1:** dementia with Parkinsonism (G31.83)

45.　　As shown above, the coding rules provide clear instructions on (1) the specific items the medical record documentation must contain to support a condition, *supra* ¶¶ 37–39, (2) how to look up a particular condition or variants of a condition in the Alphabetical Index to identify the ICD code and further requirements for assigning the code, and (3) the step-by-step process of applying those requirements to arrive at code assignment.

46.　　In addition, there are rules about how a coder should use these resources.  For example, it is well established a coder must use the Alphabetical Index and Tabular List sequentially and follow the instructional notations in both.[34]  Coders may never select a final code based just on what the Alphabetical Index provides.  As long as the coder follows this order of operations, the instructions in the Alphabetical Index and Tabular List are consistent and will lead the coder to the proper code assignment.

### *Coding Rules Are Highly Specific and Particularized to Features of Patients' Conditions.*

47.　　The ICD guidelines provide specific rules for assigning ICD codes regarding how particular features of a patient's condition should be coded.  This specificity makes clear to coders under what circumstances a particular ICD code should be assigned.

48.　　For example, ICD-10 specifies the codes to assign when a condition occurs on the left or right side of the body, and in some cases provides a code indicating that a condition occurs on both sides of the body (bilaterally).  If the medical record does not specify which side the condition occurs, the rules generally require the coder to assign the code denoting the side is

---

[34] ICD-9, § I.B.1–2 (effective Oct. 1, 2015), https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf; ICD-10, § I.A.1, § I.B.1 (updated Apr. 1, 2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf.

unspecified.[35]  If, however, the condition occurs bilaterally, but there is no specific ICD code designating that the condition occurs bilaterally, the guidelines require the coder to report the ICD codes for both the right and left sides of the body separately.[36]

49.    For example, ICD-10 provides codes based on where the condition staphylococcal arthritis manifests: M00.011 (Staphylococcal arthritis, right shoulder), M00.012 (Staphylococcal arthritis, left shoulder), and M00.019 (Staphylococcal arthritis, unspecified shoulder).  There is no code designating this condition as bilateral.  If the medical record indicates that the patient has staphylococcal arthritis in both shoulders, the coder should report *both* M00.011 (right shoulder) and M00.012 (left shoulder) as there is no specific ICD code designating this condition as bilateral.

### *Difficult Coding Scenarios Do Not Indicate that Coding is a Subjective or Ambiguous Process.*

50.    The existence of difficult coding scenarios does not mean coding itself is a subjective process with no right answers as to whether a code is properly assigned or not.   Nor do these difficult scenarios show that the coding guidelines themselves are ambiguous or fail to provide objective rules for a coder to follow.

51.    Rather, difficult scenarios generally are caused by and reflect (1) the varying degrees of skill level and experience among coders; (2) errors in how those coders apply the guidelines and rules; and (3) problems extrinsic to the guidelines and the required coding process, such as problems with the medical record documentation itself.   All of these issues, however, are far less likely to be present in sophisticated coding programs that use certified, well-trained coders and implement sufficient quality assurance processes to check coders' work.

52.    Below, I address some potentially difficult coding scenarios, and explain why they do not demonstrate the coding process and guidelines are fundamentally subjective or ambiguous:

a.  **Updated coding guidelines**: One potential source of error during the relevant time period was coders' relative levels of experience with and training on operative coding

---

[35] ICD-10, § I.B.13 (updated Apr. 1, 2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf.
[36] *Id.*

guidelines.  The CDC transitioned from ICD-9 to ICD-10 in 2015.  While some less-experienced coders may have erred in applying the new ICD-10 guidelines, this does not indicate that the guidelines themselves were unclear or ambiguous.

For example, as the table below shows, under ICD-10, coders are required to assign a single combination code (E11.331) where a patient has both diabetes mellitus with diabetic retinopathy.  ICD-9, however, provided a different rule where these conditions were required to be coded separately (250.52, 362.05).  Under the new rule, the objectively correct code is the single combination code.  In my experience, coders who were unfamiliar with the operative ICD-10 rules might attempt to search for two separate codes or simply miss the combination code and apply a different diabetes code.  This example does not illustrate that ICD-10 is itself ambiguous or allows for varying or inconsistent results (i.e., different diabetes code assignments) among coders.  Rather, it indicates that lack of experience with the operative rules may lead to error.

| ICD-9 Coding | ICD-10 Coding |
| --- | --- |
| 250.52 – Diabetes with ophthalmic manifestations, type II or unspecified type, controlled | E11.331 – Type II diabetes mellitus with moderate non-proliferative diabetic retinopathy with macular edema |
| 362.05 – Moderate non-proliferative diabetic retinopathy | |

Notably, the coding industry attempts to provide training and other resources to address varying levels of experience on the part of coders.  For example, during the transition to ICD-10, there were numerous continuing education classes that focused on educating coders on the new rules.  The AAPC also required its certified members to pass a proficiency assessment on ICD-10 "format and structure, groupings and

categories of codes, ICD-10-CM official guidelines, and coding concepts."[37]  A major focus on my work during this time was providing trainings on ICD-10 rules, including trainings customized for specific practice groups.

b. **Problems extrinsic to coding rules, guidelines, and resources**: Some difficult coding scenarios are due to problems extrinsic to the coding rules, for example, issues in the medical record documentation itself or its legibility.  These issues do not indicate that the coding rules or process themselves are subjective, and experienced coders are trained to handle these circumstances properly.

For example, a provider might use the abbreviation "PE" in a medical record, which typically stands for "pulmonary embolism," but may also mean "pulmonary edema" or "physical exam."  Under this circumstance, unless the coder is able to verify the meaning of the ambiguous or illegible term (e.g., via a physician query), the coder should not assume the meaning of the term and base a coding assignment on it.[38]  Rather, a code assignment is only appropriate if based on clear and consistent medical record documentation.[39]

53.    I also reviewed the deposition transcripts of some United witnesses that discuss difficult coding scenarios.  For example, United coding supervisor, Tammy Dickey, testified: "if

---

[37] *See ICD-10 Proficiency Assessment*, AAPC (Mar. 26, 2013), https://www.aapc.com/blog/24145-icd-10-proficiency-assessment/#:~:text=The%20assessment%20will%20measure%20your,for%20other%20exams%20or%20assessments.

[38] ICD-10 at 1 (updated Apr. 1, 2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf (stating that "The importance of consistent, complete documentation in the medical record cannot be overemphasized.  Without such documentation accurate coding cannot be achieved.").  The AHIMA Standards of Ethical Coding also provide that coders should "[a]ssign and report . . . only the codes and data that are clearly and consistently supported by health record documentation in accordance with applicable code set and abstraction conventions" and should "[q]uery and/or consult as needed with the provider for clarification and additional documentation prior to final code assignment in accordance with acceptable healthcare industry practices."  *American Health Information Management Association Standards of Ethical Coding (2016 Version)*, AHIMA (revised and approved Dec. 12, 2016), https://bok.ahima.org/doc?oid=302237#.X0-0BRNKg_U.

[39] *Id.*

you gave the same record to ten coders, you would probably be get [sic] five sets of answers." [40] To the extent this example illustrates that coding is subjective and the rules lack clarity, I disagree. In my opinion, what Ms. Dickey describes does not reflect a phenomenon in ICD coding. ICD coding is highly specific and governed by a set of particularized rules. In my opinion and experience, there is not substantial variance in ICD coding among qualified coders, nor have I experienced this level of variance in my own practice.

### c. There Are Well-Established Industry Best Practices For Achieving Complete and Accurate Coding.

54.     In the Medicare Advantage context, there are industry best practices for achieving accurate and complete coding. In my opinion, these best practices include: (1) requiring coders to be certified; (2) providing extensive and ongoing training to the coders, including training in Medicare Advantage risk adjustment; (3) requiring coders to meet high quality standards in order to graduate from training; (4) requiring coders to maintain high quality standards after training; (5) providing coders with resources to address coding questions; (6) providing remedial training to coders who fall below the organization's standards; (7) terminating coders who fail to perform up to the organization's standards despite remedial training; and finally, (8) maintaining robust quality assurance processes to check the coders' work on an ongoing basis. Issues with coding accuracy and completeness are more likely to be avoided when an organization's policies and procedures encompass these elements.

55.     Although coders approach their work with varying types of experience, the impact of these variances is limited when they are certified and provided with training that augments their prior work experience. For example, coders who have only worked on electronic medical records should be trained on coding from handwritten records and vice versa. In addition, coders should be exposed to different medical specialties during training if they had previously only worked in one specialty.

56.     As discussed throughout this report, using certified coders is key in ensuring accurate and complete coding. Coders certified by the AAPC or AHIMA have had their knowledge tested by an independent body and must obtain a number of Continuing Education Credits ("CEUs") to retain their certification. In addition, organizations participating in the

---

[40] Dickey Dep. 195:8–12, 220:17–23, May 24, 2022.

18

1241

Medicare Advantage risk adjustment program should ensure that their coders are trained in risk adjustment coding.

Signed on April 5, 2024.

_____

Jean Acevedo

1242

**EXHIBIT D-53**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA ex rel.

BENJAMIN POEHLING,

      Plaintiffs,

v.

UNITEDHEALTH GROUP, INC., et al.,

      Defendants


EXPERT REBUTTAL REPORT OF JEAN ACEVEDO TO

SEPTEMBER 29, 2023 EXPERT REPORT OF BARBARA BLAIR

January 29, 2024

1244

## I.    INTRODUCTION

1.    I have reviewed the September 29, 2023 expert report of Barbara Blair ("Blair Report"). I respond below to Blair's opinions section-by-section.  This report incorporates my September 29, 2023 expert report ("Opening Report") and assumes familiarity with the case background and abbreviations used there.

2.    I have three overarching concerns with Blair's opinions that I discuss more fully in the body of this rebuttal:

3.    ***First***, Blair's two overarching opinions, which she refers to as Opinion One and Opinion Two, are at odds with each other, and she unjustifiably switches between them depending on the conclusion she is trying to support.  In her first opinion, she seems to claim that MA program coding tends to be more reliable than provider coding (to justify programs like chart reviews, which supplement provider-reported codes with additional codes identified by a chart review coder to address "undercoding").  Yet, in her second opinion, she opines that provider coding tends to be more reliable than MA program coding (apparently to justify why the codes reported only by the provider coder, but not identified by the MA chart review coder, tend to be correct and should not be deleted from claims, therefore rejecting that provider "overcoding" is an issue).  In my experience, the deficiencies in provider coding that Blair describes in her first opinion lead *both* to provider undercoding and overcoding.  Throughout her report, Blair improperly and implausibly focuses only on how provider coders' lack of experience, expertise, and training in ICD coding leads to error in one direction (i.e., missed codes) but not the other (i.e., unsupported or misassigned codes).

4.    ***Second***, the explanation that Blair provides for why provider coding should be deferred to over MA program coding violates fundamental principles of coding.  Blair claims that provider

<div align="center">2</div>

coders deserve deference because they may have access to unique information about a patient's condition to support assigned codes that is unavailable to the MA program coder.  But Blair's examples are all instances where the provider coders' information is *not* clearly documented in the medical record, as ICD and MA program rules require.  For instance, Blair gives the example of a provider coder who is on-site at the provider's office, infers when undated additions to a chart were made, and then assigns a code based on that unwritten date-of-service (DOS) information.  Blair Report ¶ 59.  Another example Blair gives is a provider coder who can uniquely interpret the provider's handwriting, idiosyncratic note-taking, or abbreviations while the MA program coder (or any coder outside the provider's office) cannot.  *Id.* ¶¶ 29, 58.  Blair's opinion that these are circumstances in which the provider-only codes are "properly supported" in the medical record is oxymoronic and violates the fundamental rule of coding: all diagnosis codes submitted by MAOs for payment under the MA program must be clearly and unambiguously documented in the medical record per ICD Coding Guidelines and MA program rules.[1]  A coder's idiosyncratic assumptions or reliance on unwritten information to support code assignment are not proper.  Unless clear written documentation for a code is obtained, such as through a physician query or retrieval of additional medical records, the codes in Blair's examples are not properly supported under ICD.

5.    ***Third***, Blair relies throughout her report on hypotheticals to support her conclusions.  Based on my experience, each of her hypotheticals is highly theoretical.  They do not reflect actual, common, or likely scenarios in ICD coding.  Rather, the hypotheticals appear designed to support predetermined conclusions, rather than describe realistic extrinsic support for those conclusions.

---

[1] ICD-9, § IV.K (effective Oct. 1, 2011), https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf; ICD-10, § IV.J (updated Apr. 1, 2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf; see also 2008 Participant Guide, § 6.4.1.

## II.  REBUTTAL TO BACKGROUND SECTION

### A.  <u>Medical Record Documentation and Diagnosis Coding</u>

6.  Blair begins the background section with an overview of the MA diagnosis coding process.  In describing common coding errors, Blair's overview is skewed.  She identifies only "undercoding" (or instances where provider coders miss reporting codes documented in the medical record) and entirely ignores "overcoding" (or instances where provider coders report codes not properly documented in the medical record).  In my significant experience working with providers of varying sizes and with varying resources, both types of errors are common.

7.  In ¶ 18 of her report, Blair recognizes providers have "historically" received less training in MA diagnosis coding than in fee-for-service (FFS) procedure and services coding.  But Blair opines that this deficiency in training and experience somehow leads only to undercoding: "providers did not always submit all of a patient's applicable diagnosis codes on a claim."  Blair Report ¶ 18.  In my experience, the relative lack of training and experience in MA diagnosis coding causes provider coders to report codes not properly supported in the medical record and not compliant with ICD and MA program rules.

8.  Blair also takes inconsistent positions on the reliability of MA program coding versus provider coding.  On the one hand, she emphasizes in ¶ 18 that MA coders provide a useful corrective to provider coding: "MA Plan chart reviews may identify these additional diagnosis codes that are supported by documentation in a patient's medical record but that were not submitted on the claim" by the provider coder.  On the other hand, Blair takes the position that provider coders are more reliable than MA coders.  She opines at ¶ 58: "A coder in the provider's office may be better situated [than an MA coder] to identify many properly supported diagnosis codes."

9.   Blair provides no credible explanation for how MA program coders are both (i) more effective than provider coders at identifying the complete set of properly supported codes in a medical record, and yet (ii) tend to miss properly supported codes only the provider coder can identify.

10.   Blair's attempt to explain the inconsistency is not valid, because she relies on an improper approach to coding (dubbed "assumption coding"), *see infra* ¶ 74.  She opines that provider coders are able to identify "properly supported" codes that MA program coders miss, because the former possess unique (often unwritten) information about a patient's condition.  Blair Report ¶¶ 29, 57-62.  This justification violates a fundamental rule of MA program coding.  A code cannot be assigned unless it is clearly and unambiguously supported by written documentation in the medical record.  "Assumption coding" defeats the purpose of the ICD rules to enforce uniform coding, by leading to non-uniform interpretation of medical records and assignment of codes.

11.   Ultimately, as discussed in my Opening Report at ¶¶ 54-55, accuracy and completeness in coding is contingent on how experienced and well-trained coders are, whether they are held to quality control standards, and whether they are subject to oversight.  Coders subject to these processes and standards code more accurately and completely than coders lacking such qualifications, standards, and resources.  In my experience, working in both provider and MA program settings, these measures tend to be more institutionalized in the latter context.  Consequently, MA program coding tends to be more reliable, accurate, and complete than provider coding on average.

### B.  Sources of Coding

12.   Blair discusses at ¶¶ 20-22 in her report "Sources of Coding."  She claims that there is a "multitude" of sources governing MA diagnosis coding and that they provide only a "framework"

5

1248

for coders. She opines that the various "Sources of Coding" sometimes offer conflicting guidance and that coders are forced to apply their own "judgment and experience."

13. I disagree. Coding rules do not provide merely a "framework" for coding. Nor are the rules in conflict. Blair describes coding rules and guidance as an assortment of miscellaneous references from which coders may pick and choose on what to rely, but this is inaccurate.

14. For example, in ¶¶ 20-21, Blair states that coding guidance includes, but is not limited to, the ICD-9 and ICD-10 and their Tabular List and Alphabetic Index, the Coding Clinic, CMS materials, and providers' own references about how to interpret the coding guidelines.

15. As I explained in my Opening Report, there is a clear and definitive hierarchy among "Sources of Coding." The ICD-9/10 (and their Tabular List and Alphabetic Index) are the authoritative rules on diagnosis coding and trump other references that Blair identifies.

16. As Blair recognizes at ¶¶ 19-20, the ICD-9/10 provides a highly specific code set and particularized rules for assigning each code. United's own coders agreed in their depositions that ICD-9/10 are the definitive set of coding guidelines.[2] Coders are trained to apply the ICD-9/10 and these other sources in accordance with this hierarchy.

17. In ¶ 21 of her report, Blair opines that the "Sources of Coding" conflict with one another. However, she does not provide any actual examples of such conflicts. *See infra* ¶ 39. As discussed in my Opening Report at ¶ 17, no such conflicts exist in my experience. Rather, the ICD-9/10 guidelines provide the authoritative rules that trump other coding guidance and complement MA program requirements. *See infra* ¶¶ 18-19, 50.

18. Blair further claims in ¶ 21 that, due to the purported conflicts in the "Sources of Coding," "[c]oders therefore use the available guidance as a framework but ultimately must also

---

[2] Dickey Dep. 34:18–35:10, May 24, 2022; Bradberry Dep. 34:2–10, 104:19–105:3, July 1, 2021.

rely on their judgment and experience." Again, ICD-9/10 is an authoritative set of highly specific rules and not a "framework." *See* ICD-9 ("These guidelines are a set of rules that have been developed to accompany and complement the official conventions and instructions provided within the ICD-9-CM itself.").[3] Further, use of ICD-10 for reporting diagnosis codes is mandated by the Department of Health and Human Services in the Health Insurance and Portability Act's Transactions and Code Sets rule.[4]

19. The "Sources of Coding" that Blair lists beyond the ICD-9/10 (discussed below, ¶¶ 19(a)-(d)) do not provide coding rules that trump or conflict with the ICD-9/10:

a. **The Coding Clinic** – This is a secondary source that provides answers to coder-submitted questions regarding highly specific scenarios under ICD-9/10. Blair has not identified any credible support or example of an instance where the Coding Clinic contradicts ICD-9/10. This is because the Coding Clinic applies, but does not supplant, ICD-9/10. For example, a question that was posed to the Coding Clinic was: "What is the correct code for a 20-year-old patient with gestational diabetes who presents due to diabetes with ketoacidosis?" The answer provided by the Coding Clinic was "Assign codes O24.419, Gestational diabetes mellitus in pregnancy, unspecified control, and E87.2, Acidosis, for gestational diabetes with ketoacidosis. Codes from categories E10 and E11 would not be appropriate if the patient does not have pre-existing diabetes mellitus."[5] This answer provided by the Coding Clinic mirrors the ICD-9/10 guidelines. ICD codes for diabetes mellitus, such as E10 and E11 noted, both have instructions to never assign either code ("Excludes 1");

---

[3] ICD-9 (effective Oct. 1, 2011), https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf, at 1.
[4] *International Classification of Diseases, (ICD-10-CM/PCS) Transition – Background*, Centers for Disease Control and Prevention (last reviewed Nov. 6, 2015), https://www.cdc.gov/nchs/icd/icd10cm_pcs_background.htm.
[5] *Gestational Diabetes and Diabetic Ketoacidosis*, 7 AHA Coding Clinic for ICD 30 (Third Quarter 2020).

7

pointing the coder to "gestational diabetes (O24.4-)." Both the Coding Clinic and ICD instruct coders to assign the gestational diabetes code (O24.419) for a pregnant woman who developed diabetes mellitus during pregnancy and presents with ketoacidosis. The Coding Clinic's instructions complement the ICD for reporting ICD codes.

b. **CMS guidance on the MA program** – CMS sources, like the CMS 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("2008 Participant Guide"), do not provide rules at the level of the ICD-9/10 code set or instruct how to assign those codes. Rather, they discuss MA program requirements. For example, the Participant Guide limits the types of providers and medical record documentation acceptable in the MA program. *See e.g.*, 2008 Participant Guide, §§ 3.2.3, 7.2.4.1. By contrast, the ICD-9/10 guidelines do not provide rules for assigning codes based on types of provider or unacceptable types of medical record documentation.

This is not a contradiction between CMS guidance and the ICD-9/10 guidelines. Rather, the CMS guidance and ICD-9/10 guidelines are complementary. CMS guidance expressly incorporates, and requires all submitted codes in the MA program to comply with, ICD-9/10. *See* 2008 Participant Guide, § 7.2.4. While ICD-9/10 provides requirements for code selection, CMS provides further requirements for when and under what circumstances those codes should be reported in the MA program (i.e., only if the code resulted from a diagnosis made by particular types of providers and supported by particular types of documentation from those providers).

c. **CMS RADV guidance** – RADV guidance applies only in the RADV audit context. Based on my years of experience, coders do not rely on this guidance as a source for rules on code

assignment and would not defer to RADV guidance over ICD-9/10, and certainly not outside the RADV audit context.

CMS itself is clear – including in the RADV source that Blair cites – that this "Contract-Level Risk Adjustment Data Validation (RADV) Medical Record Reviewer Guidance has been created to provide information on the RADV medical record process" and that the "guidance does not give advice for specific diagnosis coding."[6] CMS further emphasizes that this guidance "does not contradict the *ICD-9-CM Official Guidelines for Coding and Reporting*." *Id.* Blair ignores these clear statements by suggesting, in her misleading quoting of this source, that RADV guidance conflicts with (and thus, must carry the same authority as) ICD-9/10 in dictating how diagnosis codes are assigned. *See, e.g.*, Blair Report ¶¶ 37-41.

This is wrong. Blair's suggestion that coders may use RADV guidance as a source for assigning and reporting codes in the MA program is practically impossible. She ignores that CMS publishes RADV guidance for auditing a particular DOS year many years *after* the submission window for diagnosis codes in that DOS year has closed. For example, in ¶ 53, Blair implies that RADV guidance issued in 2019, which may apply to DOS 2013 codes that are undergoing RADV audits in 2019 and onward, should somehow govern the coding of DOS 2013 codes at the time of their submission. But a coder assigning and

---

[6] *See* Centers for Medicare & Medicaid Services, *Contract-Level Risk Adjustment Data Validation – Medical Record Reviewer Guidance* (effective Mar. 20, 2019) ("2019 RADV Guidance"), https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/Medical-Record-Reviewer-Guidance.pdf, at 6-7.

submitting codes for DOS 2013 would have been doing so in 2015 at the latest,[7] years before the 2019 guidance ever existed.

Furthermore, Blair's reliance on *future* RADV guidance not in existence at the time of the DOS violates the basic rule of coding that coders must apply the coding rules in effect during the DOS year and not the rules in effect after the fact. Blair herself emphasizes this rule. In ¶ 35, she writes: "MA Plan coders reviewing a medical record in 2013 that was created on the date of the patient visit in 2012 should apply the guidance that was effective on the date of service (2012), not the guidance effective on the date of review (2013)." The effective date for ICD codes is October 1 of the current year through September 30 of the subsequent year (e.g. 10/1/2023 through 9/30/2024).[8] CMS is clear that one must only use the then-current Guidelines when assigning ICD-10 codes.[9] By way of example, CMS's current guidance states, "The 2024 ICD-10-CM files below contain information on the ICD-10-CM updates for FY 2024. These 2024 ICD-10-CM codes are to be used for discharges occurring from October 1, 2023 through September 30, 2024 and for patient encounters occurring from October 1, 2023 through September 30, 2024."[10] Blair's suggestion that RADV guidance issued in 2019 should nevertheless govern codes in the DOS period of this dispute (DOS 2009-2016) is wrong.[11]

---

[7] *See* Centers for Medicare & Medicaid Services, *Corrected Deadline for Submitting RAPS Data for Use in Risk Score Calculation Runs for Payment Years 2014, 2015, 2016* (Sept. 11, 2014), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/correction%20-%20hpms%202014_2015_2016%20payment%20run%20notice_172.pdf (indicating the final submission deadline for DOS January 1, 2013 to December 31, 2023 was January 31, 2015).

[8] ICD-9 and ICD-10, all years.

[9] ICD-10 (updated Oct. 1, 2023), https://www.cms.gov/files/document/fy-2024-icd-10-cm-coding-guidelines.pdf.

[10] *2024 ICD-10-CM*, Centers for Medicare & Medicaid (last modified Sept. 6, 2023), https://www.cms.gov/medicare/coding-billing/icd-10-codes/2024-icd-10-cm.

[11] Blair's cited RADV guidance (*see, e.g.*, Footnotes 22 and 34 in the Blair Report) does not apply to DOS 2009-2016. Blair relies on RADV guidance that came into effect only on March 20, 2019, applying at the earliest to audits beginning on September 27, 2017. Blair Report ¶¶ 37-41. Although Blair claims those audits

Blair's opinion also ignores the specific process and methodology of the RADV program in contrast to coding for MA program submission. I regularly provide consulting services for providers and plans that will undergo or are undergoing a RADV audit, and am experienced in this process. Blair's suggestion that coding assignment rules and RADV guidance should be treated apples-to-apples is misleading.

Unlike in the former context, a RADV audit is a back-and-forth process between CMS and plans regarding particular HCCs under audit and the medical record support the plans must furnish to justify their assigned HCCs. Even if plans had failed to identify adequate medical record support for their submitted HCCs, they may attempt to correct or supplement this during the RADV audit with support that the plans did not (and could not have properly) relied on at the time that they submitted the HCCs for payment. *See*, *e.g.*, 2019 RADV Guidance at 8 ("CMS understands the constraint when provider medical records are incomplete or <u>documented inadequately</u>. Therefore, the RADV process . . . allows for multiple medical record submissions from multiple approved providers from any encounter date in the data collection period, <u>even if a diagnosis from that encounter was not previously submitted to Medicare.</u>") (emphasis added).[12] In other words, although the plan had reported an "inadequately" "documented" HCC, the RADV process uniquely allows plans to re-submit the HCC based on a different medical record for a different DOS, even if the plan had never reported any diagnoses from that medical record previously.

---

may review codes from DOS 2013 onward, plainly this RADV guidance did not exist during the DOS years of this dispute.

[12] *See also* Centers for Medicare & Medicaid Services, *Contract-Level Industry-Wide Training Event* (Jan. 29, 2019), <u>https://www.cms.gov/research-statistics-data-and-systems/monitoring-programs/medicare-risk-adjustment-data-validation-program/other-content-types/radv-docs/radv-industry-slide-deck.pdf</u>, at 13 (allowing plans subject to RADV audit 20 weeks to provide supporting documentation, and allowing the plan to research and obtain documentation that may not have been available at the time of claim submission).

Given the unique context of RADV, Blair's attempt at ¶ 31 to show a purported "conflict" between the official coding rules and RADV guidance is misleading.  She writes:

> "<u>In a RADV audit, when a coder</u> encounters abbreviations with multiple meanings, CMS instructs: 'If more than one meaning applies or documentation is too limited to differentiate, and this is the only diagnosis listed within the record, evaluate on a case-by-case basis. Otherwise, use discretion to report or not based on other circumstances in the record.'"

Blair implies that the above-quoted language from RADV guidance is authorization by CMS to "a coder" to make a "discretion[ary]" inference about the meaning of an abbreviation during code assignment, even if the medical record is "too limited" to provide definitive clarity on the meaning.

This misquotes the source.  In reality, Blair is quoting from a chart in the RADV guidance regarding <u>the "Action" that a "RADV Auditor" may take</u> when a medical record submitted to support an HCC under audit shows red flags.  2019 RADV Guidance at 59.

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Non-English Documentation** | Coder Guidance: The record submitted includes diagnoses, but the words are not English. | Identify the documentation that validates the CMS- HCC. If it is legible and can be translated, then it is acceptable to submit. | Refer to Medical Record Review Contractor (MRRC) Project Manager regarding resources for medical translation of pertinent sections of the medical record. |
| **Abbreviation with Multiple Meanings** | Coder Guidance: Several common abbreviations have more than one meaning. ***Examples:*** MD – major depression, muscular dystrophy, macular degeneration CRF – chronic renal failure, chronic respiratory failure | Evaluate the abbreviation within the context of the full medical record before submitting to support the condition. | If more than one meaning applies or documentation is too limited to differentiate, and this is the only diagnosis listed within the record, evaluate on a case- by-case basis. Otherwise, use discretion to report or not based on other circumstances in the record. |

1255

Per the chart above, during the RADV process, CMS's diagnosis coder (referred as the RADV Medical Record "Reviewer"[13]) must first review the medical record and determine whether the meaning of an "abbreviation" used by the provider is established "within the context of the full medical record before submitting [that record] to support the condition." Consistent with my opinion, only if the "medical record" clearly documents the abbreviation's meaning may that coder or "reviewer" then credit that record as proper "support [for] the condition."

Blair's key quote, which she claims shows the purported "discretion" of a diagnosis coder generally, is from the last column in the chart regarding the options that a <u>RADV Auditor</u> has and *not* the RADV coder: "If more than one meaning applies or documentation is too limited," then the <u>auditor</u>, not the coder, may investigate further on a "case-by-case basis" or consider "other circumstances in the record." This guidance confers "discretion" on the RADV auditor, consistent with the RADV process discussed above in which a plan may work to redress inadequate documentation with guidance from the auditor.

The above RADV guidance does not show a conflict in coding rules, because as explained, this is not guidance on code assignment for coders. Rather, this is guidance about how a RADV auditor performs the audit. Throughout the rest of this RADV guidance, *see generally* 2019 RADV Guidance, CMS makes clear that the coding rules to which plans are subject are the ICD-9/10 and the basic principles I have discussed

---

[13] In the RADV audit context, the medical record coder (or "Reviewer") and the RADV Auditor play different roles. As the 2019 RADV Guidance at 14 explains: "CMS RADV <u>reviewers</u> are certified coders, experienced in risk adjustment data validation that are familiar with a variety of medical record layouts, electronic medical record entries, and handwritten medical record documentation. The following table presents . . . guidance on the action <u>auditors</u> may use to evaluate and resolve the issue[s]" regarding the "MA Organization's decision to submit [particular] medical record" support for HCCs under audit.

<center>13</center>

throughout my two reports.[14]  Regardless of CMS's approach during a RADV audit, the fundamental coding rule is that there must be clear and unambiguous medical record documentation to support codes submitted for payment.

d. **Provider-created reference documents** – Documents made by providers to summarize or interpret coding guidelines have no authority.  Coders should not (and are trained not to) defer to such documents.  Nor is it best practice for coders to rely on these informal references developed by and for the provider offices.  Based on my experience training coders at provider offices, I have observed these internal reference documents, and they are frequently outdated, incomplete, or inaccurate under the coding rules.  For example, some provider offices will list only common diagnosis codes applicable to their patients.  Other times, provider references fail to keep up with updates to rules, such as during the transition to ICD-10.  The best practice for coders in any setting is to refer back to the primary source itself (ICD-9/10), which provides comprehensive, specific, and uniform rules.

## III.    OPINION ONE – REBUTTAL

20.    Blair summarizes her Opinion One as: "The identification of diagnosis codes supported by documentation in a medical record is a complex process, informed by a variety of coding guidance and dependent on a coder's training, experience, and judgment."  Blair Report at 11.

---

[14] A stark example is that, at the bottom of every page of the 2019 RADV guidance, the following reminder about the authoritative coding rules is stamped: "The general guidance in this document is not exclusive. . . . [The] rules, requirements, and instructions relating to medical record documentation substantiation of diagnoses and the coding of diagnoses [that] apply, includ[e], but [are] not limited to, that the supporting medical records be clear and unambiguous, the requirements set forth in Chapter 7 of the Medicare Managed Care Manual, the requirements of the International Classification of Diseases (ICD) Clinical Modification Guidelines for Coding and Reporting (ICD-9-CM) . . . ."

21.    I disagree.  None of Blair's positions affect my core opinions in the Opening Report. The coding rules are designed to limit coder discretion.  The rules dictate the specific content that a medical record must clearly contain to support a code.  They provide important defaults in coding, for instance, unless the medical record unquestionably documents the required information to support a code, the code cannot be assigned.

### A.  Blair's Description of Coding As "Complex" Is Not Meaningful.

22.    The main opinion Blair offers is that medical record coding is "complex."  This description is vague.  Whatever "complex" means to Blair, coding is more precisely described as a professional technical skill, not a lay skill.  Like any professional technical skill, coders must receive specialized training, and improve their coding abilities through repeated practice and experience.  Coding accuracy is impacted by oversight of experienced coders and requirements that coders meet quality-control standards (like United's 95% accuracy standard for its chart review coders, Opening Report ¶¶ 51, 54-56).

23.    Industry-wide, as Blair acknowledges at ¶ 44, there is a well-established norm that coders meet a 95% accuracy standard.  Her acknowledgment of this standard shows codes can be objectively evaluated, determined to be correct or incorrect, and thus support the calculation of a coder's accuracy rate.  In my experience, coders are capable of performing at this standard, because it is a professional expectation.

### B.  Variation in Coder Ability Does Not Undermine Objectivity of Coding Process.

24.    Contrary to Blair's suggestion at ¶¶ 23-25, the reality that coders' abilities may vary and in turn impact coding accuracy does <u>not</u> mean that coding itself lacks objectively correct or incorrect answers under the coding rules.  Opening Report ¶¶ 50-56.  As discussed above, United

itself recognized this, as it measured coders' error rates, and required coders to stay under certain error rates to remain "in production" as an active coder.[15]

### C. **Coding is Not "Subjective."**

25.    I disagree with Blair's opinion that coding "involves judgment and can be a subjective exercise where coders may not always agree." Blair Report ¶ 22. Blair fails to define what she means by "subjective" and "involves judgment." The Opening Report sets out my opinions. Opening Report ¶¶ 40-56.

26.    Throughout her report, Blair frequently claims that assignment of diagnosis codes may be based on what a coder subjectively "believes" about the medical record or coding guidelines. *See* Blair Report ¶ 34. This is misleading. Code assignment based on anything other than objectively clear, legible documentation – what a coder may "believe" or infer about a medical record does not qualify – is not an acceptable practice. *See*, *e.g.*, AHIMA's Standards of Ethical Coding ("AHIMA Standards") ("3. Assign and report, in any format, only the codes and data that are clearly and consistently supported by health record documentation in accordance with applicable code set and abstraction conventions, and requirements.").[16]

27.    For any content in the medical record that is unclear, ambiguous, or subject to interpretation and disagreement, the coder must <u>ignore</u> that portion of the medical record, unless the coder obtains definitive clarity (for instance, through a physician query). *See id.* ("4.3. Query with established practice brief guidance when there is conflicting, incomplete, illegible, imprecise, or ambiguous information.").

---

[15] Dickey Dep. 198:14–199:3, May 24, 2022.
[16] *American Health Information Management Association Standards of Ethical Coding (2016 version)*, AHIMA (revised and approved Dec. 12, 2016), https://bok.ahima.org/topics/coding-compliance-and-revenue-cycle/american-health-information-management-association-standards-of-ethical-coding-2016-version/.

1259

28.    That coders may disagree on the proper code assignment also does not mean coding itself lacks objectively correct or incorrect answers.  Blair assumes that the differing codes proposed by various coders based on a hypothetical medical record are somehow all defensible, but this is wrong.  Neither Blair's report nor any of United's witnesses have to date identified an actual example where the same medical record documentation properly supports multiple coding assignments for the same condition.

### D.  Blair's "Six Factors"

29.    The bulk of Blair's analysis in Opinion One discusses six factors that she claims make coding "complex" or "subjective" and causes coders to reach "different conclusions" when reviewing the same medical record:

### Factor 1: Coder Certification, Experience, and Training

30.    In my Opening Report, I discuss how varying levels of coder experience and training impact the accuracy and quality of coders' work.  I refer back to and incorporate those opinions here.  *See* Opening Report ¶¶ 51, 52(a), 52(b), 55.

31.    Blair opines that "a coder with more specialized diagnosis code training, such as a coder with a CRC certification, may make different coding determinations than a coder with a more generalized training background."  Blair Report ¶ 25.  Blair also opines that "coders who work in an office with a medical specialist who focuses in one area, such as cardiology," may have more limited coding knowledge than coders with less of a specialized focus.  *Id.* ¶ 23.

32.    I agree with Blair that coders who have experience only in a specialized area and who lack training in risk adjustment coding generally code less accurately and completely in the MA context.  I have observed that providers' coders will assign and report diagnosis codes improperly, because they do not understand or apply the ICD-9/10 rules properly.

17

1260

33.    By contrast, in organizations that require coder certification, ongoing training, and oversight and quality control of coders' work, the resulting coding tends to be more accurate and complete than at organizations that lack these requirements. These requirements also help minimize differences in coding ability across coders who came from different coding experiences or specialty areas.

### Factor 2: Availability, Legibility, and Variability of Provider Documentation

34.    Blair next opines that issues with provider documentation, such as the availability, legibility, and format of records, may cause variability in coding results across coders.

35.    Proper application of coding rules constrains such variability.  The basic rule of coding is that unless every factor necessary for assignment of a particular code is clearly documented in the medical record the coder is reviewing, the code cannot be assigned.

36.    Blair raises issues of incomplete provider documentation, where providers may not turn over all their records, records may be missing pages, or records may not have been obtained from all providers.  Blair Report ¶ 26.  As discussed below at ¶ 75 and in my Opening Report at ¶ 35, the simple response is that coding rules require that a coder rely on the medical record before it. The coder cannot assume that a "theoretical" medical record or portion of a medical record not yet retrieved or accessible exists to support the code.

37.    Blair further observes that legibility of provider records impacts coding: "[A] coder who cannot read a provider's handwriting may not identify a diagnosis code during a chart review that is, in fact, properly supported by documentation in the medical record."  Blair Report ¶ 29.  But Blair's claim is oxymoronic.  A code is not "in fact, properly supported by documentation in the medical record" when that record is not legible except to those uniquely familiar with a provider's handwriting.  That coder or any other coder may misinterpret the illegible documentation.

18

38.   The rules forbid a coder to base code assignment on illegible or ambiguous records precisely to reduce variability in coding.  *See* 2008 Participant Guide Table 6C (requiring that acceptable documentation supporting code assignment is documentation that is: "legible."); ICD-10 ("consistent, complete documentation" is required and "[w]ithout such documentation accurate coding cannot be achieved.").[17]  Until a coder obtains proper and clear documentation (redressing the illegibility), the code cannot be assigned.

### Factor 3: Sources of Coding Guidance

39.   Throughout her report, Blair makes general claims about how various sources of coding provide insufficient, confusing, or conflicting guidance.  But Blair does not give any actual or realistic examples of these issues.  Instead, working backwards from the conclusion she seeks to support, Blair constructs several hypotheticals to make her point.  But these do not reflect likely real-world scenarios and are not extrinsic evidence that support her conclusion.

40.   ***First***, in ¶ 34, Blair opines that the coding rules are deficient because they fail to inform coders how to interpret ambiguous abbreviations like "CRF" in a medical record.  According to Blair, "CRF" can mean either "chronic renal failure or chronic respiratory failure," yet the ICD 9/10 provides no guidance on which to pick and how to assign the proper code.  Along the same line of thinking, Blair complains that the ICD-9/10 Alphabetic Index and Tabular List do not list "CRF."

41.   This is a complete red herring.  The problem in this scenario is *not* the ICD-9/10, but the medical record.  The ICD-9/10 is clear that, under such a circumstance where the meaning of an abbreviation (i.e., CRF) is not clear, the coder cannot rely on this note in the medical record to

---

[17] ICD-10 (updated Apr. 1, 2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf, at 1.

assign a code. The coder must first obtain clarification from the provider about this note before proceeding to assign a code.

42. Blair's complaint about the absence of "CRF" in the ICD-9/10 index reveals how unrealistic this hypothetical is. Any coder with minimal training knows that the Alphabetic Index and Tabular List are not organized by abbreviation, but by the full names of conditions and diagnosis codes (to avoid the ambiguity of abbreviations such as this).

43. **Second**, Blair presents a hypothetical in ¶ 35 that coders have trouble keeping straight the coding rules that apply when the coder is performing coding in the present, but for conditions examined in another DOS year. This again is an unrealistic hypothetical. It is an elementary rule that a coder must apply the coding rules in effect during the applicable DOS year and not the coding rules in effect at the time coding is taking place. *See infra* ¶ 53. This is not an example of confusion in the rules at all, because there is an applicable well-known rule.

44. **Third**, in ¶ 36, Blair poses that the coding rules have been unclear on how a coder should interpret the phrase "evidence of" a given condition in a medical record. Blair claims that, until the Coding Clinic "clarified" how coders should interpret the term "evidence of" in 2009, there was widespread confusion among coders.

45. Blair cites no evidence of this industry-wide confusion. Nor does she cite any support or evidence for her claim that the Coding Clinic's 2009 Q&A response about "evidence of" represented a sea change in how the industry approached interpreting "evidence of" language in a medical record.

46. In my experience, and to the best of my recollection, this was not a widespread issue prior to 2009. Nor does the Coding Clinic's 2009 Q&A response suggest it was. Rather, the

response is a typical Coding Clinic entry where it provides an expert coding view on how to handle

a specific scenario posed by a single questioner:

> Third Quarter
> Coding Uncertain Diagnoses, p 7
>
> **VOLUME 26        THIRD QUARTER**
> **NUMBER 3        2009, Page 7**
>
> **Coding Uncertain Diagnoses**
>
> **Question:** Is it appropriate to report codes for diagnoses recorded as "evidence of cerebral atrophy" and "appears to be a nasal fracture," when documented on outpatient radiology reports?
>
> **Answer:** The phrase "appears to be," listed in the diagnostic statement fit the definition of a probable or suspected condition and would not be coded in the **outpatient** setting. The *Official Guidelines for Coding and Reporting*, Section IV.I. state, 'Do not code diagnoses documented as "probable," "suspected," "questionable," "rule out," or "working diagnosis" or other similar terms indicating uncertainty. Rather, code the condition(s) to the highest degree of certainty for that encounter/visit, such as symptoms, signs, abnormal test results, or other reason for the visit.' In terms of coding and reporting for hospital inpatients, according to the *Official Guidelines for Coding and Reporting*, Section III.B., it would not be appropriate to code abnormal findings from radiology reports.
>
> However, when the provider documents "evidence of" a particular condition, it is not considered an uncertain diagnosis and should be appropriately coded and reported in the **outpatient** setting.

47.    Before and after the 2009 Coding Clinic response, a coder in the MA context could never

base a code assignment on the term "evidence of" alone.  It is well-established that a condition

may only be assigned a code if the medical record shows the condition was being treated,

monitored, or managed on the given DOS.  Blair puts too much emphasis on the single phrase

"evidence of" to justify coding in a MA context.

48.    I further disagree with Blair's characterization that the Coding Clinic provides

"guidance" on par with official coding guidelines.  Blair Report ¶¶ 55, 61.  The Coding Clinic does

not set generally applicable guidelines or authoritative requirements.  Rather, it is a secondary

source for coders to ask questions about applying ICD-9/10 guidelines in the specific context the

coders identify.  Per AHIMA, *AHA Coding Clinic for ICD-10-CM/PCS and AHA Coding Clinic for*

*HCPCS*, published quarterly by the AHA Central Office, provides expert guidance supporting coders,

21

1264

auditors, and insurers with coding advice.[18]  In referring to previously published Coding Clinic Q&As, a coder must proceed with caution in determining whether a particular, specific Q&A response regarding a specific scenario is applicable to the scenario before the coder.

49.    **Fourth**, Blair once again opines that conflict between RADV guidance and coding rules has led to coder confusion.  Blair Report ¶¶ 37-41.  But as addressed above in ¶ 19(c), RADV guidance is not guidance that coders are permitted to apply, nor have I observed coders applying it outside the RADV context.  I have also explained above why Blair's opinion at ¶ 31 in her report – about how 2019 RADV guidance authorizes coder discretion or guesswork based on the coder's unique subjective judgment – is misleading.  *Supra* ¶ 19(d).  I have also discussed why it is improper for a coder to rely on RADV guidance issued many years after the relevant DOS year and effective only for years after that DOS.  *Supra* ¶ 19(c).

50.    In my experience, I have not encountered coders applying RADV guidance of the type cited by Blair in lieu of ICD-9/10 coding rules or as an interpretive source about those rules.  As discussed above, RADV guidance focuses on describing how the audit process works and specifies the different roles and responsibilities of parties involved (e.g., the auditor).  *Supra* ¶ 19(d).  But the authoritative source of coding rules remains ICD-9/10.  RADV guidance makes this explicit and repeatedly warns that ICD-9/10 must be deferred to and that RADV guidance is not intended to conflict with those rules (even if a reader misinterprets the guidance to create a conflict, as Blair does).

51.    My opinion is based on extensive experience in training, educating, and reviewing the coding of both providers and MA plans, as well as working with providers with plans undergoing RADV and understanding the different process and RADV-specific guidance applicable there.

---

[18] *AHA Coding Clinic*, AHIMA, https://www.ahima.org/landing-pages/ghealth/ahima-ghealth-associates-directory/associates/aha-coding-clinic/ (last visited Jan. 22, 2024).

The record is not clear on what experience or background Blair bases her contrary opinions treating RADV guidance such as the 2019 guidance as "source of interpretation and application of coding guidelines."

52.   **Fifth**, in ¶ 40, Blair claims there is a lack of consensus around whether coders should apply the MEAT guidelines.  But, as Blair recognizes, the MA guidelines are clear that MEAT is not required.  As discussed in my Opening Report at ¶ 35, what is required is documentation showing that a condition existed at the time of the encounter/visit and "require[d] or affect[ed] patient care, treatment or management."[19]

### Factor 4: Human Error

53.   Blair opines that another reason coding results vary across coders is human error – for instance, coders sometimes get tired or make mistakes and typos in what they code.  In ¶ 42, Blair opines "this can lead coders to experience fatigue while reviewing medical records, which can result in mistakes, including missed diagnosis codes."

54.   Human error is inevitable, but Blair provides no evidence or explanation why human error is more likely to cause undercoding rather than overcoding.  A "mistyping" error may just as well result in reporting a nonexistent and unsupported condition.  For instance, mistyping the first letter of E08 (Diabetes mellitus due to underlying condition without complications) versus C08 (Malignant neoplasm of major salivary gland, unspecified), both from the ICD-10 code set, results in vastly different diagnoses.  Nor does Blair explain why variability in coding due to inevitable human error is relevant.  Mistakes in coding do not show that coding lacks objectively correct and incorrect results.

---

[19] ICD-9, § IV.K (effective Oct. 1, 2011), https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf; ICD-10, § IV.J (updated Apr. 1, 2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf; *see also* 2008 Participant Guide, § 6.4.1.

55.    The fact that "human error" is responsible for reporting of nonexistent and unsupported codes was identified in a recent HHS Office of the Inspector General (OIG) report.[20]  While not all related to human error, for some diagnosis codes that were not supported, the error rate was as high as 90%.  The Toolkit used data from various audits OIG conducted from 2013 through 2019 payment years and identified possible "mis-keyed diagnosis codes" within the high-risk code groups addressed.  OIG provides the following example: "For example, ICD-10 diagnosis code I720 (which maps to the HCC for Vascular Disease) could be transposed as diagnosis code I270 (which maps to the HCC for Congestive Heart Failure and in this example would be unvalidated). Using an analytical tool that we developed, we identified 3,780 scenarios in which diagnosis codes could have been mis-keyed because numbers were transposed or because other data-entry errors occurred that could have resulted in the assignment of an unvalidated HCC."  Again, a mistyped or mis-keyed error may just as well result in reporting a nonexistent or unsupported diagnosis.

### Factor 5: Transition from ICD-9 to ICD-10

56.    Blair opines that the transition from ICD-9 to ICD-10 led to confusion among coders in how to properly apply the new ICD-10.  As discussed in my Opening Report at ¶ 16, ICD-10 made coding even more granular and particularized and provides more specific rules for code assignment than in ICD-9.  The effect is that ICD-10 directs coders even more precisely to the correct code(s) and thus limits discretion.

57.    That some coders were less familiar or experienced with ICD-10 coding rules causing them to err was a short-term issue.  As discussed in my Opening Report at ¶ 52, during the transition period from ICD-9 to ICD-10, there were industry-wide efforts to ensure coder

---

[20] Amy Frontz, OIG, *Toolkit To Help Decrease Improper Payments in Medicare Advantage Through the Identification of High-Risk Diagnosis Codes* (Dec. 2023), https://oig.hhs.gov/oas/reports/region7/72301213.pdf, at 43.

competence and training in ICD-10. To maintain certifications, the AAPC required certified coders to take and pass an ICD-10-CM proficiency test. These efforts helped improve coder accuracy under ICD-10. In any case, errors based on lack of training or experience with ICD-10 do not indicate that ICD-10 itself is unclear or ambiguous.

### **Factor 6: Gray Areas of Coding**

58. Blair opines in ¶ 48: "There are several additional areas in which coding involves a degree of subjectivity (often called "gray areas"), because they are open for interpretation and debated among medical coders and even the organizations that offer diagnosis coding guidance."

59. Blair does not provide a clear definition of what she means by "gray areas" in coding. She claims only that any "area[] in which coding involves a degree of subjectivity" may "often [be] called 'gray areas.'" Blair Report ¶ 48. I do not know in what context or to whom Blair is referring when she states this term is "often" used.

60. The only four examples Blair gives of "gray areas" do not meet her vague definition. *First*, Blair gives the example of problem lists. Blair Report ¶¶ 51-53. She claims that there has been confusion regarding problem lists, because CMS's guidance on problem lists in the 2008 Participant Guide conflicts with CMS RADV guidance issued in 2019 on problem lists. This is another example in which Blair invents a change in guidance to create a purported conflict that does not in fact exist, just as she did in the context of coding abbreviations with multiple meanings, *see supra* ¶¶ 17-19. Blair correctly writes at ¶ 52:

> "In 2008, CMS stated, 'an acceptable problem list must be comprehensive and show evaluation and treatment for each condition that relates to an ICD-9 code on the date of service, and it must be signed and dated by the physician or physician extender.'"

But she goes on at ¶ 53 to mischaracterize 2019 RADV guidance to create the supposed conflict:

> "The [2019] guidance stated, '[p]roblem lists are evaluated on a case-by-case basis when the problem list is not clearly dated as part of the face-to-face encounter indicated on the

coversheet, or there are multiple dates of conditions both before and after the DOS.' In other words, CMS acknowledged the fact that problem lists may or may not relate to a given date of service, so the guidance left it to the <u>discretion of individual coders</u> to determine whether a problem list included sufficient details regarding what diagnoses were current."

Once again, Blair is quoting from a chart in the RADV guidance that applies to "Actions" that a "RADV Auditor" may take.  2019 RADV Guidance at 42.

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Problem Lists (within a medical record)** | See related topic of **Chronic and Other Additional Diagnoses**. Lists of diagnoses (conditions, problems) may be numbered, bulleted, or separated by commas. A list may be documented in the patient history, assessment, discharge summary, or other areas of a medical record. When conditions commonly associated are listed under the same number or bullet, the conditions can assume to be linked. These diabetes examples are effective for ICD-9-CM and will be updated for ICD-10-CM. *Example 1:* 1. Hypertension 2. DM, neuropathy (link diabetes and neuropathy) *Example 2:* 1. Hypertension 2. DM 3. Neuropathy (do not link diabetes and neuropathy) | Evaluate the problem list for evidence of whether the conditions are chronic or past and if they are consistent with the current encounter documentation (i.e., have they been changed or replaced by a related condition with different specificity). Evaluate conditions listed for chronicity and support in the full medical record, such as history, medications, and final assessment. Do not submit conditions from lists labeled as PERTINENT NEGATIVES. | Problem lists are evaluated on a case-by-case basis when the problem list is not clearly dated as part of the face to face encounter indicated on the coversheet or there are multiple dates of conditions both before and after the DOS. Lists of conditions written by the patient are not acceptable. Lists of code numbers without narratives are not acceptable. |

The chart above directs the coder (referred to as the "Reviewer") to "evaluate the problem list" to determine "whether conditions are chronic or past" and, consistent with my opinion and with CMS's longstanding guidance on coding from problem lists, the coder must decide "if th[ose] conditions] are consistent with the current encounter documentation."

Blair's quote, which she claims shows the "discretion" of "individual coders" in fact comes from the far-right column that applies to a RADV Auditor and not to a coder.  The chart allows the auditor, *not* the coder, the option to "evaluate[] on a case-by-case basis" under specific circumstances such as "when the problem list is not clearly dated."  In these instances, the RADV auditor, *not* the coder, is given certain "discretion."

26

1269

61.    There is no conflict in the applicable guidance for coders.  Furthermore, as discussed above, RADV guidance does not supplant the ICD-9/10 coding rules that govern code assignment and submission.  *Supra* ¶¶ 17-19, 50.

62.    ***Second***, Blair gives the example in ¶ 54 of chronic conditions as another "gray area" in coding, due to variability in how providers may document, treat, or discuss chronic conditions with patients.  But the examples Blair gives do not show a "gray area" in coding rules or invite coder discretion.  Rather, they all address problems in medical record documentation, and the coding rule to apply in this context is clear: unless and until there is further clarification from the provider or additional unambiguous documentation is obtained, the coder cannot code the chronic condition in each of Blair's examples.  I quote these examples and give my contrary opinions below:

- "Providers may take varying amounts of time to document each chronic condition assessed as part of a visit" – documentation of chronic condition does not yet exist.

- "Patient might not have discussed her chronic condition at each visit" – chronic condition not addressed at visit and thus not documented for that DOS.

- "The provider might in fact have taken the chronic condition into account when considering treatment for other conditions addressed at a patient visit and might have included documentation supporting chronic condition" – no confirmation that adequate documentation exists if providers fail to note they assessed and treated the condition on a given DOS.

63.    All of the above are hypotheticals by Blair regarding the possibility a patient has a chronic condition, but where either the provider did not properly or clearly document such a condition or where such documentation "might" exist but has yet to be located.  These scenarios raise problems with documentation, not a "gray area" permitting a coder to code the chronic condition anyway based on his own judgment.

64.    ***Third***, Blair claims in ¶ 55 that coders may be confused when coding chronic conditions because different rules for coding chronic conditions apply to inpatient versus outpatient medical

27

1270

records.  This example is baffling because it is a basic rule of coding that any coder has to apply the coding rules that govern in a particular clinical setting where the patient encounter occurred.

65.  Blair's specific example is even more baffling.  She claims at ¶ 55 that there is an inconsistency between Coding Clinic guidance on coding chronic conditions *in the inpatient setting* versus ICD rules on coding chronic conditions in the *outpatient setting*.  However, these are not conflicting coding references.  A coder would not attempt to apply both at the same time since one addresses inpatient records and the other outpatient records.

66.  Furthermore, if a coder mistakenly believed these rules somehow are both relevant simultaneously, a coder is trained to defer to the ICD rules and not a secondary source, like the Coding Clinic.  *Supra* ¶¶ 17-19.  This is not a "gray area" but shows the opposite: the clarity and specificity of the ICD rules and the hierarchy of rules a coder is trained to follow.

67.  *Fourth*, Blair claims in ¶ 48 that "MA Plan coders performing a blind chart review may approach coding gray areas differently based on their knowledge and experience which may differ from that of the provider or coder in the provider's office that submitted diagnosis codes on the claim, which can cause discrepancies between the diagnosis codes identified by both."

68.  To the extent there are "discrepancies" between the MA plan coder's and the provider coder's coding results, Blair's statement appears to make the basic point that different levels of coder experience and training impact coding accuracy.  Blair also gives no support for her point that MA plan coders in fact "approach coding gray areas differently."  As discussed above, MA plan coders are not permitted to assign codes in the examples Blair gives of "gray areas" (e.g., where the medical record is unclear as to a chronic condition or a coder mistakenly attempts to apply in-patient coding rules to an out-patient chart), let alone use different "approach[es]" to assign codes.

69.    Blair continues to make conclusory and vague statements about "gray areas" in ¶ 50: "While regulators and the healthcare industry . . . attempt to clarify gray areas, disagreements remained unresolved for long periods of time in many cases and some remain unresolved today, rendering it difficult for coders to consistently approach these areas."  Blair does not explain what "gray areas" she is describing, what "disagreements" are unresolved, and based on what sources she is making these broad-stroke points.  Presumably, because Blair is claiming to describe how the coding industry and government regulators have already "attempt[ed]" to address these issues, there should be some sources supporting these events, but she does not offer any.

## IV.    OPINION TWO – REBUTTAL

70.    In Blair's second opinion, she switches to opining on why provider coding may be more reliable than MA Plan coding: "During blind chart reviews, if a coder does not identify a diagnosis code that a healthcare provider submitted on a claim to the MA Plan, that code may still be supported by documentation in the patient's medical record."  Blair Report at 27.

71.    Blair justifies her position by suggesting (1) provider-submitted codes tend to be more reliable than MA plan coding and (2) provider coders are "better situated to identify many properly supported diagnosis codes" based on information that Blair admits cannot be found in the medical record.  I disagree with both of these points.

72.    ***First***, the opposite of what Blair newly claims in Opinion Two (but that she endorsed in Opinion One) is true: in my extensive experience, working with both providers and MA plans, MA plan coding has typically been more reliable and accurate than provider coding.  In all but the largest physician practices and academic medical centers, provider coders may not hold coding certifications.  And, in the settings in which they do, there are rarely any checks or safeguards – such as the quality assurance programs at MA organizations – to ensure accuracy of coding.

29

1272

73.   As discussed, MA organizations tend to institutionalize industry best practices to support coding accuracy, while provider organizations do much less, if at all.  For instance, articles by AHIMA and Rise Health cite to the importance of a 95% coding accuracy as an industry best practice.[21]  MA organizations tend to require such best practices, including that coders must be certified, continually trained, held to performance and quality control standards (e.g., 95% coding accuracy and completeness), and be subject to oversight and supervision by experienced coders.

74.   **Second**, Blair's rationale for why provider coding is more reliable than MA coding is that the former knows better than the latter whether a patient in fact has a condition irrespective of how it is documented in the medical record.  Blair seems to equate a patient having a condition with a code being "properly supported" or sufficiently "document[ed] in the patient's medical record."  Blair Report ¶¶ 57-62.  So long as documentation *could* be obtained, because the patient in fact has the condition, then Blair's position is it is appropriate to describe that condition and the corresponding code as "properly documented."  *Id.* at ¶¶ 57-59.

75.   This opinion is at odds with the fundamental principle of coding that the medical record is the source of "truth" for code assignment.  If a condition is clearly and unambiguously documented in the medical record, the code can be assigned; if not, the code cannot be assigned.  That a medical record could be obtained or that a condition could be assumed to exist is not sufficient.  United's own coding leadership recognized this fundamental principle as the "golden rule of coding."  *See* Dickey Dep. 145:10–12, May 24, 2022 (The "golden rule of coding [is] that if it's not documented, then you don't code it.").  Blair attempts to support her opinion based on several hypotheticals.  I disagree with each:

---

[21] *See Body of Knowledge*, AHIMA, https://bok.ahima.org/ (last visited Jan. 22, 2024); Erik Simonsen, *Is 95% coding accuracy good enough?*, RISE (Dec. 23, 2021), https://www.risehealth.org/insights-articles/is-95-coding-accuracy-good-enough/.

**Hypothetical: Provider coder is uniquely familiar with provider idiosyncrasies**

76.   Blair argues that the provider coder uniquely comprehends the provider's handwriting, abbreviations, or documentation practices, can ask the provider questions about the patient's condition, or can find additional medical records to support a code.  Blair Report ¶ 58.  Each of these points shows why the medical record documentation as it exists or is known fails to support a code, because the documentation is ambiguous, illegible, or incomplete.

77.   As I have explained, where there is no clear support for a particular condition in the medical record, a coder has only three options: (1) Ask the physician for any additional documentation that exists; (2) Query the provider to obtain clarification on the medical record; or (3) Not code the suspected but undocumented condition.[22]

78.   For instance, ICD-10 repeatedly instructs coders that the proper way of handling ambiguous documentation (such as unclear handwriting and language or an incomplete record) is to query the provider: "Query the provider for clarification, if the complication is not clearly documented." (Complications of Care); "Whenever the documentation is unclear regarding a borderline condition, coders are encouraged to query for clarification." (Borderline Diagnosis); "If the documentation is not clear as to whether acute respiratory failure and another condition are equally responsible for occasioning the admission, query the provider for clarification." (Sequencing of acute respiratory failure and another acute condition).  ICD-10, § I.B.16-17, § I.C.10.b.3.[23]

---

[22] *See*, *e.g.*, AHIMA Standards (revised and approved Dec. 12, 2016), https://bok.ahima.org/topics/coding-compliance-and-revenue-cycle/american-health-information-management-association-standards-of-ethical-coding-2016-version/ ("3. Assign and report, in any format, only the codes and data that are clearly and consistently supported by health record documentation in accordance with applicable code set and abstraction conventions, and requirements," "4. Query and/or consult as needed with the provider for clarification and additional documentation prior to final code assignment in accordance with acceptable healthcare industry practices.").
[23] ICD-10 (updated Apr. 1, 2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf.

**Hypothetical: Condition listed only in undated problem list**

79.   In Figure 4 of her report at ¶ 59, Blair presents a hypothetical in which a provider coder reported respiratory failure and a MA Plan coder did not, where the problem list made a note suggesting the patient had the condition but "no date [was] specifically assigned" to the note.

80.   Despite the improper lack of a date, Blair imagines in the hypothetical that the provider coder "might have included . . . respiratory failure on the claim" anyway because that coder knew, from being at the provider's office, the relevant note was added "on the date of service, which means that respiratory failure was, in fact, a current condition for this patient."  Blair Report ¶ 59. Blair then claims that the "MA Plan coder might have determined that because there is no date on the problem list and the information within it, they are unable to support the coding of respiratory failure during their review."  *Id.*

81.   This hypothetical is nonsensical and again violates a basic rule of coding: Blair characterizes the provider coder as having properly coded respiratory failure when that coder relied on information about the date of service *not in the medical record*.  As discussed above at ¶ 78, any person attempting to assign the respiratory failure code must first take steps – such as a physician query – to obtain the necessary medical record support.

**Hypothetical: Diagnosis code not linked to medication**

82.   In Blair's next hypothetical, in ¶ 60 of her report at Figure 5, a MA Plan coder fails to identify a COPD diagnosis in a medical record even though COPD was included on the problem list and the record "documented that the provider renewed the medication Albuterol, a medication used to treat COPD, but did not explicitly mention COPD otherwise in the note." "While the Albuterol was not specifically linked to a COPD diagnosis in the chart, COPD was the only past condition that would require this medication, and the orders noted that Albuterol was being

32

1275

renewed, indicating the COPD was still current." Blair Report ¶ 60. Blair's hypothetical suggests "a coder at the provider's office may have drawn this linkage" while "an MA Plan coder may fail to identify [the] diagnosis that is supported by the medical record." *Id.*

83. This is another unrealistic hypothetical. It assumes, without explanation, that the MA Plan's certified, highly trained coder, who is subject to quality control review, would miss the obvious link between a well-established COPD medication (Albuterol) and the management of COPD, even though the condition appears in the problem list before the MA Plan coder. In my experience, this is unlikely to occur, particularly at a MA organization enforcing strict performance standards. Blair does not explain how this hypothetical justifies that a provider coder is more likely than a MA coder to approach this situation correctly.

### Hypothetical: Failure to identify specific diabetes subtype

84. In Blair's final hypothetical, "[a]n MA Plan coder may see diabetes supported by the medical record but assume the diabetes does not have complications because the record does not include an additional diagnosis for the complication. The [provider's] coder, on the other hand, may have more *intimate* knowledge of the patient's current diagnoses and can identify a diabetes diagnosis with complications. For instance, if the provider or coding personnel at the provider's office reviewed the record and noted an order for an arterial scan of the lower legs, which subsequently showed a diagnosis of peripheral artery disease, then they might have coded diabetes with complications." *Id.* at ¶ 61 (emphasis added).

85. Blair provides a medical chart at Figure 6 that accompanies the hypothetical, but the chart only shows why the hypothetical and Blair's points fail. Based on the chart, the MA Plan coder who did not code a diabetes complication for DOS 1/1/2015 is correct. The hypothetical chart has no indication that an arterial scan of the lower legs was actually performed, but only that

33

it was ordered.  Nor does the record reflect a face-to-face encounter where a provider addressed the peripheral artery disease.  As a result, the medical record does not provide adequate documented support for a coder to link peripheral artery disease to diabetes at the 1/1/2015 visit. As in Blair's other hypotheticals, it is irrelevant the provider's coder might theoretically and "intimately" know additional information about the patient, which Blair assumes is <u>not</u> documented in the record.

86.   The opinions above are based on information currently available to me. I reserve the right to supplement or modify these opinions as necessary if new information later becomes available.


Signed on January 29, 2024.


_____

Jean Acevedo

34

1277

Appendix A

## Resources Relied Upon

### I.    Publicly-Available Resources

*2024 ICD-10-CM*, Centers for Medicare & Medicaid (last modified Sept. 6, 2023),
https://www.cms.gov/medicare/coding-billing/icd-10-codes/2024-icd-10-cm

*AHA Coding Clinic*, AHIMA, https://www.ahima.org/landing-pages/ghealth/ahima-ghealth-associates-directory/associates/aha-coding-clinic/

*American Health Information Management Association Standards of Ethical Coding (2016 version)*, AHIMA (revised and approved Dec. 12, 2016), https://bok.ahima.org/topics/coding-compliance-and-revenue-cycle/american-health-information-management-association-standards-of-ethical-coding-2016-version/

Amy Frontz, OIG, *Toolkit To Help Decrease Improper Payments in Medicare Advantage Through the Identification of High-Risk Diagnosis Codes* (Dec. 2023),
https://oig.hhs.gov/oas/reports/region7/72301213.pdf

*Body of Knowledge*, AHIMA, https://bok.ahima.org/

Centers for Medicare & Medicaid Services, *Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide* (2008),
https://www.hhs.gov/guidance/document/2008-risk-adjustment-data-technical-assistance-medicare-advantage-organizations

Centers for Medicare & Medicaid Services, *Contract-Level Industry-Wide Training Event* (Jan. 29, 2019), https://www.cms.gov/research-statistics-data-and-systems/monitoring-programs/medicare-risk-adjustment-data-validation-program/other-content-types/radv-docs/radv-industry-slide-deck.pdf

Centers for Medicare & Medicaid Services, *Contract-Level Risk Adjustment Data Validation – Medical Record Reviewer Guidance* (effective Mar. 20, 2019), https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/Medical-Record-Reviewer-Guidance.pdf

Centers for Medicare & Medicaid Services, *Corrected Deadline for Submitting RAPS Data for Use in Risk Score Calculation Runs for Payment Years 2014, 2015, 2016* (Sept. 11, 2014), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/correction%20-%20hpms%202014_2015_2016%20payment%20run%20notice_172.pdf

Centers for Medicare & Medicaid Services, *ICD-9-CM Official Guidelines for Coding and Reporting FY 2011* (2010), https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf

Centers for Medicare & Medicaid Services, *ICD-10-CM Official Guidelines for Coding and Reporting FY 2023* (2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf

Centers for Medicare & Medicaid Services, *ICD-10-CM Official Guidelines for Coding and Reporting FY 2024* (2023), https://www.cms.gov/files/document/fy-2024-icd-10-cm-coding-guidelines.pdf

Erik Simonsen, *Is 95% coding accuracy good enough?*, RISE (Dec. 23, 2021), https://www.risehealth.org/insights-articles/is-95-coding-accuracy-good-enough/

*Gestational Diabetes and Diabetic Ketoacidosis*, 7 AHA Coding Clinic for ICD 30 (Third Quarter 2020)

*International Classification of Diseases, (ICD-10-CM/PCS) Transition – Background*, Centers for Disease Control and Prevention (last reviewed Nov. 6, 2015), https://www.cdc.gov/nchs/icd/icd10cm_pcs_background.htm

## II.    Case Documents

Tammy Dickey Deposition Transcript, May 24, 2022

Tracey Bradberry Deposition Transcript, July 1, 2021

**EXHIBIT D-54**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

Civil Action No. 16-08697

UNITED STATES OF AMERICA

*ex rel.* BENJAMIN POEHLING,

    *Plaintiffs*,

v.

UNITEDHEALTH GROUP, INC. *et al.,*

    *Defendants*.

<u>EXPERT REPORT OF</u>

<u>BARBARA BLAIR, RN, MSN, CCS, CPC, CPCO, CRC</u>

CONFIDENTIAL

Barbara Blair, RN, MSN, CCS, CPC, CPCO, CRC

Senior Director

FTI Consulting, Inc.

September 29, 2023

1281

September 29, 2023 Expert Report of Barbara Blair

— Table of Contents

I.    Qualifications ................................................................................................ 3

II.   Introduction and Summary of Opinions ...................................................... 4

III.  Background .................................................................................................. 6

IV.   Opinions .................................................................................................... 11

*Opinion One: The identification of diagnosis codes supported by documentation in a medical record is a complex process, informed by a variety of coding guidance and dependent on a coder's training, experience, and judgment.* ............................................................ 11

*Opinion Two: During blind chart reviews, if a coder does not identify a diagnosis code that a healthcare provider submitted on a claim to the MA Plan, that code may still be supported by documentation in the patient's medical record.* ........................................................ 27

V.    Conclusion ................................................................................................ 31

VI.   Exhibits .................................................................................................... 31

CONFIDENTIAL

September 29, 2023 Expert Report of Barbara Blair

3

## I.     Qualifications

1.  I, Barbara Blair, am a Senior Director at FTI Consulting ("FTI"). I received my Associate Degree from Rockland Community College in 1986, followed by my Bachelor of Science in Nursing from the University of Rochester in 1991 and, ultimately, my Master of Science in Nursing from the University of Rochester in 1992. Upon receiving my Associate Degree, I passed the exam to become a licensed Registered Nurse. I practiced as a Registered Nurse from 1986 to 1995 in different specialties, including medical/surgical, emergency medicine, short-stay patients, oncology, and cardiac critical care, and I have maintained my Registered Nurse license to date. Upon receipt of my master's degree, I passed the exam to become a certified Adult Nurse Practitioner. I practiced as an Adult Nurse Practitioner from 1992 to 1995. As a Registered Nurse and an Adult Nurse Practitioner, I worked in a variety of medical settings, including a large metropolitan hospital, a private hospital, and a teaching hospital.

2.  I transitioned from being a provider to being a consultant in 1995. I provide consulting services to healthcare organizations, working with providers and various members of their healthcare teams, including but not limited to nurses, therapists, and nutritionists. My work focuses on provider documentation and medical diagnosis coding. I lead trainings at hospitals, physician offices, and outpatient clinics. I became a Certified Coding Specialist ("CCS") in 2000 and subsequently obtained several coding and compliance certifications, set forth more fully on my curriculum vitae, including Certified Professional Coder ("CPC"), Certified Risk Adjustment Coder ("CRC"), Certified Professional Compliance Officer ("CPCO"), a certificate of completion for Certified Documentation Expert Inpatient ("CDEI"), and am an American Health Information Management Association ("AHIMA") ICD-10-Clinical Modification/Procedure Coding System trainer.

3.  For the past twenty years, I have served as a lead coder for FTI, where I work with clients, including health insurance plans and providers. I provide clinical and coding expertise for various reviews related to diagnosis code identification and assignment. As part of these reviews, one of my focus areas is the proper identification of support for diagnosis codes in medical records for providers and Medicare Advantage Plans ("MA Plans") with risk adjustment reimbursement models. My work in this area includes reviewing company policies and procedures around diagnosis coding; reviewing internal training related to

proper diagnosis coding; creating coder education related to proper diagnosis code identification; reviewing diagnosis coding in connection with internal and external investigations; supporting reviews related to due diligence for potential acquisitions; and providing support for mock Risk Adjustment Data Validation ("RADV") reviews.

4. For a detailed summary of my experience, please refer to Exhibit A for my CV. I have been retained by counsel for UnitedHealth Group, Inc. in the matter of *United States ex rel. Poehling v. UnitedHealth Group, Inc. et al.* to opine on the topics as set forth in this report. FTI is being paid $560 per hour for my work in this case. In addition, other employees of FTI have worked under my direction in this matter. The billing rates for these individuals range from $350-$625 per hour. Compensation for FTI's services is not based on the outcome of this matter or the content of my opinions.

## II.    Introduction and Summary of Opinions

5. Health insurance programs in the United States are administered by the government, private companies, or a combination of both. At age 65 (or as a result of certain disabilities or other conditions), individuals become eligible to receive their healthcare coverage through Medicare, which includes the option to receive healthcare coverage either through the federal government or through private health plans. Medicare Parts A and B, also known as Traditional Medicare, are administered by the Centers for Medicare & Medicaid Services ("CMS").[1] Medicare Part C, also known as Medicare Advantage ("MA"), is administered by private health insurance companies called MA Plans.[2]

6. In contrast to a fee-for-service model where a healthcare provider's payment is based on the services provided, CMS pays MA Plans based on its risk adjustment model, which takes into account a patient's health status and certain demographic details, rather than the healthcare services a provider rendered to a patient. MA Plans obtain information regarding a patient's health status from providers who submit healthcare claims, which contain

---

[1] *See* CMS, *Fact Sheet: Introduction to Medicare*, available at https://www.cms.gov/outreach-and-education/find-your-provider-type/employers-and-unions/fs1-intro-to-medicare.pdf.

[2] *See* Medicare.gov, *Your health plan options*, available at https://www.medicare.gov/health-drug-plans/health-plans/your-health-plan-options.

CONFIDENTIAL

September 29, 2023 Expert Report of Barbara Blair

diagnosis codes, to the MA Plan.[3] Diagnosis codes are a lengthy set of standardized codes used by providers and health insurance plans to identify and track a patient's health conditions. CMS uses diagnosis codes as a basis for reimbursement in the MA program.

7.  After a patient visit, a provider submits the claim to the patient's MA Plan, which contains information about the patient visit, such as the services provided and relevant diagnosis codes. A provider may identify the diagnosis code(s) to submit on the claim or the provider may rely on coders to review the information documented in a patient's medical record and translate this information into diagnosis codes. The MA Plan then, in turn, submits the diagnosis codes for all of its beneficiaries to CMS, and CMS uses this information (along with other characteristics of the beneficiary, including demographic information) to determine payment to the MA Plan for providing health coverage to this beneficiary.

8.  After the submission of a claim, MA Plans often use certified coders to perform a separate review of patient medical records, sometimes called "chart review," during which a coder reviews the medical records to determine which diagnosis codes she believes are supported by the documentation in the medical record. MA Plan chart reviews typically occur retrospectively, meaning after the provider submitted diagnosis codes to the MA Plan.

9.  One form of chart review employed by MA Plans is referred to as a "blind review," meaning the coder reviews a patient's medical record without knowledge of any diagnosis codes assigned by other coders who may have reviewed the documentation, or any diagnosis codes submitted by a provider to the MA Plan on a claim. In a blind chart review, the coder identifies diagnosis codes the coder believes have supporting documentation in the patient's medical record. This determination of diagnosis codes entails judgment and can be subjective, often relying on a coder's training, experience, and interpretation and application of coding guidance, which is not always definitive. Although coding medical records is standard practice in the healthcare industry, for the variety of reasons noted and discussed in more detail below, coders may not agree as to which diagnosis codes have documentation in a medical record sufficient to support coding the diagnosis code.

---

[3] The "diagnosis codes" (otherwise known as ICD-9-CM and ICD-10-CM codes) that are used by providers in the United States are derived from the International Classification of Diseases ("ICD") developed by the World Health Organization. ICD codes were developed to classify the cause of death for mortality statistics. *See* CDC, *International Classification of Diseases, Tenth Revision, Clinical Modification (ICD-10-CM)*, available at https://www.cdc.gov/nchs/icd/icd-10-cm.htm.

CONFIDENTIAL

September 29, 2023 Expert Report of Barbara Blair

6

Therefore, coders may identify different diagnosis codes than the diagnosis codes identified by a provider, a coder in a provider's office, or another coder performing a chart review.

10. Based on the materials I have relied upon (listed in Exhibit B) and my experience as a clinician and certified coder, I have the following opinions:

**Opinion One:** The identification of diagnosis codes supported by documentation in a medical record is a complex process, informed by a variety of coding guidance and dependent on a coder's training, experience, and judgment.

**Opinion Two:** During blind chart reviews, if a coder does not identify a diagnosis code that a healthcare provider submitted on a claim to the MA Plan, that code may still be supported by documentation in the patient's medical record.

11. My opinions are based on my experience as a nurse and certified coder, my consulting experience, and my 25+ years working in the healthcare industry. I also considered various industry writings from accredited organizations such as AHIMA and the American Academy of Professional Coders ("AAPC"). A list of the documents I relied upon in reaching my opinions is included in Exhibit B.

## III.   Background

<u>Medical Record Documentation and Diagnosis Coding</u>

12. Healthcare providers evaluate patients to determine and provide appropriate care. When meeting with a patient, the provider assesses the patient's chief complaint, presentation, medical history, signs and symptoms and then documents these pertinent details in the patient's medical record (also referred to as "provider documentation"). The provider is also supposed to determine any relevant diagnoses for the patient (e.g., rheumatoid arthritis), which should be noted in the patient's medical record. Figure 1 below is a condensed example of a hypothetical medical record on a specific visit date (1/1/2014):

September 29, 2023 Expert Report of Barbara Blair

**Figure 1: Example Patient Medical Record**

- **Jane Smith, MD – 1/1/2014**
- **John Doe (1/1/1947)**
- **Chief Complaint:** Swelling and joint pain in hand
- **History of Present Illness:** Onset of joint pain in the past two weeks with recent swelling
- **Medication** Aspirin
- **Medical History/Problem List:** Chronic Back Pain, Hip Replacement, Diabetes
- **Lab/Imaging**: x-ray of right hand
- **Exam:** Well-nourished, well-developed male, tenderness in right hand
- **Assessment/Plan:** right hand pain due to rheumatoid arthritis, start prednisone, continue diabetic diet

13. In this example, the medical record states that a hypothetical patient complained of pain and swelling in his hand. The doctor examined the patient's hand, reviewed the patient's relevant medical history, documented the patient's diagnosis of rheumatoid arthritis, and developed a personal care plan to address the patient's hand pain. While meeting with the patient to discuss his hand pain, the doctor also discussed how the patient was managing his diet for diabetes.

14. At some point following the patient visit, the provider submitted a claim to the MA Plan specifying the services the provider rendered to the patient (e.g., x-ray of hand) as well as the diagnosis codes that described the patient's underlying health status (e.g., rheumatoid arthritis in the example described in Figure 1). The provider's office included diagnosis codes on the claim form using the standardized set of diagnosis codes.

15. An important step in the patient visit and claim creation process is the assignment of diagnosis codes on a claim. Although the provider typically submits diagnosis codes on the health insurance claim, the resulting claim may not include all diagnosis codes supported by documentation in the medical record. In the example in Figure 1, the record supported the diagnosis codes for both rheumatoid arthritis and diabetes. Given that the patient's hand pain, which the provider determined to be rheumatoid arthritis, was the primary focus of the visit, the provider's office might have inadvertently failed to include a diagnosis code for diabetes on the claim, even though the provider discussed the diet plan for diabetes with the patient during the same visit and documented diabetes in the medical record.

16. Separate and apart from the submission of diagnosis codes on the claim, an MA Plan may conduct its own reviews of medical records through a chart review process. Although these reviews can be performed in a variety of ways, one option is a "blind chart review." In a

CONFIDENTIAL

September 29, 2023 Expert Report of Barbara Blair                    8

blind chart review, a certified coder reviews the patient's medical record without knowledge of any diagnosis code(s) previously submitted by the provider on the claim, or diagnosis code(s) identified for that patient by another coder. The MA Plan coder will identify the diagnosis codes she determines—based on the coder's judgment, training, education, experience, interpretation of the medical record, and applicable coding guidance—are supported by documentation in the medical record. The documentation the MA Plan coder reviews may contain information captured from a single date of service, such as the example in Figure 1 above, or information captured on many dates of service. In the single date of service example in Figure 1, the provider submitted only the diagnosis code for rheumatoid arthritis on the claim, but the MA Plan coder later reviewing the medical record may have added a diagnosis code for diabetes through chart review because diabetes was supported by documentation in the medical record.

17. MA Plans often conduct chart reviews to determine whether additional diagnosis codes not included in the provider's claim are documented in the underlying medical records. These reviews help MA Plans obtain a more complete picture of a patient's health status, which is an important part of a patient's overall care management and helps ensure the coordination of comprehensive patient care.

18. Providers had historically received more training for the documentation of procedures and services under the fee-for-service model, as provider reimbursement was more commonly derived from the procedures providers performed or services providers rendered, rather than derived from a patient's diagnoses and the documentation of diagnoses. In the past, providers did not always submit all of a patient's applicable diagnosis codes on a claim and in fact may have submitted only one diagnosis code on a claim as the basis and support for the services rendered or procedures performed even though other diagnosis codes may have applied for the visit. During their blind reviews, coders conducting MA Plan chart reviews may identify these additional diagnosis codes that are supported by documentation in a patient's medical record but that were not submitted on the claim.

<u>Establishment and Evolution of Diagnosis Coding</u>

19. Diagnosis codes changed in a variety of ways between 2008 and 2016. Most significantly, a new version of diagnosis codes (ICD-10-CM or "ICD-10") was established in October

2015 after the previous version (ICD-9-CM or "ICD-9") had been in use in the United States since 1979.[4] There are over 68,000 unique codes in the current ICD-10-CM code set, which uses up to seven alphanumeric characters per diagnosis. There were roughly 13,000 unique codes in the ICD-9-CM code set, which was limited to a five numeric character format.[5] The transition between ICD-9-CM and ICD-10-CM represented a significant improvement in terms of tracking and analyzing patient care. The larger set of unique diagnosis codes in ICD-10-CM allows for a higher degree of specificity when categorizing a particular diagnosis and can account for additional factors like laterality (right or left side of the body), recurrence, and severity.[6]

<u>Sources of Coding</u>

20. In order to assign diagnosis codes, coders rely on guidance from many sources to review provider documentation and translate the information contained in the medical record into diagnosis codes. Several key resources from professional organizations provide guidance to coders on numerous aspects of coding. These include, but are not limited to, the below examples:

- An official list of diagnosis codes contained within the Tabular List and Alphabetic Index is included in the vast majority of coding reference books with instructions and is annually updated by the National Center for Health Statistics ("NCHS").[7]

- The Official Guidelines for Coding and Reporting are jointly published on an annual basis by AHA,[8] AHIMA,[9] CMS, and NCHS as a "companion document" to the NCHS diagnosis code list.[10]

---

[4] *See* CDC, *International Classification of Diseases, (ICD-10-CM/PCS) Transition - Background*, available at https://www.cdc.gov/nchs/icd/icd10cm_pcs_background.htm.

[5] *See* AHIMA, *ICD-10-CM Primer*, available at https://library.ahima.org/doc?oid=106177.

[6] *Id.*

[7] *See, e.g.*, CDC, *FY 2016 release of ICD-10-CM - ICD-10-CM List of codes and Descriptions,* available at https://www.cdc.gov/nchs/data/icd/icd10cm/2016/ICD10CM_FY2016_code_descriptions.zip.

[8] American Hospital Association is the national organization that represents and serves all types of hospitals, health care networks, and their patients and communities. *See* https://www.aha.org/about.

[9] American Health Information Management Association is a global nonprofit association of health information professionals focused on health information management. *See* https://www.ahima.org/who-we-are/about-us/.

[10] *See, e.g.*, CMS, *ICD-10-CM Official Guidelines for Coding and Reporting: FY 2016*, available at https://www.cms.gov/medicare/coding/icd10/downloads/2016-icd-10-cm-guidelines.pdf.

CONFIDENTIAL

- AHA, AHIMA, CMS, and NCHS coordinate to provide a quarterly newsletter referred to as the Coding Clinic, which has provided additional guidance since 1984 on topics that lack clarity in the code instructions or official guidelines.[11]

- Coders also rely on materials published by CMS for MA Plans, which contain additional coding guidance. This includes feedback provided in connection with CMS's RADV audits of medical records for patients enrolled in MA Plans, the coding sections (Module 6 – Diagnosis Codes & Risk Adjustment, Module 7 – Risk Adjustment Data Validation) of the Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide ("coding sections of the CMS Participant Guide"),[12] and Contract-Level Risk Adjustment Data Validation Medical Record Reviewer Guidance ("RADV Reviewer Guidance").[13]

- Coders may also rely on a provider's own coding references. It is not uncommon for providers to summarize their own interpretation of the above sources to assist coders with code assignment.

21. These resources, among others, provide coders with guidance on how to interpret documentation in a medical record and how to properly assign diagnosis codes. Even with the multitude of guidance described above, coders often use their own judgment to assign diagnosis codes because the coding guidance may be silent or ambiguous on a specific issue and the guidance alone does not address all areas of ambiguity present in diagnosis coding. And in certain cases, one set of coding guidance may actually conflict with another set of coding guidance. Coders therefore use the available guidance as a framework but ultimately must also rely on their judgment and experience.

---

[11] *See* Coding Clinic, *What is Coding Clinic for ICD-10-CM and ICD-10-PCS?*, available at https://www.codingclinicadvisor.com/about-icd-10-coding.

[12] *See* CMS, *2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide*, at Module 6 – Diagnosis Codes & Risk Adjustment, Module 7 – Risk Adjustment Data Validation, available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2012183293-yv-participant-guide-publish_052909.pdf.

[13] *See, e.g.*, CMS, *Contract-Level Risk Adjustment Data Validation Medical Record Reviewer Guidance In effect as of 03/20/2019*, (last updated, Nov. 14, 2018), available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/Medical-Record-Reviewer-Guidance.pdf.

CONFIDENTIAL

September 29, 2023 Expert Report of Barbara Blair

## IV.    Opinions

### *Opinion One: The identification of diagnosis codes supported by documentation in a medical record is a complex process, informed by a variety of coding guidance and dependent on a coder's training, experience, and judgment.*

22.  In chart review, MA Plan coders review the available medical record documentation and translate the information within it into the applicable diagnosis codes supported by the documentation in the medical record. Provider documentation varies in terms of format, legibility, source of information, length, and complexity, which can impact and potentially complicate a coder's review. Determining which diagnosis codes are supported by documentation in the medical record involves judgment and can be a subjective exercise where coders may not always agree. Different coders may reach different conclusions as to which diagnosis codes are supported by documentation in a given medical record for a variety of reasons, including but not limited to (1) the coder's professional experience and training; (2) availability, legibility, and variability of provider documentation; (3) the interpretation and application of various sources of coding guidance; (4) human error; (5) the transition from ICD-9 to ICD-10 diagnosis code sets; and (6) coding "gray areas."

Coder Certification, Experience, and Training

23. Certified coders have varying levels of experience and training, as well as different coding certifications. For instance, one coder may have years of experience coding certain specific diagnoses, while another coder may have limited experience with those same diagnoses. This is seen often with coders who work in an office with a medical specialist who focuses in one area, such as cardiology. As a result of the provider's specialization, the coder focuses on a relatively small number of conditions. The coder in that specialized practice will have extensive coding experience with the conditions the cardiologist treats but less coding experience with conditions outside of the provider's specialty. The cardiology coder's experience differs from a coder supporting a family medicine practice, who experiences a different and likely broader range of conditions based on the patients the family practitioner treats.

24. Similarly, while some coders focus on coding the services (using procedure codes, for example) performed during the patient visit, and may only give cursory consideration to coding diagnoses, other coders may focus more closely on the documentation of diagnosis

CONFIDENTIAL

1291

September 29, 2023 Expert Report of Barbara Blair

codes. Still, other coders may have roles that require a detailed focus on the coding of both procedures and diagnoses for the same medical chart. The coder's work experience may influence her ability to identify diagnosis codes supported by documentation in a patient's medical record. For example, a coder who is more experienced with procedure codes and less experienced with diagnosis codes may be less effective at identifying all the diagnosis codes supported by the documentation in the medical record than a coder whose career focuses heavily on diagnosis coding.

25. Training, including various certifications coders may receive, also varies from coder to coder. Certain coding certifications are general, such as the Certified Professional Coder (CPC) certification, and include training for multiple types of medical codes like procedure codes and diagnosis codes.[14] Other certifications, such as the Certified Risk Adjustment Coder (CRC) certification, are more specialized and focus only on diagnosis coding, including coding for complicated medical diagnoses like diabetes or depression. The AAPC explains that "Healthcare professionals earning their CRC credential possess demonstrated expertise in the complexity of diseases associated with chronic conditions and comorbidities, as well as mastery of ICD-10-CM guidelines and risk adjustment guidelines."[15] While a coder with a more generalized training background and certification may understand the basics of what is required to generally identify diagnosis codes from within a medical record, that coder may not have the same depth of understanding and experience as a coder who received specific training for identifying diagnosis codes supported by documentation in a medical record. As a result, a coder with more specialized diagnosis code training, such as a coder with a CRC certification, may make different coding determinations than a coder with a more generalized training background.

Availability, Legibility, and Variability of Provider Documentation

26. In addition to varied coder backgrounds, the provider documentation available to coders during chart review varies greatly. MA Plans typically retrieve some of the patient's medical records from providers for review by the MA Plan's coders. This process can involve outreach to multiple providers for specific patients and, in some cases, working

---

[14] **See** AAPC, *Certified Professional Coder (CPC)® certification*, available at https://www.aapc.com/certifications/cpc.

[15] AAPC, *Certified Risk Adjustment Coder (CRC)® certification*, available at https://www.aapc.com/certifications/crc.

CONFIDENTIAL

Case 2:16-cv-08697-FMO-PVC    Document 616-8    Filed 08/06/24    Page 77 of 887
Page ID #:20153
September 29, 2023 Expert Report of Barbara Blair

13

with those providers to supply the particular medical records. The medical record documentation retrieved for a given patient may be incomplete, as MA Plan chart reviews are limited to the documentation providers supply. As a result, the medical documentation provided may only contain a portion of the visits the patient had with the provider for a given year or may be missing key pages of the medical record related to the days those visits occurred. For example, scanned medical record documentation may only show the odd-numbered pages (pages 1, 3, 5, etc.) because the original medical record documentation was double-sided, and the provider's office only scanned in one side of the record. As another example, providers may have document retention limitations and store only the last year of records in their office and may store older records at an offsite location. A provider could have difficulty retrieving the offsite records for an MA Plan because they do not have time to go to the offsite location to retrieve the records, lack organization of those records, or find it difficult to identify records for a specific patient. Therefore, a provider's office may provide only what is stored on-site, which may not include information regarding every visit a patient had with the provider in a given year.

27. Additionally, due to the advanced age of patients enrolled in MA Plans, these patients often see multiple providers in a given year. These providers may be at the same location, or they could be spread out across various locations. Each provider may also have a different medical record for the patient. All of these factors make it challenging to collect complete medical records for patients. Even if an MA Plan retrieves multiple medical records for a patient for a given year, the MA Plan still may not have access to all of the patient's medical records, or all pages of a medical record, that may exist for every visit the patient had with a provider in a given year. Due to the large volume of records retrieved and also records reviewed, the MA Plan's coder may not know that documentation is missing or incomplete.

28. The completeness of medical records can influence whether a coder identifies a particular diagnosis code as being appropriately supported by documentation in the medical record. For example, consider a hypothetical case in which a patient visited a primary care physician the morning of May 5, 2016, and was diagnosed with an abnormal pap smear. Upon checkout, the office staff noted the group's oncologist had availability that afternoon to perform a biopsy. The biopsy ultimately confirmed that the patient had cervical cancer. The claim submission for May 5, 2016, would likely contain the diagnosis code for cervical

CONFIDENTIAL

September 29, 2023 Expert Report of Barbara Blair

14

cancer. But when the MA Plan contacted the group to obtain the patient's medical records, the MA Plan got routed to the receptionist in the primary care physician's office to ask for the medical records for the patient's May 5, 2016, visit. The receptionist went into the primary care physician's electronic health record system, printed out the notes from the visit with the primary care physician on the morning of May 5, 2016, and sent those records to the MA Plan. In this example, if an MA Plan coder only had access to the primary care physician's notes in the patient's medical record for the morning of May 5, 2016, the coder likely would not have assigned the cancer diagnosis code because the conclusive pathology report from that afternoon indicating the patient had cancer was not included in what was provided to the MA Plan. Even though another provider diagnosed the patient with cervical cancer, which was documented in her medical records, the MA Plan coder may not have identified that diagnosis code in the course of chart review because the MA Plan coder did not have the full medical record.

29. In addition, the legibility and clarity of the available documentation affect a coder's ability to identify diagnosis codes. For example, a coder who cannot read a provider's handwriting may not identify a diagnosis code during a chart review that is, in fact, properly supported by documentation in the medical record.[16] Some coders may be able to interpret the same provider's handwriting and identify the diagnosis code as supported by documentation in the medical record. A coder working closely with a provider, for example, may develop a familiarity with that provider's handwriting style, shorthand, and abbreviations and can better decipher the provider's handwriting than an MA Plan's coder less familiar with the provider. A coder in the provider's office could have also asked the provider to clarify what was documented in a medical record whereas an MA Plan coder would not have had the same opportunity.

30. The format of a medical record further impacts a coder's ability to assign diagnosis codes. For example, medical records stored only in hard-copy format are more likely to be unavailable or incomplete due to loss, damage, misfiling, or other issues. Electronic medical records ("EMR") may also be unavailable or incomplete. For instance, a patient's

---

[16] **See** AAPC, *Medical Record Entries: What Is Timely and Reasonable?*" (last updated, Sept. 1, 2013), available at https://www.aapc.com/blog/25667-medical-record-entries-what-is-timely-and-reasonable.

CONFIDENTIAL

providers may use different EMR systems that store her medical records in varied formats. Additionally, providers may fail to update a shared EMR. Obtaining complete medical records for any given patient can be challenging if different portions of the patient's chart exist in hard-copy and electronic format or if a provider uses both hard-copy charts and EMR in a given year. Handwritten records remained common and were used by more than 50% of providers until 2013. As shown in Figure 2 below, less than 20% of physician offices and hospitals utilized EMRs in 2008 but by 2014 the vast majority of physician offices and hospitals utilized EMRs.[17]

**Figure 2: Electronic Medical Record Transition**[18]



31. Even after the majority of providers transitioned to EMR by 2014, some continued to use handwritten medical records or a combination of EMR and handwritten records.[19] Even within an EMR, providers sometimes use shorthand or abbreviations without clear or consistent meaning. In a RADV audit, when a coder encounters abbreviations with multiple meanings, CMS instructs: "If more than one meaning applies or documentation is too limited to differentiate, and this is the only diagnosis listed within the record, evaluate on a case-by-case basis. Otherwise, use discretion to report or not based on other circumstances in the record."[20] MA Plan coders do the same case-by-case evaluation and

---

[17] *See* HealthIT.gov, *National Trends in Hospital and Physician Adoption of Electronic Health Records*, available at https://www.healthit.gov/data/quickstats/national-trends-hospital-and-physician-adoption-electronic-health-records.

[18] *Id.*

[19] *Id.*

[20] CMS, *Contract-Level Risk Adjustment Data Validation Medical Record Reviewer Guidance In effect as of 03/20/2019* at 59, (last updated, Nov. 14, 2018), available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/Medical-Record-Reviewer-Guidance.pdf.

CONFIDENTIAL

Case 2:16-cv-08697-FMO-PVC    Document 616-8    Filed 08/06/24    Page 80 of 887
Page ID #:20156
September 29, 2023 Expert Report of Barbara Blair

16

employ their own discretion to conduct a chart review of medical records that contain abbreviations or shorthand. One coder may choose to interpret the shorthand or abbreviation as support for a particular diagnosis code while another may not. In either scenario, RADV guidance supports the coder's choice to consider the shorthand or abbreviation on a case-by-case basis.

32. Varied provider practices for documenting a patient's condition(s) may also impact a coder's ability to determine whether a diagnosis code is supported by documentation in the medical record. Patients enrolled in MA Plans generally see a variety of healthcare providers, including providers from different specialties (e.g., oncologists, cardiologists, and primary care physicians). These providers have different practices and processes for documenting patient health information in the medical record. For example, providers do not consistently document information about a patient's visit in the same location in a medical record. This may be confusing for coders that do not work with a specific provider on a regular basis or with specialists in a particular area. MA Plan coders often lack familiarity with how and where the provider documents conditions. Given all of the different ways providers may document their visits with patients, it can be difficult for an MA Plan coder reviewing documentation from a variety of providers to understand and identify all diagnosis codes potentially supported by documentation in the medical records reviewed.

The Interpretation and Application of Various Sources of Coding Guidance

33. Coders rely on a variety of sources of coding guidance. I have listed various sources of coding guidance above in the background section within. *See supra* at Paragraph 20. This coding guidance comes from nationally recognized organizations, including NCHS, AHA, AHIMA and CMS. The guidance includes annual guidance, such as the Official Guidelines for Coding and Reporting, and quarterly guidance, such as the Coding Clinic. MA Plan coders also need to understand and consider coding guidance published on an ad-hoc basis, including the coding sections of the CMS Participant Guide and RADV Reviewer Guidance, which is specific to diagnosis coding for the CMS Risk Adjustment program.

34. Coders interpret and apply various sources of coding guidance when conducting a chart review. This task is made more complicated by the number of sources of coding guidance,

CONFIDENTIAL

September 29, 2023 Expert Report of Barbara Blair

the complexity and technical nature of the coding guidance, ambiguity or lack of clarity in coding guidance, changes to coding guidance over time, and conflicts in coding guidance. Despite the volume of available coding guidance, not every nuance or subject area of medical record documentation is addressed. Coders will therefore sometimes not identify diagnosis codes that are, in fact, supported by documentation in the medical record. Two coders that review the same medical record could reach different conclusions about whether a diagnosis code is supported by documentation in the medical record because they interpret or apply the coding guidance—or a lack thereof—differently. For example, in the medical record the physician may have written the standard abbreviation of "CRF." A coder may look up "CRF" in the ICD coding index and find no guidance as to the appropriate code for "CRF." CRF is a common abbreviation for either chronic renal failure or chronic respiratory failure. One coder may not feel comfortable assigning either of the chronic renal failure or chronic respiratory failure diagnoses based on the abbreviation due to there being more than one possible meaning whereas another coder may assign one of the diagnoses because the coder—based on her experience, training, and judgement—believes it is supported by the documentation in the record.

35. Coding guidance, such as the Coding Clinic referenced above, is effective as of a specified date. For example, updates to the Official Coding Guidelines specify the time period they relate to (e.g., FY 2016 or October 1, 2015-September 30, 2016). When coding charts, including those for MA patients, coders consider the dates of service in the review and identify and utilize the applicable coding guidance relevant to the dates of service in the review. Ultimately, the date of the patient visit will dictate the coding guidance applicable for reviewing a specific record. For example, MA Plan coders reviewing a medical record in 2013 that was created on the date of the patient visit in 2012 should apply the guidance that was effective on the date of service (2012), not the guidance effective on the date of review (2013). Coders may even be tasked with reviewing dates of service spanning multiple years in a single review such as a coder performing a review in 2013 on dates of service from 2010-2012, which means the coder would have to consider and apply different sources for different years while performing the same review.

36. As noted above, coders must consider which sources and versions of guidance should be applied at the relevant time. For example, in the third quarter of 2009, the Coding Clinic

issued guidance to address the use of the common phrase "evidence of" in provider documentation for diagnosis coding. Before this new guidance was issued, coders used their independent judgment to interpret whether the phrase "evidence of" and other context was enough for the coder to determine if a diagnosis was supported by documentation in the medical record. Before the new guidance was issued, if a medical record contained the phrase "evidence of COPD" some coders may have interpreted this as a conclusive statement supporting a diagnosis code for COPD. Other coders may have interpreted that statement to suggest the doctor saw signs of COPD but did not ultimately conclude the patient had COPD and accordingly not coded COPD. However, the third quarter 2009 Coding Clinic's guidance states that "when the provider documents 'evidence of' a particular condition, it is not considered an uncertain diagnosis and should be appropriately coded and reported in the outpatient setting."[21] Therefore, after this guidance was issued, if a medical record contained "evidence of COPD," this was enough for a coder to code COPD even though the medical record did not specifically state that the patient had COPD. If a coder identified the phrase "evidence of" in the medical record, she would consider if the date of the patient's visit was before the conclusive guidance was issued. This is just one of the many clarifications and changes that have occurred over the past 15 years in the applicable coding guidance references that coders have to take into consideration.

37. In addition, CMS publishes RADV Reviewer Guidance periodically, and sometimes for each calendar year, in connection with its RADV audit process. CMS uses RADV audits to determine if an MA Plan can provide documentation to support the diagnosis codes submitted to CMS in a given year for a sample of beneficiaries. RADV Reviewer Guidance includes a summary of the diagnosis coding guidelines for the MA program. The RADV Reviewer Guidance also provides topics, examples, and guidance based on CMS's review of RADV audit samples and notes "medical records can be unique in format, legibility, content, organization, etc." and "the guidance and examples are not exhaustive in content," and therefore "documentation issues will be considered on a case-by-case basis."[22]

---

[21] AHA, Coding Clinic for ICD-9-CM, Volume 26, Number 3, Third Quarter, 2009 at 7.

[22] CMS, *Contract-Level Risk Adjustment Data Validation Medical Record Reviewer Guidance In effect as of 03/20/2019* at 7,(last updated, Nov. 14, 2018), available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/Medical-Record-Reviewer-Guidance.pdf.

CONFIDENTIAL

Similarly, the RADV Reviewer Guidance itself notes that it is merely a resource and other sources must be considered.[23]

38.  Once CMS completes the RADV audit process for a given year, CMS provides audit results to MA Plans that were subject to the audit. These RADV audit results help demonstrate the RADV coding auditors' interpretations of industry guidance, such as Coding Clinic guidance or the application of RADV Reviewer Guidance. While the RADV Reviewer Guidance only formally applies to the coders CMS engages to perform RADV audits on behalf of CMS, industry participants (including providers, plans, and their coders) look to RADV Reviewer Guidance—and the results of RADV audits—as a source of interpretation and application of coding guidelines. The results showing diagnoses the RADV coding auditors determine are supported in specific scenarios provide further coding guidance for MA Plan coders in similar situations in their own reviews.

39.  For example, the RADV Reviewer Guidance states that reviewers may encounter a Consultation Report, which is a report prepared by a consulting physician to assist with a patient's care. The coding guidance specifies that if the consultation report contains an unconfirmed diagnosis and the diagnosis is not ruled out elsewhere, but also is not mentioned in the final discharge diagnosis, a decision to support the diagnosis should be made on a case-by-case basis.[24] Similarly, when discussing a RADV coding auditor's evaluation of diagnostic testing documentation, the guidance states that "the reviewer must use judgment based on the type of procedure/test or other documentation available when determining if a chief complaint or reason for a test is a current diagnosis or was a condition to be ruled out."[25]

40.  In addition to official coding guidance and CMS RADV guidance (such as the RADV Reviewer Guidance and the RADV audit results), the coding industry has also developed a variety of criteria for coders to use to identify diagnosis codes supported by documentation in a medical record. One common set of coding criteria is referred to as "MEAT" where the provider documentation must sufficiently show that a diagnosis is

---

[23] *Id.* (providing on each of the 72 pages that the RADV Reviewer Guidance contains general guidance that is not exclusive).

[24] *Id.* at 22.

[25] *Id.* at 34.

CONFIDENTIAL

monitored/managed, evaluated, assessed and/or treated in order for a diagnosis code to be assigned.[26] For example, a provider can demonstrate evaluation (an element of MEAT) of Type 2 Diabetes by documenting "A1c results reviewed and discussed with patient" in the medical record. The adoption of the MEAT criteria, in the early 2010s, coincides with guidance from CMS available at the time to describe supporting documentation, but CMS has never officially defined, required, or codified the MEAT coding standard. As a result, one medical coder may follow the MEAT standard while others may follow a different coding standard. Providers may also determine how many elements of MEAT are necessary to support the diagnosis code and this varies across practices. Similarly, MA Plans may differ on how to implement the MEAT criteria when performing the chart reviews because CMS does not require MEAT. Some coders look for multiple elements of MEAT before assigning a diagnosis code, while other coders look for only one element. For example, one coder may have found a notation of "Type 2 Diabetes on Metformin," which demonstrated one element of MEAT, and coded the condition. Another coder may have found that notation insufficient to support the diagnosis code because it related to only one element of MEAT rather than multiple. The lack of consensus on the use of MEAT among coders may result in coders reaching different conclusions about whether a condition is properly supported by documentation in a medical record.

41. General diagnosis coding guidance, results of CMS RADV audits, and ever-evolving industry guidance are all important sources of information for coders to consider. The available guidance changed (and continues to change) as diagnosis codes are published. Additionally, in certain instances, the available coding guidance lacks clarity, which makes it challenging for chart review coders to interpret and apply the available coding guidance in a similar manner. Even when guidance is available, coders may still have questions about what diagnosis codes are supported based on what information is documented in the medical record. In response to a series of questions posed by MA Plans, CMS recognized this complexity and the individualized nature of diagnosis code assignment and noted it is "unable to respond specifically to individual questions regarding risk adjustment requests for interpretation of RADV coding and reporting questions as a full review of the

---

[26] **See** AHIMA, *Cut Through the ICD-10 Noise with Documentation Guidelines*, (last updated Jan. 2015), available at https://bok.ahima.org/doc?oid=300844.

CONFIDENTIAL

documentation is required before reporting or coding any diagnosis. For the purposes of risk adjustment data validation, all review is considered on a case by case basis due to multiple coding rules that may apply."[27] The necessary interpretation of the changing guidance from various sources can lead coders to apply the guidance differently and ultimately find different diagnosis codes supported in medical records.

<u>Human Errors</u>

42.  Coders also reach different conclusions as to which diagnosis codes are supported in a medical record because of human error. Coders review large volumes of technical medical documentation from a variety of sources and apply their judgment to determine which conditions are supported by documentation in a medical record. This may include reviewing information in varied formats with challenging handwriting and unique, unfamiliar abbreviations. This may also include long days reviewing medical records, some of which can be very complicated and hundreds of pages long. For example, records for multi-day stays in a hospital or emergency department, where the providers must detail every checkpoint, result, and decision, can be 75-100 pages long for each encounter. Medicare beneficiaries tend to have particularly voluminous records, as it is not uncommon for them to have multiple acute and chronic conditions. Based on a 2010 study, 36.4% of Medicare beneficiaries had four or more chronic conditions.[28] All of this can lead coders to experience fatigue while reviewing medical records, which can result in mistakes, including missed diagnosis codes.

43.  Coders also sometimes mistype the diagnosis code at issue. For instance, coders might accidentally type in a similar, yet different, code than the one intended. For example, ICD-9-CM 402.01 (hypertensive heart disease, malignant, with heart failure) is a high-severity code, and ICD-9-CM 402.10 (hypertensive heart disease, benign, without heart failure) is

---

[27] CMS, *Question and Answer Session – CY 2011 RADV Industry Training* at 2 (last updated, March 20, 2014), available at https://www.cms.gov/Medicare/Medicare-Advantage/Plan-Payment/Downloads/radvtrainingquestions.pdf.

[28] *See* Kimberly Lochner & Christine Cox, *Prevalence of Multiple Chronic Conditions Among Medicare Beneficiaries, United States, 2010* (last updated Apr., 25, 2013), available at https://www.cdc.gov/pcd/issues/2013/12_0137.htm.

CONFIDENTIAL

September 29, 2023 Expert Report of Barbara Blair

a less severe code,[29] but the codes are almost the same. This typographical error, while simple, is not uncommon.

44. Organizations that administer coder guidelines and training acknowledge that coders cannot be expected to be correct 100% of the time. AHIMA notes that a minimum of 95% (not 100%) is best practice for coding quality standards.[30] CMS historically has also targeted an 85-95% consistency standard for its Inter-Rater Reliability (IRR) quality control measures used in audit activities of non-MA Plan data.[31] Furthermore, actual error rates may be higher than these numbers suggest, as these targets and thresholds do not guarantee that those levels are actually achieved.

Transition from ICD-9-CM to ICD-10-CM Code Sets

45. While providers had used the ICD-9 diagnosis code set since 1979, CMS mandated that providers exclusively use the ICD-10 diagnosis code set beginning in October 2015. This increased the total number of diagnosis codes fivefold and created a substantial number of new diagnosis codes that providers and coders needed to consider when reviewing medical records. Requiring this change midyear added more confusion for coders reviewing a medical record with patient visits in 2015.

46. Due to the transition from ICD-9 to ICD-10, coders performing a chart review for patient visits in 2015 had to consider whether the date of service was before or after October 1, 2015. If the date of service was before October 1, 2015, the coder had to use ICD-9 diagnosis codes. If the date of service was on or after October 1, 2015, the coder had to use ICD-10 diagnosis codes. This added layer of complexity could lead to coders missing diagnosis codes that were supported by documentation in the medical record.

47. As noted previously, the diagnosis code sets vary greatly in form and structure. Given that ICD-10 added tens of thousands of additional unique diagnosis codes, the code sets cannot be compared in a one-to-one manner. For example, a provider may have diagnosed a patient experiencing severe neck pain after a fall with a broken neck (first cervical vertebra). The

---

[29] *See* CDC, *ICD-9-CM Index to Diseases (FY12)*, at Dindex12.zip, available at
https://ftp.cdc.gov/pub/Health_Statistics/NCHS/Publications/ICD9-CM/2011/.

[30] *See* AHIMA, *Benchmarking Coding Quality – Audio Seminar/Webinar* (2008).

[31] *See* 45 CFR § 153.630(b)(8).

CONFIDENTIAL

Case 2:16-cv-08697-FMO-PVC    Document 616-8    Filed 08/06/24    Page 87 of 887
Page ID #:20163
September 29, 2023 Expert Report of Barbara Blair

23

relevant diagnosis would be a fracture of the first cervical vertebra. While there is one code for this diagnosis in ICD-9, there are ten possible diagnosis codes under ICD-10. If this diagnosis occurred on or after October 1, 2015, a coder was tasked with determining which specific ICD-10 diagnosis code, from the choice of ten, applied based on the type and severity of the broken neck. Figure 3 below shows the one ICD-9 code related to a fracture of the first cervical vertebra, along with the corresponding ten possible ICD-10 codes. Providers would also have to learn how to document with the level of detail and specificity that aligned with and would support the new ICD-10 codes.

**Figure 3: ICD-9-CM to ICD-10-CM Translation [32]**

| Fracture of First Cervical Vertebra (Broken Neck) | | | |
|---|---|---|---|
| **ICD-9-CM** | | **ICD-10-CM** | |
| **Code** | **Code** | **Code** | **Code Description** |
| 805.01 | Closed fracture of first cervical vertebra | S12.000A | Unspecified displaced fracture of first cervical vertebra, initial encounter for closed fracture |
| | | S12.001A | Unspecified nondisplaced fracture of first cervical vertebra, initial encounter for closed fracture |
| | | S12.01XA | Stable burst fracture of first cervical vertebra, initial encounter for closed fracture |
| | | S12.02XA | Unstable burst fracture of first cervical vertebra, initial encounter for closed fracture |
| | | S12.030A | Displaced posterior arch fracture of first cervical vertebra, initial encounter for closed fracture |
| | | S12.031A | Nondisplaced posterior arch fracture of first cervical vertebra, initial encounter for closed fracture |
| | | S12.040A | Displaced lateral mass fracture of first cervical vertebra, initial encounter for closed fracture |
| | | S12.041A | Nondisplaced lateral mass fracture of first cervical vertebra, initial encounter for closed fracture |
| | | S12.090A | Other displaced fracture of first cervical vertebra, initial encounter for closed fracture |
| | | S12.091A | Other nondisplaced fracture of first cervical vertebra, initial encounter for closed fracture |

Gray Areas of Diagnosis Coding

48. There are several additional areas in which coding involves a degree of subjectivity (often called "gray areas"), because they are open for interpretation and debated among medical coders and even the organizations that offer diagnosis coding guidance. There is

---

[32] *See* CDC, *ICD-9-CM Index to Diseases (FY12)*, at Dindex12.zip, available at
https://ftp.cdc.gov/pub/Health_Statistics/NCHS/Publications/ICD9-CM/2011/ and CDC, *FY 2016 release of ICD-10-CM - ICD-10-CM List of codes and Descriptions,* available at https://www.cdc.gov/nchs/data/icd/icd10cm/2016/ICD10CM_FY2016_code_descriptions.zip.

CONFIDENTIAL

voluminous discussion and debate about these gray areas within the healthcare industry, and coders and applicable organizations like AHIMA or CMS frequently cannot agree on how to handle these topics. Since coders and the industry may have differing views on how to approach these gray areas, and because the guidance may be unclear or confusing, there is no uniform way for coders to resolve gray areas. Importantly, MA Plan coders performing a blind chart review may approach coding gray areas differently based on their knowledge and experience which may differ from that of the provider or coder in the provider's office that submitted diagnosis codes on the claim, which can cause discrepancies between the diagnosis codes identified by both.

49. When coders encounter gray areas, they may devote significant time and attention to try to resolve these gray areas and determine if a diagnosis code is properly supported by documentation in the medical record. This may result in a coder missing other diagnosis codes that may in fact be supported by documentation in the medical record. For example, a coder may spend a significant amount of time reviewing the medical record for a particular condition to try to identify whether there are enough details in the medical record to support that the condition is current and can be coded. The MA Plan coder may miss other properly supported diagnoses in the medical record because they are focused on assessing these gray areas that lack clarity or consistency in coding guidance.

50. Some of the most common gray areas that can cause coding discrepancies are the appropriate handling of "problem lists" and "chronic conditions," which are discussed in more detail below. The overarching concern is that most diagnosis coding guidelines require, among other things, that a condition be present or current on the date the patient visits their provider for a diagnosis code to be supported by documentation in the medical record. However, uniform and consistent handling of these gray areas adds complexity to the review of documentation to assess if a diagnosis code is supported. While regulators and the healthcare industry recognize this and attempt to clarify gray areas, disagreements remained unresolved for long periods of time in many cases and some remain unresolved today, rendering it difficult for coders to consistently approach these areas.

CONFIDENTIAL

Gray Areas of Diagnosis Coding - Problem Lists

51. Providers use many different parts of a patient's medical record to keep track of a patient's history and current visit. Problem lists are a running list or database of the patient's diagnoses and are one part of a medical record that a provider may use to maintain information about a patient. This list may be on a sheet of paper within the patient's physical record or in a specific area in the EMR.

52. Problem lists have historically caused confusion because CMS guidance regarding problem lists varied over time. In 2008, CMS stated, "an acceptable problem list must be comprehensive and show evaluation and treatment for each condition that relates to an ICD-9 code on the date of service, and it must be signed and dated by the physician or physician extender."[33] This guidance defines the problem list as a portion of the medical record capturing only those conditions that are treated on a specific date of service. Under this definition, a coder can often rely on a signed and dated problem list to identify supported diagnosis codes because it includes a list of a patient's diagnoses current at the time of the visit diagnoses.

53. EMRs introduced further ambiguity and a lack of clarity regarding when the conditions listed in a problem list should be coded or not. In 2019, CMS issued guidance that applied retroactively to audits commencing after September 27, 2017 and covered dates of service going back as far as 2013. The guidance stated, "[p]roblem lists are evaluated on a case-by-case basis when the problem list is not clearly dated as part of the face-to-face encounter indicated on the coversheet, or there are multiple dates of conditions both before and after the DOS."[34] In other words, CMS acknowledged the fact that problem lists may or may not relate to a given date of service, so the guidance left it to the discretion of individual coders to determine whether a problem list included sufficient details regarding what diagnoses were current. The change in guidance, as well as the lack of additional guidance

---

[33] CMS, *2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide* at Section 7.2.4.3., available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2012183293-yv-participant-guide-publish_052909.pdf.

[34] CMS, *Contract-Level Risk Adjustment Data Validation Medical Record Reviewer Guidance In effect as of 03/20/2019* at 42, (last updated, Nov. 14, 2018), available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/Medical-Record-Reviewer-Guidance.pdf.

CONFIDENTIAL

clarifying how individual coders should exercise their discretion on a case-by-case basis, makes it difficult for coders to use problem lists uniformly.

<u>Gray Areas of Diagnosis Coding – Chronic Conditions</u>

54. Chronic conditions have historically been another coding gray area and a source of debate and discrepancies. "Chronic conditions" are generally defined as conditions that are ongoing, last an extended period of time (sometimes defined as a year or more), and either require continuous medical maintenance or routinely limit daily activities. Examples of chronic conditions include heart disease, cancer, and diabetes.[35] A patient might not have discussed her chronic condition at each visit she had with a provider. This did not mean the patient no longer had that medical condition. The provider might in fact have taken the chronic condition into account when considering treatment for other conditions addressed at a patient visit and might have included documentation supporting chronic condition diagnoses. Coders may disagree, however, as to whether a provider has adequately documented a particular chronic condition in the medical record. Providers may take varying amounts of time to document each chronic condition assessed as part of a visit, which can lead to varying judgment calls for coders reviewing medical records.

55. Furthermore, the coding guidance varies depending on the care setting. In the inpatient setting, guidance published by the Coding Clinic notes that chronic systemic diseases should generally be coded even in the absence of documented intervention or further evaluation at the time of care.[36] In other words, MEAT, or a similar coding standard, is not required to support diagnosis codes in the inpatient setting for these diseases. The official ICD guidance for outpatient services, on the other hand, instructs coders to code chronic diseases "as many times as the patient receives treatment and care for the conditions(s)" but also specifies that coders should "code all documented conditions that coexist at the time of the encounter/visit and require or affect patient care treatment or management."[37]

---

[35] **See** CDC, *About Chronic Diseases*, available at  https://www.cdc.gov/chronicdisease/about/index.htm#:~:text=Chronic%20diseases%20are%20defined%20broadly,disability%20in%20the%20United%20States.

[36] **See** AHA, Coding Clinic for ICD-9-CM, Volume 24, Number 3, Third Quarter, 2007 at 13-14.

[37] CMS, *ICD-9-CM Official Guidelines for Coding and Reporting: FY 2011*, available at https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf.

CONFIDENTIAL

Setting aside the fact that coders may be unsure how to interpret the two pieces of outpatient guidance in tandem, the Coding Clinic and official ICD guidance on chronic conditions differ. Certain coders may find that a record that simply lists the diagnoses is sufficient to support a code, based on the Coding Clinic Guidance, while an MA Plan coder may find that record insufficient by mistakenly applying the additional requirements included in the outpatient guidelines to an inpatient record.

***Opinion Two: During blind chart reviews, if a coder does not identify a diagnosis code that a healthcare provider submitted on a claim to the MA Plan, that code may still be supported by documentation in the patient's medical record.***

56. Due to the many complexities detailed above, an MA Plan coder conducting a blind chart review may not identify diagnosis codes that a provider submitted on the claim that are in fact supported by documentation in the medical record.

57. As an initial matter, for all of the reasons discussed above, an MA Plan coder may fail to identify a properly supported diagnosis code due to differences in coder experience, the limited availability or quality of provider documentation, the wide variety of available guidance subject to individual interpretation and judgment, the potential for human error, and changes in diagnosis code sets. It is therefore possible that a provider or a coder in the provider's office will identify a properly supported diagnosis code that an MA Plan chart review coder will not identify during their blind chart review. Simply because the MA Plan coder does not identify the same diagnosis code during a blind chart review does not mean the code is not supported by documentation in the medical record.

58. A coder in the provider's office may be better situated to identify many properly supported diagnosis codes. For instance, coders in a provider's office may have access to a more complete set of the patient's medical records than an MA Plan coder. They are also more familiar with the provider and the provider's specialty and more likely to be able to interpret a provider's handwriting, abbreviations, or other documentation practices or be able to ask the provider to clarify what is documented in the record. All of these factors can lead to additional diagnosis codes submitted on a claim than those an MA Plan coder identifies in a blind chart review.

CONFIDENTIAL

59. To give an example, the hypothetical condensed medical record shown in Figure 4 had no date specifically assigned to the problem list. The coder responsible for reviewing the medical record in the provider's office might have reviewed the record and found support in documentation outside the problem list for all conditions on the problem list except for respiratory failure. That coder might have included a diagnosis code for respiratory failure on the claim because the updated language about "fitting for nasal cannula scheduled" associated with respiratory failure was added to the record on the date of service, which means that respiratory failure was, in fact, a current condition for this patient, even if respiratory failure was only included in the problem list section of the medical record. At a later date, an MA Plan coder was asked to do a blind review on the same medical record. The MA Plan coder might have determined that because there is no date on the problem list and the information within it, they are unable to support the coding of respiratory failure during their review. In this case, a MA Plan coder did not code for respiratory failure during a chart review, while the original coder properly included it as a diagnosis code on the claim.

**Figure 4: Supported Diagnoses – Only Noted in Problem List**

- Jane Smith, MD – 1/1/2016
- John Doe (1/1/1948)
- **Chief Complaint:** Annual Wellness Visit
- **History of Present Illness:** Patient last seen during semi-annual visit
- **Medication:** Aspirin, Coumadin (1/1/2016)
- **Medical History/Problem List:** Depression, DVT right leg, High blood pressure, Respiratory Failure – has fitting for nasal cannula scheduled
- **Exam:** Well-nourished, well-developed male, right leg swelling decreased
- **Assessment/Plan:** Renew medications, HTN - stable, Depression - stable, DVT resolving

60. Another example where an MA Plan coder may fail to identify a diagnosis that is supported by the medical record is when a diagnosis is not explicitly linked to the management of that diagnosis in the provider documentation. For instance, the hypothetical medical record in Figure 5 included COPD on the patient's problem list. The chart also documented that the provider renewed the medication Albuterol, a medication used to treat COPD, but did not explicitly mention COPD otherwise in the note. The claim may have contained the diagnosis code for COPD given the renewal of the medication, whereas an MA Plan chart review coder may not have coded the diagnosis since the provider did not explicitly document the language "COPD" outside of the problem list or in relation to the Albuterol

renewal. While the Albuterol was not specifically linked to a COPD diagnosis in the chart, COPD was the only past condition that would require this medication, and the orders noted that Albuterol was being renewed, indicating the COPD was still current. A coder at the provider's office may have drawn this linkage and been comfortable including this diagnosis code on the claim given the "case-by-case" guidance around problem lists.

**Figure 5: Supported Diagnoses – Diagnosis Not Linked to Medication**

- Jane Smith, MD – 1/1/2018
- John Doe (1/1/1948)
- **Chief Complaint:** High blood pressure
- **History of Present Illness:** Persistent headache, coinciding with elevated blood pressure
- **Medication:** Lisinopril, Albuterol
- **Medical History/Problem List:** COPD, High Blood Pressure
- **Exam:** Well-nourished, well-developed male
- **Assessment/Plan:** Increase dosage of Lisinopril
- **Orders:** Change dose of Lisinopril to 10mg and renew Albuterol

61. Further, an MA Plan coder may fail to identify a specific diagnosis code related to a diabetic complication. There are a wide range of diagnosis codes associated with diabetes, which can cause discrepancies. Depending on the diabetes diagnosis code selected, the diagnosis code may correspond to different risk adjustment categories that range in severity (e.g., Diabetes with Acute Complications, Diabetes with Chronic Complications, and Diabetes without Complications). An MA Plan coder may see diabetes supported by the medical record but assume the diabetes does not have complications because the record does not include an additional diagnosis for the complication. The coder, on the other hand, may have more intimate knowledge of the patient's current diagnoses and can identify a diabetes diagnosis with complications. For instance, if the provider or coding personnel at the provider's office reviewed the record and noted an order for an arterial scan of the lower legs, which subsequently showed a diagnosis of peripheral artery disease, then they might have coded diabetes with complications. Guidance from the Coding Clinic, the coding index for ICD-10, and RADV Reviewer Guidance has differed over time on whether the linkage between diabetes and the complication can be assumed.[38] As demonstrated in

---

[38] Coding Clinic advice prior to Q2 2009 instructed coders to not assume a causal relationship between diabetes and certain manifestations as the physician should establish the relationship with terms such as "due to diabetes". After that, Coding Clinic noted that the language "with" was sufficient to demonstrate the diabetes was due to or associated with the other condition. Finally, in RADV Reviewer Guidance, it notes diabetes should be listed on the same line as the condition to consider it linked. *See* AHA, Coding Clinic for ICD-9-CM, Second

September 29, 2023 Expert Report of Barbara Blair

Figure 6 below, the provider or coder assigning the diagnosis code on the claim may have assumed the linkage and included the diagnosis code for the complication, whereas an MA Plan coder might not have assigned a secondary code because they lacked the scan. An MA Plan coder might also not have assigned the secondary code because they might have used guidance that suggested there must be explicit linkage in order to code the secondary code.

**Figure 6: Supported Diagnoses – Diabetes Specification**



62. These examples illustrate where an MA Plan coder may not identify a diagnosis code during the chart review that is in fact supported by documentation in the chart. The inclusion of this diagnosis code on the claim submitted to the MA Plan may in fact be appropriate because the provider or coder in the provider's office believed it was supported, whether because of experience with documentation related to a specific condition, access to additional medical records or information, a reliance on specific guidance, or any of the other reasons discussed above.

---

Quarter, 2009 and CMS, *Contract-Level Risk Adjustment Data Validation Medical Record Reviewer Guidance In effect as of 03/20/2019* at 42, (last updated, Nov. 14, 2018), available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/Medical-Record-Reviewer-Guidance.pdf.

CONFIDENTIAL

September 29, 2023 Expert Report of Barbara Blair

## V.    Conclusion

63. This report presents a summary of my work and opinions to date.

## VI.    Exhibits

Exhibit A – Curriculum Vitae

Exhibit B – Documents Relied Upon

CONFIDENTIAL



# Exhibit A

## BARBARA BLAIR

**ACADEMIC BACKGROUND:**

| | | |
|---|---|---|
| University of Rochester | M.S.N. | 1992 |
| University of Rochester | B.S.N. | 1991 |
| Rockland Community College | A.S. | 1986 |

**CERTIFICATIONS AND LICENSES:**

Certified Coding Specialist (CCS) - 2000

Certified Professional Coder (CPC) - 2004

Certified Professional Compliance Officer (CPCO) - 2013

Certified Risk Adjustment Coder (CRC) - 2016

Certificate of Completion for Certified Documentation Expert Inpatient (CDEI) - 2022

AHIMA Certified ICD-10-CM/PCS Trainer - 2013

Licensed Registered Nurse

Licensed Nurse Practitioner (Adult) - Retired

**PROFESSIONAL AFFILIATIONS:**

American Academy of Professional Coders (AAPC)

American Health Information Management Association (AHIMA)

American Association of Adult Nurse Practitioners (AANP)

**EMPLOYMENT:**

| | |
|---|---|
| 2003 – Present: | FTI Consulting, Inc., Senior Director (current position), |
| 2000 – 2003: | KPMG LLP, Manager |
| 1998 – 2000: | Orion Consulting Inc., Manager |

EXHIBIT A

1997 – 1998:                          Successful Solutions Inc., Manager

1995 – 1997:                          Hyatt, Imler, Ott & Blount LLP, Associate

**SELECT PROFESSIONAL EXPERIENCE:**

- Independent Review Organization (IRO): Lead reviewer on over a dozen reviews multi-year reviews for providers such as health systems, hospitals and medical centers, operating under Corporate Integrity Agreements with the U.S. Department of Health and Human Services Office of Inspector General (HHS OIG) for over 20 years.

- Risk Adjustment Data Validation (RADV) Audits: Lead reviewer on responses to RADV audits conducted by the Department of Health and Human Services (HHS) for over a decade. Assisted Medicare Advantage and commercial health plans and health systems with responses to Centers for Medicare & Medicaid Services (CMS) RADV audits, HHS audits and other RADV-like audit requests. The dates of service reviewed and analyzed spanned from 2007 through current. Frequently served in the capacity of a second level and quality control reviewer on large coding teams.

- Coding Reviews: Over the past 20 years, I have performed coding and clinical reviews to provide expertise and guidance for many different types of work. I have advised on corrective action and coding best practices based on the findings of reviews. These reviews included, but are not limited to the following:
  - Department of Justice (DOJ) investigations
  - Governmental response to contractor audits conducted by entities such as Recovery Audit Contractors, Medicare Administrative Contractors, Zone Program Integrity Contractors, Medicaid Integrity Contractors, etc.
  - Disputes between payers and providers
  - Due diligence for potential acquisitions
  - Support of general compliance initiatives such as work plans, internal audits and focused reviews

**EXPERT TESTIMONY IN PAST FOUR YEARS**

N/A

**PRESENTATIONS AND PUBLICATIONS – IN THE LAST TEN YEARS**

N/A

**CONTACT INFORMATION:**

Barbara Blair, Senior Director at FTI Consulting, Inc.
(561) 866-1667 - barbara.blair@fticonsulting.com



# Exhibit B

**Public Sources**

- Fact Sheet: Introduction to Medicare (https://www.cms.gov/outreach-and-education/find-your-provider-type/employers-and-unions/fs1-intro-to-medicare.pdf)

- Your Health Plan Options (https://www.medicare.gov/health-drug-plans/health-plans/your-health-plan-options)

- International Classification of Diseases, Tenth Revision, Clinical Modification (ICD-10-CM) (https://www.cdc.gov/nchs/icd/icd-10-cm.htm)

- International Classification of Diseases, (ICD-10-CM/PCS) Transition – Background (https://www.cdc.gov/nchs/icd/icd10cm_pcs_background.htm)

- ICD-10-CM Primer (https://library.ahima.org/doc?oid=106177)

- FY 2016 release of ICD-10-CM: ICD-10-CM List of Codes and Descriptions (https://www.cdc.gov/nchs/data/icd/icd10cm/2016/ICD10CM_FY2016_code_descriptions.zip)

- ICD-9-CM Index to Diseases (FY12) (https://ftp.cdc.gov/pub/Health_Statistics/NCHS/Publications/ICD9-CM/2011/)

- About the AHA (https://www.aha.org/about)

- Who We Are (https://www.ahima.org/who-we-are/about-us/)

- ICD-10-CM Official Guidelines for Coding and Reporting: FY 2016 (https://www.cms.gov/medicare/coding/icd10/downloads/2016-icd-10-cm-guidelines.pdf)

- ICD-9-CM Official Guidelines for Coding and Reporting: FY 2011 (https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf)

- What is Coding Clinic for ICD-10-CM and ICD-10-PCS? (https://www.codingclinicadvisor.com/about-icd-10-coding)

- Certified Professional Coder (CPC)® certification (https://www.aapc.com/certifications/cpc)

- Certified Risk Adjustment Coder (CRC)® certification (https://www.aapc.com/certifications/crc)

- Medical Record Entries: What Is Timely and Reasonable? (https://www.aapc.com/blog/25667-medical-record-entries-what-is-timely-and-reasonable)

1314

EXHIBIT B

- National Trends in Hospital and Physician Adoption of Electronic Health Records (https://www.healthit.gov/data/quickstats/national-trends-hospital-and-physician-adoption-electronic-health-records)

- Cut Through the ICD-10 Noise with Documentation Guidelines (https://bok.ahima.org/doc?oid=300844)

- Question and Answer Session - CY 2011 RADV Industry Training (https://www.cms.gov/Medicare/Medicare-Advantage/Plan-Payment/Downloads/radvtrainingquestions.pdf)

- About Chronic diseases (https://www.cdc.gov/chronicdisease/about/index.htm)

- Prevalence of Multiple Chronic Conditions Among Medicare Beneficiaries, United States, 2010 (https://www.cdc.gov/pcd/issues/2013/12_0137.htm)

- 2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide  (https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2012183293-yv-participant-guide-publish_052909.pdf)

- Contract-Level Risk Adjustment Data Validation Medical Record Reviewer Guidance In effect as of 03/20/2019. (https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/Medical-Record-Reviewer-Guidance.pdf)

- 45 CFR § 153.630(b)(8).

**Other References**

- Coding Clinic for ICD-9-CM, Volume 26, Number 3, Third Quarter, 2009

- Coding Clinic for ICD-9-CM, Volume 24, Number 3, Third Quarter, 2007

- Coding Clinic for ICD-9-CM, Second Quarter, 2009

- AHIMA, Benchmarking Coding Quality – Audio Seminar/Webinar (2008)

**EXHIBIT D-55 INTENTIONALLY BLANK**

**EXHIBIT D-56**

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, Plaintiffs, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC. *et al.* Defendants | No. CV 16-08697 MWF (SSx) |

# Expert Report of Mark Duggan, PhD

# September 29, 2023

# CONFIDENTIAL

# (Specific pages also designated Attorneys' Eyes Only & Outside Counsel Only)

# Table of Contents

I.      Qualifications ................................................................................................. 1

II.     Case Background and Summary of Allegations .......................................... 2

III.    Assignment .................................................................................................... 5

IV.     Summary of Opinions .................................................................................. 6

V.      Background on FFS Medicare and Medicare Advantage ............................ 8

        A.      Key Characteristics of Health Insurance ......................................... 9

        B.      FFS Medicare .................................................................................. 11

        C.      Medicare Advantage ....................................................................... 14

VI.     The Medicare Advantage Program Has Provided Value to Plan Enrollees ..... 19

        A.      Medicare Advantage Plans Provide Medicare Beneficiaries with More Choices 20

        B.      Market Data and Academic Literature Indicate that Many Medicare Beneficiaries
                Have Preferred Medicare Advantage Plans to FFS Medicare .............................. 21

        C.      MA Plans Have Often Provided Better or More Efficient Care than FFS Medicare
                ........................................................................................................... 27

VII.    CMS Payments to MA Plans Are Based on Predicted Health Care Expenditures and
        Account for Enrollee Risk Profiles, Plan Quality, and Other Factors ............................. 31

        A.      CMS Pays MA Plans a Fixed Fee for Each Enrollee, Exposing Insurers to
                Financial Risk .................................................................................. 32

        B.      CMS Uses Risk Adjustment to Ensure that Payments to MA Plans Account for
                the Individual Risk of Each Enrollee within the Plan ............................. 33

        C.      CMS's Payments to Medicare Advantage Plans Are Based on Enrollee Risk
                Scores and Account for Plan Quality ................................................. 41

        D.      Reporting Complete Diagnosis Information Is Important for Medicare Advantage
                Insurers ............................................................................................ 50

        E.      CMS Adjusts the Fixed Payments to MA Plans to Account for Differences in
                Diagnosis Coding Patterns between MA Plans and FFS Medicare ...................... 52

VIII.   Requiring MA Plans to Delete Unsupported Diagnosis Codes without FFS Medicare
        Doing the Same Would Result in Improper Compensation to MA Plans ........................ 55

        A.      Requiring MA Plans to Identify and Delete Unsupported Diagnosis Codes Would
                Result in CMS Undercompensating MA Plans Relative to FFS Medicare when
                MA Plans and FFS Medicare Have an Identical Pool of Enrollees and Identical
                Unsupported Diagnosis Codes ......................................................... 56

        B.      When an MA Plan and FFS Medicare Have Different Pools of Enrollees or
                Different Probabilities of Unsupported Codes, Requiring MA Plans to Remove
                Unsupported Codes without FFS Medicare Doing the Same Would Result in
                Improper Compensation to MA Plans ............................................... 60

IX.    CMS's FFS Adjuster Study Is Flawed .............................................................................. 63

    A.    Overview of CMS Methodology to Estimate the Impact of Unsupported Codes in FFS Data on Payments to MA Plans .......................................................................... 66

    B.    CMS Uses a Flawed Methodology to Determine Whether an FFS Adjuster Is Necessary .......................................................................................................................... 67

    C.    CMS Uses Data Wholly Inadequate for the Task of Estimating the Impact of Unsupported Codes in FFS Data on the CMS-HCC Model ................................. 78

    D.    Contrary to the Conclusion of CMS's Flawed FFS Adjuster Study, an FFS Adjuster Is Necessary and Unsupported Diagnosis Codes that Exist in FFS Data Likely Impact Payments to MA Plans ................................................................... 82

X.    Economic Theory and Historical Evidence Indicate that Requiring MA Plans to Remove Unsupported Diagnosis Codes Would Result in Higher Prices or Less Generous Plans . 85

    A.    If Payments to MA Plans Decline, Some MA Plans Would Increase Their Bids, Thereby Increasing Government and Enrollee Expenses, or Increase Enrollee Cost Sharing ............................................................................................................................... 86

    B.    If Payments to MA Plans Decline, Some MA Plans Would Reduce the Quality of Benefits Provided ............................................................................................................. 90

    C.    If Payments to MA Plans Decrease, Some MA Plans Would Exit the Market, Reducing the Number of Options Available to Consumers .................................... 91

    D.    Correctly Estimating the Change in Government Payments to UnitedHealth, If UnitedHealth Were Required to Identify and Delete Unsupported Codes, Requires Accounting for Behavioral Responses from MA Plans ......................................... 93

## I.    Qualifications

1.      I am the Wayne and Jodi Cooperman Professor of Economics at Stanford University and the Trione Director of the Stanford Institute for Economic Policy Research. I received my B.S. and M.S. degrees in Electrical Engineering from the Massachusetts Institute of Technology in 1992 and 1994, respectively, and my Ph.D. in Economics from Harvard University in 1999. From 2009 to 2010, I served as the Senior Economist for Health Care Policy on the Council of Economic Advisers to the Executive Office of the President. I have previously served as a visiting or regular faculty member at the Wharton School of the University of Pennsylvania, the University of Maryland, the University of Chicago, and the Massachusetts Institute of Technology.

2.      I am an expert in health economics. My research focuses on the effects of government programs such as Medicare, Medicaid, and Social Security on individuals and firms. I have studied diverse topics such as pharmaceutical pricing and utilization under the Medicare Part D and Medicaid programs,[1] the effectiveness of Medicare prescription drug coverage for seniors,[2] reimbursement issues in Medicare Advantage,[3] and health insurance industry dynamics.[4] My research has been published in leading economics journals, including the American Economic Review, the Journal of Political Economy, and the Quarterly Journal of Economics. I serve on

---

[1] Mark Duggan and Fiona Scott Morton, "The Distortionary Effects of Government Procurement: Evidence for Medicaid Prescription Drug Purchasing," *Quarterly Journal of Economics*, 121(1), 2006, pp. 1–30; Mark Duggan and Fiona Scott Morton, "The Effect of Medicare Part D on Pharmaceutical Prices and Utilization," *American Economic Review*, 100(1), 2010, pp. 590–607; Mark Duggan and Fiona Scott Morton, "The Medium-Term Impact of Medicare Part D on Pharmaceutical Prices," *American Economic Review*, 101(3), 2011, pp. 387–392; Abby Alpert, et al., "Perverse Reverse Price Competition: Average Wholesale Prices and Medicaid Pharmaceutical Spending," *Journal of Public Economics*, 108, 2013, pp. 42–62.

[2] Mark Duggan, et al., "Providing Prescription Drug Coverage to the Elderly: America's Experiment with Medicare Part D," *Journal of Economic Perspectives*, 22(4), 2008, pp. 69–92.

[3] Jason Brown, et al., "How Does Risk Selection Respond to Risk Adjustment? Evidence from the Medicare Advantage Program," *American Economic Review*, 104(10), 2014 ("Brown et al., How Does Risk Selection Respond to Risk Adjustment"), pp. 3335–3364; Mark Duggan, et al., "Who Benefits when the Government Pays More? Pass-through in the Medicare Advantage Program," *Journal of Public Economics*, 141, 2016 ("Duggan et al., Who Benefits when the Government Pays More"), pp. 50–67.

[4] Leemore Dafny, et al., "Paying a Premium on Your Premium? Consolidation in the Health Insurance Industry," *American Economic Review*, 102(2), 2012, pp. 1161–1185; Mark Duggan, et al., "The Consequences of Health Care Privatization: Evidence from Medicare Advantage Exits," *American Economic Journal: Economic Policy*, 10(1), 2018 ("Duggan et al., The Consequences of Health Care Privatization"), pp. 153–186; Hui Ding, et al., "Getting the Price Right? The Impact of Competitive Bidding in the Medicare Program," forthcoming at *Review of Economics and Statistics*.

the editorial board of the Journal of Policy Analysis and Management and previously served as a Co-Editor for the American Economic Journal: Economic Policy and for the Journal of Public Economics. I have also taught courses on health economics, public economics, and econometrics at the undergraduate and graduate levels and received the Stanford University Economics Department Distinguished Faculty Teaching Award in 2022. I received the 2010 ASHEcon Medal from the American Society of Health Economists, awarded once every two years to the leading health economist in the United States under the age of forty.

3.      I have received several research grants from the Social Security Administration, National Science Foundation, other federal agencies, and private foundations to support my research. I am frequently invited to present my work at professional conferences and invited seminars. I have testified to Congress about my research on three occasions. My curriculum vitae, including a list of my prior testimony from the past four years and my published works, is attached as **Appendix A**.

4.      For my work on this matter, I am being compensated at my standard billing rate of $1,000 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

## II.      Case Background and Summary of Allegations

5.      UnitedHealth Group Incorporated ("UnitedHealth") is a health care company with diversified businesses that fall under two platforms: health benefits and health services. The health benefits platform, UnitedHealthcare, provides health insurance. The health services platform, Optum, offers pharmacy, health care financial, and other services.[5]

6.      UnitedHealth serves different customers and markets, such as employers and individual consumers through UnitedHealth Employer & Individual, and retirees and Medicare beneficiaries through UnitedHealth Medicare & Retirement. UnitedHealth Medicare &

---

[5] UnitedHealth Group Incorporated, SEC Form 10-K for period ended December 31, 2021, filed on February 15, 2022 ("UnitedHealth 2021 Form 10-K"), pp. 1–2.

Retirement offers different products, including Medicare Advantage ("MA") plans and Medicare Part D plans for seniors and other eligible Medicare beneficiaries.[6]

7.     As described in more detail in Section V, Medicare beneficiaries can choose to receive their health benefits through MA plans managed by private insurers such as UnitedHealth rather than through the traditional Medicare fee-for-service program ("FFS Medicare") that is managed by the federal government through the Centers for Medicare & Medicaid Services ("CMS"). The program is referred to as FFS Medicare because providers are paid based on the care that they deliver. FFS Medicare is sometimes called "Traditional Medicare," or "TM." For Medicare beneficiaries who elect to enroll in an MA plan, CMS pays the private insurers to coordinate and finance health benefits.[7]

8.     In order to determine the amount that CMS will pay for each Medicare beneficiary who selects an MA plan, private insurers that provide MA plans are required to submit information using CMS's Risk Adjustment Processing System ("RAPS") on enrollees' diagnoses stemming from one or more health care encounters.[8] Each submission needs to cover the following items: the Medicare enrollee's identification number, the date(s) of the health care encounter, the type of provider (e.g., physician or hospital), and the diagnosis code(s) reported by the provider for the encounter.[9]

9.     In this matter, Plaintiffs allege that since 2005, UnitedHealth has conducted programs and engaged in activities to increase the number of diagnoses submitted to CMS.[10] Plaintiffs

---

[6] UnitedHealth 2021 Form 10-K, pp. 1, 4–5.

[7] "What is Medicare Part C?," *U.S. Department of Health & Human Services*, August 3, 2021 ("HHS, What is Medicare Part C"), available at https://www.hhs.gov/answers/medicare-and-medicaid/what-is-medicare-part-c; "Medicare Managed Care Manual Chapter 8 – Payments to Medicare Advantage Organizations," *Centers for Medicare & Medicaid Services,* revised September, 19, 2014 ("CMS, Medicare Managed Care Manual Chapter 8"), §§ 10, 140.2, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/mc86c08.pdf.

[8] Beginning in 2016, CMS also began incorporating data submitted by MA plans to its "encounter data system," in addition to RAPS, to generate risk scores. MA plans submit detailed information about each encounter between MA enrollees and health care providers to the encounter data system. Over the period 2016–2021, CMS calculated risk scores using a combination of RAPS data and encounter data, with an increasing emphasis on encounter data over time. As of 2022, CMS has based risk scores for MA plans entirely on encounter data. See "Report to the Congress: Medicare Payment Policy," *MedPAC*, March 2022 ("MedPAC, Report to the Congress"), p. 433, available at https://www.medpac.gov/wp-content/uploads/2022/03/Mar22_MedPAC_ReportToCongress_v3_SEC.pdf.

[9] "Medicare Managed Care Manual Chapter 7 – Risk Adjustment," *Centers for Medicare & Medicaid Services*, revised September 19, 2014, ("CMS, Medicare Managed Care Manual Chapter 7"), § 120, Table 12, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/mc86c07.pdf.

[10] United States' Amended Complaint-In-Partial-Intervention and Demand for Jury Trial, *United States of America ex rel. Benjamin Poehling v. UnitedHealth Group, Inc. et al.*, November 17, 2017 ("Complaint"), ¶ 122 ("Defendants conducted millions of medical record reviews as part of their revenue-generating national Chart Review program.").

further allege that UnitedHealth knew that many of the subsequent diagnoses reported by its providers "were not supported and validated by the beneficiaries' medical records."[11] Plaintiffs also assert that MA plans "are obligated to delete invalid diagnoses previously submitted by them to RAPS or to use other available means to return […] payments based on invalid diagnoses," and that these deletions represent the main mechanism by which CMS can ensure that its compensation to MA plans is proper or that it recovers improper compensation that it made.[12] Plaintiffs allege that UnitedHealth knew that it was "obliged to undertake good faith efforts to identify and delete those unsupported and invalid diagnoses," but that it failed to either delete these unsupported diagnoses in the RAPS program or to return the overcompensation generated by these unsupported diagnoses.[13] Plaintiffs allege that, as a result, UnitedHealth received MA risk-adjustment payments to which it was "not entitled," and that UnitedHealth failed to return the overcompensation to UnitedHealth.[14]

10.    Moreover, there has been discussion as to whether CMS needs to account for unsupported codes in the FFS data when assessing whether compensation to MA plans is proper. In October 2018, CMS put forth a study (the "FFS Adjuster Study") in which it claimed that unsupported codes in FFS data do not "systematically" impact CMS's payments to MA plans, and therefore that there is no need for CMS to account for such unsupported codes when assessing whether MA plans were overpaid.[15] In 2023, CMS adopted a "Final Rule" which finalized CMS's decision to not apply an "FFS adjuster" that would account for unsupported codes in FFS data when assessing payments to MA plans.[16]

---

[11] Complaint, ¶ 122.

[12] Complaint, ¶ 103.

[13] Complaint, ¶¶ 122, 342.

[14] Complaint, ¶ 342 ("Specifically, Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program. In particular, Defendants knowingly and improperly failed to delete in the RAPS system the invalid diagnoses that had been submitted to the Medicare Program for risk adjustment payments which were made by the Medicare Program to them or knowingly and improperly failed to otherwise return to the Medicare Program the overpayments based on the invalid diagnoses.").

[15] "Fee for Service Adjuster and Payment Recovery for Contract Level Risk Adjustment Data Validation Audits," *Centers for Medicare & Medicaid Services*, October 26, 2018 ("CMS, FFS Adjuster Study"), p. 5, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/FFS-Adjuster-Excecutive-Summary.pdf.

[16] Centers for Medicare & Medicaid Services and U.S. Department of Health & Human Services, Final Rule, "Medicare and Medicaid Programs; Policy and Technical Changes to the Medicare Advantage, Medicare Prescription Drug Benefit, Program of All-Inclusive Care for the Elderly (PACE), Medicaid Fee-For-Service, and Medicaid Managed Care Programs for Years 2020 and 2021," *Federal Register*, 88(21), February 1, 2023, pp. 6643–6665 ("CMS Final Rule"), available at https://www.govinfo.gov/content/pkg/FR-2023-02-01/pdf/2023-01942.pdf.

11.    I understand from counsel for UnitedHealth that the damages period ends in 2017.

### III.    Assignment

12.    I have been retained by counsel for UnitedHealth to evaluate several topics:

- First, I have been asked to provide historical information about FFS Medicare and MA, including explaining how MA compares to FFS Medicare;

- Second, I have been asked to evaluate whether the MA program has provided benefits to Medicare enrollees;

- Third, I have been asked to explain how CMS compensates MA plans for insuring Medicare enrollees;

- Fourth, I have been asked to evaluate whether MA plans would be properly compensated if they were required to identify and delete unsupported diagnosis codes;

- Fifth, I have been asked to evaluate the methodology and conclusions of CMS's FFS Adjuster Study; and

- Finally, I have been asked to evaluate, as a matter of economic theory, whether and how private insurers such as UnitedHealth would respond if they had been required to identify and delete unsupported diagnosis codes without the government making any changes in how MA plans are paid.

13.    In the process of preparing this report, I have reviewed a variety of documents, including academic articles, reports from organizations such as the Medicare Payment Advisory Commission, documents and depositions produced in this matter, and CMS's FFS Adjuster Study. A complete list of the documents that I have relied upon in forming my opinions is attached as **Appendix B**.

14.    My work in this matter is ongoing. I reserve the right to update my opinions as additional information becomes available.

## IV.    Summary of Opinions

15.    First, I conclude that the MA program has provided value to plan enrollees (Section VI). MA plans provide Medicare beneficiaries with a greater number of health insurance plans to choose from, making it possible for individuals to choose a plan that better fits their preferences and needs. Consistent with this, data on Medicare enrollment indicates that many Medicare beneficiaries have preferred MA plans to FFS Medicare: the share of Medicare beneficiaries choosing MA has increased from 13 percent in 2003 to 51 percent in 2023. There are several reasons why Medicare beneficiaries may prefer MA plans over FFS Medicare, including that most MA enrollees enjoy benefits not available to enrollees in FFS Medicare (e.g., coverage for eye exams and glasses, dental and fitness benefits, and hearing aids) and that MA enrollees frequently pay less in premiums than FFS Medicare enrollees for plans with comparable or more extensive coverage. Evidence also indicates that MA plans have often provided more efficient care than FFS Medicare. This means that MA patients can achieve the same health outcomes as patients in FFS Medicare while using fewer resources (e.g., going to a hospital less), which is beneficial for patients. This also has positive spillover effects for all Medicare enrollees.

16.    Second, I explain that CMS compensates MA plans for enrollees in a way that exposes insurers to financial risk (Section VII). CMS pays a fixed, pre-arranged monthly payment to MA plans for each enrollee. The payment amount is based on an estimate of predicted health care expenditures for the enrollee that accounts for the diagnosis codes, which are grouped into Hierarchical Condition Categories ("HCCs"), and demographic characteristics of the enrollee. These predicted health care expenditures are estimated from the FFS Medicare population using a regression model that predicts the incremental health care expenditures of a specific HCC or demographic trait relative to the average per capita predicted health care expenditures of FFS Medicare enrollees. Thus, MA plans have an incentive to identify and record all relevant diagnoses that an enrollee has so they can receive proper compensation. Accordingly, CMS adjusts the fixed payments to MA plans to account for different coding patterns between MA plans and FFS Medicare.

17.    Third, I conclude that CMS would underpay MA plans if MA plans were required to identify and delete unsupported diagnosis codes without requiring CMS to do the same in FFS

Medicare when MA plans and FFS Medicare have identical populations with identical distributions of unsupported diagnosis codes (Section VIII.A). An MA plan is undercompensated relative to FFS Medicare if the total payment it receives is less than the total expected cost of treating FFS Medicare enrollees with identical risk scores as beneficiaries enrolled in the MA plan, while also accounting for the plan's bid. Requiring MA plans to identify and delete unsupported diagnosis codes in this situation, while maintaining the coefficients from the CMS-HCC model estimated on FFS data with unsupported diagnosis codes, mechanically reduces payments to MA plans even though the expected cost of treating the patients in the MA plan remains unchanged. This results in MA plans being undercompensated relative to what CMS would spend in FFS Medicare.

18.     Fourth, I conclude that requiring MA plans to remove unsupported diagnosis codes without requiring CMS to do the same in FFS Medicare would also result in improper compensation to MA plans when MA plans and FFS Medicare have different pools of enrollees or different rates of unsupported diagnosis codes (Section VIII.B). Proper compensation requires that the CMS-HCC model provides the true incremental cost of the HCC under FFS, which is not the case when the model is estimated on FFS data with unsupported diagnosis codes. Evidence indicates that FFS data do contain unsupported diagnosis codes and that these data are typically unaudited before the estimation of the CMS-HCC model. The resulting impact of estimating the CMS-HCC model using FFS data with unsupported diagnosis codes versus audited FFS data on payments to an MA plan depends on the pool of enrollees and distribution of unsupported codes in the MA plan data relative to the FFS data. Thus, neither the MA plan nor CMS can determine whether the MA plan was properly compensated without information on the extent to which the plan's pool of enrollees and probabilities of unsupported codes differ compared to the FFS Medicare population.

19.     Fifth, I conclude that the existence of unsupported codes in FFS data likely impacts payment to MA plans under the CMS-HCC model, contrary to what CMS concludes in its FFS Adjuster Study (Section IX). This study aimed to evaluate how removing unsupported codes from the FFS data would impact the dollar coefficients and relative factors estimated by the CMS-HCC model, and, as a consequence, the risk scores used to determine payments to MA plans. An impact would imply that an adjustment, referred to as the "FFS adjuster," was needed

when assessing whether MA plans were properly compensated. CMS concluded that an FFS adjuster is unnecessary. However, this conclusion is flawed. CMS reached this erroneous conclusion by relying on an incorrect and flawed methodology and by using data that does not allow it to reliably determine how unsupported diagnosis codes in FFS data affect risk scores and therefore payments to MA plans. Some of the methodological errors in CMS's methodology include: (1) flaws in estimating the probability that an HCC is unsupported in the FFS data; and (2) CMS inappropriately deflating the dollar coefficients estimated from the audited FFS data to purportedly adjust for the effects of the auditing process on expenditures, despite actual expenditures being unaffected by auditing. Other studies have also concluded that the FFS Adjuster Study is flawed, that unsupported diagnosis codes in the FFS data likely impact payments to MA plans, and that an FFS adjuster is necessary.

20.    Sixth, I conclude that requiring MA plans to remove unsupported diagnosis codes while making no other changes to the way MA plans are paid would result in higher prices for Medicare beneficiaries or less generous plans (Section X). Economic theory predicts that a firm faced with declining reimbursement along with similar costs would adjust their behavior. I conclude that MA plans required to remove codes would respond in one or more of the following ways: (1) by increasing their bids, thereby increasing government and patient expenses; (2) by reducing the quality of benefits provided; and/or (3) by exiting the market, reducing the number of available MA plans to choose from and thereby reducing consumer welfare. I draw this conclusion based on predictions consistent with economic theory, as well as historical evidence of how MA plans responded to changes in the amount of compensation they received from CMS. Correctly estimating the change in government payments to UnitedHealth if UnitedHealth were required to identify and delete unsupported codes would therefore need to account for such changes in UnitedHealth's behavior.

## V.    Background on FFS Medicare and Medicare Advantage

21.    In this section, I first describe some of the characteristics of health insurance generally, and then I provide information about the two specific health insurance options that are available to Medicare beneficiaries: FFS Medicare and Medicare Advantage.

## A.    Key Characteristics of Health Insurance

22.    Health insurance is a type of insurance that typically provides payment or reimbursement to health care providers for some or all of the cost of covered health care expenditures incurred by an insured individual. In the United States, private insurers provide some health insurance products, while federal and/or state governments provide other health insurance products. Medicare and Medicaid are two examples of public health insurance programs offered by the U.S. government and collectively insured about 40 percent of Americans in 2021.[17] About 12 million individuals were dually eligible for Medicare and Medicaid in 2022.[18] Medicare primarily covers people aged 65 and older, with eligibility conferred regardless of income, medical history, or preexisting conditions.[19] Medicaid is a public health insurance program primarily serving low-income individuals that is jointly funded by the federal and state governments.[20]

23.    Health insurance often does not pay for or reimburse all of the health care expenditures incurred by covered individuals. Instead, enrollees may face "out-of-pocket" costs for health care expenditures that are not covered by health insurance.[21] In addition to the premium that

---

[17] Medicaid is a means-tested public health insurance program jointly funded by the federal and state governments that covers low-income individuals who meet certain eligibility requirements. States have some flexibility in designing their programs and there are significant differences across state Medicaid programs. See "Who is Eligible for Medicaid?," *U.S. Department of Health & Human Services*, December 8, 2022, available at https://www.hhs.gov/answers/medicare-and-medicaid/who-is-eligible-for-medicaid; Robin Rudowitz, et al., "10 Things to Know about Medicaid," *Kaiser Family Foundation*, June 30, 2023 ("Rudowitz et al., 10 Things to Know about Medicaid"), available at https://www.kff.org/medicaid/issue-brief/10-things-to-know-about-medicaid;"CMS Releases Latest Enrollment Figures for Medicare, Medicaid, and Children's Health Insurance Program (CHIP)," *Centers for Medicare & Medicaid Services*, December 21, 2021, available at https://www.cms.gov/newsroom/news-alert/cms-releases-latest-enrollment-figures-medicare-medicaid-and-childrens-health-insurance-program-chip; "U.S. and World Population Clock," *United States Census Bureau*, December 31, 2021, available at https://www.census.gov/popclock.

[18] "Report to Congress on Medicaid and CHIP," *Medicaid and CHIP Payment and Access Commission*, June 2023, p. 36, available at  https://www.macpac.gov/wp-content/uploads/2023/06/MACPAC_June-2023-WEB-508.pdf.

[19] Juliette Cubanski, et al., "A Primer on Medicare: Key Facts About the Medicare Program and the People it Covers," *Kaiser Family Foundation*, March 20, 2015 ("Cubanski et al., A Primer on Medicare"), pp. 2–3, available at https://files.kff.org/attachment/report-a-primer-on-medicare-key-facts-about-the-medicare-program-and-the-people-it-covers ("Medicare was established in 1965 under Title XVIII of the Social Security Act to provide health insurance to people age 65 and older, regardless of income or medical history. […] People age 65 and older qualify for Medicare if they are U.S. citizens or permanent legal residents with at least five years of continuous residence. Individuals qualify without regard to their medical history or preexisting conditions, and do not need to meet an income or asset test.").

[20] "Medicaid," *Medicare.gov*, available at https://www.medicare.gov/basics/costs/help/medicaid, ("Medicaid is a joint federal and state program that helps cover medical costs for some people with limited income and resources."); Rudowitz et al., 10 Things to Know about Medicaid ("Medicaid is jointly financed by the federal government and states and administered by states within broad federal guidelines.").

[21] "Out-of-Pocket Costs," *HealthCare.gov Glossary*, available at https://www.healthcare.gov/glossary/out-of-pocket-costs.

enrollees (and/or their employer) may pay for health insurance, enrollees may face out-of-pocket costs in the form of a deductible, copayment, and coinsurance, along with the costs for any uncovered health care services. These costs are defined below.

- Premiums are the amount that enrollees and/or their employers pay, usually on a monthly basis, to a health insurer in order for the enrollee to receive some insurance coverage for their future health care expenditures.[22]

- A deductible represents the amount of money that an enrollee must pay out of pocket for health care expenditures before the health insurance plan begins to pay for benefits (e.g., $500 or $1,000 annually).[23]

- Copayments are an amount of money that an enrollee pays for certain medical services or supplies such as physician visits or prescription drugs. They are typically a set amount rather than a percentage (e.g., a copayment could be $10, $20, or a different set amount).[24] For some services, plans can charge coinsurance instead of a copayment, which is a percentage of the total cost paid to the health care provider (e.g., 10 percent or 20 percent) instead of a set dollar amount.[25]

24.    The amount of out-of-pocket expenses an enrollee faces can vary substantially in health insurance plans. For example, plans can set out-of-pocket limits, which are an amount of total out-of-pocket expenses incurred by an enrollee over a plan year, above which enrollee out-of-pocket costs are eliminated. These out-of-pocket limits have varied substantially across plans. In 2023, the average annual out-of-pocket limit for MA plans ranges from $4,033–$9,643, depending on the plan type.[26] FFS Medicare has no limit on out-of-pocket expenses for services

---

[22] "Premium," *HealthCare.gov Glossary*, available at https://www.healthcare.gov/glossary/premium.

[23] "Understanding Medicare Advantage Plans," *Centers for Medicare & Medicaid Services*, July 2022 ("CMS, Understanding Medicare Advantage Plans"), p. 11, available at https://www.medicare.gov/Pubs/pdf/12026-Understanding-Medicare-Advantage-Plans.pdf.

[24] CMS, Understanding Medicare Advantage Plans, p. 11.

[25] CMS, Understanding Medicare Advantage Plans, p. 11.

[26] The average annual out-of-pocket limit for MA plans refers to the enrollee-weighted average out-of-pocket limit by plan type for Part A and Part B services. HMOs have an average out-of-pocket limit of $4,033, while Regional PPOs have an average out-of-pocket limit of $6,842 for in-network services and $9,643 for in-network and out-of-networks services combined. Nancy Ochieng, et al., "Medicare Advantage in 2023: Premiums: Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings," *Kaiser Family Foundation*, August 9, 2023 ("Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings"), available at https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2023-premiums-out-of-pocket-limits-cost-sharing-supplemental-benefits-prior-authorization-and-star-ratings.

Confidential

covered under Parts A and B.[27] In addition, as detailed further below, premiums under both FFS Medicare and MA vary widely by plan.

### B.    FFS Medicare

25.    The federal government created Medicare in 1965 and then expanded it in 1972 to cover not only individuals aged 65 and over, but also certain people under 65 years old who have long-term disabilities. This program helps pay for a broad set of health care services, including hospitalizations, hospital outpatient visits, and physician visits.[28]

26.    From its inception in 1965 and until the introduction of the MA program, Medicare consisted of what is known today as Traditional Medicare, or FFS Medicare.[29] Under FFS Medicare, CMS typically pays health care providers on an FFS basis, meaning that CMS pays providers a specific amount for the health care services the provider rendered to the enrollee.[30]

27.    FFS Medicare provides two types of insurance that cover different health services:

---

[27] See "An Overview of Medicare," *Kaiser Family Foundation*, February 13, 2019 ("KFF, An Overview of Medicare"), available at https://www.kff.org/medicare/issue-brief/an-overview-of-medicare. Currently, Medicare Part D limits cost-sharing after an enrollee's out-of-pocket spending reaches $7,400, qualifying them for "catastrophic coverage." Beginning in 2024, Medicare Part D recipients will no longer pay copayments or coinsurance for covered drugs after their out-of-pocket spending reaches $8,000. See "Catastrophic coverage," *Medicare.gov*, available at https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/catastrophic-coverage.

[28] People under 65 years old who receive benefits from the Social Security Disability Insurance ("SSDI") program generally become eligible for Medicare after a two-year waiting period and people under 65 years old with end-stage renal disease and amyotrophic lateral sclerosis are eligible with no waiting period. See KFF, An Overview of Medicare.

[29] Medicare began contracting with private insurance plans through Medicare Part C in the mid-1980s with the name of this updated to Medicare + Choice in 1999 and to Medicare Advantage six years later. "Health Plans – General Information," *Centers for Medicare & Medicaid Services,* modified September 6, 2023 ("CMS, Health Plans"), available at https://www.cms.gov/medicare/enrollment-renewal/health-plans; "History," *Centers for Medicare & Medicaid Services*, modified September 6, 2023, available at https://www.cms.gov/about-cms/who-we-are/history. See also Thomas McGuire, et al., "An Economic History of Medicare Part C," *The Milbank Quarterly*, 89(2), 2011 ("McGuire et al., Economic History of Medicare Part C"), pp. 289–332.

[30] See, e.g., "Fee Schedules – General Information," *Centers for Medicare & Medicaid Services*, modified September 6, 2023, available at https://www.cms.gov/medicare/medicare-fee-for-service-payment/feeschedulegeninfo. Note that in some cases, diagnosis information may inform the reimbursement amount that providers receive under FFS Medicare. For example, for inpatient services, hospitals are paid a fixed payment for each patient discharged based on the Diagnoses Related Group ("DRG"), which combines information on the patient's diagnosis and the services provided. See "Acute Inpatient PPS," *Centers for Medicare & Medicaid Services*, modified September 6, 2023, available at https://www.cms.gov/medicare/payment/prospective-payment-systems/acute-inpatient-pps; "Glossary," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/apps/glossary/ ("Diagnosis-Related Groups[:] A classification system that groups patients according to diagnosis, type of treatment, age, and other relevant criteria. Under the prospective payment system, hospitals are paid a set fee for treating patients in a single DRG category, regardless of the actual cost of care for the individual.").

- Medicare Part A is the hospital insurance provided by FFS Medicare. This insurance covers inpatient care in hospitals and skilled nursing facilities, hospice care, and some home health care.[31] Most enrollees do not have to pay a premium for Part A,[32] but benefits are subject to a deductible and may require cost sharing.[33] In 2023, the deductible for each inpatient hospital benefit period is $1,600.[34] Cost-sharing amounts for Part A are based on days of consecutive inpatient care. They can be as low as $0 when an enrollee has less than sixty consecutive days of inpatient care, and up to the full cost of care when an enrollee has longer periods of care.[35]

- Medicare Part B is medical insurance provided by FFS Medicare. This insurance helps cover the costs of physician visits, outpatient services, preventive services, and some home health visits.[36] Part B benefits are subject to an annual deductible (e.g., $226 in 2023)[37] and, typically, a coinsurance payment of 20 percent.[38] Most Medicare enrollees pay a Part B premium, and these premiums are set at 25 percent of the projected average per capita Part B costs.[39] In 2023, the monthly Part B premium is $164.90.[40]

---

[31] "What Part A Covers," *Medicare.gov*, available at https://www.medicare.gov/what-medicare-covers/what-part-a-covers; "How Original Medicare works," *Medicare.gov* ("CMS, How Original Medicare Works"), available at https://www.medicare.gov/what-medicare-covers/your-medicare-coverage-choices/how-original-medicare-works.

[32] "Costs," *Medicare.gov* ("CMS, Medicare Costs"), available at https://www.medicare.gov/basics/costs/medicare-costs.

[33] For example, a beneficiary may be responsible for the full cost of care for extended inpatient hospital and skilled nursing facilities stays. See CMS, Medicare Costs.

[34] Inpatient hospital benefit periods begin when a beneficiary is admitted as an inpatient and end after a beneficiary has not received any inpatient hospital or skilled nursing facility ("SNF") care for 60 days. There is no limit to the number of benefit periods beneficiaries can have in a year. See CMS, Medicare Costs.

[35] In 2023, there is no copayment for the first 60 days of a benefit period. There is a $400 daily copayment for days 61–90. After 90 days, beneficiaries can pay a $800 daily copayment by using a "lifetime reserve day," of which all beneficiaries receive 60 over the course of their lifetimes. After using all 60 lifetime reserve days, beneficiaries pay all costs for the remainder of a given stay. The copayment and deductible schedule resets whenever a beneficiary goes 60 consecutive days without care from a hospital or SNF. See CMS, Medicare Costs.

[36] KFF, An Overview of Medicare; CMS, How Original Medicare Works.

[37] "2023 Medicare Parts A & B Premiums and Deductibles 2023 Medicare Part D Income-Related Monthly Adjustment Amounts," *Centers for Medicare & Medicaid Services*, September 27, 2022 ("CMS, 2023 Medicare Parts A & B Premiums and Deductibles"), available at https://www.cms.gov/newsroom/fact-sheets/2023-medicare-parts-b-premiums-and-deductibles-2023-medicare-part-d-income-related-monthly.

[38] CMS, Medicare Costs. No coinsurance or deductible is charged for some preventive services. See "What Part B Covers," *Medicare.gov*, available at https://www.medicare.gov/what-medicare-covers/what-part-b-covers.

[39] Patricia A. Davis, "Medicare Part B: Enrollment and Premiums," *Congressional Research Service*, May 19, 2022, available at https://sgp.fas.org/crs/misc/R40082.pdf.

[40] About seven percent of Part B recipients face higher premiums due to their relatively high incomes. See CMS, 2023 Medicare Parts A & B Premiums and Deductibles.

28.    In 2021, FFS Medicare provided its enrollees with average benefits of $5,207 and $6,757 for Part A and Part B, respectively, with average cost sharing (excluding monthly premiums and uncovered services) of $396 and $1,621 for Part A and Part B, respectively.[41]

29.    Since 2006, Medicare beneficiaries can also obtain coverage for outpatient prescription drugs.[42] This type of insurance, offered through private insurers that contract with Medicare, is called Medicare Part D. Part D enrollees typically pay a monthly premium and are subject to other cost-sharing payments, with premiums, drug formularies, and other cost sharing varying substantially across plans.[43] For example, monthly premiums for Part D plans in 2023 range from $1.60 to $201.10.[44] In 2019, approximately 25 million FFS Medicare enrollees (about 66 percent of all FFS Medicare enrollees) were enrolled in a stand-alone prescription drug plan through Medicare Part D.[45]

30.    FFS Medicare has certain limitations. For example, it does not cover services such as long-term care, hearing aids, or dental care, and many services require significant cost sharing, such as the 20 percent copayment for Medicare Part B described above.[46] Moreover, among noninstitutionalized Medicare beneficiaries enrolled in FFS Medicare in 2020, Medicare covered 69 percent of total health care expenditures.[47] Because of the gaps in Medicare coverage, many FFS Medicare enrollees also enroll in Medicare supplemental insurance

---

[41] "Health care spending and the Medicare program," *MedPAC*, July 2023 ("MedPAC, Health care spending and the Medicare Program"), p. 12, available at https://www.medpac.gov/wp-content/uploads/2023/07/July2023_MedPAC_DataBook_SEC.pdf.

[42] "Prior to 2006, Medicare paid for some drugs administered during a hospital admission (under Medicare Part A), or a doctor's office (under Medicare Part B). Medicare did not cover *outpatient* prescription drugs until January 1, 2006, when it implemented the Medicare Part D prescription drug benefit, authorized by Congress under the 'Medicare Prescription Drug, Improvement, and Modernization Act of 2003.'" See "Part D/Prescription Drug Benefits," *Center for Medicare Advocacy*, available at https://www.medicareadvocacy.org/medicare-info/medicare-part-d.

[43] "An Overview of the Medicare Part D Prescription Drug Benefit," *Kaiser Family Foundation*, October 19, 2022 ("KFF, An Overview of the Medicare Part D Prescription Drug Benefit"), available at https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit.

[44] KFF, An Overview of the Medicare Part D Prescription Drug Benefit.

[45] A further 19.7 million individuals received Part D coverage through Medicare Advantage plans. These figures include both employer-only group plans and non-employer plans. See Juliette Cubanski, et al., "10 Things to Know About Medicare Part D Coverage and Costs in 2019," *Kaiser Family Foundation*, June 4, 2019, available at https://www.kff.org/medicare/issue-brief/10-things-to-know-about-medicare-part-d-coverage-and-costs-in-2019; "Total Number of Medicare Beneficiaries by Type of Coverage," *Kaiser Family Foundation*, 2019, available at https://www.kff.org/medicare/state-indicator/total-medicare-beneficiaries.

[46] CMS, Medicare Costs; "Medicare Advantage: A Policy Primer," *Commonwealth Fund*, May 3, 2022, available at https://www.commonwealthfund.org/publications/explainer/2022/may/medicare-advantage-policy-primer ("Commonwealth Fund, Medicare Advantage: A Policy Primer").

[47] This figure includes all public, private, and direct beneficiary spending on "all health care goods and services." MedPAC, Health care spending and the Medicare program, p. 29.

policies, known as Medigap policies. Medigap plans are provided through private insurers and pay for costs not covered by FFS Medicare, including copayments.[48] These plans require enrollees to pay monthly premiums in addition to the premiums they may pay for Part B and Part D.[49]

31.     As an alternative to enrolling in FFS Medicare and supplementing it with Medigap, beneficiaries can choose to enroll in Medicare Advantage. This is described below.

### C.     Medicare Advantage

32.     The federal government introduced the Medicare Advantage program within Medicare to (1) provide Medicare beneficiaries with health insurance plans that are an alternative to FFS Medicare, and (2) transfer to Medicare some of the efficiencies and cost savings that had been observed for health care plans in the private sector.[50] In particular, the Medicare Advantage program relies on private insurers to provide health insurance to Medicare enrollees through the use of managed care, whereby health care is provided through provider networks. Managed care plans use their capitation payments to manage the health care expenditures of enrollees.[51] In this section, I first describe some features of current MA plans, and then briefly review the history of the MA program.

33.     MA plans must provide enrollees with both Part A and Part B coverage, and may offer enrollees Part D prescription drug coverage as well.[52] In 2023, 89 percent of MA plans offer prescription drug coverage and 97 percent of MA enrollees in "individual plans," which are plans open for general enrollment to individual consumers, selected plans with this benefit.[53] MA plans can differ in the amount of premiums that they charge, the limits on out-of-pocket

---

[48] Commonwealth Fund, Medicare Advantage: A Policy Primer.

[49] Commonwealth Fund, Medicare Advantage: A Policy Primer.

[50] McGuire et al., Economic History of Medicare Part C, pp. 289–332 at p. 289.

[51] "Managed Care," *Centers for Disease Control and Prevention*, August 12, 2022, available at https://www.cdc.gov/nchs/hus/sources-definitions/managed-care.htm; Commonwealth Fund, Medicare Advantage: A Policy Primer; Deposition of Anne Hornsby (CMS), May 19, 2023 ("Hornsby Deposition"), pp. 11:24–12:3, 39:12–18 ("CMS pays the Medicare Advantage organization which, in turn, has developed contracted provider networks that they then pay for services.").

[52] CMS, Health Plans.

[53] Meredith Freed, et al., "Medicare Advantage 2023 Spotlight: First Look," *Kaiser Family Foundation*, November 10, 2022 ("Freed et al., Medicare Advantage 2023 Spotlight: First Look"), available at https://www.kff.org/medicare/issue-brief/medicare-advantage-2023-spotlight-first-look; Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings. Individual plans exclude employer group health plans and Special Needs Plans.

costs,[54] and the structure of out-of-pocket costs.[55] For example, in 2023, about 73 percent of enrollees in individual MA plans that offer prescription drug coverage pay no "incremental premium" (i.e., a premium in addition to the standard Part B premium), while only about three percent have incremental premiums of $100 or more per month.[56] Overall, the average enrollment-weighted incremental premium among individual MA plans offering prescription drug coverage, including those that do not pay a premium, is $15 per month in 2023.[57] The average enrollment-weighted premium for just the Part D portion of covered benefits is $10 per month among these MA plans.[58] In contrast, the stand-alone prescription drug plans available to FFS Medicare enrollees require an additional Part D premium, which averages $40 per month in 2023.[59]

34.     If MA enrollees are interested in switching to another plan, such as a different MA plan with drug coverage through Part D, they can do so during the Medicare Advantage Open Enrollment period. The Open Enrollment period occurs annually from January through March, and during this time, MA enrollees may switch to another MA plan or return to FFS Medicare.[60]

---

[54] Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings.

[55] See Matthew Rae, et al., "Patient Cost-Sharing in Marketplace Plans, 2016," *Kaiser Family Foundation*, November 13, 2015 available at https://www.kff.org/health-costs/issue-brief/patient-cost-sharing-in-marketplace-plans-2016 for a discussion of out-of-pocket costs.

[56] Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings.

[57] These figures do not include the standard Medicare Part B premium all beneficiaries must pay. Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings.

[58] Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings.

[59] Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings.

[60] "What's the Difference Between Medicare's Open Enrollment Period and Medicare Advantage Open Enrollment?" *National Council on Aging*, November 12, 2022, available at https://ncoa.org/article/whats-the-difference-between-medicares-open-enrollment-period-and-medicare-advantage-open-enrollment.

35.    MA plans vary according to their hospital and physician networks,[61] their rules regarding how enrollees can access services,[62] and the services they cover, which can include services not covered by FFS Medicare such as vision, hearing, or dental.[63] MA plan health care provider networks can be more limited than the set of providers that accept FFS Medicare.[64] In this regard, MA has more in common with an employer-sponsored plan than with FFS Medicare.[65]

36.    Medicare Advantage plans are offered by many of the same insurers that offer employer-sponsored health plans. Three private insurers account for approximately 61 percent of the 30.8 million enrollees in MA plans in 2023: 29 percent of MA enrollees have plans with UnitedHealth, 18 percent with Humana, and 14 percent with BlueCross BlueShield affiliates.[66] Other insurers offering MA plans include CVS Health, Kaiser Permanente, Centene, and Cigna, with shares ranging from 2 to 11 percent.[67]

37.    The MA program has undergone substantial changes over the course of its existence with regards to how the government compensates private insurers. The original version of the MA program began with the Social Security Amendments of 1972, which authorized the government to contract with private health insurers to offer private health plans as additional options for Medicare beneficiaries. However, a substantial increase in plan participation and enrollment only occurred when the Tax Equity and Fiscal Responsibility Act ("TEFRA") of 1982 introduced some changes in the program's risk sharing arrangements including, for

---

[61] For example, a 2017 Kaiser Family Foundation study that examines 391 MA plans in 20 counties in 2015 finds heterogeneity in the size of plan's physician networks: 22 percent of enrollees were in plans that included over 70 percent of physicians in the county in their network, while 35 percent of enrollees were in plans that included less than 30 percent of physicians in the county in their network. See Gretchen Jacobson, et al., "Medicare Advantage: How Robust Are Plans' Physician Networks?," *Kaiser Family Foundation*, October 5, 2017, Figure ES.1, available at https://www.kff.org/medicare/report/medicare-advantage-how-robust-are-plans-physician-networks. A similar 2016 Kaiser Family Foundation study also found heterogeneity in the size of plans' hospital networks. See Gretchen Jacobson, et al., "Medicare Advantage Hospital Networks: How Much Do They Vary?," *Kaiser Family Foundation*, June 20, 2016, Figure ES.1, available at http://files.kff.org/attachment/Report-Medicare-Advantage-Hospital-Networks-How-Much-Do-They-Vary.
[62] HHS, What is Medicare Part C.
[63] CMS, Understanding Medicare Advantage Plans, p. 5.
[64] CMS, Understanding Medicare Advantage Plans, p. 5.
[65] As another example, MA plans and employer plans often have cost sharing that varies by service, whereas Medicare Part B enrollees pay a flat 20 percent. See CMS, Understanding Medicare Advantage Plans, p. 6. See also "Employer Health Benefits: 2021 Annual Survey," *Kaiser Family Foundation*, November 2021, p. 92, available at https://files.kff.org/attachment/Report-Employer-Health-Benefits-2021-Annual-Survey.pdf.
[66] Nancy Ochieng, et al., "Medicare Advantage in 2023: Enrollment Update and Key Trends," *Kaiser Family Foundation*, August 9, 2023 ("Ochieng et al., Medicare Advantage in 2023: Enrollment Update and Key Trends"), available at https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2023-enrollment-update-and-key-trends.
[67] Ochieng et al., Medicare Advantage in 2023: Enrollment Update and Key Trends.

Confidential

example, allowing plans to reduce cost sharing for beneficiaries. By 1997, enrollment in these private health plans had grown to about six million beneficiaries, located primarily in urban counties.[68]

38.     CMS pays MA plans a fixed payment per enrollee in exchange for providing health care coverage to beneficiaries who enroll.[69] To estimate these payments in the 1980s and 1990s, CMS used a model based primarily on demographics, such as gender, age, Medicaid status, and disability status, along with the enrollee's county of residence. The demographic factors served as a proxy for health risks, which are associated with enrollees' health care expenditures. The model assessed the relationship between these demographic factors and total spending in Parts A and B of FFS Medicare.[70] This quantification of the relationship between these demographic factors and spending was then used to adjust payments to MA plans up or down based on whether the demographic profile of an enrollee represented a higher or lower health and medical expenditure risk. This process of adjusting payments to MA plans up or down to account for the risk of future health expenditures is known as "risk adjustment."[71] This type of risk adjustment based on demographic factors was limited in that it did not include any disease or health variables in trying to predict an enrollee's total health and medical expenditures.[72] Although the payment model was limited with regard to the direct use of such health variables, it did consider the geographic variation in Medicare costs.[73] Studies such as the Dartmouth Atlas have shown that geographic differences in per-recipient Medicare spending can be substantial, even after controlling for demographic factors.[74]

39.     The Balanced Budget Act of 1997 ("BBA") took Medicare's system of providing fixed payments to private health plans to cover enrollees, renamed these plans Medicare+Choice

---

[68] Office of Health Policy, "Payment for Medicare Advantage Plans: Policy Issues and Options," *Office of the Assistant Secretary for Planning and Evaluation*, June 2009, p. 2, available at https://aspe.hhs.gov/system/files/pdf/75816/report.pdf.

[69] I refer to these payments as "payments to MA plans" throughout the remainder of this report.

[70] Brown et al., How Does Risk Selection Respond to Risk Adjustment, pp. 3335–3364 at p. 3339.

[71] MedPAC, Report to the Congress, p. 413.

[72] Gregory Pope, et al., "Risk Adjustment of Medicare Capitation Payments Using the CMS-HCC Model," *Health Care Financing Review*, 25(4), 2004 ("Pope et al., Risk Adjustment of Medicare Capitation Payments"), pp. 119–141 at p. 119.

[73] Pope et al., Risk Adjustment of Medicare Capitation Payments, pp. 119–141 at p. 119.

[74] For example, after adjusting for age, sex and race, FFS Medicare reimbursements per enrollee (Part A and Part B) for 2019 in the Des Moines hospital referral region ("HRR," a region with similar medical usage patterns used by the Dartmouth Atlas) was $9,169.86. The same measure was $14,675.29 in the Miami HRR. See "Medicare Reimbursements," *Dartmouth Atlas Project*, 2022, available at https://www.dartmouthatlas.org/interactive-apps/medicare-reimbursements; "FAQ," *Dartmouth Atlas Project*, available at https://www.dartmouthatlas.org/faq.

("M+C"), and formally defined this system as Part C of Medicare.[75] The BBA required CMS to improve its risk-adjustment model by using health information (i.e., data on diagnoses of health care conditions for inpatients—but not for outpatients) in addition to demographic variables. CMS began to use this new model in 2000, but only 10 percent of the payments made to MA plans were based on the updated methodology of incorporating health information along with enrollee demographic variables.[76]

40.    In addition, the BBA authorized CMS to contract with private organizations to offer a variety of new health plan options (such as Health Maintenance Organization or Preferred Provider Organization plans, two types of plans that are commonly used in employer-sponsored health insurance) for enrollees in the M+C program.[77] The BBA also altered reimbursement to Part C plans, limiting plans' reimbursements in many counties to be at most two percent higher than the prior year's reimbursement.[78]

41.    The Benefits Improvement and Protection Act of 2000 ("BIPA") addressed the limitation of a risk-adjustment model that only included data on diagnoses for inpatients by requiring the use of such data for outpatients as well.[79] Moreover, BIPA provided a phase-in schedule regarding the risk-adjusted portion of the payments to MA plans. This portion increased to 30 percent in 2004, to 50 percent in 2005, to 75 percent in 2006, and to 100 percent in 2007.[80]

42.    The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") renamed the M+C program as the Medicare Advantage program.[81] The MMA included the most significant changes to the Medicare program since its creation by establishing

---

[75] McGuire et al., Economic History of Medicare Part C, pp. 289–332 at pp. 306, 308.
[76] McGuire et al., Economic History of Medicare Part C, pp. 289–332 at pp. 308–309.
[77] CMS, Health Plans.
[78] McGuire et al., Economic History of Medicare Part C, pp. 289–332 at p. 309.
[79] Pope et al., Risk Adjustment of Medicare Capitation Payments, pp. 119–141 at p. 120.
[80] "Advance Notice of Methodological Changes for Calendar Year (CY) 2004 Medicare+Choice (M+C) Payment Rates," *Centers for Medicare & Medicaid Services*, March 28, 2003, pp. 4–5, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Advance2004.pdf; "Advance Notice of Methodological Changes for Calendar Year (CY) 2005 Medicare Advantage (MA) Payment Rates," *Centers for Medicare & Medicaid Services*, March 26, 2004, p. 6, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/advance2005.pdf; "Advance Notice of Methodological Changes for Calendar Year (CY) 2006 Medicare Advantage (MA) Payment Rates," *Centers for Medicare & Medicaid Services*, February 18, 2005, p. 8, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/advance2006.pdf; "Advance Notice of Methodological Changes for Calendar Year 2007 for Medicare Advantage (MA) Payment Rates and Part D Payment," *Centers for Medicare & Medicaid Services*, February 17, 2006, pp. 5–6, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/Advance2007.pdf.
[81] CMS, Health Plans.

a larger role for private health plans and enacting increases to payments to MA plans, effective in March 2004.[82] The participation of plans in the MA program and enrollment both increased steadily after the MMA.[83]

43.     In more recent years, CMS has limited MA plans' profits through the implementation of a minimum Medical Loss Ratio ("MLR") to which MA plans must adhere. The MLR represents "the percentage of revenue used for patient care, rather than for such other items as administrative expenses or profit."[84] Starting in 2014, MA insurers needed to have an MLR of at least 85 percent for each contract—meaning that at least 85 percent of revenue must be used for patient care—or they could be subject to sanctions.[85] The MLR limits MA plans' ability to charge high premiums without offering patients correspondingly generous benefits, or to offer plans with few benefits without offering correspondingly low premiums.

## VI.    The Medicare Advantage Program Has Provided Value to Plan Enrollees

44.     In this section, I explain why the Medicare Advantage program has provided value to Medicare enrollees. I first explain that Medicare enrollees are better off when they have more health insurance plans to choose from. This is because with more choices it is possible for individuals to choose a plan better tailored to their health care preferences and needs. Second, I discuss evidence indicating that Medicare beneficiaries have often preferred Medicare Advantage plans to FFS Medicare. Finally, I explain that Medicare Advantage plans have often provided better or more efficient care than FFS Medicare.

---

[82] Gregory Pope, et al., "Impact of Increased Financial Incentives to Medicare Advantage Plans: Final Report," *RTI International*, September 2006 ("Pope et al., Impact of Increased Financial Incentives to Medicare Advantage Plans"), pp. 11–12, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Reports/Downloads/Pope.pdf.

[83] McGuire et al., Economic History of Medicare Part C, pp. 289–332 at pp. 313–314, Figure 2, Figure 4.

[84] "Medical Loss Ratio," *Centers for Medicare & Medicaid Services*, modified September 6, 2023 ("CMS, Medical Loss Ratio"), available at https://www.cms.gov/medicare/health-drug-plans/medical-loss-ratio.

[85] CMS, Medical Loss Ratio. See also Deposition of Kirk Limmer (CMS), June 21, 2023 ("Limmer Deposition"), pp. 14:9–16, 116:5–117:20 ("A The medical loss ratio was enacted—enacted by Congress—to my understanding is to place—to basically ensure that a certain percentage of benefits within the total revenue—or a minimum—say, a minimum level of benefits is being passed on to the beneficiaries. And that the—I guess, conversely, that the non—non-benefit—well, I don't want to use the word non-benefit because that might be confusing. The portion that is not medical is—is limited by a certain percentage, also. So for Medicare, it is set at 85 percent. [...] it could be greater than 85 percent. But as long as they are, as long as the results that—and using the medical loss ratio formula—as long as those results are over 85 percent or—then—then there's no payment. If there—if it's below that, there are— there are specified actions that would be taken, including possible payments to CMS.").

### A. Medicare Advantage Plans Provide Medicare Beneficiaries with More Choices

45.    MA plans provide Medicare beneficiaries with alternatives to FFS Medicare that may better fit their health care preferences and needs. Beneficiaries choose between FFS Medicare and MA plans, or among different MA plans, based upon their preferences and upon plan features such as premiums, cost sharing, limits on out-of-pocket expenses, provider networks, conditions to access care, and the availability of benefits not offered by FFS Medicare (e.g., vision care coverage). All else equal, Medicare beneficiaries are made better off if they have more plans to choose from because a broader menu of plans allows each beneficiary to choose a plan more tailored to their specific preferences and health care needs.

46.    The concept that increased choice makes consumers better off is well understood in economics. Economists use the term "utility," where an individual is better off if they have higher utility and worse off if they have lower utility.[86] Typical economic models demonstrate that expanding an individual's choices will leave them at least equally well off, and in many cases better off.[87] In the context of discussing Medicare, and Medicare Advantage in particular, Newhouse et al. (2014) state that "[i]n conventional economic theory, more choices always benefit a consumer because more choices offer the possibility of a better match between what is bought and the consumer's preferences."[88] This principle is consistent with CMS statements as to why it supports the growth of MA. For example, a CMS-contracted study states that the 2003 MMA was intended "to increase the choice of plans available to beneficiaries."[89] In 2018, CMS Administrator Seema Verma stated that "[o]ur priority is to ensure that our seniors have more choices [...] We are focused on addressing the specific needs of beneficiaries and providing new flexibilities for Medicare Advantage plans to offer new health-related benefits. This is a big win for patients."[90] In other words, the utility of Medicare beneficiaries will be, on average,

---

[86] Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics, Eighth Edition*, (Upper Saddle River: Pearson Education, Inc., 2013) ("Pindyck and Rubinfeld, Microeconomics"), p. 78.

[87] Pindyck and Rubinfeld, Microeconomics, pp. 67–95, 417–419.

[88] Joseph Newhouse and Thomas McGuire, "How Successful is Medicare Advantage," *The Milbank Quarterly*, 92(2), 2014, pp. 351–394 at p. 356.

[89] Pope et al., Impact of Increased Financial Incentives to Medicare Advantage Plans, p. 7.

[90] "CMS proposes Medicare Advantage and Part D payment and policy updates to provide new benefits for enrollees, new protections to combat opioid crisis," *Centers for Medicare & Medicaid Services*, February 1, 2018, available at https://www.cms.gov/newsroom/press-releases/cms-proposes-medicare-advantage-and-part-d-payment-and-policy-updates-provide-new-benefits-enrollees.

higher because of the increased choice that Medicare Advantage plans provide. This is because, for some individuals, the additional MA plan options will be a better fit than FFS Medicare or will be a better fit than already-existing MA plan options. This is an important reason why the Medicare Advantage program benefits Medicare beneficiaries.

### B.    Market Data and Academic Literature Indicate that Many Medicare Beneficiaries Have Preferred Medicare Advantage Plans to FFS Medicare

47.    MA enrollment has grown tremendously over time since the passage of the MMA and the creation of the current MA program in 2003. As shown in Exhibit 1, MA plans enrolled approximately 5 million Medicare beneficiaries in 2003, and enrollment increased to approximately 31 million Medicare beneficiaries in 2023.

48.    Enrollment has not only grown in absolute terms—the share of Medicare beneficiaries choosing Medicare Advantage has also increased over time. As shown in Exhibit 1, the share of Medicare beneficiaries selecting Medicare Advantage plans grew from 13 percent in 2003 to 51 percent in 2023. The Congressional Budget Office projects that under current law MA enrollment will continue to grow and could reach 62 percent of Medicare beneficiaries by 2033.[91]

---

[91] Ochieng et al., Medicare Advantage in 2023: Enrollment and Key Trends.

**Exhibit 1**
*Medicare Advantage Enrollment and Share of All Medicare Enrollment, 2003–2023*



Source: Ochieng et al., Medicare Advantage in 2023: Enrollment Update and Key Trends; Meredith Freed, et al., "A Dozen Facts About Medicare Advantage in 2020," *Kaiser Family Foundation*, April 22, 2020 ("Freed et al., A Dozen Facts About Medicare Advantage in 2020"), available at https://web.archive.org/web/20201210075019/https://www.kff.org/medicare/issue-brief/a-dozen-facts-about-medicare-advantage-in-2020.

Note: Enrollment data is from March of each year, with the exception of 2006, which is from April. KFF updated its methodology so that starting in 2010, the data do not include cost plans. Cost plans are a Medicare managed care plan that can also be reimbursed by FFS Medicare for out of network services. Data from before 2010 include cost plans. Data for the period 2007 – 2023 are from KFF's 2023 report, while data for before 2007 are from KFF's 2020 report. About 60.0 million people are enrolled in Medicare Parts A and B in 2023.

49.     The fact that a substantial share of Medicare beneficiaries selects MA over FFS Medicare reveals that many individuals prefer MA. According to economic theory, if an individual has two items they can choose from, option A and option B, and both are within their budget, then one can infer from their selection of option A that they prefer option A to option B.[92] Applied to the choice of Medicare products, the fact that 51 percent of Medicare beneficiaries selected an MA plan rather than FFS Medicare in 2023 reveals that many Medicare beneficiaries prefer MA plans over FFS Medicare. The steady growth in the share of individuals selecting MA plans

---

[92] It is possible that an individual who selected option A is indifferent between option A and option B, but nonetheless selected option A. Economists would say the individual "weakly" prefers option A to option B in this instance. See David Besanko and Ronald Braeutigam, *Microeconomics, Fifth Edition*, (Jefferson City: John Wiley & Sons, Inc., 2014), p. 134.

over time also reveals that the fraction of Medicare beneficiaries who prefer MA plans to FFS Medicare is growing.

50.    There is similar evidence indicating that UnitedHealth MA plans are attractive to Medicare beneficiaries. In 2023, UnitedHealth had more MA enrollees than any other insurer (29 percent for UnitedHealth as compared to 18 percent for Humana, 14 percent for BlueCross BlueShield, 11 percent for CVS Health, 6 percent for Kaiser Permanente, and 22 percent for all other plans). Additionally, UnitedHealth's share of enrollees among MA insurers has grown substantially over the past decade (from 22 percent in 2013 to 29 percent in 2023), while the share for many other leading MA insurers (such as Humana, BlueCross BlueShield, and Kaiser Permanente) has been relatively flat.[93] Taken together, these facts reveal that many Medicare beneficiaries prefer UnitedHealth MA plans to other MA plans and to FFS Medicare, and that the number of individuals with this preference has been increasing over time.

51.    In addition to market data indicating that many Medicare beneficiaries prefer MA plans, survey data shows that MA plan enrollees are satisfied with their health insurance plans. For example, Duggan et al. (2016) analyze data from the 2007–2011 Consumer Assessment of Healthcare Providers and Systems ("CAHPS") survey that contains enrollees' ratings of plans for every MA plan that is at least one year old.[94] Surveyors questioned 600 individuals from each MA contract and collected responses from over 160,000 MA enrollees in each year between 2007 and 2011. Duggan et al. (2016) find that "MA enrollees are on average quite satisfied with their plans."[95]

52.    There are several reasons why Medicare beneficiaries may prefer MA plans over FFS Medicare.

53.    First, most MA enrollees enjoy benefits not available to their counterparts who are enrolled in FFS Medicare. For example, in 2023, more than 90 percent of MA plans offer coverage for eye exams and glasses, dental care, fitness benefits, and/or hearing aids, while FFS

---

[93] Humana saw slight growth in its share of enrollees from 17 percent to 18 percent, while both BlueCross BlueShield and Kaiser Permanente saw a decline in market share over the past decade. CVS Health's share of enrollees among MA insurers grew from 7 percent in 2013 to 11 percent in 2023, representing the only substantial growth in market share aside from UnitedHealth among insurers with at least 6 percent of MA enrollees. See Ochieng et al., Medicare Advantage in 2023: Enrollment Update and Key Trends.

[94] Duggan et al., Who Benefits when the Government Pays More, pp. 50–67 at pp. 55, 62.

[95] Duggan et al., Who Benefits when the Government Pays More, pp. 50–67 at footnote 12.

Medicare does not cover these benefits.[96] Additionally some MA enrollees have access to other benefits not covered under FFS Medicare such as meal, transportation, and in-home support benefits.[97] As acknowledged by Sean Creighton, former Director for Payment Policy and Risk Adjustment at CMS, beneficiaries of MA plans enjoy "an array of additional benefits that are not available to them in fee-for-service," including prescription drug coverage at a reduced cost and an out-of-pocket maximum that limits enrollees' out-of-pocket spending.[98]

54.    Second, many MA enrollees pay less in premiums than FFS Medicare enrollees for plans with comparable coverage (health care expenditures covered under Parts A, B, and D) or even for plans with more extensive coverage (e.g., vision or dental coverage in addition to services covered under Parts A, B, and D).[99] In 2023, most MA plans (about 89 percent) offer prescription drug coverage, and most MA enrollees (about 92 percent) are enrolled in these plans.[100] Among MA plans with Part D coverage, 73 percent of MA enrollees with prescription drug coverage pay no incremental premium (i.e., no premium other than their Medicare Part B premium), and the average enrollment-weighted incremental premium for MA enrollees (across

---

[96] 97 percent of individual MA plans include telehealth benefits beyond what was allowed under FFS Medicare prior to the COVID-19 public health emergency. Freed et al., Medicare Advantage 2023 Spotlight: First Look. FFS Medicare currently covers a range of telehealth services, but most of this coverage is temporarily available due to a broad, but time-limited, expansion triggered by the COVID-19 pandemic. MA plans have been able to offer telehealth benefits since 2020 due to a pre-pandemic CMS policy adjustment. See Wyatt Koma, et al., "FAQs on Medicare Coverage of Telehealth," *Kaiser Family Foundation*, May 23, 2022, available at https://www.kff.org/medicare/issue-brief/faqs-on-medicare-coverage-of-telehealth; "CMS finalizes policies to bring innovative telehealth benefit to Medicare Advantage," *Centers for Medicare & Medicaid Services*, April 5, 2019, available at https://www.cms.gov/newsroom/press-releases/cms-finalizes-policies-bring-innovative-telehealth-benefit-medicare-advantage.

[97] Freed et al., Medicare Advantage 2023 Spotlight: First Look.

[98] Deposition of Sean Creighton (CMS), March 23, 2022 ("Creighton Deposition, day 1"), pp. 33:7–34:6, 41:21–45:23.

[99] Statement of Jonathan Morse Acting Director of the Center for Program Integrity, Centers for Medicare and Medicaid Services on "Efforts to Combat Waste, Fraud and Abuse in the Medicare Program" before the U.S. House Ways and Means Committee, Subcommittee on Oversight, July 19, 2017, p. 1, available at https://waysandmeans.house.gov/wp-content/uploads/2017/07/20170719OS-Testimony-Morse.pdf ("Additionally, while average premiums have remained stable, access to most Medicare Advantage supplemental benefits has increased, and enrollment is growing faster than in original Medicare. Medicare Advantage plans may offer additional benefits and cost-sharing arrangements that are at least as generous as the standard Parts A and B benefits under original Medicare.").

[100] Freed et al., Medicare Advantage 2023 Spotlight: First Look. I calculate the share of MA enrollees that are enrolled in an MA plan with Part D coverage using the number of MA-PD enrollees in 2023 (28.3 M), divided by the total number of MA enrollees in 2023 (30.8M). 28.3M / 30.8M = 92 percent. See Ochieng et al., Medicare Advantage in 2023: Enrollment Update and Key Trends; Juliette Cubanski and Anthony Damico, "Key Facts About Medicare Part D Enrollment and Costs in 2023," KFF, July 7, 2023, available at https://www.kff.org/medicare/issue-brief/key-facts-about-medicare-part-d-enrollment-and-costs-in-2023.

all plans that offer prescription drug coverage) is just $15 per month in 2023.[101] The average enrollment-weighted premium for just the Part D portion of covered benefits is $10 per month among these MA plans.[102]

55.    In contrast, enrollees in FFS Medicare only receive prescription drug coverage if they enroll in Medicare Part D, which costs, on average, $40 per month in additional premiums in 2023.[103] Individuals in FFS Medicare who have prescription drug coverage pay more in premiums, on average, than individuals in MA plans who have prescription drug coverage. That is, to receive all benefits listed under Medicare Parts A and B, and prescription drug coverage, MA enrollees on average pay the cost of the Part B premium, plus $15 per month, while FFS Medicare enrollees on average pay the cost of the Part B premium, plus $40 per month.[104] Indeed, Sean Creighton, testified that MA typically covers additional prescription drug benefits over those covered by FFS Medicare, and can offer prescription drug coverage at a reduced cost to beneficiaries.[105]

56.    Third, MA plans guarantee that annual out-of-pocket expenses will not exceed a maximum threshold while FFS Medicare offers no such guarantee.[106] This guarantee is

---

[101] Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings.

[102] Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings.

[103] Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings. See also "What is a stand-alone prescription drug plan?" *Healthinsurance.org*, available at https://www.healthinsurance.org/glossary/stand-alone-prescription-drug-coverage.

[104] Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings. Some enrollees may have a reduced Part B premium. See Section VII.C and "Medicare Advantage Program Payment System," *MedPAC*, November 2021 ("MedPAC, Medicare Advantage Program Payment System"), p. 3, available at https://www.medpac.gov/wp-content/uploads/2021/11/medpac_payment_basics_21_ma_final_sec.pdf.

[105] Creighton Deposition, day 1, p. 43:7–21 ("A. The other advantage is obviously that the medical and the drug benefit are integrated typically in Medicare Advantage. So these plans are both Part C, meaning Part A plus B equals C plans, and Part D plans. And within that there is a whole other level of advantage, too, because the Part C plans can use their rebate to reduce cost sharing for drugs under Part D, and generally do, and generally have better – they typically have co-pays rather than coinsurance for drugs under Part D, particularly for preferred drugs, generics or preferred brands. So there's a whole range of additional benefits that accrue from joining a Medicare Advantage plan for a beneficiary."), p. 44:14–15 ("You can also use the – Part C plans can use their money to reduce Part D premium.").

[106] Creighton Deposition, day 1, pp. 42:12–43:5 ("Medicare Advantage has a concept called the maximum out-of-pocket, which means that in any given year the amount that a beneficiary can spend out of pocket is capped. It was around 6,800 recently, like that; it might be a little higher now. That does not exist in fee-for-service. There's unlimited liability. So in fee-for-service, Medicare people either have to buy a supplemental insurance to cap their liability, or a lot of people in traditional fee-for-service still have supplemental insurance through either a Medicaid program or an employer program. So about 80 percent of fee-for-service – people in fee-for-service have or must have – you know, kind of have to have some other program to control the cost. You don't need that in Medicare Advantage because of this concept of the maximum out-of-pocket.").

beneficial for some individuals—for example those who expect to have very high health care expenditures or who have a fixed income and are unable to afford large, unanticipated spikes in out-of-pocket health care expenditures.[107] In 2023, MA plans are required to provide an out-of-pocket limit for Part A and Part B services that cannot exceed $8,300 annually for in-network services and $12,450 annually for in-network and out-of-network services combined.[108] The average out-of-pocket limit observed for MA plans in 2023 is lower than what was mandated: $4,835 for in-network services and $8,659 for in-network and out-of-network services combined.[109]

57.    In contrast, there is no annual out-of-pocket limit for FFS Medicare, and out-of-pocket spending for FFS Medicare enrollees can exceed out-of-pocket limits set by MA plans.[110] As discussed above, FFS Medicare enrollees may be required to bear the full cost of care for long inpatient stays and typically face coinsurance payments of 20 percent on physician visits and outpatient services, both of which can contribute to high out-of-pocket expenditures. In 2018, FFS Medicare enrollees in the top 10 percent of spenders had out-of-pocket payments that exceeded the in-network out-of-pocket limit for MA plans.[111] Consequently, out-of-pocket spending can be considerably higher under FFS Medicare than under Medicare Advantage for many individuals. A risk of high out-of-pocket expenditures is especially concerning for many

---

[107] FFS Medicare has a 20 percent coinsurance requirement for Part B coverage, so out-of-pocket spending for FFS Medicare enrollees can be substantial in cases where enrollees need frequent or costly physician services. See CMS, Medicare Costs at a Glance.

[108] MA implemented the out-of-pocket spending limit in 2011. Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings.

[109] These figures represent enrollment-weighted averages. Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings. One way that MA plans can potentially manage enrollees' out-of-pocket expenses is by controlling service use and spending through utilization-management techniques (e.g., limited provider networks or coordination of care programs to deliver appropriate services more efficiently). These savings can lower costs for enrollees through lower cost sharing or through lower premiums. See Vilsa Curto, et al., "Health Care Spending and Utilization in Public and Private Medicare," *American Economic Journal: Applied Economics*, 11(2), 2019 ("Curto et al., Health Care Spending and Utilization in Public and Private Medicare"), pp. 302–332 at pp. 302, 328.

[110] Claire Noel-Miller, "Medicare Beneficiaries' Out-of-Pocket Spending for Health Care," *AARP Public Policy Institute*, December 2021 ("Noel-Miller, Out-of-Pocket Spending"), p. 1, available at https://www.aarp.org/content/dam/aarp/ppi/2021/12/medicare-beneficiaries-out-of-pocket-health-care-spending.doi.10.26419-2Fppi.00105.002.pdf.

[111] Noel-Miller, Out-of-Pocket Spending, Table 1. In 2018, MA plans were required to provide an out-of-pocket limit for Part A and Part B services that could not exceed $6,700 for in-network services. As I explain in Section V.C, MA plan provider networks (i.e., the set of providers that provide "in-network services") can be more limited than the set of providers that accept FFS Medicare. See Gretchen Jacobson, et al., "A Dozen Facts About Medicare Advantage," *Kaiser Family Foundation*, November 13, 2018, available at https://web.archive.org/web/20181129174017/https://www.kff.org/medicare/issue-brief/a-dozen-facts-about-medicare-advantage.

Medicare beneficiaries since many Medicare beneficiaries have very limited and/or fixed income. For example, in 2019, half of all Medicare beneficiaries had incomes below $29,650.[112]

58.    Moreover, academic literature has found that MA confers surplus (i.e., utility gains) to Medicare beneficiaries. For example, Miller et al. (2023) use data from 2008–2017 to estimate a Medicare beneficiary's willingness to pay for additional features covered by MA plans but not covered by FFS Medicare, such as dental, vision, and hearing coverage. The authors find that over the period 2008–2017, average consumer willingness to pay was $604 per year for dental, vision, and hearing coverage packages that MA plans typically offer to beneficiaries without any additional premium.[113] These results indicate that MA plans provide substantial benefits to consumers. In fact, the authors show that MA plans generated $4.62 billion of surplus (i.e., utility benefits) to enrollees in 2017.[114] Likewise, Curto et al. (2021) estimate that MA plans conferred approximately $15 billion of surplus to enrollees in 2018.[115]

59.    In sum, economic theory, market data, survey data, and academic literature all indicate that many Medicare beneficiaries prefer and benefit from the Medicare Advantage program.

### C.    MA Plans Have Often Provided Better or More Efficient Care than FFS Medicare

60.    Academic literature has also found that MA plans can provide better or more efficient care than FFS Medicare. Following economic literature, I define more efficient care to be health care that provides the same patient outcomes while using fewer resources (i.e., while having lower health care utilization).[116] As noted in one study, because CMS pays MA plans fixed, risk-

---

[112] Wyatt Koma, et al., "Medicare Beneficiaries' Financial Security Before the Coronavirus Pandemic," *Kaiser Family Foundation*, April 24, 2020, available at https://www.kff.org/medicare/issue-brief/medicare-beneficiaries-financial-security-before-the-coronavirus-pandemic.

[113] Keaton Miller, et al., "The Optimal Geographic Distribution of Managed Competition Subsidies," Working Paper, January 20, 2023 ("Miller et al., The Optimal Geographic Distribution of Managed Competition Subsidies"), p. 4, available at
https://static1.squarespace.com/static/56a1484625981dd79f45da68/t/63caf1235229f06b12bda94a/1674244394942/2023-01-20-Optimal_Managed_Competition_Subsidies-paper.pdf.

[114] Miller et al., The Optimal Geographic Distribution of Managed Competition Subsidies, p. 5. They also estimate that the surplus for insurance companies was $3.10 billion.

[115] Vilsa Curto, et al., "Can health insurance competition work? Evidence from Medicare Advantage," *Journal of Political Economy*, 129(2), 2021, pp. 570–606 ("Curto et al., Can health insurance competition work? Evidence from Medicare Advantage") at p. 598. The paper also finds that the surplus for insurance companies was $33 billion. While the Miller et al. (2023) and Curto et al. (2021) estimates for the surplus generated by MA plans range in value, both sets of estimates are positive and substantial.

[116] John Wennberg, et al., "Tracking the Care of Patients with Severe Chronic Illness: The Dartmouth Atlas of Health Care 2008," *The Dartmouth Institute for Health Policy and Clinical Practice*, 2008, p. 54, available at

adjusted payments for the total cost of care, MA plans are incentivized to "use managed care techniques to limit their costs."[117] A recent study of Medicare enrollees found that those enrolled in MA had a lower overall utilization of health care when compared to enrollees in FFS Medicare, while not reporting less satisfaction with the quality of their care and having similar overall health outcomes to comparable enrollees in FFS Medicare.[118] Another study found that MA enrollees experienced lower intensity of post-acute care and fewer hospital readmissions than FFS Medicare patients, indicating more efficient care by reducing cost and maintaining or improving patient outcomes.[119] Duggan et al. (2018) show that hospital utilization (as measured by visits, procedures, and length of stay) increased for individuals who were forced out of MA plans when MA plans completely exited the individual's county.[120] In other words, MA plans had reduced utilization for their enrollees relative to FFS Medicare.[121] Additionally, Curto et al. (2019) compared spending in MA and FFS Medicare, controlling for enrollee county, risk score, and mortality, and found that health care spending per enrollee in MA was nine percent lower than FFS Medicare in 2010.[122] In other words, similar enrollees that would achieve similar mortality outcomes had lower spending in MA, indicating more efficient care. The study

https://data.dartmouthatlas.org/downloads/atlases/2008_Chronic_Care_Atlas.pdf ("Remember, efficiency here means using less money and fewer resources to achieve high-quality care in treating a similar set of patients over a given period of time.").

[117] Rajender Agarwal, et al., "Comparing Medicare Advantage And Traditional Medicare: A Systematic Review," *Health Affairs*, 40(6), 2021, pp. 937–944 at p. 937.

[118] Sungchul Park, et al., "Health Care Utilization, Care Satisfaction, and Health Status for Medicare Advantage and Traditional Medicare Beneficiaries With and Without Alzheimer Disease and Related Dementias," *JAMA Network Open*, 3(3), e201809, 2020, p. 9, available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2763477 ("Hence, a higher number of medical practitioner visits among TM beneficiaries compared with MA beneficiaries may indicate inefficient care delivery in TM associated with a lack of incentive to control utilization and coordinate care […] We detected no differences in care satisfaction between MA and TM beneficiaries with or without [Alzheimer disease and related dementias ("ADRD")] […] There were no or negligible differences in health status between MA and TM beneficiaries with or without ADRD.").

[119] Peter Huckfeldt, et al., "Less Intense Postacute Care, Better Outcomes for Enrollees in Medicare Advantage Than Those in Fee-For-Service," *Health Affairs*, 36(1), 2017, pp. 91–100 at pp. 91, 96, 98–99.

[120] Duggan et al., The Consequences of Health Care Privatization, pp. 153–186 at pp. 164–166, 179.

[121] Duggan et al., The Consequences of Health Care Privatization, pp. 153–186 at p. 179.

[122] Curto et al., Health Care Spending and Utilization in Public and Private Medicare, pp. 302–332 at pp. 303–304 ("Without either adjustment [for observable and unobservable characteristics], MA spending per enrollee-month is 30 percent lower than TM spending per enrollee-month. Holding county and risk score fixed, the spending difference becomes 25 percent, and adjusting for mortality differences further reduces it to 9 percent.").

additionally found that states with higher FFS Medicare spending had greater MA "savings," consistent with MA's efficiency relative to FFS Medicare.[123]

61.     Consistent with this notion, former CMS Administrator Marilyn Tavenner has stated that MA is a "game-changer" which serves as an "innovative" insurance product for millions of beneficiaries.[124] During her deposition, she also emphasized why MA plans provide a "good alternative" to FFS Medicare, noting that MA allowed CMS to move toward paying for "outcomes and quality."[125] This is consistent with MA plans providing better or more efficient care than FFS Medicare.

62.     MA plans may be more efficient relative to FFS Medicare in part due to care coordination measures, such as prior authorization or limited provider networks.[126] Such

---

[123] Curto et al., Health Care Spending and Utilization in Public and Private Medicare, pp. 302–332 at p. 320 ("Figure 3 shows that states with higher TM spending have greater MA 'savings' as measured by the percentage difference between MA spending and adjusted TM spending. This is consistent with the 'conventional wisdom' that higher spending TM areas are less efficient or productive (e.g., Skinner 2011).").

[124] Deposition of Marilyn B. Tavenner (CMS), February 28, 2018 ("Tavenner Deposition"), pp. 28:1–29:2, Exhibit 1000 ("'Medicare Advantage is the game-changer. It's the foundation for innovative, high-quality care delivery that seniors and the country demand,' AHIP President and CEO Marilyn Tavenner said. 'CMS should protect millions of beneficiaries who depend on Medicare Advantage and strengthen — not undermine — the program moving forward.'"), and pp. 49:19–50:4 ("Q Okay, and do you believe that Medicare Advantage is the foundation for innovative, high-quality care delivery? A Yes, sir, I do. Q And is that an opinion that you held while you were the administrator of CMS? A While I was the administrator of CMS, I probably learned what the Medicare Advantage program was about, and I felt it was a good alternative for a fee-for-service program, and I still feel that way today.").

[125] Tavenner Deposition, pp. 49:25–50:25 ("A While I was the administrator of CMS, I probably learned what the Medicare Advantage program was about, and I felt it was a good alternative for a fee-for-service program, and I still feel that way today. Q And can you tell us why did you, why did you believe it was a good alternative to fee-for-service? A I can answer that, and the best way is to talk about what was going on with us and the Affordable Care Act at the time, which is to say that we were looking at a way to pay for – move away from fee-for-service and pay for outcomes and quality and cost, and the Medicare Advantage program offered that. Q And can you tell us in what way the Medicare Advantage service provided a superior alternative to fee-for-service? A 'Superior alternative' I don't think is what I said. I just said that it offered an alternative to a fee-for-service model which tend to focus more on process, and we were trying to move toward outcomes, if that's helpful. Q Did you believe the Medicare Advantage program allowed CMS to move toward outcomes? A I did.").

[126] Bruce Landon, et al., "Analysis of Medicare Advantage HMOs Compared with Traditional Medicare Shows Lower Use of Many Services during 2003–2009," *Health Affairs*, 31(12), 2012, pp. 2609–2617 at pp. 2609–10 ("Health plans may actively manage the provider networks through which they deliver care and employ programs to promote the delivery of appropriate services and avoid excessive utilization. In addition, plans use a variety of financial incentives to physicians to influence the quality and quantity of services delivered. These are all hallmarks of integrated care. In contrast, in traditional Medicare, physicians make clinical decisions for their patients with little or no oversight."); Rajender Agarwal, et al., "Comparing Medicare Advantage And Traditional Medicare: A Systematic Review," *Health Affairs*, 40(6), 2021, pp. 937–944 at p. 937 ("Evidence from forty-eight studies showed that in most or all comparisons, Medicare Advantage was associated with more preventive care visits, fewer hospital admissions and emergency department visits, shorter hospital and skilled nursing facility lengths-of-stay, and lower health care spending. […] The Centers for Medicare and Medicaid Services (CMS) pays MA plans a fixed, risk-adjusted payment for the total cost of care. This payment method incentivizes MA plans to use managed care techniques to limit their costs. For example, health maintenance organizations (HMOs) require beneficiaries to use a defined network of providers, and these providers use utilization management policies and procedures (such as prior authorization) to prevent overuse.").

provisions can require enrollees to seek approval before utilizing expensive services and encourage enrollees to use lower-cost providers.[127] Previous research has shown that MA plans save costs relative to FFS Medicare, while simultaneously generating surplus (i.e., utility gains) for enrollees even after accounting for any consumer disutility associated with having more-limited provider access.[128] In sum, evidence suggests that MA plans are more cost efficient than FFS Medicare.

63.    Moreover, research shows that because MA insurers have an incentive to reduce overall health care expenditures for enrollees, MA plans with Part D coverage offer more generous prescription drug coverage than Medicare Part D prescription drug plans.[129]

64.    Evidence on aggregate Medicare spending also suggests that Medicare Advantage offers efficient care. Despite the steady growth in MA enrollment since 2006, as described in Section VI.B above, overall Medicare spending has not grown as rapidly as expected. In 2010, the Congressional Budget Office overestimated mandatory spending by the federal government for health care, which includes Medicare spending, in its projections for 2010–2020.[130] This overestimation was largely related to an overestimate of Medicare spending per beneficiary—the growth rate of Medicare spending per beneficiary dropped from 6.6 percent between 1987 and 2005 to 2.2 percent between 2013 and 2019.[131] Indeed, growth in average Medicare spending per beneficiary has declined substantially after 2010.[132] Furthermore, from 2010–2021, Medicare spending per beneficiary grew more slowly than per-capita private health care

---

[127] Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings.

[128] Curto et al, Can health insurance competition work? Evidence from Medicare Advantage, pp. 570–606 at p. 604 ("Our estimates suggest that private plans are able to obtain cost savings over traditional Medicare, sufficiently large to generate net surplus even after accounting for consumer disutility from having limited provider access.").

[129] Amanda Starc and Robert J. Town, "Externalities and Benefit Design in Health Insurance," *The Review of Economic Studies*, 2020, 87(6), pp. 2827–2858 at pp. 2–3 ("Stand-alone PDPs have an incentive to minimize drug expenditures, ignoring the impact on medical spending, while MA-PD plans have an incentive to minimize overall medical and drug expenditures […] Using the detailed prescription level data with over 123 million claims, we estimate that MA-PD plan enrollees spend between 8 and 11% less on average for an identical bundle of drugs. The differences across plan type are larger for sicker enrollees. Furthermore, consistent with externalities playing a key role, the expenditure differentials are largely driven by drugs that have been explicitly identified as having large medical care offsets and treat chronic conditions like asthma, diabetes, and high cholesterol.").

[130] "CBO's Projections of Federal Health Care Spending," *Congressional Budget Office*, March 17, 2023 ("CBO, Projections of Federal Health Care Spending"), available at https://www.cbo.gov/publication/58997.

[131] CBO, Projections of Federal Health Care Spending.

[132] Margot Sanger-Katz, et al., "A Huge Threat to the U.S. Budget Has Receded. And No One is Sure Why," *The New York Times*, September 4, 2023, available at https://www.nytimes.com/interactive/2023/09/05/upshot/medicare-budget-threat-receded.html.

spending.[133] And while overall Medicare Advantage spending has grown at a faster rate than overall FFS Medicare spending in recent years, that growth appears to be closely related to the overall growth in MA enrollment.[134]

65.    In addition to evidence showing that MA plans are more efficient than FFS Medicare, evidence shows that MA plans benefit the Medicare program as a whole. Specifically, a study from 2013 shows that increases in Medicare Advantage enrollment are associated with lower hospitalization costs and shorter hospital stays for all seniors, even those in FFS Medicare.[135]

66.    In sum, there are many reasons why Medicare Advantage provides value to plan enrollees, such as those I have discussed in this section. Medicare Advantage plans provide beneficiaries with increased choice, allowing individuals to choose plans that better fit their preferences and needs. The benefit of this increased choice is confirmed by market data, surveys, and academic literature that indicate that many individuals prefer and benefit from MA plans over FFS Medicare. Additional benefits, lower premiums, and lower out-of-pocket costs for MA plans as compared to FFS Medicare are all reasons why Medicare beneficiaries may prefer MA plans over FFS Medicare. And finally, evidence indicates that MA plans may provide better, or more efficient, care, and that Medicare Advantage has positive spillovers to the Medicare program more generally.

## VII.    CMS Payments to MA Plans Are Based on Predicted Health Care Expenditures and Account for Enrollee Risk Profiles, Plan Quality, and Other Factors

67.    In this section I explain that MA plans receive fixed payments from CMS in exchange for providing health insurance to enrollees, and that CMS adjusts these payments to account for the financial risk borne by MA plans. In particular, the fixed payment for each enrollee accounts for factors that relate to their predicted future health care expenditures such as the enrollee's health

---

[133] "The Facts About Medicare Spending," *Kaiser Family Foundation*, June 2023, available at https://www.kff.org/interactive/medicare-spending.

[134] Juliette Cubanski and Tricia Neuman, "What to Know about Medicare Spending and Financing," *Kaiser Family Foundation*, January 19, 2023, available at https://www.kff.org/medicare/issue-brief/what-to-know-about-medicare-spending-and-financing ("Historically, growth in spending on Medicare Advantage is due in large part to steady growth in private plan enrollment").

[135] Katherine Baicker, et al., "The Spillover Effects of Medicare Managed Care: Medicare Advantage and Hospital Utilization," *Journal of Health Economics*, 32(6), 2013, pp. 1289–1300 at p. 1299 ("We find that increasing MA penetration results in lower hospitalization costs and shorter lengths of stay system-wide. The magnitude of these spillovers is substantial, and taking them into account suggests higher optimal MA payments than would otherwise be the case.").

profile and demographic information. I also discuss other factors that are used to determine the fixed payment received by MA plans for each enrollee.[136]

## A.   CMS Pays MA Plans a Fixed Fee for Each Enrollee, Exposing Insurers to Financial Risk

68.     As explained in Section V, the MA program contracts with private insurers to provide health insurance to Medicare beneficiaries. Under MA, CMS pays MA plan providers (such as UnitedHealth) a fixed, pre-arranged monthly payment for each MA enrollee they cover, and this payment amount is updated based on bids provided annually by MA plans.[137] As I explain in more detail in Sections VII.B and VII.C, CMS's payment to MA plans does not depend on the actual health care expenditures incurred by plan enrollees. Instead, CMS payments to MA plans reflect an estimate of predicted health care expenditures for each enrollee in the MA plan. This predicted amount varies according to the characteristics of each enrollee.[138] For example, CMS would expect a 67-year-old woman with no known diagnoses for health conditions to have relatively low costs given her health status and relatively young age as a Medicare enrollee. As a result, CMS would predict that she would incur lower health care expenditures than another enrollee who was older or who already had known diagnoses. CMS would therefore pay less to an MA plan for insuring the 67-year-old healthy woman than for insuring an older enrollee in worse health. Sections VII.B and VII.C provide discussion on how CMS pays MA plans based on enrollees' demographics and diagnoses for health conditions.

69.     Because CMS payments to MA plans do not depend on the *actual* health care expenditures of covered enrollees, MA plans are exposed to financial risk, since *actual* health care expenditures that the MA plans may have to pay for their enrollees may differ from the *estimated* health care expenditures that the MA plans receive from CMS. In the above example of the 67-year-old healthy woman, CMS would not adjust its fixed payment to the MA plan later in the year even if this enrollee experienced substantial unexpected health issues during the

---

[136] In total, MA plans are paid the sum of their per-enrollee payments. CMS, Medicare Managed Care Manual Chapter 8, § 80 ("Monthly payments to MA organizations reflect all beneficiaries with an effective enrollment in the MA plan in question for the month for which payment is made, including those whose enrollment was effective prior to that month, and those for whom enrollment is effective as of that month.").

[137] "Report to Congress: Risk Adjustment in Medicare Advantage," *Centers for Medicare & Medicaid Services*, December 2021 ("CMS, Report to Congress: Risk Adjustment in Medicare Advantage"), p. 3, available at https://www.cms.gov/files/document/report-congress-risk-adjustment-medicare-advantage-december-2021.pdf.

[138] CMS, Report to Congress: Risk Adjustment in Medicare Advantage, pp. 3–4.

year such as a serious accident requiring hospitalization. In this hypothetical, the MA plan
would likely incur more expenditures associated with this enrollee's care than it would receive
in payment from CMS that year.[139]

70.    This example illustrates why paying MA plans a fixed amount per enrollee creates a
system in which MA plans assume financial risks even after CMS adjusts payments for
predicted health care expenditures: this happens because actual health care expenditures can be
different from predicted expenditures. That is, because enrollee expenses are not perfectly
predictable and can deviate substantially from the prediction, an MA plan may not receive
sufficient funds to cover its costs. This is one reason why it is particularly important that
insurers are properly compensated for the risks they bear when providing insurance to Medicare
enrollees.

**B.    CMS Uses Risk Adjustment to Ensure that Payments to MA Plans Account
for the Individual Risk of Each Enrollee within the Plan**

71.    Payments made by CMS to MA plans reflect an estimate of future health care
expenditures for the plan's enrollees, where the prediction is based on what these enrollees
would cost if they were enrolled in FFS Medicare and takes into account geographic variation in
costs.[140] These estimates are not the same for each enrollee because enrollees' expected health
care expenditures vary due to differences in health status and demographics. Not surprisingly,
sicker individuals are more likely to incur greater health care expenditures relative to healthier
individuals,[141] just as older individuals are more likely to incur greater health care expenditures
relative to younger ones.[142] As explained in Section V.C, risk adjustment is the process by which
payments to MA plans are adjusted to account for the risk of future health care expenditures of

---

[139] MA plans consider the risk profile of the plan's population as opposed to each individual enrollee. This means
that an MA plan does not consider the financial risk of taking on one enrollee, but of taking on the pool of enrollees
that it insures. See "Actuarial Bid Training: Introduction to Bidding," available at Introduction to Bidding.pdf when
accessing "Actuarial Bid Training (ZIP)" at "Actuarial Bid Training," *Centers for Medicare & Medicaid Services,*
modified September 6, 2023 ("CMS, Actuarial Bid Training: Introduction to Bidding"), p. 6 ("Projected costs that
are based on actual plan experience must reflect the risk profile of that plan's population"), available at
https://www.cms.gov/medicare/payment/medicare-advantage-rates-statistics/actuarial-bid-training.
[140] MedPAC, Report to the Congress, p. 432; CMS, Report to Congress: Risk Adjustment in Medicare Advantage,
pp. 3, 9.
[141] CMS, Report to Congress: Risk Adjustment in Medicare Advantage, pp. 3–4; MedPAC, Report to the Congress,
p. 432; Hornsby Deposition, pp. 36:20–37:8.
[142] Jared Ortaliza, et al., "How do health expenditures vary across the population," *Peterson-KFF Health System
Tracker,* November 12, 2021, available at https://www.healthsystemtracker.org/chart-collection/health-expenditures-
vary-across-population.

enrollees. In its current form, risk adjustment is based on health care diagnoses and certain demographic variables, all of which are associated with different expected health care expenditures.[143]

72.    A central goal of risk adjustment is to ensure that insurers receive proper compensation for the risk they bear in paying for the health care expenditures that their particular pool of enrollees will incur.[144] Without risk adjustment, insurers may be exposed to unacceptable risks and may not have sufficient funding to cover all of the health care expenditures associated with the sicker or older beneficiaries enrolled in a plan. Risk adjustment is intended to compensate insurers for covering beneficiaries who are expected to have high health care expenditures, for example due to poor health, so that insurers will not avoid covering such beneficiaries.[145]

73.    At a high level, CMS performs the risk adjustment process by first modeling the cost of various demographic characteristics and health conditions using data from FFS Medicare to estimate the "dollar coefficients" and "relative factors" of these components. Next, CMS applies the relative factors from the model to data from the MA plans on enrollee demographic characteristics and health conditions to arrive at MA patient risk scores. In this section, I describe these components in more detail, including providing information about the model, the relative factors obtained from the model, the information used from enrollees, and the process to estimate the risk scores for MA enrollees. Then, I provide an illustrative example showing how these components fit together.

---

[143] CMS, Medicare Managed Care Manual Chapter 7, §§ 70.1, 70.2; MedPAC, Report to the Congress, pp. 432–433.
[144] Hornsby Deposition, pp. 51:16–52:4 ("Q And CMS knew when it was creating the HCC model that it was creating incentives for MAOs to find and report diagnoses that were supported by the medical records, right? A The point of choosing an additive model is to pay an MA more for people with complex medical conditions who are sicker. That's the point; because they do have more diagnoses and because they're sicker. Therefore, they – the MAO should be paid more for those individuals. And conversely, to pay less for the people who really have very few diagnoses or – or just very non-serious conditions. That's the – that's the point of an additive model.").
[145] Hornsby Deposition, p. 53:16–20 ("My – the testimony – CMS' position is  that this model is meant to encourage MAOs to enroll sicker beneficiaries and care for them, and then CMS would like to pay them for – more for those sicker beneficiaries. That's CMS' view."); MedPAC, Report to the Congress, p. 432 ("The purpose of risk adjustment is to ensure that plans are adequately and fairly compensated for treating all categories of enrollees— those with high medical costs as well as those with less health care utilization. If the risk-adjustment system is flawed, misaligned incentives could result in 'favorable selection,' in which plans have an incentive to attract certain types of beneficiaries and avoid enrolling others. Plans can achieve unwarranted profits if the risk-adjustment system overpays for some enrollees and underpays for others.").

### 1. The CMS-HCC Regression Model and the Relative Factors

74.     Payments to MA plans are based on estimates of the costs associated with various demographic characteristics and health conditions in the FFS Medicare population. The model CMS used to estimate the costs associated with various demographic characteristics and health conditions is called the hierarchical condition category ("CMS-HCC") model. The CMS-HCC model estimates the average Medicare Part A and Part B costs associated with various demographic characteristics and health conditions.[146] In particular, the model uses data from enrollees in FFS Medicare ("FFS data") to estimate the contribution of certain demographic characteristics (e.g., age, gender, Medicaid enrollment, and disability status) and certain health conditions to the observed health care expenditures in FFS Medicare.[147] The model is considered to be a multivariate regression model because it relates a dependent variable (here Medicare Part A and B expenditures) to *multiple* explanatory variables (here demographic characteristics and health conditions) and aims to isolate the incremental contribution of each of these factors to the dependent variable.[148] The model is prospective, meaning that the demographic and health conditions of one calendar year are used to predict Medicare Part A and B expenditures of the enrollee in a subsequent calendar year.[149]

75.     CMS estimates the CMS-HCC model using data from beneficiaries enrolled in FFS Medicare.[150] These FFS data include information on expenditures for Parts A and B benefits for the enrollee, enrollee demographic information (such as age, gender, Medicaid status, and disability status), and enrollee health conditions.[151] In order to measure and identify health conditions of FFS Medicare enrollees, CMS uses the diagnosis codes associated with health care services rendered to these enrollees, which are reported to CMS on claims from medical

---

[146] CMS estimates multiple regression models for different sub-populations of Medicare beneficiaries that CMS anticipates have substantively different health care expenditures. For example, CMS estimates separate regression models for Medicare beneficiaries who live in the community, who live in long-term institutionalized settings, who are new enrollees, or who have end-stage renal disease. See CMS, Medicare Managed Care Manual Chapter 7, §§ 70.2, 70.3.

[147] From here on, when I discuss health care expenditures in the context of the CMS-HCC regression model, I am referring to Medicare Part A and Part B expenditures.

[148] CMS, Medicare Managed Care Manual Chapter 7, § 70.1.

[149] MedPAC, Report to the Congress, p. 433.

[150] CMS, Medicare Managed Care Manual Chapter 7, § 70.1.

[151] CMS, Medicare Managed Care Manual Chapter 7, §§ 70, 70.1; CMS, Report to Congress: Risk Adjustment in Medicare Advantage, p. 9.

providers.[152] Diagnosis information from medical providers is stipulated using diagnosis codes from the International Classification of Diseases ("ICD"),[153] which defines more than 10,000 unique diagnosis codes.[154] Rather than using all of these individual diagnosis codes directly in the regression model, CMS groups these codes into roughly 200 different hierarchical condition categories ("HCCs") and uses a subset of those HCCs within the model.[155] These HCCs are broad groups of diagnosis codes "based on similar clinical characteristics and severity, and cost implications."[156]

---

[152] CMS, Medicare Managed Care Manual Chapter 7, § 70.1.

[153] ICD codes are the medical standard used to classify medical conditions and procedures. See "CMS and AMA Announce Efforts to Help Providers Get Ready for ICD-10," *Centers for Medicare & Medicaid Services*, July 6, 2015, available at https://www.cms.gov/Medicare/Coding/ICD10/Downloads/AMA-CMS-press-release-letterhead-07-05-15.pdf. For example, the Medicare Provider Analysis and Review Hospital Stay File, which comprises inpatient hospitalization and skilled nursing facility claims, includes "up to 10 ICD-9-CM diagnoses and 6 ICD-9-CM procedures associated with each hospital or [skilled nursing facility] stay." The Outpatient File, which comprises "claims from institutional outpatient providers," likewise includes ICD-9-CM diagnosis and procedure codes, though "the reporting of these codes is sporadic." See "Analytics Issues in Using the Medicare Enrollment and Claims Data Linked to NCHS Surveys," *National Center for Health Statistics, Office of Analysis and Epidemiology*, December 3, 2012 ("NCHS, Analytic Issues in Using the Medicare Enrollment and Claims Data"), pp. 8–9, available at https://www.cdc.gov/nchs/data/datalinkage/cms_medicare_analytic_issues_final.pdf.

[154] See 2022 Midyear_Final ICD-1-CM Mappings.xlsx when accessing "2022 Midyear Final ICD-10 Mappings (ZIP)," at "2022 Model Software/ICD-10 Mappings," *Centers for Medicare & Medicaid Services* ("CMS, 2022 Midyear Final ICD-10 Mappings"), available at https://www.cms.gov/medicarehealth-plansmedicareadvtgspecratestatsrisk-adjustors/2022-model-softwareicd-10-mappings; Hornsby Deposition, pp. 184:14–15 ("There are 15,000 ICD-9 codes. There are about 3,000 in the payment model."). See also, Deposition of Kathleen O. Baker (UnitedHealth), May 30, 2023 ("Baker Deposition"), pp. 20:6–13, 223:16–18 ("There's thousands – tens of thousands of diagnosis codes. About 15,000 map to HCC.").

[155] In the CMS-HCC model used prior to 2011, CMS included only 70 out of 177 (or more) possible HCCs, while the model used in 2020 included 86 out of 204 possible HCCs. CMS, Report to Congress: Risk Adjustment in Medicare Advantage, pp. 14, 17, 19; "Advance Notice of Methodological Changes for Calendar Year (CY) 2011 for Medicare Advantage (MA) Capitation Rates, Part C and Part D Payment Policies and 2011 Call Letter," *Centers for Medicare & Medicaid Services*, February 19, 2010 ("CMS, Advance Notice of Methodological Changes for 2011"), pp. 8, 45, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Advance2011.pdf. See also Hornsby Deposition, pp. 183:13–17 ("The original CMS-HCC model assigned all diagnosis codes to an HCC. And then subsequently, CMS developed a payment model, and the payment model has a smaller subset of HCCs."); Deposition of Biggs Cannon (UnitedHealth), June 6, 2023 ("Cannon Deposition"), pp. 18:8–13, 229:4–10 ("Q Okay. And you have already testified that there's some – there are some diagnosis codes that do not map to an HCC; correct? […] THE WITNESS: Not all diagnosis codes map to an HCC in the Medicare Advantage risk adjustment model."); Baker Deposition, p. 47:2–3 ("About 15,000 ICD-9 codes map to 70-something HCC codes."). The CMS-HCC model has changed over time, including different HCCs and different interactions between HCCs as regressors, and changing which diagnosis codes correspond to which HCC. For two examples of model changes, see the discussions in the 2011 and 2020 Advance Notices: CMS, Advance Notice of Methodological Changes for 2011 pp. 7–10; "Advance Notice of Methodological Changes for Calendar Year (CY) 2020 for the Medicare Advantage (MA) CMS-HCC Risk Adjustment Model," *Centers for Medicare & Medicaid Services*, December 20, 2018, available at https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/advance2020part1.pdf.

[156] CMS, Medicare Managed Care Manual Chapter 7, § 70.1. For example, instead of having two different variables in the model for the "unspecified chronic bronchitis" and "interstitial emphysema" diagnoses, CMS groups these two diagnoses into one HCC named "Chronic Obstructive Pulmonary Disease" ("COPD"). The classification of diagnosis codes is exhaustive, so CMS assigns all diagnosis codes to an HCC. See CMS, 2022 Midyear Final ICD-

76.    The CMS-HCC regression model estimates the average incremental (Part A and B) costs associated with each HCC.[157] It might be the case that many patients with one condition, say diabetes without complication, also have another condition, say a heart attack (acute myocardial infarction), which are two different HCCs. By using the data on the sum of Part A and B costs, demographics, and HCCs for a large number of FFS Medicare enrollees with various HCCs, the CMS-HCC model can estimate the average incremental Part A and B expenditures for each HCC—in this example the HCC associated with diabetes and the HCC associated with a heart attack. The estimates of the incremental costs associated with each HCC and each demographic trait are called "dollar coefficients."[158]

77.    Once CMS estimates the CMS-HCC regression model and obtains dollar coefficient estimates associated with each demographic characteristic and HCC, it then uses the dollar coefficient estimates to calculate what are called "relative factors." A relative factor measures the incremental predicted health care expenditure for a given HCC or demographic characteristic relative to the average spending per enrollee in FFS Medicare.[159] More specifically, CMS calculates relative factors by dividing the dollar coefficients for the demographic characteristics and HCCs by the average predicted health care expenditures for a FFS Medicare enrollee in a specific year (i.e., the "denominator year").[160] The relative factors

10 Mappings; "Announcement of Calendar Year (CY) 2023 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies," *Centers for Medicare & Medicaid Services*, April 4, 2022, p. 127, available at https://www.cms.gov/files/document/2023-announcement.pdf; "Announcement of Calendar Year (CY) 2017 Medicare Advantage Capitation Rates and Medicare Advantages and Part D Payment Policies and Final Call Letter," *Centers for Medicare & Medicaid Services*, April 4, 2016, p. 81, available at https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/announcement2017.pdf; Pope et al., Risk Adjustment of Medicare Capitation Payments, pp. 119–141, Figure 3; Baker Deposition, pp. 43:18–44:10 ("Q […] HCC refers to hierarchical condition categories; is that right? A Yes. Q Okay. And what are hierarchical condition categories? A They're the risk adjustment disease categories related for risk adjustment. Q Okay. And they're used in the CMS HCC model to determine risk adjustment payments, correct? […] THE WITNESS: They are used to determine appropriate payment to health plans."); Cannon Deposition, pp. 222:24–223:6 ("Q What is a hierarchical condition category? […] THE WITNESS: Generally speaking, within Medicare Advantage CMS creates a mapping list of diagnosis codes and HCCs, and those HCCs are how they track conditions that are present for a given Medicare Advantage beneficiary.").

[157] CMS, Medicare Managed Care Manual Chapter 7, § 70.1.
[158] CMS, Medicare Managed Care Manual Chapter 7, § 70.1. I recognize that the coefficients from the CMS-HCC model represent correlations (or associations) and do not necessarily capture the causal impact of each HCC on Medicare expenditures. Despite this, I subsequently use causal language to describe the coefficients and relative factors, which is consistent with CMS's description of them.
[159] CMS, Medicare Managed Care Manual Chapter 7, § 70.1.
[160] Over time, CMS changes which years of FFS Medicare enrollees' data are used to estimate the regression coefficients of the CMS-HCC model. This process is known as re-calibration. See CMS, Medicare Managed Care Manual Chapter 7, § 70.1.

are used along with information from the MA plan enrollees to calculate MA enrollee risk scores, as described next.

## 2. Using MA Plan Patient Data to Calculate MA Risk Scores

78.    After CMS calculates the relative factors, it then calculates a "risk score" for each MA enrollee. The risk score of a specific MA enrollee depends on their demographic characteristics (e.g., age, sex, Medicaid enrollment, and disability status) and HCCs (e.g., dementia with complications (HCC51), congestive heart failure (HCC85), diabetes without complication (HCC19)).[161] To calculate the risk score, CMS receives data from MA plans regarding diagnosis codes and demographic information for all its plan enrollees.[162] For each enrollee, CMS first determines the associated HCCs, and then sums the relative factors associated with their HCCs as well as the relative factors associated with their demographic characteristics.[163] The enrollee's risk score is therefore equal to the sum of all of their relative factors.[164]

79.    CMS uses the enrollee's risk score in calculating the payment to the MA plan for each enrollee, such that all else being equal, payments will be higher for MA enrollees with higher risk scores and lower for enrollees with lower risk scores.[165] Exhibit 2 summarizes how CMS

---

[161] MedPAC, Report to the Congress, p. 432; CMS, Report to Congress: Risk Adjustment in Medicare Advantage, Table 5-20a, pp. 80–83.

[162] CMS, Medicare Managed Care Manual Chapter 7, §§ 20, 40, 120.3.2.

[163] CMS, Medicare Managed Care Manual Chapter 7, Table 2.

[164] See Limmer Deposition, pp. 66:9–68:7 ("Q The third bullet refers to a term 'risk scores.' What are the risk scores? Or what does the term 'risk score' refer to? A Risk scores are numerical calculations that provide a gauge or a value related to the – to individual beneficiaries; so its members, you know, seeking health care. And it's related to their – their health status. So the degree to which the cost of their health care will – would be. Where 1.0 is representing an average risk, a number greater than 1.0 is representing someone that has potentially greater costs than the average, and under 1 is less than average. Q And just to be precise, you said it reflects the health status? As stated here, it reflects both the health status and the demographics characteristics of a beneficiary, correct? A The risk score is calculated from various factors, including demographics and health status. And I thought that you were asking, like, what it reflects in terms of – it reflects expected costs or projected costs relative to these – these factors. Q Right. And so the higher the risk score for a beneficiary, the more costly they're likely to be compared to an average beneficiary? A Correct. Q And to obtain an individual beneficiary's risk score, one would add up the values that the risk model has calculated as the appropriate values for each of the health conditions and demographic statuses for that beneficiary, correct? A It would be based on the form and processes defined in the risk model. I think – so if that – Yes, so if that model has various factors, numerical factors, then that are added together, then based on the – and there's – there's a lot of different categories, right? There's – there's, you know, all the demographic categories, all the health status categories. But basically, you go through the specifications that are laid out for the model, and you compile that – that final numerical number.").

[165] MedPAC, Report to the Congress, p. 413.

calculates MA enrollee risk scores. Details of how risk scores influence payments to MA plans are discussed in Section VII.C.

*Exhibit 2*
*How Risk Scores Are Calculated*



Source: MedPAC, Report to the Congress; CMS, Medicare Managed Care Manual Chapter 7.
Note: For a given MA plan enrollee, the risk score is the sum of the relative factors that apply to that enrollee.

### 3. Illustrative Example of Calculating Relative Factors and Risk Score for Hypothetical Enrollee

80.     Exhibit 3 below shows the components of the risk score calculation for a hypothetical enrollee. The enrollee is a male in the 70–74-year-old age bracket who has two HCCs—diabetes with chronic complications (HCC 18) and acute myocardial infarction (i.e., a heart attack)

(HCC 86).[166] The example in Exhibit 3 is adopted from a CMS "clinical vignette" that is based on the CMS-HCC model used in 2020.[167]

81.    The CMS-HCC model estimates dollar coefficients associated with gender and age categories, which reflect the average Part A and B expenditures for someone in each of these categories (putting aside any particular health conditions that person may have). In the example, the coefficient associated with being a male aged 70 to 74 years is $5,615. The dollar coefficient from the CMS-HCC model associated with HCC 18 (diabetes with chronic complications) is $3,181 and the coefficient associated with HCC 86 (acute myocardial infarction) is $3,534. These dollar coefficients are shown in Exhibit 3.

82.    To arrive at the relative factors, CMS normalizes the dollar coefficients by dividing each dollar coefficient by the average per capita predicted health care expenditure for beneficiaries in FFS Medicare in the denominator year, as described earlier. As shown in Exhibit 3, the relative factor for a 70–74-year-old male is calculated as 0.600 ($5,615 / $9,365). Similarly, the relative factor for HCC 18 (diabetes with chronic complications) is 0.340 ($3,181 / $9,365) and for HCC 86 (acute myocardial infarction) it is 0.377 ($3,534 / $9,365).

83.    This individual's risk score is therefore 1.317, calculated by summing the three relative factors.

---

[166] The HCC for heart attack is only relevant the year in which the heart attack occurs. CMS coding guidelines indicate that the ICD-10 code for acute myocardial infarction may be used with four weeks of the event. See "Hierarchical Condition Category Coding," *American Academy of Family Physicians*, available at https://www.aafp.org/family-physician/practice-and-career/getting-paid/coding/hierarchical-condition-category.html ("Risk adjustment scores reset every year. Practices need to report active diagnoses annually, even chronic conditions."); "ICD-10-CM Official Guidelines for Coding and Reporting," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/ICD10/Downloads/2020-Coding-Guidelines.pdf. ("For encounters occurring while the myocardial infarction is equal to, or less than, four weeks old, including transfers to another acute setting or a postacute setting, and the myocardial infarction meets the definition for "other diagnoses" (see Section III, Reporting Additional Diagnoses), codes from category I21 may continue to be reported. For encounters after the 4 week time frame and the patient is still receiving care related to the myocardial infarction, the appropriate aftercare code should be assigned, rather than a code from category I21. For old or healed myocardial infarctions not requiring further care, code I25.2, Old myocardial infarction, may be assigned.")

[167] CMS, Report to Congress: Risk Adjustment in Medicare Advantage, pp. 14, 21; "Advance Notice of Methodological Changes for Calendar Year (CY) 2020 for Medicare Advantage (MA) Capitation Rates, Part C and Part D Payment Policies and 2020 Draft Call Letter," *Centers for Medicare & Medicaid Services*, January 30, 2019, pp. 38, 41, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Advance2020Part2.pdf; "Announcement of Calendar Year (CY) 2020 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," *Centers for Medicare & Medicaid Services*, April 1, 2019 ("CMS, Announcement of 2020 Medicare Advantage Capitation Rates"), p. 81, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2020.pdf.  The CMS-HCC model used in 2020 was estimated using 2014 diagnostic data and 2015 spending data, and was normalized using 2015 as the denominator year.

84.    By construction, the average risk score is 1.0 for the FFS Medicare population used to estimate the relative factors.[168] As such, a FFS Medicare enrollee with an "average health status" has a risk score of 1.0.[169] The hypothetical individual in the example with a risk score of 1.317 has demographic characteristics and HCCs associated with higher than average health risk, as is evidenced by the fact that their risk score is greater than 1.0.

---

**Exhibit 3**
**Hypothetical Example of Calculating a Risk Score**

| | Demographics and health conditions | Dollar Coefficient [a] | Average per capita predicted expenditure per year [b] | Relative factors [c] = [a] ÷ [b] |
|---|---|---|---|---|
| 1. | Male, age 70–74 | $5,615 | $9,365 | 0.600 |
| 2. | Diabetes with chronic complications (HCC 18) | $3,181 | $9,365 | 0.340 |
| 3. | Acute myocardial infarction (HCC 86) | $3,534 | $9,365 | 0.377 |
| | **Risk score** | | | **1.317** |

Source: CMS, "Report to Congress: Risk Adjustment in Medicare Advantage," pp. 20–22; CMS, Announcement of 2020 Medicare Advantage Capitation Rates, p. 81.
Note: This table is based on the "clinical vignette" hypothetical example from CMS. The Dollar Coefficients [a] are from the Version 24 CMS-HCC model for the Full Benefit Dual Aged community segment, as estimated using 2014 data on diagnoses and 2015 data on expenditures provided in the source. Numbers in this table are used for illustrative purposes.

---

### C.    CMS's Payments to Medicare Advantage Plans Are Based on Enrollee Risk Scores and Account for Plan Quality

85.    In this section, I explain how CMS's payments to MA plans relate to the risk scores of the plans' enrollees as well as to the quality of the plans. Specifically, CMS compensates MA plans using a methodology that compares a CMS benchmark against a bid from the MA plan. This methodology also incorporates enrollee risk scores and payment adjustments to reward plans for providing high-quality services. This payment methodology is described next.

---

[168] CMS, Medicare Managed Care Manual Chapter 7, §§ 70.1, 70.5.1. When the model is used to predict risk scores for years other than the denominator year, a normalization factor for each year is calculated so that the average FFS Medicare enrollee gets a risk score of 1.0 in subsequent years. See CMS, Medicare Managed Care Manual Chapter 7, § 90.
[169] "Average health status" in this context includes both the health conditions and the demographic factors associated with health. For example, to the extent being in an older age group and being male is associated with greater health costs than the Medicare population as a whole, an older male enrollee's risk score will reflect the health risks associated with his demographics.

86.     Payments from CMS to MA plans depend on a benchmark, which CMS calculates for each county, and which serves as a baseline for payments to MA plans.[170] The benchmark is based on the average expected health care expenditures for a resident of the county with average health status (i.e., a risk score of 1.0) in FFS Medicare.[171] This benchmark factors in average per capita Part A and Part B monthly expenditures from FFS Medicare beneficiaries residing in the county.[172] By creating a benchmark for each county, CMS pays MA plans in a way that accounts for differences in health care expenditures and utilization across different geographic regions. For example, in 2023, the benchmark in Wrangell, Alaska—a county with relatively high costs and/or high utilization—is $1,468.31; the benchmark in Miami-Dade, Florida is $1,105.92; while the benchmark in Marshall, Iowa—a relatively low cost and/or low utilization county—is $936.54.[173] This means that, all else equal, an MA plan in Wrangell, Alaska or Miami-Dade, Florida will be paid more per enrollee than an MA plan in Marshall, Iowa.

87.     Payments from CMS to MA plans also incorporate adjustments that reward plans for providing high-quality services through what is known as "star ratings."[174] CMS created the star ratings system to measure plan quality and incentivize insurers to offer high-quality plans, as

---

[170] Limmer Deposition, pp. 52:6–53:7 ("Q So the phrase 'release of MA Rate Book,' what is the MA Rate Book? A The MA Rate Book is – it's basically a compilation of the various rates that CMS would pay for – for individuals that enroll in the Medicare Advantage Program. So those are – they vary across the country by geographic area. And each – each area that – that's represented in that rate book has a unique rate. Q And those are generally by county, correct? A Correct, by county. Q And the county rate, is that also sometimes called a benchmark? A Yes. Those – those two terms are similar. Q And the benchmark that's published in the MA Rate Book by county, is it – is it accurate to say that it's a – a standardized benchmark? A It is standardized for risk. Yes. Basically, yes, it's a standardized benchmark, correct. Q And so what that means, it's the benchmark set for a 1.0 population, correct? A Yes.").

[171] MedPAC, Report to the Congress, p. 419.

[172] The counties are organized into quartiles based on this average FFS Medicare spending. "The highest spending quartile of counties has benchmarks set at 95 percent of local FFS Medicare spending. The next highest spending quartile of county benchmarks is set at 100 percent of FFS Medicare spending, followed by the third highest quartile set at 107.5 percent of FFS Medicare spending. The lowest spending quartile has benchmarks set at 115 percent of local FFS Medicare spending. (U.S. territories are treated like counties in this low-spending quartile.) Counties can move among quartiles from year to year and in doing so receive a blended quartile factor; for example, a county moving from the 100 percent quartile in 2021 to the 107.5 percent quartile in 2022 would have a blended rate of 103.75 percent." See MedPAC, Report to the Congress, pp. 420–421, 455.

[173] See CountyRate2023.csv when accessing "2023 MA Rate Book (ZIP)," at "2023," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/medicarehealth-plansmedicareadvtgspecratestatsratebooks-and-supporting-data/2023.

[174] See Jeannie Fuglesten Biniek, et al., "Spending on Medicare Advantage Quality Bonus Payments Will Reach at Least $12.8 Billion in 2023," *Kaiser Family Foundation*, August 9, 2023, available at https://www.kff.org/medicare/issue-brief/spending-on-medicare-advantage-quality-bonus-payments-will-reach-at-least-12-8-billion-in-2023("To encourage Medicare Advantage plans to compete for enrollees based on quality, the Affordable Care Act (ACA) established a quality bonus program that increases payments to plans based on a five-star rating system.").

well as to provide Medicare beneficiaries with information about the quality and performance of MA plans.[175] The star rating system measures five broad "domains" of plan performance: offering screenings, tests, and vaccines for staying healthy, managing chronic care, enrollee experience, enrollee complaints, and customer service.[176] Plans are rated up to five stars, in half star increments.[177]

88.     MA plans are incentivized to offer attractive plans to potential enrollees and to perform well on their ratings.[178] There are two financial incentives. First, CMS provides "Quality Bonus Payments" which increase the relevant CMS benchmark (and thus the baseline for payments to MA plans) for plans that realize at least four stars in the star rating system.[179] The second incentive is a higher payment, through a "rebate multiplier," for MA plans that bid below the benchmark. The rebate multiplier is applied to the difference between the bonus-adjusted benchmark and the bid, and as a result, plans with higher star ratings can receive greater rebate payments. Specifically, the difference between the bid and the benchmark is multiplied by the rebate multiplier, which is a factor equal to 50, 65, or 70 percent, depending on the plan's star rating.[180] This leads to a rebate payment from CMS, which is also risk-adjusted based on the risk

---

[175] See MedPAC, Medicare Advantage Program Payment System, p. 1; "Medicare 2022 Part C & D Star Ratings Technical Notes," *Centers for Medicare & Medicaid Services*, October 4, 2021 ("CMS, Medicare 2022 Part C & D Star Ratings Technical Notes"), p. 1, available at https://www.cms.gov/files/document/2022-star-ratings-technical-notes-oct-4-2022.pdf. During the coronavirus public health emergency, CMS relaxed MA quality reporting rules, impacting 2022 star ratings and 2023 payment rates (which are based on 2022 ratings). Some plans that would not otherwise have received quality bonuses in 2023 will receive bonus payments due to the relaxation of reporting rules. See MedPAC, Report to Congress; p. 446.

[176] CMS, Medicare 2022 Part C & D Star Ratings Technical Notes, pp. 3–4, 10.

[177] CMS, Medicare 2022 Part C & D Star Ratings Technical Notes, p. 3.

[178] Plans rated at four-and-a-half or five stars receive a rebate payment of 70 percent of the difference between the bid and the benchmark. Plans rated at three-and-a-half or four stars, as well as new plans, receive a rebate payment of 65 percent. Finally, plans rated at three or fewer stars receive a rebate payment of 50 percent. See CMS, Advance Notice of Methodological Changes for 2023, Table II-3 on p. 23.

[179] As explained in fn. 172 above, counties are organized into quartiles based on average FFS Medicare spending, with benchmarks set at a certain percentage of local FFS Medicare spending depending on the quartile. For high-rated plans, CMS adds five percentage points to the benchmark percentage. For example, a five-star plan in a county with the lowest spending quartile would have a benchmark set at 120 percent of local FFS Medicare spending (115 percent + 5 percent). By contrast, a low-rated plan within the same county would have a benchmark set at 115 percent of local FFS Medicare spending. See CMS, Advance Notice of Methodological Changes for 2023, pp. 18–20, Table II-2. Quality Bonus Payments originated in 2012 after the Affordable Care Act required CMS to incorporate star ratings into payments to MA plans. See also "Evaluation of the Medicare Quality Bonus Payment Demonstration: Final Report," *L&M Policy Research*, February 2016, p. 4, available at https://innovation.cms.gov/files/reports/maqbpdemonstration-finalevalrpt.pdf.

[180] "Advance Notice of Methodological Changes for Calendar Year (CY) 2023 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies," *Centers for Medicare & Medicaid Services*, February 2, 2022 ("CMS, Advance Notice of Methodological Changes for 2023"), Table II-3 on p. 23, available at https://www.cms.gov/files/document/2023-advance-notice.pdf.

score of the plan's enrollees.[181] CMS requires the insurer to return these funds to its enrollees in some form, such as by providing supplemental benefits or reducing premiums.[182] Most MA enrollees (71 percent) are in plans with star ratings of four or higher, which means that most MA enrollees are in plans that receive Quality Bonus Payments, as well as higher rebates (if bidding below the benchmark).[183]

89.    When proposing a plan for a particular county, MA plans submit a "bid" to CMS that is based on both the benefits (including financial parameters of the benefit structure such as copayments) that the plan will offer its enrollees as well as what the MA plans require as monthly compensation from CMS (based on historical trends).[184] To determine how much to pay the MA insurer for its plan in a particular county, CMS compares this bid against the benchmark.[185]

90.    MA plans choose both their plan benefits and their bid amount when making an offering. Both of these components can impact an insurer's prediction of future health care expenditures, and MA plans may face tradeoffs between these two components.[186] For example, the plan may choose to offer more benefits, but then could require a higher bid to cover any higher predicted costs. In turn, a particular bid amount would have implications for what benefits the insurer decides to cover.

---

[181] MedPAC, Medicare Advantage Program Payment System, p. 3.

[182] Plans can also allocate some of the rebate towards administrative expenses and margins. See MedPAC, Medicare Advantage Program Payment System, p. 3; MedPAC, Report to the Congress, p. 420.

[183] Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings.

[184] 42 CFR § 422.254, "Submission of bids," available at https://www.law.cornell.edu/cfr/text/42/422.254; Deposition of Melissa Sedor (UnitedHealth), June 29, 2023 ("Sedor Deposition"), pp. 10:8–10, 28:3–31:24; CMS, Actuarial Bid Training: Introduction to Bidding, p. 4.

[185] MA plans can serve one or more counties, and CMS adjusts its payments based on the county or counties in which the enrollees reside. CMS pays local MA plans and regional MA plans slightly differently. Regional plans were created to improve access to Medicare Advantage plans for rural beneficiaries. They can cover statewide or multi-state regions. See MedPAC, Medicare Advantage Program Payment System, p. 1; Meredith Freed, et al., "Medicare Advantage in 2022: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings," *Kaiser Family Foundation*, August 25, 2022, available at https://web.archive.org/web/20230211090856/https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2022-premiums-out-of-pocket-limits-cost-sharing-supplemental-benefits-prior-authorization-and-star-ratings. In this section, I focus on local plans, though the methodology for regional plans is conceptually similar. See CMS, Actuarial Bid Training: Introduction to Bidding, pp. 12–14.

[186] CMS, Actuarial Bid Training: Introduction to Bidding, pp. 4–6; Sedor Deposition, pp. 28:3–31:24 ("Q Okay. And then the number you give CMS is what amount of money it needs to cover the benefits it hopes to provide assuming the average risk score is 1; correct? A Correct. The 1.0 bid is the amount of money we would need from CMS assuming the average risk score was 1 to cover the benefits we have planned for that member for each plan.").

91.     Insurers compete by offering plans with different attributes.[187] When bidding below the benchmark, plans must use the rebate to provide additional benefits to enrollees, whether that is through reduced cost sharing, reduced premiums, or supplemental benefits, such as dental or vision benefits.[188] Competition between MA plans and the desire to offer these additional benefits may incentivize insurers to place bids below the benchmark. Plans may also offer additional supplemental benefits not financed by the rebate and can charge premiums to enrollees to cover those benefits.[189]

92.     MA plans cannot submit excessively high bids: they must adhere to CMS policies that limit the maximum bid they are allowed to make above the Medicare benefits they need to cover, mandatory or optional supplemental benefits, and administrative and operational costs.[190] When choosing plan benefits and their bid amount, MA insurers must also consider that CMS limits their profits through the Medical Loss Ratio, or MLR, as discussed in Section V.C above. Because insurers are required to spend at least 85 percent of their premium revenues on patient care, they cannot, for example, charge high premiums without providing correspondingly more generous benefits.

93.     Actual payments to an MA plan depend on whether their bid is higher or lower than the benchmark. If the bid is higher, the enrollees must pay a premium, and if the bid is lower, the plans receive a rebate, which as described above, depends on the difference between the benchmark and the plan bid, and on the plan's star rating. CMS uses risk adjustment to account for the fact that some beneficiaries have higher than average costs while others have lower than average costs. The rest of this section explains the scenarios where (1) the bid is equal to or

---

[187] MA insurers in more competitive markets are incentivized to offer more generous plans to attract beneficiaries. As one study demonstrates, reduced competition among MA insurers may reduce plan generosity. See Daria Pelech, "Paying more for less? Insurer competition and health plan generosity in the Medicare Advantage program," *Journal of Health Economics*, 61, 2018, pp. 77–92.

[188] MedPAC, Report to the Congress, p. 420. See also, Limmer Deposition, p. 149:9–21 ("Q And so I think this is what you were talking about before, which is the plan has to take that rebate amount that it calculated and it has to allocate it between these various categories of what we're calling supplemental benefits; namely, reducing A/B cost sharing, other A/B mandatory supplemental benefits; Part B premium buydown, Part B basic premium buydown, and Part D supplemental premium buydown, correct? A Yes. And those are the only options.").

[189] MedPAC, Report to the Congress, p. 420.

[190] CMS regulates MA plan's "gain/loss margin," or the revenue margin that the MA plan can accrue above the revenue required by the plan to cover Medicare-covered benefits, mandatory or optional supplemental benefits, and costs to cover the administration and operation of the MA bid. The aggregate "gain/loss margin" across an MA insurer's plans cannot be more than 5.5 percent without CMS approval. See "Instructions for Completing the Medicare Advantage Bid Pricing Tools For Contract Year 2023," *Centers for Medicare & Medicaid Services*, February 2022, available at https://www.cms.gov/files/document/draft-instructions-completing-medicare-advantage-bid-pricing-tools-cy2023.pdf, pp. 13, 25–27, 31.

higher than the benchmark, and (2) the bid is below the benchmark. These scenarios are also illustrated via numerical examples below.

### 1. MA Plan Bid Is Equal to or Higher than the Benchmark

94.    If the insurer's MA plan bid is equal to or *higher* than the benchmark, CMS sets a monthly enrollee "base rate" equal to the benchmark. This base rate is then adjusted to account for the risk score of the plan's enrollees. When the bid is higher than the benchmark, each enrollee in the plan pays the insurer the same premium,[191] which is equal to the difference between the insurer's bid and CMS's benchmark.[192] CMS then makes an additional adjustment to the payment to the MA plan for each enrollee based on their individual risk score and on the MA plan's premium amount. This adjustment is called the "enrollee premium adjustment" and compensates the insurer for any risk it bears from receiving identical (i.e., not risk-adjusted) premiums from individual enrollees.[193] The sum of the enrollee premium adjustments is zero if the average enrollee risk scores across all enrollees in the plan is 1.0.

95.    Exhibit 4 shows an example for the per-enrollee monthly payment that a plan would receive if it bid above the benchmark. Consider a simplified example, where the benchmark is $1,000. The plan enrolls two individuals, one with a risk score of 0.9, and one with a risk score of 1.1. The plan bids $1,100 to CMS. Exhibit 4 shows the payment for two different plans, one with a star rating of 3 (Plan Alpha), and one with a star rating of 5 (Plan Beta).

96.    Since Plan Alpha has a 3-star rating, it does not qualify for the Quality Bonus Payment, so CMS uses the benchmark ($1,000) as its base rate. The plan collects $100 in premium from each enrollee, which is the difference between its bid and the benchmark. For each individual, CMS pays Plan Alpha an amount equal to the base rate multiplied by the individual's risk score, plus or minus any necessary enrollee premium adjustment (the individual premium adjustments are offset in aggregate if the average risk score across all enrollees is 1.0). Thus, for the low-risk individual with risk score 0.9, CMS pays Plan Alpha the risk-adjusted benchmark, $900 ($1,000 x 0.9), minus $10 ($100 x (0.9 - 1)), the enrollee premium adjustment, for a total of $890. The

---

[191] This premium is incremental to the Part B premium that all enrollees in Medicare pay (which is $164.90 per month in 2023). See CMS, 2023 Medicare Parts A & B Premiums and Deductibles; MedPAC, Medicare Advantage Program Payment System, p. 2.

[192] MedPAC, Medicare Advantage Program Payment System, pp. 2–3.

[193] MedPAC, Medicare Advantage Program Payment System, pp. 2–3.

individual pays a premium of $100, but the plan will receive $90 "in premium" for this individual (from the patient and CMS combined) due to the negative premium adjustment. For the high-risk individual with risk score 1.1, CMS pays Plan Alpha the risk-adjusted benchmark, $1,100 ($1,000 x 1.1), plus $10 ($100 x (1.1 - 1)), the enrollee premium adjustment, for a total of $1,110. In this case, the plan receives more than the premium paid by the individual, as CMS pays a premium adjustment of $10. The enrollee premium adjustment means that CMS, not enrollees, pays the risk adjustment associated with the $100 premium for that enrollee.

97.     Plan Beta has a 5-star rating, so it benefits from the bonus-adjusted benchmark. The plan receives a Quality Bonus Payment that increases the benchmark by 5 percent to $1,050.[194] The plan collects $50 from each enrollee, the difference between its bid ($1,100) and the bonus-adjusted benchmark ($1,050). For each enrollee, CMS pays Plan Beta an amount equal to the bonus-adjusted benchmark multiplied by the individual's risk score, plus or minus any necessary premium adjustments. So, for the low-risk individual, CMS pays Plan Beta the risk-adjusted and bonus-adjusted benchmark, $945 ($1,050 x 0.9) minus $5 ($50 x (0.9 - 1)), the enrollee premium adjustment, for a total of $940. For the high-risk individual, CMS pays Plan Beta the risk-adjusted and bonus-adjusted benchmark, $1,155 ($1,050 x 1.1) plus $5 ($50 x (1.1 - 1)), the enrollee premium adjustment, for a total of $1,160.

98.     The total payment that Plan Alpha receives from CMS for these two enrollees, with an average risk score of 1.0, is equivalent to twice the benchmark. The payment that Plan Beta receives from CMS is equivalent to twice the bonus-adjusted benchmark.

---

[194] Counties are organized into quartiles based on average FFS Medicare spending, with benchmarks set at a certain percentage of local FFS Medicare spending depending on the quartile. For high-rated plans, CMS adds five percentage points to the benchmark percentage. For the examples throughout Section VII.C, I assume the plan is in a county in the 2nd highest quartile of FFS Medicare spending, and thus has a benchmark set at 100 percent of local FFS Medicare spending. With the Quality Bonus Payment, this means the bonus-adjusted benchmark is 105 percent of local FFS Medicare spending. See fn. 179 above.

***Exhibit 4***
***Illustration of Medicare Advantage Plan Payment for Plans Bidding Above the Benchmark***

| | | Plan Alpha Lower Quality Plan, 3 Stars | | Plan Beta Higher Quality Plan, 5 Stars | |
|---|---|---|---|---|---|
| | | Low Risk | High Risk | Low Risk | High Risk |
| 1. | CMS Plan Benchmark | [a] | $1,000 | $1,000 | $1,000 | $1,000 |
| 2. | Plan Star Rating Bonus Percentage | [b] | 0% | 0% | 5% | 5% |
| 3. | Quality Bonus Payment | [c] = [a] x [b] | $0 | $0 | $50 | $50 |
| 4. | Bonus-Adjusted Benchmark | [d] = [a] + [c] | $1,000 | $1,000 | $1,050 | $1,050 |
| 5. | Bid | [e] | $1,100 | $1,100 | $1,100 | $1,100 |
| 6. | CMS Base Rate | [f] = [d] | $1,000 | $1,000 | $1,050 | $1,050 |
| 7. | Risk Score | [g] | 0.9 | 1.1 | 0.9 | 1.1 |
| 8. | Risk Adjusted Payment | [h] = [f] x [g] | $900 | $1,100 | $945 | $1,155 |
| 9. | Enrollee Premium | [i] = [e] - [f] | $100 | $100 | $50 | $50 |
| 10. | CMS Enrollee Premium Adjustment | [j] = ([g]-1) x [i] | -$10 | $10 | -$5 | $5 |
| 11. | Total CMS Payment to Plan | [k] = [h] + [j] | $890 | $1,110 | $940 | $1,160 |
| 12. | Total Payment to Plan | [l] = [i] + [k] | $990 | $1,210 | $990 | $1,210 |

Source: MedPAC, Medicare Advantage Program Payment System; CMS, Advance Notice of Methodological Changes for 2023.
Note: In this example, there are two plans, one with a 3-star rating, and one with a 5-star rating. Each plan has two enrollees, one with a risk score of 0.9, and one with a risk score of 1.1. Since both plans are bidding above the bonus-adjusted benchmark, neither qualifies for rebates.

## 2. MA Plan Bid Is Lower than the Benchmark

99.     If, the insurer's MA plan bid is *lower* than the benchmark, CMS sets the monthly enrollee base rate equal to the bid. The plan enrollees will not have an incremental premium to the Part B premium, and in some cases they may pay a reduced Part B premium.[195] One report indicates that over 7 in 10 MA enrollees pay no incremental premium, indicating that the insurer bids are often at or below CMS's benchmark.[196] CMS also adjusts the base rate to account for the risk scores of the plan's enrollees. In addition, when the MA plan bid is lower than the benchmark, CMS provides the MA plan with a rebate, as explained earlier, which depends on the plan's star rating and is also adjusted based on enrollees' risk scores.[197]

100.   Exhibit 5 shows an example of the per-enrollee monthly payment that a plan would receive if it bid below the benchmark. As in the previous example, the benchmark is $1,000 and the plan enrolls two individuals, one with a risk score of 0.9, and one with a risk score of 1.1. Similar to the prior exhibit, Exhibit 5 shows two plans, one with a 3-star rating (Plan Gamma),

---

[195] MedPAC, Medicare Advantage Program Payment System, p. 3.
[196] Ochieng et al., Medicare Advantage in 2023: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings.
[197] MedPAC, Medicare Advantage Program Payment System, p. 3.

and one with a 5-star rating (Plan Delta). Plan Gamma has a 3-star rating and does not qualify for a Quality Bonus Payment, so its benchmark is not adjusted. Here, the plans bid $900. CMS uses the bid as its base rate. For each enrollee, CMS pays Plan Gamma an amount equal to the base rate multiplied by the individual's risk score. So, for the low-risk enrollee with a risk score of 0.9, CMS pays Plan Gamma $810 ($900 x 0.9). For the high-risk individual with a risk score of 1.1, CMS pays Plan Gamma $990 ($900 x 1.1). Since Plan Gamma bids below the benchmark, it also receives a rebate from CMS for each enrollee (which the plan must redistribute to enrollees as additional benefits or as a reduced Part B premium).[198] As a 3-star plan, Plan Gamma's per-enrollee rebate multiplier is 50 percent.[199] For the low-risk individual, the rebate is equal to $45, the difference between the risk-adjusted bid and the risk-adjusted benchmark, multiplied by the rebate multiplier [(($1,000 - $900) x 0.9) x 0.5]. Plan Gamma receives a rebate of $55 for the high-risk enrollee [(($1,000 - $900) x 1.1) x 0.5].

101.    Plan Delta has a 5-star rating, so receives the Quality Bonus Payment. As in the previous example, the benchmark is increased five percent. For each enrollee, CMS pays Plan Delta an amount equal to the base rate (i.e., the bid) multiplied by the individual's risk score. Thus, for the low-risk individual, with risk score 0.9, CMS pays Plan Delta $810 ($900 x 0.9). For the high-risk individual, with risk score 1.1, CMS pays Plan Delta $990 ($900 x 1.1). Plan Delta also receives a rebate from CMS but is eligible for a 70 percent rebate multiplier due to its quality rating.[200] For the low-risk individual, the rebate is equal to $94.50, the difference between the risk-adjusted and bonus-adjusted benchmark and the risk-adjusted bid multiplied by the rebate multiplier [(($1,050 - $900) x 0.9) x 0.7]. After a similar calculation, CMS pays Plan Delta $115.50 as a rebate for the high-risk individual [(($1,050 - $900) x 1.1) x 0.7].

102.    The total payment that Plan Gamma receives from CMS for these two enrollees is below twice the benchmark but above twice the bid due to the rebate (average payment of $950). The total payment that Plan Delta receives from CMS for these two enrollees is above twice the benchmark (average payment of $1,005) due to the rebate and the Quality Bonus Payment. And because the bid is below the benchmark, enrollees do not pay a premium.

---

[198] MedPAC, Medicare Advantage Program Payment System, p. 3.
[199] CMS, Advance Notice of Methodological Changes for 2023, Table II-3 on p. 23.
[200] CMS, Advance Notice of Methodological Changes for 2023, Table II-3 on p. 23, available at https://www.cms.gov/files/document/2023-advance-notice.pdf.

*Exhibit 5*
*Illustration of Medicare Advantage Plan Payment for Plans Bidding Below the Benchmark*

| | | Plan Gamma<br>Lower Quality Plan, 3 Stars | | Plan Delta<br>Higher Quality Plan, 5 Stars | |
|---|---|---|---|---|---|
| | | Low Risk | High Risk | Low Risk | High Risk |
| 1. | CMS Plan Benchmark | [a] | $1,000 | $1,000 | $1,000 | $1,000 |
| 2. | Plan Star Rating Bonus Percentage | [b] | 0% | 0% | 5% | 5% |
| 3. | Quality Bonus Payment | [c] = [a] x [b] | $0 | $0 | $50 | $50 |
| 4. | Bonus-Adjusted Benchmark | [d] = [a] + [c] | $1,000 | $1,000 | $1,050 | $1,050 |
| 5. | Bid | [e] | $900 | $900 | $900 | $900 |
| 6. | CMS Base Rate | [f] = [e] | $900 | $900 | $900 | $900 |
| 7. | Risk Score | [g] | 0.9 | 1.1 | 0.9 | 1.1 |
| 8. | Risk Adjusted Payment | [h] = [f] x [g] | $810 | $990 | $810 | $990 |
| 9. | Rebate Multiplier | [i] | 0.5 | 0.5 | 0.7 | 0.7 |
| 10. | Rebate | [j] = ([d]-[f]) x [i] | $50 | $50 | $105 | $105 |
| 11. | Risk Adjusted Rebate | [k] = [g] x [j] | $45.00 | $55.00 | $94.50 | $115.50 |
| 12. | Total CMS Payment to Plan | [l] = [h] + [k] | $855.00 | $1,045.00 | $904.50 | $1,105.50 |

Source: MedPAC, Medicare Advantage Program Payment System; CMS, Advance Notice of Methodological Changes for 2023.
Note: In this example, there are two plans, one with a 3-star rating, and one with a 5-star rating. Each hypothetical plan has two enrollees, one with a risk score of 0.9, and one with a risk score of 1.1. Since both plans are bidding below the bonus-adjusted benchmark, both qualify for rebates.

### D.    Reporting Complete Diagnosis Information Is Important for Medicare Advantage Insurers

103.    As explained earlier in this report and is further detailed above in Sections VII.A–C, enrollees' diagnosis codes (i.e., ICD codes) affect risk scores, and these affect CMS payments to MA plans. These CMS payments ensure that plans can offer the full array of health care services to plan members. If the diagnosis information that determines payments to MA plans is incomplete, MA plans risk not being reimbursed sufficiently to cover their expected costs, and MA insurers might attempt to avoid providing insurance for those who are very sick. Because of this, MA insurers are incentivized to provide complete enrollee diagnosis information to CMS.[201] Additionally, having complete information about enrollee health status can be helpful in providing more efficient and/or better care.[202] For example, knowing that an enrollee has

---

[201] MedPAC, Report to the Congress, p. xxviii ("MA plans have a financial incentive to ensure that their providers record all possible diagnoses: Each diagnosis documented raises an enrollee's risk score, and higher enrollee risk scores result in higher payments to the plan.").
[202] "Importance of Documentation" *U.S. Department of Health & Human Services, Office of Inspector General,* January 30, 2012, available at https://oig.hhs.gov/newsroom/oig-podcasts/importance-documentation ("Good documentation is important to protect your patients. Good documentation promotes patient safety and quality of care. Complete and accurate medical recordkeeping can help ensure that your patients get the right care at the right time. At the end of the day, that's what really matters.").

diabetes before they develop significant complications can help MA plans and enrollees better manage care and can lead to better health outcomes.

104.    Given these incentives to ensure a complete record of enrollee diagnosis information, MA plans, such as UnitedHealth, often take actions to capture complete diagnosis information for their plan enrollees.[203] For example, MA plans have taken steps to review medical records and report all diagnoses that are supported in the medical record, even those that were not previously reported in claim submissions.[204] MA plans have also used home visits to conduct health assessments of enrollees and report diagnoses that are found.[205] Without this type of additional review, the plan's information about its enrollees' health conditions may not be complete.

105.    MA insurers and FFS Medicare have different incentives concerning the submission of diagnosis codes to CMS. As explained above, MA insurers have an incentive to identify and record all relevant diagnoses so that they can receive adequate compensation for the risk they bear. In contrast, physicians billing to FFS Medicare are compensated by CMS for each procedure performed so long as there is a *single* diagnosis that supports a need for the services provided. Therefore, these physicians do not have the same incentives to submit complete diagnosis information.[206] Indeed, information on diagnoses for claims submitted for FFS Medicare enrollees through Medicare Part B can be "sporadic," potentially reflecting these providers' diminished incentive to submit complete information on diagnoses.[207]

---

[203] MedPAC, Report to the Congress, p. 437 ("MA plans use several mechanisms that do not exist in FFS Medicare to document diagnoses for their enrollees.").

[204] MedPAC, Report to the Congress, p. 437 ("MA plans often identify enrollees with additional HCCs by using an enrollee's historical information (e.g., electronic health records, claims, or risk score data), when it is available, or by identifying likely diagnoses in data that are not used in MA risk adjustment, such as prescription drug data (e.g., a prescription for insulin likely indicates a diabetes diagnosis). Plans then need to ensure that all diagnoses are appropriately documented in the current year to count toward MA payment.").

[205] Richard Kronick and Pete Welch, "Measuring Coding Intensity in the Medicare Advantage Program," *MMRR*, 4(2), 2014 ("Kronick and Welch, Measuring Coding Intensity"), p. E3; MedPAC, Report to the Congress, p. 438.

[206] Kronick and Welch, Measuring Coding Intensity, p. E3 ("If, for example, a FFS patient with quadriplegia and a urinary tract infection (UTI) has an office visit for treatment of the UTI, the payment to the physician will be no more if both the UTI and quadriplegia are reported on the claim than if only the UTI is reported. Coding guidelines specify that the quadriplegia can legitimately be coded if it contributes to the complexity of care, but unlike the situation for MA plans, in FFS there is no incentive to report more than one diagnosis.").

[207] NCHS, Analytic Issues in Using the Medicare Enrollment and Claims Data, p. 9.

106.   This difference in incentives to report information on diagnoses led Congress to become concerned about a potential overpayment of MA plans.[208] Specifically, in the Deficit Reduction Act of 2005, Congress instructed CMS to measure and adjust for the difference in diagnosis coding patterns between MA plans and FFS Medicare.[209] This is explained next.

### E.   CMS Adjusts the Fixed Payments to MA Plans to Account for Differences in Diagnosis Coding Patterns between MA Plans and FFS Medicare

107.   Analyses done by CMS have indicated that there is a difference in coding patterns between MA plans and FFS Medicare. Specifically, CMS observed that risk scores for MA enrollees were growing faster than risk scores for FFS Medicare enrollees.[210] In the course of its analysis, CMS noted that "we do not assume that the coding pattern differences that we found in our study are the result of improper coding." Rather, it noted the need for an adjustment in cases where there is a "difference in coding patterns" between MA and FFS Medicare.[211] This difference in coding patterns could be the result, for example, of the stronger incentive to record enrollee diagnosis information in MA when compared to FFS Medicare, as I discussed above in Section VII.D. As a result of this difference in coding patterns, the risk score of a beneficiary in an MA plan could be different when using the diagnosis codes recorded in an MA plan rather than the diagnoses that would be coded for the same beneficiary if they were enrolled in FFS Medicare.

108.   As explained by Kronick and Welch (2014), "[i]f, for example, Jane Doe would have a risk score of 1.0 if she were in FFS, the implicit assumption in the design of the MA payment

---

[208] United States Government Accountability Office, "Medicare Advantage: CMS Should Improve the Accuracy of Risk Score Adjustments for Diagnostic Coding Practices," Report to Congressional Requesters GAO-12-51, January 2012 ("GAO, Report to Congressional Requesters"), available at https://www.gao.gov/assets/gao-12-51.pdf ("Policymakers raised concerns that differences in diagnostic coding between MA plans and Medicare FFS could lead to inappropriately high MA risk scores and payments to MA plans."). See also Kronick and Welch, Measuring Coding Intensity, p. E2 ("Concerns about overpayment as a result of favorable risk selection have confronted the Medicare program throughout the history of Medicare contracting with health maintenance organizations and other private plans.").

[209] Kronick and Welch, Measuring Coding Intensity, p. E4.

[210] "Advance Notice of Methodological Changes for Calendar Year (CY) 2010 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies," *Centers for Medicare & Medicaid Services*, February 20, 2009 ("CMS, Advance Notice of Methodological Changes for 2010"), p. 8, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/Advance2010.pdf.

[211] "Announcement of Calendar Year (CY) 2010 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies," *Centers for Medicare & Medicaid Services*, April 6, 2009 ("CMS, Announcement of 2010 Medicare Advantage Capitation Rates"), p. 20, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2010.pdf.

system is that she would have the same risk score of 1.0 if enrolled in MA."[212] However, due to the differences in coding patterns between MA and FFS Medicare, this assumption may not hold. Thus, the asymmetry of having a higher risk score in MA than the same individual would have in FFS Medicare could lead to payments to MA plans that are too high relative to FFS Medicare.[213]

109.    In response to the different observed coding patterns, in 2010, CMS first implemented a "coding adjustment," commonly referred to as the "coding intensity adjustment."[214] The coding intensity adjustment scales MA enrollee risk scores downward, amounting to an across-the-board reduction in risk-adjusted payments to an MA plan.[215] The coding intensity adjustment has been approximately 5.9 percent since 2018.[216] This means that since 2018, CMS has reduced MA risk scores—and therefore an individual enrollee's payment to an MA plan—by

[212] Kronick and Welch, Measuring Coding Intensity, p. E4.

[213] Hornsby Deposition, pp. 45:21–46:3 ("Q. And when you say that plans should be coding as fee-for-service coding occurs, the payments to plans are correct to the extent that the plans are coding similarly to fee-for-service as opposed to differently from fee-for-service, right? A. That is correct. And if plans code more intensely, then they are being overpaid under the model.").

[214] 42 U.S.C. 1395w-23, "Payments to Medicare+Choice organizations," § 1853(1)I(ii), available at https://www.ssa.gov/OP_Home/ssact/title18/1853.htm; CMS, Announcement Of 2010 Medicare Advantage Capitation Rates, p. 19. See also CMS, Advance Notice of Methodological Changes for 2010, pp. 7, 9; "Announcement of Calendar Year (CY) 2009 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies," *Centers for Medicare & Medicaid Services*, April 7, 2008, p. 18, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/announcement2009.pdf; Hornsby Deposition, p. 116:10–12 and p. 89:2–11 ("Q. Okay. M—Ms. Hornsby, what was the impetus behind the coding intensity adjustment? A. Congress. Congress passed the requirement in the Deficit Reduction Act of 2005 for CMS to conduct research to determine whether there was more intense coding or a higher volume of coding in the Medicare Advantage program compared to fee-for-service. And if CMS found such a difference, CMS was to develop an adjustment to adjust risk scores for the coding intensity.").

[215] The coding intensity adjuster is applied to risk scores for MA enrollees. All MA enrollees risk scores are scaled down by a percentage intended to capture faster increases in the number of diagnoses submitted by MA insurers compared to FFS Medicare providers. See CMS, Advance Notice of Methodological Changes for 2010, pp. 9–10. See also CMS, Medicare Managed Care Manual Chapter 7, § 100.

[216] The coding intensity adjustment was 5.91 percent in 2018 and has been 5.90 percent since 2019. See Kronick and Welch, Measuring Coding Intensity, p. E4; CMS, Advance Notice of Methodological Changes 2023, p. 60; "Announcement of Calendar Year (CY) 2022 Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies," *Centers for Medicare & Medicaid Services*, January 15, 2021, p. 105, available at https://www.cms.gov/files/document/2022-announcement.pdf; "Advance Notice of Methodological Changes for Calendar Year (CY) 2021 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies – Part II," *Centers for Medicare & Medicaid Services*, February 5, 2020, p. 34, available at https://www.cms.gov/files/document/2021-advance-notice-part-ii.pdf; CMS, Announcement of 2020 Medicare Advantage Capitation Rates, p. 5; "Announcement of Calendar Year (CY) 2019 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," *Centers for Medicare & Medicaid Services*, April 2, 2018, p. 4, available at https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/announcement2019.pdf; "Advance Notice of Methodological Changes for Calendar Year (CY) 2018 for Medicare Advantage (MA) Capitation Rates, Part C and Part D Payment Policies, and 2018 Call Letter," *Centers for Medicare & Medicaid Services*, February 1, 2017, p. 28, available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/advance2018_119.pdf.

approximately 5.9 percent. CMS performs this adjustment for all payments it makes to MA plans.

110.    The minimum coding intensity adjustment has been set by congressional mandate since 2010.[217] The minimum adjustment was 3.4 percent in 2010–2013, 4.9 percent in 2014, and then was gradually increased until it reached its current level of approximately 5.9 percent in 2018.[218] Since its inception in 2010, CMS has never increased the coding intensity adjustment by any amount other than the legislative minimum.[219]

111.    CMS has stated that its "methodology results in an accurate measure of the coding differential between FFS and MA," and that it "continually develops its understanding of coding trends and makes an assessment for each payment year regarding the appropriate adjustment based on specific considerations of both coding trends and other market changes."[220] As noted, CMS set the 2023 coding intensity adjustment at the statutory minimum of 5.9 percent, suggesting that CMS believes this level is the appropriate amount to adjust for any coding differences between MA and FFS Medicare.[221]

112.    In describing the need for the coding intensity adjustment, CMS stated that "MA plans must code the way Medicare Part A and B providers do for risk adjustments to be valid. This means that MA organizations are coding 'accurately' when they are coding in a manner similar to fee-for-service coding used on the beneficiaries to whom MA plan enrollees are being compared."[222] CMS's use of the coding intensity adjustment to determine payments to MA plans indicates that, when coding practices are distinct between MA plans and FFS Medicare, CMS attempts to restore coding symmetry (or to ensure that "MA organizations are coding 'accurately,'" as described by CMS).[223]

---

[217] MedPAC, Report to the Congress, p. 439.

[218] MedPAC, Report to the Congress, p. 439, Figure 12–6.

[219] MedPAC, Report to the Congress, pp. 413, 440.

[220] "Announcement of Calendar Year (CY) 2013 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," *Centers for Medicare & Medicaid Services*, April 2, 2012, p. 25, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2013.pdf.

[221] "2023 Medicare Advantage and Part D Advance Notice Fact Sheet," *Centers for Medicare & Medicaid Services*, February 2, 2022, available at https://www.cms.gov/newsroom/fact-sheets/2023-medicare-advantage-and-part-d-advance-notice-fact-sheet.

[222] CMS, Announcement of 2010 Medicare Advantage Capitation Rates, p. 20.

[223] CMS, Announcement of 2010 Medicare Advantage Capitation Rates, p. 20. ("Given the fact that the MA payment methodology is based on fee-for-service payments, and that the risk adjustment methodology is designed to

### VIII.  Requiring MA Plans to Delete Unsupported Diagnosis Codes without FFS Medicare Doing the Same Would Result in Improper Compensation to MA Plans

113.    In this matter, Plaintiffs allege that UnitedHealth "failed to delete in the RAPS system the invalid diagnoses […] or knowingly and improperly failed to otherwise return to the Medicare Program the overpayments based on the invalid diagnoses."[224] In this section, I assess the consequences for payments to MA plans of requiring MA plans to remove unsupported diagnosis codes without FFS Medicare doing the same.

114.    I first consider the situation in which an MA plan and FFS Medicare have an identical pool of enrollees and identical unsupported diagnosis codes.[225] An identical pool of enrollees means that the MA plan and FFS Medicare have enrollees with the same demographic and diagnosis codes prior to any auditing being done. Identical unsupported diagnosis codes means that the probability that a diagnosis code is unsupported is the same in the MA plan and in FFS Medicare. In this situation, requiring MA plans to delete unsupported diagnosis codes without requiring FFS Medicare to do the same would lead MA plans to be undercompensated relative to FFS Medicare.

115.    I then consider situations in which an MA plan and FFS Medicare have different populations or different rates of unsupported codes. I explain that in these situations, requiring MA plans to remove unsupported codes without FFS Medicare doing the same would result in improper compensation to MA plans.

---

compare the risk scores of MA plan enrollees to other plan enrollees and beneficiaries not enrolled in MA plans, for this comparison to be valid, MA plans must code the way Medicare Part A and B providers do in order for risk adjustments to be valid. This means that MA organizations are coding 'accurately' when they are coding in a manner similar to fee-for-service coding used on the beneficiaries to whom MA plan enrollees are being compared.").

[224] Complaint, ¶ 342.

[225] I understand that in this matter an unsupported diagnosis code is a code that is not supported by the underlying medical records of an enrollee.

A.  **Requiring MA Plans to Identify and Delete Unsupported Diagnosis Codes Would Result in CMS Undercompensating MA Plans Relative to FFS Medicare when MA Plans and FFS Medicare Have an Identical Pool of Enrollees and Identical Unsupported Diagnosis Codes**

1.  **Defining What It Means for an MA Plan to Be Undercompensated Relative to FFS Medicare**

116.  I first discuss the situation where MA plans and FFS Medicare have an identical pool of enrollees and identical unsupported diagnosis codes. Although the pool of enrollees and probabilities of unsupported diagnosis codes are unlikely to be identical between a given MA plan and FFS, analyzing the situation in which they are both identical allows one to isolate the impact of deleting unsupported codes in the MA data on payments to MA plans. To understand whether a given policy results in proper compensation to MA plans in this situation, I first introduce the concept of being undercompensated relative to FFS. I define this as follows: MA plans are undercompensated relative to FFS Medicare when MA plans are paid less than what these same enrollees would be expected to cost if they were enrolled in FFS, while also accounting for the plan's MA bid (i.e., accounting for the fact that if a plan's bid is below the benchmark, CMS sets the base rate to be below the benchmark).

117.  This definition means that for an insurer that bids at or above the benchmark for a plan with an average risk score of 1.0, an MA plan is undercompensated if it receives less than the benchmark amount, which is the maximum that the MA plan is entitled to receive from CMS for insuring this pool of enrollees. As I explained in Section VII.C, the benchmark is based on the expected health care expenditures that an average enrollee (with a risk score of 1.0) would incur in FFS Medicare (in a given county). Thus, when an MA insurer bids at or above the benchmark, CMS pays the plan the risk-adjusted benchmark, which is equivalent to the total expected cost of treating these same enrollees in FFS Medicare (with identical risk scores). The MA plan would be undercompensated in this scenario if the total payment it received from CMS were less than this total expected cost.[226]

---

[226] MA plans cannot be overcompensated in this scenario, as model coefficients and thus relative factors are constrained to be positive. That is, risk scores for MA enrollees will mechanically decline as MA plans are required to remove codes. See Pope et al., Risk Adjustment of Medicare Capitation Payments, pp. 119–141 at pp. 121–122.

118.    When an insurer bids below the benchmark for a plan, determining whether a plan is undercompensated will not be based on a direct comparison to the benchmark. This is because the plan expects to be paid below the benchmark (and thus below expected FFS Medicare costs for the same pool of enrollees) consistent with its bid for an average enrollee. When insurers bid below the benchmark, MA plans are undercompensated if the total payment they receive is less than the amount to which they are entitled, based on the plan's quality rating and the insurer's bid. Note that I apply this definition of undercompensation only to situations where MA plans and FFS Medicare have an identical pool of enrollees and identical probabilities of unsupported diagnosis codes.

119.    Examining situations where MA plans and FFS Medicare have an identical pool of enrollees and identical probabilities of unsupported diagnosis codes is consistent with the origins of the CMS-HCC model.[227] First, the basis of the CMS-HCC model is that, for an enrollee, CMS should pay MA plans the expected cost of covering that enrollee in FFS Medicare. For example, the 2003 MMA (described above in Section V.C) increased payments to plans to 100 percent of FFS Medicare costs, rather than 95 percent: "The 100 percent provision ensured that all plans were at least immediately brought to equality with [FFS Medicare]."[228]

120.    Second, because the model relies on FFS Medicare enrollees to predict expenditures that are associated with each HCC for MA enrollees, it implicitly assumes that, for each HCC, the relative cost to treat enrollees is the same in FFS Medicare and MA plans.[229] This assumption is only true when the distribution of unsupported diagnosis codes (and thus HCCs) is identical in

---

[227] Gregory Pope, et al., "Principal Inpatient Diagnostic Cost Group Model for Medicare Risk Adjustment" *Health Care Finance Review*, 21(3), 2000 ("Pope et al., Principal Inpatient Diagnostic Cost Group Model"), pp. 93–118 at p. 93 ("The goal of implementing health-status-based risk adjustment for Medicare capitation payments is to fairly compensate the health plans for the expected cost associated with the disease burden of their enrollees.").

[228] As I explained in Section VII.C, when an MA plan submits a bid equal to or higher than the benchmark, CMS pays the plan the expected cost of covering the same beneficiaries (with the same diagnosis codes) in FFS; when plans bid below the benchmark CMS will pay less than this expected cost. See Pope et al., Principal Inpatient Diagnostic Cost Group Model, pp. 93–118 at p. 97 ("The PIPDCG model has been developed and calibrated with data from the traditional Medicare fee-for-service (FFS) program, reflecting the legislative mandate that Medicare capitation be based on 95 percent of what a beneficiary is expected to cost in the FFS program, as it was under the previous AAPCC methodology. Risk adjustment factors developed from FFS data are in this sense consistent with the historical basis of Medicare's capitation payment methodology."); McGuire et al., Economic History of Medicare Part C, pp. 289–332 at p. 314.

[229] Pope et al, Principal Inpatient Diagnostic Cost Group Model, pp. 93–118 at p. 98 ("The implicit assumption is that the relative cost of patients with specified levels of disease burden are similar in the FFS and managed care sectors.").

FFS Medicare and MA plans. Thus, the model is unlikely to accurately predict expenditures for MA enrollees unless the distribution of unsupported diagnosis codes (and thus HCCs) is identical in the FFS Medicare and MA populations (so that the incremental cost of an HCC is the same across the two populations).

**2. MA Plans Would Be Undercompensated Relative to FFS Medicare If They Were Required to Identify and Delete Unsupported Diagnosis Codes without FFS Medicare Doing the Same when the Enrollee Populations and Unsupported Diagnosis Codes Are Identical**

121.    As discussed in Section VIII.A.1, when an MA plan has an identical enrollee population and identical probabilities of unsupported diagnosis codes as FFS Medicare, the MA plan would be properly compensated if CMS paid it the amount that the MA plan is entitled to receive based on the bid and the benchmark amount. As I explain below, in this scenario, requiring MA plans to delete unsupported diagnosis codes that result in the removal of HCCs, without making any other changes to CMS's payments to those plans, reduces payments to MA plans for a given enrollee without reducing the expected cost of that enrollee. Therefore, such a requirement would result in CMS undercompensating MA plans with an identical enrollee population as FFS Medicare.

122.    Specifically, requiring MA plans to identify and delete unsupported diagnosis codes, while maintaining the coefficients from the CMS-HCC model estimated on FFS data with unsupported diagnosis codes, mechanically reduces payments to MA plans. This is because removing unsupported diagnosis codes would reduce the risk score for each MA plan enrollee.[230] Hence, the total risk-adjusted payment that the MA plan would receive would decrease.

123.    On the other hand, the expected costs to CMS of providing care for the identical population as an MA plan with identical diagnosis codes remains unchanged when the MA plan removes diagnosis codes. This is because removing diagnoses recorded for this hypothetical pool of FFS Medicare enrollees does not change their FFS Medicare expenditures in any way. That is, regardless of whether an FFS Medicare enrollee is designated as having a given

---

[230] As discussed in Section VII.B.1, CMS groups related diagnosis codes into HCCs. Removing unsupported diagnosis codes can remove an HCC code for a patient if the remaining diagnosis codes for the patient in that calendar year do not support inclusion of that HCC.

diagnosis (for example, Type 1 diabetes mellitus without complications[231]), services were rendered to the FFS Medicare enrollee that CMS paid for and that would factor into expected costs for the enrollee. Put another way, removing diagnosis codes for FFS Medicare enrollees would not change the benchmark against which plans bid.

124.    The previous two paragraphs mean that when an MA plan has an identical enrollee population as FFS Medicare with an identical distribution of both supported and unsupported diagnosis codes, requiring that MA plans delete unsupported codes while not requiring CMS to do the same means that the MA plan would be undercompensated relative to FFS Medicare. As explained above, this is because when the MA plan has identical enrollees and an identical distribution of unsupported diagnosis codes as in the FFS data, it should receive as payment (when bidding at or above the benchmark) the total expected cost for the FFS Medicare enrollees. When the MA plan deletes unsupported codes, it receives less than this amount.

125.    For clarity of exposition, consider the following example in which the total expected costs for the FFS Medicare population are $100,000.[232] Then the CMS-HCC model, estimated on an FFS dataset that contains unsupported diagnosis codes, would distribute this $100,000 across the set of supported and unsupported diagnosis codes to generate relative factors. Now suppose that an MA plan has an identical population with an identical set of both supported and unsupported diagnosis codes as FFS. This MA plan should receive $100,000 in compensation (assuming it bid the benchmark). Requiring the MA plan to identify and delete unsupported diagnosis codes, without making any additional changes to how CMS pays the plan, mechanically means the plan receives less than $100,000 (because the risk scores for its enrollees decline when it removes codes, as model coefficients and relative factors can never be negative). Hence, CMS would pay the MA plan less than what CMS would pay for these same enrollees under FFS, and therefore the MA plan would be undercompensated relative to FFS.

---

[231] "ICD-10-CM/PCS MS-DRGv33 Definitions Manual: MDC 10 Endocrine, Nutritional, & Metabolic Diseases & Disorders," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/icd10manual/version33-fullcode-cms/fullcode_cms/P0240.html.

[232] This example is intended to illustrate what it means to undercompensate or overcompensate a MA plan relative to FFS Medicare. As such, it does not consider instances in which MA plans code more intensely than FFS Medicare, as that type of difference in coding patterns is meant to be corrected for by the coding intensity adjuster. See Section VII.E for further discussion.

**B.    When an MA Plan and FFS Medicare Have Different Pools of Enrollees or Different Probabilities of Unsupported Codes, Requiring MA Plans to Remove Unsupported Codes without FFS Medicare Doing the Same Would Result in Improper Compensation to MA Plans**

126.    I now discuss situations in which an MA plan and FFS Medicare have different pools of enrollees or have different probabilities of unsupported codes. In these situations, MA plans that are required to remove unsupported codes would be properly compensated when FFS Medicare also removes its unsupported codes. Only when this happens will the coefficients from the CMS-HCC model reflect the true incremental cost of each HCC, resulting in proper compensation when MA plans remove their unsupported codes.

127.    CMS has recognized that unsupported diagnosis codes exist in the FFS data. Additionally, I understand that Michael Salve, who has been retained by UnitedHealth in this matter, has conducted an analysis of 2013 FFS data and determined that 31.6 percent of HCCs are unsubstantiated.[233] Consistent with this, a CMS document from 2009 explains that it is reasonable to expect that the FFS data used to estimate the CMS-HCC model contains unsupported diagnoses.[234] Yet, CMS generally does not audit the FFS data for such unsupported diagnosis codes. Connie Leonard, Director of the Provider Compliance Group at the Center for Program Integrity at CMS, testified that CMS audits less than one percent of FFS Medicare claims.[235] Of the FFS Medicare claims that are subject to a medical record review, diagnosis

---

[233] Expert Report of Michael P. Salve, Ph.D., September 29, 2023, § I.

[234] USBP001729882–4 at USBP001729882 ("As a consequence, it is reasonable to expect that there would be some inherent level of unsupported diagnoses in the FFS claims. Thus, that level of unsupported diagnoses would be calibrated into the model. Hence, the MA industry believes that their payments are subject to error inherent in FFS coding patterns.").

[235] Deposition of Connie Lynn Leonard (CMS), May 26, 2023 ("Leonard Deposition"), pp. 10:15–21, 24:20–25:10 ("Q. So for all of the auditing of fee for service claims that CMS conducts, it's looking at less than 1 percent of this whole fee for service claim? […] THE WITNESS: Okay. So from a claim perspective, when we conduct claim review and medical record, when we request medical records, then we typically do review less than 1 percent of all claims."), p. 200:5–20 ("Q. Okay. And for 99 percent of the claims from which that data comes from, they have not been audited at all by CMS through a medical record review; correct? […] THE WITNESS: CMS has stated that we only review less than 1 percent of all Medicare fee for service claims. So the majority of the claims in that data sample have not been audited by a medical records review, that is correct BY MR. MARTINEZ: By 'majority,' you mean more than 99 percent of the claims; right? A. Give or take 99 percent of the claims, yes.").

codes are not always reviewed and audited.[236] Thus, the overall rate of unsupported codes in the FFS data is unknown to MA plans.[237]

128.    The existence of unsupported diagnosis codes in the FFS data affects the payments to MA plans because such unsupported diagnosis codes in the FFS data affect the size of the estimated dollar coefficients and relative factors from the CMS-HCC model. Indeed, a 2009 CMS document notes that "diagnostic error[s] [are] calibrated into the risk adjustment model that formulates MA payment."[238] This is also supported by CMS's Addendum to its FFS Adjuster Study ("FFS Adjuster Study Addendum"), as described in more detail in Section IX below, which indicates that the average estimated dollar coefficient in the CMS-HCC model increases when unsupported codes are removed from the FFS data.[239]

---

[236] Leonard Deposition, pp. 59:2–13 ("So just take a step back about how Medicare fee for service reviews. We review claims. Now, each claim has several—could, not all, could have several claim lines. Those lines could have several diagnosis codes. When we conduct medical record review, we're reviewing that claim. During that medical record, we could or could not, maybe not, make it down to that diagnosis code. We may not. It would depend on the claim.") and pp. 85:15–86:16 ("Q. So from time to time the government will conduct audits of diagnosis codes in the fee for service data; correct? […] THE WITNESS: What we will do in the Medicare fee for service program is we will review a claim, the care, some type of benefit and during that review bringing the claim and the claim line and we may actually review the diagnosis code and compare it to the medical documentation in the medical record. […] Q. In the auditing of claims that the government does, sometimes it will audit diagnosis codes as part of that process, but not always? […] THE WITNESS: That is correct, that sometimes a claim audit will include a diagnosis code review, and sometimes it will not.").

[237] See Leonard Deposition, p. 229:2–5 ("[W]e do not calculate a diagnosis code error rate, improper payment rate, percentage of diagnosis codes that were incorrect on the claims. We do not track that in any way.") and pp. 232:16–233:10 ("Q. So my question then is with that understanding, because CMS doesn't track this information and doesn't have this information, am I correct that CMS has not determined what the rate of unsupported diagnosis codes are in the fee for service data that's been used to calibrate the risk adjustment model? […] THE WITNESS: CMS does not track the diagnosis code error rates for claims that have been reviewed and presented based on unsupported documentation, and they would not have it before they ran the data to do the risk adjustment model.").

[238] USBP001729882–4 at USBP001729882 ("In fact, there is a certain level of diagnostic error calibrated into the risk adjustment model that formulates MA payment. The FFS claims from which the CMS-HCC model is estimated are not subject to RADV audit. As such, there is an error rate calibrated into the model, and as a consequence, factored into current payments to MA plans."). See also DC027431–40 at DC027433 ("Medicare Advantage (MA) payment model (CMS-HCC model) is calibrated on diagnoses from FFS claims data, which contain a level of error due to diagnoses not supported by medical record documentation in FFS.").

[239] "Addendum to the Fee-For-Service Adjuster Study," *Centers for Medicare & Medicaid Services*, June 2019, available at Addendum to the Fee-for-Service Adjuster Study.pdf when accessing "RADV Provision CMS 4185-N4 Data Release June 2019 (ZIP)" at "Medicare Risk Adjustment Data Validation Program Resources," *Centers for Medicare & Medicaid Services* ("CMS, FFS Study Addendum"), modified September 6, 2023, p. 8, steps (3–6), available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Resources (" $\bar{\bar{b}} > \bar{b}$ "). Note that $\bar{\bar{b}}$ represents the average estimated dollar coefficient in the CMS-HCC model after auditing the FFS data, and $\bar{b}$ represents the average estimated dollar coefficient before auditing. In the FFS Adjuster Study, CMS applies an Inflated Post-Audit Risk Score ("IPARS") adjustment to support its claim that unsupported HCC codes in the FFS data do not impact payments to MA plans. As I discuss in Section IX, I disagree with CMS's use of an IPARS adjustment, and I disagree with CMS's claim that unsupported codes in the FFS data do not impact payments to MA plans.

129.   When an MA plan and FFS Medicare have different pools of enrollees or different probabilities of unsupported codes, requiring an MA plan to remove unsupported codes while failing to also remove unsupported codes from the FFS data used to estimate the CMS-HCC model would result in improper compensation to MA plans. In particular, if unsupported codes are removed from the data submitted by MA plans, proper compensation requires that the relative factors applied to each HCC in the audited MA plan data reflect the true incremental cost of the HCC according to similarly audited FFS data. However, when the CMS-HCC model is estimated on FFS data that contain unsupported codes, this will not be the case. In fact, CMS's FFS Adjuster Study Addendum indicates that the average of the estimated dollar coefficients (and thus relative factors) in the CMS-HCC model increases when unsupported codes are removed from the FFS data.[240] CMS also found that for any given HCC, estimating the CMS-HCC model using FFS data with unsupported codes will result in a dollar coefficient that may be larger or smaller than the true incremental costs of the HCC under audited FFS data, depending on the relative likelihood that the HCC is unsupported in the FFS data.[241] Likewise, the estimated value of the relative factor for a given HCC may be larger or smaller relative to its true value based on audited FFS data. This means that if MA plans are required to remove unsupported codes, the FFS data used to estimate the CMS-HCC model must also remove unsupported codes in order for MA plans to be properly compensated.

130.   The resulting impact of estimating the CMS-HCC model using unaudited FFS data versus audited FFS data on payments to the MA plan depends on the pool of enrollees and distribution of unsupported codes in the MA plan data relative to the FFS data. For example, if unsupported codes in the FFS data lead the CMS-HCC model to underestimate the dollar coefficient and relative factor for a particular HCC, and an MA plan has a relatively large number of enrollees for whom this HCC is supported, original payments to the MA plan could have been too low. In

---

[240] CMS, FFS Study Addendum, p. 8, steps (3–6).

[241] Deposition of Sean Creighton (CMS), October 4, 2022 ("Creighton Deposition, day 2"), pp. 30:17–34:10. ("[…] Q. And going back to that notion of removing from the population the erroneous diagnosis codes so that you have the true population that suffer from the conditions, you would expect the costs, the incremental costs, of caring for that condition to rise? […] THE WITNESS: That – that has been my expectation. The – our study showed that it was a bit more complicate than that.  So, yeah, that's normally the expectation […] However, it turns out it's not, like a lot of statistical stuff, it's not quite as simple as that. So we found in our studies, sometimes they rise, sometimes they go down.  But on––on average what you do know is they're gonna be different, they're… You know. So I agree with your initial hypothesis, it was my hypothesis, too. Turns out it's not true for all conditions across the model. […]").

this case, removing unsupported codes from the FFS data and re-estimating the CMS-HCC model on the audited FFS data would lead the dollar coefficient and the relative factor for this HCC to increase. As a result, payments to the MA plan would likely increase because the risk scores of enrollees with this HCC would increase, due to the now higher relative factor from the higher CMS-HCC dollar coefficient (estimated using the audited FFS data) for this HCC. This example demonstrates that in cases where the MA plan and FFS Medicare have different pools of enrollees or different probabilities of unsupported codes, requiring MA plans to remove unsupported codes without FFS Medicare doing the same would result in improper compensation to MA plans.

131.    Moreover, in order to determine whether CMS's payments based on unaudited FFS data constitute proper compensation to the MA plan, one would need to determine the extent to which the pool of enrollees and the probabilities of unsupported codes differed between the MA plan and the FFS Medicare population.[242] CMS, however, does not track the rate of unsupported codes in the FFS Medicare population.[243] Without this information, neither the MA plan nor CMS can determine whether CMS has properly compensated the MA plan.

## IX.    CMS's FFS Adjuster Study Is Flawed

132.    In February 2012, CMS released a notice presenting the mechanics of its contract-level audits of MA plans known as Risk Adjustment Data Validation ("RADV") audits.[244] CMS has described the RADV audits as its "main corrective action for overpayments made to Medicare Advantage organizations […] when there is a lack of documentation in the medical record to

---

[242] See Deposition of Jonathan D. Morse (CMS), August 17, 2022, pp. 25:15–27:6, 177:22–178:3 ("And so in order to know whether a particular plan would—would have an overpayment or an underpayment problem when you go and remove unsupported codes, you would need to know the distribution of that plan's particular disease and demographic characteristics— A. Right.").

[243] See Leonard Deposition, p. 229:2–5 ("[W]e do not calculate a diagnosis code error rate, improper payment rate, percentage of diagnosis codes that were incorrect on the claims. We do not track that in any way.").

[244] "Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits," *Centers for Medicare & Medicaid Services*, February 24, 2012 ("CMS, Notice of Final Payment Error Calculation Methodology"), p. 1, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Other-Content-Types/RADV-Docs/RADV-Methodology.pdf.

support the diagnoses reported for risk adjustment."[245] I note that by describing "corrective action for overpayments," CMS is using the term "overpayments" to refer to what it considers to be excess compensation to MA plans when MA plans have not deleted any unsupported diagnosis codes.

133.    In its notice, CMS stated that it would "apply a Fee-for-Service Adjuster (FFS Adjuster) amount as an offset to the preliminary recovery amount" in the RADV audits.[246] The FFS adjuster was intended to account for the fact that the preliminary recovery amount resulting from RADV audits account for unsupported diagnosis codes from only MA enrollees, even though there are also unsupported diagnosis codes in the FFS data that are used in the CMS-HCC model.[247] The presence of unsupported diagnosis codes in the FFS data implies that the coefficients from the CMS-HCC model do not accurately measure the incremental cost of HCCs in the FFS data,[248] which can result in payments to MA plans that are too low if MA plans are required to remove unsupported diagnosis codes but FFS Medicare is not required to do so. Applying an FFS adjuster would decrease preliminary RADV audit recovery amounts to reflect the presence of unsupported codes in FFS data.[249]

134.    In 2023, CMS adopted a Final Rule which indicated it would not apply an FFS adjuster.[250] Prior to adopting this Final Rule, CMS released several documents related to its analysis of the impact of unsupported diagnosis codes in the FFS data on payments to MA

---

[245] CMS Final Rule. See also Deposition of Christopher Gile Bresette (OIG), May 31, 2023, pp. 17:16–18:6, 42:14–25 ("The objective of our audit was to determine whether the diagnosis codes that – that they submitted to CMS complied with federal requirements. Q. And as part of the explanation for why [U.S. Department of Health & Human Services, Office of Inspector General ("OIG")] did this – this audit, it notes in the second paragraph there that – that OIG was assessing whether MAO had received improper payments. Is that right? A. If – if an MAO submits incorrect diagnosis, it will lead to improper payments. So – it could lead to improper payments; I clarify.").

[246] CMS, Notice of Final Payment Error Calculation Methodology, pp. 4–5 ("The FFS adjuster accounts for the fact that the documentation standard used in RADV audits to determine a contract's payment error (medical records) is different from the documentation standard used to develop the Part C risk-adjustment model (FFS claims)."). See also, Deposition of Thomas Kornfield (CMS), March 10, 2022 ("Kornfield Deposition"), pp. 20:21–21:1, 196:23–197:12.

[247] See discussion in Section VIII; CMS, Notice of Final Payment Error Calculation Methodology, pp. 1, 4–5.

[248] See further discussion in Section IX.B.2.

[249] Deposition of Carolyn Kapustij (CMS), August 25, 2023, pp. 14:2–20, 161:5–23 ("Q. Okay. And if a fee-for-service adjuster had been applied to that $98 million figure, that figure would have been even lower; correct? […] THE WITNESS: It seems that the fee-for-service adjuster would reduce that amount. […] Q. Assuming it's a positive fee-for-service adjuster; correct? […] THE WITNESS: Correct") and pp. 214:21–215:5 ("Q. Okay. So if that's what preliminary means according to CMS, then the recovery amounts that are listed in Exhibit 1187-1. Those recovery amounts are only going to decrease through the application of a fee-for-service adjuster or any appeals process; right? […] THE WITNESS: That would seem to be the case.").

[250] CMS Final Rule.

plans. In October 2018, CMS put forth a study (the "FFS Adjuster Study") in which it claimed that applying an FFS adjuster would not be "appropriate."[251] Specifically, the study stated that "errors in FFS claims data do not have any systematic effect on the risk scores calculated by the CMS-HCC risk adjustment model, and therefore do not have any systematic effect on the payments made to MA organizations."[252] That is, CMS claimed that unsupported codes in FFS data do not "systematically" impact CMS's payments to MA plans, and therefore that there is no need for CMS to account for such unsupported codes when assessing whether MA plans were overpaid. In November 2018, CMS released a "Proposed Rule" which included a proposal to not apply an FFS adjuster when assessing potential overpayments to MA plans.[253] CMS subsequently published a technical addendum to the FFS Adjuster Study in 2019,[254] and the Final Rule was adopted in 2023.[255]

135.    As I explain in detail below, I disagree with CMS's conclusion that unsupported diagnosis codes in the FFS data do not have a systematic effect on CMS's payments to MA plans. CMS's FFS Adjuster Study exhibits a number of methodological flaws that render it unreliable, and as a result, the Study fails to demonstrate that an FFS adjuster is unnecessary.

136.    In this section, I first describe the methodological framework that CMS adopted in the FFS Adjuster Study to evaluate the impact of unsupported codes in FFS data on payments to MA plans. I then describe critical errors in CMS's methodology, and, as a result, in CMS's conclusion that unsupported codes in FFS data do not impact payments to MA plans. I then explain why the data that CMS used to calculate the FFS adjuster are inadequate to evaluate the impact of unsupported codes in FFS data on payments to MA plans. Finally, I explain that contrary to CMS's conclusion, unsupported diagnosis codes in the FFS data likely impact payments to MA plans, and thus an FFS adjuster is necessary.

---

[251] CMS, FFS Adjuster Study, p. 6.
[252] CMS, FFS Adjuster Study, p. 5.
[253] Centers for Medicare & Medicaid Services and US Department of Health & Human Services, Proposed Rule, "Medicare and Medicaid Programs; Policy and Technical Changes to the Medicare Advantage, Medicare Prescription Drug Benefit, Program of All-Inclusive Care for the Elderly (PACE), Medicaid Fee-for-Service, and Medicaid Managed Care Programs for Years 2020 and 2021," *Federal Register*, 83(212), November 1, 2018, pp. 54892–55088, available at https://www.govinfo.gov/content/pkg/FR-2018-11-01/pdf/2018-23599.pdf.
[254] CMS replicated the initial study within this June 2019 addendum (the "FFS Adjuster Study Addendum"), finding results consistent with the initial implementation. See CMS, FFS Study Addendum, p. 1.
[255] CMS Final Rule.

### A.    Overview of CMS Methodology to Estimate the Impact of Unsupported Codes in FFS Data on Payments to MA Plans

137.    At a high level, CMS's methodology seeks to understand how removing unsupported codes from the FFS data would impact the dollar coefficients and relative factors estimated by the CMS-HCC model, and as a consequence, the risk scores used to determine payments to MA plans.[256] CMS calculates for each MA enrollee the percentage difference between the risk score resulting from the model estimated with audited FFS data relative to the risk score resulting from the model estimated with unaudited FFS data. CMS then calculates the average of these percentage differences across MA enrollees in their study. According to CMS's framework, if this average percentage difference in risk scores is not a "large, positive percentage," then expected payments are not impacted and no FFS adjuster is needed.[257] Thus, to evaluate the need for an FFS adjuster, CMS needs to understand how the dollar coefficients and the relative factors from the CMS-HCC model change when the FFS data are audited.

138.    Because a comprehensive audit of all diagnosis codes in the FFS data is not feasible, CMS audits the diagnosis codes in only a sample of the FFS data in its FFS Adjuster Study, and then extrapolates the results from the sample to the overall FFS data.[258] Using this sample, CMS seeks to implement the following methodology to estimate the impact of removing unsupported codes from the FFS data:[259]

- First, estimate the probability each HCC is unsupported at the patient level in a given year within the sample.

- Second, use these sample probabilities to estimate the probability that each HCC is unsupported at the patient level in that year for the overall FFS Medicare population.

- Third, apply these estimated FFS Medicare population-wide probabilities to the unaudited FFS data to simulate audited FFS data in which unsupported diagnosis codes are removed.

---

[256] CMS, FFS Adjuster Study, pp. 1–4.
[257] "Fee for Service Adjuster and Payment Recovery for Contract Level Risk Adjustment Data Validation Audits – Technical Appendix," *Centers for Medicare & Medicaid Services*, October 26, 2018 ("CMS, FFS Adjuster Study Technical Appendix"), pp. 13–16, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/FFS-Adjuster-Technical-Appendix.pdf.
[258] CMS, FFS Adjuster Study Technical Appendix, pp. 6–12.
[259] CMS, FFS Adjuster Study Technical Appendix, p. 6–16. For this discussion, I do not address whether the framework used by the CMS FFS Adjuster Study is appropriate.

- Fourth, re-estimate the CMS-HCC model on the simulated audited data to estimate simulated audited relative factors.

- Fifth, compare the implied MA plan risk scores using simulated audited relative factors to the corresponding risk scores using unaudited relative factors from estimating the CMS-HCC model on the original, unaudited FFS data.

139.   I now explain some of the critical methodological flaws leading CMS to conclude that unsupported codes in FFS data do not impact payments to MA plans.

### B.     CMS Uses a Flawed Methodology to Determine Whether an FFS Adjuster Is Necessary

140.   In this sub-section, I address two errors that bias CMS's estimate of the impact of unsupported codes in the FFS data on the audited relative factors and the resulting MA risk scores, leading CMS to incorrectly conclude that payments to MA plans are unaffected: (1) CMS incorrectly estimates the beneficiary-level probability that an HCC is unsupported in the FFS data; and (2) CMS inappropriately adjusts for the effects of the auditing process on FFS Medicare costs, despite actual FFS Medicare costs being unaffected. Both of these errors bias CMS's estimate of the average audited relative factors and resulting MA risk scores downwards, and lead to incorrect conclusions regarding the impact of removing unsupported codes from the FFS data on payments to MA plans.

### 1.     CMS's Methodology for Estimating the Probability That an HCC Is Unsupported Is Flawed

141.   The FFS Adjuster Study relies on incorrect assumptions to estimate the probability that each HCCs is unsupported (the first two steps in the methodology outlined in Section IX.A).[260] As a result, CMS's estimates of these probabilities are unreliable, as are its estimates of the resulting audited dollar coefficients, audited relative factors, and resulting MA risk scores.

---

[260] For clarity of exposition, when I refer to HCCs being unsupported, it means the HCC is unsupported for a patient in a year. In addition, CMS defines an HCC as unsupported when none of the associated claims have a diagnosis code that maps to the HCC and that is supported by the medical record. CMS, FFS Adjuster Study, p. 3 ("The correctness of the status of an HCC in the profile is determined by the presence of at least one claim that both has a diagnosis that maps to that HCC and is supported by medical record documentation. For this reason, the impacts of the unsupported diagnoses in the claims on the model parameter estimates are driven by the number of HCCs in each beneficiary's profile that do not have at least one claim supported by medical record documentation.").

142.   To estimate the probability that an HCC is unsupported, CMS relies on a sample from the 2008 Comprehensive Error Rate Testing ("CERT") data containing 8,630 unique outpatient FFS Medicare claims and the underlying medical records that CMS uses to assess whether the diagnosis codes for each of these claims are supported.[261] These data do not include all claims for a beneficiary in a year, and thus, CMS cannot directly determine from these data whether an HCC is unsupported for a beneficiary in that year.[262] Instead, CMS estimates the probability that a particular HCC is unsupported for a given *claim* (i.e., the "claim-level probability") by estimating the number of claims that are associated with the HCC but do not support the HCC, as a share of all the claims that are associated with the HCC (i.e., both claims with and without diagnosis codes and medical records that support the HCC).[263]

143.   CMS uses these claim-level probabilities to estimate the likelihood that each HCC is unsupported for a given beneficiary. Specifically, for each HCC, CMS first estimates the average number of claims that include a diagnosis code within the HCC across beneficiaries. CMS estimates this average using a different dataset, namely a 2004 sample of FFS Medicare beneficiaries and their claims.[264] For example, if there were two beneficiaries with diagnosis codes that indicate a particular HCC, one with two claims that have a diagnosis code associated with the HCC and the other with four claims that have a diagnosis code associated with the HCC, then the per-beneficiary average number of claims indicating the HCC would be three. CMS then estimates the probability that an HCC is unsupported at the beneficiary level as equal to the claim-level probability that an HCC is unsupported raised to an exponent equal to the average number of claims per beneficiary indicating that HCC.[265] So, for example, if on average each beneficiary has three claims with an HCC, CMS would raise the claim-level probability that the HCC is unsupported to the power of three to account for the fact that the HCC would only be unsupported if all three claims were unsupported.

---

[261] CMS, FFS Adjuster Study Technical Appendix, p. 6.

[262] I further address issues with the adequacy of CMS's data in Section IX.C.

[263] CMS, FFS Adjuster Study Technical Appendix, p. 6, Table 2a. CMS provides its estimates of the claim-level probability that an HCC is unsupported in Table 2a of the FFS Adjuster Study Technical Appendix. CMS uses the term "sampled" to refer to the number of sampled claims associated with the HCC and the term "discrepant" to refer to the number of claims associated with the HCC that are unsupported. CMS estimates "%Discrepant" as the percent of "sampled" claims that are "discrepant."

[264] Specifically, CMS uses these data to identify all beneficiaries with claims indicating a given HCC and, among these beneficiaries, calculates the average number of claims indicating that HCC. CMS, FFS Adjuster Study, p. 3; CMS, FFS Adjuster Study Technical Appendix, pp. 9–11.

[265] CMS, FFS Adjuster Study Technical Appendix, p. 9.

144. For CMS's calculation to yield a correct estimate of the probability that an HCC is unsupported at the beneficiary level, two assumptions must hold. First, it must be the case that using the average number of claims per HCC among beneficiaries in the FFS sample data does not bias the calculation of the relevant probability. Second, it must be the case that the probability that a claim has an unsupported HCC is independent across claims within a beneficiary.[266] As I discuss below, both of these assumptions likely do not hold, and both can bias downward the probability that an HCC is unsupported in the FFS data.

145. First, CMS's use of the average number of claims per HCC would lead it to underestimate the probability an HCC is unsupported for a beneficiary.[267] Using the average number of claims per HCC among beneficiaries implicitly assumes that every beneficiary with that HCC has the average number of claims. To see why this is not always the case, consider the following stylized example. Suppose that half of the beneficiaries with a given HCC have exactly one claim indicating that HCC and the other half have exactly five claims indicating that HCC. The average number of claims for the HCC among beneficiaries is three. Suppose further that each claim has a 30 percent probability of being unsupported and, for simplicity, that this probability does not vary across beneficiaries and is independent across claims.[268] CMS's approach would estimate that the probability that the HCC is unsupported for a beneficiary is 2.7 percent.[269] In reality, the true probability would be much higher. Specifically, the probability of an unsupported HCC is 30 percent for beneficiaries with one claim and 0.243 percent for beneficiaries with five claims.[270] Thus, the correct estimate for the probability that a randomly drawn beneficiary has the HCC is the weighted average of these two probabilities, where the weights are the proportions of beneficiaries with the given number of claims indicating the

---

[266] Two events are independent if the occurrence of one event does not affect the probability of the occurrence of the other event. See, e.g., James H. Stock and Mark Watson, *Introduction to Econometrics*, *Second Edition*, (Boston: Addison Wesley, 2006), p. 34 ("Two random variables X and Y are independently distributed, or independent, if knowing the value of one of the variables provides no information about the other.").

[267] The findings of the Lambert Report also support this assertion. See Julia Lambert, "Actuarial Report on Medicare Advantage FFS Adjuster," *Wakely*, August 28, 2019 ("Lambert Report"), pp. 26–29.

[268] The assumption that each claim has the same probability of being unsupported is unlikely to hold. The probability a claim is unsupported is likely to decrease with the number of claims with a given diagnosis. For example, an individual that only has one claim with a diagnosis code for diabetes is likely to have a higher probability that the diabetes diagnosis is unsupported than an individual with five claims including a diagnosis code for diabetes.

[269] $0.3^3 = 0.3 \times 0.3 \times 0.3 = 0.027$.

[270] $0.3^1 = 0.3$, and $0.3^5 = 0.3 \times 0.3 \times 0.3 \times 0.3 \times 0.3 = 0.00243$.

HCC. In the example, this weighted average would be 15.12 percent—more than 5 times greater than the estimate derived from CMS's methodology.[271]

146.    This example applies more generally. Specifically, as I describe in the example above, the correct method of calculating the probability that an HCC is unsupported for a beneficiary would use the actual distribution of claims underlying HCCs across beneficiaries instead of just the average number of claims associated with a particular HCC. Mathematically, the correct method will estimate a higher probability that an HCC is unsupported relative to CMS's use of the average number of claims.[272] Likewise, Ms. Lambert, a health actuary retained by UnitedHealth to evaluate the CMS FFS Adjuster Study, demonstrates this flaw in CMS's calculation.[273] Underestimating the probability that an HCC is unsupported leads to lower estimates of the average audited relative factors,[274] and contributes to CMS's incorrect conclusion that unsupported codes in the FFS data have no impact on payments to MA plans. Thus, this error by CMS leads it to incorrectly conclude that an FFS adjuster is not needed.

147.    Second, the probability that a claim does not support an HCC is not independent across claims within a beneficiary or across beneficiaries, and this assumption can also bias downward CMS's estimates of the beneficiary-level probability that an HCC is unsupported, again biasing the average estimates of the audited relative factors downwards. Whether a claim supports an HCC for a given beneficiary is likely correlated across claims due to the types of diagnoses the beneficiary has and variation in physician coding practices that would similarly affect all claims

---

[271] 0.1512 (0.5 x 0.3 + 0.5 x 0.00243) is the weighted average of 30 percent and 0.243 percent, where the weights correspond to the fraction of beneficiaries with one claim indicating the HCC and five claims indicating the HCC, respectively. In my example, both weights are 50 percent.

[272] It is a mathematical fact known as the "Jensen's Inequality" that raising a probability to the average of *k* numbers is higher than the average of that probability raised to each of the *k* numbers. See, for example, Patrick Billingsley, *Probability and Measure, Third Edition*, (New Delhi: Wiley India Edition, 1995), p. 80. To see why, consider two points on the graph of a convex function (an example of a convex function is a U-shaped curve). The average of the function values at those two points is greater than the value of the function at the average of the two points.

[273] Ms. Lambert estimated a beneficiary-level HCC discrepancy rate of 13.716 percent, compared to CMS's calculation of 2.115 percent. See Lambert Report, pp. 26–29. See also, Letter from Matthew Eyles (AHIP) to Seema Verma (CMS), "RE: Medicare and Medicaid Programs; Policy and Technical Changes to the Medicare Advantage, Medicare Prescription Drug Benefit, Program of All-inclusive Care for the Elderly (PACE), Medicaid Fee-For-Service, and Medicaid Managed Care Programs for Years 2020 and 2021 ('Proposed Rule')," August 27, 2019 ("Letter from Matthew Eyles to Seema Verma"), p. 20, available at https://ahiporg-production.s3.amazonaws.com/documents/AHIP_RADV_comments_FINAL_8_27.pdf.

[274] CMS, FFS Study Addendum, p. 8, step (6).

Confidential

for a beneficiary from the same physician.[275] For example, if a given physician was systematically less accurate at medical coding than another physician, all of the first physician's claims would be more likely to have unsupported diagnosis codes. Deposition testimony from Thomas Kornfield, who was the Director of Payment Systems at CMS and a former Vice President at America's Health Insurance Plans ("AHIP"), supports this point: "CMS is assuming that [diagnoses are] independent when they probably aren't, meaning a provider that codes an error is probably going to code an error."[276]

148.    Because claim-level probabilities are not independent, CMS cannot simply multiply them to estimate the probability that an HCC is unsupported. This is a fundamental law of probability.[277] Instead, CMS would need to estimate how the presence of one unsupported diagnosis for a beneficiary impacts the likelihood that other diagnosis codes are unsupported for that beneficiary. CMS has not done so.

149.    To see why this matters, consider the following simple example. There are 100 beneficiaries with a given HCC, and each beneficiary has 2 claims associated with the HCC. Two physicians, doctor A and doctor B, each treat 50 Medicare beneficiaries. Doctor A keeps high-quality medical records, and all of the claims—and thereby the HCCs associated with these claims—for the beneficiaries they treat are supported. By contrast, none of the claims for the beneficiaries treated by doctor B are supported. Thus, the data contain a total of 200 claims: 100 supported claims (i.e., 2 claims for each of doctor A's 50 patients) and 100 *un*supported claims (i.e., 2 claims for each of doctor B's 50 patients). The FFS Adjuster Study methodology would estimate a 50 percent probability that a claim is unsupported (i.e., 100 unsupported claims divided by 200 total claims). Furthermore, each beneficiary has 2 claims, so the average number of claims per beneficiary is 2. Thus, the FFS Adjuster Study methodology would estimate a 25 percent probability that the HCC is unsupported for an FFS Medicare beneficiary

---

[275] Correlation in the accuracy of a patient's claims may arise if there are common factors impacting the coding of patients' diagnoses. For example, physician qualities such as experience play a role in coding accuracy and hospitals differ in their rates of diagnosis code accuracy. See Kimberly O'Malley, et al., "Measuring Diagnoses: ICD Code Accuracy," *Health Services Research*, 40(5 Pt. 2), October 2005, pp. 1620–1639 at pp. 1627–1628; Pavani Rangachari, "Coding for Quality Measurement: the Relationship Between Hospital Structural Characteristics and Coding Accuracy from the Perspective of Quality Measurement," *Perspectives in Health Information Management*, 4(3), 2007.

[276] Kornfield Deposition, pp. 19:18–21:22, 218:22–25.

[277] See, e.g., Morris DeGroot and Mark Schervish, *Probability and Statistics, Fourth Edition*, (Boston: Addison Wesley, 2012), pp. 66–67.

(i.e., claim level probability of 50 percent raised to the power of 2). However, in this example, the actual probability that the HCC is unsupported for an FFS Medicare beneficiary is 50 percent: the HCC is unsupported for the 50 beneficiaries treated by doctor B, out of 100 beneficiaries total. In this example, CMS's methodology underestimates the probability that an HCC is unsupported for an FFS Medicare beneficiary because it fails to take into account potential correlation that claims could be supported (or unsupported) within beneficiaries (because of the systematic difference in coding patterns between doctor A and doctor B). If, as in the example above, CMS underestimates the probability that an HCC is unsupported, CMS's conclusions that the audited relative factors and resulting MA risk scores are unaffected and that an FFS adjuster is unnecessary will be incorrect.

### 2. No IPARS Adjustment Is Needed, and Its Use Biases the Impact of Unsupported Codes in the FFS Data on Audited Coefficients, Audited Relative Factors, and MA Risk Scores towards Zero

150.    In its Addendum to the FFS Study, CMS shows that the removal of unsupported codes from the FFS data impacts the dollar coefficients estimated in its CMS-HCC model.[278] However, CMS then makes a fundamental conceptual error—it reasons that "diagnoses cannot soundly be deleted in the CMS-HCC modeling context without making adjustments to account for the bias that the deletion procedure itself creates in expenditures."[279] In other words, CMS states that if it removes diagnosis codes from the FFS data, it also needs to adjust the observed expenditures under FFS Medicare when estimating the CMS-HCC model. Based on this fundamental misconception that FFS Medicare expenditures should be reduced, CMS makes an adjustment to the audited dollar coefficients, called an Inflated Post-Audit Risk Score ("IPARS") adjustment.[280] Mechanically, CMS calculates the IPARS adjustment by calculating a ratio of predicted average FFS Medicare expenditures.[281] Specifically, the numerator of this ratio is equal to the average predicted FFS Medicare expenditures estimated using *audited* dollar

---

[278] CMS, FFS Study Addendum, p. 8, steps (3)–(6). As described in Section VIII.B, CMS's FFS Study Addendum notes that "$\overline{\overline{b}} > \overline{b}$," where $\overline{\overline{b}}$ represents the average of the dollar coefficient obtained from estimating the CMS-HCC model on audited FFS data, and $\overline{b}$ represents the average of the dollar coefficient obtained from estimating the model on unaudited FFS data.
[279] CMS, FFS Study Addendum, p. 5.
[280] CMS, FFS Study Addendum, pp. 5, 10.
[281] CMS, FFS Study Addendum, p. 10.

coefficients and *unaudited* FFS data. The denominator of this ratio is the average predicted FFS Medicare expenditures using *unaudited* dollar coefficients and *unaudited* FFS data, which equals the realized average FFS Medicare expenditures.[282] The IPARS adjustment is:

$$\frac{Audited\ coefficients\ \times\ unaudited\ data}{Unaudited\ coefficients\ \times\ unaudited\ data}$$

151.    This ratio is always greater than one because, as CMS shows in the FFS Study Addendum, the average *audited* dollar coefficient is larger than the average *unaudited* dollar coefficient.[283]

152.    CMS then divides the *audited* dollar coefficients by the IPARS adjustment, thereby deflating these dollar coefficients, the relative factors, and the subsequent risk scores in the MA data.[284] CMS's use of the IPARS adjustment therefore systematically biases the impact of unsupported codes in the FFS data on average audited dollar coefficients, average audited relative factors, and subsequent MA risk scores towards zero. That is, this IPARS adjustment removes the very change in the dollar coefficients that CMS intends to measure. Indeed, Sean Creighton testified that the IPARS adjuster methodology was circular.[285]

153.    To illustrate, first consider the impact of removing unsupported codes from the FFS data on the payments to MA plans, before applying any IPARS adjustment. Exhibit 6 provides a simplified example where there is a single HCC and no other regressors in the CMS-HCC model. Suppose there are 100 FFS Medicare beneficiaries that generated $10,000 in FFS Medicare costs and suppose that the unaudited FFS data indicates that 50 of these beneficiaries have the HCC. Then the *unaudited* dollar coefficient for the HCC is $200 ($10,000 / 50). Now

---

[282] CMS, FFS Study Addendum, p. 10; Lambert Report, p. 18.

[283] CMS, FFS Study Addendum, p. 8. See Steps (5) and (6). See also CMS, FFS Study Addendum, Figure 2.

[284] Lambert Report, p. 18 ("A review of CPI's provided SAS code indicates that as part of the normalization process, before converting the revised dollar coefficients to relative factors (like in the baseline model), it first made a reduction to the resulting dollar coefficients by dividing them by an IPARS adjustment."). See also CMS, FFS Study Addendum, pp. 8–9, step (13) and p. 10. Elsewhere in the FFS Study Addendum, CMS defines the IPARS "adjustment factor" as the ratio of average realized expenditures to average predicted expenditures, or the inverse of the ratio shown in the text of the current report. For this definition, CMS indicates that the dollar coefficients would be multiplied, rather than divided, by the IPARS adjustment. This alternative process is mathematically equivalent to the process described in the text of the current report. See CMS, FFS Study Addendum, pp. 8–9.

[285] Creighton Deposition, day 2, pp. 36:10–39:1. ("Q And you wrote […] 'If CMS had found that the different [sic] was 10 percent, it would have divided all coefficients by 1.1 (in other words, in effect, CMS's approach is similar to multiplying a number by 10 and then dividing by 10).' A Correct. Q And am I correct in saying that—or what you said here is that the CMS methodology was circular? A Absolutely.").

suppose that after auditing these data, only 40 of these FFS Medicare beneficiaries have the HCC. Then the *audited* dollar coefficient for the HCC is $250 ($10,000 / 40). Assuming there are 100 MA beneficiaries, 40 of whom have the HCC after the MA data are audited, MA plans would have received $8,000 ($200 x 40) when payments were based on CMS-HCC model calibrated on *unaudited* FFS data. However, when the FFS data used to calibrate the model is *audited*, payment to MA plans would increase to $10,000 ($250 x 40).

**Exhibit 6**
***Example of FFS Data Audits on Payments to MA Plans***

|  |  | Unaudited FFS Data | Audited FFS Data |
|---|---|---|---|
| **FFS** |  |  |  |
| Total FFS expenditure for 100 patients | [a] | $10,000 | $10,000 |
| FFS patients with HCC | [b] | 50 | 40 |
| Dollar coefficient | [c] = [a] / [b] | $200 | $250 |
| **MA Plan** |  |  |  |
| MA patients with HCC (audited) | [d] | 40 | 40 |
| Total payment to MA plan | [e] = [c] x [d] | $8,000 | $10,000 |

154.    This simplified example provides two key results, which extend readily to the full CMS-HCC model: (1) removing unsupported HCCs from FFS enrollee data has the effect of spreading the same amount of expenditures incurred by CMS for FFS Medicare enrollee health care over fewer enrollees per HCC, and so per-enrollee payments per HCC—i.e., the dollar coefficient—must on average increase; and (2) MA plans that have enrollees for whom the payments per HCC increase would be paid more by CMS if CMS audited the FFS data. This intuition and the logic of this example are entirely consistent with the mathematics outlined in CMS's FFS Study Addendum.[286]

155.    CMS's motivation for applying the IPARS adjustment derives from its claim in the FFS Study Addendum that it must "maintain coefficient values such that predicted FFS expenditures do not increase."[287] That is, CMS claims that the total predicted expenditures derived using *audited* dollar coefficients and unaudited data ($12,500 = $250 x 50 beneficiaries with the HCC,

---

[286] CMS, FFS Study Addendum, p. 8, steps (3–7).
[287] CMS, FFS Study Addendum, p. 9, step (11).

in the above example) should equal the total predicted expenditures derived using *unaudited* dollar coefficients and *unaudited* data ($10,000 = $200 x 50 beneficiaries with the HCC in the above example).[288] As a practical matter, this statement would only be true if the *audited* and *unaudited* dollar coefficients were identical because both predicted expenditures are estimated using the same unaudited data. However, as the simplified example above demonstrates, removing unsupported codes from FFS data for a particular HCC would increase the average of the dollar coefficients estimated from the CMS-HCC model for that HCC. As CMS has shown, removing unsupported codes from FFS data increases the average of the dollar coefficients estimated from the CMS-HCC model.[289] Thus, CMS's claim that these two predicted expenditures should be equal is incorrect. However, based on this incorrect claim, CMS applies an IPARS adjustment. Specifically, as explained above, the IPARS adjustment is the ratio of the average predicted FFS Medicare expense calculated using *audited* dollar coefficients multiplied by *unaudited* data to the average FFS Medicare expenditure using *unaudited* dollar coefficients and *unaudited* FFS data. CMS then divides the audited dollar coefficients by the IPARS adjustment (which is greater than one), thus deflating these coefficients and effectively cancelling out the increase in the average of the dollar coefficients that results from removing unsupported codes from the FFS data. That is, the IPARS adjustment incorrectly biases downward the dollar coefficients used to estimate the HCC relative factors and the MA risk scores.

156.    The intuition for why this is the case is most easily seen in the example in Exhibit 7. In this example, CMS would calculate the IPARS adjustment as 1.25 [($250 x 50) / ($200 x 50)]. CMS would then divide the *audited* coefficient of $250 by this ratio and derive the exact same value as the *unaudited* coefficient: $200. CMS would label this final value as the "audited"

---

[288] This claim is clear by examining steps (2) through (12) in the FFS Study Addendum justifying a "General Expenditure Adjustment to Offset Deletion Bias." CMS writes that "To maintain coefficient values such that predicted FFS expenditures do not increase, we need a factor Z such that [...] the total using the 'new' coefficients [is not] greater than the original predicted expenditures," see steps (9) and (11). CMS estimates this "total using the 'new' coefficients" by multiplying the *audited* dollar coefficients by the "original number of ones" or, equivalently, the *unaudited* data, see step (7). CMS compares this with the "original predicted expenditures" calculated by multiplying the *unaudited* dollar coefficients by the *unaudited* data. See CMS, FFS Study Addendum, pp. 8–9.
[289] See CMS, FFS Study Addendum, p. 8, steps (3–6).

coefficient despite their flawed, circular logic. Indeed, Mr. Kornfield testified that the CMS methodology "divided away the difference" it found in the coefficients.[290]

*Exhibit 7*
*The IPARS Adjustment Is Circular*

| | | Unaudited FFS Data | Audited FFS Data |
|---|---|---|---|
| **FFS** | | | |
| Total FFS expenditure for 100 patients | [a] | $10,000 | $10,000 |
| FFS patients with HCC | [b] | 50 | 40 |
| Dollar coefficient | [c] = [a] / [b] | $200 | $250 |
| **MA Plan** | | | |
| MA patients with HCC (audited) | [d] | 40 | 40 |
| Total payment to MA plan | [e] = [c] x [d] | $8,000 | $10,000 |
| | | **IPARS Payment Adjustment** | |
| Audited Coefficient | [c (audited)] | $250 | |
| CMS Claimed Expenses | [f] = [b (unaudited)] x [c (audited)] | $12,500 | |
| IPARS Adjustment | [g] = [f]/([b (unaudited)] x [c (unaudited)]) | 1.25 | |
| IPARS Adjusted Coefficient | [h] = [c (audited)]/[g] | $200 | |
| Total payment to MA plan after IPARS Adjustment | [i] = [h] x [d] | $8,000 | |

157.   As this example makes clear, through its use of the IPARS adjustment, CMS does not estimate the impact of unsupported codes in FFS data on the CMS-HCC model but rather uses a methodology that effectively assumes the presence of unsupported codes have no impact.

158.   I note that CMS's flawed reasoning leading to the IPARS adjustment is based on its incorrect claim in the FFS Study Addendum that the total predicted expenditures derived using *audited* dollar coefficients and *unaudited* FFS data ($12,500 = $250 x 50 FFS Medicare beneficiaries with the HCC, in the above example) should equal the total predicted expenditures derived using *unaudited* dollar coefficients and *unaudited* FFS data ($10,000 = $200 x 50 FFS Medicare beneficiaries with the HCC in the above example). This IPARS adjustment undoes the entire premise of deriving new coefficients based on audited data. Instead, total predicted expenditures derived using *audited* dollar coefficients and *audited* FFS data should be equal to total predicted expenditures derived using *unaudited* dollar coefficients and *unaudited* FFS data.

---

[290] Kornfield Deposition, pp. 217:21-218:4 ("Q Do you agree that CMS's methodology appears to be designed to minimize differences in payments under the two models? A Yeah, I don't—I don't remember the specifics of—of exactly how CMS did this, but—but if memory serves, the study that they did, there was a difference, but then they essentially divided away the difference to show that there wasn't a difference. So yes, I agree with that.").

As the simple example demonstrates, the total predicted expenditures are indeed equivalent—$10,000 in both cases.

159.  Moreover, there is no conceptual reason for CMS to "make adjustments" to FFS Medicare expenditures. The exercise of determining whether an FFS adjuster is necessary requires keeping FFS Medicare expenditures *constant* while removing unsupported diagnosis codes to derive audited dollar coefficients and audited relative factors. As discussed in Section VIII.A, the basis of the CMS-HCC model is that CMS should pay MA plans for a beneficiary the expected cost of covering that beneficiary in FFS Medicare. MA plans should not be paid less than what their enrollees would be expected to cost if they were enrolled in FFS Medicare, while also accounting for the plan's MA bid.[291] The expected cost of covering a beneficiary in FFS Medicare includes expenditures that CMS incurs for claims with unsupported diagnosis codes.[292] Thus, the CMS-HCC model should compensate MA plans for these codes to preserve 100 percent parity to FFS Medicare. This also mirrors the fact that MA plans pay providers that provide services to the plans' enrollees for claims with unsupported diagnosis codes.[293] CMS's use of an IPARS adjustment to reduce FFS Medicare expenditures in the audited data assumes that Medicare did not pay expenditures reported in the FFS data for claims with unsupported diagnosis codes and that MA plans *never* pay providers for claims with unsupported diagnosis codes, which is implausible.[294]

---

[291] As noted in Section VIII.A, when insurers bid below the benchmark, MA plans are undercompensated if the total payment they receive is less than the amount to which they are entitled, based on the plan's quality rating and how far below the benchmark the insurer bid.

[292] In 2021, FFS Medicare found a 6.26 percent improper payment rate from claims submitted from July 2019 through June 2020, with 79.5 percent of improper payments attributed to incorrect coding or insufficient or no documentation. See "2021 Medicare Fee-for-Service Supplemental Improper Payment Data," *U.S. Department of Health & Human Services*, December 7, 2021, pp. 1–2, available at https://www.cms.gov/files/document/2021-medicare-fee-service-supplemental-improper-payment-data.pdf-0.

[293] In 2012, the Federal Bureau of Investigation reported that "fraudulent billings to health care programs, both public and private, are estimated between three and ten percent of total health care expenditures." See "Financial Crimes Report To the Public, Fiscal Years 2010–2011," *Federal Bureau of Investigation*, February 27, 2012, p. 16, available at https://www.fbi.gov/file-repository/stats-services-publications-financial-crimes-report-2010-2011-financial-crimes-report-2010-2011.pdf/view.

[294] As noted above, CMS should not "make adjustments" to FFS Medicare expenditures through the IPARS adjustment. However, even setting this aside, CMS's methodology to estimate the impact of removing unsupported codes in the FFS data is incorrect. Specifically, the IPARS adjustment assumes an equivalent expenditure reduction regardless of which diagnosis codes were removed, but this is unlikely to be the case. For example, diagnosis codes associated with outpatient services in FFS Medicare would not necessarily lead to a reduction in FFS Medicare expenditures because outpatient services are reimbursed based on health care services conducted, not solely on patient diagnoses. See Cubanski et al., A Primer on Medicare. It is possible that CMS believes that some of the unsupported codes they identified in the FFS data indicate that CMS should never have paid providers for those

160.    In sum, CMS's reasoning for an IPARS adjustment is flawed. No such adjustment is needed.

### C.    CMS Uses Data Wholly Inadequate for the Task of Estimating the Impact of Unsupported Codes in FFS Data on the CMS-HCC Model

161.    I now explain why the data that CMS used in the FFS Adjuster Study is inadequate for estimating the impact of unsupported codes in FFS data on MA risk scores and, as a result, payments to MA plans. Specifically, CMS uses a sample of 2008 CERT data in its FFS Adjuster Study to estimate the probability that an HCC is unsupported in the FFS data.[295] However, using this CERT data sample is problematic, and its use for estimating the probability that an HCC is unsupported requires making assumptions that likely do not hold.

162.    I discuss three key shortcomings of using the CERT data sample for estimation of the FFS Adjuster:

- First, the sample includes claims from only the year 2008;
- Second, the sample is unlikely to be nationally representative; and
- Third, the sample contains many HCCs with very few claims, in part because it relies only on claims for outpatient services.

163.    CMS's methodology cannot overcome these shortcomings and so cannot recover credible estimates for the true probability that an HCC is unsupported. This renders CMS's conclusions that unsupported diagnosis codes in FFS data do not affect payments to MA plans unfounded and unreliable. I discuss each of these shortcomings further below.

164.    First, the CERT data sample includes claims from only 2008—a single calendar year.[296] Thus, CMS's estimates of the probability that an HCC is unsupported and of the impact of unsupported codes in the FFS data apply to only 2008. For CMS to extrapolate these estimates to all years after 2008 requires CMS to assume that there have been no changes in the coding accuracy in FFS or MA data for any HCC over time. Such an assumption is implausible for several reasons.

---

services. If that is the case, correctly calculating an FFS adjuster requires a comprehensive audit of all FFS Medicare claims to determine which claims do not support diagnoses and whether the expenditures on those claims need to be refunded to the government. Such an exercise is well beyond anything that CMS has done.
[295] CMS, FFS Adjuster Study Technical Appendix, p. 6.
[296] CMS, FFS Adjuster Study Technical Appendix, p. 6.

- CMS has added new HCCs and significantly changed the structure of the HCCs since 2008.[297] CMS's FFS Adjuster Study has not investigated whether new HCCs or changes to groups of diagnoses in a given HCC would impact the probability that an HCC is unsupported for a given beneficiary in a year and, hence, the need for an FFS Adjuster.

- Since 2008 there has been an increase in the use of health information technology that could impact the accuracy of coding,[298] as well as changes in diagnostic practices that could impact the probability that an HCC is unsupported.[299]

- When the underlying diagnoses that indicate a given HCC vary with respect to their probabilities of being unsupported, an increased share of beneficiaries with a diagnosis that has a higher probability of being unsupported would increase the probability that the HCC is unsupported. When using data only from 2008 to form its conclusions, CMS is ignoring all such possible changes that could have occurred since 2008.

- Finally, as discussed in Section VI.B, there has been a steady increase in the fraction of Medicare beneficiaries enrolled in MA over time. It is plausible that the average characteristics of these beneficiaries is changing over time (e.g., with sicker beneficiaries with a different distribution of HCCs enrolling in MA over time, or with beneficiary take-up of MA spreading across geographic regions in the United States so that newer beneficiaries are more likely to live in certain states, etc.).[300] What this means is that the probability that HCCs are unsupported among remaining FFS Medicare patients would likewise change over time.

---

[297] See fn. 155 above.

[298] See, e.g., Jinhyung Lee and Jae-Young Choi, "Improved efficiency of coding systems with health information technology," *Scientific Reports*, 11, Article No. 10294, 2021, p. 1.

[299] For instance, more advanced big data approaches can improve accuracy of diagnosis. See, e.g., "AI Improves Accuracy of Heart Condition Diagnosis," *Cedars-Sinai*, October 27, 2022, available at https://www.cedars-sinai.org/newsroom/ai-improves-accuracy-of-heart-condition-diagnosis. Similarly, there is evidence that the transition to the ICD-10 in 2015 impacted coding, improving accuracy over time in some settings. See Cindy Cai, et al., "Effect of ICD-9 to ICD-10 Transition on Accuracy of Codes for Stage of Diabetic Retinopathy and Related Complications: Results From the CODER Study," *Ophthalmology Retina*, 5 (4), April 2021, pp. 374–380.

[300] One study found an increase in the share of Medicare Advantage enrollees who are young, black, and dually enrolled in Medicaid between 2011 and 2019. See William Weeks, et al., "Trends in Characteristics of Adults Enrolled in Traditional Fee-for-Service Medicare and Medicare Advantage, 2011–2019," *Medical Care*, 60(3), March 2022, pp. 227–231 at p. 227.

165.    Second, the 2008 CERT data sample may not be nationally representative of the FFS Medicare population, and CMS has not provided any evidence that it is. Indeed, CMS conceded that the CERT data sample was "not designed to produce a representative sample of diagnoses."[301] Without a representative sample, CMS must assume that the probability that an HCC is unsupported for the entire FFS Medicare population is the same as the probability estimated using the 2008 CERT data sample. This is an unsupported and implausible assumption. For example, the CERT data sample could oversample a healthier population, a younger population, or a wealthier population. Relatedly, the CERT data sample includes only outpatient claims, which may lead to bias in both the set of beneficiaries included in the sample and in the claim-level probability that a diagnosis code is unsupported, to the extent that the probability of unsupported codes is different between outpatient and inpatient claims.[302] In sum, any systematic differences between the 2008 CERT data sample and the overall FFS Medicare population (in terms of both demographic characteristics and HCCs) would result in differences between the estimated probability that an HCC is unsupported in the 2008 CERT data sample (and thus the FFS Adjuster Study) and in the overall FFS Medicare population.

166.    Third, the 2008 CERT data sample contains many HCCs with an extremely small number of claims. CMS acknowledges that "for many of the diagnoses and by extension, the HCCs, we have an insufficient sample size to develop reliable discrepancy rates at the HCC level."[303] For example, the data sample includes only one claim with a diagnosis of extensive third-degree burns, and only two claims with a diagnosis of severe head injury.[304] CMS admits that "[v]ariation [in HCC discrepancy rates] due to insufficient sample size confounds the analysis."[305] A fundamental principle of statistics (i.e., the Law of Large Numbers) is that statistics estimated on larger sample sizes are likely to be closer to the population value of the statistic (since the variance of an estimate declines with sample size).[306] Thus, conclusions about population statistics drawn from small samples are inherently less reliable. Because of this, estimates of the probability that an HCC is unsupported based on a very small set of claims

---

[301] CMS, FFS Adjuster Study Technical Appendix, p. 8.
[302] CMS, FFS Adjuster Study Technical Appendix, p. 6.
[303] CMS, FFS Adjuster Study Technical Appendix, p. 8.
[304] CMS, FFS Adjuster Study Technical Appendix, p. 8.
[305] CMS, FFS Adjuster Study Technical Appendix, p. 8.
[306] Morris DeGroot and Mark Schervish, *Probability and Statistics, Fourth Edition*, (Boston: Addison Wesley, 2012), pp. 348–353.

from the 2008 CERT data sample would be unreliable. Thus, CMS's conclusions derived from the 2008 CERT data sample would be unreliable.

167.    As further examples of the small number of claims in the 2008 CERT data sample, the data contain only one observation each for HCCs 70 (muscular dystrophy), 107 (cystic fibrosis), 150 (extensive third-degree burns), and 177 (amputation status, lower limb/amputation complications). For HCCs 70 and 150, the single claim is supported, and CMS estimates a probability of being unsupported of 0 percent. For HCCs 107 and 177, the single claim is unsupported, and CMS estimates a probability of being unsupported of 100 percent.[307] These two estimates likely suffer from the small sample bias described above. CMS attempts to "mitigate" the impact of small sample size by replacing observed probabilities with "effective" probabilities. Specifically, CMS assigns all four of these HCCs a probability of being unsupported of 33.8 percent based on the overall probability in the entire CERT data sample.[308] However, there is no reason to believe the actual probabilities of being unsupported for these HCCs are all equal to overall probability of 33.8 percent.

168.    Further, the CERT data sample had no claims with HCC 77 (respirator dependence/tracheostomy status).[309] In this case, CMS has no data with which to estimate the actual probability of being unsupported for this HCC. Again, CMS simply assigns a claim level probability of 33.8 percent to this HCC.[310] But again, there is no reason to believe that this 33.8 probability rate is accurate.

169.    In sum, for all of the reasons discussed in this sub-section, the data that CMS used in the FFS Adjuster Study is inadequate for estimating the impact of unsupported codes in Medicare FFS data on audited relative factors, MA risk scores, and as a consequence, payments to MA plans. As such, CMS cannot use the FFS Adjuster Study to conclude that payments to MA plans are not systematically affected by unsupported codes in the Medicare FFS data.

---

[307] CMS, FFS Adjuster Study Technical Appendix, pp. 7–8.
[308] In general, CMS bucketed HCCs into high, baseline, and low probabilities of being unsupported based on the probability they estimated in the sample. HCCs were assigned to the high or low categories if they had a discrepancy rate that was statistically different from the overall discrepancy rate (at a 95 percent confidence level) and were assigned to the baseline category otherwise. For the four HCCs discussed in the text, because there was only one claim for each HCC in the sample, the probability that the HCC was unsupported was indistinguishable from the mean. These HCCs were therefore assigned to the baseline category, with a rate of being unsupported of 33.8 percent. See CMS, FFS Adjuster Study Technical Appendix, pp. 8–11.
[309] CMS, FFS Adjuster Study Technical Appendix, p. 7.
[310] CMS, FFS Adjuster Study Technical Appendix, pp. 9–11.

**D.    Contrary to the Conclusion of CMS's Flawed FFS Adjuster Study, an FFS Adjuster Is Necessary and Unsupported Diagnosis Codes that Exist in FFS Data Likely Impact Payments to MA Plans**

170.    Although CMS's 2023 Final Rule indicated that CMS would not apply an FFS adjuster, CMS's conclusion in its FFS Adjuster Study that unsupported codes in FFS data have no impact on payments to MA plans under the CMS-HCC model is incorrect. As I have explained in this section, CMS's FFS Adjuster Study is based on unfounded assumptions, follows a deeply flawed methodology, and relies on problematic data. Accordingly, CMS's analysis is unreliable and cannot be used to determine whether unsupported diagnosis codes in the FFS data impact payments to MA plans and if so, by how much. Also as discussed in this report, CMS's methodology biases its estimate of the impact of unsupported diagnosis codes in the FFS data towards zero due to: (1) CMS likely underestimating the probability that an HCC is unsupported in the FFS Medicare population, which would lead it to underestimate audited relative factors on average; and (2) CMS inappropriately deflating the audited relative factors by the IPARS adjustment, which incorrectly adjusts FFS Medicare expenditures despite actual FFS Medicare expenditures being unaffected.

171.    As I explained above, using FFS data with unsupported codes to estimate the CMS-HCC model leads to lower estimated dollar coefficients, on average, relative to using FFS data in which such unsupported codes are removed. Thus, removing such unsupported codes in FFS data increases, on average, the dollar coefficients estimated by the CMS-HCC model. Therefore, had CMS defined an FFS adjuster in a manner consistent with this increase in the average of the dollar coefficients, such an FFS adjuster would lead to increased payments to MA plans relative to the situation where only MA plans remove unsupported codes. Consistent with this, Hans Dutt, President and Principal Economist at Stat Analytics and author of the CMS FFS Adjuster Study, testified in his deposition that if diagnoses are deleted from the FFS data, the coefficients in the CMS-HCC model will increase.[311] And as further supported by the evidence below, this contradicts CMS's conclusion that the FFS Adjuster is unnecessary.

---

[311] Deposition of Hans Dutt (Stat Analytics), September 28, 2022, pp. 34:9–12, 118:11–21 ("Q. And Dr. Dutt, do you agree with that mathematical phenomenon, that if you don't adjust the expenditures but you delete certain diagnoses codes, the coefficients go up? A. Yes, so—so that is—I think you articulated it well. It is a mathematical certainty, right? It's a phenomenon that's going to happen, is if you have the expenditures staying the same, and you know, you basically delete the—make the—the denominator smaller, the coefficients are going to go up. That is going to happen.").

172.   In the remainder of this section, I highlight testimony in this matter as well as other sources that indicate that the removal of unsupported diagnosis codes from FFS data would impact payments to MA plans, and that an FFS adjuster is necessary.

173.   First, officials have testified that the removal of unsupported diagnosis codes from FFS would impact payments to MA plans by changing the coefficients of the CMS-HCC model. For instance, Thomas Kornfield testified that the coefficients would be different if the FFS data did not have unsupported diagnoses.[312] Sean Creighton also explained in his deposition that if CMS removes unsupported diagnosis from the FFS data used to estimate the dollar coefficients from the CMS-HCC risk adjustment model, the average of the dollar coefficients would change.[313] Thomas Hutchinson, former Director of Medicare Plan Payment Group at CMS, testified that an FFS adjuster was necessary to improve the accuracy of CMS's assessment as to whether MA plans were overpaid.[314]

174.   Additionally, CMS has performed or commissioned studies which have found that unsupported codes in the FFS data impact the dollar coefficients and relative factors from the CMS-HCC model, and consequently impact MA risk scores and payments to MA plans.[315] Specifically, a 2009 study suggested that a "proxy" for the FFS adjuster is equal to 3.9 percent.[316] A 2010 study proposed that an adjustment of approximately 4.9 percent be applied to MA risk scores when assessing compensation to MA plans, based on the estimated impact of

---

[312] Kornfield Deposition, pp. 198:24–199:12.

[313] Creighton Deposition, day 2, pp. 30:17–34:10. ("[…] Q. And going back to that notion of removing from the population the erroneous diagnosis codes so that you have the true population that suffer from the conditions, you would expect the costs, the incremental costs, of caring for that condition to rise? […] THE WITNESS: That – that has been my expectation. The – our study showed that it was a bit more complicate than that. So, yeah, that's normally the expectation […] However, it turns out it's not, like a lot of statistical stuff, it's not quite as simple as that. So we found in our studies, sometimes they rise, sometimes they go down. But on—on average what you do know is they're gonna be different, they're… You know. So I agree with your initial hypothesis, it was my hypothesis, too. Turns out it's not true for all conditions across the model. […]").

[314] Deposition of Thomas Hutchinson (CMS), January 26, 2022, pp. 18:12–19, 59:10–17 ("When I refer to 'accurate amount' or when I referred to 'accurate amount,' I meant the amount to—the amount of payment error that CMS measured in a RADV audit at a plan level. The accurate calculation of that payment amount needs to have a fee-for-service adjuster built into it to be maybe more accurate, we will say, rather than the perfect accuracy.")

[315] Hornsby Deposition, p. 83:9–20 ("Q. […] Are you aware of a single document before 2016 where the government determined that using unaudited fee-for-service claims data really has no impact or an indeterminate impact on the calculation of coefficients and risk scores in the risk adjustment model? […] A. I am not aware of any MPPG document that says there is no impact.").

[316] USBP001706860–63 at USBP001706861. This 3.9 percent "proxy" for the FFS Adjuster was based on a November 2008 "FFS CERT National Paid Claims Error Rate" of 3.9 percent.

removing unsupported codes from the FFS data.[317] Similarly, a 2011 document suggested that the average risk score in MA plans be adjusted upward by 5 percent to account for the impact of unsupported diagnosis codes in the FFS data when assessing overpayments to MA plans.[318] Around the time when CMS announced the RADV audits for MA plans in 2012, a CMS study proposed that an FFS adjuster be 8.1 percent.[319]

175.    Since the CMS FFS Adjuster Study was published in 2018, three separate studies published in 2019 by Avalere, Milliman, and the Wakely Consulting Group also concluded that an FFS adjuster is necessary.[320] In particular, Avalere tested three alternatives to the assumptions made by CMS and concluded that the presence of coding errors in FFS claims data results in underpayments of nearly 8 percent to MA plans.[321] The Milliman study also found that the CMS FFS Adjuster Study cannot be used to conclude that the FFS adjuster is not necessary.[322] In contrast to CMS's findings, Milliman's estimates suggest that the audited CMS-HCC model increases risk scores for the MA population by 10–32 percent relative to the model run with unaudited FFS data.[323] Likewise, a study conducted by the Wakely Group concluded that, after correcting errors in the FFS Adjuster Study, failing to use an FFS Adjuster would lead to underpayments to MA of almost 10 percent.[324]

---

[317] USBP052805236–8 at USBP052805236–7; Deposition of Mark Boward (Deloitte), September 20, 2022, Exhibit 1327-1.

[318] USBP001648100–1 at USBP001648100.

[319] CMS, Notice of Final Payment Error Calculation Methodology; Deposition of Cheri Rice (CMS), August 3, 2022, pp. 16:2–7, 101:7–17; USBP001565703–8 at USBP001565706 ("Based on this CERT RADV audit, we estimate the FFS adjustor to be 8.1%").

[320] Letter from Matthew Eyles to Seema Verma, p. 6 ("Since CMS published the Proposed Rule, two independent analyses – one by Avalere (the Avalere study) and one by Milliman (the Milliman study) – clearly demonstrate the need for a FFS adjuster. Importantly, neither analysis estimates the appropriate amount of the FFS adjuster. Rather, each study demonstrates that CMS's methodology, after adjusting for methodological flaws, would lead to a FFS adjuster that is **not zero**.").

[321] "Eliminating the FFS Adjuster from the RADV Methodology May Affect Plan Payment," *Avalere Health*, March 2019, available at https://avalere.com/wp-content/uploads/2019/03/20190318-FFS-Adjuster-Analysis-Final-.pdf ("Avalere tested 3 alternatives to the assumptions made by CMS, comparing the results. Avalere's analysis finds that audit miscalibration bias yields underpayments of nearly 8%.").

[322] Letter from Matthew Eyles to Seema Verma, p. 2 ("Milliman finds that the CMS technical analysis 'cannot appropriately be used to conclude a FFS adjuster is not required.' Milliman adjusts for errors in CMS's methodology to find that an FFS adjuster is both positive and material. As such, Milliman's study refutes CMS's conclusion that a FFS adjuster is not necessary."). See also, Rob Pipich, "Medicare Advantage RADV FFS adjuster: White paper," *Milliman White Paper*, August 23, 2019 ("Milliman White Paper"), pp. 1, 4, available at https://assets.milliman.com/ektron/Medicare_Advantage_RADV_FFS_adjuster_8-23-2019.pdf ("Further analysis must be completed to calculate an accurate FFS adjuster. In any case, the range is wide and even the bottom end is material and significant.").

[323] Milliman White Paper, p. 21.

[324] Lambert Report, p. 6.

176.    In sum, contrary to the findings of the CMS FFS Adjuster Study, other studies have shown that the removal of unsupported diagnosis codes from the FFS data would impact assessment of the proper compensation to MA plans and that an FFS adjuster is needed. Indeed, these studies indicate that CMS's payments to MA plans would be too low if MA plans were required to remove unsupported diagnosis codes from their data, but FFS Medicare was not required to do the same.

## X.    Economic Theory and Historical Evidence Indicate that Requiring MA Plans to Remove Unsupported Diagnosis Codes Would Result in Higher Prices or Less Generous Plans

177.    CMS alleges that UnitedHealth failed to delete unsupported codes.[325] Removing unsupported diagnosis codes associated with certain MA enrollees lowers those enrollees' risk scores, thereby—all else equal—lowering CMS's payments to the MA plan. This, however, does not reduce the enrollees' actual health care expenditures. Hence, requiring that MA plans remove unsupported diagnosis codes, relative to the current world and making no other changes to the way MA plans are paid, would reduce MA plans' revenues while the costs associated with providing care to their enrollees would remain unchanged.

178.    Economic theory predicts that a firm faced with falling revenues and similar costs would adjust their behavior.[326] Indeed, both economic theory and historical evidence indicate that MA plans in a similar situation would act in one or more of the following ways: (1) increase their plan bids, with the consequence of increasing government or enrollee expenses, or increase

---

[325] Complaint, ¶ 342.

[326] It is possible that in the short run, a firm faced with falling revenues and similar costs (i.e., falling profits) may not alter its behavior. For example, suppose all firms in an industry face falling profits due to a short-term industry-wide shock. In this context, firms face an opportunity cost by remaining in the industry—they could gain higher returns on investments, capital, and labor in other industries or sectors. In the short run, these firms may also face costs to switching their resources to alternate uses and so may not change their behavior. In the long run, these same firms would alter their behavior: economic theory tells us that firms facing systematically better opportunities (i.e., better returns on investing its resources) by allocating these resources differently will do so. MA insurers are particularly unlikely to absorb profit losses without altering their behavior because MA plan profits are capped through the MLR. As discussed in ¶ 43, MLR is the proportion of premium revenues that a health insurance company spends on clinical services and quality improvement. MA insurers are required to have an MLR of at least 85 percent, meaning that only the remaining 15 percent of premium revenues can be spent on administrative costs and profits. Due to this constraint on how an MA plan can allocate its revenues, MA plans are likely to adjust their behavior. See CMS, Medical Loss Ratio. See also, "Medical Loss Ratio," *Centers for Medicare & Medicaid Services*, modified September 6, 2023, available at https://www.cms.gov/marketplace/private-health-insurance/medical-loss-ratio; Pindyck and Rubinfeld, Microeconomics, p. 205.

Confidential

enrollee cost sharing; (2) reduce the quality and/or number of benefits associated with their plans; and/or (3) exit the market altogether, with the consequence of reducing the options available to Medicare beneficiaries and thereby reducing consumer welfare. I discuss each of these potential responses by MA plans in Sections X.A–C below.

179.   As a matter of economics, accurately estimating the change in government payments to UnitedHealth or the change in consumer welfare when requiring UnitedHealth to remove unsupported codes necessitates accounting for such dynamic effects. I discuss this further in Section X.D below.

### A.    If Payments to MA Plans Decline, Some MA Plans Would Increase Their Bids, Thereby Increasing Government and Enrollee Expenses, or Increase Enrollee Cost Sharing

180.   Requiring MA plans to identify and delete unsupported codes would lead to lower payments from CMS to MA plans. In turn, MA plans would have an incentive to increase their bids to compensate for these lower payments. MA plans would also have an incentive to increase enrollee cost sharing to compensate for lower payments.

181.   As discussed in Section VII.C, CMS compensates an MA plan based on a comparison between a CMS benchmark and the bid from the MA plan, while incorporating the risk scores of the MA plan enrollees and the quality of the MA plan. When an MA plan anticipates a reduction in risk scores (which would reduce payments to the MA plan, all else equal), the plan can increase its bid and thereby compensate for the impact that this reduction in risk scores would have on payments to the plan.

182.   If an MA plan were to increase its bid, there are three scenarios to consider: (1) a plan that would bid *below* the benchmark both before and after the rule change; (2) a plan that would bid *below* the benchmark before the rule change but *above* the benchmark after; and (3) a plan that would bid *above* the benchmark both before and after the rule change.

- If the plan's bid is originally below the benchmark, and the plan increases its bid to a value that remains below the benchmark, then CMS would pay more for each of this plan's enrollees via a higher agreed-upon payment for an enrollee with the average health status. As the plan's bid is now closer to the benchmark, CMS would provide a smaller rebate to the MA plan for each enrollee, mechanically leading to lower

incremental benefits for its enrollees.[327] As discussed in Section VI.B, these benefits can include eye exams and glasses, dental and fitness benefits, and hearing aids. It is thus likely that such benefits would become less widely available following an increase in plan bids.

- If the plan's bid is originally below the benchmark, and the plan increases its bid to a value above the benchmark, then CMS would pay more for each of this plan's enrollees *and* the plan's enrollees would now be required to pay the MA plan premiums to cover the shortfall between the benchmark and the plan's bid.[328] In this case, the plan would no longer receive any rebates from CMS. The elimination of the rebate would reduce incremental benefits for plan enrollees. Enrollees might leave the plan due to the absence of incremental benefits or due to the additional cost of an incremental premium.

- If the plan's bid is originally above the benchmark, and the plan further increases its bid, then the plan's enrollees would need to pay the MA plan higher premiums for the same insurance product and benefits. Enrollees might leave the plan rather than pay these higher premiums.

183.    From the perspective of the MA plan's enrollees, an increase in an MA plan's bid results in either reduced incremental benefits, higher premiums, or both. In all cases, there is a loss to the enrollee. Moreover, in the first two cases discussed above, any savings realized by CMS from removing unsupported codes and decreasing the risk scores for some MA plan enrollees could be partially or even fully offset by the resulting increase in the plan bids, and thus result in some additional payments to the MA plans.

184.    Additionally, some MA insurers would increase enrollee cost sharing (e.g., drug copayments) for their MA plans in response to a reduction in payments from CMS. As I discuss below, in order to ensure that the plan can cover enrollee health care expenditures, a plan could require enrollees to pay a larger share of some of their procedures out-of-pocket. Such a change

---

[327] MA plan rebates can be used to add additional benefits or to reduce plan premiums or cost-sharing requirements. I use the expression "incremental benefits" to refer to the variety of uses plans have for rebates. See MedPAC, Medicare Advantage Program Payment System, p. 3.

[328] For examples of how plans are compensated when bidding at or above the benchmark, see Section VII.C.1.

would directly reduce the welfare of MA enrollees and potentially drive MA enrollees to leave the plan.

185.   Historical evidence confirms that MA insurers have responded to legislated changes in the generosity of CMS payments to MA plans by adjusting cost-sharing requirements and premiums. As discussed in Section V, two major changes in Medicare law, first the BBA (passed in 1997) and later the MMA (passed in 2003), impacted the size of the payments CMS provided to MA plans. The BBA first imposed a cap on payments, and the MMA went on to remove this cap and increase payments.[329] Following the MMA, CMS contracted a study to assess the effects of these legislated changes in payment provisions.[330] The CMS study noted that "plans responded to the payment update restrictions of the BBA and rising medical cost inflation by attempting to raise revenue through higher premiums."[331] It also noted that "[c]ost sharing increased substantially in the early years of the decade, then declined or stabilized post MMA."[332]

186.   Other academic research affirms this point as well. A paper by Cabral and coauthors (2018), for example, shows that an increase in payments to private plans reduced both premiums and enrollee cost sharing.[333] Duggan et al. (2016) also find suggestive evidence that increases in payments to MA plans pass through to consumers, especially in the most competitive markets.[334] Similarly, Pelech and Song (2023) find that the ACA-induced reductions

---

[329] See ¶¶ 39–42.

[330] Pope et al., Impact of Increased Financial Incentives to Medicare Advantage Plans, p. 7.

[331] Pope et al., Impact of Increased Financial Incentives to Medicare Advantage Plans, p. 3.

[332] Pope et al., Impact of Increased Financial Incentives to Medicare Advantage Plans, p. 4. See also, Daria Pelech and Zirui Song, "Pricing and Pass-Through in Response to Subsidies and Competition: Evidence from Medicare Advantage Before and After the Affordable Care Act," Working Paper, January 12, 2023 ("Pelech and Song, Pricing and Pass-Through in Response to Subsidies and Competition"), p. 4, available at https://hcp.hms.harvard.edu/sites/default/files/assets/users/Working Papers/Pricing_Pass-through_MA_1-12-23.pdf ("High benchmarks, combined with the new bidding mechanism, also changed how insurers allocated resources between enrollee benefits and premiums. Because benchmarks were high, few insurers charged additional premiums beyond the standard Medicare premium paid by all beneficiaries, and instead competed by providing additional covered benefits and reduced cost sharing.").

[333] Marika Cabral, et al., "Do Larger Health Insurance Subsidies Benefit Patients or Producers? Evidence from Medicare Arbitrage," *American Economic Review*, 108(8), 2018 ("Cabral et al., Evidence from Medicare Arbitrage"), pp. 2048–2087 at pp. 2049, 2063–2068, 2085. The authors also describe that decreased payments might result in an increase in premiums or less generous benefits ("Naturally, the lines of argument are reversed when a reduction in payments is proposed.").

[334] Duggan et al., Who Benefits when the Government Pays More, p. 62.

in benchmarks, and the associated decrease in payments to plans, are associated with a decrease in the rebates offered to prospective enrollees.[335]

187.   Finally, evidence in the current matter is also consistent with this academic research. In particular, Melissa Sedor, Vice President of Finance of Medicare & Retirement for UnitedHealthcare, provided testimony related to UnitedHealth's MA bids.[336] Ms. Sedor testified that UnitedHealth, following discussion with CMS in 2014, discontinued its claim verification process, which she testified typically led UnitedHealth to delete diagnosis codes associated with their MA plan enrollees.[337] Ms. Sedor testified that the discontinuation of claims verification led to an increase in risks scores for its MA plans and, as a result, to an increase in the payments received by its MA plans.[338] As part of the MA bid process for payment years 2015 and later, however, UnitedHealth used most of the increase in payments to reduce MA plan enrollee premiums or to offer supplemental benefits to MA plan enrollees.[339] That is, when UnitedHealth received more payments from CMS for its MA plans, it reduced the cost sharing faced by its MA plan enrollees and provided additional benefits to those enrollees. For example, for payment year 2015, UnitedHealth estimated that changing the claims verification process resulted in an expected increase in payments of $140 million, but that roughly $135 million of that was reinvested back into health plans, with lower premiums and better Part D benefits.[340]

---

[335] Pelech and Song, Pricing and Pass-Through in Response to Subsidies and Competition, pp. 5–6 ("For each dollar decrease in the benchmark post-ACA, plans reduced their bids by roughly the same amount—57 cents on average—while passing through an average cut of 26 cents in rebates to beneficiaries. Within this change in rebates, plans reduced cost-sharing and covered benefits by about twice as much on the margin after the ACA as they had increased those buy-downs and coverage before the ACA – perhaps suggesting that insurers allocate cuts towards plan characteristics that are less salient to beneficiaries.")
[336] Sedor Deposition, p. 19:14–18.
[337] Sedor Deposition, p. 32:1–10 ("Q. […] And I'm not going to ask you what the claims verification program did or how it worked. But in general, it tended to delete more codes than it added; is that correct? […] THE WITNESS: The claims verification process generally resulted in deleting of codes. […] Q. And hence lower risk scores? A. Yes."), p. 35:10–22.
[338] Sedor Deposition, pp. 32:19–33:8 ("Q. […] Did the cancellation of the claims verification program affect United's bids? A. Yes, it did. Q. How so? A. When the claims verification process ceased, we were towards the end of pricing for 2015, and the cessation of that process resulted in the 2014 risk scores being higher, which went into the bids, which they then would have projected to also have a higher risk score in 2015. As a result of that higher risk score in 2015, we were able to change our bids around and pass that benefit back to the member by lowering the premiums we received from the members or by adding supplemental benefits to those bids.").
[339] Sedor Deposition, pp. 33:18–34:3 ("Q. Okay. So the thing that happened was the bid amount stayed the same, the risk score went up, and that money was redistributed to things like supplemental benefits? A. Correct. Q. Or lowering— A. Or lower premiums. Q. And when you say 'premiums' in this context, you mean collected from the beneficiaries, not CMS? A. Yes.").
[340] Sedor Deposition, pp. 46:8–48:13, Exhibit 732.

**B.** **If Payments to MA Plans Decline, Some MA Plans Would Reduce the Quality of Benefits Provided**

188.    In addition to increasing bids and enrollee cost sharing to account for reduced payments, some MA plans would reduce their costs by reducing the quality of the experience enrollees have with their plan. For example, managed care plans, such as MA plans, rely on a network of health care providers and negotiate rates with these providers to help manage costs.[341] MA plans may reduce the quality of their network as a cost-saving measure when the payments they receive decline, for example by relying more on lower-quality providers.

189.    Historical evidence from proposed payment cuts to Medicare Advantage in the last decade supports this conclusion. In 2014, proposed decreases to payments to Medicare Advantage plans were rolled back due to pressure from insurers and lawmakers, who claimed that the cuts would hurt seniors by increasing costs or limiting their provider networks.[342] This is consistent with declining payments to MA plans having a negative impact on the quality of plans provided and the patient experience.

190.    Academic research confirms these points, as does the evidence in this matter. As discussed above, Cabral and coauthors (2018) find that an increase in payments to private plans increased the generosity of MA plans, and they similarly note that a decrease in payments may result in less generous benefits.[343] As also discussed above, UnitedHealth increased supplemental benefits to its MA plan enrollees when payments to its MA plans from CMS increased.[344]

---

[341] See ¶ 35.

[342] Caroline Humer and David Morgan, "U.S. Government Rolls Back Proposed Medicare Advantage Cut," *Reuters*, April 7, 2014, available at https://www.reuters.com/article/us-usa-healthcare-medicare/u-s-government-rolls-back-proposed-medicare-advantage-cut-idINBREA361R520140407 ("'In many parts of the country, including New York, Medicare Advantage works very well. They've shouldered their share already and this proposed cut would have been disproportionate, hurting seniors who would lose doctors or pay more. We're glad the administration heeded our call and reversed the policy,' Democratic Senator Charles Schumer said in a statement.").

[343] Cabral et al., Evidence from Medicare Arbitrage, pp. 2048–2087 at pp. 2049, 2063–2068, 2085.

[344] Sedor Deposition, pp. 32:1–34:2.

### C.    If Payments to MA Plans Decrease, Some MA Plans Would Exit the Market, Reducing the Number of Options Available to Consumers

191.    If MA plans were to receive less in payments from CMS, some MA plans would cease to provide MA insurance (in certain, or even all, counties). In this case, Medicare beneficiaries in the affected counties would face reduced choice in Medicare insurance products.

192.    Historical evidence confirms that when MA plans receive less payments, some plans exit. For example, the BBA capped payments to MA plans. Specifically, in 1997, the BBA limited plans' reimbursements to be at most 2 percent higher than the prior year's reimbursement,[345] yet between 1999 and 2003, overall Medicare expenditures per enrollee grew between 4.2 and 9.0 percent per year, meaning that many plans were not able to fully cover their costs.[346] Plans responded to these reimbursement caps by "reduc[ing] the number of covered services, such as prescription drug coverage, and rais[ing] their cost-sharing requirements."[347] In addition, some plans withdrew from certain counties and enrollment in Part C started to decline in 1999. The number of MA contracts fell from 264 to 154 within the first two years following the full implementation of the BBA caps.[348] Between 1999 and 2003, more than two million beneficiaries were involuntarily disenrolled from the MA plans that withdrew.[349]

193.    A 2006 report to CMS indicated that following the implementation of the MMA in 2003 and the associated increase in payments in 2004, the number of MA plans available increased by approximately 62 percent in 2005.[350] The conclusions of this report to CMS are consistent with other academic work that has studied plan entry in response to increased payments to MA plans.[351] For example, Duggan et al. (2016) find that relative to comparable counties, those with

---

[345] McGuire et al., Economic History of Medicare Part C, pp. 289–332 at pp. 306, 309.

[346] See Workpaper 1. Medicare expenditure data available at NHE2021.xlsx when accessing "National Health Expenditures by type of service and source of funds, CY 1960-2021 (ZIP)" at "Historical," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/data-research/statistics-trends-and-reports/national-health-expenditure-data/historical. Medicare enrollment data available at Medicare_Enrollment_Trend_by_State_1985_2012.xslx when accessing "Historical Enrollment Data (ZIP)" at "CMS Program Statistics," *Centers for Medicare & Medicaid Services*, available at https://data.cms.gov/collection/cms-program-statistics.

[347] McGuire et al., Economic History of Medicare Part C, pp. 289–332 at p. 310.

[348] Pope et al., Impact of Increased Financial Incentives to Medicare Advantage Plans, pp. 29–30.

[349] McGuire et al., Economic History of Medicare Part C, pp. 289–332 at p. 310.

[350] Pope et al., Impact of Increased Financial Incentives to Medicare Advantage Plans, pp. 11, 29–30.

[351] Duggan et al., Who Benefits when the Government Pays More, pp. 50–67 at p. 50 ("Our results demonstrate that the additional reimbursement leads more private firms to enter this market."). I note that other papers—including Cabral et al., Evidence from Medicare Arbitrage, pp. 2048–2087 at pp. 2070–2071—have found more muted responses in terms of entry in response to changes in reimbursement rates. They observe no evidence of increased

a 10.5 percent higher reimbursement floor (due to being located in a metropolitan statistical area with a population of 250,000 or more) had an average of 1.8 more MA insurers.[352]

194.   If MA plans were to exit, Medicare beneficiaries would be less likely to choose an MA plan, as they would consequently have fewer MA plan options from which to choose. As a result, a decline in reimbursements to MA plans will not only reduce plan availability; it would also be expected to reduce total enrollment in MA. Between 1999 and 2004, enrollment in MA fell from 6.9 million (18 percent of all Medicare enrollees) to 5.3 million (13 percent of all enrollees).[353] The timing of this decline directly followed the capped growth in MA reimbursement under the BBA, up through the point where plans were able to re-contract under the more generous terms of the MMA.[354] Following the passage of the MMA and the subsequent increase in plan entry, the share of beneficiaries enrolled in MA continued to grow from 2003 to present day.[355]

195.   The academic literature also shows that MA plan enrollment responds to plan reimbursement. Duggan et al. (2016) also find that average share of Medicare enrollees electing MA plans was 13.1 percentage points higher in counties where plans were reimbursed an amount 10.5 percent higher than in other counties.[356] In a separate paper, Duggan et al. (2018) find that an additional $100 per person, per month in MA reimbursement is associated with a 5.1 percent increase in the share of Medicare recipients enrolled in MA.[357] Curto et al. (2021) use data from 2006-2011 to estimate an equilibrium model of optimal bidding in the context of MA. They estimate that an increase of $100 in the risk-adjustment benchmark would increase the share of Medicare beneficiaries enrolled in MA by approximately 10 percentage points, and

payments increasing either the number of counties with at least one plan or the number of plans per county more generally. In regards to the former, the authors attribute this to the small additional revenue that could have been earned by insurers entering zero-plan counties that received more payments.

[352] Duggan et al., Who Benefits when the Government Pays More, pp. 50–67 at p. 51.

[353] The total number of Medicare enrollees calculated as the total number of Medicare beneficiaries enrolled in Part A and/or Part B. Freed et al., A Dozen Facts About Medicare Advantage in 2020; Ochieng et al., Medicare Advantage in 2023: Enrollment Update and Key Trends.

[354] Pope et al., Impact of Increased Financial Incentives to Medicare Advantage Plans, p. 2.

[355] Ochieng et al., Medicare Advantage in 2023: Enrollment Update and Key Trends; Freed et al., A Dozen Facts About Medicare Advantage in 2020.

[356] Duggan et al., Who Benefits when the Government Pays More, pp. 50–67 at p. 51.

[357] Mark Duggan, et al., "The Consequences of Health Care Privatization: Evidence from Medicare Advantage Exits," *American Economic Journal: Economic Policy*, 10(1), 2018, pp. 153–186 at p. 181 ("Consistent with the existing literature (Afendulis, Chernew, Kessler 2013; Cawley, Chernew, and McLaughlin 2005; Pope et al. 2006) we find that an additional $100, per person month, in MA reimbursement (or about a 20 percent increase, relative to average reimbursement) is associated with a 5.1 percent increase in the share of nationwide Medicare recipients in MA.").

that conversely, reducing the benchmark decreases the MA enrollment share as well as consumer surplus.[358]

> **D.    Correctly Estimating the Change in Government Payments to UnitedHealth, If UnitedHealth Were Required to Identify and Delete Unsupported Codes, Requires Accounting for Behavioral Responses from MA Plans**

196.    As I discuss in Sections X.A–C, economic theory and historical evidence indicate that MA plans would alter their behavior were they required to identify and delete unsupported diagnosis codes. As a matter of economics, then, any credible estimate of the change in government payments to an MA plan that was required to identify and delete unsupported codes would need to account for changes in the behavior of MA plans and of Medicare beneficiaries. Failure to do so would ignore the full ramifications of a policy requiring MA plans to identify and delete unsupported codes and would ignore the potential for the government (and enrollees) to pay more due to higher bids (and higher cost sharing, in the case of enrollees).

Executed this 29th of September, 2023

_____

MARK DUGGAN, Ph.D.

---

[358] Curto et al., Can health insurance competition work? Evidence from Medicare Advantage, p. 599, Table 3.

Confidential

**Appendix A**

**Mark G. Duggan**
Curriculum Vita  (September 2023)

## Business Address

Stanford University
SIEPR
579 Jane Stanford Way
Stanford, CA 94305
Email: mgduggan@stanford.edu

## Work Experience

The Trione Director, Stanford Institute for Economic Policy Research (SIEPR), 2015 - present.

The Wayne and Jodi Cooperman Professor of Economics, Stanford University, 2014 – present.

Senior Fellow, Stanford Institute for Economic Policy Research, 2014 - present.

Chair, Department of Business Economics and Public Policy, the Wharton School, University of Pennsylvania, 2012 – 2014.

Rowan Family Foundation Professor, Wharton School, University of Pennsylvania, 2012 - 14.

Faculty Director, Penn Wharton Public Policy Initiative, 2012 – 2014.

Professor, Department of Business Economics and Public Policy, Department of Health Care Management, the Wharton School, University of Pennsylvania, 2011 – 2014.

Professor, University of Maryland, Department of Economics, 2007 - 2011.

Senior Economist, Council of Economic Advisers, Executive Office of the President, 2009 - 2010.

Associate Professor, University of Maryland, Department of Economics, 2003 – 2007.

Visiting Fellow, Brookings Institution, 2006 – 2007.

Assistant Professor, University of Chicago, Department of Economics, 1999 – 2003.

Visiting Assistant Professor, MIT, Department of Economics, 2001 – 2002.

Teaching Fellow, Harvard University, Department of Economics, 1996 - 1998.

Research Assistant, Harvard University, Department of Economics, 1994 - 1996.

Teaching Assistant, M.I.T. Department of Electrical Engineering and Computer Science, 1993-94.

## Education

Ph.D., Economics, June 1999, Harvard University.

M.S., Electrical Engineering, June 1994, M.I.T.

B.S., Electrical Engineering, June 1992, M.I.T.


## Journal Publications:

Mark Duggan. 2000. "Hospital Ownership and Public Medical Spending" *Quarterly Journal of Economics*, 115(4): 1343-1374.

Mark Duggan. 2001. "More Guns, More Crime" *Journal of Political Economy*, 109(5): 1086-1114.

Mark Duggan. 2002. "Hospital Market Structure and the Behavior of Not-for-Profit Hospitals" *RAND Journal of Economics*, 33(3): 433-446.

Mark Duggan and Steven Levitt. 2002. "Winning Isn't Everything: Corruption in Sumo Wrestling" *American Economic Review*, 92(5): 1594-1605.

David Autor and Mark Duggan. 2003. "The Rise in the Disability Rolls and the Decline in Unemployment" *Quarterly Journal of Economics*, 118(1): 157-206.

Mark Duggan. 2004. "Does Contracting Out Increase the Efficiency of Government Programs? Evidence from Medicaid HMOs" *Journal of Public Economics*, 88(12): 2549-2572.

Mark Duggan. 2005. "Do New Prescription Drugs Pay for Themselves? The Case of Second-Generation Antipsychotics" *Journal of Health Economics*, 24(1): 1-31.

David Autor and Mark Duggan. 2006. "The Growth in the Social Security Disability Rolls: A Fiscal Crisis Unfolding" *Journal of Economic Perspectives,* 20(3): 71-96.

Mark Duggan and Fiona Scott Morton. 2006. "The Distortionary Effects of Government Procurement: Evidence for Medicaid Prescription Drug Purchasing" *Quarterly Journal of Economics,* 121(1): 1-31.

David Autor and Mark Duggan. 2007. "Distinguishing Between Income and Substitution Effects in Disability Insurance" *American Economic Review: Papers and Proceedings*, 97(2): 119-124.

Mark Duggan and Melissa Kearney. 2007. "The Impact of Child SSI Enrollment on Household Outcomes" *Journal of Policy Analysis and Management*, 26(4): 861-886.

Mark Duggan, Perry Singleton, and Jae Song. 2007. "Aching to Retire?  The Rise in the Full Retirement Age and its Impact on the Disability Rolls" *Journal of Public Economics*, 91(7): 1327-1350.

**Appendix A**

Mark Duggan and Bill Evans. 2008. "Estimating the Impact of Medical Innovation: A Case Study of HIV Antiretroviral Treatments" *Forum for Health Economics and Policy*, 11(2): 1-39.

Mark Duggan, Patrick Healy, and Fiona Scott Morton. 2008. "Providing Prescription Drug Coverage to the Elderly: America's Experiment with Medicare Part D" *Journal of Economic Perspectives*, 22(4): 69-92.

Mark Duggan and Fiona Scott Morton. 2010. "The Effect of Medicare Part D on Pharmaceutical Prices and Utilization" *American Economic Review*, 100(1): 590-607.

Mark Duggan, Robert Rosenheck, and Perry Singleton. 2010. "Federal Policy and the Rise in Disability Enrollment: Evidence for the VA's Disability Compensation Program" *Journal of Law and Economics*, 53(2): 379-398.

David Autor and Mark Duggan. 2011. "Battle Scars: The Puzzling Decline in Employment and Rise in Disability Receipt among Vietnam-Era Veterans" *American Economic Review: Papers and Proceedings*, 101(3): 339-344.

Mark Duggan and Fiona Scott Morton. 2011. "The Medium-Term Impact of Medicare Part D on Pharmaceutical Prices" *American Economic Review: Papers and Proceedings*, 101(3): 387-392.

Mark Duggan, Randi Hjalmarsson, and Brian Jacob. 2011. "The Short-Term and Localized Effect of Gun Shows: Evidence from California and Texas" *Review of Economics and Statistics*, 93(3): 786-799.

Leemore Dafny, Mark Duggan, Subramaniam Ramanarayan. 2012. "Paying a Premium on Your Premium? Consolidation in the Health Insurance Industry" *American Economic Review*, 102(2): 1161-1185.

Mark Duggan and Tamara Hayford. 2013. "Has the Shift to Managed Care Reduced Medicaid Spending? Evidence from State and Local-Level Mandates" *Journal of Policy Analysis and Management*, 32(3): 505-535.

Rachel Werner, Mark Duggan, Elizabeth Stuart, Katia Duey, Jingsan Zhu, Lin Yang. 2013. "The Patient-Centered Medical Home: An Evaluation of a Single Private Payer Demonstration in New Jersey" *Medical Care*, 51(6): 487-493.

Abby Alpert, Mark Duggan, and Judith Hellerstein. 2013. "Perverse Reverse Price Competition: Average Wholesale Prices and Medicaid Pharmaceutical Spending" *Journal of Public Economics*, 108(C): 44-62.

David Autor, Mark Duggan, and Jon Gruber. 2014. "Moral Hazard and Claims Deterrence in Private Disability Insurance" *American Economic Journal: Applied Economics*, 6(4):110-141.

Jason Brown, Mark Duggan, Ilyana Kuziemko, and William Woolston. 2014 "How Does Risk
    Selection Respond to Risk Adjustment? New Evidence from the Medicare Advantage Program"
    *American Economic Review*, 104(10): 3335-3364.

Courtney Coile, Mark Duggan, and Audrey Guo. 2015. "Veterans' Labor Force Participation: What
    Role Does the VA's Disability Compensation Program Play?" *American Economic Review:
    Papers and Proceedings*, 105(5): 131-136.

Mike Dickstein, Mark Duggan, Joe Orsini, and Pietro Tebaldi. 2015. "The Impact of Market Size and
    Compostion on Health Insurance Premiums: Evidence from the first year of the Affordable
    Care Act" *American Economic Review: Papers and Proceedings*, 105(1): 120-125.

Mark Duggan, Craig Garthwaite, and Aparajita Goyal. 2016. "The Market Impacts of Pharmaceutical
    Product Patents in Developing Countries: Evidence for India." *American Economic Review*,
    106(1): 99-135.

David Autor, Mark Duggan, Kyle Greenberg, and David Lyle. 2016. "The Impact of Disability
    Benefits on Labor Supply: Evidence from the VA's Disability Compensation Program."
    *American Economic Journal: Applied Economics*, 8(3): 31-68.

Mark Duggan, Amanda Starc, and Boris Vabson. 2016. "Who Benefits when the Government Pays
    More? Pass-through in the Medicare Advantage Program." *Journal of Public Economics*, 141:
    50-67.

Mark Duggan, Jon Gruber, and Boris Vabson. 2018. "The Efficiency Consequences of Health Care
    Privatization: Evidence from Medicare Advantage Exits" *American Economic Journal:
    Economic Policy*, 10(1): 153-186.

Courtney Coile and Mark Duggan. 2019. "When Labor's Lost: Health, Family Life, Incarceration, and
    Education in a Time of Declining Economic Opportunity for Low-Skilled Men." *Journal of
    Economic Perspectives*, 33(2): 191-210.

Mark Duggan, Gopi Shah Goda, and Emilie Jackson. 2019. "The Labor Market Effects of the
    Affordable Care Act" *National Tax Journal*, 72(2): 261-322.

Rodrigo Carril and Mark Duggan. 2020. "The Impact of Industry Consolidation on Government
    Procurement: Evidence from Department of Defense Contracting." *Journal of Public
    Economics*. 184(4): 104-141.

Courtney Coile, Mark Duggan, and Audrey Guo. 2021. "To Work for Yourself, for Others, or Not at
    All? How Disability Benefits Affect the Employment Decisions of Older Veterans."
    *Journal of Policy Analysis and Management*, 40(3) 686-714.

Mark Duggan, Atul Gupta, and Emilie Jackson. 2022. "The Impact of the Affordable Care Act:
    Evidence from California's Hospital Sector" *American Economic Journal: Economic Policy*,
    14(1): 111-151.

Mark Duggan, Audrey Guo, and Andrew Johnston. 2022. "Would Broadening the Unemployment Insurance Tax Base Benefit Low-Income Workers?" *American Economic Review: Papers and Proceedings* 112: 107-111.

Hui Ding, Mark Duggan, and Amanda Starc. 2022. "Getting the Price Right? The Impact of Competitive Bidding in the Medicare Program." (with Hui Ding and Amanda Starc) forthcoming at *Review of Economics and Statistics*.

Danea Horn, Abby Alpert, Mark Duggan, Nicolas Garcia, and Mireille Jacobson. 2023. "Biosimilar Competition and Payments in Medicare: The Case of Trastuzumab." *Journal of Clinical Oncology: Oncology Practice*, Vol 19, Issue 4.

Mark Duggan, Irena Dushi, Sookyo Jeong, and Gina Li. 2023. "The Effect of Changes in Social Security's Delayed Retirement Credit: Evidence from Administrative Data." *Journal of Public Economics,* July 2023.

Sam Heft-Neal, Carlos Gould, Marissa Childs, Matthew Kiang, Kari Nadeau, Mark Duggan, Eran Bendavid, and Marshall Burke. "Emergency Department Visits Respond Non-Linearly to Wildfire Smoke." forthcoming at *Proceedings of the National Academy of Sciences*.

**Other Publications:**

Mark Duggan. 2003. "Guns and Suicide: Correlation or Causation?" in *Evaluating Gun Policy*, edited by Philip Cook and Jens Ludwig, Brookings Institution Press.

Mark Duggan. 2004. Comment on Steven Raphael and Michael Stoll's "The Effect of Prison Releases on Regional Crime Rates" for the *Brookings-Wharton Papers on Urban Affairs*.

Mark Duggan and Scott Imberman. 2009. "Why Are the DI Rolls Skyrocketing? The Contribution of Population Characteristics, Economic Conditions, and Program Generosity" *Health at Older Ages*, edited by David Cutler and David Wise, University of Chicago Press.

Mark Duggan and Bob Kocher. 2010. "The Economics, Opportunities, and Challenges of Health Insurance Exchanges" *The Economists' Voice*.

David Autor and Mark Duggan. 2010. "Supporting Work: A Proposal for Modernizing the U.S. Disability Insurance System" Center for American Progress and The Hamilton Project.

Craig Garthwaite and Mark Duggan. 2012. "Empirical Evidence on the Value of Pharmaceuticals" in *The Oxford Handbook of the Economics of the Pharmaceutical Industry*.

Mark Pauly and Mark Duggan. 2013. "Employer Insurance under Employer Mandates and Subsidized Exchanges: Time to Dump or Stay?" *Health Management, Policy, and Innovation*.

Mark Duggan. 2014. "The Labor Market Effects of the VA's Disability Compensation Program." SIEPR Policy Brief.

Mark Duggan, Melissa Kearney, and Stephanie Rennane. 2016. "The SSI Program." *Means-Tested Transfer Programs in the U.S.* National Bureau of Economic Research. Editor: Robert Moffitt.

Mark Duggan and Valerie Scimeca. 2017. "Safety Net." Stanford Center on Poverty and Inequality. *State of the Union Report*.

Mark Duggan. 2017. "How to Heal Obamacare." SIEPR Policy Brief. September.

Mark Duggan and Valerie Scimeca. 2018. "Health." Stanford Center on Poverty and Inequality. *State of the Union: Gender Inequality*.

Mary Daly and Mark Duggan. 2019. "When One Size Does Not Fit All: Modernizing the SSI Program." *Annals of the American Academy of Political and Social Science*. 686(1): 229-249.

Mark Duggan and Jacqueline Li. 2019. "Health." Stanford Center on Poverty and Inequality. *State of the Union: Millenial Dilemma*.

Mark Duggan, Gopi Shah Goda, and Gina Li. 2021. "The Effects of the Affordable Care Act on the Near-Elderly: Evidence for Health Insurance Coverage and Labor Market Outcomes." *Tax Policy and the Economy*, Volume 35.

Mark Duggan, Audrey Guo, and Andrew Johnston. 2020. "Unemployment During the Pandemic: How to Avoid Going for Broke." SIEPR Policy Brief. September.

Mark Duggan. 2020. "Economic Policy in a Biden Administration." SIEPR Policy Brief. December.

Mark Duggan and Audrey Guo. 2021. "Soldiering On: Improving Policies to Benefit America's Veterans." SIEPR Policy Brief. February.

Mark Duggan and Sheila Olmstead. 2021. "A Tale of Two States: Contrasting Economic Policy in California and Texas." SIEPR Policy Brief. September.

Mark Duggan and Irena Asmundson. 2022. "Why California Needs to Reform Unemployment Insurance Funding." SIEPR Policy Brief. February.

Mark Duggan and Emma Hou. 2022. "Apples and Oranges: Contrasting Economic Policy in New York and Florida." SIEPR Policy Brief. September.

Mark Duggan, Audrey Guo, and Andrew Johnston. 2023. "Experience Rating as an Automatic Stabilizer," *Tax Policy and the Economy,* Volume 37, 109-133.

**<u>Working Papers</u>**

"The Impact of Privatization: Evidence from the Hospital Sector." (with Atul Gupta, Emilie Jackson, and Zachary Templeton) reject-and-resubmit at *Quarterly Journal of Economics*.

"Why Does the Inflation Reduction Act Exclude expensive Cancer Treatments in Price Negotiations?" revise and resubmit at *Journal of Clinical Oncology: Oncology Practice*.

"Heterogeneity in the Impact of Privatizing Social Insurance: Evidence from California's Medicaid Program" (with Craig Garthwaite, Gina Li, and Adelina Wang).

"Do CEOs Know Best? Evidence from China." (with Nicholas Bloom, Hong Cheng, Hongbin Li, and Franklin Qian).

## **Popular Press Articles**

"Pandemic Unemployment Will Soon Bring Tax Hikes." (with Andrew Johnston). *Wall Street Journal*. September 14, 2020.

"Rethinking Federal Policy for America's Veterans." (with Audrey Guo). *The Hill*. January 27, 2021.

"Fraud is Just One Problem with California's Unemployment Insurance Program." *San Francisco Chronicle*. February 23, 2021.

"State Unemployment Insurance Needs Reform Now." (with Marika Cabral). *Houston Chronicle*. March 24, 2021.

"The Time is Now for Action on Social Security." (with Jeff Brown). *The Hill*. May 29, 2021.

"Social Security is on Life Support. Here's How to Get it to its 100th Birthday." *The Hill*. August 17, 2023.

## **Congressional Testimony**

"Ensuring Success for the Social Security Disability Insurance Program and its Beneficiaries" testimony before the Joint Economic Committee, November 4, 2015.

"The Coming Crisis: Social Security Disability Insurance Trust Fund Insolvency" testimony before the Senate Budget Committee, February 11, 2015.

"The Rise in SSDI Enrollment, the Impact on the Labor Market, and the Need for Reform," testimony before the Social Security Subcommittee of the U.S. House Committee on Ways and Means, June 19, 2013.

## **Research Grants**

Emerson Collective. The Impact of the Medicare Program on the Price, Utilization, and Development of Cancer Treatments. 2021-2023.

Social Security Administration. The Minimum Wage and Social Security Disability Insurance. 2019-2020 (with Gopi Shah Goda).

**Appendix A**

Social Security Administration. The Effect of the Delayed Retirement Credit on Social Security Claiming and Employment. 2019-2020.

Washington Center for Equitable Growth. The Effects of Industry Consolidation on Government Procurement: The Case of DoD. 2017-2018.

Social Security Administration. Are Veterans' and Social Security Disability Benefits, Old Age Benefits, and Earnings Complements or Substitutes? 2016-17 (with Courtney Coile).

Laura and John Arnold Foundation. Strengthening Economic Policy Relevant Research at SIEPR. 2016-2019.

Alfred P. Sloan Foundation. The Labor Market Effects of the Affordable Care Act. 2016-2020 (with Gopi Shah Goda).

Alfred P. Sloan Foundation. The Labor Market Effects of the VA's Disability Compensation Program. 2015-2019 (with Courtney Coile).

National Institute on Aging. P01 AG00584 Project 7: Disability Programs, Health, and Work at Older Ages around the World. Co-Investigator (PI: David Wise). 2011-2015.

Social Security Administration. Public Health Expenditures on the Working Age Disabled: Assessing Medicare and Medicaid Utilization of SSDI and SSI Recipients. Co-principal investigator (Co-PIs: David Autor and Amitabh Chandra), 2008-2010.

Social Security Administration. How Has the Growth of the Disability Compensation program affected the SSI and OASDI Programs? Co- principal investigator (Co-PI: David Autor), 2007– 2008.

National Science Foundation. Government Procurement of Pharmaceuticals. 0518858. Co-Principal investigator (PI: Fiona Scott Morton), 2005 – 2011.

Social Security Administration. #10-P-98363-1-04. How Does the Design of Social Security Affect Work and Retirement Decisions? Disability Insurance and Labor Supply Forecasts. Co-Principal investigator (Co-PI: David Autor), 2006 – 2007.

National Institute of Child Health and Development. The Impact of Child SSI Enrollment. R03HD050441. Principal Investigator (Co-PI: Melissa Kearney), 2005 – 2008.

Robert Wood Johnson Foundation. The Effect of HMO Contracting on Government Spending and Health Care Quality. Principal Investigator, 2002 – 2004.

Sandell Center for Retirement Research. The Rise in the Disability Rolls and the Decline in Unemployment. Co-principal investigator (Co-PI: David Autor), 2001 – 2002.

**Appendix A**

**<u>Professional Activities</u>**

American Economic Association 2022 Annual Meeting Program Committee, 2020 – 2022.

Program Area Coordinator, Econometric Society World Congress, 2020.

Chair, Bay Area Council Economic Institute, 2019 - present.
Member of Committee to select Editor of *American Economic Journal: Economic Policy*, 2018.

Affiliated Expert, Cornerstone Research, 2015 – present.

Advisory Board, Nuna Health, 2015 – 2019.

National Institutes of Health, Health and Retirement Study Data Monitoring Committee, 2014 - 2020.

American Economic Association, Committee on Government Relations, 2013 – 2017.

National Bureau of Economic Research IRB Committee, 2012 – 2015.

U.S. Bureau of Economic Analysis, Health Experts Advisory Group, 2012 – 2016.

Leonard Davis Institute, Senior Fellow, 2011 – 2014.

Social Security Advisory Board, Technical Panel on Assumption and Methods, 2010 – 2011.

Food and Drug Administration, Special Government Employee, 2011.

Advisory Board Member, McKinsey Center for U.S. Health System Reform, 2010 - 2012.

Research Associate, National Bureau of Economic Research, 2007–present.

Faculty Research Fellow, National Bureau of Economic Research, 2000-2007

Research Associate, Maryland Population Research Center, 2003-2011.

Co-organizer (with Amy Finkelstein) of NBER Public Economics Program meeting, Spring 2007.

Organizer of NBER Health Care meeting, Autumn 2007.

Member of Committee to Select Editor of *American Economic Journal: Applied Economics*, 2006-07.

Member of Social Security Administration's Technical Advisory Panel for Modeling the Effect of Social Security Reform on the SSDI Program, 2004-05.

Program Committee Member for the Econometric Society's 2005 World Congress.

Co-organizer (with Steven Levitt) of NBER Universities' Research Conference "The Economic Analysis of Government Expenditure Programs," 2002.

Member of American Economic Association, American Society of Health Economists, and National Academy of Social Insurance.

## Fellowships and Awards

Stanford University Economics Department Distinguished Faculty Teaching Award, 2021-2022.

National Institute for Health Care Management Research Award (with Fiona Scott Morton), 2011.

ASHEcon Medal awarded once every two years to "Economist Age 40 and under who has Made the Most Significant Contributions to the Field of Health Economics", 2010.

Raymond Vernon Prize (with Melissa Kearney) for Best Article in the *Journal of Policy Analysis and Management*, 2007.

University of Maryland Undergraduate Student Teaching Award, 2006.

University of Maryland Graduate Student Teaching Award, 2005, 2006.

Alred P. Sloan Foundation Research Fellow, 2004 - 2006.

*Journal of Political Economy* Griliches Award, Honorable Mention, 2002.

University of Chicago Faculty Appreciation Award, 2000 (awarded by economics Ph.D students)

Alfred P. Sloan Foundation Doctoral Dissertation Fellowship, 1998-99.

Harvard's Derek Bok Center Award for Excellence in Undergraduate Teaching, 1997 and 1998.

NBER Not-for-Profit Fellowship, 1997-98.

Harvard University Positive Political Economy Fellowship, 1996-97.

Harvard University Economics Department Fellowship, 1994-98.

Harvard University Albert J. Lynch Fellowship, 1994-98.

M.I.T. Frederick Hennie Award for Excellence in Undergraduate Teaching, 1994.

William T. Grant Foundation Fellowship, 1993-94.

Tau Beta Pi, 1991.

## Editorial and Referee Service

Board of Editors, *Journal of Policy Analysis and Management*, 2021 – present.

Board of Editors, *American Economic Journal: Economic Policy*, 2007-2012, 2015 – 2021.

Co-Editor, *American Economic Journal: Economic Policy*, 2012 – 2015.

Co-Editor, *Journal of Public Economics*, 2010-2013.

Associate Editor, *Journal of Public Economics*, 2007-2010.

Referee for: *American Economic Journal: Applied Economics, American Economic Journal: Economic Policy, American Economic Review, B.E. Journals in Economic Analysis and Policy, Demography, Econometrica, Economic Inquiry, Economic Journal, Economics Letters, European Economic Review, Health Affairs, Health Economics, Health Services Research, Industrial and Labor Relations Review, Journal of the American Medical Association, Journal of Applied Econometrics, Journal of Development Economics, Journal of Economics and Management Strategy, Journal of Economic Literature, Journal of the European Economic Association, Journal of Health Economics, Journal of Human Resources, Journal of Labor Economics, Journal of Law and Economics, Journal of Legal Studies, Journal of Policy Analysis and Management, Journal of Political Economy, Journal of Public Economics, Labour Economics, National Institute of Health, National Science Foundation, Quarterly Journal of Economics, Review of Economics and Statistics, Review of Economic Studies, Review of Industrial Organization, Southern Economic Journal.*

## Stanford University Service

Senate of the Academic Council, 2016 – 2018, 2023 - present.

COVID-19 Vaccine Governance Committee, 2021.

Sustainability Blueprint Advisory Committee, 2020 – 2021.

Human-Centered AI Design Team, 2018 - 2019.

Precision and Population Health Design Team, 2018 - 2019.

Faculty Athletic Fellow, Stanford Cross-Country and Track and Field Teams, 2016 - present.

Stanford Fellows program, 2016 – 2018.

Faculty Advisory Board, Haas Center for Public Service, 2015 – 2021.

Executive Committee Chair, Public Policy Program, 2015 – present.

Pre-Major Advisor, 2015 – 2021.

**Appendix A**

**University of Pennsylvania Service**

Member of Executive Committee, Leonard Davis Institute for Health Economics, 2012-14.

Penn Fellow (one of 8 faculty selected university-wide), 2011-13.
Chair of Business and Public Policy Department's Junior Recruiting Committee, 2011-12.

Member of Wharton Personnel Committee, 2011-12.

**University of Maryland Service**

Member of Economics Department Executive Committee, 2004-06, 2008-09.

Chair of Economics Department Junior Recruiting Committee, 2004-05, 2007-08.

Member of Economics Department Junior Recruiting Committee, 2004-06, 2007-08.

Member of Economics Department Senior Recruiting Committee, 2006-07, 2008-09.

Member of Economics Department Salary Committee, 2006-09.

**Presentations:**

2020-2023:    ASSA Annual Meetings, Bocconi, Boston University / Harvard / MIT, University
of California at Berkeley, University of California at Irvine (scheduled), University of
Chicago, Collegio Carlo Alberto, NBER,University of Pennsylvania, Tsinghua
University, New York University, University of Virginia (scheduled).

2016-2020:    University of Arizona, ASSA Annual Meetings, Brigham Young University,
University of California at Irvine, University of California at Los Angeles, University
of Chicago, City University of New York, Columbia University, Federal Reserve Bank
of Chicago, Federal Reserve Bank of Dallas, Federal Reserve Bank of New York,
Harvard University, Johns Hopkins University, University of Maryland, Michigan
State, NBER, Northwestern University, University of Southern California, Texas A&M.

2013-2015:    Arizona State University, ASSA Annual Meetings, Brookings Institution, Brown
University, University of California at Berkeley, University of California at Los
Angeles, University of California at Santa Barbara, Columbia University,
Congressional Budget Office, Duke University, Federal Reserve Board of Governors,
University of Illinois at Urbana-Champaign, M.I.T., University of Minnesota, NBER,
University of Oregon, Princeton University, RAND, Stanford University.

2010-2012:    ASSA Annual Meetings, Boston University, Brown University, University of California
at Berkeley, University of Chicago, Columbia University, Cornell University, Harvard
University, University of Illinois at Chicago, Institute for Fiscal Studies, Johns Hopkins
University, London School of Economics, M.I.T., National Tax Association, NBER,
Northwestern University, Princeton University, Renaissance Technologies, University

**Appendix A**

of Pennsylvania (Wharton), Rice University, University of Southern California, Stanford University, Warwick University, Yale University.

2007-2009:    American Enterprise Institute, American Society of Health Economists, American University, ASSA Annual Meetings, Brown University, Bureau of Economic Analysis, Centers for Medicare and Medicaid Services, Columbia University, Dartmouth College, Duke University, Georgetown University, Georgia State, Harvard University, University of Houston, University of Illinois at Urbana-Champaign, NBER, RAND, Stanford University, Syracuse University, University of Houston, University of Maryland, U.S. Department of Veterans Affairs.

2006-2007:    ASSA Annual Meetings, Brigham Young University, Brookings Institution, University of California at Berkeley, CINP 2006 Chicago Congress, Federal Trade Commission, Free University of Amsterdam, Harvard University (KSG), University of Illinois at Chicago, NBER, National Center of Health Statistics, University of Pittsburgh / Carnegie Mellon, Population Association of America, Social Security Administration, Southern Economic Association, Yale University.

2005-2006:    American Society of Health Economists, Boston University, Brookings Institution, University of California at Berkeley, Georgetown University,  George Washington University, NBER-CCER Conference in Beijing, University of North Carolina at Chapel Hill,  University of Pennsylvania (Wharton), Population Association of America, Princeton University, University of Rochester, Stanford Graduate School of Business, Washington University.

2004-2005:    Centers for Medicare and Medicaid Services, Cornell University, Federal Trade Commission, Harvard University, MIT, University of Michigan, HEC Montreal, NBER, Northwestern University (Kellogg), RAND, Stanford University, SUNY-Buffalo, Urban Institute, World Bank, Yale School of Public Health.

2003-2004:    ASSA Annual Meetings, Baruch College, Brookings Institution, Case Western Reserve University,  University of Chicago, Columbia University, George Mason University, NBER,  University of Pennsylvania (Wharton), Social Security Administration, University  of Virginia.

2002-2003:    University of British Columbia, Brown University, University of California at San Diego, Case Western Reserve University, University of Chicago GSB, University  of Colorado at Denver, Columbia University, Harvard University, NBER,  Princeton University, University of Texas at Austin, University of Wisconsin at  Madison.

1998-2002:    ASSA Annual Meetings, University of California at Berkeley, University of California at Los Angeles,  University of Chicago, Duke University, Harvard University, Mathematica, MIT,  University of Michigan, NBER, Northwestern University, Princeton University, Stanford University, University of Wisconsin at Madison.

**Appendix A**

**University of Chicago Ph.D. Advisees (with first job placement)**

Rodrigo Garcia-Verdu, 2000, Mexico Central Bank
Rena Rosenberg, 2000, McKinsey and Company
Joseph Doyle, 2001, M.I.T. Sloan School
Ming-Jen Lin, 2001, National Taiwan University
Deborah Healy, 2002, U.S. Department of Justice
Grecia Marrufo, 2002, Stanford post-doctoral fellowship
Raphael de Coninck, 2003, NYU post-doctoral fellowship
Damien de Walque, 2003, World Bank
Chris Rohlfs, 2006, Syracuse University

**University of Maryland Ph.D. Advisees (with first job placement, ** indicates Chair or Co-Chair)**

Jennifer Goodwin, 2004, Duke post-doctoral fellowship
Rubiana Chamarbagwala, 2005, Indiana University
Julian Cristia, 2006, Congressional Budget Office
Beomsoo Kim, 2006, University of North Carolina at Greensboro
Gaobo Pang, 2006, Watson Wyatt
Heng Wei, 2006, Price Waterhouse Coopers
Alex Whalley, 2006, University of California at Merced
Janet Hao, 2007, Conference Board
Scott Imberman **, 2007, University of Houston
Emily Owens, 2007, Cornell University, Public Policy and Management
Perry Singleton **, 2007, Syracuse University
Aparajita Goyal **, 2008,World Bank
Melissa Powell McInerney, 2008, College of William and Mary
Melinda Sandler, 2008, North Carolina State University
Meltem Daysal, 2009, Tillburg University
Craig Garthwaite **, 2009, Northwestern University (Kellogg)
Tamara Hayford **, 2009, Congressional Budget Office
Jessica Hennessey, 2009, Furman University
Yeon Soo Kim, 2010, Korea Development Institute
Lingsheng Meng **, 2010, Tsinghua University
Quynh Nguyen, 2010, World Bank
Li Tang, 2010, Inter-American Development Bank
Abby Alpert **, 2011, RAND
Diether Beuermann **, 2011, IADB
Keith Kranker **, 2011, Mathematica
Timothy Moore, 2012, George Washington University

**University of Pennsylvania Ph.D. Advisees (with first job placement, ** indicates Chair or Co-Chair)**

Adam Isen, 2013, U.S. Department of the Treasury
Jillian Popadak, 2014, Duke University (Fuqua)

**Appendix A**

Daniel Sacks, 2014, Indiana University (Kelley)
Victoria Perez, 2015, Indiana University (SPEA)
Boris Vabson **, 2016, Nuna Health
Andrew Johnston **, 2016, University of California at Merced

### Stanford Ph.D. Advisees (with first job placement, ** indicates Chair or Co-Chair)

Joe Orsini, 2016, Nuna Health
Pietro Tebaldi, 2016, University of Chicago
Monica Bhole, 2017, Pandora
Atul Gupta, 2017, University of Pennsylvania (Wharton)
Kevin Nguyen, 2017, Amazon
Ian Hoffman, 2018, Cornerstone Research
Cristos Makridis, 2018, Council of Economic Advisers
Daniel Bennett, 2019, Analysis Group
Yiwei Chen, 2019, Quantco
Audrey Guo **,  2019, Santa Clara University
Rodrigo Carril **, 2020, Pompeu Fabra University
Yiqun Chen, 2020, University of Illinois at Chicago
Sarah Eichmeyer, 2020, University of Munich
Emilie Jackson **, 2020, Michigan State University
Adelina Wang **, 2020, NBER Post-Doctoral Fellowship
Sookyo Jeong **, 2021, Lyft
Hui Ding **, 2022, Fudan University
Gina Li **, 2023, Federal Reserve Board

### Popular Press Coverage

*Boston Globe, Business Week, CNN, Christian Science Monitor, Economist, Financial Times, The Hill, Houston Chronicle, Los Angeles Times, NPR, New York Times, San Francisco Chronicle, Wall Street Journal, and others.*

### Prior Testimony of Mark G. Duggan, Ph.D.

### Testimony Since 2019

*Amgen Inc., Amgen Manufacturing Limited, and Amgen USA, Inc. v. Sanofi, Aventisub LLC, Regeneron Pharmaceuticals Inc., and Sanofi-Aventis U.S.*, United States District Court for the District of Delaware, Case No. 1:14-cv-01317. Deposed on November 1, 2018. Hearing Testimony on June 21, 2019.

*Washtenaw County Employees' Retirement System v. Walgreen Co., Gregory D. Wasson, and Wade Miquelon*, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 1:15-cv-03187. Expert reports submitted November 11, 2020 and December 15, 2020. Deposed on February 11, 2021.

*In Re: National Prescription Opiate Litigation: State of Washington v. McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Drug Corporation*, State of Washington, King County Superior Court, Case No. 19-2-06975-9. Expert reports submitted January 11, 2021, April 19, 2021, July 11, 2021, and October 8, 2021. Deposed on July 13, 2021.

*County of Dallas v. Purdue Pharma L.P., et al.*, District Court, 116th Judicial District, Dallas County, TX, Cause No. 2018-CI-77098. Expert report submitted July 30, 2021. Deposed on September 14, 2021.

*County of Bexar v. Purdue Pharma L.P., et al.*, District Court, 224th Judicial District, Bexar County, TX, Cause No. 2018-CI-08728. Expert report submitted September 21, 2021.

**Appendix B**

Documents Relied Upon

| Document Title | Document Date |
| --- | --- |

**Legal Pleadings and Decisions**

United States' Amended Complaint-In-Partial-Intervention and Demand for Jury Trial, *United States of America ex rel. Benjamin Poehling v. UnitedHealth Group, Inc. et al.* — November 17, 2017

**Industry Reports**

"Eliminating the FFS Adjuster from the RADV Methodology May Affect Plan Payment," *Avalere Health*, available at https://avalere.com/wp-content/uploads/2019/03/20190318-FFS-Adjuster-Analysis-Final-.pdf — March 2019

"Employer Health Benefits: 2021 Annual Survey," *Kaiser Family Foundation*, available at https://files.kff.org/attachment/Report-Employer-Health-Benefits-2021-Annual-Survey.pdf — November 2021

"Medicare Advantage: A Policy Primer," *Commonwealth Fund*, available at https://www.commonwealthfund.org/publications/explainer/2022/may/medicare-advantage-policy-primer — May 3, 2022

"The Facts About Medicare Spending," *Kaiser Family Foundation*, available at https://www.kff.org/interactive/medicare-spending — June 2023

"Total Number of Medicare Beneficiaries by Type of Coverage," *Kaiser Family Foundation*, available at https://www.kff.org/medicare/state-indicator/total-medicare-beneficiaries — 2019

Claire Noel-Miller, "Medicare Beneficiaries' Out-of-Pocket Spending for Health Care," *AARP Public Policy Institute*, available at https://www.aarp.org/content/dam/aarp/ppi/2021/12/medicare-beneficiaries-out-of-pocket-health-care-spending.doi.10.26419-2Fppi.00105.002.pdf — December 2021

Gregory Pope, et al., "Impact of Increased Financial Incentives to Medicare Advantage Plans: Final Report," *RTI International*, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Reports/Downloads/Pope.pdf — September 2006

Gretchen Jacobson, et al., "A Dozen Facts About Medicare Advantage," *Kaiser Family Foundation*, available at https://web.archive.org/web/20181129174017/https://www.kff.org/medicare/issue-brief/a-dozen-facts-about-medicare-advantage/ — November 13, 2018

Gretchen Jacobson, et al., "Medicare Advantage Hospital Networks: How Much Do They Vary?," *Kaiser Family Foundation*, available at http://files.kff.org/attachment/Report-Medicare-Advantage-Hospital-Networks-How-Much-Do-They-Vary — June 20, 2016

Gretchen Jacobson, et al., "Medicare Advantage: How Robust Are Plans' Physician Networks?," *Kaiser Family Foundation*, available at https://www.kff.org/medicare/report/medicare-advantage-how-robust-are-plans-physician-networks/ — October 5, 2017

Meredith Freed, et al., "A Dozen Facts About Medicare Advantage in 2020," *Kaiser Family Foundation*, available at https://web.archive.org/web/20201210075019/https://www.kff.org/medicare/issue-brief/a-dozen-facts-about-medicare-advantage-in-2020 — April 22, 2020

Jared Ortaliza, et al., "How Do Health Expenditures Vary Across the Population," *Peterson-KFF Health System Tracker*, available at https://www.healthsystemtracker.org/chart-collection/health-expenditures-vary-across-population/ — November 12, 2021

Jeannie Fuglesten Biniek, et al., "Spending on Medicare Advantage Quality Bonus Payments Will Reach at Least $12.8 Billion in 2023," *Kaiser Family Foundation*, available at https://www.kff.org/medicare/issue-brief/spending-on-medicare-advantage-quality-bonus-payments-will-reach-at-least-12-8-billion-in-2023/ — August 9, 2023

John Wennberg, et al., "Tracking the Care of Patients with Severe Chronic Illness: The Dartmouth Atlas of Health Care 2008," *The Dartmouth Institute for Health Policy and Clinical Practice*, available at https://data.dartmouthatlas.org/downloads/atlases/2008_Chronic_Care_Atlas.pdf — 2008

Julia Lambert, "Actuarial Report on Medicare Advantage FFS Adjuster," *Wakely* — August 28, 2019

Juliette Cubanski and Anthony Damico, "Key Facts About Medicare Part D Enrollment and Costs in 2023," KFF, available at https://www.kff.org/medicare/issue-brief/key-facts-about-medicare-part-d-enrollment-and-costs-in-2023 — June 7, 2023

| Document Title | Document Date |
|---|---|
| Juliette Cubanski and Tricia Neuman, "What to Know about Medicare Spending and Financing," *Kaiser Family Foundation*, available at https://www.kff.org/medicare/issue-brief/what-to-know-about-medicare-spending-and-financing/ | January 19, 2023 |
| Juliette Cubanski, et al., "10 Things to Know About Medicare Part D Coverage and Costs in 2019," *Kaiser Family Foundation*, available at https://www.kff.org/medicare/issue-brief/10-things-to-know-about-medicare-part-d-coverage-and-costs-in-2019/ | June 4, 2019 |
| Juliette Cubanski, et al., "A Primer on Medicare: Key Facts about the Medicare Program and the People it Covers," *Kaiser Family Foundation*, available at https://www.kff.org/report-section/a-primer-on-medicare-how-does-medicare-pay-providers-in-traditional-medicare/ | March 20, 2015 |
| Letter from Matthew Eyles (AHIP) to Seema Verma (CMS), "RE: Medicare and Medicaid Programs; Policy and Technical Changes to the Medicare Advantage, Medicare Prescription Drug Benefit, Program of All-inclusive Care for the Elderly (PACE), Medicaid Fee-For-Service, and Medicaid Managed Care Programs for Years 2020 and 2021 ('Proposed Rule')", available at https://ahiporg-production.s3.amazonaws.com/documents/AHIP_RADV_comments_FINAL_8_27.pdf | August 27, 2019 |
| Matthew Rae, et al., "Patient Cost-Sharing in Marketplace Plans, 2016," *Kaiser Family Foundation*, available at https://www.kff.org/health-costs/issue-brief/patient-cost-sharing-in-marketplace-plans-2016 | November 13, 2015 |
| Meredith Freed, et al., "Medicare Advantage 2023 Spotlight: First Look," *Kaiser Family Foundation*, available at https://www.kff.org/medicare/issue-brief/medicare-advantage-2023-spotlight-first-look/ | November 10, 2022 |
| Meredith Freed, et al., "Medicare Advantage in 2022: Premiums, Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings," *Kaiser Family Foundation*, available at https://web.archive.org/web/20230211090856/https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2022-premiums-out-of-pocket-limits-cost-sharing-supplemental-benefits-prior-authorization-and-star-ratings | August 25, 2022 |
| Nancy Ochieng, et al., "Medicare Advantage in 2023: Enrollment Update and Key Trends," *Kaiser Family Foundation*, available at https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2023-enrollment-update-and-key-trends/ | August 9, 2023 |
| Nancy Ochieng, et al., "Medicare Advantage in 2023: Premiums: Out-of-Pocket Limits, Cost Sharing, Supplemental Benefits, Prior Authorization, and Star Ratings," *Kaiser Family Foundation*, available at https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2023-premiums-out-of-pocket-limits-cost-sharing-supplemental-benefits-prior-authorization-and-star-ratings/ | August 9, 2023 |
| Rob Pipich, "Medicare Advantage RADV FFS adjuster: White paper," *Milliman White Paper*, available at https://assets.milliman.com/ektron/Medicare_Advantage_RADV_FFS_adjuster_8-23-2019.pdf | August 23, 2019 |
| Robin Rudowitz, et al., "10 Things to Know about Medicaid," *Kaiser Family Foundation*, available at https://www.kff.org/medicaid/issue-brief/10-things-to-know-about-medicaid | June 30, 2023 |
| Wyatt Koma, et al., "Medicare Beneficiaries' Financial Security Before the Coronavirus Pandemic," *Kaiser Family Foundation*, available at https://www.kff.org/medicare/issue-brief/medicare-beneficiaries-financial-security-before-the-coronavirus-pandemic/ | April 24, 2020 |
| Wyatt Koma, et al., "FAQs on Medicare Coverage of Telehealth," *Kaiser Family Foundation*, available at https://www.kff.org/medicare/issue-brief/faqs-on-medicare-coverage-of-telehealth/ | May 23, 2022 |

## Government Literature

| | |
|---|---|
| "2021 Medicare Fee-for-Service Supplemental Improper Payment Data," *U.S. Department of Health and Human Services*, available at https://www.cms.gov/files/document/2021-medicare-fee-service-supplemental-improper-payment-data.pdf-0 | December 7, 2021 |
| "2023 Medicare Advantage and Part D Advance Notice Fact Sheet," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/newsroom/fact-sheets/2023-medicare-advantage-and-part-d-advance-notice-fact-sheet | February 2, 2022 |
| "2023 Medicare Parts A & B Premiums and Deductibles 2023 Medicare Part D Income-Related Monthly Adjustment Amounts," *Centers for Medicare & Medicaid Services*, available at | September 27, 2022 |

| Document Title | Document Date |
|---|---|
| https://www.cms.gov/newsroom/fact-sheets/2023-medicare-parts-b-premiums-and-deductibles-2023-medicare-part-d-income-related-monthly | |
| "Actuarial Bid Training: Introduction to Bidding" available at Introduction to Bidding.pdf when accessing "Actuarial Bid Training (ZIP)" at "Actuarial Bid Training," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/medicare/payment/medicare-advantage-rates-statistics/actuarial-bid-training | September 6, 2023 |
| "Acute Inpatient PPS," *Centers for Medicare & Medicaid Services*, https://www.cms.gov/medicare/payment/prospective-payment-systems/acute-inpatient-pps | September 6, 2023 |
| "Addendum to the Fee-For-Service Adjuster Study," *Centers for Medicare & Medicaid Services*, available at Addendum to the Fee-for-Service Adjuster Study.pdf when accessing "RADV Provision CMS 4185-N4 Data Release June 2019" at "Medicare Risk Adjustment Data Validation Program Resources," *Centers for Medicare & Medicaid Services*, September 6, 2023, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Resources | June 2019 |
| "Advance Notice of Methodological Changes for Calendar Year (CY) 2004 Medicare+Choice (M+C) Payment Rates," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Advance2004.pdf | March 28, 2003 |
| "Advance Notice of Methodological Changes for Calendar Year (CY) 2005 Medicare Advantage (MA) Payment Rates," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/advance2005.pdf | March 26, 2004 |
| "Advance Notice of Methodological Changes for Calendar Year (CY) 2006 Medicare Advantage (MA) Payment Rates," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/advance2006.pdf | February 18, 2005 |
| "Advance Notice of Methodological Changes for Calendar Year (CY) 2011 for Medicare Advantage (MA) Capitation Rates, Part C and Part D Payment Policies and 2011 Call Letter," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Advance2011.pdf | February 19, 2010 |
| "Advance Notice of Methodological Changes for Calendar Year (CY) 2019 for the Medicare Advantage (MA) CMS-HCC Risk Adjustment Model," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Advance2019Part1.pdf | December 27, 2017 |
| "Advance Notice of Methodological Changes for Calendar Year (CY) 2020 for Medicare Advantage (MA) Capitation Rates, Part C and Part D Payment Policies and 2020 Draft Call Letter," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Advance2020Part2.pdf | January 30, 2019 |
| "Advance Notice of Methodological Changes for Calendar Year (CY) 2023 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/files/document/2023-advance-notice.pdf | February 2, 2022 |
| "Advance Notice of Methodological Changes for Calendar Year (CY) 2010 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/Advance2010.pdf | February 20, 2009 |
| "Advance Notice of Methodological Changes for Calendar Year (CY) 2021 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies – Part II," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/files/document/2021-advance-notice-part-ii.pdf | February 5, 2020 |
| "Advance Notice of Methodological Changes for Calendar Year (CY) 2018 for Medicare Advantage (MA) Capitation Rates, Part C and Part D Payment Policies, and 2018 Call Letter," *Centers for Medicare & Medicaid Services*, available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/advance2018_119.pdf | February 1, 2017 |
| "Advance Notice of Methodological Changes for Calendar Year (CY) 2020 for the Medicare Advantage (MA) CMS-HCC Risk Adjustment Model," *Centers for Medicare & Medicaid* | December 20, 2018 |

| Document Title | Document Date |
|---|---|
| *Services*, available at https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/advance2020part1.pdf. | |
| "Advance Notice of Methodological Changes for Calendar Year 2007 for Medicare Advantage (MA) Payment Rates and Part D Payment," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/Advance2007.pdf | February 17, 2006 |
| "Analytic Issues in Using the Medicare Enrollment and Claims Data Linked to NCHS Surveys," *National Center for Health Statistics, Office of Analysis and Epidemiology*, available at https://www.cdc.gov/nchs/data/datalinkage/cms_medicare_analytic_issues_final.pdf | December 3, 2012 |
| "Announcement of Calendar Year (CY) 2009 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/announcement2009.pdf | April 7, 2008 |
| "Announcement of Calendar Year (CY) 2010 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2010.pdf. | April 6, 2009 |
| "Announcement of Calendar Year (CY) 2013 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2013.pdf | April 2, 2012 |
| "Announcement of Calendar Year (CY) 2017 Medicare Advantage Capitation Rates and Medicare Advantages and Part D Payment Policies and Final Call Letter," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/announcement2017.pdf | April 4, 2016 |
| "Announcement of Calendar Year (CY) 2019 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/announcement2019.pdf | April 2, 2018 |
| "Announcement of Calendar Year (CY) 2020 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2020.pdf | April 1, 2019 |
| "Announcement of Calendar Year (CY) 2022 Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/files/document/2022-announcement.pdf | January 15, 2021 |
| "Announcement of Calendar Year (CY) 2023 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/files/document/2023-announcement.pdf | April 4, 2022 |
| "Catastrophic coverage," *Medicare.gov*, available at https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/catastrophic-coverage | |
| "CBO's Projections of Federal Health Care Spending," *Congressional Budget Office*, available at https://www.cbo.gov/publication/58997 | March 17, 2023 |
| "CMS and AMA Announce Efforts to Help Providers Get Ready for ICD-10," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/ICD10/Downloads/AMA-CMS-press-release-letterhead-07-05-15.pdf | July 6, 2015 |
| "CMS finalizes policies to bring innovative telehealth benefit to Medicare Advantage," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/newsroom/press-releases/cms-finalizes-policies-bring-innovative-telehealth-benefit-medicare-advantage | April 5, 2019 |
| "CMS proposes Medicare Advantage and Part D payment and policy updates to provide new benefits for enrollees, new protections to combat opioid crisis," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/newsroom/press-releases/cms-proposes-medicare-advantage-and-part-d-payment-and-policy-updates-provide-new-benefits-enrollees | February 1, 2018 |
| "CMS Releases Latest Enrollment Figures for Medicare, Medicaid, and Children's Health Insurance Program (CHIP)," *Centers for Medicare & Medicaid Services*, available at | December 21, 2021 |

| Document Title | Document Date |
|---|---|
| https://www.cms.gov/newsroom/news-alert/cms-releases-latest-enrollment-figures-medicare-medicaid-and-childrens-health-insurance-program-chip | |
| "Costs," *Medicare.gov,* available at https://www.medicare.gov/basics/costs/medicare-costs | |
| "Evaluation of the Medicare Quality Bonus Payment Demonstration: Final Report," *L&M Policy Research*, available at https://innovation.cms.gov/files/reports/maqbpdemonstration-finalevalrpt.pdf | February 2016 |
| "Fee for Service Adjuster and Payment Recovery for Contract Level Risk Adjustment Data Validation Audits," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/FFS-Adjuster-Exceecutive-Summary.pdf | October 26, 2018 |
| "Fee for Service Adjuster and Payment Recovery for Contract Level Risk Adjustment Data Validation Audits – Technical Appendix," *Center for Medicare & Medicaid Services*, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/FFS-Adjuster-Technical-Appendix.pdf | October 26, 2018 |
| "Fee Schedules – General Information," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/medicare/medicare-fee-for-service-payment/feeschedulegeninfo | September 6, 2023 |
| "Financial Crimes Report To the Public, Fiscal Years 2010–2011," *Federal Bureau of Investigation*, available at https://www.fbi.gov/file-repository/stats-services-publications-financial-crimes-report-2010-2011-financial-crimes-report-2010-2011.pdf/view | February 27, 2012 |
| "Glossary," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/apps/glossary | |
| "Health care spending and the Medicare program," *MedPAC*, available at https://www.medpac.gov/wp-content/uploads/2023/07/July2023_MedPAC_DataBook_SEC.pdf | July 2023 |
| "Health Plans – General Information," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/medicare/enrollment-renewal/health-plans | September 6, 2023 |
| "How Original Medicare works," *Medicare.gov*, available at https://www.medicare.gov/what-medicare-covers/your-medicare-coverage-choices/how-original-medicare-works | |
| "ICD-10-CM Official Guidelines for Coding and Reporting," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/ICD10/Downloads/2020-Coding-Guidelines.pdf | |
| "ICD-10-CM/PCS MS-DRGv33 Definitions Manual: MDC 10 Endocrine, Nutritional, & Metabolic Diseases & Disorders," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/icd10manual/version33-fullcode-cms/fullcode_cms/P0240.html | |
| "Importance of Documentation" *U.S. Department of Health & Human Services, Office of Inspector General*, available at https://oig.hhs.gov/newsroom/oig-podcasts/importance-documentation | January 30, 2012 |
| "Instructions for Completing the Medicare Advantage Bid Pricing Tool and the Medical Savings Account Bid Pricing Tool for Contract Year 2010," *Centers for Medicare & Medicaid Services*, available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2012215122-op-cy2010_ma_msa_bpt_instructions_04102009.pdf | February 2022 |
| "Instructions for Completing the Medicare Advantage Bid Pricing Tools For Contract Year 2023," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/files/document/draft-instructions-completing-medicare-advantage-bid-pricing-tools-cy2023.pdf | February 2022 |
| "Managed Care," *Centers for Disease Control and Prevention*, available at https://www.cdc.gov/nchs/hus/sources-definitions/managed-care.htm | August 12, 2022 |
| "Medicaid," *Medicare.gov*, available at https://www.medicare.gov/basics/costs/help/medicaid | |
| "Medical Loss Ratio," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/medicare/health-drug-plans/medical-loss-ratio | September 6, 2023 |
| "Medical Loss Ratio," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/marketplace/private-health-insurance/medical-loss-ratio | September 6, 2023 |

**Document Title** | **Document Date**
---|---

| Document Title | Document Date |
|---|---|
| "Medicare 2022 Part C & D Star Ratings Technical Notes," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/files/document/2022-star-ratings-technical-notes-oct-4-2022.pdf | October 4, 2021 |
| "Medicare Advantage Program Payment System," *MedPAC*, available at https://www.medpac.gov/wp-content/uploads/2021/11/medpac_payment_basics_21_ma_final_sec.pdf | November 2021 |
| "Medicare Managed Care Manual Chapter 7 – Risk Adjustment," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/mc86c07.pdf | September 19, 2014 |
| "Medicare Managed Care Manual Chapter 8 – Payment To Medicare Advantage Organizations," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/mc86c08.pdf | September 19, 2014 |
| "Medicare Managed Care Manual Chapter 8 – Payments to Medicare Advantage Organizations," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/mc86c08.pdf | September 19, 2014 |
| "Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Other-Content-Types/RADV-Docs/RADV-Methodology.pdf | February 24, 2012 |
| "Out-of-Pocket Costs," *HealthCare.gov Glossary*, available at https://www.healthcare.gov/glossary/out-of-pocket-costs/ | |
| "Premium," *HealthCare.gov Glossary*, available at https://www.healthcare.gov/glossary/premium/ | |
| "Report to Congress: Risk Adjustment in Medicare Advantage," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/files/document/report-congress-risk-adjustment-medicare-advantage-december-2021.pdf | December 2021 |
| "Report to the Congress: Medicare Payment Policy," *MedPAC*, available at https://www.medpac.gov/wp-content/uploads/2022/03/Mar22_MedPAC_ReportToCongress_v3_SEC.pdf | March 2022 |
| "Understanding Medicare Advantage Plans," *Centers for Medicare & Medicaid Services*, available at https://www.medicare.gov/Pubs/pdf/12026-Understanding-Medicare-Advantage-Plans.pdf | July 2022 |
| "What is Medicare Part C?," *U.S. Department of Health & Human Services*, available at https://www.hhs.gov/answers/medicare-and-medicaid/what-is-medicare-part-c | August 3, 2021 |
| "What Part A Covers," *Medicare.gov*, available at https://www.medicare.gov/what-medicare-covers/what-part-a-covers | |
| "What Part B Covers," *Medicare.gov*, available at https://www.medicare.gov/what-medicare-covers/what-part-b-covers. | |
| "Who is Eligible for Medicaid?," *U.S. Department of Health & Human Services*, available at https://www.hhs.gov/answers/medicare-and-medicaid/who-is-eligible-for-medicaid | December 8, 2022 |
| 2022 Midyear_Final ICD-1-CM Mappings.xlsx when accessing "2022 Midyear Final ICD-10 Mappings (ZIP)," at "2022 Model Software/ICD-10 Mappings," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/medicarehealth-plansmedicareadvtgspecratestatsrisk-adjustors/2022-model-softwareicd-10-mappings | |
| Centers for Medicare & Medicaid Services and U.S. Department of Health & Human Services, Proposed Rule, "Medicare and Medicaid Programs; Policy and Technical Changes to the Medicare Advantage, Medicare Prescription Drug Benefit, Program of All-Inclusive Care for the Elderly (PACE), Medicaid Fee-for-Service, and Medicaid Managed Care Programs for Years 2020 and 2021," *Federal Register*, 83(212), pp. 54892–55088, available at https://www.govinfo.gov/content/pkg/FR-2018-11-01/pdf/2018-23599.pdf | November 1, 2018 |
| Centers for Medicare & Medicaid Services and U.S. Department of Health & Human Services, Final Rule, "Medicare and Medicaid Programs; Policy and Technical Changes to the Medicare Advantage, Medicare Prescription Drug Benefit, Program of All-Inclusive Care for the Elderly (PACE), Medicaid Fee-For-Service, and Medicaid Managed Care Programs for Years 2020 and | February 1, 2023 |

| Document Title | Document Date |
|---|---|

2021," *Federal Register*, 88(21), pp. 6643–6665, available at https://www.govinfo.gov/content/pkg/FR-2023-02-01/pdf/2023-01942.pdf

CountyRate2023.csv when accessing "2023 MA Rate Book (ZIP)," at "2023," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/medicarehealth-plansmedicareadvtgspecratestatsratebooks-and-supporting-data/2023

Medicare_Enrollment_Trend_by_State_1985_2012.xslx when accessing "Historical Enrollment Data (ZIP)" at "CMS Program Statistics," *Centers for Medicare & Medicaid Services*, available at https://data.cms.gov/collection/cms-program-statistics

NHE2021.xlsx when accessing "National Health Expenditures by type of service and source of funds, CY 1960-2021 (ZIP)" at "Historical," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/data-research/statistics-trends-and-reports/national-health-expenditure-data/historical

| | |
|---|---|
| Office of Health Policy, "Payment for Medicare Advantage Plans: Policy Issues and Options," *Office of the Assistant Secretary for Planning and Evaluation*, available at https://aspe.hhs.gov/system/files/pdf/75816/report.pdf | June 2009 |
| Patricia A. Davis, "Medicare Part B: Enrollment and Premiums," *Congressional Research Service*, available at https://sgp.fas.org/crs/misc/R40082.pdf | May 19, 2022 |
| Report to Congress on Medicaid and CHIP, *Medicaid and CHIP Payment and Access Commission*, available at https://www.macpac.gov/wp-content/uploads/2023/06/MACPAC_June-2023-WEB-508.pdf | June 2023 |
| Statement of Jonathan Morse Acting Director of the Center for Program Integrity, Centers for Medicare and Medicaid Services on "Efforts to Combat Waste, Fraud and Abuse in the Medicare Program" before the U.S. House Ways and Means Committee, Subcommittee on Oversight, available at https://waysandmeans.house.gov/wp-content/uploads/2017/07/20170719OS-Testimony-Morse.pdf | July 19, 2017 |
| United States Government Accountability Office, "Medicare Advantage: CMS Should Improve the Accuracy of Risk Score Adjustments for Diagnostic Coding Practices," Report to Congressional Requesters GAO-12-51, available at https://www.gao.gov/assets/gao-12-51.pdf | January 2012 |

**Books**

| | |
|---|---|
| David Besanko and Ronald Braeutigam, *Microeconomics, Fifth Edition*, (Jefferson City: John Wiley & Sons, Inc.) | 2014 |
| James H. Stock and Mark Watson, *Introduction to Econometrics*, *Second Edition*, (Boston: Addison Wesley) | 2006 |
| Morris DeGroot and Mark Schervish, *Probability and Statistics, Fourth Edition*, (Boston: Addison Wesley) | 2012 |
| Patrick Billingsley, *Probability and Measure, Third Edition*, (New Delhi: Wiley India Edition) | 1995 |
| Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics, Eighth Edition*, (Upper Saddle River: Pearson Education, Inc.) | 2013 |

**Academic Literature**

| | |
|---|---|
| Abby Alpert, et al., "Perverse Reverse Price Competition: Average Wholesale Prices and Medicaid Pharmaceutical Spending," *Journal of Public Economics*, 108, pp. 42–62 | 2013 |
| Amanda Starc and Robert J. Town, "Externalities and Benefit Design in Health Insurance," *The Review of Economic Studies*, 87(6), pp. 2827–2858 | 2020 |
| Bruce Landon, et al., "Analysis of Medicare Advantage HMOs Compared with Traditional Medicare Shows Lower Use of Many Services during 2003–2009," *Health Affairs*, 31(12), pp. 2609–2617 | 2012 |
| Cindy Cai, et al., "Effect of ICD-9 to ICD-10 Transition on Accuracy of Codes for Stage of Diabetic Retinopathy and Related Complications: Results From the CODER Study," *Ophthalmology Retina*, 5 (4), pp. 374–380 | April 2021 |
| Daria Pelech and Zirui Song, "Pricing and Pass-Through in Response to Subsidies and Competition: Evidence from Medicare Advantage Before and After the Affordable Care Act," Working Paper, available at https://hcp.hms.harvard.edu/sites/default/files/assets/users/Working Papers/Pricing_Pass-through_MA_1-12-23.pdf | January 12, 2023 |

Appendix B

| Document Title | Document Date |
|---|---|
| Daria Pelech, "Paying more for less? Insurer competition and health plan generosity in the Medicare Advantage program," *Journal of Health Economics*, 61, pp. 77–92 | 2018 |
| Gregory Pope, et al., "Principal Inpatient Diagnostic Cost Group Model for Medicare Risk Adjustment," *Health Care Finance Review*, 21(3), pp. 93–118 | 2000 |
| Gregory Pope, et al., "Risk Adjustment of Medicare Capitation Payments Using the CMS-HCC Model," *Health Care Financing Review*, 25(4), pp. 119–141 | 2004 |
| Hui Ding, Mark Duggan, and Amanda Starc, "Getting the Price Right? The Impact of Competitive Bidding in the Medicare Program," forthcoming at *Review of Economics and Statistics* | |
| Jason Brown, et al., "How Does Risk Selection Respond to Risk Adjustment? Evidence from the Medicare Advantage Program," *American Economic Review*, 104(10), pp. 3335–3364 | 2014 |
| Jinhyung Lee and Jae-Young Choi, "Improved efficiency of coding systems with health information technology," *Scientific Reports*, 11, Article No. 10294 | 2021 |
| Joseph Newhouse and Thomas McGuire, "How Successful is Medicare Advantage," *The Milbank Quarterly*, 92(2), pp. 351–394 | 2014 |
| Katherine Baicker, et al., "The Spillover Effects of Medicare Managed Care: Medicare Advantage and Hospital Utilization," *Journal of Health Economics*, 32(6), pp. 1289–1300 | 2013 |
| Keaton Miller, et al., "The Optimal Geographic Distribution of Managed Competition Subsidies," Working Paper, available at https://static1.squarespace.com/static/56a1484625981dd79f45da68/t/63caf1235229f06b12bda94a/1674244394942/2023-01-20-Optimal_Managed_Competition_Subsidies-paper.pdf | January 20, 2023 |
| Kimberly O'Malley, et al., "Measuring Diagnoses: ICD Code Accuracy," *Health Services Research*, 40(5 Pt. 2), pp. 1620–1639 | October 2005 |
| Leemore Dafny, et al., "Paying a Premium on Your Premium? Consolidation in the Health Insurance Industry," *American Economic Review*, 102(2), pp. 1161–1185 | 2012 |
| Marika Cabral, et al., "Do Larger Health Insurance Subsidies Benefit Patients or Producers? Evidence from Medicare Arbitrage," *American Economic Review*, 108(8), pp. 2048–2087 | 2018 |
| Mark Duggan and Fiona Scott Morton, "The Distortionary Effects of Government Procurement: Evidence for Medicaid Prescription Drug Purchasing," *Quarterly Journal of Economics*, 121(1), pp. 1–30 | 2006 |
| Mark Duggan and Fiona Scott Morton, "The Effect of Medicare Part D on Pharmaceutical Prices and Utilization," *American Economic Review*, 100(1), pp. 590–607 | 2010 |
| Mark Duggan and Fiona Scott Morton, "The Medium-Term Impact of Medicare Part D on Pharmaceutical Prices," *American Economic Review*, 101(3), pp. 387–392 | 2011 |
| Mark Duggan, et al., "Who Benefits when the Government Pays More? Pass-through in the Medicare Advantage Program," *Journal of Public Economics*, 141, pp. 50–67 | 2016 |
| Mark Duggan, et al., "The Consequences of Health Care Privatization: Evidence from Medicare Advantage Exits," *American Economic Journal: Economic Policy*, 10(1), pp. 153–186 | 2018 |
| Mark Duggan, et al., "Providing Prescription Drug Coverage to the Elderly: America's Experiment with Medicare Part D," *Journal of Economic Perspectives*, 22(4), pp. 69–92 | 2008 |
| Pavani Rangachari, "Coding for Quality Measurement: the Relationship Between Hospital Structural Characteristics and Coding Accuracy from the Perspective of Quality Measurement," *Perspectives in Health Information Management*, 4(3) | 2007 |
| Peter Huckfeldt, et al., "Less Intense Postacute Care, Better Outcomes for Enrollees in Medicare Advantage Than Those in Fee-For-Service," *Health Affairs*, 36(1), pp. 91–100 | 2017 |
| Rajender Agarwal, et al., "Comparing Medicare Advantage And Traditional Medicare: A Systematic Review," *Health Affairs*, 40(6), pp. 937–944 | 2021 |
| Richard Kronick and Pete Welch, "Measuring Coding Intensity in the Medicare Advantage Program," *MMRR*, 4(2) | 2014 |
| Sungchul Park, et al., "Health Care Utilization, Care Satisfaction, and Health Status for Medicare Advantage and Traditional Medicare Beneficiaries With and Without Alzheimer Disease and Related Dementias," *JAMA Network Open*, 3(3), e201809 | 2020 |
| Thomas McGuire, et al., "An Economic History of Medicare Part C," *The Milbank Quarterly*, 89(2), pp. 289–332 | 2011 |

| Document Title | Document Date |
|---|---|

Vilsa Curto, et al., "Can health insurance competition work? Evidence from Medicare Advantage," *Journal of Political Economy*, 129(2), pp. 570–606 — 2021

Vilsa Curto, et al., "Health Care Spending and Utilization in Public and Private Medicare," *American Economic Journal: Applied Economics*, 11(2), pp. 302–332 — 2019

William Weeks, et al., "Trends in Characteristics of Adults Enrolled in Traditional Fee-for-Service Medicare and Medicare Advantage, 2011–2019," *Medical Care*, 60(3), pp. 227–231 — March 2022

## Depositions

| | |
|---|---|
| Deposition of Marilyn B. Tavenner (CMS) | February 28, 2018 |
| Deposition of Thomas Hutchinson (CMS) | January 26, 2022 |
| Deposition of Thomas Kornfield (CMS) | March 10, 2022 |
| Deposition of Sean Creighton (CMS) | March 23, 2022 |
| Deposition of Cheri Rice (CMS) | August 3, 2022 |
| Deposition of Jonathan D. Morse (CMS) | August 17, 2022 |
| Deposition of Hans Dutt (Stat Analytics) | September 28, 2022 |
| Deposition of Sean Creighton (CMS) | October 4, 2022 |
| Deposition of Anne Hornsby (CMS) | May 19, 2023 |
| Deposition of Connie Lynn Leonard (CMS) | May 26, 2023 |
| Deposition of Kathleen O. Baker (UnitedHealth) | May 30, 2023 |
| Deposition of Christopher Giles Bresette (OIG) | May 31, 2023 |
| Deposition of Biggs Cannon (UnitedHealth) | June 6, 2023 |
| Deposition of Kirk Limmer (CMS) | June 21, 2023 |
| Deposition of Melissa Sedor (UnitedHealth) | June 29, 2023 |
| Deposition of Carolyn Kapustij (CMS) | August 25, 2023 |

## Legal Documents & Patents

42 CFR § 422.254, "Submission of bids," available at https://www.law.cornell.edu/cfr/text/42/422.254

42 U.S.C. 1395w-23, "Payments to Medicare+Choice organizations," § 1853(1)(C)(ii), available at https://www.ssa.gov/OP_Home/ssact/title18/1853.htm

## Expert Reports

| | |
|---|---|
| Expert Report of Michael P. Salve, Ph.D. | September 29, 2023 |

## Produced Documents

USBP001729882–4

USBP001648100–1

USBP001706860–63

DC027431–40

USBP001565703–8

USBP052805236–8

Exhibit 1327-1 (from Deposition of Mark Boward (Deloitte), September 20, 2022)

Exhibit 1000 (from Deposition of Marilyn B. Tavenner (CMS), February 28, 2018)

Exhibit 732 (from Deposition of Melissa Sedor (UnitedHealth), June 29, 2023)

## SEC Filings

| | |
|---|---|
| UnitedHealth Group Incorporated, SEC Form 10-K for period ended December 31, 2021 | February 15, 2022 |

## Public Press and Press Releases

"AI Improves Accuracy of Heart Condition Diagnosis," *Cedars-Sinai*, available at https://www.cedars-sinai.org/newsroom/ai-improves-accuracy-of-heart-condition-diagnosis/ — October 27, 2022

Caroline Humer and David Morgan, "U.S. Government Rolls Back Proposed Medicare Advantage Cut," *Reuters*, available at https://www.reuters.com/article/us-usa-healthcare- — April 7, 2014

**Appendix B**

| Document Title | Document Date |
| --- | --- |

medicare/u-s-government-rolls-back-proposed-medicare-advantage-cut-idINBREA361R520140407

Margot Sanger-Katz, et al., "A Huge Threat to the U.S. Budget Has Receded. And No One is Sure Why," *The New York Times*, available at https://www.nytimes.com/interactive/2023/09/05/upshot/medicare-budget-threat-receded.html — September 4, 2023

### Other Websites

"An Overview of Medicare," *Kaiser Family Foundation*, available at https://www.kff.org/medicare/issue-brief/an-overview-of-medicare/ — February 13, 2019

"An Overview of the Medicare Part D Prescription Drug Benefit," *Kaiser Family Foundation*, available at https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit/ — October 19, 2022

"FAQ," *Dartmouth Atlas Project*, available at https://www.dartmouthatlas.org/faq/

"History," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/about-cms/who-we-are/history — September 6, 2023

"Part D/Prescription Drug Benefits," *Center for Medicare Advocacy*, available at https://www.medicareadvocacy.org/medicare-info/medicare-part-d/

"Hierarchical Condition Category Coding," *American Academy of Family Physicians*, available at https://www.aafp.org/family-physician/practice-and-career/getting-paid/coding/hierarchical-condition-category.html

"Medicare Reimbursements," *Dartmouth Atlas Project*, available at https://www.dartmouthatlas.org/interactive-apps/medicare-reimbursements/ — 2022

"What's the Difference Between Medicare's Open Enrollment Period and Medicare Advantage Open Enrollment?" *National Council on Aging*, available at https://ncoa.org/article/whats-the-difference-between-medicares-open-enrollment-period-and-medicare-advantage-open-enrollment — November 12, 2022

**Note: In addition to the documents on this list, I considered all documents cited in my report, workpapers, and exhibits to form my opinions.**

**EXHIBIT D-57**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, <br><br> Plaintiffs, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC., et al, <br><br> Defendants. | Case No. 16-cv-08697 FMO |

# EXPERT REPORT OF CRAIG GARTHWAITE
## SEPTEMBER 29, 2023

# TABLE OF CONTENTS

I.     Introduction and Qualifications ....................................................................1
       A.    Qualifications.................................................................................1
       B.    Assignment ...................................................................................2
II.    Summary of Opinions ..................................................................................3
III.   Background ..................................................................................................4
       A.    Medicare Overview........................................................................5
       B.    Risk Adjustment for Medicare Advantage .....................................6
             i.    Payments to Medicare Advantage Plans.................................. 6
             ii.   Payments to MA-PD Plans ................................................... 15
IV.    Defendants' Risk Adjustment-Related Programs .......................................17
       A.    Defendants' Chart Review Program ..............................................18
       B.    Defendants' Claims Verification Program......................................23
       C.    Example Calculations of Changes to Risk Scores Resulting from
             Submissions of Adds and Deletes ..................................................26
       D.    Defendants' Risk Adjustment Systems and Submission of Diagnosis
             Codes..............................................................................................29
             i.    Defendants' Risk Adjustment Systems................................... 29
             ii.   Defendants' Submission of Diagnosis Codes for Risk
                   Adjustment ........................................................................... 31
       E.    Matching Provider-Reported Encounters to Chart Review Records ..........34
V.     Method Overview ......................................................................................35
VI.    Method for Identifying Deletes...................................................................37
       A.    Identification of Reviewed Encounters..........................................37
             i.    Identification of Encounters in Chart Review Data................. 37
             ii.   Matching Encounters from Chart Review Data to Provider-
                   Reported Encounters ............................................................. 38
       B.    Identification of Supported Diagnosis Codes .................................41
       C.    Identification of Submitted Diagnosis Codes .................................41
       D.    Identification of Potential Deletes .................................................41
       E.    Classification of Potential Deletes .................................................42
             i.    Potential Deletes Sharing HCCs with Other Submitted
                   Diagnosis Codes.................................................................... 42
             ii.   Potential Deletes Sharing HCCs with Other Unsubmitted
                   Diagnosis Codes.................................................................... 43
             iii.  Potential Deletes Mapping to HCCs Recorded in Claims
                   Verification ........................................................................... 46

i

F.      Identification of Deletes.................................................................46

VII.    Calculating Financial Impact of Defendants' Failure to Submit Deletes ............48

        A.      Revised Risk Scores...........................................................48

        B.      Changes in Risk Scores.......................................................49

        C.      Changes in Payment for Part C.............................................51

        D.      Changes in Payment for Part D.............................................51

        E.      Total Financial Impact of Defendants' Failure to Submit Deletes ............52

VIII.   Calculating the Number of Beneficiaries Year-By-Year for Whom
        Defendants Would Have Received Reduced Risk Adjustment Payments
        from CMS .........................................................................53

IX.     Calculating Financial Impact of Deleting Diagnosis Codes on Defendants'
        CV Pipeline Lists.................................................................54

1443

## I.    INTRODUCTION AND QUALIFICATIONS

### A. Qualifications

1.    My name is Craig Garthwaite. I am the Herman Smith Research Professor in Hospital and Health Services and a tenured Professor of Strategy at the Kellogg School of Management, Northwestern University. I am also the Director of the Program on Healthcare at Kellogg, and I organize Kellogg's healthcare business curriculum. At Kellogg, I teach courses in health care strategy, the economics of strategy, and value creation in biopharmaceuticals.

2.    I am a Research Associate at the National Bureau of Economic Research, and a Faculty Associate at the Institute for Policy Research at Northwestern University. I received a Ph.D. in Economics from the University of Maryland at College Park, a Master's in Public Policy from the Gerald R. Ford School of Public Policy at the University of Michigan, and a B.A. in Political Science from the University of Michigan.

3.    Prior to my graduate studies, I was an Economist at Public Sector Consultants in Lansing, Michigan, and the Director of Research and Chief Economist at the Employment Policies Institute in Washington, DC.

4.    My research focuses on a variety of issues, including the potential impacts of health policy and the changing health care market on the operations of private health firms such as hospitals and insurers. In my academic research, I have worked with a variety of large and complex datasets, including insurer claims datasets,[1] hospital discharge datasets,[2] and hospital financial reports.[3] My research has been published in journals such as the *Quarterly Journal of Economics*, the *American Economic Review*, the *Review of Economics and Statistics*, the *Journal of Health Economics*, the *New England Journal of Medicine*, the *Annals of Internal Medicine*, and *Health Affairs*, and has been profiled in

---

[1]    Craig Garthwaite, David Dranove, and Christopher Ody, "The Economic Downturn And Its Lingering Effects Reduced Medicare Spending Growth By $4 Billion In 2009–12," *Health Affairs*, Vol. 34, No. 8, August 2015, pp. 1368-1375, https://www.healthaffairs.org/doi/10.1377/hlthaff.2015.0100.

[2]    Mark Duggan, Craig Garthwaite, and Adelina Yanyue Wang, "Heterogeneity in the Impact of Privatizing Social Health Insurance: Evidence from California's Medicaid Program," *NBER Working Paper Series*, No. 28944, June 2021.

[3]    Craig Garthwaite, Christopher Ody, and Amanda Starc, "Endogenous Quality Investments in the U.S. Hospital Market," *Journal of Health Economics*, Vol. 84, No. 102636, May 14, 2022.

media outlets such as *The New York Times*, *The Wall Street Journal,* and *The Washington Post*. I have testified before the United States House of Representatives and the United States Senate on matters related to health care markets, prescription drugs, and health care reform.

5.    A copy of my Curriculum Vitae, including a list of all publications I have authored in the last ten years, is attached as **Appendix A**. A list of my prior testimony from the last four years is attached as **Appendix B**.

### B.  Assignment

6.    The United States of America ("United States") and Relator Benjamin Poehling (together, "Plaintiffs") allege that, in relation to their Medicare Advantage and Medicare Advantage prescription drug plans, UnitedHealth Group Inc. and its subsidiaries (collectively, "Defendants") knowingly and improperly avoided or decreased an obligation to repay risk adjustment payments to the Medicare program administered by the Centers for Medicare and Medicaid Services ("CMS") by retaining risk adjustment payments to which they were not entitled.[4]

7.    I have been engaged by counsel for Plaintiffs to provide expert testimony in this matter. Specifically, I have been asked to (1) identify diagnosis codes from service years 2008 through 2016 that Defendants submitted to CMS for risk adjustment payments covering payment years 2009 through 2017, where Defendants reviewed the medical records associated with those diagnosis codes as part of their Chart Review Program and did not find support for the diagnosis codes, and those diagnosis codes affected payment; (2) calculate the financial impact on Defendants' Medicare Advantage and Medicare Part D risk adjustment payments that would have resulted had Defendants deleted the diagnosis codes I identified;[5] and (3) determine the number of beneficiaries in each payment year for

---

[4]    United States' Amended Complaint-In-Partial-Intervention and Demand for Jury Trial, *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. CV 16-08697 MWF (SSx), November 17, 2017 ("US vs UHG Amended Complaint").

[5]    I was also asked to separately calculate the portion of this impact that is associated with diagnosis codes reviewed by Defendants in Second Level Review as part of the Chart Review Program.

whom Defendants would have received reduced risk adjustment payments from CMS had Defendants deleted the diagnosis codes I identified.

8.    I have also been asked to separately calculate the financial impact on Defendants' Medicare Advantage and Medicare Part D risk adjustment payments resulting from their failure to delete the diagnosis codes included on two spreadsheets produced by Defendants, which contain diagnosis codes that Defendants identified as having been included in their Claims Verification program but not having completed all the steps of the program (hereinafter referred to as "Defendants' CV Pipeline Lists").

9.    For my work on this case, I am being compensated at my standard hourly billing rate of $900. Staff at Analysis Group, a consulting firm, worked under my direction and helped me prepare my report. I also receive compensation from Analysis Group based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Analysis Group is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

10.   I have reviewed documents, data, testimony, and other materials provided through discovery or obtained from public sources. The documents, data, testimony, and other materials that I have relied upon as a basis for my opinions are listed in **Appendix C**.

11.   **Appendix D** contains more detailed descriptions of the data I relied upon and the methods I used for my analyses, as well as illustrative examples of the data and methods.

12.   My opinions are based on the research and analyses that I undertook during this period and the information available to me as of the date of this report. Should additional relevant materials including documents, data, testimony, declarations or reports of other experts, or other information be made available to me, I may adjust or supplement my opinions as appropriate.

## II.    SUMMARY OF OPINIONS

13.   I have identified in **Attachment 1** a set of diagnosis codes that Defendants submitted to CMS for risk adjustment purposes. According to my analysis, Defendants reviewed the medical records that were the source of these diagnosis codes as part of their Chart Review Program and their review found no support for these diagnosis codes or their associated

Hierarchical Condition Categories or Rx Hierarchical Condition Categories. In addition, I found no other instances of these diagnosis codes nor did I find other diagnosis codes associated with the same Hierarchical Condition Categories or Rx Hierarchical Condition Categories that Defendants may have submitted for that beneficiary in the same year.[6] I have calculated that the risk adjustment payments Defendants received from CMS would have been reduced if Defendants had deleted these diagnosis codes.

14. I have concluded that:

    i. The total financial impact on Defendants' Medicare Advantage and Medicare Part D risk adjustment payments resulting from Defendants' failure to delete the diagnosis codes in **Attachment 1** is $2,135,252,375 for payment years 2009-2017.

    ii. The total number of affected beneficiaries counted year-by-year across payment years 2009-2017 is 1,132,418.[7]

    iii. The total financial impact on Defendants' Medicare Advantage and Medicare Part D risk adjustment payments resulting from Defendants' failure to delete the diagnosis codes listed in Defendants' CV Pipeline Lists is $188,402,348.

## III.  BACKGROUND

15. In this section, I provide a description of Medicare Advantage, which is based on my professional understanding and my review of the documents cited herein. My intent is to provide background and context relevant to understanding the analyses I have performed.

---

[6]   Specifically, the diagnosis codes in **Attachment 1** do not share an HCC with any other submitted diagnosis code, do not share an HCC with any other risk adjustment-eligible but unsubmitted diagnosis code, *and* do not map to an HCC recorded in the Claims Verification program, as further explained in Section **VI.E**.

[7]   Each beneficiary is counted once for each payment year in which their risk adjustment payments are affected. If a beneficiary's Medicare Advantage and Medicare Part D risk adjustment payments are affected in a single year, that beneficiary is counted only once in that year.

### A.  Medicare Overview

16.  Medicare provides health insurance for people aged 65 or older, younger people with a disability, end-stage renal disease, or amyotrophic lateral sclerosis, and certain railroad retirement beneficiaries.[8]

17.  Medicare beneficiaries have the option to enroll in "Traditional Medicare," which is largely administered by CMS,[9] or "Medicare Advantage," which is administered by commercial insurers known as Medicare Advantage Organizations ("MAOs").[10]

18.  Traditional Medicare includes two types of coverage, called "Parts." **Part A** generally covers inpatient care in hospitals, care in nursing facilities, care in hospice facilities, and home health care.[11] **Part B** generally covers outpatient services from doctors and other health care providers, durable medical equipment, and other preventative services.[12] Under Traditional Medicare, healthcare providers submit claims for services to CMS for payment by CMS on a claim-by-claim basis (sometimes called "fee-for-service").[13] Traditional Medicare beneficiaries may also purchase prescription drug coverage under Medicare Part D.

19.  Medicare Advantage, or **Part C**, is an alternative to Traditional Medicare through which MAOs offer Medicare-approved plans that bundle coverage normally provided by CMS in Part A and Part B to beneficiaries enrolled in Part C. MAOs may also offer plans that include prescription drug coverage under Medicare **Part D**.[14] A Medicare Advantage plan that includes Part D coverage is called a Medicare Advantage Prescription Drug ("MA-

---

[8]   42 USC § 426 et seq; 42 CFR § 406.5; 42 CFR § 406.10; 42 CFR § 406.11; 42 CFR § 406.12; 42 CFR § 406.13.

[9]   Gabrielle Clerveau, Nancy Ochieng, Juliette Cubanski, and Tricia Neuman, "A Snapshot of Sources of Coverage Among Medicare Beneficiaries," Henry J. Kaiser Family Foundation, August 14, 2023, https://www.kff.org/medicare/issue-brief/a-snapshot-of-sources-of-coverage-among-medicare-beneficiaries/, accessed September 28, 2023; 42 USC § 1395c et seq.

[10]  "Medicare Advantage Promoting Interoperability Programs," Centers for Medicare & Medicaid Services, September 6, 2023, https://www.cms.gov/medicare/regulations-guidance/promoting-interoperability-programs/medicare-advantage, accessed September 28, 2023; 42 USC § 1395w et seq.

[11]  42 USC § 1395c.

[12]  *Ibid*.

[13]  42 USC § 1395c et seq.

[14]  42 USC § 1395w et seq.

1448

PD") plan.[15] MAOs can, and generally do, operate a large number of Medicare Advantage plans.

20.    Under Medicare Advantage, beneficiaries and/or their healthcare providers submit claims to Medicare Advantage plans and, instead of receiving payment from CMS on a "fee-for-service" basis, receive payment from the MAO.[16] MAOs that participate in the Medicare Advantage program receive monthly premium payments for each beneficiary enrolled in their plans.[17] These "per member per month" payments are calculated in accordance with a method for determining anticipated medical costs, called risk adjustment.[18]

### B.  Risk Adjustment for Medicare Advantage

#### i.  Payments to Medicare Advantage Plans

21.    Under Part C, each MAO receives per member per month payments from CMS for each beneficiary enrolled in its Medicare Advantage plans.

22.    The per member per month payments that MAOs receive from CMS are calculated as a plan-specific "bid," or base rate,[19] which is adjusted based on geography but otherwise the same for every beneficiary in the plan, multiplied by a risk score, which is beneficiary-specific and calculated based on the beneficiary's health status and demographics, such as age and sex.[20] The base rate is meant to reflect the average cost of coverage for a beneficiary in the plan.[21] The risk score is designed to broadly account for anticipated

---

[15]   *Ibid.*

[16]   *Ibid.*

[17]   42 USC § 1395w-23(a)(1)(C); 42 CFR § 422 et seq.

[18]   42 USC § 1395w-23(a)(1)(C); 42 CFR § 422 et seq.

[19]   Each MAO plan submits bids to CMS indicating the premium amount that would be required to cover an average beneficiary's expenses. There is a maximum premium CMS will pay for an average beneficiary based on geography (the "benchmark"). If a plan's bid falls below the benchmark, it receives a rebate. If the plan's bid exceeds the benchmark, the plan collects that difference from its beneficiaries. See 42 USC § 1395w-23(a)(1)(B); *Ibid.*(b)(1)(B).

[20]   Other factors, such as the congressionally mandated coding adjustment (see *Ibid.*(a)(1)(C)(ii)) and the normalization factor (see 42 CFR § 422.308(a)) also affect the amount CMS pays MAOs.

[21]   See 42 USC § 1395w-24 et seq; 42 CFR § 422.254 et seq.

1449

differences in the cost of coverage between beneficiaries.[22] In general, CMS pays MAOs higher per member per month amounts to cover beneficiaries who are expected to incur more medical costs because of their poor health status.

23. CMS calculates the risk score using the CMS Hierarchical Condition Category Risk Adjustment Model ("CMS HCC Model"),[23] which assigns weighted numeric values to various factors that affect the expected costs to cover a beneficiary, including health status and demographics (*e.g.*, sex, age, disability, whether institutionalized, and whether enrolled in Medicaid).[24] CMS makes publicly available on its website computer programs for calculating risk scores.[25] These programs take beneficiary health status information and demographics as inputs, and automatically calculate a risk score for each beneficiary based on the weighted numeric values assigned to the various factors in the CMS HCC Model.

24. The health status portion of a beneficiary's risk score depends upon the medical diagnosis codes that an MAO submits to CMS for that beneficiary. CMS requires MAOs to submit beneficiary diagnosis codes using the International Classification of Diseases ("ICD") system established by the World Health Organization.[26, 27]

---

[22]    Tamara Beth Hayford and Alice Levy Burns, "Medicare Advantage Enrollment and Beneficiary Risk Scores: Difference-in-Differences Analyses Show Increases for All Enrollees On Account of Market-Wide Changes," *The Journal of Health Care Organization, Provision, and Financing*, Vol. 55, No. I-II, June 22, 2018, p. 2.

[23]    42 USC § 1395w-23(a)(1)(C); 42 CFR §§ 422.300 - 422.308.

[24]    "CMS Manual System Transmittal 118," Department of Health & Human Services and Centers for Medicare & Medicaid Services, September 19, 2014, https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R118MCM.pdf, accessed June 30, 2022 ("In order to use the risk adjustment model to calculate risk scores for payment, CMS creates a relative factor for each demographic factor and HCC in the model.").

[25]    "Medicare risk adjustment information," Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare/payment/medicare-advantage-rates-statistics/risk-adjustment, downloaded on June 16, 2023.

[26]    During the time period at issue in this matter, diagnosis codes were coded using the ICD-9-CM coding system until the Centers for Disease Control and Prevention fully transitioned diagnosis codes to the ICD-10-CM coding system on October 1, 2015. See "Announcement of Calendar Year (CY) 2015 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," Centers for Medicare & Medicaid Services, April 7, 2014, https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/announcement2015.pdf, accessed September 14, 2023 Section N.

[27]    "CMS Manual System Transmittal 118," Department of Health & Human Services and Centers for Medicare & Medicaid Services, September 19, 2014, https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R118MCM.pdf, accessed June 30, 2022, p. 4.

1450

25. Each year, CMS calculates a new risk score for each beneficiary based on diagnosis codes documented for that beneficiary in the previous year.[28] For example, the health status component of a beneficiary's final risk score used for payment in 2011 (the "payment year") is determined only by the diagnosis codes documented during medical encounters with their providers in 2010 (the "service year"). Diagnosis codes from encounters that occurred outside of the service year do not affect the calculation of the beneficiary's final risk score for the associated payment year.

26. During payment years 2009-2017 (corresponding to service years 2008-2016), which is the time period at issue in this matter, CMS had specific rules governing MAO submissions of diagnosis code data (also called "risk adjustment data"). For example, diagnosis codes used to determine payments for a particular payment year (*e.g.*, 2011) must be supported by the beneficiary's medical records and must generally result from face-to-face encounters[29] between beneficiaries and providers with an acceptable specialty[30] that occurred during the corresponding service year (*e.g.*, 2010). Furthermore, for every date of service (*e.g.*, a medical encounter that took place on January 1, 2010) included within a medical record ("Chart") and used as the basis for submission of a given diagnosis code, the Chart must be signed and include the provider's credentials.[31] In this Report, I refer to encounters that meet CMS' rules as risk adjustment-eligible encounters, and I refer to the diagnosis codes associated with these encounters as risk adjustment-eligible diagnosis codes.

27. The CMS HCC Model maps some, but not all, diagnosis codes to one of 70 or 79 (depending on the time period)[32] Hierarchical Condition Categories ("HCCs"), which

---

[28] 42 CFR § 422.304 et seq.

[29] For example, labs and diagnostic radiology encounters are not considered valid sources for diagnosis codes used to determine payment. See *2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide*, Centers for Medicare & Medicaid Services, January 1, 2008, https://www.hhs.gov/guidance/document/2008-risk-adjustment-data-technical-assistance-medicare-advantage-organizations, accessed September 5, 2023, at Section 3.2.3. There are limited exceptions to the face-to-face requirements, such as diagnoses made by pathologists. See also 42 CFR 422.310(d)(1); 45 CFR 162.1002(c)(2) and (c)(3).

[30] A list of acceptable physician specialties is found in *Ibid.*, at Table 3H.

[31] *Ibid.* at Section 7.2.4.2.

[32] For service years 2008-2012, CMS used version 12 of the CMS HCC Risk Adjustment Model, which included 70 HCCs. Starting with service year 2013, CMS began phasing in version 22 of the model, which included 79 HCCs. Full implementation of version 22 began with service year 2016. See "Announcement of Calendar Year

represent groups of diagnosis codes that define major health conditions.[33] For example, diagnosis code 25000, *Diabetes mellitus without mention of complications*, diagnosis code 24900, *Secondary diabetes mellitus without mention of complication, not stated as uncontrolled, or unspecified*, and diagnosis code 25003, *Diabetes mellitus without mention of complication, type I, uncontrolled - as a primary diagnosis code* all map to HCC 19, *Diabetes without complications*.[34]

28.   If an MAO does not submit any diagnosis codes for a particular beneficiary during the service year, the beneficiary's risk score for the payment year is based solely on the beneficiary's demographic factors. For example, in service year 2010, a beneficiary who is female, 65 years old, not disabled, not institutionalized, and not dually enrolled in Medicaid would have a demographic factor of 0.298.[35] If the MAO did not report any diagnosis codes for this beneficiary in service year 2010, the associated per member per month payment in payment year 2011 would be 29.8% of the plan's base rate. Thus, if the base rate for this beneficiary's plan is $100, then CMS would pay the MAO a risk adjusted per member per month payment of $29.80 for this beneficiary.

29.   If an MAO submits a diagnosis code for a beneficiary mapping to an HCC, the CMS HCC Model incorporates that HCC into its calculation of the beneficiary's risk score. For

---

(CY) 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," Centers for Medicare & Medicaid Services, April 1, 2013, https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/announcement2014.pdf, accessed September 14, 2023 at Table 5; *Report to Congress: Risk Adjustment in Medicare Advantage*, Centers for Medicare & Medicaid Services, December 2021, https://www.cms.gov/files/document/report-congress-risk-adjustment-medicare-advantage-december-2021.pdf, accessed June 30, 2022, at 7. CMS determines which diagnosis codes map to which HCCs each year.

[33]   In the CMS HCC Model, diagnosis codes are grouped with other clinically similar diagnosis codes and the diagnosis groupings are mapped to condition categories based on similar clinical characteristics and severity, and cost implications. Hierarchies are imposed on the condition categories included in the model (then called "Hierarchical Condition Categories or "HCCs"). "CMS Manual System Transmittal 118," Department of Health & Human Services and Centers for Medicare & Medicaid Services, September 19, 2014, https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R118MCM.pdf, accessed June 30, 2022, at § 70.1.

[34]   The illustrative examples presented in my Report and in **Appendix D** use ICD-9 codes, but the same concepts apply to ICD-10 diagnosis codes.

[35]   The factors presented in the examples in my Report are from CMS' "Announcement of Calendar Year (CY) 2008 Medicare Advantage Capitation Rates and Payment Policies," Centers for Medicare & Medicaid Services, April 2, 2007, https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/announcement2008.pdf, accessed September 5, 2023 at Table 1-4.

example, assume that the beneficiary described above had only one risk adjustment-eligible medical encounter in 2010, with Provider A, and that Provider A reported diagnosis code 25000 to the MAO for this encounter. Assume that in turn, the MAO submitted this diagnosis code to CMS. As noted above, diagnosis code 25000 maps to HCC 19, *Diabetes without complication*, which is assigned a factor of 0.181. When the demographic risk factor (0.298) and HCC 19 risk factor (0.181) are combined, the resulting total risk score for this beneficiary would be 0.479.[36] If the base rate for this beneficiary's plan is $100, then CMS would pay the MAO a risk adjusted per member per month payment of $47.90 for this beneficiary.

30.    Some HCCs are strictly additive, such that multiple diagnosis codes mapping to different HCCs will have a numerical value assigned to each HCC and each HCC will be included in the risk score and payment calculation. For example, consider Beneficiary 1 in **Exhibit 1** below. Assume that she has the same demographic factor as the hypothetical beneficiary described above (0.298) but that Provider A reported two diagnosis codes for her based on the 1/1/2010 medical encounter. In this hypothetical, Provider A reported diagnosis codes 25000 and 82100, which map to HCC 19, *Diabetes without complication* and HCC 158, *Hip fracture/dislocation*, respectively. HCC 19 is assigned a factor of 0.181 and HCC 158 is assigned a factor of 0.450, resulting in a total risk score of 0.929 for this beneficiary.[37] If the base rate for this beneficiary's plan is $100, then CMS would pay the MAO a risk adjusted per member per month payment of $92.90 for this beneficiary.

---

[36]    0.479 = 0.298 demographic factor + 0.181 HCC 19 factor.

[37]    0.929 = 0.298 demographic factor + 0.181 HCC 19 factor + 0.450 HCC 158 factor.

1453

**Exhibit 1**
**Risk Score Calculation for Hypothetical Beneficiary 1**

| Beneficiary | Date | Provider | Source | Diagnosis | HCC | HCC Factor |
|---|---|---|---|---|---|---|
| 1 | 1/1/2010 | A | Claims | 25000 | 19 | 0.181 |
| 1 | 1/1/2010 | A | Claims | 82100 | 158 | 0.450 |
| | | | | | Demographic Factor | 0.298 |
| | | | | | Total Risk Score | 0.929 |
| | | | | | x Base Rate | $100 |
| | | | | Per Member Per Month Payment | | $92.90 |

31.   If an MAO submits multiple diagnosis codes mapping to the same HCC for a beneficiary, the beneficiary's risk score does not depend on which specific diagnosis code was reported. Nor does the risk score depend on how many times a particular diagnosis code is reported within a service year.

32.   This principle can be observed in **Exhibit 2** below. Like Beneficiary 1, Beneficiary 2 had her first encounter in 2010 with Provider A on 1/1/2010. Again, Provider A reported diagnosis codes 25000 and 82100, which map to HCC 19 and HCC 158, respectively. Beneficiary 2 then had three subsequent encounters with Provider A in the same year, for which Provider A only reported diagnosis code 25001. Diagnosis code 25001, like diagnosis code 25000, maps to HCC 19. In service year 2010, Beneficiary 2 has the same two distinct HCCs as Beneficiary 1 (HCC 19 and HCC 158). As a result, despite having a greater number of submitted diagnosis codes, Beneficiary 2 has the same risk score as Beneficiary 1 (0.929). Likewise, if the base rate for this beneficiary's plan is $100, then CMS would pay the MAO a risk adjusted per member per month payment of $92.90 for this beneficiary.[38]

---

[38]   0.929 = 0.298 demographic factor + 0.181 HCC 19 factor + 0.450 HCC 158 factor.

1454

**Exhibit 2**
**Risk Score Calculation for Hypothetical Beneficiary 2**

| Beneficiary | Date | Provider | Source | Diagnosis | HCC | HCC Factor |
|---|---|---|---|---|---|---|
| 2 | 1/1/2010 | A | Claims | 25000 | 19 | 0.181 |
| 2 | 1/1/2010 | A | Claims | 82100 | 158 | 0.450 |
| 2 | 4/1/2010 | A | Claims | 25001 | 19 | 0.181 |
| 2 | 5/1/2010 | A | Claims | 25001 | 19 | 0.181 |
| 2 | 6/1/2010 | A | Claims | 25001 | 19 | 0.181 |
| 2 | 7/1/2010 | A | Claims | 25001 | 19 | 0.181 |

| Distinct HCCs | HCC Factor |
|---|---|
| 19 | 0.181 |
| 158 | 0.450 |
| **Demographic Factor** | 0.298 |
| **Total Risk Score** | 0.929 |
| **x Base Rate** | $100 |
| **Per Member Per Month Payment** | $92.90 |

33.    While some HCCs are strictly additive, certain HCCs represent more or less severe cases of the same condition or related conditions, and these are not strictly additive.[39] In these cases, the model utilizes a hierarchy such that only the most severe case of the condition is included in the risk score. For example, HCCs 15 through 19 are related to diabetes and defined by CMS as belonging to a single hierarchy.[40] If a beneficiary has a diagnosis code mapping to HCC 15 and a different diagnosis code mapping to HCC 19, only the more severe condition will be used for calculating that beneficiary's risk score.[41] Within a hierarchy, more severe conditions map to lower HCCs,[42] so in this example, HCC 15 would be included in the beneficiary's risk score and HCC 19 would not.

---

[39]    "Announcement of Calendar Year (CY) 2008 Medicare Advantage Capitation Rates and Payment Policies," Centers for Medicare & Medicaid Services, April 2, 2007, https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/announcement2008.pdf, accessed September 5, 2023.

[40]    The five diabetes-related HCCs are defined as follows: Diabetes with renal or peripheral circulatory manifestation (HCC 15), Diabetes with neurologic or other specified manifestation (HCC 16), Diabetes with acute complications (HCC 17), Diabetes with ophthalmologic or unspecified manifestation (HCC 18), and Diabetes without complication (HCC 19); *Ibid*. at Table 1-4.

[41]    *Ibid*. at Table 1-4.

[42]    *Ibid*. at Table 1-4. The relative factor for HCC 19 for a non-institutionalized beneficiary is 0.181 and the relative factor for HCC 15 for that same beneficiary would be 0.608.

34.    Consider Beneficiary 3 in **Exhibit 3** below. As with Beneficiary 1 and Beneficiary 2, this beneficiary has a demographic factor of 0.298 and had her first encounter in 2010 with Provider A on 1/1/2010. Again, Provider A reported diagnosis codes 25000 and 82100, which map to HCC 19 and HCC 158, respectively. If this were Beneficiary 3's only encounter during this service year, then she would have the same risk score as Beneficiary 1 and Beneficiary 2. However, Beneficiary 3 had one subsequent encounter with Provider A, for which Provider A reported diagnosis code 25040. Diagnosis code 25040 maps to HCC 15, which is a more severe condition in the same disease hierarchy as HCC 19.[43] For the purpose of risk adjustment, HCC 15 is included in Beneficiary 3's risk score and HCC 19 is not (HCC 19 is effectively subsumed by HCC 15). HCC 15 is assigned a factor of 0.608 and HCC 158 is assigned a factor of 0.450, resulting in a total risk score of 1.356 for Beneficiary 3.[44] If the base rate for this beneficiary's plan is $100, then CMS would pay the MAO a risk adjusted per member per month payment of $135.60 for this beneficiary.

**Exhibit 3**
**Risk Score Calculation for Hypothetical Beneficiary 3 (Hierarchy)**

| Beneficiary | Date | Provider | Source | Diagnosis | HCC | HCC Factor |
|---|---|---|---|---|---|---|
| 3 | 1/1/2010 | A | Claims | 25000 | 19 | 0.181 |
| 3 | 1/1/2010 | A | Claims | 82100 | 158 | 0.450 |
| 3 | 4/1/2010 | A | Claims | 25040 | 15 | 0.608 |

| Distinct HCCs | HCC Factor |
|---|---|
| 15 | 0.608 |
| 158 | 0.450 |
| Demographic Factor | 0.298 |
| Total Risk Score | 1.356 |
| x Base Rate | $100 |
| Per Member Per Month Payment | $135.60 |

35.    The CMS HCC Model also accounts for anticipated costs associated with disease interactions, such that a risk score may be impacted if a beneficiary has a combination of

---

[43]    *Ibid*. at Table 1-4.

[44]    $1.356 = 0.298$ demographic factor $+ 0.608$ HCC 15 factor $+ 0.450$ HCC 158 factor.

1456

certain HCCs. In these cases, the beneficiary may receive an additional increase in their risk score.[45]

36. To illustrate, consider Beneficiary 4 in **Exhibit 4** below. As with Beneficiaries 1, 2, and 3, this beneficiary has a demographic factor of 0.298 and had her first encounter in 2010 with Provider A on 1/1/2010. In this hypothetical, Provider A reported diagnosis codes 25000 and 436, which map to HCC 19, *Diabetes without complication*, and HCC 96, *Ischemic or unspecified stroke*, respectively. CMS applies a disease interaction factor for the combination of HCC 19 and HCC 96, which will increase this beneficiary's risk score by 0.149.[46] To calculate the risk score for Beneficiary 4, CMS totals the value of HCC 19 (which is assigned a factor of 0.181), HCC 96 (which is assigned a factor of 0.303), and the disease interaction factor (which is assigned a factor of 0.149), thereby resulting in a total risk score of 0.931 for this beneficiary.[47] If the base rate for this beneficiary's plan is $100, then CMS would pay the MAO a risk adjusted per member per month payment of $93.10 for this beneficiary.

---

[45] "Announcement of Calendar Year (CY) 2008 Medicare Advantage Capitation Rates and Payment Policies," Centers for Medicare & Medicaid Services, April 2, 2007, https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/announcement2008.pdf, accessed September 5, 2023 at Table 1-4. CMS also applies a disabled/disease interaction factor if a beneficiary qualifies for disability status and has a combination of certain co-existing conditions, as reflected in the HCCs assigned to the beneficiary that result in a lift to the beneficiary's risk score. For the purposes of the examples included here, assume that the beneficiary does not qualify for disability status. "Medicare Managed Care Manual Chapter 7 - Risk Adjustment," Centers for Medicare & Medicaid Services, September 19, 2014, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c07.pdf, accessed October 15, 2022 at § 70.2.7; "Announcement of Calendar Year (CY) 2008 Medicare Advantage Capitation Rates and Payment Policies," Centers for Medicare & Medicaid Services, April 2, 2007, https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/announcement2008.pdf, accessed September 5, 2023, p. 29.

[46] "Announcement of Calendar Year (CY) 2008 Medicare Advantage Capitation Rates and Payment Policies," Centers for Medicare & Medicaid Services, April 2, 2007, https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/announcement2008.pdf, accessed September 5, 2023 at Table 1-4.

[47] 0.931 = 0.298 demographic factor + 0.181 HCC 19 factor + 0.303 HCC 96 factor + 0.149 interaction factor for HCC 19 and HCC 96.

**Exhibit 4**
**Risk Score Calculation for Hypothetical Beneficiary 4 (Disease Interactions)**

| Beneficiary | Date | Provider | Source | Diagnosis | HCC | HCC Factor |
|---|---|---|---|---|---|---|
| 4 | 1/1/2010 | A | Claims | 25000 | 19 | 0.181 |
| 4 | 1/1/2010 | A | Claims | 436 | 96 | 0.303 |
| | | | | Demographic Factor | | 0.298 |
| | | | | Disease Interaction Factor | | 0.149 |
| | | | | Total Risk Score | | 0.931 |
| | | | | x Base Rate | | $100 |
| | | | Per Member Per Month Payment | | | $93.10 |

### ii. Payments to MA-PD Plans

37. Risk adjustment is also a component of how CMS makes payments under Part D to MA-PD plans. The per member per month payment that CMS pays MA-PD plans for each beneficiary is based on a base rate, multiplied by a risk score.

38. The Part D risk score is calculated in a similar manner to the risk score for Part C and, as is true in Part C, is affected by the submission of diagnosis codes that map to Rx Hierarchical Condition Categories ("RxHCCs") included within the CMS RxHCC Risk Adjustment Model ("CMS RxHCC Model"). The construction and use of RxHCCs is similar to the construction and use of HCCs. As with Part C, CMS makes publicly available on their website computer programs for calculating Part D risk scores based on the beneficiary diagnosis codes and demographics that are inputs to the program.[48]

39. Many diagnosis codes map to both an HCC and an RxHCC, meaning that submission of such codes may impact payments under both models. Some diagnosis codes only map to an HCC or only map to an RxHCC and will only impact payments under the corresponding model. The same CMS rules discussed in the context of Part C above also apply to Part D: risk scores are calculated anew each year and are based only on diagnosis codes supported

---

[48] "Medicare risk adjustment information," Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare/payment/medicare-advantage-rates-statistics/risk-adjustment, downloaded on June 16, 2023.

1458

by the beneficiary's medical records and, generally, resulting from face-to-face medical encounters with providers of certain specialties.[49]

40. Part D payments from CMS to MA-PDs cover approximately 75% of the average total cost of prescription drug benefits, and beneficiary premiums cover the remainder.[50] CMS' portion of the payment is referred to as the "direct subsidy," and the beneficiary's portion is referred to as the "beneficiary premium."[51] Like CMS' payment, the beneficiary's portion of the payment also depends on the risk score that CMS calculates based on diagnosis codes submitted to CMS for the beneficiary.

41. Additionally, unlike Part C, CMS applies "risk corridors" to Part D payments. Risk corridors are designed to reduce the risk that MAOs take on in providing prescription drug benefits to beneficiaries enrolled in MA-PD Plans.[52] Risk corridors function at the plan level rather than at a beneficiary level. If an MAO's actual costs across all beneficiaries enrolled in a plan are higher than the expected costs, CMS will make additional payments to the MAO to help cover those costs. Conversely, if actual costs are lower than expected, the MAO must share those profits with CMS.

42. The expected costs for a given plan, referred to as the "target" amount, are set just below the amount the MAO receives to cover the beneficiaries in the plan, which includes CMS' portion of the payment (the direct subsidy) plus the beneficiaries' portion (the beneficiary premium), as MAOs are expected to incur some administrative costs in covering the

---

[49]  *2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide*, Centers for Medicare & Medicaid Services, January 1, 2008, https://www hhs.gov/guidance/document/2008-risk-adjustment-data-technical-assistance-medicare-advantage-organizations, accessed September 5, 2023, pp. 62–63, 76.

[50]  "Part D Payment System," Medicare Payment Advisory Commission, November 2021, https://www.medpac.gov/wp-content/uploads/2021/11/medpac_payment_basics_21_partd_final_sec.pdf, accessed August 29, 2022.

[51]  42 CFR § 423.329(a); 42 CFR § 423.286; "CMS Releases 2024 Projected Medicare Part D Premium and Bid Information," Centers for Medicare & Medicaid Services, July 31, 2023, https://www.cms.gov/newsroom/fact-sheets/cms-releases-2024-projected-medicare-part-d-premium-and-bid-information, accessed September 28, 2023.

[52]  *Sharing Risk in Medicare Part D Chapter 6*, Medpac, June 2015, https://www medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/chapter-6-sharing-risk-in-medicare-part-d-june-2015-report-.pdf, accessed September 26, 2023.

1459

beneficiary.[53] If an MAO's actual costs for a given plan are less than 5% below the target amount, the MAO keeps all of those excess profits. Profits that the MAO earns based on costs that are between 5% and 10% below the target amount must be shared equally with CMS. For any profits the MAO earns based on costs that are more than 10% below the target, the majority (80%) must be returned to CMS. Conversely, the same tiers of risk sharing apply if the MAO incurs losses. The MAO must absorb all losses until their costs exceed the target amount by 5%. Losses associated with costs between 5% and 10% above the target amount are shared equally with CMS, and losses based on costs exceeding 10% above the target amount are largely borne by CMS (80%).

43.   The diagnosis codes that MAOs submit to CMS for use in risk adjustment determine CMS' payment to MAOs, and these payments in turn are used to calculate the target amount for each MA-PD. The size of the gap between this target amount and the plan's actual costs may then result in an additional transfer of payment between MAOs and CMS under the risk corridors. In this way, under Part D, the diagnosis codes that MAOs submit for beneficiaries have an additional impact on payments which does not apply under Part C.

## IV.   DEFENDANTS' RISK ADJUSTMENT-RELATED PROGRAMS

44.   In this section, I provide a description of certain programs Defendants implemented related to Medicare Advantage risk adjustment, which is based on my professional understanding and my review of the testimony and documents cited. My intent is to provide background and context relevant to understanding the analyses I have performed.

45.   MAOs submit diagnosis code data for beneficiaries enrolled in their plans to CMS for use in risk adjustment.[54] Some of this data originates from provider-reported encounters, which providers report to MAOs as claims for reimbursement.[55] MAOs may also supplement this data with additional diagnosis codes that are supported by the beneficiary's medical records

---

[53]   42 CFR § 423.336(a)(2).

[54]   42 CFR § 422.310(a)-(b).

[55]   *2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide*, Centers for Medicare & Medicaid Services, January 1, 2008, https://www.hhs.gov/guidance/document/2008-risk-adjustment-data-technical-assistance-medicare-advantage-organizations, accessed September 5, 2023, Section 3.2.1 – 3.2.3.

from the relevant service year, but that may not have already been reported on the provider's claim.[56]

46.  For the years at issue in this matter, Defendants conducted retrospective reviews of their Medicare Advantage beneficiaries' medical records, also known as "Charts," to identify diagnosis codes that were supported by those Charts.[57] Defendants' primary program for conducting these reviews, the Chart Review Program, was implemented for every payment year at issue in this matter. For some of these years, Defendants also implemented an additional program called Claims Verification.

### A.  Defendants' Chart Review Program

47.  In the Chart Review Program, Defendants, either themselves or through a third-party vendor,[58] identified and collected Charts from certain providers who had reported encounters with beneficiaries to Defendants, and for which Defendants had submitted diagnosis codes to CMS.[59] The collected Charts could include information about only one encounter for a beneficiary from the relevant service year or multiple encounters from that year.[60] Some of the collected Charts included information about encounters with multiple

---

[56]  *Ibid.* Section 3.2.4.

[57]  Deposition of Kathleen O. Baker 30(b)(6), *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, Case No. 2:16-cv-08697-FMO-SS, May 30, 2023 ("Baker Deposition Volume 1"), 33:10–20 ("Q. Okay. So broadly speaking, what is Optum's retrospective chart review program? A. Optum's retrospective chart review program is a program where we submit a more complete health status from medical records collected on a member for appropriate payment from CMS. Q. Okay. So what is the purpose of Optum's chart review program? A. To submit more complete health statuses to CMS on risk adjustment members.").

[58]  *Ibid.*, 137:1–9 ("Q. Okay. So let's go back to our hypothetical patient, Mary, who's seeing doctors at Vanderbilt Health. So -- and we're -- I'm focused now on the 2008 and 2009 dates of service. Can you just -- what was the name of one of the coding vendors that you used at the time? A. TCS, The Coding Source.").

[59]  *Ibid.*, 65:5–68:9 ("In the retrieval process itself, if it went to a -- vendor for retrieval, for instance, it could be something along the lines of when you send the chart over -- you know, a chart is a member-provider combination where the provider is based upon -- is selected from a location, for instance. ... And then as you're retrieving the chart, what the vendor will do is they'll call up the provider. They'll do some sort of provider verification, like asking are there X number of providers and their ID there to make sure they've got the right area. Then they'll go through a member verification to say hey, do you have these members with this information. ... And then once we get validation from there, typically we either fax or we would secure E-mail the complete list of the members. And then, based upon the number, we'd work with them to schedule either on site or they could themselves decide to send us the charts").

[60]  *Ibid.*, 35:1–15 ("So in my personal opinion, when I say more complete health status, it's the recognition that there's -- we may not ever be able to submit 100 percent of a person's medical status, but it's -- in context of the retrospective chart review program, it's being able to say based upon a chart that we have on a member, knowing that a member may have multiple charts from different providers that contain different providers

---

providers.[61] Certified medical record coders ("Coders") reviewed the collected Charts to identify and code medical conditions that were documented by physicians in the Charts.[62]

48. Defendants' Chart Review Program, which began prior to the first year I was asked to analyze for this matter, grew during the time period at issue. **Exhibit 5** shows the number of beneficiaries enrolled in Defendants' Medicare Advantage plans,[63] according to their annual public filings, along with the number of beneficiaries and service dates that were reviewed in Defendants' Chart Review Program for the years at issue in this matter, according to Defendants' data.

---

within those charts on different dates of services that we're, you know, attempting for one of those charts to provide information."); *Ibid*., 222:1–2. ("A chart could contain multiple dates of services.").

[61]   *Ibid*., 119:13–120:2 ("Q. Okay. So as a result of Optum's consolidation process for that retrieval -- retrieval provider ID, was it possible to collect charts for members that included encounters with multiple providers? ... THE WITNESS: So after we -- after we released the charts to the retrieval vendor and they did their consolidation and they did their validation and we retrieved the chart under that method, it could include multiple providers.").

[62]   *Ibid*., 187:17–188:4 ("Q. And did you believe that the coders hired by Optum for the 2008-2016 date of service chart reviews were among the best in -- available in the business? ... THE WITNESS: We required that our coders be certified coders. And then from there, we provided them training on risk adjustment coding."); Deposition of Kathleen O. Baker 30(b)(6) *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, Case No. 2:16-cv-08697-FMO-SS, May 31, 2023 ("Baker Deposition Volume 2") ,420:7–422:22 ("Q. Okay. And then going forward for subsequent date of service years, so date of -- dates of service 2013, 2014, 2015 and 2016, were coders consistently instructed to record all RxHCCs? ... THE WITNESS: They were asked to code all HCCs and RxHCCs that they could identify in the chart according to their ability, according to the chart difficulty levels."); Deposition of Melissa Sedor 30(b)(6), *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. CV 16-08697 FMO, June 29, 2023 ("Sedor Deposition"), 184:17–20 ("The chart review is looking at the medical record to determine which diagnosis the doctor or provider had documented in that medical record.").

[63]   *2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide*, Centers for Medicare & Medicaid Services, January 1, 2008, https://www.hhs.gov/guidance/document/2008-risk-adjustment-data-technical-assistance-medicare-advantage-organizations, accessed September 5, 2023, p. 168 ("During medical record review, the certified coder checks for the following: [t]he service was provided by an acceptable risk adjustment provider type and physician specialty … [d]iagnoses supported by medical record submission.").

1462

**Exhibit 5**
**Defendants' Medicare Advantage Beneficiaries[64] and**
**Beneficiaries and Service Dates Reviewed in Defendants' Chart Review Program**
**Service Years 2008–2016**

| Service Year | Defendants' Medicare Advantage Beneficiaries *based on 10-K filings* [A] | Beneficiaries Reviewed [B] | Beneficiary Service Dates Reviewed [C] |
|---|---|---|---|
| 2008 | 1,495,000 | 540,037 | 1,962,873 |
| 2009 | 1,790,000 | 811,013 | 3,437,735 |
| 2010 | 2,005,000 | 1,040,460 | 5,150,626 |
| 2011 | 2,165,000 | 1,172,337 | 6,641,373 |
| 2012 | 2,565,000 | 1,291,814 | 7,255,206 |
| 2013 | 2,990,000 | 1,568,691 | 8,780,321 |
| 2014 | 3,005,000 | 1,901,809 | 11,949,263 |
| 2015 | 3,235,000 | 2,059,941 | 14,476,590 |
| 2016 | 3,630,000 | 2,212,997 | 16,412,551 |

49.    While the number of beneficiaries enrolled in Defendants' Medicare Advantage plans grew by 143% from service year 2008 to 2016, the number of beneficiaries reviewed in Defendants' Chart Review Program grew by 310% and the number of service dates

---

[64]    UnitedHealth Group Incorporated Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2010, filed February 10, 2011, https://www.sec.gov/Archives/edgar/data/731766/000119312511030615/d10k htm, accessed September 29, 2023 p. 43; UnitedHealth Group Incorporated, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2011, filed February 8, 2012, https://www.sec.gov/Archives/edgar/data/731766/000073176612000009/unh2011123110k.htm, accessed September 29, 2023 p. 37; UnitedHealth Group Incorporated, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2012, filed February 6, 2013, https://www.sec.gov/Archives/edgar/data/731766/000073176613000005/unh2012123110-k.htm, accessed September 29, 2023 p. 39; UnitedHealth Group Incorporated, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2013, filed February 12, 2014, https://www.sec.gov/Archives/edgar/data/731766/000073176614000008/unh2013123110-k.htm, accessed September 29, 2023 p. 36; UnitedHealth Group Incorporated, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2014, filed February 10, 2015, https://www.sec.gov/Archives/edgar/data/731766/000073176615000007/unh2014123110-k.htm, accessed September 29, 2023 p. 35; UnitedHealth Group Incorporated, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2015, filed February 9, 2016, https://www.sec.gov/Archives/edgar/data/731766/000073176616000058/unh2015123110-k.htm, accessed September 29, 2023 p. 33; UnitedHealth Group Incorporated, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2016, filed February 8, 2017, https://www.sec.gov/Archives/edgar/data/731766/000073176617000009/unh2016123110-k.htm, accessed September 29, 2023 p. 32.

1463

reviewed grew by more than 736%.[65] In 2008, approximately 36% of the beneficiaries enrolled in Defendants' Medicare Advantage plans had a Chart reviewed in Defendants' Chart Review Program. By 2016, Defendants Chart Review Program included over 60% of Defendants' beneficiaries.[66]

50. The Chart Review Program generally conducted reviews in a "blind" fashion,[67] meaning that the Coder did not know which diagnosis codes the provider had initially reported (and Defendants had submitted to CMS) for the encounter or encounters documented in the Chart under review.[68] In blind reviews, Defendants instructed their Coders to record all diagnosis codes eligible for risk adjustment that they determined were supported by the beneficiary's Chart.[69]

51. For service years 2014-2016, Defendants also conducted a step in the Chart Review Program called "Second Level Review," where a *second* blind review was conducted for some Charts.[70] Based on Defendants' data, approximately 73% of the Charts reviewed in these years underwent a Second Level Review.[71]

---

[65] These calculations are based on the change in the number of beneficiaries (or beneficiary service dates) reviewed from 2008 to 2016, divided by the number of beneficiaries (or beneficiary service dates) reviewed in 2008, as shown in **Exhibit 5**.

[66] These calculations are based on the number of beneficiaries Defendants reviewed in the Chart Review Program [B], divided by the number of Defendants' Medicare Advantage beneficiaries, as shown in **Exhibit 5**.

[67] Baker Deposition Volume 1, 298:17–22 ("Q. Okay. Okay. So aside from the charts marked with the recode flag discussed here, Optum coded charts for UnitedHealthcare's chart review program using blind coding for the 2008 to 2016 dates of service, correct? A. Yes.").

[68] *Ibid.*, 260:1–260:16 ("–[I]n blind coding a coder's given no additional information, other than the image of the chart to -- to code to the best of their ability.").

[69] *Ibid.*, 197:1–203:9 ("Q. And Optum also instructed its coders that the medical record had to support the diagnosis code selected, correct? ... THE WITNESS: We, as part of our QA process, would check to make sure that the code that the coder coded from the chart was supported appropriately within the medical record. But, again, that doesn't mean that they were 100 percent complete in what was coding from that chart.").

[70] *Ibid.*, 351:4–354:3 ("A. We would send charts to second-level review based upon the information that we saw where again, depending upon the coder's experience -- the complexity of the chart, the type of chart, if it was EMR or if it was handwritten -- that we would send it to second-level review."); 359:16–360:8 ("Q. Okay. So then if we're trying to figure out which one of Mary's chart reviews is first-time coding versus second-level review, would you determine that by looking at the dates that the chart was coded on? ... THE WITNESS: When we assigned a chart, we assigned it, like, in a work list. … Q. Okay. A. And the work list would be this is work list 1LR. Then we would assign it, this is work list 2LR.").

[71] See **Appendix D, Section III.A.ii.c** for an explanation of how I identified Charts that underwent a Second Level Review.

52.   While most Chart Review Program reviews were blind, there were limited exceptions. In particular, in a project known as the "Recode Project," Defendants gave Coders information about diagnosis codes previously submitted to CMS for the beneficiary, a type of review known as "informed coding."[72] In these instances, Defendants instructed Coders that it was not necessary to record diagnosis codes that had already been submitted for that year, since each distinct HCC only counts once per year toward a beneficiary's risk score.[73] Based on Defendants' data,[74] approximately 33% of the Charts reviewed in service years 2011 and 2012 were subject to informed coding.[75]

53.   Defendants analyzed diagnosis codes reported by providers and Chart Review Program results and identified the new diagnosis codes (*i.e.*, diagnosis codes not previously reported by the provider and not previously submitted by Defendants to CMS) that their Coders found as being documented in the Chart, and submitted those diagnosis codes to CMS for additional risk adjustment payments.[76] Defendants' submission of these diagnosis codes, called "adds," generally resulted in increases in beneficiaries' risk scores and thus increases in CMS' payments to Defendants to cover these beneficiaries. Defendants estimated that for payment years 2010-2015, the adds generated by their Chart Review Program resulted in over $3.5 billion in additional risk adjustment payments made by CMS to Defendants.[77]

---

[72]   Baker Deposition Volume 1, 263:14–264:11 ("A. I mean, I would maybe also just continue that further informed coding, as UnitedHealth uses the term to respond to this interrogatory was not specific to the rendering provider or date of service as the charts reviewed during chart review could contain information from multiple providers and multiple dates of services across different data collection years and different provider encounters.").

[73]   *Ibid.*, 285:6–14 ("Q. Okay. And those directions included a direction to only code each HCC once per year? A. Um-hmm. And I believe we also said do not – you do not need to code every RxHCC.").

[74]   Recode reviews were only conducted for services years 2011 and 2012. *Ibid.*, 268:9–269:11 and 298:6–15; UnitedHealth's First Supplemental Responses and Objections to Plaintiff United States' Sixth Set of Interrogatories, *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, CASE NO. CV 16-08697 (SSx), July 19, 2022 ("UnitedHealth's First Supplemental Responses and Objections to Plaintiff United States' Sixth Set of Interrogatories").

[75]   See **Appendix D, Section III.A.iii** for an explanation of how I identified informed coded Charts. Defendants also identified a small number of informed coded Charts outside of these years. These represent less than 0.5% of Charts in service years 2013-2016.

[76]   Sedor Deposition, 181:8–22 ("So I would say that the chart review process identified all HCCs, and then a separate process that was not part of the chart review program itself but was part of the submission process would identify which of those codes from a chart review were new and unique for submission.").

[77]   Production of Responses and Documents Responsive to CR / CV Interrogatories 1(F),1(J), 1(K) and Document Requests 4(C)(iii)(t), 4(C)(vii)(i), 5, and 6(D), December 21, 2015, p. 5.

54.     While Defendants submitted the new diagnosis codes that were found to be supported in the Chart Review Program but were not previously reported by providers, they did not, as part of the Chart Review Program, generally[78] delete, investigate, or even flag diagnosis codes that were previously reported by a provider and submitted by Defendants to CMS but were *not* found to be supported in the Chart Review Program.[79]

## B.  Defendants' Claims Verification Program

55.     From 2010 through April 2014, Defendants conducted a program called "Claims Verification" or "CV," which involved the re-review of some Charts from the Chart Review Program for service years 2009-2012.[80] According to Defendants, CV utilized Charts previously reviewed in the Chart Review Program to determine if there were any provider-reported diagnosis codes that had been submitted to CMS, but were not supported by the Chart.[81]

56.     The CV program applied only to a subset of Charts that had been reviewed in the Chart Review Program. For example, a Chart was only eligible for inclusion in the CV program if it was associated with what Defendants called an "exclusive HCC."[82] An exclusive HCC is an HCC that is exclusive to one provider in the service year, and was not found to be

---

[78]  For two years, Defendants investigated some of these diagnosis codes and, in some instances, deleted them, as further discussed in **Section IV.B**.

[79]  Sedor Deposition, 249:16–251:16 ("Q. But you didn't do anything in particular with respect to the charts that had gone through chart review, right, to make sure that anything that the coders did not find as supported to try to validate any of those codes; correct? … THE WITNESS: Correct. … Q. And I would say by definition, if you didn't have that type of process, then you were not submitting deletes that would have -- that would have resulted; correct? … THE WITNESS: Correct. Without a program to identify the deletes, we would not have been submitting deletes.").

[80]  Production of Responses and Documents Responsive to CR / CV Interrogatories 1(F),1(J), 1(K) and Document Requests 4(C)(iii)(t), 4(C)(vii)(i), 5, and 6(D), December 21, 2015, p. 7 ("… the Claims Verification program continually evolved between 2010 and 2014 …"); Deposition of Jon H. Bird 30(b)(6), *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. CV 16-08697 FMO, June 22, 2023 ("Bird Deposition Volume 1"), 102:21–103:21.

[81]  Sedor Deposition, 115:9–18 ("What [the CV] program did was to, when a medical record was looked at for chart review purposes to identify diagnosis codes that were not on the claim, it would also utilize those medical records to compare against the claim submitted by the provider to see if there were any codes submitted on the claim that were not supported by the medical records.").

[82]  Bird Deposition Volume 1, 109:1–18 ("[An exclusive HCC] would be an HCC or diagnoses that mapped to an HCC and that HCC is submitted by one and only one provider.").

23

1466

supported by the review of that provider's Chart in the Chart Review Program.[83] Put differently, an exclusive HCC is one that was included in a beneficiary's record solely on the basis of a diagnosis code (or diagnosis codes) reported by one provider in the service year, but Defendants' Coders in the Chart Review Program identified no diagnosis codes mapping to that HCC in the review of that provider's Chart.[84] According to Defendants' data, 53% of the Charts that went through the Chart Review Program in service years 2011 and 2012[85] were excluded from the CV program because they did not include an exclusive HCC.[86] Defendants had various other reasons for excluding Charts from CV.[87] According to Defendants' data, for service years 2011 and 2012 only 16% of the Charts reviewed in the Chart Review Program were re-reviewed in the CV program.

57.    In the CV program, Defendants often had multiple Coders re-review Charts to look for support for a diagnosis code mapping to the same HCC as the diagnosis code that was reported by the provider but was not found to be supported by Coders in the Chart Review

---

[83]    "Exhibit 712-5 of Bird Deposition," MARA2076620 ("Charts will only be eligible for CV if the provider linked to the chart reported at least one exclusive HCC or exclusive RXHCC in a claim. An Exclusive HCC is defined as an HCC reported only in a claim by the linked provider during the data collection period."); Bird Deposition Volume 1, 102:15–20 ("Q. Can you explain what the claims verification program is? A. It was a program that we operated during a certain time frame that identified and reviewed exclusive HCCs that were submitted by providers that were part of the chart review program.").

[84]    For example, suppose two providers submitted diagnosis codes mapping to HCC 15 for a beneficiary from two distinct encounters in a given service year. Further suppose that both of these encounters were reviewed in Defendants' Chart Review Program and that the Coders found no supporting diagnosis codes in the Charts corresponding to either encounter. HCC 15 would not be considered an exclusive HCC for the beneficiary and not eligible for the CV program because it was associated with diagnosis codes submitted by two providers in the service year. In contrast, if only one provider had submitted a diagnosis code mapping to HCC 15 for this beneficiary, HCC 15 would have been eligible for the CV program.

[85]    Defendants have not produced data related to the CV program for service years 2009-2010. The CV program was in pilot phases and thus limited in scope in these years. Production of Responses and Documents Responsive to CR / CV Document Request 4(C) for 2010 DOS, May 2, 2016, pp. 5–6.

[86]    Defendants have indicated a reason for each Chart's exclusion from the CV program in two datasets, MARA2157340 and MARA2152921. This count of Charts excluded from the CV program because they did not meet the exclusive HCC criteria includes two reasons: 1) "[Chart IDs] with no exclusive HCC's present in claims" and 2) "Exclusive HCC not related to chart provider." Production of Responses and Documents Responsive to CR / CV Interrogatories 1(A), 1(E), 3(A)-(B), 3(E), 3(H), 3(M), and 6 and Document Requests 4(C)(iv)(n) and 5, January 29, 2016, p. 8.

[87]    Defendants also excluded Charts associated with new enrollees, and Charts whose image was no longer available in their systems. Production of Responses and Documents Responsive to CR / CV Interrogatories 1(A), 1(E), 3(A)-(B), 3(E), 3(H), 3(M), and 6 and Document Requests 4(C)(iv)(n) and 5, January 29, 2016, p. 8.

1467

Program.[88] These re-reviews were conducted by Coders employed by Defendants and third-party vendors engaged by Defendants.[89]

58. Diagnosis codes that were still not found to be supported by the Chart in accordance with CMS guidelines after completing the re-reviews in the CV process were submitted as "deletes" to CMS.[90] If any CV Coder reported finding support for a diagnosis code mapping to the relevant HCC in any of the re-reviews, Defendants did not submit a delete to CMS for that diagnosis code.[91]

59. Defendants terminated the CV program in mid-2014.[92] At the time that CV was terminated, Defendants had already identified a set of diagnosis codes associated with 2011 and 2012 services years that they had submitted to CMS based on a provider-reported claim but for which they found no support in the Chart Review Program. This set of diagnosis codes included 74,722 diagnosis codes associated with service year 2011 and 78,875 diagnosis codes associated with service year 2012.[93] Of these 153,597 diagnosis codes, Defendants

---

[88]    Bird Deposition Volume 1, 311:2–22 ("And in this document -- or in this section it refers to RADV expert level review. Do you see that? A. I do see that. Q. And does that refer to external coders from your vendor, iCodify? A. iCodify was one of the vendors used. I don't know if it was exclusively used, but iCodify was one of the entities that did expert level review. Q. And when you say expert level review this is the review step that happens after the CVA analysis; is that right? A. CV analyst. Q. CV analyst? A. Correct. Q. And sometimes it's expert level review. Here it says RADV expert level review. But those refer to the same thing? A. Correct.").

[89]    *Ibid.*

[90]    Sedor Deposition, 116:17–117:4 ("And then if you identified diagnosis codes through claims verification that had not been identified in the chart review, then you would delete -- you deleted those codes through the process that's depicted here. You'd submit the deletes to CMS; is that right? ... THE WITNESS: If through the claims verification process we obtained knowledge that that code was not supported in the medical record it would be submitted as a delete through the process depicted on the screen."); Bird Deposition Volume 1, 119:12–120:10 ("[I]n terms of the main components that are listed here, outside of it being part of the chart review program, diagnoses were reviewed and they were -- to determine if supported, and deletes were processed.").

[91]    Bird Deposition Volume 1, 232:6–13.

[92]    *Ibid.*, 104:7–105:11 ("Q. And so is that your testimony as the designee for UnitedHealthcare and Optum, that the suspension of CV went into place on April 18, 2014, and the termination of CV went into place on May 27, 2014? A. Yeah, my testimony is on or around April 18th is when I saw notification of delete processing, and I believe the program was also suspended on or around that date. And yeah, based upon the -- we have the exhibit in here which is Steve Nelson's email or memorandum to Scott Theisen. He indicates in there that the decision was made to terminate on May 27th, and then that memorandum was dated with notification to Scott and others that was on June 11th.").

[93]    MARA2164481 and MARA2160501.

identified only 800 codes that had not already been re-reviewed by one Coder in the CV program.[94]

60.     In general, the deletion of diagnosis codes results in a reduction in risk adjustment payments MAOs receive from CMS, because a deletion may result in the removal of an HCC, the removal of that HCC's factor from the risk score, and thus a lower payment for the beneficiary. During the CV program, Defendants accrued reductions in revenue to cover the reduction in risk adjustment payments from CMS that they expected the deletes might have.[95] At the time CV was terminated, Defendants were able to release the accrued reductions.[96] Defendants' estimate that these released funds total $26 million for service year 2011 and $166.7 million for service year 2012.[97]

### C. Example Calculations of Changes to Risk Scores Resulting from Submissions of Adds and Deletes

61.     In this section, I provide example calculations of how risk scores might change due to the submission of adds and deletes resulting from Defendants' risk adjustment programs.

62.     As an example, consider again hypothetical Beneficiary 4 presented in **Exhibit 4** above, whose provider-reported diagnosis codes 25000 and 436. Now suppose that in Defendants' Chart Review Program, a Coder reviewed the Chart from the 1/1/2010 encounter with Provider A, and that Coder identified support for diagnosis codes 25000 and 82100 in the Chart. However, the Coder did not find support for diagnosis code 436.

---

[94]    Of the 78,875 diagnosis codes associated with service year 2012, Defendants have indicated in the spreadsheet that 800 had been reviewed in the Chart Review Program but not yet re-reviewed by any Coder in the Claims Verification program. For service year 2011, no such indicator exists in Defendants' spreadsheet.

[95]    Sedor Deposition, 193:23–194:17 ("Q. I see. Now, you're here to talk about the claims verification roll forward schedules for certain quarters in 2013 and 2014. How did you use the roll forward schedules? A. The roll forward schedule was created on our entire risk adjustment receivable account which is at times, depending on the time of year, could be a very large account. Within that risk adjustment receivable account we're accruing for the midyear reconciliation, the final reconciliation. We have reserves against it for possible deletes that we're paying out. So across our entire Medicare Advantage business, that balance can be pretty large. So the roll forward is actually detailing that entire RAF receivable account and then breaking it down into subcategories of what is in that account based on the supporting schedules that add up to those balances.").

[96]    Ibid., 217:22–218:2 ("Q. Okay. Why did you release the reserves for claims verification in 2014? ... THE WITNESS: The reserves were released because the program was discontinued.").

[97]    Ibid., 210:1–211:21 and 212:5–214:8 ([For service year 2012] "Q. Okay. Because the total would have been 166.7? A. Across -- the total negative revenue would have been 166.7 across all of 2013 and Q1 of 2014.") ([For service year 2011] ("So therefore our entire P&L activity was a favorable 26 million.").

63. For the purposes of this example calculation, assume that this beneficiary's Chart Review
Program results were used to identify adds but not deletes. In this case, diagnosis code
82100 would have been added to this beneficiary's records, and diagnosis 436 would not
have been deleted.

**Exhibit 6**
**Beneficiary Diagnosis Codes if Chart Review Data Only Used for Adds**

| Beneficiary | Date | Provider | Source | Diagnosis | HCC | HCC Factor |
|---|---|---|---|---|---|---|
| 4 | 1/1/2010 | A | Claims+Chart Review | 25000 | 19 | 0.181 |
| 4 | 1/1/2010 | A | Claims | 436 | 96 | 0.303 |
| 4 | 1/1/2010 | A | Chart Review | 82100 | 158 | 0.450 |

| Distinct HCCs | HCC Factor |
|---|---|
| 19 | 0.181 |
| 96 | 0.303 |
| 158 | 0.450 |
| **Demographic Factor** | 0.298 |
| **Disease Interaction Factor** | 0.149 |
| **Total Risk Score** | 1.381 |
| **x Base Rate** | $100 |
| **Per Member Per Month Payment** | $138.10 |

64. In **Exhibit 6**, diagnosis codes 25000, 436, and 82100 are in HCC 19, HCC 96, and HCC
158, respectively. In the CMS HCC Model, HCC 19 is assigned a factor of 0.181, HCC 96
is assigned a factor of 0.303, and HCC 158 is assigned a factor of 0.450. After accounting
for demographic factors and the disease interaction between HCC 19 and HCC 96, the use
of Chart Review Program data results in a total risk score of 1.381 for this beneficiary.[98] If
the base rate payment for this beneficiary's plan is $100, then CMS would pay Defendants
a risk adjustment per member per month payment of $138.10 for this beneficiary, or $45
more than if Defendants had not added diagnosis code 82100.[99]

---

[98]  1.381 = 0.298 demographic factor + 0.181 HCC 19 factor + 0.303 HCC 96 factor + 0.450 HCC 158 factor +
0.149 interaction factor for HCC 19 and HCC 96.

[99]  My assignment is not to calculate the value of adds from the Chart Review Program. I include this example to
demonstrate how risk scores and per member per month payments are impacted by the submission of additional
diagnosis codes.

1470

65. Now reconsider the example from **Exhibit 6** if this beneficiary's Chart Review Program results were used to identify deletes as well as adds. Diagnosis code 82100 would have been added to the list of diagnosis codes submitted to CMS, *and* diagnosis 436 would have been reported to CMS as a delete. CMS increases the risk score by the value of HCC 158 and removes the risk score lift caused by the prior submission of HCC 96. Because HCC 19 and HCC 96 are no longer co-existing conditions assigned to this beneficiary, CMS also removes the risk score lift caused by the disease interaction factor.

**Exhibit 7**
**Beneficiary Diagnosis Codes if Chart Review Data Used for Adds and Deletes**

| Beneficiary | Date | Provider | Source | Diagnosis | HCC | HCC Factor |
|---|---|---|---|---|---|---|
| 4 | 1/1/2010 | A | Claims+Chart Review | 25000 | 19 | 0.181 |
| ~~4~~ | ~~1/1/2010~~ | ~~A~~ | ~~Claims~~ | ~~436~~ | ~~96~~ | ~~0.303~~ |
| 4 | 1/1/2010 | A | Chart Review | 82100 | 158 | 0.450 |

| Distinct HCCs | HCC Factor |
|---|---|
| 19 | 0.181 |
| 158 | 0.450 |
| **Demographic Factor** | 0.298 |
| ~~**Disease Interaction Factor**~~ | ~~0.149~~ |
| **Total Risk Score** | 0.929 |
| **x Base Rate** | $100 |
| **Per Member Per Month Payment** | $92.90 |

66. As shown in **Exhibit 7**, diagnosis codes 25000, 436, and 82100 map to HCC 19, HCC 96, and HCC 158, respectively, which are assigned factors of 0.181, 0.303, and 0.450, respectively. However, deleting diagnosis code 436 now excludes HCC 96 from the beneficiary's risk score calculation, reducing the total risk score from 1.381 to 0.929. If the base rate payment for this beneficiary's plan is $100, then CMS would pay Defendants a risk adjustment per member per month payment of $92.90 for this beneficiary, or $45.20 less in per member per month payments than if Defendants had only added diagnosis code 82100 and not deleted diagnosis code 436.

67. The presence of other diagnosis information submitted to CMS for a beneficiary can mean that some deletes may not have had financial impact. Continuing with the example from **Exhibit 7**, suppose that the beneficiary had a second encounter in that service year, this time with Provider B on 2/1/2010. Further suppose that Provider B reported that the

1471

beneficiary had diagnosis code 43491, which maps to HCC 96. In this example, even though the Coder did not find support for diagnosis code 436 in the Chart associated with Provider A's encounter with the beneficiary on 1/1/2010, HCC 96 nevertheless would be preserved in the beneficiary's risk score calculation because on 2/1/2010, Provider B reported diagnosis 43491, which also maps to HCC 96.

**Exhibit 8**
**Beneficiary Diagnosis Codes if Chart Review Data Used for Adds and Deletes**

| Beneficiary | Date | Provider | Source | Diagnosis | HCC | HCC Factor |
|---|---|---|---|---|---|---|
| 4 | 1/1/2010 | A | Claims+Chart Review | 25000 | 19 | 0.181 |
| ~~4~~ | ~~1/1/2010~~ | ~~A~~ | ~~Claims~~ | ~~436~~ | ~~96~~ | ~~0.303~~ |
| 4 | 1/1/2010 | A | Chart Review | 82100 | 158 | 0.450 |
| 4 | 2/1/2010 | B | Claims | 43491 | 96 | 0.303 |

| Distinct HCCs | HCC Factor |
|---|---|
| 19 | 0.181 |
| 158 | 0.450 |
| 96 | 0.303 |
| Demographic Factor | 0.298 |
| Disease Interaction Factor | 0.149 |
| Total Risk Score | 1.381 |
| x Base Rate | $100 |
| Per Member Per Month Payment | $138.10 |

68.  The HCC factors for **Exhibit 8** are the same as those for Exhibit 6, resulting in the same total risk score of 1.381 for this beneficiary, implying the same per member per month payment of $138.10 at a base rate of $100. In this hypothetical, the use of Chart Review Program results to delete a diagnosis code does not affect the ultimate payment, because it does not impact the list of HCCs that CMS uses to calculate the payment for the beneficiary.

### D.  Defendants' Risk Adjustment Systems and Submission of Diagnosis Codes

#### i.  Defendants' Risk Adjustment Systems

69.  Defendants maintained databases to store diagnosis codes associated with their Medicare Advantage beneficiaries in order to submit them to CMS each year. Defendants pooled, validated, and filtered diagnosis codes from various sources into two final databases, hereinafter referred to collectively as "Defendants' Risk Adjustment Databases."

29

1472

70. One of these databases, the Ingenix Risk Adjustment Data System ("IRADS"), was in use for all years at issue in this matter.[100] The other database, the Encounter Data Processing System ("EDPS"), was used from service year 2014 onwards.[101]

71. Defendants' Risk Adjustment Databases generally tracked the source(s) of each diagnosis code.[102] Many of the diagnosis codes in Defendants' Risk Adjustment Databases came from one of two sources:

   i. **Provider-reported claims data**. When providers submit claim and encounter data to Defendants, they include diagnosis codes in the submission. Defendants passed diagnosis codes from these provider-reported claims into their Risk Adjustment Databases.[103]

   ii. **Defendants' Chart Review Program data**. Defendants maintained data sets that contained the results of the Chart Review Program ("Chart Review Databases").[104] Defendants passed diagnosis codes from their Chart Review Databases into their Risk Adjustment Databases.

72. Some of the diagnosis codes in Defendants' Risk Adjustment Databases came from other sources and programs. For example, if a Chart was included in the CV program and the

---

[100] Deposition of Biggs T. Cannon, III 30(b)(6), *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. CV 16-08697 FMO, June 6, 2023 ("Cannon Deposition Volume 1"), 59:22–60:5 ("Q. Okay. IRADS. What is IRADS used for? A. IRADS is a database within Optum that is used to house information related to Medicare Advantage beneficiaries. Q. And how long has -- or actually, was IRADS used for data that was being housed for dates of service 2008 through 2016? A. Yes, it would have stored data at that time frame."); Deposition of Biggs T. Cannon, III 30(b)(6), *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. CV 16-08697 FMO, June 7, 2023 ("Cannon Deposition Volume 2"), 353:5–353:23 ("Q. And my question for you is: Is there another system by which you use to submit that same type of data to CMS through the systems that we've mentioned that is outside of IRADS? ... THE WITNESS: The EDPS system also submits data to CMS for Medicare Advantage beneficiaries. BY MS. GLOVER: Q. Okay. Outside of EDPS and IRADS, are there any systems that you use to submit data to CMS for the beneficiaries enrolled in UnitedHealthcare's plans? ... THE WITNESS: I believe IRADS and EDPS are the two systems that submit data for Medicare Advantage beneficiaries to CMS.").

[101] See **Section IV.D.i** for an explanation of why Defendants maintained two separate systems. While both databases served the same function for Defendants, they each have unique data elements and structures.

[102] Cannon Deposition Volume 2, 353:5–353:23 Defendants produced EDPS data in two separate tables, one containing provider-report claims data and one containing data from other sources, including records from the Chart Review Program. In the data containing encounters from other sources, it is not clear how to distinguish records from the Chart Review Program from records from other sources.

[103] See **Appendix D, Section III.B** for a description of provider-reported claims data.

[104] See **Appendix D, Section III.A** for a description of Defendants' chart review data.

30

1473

CV Coder found support for an additional diagnosis code that was not previously reported by a provider or any Coders in the Chart Review Program, that diagnosis code might be added to Defendants' Risk Adjustment Databases.[105] A variety of other programs, such as provider attestations and hospital abstracts, also contributed diagnosis codes through what Defendants referred to as Alternative Submission Mechanism ("ASM").[106]

73. The relationship between these databases is summarized in **Exhibit 9**.

<div align="center">

**Exhibit 9**
**Defendants' Databases for Diagnosis Codes**

</div>



### ii. Defendants' Submission of Diagnosis Codes for Risk Adjustment

74. Defendants determined which diagnosis codes in their Risk Adjustment Databases could be submitted to CMS based on CMS requirements.[107] For example, was Defendants' policy not to submit diagnosis codes associated with Charts reviewed in the Chart Review

---

[105]  Bird Deposition Volume 1, 167:13–168:9.

[106]  *Ingenix Risk Adjustment Data System ("IRADS")*, UnitedHealth Group, December 16, 2014, p. 5. Production of Responses to Questions re: Document Request 4(C) – July 26th Letter, Attachment A, Sections B3, H, I, and J, September 23, 2016 September 23, 2016

[107]  Defendants identified a specific set of conditions under which they would not submit diagnosis codes identified in the Chart Review Program. In particular, Defendants indicated that it was their policy not to submit diagnosis codes identified in the Chart Review Program if the Chart was not signed by a provider. Production of Responses and Documents Responsive to CR / CV Interrogatories 1(F),1(J), 1(K) and Document Requests 4(C)(iii)(t), 4(C)(vii)(i), 5, and 6(D), December 21, 2015; Production of Responses to Questions re: Chart Reviewed File 4(C)(iv) – Chart Error & Omission Codes and Chart Reviewed File 4(C)(v) – Diagnosis Error & Omission Codes, December 1, 2016.

1474

Program where the Coder noted that the Chart had not been signed by the provider.[108] As discussed in **Section III.B**, this is consistent with CMS policy regarding what constitutes a risk adjustment-eligible diagnosis code.

75.     Defendants' Risk Adjustment Databases track whether each diagnosis code was submitted to CMS, and if so, CMS' response to the submission (*e.g.*, whether CMS accepted the diagnosis code for use in risk adjustment).

76.     Just as Defendants maintained two risk adjustment systems during the at-issue time period, so did CMS, which I collectively refer to as "CMS' Risk Adjustment Databases."[109] For the entire time period at issue, Defendants' submitted diagnosis codes from their IRADS database to CMS' Risk Adjustment Processing System ("RAPS").[110, 111] For service years 2014–2016, Defendants also submitted diagnosis codes from their EDPS database to the "CMS EDPS" database.[112] Two Risk Adjustment Databases were maintained by both Defendants and CMS starting in service year 2014 because this is when CMS began requiring MAOs to submit a broader set of information associated with beneficiaries

---

[108]    Sedor Deposition, 125:3–20 ("Q. Okay. Did you ever delete diagnosis codes because they were missing a signature or a credential? . . . THE WITNESS: Yes. If we submitted something from a medical record that did not have a signature and we were not able to achieve or obtain some kind of attestation from that provider to tell us that was in fact their medical record, then we would have submitted a delete for it. Q. Okay. And do you now if you actually made deletes on that basis? A. Yes, we did.") and 168:13-20 ("Additionally, as we've discussed, charts or medical records need to have a provider signature and credentials. There could have been times where we submitted a code through our chart review process and then realized that they did not have the proper signature and credentials and then had to submit a closed period delete for that original submission.").

[109]    These CMS Risk Adjustment Databases were used for Part C and Part D, such that MAOs could submit a diagnosis code just once for use in both risk score calculations.

[110]    *Ingenix Risk Adjustment Data System ("IRADS")*, UnitedHealth Group, December 16, 2014, p. 8; Cannon Deposition Volume 2 353:21–23 ("I believe IRADS and EDPS are the two systems that submit data for Medicare Advantage beneficiaries to CMS.")

[111]    Each RAPS submission must include the following information, also referred to as a "cluster": the Medicare beneficiary's identification number; the date(s) of the medical encounter (the physician office visit, hospital outpatient visit, or hospital inpatient stay); the type of provider (inpatient, outpatient, or physician); and the diagnosis code(s) reported by the provider for the encounter. *2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide*, Centers for Medicare & Medicaid Services, January 1, 2008, https://www.hhs.gov/guidance/document/2008-risk-adjustment-data-technical-assistance-medicare-advantage-organizations, accessed September 5, 2023, at Section 4.6.

[112]    Each CMS EDPS submission includes, at least, the information included in RAPS submissions as well as other information relating to the encounter.

1475

enrolled in Medicare Advantage and MA-PD Plans.[113] During service years 2014–2016, the new CMS EDPS database was phased in, while the RAPS database was phased out.

77.    In service year 2014, all diagnosis codes submitted to both RAPS and CMS EDPS counted for a given beneficiary's total risk score. It did not matter to which system a diagnosis code was submitted or whether it was submitted to only one system or both. CMS credited all diagnosis codes submitted to either system and calculated a single, total risk score.

78.    In service years 2015 and 2016, CMS calculated two separate risk scores for each beneficiary using diagnosis codes submitted to RAPS and CMS EDPS. CMS then blended the RAPS risk score and the CMS EDPS risk score to calculate the final risk score used for payment.[114] In 2015, the blend was 90% RAPS and 10% CMS EDPS. In 2016, the blend was 75% RAPS and 25% CMS EDPS.[115] For example, for service year 2016, if the diagnosis codes submitted to the RAPS system resulted in a risk score of 1.1, and the diagnosis codes submitted to CMS EDPS system resulted in a risk score of 0.9, the final risk score used for payment would be 1.05 (*i.e.*, 1.1 multiplied by 0.75 plus 0.9 multiplied by 0.25).[116]

79.    Both of CMS' Risk Adjustment Databases allow MAOs to delete previously submitted diagnosis codes. While CMS imposes a deadline for MAOs to submit adds, it allows submission of deletes after that deadline.[117] In the event that MAOs submit deletes after

---

[113]  "Advance Notice of Methodological Changes for Calendar Year (CY) 2015 for Medicare Advantage (MA) Capitation Rates, Part C and Part D Payment Policies and 2015 Call Letter," Centers for Medicare & Medicaid Services, February 21, 2014, https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/advance2015.pdf, accessed September 28, 2023, p. 28.

[114]  *Risk Adjustment for EDS & RAPS User Group*, Centers for Medicare & Medicaid Services, November 17, 2016, https://www.csscoperations.com/internet/cssc3 nsf/files/RA_Slides_111716_5CR_111816.pdf/$FIle/RA_Slides_111716_5CR_111816.pdf, accessed September 28, 2023, p. 56.

[115]  *Ibid.*, p. 56.

[116]  (75% RAPS * 1.1 RAPS Risk Score) + (25% CMS EDPS * 0.9 CMS EDPS Risk Score) = 1.05 Weighted Risk Score.

[117]  42 CFR § 422.310(g)(2)(ii).

1476

the deadline, CMS effectively retroactively adjusts the per member per month payments that it previously paid the plan.[118, 119]

### E. Matching Provider-Reported Encounters to Chart Review Records

80.    Defendants' Risk Adjustment Databases contain diagnosis codes from multiple sources, as discussed in **Section IV.D.i**. The same encounter may be associated with multiple sets of diagnosis codes, with variations in the diagnosis codes contained in each set. For example, an encounter in Defendants' Risk Adjustment Databases may be associated with (1) diagnosis codes reported by the provider; and (2) diagnosis codes identified as supported in the Chart Review Program. In order to compare the diagnosis codes reported by the provider and the diagnosis codes identified as supported in the Chart Review Program for a given encounter, I needed to address two issues arising from the structure of Defendants' databases.

81.    First, provider-reported encounters in Defendants' Risk Adjustment Databases do not contain encounter identifiers that allow direct linkage to Chart Review Program results Defendants' Risk Adjustment Databases or to Chart Review Program results in Defendants' Chart Review Databases. Because of this way in which Defendants structured these databases, connecting a provider-reported encounter to the Chart Review Program Coder's results for that same encounter necessitates taking additional analytic steps.

82.    Second, Defendants' databases do not consistently track provider information associated with records from the Chart Review Program. In particular, for records from the Chart Review Program in IRADS, the provider identified on the record was typically a "dummy" identifier such as 1099999, which bore no relationship to the actual provider who had the

---

[118]    Sedor Deposition, 79:9–14 ("Q. Okay. And when you say their processing closed period deletes, that is because you can't submit additional codes after the final submission deadline, but I think as you testified earlier you can submit deletes; right? A. Correct. Q. Okay. And functionally, what the rerun does is it's a rerun of that final reconciliation; is that right? A. Yes. Q. Okay. So functionally, it's retroactively adjusting the per member per month payments that the plan received for a given beneficiary in a given payment year; right? A. Yes, that's correct.").

[119]    During the CV program, it was Defendants' practice to submit "closed period" deletes. "Exhibit 712-5 of Bird Deposition," MARA2076620 ("Because of the nature of the CV process, closed period deletes are to be expected each year. This is because chart review is conducted up until the final sweep and the CV process occurs after the chart review is completed.").

1477

face-to-face encounter with the beneficiary.[120] Additionally, testimony and documents explain that the provider identifiers in Defendants' Chart Review Databases also do not always reflect the actual provider who had the face-to-face encounter with the beneficiary.[121] This is a result of Defendants' process for collecting Charts in the Chart Review Program, which sometimes grouped providers together under a single provider identifier.[122]

83.   Because of these issues, comparing the diagnosis codes on a provider-reported encounter to diagnosis codes identified in the Chart Review Program for that same encounter required that I develop methods of carefully matching these encounters, which are described in **Section VI.A.ii** and in **Appendix D, Section III.B.i**.

## V.   METHOD OVERVIEW

84.   As noted above, I have been asked to identify diagnosis codes that Defendants submitted to CMS and for which Defendants did not find support in their Chart Review Program. To be clear, my assignment was not to identify all diagnosis codes that Defendants submitted to CMS for which there may not be support. My assignment was limited to only diagnosis codes associated with Charts that Defendants reviewed in the Chart Review Program. As illustrated by **Exhibit 5** in **Section IV.A** above, which shows the number of Medicare Advantage beneficiaries listed in Defendants' annual public filings, not all of Defendants'

---

[120]   In Defendants' EDPS data, it is not clear how to distinguish records from the Chart Review Program from records from other sources.

[121]   "Exhibit 712-5 of Bird Deposition," MARA2076620 ("… providers are rolled up at the location level (based on address) and, we currently only capture the main (header) provider in ChartSync."); Bird Deposition Volume 1, 259:21–260:25 ("… there was a lack of -- because a lot of these claim systems came together through acquisition, there could be duplicative IDs across systems and the addition of things like, you know, a suffix, prefix to try and make it unique … So do you see a complete match in terms of what appears in the chart review system with what you see in IRADS? Probably not. But through these processes of crosswalk and enrichment, that's how the match was achieved. Q. Okay. And so it was considered a match even if the data element wasn't identical if you could, through the process of enrichment, remove a suffix or add a leading zero or do something of that nature that satisfied you that it was the same provider on both sides; is that right? … THE WITNESS: It would be sufficient to move to the next stage of the process.").

[122]   Production of Responses to Questions re: Document Request 4(C) – July 26th Letter, Attachment A, Sections A1, B2, B5, B6, C1, E, F, & K, August 26, 2016 B2, B5, B6, C1, E, F, & K, August 26, 2016, p. 5 ("… information from other providers (outside of the retrieval provider) may have been present and subsequently coded from the chart"); Baker Deposition Volume 1, 65:5–68:22, 110:3–128:21 ("[T]he chart that included the encounters with potentially multiple providers would all be -- would be assigned one retrieval provider ID, correct? A. It would be assigned one retrieval provider ID for that specific member-provider group location, but that member could have seen, you know, five different doctors.").

1478

beneficiaries were included in the Chart Review Program. My analysis pertains only to beneficiaries with Charts reviewed in the Chart Review Program.

85.    To identify the list of diagnosis codes that Defendants submitted to CMS for which Defendants did not find support in their Chart Review Program, my analysis proceeds, for each beneficiary in each year, in six steps.[123]

  i.   First, I match provider-reported encounters in Defendants' Risk Adjustment Databases to data from the Chart Review Program in order to identify a list of encounters that Defendants reviewed in their Chart Review Program ("Reviewed Encounters").

  ii.  Second, I identify the diagnosis codes that Defendants' Coders determined were supported by the beneficiary's Charts upon their review of those Charts ("Supported Diagnosis Codes").

  iii. Third, I identify the diagnosis codes that were submitted to CMS from these encounters and used to calculate risk scores ("Submitted Diagnosis Codes").

  iv.  Fourth, I compare these Submitted Diagnosis Codes to the Supported Diagnosis Codes to identify a list of "Potential Deletes." A diagnosis code is considered a Potential Delete if it is a Submitted Diagnosis Code from a Reviewed Encounter but *not* a Supported Diagnosis Code for a chart review corresponding to the same Reviewed Encounter.

  v.   Fifth, I classify diagnosis codes on the list of Potential Deletes according to the presence of other relevant diagnosis codes in Defendants' data that map to the same HCC.

  vi.  Sixth, I use this classification and additional criteria to create a final list of "Deletes" that is composed of some, but not all, of the diagnosis codes on the Potential Deletes list.

---

[123]   The method summarized herein provides an overview of the analytical steps I have undertaken. Further technical detail is provided in **Appendix D**, which along with the programs I have provided can be used to replicate my results.

86.    I then calculate the financial impact of these Deletes on the Part C and Part D payments that Defendants received from CMS. My financial analysis proceeds in three steps.

    i.    <u>First</u>, I calculate a revised risk score for each beneficiary, using the diagnosis codes that would have remained had Defendants submitted the Deletes to CMS.

    ii.    <u>Second</u>, I compare the revised risk score to the risk score used to calculate CMS' actual payment to Defendants, in order to calculate a change in risk score. As part of this step, I ensure I can replicate the calculation of the actual risk score for the beneficiaries on the Deletes list and filter out a small number of beneficiaries for whom I am unable to exactly replicate the risk score calculated by CMS.

    iii.    <u>Third</u>, I use the change in risk score to calculate the change in payment, which reflects the amount by which Defendants' risk adjustment payments would have been reduced had they submitted the Deletes to CMS.

87.    I then count the number of beneficiaries per year whose risk adjustment payments would have been reduced had Defendants submitted the Deletes to CMS.

88.    Finally, I was instructed to separately quantify the financial impact associated with the diagnosis codes on Defendants' CV Pipeline Lists.

89.    The remainder of this report explains this analysis in greater detail.

## VI.    METHOD FOR IDENTIFYING DELETES

### A.    Identification of Reviewed Encounters

90.    To identify Reviewed Encounters, I use data from two sources: Defendants' Risk Adjustment Databases and Defendants' Chart Review Databases.

#### i.    Identification of Encounters in Chart Review Data

91.    When Defendants' Coders reviewed a Chart in the Chart Review Program, the diagnosis codes that Coders found to be supported in the Chart were recorded in Defendants' Chart Review Databases. In general, the diagnosis codes found to be supported in the Chart were also passed into Defendants' Risk Adjustment Databases with an indicator that the record originated from the Chart Review Program. To identify the encounters reviewed in the Chart Review Program, I rely on both of these sources. I cannot exclusively rely on

1480

Defendants' Risk Adjustment Databases for two reasons. <u>First</u>, in some cases, the Coder identified no risk adjustment-eligible diagnosis codes on the Chart, and so no information about that review is recorded in Defendants' Risk Adjustment Databases, but the existence of that review *is* recorded in Defendants' Chart Review Databases. <u>Second</u>, in EDPS, Defendants' Risk Adjustment Database that was used for service years 2014-2016, there is no clear indicator for whether each record originated from the Chart Review Program, and thus I cannot rely on such records to identify encounters reviewed in the Chart Review Program. For these reasons, to identify the full set of encounters that were reviewed in the Chart Review Program, I supplement the data from the Chart Review Program in Defendants' Risk Adjustment Databases with the data in Defendants' Chart Review Databases.

92.    As discussed in **Section IV.A**, in Defendants' Chart Review Program, 65% of Charts for 2014-2016 service years were reviewed by a second blind Coder in Second Level Review. Defendants' Chart Review Databases for service years 2014-2016 contain an indicator to identify these Charts. When creating the list of Reviewed Encounters, I include an indicator for whether each encounter was identified in Defendants' Chart Review Databases as originating from a Chart that went through Second Level Review. [124]

93.    See **Appendix D, Section III.A.ii** for details on my use of Defendants' Chart Review Databases to identify encounters reviewed in the Chart Review Program, and identification of encounters subject to Second Level Review.

### ii.    Matching Encounters from Chart Review Data to Provider-Reported Encounters

94.    Having generated a list of encounters that were reviewed in the Chart Review Program, I then match these encounters to their corresponding provider-reported encounters in Defendants' Risk Adjustment Databases. I must match these encounters in order to later compare the diagnosis codes found to be supported in the Chart Review Program to the diagnosis codes reported by the provider for the same encounter. I apply the same method

---

[124]    Of the $997,051,302 total financial impact for Part C and Part D in service years 2014-2016 shown in **Exhibit 10**, $799,407,848 is associated with diagnosis codes submitted by Defendants to CMS associated with Charts that were reviewed in Defendants' Second Level Review program.

to match records from the Chart Review Program to each of Defendants' Risk Adjustment Databases, IRADS and EDPS.

95.    As discussed in **Section IV.E**, Defendants' Risk Adjustment Databases do not assign a unique encounter identifier to each encounter and do not consistently track provider information associated with each record. For these reasons, I employ two methodologies for matching encounters reviewed in the Chart Review Program to their associated encounters reported by providers.

96.    The first method matches the beneficiary identifier, date of service, and provider identifier associated with the provider-reported encounter in Defendants' Risk Adjustment Databases with the beneficiary identifier, date of service, and provider identifier associated with the Chart in Defendants' Chart Review Databases.[125] If these data elements match, I conclude that the provider-reported encounter in Defendants' Risk Adjustment Databases must be a Reviewed Encounter. See **Appendix D, Section III.C.i** for a detailed description and example of this method for identifying Reviewed Encounters.

97.    The second method of matching applies when all provider-reported diagnosis codes for a given beneficiary on a particular service date were reported by a single provider. I am able to ascertain whether a single provider reported all diagnosis codes on a given service date by counting the unique provider identifiers across all entries where Defendants' Risk Adjustment Databases indicate the encounter originated from a provider submission (and not another one of Defendants' Risk Adjustment programs, *i.e.*, Chart Review or CV). If Defendants' Risk Adjustment Databases indicate a single provider for all provider-reported diagnosis codes on a given service date, and Defendants' data also shows that a Chart with that service date was reviewed in the Chart Review Program, I conclude that the provider-reported encounter in Defendants' Risk Adjustment Databases must be a Reviewed

---

[125]    I rely on the records from the Chart Review Program in Defendants' Chart Review Databases for this matching method, as opposed to the chart review data in Defendants' Risk Adjustment Database, as provider identifier information was not always passed from Defendants' Chart Review Databases to Defendants' Risk Adjustment Databases.

1482

Encounter.[126] See **Appendix D, Section III.C.ii** for a detailed description and example of this method for identifying Reviewed Encounters.

98.   With these matching methods, I am able determine which provider-reported encounters in Defendants' Risk Adjustment Databases are Reviewed Encounters.[127]

99.   In some cases, I am able to match a provider-reported encounter to a corresponding record from the Chart Review Program using one or both of these methods, but I nevertheless do not include that encounter in the final list of Reviewed Encounters. For example, if it is not clear that the provider-reported encounter is risk adjustment-eligible (*e.g.*, it is not a face-to-face encounter with an acceptable provider specialty), I exclude it even if it clearly matches to an encounter reviewed in the Chart Review Program. See **Appendix D, Section III.B.i** for details on how I identify provider-reported, risk adjustment-eligible encounters.

100.  I also exclude from the final list of Reviewed Encounters all encounters for which the data from the Chart Review Program is potentially incomplete because the Coder was "informed." As discussed in **Section IV.A**, informed Coders were made aware of which diagnosis codes were already submitted to CMS for that beneficiary, and so, to avoid duplication, may not have recorded those diagnosis codes, resulting in an incomplete record of their findings. Therefore, I exclude the encounters on these Charts from the list of Reviewed Encounters.[128] See **Appendix D, Section III.A.iii** for details on my identification encounters subject to informed coding.

101.  Some encounters from the Chart Review Program were not matched to a provider-reported encounter in Defendants' Risk Adjustment Databases using these methods. Of the 76

---

[126]   The provider identifiers in the Reviewed Encounters identified under this second method do not always match the provider identifiers in their corresponding record from the Chart Review Program. This is an expected result, as Defendants have explained that that is because the chart review data does not always reflect the actual provider in the face-to-face encounter with the beneficiary. See **Section IV.E**.

[127]   Of the $2,135,252,375 total financial impact for Part C and Part D shown in **Exhibit 10**, $1,382,953,493 is associated with only method one.

[128]   Defendants produced data to identify the specific Charts that underwent informed coding, and I have excluded from the list of Reviewed Encounters every encounter associated with a Chart that Defendants' data identified as informed coded. Defendants have indicated that a small number of additional Charts were subject to informed coding during a pilot project that was operational for only one month in 2013. Should Defendants produce data identifying these, I may update my analyses to exclude them. Production of Responses and Documents Responsive to CR / CV Interrogatories 1(A), 1(E), 3(A)-(B), 3(E), 3(H), 3(M), and 6 and Document Requests 4(C)(iv)(n) and 5, January 29, 2016.

million beneficiary service dates in Defendants' Chart Review Databases for the at-issue service years, I was not able to identify a corresponding provider-reported encounter with the same service date in either of Defendants' Risk Adjustment Databases for approximately 16%. While these records from the Chart Review Program may correspond to a provider-reported encounter in Defendants' Risk Adjustment Database, they were not matched under either of my two methods. It is therefore possible that the final list of Reviewed Encounters undercounts the actual number of provider-reported encounters that Defendants reviewed in the Chart Review Program.

### B.  Identification of Supported Diagnosis Codes

102.  After identifying Reviewed Encounters, I compare the diagnosis codes reported by the provider to the diagnosis codes found to be supported in the Chart Review Program. If a diagnosis code was reported by the provider and was found to be supported in the Chart Review Program (either in the initial review or the Second Level Review), I consider the diagnosis code to be a Supported Diagnosis Code. See **Appendix D, Section IV** for a detailed description of how I identify Supported Diagnosis Codes.

### C.  Identification of Submitted Diagnosis Codes

103.  Next, I analyze Defendants' Risk Adjustment Databases to identify the diagnosis codes from Reviewed Encounters that Defendants submitted to CMS. Each of Defendants' Risk Adjustment Databases, IRADS and EDPS, contains fields that indicate whether each instance of a diagnosis code was submitted to, and accepted by, CMS. See **Appendix D, Section V** for details on how I identify these diagnosis codes.

### D.  Identification of Potential Deletes

104.  To identify Potential Deletes, I identify all diagnosis codes that are Submitted Diagnosis Codes but not Supported Diagnosis Codes (*i.e.*, all diagnosis codes from Reviewed Encounters that were submitted to CMS but were not found to be supported in the Chart Review Program).

105.  For example, if diagnosis code 436, *Acute, but ill-defined, cerebrovascular disease*, was reported by a provider and submitted to CMS, it would be on the Submitted Diagnosis Codes list. If the provider encounter that was the source of this code was matched to a

1484

Chart Review encounter, but the Chart Reviewer did not find support for diagnosis code 436, then diagnosis code 436 would not be on the Supported Diagnosis Codes list. Comparison of the Submitted Diagnosis Codes to the Supported Diagnosis Codes would therefore identify diagnosis code 436 as a Potential Delete. It remains to be determined, however, whether 436 should be on the final Deletes list.

### E. Classification of Potential Deletes

106. Next, I use three criteria related to HCC-mapping to classify the diagnosis codes on my list of Potential Deletes.[129] These criteria, which are not mutually exclusive, assess whether diagnosis codes on my list of Potential Deletes map to the same HCC as other diagnosis codes (or, in the instance of Claims Verification, other recorded HCCs) in Defendants' databases. Only Potential Deletes that do not meet any of these criteria are included in the final Deletes list.

### i. Potential Deletes Sharing HCCs with Other Submitted Diagnosis Codes

107. For the first criterion, I assess whether the diagnosis code, if deleted, would have an effect on the beneficiary's risk score and in turn, a financial impact on the risk adjustment payments Defendants received from CMS. A diagnosis code would not affect the beneficiary's risk score when deleted if it maps to the same HCC as another diagnosis code that is *not* on the Potential Deletes list and that was submitted to CMS for the beneficiary in the relevant year.[130] In this case, deleting the diagnosis code would not result in a deletion of the HCC for the beneficiary, and thus it would not impact financial payments from CMS, as it is the HCC that is relevant to the beneficiary's risk score, as explained in **Section III.B** above. For example, suppose diagnosis code 436, which maps to HCC 96, appears on the Potential Deletes list for a beneficiary. If diagnosis code 43491, which also maps to HCC 96, was also submitted for the beneficiary that year and does *not* appear on the Potential Deletes list, the deletion of diagnosis code 436 would have no effect on the beneficiary's risk score. I consider diagnosis codes on the Potential Deletes list that share an HCC with another submitted diagnosis code *not* on the Potential Deletes list to meet this first criterion.

---

[129]   While I refer to HCCs in this section, the same concepts and methods apply to RxHCCs for my Part D analysis.

[130]   For ease of exposition, I use the phrase "submitted to CMS" in this section to refer to diagnosis codes that were both submitted to CMS by Defendants' and accepted by CMS.

1485

108. To assess whether diagnosis codes on the Potential Deletes list meet this criterion, I examine the full set of diagnosis codes submitted to CMS for the beneficiary in the year. I identify these diagnosis codes in IRADS and EDPS following the method described in **Section VI.D** above, but do not limit to those associated with Reviewed Encounters or even provider-reported encounters. Diagnosis codes relevant to this assessment, like diagnosis code 43491 above, include diagnosis codes submitted from provider-reported, risk adjustment-eligible encounters, that I do not identify as Reviewed Encounters.[131] I also examine submitted diagnosis codes associated with other encounter types, including Chart Review encounters, in Defendants' Risk Adjustment Databases.

### ii. Potential Deletes Sharing HCCs with Other Unsubmitted Diagnosis Codes

109. The second criterion is similar to the first criterion in that I again assess whether the diagnosis code on the Potential Deletes list map to the same HCC as another diagnosis code in Defendants' databases. However, in contrast to the first criterion, the other diagnosis codes I examine for this second criterion are risk adjustment-eligible but were *not* submitted to CMS for the beneficiary in the relevant year. Since Potential Deletes only include codes submitted to CMS, these unsubmitted diagnosis codes would, by definition, not be on the Potential Deletes list. Continuing with the above example, I would consider diagnosis code 436 to meet this criterion – but not the first criterion – if diagnosis code 43491 was also observed in Defendants' databases as a risk adjustment-eligible diagnosis code, but had not been submitted to CMS.[132] In this case, the deletion of diagnosis code 436 could affect the beneficiary's risk score, depending on whether any other diagnosis codes, also mapping to HCC 96, were submitted to CMS that year. I consider diagnosis codes on the Potential Deletes list that share an HCC with another unsubmitted diagnosis code that is *not* on the Potential Deletes list to meet this second criterion.

---

[131] In addition to encounters that were not reviewed by Defendants, this set of encounters may include certain encounters that *were* reviewed as part of Defendants' Chart Review Program, but which I do not identify as Reviewed Encounters using either of my two methodologies.

[132] An instance of a diagnosis code may not have been submitted to CMS if it was a duplicate of a diagnosis code that Defendants already submitted for a beneficiary in the service year. Instances of diagnosis codes outside or Defendants' Risk Adjustment Databases are by definition unsubmitted.

1486

110. To assess whether diagnosis codes on the Potential Deletes list meet this criterion, I examine four types of unsubmitted diagnosis codes within and outside of Defendants' Risk Adjustment Databases:

    i. Diagnosis codes associated with chart review encounters in Defendants' Risk Adjustment Databases;

    ii. Diagnosis codes associated with provider-reported, risk adjustment-eligible encounters in Defendants' Risk Adjustment Databases;

    iii. Diagnosis codes from Defendants' Chart Review Databases that do not appear in Defendants' Risk Adjustment Databases; and

    iv. Diagnosis codes from Defendants' Provider-reported Claims databases that do not appear in Defendants' Risk Adjustment Databases.[133]

111. First, I examine unsubmitted diagnosis codes associated with chart review encounters in Defendants' Risk Adjustment Databases. Diagnosis codes associated with these encounters may be unsubmitted as a result of Defendants' policy to not submit duplicate diagnosis codes for a beneficiary.[134]

112. Second, I examine unsubmitted diagnosis codes associated with provider-reported, risk adjustment-eligible encounters in Defendants' Risk Adjustment Databases, including but not limited to those I identify as Reviewed Encounters. Diagnosis codes associated with provider-reported, risk adjustment-eligible encounters may be unsubmitted for the same reason that chart review encounters in Defendants' Risk Adjustment Databases were not submitted.

113. Third, I examine diagnosis codes from Defendants' Chart Review Databases that do not appear in Defendants' Risk Adjustment Databases. The absence of these codes in Defendants' Risk Adjustment Databases necessarily makes them unsubmitted. I rely on Defendants' Chart Review Databases to identify these diagnosis codes. In general, Defendants passed all diagnosis codes that were identified in the Chart Review Program

---

[133] Out of caution, I do not apply a risk adjustment-eligible requirement to these diagnosis codes.

[134] Bird Deposition Volume 1, 194:25–196:10.

into their Risk Adjustment Databases. However, Defendants held some diagnosis codes back and did not transmit them from their Chart Review Databases to their Risk Adjustment Databases. Regardless, I consider *all* diagnosis codes found by *any* of the Coders in my assessment, regardless of whether they were transmitted from Defendants' Chart Review Databases to its Risk Adjustment Databases.[135] The only diagnosis codes in this category which I do not consider are diagnosis codes which are not risk adjustment-eligible. As discussed in **Section IV.D**, Defendants had internal policies that governed which diagnosis code from Chart Review were submitted for risk adjustment through their Risk Adjustment Databases. In particular, Defendants had a policy not to submit diagnosis codes associated with unsigned Charts, as these diagnosis codes were not considered risk adjustment-eligible.[136, 137] Consistent with Defendants' policy, I do not examine these codes in my assessment of this criterion.[138]

114. <u>Fourth</u>, I examine diagnosis codes from Defendants' Provider-reported Claims databases that do not appear in Defendants' Risk Adjustment Databases. Like the third category, the absence of these diagnosis codes in Defendants' Risk Adjustment Databases necessarily means that these diagnosis codes were unsubmitted. I examine these diagnosis codes because deposition testimony in this matter has indicated that, for a period of time, some diagnosis codes reported by providers may not have been added to IRADS due to a technical issue.[139]

---

[135]  I include diagnosis codes associated with informed coded Charts as well.

[136]  Bird Deposition Volume 1, 217:9–221:19 ("Q. And if a chart was assigned one of those EO codes, the HCCs associated with that chart review were not included in the comparison list; right? A. At this point, correct.").

[137]  Defendants identified a specific set of "error and omission" codes which, when associated with a Chart or diagnosis code in chart review, would prevent transmission of those results to Defendants' Risk Adjustment Databases. Production of Responses to Questions re: Chart Reviewed File 4(C)(iv) – Chart Error & Omission Codes and Chart Reviewed File 4(C)(v) – Diagnosis Error & Omission Codes, December 1, 2016, p. 2.

[138]  If these diagnosis codes were examined in this step, the total financial impact for Part C and Part D would be reduced to $2,070,024,611.

[139]  Deposition of Marybeth Meyer, *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. 16-08697 FMO, June 7, 2022 ("Meyer Deposition"), 232:19–234:5 ("Well, the focus on the data issues really came with the implementation of the Encounter Data System. That was also one of the ways where we identified that the data being submitted to Optum and then being submitted to CMS via the new encounter data submitted system was -- had gaps in it.").

115. See **Appendix D, Section VII.A** for more details regarding these categories of unsubmitted diagnosis codes.

### iii. Potential Deletes Mapping to HCCs Recorded in Claims Verification

The third criterion relates to Defendants' Claims Verification program and therefore applies only to diagnosis codes on the Potential Deletes list with dates of service in 2011 and 2012. In particular, I assess whether any of these diagnosis codes map to an HCC that was found to be supported as part of the Claims Verification program. As discussed above in **Section IV.B**, the Claims Verification program identified support for diagnosis codes at the HCC level. To identify these HCCs, I use data in Defendants' Risk Adjustment Databases, as well as other data produced by Defendants that houses CV results. I consider diagnosis codes on the Potential Deletes list which share an HCC with one of these CV-recorded HCCs to meet this third criterion.

### F. Identification of Deletes

116. I identify as Deletes those diagnosis codes from the Potential Deletes list which did not meet *any* of the three criteria above. In other words, I identify Deletes as those diagnosis codes on the Potential Deletes list that do not share an HCC with any other submitted diagnosis code, do not share an HCC with any other risk adjustment-eligible but unsubmitted diagnosis code, *and* do not map to an HCC recorded in the Claims Verification program.[140] I also require that Deletes satisfy several additional checks, discussed below.

117. The first check pertains to service years 2014-2016, when both of Defendants' Risk Adjustment Databases – IRADS and EDPS – were in use. In these years, I identify Potential Deletes separately for each database, based on information in that database, as well as data

---

[140] Testimony indicates that this method also follows Defendants' practice during the operation of the CV program. Specifically, it is my understanding that Defendants would delete an HCC if a diagnosis code in that HCC was not supported by the medical record, and there were no other diagnosis codes in that HCC that were supported by the medical record. See Deposition of Rebecca Martin, *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. 16-08697 FMO, August 5, 2022 ("Martin Deposition"), 79:12–80:11 ("Q. And if it is the only diagnosis code that maps to the risk adjustment -- risk adjusting HCC, there's no other ones that can be submitted or take its place, is it your understanding that a diagnosis that's not supported by medical record documentation needs to be deleted? … THE WITNESS: In the context of what you just described where it is the only diagnosis code that supports the HCC, there's no other X19 or other risk adjusting transaction that would otherwise support the HCC and we learn that the HCC is no longer supported or that there's something about the medical record that cannot support the condition, then yes, there would be an expectation that upon learning of that information, we would delete the code.").

external to both of Defendants' Risk Adjustment Databases. I use the same method to identify Potential Deletes for each database, which was specifically designed to limit false positives. However, the structural differences between the two databases introduce the possibility that a given diagnosis code, which is submitted to and accepted by CMS in both systems, meets one or more of the criteria from **Section VI.E** in one system but none of the criteria from **Section VI.E** in the other system. Out of an abundance of caution, I do not consider such diagnosis code to be a Delete in either system.

118. I also do not consider as Deletes any of the following:[141]

    i.   Diagnosis codes that did not impact risk adjustment payments for the beneficiary, including diagnosis codes for newly enrolled beneficiaries;[142]

    ii.   Diagnosis codes associated with beneficiaries who were not enrolled in a Medicare Advantage plan (or in the case of Part D, a MA-PD plan) for the whole year;

    iii.   Diagnosis codes associated with beneficiaries who were not enrolled in Defendants' plans during the year; and

    iv.   Diagnosis codes associated with beneficiaries with end stage renal disease, whose risk adjustment payments are not determined by the CMS HCC Model or the CMS RxHCC Model.

119. My final list of Deletes can be found in **Attachment 1**.[143, 144]

---

[141]  See **Appendix D, Section VIII** for a description of how I identify the referenced groups of beneficiaries.

[142]  Sedor Deposition, 90:13–17 ("Not all risk scores are calculated using HCCs if the person is newly aged into Medicare and is only 65. I believe for the first year of their enrollment they are not getting a risk score based on any HCCs.").

[143]  There is a separate list for each year at issue in this matter. There are also separate lists for each of Defendants' Risk Adjustment Databases. Each list contains columns indicating whether the diagnosis code is a Delete under each CMS model.

[144]  As explained in **Section VII** below, the final Deletes list is limited to beneficiaries for whom I can perfectly replicate actual risk scores. The final Deletes list for Part D additionally excludes diagnosis codes which only impact Part D risk scores and which are associated with beneficiaries enrolled in MA-PD plans for which changes in risk corridor payments fully offset changes in direct subsidy payments.

## VII. CALCULATING FINANCIAL IMPACT OF DEFENDANTS' FAILURE TO SUBMIT DELETES

120. I rely on data and publicly available computer programs from CMS to calculate the amount of risk adjustment payments that Defendants retained for the Deletes.[145] I proceed as follows.

121. <u>First</u>, I calculate a revised risk score for each beneficiary, based on a list of diagnosis codes that does *not* include diagnosis codes on the Deletes list.

122. <u>Second</u>, I compare the revised risk score to the actual risk score that was used by CMS in order to calculate the actual per member per month payment for that beneficiary (*i.e.*, the risk score that was calculated based on diagnosis codes that Defendants submitted to CMS, which includes the diagnosis codes on the Deletes list). I calculate the change in risk score as the actual risk score used by CMS to calculate the payment, minus the revised risk score. As part of this step, I ensure I can replicate actual risk scores calculated by CMS for beneficiaries on the Deletes list and filter out a small number of beneficiaries for whom I am unable to do so.

123. <u>Third</u>, I use the change in risk score to calculate a change in the per member per month payment for each beneficiary. I then aggregate across all beneficiaries to calculate the amount of risk adjustment payments that Defendants retained for the Deletes across all years.

124. I perform these steps for Part C and for Part D separately, and then aggregate the results to calculate the amount of risk adjustment payments that Defendants retained for the Deletes for Part C and Part D combined.

### A. Revised Risk Scores

125. To calculate a revised risk score for each beneficiary, I begin with a list of unique diagnosis codes that Defendants submitted to CMS based on the data in their Risk Adjustment Databases, and I remove the diagnosis codes that appear on the Deletes list. Then, using CMS' Risk Adjustment Database I identify and add to this list all diagnosis codes that other

---

[145] "Medicare risk adjustment information," Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare/payment/medicare-advantage-rates-statistics/risk-adjustment, downloaded on June 16, 2023.

1491

MAOs submitted to CMS for the beneficiary in the relevant service year (these may exist if the beneficiary switched plans mid-year).[146] I input this list of diagnosis codes into the publicly available CMS HCC Model and CMS RxHCC Model computer programs discussed in **Section III.B**, which calculate the beneficiary's risk score.[147]

126.  As discussed in **Section III.B**, these computer programs require information on the beneficiary's demographics.[148] I rely on a CMS-produced database called MARx ("Medicare Advantage Prescription Drug System"), as well as other data produced by CMS to obtain information on the beneficiary's demographics and input that into CMS' computer program along with the list of diagnosis codes.

127.  See **Appendix D, Section IX.A** for detailed information about how I identify diagnosis codes that Defendants submitted to CMS, how I identify diagnosis codes that other MAOs submitted to CMS, how I identify beneficiary demographic information in MARx, and how I use the CMS HCC Model and CMS RxHCC Model computer programs to calculate a risk score for each beneficiary and how I replicate the additional adjustments CMS applies to calculate a final risk score.

128.  I calculate a Part C revised risk score and as relevant, a Part D revised risk score for each beneficiary in each year.

### B.  Changes in Risk Scores

129.  Having calculated a revised risk score for each beneficiary based on the list of diagnosis codes that does not include the diagnosis codes on the Deletes list, I subtract each revised risk score from the actual risk score that was used by CMS in order to calculate the actual

---

[146]  Some beneficiaries may also have switched mid-year from or to a Traditional Medicare plan. I do not have data on those diagnosis codes and therefore drop these beneficiaries from my analyses and do not calculate any financial impact associated with them.

[147]  As discussed in **Section IV.D**, for service year 2014, submitted diagnosis codes were pooled from CMS' two Risk Adjustment Databases to calculate a single risk score. Therefore, for service year 2014, I pool diagnosis codes from both databases to input into CMS' models. For service years 2015 and 2016, when two separate risk scores were calculated and then weighted, I perform this step twice, once using diagnosis codes submitted by Defendants from IRADS and diagnosis codes submitted by other MAOs from RAPS, and once using diagnosis codes submitted by Defendants from EDPS and diagnosis codes submitted by other MAOs from CMS EDPS.

[148]  "Medicare risk adjustment information," Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare/payment/medicare-advantage-rates-statistics/risk-adjustment, downloaded on June 16, 2023.

per member per month payment for that beneficiary (*i.e.*, the risk score that was calculated based on diagnosis codes that Defendants submitted to CMS, which includes the diagnosis codes on the Deletes list). The actual risk score that was used by CMS to calculate each beneficiary's actual payment can be derived from CMS' MARx database.[149] See **Appendix D, Section IX.B** for detailed information on how I derived the actual risk score that was used by CMS for payment.

130. By subtracting the revised risk score from the actual risk score that was used by CMS for payment, I obtain a change in risk score for each beneficiary. This represents the change in risk score that would have occurred had Defendants submitted the diagnosis codes identified on the Deletes list as deletes to CMS. I calculate a Part C change in risk score and a Part D change in risk score for each beneficiary in each year.

131. As a confirmatory step, for each beneficiary, I also rerun CMS' computer programs using the full set of diagnosis codes that Defendants and other MAOs submitted to CMS, and the demographic information from MARx, to ensure that I can replicate exactly the MARx-derived risk score that was actually used by CMS to calculate payments. This ensures that the change in risk score that I calculate for each beneficiary is entirely attributable to the change in the list of diagnosis codes input into CMS' computer programs (*i.e.*, entirely due to Defendants' failure to submit the Deletes), and not some other inaccuracies in demographic data in MARx or missing diagnosis codes from other MAOs. I am able to exactly replicate approximately 98% of the actual risk scores used by CMS for payment.[150] I conservatively remove from my analysis any beneficiary whose risk score I was not able to perfectly replicate, such that these beneficiaries are not included in the final list of Deletes or my quantification of financial impact of the Deletes. See **Appendix D, Section IX** for detailed information on how I replicated risk scores.

---

[149]  Sedor Deposition, 97:4–12 ("The MARX system is a CMS system that they utilize to generate the payments on a monthly basis.").

[150]  This reflects the number of beneficiary months in which I am able to replicate Part C risk scores across all years, using the diagnosis codes in IRADS/RAPS or diagnosis codes in EDPS/CMS EDPS. I exclude from this calculation beneficiaries who were not enrolled in one of Defendants' plans for the entirety of the year, as well as beneficiaries who were enrolled in Traditional Medicare at any point during the year. It also excludes beneficiaries who are not on either the CMS HCC Model or the CMS RxHCC model, such as beneficiaries with end stage renal disease or on hospice or newly enrolled in Medicare.

1493

### C. Changes in Payment for Part C

132. Having calculated a change in each beneficiary's Part C risk score that is attributable to Deletes, I multiply it by the plan's base rate to calculate a change in payment. The base rate for plans is generally available in the MARx database, but in some cases, it is not. In cases where the plan base rate is not available in the MARx database, I derive it using other variables that are available. See **Appendix D, Section IX.C** for details on how I derive the base rate when it is not available.

133. Across all beneficiaries and years, I calculate an aggregated Part C change in payments of $2,109,423,348. This represents the total amount by which Defendants' Part C risk adjustment payments from CMS would have been reduced had Defendants submitted the diagnosis codes identified on the Deletes list as deletes to CMS.

### D. Changes in Payment for Part D

134. Similar to Part C, having calculated a change in each beneficiary's Part D risk score that is attributable to Deletes, I multiply it by the plan's base rate to calculate a change in payment. As discussed above in **Section III.B**, under Part D, the base rate includes two elements, both of which are determined by the beneficiary's risk score: the direct subsidy, paid by CMS, and the beneficiary premium, paid by the beneficiary. I separately calculate the change in CMS' payment and the change in beneficiary payments based on the change in risk score. Across all of Defendants plans in all years of my analysis, I calculate the change in beneficiary payments to be $28,927,661. In other words, had Defendants submitted the diagnosis codes on the Deletes list, beneficiaries on Defendants' plans would have, in aggregate, paid $28,927,661 less in premiums. Because this cost was not covered by CMS, it is not subject to the risk corridors payments discussed in **Section III.B.ii**. It is also not included in my final calculations of the financial impact of Defendants' failure to submit Deletes, as my assignment was to assess the financial impact to CMS, not beneficiaries on Defendants plans.

135. For the CMS portion of Part D payments, as a final step, I calculate the change in payment that results from the application of risk corridors. I calculate this change at the plan level, rather than the beneficiary level consistent with how CMS calculates risk corridors. As described in **Section III.B.ii**, the size of the gap between a plan's target spending and actual

spending affects the profit sharing between MAOs and CMS. As a plan's target spending amount depends on risk adjustment payments, a change to risk adjustment payments may impact this profit sharing. I therefore calculate a change in risk corridor payments for each of Defendants' Part D plans based on their calculated change in risk adjustment payments, including both the change in direct subsidies and the change in beneficiary premiums. I then calculate each plan's change in Part D payments from CMS as the change in their direct subsidy payments less the change in their risk corridor payments. For some plans, the change in risk corridor payments offsets the entire change in direct subsidy payments, and I remove beneficiaries associated with those plans from the Deletes list as explained below in **Section VII.E**. See **Appendix D, Section IX.D** for a detailed description of how I calculate changes in Part D payments, including these risk corridor payments.

136. Across all beneficiaries and years, after accounting for risk corridors, I calculate an aggregated Part D change in CMS payments of $25,829,027.[151] This represents the total amount by which Defendants' Part D risk adjustment payments from CMS would have been reduced had Defendants submitted the diagnosis codes identified on the Deletes list as deletes to CMS.

### E.  Total Financial Impact of Defendants' Failure to Submit Deletes

137. I calculate the amount that was retained by Defendants by not deleting the diagnosis codes identified as Deletes in my analysis by summing the Part C and Part D payment amounts calculated above. **Exhibit 10** shows these amounts by year. See **Attachment 2** for a list of these amounts by year and contract. See **Attachment 3** for a list of these amounts by beneficiary, year, and contract.[152]

---

[151]  Prior to the application of risk corridors, this amounts to $67,445,692.

[152]  There is a separate list for each year at issue in this matter. Because risk corridors are applied at the plan level rather than the beneficiary level, the Part D amounts in these lists do not account for risk corridor payments.

**Exhibit 10**
**Total Financial Impact of Defendants' Failure to Submit Deletes**

| Service Year | Part C | Part D | Total |
|---|---|---|---|
| 2008 | $82,582,771 | $1,997,923 | $84,580,694 |
| 2009 | $147,171,500 | $3,001,475 | $150,172,975 |
| 2010 | $331,821,261 | $6,781,677 | $338,602,938 |
| 2011 | $100,694,304 | $1,595,961 | $102,290,264 |
| 2012 | $214,581,077 | $2,512,619 | $217,093,696 |
| 2013 | $242,617,635 | $2,842,871 | $245,460,506 |
| 2014 | $272,202,891 | $1,214,241 | $273,417,133 |
| 2015 | $322,034,749 | $2,507,514 | $324,542,263 |
| 2016 | $395,717,161 | $3,374,745 | $399,091,906 |
| | | | |
| **TOTAL** | **$2,109,423,348** | **$25,829,027** | **$2,135,252,375** |

## VIII. CALCULATING THE NUMBER OF BENEFICIARIES YEAR-BY-YEAR FOR WHOM DEFENDANTS WOULD HAVE RECEIVED REDUCED RISK ADJUSTMENT PAYMENTS FROM CMS

138. As stated above, I was also asked to calculate the number of beneficiaries in each payment year for whom Defendants would have received reduced risk adjustment payments from CMS had they submitted the Deletes.

139. Because I have already calculated the total amount that was retained by Defendants by not deleting the diagnosis codes identified as Deletes across all beneficiaries, determining the total number of impacted beneficiaries is straightforward. For each year, I sum the total number of unique beneficiaries who have at least one Delete, as reflected in **Attachment 1**.

140. Individual beneficiaries are counted once per year if they have a change in their risk score for Part C and/or Part D. Thus, a beneficiary enrolled in an MA-PD plan who has a change in both their Part C risk score and Part D risk score would be counted once not twice. I make one exception to this counting rule, which pertains to beneficiaries enrolled in MA-PD plans for which changes in risk corridor payments fully offset changes in direct subsidy payments for Part D. These beneficiaries are only counted if they have a change in their Part C risk score, as the changes in their Part D risk scores do not impact Part D payments due to the risk corridors.

141. For payment years 2009-2017, the total number of beneficiaries counted year-by-year where the beneficiary's risk score would have changed *and* for whom Defendants would have received reduced risk adjustment payments, either under Part C or Part D or both, had Defendants submitted the Deletes is 1,132,418. **Exhibit 11** shows the number of beneficiaries by year.

**Exhibit 11**
**Total Beneficiaries Resulting in a Payment Change Due to
Defendants' Failure to Submit Deletes**

| Service Year | Part C | Part D | Total |
|:---:|:---:|:---:|:---:|
| 2008 | 24,579 | 58,012 | 66,013 |
| 2009 | 44,549 | 102,395 | 116,115 |
| 2010 | 98,171 | 154,091 | 187,372 |
| 2011 | 32,418 | 59,046 | 70,832 |
| 2012 | 70,663 | 78,282 | 107,894 |
| 2013 | 90,731 | 95,960 | 134,036 |
| 2014 | 104,298 | 96,640 | 144,945 |
| 2015 | 107,152 | 64,628 | 135,361 |
| 2016 | 134,592 | 82,555 | 169,850 |
| **TOTAL** | **707,153** | **791,609** | **1,132,418** |

Note: total counts do not equal the sum of counts for Part C and Part D for the reasons described in Paragraph 140.

## IX.    CALCULATING FINANCIAL IMPACT OF DELETING DIAGNOSIS CODES ON DEFENDANTS' CV PIPELINE LISTS

142. As stated above, I was also asked to separately calculate the financial impact on Defendants' Medicare Advantage and Medicare Part D risk adjustment payments resulting from their failure to delete the diagnosis codes on Defendants' CV Pipeline Lists.[153]

143. One of these lists includes "2011 [service date] encounters in RAPS for which the multi-stage CV process was begun but not completed" at the time Defendants terminated their CV program.[154] The other list "includes a complete list of all identified 2012 [service date]

---

[153]    MARA2164481; MARA2160501.

[154]    Production of Replacement File for MARA2117116, September 30, 2016, p. 1.

1497

In Process CV Encounters or CV Cancelled Deletes with Part C financial impact."[155] The second list includes approximately 800 encounters that "were not reviewed by any coder as part of the CV process."[156]

144. Had Defendants deleted the diagnosis codes on these lists, the risk adjustment payments Defendants received from CMS would have been reduced by $36,032,222 in 2011 and $152,370,126 in 2012 for Part C and Part D, or $188,402,348 in aggregate across the two years.[157]

Signed on September 29, 2023.

_____

Craig Garthwaite

---

[155] Response to Follow Up Questions on March 18, 2016 Letter re: 2012 DOS Encounters Identified for CV Review, May 27, 2016, p. 1.

[156] *Ibid.*, p. 2.

[157] The value associated with the 800 diagnosis codes on the 2012 service date list that Defendants identified as not reviewed by any coded as part of the CV process are associated with $955,195 of this total.

**APPENDIX A**
**CRAIG GARTHWAITE**
Strategy Department
Kellogg School of Management, Northwestern University
2211 Campus Drive, Evanston, IL 60208
Email: c-garthwaite@kellogg.northwestern.edu

---

**APPOINTMENTS**

Kellogg School of Management, Northwestern University
*Professor of Strategy,* 2020 - Present
*Herman R. Smith Research Professor in Hospital and Health Services,* 2017-Present
*Director, Program on Healthcare at Kellogg,* 2016 - Present
*Associate Professor of Strategy (with tenure),* 2016 – 2020
*Assistant Professor of Strategy,* 2010 - 2016
*Senior Lecturer and Donald P. Jacobs Scholar in Management and Strategy*, 2009 - 2010

National Bureau of Economic Research
*Research Associate,* 2016-Present
*Faculty Research Fellow,* 2011-2016

Institute for Policy Research, Northwestern University
*Faculty Associate,* 2015 - Present

**EDUCATION**

Ph.D. Economics, University of Maryland at College Park, 2009
M.A. Economics, University of Maryland at College Park, 2008
M.P.P Gerald R. Ford School of Public Policy at the University of Michigan, 2001
B.A. Political Science, cum laude, University of Michigan, 2000

**PUBLIC SERVICE**

Member, Aspen Economic Strategy Group (2021 – Present)

Member, Congressional Budget Office Panel of Healthcare Advisers (2020 – Present)

Member, Congressional Budget Office Technical Review Panel for the Health Insurance
Simulation Model (2018-2020)

Member, Health Affairs Council on Spending and Value (2018-2023)

Testimony, United States House of Representatives, 2018
- House Judiciary Committee, Subcommittee on Regulatory Reform, Commercial and
Antitrust Law: "Competition in the Pharmaceutical Supply Chain: The Proposed
Merger of CVS Health and Aetna"

Testimony, United States House of Representatives, 2019
- House Judiciary Committee, Subcommittee on Regulatory Reform, Commercial and
Antitrust Law: "Diagnosing the Problem: Exploring the Effects of Consolidation and
Anticompetitive Conduct in Health Care Markets"

1499

Testimony, United States Senate, 2019
- Senate Judiciary Committee, Subcommittee on Antitrust, Competition Policy, and Consumer Rights: "Your Doctor/Pharmacist/Insurer Will See You Now: Competitive Implications of Vertical Consolidation in the Healthcare Industry"

Testimony, United States House of Representatives, 2019
- House Education and Labor Committee, Subcommittee on Health, Education, Labor and Pensions: "Making Health Care More Affordable: Lowering Drug Prices and Increasing Transparency"

Testimony, United States House of Representatives, 2021
- House Oversight and Reform Committee "Unsustainable Drug Prices (Part III)"

Testimony, United States Senate, 2022
- Senate Committee on Commerce, Science, and Transportation's Consumer Protection, Product Safety, and Data Security Subcommittee: "Ensuring Fairness and Transparency in the Market for Prescription Drugs"

Testimony, United States Senate, 2023
- Senate Committee on Health, Education, Labor, and Pensions: "Taxpayers paid billions for it: So why is Moderna considering quadrupling the price of the COVID vaccine?"

## ACADEMIC PUBLICATIONS

"The Impact of Early Discharge Laws on the Health of Newborns," (with William Evans and Heng Wei), *Journal of Health Economics,* 2008, 27(4): 843-870.

"The Economic Benefits of Pharmaceutical Innovations: The Case of Cox-2 Inhibitors," *American Economic Journal: Applied Economics,* 2012, 4(3): 116-137.

"Empirical Evidence on the Value of Pharmaceuticals," (with Mark Duggan), in *The [Oxford] Handbook of the Economics of the Biopharmaceutical Industry*: Oxford University Press: Oxford, 2012: 463-492.

"The Doctor Might See You Now: The Supply Side Effects of Public Health Insurance Expansions." *American Economic Journal: Economic Policy* 2012, 4(3): 190-217.

"Heterogeneity in the Benefits of Greater Treatment Intensity" (with William Evans), *The Review of Economics and Statistics,* 2012, 94(3): 635-649.

"Can Celebrity Endorsements Affect Political Outcomes: Evidence from the 2008 US Democratic Presidential Primary," (with Tim Moore), *The Journal of Law, Economics, and Organizations,* 2013, 29(2): 355-384.

"Demand Spillovers, Combative Advertising, and Celebrity Endorsements," *American*

*Economic Journal: Applied Economics,* 2014, 6(2): 76-104.

"Giving Mom a Break: The Effect of Higher EITC Payments on Maternal Health" (with William Evans), *American Economic Journal: Economic Policy,* 2014, 6(2): 258-290.

"Public Health Insurance, Labor Supply, and Employment Lock," (with Tal Gross and Matthew Notowidigdo), *Quarterly Journal of Economics*, 2014, 129(2): 653-696.

"Health Spending Slowdown Is Mostly Due to Economic Factors, Not Structural Change in the Health Care Sector" (with David Dranove and Christopher Ody), *Health Affairs,* 2014, 33(8): 1399-1406.

"The Economic Downturn and its Lingering Effects Reduced Medicare Spending Growth by $4 Billion In 2009–12," (with David Dranove and Christopher Ody), *Health Affairs*, 2015, 34(8): 1368-1375.

"Investment Subsidies and the Adoption of Electronic Medical Records in Hospitals." (with David Dranove, Chris Ody, and Bingyang Li), *Journal of Health Economics,* 2015, 44: 309-19.

"The Market Impacts of Product Patents in Developing Countries," (with Mark Duggan and Aparajita Goyal), A*merican Economic Review*, 2016, 106(1): 99-135

"The Black/White Educational Gap, Stalled Progress, and the Long Term Consequences of the Emergence of Crack Markets," (with William Evans and Timothy J. Moore), *The Review of Economics and Statistics*, 2016, 98(5): 832-847.

"Affordable Care Act's Medicaid Expansion Led to Substantial Decreases in Uncompensated Care but Levels and Many Hospitals Remain High," (with David Dranove and Christopher Ody), *Health Affairs,* 2016, 35(8): 1471-1479.

"How do Hospitals Respond to Negative Financial Shocks? The Impact of the 2008 Stock Market Crash (with David Dranove and Christopher Ody)," *The RAND Journal of Economics*, 2017, 48(2): 485–525.

"Insurance Expansion and Hospital Emergency Department Access: Evidence from the Affordable Care Act," (with John Graves, Tal Gross, and Matthew Notowidigdo), *Annals of Internal Medicine,* Feb 7 2017, 166(3):172-179

"Success and Failure in the Insurance Exchanges (with John Graves)," *New England Journal of Medicine,* March 9, 2017, 376(10):907-910

"The Economics of Indication Based Pricing (with Amitabh Chandra)," *New England Journal of Medicine,* July 2017, 377(2):103-106.

"Hospitals as Insurers of Last Resort," (with Tal Gross and Matthew Notowidigdo), *American Economic Journal: Applied Economics,* 2018, 10(1): 1-39.

"The CVS–Aetna Merger: Another Large Bet on the Changing U.S. Health Care Landscape," (with Austin Frakt), *Annals of Internal Medicine,* January 9, 2018.

"The Orphan Drug Act at 35: Observations and an Outlook for the Twenty-First Century," (with Nicholas Bagley, Benjamin Berger, Amitabh Chandra, and Ariel D. Stern) in *Innovation Policy and the Economy*, 2018, Volume 19, pages 97-137, National Bureau of Economic Research, Inc.

"Characterizing the Drug Development Pipeline for Precision Medicine, (with Chandra, Amitabh, Garthwaite, Craig and Stern, Ariel Dora Stern), *Economic Dimensions of Personalized and Precision Medicine,* 2018, National Bureau of Economic Research, Inc.

"It's Time to Reform the Orphan Drug Act," (with Nicholas Bagley, Amitabh Chandra, and Ariel D. Stern), *NEJM Catalyst*, Dec 19, 2018.

"Economic Principles for Medicare Reform (with Amitabh Chandra)," *ANNALS of the American Academy of Political and Social Science,* 2019, 686(1): 63-92.

"All Medicaid Expansions Are Not Created Equal: The Geography and Targeting of the Affordable Care Act," *Brookings Papers on Economic Activity,* Fall 2019 (with John Graves, Tal Gross, Zeynal Karaca, Victoria Marone, and Matthew Notowidigdo)

"The Economics of Medicare for All," book chapter in *Maintaining the Strength of American Capitalism* published by the *Aspen Economic Strategy Group*, eds. Melissa Kearney and Amy Ganz, December 2019.

"Insurance access and demand response: Price and welfare implications," (with David Dranove and David Besanko), *Journal of Health Economics,* 2020, 73.

"The Economics of Medical Procedure Innovation," (with David Dranove, Christopher Heard, and Bingxiao Wu), *Journal of Health Economics,* January 2022, Vol. 81.

Guns and Violence: The Enduring Impact of Crack Cocaine Markets on Young Black Males, (with Bill Evans and Timothy J. Moore), *Journal of Public Economics,* February 2022, vol. 206.

"Endogenous Quality Investments in the US Hospital Market," (with Chris Ody and Amanda Starc), *Journal of Health Economics,* July 2022, 84:10236.

"Does consumer demand pull scientifically novel drug innovation?," (with David Dranove and Manuel Hermosilla), *RAND Journal of Economics*, August 18 2022, Vol. 53 Issue 3.

"The Returns to Medical Inventions," (with David Dranove and Binxiao Wu), *The Journal of Law & Economics*, November 2022, Vol 65 Num. S2.

"Expected Profits and The Scientific Novelty of Innovation," NBER Working Paper #27093, (with David Dranove and Manuel Hermosilla), forthcoming, *RAND Journal of Economics*

## WORKING PAPERS

"Regulatory Approval and Expanded Market Size," NBER Working Paper #28889 (with Amitabh Chandra and Benjamin Berger)

"Who Profits From Amateurism: Rent-Sharing in Modern College Sports," NBER Working Paper #27734 (with Jordan Keener Matthew J. Notowidigdo Nicole F. Ozminkowski), *revise and resubmit, American Economic Journal: Applied Economics*

"The Impact of Private Contracting on Healthcare for the Old and Sick: Evidence from California's Medicaid Program" (with Mark Duggan and Adelina Wang)

"Reinsuring the Insurers of Last Resort" (with Chris Ody and David Dranove)

"The Opportunities and Limitations of Monopsony Power in Healthcare: Evidence from the United States and Canada," July 2019 (with Jillian Chown, David Dranove, and Jordan Keener)

"Artificial Intelligence, the Evolution of the Healthcare Value Chain, and the Future of the Physician," NBER Working Paper #30607 (with David Dranove)

## OTHER PUBLICATIONS

The Impact of the ACA's Medicaid Expansion on Hospitals' Uncompensated Care Burden and the Potential Effects of Repeal (with David Dranove and Christopher Ody), *Commonwealth Fund Issue Brief*, May 2017.

"A Floor and Trade Proposal for Hospital Charity Care," The Hamilton Project working paper.

## CASES

*Wildcat Physical Therapy* (with Dylan Duffy), 2019

*Evaluating Vertical Integration at AB-Inbev Across the Globe* (with Sarit Markovich, Eugenio Gomez A Latorre, and Andrea Meyer), 2018, Kellogg 5-118-002)

*Consumer Cost Sharing in Health Insurance* (with Chris Ody), 2018

*Quality Provision in the Nursing Home Industry* (with Chris Ody), 2017

*Renal Care in the United States, 2020*

*Sovaldi: Pricing a Breakthrough Drug* (with Meghan Busse), 2015

*The Global Aircraft Manufacturing Industry, 2002-2011* (with Jen Brown), 2012. Kellogg Case #5-312-505.

*Starbucks: A Story of Growth,* (with Jen Brown and Meghan Busse), 2011. Kellogg Case #5-211-259.

## PERMANENT WORKING PAPERS

Pharmaceutical Profits and the Social Value of Innovation, NBER Working Paper #20212, (with David Dranove and Manuel Hermosilla)

"The Effect of In-Utero Conditions on Long Term Health: Evidence from the 1918 Spanish Flu Pandemic," April 2008 (First Draft, July 2007).

## TEACHING

Core Business Strategy (STRT 431), Kellogg School of Management, 2009-Present
Foundations of Strategy, Kellogg-HKUST EMBA, 2016-Present
Strategy Frameworks Kellogg EMBA, 2017-Present
Healthcare Strategy (STRT 443), Kellogg School of Management, 2017-Present
Healthcare Strategy (STRTX 945), Kellogg School of Management EMBA, 2017-Present
Value Creation and Capture in Biopharmaceuticals (HCAK 960), 2022 - Present

## HONORS AND AWARDS

Sidney J. Levy Teaching Award for Electives, 2021
Kellogg Chairs' Core Course Teaching Award, 2019
Lavengood Professor of the Year Finalist, 2019
Lavengood Professor of the Year Finalist, 2018
Kellogg Faculty Impact Award, Healthcare Strategy, 2018
Sidney J. Levy Teaching Award for Electives, 2017
*Poets and Quants* 40 Best Under 40 Professors, 2015
Kellogg Faculty Impact Teaching Award, Business Strategy, 2012
Kellogg Faculty Impact Teaching Award, Business Strategy, 2012
Kellogg Chairs' Core Course Teaching Award, 2011
International Institute of Public Finance (IIPF) Young Economists Award, 2011
Kellogg Faculty Impact Teaching Award, Business Strategy, 2010
University of Maryland Third Year Paper Fellowship

## INVITED PRESENTATIONS

2008:  University of Notre Dame
2009:  Chicago Booth Graduate School of Business
2010:  University of Wisconsin-Madison, Dartmouth College, University of Notre Dame
2011:  AEA Annual Meeting, University of Illinois-Chicago, Olin Business School at Washington University, Harris School of Public Policy at the University of Chicago, Indiana University SPEA, National Tax Association Annual Meeting, AcademyHealth Research Insights Meeting
2012:  AEA Annual Meeting (Presenter and Discussant), Society of Labor Economists Annual Meeting, NBER Summer Institute, University of Illinois Urbana-Champaign, University of California-Davis, Columbia University

2013:   University of Chicago Health Economics Workshop, University of British Columbia, University of California-San Diego, University of Kentucky, Texas A&M University, Wharton School of the University of Pennsylvania, University of Maryland, Brookings Institution, UC-Davis Poverty Center
2014:   AEA Annual Meeting, Northwestern Law School, RAND Corporation, Rice University/University of Houston, HDMS User Forum, Bates/White Life Science Conference, Vanderbilt University, University of Michigan RWJF Scholars, Northwestern University Economics Department
2015:   AEA Annual Meeting, Stanford University, University of California-Irvine, MIT/BU Health Economics Seminar, Syracuse University, NBER Summer Institute, UT-Austin, University of Maryland
2016:   Harris School of Public Policy at the University of Chicago, Owen School of Management, Vanderbilt University.
2017:   National Tax Association Annual Meeting
2018:   University of Georgia, Auburn University, Harvard University, Boston University, American Enterprise Institute, University of Southern California
2019:   American Medical Association, Ohio State University, University of Louisville, Emory University, Aspen Ideas Festival, Aspen Economic Strategy Group, University of Utah, Aspen Ideas Festival, Aspen Ideas Health Festival, Aspen Economic Strategy Group
2020:   Harris School of Public Policy at the University of Chicago
2022:   The Wharton School

## ACADEMIC ACTIVITIES

Co-Editor, *Journal of Public Economics*, (2016 – 2020)

Reviewer: *American Economic Review, Quarterly Journal of Economics; Journal of Political Economy; Econometrica; Review of Economic Studies; New England Journal of Medicine, The Journal of Public Economics; American Economic Journal: Economic Policy; Health Affairs; The Review of Economics and Statistics; The Journal of Industrial Economics; The Journal of Health Economics; The Journal of Human Resources; Journal of Policy Analysis and Management; International Journal of Industrial Organization; Health Economics; Social Science and Medicine; Economic Inquiry*

## PAST EMPLOYMENT

Employment Policies Institute, Washington, DC
    *Director of Research and Chief Economist*, 2003-2005
Public Sector Consultants, Lansing, MI
    *Economist,* 2002-2003

## OUTSIDE ACTIVITIES

Affiliated Consultant, Analysis Group (2018-Present)
Consultant for Wal-Mart Inc. (2019-2020)
Eli Lilly Advisory Board (2020)
Janssen Advisory Board (2021 - Present)

Speaking engagements for Allergan, Alexion, Digestive Health Professionals Association
National Pharmaceutical Council, Wisconsin Association of Health Plans, Great American
Insurance.

# APPENDIX B
## EXPERT CONSULTING AND TESTIMONY

1. (Presentation) Marshfield Clinic Zoning Appeal, Oneida County Planning and Development committee, Oneida County, WI, December 14, 2017 (on behalf of appellant).

2. (Deposition testimony) *In Re*: United States of America ex rel. Frank M. Rembert and Michael R. Paradise vs. Bozeman Health Deaconess Hospital D/B/A Bozeman Health and Deaconess-Intercity Imaging, LLC. D/B/A Advanced Medical Imaging, United States District Court, District of Montana, Butte Division, Case No. 2:15-cv-00080-SHE, December 11, 2015 (on behalf of Relators).

3. (Testimony) Before the House Judiciary Committee, Subcommittee on Regulatory Reform, Commercial and Antitrust Law, February 27, 2018.

4. (Testimony) Before the House Judiciary Committee, Subcommittee on Regulatory Reform, Commercial and Antitrust Law, March 7, 2019.

5. (Deposition testimony) *In Re*: National Prescription Opiate Litigation, United States District Court, Northern District of Ohio, Eastern Division, MDL No. 2804 Case No 17-MD-2804, June 7, 2019 and July 14, 2021 (on behalf of Defendant CVS).

6. (Testimony) Before the Senate Judiciary Committee, Subcommittee on Antitrust, Competition Policy, and Consumer Rights, June 12, 2019.

7. (Testimony) Before the United States House of Representatives, House Education and Labor Committee, Subcommittee on Health, Education, Labor and Pensions, September 26, 2019.

8. (Testimony) Before the House Oversight and Reform Committee, May 18, 2021.

9. (Deposition testimony) State of Florida, Office of the Attorney General, Department of Legal Affairs v. Purdue Pharma L.P. et al., in the Circuit Court of the Sixth Judicial Circuit in for Pasco County, Florida, Case No. 2018-CA-001438, December 13, 2021 (on behalf of Defendant CVS).

10. (Testimony) Before the Senate Committee on Commerce, Science, and Transportation's Consumer Protection, Product Safety, and Data Security Subcommittee, May 5, 2022.

11. (Testimony) Before the Senate Committee on Health, Education, Labor, and Pensions, March 22, 2023.

# APPENDIX C

## MATERIALS RELIED UPON

**Legal Documents**

42 CFR § 406.10.
42 CFR § 406.11.
42 CFR § 406.12.
42 CFR § 406.13.
42 CFR § 406.5.
42 CFR § 422 et seq.
42 CFR § 422.254 et seq.
42 CFR § 422.304 et seq.
42 CFR § 422.308(a).
42 CFR § 422.310(a)-(b).
42 CFR § 422.310(g)(2)(ii).
42 CFR § 423.286.
42 CFR § 423.329(a).
42 CFR § 423.336(a)(2).
42 CFR §§ 422.300 - 422.308.
42 USC § 1395c et seq.
42 USC § 1395c.
42 USC § 1395w et seq.
42 USC § 1395w-23.
42 USC § 1395w-24 et seq.
42 USC § 426 et seq.
*Chart Sync and Medical Record Manager*, UnitedHealth Group, December 16, 2014.
Deposition of Biggs T. Cannon, III 30(b)(6), *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. CV 16-08697 FMO, June 6, 2023.
Deposition of Biggs T. Cannon, III 30(b)(6), *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. CV 16-08697 FMO, June 7, 2023.
Deposition of Jon H. Bird 30(b)(6), *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. CV 16-08697 FMO, June 22, 2023.
Deposition of Kathleen O. Baker 30(b)(6), *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, Case No. 2:16-cv-08697-FMO-SS, May 30, 2023.
Deposition of Kathleen O. Baker 30(b)(6) *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, Case No. 2:16-cv-08697-FMO-SS, May 31, 2023.
Deposition of Marybeth Meyer, *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. 16-08697 FMO, June 7, 2022.
Deposition of Melissa Sedor 30(b)(6), *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. CV 16-08697 FMO, June 29, 2023.
Deposition of Rebecca Martin, *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. 16-08697 FMO, August 5, 2022.
*Ingenix Risk Adjustment Data System ("IRADS")*, UnitedHealth Group, December 16, 2014.
Production of Replacement File for MARA2117116, September 30, 2016.
Production of Responses and Documents Responsive to CR / CV Document Request 4(C) for 2010 DOS, May 2, 2016.

1508

Production of Responses and Documents Responsive to CR / CV Interrogatories 1(A), 1(E), 3(A)-(B), 3(E), 3(H), 3(M), and 6 and Document Requests 4(C)(iv)(n) and 5, January 29, 2016.

Production of Responses and Documents Responsive to CR / CV Interrogatories 1(F),1(J), 1(K) and Document Requests 4(C)(iii)(t), 4(C)(vii)(i), 5, and 6(D), December 21, 2015.

Production of Responses and Documents Responsive to CR / CV Interrogatory 1(F) and Document Requests 4(C)(iv)(n) and 4(C)(vii)(i), March 31, 2016.

Production of Responses to Questions re: Chart Reviewed File 4(C)(iv) – Chart Error & Omission Codes and Chart Reviewed File 4(C)(v) – Diagnosis Error & Omission Codes, December 1, 2016.

Production of Responses to Questions re: Document Request 4(C) – July 26th Letter, Attachment A, Sections A1, B2, B5, B6, C1, E, F, & K, August 26, 2016.

Production of Responses to Questions re: Document Request 4(C) – July 26th Letter, Attachment A, Sections B3, H, I, and J, September 23, 2016.

Response to Follow Up Questions on March 18, 2016 Letter re: 2012 DOS Encounters Identified for CV Review, May 27, 2016.

United States' Amended Complaint-In-Partial-Intervention and Demand for Jury Trial, *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. CV 16-08697 MWF (SSx), November 17, 2017.

UnitedHealth's First Supplemental Responses and Objections to Plaintiff United States' Sixth Set of Interrogatories, *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, CASE NO. CV 16-08697 (SSx), July 19, 2022.


**Financial Documents**

UnitedHealth Group Incorporated Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2010, filed February 10, 2011, https://www.sec.gov/Archives/edgar/data/731766/000119312511030615/d10k.htm, accessed September 29, 2023.

UnitedHealth Group Incorporated, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2011, filed February 8, 2012, https://www.sec.gov/Archives/edgar/data/731766/000073176612000009/unh2011123110 k.htm, accessed September 29, 2023.

UnitedHealth Group Incorporated, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2012, filed February 6, 2013, https://www.sec.gov/Archives/edgar/data/731766/000073176613000005/unh2012123110 -k.htm, accessed September 29, 2023.

UnitedHealth Group Incorporated, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2013, filed February 12, 2014, https://www.sec.gov/Archives/edgar/data/731766/000073176614000008/unh2013123110 -k.htm, accessed September 29, 2023.

UnitedHealth Group Incorporated, Annual Report Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2014, filed
February 10, 2015,
https://www.sec.gov/Archives/edgar/data/731766/000073176615000007/unh2014123110
-k.htm, accessed September 29, 2023.

UnitedHealth Group Incorporated, Annual Report Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2015, filed
February 9, 2016,
https://www.sec.gov/Archives/edgar/data/731766/000073176616000058/unh2015123110
-k.htm, accessed September 29, 2023.

UnitedHealth Group Incorporated, Annual Report Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2016, filed
February 8, 2017,
https://www.sec.gov/Archives/edgar/data/731766/000073176617000009/unh2016123110
-k.htm, accessed September 29, 2023.


**Public Documents**

"2006-2011 Model Software/ICD-9-CM Mappings," *Centers for Medicare & Medicaid Services*,
https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/risk-adjustors-
items/risk2006-2011, accessed September 25, 2023.

"Advance Notice of Methodological Changes for Calendar Year (CY) 2010 for Medicare
Advantage (MA) Capitation Rates and Part C and Part D Payment Policies," Centers for
Medicare & Medicaid Services, February 20, 2009,
https://www.cms.gov/medicare/health-
plans/medicareadvtgspecratestats/downloads/advance2010.pdf, accessed September 26,
2023.

"Advance Notice of Methodological Changes for Calendar Year (CY) 2014 for Medicare
Advantage (MA) Capitation Rates, Part C and Part D Payment Policies and 2014 Call
Letter," Centers for Medicare & Medicaid Services, February 15, 2013,
https://www.cms.gov/medicare/health-
plans/medicareadvtgspecratestats/downloads/advance2014.pdf, accessed September 29,
2023.

"Advance Notice of Methodological Changes for Calendar Year (CY) 2015 for Medicare
Advantage (MA) Capitation Rates, Part C and Part D Payment Policies and 2015 Call
Letter," Centers for Medicare & Medicaid Services, February 21, 2014,
https://www.cms.gov/medicare/health-
plans/medicareadvtgspecratestats/downloads/advance2015.pdf, accessed September 28,
2023.

"Announcement of Calendar Year (CY) 2008 Medicare Advantage Capitation Rates and
Payment Policies," Centers for Medicare & Medicaid Services, April 2, 2007,
https://www.cms.gov/Medicare/Health-
Plans/MedicareAdvtgSpecRateStats/downloads/announcement2008.pdf, accessed
September 5, 2023.

"Announcement of Calendar Year (CY) 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," Centers for Medicare & Medicaid Services, April 1, 2013, https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/announcement2014.pdf, accessed September 14, 2023.

"Announcement of Calendar Year (CY) 2015 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," Centers for Medicare & Medicaid Services, April 7, 2014, https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/announcement2015.pdf, accessed September 14, 2023.

"Announcement of the August 2019 Software Release," Centers for Medicare & Medicaid Services, July 29, 2019, https://www.cms.gov/Research-Statistics-Data-and-Systems/CMS-Information-Technology/mapdhelpdesk/Downloads/Announcement-of-the-August-2019-Software-Release.pdf, accessed September 29, 2023.

"Announcements and Documents," *Centers for Medicare & Medicaid Services*, September 6, 2023, https://www.cms.gov/medicare/payment/medicare-advantage-rates-statistics/announcements-and-documents, accessed September 29, 2023.

"Apply for Medicare Part D Extra Help program," *The United States Social Security Administration*, https://www.ssa.gov/medicare/part-d-extra-help, accessed September 29, 2023.

"CMS Manual System Transmittal 118," *Department of Health & Human Services and Centers for Medicare & Medicaid Services*, September 19, 2014, https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R118MCM.pdf, accessed June 30, 2022.

"CMS Releases 2024 Projected Medicare Part D Premium and Bid Information," *Centers for Medicare & Medicaid Services*, July 31, 2023, https://www.cms.gov/newsroom/fact-sheets/cms-releases-2024-projected-medicare-part-d-premium-and-bid-information, accessed September 28, 2023.

"CPT code 99212: Established patient office visit, 10-19 minutes," *American Medical Association*, https://www.ama-assn.org/practice-management/cpt/cpt-code-99212-established-patient-office-visit-10-19-minutes, accessed September 25, 2023.

"Data Dictionary for CJR Baseline, Monthly, Target Price, and Reconciliation Reports," *U.S. Department of Health & Human Services*, December 21, 2018, https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/cjr%20data%20dictionary%2012%2021%2018.html, accessed September 25, 2023.

"Medicare Advantage Promoting Interoperability Programs," *Centers for Medicare & Medicaid Services*, September 6, 2023, https://www.cms.gov/medicare/regulations-guidance/promoting-interoperability-programs/medicare-advantage, accessed September 28, 2023.

"Medicare Managed Care Manual Chapter 7 - Risk Adjustment," *Centers for Medicare & Medicaid Services*, September 19, 2014, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c07.pdf, accessed October 15, 2022.

"Medicare Risk Adjustment Eligible CPT/HCPCS Codes," *Centers for Medicare & Medicaid Services*, https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/risk-adjustors-items/cpt-hcpcs, accessed September 18, 2023.

"Medicare risk adjustment information," *Centers for Medicare & Medicaid Services*, https://www.cms.gov/medicare/payment/medicare-advantage-rates-statistics/risk-adjustment.

"NPPES NPI Registry," *Centers for Medicare & Medicaid Services*, https://npiregistry.cms.hhs.gov/search, accessed September 25, 2023.

"Part D Payment System," *Medicare Payment Advisory Commission*, November 2021, https://www.medpac.gov/wp-content/uploads/2021/11/medpac_payment_basics_21_partd_final_sec.pdf, accessed August 29, 2022.

"Understanding the Medicare Beneficiary Identifier (MBI) Format," *Centers for Medicare & Medicaid Services*, https://www.cms.gov/medicare/new-medicare-card/understanding-the-mbi.pdf, accessed September 25, 2023.

"Why SAS," *SAS*, 2023, https://www.sas.com/en_us/company-information/why-sas.html, accessed September 25, 2023.

*2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide*, Centers for Medicare & Medicaid Services, January 1, 2008, https://www.hhs.gov/guidance/document/2008-risk-adjustment-data-technical-assistance-medicare-advantage-organizations, accessed September 5, 2023.

Clerveau, Gabrielle, Nancy Ochieng, Juliette Cubanski, and Tricia Neuman, "A Snapshot of Sources of Coverage Among Medicare Beneficiaries," *Henry J. Kaiser Family Foundation*, August 14, 2023, https://www.kff.org/medicare/issue-brief/a-snapshot-of-sources-of-coverage-among-medicare-beneficiaries/, accessed September 28, 2023.

Duggan, Mark, Craig Garthwaite, and Adelina Yanyue Wang, "Heterogeneity in the Impact of Privatizing Social Health Insurance: Evidence from California's Medicaid Program," *NBER Working Paper Series*, No. 28944, June 2021.

Ellen, Stephanie, "Definition of Medicare HIC Number," *Sapling*, https://www.sapling.com/7890627/definition-medicare-hic-number, accessed September 25, 2023.

Garthwaite, Craig, Christopher Ody, and Amanda Starc, "Endogenous Quality Investments in the U.S. Hospital Market," *Journal of Health Economics*, Vol. 84, No. 102636, May 14, 2022.

Garthwaite, Craig, David Dranove, and Christopher Ody, "The Economic Downturn And Its Lingering Effects Reduced Medicare Spending Growth By $4 Billion In 2009–12," *Health Affairs*, Vol. 34, No. 8, August 2015, pp. 1368-1375, https://www.healthaffairs.org/doi/10.1377/hlthaff.2015.0100.

Hayford, Tamara Beth, and Alice Levy Burns, "Medicare Advantage Enrollment and Beneficiary Risk Scores: Difference-in-Differences Analyses Show Increases for All Enrollees On Account of Market-Wide Changes," *The Journal of Health Care Organization, Provision, and Financing*, Vol. 55, No. I-II, June 22, 2018.

*NPI: What You Need to Know*, Centers for Medicare & Medicaid Services, March 2022, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/NPI-What-You-Need-To-Know.pdf, accessed September 25, 2023.

*Plan Communication User Guide for Medicare Advantage Prescription Drug Plans*, Centers for Medicare & Medicaid Services, August 30, 2019, https://www.cms.gov/Research-Statistics-Data-and-Systems/CMS-Information-

Technology/mapdhelpdesk/Downloads/Plan-Communication-User-Guide-v132-August-30-2019.pdf, accessed September 25, 2023.

*Report to Congress: Risk Adjustment in Medicare Advantage*, Centers for Medicare & Medicaid Services, December 2021, https://www.cms.gov/files/document/report-congress-risk-adjustment-medicare-advantage-december-2021.pdf, accessed June 30, 2022.

Rice, Cheri, "Final Encounter Data Diagnosis Filtering Logic," *Centers for Medicare & Medicaid Services*, December 22, 2015, https://www.csscoperations.com/internet/cssc3.nsf/files/Final%20Industry%20Memo%20Medicare%20Filtering%20Logic%2012%2022%2015.pdf/$FIle/Final%20Industry%20Memo%20Medicare%20Filtering%20Logic%2012%2022%2015.pdf, accessed October 15, 2022.

*Risk Adjustment for EDS & RAPS User Group*, Centers for Medicare & Medicaid Services, August 15, 2019, https://www.csscoperations.com/internet/csscw3_files.nsf/F/CSSC081519_RAWebSlides_5CR_082019.pdf/$FILE/081519_RAWebSlides_5CR_082019.pdf, accessed September 25, 2023.

*Risk Adjustment for EDS & RAPS User Group*, Centers for Medicare & Medicaid Services, November 17, 2016, https://www.csscoperations.com/internet/cssc3.nsf/files/RA_Slides_111716_5CR_111816.pdf/$FIle/RA_Slides_111716_5CR_111816.pdf, accessed September 28, 2023.

Selvaraj, Natassha, "What is SQL Used For? 7 Top SQL Uses," *Datacamp*, October 2022, https://www.datacamp.com/blog/what-is-sql-used-for, accessed September 25, 2023.

*Sharing Risk in Medicare Part D Chapter 6*, Medpac, June 2015, https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/chapter-6-sharing-risk-in-medicare-part-d-june-2015-report-.pdf, accessed September 26, 2023.

**Data**

2018_0917 - 2008 - 2009 DOS Production Tracker_P6000706.xlsx.

**Bates-Stamped Documents**
**United**

| | | |
|---|---|---|
| MAPL000724236 | MAPL002077009 | MAPL002077035 |
| MAPL000724237 | MAPL002077017 | MAPL002077036 |
| MAPL000724238 | MAPL002077018 | MAPL002077037 |
| MAPL002077000 | MAPL002077019 | MAPL002077038 |
| MAPL002077001 | MAPL002077023 | MAPL002077039 |
| MAPL002077002 | MAPL002077024 | MAPL002077040 |
| MAPL002077003 | MAPL002077025 | MAPL002077041 |
| MAPL002077004 | MAPL002077026 | MAPL002077049 |
| MAPL002077005 | MAPL002077027 | MAPL002077050 |
| MAPL002077006 | MAPL002077032 | MAPL002077051 |
| MAPL002077007 | MAPL002077033 | MAPL002077052 |
| MAPL002077008 | MAPL002077034 | MAPL002077053 |

| | | |
|---|---|---|
| MAPL002077054 | MAPL002077148 | MAPL002077235 |
| MAPL002077055 | MAPL002077153 | MAPL002077236 |
| MAPL002077056 | MAPL002077154 | MAPL002077247 |
| MAPL002077065 | MAPL002077155 | MAPL002077248 |
| MAPL002077066 | MAPL002077156 | MAPL002077249 |
| MAPL002077067 | MAPL002077161 | MAPL002077250 |
| MAPL002077068 | MAPL002077162 | MAPL002077255 |
| MAPL002077069 | MAPL002077163 | MAPL002077256 |
| MAPL002077070 | MAPL002077164 | MAPL002077257 |
| MAPL002077071 | MAPL002077165 | MAPL002077258 |
| MAPL002077072 | MAPL002077166 | MAPL002077259 |
| MAPL002077073 | MAPL002077167 | MAPL002077260 |
| MAPL002077083 | MAPL002077168 | MAPL002077261 |
| MAPL002077084 | MAPL002077169 | MAPL002077262 |
| MAPL002077085 | MAPL002077170 | MAPL002077263 |
| MAPL002077086 | MAPL002077171 | MAPL002077273 |
| MAPL002077087 | MAPL002077172 | MAPL002077274 |
| MAPL002077088 | MAPL002077185 | MAPL002077275 |
| MAPL002077089 | MAPL002077186 | MAPL002077276 |
| MAPL002077097 | MAPL002077187 | MAPL002077277 |
| MAPL002077098 | MAPL002077188 | MAPL002077278 |
| MAPL002077099 | MAPL002077189 | MAPL002077279 |
| MAPL002077100 | MAPL002077190 | MAPL002077280 |
| MAPL002077101 | MAPL002077191 | MAPL002077281 |
| MAPL002077102 | MAPL002077192 | MAPL002077282 |
| MAPL002077103 | MAPL002077193 | MAPL002077283 |
| MAPL002077104 | MAPL002077194 | MAPL002077284 |
| MAPL002077105 | MAPL002077195 | MAPL002077285 |
| MAPL002077106 | MAPL002077207 | MAPL002077286 |
| MAPL002077117 | MAPL002077208 | MAPL002077287 |
| MAPL002077118 | MAPL002077209 | MAPL002077288 |
| MAPL002077119 | MAPL002077210 | MAPL002077289 |
| MAPL002077120 | MAPL002077211 | MAPL002077290 |
| MAPL002077121 | MAPL002077212 | MAPL002077291 |
| MAPL002077122 | MAPL002077213 | MAPL002077292 |
| MAPL002077123 | MAPL002077214 | MAPL002077293 |
| MAPL002077131 | MAPL002077215 | MAPL002077294 |
| MAPL002077132 | MAPL002077216 | MAPL002077295 |
| MAPL002077133 | MAPL002077227 | MAPL002077296 |
| MAPL002077134 | MAPL002077228 | MAPL002077297 |
| MAPL002077135 | MAPL002077229 | MAPL002077298 |
| MAPL002077136 | MAPL002077230 | MAPL002077299 |
| MAPL002077137 | MAPL002077231 | MAPL002077317 |
| MAPL002077145 | MAPL002077232 | MAPL002077318 |
| MAPL002077146 | MAPL002077233 | MAPL002077319 |
| MAPL002077147 | MAPL002077234 | MAPL002077320 |

| | | |
|---|---|---|
| MAPL002077321 | MAPL002077417 | MAPL002077507 |
| MAPL002077322 | MAPL002077418 | MAPL002077508 |
| MAPL002077323 | MAPL002077419 | MAPL002077509 |
| MAPL002077331 | MAPL002077420 | MAPL002077515 |
| MAPL002077332 | MAPL002077421 | MAPL002077516 |
| MAPL002077333 | MAPL002077422 | MAPL002077517 |
| MAPL002077334 | MAPL002077423 | MAPL002077521 |
| MAPL002077335 | MAPL002077431 | MAPL002077522 |
| MAPL002077336 | MAPL002077432 | MAPL002077523 |
| MAPL002077337 | MAPL002077433 | MAPL002077524 |
| MAPL002077338 | MAPL002077434 | MAPL002077525 |
| MAPL002077347 | MAPL002077435 | MAPL002077526 |
| MAPL002077348 | MAPL002077436 | MAPL002077527 |
| MAPL002077349 | MAPL002077437 | MAPL002077535 |
| MAPL002077350 | MAPL002077438 | MAPL002077536 |
| MAPL002077351 | MAPL002077439 | MAPL002077537 |
| MAPL002077352 | MAPL002077449 | MAPL002077538 |
| MAPL002077353 | MAPL002077450 | MAPL002077539 |
| MAPL002077354 | MAPL002077451 | MAPL002077540 |
| MAPL002077355 | MAPL002077452 | MAPL002077541 |
| MAPL002077356 | MAPL002077453 | MAPL002077542 |
| MAPL002077357 | MAPL002077454 | MAPL002077551 |
| MAPL002077358 | MAPL002077455 | MAPL002077552 |
| MAPL002077359 | MAPL002077456 | MAPL002077553 |
| MAPL002077373 | MAPL002077465 | MAPL002077554 |
| MAPL002077374 | MAPL002077466 | MAPL002077555 |
| MAPL002077375 | MAPL002077467 | MAPL002077556 |
| MAPL002077376 | MAPL002077468 | MAPL002077557 |
| MAPL002077377 | MAPL002077469 | MAPL002077558 |
| MAPL002077383 | MAPL002077470 | MAPL002077559 |
| MAPL002077384 | MAPL002077471 | MAPL002077560 |
| MAPL002077385 | MAPL002077479 | MAPL002077561 |
| MAPL002077386 | MAPL002077481 | MAPL002077573 |
| MAPL002077387 | MAPL002077483 | MAPL002077575 |
| MAPL002077388 | MAPL002077484 | MAPL002077576 |
| MAPL002077389 | MAPL002077485 | MAPL002077577 |
| MAPL002077397 | MAPL002077486 | MAPL002077578 |
| MAPL002077398 | MAPL002077487 | MAPL002077579 |
| MAPL002077399 | MAPL002077488 | MAPL002077580 |
| MAPL002077400 | MAPL002077489 | MAPL002077581 |
| MAPL002077401 | MAPL002077497 | MAPL002077582 |
| MAPL002077402 | MAPL002077498 | MAPL002077583 |
| MAPL002077403 | MAPL002077499 | MAPL002077584 |
| MAPL002077404 | MAPL002077500 | MAPL002077585 |
| MAPL002077405 | MAPL002077505 | MAPL002077593 |
| MAPL002077406 | MAPL002077506 | MAPL002077594 |

| | | |
|---|---|---|
| MAPL002077595 | MAPL002077687 | MAPL002077778 |
| MAPL002077596 | MAPL002077688 | MAPL002077780 |
| MAPL002077601 | MAPL002077689 | MAPL002077782 |
| MAPL002077602 | MAPL002077690 | MAPL002077784 |
| MAPL002077603 | MAPL002077691 | MAPL002077785 |
| MAPL002077604 | MAPL002077698 | MAPL002077788 |
| MAPL002077605 | MAPL002077699 | MAPL002077790 |
| MAPL002077611 | MAPL002077700 | MAPL002077791 |
| MAPL002077612 | MAPL002077701 | MAPL002077794 |
| MAPL002077615 | MAPL002077702 | MAPL002077796 |
| MAPL002077617 | MAPL002077703 | MAPL002077798 |
| MAPL002077618 | MAPL002077704 | MAPL002077800 |
| MAPL002077619 | MAPL002077712 | MAPL002077802 |
| MAPL002077623 | MAPL002077713 | MAPL002077804 |
| MAPL002077624 | MAPL002077714 | MAPL002077806 |
| MAPL002077625 | MAPL002077715 | MAPL002077808 |
| MAPL002077626 | MAPL002077716 | MAPL002077810 |
| MAPL002077631 | MAPL002077722 | MAPL002077811 |
| MAPL002077632 | MAPL002077723 | MAPL002077813 |
| MAPL002077633 | MAPL002077726 | MAPL002077814 |
| MAPL002077634 | MAPL002077727 | MAPL002077817 |
| MAPL002077635 | MAPL002077728 | MAPL002077819 |
| MAPL002077641 | MAPL002077732 | MAPL002077821 |
| MAPL002077642 | MAPL002077734 | MAPL002077823 |
| MAPL002077645 | MAPL002077735 | MAPL002077825 |
| MAPL002077646 | MAPL002077738 | MAPL002077827 |
| MAPL002077647 | MAPL002077740 | MAPL002077828 |
| MAPL002077648 | MAPL002077741 | MAPL002077831 |
| MAPL002077653 | MAPL002077742 | MAPL002077832 |
| MAPL002077654 | MAPL002077743 | MAPL002077833 |
| MAPL002077655 | MAPL002077744 | MAPL002077834 |
| MAPL002077656 | MAPL002077745 | MAPL002077839 |
| MAPL002077657 | MAPL002077746 | MAPL002077840 |
| MAPL002077663 | MAPL002077752 | MAPL002077843 |
| MAPL002077664 | MAPL002077754 | MAPL002077845 |
| MAPL002077665 | MAPL002077755 | MAPL002077847 |
| MAPL002077666 | MAPL002077758 | MAPL002077848 |
| MAPL002077667 | MAPL002077759 | MAPL002077849 |
| MAPL002077668 | MAPL002077760 | MAPL002077850 |
| MAPL002077675 | MAPL002077761 | MAPL002077852 |
| MAPL002077676 | MAPL002077766 | MAPL002077854 |
| MAPL002077678 | MAPL002077767 | MAPL002077856 |
| MAPL002077679 | MAPL002077768 | MAPL002077858 |
| MAPL002077680 | MAPL002077772 | MAPL002077860 |
| MAPL002077681 | MAPL002077773 | MAPL002077862 |
| MAPL002077686 | MAPL002077776 | MAPL002077864 |

| | | |
|---|---|---|
| MAPL002077866 | MAPL002077949 | MAPL002078031 |
| MAPL002077867 | MAPL002077952 | MAPL002078032 |
| MAPL002077868 | MAPL002077953 | MAPL002078045 |
| MAPL002077874 | MAPL002077956 | MAPL002078046 |
| MAPL002077877 | MAPL002077957 | MAPL002078047 |
| MAPL002077878 | MAPL002077958 | MAPL002078048 |
| MAPL002077879 | MAPL002077962 | MAPL002078049 |
| MAPL002077882 | MAPL002077964 | MAPL002078055 |
| MAPL002077884 | MAPL002077965 | MAPL002078056 |
| MAPL002077886 | MAPL002077966 | MAPL002078057 |
| MAPL002077887 | MAPL002077967 | MAPL002078058 |
| MAPL002077888 | MAPL002077972 | MAPL002078063 |
| MAPL002077892 | MAPL002077973 | MAPL002078064 |
| MAPL002077893 | MAPL002077974 | MAPL002078067 |
| MAPL002077894 | MAPL002077975 | MAPL002078069 |
| MAPL002077895 | MAPL002077976 | MAPL002078071 |
| MAPL002077896 | MAPL002077982 | MAPL002078072 |
| MAPL002077897 | MAPL002077984 | MAPL002078075 |
| MAPL002077898 | MAPL002077985 | MAPL002078077 |
| MAPL002077899 | MAPL002077986 | MAPL002078078 |
| MAPL002077900 | MAPL002077990 | MAPL002078079 |
| MAPL002077902 | MAPL002077991 | MAPL002078085 |
| MAPL002077904 | MAPL002077992 | MAPL002078086 |
| MAPL002077905 | MAPL002077993 | MAPL002078087 |
| MAPL002077906 | MAPL002077994 | MAPL002078088 |
| MAPL002077907 | MAPL002077998 | MAPL002078089 |
| MAPL002077908 | MAPL002078000 | MAPL002078090 |
| MAPL002077909 | MAPL002078002 | MAPL002078091 |
| MAPL002077914 | MAPL002078003 | MAPL002078092 |
| MAPL002077915 | MAPL002078004 | MAPL002078093 |
| MAPL002077916 | MAPL002078005 | MAPL002078094 |
| MAPL002077917 | MAPL002078006 | MAPL002078095 |
| MAPL002077922 | MAPL002078007 | MAPL002078096 |
| MAPL002077923 | MAPL002078008 | MAPL002078097 |
| MAPL002077926 | MAPL002078009 | MAPL002078098 |
| MAPL002077927 | MAPL002078010 | MAPL002078100 |
| MAPL002077930 | MAPL002078011 | MAPL002078101 |
| MAPL002077931 | MAPL002078012 | MAPL002078102 |
| MAPL002077934 | MAPL002078019 | MAPL002078103 |
| MAPL002077935 | MAPL002078020 | MAPL002078104 |
| MAPL002077938 | MAPL002078023 | MAPL002078105 |
| MAPL002077939 | MAPL002078024 | MAPL002078106 |
| MAPL002077940 | MAPL002078027 | MAPL002078107 |
| MAPL002077941 | MAPL002078028 | MAPL002078108 |
| MAPL002077942 | MAPL002078029 | MAPL002078109 |
| MAPL002077948 | MAPL002078030 | MAPL002078110 |

MAPL002078111
MAPL002078112
MAPL002078113
MAPL002078114
MAPL002078115
MAPL002078116
MAPL002078117
MAPL002078118
MAPL002078119
MAPL002078120
MAPL002078121
MAPL002078122
MAPL002078123
MAPL002078124
MAPL002078125
MAPL002078126
MAPL002078127
MAPL002078128
MAPL002078129
MAPL002078130
MAPL002078131
MAPL002078132
MAPL002078133
MAPL002078134
MAPL002078135
MAPL002078136
MAPL002078137
MAPL002078138
MAPL002078139
MAPL002078140
MAPL002078141
MAPL002078142
MAPL002078143
MAPL002078144
MAPL002078145
MAPL002078146
MAPL002078147
MAPL002078148
MAPL002078149
MAPL002078150
MAPL002078151
MAPL002078152
MAPL002078153
MAPL002078154
MAPL002078155
MAPL002078156

MAPL002078157
MAPL002078158
MAPL002078159
MAPL002078160
MAPL002078161
MAPL002078162
MAPL002078163
MAPL002078164
MAPL002078165
MAPL002078166
MAPL002078167
MAPL002078168
MAPL002078169
MAPL002078170
MAPL002078171
MAPL002078172
MAPL002078173
MAPL002078174
MAPL002078175
MAPL002078176
MAPL002078177
MAPL002078178
MAPL002078179
MAPL002078180
MAPL002078181
MAPL002078182
MAPL002078183
MAPL002078184
MAPL002078185
MAPL002078186
MAPL002078187
MAPL002078188
MAPL002078189
MAPL002078190
MAPL002078191
MAPL002078192
MAPL002078193
MAPL002078194
MAPL002078195
MAPL002078196
MAPL002078197
MAPL002078198
MAPL002078199
MAPL002078200
MAPL002078201
MAPL002078202

MAPL002078203
MAPL002078204
MAPL002078205
MAPL002078206
MAPL002078207
MAPL002078208
MAPL002078209
MAPL002078210
MAPL002078211
MAPL002078212
MAPL002078213
MAPL002078214
MAPL002078215
MAPL002078216
MAPL002078217
MAPL002078218
MAPL002078219
MAPL002078220
MAPL002078221
MAPL002078222
MAPL002078223
MAPL002078224
MAPL002078225
MAPL002078226
MAPL002078227
MAPL002078228
MAPL002078229
MAPL002078230
MAPL002078231
MAPL002078232
MAPL002078233
MAPL002078234
MAPL002078235
MAPL002078236
MAPL002078237
MAPL002078238
MAPL002078239
MAPL002078240
MAPL002078241
MAPL002078242
MAPL002078243
MAPL002078244
MAPL002078245
MAPL002078246
MAPL002078247
MAPL002078248

| | | |
|---|---|---|
| MAPL002078249 | MAPL002078295 | MAPL002078341 |
| MAPL002078250 | MAPL002078296 | MAPL002078342 |
| MAPL002078251 | MAPL002078297 | MAPL002078343 |
| MAPL002078252 | MAPL002078298 | MAPL002078344 |
| MAPL002078253 | MAPL002078299 | MAPL002078345 |
| MAPL002078254 | MAPL002078300 | MAPL002078346 |
| MAPL002078255 | MAPL002078301 | MAPL002078347 |
| MAPL002078256 | MAPL002078302 | MAPL002078348 |
| MAPL002078257 | MAPL002078303 | MAPL002078349 |
| MAPL002078258 | MAPL002078304 | MAPL002078350 |
| MAPL002078259 | MAPL002078305 | MAPL002078351 |
| MAPL002078260 | MAPL002078306 | MAPL002078352 |
| MAPL002078261 | MAPL002078307 | MAPL002078353 |
| MAPL002078262 | MAPL002078308 | MAPL002078354 |
| MAPL002078263 | MAPL002078309 | MAPL002078355 |
| MAPL002078264 | MAPL002078310 | MAPL002078356 |
| MAPL002078265 | MAPL002078311 | MAPL002078357 |
| MAPL002078266 | MAPL002078312 | MAPL002078358 |
| MAPL002078267 | MAPL002078313 | MAPL002078359 |
| MAPL002078268 | MAPL002078314 | MAPL002078360 |
| MAPL002078269 | MAPL002078315 | MAPL002078361 |
| MAPL002078270 | MAPL002078316 | MAPL002078362 |
| MAPL002078271 | MAPL002078317 | MAPL002078363 |
| MAPL002078272 | MAPL002078318 | MAPL002078364 |
| MAPL002078273 | MAPL002078319 | MAPL002078365 |
| MAPL002078274 | MAPL002078320 | MAPL002078366 |
| MAPL002078275 | MAPL002078321 | MAPL002078367 |
| MAPL002078276 | MAPL002078322 | MAPL002078368 |
| MAPL002078277 | MAPL002078323 | MAPL002078369 |
| MAPL002078278 | MAPL002078324 | MAPL002078370 |
| MAPL002078279 | MAPL002078325 | MAPL002078371 |
| MAPL002078280 | MAPL002078326 | MAPL002078372 |
| MAPL002078281 | MAPL002078327 | MAPL002078373 |
| MAPL002078282 | MAPL002078328 | MAPL002078374 |
| MAPL002078283 | MAPL002078329 | MAPL002078375 |
| MAPL002078284 | MAPL002078330 | MAPL002078376 |
| MAPL002078285 | MAPL002078331 | MAPL002078377 |
| MAPL002078286 | MAPL002078332 | MAPL002078378 |
| MAPL002078287 | MAPL002078333 | MAPL002078379 |
| MAPL002078288 | MAPL002078334 | MAPL002078380 |
| MAPL002078289 | MAPL002078335 | MAPL002078381 |
| MAPL002078290 | MAPL002078336 | MAPL002078382 |
| MAPL002078291 | MAPL002078337 | MAPL002078383 |
| MAPL002078292 | MAPL002078338 | MAPL002078384 |
| MAPL002078293 | MAPL002078339 | MAPL002078385 |
| MAPL002078294 | MAPL002078340 | MAPL002078386 |

| | | |
|---|---|---|
| MAPL002078387 | MAPL002078433 | MAPL002078479 |
| MAPL002078388 | MAPL002078434 | MAPL002078480 |
| MAPL002078389 | MAPL002078435 | MAPL002078481 |
| MAPL002078390 | MAPL002078436 | MAPL002078482 |
| MAPL002078391 | MAPL002078437 | MAPL002078483 |
| MAPL002078392 | MAPL002078438 | MAPL002078484 |
| MAPL002078393 | MAPL002078439 | MAPL002078485 |
| MAPL002078394 | MAPL002078440 | MAPL002078486 |
| MAPL002078395 | MAPL002078441 | MAPL002078487 |
| MAPL002078396 | MAPL002078442 | MAPL002078488 |
| MAPL002078397 | MAPL002078443 | MAPL002078489 |
| MAPL002078398 | MAPL002078444 | MAPL002078490 |
| MAPL002078399 | MAPL002078445 | MAPL002078491 |
| MAPL002078400 | MAPL002078446 | MAPL002078492 |
| MAPL002078401 | MAPL002078447 | MAPL002078493 |
| MAPL002078402 | MAPL002078448 | MAPL002078494 |
| MAPL002078403 | MAPL002078449 | MAPL002078495 |
| MAPL002078404 | MAPL002078450 | MAPL002078496 |
| MAPL002078405 | MAPL002078451 | MAPL002078497 |
| MAPL002078406 | MAPL002078452 | MAPL002078498 |
| MAPL002078407 | MAPL002078453 | MAPL002078499 |
| MAPL002078408 | MAPL002078454 | MAPL002078500 |
| MAPL002078409 | MAPL002078455 | MAPL002078501 |
| MAPL002078410 | MAPL002078456 | MAPL002078502 |
| MAPL002078411 | MAPL002078457 | MAPL002078503 |
| MAPL002078412 | MAPL002078458 | MAPL002078504 |
| MAPL002078413 | MAPL002078459 | MAPL002078505 |
| MAPL002078414 | MAPL002078460 | MAPL002078506 |
| MAPL002078415 | MAPL002078461 | MAPL002078507 |
| MAPL002078416 | MAPL002078462 | MAPL002078508 |
| MAPL002078417 | MAPL002078463 | MAPL002078509 |
| MAPL002078418 | MAPL002078464 | MAPL002078510 |
| MAPL002078419 | MAPL002078465 | MAPL002078511 |
| MAPL002078420 | MAPL002078466 | MAPL002078512 |
| MAPL002078421 | MAPL002078467 | MAPL002078513 |
| MAPL002078422 | MAPL002078468 | MAPL002078514 |
| MAPL002078423 | MAPL002078469 | MAPL002078515 |
| MAPL002078424 | MAPL002078470 | MAPL002078518 |
| MAPL002078425 | MAPL002078471 | MAPL002078519 |
| MAPL002078426 | MAPL002078472 | MAPL002078520 |
| MAPL002078427 | MAPL002078473 | MAPL002078521 |
| MAPL002078428 | MAPL002078474 | MAPL002078522 |
| MAPL002078429 | MAPL002078475 | MAPL002078523 |
| MAPL002078430 | MAPL002078476 | MAPL002078524 |
| MAPL002078431 | MAPL002078477 | MAPL002078525 |
| MAPL002078432 | MAPL002078478 | MAPL002078526 |

| | | |
|---|---|---|
| MAPL002078527 | MAPL002078578 | MAPL002078624 |
| MAPL002078528 | MAPL002078579 | MAPL002078625 |
| MAPL002078529 | MAPL002078580 | MAPL002078626 |
| MAPL002078530 | MAPL002078581 | MAPL002078627 |
| MAPL002078531 | MAPL002078582 | MAPL002078628 |
| MAPL002078532 | MAPL002078583 | MAPL002078629 |
| MAPL002078533 | MAPL002078584 | MAPL002078630 |
| MAPL002078534 | MAPL002078585 | MAPL002078631 |
| MAPL002078535 | MAPL002078586 | MAPL002078632 |
| MAPL002078536 | MAPL002078587 | MAPL002078633 |
| MAPL002078537 | MAPL002078588 | MAPL002078634 |
| MAPL002078538 | MAPL002078589 | MAPL002078635 |
| MAPL002078539 | MAPL002078590 | MAPL002078636 |
| MAPL002078540 | MAPL002078591 | MAPL002078637 |
| MAPL002078541 | MAPL002078592 | MAPL002078639 |
| MAPL002078542 | MAPL002078593 | MAPL002078642 |
| MAPL002078543 | MAPL002078594 | MAPL002078647 |
| MAPL002078544 | MAPL002078595 | MAPL002078648 |
| MAPL002078545 | MAPL002078596 | MAPL002078649 |
| MAPL002078546 | MAPL002078597 | MAPL002078650 |
| MAPL002078547 | MAPL002078598 | MAPL002078651 |
| MAPL002078548 | MAPL002078599 | MAPL002078652 |
| MAPL002078549 | MAPL002078600 | MAPL002078653 |
| MAPL002078550 | MAPL002078601 | MAPL002078654 |
| MAPL002078551 | MAPL002078602 | MAPL002078655 |
| MAPL002078552 | MAPL002078603 | MAPL002078656 |
| MAPL002078553 | MAPL002078604 | MAPL002078657 |
| MAPL002078554 | MAPL002078605 | MAPL002078658 |
| MAPL002078557 | MAPL002078606 | MAPL002078659 |
| MAPL002078558 | MAPL002078607 | MAPL002078660 |
| MAPL002078559 | MAPL002078608 | MAPL002078661 |
| MAPL002078560 | MAPL002078609 | MAPL002078662 |
| MAPL002078561 | MAPL002078610 | MAPL002078663 |
| MAPL002078562 | MAPL002078611 | MAPL002078664 |
| MAPL002078563 | MAPL002078612 | MAPL002078665 |
| MAPL002078564 | MAPL002078613 | MAPL002078666 |
| MAPL002078565 | MAPL002078614 | MAPL002078667 |
| MAPL002078566 | MAPL002078615 | MAPL002078668 |
| MAPL002078567 | MAPL002078616 | MAPL002078669 |
| MAPL002078570 | MAPL002078617 | MAPL002078670 |
| MAPL002078571 | MAPL002078618 | MAPL002078671 |
| MAPL002078572 | MAPL002078619 | MAPL002078672 |
| MAPL002078574 | MAPL002078620 | MAPL002078673 |
| MAPL002078575 | MAPL002078621 | MAPL002078674 |
| MAPL002078576 | MAPL002078622 | MAPL002078675 |
| MAPL002078577 | MAPL002078623 | MAPL002078676 |

| | | |
|---|---|---|
| MAPL002078677 | MAPL002078724 | MAPL006427493 |
| MAPL002078678 | MAPL002078725 | MARA2152918 |
| MAPL002078679 | MAPL002078726 | MARA2152919 |
| MAPL002078680 | MAPL002078727 | MARA2152921 |
| MAPL002078681 | MAPL002078728 | MARA2152923 |
| MAPL002078682 | MAPL002078729 | MARA2152924 |
| MAPL002078683 | MAPL002078730 | MARA2152925 |
| MAPL002078684 | MAPL002078731 | MARA2157337 |
| MAPL002078685 | MAPL002078732 | MARA2157338 |
| MAPL002078686 | MAPL002078733 | MARA2157340 |
| MAPL002078687 | MAPL002078734 | MARA2157342 |
| MAPL002078688 | MAPL002078735 | MARA2157343 |
| MAPL002078689 | MAPL002078736 | MARA2157344 |
| MAPL002078690 | MAPL002078737 | MARA2160495 |
| MAPL002078691 | MAPL002078738 | MARA2160496 |
| MAPL002078692 | MAPL002078739 | MARA2160692 |
| MAPL002078693 | MAPL002078740 | MARA2160693 |
| MAPL002078694 | MAPL002078741 | MARA2180342 |
| MAPL002078695 | MAPL002078742 | MARA2180343 |
| MAPL002078696 | MAPL002078743 | MAPL001370202 |
| MAPL002078697 | MAPL002078744 | MAPL001370204 |
| MAPL002078698 | MAPL002078745 | MAPL001370207 |
| MAPL002078699 | MAPL002078746 | MAPL001370209 |
| MAPL002078700 | MAPL002078747 | MAPL001370210 |
| MAPL002078701 | MAPL002078748 | MAPL001370211 |
| MAPL002078702 | MAPL002078749 | MAPL001370212 |
| MAPL002078703 | MAPL002078750 | MAPL001370215 |
| MAPL002078704 | MAPL002078751 | MAPL001370216 |
| MAPL002078705 | MAPL002078752 | MAPL001370219 |
| MAPL002078706 | MAPL002078753 | MAPL001370221 |
| MAPL002078707 | MAPL002078754 | MAPL001370225 |
| MAPL002078708 | MAPL002078755 | MAPL006427580 |
| MAPL002078709 | MAPL002078756 | MAPL006427581 |
| MAPL002078710 | MAPL002078757 | MAPL006427582 |
| MAPL002078711 | MAPL002078758 | MAPL006427586 |
| MAPL002078712 | MAPL002078759 | MAPL006427588 |
| MAPL002078713 | MAPL002078760 | MAPL006427592 |
| MAPL002078714 | MAPL002078761 | MAPL006427594 |
| MAPL002078715 | MAPL002078762 | MAPL006427595 |
| MAPL002078716 | MAPL002078763 | MAPL006427597 |
| MAPL002078718 | MAPL002078764 | MAPL006427600 |
| MAPL002078719 | MAPL002078765 | MAPL006427601 |
| MAPL002078720 | MAPL003667028 | MAPL000724256 |
| MAPL002078721 | MAPL005462834 | MAPL000724261 |
| MAPL002078722 | MAPL005462835 | MAPL000724265 |
| MAPL002078723 | MAPL006427492 | MAPL000724266 |

| | | |
|---|---|---|
| MAPL000724267 | MARA2083695 | MAPL001370229 |
| MAPL000724268 | MARA2083697 | MAPL001370233 |
| MAPL000724269 | MARA2083698 | MAPL001370236 |
| MAPL000724270 | MARA2152913 | MAPL002079170 |
| MAPL000724271 | MARA2152916 | MAPL002079171 |
| MAPL000724272 | MARA2157332 | MAPL002079172 |
| MAPL000724273 | MARA2157335 | MAPL002079173 |
| MAPL000724274 | MARA2160490 | MAPL002079179 |
| MAPL000724275 | MARA2160493 | MAPL002079180 |
| MAPL000724276 | MARA2160687 | MAPL002079191 |
| MAPL002079145 | MARA2160690 | MAPL002079195 |
| MAPL002079150 | MARA2160706 | MAPL002079197 |
| MAPL002079154 | MARA2160707 | MAPL002079201 |
| MAPL002079155 | MARA2160711 | MAPL002079205 |
| MAPL002079156 | MARA2160712 | MAPL002079208 |
| MAPL002079157 | MARA2160716 | MAPL002079209 |
| MAPL002079158 | MARA2160717 | MAPL002079214 |
| MAPL002079159 | MARA2160721 | MAPL003292417 |
| MAPL002079160 | MARA2160722 | MAPL003292421 |
| MAPL002079161 | MAPL000724254 | MAPL003292424 |
| MAPL003667033 | MAPL005462847 | MAPL003292431 |
| MAPL003667038 | MARA2083683 | MAPL003292433 |
| MAPL003667042 | MARA2117127 | MAPL003292437 |
| MAPL003667043 | MARA2117128 | MAPL003292439 |
| MAPL003667044 | MARA2152917 | MAPL003292444 |
| MAPL003667047 | MARA2157336 | MAPL003292448 |
| MAPL005462849 | MARA2160501 | MAPL003292449 |
| MAPL005462854 | MARA2164481 | MAPL003292451 |
| MAPL005462858 | MAPL003292341 | MAPL003292463 |
| MAPL005462859 | MAPL003292353 | MAPL003292465 |
| MAPL005462860 | MAPL003292364 | MAPL003292469 |
| MAPL005462861 | MAPL003292376 | MAPL003292471 |
| MAPL005462862 | MAPL003292387 | MAPL003292475 |
| MAPL005462863 | MAPL003292388 | MAPL003292477 |
| MAPL005462864 | MAPL000724289 | MAPL003292481 |
| MAPL005462865 | MAPL000724290 | MAPL003292483 |
| MAPL005462890 | MAPL000724291 | MAPL003292489 |
| MAPL006427505 | MAPL000724293 | MAPL003292492 |
| MAPL006427508 | MAPL000724294 | MAPL003292494 |
| MAPL006427509 | MAPL000724305 | MAPL003292498 |
| MAPL006427510 | MAPL000724307 | MAPL003667049 |
| MAPL006427511 | MAPL000724324 | MAPL003667050 |
| MAPL006427512 | MAPL000724326 | MAPL003667051 |
| MAPL006427513 | MAPL000724329 | MAPL003667052 |
| MAPL006427514 | MAPL000724330 | MAPL003667058 |
| MAPL006427515 | MAPL001370227 | MAPL003667059 |

| MAPL003667072 | MAPL003958969 | MAPL005462897 |
| MAPL003667076 | MAPL003958970 | MAPL005462899 |
| MAPL003667078 | MAPL003958975 | MAPL006427526 |
| MAPL003667082 | MAPL003958976 | MAPL006427528 |
| MAPL003667086 | MAPL003958981 | MAPL006427534 |
| MAPL003667089 | MAPL003958982 | MAPL006427536 |
| MAPL003667090 | MAPL003958987 | MAPL006427540 |
| MAPL003667095 | MAPL003958988 | MAPL006427542 |
| MAPL003958939 | MAPL003958993 | MAPL006427546 |
| MAPL003958940 | MAPL003958994 | MAPL008529763 |
| MAPL003958945 | MAPL003958999 | MAPL008529764 |
| MAPL003958946 | MAPL003959000 | MAPL008529765 |
| MAPL003958951 | MAPL003959005 | MAPL008529767 |
| MAPL003958952 | MAPL003959006 | MAPL008529769 |
| MAPL003958957 | MAPL005462876 | MAPL008529770 |
| MAPL003958958 | MAPL005462878 | MAPL008529793 |
| MAPL003958963 | MAPL005462891 | MAPL003292389 |
| MAPL003958964 | MAPL005462893 | MARA2076620 |

**CMS**

| USBP009429388 | USBP009429438 | USBP009429472 |
| USBP009429389 | USBP009429440 | USBP009429473 |
| USBP009429391 | USBP009429441 | USBP009429474 |
| USBP009429392 | USBP009429444 | USBP009429476 |
| USBP009429395 | USBP009429445 | USBP009429477 |
| USBP009429396 | USBP009429446 | USBP009429478 |
| USBP009429397 | USBP009429447 | USBP009429479 |
| USBP009429399 | USBP009429448 | USBP009429480 |
| USBP009429400 | USBP009429449 | USBP009429482 |
| USBP009429404 | USBP009429452 | USBP009429483 |
| USBP009429405 | USBP009429453 | USBP009429484 |
| USBP009429406 | USBP009429454 | USBP009429485 |
| USBP009429408 | USBP009429455 | USBP009429486 |
| USBP009429409 | USBP009429456 | USBP009429488 |
| USBP009429412 | USBP009429457 | USBP009429489 |
| USBP009429419 | USBP009429459 | USBP009429490 |
| USBP009429420 | USBP009429460 | USBP009429491 |
| USBP009429421 | USBP009429461 | USBP009429492 |
| USBP009429428 | USBP009429462 | USBP009429493 |
| USBP009429429 | USBP009429463 | USBP009429494 |
| USBP009429430 | USBP009429465 | USBP009429495 |
| USBP009429431 | USBP009429466 | USBP009429496 |
| USBP009429432 | USBP009429467 | USBP009429497 |
| USBP009429433 | USBP009429468 | USBP009429498 |
| USBP009429436 | USBP009429469 | USBP009429500 |
| USBP009429437 | USBP009429471 | USBP009429501 |

USBP009429503          USBP009865182          USBP009865189
USBP009865176          USBP009865183          USBP009865190
USBP009865177          USBP009865184          USBP009865191
USBP009865178          USBP009865185          USBP009865192
USBP009865179          USBP009865186          USBP009865193
USBP009865180          USBP009865187          USBP009865194
USBP009865181          USBP009865188

**APPENDIX D**

# TABLE OF CONTENTS

I.      Overview ................................................................................................................ 1

II.     Identification of Unique Beneficiaries ................................................................ 2

III.    Identification of Reviewed Encounters ............................................................... 3

        A.    Identification of Encounters in Chart Review Data .............................. 3
              i.    Chart Review Data in Defendants' Risk Adjustment
                    Databases ...................................................................................... 4
              ii.   Chart Review Data in Defendants' Chart Review Databases ..... 4
              iii.  Identification of Informed-Coded Charts .................................. 11

        B.    Identification of Provider-Reported, Risk Adjustment-Eligible
              Encounters in Defendants' Risk Adjustment Databases ..................... 11
              i.    Identification of Provider-Reported Encounters ...................... 12
              ii.   Identification of Risk Adjustment-Eligible Encounters ........... 12

        C.    Matching Encounters from Chart Review Data to Provider-Reported
              Encounters ............................................................................................ 14
              i.    Provider Identifier Match ......................................................... 14
              ii.   Single Provider on Date of Service .......................................... 16

IV.     Identification of Supported Diagnosis Codes ................................................... 19

V.      Identification of Submitted Diagnosis Codes ................................................... 20

VI.     Identification of Potential Deletes .................................................................... 21

VII.    Classification of Potential Deletes .................................................................... 22

        A.    Data Sources ........................................................................................ 23
              i.    Chart Review Encounters in Defendants' Risk Adjustment
                    Databases .................................................................................... 23
              ii.   Unreviewed Risk Adjustment-Eligible Encounters .................. 23
              iii.  Additional Chart Review Data .................................................. 24
              iv.   Defendants' Provider-Reported Claims Databases ................... 25
              v.    Data from Defendants' Claims Verification Program ............. 27

VIII.   Identification of Deletes .................................................................................... 27

IX.     Calculation of Financial Impact of Deletes ...................................................... 28

        A.    Revised Risk Scores ............................................................................. 29
              i.    Model Inputs .............................................................................. 29
              ii.   Raw Risk Scores ........................................................................ 30
              iii.  Risk Score Adjustment .............................................................. 31
              iv.   Risk Score Weighting ................................................................ 33
              v.    Risk Score Selection .................................................................. 34

        B.    Changes in Risk Scores ........................................................................ 35

        C.    Changes in Payment for Part C ............................................................ 36

D.    Changes in Payment for Part D.......................................................................37

X.    Financial Impact of Deleting Diagnosis Codes on Defendants' CV Pipeline
Lists..........................................................................................................................39

## I.    OVERVIEW

1.    This appendix explains in detail the methods I used for the analyses in my report. It includes descriptions of the data sources I relied upon and illustrative examples.

2.    The code produced with this report implements every stage of my analysis, from the initial loading of data produced by Defendants and CMS to the creation of the final output that forms the basis of my opinions. It was prepared under my direction by staff at Analysis Group. Every detail of my analysis is therefore exactly specified in the code.[1] Accordingly, my method can be reviewed, in its entirety, by anyone with knowledge of the SAS language[2] and SQL.[3]

3.    As discussed in my Summary of Opinions,[4] my analysis begins by identifying a set of diagnosis codes for each beneficiary that were (i) submitted by Defendants to CMS for risk adjustment purposes; (ii) used in the calculation of the risk adjustment payments Defendants received from CMS for that beneficiary; (iii) sourced from medical records reviewed by Defendants as part of their Chart Review Program; (iv) not found to be supported by Defendants during the Chart Review Program; and (v) not associated with HCCs for which other instances of diagnosis codes mapping to the same HCC could have been submitted by Defendants for that beneficiary in the same year. After identifying this set of diagnosis codes, I analyze the impact of Defendants' failure to delete them, including the financial impact on Defendants' risk adjustment payments for Medicare Advantage and

---

[1]    Any perceived discrepancies between the analytic code itself and a written description of it (in this Appendix or in my Report) should be resolved by inspection of the code, since the code is the definitive description of my method.

[2]    SAS, the principal programming language used for my analytic code, is a standard language designed for statistical computing and data analysis. "Why SAS," SAS, 2023, https://www.sas.com/en_us/company-information/why-sas html, accessed September 25, 2023. It is the language chosen by CMS to implement its risk adjustment program. See, for example, "2006-2011 Model Software/ICD-9-CM Mappings," Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/risk-adjustors-items/risk2006-2011, accessed September 25, 2023.

[3]    In addition to native SAS commands, my analytic code contains SQL code embedded within SAS "proc sql" procedures. SQL is a ubiquitous programming language used to create, modify, and analyze databases in many industries, including but not limited to health care. Natassha Selvaraj, "What is SQL Used For? 7 Top SQL Uses," Datacamp, October 2022, https://www.datacamp.com/blog/what-is-sql-used-for, accessed September 25, 2023.

[4]    **Report, Section II**.

Medicare Part D and the total number of affected beneficiaries year-by-year for payment years 2009–2017. I use the same analytic code to calculate the financial impact on Defendants' risk adjustment payments resulting from Defendants' failure to delete the set of diagnosis codes in Defendants' CV Pipeline Lists. The only difference between the two analyses is that the second analysis uses the diagnosis codes found on the CV Pipeline Lists, rather than the set of diagnosis codes identified in my review of Defendants' databases, as the input to the financial impact analysis.

## II.    IDENTIFICATION OF UNIQUE BENEFICIARIES

4.    Defendants' risk adjustment payments for Medicare Advantage and Medicare Part D are beneficiary-specific. Each year, payments depend upon a beneficiary's diagnosis codes in the prior year as well as beneficiary-level demographic factors. I therefore conduct my analysis at the beneficiary-year level.[5]

5.    Since the analysis is done per beneficiary and per year, correctly identifying the data associated with each beneficiary in each year is a necessary preliminary step. Treating data associated with one beneficiary as data associated with multiple beneficiaries, or treating data associated with multiple beneficiaries as if it belonged to a single beneficiary, could lead to incorrect conclusions.

6.    During the time period in question, CMS (and therefore Defendants) chiefly identified beneficiaries using HICNs ("Health Insurance Claim Numbers"). HICNs are assigned based on a beneficiary's Social Security Number ("SSN") as well as the reason a beneficiary qualifies for Medicare, and since the reason for qualification can change, a single beneficiary can have multiple HICNs over time, even in the same year.[6] CMS later

---

[5]    The only exception to this principle is the application of Medicare Part D risk corridors, which are analyzed at the plan-year level and pertain only to the calculation of payments. The identification of Deletes and risk score impact in both Part C and Part D is strictly isolated on a per-beneficiary, per-year basis.

[6]    Stephanie Ellen, "Definition of Medicare HIC Number," Sapling, https://www.sapling.com/7890627/definition-medicare-hic-number, accessed September 25, 2023.

transitioned from HICNs to MBIs ("Medicare Beneficiary Identifiers"), which are randomly generated and not linked to SSNs or eligibility.[7]

7.  In order to correctly associate data from Defendants and CMS with unique beneficiaries in each year, I use data provided by CMS which maps HICNs and MBIs to an internal CMS identifier called BENE_SK, which is intended as a unique, unchanging identifier for each beneficiary.[8,9] I use this mapping to create a crosswalk between all values of HICNs and MBIs and their corresponding unique BENE_SK values.[10] To avoid cases where beneficiary identity may be in doubt, I exclude from my analysis approximately 0.01% of HICNs and MBIs because they map to multiple BENE_SKs or no BENE_SKs.

## III.  IDENTIFICATION OF REVIEWED ENCOUNTERS

8.  As discussed in my **Report, Section VI.A**, I identify provider-reported encounters reviewed as part of Defendants' Chart Review Program (*i.e.*, Reviewed Encounters) using data from Defendants' Chart Review Databases and Defendants' Risk Adjustment Databases.

### A.  Identification of Encounters in Chart Review Data

9.  As shown in **Exhibit 9** in my Report, Defendants' Risk Adjustment Databases contain data from multiple sources, including but not limited to Defendants' Provider-Reported Claims Databases and Defendants' Chart Review Databases. However, not all information from these databases is reflected in Defendants' Risk Adjustment Databases. I therefore create a list of encounters that were reviewed in the Chart Review Program by supplementing the

---

[7]    "Understanding the Medicare Beneficiary Identifier (MBI) Format," Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare/new-medicare-card/understanding-the-mbi.pdf, accessed September 25, 2023.

[8]    CMS files USBP009429489-498, USBP009429500-01, USBP009429503.

[9]    "Data Dictionary for CJR Baseline, Monthly, Target Price, and Reconciliation Reports," U.S. Department of Health & Human Services, December 21, 2018, https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/cjr%20data%20dictionary%2012%2021%2018.html, accessed September 25, 2023.

[10]   To reduce the presence of personal identifiable information during my analysis and in intermediate results, I assign each BENE_SK to an anonymized identifier at the beginning of my analysis, and I use this ANONYMOUS_SK as the beneficiary identifier until remapping it to BENE_SK and HICN at the end of my analysis.

chart review data in Defendants' Risk Adjustment Databases with additional data which can only be found in Defendants' Chart Review Databases.

### i. Chart Review Data in Defendants' Risk Adjustment Databases

10. IRADS, Defendants' Risk Adjustment Database that was used during the entire time period at issue in this matter, contains a field called SUB_SOURCE_CD, which generally indicates the source of data for each encounter. For encounter data that originated from Defendants' Chart Review Databases, the SUB_SOURCE_CD is "CHARTAUDIT." I consider CHARTAUDIT data to represent records of encounters that were reviewed in Defendants' Chart Review Program.[11]

11. Defendants' data production of EDPS, Defendants' Risk Adjustment Database that was used for service dates in 2014–2016, includes separate tables for data originating from provider-reported encounters and alternative sources, including but not limited to, records from the Chart Review Program. I have not identified an equivalent field within the EDPS alternative sources data that allows the immediate identification of records originating from the Chart Review Program. For this reason, I do not use data from the Chart Review Program contained within EDPS to identify encounters for inclusion in the list of encounters reviewed in Defendants' Chart Review Program. Instead, I rely exclusively on data contained within Defendants' Chart Review Databases, discussed in the next section.

### ii. Chart Review Data in Defendants' Chart Review Databases

12. I supplement the list of encounters that I identified above using data from the Chart Review Program in Defendants' Risk Adjustment Databases with encounters from Defendants' Chart Review Databases. As explained in my **Report, Section VI.A.i**, the principle reason I do this when analyzing the IRADS database is that Defendants' Risk Adjustment Databases do not contain the CHARTAUDIT encounters described above where Defendants' Coders (or a third-party vendor employed by the Defendant) observed no risk

---

[11] Defendants produced data for mapping Chart IDs from chart review data to corresponding IRADS 'CHARTAUDIT' data. MARA2157336; MARA2152917. See also Deposition of Biggs T. Cannon, III 30(b)(6), *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. CV 16-08697 FMO, June 7, 2023 ("Cannon Deposition Volume 2"), 391:15–19 ("And so if you look in IRADS, I think it eventually got to the point where if you looked at that ASM, it should be – let's put it this way, it should be assigned something related to chart review or chart or chart audit.").

adjustment-eligible diagnosis codes for a particular encounter on the Chart, but the encounter was still reviewed by Defendants. For EDPS, I do this because I have not identified a direct equivalent of a CHARTAUDIT encounter (as discussed above).

13.   During the at-issue period, Defendants' Chart Review Program was carried out by their own Coders as well as various third-party vendors. The systems used to conduct the Chart Review Program also changed over time. For service dates in 2008 and 2009, Defendants used multiple vendors and loaded the data collected and submitted by individual vendors directly into IRADS. As a result, results from the Chart Review Program results recorded during these years were produced in a set of over 1,000 files from five different vendors, which I collectively refer to as "vendor files." From service year 2010 forward, Defendants relied on their own Coders as well as some third-party vendors to review Charts, but they consolidated the results of these reviews into central databases. For service dates in 2010–2013, Defendants consolidated data from the Chart Review Program into a single database called ChartSync.[12]  For service dates in 2014–2016, data from the Chart Review Program were recorded in two systems known as Medical Record Manager ("MRM") and Epsilon. According to deposition testimony, MRM was the primary system used to record results from the Chart Review Program, while Epsilon was a secondary system used to prepare such data for transmission into Defendants' Risk Adjustment Databases.[13] I therefore rely on MRM for service dates in 2014–2016. In the following sub-sections, I describe these three categories of data from the Chart Review Program: vendor files, ChartSync, and MRM. From each of these sources, I identify encounters recorded by Coders in the Chart

---

[12]   *Chart Sync and Medical Record Manager*, UnitedHealth Group, December 16, 2014, pp. 4, 10. There is also some ChartSync data for service dates in 2009, and very little for service dates in 2008, which I use to supplement the data in the vendor files; Deposition of Biggs T. Cannon, III 30(b)(6), *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. CV 16-08697 FMO, June 6, 2023 ("Cannon Deposition Volume 1") 37:11–14 ("Generally speaking, the ChartSync system was a database or a tool that was used to capture chart information related to the review of medical charts for Medicare Advantage beneficiaries"), 44:25–45:1 ("ChartSync was used for chart review.").

[13]   Cannon Deposition Volume 1, 54:5–23 ("Q. What is Epsilon used for? A. Epsilon is more of a staging area. So it can store results related to those programs. Q. Oh, okay. What do you mean by staging program? A. So it's another database that just houses the results and can be used as just an additional area to house results and potentially analyze data from. Q. Okay. I guess different from -- does MRM also store results? A. Yes. Q. What's the difference, then, between MRM and Epsilon insofar as the use of it for the chart review program is concerned? ... THE WITNESS: I believe MRM is more of a front end where people doing chart review can actually conduct the review.").

Review Program as unique combinations of the following fields: beneficiary identifier, start date of service, end date of service, and provider identifier. The availability of provider identifiers differs by source and by year, as discussed below.

### a) Vendor Files

14.    My analysis of the "vendor files" used for service dates in 2008 and 2009 begins by classifying each file according to the specific vendor. The five vendors are TCS, Mediconnect, Outcomes, Pi, and ECS. I classify files by their Bates stamp using the correspondence below, which I derived based on underlying file names and consistency in data fields across files:[14]

**Exhibit A**

**Vendor File Classification**

| Vendor | Bates Range |
|---|---|
| TCS | MAPL002077000-MAPL002078102 |
| Outcomes | MAPL002078103-MAPL002078719 |
| Mediconnect | MAPL002078720-MAPL002078749 |
| Pi | MAPL002078750-MAPL002078751 |
| ECS | MAPL002078752-MAPL002078763 |

15.    I process data from the five different vendors and create a single consolidated dataset with fields relevant to my analysis. These fields include beneficiary identifiers (first name, last name, date of birth, member ID, and sometimes, HICN) as well as information about the medical encounter (provider identifier, service date, and diagnosis code). I standardize the formats and names of these fields across files to facilitate consolidation into a single dataset. As part of this process, I convert certain invalid values (such as a service date of "99/99/99") to blank values. I also remove spaces from fields containing beneficiary first and last names (*e.g.*, converting "MARY ANNE" to "MARYANNE") and ensure that

---

[14]    Produced file names were provided in 2018_0917 - 2008 - 2009 DOS Production Tracker_P6000706.xlsx. For each vendor, up to 18 files were provided with names following the format "Vendor_[Name]_FileType[N]" (e.g., MAPL002078746  is named "Vendor_Mediconnect_FileType2"). I classify other files based on data field alignment with these "FileType" files. For example, the data fields in MAPL002078720 ("named UHC_FinalCompletes_20090419.txt") align with those in MAPL002078746, suggesting that MAPL002078720 is a Mediconnect file following the FileType2 format.

diagnosis codes are normalized to the common format used elsewhere in Defendants' databases.

16. While the vendor files do contain some information on the provider associated with the Reviewed Encounter, the provider identifiers in these files are inconsistently formatted. For this reason, I do not rely on provider identifiers when I identify Reviewed Encounters by matching provider-reported encounters to encounters from the Chart Review Program, as described in **Section III.C** below. This reflects my cautious choice to minimize the chance of identifying a false encounter match, which could lead to incorrect conclusions about whether chart review recorded the diagnosis codes associated with the provider-reported encounter. This approach likely means that some provider-reported encounters reviewed in Defendants' Chart Review Program for service years 2008 and 2009 will not be matched and will therefore not contribute any diagnosis codes to the Deletes list even though they were reported by providers and not found in the Chart Review Program.

17. A key difference between the vendor file types is the information provided to identify unique beneficiaries. While TCS, Mediconnect, and Outcomes files have a field corresponding to the HICN described above, this field is blank for the majority of observations, and the Pi and ECS files do not have a HICN field. I therefore rely on other member identifiers, including numeric or alphanumeric member ID variables, names, and dates of birth – which are populated for the majority (and, in some instances, 100%) of observations in each dataset – to identify unique beneficiaries within the files. I map a BENE_SK to each vendor file observation using a crosswalk I created using the IRADS member data for 2008-2009 dates of service[15] and the BENE_SK crosswalk described above in **Section II**. The IRADS member data include the HICN field, as well as fields for name, date of birth, and a member ID.

18. I use the following approach to map a BENE_SK to each vendor file observation. If a HICN is provided in the vendor file observation, I directly map the BENE_SK to the provided HICN.[16] If a HICN is not provided, I identify a set of potential BENE_SK

---

[15]   MAPL002079150.

[16]   While certain vendor file types have dedicated HICN fields, I have also observed HICN values in member ID fields. I therefore use both the dedicated HICN field and the member ID field in this step.

matches using name, date of birth, and if needed, member ID. If name and date of birth are both provided, I use them both to identify potential matches in the IRADS member data. If either name or date of birth is unavailable *or* if no potential matches sharing both name and date of birth are found, I identify potential matches based on matches between member ID (which is never missing in the vendor files) and either date of birth *or* name.

19.     When identifying potential matches using these other fields, I require exact matches for name and date of birth. However, I consider there to be a member ID match even when one member ID is contained within the other, as I have observed many instances in which this occurs for beneficiaries who can be conclusively identified by name, date of birth and BENE_SK.[17] For example, I would consider a member ID of 000039570212 to match a member ID of 00039570212. Since this containment logic only applies in cases where there is also a match on name or date of birth, I consider it unlikely to generate false matches.

20.     After using these rules to identify potential matches for each vendor file observation, I classify observations according to the number of potential matches: no potential matches, a single match, and more than one match. I map observations with a single match to the corresponding BENE_SK because there does not seem to be any possible ambiguity about their identity. I exclude observations with no matches. I also exclude observations with multiple matches to avoid the risks that would be associated with a false match. These "unmapped observations" represent beneficiaries for whom I potentially have incomplete chart review data. I therefore exclude from my analysis, for service dates in 2008 and 2009, all BENE_SKs with a member ID match to these observations. Ultimately, I am able to map a BENE_SK to 98.7% of observations in the vendor files. The 1.3% of unmatched observations translates to approximately 22,000 unique BENE_SKs, which I exclude from my analysis of service year 2008–2009 data. I exclude these beneficiaries out of caution, despite the possibility that certain provider-reported encounters associated with these beneficiaries were reviewed in Defendants' Chart Review Program and that certain

---

[17]     Among approximately 892,000 unique and populated combinations of first name, last name and date of birth in the IRADS member data for 2008–2009, which all map to the same BENE_SK, 66% are associated with multiple member ID variables. Among those associated with multiple member ID variables, 29% are associated with at least two member IDs where one is contained within the other.

diagnosis codes from those Reviewed Encounters were submitted to and accepted by CMS but unsupported by the review.

### b) ChartSync

21. For service years 2009 through 2013 (and, to a much lesser extent, 2008), Defendants collected and stored chart review data in a system called ChartSync.[18] Unlike the vendor files, ChartSync consistently recorded the beneficiary's HICN, which I map to a BENE_SK. It also consistently recorded for each encounter a unique provider identifier that Defendants used to identify providers across its data systems, which I refer to as the "Provider ID" field.[19, 20] The BENE_SK, the Provider ID and the service dates are used together to create a list of encounters reviewed in the Chart Review Program. I exclude from this list a small number (2%) of encounters for which the CHART_STATUS field indicates that the review may not have been complete or for which there is any indication that the record is associated with a program other than chart review.[21]

### c) MRM

22. For service dates in 2014 through 2016, Defendants collected and stored chart review data in a system called MRM.[22] Similar to ChartSync, MRM consistently recorded the beneficiary's HICN, which I map to a BENE_SK, as well as the service dates and Provider ID[23] associated with each encounter. MRM also recorded the National Provider Identifier

---

[18] *Chart Sync and Medical Record Manager*, UnitedHealth Group, December 16, 2014, pp. 4, 10; Cannon Deposition Volume 1, 37:11–14 ("Generally speaking, the ChartSync system was a database or a tool that was used to capture chart information related to the review of medical charts for Medicare Advantage beneficiaries") and 44:25–45:1 ("ChartSync was used for chart review.").

[19] In ChartSync, the Provider ID field is called CHART_PROVIDER_NBR.

[20] For service year 2013, approximately 27% of the unique Provider IDs appear to be populated with a federal taxpayer identification number, rather than Defendants' Provider ID. I do not apply my second method of matching to these encounters.

[21] Defendants identified five "error and omission" codes that Defendants did not use in the Chart Review Program (D14, D28, C07, C08, C30). I exclude from the list of chart review encounters any encounters that have diagnosis codes associated with these five "error and omission" codes. Production of Responses and Documents Responsive to CR / CV Interrogatory 1(F) and Document Requests 4(C)(iv)(n) and 4(C)(vii)(i), March 31, 2016, p. 2.

[22] Cannon Deposition Volume 1, 50:4–10. ("Q. Okay. And was MRM used as a repository for chart review results for 2014 to 2016 data of service? … THE WITNESS: I believe it captured chart review results at that time frame. That sounds about right, yes.").

[23] In MRM, the Provider ID field is called SOURCE_SYSTEM_PROV_ID.

("NPI") associated with each encounter.[24, 25] For service dates 2014-2016, I use Provider IDs *and* NPIs in the lists of encounters reviewed in the Chart Review Program. As discussed in my **Report, Section VI.A.ii**, the first method I use to identify Reviewed Encounters relies on identifying a match between provider identifiers in Defendants' Risk Adjustment Databases and chart review data. The provider identifier that is predominant in IRADS is Provider ID. However, Provider IDs are not present in EDPS, which uses NPI as the provider identifier. Thus, to apply the first method, I rely on Provider IDs to match IRADS records to chart review and I rely on NPI to match EDPS records to chart review. For this reason, there are effectively two lists of chart review encounters for these years: 1) a list of BENE_SK, service dates, and Provider IDs for matching to IRADS, and 2) a list of BENE_SK, service dates, and NPIs for matching to EDPS.[26] As with ChartSync, I exclude from both of these lists encounters for which the status field indicates that the review may not have been complete or for which there is any indication that the record is associated with a program other than chart review (11%).[27]

---

[24]   National Provider Identifiers ("NPIs") are unique 10-digit numeric identifiers assigned to health care providers by CMS as part of its National Plan and Provider Enumeration System (NPPES). Unlike other identifiers, which may be specific to a given practice location or time period, a provider's NPI will remain the same even if the provider changes his/her name, address, or area of specialization. Health care organizations, such as health plans, physician offices, and hospitals, are required to use NPIs in administrative and financial transactions. *NPI: What You Need to Know*, Centers for Medicare & Medicaid Services, March 2022, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/NPI-What-You-Need-To-Know.pdf, accessed September 25, 2023.

[25]   In MRM, the NPI field that is consistently populated across 2014-2016 is called PROV_NPI. In addition, there is a second NPI field in MRM called REND_PROV_NPI, which is only populated in service year 2016 for just under half of records). I use both of these fields when matching chart review records to EDPS, such that if either one matches the NPI information in EDPS, it is considered a match and thus a Reviewed Encounter.

[26]   To avoid any potential incorrect match to EDPS, I exclude NPIs that are associated with groups of providers, rather than individual providers, according to a publicly available CMS dataset. This excludes the possibility of my second matching method matching a provider-reported EDPS encounter with Provider A to a chart review encounter with Provider B, if Provider A and B share an NPI because they are in the same group. The publicly available CMS dataset that I rely on to identify individual and group NPIs is called the "National Plan and Provider Enumeration System (NPPES) Downloadable File," and it contains deactivated as well as active NPIs. "NPPES NPI Registry," Centers for Medicare & Medicaid Services, https://npiregistry.cms.hhs.gov/search, accessed September 25, 2023.

[27]   For this exclusion in MRM, I rely on the same list of five "error and omission" codes discussed in **FN 21** for ChartSync, and to determine the chart status I rely on the GCM_BUS_FUNC_STATUS field. MRM also contains a field called GCM_PROGRAM_NAME, which I use to exclude all Charts associated with a program other than the Chart Review Program (as indicated by the value 'CR' in this field).

23.    MRM, unlike ChartSync or the vendor files, directly indicates whether each Chart went through Second Level Review.[28] I identify each encounter associated with a Second Level Review and separately quantify the financial impact of Defendants' failure to delete unsupported diagnosis codes associated with these encounters.

### iii.   Identification of Informed-Coded Charts

24.    As discussed in the Report, I exclude from the list of chart review encounters used to identify Reviewed Encounters all encounters associated with Charts for which the chart review data is potentially unreliable or incomplete due to the Coder being informed about diagnosis codes previously submitted to CMS for that beneficiary in that year. To identify informed coded Charts, I rely on the lists of Chart IDs that Defendants identified as being subject to informed coding.[29, 30]

### B. Identification of Provider-Reported, Risk Adjustment-Eligible Encounters in Defendants' Risk Adjustment Databases

25.    Defendants' Chart Review Program reviewed certain Charts associated with provider-reported, risk adjustment-eligible encounters. To assess the correspondence between diagnosis codes recorded by Defendants' Coders during Chart Review and diagnosis codes submitted by providers for those encounters reviewed during Chart Review, I must first identify provider-reported, risk adjustment-eligible encounters in each of Defendants' Risk Adjustment Databases, as discussed in **Section III.B**.[31]

---

[28]    Charts that went through Second Level Review in MRM appear twice in the data, with a value of "Coding" in the GCM_BUSS_FUNC_NAME field for the first review and "SLR" for the Second Level Review.

[29]    MARA2117127; MARA2117128; Production of Responses and Documents Responsive to CR / CV Interrogatories 1(A), 1(E), 3(A)-(B), 3(E), 3(H), 3(M), and 6 and Document Requests 4(C)(iv)(n) and 5, January 29, 2016. This document identifies: (1) charts that were subject to informed coding as a result of the Recode Project that occurred in project year 2012; and (2) charts that were reviewed by iCodify which were coded using informed coding.

[30]    In addition to the list of Chart IDs produced by Defendants, I also rely on a crosswalk Defendants produced for mapping Chart IDs to IRADS 'CHARTAUDIT' encounters, so that I can identify and exclude these encounters in IRADS as well. MARA2157336; MARA2152917.

[31]    While it is possible that some encounters that are not eligible for use in risk adjustment were reviewed in Defendants' Chart Review Program, these encounters are not relevant to my analysis, because they are not allowed to affect payment amounts from CMS to Defendants. I therefore exclude these encounters from my analyses.

### i. Identification of Provider-Reported Encounters

26.   The SUB_SOURCE_CD field in IRADS, mentioned above in **Section III.A.i**, can be used to identify whether an encounter originated from a Provider-Reported Claims Databases, and if so, which Provider-Reported Claims Database. I rely on this field to identify provider-reported encounters in IRADS.[32]

27.   As discussed in **Section III.A.i**, in EDPS, provider-reported encounters are stored in a separate table from encounters from alternative sources, so they are easy to identify. However, unlike IRADS, EDPS can contain multiple versions of a single provider-reported encounter. For example, it is possible for a provider-reported encounter to be submitted by the provider and later corrected or deleted.[33] I therefore identify the most recent version of each provider-submitted encounter using a combination of fields.

### ii. Identification of Risk Adjustment-Eligible Encounters

28.   In IRADS, Defendants attached error messages to encounters that were not eligible for use in risk adjustment.[34] Some of the most common error messages in IRADS are "Lab services are excluded," "Provider specialties are excluded," and "Diagnostic Radiology Services are excluded."[35] IRADS encounter error information also contains a variable called ACTIVE_FLG which indicates whether the error message in question was "active." I

---

[32]   The Provider-Reported Claims Databases evolved over time.

[33]   Each edit to a provider-reported encounter in EDPS is associated with a unique identifier in a field called MED_CLM_SK. A provider-reported encounter that was never altered in EDPS is associated with a single MED_CLM_SK, whereas a provider-reported encounter that was edited multiple times would include a unique MED_CLM_SK for each edit. Edits can include adding diagnosis codes to the encounter, as well as correcting or deleting diagnosis codes, and the PRCS_STS_NM field indicates the edit type (e.g., "Original," "Correction," "Delete"). EDPS also includes a field called PRNT_MED_CLM_SK, which indicates the "parent" MED_CLM_SK to which corrections and deletions are tied. First, I identify a set of voided versions by creating a list of the "parent" claims (PRNT_MED_CLM_SKs) associated with deletions and correction that were accepted by CMS. I rely on the PRCS_STS_NM field to identify whether a claim is a correction or a delete. If CMS accepted a deletion or correction, it implies the associated "parent" claim is now void. I remove these voided versions of the claim. I then limit the remaining claims to those accepted by CMS. I rely on the PRCS_ST_NM field to determine whether CMS accepted each version of the claim. This field takes on values such as "CMS Accepted" and "CMS Rejected."

[34]   In IRADS, the ERROR_KEY field contains a numerical value which can be mapped to an ERROR_MSG field which contains the meaning of each numerical value.

[35]   As discussed in my **Report, Section III.B.i**, only face-to-face encounters with providers from certain specialties are considered eligible for risk adjustment.

**1540**

identify risk adjustment-eligible encounters as encounters that are not associated with an active error message.[36]

29.    In EDPS, risk adjustment-eligible encounters are identified based on the type of bill ("TOB") codes[37] and Current Procedural Terminology/Healthcare Common Procedure Coding System ("CPT/HCPCS") codes[38] associated with the encounter. CMS uses the TOB code to determine whether an encounter reflects services provided by a facility that is an acceptable source of risk adjustment diagnosis codes.[39] Institutional inpatient and institutional outpatient claim types are mapped to acceptable TOB codes as determined by CMS.[40] CPT/HCPCS codes are used in healthcare billing for coding medical services, procedures, and supplies. For example, CPT code 99212 represents an office visit or other outpatient visit for an established patient (as opposed to a new patient) lasting between 10 and 19 minutes.[41] For each service year, CMS publishes a list of CPT/HCPCS code that it considers eligible for use in risk adjustment. Per CMS guidelines, as long as one service associated with the encounter is risk adjustment-eligible, all diagnosis codes associated with the encounter are risk adjustment-eligible.[42] I use these two types of codes to identify

---

[36]    To determine whether an encounter is associated with an error message, I consider only the error messages that are active for that encounter (i.e., the ACTIVE_FLG is equal to "Y"). While I observe that Defendants generally did not submit to CMS diagnosis codes on encounters with an active error message, in a small number of cases, even though the encounter is associated with an active error message, Defendants appear to have submitted at least some of the diagnosis codes on the encounter to CMS. In these cases, I consider the encounter risk adjustment-eligible, despite the error message.

[37]    EDPS does not contain a field that reflects the TOB associated with each encounter. However, CMS produced three datasets that contain TOBs for each encounter in EDPS (USBP009429419-21), which I rely on to identify TOBs.

[38]    EDPS contains a field called BILL_PRCDR_CD, which contains the CPT/HCPCS code associated with each service associated with the encounter.

[39]    Cheri Rice, "Final Encounter Data Diagnosis Filtering Logic," Centers for Medicare & Medicaid Services, December 22, 2015, https://www.csscoperations.com/internet/cssc3 nsf/files/Final%20Industry%20Memo%20Medicare%20Filterin g%20Logic%2012%2022%2015.pdf/$FIle/Final%20Industry%20Memo%20Medicare%20Filtering%20Logic% 2012%2022%2015.pdf, accessed October 15, 2022, pp. 3–5.

[40]    *Ibid.*, pp. 3–5.

[41]    "CPT code 99212: Established patient office visit, 10-19 minutes," American Medical Association, https://www.ama-assn.org/practice-management/cpt/cpt-code-99212-established-patient-office-visit-10-19-minutes, accessed September 25, 2023.

[42]    Cheri Rice, "Final Encounter Data Diagnosis Filtering Logic," Centers for Medicare & Medicaid Services, December 22, 2015, https://www.csscoperations.com/internet/cssc3 nsf/files/Final%20Industry%20Memo%20Medicare%20Filterin g%20Logic%2012%2022%2015.pdf/$FIle/Final%20Industry%20Memo%20Medicare%20Filtering%20Logic%

risk adjustment-eligible encounters among three risk adjustment-eligible provider types (institutional inpatient, institutional outpatient, and professional encounters) following the CMS Final Encounter Data Diagnosis Filtering Logic.[43]

### C. Matching Encounters from Chart Review Data to Provider-Reported Encounters

30. Defendants' Chart Review Program did not review all provider-reported, risk adjustment-eligible encounters. As discussed in my **Report, Section IV.A**, chart review was only performed on a subset of Charts. Making the further determination that the Chart associated with a given provider-reported, risk adjustment-eligible encounter was reviewed involves matching these encounters to encounters in chart review data.

31. I employ two matching methods to identify which provider-reported, risk adjustment eligible encounters in Defendants' Risk Adjustment Database represent Reviewed Encounters. If either method is satisfied, I consider the encounter to have been reviewed. I use both methods in both of Defendants' Risk Adjustment Databases.

### i. Provider Identifier Match

32. My first matching method applies in cases where there is an exact date of service match and a provider identifier match between a provider-reported, risk adjustment-eligible encounter and a chart review record.

33. To determine if there is an exact date of service match, I look for records in Defendants' chart review data that have start and end dates that exactly correspond to the start and end dates of provider-reported encounters. If the start and end dates are not identical,

---

2012%2022%2015.pdf, accessed October 15, 2022; "Medicare Risk Adjustment Eligible CPT/HCPCS Codes,"ibid., https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/risk-adjustors-items/cpt-hcpcs, accessed September 18, 2023.

[43] Cheri Rice, "Final Encounter Data Diagnosis Filtering Logic," Centers for Medicare & Medicaid Services, December 22, 2015, https://www.cssoperations.com/internet/cssc3 nsf/files/Final%20Industry%20Memo%20Medicare%20Filtering%20Logic%2012%2022%2015.pdf/$FIle/Final%20Industry%20Memo%20Medicare%20Filtering%20Logic%2012%2022%2015.pdf, accessed October 15, 2022; "Medicare Risk Adjustment Eligible CPT/HCPCS Codes," Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/risk-adjustors-items/cpt-hcpcs, accessed September 18, 2023. Institutional inpatient encounters and institutional outpatient encounters are identified using TOB codes found in Tables 1 and 2 of the CMS Final Encounter Data Diagnosis Filtering Logic, respectively. Institutional outpatient encounters and professional encounters are limited to those with risk adjustment-eligible CPT/HCPCS codes found in the risk adjustment-eligible CPT/HCPCS Code list published annually by CMS.

encounters are not matched, even if the provider-reported encounter's date range contains, is contained within, or otherwise overlaps with the chart review record's date range.

34.   If I have found an exact service date match, I then determine if there is a provider identifier match by comparing the provider identifier on the provider-reported encounter in Defendants' Risk Adjustment Databases to the provider identifier that Defendants associated with a given Chart for collection purposes in their Chart Review Program. For matching IRADS provider-reported encounters to chart review, I rely on Provider ID. However, because the format of Provider ID differs in IRADS and Chart Review Databases, I leverage a crosswalk created and used by Defendants[44] called SAS_ALL_PROVIDERS to reconcile Provider IDs.[45] I use this table to evaluate correspondence between Provider IDs in Defendants' Risk Adjustment Databases with Provider IDs in Defendants' Chart Review Databases.[46] For matching EDPS provider-reported encounters to chart review, I rely on NPI.[47]

35.   To demonstrate this method, consider the hypothetical presented in **Exhibit B** below. Because the beneficiary, dates of service and provider identifiers match for the January 1, 2010 encounter, I conclude that the chart reviewed with Chart ID 123abc-45de was associated with encounter 0000A00001, making encounter 0000A00001 a Reviewed Encounter. Similarly, I conclude that the chart reviewed with Chart ID 678fab-90c was associated with encounter 0000A00002, making encounter 0000A00002 a Reviewed Encounter. I would not consider encounter 0000A00003 to be a Reviewed Encounter under

---

[44]   Cannon Deposition Volume 1, 99:7–9 ("I think data elements from the SAS_All_Providers table could be used in ChartSync to help to identify providers.").

[45]   MAPL003292389 ("All_Providers program collects provider and provider_group related data from different sources and consolidates all this data into one record per provider_id.").

[46]   Deposition of Jon H. Bird 30(b)(6), *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. CV 16-08697 FMO, June 22, 2023 ("Bird Deposition Volume 1"), 262:2–263:10.

[47]   As described above in **Section III.A ii.c**, I limit my use of NPIs to only those associated with individual providers. To perform this matching, I rely on two fields in MRM (PROV_NPI and REND_PROV_NPI), and the rendering and billing providers recorded in the NPI and PROV_TYPE fields in EDPS.

this method because while the beneficiary and dates of service match to the chart review encounter, the provider identifiers do not match.[48]

**Exhibit B**
**Provider-Reported Encounters**

| Beneficiary | Encounter | Start Date | End Date | Provider | Source |
|---|---|---|---|---|---|
| 123456789A | 0000A00001 | 1/1/2010 | 1/1/2010 | 000000123 | Claims |
| 123456789A | 0000A00002 | 3/1/2010 | 3/1/2010 | 000000456 | Claims |
| 123456789A | 0000A00003 | 3/1/2010 | 3/1/2010 | 000000789 | Claims |

**Chart Review Encounters**

| Beneficiary | Chart ID | Start Date | End Date | Provider |
|---|---|---|---|---|
| 123456789A | 123abc-45de | 1/1/2010 | 1/1/2010 | 000000123 |
| 123456789A | 678fab-90c | 3/1/2010 | 3/1/2010 | 000000456 |

36.    As illustrated by the above hypothetical, this method of matching allows for the identification of Reviewed Encounters on dates of service where a beneficiary sees multiple providers if and only if there is a provider match between one of the provider-reported encounters and the chart review encounter. If a beneficiary sees multiple providers on a date of service and none of these providers match to the provider associated with a chart review encounter for that same beneficiary on that same date of service, as would be the case if the provider identifier for the chart review on March 1, 2010 above were an identifier other than 456 (e.g., 731 or 198), I would not consider any of the provider-reported encounters to be Reviewed Encounters. I apply this limit out of caution, despite the possibility that one of these provider-reported encounters does correspond to the chart review encounter.

### ii.  Single Provider on Date of Service

37.    The second method of matching identifies Reviewed Encounters when there is only one provider identifier associated with all provider-reported, risk-adjustment eligible encounters in Defendants' Risk Adjustment Databases for a beneficiary on a particular date of service and an encounter for that beneficiary on that date of service is observed in chart

---

[48]    While I would not identify encounter 0000A00003 as a Reviewed Encounter, I would still consider diagnosis codes associated with encounter 0000A00003 in constructing the final Deletes list. I elaborate upon how I do this in **Section VIII**.

review. In this case, I conclude that the Chart associated with the provider-reported encounter(s) was reviewed in the Chart Review Program., regardless of whether there is a provider identifier match. If Defendants' Risk Adjustment Databases indicate that the beneficiary only saw one provider on a given date of service, and there is a Chart associated with that beneficiary and date of service, the Chart must be associated with that same provider.

38.  As explained in my **Report, Section IV.E**, there are valid reasons why the provider identifier may differ between a provider-reported encounter and the chart review record of that encounter. Chart review records may include "dummy" provider identifiers or provider identifiers corresponding to a provider related to but different from the true provider who had the face-to-face encounter with the beneficiary and who is typically the provider identified in provider-reported encounters. For example, a related provider may be another provider practicing in the same office or location as the provider who had the face-to-face encounter with the beneficiary.

39.  When determining whether only one provider identifier is associated with a particular date of service in Defendants' Risk Adjustment Databases for a given beneficiary, I consider provider identifiers associated with both single-day encounters (*i.e.*, encounters where the start and end dates are the same) and multi-day encounters (*i.e.*, encounters where the end date is after the start date). This means that for a given date of service, I count the number of distinct providers across both single-day encounters taking place on that date and multi-day encounters where the service date range includes that date. As discussed in **Section III.A**, I use Provider ID as the provider identifier in IRADS and NPI as the provider identifier in EDPS. I therefore use Provider ID to count providers on each date of service in IRADS and I use NPI to count providers on each date of service in EDPS.[49]

40.  As I explain in my **Report, Section VI.E** and discuss further in **Section VI.A.iv** below, deposition testimony indicates that a technical issue may have impacted transmission of data from certain Provider-Reported Claims Databases to IRADS during the at-issue

---

[49]  Each encounter in EDPS can be associated with a rendering provider and a billing provider. To select a provider identifier for use in counting, I choose the field that is populated with an individual NPI, according to the NPPES data discussed in **FN 24** above. In the rare case that both fields are populated with an individual NPI, I give preference to the rendering provider NPI.

period.[50] I therefore also check the Provider-Reported Claims Databases to ensure that there is just one provider associated with the date of service in those databases before I match a provider-reported encounter from IRADS to chart review using this method.

41.    To demonstrate this method of matching, reconsider the hypothetical shown in **Exhibit B** above. Based on the provider identifiers in the provider-reported encounter data, this beneficiary saw one provider on January 1, 2010 (Provider 123) and two providers on March 1, 2010 (Providers 456 and 789). Because only one provider identifier is associated with January 1, 2010 and we observe a chart review record associated with that exact date, I would conclude under this method that the chart reviewed with Chart ID 123abc-45de was associated with provider-reported encounter 0000A00001, making encounter 0000A00001 a Reviewed Encounter.

42.    In this example, the provider identifiers on the provider-reported encounter and the chart review record match exactly (both are Provider 123). However, if the provider identifier in chart review for the January 1, 2010 encounter were Provider 999, encounter 0000A00001 would still be considered a Reviewed Encounter under my second method, because only one provider was seen on January 1, 2010 and there is a chart review record for January 1, 2010.

43.    In contrast, neither encounter 0000A00002 nor encounter 0000A00003 would be considered a Reviewed Encounter under my second method. While these two encounters take place on a date of service that is observed in Defendants' chart review data, they are associated with different providers (*i.e.*, the provider count is two for that beneficiary-date of service combination) and it is unclear which encounter was reviewed without

---

[50]    Deposition of Marybeth Meyer, *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. 16-08697 FMO, June 7, 2022 ("Meyer Deposition"), 232:19–233:10 ("Well, the focus on the data issues really came with the implementation of the Encounter Data System. That was also one of the ways where we identified that the data being submitted to Optum and then being submitted to CMS via the new encounter data submitted system was -- had gaps in it. And the Encounter Data System, we started submitting data to CMS in -- was 2012 dates of service. I think it was mid-- early to mid-2013 EDS data started to go to CMS, and CMS did not move to EDS as a primary -- as the only source of risk adjustment calculation until dates of service. So I would say from the 2012 dates of service all the way through the 2021 dates of service, there was a lot of activity on improving the completeness of the date of submissions."). I perform this check when matching IRADS provider-reported encounters to chart review only. I do not perform a similar check when matching EDPS provider-reported encounters to chart review as the deposition testimony indicated the technical issue was specific to IRADS.

additionally comparing provider identifiers. However, since one of the provider identifiers (456) does match exactly, 0000A00002 would be considered reviewed under my first method.

## IV.  IDENTIFICATION OF SUPPORTED DIAGNOSIS CODES

44.  After identifying provider-reported encounters in Defendants' Risk Adjustment Databases that were reviewed in Defendants' Chart Review Program (*i.e.*, Reviewed Encounters), I check whether the diagnosis codes from those provider-reported encounters were supported by the chart review. I consider an instance of a given diagnosis code from a provider-reported encounter to be supported if, and only if, the same diagnosis code is included in the chart review record of that encounter in Defendants' Risk Adjustment Databases.[51] Otherwise, I consider that particular diagnosis code instance to be unsupported.

45.  As an example, consider the reviewed encounter on January 1, 2010 for Beneficiary 123456789A discussed above (encounter number 0000A00001). Since I determined that this provider-reported encounter was a Reviewed Encounter, I next determine whether its associated diagnosis codes were identified in Defendants' Chart Review Program by looking to the corresponding chart review data in Defendants' Risk Adjustment Database. **Exhibit C** shows that diagnosis codes 25000, 43491, and 5569 were reported by the provider. However, only diagnosis codes 25000 and 43411 were identified by Defendants in their Chart Review Program. I therefore consider diagnosis 25000 to be supported and diagnosis codes 43491 and 5569 to be unsupported.[52] If my method had *not* determined that encounter number 0000A00001 was a Reviewed Encounter, I would of course not find any diagnosis codes unsupported in this case.

---

[51]  I perform this comparison in IRADS using encounters with a SUB_SOURCE_CD value of "CHARTAUDIT." As noted above, EDPS does not contain an analogous field to identify records originating from Defendants' Chart Review Databases. I therefore rely on Defendants' Chart Review Databases directly for EDPS.

[52]  While I do not consider diagnosis code 43491 to be supported, I check for other diagnosis codes mapping to the same HCC as an unsupported diagnosis code – such as diagnosis code 43411 in this hypothetical – before I classify an unsupported diagnosis such as 43491 as a Delete.

**Exhibit C**
**Provider-Reported Diagnosis Codes**

| Beneficiary | Encounter | Start Date | End Date | Provider | Source | Diagnosis | HCC |
|---|---|---|---|---|---|---|---|
| 123456789A | 0000A00001 | 1/1/2010 | 1/1/2010 | 000000123 | Claims | 25000 | 19 |
| 123456789A | 0000A00001 | 1/1/2010 | 1/1/2010 | 000000123 | Claims | 43491 | 96 |
| 123456789A | 0000A00001 | 1/1/2010 | 1/1/2010 | 000000123 | Claims | 5569 | 33 |

**Chart Review Diagnosis Codes**

| Beneficiary | Chart ID | Start Date | End Date | Provider | Source | Diagnosis | HCC |
|---|---|---|---|---|---|---|---|
| 123456789A | 123abc-45de | 1/1/2010 | 1/1/2010 | 000000123 | Chart Review | 25000 | 19 |
| 123456789A | 123abc-45de | 1/1/2010 | 1/1/2010 | 000000123 | Chart Review | 43411 | 96 |

## V.   IDENTIFICATION OF SUBMITTED DIAGNOSIS CODES

46.   As explained in my **Report, Section VI.C**, both of Defendants' Risk Adjustment Databases, IRADS and EDPS, contain fields that indicate whether each diagnosis code was submitted to, and accepted by, CMS. Diagnosis codes submitted by Defendants to CMS were maintained by CMS in parallel risk adjustment databases to IRADS and EDPS, known as RAPS and CMS EDPS, respectively. In this section, I describe how I identify submitted diagnosis codes among those diagnosis codes associated with Reviewed Encounters.[53]

47.   During the at-issue period, it was Defendants' policy not to submit some duplicate diagnosis codes from IRADS to RAPS if the same diagnosis code had already been submitted for a given beneficiary for the same service year.[54] In these cases, diagnosis

---

[53]   To confirm I am correctly identifying submitted diagnosis codes, I replicate the risk scores that CMS calculates for each beneficiary using the list of submitted diagnosis codes that I identify. As discussed in **Section IX.B**, I am able to replicate 98% of beneficiary Part C risk scores recorded by CMS and 95% of Part D risk scores.

[54]   Bird Deposition Volume 1, 194:6 –196:10 ("So there's other codes that CMS would – so a true duplicate, then you were not supposed to submit to CMS. They didn't want to get multiple versions of the same code submitted. This was a process that was implemented internally. And legend has it that at the request of CMS – I don't know exactly what the source was – to limit the amount of data that they were receiving where only one member diagnosis combination per six months should be submitted for risk adjustment purposes."); Deposition of Melissa Sedor 30(b)(6), *United States of America, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc., et al.*, No. CV 16-08697 FMO, June 29, 2023 ("Sedor Deposition"), 101:6–23 ("Q. And in RAPS, CMS had a

codes would be flagged in IRADS as not submitted even though they were eligible for use in risk adjustment. Therefore, in IRADS, even when an encounter is eligible for use in risk adjustment, not every risk-adjustment eligible diagnosis code associated with that encounter was necessarily submitted to and accepted by CMS. To identify submitted and accepted diagnosis codes in IRADS, I rely on two fields, which reflect the "state" of the diagnosis code (*i.e.*, whether it was submitted by Defendants to CMS)[55] and the "status" of the diagnosis code (*i.e.*, whether it was accepted by CMS).[56, 57] If a diagnosis code associated with a Reviewed Encounter is associated with a state of "CMS Response Processed" and a status of "RAPS Accepted," I consider that diagnosis code to have been submitted by Defendants and accepted by CMS.

48.    CMS EDPS processing was not similarly limited. CMS guidance to MAOs was to submit all diagnosis codes associated with risk adjustment-eligible encounters, regardless of whether the diagnosis code had already been submitted with another encounter in the same year. As discussed in **Section III.B.i**, I rely on a combination of fields in EDPS to determine the most recent accepted version of each provider-reported encounter. Consistent with CMS guidance, I consider all diagnosis codes associated with the most recent accepted version of these encounters to be submitted to and accepted by CMS.

## VI.  IDENTIFICATION OF POTENTIAL DELETES

49.    As explained in my **Report, Section VI.D**, I identify Potential Deletes in two steps. I first create a list of all diagnosis codes that are Submitted Diagnosis Codes but not Supported Diagnosis Codes (*i.e.*, all diagnosis codes from Reviewed Encounters that were submitted

---

policy that you couldn't have more than 5 percent duplicate diagnosis clusters; right? A. Yes. … Our business practice was to submit one and not two.").

[55]   To obtain the "state" of each diagnosis code, I use the REC_STATE_KEY in IRADS, which contains a numerical value from 1 to 10, and map that a meaning using a crosswalk produced by Defendants. MARA2083697.

[56]   To obtain the "status" of each diagnosis code, I rely on the REC_STATUS_KEY in IRADS, which contains a numerical value from 1 to 13, and map that a meaning using a crosswalk produced by Defendants. MARA2083698.

[57]   Cannon Deposition Volume 1, 301:1–304:2 ("Is there a way to tell from the data whether those specific diagnosis codes were in fact submitted to CMS and accepted by RAPS? THE WITNESS: A potential way is to utilize the Rec_State and Rec_Status_Key. The best way to do that is really to utilize the RAPS return data from CMS."). As discussed below, I also look for diagnosis codes in the finalized CMS data, which should correspond to the RAPS return data.

to CMS but were not supported by chart review). I then remove from this list any diagnosis codes where the Coder in the Chart Review Program found support for a different diagnosis that maps to the same HCC.[58] I therefore consider the provider-reported diagnosis code to be indirectly supported by the Chart Review if the diagnosis code reported by the provider and the diagnosis code recorded by the Coder in chart review map to the same HCC.

50.    To illustrate this, consider the example of Beneficiary 123456789A's encounter on January 1, 2010 in **Exhibit C** above. While the chart review of this encounter did not find support for diagnosis code 43491, it did find support for diagnosis code 43411. Both diagnosis code 43491 and diagnosis code 43411 map to HCC 96. I would therefore *not* include diagnosis code 43491 on the list of Potential Deletes.[59] I would, however, include diagnosis code 5569 from the provider-reported encounter on the list of Potential Deletes, as the Coder in chart review did not record any diagnosis mapping to the same HCC (33).

## VII.  CLASSIFICATION OF POTENTIAL DELETES

51.    As discussed in my **Report, Section VI.E**, I classify diagnosis codes on my list of Potential Deletes as meeting certain HCC-related criteria, which I then use to identify the Deletes list. Specifically, I assess whether diagnosis codes on my list of Potential Deletes map to the same HCCs as other diagnosis codes observed in Defendants' databases, which do not appear on the list of Potential Deletes, or to HCCs, which were recorded in Defendants' Claims Verification Program. For the former, I distinguish between other diagnosis codes that were submitted to CMS and other diagnosis codes that were not submitted to CMS. As explained in my **Report, Section VI.E**, I make this distinction because deleting a diagnosis code that maps to the same HCC as another *submitted* diagnosis code would have no impact on a beneficiary's risk score or payment, while deleting a diagnosis code that only maps to the same HCC as another *unsubmitted* code (or one that does not map to the same HCC as any other diagnosis code) would impact the beneficiary's risk score, and in turn, the risk adjustment payments.

---

[58]    See **Report, Section III.B** for a discussion of how multiple diagnosis codes can map to the same HCC.

[59]    I would also exclude diagnosis code 25000 from the list of Potential Deletes, as it is directly supported by the chart review record.

52.    I discuss below the different data sources I use to examine these other submitted and other unsubmitted diagnosis codes. The first two data sources include both submitted and unsubmitted codes, while the others include only unsubmitted codes. I additionally discuss the Claims Verification data, which I also use as a basis for classifying diagnosis codes on my Potential Deletes list.

### A.  Data Sources

#### i.  Chart Review Encounters in Defendants' Risk Adjustment Databases

53.    I examine submitted and unsubmitted diagnosis codes associated with Chart Review encounters in Defendants' Risk Adjustment Databases. As discussed in **Section III.A.i** above, Chart Review records in IRADS are indicated with 'CHARTAUDIT' in the SUB_SOURCE_CD field. As I have not identified an equivalent field in EDPS to identify Chart Review records, I instead examine the broader set of all non-provider-reported diagnosis codes that are associated with risk adjustment-eligible encounters in EDPS, including but not limited to encounters originating from Chart Review. [60] For both IRADS and EDPS, I follow the method described in **Section V** above to identify submitted versus unsubmitted diagnosis codes from these encounters.

#### ii.  Unreviewed Risk Adjustment-Eligible Encounters

54.    I examine submitted and unsubmitted diagnosis codes associated with risk adjustment-eligible encounters in Defendants' Risk Adjustment Databases that I do not identify as Reviewed Encounters using either of the matching methods described in **Section III.C**.

55.    For IRADS, I examine all diagnosis codes associated with provider-reported, risk adjustment-eligible encounters (the identification of which is described in **Section III.B**), which were not matched to Chart Review records using either matching method, either because the encounter was not reviewed or because it was reviewed but there was misalignment in the fields used for matching. I also examine a small number of additional risk adjustment-eligible diagnosis codes associated with encounters in IRADS that did not originate from provider-reported claims or from the Chart Review Program, according to

---

[60]    I describe in **Section III.B.ii** the method I use to identify the final accepted version of risk-adjustment eligible provider-reported encounters in EDPS. I apply these same methods to identify the final accepted version of risk-adjustment eligible non-provider-reported encounters in EDPS.

the SUB_SOURCE_CD.[61] As discussed in **Section V**, Defendants' practice in IRADS was to not submit duplicate diagnosis codes, even if those diagnosis codes were associated with a risk adjustment-eligible encounter. I choose to examine these unsubmitted diagnosis codes given the possibility that Defendants would have submitted them had they been the only instances of those diagnosis codes.[62, 63]

56.     For EDPS, I examine all diagnosis codes associated with provider-reported, risk adjustment-eligible encounters (the identification of which is described in **Section III.B.ii**), which were not matched to chart review records using either matching method.

57.     For both IRADS and EDPS, I follow the method described in **Section V** above to identify submitted versus unsubmitted diagnosis codes from these encounters. In my examination of these diagnosis codes in both systems, I do not consider any diagnosis codes associated with these encounters, which were deleted by Defendants.

### iii.   Additional Chart Review Data

58.     I examine diagnosis codes from Defendants' Chart Review Databases that do not appear in Defendants' Risk Adjustment Databases. These diagnosis codes are necessarily unsubmitted. I consider all such diagnosis codes, with the exception of diagnosis codes that Defendants have indicated they purposefully did not pass into their Risk Adjustment Databases. Defendants identified a set of 21 "error and omission" codes which, when associated with a diagnosis code in chart review data, would "block" the submission of that diagnosis code to its Risk Adjustment Databases.[64] I do not consider instances of diagnosis

---

[61]   These additional values for SUB_SOURCE_CD, including DIRECT and HOUSECALL, represent 6.3% of encounters in IRADS.

[62]   I do this because Defendants did not necessarily submit a previously unsubmitted instance of a given diagnosis code when a submitted instance of that diagnosis code was found to be unsupported. Sedor Deposition, 104:1–11 ("So if we had -- if the same member saw the same provider three times and got diagnosed with diabetes, we would only submit that one time and save the other two in the database. If at some point we found out that the one we chose to submit was no longer supported but we still had two others that were supported, then we chose to net those out because ultimately the impact to your risk score is still the same. You could still support that that member had diabetes for that date of service year.").

[63]   The only exceptions are by state code, status code, and their associated descriptions are: 10-11, CMS Response Processed / Delete; 3-1, Front End Error / Front End Error; 4-4, Excluded / Excluded by User.

[64]   The diagnosis codes that Defendants identified take on the following values: C01, C02, C03, C04, C05, C06, D01, D02, D03, D05, D06, D07, D09, D11, D12, D13, D14, D19, D20, D27 and D28. Production of Responses to Questions re: Chart Reviewed File 4(C)(iv) – Chart Error & Omission Codes and Chart Reviewed File 4(C)(v) – Diagnosis Error & Omission Codes, December 1, 2016, p. 2.

codes associated with these error and omission codes unless there is at least one instance of the same diagnosis code for a beneficiary within the service year that does <u>not</u> include one of these error and omission codes.

### iv.  Defendants' Provider-Reported Claims Databases

59.  I examine diagnosis codes from Defendants' Provider-Reported Claims databases that do not appear in Defendants' Risk Adjustment Databases.

60.  As shown in **Exhibit 9** in my Report, information from Defendants' Provider-Reported Claims databases that is relevant to risk adjustment generally was passed into Defendants' Risk Adjustment Databases. However, due to testimony from a witness in this matter regarding a potential technical issue with this transmission during the at-issue period, I examine diagnosis codes that may not have been transmitted from these systems in my classification of Potential Deletes.

61.  The witness did not specify with certainty the time period over which the transmission process was affected, nor did the witness specify which of multiple Provider-Reported Claims systems were impacted.[65] I therefore processed data from several of the largest Provider-Reported Claims systems in an effort to identify diagnosis codes that may not have been properly transmitted to IRADS. I refer to these claims systems by the following names, as recorded in the MEMBER_SOURCE_CD field in IRADS: COSMOS, NICE, FACETSRV, FACETSCSP, and SNFCT. Together, these systems represent 96.8% of diagnosis codes associated with provider-reported encounters in IRADS from service dates 2008–2016. While many diagnosis codes present in these Provider-Reported Claims databases may not have been transmitted to IRADS for a valid reason other than the technical issue (*e.g.*, the claim is for an encounter that is not risk adjustment-eligible), I

---

[65]  The witness mentioned COSMOS and FACETS as examples of impacted systems but could not confirm that these were the only impacted systems. Meyer Deposition, 196:9–197:9 ("A. There is multiple claim -- claim processing systems. There's – there's Facets; there's Cosmos. Those are the two big claim processing systems that process Medicare Advantage claims. … They included information that Optum did not have. They did not receive that information in their data feeds. Q. Any other system besides Facets and Best [sic]? A. I think there were other claims processing systems. There's been a lot of, you know, company acquisitions where you get their claim processing system and then it gets merged. I can't think of other system names. … Q. Was this additional data that you're referring to not in IRADS? A. Correct. It's not in IRADS.").

identify and examine a broad set of diagnosis codes in these databases that were not transmitted to IRADS. I describe my process for identifying these diagnosis codes below.

62. Across the Provider-Reported Claims databases, the following information is available for a given medical claim: beneficiary information (*e.g.*, ID number, first name, last name, date of birth), provider information (*e.g.*, provider identifier, specialty, name, address), dates of service, diagnosis codes, and procedure codes.

63. In processing the data from each Provider-Reported Claims database, I first identify the variables that would enable me to match beneficiaries and encounters to IRADS (including dates of service, provider identifiers, and diagnosis codes). For each database and year, I then take the following steps to generate a list of diagnosis codes that may not have been transmitted to IRADS due to the technical issue mentioned above. First, I identify all beneficiaries associated with the particular claims database in IRADS that year using the MEMBER_SOURCE_CD field and limit the Provider-Reported Claims data to data associated with these beneficiaries. Second, I identify the encounters in the Provider-Reported Claims data for which there is an encounter match to IRADS.[66] For *matched* encounters, I then identify those diagnosis codes associated with the encounter in the Provider-Reported Claims database, which are not observed in IRADS as part of the same encounter.[67] For *unmatched* encounters, I identify those diagnosis codes associated with the encounter in the Provider-Reported Claims database, which were not observed in IRADS under the same dates of service and provider. In a third and final step, I generate for each beneficiary and year a list of unique diagnosis codes for examination based on the diagnosis codes identified in the second step.

---

[66] I match encounters using member identifiers, encounter identifiers, and dates of service. In this step, I limit provider-reported encounters in IRADS to those where the MEMBER_SOURCE_CD corresponds to the claims system being analyzed. In the largest Provider-Reported Claims database, COSMOS, I find that up to 13% of encounters have no match in IRADS and up to 0.5% of diagnosis codes from matched encounters are not observed in IRADS, depending on the year. For unmatched encounters, I find that up to 29% of diagnosis codes are not observed in IRADS under the same dates of service and provider, depending on the year.

[67] I identify unobserved diagnosis codes from observed encounters, as well as diagnosis codes observed in unobserved encounters given deposition testimony that the technical issue impacted entire claims as well as certain diagnosis codes on claims. Meyer Deposition, 200:15–17 ("[T]hey had been missing claims. They had been missing diagnosis codes on claims.").

### v. Data from Defendants' Claims Verification Program

64. I examine HCCs that were recorded in the Claims Verification program. To the extent that Claims Verification Coders identified HCCs supported by a Chart, and that had not already been identified by a Chart Review Coder, I consider such HCCs in my examination. Diagnosis codes mapping to HCCs that originated from CV are present in IRADS, as well as in separate CV datasets produced by Defendants, and I use both of these sources to identify diagnosis codes and HCCs recorded in the CV program. In IRADS, these are associated with a SUB_SOURCE_CD of 'CVADD'. In Defendants' CV datasets, I identify supported diagnosis codes and HCCs as those confirmed by either the initial CV Coder or the second, "expert" CV coder, as identified in the fields CV_REVIEW_CODED and CV_EXPERT_REVIEW_CODED. I also examine diagnosis codes and HCCs with a "disposition code" that indicates support was found for the medical condition the CV Coder was looking for.[68]

## VIII. IDENTIFICATION OF DELETES

65. As explained in my **Report, Section VI.F**, I identify Deletes as those diagnosis codes from the Potential Deletes list which did not meet *any* of the three criteria defined in my **Report, Section VI.E**. Deletes therefore represent diagnosis codes that do not share an HCC with any other submitted diagnosis code, do not share an HCC with any other risk adjustment-eligible but unsubmitted diagnosis code, and do not map to an HCC recorded in the Claims Verification program.

66. In addition, I require that Deletes satisfy several additional checks. Specifically, I do not consider as Deletes any of the following:

   i. Diagnosis codes that did not impact risk adjustment payments for the beneficiary, including diagnosis codes for newly enrolled beneficiaries;[69]

   ii. Diagnosis codes associated with beneficiaries who were not enrolled in a Medicare Advantage plan (or in the case of Part D, a MA-PD plan) for the whole year;

---

[68] These disposition codes include CVD02 (HCC and RxHCC on Chart) and CVD03 (Higher HCC and RxHCC on Chart). Production of Responses and Documents Responsive to CR / CV Interrogatories 1(A), 1(E), 3(A)-(B), 3(E), 3(H), 3(M), and 6 and Document Requests 4(C)(iv)(n) and 5, January 29, 2016, p. 6.

[69] I identify new enrollees using the RAF type, as discussed in **Section IX.A.v.**

    iii.    Diagnosis codes associated with beneficiaries who were not enrolled in Defendants' plans during the year; and

    iv.    Diagnosis codes associated with beneficiaries with end stage renal disease, whose risk adjustment payments are not determined by the CMS HCC Model or the CMS RxHCC Model.[70]

67.    For checks (ii) and (iii), I identify beneficiaries enrolled in Defendants' plans for at least one month of the year using a list of plan identifiers and dates produced by Defendants.[71]

68.    The final Deletes list is additionally limited to beneficiaries for whom I can perfectly replicate actual risk scores, as described in **Section IX.B** below. The final Deletes list for Part D additionally excludes diagnosis codes which only impact Part D risk scores and which are associated with beneficiaries enrolled in MA-PD plans for which changes in risk corridor payments fully offset changes in direct subsidy payments.

## IX.   CALCULATION OF FINANCIAL IMPACT OF DELETES

69.    As explained in my **Report, Section III.B**, Defendants received risk adjustment payments from CMS based on their beneficiaries' risk scores, based on beneficiary demographics and diagnosis codes MAOs submit to CMS. Risk scores are fundamental to my calculation of the financial impact of Defendants' failure to delete the diagnosis codes I identify as Deletes.

70.    The financial impact of Defendants' failure to submit the Deletes is equal to the amount of risk adjustment payments that Defendants retained, which were associated with these Deletes. I calculate this amount in three steps. First, I calculate a revised risk score for each beneficiary using a list of diagnosis codes that excludes diagnosis codes on the Deletes list. Second, I calculate the change in risk score as the difference between this revised risk score and the actual risk score that CMS used to determine risk adjustment payments to Defendants. As part of this step, I ensure I can replicate the actual risk score for each

---

[70]   I identify beneficiaries with end stage renal disease using the RAF type, as discussed in **Section IX.A.v.**

[71]   Defendants produced lists of their plan numbers, identified by CONTRACT_NBR, which do not include stand-alone prescription drug plans. My analysis therefore only includes Medicare Advantage Part C plans and Medicare Advantage plans with both Part C and Part D coverage. To limit to months in which a beneficiary was covered by a Defendants' plan I limit to months that fall between FROM_DT and THRU_DT. I do not include plans where CONTRACT_DESC is "INVALID CONTRACT NUMBER" or IS_BAD is equal to 1.

beneficiary in each year. Third, I use the change in each beneficiary's risk score to calculate an implied change in per member per month payments for each beneficiary. The calculated change in payments represents the payments retained by Defendants for the Deletes.

### A. Revised Risk Scores

71.    For each beneficiary and year, I calculate risk scores using CMS' risk adjustment model software, which is publicly available on the CMS website.[72] The software, which includes SAS macros and formats corresponding to different risk scoring models, is released every year for the upcoming payment year. Each yearly release includes the CMS HCC Model[73] and the CMS RxHCC Model, among others.[74] The CMS HCC Model is used to calculate risk scores and payments for the majority of Part C beneficiaries, while the CMS RxHCC Model is used to calculate risk scores and payments for Part D.

### i. Model Inputs

72.    The CMS HCC Model software and CMS RxHCC Model software both require two main inputs for each beneficiary: beneficiary diagnosis codes and beneficiary demographics. The beneficiary demographics used by the model are the beneficiary's sex, date of birth, Medicaid status, and original reason for enrollment in Medicare ("OREC").[75]

---

[72] "Medicare risk adjustment information," Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/risk-adjustors, downloaded on June 16, 2023.

[73] For some years at issue in this matter, there are two CMS HCC Models. As explained in my **Report, Section III.B**, the CMS Model assigns a numeric value to various factors that affect the expected costs to cover a beneficiary, including health status and demographics. The version of the model corresponds with its calibration, which is the process by which those factors that affect the expected costs to cover a beneficiary are assigned the numeric coefficient that contributes to a beneficiary's risk score. From payment year 2009 to 2013 scores were calculated using version 12 of the CMS HCC Model. In payment year 2014 model was recalibrated, which correspond with version 22 of the CMS HCC Model.

[74] The software also includes programs to calculate risk scores for beneficiaries whose payments are determined by other models, such as beneficiaries with end stage renal disease ("ESRD"). "Medicare risk adjustment information," Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/risk-adjustors. Some beneficiaries also have a "frailty" adjustor, which mandated that capitated payments for beneficiaries enrolled in the Program of All-Inclusive Care for the Elderly (PACE) be adjusted for the comparative frailty of PACE enrollees. I exclude ESRD and PACE beneficiaries from my analysis. Additionally, I exclude beneficiaries for whom I do not have sufficient data to complete my analyses, including new enrollees, beneficiaries in the data for less than 12 months in a year, and beneficiaries with no populated payment amount.

[75] The original reasons for enrollment in Medicare include old age, disability, ESRD, or both disability and ESRD.

73.  To identify the diagnosis codes relevant to beneficiaries' revised risk scores, I begin with a list of unique diagnosis codes that Defendants submitted to CMS. I identify these diagnosis codes using the method described in **Section V**, but I include all risk adjustment-eligible encounters in the service year rather than just Reviewed Encounters. I then remove from this list all diagnosis codes on the Deletes list. Finally, I add to this list any diagnosis codes that plans *not* administered by Defendants submitted to CMS for the beneficiary in the relevant service year. (These may exist if the beneficiary switched plans mid-year.) These additional diagnosis codes appear in the RAPS and CMS EDPS databases with submission information linked to plans that are not associated with Defendants.[76]

74.  I obtain beneficiary demographic information from multiple datasets produced by CMS. I obtain each beneficiary's gender and date of birth from data produced by CMS with information on beneficiaries.[77] I use Risk Adjustment System ("RAS") data to determine whether the beneficiary is enrolled in Medicaid.[78] Finally, I use MARx ("Medicare Advantage Prescription Drug System") data to obtain information on the beneficiary's original reason for enrolling in Medicare.

### ii.  Raw Risk Scores

75.  The CMS model software uses a list of diagnosis codes and demographics for each beneficiary to determine which HCCs and RxHCCs contribute to that beneficiary's risk score. Within a given population segment (discussed further below), every HCC or RxHCC

---

[76]  To identify plans that are not administered by Defendants, I again rely on the list of plans produced by Defendants, described in **Section VIII** above. As discussed in **Section III.B**, EDPS, unlike IRADS, can contain multiple versions of a single encounter. The same is true for CMS EDPS. In CMS EDPS, I use the same method to identify the most recent accepted version of each encounter as I do in EDPS. Also similar to EDPS, in CMS EDPS I identify risk-adjustment eligible encounters using TOB and CPT/HCPCS codes, following the CMS Final Encounter Data Diagnosis Filtering Logic as described in **Section III.B**.

[77]  The beneficiary's age is calculated by CMS software as of February 1 of the payment year based on his or her date of birth, in the BENE_BRTH_DT field. The beneficiary's gender is determined based on the BENE_SEX_CD field.

[78]  The fields indicating whether the beneficiary is enrolled in Medicaid are BENE_MDCD_MALE_DSBLD_SW, BENE_MDCD_MALE_AGED_SW, BENE_MDCD_FEML_DSBLD_SW, and BENE_MDCD_FEML_AGED_SW.

is assigned an HCC or RxHCC factor that quantifies its additive contribution to the beneficiary's total risk score.[79]

76.    The CMS HCC Model software generates multiple risk scores for each beneficiary corresponding to certain population segments. For payment years prior to 2011, the CMS HCC Model generates risk scores for three population segments: Community, Institutional, and New Enrollee.[80] Starting in payment year 2011, the CMS HCC Model includes a fourth segment for new enrollees in Medicare special needs plans, and starting in payment year 2016, the Community segment of the CMS HCC Model is split into six sub-categories based on Medicaid and Medicare eligibility.[81]

77.    For payment years 2009 and 2010, the CMS RxHCC Model generates a base risk score, which is then scaled with a multiplier for beneficiaries belonging to four population segments characterized by income, institutional status, and low-income subsidy eligibility.[82] Starting in payment year 2011, the CMS RxHCC Model generates segment-specific risk scores for eight population segments characterized by income, institutional status, and Medicare eligibility.[83]

### iii.    Risk Score Adjustment

78.    I make two adjustments to the risk scores that are output by the CMS HCC and CMS RxHCC Model software, which are consistent with adjustments performed by CMS.

---

[79]    As discussed in my **Report, Section III.B** some combinations of HCCs also increase the risk score by a disease interaction factor.

[80]    Community refers to a beneficiary who is not institutionalized or who is institutionalized for less than 90 days in the year. Institutional refers to a beneficiary who is institutionalized in a place such as a nursing home for more than 90 days in the year. "Medicare Managed Care Manual Chapter 7 - Risk Adjustment," Centers for Medicare & Medicaid Services, September 19, 2014, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c07.pdf, accessed October 15, 2022, p. 11.

[81]    These included six segments defined by three types of Medicaid Eligibility (Full Benefits, Partial Benefits, and Non-Dual) and two types of Medicare Eligibility (aged and disabled).

[82]    These segments include Low Income (partial), Low income (full), Long Term Institutional (aged), and Long Term Institutional (disabled). I identify long term institutional status and low-income status using the fields BENE_PTD_LTI_CD and BENE_PTD_LOW_INCM_STUS_IND in MARx, respectively.

[83]    These segments include Aged, non-low income; Aged, low income; Disabled, non-low income; Disabled, low income; Institutional; New Enrollee, non-low income; New Enrollee, low income; and New Enrollee, institutional.

79. The first adjustment is applied to both CMS HCC and CMS RxHCC Model risk scores and involves dividing all risk scores by a normalization factor. CMS performs this adjustment to ensure that, despite variation in average expenditures for Traditional Medicare beneficiaries over time, a beneficiary's expected expenditure continues to equal that beneficiary's risk score times the expenditure of the average Traditional Medicare beneficiary in the payment year.[84] The annual normalization factor is calculated by CMS separately for each model by fitting a trend to a sliding window of five years of data. Every year, the dataset used to calculate the normalization factor is updated by dropping the oldest year in the dataset and adding a new year.[85] In accordance with CMS calculations, I divide each beneficiary's risk scores for Part C and Part D by the relevant normalization factors.[86]

80. The second adjustment applies only to risk scores generated by the CMS HCC Model starting in plan year 2010. It accounts for differences in diagnostic coding practices between Medicare Advantage and Traditional Medicare plans. I make this adjustment by multiplying relevant risk scores by a quantity equal to one minus a coding intensity adjustment factor, which is released annually by CMS.[87]

---

[84] "Because average predicted FFS risk scores increase after the model calibration year due to coding and population changes, CMS applies a normalization factor to adjust beneficiaries' risk scores so that the average risk score is 1.0 in subsequent years." "Medicare Managed Care Manual Chapter 7 - Risk Adjustment," Centers for Medicare & Medicaid Services, September 19, 2014, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c07.pdf, accessed October 15, 2022, p. 32.

[85] *Ibid*. p. 32 ("The normalization factor is calculated by first using the model to predict risk scores for the FFS population over a number of years. Next, CMS estimates the annual average trend in the risk scores over these years. This annual trend is then compounded by the number of years between the model denominator year and the payment year to produce the normalization factor for the payment year.").

[86] For Part C, the normalization factors range from 0.988-1.034, depending on the service year. For Part D, the normalization factors range from 0.980-1.015, depending on the service year. "Announcements and Documents," Centers for Medicare & Medicaid Services, September 6, 2023, https://www.cms.gov/medicare/payment/medicare-advantage-rates-statistics/announcements-and-documents, accessed September 29, 2023.

[87] Specifically, I multiply the normalized risk score by (1 – the coding intensity adjustment factor). For more details on how the coding adjustment factor is calculated, see "Advance Notice of Methodological Changes for Calendar Year (CY) 2010 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies," Centers for Medicare & Medicaid Services, February 20, 2009, https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/advance2010.pdf, accessed September 26, 2023, pp. 9–11.

81.    When applying these adjustments, I follow CMS practices for rounding, which is to round to the third decimal place after each risk score calculation step.[88]

### iv.  Risk Score Weighting

82.    After applying the adjustments described above, I follow CMS practice by combining certain pairs of risk scores into a single blended risk score.

83.    The first combination of risk scores stems from the fact that there were two versions of the HCC CMS Model software – version 12 and version 22 – during the at-issue period.[89] Version 12 was used for payment years 2009-2013, version 22 was used for payment years 2016-2017, and both versions were used in payment years 2014-2015. The CMS HCC Model therefore generates separate risk scores for each version in payment years 2014-2015. For each beneficiary and population segment, I calculate a single risk score as a weighted combination of the version 12 and version 22 risk scores. In payment year 2014, version 12 is weighted at 25% and version 22 is weighted at 75%.[90] In payment year 2015, version 12 is weighted at 67% and version 22 is weighted at 33%.[91]

84.    The second combination of risk scores stems from Defendants' and CMS' use of two Risk Adjustment Databases in payment years 2015-2017 (service years 2014-2016). As discussed in my **Report, Section IV.D**, all diagnosis codes present in either of the two CMS databases (RAPS and CMS EDPS) are pooled and counted in payment year 2015,

---

[88]   *Risk Adjustment for EDS & RAPS User Group*, Centers for Medicare & Medicaid Services, August 15, 2019, https://www.cssoperations.com/internet/csscw3_files nsf/F/CSSC081519_RAWebSlides_5CR_082019.pdf/$FILE/081519_RAWebSlides_5CR_082019.pdf, accessed September 25, 2023, p. 11.

[89]   "Advance Notice of Methodological Changes for Calendar Year (CY) 2014 for Medicare Advantage (MA) Capitation Rates, Part C and Part D Payment Policies and 2014 Call Letter," Centers for Medicare & Medicaid Services, February 15, 2013, https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/advance2014.pdf, accessed September 29, 2023, pp. 16, 63. Although there were two versions of the RxHCC software during the at-issue years, the model transitioned directly from version 3 to version 5 in payment year 2016 and did not require blending.

[90]   "Announcement of Calendar Year (CY) 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," Centers for Medicare & Medicaid Services, April 1, 2013, https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/announcement2014.pdf, accessed September 14, 2023, p. 2.

[91]   "Announcement of Calendar Year (CY) 2015 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," Centers for Medicare & Medicaid Services, April 7, 2014, https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/announcement2015.pdf, accessed September 14, 2023, p. 2.

but risk scores are calculated separately for RAPS and CMS EDPS in payment years 2016 and 2017. I therefore input a list of all beneficiary diagnosis codes submitted across both systems to the CMS HCC and CMS RxHCC Model software in payment year 2015. In payment years 2016 and 2017, I follow CMS practice and calculate a single blended risk score for each segment by weighting the RAPS risk score at 90% and the CMS EDPS risk score at 10% in payment year 2016 and weighting the RAPS risk score at 75% and the EDPS risk score at 25% in payment year 2017.[92]

85. When applying these adjustments, I again follow CMS stated practices for rounding with one exception. When calculating blended RAPS and CMS EDPS risk scores in payment year 2016, I truncate scores rather than rounding them in order to replicate the risk scores as calculated by CMS that year.[93]

### v. Risk Score Selection

86. After completing the adjustment and weighting steps described above, I select the appropriate Part C and/or Part D risk scores for each beneficiary, according to their demographics and benefit type(s).

87. For each beneficiary with Part C benefits, I select a risk score for each month based on the beneficiary's model segment in that month. A beneficiary's Risk Adjustment Factor ("RAF") type, either alone or in combination with the beneficiary's age, indicates the model segment used by CMS to calculate the beneficiary's final risk score.[94] I identify each

---

[92] *Risk Adjustment for EDS & RAPS User Group*, Centers for Medicare & Medicaid Services, November 17, 2016, https://www.csscoperations.com/internet/cssc3 nsf/files/RA_Slides_111716_5CR_111816.pdf/$FIIe/RA_Slides _111716_5CR_111816.pdf, accessed September 28, 2023, p. 56.

[93] CMS identified an error and subsequently corrected it, however, this error is observable in the data produced by CMS. *See* "Risk Adjustment for EDS and RAPS User Group," *CMS*, August 15, 2019, available at *Risk Adjustment for EDS & RAPS User Group*, Centers for Medicare & Medicaid Services, August 15, 2019, https://www.csscoperations.com/internet/csscw3_files nsf/F/CSSC081519_RAWebSlides_5CR_082019.pdf/$F ILE/081519_RAWebSlides_5CR_082019.pdf, accessed September 25, 2023 at slide 11 ("CMS received questions describing instances where plan calculated risk scores differ at the third decimal place from CMS calculated risk scores (i.e., those shown on the monthly membership reports (MMR)). We discovered a technical issue in the way rounding was applied in the risk scores calculations and have corrected the issue. As we indicated in prior webinars, when validating risk scores plans should round at the third decimal place after each risk score calculation step.").

[94] For payment years 2009-2016, I select the community score (SCORE_COMMUNITY) for beneficiaries with RAF type 'C' and the institutional score (SCORE_INSTITUTIONAL) for beneficiaries with RAF type 'I'. For payment year 2017, when CMS introduced more granularity to the CMS HCC model segments, I follow CMS

beneficiary's RAF types using the BENE_RAF_TYPE_CD field in the MARx data. As this field may be retroactively updated in the MARx data to accommodate mid-year demographic changes, I follow CMS guidance in selecting the correct value for each beneficiary in each month.[95]

88.    In payment years 2010 – 2017, for each beneficiary with Part D benefits, I select a Part D risk score for each month based on the beneficiary's model segment. In payment years 2009 and 2010, I apply a multiplier to a single base score based on the beneficiary's model segment. A beneficiary's Long Term Institutional and Low-Income Status, either alone or in combination with the beneficiary's age, indicates the model segment used by CMS to calculate the beneficiary's final risk score.[96] I identify each beneficiary's Long Term Institutional Status and Low-Income Status using the BENE_PTD_LTI_CD and BENE_PTD_LOW_INCM_STUS_IND fields in the MARx data.[97]

### B.  Changes in Risk Scores

89.    After identifying revised risk scores for all beneficiaries, I calculate changes in risk scores as the difference between the revised risk scores and the actual risk scores that CMS used to calculate per beneficiary per month risk adjustment payments. For my analysis, I obtain the actual risk scores used by CMS from MARx data.[98] These risk scores represent the final risk score, after adjustments and weighting.

---

guidance in selecting the relevant risk score. "Announcement of the August 2019 Software Release," Centers for Medicare & Medicaid Services, July 29, 2019, https://www.cms.gov/Research-Statistics-Data-and-Systems/CMS-Information-Technology/mapdhelpdesk/Downloads/Announcement-of-the-August-2019-Software-Release.pdf, accessed September 29, 2023, p. 2.

[95]  To identify the RAF type ultimately used to determine a beneficiary's risk score and associated monthly payment, I identify instances of retroactive updates to the RAF type and replace the RAF type in any prior months in that payment year with the updated RAF type.

[96]  Similar to Part C, I follow CMS guidance in identifying each beneficiary's model segment and calculating the relevant risk score. "Medicare Managed Care Manual Chapter 7 - Risk Adjustment," Centers for Medicare & Medicaid Services, September 19, 2014, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c07.pdf, accessed October 15, 2022, p. 26.

[97]  See **FN 95** for a description of how I identify relevant values of these fields given MARx retroactive adjustments.

[98]  I identify the actual risk score used by CMS in MARx using the same approach used to identify the beneficiary's RAF type, as described in **FN 95**.

90.   As discussed in my **Report, Section VII.B**, as a confirmatory step, I ensure that I can replicate the risk score recorded in MARx for each beneficiary by following the steps outlined in **Section IX.A**, but using the full set of risk adjustment-eligible diagnosis codes that Defendants and other plans submitted to CMS. In months where a beneficiary is covered by Defendants, I am able to replicate 98% of the beneficiary Part C risk scores recorded in MARx and 95% of the Part D risk scores.[99] I exclude from my analysis any beneficiary for whom I cannot exactly replicate exactly the MARx risk score in the relevant year.[100] I exclude these beneficiaries to eliminate the possibility that the revised risk scores I calculate for the beneficiary are in any way inaccurate. As discussed in my **Report, Section VII.B**, I apply this exclusion by removing diagnosis codes for these beneficiaries from the final Deletes list in the year, meaning these beneficiaries have no financial impact and do not contribute to the affected beneficiary counts.

### C.  Changes in Payment for Part C

91.   After calculating changes in Part C risk scores, I calculate corresponding changes in risk adjustment payments. To do so, I multiply changes in risk scores for each beneficiary and month by the beneficiary's plan's base rate.

92.   I derive the base rate using the MARx data using two elements: the monthly contract rate and a "Medicare as a Secondary Payor" reduction amount.[101, 102] Similar to a beneficiary's RAF types and risk scores, plan base rates may be updated retroactively. I account for this

---

[99]   This calculation does not include the beneficiaries I have excluded for the reasons discussed in **Section X**.

[100]   The only exception is that for payment years 2016 and 2017, I still include 0.7% of beneficiary months in my analysis of Part C if I am able to replicate either their "raw" RAPS risk score or their "raw" CMS EDPS risk score, but not both. CMS' RAS data contain "raw" risk scores for each beneficiary. For these beneficiaries, I re-calculate a revised risk score using the method described in **Section IX.A**, using (i) the actual "raw" risk score for the system where I cannot replicate the score; and (ii) the revised risk score I calculate for the system where I can replicate the score.

[101]   Similar to RAF types and risk scores, I identify the relevant values of these variables. Contract rates for Part C are associated with MARx variables BENE_PTA_CNTRCT_RATE_AMT and BENE_PTB_CNTRCT_RATE_AMT. *Plan Communication User Guide for Medicare Advantage Prescription Drug Plans*, Centers for Medicare & Medicaid Services, August 30, 2019, https://www.cms.gov/Research-Statistics-Data-and-Systems/CMS-Information-Technology/mapdhelpdesk/Downloads/Plan-Communication-User-Guide-v132-August-30-2019.pdf, accessed September 25, 2023, section 6.

[102]   "When MSP status applies, the risk-adjusted portion of the Part C Payment is reduced to account for the coverage that the employer provides for Working Aged or Working Disabled beneficiaries, or that the health Plan provides for beneficiaries with ESRD." *Ibid.*, pp. 6-11.

and identify the actual base rates used by CMS using a similar approach, except that adjustment amounts have to be allocated evenly over the months to which the adjustment applies.[103]

93.    In some cases, the contract rate is not directly available in the MARx data and I derive it from other fields available in the MARx data. Specifically, I calculate the contract rate by dividing the portion of the risk adjustment payment that depends on the risk score by the actual risk score.[104] This method does not introduce uncertainty about the contract rate because the contract rate has a simple algebraic relationship to other quantities which are populated. I have confirmed that when I perform this calculation for contracts where the contract rate is available in the MARx data, my result always matches the stated contract rate.

### D.  Changes in Payment for Part D

94.    I begin my approach for calculating changes in risk adjustment payments for Part D by multiplying changes in Part D risk scores for each beneficiary and month by the beneficiary's plan's base rate.

95.    The base rate for Part D plans is also available in the MARx data. Like the Part C base rate, includes two elements: the direct subsidy and the beneficiary premium.[105] However, in Part C, both elements represent payments from CMS, and in Part D only the direct subsidy element is paid by CMS (the beneficiary premium is, as the name suggests, paid by the

---

[103]    I apply retroactive adjustments to the MSP reduction amount in MARx by identifying instances of retroactive adjustments and reallocating payments to the relevant months. I identify the months over which to reallocate payments using BENE_PMT_ADJSTMNT_MSA_STRT_DT and BENE_PMT_ADJSTMNT_MSA_END_DT and calculate the final monthly payment amount by dividing the adjustment amount (BENE_PTA_MSP_RDCTN_ADJSTMT_AMT and BENE_PTB_MSP_RDCTN_ADJSTMT_AMT) by the number of months over which the adjustment applies (BENE_PTA_PMT_ADJSTMT_MOS_CNT and BENE_PTB_PMT_ADJSTMT_MOS_CNT).

[104]    For the purpose of an analysis of repayments I am only concerned with the part of the payment that is a function of the risk score, since I am concerned with the financial impact of Defendants' failure to delete certain diagnosis codes and the resulting impact on risk scores. In addition to the MSP reduction amount, the portion of the payment that is a function of the risk score is identified by the following variables in MARx, which are also subject to the same reshaping as the MSP reduction amount: BENE_PTA_RISK_ADJSTMT_AMT and BENE_PTB_RISK_ADJSTMT_AMT.

[105]    The direct subsidy and beneficiary Part D premium are derived from BENE_PTD_DRCT_SBSDY_PMT_AMT and BENE_PTD_BASIC_PRM_AMT in MARx and are adjusted for incremental updates using the method previously described.

beneficiary).[106] I therefore quantify changes in payments separately for payments Defendants received from CMS through direct subsidies and payments Defendants received from beneficiaries through beneficiary premiums.

96.    I further adjust these changes in payments for the Part D program's risk corridors. The risk corridors are a symmetric risk-sharing mechanism between CMS and Part D plan sponsors, such as Defendants. They are symmetric in that they limit each plan's losses as well as profits. If a plan's spending in a year is much higher than anticipated, CMS provides the plan with additional payments. If a plan's spending in a year is much lower than anticipated, the plan returns a share of the prospective payments it received from CMS (*i.e.*, direct subsidy payments). Risk corridors are calculated using a statutory formula as part of a reconciliation process, which occurs six months after the end of each benefit year.[107]

97.    To account for risk corridors in my analysis of changes in Part D payments, I rely on Payment and Reconciliation System ("PRS") data from CMS.[108] For each plan and year, I recalculate the risk corridor payment using a revised measure of the plan's target amount, upon which the risk corridor payment is based.[109] For each plan and year, I calculate a revised target amount by subtracting the plan's total change in risk adjustment payments from the actual target amount that is in the PRS data, while adjusting for the administrative cost ratio. I then use this revised target amount to recalculate the plan's risk corridor payments with the formula used by CMS in its reconciliation process.

98.    After calculating each plan's revised risk corridor payments, I calculate each plan's change in Part D payments from CMS as the change in their direct subsidy payments less their change in risk corridor payments. In doing so, I identify plans for which the change in risk

---

[106]  "Apply for Medicare Part D Extra Help program," The United States Social Security Administration, https://www.ssa.gov/medicare/part-d-extra-help, accessed September 29, 2023.

[107]  *Sharing Risk in Medicare Part D Chapter 6*, Medpac, June 2015, https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/chapter-6-sharing-risk-in-medicare-part-d-june-2015-report-.pdf, accessed September 26, 2023.

[108]  CMS reopens their reconciliations after four years and recalculates risk corridors to update payment calculations based on post-deadline submissions from MAOs.

[109]  The target amount, identified by PRS variable TA, reflects the total amount paid to the plan for Part D less administrative costs and can be calculated as the sum of the total direct subsidy paid and the total beneficiary basic premium amount paid, times one minus the administrative cost ratio, which is the ratio of administrative costs to total costs for the Basic Benefit. USBP009865191.

corridor payments offsets the entire change in direct subsidy payments, as such plans would not have retained any Part D payments associated with Deletes.

## X.  FINANCIAL IMPACT OF DELETING DIAGNOSIS CODES ON DEFENDANTS' CV PIPELINE LISTS

99.  I separately calculate the financial impact on Defendants' Medicare Advantage and Medicare Part D premium payments resulting from their failure to delete the diagnosis codes on Defendants' CV Pipeline Lists, as discussed in my **Report, Section VIII.**

100.  For this calculation, I run the CMS software on all submitted diagnosis codes, minus any diagnosis codes on the Defendants' CV Pipeline Lists. This analysis does not rely on the Deletes list. As a final step, I make the same beneficiary exclusions as I do when calculating the financial impact of Deletes, discussed in **Section VIII**.

**EXHIBIT D-58 INTENTIONALLY BLANK**

**EXHIBIT D-59**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>    Plaintiffs,<br><br>  v.<br><br>UNITEDHEALTH GROUP, INC., et al,<br><br>    Defendants. | Case No. 16-cv-08697 FMO |

**ERRATA TO**
**EXPERT REPORT OF CRAIG GARTHWAITE**
**MARCH 11, 2024**

1. I submitted a report in this matter on September 29, 2023, an initial errata on October 4, 2023, and a subsequent errata on January 5, 2024. On January 29, 2024, Mr. M. Timothy Renjilian submitted a rebuttal report to my report (the "Renjilian Rebuttal Report"). Since that time, my team and I have investigated two points that Mr. Renjilian raised in his rebuttal report that relate to **Attachment 1** to my report.

2. First, in footnote 32, the Renjilian Rebuttal Report stated that a number of member-dx-DOS combinations on my deletes list do not appear in CMS' RAPS data. The Renjilian Rebuttal Report states that for each of these diagnosis codes, there is another instance of the same diagnosis code for that same member – but on another date of service for the member in the same service year – which was submitted to RAPS; thus, "the inclusion of the 46,149 diagnosis codes in the Deletes did not affect Dr. Garthwaite's financial impact calculations." I agree with these statements. The inclusion of these diagnosis codes also did not affect the counts of beneficiaries with financial impact in my report. However, the inclusion of these specific instances of these diagnosis codes that do not appear in RAPS was inadvertent, and I have removed these instances from the version of **Attachment 1** submitted with this errata.

3. Second, in paragraph 57, the Renjilian Rebuttal Report states: "The version of the Garthwaite Deletes from the January 5, 2024 Errata contained the same number of IRADS diagnosis codes but 36% fewer EDPS diagnosis codes than the October 4, 2023 Errata version," and "there are more than 1,200 members across service years 2014–2016 for whom Dr. Garthwaite identified an alleged Part C overpayment but who do not have any diagnosis codes in the January 5, 2024 Errata version of the Garthwaite Deletes." In the process of revising **Attachment 1** produced on January 5, 2024, I inadvertently dropped from the list of EDPS deletes the diagnosis codes and beneficiaries that the Renjilian Rebuttal Report is referring to. This issue has been corrected in the version of **Attachment 1** submitted with this errata.

4. My team and I identified two additional issues that resulted in a small overinclusion of diagnosis codes and beneficiaries on **Attachment 1**.

5. The first issue resulted in an overinclusion of diagnosis codes in the final two years of my analysis. As discussed in my report, I exclude from my analysis a small number of

beneficiaries for whom I cannot replicate exactly the MARx risk score in the relevant year.[1] As noted in my report, in the final two years, I am sometimes able to replicate the MARx risk score from either RAPS or CMS EDPS, but not both, and in those cases, I include in my analysis only the deletes and financial impact associated with the system in which I was able to replicate the MARx risk score.[2] However, in these instances, the January 5, 2024 version of **Attachment 1** included both the IRADS and EDPS deletes for these beneficiaries, even if the risk score could only be replicated in one system and thus no financial impact was included in my analysis for the other system (and removing these diagnosis codes from **Attachment 1** therefore has no effect on my financial impact calculations). This resulted in the overinclusion of approximately 1,000 bene-dx-DOS on the IRADS deletes list and 4,000 bene-dx-DOS on the EDPS deletes list. I have removed these diagnosis codes from the version of **Attachment 1** submitted with this errata.[3]

6.     The second issue resulted in the inclusion of 9 beneficiaries on **Attachment 1** for whom I ultimately did not calculate any financial impact. While I identified deletes for each of these beneficiaries, CMS' MARx payment data indicated that Defendants did not receive net positive payments from CMS for these beneficiaries for the months that were included in my analyses, and thus I excluded these beneficiaries from the figures and exhibits in my report, and from Attachments 2 and 3. I have now also removed these 9 beneficiaries from the version of **Attachment 1** submitted with this errata.

7.     I here submit a revised version of **Attachment 1** and a revised version of the computer code for **Attachment 1**, reflecting the issues discussed above**.**

---

[1]     See my Report, Appendix D, ¶ 90. ("In months where a beneficiary is covered by Defendants, I am able to replicate 98% of the beneficiary Part C risk scores recorded in MARx and 95% of the Part D risk scores. I exclude from my analysis any beneficiary for whom I cannot exactly replicate exactly the MARx risk score in the relevant year.")

[2]     See my Report, Appendix D, footnote 100. ("For payment years 2016 and 2017, I still include 0.7% of beneficiary months in my analysis of Part C if I am able to replicate either their 'raw' RAPS risk score or their 'raw' CMS EDPS risk score, but not both.")

[3]     The removal of these diagnosis codes does not change the number of unique beneficiaries on **Attachment 1** because each of these beneficiaries does have financial impact, but, out of caution, my calculations only included their financial impact in one system because I was not able to replicate exactly their MARx risk score in the other system.

8.     Finally, as my team and I engaged in revising **Attachment 1** as described above, we identified two additional issues that have a de minimis effect on the figures, exhibits, and attachments to my report. In an effort to provide full transparency, these two issues are described below.

9.     The first issue is related to risk score rounding and resulted in an overinclusion of 10 beneficiaries and an associated $85 in financial impact in the final two years of my analysis.[4] In my calculations, each of these beneficiaries had IRADS deletes and thus a change in their RAPS risk score, but they had no EDPS deletes. However, in my calculations, the CMS EDPS risk score change was calculated as the change in the beneficiary's blended risk score, less the change in their RAPS risk score, which resulted in the appearance of a small change in their CMS EDPS risk score despite the lack of EDPS deletes. Due to the way risk scores were rounded, the change in the blended risk score for these beneficiaries was calculated as 0.001 higher than the change in their IRADS risk score, resulting in a calculation of the change in their CMS EDPS risk score as 0.001.[5] However, these beneficiaries did not actually have EDPS deletes and thus their CMS EDPS risk score change should be 0.000; they only appear to have 0.001 change because of these rounding differences. While these 10 beneficiaries did not appear on EDPS **Attachment 1**, because there were no deletes in that system to include, they were incorrectly included in beneficiary counts that appear in the figures, exhibits, and other attachments to my report. Due to the de minimis nature of this issue, I have not updated the figures, exhibits, and attachments to my report to account for them.

10.    The second issue relates to beneficiaries for which a negative financial impact is calculated. In Attachment 3, there are a total of 3 beneficiaries with a negative value in the Part C financial impact field and a total of 8,396 beneficiaries with a negative value in the Part D financial impact field. The net effect of including these beneficiaries is to reduce the total financial impact calculation in my report. While I identified deletes for each of these beneficiaries, CMS' MARx payment data indicated that on net, Defendants paid more to

---

[4]    Two of these beneficiaries are associated with service year 2015 and eight are associated with service year 2016.

[5]    For example, the beneficiary's blended risk score change would be 1.002, and their RAPS risk score change would be 1.001, resulting in a calculated CMS EDPS risk score change of 0.001.

3

CMS than they received from CMS for these beneficiaries in the months that were included in my analyses.[6] Part of my assignment in this matter was to determine the number of beneficiaries for whom Defendants would have received reduced risk adjustment payments from CMS had Defendants deleted the diagnosis codes I identified. Therefore, these beneficiaries should have been excluded from the final count of beneficiaries in my report. Correcting this issue would result in a reduction in the final count of beneficiaries from 1,154,197 to 1,148,038, which is a reduction of 6,159 or 0.5%. Due to the de minimis nature of this issue, I have not updated the figures, exhibits, and attachments to my report to account for them.

Signed on March 11, 2024.

_____

Craig Garthwaite

---

[6] For some of these beneficiaries, there are months with positive payments from CMS to Defendants, but these months were excluded from my analysis (for example, because I could not replicate exactly the risk score in that month). These reason that this issue disproportionately affects Part D is that CMS' payment to Defendants under Part D depends in part on the size of the beneficiary premium, and for many of these beneficiaries, the beneficiary premium was high enough to result in a net negative payment from CMS to Defendants.

4

1574

**EXHIBIT D-60**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, <br><br> Plaintiffs, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC., et al, <br><br> Defendants. | Case No. 16-cv-08697 FMO |

**EXPERT REPORT OF MELVIN J. INGBER, PHD**
**JANUARY 29, 2024**

1

## EXPERT REPORT OF MELVIN J. INGBER

**January 26, 2024**

## Qualifications

I am currently a consultant on health services payment, risk adjustment and quality issues. I have been asked to provide a rebuttal to expert reports particularly addressing diagnosis codes in Traditional Medicare (TM) deemed unsupported by medical records and their effect on the CMS-HCC risk adjustment model and payment to MA plans.  In particular, I am rebutting specific opinions offered by UnitedHealthcare's experts Mark Duggan, Julia Lambert, and Michael P. Salve.

From July 1, 2006 through April 7, 2023, I was a Principal Scientist at RTI International, specializing in health economics, health care payment, and quality measures. At RTI, I served as a project director, analyst, or consultant on numerous projects, many listed in the appended résumé. Topic areas covered included risk adjustment modeling for spending on medical services, prescription drugs, and quality measures; post-acute care (PAC) assessments, episodes, and payment systems; frailty measures; an evaluation of the Centers for Medicare & Medicaid Services (CMS) initiative to reduce avoidable admissions of nursing home residents; and the statistical design for adjusting the data in the Home Health Consumer Assessment of Healthcare Providers and Systems (CAHPS) survey.

Particularly related to the subject matter of this rebuttal expert report, while at RTI, I was able to continue working on the risk adjustment models being used by CMS for Part C and Part D payment. I was the project director for this work for a few years and senior analyst for the following years at RTI.  I was deeply involved in the decision-making related to grouping ICD-9 and ICD-10 codes into HCCs. I also was involved in deciding which provider types would be considered best sources for diagnoses. A major process shift was the need to use reported procedure types rather than provider types when MA encounter data became a source of diagnoses. (Encounters do not have specialty indicators for physicians.) I worked on the same decision-making for the ACA Health Exchange risk adjuster system when RTI received that contract. In addition, I developed a demographically-based risk adjustment system for new enrollees joining MA C-SNPs. These are Special Needs Plans for beneficiaries with existing chronic conditions. The demographic system is for C-SNP enrollees who do not have full prior year Medicare or MA claims records but are reported by a C-SNP to have a known qualifying condition; they have higher costs than typical new enrollees.

2

Another related area I worked on was the adjustment for beneficiary frailty that CMS applies to certain MA plans and PACE plans because they enroll a relatively large proportion of people with functional deficits.[1] This was an add-on to the base risk adjustment models.

Prior to working at RTI, I was an economist at CMS for more than 15 years and was the director of CMS's Division of Payment Research for more than 5 years. As division director, I supervised intra- and extramural research and demonstration evaluations, particularly those related to payment for TM and MA, including refinement and reform of payment for hospitals, PAC, and geographic adjustment of physician payment. Pay-for-performance issues were also an area of study. I was a frequent consultant on other CMS research projects for technical and operational issues.

Focusing on the topic of the subject matter of this rebuttal expert report, I was the lead government analyst for the research and development of risk adjuster systems for Medicare enrollees in MA plans and for the Medicare Part D program[2,3,4]. This was the multi-year work to investigate the characteristics, advantages and disadvantages, of candidate risk adjustment systems for a future managed care payment system, ultimately called Medicare Advantage. A brief outline of this work is below.

I was the project officer for grants and contracts for risk adjustment system development for Part C and Part D. For Part C, I managed grants (in the form of cooperative agreements) and contracts with researchers at Johns Hopkins School of Public Health, Boston University, Health Economics Research, RTI International, University of California at San Diego, Kaiser Permanente Center for Health Research, and studied the work of 3M. I evaluated the application of their proposed systems to Medicare and advised on making changes to test the effects of modifications. I also made recommendations to HCFA (renamed CMS) as to the characteristics of each system. Some of these systems were proprietary, *e.g.*, the ACGs from Johns Hopkins and the CRGs from 3M. I recommended one of the nonproprietary systems that had great transparency as to how it created the risk factor values. Although they all had reasonable predictive power, some had risk groups constructed in a complex manner. It was my recommendation (agreed to by others) that the transition to a clinical from a demographic model

---

[1] Kautter, J., Ingber, M.J., & Pope, G.C. (2008). Medicare Risk Adjustment for the Frail Elderly. Health Care Financing Review, 30, 83 - 93.

[2] Ash, A. S., Ellis, R. P., Pope, G., Ayanian, J. Z., Bates, D. W., Burstin, H., Iezzoni, L. I., & Ingber, M. J. (2000). Using diagnoses to describe populations and predict costs. *Health Care Financing Review, 21*(3), 7–28.

[3] Pope, G. C., Ellis, R. P., Ash, A. S., Liu, C. F., Ayanian, J. Z., Bates, D. W., Burstin, H., Iezzoni, L. I., & Ingber, M. J. (2000). Principal inpatient diagnostic group model for Medicare risk adjustment. *Health Care Financing Review, 21*(3), 93–119

[4] Ingber, M. J. (2000). Implementation of risk adjustment for Medicare. *Health Care Financing Review, 21*(3), 119–126.

3

would need transparency to be accepted. I did recommend what would be the RTI HCC system as transparent and nonproprietary and amenable to CMS' desired changes.  That is the risk adjustment model that has been utilized in the MA program since 2004 and is (with developments over time) the model used today[5].

I also used the HCC system as the basis of the CMS internally developed risk adjuster model for beneficiaries with End-Stage Renal Disease (ESRD). Using the RTI HCC code mappings, I led the development at CMS of the system of risk adjustment for beneficiaries 1) on dialysis, 2) having a kidney transplant, and 3) the post kidney-transplant period. The segments of risk adjusted payments and risk adjustment differed from what had been used in the prior AAPCC ESRD system. This model formulation was then further developed by RTI.[6]

For the Part D prescription drug risk adjustment model, I led the development internally at CMS to build a model using a complex substitution of Blue Cross Blue Shield and Medicaid drug data for nonexistent Medicare drug data.[7] RTI would later develop similar models using actual Medicare drug data. The Part D model was implemented in 2006.

I have not testified as an expert prior to this case, but was deposed as a fact witness in connection with this matter in June 2022.

My fuller résumé is attached as Appendix A of this report.

For my work on this matter, I am being compensated at the rate of $200.00 per hour.  The content of my opinions is in no way influenced by my compensation in this matter, nor is my compensation in any way contingent or based on the content of my opinions or the outcome of this, or any other matter.

In the process of preparing this report, I reviewed a variety of documents, CMS publications, and other related material, including documents and depositions produced in this matter.  A complete list of the documents I relied upon in forming my opinions is attached as Appendix B.

A list of all publications that I have authored in the previous 10 years is part of my résumé in Appendix A.

My work in this matter is ongoing.  I reserve the right to update my opinions as additional information becomes available.

---

[5] A risk adjustment model based on hospital diagnoses was used from 2000 until 2004. This was the PIP-DCG model. Plan payments from these models phased-in averages of demographic and risk models until 2008.

[6] Robst, J., Levy, J. M., & Ingber, M. J. (2007). Diagnosis-based risk adjustment for Medicare prescription drug plan payments. *Health Care Financing Review, 28*(4), 15–30

[7] Levy, J. M., Robst, J., & Ingber, M. J. (2006). Risk adjustment system for the Medicare capitated ESRD program. *Health Care Financing Review, 27*(4), 53–70

4

## Background and Summary of Opinions

In this report I will describe the place and characteristics of the risk adjustment model in payment for MA plans. The history of Medicare managed care and the nature of payment to MA plans is relevant to understanding what the payment system does and does not do, and how the statistical estimation of the current risk adjustment models affects and does not affect payment to MA plans. In particular, I will describe the different effects of patterns of diagnosis coding in the creation of the risk adjustment model and in the use of it in determining MA plan payments.

## Summary of Opinions

Mark Duggan's and Julia Lambert's opinions are based on the view that the presence of unsupported codes in TM data used in the risk adjustment model to estimate the expenditures for the HCCs for MA enrollees results in systematic underpayment for MA plans that have unsupported codes removed from their risk adjustment submissions. This view is incorrect because average relative risk scores produced by the model are not systematically affected by unsupported codes in the TM data and the related changes that occur in the computation of county rates. As I explain more fully below, the presence of unsupported codes in TM data has a mixed effect on group risk scores generated by the model and does not have the unidirectional affect that the presence of unsupported codes has in the MA data. The model uses millions of codes from TM data, and the model compensates for the effect of some unsupported codes on group risk scores by allocating costs to other risk factors used to generate the risk scores. By sharp contrast, an unsupported code submitted by an MA plan increases payment to the MA plan – there is no averaging out to compensate for the effect of the unsupported code as there is when unsupported codes in TM data are used in calibrating the model. It should be mentioned here that CMS audits of MA plan data (RADV audits) that disallow unsupported codes submitted by MA plans also allow for the addition of codes that may have been omitted. The TM data used for model calibration typically has more unreported supportable diagnosis codes than MA data because payment is based more on procedures than diagnoses. The non-unidirectional effect of the unsupported and unreported codes is shown in Exhibit 1.

Similarly, Michael Salve's opinion compares error rates for TM data to error rates found for some UnitedHealth MA submissions, but Salve ignores the fact that error rates in the TM and MA data do not lead to parallel effects on payment. Errors in TM data do not cause systematic over-or-under-payments. Errors in MA data do. Even if there were a 31% error rate in the TM data used to calibrate the model, and even if some of UnitedHealth's MA submissions had a 13% error rate, that does not mean UnitedHealth was underpaid, nor that UnitedHealth can keep payments for unsupported codes until its error rate equals 31% (or any other percentage).

An important ignored aspect of the difference between building the estimated model using TM data and using the model when making payments is the important role the risk scores from the TM model play in determining the county or (benchmark) payment rates. The county rates are

5

constructed by the CMS Office of the Actuary using the TM payment data. For the county rate the average spending in each county is converted to the spending on the person with a 1.0 risk score. The average risk score for beneficiaries in a given location is rarely 1.0, but varies with the characteristics of the population. The conversion to get the county rate is:

Eq. 1

> County rate = (average spending in county)/risk score of county.

If the county average risk score is lower than 1.0, e.g., 0.8, the normalization to a rate for a 1.0 person is higher than the average spending in the county; a higher risk score lowers the rate. .

If one accepts that a large number of unsupported codes are in the TM data and that, as a result and on average, the risk factor values are low, then the risk scores for the full population are low. As the effect on the HCCs varies in magnitude and direction the average risk score for each county might be lower or higher than it would be without unsupported codes. As a result, the county spending could be divided by a low risk score resulting in a higher county rate or a lower risk score resulting in a lower rate. The population illness profiled in each county in each year is not the same as the population used to estimate the model and the rates of unsupported (and missing) codes vary. This means that lower risk scores do not necessarily result in lower payment to MA plans even if there are unsupported codes in the TM data.

As I will explain below, a brief summary of my specific opinions are:

Opinion 1: In the CMS-HCC risk adjustment model, average relative risk scores of MA enrollees are not strongly and systematically affected by the presence of unsupported codes in the TM data. Any presence of unsupported codes in TM data has a mixed effect on group risk scores and does not have the one directional affect that unsupported codes have when submitted by MA plans for payment. Instead, due to the statistical process of model estimation, the relative weight of factors may shift due to the presence of unsupported codes in the TM data, but average payments for large groups would stay consistent and accurately compensate MA plans for the risk they bare, particularly for larger insurers with diverse enrollees.

Opinion 2:  The effect of errors in TM calibration data are not comparable to the effect of errors in MA data or underpayment of plans. Some unsupported diagnosis codes may be present or deleted but when the model is calibrated the total Medicare expenditures used in the calibration do not change. This means that while the removal of an unsupported diagnosis code from a given HCC has the potential to impact the coefficient for that HCC, the costs associated with the beneficiary with the unsupported HCC will simply shift to another HCC or demographic factor and the resulting predicted payments from CMS for the MA population as a whole will be about the same as they were with a model utilizing unsupported codes in the calibration process. Likewise, the payments to MA organizations with representative plans (*i.e.*, plans that include beneficiaries with a wide variety of conditions and demographics) will not necessarily

6

substantively change or will change in a *de minimis* way, despite the removal of unsupported codes from the calibration data. Only if there was a very large misrepresentation of the morbidity of the population would there be a substantive distortion in the risk scores.

Opinion 3:

The average change in risk scores resulting from large numbers of unsupported codes that might be in the TM data is variably offset when the county rates are created by CMS each year. The hypothetical lowered HCC risk factors (and, ultimately, lower person risk scores) could result in increased county rates in some cases. These increased county rates are used to pay MA plans and the impact of risk scores potentially lowered by the presence of unsupported codes in the model is offset.

**Definitions**

There are a few terms that I use with regularity throughout this report. For ease of reference, I am including here the meaning of those terms, as well as specific context for their use in instances where that may be helpful:

- Risk factor: The term risk factors may be the person characteristics used to estimate the costs of medical care for people or the values of the effects of the characteristics. It is usually clear when the characteristic itself or its effect is being referred to. Although applied to individuals, they are used to profile groups of people so as to determine the amounts Medicare would pay MA plans for their enrollees. The risk factor effects are usually estimated in dollar terms but converted to relative factors in application, as noted below. A person may be characterized by a single risk factor in a simple demographic-only model, or the sum of the person's risk factors in the richer models, such as the HCC and RxHCC models currently used.
  - Demographic (risk) factor: These are the risk factors associated with person characteristics not associated with clinical conditions per say, but with related characteristics, such as age, sex, and eligibility for Medicaid.
  - Clinical (risk) factor: These are factors related to the clinical characteristics of people. They are based on diagnosis codes on medical claims (and medical records when plans add these) and aggregated into clinically and cost similar groups, e.g., diabetes, various cancer types, various cardiac conditions, etc.
- Relative risk factor: The risk factor magnitudes are currently estimated using claims data from TM that have both diagnoses and provider payment amounts. The factors are in dollar terms. These absolute dollars are national average values for the factors and not suitable for payment in every geographic region and in a future year. The dollar amounts do reflect the relative sizes of the risk factors, however. The dollar factors are divided by the Medicare population average dollars per person to create relative factors that are used to adjust average Medicare payments in smaller geographic areas.

7

- Risk scores: Risk scores are the sum of the relative risk factors for each person that are used to predict the cost of care for a person with those characteristics. Average risk scores are used in describing groups as well.
- Relative cost: A relative cost may refer to the total estimated cost of a person or group of people based on the applicable risk factors for the individuals in the group. These costs are either from the dollars estimated by the risk model or the costs predicted after the risk scores are converted to payment amounts.
- Dollar coefficient: The term coefficient is the magnitude of the dollar risk factor as estimated by the statistical model. When mathematical formulas are used to predicted risk, the effect sizes of the factors in the formula are called coefficients in math terminology. Statistical software used to estimate the factor magnitudes use this term.

## Brief history of managed care in Medicare[8]

The history of managed care in Medicare is meaningful as it indicates how average payments for groups are the goal of the payment to risk plans. As can be seen, models for demographically-defined groups would pay well for groups of people with typical ranges of health for their age and sex. The risk adjuster clinical groupings were needed because research showed the enrollees of many risk plans were healthier than average TM beneficiaries for their demographics. Below I describe how the clinical information was added to account for favorable or unfavorable health selection of enrollees.

Managed care in Medicare was present as early as 1965. Payment for these plans, some of which are still functioning today, was based on cost of the plan to provide services. The early cost plans did not have to serve all comers and were mostly employer or union based. These plans, based on reported costs, were not "risk" plans, a type of plan that is paid a premium determined by formulas that estimate the expected cost to treat plan enrollees and not the actual costs incurred by the plans determined after the fact.

In the 1970s, there was evolution in the definition of what standards a Medicare HMO would have to meet and there was also the introduction of the prepaid method. The concept of risk sharing was introduced, initially with plans reporting costs to be compared with a Medicare expected cost. Savings relative to the expected cost would be shared with the government. The expected cost is the first form of risk adjustment for managed care and was a classic actuarial method based on demographic factors. The adjusted annual per capita cost (AAPCC)[9] was computed by accounting for age, sex, institutional status, dual eligibility for Medicaid and later

---

[8] For a fuller description of history see: Zarabozo C. (2000). Milestones in Medicare Managed Care. Health care financing review, 22(1), 61–67.
[9] https://www.cms.gov/newsroom/fact-sheets/federal-payment-methodology-medicare-health-plans

whether Medicare was a primary payer.[10] The base payments and adjustment were estimated using Medicare payments for the vast majority of Medicare beneficiaries in the standard fee-for-service program that paid providers for individual services. That part of the program is currently often referred to as Traditional Medicare (TM). This method was later applied to the initial full risk program in which payments were fixed at 95 percent of the full AAPCC amount.

There was an AAPCC computed for each county based on the TM costs in the county, with adjustment for the varied demographic factors of each county. An important feature, carried over to full risk adjustment, is the form the demographic risk adjusters take. The AAPCC adjustment factors are based on the ratio of the costs of each demographic group to the national costs. The AAPCC adjustment factors are not expressed as costs, but as relative factors (demographic scores). The formula for assigning a payment for an individual enrolled in a plan was:

*Payment = (0.95) × (County Per Capita Costs/Avg. County Demographic Score) × Enrollee Demographic Score*

Examples of the scores that would be applied to the AAPCC county rates in 1999 are:

#### 1999 DEMOGRAPHIC COST FACTORS - AGED[11]

| PART | SEX | AGE | INSTITU-TIONALIZED | NON-INSTITUTIONALIZED | | |
|------|-----|-----|------|---------|-------------|---------------|
| | | | | MEDICAID | NONMEDICAID | WORKING AGED |
| A | MALE | 65-69 | 1.75 | 1.15 | 0.65 | 0.4 |
| | | 70-74 | 2.25 | 1.5 | 0.85 | 0.45 |
| | | 75-79 | 2.25 | 1.95 | 1.05 | 0.7 |
| | | 80-84 | 2.25 | 2.35 | 1.2 | 0.8 |
| | | 85+ | 2.25 | 2.6 | 1.35 | 0.9 |
| | FEMALE | 65-69 | 1.45 | 0.8 | 0.55 | 0.35 |
| | | 70-74 | 1.8 | 1.05 | 0.7 | 0.45 |
| | | 75-79 | 2.1 | 1.45 | 0.85 | 0.55 |
| | | 80-84 | 2.1 | 1.7 | 1.05 | 0.7 |
| | | 85+ | 2.1 | 2.1 | 1.2 | 0.8 |
| B | MALE | 65-69 | 1.6 | 1.1 | 0.8 | 0.45 |
| | | 70-74 | 1.8 | 1.35 | 0.95 | 0.65 |
| | | 75-79 | 1.95 | 1.55 | 1.1 | 0.8 |
| | | 80-84 | 1.95 | 1.7 | 1.15 | 0.9 |
| | | 85+ | 1.95 | 1.7 | 1.15 | 1 |

---

[10] For simplicity the similar but separate set of AAPCCs for beneficiaries with end-stage renal disease will not be discussed here.

[11] https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/ratebook1999.zip

9

| | | | | | |
|---|---|---|---|---|---|
| FEMALE | 65-69 | 1.5 | 1.05 | 0.7 | 0.4 |
| | 70-74 | 1.65 | 1.15 | 0.85 | 0.55 |
| | 75-79 | 1.65 | 1.25 | 0.95 | 0.7 |
| | 80-84 | 1.65 | 1.25 | 0.95 | 0.75 |
| | 85+ | 1.65 | 1.25 | 1 | 0.85 |

Because there are two trust funds that are used to pay for Medicare services, there are actually separate demographic risk factors for Part A (inpatient care), and Part B (outpatient care). Note that these demographic risk factors are used to multiply the average county rate to produce a payment, which is an average for that demographic group. Note also that they increase with age, creating higher payments for those groups that cost more to the program, so they are true risk adjusters, but based on differences in average risk for relatively large groupings containing individual beneficiaries with very varied costs.

I will first focus on the changes in the risk adjuster component and not the other aspects of county per capita costs, which are both determined by the risk adjusters and also have been modified over time for policy reasons not directly related to risk.

## How well the demographic adjuster worked and need for improvement

In the early period of capitated (full risk) plans, enrollment in this part of the Medicare Program was relatively low with relatively few plans. Plans were expected to enroll populations that were similar to the overall Medicare program and, as in most insurance, average payments to plans would be good enough to meet the needed revenues at the plan level. The demographic risk adjusters may not predict the spending for individuals very well, but predictive power at the group level is much better. Prediction errors for individuals tend to average out. This "law of large numbers" principal is used in the more detailed forms of risk adjustment as well.

The demographic risk adjusters were observed to have weakness that resulted in producing Medicare payments to the MA Plans that were too high for the actual enrollment. Many studies showed that plans were targeting for enrollment healthier than average Medicare beneficiaries. The financial incentive for plans to attempt to select healthier than average enrollees is clearly present, as is the tendency of sicker beneficiaries to stay with current providers.  Studies of the matter are in my Reliance Materials, Appendix B. A summary statement of such findings was presented in the United States General Accounting Office[12] (GAO) testimony to the Subcommittee on Health, Committee on Ways and Means, House of Representatives, in 1977.[13]

> We are pleased to be here today to discuss the rates Medicare pays health maintenance organizations (HMO) in its risk contract program, Medicare's

---

[12] More recent name is United States Government Accountability Office.
[13] https://www.gao.gov/assets/t-hehs-97-78.pdf

principal managed care option. As you know, Medicare's method for paying risk contract HMOs was designed to save the program 5 percent of the costs for beneficiaries who enroll in HMOs. However, 10 years of research on Medicare's costs under HMOs has found that the program's rate-setting method results in excess payments to HMOs because HMO enrollees would have cost Medicare less if they had stayed in the fee-for-service sector. Recently, the Physician Payment Review Commission (PPRC) estimated that annual excess payments to HMOs nationwide could total $2 billion.

This issue for the program became more serious financially over time as enrollment in capitated risk plans grew.

**Medicare HMO Enrollment 1985 – 1996**[14]



NOTES: HMO is health maintenance organization. Cost HMO enrollment numbers include cost HMOs and health care prepayment plans. All data are for December of the given year, except for 1996, which are as of April.
SOURCE: Data from the Health Care Financing Administration, Office of Managed Care.

Well before the implementation of clinical risk factors being added to the risk adjuster formula, researchers were working on such formulations. A major obstacle was getting the required information into the risk adjuster system. There was a significant amount of claims-based information available to Medicare for the great number of beneficiaries in TM, allowing a more clinically-based risk model to be built using that TM data. On the other hand, there was little

---

[14] Zarabozo C. (2000). Milestones in Medicare Managed Care. Health care financing review, 22(1), 61–67.

information available on the managed care enrollees, not enough to allow assignment of risk to plan enrollees. (Much of the limited information on plan enrollees that could be used in research came from the Medicare Current Beneficiary Survey, which collects information more directly from a statistical sample of beneficiaries.)

CMS, then named Health Care Financing Administration (HCFA), was researching risk models using various types of clinical information starting in the early 1990s. Studies were done on formulations by researchers at Johns Hopkins, Boston University, University of California San Diego, 3M and Health Economics Research (merged into RTI). In common, was the use of diagnosis data to profile the cost risk of Medicare beneficiaries and, ultimately, health plan enrollees.

Plans being overpaid was one of the issues that resulted in Congress passing sections of the Balanced Budget Act of 1997 (Pub. L. 105-33), which mandated:[15]

```
``(3) Establishment of risk adjustment factors.--
              ``(A) Report.--The Secretary shall develop, and
          submit to Congress by not later than March 1, 1999, a
          report on the method of risk adjustment of payment rates
          under this section, to be implemented under subparagraph
          (C), that accounts for variations in per capita costs
          based on health status. Such report shall include an
          evaluation of such method by an outside, independent
          actuary of the actuarial soundness of the proposal.
              ``(B) Data collection.--In order to carry out this
          paragraph, the Secretary shall require Medicare+Choice
          organizations (and eligible organizations with risk-
          sharing contracts under section 1876) to submit data
          regarding inpatient hospital services for periods
          beginning on or after July 1, 1997, and data regarding
          other services and other information as the Secretary
          deems necessary for periods beginning on or after July
          1, 1998. The Secretary may not require an organization
          to submit such data before January 1, 1998.
              ``(C) Initial implementation.--The Secretary shall
          first provide for implementation of a risk adjustment
          methodology that accounts for variations in per capita
          costs based on health status and other demographic
          factors for payments by no later than January 1, 2000.
              ``(D) Uniform application to all types of plans.--
          Subject to section 1859(e)(4), the methodology shall be
          applied uniformly without regard to the type of plan.
```

The Medicare+Choice Program evolved into the Medicare Advantage Program. Because of data limitations, the diagnosis data for payment year 2000 were only from hospital inpatient services. (This transition model was called the PIP-DCG model.) Data from other provider types were

---

[15]Public Law No. 105-33 Sec. 1853(a)(3)

12

1587

used for the period starting payment year 2004 after a method for data submission was developed. The two versions of clinical risk adjustment were phased in slowly, starting at 10 percent of payment in 2000 with the rest based on the demographic model. The 2004 model, called the HCC model, has continued with various improvements to this day.

## How the HCC model uses diagnoses to produce risk factors

An essential aspect of the HCC models is that the diagnoses (from the TM data) included in the model are used to predict relative costs of conditions in the following year. In effect, they profile the MA enrollees as they are expected to cost in the payment year starting after the medical profile is created from the immediately preceding year. This means some acute events in the diagnosis year have lower costs predicted for the following year. The model is termed prospective.

In producing the HCC risk models, full data, with diagnoses and payments, are needed. CMS uses TM claims as the source for the data. The types of claims from TM to be used as reliable sources of diagnoses include hospital inpatient and outpatient and most physician claims. Alternatively, claims from laboratory tests and radiology are not used, as they will, for example, report diagnoses that ordering physicians particularly want evaluated. Such claims however would report disease codes, even if the test for the condition is negative.

For clarity, I will use terminology from this point in the report distinguishing the persons in Medicare TM and in MA plans. All the people entitled to Medicare are beneficiaries. However, I will use the term beneficiaries for those in TM; I will use the term enrollees for those enrolled in MA plans. Thus, beneficiary data are used to determine the relative risk factor magnitudes and enrollee data are used to assign which factors are applied to each MA plan enrollee.

For the early years of risk adjustment, MA plans had been submitting enrollee diagnoses that were extracted from claims submitted to them by providers. CMS instructed MA plans which sources to use, which were the same ones used in the TM data. Reporting a diagnosis once during a year was deemed sufficient for the diagnosis to be considered to be included in an enrollee profile. This was termed the Risk Adjustment Processing System (RAPS) data. Since 2012 MA plans have been required to submit fuller extracts from provider claims, with more detail, including payments to their providers. These claim-like records are referred to as Encounter Data. This data stream is the Encounter Data System (EDS). Use of these Encounter Data has been phased in, supplementing the prior RAPS records. Recently, only encounter records are used to profile MA enrollees.

The MA Encounter Data diagnoses are used to assign risk factors to enrollees. They have not as yet been used to calibrate the relative risk factors associated with clinical conditions, as reliability of all the data elements, including payments, is being evaluated. Rather, the model risk adjustment factors come from relative costs for beneficiaries in TM. The TM model does not

determine which or how many MA enrollees are assigned clinical risk factors. The MA encounter records determine that.

The HCC risk model is an equation that sums up the effects of many risk factors. Demographic relative factor amounts are supplemented by the relative factor amounts associated with medical conditions. A simplified form of the equation is

Total risk score = relative factor for a demographic factor + relative factor for medical condition 1 + relative factor for medical condition 2 … + relative factor medical condition n.

Any one person might have a demographic factor and only a few or none of the medical conditions in their score.

Because there are so many combinations of medical conditions and demographic types, a statistical method is used to estimate the average relative cost effect of each of the factors. Ordinary least squares regression is the method used to determine the best estimate of costs associated with all the risk factors in the model.[16] The data used are those characterizing all the TM beneficiaries appropriate to be in risk plans; millions of beneficiaries go into the estimation.

Before describing the characteristics of this method, it is useful to understand how the clinical conditions are included in the model. Diagnoses in medical claims in the U.S. have the form of codes in the 10th version of the International Classification of diseases – Clinical Modification (ICD-10-CM) (Prior to October 1, 2015, the U.S. used ICD-9-CM). There are more than 70,000 disease codes in the system. A small example is:

> **E11.34 Type 2 diabetes mellitus with severe nonproliferative diabetic retinopathy**
>
>> One of the following 7th characters is to be assigned to codes in subcategory E11.34 to designate laterality of the disease:
>>> 1 - right eye
>>> 2 - left eye
>>> 3 - bilateral
>>> 9 - unspecified eye
>
> **E11.341 Type 2 diabetes mellitus with severe nonproliferative diabetic retinopathy with macular edema**
> **E11.349 Type 2 diabetes mellitus with severe nonproliferative diabetic retinopathy without macular edema**

In order to have enough people to get reliable estimates of the cost of diseases it is necessary to group conditions that are clinically related and reasonably close in costs. The process does not produce a precise cost estimate for every narrowly defined medical condition, but does produce

---

[16] Ordinary least squares (OLS) computes the values of average relative factor costs that minimize the sum of the squared errors of prediction for the model beneficiaries. Squares of negatives are positive, so this basically sums the error magnitudes. The OLS method produces the sum of 0 for the offsetting positive and negative errors.

an average cost for people with conditions within a range of related conditions. Diseases that are related but differ by severity, as indicated by cost, are assigned different condition categories. The resulting groups, formed after much clinical discussion and statistical cost estimation, are called Hierarchical Condition Categories (HCCs). Some HCCs are not included in the model because numbers of patients are too small, expected costs are low, coding of the condition is considered too variable and discretionary, or the diagnosis is a symptom or test finding without definitive cause. The guidelines for the included and excluded condition categories are described in the 2021 Report to Congress on the model.[17] For example, the code for the common cold (J00) is not included in the model because the value of the risk factor is very low, especially for the payment year following, and the prevalence is so high it does not distinguish populations. Similarly treated is acute pharyngitis (J02), sore throat. Codes for conditions with low frequency but high costs must be added to groups with higher frequency to accurately predict the costs on average for the group.

Next, I will explain how the data are entered into the estimating model, what the factors actually mean, and how imperfect data affect the model results.

## Estimating the HCC risk model

The HCC risk adjuster model does not produce a unique category for every possible combination of demographics and HCCs. Instead, it treats the risk factors as additive in creating a risk score for a person. The equation that is used has the simplified form:

Eq. 2

Actual beneficiary cost = $a_1 \times$ age/sex group$_1$ + $a_2 \times$ age/sex group$_2$ +…+ $a_n \times$ age/sex group$_n$ + $b_1 \times$ HCC1 + $b_2 \times$ HCC2 +…+ $b_m \times$ HCCm + random error

Each beneficiary in the model population has data that are used to indicate whether they have the characteristics that are risk factors in the model equation. Each beneficiary has a total cost of treatment during the year and belongs to some age/sex group. For a female age 72, the variable for the age/sex group including females 70 – 74 is set to a value of 1; all the other age/sex group characteristics are set to a value of 0. For the HCC disease categories, a healthy beneficiary would have all the HCC characteristic values set to 0. A beneficiary with diseases included as important risk factors would have each of the HCCs assigned a value of 1 for the conditions that medical providers that are accepted sources of diagnoses have coded in that beneficiary's medical claims.

The coefficients of the equation (Eq. 2), the letters a and b, are estimated average costs of each of the risk factors computed by the statistical process that uses information from the millions of beneficiaries to produce the estimates for a model that predicts all the costs of the population,

---

[17] https://www.cms.gov/files/document/report-congress-risk-adjustment-medicare-advantage-december-2021.pdf

based on much more information than just demographic characteristics. Although the model is estimated using payments in dollars, the average dollar risk score of each factor is divided by the population average spending per person to create relative risk factors. Summing the relative factors for an individual yields the person's risk score. With so many possible demographic and HCC combinations, the relative score that will be used to assign a payment for a person has a much wider range than the purely demographic scores. A person with no model HCC will have a score based on a model demographic factor and a resulting score usually less than 1.0 (average). Some HCCs will add a small amount to the score, perhaps 0.1; others may add 10 or more. This creates payment ranges more sensitive to differences in plan enrollee characteristics.  A sample of relative risk factors for the characteristics in the model is shown in the table on page 17.

The process of estimating the HCC model produces a risk score of 1.0 as the average beneficiary score using the data for the population for that year. Because the model is expressed in relative scores and not actual dollars, it may be applied to future years. Average treatment patterns do not change rapidly. However, coding patterns have been observed to change, as do updates in the ICD-10 codes. The result is that the TM population, which has an average risk score of 1.0 in the calibration year, may have a higher score when the model is applied to the following year, 1.05, for example. Because the payment system is always based on the TM population having an average of 1.0, the model scores are normalized back to 1.0 by dividing the HCC scores by 1.05 in this example. This is needed to create the correct average county rates used as the basis for converting risk scores to payment. This is often referred to as the fee-for-service normalization factor, and is in the MA yearly payment announcements published by CMS.

Among the causes for the upward "creep" in risk scores is the medical profession having their consciousness raised about screening and reporting particular medical conditions. An example of such "collective" behavior is that, for a few years, there was an observed increase in coding of kidney disease. A more recent example relates to the increased adoption by some healthcare systems of electronic medical record software that reminds providers of codes they might add to a billing record based on data in the system. Some of these systems intentionally focus on codes in the HCCs. For example, the Epic system used by certain medical providers allows for a module added for just that purpose.

16

## 2024 CMS-HCC Model Relative Factors for Continuing Enrollees,[18] excerpt

| Variable | Description Label | Community, NonDual, Aged | Community, NonDual, Disabled | Community, FBDual, Aged | Community, FBDual, Disabled | Community, PBDual, Aged | Community, PBDual, Disabled | Institutional |
|---|---|---|---|---|---|---|---|---|
| **Female** | | | | | | | | |
| 0-34 Years | | - | 0.238 | - | 0.346 | - | 0.454 | 0.948 |
| 35-44 Years | | - | 0.288 | - | 0.332 | - | 0.420 | 0.810 |
| 45-54 Years | | - | 0.340 | - | 0.384 | - | 0.404 | 1.031 |
| 55-59 Years | | - | 0.385 | - | 0.421 | - | 0.424 | 0.949 |
| 60-64 Years | | - | 0.436 | - | 0.502 | - | 0.414 | 0.881 |
| 65-69 Years | | 0.330 | - | 0.435 | - | 0.365 | - | 1.188 |
| 70-74 Years | | 0.395 | - | 0.506 | - | 0.423 | - | 1.119 |
| 75-79 Years | | 0.465 | - | 0.596 | - | 0.485 | - | 0.965 |
| 80-84 Years | | 0.524 | - | 0.665 | - | 0.544 | - | 0.862 |
| 85-89 Years | | 0.624 | - | 0.775 | - | 0.618 | - | 0.750 |
| 90-94 Years | | 0.737 | - | 0.869 | - | 0.738 | - | 0.627 |
| 95 Years or Over | | 0.742 | - | 0.877 | - | 0.835 | - | 0.481 |
| **Male** | | | | | | | | |
| 0-34 Years | | - | 0.106 | - | 0.191 | - | 0.306 | 0.826 |
| 35-44 Years | | - | 0.154 | - | 0.204 | - | 0.261 | 0.719 |
| 45-54 Years | | - | 0.215 | - | 0.293 | - | 0.300 | 0.991 |
| 55-59 Years | | - | 0.283 | - | 0.410 | - | 0.353 | 0.989 |
| 60-64 Years | | - | 0.345 | - | 0.504 | - | 0.374 | 0.917 |
| 65-69 Years | | 0.332 | - | 0.531 | - | 0.375 | - | 1.275 |
| 70-74 Years | | 0.396 | - | 0.626 | - | 0.417 | - | 1.224 |
| 75-79 Years | | 0.502 | - | 0.714 | - | 0.498 | - | 1.319 |
| 80-84 Years | | 0.571 | - | 0.789 | - | 0.565 | - | 1.238 |
| 85-89 Years | | 0.664 | - | 0.907 | - | 0.615 | - | 1.135 |
| 90-94 Years | | 0.800 | - | 0.993 | - | 0.712 | - | 0.946 |
| 95 Years or Over | | 0.896 | - | 1.058 | - | 0.904 | - | 0.825 |
| **Medicaid and Originally Disabled Interactions** | | | | | | | | |
| Originally Disabled, Female | | 0.228 | - | 0.160 | - | 0.103 | - | - |
| Originally Disabled, Male | | 0.135 | - | 0.158 | - | 0.075 | - | - |
| Medicaid | | - | - | - | - | - | - | 0.130 |

*continued*

Note: FB means full benefit; PB means partial benefit

---

[18] https://www.cms.gov/files/document/2024-announcement-pdf.pdf

| Variable | Description Label | Community, NonDual, Aged | Community, NonDual, Disabled | Community, FBDual, Aged | Community, FBDual, Disabled | Community, PBDual, Aged | Community, PBDual, Disabled | Institutional |
|---|---|---|---|---|---|---|---|---|
| **Disease Coefficients** | | | | | | | | |
| HCC1 | HIV/AIDS | 0.301 | 0.213 | 0.397 | 0.237 | 0.196 | 0.109 | 1.322 |
| HCC2 | Septicemia, Sepsis, Systemic Inflammatory Response Syndrome/Shock | 0.500 | 0.598 | 0.649 | 0.780 | 0.447 | 0.591 | 0.605 |
| HCC6 | Opportunistic Infections | 0.381 | 0.763 | 0.588 | 0.833 | 0.518 | 0.685 | 0.728 |
| HCC17 | Cancer Metastatic to Lung, Liver, Brain, and Other Organs; Acute Myeloid Leukemia Except Promyelocytic | 4.209 | 3.995 | 3.896 | 4.235 | 3.946 | 4.103 | 1.952 |
| HCC18 | Cancer Metastatic to Bone, Other and Unspecified Metastatic Cancer; Acute Leukemia Except Myeloid | 2.341 | 2.486 | 2.277 | 2.537 | 2.166 | 2.403 | 1.110 |
| HCC19 | Myelodysplastic Syndromes, Multiple Myeloma, and Other Cancers | 1.798 | 1.989 | 1.563 | 1.661 | 1.520 | 1.554 | 0.957 |
| HCC20 | Lung and Other Severe Cancers | 1.136 | 0.978 | 1.166 | 1.173 | 1.214 | 1.067 | 0.672 |
| HCC21 | Lymphoma and Other Cancers | 0.671 | 0.540 | 0.654 | 0.739 | 0.627 | 0.618 | 0.493 |
| HCC22 | Bladder, Colorectal, and Other Cancers | 0.363 | 0.366 | 0.382 | 0.409 | 0.410 | 0.351 | 0.314 |
| HCC23 | Prostate, Breast, and Other Cancers and Tumors | 0.186 | 0.233 | 0.196 | 0.218 | 0.203 | 0.237 | 0.197 |
| HCC35 | Pancreas Transplant Status | 0.949 | 1.393 | 1.117 | 0.573 | 1.117 | 2.740 | 1.106 |
| HCC36 | Diabetes with Severe Acute Complications | 0.166 | 0.191 | 0.186 | 0.235 | 0.166 | 0.210 | 0.280 |
| HCC37 | Diabetes with Chronic Complications | 0.166 | 0.191 | 0.186 | 0.235 | 0.166 | 0.210 | 0.280 |
| HCC38 | Diabetes with Glycemic, Unspecified, or No Complications | 0.166 | 0.191 | 0.186 | 0.235 | 0.166 | 0.210 | 0.280 |
| HCC48 | Morbid Obesity | 0.186 | 0.144 | 0.300 | 0.178 | 0.164 | 0.118 | 0.442 |
| HCC49 | Specified Lysosomal Storage Disorders | 9.256 | 13.778 | 2.833 | 6.399 | 3.269 | 7.771 | 1.528 |

...

18

Note that to create even better distinctions in the risk modeling, there are actually seven separate risk models, distinguishing people with different levels of dual eligibility for Medicaid and nursing home institutionalization status. One can see that for a given HCC, the relative risk factors differ across the models for the subpopulations.

No model can predict perfectly for individuals because all the information about every possible coded condition and severity of the condition is not included in the model, nor is it available. The process of statistical estimation is to get the best combinations of estimated weights to predict for the whole population and to predict well for subgroups of the population that differ in health as well as demographic characteristics. Getting the predictions good for groups as large as MA plans and not for individuals or small groups of individuals is the goal for insurance purposes. Insurance of all kinds depends on getting good estimates of the risk of groups of covered entities, people in the case of Medicare. This works for the insured and insurer. If the exact future cost of an insured entity were known, the premium would be that cost, and the insured entity would have no benefit from buying insurance. Setting premiums for a group means each insured entity is covered for worst cases, but paying for the average case in the group. The plan revenue is the average for the group. The data for health insurance always show that the insurer is underpaid for some of the insured and overpaid for others, as compared to each insured's actual costs. The HCC risk adjusters get better average estimates for narrower subgroups than demographic adjusters, and even better averages across the full plan enrollment. There is always some risk of unexpected costs or savings for the plan, but reserves and reinsurance is part of the business.

## Data quality and the effect on the risk factors

The diagnosis data describing the beneficiaries in the model are determined by TM physicians and professional coders who interpret physician written diagnoses, using ICD-10-CM. Given the large number of TM claims feeding into the model, overcoding (diagnosis codes not supported by the beneficiary's medical records) and under-reporting of diagnoses (diagnosis codes that are supported by the beneficiary's medical records, but are not coded for that beneficiary) may, and likely do occur. We observe the average of coding practices by providers in TM. What is seen in the claims used to estimate the HCC model is the average coding pattern of diagnoses across accepted provider sources. The HCCs describing a patient are those reported on any of accepted claim types for that patient. It does not matter how many times a condition is coded through the year or whether more than one ICD-10 code in an HCC is reported. A diagnosis falling within one of the model HCCs will be captured in the model by setting that HCC marker equal to 1.

### How the Model Works

Coding variation, or errors, have a minor effect on the risk scores estimated in the HCC modeling process, as will be discussed. There may be codes on claims that are unsupported by the medical record.  While these errors are present on both TM claims and MA claims, they have very different consequences when they occur in the TM data used for estimation in the model vs.

19

occurring in data submitted by MA plans for payment. Because such unsupported codes can occur in both data sets, it is important to consider the consequences of these errors and any appropriate reaction to the errors. As will be seen below, the consequences of such unsupported codes in TM estimation data is not of the same magnitude as the consequence of unsupported codes in the MA encounters—which is substantive and always increases payments to the MA plans.

The entire Medicare population exhibits varied constellations of medical conditions. The way the model works is that for any one HCC reported for a person there may be a few, many or no other HCCs reported. The total patient costs for that beneficiary will be spread over all the HCCs and demographic factors the beneficiary has, to varying degrees for that person. Inclusion of more or fewer diagnoses for a person does not affect the total costs reported on claims. The statistical process employed in the model uses information from all the beneficiaries to come up with estimates of the average costs associated with each of the risk factors to best predict the total spending, using those markers for risk. Spending related to conditions not explicitly included in the model is not lost. The costs are often captured by demographic factors, age/sex, with greater effect if the conditions are more frequent in a particular age group, increasing the estimated factor for the group. They also may be similarly captured by included model HCCs that frequently co-occur with the conditions not explicitly in the model. The statistical process assigns costs to the risk factors that *best* explain the cost profile of the population. "Best" in this type of model means the estimated set of risk factors minimizes the sum of the square of the errors in predicting the actual costs of individuals in the model population.  The squares of errors are always positive numbers, even if the error is a negative number. The average error (not squared) for the population modeled is 0 using the OLS method described. It is important to understand that pursuant to this model, individuals' actual costs may not be predicted with very high precision, but the costs of groups of beneficiaries are much more precise because errors for the individuals average out.

### The Effect on the Risk Scores in the Model of Having a Valid Diagnosis Omitted for some of the Beneficiaries or an Unsupported Diagnosis being Incorrectly Included for a Beneficiary

In this discussion the presentation is not intended to say that the ideal situation for data used for calibration and the data submitted for payment should not have the same characteristics. Ideally if a population were coded by the TM practitioners they would have the same codes as those in the data submitted by MA plans.  This discussion will show that the effect of having unsupported codes or excluding them from the MA data is entirely different from the effects of such code changes in the data used to calibrate the model. More coding—whether supported or unsupported—in MA always increases payment. More coding—whether supported or unsupported—in the TM calibration data changes the relative risk factor levels to some degree. Some factors may increase and others decrease.

20

The costs to be explained by the model that were reported by a provider for a beneficiary for whom a valid diagnosis (HCC) was not submitted or for whom an unsupported diagnosis (HCC) was submitted are not changed by the reported presence or absence of the diagnosis.[19] The particular HCC in question is exhibited by hundreds, thousands or even millions of others. The average estimated cost for that particular HCC is affected in a minor way by the presence or exclusion of an unsupported code. At a population level, the effect of an unsupported code has mixed effects on factors but the average population risk score is 1.0. Net payment effects vary when the model is estimated with and without the code and vary at the payment phase because the county rates are also changed.

In Exhibit 1, I demonstrate the concept described above by using a small, hypothetical model (meaning that the impact of changes will be more dramatic than in the CMS HCC model because Exhibit 1 includes a smaller set of diseases and beneficiaries than the CMS HCC model). The exhibit shows the effects of removing codes deemed unsupported and adding codes that were deemed supported but not originally reported. I generated Exhibit 1 in Excel on a small fictitious data set similar in form to TM model data. The data have total costs and a set of HCCs for each person. Exhibit 1 has a model similar to Eq. 2, with some data indicated as unsupported for some people. The Descriptions tab in the exhibit has greater detail than is described here. On the "(1) with unsupported codes" tab, I show an initial model, which includes a certain number of HCC markers defined as unsupported.  On the "(2) supported codes only" sheet, I show the same model, but I have removed the unsupported HCCs (turning those HCC marker values from "1" to "0").  The costs associated with the unsupported HCCs remain with the individual person but are redistributed to other HCCs and demographic factors in the second iteration of the Exhibit 1 model (i.e., they are not removed from the model). On the tab "(3) Supported+unsubmitted" HCCs that are simulated to be supported, but not reported, have their markers changed from "0" to "1". The "Differences" tab in the workbook compares the relative risk factors in the three models and creates person risk scores for people with different profiles of HCCs. The result is that going through the process of doing an HCC audit on the simulated TM data, removing the HCCs with unsupported diagnosis codes, has some relative factors decreasing and some increasing in the "audited" version. Changes when unsubmitted codes are added are also shown. Looking at the total risk scores for a few people profiled, it shows that the scores do not all go up or down as HCCs are removed or added. The code changes and simulated people were chosen with no knowledge of what the results would be. Also, as indicated in the exhibit, the settings of initial set of HCCs were done randomly and the addition of unsupported codes done without knowledge of the consequences.  The final examples shown in the Difference tab demonstrate

---

[19] The data used to estimate a model must be pulled at some point in time. Any audits done before the pull that denied some of a provider's claims would have been done. Any effects of audits in the future are not known. Denial of a claim removes both that claim's diagnoses and payment. (The diagnoses may appear on other claims.) Although the effect on the audited provider might be substantive, given the volume of claims in the data across so many providers, the effect on average estimated costs of a condition and the total cost of the population would not be substantive.

21

how the 1.0 risk score is identical under all Exhibit 1 models. So, regardless of any observed fluctuations in risk scores for individuals (with some going up and some going down), at a population level adding or subtracting codes does not have a unidirectional effect on risk scores for individuals or subgroups.

Lambert and Duggan suggest that United would be inappropriately underpaid if it is required to repay CMS for unsupported diagnosis codes it has submitted and for which it has been paid if its payments were determined through application of the CMS HCC model and the model TM data included an equal or greater number of unsupported diagnosis codes that were not removed from the data. There are multiple reasons this result is not always substantive or true when payment is made. First, the TM unsupported codes are akin to the unsupported codes accounted for in my example in Exhibit 1—meaning unsupported codes in TM will have varied impacts at the HCC and group levels. And as I will describe below, unsupported diagnosis codes submitted by MA Plans in Part C will have direct positive impact on the payments MA Plans receive. Essentially, Lambert's and Duggan's analysis is misleading because it fails to recognize the different impacts unsupported codes have in the TM data versus the MA data. The effect of added unsupported codes in MA data when a TM estimated model is being applied to determine payment to the MA is quite different and increases payments; there is no averaging out or redistribution of costs to other HCCs or demographic factors.

Further, Lambert and Duggan ignore another piece of correcting model calibration data— accounting for codes that are supported by the medical record but have not been submitted by providers in TM ("unsubmitted codes"). Neither Lambert nor Duggan substantively address the issue of unsubmitted codes in the TM data. Just as removing unsupported codes in the TM data would have some effect on the specific HCC average scores, so would the adding of missing, but supportable codes. I demonstrate this in Exhibit 1 on the "(3) Supported+unsubmitted" tab, where I exclude the same unsupported codes as were excluded on the "(2) supported codes only" tab but I add HCCs that I assume were supported by the medical record but were not submitted in the initial data. In the "Differences" sheet, I include a comparison of the three different hypothetical Exhibit 1 models. As was true with removing the unsupported HCCs, including additional supported HCCs changes the relative factors. Some risk scores go up and some risk scores go down but, at a population level, the model still predicts the same overall payments. As Exhibit 1 demonstrates, including unsubmitted codes in the TM calibration data has a varied and not directionally consistent impact on the relative risk factors, i.e., the relative factors may go up or down. I will show that changes in risk scores that do occur if coding errors are very frequent are inconsistent when the payment amounts are computed

## The effect of coding variation when the model is used for payment

When an unsupported diagnosis that triggers a model HCC is reported in MA encounter data, it increases the risk score of that enrollee, unambiguously. The average score for the MA enrollees and payment to the MA plan is increased by a fixed amount, dependent on the size of the risk

22

1597

factors and the local ratebook amount for the location of the plan. Submitting unsupported diagnoses at the payment stage has a one-way effect on payment; it increases payment. And, importantly, these codes do not represent higher intensity of coding, but a payment for diagnoses for a condition that is wrongly associated with that plan's enrollee. There is no model-based justification for the extra cost paid resulting from the reporting of an unsupported code not to be refunded to the payer, the Medicare program. But, as shown in the section above, an unsupported code in the TM data does not have a similarly unidirectional impact on payment – and may not have any impact on payment at all.  There is, therefore a stark difference between the impact of an unsupported code reported by a TM provider on behalf of a TM beneficiary (moderated by the statistical process that determines estimated risk scores based on averages of many risk factors for many beneficiaries as well as the redistribution of costs to other factors in the model) and the impact of an unsupported code reported by an MA plan for one of its enrollees (the MA plan is paid the entire amount estimated for the cost of the unsupported HCC, despite it being incorrectly associated with its enrollee).

Likewise, in MA, the incentives are to capture codes not on claims (and, as noted, there is software that can be utilized to do so) because, as explained above, MA plans are paid directly and unidirectionally (more) for every diagnosis submitted.  Some MA plans may schedule additional visits – like home health assessment visits – during which the MA plan gathers diagnosis codes that may not be gathered for a TM beneficiary.  While the TM data has some rate of missing as well as unsupported codes that may raise some risk factors and lower other risk factors, the same incentives to capture all supported claims do not exist for TM providers, as they are not directly paid for diagnosis codes. (For most services, procedures reported determine payment.) Presumably therefore, the rate of missing codes in MA is smaller than that in the TM data.  The high intensity of coding in MA, with the medical records being an accepted source, as well as provider claims, means the proportion of omitted codes is much lower in MA. MA starts with an advantage of higher intensity of supported codes. The TM data may have more unsupported codes (that rate, however, is unknown) but it likely has a larger balance of supported, but unreported codes because there is little incentive to code everything in the medical record on TM claims.  As demonstrated in Exhibit 1, both unsupported and unsubmitted codes in the calibration data can have impact – some going up and some going down – on Relative Factors, but, at a population level, will not impact payment as directly as such codes in the MA data.  Unsupported codes on the MA side will absolutely impact payments to MA plans.

One other offsetting factor must be considered that occurs even if there are unsupported diagnoses in the TM calibration data. If there is some net reduction of risk factors because of large numbers of unsupported codes the lower scores that result can increase the county rates used for payment. As shown above in Eq. 1, the county rate is a county spending amount divided by the average risk score for the county. If the average risk score for a county were lowered by unsupported codes the smaller average risk score in the denominator of the equation results in

increased payment to the plan. The MA plan would have its risk scores for people in such a county paid at a higher county rate.

**Summary Rebuttal to Specific Comments in Lambert report**

In Julia Lambert's report, starting at page 11, the concept of actuarial soundness in coding of data by TM and plans is discussed. Ideally, data consistency is the desired situation. But the data reporting processes differ in the calibration and payment phases. The inconsistency of the effects of making adjustments at the payment phase and at the calibration phase should be accounted for. The problem, as described by Julia Lambert, is that the disallowance of unsupported diagnoses by CMS is not done in the TM claims as well. The other error type, adjusting for supported but unreported codes will be discussed below. Importantly, even with Lambert concentrating on the errors in the TM data, she wholly fails to address the completely different effects that unsupported diagnoses have on estimation (in the TM data) and payment (to the MA plans). Because the modeling process inherently has to attribute costs to one or more of the risk factors in the model (the sum of the error is 0) the effect of having errors in TM data associated with unsupported diagnoses is to alter the risk factor of the HCC involved and alter other risk factors for HCCs or demographics in varying directions. With the effects in varying directions unsubmitted and unsupported codes may ultimately minimize or cancel out impacts on the relative risk factors. The estimates of individual coefficients are impacted slightly by having these errors present in the TM data. What is not captured in one risk factor is added to whole demographic groups in the estimation population, or related medical conditions. The process of model estimation is to get good estimates of the relative risk factors based on typical coding. Changes in one factor are compensated for by changes in others. But, the effect of removing unsupported codes in MA data is not parallel to removing such codes in the modeling process. Including unsupported codes in the modeling data will move the relative factors slightly; while including unsupported codes at the MA payment stage can add thousands of dollars to payments to MA plans for the enrollees associated with those unsupported codes.  Julia Lambert ignores this distinction.

On page 26 of her report, Lambert claims that her analysis shows that, in removing unsupported diagnosis codes from the model, "1) the average dollar coefficients increase, 2) the average relative values  of the model increase, 3) the resulting risk scores to the MAOs also increase as a result when applying the revised relative values to existing MAO data, and 4) results do not change even if expenditures from unsupported diagnoses are removed."

"An equivalent, and perhaps more important, conclusion of the analysis is that the unsupported diagnosis codes in the TM data result in reduced relative values on average in the current risk adjustment model from what they would have been had CMS developed the model on only supported codes. That is, unsupported HCCs in the TM data dilute the average relative values currently used in MA payment."

24

But Lambert neglects to assess how the county rates will be adjusted for any on-average reduction of relative values of the model that could exist because of the presence of unsupported codes. As I state above and in Opinion 3, the average change in risk scores resulting from large numbers of unsupported codes that might be in the TM data is offset variably when the county rates are calculated by CMS. The hypothetical lowered risk factors (and, thereby, risk scores) could result in increased county rates depending on the medical profile of the beneficiaries for the year of data the model is being applied. The payment results are mixed. This part of the payment determination ignores the opposite effects on risk factor values caused by the data not reported by TM providers in typical coding.

Additionally, Lambert discusses CMS Part D payment for prescription drugs in the same context of unsupported codes. She points out that CMS has not applied the removal of unsupported MA diagnosis codes to that model. This does, in fact, suggest that CMS should be doing so. However, there is another difference, not noted by Lambert, in the modeling data for Part D. She states that TM data alone are used for the modeling. In fact, MA as well as TM data are included in the costs and claims for all Medicare beneficiaries. For Part C, costs reported on MA encounter data have not been yet deemed accurate enough for use to calibrate models. There are plans that are reporting values of 0 for payment for all or a large proportion of medical encounters. The cost data for drugs are in Prescription Drug Event datasets for both standalone plans (PDPs) and MA drug plans (MAPDs) — TM and MA beneficiaries. The plan payments to pharmacies and the plan liability are considered accurate. The coding patterns of diagnoses are being averaged, and the average, not solely TM, is what is used to estimate the risk factors for drug spending for the drug HCCs, called RxHCCs. However, in the payment phase it actually is proper to exclude unsupported codes. As with Part C, the model estimation data containing some unsupported codes (whether from TM or MA) will have minimal impact on the risk factors— possibly increasing or possibly decreasing for some groups.  However, unsupported diagnosis codes that are submitted for payment when the Part D model is applied will result in a windfall for the MA-PD plan.

Returning to the issue of supported, but unreported, diagnoses, Lambert puts it into the discussion of the statutorily mandated Coding Intensity Adjuster (CIA) starting on page 15. The CIA is a statistical adjustment based on analyses separate from the consideration of auditing claims and encounters when payments are in the computation phase. She does not discuss the underlying reasons for differences in incentives for coding in TM and MA. It is my understanding, and observation, that MA plans "mine" their data to reduce the degree of supported, but unreported codes as well as engage in other activities that lead to increased coding.

Aside from the issue of unsupported diagnosis codes that raise MA enrollees' risk scores, is the effort MA plans make to increase supportable diagnoses that might not be reported in the typical coding pattern. There are seminars on optimal coding practices with the risk models as the target

25

for optimization. One of the practices has been to give financial incentives to providers that increase the risk scores of their managed care patients. (I have personally attended such a meeting with testimonials from a physician group that was rewarded for more intense coding than they typically had done.) There are many companies offering assistance in improving coding of HCCs and software like the Epic system add-ons mentioned above. The increased intensity is not for unsupported codes, but to be sure supported codes are coded on claims at a level that would otherwise be lower if coded with the same incentives as a TM provider has.

An example of coding practice as it differs from traditional practice is given in the advice by American Health Information Management Association (AHIMA), which is describing reasonable practices specifically for HCC payment.[20]

> There are two important aspects of HCC coding:

> 1. Analyzing health record documentation to identify reportable conditions
> 2. Accurately assigning ICD-10-CM codes to these conditions

> ICD-10-CM coding for HCC reporting is different from traditional ICD-10-CM coding because the intent is to report all conditions that affect the individual's health status concurrently across the continuum of care. Similar to traditional coding practices—used for reimbursement, statistics, and research—all the conditions for a particular episode of care (inpatient admission, clinic visit, same-day surgery, etc.) are reported. In HCC coding, the risk adjustment coding professional codes all conditions for the episode of care like traditional coding. However, continuous review of the health record documentation throughout the year is necessary to ensure all conditions have been considered and abstracted by the end of the year.

As described by Lambert, CMS is by law required to develop a correction factor for this level of coding intensity. It is now 5.9 percent. This factor assumes the codes are supportable and does not intend to correct for unsupported codes.

**Summary Rebuttal to Specific Comments in Duggan report**

First, Mark Duggan mischaracterizes the import of the CIA in the same way as does Julia Lambert. Starting on page 50 of his expert report, Duggan describes the reasons that plans should collect very complete diagnoses for their enrollees from sources, including medical records. Reporting this highly complete diagnosis set is unquestionably more intense than the reporting done on TM claims. For purposes of this discussion, however, just as was the case with Julia Lambert, it is important to recognize that the CIA is designed to address a separate issue from the existence of potentially unsupported codes in the MA data that has been submitted to CMS. Rather, it is intended to address the increased intensity of diagnoses submission

---

[20] Watson, M. M. (2018). Documentation and coding practices for risk adjustment and hierarchical condition categories.

compared to TM. There is a difference between the presence of a diagnosis in the medical record and whether that code would be usually reported on claims (the source of TM data). Claims are supposed to report diagnoses relevant to care of the patient. Some diagnoses are under control or so mild that there are no treatment costs associated with them. They would not warrant reporting in the TM claims. Using the medical records as a source increases coding intensity.

Second, while Duggan provides much detail about the benchmark, which is the newer version of the AAPCC county rates that are multiplied by relative risk scores, his statement on page 57, paragraph 120, is an overstatement of the relevant issue.

> … because the model relies on FFS Medicare enrollees to predict expenditures that are associated with each HCC for MA enrollees, it implicitly assumes that, for each HCC, the relative cost to treat enrollees is the same in FFS Medicare and MA plans. This assumption is only true when the distribution of unsupported diagnosis codes (and thus HCCs) is identical in FFS Medicare and MA plans. Thus, the model is unlikely to accurately predict expenditures for MA enrollees unless the distribution of unsupported diagnosis codes (and thus HCCs) is identical in the FFS Medicare and MA populations (so that the incremental cost of an HCC is the same across the two populations).

I disagree with the argument that follows starting in paragraph 121, for reasons I have described above. As I have discussed, the effect of unsupported codes is very different in the estimation of the relative risk factors from the effect in payment to MA plans. In payment, unsupported codes directly increase payments. In the estimation for relative risk factors, because all the beneficiary costs used in the model estimation are accounted for, irrespective of the presence of the unsupported codes, the unsupported codes have only small effects on the average estimated risk factors. Some go up and some go down, and the net effect on large group risk scores is much smaller than the effect on risk scores in the payment phase. If the result of an unsupported code for a beneficiary is to reduce a relative factor, the value for everyone in the same demographic group or some related HCC would be slightly increased. Conversely, an unsupported code submitted for an MA enrollee will result in hundreds or thousands of dollars in additional payments for that enrollee because the added HCC marker adds and amount related to its risk factor. This means that any direct comparison of error rates in TM data to MA data is not valid.

While it is true that the risk score for a TM person could vary somewhat related to the presence of an unsupported code in a particular HCC, the effect would depend on the full constellation of HCCs the person is coded for. Some of that person's HCC factors could be affected oppositely. In addition, and significantly, the purpose of the HCC model is to pay properly at the group level. It is not just one person or HCC factor that is affected by the presence of the unsupported code, but all beneficiaries in the model, with varied patterns of HCCs that are affected in varied ways.

I also disagree with Duggan's statement on page 59 of his report that "removing diagnosis codes for FFS Medicare enrollees would not change the benchmark against which plans bid." In fact, the benchmark (which is the county rate) could be higher lower in different counties and year of application of the model. Payments are not always reduced by lower scores if base rates increase.

27

1602

**Summary Rebuttal to Specific Comments in Salve report**

Salve concentrates on determining the error rate in the TM data and comparing it to the error rate determined in other studies for MA data, as if the two rates are equivalent in consequences. Even if one accepts the "unsubstantiated" TM error rate of 31.6% cited on page 6 of his report, and further accepts the 13.3% error rate cited for UnitedHealth on page 47 of his report, Salve does not follow through on the consequences to the model risk scores when the model is re-estimated on the data with the unsupported codes removed. Rather, he seemingly simply – and without any analysis or recognition of how the model estimation works – compares the whole number percentages of the two error rates he describes, finding 31.6% to be higher than 13.3% (a fact that is obviously accurate, but without accounting for differences in impact on risk scores). He describes the regression model, but does not address how the process adjusts the risk factor values to properly predict at the group level. Differences in error rates in the TM and MA data do not lead to parallel effects on payment. Errors in TM do not cause systematic over- or under-payments. Errors in MA data do – they cause over-payment.

## Summary

Although both of the Lambert and Duggan expert reports discuss the CMS-HCC payment system in detail, neither addresses the issue of how the presence of unsupported data actually affects the HCC model relative factors and how it impacts the total risk factors for individuals and for larger groups.  Salve similarly ignores the impact unsupported codes have on model calibration and, instead, compares two percentages that should not be compared per se. I opine that the OLS regression compensates strongly for the unsupported codes. Not excluding unsupported codes at the payment phase would create much greater errors than having unsupported codes in the calibration data. Unsupported codes in MA always increase payments. Such codes in the TM data have varied effects on payments, not unidirectional. It is an important distinction to recognize that the model creates relative risk factors; it does not assign payments. The average relative risk score for a large group is not affected greatly by the presence of unsupported diagnosis codes in the TM data, and the impact that is created is small and does not go in only one direction. Conversely, the effect of unsupported diagnoses in the MA data is to systematically raise payments for every person assigned such a diagnosis.

Going back to the original AAPCC method I described above, plans were paid on demographic factors only, with no clinical data, and the large groups that were HMOs were adequately paid, with most studies indicating overpayment because of favorable selection of enrollees in those demographic groups. Those demographic factors did not vary by clinical subgroup. The HCC model uses clinical information to produce better averages for smaller groups. The issue raised by Lambert, Duggan, and Salve is whether the presence of some unsupported codes **in the data used for estimation** results in systematic underpayment for plans that have their unsupported codes removed. It does not because the unsupported codes in TM do not have the same effect as

unsupported codes in MA plans and because there are offsets by group when county rates are set and by data year.

Executed the 26th day of January 2024

_Melvin J. Ingber_

Melvin J. Ingber,  PhD

29

# MELVIN J. INGBER

## Summary of Professional Experience

Melvin J. Ingber is currently a consultant on health services payment, risk adjustment and quality issues.

Previously he was a principal scientist at RTI International, specializing in health economics, health care payment, and quality measures. At RTI, he served as a project director, analyst, or consultant on numerous projects, some of which are listed below. Topic areas covered included risk adjustment modeling for spending on medical services, prescription drugs, and quality measures; post-acute care (PAC) assessments, episodes, and payment systems; frailty measures; an evaluation of the Centers for Medicare & Medicaid Services (CMS) initiative to reduce avoidable admissions of nursing home residents; and the statistical design for adjusting the data in the Home Health Consumer Assessment of Healthcare Providers and Systems (CAHPS) survey.

Dr. Ingber was an economist at CMS for more than 15 years and was director of CMS's Division of Payment Research for more than 5 years. As division director, he supervised intra- and extramural research and demonstration evaluations, particularly those related to payment, including refinement and reform of payment for hospitals, PAC, and geographic adjustment of physician payment. Pay-for-performance issues were also an area of study. He was a frequent consultant on other CMS research projects for technical and operational issues.

Dr. Ingber was the lead government analyst for the research and development of risk adjuster systems for the Medicare Part D program and for Medicare enrollees in HMOs. He continued that work at RTI while expanding into other areas.

## Education

PhD, Economics, State University of New York at Stony Brook, Stony Brook, NY, 1985.
MS, Physics, Cornell University, Ithaca, NY, 1965.
BS, Physics, Queens College, City University of New York, Flushing, NY, 1962.

## Selected Project Experience

### RTI

***Site-Neutral Payment Systems for Post-Acute Care Settings*** (2014 to 2015, 2017 to 2022)—*Senior Analyst*. In this project, measures for risk-adjusted admission and readmission rates for beneficiaries in ACOs were being developed. The measures are being developed for ACOs, treating them as responsible parties.

***Evaluation of the Initiative to Reduce Avoidable Hospitalizations Among Nursing Facility Residents*** (2012 to 2021)—*Project Director*. Directed a team in a multifaceted project to evaluate the effects of a CMS initiative on many measures, including admissions, emergency department visits, costs, and quality measures. The project included long-term care residents in more than 120 nursing homes in seven states. Comparison groups were selected and tracked. Primary and secondary data collection was required covering Medicare and Medicaid services. A second phase of this Initiative, concentrating on six medical conditions, was evaluated. This phase added a payment incentive to the first phase and a second arm that had payment incentives only.

***Development of Post-discharge Readmission Measures for IRFs, LTCHs, and SNFs*** (2012 to 2023)—*Task Leader*. Directed the development of risk-adjusted measures of all-cause unplanned readmissions

during the 30 days after discharge from an inpatient rehabilitation facility (IRF) or long-term care hospital (LTCH) to a lower level of care. This involved model development, determination of planned readmissions, validation of measures, and presentation to the National Quality Forum. This work was expanded to readmission measures for SNFs, discharge to community measures for all these facility types, and Medicare spending per beneficiary for episodes of care starting with a PAC stay.

***Part C&D Risk Adjustment Model Research, Development and Maintenance for Medicare Advantage and Prescription Drug Plans*** (2007 to 2023)—*Project Director/Senior Analyst.* Directed a team in a multitask project to maintain and improve risk adjustment methods for Medicare capitated plans. This included refining the ICD-9-CM diagnosis grouper, re-estimating models over time using newer data, including the Medicare Part D prescription drug data, updating the groupers with new diagnosis codes, and improving models using additional predictors. The project also includes adapting all the models, aged/disabled, institutionalized, end-stage renal disease (ESRD), and Part D drug, to ICD-10-CM diagnosis codes. Recent work included expanding the modeling to the mandated federal ACA health exchange plans, accounting for multiple benefit structures.

***Risk Adjustment Model Research, Development and Maintenance for ACA Health Exchange Plans*** (2011 to 2023)—*Senior Analyst.* Worked on development of models for ACA plans, methods of filtering claims for acceptability of diagnoses, addition of drug categories, nonlinear models.

***Chronically Critically Ill Patient Payment Recommendations*** (2010 to 2014)—*Senior Analyst and Project Director.* A study to identify the chronically critically ill and medically complex (CCI/MC) patients for payment reform in short- and long-stay acute hospitals (LTCHs). CCI/MC patient profiles and potential payment alternatives were developed in both settings. Simulations of impacts of changes to LTCH payment required by law were run under various behavioral scenarios.

***National Implementation of the Home Health CAHPS*** (2008 to 2011)—*Statistical Consultant.* Developed the sampling design and modeling for estimation of effects of survey mode and patient characteristics on responses of home health patients to the patient survey of perceptions of care. The adjustments derived will be applied to the national implementation of the survey.

***Development of Post-acute Care Episodes*** (2007 to 2014)—*Senior Analyst.* This was a series of projects to define episodes of PAC appropriate for bundled payment, to create predictive models for payments and costs using Consumer Assessment and Record Evaluation (CARE) assessment data and to extrapolate the model nationally.

***Post-Acute Care Payment Reform Demonstration*** (2007 to 2012)—*Associate Project Director.* Assisted in coordinating demonstration, collecting data from a new PAC assessment instrument (CARE) and care resource report and supervising analysis of the data to create new payment systems for Medicare post-acute care providers—LTCHs, IRFs, skilled nursing facilities, and home health agencies.

***Medicare Part D Program Evaluation*** (2007 to 2011)—*Project Director.* Directed team in evaluating the effect of the new drug program on non-drug Medicare services. The goal was to determine if the program changed utilization and expenditures on other services. Other aspects were the effects in the Medicare Advantage program and the effects particularly on beneficiaries with chronic diseases. Adherence to drug regimens in the subsidized and unsubsidized enrollees were studied and the effects of adherence were determined.

***Physician Group Practice Demonstration*** (2006 to 2013)—*Analyst.* Worked with team to conduct and evaluate a Medicare demonstration in which large group practices were rewarded for reducing expenditure growth for an assigned treated population compared to other practices in their service area. All measures of change were measured after accounting for changes in population morbidity.

***Development of Patient Assessment Instrument for Medicare Post-Acute Care*** (2006 to 2010)—*Scientific Advisor/Analyst.* Worked with team to develop new web-based patient assessment instrument

31

and data analysis to evaluate the predictive power of the assessment tool. The new instrument, CARE, has been used to develop new PAC payment methods.

***Development of Frailty Adjuster for Medicare Advantage Payment System*** (2006)—*Analyst*. Developed models to predict the number of activities of daily living difficulties that would be reported by beneficiaries in surveys, using demographic, clinical, and county characteristics from the census; and a similar model to predict the frailty factors needed to adjust predicted costs. Models were developed using survey data and applied to develop adjusters for all counties in the Medicare Advantage ratebook.

# Professional Experience

2023 to present. Independent consultant

2006 to 2023. RTI International, <u>Division for Health Services and Social Policy Research,</u> Washington, DC.

> *Principal Scientist.*

1990 to 2006. Centers for Medicare & Medicaid Services (CMS), Office of Research, Development and Information, Baltimore, MD.

> ***Director***, *Division of Payment Research* (2000 to 2006).

> ***Economist*** (1990 to 2006).

1984 to 1990. University of Texas at Dallas, Department of Economics and Political Economy, School of Social Sciences, Dallas, TX.

> ***Assistant Professor***.

# Professional Service

Panel member, National Institutes of Health State of the Science Committee on Prevention of Fecal and Urinary Incontinence, 2007

# Books, Book Chapters, and Monographs

Coomer, N. M., Ingber, M., Coots, L. A., & Morley, M. (2017). *Using Medicare cost reports to calculate costs for post-acute care claims*. Research Triangle Park, NC: RTI Press. doi:10.3768/rtipress.2017.op.0036.1701

Ingber, M. J. (2002). Implementation of risk adjustment for Medicare. In C W. Wrightson, Jr. (Ed.), *Financial strategy for managed care organizations*. Chicago, IL: Health Administration Press.

Ingber, M. J. (1999). The current state of risk adjustment technology for capitation. In N. Goldfield (Ed.), *Physician profiling and risk adjustment* (2nd ed.). New York, NY: Aspen Publishers, Inc.

# Peer-Reviewed Journal Articles

Feng, Z., Vadnais, A., Huber, B., Deutsch, A., Li, Q., Bercaw, L., Ingber, M. J., Segelman, M., Khatutsky, G., Sroczynski, N., & Xu, L., (2023). Hospital Transfer Rates among Long-Stay Nursing Home Residents: Variation by Day of the Week. *Journal of the American Medical Directors Association*. <u>https://doi.org/10.1016/j.jamda.2023.06.018</u>

**Appendix A**

Segelman, M., Hariharan, D., Fletcher, D., Gasdaska, A., Ingber, M. J., Khatutsky, G., Berkaw, L., & Feng, Z., (2023). Outcomes for Long-Stay Nursing Facility Residents Following On-Site Acute Care under a CMS Initiative. *Journal of the American Medical Directors Association*. https://doi.org/10.1016/j.jamda.2023.05.001

Deutsch, A., Palmer, L., Neumann, H., Potelle, J., Ignaczak, M., McMullen, T., & Ingber, M. J. (2023). Characteristics and outcomes of Medicare patients treated in inpatient rehabilitation facilities: 2013-2018. *Rehabilitation Nursing Journal*, *48*(3), 109-121. https://doi.org/10.1097/RNJ.0000000000000412

Deutsch, A., Palmer, L., Vaughan, M., McMullen, T., Kwon, S., Karmarkar, A., & Ingber, M. J. (2023). Reliability and validity of the inpatient rehabilitation facility discharge mobility and self-care quality measures. *Journal of the American Medical Directors Association*. https://doi.org/10.1016/j.jamda.2023.03.015

Tyler, D. A., Feng, Z., Grabowski, D. C., Bercaw, L. E., Segelman, M. D., Khatutsky, G., Wang, J. M., Gasdaska, A. E., & Ingber, M. J. (2022). CMS initiative to reduce potentially avoidable hospitalizations among long-stay nursing facility residents: Lessons learned. *Milbank Quarterly*, *100*(4), 1243-1278. https://doi.org/10.1111/1468-0009.12594

Bercaw, L. E., Gasdaska, A., Segelman, M., Voltmer, H., Jones, J. M., Feng, Z., Khatutsky, G., & Ingber, M. J. (2022). Implementation of a CMS nursing facility initiative: Differences by racial minority resident population. *Journal of Applied Gerontology*, [7334648221141411]. https://doi.org/10.1177/07334648221141411

Deutsch, A. F., McMullen, T., Vaughan, M., Palmer, L. A. M., Kwon, M. S., & Ingber, M. J. (2022). The change in self-care score quality measure for inpatient rehabilitation facilities: Exclusion criteria and the risk-adjustment model. *Archives of Physical Medicine and Rehabilitation*. https://doi.org/10.1016/j.apmr.2022.03.001

Deutsch, A. F., Palmer, L. A. M., Vaughan, M., Mcmullen, T., Karmarkar, A. M., Kwon, M. S., & Ingber, M. J. (2022). The inpatient rehabilitation facility change in self-care and change in mobility quality measures: Development and reliability and validity testing. *Archives of Physical Medicine and Rehabilitation*. https://doi.org/10.1016/j.apmr.2021.12.031

Tyler, D. A., Kordomenos, C., & Ingber, M. J. (2022). Reducing hospitalizations among nursing facility residents: Policy environment and suggestions for the future in seven states. *Journal of Gerontological Nursing*, *48*(8), 10–16. https://doi.org/10.3928/00989134-20220629-03

Vaughan, M., Deutsch, A. F., McMullen, T., Palmer, L. A. M., Kwon, M. S., & Ingber, M. J. (2022). The change in mobility quality measure for inpatient rehabilitation facilities: Exclusion criteria and the risk adjustment model. *Archives of Physical Medicine and Rehabilitation*. https://doi.org/10.1016/j.apmr.2022.03.001

Daras, L. C., Vadnais, A., Pogue, Y. Z., DiBello, M., Karwaski, C., Ingber, M., He, F., Segelman, M., Le, L., & Poyer, J. (2021). Nearly one in five skilled nursing facilities awarded positive incentives under value-based purchasing. *Health Affairs*, *40*(1), 146–155. https://doi.org/10.1377/hlthaff.2019.01244

Segelman, M. D., Ingber, M. J., Feng, Z., Khatutsky, G., Bercaw, L. E., Gasdaska, A., Huber, B., & Voltmer, H. (2021). Treating in place: Acute care for long-stay residents in nursing facilities under a CMS initiative. *Journal of the American Geriatrics Society*, *69*(2), 407–414. https://doi.org/10.1111/jgs.16901

Daras, L. C., Deutsch, A., Ingber, M. J., Hefele, J. G., & Perloff, J. (2020). Inpatient rehabilitation facilities' hospital readmission rates for Medicare beneficiaries treated following a stroke. *Topics in Stroke Rehabilitation*, *Latest Articles*, 1-11. https://doi.org/10.1080/10749357.2020.1771927

**Appendix A**

Pope, G. C., Pearlman, A., Ingber, M. J., Kautter, J., Drury, K., Amin, K., & Wrocklage, J. (2020). Incorporating prescription drugs into Affordable Care Act risk adjustment. *Medical Care, 58*(6), 504–510. https://doi.org/10.1097/MLR.0000000000001302

Vadnais, A. J., Vreeland, E., Coomer, N. M., Feng, Z., & Ingber, M. J. (2020). Reducing transfers among long-stay nursing facility residents to acute care settings: Effect of the 2013–2016 Centers for Medicare and Medicaid Services Initiative. *Journal of the American Medical Directors Association, 21*(9), 1341-1345. https://doi.org/10.1016/j.jamda.2020.01.002

Daras, L. C., Ingber, M. J., Carichner, J., Barch, D., Deutsch, A., Smith, L. M., ... Andress, J. (2018). Evaluating hospital readmission rates after discharge from inpatient rehabilitation. *Archives of Physical Medicine and Rehabilitation, 99*(6), 1049-1059. https://doi.org/10.1016/j.apmr.2017.07.008

Daras, L. C., Ingber, M. J., Deutsch, A., Hefele, J. G., & Perloff, J. (2018). Geographic region and profit status drive variation in hospital readmission outcomes among inpatient rehabilitation facilities in the United States. *Archives of Physical Medicine and Rehabilitation, 99*(6), 1060-1066. https://doi.org/10.1016/j.apmr.2017.11.011

Feng, Z., Ingber, M. J., Segelman, M., Zheng, N. T., Wang, J. M., Vadnais, A., Coomer N. M., & Khatutsky, G. (2018). Nursing facilities can reduce avoidable hospitalizations without increasing mortality risk for residents. *Health Affairs (*Project Hope*), 37*(10), 1640-1646. https://doi.org/10.1377/hlthaff.2018.0379

Pardasaney, P. K., Deutsch, A., Iriondo-Perez, J., Ingber, M. J., & McMullen, T. (2018). Measuring inpatient rehabilitation facility quality of care: Discharge self-care functional status quality measure. *Archives of Physical Medicine and Rehabilitation, 99*(6), 1035-1041. https://doi.org/10.1016/j.apmr.2017.02.023

Coomer, N. M., Morley, M., Ingber, M. J., Briggs, A., & Gage, B. (2017). A preliminary look at readmission and mortality among chronically critically ill and other medically complex Medicare patients. *Applied Economics Letters, 24*(20), 1435-1438. https://doi.org/10.1080/13504851.2017.1282138

Daras, L., Ingber, M., Deutsch, A., Hefele, J. G., & Perloff, J. (2017). Variation in hospital readmission outcomes among inpatient rehabilitation facilities: Oral Presentation 305151. *Archives of Physical Medicine and Rehabilitation, 98*(10), e12-e13. https://doi.org/10.1016/j.apmr.2017.08.037

Daras, L. C., Wang, J. M., Ingber, M. J., Ormond, C., Breg, N. W., Khatutsky, G., & Feng, Z. (2017). What are nursing facilities doing to reduce potentially avoidable hospitalizations? *Journal of the American Medical Directors Association, 18*(5), 442-444. https://doi.org/10.1016/j.jamda.2017.02.007

Deutsch, A., Pardasaney, P., Iriondo-Perez, J., Ingber, M. J., Porter, K. A., & McMullen, T. (2017). Development of a risk-adjustment model for the inpatient rehabilitation facility discharge self-care functional status quality measure. *Medical Care, 55*(7), 706-715. https://doi.org/10.1097/MLR.0000000000000736

Ingber, M. J., Feng, Z., Khatutsky, G., Wang, J. M., Bercaw, L. E., Zheng, N. T., ... Segelman, M. (2017). Initiative to reduce avoidable hospitalizations among nursing facility residents shows promising results. *Health Affairs*, *36*(3), 441-450. https://doi.org/10.1377/hlthaff.2016.1310

Daras, L. C., Ingber, M., Beadles, C., Chong, N., Nguyen, M., Carichner, J., ... Prakash, S. (2016). Assessing potentially preventable hospital readmissions following discharge from post-acute care. *Gerontologist, 56*, 599. https://doi.org/10.1093/geront/gnw162.2416

**Appendix A**

Feng, Z., Ingber, M., Zheng, N., Coomer, N., Wang, J., Vadnais, A., ... Bayliss, W. (2016). Evaluation of CMS initiative to reduce avoidable hospitalizations among nursing facility residents. *Gerontologist*, *56*, 599–600. https://doi.org/10.1093/geront/gnw162.2418

Pardasaney, P., Ingber, M., Broyles, I., Deutsch, A., Clayton, D., Frank, J., Haines, E., & McMullen, T. (2016). Assessing discharge to community outcomes in post-acute care settings. *Gerontologist*, *56*(suppl_3), 599. https://doi.org/10.1093/geront/gnw162.2416

Kautter, J., Pope, G., Ingber, M. J., Freeman, S. E., Patterson, L. J., Cohen, M. A., & Keenan, D. P. (2014). The HHS-HCC risk adjustment model for individual and small group markets under the Affordable Care Act. *Medicare & Medicaid Research Review, 4*(3), E1–E46. doi:10.5600/mmrr.004.03.a03

Morley, M., Bogasky, S., Gage, B., Flood, S., & Ingber, M. (2014). Medicare post-acute care episodes and payment bundling. *Medicare & Medicaid Research Review*, *4*(1), E1-E12. doi:10.5600/mmrr.004.01.b02

Kautter, J., Ingber, M. J., Pope, G., & Freeman, S. E. (2012). Improvements in Medicare Part D Risk Adjustment: Beneficiary access and payment accuracy. *Medical Care*, *50*(12), 1102–1108. doi:10.1097/MLR.0b013e318269eb20

Kautter, J., Ingber, M. J., & Pope, G. (2009). Medicare risk adjustment for the frail elderly. *Health Care Financing Review, 30*(2), 83–93.

Landefeld, C. S., Bowers, B. J., Feld, A. D., Hartmann, K. E., Hoffman, E., Ingber, M. J., …, & Trock, B. J. (2008). National Institutes of Health state-of-the-science conference statement: Prevention of fecal and urinary incontinence in adults. *Annals of Internal Medicine, 148*(6), 449–458.

Robst, J., Levy, J. M., & Ingber, M. J. (2007). Diagnosis-based risk adjustment for Medicare prescription drug plan payments. *Health Care Financing Review, 28*(4), 15–30.

Krumholz, H. M., Wang, Y., Mattera, J. A., Wang, Y., Han, L. F., Ingber, M. J., Roman, S., & Normand, S. T. (2006). An administrative claims model suitable for profiling hospital performance based upon 30-day mortality rates among patients with heart failure. *Circulation, 113,* 1693–1701. doi:10.1161/CIRCULATIONAHA.105.611194

Levy, J. M., Robst, J., & Ingber, M. J. (2006). Risk adjustment system for the Medicare capitated ESRD program. *Health Care Financing Review, 27*(4), 53–70.

Pope, G. C., Kautter, J., Ellis, R. P., Ash, A. S., Ayanian, J. Z., Iezzoni, L. I., Ingber, M. J., Levy, J. M., & Robst, J. (2004). Risk adjustment of Medicare capitation payments using the CMS-HCC model. *Health Care Financing Review, 25*(4), 119–141.

Ash, A. S., Ellis, R. P., Pope, G., Ayanian, J. Z., Bates, D. W., Burstin, H., Iezzoni, L. I., & Ingber, M. J. (2000). Using diagnoses to describe populations and predict costs. *Health Care Financing Review, 21*(3), 7–28.

Ingber, M. J. (2000). Implementation of risk adjustment for Medicare. *Health Care Financing Review, 21*(3), 119–126.

Pope, G. C., Ellis, R. P., Ash, A. S., Liu, C. F., Ayanian, J. Z., Bates, D. W., Burstin, H., Iezzoni, L. I., & Ingber, M. J. (2000). Principal inpatient diagnostic group model for Medicare risk adjustment. *Health Care Financing Review, 21*(3), 93–119.

Greenwald, L. M., Esposito, A., Ingber, M. J., & Levy, J. M. (1998). Risk adjustment for the Medicare program: Lessons learned from research and demonstrations. *Inquiry, 35*(2), 193–209.

Ingber, M. J. (1998). The current state of risk adjustment technology for capitation. *Journal of Ambulatory Care Management, 21*(4), 1–28.

Appendix A

Tudor, C. G., Ingber, M. J., & Riley, G. (1998). Satisfaction with care: Do Medicare HMOs make a difference? *Health Affairs, 17*(2), 165–176.

Riley, G. F., Ingber, M. J., & Tudor, C. G. (1997). Disenrollment of Medicare beneficiaries from HMOs. *Health Affairs, 16*(5), 117–124.

Riley, G., Tudor, C., Chang, Y. P., & Ingber, M. J. (1996). Health status of Medicare enrollees in HMOs and fee-for-service. *Health Care Financing Review, 17*(4), 65–76.

## Presentations and Proceedings

Tyler, D. A., Kordomenos, C. C., & Ingber, M. J. (2020). *Stakeholder perspectives on reducing hospitalizations among nursing home residents*. Gerontological Society of America Annual Meeting.

Friedman, H., He, F., Daras, L. C., Ingber, M. J., Evans, R., & Levitt, A. (2019). *Evaluating the relationship between post-acute care providers' performance on post-discharge potentially preventable hospital readmission measures and other quality measures*. Poster session presented at AcademyHealth Annual Research Meeting 2019, Washington, DC, United States.

Daras, L. C., Pardasaney, P. K., He, F., Morley, M. A., DiBello, M. V., Li, Q., & Ingber, M. J. (2018). *National data on Medicare claims-based measures used in the skilled nursing facility quality reporting program*. Gerontological Society of America's Annual Scientific Meeting, Boston, MA, United States.

Daras, L. C., Vadnais, A. J., Karwaski, C., Zhang Pogue, Y., DiBello, M. V., Shah, A. R., ... Poyer , J. (2019). *The skilled nursing facility value-based purchasing program highlights from program year one*. Academy Health, Washington, DC, United States.

Marino, M., Pardasaney, P. K., Blackmon, B. D., Ingber, M. J., Broyles, I. H., Levitt, A. F., & Mcmullen, T. (2019). *Variation in post-acute care discharge to community rates by social risk factors*. Poster session presented at Academy Health Annual Research Meeting, Washington, DC.

Pardasaney, P. K., Marino, M., Ingber, M. J., He, F., Broyles, I. H., Levitt, A. F., & Mcmullen, T. (2019). *Reliability and validity of the discharge to community measures in the Centers for Medicare & Medicaid Services' (CMS) post-acute care quality reporting programs*. Academy Health Annual Research Meeting, Washington, DC.

Vaughan, M., Broyles, I. H., Ingber, M. J., Palmer, L. A. M., McMullen, T., Anderson, K. K., & Deutsch, A. F. (2019). *The effect of dual eligibility on improvement in mobility: Variation by patients' primary diagnosis*. Poster session presented at Gerontological Society of America 2019 Annual Scientific Meeting, Austin, TX, United States.

Daras, L. C., Deutsch, A. F., Ingber, M. J., Hefele, J. G., & Perloff, J. (2018). *Assessing inpatient rehabilitation facilities' hospital readmission rates for Medicare beneficiaries treated following a stroke*. Poster session presented at AcademyHealth 2018, Seattle, WA.

Feng, Z., Ingber, M., Segelman, M., Zheng, N., Wang, J. M., Vadnais, A., ... Khatutsky, G. (2018). *Impact of the CMS initiative to reduce avoidable hospitalizations among nursing facility residents on mortality*. AcademyHealth 2018, Seattle, WA.

He, F., Daras, L. C., Ingber, M. J., Barch, Jr., D. H., Prakash, S. G., Friedman, H., & Andress, J. (2018). *Evaluating the relationship between post-acute care providers' performance on all-cause versus potentially preventable hospital readmission measures*. Poster session presented at AcademyHealth 2018, Seattle, WA.

**Appendix A**

Li, Q., Deutsch, A. F., Seibert, J. H., Barch, Jr., D. H., Livingstone, I. H., McMullen, T., & Ingber, M. J. (2018). *National data on the first set of assessment-based quality measures publicly reported in SNF QRP*. Paper presented at Gerontological Society of America 2018 Annual Scientific Meeting, Boston, MA, United States.

Carichner, J., Freeman, S., Kautter, J., Pope, G., Ingber, M., & Scope, S. (2017, June). *Initial ICD-10-CM diagnosis reporting patterns in the Medicare fee-for-service population*. Poster session presented at AcademyHealth Annual Research Meeting, New Orleans, LA.

Daras, L., Deutsch, A., Ingber, M., Perloff, J., & Hefele, J. G. (2017). *Are inpatient rehabilitation facilities' Medicare margins associated with quality of care?* Poster session presented at 2017 ACRM Annual Conference, Atlanta, GA.

Pardasaney, P., Ingber, M., Broyles, I., Gillen, E. M., Deutsch, A., Parks, K., ... Levitt, A. (2017). *Assessing quality of care: Variation in discharge to community rates from post-acute care settings*. 2017 ACRM Annual Conference, Atlanta, GA

Daras, L. C., Ingber, M. J., Beadles, C. A., Chong, N. J., Nguyen, M., Carichner, J. L., et al. (2016, November). *Assessing potentially preventable hospital readmissions following discharge from post-acute care*. Presented at The Gerontological Society of America's Annual Scientific Meeting, New Orleans, LA.

Feng, Z., Ingber, M. J., Zheng, N., Coomer, N. M., Wang, J. M., Vadnais, A. J., et al. (2016, November). *Evaluation of CMS initiative to reduce avoidable hospitalizations among nursing facility residents*. Presented at Gerontological Society of America, New Orleans, LA.

Ingber, M. J. (Chair). (2016, November). *Symposium: Care coordination and care transition: Initiatives to improve quality of care across the continuum*. Gerontological Society of America, New Orleans, LA.

Pardasaney, P. K., Ingber, M. J., Broyles, I. H., Deutsch, A. F., Clayton, D. H., Frank, J. M., et al. (2016, November). *Assessing discharge to community outcomes in skilled nursing facilities, long-term care hospitals & inpatient rehabilitation facilities*. Presented at Gerontological Society of America, New Orleans, LA.

Deutsch, A. F., Ingber, M. J., Daras, L. C., Pardasaney, P. K., & Heinemann, A. (2015, October). *Quality measures for inpatient rehabilitation facilities*. Presented at American Congress of Rehabilitation Medicine (ACRM) Annual Conference, Dallas, TX.

Coomer, N. M., Morley, M. A., Kandilov, A. M., Ingber, M. J., Kennell, D., Superina, C., Briggs, A. D., Gage, B., & Dalton, K. (2015, June). *Readmission and mortality among chronically critically ill and other medically complex (CCI/MC) Medicare patients*. Poster presented at AcademyHealth annual research meeting, Minneapolis, MN.

Kandilov, A. M., Kennell, D., Ingber, M. J., Briggs, A. D., Superina, C., Coomer, N. M., & Morley, M. A. (2015, June). *Site-neutral patients in long-term care hospitals: Which patients will be most affected by the Bipartisan Budget Act*. Poster presented at AcademyHealth annual research meeting, Minneapolis, MN.

Smith, L. M., West, S. L., Ingber, M. J., Feng, Z., & Reilly, K. E. (2013, November). *CMS' Skilled Nursing Facility 30-Day All-Cause Readmission Measure (SNFRM): Design and analyses*. Presented at annual scientific meeting of the Gerontological Society of America, New Orleans, LA.

Feng, Z., West, S. L., Reilly, K. E., Smith, L. M., Zheng, N., & Ingber, M. J. (2013, June). *Risk adjusting the hospital readmission measure for skilled nursing facilities: A comparison between cohort and non-cohort approaches*. Poster presented at the annual research meeting of Academy Health, Baltimore, MD.

**Appendix A**

Patterson, L., Freeman, S. E., Ingber, M. J., Kautter, J., & Pope, G. (2013, June). *ICD-10: It's coming definitely! Preparing for implementation in the Medicare risk adjustment models.* Poster presented at the annual research meeting of AcademyHealth, Baltimore, MD.

Anderson, W. L., Bachofer, H. J., Bella, M., Bogasky, S., Englehardt, T., Feng, Z., ... Wilkin, J. (2013). *Risk adjustment approaches for Medicare and Medicaid expenditures: Assistant Secretary for Planning and Evaluation (ASPE).*

Freeman, S. E., Pope, G., Kautter, J., Ingber, M. J., & Calfo, S. (2011, June). *Risk adjustment models for Medicare Part D capitation payments.* Presented at AcademyHealth annual research meeting, Seattle, WA.

Freeman, S. E., Ingber, M. J., Healy, D. A., Siegel, S. Y., & Kautter, J. (2011, June). *Part D enrollment for Medicare beneficiaries with chronic conditions.* Poster presented at AcademyHealth annual research meeting, Seattle, WA.

Smith, L. M., Gage, B. J., Coots, L. A., Spain, P. C., Morley, M. A., & Ingber, M. J. (2010, June). *Death and the bundle: patterns of service use associated with mortality among Medicare post-acute care patients.* Poster presented at AcademyHealth, Boston, MA.

Freeman, S. E., Kautter, J., Ingber, M. J., & Pope, G. (2010, June). *Predicting prescription drug spending in Medicare Part D.* Poster presented at AcademyHealth, Boston, MA.

Ingber, M. J., Greenwald, L. M., Healy, D. A., & Freeman, S. E. (2010, June). *Effects of Part D on Medicare Part A/B.* Presented at AcademyHealth research meeting, Boston, MA.

Ingber, M. J., Freeman, S. E., Healy, D. A., & Greenwald, L. M. (2009, September). *Evaluation of the Medicare Part D program.* Presented at Centers for Medicare & Medicaid Services, Baltimore, MD.

Morley, M. A., Smith, L. M., Ingber, M. J., & Gage, B. J. (2009, April). *Defining post-acute episodes of care.* Presented at ASPE Leadership team and ASPE/DHHS offices, Washington, DC.

Ingber, M. (2005, June). *Topics in Medicare risk adjustment.* Session chair at AcademyHealth research meeting.

Ingber, M. (2004, June). *Medicare capitation.* Session chair at AcademyHealth research meeting.

Ingber, M., Robst, J., & Levy, J. (2004, June). *Medicare drug benefit risk adjustment.* Presented at AcademyHealth research meeting.

Ingber, M. (2002, July). *Interpreting the guidelines for statistical sampling.* Presented at national training broadcast for administrative law judges and staff on statistical sampling for program integrity.

Ingber, M. (2000, May). *Comprehensive risk adjuster models.* Presented at Society of Actuaries annual meeting.

## Selected Technical Reports

Silver, B. C., Deutsch, A. F., Coomer, N. M., Kandilov, A. M. G., Ingber, M. J., Dorneo, A. C., & Potelle, J. (2022). *Report to Congress: Unified payment for Medicare-covered post-acute care: Analysis and development of the prototype unified PAC prospective payment system called for in the IMPACT Act.*

Feng, Z., Wang, J. M., Gasdaska, A. E., Knowles, M., Haber, S. G., Ingber, M. J., & Grouverman, V. (2021). *Comparing outcomes for dual eligible beneficiaries in integrated care: Final report.*

## Appendix A

Silver, B. C., Segelman, M. D., Marino, M., Jones, M. D., Pickett, R. F., Feng, Z., Leung, M. Y., & Ingber, M. J. (2020). *Testing and evaluating quality measures for MedPAC's Voluntary Value Program: Draft report*.

Baker, B., Billings, K., Daras, L. C., DiBello, M. V., He, F., Ingber, M. J., ... Vadnais, A. J. (2019). *Skilled nursing facility 30-day all-cause readmission measure (SNFRM) NQF #2510: All-cause risk-standardized readmission measure technical report supplement—2019 update*. U.S. Centers for Medicare & Medicaid Services.

Feng, Z., Silver, B. C., Segelman, M. D., Jones, M. D., Ingber, M. J., Beadles, C. A., & Pickett, R. F. (2019). *Developing risk-adjusted avoidable hospitalizations and emergency department visits quality measures: Final report*.

Ingber, M. J., Feng, Z., Khatutsky, G., Bercaw, L. E., Segelman, M. D., Wang, J. M., ... Zoromski, P. (2019). *Evaluation of the initiative to reduce avoidable hospitalizations among nursing facility residents—payment reform*. Prepared for the Centers for Medicare & Medicaid Services.

Ingber, M., Feng, Z., Khatutsky, G., Bercaw, L., Arnold, S., Adisa, L., ... Zoromski, P. (2018, February). *Evaluation of the initiative to reduce avoidable hospitalizations among nursing facility residents—payment reform*. Prepared for Centers for Medicare & Medicaid Services.

Morley, M. A., Silver, B. C., Deutsch, A. F., & Ingber, M. J. (2018). *Analyses to inform the potential use of standardized patient assessment data elements in the inpatient rehabilitation facility prospective payment system*. Center for Medicare and Medicaid Services.

Ingber, M., Feng, Z., Khatutsky, G., Ferrell, A. R., Baker, R., Jones, J., ... Zoromski, P. (2017, September). *Evaluation of the initiative to reduce avoidable hospitalizations among nursing facility residents: Final report*. Prepared for Center for Medicare and Medicaid Innovation, Centers for Medicare & Medicaid Services.

Ingber, M., Feng, Z., Khatutsky, G., Ferrell, A. R., Bayliss, W., Jones, J., ... Zoromski, P. (2017, March). *Evaluation of the initiative to reduce avoidable hospitalizations among nursing facility residents: Annual report project year 4*. Prepared for Center for Medicare and Medicaid Innovation, Centers for Medicare & Medicaid Services.

Kandilov, A. M., Kennell, D., Ingber, M. J., Superina, C., Coomer, N. M., & Briggs, A. D. (2016, June). *Simulating Medicare payment changes in long-term care hospitals: Which hospitals will be most affected by Section 1206 of the Bipartisan Budget Act*. Poster presented at AcademyHealth annual research meeting, Boston, MA.

Daras, L. C., Chong, N. J., Ingber, M. J., Nguyen, M., Barch, D. H., Deutsch, A. F., et al. (2016, February). *Technical expert panel summary report: Development of potentially preventable readmission measures for post-acute care, deliverable 14*. Prepared for Centers for Medicare & Medicaid Services.

Pardasaney, P. K., Haines, E. R., Broyles, I. H., Ingber, M. J., Deutsch, A. F., Seibert, J. H., et al. (2016, February). *Technical Expert Panel Summary Report: Development of a Discharge to Community Quality Measure for Skilled Nursing Facilities (SNFs), Inpatient Rehabilitation Facilities (IRFs), Long-Term Care Hospitals (LTCHs), and Home Health Agencies (HHAs)*. Prepared for the Centers for Medicare & Medicaid Services.

Ingber, M. J., Feng, Z., Khatutsky, G., Bayliss, W. S., Bercaw, L. E., Breg, N. W., et al. (2015, September). *Evaluation of the Initiative to Reduce Avoidable Hospitalizations Among Nursing Facility Residents: Final annual report, project year 3*. Prepared for Center for Medicare and Medicaid Innovation, Centers for Medicare & Medicaid Services.

**Appendix A**

Ingber, M. J., Feng, Z., Khatutsky, G., Zheng, N., Vadnais, A. J., Ormond, C., et al. (2015, May). *Evaluation of the initiative to reduce avoidable hospitalizations among nursing facility residents: Summary of evaluation as of December 2014*. Prepared for the Center for Medicare and Medicaid Innovation, Centers for Medicare & Medicaid Services.

Smith, L. M., West, S. L., Coots, L. A., Ingber, M. J., Reilly, K. E., Feng, Z., et al. (2015, April). *Skilled nursing facility readmission measure (SNFRM) NQF #2510: All-cause risk-standardized readmission measure. Technical report*. Prepared for the Centers for Medicare & Medicaid Services.

Amico, P. R., Pearlman, A. M., Kautter, J., Ingber, M. J., Pope, G., & Leahy, S. P. (2015, March). *Using outpatient prescription drug utilization data for risk adjustment in the health insurance marketplaces*. Prepared for The Center for Consumer Information and Insurance Oversight.

Morley, M. A., Coomer, N. M., Ingber, M. J., Deutsch, A. F., & Briggs, A. D. (2015, March). *Post-acute care episode risk adjustment using patient assessment data.* Prepared for Assistant Secretary for Planning and Evaluation.

Ingber, M. J., Feng, Z., Khatutsky, G., Reilly, K. E., Coots, L. A., Zheng, N., et al. (2014, September). *Evaluation of the initiative to reduce avoidable hospitalizations among nursing facility residents: Final annual report project year 2*. Prepared for Center for Medicare and Medicaid Innovation, Centers for Medicare & Medicaid Services.

Kandilov, A. M., Ingber, M. J., Morley, M. A., Coomer, N. M., Dalton, K., Gage, B., et al. (2014, March). *Chronically critically ill population payment recommendations (CCIP-PR)*. Prepared for Centers for Medicare & Medicaid Services.

Morley, M. A., Coomer, N. M., Zheng, N., Deutsch, A. F., Ingber, M. J., Coots, L. A., Kelleher, C. A., & Garfinkel, D. B. (2013, November). *Post-acute care episode risk adjustment extrapolation analyses*. Prepared for Assistant Secretary for Planning and Evaluation.

Reilly, K. E., Feng, Z., Ingber, M. J., Khatutsky, G., Coots, L. A., Zheng, N., et al. (2013, December). *Evaluation of the initiative to reduce avoidable hospitalizations among nursing facility residents: Final annual report project year 1*. Prepared for Center for Medicare and Medicaid Innovation Centers for Medicare & Medicaid Services.

Gage, B. J., Morley, M. A., Smith, L. M., Ingber, M. J., Deutsch, A. F., Kline, T. L., et al. (2012, March). *Post-acute care payment reform demonstration: Final report*. Prepared for the Centers for Medicare & Medicaid Services.

Gage, B. J., Coomer, N. M., O'Neil, M. M., Ingber, M. J., Morley, M. A., & Garfinkel, D. B. (2011, October). *Medicare post-acute care supply and outcomes project*. Prepared for the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services.

Morley, M. A., Coomer, N. M., Gage, B. J., Ingber, M. J., & Smith, L. M. (2011, August). *Post-acute care episode risk adjustment using CARE assessment data*. Prepared for the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services.

Ingber, M. J., Freeman, S., Healy, D., Kautter, J., & Siegel, S. (2011, June). *Medicare Part D program evaluation: Analysis of the impact of Medicare Part D on the FFS Program and issues related to medication adherence for six chronic conditions—2008.* Prepared for the Centers for Medicare & Medicaid Services.

Gage, B. J., Smith, L. M., Morley, M. A., Drozd, E. M., Abbate, J. H., Coots, L. A., Macek, J. F., Lines, L. M., Phair, S. B., Ingber, M. J., Deutsch, A. F. et al. (2010, December). *Post-acute care payment reform demonstration: Draft report to Congress*. Prepared for Office of Assistant Secretary for Planning and Evaluation.

40

## Appendix A

Ingber, M. J., Freeman, S., Healy, D., Kautter, J., & Siegel, S. (2010, December). *Medicare Part D program evaluation: Analysis of the impact of Medicare Part D on the FFS program and issues related to medication adherence for six chronic conditions—2007*. Prepared for the Centers for Medicare & Medicaid Services.

Ingber, M. J., Greenwald, L., Freeman, S., & Healy, D. (2010, March). *Medicare Part D program evaluation: Analysis of the impact of Medicare part d on the FFS program*. Prepared for the Centers for Medicare & Medicaid Services.

Gage, B. J., Morley, M. A., Spain, P. C., & Ingber, M. J. (2009, February). *Examining post-acute care relationships in an integrated hospital system*. Prepared for the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services.

Kautter, J., Pope, G., Trisolini, M., Leung, M. Y., Drozd, E. M., Aggarwal, J., Crespin, D. J., Kaganova, Y. M., Adamache, W. O., & Ingber, M. J. (2008, August). *Physician group practice demonstration: Second evaluation report*. Prepared for the Centers for Medicare & Medicaid Services.

Ingber, M. J., Anderson, W. L., & Lynch, J. T. (2008, June). *Considerations and issues for a mode experiment design and analysis*. Prepared for the Centers for Medicare & Medicaid Services.

Gage, B. J., Morley, M. A., Constantine, R. T., Spain, P. C., Allpress, J. L., Garrity, M. K., & Ingber, M. J. (2008, February). *Examining relationships in an integrated hospital system. Final Report* (ASPE Contract No. HHS-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). Prepared for the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services.

Gage, B. J., Ingber, M. J., Constantine, R. T., Bernard, S. L., Drozd, E. M., Morley, M. A., Wen, C., Kurlantzick, V. G., Munevar, D., & Garrity, M. K. (2008, January). *Post-acute care payment reform demonstration (PAC PRD): Year one report*. Prepared for the Centers for Medicare & Medicaid Services.

## Appendix B

Reliance Material

Kautter, J., Ingber, M.J., & Pope, G.C. (2008). Medicare Risk Adjustment for the Frail Elderly. Health Care Financing Review, 30, 83 - 93.

Ash, A. S., Ellis, R. P., Pope, G., Ayanian, J. Z., Bates, D. W., Burstin, H., Iezzoni, L. I., & Ingber, M. J. (2000). Using diagnoses to describe populations and predict costs. *Health Care Financing Review, 21*(3), 7–28.

Pope, G. C., Ellis, R. P., Ash, A. S., Liu, C. F., Ayanian, J. Z., Bates, D. W., Burstin, H., Iezzoni, L. I., & Ingber, M. J. (2000). Principal inpatient diagnostic group model for Medicare risk adjustment. *Health Care Financing Review, 21*(3), 93–119

Ingber, M. J. (2000). Implementation of risk adjustment for Medicare. *Health Care Financing Review, 21*(3), 119–126.

Robst, J., Levy, J. M., & Ingber, M. J. (2007). Diagnosis-based risk adjustment for Medicare prescription drug plan payments. *Health Care Financing Review, 28*(4), 15–30

Levy, J. M., Robst, J., & Ingber, M. J. (2006). Risk adjustment system for the Medicare capitated ESRD program. *Health Care Financing Review, 27*(4), 53–70

Zarabozo C. (2000). Milestones in Medicare Managed Care. Health care financing review, 22(1), 61–67.

United States General Accounting Office (1997). Medicare HMOs: HCFA Could Promptly

Reduce Excess Payments by Improving Accuracy of County Payment Rates. https://www.gao.gov/assets/t-hehs-97-78.pdf

Federal Payment Methodology to Medicare Health Plans (2004). https://www.cms.gov/newsroom/fact-sheets/federal-payment-methodology-medicare-health-plans

Factor99.CSV in https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/ratebook1999.zip

Publiic Law No. 105-33 Sec. 1853(a)(3)

CMS. Report to Congress: Risk Adjustment in Medicare Advantage, December 2021. https://www.cms.gov/files/document/report-congress-risk-adjustment-medicare-advantage-december-2021.pdf

Announcement of Calendar Year (CY) 2024 Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies. https://www.cms.gov/files/document/2024-announcement-pdf.pdf.

Watson, M. M. (2018). Documentation and coding practices for risk adjustment and hierarchical condition categories. *Documentation and Coding Practices for Risk Adjustment and Hierarchical Condition Categories/AHIMA, American Health Information Management Association*.

Brown, R. S., Bergeron, J. W., Clement, D. G., Hill, J. W., & Retchin, S. M. (1993). *The Medicare risk program for HMOs: final summary report on findings from the evaluation* (No. bcd980d40db84cfa936366a0abf48327). Mathematica Policy Research. https://www.mathematica.org/-/media/publications/pdfs/health/medicare_risk_hmos.pdf

Hellinger F. J. (1995). Selection bias in HMOs and PPOs: a review of the evidence. *Inquiry : a journal of medical care organization, provision and financing*, 32(2), 135–142. https://www.jstor.org/stable/29772533

Lichtenstein, R., Thomas, J. W., Adams-Watson, J., Lepkowski, J., & Simone, B. (1991). Selection bias in TEFRA at-risk HMOs. *Medical Care, 29*(4), 318-331. https://journals.lww.com/lww-medicalcare/Abstract/1991/04000/Selection_Bias_in_TEFRA_At_Risk_HMOs.2.aspx

Mello, M. M., Stearns, S. C., Norton, E. C., & Ricketts, T. C. (2003). Understanding biased selection in Medicare HMOs. *Health services research*, 38(3), 961-992  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1360925/

42

**Appendix B**

Call, K. T., Dowd, B. E., Feldman, R., Lurie, N., McBean, M. A., & Maciejewski, M. (2001). Disenrollment from Medicare HMOs. *American Journal of Managed Care*, *7*(1),  https://www.ajmc.com/view/jan01-438p37-51

Khan, M. M., Tsai, W. C., & Kung, P. T. (2002). Biased Enrollment of Medicare Beneficiaries in HMO Plans-Implications for Medicare Costs. *Journal of Health Care Finance*, *28*(4), 43-57.

**EXHIBIT D-61**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

---

**UNITED STATES OF AMERICA** *ex rel*.
**BENJAMIN POEHLING,**

                    **Plaintiff,**

          **v.**

**UNITEDHEALTH GROUP, INC.** *et al.*,

                    **Defendants.**

---

**CASE NO. 2:16-cv-08697-FMO (SSx)**

---

**EXPERT REPORT OF**
**DANIEL KESSLER, Ph.D.**
**SEPTEMBER 29, 2023**

---

*CONFIDENTIAL*

*(Contains Attorneys' Eyes Only Information As Designated)*

1620

# Table of Contents

I.      Qualifications .............................................................................................................3

II.     Assignment and Summary of Opinions ......................................................................4

III.    Attempting to Achieve "Payment Neutrality" Between Medicare Advantage and Fee-
        For-Service Creates Incentives For Differences in Coding Between the Sectors .........6

IV.     Differences in Coding Between the Sectors Can Be Due to Either Present Unsupported
        or Absent Supported Codes in Either MA or FFS .......................................................8

V.      The Coding Intensity Adjustment Does Not and Has Never Identified Whether
        Differences in Coding Between the Sectors Are Due to Differences in Supported or
        Unsupported Codes ...................................................................................................12

        A.      Background on the Coding Intensity Adjustment ................................................. 12

        B.      According to CMS, the Deficit Reduction Act of 2005 Did Not Require CMS
                To Identify the Source of Coding Differences When It Directed CMS To Adopt
                a Coding Intensity Adjustment .............................................................. 14

        C.      CMS Did Not Identify the Source of Coding Differences In Its Preliminary
                Studies of a Coding Intensity Adjustment ........................................................ 14

        D.      CMS Did Not Identify the Source of Coding Differences In Its Initial
                Implementation of a Coding Intensity Adjustment in 2010.................................. 17

        E.      CMS Did Not Identify the Source of Coding Differences In Its Implementation
                of Coding Intensity Adjustments After 2010........................................................ 18

        F.      Changes to the Specification of the CIA that CMS Considered After 2010 Did
                Not Identify the Source of Coding Differences ..................................................... 19

VI.     If the Coding Intensity Adjustment Achieves Its Stated Goal, CMS Has Already
        Recovered Payments to MA Plans in Aggregate Due to MA-FFS Differences in
        Unsupported Codes ...................................................................................................20

        A.      Any Removal of Unsupported Codes from MA Plans in Aggregate Would
                Result in Underpayment to Plans by Allowing CMS to Recover Twice.............. 21

        B.      Other Implications of CMS Having Already Recovered Payments to MA Plans
                In Aggregate Due to MA-FFS Differences in Unsupported Codes ...................... 23

VII.    If the Coding Intensity Adjustment Is Too Low, CMS Must Conduct Medical Record
        Reviews To Determine Whether and To What Extent It Has Already Recovered
        Payments Due to Unsupported Codes........................................................................25

VIII.   If the Coding Intensity Adjustment Is Too Low, the Regulatory Process Would Be the
        Economically Efficient Means To Address Remaining MA-FFS Differences in Coding
        Intensity....................................................................................................................29

        A.      The Regulatory Process Increases Clarity and Predictability, Thereby
                Decreasing Policy Uncertainty ............................................................................ 31

B.    Reduced Policy Uncertainty Increases Investment and Employment in Firms In the Health Care Sector ........................................................................................ 34

C.    CMS's Behavior Is Consistent With My Opinion That the Regulatory Process Is The Economically Efficient Means To Evaluate Two-Sided Review ............. 35

## I.    Qualifications

1.    I am a tenured professor at Stanford Law School and the Stanford Graduate School of Business; a professor (by courtesy) at the Stanford School of Medicine; a Senior Fellow at Stanford's Hoover Institution and its Institute for Economic Policy Research; and a Research Associate at the National Bureau of Economic Research, the country's leading nonprofit, nonpartisan economic research organization.  I teach a University-wide course in health care finance and regulation at Stanford.  I have also taught courses in health policy at the Wharton School of the University of Pennsylvania and Harvard Law School.  I have served as a consultant to the U.S. Federal Trade Commission, hospitals, health systems, and insurers.  I currently serve on Stanford's Committee on Faculty and Staff Human Resources, which oversees the University's health insurance plans and reports to its Chief Financial Officer.  I obtained a J.D. from Stanford Law School in 1993 and a Ph.D. in economics from MIT in 1994, specializing in law-and-economics and health economics.

2.    I study the empirical effects of health policy.  I have published numerous books and papers in peer-reviewed journals on health economics, health insurance, and regulation.  I served as the principal investigator for a grant from the U.S. National Institutes of Health to study how Medicare reimbursement policy should account for hospital integration and as an investigator for a grant from the U.S. Agency for Healthcare Research and Quality to study how physician organizational choices affect the cost and quality of care.  I have also received grant support from the U.S. National Science Foundation, the California Health Care Foundation, and the American Cancer Society.  In addition, my recent research is directly relevant to this case.  I have published several peer-reviewed papers on how CMS should regulate and pay Medicare Advantage plans, how risk-adjustment data should be collected, and on the effects of Medicare Advantage on medical treatments and mortality.  My full curriculum vitae is attached as Appendix A.  It also summarizes my expert testimony over the last four years.

3.    My compensation for work on this matter is $900 per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  My compensation in this matter is not contingent or based in any way on the content of my opinion or the outcome of this or any other matter.

4.      I hold the opinions I express in this report to a reasonable degree of certainty in the field of economics.

## II.    Assignment and Summary of Opinions

5.      I offer six main opinions. My first opinion, discussed in § III, is that attempting to achieve "payment neutrality" between Medicare Advantage (MA) and Fee-For-Service Medicare (FFS) creates incentives for differences in coding between the sectors. This occurs because attempting to achieve payment neutrality – that is, payments for MA enrollees to equal what they would be expected to cost in FFS – requires the Centers for Medicare and Medicaid Services (CMS) to pay MA plans on the basis of their enrollees' health. But paying plans on the basis of their enrollees' health creates a dilemma – it gives plans an incentive to find and report as many diagnoses as possible so as to increase the reported morbidity of their enrollees. This incentive is absent in FFS, which pays providers on the basis of the procedures that they perform, not on the basis of the diagnoses that they code. Thus, payment neutrality creates a differential incentive for "coding intensity" in MA versus FFS – that is, the coding of diagnoses conditional on a patient's true medical condition.

6.      My second opinion, discussed in § IV, is that differences in coding intensity between the sectors can be due to either present unsupported codes ("overcoding") or absent supported codes ("undercoding") in either MA or FFS. In § IV, I explain how increases in present unsupported codes increase a sector's coding intensity, as do decreases in absent supported codes. More present unsupported codes in claims data imply that the claims data overstate the severity of patients' true medical conditions; more absent supported codes imply that the claims data understate severity.

7.      My third opinion, discussed in § V, is that the Coding Intensity Adjustment (CIA, also known as the Coding Pattern Adjustment) does not and has never identified whether differences in coding between the sectors are due to differences in the rates of either present unsupported or absent supported codes. The CIA was created by CMS in order to make payments to MA plans account for differences in coding intensity between MA and FFS. In § V, I review public and confidential documents that show that the CIA does not and has never distinguished whether the differences in coding intensity between MA and FFS for which it accounts arise from differences in present unsupported or absent supported codes.

8.      My fourth opinion, discussed in § VI, is that CMS has already recovered payments to MA plans in aggregate due to MA-FFS differences in unsupported codes, if the CIA achieves its stated goal.  Because the CIA does not identify whether differences in coding intensity are due to supported or unsupported codes, if it accounts for all of the differences in coding intensity between MA and FFS, then CMS has necessarily already recovered payments to MA plans in aggregate due to MA-FFS differences in unsupported codes.  In § VI, I also explain several corollaries to this proposition, including the following:

  a.  Any removal of unsupported codes from MA plan data in the aggregate would allow CMS to recover twice for the removed unsupported codes, causing MA plans to receive less than their intended payments and, thus, to be "underpaid";

  b.  In order to know whether CMS has "overpaid" any particular plan due to that plan's level of unsupported codes, it is necessary to determine how much the particular plan's coding intensity deviates from the industry average and in what direction; and

  c.  Unless a plan knows how much its own coding intensity deviates from the industry average and in what direction, it cannot know whether it is "overpaid" or "underpaid."

9.      My fifth opinion, discussed in § VII, is that CMS must conduct chart (also known as medical record) reviews to determine whether and to what extent it has already recovered payments due to unsupported codes, if the CIA is too low.  If the CIA is too low, then CMS has not fully recovered payments to MA plans due to coding intensity differences, even after adjusting for the CIA.  These unrecovered payments, however, can be from more present unsupported codes in MA versus FFS, or fewer absent supported codes in MA versus FFS.  Unless MA-FFS differences in absent supported codes account for all of the CIA, some of the CIA must compensate CMS for MA-FFS differences in present unsupported codes.  If this is true, then there is no way to determine how much CMS has already recovered for present unsupported codes without knowing the relative rates of absent supported and present unsupported codes in MA and FFS – which would require medical record reviews.  In § VII, I explain several corollaries to this proposition, including that deleting unsupported codes (or even a subset of unsupported codes) from a particular MA plan's

data could bring payments to the plan closer to or farther from payment based on CMS's payment model.

10.    My sixth opinion, discussed in § VIII, is that the regulatory process would be the economically efficient means to address remaining MA-FFS differences in coding intensity, if the CIA is too low.  The regulatory process increases clarity and predictability, which reduces policy uncertainty, and thereby increases investment and employment in firms in the health care sector. If the CIA is too low, the most efficient way to address remaining MA-FFS differences in coding intensity would be to increase the CIA explicitly through the regulatory process by which it was determined in the first place.  If the CIA is too low, and there is some reason not to address remaining MA-FFS differences by increasing the CIA, then the regulatory process would again be the economically efficient means to consider alternative approaches (such as Mandatory Two-Sided Review, which would require that MA plans evaluate *all* the diagnoses on any claim subjected to a medical record review – not just the absent supported diagnoses – and delete any diagnoses not supported by the chart) to addressing remaining MA-FFS differences in coding intensity.  I also show that my opinion is consistent with CMS's historical treatment of Mandatory Two-Sided Review.

### III.    Attempting to Achieve "Payment Neutrality" Between Medicare Advantage and Fee-For-Service Creates Incentives For Differences in Coding Between the Sectors

11.    The Medicare program offers beneficiaries two ways to obtain health insurance coverage: FFS and MA.  FFS, sometimes called "traditional" Medicare, pays physicians and other providers based on the services they supply, such as office visits and procedures.  All services are classified according to the Healthcare Common Procedure Coding System (HCPCS), which contains codes for over 7,000 different services.  Each service is associated with a payment rate, based on the amount of work required to provide the service and the expenses in providing it, that the provider would be expected to incur.[1]  The MA program makes a fixed payment per enrollee per month to an MA plan, which then contracts with providers for services for the plan's participants.[2]  In doing

---

[1] *See* MedPAC, Report to the Congress: Medicare and the Health Care Delivery System 95–96 (June 2019).
[2] *See* Centers for Medicare & Medicaid Services, Report to Congress: Risk Adjustment in Medicare Advantage 3 (Dec. 2021), https://www.cms.gov/files/document/report-congress-risk-adjustment-medicare-advantage-december-2021.pdf.

so, the MA program seeks to give plans incentives to manage their enrollees care to be lower cost and/or higher quality than it would have been in FFS.[3]

12.    Most Medicare policy analysts start from the principle that payments to MA plans should achieve "payment neutrality," sometimes also described as "financial neutrality" or a "level playing field"[4] with FFS.   The Medicare Payment Advisory Commission, or MedPAC, is an independent congressional agency established by the Balanced Budget Act of 1997 to advise the U.S. Congress on the Medicare program, including payments to health plans participating in Medicare Advantage.[5]   MedPAC defines payment neutrality as requiring payments for MA enrollees to equal what they would be expected to cost in FFS Medicare.[6]   MedPAC has for many years supported the principle of payment neutrality,[7] as has my own research.[8]   According to MedPAC, "an underlying rationale for this policy is that it encourages beneficiaries to enroll in whichever sector (MA or FFS) is more efficient in their local health care market."[9]

13.    To achieve payment neutrality, CMS must pay MA plans on the basis of their enrollees' health.  MA plans report their enrollees' health to CMS in the form of diagnosis codes and other enrollee characteristics.  If MA plans enroll beneficiaries who are healthier (and therefore likely to be lower cost) than those in FFS, then payment neutrality would require CMS to pay the plans less than the average cost of FFS enrollees; but if MA plans enroll beneficiaries who are sicker than those in FFS, then payment neutrality would require CMS to pay the plans more than the average cost of FFS enrollees.  The process of determining how much less or more CMS should pay MA plans than the average cost of FFS enrollees is called "risk adjustment."

14.    But paying plans on the basis of their enrollees' health creates a dilemma – it gives plans an incentive to find and report as many diagnoses as possible so as to increase the reported morbidity of their enrollees.[10]  This incentive is absent in FFS, which pays providers on the basis

---

[3] Thomas McGuire, Joseph Newhouse, & Anna Sinaiko, *An Economic History of Medicare Part C*, 89(2) Milbank Quarterly 289, 289 (2011).
[4] Jacob Glazer & Thomas G. McGuire, *Paying Medicare Advantage Plans: To Level or Tilt the Playing Field*, 56 J. Health Econ. 281, 281 (2017).
[5] *See What We Do*, MedPAC, https://www.medpac.gov/what-we-do.
[6] *See* MedPAC, Report to the Congress: Medicare and the Health Care Delivery System 97 (June 2019).
[7] *See id.* at 261.
[8] *See* Gary E. Bacher, Michael E. Chernew, Daniel P. Kessler, Stephen M. Weiner, *Regulatory Neutrality Is Essential To Establishing a Level Playing Field For Accountable Care Organizations*, 32(8) Health Affairs 1426 (2013).
[9] MedPac, Issues for Risk Adjustment in Medicare Advantage 97 (June 2012).
[10] Richard Kronick & Pete Welch, *Measuring Coding Intensity in the Medicare Advantage Program*, 4(2) Medicare & Medicaid Research Review E2–3 (2014).

of the procedures that they perform, not on the basis of the diagnoses that they code. Thus payment neutrality creates a differential incentive for "coding intensity" in MA versus FFS – that is, the coding of diagnoses conditional on a patient's true medical condition.[11]

## IV.    Differences in Coding Between the Sectors Can Be Due to Either Present Unsupported or Absent Supported Codes in Either MA or FFS

15.    MA-FFS coding intensity differences can arise from type I and type II errors. Type I errors, also known as overcoding, refer to the presence of "unsupported" codes – codes that are recorded on the claims-based data, but do not reflect a patient's true medical condition. Type II errors, also known as undercoding, refer to the absence of "supported" codes – codes that are not recorded on the claims-based data, but do reflect a patient's true medical condition.

16.    Because both MA and FFS data may include both type I and type II errors, MA-FFS coding intensity differences can arise from four sources: the presence of unsupported codes in MA, the absence of supported codes in MA, the presence of unsupported codes in FFS, and the absence of supported codes in FFS. The frequency in MA and FFS of present unsupported codes and absent supported codes – and therefore the sources of coding intensity differences between the sectors – are empirical questions.

17.    The direction and magnitude of the difference in coding intensity between MA and FFS depends on the frequency of present unsupported and absent supported codes in the two sectors. For example:

    a.    If MA contains the same number of present unsupported codes than FFS but the fewer absent supported codes, then MA would have greater coding intensity than FFS.

    b.    MA might still have greater coding intensity than FFS, even if it contains fewer present unsupported codes, if MA also contains many fewer absent supported codes.

    c.    Alternatively, if MA contains fewer present unsupported codes than FFS, and the same number of absent supported codes, then MA would have lesser coding intensity than FFS.

---

[11] I use the term "true medical condition" to refer to the patient's medical condition as documented in the patient's medical record.

    d. MA could have the same coding intensity as FFS, even if it has fewer present unsupported codes, as long as it also has fewer absent unsupported codes.

18. A stylized example makes this point clear. For simplicity, assume that every diagnosis code has the same effect on a patient's expected cost. In this example, the coding intensity of a sector (MA or FFS) would be equal to the number of present unsupported codes less the number of absent supported codes. Exhibit 1 reports the number of present unsupported and absent supported codes for the average patient in MA and FFS under four different hypothetical scenarios, which correspond (respectively) to ¶¶ 17.a – 17.d.

19. In scenario a, the average patient in MA has 10 present unsupported and no absent supported codes, whereas the average patient in FFS has 10 present unsupported and 5 absent supported codes. In this scenario, MA has greater coding intensity than FFS. MA also has greater coding intensity than FFS in scenario b, in which the average patient has 8 present unsupported codes and no absent supported codes, as compared to 10 present unsupported and 5 absent supported codes in FFS. By contrast, in scenario c, MA has lesser coding intensity than FFS: the average patient in MA has 5 present unsupported and 5 absent supported codes, as compared to 10 present unsupported and 5 absent supported codes in FFS. In scenario d, MA has the same coding intensity as FFS. Even though the numbers of present unsupported and absent supported codes in MA are not the same as the numbers in FFS, the difference in each sector between the numbers of present unsupported and absent supported codes – which determines the sector's coding intensity – are the same.

**Exhibit 1:  Coding intensity in MA and FFS in Four Hypothetical Scenarios**

| Scenario | MA average patient | | FFS average patient |
|---|---|---|---|
| a | 10 present unsupported<br>0 absent supported<br>Coding intensity 10 = 10 − 0 | More intense<br>← | 10 present unsupported<br>5 absent supported<br>Coding intensity 5 = 10 − 5 |
| b | 8 present unsupported<br>0 absent supported<br>Coding intensity 8 = 8 − 0 | More intense<br>← | 10 present unsupported<br>5 absent supported<br>Coding intensity 5 = 10 − 5 |
| c | 5 present unsupported<br>5 absent supported<br>Coding intensity 0 = 5 − 5 | More intense<br>→ | 10 present unsupported<br>5 absent supported<br>Coding intensity 5 = 10 − 5 |
| d | 8 present unsupported<br>3 absent supported<br>Coding intensity 5 = 8 − 3 | Equally intense<br>= | 10 present unsupported<br>5 absent supported<br>Coding intensity 5 = 10 − 5 |

20.     The existence of a difference in coding intensity between MA and FFS does not imply that MA coding less closely reflects a patient's true medical condition than FFS, or vice versa.  Define the extent to which a sector reflects a patient's true medical condition as the average total error rate in the sector, i.e., the sum of the number of present unsupported and absent supported codes. For example:

a.  MA could have greater coding intensity than FFS if MA perfectly reflected a patient's true medical condition (i.e., did not have an error rate) when FFS imperfectly reflected a patient's true medical condition due to absent supported codes.

b.  Greater coding intensity in MA could be consistent with MA coding less closely reflecting a patient's true medical condition (i.e., had an error rate), if MA's greater coding intensity were due to a greater number of present unsupported codes and the same number of absent supported codes as FFS.

c.  Greater coding intensity in MA could also be consistent with MA and FFS equally imperfectly reflecting a patient's true medical condition (i.e., both MA and FFS had error rates), depending on the source of the imperfections in the two sectors.

21.    A stylized example makes this point clear.  For simplicity, again assume that every diagnosis code has the same effect on a patient's expected cost.  Exhibit 2 reports the number of present unsupported and absent supported codes for the average patient in MA and FFS under three different hypothetical scenarios, which correspond (respectively) to ¶¶ 20.a – 20.c.

**Exhibit 2:  Coding Intensity Differences Do Not Indicate Which Sector's Coding Most Closely Reflects Patients' True Medical Condition**

| Scenario | MA average patient | | FFS average patient |
|---|---|---|---|
| a. MA perfectly reflects true medical condition, FFS imperfectly | 0 present unsupported<br>0 absent supported<br>Coding intensity 0 = 0 - 0 | More intense<br>← | 0 present unsupported<br>5 absent supported<br>Coding intensity -5 = 0 - 5 |
| b. MA imperfectly reflects true medical condition, FFS perfectly | 5 present unsupported<br>0 absent supported<br>Coding intensity 5 = 5 - 0 | More intense<br>← | 0 present unsupported<br>0 absent supported<br>Coding intensity 0 = 0 - 0 |
| c. MA and FFS reflect medical condition equally imperfectly | 10 present unsupported<br>5 absent supported<br>Coding intensity 5 = 10 - 5 | More intense<br>← | 5 present unsupported<br>10 absent supported<br>Coding intensity -5 = 5 - 10 |

22.    In scenario a, the average patient in MA has no present unsupported and no absent supported codes, so it perfectly reflects the patient's true medical condition; the average patient in FFS has no present unsupported and 5 absent supported codes, so it imperfectly reflects the patient's true medical condition.  In this scenario, MA has greater coding intensity than FFS.  In scenario b, the average patient in MA has 5 present unsupported codes and no absent supported codes, so it imperfectly reflects the patient's true medical condition.  In this scenario, MA has greater coding intensity than FFS.  In scenario b, the average patient in MA has 5 present unsupported codes and no absent unsupported codes, so it imperfectly reflects the patient's true medical condition; the average patient in FFS has no present unsupported and no absent supported codes, so it perfectly reflects the patient's true medical condition.  In this scenario, MA still has

greater coding intensity than FFS. Scenario c shows that even if both MA and FFS reflect the average patient's medical average patient's medical condition equally imperfectly – that is, by making 15 coding errors – MA can have greater coding intensity than FFS. Simply reversing the hypothetical shows that MA can also have lesser coding intensity than FFS, even if both MA and FFS reflect the patient's true medical condition equally imperfectly.

## V.   The Coding Intensity Adjustment Does Not and Has Never Identified Whether Differences in Coding Between the Sectors Are Due to Differences in Supported or Unsupported Codes

### A.   Background on the Coding Intensity Adjustment

23.    Federal law requires CMS to publish annually a "Rate Announcement" no later than April 6 that explains how payments to MA plans will change in the following calendar year (also known as the "Payment Year").[12]  Federal law also requires CMS to publish annually an "Advance Notice" draft of its "Rate Announcement" no later than February 15 to enable public comment on any changes to MA plan payment that will be specified in its subsequent "Rate Announcement."[13] In many (but not all) years, CMS publishes some comments that it receives on the year's Advance Notice, along with its responses to the comments, as part of its Rate Announcement.  Thus the 2008-2018 set of Advance Notices and Rate Announcements provide a complete history of all changes to MA plan payment policy for that period, including the adoption of a CIA.[14]  Through CMS's responses to comments on the Advance Notices, the Rate Announcements also in many years explain the reasoning behind and details about changes to MA plan payment, including the CIA.[15]

24.    The CIA was created by CMS in response to the Deficit Reduction Act of 2005 (DRA 2005).  DRA 2005 added § 1853(k)(2)(B)(iv)(III) to the Social Security Act, requiring risk adjustment to account for "differences in coding patterns between [MA] plans and providers under … parts A and B to the extent that the Secretary has identified such differences."[16]  In its 2008 and 2009 Advance Notices and Rate Announcements, CMS described and reported results from studies

---

[12] 42 U.S.C. 1395w-23 § 1853(b)(1)-(b)(2).

[13] *Id.*

[14] I assign each Advance Notice and Rate Announcement to the Payment Year to which the Advance Notice or Rate Announcement applies.

[15] *See, e.g.*, Rate Announcement, April 4, 2011 at 37.

[16] 42 U.S.C. 1395w-23 § 1853(k)(2)(B)(iv)(III).

"designed to assess the degree of coding patterns (sic) differences that may be identified between FFS and MA and the extent to which any differences could be appropriately addressed by an adjustment to the CMS-HCC risk scores."[17]  In those years, CMS declined to adopt a CIA.[18]  In the 2010 Rate Announcement, CMS adopted a CIA, and has retained a CIA for all of the subsequent years.[19]

25.      As I explain below, these Advance Notices and Rate Announcements, along with internal CMS documents, show that the CIA does not and has never identified whether differences in coding between MA and FFS are due to differences in supported or unsupported codes.[20]  In particular:

   a. According to CMS, the DRA 2005 did not require CMS to identify the source of MA-FFS differences in coding (§ V.B);

   b. CMS did not identify the source of coding differences in its preliminary studies of a CIA (§ V.C);

   c. CMS did not identify the source of coding differences in the methodology it used in 2009 to calculate the CIA for 2010 (§ V.D);

   d. CMS did not identify the source of coding differences in its implementation of the CIA after 2010 (§ V.E); and

   e. Changes to the specification of the CIA that CMS considered after 2010 did not identify the source of coding differences (§ V.F).

26.      This is not surprising.  CMS's calculation of the CIA does not and has never relied on medical record reviews.  Without medical record reviews from both MA and FFS, it is impossible to determine the extent to which claims-based differences in MA-FFS enrollee health are due to differences in the volume of supported versus unsupported codes.  To determine the extent to which claims-based differences in MA-FFS enrollee health were due to one source of coding error or the other requires knowledge of the scope of that type of error in both MA and FFS.

---

[17] Advance Notice, February 16, 2007 at 8; *see* Advance Notice, February 22, 2008 at 10–14.
[18] *See* Rate Announcement, April 2, 2007 at 17; Rate Announcement, April 7, 2008 at 18.
[19] *See* Rate Announcement, April 6, 2009 at 19; *see e.g.,* Rate Announcement, April 2, 2012 at 25 (addressing comments related to the CIA).
[20] *See also* Sean Creighton Deposition ("Creighton Dep."), October 4, 2022, at 101:15–102:1 ("Q: And so it's fair to say that as part of calculating the coding intensity adjustment, CMS made no attempt to distinguish between supported and unsupported codes in the Fee-for-Service population or in the MA population; correct?  A:  That is correct.").

**B.    According to CMS, the Deficit Reduction Act of 2005 Did Not Require CMS To Identify the Source of Coding Differences When It Directed CMS To Adopt a Coding Intensity Adjustment**

27.    CMS first adopted a CIA in its 2010 Rate Announcement.  In that Rate Announcement, CMS responded to comments on that year's Advance Notice.  One response to comments stated that:

> As documented in the 2009 Announcement, CMS believes that the statutory language in the DRA provision at issue provides for a payment adjustment if CMS establishes that there are "differences in coding patterns between [MA] plans and providers under part A and B"…This means that MA organizations are coding "accurately" when they are coding in a manner similar to fee-for-service coding used on the beneficiaries to whom MA plan enrollees are being compared.  In this sense, "differences" in coding patterns, **regardless of the source** [emphasis added], would make the MA plan coding "inaccurate" for purposes of implementing risk adjustment.[21]

28.    As I explain in ¶ 16, there are four sources of differences in coding patterns:  the presence of unsupported codes in MA, the absence of supported codes in MA, the presence of unsupported codes in FFS, and the absence of supported codes in FFS.  According to CMS, any of these four sources of differences in coding could make MA organizations coding "inaccurate" for purposes of implementing risk adjustment – and thereby support the adoption of a CIA.

**C.    CMS Did Not Identify the Source of Coding Differences In Its Preliminary Studies of a Coding Intensity Adjustment**

29.    Prior to adopting a CIA in the 2010 Rate Announcement, CMS described and reported results from studies "designed to assess the degree of coding patterns (sic) differences that may be identified between FFS and MA and the extent to which any differences could be appropriately addressed by an adjustment to the CMS-HCC risk scores."[22]  These preliminary studies did not identify which of the four sources underlaid coding pattern differences between the sectors.

---

[21] Rate Announcement, April 6, 2009 at 20.
[22] Advance Notice, February 16, 2007 at 8.

30.     In its 2008 Rate Announcement, CMS described two studies that it conducted to assess the extent of coding differences.[23]  The first study compared the extent to which MA and FFS consistently identified beneficiaries with ongoing, chronic conditions from year-to-year.  It found no notable differences between the consistency with which MA and FFS identified ongoing, chronic conditions.  It concluded that the consistency with which MA and FFS identified ongoing, chronic conditions was therefore not a source of MA-FFS coding differences.

31.     The second study compared the risk score trends in MA versus FFS.  It found that, over the 2004-2006 period, MA risk scores increased faster than FFS risk scores.  To further investigate the source of this difference in trends, the study separately compared the trends in risk scores for three groups of enrollees:  "joiners" (enrollees who enter MA versus those who enter FFS), "leavers" (enrollees who exit MA versus FFS), and "stayers" (enrollees who remain in MA versus FFS).  It found two dynamics that explained the difference in trends.

32.     The first dynamic was changes in enrollment patterns in MA versus FFS:  the risk scores of joiners and leavers.  The study found that more high-risk-score enrollees entered MA than FFS, and more high-risk-score enrollees exited FFS than MA.  According to CMS, "with FFS losing higher risk beneficiaries than MA, and with MA enrolling higher risk beneficiaries than FFS, MA risk scores were pushed up at a faster rate than risk scores in FFS."[24]  According to CMS, "[w]e would not want to adjust payment for such factors [as different enrollment patterns in MA versus FFS] since they are unrelated to coding patterns."[25]

33.     The second dynamic was changes in risk scores in enrollees who remained in MA and FFS:  the risk scores of stayers.  The study found that part of this difference was due to "changes in the demographic characteristics of enrollees (such as aging into brackets with higher relative factors or obtaining Medicaid eligibility)"[26] and that "[w]e would not want to adjust payment for such factors [as changes in demographic characteristics] since they are unrelated to coding patterns."[27]  The study also found that "part of the differential increase in risk scores is due to the increase in the disease component of MA stayers' risk scores"[28] but that "we have not been able to measure

---

[23] *See* Rate Announcement, April 2, 2007 at 16–17.  The description of the studies in the following paragraphs follows closely the language in this Rate Announcement.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*

the possible causes of this differential."[29]  The study concluded that "[g]iven that we [CMS] cannot yet definitively attribute the difference in MA and FFS risk scores to underlying coding patterns [sic] differences, we will not make a coding intensity adjustment to MA payment for 2008."[30]

In its 2009 Advance Notice, CMS described additional research into the possible causes of the differential increase in the disease component of MA stayers' risk scores.  According to CMS, "[a]lthough CMS cannot definitely determine whether 'catch up' to FFS coding occurred or not, CMS recognizes that plans may have experienced some catch up, particularly during initial years of operation."[31]  In a subsection titled "More complete coding," CMS concluded that "[w]e do not assume that the coding pattern differences that we found in our study are the result of improper coding.  As discussed above, CMS understands that MA plans have made efforts to identify enrollees' conditions and may be coding more completely than FFS."[32]  This means that the additional research described in the 2009 Advance Notice did not identify the extent to which MA-FFS differences in coding patterns were caused by the relatively greater absence of supported codes in FFS (catch up) or by the relatively greater presence of unsupported codes in MA.

34.     CMS affirmed this conclusion in its 2009 Rate Announcement, in which it again decided not to make a coding intensity adjustment:

> In the Advance Notice, we identified differences between the risk scores of MA and FFS Medicare enrollees.  However, we did not have available comprehensive information from medical records to support our hypothesis that risk score differences were driven by coding pattern differences, rather than by the health status of MA enrollees.[33]

---

[29] *Id.*
[30] *Id.*
[31] Advance Notice, February 22, 2008 at 12.  CMS defines "catch-up" in its 2008 Rate Announcement as "MA plans increasing their coding to 'catch up' to the level of FFS" and contrasts catch-up with "coding patterns that exceed FFS."  Rate Announcement, April 2, 2007 at 17.
[32] Advance Notice, February 22, 2008 at 12.
[33] Rate Announcement, April 7, 2008 at 18.

**D.    CMS Did Not Identify the Source of Coding Differences In Its Initial Implementation of a Coding Intensity Adjustment in 2010**

35.    In its 2010 Advance Notice, CMS concluded that "there exists a difference in coding patterns between MA and FFS"[34] and expressed its intention "to apply a coding pattern difference adjustment in 2010."[35]  In its 2010 Rate Announcement, CMS established a CIA of 3.41 percent. Nowhere in the Advance Notice or Rate Announcement does CMS do any of the following:

  a.  Report results from medical record reviews;

  b.  Quantify the extent to which the 3.41 percent difference is due to a relatively greater absence of supported codes in FFS, a relatively greater presence of unsupported codes in MA, or some combination of the two; or

  c.  Identify whether any of the difference is due to any unsupported codes in MA at all.

36.     Indeed, as I explain in ¶ 27, in its 2010 Rate Announcement CMS explicitly states that it understands that "'differences' in coding patterns, regardless of the source, would make the MA plan coding 'inaccurate' for purposes of implementing risk adjustment"[36] and that "[a]s discussed above, the MA coding pattern difference adjustment is not adjusting for coding that is incorrect, but for coding that differs from FFS and is therefore inaccurate for payment."[37]

37.    CMS's statement that "the MA coding pattern difference adjustment is not adjusting for coding that is incorrect, but for coding that differs from FFS" is consistent with the method that CMS used to calculate the CIA.  In particular, according to the 2010 Advance Notice (as modified by the 2010 Rate Announcement) CMS calculated the CIA as follows:

  a.  Create "stayer" cohorts of MA and FFS beneficiaries for 2004-05, 2005-06, and 2006-07;

  b.  Calculate the difference in disease score growth for each MA and FFS cohort, and then subtract the FFS disease score growth from the MA disease score growth;[38]

  c.  Calculate the average annual difference in MA-FFS disease score growth (which CMS determined to be 1.75 percent);

---

[34] Advance Notice, February 20, 2009 at 8.
[35] *Id*. at 9.
[36] Rate Announcement, April 6, 2009 at 20.
[37] *Id.* at 26.
[38] See Appendix B for a general description of how CMS calculates disease scores.

    d.   Multiply the average annual difference in MA-FFS disease score growth by the MA enrollment duration factor (EDF), which is the average length of time that beneficiaries enrolled in an MA plan in January 2009 had been enrolled in an MA plan since January 2006. According to CMS, the product of the annual average difference in MA-FFS disease score growth and the EDF "is an estimate of how much lower [MA] risk scores would be in 2010 if they rose at the same rate as FFS risk scores over the period 2007-2010."[39] CMS determined the EDF to be 2.45, so it determined that the product of the annual average difference in MA-FFS disease score growth and the EDF was 4.16 percent (= 1.75 percent × 2.38); and

    e.   Multiply by the percent of MA enrollees who are stayers in January 2009 (which CMS determined to be 81.8 percent) to allow the application of the CIA to all MA enrollees' risk scores.[40]

38. In its 2010 Rate Announcement, CMS set the CIA to be 3.41 percent ≈ 4.16 percent × 0.818.[41]

### E.    CMS Did Not Identify the Source of Coding Differences In Its Implementation of Coding Intensity Adjustments After 2010

39. Exhibit 3 reports the CIAs for 2011-2018. Exhibit 3 shows that, after the 2010 Rate Announcement, CMS set the CIA at the same level for 2011-2013, increasing it in 2014-2018 to the statutory minima specified by the American Taxpayer Relief of 2012.[42] In no year's Advance Notice or Rate Announcement did CMS provide any calculations to support its decision.

40. Because CMS did not identify the source of coding differences in its initial implementation of a CIA in 2010; in every year from 2010-2018 CMS set the CIA at either the 2010 level or the statutory minimum; and in no year after 2010 did CMS provide any calculations to support its decision in any Advance Notice or Rate Announcement, I conclude that CMS did not identify the source of coding differences in its implementation of coding intensity adjustments after 2010.

---

[39] Rate Announcement, April 6, 2009 at 22.
[40] *See* Advance Notice, February 20, 2009 at 10; Rate Announcement, April 6, 2009 at 19.
[41] *See* Rate Announcement, April 6, 2009 at 19.
[42] *See* Kronick & Welch, *supra* note 10, at E4.

**Exhibit 3: CMS Offered No Basis For the Magnitude of the CIA After 2010**

| Year | CIA | Statutory Minimum | Basis for Calculation of CIA In Advance Notice or Rate Announcement |
|---|---|---|---|
| 2011 | 3.41% | | None |
| 2012 | 3.41% | | None |
| 2013 | 3.41% | | None |
| 2014 | 4.91% | 4.91% | None |
| 2015 | 5.16% | 5.16% | None |
| 2016 | 5.41% | 5.41% | None |
| 2017 | 5.66% | 5.66% | None |
| 2018 | 5.91% | 5.91% | None |

**F.    Changes to the Specification of the CIA that CMS Considered After 2010 Did Not Identify the Source of Coding Differences**

41.    CMS considered at least three studies after 2010 that proposed changes to the way that it calculated the CIA.  None of these studies identified the source of coding differences between the sectors:

> In 2011, CMS considered GAO's argument that CMS's calculation of the 2010 CIA of 3.41 percent likely resulted in excess payments to MA plans.[43]  The GAO study proposed several steps to improve the accuracy of CMS's calculation of the CIA including "accounting for additional beneficiary characteristics, including the most current data available, identifying and accounting for all years of coding differences that could affect the payment year for which an adjustment is made, and incorporating the trend of the impact of coding differences on risk scores."[44]

---

[43] GAO, Medicare Advantage: CMS Should Improve the Accuracy of Risk Score Adjustments for Diagnostic Coding Practices, GAO-12-51, at 2 (January 2012).
[44] *Id.* at 14.

a.  In 2012, CMS conducted an internal analysis that showed how the CIA would change using different cohort years, a longer EDF, a different risk adjustment model, and a different MA stayer percentage.  None of these variants affect the underlying method established in the 2010 Advance Notice and Rate Announcement (which did not identify the source of coding differences, see § V.C) so none of them identify the source of coding differences.[45]

b.  In 2014, CMS considered an ASPE analysis that concluded that "most of this [differential MA risk score growth] appears to result from the plans identifying more diagnoses in a population that is no sicker than before"[46] but provides no evidence beyond its citation to a prepublication version of a study later published in the Medicare and Medicaid Research Review (MMRR).[47]  This study, in turn identifies the differential trend in MA coding intensity by assuming that "in the absence of coding intensity efforts, the risk score for a given MA beneficiary would increase, on average, at the same rate as the risk score for an otherwise similar FFS beneficiary from one year to the next."[48]  For the reasons discussed in § V.D, this approach does not identify whether increases in coding intensity are due to supported or unsupported codes.

## VI.  If the Coding Intensity Adjustment Achieves Its Stated Goal, CMS Has Already Recovered Payments to MA Plans in Aggregate Due to MA-FFS Differences in Unsupported Codes

42.  Because the CIA does not identify whether differences in coding patters are due to supported or unsupported codes, if it achieves its stated goal and accounts for "differences in coding patterns between [MA] plans and providers under … parts A and B,"[49] then CMS has necessarily already recovered payments to MA plans in aggregate due to MA-FFS differences in unsupported codes.  Because the CIA does not identify whether differences in coding patterns

---

[45] *See* USBP052417595 (AEO).
[46] *See* USBP001836865 (AEO).
[47] *See* Kronick & Welch, *supra* note 10.
[48] *Id*. at E6.
[49] 42 U.S.C. 1395w-23 § 1853(k)(2)(B)(iv)(III).

are due to supported or unsupported codes, if it accounts for "differences in coding patterns between [MA] plans and providers under … parts a and b," then it must account for the net impact of all of the four sources of differences in ¶ 16.[50]  If it accounts for all of the four sources of differences in ¶ 16, then all differences due to coding intensity would be removed from MA-FFS differences in payments in aggregate – including differences in unsupported codes.  I refer to the payments to MA plans in aggregate, after risk adjustment and the application of the CIA (excluding rebates and beneficiary premiums) as the "intended payments."[51]

### A. Any Removal of Unsupported Codes from MA Plans in Aggregate Would Result in Underpayment to Plans by Allowing CMS to Recover Twice

43.    After adjusting for the CIA, any removal of unsupported codes from MA plan data in aggregate (i) would reduce payments to MA plans in aggregate below the intended payments, (ii) is inconsistent with the attempt to achieve payment neutrality, and (iii) would allow CMS to recover twice for the removed unsupported codes.[52]  A stylized example shows how this follows directly from ¶ 42.  For simplicity, assume that every diagnosis code has the same effect on a patient's expected cost, equal to an effect of 0.01 on the patient's risk score.  Consider an extended version of the hypothetical scenario a from Exhibit 1, in which the average patient in MA has 110 codes (with 10 present unsupported and no absent supported codes), whereas the average patient in FFS has 100 codes (with 10 present unsupported and 5 absent supported codes).  By construction, the average patient in MA has a risk score of 1.1 (= $110 \times 0.01$); the average patient

---

[50] *See, e.g.*, Creighton Dep., October 4, 2022, at 99:9–15 ("Q. Got it.  Now, ultimately the coding intensity adjustment attempts to account for all the differences in coding patterns between the Medicare Advantage population and the Fee-for-Service population; correct?  A. Correct.")  Sean Creighton was the division director responsible for preparing the annual advance notice, which is the governing document for payment to MA and Part D plans for the forthcoming year.").  Mr. Creighton reported to the director of the Medicare Plan Payment Group.  *See* Creighton Dep., March 23, 2022, at 33:13–34:10.

[51] *See* Creighton Dep., March 23, 2022, at 119:21–120:14 ("Q. And you go on to write: 'This would result in the MA plan coding "accurately" reflecting the fee-for-service coding used on the beneficiaries to whom MA plan enrollees are being compared. In this sense, "differences" in coding patterns, regardless of the source, would make the MA plan coding "inaccurate" for purposes of implementing risk adjustment.' And I take it that's part of the effort to respond to this question about accurate versus inaccurate. Correct? A. Yeah. It's really saying that in this context, differences in coding patterns result in inaccurate payments. And by 'inaccurate,' what is actually meant is essentially payments that would – either you could say violate actuarial equivalence at a high level, but in a more real sense that result in different payment than was intended.").

[52] This proposition holds even if there are no MA-FFS differences in unsupported codes.  In this case, CMS would have no economic rationale for recovering for unsupported codes in MA plans in aggregate in the first instance, so any removal of unsupported codes from MA plans in aggregate would allow CMS to recover for the removed unsupported codes when it had no economic rationale to do so.

in FFS has a risk score of 1.0 (= 100 × 0.01). Because the coding intensity of MA is 10 (= 10 present unsupported – 0 absent supported codes), whereas the coding intensity of FFS is 5 (= 10 present unsupported – 5 absent supported codes), the average MA risk score after adjusting for MA-FFS differences in coding intensity is 1.05 (= [110 – (10 – 5)] × 0.01). The average MA risk score of 1.05 after adjusting for differences in coding intensity reflects the fact that the average MA patient has 5 more "true medical conditions" than the average FFS patient. The intended payment would therefore be $1.05 per dollar of expected FFS spending. Because the average MA risk score after adjusting for MA-FFS differences in coding intensity is 1.05, the CIA must be 4.55 percent (≈ 1 - [1.05 / 1.1], since 1.1 × [1 – CIA] = 1.05).[53]

44.    If CMS required deletion of any of the present unsupported codes from MA plan data in aggregate without changing the CIA, then it would reduce the average MA risk score after adjusting for the CIA below 1.05. This means that CMS would reduce payments to MA plans below the intended payment, effectively allowing CMS to recover twice for the removed unsupported codes and resulting in the MA plans being "underpaid." This result would be inconsistent with the attempt to achieve payment neutrality, and would be inconsistent with payment neutrality itself if CMS's estimate of the effect of a diagnosis code on a patient's expected cost were correct.

45.    For example, suppose that CMS required an MA plan with average coding intensity from the scenario above to delete 5 of the 10 present unsupported codes from its data. This would make the coding intensity of the MA plan (5 = 5 present unsupported – 0 absent supported codes) equal to the coding intensity of FFS (5 = 10 present unsupported – 5 absent supported codes). It would not change the fact that the average MA patient has 5 more "true medical conditions" than the average FFS patient; would not change the average MA risk score after adjusting for MA-FFS differences in coding intensity from 1.05 (= [105 – (5 – 5)] × 0.01); and would not change the intended payment of $1.05 per dollar of expected FFS spending. Yet, if the old CIA of 4.55 percent were imposed, it would reduce the average MA risk score after adjusting for the CIA to approximately 1 (≈ 1.05 × [1 – 0.0455]). The problem is that the CIA was calculated based on the presence of the 5 unsupported codes that CMS, after calculating the CIA, required the MA plans to remove.

---

[53] *See* USBP000161652 at 39.

46.    The example also demonstrates that the presence of unsupported codes in MA plan data is insufficient to establish that CMS has paid more than the intended payments—i.e., that CMS has "overpaid" the average MA plan.[54]  With a CIA of 4.55%, the average plan would be neither overpaid nor underpaid despite the fact that it had 10 present unsupported codes.

### B.    Other Implications of CMS Having Already Recovered Payments to MA Plans In Aggregate Due to MA-FFS Differences in Unsupported Codes

47.    Five corollaries also follow from ¶ 42.  Consider the example from ¶ 43, adding to it the specific characteristics of three equally-sized MA plans, A, B, and C.  Consistent with the example above, assume that the average patient in each MA plan has 110 codes, giving each MA plan an average risk score of 1.10 (= 110 × 0.01).  Also continue to assume a CIA of 4.55 percent, so that the average MA risk score after adjustment for the CIA in each plan would continue to be 1.05.

48.    Additionally, assume that the average patient in A has 15 present unsupported and no absent supported codes, in B has 10 present unsupported and no absent supported codes, and in C has 5 present unsupported and no absent supported codes.  Although the CIA of 4.55 percent adjusts for MA-FFS differences in coding intensity *in aggregate*, it does not adjust for plan-specific differences in coding intensity.  In particular, the CIA does not fully adjust for the level of unsupported codes in A, which has a coding intensity of 15 and so should receive $1 per dollar of expected FFS spending based on CMS's risk-adjustment model, after fully adjusting for the level of unsupported codes in that plan.  The difference between plan A's and FFS coding intensity is 10 (= 15 – 5), exactly offsetting the difference in codes between A and FFS (= 110 – 100).  As CMS would have paid A $1.05 per dollar of expected FFS spending, after adjusting for the CIA, CMS has therefore not fully recovered payments from A due to its level of unsupported codes – A has been "overpaid."  By contrast, CMS has fully recovered payments from B and C due to their levels of unsupported codes.  In particular, the CIA exactly adjusts for the level of unsupported codes in B, which has a coding intensity of 10 (which equals the industry average); the CIA actually over-adjusts for the level of unsupported codes in C, which has a coding intensity of 5

---

[54] *See also* Anne Hornsby 30(b)(6) Deposition ("Hornsby 30(b)(6) Dep."), May 19, 2023, at 111:15–21 ("Q. Okay. But for the purposes of MA plan payments, the determination of whether or not the payments were equitable or overpaid or underpaid requires an analysis of the different level of coding between the diagnoses and fee-for-service data or the Medicare Advantage data?  A. Yes.").

(which is less than the industry average).  Despite having unsupported codes in their data, plans B and C would not be "overpaid" in this scenario.

49.    This example demonstrates five corollaries.  First, in order to determine whether CMS has "overpaid" any particular plan due to that plan's level of unsupported codes, it is necessary to know how much the particular plan's coding intensity deviates from the industry average and in what direction.  Moreover, unless a plan knew how much its own coding intensity deviates from the industry average and in what direction, it cannot know whether it is "overpaid" or "underpaid."[55]  A plan with a given coding intensity would be "overpaid" if its coding intensity is greater than the industry average, but would be "underpaid" if its coding intensity is less than the industry average.  I am not aware of any data or information that would allow United to have calculated the extent to which its coding intensity would have exceeded (or differed from) the industry average, which means I am unaware of how United could have determined whether it was overpaid or underpaid.

50.    Second, the presence of unsupported codes in any particular plan's data is insufficient to establish that CMS has "overpaid" or "underpaid" it.  Correct calculation of the presence and extent of "overpayment" must also account for the plan's level of absent supported codes and the industry average level of present unsupported and absent supported codes.

51.    Third, if all differences in coding intensity are removed from MA-FFS differences in payments in aggregate, then differences in coding intensity due to MA plans' review of claims to add (otherwise absent) supported codes but not to delete (otherwise present) unsupported codes are necessarily also removed from MA-FFS differences in payments in aggregate.

52.    Fourth, if differences in coding intensity due to MA plans' review of claims to add (otherwise absent) supported codes but not to delete (otherwise present) unsupported codes are removed from MA-FFS differences in payments in aggregate, then any additional reductions in payments to MA plans in aggregate for either of these reasons would necessarily reduce payments to MA plans in aggregate below the intended payments.  As a result, MA plans in this scenario would be "underpaid."

---

[55] Alternatively, if a plan knew its own coding intensity and the coding intensity of FFS (along with the CIA), it could back out the industry average MA coding intensity.

53.     Fifth, because the intended payments attempt to achieve MA-FFS payment neutrality[56] – that is, payments for MA enrollees equal to what they would be expected to cost in FFS – additional reductions in payments to MA plans in aggregate (after the application of the CIA) for MA-FFS differences in coding intensity due to MA plans' review of claims to add (otherwise absent) supported codes but not to delete (otherwise present) unsupported codes is inconsistent with the attempt to achieve payment neutrality.[57]

## VII.     If the Coding Intensity Adjustment Is Too Low, CMS Must Conduct Medical Record Reviews To Determine Whether and To What Extent It Has Already Recovered Payments Due to Unsupported Codes

54.     If the CIA is too low to account for "differences in coding patterns between [MA] plans and providers under … parts A and B,"[58] then CMS has not fully recovered payments to MA plans due to coding intensity differences, even after adjusting for the CIA.[59]   These unrecovered payments can be from two sources:  from fewer absent supported codes in MA relative to FFS, or more present unsupported codes in MA relative to FFS.  Unless MA-FFS differences in absent supported codes account for all of the CIA, some of the CIA must compensate CMS for MA-FFS differences in present unsupported codes.  If this is true, then there is no way to determine how

---

[56] See Creighton Dep., March 23, 2022, at 106:17–107:11 ("Q. Sorry about that, Mr. Creighton.  So what I was asking you in layman's terms, how would you describe that proposition that MA plans have a differential rate of increase in coding relative to fee-for-service? A. As we've discussed, the incentive for MA plans is to more comprehensively and accurately collect and report data on the conditions, health conditions, and specifically the diagnosis of their members. You know, over time what that leads to is a different pattern or accelerated rate of coding relative to fee-for-service. So what -- and that is what coding intensity refers to.  So a coding intensity adjustment is a way of saying, okay, we understand that incentive exists, we're going to measure it, make a payment adjustment for it so that the standard of actuarial equivalence or comparability between fee-for-service and MA is maintained in payment.").

[57] If the intended payment actually achieves payment neutrality, then additional reductions in payments to MA plans in aggregate (after the application of the CIA) for MA-FFS differences in coding intensity due to MA plans' review of claims to add (otherwise absent) supported codes but not to delete (otherwise present) unsupported codes is inconsistent with payment neutrality.

[58] 42 U.S.C. 1395w-23 § 1853(k)(2)(B)(iv)(III).  Because of the absence of medical record reviews, it is not known definitively whether the CIA accounts for "differences in coding patterns between [MA] plans and providers under … parts A and B," is too low to do so, or too high to do so.  CMS acknowledged this in its 2009 Rate Announcement: "We did not have available comprehensive information from medical records to support our hypothesis that risk score differences were driven by coding pattern differences, rather than by the health status of MA enrollees."   Rate Announcement, April 7, 2008 at 18.  The average annual difference in MA-FFS risk score growth inflated by the EDF – the basis on which CMS has set the CIA – is *only an approximation* of the extent to which claims-data-based differences in MA-FFS risk score growth represent differences in coding intensity and can only be determined by comparing the diagnoses recorded in each sector's claims data to matching medical records.

[59] In order to be as favorable to CMS as possible, the analysis in this section assumes that CMS should recover for MA-FFS differences in coding intensity, after adjusting for the CIA, even though it was mandated to have set the CIA to have done so in the first instance.  If CMS's failure to meet its mandate were to preclude it from seeking recovery from MA plans attributable to "differences in coding patterns between [MA] plans and providers under … parts A and B" in aggregate, then it should recover nothing for such differences in aggregate if the CIA is too low.

much CMS has already recovered for present unsupported codes without knowing the relative rates of absent supported and present unsupported codes in MA and FFS – which would require medical record reviews.

55.    Several corollaries follow from ¶ 54.  First, removing unsupported codes from MA plan data in aggregate could bring payments to MA plans closer to or farther from the intended payments, depending on the relative rates of absent supported and present unsupported codes in MA and FFS.  To determine whether removing unsupported codes from MA plan data in aggregate would bring payments to plans closer to the intended payments would require knowing the relative rates of absent supported and present unsupported codes in MA and FFS – which would require medical record reviews.

56.    A stylized example makes this point clear.  In the example, assume the following:

    a.  Every diagnosis code has the same effect on a patient's expected cost, equal to an effect of 0.01 on the patient's risk score;

    b.  The average patient in MA has 110 codes, whereas the average patient in FFS has 100 codes; and

    c.  The CIA is set to be 4.55 percent.

As a consequence, the average MA risk score after adjusting for the CIA would be 1.05 (= [1.1 × (1 – 0.0455)).

57.    Exhibit 4 reports the number of present unsupported and absent supported codes for the average patient in MA and FFS under two different hypothetical scenarios.  In scenario a, the average patient in MA has 2 present unsupported and no absent supported codes, whereas the average patient in FFS has 2 present unsupported and 7 absent supported codes.  In this scenario, MA has greater coding intensity than FFS (2 > -5).  MA has the same greater coding intensity than FFS in scenario b.  In both scenarios, the CIA is set too low (4.55 percent < 6.36 percent).

**Exhibit 4:  Coding intensity in MA and FFS in Two Hypothetical Scenarios**

| Scenario | MA average patient | FFS average patient | CIA Should Be |
|---|---|---|---|
| a | 2 present unsupported<br>0 absent supported<br>Coding intensity 2 = 2 – 0 | 2 present unsupported<br>7 absent supported<br>Coding intensity -5 = 2 - 7 | 6.36 percent[60] |
| b | 6 present unsupported<br>4 absent supported<br>Coding intensity 2 = 6 – 4 | 5 present unsupported<br>10 absent supported<br>Coding intensity -5 = 5 - 10 | 6.36 percent |

58.    In the example, removing unsupported codes from MA plan data in aggregate would bring payments to MA plans closer to the intended payments in scenario a, but farther from the intended payments in scenario b.  In scenario a, deleting the 2 unsupported codes from the average MA patient would bring the intended payments to the approximately correct amount.  Deleting these 2 unsupported codes would bring the average MA risk score after adjusting for the CIA to approximately 1.03 ($\approx ([110-2] \times 0.01 \times [1-0.0454])$), which would be correct.[61]  In scenario b, however, deleting the 6 unsupported codes from the average MA patient would bring the intended payments below the correct amount.  Deleting these 6 unsupported codes would bring the average MA risk score after adjusting for the CIA to approximately 0.99 ($\approx ([110-6] \times 0.01 \times [1-0.0454])$) – approximately 0.04 less than it should be, as compared to the base case in which the average MA risk score after adjusting for the CIA is 0.02 greater (= 1.05 – 1.03) than the correct risk score.[62]

59.    The example highlights why removing unsupported codes from MA plan data, after adjusting for the CIA but without considering the relative rates of absent supported and present

---

[60] Because the coding intensity of MA is 2 (= 2 present unsupported – 0 absent supported codes), whereas the coding intensity of FFS is -5 (= 2 present unsupported – 7 absent supported codes), the average MA risk score after adjusting for MA-FFS differences in coding intensity is 1.03 (= $[110 – (2 – [-5])] \times 0.01$).  The average MA risk score of 1.03 after adjusting for coding intensity reflects the fact that the average MA patient has 3 more "true medical conditions" than the average FFS patient.  Because the average MA risk score after adjusting for MA-FFS differences in coding intensity is 1.03, the CIA must be 6.36 percent ($\approx 1 - [1.03 / 1.1]$, since $1.1 \times [1 – CIA] = 1.03$).  *See* USBP000161652 at 39.

[61] *See id.*

[62] Scenario b also shows that removing a subset of unsupported codes can also bring payments to MA plans farther from the intended payments.  Instead of deleting all 6 unsupported codes, suppose that only 5 were deleted.  Deleting these 5 unsupported codes would bring the average MA risk score after adjusting for the CIA to approximately 1.0 ($\approx ([110 – 5] \times 0.01 \times [1 – 0.0454])$) – approximately 0.03 less than it should be.

unsupported codes in MA and FFS, is arbitrary.[63]  If the number of unsupported codes in MA plan data happens to be small relative to the magnitude of the gap between the actual and the correct CIA, then removing the unsupported codes could bring payments to MA plans closer to the intended payment.  But if the number of unsupported codes in MA plan data happens to be large relative to the gap between the actual and the correct CIA, then removing the unsupported codes could cause payments to MA plans to diverge from intended payments even more than they would have, were the unsupported codes left unremoved.

60.    Second, removing unsupported codes from any particular MA plan's data could bring payments to the plan closer to or farther from those based on CMS's risk-adjustment model.  To determine whether removing unsupported codes from any particular MA plan's data would bring payments to it closer to or farther from this amount would require knowing both the relative rates of absent supported and present unsupported codes in aggregate and how much the particular plan's rates of absent supported and present unsupported codes deviate from the industry average and in what direction.

61.    Consider scenario b in the example from ¶¶ 56-58, adding to it the specific characteristics of three equally-sized MA plans, A, B, and C.  Assume that the average patient in A has 6 present unsupported and no absent supported codes, in B has 6 present unsupported and 4 absent supported codes, and in C has 6 present unsupported and 8 absent supported codes.[64]  Removing unsupported codes from A would bring payments to it approximately to those based on CMS's risk-adjustment model, after adjusting for the CIA.  By construction, the CIA is set to be 4.55 percent; so the

---

[63] Moreover, even if CMS considered the rates in MA and FFS of absent supported and present unsupported codes – which it did not – the amount of additional recovery that it should receive for MA-FFS differences in *present unsupported codes alone* would depend on how much of the CIA should be allocated to compensating CMS for MA-FFS differences in absent supported versus present unsupported codes.  Because there is no intrinsic basis for this allocation, calculating the amount of additional recovery that CMS should receive for MA-FFS differences in present unsupported codes alone would require an extrinsically-imposed rule.  In scenario b, if the CIA should be allocated first to compensating CMS for MA-FFS differences in absent supported codes, then CMS should receive an additional $0.01 per dollar of FFS spending for MA-FFS differences in present unsupported codes alone (since the CIA of 4.55 percent fails to fully compensate CMS even for MA-FFS differences in absent supported codes, it should receive full additional compensation for all MA-FFS differences in present unsupported codes).  But if the CIA should be allocated proportionately to compensating CMS for MA-FFS differences in absent supported versus present unsupported codes, then CMS should receive only an additional  $0.00286 per dollar of FFS spending (= $0.01 - $0.00714 = $0.01 – ($0.01 × [1 / 7] × 0.05), since 1/7 of the CIA of 5 percent should be allocated to compensating CMS for MA-FFS differences in present unsupported codes and 6/7 should be allocated to compensating CMS for MA-FFS differences in absent supported codes).

[64] The average number of present unsupported codes is 6 and of absent supported codes is 4 in MA in aggregate, consistent with scenario b.

average risk score in A after adjusting for the CIA (but before removing the unsupported codes) would be 1.05; and the average risk score in A after removing unsupported codes from A and adjusting for the CIA would be approximately 0.99 ($\approx$ ([110 – 6] × 0.01 × [1 – 0.0454]). This is approximately correct, given that the average patient in A would have one fewer "true medical conditions" than the average FFS patient (110 codes with 6 unsupported and 0 absent supported codes implying 104 true medical conditions in A, versus 100 codes with 2 unsupported and 7 absent supported implying 105 true medical conditions in FFS).

62.    For C, removing unsupported codes brings payment to the plan below those based on CMS's risk-adjustment model, after adjusting for the CIA. Deleting C's 6 unsupported codes would bring the average risk score in C after adjusting for the CIA to 0.99, just as it did for A. However, because C has a coding intensity of -2 (6 present unsupported and 8 unsupported codes), it should receive $1.07 per dollar of expected FFS spending based on CMS's risk-adjustment model, after fully adjusting for the level of unsupported codes in that plan – not $0.99. The average patient in C would have seven more "true medical conditions" than the average FFS patient (110 codes with 6 unsupported and 8 absent supported codes implying 112 true medical conditions in C, versus 100 codes with 2 unsupported and 7 absent supported implying 105 true medical conditions in FFS).

## VIII.    If the Coding Intensity Adjustment Is Too Low, the Regulatory Process Would Be the Economically Efficient Means To Address Remaining MA-FFS Differences in Coding Intensity

63.    As I explain in § VI, if the CIA achieves its stated goal, then CMS has already recovered for all MA-FFS differences in coding intensity, so no additional policies are necessary to address MA-FFS differences in coding intensity.

64.    Mandatory Two-Sided Review is one means to address MA-FFS differences in coding intensity. Mandatory Two-Sided Review would require that MA plans evaluate *all* the diagnoses on any claim subjected to a medical record review – not just the absent supported diagnoses – and delete any diagnoses not supported by the chart. Given a particular value for the CIA, Mandatory Two-Sided Review would tend to decrease payments to plans in aggregate just as would increasing the CIA.

65.    If the CIA achieves its stated goal, then Mandatory Two-Sided Review would not only be unnecessary but also push the CIA farther from achieving its stated goal. If the CIA achieves its

stated goal, any policy like Mandatory Two-Sided Review that would have the same effect as increasing the CIA effectively would make the CIA greater than it needed to be and result in MA plans being underpaid in the aggregate.

66.    If the CIA is too low, then Mandatory Two-Sided Review could address the MA-FFS coding differences that remain.  However, even if the CIA is too low, Mandatory Two-Sided Review may or may not bring the CIA closer to achieving its stated goal.  If the CIA is too low, and Mandatory Two-Sided Review reduces payments to MA plans by exactly the amount of the MA-FFS difference in coding intensity that remains after accounting for the CIA, then it would bring the CIA closer to achieving its stated goal.  But if Mandatory Two-Sided Review reduces payments to MA plans by more than the MA-FFS difference in coding intensity that remains after accounting for the CIA, then it may not bring the CIA closer to achieving its stated goal.  If Mandatory Two-Sided Review reduces payments to MA plans by more than the MA-FFS difference in coding intensity that remains after accounting for the CIA, then that would result in "underpayments" to MA plans.  Even if the government is agnostic as to whether plans are overpaid or underpaid, adding Mandatory Two-Sided Review on top of the CIA would bring the CIA closer to achieving its stated goal only if the magnitude of the difference that remains after accounting for the CIA before Mandatory Two-Sided review is greater than the magnitude of the difference that exists after accounting for the CIA and Mandatory Two-Sided Review.  Put another way, if the CIA underestimates the average MA-FFS difference in coding intensity, then requiring Mandatory Two-Sided Review could overshoot the mark by more than the original error from underestimation of the CIA, adding a greater inaccuracy to payments than existed in the first place based on any misestimation of the CIA.

67.    If the CIA is too low, then the regulatory process would be the economically efficient means to address remaining MA-FFS differences in coding intensity.  If the CIA is too low, the efficient way to address remaining MA-FFS differences in coding intensity would be to increase the CIA explicitly through the regulatory process by which it was determined in the first place, discussed in detail above in § V of this report.  If the CIA is too low, and there is some reason not to address remaining MA-FFS differences by increasing the CIA, then the regulatory process would be the economically efficient means to consider alternative approaches (such as Mandatory Two-Sided Review) to addressing remaining MA-FFS differences in coding intensity.

68.    In § VIII.A - VIII.C, I explain why the regulatory process would be the economically efficient means to consider alternative approaches (such as Mandatory Two-Sided Review) to addressing remaining MA-FFS differences in coding intensity if the CIA is too low, and there is some reason not to address remaining MA-FFS differences by increasing the CIA:

  a.  In § VIII.A, I explain why the regulatory process provides clarity and predictability, and in turn reduced policy uncertainty;

  b.  In § VIII.B, I explain why reduced policy uncertainty increases investment and employment in markets for health care; and

  c.  In § VIII.C, I show that CMS originally sought to use the regulatory process to impose Mandatory Two-Sided Review, which is consistent with my opinion that the regulatory process would be the efficient means to evaluate it.

### A.    The Regulatory Process Increases Clarity and Predictability, Thereby Decreasing Policy Uncertainty

69.    MA plans are obliged to attest that their risk adjustment data "[b]ased on best knowledge, information, and belief . . .  [is] accurate, complete, and truthful."[65]  The language in the Risk Adjustment chapter of the 2011 Medicare Managed Care Manual states that MA plans must "[e]nsure the accuracy and integrity of risk adjustment data submitted to CMS."[66]  But CMS has elsewhere made clear that the requirement that plans certify accuracy based on "best knowledge, information, and belief," reflects "recognition of the fact that [MA] organizations cannot reasonably be expected to know that every piece of data is correct, nor is that the standard that HCFA, the OIG, and DoJ believe is reasonable to enforce."[67]

70.    The term "accuracy" has more than one definition.  On one hand, according to CMS's 30(b)(6) witness, "accuracy of diagnosis data means it's documented in the medical record."[68]  On the other hand, in its 2010 Rate Announcement, CMS defined "inaccurate for purposes of risk adjustment" as "differences in coding patterns [between MA and FFS], regardless of the source."[69]  As I explain in ¶ 66, Mandatory Two-Sided Review increases accuracy, as defined by CMS in its

---

[65] USBP009417534; MAPL002846682 at 7.
[66] Hornsby 30(b)(6) Dep., May 25, 2023, Exhibit 1080 at 4.
[67] Hornsby 30(b)(6) Dep., May 25, 2023, Exhibit 164 (Medicare Program; Medicare+Choice Program, 65 Fed. Reg 40,170, 40,268 (proposed June 29, 2000) (to be codified at 42 C.F.R. pt. 422)).
[68] Hornsby 30(b)(6) Dep., May 25, 2023, at 167:8-9.
[69] Rate Announcement, April 6, 2009 at 20; *supra* ¶ 27.

2010 Rate Announcement, only if a) the CIA is too low and b) Mandatory Two-Sided Review reduces the magnitude of the difference in MA-FFS coding intensity that exists after accounting for the CIA and Mandatory Two-Sided review to less than the magnitude of the difference that remains after accounting for the CIA but before Mandatory Two-Sided Review.

CMS is aware that MA plans may not know which definition of "accuracy" to use to satisfy their obligation to submit accurate data.[70]  The ambiguity of the term "accuracy" arises out of the fact that "accurate" for purposes of risk adjustment does not mean "accurate" in terms of reflecting the medical record correctly.[71]  And, as Ms. Hornsby testified, "CMS believes that [it] is the MAO's responsibility to determine how it is they can truthfully certify to their risk adjustment data."[72]

71.    I am not aware of any data or information that would allow United to have determined whether Mandatory Two-Sided Review increases accuracy, as defined by CMS in its 2010 Rate Announcement.  As I explain in ¶ 49, I am not aware of any data or information that would allow United to have determined whether it was overpaid or underpaid.  But if United could not have determined whether it was overpaid or underpaid, then it could not have determined whether Mandatory Two-Sided Review would have increased accuracy, as defined by CMS in its 2010 Rate Announcement.

72.    I understand the following:

> a.    The government's position in this case is that the general requirement that MA plans must warrant the "accuracy, completeness, and truthfulness" of their data also creates a specific obligation for MA plans to conduct Mandatory Two-Sided

---

[70] *See* Hornsby 30(b)(6) Dep., May 25, 2023, at 182:7-12 ("Q:  So why did you want to propose a rule to address this instead of, you know, just enforcing the rules you already provided?  A:  There was a concern that MAOs did not understand accuracy.").

[71] *See* Rebecca Paul Deposition, April 13, 2022, at 156:9–157:7 ("A. And again, just to clarify the context of what this means, that differences in coding patterns between who is being paid and the data that the model is based on make the coding -- the result of the coding inaccurate, even if the coding -- even if the codes themselves are accurate. The word here, 'inaccurate,' is referencing to a level of the scores and the risk adjustment that would result from it, not some – the sentence is accurate. Q. So is it your testimony, Ms. Paul, that there are circumstances where the coding is accurate, but the result of the coding is inaccurate? A. That they mean different things. Coding accurate, meaning based in the medical record. The inaccuracy that might result is the level of the score, and it's a technical issue, not a -- it wasn't documented issue.  When we calculate risk scores, we make adjustments to them to offset different things before we produce risk scores that are used in payments.  This is common. And so if we didn't make such adjustments, the risk scores used in payment would not be the right ones.").

[72] *See* Hornsby 30(b)(6) Dep., May 25, 2023, at 167:20–168:4 ("Q: And – and when you say 'all requirements,' you've never had a requirement that MAOs conduct a medical record review, have you?  A:  CMS has not put in writing a requirement to conduct medical record reviews.  CMS believes that is the MAO's responsibility to determine how it is they can truthfully certify to their risk adjustment data.").

Review;[73] United disagrees with that position, and that United sought clarity from CMS in 2014 as to whether it was obligated to conduct Mandatory Two-Sided Review;[74]

b. CMS's position in this case appears to be that CMS, as a matter of policy, generally would not provide such clarity to MA plans that ask for it,[75] despite statements by the Department of Justice in another case suggesting that contractors with the government should make this sort of request.[76]

I do not offer a legal opinion regarding MA plans' obligation to conduct Mandatory Two-Sided Review or the ambiguity of that obligation.

73.    But to the extent that obligation is ambiguous, the regulatory process would increase clarity and predictability, especially if (as Ms. Hornsby testified) CMS generally would decline to answer plans' questions about ambiguities about plans' obligations.  Indeed, Ms. Hornsby and Ms. Rice both suggest the regulatory process as a means to clarify MA plans' obligation to conduct Mandatory Two-Sided Review.  In an email dated June 4, 2013, Ms. Hornsby states that Mandatory Two-Sided Review should be proposed as an official rule.[77]  In an email dated October 26, 2015, Ms. Rice agrees that the regulatory process would reduce the ambiguity of MA plans' obligation to conduct Mandatory Two-Sided Review:

Our regs say that plans must use reasonable diligence to identify overpayments.

We have not yet defined what that means.  We could through regulation, define

---

[73] *See* Hornsby 30(b)(6) Dep., May 25, 2023, at 67:15–72:21 (citing Hornsby 30(b)(6) Dep., May 25, 2023, Exhibit 164, Medicare Program; Medicare+Choice Program, 65 Fed. Reg 40,170, 40,268 (proposed June 29, 2000) (to be codified at 42 C.F.R. pts. 417 and 422)).

[74] *See* Brian Thompson Deposition, March 1, 2022, at 55:10–61:2; 151:22–152:3; Steve Nelson Deposition, July 26, 2022, Exhibit 320 (MARA2157039 (AEO)).

[75] *See supra* note 74; Hornsby 30(b)(6) Dep., May 25, 2023, at 45:9–45:22, 80:2–16.

[76] According to the Brief for the United States in *United States Ex Rel. Tracy Schutte v. Supervalu, Inc.*, Nos. 21-1326 & 22-111, (a) "companies that seek funds from the government (particularly on a recurring basis) often have ready avenues for resolving ambiguity in payment rules" (p. 25 n. 4); (b) "When such avenues for clarification are readily available, a contractor's failure to invoke those mechanisms while seeking public funds may be evidence of deliberate ignorance or recklessness under the FCA" (p. 25 n. 4); and (c) "The government therefore relies on its contracting partners to approach the inevitable ambiguities in good faith, following what they understand to be the best interpretation and seeking clarification when necessary." (p. 32)

[77] *See* Hornsby 30(b)(6) Dep., May 25, 2023, Exhibit 1206 (USBP065879950) and 174:4–174:18 ("Q: All right.  So let's start with the email, the last paragraph.  You – of the – of the first email on the page, which actually is from June 2013 and carries over to the – the second page of the document.  So the last paragraph of that email says, "We really think we should do 6B requiring an MAO that conducts medical record review to look for both over- and underpayments."  Do you see that?  A: Yes, I do.  Q: Okay.  And that's a reference to the medical record review rule that was proposed in – in January of 2014; correct?  A:  Yes, that is.").

---

specific steps a plan must take, at a minimum, to meet that requirement.  For example, we could require them to self-audit (i.e., their own RADV audits).  We could also revive the NPRM proposal we had that if a plan is checking a medical record for underpayments, they must also look for overpayments [Mandatory Two-Sided Review].  On the attestation language, we are working now to tighten it up.  But without a reg change (as described above), we are limited in how high we set the bar.[78]

74.    In particular, the regulatory process could be used to determine the extent to which MA-FFS differences in coding intensity remain, after accounting for the CIA; propose specific ex ante rules governing how Mandatory Two-Sided Review would be implemented; and evaluate whether the proposed implementation of Mandatory Two-Sided Review brought the CIA closer to achieving its stated goal.  By proposing the rule ex ante and with specificity, the regulatory process would improve clarity and predictability.[79]  Improving clarity and predictability, in turn, would reduce the policy uncertainty that MA plans would otherwise face in seeking to comply with the law.

### B.    Reduced Policy Uncertainty Increases Investment and Employment in Firms In the Health Care Sector

75.    Reduced policy uncertainty, in turn, increases investment and employment in firms in the health care sector.  The inverse relationship between policy uncertainty on one hand, and investment and employment on the other hand, was observed in general by former Federal Reserve Chairman Benjamin Bernanke.  In a study published in one of the leading peer-reviewed economics journals, Bernanke formalizes the intuition that uncertainty gives firms an incentive to

---

[78] Cheri Rice Deposition, August 3, 2022, Exhibit 1067 (USBP001891973).  Ms. Rice was the Director of the Medicare Plan Payment Group from 2010-2017.  *See id.* at 16:22–17:4.

[79] *See* Richard A. Posner, *Regulation (Agencies) versus Litigation (Courts):  An Analytical Framework*, §§ 1.2.1–1.2.2, in Daniel P. Kessler, *Regulation vs. Litigation:  Perspectives from Economics and Law*, Chapter 1, University of Chicago Press (2010);  *see also* Sean Cavanaugh Deposition ("Cavanaugh Dep."), February 17, 2022, at 144:24–145:4 (" Q. And one reason you would promulgate rules, or propose rules, is to set the requirements, give your interpretation of the statute, or clear up ambiguity in the rules and requirements for things like Medicare Advantage plans?  A. Yes.").  Mr. Cavanaugh was the Director for the Center of Medicare, reporting to the Administrator of CMS.  *See id.* at 23:12-23.

delay investment and hiring when investment projects are costly to undo or workers are costly to hire and fire.[80]

76.    More recent research shows that the relationship proposed by Bernanke exists empirically in markets for health care.  A study in the same journal as Bernanke's original article develops new indices of economic policy uncertainty based on newspaper coverage of current events.[81]  One of these indices seeks to quantify economic policy uncertainty in the health care sector.  This health care economic policy uncertainty index increases with the number of mentions of regulatory uncertainty in health care entitlement programs, which include Medicare and Medicaid.

77.    The study matches its health care economic policy uncertainty index with data on individual government contracts with specific firms from the Federal Registry of Contracts and government health care spending to calculate the share of firm revenues derived from sales to the government.  The study finds that, holding other factors constant, firms with greater exposure to government purchases experience reduced investment and employment growth when health care economic policy uncertainty increases.[82]

###    C.    CMS's Behavior Is Consistent With My Opinion That the Regulatory Process Is The Economically Efficient Means To Evaluate Two-Sided Review

78.    Assuming that CMS considers economic efficiency to be desirable in determining its policy toward MA plans, CMS's behavior is consistent with my opinion that the regulatory process is the economically efficient means to consider Mandatory Two-Sided Review for MA plans:

   a.    On January 10, 2014, CMS proposed Mandatory Two-Sided Review on MA plans through the rulemaking process.  According to the proposed rule:

      Under our proposal, medical record reviews conducted by an MA organization cannot be designed only to identify diagnoses that would trigger additional payments by CMS to the MA organization; and medical record review methodologies must be designed to identify errors in diagnoses submitted to

---

[80] *See* Ben S. Bernanke, *Irreversibility, Uncertainty and Cyclical Investment*, 97 Quarterly J. of Economics 85 (1983).
[81] *See* Scott R. Baker, Nicholas Bloom, Steven J. Davis, Measuring Economic Policy Uncertainty, Quarterly J. of Economics (Mar. 10, 2016).
[82] *Id.* at 3.

CMS as risk adjustment data, regardless of whether the data errors would result in positive or negative payment adjustments.[83]

b. On May 23, 2014, at the direction of the Administrator of CMS, CMS declined to impose Mandatory Two-Sided Review on MA plans through the rulemaking process.[84]  According to the final rule, "In summary, after consideration of the public comments received, we are not finalizing the proposed amendment to § 410.322(e) [imposing Mandatory Two-Sided Review]."[85]

c. I am not aware of any attempts by CMS to clearly specify that Mandatory Two-Sided Review is required for MA plans through an alternative process[86] such as subregulatory guidance.[87]

---

[83] Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 1,918, 2,000 (proposed Jan. 10, 2014) (to be codified at 42 C.F.R. pt. 422).

[84] *See* Cavanaugh Dep., February 17, 2022, at 151:8–15 ("Q. Whose ultimate decision was it not to finalize this rule? Who had that authority? A. I – I received my instructions on what to finalize and what not to finalize from the administrator's office.  Q. That would be the Secretary? Or the – or the administrator of CMS?  A. The administrator of CMS.").

[85] Federal Register, Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 29,844, 29, 925-26 (May 23, 2014) (to be codified at 42 C.F.R. pt. 422).

[86] *See* Cavanaugh Dep., February 17, 2022, at 155:16–23 ("Q. Sitting here today, you can't identify any rule or regulation that created an affirmative obligation to audit the claims data submitted by providers, or to proactively review medical records,  to ensure that the codes selected by providers were supported?  A. I cannot. But I'm not an expert in the area and don't work in that area.").  *See also* Hornsby 30(b)(6) Dep., May 25, 2023, Exhibit 1206-1 (USBP076134076) ("Under existing regulation, there is no requirement to counter the incentive for MA organizations to conduct medical record reviews only for the purpose of identifying underpayments.").

[87] At some time in 2013 or 2014, I understand that CMS specified through subregulatory guidance that Affordable Care Act Marketplace plans perform Mandatory Two-Sided Review.  *See* Creighton Dep., October 4, 2022, at 85:17– 88:2 ("Q. I understand your objections. Let's be clear here, in the contexts of an ACA health exchange, an ACA health plan, when that health plan undertook to do a chart review of claims that it received from a provider that – A. Right. Q. -- in doing fee-for-service, small f; correct? A. Yes. Q. If that ACA health plan undertook to do a chart review, for example, to look for additional diagnosis codes under this guidance from CMS, that health plan was required to evaluate all the diagnoses on the original claim and delete any diagnoses not supported by the chart; correct? A. That -- that is correct. Q. And this was guidance that was applicable only to the ACA health plans; correct? A That is absolutely correct. Q. And on Page 2 Section 1 b, 'Encounters in a Capitated Environment.' A. (Indicating). Q. Do you see that? A. (Indicating). Q. All right. Again, CMS is directing the health plans in the ACA exchange space – A. (Indicating). Q. -- that if they were to undertake a chart review, a medical-record review, of claims submitted by providers in a capitated environment that chart review must also evaluate diagnoses on the original claim and delete any diagnoses not supported by the chart; correct. A. That is correct. Q. Okay. And, again, this was an obligation that was imposed, or a guidance that was imposed, solely upon the ACA health plans; correct? A. That's correct. And if I might ask, what was of the date of this memo? Q. The note on the -- on the top... A. Okay. So sometime between -- sometime before April 30th, 2015. Okay. That's fine. Q. I'll represent to you that on the website it was dated June 2013. And if you look at the first answer it indicates that it's a Notice of Benefit  Payments for 2014. So it had to be promulgated at some point prior to 2014; correct? A. Generally speaking, yes. But their -- their timing on everything was so off then. But, yeah, generally, that would be correct. So sometime 2013 or '14.").

Signed on the 28th of September, 2023, at Stanford, CA.


_____
Dr. Daniel P. Kessler

---

I am not offering an opinion as to why CMS in fact took different approaches to Mandatory Two-Sided Review in Affordable Care Act Marketplace and MA plans or whether CMS could validly impose such an obligation on MA plans through subregulatory guidance.  However, differences between the MA and Marketplace risk adjustment processes may explain the difference in CMS's approaches to them.  MA risk adjustment uses FFS data to estimate the underlying model that is used to calculate MA risk adjustment payments.  I understand that a number of plans, including United, objected on that basis to requiring MA plans to engage in reviews to identify and delete unsupported codes because FFS data also contained unsupported codes and CMS did not engage in similar reviews to identify and delete them from FFS data.  *See* UHG Response to CMS's Request for Comment on RADV Contract-Level Payment Recovery Methodology, at 1-3.  By contrast, Marketplace risk adjustment uses *Marketplace* plans' data to estimate the underlying model that is used to calculate Marketplace risk adjustment payments.  *See* John Kautter, Gregory Pope, & Patricia Keenan, *Affordable Care Act Risk Adjustment: Overview, Context, and Challenges*, 4(3) Medicare & Medicaid Research Review E1 (2014) (describing ACA risk adjustment generally).  Thus, there would be no *a priori* difference in unsupported codes between the data on which the underlying Marketplace risk adjustment model relies and the sector in which the risk adjustment payments would be made, making the objection above inapplicable.

# APPENDIX A

**Daniel P. Kessler**
Law School, Graduate School of Business, Hoover Institution,
and Stanford Institute for Economic Policy Research
Stanford University
Stanford, CA 94305
fkessler@stanford.edu

**Education**

| | |
|---|---|
| Ph.D. | Economics, Massachusetts Institute of Technology, 1994 |
| J.D. | Stanford Law School, 1993 |
| B.A. | Economics, Harvard University, 1988 |

**Academic Positions**

Professor, by courtesy, Stanford School of Medicine, Department of Medicine, Center for
 Primary Care and Outcomes Research, 2021-
Director of Research, Hoover Institution, 2019-
Senior Fellow, Stanford Institute for Economic Policy Research, 2016-
Professor, Stanford Law School, 2009-
Professor, by courtesy, Stanford School of Medicine, Department of Health Research and Policy,
 2008-20
David S. and Ann M. Barlow Professor in Management, Graduate School of Business,
 Stanford University, 2007-10
Visiting Professor, Harvard Law School, 2007
Senior Fellow, Hoover Institution, Stanford University, 2006-
Professor, by courtesy, Stanford Law School, 2004-2009
Professor, Graduate School of Business, Stanford University, 2003-
Visiting Associate Professor, Wharton School, University of Pennsylvania, 2002-03
Associate Professor, Graduate School of Business, Stanford University, 1998-2003
Assistant Professor, Graduate School of Business, Stanford University, 1994-98

**Awards, Fellowships, and Other University Affiliations**

Affiliate, Stanford Center on Longevity, 2008-
Health Care Research Award, National Institute for Health Care Management Foundation, 2003
Fellow, Center for Advanced Study in the Behavioral Sciences, 2003-04
Graduate School of Business Trust Faculty Fellow, 2000-01
Affiliate, Center for Social Innovation, Stanford Graduate School of Business, 2000-
Research Associate, National Bureau of Economic Research, 1999-
Public Policy Advising Award, Stanford University, 1998
Kenneth J. Arrow Award for Best Paper in Health Economics, International Health Economics
 Association, 1997
Affiliate, Center for Health Policy, Stanford University, 1997-
Class of 1969 Faculty Scholar, Stanford Graduate School of Business, 1997-98
National Fellow, Hoover Institution, 1997-98
John M. Olin Faculty Fellow, 1996-97
Faculty Research Fellow, National Bureau of Economic Research, 1994-99

1

1659

## Academic Publications

"The Responsiveness of Medicaid Spending to the Federal Subsidy," with M. Kate Bundorf, *National Tax Journal* 75(4): 661-80 (2022).

"The Relationship Between Provider Age and Opioid Prescribing Behavior" with Laurence C. Baker and Grant K. Vaska, *American Journal of Managed Care* 28(5):223-8 (2022).

"Does Multispecialty Practice Enhance Physician Market Power?" with Laurence C. Baker and M. Kate Bundorf, *American Journal of Health Economics* 6(3): 324-47 (2020).

"The Effects of Medicare Advantage on Opioid Use," with Laurence C. Baker and M. Kate Bundorf, *Journal of Health Economics* 70: 102278 (2020).

"Why Don't Commercial Health Plans Use Prospective Payment?" with Laurence C. Baker, M. Kate Bundorf, and Aileen M. Devlin, *American Journal of Health Economics* 5(4):465-80 (2019).

"Competition in Outpatient Procedure Markets," with Laurence C. Baker and M. Kate Bundorf, *Medical Care* 57(1): 36-41 (2019).

"Neurophysiological monitoring during cervical spine surgeries:  Longitudinal costs and outcomes," with John P. Ney, *Clinical Neurophysiology* 129: 2245-51 (2018).

"ACA Marketplace Premiums and Competition Among Hospitals and Physician Practices," with Maria Polyakova, M. Kate Bundorf, and Laurence C. Baker, *American Journal of Managed Care* 24(2): 85-90 (2018).

"The Effect of Medicare Advantage on Hospital Admissions and Mortality" with Christopher Afendulis and Michael Chernew, *American Journal of Health Economics* 3(2): 254-79 (2017).

"Hospital Ownership of Physicians:  Hospital Versus Physician Perspectives" with Laurence C. Baker, Aileen M. Devlin, and M. Kate Bundorf, *Medical Care Research and Review*: 1-12 (2016).

"The Effect of Hospital/Physician Integration on Hospital Choice" with Laurence C. Baker and M. Kate Bundorf, *Journal of Health Economics* 50: 1-8 (2016).

 "Medicare Advantage Plans Pay Hospitals Less Than Traditional Medicare Pays" with Laurence C. Baker and M. Kate Bundorf, *Health Affairs* 35: 1444-51 (2016).

"Does Health Plan Generosity Enhance Hospital Market Power?" with Laurence C. Baker and M. Kate Bundorf, *Journal of Health Economics* 44: 54-62 (2015).

"Designing Antitrust Policy for Accountable Care Organizations," with Laurence C. Baker and M. Kate Bundorf, *Journal of Competition Law & Economics* 11: 317-29 (2015).

1660

"Expanding Patients' Property Rights in Their Medical Records," with Laurence C. Baker and M. Kate Bundorf, *American Journal of Health Economics* 1: 82-100 (2015).

"Patient Preferences Explain a Small But Significant Share of Regional Variation in Medicare Spending," with Laurence C. Baker and M. Kate Bundorf, *Health Affairs* 33: 957-63 (2014).

"Vertical Integration:  Hospital Ownership of Physician Practices Is Associated With Higher Prices and Spending," with Laurence C. Baker and M. Kate Bundorf, *Health Affairs* 33: 756-76 (2014).

"Medical Malpractice, Defensive Medicine, and Physician Supply," in the *Encyclopedia of Health Economics*, Volume 2, ed. Anthony J. Culyer, Elsevier (2014).

"Why Are Medicare and Commercial Insurance Spending Weakly Correlated?" with Laurence C. Baker and M. Kate Bundorf, *American Journal of Managed Care* 20: e8-e14 (2014).

"Regulatory Neutrality Is Essential To Establishing A Level Playing Field For Accountable Care Organizations" with Gary E. Bacher, Michael E. Chernew, and Stephen M. Weiner, *Health Affairs* 32: 1426-32 (2013).

"Reforming Medicare," *Tax Law Review* 65 (2012): 811-833.

"How Should Risk Adjustment Data Be Collected?" *Inquiry* 49 (Summer 2012): 127-140.

"Reforming the Tax Preference for Employer Health Insurance," with Joseph Bankman, John F. Cogan, and R. Glenn Hubbard, in *Tax Policy and the Economy, Volume 26*, ed. Jeffrey Brown, MIT Press (2011).

"Vertical Integration and Optimal Reimbursement Policy," with Christopher C. Afendulis, *International Journal of Health Care Finance and Economics* 11 (2011):  165-179.

"The Effect of Tax Preferences on Health Spending," with John F. Cogan and R. Glenn Hubbard, *National Tax Journal* 64 (September 2011):  795-816.

"The Effect of Bivalirudin on Costs and Outcomes of Treatment of ST-segment Elevation Myocardial Infarction," with Eugene Kroch and Mark A. Hlatky, *American Heart Journal* 162 (2011):  494-500.

"Evaluating the Medical Malpractice System and Options for Reform," *Journal of Economic Perspectives* 25 (2011): 93-110.

"Does Patient Satisfaction Affect Patient Loyalty?" with Deirdre Mylod, *International Journal of Health Care Quality Assurance* 24 (2011): 266-73.

1661

*Regulation versus Litigation: Perspectives from Economics and Law*, ed., University of Chicago Press (2011).

"The Persuasive Effects of Direct Mail: A Regression Discontinuity Approach," with Alan Gerber and Marc Meredith, *Journal of Politics* 73 (January 2011): 140-55.

"HMO Coverage Reduces Variations in the Use of Health Care Among Patients Under Age Sixty-five" with Laurence Baker and M. Kate Bundorf, *Health Affairs* 29 (November 2010): 2068-74.

"The Effect of Massachusetts Health Reform on Employer-sponsored Insurance Premiums," with John F. Cogan and R. Glenn Hubbard, *Forum for Health Economics and Policy* 13 (2010): article 5.

"The Effect of Medicare Coverage for the Disabled on the Market for Private Insurance," with John F. Cogan and R. Glenn Hubbard, *Journal of Health Economics* 29 (May 2010): pp. 418-25.

"Why Is Health Reform So Difficult?" with David Brady, *Journal of Health Politics, Policy, and Law* 35 (April 2010): 161-75.

"Who Supports Health Reform?" with David Brady, *PS: Political Science and Politics* 43 (January 2010): 1-6.

"Putting the Public's Money Where Its Mouth Is," with David Brady, *Health Affairs* 28 (September/October 2009): w917-w925.

"Do Markets Respond to Quality Information?  The Case of Fertility Clinics," with M. Kate Bundorf, Natalie Chun, and Gopi Shah Goda, *Journal of Health Economics* 28 (2009): 718-27.

"Empirical Study of the Civil Justice System," with Daniel L. Rubinfeld, in the *Handbook of Law and Economics*, eds. A. Mitchell Polinsky and Steven Shavell, North-Holland (2007).

"Tradeoffs from Integrating Diagnosis and Treatment in Markets for Health Care," with Christopher Afendulis, *American Economic Review* 97 (June 2007): 1013-20.

"Evaluating Effects of Tax Preferences on Health Care Spending and Federal Revenues," with John F. Cogan and R. Glenn Hubbard, in *Tax Policy and the Economy, Volume 21*, ed. James Poterba, MIT Press (2007).

"The Effects of the Medical Liability System in Australia, the UK, and the US," with Nicholas Summerton and John R. Graham, *Lancet* 368 (2006): 240-46.

"The Effect of Cardiac Specialty Hospitals on the Cost and Quality of Care," with Jason Barro and Robert Huckman, *Journal of Health Economics* 25 (2006): 702-21.

4

1662

"The Effects of the US Malpractice System on the Cost and Quality of Care," with David Becker, in *Medical Malpractice and the US Health Care System: New Century, Different Issues*, eds. William Sage and Rogan Kirsch, Cambridge University Press (2006).

"Making Markets Work: Five Steps to a Better Health Care System," with John F. Cogan and R. Glenn Hubbard, *Health Affairs* 24 (November/December 2005): 1447-57.

*Healthy, Wealthy, and Wise: Five Steps to a Better Health Care System*, with John F. Cogan and R. Glenn Hubbard, Hoover Institution/AEI Press (1st. ed., 2005; 2nd. ed., 2011).

"The Effects of Competition on Variation in the Quality and Cost of Medical Care," with Jeffrey Geppert, *Journal of Economics and Management Strategy* 14 (2005): 575-89.

"Impact of Malpractice Reforms on the Supply of Physician Services," with David Becker and William Sage, *JAMA* 293 (6/1/05): 2618-25.

"Detecting Medicare Abuse," with David Becker and Mark McClellan, *Journal of Health Economics* 24 (2005): 189-210.

"The Medical Liability System: Current Debates," in *Power to the Patient: Selected Health Care Issues and Policy Solutions*, ed. Scott W. Atlas, Hoover Institution Press (2005).

"Toward Better Drugs for Less (book review)," *Science* 306 (12/24/04): 2192-3.

"Advance Directives and Medical Treatment at the End of Life," with Mark McClellan, *Journal of Health Economics* 23 (2004): 111-27.

"Is More Information Better?  The Effects of 'Report Cards' on Health Care Providers," with David Dranove, Mark McClellan, and Mark Satterthwaite, *Journal of Political Economy* 111 (2003), pp. 555-88.

"Ownership Form and Trapped Capital in the Hospital Industry," with Henry Hansmann and Mark McClellan, in *The Governance of Not-for-Profit Firms*, Edward L. Glaeser ed., University of Chicago Press (2003).

"How Liability Law Affects Medical Productivity," with Mark McClellan, *Journal of Health Economics* 21 (2002), pp. 931-55.

"The Effects of Hospital Ownership on Medical Productivity," with Mark McClellan, *RAND Journal of Economics* 33 (Autumn 2002), pp. 488-506.

*A Global Analysis of Technological Change in Health Care: Heart Attack*, ed., with Mark McClellan, University of Michigan Press (2002).

"Technological Change in Heart Attack Care in the United States: Causes and Consequences,"
with Mark McClellan, Nathan Every, Alan Garber, Paul Heidenreich, Mark Hlatky,
Joseph Newhouse, and Olga Saynina, in *A Global Analysis of Technological Change in
Health Care: Heart Attack*, ed., with Mark McClellan, University of Michigan Press
(2002).

"Malpractice Pressure, Managed Care, and Physician Behavior," with Mark McClellan, in
*Regulation Through Litigation*, W. Kip Viscusi ed., Brookings Institution Press (2002).

"Does Party Matter in Senators' Voting Behavior?  An Historical Test Using Tariff Votes," with
David Brady and Judith Goldstein, *Journal of Law, Economics, and Organization* 18
(April 2002), pp. 140-54.

"Malpractice Law and Health Care Reform: Optimal Liability Policy in an Era of Managed
Care," with Mark McClellan, *Journal of Public Economics* 84 (2002), pp. 175-197.

"Technological Change Around the World: Evidence from Heart Attack Care," authored as the
TECH Research Network, *Health Affairs* 20 (May/June 2001), pp. 25-42.

"Prevailing Wage Laws and Construction Labor Markets," with Lawrence Katz, *Industrial and
Labor Relations Review* 54 (January 2001), pp. 259-74.

"What Do Prosecutors Maximize? An Analysis of the Federalization of Drug Crimes," with
Anne Morrison Piehl and Edward Glaeser, *American Law and Economics Review* 2
(2000), pp. 259-90.

Review of *Measuring the Prices of Medical Treatments* (Jack E. Triplett, ed.), *Journal of
Economic Literature* XXXVIII (September 2000), pp. 664-6.

"Is Hospital Competition Socially Wasteful?" with Mark McClellan, *Quarterly Journal of
Economics* 115 (May 2000), pp. 577-615.

"Designing Hospital Antitrust Policy to Promote Social Welfare," with Mark McClellan, in
*Frontiers in Health Policy Research: Volume 2*, ed. Alan Garber, MIT Press (1999).

"A Global Analysis of Technological Change in Health Care: The Case of Heart Attacks," with
Mark McClellan for the TECH Investigators, *Health Affairs* 18 (May/June 1999), pp.
250-55.

"Using Sentence Enhancements to Distinguish Between Deterrence and Incapacitation," with
Steven Levitt, *Journal of Law and Economics* 42 (April 1999), pp. 343-365.

"The Link Between Liability Reforms and Productivity: Some Empirical Evidence," with
Thomas Campbell and George Shepherd, *Brookings Papers on Economic
Activity: Microeconomics* (1998).

"The Role of Discretion in the Criminal Justice System," with Anne Morrison Piehl, *Journal of Law, Economics, and Organization* 14 (Winter 1998), pp. 256-276.

"The Law and Economics of Tying Arrangements: Lessons for Competition Policy Treatment of Intellectual Property," with William Baxter, in *Competition Policy and Intellectual Property Rights in the Knowledge-Based Economy*, eds. Robert Anderson and Nancy Gallini, Industry Canada Research Series, University of Calgary Press (1998).

"The Effects of Malpractice Pressure and Liability Reforms on Physicians' Perceptions of Medical Care," with Mark McClellan, *Law and Contemporary Problems* 60 (Winter 1997), pp. 81-106.

"Institutional Causes of Delay in the Settlement of Legal Disputes," *Journal of Law, Economics, and Organization* 12 (Winter 1996), pp. 432-460.

"Dynamics of Cosponsorship," with Keith Krehbiel, *American Political Science Review* 90 (September 1996), pp. 555-566.

"Do Doctors Practice Defensive Medicine?" with Mark McClellan, *Quarterly Journal of Economics* 111 (May 1996), pp. 353-390.

"Explaining Deviations from the Fifty Percent Rule: A Multimodal Approach to the Selection of Cases for Litigation," with Thomas Meites and Geoffrey Miller, *Journal of Legal Studies* 35 (January 1996), pp. 233-261.

"Liability Reforms and Economic Performance," with Thomas Campbell and George Shepherd, in *The Mosaic of Economic Growth*, eds. Ralph Landau, Timothy Taylor, and Gavin Wright, Stanford University Press (1996).

"Fault, Settlement, and Negligence Law," *RAND Journal of Economics* 26 (Summer 1995), pp. 296-313.

"Toward a Consistent Theory of the Welfare Analysis of Agreements," with William Baxter, *Stanford Law Review* 47 (April 1995),  pp. 301-317.

"Birth Order, Family Size, and Achievement: Family Structure and Wage Determination," *Journal of Labor Economics* 9 (October 1991), pp. 413-426.

**Academic Manuscripts in Progress**
"Can Ranking Hospitals on the Basis of Patients' Travel Distances Improve Quality of Care?" NBER Working Paper 11419.

<u>**Nonacademic Publications**</u>

"A Simple Fix Can Bring Revolutionary Change to Health Spending," *The Hill*, September 26, 2021.

"Hospital Ownership of Physician Practices," *One Percent Steps for Health Care Reform*, February 2021.

"The Health of Obamacare," *Wall Street Journal*, December 11, 2015, p. C3.

"By Reducing Competition, ObamaCare Raises Costs," *Investor's Business Daily*, June 11, 2014, p. A13.

"ObamaCare is Raising Insurance Costs," *Wall Street Journal*, June 4, 2013, p. A13.

"The Coming ObamaCare Shock," *Wall Street Journal*, April 30, 2013, p. A17.

"ObamaCare's Broken Promises," *Wall Street Journal*, February 1, 2013, p. A13.

"Real Medicare Reform," *National Affairs*, Fall 2012.

"The Wrong Remedy for Health Care," *Wall Street Journal*, June 29, 2012, p. A13.

"ObamaCare's Bogus Cost Savings," *Wall Street Journal*, March 14, 2012, p. A12.

"Medicare Reform: Obama vs. Ryan," with John Taylor, *Wall Street Journal*, August 17, 2011, p. A15.

"How Health Reform Punishes Work," *Wall Street Journal*, April 25, 2011, p. A15.

"ObamaCare and the Truth About Cost Shifting," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, March 11, 2011, p. A15.

"Voters on Obamacare: Informed and Opposed," with David W. Brady and Douglas Rivers, *Wall Street Journal*, October 15, 2010, p. A17.

"Health Care: The Prognosis," with John F. Cogan, *Hoover Digest* (2010).

"A Better Way to Reform Health Care," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, February 25, 2010, p. A13.

"Health Care Is Hurting Democrats," with David W. Brady and Douglas Rivers, *Wall Street Journal*, January 19, 2010, p. A17.

"Public Opinion and Health Reform," with David W. Brady, *Wall Street Journal*, October 22, 2009, p. A15.

"Doubling Down on a Flawed Insurance Model," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, September 25, 2009, p. A15.

"The Uninsured's Hidden Tax on Health Insurance Premiums in California: How Reliable is the Evidence?" with John F. Cogan, Matthew Gunn, and Evan J. Lodes, *Hoover Essays in Public Policy* (2007).

"Not a Panacea..." with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, February 9, 2006, p. A12.

"Keep Government Out," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, January 13, 2006, p. A12.

"Reforming Health Care," *Hoover Digest* (2005).

"Reforming Malpractice Liability," *Hoover Digest* (2005).

"Brilliant Deduction" with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, December 8, 2004, p. A12.

"Healthy, Wealthy, and Wise," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, May 4, 2004, p. A20.

"Want to Sue HMOs?  It'll Cost You," *Wall Street Journal*, July 25, 2001, p. A16.

"The Economic Effects of the Liability System," *Hoover Essays in Public Policy* (1998).

"Robbing Smokers to Pay Lawyers," with Jeremy Bulow, *Wall Street Journal*, April 7, 1998, p. A16.

"If You Smoke, Florida Wants to Tax You," with Jeremy Bulow, *Wall Street Journal*, November 26, 1997, p. A16.

## Case Studies

"Asian Neighborhood Design," with Lauren Dutton and Melinda Tuan, Stanford GSB (1998) (updated in 2003 by Rick Aubry and Susan Mackenzie).

"The Roberts Enterprise Development Fund," with Lauren Dutton, Jed Emerson, and Melinda Tuan, Stanford GSB (1998).

"Echelon and the Home Automation Standard," with David Baron, Keith Krehbiel, Erik Johnson, and Michael Ting, Stanford GSB (1997).

"The European Union Carbon Tax," with David Baron and Daniel Diermeier, Stanford GSB (1996).

9

1667

## Unpublished Reports

"Cost Shifting in California Hospitals: What is the Effect on Private Payers?" for the California Foundation for Commerce and Education (2007).

"The Determinants of the Cost of Medical Liability Insurance," for Physician Insurers Association of America (2006).

"The Effects of Behavioral Health Interventions on Health Care Costs," for the Foundation for Better Health (2005).

"The Effects of Pharmaceutical Price Controls on the Cost and Quality of Medical Care: A Review of the Empirical Literature," for Pharmaceutical Research and Manufacturers of America (2004).

"The Impact of the Balanced Budget Act of 1997 on Skilled Nursing Care in California," with Chris Afendulis, Jeffrey Geppert, and Owen Kearney, for the California Health Care Foundation (2003).

## Referee/Reviewer

American Cancer Society; *American Journal of Health Economics; American Journal of Managed Care; American Economic Review; Health Affairs;  Journal of Health Economics; Journal of Health Politics, Policy, and Law; Journal of Law, Economics, and Organization; Journal of Law and Economics; Journal of Legal Studies; Journal of Political Economy;* National Science Foundation; National Institutes of Health; *RAND Journal of Economics; Quarterly Journal of Economics*

**Testimony in the past four years**

- *State of Nevada v. McKesson Corp. et al.*, District Court, Clark County, Nevada, Case No. A-19-796755-C (report and deposition testimony).

- *In re: Opioid Litigation,* Civil Action No. 21-C-9000 PHARM, In the Circuit Court of Kanawha County, West Virginia (reports and deposition testimony).

- *State of New Mexico v. Purdue Pharma L.P. et al.*, First Judicial District Court, State of New Mexico, Case No. D-101-CV-2017-02541 (report, deposition, and trial testimony).

- *People of the State of California ex rel. State Farm Mutual Auto Insurance Co. v. Ramin Aghaei, D.C., et al.*, Superior Court of the State of California, County of Los Angeles, Central District, Case No. BC656651 (deposition testimony).

- *Jeffrey Neufeld et al. v. Cigna Health Corporation,* United States District Court, District of Connecticut, Case No. 3:17-cv-1693-KAD (report and deposition testimony).

- Confidential AHLA arbitration involving Cigna Health Corporation (reports and arbitration testimony).

- Confidential AHLA arbitration involving Aetna, Inc. (reports and arbitration testimony).

- *In re: Opioid Litigation,* Supreme Court of the State of New York, County of Suffolk, Index No. 400008/2017 (Nassau) and 400001/2017 (Suffolk) (reports and deposition testimony).

- *In re: National Prescription Opiate Litigation*, Case No. 1:17-MD-2804 (reports, deposition, and trial testimony).

1669

# APPENDIX B

CMS estimates the MA-FFS difference in disease score growth for a given cohort using a five-step process, *see* USBP000161652 at 39:

    a.  Collect claims-based data on diagnoses (and demographic characteristics) from MA and FFS beneficiaries;

    b.  Collect spending data from FFS beneficiaries for the calendar year subsequent to year in which diagnosis data were collected;

    c.  Estimate a regression model of FFS spending data on demographic characteristics and FFS diagnosis data;

    d.  Using the estimates from this model, predict what spending on the MA enrollee with the average set of demographic characteristics and diagnoses would have been, were the enrollee in FFS; and

    e.  Calculate the difference between this value and the average spending of FFS enrollees, expressed as a percentage of the average spending of FFS enrollees.

**EXHIBIT D-62**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA *ex rel*.**<br>**BENJAMIN POEHLING,**<br><br>        **Plaintiff,**<br><br>   **v.**<br><br>**UNITEDHEALTH GROUP, INC. *et al.*,**<br><br>        **Defendants.** | **CASE NO. 2:16-cv-08697-FMO (SSx)** |

—————————————————

**EXPERT REPORT OF**

**JULIA LAMBERT, FSA, MAAA**

**SEPTEMBER 29, 2023**

—————————————————

*CONFIDENTIAL*

*(Contains Attorneys' Eyes Only Information As Designated)*

1673

# Table of Contents

Introduction ........................................................................................................................ 1

Summary of Opinions ........................................................................................................ 1

Background of the MA Payment System............................................................................. 3

    Risk Adjustment, MA Bidding, Actuarial Certification, and MA Payment........................... 4

    Development of the CMS-HCC Risk Model............................................................... 6

Opinion Support............................................................................................................... 11

    I.    The actuarial soundness of payments to MAOs depends on Data Consistency between the development and application of the risk adjustment model.  To comply with actuarial principles, UHG may be considered as overpaid only by comparing its level of unsupportd codes with that in the TM data used to develop the risk adjustment model.  Further, due to the presence of unsupported codes in the TM data used to calibrate the model, removing MA payments related to unsupported codes could introduce an inconsistency and result in payments that are not actuarially sound. ............................................................................................................. 11

    II.    Reducing risk scores by removing unsupported codes for UHG payment could interfere with CMS's goals for same risk score for same cohort regardless of program and thereby undermine payment accuracy. ............................................................................................. 22

    III.    Alternative calibrations of the CMS-HCC risk model based on simulating the removal of unsupported diagnosis codes provide evidence that unsupported codes in the TM data reduce dollar coefficients and relative values compared to risk models developed with only supported codes. ....................................................................................................................... 24

    IV.    Retrospectively removing unsupported diagnosis codes and the associated revenue would materially change the assumed payment methodology relied on in the bid submission process, nullify the actuarial certification, and underpay MAOs for the benefits offered. ..................... 30

    V.    All of the previous opinions except the second opinion are directly applicable to Part D payment for MAPD plans as well. ......................................................................................... 39

Conclusion ....................................................................................................................... 40

Disclosures, Limitations, and Qualifications ....................................................................... 41

## INTRODUCTION

I have been retained by counsel on behalf of UnitedHealth Group, Inc. and its various related parties ("UHG") to provide an expert opinion regarding the allegations in a lawsuit filed by Benjamin Poehling and the United States ("Government").[1]  UHG is a Medicare Advantage Organization ("MAO").  My opinion concerns the actuarial methods that the Centers for Medicare & Medicaid Services ("CMS") uses to calculate payment to MAOs in the Medicare Advantage ("MA") program and how the Government's allegations compare to those methods and the Actuarial Standards of Practice ("ASOPs").

The Government alleges that UHG has unlawfully retained overpayments from the MA program. This report reflects my opinion and associated support regarding actuarially sound payment in the MA program and whether the alleged amounts are overpayments.

Information regarding my background, qualifications, and compensation is included at the end of this report.

## SUMMARY OF OPINIONS

ASOPs, promulgated by the Actuarial Standards Board, set forth the principles and procedures for sound actuarial practice in the United States.  In order for a risk adjustment model to be actuarially sound, ASOP 45 specifically provides that the risk adjustment model should be applied in a manner reasonably consistent with how it was designed.[2]

Based on my experience as an actuary specializing in the MA program, the ASOPs, a review of various materials, CMS's design of the MA payment model, and my calculations of alternative risk model calibrations, it is my opinion that MA and Part D risk-adjusted payment resulting from a MAO's submission of unsupported diagnosis codes does not necessarily result in overpayments. Classifying all such payments as "overpayments" is actuarially inappropriate, because it ignores both the fundamentals of the MA rating program and how CMS developed the risk adjustment model.

My opinion is based on the following:

1. Based on my experience as an actuary and the ASOPs, actuarially sound risk-adjusted payment depends on applying the risk model in a manner reasonably consistent with how it was developed.  That is, there must be "Data Consistency" between the data used to develop the model and the data it is applied to.  The MA risk model was developed from Traditional Medicare ("TM") data, which is largely unaudited, and contains diagnosis codes that are not supported in the medical record.  As a result, the MA risk model distributes the cost of treating beneficiaries across demographic and medical conditions in

---

[1] *See* Compl., Doc. 171, *United States ex rel. Poehling v. UnitedHealth Group, Inc. et al.*, No. 16-cv-08697 (Nov. 11, 2017).

[2] American Academy of Actuaries, Actuarial Standard of Practice ("ASOP") No. 45, https://www.actuarialstandardsboard.org/asops/regulatory-filings-health-benefits-health-insurance-andentities-providing-health-benefits.

the data, including conditions identified by diagnosis codes that are supported in the medical records and others that are not supported. This generally results in reducing the payment for any given code. However, that reduction per medical condition is offset (and the resulting payment may then be appropriate) by the fact that MAOs will be paid for some beneficiaries who do not have the medical condition supported (i.e., the unsupported codes). So long as the MAO's rate of unsupported codes is roughly the same as that used in the development of the MA risk model, the payment should be consistent and accurate. But if the MAO is paid only for conditions identified by diagnosis codes that are supported in the medical records—and as a result the rate of unsupported codes in the MAO's data is lower than in the TM data—then the MAO will be underpaid because the payment amounts were calculated based in part on unsupported codes in the TM data.

To abide by the ASOP 45, the MA risk model should be applied in a manner reasonably consistent with how it was designed. Removing MAO payments related to unsupported codes fundamentally changes the application of the risk model. Whether or not an MAO was overpaid cannot be determined solely by the presence of unsupported medical conditions in its data. Rather, an MAO is overpaid only if its level of unsupported diagnosis codes exceeds or is not reasonably consistent with the level of unsupported diagnosis codes in the TM data used to develop the risk model.

The Government has recognized the consistency principle in other programs where risk scores are similarly calculated for beneficiaries based on unsupported codes, including the Medicare standalone Part D Plan ("PDP") program and individual and small group programs under the Affordable Care Act ("ACA"). Through the ACA, the Government created a national, comprehensive health insurance program where private insurers offer coverage to individuals and small businesses, and the Government subsidizes eligible members with premiums and cost-sharing assistance. The plan designs must meet certain coverage requirements, and premiums and coverage are not based on pre-existing conditions. In both the Medicare PDP and the ACA programs, the risk-adjusted payments made to MAOs and ACA insurers are calculated in part on diagnoses that are not supported in the medical record.

2. Reducing risk scores by removing unsupported codes for UHG payment—without regard for the unsupported code error rate in the TM data—could interfere with CMS's ability to establish equivalent risk scores for the same cohort regardless of program. Since 2005, CMS has upheld the principle that the same population, whether in the TM or MA program, should have the same risk scores, in order to ensure accurate payment. If the Government removes a significant amount of unsupported codes, it must test to ensure it has not invalidated this requirement.

3. Testing conducted under my supervision and detailed in Appendix I shows that the relative risk values in the MA model (the values assigned to each condition by the risk model) are already reduced as a result of a significant level of unsupported diagnosis codes in the TM data. Additional reduction to UHG payment through removing UHG payment related to unsupported diagnosis codes could result in an inappropriate, double reduction to payment.

4. A decision that retrospectively removes a significant amount of UHG revenue related to unsupported diagnosis codes would materially change the payment rules and nullify the actuarial certification UHG submitted with the filing of MA plan benefits and premiums. Almost all health insurance rate filings include an actuarial certification that guarantees an accurate and reasonable projection of the required revenue, based on projected expenses and margin under the proposed benefits. The Government, the insurer, and the beneficiaries rely on the certification as confirmation that the benefits and premium comply with applicable rules and that the coverage does not threaten the insurer's solvency. For MA filings, the Government mandates an additional certification provision where actuaries must certify that the required revenue reflect an *average risk profile.* This requirement for an average risk profile is essential for actuarially sound payment in the carefully constructed MA payment and risk adjusted program. If the Government succeeds in removing revenue related to unsupported diagnosis codes after the fact, it is retrospectively changing the definition of the average risk profile certified by the UHG actuaries. If the unsupported diagnoses are material, the submitted actuarial certification no longer holds, and the actuarial soundness of the program, which the Government relied on through the actuarial certification, would be undermined resulting in underpaying the MAO for the provided benefits.

5. All of the previous opinions except the second opinion are directly applicable to Part D payment for the combined medical and pharmacy program (the Medicare Advantage and Part D or "MAPD" program) plans as well. That is, it is my opinion that Part D risk-adjusted payment resulting from a MAO's submission of unsupported diagnosis codes does not necessarily result in overpayments. Classifying all such payments as "overpayments" is actuarially inappropriate, because it ignores both the fundamentals of the MA rating program and how CMS developed the risk adjustment model.

## BACKGROUND OF THE MA PAYMENT SYSTEM

The following sections provide background information on the development of the risk model used for the MA program. Although the entire description is important, the key takeaways from this section include:

1) The risk adjustment model used for MA payment was developed using TM claim data and costs.

2) The TM claim data includes diagnosis codes that are unsupported in the claim records.

3) MA payment is based on actuarially certified bids that include a calculation of costs for an enrollee with a national average risk profile.

4) The definition of a national average risk profile is based on an average TM beneficiary with a 1.0 risk score that is calculated using the MA risk model.

**Risk Adjustment, MA Bidding, Actuarial Certification, and MA Payment**

The risk adjustment methodology for the MA program dates back to the Balanced Budget Act of 1997 (the "Act"). The Act provides that "the Secretary shall develop, and submit to Congress by not later than March 1, 1999, a report on the method of risk adjustment of payment rates under this section, to be implemented under subparagraph (C), that accounts for variations in per capita costs based on health status. Such report shall include an evaluation of such method by an outside, independent actuary of the actuarial soundness of the proposal."[3]

During the time relevant here (payment years 2009 through 2017 based on diagnosis years 2008 through 2016, or the "Review Period"), CMS paid capitation rates to MAOs based on projected medical and administrative expenses for the offered healthcare benefits as well as the margin levels sought by the MAO. The capitation rates for an average (1.0) beneficiary are required to be lower than or equal to the MA benchmark amounts, which CMS develops based on the per capita costs from the TM program.

The precise capitation amounts by county, the beneficiary premiums, and the benefits offered in any MA contract year are proposed by the MAO via a rate filing submitted to the Government in the year prior to the contract year. In addition to a description of the benefits, the rate filing includes a standardized worksheet called a Bid Pricing Tool (also referred to as the "BPT" or "bid"). Each BPT includes an actuarial calculation of the required revenue amount and beneficiary premium that the MAO needs to cover the proposed benefits, administrative expenses, and the target margin.

CMS requires a separate bid submission for each plan design and that each one be certified by a qualified actuary. The actuarial certification indicates, among other things, that:[4]

1. The bids are based on the "average revenue requirements in the payment area for a [Medicare Advantage and Medicare Part D] enrollee with a national average risk profile."[5]

2. The pricing data and assumptions are reasonable for the benefits offered.

3. The bids were prepared in compliance with the current ASOPs.

The first certification item above refers to bids being based on an enrollee with a national average risk profile. That means that the calculations of the revenue and beneficiary premium are based on an average beneficiary in the TM program with a risk score of 1.0 ("a 1.0 beneficiary") in the contract year. For MAOs to identify how their own beneficiaries' average risk scores compare to a national average risk profile of 1.0, CMS provides various payment and risk adjustment information in advance of the bid deadline through advance and final rate notices.

Through these notices, MAOs receive details on how risk scores will be calculated, including CMS's publication of its risk model, the relevant county level benchmarks, and the services the plan is required to cover during the following contract year. Using CMS's published risk model,

---

[3] 42 U.S.C. § 1395w-23(a)(3)(A).
[4] Instructions for Completing the Medicare Advantage Bid Pricing Tools for Calendar Year 2017, p. 98.
[5] *Id.*

*Confidential*

MAOs compare the average risk scores of the beneficiaries expected to enroll in their MAO to an average beneficiary risk score of 1.0 to calculate the revenue requirement for that national average enrollee profile covered in the certification.

These bids are reviewed and approved by CMS before the start of the following contract year. In addition, approximately one third of the bids go through a rigorous audit procedure where an actuary hired by CMS reviews the calculations and checks the bid information, including the supporting data and assumptions for compliance with CMS's instructions, guidance, and regulations (called "Bid Audits"). These audits result in a written list of observations and findings that provide a foundation for improvement in future bid submissions, as well as potentially more formal consequences including fines and penalties for MAO with egregious results.

After CMS approves the bids and the contract year starts, the Government pays the MAO using this average revenue requirement based on the national average risk profile submitted in the bids. CMS generally pays MAOs for the medical portion of the benefits in two components:

1) <u>A risk-adjusted capitation payment</u>. This amount is to reimburse MAOs for covering the TM benefits for the population. It is calculated based on an individual risk score for each beneficiary that the MAO enrolls and multiplied by the revenue requirement for a national average enrollee (also called the "standardized bid amount").

2) <u>A rebate amount</u>. This amount is paid to MAOs that bid a revenue requirement below the county level benchmark. The rebate is calculated as a percentage of the difference between the risk-adjusted benchmark and the revenue requirement for covering TM benefits for the expected population. This rebate amount helps fund the MAO for any additional benefits beyond the basic TM benefit. The MAO cannot just keep the rebate as profit. Rather, it is required to offer supplemental benefits with a value (including benefit cost, administrative expense, and margin) at least as great as the rebates in the BPT.

The beneficiary's risk score is a relative amount (centered around 1.0) that reflects various risk factors that correlate with that beneficiary's expected healthcare costs, including demographic information like age and originally disabled factors, as well as diagnosed medical conditions. The risk score value is correlated to the expected healthcare costs of the beneficiary. More critical medical conditions and additional medical conditions usually mean higher expected costs and result in higher risk scores. A beneficiary risk score over 1.0 means the beneficiary has risks and expected costs that are higher than the average TM beneficiary. A risk score lower than 1.0 means the beneficiary has risks and expected costs that are lower than the average TM beneficiary. Because the risk score is multiplied by the standardized bid amount to get the risk-adjusted payment for each individual beneficiary, the application of the risk scores results in MAOs receiving a higher capitation amount for beneficiaries that are likely to incur high healthcare costs and a lower capitation amount for healthier beneficiaries expected to have lower healthcare costs.

The applicable MA risk adjustment model during the Review Period is called the CMS Hierarchical Condition Categories ("CMS-HCC") risk model. A similar Part D ("PD") model, used for the both the pharmacy offering of MAOs and the standalone PDP programs, is called the Prescription Drug Hierarchical Condition Category ("RxHCC") risk model. Standalone PDPs are

prescription drug plans offered by insurers where the Government pays a capitation rate for only pharmacy benefits. Beneficiaries in the standalone PDP program are generally enrolled in Part A and/or Part B of the TM program.

The MA and PD models are *prospective* risk adjustment systems. Prospective risk adjustment systems use diagnosis codes from the previous year (Year 1) to estimate relative risks in the current year (Year 2) for payment. Demographic factors are generally determined based on the same year as the payment.[6] For example, for MAO beneficiaries in contract year 2017, each beneficiary's diagnoses from 2016 and demographic information from 2017 are used to estimate the beneficiary's risk score for 2017.

**Development of the CMS-HCC Risk Model**

The Government developed the CMS-HCC risk model using regression, a predictive analytic process. A regression process identifies which variables (medical conditions and demographic characteristics) are significant in predicting relative costs and also quantifies the amount of cost each variable contributes to the overall amount. For MA, like many other risk adjustment systems, the regression process is executed on historical data where both the Year 1 medical conditions and the Year 2 demographic information and costs are known. The costs from Year 2 are regressed against the medical condition and demographic variables to determine the relative contributions of each predictive variable to the costs in Year 2.

For the CMS-HCC risk model, the regression is performed on historical TM data where the TM paid claim amounts are used for costs and the diagnosis codes included on those claims submitted for payment are used to identify medical conditions. The diagnosis codes on the TM claims are largely unaudited. By "unaudited," I mean that the diagnosis codes used to identify medical conditions are used in the model as they are submitted by the providers to the Medicare program. CMS does not generally audit those TM diagnosis codes to confirm they are supported in the medical records.[7] Therefore, some diagnosis codes in the TM data, which are used as the basis for the risk adjustment model, are not supported in medical records. CMS has acknowledged that not all diagnosis codes in the TM data are fully supported.[8] As discussed below, the estimate of unsupported diagnosis codes in the TM data is significant.

As a first step in the model development, related diagnosis codes for medical conditions with similar costs are mapped to groupings of Condition Categories ("CCs"). Only diagnosis codes

---

[6] In concurrent (as opposed to prospective) risk models, diagnosis codes and demographic information from the current year are used to estimate current risk scores, so there is no one-year lag between the diagnosis year and the payment year.

[7] *See* Sean Creighton Deposition, Mar. 23, 2022, at 61:11–18 ("Q. But other than that, I think you testified a moment ago that the majority of the diagnosis codes that are submitted by providers are not audited, not reviewed by CMS for accuracy before being incorporated into the model. Is that accurate? A. There is certainly no medical record review."); Anne Hornsby 30(b)(6) Deposition, May 19, 2023, at 69:5–15 ("A. CMS understands that some diagnoses in the fee-for-service program are likely not supported by the medical record.").

[8] *See* CMS, *Fee for Service Adjuster and Payment Recovery for Contract Level Risk Adjustment Data Validation Audits - Technical Appendix*, at 6, https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/FFS-Adjuster-Technical-Appendix.pdf (showing the discrepancy rates in the CERT data).

*Confidential*

from "risk-eligible" claims are used in mapping to Hierarchical Condition Categories ("HCCs"). In their evaluation of predictors of cost, CMS found that only diagnosis codes from certain types of claims were good cost predictors. Generally, diagnosis codes from laboratory and diagnostic claims were excluded when mapping diagnosis codes to CCs.

Each CC is evaluated to determine which CCs are the primary predictors of medical costs for the subsequent year. The CCs are mapped to HCCs to distinguish varying degrees of severity in the manifestation of a condition. For example, diabetes is a disease with multiple groupings of condition categories. Diabetes is divided into three levels of complications (diabetes without complications, diabetes with acute complications, and diabetes with chronic complications), where the related costs vary for these complication categories. The HCCs are defined to be hierarchical in nature so that a beneficiary that has multiple diagnosis codes that map to more than one of these diabetes categories will be limited to reflect only the most severe diabetes category. That is, a beneficiary with diabetes will only be assigned one condition category in the hierarchy of the diabetes condition categories.

In addition, demographic qualities are also studied to determine which age bands and demographic characteristics are predictive of costs. As you might expect, older ages correlate with higher costs. Exhibit A includes a list of the demographic and disease variables in the 2017 Community, Non-Dual, Aged MA Model for Continuing Enrollees. After CMS determines the HCC and demographic predictive variables, it then calculates the relative costs and relative values associated with each variable by performing the following:

1. Each TM beneficiary's conditions and demographic characteristics (e.g., age, gender, original reason of entitlement) are determined based on diagnosis codes in Year 1 TM claims data and Year 2 enrollee information. Each beneficiary is assigned an array of "1" and "0" markers, indicating whether the beneficiary meets the demographic characteristics or has been diagnosed with the associated HCC condition. The HCCs for each beneficiary are denoted as "1" if the risk-eligible claims for that beneficiary contain any diagnosis codes that are mapped to that HCC. It only takes one diagnosis code from a risk-eligible claim to result in an HCC marker of "1." If there are multiple providers that submit diagnosis codes on risk-eligible claims that all map to the same HCC, that HCC marker still reflects a value of "1," the same as if only one risk-eligible claim included the diagnosis code.

   Any demographic or HCC diagnoses that the beneficiary does not have are denoted as a "0". This array of HCC and demographic markers is referred to as the beneficiary's "risk profile." Each beneficiary's risk profile is linked to the beneficiary's Year 2 costs.[9] The risk profiles and costs together comprise the beneficiary input file dataset used by the regression to create the risk model.

   Exhibit B contains an illustration of a beneficiary input dataset for the CMS 2017 Community, Non-Dual, Aged MA Model for Continuing Enrollees. In this Exhibit, Beneficiary "a" has Year 2 costs of $11,403, is a female between 75 and 79 during Year 2,

---

[9] Year 2 costs are beneficiary's total expenditures incurred in Year 2 for TM benefits.

was not originally disabled, and had two conditions identified by HCC 170 (Hip Fracture/Dislocation) and HCC 173 (Complications of Specified Implanted Device or Graft).

2. CMS determines the marginal annual dollar costs associated with each HCC and demographic variable using a statistical regression analysis. Year 2 cost is the dependent variable, and the risk profiles reflect the independent variables of the regression. The regression allocates the TM costs from Year 2 to the demographic characteristics and the Year 1 HCCs. Marginal annual dollar costs associated with HCC and demographic variables are the output of the regressions and are commonly referred to as the "dollar coefficients."

Exhibit A, Column (b) shows the dollar coefficients resulting from the regression on the Community, Non-Dual, Aged, Continuing Enrollees. For example, the regression analysis predicts:

- Being a female age 75-79 in Year 2, contributes $4,111.23 of cost in Year 2.

- A diagnosis of HIV/Aids (HCC 1) in Year 1 contributes $2,864.04 of cost in Year 2.

- A diagnosis of Septicemia (HCC 2) in Year 1 contributes an additional amount of $4,183.18 of cost in Year 2.

With the dollar coefficients for each predictive variable produced by the regression, a predicted cost for each individual beneficiary can be calculated. The predicted cost for a beneficiary is the sum of the dollar coefficients where the beneficiary has predictive markers. For example, for a non-dual, aged, continuing enrollee living in the community who is female, age 77 and with a hip fracture and a traumatic amputation, the predicted cost would be $10,392 as shown in the table below (using the dollar coefficients from Exhibit A).

**Table 1 - Example of Predicted Cost for a Beneficiary**

| 2017 CMS-HCC Model Community, Non-dual, Aged, Continuing Enrollee | | |
|---|---|---|
| Demographic Variable | | |
| (a)   Female, 75-79 Years | | $4,111 |
| | | |
| Condition Variables | | |
| (b)   HCC 170    Hip Fracture/Dislocation | | $3,837 |
| (c)   HCC 173    Traumatic Amputations and Complications | | $2,444 |
| | | |
| (d)   Total predicted cost (a) + (b) + (c) | | $10,392 |

3. Year 2 dollar coefficients are converted to relative values for each HCC and demographic variables by dividing the dollar coefficients associated with each variable by the *mean*

*predicted expenditure* across all TM beneficiaries.  Unless a different denominator year is used, the *mean predicted expenditure* is the average of all predicted costs calculated by applying the dollar coefficients (output from the regression model) to the risk profiles determined in step one above.  Of note, the mean predicted expenditure using the risk profiles of the beneficiary input file will match the average actual costs in the beneficiary input file.[10]  The schedule of relative values for each predictive variable constitutes the CMS-HCC risk model which CMS publishes in its annual rate notice.

Continuing with Exhibit A, the mean predicted expenditure for the 2017 CMS-HCC model was announced in the 2017 Final Rate Announcement to be $9,185.29 for the denominator year.[11]  By dividing each of the dollar coefficients in column (b) by $9,185.29, the relative values (also called relative factors) for each variable are computed.  For example, the relative value for HIV is calculated by dividing the HIV dollar coefficient of $2,864.04 by the denominator of $9,185.29 to get 0.312.

The entire set of relative values for the 2017 Community, Non-Dual, Aged MA Model for Continuing Enrollees are listed in the last column of Exhibit A.

The model's relative values can then be used to determine risk scores for each beneficiary in a payment year.

1. The risk score for each TM beneficiary can be determined by adding the relative values for the demographic characteristics and Year 1 HCCs applicable to that beneficiary. Beneficiaries who have more costly diagnoses and demographic characteristics will have a risk score greater than 1.  For example, a beneficiary whose risk factors result in health care costs that are 30% greater than average would have a risk score of 1.3.  On the other hand, beneficiaries with less costly diagnoses and demographic characteristics will have a risk score less than 1.  For example, a beneficiary whose costs are 5% less than average will have a risk score of 0.95.  By design, the average risk score calculated in this manner across all TM beneficiaries is always equal to 1.0 for Year 2, or the denominator year.

   For example, a Medicare continuing enrollee living in the community that is non-dual and aged (i.e., non-disabled) that has a profile like the first beneficiary "a" in the beneficiary input file from Exhibit B will have a risk score of 1.132 using the relative values from Exhibit A.  The relative values for each of the variables is added together to calculate the risk score as shown in the following table.

---

[10]  If a different denominator year is used, the mean predicted expenditure will not match the actual costs of the denominator year, but the average risk score for the denominator year will still equal 1.0.

[11]  *See* 2017 Rate Announcement at 84 (Apr. 4, 2016).

*Confidential*

**Table 2 - Example of Raw Risk Score for a Beneficiary**

| 2017 CMS-HCC Model Community, Non-dual, Aged, Continuing Enrollee | | |
|---|---|---|
| Demographic Variable | | Relative Value |
| (a) | Female, 75-79 Years | 0.448 |
| | | |
| Condition Variables | | |
| (b) | HCC 170    Hip Fracture/Dislocation | 0.418 |
| (c) | HCC 173    Traumatic Amputations and Complications | 0.266 |
| | | |
| (d) | Raw Risk Score (a) + (b) + (c) | 1.132 |

2.  The CMS-HCC risk model's relative values are also used to calculate risk scores for the MA enrollees, with two additional adjustments:

    a.  Expected TM coding changes between the denominator year and the payment year used for MAO payment.

        i.  There is typically a lag of at least two to three years between the TM data used as the denominator year and the MAO payment year. During that time, coding or demographics can change and impact the average risk score of the TM population. This adjustment is intended to ensure that the average risk score across all TM beneficiaries remains 1.0 despite potential increased coding or demographic changes following the denominator year. This factor is called the Fee-For-Service ("FFS") Normalization Factor. MAO risk scores from the model are divided by this factor (which is usually greater than 1.0).

    b.  Differences in coding between the TM and the MA program.

        i.  The Coding Intensity Adjustment ("CIA"), sometimes called the "coding pattern adjustment," reduces the MAO risk scores to account for the perception that MAOs code more intensely than TM providers. In other words, a beneficiary may receive more numerous and intense HCCs in MA (where payment is based on such codes) than in TM where payment is generally based on procedures. The CIA aims to adjust the MAO risk scores down to a level of coding that is similar to the TM program. MAO risk scores from the CMS-HCC risk model are multiplied by (1 – CIA), where the CIA is between 3% and 6% over the Review Period.

Continuing with our above example from Table 2 for 2017: the FFS Normalization Factor was 0.998 and the MA Coding Intensity Adjustment was 5.66%.[12] The beneficiary's final risk score would be 1.070 as calculated below.

---

[12] *Id.* at 3-4.

*Confidential*

**Table 3 - Example of Final Risk Score for a Beneficiary**

| 2017 CMS-HCC Model Community, Non-dual, Aged, Continuing Enrollee | |
|---|---|
| Demographic Variable | |
| (a)    Female, 75-79 Years | 0.448 |
| | |
| Condition Variables | |
| (b)    HCC 170    Hip Fracture/Dislocation | 0.418 |
| (c)    HCC 173    Traumatic Amputations and Complications | 0.266 |
| | |
| (d)    Raw Risk Score (a) + (b) + (c) | 1.132 |
| | |
| Additional Adjustments | |
| (e)    2017 FFS Normalization Factor | 0.998 |
| (f)    2017 MA Coding Intensity Adjustment | 5.66% |
| | |
| (g)    Final 2017 Risk Score (d) / (e) * [1- (f)] | 1.070 |

**OPINION SUPPORT**

I.    **The actuarial soundness of payments to MAOs depends on Data Consistency between the development and application of the risk adjustment model.  To comply with actuarial principles, UHG may be considered as overpaid only by comparing its level of unsupported codes with that in the TM data used to develop the risk adjustment model.  Further, due to the presence of unsupported codes in the TM data used to calibrate the model, removing MA payments related to unsupported codes could introduce an inconsistency and result in payments that are not actuarially sound.**

**Actuarially Sound Payment Requires that the Risk Adjustment Model be Developed and Applied to Reasonably Consistent Data.**

The ASOPs, promulgated by the Actuarial Standards Board, set forth the principles and procedures for sound actuarial practice in the United States.  ASOP 45 provides the actuarial standards for "quantifying differences in morbidity across organizations, populations, programs and time periods using commercial, publicly available or other health status based risk adjustment models or software products."[13]  In the section addressing data, ASOP 45 provides that "the type of input

---

[13]  ASOP No. 45 § 1.2, The Use of Health Status Based Risk Adjustment Methodologies.

*Confidential*

data that is used in the application of risk adjustment should be reasonably consistent with the type of data used to develop the model."[14]

This actuarial principle of "Data Consistency" is a cornerstone of risk adjustment development. Much of the model construction is devoted to testing this principle, as risk adjustment development almost always uses a different set of data than what the risk adjustment will be applied to. In most cases the time period of the development data is older than the application data, but the source of data can also vary. If significant inconsistencies exist that violate the actuarial principle between development and application data, adjustments to the risk adjustment model must be implemented to offset the differences and bring the development data and application data back into reasonable consistency.

For MA payment, CMS uses historical diagnosis codes and expenditures from the TM data to create the model and then applies the model to the MA program. Both the source and the time period of the development data is different than the MA data to which it is applied. In its testing of consistency between the datasets, CMS found significant differences in the diagnosis code patterns (violating the Data Consistency principle) that warranted adjustment. As a result, CMS implemented factors to account for the differences and correct for the inconsistencies, namely the FFS Normalization Factor and the CIA. The FFS Normalization factor accounts for the time difference between the two datasets, and the CIA accounts for the source difference between the two datasets. These factors are described in more detail later in this section of the report.[15]

In this lawsuit, the Government alleges that UHG has retained "overpayments" from CMS. The Government maintains that UHG's risk scores are too high because some portion of its risk scores result from diagnosis codes that the Government claims were not supported in the medical record. The Government maintains that any payments resulting from these alleged unsupported codes constitute overpayments that should be returned to the Government.

The Government's overpayment theory ignores the actuarial principle of Data Consistency that is at the center of CMS's risk adjustment model. Accurate risk adjustment payment results when the data used to calculate risk adjustment payments (i.e., apply the relative values from the model) is reasonably consistent with the data used to set risk adjustment factors (i.e., develop the model's relative values). This consistency standard applied to MA payment means that payment to an MA plan is accurate if it is based on MA data that contains the same level of unsupported diagnoses as in the TM data upon which the model was designed.

If the Government is able to define an "overpayment" as any payment arising from unsupported diagnosis codes, it will alter the level and pattern of supported and unsupported codes in the UHG data. As such, it may be introducing an unreasonable inconsistency between the TM data used in developing the model and the UHG data to which the risk adjustment model is applied. A significant inconsistency in the level of unsupported diagnosis codes between the TM data and UHG data used for payment would violate the actuarial principle of Data Consistency and would call the actuarial soundness of the payments into question. One cannot categorically classify any

---

[14] ASOP No. 45 § 3.2, The Use of Health Status Based Risk Adjustment Methodologies.

[15] *See infra* § I.

payment related to unsupported HCCs as overpayments without considering the amount of unsupported HCCs in the MAO data relative to the TM data.

**The TM Data Used for MA Model Development has a Significant Amount of Unsupported Diagnosis Codes.**

CMS has acknowledged that the MA risk model development includes unsupported diagnosis codes (and HCCs) from the TM data.[16]  Until now, it has been unclear how many HCCs in the TM data were unsupported.  Using the data from discovery in this case, Dr. Michael Salve from Berkeley Research Group ("BRG") has reported that the level of unsupported HCCs (those HCCs resulting from unsupported diagnosis) in the TM data is significant.  Based on sampled 2013 TM charts, the level of unsupported HCCs in the 2013 diagnoses year varies by HCC, but overall is estimated to be between 28.0% and 35.1% at a 90% confidence level.  That is, approximately 28.0% to 35.1% (31.6% on average) of the conditions (HCCs) identified for beneficiaries in the TM data and used for risk adjustment were not supported in the claim record.  For ease of reference, we will refer to the overall level of unsupported HCCs in the TM data as a simple 31.6% HCC error rate.

**Accurate Payment Results When Risk Adjustment is Applied to Both Supported and Unsupported HCCs.**

The relative values for each HCC were calculated by CMS using TM data with a 31.6% error rate.  Therefore, MAO payments will be accurate from an actuarial perspective only if those relative values are applied to data that also contains a level of unsupported diagnosis codes reasonably consistent with this 31.6% rate of unsupported HCCs, all else being similar.

To determine whether UHG has received accurate payment, one must study the HCC error rates of the UHG HCC data relative to TM HCC data.  The approach used for testing differences of HCC error rates between the UHG and TM data includes not only the overall error rate, but also, among other things, testing of:

1. consistency of unsupported diagnosis codes across various cohorts,

2. the distribution of errors by HCCs, and

3. changes in the error rates over time.

While the exact nature of any such study is beyond the scope of this opinion, the 31.6% error rate is useful for illustrative purposes.  To the extent that UHG was receiving payment for HCCs that had error rates significantly greater than 31.6%, the Government would be justified actuarially in making an adjustment to payment.  To the extent that UHG has lower error rates, UHG may be underpaid.

The following three possible scenarios should be considered to determine whether UHG was paid accurately according to the development of the MA model:

---

[16] *See supra* notes 7-8.

1. UHG's HCC error rate is materially above the TM error rate of 31.6%;

2. UHG's HCC error is reasonably consistent with the TM error rate of 31.6%; or

3. UHG's HCC error is materially below the TM error rate of 31.6%.

In Scenario 1, the Government likely could modify the risk scores and recoup the associated payment related to unsupported diagnosis codes to some degree while maintaining the actuarial soundness of the risk model. The Government would need to be careful, however, to not remove so many unsupported diagnosis codes that the HCC error rate of the resulting data would be reduced significantly below the 31.6% TM level. Such recoupment would violate the actuarial risk adjustment principle and could result in actuarially unsound payment, absent other mitigating factors.

In Scenario 2, the payment is accurate from an actuarial standpoint given the reasonably consistent rate of error. Any further reduction in risk scores by the Government that removes significant amounts of payment would likely violate the actuarial principle.

In Scenario 3, the Government likely would not be justified in reducing risk scores and payment related to unsupported codes any further. In fact, actuarial principles would indicate that, absent some other mitigating factor, the payment already made to UHG could be understated and violate actuarial principles of consistency.

To my knowledge, the Government has not performed any analysis of HCC error rates for either UHG's MA data as a whole or TM data to date. As a result, its allegations of overpayment ignore basic actuarial principles related to risk adjustment, and oversimplify the complexities of the MA payment system, resulting in an unsound conclusion. Regardless of the scenario above, the undisputed presence of unsupported codes in the TM data that was used to develop the MA risk adjustment model requires the Government to account for such unsupported codes in any assessment of overpayment to an MAO related to unsupported codes.

**The Data Consistency Principle and Accurate Payment Must be Assessed in the Aggregate.**

It cannot be determined whether any single payment or subset of payments is actuarially appropriate without considering the overall levels of supported and unsupported codes in both the UHG and TM data.

As is the case with many items in actuarial science and insurance topics, a larger cohort of beneficiaries must be considered to determine actuarial soundness. In many cases, it's the statistical variation in claims that necessitates a larger set of data be used. In this case, an unsupported code for an individual beneficiary may not be an overpayment because the model payments are calculated in part on unsupported diagnosis codes that help offset the underpayments for other supported codes. The rating system is designed to create accurate payment over a large cohort of beneficiaries.

Accordingly, the determination of the appropriateness and actuarial soundness of risk adjustment payments must be made in aggregate or on average for larger cohorts. That is, a single payment for an MA beneficiary that is based on an HCC from an unsupported diagnosis code cannot be

assessed as an overpayment in isolation. Evaluation of any single payment or subset of payments for actuarial soundness would be inconclusive.

**CMS Maintains the Consistency Principle in MA Rate Setting.**

CMS has recognized the consistency principle in multiple contexts in MA rate setting:

1. <u>Coding Intensity Adjustment</u>. CMS acknowledged the consistency principle when implementing the CIA.[17] The CIA is applied to all MA risk scores to account for differences in the volume and pattern of diagnosis coding between the providers in the TM program and the MA program.[18] That is, the CIA is an adjustment that accounts for the differences in sources between the development and application data. Because more robust diagnosis coding results in higher risk scores and higher revenue, MAOs have an incentive to document and submit more codes than providers in the TM program, who do not have the same incentives. Absent some offsetting adjustment, the MAO risk scores would be higher for a cohort of TM members in an MA setting compared to the TM setting. The intention of the CIA reduction to MA risk scores is to normalize or standardize the MA risk scores to a level of coding that is reasonably consistent with the TM program.[19]

   The Deficit Reduction Act of 2005 ("DRA") required CMS to perform an analysis of "differences in coding patterns between Medicare Advantage plans and providers under" the TM program and establish an adjustment to MA payments for Calendar Year ("CY") 2008 – CY 2010 "to the extent that the Secretary has identified such differences."[20] The DRA provides that in implementing the CIA factor: "In order to ensure payment accuracy, the Secretary should conduct an analysis of the differences."[21] The DRA and actuarial principles both agree that accurate MA payment requires consistency between the MA and the TM coding patterns.

   Per the DRA, CMS has performed analyses to estimate the CIA, and implemented the following amounts for the payment years in the review period:[22]

---

[17] The Coding Intensity Adjustment is also sometimes called the "Coding Pattern Adjustment."
[18] *See* 2010 Rate Notice at 19 (Apr. 6, 2009).
[19] *See id.* at 21.
[20] Deficit Reduction Act of 2005, 120 Stat. 50, Pub. L. 109-171 (Feb. 8, 2006), https://www.govinfo.gov/content/pkg/PLAW-109publ171/pdf/PLAW-109publ171.pdf.
[21] *Id.*
[22] These values are compiled from the applicable Rate Notices for the associated calendar years.

*Confidential*

**Table 4 – CIA Amounts**

| Payment Year | CIA |
|:---:|:---:|
| 2009 | n/a |
| 2010 | 3.41% |
| 2011 | 3.41% |
| 2012 | 3.41% |
| 2013 | 3.41% |
| 2014 | 4.91% |
| 2015 | 5.16% |
| 2016 | 5.41% |
| 2017 | 5.66% |

In 2017, for example, risk scores were reduced by the CIA of 5.66%. That is, each beneficiary risk score was multiplied by 0.9434 (1-5.66%). The CIA reduced risk adjusted revenue for all MAOs, including UHG. Note that the CIA reduction amounts during these years were statutorily required minimums.

Through the CIA, CMS normalizes the risk adjustment model for additional coding that exists in MA data (application data) that is not present in the TM data (development data) and maintains the Data Consistency between the development and the application of the risk adjustment model.

2. <u>FFS Normalization Factor</u>. CMS also applies a normalization factor to account for the fact that the volume and pattern of coding varies within the TM program due to the timing differences between the year of data underlying the risk adjustment model development (denominator year) and the year of data to which the model is applied (payment year). CMS realizes that to the extent that the coding and demographic changes over time, the originally developed relative values may no longer maintain a 1.0 average. Therefore, CMS implemented an adjustment (usually a reduction) to the risk scores for the differences in coding between the denominator year and the payment year. The table below shows the timing difference and the associated FFS Normalization Factors for the Community, Non-Dual, Aged MA Model for Continuing beneficiaries during the Review Period. In each year, the beneficiary risk scores for all MAOs, including UHG, are divided by the FFS Normalization Factor to calculate the beneficiary risk score.[23]

---

[23] All of the below values are taken from the Rate Notices for the applicable calendar years.

**Table 5 - FFS Normalization Factors for the Community, Non-dual, Aged, Continuing Enrollee CMS-HCC Model**

| Payment Year | Denominator Year | Timing Difference | FFS Normalization Factor (to adjust for the timing difference) |
|---|---|---|---|
| 2009 | 2007 | 2 years | 1.030 |
| 2010 | 2007 | 3 years | 1.041 |
| 2011 | 2007 | 4 years | 1.058 |
| 2012 | 2007 | 5 years | 1.079 |
| 2013 | 2011 | 2 years | 1.028 |
| 2014* | 2011/2012 | 3/2 years | 1.041/1.026 |
| 2015* | 2011/2012 | 4/3 years | 0.992/0.978 |
| 2016 | 2012 | 4 years | 0.992 |
| 2017 | 2015 | 2 years | 0.998 |

*In 2014 and 2015, CMS used a blend of risk scores from the 2013 and 2014 HCC models. In 2014, the factors of 1.041 and 1.026 were used for the 2013 and 2014 HCC Models, respectively. In 2015, the factors of 0.992 and 0.978 were used for the 2013 and 2014 HCC Models, respectively.

In 2017, for example, risk scores were divided by the FFS normalization of 0.998, which increased the risk scores from what they otherwise would have been.

3. <u>Provider Data Sources</u>. CMS does not accept "prescription drug data or lab results" to support a diagnosis during its Risk Adjustment Data Validation ("RADV") audits. These codes were not identified as predictors of cost, so were not included as valid or risk-eligible diagnosis codes supporting the HCCs in the development of the model. Including these diagnosis codes as valid indicators of conditions during payment years or part of RADV audits would violate the consistency principle. In describing the exclusion of this data, CMS explained that payment should be determined only "based upon supporting medical record documentation from provider data sources that are used to calibrate the model."[24] This precisely illustrates the fundamental importance of using consistent data in the development and application of the risk adjustment model.

All of these examples show how CMS strives to abide by the Data Consistency principle in its risk adjustment methodology.

**The Government Recognizes the Actuarial Principle of Data Consistency in Other Programs and Allows Risk Scores Based on Unsupported Diagnosis Codes.**

In other programs where risk scores are similarly calculated for beneficiaries, the Government has recognized that actuarially sound payment depends on Data Consistency between the development and application of the payment model. Two programs worth explaining are the Part D program

---

[24] *Medicare Program; Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs*, 75 Fed. Reg. 19,678-01, 19,748 (Apr. 15, 2010) (as corrected on June 7, 2010).

and the ACA program.  In these programs, the Government makes payments based on submitted diagnosis codes, and payments based on known unsupported diagnosis code submissions are not categorically deemed inaccurate.

## A.  Part D Program

The Part D program similarly uses a risk adjustment model for Medicare beneficiaries.  This model is developed from and applied to Part D programs that operate both as part of the MAPD program as well as the standalone program (the PDP program).  The MAPD beneficiaries are largely the same as the beneficiaries being scored under the MA program.[25]  The PDP beneficiaries are generally those who receive medical coverage under the TM program.

When assigning Part D risk scores to beneficiaries, TM beneficiaries under PDP plans receive risk scores based on the medical diagnosis codes present in the FFS data underlying the TM beneficiaries.  This FFS data are the same data that are used to develop the MA risk adjustment model, and therefore contain a significant amount of unsupported diagnosis codes.  Also, similar to the MA program, actuaries submit Part D bids based on an average 1.0 beneficiary, but here the average is based over all MAPD and PDP beneficiaries.

Unlike the MA program, the Part D risk scores used to calculate payments to PDP sponsors are largely unaudited and not subject to any targeted validation of the underlying diagnosis codes.  All supported and unsupported diagnoses from the TM FFS claims that get mapped to HCCs result in additional risk score and payment to the PDP plans.  If the Government's theory that any unsupported diagnoses should not result in payment, this difference in eligible diagnoses would result in a profound difference in methodologies between Part D payments for a TM beneficiary in a PDP and Part D payments for a MA beneficiary receiving PD benefits who are in theory paid under the same rate-setting and risk adjustment system.

Consider the following scenario:

- Provider P is a cardiologist in the TM program as well as UHG's MAPD network.
- Suppose Samantha is enrolled in a stand-alone PDP plan of a UHG competitor.
- Suppose Martha is enrolled in UHG's MAPD plan.
- Suppose Martha and Samantha both have the same demographics and diagnosis codes from provider P during 2016.
- Because of similar diagnoses and demographics, Martha and Samantha should both have the same risk score.
- However, suppose Provider P does a poor job in substantiating the diagnosis codes for his patients, and so all of the cardiac diagnosis codes for both Martha and Samantha are unsupported in the medical records.

If only supported diagnosis codes are included in payment for MAPD plans, dramatic differences in Part D risk scores and payments between similarly situated beneficiaries in MAPD versus PDP

---

[25] Most MA beneficiaries select plans that include Part D coverage.  However, some MA beneficiaries choose plans that are "MA-only" and do not include coverage for Part D.

*Confidential*

would result.  The premise being used in the allegations of this case would indicate that Martha's risk score should be reduced but that Samantha's risk score should not change.

If the Government believes that payment should only be made on supported diagnosis codes for both MAPD and PDP programs, then a series of illogical consequences would ensue, again calling into question the actuarial soundness of the Part D payment model and associated risk adjustment program:

1. CMS would need to identify and delete all diagnosis codes for PDP beneficiaries for unsupported diagnosis codes in the TM data.  This would remove diagnosis codes that the model was developed on and would create an inconsistency between the development and application of the model.

2. Payments for PDP sponsors would be reduced for approximately 31.6% of HCCs.[26]

3. The average risk score for the PD beneficiaries would no longer be 1.0 and would be significantly less than 1.0.  The average of PD risk scores across all PDP and MAPD plans would also be less than 1.0.

4. This result contradicts the requirement that the average PD risk score across all beneficiaries is 1.0 and would be a material payment methodology change that would impact the offering of benefits and premiums in this market.

The point of the Part D payment example is to illustrate how CMS's position on unsupported diagnosis in the MA program, when applied to the Part D program, creates problematic results.  If only the unsupported diagnoses in MA are overpayments, then similarly situated beneficiaries (Martha and Samantha) will have the different Part D risk scores, an irrational outcome.  Alternatively, if all unsupported diagnoses in both the PD portions of MAPD and PDP payment are overpayments, then the national average risk profile in the Part D program will no longer have a risk score of 1.0, violating a core tenet of the RxHCC model.  CMS cannot assume that accurate payment must only be on supported diagnosis codes and that certain unsupported diagnosis codes, along with the associated payment, be deleted from the MAPD program only.  Their own PDP program has been operating alongside the Part D component of the MAPD program, making payments on submitted unsupported codes, for over a decade.

If CMS would abide by the Data Consistency principle, the coding underlying the PDP beneficiaries in the TM data would be reasonably consistent with the coding underlying the MAPD Part D risk scores, and no incongruities would result.

## B.  Individual and Small Group Marketplaces That are Part of the Affordable Care Act (ACA)

As part of the ACA, the Government introduced a new program of coverage for individuals and small groups starting in 2014 offered by private insurers (issuers).  As part of the program,

---

[26] Although the RxHCC model does not include the exact same HCCs, many are the same and would produce a similar result.  To get a revised overall estimate, a similar statistical analysis would need to be performed on the HCCs in the Rx-HCC model.

*Confidential*

enrollees are charged premiums based on costs for an average enrollee (based on a 1.0 risk level). Using a risk adjustment system, each of the issuers' covered members is scored and premiums are transferred between issuers based on the relative aggregated risk of the issuers' members. Relative risk is calculated based on the plan liability risk score ("PLRS"), allowable rating factors, induced demand factors, actuarial value factors, and geographic rating factors. Those issuers that have members with a lower relative risk will transfer revenues to those issuers where the membership has a higher relative risk.

The PLRS is calculated at both a plan level and an enrollee level (the plan level being the weighted average of the enrollees in the plan). At the enrollee level, the PLRS (or risk score) is determined based on the Department of Health and Human Services (HHS) HCC ("HHS-HCC") model, which is developed using regression techniques similar to the CMS-HCC risk model. The HHS-HCC model for ACA was originally calculated based on an alternate set of data,[27] but once the ACA data became reliable, the HHS-HCC risk adjustment model was developed based on the historical data from the ACA program itself (beginning with payment year 2021). The HHS-HCC model has separate segments for each metal plan level, taking into account the fact that higher-AV plans will incur greater costs due to their more generous benefit designs. In addition, the HHS-HCC model generally consists of the following types of predictive variables: demographic, enrollment duration, cost sharing reduction level, hierarchical condition categories, and prescription drug categories.

The diagnostic classification system for the HHS HCCs is similar to the MA program in that submitted diagnosis codes are mapped to chronic conditions and those chronic conditions that are found to be predictive of costs are grouped into HCCs. In similar fashion to MA, a regression model takes a beneficiary input file (containing all the markers of the predictive variables by enrollee) and calculates the marginal dollar contributions for each HCC. These dollars are converted to relative values, which are then applied to the ACA members to calculate their risk scores (PLRS values). The ACA risk model also is similar to the MA model scheme in that it must define a 1.0 average member that is used for premium development.

For years 2014 through 2016, no adjustments to the risk scores were made for the level of unsupported diagnosis codes (substantiation failure rate) in the claim records. Beginning in 2017, a RADV program for the ACA was finalized. Per the ACA 2019 rate notice, "the goal for the HHS-operated risk adjustment program is to ensure that enrollees' diagnoses on paid claims reflect the appropriately assigned HCCs and were diagnosed by a licensed clinician."[28]

This RADV program for the ACA adjusts risk scores for errors when an issuer's failure rate is statistically meaningfully different than other issuers. Failure rates are used in calculating the final error rate of an issuer.[29] Issuers where the failure rate does not meet this threshold of statistical

---

[27] MarketScan data was used in full or in part for payment years prior to 2021.

[28] *Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2019*, 83 Fed. Reg. 16,930, 16,943 (Apr. 17, 2018), https://www.govinfo.gov/content/pkg/FR-2018-04-17/pdf/2018-07355.pdf.

[29] Failure rate refers to the non-validation rate of an HCC and is calculated as 1 – (IVA HCC Count / EDGE HCC Count). Error rate is developed when an issuer has failure rates that are deemed outliers and is used to calculate the PLRS adjustment for the RADV transfer. The adjusted PLRS is calculated as PLRS * (1 – Error Rate).

*Confidential*

significance receive a 0% error rate and therefore do not have their issuer PLRS or risk score adjusted. For every issuer, the substantiation failure rates are calculated based on a documented process where Independent Validation Auditors ("IVAs") review the medical records for sampled members. The IVAs identify the sample and review medical records for each HCC in the sample and identify the level of unsupported HCCs. Based on the results of these audits for the 2017 benefit and 2018 benefit year RADV programs, "HHS aggregates all issuers' failure rates and creates HCC groupings, national means, and 95% confidence intervals at 1.96 standard deviations for that benefit year of HHS-RADV."[30] Those issuers where the failure rate is outside the 95% confidence failure rate are identified as statistically significant or 'outliers.' In the 2019, 2020, and 2021 benefit years, RADV program outliers were identified as those with failure rates outside of the 90% confidence failure rate interval. Outlier issuers with higher failure rates than the confidence interval have their risk scores adjusted downward using a prescribed formula. For outlier issuers who have lower failure rates than the confidence interval, risk scores may be adjusted upward. Beginning in the 2019 benefit year RADV program there is "modification to the error rate calculation in cases where a negative error rate outlier issuer also has a negative failure rate".[31] HHS described the formula by indicating that "statistically meaningful errors should be adjusted to the weighted mean failure rate of each HCC group."[32] That is, the issuers' risk scores are reduced in aggregate so that the error rate reflects the average of the HCC group (still reflecting an average level of unsupported codes). "If the issuer is not an outlier, the issuer is determined to have a zero error rate."[33] For those issuers who have amounts of substantiation errors in their diagnosis codes that do not meet the outlier threshold, no adjustment is made to the risk score, and the risk scores continue to reflect the unsupported diagnosis codes in the original issuer data.

After adjusting the risk scores for the outlier issuers, the payment transfer methodology that moves revenue from issuers with low relative risk members to issuers with high relative risk members are recalculated and adjusted. Because of this payment transfer mechanism, issuers receiving a 0% error rate may still have their transfer amounts adjusted if the market error rate is nonzero.

An additional point contrary to the MA risk adjustment system is the timing of the RADV methodology announcement for ACA. Because these RADV processes affect the overall 1.0 member and the premium development, the RADV processes and calculations were announced prior to the application year so that any adjustments to the premium development could be made. That is, if an issuer suspected that their risk scores would be adjusted down due to a high error rate, they could make an adjustment when calculating and filing the premiums for 1.0 member to ensure that the premiums were actuarially sound.

---

[30] CMS, 2019 RADV White Paper, at 15 (Dec. 6, 2019), https://www.cms.gov/files/document/2019-hhs-risk-adjustment-data-validation-hhs-radv-white-paper.pdf.

[31] *Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2019*, 83 Fed. Reg. 16,930, 16,943 (Apr. 17, 2018), https://www.govinfo.gov/content/pkg/FR-2018-04-17/pdf/2018-07355.pdf.

[32] 83 Fed. Reg. at 16,944.

[33] CMS, 2019 RADV White Paper, at 15 (Dec. 6, 2019), https://www.cms.gov/files/document/2019-hhs-risk-adjustment-data-validation-hhs-radv-white-paper.pdf.

*Confidential*

Although some of the details of the ACA program are different than in MA risk adjustment, the ACA risk adjustment program supports multiple points made in this report:

1. The intended premium adjustments for unsupported codes were tested and announced prior to the rate filing, so actuaries' certifications of those rate filings would be consistent with the intended practices.

2. Risk scores calculated on unsupported diagnosis codes do not necessarily result in overpayments. Only those issuers that are determined as compared to the development data have risk scores recalculated. Accurate payment requires that some level of unsupported diagnosis codes be used to calculate risk scores.

3. Testing for unsupported codes and accurate payment is not determined for a subset of members or codes, but rather testing is statistically done to measure the aggregate level of unsupported codes. Adjustments are similarly made at an aggregate level.

4. In compliance with the actuarial principle of Data Consistency, only those risk scores that are substantially different than that used in the development of the model are adjusted. The adjustment that is made is to move those risk scores to the weighted mean failure rate of each HCC group, that is, the average failure rate across the data used to the develop of the model. The adjustment does not entirely remove the failure error rate by moving the errors to zero. Rather, the payments are adjusted only to reflect the average failure rate in the data, maintaining consistency of application and development risk adjustment data.

5. The entire ecosystem of payment must be considered when adjusting payments. HHS was careful in the development of the ACA RADV program so as to not disturb the rate ecosystem and actuarially sound rate process. Prior to the implementation in 2017, two beta years of results were tested and distributed to the issuers without impact to premium revenues. The process continued to be refined during that time. HHS indicated in 2013 and throughout subsequent years that "[t]he purpose of data validation for risk adjustment is to promote confidence in the budget neutral payment transfer methodology by ensuring the integrity and quality of data provided from issuers operating in state markets under the HHS-operated risk adjustment program."[34]

## II. Reducing risk scores by removing unsupported codes for UHG payment could interfere with CMS's goals for same risk score for same cohort regardless of program and thereby undermine payment accuracy.

The Government maintains that an accurate risk adjustment system in the MA program should be implemented in such a way that the same population, whether enrolled in TM or MA, should have the same risk score. That is, accurate payment depends on a risk adjustment system where the same population cohort should have the same risk score regardless of the program (MA versus TM) where they are enrolled. Furthermore, since the average beneficiary in the TM program has

---

[34] CMS, *Affordable Care Act (ACA) HHS-Operated Risk Adjustment Data Validation (RADV) Process White Paper*, at 6 (June 22, 2013), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/ACA_HHS_OperatedRADVWhitePaper_062213_5CR_050718.pdf.

*Confidential*

a risk score of 1.0, a similar beneficiary should have a risk score of 1.0 in the MA program. The references below support this long-standing principle:

1. The DRA directed the Secretary to "adjust the risk scores for differences in coding patterns between Medicare Advantage plans and providers under the original Medicare fee-for-service program under parts A and B to the extent that the Secretary has identified such differences."[35] That is, if coding is different between MA and TM providers, CMS must correct the risk scores so that the ultimate risk scores are similar.

2. As a result of the DRA, CMS studied the coding pattern differences between MA and TM and published adjustments to account for the differences in coding patterns between MA and TM. As part of the 2010 Final Rate Notice, CMS stated:

   > Given the fact that the MA payment methodology is based on fee-for-service payments, and that the risk adjustment methodology is designed to compare the risk scores of MA plan enrollees to other plan enrollees and beneficiaries not enrolled in MA plans, for this comparison to be valid, MA plans must code the way Medicare Part A and B providers do in order for risk adjustments to be valid. This means that MA organizations are coding "accurately" when they are coding in a manner similar to fee-for-service coding used on the beneficiaries to whom MA plan enrollees are being compared. In this sense, "differences" in coding patterns, regardless of the source, would make the MA plan coding "inaccurate" for purposes of implementing risk adjustment.[36]

   This reading of the word "inaccurate" is supported by floor statements made by Senator Grassley, Congressman Barton, and Congressman Thomas. Senator Grassley made the following floor statement; the other two committee chairs made very similar statements:

   > Section 5301 and the joint statement which accompanied the conference report in the Senate requiring adjustments for differences in coding patterns is intended to include adjustments for coding that is inaccurate or incomplete *for the purpose of establishing risk scores that are consistent across both fee-for-service and Medicare Advantage settings*, even if such coding is accurate or complete for other purposes. This will ensure that the goal of risk adjustment—to pay plans accurately—is met.[37]

3. In CMS's publication in 2014 regarding measuring coding intensity, Kronick and Welch stated:

   > As noted, payment to MA plans is calibrated based on coding patterns in FFS. *If, for example, Jane Doe would have a risk score of 1.0 if she were in FFS, the*

---

[35] Deficit Reduction Act of 2005, 120 Stat. 50, Pub. L. 109-171 (Feb. 8, 2006),
https://www.govinfo.gov/content/pkg/PLAW-109publ171/pdf/PLAW-109publ171.pdf.
[36] 2010 Final Rate Notice.
[37] 152 Cong. Rec. S438 (daily ed. Feb. 1, 2006) (statement of Sen. Charles Grassley) (emphasis added); *see also id.* at H46 (statement of Rep. Joseph Barton) (similar); *id.* at H54 (statement of Rep. William Thomas) (similar).

*Confidential*

> *implicit assumption in the design of the MA payment system is that she would have the same risk score of 1.0 if she were enrolled in MA.* Alternatively, if the same Jane Doe had a risk score of 1.1 if enrolled in MA, then her plan would be overpaid. As we use the phrase, "coding intensity" is the difference between the scores that a group of beneficiaries would have if enrolled in MA and their scores in FFS . . . . [F]or the purposes of creating an equitable MA payment system, the relevant question is whether MA risk scores are systematically different than those risk scores would be in FFS . . . . Suppose, for example, that average expenditure per FFS beneficiary is $10,000/ year, and that the average risk score for all FFS beneficiaries is 1.0. The goal of the payment system is to assure that—if all of those beneficiaries were to enroll in MA—the average payment to MA plans would be approximately $10,000 per beneficiary . . . . *The goal of the risk adjustment system is* to assure that MA plans that enroll sicker-than-average beneficiaries are paid appropriately, but *not to increase payment for an average beneficiary*.[38]

The same would be true of risk adjustment in the opposite direction as well. That is, the goal of risk adjustment is also not to decrease payment for average beneficiary.

Should the Government succeed in removing certain HCCs (relative values) due to unsupported codes, and thus lower UHG's risk scores and the related payment in this case, the government will be introducing an inconsistency in risk scores between the TM and the MA programs for the same population, assuming that coding intensity adjustment appropriately adjusts for intensity differences and all else is equal. In the TM data, the risk scores for any population cohort are calculated based on all available unsupported and supported diagnosis codes. However, this same population cohort, if enrolled in UHG, would not have any part of the risk score calculated on diagnoses that are known to be unsupported. As such, the risk scores for the same population cohort may be less in the MA program than in the TM program. Thus, the Government may be introducing a difference that violates the established and core tenet of same risk score for same cohort, regardless of the program.

## III.  Alternative calibrations of the CMS-HCC risk model based on simulating the removal of unsupported diagnosis codes provide evidence that unsupported codes in the TM data reduce dollar coefficients and relative values compared to risk models developed with only supported codes.

To understand the effects of unsupported codes on the MA risk adjustment model, I have simulated the removal of unsupported diagnosis codes in the TM data and studied the effects on the MA risk adjustment model.

---

[38]  R. Kronick & W.P. Welch, *Measuring Coding Intensity in the Medicare Advantage Program*, 4 Medicare & Medicaid Research Review (2014), https://www.cms.gov/mmrr/downloads/mmrr2014_004_02_a06.pdf (emphasis added).

*Confidential*

CMS has also performed analyses to address how the MA model would change if unsupported diagnosis were removed from the development of the model.[39]  CMS's work was in support of its analysis on whether an FFS Adjuster was needed in its application of penalty calculations for RADV.  My disagreements with CMS's ultimate findings have been published in comments,[40] where I detailed how the flaws in CMS's methodologies led to erroneous conclusions.[41]  However, I agree with one of CMS's findings: in its development of the revised risk model, CMS confirmed that the dollar coefficients on average would increase when removing unsupported diagnosis codes.

I have revisited the risk adjustment development analysis based on revised data received as part of discovery for this case to further understand and test what would happen to MA payment should the MA risk adjustment model be based on only supported diagnosis codes.  My additional work, which is fully documented in Appendix I, included the following process:

- The original 2017 model for the Community, Non-Dual, Aged, Continuing Enrollee cohort was first replicated based on the CMS provided beneficiary input file.
- Estimated HCC error rates based on statistically valid samples from the TM FFS data were obtained from another expert.
- A number of simulations of removing unsupported HCCs (based on the HCC error rates) from the beneficiary input file were tested to see how dollar coefficients and relative values varied.  These simulations include:
  - Random on/off
  - Scalar Method
  - On/off by Number of Charts
  - Scalar Method by Number of Charts
- Revised relative values and dollar coefficients from the recalibrated risk models were compared to the original model.
- These revised relative values were applied to beneficiary risk profiles in the UHG Final Model Output Data Files to confirm impact at a contract level.

---

[39]  *See* CMS: *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits*, https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Other-Content-Types/RADV-Docs/RADVMethodology.pdf; *Fee for Service Adjuster and Payment Recovery for Contract Level Risk Adjustment Data Validation Audits*, (Oct. 26, 2018), https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/FFS-Adjuster-Executive-Summary.pdf; *Fee for Service Adjuster and Payment Recovery for Contract Level Risk Adjustment Data Validation Audits - Technical Appendix*, https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/FFS-Adjuster-Technical-Appendix.pdf; *Addendum to the Fee-For-Service Adjuster Study*, https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/RADV-Provision-CMS-4185-N4-Data-Release-June-2019.zip.

[40]  Paper, UnitedHealth Group, "*Actuarial Report on Medicare Advantage FFS Adjuster*," (Aug. 28, 2019), https://www.regulations.gov/document/CMS-2018-0133-0263.

[41]  CMS initially concluded that there was no material impact to the risk adjustment model nor to MA payment resulting from developing the model based only on supported diagnosis codes.  This conclusion was based on introducing a new and never-used-before "Inflated Post-Audit Risk Score" adjustment to offset the change in relative risk values and HCC beneficiary error rates that were incorrectly developed.

*Confidential*

- Further testing was performed to understand how removing costs in addition to removing unsupported HCCs impacts relative values.

My analyses indicate that the impact to the MA risk adjustment model of removing unsupported diagnoses, regardless of the manner in which unsupported HCCs are removed, are consistent with those I previously disclosed to CMS in my published comments. Specifically: 1) the average dollar coefficients increase, 2) the average relative values of the model increase, 3) the resulting risk scores to the MAOs also increase as a result when applying the revised relative values to existing MAO data, and 4) results do not change even if expenditures from unsupported diagnoses are removed.

An equivalent, and perhaps more important, conclusion of the analysis is that the unsupported diagnosis codes in the TM data result in reduced relative values on average in the current risk adjustment model from what they would have been had CMS developed the model on only supported codes. That is, unsupported HCCs in the TM data dilute the average relative values currently used in MA payment.

**Illustration Using a Simplified Risk Model**

These conclusions can be illustrated with a simplified risk model with only one HCC. If the model is designed with supported and unsupported diagnoses (unaudited data), the payment for one diagnosis will be calculated based on costs associated with beneficiaries who have the diagnosis (supported codes) and some who do not (unsupported codes). The unsupported codes will dilute (reduce) the average cost and average relative value used for MA payment for that diagnosis. The risk adjustment model therefore will underpay MAOs for beneficiaries coded with the diagnosis; however, because MAOs will receive payment for beneficiaries who have the diagnosis (supported codes) and some who do not have it (unsupported codes), the MAOs will ultimately receive appropriate payment consistent with the model design if their rate of unsupported codes for this condition mirrors that of CMS. In other words, MAOs will generally be underpaid for all diagnoses, but will make up for this underpayment because they will also be paid for beneficiaries who do not have the supported diagnoses (unsupported codes).

In contrast, if the model were designed with only audited data, that is, only supported codes, then the payment for each diagnosis would be higher, but there will be fewer beneficiaries with those diagnoses because the audit will remove any unsupported codes. If the model is applied with that design, that is, by paying MAOs only on audited data, the MAOs will then be paid accurately because they will receive the higher payment but only for those beneficiaries who have the diagnosis supported and not for any unsupported codes.

This dynamic can be illustrated further with a numerical example. Assume a population of five beneficiaries with only one potential Diagnosis – Diagnosis X. The cost of treating beneficiaries with a supported Diagnosis X is always $5 per beneficiary, the cost of treating someone without Diagnosis X supported is always $0, and that there are four beneficiaries who have Diagnosis X supported and one who does not have the code supported. The total cost of treating these five beneficiaries is $20 ($5+$5+$5+$5+$0) and the average cost is $4 ($20/5). The presence of the unsupported code diluted the average cost of treating Diagnosis X from $5 to $4. Therefore,

MAOs are underpaid $1 for every beneficiary with Diagnosis X. MAOs, however, will be adequately paid in the aggregate so long as they receive payment for unsupported codes and there is at least one unsupported beneficiary with Diagnosis X out of every five diagnosed. Put simply, receiving $4 for five beneficiaries (lower payment applied to unaudited data) will be the same as receiving $5 for four beneficiaries (higher payment for only audited data).

Inaccurate payment occurs when the model is applied in a manner inconsistent with its design. For example, if a model is based on unaudited data but payment is based only on audited data, MAOs will be underpaid because they will receive the diluted payment for each supported diagnosis and no payment for the unsupported codes to make up for those underpayments. Using the example above, if the model is applied solely to audited (supported) data, an MAO with five beneficiaries coded with Diagnosis X but only four with supported diagnoses would receive a total payment of $16 (four payments of $4 each) when its true cost was $20 (four patients at $5 each and one at $0).

Because of these diluted relative values created from unsupported TM HCCs in the risk model development data, actuarially sound risk adjustment depends on applying the diluted relative values to a combination of both supported and unsupported HCCs in the MA data. That is, accurate payment depends on both supported codes and unsupported codes being present in the MA data in a similar pattern to what exist in the TM data used to build the model.

Using the simplified example above (which is designed to illustrate the overall average impact of unsupported codes on payment), in the MAO one out of every five beneficiaries coded with Diagnosis X was unsupported. If an MAO plan has the same one out of five (20%) error rate for Diagnosis X, it would be paid consistent with the design. If, however, it has a higher error rate for Diagnosis X, then it would be overpaid because it will be receiving the wrong and higher payment more than one out of every five times. Accordingly, if the MAO's error rate is lower than 20%, the MAO will be underpaid.

This again can be illustrated with a simplified example. If the MAO has six beneficiaries all coded as having Diagnosis X, it would receive $24 (six times $4). If only four of those are supported, the error rate would be 33%, which is higher than the 20% built into the model. Accordingly, the MAO would be overpaid because it received $24 when its actual costs were $20 (four times the actual cost of $5 per beneficiary with two beneficiaries at $0 cost). If all six beneficiaries had supported codes, the error rate would be 0% and thus lower than the 20% built into the model. Accordingly, the MAO would be underpaid because it would have received $24 when its actual costs was $30 (six times $5 per beneficiary).

Removing the unsupported HCCs from the MA data, as the Government intends to do here, may effectively result in a double-reduction of MA payment due to unsupported codes—once via paying the MAOs on reduced relative values (resulting from including unsupported TM HCCs in the development of the MA model) and secondly by removing payment related to unsupported codes. In the example above, the first reduction is the fact that the payment for Diagnosis X is only $4 due to including unsupported codes in the model design. The second reduction would be applying the model on audited data only and not paying the MAO for the fifth unsupported beneficiary. In short, because the relative values already build in a reduction that accounts for a

certain level of error in CMS's TM data, neither the Government nor UHG can know whether there is an overpayment in the UHG data without first accounting for the TM error rate. And if UHG's error rate is consistent with or lower than the rate in the TM data, then requiring UHG to delete unsupported codes may risk double-dipping against UHG.

**Algebraic Proof of Result**

The fact that all tested scenarios of the recalibrated risk models result in higher average relative values is not surprising. Basic algebra, along with the basic tenets of regression and risk adjustment, prove that the average relative value from any recalibrated model using fewer markers must be higher than average relative value from the original risk adjustment model.

## **Definitions**

$N = number\ of\ beneficiaries$

$T = number\ of\ relative\ values$

$\vec{v} =$
$array\ of\ relative\ values\ for\ all\ demographic\ and\ HCC\ variables\ for\ original\ model =$
$(v_1, v_2, v_3 \ldots v_T)$

$m_{tk} = 0\ or\ 1,$
$for\ variable\ t\ (ranging\ from\ 1\ to\ T), and\ for\ beneficiary\ k\ (ranging\ from\ 1\ to\ N)$

Similarly for the recalibrated model:

$\vec{v}' =$
$array\ of\ relative\ values\ for\ all\ demographic\ and\ HCC\ variables\ for\ revised\ model$
$with\ diagnoses\ and\ payment\ removed$
$m'_{tk} = markers\ 0\ or\ 1\ for\ recalibrated\ model\ for\ variable\ t\ and\ beneficiary\ k$

It follows that:

$$\sum_{k=1}^{N}\sum_{t=1}^{T} m_{tk} = number\ of\ markers\ in\ baseline\ model\ across\ all\ beneficiaries$$

$$\sum_{k=1}^{N}\sum_{t=1}^{T} m'_{tk} = number\ of\ markers\ in\ revised\ model\ across\ all\ beneficiaries$$

And:

$$\bar{v} = Average\ relative\ value\ for\ original\ model = \frac{\sum_{k=1}^{N}\sum_{t=1}^{T} m_{tk} v_t}{\sum_{k=1}^{N}\sum_{t=1}^{T} m_{tk}}$$

*Confidential*

$$\bar{v}' = average\ relative\ value\ for\ revised\ model = \frac{\sum_{k=1}^{N}\sum_{t=1}^{T} m'_{tk} v'_t}{\sum_{k=1}^{N}\sum_{t=1}^{T} m'_{tk}}$$

Basic tenets of risk adjustment indicate that the average risk score over the population for both the original model and the recalibrated model is 1.0. That is:

(a) $\quad\dfrac{\sum_{k=1}^{N}\sum_{t=1}^{T} m_{tk} v_t}{N} = 1$ AND $\quad\dfrac{\sum_{k=1}^{N}\sum_{t=1}^{T} m'_{tk} v'_t}{N} = 1$

Multiplying both of these equations by number of beneficiaries 'N' provides the following equalities:

(b) $\quad\displaystyle\sum_{k=1}^{N}\sum_{t=1}^{T} m_{tk} v_t = N$ AND $\quad\displaystyle\sum_{k=1}^{N}\sum_{t=1}^{T} m'_{tk} v'_t = N$

Assume that the number of markers in the revised model is less than the number of markers in the original model. That is, some of the markers $m'_{tk}$ change from 1 to 0 as a result of auditing the markers.

This means that the sum of all markers in the revised model using only supported codes is less than the sum of the markers in the original model:

(c) $\quad\displaystyle\sum_{k=1}^{N}\sum_{t=1}^{T} m'_{tk} < \sum_{k=1}^{N}\sum_{t=1}^{T} m_{tk}$

It follows algebraically that:

(d) $\quad\dfrac{1}{\sum_{k=1}^{N}\sum_{t=1}^{T} m'_{tk}} > \dfrac{1}{\sum_{k=1}^{N}\sum_{t=1}^{T} m_{tk}}$

We then can maintain the inequality in (d) by multiplying each side of the inequality by number of beneficiaries 'N':

(e) $\quad\dfrac{N}{\sum_{k=1}^{N}\sum_{t=1}^{T} m'_{tk}} > \dfrac{N}{\sum_{k=1}^{N}\sum_{t=1}^{T} m_{tk}}$

Using substitution, we can replace the N {using the equivalences in (b)} in the inequality. Now we have:

(f) $\quad\dfrac{\sum_{k=1}^{N}\sum_{t=1}^{T} m'_{tk} v'_t}{\sum_{k=1}^{N}\sum_{t=1}^{T} m'_{tk}} > \dfrac{\sum_{k=1}^{N}\sum_{t=1}^{T} m_{tk} v_t}{\sum_{k=1}^{N}\sum_{t=1}^{T} m_{tk}}$

This is the same as $\bar{v}' > \bar{v}$.

That is, the average relative value of the revised model is greater than the average relative value of the original model.

*Confidential*

1703

This proof holds regardless of what the expenditures are in the regression calculations or the magnitude of the HCC error rate.

## IV. Retrospectively removing unsupported diagnosis codes and the associated revenue would materially change the assumed payment methodology relied on in the bid submission process, nullify the actuarial certification, and underpay MAOs for the benefits offered.

MAO payment rates, benefit plans, and beneficiary premiums are not unilaterally set by CMS. Rather, they are the result of the bid submission process in which MAOs and their actuaries must project the revenue requirement of providing the proposed benefits to an enrolled population in an actuarially sound manner. MA payment relies on this revenue requirement, along with individually calculated risk scores for the beneficiaries that enroll, to calculate the risk adjusted capitation provided to MAOs.

A lynchpin between the bid process and the payment process that ensures actuarially sound payment is the definition of a beneficiary with a "national average risk profile." In fact, as part of the actuarial certification of MA bids, actuaries must attest that the bids are based on the average revenue requirements in the payment area for a MAPD enrollee with a national average risk profile. In order to certify to this requirement, the actuary must understand the contract year risk model in order to project the risk score for the MAO's expected population.

An enrollee with a national average risk profile refers to an average TM beneficiary with a risk score of 1.0 (also called a "1.0 beneficiary"). Projecting the revenue for a national average risk profile inextricably links the bid to the risk adjustment model in the contract year. As I will show, MAOs must have a correct understanding of the national average risk profile and method for computing risk scores in order to accurately determine a benefit design, beneficiary premiums, and payment rates that are financially viable.

In practice, actuaries calculate the needed revenue for a 1.0 beneficiary through completion of the BPT worksheets using the following general steps:

1. Actuaries project the cost for beneficiaries they anticipate will enroll in the plan in the contract year. The anticipated enrollment generally reflects the membership that has historically enrolled in the plan along with any expected changes in that membership. In practice, the estimated cost is calculated by trending the historical medical costs of the MAO's beneficiaries to the contract year, adjusting the costs to reflect the benefits being proposed, and adding in administrative expenses and margin.

2. Actuaries estimate the average contract year's risk score for this anticipated enrollment. The anticipated enrollment almost never reflects a 1.0 beneficiary.

3. The Government's standardized BPT worksheet uses prescribed calculations to adjust the amounts actuaries project in #1 to calculate the revenue requirement for the anticipated population for the TM benefit.

*Confidential*

4.  CMS's standardized BPT worksheet then divides the required revenue in #3 above by the estimated contract year's risk score in #2 to determine the revenue requirement for an enrollee with a national average risk profile (a 1.0 beneficiary). This revenue requirement is called the "Standardized A/B Bid" in the BPT and is the same amount that actuaries opine on in the certification of the BPTs.

When submitting the bids, actuaries must provide both the BPT worksheets along with required supporting documentation and an actuarial certification. The supporting documentation describes how the actuaries completed the worksheets concentrating on detail for the estimated cost (#1) and risk scores (#2) above.

Actuaries need a complete understanding of the contract year risk score development in order to estimate the risk score for the anticipated population (#2). This includes government rating methodologies and the CMS-HCC model descriptions, as well as operational changes in how the MAO and its providers intend to code diagnoses. The Government validates the importance of accurately projecting risk scores with the following requirements:

- The Social Security Act Section 1853 mandates advance notice to the MAOs by requiring that CMS provide notice of assumptions and risk adjustment methodology in the annual rate letter and notice of changes at least 45 days in advance of the bid submission. As part of the 21st Century Cures act, CMS provided even a longer period (more than 60 days) for review of proposed changes to the CMS-HCC risk model.[42]

- The MA BPT instructions specify that risk scores be estimated based on the methodology as discussed in the Rate Announcement and reflect plan specific coding trend.[43] They indicate that the coding trend be based on historical year over year risk score changes. In addition, the instructions indicate "[i]f deviations from previous trend are expected in the payment year, provide justification for such changes in the supporting documentation."[44]

The actuarial profession also endorses this idea. ASOP 8, which provides guidance to actuaries submitting regulatory rate filings, states "the actuary should adjust past experience for any known or expected changes that, in the actuary's professional judgment, are likely to materially affect expected future results."[45] For the MA bid process, this includes changes in the risk adjustment process and the national average bid profile.

During the Review Period, UHG actuaries disclosed the following in their supporting documentation of the projected risk scores:

---

[42] As amended by the 21st Century Cures Act, section 1853(a)(1)(I)(iii) of the Social Security Act requires that CMS provide an opportunity for review of the proposed changes and a public comment period of at least 60 days for proposed changes under section 1853(a)(1)(I) to the Part C risk adjustment model.

[43] Instructions for Completing the Medicare Advantage Bid Pricing Tools for Contract Year 2015, at 45 (Apr. 8, 2014).

[44] Instructions for Completing the Medicare Advantage Bid Pricing Tools for Contract Year 2015, at 155 (Apr. 8, 2014).

[45] ASOP No. 8 § 3.2.5.

*Confidential*

- In every year during the Review Period: "As part of the preparation of the bids, we did not attempt to validate any actual or projected risk scores through a review of applicable medical records or of the systems used to submit RAF data to CMS."[46]

- And starting with the BPT submissions in 2015: "We also adjusted projected risk scores to account for changes in our medical record review processes. Specifically, based on multiple conversations with CMS and CMS's treatment of medical record review in its recent rulemaking process, the health plan has decided to cease one of its prior processes that identified and deleted certain diagnoses codes through the medical record review process."[47]

Based on these disclosures, it is clear that UHG actuaries projected risk scores for contract years during the Review Period based on diagnosis codes that were not validated in medical records. Thus, UHG projections of risk scores are higher than they would have been had UHG accounted for the removal of unsupported codes from the population. For example, the projected average risk score of an unaudited population may be 1.05 but once unsupported codes are removed the projected risk score may decrease to 0.98. As a result, the average revenue requirement for an enrollee with a national average risk profile, as certified by the actuary, is lower than it would have been had their data been subject to such coding programs.

The actuaries set benefits and premiums based on this risk score projection and related assumptions, setting benefits on a CMS revenue amount that was higher than it would have been had the unsupported diagnosis codes been deleted. This resulted in additional supplemental benefits being offered by the plan. These assumptions were reviewed by CMS through Desk Reviews and Bid Audits. Ultimately, the UHG bid submissions, including the methodology used to set risk scores, were approved by CMS.

Below I further explain how the bid amounts and actual payments are linked to the projected risk score and the national average risk profile, and how any significant retrospective change to the risk score definitions (as are being contemplated in this case) can result in underpayments or overpayments of revenue.

**MAO Payment Depends on the Required Revenue for the National Average Risk Profile Defined in the BPT.**

"The Required Revenue for the National Average Risk Profile" directly affects the payment to the MAO and is an amount developed and submitted as part of the MAO bid. The Part C revenue that CMS pays MAOs for an enrolled member uses the formula:

[(Risk Score of the beneficiary) times (the Standardized A/B bid)] plus (the Rebate).

The "Standardized A/B Bid" (the 1.0 bid) in this formula is the Required Revenue for the National Average Risk Profile for covering the TM benefits. The formula shows that payment to MAOs is

---

[46] *See* UHG Bid Documentation for 2009-2016 (AEO).
[47] *See* UHG Bid Documentation for 2015-2016 (AEO).

not only dependent on the individual member's risk score, but also the amount of the Standardized A/B Bid and Rebate, which are both determined via the bid submission process.

To the extent the bid submission under/overestimates the required revenue for a national average risk profile, the MAO will be under/overpaid. CMS recognizes the significance of the 1.0 bid by requiring an actuarial certification stating that in accordance with Federal law, the bid(s) are based on the "average revenue requirements in the payment area for a Medicare Advantage/Prescription Drug enrollee with a national average risk profile."[48]

**The Required Revenue for the National Average Risk Profile Depends on an Accurate Projection of Risk Scores for the Expected Population.**

Projecting an accurate 1.0 bid through bid submission depends on a thorough understanding of the MAO payment process, including how risk scores will be determined. The MAO's estimate of the Required Revenue for the National Average Risk Profile is derived in part from projected risk scores.

Table 6 below illustrates the major components of a BPT.

**Table 6 - Major Components of a BPT**

| Description | PMPM [1] |
|---|---|
| a. Standardized A/B Benchmark (1.0) | $952.38 |
| b. Projected Average Risk Score for Plan Population | 1.05 |
| c. Plan A/B Benchmark (a*b) | $1,000.00 |
| d. Plan A/B Bid for Contract Year (for expected plan population) | $900.00 |
| e. Standardized A/B Bid (1.0 Bid) (d/b) | $857.14 |
| f. Savings (c-d) | $100.00 |
| g. Rebate/Amt Available for Supp Benefits (.75*f) [2] | $75.00 |
| h. Expected payment/required revenue for benefits provided (b*e+g) | $975.00 |

[1] PMPM refers to Per Member Per Month amount.

[2] The rebate percentage can vary based on star rating of the plan. We are using 75% in this example.

The Standardized A/B Bid in Row e (which is certified as being based on the national average risk profile) is calculated by dividing (d. the Plan A/B Bid for the Contract year) by the (b. Projected Average risk score for the plan population).

Row d or the A/B Bid is the estimated costs for the MAO of offering the TM benefits, including administrative expense and margin requirements. This amount is normalized to reflect costs for a national average risk profile by dividing it by (b. Projected Risk Score). That is, since the Plan A/B Bid for a 1.05 average risk member is $900, the Standardized A/B Bid (in row e) for a national average risk member is $900/1.05 or $857.14. As you will see in the following section, the

---

[48] Instructions for Completing the Medicare Advantage Bid Pricing Tools for Calendar Year 2017, at 98.

*Confidential*

Standardized A/B Bid is the basis for risk adjusted payment in the contract year and must be accurate. Any misestimate will result in incorrect payment.

To appropriately identify the required revenue for a national average risk member, the Medicare actuary must accurately assign a risk score to the expected plan population (the 1.05 in this example). If the projected risk score (item b.) is too high, the standardized A/B bid will be understated. If the projected risk score (item b.) is too low, the standard A/B bid will be overstated. See the example below for an illustration.

**Table 7 - Illustrations of Over- and Under-Estimating Risk Score**

| Description | Baseline | Scenario A Over-estimate of Risk Score | Scenario B Under-estimate of Risk Score |
|---|---|---|---|
| b. Projected Average Risk Score for Plan Population | 1.05 | 1.1 | 1 |
| d. Plan A/B Bid for Contract Year (for expected plan population) | $900.00 | $900.00 | $900.00 |
| e. Standardized A/B Bid (1.0 Bid) (d/b) | $857.14 | $818.18 | $900.00 |
| Result | | Standardized bid too low | Standardized bid too high |

During the Review Period for this case, UHG and its actuaries explained that the projected risk scores did not reflect validation of diagnosis codes in the medical record. This means that the projected risk score was higher than it would have been had it reflected the reductions in risk scores that result from identifying and removing unsupported codes. For example, an unaudited population may have an average risk score of 1.1, but an audit may reveal that on average .05 of the risk score arises from unsupported codes and thus the audited average risk score would be 1.05. As reflected in the chart above, the unaudited 1.1 average risk score results in a standardized bid of $818.18 and the audited 1.05 average risk score would result in a higher standardized bid of $857.14.

As a result, UHG bid lower than it would have based on the expectation that the data included unsupported codes. UHG expected the national average risk profile member with a 1.0 risk score to be paid in a manner consistent with how UHG calculated and certified its bid. If CMS retrospectively changes how risk scores are calculated by removing known diagnoses, that is a material change not contemplated in the bid submission or the actuarial certification.

**MA Payment Depends on the Required Revenue for the National Average Risk Profile (the Standardized A/B Bid) Defined in the BPT.**

The Standardized A/B Bid (e.) is then used for MA payment for each beneficiary enrolled in the plan.  Continuing with the baseline illustration, Table 8 shows the plan payment for beneficiaries with various risk scores.

**Table 8 - Illustrations of Plan Payment for Various Beneficiaries**

| Beneficiary | Contract Year Risk Score (a) | Standardized A/B Bid (for Nat'l Average Profile) from BPT (b) | Rebate (c) | Plan Payment from CMS (a) * (b) + (c) |
|---|---|---|---|---|
| 1 | 0.80 | $857.14 | $75.00 | $760.71 |
| 2 | 0.85 | $857.14 | $75.00 | $803.57 |
| 3 | 0.90 | $857.14 | $75.00 | $846.43 |
| 4 | 0.95 | $857.14 | $75.00 | $889.28 |
| 5 | 1.00 | $857.14 | $75.00 | $932.14 |
| 6 | 1.05 | $857.14 | $75.00 | $975.00 |
| 7 | 1.10 | $857.14 | $75.00 | $1,017.85 |
| 8 | 1.20 | $857.14 | $75.00 | $1,103.57 |

As you can see from the table, the filed Standardized A/B Bid Amount listed in column (b) is foundational to payment in the contract year.  If it is misestimated, it will affect payment for every enrolled beneficiary.

**Retrospectively Changing the Risk Score Methodology Invalidates the Actuarial Certification, Results in Underpayment and Ruins the Actuarially Sound Rating System.**

Any significant change to the rating system from what was assumed in the rate filing will introduce financial risks and disrupt the actuarial soundness of the MA rating program.  As part of the bid submission, MAOs promise to pay for claims incurred at a benefit level for individuals based on an understanding of the revenue they will receive.  Significantly reducing the payments to MAOs without providing an opportunity to adjust the benefits or collect additional premiums will almost certainly result in financial risks.  Significant changes could take multiple forms, including changes to the 1.0 bid, changes to how risk scores are calculated, or eligibility changes on who can enroll.

In this case, the Government is proposing to significantly change how UHG is paid for past contract years by changing the methodology of calculating the risk scores.  Here, the Government has alleged that approximately 28 million codes are unsupported and that any HCCs and revenue resulting from these codes should be removed.  This methodology is clearly at odds with the assumptions UHG actuaries made during the bidding process, as documented in the supporting documentation that indicated risk scores were not validated in the medical record.

Reducing the risk scores for unsupported diagnosis codes results in the risk-adjusted capitation amounts for the population to be understated relative to the methodology expected in the bid. The revenue that MAOs receive for covering the TM benefits would be less than what was certified to be needed based on assumptions in the bid. By effectively changing the method in which risk scores are calculated from what was assumed in the bids, the Government would be changing the definition of the enrollee with a national average profile. At this adjusted revenue amount, the MAO would be underpaid, not receiving enough revenue to cover its expenses and obligations. The change relative to what was bid invalidates the actuarial certification and ruins the actuarial sound payment system.

The table below illustrates how the standardized A/B Bid (row e) would have changed had UHG assumed in its bid that it would undertake coding activities to identify and delete unsupported codes. In this illustration, we have assumed the removal of unsupported codes would have reduced the projected average risk score (row b) by approximately 7% (from 1.05 to 0.98).

**Table 9 - Development of Bids Under Alternate Scenarios**

| Description | Scenario | |
|---|---|---|
| | **Original Bid** (assuming plan does not anticipate coding activities to identify and remove unsupported codes) | **Revised Bid** (assuming plan anticipates coding activities to identify and remove unsupported diagnoses) |
| **Illustrative development of submitted bid** | | |
| a. Standardized A/B Benchmark (1.0) | $952.38 | $952.38 |
| b. Projected Average Risk Score for Plan Population | 1.05 | 0.98 |
| c. Plan A/B Benchmark (a*b) | $1,000.00 | $933.33 |
| d. Plan A/B Bid for Contract Year (for expected plan population) | $900.00 | $900.00 |
| e. Standardized A/B Bid (1.0 Bid) (d/b) | $857.14 | $918.37 |
| f. Savings (c-d) | $100.00 | $33.33 |
| g. Rebate/Amt Available for Supp Benefits (.75*f) | $75.00 | $25.00 |
| h. Expected payment/required revenue for benefits provided (b*e+g) | $975.00 | $925.00 |

In the first column, the table shows an original bid that requires benefits (including administrative expense and margin) worth $975 be offered to beneficiaries. If, alternatively, the projected risk scores would be estimated based on the assumption that the plan would undertake coding activities to identify and remove unsupported codes, the revised bid requires only $925 of benefits (including administrative expense and margin) be offered to beneficiaries. The changed risk score model also results in a change to the standardized A/B Bid, where the original bid had an $857.14 figure and the revised bid reflects an increased standardized A/B bid of $918.37. These amounts reflect costs

to cover the national average risk profile included in the certification. As you can see, the assumptions for the projected risk score directly impact amounts required to be certified by the actuary.

As a result of the revised bid, even though the expected population would have been the same as in the original bid, the amount of rebate available for supplemental benefits would have reduced from $75 PMPM to $25 PMPM. Total payment would reduce from $975 to $925, about $50 PMPM. This illustration shows that for the same member premium, benefits would need to be reduced by about $50 PMPM from what was originally offered, or the MAO would need to go back and collect the premiums equal to $50 per month from every beneficiary in order satisfy the actuarial certification under the revised assumption.

See the table below for the illustration how payment resulting from these two bids would have varied.

**Table 10 - Illustration of Variation in Payment Resulting from Alternate Bids**

| Description | Scenario | |
|---|---|---|
| | **Original Bid (assuming plan does not anticipate implementing coding program to identify and remove unsupported codes)** | **Revised Bid (assuming plan anticipates implementing coding program to identify and remove unsupported codes)** |
| **Illustrative development of submitted bid** | | |
| a. Standardized A/B Benchmark (1.0) | $952.38 | $952.38 |
| b. Projected Average Risk Score for Plan Population | 1.05 | 0.98 |
| c. Plan A/B Benchmark (a*b) | $1,000.00 | $933.33 |
| d. Plan A/B Bid for Contract Year (for expected plan population) | $900.00 | $900.00 |
| e. Standardized A/B Bid (1.0 Bid) (d/b) | **$857.14** | **$918.37** |
| f. Savings (c-d) | $100.00 | $33.33 |
| g. Rebate/Amt Available for Supp Benefits (.75*f) | $75.00 | $25.00 |
| h. Expected payment/required revenue for benefits provided (b*e+g) | $975.00 | $925.00 |
| **Payment Scenario I - assuming risk scores include unsupported diagnoses & population as expected in original bid** | | |
| i. Risk score of population (including unsupported diagnoses) | 1.05 | 1.05 |
| j. Payment based on all diagnoses for TM benefits (e*i) | $900.00 | $964.29 |
| k. Payment based on all diagnoses for offered benefits (e*i+g) | $975.00 | $989.29 |
| l. Overpayment/(Underpayment) (k-h) | $0.00 | $64.29 |

| Result: | Actuarially Sound and consistent with bidding assumptions | Overpayment, not consistent with bidding assumptions |
|---|---|---|
| **Payment Scenario II - assuming risk scores do not include unsupported diagnoses & population as expected in original bid** | | |
| m. Risk score of population (excluding unsupported diagnoses) | 0.98 | 0.98 |
| n. PMPM Payment for TM benefits at adjusted risk score (e*m) | $840.00 | $900.00 |
| o.  Difference from expected payment/required revenue (n-j) | ($60.00) | ($64.29) |
| | | |
| p. PMPM Payment for offered benefits at adjusted risk score (n+g) | $915.00 | $925.00 |
| q. Overpayment/(Underpayment) (p-h) | ($60.00) | $0.00 |
| Result: | Underpayment, not consistent with bidding assumptions | Actuarially Sound and consistent with bidding assumptions |

This illustration shows several results:

1) Retrospectively changing the risk adjustment model to adjust risk scores for HCCs that are unsupported (Scenario II payment with the original bid) results in payments that are lower than what was projected.  In this case, the benefits were set based on a projection of revenue that was $60 PMPM higher than actual revenue collected (p-h in the original bid column). This underpayment is directly related to the misestimate of the Standardized A/B Bid amount.  That is, the actuarially certified amount related to the national average risk profile was not correct and resulted in underpayment.

2) If the unsupported codes were removed from the projected risk scores at the time of bidding (Scenario II payment with a revised bid), the bid could be adjusted so that the ultimate payment matches what was anticipated (p=h in the revised bid column).  However, in this example, the supplemental benefits provided to members as part of the rebates would have been based on $50 PMPM less revenue ($75 - $25), which is the difference in rebates in row g between the two columns.

3) While CMS pays the same amount for TM benefits under either the original or revised bid (see row j in original bid versus row n in the revised bid), the effect of revising the bid for unsupported diagnosis on MA payment would simply reduce their rebate amount (from $75 to $25 in row g), which in turn would reduce the supplemental benefits they offer to their beneficiaries.

*Confidential*

UHG projected risk scores without validating them in the medical record, and CMS accepted those bids under these assumptions. A decision now to remove a material amount of unsupported HCCs creates a retrospective change to the rating, disrupts the actuarially sound payment system, nullifies the actuarial certification, and results in underpayment to the MAO. The actuarial certification, which protects both the enrolled beneficiaries and the MAO from significant risk of insolvency, would no longer apply.

## V. All of the previous opinions except the second opinion are directly applicable to Part D payment for MAPD plans as well.

It is my opinion that Part D risk-adjusted payment resulting from a MAO's submission of unsupported diagnosis codes does not necessarily result in overpayments. Classifying all such payments as "overpayments" is actuarially inappropriate, because it ignores both the fundamentals of the Part D rating program and how CMS developed the risk adjustment model.

Each opinion (except the second one[49]) is applicable because the Part D RxHCC model is developed in a similar manner to the CMS-HCC model in that it is a prospective model using HCCs built in part based on the diagnosis codes present in the TM claims data. As such, the RxHCC risk model was built on data that included a significant amount of HCC errors. The actuarial principle of Data Consistency means that the Part D risk model should be applied to data that includes both supported and unsupported codes. Like in MA, any single Part D payment or subset of payments based on unsupported diagnosis codes cannot be determined to be an overpayment without considering the overall unsupported HCC rate in the UHG data compared to the data used to develop the model.

Although we have not empirically studied the RxHCC model for impacts related to auditing the underlying diagnosis codes, the mathematical proof that the average relative value increases under alternative risk models based on audited data that I set forth above also applies to Part D. That is, the current relative values in the RxHCC model are diluted based on the unsupported codes included in the development data of the RxHCC model. Any additional reduction to Part D payment may double-reduce the payment for unsupported codes.

Furthermore, the actuarial certifications of the Part D rate filings also require that actuaries opine that the bids are based on the average revenue requirements for a Medicare Part D enrollee with a national average risk profile.[50] UHG's bid documentation of projecting risk scores also applies to the Part D bid development, resulting in a bid that is lower than it would have been had the risk scores been projected based on only audited codes. Reducing UHG Part D payment for unsupported codes materially changes the assumed payment methodology relied on in the bid submission process, nullifies the Part D actuarial certification, and underpays MAOs for the benefits offered.

---

[49] To my knowledge, CMS has not maintained that the Part D risk score should be the same for the same cohort regardless of program (TM vs. MAPD) and the DRA does not apply to Part D risk scores.

[50] Instructions for Completing the Prescription Drug Plan Bid Pricing Tool for Calendar Year 2017, p. 66.

*Confidential*

## CONCLUSION

The MA and PD risk adjustment models used for MAPD payment include unsupported diagnosis codes in the development of the relative values of each HCC.  Under the well-established actuarial principle that models should be applied consistent with their design, it is fundamentally incorrect to conclude that a payment to an MAO is an "overpayment" simply because a beneficiary's diagnosis code is not supported by the medical records.  Reducing risk scores and the associated payment for such unsupported diagnosis codes may introduce an unreasonable inconsistency between how the model was designed to calculate accurate payments and how it is being applied to MA data, ignoring the actuarial standards of ratemaking and the complexities of the risk adjustment system.  Furthermore, removing known unsupported diagnosis codes in MA data without a similar adjustment in the TM data may introduce a variation in risk scores between the TM and MA programs for the same population cohort, resulting in inaccurate payment and potential underpayment.

The relative values are currently diluted as a result of including unsupported HCCs in the development of the models.  Accurate payment depends on applying those diluted factors to both supported and unsupported codes in the MA data.  Retrospectively removing payment related to unsupported diagnosis codes unfairly changes the payment rules of the carefully constructed MA rating system.  UHG relied on those payment rules when developing and certifying its bids—which CMS itself approved.

*Confidential*

## DISCLOSURES, LIMITATIONS, AND QUALIFICATIONS

I am an employee of Wakely Consulting Group, LLC, an HMA Company ("Wakely"). Wakely was retained on behalf of UHG to provide an independent review and opinion of the allegations of the Complaint. Wakely is a premier actuarial consulting firm and, as such, has provided support to the majority of health insurers in the U.S. Past engagements with UHG include the following.

- Tool/product sales of:
  - WACA (Wakely ACA Database),
  - WRI (Wakely Risk Insights),
  - WPM (Wakely Pricing Model),
  - WNRAR (Wakely National Risk Adjustment Report),
  - WMRAT (Wakely Medicare Repricing Analysis Tool), and
  - RAPID-M (Identification of diagnoses discrepancies between sources – Medicare version)
- General consulting of Medicare Advantage topics
- Large Group Benchmarking
- ACA Pricing and Rate Filings
- Consulting on the FFS Adjuster

My personal affiliation with the prior work that Wakely has performed for UHG primarily includes the Paper, "*Actuarial Report on Medicare Advantage FFS Adjuster*," written in response to the Proposed Rule for the 2020 Medicare Advantage (MA) Program and Prescription Drug Benefit Program.

This report reflects my professional judgment. I was supported in my work by a team of individuals at Wakely who worked at my direction. My conclusions and report are based on my interpretation of actuarially sound payment and the supporting analysis Wakely performed at my direction.

I am currently a Member of the American Academy of Actuaries and am in good standing as a Fellow with the Society of Actuaries.

### Qualifications

I am a Principal and Senior Consulting Actuary of Wakely. As an actuarial consultant, I have helped clients with health analyses involving financial risk involving claims and revenue. My clients are primarily in the insurance and pharmaceutical industries and include Medicare Advantage and Part D plans, state and federal governments, and healthcare providers.

Much of my current work involves reviewing Wakely publications, client deliverables, and tool development for the firm. My direct consulting work primarily involves providing analyses regarding health policy for Medicare-eligible populations, including risk adjustment impacts in the Medicare Advantage and Part D programs, changes to the Medicare Advantage and Part D drug benefit, and the CMMI programs. These analyses include estimating the effects of policies on Federal spending and providing consultation on the feasibility of these programs and/or policy

changes. Done properly, feasibility studies include multi-year projections of revenues and costs and require a full understanding of both current and potential changes to the health care landscape across many spectrums: payer risk and solvency, current Medicare programs and offerings, network adequacy and requirements, provider reimbursement and contracting as well as member behavior and incentives.

Most of my career has been devoted to actuarial consulting, where my work has varied, but generally focused on MAPD programs – where actuarial certifications are required for annual rate submissions for both the medical and pharmacy plan designs. I began working for clients on Medicare rate submissions in 2000 and have signed the rate filings related to the Medicare medical and pharmacy benefits most every year since then. In addition to the rate filings, I also performed Part D reconciliations for many of the same MAOs where I certified the rate filings.

Over the years, I routinely presented the results of my financial estimates and analysis to insurers. I also presented on countless occasions to clients and have made numerous presentations to various audiences on a broad range of topics in health care.

I received a bachelor's degree from the University of Nebraska, a master's degree in mathematics from the University of Colorado, and a Fellowship of the Society of Actuaries. I also am a member of and in good standing with the Academy of Actuaries. A copy of my resume is attached as Appendix II to this report. My publications of the last ten years and the cases in which I have served as a testifying expert over the last four years are listed in my resume.

**Reliance**

In forming my opinions, I relied on various data and information. This data will be provided and is also referenced by citations in the body of my report.

**Other**

To prepare this report, Wakely is being compensated at a rate of $840 per hour for my services. Other members of the Wakely team are being compensated at the hourly amounts ranging from $170 to $790. The amount of my compensation did not depend in any way on the conclusions that I reached in this report.

Respectfully,

*Julia S Lambert*

Julia Lambert, FSA, MAAA
Principal and Senior Consulting Actuary

September 29, 2023

*Confidential*

# APPENDIX  I

## QUANTITATIVE ANALYSIS AND TESTING

The Centers for Medicare & Medicaid Services ("CMS") uses a combination of both supported and unsupported diagnosis codes from the Traditional Medicare ("TM") data when identifying and developing Hierarchical Condition Categories ("HCCs") for its CMS-HCC model. A team at Wakely working at my direction has conducted quantitative and theoretical testing to analyze the impact of using only supported (or audited) codes on CMS-HCC model coefficients and relative values. This appendix discusses the technical aspects of the simulations and the results of those recalibration analyses.

## OVERVIEW OF ANALYSES AND RESULTS

In assessing the impact of using only audited codes on the CMS-HCC model, the Wakely team first recreated the 2017 CMS-HCC model for the community (non-institutional), non-dual, aged continuing enrollees using CMS provided beneficiary input files. The Wakely team then simulated the removal of unsupported HCCs in the beneficiary input file using the following four methodologies:

1. On/Off
2. Scalar
3. On/Off by Number of Charts
4. Scalar by Number of Charts

Each method provides a different technique of removing HCC markers from the beneficiary input file. These four methods are described in more detail in the Methodology section below.

As described in the main report, HCC markers in the TM beneficiary input file are beneficiary-level attributes, where a value '1' denotes the presence of at least one diagnosis code that maps to an HCC during the 12-month experience period (also referred to as diagnosis period). For example, HCC1 HIV/Aids has three diagnosis codes[1] (B20, N9735, and Z21) that map to it. A beneficiary will receive an HCC marker of '1' if an acceptable provider includes one of those diagnoses on a TM claim it submits to CMS for payment.

The Wakely team also tested varying levels of HCC specific error rates. For each HCC, the HCC error rate is defined as a proportion of HCC markers that are not supported by any of the documentation included in the provider's medical chart(s) (also called medical records) for that beneficiary. Because HCC markers are assigned at the beneficiary level, the HCC error rate can also be described as a beneficiary-level error rate. For example, suppose a beneficiary has five

---

[1] The 2017 v22 mapping of diagnosis codes to HIV/Aids included:
- B20 Human immunodeficiency virus disease
- N9735 Human immunodeficiency virus, type 2 as the cause of diseases classified elsewhere
- Z21 Asymptomatic human immunodeficiency virus infection status

https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/risk-adjustors-items/risk2017

*Confidential*

acceptable providers that each include one of the HCC1 HIV/Aids diagnosis codes in the claims submitted for TM payment. Further, assume that only two of the five providers have adequate supporting documentation in the medical chart. The HCC marker for HIV/Aids for this beneficiary would be considered adequately supported even though three of the providers' diagnoses were not supported. The only way that this beneficiary's HCC marker would be considered an error is if all five providers' diagnoses were unsupported.

The range of error rates for each HCC is based on the results of a Coding Review[2] performed by FTI Consulting ("FTI") on a sample of HCCs for TM beneficiaries and a subsequent statistical analysis on those results. All error rates were developed by Dr. Michael Salve at Berkeley Research Group ("BRG") and provided to Wakely for this analysis.

Given the statistical nature of the sample and the lack of a full response rate for the sample, I identified four sets of HCC error rates for testing. Error rates (a-c) are provided at the HCC level while the last set of error rates (d) is provided at a more detailed level—by HCC and chart count level. The three sets of error rates by HCC included a best estimate of error rates and two alternative scenarios at lower levels of error rates. The last set of error rates by HCC and chart count is similar to error rate set (a), but is by HCC and chart count.

a. Best estimate of HCC error rates. This best estimate of the HCC error rates reflects an adjustment for missing charts,[3] is the highest level of errors by HCC (a-c) tested, and equates to an overall 31.6% error rate of unsupported HCCs in the TM data.[4]

b. HCC error rates at a 95% confidence level. The error rates in this scenario reflect the same assumptions as the best estimate, but here there is 95% confidence that the actual HCC error rates are greater than those listed (versus a 50% confidence level in the best estimate HCC error rate in (a)). This error rate equates to an overall 20.0% rate of unsupported HCCs in the TM data.

c. Assuming non-respondent charts validated. This scenario of error rates reflects the HCC error rates assuming that every non-respondent chart would have validated the HCC. This scenario is below a range that I would consider reasonable, at an overall 13.7% rate of unsupported codes, but was included for testing purposes.

d. HCC error rates by number of charts. The last set of error rates by HCC and chart count includes error rates by HCC and chart count with an adjustment for missing charts.[5] This error rate equates to an overall 37.7% rate of unsupported HCCs in the TM data.

---

[2] For a complete description of the FTI Coding Review process, please refer to Dr. Paul Isaacs' Expert Report.
[3] The adjustment for missing charts was developed by controlling for the number of the missing charts in the logistic regression analysis. *See* Dr. Salve's Expert Report for more details.
[4] This error rate (as well as all subsequent error rates in the report) is calculated as the average of error rates by HCC weighted by the number of HCC markers in the beneficiary input file, adjusted by the months of eligibility observed during CY 2014. Interaction HCC variables were excluded from the average.
[5] *See* Dr. Salve's Expert Report for more details.

Case 2:16-cv-08697-FMO-PVC    Document 616-8    Filed 08/06/24    Page 504 of 887
Page ID #:20580

Page A.I-3

The last set of error rates by HCC and chart count reflect an observation that, in the sample Coding Review, error rates varied depending on the number of charts with at least one diagnosis that map to the HCC. Specifically, the number of charts containing a diagnosis for a given HCC was shown to be positively correlated with a supported HCC and inversely correlated with the HCC error rate. By "number of charts," I mean the number of distinct acceptable medical providers (as identified by National Provider Identifier ("NPI")) who code diagnoses that map to an HCC. In the HIV/Aids HCC1 example above of five medical providers each coding one of the HIV/Aids diagnoses, the chart count would be five. Note that chart count refers to the number of distinct providers that code the diagnoses, not the number of visits or claims.

In general, the results indicate that recalibrating the CMS-HCC model on a simulated audited dataset with a lower number of HCC risk markers resulted on average in higher HCC and demographic dollar coefficients and relative values. The testing results provide quantitative evidence of a reduction of the original CMS-HCC model relative values due to the presence of the unsupported HCCs in the TM data.

## DATA SOURCES

The analysis relied on three sources of data:

1. Payment year (PY) 2017 CMS-HCC model development files,
2. HCC error rates, and
3. Chart counts underlying each HCC marker in the beneficiary input file.

Each of these data sources are described in more detail below.

### CMS-HCC Model Development Files

The main file used in developing the PY2017 CMS-HCC risk adjustment model is the beneficiary input file, which includes HCC risk markers incurred during the calendar year (CY) 2013 experience year and CY 2014 payment year claims costs (expenditures). The data was limited to the subset of the community, non-dual, aged, continuing enrollee cohort of beneficiaries underlying the corresponding segment of the risk model.[6] This group represents the largest segment of the total TM beneficiary population, or 20.5 million beneficiaries. Table 1 presents the distribution of the beneficiary cohort by age categories. Note that I have shown both a raw count of beneficiaries in 2014 as well as a member month weighted count of 2014 enrollees.[7] For example, a member that was enrolled for only six months of the 2014 calendar year would be counted as 0.5 of a member.

---

[6] Other segments of the CMS-HCC model include risk values for various combinations of ESRD, Institutional, Dual, Disabled and New Enrollees.

[7] Since the model development logic applies a weighting to the beneficiary risk markers based on the months of eligibility observed during CY 2014, a similar adjustment was applied to the enrollment for this table.

**Table 1 - Original FFS Enrollee Profile - Community, Non-Dual, Aged, Continuing Enrollee Cohort**

| Description | 2013/2014 FFS Original, Counts of Beneficiaries (a) | 2013/2014 FFS Adjusted (Monthly Weighted) Counts of Beneficiaries (b) | Distribution % based on column (b) |
|---|---|---|---|
| Female, age 65 to 69 | 2,694,009 | 2,611,640 | 13.3% |
| Female, age 70 to 74 | 2,802,919 | 2,723,393 | 13.9% |
| Female, age 75 to 79 | 2,182,743 | 2,108,981 | 10.8% |
| Female, age 80 to 84 | 1,702,503 | 1,625,706 | 8.3% |
| Female, age 85 to 89 | 1,237,811 | 1,155,534 | 5.9% |
| Female, age 90 to 94 | 595,617 | 534,174 | 2.7% |
| Female, age 95 and greater | 184,628 | 157,589 | 0.8% |
| Male, age 65 to 69 | 2,427,735 | 2,346,616 | 12.0% |
| Male, age 70 to 74 | 2,435,134 | 2,359,118 | 12.0% |
| Male, age 75 to 79 | 1,806,453 | 1,739,454 | 8.9% |
| Male, age 80 to 84 | 1,268,526 | 1,204,256 | 6.1% |
| Male, age 85 to 89 | 768,952 | 711,317 | 3.6% |
| Male, age 90 to 94 | 297,326 | 263,118 | 1.3% |
| Male, age 95 and greater | 61,701 | 51,307 | 0.3% |
| **Total** | **20,466,057** | **19,592,203** | **100.0%** |

Additionally, I received the beneficiary level file for the denominator year corresponding to the 2017 CMS-HCC model. This file contains the 2014 HCCs and demographic information for each beneficiary who had eligibility in CY 2015.

**HCC Error Rates**

The second data source included various HCC specific error rates. These error rates are based on the results of a Coding Review for a sample of risk-eligible charts[8] performed by FTI and a subsequent statistical analysis performed by BRG. FTI performed a Coding Review on a sample of 3,950 selected HCCs for TM beneficiaries (3,950 'HCC-beneficiary markers'). Lack of provider responses to requested charts[9] created a meaningful limitation in calculating the HCC error rates. Based on the sample results and a subsequent statistical analysis they performed, BRG estimated various sets of HCC error rates.[10] Each HCC error rate set reflects a different methodology to address the lack of provider responses to requested charts.

---

[8] Risk eligible charts included claims that would be eligible for inclusion in the HCC risk adjustment and exclude claims for diagnostic services such as laboratory claims. *See* 2022-09-15 CONFIDENTIAL_2013 FFS SAMPLE REVIEW RESULTS.xlsx (AEO-CONTAINS PHI).
[9] In the context of this analysis, a chart means all medical information on a beneficiary in a given year received from a single provider.
[10] *See* Dr. Salve's Expert Report for more details.

*Confidential*

Using the results of the Coding Review sample, BRG performed a logistic regression model with stratification by HCC.[11]  This model ignored selected HCC-beneficiary markers where no charts were provided (dropped from the analysis).  This statistical model estimates the probability of HCC validation rates with the following set of control variables.

1. Total number of charts. The chart count for a specific HCC-beneficiary marker of '1' was defined as the number of unique providers that coded a diagnosis mapping to that HCC for the beneficiary during the diagnosis year.  Only risk-eligible charts from distinct providers serving the beneficiary during the diagnosis year and coding a particular HCC were included in the chart count for that HCC.[12]

2. Total cost associated with the sampled beneficiary.  This is the amount of the Year 2 costs, or 2014.

3. The number of missing charts.  These are the number of charts that were requested as part of the sample but were not returned.

4. The presence of an observed HCC (either supported or unsupported).

Wakely reviewed the methodology used by BRG and was comfortable with the reasonability of the results.  Wakely selected three sets (a-c) of the error rates by HCC and one set (d) of error rates by HCC and chart count for testing:

a. Estimated error rates by HCC from the logistic regression controlling for the missing charts.  These error rates were estimated by BRG based on the sample data where sampled HCC-beneficiary markers with partially missing charts that remained invalidated were adjusted.  The adjustment increased the 0% validation up, (reducing the error rate) by assuming that some of the missing charts would have validated, had they been received.  This adjustment was informed by BRG's logistic model.[13]

These rates reflect the midpoint of the confidence interval of error rates for each HCC with a 50% likelihood that the true HCC error is higher and a 50% likelihood that the true HCC error is less than this level.  Because this is the mid-point of the statistical range and because the rates have been adjusted to remove the impact of unresponsive charts, I have labeled this as my "best estimate" of error rates.

The overall average level of error rates across all HCCs in the TM data at the beneficiary level is 31.6% using this scenario.  The average error rate is calculated using the number of HCC risk markers and the beneficiaries' PY2014 member months as weights.  The average error rate calculated using only the number of HCC risk markers (and not the

---

[11]  For a complete description of BRG's development of error rates, please refer to Dr. Salve's Expert Report at § V.III.

[12]  The number of distinct risk-eligible provider charts is defined as the number of distinct NPI codes found in the beneficiary's medical claims history who billed to at least one diagnosis code that is associated with the given HCC marker and where the provider's specialty code is risk-eligible.  This association was provided to BRG by CMS's published mapping of diagnosis codes to HCCs.

[13]  *See supra* note 11.

*Confidential*

beneficiaries' PY2014 member months as weights) produced the same average value to the three significant digits.  For consistency, the same calculation is applied to all error rate scenarios described below.

b.  The lower bound of the 90% confidence interval of error rates estimated from the logistic regression controlling for missing charts.  These error rates reflect the bottom end of the statistical range of error rates from set (a) where there is 95% confidence that each actual HCC error rate is greater than those listed.  These error rates are on average lower than in set (a) and (d), and higher on average than in set (c).

The overall level of error rates across all HCCs in the TM data is 20.0% using this scenario.

Given that each actual HCC error rate is 95% likely to be above this level, I view this as an extremely conservative (low) estimate of the HCC error rate in the TM data.

c.  HCC error rate estimated from the audited sample where diagnoses from any non-respondent (not returned) charts were assumed to be fully supported and the corresponding HCC validated.  As stated earlier, this scenario was included for testing purposes, but is below what I believe to be a reasonable estimate.  Although some of the specific HCC error rates in this scenario are higher than in scenario (b), this scenario produced the lowest level of error rates (13.7%) on average across all HCCs.

d.  Error rates by HCC and by chart count estimated from the logistic regression controlling for missing charts.  BRG's statistical analysis found that the probability of an HCC being unsupported (HCC error rate) was inversely correlated with the number of charts with diagnoses mapping to the HCC (i.e., the more risk-eligible, distinct providers that submit a diagnosis that maps to a particular HCC, the less likely the HCC will be in error).  The logistic regression produced a probability of an HCC being valid conditional on the number of distinct provider charts found with a particular HCC-beneficiary marker.  The conditional probabilities (or error rates) by HCC and chart count were provided by BRG and used in Wakely's testing.  The adjustment for the missing charts refers to the assumption regarding the number of missing charts.  Conditional probability was calculated assuming the number of missing charts is 0.  Similar to error rate (a) by HCC, this adjustment increases the validation rate assuming that all charts were received (same as reducing the error rate assuming all charts were received).  This conditional probability is useful for applying to data where all charts are available such as the beneficiary input file.  The additional information about the number of charts that were missing allows the model to account for the additional probability of HCC validation among the missing charts.  The average of the HCC error rates in this set was 37.7%.

The first three sets of the error rates by HCC are presented in **Exhibit A. HCC Error Rates Scenarios** and the fourth set of error rates by HCC and chart count combination are presented in **Exhibit B. HCC Error Rates by Number of Charts**.

*Confidential*

**Chart Counts underlying each HCC Marker in Beneficiary Input File**

In order to apply error rates listed by HCC and chart count (error rate set (d) described above) to the beneficiary input file, information regarding how many charts contain diagnoses that map to each HCC-beneficiary marker in the beneficiary input file was needed. BRG also provided Wakely with a data set containing the number of distinct, risk-eligible, provider charts containing diagnoses mapping to each HCC-beneficiary marker in the original CMS-HCC beneficiary input file. This summary of chart counts for each HCC-beneficiary marker in the beneficiary input file was based on the underlying TM claim data files received as part of discovery. The BRG file contains 79 fields, one for each of the HCCs, for each beneficiary in the beneficiary input file. Each of the 79 fields contain the number of distinct risk-eligible provider charts for the given beneficiary ID mapping to that HCC. A detailed description of the data set and its development are included in the BRG report. For some HCC-beneficiary markers, no diagnoses mapping to that HCC were found in the TM claim data. Approximately 4.9% of beneficiaries with at least one HCC were missing a chart count.

**TESTING METHODS AND RESULTS**

First, I replicated the 2017 CMS-HCC model for the community, non-dual, aged, continuing enrollees using the beneficiary input file described above. Using linear regression where the PY2014 claim costs were the dependent variable and the 85 HCCs (including 79 HCCs and 6 interaction HCCs) and 16 demographic variables were the independent values, and using PY2014 member months as the enrollment weights, I reproduced the dollar coefficients and relative values indicated in the 2017 Rate notice.[14] For the remainder of this appendix, I call this the original CMS-HCC model.

I conducted testing using four methodologies of removing HCC markers (simulating the removal of unsupported HCCs) to quantify the range of potential impacts of removing the unsupported portion of HCC risk markers on the CMS-HCC model relative values. The four methodologies are summarized in Table 2. For each methodology, error rate scenario, and iteration, I performed the same regression used to recreate the original CMS-HCC model to calculate a revised set of CMS-HCC model dollar coefficients. In each revision, a set of simulated unsupported markers were removed from the beneficiary input file. Revised relative values were then calculated for each scenario by dividing the revised dollar coefficients by the same denominator of $9,185.29.[15] I then compared the revised dollar coefficients and relative values to the original dollar coefficients and relative values. For the methods involving random reassignment of 1's to 0's HCC risk

---

[14] The rate notice contained the relative values, which I matched by dividing the dollar coefficients by the average predicted value in the denominator file of $9,185.29.

[15] Wakely was not provided detailed information to fully replicate the denominator under audited marker circumstances. However, testing of the 2017 denominator file using similar discrepancy rates as those used in the regression indicates that the revised denominator would be within +/-0.5% of the original value of $9,185.29. More information on this testing is presented in supporting reference materials.

*Confidential*

markers, the resulting coefficients developed from ten random iterations were averaged. As a last step, I compared the risk scores under the revised models to the original model for a subset of the UHG beneficiaries.

**Table 2 – Overview of Testing and Results**

| Methodology Name | Description | Error Rate Scenarios | Output | Output Exhibit |
|---|---|---|---|---|
| (1) On/Off | Random reassignment of 1's to 0's for each HCC risk markers based on HCC's error rate | Three sets of error rates by HCC (a-c) | 30 sets of results from 10 random iterations for three sets error rates | Exhibit C, columns 3-14 |
| (2) Scalar | Multiplying HCC risk markers by a (1 - error rate) scalar for the corresponding HCC | Three sets of error rates by HCC (a-c) | Three sets of results (one for each error rate set) | Exhibit C, columns 15-26 |
| (3) On/Off by Number of Charts | Random reassignment of 1's to 0's for HCC risk markers based on error rates conditional on the number of charts | One set of error rates by HCC by chart count (d) | 10 sets of results from 10 random iterations of error rates | Exhibit C, columns 27-30 |
| (4) Scalar Method by Number of Charts | Replacing all 1's in each HCC risk markers by the (1 - error rate) for the HCC conditional on the number of charts | One set of error rates by HCC by chart count (d) | One set of results for the error rate set | Exhibit C, columns 31-34 |

For the first method, (1) On/Off, a portion of HCC risk markers coded as present ('1') are reassigned to not present ('0'). Using the three sets of error rates for each HCC, for a randomly selected subset of beneficiaries, HCC risk marker is changed from present ('1') to not present ('0'). For example, if 20,000 beneficiaries in the development data set had HCC1 coded as present ('1') and the corresponding error rate for HCC1 in the highest rate scenario was 0.20, for a random subset of 4,000 beneficiaries (0.20 x 20,000), the HCC1 risk marker would be changed from present ('1') to not present ('0'), producing an overall 20% lower prevalence of HCC1 thereby simulating an audited set of markers. Since the approach involved a random reassignment of risk markers, we performed the random deletion ten times creating ten simulated beneficiary input files for each error rate scenario.

For the second method, (2) Scalar, all risk markers were proportionally reduced by a scalar for the corresponding HCC calculated as (1 - error rate for HCC). For example, if the error rate for HCC1 in the highest rate scenario was 0.20, the HCC1 risk markers would be recalculated as original HCC1 risk marker x (1 - 0.20) or 0.80, producing an overall 20% lower prevalence of HCC1

*Confidential*

thereby simulating an audited set of markers. The original risk markers values remained at '0' for members without HCC1 coded and were revised to '0.80' for members with HCC1 coded.

For the third method, (3) On/Off by Number of Charts, a portion of HCC risk markers coded as present ('1') are also reassigned to not present ('0') based on the predicted error rates by HCC and chart count. I performed the random deletion of markers 10 times. In each simulation, the HCC risk marker is changed from present ('1') to not present ('0') conditional on the number of charts indicated for the beneficiary-HCC marker. For example, suppose 2,000 beneficiaries in the development data set had HCC1 coded as present ('1') and were coded in seven charts. Also assume one of the provided error rates for HCC1 with seven charts was 0.10. Then, for a random subset of 200 beneficiaries with seven charts indicating HCC1 (0.10 x 2,000), the HCC1 risk marker would be set to not present ('0'), producing a 10% lower prevalence of HCC1 with seven charts, thereby simulating an audited set of markers. Again, since the approach involved a random reassignment of risk markers, we performed the random deletion ten times creating ten simulated beneficiary input files for the error rate scenario (d).

For the fourth method, (4) Scalar Method by Number of Charts, all risk markers were proportionally reduced by a scalar for the corresponding HCC calculated as (1 - error rate) for HCC, given number of charts. For example, if the error rate for HCC1 with seven charts was 0.10, the HCC1 risk markers for beneficiaries with seven charts would be recalculated as original HCC1 risk marker x (1 - 0.10) or 0.90, producing an overall 10% lower prevalence of HCC1 with seven charts, thereby simulating an audited set of markers. Note that the risk markers values in this methodology also would no longer be binary in nature. The HCC1 marker for members who were never coded would maintain '0', and the HCC1 marker for members who originally were coded as a '1' would be revised to a range values less than one, based on the number of charts present.

The average of the HCC error rates in the error set (d) was 37.7%, calculated as a weighted average by the number of simulated audited HCC risk markers (adjusted for partial CY2014 enrollment) using the error rates by chart count. Table 3 below presents an illustrative example of applying HCC error rates by chart count and calculating the overall average HCC error rate. The error rate for the specific HCC is based on the number of charts except for the HCCs where the chart count data was not available (the 4.9% of beneficiaries with no charts counts found in the TM data). In those cases, the HCC error rate from set (a) was used. **Exhibit C** columns 31 and 35 correspond to the reduction in risk markers based on the average HCC error rate corresponding to the illustrative error rate values of 0.046 for HCC1 and 0.281 for HCC6. The overall average error rate of 0.184 is calculated taking into account the partial enrollment in the Year 2 (CY2014), as well as the overall prevalence of HCC1 and HCC6.

**Table 3 - Illustration of Average Error Rate Calculation for Error Rate Set (d)**

| Beneficiary | HCC Risk Marker | Number of Charts for HCC | Error Rate by # Charts [1] | Months Enrolled in CY2014 |
|---|---|---|---|---|
| A | HCC1 = 1 | 6 | 0.017 | 12 |
| B | HCC1 = 1 | 10 | 0.002 | 8 |
| C | HCC1 = 1 | N/A [2] | 0.124 | 9 |
| A | HCC6 = 1 | 3 | 0.231 | 12 |
| B | HCC6 = 1 | N/A [2] | 0.338 | 8 |
| C | HCC6 = 1 | 8 | 0.016 | 9 |
| D | HCC6 = 1 | 1 | 0.493 | 12 |
| **HCC1 Avg** | **Over 3 benes** | | **0.046 [3]** | **0.806 [4]** |
| **HCC6 Avg** | **Over 4 benes** | | **0.281 [5]** | **0.854 [6]** |
| **Overall Avg** | | | **0.184 [7]** | |

[1] The error rates by HCC set (a) are presented in **Exhibit A**. The error rates by HCC and chart counts set (d) are presented in **Exhibit B**.

[2] Note that for beneficiary-HCC combination where no chart data was available in the beneficiary input file, the average HCC error rate was used (from error set (a)).

[3] 0.046 = (0.017 x 12 + 0.002 x 8 + 0.124 x 9)/(12+8+9)

[4] 0.806 is the average of 12, 8, 9 months, or 9.67, divided by 12.

[5] 0.281 = (0.231 x 12 + 0.338 x 8 + 0.016 x 9 + 0.493 x 12)/(12+8+9+12)

[6] 0.854 is the average of 12, 8, 9, 12 months, or 10.25, divided by 12.

[7] 0.184 = (0.046 x 3 x 0.806+0.281 x 4 x 0.854)/(3 x 0.806+4 x 0.854)

The error rates by HCC and chart count were used to simulate a simplified two-step regression, where the probability of validation of the HCC markers is first predicted using a logistic regression and then those predicted probabilities of valid HCC markers are used as inputs into the linear regression that estimates the dollar coefficients of the CMS-HCC risk adjustment model. This two-step regression is referred to as "regression calibration" in depositions[16] and discovery documents[17] of this case. Because some of the results of regression calibration performed by CMS and received as part of discovery are directionally different, I wanted to test the results using this two-step regression approach. As discussed in the results section below, my results were directionally consistent in all testing.

---

[16] Rebecca Paul Deposition, April 13, 2023, at 218:20-219:13 (AEO); Ilina Chaudhuri Deposition, August 10, 2023, at 185:5-186:22 (AEO).

[17] Exhibit 1184-A to Rebecca Paul's Deposition (AEO); Exhibit 1192-1 to Ilina Chaudhuri's Deposition (AEO).

**High-Level Results**

Table 4a summarizes the original CMS-HCC and revised weighted average[18] dollar coefficients for the original community, non-dual, aged, continuing enrollee model and the recalibrated models. Table 4b summarizes the original CMS-HCC and revised weighted average relative values corresponding to Table 4a. Table 5 summarizes the increase in weighted average relative values in each testing scenario. Each table shows the dollar coefficients for all risk markers, and the HCC and demographic markers, separately. Table 6 summarizes the number of demographic and HCC risk markers with a decrease and an increase in the relative values in each method and scenario tested. Based on these findings, the following conclusions can be drawn:

1. The CMS-HCC model development is impacted by the presence of the unsupported codes.
2. Testing showed that the dollar coefficients and relative values were higher on average for a risk model where the unsupported codes have been removed compared to a risk model based on both supported and unsupported codes. Said another way, the current relative values were lower on average than they would be if unsupported codes were removed.
3. If the risk adjustment model were revised to be based on only supported codes, such a model would have higher relative values for the majority of risk markers (over 90%), including the demographic risk markers as well as HCC risk markers, depending on the methodology.
4. The results were directionally similar when using the two-step regression approach.

Notably, the impact to the risk model for all of the various testing scenarios (even those where the error rates were at conservatively low levels) was material. While the chosen methodology of removing markers creates differences in how the demographic versus HCC dollar coefficients and relative values move, the average impact over all markers was consistent across all the methodologies when the same error rates are used. Even for those scenarios at the lowest error rates (listed as (b) and (c)), the impact to the average relative values and the dollar coefficients are 12.2% and 8.5% increases, respectively.[19] For the best estimate error rate, the increase to the average relative values was 21.2%. In the deletion methods where the error rates from the chart counts were used to inform the level of removed markers, the impact to relative values was even higher, at 26.0%.

---

[18] The weighting was based on the member month weighted number of risk markers in the TM data similar to column b in Table 1 for each HCC in the beneficiary input file for each regression. Note, the distribution of risk markers by HCC in this full data set is a different distribution than what was included in the sampled data of audited charts.

**Table 4a - Weighted Average Coefficients by Method and Scenario**

| | Scenario Description | | Weighted Average Coefficient | | |
| --- | --- | --- | --- | --- | --- |
| | Deletion Method | Discrepancy Rate Used | All Risk Markers [1] | HCC Risk Markers [2] | Demog. Risk Markers [3] |
| | **Original CMS-HCC Model** | **N/A** | **$3,365** | **$2,954** | **$3,971** |
| 1a | On/Off [4] | Best Est with adj | $4,190 | $3,694 | $4,682 |
| 1b | On/Off [4] | Low end of the 90% Confidence Interval | $3,844 | $3,381 | $4,384 |
| 1c | On/Off [4] | Non-respondent charts valid | $3,681 | $3,238 | $4,241 |
| 2a | Scalar | Best Est with adj | $4,190 | $4,411 | $3,972 |
| 2b | Scalar | Low end of the 90% Confidence Interval | $3,844 | $3,733 | $3,973 |
| 2c | Scalar | Non-respondent charts valid | $3,681 | $3,452 | $3,971 |
| 3d | On/Off by # of Charts [4] | By HCC by chart count | $4,384 | $3,886 | $4,833 |
| 4d | Scalar by # of Charts | By HCC by chart count | $4,384 | $4,746 | $4,057 |

**Table 4b - Weighted Average Relative Values by Method and Scenario**

| | Scenario Description | | Weighted Average Coefficient | | |
| --- | --- | --- | --- | --- | --- |
| | Deletion Method | Discrepancy Rate Used | All Risk Markers [1] | HCC Risk Markers [2] | Demog. Risk Markers [3] |
| | **Original CMS-HCC Model** | **N/A** | **0.366** | **0.322** | **0.432** |
| 1a | On/Off [4] | Best Est with adj | 0.456 | 0.402 | 0.510 |
| 1b | On/Off [4] | Low end of the 90% Confidence Interval | 0.418 | 0.368 | 0.477 |
| 1c | On/Off [4] | Non-respondent charts valid | 0.401 | 0.353 | 0.462 |
| 2a | Scalar | Best Est with adj | 0.456 | 0.480 | 0.432 |
| 2b | Scalar | Low end of the 90% Confidence Interval | 0.418 | 0.406 | 0.432 |
| 2c | Scalar | Non-respondent charts valid | 0.401 | 0.376 | 0.432 |
| 3d | On/Off by # of Charts [4] | By HCC by chart count | 0.477 | 0.423 | 0.526 |
| 4d | Scalar by # of Charts | By HCC by chart count | 0.477 | 0.517 | 0.442 |

[1] Represents the average weighted by the risk markers resulting from each method for all demographic and HCC risk markers.

[2] Represents the average weighted by the risk markers resulting from each method for all HCC risk markers.

[3] Represents the average weighted by the risk markers resulting from each method for all demographic risk markers.

[4] Each of the weighted for these scenarios reflect the average of the ten regressions based on the random removal of markers.

*Confidential*

**Table 5 - Average Discrepancy Rate and Difference in Relative Values by Method and Scenario**

| | Scenario Description | | Average HCC Discrepancy Rate (Excl. Interaction HCCs) [1] | % Difference in Relative Values | | |
| | Deletion Method | Discrepancy Rate Used | | All Risk Markers [2] | HCC Risk Markers [3] | Demog. Risk Markers [4] |
|---|---|---|---|---|---|---|
| 1a | On/Off | Best Est with adj | 31.6% | 21.2% | 24.2% | 17.9% |
| 1b | On/Off | Low end of the 90% Confidence Interval | 20.0% | 12.2% | 13.9% | 10.4% |
| 1c | On/Off | Non-respondent charts valid | 13.7% | 8.5% | 10.1% | 6.8% |
| 2a | Scalar | Best Est with adj | 31.6% | 21.2% | 48.5% | 0.0% |
| 2b | Scalar | Low end of the 90% Confidence Interval | 20.0% | 12.2% | 25.8% | 0.0% |
| 2c | Scalar | Non-respondent charts valid | 13.7% | 8.5% | 17.3% | 0.0% |
| 3d | On/Off by # of Charts | By HCC by chart count | 37.7% | 26.0% | 30.1% | 21.7% |
| 4d | Scalar by # of Charts | By HCC by chart count | 37.7% | 26.0% | 59.2% | 2.2% |

[1] Represents the average rate of unsupported risk markers weighted by the revised risk markers (reduced) for non-interaction HCC risk markers.

[2] Represents the change in the average relative value weighted by the revised risk markers (reduced) for all HCC risk markers, relative to the original weighted average value in column [1] in Table 4b.

[3] Represents the change in the average relative value weighted by the revised risk markers (reduced) for all HCC risk markers, relative to the original weighted average value in column [2] in Table 4b.

[4] Represents the change in the average relative value weighted by the revised risk markers (reduced) for all demographic risk markers, relative to the original weighted average value in column [3] in Table 4b.

*Confidential*

**Table 6 - Directionality of Coefficient Changes by Method and Scenario**

| | Scenario Description | | # HCCs with Lower Rel Values [1] | # Demog. with Lower Rel Values [2] | # Markers with Higher Rel Values [3] |
|---|---|---|---|---|---|
| | Deletion Method | Discrepancy Rate Used | | | |
| 1a | On/Off | Best Est with adj | 8 | 0 | 93 |
| 1b | On/Off | Low end of the 90% Confidence Interval | 9 | 0 | 92 |
| 1c | On/Off | Non-respondent charts valid | 8 | 0 | 93 |
| 2a | Scalar | Best Est with adj | 0 | 6 | 95 |
| 2b | Scalar | Low end of the 90% Confidence Interval | 0 | 3 | 98 |
| 2c | Scalar | Non-respondent charts valid | 1 | 12 | 88 |
| 3d | On/Off by # of Charts | By HCC by chart count | 5 | 0 | 96 |
| 4d | Scalar by # of Charts | By HCC by chart count | 4 | 1 | 96 |

[1] Represents the count of unique HCC risk markers with lower relative values in the revised tested model compared to the original CMS-HCC model relative values for each HCC.

[2] Represents the count of unique demographic risk markers with lower relative values in the revised tested model compared to the original CMS-HCC model relative values for each demographic risk marker.

[3] Represents the count of unique all risk markers (HCCs and demographic) with higher relative values in the revised model compared to the original CMS-HCC model relative values.

In relaying this result of higher relative values of the revised model, it is important to note that the average relative factors can go up while maintaining the average risk score of 1.0 for the TM population. Because the total number of markers in the TM has gone down, the average number of markers *per beneficiary* has gone down as well by the same proportion. To further illustrate this point, consider the example in Table 7 below.

**Table 7 - Illustration of Average Risk Score Under Revised Methodology**

| | Description | Original | Revised (with unsupported diagnoses removed) |
|---|---|---|---|
| a | Number of Markers | 99M | 81M |
| b | Number of Beneficiaries | 37M | 37M |
| c | Average Number of Markers per Beneficiary (a/b) | 2.676 | 2.189 |
| d | Average Relative Value | 0.373 | 0.457 |
| e | Average Risk Score (c x d) | 1.00 | 1.00 |

*Confidential*

In the 2015 denominator file, suppose there are 99 million markers (including all demographic, HCC and interaction variables) on 37 million beneficiaries, or 2.676 markers per beneficiary[20]. After removing markers for unsupported HCCs, suppose there is 81 million markers (19.2% less) over the same amount of beneficiaries, resulting in 2.189 markers per beneficiary (also 19.2% less).

The risk scores of the beneficiary population in both cases is 1.00:

- In the baseline example, the average relative value is 0.373. That is, 2.676 x 0.373 = 1.00
- In the revised scenario, where the relative values are only based on supported markers, the average relative value is 0.457.  That is, 2.189 x 0.457 = 1.00

This simplified math concept illustrates how the average risk score can remain at 1.00 while the average value of the relative factors increases.

**Impact on UHG MA Contract Experience in PY2017**

Since the simulated audited data testing suggests that not every relative value increases and that a small number of variables would have lower relative values compared to the original data, the distribution of risk markers for a particular contract or set of members would matter to the overall calculated risk scores.

To analyze the overall impact of the revised relative values on UHG membership data, Wakely received model output reports distributed by CMS in the Final Yearly Model Output Data File, Part C data file format for UHG PY2017 MA contracts that contain the distribution of markers by beneficiary.  Wakely calculated the original and revised risk scores for each beneficiary and summarized by contract using the original and revised relative values estimated in the methods and scenarios discussed above.  The change in UHG risk scores between the original model (with lower average relative values) and the recalibrated models (with higher coefficients) is presented in Table 7.  The table shows the range of the average changes in the risk scores by contract for non-ESRD, non-hospice, non-dual, aged, continuing enrollees.  While the impact varied by contract, the revised risk adjustment model resulted in materially increased risk scores for all contracts with at least 300 beneficiaries in a contract for all tested scenarios.  That is, the small number of HCC or demographic variables with lower coefficients did not have meaningful impacts when testing against the 2017 UHG data.

---

[20]  All values referenced in this paragraph are illustrative; however, the conclusion does not depend on the precise numbers.

**Table 8 - Impact on UHG MA Contract Experience by Method and Scenario**

| Scenario | Deletion Method | Discrepancy Rate Used | Average % Change in Risk Scores by Contract* | Range of Changes by Contract |
|---|---|---|---|---|
| 1a | On/Off | Best Est with adj | 20.4% | 19.1% - 22.2% |
| 1b | On/Off | Low end of the 90% Confidence Interval | 11.9% | 11.0% - 12.8% |
| 1c | On/Off | Non-respondent charts valid | 8.6% | 7.9% - 9.4% |
| 2a | Scalar | Best Est with adj | 33.8% | 27.8% - 42.0% |
| 2b | Scalar | Low end of the 90% Confidence Interval | 17.4% | 14.3% - 21.5% |
| 2c | Scalar | Non-respondent charts valid | 11.1% | 9.4% - 14.4% |
| 3d | On/Off by # of Charts | By HCC by chart count | 26.0% | 24.5% - 27.0% |
| 4d | Scalar by # of Charts | By HCC by chart count | 42.0% | 35.4% - 49.1% |

*Testing includes only contracts with at least 300 beneficiaries.  This is based on guidelines from The Office of the Actuary (OACT) for full risk score credibility as used in the bid pricing tools (BPTs).

The key results from Tables 5 and 8 (which are listed in blue font above) are repeated in Table 9 below.

**Table 9 - Summary of Key Results**

| | Scenario | | Average Error Rate (a) | Average Impact to Relative Risk Values (b) | Average Impact to UHC Risk Scores (c) |
|---|---|---|---|---|---|
| | Deletion Method | Error Rate Used | | | |
| 1a | On/Off | Best Est with adj | 31.6% | 21.2% | 20.4% |
| 1b | On/Off | Low end of the 90% Confidence Interval | 20.0% | 12.2% | 11.9% |
| 1c | On/Off | Non-respondent charts valid | 13.7% | 8.5% | 8.6% |
| 2a | Scalar | Best Est with adj | 31.6% | 21.2% | 33.8% |
| 2b | Scalar | Low end of the 90% Confidence Interval | 20.0% | 12.2% | 17.4% |
| 2c | Scalar | Non-respondent charts valid | 13.7% | 8.5% | 11.1% |
| 3d | On/Off by # of Charts | By HCC by chart count with adj | 37.7% | 26.0% | 26.0% |
| 4d | Scalar by # of Charts | By HCC by chart count with adj | 37.7% | 26.0% | 42.0% |

This table shows that when removing HCC markers from the TM data due to unsupported HCC codes, larger HCC error rates (in column a) have larger impacts to the risk values (in column b), which in turn have directionally similar impacts on UHG risk scores (in column c). Put differently, the current UHG risk scores are reduced from what they otherwise would be if unsupported codes were removed in the development of the MA CMS-HCC risk score model. The larger the error rate in the data, the lower the current UHG risk scores are relative to revised data. By not accounting for the unsupported codes in the TM data, the current average relative risk factors are diluted on average by at least 7.8% [1-1/(1+8.5%)], and likely diluted by much more than that. Our best estimate is that relative risk scores are diluted by 17.5% [1-1/(1+21.2%)] using values from column (b). Using column (c), UHG risk scores are likely at least 7.9% [1-1/(1+8.6%)] less than they would be had unsupported HCC codes been removed in the development of the risk adjustment model.

**Removing Expenditures**

The focus of the revised regression work so far discusses the simulations of removing unsupported HCC risk markers and recalibrating model coefficients and relative values, where the payment year costs were unchanged. To summarize, that work provides evidence that current relative values are lower on average than they would be should unsupported diagnoses be removed from the beneficiary input files.

In a 2018 Fee-For-Service ("FFS") Adjuster study where CMS similarly removed HCC markers due to unsupported diagnoses and recalibrated the regression model based on the revised markers, the authors posit that diagnosis error in the TM claims may lead to payment error, and therefore

*Confidential*

that TM payment year costs (also called expenditure data) should be adjusted for claims where the diagnoses are unsupported. Based on this assumption, the author accounts for the purportedly inflated expenditures via an "IPARS" adjustment, and then argues that such an adjustment reveals no material change to MA payment from their recalibration.[21] The following analysis supports my opinion that removing expenditures is unwarranted, and even if expenditures were removed, the results would be the same as the previous testing shows. That is, the average relative values for recalibrated regression models where unsupported diagnoses are removed are higher on average than recalibrated regression models where both supported and unsupported diagnoses are included in the beneficiary input files, even if expenditures are removed in the development of the revised models.

1. The IPARs (Inflated Post-Audit Risk Score) adjustment is a faulty adjustment created in response to an incorrect application of the dollar coefficients from the regression calibration.

As detailed in my response to the CMS FFS Adjuster analysis,[22] CMS made a mistake in their calibration. CMS incorrectly applied the higher dollar coefficients from their revised regression calibrations to the original and unaudited HCCs (in the original beneficiary input file). This application of the revised dollar coefficients to the original HCC markers resulted in a prediction that was higher than the actual TM expenditures. Because of this discrepancy, CMS felt it necessary to make the IPARs adjustment to the dollar coefficients, which ultimately undermined the conclusions of their analysis. The IPARs adjustment reduced the dollar coefficients by dividing them by a factor equal to (a contrived average predicted expenditure divided by the average cost of TM beneficiaries) where the contrived average predicted expenditure was calculated by applying the revised dollar coefficients to the original HCC markers.

Had CMS correctly applied the revised, higher dollar coefficients to their simulated, audited HCCs (the revised beneficiary input file), they would have seen that the predicted expenditures matched the actual TM expenditures and concluded that no IPARs adjustment was warranted. More information regarding my opinion is included in my response paper referenced above.

2. The prospective nature of the model removes the direct link between the expenditures and the unsupported HCCs used to develop the risk models.

The prospective nature of the CMS-HCC risk adjustment model entails using risk markers observed during the experience year (Year 1) to predict future costs incurred in the following calendar year (Year 2). As such, there is a one year difference between the unsupported HCCs and claim costs, and the association is not direct. Removing unsupported HCCs for claims in Year

---

[21] *See* p. 5 of CMS, *Addendum to the Fee-For-Service Adjuster Study*, https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/RADV-Provision-CMS-4185-N4-Data-Release-June-2019.zip. ("We performed this normalization because diagnoses cannot soundly be deleted in the CMS-HCC modeling context without making adjustments to account for the bias that the deletion procedure itself creates in expenditures.").

[22] Paper, UnitedHealth Group, "Actuarial Report on Medicare Advantage FFS Adjuster," (Aug. 28, 2019), https://www.regulations.gov/document/CMS-2018-0133-0263.

*Confidential*

1 could not possibly remove incurred costs during Year 2. They are not the same claims. Incurred claims may have an indirect relationship to the HCCs in the prior year, should the same or a different physician provide a similar service and code an unsupported HCCs in Year 2 in the same way that it was unsupported during Year 1. If expenditures in Year 2 are questioned as invalid for unsupported HCCs, a secondary audit of Year 2 diagnoses and their validity would be necessary in order to appropriately identify claims in Year 2 costs that have unsupported diagnoses.

   3. The goal of MA risk adjustment is to use actual TM costs, which are not restated or audited for unsupported diagnoses.

Removing expenditures related to claims with unsupported diagnoses from actual TM incurred claims is fundamentally inconsistent with the core requirement of the MA risk adjustment model being based on the TM data costs. Removing costs from TM data for unsupported diagnoses would ultimately mean modifying costs that are to be the very basis of the relative factors. The point of the MA model is to create risk adjustment that adjusts the MA payments across beneficiaries in the same way that costs are incurred in the TM program.

To date, the TM data is largely unaudited and the TM claims have not been targeted to remove costs due to unsupported diagnoses. Doing so would require new audits that have not historically been performed and would likely change cost profiles from historical patterns.

   4. Even if incurred costs were audited, most of TM costs are unaffected by unsupported diagnoses.

Payments for most claims, including outpatient claims, diagnostic lab and radiology claims, and physician claims are not dependent on specific diagnoses being on the claim. Even if unsupported diagnoses are found on these claims, the paid claims would be unaffected. Only Medicare inpatient claim payment is directly dependent on certain diagnosis codes. And even for inpatient claims where a diagnosis may be unsupported, other supported diagnoses on the inpatient claim could still result in partial or full payment. Therefore, unsupported diagnoses would have a potential impact on only the minority of TM costs.

   5. Wakely testing indicates that the results of the analysis would be the same, regardless of removing expenditures.

Lastly, and perhaps most importantly, the testing[23] shows that even though the impact of dollar coefficients would be impacted by reductions in the expenditures, the directional impacts of the relative values would remain unchanged. Namely, if CMS were to adjust the beneficiary input file data by fully removing all unsupported diagnoses in Year 1 and adjust all expenditures due to unsupported diagnoses in Year 2 before running its regression, the average relative factors in the revised risk models would still *increase* compared to the original model.

The reason lies in the following risk adjustment principle: The average risk score for the calibration data set is 1.0.

---

[23] The results here are consistent with my original testing performed in response to CPI claims regarding reduced expenditure data. *See also id. at* Appendix III of my Actuarial Report in response to the CPI study.

Based on this principle, it algebraically follows that if the sum of indicated markers in the calibration dataset go down, the average relative value goes up regardless of how the payment amounts change. That algebraic proof is shown in the main report.

In addition, the analyses below establish the result to be true as an empirical matter by running recalibrated regression models where random amounts of expenditures are removed from the costs of the calibration dataset.[24] In all cases the answer is the same: Although the dollar coefficients of the revised regressions may change and can be reduced on average compared to the original dollar coefficients, the average revised relative values are never reduced compared to the original because the average predicted expenditure used in the normalization is also reduced.

My simulations show that if the revised dollar coefficients are normalized using this reduced predicted expenditure figure, the resulting revised relative factors would be similar to the revised relative factors and higher than the original relative factors, on a weighted average basis.

I modeled the reduction in expenditures using the following eight scenarios. Within Scenarios 1-4 and within Scenarios 5-8, I kept the revised risk profile markers the same and varied the manner in which expenditures were adjusted. Scenarios 1 through 4 present various reductions to expenditures along with the revised HCC markers matching the regression from 2a above. Scenarios 5-8 present various reductions to expenditures along with the first set of randomized HCC markers created for regression 1c.

Each scenario reflects performing a revised regression on beneficiary input files that simulate different expenditure reductions, calculating dollar coefficients for each regression. I then divided these dollar coefficients by the average predicted expenditure in the denominator file (hence also reflecting a parallel reduction in expenditures) to develop relative values. More descriptive information on these scenarios are in **Exhibit D** to the Appendix. Table 10 below provides a summary of the results.

The results are informative and provide empirical evidence that the average relative value increases in a similar manner regardless of how and if the expenditures are adjusted.

- Reducing expenditures in the calibration dataset results in the average dollar coefficients (column (a) in Table 10) that are generally lower than those without the reduction. The average dollar coefficient change is dependent on the amount of expenditures that are removed from the risk profiles. When proportionally more claim dollars than markers are removed from the revised risk profiles, the average dollar coefficient is reduced (as in Scenario 6 relative to the original model). When more markers are removed than costs, the average dollar coefficient increases (as in Scenario 3, relative to the original model).

    The dollar coefficients, however, are divided by a lower average predicted cost (developed using the denominator dataset, column (c) in Table 10) when normalizing. The resulting

---

[24] Because we have not studied the expenditure impact of unsupported codes, we randomly reduced the expenditures with some high level constraints to evaluate the impact.

amounts in column (d) represent an average relative values for each of the recalibrated risk adjustment models.

- The average relative value (column (d) in Table 10), when weighting by the revised markers in the risk profiles of the denominator dataset, does not change within the scenarios 1-4 or within the scenarios 5-8, and is larger than the original average relative value in all scenarios.

*Confidential*

**Table 10 - Summary of Analysis Testing Changes in Expenditures**

| Description | Calibration Dataset | Expenditure Description | (a) Avg Dollar Coefficient . | (b) Avg Predicted Cost in Calibration Dataset | (c) Predicted Cost in Denominator Dataset | (d) Avg Relative Value (a) / (c) | (e) Avg Risk Score in Denominator Dataset |
|---|---|---|---|---|---|---|---|
| **Original Model** | **Original Risk Profiles** | **Original Expenditures** | **$3,365** | **$8,968** | **$9,185** | **0.366** | **1.000** |
| **Revision 2a** | **Scalar with Error (a)** | **No change** | **$4,190** | **$8,968** | **$9,185** | **0.456** | **1.000** |
| **Scenario 1** | Scalar with Error (a) | Reduce 20% of expenditures for all members | $3,352 | $7,175 | $7,348 | 0.456 | 1.000 |
| **Scenario 2** | Scalar with Error (a) | Reduce 30% of expenditures for all members | $2,933 | $6,278 | $6,430 | 0.456 | 1.000 |
| **Scenario 3** | Scalar with Error (a) | Reduce expenditures by an average of 90% for randomly selected 10% of members | $3,813 | $8,160 | $8,358 | 0.456 | 1.000 |
| **Scenario 4** | Scalar with Error (a) | Reduce expenditures by an average of 85% for randomly selected 15% of members | $3,657 | $7,826 | $8,015 | 0.456 | 1.000 |
| **Revision 1c** | **One Set of On/Off with Error (b)** | **No change** | **$3,681** | **$8,968** | **$9,185** | **0.401** | **1.000** |
| **Scenario 5** | One Set of On/Off with Error (b) | Reduce 20% of expenditures for all members | $2,945 | $7,175 | $7,348 | 0.401 | 1.000 |
| **Scenario 6** | One Set of On/Off with Error (b) | Reduce 30% of expenditures for all members | $2,577 | $6,278 | $6,430 | 0.401 | 1.000 |

| Description | Calibration Dataset | Expenditure Description | (a) Avg Dollar Coefficient * | (b) Avg Predicted Cost in Calibration Dataset | (c) Predicted Cost in Denominator Dataset | (d) Avg Relative Value (a) / (c) | (e) Avg Risk Score in Denominator Dataset |
|---|---|---|---|---|---|---|---|
| **Scenario 7** | One Set of On/Off with Error (b) | Reduce expenditures by an average of 90% for randomly selected 10% of members | $3,350 | $8,161 | $8,358 | 0.401 | 1.000 |
| **Scenario 8** | One Set of On/Off with Error (b) | Reduce expenditures by an average of 85% for randomly selected 15% of members | $3,212 | $7,824 | $8,013 | 0.401 | 1.000 |

\* The average dollar coefficient reflects the weighted average across all risk markers from beneficiary input dataset.

*Confidential*

# EXHIBIT A

**Data Associated with This Exhibit Will be Produced at a Later Date.**

# EXHIBIT B

**Data Associated with This Exhibit Will be Produced at a Later Date.**

# EXHIBIT C

**Data Associated with This Exhibit Will be Produced at a Later Date.**

# EXHIBIT D

**Descriptions of Expenditure Testing Scenarios**

Scenario 1 Methodology: For this testing, I relied on the 2013-2014 beneficiary input file that was modified using the deletion method and error rate corresponding to the scenario "2a Scalar," which is described in the section "Testing Methods and Results." 2014 expenditures for all beneficiaries were reduced by 20%. The regression to estimate CMS-HCC model dollar coefficients was rerun using the reduced expenditure amounts. A parallel process for risk marker deletion was performed on a subset of the denominator file consisting of community, non-dual, aged continuing enrollees. This revised subset of the denominator file was then used with the estimated dollar regression coefficients to calculate the reduction in the average predicted expenditures in the denominator file. This reduced denominator amount was used to calculate the revised relative values with the expenditure reduction.

Scenario 2 Methodology: Same as Scenario 1 but the expenditures were reduced by 30%.

Scenario 3 Methodology: For this testing, I also relied on the 2013-2014 beneficiary input file that was modified using the deletion method and error rate corresponding to the scenario "2a Scalar," which is described in the section "Testing Methods and Results." 2014 expenditures for a random set of 10% beneficiaries were reduced by a random amount (90% on average), and a regression to estimate CMS-HCC model dollar coefficients was rerun using the reduced expenditure amounts. A parallel process for risk marker deletion was performed on a subset of the denominator file consisting of community, non-dual, aged, continuing enrollees. This revised subset of the denominator file was then used with the estimated dollar regression coefficients to calculate the reduction in the average predicted expenditures in the denominator file. This reduced denominator amount was used to calculate the revised relative values with the expenditure reduction.

Scenario 4 Methodology: Same as Scenario 3 but with 2014 expenditures for a random set of 15% beneficiaries were reduced by random amount (85% on average).

Scenario 5 Methodology: For this testing, I relied on the 2013-2014 beneficiary input file that was modified using the deletion method and error rate corresponding to the scenario "1c On/Off," which is described in the section "Testing Methods and Results." 2014 expenditures for all beneficiaries were reduced by 20% and regression to estimate CMS-HCC model dollar coefficients was rerun using the reduced expenditure amounts. A parallel process for risk marker deletion was performed on a subset of the denominator file consisting of community, non-dual, aged, continuing enrollees. This revised subset of the denominator file was then used with the estimated dollar regression coefficients to calculate the reduction in the average predicted expenditures in the denominator file. This reduced denominator amount was used to calculate the revised relative values with the expenditure reduction.

*Confidential*

Scenario 6 Methodology: Same as Scenario 5 but the expenditures were reduced by 30%.

Scenario 7 Methodology: For this testing, I relied on the 2013-2014 beneficiary input file that was modified using the deletion method and error rate corresponding to the scenario "1c On/Off," which is described in the section "Testing Methods and Results." 2014 expenditures for a random set of 10% beneficiaries were reduced by a random amount (90% on average), and a regression to estimate CMS-HCC model dollar coefficients was rerun using the reduced expenditure amounts. A parallel process for risk marker deletion was performed on a subset of the denominator file consisting of community, non-dual, aged, continuing enrollees. This revised subset of the denominator file was then used with the estimated dollar regression coefficients to calculate the reduction in the average predicted expenditures in the denominator file. This amount was used as a denominator to calculate the revised relative values with the expenditure reduction.

Scenario 8 Methodology: Same as Scenario 7 but with 2014 expenditures for a random set of 15% beneficiaries were reduced by a random amount (85% on average).

*Confidential*

# APPENDIX II

**Julia Lambert Resume**

**Wakely Consulting Group, Tampa, CO**
Principal and Senior Consulting Actuary

2008 – Current

- Oversight of firm's model development and training related to Medicare Advantage bid work.

- Has served as the lead actuary for several regional health plans in various states, where responsibilities include product design and rating, feasibility studies, rate certification, and valuation for Medicare, Medicaid, commercial group, and commercial individual products.

- Support reform analyses and policy implications of policy affecting Medicare beneficiaries.

- Performs expert witness work for various healthcare-related practice areas, including pharmacy programs, risk adjustment, and Medicare Advantage.

- Supported the state of Vermont in various projects including the evaluation of the Medicare-Medicaid Program (MMP) in support of their MMP application and performing cost estimates for the Medicare population as part of the single-payer proposal.

- Modeled impact of Medicaid eligibility expansion and pharmacy Carve-in/Carve-out analyses in Ohio on behalf of Association.

- Served as supporting actuary for SHOP exchange analyses for Illinois, Vermont, Delaware, and Rhode Island.

- Served as President of firm from 2015 through 2021.

**Reden & Anders/Ingenix Consulting/now Optum Insight, Denver, CO**
Managing Principal

2000 – 2008

- Appointed Medicare Actuarial Practice Leader responsible for the actuarial bidding process and Medicare strategy for the entire Reden & Anders actuarial practice.

- Provided strategic assistance on proposed and passed legislation. Advised client lobbyist on Medicare payment reform and been involved in discussions with MedPAC. This drove critical business decisions that had a significant impact on profitability.

- Developed feasibility studies for diverse products and services including Medicare, Medicaid, large group, and small group populations.

- Evaluated health care liabilities and complete actuarial opinions for financial statements.

- Actuarially certified large group and small group rate filings, Medicare bids, and small group rating methodologies.

- Forecasted revenues, costs, and financial profitability for diverse products and services.

- Established required rates and project costs for various products with an emphasis on Medicare Advantage plans.

- Determined risk targets, incentives, and capitation rates for provider contracts.

- Performed reimbursement analyses used for contract negotiations and establishing unit cost trends.

- Provider contracting analyses and negotiations:  By comparing the differences in underlying demographics, health risks, unit costs, and utilization for the members associated with providers, carrier clients have been able to improve provider contracts through negotiations.

- Unit cost and utilization trend analyses:  Created service reports that analyze unit cost and utilization by provider group, service category, and period, allowing the improvement of forecasts and expected outcomes.

- Underwriting and group pricing:  Quantifying costs for large employers or carriers using detailed claims experience.  Group renewals and new quotes, taking into account changes in plan designs, including high-deductible health plans, member cost-sharing, benefit maximums, and mandates.

- Facilitated the introduction of a new individual line of business by investigating competitor products, researching state regulations, generating scenario testing, integrating expected underwriting results, and establishing models to convey outcomes easily to the client.

- Reserve-setting:  Oversee IBNR and lag adjustment expense reserve analyses for several clients.

- Forecasting and budgeting for health plans, implementing changes in risk scores.  Deliver results to management determining participation in a particular line of business.

**Leif Associates, Inc., Denver, CO**
Consulting Actuary

1997-2000

- Provided large group underwriting assistance to HMOs.

- Prepared Colorado Annual Reports for HMOs, insurance companies, and dental carriers. These reports require that the rates/capitation amounts for all lines of business (including Medicaid and Medicare) be examined for appropriateness and adequacy of the claims experience, risk contracts, reinsurance, and administrative expenses of the company.

- Evaluated carrier compliance with applicable state and Federal small group law and regulations.

- Completed rate filings for HMOs, insurance companies, dental carriers, and mental health providers in various states.

- Completed reserve valuations for HMOs, self-funded employer health plans, employer trusts, mental health agencies, and state agencies.

- Studied the therapy needs of children with developmental delay and established projected costs of coverage.

- Established beginning claim costs used for establishing FAS 106 valuations for self-funded retiree medical plans.

**Great-West Life, Englewood, CO**
Assistant Actuarial Manager

1996 – 1997

- Supervised initial HMO rate filings in multiple states including pricing benefits and plan designs.

- Created and tested computer rating models for national health products.

- Responded to field questions regarding plan design, benefits, and pricing on newly released copay plans.

- Priced and coordinated release of PPO copay plans in hospital-only networks.

- Set POS targets for risk-sharing medical groups.

**Physicians Mutual, Omaha, NE**
Senior Actuarial Associate

1993 – 1996

- Designed and programmed the Agency Profitability Measurement System for life and health products.

- Designed and priced a new 10-year life product.

- Modeled profitability of all life policies for five years.

- Collected data and compiled information for the annual persistency study.

- Priced various optional health benefits.

**University of Nebraska-Omaha, Omaha, NE**
Mathematics Lecturer

1993 – 1996

- Taught Discrete Mathematics (logic, probability, statistics) and Linear Algebra to mathematics and computer science students.

## EDUCATION

Master of Science, Mathematics, University of Colorado-Boulder, (1992)
Bachelor of Science, Magna Cum Laude, Secondary Education, University of Nebraska-Lincoln, (1989)

## PROFESSIONAL DESIGNATIONS

Fellow, Society of Actuaries (FSA)
Member, American Academy of Actuaries (MAAA)

## PROFESSIONAL AFFILIATIONS

Participant of Medicaid Certification Workgroup of the American Academy of Actuaries

Elected by peers to serve a three-year term on the Health Section Committee of the Society of Actuaries (SOA), in which she played a key role in Medicare Advantage education for the SOA. She also regularly speaks at webinars, seminars, and SOA meetings.

## PUBLICATIONS IN LAST TEN YEARS (AUTHORED OR CO-AUTHORED)

Wakely White Paper, "*Wakely Summary of 2024 MA Advance Notice,*" Feb. 2022

Wakely White Paper, *"Issues in Part D Bids and Reconciliations that Lead to Overestimation of Cost,"* Nov. 2019

Wakely White Paper, "*Medicare Part D 2020: Where, Oh Where, Should My Pharmacy Rebates Go?,*" Mar. 2019

Paper, UnitedHealth Group, "*Actuarial Report on Medicare Advantage FFS Adjuster,*" Aug. 28, 2019 https://www.regulations.gov/document/CMS-2018-0133-0263

Wakely White Paper, "*MA Unleashed: CMS Issues Guidance on Newly Established Benefit Design Flexibility,*" May 2018

Paper, Office of the Assistant Secretary for Planning and Evaluation, *"Estimates of the Impact on Beneficiaries, CMS, and Drug Manufacturers in CY2020 of Eliminating Rebates for Reduced List Prices at Point-of-Sale for the Part D Program,"* Aug. 30, 2018

## TESTIMONIES AND DEPOSITIONS IN LAST FOUR YEARS

United States of America and The State of Florida, ex rel., Amy Sanchez vs. Smart Pharmacy, Inc., Deposition taken March 29, 2022

## PRESENTATIONS

Presentation, FRALL, "Strategic Framework for the MAPD Bid Process," Jan. 25, 2015
Presentation, 2015 SOA Health Meeting, "Payment Transfer Formula - the Mystery Revealed", June 16, 2015

Presentation, Health Plan Alliance, "Payment Transfer Formula - the Mystery Revealed", Jan. 25, 2016

Presentation, 2016 SOA Health Meeting, "Implications of the Encounter Data Processing System," June 15, 2016

Presentation, AHIP, "Encounter Data Filtering,"  June 8, 2017

Presentation, Health Plan Alliance, "2019 Rate Setting, Market Stabilization, and 1332 Waivers", Aug. 10, 2018

**EXHIBIT D-63**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, <br><br> Plaintiffs, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC., et al, <br><br> Defendants. | Case No. 16-cv-08697 FMO (SSx) |

UPDATED EXPERT REPORT OF PHILIP B. STARK
28 MARCH 2024

1754

1.      I am Distinguished Professor of Statistics at the University of California, Berkeley, where I am also a faculty member in the Graduate Program in Computational Data Science and Engineering; a co-investigator at the Berkeley Institute for Data Science; director of Berkeley Open Source Food; and affiliated faculty of the Simons Institute for the Theory of Computing, the Theoretical Astrophysics Center, and the Berkeley Food Institute. Previously, I was Associate Dean of Mathematical and Physical Sciences, Interim Regional Associate for the College of Chemistry and the Division of Mathematical and Physical Sciences, Chair of the Department of Statistics, and Director of the Statistical Computing Facility.

2.      I have published more than two hundred articles and books. I have served on the editorial boards of archival journals in physical science, Applied Mathematics, Computer Science, and Statistics. I currently serve on three editorial boards. I have lectured at universities, professional societies, and government agencies in thirty countries. I was a Presidential Young Investigator and a Miller Research Professor. I received the U.C. Berkeley Chancellor's Award for Research in the Public Interest, the Leamer-Rosenthal Prize for Open Social Science, the IEEE Cybersecurity Award for Practice, a Velux/Villum Foundation Professorship, and the John Gideon Award for Election Integrity. I am a member of the Institute for Mathematical Statistics and the Bernoulli Society. I am a Fellow of the American Statistical Association, the Institute of Physics, and the Royal Astronomical Society. I am professionally accredited as a statistician by the American Statistical Association and as a physicist by the Institute of Physics.

3.      I have consulted for many government agencies, including the U.S. Department of Justice, the U.S. Department of Agriculture, the U.S. Department of Commerce, the U.S. Department of Housing and Urban Development, the U.S. Department of Veterans Affairs, the Federal Trade Commission, the California Secretary of State, the California Attorney General, the California Highway Patrol, the Colorado Secretary of State, the Georgia Department of Law, the Illinois State Attorney, the New Hampshire Attorney General, and the New Hampshire Secretary of State. I currently serve on the Board of Advisors of the U.S. Election Assistance

Commission and its Voluntary Voting Systems Guidelines Committee. (The opinions expressed herein are, however, my own: I am not writing as a representative of any entity.)

4.      I have testified before the U.S. House of Representatives Subcommittee on the Census; the State of California Senate Committee on Elections, Reapportionment and Constitutional Amendments; the State of California Assembly Committee on Elections and Redistricting; the State of California Senate Committee on Natural Resources; and the State of California Little Hoover Commission.

5.      Methods I invented for auditing elections statistically are in law in approximately fifteen U.S. States.

6.      I have been an expert witness or non-testifying expert in a variety of state and federal cases, for plaintiffs and for defendants, in criminal matters and a range of civil matters, including, *inter alia*: truth in advertising, antitrust, construction defects, consumer class actions, credit risk, disaster relief, elections, employment discrimination, environmental protection, equal protection, fairness in lending, federal legislation, First Amendment, import restrictions, insurance, intellectual property, jury selection, mortgage-backed securities, natural resources, product liability class actions, *qui tam*, risk assessment, toxic tort class actions, trade secrets, utilities, and wage and hour class actions.

7.      I have been qualified as an expert on statistics in federal courts, including the Central District of California, the Northern District of Georgia, the District of Maryland, the Southern District of New York, and the Eastern District of Pennsylvania, as well as several state courts.

8.      I have used statistics to address a wide range of questions in many fields.[1]

---

[1] For example, I have used statistics to analyze the Big Bang, the interior structure of the Earth and Sun, earthquake risk, the reliability of clinical trials, the accuracy of election results, the accuracy of the U.S. Census, the risk of consumer credit default, food safety, the causes of geriatric hearing loss, the effectiveness of water treatment, sequestration of carbon in agricultural soils, the fragility of ecological food webs, risks to protected species, the effectiveness of Internet content filters, high-energy particle physics data, and the reliability of models of climate, among other things.

1756

9.      Since 1988, I have taught statistics at the University of California, Berkeley, one of the top two statistics departments in the world (see, e.g., QS World University Rankings, 2014) and the nation (US News and World Reports, 2018). I teach statistics regularly at the undergraduate and graduate levels. I have created five new statistics courses at Berkeley. I developed and taught U.C. Berkeley's first for-credit online course in any subject, which was among the first online courses approved for credit throughout the ten campuses of the University of California system. I also developed and co-taught online statistics courses to over 52,000 students, using an online textbook and interactive pedagogical materials I wrote and programmed.

10.     Appendix 1 is my current *curriculum vitae*, which includes my publications for the last ten years and all cases in the last four years in which I gave deposition or trial testimony.

11.     I am being compensated at the rate of $1,800 per hour for my work in this matter. My compensation is not contingent upon the opinions I express nor upon the outcome of the litigation.

**Assignment**

12.     I was asked to find the overlap between the list of diagnosis instances[2] identified by Mr. M. Timothy Renjilian in Opinions 2 and 3 of his expert report dated September 29, 2023, and subsequently updated on December 3, 2023 ("the Renjilian Report"), and the list of diagnosis instances included in the updated Final Deletes List from Dr. Craig Garthwaite's report dated March 11, 2024 ("the Garthwaite Report").

---

[2] I use the phrase "diagnosis instance" to refer to a unique record of a diagnosis code—that is, a diagnosis code associated with a particular from and through date of service, arising from a particular encounter with a particular provider. Mr. Renjilian uses the phrase "diagnosis code" to refer both to individual instances and to the underlying codes themselves. Mr. Renjilian notes this distinction (see e.g. Renjilian Report, at ¶139, in which he discusses "two instances of diagnosis code 571.5" belonging to a single member), but when he uses phrases like "67% of the diagnosis codes listed in the government's First Interrogatory Response," he is evidently counting *instances* of diagnosis codes. This is somewhat abstract, so here are some concrete numbers. Each of the 27,937,651 lines in the First Interrogatory Response has a unique combination of dx, hicn, fti_DosYr, dos_from, dos_thru, provider_nbr, and npi_iradstable. I call these *diagnosis instances* or *Dx instances* of which Mr. Renjilian identifies 18,849,686, or 67.47 percent, as belonging to his Opinion 2 (fti_Op2Total = 1). However, there are only 18,883,554 unique combinations of dx, hicn, and fti_DosYr in the First Interrogatory Response file, of which 12,107,495, or 64.12 percent, are identified as belonging to his Opinion 2. These are the *diagnosis codes* for each beneficiary in each year.

13.     I was asked to analyze the rates at which CMS's RADV audit, discussed in Opinions 4, 5, and 7 in the Renjilian Report, found support for member-HCC-year combinations present in the First Interrogatory Response and identified in the Renjilian Report as having financial impact. I was also asked to determine whether the support rate associated with these combinations was statistically distinguishable from the support rates associated with RADV-reviewed member-HCC-year combinations not identified as having financial impact or not listed in the First Interrogatory Response at all.

14.     I was asked to perform the two analyses described in the previous paragraph on the member-HCC-year combinations in the Garthwaite Final Deletes List.

15.     I was asked to assess the overlap between the Garthwaite Final Deletes List and the CMS RADV audit and the statistical implications of the non-comprehensive nature of that overlap.

16.     I was asked to review the statistical content of the expert report of Dr. Michael P. Salve, dated 29 September 2023 ("the Salve Report") including the sampling methodology and statistical models it employs.

**Materials Relied Upon**

17.     The materials I relied upon in reaching my conclusions are listed in Appendix 2. Copies of some of those materials are provided as an electronic supplement to this report.

18.     The computer programs I used to aggregate, load, and analyze data and to create the tables and figures in this report are provided as an electronic supplement to this report.

**Opinions and Analysis**

   **The Renjilian Report**

I.     **Opinions 2 and 3 of the Renjilian Report regarding the First Interrogatory Response (FIR) do not apply to the Garthwaite Final Deletes List, which contains a miniscule percentage of the diagnosis instances flagged in Opinion 2 and/or Opinion 3.**

4

1758

**(a) The Garthwaite Final Deletes List contains 2,087 of the diagnosis instances that Opinion 2 of the Renjilian report alleges are supported by other diagnosis instances at the HCC level. This overlap is very small: it comprises about 0.01 percent of the 18,849,686 diagnosis instances identified in Renjilian's Opinion 2 and about 0.11 percent of the 1,930,455 distinct diagnosis instances in the Garthwaite Final Deletes List.**

**(b) The Garthwaite Final Deletes List contains 5,922 of the diagnosis instances that Opinion 3 of the Renjilian report alleges would have no marginal effect on Part C or Part D Medicare Advantage payments to United if they were deleted. This overlap is also very small: it comprises approximately 0.03 percent of the 23,277,486 diagnosis instances identified in Renjilian's Opinion 3 and about 0.31 percent of the 1,930,455 distinct diagnosis instances in the Garthwaite Final Deletes List.**

**(c) The Garthwaite Final Deletes List contains 6,035 of the 23,491,048 diagnosis instances identified in Renjilian's Opinion 2 or Opinion 3 or both. This overlap is very small: It comprises about 0.03 percent of the diagnosis instances identified in Renjilian's Opinion 2 or Opinion 3 or both, and about 0.31 percent of the 1,930,455 distinct diagnosis instances in the Garthwaite Final Deletes List.**

19.     Opinion 2 of the Renjilian Report purports to identify and count, among the diagnosis instances listed in the FIR, those that were supported at the level of their associated HCC/RxHCC (or by an HCC/RxHCC above them in a hierarchy) by other diagnosis instances that were recorded by United reviewers but not found in the FIR list. I have not assessed whether any of Mr. Renjilian's factual claims about the diagnosis instances he flagged as belonging to Opinion 2 are correct.

20.     Opinion 3 of the Renjilian Report purports to identify and count, among the diagnosis instances listed in the FIR, those that would have no impact on Part C or Part D

Medicare Advantage payments if they were deleted. I have not assessed whether any of Mr. Renjilian's factual claims about the diagnosis instances he flagged as belonging to Opinion 3 are correct.

21.    I wrote computer programs to count the diagnosis instances identified in Opinion 2 and/or Opinion 3 of the Renjilian Report that are also present in Attachment 1 to Dr. Garthwaite's report, the "Final Deletes List." I understand from Dr. Garthwaite's report that the Final Deletes List includes diagnosis instances that satisfy all three of the following conditions:

(1)    Dr. Garthwaite concluded that "[chart] review found no support for these diagnosis codes or their associated [HCCs] or [RxHCCs]", Garthwaite Report, at ¶13;

(2)    Dr. Garthwaite "found no other instances of these diagnosis codes [or] diagnosis codes associated with the same [HCCs] or [RxHCCs] that Defendants may have submitted for that beneficiary in the same year", *Ibid.*;

(3)    Dr. Garthwaite "calculated that the risk adjustment payments Defendants received from CMS would have been reduced if Defendants had deleted these diagnosis codes." *Ibid*.

22.    Table 1 below shows the overlap between the diagnosis instances identified in Opinions 2 and 3 of the Renjilian Report and the diagnosis instances in the Garthwaite Final Deletes List.[3]

---

[3] Mr. Renjilian's calculations are described in Appendix 1 of his report, a document with the filename "CONFIDENTIAL Appendix 1 - FTI FIR Table and Appendices Description.pdf," and the results of his putative identifications are in fields added to the file "FIR_2008_2016_FINAL_FLAGS.txt" he produced with his report. Dr. Garthwaite's Final Deletes List is presented as a collection of twelve files produced with his report: attachment1_edps_2014.csv, attachment1_edps_2015.csv, attachment1_edps_2016.csv, attachment1_irads_2008.csv, attachment1_irads_2009.csv, attachment1_irads_2010.csv, attachment1_irads_2011.csv, attachment1_irads_2012.csv. attachment1_irads_2013.csv. attachment1_irads_2014.csv, attachment1_irads_2015.csv, and attachment1_irads_2016.csv. Following Mr. Renjilian's approach, I did not analyze the three EDPS files and focused instead on the nine IRADS files. To calculate the numbers in Table 1, I used Python scripts to construct a SQLite database containing tables with Mr. Renjilian's results and Dr. Garthwaite's results. I then wrote Python scripts to generate SQL queries that matched diagnosis instances across the two tables using healthcare identification numbers, diagnoses, and dates of service. I ran the SQL queries and analyzed the results within a Jupyter notebook.

1760

**Table 1: Overlap of Dx instances in Renjilian's Opinion 2 and 3 with the Garthwaite Final Delete List**

| Renjilian Opinion | Renjilian count in FIR | Count in Garthwaite Final Deletes List | Percentage of Garthwaite Final Deletes List Dx Instances |
|---|---|---|---|
| Neither Opinion 2 nor 3 | 4,446,603 | 1,907,463 | 98.81 |
| Opinions 2 and/or 3 | 23,491,048 | 6,035 | 0.31 |
| *o/w Opinion 2 only* | *213,562* | *113* | *<0.01* |
| *o/w Opinion 3 only* | *4,641,362* | *3,948* | *0.20* |
| *o/w both Opinions 2 and 3* | *18,636,124* | *1,974* | *0.10* |
| New Instances in FDL | n/a | 16,957 | 0.88 |
| Total Dx Instances | 27,937,651 | 1,930,455 | 100.0% |

**II.    Opinion 4 of the Renjilian Report is based on all diagnosis instances in the FIR, even though Opinion 3 of the Renjilian Report had flagged a large percentage of those diagnosis instances as having no financial impact if deleted. RADV found support for those (inconsequential) diagnosis instances at a much higher rate (approximately 96 percent) than the instances that have financial impact if deleted according to Opinion 3 (approximately 60 percent). This difference in rates of support is large and highly statistically significant. Moreover, the overall rate at which RADV found support (approximately 88 percent) was substantially and statistically significantly higher than the rate at which RADV found support for those diagnosis instances in the FIR list identified in Renjilian's Opinion 3 as having financial impact if deleted (approximately 59 percent). Thus, Renjilian's Opinion 5 does not apply to those diagnosis instances in the FIR list that Renjilian identifies as having financial impact if deleted.**

23.    The CMS RADV audits analyzed in Opinion 4 of the Renjilian Report found support for member-HCC-year combinations contained in the FIR that are identified in the Renjilian Report as having financial impact if deleted (i.e., those covered by Renjilian's Opinion 3) at a much lower rate than the overall 89% to 91% rate of RADV support stated in the

Renjilian Report.[4] The conclusion of Opinion 5 of the Renjilian Report does not apply to these member-HCC-year combinations: according to Renjilian's work product, RADV found support for these combinations that had financial impact at a rate substantially lower than for the member-HCC-year combinations identified in Opinion 3: 61.3 percent versus 96.3 percent for those without financial impact for the V12 model, and 58.6 percent versus 96.2 percent for those without financial impact for the V22 model. These differences in the rates of support are highly statistically significant according to Fisher's exact test, with P-values below 0.0000001.[5] In other words, there is a strong, statistically significant association between having financial impact (according to Renjilian's Opinion 3) and *not* having support in RADV.

24.    To evaluate the rates at which RADV audits found support for member-HCC-years[6] that Mr. Renjilian identified as having financial impact if deleted, I replicated and extended portions of Mr. Renjilian's analysis.

25.    The first step was to construct a single "stacked" database table (as Mr. Renjilian calls it in paragraph 155 of his report) containing the data in the files produced by CMS.

26.    Two fields[7] in the "stacked" PFR data[8] appear to indicate whether the medical record was submitted. The "Submission Status" field agreed with the other when both were present, and was always populated, so I used it to infer submission status. This agrees with the analysis described in paragraph 156(a) of the Renjilian Report.

27.    Three fields[9] in the "stacked" PFR data appear to indicate whether the submitted medical records were valid. I cross-tabulated the values of those fields and determined that

---

[4] The Renjilian Report sometimes counts individual lines in FIR, which correspond to diagnosis instances ("Dx instances") rather than to member-HCC-year combinations, which I understand risk adjustments are based on. In this report, I generally focus on member-HCC-year combinations rather than on Dx instances. However, in discussing the Renjilian Report, the numbers I present may refer to Dx instances or to member-HCC-year combinations, as appropriate.

[5] The rates differ across those groups by an amount that would be surprisingly large if the groups had been constructed by taking the pooled collection of member-HCC-year combinations and randomly splitting it into two groups of the respective sizes.

[6] Mr. Renjilian refers to "member-HCC combinations" or, more concisely, "member-HCCs." The actual unit of analysis is member-HCC-year due to the annual nature of risk adjustment so I will refer to "member-HCC-years."

[7] "Submission Status" and "submission_status."

[8] Plan Feedback Report, *See* Renjilian Report at paragraph 153.

[9] "Valid/Invalid MR", "Valid/Invalid MR (old)", and "Review Status".

1762

"Valid/Invalid MR" agreed with the others whenever it was populated and one or more of the other fields was also present, but there were instances where "Valid/Invalid MR" was blank but "Valid/Invalid MR old" indicated "Valid." I therefore treated the medical record as valid unless "Valid/Invalid MR" was "Invalid." This follows the approach described in paragraph 156(b) of the Renjilian Report.

28.    Five fields[10] in the "stacked" PFR data appear to indicate whether support for the HCC was found. I cross-tabulated the values of those fields, which showed that the "Initial Findings" field was always present, was always populated, and had the same value as the other fields when they were present. Hence, I based the determination of whether support for the HCC was found on "Initial Findings." This follows the approach described in paragraph 156(c) of the Renjilian Report.

29.    Combining Dx instances corresponding to individual member-HCC-years and checking whether they were audited by RADV involves matching enrollees in the RADV data to the same enrollees in the FIR data. For contract years 2011 through 2013, I performed that process by looking for any match between the "HICN," "RRHICN," "MBI," and "RRMBI" member identifiers provided in the PFR crosswalk[11] and the "hicn" and "hist_hicn" fields provided in the FIR[12]. The crosswalk provided with the updated Renjilian Report for contract years 2014 and 2015 list[13]s only a single member identifier for each enrollee ID ("HICNBR"), so for those years I check that against both the "hicn" and "hist_hicn" fields in the FIR.

30.    My results match the 2011–2013 counts in the left panel of Figure 15 of the Renjilian Report, which gives the number of member-HCC-years supported by RADV audits according to whether the audited member-HCC-year was or was not in the FIR.

---

[10] "hcc_2013out", "hcc_2014out", "Initial Findings", "Initial Findings (2014 HCCs)", and "HCC_Initial_Finding".

[11] MAPL010977189

[12] Renjilian Support Materials, "CONFIDENTIAL - UPDATED AS OF 12-03-23 - FTI First Interrogatory Response Table.txt"

[13] Renjilian Support Material, "CON14 CON15 Member Mapping.xlsx"

31.    RADV found support for a substantially smaller fraction of the member-HCC-years not identified in Opinion 3 of the Renjilian Report than it did for the member-HCC-years identified in Opinion 3. RADV found support for the member-HCC-years that (according to Opinion 3 of the Renjilian Report) have financial impact at a much lower rate than it found for member-HCC-years that do not have financial impact: 61.3 percent versus 96.3 percent for the V12 model, and 58.6 percent versus 96.2 percent for the V22 model. Thus, the comparison in paragraph 165 of the Renjilian Report is inapt and misleading. Previously submitted member-HCC-years that had not been identified by a United coder in Chart Review, *and* that were found—by Mr. Renjilian's analysis—to have financial impact if deleted, were supported at a rate that was lower than other member-HCC-years examined by RADV.

32.    I performed a statistical test known as Fisher's Exact Test[14] to assess whether the difference in the rates at which RADV found support could reasonably be ascribed to "the luck of the draw." Fisher's exact test compares the observed difference in rates between two groups to the distribution of differences that would arise if the two groups were formed by randomly partitioning their union into two groups of the observed sizes; it is based on the hypergeometric distribution. The null hypothesis for this test is that member-HCC-years in FIR that Renjilian did not flag in Opinion 3 and that were reviewed by RADV were like a random sample of all the member-HCC-years reviewed by RADV. The (two-sided) P-value for the tests was less than 0.0000001: it would be extremely unlikely to observe this difference in rates (61.3 percent versus 96.3 percent for the V12 model HCCs, and 58.6 percent versus 96.2 percent for the V22 model HCCs) if the grouping were random.

33.    This shows that there is a strong, statistically significant association between a Dx instance having financial impact if deleted (according to Renjilian's Opinion 3) and that instance *not* being supported by the RADV audit. Dx instances in the FIR list that Renjilian's Opinion 3

---

[14] See, e.g., See, e.g., Kaye, D. and Freedman, D.A., 2011. Handbook on Statistics, in *Reference Manual on Scientific Evidence, 3rd Edition,* Federal Judicial Center, at 255 (note 108) and 287. I used a two-sided test.

identifies as having financial impact are supported at a much lower rate than Dx instances in the FIR list that Renjilian identifies as having no financial impact.

**Table 2: RADV Support for FIR Dx instances by value of Renjilian's Opinion 3 Flag**

| Model | years | RADV supported Op3=1 | RADV unsupported Op3=1 | percent supported | RADV supported Op3=0 | RADV unsupported Op3=0 | percent supported | P-value |
|-------|-------|----------------------|------------------------|-------------------|----------------------|------------------------|-------------------|---------|
| V12 | all | 3,082 | 119 | 96.3 | 537 | 339 | 61.3 | <0.0000001 |
| | 11–13 | 767 | 31 | 96.1 | 213 | 108 | 66.4 | <0.0000001 |
| | 14–15 | 2,315 | 88 | 96.3 | 324 | 231 | 58.4 | <0.0000001 |
| V22 | all | 2,106 | 84 | 96.2 | 331 | 234 | 58.6 | <0.0000001 |

34.    In Opinion 5 and Figure 15, Renjilian counts member-HCC-year combinations and does not consider the impact of his Opinion 3 on his calculations. Indeed, Opinion 5 does not even mention Opinion 3. Opinion 7, however, *does* consider the impact of Opinion 3, and acknowledges that the RADV support rate is significantly lower for HCCs that Renjilian's analysis says would have financial consequences if deleted. However, for unclear reasons, the findings in Opinion 7 involve diagnosis instances rather than member-HCC-years. (Oddly, he reports the overall member-HCC-year counts but not the member-HCC-year counts that he concludes have financial significance.)

35.    My method for replicating Renjilian's results using the flags he added to the FIR table yields an exact match for CY2011–13. This suggests that my findings may well be compatible with Renjilian's own figures. Using the same method, I find that 213 out of 321 member-HCC-year combinations in CY2011–13 not excluded by Renjilian's Opinion 3 were reviewed and supported in RADV (for a support rate of 66.4%).

36.    However, in CY2014–15, there is a small discrepancy[15] between Renjilian's counts of member-HCC-years in FIR that were audited by RADV and my counts: I find two fewer member-HCCs supported than he does (4,795 instead of 4,797) and sixteen more member-

---

[15] The simultaneous use of two HCC models (V12 and V22) in CY2014 and CY2015 makes counting member-HCC-year combinations less straightforward than it is in CY2011 through CY2013. My goal for this analysis is to match Renjilian's methodology in his Figure 15 as closely as possible, even though his chosen approach of "count[ing] member-V12 HCC and member-V22 HCC combinations separately and add[ing] them together" might not be well-specified or appropriate. Renjilian Report at fn. 236.

HCCs unsupported than he does (594 instead of 578). This suggests that Renjilian might have reached slightly different results than I do when applying Opinion 3 to his CY2014–15 analysis. My determination in CY2014–15 is that 632 out of 1,079 member-HCC-year combinations in CY2014–15 not excluded by Renjilian's Opinion 3 were reviewed and supported in RADV (for a support rate of 58.6%).

37.     For the entire RADV period, I find 1,400 member-HCC-year combinations in FIR that were audited by RADV, of which RADV found support for 845, a rate of 60.4 percent. In contrast, Figure 15 of the Renjilian Report finds that for RADV overall, there were 55,730 member-HCC-year combinations and that RADV found that 48,911 of them had support, a rate of 87.8 percent. I performed Fisher's Exact Test to assess the statistical significance of this difference in rates. The resulting P-value was less than 0.0000001; the difference is highly significant. Thus the claim in Renjilian's Opinion 5 that the overall rate of support in RADV is approximately the same as the rate at which RADV found support for member-HCC-years in FIR does not apply to the subset of member-HCC-years that, according to Renjilian's Opinion 3, would have financial consequences if deleted.

**III.     The overall rates at which member-HCC-year combinations are supported by RADV audits are substantially higher than the rates at which member-HCC-year combinations in the Garthwaite Final Deletes List were supported by RADV audits: for V12, roughly 83 percent for RADV overall versus 57 percent for the limited number of member-HCC-years in the Garthwaite Final Deletes list that were audited, and for V22, 79 percent versus 55 percent. These differences in rates are large and highly statistically significant. Thus, the claim in Opinion 5 that HCCs in FIR are supported at similar rates to those in RADV is not true for those diagnosis instances in the Garthwaite Final Deletes List: RADV finds a substantially lower rate of support for those.**

38.     I constructed a crosswalk from RADV enrollee identifiers to the Garthwaite Final Deletes List using a method similar to the one I used for the FIR (discussed above), except that

the Garthwaite Final Deletes List contains up to three member identifiers per line ("hic1," "hic2," and "hic3"). I merged repeated instances of a given HCC for each member for each year, separately for V12 and V22 HCCs, both for RADV and for the Garthwaite Final Deletes List. I considered a member-HCC-year combination to be supported by RADV if that HCC was supported for that member for that year in anywhere in the RADV data. After calculating the rates of support, I assessed whether the differences were statistically significant using Fisher's Exact Test, as described in ¶32, *supra*.

39.     For the V12 model, overall, RADV found support for 41,681 of 49,978 audited member-HCC-year combinations, a rate of 83.4 percent. In contrast, RADV found support for 263 of the 463 member-HCC-year V12 combinations it checked that are among the Garthwaite Final Deletes List, a rate of 56.8 percent. This difference in rates is large and highly statistically significant, with a P-value below 0.0000001.

40.     For the V22 model, overall, RADV found support for 37,969 of 48,044 audited member-HCC-year combinations, a rate of 79.0 percent. In contrast, RADV found support for 161 of the 295 member-HCC-year V22 combinations on the Garthwaite Final Deletes List that it checked, a rate of 54.6 percent. This difference in rates is large and highly statistically significant, with a P-value below 0.0000001. This shows that there is a strong, statistically significant association between a member-HCC-year appearing in the Garthwaite Final Deletes List and that combination not being supported by the RADV audit. Combinations in the Garthwaite Final Deletes List are supported at a much lower rate than combinations in the RADV data.

**IV.     The RADV samples of individual HCCs are very small. When sample sizes are small, the uncertainty in estimated support rates for individual HCCs is so large that the estimates are not helpful, even if the RADV sample were a simple random**

**sample of HCCs—which it is not.[16] For instance, for a sample of size 10 drawn uniformly at random from a large population, the width of a 95 percent confidence interval for the population rate ranges from about 31 percent (if the rate in the sample is 0 or 100 percent) to about 63 percent (if the rate in the sample is 50 percent). For a sample of size 30, the width of the interval ranges from about 12 percent (if the rate in the sample is 0 or 100 percent) to about 37 percent (if the rate in the sample is 50 percent). For the Garthwaite Final Deletes List, less than 19 percent of the total risk adjustment (the sum of the risk adjustments for all members for all years) for V12 and less than 8 percent of the total risk adjustment for V22 involves HCCs that were sampled at least 30 times in all by RADV. No V12 or V22 HCC was sampled 30 times or more in any year. HCC sample sizes for individual contracts (and plans) and individual years need to be adequate to estimate support rates for individual contracts, plans,[17] and individual years, since the rate at which a given HCC is supported may vary.**

41.    Paragraph 158 of the Renjilian Report states, "Finally, in my experience, a sample of 1,891 codes would generally be considered quite robust for most evaluative purposes. Thus, the RADV audit results form an instructive basis on which to assess the First Interrogatory Response." This is nonsense from a statistical perspective, for several reasons:

A.    To construct unbiased estimates from random samples and to assess the accuracy of estimates based on random samples requires taking into account the statistical design of the sample, namely, the probability of selecting each subset of the population. I understand that as of 2012, the RADV sample is a random sample of enrollees, not of HCCs; that it is stratified by contract and may draw a different number

---

[16] "Simple random sample" is a term of art. A simple random sample is a sample of a pre-specified size drawn from a population in such a way that every subset of that size has the same probability of being the sample. See ¶41A, *infra*, for reasons the RADV sample is not a simple random sample of enrollee-HCC-years.

[17] I understand that RADV audits are "contract-level," not plan-level or organization-level. I understand that during the relevant time period, CMS did not extrapolate from the RADV sample to contracts nor to all contracts operated by a given parent organization; and that starting in 2018, CMS will extrapolate RADV sample results to contracts but not to all contracts operated by a parent organization such as United Health Group.

of enrollees from different contracts and have different sampling fractions for different contracts; that it is stratified within contracts by risk score tercile; and that it excludes some enrollees. It is a stratified cluster sample of member-HCC-years within individual contracts, and the sampling frame differs from the population.[18] It is not a simple random sample of member-HCC-years in the First Interrogatory Response. The sampling design must be taken into account to construct unbiased estimates from the sample and to quantify the uncertainties of those estimates.

B.    "Robust" is also a term of art in statistics, but the use of that term in the Renjilian Report is not correct. An estimator (a function of the sample data used to estimate a parameter of the population) is robust if "small" violations of the distributional assumptions that justify the use of the estimator do not have a large impact on the accuracy of the estimator.[19] "Robust" does not apply to sample sizes.

C.    Whether the sample size is adequate depends on the design of the sample and the purpose to which the sample will be put. There is no such thing as a generically "adequate" sample size nor a sample size that provides an "instructive basis."

D.    I do not know whether the medical records reviewed by RADV were the same as the records reviewed by United's chart review program when both examined the same member-HCC-year instance. It is possible that the records reviewed in United's chart review program differ from those reviewed by RADV. To the extent that the records examined by the two programs differ, extrapolating RADV results to FIR or the Garthwaite Final Deletes List will have additional bias, beyond statistical bias relating to how the sample was drawn, no matter how large the sample is.

42.    The discussion of the CMS RADV audit in the Renjilian Report does not consider HCCs separately: it only finds overall support rates pooled across HCCs. Other than a brief

---

[18] See, e.g., Kaye, D. and Freedman, D.A., 2011. Handbook on Statistics, in *Reference Manual on Scientific Evidence, 3rd Edition,* Federal Judicial Center, at 292, 296.

[19] See, e.g., Kaye, D. and Freedman, D.A., 2011. Handbook on Statistics, in *Reference Manual on Scientific Evidence, 3rd Edition,* Federal Judicial Center, at 295.

discussion of proportional similarity in paragraph 158, the cross-HCC support counts and rates that Mr. Renjilian presents treat all member-HCC-year or diagnosis instances as fungible.

43.     Notably, while the Salve Report has serious statistical deficiencies as discussed below, it *does* point out that support varies significantly across HCCs and that stratification by HCC is important. *See* Salve Report at paragraphs 47 and 58 and Appendices D and E. The financial impact of different HCCs is in general different, so any variability in the rates of support across HCCs (or even variability of the rate of support for a given HCC across contracts and years) has financial implications, which the Renjilian Report ignores. Ignoring differences in rates of support across HCCs is misleading for several reasons.

44.     First, under the CMS payment system, the mix of member-HCCs matters, not just the total number of HCCs.[20]  There is no reason to assume that the RADV process examines or finds support for different HCCs at the same rate or finds support for the same HCC at the same rate in different years or for different contracts—indeed, there are reasons to assume the opposite.

45.     Second, reporting only a pooled rate of support for all HCCs in the RADV data obscures the fact that the RADV sample is not a simple random sample of member-HCC-years and that the sample size for estimating the rates at which RADV finds support for individual HCCs overall, within individual years, and/or within particular contracts is often tiny. Indeed, two V12 HCCs in the Garthwaite Final Deletes List were not sampled at all by RADV. The sample sizes are smaller for comparisons limited to the relevant member-HCC-years (RADV overlap and support for member-HCC-year combinations present in the Garthwaite Final Deletes List). They are even smaller for HCCs within individual contract years. I understand that contract-years may be a more appropriate unit of analysis for financial issues than years without regard to contract, in part because RADV samples members from individual contracts.

---

[20] *See e.g.,* Announcement of Calendar Year (CY) 2012 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter (April 4, 2011), at Table 9.

1770

Moreover, I understand that contract-years may differ in characteristics that affect support rates overall and for individual HCCs (e.g., geography, providers, and patient demographics). I am not aware of any affirmative evidence that RADV finds support for HCCs in different contract-years at the same rates.

46.    To make an unbiased estimate of the rate at which a particular HCC is supported by RADV in a particular period of time and/or for a particular contract and to quantify the uncertainty of any estimate (biased or not) requires knowledge of how the sample is drawn. The uncertainty will be large unless the sample size of that HCC from that period of time and/or contract is adequately large. I calculated the RADV sample sizes for each HCC-contract-year combination,[21] separately for the V12 model HCCs and the V22 model HCCs. I also calculated the RADV sample sizes for higher levels of aggregation, including HCC-year combinations without regard to contract, HCC-contract combinations without regard to the year, and overall HCC sample sizes without regard to contract or year.

47.    Because there are nearly 80 HCCs, many contracts, five years, and two risk models, there are thousands of HCC-contract-year combinations: 9,270 for model V12 and 4,157 for model V22. To summarize the sample sizes for such a large number of populations, I calculated the fraction of the "final deletes total risk score" (the total of the risk scores of the HCC-enrollee-years that, per Dr. Garthwaite's analysis, should be deleted)[22] represented by combinations that were sampled at least once, twice, …, and at least 30 times, for each level of aggregation (all contracts in all years, each contract without regard to year, each year without regard to contract, and each contract in each year).

---

[21] I understand that some contracts and plans merged or were renumbered in various years. To be conservative, I pooled the sample sizes for all contracts that were connected to each other according to CMS, even if only some plans moved from one of those contracts to another. See https://www.cms.gov/data-research/statistics-trends-and-reports/medicare-advantagepart-d-contract-and-enrollment-data/plan-crosswalks (last visited 27 January 2024).

[22] To find the risk adjustment for each HCC under the V12 and V22 models, as appropriate, I downloaded the corresponding SAS code from CMS. https://www.cms.gov/medicare/payment/medicare-advantage-rates-statistics/risk-adjustment (last visited 24 January 2024) The "final deletes total risk score" that I computed does not account for interactions among HCCs nor for whether an HCC lower in the hierarchy of a deleted HCC would have been determined to be supported.

48.     To calculate these summaries, first I calculated the "final deletes total risk score" for each level of aggregation, separately for V12 and V22. I repeated that calculation, omitting HCCs that RADV had not sampled at least once, at least twice, etc., up to at least 30 times at that level of aggregation (overall, per contract, per year, or per contract per year). The result of these calculations is in Figure 1, plotted separately for each contract year. The highest curve in each panel (blue, dots) is for aggregation across all contracts and all years; the second-highest (green, dots and dashes) is for aggregation within years across contracts; the third-highest (orange, dashes) is for aggregation within contracts across years; and the lowest (red, solid) is for aggregation within contracts and within years.

49.     Figure 1 shows that roughly 20 percent of the final deletes total risk score is in HCCs that were sampled 20 times or more across all years and all contracts. Less than 30 percent of the final deletes total risk score is in HCCs that were sampled even once in the corresponding a contract-year, and in some instances (e.g., the V12 model in CY2011, 2012, and 2013), this figure is less than 10 percent. A vanishingly small fraction is in HCCs that were sampled at least five times in the corresponding contract-year. Because these sample sizes are so small, estimates of the population support rate based on the RADV sample would have very high uncertainty, regardless of how the RADV sample was drawn.



**Figure 1: Percentage of the "final deletes total risk score" in groups of HCCs sampled at least 1, 2, …, 30 times. HCC: samples per HCC without regard to year or contract. Year-HCC: samples per HCC per year. Contract-HCC: samples per contract. Year-Contract-HCC: samples per HCC per contract per year.**

1773



50.    Figure 2 shows, for each HCC in the V12 model, the ratio of the relative frequency of the HCC in the RADV sample to its relative frequency in the Garthwaite Final Deletes List. Figure 3 shows, for each HCC in the V12 model, the ratio of the relative frequency of the HCC in the RADV sample to its relative frequency in the First Interrogatory Response (FIR). The ratios vary from 0 (for HCCs that were not sampled at all in RADV) to almost 29. If the sample were representative, all the ratios would be close to 1.

1774



**Figure 2: Ratio of relative frequencies of V12 HCCs in the RADV sample to their relative frequencies in the Garthwaite Final Deletes List, sorted by ratio. The dashed horizontal line corresponds to equal relative frequencies.**

1775



**Figure 3: Ratio of relative frequencies of V12 HCCs in the RADV sample to their relative frequencies in the First Interrogatory Response (FIR), sorted by ratio. The dashed horizontal line corresponds to equal relative frequencies.**

51.    The large differences in relative frequencies of HCCs in the RADV sample versus their relative frequencies in the two populations in question suggest that if the RADV sample is a random sample at all, it is not a simple random sample from either of those populations. Indeed, for the hypotheses that the RADV HCCs are a simple random sample from populations with the same HCC frequencies as the Garthwaite Final Deletes List or from the First Interrogatory Response, chi-square tests based on the HCC frequencies yield P-values below 0.0000001: the V12 HCCs in the RADV sample are not representative of either of those populations. This is unsurprising given how the RADV sample is drawn.

52.    Because the rate of support may vary by HCC (and by contract and by year), because the mix of HCCs differs so much between the RADV sample and the two populations in question, and because the RADV sample is not a simple random sample of member-HCC-years, extrapolating the overall rate of support in the RADV sample to the Garthwaite Final Deletes List or to the Dx instances in the FIR list may have considerable statistical bias. The design of the RADV sample needs to be taken into account, and an adjustment for the different mixes of HCCs is needed.

**Summary of Opinions Regarding the Renjilian Report**

53.    In summary, the Renjilian Report's conclusions about the rate of diagnosis events that have no financial consequences (either because they are subject to Opinion 2 or Opinion 3) does not apply to the Garthwaite Final Deletes List, which contains very few diagnosis events flagged by Renjilian's Opinion 2 and/or Opinion 3. The rate at which RADV found support is much lower different for diagnosis instances in the FIR list with financial consequences (according to Renjilian Opinion 3) than it is for those without financial consequences. Yet the Renjilian Report ignores those differences, which undermine Opinion 5. The overall rate at which RADV found support is much higher than the rate at which it found support for member-HCC-years within the Garthwaite Final Deletes List: the raw RADV support rate should not be extrapolated to the Garthwaite Final Deletes List. (Moreover, the raw RADV support rate is not an unbiased estimate of the overall support rate for HCCs, because of how the RADV sample is drawn.) In addition, the Renjilian Report lumps together all HCCs, even though the deletion of different HCCs has different financial consequences and the rates at which RADV found support for different HCCs varies. The RADV sample size is very small (even zero) at the level of some individual HCCs, and smaller still if HCCs in different contracts and/or years are considered separately, which they should be if the rates of support differ across such groups and because the RADV sample is drawn separately from different contracts. The Renjilian Report treats the RADV sample as if it were a simple random sample from the relevant population of member-HCC-years, but it is not.

**The Salve Report**

**V.    The Salve Report did not draw a proper random sample of HCCs. It relied on a pseudo-random number generator that was inadequate for drawing samples of 50 HCCs from populations as large as those the samples were drawn from.**

54.    Most computers cannot generate truly random numbers. Instead, they use algorithms called *pseudo-random number generators* (PRNGs) to produce sequences of numbers that behave, to some degree of approximation, like truly random numbers. The degree of

approximation depends on details of the PRNG: some are better than others. Some are suitable for some purposes but not for others. The quality of PRNGs—how hard it is to tell that their output is not truly random—varies widely. A high-quality PRNG generally involves more complicated computations and is thus slower than lower quality PRNGs. When choosing among PRNGs, one should consider the purpose to which the pseudo-random numbers will be put. Some applications require higher quality PRNGs than others.

55.     A PRNG generally operates as follows: starting from an initial *state* (related to a *seed*), the PRNG calculates an output (some number of pseudo-random bits) and updates its state to a new state. The *state space* is the set of possible states of the PRNG. The *period* is the number of outputs the PRNG can have before it starts to repeat itself. The period cannot be larger than the number of possible states.

56.     Dr. Salve used the default PRNG in STATA, the Mersenne Twister, to draw samples of 50 members for each HCC. He used the Mersenne Twister to assign a pseudo-random number to each member-HCC pair, sorted the pairs within each HCC to put them in a pseudo-random order, then took the top 50 in each sorted list. Salve Report, at ¶60. I call that approach PIKK: permute indices and keep the top $k$.[23] The PIKK approach is like dealing a hand of cards: you can deal a hand of five random cards by shuffling the entire deck thoroughly to put the cards in a random order, then dealing the top five cards. It is crucial to shuffle thoroughly—well enough that every set of five cards is equally likely to be the top five cards in the deck.

57.     PIKK works in theory with perfect random numbers, but it cannot work in practice with the particular PRNG that Salve used, for populations as large as the member-HCC population from which he sampled. Because of the size of its state space, the Mersenne Twister cannot construct every permutation of lists of more than 2,083 items,[24] but Dr. Salve tries to use

---

[23] See Stark, P.B., and K. Ottoboni, 2018. Random Sampling: Practice Makes Imperfect. https://arxiv.org/pdf/1810.10985.pdf (last accessed 15 November 2023).
[24] The state space for the Mersenne Twister contains 19,937 bits. Two to the power 19,937, the number of possible states of the Mersenne Twister, is between 2,083 factorial (the number of orderings of 2,083 distinguishable items) and 2,084 factorial (the number of orderings of 2,084 distinguishable items). See Stark, P.B., and K. Ottoboni, 2018. Random Sampling: Practice Makes Imperfect, https://arxiv.org/pdf/1810.10985.pdf (last visited 11 January 2024).

1778

it to permute up to 3,100,061 things (for HCC 96). The ratio of the number of possible permutations of 3,100,061 things to the number of permutations that the Mersenne Twister can generate has more than 18 million digits before the decimal point. The Mersenne Twister is grossly underpowered for drawing samples from such large populations using PIKK. The PIKK approach using the Mersenne Twister cannot shuffle such a large deck (3,100,061 items) well at all.

58.     Of the 79 HCCs in the dataset, 77 occur more than 2,083 times (only HCC 110 and HCC 166 have fewer occurrences). Dr. Salve's approach cannot in principle generate simple random samples of any of those 77 HCCs.

59.     Dr. Salve could have drawn better random samples of HCCs in many different ways. To do so would require both a better PRNG (for instance, one based on cryptographic hash functions, as in the cryptorandom python package[25], which I co-wrote) and a better algorithm than PIKK for drawing random samples, such as the Fisher-Yates-Knuth-Durstenfeld method.

60.     Because Dr. Salve's samples were not drawn in a way that ensures that each subset of 50 member HCC-pairs had the same chance of being selected from the data he had for each HCC, the estimates he computes are statistically biased to an unknown extent and in an unknown direction. The usual formulae for calculating uncertainties for statistical estimates do not apply to his results, because the samples were not drawn properly. There is no way to quantify the uncertainty in the estimates and conclusions he draws from the samples. In short, none of his statistical analyses is sound and none of the statistical conclusions he draws from the sample of HCCs is reliable, because the first step—drawing the sample—was done poorly.

61.     The statistical tests in the Salve Report demonstrate that the sample of HCCs is not representative. The Salve Report misinterpreted the results of the tests it reported as supporting its conclusion that these samples were representative.

---

[25] See https://github.com/statlab/cryptorandom (last accessed 15 November 2023).

1779

**VI.**  **The samples of HCCs in the Salve Report are not representative of the population from which they were drawn. The differences are large and statistically significant. The Salve Report misinterprets the results of the tests performed. Those tests were statistically weak, statistically inappropriate, and considered only two of many variables that could have been examined. In concluding that its test results showed no statistically significant difference between the member-HCC pairs sampled and the member-HCC pairs in the dataset from which it drew the sample, the Salve Report makes the basic logical error of conflating "weak evidence of a difference" with "affirmative evidence of no difference."**

62.    Many of the Salve samples differ substantially from the populations from which they were drawn. For example, consider the cost variable, APAY_NonDual14. For nine HCC/sample-size combinations, the difference between the population mean and the sample mean *is larger than the population mean*. In one case, HCC 104, for the overall sample size 2,493 (the middle block in Table 3 below), the population mean is $29,157 but the sample mean is $123,310. This is a difference of $94,153, more than three times the population mean! Table 3: Sample Means That Differ from Population Means by 50% or more, lists 35 combinations of HCC and sample size for which the difference between the APAY_NonDual14 for the Salve sample and the mean APAY_NonDual14 for the population is at least 50 percent of the population mean. The samples are hardly representative of the population in those examples.

1780

**Table 3: Sample Means That Differ from Population Means by 50% or more**

| HCC | Overall Sample Size | Population mean ($) | Sample Mean ($) | Difference ($) | Relative difference (%) |
|---|---|---|---|---|---|
| 18 | 3,950 | 20,077 | 7,400 | 12,677 | 63 |
| 19 | | 12,845 | 5,217 | 7,627 | 59 |
| 34 | | 26,265 | 49,411 | 23,146 | 88 |
| 73 | | 33,180 | 79,084 | 45,904 | 138 |
| 74 | | 23,964 | 46,463 | 22,499 | 94 |
| 104 | | 29,157 | 65,856 | 36,699 | 126 |
| 161 | | 26,960 | 48,395 | 21,435 | 80 |
| 162 | | 40,282 | 15,502 | 24,780 | 62 |
| 170 | | 29,253 | 77,236 | 47,983 | 164 |
| 176 | | 30,970 | 57,924 | 26,954 | 87 |
| 12 | 2,493 | 12,103 | 5,911 | 6,192 | 51 |
| 18 | | 20,077 | 9,433 | 10,643 | 53 |
| 19 | | 12,845 | 5,259 | 7,586 | 59 |
| 34 | | 26,265 | 60,593 | 34,328 | 131 |
| 39 | | 33,718 | 14,497 | 19,220 | 57 |
| 73 | | 33,180 | 87,128 | 53,949 | 163 |
| 75 | | 25,309 | 38,697 | 13,388 | 53 |
| 77 | | 19,683 | 31,874 | 12,191 | 62 |
| 99 | | 32,938 | 53,667 | 20,730 | 63 |
| 104 | | 29,157 | 123,310 | 94,153 | 323 |
| 161 | | 26,960 | 50,106 | 23,146 | 86 |
| 162 | | 40,282 | 14,624 | 25,658 | 64 |
| 170 | | 29,253 | 106,703 | 77,450 | 265 |
| 189 | | 35,661 | 58,105 | 22,444 | 63 |
| 11 | 2,370 | 17,143 | 7,769 | 9,374 | 55 |
| 18 | | 20,077 | 5,745 | 14,331 | 71 |
| 19 | | 12,845 | 4,236 | 8,609 | 67 |
| 23 | | 22,573 | 10,570 | 12,003 | 53 |
| 34 | | 26,265 | 67,511 | 41,246 | 157 |
| 73 | | 33,180 | 61,409 | 28,229 | 85 |
| 99 | | 32,938 | 55,753 | 22,815 | 69 |
| 134 | | 56,550 | 87,606 | 31,056 | 55 |
| 162 | | 40,282 | 17,265 | 23,017 | 57 |
| 170 | | 29,253 | 112,056 | 82,803 | 283 |
| 176 | | 30,970 | 47,149 | 16,178 | 52 |

63.    Nonetheless, the Salve Report claims repeatedly that the samples are

"representative" of the populations.[26] This erroneous conclusion is based on misinterpreting the

---

[26] "I confirmed via statistical tests that the beneficiaries associated with a particular sampled HCC marker
("**sampled beneficiaries**") were statistically representative of the beneficiaries in the larger FFS calibration data

statistical tests Dr. Salve conducted,[27] as I shall explain. Not only are there large differences between many of the samples and the populations they were drawn from, those differences are statistically significant according to the tests reported in the Salve Report, which misinterpreted the results. Moreover, the statistical tests the Salve Report used are inappropriate and weak, and the Salve Report failed to examine all the fields in the data that were available.

64.     The Salve Report only tested two variables (APAY_NonDual14 and WGT_NonDual14). Salve Report at ¶¶62–66. Many other facially relevant variables were available for Dr. Salve to examine. For instance, the Salve Report did not check whether the mix of plans in the sample was representative nor whether the mix of member ages was representative. Furthermore, there is no way to check whether the sample is representative with respect to support for HCCs, because that information is available only *after* inspecting the sampled medical records. If that information were available, there would be no reason to draw a sample.

65.     The two particular tests used in the Salve Report to test representativeness, the Student-t test and the Kolmogorov-Smirnov test, are relatively weak (their *statistical power*, the probability that they detect a true difference, is relatively low), as I shall explain.

66.     Student's t test is not appropriate for samples from populations that do not have a normal distribution (it can produce nominal P-values that are very different from its actual P-values), and it only tests for a difference in means, not other differences in the distributions. When population distributions are skewed, Student's t test tends to have only a small chance of

---

population who were identified as having that HCC in their health profile in the diagnosis year but who were not sampled ("**non-sampled beneficiaries**")." Salve Report, at ¶19.1 "For each of the 79 different HCCs, the 50 unique beneficiaries associated with the 50 sampled HCC markers are statistically representative of the population of beneficiaries who have that specific HCC marker." Salve Report, at ¶49. "Through these tests, I was able to ensure that the sampled beneficiaries (the beneficiaries associated with the sampled HCC markers) were statistically representative of the larger population of beneficiaries associated with those markers and that the estimates of the HCC error rates were accurate." Salve Report, at ¶64.

[27] Had the samples been drawn properly using an adequately powered PRNG and an appropriate sampling algorithm, there would be no point in conducting any test of representativeness: the possibility that the samples are not representative is automatically taken into account in appropriate methods for statistical inference. Indeed, if Dr. Salve had planned to draw new samples if his samples failed the tests, standard tests of significance and standard methods for computing confidence intervals using the resulting samples would not have been applicable. However, as described above, the samples were not random, and the tests in the Salve Report demonstrate that fact.

finding real differences. The cost figures, column APAY_NonDual14, are strongly skewed to the right for all HCCs, as shown in Figure 4: Histograms of Annualized Payments by HCC. A 2-sample permutation test would be more appropriate than the Student-t test.

**Figure 4: Histograms of Annualized Payments by HCC**



67.     The Kolmogorov-Smirnov test is known to have little sensitivity to differences in the tails of distributions. The Stata documentation warns, "[i]n general, the Kolmogorov – Smirnov test (Kolmogorov 1933; Smirnov 1933; also see Conover [1999], 428 – 465) is not very

1783

powerful against differences in the tails of distributions."[28] (The "tails" of a distribution are the frequencies of large and small values.)

68.      The Salve Report claims, "[f]or each of these statistical tests of representativeness, the null hypothesis being tested is that the sample is representative of the population." Salve Report, at ¶67. That is incorrect. For the 1-sample Student-t test, the null hypothesis is that the parent population has a normal ("Gaussian") distribution with a given mean and variance, and that the sample is a random sample from that population. For the Kolmogorov-Smirnov test, the null hypothesis is that the sample is a random sample from the population. "Representativeness" is not part of either null hypothesis.

69.      The Salve Report misinterprets the number of "failed" tests, erroneously concluding that because relatively few tests gave results that were statistically significant at the 5 percent level, the data passed the suite of tests as a whole. In fact, the tests provide strong statistical evidence that the HCC sample is not random to an adequate degree of approximation—which is to be expected because the method used to draw HCC samples was inappropriate. I shall explain in detail why Salve's conclusion that his samples are adequately random is incorrect.

70.      The Salve Report states, "[t]he number of tests expected to pass will depend on the significance level and the number of tests performed. In this case, I conducted 316 tests at a 5% significance level, and therefore, I would expect approximately 16 tests (5% of 316) to produce a false positive result due to random chance. Therefore, approximately 300 tests (95%) should pass the statistical test by chance alone." Salve Report, at ¶68. That statement is inside out. The correct statement is that if every null hypothesis were true, one would expect roughly 5 percent of the tests to produce yield results that are "statistically significant" at significance level 5 percent.[29]

---

[28] Stata Corporation, "ksmirnov — Kolmogorov–Smirnov equality-of-distributions test," at p4. https://www.stata.com/manuals/rksmirnov.pdf (last visited 26 November 2023).
[29] See, e.g., Kaye, D. and Freedman, D.A., 2011. Handbook on Statistics, in *Reference Manual on Scientific Evidence, 3rd Edition*, Federal Judicial Center, at pp. 249–257 and n. 100.

71.    There are a variety of ways of "adjusting" P-values to account for the fact that many tests were performed. The simplest and most conservative is called the *Bonferroni adjustment* or *union bound.* It simply multiplies P-values by the number of tests that were performed. Dr. Salve ran 948 tests in all:

(79 HCCs)*(3 sample sizes)*(2 variables)*(2 tests) = 948.

72.    The four smallest P-values among those 948 tests were 0.00000002058, 0.00000006436, 0.000002071, and 0.00001810. After the Bonferroni adjustment, they become 0.00001951, 0.00006101, 0.00196330, and 0.01715880: all remain substantially less than 5 percent, the threshold for statistical significance used in the Salve Report.[30] Hence, even though 948 tests were performed, the chance that *any* of them would have produced a small P-value as small as the smallest if the samples had been random is less than 0.002 percent. Similarly, the chance that any would have produced a P-value as small as the fourth-smallest is less than 1.72 percent. Thus, the tests Dr. Salve performed provide compelling statistical evidence that the samples were *not* approximately random. It is unsurprising that the samples failed the tests since they were drawn using an inadequate PRNG with an inappropriate sampling algorithm.

73.    The Salve Report confuses 'no statistical evidence of a difference' with 'statistical evidence of no difference.' Viz, "[o]f the 316 tests conducted, 306 (97%) tests passed at the 5% significance level when conducted on the sample of 3,950 sampled and spare HCC markers. Similarly, 309 (98%) tests passed at the 5% significance level when conducted on the sample of 2,370 sampled HCC markers only. These results indicate that the samples are highly representative of the larger population and that the estimates of the HCC error rates are reliable." Salve Report, at ¶69.

74.    The ability of a statistical test to find a real difference generally increases as the sample size increases. By Dr. Salve's faulty logic, if samples of size 5 gave larger P-values than the samples of size 50 he drew, those smaller samples would be *stronger* evidence that the

---

[30] If they were adjusted for only 316 tests, the number Dr. Salve focuses on (despite having performed at least 948 tests), the results would be even more significant.

samples were representative! In fact, a large P-value (or "insignificant" test result) is not evidence that the null hypothesis is true, merely the absence of evidence that the hypothesis is false. This is an elementary statistical error.[31]

75.    Moreover, as explained above, if the samples were genuinely random the chance that any of the 948 P-values would be as small as 0.00000002058 is not greater than 0.002 percent, far less than 5 percent. The tests reported in the Salve Report thus provide strong statistical evidence that the samples were *not* in fact random samples. They do not provide affirmative evidence of representativeness, as the Salve Report claims.

76.    Also, as explained above, the Salve Report stacked the deck by selecting inappropriate, weak tests and by testing only two of the available variables. Those two tests were unlikely to find real differences, because of the nature of the tests and (for Student's t test) because of the extreme skewness of APAY_NonDual14—they have low *power.*

77.    Finally, even if the sample sizes had been larger *and* the tests had been more powerful *and* the tests had not given such strong evidence that the sampling had gone wrong, that would not constitute affirmative evidence that the samples are representative with respect to the variable he draws conclusions about, namely, whether the HCC code has support.

**VII.    The Salve Report commits many basic statistical gaffes. In addition to the errors described above, the Salve Report misuses statistical terminology such as "statistically valid" and "statistically significant." It uses complex approximate statistical methods in situations for which there are simple exact or conservative**

---

[31] This is addressed in Kaye, D.H., and D.A. Freedman, Reference Guide on Statistics, in National Research Council, 2011. *Federal Judicial Center Reference Manual on Scientific Evidence*, 3rd edition, at pp. 250–251: "p is not the probability of the null hypothesis given extreme data."; also at fn. 99:

"("According to Dr. Howell, . . . a 'P value' of 0.30 . . . indicates that there is a thirty percent probability that the results of the . . . [s]tudy were merely due to chance alone.") Such statements confuse the probability of the kind of outcome observed, which is computed under some model of chance, with the probability that chance is the explanation for the outcome—the "transposition fallacy."

"Instances of the transposition fallacy in criminal cases are collected in David H. Kaye et al., The New Wigmore: A Treatise on Evidence: Expert Evidence §§ 12.8.2(b) & 14.1.2 (2d ed. 2011). In McDaniel v. Brown, 130 S. Ct. 665 (2010), for example, a DNA analyst suggested that a random match probability of 1/3,000,000 implied a .000033 probability that the DNA was not the source of the DNA found on the victim's clothing. See David H. Kaye, "False But Highly Persuasive": How Wrong Were the Probability Estimates in McDaniel v. Brown? 108 Mich. L. Rev. First Impressions 1 (2009)."

**methods. It includes negative values in confidence intervals for quantities that cannot be negative. It reports narrower confidence intervals for quantities that involve additional unknowns. It interprets associations as if they were causal relationships, treating invented models with no theoretical or empirical support as if they were response schedules. It ignores uncertainties due to modeling assumptions. Its treatment of missing charts has no statistical foundation.**

78.     The Salve Report makes a number of basic statistical errors. For instance, paragraph 3 of the Salve Report states, "[m]y study began with drawing a statistically valid sample of HCC markers found in the 2013 HCC Dataset referenced above." There is no such thing as "statistically valid sample" as a term of art in Statistics.[32] Moreover, as discussed above, the sample was not drawn using an appropriate method, and it fails a number of statistical tests performed by Dr. Salve.

79.     Similarly, Dr. Salve writes, "This sample size of 50 HCC markers per each HCC yielded enough HCC markers with collected Chart information such that 77 of the 79 HCC error rates were statistically significant at the 95% confidence level." Salve Report, at ¶48. This is garbled in a number of ways, as I shall explain.

80.     First, *any* nonzero rate is statistically significantly different from zero in this situation, because if the true population rate were zero, it would be impossible to observe even a single unsupported HCC in the sample. No statistical calculation is needed. In the samples the Salve Report relies on, every HCC except HCC 96 had at least one instance in which all requested, "risk-eligible" charts for a beneficiary were received, and yet none of those charts

---

[32] Kaye and Freedman (2011) discuss statistical terms for describing samples in the context of discussing the misuse of 'statistical significance': "Many a sample has been praised for its statistical significance or blamed for its lack thereof. Technically, this makes little sense. Statistical significance is about the difference between observations and expectations. Significance therefore applies to statistics computed from the sample, but not to the sample itself, and certainly not to the size of the sample. Findings can be statistically significant. Differences can be statistically significant (supra Section IV.B.2). Estimates can be statistically significant (infra Section V.D.2). *By contrast, samples can be representative or unrepresentative. They can be chosen well or badly (supra Section II.B.1). They can be large enough to give reliable results or too small to bother with (supra Section IV.A.3). But samples cannot be "statistically significant," if this technical phrase is to be used as statisticians use it.*" Kaye, D. and D.A. Freedman, 2011. Reference Guide on Statistics, in *Reference Manual on Scientific Evidence*, 3rd edition, Federal Judicial Center, at 252. (emphasis added).

1787

provided support for the HCC at issue. Thus the raw data provide *certainty* (not merely statistical evidence) that the rate of unsupported HCCs in the population from which the sample was drawn is greater than zero for 78 of the 79 HCC codes, on the assumption that the chart reviews were accurate and that charts that were not requested would not have shown support. When data are incompatible with the null hypothesis, they are statistically significant. Dr. Salve's claim that *two* of the observed rates were not "statistically significant" is a basic statistical error.[33]

81.    Second, it is impossible for the rate of unsupported HCCs to be negative. Nonetheless, two of the confidence intervals for rates in the Salve Report include negative values: "[t]he 2 HCC error rates that were not statistically significant at the 95% confidence level were HCC 124 and HCC 189 with confidence interval lower bounds of -0.0088 and -0.0065, respectively." Salve Report, at note 25. Reporting negative lower endpoints for confidence intervals for rates of support, which cannot be negative, suggests that Dr. Salve used an inappropriate method to construct his confidence intervals or did not calculate or report the intervals correctly. If Dr. Salve used this same method to calculate confidence intervals for all HCCs, then there is reason to be skeptical of his conclusions for all HCCs, not only HCC 124 and HCC 189.

82.    The method the Stata survey package[34] uses for constructing confidence intervals for rates cannot produce a negative lower endpoint. However, the method Stata uses to find confidence intervals for rates is not the best in this situation: it is approximate rather than exact.[35] Had the Salve samples actually been random, exact or conservative confidence intervals would be straightforward to calculate. See paragraphs 95–98, *infra*, for *pro forma* calculations of such confidence intervals.

**Treatment of Charts That Were Not Retrieved**

---

[33] See also paragraph 104, *infra*.
[34] https://www.stata.com/manuals/svy.pdf at pp148, 167ff (last accessed 15 November 2023)
[35] It is based on the normal approximation to the logit transform of the rate. https://www.stata.com/manuals/svy.pdf (last accessed 15 November 2023)

83.     Some of the charts requested by Dr. Salve were not retrieved. Had all the requested charts been available, support for the HCC instances could not have decreased; it might have increased. However, it is impossible to know how many additional HCC instances would have been supported by the unretrieved charts.

84.     Rather than accept the uncertainty in rates of support produced by these charts, the Salve Report purports to estimate the number of additional HCC instances the missing charts would have supported. The approach to estimating the number of HCC instances that would have found support involves making up a model for whether an HCC instance is supported. According to the (logistic regression) model Dr. Salve made up, whether an HCC instance has support is not an unknown fact (like whether a previously tossed coin landed showing heads or tails). Instead, it is random (like whether a yet-to-be-tossed coin *will* land heads or tails). According to the logistic regression, the "probability" that a given HCC instance has support in an unretrieved chart depends on the HCC, the number of charts requested, and the number of charts retrieved, and the value of APAY_NonDual14, according to a specific formula.

85.     Logistic regression makes strong assumptions that have neither a theoretical nor an empirical basis here.[36] In the current context, logistic regression assumes that a given HCC-member pair has support if and only if a particular sum is greater than zero. In Dr. Salve's model, that sum consists of a random variable with a logistic distribution, a constant that depends only on the particular HCC at issue, a second constant that is multiplied by the number of charts requested, a third constant that is multiplied by the number of charts that were unavailable, a fourth constant that is multiplied by both the number of charts requested and the number of charts unavailable, and a fifth constant that is multiplied by the value of APAY_NonDual14. Salve Report, at figure 4. The random variables are assumed to be independent and identically distributed across HCC-member pairs. These are very restrictive assumptions with no theoretical

---

[36] See, e.g., Freedman, D.A., 2009. *Statistical Models: Theory and Practice*, Cambridge University Press, at 121–128, 153–154.

1789

basis in this application, nor any empirical basis to the best of my knowledge. The Salve Report provides none.

86.    The Salve Report attempts to draw *causal inferences* using logistic regression to answer a hypothetical counterfactual question: had the unretrieved charts been retrieved, how many additional HCC-member pairs would have been supported?

87.    That is entirely speculative. The Salve Report conflates observed associations (on average, HCC instances for which a larger fraction of requested charts were available were supported more often) with causal inference (if every requested chart for a particular HCC instance had been retrieved, would that HCC instance have been supported?)

88.    The Salve Report also conflates rates (the fraction of HCC instances with various characteristics that were supported) with probabilities (the "likelihood" that a particular HCC instance is supported[37]). A given chart either does or does not support a particular HCC instance. There is no "likelihood" or probability involved. There are *rates* at which HCCs with various characteristics are supported, but rates are not probabilities.[38]

89.    Fitting curves to data is unobjectionable. But using a fitted curve to (reliably) predict the effect of interventions—such as whether retrieving additional charts would find support—in general requires that the fitted curve be a *response schedule*. A response schedule is the rule Nature used to generate the data, not merely a pattern in the observed data.[39] Predicting the effect of a change to the system, such as retrieving additional charts, requires a response schedule (or a randomized controlled experiment, which was not undertaken).

90.    It may be true that the rate of support for HCC instances for which more charts were retrieved is higher. It does not follow that one can reliably estimate how many additional

---

[37] Salve Report, at ¶¶ 86, 89, 94–96, 99, 100, 102–104.

[38] See, e.g., Stark, P.B., 2022. Pay No Attention to the Model Behind the Curtain, *Pure and Applied Geophysics*, 179, 4121–4145.

[39] For a discussion of response schedules and the assumptions that must be satisfied to draw causal inferences from regression, see Freedman, D.A., 2009. *Statistical Models: Theory and Practice*, Cambridge University Press, at 91–102.

HCC instances would have been supported had all the requested charts been retrieved, because the logistic regression model is not a response schedule.

91.    To illustrate the fallacy of treating an observed relationship as if it were a response schedule, consider household size and household income. In the U.S., on average, larger household have higher household incomes.[40] The observed relationship does not mean that if a household of three adopts two children, its household income will increase, nor that if someone in the household gets a bonus, the household will grow. It certainly does not mean that one can reliably predict how much household income will increase if a household adopts two children. The response to a change, such as the response of income to increasing the size of a household, does not have any necessary connection to the population-level pattern in household income and household size.

92.    There may be an association between the number of charts retrieved and finding support for an HCC instance. That does not mean that one can reliably predict whether a given HCC instance would have had support if every related chart had been retrieved. It does not even mean that one can reliably predict the fraction of HCC instances that would have had support if every requested chart had been retrieved. Association is not necessarily causation, and a curve fitted to data is not necessarily a response schedule. One cannot compensate for failing to collect adequate data by making up a model for the available data, generating fake data from that model, and pretending that the fake data can be substituted for the missing observations. Statistical technology cannot necessarily be substituted for shoe leather. In essence, that is what Salve's logistic regression model does.

93.    Even when logistic regression is justified, it is fragile. Kennedy (2008, at p250), cited by the Salve Report,[41] cautions "[u]nfortunately, logit and probit models are sensitive to misspecifications. In particular, in contrast to OLS in the classical linear regression (CLR)

---

[40] For 2022 U.S. Census Bureau Current Population Survey data, see Mean Size of Household by Income, All Races https://www.census.gov/data/tables/time-series/demo/income-poverty/cps-hinc/hinc-01.html (last visited 25 November 2023)
[41] Salve Report, at note 62.

model, estimators will be inconsistent if an explanatory variable (even an orthogonal variable) is omitted or if there is heteroskedasticity." A model is "misspecified" if it omits dependent variables upon which the outcome depends or if the functional dependence of the outcome on the dependent variables is different from what the model bakes in. "Inconsistent" means that the estimates do not necessarily improve (according to a particular statistical measure[42]) as the sample size grows. Setting aside the issue of whether having support is random or simply unknown, the logistic regression in the Salve Report might well be misspecified. For instance, the rate of support might depend on the healthcare provider, on geography, on the contract or plan, on the year, or on the specific diagnosis that led to the HCC. The Salve Report does not discuss performing tests of whether the model was correctly specified, nor any analyses of the sensitivity of the estimates to the model specification, nor even any uncertainty estimates for the predicted fraction of additional HCCs that would have been supported.

94.    Even if the logistic regression model were justified and constituted a response schedule, the Salve Report does not take into account the uncertainty in the logistic regression in the reported uncertainties. Consider Appendix E of the Salve Report, which gives confidence intervals for the rates of unsupported HCCs in various scenarios. The scenario in the first table ignores the fact that some requested charts could not be retrieved. The scenario in the second table attempts to adjust for the unretrieved charts using the logistic regression model. The width of the 95 percent confidence interval for HCC 1 is 0.2632 before adjustment and 0.1879 after: the reported uncertainty is *smaller* after the adjustments than before the adjustments, even though the adjustment involves pulling a model out of thin air and fitting coefficients in the model to data. As a matter of logic, making additional unfounded assumptions cannot decrease the uncertainty.

---

[42] An estimator of a parameter is *consistent* if, for every positive threshold, the probability that it differs from the true value of the parameter by more than that threshold approaches zero as the sample size increases.

### Proper *Pro Forma* Confidence Intervals

95.     I computed *pro forma* 95 percent confidence intervals for the rates of HCC support and for the overall rate of support across HCCs. The computations yield *pro forma* confidence intervals rather than *actual* confidence intervals because the calculations assume that Dr. Salve's samples were actual random samples, which they were not, as explained above. The intervals also assume that no chart that was not requested would have supported the HCCs.

96.     The confidence intervals for HCC support are given in Appendix 3. To find the lower endpoint of the intervals, I assumed that missing charts would have shown support for the corresponding HCC. To find the upper endpoint of the intervals, I assumed that the missing charts would not have found support for the HCC. That treatment accounts for the potential bias from the charts that were requested but not retrieved. Unlike the intervals in the Salve Report, which are based on approximations, the statistical uncertainties I report for individual HCCs are exact, based on "inverting" hypergeometric hypothesis tests. The confidence interval for the overall rate of support for HCCs is based on inverting exact union-of-intersections tests.

97.     The resulting *pro forma* intervals are substantially wider than the intervals in the Salve Report. For instance, the 95 percent confidence interval for HCC 1 goes from 2.2 percent to 58.7 percent, a range of 56.5 percent. In contrast, the Salve Report claims that after the "adjustments," there is 95 percent confidence that the rate is between 3.0 percent and 21.8 percent, a range of 18.8 percent. Salve Report at p62. The illusion of precision results from ignoring the uncertainty in the logistic regression adjustment and from using an approximate method for computing confidence intervals rather than an exact method.

98.     The most common HCC in the dataset is 96, which occurred 3,100,061 times: it comprises more than 10 percent of the 30,398,333 HCC codes in the population from which Dr. Salve drew the sample. The Salve Report claims that a 95 percent confidence interval for the rate of support for HCC 96 is 3.4 percent to 21.9 percent, a range of 18.5 percent. Salve Report at 63. In fact, an exact *pro forma* 95 percent confidence interval is 0 to 58.8 percent, a range of 58.8 percent. Again, the Salve Report grossly overstates the precision of its results by ignoring the

uncertainty in the ad hoc logistic regression adjustments and using an approximate method to construct the confidence interval.

99.    I calculated an exact *pro forma* confidence interval for the overall rate of HCC support, based on a "union of intersections" approach that relies on Fisher's combining function for independent P-values. The exact *pro forma* confidence interval was 7.3 percent to 73.6 percent, a range of 66.3 percent. In contrast, Dr. Salve reports the interval of 27.4 percent to 35.8 percent, a range of 8.4 percent. Salve Report, at p54. Once again, the Salve Report grossly overstates the precision of its estimates by ignoring the uncertainty in the logistic regression adjustment and by using an approximate method rather than an exact or conservative method.

**Summary of Errors in the Salve Report**

100.    The Salve Report did not draw samples of HCC instances properly: it used an inadequate pseudo-random number generator and an inappropriate algorithm for selecting samples using that generator. This produced a sample that was not random to an adequate degree of approximation and invalidates standard statistical methods for assessing uncertainty in estimates and inferences.

101.    The Salve Report misinterprets the "representativeness" tests it conducted. The tests—which were statistically weak, inappropriate, and considered only two variables— nonetheless soundly reject the hypothesis that the samples were random, despite claims to the contrary in the Salve Report. Even though 948 tests were performed, had the samples been genuinely random, the chance of observing discrepancies in APAY_NonDual14 as large as were observed would be less than 0.002 percent, well below the 5 percent threshold for statistical significance used in the Salve Report. Thus, Dr. Salve's assertion that the tests support his methodology is incorrect: the tests show that his statistical sampling methodology is broken.

102.    The Salve Report commits numerous basic errors of statistics, including using inappropriate statistical tests and inappropriate methods for computing confidence intervals, misinterpreting large P-values as affirmative evidence that the null hypothesis is true, failing to account for the uncertainty in estimated parameters, treating a fitted curve as if it were a response

40

schedule, and conflating correlation with causation. These errors undermine many of the statistical conclusions in the Salve Report.

103.    One of the texts cited in the Salve Report, Kennedy (2008), includes "The Ten Commandments of Applied Econometrics." The Salve Report violates at least five of the ten commandments:

a. Rule 1 is "Use common sense and economic theory." Common sense says that a negative rate of support for HCCs is silly, yet the Salve Report has negative lower confidence bounds for two such rates. Common sense says, "you don't know what you don't know," but the Salve Report purports to estimate the fraction of HCCs that would have had support had all the requested charts been retrieved, without inspecting even a random sample of those charts. Common sense says that if your analysis involves untested, ungrounded assumptions, the uncertainty of your analysis increases. Yet the Salve Report gives shorter confidence intervals for rates that were "adjusted" using models with strong, ungrounded assumptions than it gives for rates without such uncertain adjustments.

b. Rule 2 is "Avoid type III errors." A type III error is to answer the wrong question. Logistic regression answers the wrong question. The Student-t tests, which assume that the population distribution is normal, answer the wrong question when used on samples from a population known to be non-normal. Arguably, confidence bounds for the overall rate of HCCs that are unsupported answer the wrong question, because they do not directly relate to changes in risk scores or payments to providers.

c. Rule 4 is "Inspect the data." Had Dr. Salve inspected the APAY_NonDual14 data, it would have been obvious that Student's t test was inappropriate because the population distributions are strongly skewed and hence non-normal. Had he looked at the differences between the population means and the sample means, it would have been obvious that the samples were not representative of the populations from which they were drawn.

41

1795

d. Rule 5 is "Keep it sensibly simple." The sensible, simple treatment of missing charts is to assume the worst (the "minimum error rate scenario"). It is neither simple nor sensible to make up a logistic regression model with no basis in theory or in the data, then to misinterpret a fitted curve (pulled from thin air) as if it were a response schedule (the "baseline with adjustment scenario").

e. Rule 10 is "Report a sensitivity analysis." Dr. Salve did not report a sensitivity analysis for his logistic regression model, nor did he take uncertainty in that model into account in his confidence intervals for the rates of support for the HCCs. He did not report any exploration of the sensitivity of the confidence intervals to the asymptotic approximations they ride on.

104. Because Dr. Salve's sample was not random, there is no useful way to quantify the error in extrapolating from the sample to the population. The 31.6 percent number is meaningless, as are the so-called "confidence intervals." And even if the estimated rate were meaningful, Mr. Salve does not explain whether or to what extent a rate of unsupported HCC instances translates to a change in risk scores or in dollars.



_____    Date:    28 March 2024

Philip B. Stark, Ph. D.

**EXHIBIT D-64**

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. BENJAMIN POEHLING, | § § § § § |
| Plaintiffs, | § § |
| vs. | § CASE NO.:  CV 16-08697 (FMO SSx) § HON. FERNANDO MANZANO OLGUIN |
| UNITEDHEALTH GROUP, INC. ET AL., | § § |
| Defendants. | § § § § |

UPDATED EXPERT REPORT OF M. TIMOTHY RENJILIAN

December 3, 2023

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

## TABLE OF CONTENTS

I.    QUALIFICATIONS .................................................................................... 1

II.   DESCRIPTION OF ENGAGEMENT ....................................................... 2

     A.    Scope of Work ...................................................................................... 2

     B.    Materials Relied Upon ........................................................................ 2

III.  BACKGROUND ......................................................................................... 2

     A.    Summary of the Relevant Allegations ............................................... 2

          i.    First Amended Complaint .............................................................. 2

          ii.   United's First Interrogatory to the Government and Government's Response..... 4

     B.    Background on the Medicare Advantage Program ............................ 8

          i.    The Medicare Program Coverage Components ............................. 8

          ii.   The CMS-HCC and CMS-RxHCC Models ................................ 10

          iii.  Risk Adjustment Data Validation Audits .................................... 15

          iv.   Medicare Part C Payment Error Rate .......................................... 18

     C.    Summary of Relevant Data Sources .................................................. 19

          i.    United Risk Adjustment Claims Data ......................................... 19

          ii.   United/Vendor Chart Review Data .............................................. 21

          iii.  Additional Reference Materials ................................................... 23

     D.    Summary of Relevant Data Requests ................................................ 24

          i.    Chart Review and Claims Verification Document Request 4C ......... 24

          ii.   In Process CV Encounter Request ............................................... 25

          iii.  United States' First Request for Production of Documents to Defendants......... 25

     E.    Summary of Relevant Data Productions ........................................... 26

          i.    In Process CV Encounter Production ........................................... 26

          ii.   Document Request 4C Production ................................................ 26

          iii.  Document Request 4C Supplemental Production ........................ 28

          iv.   2008 – 2009 and 2014 – 2016 DOS RFP Production ................. 29

          v.    SAS All Providers ....................................................................... 29

          vi.   Verscend Production .................................................................... 30

          vii.  July 2019 Supplemental Production............................................. 31

          viii. ..................................................................Post Sweeps Production
31

          ix.   Post Sweeps Supplemental Production ........................................ 31

IV.   SUMMARY OF OPINIONS ..................................................................... 32

2

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

V.  BASIS FOR OPINIONS ....................................................................... 34

  A.   Opinion 1:  The government's approach for identifying diagnosis codes that United allegedly improperly failed to delete or otherwise return as overpayments is flawed and overinclusive because millions of the diagnosis codes in the government's list are from providers whose charts do not appear to have undergone Chart Review and thus could not have resulted in the identification of unsupported diagnosis codes under the government's theory. 34

    i.   Overview .............................................................................. 34

    ii.  Data Relied Upon ................................................................ 35

    iii. Methodology ........................................................................ 37

    iv.  Summary of Findings ........................................................... 47

  B.   Opinion 2:  The government's approach for identifying diagnosis codes that United allegedly improperly failed to delete or otherwise return as overpayments is flawed and overinclusive because it is mistakenly executed at the diagnosis code level rather than the condition (i.e., HCC or RxHCC) level.  In fact, for approximately 67% of the allegedly improper diagnosis codes in the government's list, United's Chart Review confirmed that the member had the condition corresponding to the diagnosis code at issue (or a more severe condition in the same hierarchy), meaning that there is no overpayment associated with the diagnosis code. ....................................................................................................... 48

    i.   Overview .............................................................................. 48

    ii.  Data Relied Upon ................................................................ 50

    iii. Methodology ........................................................................ 51

    iv.  Summary of Findings ........................................................... 60

  C.   Opinion 3:  The diagnosis codes listed in the government's First Interrogatory Response form an improper basis for evaluating potential overpayments because, in approximately 83% of cases, even if the diagnosis codes were incorrect, deleting those codes would not have impacted the Part C or Part D MA payments to United in the years at issue. There are a variety of reasons for this, including but not limited to the fact that (a) some diagnosis codes do not impact the risk adjustment process; (b) multiple diagnosis codes may support the same condition code; and (c) a higher level condition code may also be supported, superseding any lower level condition code that may be found to be unsupported. ................. 62

    i.   Overview .............................................................................. 62

    ii.  Overview of Simulated Deletion Analysis .......................... 63

    iii. Data Relied Upon ................................................................ 64

    iv.  Methodology ........................................................................ 65

    v.   Summary of Findings ........................................................... 67

    vi.  Example – Same HCC or RxHCC Supported by Diagnosis Code that was Identified by Chart Review ..................................................................... 68

    vii. Example – Same Provider Submitted a Different Diagnosis Code Mapping to Same HCC or RxHCC. .......................................................................... 69

3

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

viii. ...Example – Higher HCC or RxHCC Supported by Other Diagnosis Code About Which No Allegations Have Been Raised. ............................................................................ 71

ix. Example – Same Provider Submitted the Same Diagnosis Code on a Different DOS. 72

x. Example – Different Provider Submitted a Diagnosis Code Mapping to the Same HCC/RxHCC. ............................................................................................................. 72

xi. Example – Diagnosis Code Does Not Map to HCC or RxHCC. ........................ 73

xii. Conclusion ............................................................................................................ 74

D.    Opinion 4:  The government's assertion that the diagnosis codes in the First Interrogatory Response are not supported is contradicted by CMS's own RADV auditors.  In fact, CMS's coders found support for more than 89% of the First Interrogatory Response diagnosis codes mapping to member-HCC combinations that CMS reviewed as part of the CON11-13 RADV audits. This rate increases to 91% when also taking into account the results of the CON14-15 RADV audits. ............................................................................................... 76

i. Overview ............................................................................................................... 76

ii. Data Relied On ...................................................................................................... 78

iii. Methodology ......................................................................................................... 79

iv. Summary of Findings ............................................................................................ 81

E.    Opinion 5:  Based on the results of CMS's RADV audits, the First Interrogatory Response codes were no more likely to be unsupported than any other codes submitted in connection with United plans reviewed by CMS's RADV audits. ............................................ 85

F.    Opinion 6:  Contrary to the practice that it typically follows in identifying and quantifying overpayments resulting from diagnosis code errors in the risk adjustment process, the government here has chosen to focus solely on allegedly unsupported codes that were submitted to Medicare rather than considering the net impact of both unsupported codes and codes that should have been, but were not, submitted.   Even in cases where an MA plan sponsor has employed a chart review process like the one at issue here, there is a substantial possibility, as demonstrated in the government's own RADV audits, that there are additional appropriate codes that were missed and not submitted.  In fact, the evidence in this matter indicates that such unsubmitted codes can outweigh any submitted codes which may lack proper support.  Thus, to fully assess whether and to what extent a possible overpayment exists – even before considering whether any such overpayment was knowingly retained by United - it would be necessary to consider both the codes that may lack support as well as appropriate codes that were not submitted. ............................................................................................... 87

G.    Opinion 7: If the results of CMS's CON11-13 RADV audits hold constant across all of the First Interrogatory Response codes at issue, then over 94% of the diagnosis codes identified in the government's list could not be overpayments. If the results of CMS's CON11-15 RADV audits hold constant across all of the First Interrogatory Response codes at issue, then approximately 94% of the diagnosis codes identified in the government's list could not be overpayments. This is the result of two factors.  First, as noted above, the analysis in Opinion 3 shows that approximately 83.3% of the diagnosis codes in the government's list do not have

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

any financial impact on the government's payments to United plans.  Second, with respect to the remaining diagnosis codes, the CMS CON11-13 RADV audits found support for 65.3% of the at-issue diagnosis codes that were (a) addressed in a CON11-13 RADV audit and (b) found to have financial impact based on Opinion 3.  Combining these results with those of the CON14-15 RADV audits, the CMS CON11-15 RADV audits in total found support for 62.5% of the at-issue diagnosis codes that were (a) addressed in a CON11-15 RADV audit and (b) found to have financial impact based on Opinion 3. Thus, to the extent that the government's First Interrogatory Response is intended to be used as a basis for assessing either the pervasiveness or the dollar impact of improper diagnosis codes, it is biased and unreliable. ... 93

VI. CONCLUSION ......................................................................................................... 96

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

## I.    <u>QUALIFICATIONS</u>

1.    I am a Senior Managing Director with FTI Consulting, Inc. ("FTI") and am based in Atlanta, Georgia.  I am licensed as a Certified Public Accountant in Georgia.  The primary focus of my work is (a) to conduct forensic accounting investigations of compliance and legal issues in the health care and life sciences industry, and (b) to provide consulting services related to operational, financial and compliance issues faced by health care and life sciences companies.

2.    In an investigation context, I have worked on a wide range of matters involving potential financial and legal exposure related to billings made in connection with the provision of health care services.  Among other things, these matters have involved audit and administrative adjustments; legal claims for recoupment of amounts paid; issues related to the preparation and presentation of Medicare cost reports; post-acquisition disputes; and alleged violations of applicable Federal and state laws.  My role in such matters has included frequent interaction with corporate management and boards and with regulatory authorities and oversight organizations including, for example, the Department of Health and Human Services, the Department of Justice, and state Medicaid Fraud Control Units.

3.    In my consulting role, my work has involved a variety of tasks related to operational issues, financial and accounting matters, auditing and monitoring activities, compliance programs, and evaluating and facilitating mergers and acquisitions.

4.    My resume, including a list of all publications I have authored in the previous ten years and all cases in which I have testified as an expert at trial or by deposition in the previous four years, is included as <u>Exhibit 1</u>.

5.    FTI is being paid $695 per hour for my services in this case.  In addition, other employees of FTI have worked under my direction in this matter.  The billing rates for these individuals ranges from $350 to $625 per hour.  Compensation for FTI's services is not dependent on the outcome of this matter.

CONFIDENTIAL & ATTORNEYS' EYES ONLY

## II.    DESCRIPTION OF ENGAGEMENT

### A.    *Scope of Work*

6.     I have been requested by Counsel for Defendant UnitedHealthcare and related entities ("United") to review the government's allegations that United knew it was overpaid, or recklessly disregarded an overpayment, each time United reviewed a Medicare beneficiary's medical record and did not identify medical record support for a specific diagnosis code previously submitted to the Centers for Medicare & Medicaid Services ("CMS") for the same beneficiary. My work has included, among other things, reviewing the government's response to United's first interrogatory in this matter, which requested that the government identify certain information related to each and every diagnosis code the government alleges United knowingly and improperly failed to delete or otherwise return to the Medicare Program as an overpayment.[1]  In response to this interrogatory, the government provided data tables comprising approximately 28 million records of data representing diagnosis codes submitted by United for date of service years 2008 – 2016 that United allegedly improperly failed to delete.  As part of my review of the government's response, I have also reviewed relevant data maintained by United and produced in this matter and used it to evaluate the government's response.  Finally, based on this work, I have considered whether the government's response to United's first interrogatory constitutes an appropriate basis on which to calculate or evaluate potential damages in this case.

7.     This report sets forth my opinions as of December 3, 2023.

### B.    *Materials Relied Upon*

8.     A listing of the specific materials on which I have relied in forming the opinions expressed in this report is attached as Exhibit 2a and Exhibit 2b.

## III.    BACKGROUND

### A.    *Summary of the Relevant Allegations*

i.    First Amended Complaint

---

[1] United's First Interrogatory to the Government, dated January 3, 2020.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

2

9.      On November 17, 2017, the government filed the First Amended Complaint-in-Partial-Intervention in this case (the "First Amended Complaint" or "Complaint").   In the Complaint, the government alleges that, "for many years, the [United] Managing Defendants have conducted programs and engaged in other activities to increase the amount of risk adjustment payments from the Government to the Defendant [Medicare Advantage] Organizations."[2] Specifically, the government alleges that United "conducted millions of medical record reviews as part of their revenue-generating national Chart Review Program, turned a blind eye to the negative results of those reviews showing hundreds of thousands of unsupported diagnoses that [United] had previously submitted to Medicare…, and knowingly and improperly avoided repaying Medicare for at least over a billion dollars in risk adjustment payments to which they were not entitled."[3]

10.      The government's Complaint asserts that, since 2005, United conducted a large national Chart Review Program to increase risk adjustment payments received from the government by "collecting millions of medical records (also known as 'charts')[4] from providers and then employing diagnosis coders (also known as 'chart reviewers') to review the medical records in order to mine them for diagnoses that the providers themselves did not report to the Defendant MA Organizations for the beneficiaries in their Plans.   The [United] Managing Defendants then submitted these additional diagnosis codes ('ADDS') to the Government for billions of dollars of additional risk adjustment payments."[5]

11.      The Complaint goes on to allege that United "used the results of the chart reviews to only increase payments, *i.e.*, to submit additional diagnoses not reported by the providers."   At the same time, the Complaint asserts, United "systematically ignored the results of chart reviews that would have led to decreased payments, *i.e.*, results showing that diagnoses reported by providers to them and then submitted by them to the Government were not supported by the beneficiaries' medical records."[6]

---

[2] Complaint, para. 9.
[3] *Id.*, para. 122.
[4] Throughout my report, I will refer to "charts" and "medical records" interchangeably to mean the same thing.
[5] Complaint, para. 10.
[6] *Id.*, para. 11.

3

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

12.     The government alleges that United "knowingly and improperly avoided comparing the diagnoses reported by the providers and submitted by them to the Government with the results of the coders' chart reviews to identify those provider-reported diagnoses that were not supported by the beneficiaries' medical records."[7]  Moreover, the government contends that, if a coder performing a blinded chart review did not document a code that had been submitted, United "could and should have…withdrawn their prior submission of these unsupported diagnoses" and that if they had done so, the government "would not have made risk adjustment payments based on these unsupported diagnoses or, if it had already made the payments, it would have recovered them from [United]."[8]

13.     While the government originally asserted six claims for relief, in light of a ruling on a motion to dismiss, I understand that this case now centers on the "reverse false claim" allegation from the First Claim for Relief.  This specifically relates to the second portion of 31 U.S.C. § 3729(a)(1)(G), which states that it is a violation of the False Claims Act to knowingly conceal or knowingly and improperly avoid or decrease an "obligation to pay or transmit money or property to the Government."[9]  The False Claims Act defines an "obligation" to include "an established duty, whether or not fixed, arising from…retention of any overpayment."[10]  The government seeks to prove that United "knowingly and improperly failed to delete…invalid diagnoses that had been submitted to the Medicare Program for risk adjustment payments which were made by the Medicare Program to [United] or knowingly and improperly failed to otherwise return to the Medicare Program the overpayments based on the invalid diagnoses."[11]

    ii.     <u>United's First Interrogatory to the Government and Government's Response</u>

14.     In January 2020, more than two years after the government filed its First Amended Complaint, United submitted its first interrogatory, "Interrogatory No. 1," to the government.  That interrogatory asked the government to "[i]dentify for date of service years 2008-2016 the Beneficiary…Date of Service, Diagnosis Code(s), CMS HCC(s) or RxHCC(s), and Provider…that

---

[7] *Id.*, para. 12.
[8] *Id.*, para. 12.
[9] 31 U.S.C. §3729(a)(1)(G).
[10] 31 U.S.C. §3729(b)(3).
[11] Complaint, para. 342.

4

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

corresponds to each and every diagnosis code [the government alleges United] 'knowingly and improperly failed to delete…or otherwise return to the Medicare Program [as an] overpayment.'"[12]

15.    The government responded to United's Interrogatory No. 1 on February 3, 2020. After asserting objections to the interrogatory, the government responded that "although fact discovery is ongoing, and expert disclosures are not due until December 18, 2020, and that the United States reserves the right to supplement and/or amend this answer in full or in part as it learns new information and as expert analysis progresses, the United States alleges that UnitedHealth Defendants 'knowingly and improperly failed to delete in the RAPS system the invalid diagnoses that had been submitted to the Medicare Program for risk adjustment payments which were made by the Medicare Program to them or knowingly and improperly failed to otherwise return to the Medicare Program the overpayments based on the invalid diagnoses' for each and every Diagnosis Code that was known (as that term is defined by the False Claims Act) to be unsupported by medical records and that affected the amount of payment received by UnitedHealth from the Medicare Program."[13]  The government then identified what it described as "representative examples" of such diagnosis codes and identified various documents from which the government claimed United could derive the information it sought.[14]

16.    The parties disputed whether the government's response to Interrogatory No. 1 was sufficient and whether the government was obligated to identify every diagnosis code the government contends United knowingly and improperly failed to delete or otherwise return to the Medicare Program as an overpayment.  The parties brought their dispute to the Special Master during a May 21, 2020 conference, and the government then agreed to supplement its response. On June 8, 2020, the Special Master issued an order requiring the government to supplement its response to Interrogatory No. 1 by August 17, 2020 for date of service ("DOS") years 2010 – 2013, by October 30, 2020 for DOS years 2008 – 2009, and by December 15, 2020 for DOS years 2014 – 2016.[15]

---

[12] United's First Interrogatory to the Government, p. 6.
[13] Government's Responses and Objections to United's First Set of Interrogatories to the Government, February 3, 2020, p. 8.
[14] Id., p. 9.
[15] Order Re: Supplemental Response to Defendants' Interrogatory No. 1, June 8, 2020.

5

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

17.     In response to United's Interrogatory No. 1, the government provided data tables comprising approximately 28 million[16] line-item records of data representing allegedly unsupported diagnosis codes from DOS years 2008 – 2016 ("First Interrogatory Response") that the government alleges led to overpayments that United should have returned.  Each row of data in the First Interrogatory Response reflects a unique combination of Health Insurance Claim Number (or "HICN", a unique Medicare member identifier), DOS, diagnosis code, corresponding HCC or RxHCC, and provider number.

18.     All line-item records in the First Interrogatory Response are populated with a diagnosis code.  However, not all records are populated with an HCC or RxHCC (HCCs and RxHCCs, and their importance to Medicare Advantage risk adjustment, are explained in Section B.ii. below).  As summarized in Figure 1 below, only 41.9% of First Interrogatory Response records contain a diagnosis code mapping to an HCC, 89.2% contain a diagnosis code mapping to an RxHCC, and 3.2% contain a diagnosis code that does not map to either an HCC or an RxHCC.

**Figure 1. First Interrogatory Response Records, by HCC or RxHCC.[17]**

| DOS Year | Total First Interrogatory Response Records | | | | | | =A+C | =B+C |
| | A | B | C | D | | | | |
| | Only HCC | Only RxHCC | HCC and RxHCC | Neither HCC nor RxHCC | Total | | HCC Populated | RxHCC Populated |
|---|---|---|---|---|---|---|---|---|
| 2008 | 17,439 | 832,857 | 257,606 | 173,358 | 1,281,260 | | 275,045 | 1,090,463 |
| 2009 | 36,432 | 1,688,573 | 539,470 | 408,597 | 2,673,072 | | 575,902 | 2,228,043 |
| 2010 | 111,985 | 1,514,765 | 731,714 | - | 2,358,464 | | 843,699 | 2,246,479 |
| 2011 | 111,841 | 1,413,035 | 621,985 | - | 2,146,861 | | 733,826 | 2,035,020 |
| 2012 | 253,526 | 2,232,288 | 1,344,038 | - | 3,829,852 | | 1,597,564 | 3,576,326 |
| 2013 | 336,255 | 2,505,401 | 1,589,395 | - | 4,431,051 | | 1,925,650 | 4,094,796 |
| 2014 | 346,027 | 1,798,320 | 1,315,001 | 3,480 | 3,462,828 | | 1,661,028 | 3,113,321 |
| 2015 | 393,363 | 1,626,036 | 1,243,242 | 145,801 | 3,408,442 | | 1,636,605 | 2,869,278 |
| 2016 | 503,802 | 1,726,572 | 1,952,081 | 163,366 | 4,345,821 | | 2,455,883 | 3,678,653 |
| **Total** | **2,110,670** | **15,337,847** | **9,594,532** | **894,602** | **27,937,651** | | **11,705,202** | **24,932,379** |
| **%** | **7.6%** | **54.9%** | **34.3%** | **3.2%** | **100.0%** | | **41.9%** | **89.2%** |

---

[16] When I refer to the First Interrogatory Response data, I am referring specifically to the tables named: 2008dos.csv, 2009dos.csv, 2010DOS_Amended.csv, 2011DOS_Amended.csv, 2012DOS_Amended.csv, 2013DOS_Amended.csv, IRADS 2014dos.csv, IRADS 2015dos.csv, and IRADS 2016dos.csv.  There are 27,937,651 records across these tables.  The government produced IRADS and EDPS versions of the tables for the 2014 – 2016 DOS years.  I relied upon the IRADS versions.

[17] See Exhibit 3. These counts are based on my mappings of the diagnosis codes in the First Interrogatory Response to HCC(s) or RxHCC(s) based on the relevant diagnosis code mappings published by CMS for each payment year. They are not based on the HCC or RxHCC fields originally populated in the government's list.  The mapped HCC

19.    These tables were provided across multiple data productions culminating in December 2020.[18]    In its initial production of the first of these tables in August 2020, the government "identifie[d] and incorporate[d] into its answer [to United's First Interrogatory] the attached charts of Diagnosis Codes that [United] 'knowingly and improperly failed to delete' or 'knowingly and improperly failed to otherwise return to the Medicare Program the overpayments based on such diagnoses.'"[19]    The First Interrogatory Response was described as the result of work through which the government:

> …identified every diagnosis code that it contends UnitedHealth submitted to CMS to increase its risk adjustment payments, and then improperly failed to delete when UnitedHealth's own reviewers found no support for the diagnosis code in the member's medical records.    For each diagnosis code on the United States' list: (1) the diagnosis code was submitted by UnitedHealth to CMS and was required, by regulation, to be supported by an underlying medical record; (2) that medical record went through UnitedHealth's medical record review program; and (3) UnitedHealth's own reviewers did not find the diagnosis code to be supported by medical records.    That is, each diagnosis code on the United States' list is associated with a medical chart that UnitedHealth has already thoroughly reviewed, and in none of those reviews found support for the diagnosis code in question.    However, UnitedHealth never deleted any of these diagnosis codes.[20]

20.    My understanding is that these tables comprise the government's full list of allegedly at-issue diagnosis codes in this case.    Beyond this description, I understand that the government has not explained in detail how the 28 million records in the First Interrogatory

---

and RxHCC values were almost always the same as the values populated in the First Interrogatory Response from DOS years 2008 – 2013 (<0.1% variation).    For DOS years 2014 – 2016, these mapped values were different than the values populated in the First Interrogatory Response for approximately two-thirds of records.    These differences are driven primarily by a large volume of the HCC and RxHCC fields in the First Interrogatory Response being blank or populated with "dummy" values (i.e., 9999, 999, 8888) in these years.

[18] Joint Stipulation Regarding Government's Motion to Compel, dated April 29, 2021, p. 13.
[19] Government's First Interrogatory Response, dated August 17, 2020, p. 9.
[20] Joint Stipulation Regarding Government's Motion to Compel, dated April 29, 2021, p. 8.

7

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

Response were identified – *e.g.*, what specific sources were queried, what assumptions were made – nor has it provided supporting data query scripts or workpapers.[21]  Also, the government has not quantified what the financial impact would have been had these codes actually been deleted from United's risk adjustment submissions during the relevant years.

### B. *Background on the Medicare Advantage Program*

#### i. The Medicare Program Coverage Components

21.    Medicare is the federal health insurance program for people who are 65 or older, certain younger people with disabilities, and people with End-Stage Renal Disease.  Since its inception in 1965, Medicare has been administered directly by the Federal government and historically has had two parts: Medicare Part A (Hospital Insurance) and Medicare Part B (Medical Insurance).[22]  Medicare Part A covers inpatient hospital stays, skilled nursing care after a hospital stay, hospice care, and some home health care.  Medicare Part B covers a portion of certain doctors' visits, some home health care, medical equipment and supplies, certain outpatient services, and certain preventive services such as rehabilitation therapy, laboratory tests, and x-rays.  Medicare Part B coverage requires that a monthly premium be paid to Medicare, along with a small deductible that must be reached before Medicare Part B begins paying for services.[23]

22.    Medicare Parts A and B (also called "original Medicare" coverage) are often referred to as "fee-for-service" ("FFS") coverage as they (a) allow Medicare-eligible members to see any Medicare-approved doctor or hospital that accepts Medicare payment, and (b) provide payment to such doctors and hospitals on the basis of the specifically identified covered services actually provided.[24]

23.    Following the Balanced Budget Act of 1997, an additional Medicare coverage component was enacted: Medicare Part C (also known as "Medicare Advantage" or "MA").[25]

---

[21] Deposition of Amanda Johnson, September 30, 2022, p. 27.
[22] Klees, B. S., Eckstein, E. T., & Curtis, C. A. (2021, November 15).  Office of the Actuary, Centers for Medicare & Medicaid Services, Department of Health and Human Services.  *Brief Summaries of Medicare & Medicaid*, p. 8. (https://www.cms.gov/files/document/brief-summaries-medicare-medicaid-november-15-2021.pdf).
[23] *Id.*, pp. 8 – 11.
[24] *Id.*, pp. 9 – 11
[25] *Id.,* p. 8.  The Balanced Budget Act of 1997 created Part C as the "Medicare+Choice" program.  It was later modified and renamed "Medicare Advantage" as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003.

8

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

Medicare Part C addresses a type of Medicare health insurance plan offered by private insurance companies, called Medicare Advantage Organizations ("MAOs"), that contract with CMS to receive a "capitated" (*i.e.*, fixed) payment per enrolled Medicare member per month[26] and then to provide those enrolled Medicare members with insurance coverage in lieu of their original Medicare Part A and Part B coverage.[27]  By law, Medicare Advantage plans must cover at least the same health care services as original Medicare.  However, as an incentive to join the plan, many Medicare Advantage plans cover services that are not covered by original Medicare, such as certain vision and dental care.[28]

24.    As noted above, original Medicare coverage pays health care providers for each covered service they furnish to eligible members.  While Medicare sets the price it pays to health care providers, the volume of services (and, thus, the total spending by the program) remains largely uncontrolled.  A key congressional objective of establishing the Medicare Part C program was to help restrain the growth of Medicare spending based on the belief that private MA plans, because of the fixed nature of the capitated payments they receive, have more incentive to control both (a) the price they pay to health care providers for services provided to their members, and (b) the quantity of such services provided.

25.    Medicare Part D was established under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and adds prescription drug coverage to the original Medicare program.[29]  Beginning in 2006, Part D provides subsidized access to prescription drug coverage on a voluntary basis, upon payment of a premium, to individuals entitled to Part A or enrolled in Part B, with premium and cost-sharing subsidies for low-income members.[30]  Medicare Part D coverage plans are offered by insurance companies and other private companies approved by Medicare.  Medicare Advantage plans may also offer prescription drug coverage so long as they follow the same rules as the Medicare Part D plans.[31]

---

[26] *Id.,* p. 19.
[27] *Id.,* p. 11.
[28] *Id.,* pp. 11-12.
[29] Klees, B. S., Eckstein, E. T., & Curtis, C. A. (2021, November 15).  Office of the Actuary, Centers for Medicare & Medicaid Services, Department of Health and Human Services.  *Brief Summaries of Medicare & Medicaid*, p. 8. (https://www.cms.gov/files/document/brief-summaries-medicare-medicaid-november-15-2021.pdf).
[30] *Id.*, pp. 8-9.
[31] *Id.*, p. 12.

9

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

ii.    The CMS-HCC and CMS-RxHCC Models

26.    As noted above, MAOs are compensated by CMS on a capitated basis.  That is, they receive a monthly amount from CMS for each Medicare member enrolled with one of their MA plans.  Under the Medicare Advantage program, the capitation payment received by the MAO can vary depending upon the health status of the member.  In other words, while the payment for any given member is fixed, the payment amount across different members can vary based on the differing health statuses of the various members.  This process of adjusting the payment based upon health status is referred to as "risk adjustment." [32]

27.    Through its risk adjustment calculations, CMS alters future payments to MAOs based on the anticipated costs of particular MA member populations by taking into account information regarding MA members' health statuses.[33]  Payments are expected to be higher for populations of less healthy members, for example, in order to cover their higher expected costs of care.[34]

28.    CMS's current risk adjustment payment methodology is the CMS-Hierarchical Condition Category ("HCC") model.  This model was first fully implemented for calendar year 2007.[35]  Under the CMS-HCC model, CMS organizes clinically-related diagnosis codes into categories referred to as HCCs.  HCCs are disease groupings consisting of diagnosis codes that are ranked based on disease severity and cost.[36]  The diagnosis codes were initially based on the International Classification of Diseases, 9th Edition Clinical Modification (ICD-9-CM) coding, but were transitioned to the 10th Edition, or ICD-10, on October 1, 2015.[37]

29.    A separate risk adjustment model exists for Part D – the RxHCC model.  This model is similar to the CMS-HCC risk adjustment model in its use of health status (demographics and diagnosis codes) to predict expenditures; however, it focuses on the expected Part D (*i.e.*, prescription drug) costs a plan will incur under the Medicare standard Part D benefit, rather than on the expected medical costs under Medicare Parts A and B.  Different diseases are used to

---

[32] 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide, p. 1-1.
[33] 73 Fed. Reg. 48279, at 48650 (Aug. 19, 2008).
[34] 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide, p. 1-4.
[35] 2013 Risk Adjustment Regional Technical Assistance Participant Guide, p. 6.
[36] *Id.*, p. 7.
[37] CMS, *Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 6, 2015, p. 32.

10

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

estimate expected Part D drug costs than are used to predict expected Part A / B costs.  Incremental costs associated with low-income ("LI") and long-term institutional ("LTI") members are also incorporated into the Rx-HCC model. [38]

30.     The CMS-HCC risk adjustment model was developed using enrollment and claims data from the original Medicare FFS program.  The model is prospective, meaning diagnosis codes from the previous year, together with certain demographic information, are used to predict future costs and, thus, to set future capitation payment amounts.[39]  In other words, the risk adjustment model uses MA member demographic and diagnostic data from a base year (also referred to as the "DOS year") to calculate each MA member's risk scores and capitation payment amounts for the following year (also referred to as the "payment year" or "calendar year").  For example, CMS used MA member demographic and diagnostic data for 2021 (the DOS year) to determine the risk scores used to adjust payments to MAOs in 2022 (the payment year).

31.     According to the CMS 2012 Risk Adjustment Regional Technical Assistance Participant Guide, diagnosis codes included in risk adjustment data must be based on clinical medical record documentation from a face-to-face encounter, coded according to the applicable coding guidelines (ICD-9-CM or ICD-10), assigned based on dates of service within the data collection period, and submitted to the MAO from an acceptable source and acceptable provider type.[40]  MAOs are responsible for ensuring that the data they collect comes from such acceptable provider types.[41]

32.     For both inpatient and outpatient facilities, CMS has delineated between "covered" and "non-covered" facilities.  This designation dictates what types of facilities are acceptable sources for risk adjustment data.  For facilities designated as covered, MAOs may submit risk adjustment data, while facilities designated as non-covered may not submit risk adjustment data. For example, among inpatient facilities, covered facilities include short-term (general and specialty) hospitals, religious non-medical health care institutions, long-term hospitals, rehabilitation hospitals, children's hospitals, psychiatric hospitals, and medical assistance facilities/critical access hospitals.  Non-covered inpatient facilities include skilled nursing

---

[38] 2012 Risk Adjustment Regional Technical Assistance Participant Guide, p. 1-5.
[39] *Id.*, p. 1-2.
[40] *Id*, pp. 2-5 – 2-7.
[41] *Id,* pp. 2-5 – 2-6.

11

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

facilities, intermediate care facilities, respite care, and hospice. Among outpatient facilities, covered facilities may include short-term (general and specialty) hospitals, community mental health centers, federally qualified health centers, long-term hospitals, children's hospitals, and rural health clinics. Non-covered outpatient facilities include free-standing ambulatory surgical centers ("ASCs"), home health care, and free-standing renal dialysis facilities.[42]

33.    In addition, for outpatient facilities, CMS has also designated certain types of services that are not acceptable sources of risk adjustment data. These "non-covered" services include laboratory, ambulance, durable medical equipment, prosthetics, orthotics, supplies, and radiology services.[43]

34.    For physicians, the collection of acceptable data for risk adjustment is based on the physician's specialty and must be the result of a face-to-face visit. Acceptable data includes data collected from both non-network and network physicians. Examples of acceptable physician specialty and/or provider types include, but are not necessarily limited to, general practice, general surgery, gastroenterology, neurology, obstetrics/gynecology, pathology, urology, nephrology, physical therapy, and nurse practitioner. CMS regularly updates its list of acceptable physician specialty and provider types for risk adjustment data and posts the guidance on its website.[44]

35.    Not all clinical diagnosis codes correspond to an HCC or RxHCC (*i.e.*, not all clinical diagnosis codes are risk-adjusting). To determine which HCCs or RxHCCs to assign to members under the CMS-HCC and CMS-RxHCC models, CMS requires MAOs to collect members' appropriate clinical diagnosis codes and then to submit that information to CMS through the Risk Adjustment Processing System ("RAPS").[45] CMS requires that even chronic conditions, which by definition are ones lasting one year or more, be submitted each year in order to be used for risk adjustment purposes.

36.    CMS uses the diagnosis codes submitted by MAOs through RAPS to assign HCCs, and identify the related "interactions," for each member. Interactions are defined as "the combination of multiple diagnoses or disability that result in an extra relative factor added to the

---

[42] *Id.*, pp. 2-5 – 2-6.
[43] *Id.*, p. 2-6.
[44] *Id.*, p. 2-7.
[45] 73 Fed. Reg. 48279, at 48650-48651 (Aug. 19, 2008). *See also* Risk Adjustment 101 Participant Guide: 2013 National Technical Assistance, CMS (Jul. 23, 2013), p. 11.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

risk score evaluation."[46]  These HCCs and interactions are used to calculate the risk score for a member.  Other items considered as part of the risk adjustment process are whether the member has (a) End-Stage Renal Disease ("ESRD") status, or (b) has post-transplant status (also referred to as "Functioning Graft Status").  A payment adjustment factor is assigned for (a) each HCC supported by a diagnosis code submitted by an MAO, (b) the member's ESRD status, and (c) the member's Functioning Graft Status.[47]

37.    Multiple diagnosis codes submitted by an MAO may be assigned to the same HCC or RxHCC under the CMS-HCC and CMS-RxHCC models.  Thus, even if multiple member diagnosis codes map to the same HCC or RxHCC, that HCC or RxHCC is counted only once for risk adjustment purposes for that member.  Similarly, if one diagnosis code mapping to an HCC or RxHCC is deleted, but others still map to the same HCC or RxHCC, the payment adjustment factor based on that HCC or RxHCC will remain unchanged.[48]  In this way, member risk adjustment scores are best thought of in terms of support at the "condition level" (*i.e.*, at the level of an HCC or RxHCC) rather than at the level of a discrete diagnosis code.

38.    After all HCCs and RxHCCs are identified for a member, some HCCs or RxHCCs may be removed during the risk score calculation within the Risk Adjustment System ("RAS")[49] based on a defined hierarchy.  The process of removing HCCs and RxHCCs based on hierarchy ensures that only the most severe occurrence of a condition is included in the risk score calculation for each member.[50]  For example, in 2013, four separate HCCs (7, 8, 9, 10) were part of a hierarchical disease group labeled "metastatic cancer and acute leukemia."[51]  In this year, if a member had diagnosis codes mapping to both HCC 8 and 9, HCC 8 (the higher severity of the two) would supersede HCC 9 and be the only one considered in the member's risk score.  Therefore, not all diagnosis codes submitted by MAOs through RAPS are ultimately used in the

---

[46] 2012 Risk Adjustment Regional Technical Assistance Participant Guide, p 2-2.
[47] *Id.*, p. 1-3.
[48] *Id.*
[49] The Risk Adjustment System ("RAS") is the processor that performs the calculation and sends the risk score to the payment system (MARx).  *See* 2012 Risk Adjustment Regional Technical Assistance Participant Guide, p. 1-4.
[50] 2012 Risk Adjustment Regional Technical Assistance Participant Guide, p. 1-3.
[51] CMS, *Announcement of Calendar Year (CY) 2013 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter,* April 2, 2012.

13
CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

calculation of a member's risk score.  In addition, not all diagnosis codes submitted by MAOs impact the payment received by CMS.

39.    MAOs can both add and delete diagnosis codes as part of their data submissions through RAPS.  A specific data field called the "Delete Indicator" allows an MAO to delete a diagnosis code that has previously been stored in the RAPS database.[52]

40.    The risk adjustment model is run by CMS three times per year to calculate risk scores for all members with available data.  The first run is used to calculate an initial risk score; the second to calculate a mid-year update; and the third is done at year end for "final reconciliation."  Final reconciliation is used to complete the implementation of payments under risk adjustment, with CMS calculating the final risk adjustment factors and member status based on the full complement of data submitted by MAOs.[53]

41.    Figure 2 below, taken from the 2012 Risk Adjustment Regional Technical Assistance Participant Guide, provides an overview of the Risk Adjustment Data Flow as it pertains to physician-submitted codes.[54]

---

[52] 2008 Risk Adjustment Participant Guide, p. 4-9.

[53] *Id.*, p. 1-32.

[54] Effective January 1, 2022, CMS moved RAF calculation for payment year 2022 entirely from RAPS to EDPS (*see* CMS, *Announcement of Calendar Year (CY) 2022 Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies,* p. 6*).*  Beginning in payment year 2015, CMS announced that payments for 2015 would be based upon a blending of RAPS and EDPS risk scores (*see* CMS, *Announcement of Calendar Year (CY) 2015 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter,* April 7, 2014*,* p. 2).

14

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**Figure 2. Physician-Originated Risk Adjustment Data Flow Overview.**[55]



iii.    <u>Risk Adjustment Data Validation Audits</u>

42.    CMS is required by law to validate the accuracy of payments made to MAOs, which includes validating both underpayments and overpayments.[56]    Medicare Advantage Risk

---

[55] This overview is relevant to diagnosis codes submitted by physicians.

[56] CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits*, February 24, 2012, p. 1: "The Improper Payments Elimination and Recovery Act (IPERA) of 2010 requires CMS to validate the accuracy of the payments made to MA organizations and determine

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

15

Adjustment Data Validation ("RADV") audits have been the primary tool for CMS to audit diagnosis codes that plans have submitted for payment under Medicare Part C and to recoup certain payments made.  RADV audits are used by CMS to determine whether diagnosis codes submitted by MAOs can be validated by supporting medical record documentation.  Diagnosis codes that cannot be validated contribute to a payment error rate.[57]

43.    CMS began conducting RADV audits in 2008 for the 2007 payment year.  CMS annually selects MA contracts for RADV audits.  An eligible MA contract includes any contract held by an MAO having received risk adjusted payments for any given calendar year being audited.[58]  There are no specific rules outlining how CMS selects plans for audits, but CMS has cited that selection of contracts has been "based primarily on coding intensity, *i.e.*, the average change in the disease component of a contract's risk scores compared to the average change in [Medicare fee-for-service] risk scores."[59]

44.    To conduct RADV audits, CMS selects a set of MA contracts for each RADV audit cycle.  During a RADV audit, CMS selects a sample of an MAO's members and reviews the HCCs that were assigned based on the diagnosis codes submitted by the MAO to assess whether the diagnosis codes are supported by the applicable member medical records.  Once members are selected for audit, the MAO is required to submit medical records to support all HCCs represented in the sampled members' risk scores for the payment year.[60]  Beginning with the RADV audits for the payment year 2011, CMS has allowed audited MA contracts to submit up to five records for each HCC being validated.  Medical records may be from different providers for the same member and HCC under review.[61]  CMS allows an MAO to designate the medical record that it believes may substantiate the HCC under review as the "highest in priority."[62]  All diagnosis codes are

---

the level of payment error."  The IPERA was enacted in 2010 and amended the Improper Payments Information Act of 2002.  Both acts defined an improper payment as "any payment that should not have been made or that was made in an incorrect amount (including overpayments and underpayments) under statutory, contractual, administrative, or other legally applicable requirements."

[57] CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits*, February 24, 2012, p. 1.

[58] CMS, *Question and Answer Session – CY 2011 RADV Industry Training*, Updated March 20, 2014, p. 1.

[59] *Id.*

[60] CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits*, February 24, 2012, p. 3.

[61] *Id.*

[62] CMS, *Question and Answer Session – CY 2011 RADV Industry Training*, Updated March 20, 2014, p. 3.

16

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

abstracted from the medical record ranked highest in priority by the submitting MAO that supports the HCC under review.

45.    CMS contracts with two independent contractors to perform the medical record reviews for a given MAO's RADV audit.  The first contractor (the "Initial Validation Contractor") conducts the initial medical record review, and the second contractor (the "Second Validation Contractor") reviews all instances in which the Initial Validation Contractor believes a diagnosis code was not supported.  Both contractors use certified coders in their respective reviews.[63]  During their reviews, the coders also document any diagnosis codes that were supported but not previously submitted by the MAO.

46.    After CMS completes a RADV audit, it calculates the contract's payment error based on the audit results.  For each sampled member, the RADV-corrected risk score and corrected payment are calculated based on the HCCs that are supported by the RADV medical record review findings for the member.  The correct payment is calculated considering both (a) the diagnosis codes that were previously submitted but not supported by medical record documentation during the RADV medical record review, and (b) any diagnosis codes that were not previously submitted but that were found to be supported by the medical record documentation during the RADV audit.[64]  Member-level payment errors are defined as "the difference between the original payment and the RADV-corrected payment (per member per month)."[65]  The overall payment error for each member may be either a net overpayment or a net underpayment.[66]  Through its *Question and Answer Session – CY 2011 RADV Industry Training*, updated on March 20, 2014, CMS indicated that "recoveries based on extrapolation will begin with the calendar 2011 RADV audits;"[67] however, CMS recently released its Medicare Advantage Risk Adjustment Validation Final Rule stating that "CMS will extrapolate RADV findings beginning with payment year (PY) 2018 and will not extrapolate RADV audit findings for PYs 2011 through

---

[63] CMS, *Medicare Advantage Risk Adjustment Data Validation (RADV) Training, Contract-Level Industry-Wide Training Event,* January 29, 2019, pp. 42 – 48.

[64] United States Government Accountability Office ("GAO") Report to the Chairman, Committee on Ways and Means, House of Representatives, *Medicare Advantage: Fundamental Improvements Needed in CMS's Effort to Recover Substantial Amounts of Improper Payments*, April 2016, pp. 2 – 4.

[65] CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits*, February 24, 2012, p. 3.

[66] *Id.*

[67] CMS, *Question and Answer Session – CY 2011 RADV Industry Training*, Updated March 20, 2014, p. 3.

17

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

2017."[68]  In other words, for RADV audits completed during the timeframe relevant to the government's allegations, no RADV payment errors were extrapolated.

47.    MAOs may pursue any or all of the following approaches to respond to payment adjustments arising from a RADV audit: (1) submit physician attestations for medical records with missing information; (2) appeal the auditors' determinations arising from the medical record review; and (3) appeal the RADV payment error calculation.  If an MAO chooses to appeal medical record review-related errors and/or the RADV payment error calculation, it has 60 days from the date of issuance of the RADV report to file a written request with CMS for the appeal.  The request must include, specifically for each of the audited HCCs for which it is filing an appeal, the issues with which the MAO disagrees and the reasons for the disagreements.  While MAOs may submit multiple medical records for each HCC during the primary audit process, as part of the appeal process, they can only choose a single medical record per HCC as the basis for an appeal.[69]

### iv.    Medicare Part C Payment Error Rate

48.    CMS annually submits to Congress an Agency Financial Report ("AFR") that, among other things, reports the estimated amounts of improper payments made under Medicare Part C as well as a Part C Payment Error Rate.  Per CMS, "Inaccurate or incomplete diagnosis data may lead CMS to disburse over-payments or under-payments to MA contracts.  CMS conducts an annual Part C Improper Payment Measure ('IPM') activity, formerly known as National Risk Adjustment Data Validation ('RADV'), to estimate the improper payments for the Medicare Part C Program due to unsubstantiated risk adjustment data."[70]

49.    To calculate the Part C Payment Error Rate, Medicare selects a sample of Medicare Part C eligible members and reviews the relevant medical record documentation to substantiate the related CMS-HCC payments.  As part of the review, "certified coders code the medical records, and the findings are used to recalculate risk scores for each sampled member.  The difference

---

[68]Medicare and Medicaid Programs, *Policy and Technical Changes to the Medicare Advantage, Medicare Prescription Drug Benefit, Program of All-Inclusive Care for the Elderly (PACE), Medicaid Fee-For-Service, and Medicaid Managed Care Programs for Years 2020 and 2021*; 88 FR 6643, p. 6643.
[69] § 422.311(c) RADV audit dispute and appeal processes.
[70] CMS, *Medicare Part C Improper Payment Measure Program Background*: (https://www.cms.gov/data-research/monitoring-programs/improper-payment-measurement-programs/medicare-part-c-ipm/program-background).

18

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

between the payment risk scores and the recalculated risk scores is termed Risk Adjustment Error. Validation results from the sample are extrapolated to the broader Part C population to produce payment error estimates."[71]

50.    CMS calculates the Part C Payment Error Rates in two ways.  First, it calculates a "net" error rate, which is based on offsetting overpayments and underpayments.  Second, it calculates an error rate based on the gross payment errors (also called "Gross Improper Payments").  CMS defines "Gross Improper Payments" as the "absolute value of the sum of overpayments and underpayments."[72]

### C.  *Summary of Relevant Data Sources*

51.    The section below provides a high-level overview of the key United data sources relevant to the analyses described in this report.

#### i.    United Risk Adjustment Claims Data

52.    United maintains significant amounts of information about the members enrolled in its MA plans.  This includes the data that was submitted to CMS's RAPS for the purposes of calculating MA risk adjustment payments.  During the timeframe at issue in this case, much of this data resided in United's Internal Risk Adjustment Data System ("IRADS") or Encounter Data Processing System ("EDPS").[73]  These databases store large amounts of data pertaining to United's MA plan members across numerous data tables – including, among other things, identifying information about those members, information about those members' various healthcare encounters, information about the providers who interacted with those members in those encounters, and the diagnosis codes recorded by providers for each encounter.  In addition, a significant amount of relevant member information necessary for risk adjustment was stored within United systems other than IRADS or EDPS, or contained within reports provided by CMS

---

[71] *Id.*

[72] CMS, *Medicare Part C Improper Payment Measure Program Error Rates and Findings*: (https://www.cms.gov/data-research/monitoring-programs/improper-payment-measurement-programs/medicare-part-c-ipm).

[73] IRADS contains diagnosis data relevant to this case for DOS years 2008 – 2016.  EDPS contains diagnosis data relevant to this case for DOS years 2014 – 2016.

19

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

to United.  These latter reports include the Monthly Member Report ("MMR") and the Model Output Report ("MOR").

53.     The IRADS and EDPS data repositories are populated through several channels. This includes the submission of diagnosis codes from providers in connection with the treatment of members enrolled in United MA plans.  In this context, providers submit claim and encounter data containing member diagnosis information in multiple formats, such as CMS-1500 claim forms (for professional physician claims) and UB-04 forms (for hospital claims).  This inbound claims data is captured and maintained in several United claims adjudication systems.  During the timeframe relevant to this case, these systems included: the Comprehensive Online Software Management and Operational Support System ("COSMOS"), a United claims adjudication and payment platform; the Newly Integrated Computer Environment ("NICE"), a claims processing platform relating to claims obtained through the PacifiCare acquisition; the Professional Encounter System ("PES"), an encounter reporting platform; the FACETS RV and FACETS Sierra systems, which contained claims data generally related to the West Coast, California, and Nevada markets; the FACETS CSP system, a Medicaid and community and state program claims and administrative platform; and PULSE, the legacy claims platform used by Oxford Health Plans that eventually migrated into COSMOS in 2012.[74]  The encounter data from these multiple claims adjudication systems is aggregated, standardized, refined, and transmitted to IRADS.  Among other things, this involves a filtering process to exclude diagnosis codes arising from ineligible encounters (so that only diagnosis codes from face-to-face visits with an acceptable provider type and specialty are included) and also a data standardization process to format the data so it can be successfully submitted to CMS's RAPS.

54.     IRADS and EDPS are also populated via submission through alternative channels such as the Alternate Submission Method ("ASM"), a process whereby diagnosis codes not captured through regular processes can be submitted for evaluation and possible submission to RAPS.  ASM submissions can be necessary as a result of issues such as data errors, form limitations, or the identification of additional valid diagnosis codes through a chart review.

---

[74] Exhibit 703-2 to the 30(b)(6) Deposition of Biggs Cannon, dated 5/30/2023.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

55.     Included among the United Risk Adjustment Claims data are files that identify diagnosis codes that were initially submitted to RAPS by United but subsequently retroactively deleted after the diagnosis code was identified as not being applicable to that member in that year (the "Diagnosis Deletes Data").[75]  The Diagnosis Deletes Data contains key fields including HICN, From Date, Through Date, Diagnosis Code, and a Delete Indicator.  Diagnosis codes can be deleted retroactively up to several years after the diagnosis code's original submission.  The Diagnosis Deletes Data I relied upon for the purposes of my report only includes deletions that were made up to the date(s) that these files were produced in this case.

56.     For the purposes of my report, I define the "United Risk Adjustment Claims Data" as the data residing in any United database (including IRADS and EDPS), which: (a) maintains information about United MA plan members, their encounters, the providers associated with those encounters, and the diagnosis codes identified in those encounters (from any submission source); and (b) functioned as a repository from which diagnosis data was submitted to CMS's RAPS for claims for MA risk adjustment reimbursement.

ii.     United/Vendor Chart Review Data

57.     During the timeframe at issue in this case, United and/or vendors working with United managed various chart review programs in which medical coders (independent of the providers or coders who originally identified and submitted diagnosis codes from a member's encounter) reviewed member charts in an effort to identify diagnosis codes supported in the member's charts.  I refer collectively to the programs and efforts by United or third-party vendor coders to independently review member charts for purposes of identifying diagnosis codes supported by the charts as "Chart Review."[76]

58.     During the timeframe relevant to this case, United's Chart Review was offered by OptumInsight's Clinical Performance and Compliance ("CPC") business unit to MAO clients, including United's Medicare & Retirement division.  CPC used internal coders as well as coders

---

[75] Specifically, the Diagnosis Deletes Data includes: MARA2157342, MARA2152923, MARA2160498, MAPL003667107,     MAPL000724834-MAPL000724836,     MAPL005462874-MAPL005462875,     and MAPL006427524-MAPL006427525.

[76] For clarity, my term "Chart Review" encompasses United's Chart Review program, as well as the activities relating to the discrete "SUB_SOURCE_CD" pathways I relied upon in connection with the analyses discussed in Opinion 2 below.

21

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

from third-party vendors.[77]  In almost all cases, the Chart Review coders performed "blind" reviews in which they were unaware of the diagnosis codes actually submitted by providers in connection with the charts subject to review.[78]

59.    The objective of United's Chart Review process was to identify diagnosis codes supported in a member's medical record to provide a more complete picture of the member's overall health status.[79]  Because the Chart Reviews were blind – meaning that the reviewers were only given the chart, and not any information about what diagnosis codes had previously been submitted or coded[80] – the failure to identify a diagnosis code during Chart Review that had previously been submitted or coded did not mean that the previous code was unsupported.  It could mean, for example, that the Chart Review coder missed the code, or that a slightly different code was selected by the Chart Review coder as a result of the highly technical distinctions between certain codes.[81]

60.    The data related to Chart Review was stored in various systems.  During the timeframe relevant to this case, the data relating to United's internal Chart Review efforts was stored in the ChartSync, Medical Record Manager ("MRM"), and Epsilon systems.  The ChartSync system contains chart review data relevant to this case for DOS years 2008 – 2014.  The

---

[77] During the timeframe relevant to this case, these third-party vendors included Outcomes (2005-2009); The Coding Source / Altegra Health (2005-2012); The Claremont Group (2007); Apogee (2008-2010); Mediconnect (2009-2010); Pi International (2009-present); iCodify (2009-present); Oncall Consulting (2012-2013); EMSI (2014-present); MedSave (2014-present); and RecordFlow (2014-present).

[78] *See* K. Baker 30(b)(6) Dep. Tr. 266:6-8: "We used informed coding in a very narrowly defined time frame."  I understand that in late 2012, United performed a Chart Review "recode project" wherein coders performed an additional review of charts from the 2011 DOS year and that in this project, Chart Review coders may have used an "informed coding" process.  *See* K. Baker 30(b)(6) Dep. Tr. 268:3-270:5;281:9-282:3.  In this process, the coder was provided with diagnosis codes previously coded or received from an acceptable data source across all providers associated with the member and/or non-United MA plan submissions for the member associated with the appropriate data collection period.  *See* K. Baker 30(b)(6) Dep. Tr. 262:17-263:7.  The informed coding information provided to coders was not specific to the rendering provider or date of service, as the charts reviewed could contain information from multiple providers and multiple dates of service across different data collection years and different provider encounters.  *See* K. Baker 30(b)(6) Dep. Tr. 263:18-264:5.  Beyond this 2012 recode project, an attempt was made in 2013 to use informed coding, but this effort was aborted because of data mapping challenges.  Other than this, Chart Reviews were conducted blind during the time period at issue in this case.  *See* K. Baker 30(b)(6) Dep. Tr. 266:18-267:10.

[79] K. Baker 30(b)(6) Dep. Tr. 33:17-34:16: "…Data can be submitted to CMS, you know, through various different channels, claims, encounter [sic]. And all of that data from different sources at different points in time, you know, potentially at different health plan memberships with different providers are consolidated by CMS to create a full health status. But that health status is never, ever fully complete. So with retrospective chart review, we're trying to provide more complete health status for appropriate payment."

[80] K. Baker 30(b)(6) Dep. Tr. 260:7-16.

[81] K. Baker 30(b)(6) Dep. Tr. 36:12-37:20.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

MRM and Epsilon systems contain chart review data relevant to this case for DOS years 2014 – 2016.  When United used third-party vendors to perform chart reviews, the data related to those chart reviews was stored in the vendors' systems.  While the specific functionality and back-end data contents of these systems differ, generally speaking, they contain data about the results of the chart reviews that were performed – including, for example, information identifying the chart that was reviewed, the provider(s) associated with each chart, the results or outcomes of the chart review, and the diagnosis code(s) identified by the chart reviewer in connection with a given member's chart.

61.    For the purposes of my report, I define the "United/Vendor Chart Review Data" as the data residing in any United or vendor system or database (including ChartSync, MRM, Epsilon, and external chart review vendor data sources) that maintains information about chart reviews of United MA plan members, the results of the reviews, and the diagnosis codes identified by the reviews that were then included within the United Risk Adjustment Claims Data.

### iii.    Additional Reference Materials

62.    Most of the data I relied upon for my report derived from productions of the United Risk Adjustment Claims Data and/or United/Vendor Chart Review Data, as further explained in the summary of relevant data requests and productions below.  In some cases, I requested and obtained additional data from United that was useful to my analyses.  This additional data included information used to identify the same member across time.

63.    United maintains an internal data table providing a list of various identifiers for United members, including HICN and Medicare Beneficiary Identifier ("MBI"), as well as a "master ID" unique to the member.[82]  This table is called the "HICN-to-MBI Crosswalk."  In circumstances in which a unique member had multiple separate HICNs or MBIs, the master ID would still be the same for this member.  United updates this internal table once per month.  The table is limited to members with an MBI.  During the monthly update process, if a new MBI is found and linked to an existing member, then a record is inserted into the table using the member's existing master ID.  If a new MBI is not linked to an existing member, then a new record is inserted

---

[82] MBI replaced HICN as the unique identifier for Medicare members and became required for all Medicare transactions effective January 1, 2020.

23

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

with a new master ID.[83]  The version of the table I relied upon for my analyses was generated by United in December 2019.

64.    Additionally, the "Member" and "Member Audit" data tables, which were included as part of various productions of the United Risk Adjustment Claims Data,[84] contain lists of HICNs that crosswalk to a unique "Member Number" for members.  As further described below in my report, I used a combination of the HICN-to-MBI Crosswalk and the Member and Member Audit data tables to create a consolidated resource to identify situations where unique members had more than one identifier over time.  I refer to this data collectively as the "Related Member Identifier Data."

### D.  *Summary of Relevant Data Requests*

65.    A significant amount of data has been requested through discovery in this case at various points in time.  The section below outlines the key data requests that led to the productions of data that I relied upon for my analyses.

### i.  Chart Review and Claims Verification Document Request 4C

66.    In 2015, the government requested that United provide a significant amount of data relating to Chart Review for DOS years 2009 – 2012 ("Chart Review and Claims Verification Document Request 4C" or "DR4C").[85]  In DR4C, the government requested that United provide data related to "every member…associated with a chart subjected to Chart Review for Chart Reviews by any providers (including, but not limited to, FFS, capitated, physician and hospital providers) conducted by [United], by vendors paid in whole or in part by [United], or by the providers."[86]  For those members who had a chart subjected to Chart Review, the government requested that United provide: data tables with detailed information about the members (the "member file"); the providers visited by those members (the "provider file"); the diagnosis codes

---

[83] Information obtained via discussion with Caroline Le, Director of Medicare Risk Adjustment at Optum.
[84] Includes data produced in the DR4C, DR4C Supplemental, 2008 – 2009 & 2014 – 2016 DOS RFP, Versend, Post Sweeps, and Supplemental Post Sweeps productions. (MAPL000724261, MAPL000724262, MAPL002079150, MAPL002079151, MAPL003667038, MAPL003667039, MAPL006427505, MAPL006427506, MAPL005462854, MAPL005462855, MAPL003292399, MAPL003292400).
[85] The government's request was initially for data relating to DOS years 2009 – 2012, but the data ultimately produced in response was for DOS years 2010 – 2013.
[86] WideRight_Updated Requests 10-7-15.pdf.

24

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

belonging to those members (the "provider diagnoses" file); the members' chart(s) subjected to Chart Review (the "CR reviewed charts" file); the diagnosis codes found by the chart reviewer(s) during the Chart Review process for charts subjected to Chart Review (the "CR diagnoses" file); and other data tables pertaining to those members.[87]  The government requested information across all of United's MA plans and from any database or system containing relevant information.

ii.    In Process CV Encounter Request

67.    In 2015, the government requested that United identify and provide data relating to 2011 and 2012 DOS encounters for which the multi-stage Claims Verification Program ("CV") process was begun but not completed at the time United discontinued CV ("In Process CV Encounter Requests").  For those encounters, the government requested that United provide: "1. ProjectID (identifying the delete project as identified in the worksheet '12-13-2014 Data Set'), 2. PatientControlNumber, 3. HIC Number, 4. Provider Type, 5. From Date, 6. Through Date, 7. Diagnosis Code, 8. Plan Number, 9. The status of the code, e.g., whether it was submitted to RAPS and accepted. (or just confirm that all of them were submitted and accepted)."[88]

iii.    United States' First Request for Production of Documents to Defendants

68.    In October 2017, in the United States' First Request for Production of Documents to Defendants ("Government's First RFP"), the government requested that United provide data relating to chart reviews conducted as part of United's Chart Review Program relating to medical encounters during DOS years 2005 through 2016.[89]  Requests 35 – 36 of the Government's First RFP requested data related to the charts that were reviewed as part of United's Chart Review Program, as well as data related to each member for whom there was at least one chart subject to chart review during the requested timeframe (including, for example, all encounter and diagnosis data for those members, member identifying information, and provider identifying information for providers associated with those members' encounters).[90]  Request 38 of the Government's First RFP requested documents relating to inputs to and outputs from United's risk adjustment

---

[87] Id.

[88] See January 29, 2016 production letter ("2011 DOS Encounters Identified for CV Review") from Latham & Watkins (excerpting October 30, 2015 Request).

[89] Plaintiff United States' First Request for Production of Documents to Defendants, October 5, 2017.

[90] Id.

25

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

databases,[91] and/or ad hoc processes conducted outside the formal risk adjustment databases, relating to any chart reviews.

### E. *Summary of Relevant Data Productions*

69.     United made multiple large productions of United Risk Adjustment Claims Data and United/Vendor Chart Review Data in response to the government's data requests.   The productions upon which I relied are summarized in chronological order of production below.

#### i.     In Process CV Encounter Production

70.     In response to the In Process CV Encounter Requests, United compiled and produced several Excel spreadsheets identifying 2011 and 2012 DOS encounters in RAPS for which the multi-stage CV process was begun but not completed at the time United discontinued CV (the "In Process CV Code Data").   For 2011 DOS, these spreadsheets are Bates-stamped MARA2117116 and MARA2164481.[92]   For 2012 DOS, these spreadsheets are Bates-stamped MARA1298042, MARA2092181, and MARA2160501.[93]   These productions were explained in greater detail in cover letters from United's Counsel, Latham & Watkins, at the time of production.[94]

#### ii.     Document Request 4C Production

71.     In response to DR4C, in multiple iterations throughout 2016, United produced several large data tables containing information from the United Risk Adjustment Claims Data and United/Vendor Chart Review Data that was responsive to the government's requests for the DOS

---

[91] This referred to any and all UHG or vendor databases relating to the submission of claims and diagnosis data in relation to UHG's risk adjustment programs.

[92] *See* January 29, 2016 production letter ("2011 DOS Encounters Identified for CV Review") from Latham & Watkins; September 30, 2016 production letter ("Production of Replacement File for MARA2117116") from Latham & Watkins.

[93] *See* May 12, 2015 production letter ("2012 DOS Submissions Identified for Claims Verification") from Latham & Watkins; November 24, 2015 production letter ("2012 DOS Encounters Identified for CV Review") from Latham & Watkins; May 27, 2016 production letter ("Response to Follow Up Questions on March 18, 2016 Letter re: 2012 DOS Encounters Identified for CV Review) from Latham & Watkins.

[94] *See* May 12, 2015 production letter ("2012 DOS Submissions Identified for Claims Verification") from Latham & Watkins; November 24, 2015 production letter ("2012 DOS Encounters Identified for CV Review") from Latham & Watkins; *See* January 29, 2016 production letter ("2011 DOS Encounters Identified for CV Review") from Latham & Watkins; May 27, 2016 production letter ("Response to Follow Up Questions on March 18, 2016 Letter re: 2012 DOS Encounters Identified for CV Review) from Latham & Watkins; September 30, 2016 production letter ("Production of Replacement File for MARA2117116") from Latham & Watkins.

26

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

years 2010 – 2013 (the "DR4C Production").  In some cases, multiple tables were split out and produced in response to a single subcomponent of the DR4C request.  These productions were explained in detail in cover letters from United's Counsel, Latham & Watkins, at the time of production.[95]

72.    The DR4C tables that I relied upon for the analyses in my report include the following:

a.    DR4C.i. – "Member File" (for DOS years 2010 – 2013).[96]  The "Member File" tables provide information about every member number associated with a chart subjected to Chart Review for any providers conducted by United, by vendors paid by United, or by the providers.[97]

b.    DR4C.ii. – "Provider File" (for DOS years 2010 – 2013).[98]  The "Provider File" tables provide information about providers visited by any members identified in the "Member File" tables (*i.e.*, rendering providers) and for all billing providers listed for these visits.[99]

c.    DR4C.iii. – "Provider Diagnosis File" (for DOS years 2010 – 2013).[100]  The "Provider Diagnosis File" tables provide information about every diagnosis code that exists in any United database – including, but not limited to,

---

[95] *See* February 9, 2016 production letter ("Production of Responses and Documents Responsive to CR / CV Document Request 4(C) for 2012 DOS") from Latham & Watkins; April 15, 2016 production letter ("Production of Responses and Documents Responsive to CR / CV Document Request 4(C) for 2011 DOS") from Latham & Watkins; May 2, 2016 production letter ("Production of Responses and Documents Responsive to CR / CV Document Request 4(C) for 2010 DOS") from Latham & Watkins; June 29, 2016 production letter ("Production of Responses and Documents Responsive to CR / CV Document Request 4(C) for 2013 DOS") from Latham & Watkins.
[96] Includes Bates number MARA2160490 (DOS year 2010); MARA2157332 (DOS year 2011); MARA2152913 (DOS year 2012); and MARA2160687 (DOS year 2013).
[97] *See, e.g.*, February 9, 2016 production letter ("Production of Responses and Documents Responsive to CR / CV Document Request 4(C) for 2012 DOS") from Latham & Watkins.  Similar letters were produced for other DOS year productions.
[98] Includes Bates number MARA2160491 – MARA2160492 (DOS year 2010); MARA2157333 – MARA2157334 (DOS year 2011); MARA2152914 – MARA2152915 (DOS year 2012); and MARA2160688 – MARA2160689 (DOS year 2013).
[99] *See, e.g.*, February 9, 2016 production letter ("Production of Responses and Documents Responsive to CR / CV Document Request 4(C) for 2012 DOS") from Latham & Watkins.  Similar letters were produced for other DOS year productions.
[100] Includes Bates number MARA2160493 – MARA2160494 (DOS year 2010); MARA2157335 – MARA2157336 (DOS year 2011); MARA2152916 – MARA2152917 (DOS year 2012); and MARA2160690 – MARA2160691 (DOS year 2013).

27

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

diagnosis codes based on claims and encounters data or other types of data such as Patient Assessment Form (PAF) encounter record reviews – and that belong to any members listed in the "Member File" tables.[101]

d.  <u>DR4C.iv. – "CR Reviewed Charts File" (for DOS years 2010 – 2013)</u>.[102] The "CR Reviewed Charts File" tables provide information about every chart subjected to Chart Review.[103]

e.  <u>DR4C.v. – "CR Diagnoses File" (for DOS years 2010 – 2013)</u>.[104] The "CR Diagnoses File" tables provide information about diagnosis codes found by the chart reviewer or coder during the Chart Review process for every chart that went through the Chart Review process. [105]

f.  <u>DR4C "Deletes" file</u>[106].  This file lists diagnosis codes from the DR4C production that were subsequently retroactively deleted.

iii.  <u>Document Request 4C Supplemental Production</u>

73.    In June 2016, the government submitted a series of follow-up questions to United about the DR4C production.  Among other things, the government requested that United provide data related to certain diagnosis codes in the DR4C data that were identified as "front end excluded" from RAPS.[107]  In July 2016, United produced additional information responsive to this request (the "DR4C Supplemental Production").    This data, in documents Bates-stamped

---

[101] *See, e.g.*, February 9, 2016 production letter ("Production of Responses and Documents Responsive to CR / CV Document Request 4(C) for 2012 DOS") from Latham & Watkins.  Similar letters were produced for other DOS year productions.
[102] Includes Bates number MARA2160495 (DOS year 2010); MARA2157337 (DOS year 2011); MARA2152918 (DOS year 2012); and MARA2160692 (DOS year 2013).
[103] *See, e.g.*, February 9, 2016 production letter ("Production of Responses and Documents Responsive to CR / CV Document Request 4(C) for 2012 DOS") from Latham & Watkins.  Similar letters were produced for other DOS year productions.
[104] Includes Bates number MARA2160496 – MARA2160497 (DOS year 2010); MARA2157338 – MARA2157339 (DOS year 2011); MARA2152919 – MARA2152920 (DOS year 2012); and MARA2160693 – MARA2160694 (DOS year 2013).
[105] *See, e.g.*, February 9, 2016 production letter ("Production of Responses and Documents Responsive to CR / CV Document Request 4(C) for 2012 DOS") from Latham & Watkins.  Similar letters were produced for other DOS year productions.
[106] MARA2160498.
[107] June 24, 2016 letter from Carol Lynn Wallack, Trial Attorney, Civil Division of the U.S. Department of Justice to Latham & Watkins.

28

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

MARA2160704 to MARA2160725, includes various tables from the United Risk Adjustment Claims Data from 2010 – 2013 that provide information about the errors associated with certain diagnosis codes and/or encounters.[108]

### iv.    2008 – 2009 and 2014 – 2016 DOS RFP Production

74.    In April 2018, United produced data in response to requests 35, 36, and 38 of the Government's First RFP for DOS years 2014 through 2016 (the "2014 – 2016 DOS RFP Production"). This included documents Bates-stamped MAPL001370197 to MAPL001370236.[109] Similar to the 2008 – 2009 DOS RFP Production described above, the 2014 – 2016 DOS RFP Production comprised numerous data tables broken out by DOS year and by the type of information requested. These include "member" tables, which provide information about the members relevant to the government's requests; "diagnosis" tables, which provide information about those members' diagnosis codes in the risk adjustment data during the timeframe; and so forth.

75.    In September 2018, United produced data in response to requests 35, 36, and 38 of the Government's First RFP for DOS years 2008 and 2009 (the "2008 – 2009 DOS RFP Production"). This included documents Bates-stamped MAPL002077000 to MAPL002079216, which comprised numerous data tables for these two DOS years, broken out by year and by the type of information requested, similar to the 2008 – 2009 DOS RFP Production.[110]

76.    Broadly speaking, these productions were similar to the DR4C Production in that they provided member, provider, diagnosis code, diagnosis deletion, and chart review results information sourced from the United Risk Adjustment Claims Data and United/Vendor Chart Review Data for members who had charts subjected to chart reviews during the relevant timeframes.

### v.    SAS All Providers

---

[108] July 15, 2016 production letter ("Response to Provider Diagnosis File 4(C)(iii) Supplemental Data Requests") from Latham & Watkins.
[109] June 15, 2018 production letter ("Re: United States ex rel. Poehling v. UnitedHealth Group, Inc., No. CV 16-08697") from Latham & Watkins.
[110] September 21, 2018 production letter ("Re: United States ex rel. Poehling v. UnitedHealth Group, Inc., No. CV 16-08697") from Latham & Watkins.

29

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

77.    In March 2019, in a supplemental response to requests 35 and 36 of the Government's First RFP, United produced a series of data tables providing detailed identifier and contact information for United providers.  This includes first and last name, address, NPI, tax ID, and phone number.  These tables, which are referred to as the "SAS All Providers" tables, are contained in the documents Bates-stamped MAPL003292331 to MAPL003292389.[111]  The underlying data for the SAS All Providers tables comes from a repository maintained by OptumInsight populated with provider information submitted by OptumInsight's various customers.  (OptumInsight provides Medicare Risk Adjustment services to United as well as non-United customers.)[112]  The SAS All Providers repository contains raw provider details that were transmitted via a standardized, conforming file format that requires the population of certain data fields.  Once that data is received and stored in the data repository, OptumInsight validates the data and combines it into a single master table.  This data is refreshed monthly.  I understand that the extracts produced in this case contain data from this repository for all United providers (*i.e.*, excluding providers submitted to OptumInsight from non-United customers).[113]  United produced more than 50 monthly SAS All Providers files.[114]

vi.    Verscend Production

78.    Subsequent to the 2008 – 2009 DOS RFP Production, United received additional chart review data from the vendor Verscend.  This data included additional United members who were subject to chart review in 2008 – 2009 but who were not captured in the 2008 – 2009 DOS RFP Production.  Because these members were responsive to the Government's First RFP, in March 2019, United supplemented the 2008 – 2009 DOS RFP Production with all responsive data for the new, incremental members identified in the Verscend data (the "Verscend Production").  This was captured in documents Bates-stamped MAPL003292457 and MAPL003292390 to MAPL003292416.[115]  This data is included within my definition of the United Risk Adjustment Claims Data and United/Vendor Chart Review Data.

---

[111] March 15, 2019 production letter ("Re: United States ex rel. Poehling v. UnitedHealth Group, Inc., No. CV 16-08697") from Latham & Watkins.

[112] MAPL003292389.

[113] Information obtained via discussion with Caroline Le, Director of Medicare Risk Adjustment at Optum.

[114] March 15, 2019 production letter ("Re: United States ex rel. Poehling v. UnitedHealth Group, Inc., No. CV 16-08697") from Latham & Watkins.

[115] *Id.*

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

vii.    July 2019 Supplemental Production

79.     In July 2019, United identified and produced additional data from the United Risk Adjustment Claims Data and United/Vendor Chart Review Data that was responsive to DR4C and the Government's First RFP (the "July 2019 Supplemental Production"). The information responsive to DR4C related to DOS years 2010 and 2013, while the information responsive to requests 35, 36, and 38 of the Government's First RFP related to DOS years 2008, 2009, and 2014.[116]   This data was produced in the documents Bates-stamped MAPL003667028 to MAPL003667218.[117]

viii.   Post Sweeps Production

80.     In October 2019, United produced additional data from the United Risk Adjustment Claims Data and United/Vendor Chart Review Data that was responsive to the Government's First RFP relating to DOS years 2015 and 2016 (the "Post Sweeps Production")[118]. This data included diagnosis code submissions that were not included in the 2014 – 2016 DOS RFP Production.[119] This data was produced in the documents Bates-stamped MAPL005462834 to MAPL005462902.[120]

ix.    Post Sweeps Supplemental Production

81.     In December 2019, United produced supplemental data relating to the Post Sweeps Production (the "Post Sweeps Supplemental Production"). This included additional data from the United Risk Adjustment Claims Data and United/Vendor Chart Review Data that was responsive to the Government's First RFP relating to DOS years 2015 and 2016 that had not been included in

---

[116] July 16, 2019 production letter ("Re: United States ex rel. Poehling v. UnitedHealth Group, Inc., No. CV 16-08697") from Latham & Watkins.
[117] Id.
[118] The "Post Sweeps Production" represents diagnosis codes added after CMS completes a sweep of RAPS for dates of service for a calendar year.
[119] The 2014 – 2016 DOS RFP Production was generated prior to the final risk adjustment submission deadlines for DOS years 2015 and 2016.
[120] October 31, 2019 production letter ("Re: United States ex rel. Poehling v. UnitedHealth Group, Inc., No. CV 16-08697") from Latham & Watkins.

31

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

previous productions.  This data was produced in the documents Bates-stamped MAPL006427492 to MAPL006427602.[121]

## IV.    <u>SUMMARY OF OPINIONS</u>

82.    Based on the work I have performed to date, and as further detailed below, I have formed the following opinions:

i.    <u>Opinion 1</u>:  The government's approach for identifying diagnosis codes that United allegedly improperly failed to delete or otherwise return as overpayments is flawed and overinclusive because millions of the diagnosis codes in the government's list are from providers whose charts do not appear to have undergone Chart Review and thus could not have resulted in the identification of unsupported diagnosis codes under the government's theory.

ii.    <u>Opinion 2</u>:  The government's approach for identifying diagnosis codes that United allegedly improperly failed to delete or otherwise return as overpayments is flawed and overinclusive because it is mistakenly executed at the diagnosis code level rather than the condition (*i.e.*, HCC or RxHCC) level.  In fact, for approximately 67% of the allegedly improper diagnosis codes in the government's list, United's Chart Review *confirmed* that the member had the condition corresponding to the diagnosis code at issue (or a more severe condition in the same hierarchy), meaning that there is no overpayment associated with the diagnosis code.

iii.    <u>Opinion 3</u>:  The diagnosis codes listed in the government's First Interrogatory Response form an improper basis for evaluating potential overpayments because, in approximately 83% of cases, even if the diagnosis codes were incorrect, deleting those codes would not have impacted the Part C or Part D MA payments to United in the years at issue.  There are a variety of reasons for this, including, but not limited to, the fact that (a) some diagnosis codes do not impact the risk adjustment process; (b) multiple diagnosis codes may support the same condition code; and (c) a higher level condition code may also be

---

[121] December 6, 2019 production letter ("Re: United States ex rel. Poehling v. UnitedHealth Group, Inc., No. CV 16-08697") from Latham & Watkins.

32

supported, superseding any lower level condition code that may be found to be unsupported.

iv.    Opinion 4:  The government's assertion that the diagnosis codes in the First Interrogatory Response are not supported is contradicted by CMS's own RADV auditors.  In fact, CMS's coders found support for more than 89% of the First Interrogatory Response diagnosis codes mapping to member-HCC combinations that CMS reviewed as part of the CON11-13 RADV audits. This rate increases to 91% when also taking into account the results of the CON14-15 RADV audits.

v.    Opinion 5: Based on the results of CMS's RADV audits, the First Interrogatory Response codes were no more likely to be unsupported than any other codes submitted in connection with United plans reviewed by CMS's RADV audits.

vi.    Opinion 6: Contrary to the practice that it typically follows in identifying and quantifying overpayments resulting from diagnosis code errors in the risk adjustment process, the government here has chosen to focus solely on allegedly unsupported codes that were submitted to Medicare, rather than considering the net impact of both unsupported codes and codes that should have been, but were not, submitted.  Even in cases where an MA plan sponsor has employed a chart review process like the one at issue here, there is a substantial possibility, as demonstrated in the government's own RADV audits, that there are additional appropriate codes that were missed and not submitted.  In fact, the evidence in this matter indicates that such unsubmitted codes can outweigh any submitted codes that may lack proper support.  Thus, to fully assess whether and to what extent a possible overpayment exists – even before considering whether any such overpayment was knowingly retained by United – it would be necessary to consider both the codes that may lack support as well as appropriate codes that were not submitted.

vii.    Opinion 7: If the results of CMS's CON11-13 RADV audits hold constant across all of the First Interrogatory Response codes at issue, then over 94% of the diagnosis codes identified in the government's list could not be overpayments.  If the results of CMS's CON11-15 RADV audits hold constant across all of the First Interrogatory Response codes at issue, then approximately 94% of the diagnosis codes identified in the

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

33

government's list could not be overpayments. This is the result of two factors. First, as noted above, the analysis in Opinion 3 shows that approximately 83.3% of the diagnosis codes in the government's list do not have any financial impact on the government's payments to United plans. Second, with respect to the remaining diagnosis codes, the CMS CON11-13 RADV audits found support for 65.3% of the at-issue diagnosis codes that were (a) addressed in a CON11-13 RADV audit and (b) found to have financial impact based on Opinion 3. Combining these results with those of the CMS CON14-15 RADV audits, the CMS CON11-15 RADV audits in total found support for 62.5% of the at-issue diagnosis codes that were (a) addressed in a CON11-15 RADV audit and (b) found to have financial impact based on Opinion 3. Thus, to the extent that the government's First Interrogatory Response is intended to be used as a basis for assessing either the pervasiveness or the dollar impact of improper diagnosis codes, it is biased and unreliable.

## V.    BASIS FOR OPINIONS

### A.    *Opinion 1: The government's approach for identifying diagnosis codes that United allegedly improperly failed to delete or otherwise return as overpayments is flawed and overinclusive because millions of the diagnosis codes in the government's list are from providers whose charts do not appear to have undergone Chart Review and thus could not have resulted in the identification of unsupported diagnosis codes under the government's theory.*

#### i.    Overview

83.    Based on its own description, the government's First Interrogatory Response identified diagnosis codes with three conditions: "(1) the diagnosis code was submitted by UnitedHealth to CMS and was required, by regulation, to be supported by an underlying medical record; (2) *that medical record went through UnitedHealth's medical record review program*; and (3) UnitedHealth's own reviewers did not find the diagnosis code to be supported by medical records" (emphasis added).[122]    Based on this description, all diagnosis codes in the government's

---

[122] Joint Stipulation Regarding Government's Motion to Compel, dated April 29, 2021, p 8.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

First Interrogatory Response should have been related to charts reviewed through United's Chart Review in that year. However, many of the diagnosis codes in the government's First Interrogatory Response were submissions from providers whose charts do *not* appear to have been reviewed during that year.

84.    The government has neither provided any detailed explanation about how they identified records that allegedly went through United's Chart Review nor provided a way to test or replicate their methodology. In comparing the government's list to the data that I understand to have been used in compiling the list, it appears that the government may have assumed a member's *entire* chart was reviewed by United if that member had one or more dates of service reflected in the United/Vendor Chart Review Data. This would be a critical error in the government's analysis to the extent that it does not recognize the *provider-specific* nature of Chart Review.

85.    United's Chart Review process focused on the charts created by certain providers for a given member. In reality, members can see multiple providers on the same DOS. Consequently, there are cases in which the Chart Review would encompass charts only from some, but not all, of the providers seen by that member on that DOS. For example, assume John Doe saw Dr. Green, his general practitioner, and Dr. Red, his cardiologist, on the same day. On that day, Dr. Red recorded and submitted diagnosis code X, but Dr. Green did not. Also assume that only Dr. Green's chart underwent Chart Review; John Doe's records for the visit with Dr. Red were neither collected nor reviewed. In such a case, if the government reviewed John Doe's information in that year's Chart Review data, it would have seen that a diagnosis code X connected to this DOS was *not* identified in the Chart Review since the reviewer would not have had access to information related to the visit with Dr. Red. In such a circumstance, it appears that the government would erroneously assume that diagnosis code X was inappropriately submitted when, in actuality, diagnosis code X was submitted *by a provider whose charts were not reviewed* and, thus, would be outside the scope of the government's theory of liability.

86.    To the extent that the government's First Interrogatory Response includes such diagnosis codes, they are inconsistent with the government's own description of its analysis and should be excluded from consideration in evaluating any alleged overpayments.

    ii.    Data Relied Upon

87.    For the purposes of this analysis, in addition to the government's First Interrogatory Response data, I relied upon the following datasets:

a.    <u>United/Vendor Chart Review Data.</u>  For this analysis, I used the United/Vendor Chart Review Data, which I understand contains data for every chart subjected to Chart Review during each given year.[123]  While the specific structure and content of this data varies over time because it was generated in separate productions and sourced from separate systems, it has some key common characteristics relevant to my analysis.  First, the data provides a unique "barcode" identifier, which is a unique serial code representing a unique member chart that was subjected to Chart Review.[124]  Also, the data lists provider information associated with each unique chart.  In some cases, this provider is only described in a single piece of information: a provider number.[125]  In other cases, the provider's name, address, tax ID, and/or NPI was also available.[126]  Notably, the United/Vendor Chart Review Data does not contain the actual charts that the coder(s) analyzed in Chart Review (*i.e.*, the progress notes, visit summaries, or other chart documentation the coder would have reviewed as a basis for his or her findings about the member's supportable diagnosis

---

[123] For <u>DOS years 2008 – 2009</u>, I relied upon the United/Vendor Chart Review Data produced in the 2008 – 2009 DOS RFP Production.  This included data from ChartSync as well as from vendors working with United to perform chart reviews during this time – including vendors TCS, ECS, Pi, Mediconnect, and Outcomes.  For <u>DOS years 2010 – 2013</u>, I relied upon the United/Vendor Chart Review Data produced in response to DR4C (the "CR Reviewed Charts File" tables), which provide information about every chart subjected to Chart Review for these DOS years .  For DOS years 2010 and 2013, I relied upon a stacked combination of both the DR4C CR Reviewed Charts tables from the original DR4C productions for those years as well as the DR4C CR Reviewed Charts tables from the July 2019 Supplemental Production.  For <u>DOS years 2014 – 2016</u>, I relied upon the United/Vendor Chart Review Data produced in the 2014 – 2016 DOS RFP Production, which included data from ChartSync, MRM, and Epsilon.

[124] All data from United's Chart Review system productions – *i.e.*, those from ChartSync, MRM, and Epsilon – contain barcodes.  Some, but not all, data from the vendor productions contain barcodes.

[125] The Chart Data (DR4Civ) from the DR4C Production and DR4C Supplemental Productions for DOS years 2010 – 2013 only include a single provider number as the sole identifier for a provider within the chart data.  This provider number is a numeric or alphanumeric code created and maintained internally within United's data systems; it does not convey the provider's name, address, or other external identifiers (such as NPI).  The provider number can be linked to other data sources, further described below, which contain additional information about the provider, such as the name, address, NPI, and tax ID.

[126] The United/Vendor Chart Review Data produced in the 2008 – 2009 DOS RFP Production, July 2019 Supplemental Production, 2014 – 2016 DOS RFP Production, June 2018 Supplemental Production, and Post Sweeps Production contain provider identifiers in addition to just provider number, including provider name, address, NPI, and tax ID.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

codes in that year).  Further, the data is insufficient to determine whether the coder(s) had access to information in the member's chart beyond just the documentation pertaining to the provider listed in association with the chart.  For example, if a unique chart was associated with unique provider X, and some or all of provider X's work was performed at practice location Y, the United/Vendor Chart Review Data does not indicate whether the coder(s) would have been able to review that member's charts for all activity performed by all providers at practice location Y, or just the activity relating to services performed by provider X.

b.  The Provider File (DR4Cii).  The "Provider" tables contain information about providers visited by any members identified in the "Member File" tables (*i.e.*, rendering providers) and for all billing providers listed for these visits.  This data includes provider identifiers including name, address, facility name, phone number, and provider source (e.g., COSMOS, NICE) that can be linked to provider numbers identified in the DR4Civ Chart Data.[127]

c.  SAS All Providers data.  The SAS All Providers data includes additional provider identifying information beyond just the United-internal provider number – such as provider name, address, tax ID, and NPI – for the providers listed in the United/Vendor Chart Review Data.

d.  Related Member Identifier Data.  I used the Member, Member Audit, and HICN-to-MBI Crosswalk data to identify any related HICN(s) or MBIs for a unique United member.

iii.  Methodology

88.  To perform this analysis, I compared the member-provider combinations in the First Interrogatory Response to the United/Vendor Chart Review Data, which identifies provider

---

[127] For DOS years 2010 and 2013, I relied upon a combination of both the DR4C Provider tables from the original DR4C productions for those years as well as the DR4C provider tables from the July 2019 Supplemental Production to include all available provider identifiers and capture all potential provider matches for these years.

37

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

information related to reviewed charts.  If the First Interrogatory Response data only includes diagnosis codes from charts that were part of the Chart Review process (as the government maintains), then, in any given year, each of the member-provider pairs from the First Interrogatory Response data should be reflected in the United/Vendor Chart Review Data.  However, my analysis shows that this is not the case.

89.    As an illustration, if there is a diagnosis code for member John Doe submitted by provider Dr. Green in the First Interrogatory Response data in DOS year 2012, and Dr. Green's chart for John Doe was reviewed as part of United's Chart Review program in that year, then Dr. Green's chart for John Doe – put another way, the "member-provider" combination of Dr. Green-John Doe – would be included in the United/Vendor Chart Review Data in that year.  If a member-provider combination from the First Interrogatory Response data cannot be identified in the United/Vendor Chart Review Data, then there is no clear evidence to establish that diagnosis codes associated with that member-provider combination in that year were part of United's Chart Review in that year.  Any such codes should not have been included in the government's list.

90.    Executing this comparison is an intricate process because of the complexity of the relevant provider data across the various productions.  The United/Vendor Chart Review Data is populated with inconsistent types and formats of provider identifying information across time because it was sourced from different upstream systems with varying structures and data parameters.  This complexity has multiple dimensions.  For example, the United/Vendor Chart Review data does not always contain the same types of provider identifying information.[128] Likewise, the United/Vendor Chart Review Data is not always formatted similarly across time. For example, provider numbers from certain underlying data sources sometimes contain alphabetic characters, while provider numbers from other sources do not.[129]  Also, they can vary in terms of

---

[128] For example, the United/Vendor Chart Review Data in 2008 and 2009 – sourced from outside vendors ECS, TCS, Outcomes, and Mediconnect – does not uniformly identify a Provider NPI, an industry-standard identifier unique to a provider.  Instead, in this time period, the data tended to provide identifiers such as Provider ID, Provider Name, and Provider Address.  In more recent DOS years, the data captured in ChartSync, MRM, and Epsilon (including charts submitted by both United's internal chart reviewers as well as external vendors such as Pi Offshore, iCodify, and MedSave) includes NPIs and more comprehensive provider identifiers such as provider full name, address, and tax ID.

[129] For example, in the data from the Outcomes and Mediconnect Chart Review vendors, provider identifiers are numeric the majority of the time; in contrast, in the data from the PI, TCS, and ECS Chart Review vendors, provider identifiers are non-numeric the majority of the time.  Note that, in the government's First Interrogatory Response, providers are identified by numeric provider numbers more than 90% of the time.

38

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

whether they include leading zeros – a practice that is a function of differing requirements across different systems. Another complexity arises from the fact that individual providers can have multiple provider numbers, addresses, and even NPIs across the relevant timeframe. All of these factors make the matching of providers and codes within the data very complicated and difficult, yet they all need to be considered to properly compare a unique provider from the United/Vendor Chart Review Data to the First Interrogatory Response.

91.    Additionally, the United/Vendor Chart Review Data is further complicated by the nature of the provider identifier information itself. I understand that, in some cases, the provider identifier associated with a unique chart in the United/Vendor Chart Review Data could have been a consolidated identifier created for the purposes of retrieving chart(s) for a member from multiple providers at one location.[130] As a result, it is possible that the charts collected for some members included encounters with multiple providers.[131] As an example of this, if a member was seeing multiple providers at a single facility, and United wanted to retrieve that member's records from across all those providers for Chart Review, United may have used the unique identifiers for just one of those providers to serve as the "retrieval" identifier for that entire facility. Consequently, if all of the providers' records were actually obtained, then they all may have been labeled with the same "retrieval" identifier, derived from just one of the providers, within the Chart Review system. Importantly, the United/Vendor Chart Review Data produced in this matter does not clearly indicate whether, or to what extent, multiple providers' charts were collected and reviewed in connection with the single provider identifier listed in the data. Moreover, I understand that, even if United intended to collect multiple providers' charts in connection with a single consolidated retrieval identifier, it may not actually have been able to collect them.[132]

---

[130] K. Baker 30(b)(6) Dep. Tr. 65:5 – 68:9 describes the consolidation concept with respect to chart retrieval. *See also* K. Baker 30(b)(6) Dep. Tr. 117:18-118:6: "Q. Okay. So the retrieval provider information in ChartSync that is shown to the coder during retrospective chart review is retrieval provider information that is generated by Optum?...A: It is retrieval provider information that has been consolidated to avoid provider abrasion based upon the provider information that we had on hand."

[131] K. Baker 30(b)(6) Dep. Tr. 119:13-120:2; 123:3-124:15.

[132] K. Baker 30(b)(6) Dep. Tr. 120:8 – 121:6: "For example, you know, if it was a site…that had paper-based charts and we only went to…site 1 and it was a two-site one, we would only receive the part of the chart that was there for the doctors that saw there [sic]. But that doctor, let's say – call it Dr. A, could have been at site 1 on Monday, Wednesday, Friday but went to site 2 on…Tuesday and Thursday and we didn't have that component of the chart…And so it – the chart itself could have multiple information [sic], but we also wouldn't know for sure if it was complete."

39

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

92.    The member-provider matching comparison is further complicated because of intricacies with unique *member* identifiers.  Individual members can have multiple HICNs across time for various reasons.[133]  In these cases, it is important to link those different HICNs together to ensure the comparison of member-provider combinations is at a unique member level.

93.    To perform my analysis and ensure an accurate and comprehensive matching process, I began by creating consolidated lists of all the member-provider combinations and associated provider identifiers, where available, in the United/Vendor Chart Review Data across DOS years 2008 – 2016.  These lists reflected the unique charts which were part of Chart Review for each member and the providers and accompanying provider identifier information[134] associated with those charts.

94.    In creating these lists, I made efforts to clean and standardize the data where it was reasonably possible to systematically identify ways in which the data was inconsistent across time or between sources.  For example, to link provider identifiers from the Provider table (DR4Cii) to the chart data (DR4Civ) in 2010, the chart provider number fields needed to be standardized.  The Chart data contains an alphanumeric Chart Provider Number field, while DR4Cii contains a mostly numeric Provider Number field (similar to the provider numbers listed in the government's First Interrogatory Response).  For example, the provider "M.D., RAYMOND A. DURKIN" has a chart provider number of C_RAM_00250009593 in the chart data and a provider number of 00250009593 in the provider data.  The provider data also contains the provider name, address, NPI, and tax ID, while the chart data contains the alphanumeric provider number as the sole provider identifier.  To link these additional provider identifiers from the provider data to the chart data, the Chart Provider Number in the chart data must be standardized to exclude the "C_RAM_" prefix.  I employed similar data standardization techniques across sources for other years to be

---

[133] For example, a change in marital status can cause a member's HICN suffix to change from "B" for spouse to "D" for divorced spouse, widow, or widower.

[134] This included provider identifiers such as NPI, provider name, provider address, and provider tax ID that existed within the vendor chart data sources for DOS years 2008 – 2009 and the MRM, ChartSync, and Epsilon sources for DOS years 2014 – 2016.  To capture provider identifiers for the DR4C 2010 – 2013 years (for which the chart data does not contain additional provider identifiers other than a provider number), I linked in provider identifiers (such as NPI, provider name, provider address, and tax ID) from the Provider Files (DR4Cii) to create a comprehensive member-provider list.

40

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

overly inclusive in matching member-provider combinations in United's chart data to member-provider combinations in the government's First Interrogatory Response.

95.    Next, I pulled in additional identifying information from the SAS All Providers data to gather the names, addresses, tax IDs, and NPIs for the providers associated with the reviewed charts, as available.  This was particularly important in years in which the only provider information given in the United/Vendor Chart Review Data was the provider number, such as in the DR4C productions for DOS years 2010 – 2013.  As part of this, I extracted the SAS All Providers data across all DOS years – even in cases when the provider name, address, tax ID, and/or NPI was already provided in the United/Vendor Chart Review Data – to gather additional information to use in my analysis.[135]

96.    Next, I identified instances in which a unique member had more than one identifier. Identifying members with more than one HICN or MBI is important to ensure that the comparison of member-provider combinations between datasets is at a unique member level.  To do this, I used the Related Member Identifier Data described above.[136]  For example, member First Last with date of birth mm/dd/yyyy has a "master ID" of 12345678 and separate HICNs of 1111111A and 2222222B.[137]  Using this method, I established a link between a given HICN and any "related HICNs" for the same unique member.  I included this step to identify possible member-provider matches even in cases where a unique member may have been listed with one HICN in the First Interrogatory Response but another HICN in the United/Chart Review Data.

97.    Then, I compared the member-provider combinations in the government's First Interrogatory Response data to the United/Vendor Chart Review Data using a variety of linking methods to attempt to find matches in a systematic way.  The government's First Interrogatory Response includes data fields conveying the provider number, name, address, tax ID, and NPI for the provider who submitted each allegedly improper diagnosis code.  Based on that structure, I

---

[135] In most cases, when the provider name, address, tax ID, or NPI was present in both the United/Vendor Chart Review Data and the SAS All Providers data, the common information was identical between the two datasets. Sometimes, the information was formatted differently between the two data sets.

[136] The HICN-to-MBI Crosswalk data provides a way to link member HICNs to a "master ID" that is completely unique to a member; similarly, the Member and Member Audit data provides a way to link member HICNs to a "Member Number".  While there is overlap between the HICN-to-MBI Crosswalk and Member/Member Audit data, each source also contains a distinct population of members and their related HICNs.

[137] All data examples highlighted in green are based on real data but have been anonymized in this report.  The de-anonymized values for each example are provided in Exhibit 4.

41

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

searched for instances where the member-provider combination in the First Interrogatory Response could be found in the United/Vendor Chart Review Data on the basis of any of the following. In this methodology, I searched for matches on member HICNs as well as "related HICNs" based on the Related Member Identifier Data.

- The member + provider number from the First Interrogatory Response matched a member + provider number from the United/Vendor Chart Review Data

- The member + provider NPI from the First Interrogatory Response matched a member + NPI from the United/Vendor Chart Review Data (or SAS All Providers).

- The member + provider name + provider address from the First Interrogatory Response matched a member + provider name + provider address from the United/Vendor Chart Review Data (or SAS All Providers).

- The member + provider tax ID from the First Interrogatory Response matched a member + provider tax ID from the United/Vendor Chart Review Data (or SAS All Providers).

- I employed the above matching methods for all available data across all DOS years. In the DOS years 2008 – 2009, much of the United/Vendor Chart Review Data came from vendor systems (as opposed to United's internal systems: ChartSync, MRM, or Epsilon). Because these vendor systems were structured differently and contained different information than United's internal systems, I also employed additional matching methods in this period, including matching the member - provider last name + address combination in the vendor data to the member-provider last name + address combination in the First Interrogatory Response. To perform this matching exercise, I extracted the last name from the full name field for each source for comparison.[138]

---

[138] For example, there are two records in the government's First Interrogatory Response associated with HICN 3333333C and Provider Number 00080040163. Provider Number 00080040163 has a Provider Name "Bowles, M.D., Fred Kirk" and address of "1670 W Main St Ste 100" within the First Interrogatory Response. Within the Vendor Chart data, the same HICN 3333333C has a chart associated with the provider name "Bowles, Kirk" also at "1670 W Main St Ste 100", the exact same address identified in the First Interrogatory Response. These records would not match on the basis of full name and address because the name was presented differently between the two data sources. Nevertheless, by extracting just the provider's last name, I was able to identify a match on the basis of last name and address.

42

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

98.    Any diagnosis codes relating to member-provider combinations from the government's First Interrogatory Response that are also found in the United/Vendor Chart Review Data are considered to be a "provider match," while any other diagnosis codes are ones where the provider does not match.  As described above, my approach incorporated a large number of data points in an attempt to locate possible provider matches as exhaustively as possible.  It also incorporated a variety of steps to control for instances of incomplete or inconsistently formatted data.  These assumptions were designed to be systematic, replicable, reasonable, and to result in the identification of an over-inclusive, rather than under-inclusive, set of likely provider matches.

99.    As an illustration of the potentially over-inclusive nature of my approach, my methodology sometimes results in the identification of a provider match only at the level of the provider's tax ID – an identifier that can be shared by multiple different providers (*e.g.*, different providers associated with the same physician practice).  For approximately 4 million of the records in the government's First Interrogatory Response (14% of total), the member-provider combination can only be found in the United/Vendor Chart Review Data on the basis of the provider's tax ID.[139]  For example, as shown in Figure 3 below, there are four diagnosis code records in the government's First Interrogatory Response for HICN 4444444D in DOS year 2015 from providers who share a tax ID of 421411630.  Each of these diagnosis codes were submitted from a different provider, with different provider numbers and names: Matthew Gray (provider number 10003380), Mohammed Khalil (provider number 250007975), Laila Payvandi (provider number 250007981), and Susan Halter (provider number 250007970).  In the United/Vendor Chart Review Data, the member has five unique chart review barcodes in this year.  Of the providers listed in connection with these barcodes, only <u>one</u> (Matthew Gray) overlaps with the providers listed in the First Interrogatory Response based on the provider name and address or NPI.  However, that provider has the tax ID of 421411630.  Apparently on the basis of that connection alone, the government has assumed that the diagnosis codes from providers Khalil, Payvandi, and Halter can be associated with the chart review for which Matthew Gray was the listed provider.  In such cases, the possible member-provider connection is tenuous, yet the government appears to have assumed that a provider's diagnosis code submission for a given member was part of Chart Review when the only supporting evidence that the chart was reviewed is that the member had a

---

[139] *See* <u>Appendix X2</u>.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

chart for which some *other* provider with the same tax ID was listed in the United/Vendor Chart Review data.

**Figure 3. Example: HICN 4444444D.**

*First Interrogatory Response*
*Member 4444444D - DOS Year 2015*

| dx | prov_name_sasall | provider_nbr | address_sasall | npi_sasall | tax_sasall | |
|----|------------------|--------------|----------------|------------|------------|---|
| 4011 | GRAY, M.D., MATTHEW N. | 10003380 | 1030 5TH AVE SE STE 1400 CEDAR RAPIDS IA 52403 | 1053398982 | 421411630 | |
| 42842 | HALTER, M.D., SUSAN M. | 250007970 | 202 10TH ST SE STE 225 CEDAR RAPIDS IA 52403 | | 421411630 | ✗ |
| 41400 | KHALIL, M.D., MOHAMMED E. | 250007975 | 202 10TH ST SE STE 225 CEDAR RAPIDS IA 52403 | 1245273226 | 421411630 | ✗ |
| 41401 | PAYVANDI, M.D., LAILA A. | 250007981 | 202 10TH ST SE STE 225 CEDAR RAPIDS IA 52403 | | 421411630 | ✗ |

*United/Vendor Chart Review Data*
*Member 4444444D - DOS Year 2015*

| Barcode* | Chart_Provider_ID | | Src_Prov_ID | fullname | Address | NPI | Tax_ID |
|----------|-------------------|---|-------------|----------|---------|-----|--------|
| 2b7474e7bb310... | C_NEX_00010003380 | | | | | | |
| 195270c903969... | C_NEX_00010003380 | ⟷ | C_NEX_00010003380 GRAY, M.D., MATTHEW N. | | 1030 5TH AVE SE STE 1400 CEDAR RAPIDS IA 52403 | 1053398982 | 421411630 |
| 2b7474e7bb330... | C_NEX_00050000616 | ⟷ | C_NEX_00050000616 STRUTHERS, M.D., ROBERT J. | | 202 10TH ST SE CEDAR RAPIDS IA 52403 | 1982738795 | 421462899 |
| 2b7474e7bb340... | C_NEX_00270000620 | ⟷ | C_NEX_00270000620 BEEVERS, D.P.M., STEVEN W. | | 3053 CENTER POINT RD NE STE B CEDAR RAPIDS IA 52402 | 1639135122 | 421471231 |
| 2b7474e7bb350... | C_NEX_00760000520 | ⟷ | C_NEX_00760000520 COWDEN, M.D., JOHN DAVID | | 1026 A AVE NE CEDAR RAPIDS IA 52402 | 1982665071 | 420504780 |

Source: [Chart Review Data]    Source: [SAS All Providers 2016_02]
*Truncated for visual

100.    As another example of the possible over-inclusions stemming from reliance on the provider's tax ID, in DOS year 2012, there is a provider included in the government's First Interrogatory Response, Southeast CT Nephrology Assoc PC (provider number 00310001688), which only matches to a provider in the United/Vendor Chart Review Data on a common tax ID. In the United/Vendor Chart Review Data, HICN 5555555E has four unique chart review barcodes in this year associated with three distinct providers: provider number 00360002827, provider number 00040026173, and provider number 00310001723. None of these is the provider listed in the government's First Interrogatory Response. One of them – provider 00310001723 – has the same tax ID (061397333) as listed for the *other* provider from the First Interrogatory Response. Thus, like the example in the paragraph above, the government apparently assumes that diagnosis codes from provider 00310001688 can be associated with the chart review for which provider 00310001723 was the listed provider based only on the shared tax ID of 061397333.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**Figure 4. Example: HICN 5555555E.**



Source: [Chart Review Data]
*Truncated for visual

Source: [SAS All Providers]

101.     Beyond these issues related to the tax ID, there are other intricacies related to the identification of provider matches across the relevant time period that the government has not considered.  For example, some records in the government's First Interrogatory Response lack various provider identifiers that would enable more accurate matching to the United/Vendor Chart Review Data.[140]  Potential matches based solely on one matching field are less certain than those in which multiple fields match; nevertheless, I have included them as matches in my analysis. Also, I have observed that some individual providers are associated with multiple provider IDs, another wrinkle in the data that complicates the ability to make precise matches.[141]

102.     Still, despite employing a methodology that is likely over-inclusive in identifying charts that may have undergone chart review, I found millions of instances in which the government's First Interrogatory Response appears to include encounters for which there is no discernible evidence showing that Chart Review was performed.  Specifically, in 10% of the government's First Interrogatory Response records, I was unable to identify any form of member-

---

[140] For example, for a 2008 DOS year record in the government's First Interrogatory Response associated with HICN 6666666F, only two provider fields are populated: provider_nbr (10005732), and tax_ir (232211307).  Per my analysis, this record solely matches on the provider ID for this member's chart.  In the United/Vendor Chart Review Data, HICN 6666666F has a chart associated with 10005732.  Because of this, I consider this record to be a provider match.  However, the absence of name, address, NPI, and tax ID within the government's First Interrogatory Response complicates the ability to corroborate whether this was truly a provider whose chart went through Chart Review.
[141] For example, in the government's First Interrogatory Response, in the 2014 DOS year, there are 117 records associated with three distinct provider numbers – 40012382, 40056008, and 40015189 – that, when linked to the SAS All Providers table, are associated with only one consistent provider name (Aanonsen, D.O., Deborah A.), address (11 Ralph Place Ste 314), tax ID (830438439), and NPI (1952395717).  A single provider's association with each of the three aforementioned provider IDs complicates the member-provider matches in chart data.

45

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

provider match between the First Interrogatory Response and the United/Vendor Chart Review Data at all.

103.    As one example of this phenomenon, there are seven diagnosis code records in the government's First Interrogatory Response for HICN 7777777G ("HICN A" for purposes of this example) and five diagnosis code records for HICN 8888888H ("HICN B" for purposes of this example) in DOS year 2012.  Based on the Related HICN crosswalk sourced from the Member, Member Audit, and HICN-to-MBI Crosswalk data, both of these HICNs relate to the same member, who had a "master ID" of 23456789.  In the government's First Interrogatory Response data, for the DOS year 2012, this member had 12 diagnosis codes associated with three providers, as follows:

- Six diagnosis code records associated with provider name "Quaranta, M.D., Joseph L." (based on the data field "prov_name_sasall"); provider number 00040007797 (from "provider_nbr"); NPI 1902860232 (from "npi_sasall"); tax ID 61562459 (from "tax_sasall"); and address of 960 Main St Branford CT 06405 (from "address_sasall").

- Two diagnosis code records associated with provider name "Price, M.D., Daniel Thomas" (based on the data field "prov_name_sasall"); provider number 00250005127 (from "provider_nbr"); tax ID 60982437 (from "tax_sasall"); and address of 2 Devine St Ste 1 North Haven CT 06473 (from "address_sasall").  The NPI field ( "npi_sasall") was blank.

- Four diagnosis code records associated with provider "Toosy, M.D., Kaiser" (based on the data field "prov_name_sasall"); provider number 00480000536 (from "provider_nbr"); NPI 1215143953 (from "npi_sasall"); tax ID 201370225 (from "tax_sasall"); and address of 136 Sherman Ave Ste 504 New Haven CT 06511 (from "address_sasall").

Importantly, there are no charts involving this member and "Price, M.D., Daniel Thomas" in the United/Vendor Chart Review Data for DOS year 2012, even after considering the available additional provider identifying information in the way described above. Specifically, there are no records where either HICN A or HICN B is listed on a chart

46

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

review record with a provider number of 00250005127 or with any other provider number for which the information from the SAS All Providers data established some possible connection (*i.e.*, where the provider name was "Price, M.D., Daniel Thomas", address was "2 Devine St Ste 1 North Haven CT 06473"; or tax ID was 60982437.)  There are only two providers listed in association with these HICNs in the United/Vendor Chart Review Data in this DOS year, and they match with the providers "Quaranta, M.D., Joseph L." and "Toosy, M.D., Kaiser" listed above.  On the basis of this, there does not appear to be any clear evidence that the two diagnosis codes associated with this member and "Price, M.D., Daniel Thomas" were subjected to Chart Review in this year.  Consequently, these records could not have led to an overpayment under the government's theory.  This is shown in Figure 5 below.

**Figure 5. Example: HICN 7777777G / 8888888H.**



*First Interrogatory Response*
*Member 7777777G / 88888888H - DOS Year 2012*

| Dx | prov_name_sasall | provider_nbr | npi_sasall | tax_sasall | address_sasall |
|---|---|---|---|---|---|
| 2720 | QUARANTA, M.D., JOSEPH L. | 40007797 | 1902860232 | 61562459 | 960 MAIN ST BRANFORD CT 06405 |
| 2720 | QUARANTA, M.D., JOSEPH L. | 40007797 | 1902860232 | 61562459 | 960 MAIN ST BRANFORD CT 06405 |
| 4011 | QUARANTA, M.D., JOSEPH L. | 40007797 | 1902860232 | 61562459 | 960 MAIN ST BRANFORD CT 06405 |
| 4011 | QUARANTA, M.D., JOSEPH L. | 40007797 | 1902860232 | 61562459 | 960 MAIN ST BRANFORD CT 06405 |
| 4928 | QUARANTA, M.D., JOSEPH L. | 40007797 | 1902860232 | 61562459 | 960 MAIN ST BRANFORD CT 06405 |
| 4928 | QUARANTA, M.D., JOSEPH L. | 40007797 | 1902860232 | 61562459 | 960 MAIN ST BRANFORD CT 06405 |
| 2720 | PRICE, M.D., DANIEL THOMAS | 250005127 | | 60982437 | 2 DEVINE ST STE 1 NORTH HAVEN CT 06473 |
| 4011 | PRICE, M.D., DANIEL THOMAS | 250005127 | | 60982437 | 2 DEVINE ST STE 1 NORTH HAVEN CT 06473 |
| 49120 | TOOSY, M.D., KAISER | 480000536 | 1215143953 | 201370225 | 136 SHERMAN AVE STE 504 NEW HAVEN CT 06511 |
| 49120 | TOOSY, M.D., KAISER | 480000536 | 1215143953 | 201370225 | 136 SHERMAN AVE STE 504 NEW HAVEN CT 06511 |
| 49120 | TOOSY, M.D., KAISER | 480000536 | 1215143953 | 201370225 | 136 SHERMAN AVE STE 504 NEW HAVEN CT 06511 |
| 49120 | TOOSY, M.D., KAISER | 480000536 | 1215143953 | 201370225 | 136 SHERMAN AVE STE 504 NEW HAVEN CT 06511 |

*United/Vendor Chart Review Data*
*Member 7777777G / 88888888H - DOS Year 2012*

| Barcode* | Provider ID | | Provider ID | Full Name | NPI | Tax | Address |
|---|---|---|---|---|---|---|---|
| 9df001dc-c622... | C_PVS_00040007797 | | | | | | |
| 90fd353a-0ef3... | C_PVS_00040007797 | ⬅➡ | C_PVS_00040007797 | QUARANTA, M.D., JOSEPH L. | 1902860232 | 61562459 | 960 MAIN ST BRANFORD CT 06405 |
| d6d145e8-bc1d... | C_PVS_00480000536 | ⬅➡ | C_PVS_00480000536 | TOOSY, M.D., KAISER | 1215143953 | 201370225 | 136 SHERMAN AVE STE 504 NEW HAVEN CT 06511 |

*Source: [Chart Review Data]*        *Source: [SAS All Providers 2013_02]*
*Truncated for visual*

iv.    Summary of Findings

104.    Using the method described above, I calculated that, as a threshold matter, millions of diagnosis codes included in the government's First Interrogatory Response – across all DOS years – relate to member-provider combinations for which I identified no evidence to indicate that

47

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

the diagnosis codes had been subject to Chart Review process in that year. In fact, in every year from 2008 through 2016, the government appears to have mistakenly included hundreds of thousands of diagnosis codes that do not appear to have gone through United's Chart Review. This indicates that the very foundation of the government's analysis is flawed and unreliable, even before considering any other factors which bear on the reasonableness or reliability of the government's proposed damages framework.

**Figure 6. Standalone Impact of Provider Matching Analysis.[142]**

| DOS Year | First Interrogatory Response Records | | % of Total |
| --- | --- | --- | --- |
| | Total | No Provider Match | |
| 2008 | 1,281,260 | 290,071 | 22.6% |
| 2009 | 2,673,072 | 351,633 | 13.2% |
| 2010 | 2,358,464 | 230,886 | 9.8% |
| 2011 | 2,146,861 | 362,338 | 16.9% |
| 2012 | 3,829,852 | 376,451 | 9.8% |
| 2013 | 4,431,051 | 321,392 | 7.3% |
| 2014 | 3,462,828 | 284,731 | 8.2% |
| 2015 | 3,408,442 | 264,647 | 7.8% |
| 2016 | 4,345,821 | 353,091 | 8.1% |
| **Total** | **27,937,651** | **2,835,240** | **10.1%** |

**B.** ***Opinion 2: The government's approach for identifying diagnosis codes that United allegedly improperly failed to delete or otherwise return as overpayments is flawed and overinclusive because it is mistakenly executed at the diagnosis code level rather than the condition (i.e., HCC or RxHCC) level. In fact, for approximately 67% of the allegedly improper diagnosis codes in the government's list, United's Chart Review confirmed that the member had the condition corresponding to the diagnosis code at issue (or a more severe condition in the same hierarchy), meaning that there is no overpayment associated with the diagnosis code.***

      i.   Overview

---

[142] *See* Exhibit 5.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

105.    The government's First Interrogatory Response includes a list of diagnosis codes that it maintains United "knowingly and improperly failed to delete[,]" which thus means that United "knowingly and improperly failed to otherwise return to the Medicare Program the overpayments based on such diagnoses."[143]  The government further asserts that "each diagnosis code on the United States' list is associated with a medical chart that UnitedHealth has already thoroughly reviewed, and in none of those reviews found support for the diagnosis code in question."[144]  This characterization is misleading because my analysis demonstrates that in the case of approximately 67% of the diagnosis codes on the government's list, the chart reviewer in fact identified one or more diagnosis codes that map to the condition (or a more severe condition) at the HCC or RxHCC level, which drives the Medicare financial payment.

106.    The diagnosis codes on the government's list are organized at the level of a unique combination of HICN, HCC or RxHCC, DOS, diagnosis code, and provider number.  As explained above, diagnosis codes do not directly drive MA reimbursement or risk adjustment amounts.  Instead, diagnosis codes map to HCCs (or RxHCCs); HCCs or RxHCCs impact member risk scores; and member risk scores in turn determine MA reimbursement for those members.  A unique HCC or RxHCC can be, and often is, supported by multiple diagnosis codes and records.  Here, it is important to note that the number of possible diagnosis codes is significantly higher than the number of possible HCCs and RxHCCs.  As an illustration, for the 2017 payment year, nearly 10,000 unique diagnosis codes mapped to only 79 unique HCCs.[145]  One of the reasons for this is the highly technical and descriptive discrepancies between separate diagnosis codes – such as two unique diagnosis codes for the same condition but on the right side of the body versus the left, or multiple unique diagnosis codes for the same condition but with different underlying causes.

107.    To the extent that an HCC or RxHCC is associated with multiple diagnosis codes and records, and at least one such code/record is uncontested, then this means the HCC or RxHCC condition is uncontested – and there would be no overpayment associated with that HCC or

---

[143] Government's First Interrogatory Response, dated August 17, 2020, p. 3.
[144] Joint Stipulation Regarding Government's Motion to Compel, dated April 29, 2021, p. 2.
[145] More than 9,500 unique ICD-10-CM diagnosis codes mapped to just 79 unique HCC codes, with the number of unique diagnosis codes per HCC ranging from one to more than 800.  Based on CMS's ICD-10 mappings file for the 2017 payment year at: (https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/2017MidyearFinalICD-10-CMMappings.zip).

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

RxHCC, even if another diagnosis code mapping to the same HCC or RxHCC was suspected of not being appropriately documented in a particular chart.

108.    As explained in more detail below, for 67% of the diagnosis codes listed in the government's First Interrogatory Response, United's coders affirmatively identified in the medical record one or more diagnosis code(s) mapping to the same HCC or RxHCC condition, or a more severe HCC or RxHCC condition in the same hierarchy.

109.    Importantly, none of the diagnosis codes I rely upon in this analysis were included in the government's list of purportedly problematic diagnosis codes, and the government has not alleged them to be improper.  In other words, contrary to the government's theory, many of the allegedly improper diagnosis codes mapped to HCCs or RxHCCs for which support was identified for the HCC or RxHCC through United's Chart Review Program.  As a result, the diagnosis codes from the government's First Interrogatory Response connected to those HCCs or RxHCCs could not have led to any MA overpayment.

ii.    Data Relied Upon

110.    For the purposes of this analysis, in addition to the government's First Interrogatory Response data, I relied upon the following datasets and key fields:

    a.    Member-provider-diagnosis-level data from the United Risk Adjustment Claims Data.  In this analysis, I principally used the United Risk Adjustment Claims Data, which contains every diagnosis code in any United database for members with a chart subjected to Chart Review during each given year.[146]    These tables provide information about the diagnosis codes populated in United's data – including the associated member, provider, and

---

[146] For DOS years 2008 – 2009, I relied upon the "Encounter", "Member", "Member Audit", "Diagnosis", "Diagnosis Error", "IR Error", "Diagnosis Code", and "Provider" tables from the 2008 – 2009 DOS RFP Production and the Verscend Production.  For the 2009 DOS year, I also stacked the ChrtSupp 2009 Diagnosis table from the July 2019 Supplemental Production (MAPL003667043).  For DOS years 2010 – 2013, I relied upon the DR4C Provider-Diagnosis datasets produced by United.  For DOS years 2010 and 2013, I relied upon a stacked combination of both the DR4C Provider Diagnosis tables from the original DR4C productions for those years as well as the DR4C Provider Diagnosis tables from the July 2019 Supplemental Production.  For DOS years 2014 – 2016, I relied upon the "Encounter", "Member", "Member Audit", "Diagnosis", "Diagnosis Code", "Diagnosis Error", and "Error" tables from the 2014 – 2016 DOS RFP Production and the Post Sweeps Production.  For the 2015 and 2016 DOS year, I also used the data from the Supplemental Post Sweeps Production.

50

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

DOS; the pathway through which the diagnosis code was submitted (such as directly by a provider, or via Chart Review); whether the diagnosis code was submitted to and processed by RAPS; and, if some kind of error prevented the diagnosis code from being submitted to and processed by RAPS, the reason for that error. Though these tables came from separate productions, the fundamental components of the data relevant to my analysis are substantially similar – including the general structure of the tables (organized at the level of a member-provider-encounter-diagnosis combination) as well as the presence of the key data fields I relied upon as discussed below.

b.    HCC and RxHCC Mapping Data. For each diagnosis code in the United Risk Adjustment Claims Data, I joined in the HCC and/or RxHCC that mapped to the diagnosis code in that payment year based on publicly information available from CMS.

c.    Diagnosis Deletes Data. I joined the Diagnosis Deletes Data to the United Risk Adjustment Claims Data.[147]

d.    Related Member Identifier Data. I used the Member, Member Audit, and HICN-to-MBI Crosswalk data to identify any related HICN(s) or MBIs for a unique United member.

iii.    Methodology

111.    To perform this analysis, I reviewed each of the HCCs and/or RxHCCs listed in the government's First Interrogatory Response to identify whether other diagnosis codes existed in the United Risk Adjustment Claims Data which (a) mapped to those HCCs or RxHCCs or more severe HCCs or RxHCC based on defined hierarchies from CMS; (b) had been subjected to Chart Review; (c) were submitted to and processed in RAPS (or, alternatively, not submitted to RAPS because of

---

[147] Specifically, I excluded from consideration in my analysis any diagnosis codes included in the Diagnosis Deletes Data. For DOS years 2010-2012, I joined the Diagnosis Deletes Data to the United Risk Adjustment Claims Data on Member-DOS-diagnosis code. For DOS years 2014-2016, I joined the Diagnosis Deletes Data to the United Risk Adjustment Claims Data on Member-DOS-diagnosis code-patient control number, which is equivalent to the encounter key in the United Risk Adjustment Claims Data.

51

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

being a potential duplicate submission, as further described below); (d) had not been subsequently deleted; and (e) were not alleged by the government to have been improperly submitted.

112.   More specifically, no diagnosis code from the government's First Interrogatory Response would have led to an overpayment if the diagnosis code mapped to a unique member-HCC/RxHCC combination (*i.e.*, HICN+(HCC or RxHCC)) where that member-HCC/RxHCC combination was supported by one or more diagnosis codes in the United Risk Adjustment Claims Data that met the following conditions:

a.   *Sub Source Code Indicating the Diagnosis Code was Identified in Chart Review.*  The "sub source code" field (displayed as "sub_source_cd") from the United Risk Adjustment Claims Data provides information about the source from which a diagnosis code was submitted, identifying the origination of the diagnosis code – e.g., provider encounters, hospital data, home health visits, etc.[148]  I understand that the following "sub_source_cd" values indicate that the diagnosis code was identified via the review of a member's chart:[149]

i.   "CHARTAUDIT"[150] – This "sub_source_cd" value reflects that the diagnosis code was recorded as part of United's Chart Review program for professional encounters.

ii.   "HOSABSTRACT" – This "sub_source_cd" value reflects that the diagnosis code was recorded as part of United's Chart Review program for hospital encounters.

iii.   "PROGRAMDEV" – This "sub_source_cd" value reflects that a United coder determined the diagnosis code was

---

[148] *See* p. 15 of "WideRight_Updated Requests 10-7-15.pdf."
[149] These definitions are sourced from my discussions about the "sub_source_cd" field with Randy Myers, Director of Encounter Operations at OptumInsight, and Dylan Schulz, Director of Chart Review Record Submissions and Risk Adjustment and ASM Operations at Optum.
[150] Among the three "sub_source_cd" codes I relied upon in this analysis, "CHARTAUDIT" is the most common by a significant margin, reflecting more than 90% of the total volume of records relating to those three codes.  *See* Appendix X4.

52

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

documented in a Patient Assessment Form ("PAF") included within the patient's medical record.

b.   *Diagnosis Code Not Deleted.*  The diagnosis code was not included in the Diagnosis Deletes Data; and

c.   *Diagnosis Code either (a) Submitted to RAPS or (b) Not Submitted because it was a Duplicate.*  In addition, at least one of the following two criteria are also met:

   i.   *Diagnosis Code Submitted to RAPS.* The diagnosis code was submitted to RAPS and processed by CMS.  Specifically, this includes record where:

      1.   The "record state" ("rec_state_key") is "10" and the "record status" ("rec_status_key") is "8", indicating that a RAPS Return file was processed successfully and the associated diagnosis code was accepted by CMS without any errors, or

      2.   The "record state" ("rec_state_key") is "10" and the "record status" ("rec_status_key") is "10", indicating that a RAPS Return file was processed successfully and the associated diagnosis code was accepted by CMS with warning codes.  I understand from discussions with United that these warning codes are generated when CMS identifies the potential for submission of a certain volume of duplicate data and do not relate to a

warning about the validity of the submission itself.[151]

    ii.    *Diagnosis Code Not Submitted because it was a Duplicate* . The diagnosis code was not submitted because of a certain type of technical error relating to duplicate data entry.  In other words, the diagnosis code was not submitted to RAPS only because it was flagged as a potential duplicate diagnosis submission for that same member.[152]

        1.    The "record state" ("rec_state_key") is "4", the "record status" ("rec_status_key") is "2", and the error code is either "X19" or "X46". The "X19" error code occurs when the same member-diagnosis combination was submitted within the six month windows from January through June or July through December.  The "X46" error code occurs when the same diagnosis for the same member on the same DOS was submitted, which can potentially cause a CMS "502" error[153] in the RAPS submission process.

113.    As an example of this methodology, there are 23 line-item records in the government's First Interrogatory Response for HICN <mark>9999999I</mark> (a unique member) and HCC 7 (metastatic cancer and acute leukemia[154]) in DOS year 2012.

---

[151] This understanding is based on discussions with Randy Myers, Director of Encounter Operations at OptumInsight, and Dylan Schulz, Director of Chart Review Record Submissions and Risk Adjustment and ASM Operations at Optum.

[152] Notably, in such cases, contrary to the government's assertions, the United Chart Review did in fact find support for the questioned diagnosis code.

[153] A "502" error relates to the submission of duplicate diagnosis data for a unique member to RAPS.  *See* (https://www.csscoperations.com/internet/cssc3.nsf/files/RAPS_FERAS_Errors_Eff_01262018.pdf/$FIle/RAPS_FERAS_Errors_Eff_01262018.pdf).

[154] CMS, *Announcement of Calendar Year (CY) 2013 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter,* dated April 2, 2012.

54

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

- As shown in the data excerpt below, this unique member-HCC combination spans 23-line items because it is associated with five separate diagnosis codes, fourteen separate encounters, and four separate providers.  The diagnosis codes were:[155]

    o ICD-9-CM code 1963 (secondary and unspecific malignant neoplasm of lymph nodes of axilla and upper limb);

    o ICD-9-CM code 1970 (secondary malignant neoplasm of lung);

    o ICD-9-CM code 1972 (secondary malignant neoplasm of pleura);

    o ICD-9-CM code 1977 (malignant neoplasm of liver, secondary); and

    o ICD-9-CM code 1985 (secondary malignant neoplasm of bone and bone marrow).

---

[155] ICD-9-CM Codebook – v32, FY2012 –  FY2015.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**Figure 7. Data excerpt: 2012 First Interrogatory Response table. (Sorted by dx, dos_from; not all fields shown).**

| hicn | dx | dx description* | hcc | rxhcc | dos_from | dos_thru | provider_nbr |
|------|------|------|------|------|------|------|------|
| 99999991 | 1963 | Mal neo lymph-axilla/arm | 7 | 11 | ** | ** | 174180004 |
| 99999991 | 1963 | Mal neo lymph-axilla/arm | 7 | 11 | ** | ** | 174180004 |
| 99999991 | 1970 | Secondary malig neo lung | 7 | 10 | ** | ** | 174180004 |
| 99999991 | 1970 | Secondary malig neo lung | 7 | 10 | ** | ** | 174180004 |
| 99999991 | 1970 | Secondary malig neo lung | 7 | 10 | ** | ** | 171040001 |
| 99999991 | 1972 | Second malig neo pleura | 7 | 10 | ** | ** | 174180004 |
| 99999991 | 1972 | Second malig neo pleura | 7 | 10 | ** | ** | 174180004 |
| 99999991 | 1972 | Second malig neo pleura | 7 | 10 | ** | ** | 174180004 |
| 99999991 | 1972 | Second malig neo pleura | 7 | 10 | ** | ** | 174180004 |
| 99999991 | 1977 | Second malig neo liver | 7 | 10 | ** | ** | 174180004 |
| 99999991 | 1977 | Second malig neo liver | 7 | 10 | ** | ** | 174180004 |
| 99999991 | 1977 | Second malig neo liver | 7 | 10 | ** | ** | 171040001 |
| 99999991 | 1977 | Second malig neo liver | 7 | 10 | ** | ** | 171040001 |
| 99999991 | 1977 | Second malig neo liver | 7 | 10 | ** | ** | 168730101 |
| 99999991 | 1977 | Second malig neo liver | 7 | 10 | ** | ** | 168730101 |
| 99999991 | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | 174180004 |
| 99999991 | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | 174180004 |
| 99999991 | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | 174180004 |
| 99999991 | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | 171040001 |
| 99999991 | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | 171040001 |
| 99999991 | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | 168730101 |
| 99999991 | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | 168730072 |

*Diagnosis description added by FTI for this example.
**Anonymized for report example.

- These are not the only diagnosis code records associated with this member-HCC combination in this year in United's data. In the larger 2012 DR4C Provider Diagnosis table, there are a total of 281 records for this same member-HCC combination, with multiple records across different encounter dates (and other variations[156]), diagnosis codes, and providers. In total, there are nine unique

---

[156] Sometimes the same HICN-HCC-diagnosis-DOS-provider combination repeats across multiple rows, but with different submission timestamps.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

diagnosis codes associated with this member-HCC combination in the 2012 DR4C Provider Diagnosis table.

- These 281 records include the 23 records from the government's First Interrogatory Response for this member-HCC combination. However, they also include other records that meet the specific conditions for my analysis described above, meaning that they were confirmed by a coder in Chart Review based on the information in the member's chart.

  o First, there are ten line items (spanning three unique diagnosis codes: 1970, 1977, and 1985) where the "sub source code" indicates that the diagnosis was identified in Chart Review (CHARTAUDIT) and the "record state" is 10 (*i.e.*, CMS RESPONSE PROCESSED), and "record status" is 8 (i.e., RAPS ACCEPTED), meaning the diagnosis codes were successfully received by CMS. These diagnosis codes, which were identified in the course of a chart review (as evidenced by the "sub source code"), support the HCC of 7 for this member in this year. An excerpt of these records is shown below.

**Figure 8. Data excerpt: 2012 DR4C Provider Diagnosis Table. (Sorted by dx, new_min_dt; not all fields shown).**

Source: DR4Ciii; sorted by dx, new_min_dt

| hic_nbr | diag_cd | dx description* | hcc | rxhcc | new_min_dt | new_max_dt | sub_source_cd | rec_state_key | rec_status_key |
|---------|---------|-----------------|-----|-------|------------|------------|---------------|---------------|----------------|
| 9999999I | 1970 | Secondary malig neo lung | 7 | 10 | ** | ** | CHARTAUDIT | 10 | 8 |
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 10 | 8 |
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 10 | 8 |
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 10 | 8 |
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 10 | 8 |
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 10 | 8 |
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 10 | 8 |
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 10 | 8 |
| 9999999I | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | CHARTAUDIT | 10 | 8 |
| 9999999I | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | CHARTAUDIT | 10 | 8 |

*Diagnosis description added by FTI for this example.

  o Second, there are 21 line items (spanning two unique diagnosis codes: 1977 and 1985) where the "sub source code" indicates that the diagnosis was identified in Chart Review (CHARTAUDIT) and the "record state" is "4" (*i.e.*, Excluded) and the "record status" is "2" (*i.e.*, Excluded on Front End)

57

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

with an error code of X19, meaning the diagnosis code was technically flagged as being a potential duplicate of the same member-encounter from a recent submission.[157] These diagnosis codes, which were identified in the course of Chart Review (as evidenced by the "sub_source_cd"), also support the HCC of 7 for this member in this year. An excerpt of these records is shown below.

**Figure 9. Data excerpt: 2012 DR4C Provider Diagnosis Table. (Sorted by dx, new_min_dt; not all fields shown).**

Source: DR4Ciii; sorted by dx, new_min_dt

| hic_nbr | diag_cd | dx description* | hcc | rxhcc | new_min_dt | new_max_dt | sub_source_cd | rec_state_key | rec_status_key | error_cd |
|---|---|---|---|---|---|---|---|---|---|---|
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1977 | Second malig neo liver | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |
| 9999999I | 1985 | Secondary malig neo bone | 7 | 10 | ** | ** | CHARTAUDIT | 4 | 2 | X19 |

*Diagnosis description added by FTI for this example.

114.    In this example, this member-HCC combination would have been supported by the Chart Review findings reflected in the diagnosis codes identified above. The government has not alleged these diagnosis codes to be improper. Consequently, none of these 23 line items from the government's First Interrogatory Response associated with this member-HCC combination could have caused any Part C overpayment for this member-HCC combination in this year.

115.    The flaws in the government's diagnosis code-level approach are further underscored by the often minor differences between unique diagnosis codes relating to the same

---

[157] I joined the error code information from the 2012 DR4C Supplemental Production to the 2012 DR4C Provider Diagnosis data to identify diagnosis codes with these error codes.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

or similar clinical conditions. Put simply, many similar diagnosis codes map to the same HCCs and RxHCCs. This was true in the ICD-9 coding system, but it was exacerbated by the introduction of ICD-10 coding, which increased the number of possible diagnosis codes from 14,000 to more than 68,000 due to a desire for increased specificity in describing a patient's condition.[158] Minor coding distinctions often result in no difference to the member's HCC or RxHCC condition. For example, the government's First Interrogatory Response includes a line item for member 1010101J with diagnosis code E13.9 (other specified diabetes mellitus without complications[159]) submitted on DOS A/2016. However, on the same DOS, that member also had a diagnosis code of E11.9 (type 2 diabetes mellitus without complications[160]) as identified in Chart Review. Both E13.9 and E11.9 map to the same HCC 19 (diabetes without complications[161]), meaning there would be no change to this member's HCC condition for this year if the E13.9 had not been submitted. As another example, member 2020202K's diagnosis code of 296.30 (major depressive disorder, recurrent episode[162]) on DOS A/2014 was included in the government's First Interrogatory Response. However, that same member had a separate submitted diagnosis code of 296.20 (major depressive disorder, single episode[163]), which had been identified for the same DOS in Chart Review. These diagnosis codes map to the same HCC 55 (major depressive, bipolar, and paranoid disorders[164]), meaning there would be no impact to the member's risk score, and thus no overpayment, if the diagnosis code 296.30 had been deleted.

116.    I have observed several other similar examples following the same fact pattern as those above including:

- A member with diagnosis code 244.8 (other specified acquired hypothyroidism[165]) identified in the First Interrogatory Response that also had diagnosis code 244.9 (unspecified

---

[158] International Classification of Diseases, *(ICD-10-CM/PCS) Transition – Background, Centers for Disease Control and Prevention*, available at: (https://www.cdc.gov/nchs/icd/icd10cm_pcs_background.htm).
[159] ICD-10-CM Diagnosis Codebook – 2016.
[160] *Id*.
[161] CMS, *Announcement of Calendar Year (CY) 2017 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 4, 2016.
[162] ICD-9-CM Codebook – v32, FY2012 – FY2015.
[163] *Id*.
[164] CMS, *Announcement of Calendar Year (CY) 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 1, 2013.
[165] ICD-9-CM Codebook – v32, FY2012 – FY2015.

59

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

acquired hypothyroidism[166]) identified via Chart Review on the same DOS with both diagnosis codes mapping to RxHCC 42 (thyroid disorders[167]).

- A member with diagnosis code 438.20 (late effects of cerebrovascular disease, hemiplegia affecting unspecified side[168]) identified in the First Interrogatory Response that also had diagnosis code 342.90 (hemiplegia, unspecified, affecting unspecified side[169]) submitted via Chart Review on a different DOS within the same year, with both diagnosis codes mapping to HCC 100 (Ischemic or unspecified stroke[170]).

- A member with diagnosis code 303.93 (other and unspecified alcohol dependence, in remission[171]) identified in the First Interrogatory Response and diagnosis code 303.90 (other and unspecified alcohol dependence, continuous[172]) submitted via Chart Review on the same DOS, with both diagnosis codes mapping to HCC 55 (drug/alcohol dependence[173]).

- A member with diagnosis code 440.20 (unspecified atherosclerosis of native arteries of extremities, unspecified extremity[174]) identified in the First Interrogatory Response and diagnosis code 440.21 (atherosclerosis of native arteries of the extremities with intermittent claudication[175]) submitted via Chart Review on a different DOS within the same year, with both diagnosis codes mapping to HCC 108 (vascular disease[176]).

iv.    Summary of Findings

117.    Using the method described above, I calculated that, on a standalone basis, 67% of the government's First Interrogatory Response diagnosis codes across all DOS years (18.8 million

---

[166] *Id.*

[167] CMS, *Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 6, 2015.

[168] ICD-9-CM Codebook – v32, FY2012 – FY2015.

[169] *Id.*

[170] CMS, *Announcement of Calendar Year (CY) 2012 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 4, 2011.

[171] ICD-9-CM Codebook – v32, FY2012 – FY2015.

[172] *Id.*

[173] CMS, *Announcement of Calendar Year (CY) 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 1, 2013.

[174] ICD-9-CM Codebook – v32, FY2012 – FY2015.

[175] *Id.*

[176] CMS, *Announcement of Calendar Year (CY) 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 1, 2013.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

out of a total 28 million) relate to member-HCC/RxHCC combinations that are supported by other diagnosis codes identified through Chart Review.  In other words, United's Chart Review identified other support for the conditions related to the diagnosis codes on the government's list, so those diagnosis codes therefore could not have led to any MA overpayment or the improper retention of an overpayment.  The table below summarizes the number of such diagnosis codes in relation to the total First Interrogatory Response records for each DOS year.

**Figure 10. Standalone Impact of Condition-Level Analysis.**[177]

| DOS Year | First Interrogatory Response Records | | % of Total |
|---|---|---|---|
| | Total | HCC/RxHCC Identified in Chart Review | |
| 2008 | 1,281,260 | 560,823 | 43.8% |
| 2009 | 2,673,072 | 1,034,645 | 38.7% |
| 2010 | 2,358,464 | 1,179,454 | 50.0% |
| 2011 | 2,146,861 | 1,314,358 | 61.2% |
| 2012 | 3,829,852 | 2,966,984 | 77.5% |
| 2013 | 4,431,051 | 3,170,820 | 71.6% |
| 2014 | 3,462,828 | 2,644,678 | 76.4% |
| 2015 | 3,408,442 | 2,565,556 | 75.3% |
| 2016 | 4,345,821 | 3,412,368 | 78.5% |
| **Total** | **27,937,651** | **18,849,686** | **67.5%** |

118.    The above counts only include First Interrogatory Response records where my analysis shows that *all* condition codes related to the diagnosis code were supported by diagnosis codes identified in Chart Review (e.g., where only an HCC mapped to the diagnosis code and it was supported; where only an RxHCC mapped to the diagnosis code and it was supported; and/or where an HCC and RxHCC both mapped to the diagnosis code and were both supported).  There are additional First Interrogatory Response records not included in this count that had both HCCs and RxHCCs and where either the HCC or RxHCC, but not both, was supported by my analysis.  In total, 19.9 million First Interrogatory Response Records (71.2%) had at least one HCC or RxHCC supported by another diagnosis code identified in Chart Review.

---

[177] *See* Exhibit 6.

119.    In short, the fact that a diagnosis code was not identified in Chart Review does not mean that there was an overpayment related to that code; it does not mean that the diagnosis code itself, or the condition code linked to that diagnosis code, was false; and it does not mean that United knew of the existence of an overpayment.

C.  ***Opinion 3:  The diagnosis codes listed in the government's First Interrogatory Response form an improper basis for evaluating potential overpayments because, in approximately 83% of cases, even if the diagnosis codes were incorrect, deleting those codes would not have impacted the Part C or Part D MA payments to United in the years at issue.  There are a variety of reasons for this, including but not limited to the fact that (a) some diagnosis codes do not impact the risk adjustment process; (b) multiple diagnosis codes may support the same condition code; and (c) a higher level condition code may also be supported, superseding any lower level condition code that may be found to be unsupported.***

i.    Overview

120.    The government contends that the diagnosis codes listed in its First Interrogatory Response constitute overpayments that United should have  returned to the government by deleting those codes.  However, in the overwhelming majority of cases – approximately 83.3% – the deletion of these diagnosis codes would have had no impact on those members' risk adjustment scores, and thus would have resulted in no financial impact to the government.  An overpayment that does not exist cannot have been knowingly retained.

121.    As discussed above, HCCs and RxHCCs impact a member's risk score, which is the factor in the MA risk adjustment model that determines the payment for a member.  A unique HCC or RxHCC can be, and often is, supported by multiple diagnosis codes and charts.  Examples of HCCs or RxHCCs with multiple sources of support include the following:[178]

- An HCC can be supported by the same diagnosis code submitted from multiple different providers in the same year and/or on multiple encounters in that year.  As

---

[178] The diagnosis code mappings illustrated in this hypothetical are based on CMS's ICD-10 mappings file for the 2017 payment year at: (https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/2017MidyearFinalICD-10-CMMappings.zip).

62

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

an illustration, a member may have had a diagnosis code of E08.22 (diabetes mellitus due to underlying condition with diabetic chronic kidney disease[179]), mapping to HCC 18 (diabetes with chronic complications[180]), submitted by Dr. John Doe from an encounter in January, and then the same diagnosis code of E08.22 submitted twice from Dr. Jane Doe from two separate encounters in April and June. These three diagnosis code submissions would come from three separate encounters across two separate providers and charts, and each independently would support the HCC. Deleting any one of these diagnosis codes would not affect the payment for the beneficiary as he or she would still have the same HCC.

- An HCC can be supported by different diagnosis codes that all map to the same HCC. As an illustration, a member may have had a diagnosis code of E08.22 (diabetes mellitus due to underlying condition with diabetic chronic kidney disease), mapping to HCC 18 (diabetes with chronic complications), submitted from Dr. John Doe from an encounter in January, as well as a diagnosis code of E08.29 (diabetes mellitus due to underlying condition with other diabetic kidney complication[181]), also mapping to HCC 18, submitted from Dr. John Doe at that same encounter.[182] These two different diagnosis codes would each independently support the HCC. Deleting any one of these diagnosis codes would not affect the payment for the beneficiary as he or she would still have the same HCC.

122. To determine whether the deletion of the questioned diagnosis codes would have impacted reimbursement, I performed a "Simulated Deletion Analysis" to assess whether the deletion of the diagnosis codes in the government's First Interrogatory Response would have resulted in a change to the HCCs or RxHCCs associated with a member, and thereby, have a financial impact.

ii.   Overview of Simulated Deletion Analysis

---

[179] ICD-10-CM Diagnosis Codebook – 2016.
[180] CMS, *Announcement of Calendar Year (CY) 2017 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 4, 2016.
[181] ICD-9-CM Codebook – v32, FY2012 – FY2015.
[182] The diagnosis codes of E08.22 and E08.29 could have also been submitted from other providers and/or other encounters with Dr. John Doe. Assuming they were all valid diagnosis codes, the impact is the same.

63

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

123.    My Simulated Deletion Analysis uses CMS-HCC Risk Adjustment Model software and CMS-RxHCC Risk Adjustment Model software to simulate the calculation of supportable HCCs and RxHCCs for the at-issue members in each year.  For each payment year, CMS publishes a set of Statistical Analysis System ("SAS") programs that can be used to intake information about members and diagnosis codes and, using that information, generate data about the supported HCC(s) and RxHCC(s) for each member in that year (the "CMS SAS Model").[183]  The CMS SAS Model requires "Person File" and "Diagnosis File" data inputs to run.  The "Person File" includes key demographic data needed to calculate a member's risk score.  The "Diagnosis File" includes all diagnosis codes associated with a given member that were submitted and accepted by CMS in a given year.  To perform the Simulated Deletion Analysis, I used the CMS SAS Model to identify the HCCs and RxHCCs for all members in the government's First Interrogatory Response that would have been supported assuming none of the diagnosis codes from the First Interrogatory Response had been submitted (the "Delete Model").  By determining the HCCs and/or RxHCCs supported for each member without the diagnosis codes in the government's First Interrogatory Response, I was able to assess whether deletion of the questioned diagnosis codes could have caused a change in risk score, and thus had a financial impact.

iii.    Data Relied Upon

124.    For the purposes of this analysis, in addition to the government's First Interrogatory Response data, I relied upon the following datasets and key fields:

a.    Monthly Membership Report ("MMR") datasets.  MMR data is the basic accounting file containing member level payments, adjustments, and demographics for Medicare Advantage and Part D organizations.[184]  For purposes of this analysis, I have chosen to rely on the December MMR file

---

[183] The CMS SAS Model software for payment years 2009-2017 is publicly available at: (https://www.cms.gov/medicare/payment/medicare-advantage-rates-statistics/risk-adjustment). For my analysis, I used the CMS-HCC and CMS-RxHCC software for each year.
[184] MAPD Plan Communication User Guide Version 16.4.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

as a proxy for year-end enrollment for each payment year to determine member-level demographics at year-end.[185]

    b.     <u>Member-provider-diagnosis-level data from the United Risk Adjustment Claims Data.</u> As described above in Opinion 2.

    c.     <u>HCC and RxHCC Mapping Data.</u> For each diagnosis code in the United Risk Adjustment Claims Data, I joined in the HCC and/or RxHCC that mapped to the diagnosis code in that payment year based on publicly information available from CMS.

    d.     <u>Diagnosis Deletes Data.</u> I joined the Diagnosis Deletes Data to the United Risk Adjustment Claims Data.

    e.     <u>Related Member Identifier Data.</u> I used the Member, Member Audit, and HICN-to-MBI Crosswalk data to identify any related HICN(s) or MBIs for a unique United member.

    iv.     <u>Methodology</u>

125.    I performed the following steps to prepare the files to input into the CMS SAS Model by payment year.

126.    First, I created a "Person File" containing the key demographic data from the MMR data required to run the CMS SAS Model for every member in the government's First Interrogatory Response *except* those for whom all diagnosis codes submitted in that year were the diagnosis codes in the First Interrogatory Response (the "Delete Model Person File"). This included the following fields: HICN, sex, date of birth ("DOB"), Medicaid status ("MCAID"),[186] New

---

[185] The CMS MAPD Plan Communication User Guide ("PCUG") provides descriptions of the MMR fields. There were several PCUG versions effective during the time period in question. I have relied upon the following PCUG versions: Version 5.3, Version 6.3, Version 9.3, Version 10.1, and Version 16.4 to represent the payment years within the period of the government's First Interrogatory Response.

[186] The MCAID field is designed to indicate whether a member has Medicaid status. For the Person File, I set MCAID to equal "0" (indicating the member did not have Medicaid) when the "Current Medicaid Status" field from the MMR data was "0" or "00 – No Medicaid Status." Otherwise, I set MCAID to equal "1" (indicating the member did have Medicaid).

65

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

Medicare Enrollee with Medicaid ("NEMCAID"),[187] Original Reason for Entitlement ("OREC"),[188] and End-Stage Renal Disease Status ("ESRD").[189]  In other words, if a member in a year had diagnosis codes submitted that were included in the First Interrogatory Response as well as others that were not, the member would be included in the Delete Model Person File.  On the contrary, if *every* diagnosis code for a member in a year was included in the First Interrogatory Response, the member would not be present in the Delete Model Person File.[190]

127.    Then, I created a "Diagnosis File" containing all diagnosis codes from the United Risk Adjustment Claims Data which were submitted to RAPS for each member in the Delete Model Person File *except* those that were included in the First Interrogatory Response (the "Delete Model Diagnosis File").  This was limited to instances where (i) the diagnosis code was submitted to RAPS successfully and the associated diagnosis code was accepted by CMS without any errors (*i.e.*, Record State = 10, Record Status = 8), or (ii) the return file was processed successfully, and the associated diagnosis code was accepted by CMS with warning codes (*i.e.*, Record State = 10, Record Status = 10).  I also excluded any diagnosis codes which were listed in the Diagnosis Deletes Data.

128.    Then, for each payment year relevant to this case, I ran the CMS SAS Model for the Delete Model.  This generated the lists of HCCs and RxHCCs supported for each member from the First Interrogatory Response in each payment year based on the diagnosis codes actually submitted for that year *other than* the diagnosis codes from the government's list.  I compared the lists of supported HCCs and RxHCCs from the CMS SAS Model to the HCCs and RxHCCs on

---

[187] The NEMCAID field is designed to indicate whether a member is a new Medicare enrollee with Medicaid.  For the Person File, I set NEMCAID to equal "1" if both: (a) the "Current Medicaid Status" field from the MMR data was anything other than "0" or "00 – No Medicaid Status", and (b) the "RA Factor Type Code" from the MMR data was "E – New Enrollee", "ED – New Enrollee Dialysis (ESRD)", "E1 – New Enrollee Post Graft 4-9 (ESRD)", or "E2 (New Enrollee Post Graft 10+ (ESRD)."

[188] The OREC field is designed to indicate the original reason that the member was entitled to Medicare.  This is a native field in the MMR data.

[189] The ESRD field is designed to indicate whether the member had End-Stage Renal Disease.  For the Person File, I set ESRD to equal "1" if the "OREC" field from the MMR data was populated with "2 – Member insured due to ESRD."  Otherwise, I set the ESRD field to equal "0."

[190] Approximately 15% of beneficiaries in the government's list did not appear in the December MMR files and, thus, the demographic data associated with them was not available.  This can occur, for example, because of death or change of plan by year-end.  In order to run the CMS SAS Model, demographic information is required.  Accordingly, when demographic data was unavailable, I identified the most common demographic statuses for the members *with* MMR demographic data and applied those to the members *without* demographic data.  This convention does not impact the output of the CMS SAS Model for purposes of this analysis.

66

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

the First Interrogatory Response for these members.[191]   If an HCC or RxHCC from the government's First Interrogatory Response was still supported in the Delete Model, or supported by a higher severity HCC or RxHCC in the same hierarchy from the Delete Model, then I considered it to have no financial impact.[192]

v.    <u>Summary of Findings</u>

129.    My Simulated Deletion Analysis shows that, in 83.3% of cases, the deletion of the diagnosis codes from the government's First Interrogatory Response would have had no impact on those members' risk adjustment scores, and thus would have had no financial impact to the government.  There are many, often overlapping, reasons why the deletion of these codes would not have impacted risk adjustment scores.  The output of the CMS SAS Model does not provide those reasons.  Instead, it simply provides the HCCs/RxHCCs supported for each member based on the diagnostic and demographic data entered in the model.  Thus, for example, if a member's HCC from the First Interrogatory Response was also supported in the Delete Model, the output from the CMS SAS Model would not explicitly identify the reason(s) why that HCC was supported in the Delete Model.  Consequently, identifying the reason why any particular deletion did not impact the member's risk adjustment score requires detailed, individualized analysis.  The below table summarizes the number of such diagnosis codes in relation to the total First Interrogatory Response records for each DOS year.

---

[191] Here, I used the HCCs and RxHCCs mapped to the First Interrogatory Response diagnosis codes from the publicly available CMS data, as described earlier in my report, as opposed to the HCCs and RxHCCs natively populated in the data.

[192] I also considered there to be no financial impact for any diagnosis codes relating to members who were listed as new enrollees for that payment year in the MMR data, because new enrollees' risk scores depend only on demographic data and do not consider diagnostic data.  New enrollees are defined as members who had less than 12 months of Medicare Part B enrollment in the data collection year (*i.e.*, DOS year).  *See* CMS, *Risk Adjustment Tips: New Enrollees,* January 2013.

67

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**Figure 11. Standalone Impact of Simulated Deletion Analysis.[193]**

| DOS Year | First Interrogatory Response Records | | % of Total |
| | Total | No Financial Impact | |
|---|---|---|---|
| 2008 | 1,281,260 | 943,082 | 73.6% |
| 2009 | 2,673,072 | 1,950,855 | 73.0% |
| 2010 | 2,358,464 | 1,622,579 | 68.8% |
| 2011 | 2,146,861 | 1,559,944 | 72.7% |
| 2012 | 3,829,852 | 3,475,934 | 90.8% |
| 2013 | 4,431,051 | 3,839,543 | 86.7% |
| 2014 | 3,462,828 | 3,025,792 | 87.4% |
| 2015 | 3,408,442 | 3,008,230 | 88.3% |
| 2016 | 4,345,821 | 3,851,527 | 88.6% |
| **Total** | **27,937,651** | **23,277,486** | **83.3%** |

130.    The above counts only include First Interrogatory Response records where *none* of the condition codes related to the diagnosis code had a financial impact as per my Simulated Deletion Analysis (e.g., where only an HCC mapped to the diagnosis code and it was supported; where only an RxHCC mapped to the diagnosis code and it was supported; and/or where both an HCC and RxHCC mapped to the diagnosis code and both were supported). There are additional First Interrogatory Response records not included in this count that had both an HCC and RxHCC and where either the HCC or RxHCC, but not both, was supported by my analysis. In total, 23.7 million First Interrogatory Response Records (84.7%) had an HCC or RxHCC that was determined by my Simulated Deletion Analysis to have no financial impact.

131.    Accordingly, while I have not quantified all of the various reasons why the deletion of diagnosis codes in the First Interrogatory Response failed to impact the related HCC(s)/RxHCC(s) and risk adjustment scores, I have analyzed and provided illustrative examples for many such scenarios below.

vi.    <u>Example – Same HCC or RxHCC Supported by Diagnosis Code that was Identified by Chart Review.</u>

---

[193] *See* <u>Exhibit 7</u>.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

132.    As discussed in Opinion 2 above, to a significant degree, I have found that a Chart Review coder identified one or more diagnosis codes that support the HCCs or RxHCCs mapping to allegedly at-issue diagnosis codes from the government's First Interrogatory Response.  In these cases, deleting the diagnosis code(s) from the First Interrogatory Response would have had no financial impact to the government.

133.    For example, the First Interrogatory Response includes two line items with the diagnosis code 493.91 (asthma, unspecified type, with status asthmaticus[194]) for HICN 3030303L in DOS year 2011: one with DOS A/2011, and another with DOS B/2011.  This diagnosis code maps to RxHCC 104 (chronic obstructive pulmonary disease and asthma[195]).  Notably, the United Risk Adjustment Claims Data in this year contains two records with a diagnosis code of 493.90 (asthma, unspecified type, unspecified[196]), which also maps to RxHCC 104. One of these occurred on DOS A/2011, and the other on B/2011.  These diagnosis codes had a "record state" of 10 and "record status" of 8 (meaning the diagnosis code was submitted to and accepted by RAPS) and a "sub_source_cd" of CHARTAUDIT (reflecting that the diagnosis code was identified in Chart Review).  Further, in the United/Vendor Chart Review Data, these diagnosis codes are listed as ones identified in Chart Review for this member in this year.  These diagnosis codes, which are not included in the government's First Interrogatory Response, support the RxHCC 104 for this member.  As a result, deleting the two line items from the First Interrogatory Response would not have had a financial impact.

134.    The HCC and/or RxHCC was supported for reasons similar to this example for approximately 19.2 million (82%) of the First Interrogatory Response diagnosis codes found to have no financial impact in my Simulated Deletion Analysis.[197]

   vii.    Example – Same Provider Submitted a Different Diagnosis Code Mapping to Same HCC or RxHCC.

---

[194] ICD-9-CM Codebook – v28 FY2011.
[195] CMS, *Announcement of Calendar Year (CY) 2012 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 4, 2011.
[196] ICD-9-CM Codebook – v28 FY2011.
[197] *See* Exhibit 8.  This amount is different than the number of codes impacted by the results of my analysis in Opinion 2.  That is because my methodology in Opinion 2 includes diagnosis codes from the United Risk Adjustment Claims data with a "record state" of 4 and "record status" of 2 and the X19 or X46 error code.  However, my analysis in Opinion 3 only includes diagnosis codes with a "record status" of 10 and a "record state" of 10 or 8.

69

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

135.    As described above, many diagnosis codes can map to the same HCC and/or RxHCC.  If multiple diagnosis codes map to the same HCC/RxHCC, then the presence of one appropriate diagnosis code is sufficient to support the HCC.  If a diagnosis code from the First Interrogatory Response was deleted from the member's risk adjustment data in that year, the HCC associated with that diagnosis code would still be supported if there is another diagnosis code mapping to the same HCC for the same member.  In many cases, deleting a diagnosis code from the government's First Interrogatory Response has no financial impact because another diagnosis about which no allegations have been raised was submitted by the same provider and supports the HCC related to that diagnosis code for that member in that year.

136.    For example, the government's First Interrogatory Response includes two line items for diagnosis code 440.20 (unspecified atherosclerosis of native arteries of extremities, unspecified extremity[198]) for member 4040404M – one from Dr. Cobrin on DOS A/2015, and another from the same provider on DOS B/2015.  This diagnosis code maps to HCC 108 (vascular disease[199]).  In the United Risk Adjustment Claims Data for this member in this DOS year, there is a diagnosis code of 440.21 (atherosclerosis of native arteries of the extremities with intermittent claudication[200]) submitted by Dr. Cobrin on C/2015.  This diagnosis code also maps to HCC 108.  The diagnosis code of 440.21 on C/2015 from Dr. Cobrin is not part of the government's First Interrogatory Response, indicating that the government does not allege it should be deleted.  As a result, the deletion of the 44020 diagnosis codes on A/2015 and B/2015 would have done nothing to impact this member's HCC of 108 in this year, meaning deleting these codes would have had no financial impact to the government.

137.    The HCC and/or RxHCC was supported for reasons similar to this example for approximately 4.5 million (19%) of the First Interrogatory Response diagnosis codes found to have no financial impact in my Simulated Deletion Analysis.[201]

---

[198] ICD-9-CM Codebook – v32, FY2012 – FY2015.
[199] CMS, *Announcement of Calendar Year (CY) 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 1, 2013.
[200] ICD-9-CM Codebook – v32, FY2012 – FY2015.
[201] *See* Exhibit 8.

70

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

viii.    Example – Higher HCC or RxHCC Supported by Other Diagnosis Code About
Which No Allegations Have Been Raised.

138.    As described above, the CMS-HCC model incorporates disease hierarchies such
that the risk adjustment score depends only on the most severe manifestation of a disease.  If
another HCC in the disease hierarchy is reported for a member in that same year, the lower-severity
HCC has no impact on payment for that member.  In many cases, deleting a diagnosis code from
the government's First Interrogatory Response has no financial impact because a higher HCC (or
RxHCC) was supported by another diagnosis code about which no allegations have been raised
for that member in that year.

139.    For example, the government's First Interrogatory Response includes two line
items for diagnosis code 571.5 (cirrhosis of liver without mention of alcohol[202]) for member
5050505N – one from Dr. Mesiya on DOS A/2012, and another from Dr. Diehl on DOS B/2012.
This diagnosis code maps to HCC 26 (cirrhosis of liver[203]).  In the United Risk Adjustment Claims
Data for this member in this DOS year, there is a diagnosis code of 572.8 (other sequelae of chronic
liver disease[204]) identified on B/2012.  This diagnosis code, which is not included in the
government's First Interrogatory Response, maps to HCC 25 (end-stage liver disease).[205]  This
HCC 25 is a more severe HCC that supersedes HCC 26 for this member in this year.  As a result,
the deletion of the two instances of diagnosis code 571.5 from the government's First Interrogatory
Response would have had no financial impact to the government, because this member's risk
adjustment score was determined by the more severe HCC 25 supported by another diagnosis code
about which the government has not raised an issue.

140.    The HCC and/or RxHCC was supported for reasons similar to this example for
approximately 4.3 million (18%) of the First Interrogatory Response diagnosis codes found to have
no financial impact in my Simulated Deletion Analysis.[206]

---

[202] ICD-9-CM Codebook – v32, FY2012 –  FY2015.
[203] CMS, *Announcement of Calendar Year (CY) 2013 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 2, 2012.
[204] ICD-9-CM Codebook – v32, FY2012 –  FY2015.
[205] CMS, *Announcement of Calendar Year (CY) 2013 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 2, 2012.
[206] *See* Exhibit 8.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

ix.    Example – Same Provider Submitted the Same Diagnosis Code on a Different DOS.

141.    In some cases, a diagnosis code that appears in the government's First Interrogatory Response maps to an HCC or RxHCC that is supported by another submission of the diagnosis code from that provider on a different DOS that was not in the First Interrogatory Response.  For example, the First Interrogatory Response includes one line item for HICN 6060606P containing diagnosis code 496 (chronic airway obstruction, not elsewhere classified[207]) for DOS A/2012 from provider Dr. Bhat; this maps to HCC 108 (chronic obstructive pulmonary disease[208]).  Notably, the United Risk Adjustment Claims Data shows that the same diagnosis code of 496 was submitted by Dr. Bhat in connection with a separate encounter with a DOS of B/2012; this diagnosis code, as recorded for this date of service, was not included in the First Interrogatory Response.  Because this diagnosis code supports HCC 108 for this beneficiary in 2012, deleting the allegedly improper diagnosis code from the First Interrogatory Response for member 6060606P would have had no impact on this member's HCC 108 in 2012, and thus there would have been no financial impact to the government.

142.    The HCC and/or RxHCC was supported for reasons similar to this example for approximately 7.5 million (32%) of the First Interrogatory Response diagnosis codes found to have no financial impact in my Simulated Deletion Analysis.[209]

x.    Example – Different Provider Submitted a Diagnosis Code Mapping to the Same HCC/RxHCC.

143.    In other cases, deleting diagnosis codes from the government's First Interrogatory Response causes no financial impact because a different provider submitted a diagnosis code that maps to the same HCC or RxHCC for that member in that year.  For example, the government's First Interrogatory Response includes five line items for diagnosis code 25000 (type 2 diabetes mellitus without complication[210]) submitted by Dr. Golomb (provider number 00010010292) for HICN 7070707Q, with DOS ranging from A/2015 – B/2015.  Diagnosis code 25000 mapped to

---

[207] ICD-9-CM Codebook – v32, FY2012 – FY2015.
[208] CMS, *Announcement of Calendar Year (CY) 2013 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 2, 2012.
[209] *See* Exhibit 8.
[210] ICD-9-CM Codebook – v32, FY2012 – FY2015.

72

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

HCC 19 (diabetes without complications[211]) in this year.  However, the United Risk Adjustment Claims Data includes a diagnosis code of E11.9 (type 2 diabetes mellitus without complications[212]) submitted by a different provider – Baptist Medical Center South, provider number 00500000056 – in connection with a DOS on C/2015.  Diagnosis code E11.9 also maps to HCC 19.  There are no records with a diagnosis code of E11.9 for this member in the government's First Interrogatory Response in this year.  Since diagnosis code E11.9 supports HCC 19, the deletion of the six 25000 diagnosis codes for this member in this year would have had no financial impact.

144.    The HCC and/or RxHCC was supported for reasons similar to this example for approximately 20.4 million (88%) of the First Interrogatory Response diagnosis codes found to have no financial impact in my Simulated Deletion Analysis.[213]

xi.    Example – Diagnosis Code Does Not Map to HCC or RxHCC.

145.    As described above, not all diagnosis codes map to an HCC/RxHCC that risk adjusts.  In many cases, deleting a diagnosis code from the government's First Interrogatory Response has no financial impact because that diagnosis code was not one that mapped to an HCC or RxHCC in that payment year.

146.    For example, the government's First Interrogatory Response includes a line item for diagnosis code 305.1 (non-dependent tobacco use disorder[214]) for member 8080808R submitted by Dr. Hoshiwara on DOS A/2008.  At this time – i.e., the 2009 payment year – diagnosis code 305.1 did not map to any HCC or RxHCC.  Indeed, even in the government First Interrogatory Response data, the "HCC" and "RxHCC" fields for this line item are blank.  As a result, this diagnosis code would not have impacted this member's risk score in that year.

147.    The HCC and/or RxHCC was supported for reasons similar to this example for approximately 894,000 (4%) of the First Interrogatory Response diagnosis codes found to have no financial impact in my Simulated Deletion Analysis.[215]

---

[211] CMS, *Announcement of Calendar Year (CY) 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 1, 2013.
[212] ICD-10-CM Codebook, 2015.
[213] *See* Exhibit 8.
[214] ICD-9-CM Codebook, 2008.
[215] *See* Exhibit 8.

73

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

xii.    <u>Conclusion</u>

148.    As stated above, my Simulated Deletion Analysis shows that 23.3 million (83.3%) of the diagnosis codes in the government's First Interrogatory Response would have had no financial impact had they been deleted.  Put another way, even if every code on the government's First Interrogatory Response was unsupported – which, as shown below, is contradicted by the results of CMS's own audits – then only 4.6 million (16.7%) could even potentially have resulted in overpayments because the rest did not impact payment at all.  This once more indicates that (a) the fact that a diagnosis code was not identified in Chart Review cannot be assumed to indicate that an overpayment exists; and (b) the government's First Interrogatory Response is an inappropriate basis on which to evaluate potential overpayments.

149.    In addition to evaluating whether there was an overpayment, I understand that it is also important to ascertain whether United had the requisite knowledge of any such overpayment. To conclude that United knew about the existence of an overpayment potentially related to an allegedly unsupported diagnosis code, one would first have to establish that the diagnosis code actually lacked support within the member's medical record.  In a scenario where a diagnosis code was coded by a provider but not independently identified by a subsequent coder's review of the medical record as part of a Chart Review, it does not necessarily follow that the diagnosis code is unsupported.   For example, the chart reviewer could have misinterpreted or overlooked information in the medical record that supported the diagnosis code.  Likewise, different coders can reach different determinations based on their review of medical record documentation.[216] Coding is a complex and nuanced task, and there is no basis to believe that coders performing Chart Reviews were always perfectly correct and comprehensive in their determinations.  If a diagnosis code was supported by the member's medical record – even if it was not identified by a coder in Chart Review – then there could be no overpayment stemming from that diagnosis code.

150.    Even if a diagnosis code was definitively determined to be unsupported, multiple additional factors bear on whether that code would have caused an overpayment.  As described above, an individual diagnosis code is not determinative of reimbursement in the risk adjustment calculation.  Additional factors that would need to be investigated and considered would include:

---

[216] C. Kapustij 30(b)(6) Dep. Tr. at 118:8-119:2.

74

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

a.     *Whether other charts support the diagnosis code.* For example, the diagnosis code could be properly supported in the medical record from another provider who treated the member in that year. If the diagnosis code was properly supported by any medical records from providers for that member in that year, then the diagnosis code would be supported and could not have caused an overpayment.

b.     *Whether other properly submitted and supported diagnosis codes map to the same HCC or RxHCC as the diagnosis code at issue.* As described above, the condition code, not the diagnosis code, is the driving factor for the calculation of risk scores. Because of this, if the relevant HCC or RxHCC would still be supported by other diagnosis codes, then the diagnosis code at issue could not have caused an overpayment.

c.     *Whether the member's full set of medical records for the year support the submission of additional diagnosis codes which were not originally submitted that map to HCCs or RxHCCs that were not previously taken into account in determining the member's risk score.* To the extent this occurred, the impact of the additional HCC(s) or RxHCC(s) on the member's risk score would have to be considered and netted against any reductions in the risk score resulting from any unsupported diagnosis codes. Put another way, even if a submitted diagnosis code was found to be unsupported, and even if the deletion of that diagnosis code would have caused an HCC to be wholly unsupported, there still may not have been an overpayment if the medical record supported other unsubmitted diagnosis codes that mapped to other, additional HCC(s).

d.     *Whether the HCC or RxHCC mapping to the diagnosis at issue actually had an impact on the member's risk score.* Even if deleting the diagnosis code at issue would have rendered an HCC or RxHCC unsupported, the diagnosis code could not have led to an overpayment if that HCC or RxHCC was not one that impacted the member's risk score. For example, assume that a member had diagnosis code E11.9 (type 2 diabetes without complications)

75

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

coded by a provider. This diagnosis code maps to HCC 19 (diabetes without complications). Also assume that the E11.9 diagnosis code was found to be unsupported in the medical record and thus should have been deleted, and that the code was the only one mapping to HCC 19 for that member in that year. On its surface, that may suggest that HCC 19 improperly increased the member's risk score in that year, causing an overpayment. However, if the member was properly diagnosed with more serious diabetes complications in that year, and the member thus met the conditions for either HCC 18 (diabetes with chronic complications) or 17 (diabetes with acute complications), then the HCC 19 would not have impacted the member's risk score at all. Instead, the risk score would have depended on the more severe HCC 17 or 18.

151.    An appropriate methodology for determining whether United knowingly retained an overpayment caused by an allegedly unsupported diagnosis code would require considering all of the complexities described above. It is not sufficient to merely compare and look for differences between the diagnosis codes submitted by United and of the diagnosis codes identified by United's Chart Review coders. To my understanding, the government has not undertaken this more comprehensive analysis.

**D. _Opinion 4: The government's assertion that the diagnosis codes in the First Interrogatory Response are not supported is contradicted by CMS's own RADV auditors. In fact, CMS's coders found support for more than 89% of the First Interrogatory Response diagnosis codes mapping to member-HCC combinations that CMS reviewed as part of the CON11-13 RADV audits. This rate increases to 91% when also taking into account the results of the CON14-15 RADV audits._**

i.    Overview

152.    The government's First Interrogatory Response is comprised of diagnosis codes for which the government alleges that "(1) the diagnosis code was submitted by UnitedHealth to CMS and was required, by regulation, to be supported by an underlying medical record; (2) that medical record went through UnitedHealth's medical record review program; and *(3) UnitedHealth's own*

76

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

*reviewers did not find the diagnosis code to be supported by medical records*" (emphasis added).[217]
As described above in my Opinions 1-3, the list of diagnosis codes included in the government's
First Interrogatory Response is significantly flawed for several reasons, including the extent to
which it includes (i) diagnosis codes relating to providers who do not appear to have undergone
Chart Review, as well as (ii) diagnosis codes that would not have impacted members' risk scores
or led to an overpayment if the codes were actually found to be unsupported by the medical records.
In addition to these failings, the government's First Interrogatory Response is also flawed in
another important respect: it is premised on the unfounded assumption that a diagnosis code was
unsupported any time a Chart Review coder failed to independently identify the diagnosis.  In fact,
I have obtained and reviewed evidence that, when CMS's own RADV Validation Contractors
reviewed the medical records for all 1,119 member-HCC combinations that were also included in
the First Interrogatory Response as part of RADV Contract-Level audits[218] conducted on United
plans for CY 2011, 2012, and 2013, the RADV Validation Contractors confirmed and validated
those member-HCCs more than 89% of the time. When CMS's RADV Validation Contractors
reviewed the medical records for all 6,494 member-HCC combinations that were also included in
the First Interrogatory Response as part of RADV Contract-Level audits conducted on United
plans for CY 2011, 2012, 2013, 2014, and 2015, the RADV Validation Contractors confirmed and
validated those member-HCCs 91% of the time.

153.    I obtained and reviewed the Plan Feedback Report ("PFR") results for a series of
Contract-Level RADV audits performed by CMS pertaining to members enrolled in United plans,
meeting criteria to be "RADV eligible"[219] from payment years 2011 – 2013 (the "CON11-13 PFR

---

[217] Joint Stipulation Regarding Government's Motion to Compel, dated April 29,2021, p 8.

[218] Per the *Medicare and Medicaid Programs; Policy and Technical Changes to the Medicare Advantage, Medicare Prescription Drug Benefit, Program of All-inclusive Care for the Elderly (PACE), Medicaid Fee-For-Service, and Medicaid Managed Care Programs for Years 2020 and 2021 Final Rule* at 42 CRF Part 22, "CMS conducts post-payment audits of MAO-submitted diagnosis data from a selection of MAOs for specific payment years to ensure that the diagnoses they submitted are supported by their enrollees' medical records.  These audits are called contract-level Risk Adjustment Data Validation (RADV) program audits."

[219] CMS set forth the criteria to determine member eligibility within the *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits* released on February 24, 2012.  Per CMS, a member is "RADV-eligible" if they meet the following criteria:  (1) Enrolled in an MA contract (H-number, E-number, or R-number) in January of the payment year— based on CMS's monthly member enrollment files; (2) Continuously enrolled in the same MA contract (as identified in step (1) above) from January of the data collection year through January of the payment year; (3) Non-End Stage Renal Disease (non-ESRD) status from January of the data collection year through January of the payment year; (4) Non-hospice status

77

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

Data"). I also obtained similar data for audits performed by CMS pertaining to payment years 2014 – 2015 (the "CON14-15 PFR Data"). Collectively, I refer to this as the "CON11-15 PFR Data." I understand that this information was obtained by United from the CMS RADV Report Portal.[220] For the members included in the data, the CON11-15 PFR Data indicates whether the member-HCC combinations selected by CMS for review as part of a RADV Contract-Level audit were found by CMS Validation Contractors to be valid and supported by the members' medical record(s). Based on my review of the CON11-15 PFR Data, the data includes member-HCC combinations that were included in the government's First Interrogatory Response in DOS years 2010-2014. For any member-HCC combinations that overlapped between the government's First Interrogatory Response and the CON11-15 PFR Data ("overlapping member-HCC combinations"), I analyzed whether the CMS RADV audit validated the member-HCC combination. As detailed below, for the overlapping member-HCC combinations I identified, more than 89% (based on the CON11-13 PFR Data) and 91% (based on the CON11-15 PFR Data) were *validated* by CMS Validation Contractors.

ii.    Data Relied On

154.    For the purposes of this analysis, in addition to the government's First Interrogatory Response data, I relied upon the following datasets and key fields:

a.    CMS Plan Feedback Report (PFR) Files RADV Results ("CON11-15 PFR Data").[221] The CON11-13 PFR Data files included reports for fifteen total United MA contracts: four contracts from payment year 2011; five contracts from payment year 2012; and six contracts from payment year 2013. The CON14-15 PFR Data files included reports for 46 contracts from payment

---

from January of the data collection year through January of the payment year; (5) Enrolled in Medicare Part B coverage for all 12 months during the data collection year (*i.e.*, defined as full risk enrollees for risk adjusted payment); and (6) Had at least one risk adjustment diagnosis (ICD-9-CM code) submitted during the data collection year that led to at least one CMS-Hierarchical Condition Category (HCC) assignment for the payment year.

[220] The process for obtaining CON11, CON12, and CON13 PFR data is described in the "Appendix 6 – Plan Feedback Report" document from CMS (MAPL010977164). I understand that United obtained the PFR Data I relied upon for this analysis between approximately July 2019 and November 2023.

[221] MAPL010977147-189. The PFR files in the CON11-13 PFR Data include a disclaimer that "[t]he Plan Feedback Report results are preliminary and must not be viewed as final." My understanding is that any final results pertaining to these reports have not been provided to United. Further, I am not aware that CMS has made any different determinations than the ones presented in this data.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

year 2014 and 51 contracts from payment year 2015. These files provide results on the medical record review ("MRR") process and preliminary MRR findings. They also provide key metrics related to the audited enrollees, audited CMS-HCC(s), and the top reasons for invalid medical records. The reports provide a detailed view of each medical record submission, including the submission date, validity status, invalid reason(s) if applicable, and initial preliminary coding determinations for MA organizations.[222]

b. RADV Results Member Identifier Crosswalks: The CON11-13 RADV Results Member Identifier Crosswalk was created by United and contains the Enrollee ID (Enrollee_ID), contract number (Contract), payment year (Payment_Year), HICN (HICN), related HICN (RRHICN), MBI (MBI), and related MBI (RRMBI) for the 3,015 enrollees included in the CON11-13 PFR Data. This data provides an ability to link the member data from the CON11-13 PFR Data to the member data from the government's First Interrogatory Response. The CON14-15 RADV Results Member Identifier Crosswalk was also created by United and contains the Enrollee ID and "HICNBR" for the enrollees included in the CON14-15 PFR Data.

iii.    Methodology

155.    As the first step of my analysis, I consolidated the CON11-13 PFR Data by stacking together the four files for 2011, the five files for 2012, and the six files for 2013. Next, I used the RADV Results Member Identifier Crosswalk to identify all HICNs, related HICNs, MBIs and related MBIs for each member-HCC in the CON11-13 PFR Data. Because the "Enrollee ID" field in the CON11-13 PFR Data is masked, the RADV Results Member Identifier Crosswalk provides a link to identify all HICNs and MBIs for a given Enrollee ID.

156.    Next, I linked each member-HCC from the CON11-13 PFR Data for each year to its corresponding member-HCC in the government's First Interrogatory Response. Then, I aggregated the results across the DOS years 2010-2012. I counted the number of records in the

---

[222] MAPL010977164.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

government's First Interrogatory Response for which (a) the member mapped to an HCC subject to a RADV audit in the CON11-13 PFR Data, and (b) the member-HCC combination was *validated* by CMS's Validation Contractors as documented in the RADV results. I considered any member-HCC from the government's First Interrogatory Response to be validated by the RADV results if it met the following criteria:

    a.    The "Submission Status" field was populated with "Submitted", indicating that the member's medical record was submitted for the purposes of the RADV validation.[223]

    b.    The submitted medical record was valid for the purposes of auditing the HCC. This was indicated by a lack of any "invalid" reason code in the "Valid/Invalid MR" field.[224]

    c.    The "Initial Finding" field was populated with "HCC Found" or "HCC Found on another MR[,]" indicating that the audit validated the given enrollee/HCC combination.[225] CMS will allow audited MA Organizations to submit up to five medical records per each audited CMS-HCC sampled per enrollee.[226] CMS considers an HCC to be "supported" in the RADV results by the first medical record submitted by the plan which validates the HCC under review.[227]

157. As an example of my methodology, there is one encounter on DOS A/2011 for HICN 9090909S included in the government's First Interrogatory Response for DOS year 2011. During this encounter, HICN 9090909S was diagnosed with ICD-9 code 434.91 (cerebral artery occlusion, unspecified with cerebral infarction[228]), which maps to HCC 96 (specified heart

---

[223] MAPL010977164, p. 7.
[224] MAPL010977164, pp. 7-8. Oppositely, when the field is not populated with "invalid", it is either blank or populated with "valid."
[225] MAPL010977164, p. 8.
[226] CMS, *CMS Question and Answer Section - CY 2011 RADV Industry Training*, March 20, 2014, p. 3 available at: (https://www.cms.gov/Medicare/Medicare-Advantage/Plan-Payment/Downloads/radvtrainingquestions.pdf).
[227] CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits,* February 24, 2012.
[228] ICD-9-CM Codebook – v28 FY2011.

80

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

arrhythmias[229]).  Based on the RADV Results Member Identifier Crosswalk, 9090909S maps to enrollee ID 112233_23, who was reviewed as part of the RADV review of contract R5287 as summarized in the CON12 PFR data.  The CON12 PFR data shows that CMS reviewed five medical records for this member and validated HCC 96 in each medical record.  Thus, CMS's own reviewers confirmed support at the condition level for HICN 9090909S's diagnosis code of 434.91 on A/2011.  Consequently, it could not have resulted in an overpayment, nor could such a non-existent overpayment have been retained by United.  The example below illustrates my comparison process.

**Figure 12. First Interrogatory Response and RADV Results Comparison**



158.    I repeated this process to analyze the CON14-15 PFR Data. My methodology for analyzing this data was the same as described above for the CON11-13 PFR Data with only two exceptions. First, I used the Related Member Identifier Data in connection with the RADV Results Member Identifier Crosswalk to crosswalk the member identifier information from the PFR Data to the First Interrogatory Response. Second, I looked for overlap across both V12 HCCs and V22 HCCs, since diagnosis codes could map to either type of HCC during payment years 2014 and 2015 (and the CON14-15 PFR Data included results for both V12 and V22 HCCs).

iv.    Summary of Findings

159.    Based on the above approach, I identified 785 members from the government's First Interrogatory Response who had records in the CON11-13 PFR Data.  Of these, the members

---

[229] CMS, *Announcement of Calendar Year (CY) 2012 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 4, 2011.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

had 1,891 total diagnosis codes in the First Interrogatory Response across 1,119 unique member-HCC combinations that were reviewed in the CON11-13 PFR Data. While not necessarily a random sample, the 1,891 overlapping records nonetheless appear to have many significant similarities with the codes that map to HCCs in the First Interrogatory Response during this time period (DOS years 2010-2012). First, I performed an analysis of the distribution of HCCs in the overlapping member-HCC combinations in DOS years 2010-2012 and determined that, within this time period, the 56 different unique HCCs that were subjected to the RADV audits map to more than 99% of the records in the First Interrogatory Response. Put another way, virtually all of the unique HCCs from the First Interrogatory Response during this time period were subjected to RADV audits at least once. [230] Second, and relatedly, these 56 HCCs tend to be proportionally similar between (a) the First Interrogatory Response records relating to the overlapping member-HCC combinations and (b) the total First Interrogatory Response records mapping to HCCs during this period. On average across these 56 HCCs, there was only a 0.5% difference between the (a) and (b) proportions.[231] Moreover, there are only five (out of 56) HCCs that are in different quartiles in terms of total frequency of (a) and (b) (and, of those, all five are in adjacent quartiles). This means that, when grouping the codes into volume quartiles, the HCCs that comprise the highest volumes in (a) are the same that comprise the highest volumes in (b), and the HCCs that comprise the lowest volumes in (a) are the same that comprise the lowest volumes in (b). Finally, in my experience, a sample of 1,891 codes would generally be considered quite robust for most evaluative purposes. Thus, the RADV audit results form an instructive basis on which to assess the First Interrogatory Response.

160. I also identified 1,403 members from the government's First Interrogatory Response who had records in the CON14-15 PFR Data. These members had 6,324 total diagnosis codes in the First Interrogatory Response across 5,375 unique member-HCC combinations that were reviewed in the CON14-15 PFR Data. While not necessarily a random sample, the 6,324 overlapping records nonetheless appear to have many significant similarities with the codes that map to HCCs in the First Interrogatory Response during this time period (DOS years 2013-2014). I compared the distribution of records by HCC between (a) the First Interrogatory Response

---

[230] *See* Exhibit 9.
[231] *Id.*

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

records relating to the overlapping member-HCC combinations and (b) the total First Interrogatory Response records mapping to HCCs during this period. Because both V12 and V22 HCCs were applicable in this period, I further broke down this comparison by HCC type (V12 or V22) and year.[232] For each of these four permutations, I confirmed that the unique HCCs that were subjected to the RADV audits account for more than 99% of the records in the First Interrogatory Response. Also, I confirmed that, in each of these permutations, the average difference at an HCC level between the proportions in groupings (a) and (b) above was 1% or less.

161.    Of the 1,891 overlapping diagnosis codes relating to DOS years 2010-2012, 1,688 diagnosis codes (89.3%) mapped to HCCs that were *validated* by CMS's CON11-13 RADV audits. Of the 6,324 overlapping diagnosis codes relating to DOS years 2013-2014, 5,783 diagnosis codes (91.4%) mapped to HCCs that were *validated* by CMS's CON14-15 audits.[233] In total, of the 8,215 overlapping diagnosis codes relating to DOS years 2010-2015, 7,471 diagnosis codes (90.9%) mapped to HCCs that were *validated* by CMS's CON11-15 audits. Figure 13 below summarizes my analysis.

---

[232] *See* Exhibit 9 (Updated as of 12-03-23).

[233] A diagnosis code was only counted in the numerator in this analysis if all of the HCC(s) that mapped to the diagnosis code and overlapped with the CON14-15 PFR Data were validated by the audit. That is, if a diagnosis code mapped to a V12 HCC and V22 HCC, and both the V12 HCC and V22 HCC were included in the CON14-15 PFR Data for that member in that year, then both had to be validated for the diagnosis code to be counted in the numerator for this analysis. If a diagnosis code mapped to a V12 HCC and V22 HCC, and only one of either the V12 HCC or V22 HCC was included in the CON14-15 PFR Data for that member in that year, then the record would count in the numerator for this analysis if the overlapping HCC was validated. Additionally, I understand that the CON14-15 audits adopted a methodology that selected MAOs for RADV audits using a risk-based approach that focused on HCCs that are more likely to be in error as identified by prior audits. *See* 88 CFR 6643, published February 1, 2023. The fact that the CON14-15 audits validated the overlapping diagnosis codes at such a high validation rate, despite being designed to focus on areas of higher risk, further supports the reasonableness of United's approach.

83

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**Figure 13. Results of RADV Analysis – First Interrogatory Response.[234]**

| DOS Year | First Interrogatory Response Records | | % of Total |
|---|---|---|---|
| | Overlap with CON11-15 PFR Data: Total | Overlap with CON11-15 PFR Data: HCC Validated | |
| 2010 | 341 | 300 | 88.0% |
| 2011 | 360 | 319 | 88.6% |
| 2012 | 1,190 | 1,069 | 89.8% |
| 2013 | 2,758 | 2,480 | 89.9% |
| 2014 | 3,566 | 3,303 | 92.6% |
| **Total** | **8,215** | **7,471** | **90.9%** |

162.    In short, for 1,688 of 1,891 diagnosis codes the government has asserted are unsupported for DOS years 2010-2012 – more than 89% of the time – CMS's own reviewers confirmed that the members' conditions are supported, and thus could not have led to any overpayment. For 7,471 of 8,215 diagnosis codes the government has asserted are unsupported for DOS years 2010-2014 – approximately 91% of the time – CMS's own reviewers confirmed that the members' conditions are supported, and thus could not have led to any overpayment.

163.    In addition to analyzing the CON11-13 PFR Data's overlap with the First Interrogatory Response, I also analyzed the overlap with the In Process CV Codes Data.  The In Process CV Codes Data includes approximately 338,000 diagnosis codes from DOS years 2011 and 2012 submitted to RAPS for which the multi-stage CV process had begun but was not completed at the time United discontinued CV.  Of these diagnosis codes, 134 mapped to member-HCC combinations that were included in the CON11-13 PFR Data.  Out of those 134 diagnosis codes, 86 mapped to member-HCC combinations that were validated by CMS's RADV auditors – a 64.2% validation rate.  Among those 134 diagnosis codes, 114 were codes that were included in the First Interrogatory Response, and those mapped to member-HCC combinations that had a 58.8% validation rate (67 out of 114).  These figures are summarized in Figure 14 below.  In summary, the majority of the diagnosis codes in the In Process CV Codes Data that overlapped with the CON11-13 PFR Data were validated by CMS's auditors.

---

[234] *See* Exhibit 10 (Updated as of 12-03-23).

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**Figure 14. Results of RADV Analysis – In Process CV Codes.**[235]

| Diagnosis Codes that… | Number of In Process CV Codes | | |
| --- | --- | --- | --- |
| | Total | HCC Validated | % of Total |
| Overlap with CON11-13 PFR Data | 134 | 86 | 64.2% |
| Overlap with CON11-13 PFR Data _and_ First Interrogatory Response | 114 | 67 | 58.8% |

E. _Opinion 5:  Based on the results of CMS's RADV audits, the First Interrogatory Response codes were no more likely to be unsupported than any other codes submitted in connection with United plans reviewed by CMS's RADV audits._

164.    I understand that the government's allegation in this case is that when a Chart Review coder did not identify a diagnosis code that had been submitted for risk adjustment, then it means the code was unsupported, or, alternatively, that the code was so much more likely than other codes to be unsupported that it was reckless for United to fail to take further action to validate or delete the code.

165.    As discussed in Opinion 4 above, the CON11-13 PFR Data provides information about the results of the member-HCC combinations reviewed by CMS's RADV auditors for fifteen total United MA contracts across three years.  In analyzing member-HCCs in the CON11-13 PFR Data that overlap with the First Interrogatory Response, I found that more than 89% of First Interrogatory Response records were validated by CMS's auditors.  Similarly, I examined the validation rate for all member-HCCs in the CON11-13 PFR data, including the majority that did not overlap with the First Interrogatory Response.  Comparing these rates provides an instructive basis for determining whether the First Interrogatory Response codes are more or less likely to be supported than the remaining majority of codes submitted by United about which the government has raised no issue.

166.    Notably, the validation rate is closely equivalent between the member-HCCs from the CON11-13 PFR Data that overlapped with the First Interrogatory Response and those that did

---

[235] _See_ Exhibit 11.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

not.  Of the 1,119 member-HCCs that overlapped with the First Interrogatory Response, 87.6% were validated.[236]  Of the 7,540 member-HCCs that did *not* overlap with the First Interrogatory Response, 86.5% were validated. In total, out of 8,659 member-HCCs, 86.6% were validated.  I also performed a similar analysis for the CON14-15 PFR Data and the CON11-15 PFR data. With respect to the CON14-15 PFR data, 89.2% of the 5,375 member-HCCs that overlapped with the First Interrogatory Response were validated, while 87.8% of the 41,696 member-HCCs that did *not* overlap with the First Interrogatory Response were validated. In total across the CON11-15 PFR data, 89.0% of the 6,494 member-HCCs that overlapped with the First Interrogatory Response were validated, while 87.6% of the 49,236 member-HCCs that did *not* overlap with the First Interrogatory Response were validated. In summary, during this time period, the HCCs on the First Interrogatory Response were found by CMS's own reviewers to be valid at a rate closely equivalent to the average validation rate for all the HCCs submitted by United, or even the HCCs about which the government has raised no issue.

---

[236] The analysis from Opinion 4 counts the number of First Interrogatory Response records that map to the member-HCCs that overlap with the CON11-13 PFR data.  This figure counts the number of unique member-HCCs that overlap with the CON11-13 PFR data.  The counts are different because, in many cases, a unique member-HCC maps to more than one First Interrogatory Response record. For the CON14-15 PFR Data, I counted member-V12 HCC and member-V22 HCC combinations separately and added them together.

86

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**Figure 15. CON11-13, CON14-15, and CON11-15 PFR Data HCC Validation Rates.[237]**

| Member-HCCs, CON11-13 | | | |
|---|---|---|---|
| Type | Total | HCC Supported | % Supported |
| Overlap with FIR | 1,119 | 980 | 87.6% |
| No Overlap | 7,540 | 6,523 | 86.5% |
| Total | 8,659 | 7,503 | 86.6% |

| Member-HCCs, CON14-15 | | | |
|---|---|---|---|
| Type | Total | HCC Supported | % Supported |
| Overlap with FIR | 5,375 | 4,797 | 89.2% |
| No Overlap | 41,696 | 36,611 | 87.8% |
| Total | 47,071 | 41,408 | 88.0% |

| Member-HCCs, CON11-15 | | | |
|---|---|---|---|
| Type | Total | HCC Supported | % Supported |
| Overlap with FIR | 6,494 | 5,777 | 89.0% |
| No Overlap | 49,236 | 43,134 | 87.6% |
| Total | 55,730 | 48,911 | 87.8% |

*FIR = First Interrogatory Response*



167.    In other words, based on the available CON11-13 and CON14-15 PFR Data, the fact that a diagnosis code had not been identified by a United coder in Chart Review did not increase the likelihood that the HCC mapping to the code was unsupported.

   **F.   *Opinion 6:  Contrary to the practice that it typically follows in identifying and quantifying overpayments resulting from diagnosis code errors in the risk adjustment process, the government here has chosen to focus solely on allegedly unsupported codes that were submitted to Medicare rather than considering the net impact of both unsupported codes and codes that should have been, but were not, submitted.   Even in cases where an MA plan sponsor has employed a chart review process like the one at issue here, there is a substantial possibility, as demonstrated in the government's own RADV audits, that there are additional appropriate codes that were missed and not submitted.  In fact, the evidence in this matter indicates that such unsubmitted codes can outweigh any submitted codes which may lack proper support.  Thus, to fully assess whether and to what extent***

---

[237] *See* Exhibit 12 (Updated as of 12-03-23).

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

*a possible overpayment exists – even before considering whether any such overpayment was knowingly retained by United - it would be necessary to consider both the codes that may lack support as well as appropriate codes that were not submitted.*

168.    In this case, the government has chosen to focus solely on the allegedly unsupported codes that were submitted to Medicare, rather than considering the net impact of both unsupported codes and codes that should have been, but were not, submitted.  This is inconsistent with the approach the government typically takes in its own chart reviews performed as part of the RADV program for purposes of calculating payment errors.  It is also inconsistent with the approach the government takes when calculating the Medicare Part C Improper Payment Measure.  In both cases, when calculating either the RADV payment error or the Medicare Improper Payment Measure, the government nets the financial impact of the submission of unsupported diagnosis codes against the financial impact of unsubmitted additional diagnosis codes found to be supported by enrollees' medical records.[238]

169.    As discussed earlier, to conduct RADV audits, CMS selects a set of MA contracts for each RADV audit cycle.  During a RADV audit, CMS selects a sample of the plan members and reviews the HCCs that were assigned based on the diagnosis codes submitted by the MAO to assess whether the diagnosis codes are supported by the applicable member medical records.  For each sampled member, the RADV-correct risk score and corrected payment are calculated based on the HCCs that are supported by the RADV medical record review findings for the member.  The correct payment in the RADV audit is calculated considering both (a) the HCCs resulting from diagnosis codes that were previously submitted but not supported by medical record documentation reviewed, and (b) any HCCs based on diagnosis codes that were not previously submitted but were found to be supported by the medical record documentation reviewed.[239]

---

[238] CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits*, February 24, 2012, p. 3.; *see also* CMS, *Error Rate Findings and Results, Key Terms,* available at: (https://www.cms.gov/research-statistics-data-systems/improper-payment-measurement-programs/medicare-part-c-ipm/error-rate-findings-and-results).
[239] *See, e.g.*, Exhibit 1187-1: CON11 RADV Results, CMS, May 26, 2016, further discussed below in my report. In this 2011 RADV presentation, CMS explained that any payment errors identified in the audit were reduced by "HCCs found during medical record review that are not among the audited HCC(s) for the enrollee." *See also,* CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation*

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

Member-level payment errors are defined as "the difference between the original payment and the RADV-corrected payment (per member per month)."[240]  The overall payment error for each member either results in a net overpayment or a net underpayment.[241]

170.    Similarly, to calculate the Part C Payment Error Rate, Medicare selects a sample of Medicare Part C eligible members and reviews the relevant medical record documentation to substantiate the related CMS-HCC payments.  As part of the review, certified coders code the medical records, and the findings are used to recalculate risk scores for each sampled member. The difference between the payment risk scores and the recalculated risk scores is termed Risk Adjustment Error.  CMS calculates the Part C Payment Error Rates in two ways.  First, it calculates a "net" error rate which is based on offsetting overpayments and underpayments.  Second, it calculates an error rate based on the gross payment errors (also called "Gross Improper Payments").  CMS defines "Gross Improper Payments" as the "absolute value of the sum of overpayments and underpayments."[242]

171.    Based on the government's own methodology when conducting medical record reviews and calculating payment errors, the appropriate way to determine whether any net overpayment exists is to net the individual payments for unsupported diagnosis codes submitted against and the financial impact from unsubmitted but validated codes identified through the medical record review process.  However, as noted above, the government has not employed that methodology here.  Instead, it has chosen to focus only on allegedly unsupported codes which could potentially generate overpayments.

172.    As an illustrative example of how a net underpayment can be found, assume a member had the following diagnosis codes submitted to RAPS in 2013: diagnosis code 332.1 (secondary Parkinsonism), which maps to HCC 73 (Parkinson's and Huntington's disease), and diagnosis code 585.4 (Stage 4 chronic kidney disease, or "CKD"), which maps to HCC 131 (renal

---

*Contract-Level Audits*, February 24, 2012, p. 3: "Enrollee-level payment errors will be defined as the difference between the original payment and the RADV-corrected payment (per member per month).  The payment error for each enrollee will be either positive (representing a net overpayment), or negative (representing a net underpayment)."
[240] CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits*, February 24, 2012, p. 3.
[241] *Id.*
[242]    CMS, *Medicare Part C Improper Payment Measure Program Error Rates and Findings*: (https://www.cms.gov/research-statistics-data-systems/improper-payment-measurement-programs/medicare-part-c-ipm/error-rate-findings-and-results).

89

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

failure).  Also assume that this member's medical record was reviewed via RADV, and that the RADV reviewers found two things.  First, they did not find support for the 585.4 diagnosis code, meaning that the HCC 131 was no longer supported.  Second, they *did* find support for another diagnosis code which had not been submitted: 263.9 (unspecified protein calorie malnutrition), which maps to HCC 21 (protein calorie malnutrition).  In this example, the net effect of the RADV findings would be an *increase* to the member's risk score since the RAF of the unsupported code was less than the RAF of the supported code that had not been submitted.

**Figure 16. Illustrative Example: Net Underpayment.**[243]

| ICD-9-CM Code | HCC | Community Risk Adjustment Factor | Diagnosis Code Submission | Supported by Medical Record Documentation through RADV? |
|---|---|---|---|---|
| 332.1 (Secondary Parkinsonism) | 73 (Parkinson's and Huntington's Disease) | 0.643 | Submitted | Supported |
| 585.4 (Stage 4, CKD) | 131 (Renal failure) | 0.297 | Submitted | Not Supported |
| 263.9 (Unspecified Protein Calorie Malnutrition) | 21 (Protein calorie malnutrition) | 0.745 | Not Submitted | Supported |

173.    Even in cases where an MA plan sponsor has employed a chart review process like the one at issue here, there is a substantial possibility that there are additional appropriate codes that were missed and not submitted.  This possibility is apparent from examining the results of the government's own audits of MAOs.  For example, in August 2022, the Office of the Inspector General ("OIG") conducted an audit of an MAO, Cigna HealthSpring of Florida, with the objective of determining whether the MAO "submitted diagnosis codes to CMS for use in the risk adjustment

---

[243] Community Risk Adjustment Factors based on CMS, *Announcement of Calendar Year (CY) 2013 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 2, 2012.

90

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

program in accordance with Federal requirements."[244]  During this audit, the OIG sampled member HCCs and identified several member HCCs that were not validated by the medical record documentation reviewed.  However, the OIG also identified "support for diagnosis codes that Cigna HealthSpring should have submitted to CMS but did not.  If Cigna HealthSpring had submitted these diagnosis codes, an additional 18 HCCs would have been included in the enrollees' risk scores.  These risk scores would therefore have increased, and CMS's payments to Cigna HealthSpring would have been higher."[245]

174.    In the same vein, CMS has performed RADV audits of United's MA plans that identified net MA underpayments to United.  CMS chose plans to audit based on changes in the coding intensity of those plans – in other words, based on increases in average enrollee risk scores from one year to the next.  This approach was presumably based on the government's hypothesis that plans with higher year-over-year increases in coding might have a higher probability for error.[246]

175.    In a December 2017 presentation, CMS described the results of its CON11, CON12, and CON13 RADV audits.[247]  In total, 15 United contracts were included in the audits (four from CON11, five from CON12, and six from CON13) and 13 of the 15 were found to have net underpayments.[248]

---

[244] Frontz, Amy J., Deputy Inspector General for Audit Services, OIG, *Medicare Advantage Compliance Audi of Diagnosis Codes that Cigna HealthSpring of Florida, Inc. (Contract H5410) Submitted to CMS,* Audit 2022, A-03-18-00002, p. 2.
[245] *Id.,* pp. 5-6.
[246] Ex. 1187-1 at 2; Ex. 1498 at 2; C. Kapustij 30(b)(6) Dep. Tr. at 52:2-54:9; 205:17-206:3.
[247] USBP068691383.
[248] *Id.*, pp. 19-21.  All thirteen contracts had a negative recovery amount – *i.e.*, net underpayments – at the lower bound of the 99% confidence interval.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**Figure 17. CON11, CON12, and CON13 Recovery Amount Findings for United Contracts.**

| RADV Year | HMOID | Parent Org | Recovery Amount* |
|-----------|-------|------------|------------------|
| CON11 | H2226 | UnitedHealth Group, Inc. | $        (2,068,360) |
|       | H4522 | UnitedHealth Group, Inc. | $        (4,622,640) |
|       | H4590 | UnitedHealth Group, Inc. | $       (51,017,738) |
|       | H0543 | UnitedHealth Group, Inc. | $       (91,884,129) |
| CON12 | H5420 | UnitedHealth Group, Inc. | $        15,735,769 |
|       | R7444 | UnitedHealth Group, Inc. | $        (3,962,831) |
|       | H5652 | UnitedHealth Group, Inc. | $        (4,740,216) |
|       | H0251 | UnitedHealth Group, Inc. | $       (10,348,919) |
|       | R5287 | UnitedHealth Group, Inc. | $       (69,295,194) |
| CON13 | R9896 | UnitedHealth Group, Inc. | $         4,065,269 |
|       | H3107 | UnitedHealth Group, Inc. | $        (1,581,972) |
|       | H0151 | UnitedHealth Group, Inc. | $        (7,790,780) |
|       | H4514 | UnitedHealth Group, Inc. | $        (9,302,996) |
|       | H2931 | UnitedHealth Group, Inc. | $       (10,078,497) |
|       | R5342 | UnitedHealth Group, Inc. | $       (14,309,264) |

*Recovery amount is the extrapolated payment error incorporating the lower bound of the 99% confidence interval. *See* USBP068691383, p. 3.

176.    Using CMS's methodology, the United plans audited showed, in aggregate, a *net underpayment* of more than $261 million.[249]  Nonetheless, CMS does not intend to reimburse plans for such underpayments through the RADV audit process.[250]

177.    Further, the United contracts were found to have lower "discrepancy rates" – the number of discrepant HCCs for sampled members divided by the total audited HCCs – than other MAOs.  In a presentation focusing on the CON11 audit, the United sample contracts were found to have the lowest discrepancy rate of any MAO parent organization's sampled contracts.[251] Looking across the entire CON11-13 audits, as summarized below, the discrepancy rates for United contracts were below the average for all audited contracts with only two exceptions (one contract in CON12, and another in CON13).

---

[249] Exhibit 1501; C. Kapustij 30(b)(6) Dep. Tr. at 245:6-12.
[250] C. Kapustij 30(b)(6) Dep. Tr. at 192:6-25.
[251] Exhibit 1187 1: CON11 RADV Results, CMS, May 26, 2016, p. 1.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**Figure 18. RADV Audit HCC Discrepancy Rate by MA Contract.**[252]



178.    In total, 47 of the 90 sampled contracts across CON11, CON12, and CON13, including 13 out of the 15 United contracts, were reported as having estimated net underpayments under the government's methodology.    This demonstrates that CMS does not identify "overpayments" solely on the basis of unsupported codes, but instead considers the offsetting impact of unsupported submitted codes and unsubmitted supported codes.    It further shows that United in particular was *underpaid* on a net basis in at least 13 instances.    Notably, these audits are conducted years after the plan year under review, and thus the codes being audited include the results of the plan's own chart reviews.    This demonstrates that even after the chart review process there can still be many unsubmitted but supported codes.

> **G.  *Opinion 7: If the results of CMS's CON11-13 RADV audits hold constant across all of the First Interrogatory Response codes at issue, then over 94% of the***

---

[252] Discrepancy rate figures derived from USBP068691383, p. 7.  Contracts are listed in descending order of HCC discrepancy rate. United contracts are highlighted in blue.  For each year, the average shown is the average of the HCC discrepancy rates across the 30 contracts in that year.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

*diagnosis codes identified in the government's list could not be overpayments. If the results of CMS's CON11-15 RADV audits hold constant across all of the First Interrogatory Response codes at issue, then approximately 94% of the diagnosis codes identified in the government's list could not be overpayments. This is the result of two factors. First, as noted above, the analysis in Opinion 3 shows that approximately 83.3% of the diagnosis codes in the government's list do not have any financial impact on the government's payments to United plans. Second, with respect to the remaining diagnosis codes, the CMS CON11-13 RADV audits found support for 65.3% of the at-issue diagnosis codes that were (a) addressed in a CON11-13 RADV audit and (b) found to have financial impact based on Opinion 3. Combining these results with those of the CON14-15 RADV audits, the CMS CON11-15 RADV audits in total found support for 62.5% of the at-issue diagnosis codes that were (a) addressed in a CON11-15 RADV audit and (b) found to have financial impact based on Opinion 3. Thus, to the extent that the government's First Interrogatory Response is intended to be used as a basis for assessing either the pervasiveness or the dollar impact of improper diagnosis codes, it is biased and unreliable.*

179.     When combined, my analyses in Opinion 3 (designed to determine which diagnosis codes on the government's list could have had a financial impact) and Opinion 4 (designed to determine which diagnosis codes on the government's list were validated at the condition level by CMS's auditors) show that more than 94% of the codes on the government's First Interrogatory cannot be considered overpayments.

180.     As a starting point, approximately 83.3% of the records in the government's First Interrogatory Response did not have a financial impact and thus could not have resulted in overpayments. That is, for 83.3% of the records, the diagnosis code had no financial impact based on my Simulated Deletion Analysis (as detailed in Opinion 3 above). This significant finding is consistent across the entire time period covered in the government's First Interrogatory Response, ranging from a low of 68.8% of the codes in DOS year 2010 to a high of 90.8% in DOS year 2012.

181.     Importantly, the remaining 16.7% of First Interrogatory Response codes not eliminated from consideration by my analysis in Opinion 3 cannot be assumed to have led to

94

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

overpayments.  The fact that a Chart Review coder did not identify the code does not mean that the code was incorrect.  To the contrary, CMS's reviewers found that, among those audited records not eliminated from consideration by the analysis underlying my Opinion 3, the relevant conditions are supported nearly two-thirds of the time.

182.    More specifically, of the 1,891 First Interrogatory Response records that were also subjected to RADV audits per the CON11-13 PFR Data, 441 records (across 321 member-HCC combinations) did not get eliminated from consideration by my Opinion 3 analysis.  Of those 441 records, 288 records (65.3%) were ones where the RADV auditors found support for the member HCC.[253] Taking into account the CON14-15 PFR Data, of the 8,215 First Interrogatory Response records that were also subjected to RADV audits per the CON11-15 PFR Data, 1,404 records (across 2,837 member-HCC combinations[254]) did not get eliminated from consideration by my Opinion 3 analysis. Of those 1,404 records, 877 records (62.5%) were ones where the RADV auditors found support for the member HCC.[255] This shows that even those First Interrogatory Response records that were not otherwise removed from consideration by my Opinion 3 analysis cannot be assumed, and could not have been known, to have caused overpayments.

183.    Combining my Opinion 3 analysis with the CON11-13 PFR Data suggests that the vast majority of records – more than 94% – in the government's First Interrogatory Response could not have caused overpayments.  Combining my Opinion 3 analysis with the aggregated CON11-15 PFR Data suggests that approximately 94% of the records in the government's First Interrogatory Response could not have caused overpayments. That is, assuming the rate of records *not* captured by Opinion 3 but nonetheless supported by the RADV audits (65.3% in connection with CON11-13 and 62.5% in connection with CON11-15, as described above) remained constant across the entire time period covered by the First Interrogatory Response, then only approximately 6% of the records in the First Interrogatory Response could have caused an overpayment.[256]

---

[253] *See* Appendix X12.
[254] Here, like with the analysis in Opinion 5, I count member-V12 HCC and member-V22 HCC combinations separately and add them together.
[255] *See* Appendix X12 (Updated as of 12-03-23).
[256] 83.3% of First Interrogatory Response plus (16.7% * 65.3% = 10.9%) = 94.2%. 83.3% of First Interrogatory Response plus (16.7% * 62.5% = 10.4%) = 93.7%.

95

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

184.    Further, given that 13 of the 15 United MA plan years subjected to RADV audits in CON11-13 were reported to have underpayments in the aggregate, even the small residual percentage of potentially impactful incorrect codes could reasonably be assumed to be further reduced by a substantial amount (*i.e.*, they would have been subsumed within a larger aggregate underpayment for the plan year).[257]   Under this logic, it would be reasonable to expect that the potential overpayment error rate associated with the diagnosis codes in the government's First Interrogatory Response was vanishingly small.

185.    Because of these widespread flaws, the government's First Interrogatory Response cannot be relied upon for assessing either the pervasiveness or the dollar impact of allegedly improper diagnosis codes during the time period at issue in this case.

## VI.    CONCLUSION

186.    This report presents a summary of my work and opinions to date.  I reserve the right to revise and refine these opinions as additional work is performed and additional information is received.  To the extent that any additional evidence becomes available as a result of the Court's reconsideration, I may modify or supplement my opinions as appropriate.

**Submitted by:**  _____    **Dated:**  December 3, 2023
**M. Timothy Renjilian, CPA**

---

[257] For example, if the residual 5.8% (100-94.2%) of records were reduced by 13/15, the estimated percentage of records actually yielding a potential overpayment would be just 0.77% (5.8% X (2/15)).

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**EXHIBIT D-65**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA EX REL. BENJAMIN POEHLING, | § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CASE NO.:  CV 16-08697 (FMO SSx) HON. FERNANDO MANZANO OLGUIN |
| UNITEDHEALTH GROUP, INC. ET AL., | § § § | |
| Defendants. | § § § | |

## UPDATED REBUTTAL REPORT OF M. TIMOTHY RENJILIAN

March 18, 2024

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

1900

<u>TABLE OF CONTENTS</u>

I.    QUALIFICATIONS ........................................................................................... 1

II.   DESCRIPTION OF ENGAGEMENT ............................................................... 2

    A.    Scope of Work ............................................................................................. 2

    B.    Materials Relied Upon ................................................................................ 2

III.  BACKGROUND ............................................................................................... 2

    A.    Garthwaite Report ....................................................................................... 2

    B.    Acevedo Report ........................................................................................... 4

IV.  SUMMARY OF OPINIONS ............................................................................. 5

V.   BASIS FOR OPINIONS ................................................................................... 8

A.    Opinion 1: Dr. Garthwaite has failed to identify any Medicare Advantage overpayments to United because he has not found that the diagnosis codes at issue were unsupported.  Instead, Dr. Garthwaite assumes that any diagnosis code not found by a Chart Review coder is not supported, yet he fails to provide any basis for that assumption.  Contrary to Dr. Garthwaite's assumption, when CMS's own RADV auditors reviewed the health conditions associated with allegedly unsupported diagnosis codes, they concluded that a substantial proportion of the diagnosis codes mapped to health conditions that were supported.  Specifically, the data available from CMS's RADV audits in payment years 2011-2015 shows that 91% of the diagnosis codes in the government's First Interrogatory Response—which are diagnosis codes the government alleges United should have deleted as overpayments because they were not found in Chart Review—mapped to health conditions that were confirmed to be supported by the government in the RADV audits. .......................... 8

B.    Opinion 2: Analysis of the First Interrogatory Response diagnosis codes that overlapped with the RADV audits reveals that, for all the instances that can be identified, the subset of diagnosis codes associated with charts that underwent two levels of blinded review (i.e., an initial Chart Review and then a Second Level Review) were validated by the RADV audits at a rate comparable to that of diagnosis codes associated with charts that underwent only one level of blinded review.  Moreover, the member-HCCs associated with diagnosis codes contained in the First Interrogatory Response coming from charts that underwent two levels of blinded review were not significantly less likely to be validated by RADV audits than member-HCCs that did not overlap with the First Interrogatory Response.............................. 11

C.    Opinion 3: More than 93% of the diagnosis codes in the First Interrogatory Response are not included in Dr. Garthwaite's final set of "Deletes," confirming that no alleged overpayment existed as a result of those diagnosis codes. ............................................ 14

D.    Opinion 4: Neither Ms. Acevedo nor Dr. Garthwaite has established that diagnosis codes not independently identified in Chart Review were improper or unsupported.  Indeed, it is not unusual for coders to overlook supported diagnosis codes, and Ms. Acevedo's report identifies some of the practical issues that can cause this to occur.  Moreover, there is substantial empirical evidence demonstrating that overlooked diagnosis codes are a common occurrence.  For example, CMS's RADV audits found many additional supported HCC codes for United contracts, even after Chart Reviews occurred.  Likewise, as noted previously,

CMS's RADV audits have frequently confirmed the appropriateness of many of the conditions mapping to diagnosis codes the government asserts in its First Interrogatory Response were not independently identified by United's chart reviewers and that Dr. Garthwaite identifies as Deletes.  Additionally, as evidenced by the underpayment rates from CMS's Part C Improper Payment Measure reports, the government has consistently found substantial numbers of additional supported but unsubmitted HCCs across the industry. ............................................ 17

E.    Opinion 5: Dr. Garthwaite has failed to establish the existence of a Medicare Advantage overpayment to United because he has not considered offsetting amounts for the potential impact of unsubmitted but valid diagnosis codes.  Such consideration is a standard part of CMS's methodology for calculating the Part C Payment Error. In fact, in many cases, Dr. Garthwaite calculates financial impact for members' diagnosis codes even though CMS has already determined a net underpayment was made to United for that member's contract. 20

F.    Opinion 6: Dr. Garthwaite's financial impact calculations are unreliable because he has not considered the extent to which his alleged financial impacts would be offset by reductions to the remittances that United paid to CMS under the Medical Loss Ratio requirements of the Medicare Advantage program. .................................................................. 22

G.    Opinion 7: Dr. Garthwaite's analysis does not establish that United knowingly retained any overpayments.  To the contrary, Dr. Garthwaite's analysis shows that it is a highly detailed and complex exercise to (a) identify diagnosis codes associated with charts that underwent Chart Review and were not independently identified in Chart Review; and (b) determine whether such diagnosis codes impacted payment.  Moreover, Dr. Garthwaite's analysis makes clear that Chart Review, by its very nature, does not and cannot identify the existence, or even the likelihood, of an overpayment. ............................................................. 25

i.    Dr. Garthwaite's analysis demonstrates the difficulty of precisely locating diagnosis codes that were not independently identified in Chart Review ............................ 26

ii.    Dr. Garthwaite's analysis shows that United's Chart Review process and CV Pipeline Lists, by their very nature, are not sufficient to conclude that a potentially unsupported diagnosis code caused an overpayment ........................................................... 27

H.    Opinion 8: If the validation rates of CMS's CON11-15 RADV audits hold constant across all of the Garthwaite Deletes, then the rate of unsupported diagnosis codes with financial impact would be less than 3.5% of the diagnosis codes included in the government's First Interrogatory Response and less than 0.3% of United's total diagnosis codes submitted during this period for the members who underwent Chart Review.  In my experience, based on common industry practices in the relevant timeframe, such a low rate of potentially unsupported diagnosis codes with financial impact would not have been expected to necessitate additional investigation or analysis ....................................................... 30

I.    Opinion 9: For the reasons described in my Opinions 1-8 above, Dr. Garthwaite's calculation of the number of members for whom United was allegedly overpaid as a result of the Garthwaite Deletes is also unreliable. .......................................................... 34

VI. CONCLUSION ...................................................................................... 36

## I.   QUALIFICATIONS

1.      I am a Senior Managing Director with FTI Consulting, Inc. ("FTI") and am based in Atlanta, Georgia.  I am licensed as a Certified Public Accountant in Georgia.  The primary focus of my work is (a) to conduct forensic accounting investigations of compliance and legal issues in the health care and life sciences industry, and (b) to provide consulting services related to operational, financial and compliance issues faced by health care and life sciences companies.

2.      In an investigation context, I have worked on a wide range of matters involving potential financial and legal exposure related to billings made in connection with the provision of health care services.  Among other things, these matters have involved audit and administrative adjustments; legal claims for recoupment of amounts paid; issues related to the preparation and presentation of Medicare cost reports; post-acquisition disputes; and alleged violations of applicable Federal and state laws.  My role in such matters has included frequent interaction with corporate management and boards and with regulatory authorities and oversight organizations including, for example, the Department of Health and Human Services, the Department of Justice, and state Medicaid Fraud Control Units.

3.      In my consulting role, my work has involved a variety of tasks related to operational issues, financial and accounting matters, auditing and monitoring activities, compliance programs, and evaluating and facilitating mergers and acquisitions.

4.      My resume, including a list of all publications I have authored in the previous ten years and all cases in which I have testified as an expert at trial or by deposition in the previous four years, is included as Exhibit 1.

5.      FTI is being paid $695 per hour for my services in this case.  In addition, other employees of FTI have worked under my direction in this matter.  The billing rates for these individuals ranges from $350 to $625 per hour.  Compensation for FTI's services is not dependent on the outcome of this matter.

1

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

## II.    DESCRIPTION OF ENGAGEMENT

### A.    *Scope of Work*

6.    I have been requested by Counsel for Defendants UnitedHealthcare and related entities ("United") to review the expert report of Craig Garthwaite dated September 29, 2023 and the related "Errata to Expert Report of Craig Garthwaite" dated October 4, 2023, "Errata to Expert Report of Craig Garthwaite" dated January 5, 2024, and "Errata to Expert Report of Craig Garthwaite" dated March 11, 2024 (together, the "Garthwaite Report") and the expert report of Jean Acevedo dated September 29, 2023 (the "Acevedo Report") and to provide my opinions on them.

7.    This report sets forth my opinions as of March 18, 2024.

### B.    *Materials Relied Upon*

8.    A listing of the specific materials on which I have relied in forming the opinions expressed in this report is attached as Exhibit 2.[1]

## III.    BACKGROUND

### A.  *Garthwaite Report*

9.    Dr. Garthwaite was engaged by counsel for Plaintiffs to provide expert testimony in this matter. Specifically, Dr. Garthwaite was asked to "(1) identify diagnosis codes from service years 2008 through 2016 that Defendants submitted to CMS for risk adjustment payments covering payment years 2009 through 2017, where Defendants reviewed the medical records associated with those diagnosis codes as part of their Chart Review Program and did not find support for the diagnosis codes, and those diagnosis codes affected payment; (2) calculate the financial impact of Defendants' Medicare Advantage and Medicare Part D risk adjustment payments that would have resulted had Defendants deleted the diagnosis codes [Dr. Garthwaite] identified; and (3) determine the number of beneficiaries in each payment year for whom Defendants would have received

---

[1] Unless otherwise specified, the definition of any capitalized term is the same as in my original report dated September 29 and updated on December 3 (the "December 3 Report").

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

reduced risk adjustment payments from CMS had Defendants deleted the diagnosis codes [Dr. Garthwaite] identified."[2]

10.     Dr. Garthwaite created a "list of diagnosis codes that [United] submitted to CMS for which [United] did not find support in [the] Chart Review Program."[3]  To do this, Dr. Garthwaite identified a list of provider-reported encounters that were allegedly reviewed in United's Chart Review Program (which he termed the "Reviewed Encounters").  Then, Dr. Garthwaite identified and compared (a) the provider-reported diagnosis codes that were submitted to CMS for risk adjustment allegedly in connection with the Reviewed Encounters (which he termed the "Submitted Diagnosis Codes") with (b) the diagnosis codes independently identified by Chart Review coders allegedly in connection with the Reviewed Encounters (which he termed the "Supported Diagnosis Codes").[4]  Dr. Garthwaite identified the Submitted Diagnosis Codes that were not Supported Diagnosis Codes and dubbed them the "Potential Deletes."[5]  Then, he created a final list of diagnosis codes he deemed the "Deletes" (which I refer to herein as the "Garthwaite Deletes") by filtering and excluding Potential Deletes according to the presence of other relevant diagnosis codes in United's data and additional criteria.[6]  The Garthwaite Deletes are listed in Attachment 1 to the Garthwaite Report.[7]

11.     Dr. Garthwaite then calculated the alleged Medicare Part C and Part D financial impact attributable to the Garthwaite Deletes.  That is, for the United members with diagnosis

---

[2] Garthwaite Report, para. 7.

[3] *Id.* at para. 85.

[4] *Id.*

[5] *Id*.  Per an email dated December 1, 2023 from Martha Glover of the United States Department of Justice, "the 'Potential Deletes list' mentioned on pages 41-42 [of Dr. Garthwaite's report] is a useful way to explain how Dr. Garthwaite's analysis operates in principle, but the code that implements the analysis doesn't create this actual list at any stage.  Thus, there is no list of Potential Deletes to provide."  Dr. Garthwaite did not produce a list of Potential Deletes.

[6] *See id.* at paras. 116-118.  To identify the Deletes, Dr. Garthwaite excluded from the Potential Deletes diagnosis codes that shared an HCC with other submitted diagnosis codes or risk-adjustment eligible but unsubmitted diagnosis codes; that mapped to an HCC recorded in the Claims Verification program; that were flagged as potentially at-issue in the IRADS but not EDPS data or vice versa (with respect to DOS years 2014-2016); that did not impact risk adjustment payments; that were associated with members who were not enrolled in a Medicare Advantage Plan for the whole year; that were associated with members who were not enrolled in United's plans during the year; and/or that were associated with members with end stage renal disease.

[7] Dr. Garthwaite provided four separate versions of Attachment 1.  The first version was included with Dr. Garthwaite's original report dated September 29, 2023, and the second, third, and fourth versions were included with Dr. Garthwaite's Errata dated October 4, 2023, January 5, 2024, and March 11, 2024, respectively.  When I refer to Garthwaite Deletes in this report, I refer to the latest revised list from March 11, 2024.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

3

codes on the Garthwaite Deletes list, in each year, Dr. Garthwaite calculated what the members' risk scores would have been had the Garthwaite Deletes not been submitted by United for risk adjustment. He then compared those revised risk scores to the members' actual risk scores, calculated the differences in the per member per month payments for those members for the applicable payment year, and then summed those differences for every month the members were enrolled in a United Medicare Part C or D plan during the year. In total, Dr. Garthwaite calculated $2,109,423,348 in alleged Part C financial impact and $25,829,027 in alleged Part D financial impact related to the Garthwaite Deletes for payment years 2009 through 2017.[8]

12.     Dr. Garthwaite also separately calculated the alleged financial impact on Medicare Part C and Part D payments resulting from "[United's] failure to delete the diagnosis codes included on two spreadsheets . . . which contain diagnosis codes that [United] identified as having been included in their Claims Verification program but not having completed all the steps of the program." Dr. Garthwaite labels these the "Defendants' CV Pipeline Lists."[9] Dr. Garthwaite calculated $188,402,348 in combined financial impact to Part C and Part D attributable to the diagnosis codes on the Defendants' CV Pipeline Lists in payment years 2012 and 2013.[10]

13.     Dr. Garthwaite also noted that, "[f]or service years 2014-2016, [United] also conducted a step in the Chart Review Program called 'Second Level Review,' where a *second* blind review was conducted for some Charts."[11] The Garthwaite Report goes on to explain that Dr. Garthwaite calculated $799,407,848 in alleged financial impact "associated with diagnosis codes submitted by [United] to CMS associated with Charts that were reviewed in [United's] Second Level Review program."[12] This amount is a subset of the total alleged $2,109,423,348 and $25,829,027 Part C and D financial impacts, respectively, discussed above.

### B.     *Acevedo Report*

---

[8] Garthwaite Report, p. 53, Exhibit 10.
[9] *Id.* at para. 8.
[10] *Id.* at para. 144. As further described in my report below, a majority, but not all, of the CV Pipeline List diagnosis codes are also in the Garthwaite Deletes. The Garthwaite Report does not address or quantify the overlap between the alleged financial impact from the Deletes and the alleged financial impact from the CV Pipeline List diagnosis codes.
[11] *Id.* at para. 51.
[12] *Id.* at para. 92, fn. 124.

4

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

14.    Ms. Acevedo was engaged by the Plaintiffs to provide expert testimony in this matter. Specifically, she was asked to provide background on medical record coding, including ICD-9 and ICD-10 diagnosis coding, and its relationship to the HCCs used in the Medicare Advantage risk adjustment program. She was also asked to provide expert testimony on the following topics: "(1) the documentation standards required in risk adjustment coding; (2) the standards and guidelines governing medical record coding; and (3) industry best practices for achieving accurate and complete coding in the Medicare Advantage context."[13]

15.    Of particular relevance here, Ms. Acevedo opined that "if a coder is knowledgeable of the official ICD and CMS coding rules. . . he or she should be able to identify an objectively correct ICD code or set of ICD codes that can be reported based on a particular medical record and thus there should be little variance in code assignment among coders. . . If qualified coders properly follow these rules, they are able to identify appropriate ICD codes and rule out inappropriate codes."[14] However, Ms. Acevedo later noted that "difficult scenarios" can impact coding accuracy. Such scenarios, she stated, are "caused by and reflect (1) the varying degrees of skill level and experience among coders; (2) errors in how those coders apply the guidelines and rules; and (3) problems extrinsic to the guidelines and required coding process, such as problems with the medical record documentation itself."[15] Thus, while Ms. Acevedo appears initially to suggest that ICD-9 and ICD-10 diagnosis coding is a precise, objective exercise, she also avers that practical, real-word conditions can and do impact the accuracy with which coders do their work and the consistency of the results reached by different coders.

## IV.    <u>SUMMARY OF OPINIONS</u>

16.    Based on the work I have performed to date, and as further detailed below, I have formed the following opinions:

i.    <u>Opinion 1</u>: Dr. Garthwaite has failed to identify any Medicare Advantage overpayments to United because he has not found that the diagnosis codes at issue were unsupported. Instead, Dr. Garthwaite assumes that any diagnosis code not found by a Chart Review

---

[13] Expert Report of Jean Acevedo ("Acevedo Report"), para. 8.
[14] *Id.* at paras. 40-41.
[15] *Id.* at para. 51.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

coder is not supported, yet he fails to provide any basis for that assumption. Contrary to Dr. Garthwaite's assumption, when CMS's own RADV auditors reviewed the health conditions associated with allegedly unsupported diagnosis codes, they concluded that a substantial proportion of the diagnosis codes mapped to health conditions that were supported. Specifically, the data available from CMS's RADV audits in payment years 2011-2015 shows that 91% of the diagnosis codes in the government's First Interrogatory Response—which are diagnosis codes the government alleges United should have deleted as overpayments because they were not found in Chart Review—mapped to health conditions that were confirmed to be supported by the government in the RADV audits.

ii.   Opinion 2: Analysis of the First Interrogatory Response diagnosis codes that overlapped with the RADV audits reveals that, for all the instances that can be identified, the subset of diagnosis codes associated with charts that underwent two levels of blinded review (*i.e.*, an initial Chart Review and then a Second Level Review) were validated by the RADV audits at a rate comparable to that of diagnosis codes associated with charts that underwent only one level of blinded review. Moreover, the member-HCCs associated with diagnosis codes contained in the First Interrogatory Response coming from charts that underwent two levels of blinded review were not significantly less likely to be validated by RADV audits than member-HCCs that did not overlap with the First Interrogatory Response.

iii.  Opinion 3: More than 93% of the diagnosis codes in the First Interrogatory Response are *not* included in Dr. Garthwaite's final set of "Deletes," confirming that no alleged overpayment existed as a result of those diagnosis codes.

iv.   Opinion 4: Neither Ms. Acevedo nor Dr. Garthwaite has established that diagnosis codes not independently identified in Chart Review were improper or unsupported. Indeed, it is not unusual for coders to overlook supported diagnosis codes, and Ms. Acevedo's report identifies some of the practical issues that can cause this to occur. Moreover, there is substantial empirical evidence demonstrating that overlooked diagnosis codes are a common occurrence. For example, CMS's RADV audits found many additional

6

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

supported HCC codes for United contracts, even after Chart Reviews occurred. Likewise, as noted previously, CMS's RADV audits have frequently confirmed the appropriateness of many of the conditions mapping to diagnosis codes the government asserts in its First Interrogatory Response were not independently identified by United's chart reviewers and that Dr. Garthwaite identifies as Deletes. Additionally, as evidenced by the underpayment rates from CMS's Part C Improper Payment Measure reports, the government has consistently found substantial numbers of additional supported but unsubmitted HCCs across the industry.

v.  Opinion 5: Dr. Garthwaite has failed to establish the existence of a Medicare Advantage overpayment to United because he has not considered offsetting amounts for the potential impact of unsubmitted but valid diagnosis codes. Such consideration is a standard part of CMS's methodology for calculating the Part C Payment Error. In fact, in many cases, Dr. Garthwaite calculates financial impact for members' diagnosis codes even though CMS has already determined a net underpayment was made to United for that member's contract.

vi.  Opinion 6: Dr. Garthwaite's financial impact calculations are unreliable because he has not considered the extent to which his alleged financial impacts would be offset by reductions to the remittances that United paid to CMS under the Medical Loss Ratio requirements of the Medicare Advantage program.

vii.  Opinion 7: Dr. Garthwaite's analysis does not establish that United knowingly retained any overpayments. To the contrary, Dr. Garthwaite's analysis shows that it is a highly detailed and complex exercise to (a) identify diagnosis codes associated with charts that underwent Chart Review and were not independently identified in Chart Review; and (b) determine whether such diagnosis codes impacted payment. Moreover, Dr. Garthwaite's analysis makes clear that Chart Review, by its very nature, does not and cannot identify the existence, or even the likelihood, of an overpayment.

viii.  Opinion 8: If the validation rates of CMS's CON11-15 RADV audits hold constant across all of the Garthwaite Deletes, then the rate of unsupported diagnosis codes with financial impact would be less than 3.5% of the diagnosis codes included in the government's First

7

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

Interrogatory Response and less than 0.3% of United's total diagnosis codes submitted during this period for the members who underwent Chart Review. In my experience, based on common industry practices in the relevant timeframe, such a low rate of potentially unsupported diagnosis codes with financial impact would not have been expected to necessitate additional investigation or analysis.

ix.    Opinion 9: For the reasons described in my Opinions 1-8 above, Dr. Garthwaite's calculation of the number of members for whom United was allegedly overpaid as a result of the Garthwaite Deletes is also unreliable.

## V.    BASIS FOR OPINIONS

**A. *Opinion 1: Dr. Garthwaite has failed to identify any Medicare Advantage overpayments to United because he has not found that the diagnosis codes at issue were unsupported. Instead, Dr. Garthwaite assumes that any diagnosis code not found by a Chart Review coder is not supported, yet he fails to provide any basis for that assumption. Contrary to Dr. Garthwaite's assumption, when CMS's own RADV auditors reviewed the health conditions associated with allegedly unsupported diagnosis codes, they concluded that a substantial proportion of the diagnosis codes mapped to health conditions that were supported. Specifically, the data available from CMS's RADV audits in payment years 2011-2015 shows that 91% of the diagnosis codes in the government's First Interrogatory Response—which are diagnosis codes the government alleges United should have deleted as overpayments because they were not found in Chart Review—mapped to health conditions that were confirmed to be supported by the government in the RADV audits.***

17.    A diagnosis code from the Garthwaite Deletes can only result in an overpayment if it was, in fact, not supported by the member's medical record. However, Dr. Garthwaite has done no analysis to evaluate whether the diagnosis codes that United submitted to CMS and that United did not independently identify in Chart Review were actually unsupported. Instead, Dr.

8

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

Garthwaite simply assumes that any diagnosis code submitted by a provider that was not independently identified in Chart Review is not supported.

18.      As described in his report, Dr. Garthwaite "consider[s] an instance of a given diagnosis code from a provider-reported encounter to be supported if, and only if, the same diagnosis code is included in the chart review record of that encounter in [United's] Risk Adjustment Databases.  Otherwise, [Dr. Garthwaite considers] that particular diagnosis code instance to be unsupported."[16]

19.      In fact, the data related to CMS's RADV audits during payment years 2011–2015 shows that the diagnosis codes alleged to be at issue in this case map to condition codes that were validated by CMS's own auditors the vast majority of the time.  As shown in Opinion 4 of my updated December 3 report, approximately 91% of diagnosis codes that overlap between the First Interrogatory Response and the CON11-15 PFR Data (on a member-HCC basis) mapped to conditions that were *validated* by the RADV auditors.  Put another way, just 9% of the diagnosis codes alleged by the government not to have been independently identified in Chart Review that mapped to condition codes that were reviewed by the government's RADV auditors were found to be unsupported by the government's RADV auditors.  The government's corporate representative Anne Hornsby testified that "if an HCC is confirmed" in a RADV audit "there would be no overpayment."[17]

---

[16] Garthwaite Report, Appendix D, para. 44.
[17] *See* Hornsby 30(b)(6) Dep. (Nov. 21, 2023) Tr. at 56:8-20.

9

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**Figure 1. Results of RADV Analysis–First Interrogatory Response.[18]**

| DOS Year | First Interrogatory Response Records | | |
|---|---|---|---|
| | Overlap with CON11-15 PFR Data: Total | Overlap with CON11-15 PFR Data: HCC Validated | % of Total |
| 2010 | 341 | 300 | 88.0% |
| 2011 | 360 | 319 | 88.6% |
| 2012 | 1,190 | 1,069 | 89.8% |
| 2013 | 2,758 | 2,480 | 89.9% |
| 2014 | 3,566 | 3,303 | 92.6% |
| **Total** | **8,215** | **7,471** | **90.9%** |

20.     Additionally, as shown in Opinion 5 of my December 3 report, the member-HCCs related to diagnosis codes in the First Interrogatory Response were found by CMS's own reviewers to be valid at a rate closely equivalent to the average validation rate for all the member-HCCs submitted by United, or even the HCCs about which the government has raised no issue.  In other words, the condition codes found in the First Interrogatory Response were no less likely to be validated by the RADV audits than any other condition codes included in the RADV audits.

---

[18] *See* Updated Expert Report of M. Timothy Renjilian ("Dec. 3 Renjilian Report") at p. 84, Fig. 13: Results of RADV Analysis—First Interrogatory Response.

10

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**Figure 2. CON11-13, CON14-15, and CON11-15 PFR Data HCC Validation Rates.[19]**



| Member-HCCs, CON11-13 | | | |
|---|---|---|---|
| **Type** | **Total** | **HCC Supported** | **% Supported** |
| Overlap with FIR | 1,119 | 980 | 87.6% |
| No Overlap | 7,540 | 6,523 | 86.5% |
| Total | 8,659 | 7,503 | 86.6% |

| Member-HCCs, CON14-15 | | | |
|---|---|---|---|
| **Type** | **Total** | **HCC Supported** | **% Supported** |
| Overlap with FIR | 5,375 | 4,797 | 89.2% |
| No Overlap | 41,696 | 36,611 | 87.8% |
| Total | 47,071 | 41,408 | 88.0% |

| Member-HCCs, CON11-15 | | | |
|---|---|---|---|
| **Type** | **Total** | **HCC Supported** | **% Supported** |
| Overlap with FIR | 6,494 | 5,777 | 89.0% |
| No Overlap | 49,236 | 43,134 | 87.6% |
| Total | 55,730 | 48,911 | 87.8% |

*FIR = First Interrogatory Response*

21.     The above results of CMS's RADV audits reveal a significant deficiency in Dr. Garthwaite's analysis, because they show that, in the vast majority of cases, the health conditions associated with the diagnosis codes for which United allegedly did not find support in Chart Review were actually *confirmed* to be valid by the government.  As such, Dr. Garthwaite's financial impact calculations cannot be relied upon for purposes of calculating overpayments because he unreasonably assumes that all of the diagnosis codes on his list of Deletes are unsupported.

   **B.  *Opinion 2: Analysis of the First Interrogatory Response diagnosis codes that overlapped with the RADV audits reveals that, for all the instances that can be identified, the subset of diagnosis codes associated with charts that underwent two levels of blinded review (i.e., an initial Chart Review and then a Second Level Review) were validated by the RADV audits at a rate comparable to that of diagnosis codes associated with charts that underwent only one level of blinded review.  Moreover, the member-HCCs associated with diagnosis codes contained***

---

[19] *See id.* at p. 87, Fig. 15: CON11-13, CON14-15, and CON11-15 PFR Data HCC Validation Rates.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

11

*__in the First Interrogatory Response coming from charts that underwent two levels of blinded review were not significantly less likely to be validated by RADV audits than member-HCCs that did not overlap with the First Interrogatory Response.__*

22.    As described in the Background section above, Dr. Garthwaite observed that United conducted Second Level Reviews for certain charts in service years 2014-2016, and he identified $799,407,848 in alleged financial impact "associated with diagnosis codes submitted by [United] to CMS associated with Charts that were reviewed in [United's] Second Level Review program."[20]

23.    Because Dr. Garthwaite highlighted this Second Level Review process, I analyzed the RADV validation rates for the subset of First Interrogatory Response diagnosis codes associated with member charts that went through Second Level Review and compared them to those associated with charts subjected only to a first level review.  I focused on data from service year 2014 because, as further described below, that is the only year for which I could (a) identify charts that underwent Second Level Review, and (b) assess RADV results (per the CON15 PFR Data).

24.    To perform this analysis, I relied upon MRM data produced for 2014 service dates (MAPL000724236).  I focused on the First Interrogatory Response diagnosis codes that overlapped with the CON15 PFR Data; identified the member charts associated with those diagnosis codes;[21] and determined if the chart underwent Second Level Review.[22]  I then compared the RADV validation rates for the conditions associated with the overlapping diagnosis codes to the corresponding validation rates for conditions associated with charts that did not undergo Second Level Review.  These findings are shown in **Figure 3** below.

---

[20] Garthwaite Report, para. 92, fn. 124.

[21] I identified charts associated with particular diagnosis codes on a member-provider basis—*i.e.*, if the chart provider from the MRM data overlapped with the provider listed in the First Interrogatory Response based on the provider ID. As Dr. Garthwaite did, I used the "SAS All Providers" data to bridge the provider identifier information between MRM and the First Interrogatory Response.

[22] I assume that a Chart underwent Second Level Review if it had at least one coding result record with "Coding" and at least one with "SLR" populated in the GCM_BUSS_FUNC_NAME field.  Consistent with Dr. Garthwaite's approach, I assume "Coding" indicates the presence of a blinded first level review and "SLR" indicates the presence of a blinded Second Level Review.

12

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**Figure 3. RADV Validation–Second Level Review.[23]**

| | First Interrogatory Response Records: Charts that Underwent 2LR | | | | First Interrogatory Response Records: Charts that Did Not Undergo 2LR | | |
|---|---|---|---|---|---|---|---|
| DOS Year | Overlap with CON15 PFR Data: Total | Overlap with CON15 PFR Data: HCC Validated | % of Total | | Overlap with CON15 PFR Data: Total | Overlap with CON15 PFR Data: Validated | % of Total |
| *Count of diagnosis codes (i.e., First Interrogatory Response records)* | | | | | | | |
| 2014 | 1,833 | 1,663 | 90.7% | | 1,733 | 1,640 | 94.6% |
| *Count of unique member-HCCs* | | | | | | | |
| 2014 | 1,655 | 1,481 | 89.5% | | 1,308 | 1,206 | 92.2% |

25. Based on the above, diagnosis codes from 2014 associated with charts that underwent Second Level Review were validated at the condition level at a similar rate (90.7%) as those associated with charts that were only subjected to first level review (94.6%).

26. I also reviewed the validation rates at a unique member-HCC level and found them to be comparable as well (89.5% for member-HCCs associated with charts that underwent Second Level Review versus 92.2% for those associated with charts that were only subjected to first level of review).[24] Moreover, the validation rate for member-HCCs associated with charts that underwent Second Level Review is comparable to the validation rates for member-HCCs from the CON11-15 PFR data that did not overlap with the First Interrogatory Response, as summarized in Opinion 5 of my December 3 Report (and shown again in **Figure 2** above).[25]

27. Put another way, for the First Interrogatory response diagnosis codes that overlapped with the CON15 PFR data, a diagnosis code that went undetected through two levels of Chart Review was not meaningfully less likely to be validated at the condition level than a diagnosis code that went undetected through just one level of Chart Review. Moreover, a member-HCC that went undetected through two levels of Chart Review was not meaningfully less likely to

---

[23] *See* Exhibit 3.

[24] The number of observations and validation rates are different when analyzing the First Interrogatory Response at a diagnosis code level versus member-HCC level because, in many cases, a unique member-HCC maps to more than one First Interrogatory Response diagnosis code. Note that, with respect to payment years 2014 and 2015, I counted member-V12 HCC and member-V22 HCC combinations separately and added them together.

[25] *See* Dec. 3 Renjilian Report at p. 87. As shown in Figure 2, the validation rate for member-HCCs from the CON11-15 PFR data that did not overlap with the First Interrogatory Response was 87.6%. This rate was 89.3% for DOS year 2014 / payment year 2015, specifically, as derived in Appendix X1.

13

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

be valid than a member-HCC that did not overlap with the diagnosis codes the government has claimed must be deleted as overpayments in the First Interrogatory Response.

28.    Additionally, I understand that United performed Second Level Review for certain charts beginning in calendar year 2013 for 2012 dates of service.[26]  Specifically, my understanding is that approximately 50% of charts with 2012 dates of service underwent Second Level Review in calendar year 2013, and that approximately two-thirds of charts with 2013 dates of service underwent Second Level Review in calendar year 2014.[27]  While data is not available to allow identification of the specific First Interrogatory Response diagnosis codes from service years 2012 and 2013 associated with charts that underwent Second Level Review, it is notable that, of the First Interrogatory Response diagnosis codes that overlap with the CON11-15 PFR Data, the proportion that map to conditions that were validated in those audits remains consistent over time (as shown in **Figure 1** above).  Dr. Garthwaite's focus on Second Level Review notwithstanding, the validation rate did not decrease in service year 2012 despite the fact that a substantial percentage of United's charts began Second Level Review in that year.

### C.    *Opinion 3: More than 93% of the diagnosis codes in the First Interrogatory Response are **not** included in Dr. Garthwaite's final set of "Deletes," confirming that no alleged overpayment existed as a result of those diagnosis codes.*

29.    In its First Interrogatory Response, the government produced a list of diagnosis codes that it alleges to be at issue in this case.  These diagnosis codes are described as ones for which "(1) the diagnosis code was submitted by UnitedHealth to CMS and was required, by regulation, to be supported by an underlying medical record; (2) that medical record went through UnitedHealth's medical record review program; and (3) UnitedHealth's own reviewers did not find the diagnosis code to be supported by medical records."[28]  For these diagnosis codes, the government contends that "[United] 'knowingly and improperly failed to delete' or 'knowingly

---

[26] *See* K. Baker Dep. (Jul. 12, 2022) Tr. at 139:11-17 (testifying that, after the "recode" project in project year 2012 for date of service year 2011, Optum began to send charts through Second Level Review); *see also* K. Baker 30(b)(6) Dep. (May 30, 2023) Tr. at 355:14-356:22 (testifying about Second Level Review for the 2013 project year for 2012 dates of service).

[27] This understanding is based on discussions with Jim Colhour, Vice President of Operations at Optum Quality and Risk Adjustment Operations, and Katie Baker, Vice President of Risk Adjustment Operations and Transformation at Optum.

[28] Joint Stipulation Regarding Government's Motion to Compel, dated April 29, 2021, p. 8.

14

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

and improperly failed to otherwise return to the Medicare Program the overpayments based on such diagnoses."[29]

30.    In his analysis, Dr. Garthwaite identified a set of diagnosis codes associated with charts that allegedly underwent Chart Review and were not independently identified by the Chart Review coders *and,* importantly, that had Part C and/or Part D financial impact.  The Garthwaite Deletes are listed in 12 data tables.  There are nine data tables (labeled with an "IRADS" designation) comprising 1,930,455 line item records relating to diagnosis codes submitted to RAPS from PY 2009–PY 2017.  There are also three data tables (labeled with an "EDPS" designation) comprising 701,296 line item records relating to diagnosis codes submitted to EDPS from PY 2015–PY 2017.  There is significant overlap between the IRADS and EDPS tables; most of the diagnosis codes in the EDPS tables are found within the IRADS tables.  As shown in **Figure 4** below, taking the IRADS and EDPS tables together, there are a total of 1,934,660 unique member + DOS + diagnosis code combinations and 1,975,502 member + DOS + diagnosis code + provider combinations in the Deletes.

**Figure 4. Summary of Garthwaite Deletes.[30]**

| | Count of Garthwaite Deletes Diagnosis Codes (Revised Attachment 1) | | | | Total Unique Diagnosis Codes | |
| | Number of Total Records | | | | Total Unique Diagnosis Codes | |
| | [A] | [B] | [C]=[A]+[B] | | [D] | [E] |
| DOS Year | IRADS | EDPS | Total | | Unique Member + Dx + DOS | Unique Member + Dx + DOS + Provider |
| 2008 | 100,781 | - | 100,781 | | 100,781 | 100,781 |
| 2009 | 196,938 | - | 196,938 | | 196,936 | 196,936 |
| 2010 | 384,120 | - | 384,120 | | 384,026 | 384,026 |
| 2011 | 115,093 | - | 115,093 | | 115,029 | 115,029 |
| 2012 | 190,493 | - | 190,493 | | 190,492 | 190,493 |
| 2013 | 219,903 | - | 219,903 | | 219,903 | 219,903 |
| 2014 | 222,637 | 214,533 | 437,170 | | 223,271 | 237,498 |
| 2015 | 223,736 | 214,237 | 437,973 | | 225,087 | 236,936 |
| 2016 | 276,754 | 272,526 | 549,280 | | 279,135 | 293,900 |
| **Total** | **1,930,455** | **701,296** | **2,631,751** | | **1,934,660** | **1,975,502** |

---

[29] Government's First Interrogatory Response, dated August 17, 2020, p. 9.
[30] *See* Exhibit 4 (Updated as of 03-18-24).

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

15

31.    The Deletes are the basis for Dr. Garthwaite's calculation of approximately $2.1 billion of Part C financial impact and approximately $26 million of Part D financial impact across the relevant time period.

32.    Notably, the number of Garthwaite Deletes is significantly smaller than the number of diagnosis codes asserted to be at issue by the government in the government's First Interrogatory Response.[31]    As shown in **Figure 5** below, <u>less than 7%</u> of the First Interrogatory Response diagnosis codes are in Garthwaite's Deletes.    This is true whether counting the Garthwaite Deletes and First Interrogatory Response by total records or by unique member + DOS + diagnosis code combinations or by unique member + DOS + diagnosis code + provider combinations.

**Figure 5. Garthwaite Deletes Compared to Government's First Interrogatory Response.[32]**



| DOS Year | Data Source | Count of Total Records | | | Unique Member + DOS + Dx | | | Unique Member + DOS + Dx + Prov. | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | [A] FIR | [B] Deletes - in FIR[1] | [B]/[A] | [C] FIR | [D] Deletes - in FIR[1] | [D]/[C] | [E] FIR | [F] Deletes - in FIR[1] | [F]/[E] |
| 2008 | IRADS | 1,281,260 | 97,704 | 7.6% | 1,279,660 | 97,704 | 7.6% | 1,280,114 | 97,704 | 7.6% |
| 2009 | IRADS | 2,673,072 | 187,151 | 7.0% | 2,668,312 | 187,149 | 7.0% | 2,670,388 | 187,149 | 7.0% |
| 2010 | IRADS | 2,358,464 | 383,850 | 16.3% | 2,351,665 | 383,756 | 16.3% | 2,355,778 | 383,756 | 16.3% |
| 2011 | IRADS | 2,146,861 | 115,053 | 5.4% | 2,141,447 | 114,989 | 5.4% | 2,145,066 | 114,989 | 5.4% |
| 2012 | IRADS | 3,829,852 | 190,412 | 5.0% | 3,791,500 | 190,411 | 5.0% | 3,826,708 | 190,412 | 5.0% |
| 2013 | IRADS | 4,431,051 | 218,623 | 4.9% | 4,381,982 | 218,623 | 5.0% | 4,427,039 | 218,623 | 4.9% |
| 2014 | IRADS+EDPS | 6,618,322 | 427,137 | 6.5% | 3,449,555 | 222,789 | 6.5% | 3,878,802 | 236,007 | 6.1% |
| 2015 | IRADS+EDPS | 6,409,780 | 429,949 | 6.7% | 3,398,460 | 224,742 | 6.6% | 3,833,826 | 236,145 | 6.2% |
| 2016 | IRADS+EDPS | 8,399,092 | 541,985 | 6.5% | 4,337,305 | 278,834 | 6.4% | 4,990,419 | 293,372 | 5.9% |
| **Total, IRADS + EDPS** | | **38,147,754** | **2,591,864** | **6.8%** | **27,799,886** | **1,918,997** | **6.9%** | **29,408,140** | **1,958,157** | **6.7%** |

Notes:
FIR = First Interrogatory Response; Deletes = Garthwaite Report Attachment 1 (Rev. 01/05/2024).
[1] Based on overlap between unique member, diagnosis code, date of service, and provider.

33.    Stated differently, Dr. Garthwaite's analysis shows that less than 7% of the First Interrogatory Response diagnosis codes were diagnosis codes that Dr. Garthwaite deemed to have

---

[31] The First Interrogatory Response included 27,937,651 diagnosis codes submitted to RAPS (based on United's IRADS data) and 10,210,103 diagnosis codes submitted to EDPS (based on United's EDPS data). There is significant overlap between the diagnosis codes in the EDPS data and the IRADS data. Approximately 99% of the EDPS diagnosis codes overlap with the IRADS data on a member + DOS + diagnosis code basis. In my December 3 report, I focused on the IRADS/RAPS data because it captured the vast majority of unique diagnosis codes in the First Interrogatory Response and because the small number of additional EDPS diagnosis codes would not have affected my opinions in any material way.

[32] *See* Exhibit 5 (Updated as of 03-18-24). In a prior version of this rebuttal report, I noted that 61,502 diagnosis codes (member-dx-DOS combinations) in the original iteration of the Garthwaite Deletes did not appear in the First Interrogatory Response. I noted that of those diagnosis codes, 46,149 (75%) did *not* appear in the RAPS data. I noted that these 46,149 diagnosis codes appeared to have been included in Dr. Garthwaite's list inadvertently, as the Deletes are designed to include only submitted diagnosis codes. On March 11, 2024, Dr. Garthwaite submitted an errata confirming that his inclusion of these codes was inadvertent. Based on the updated version of the Garthwaite Deletes, more than 99% of the 1,934,660 unique diagnosis codes (member-dx-DOS combinations) in the Garthwaite Deletes are in the First Interrogatory Response (1,918,997 / 1,934,660 = 99.2%).

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

16

had a financial impact. Dr. Garthwaite did not include the remaining 93+% of First Interrogatory Response diagnosis codes in his final set of Deletes, confirming that no alleged overpayment existed as a result of those diagnosis codes.

> **D.** _Opinion 4: Neither Ms. Acevedo nor Dr. Garthwaite has established that diagnosis codes not independently identified in Chart Review were improper or unsupported. Indeed, it is not unusual for coders to overlook supported diagnosis codes, and Ms. Acevedo's report identifies some of the practical issues that can cause this to occur. Moreover, there is substantial empirical evidence demonstrating that overlooked diagnosis codes are a common occurrence. For example, CMS's RADV audits found many additional supported HCC codes for United contracts, even after Chart Reviews occurred. Likewise, as noted previously, CMS's RADV audits have frequently confirmed the appropriateness of many of the conditions mapping to diagnosis codes the government asserts in its First Interrogatory Response were not independently identified by United's chart reviewers and that Dr. Garthwaite identifies as Deletes. Additionally, as evidenced by the underpayment rates from CMS's Part C Improper Payment Measure reports, the government has consistently found substantial numbers of additional supported but unsubmitted HCCs across the industry._

34.    There is no basis to assume that a diagnosis code was unsupported simply because a Chart Review coder failed to independently identify the diagnosis. To the contrary, based on my many years of professional experience supervising coding reviews in a variety of circumstances, there are many practical, real-world factors that can make it difficult to identify diagnosis codes from a medical record comprehensively and with complete accuracy. These can include, among other things, the time available for the review; the completeness, legibility and clarity of the medical record documentation; and the skill and experience of the reviewer. Consequently, it would not be surprising for a Chart Review coder to fail to identify a diagnosis code that was actually supported by the member's record.

35.    Similarly, although Ms. Acevedo opines that coding is a theoretically objective exercise, she nevertheless notes that various factors can create "difficult coding scenarios." These

17

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

include varying degrees of skill level and experience among coders; errors in how those coders apply guidelines; and extrinsic problems (such as issues with the medical record documentation) that can impact coding results.[33]

36.     Moreover, empirical evidence *contradicts* the notion that diagnosis codes that were not independently identified in Chart Review were unsupported.  As noted earlier, just 9% of the diagnosis codes alleged by the government to be associated with charts that underwent Chart Review and not to have been independently identified by the Chart Review coder were ones that mapped to condition codes that were found to be unsupported by the government's RADV auditors.  This result—based on the government's own audits— makes unambiguously clear that submitted diagnosis codes that were not independently identified during Chart Review cannot be assumed to be unsupported.  In fact, to the contrary, the government's audits show that the conditions mapping to such diagnosis codes are supported an overwhelming majority of the time, and the conditions mapping to diagnosis codes allegedly not independently identified in Chart Review were no more likely to be unsupported than any other diagnosis codes.

37.     The notion that valid diagnosis codes can nonetheless be missed by Chart Review coders is further supported by the fact that CMS's RADV audits of United frequently found underpayments—that is, unsubmitted diagnosis codes that were in fact supported and that would have garnered United additional reimbursement.  As discussed in my previous report, for the CON11-13 RADV audits (which, to my understanding, are the only audits for which contract-level recovery amounts have been published), 13 of the 15 United contracts audited were found to have net underpayments.[34]  This again makes clear that missed or overlooked diagnosis codes are a common occurrence in practice.

38.     In addition, as shown in **Figure 6** below, the CMS Part C Improper Payment Measure Reports show that the Part C population error from underpayments was consistently 2.0%-3.4% across the industry during the time period relevant to this case (whereas the overpayment-related error rates were only somewhat higher, ranging from 4.6% to 8.6%, with the difference between the underpayment rates and overpayment rates gradually decreasing over

---

[33] Acevedo Report, para. 51.
[34] *See* Dec. 3 Renjilian Report at para. 175.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

time).  Such underpayments were identified as resulting from "additional" HCCs, which "occur during the medical record review process when the medical record submitted by the MA Organization supports a CMS-HCC that was never submitted for payment, or the medical record supports a more severe diagnosis within the same hierarchy as the CMS-HCC submitted for payment."[35]  These underpayment rates again show that coders across the industry commonly overlook diagnosis codes that are actually supported.

**Figure 6. Part C Error Rates, CY 2009 – CY 2017.[36]**



39.    Taken together, the above observations make clear that coding is, in practice, an imprecise exercise that is subject to a variety of real-world constraints and complications.  Such practical challenges can and do often mean that even a qualified coder can overlook an otherwise valid, appropriate diagnosis code.  Consequently, the fact that a diagnosis code was not independently identified by United in Chart Review does not mean that the diagnosis code was improper or unsupported.

---

[35] *See* CMS, Part C Improper Payment Measure (Part C IPM) Fiscal Year 2022 (FY 2022) Payment Error Rate Results, https://www.cms.gov/files/document/fy-2022-medicare-part-c-error-rate-findings-and-results.pdf-0.
[36] *Id.* Note that this chart shows rates by calendar year, while the comparable chart in the CMS report shows rates by fiscal year. Fiscal year rates are based on payments from the calendar year two years prior (*e.g.,* the FY 2022 rates are based on calendar year 2020 payments).

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

19

E. **_Opinion 5: Dr. Garthwaite has failed to establish the existence of a Medicare_**
**_Advantage overpayment to United because he has not considered offsetting_**
**_amounts for the potential impact of unsubmitted but valid diagnosis codes. Such_**
**_consideration is a standard part of CMS's methodology for calculating the Part C_**
**_Payment Error. In fact, in many cases, Dr. Garthwaite calculates financial impact_**
**_for members' diagnosis codes even though CMS has already determined a net_**
**_underpayment was made to United for that member's contract._**

40.     Dr. Garthwaite's financial impact calculations are inconsistent with the government's own methodology for evaluating payment errors in the Medicare Advantage program.

41.     As explained in more detail in my December 3 Report, when calculating either the RADV payment error or the Medicare Improper Payment Measure, the government nets the financial impact of the submission of unsupported diagnosis codes against the financial impact of unsubmitted additional diagnosis codes found to be supported by enrollees' medical records.[37]

42.     Dr. Garthwaite has focused only on the allegedly unsupported diagnosis codes that could theoretically generate overpayments, ignoring the substantial near-certainty that there are additional appropriate diagnosis codes that were missed and not submitted.

43.     Based on the available data from the government's RADV audits, United has often been found to have been *underpaid* at a contract level. As discussed above, 13 of the 15 United contracts reviewed in the CON11-13 RADV audits were found to have net underpayments.[38]

44.     As summarized in **Figure 7** below, Dr. Garthwaite has calculated financial impact for members who were part of contracts for which the government has already found that United was underpaid on that contract through its RADV audits. Specifically, of the 15 United contracts included in the CON11-13 RADV audits, 13 contracts had members with diagnosis codes in

---

[37] *See* CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits*, February 24, 2012, p. 3.; *see also* CMS, *Error Rate Findings and Results, Key Terms,* available at: (https://www.cms.gov/research-statistics-data-systems/improper-payment-measurement-programs/medicare-part-c-ipm/error-rate-findings-and-results). *See also* Dec. 3 Renjilian Report at paras. 169-170.

[38] USBP068691383, pp. 19-21. A net underpayment is shown as a negative "recovery amount", which is defined as the "extrapolated payment error amount based on the lower bound of the 99% confidence interval" per USBP068691383, p. 3.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

Garthwaite's Deletes in the relevant years. These same 13 contracts were all found to have net underpayments by the RADV audits. This means that, for these contracts, the government's extrapolation of all the accumulated deletions and additions arising from its audits yielded an estimated net underpayment at the lower bound of a 99% confidence interval. In contrast, across the 23,231 members under those 13 contracts, Dr. Garthwaite calculated $78.6 million in purported Part C overpayments resulting from the Garthwaite Deletes (accounting for approximately 12% of the total alleged Part C overpayments Dr. Garthwaite calculated for all members in these years).[39]

45. The government's sample-based audits are intended to be statistically valid; they include consideration of both unsupported submitted diagnosis codes and unsubmitted supported diagnosis codes; and they include consideration of the conditions that map to many of the same diagnosis codes questioned by Dr. Garthwaite. To that extent, the extrapolations represent a comprehensive, all-encompassing estimate of the actual net total underpayment or overpayment related to each contract reviewed. Dr. Garthwaite's incomplete, one-sided analysis fails to take this critical fact into account.

---

[39] For context, there were 80, 80, and 78 total unique contracts with members for whom Dr. Garthwaite calculated Part C financial impact stemming from the Garthwaite Deletes in DOS years 2010, 2011, and 2012, respectively, as identified in Attachment 2 to the Garthwaite Report.

21

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**Figure 7. Garthwaite Deletes on Contracts Reviewed in CON11-13 RADV Audits.[40]**

| RADV Year | HMOID | RADV Results Recovery Amount | Members with Alleged Financial Impact | Alleged Deletes | Garthwaite, Part C Impact Alleged Financial Impact |
|---|---|---|---|---|---|
| CON11 | H2226 | ($2,068,360) | 156 | 226 | $ 554,514 |
| | H4522 | ($4,622,640) | 1,130 | 1,825 | $ 3,421,371 |
| | H4590 | ($51,017,738) | 6,181 | 9,768 | $ 23,720,086 |
| | H0543 | ($91,884,129) | 4,249 | 6,762 | $ 16,380,547 |
| CON12 | H5420 | $15,735,769 | n/a | n/a | n/a |
| | R7444 | ($3,962,831) | 310 | 394 | $ 420,590 |
| | H5652 | ($4,740,216) | 15 | 21 | $ 72,017 |
| | H0251 | ($10,348,919) | 201 | 236 | $ 546,676 |
| | R5287 | ($69,295,194) | 1,923 | 2,487 | $ 5,382,367 |
| CON13 | R9896 | $4,065,269 | n/a | n/a | n/a |
| | H3107 | ($1,581,972) | 2,973 | 4,915 | $ 8,863,763 |
| | H0151 | ($7,790,780) | 1,627 | 2,398 | $ 4,735,077 |
| | H4514 | ($9,302,996) | 949 | 1,752 | $ 3,316,349 |
| | H2931 | ($10,078,497) | 2,194 | 3,581 | $ 7,239,676 |
| | R5342 | ($14,309,264) | 1,323 | 1,929 | $ 3,939,954 |
| **Total, RADV Underpayment Contracts** | | | **23,231** | **36,294** | **$ 78,592,989** |
| All Garthwaite Deletes 2010-2012 (Part C) | | | 201,252 | 301,698 | $ 647,096,642 |
| **% of All Garthwaite Deletes (Part C)** | | | **11.5%** | **12.0%** | **12.1%** |

46.    Dr. Garthwaite has not considered the fact that the government has already determined that there was a negative recovery amount for all of the above contracts that overlap with his Deletes.   More fundamentally, Dr. Garthwaite has failed to account for potential underpayments for *any* of the contracts at issue, which is unreasonable given the overwhelming presence of underpayments on the contracts that were actually audited. Based on these results, it is reasonable to expect that, had more of these contracts been subjected to RADV audits, many, if not most, of them would have been found to have net underpayments.

**F.    *Opinion 6: Dr. Garthwaite's financial impact calculations are unreliable because he has not considered the extent to which his alleged financial impacts would be***

---

[40] *See* Exhibit 6 (Updated as of 03-18-24).

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

*offset by reductions to the remittances that United paid to CMS under the Medical*
*Loss Ratio requirements of the Medicare Advantage program.*

47.     Since contract year 2014, MAOs have been required to submit medical loss ratio ("MLR") reports to CMS on an annual basis.  The MLR, reported at a contract level, represents "the percentage of revenue used for patient care, rather than for such other items as administrative items or profit."[41]  Plans are subject to financial and other penalties for failure to meet the statutory requirement that they have an MLR of at least 85 percent.[42]  These penalties can include remittance of funds to CMS, a prohibition on enrolling new members, and contract termination.[43]  Of particular relevance here, "[i]f CMS determines for a contract year than an MA organization has an MLR for a contract that is less than 0.85, the MA organization has not met the MLR requirement and must remit to CMS an amount equal to the product of . . . (1) [t]he total revenue of the MA contract for the contract year and (2) [t]he difference between 0.85 and the MLR for the contract year."[44]

48.     CMS publishes annual Public Use Files (the "MLR Public Use Files") that provide the data submitted by MAOs, Part D sponsors, and cost plans in their MLR reports and identify the MLR remittance amount, if any, due by the plans to CMS.[45]  An MAO's MLR is defined as the ratio of the MLR numerator to the MLR denominator.  The MLR numerator relates to expenditures incurred by the plan and equals the sum of incurred claims for all enrollees, the reduction (if any) in the Part B premium for all MA plan enrollees, and the plan expenditures for activities that improve health care quality.[46]  The MLR denominator equals total revenue under the contract, which is based on CMS's payments to the MAO for all enrollees under the contract, subject to certain exclusions and deductions.[47]  The MLR may be increased by a statutorily defined

---

[41] *See* CMS, Medical Loss Ratio, https://www.cms.gov/medicare/health-drug-plans/medical-loss-ratio.
[42] *See* 42 CFR §422.2410 and §423.2410.
[43] *See* CMS, Medical Loss Ratio, https://www.cms.gov/medicare/health-drug-plans/medical-loss-ratio.
[44] *See* 42 CFR §422.2410.
[45] *See* CMS, Medical Loss Ratio, https://www.cms.gov/medicare/health-drug-plans/medical-loss-ratio.
[46] *See* 42 CFR §422.2420(b)(1).
[47] *See* §422.2420(c).  Amounts excluded or deducted from the denominator include licensing and regulatory fees, Federal taxes and assessments, State taxes and assessments, community benefit expenditures, unpaid premiums for which the MAO can demonstrate it made a reasonable effort to collect, certain EHR payments and adjustments, and Coverage Gap Discount Program payments.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

23

1925

credibility adjustment, which is based on the number of member-months covered by the plan and adjusted by a deductible factor.[48]

49.     Based on the above, keeping all else constant, to the extent that a plan's revenues (the denominator of the MLR calculation) are reduced—such as would be the case if Dr. Garthwaite's "Deletes" had in fact been deleted by United—the plan's MLR would increase. For a plan having an MLR less than 0.85, and thus being required to make a remittance to CMS, this would result in the reduction or elimination of the remittance owed. In other words, the impact of the Garthwaite Deletes would be offset by a reduction in the MLR remittance amount. Dr. Garthwaite has not considered this mitigating effect, thereby overstating his financial impact estimates.

50.     As an illustration of this concept, I identified 36 contracts from contract years 2014–2017 for which (a) United remitted funds to CMS because of the contract having an MLR under 0.85, and (b) Dr. Garthwaite identified an alleged Part C or Part D overpayment. For these 36 contracts, I estimated what the revised MLR and remittance to CMS (if any) would have been if Dr. Garthwaite's alleged Part C and Part D financial impact amounts were removed from the MLR denominators, keeping all other factors constant. These results are summarized in **Figure 8** below. Across these 36 contracts, my calculations show that Dr. Garthwaite's alleged Part C and D financial impact, if subtracted from the MLR denominator, would have reduced United's remittances to CMS by $193,070,093, or approximately 64% of Dr. Garthwaite's total alleged financial impact for these contracts ($304,007,989). Under this calculation, the remittance to CMS was entirely eliminated for 13 contracts and was reduced for 23 contracts.

---

[48] *See* 42 CFR §422.2440.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**Figure 8. Revised MLR Remittances to CMS, 2014–2017.[49]**

| Year | Number of Contracts | Garthwaite | | FTI Calculation | | |
| | | Total Part C + D Impact | Total Remittance to CMS | Revised Remittance to CMS | Difference | |
|---|---|---|---|---|---|---|
| 2014 | 4 | $ 13,749,619 | $ 18,623,145 | $ 6,977,386 | $ (11,645,760) | |
| 2015 | 4 | $ 16,653,972 | $ 14,523,485 | $ 3,122,061 | $ (11,401,424) | |
| 2016 | 15 | $ 87,239,056 | $ 213,633,918 | $ 139,897,742 | $ (73,736,177) | |
| 2017 | 13 | $ 186,365,341 | $ 175,233,500 | $ 78,946,767 | $ (96,286,734) | |
| Grand Total | 36 | $ 304,007,989 | $ 422,014,049 | $ 228,943,956 | $ (193,070,093) | |

51.    Dr. Garthwaite's failure to consider the extent to which his alleged financial impact figures would have affected these contract-level MLR remittances is another reason his calculations cannot be relied upon to determine the presence of an overpayment to the government.

**G. _Opinion 7: Dr. Garthwaite's analysis does not establish that United knowingly retained any overpayments. To the contrary, Dr. Garthwaite's analysis shows that it is a highly detailed and complex exercise to (a) identify diagnosis codes associated with charts that underwent Chart Review and were not independently identified in Chart Review; and (b) determine whether such diagnosis codes impacted payment. Moreover, Dr. Garthwaite's analysis makes clear that Chart Review, by its very nature, does not and cannot identify the existence, or even the likelihood, of an overpayment._**

52.    I understand that the government seeks to prove that United "knowingly and improperly failed to delete . . . invalid diagnoses that had been submitted to the Medicare Program for risk adjustment payments which were made by the Medicare Program to [United] or knowingly and improperly failed to otherwise return to the Medicare Program the overpayments based on the invalid diagnoses."[50]  Importantly, Dr. Garthwaite has failed to establish that United _knowingly_ retained any overpayments.  To the contrary, Dr. Garthwaite's methodology and findings show that the identification of overpayments is a complex and imprecise exercise, and that simply

---

[49] _See_ Exhibit 7.
[50] _See_ Complaint, para. 342.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

identifying a diagnosis code as not having been independently identified in Chart Review does not mean that the diagnosis code led to an overpayment.

> i. <u>Dr. Garthwaite's analysis demonstrates the difficulty of precisely locating diagnosis codes that were not independently identified in Chart Review</u>

53. Dr. Garthwaite's analysis illustrates the highly detailed and complex process necessary to identify the diagnosis codes that were (a) submitted for risk adjustment, (b) associated with charts that underwent Chart Review, and (c) not independently identified in Chart Review. As Dr. Garthwaite notes, the United/Vendor Chart Review Data and United's Risk Adjustment Claims Data are not structured in a way that allows for direct linking and comparison.[51] Moreover, Dr. Garthwaite notes that "[United]'s databases do not consistently track provider information associated with records from the Chart Review Program" and "[United]'s Chart Review Databases also do not always reflect the actual provider who had the face-to-face encounter with the beneficiary."[52] Because of these complexities in the data, Dr. Garthwaite had to take multiple steps to transform the data and make certain assumptions to address gaps or ambiguities. This included, for example:

- Standardizing member, provider, and encounter data across multiple disparate systems (*e.g.*, with respect to thousands of Chart Review vendor files relating to service years 2008-2009: converting invalid values to blank values; removing spaces from names; attempting to identify unique members from non-standard numeric or alphanumeric member ID variables, names, and dates of birth);[53]

- Identifying and applying particular exclusions to the encounter and/or Chart Review data (*e.g.*, excluding Chart Review data from the ChartSync or MRM systems in cases where certain fields indicated that a review may not have been

---

[51] *See, e.g.*, Garthwaite Report, para. 81 ("provider-reported encounters . . . do not contain encounter identifiers that allow direct linkage to Chart Review Program results" and "connecting a provider-reported encounter to the Chart Review Program Coder's results for that same encounter necessitates taking additional analytic steps."); Bird 30(b)(6) Dep. (Jun. 22, 2023) Tr. at 135:10-136:20; 140:11-142:3; 147:12-148:15 (explaining the difficulties in matching United's Chart Review and claims data).

[52] *Id.* at para. 82. *See also* K. Baker 30(b)(6) Dep. (May 30, 2023) Tr. at 65:17-67:14, 112:15-113:9, 126:15-128:7, 229:15-231:20, 250:21-251:7, 251:17-252:7, 254:4-254:10, 311:5-311:19 (describing the complexities and limitations of the provider information collected and maintained in ChartSync).

[53] *Id.* at Appendix D, paras. 14-20.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

complete;[54] using particular sets of CPT/HCPCS codes and Type of Bill codes to identify whether EDPS encounters were eligible for risk adjustment);[55] and

- Designing and implementing multi-step rules-based logic to identify certain scenarios (*e.g.*, identifying that an encounter allegedly underwent Chart Review if (i) there is overlap between the encounter data and Chart Review data at a date of service and provider identifier level, and/or if (ii) there was only one provider who reported a diagnosis on an encounter and the date of service from that encounter was included in the Chart Review data, even if there was no provider identifier overlap).[56]

54.    The above examples represent only some of the many intricate steps that Dr. Garthwaite undertook to identify the population of diagnosis codes potentially at issue.  His methodology is explained over 18 pages of his report[57] and is executed by thousands of lines of SAS code.  And even that represents only a starting point, with substantial additional analysis necessary to determine whether the diagnosis codes so identified actually impacted payment.  Yet more analysis would be required to assess whether such diagnosis codes were truly unsupported (as opposed to having simply been overlooked by the Chart Review coder).  In short, the path from a Chart Review result to a known overpayment is a long and complicated one, and Dr. Garthwaite has provided no evidence that United did, or reasonably could have done, the work necessary to know if any overpayments existed.

   ii. <u>Dr. Garthwaite's analysis shows that United's Chart Review process and CV Pipeline Lists, by their very nature, are not sufficient to conclude that a potentially unsupported diagnosis code caused an overpayment</u>

55.    Even if Dr. Garthwaite had been able to perfectly ascertain every diagnosis code that was subject to Chart Review and not independently identified, and even if he had been able to perfectly narrow that universe down to circumstances in which the Chart Review results were

---

[54] *Id.* at Appendix D, paras. 21-22.
[55] *Id.* at Appendix D, para. 29.
[56] *Id.* at Appendix D, paras. 30-43.
[57] *Id.* at Appendix D, paras. 8-48.

27

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

complete and accurate and the diagnosis code at issue was truly unsupported, this would still not establish that submitting the diagnosis code led to an overpayment.

56.    In considering whether an unsupported diagnosis code led to an overpayment, it is important to note that there is no specific, uniform dollar value that can be ascribed to an isolated diagnosis code.  As Dr. Garthwaite shows in his report, the process of determining the financial impact of a given diagnosis code is a complex one that relies on many pieces of information.  It requires, at a minimum, identifying whether other providers submitted the same diagnosis code for that member in that year; determining what other diagnosis codes were submitted for that member in the year (including any diagnosis codes that were submitted by non-United plans if the member had coverage from other plans during the year); identifying the HCC and/or RxHCC condition codes that the diagnosis code maps to, and whether those HCC(s)/RxHCC(s) were supported by other, uncontested diagnosis codes; calculating what the member's risk score would have been in that year absent the HCCs/RxHCCs that were wholly/only supported by that given diagnosis code; and translating that risk score into a dollar amount based on the member's contract, the base rate for that contract, and certain year-specific risk factor adjustments.[58]  This multi-step process requires careful consideration of a large set of various factors.  In some cases, it requires data from CMS that United would not have had—such as the data about diagnosis codes submitted from other, non-United plans.[59]  In other cases, it relies on information that is only available after the close of the contract year and, thus, months after the completion of the Chart Review giving rise to the question.  Importantly, Dr. Garthwaite has not established that these steps—which are key to determining whether an overpayment exists—were part of the Chart Review process.

57.    The difficulty of identifying diagnosis codes that were not independently found in Chart Review and that had financial impact is further illustrated by Dr. Garthwaite's revisions to his list of Garthwaite Deletes.  He provided one version with his original report (on September 29, 2023), and subsequently issued three revised versions over the course of several months (reflected in his October 4, 2023 Errata, January 5, 2024 Errata, and March 11, 2024 Errata).  The version of the Garthwaite Deletes from the October 4, 2023 Errata contained 4% fewer IRADS diagnosis

---

[58] *Id.* at Appendix D, paras. 51-90.
[59] *Id.* at Appendix D, para. 73.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

codes and 1% fewer EDPS diagnosis codes than the original version.[60] The version of the Garthwaite Deletes from the January 5, 2024 Errata contained the same number of IRADS diagnosis codes but 36% fewer EDPS diagnosis codes than the October 4, 2023 Errata version.[61] Moreover, the January 5, 2024 version of the Garthwaite Deletes did not fully reconcile to Dr. Garthwaite's financial impact calculations. Specifically, there were more than 1,200 members across service years 2014–2016 for whom Dr. Garthwaite identified an alleged Part C overpayment but who did not have any diagnosis codes in the January 5, 2024 Errata version of the Garthwaite Deletes.[62] The March 11, 2024 version of the Garthwaite Deletes removed more than 46,000 IRADS diagnosis codes which had not been submitted to RAPS and had inadvertently been included in his previous lists; added over 200,000 EDPS diagnosis codes which had been inadvertently removed from his January 5, 2024 version; removed approximately 1,000 IRADS diagnosis codes and 4,000 EDPS diagnosis codes which had been erroneously included in his prior lists because of an issue relating to being unable to replicate MARx risk scores; and removed the diagnosis codes for 9 members for whom Dr. Garthwaite calculated no financial impact.[63] The various issues and corrections related to the Garthwaite Deletes further underscore the complexity and difficulty of the exercise.

58.    Lastly, the Garthwaite Report appears to place special emphasis on diagnosis codes from the "CV Pipeline List." However, as with the Garthwaite Deletes, Dr. Garthwaite has not established that United knowingly retained any overpayments related to the CV Pipeline List diagnosis codes. First, as Dr. Garthwaite notes, the CV Pipeline List diagnosis codes had not been

---

[60] In the October 4, 2023 Errata, Dr. Garthwaite wrote that "there are discrepancies between the total financial impact and beneficiary counts in my report and the total financial impact and beneficiary counts that would be derived from an analysis of [the original version of] Attachment 1. Additionally . . . some diagnosis codes included in [the original version of] Attachment 1 are diagnosis codes whose deletion would not have financial impact, particularly in Part C service year 2014 and Part D service year 2016." *See* Errata to Expert Report of Craig Garthwaite, October 4, 2023, para. 4.

[61] Dr. Garthwaite did not explain why the January 5, 2024 version of the Garthwaite Deletes has fewer diagnosis codes than the prior one. In the January 5, 2024 Errata, Dr. Garthwaite described making two kinds of changes to the presentation of HCC codes recorded in the Garthwaite Deletes, but he did not describe removing any diagnosis codes. *See* Errata to Expert Report of Craig Garthwaite, January 5, 2024.

[62] *See* Appendix X2 (Updated as of 03-18-24) for the calculations referenced in this paragraph. I relied upon Attachment 3 to the Garthwaite Report to identify alleged financial impact for specific members. Attachment 3 has not been revised or updated since it was published with Dr. Garthwaite's original report.

[63] *See* Errata to Expert Report of Craig Garthwaite, March 11, 2024, paras. 2-6.

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

completely evaluated when the CV process was terminated.[64] Second, as shown in my December 3 report, 64.2% of the In Process CV Codes that overlapped with the CON12-13 PFR data mapped to conditions that were validated by the RADV auditors.[65] Third, only 85.8% of the total CV Pipeline List diagnosis codes are in the First Interrogatory Response—meaning that, for the remaining 14.2%, the government has not asserted that the codes are of concern.[66] Moreover, only 54.4% of the total CV Pipeline List diagnosis codes are in the Garthwaite Deletes.[67] Thus, 45.6% of the total CV Pipeline List diagnosis codes were not identified in Dr. Garthwaite's own methodology as having had financial impact; consequently, based on Dr. Garthwaite's analysis, none of those diagnosis codes should be, or be suspected of being, the cause of overpayments. This includes 17.1% of the CV Pipeline List diagnosis codes from 2012, a year for which United attempted to filter the list to include only diagnosis codes with financial impact. For all of these reasons, it would be inappropriate to suggest or conclude that the diagnosis codes in the CV Pipeline Lists were necessarily unsupported or led to overpayments.

### H. *Opinion 8: If the validation rates of CMS's CON11-15 RADV audits hold constant across all of the Garthwaite Deletes, then the rate of unsupported diagnosis codes with financial impact would be less than 3.5% of the diagnosis codes included in the government's First Interrogatory Response and less than 0.3% of United's total diagnosis codes submitted during this period for the members who underwent Chart Review. In my experience, based on common industry practices in the relevant timeframe, such a low rate of potentially unsupported diagnosis codes with financial impact would not have been expected to necessitate additional investigation or analysis.*

---

[64] *See* Garthwaite Report, para. 143.

[65] *See* Dec. 3 Renjilian Report at p. 85, Fig. 14: Results of RADV Analysis—In Process CV Codes. I use the term "In Process CV" here because, in this analysis from my earlier report, I considered all four files produced in response to the government's requests about the In Process CV codes. Dr. Garthwaite's "CV Pipeline Lists" only incorporate two of those files. When I refer to the "CV Pipeline List" in this paragraph, I refer to the diagnosis codes in the two files that Dr. Garthwaite specifically used.

[66] *See* Appendix X8 (Updated as of 03-18-24).

[67] *Id.* Breaking the CV Pipeline List diagnosis codes down by year, only 21.2% of the 2011 diagnosis codes and 82.9% of the 2012 CV Pipeline List diagnosis codes are in the Garthwaite Deletes. I understand that the CV Pipeline List from DOS year 2011 did not filter out diagnosis codes with no financial impact, which may explain why so many are not in the Deletes. In contrast, I understand that the CV Pipeline List from DOS year 2012 was designed to only include diagnosis codes with financial impact. *See* Garthwaite Report, para. 143.

30

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

59.      As discussed above, less than 7% of the diagnosis codes alleged to be at issue by the government in the First Interrogatory Response were among the Garthwaite Deletes.  As an additional point of context, the Garthwaite Deletes comprise a minimal percentage of the total diagnosis code submissions for members who had charts that underwent Chart Review during this period.  As shown in **Figure 9** below, the Garthwaite Deletes amount to approximately 0.5% of the total diagnosis codes submitted by United for risk adjustment purposes for these members during this time period.[68]

**Figure 9. Garthwaite Deletes Compared to All United Diagnosis Code Submissions For Members with Chart that Underwent Chart Review.[69]**

| | Number of Diagnosis Codes (Unique Member - Dx - DOS) | | |
|---|---|---|---|
| DOS Year | Garthwaite Deletes | All Submitted to RAPS/EDPS | % of Total |
| 2008 | 100,781 | 7,664,458 | 1.3% |
| 2009 | 196,936 | 12,947,948 | 1.5% |
| 2010 | 384,026 | 12,657,695 | 3.0% |
| 2011 | 115,029 | 13,359,726 | 0.9% |
| 2012 | 190,492 | 36,836,367 | 0.5% |
| 2013 | 219,903 | 47,789,547 | 0.5% |
| 2014 | 223,271 | 65,969,774 | 0.3% |
| 2015 | 225,087 | 78,141,438 | 0.3% |
| 2016 | 279,135 | 96,411,956 | 0.3% |
| **Total** | **1,934,660** | **371,778,909** | **0.5%** |

60.      Moreover, as discussed above, Dr. Garthwaite has not established which, if any, of the Garthwaite Deletes were actually unsupported.  In fact, by comparing the Garthwaite Deletes to the results of the CON11-15 RADV audits, I found that more than 55% of overlapping diagnosis codes mapped to condition codes that were *validated* by CMS's auditors.

---

[68] To further contextualize the Garthwaite Deletes, I counted all diagnosis codes submitted by United to CMS for risk adjustment purposes during the relevant time period.  I only considered diagnosis codes that mapped to an HCC or RxHCC, and I did not include diagnosis codes that had been deleted.  The data produced by United in this matter only includes diagnosis code-level information for United members who had at least one chart go through Chart Review.  Accordingly, I was only able to count the number of diagnosis codes submitted for these members, which is a subset of the total diagnosis codes submitted for all members during this time period.  Thus, the percentages shown below would be even smaller if I had been able to compare the Garthwaite Deletes to the number of diagnosis codes submitted by United for *all* its members, not just the members who had a chart go through Chart Review.

[69] *See* Exhibit 8 (Updated as of 03-18-24).

31

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

61.     More specifically, I reviewed the CON11-15 PFR Data to identify the member-HCC combinations in that data that overlapped with the Garthwaite Deletes. For those overlapping instances, I then determined the percentage of the overlapping HCCs that were validated by CMS's RADV auditors.   Through this process, I identified 724 member-HCC combinations that overlapped between the Garthwaite Deletes and the CON11-15 PFR Data.[70] There were 681 total diagnosis codes in the Garthwaite Deletes that corresponded to these member-HCC combinations. The 681 overlapping diagnosis codes have notable similarities with the full set of Garthwaite Deletes with alleged Part C financial impact during this time period (DOS years 2010-2014).[71] I compared the distribution of records by HCC between (a) the Garthwaite Delete diagnosis codes relating to the overlapping member-HCC combinations and (b) all Garthwaite Deletes with alleged Part C financial impact during this period. Because both V12 and V22 HCCs were applicable in this period for service years 2013 and 2014, I further broke down this comparison in those years by HCC type (V12 or V22) and year.[72] For each of the permutations I analyzed, I confirmed that the unique HCCs that were subjected to the RADV audits account for more than 87% of the HCCs mapping to the Garthwaite Deletes with Part C financial impact. Also, I confirmed that, in each of these permutations, the average difference at an HCC level between the proportions in groupings (a) and (b) above was 2% or less. Additionally, in my experience, a sample of 681 diagnosis codes would generally be considered robust for most evaluative purposes.

62.     Of the 681 overlapping diagnosis codes, 375 diagnosis codes – 55.1% – mapped to condition codes that were validated by CMS's RADV audits, meaning that the members' conditions relating to these diagnosis codes were confirmed to be supported by CMS's own reviewers and, thus, the diagnosis codes could not have led to any overpayment. Thus, even after Dr. Garthwaite had narrowed down the diagnosis codes at issue to only such codes that would have had Part C financial impact, more than half of the diagnosis codes that overlapped with CMS's

---

[70] For this exercise, I used the same fundamental methodology with respect to identifying overlapping and validated diagnosis codes as described in Opinion 4 of my December 3 report. The count of overlapping member-HCC combinations is derived in Appendix X7 (Updated as of 03-18-24).

[71] Since the RADV audits only evaluate HCCs, and not RxHCCs, this analysis focuses on Garthwaite Deletes that had alleged Part C financial impact. I assume a Garthwaite Delete had Part C financial impact when any of the HCC fields in the data were populated.

[72] See Exhibit 9 (Updated as of 03-18-24).

32

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

RADV audits were *validated* at the condition level by CMS's auditors. **Figure 10** below summarizes my analysis.

**Figure 10. Results of RADV Analysis – Garthwaite Deletes.[73]**

| | Garthwaite Deletes | | |
|---|---|---|---|
| DOS Year | Overlap with CON11-15 PFR Data: Total | Overlap with CON11-15 PFR Data: HCC Validated | % of Total |
| 2010 | 75 | 45 | 60.0% |
| 2011 | 15 | 9 | 60.0% |
| 2012 | 137 | 70 | 51.1% |
| 2013 | 214 | 113 | 52.8% |
| 2014 | 240 | 138 | 57.5% |
| **Total** | **681** | **375** | **55.1%** |

63.    If this validation rate held constant across all of the Garthwaite Deletes, then less than half of the Garthwaite Deletes would be unsupported.  That would mean that less than 3.5% of the diagnosis codes in the First Interrogatory Response, and less than 0.3% of the total diagnosis codes submitted by United during this period for the members who underwent Chart Review, would be unsupported and have financial impact.  Put another way, based on Dr. Garthwaite's analysis and the results of the CMS RADV audits, for any given First Interrogatory Response diagnosis code, the likelihood that the diagnosis code led to an overpayment is less than 3.5%.

64.    Far from establishing knowledge that any particular diagnosis code resulted in an overpayment, this analysis indicates that the likelihood that a diagnosis code not independently identified in Chart Review amounts to an overpayment is very small.

65.    Indeed, government communications from various contexts suggests that a potential error rate of 3.5% is not sufficient to warrant additional investigation.  For example, even under Corporate Integrity Agreements in this timeframe—which by definition involve organizations that had a past history of substantial compliance issues and that were under enhanced scrutiny by the Department of Health and Human Services Office of Inspector General—error rates up to 5% were viewed as not requiring any expanded review or analysis.  Thus, for an entity

---

[73] *See* Exhibit 10 (Updated as of 03-18-24).

33

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

with no past history of Corporate Integrity Agreements, an error rate less than 5%—particularly one involving a highly complex and nuanced analysis—would not have necessarily required deeper analysis.  Additional support for this view is found in the Medicare Program Integrity Manual, which suggests that an error rate of 7% would not necessitate further review.[74]  Similar support exists in contemporaneous guidance issued by Medicare Audit Contractors, indicating that error rates of less than 10% could reasonably be viewed as not requiring additional analysis.[75]

66.    This view is further supported by the industry error rates found in the government's Part C Improper Payment Measure.  As shown earlier in **Figure 6**, the industry-wide Part C population error from overpayments ranged from 8.6% (in CY 2010) to 4.6% (CY 2017) during the time period relevant to this case for which this Part C error rate data has been published.

67.    Further corroboration of this perspective can be found in the results of the Comprehensive Error Rate Testing ("CERT") program in this timeframe.[76]  In fact, as part of the CERT program, CMS established a goal to reduce the payment error rate to 6.2% by 2012—still higher than the estimated error rate here.[77]

68.    Taken together, these varied reference points support the view that an error rate of less than 3.5% (or, in the context of all diagnosis codes submitted by United for the members who underwent Chart Review, less than 0.3%) would not have mandated additional review or analysis.

I.    _Opinion 9: For the reasons described in my Opinions 1-8 above, Dr. Garthwaite's calculation of the number of members for whom United was allegedly overpaid as a result of the Garthwaite Deletes is also unreliable._

---

[74] _See_ Medicare Program Integrity Manual section 3.7.1.2, which states in pertinent part: "Twenty claims from one provider are reviewed.  One claim is denied because a physician signature is lacking on the plan of care.  The denial reflects 7 percent of the dollar amount of claims reviewed. Judicious assessment of medical review resources indicates no further review is necessary at this time."

[75] _See, e.g._, the Palmetto GBA "Progressive Corrective Action (PCA) Decision Tree" revised on June 4, 2010, which shows that a "charge denial rate" of 0-9% would result in medical review of claims being discontinued.  _See also_ the NHIC "Progressive Corrective Action" policy from January 4, 2012, which discusses the CMS requirement that Medicare contractors perform "medical review" to reduce payment error rates and which states that medical review ". . . continues until a supplier reaches an acceptable payment error rate (usually less than 10 percent)."

[76] _See, e.g._, the Medicare Fee-for-Service 2010 Improper Payment Report, which noted that the overall Medicare improper payment rate in 2009 was 12.4%.

[77] _Id_.

34

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

69.     Dr. Garthwaite has calculated that United's risk adjustment payments would have been lower for 1,154,197 members (counted year-by-year, whether under Part C, Part D, or both) had United removed the Garthwaite Deletes.[78]  Of these, Dr. Garthwaite calculates that 707,152 members would have had lower Part C payments, and 825,936 members would have had lower Part D payments.[79] In Dr. Garthwaite's March 11, 2024 Errata, he stated that these member counts were overstated to a "de minimis" degree.[80]

70.     As set forth above, Dr. Garthwaite has not established that any of the individual diagnosis codes he identifies as Deletes were in fact unsupported or actually resulted in overpayments, and the government's RADV auditors actually validated the majority of condition codes they reviewed that map to diagnosis codes that the government alleged were unsupported. Because Dr. Garthwaite has not established that his purported Deletes led to overpayments, he similarly cannot reliably establish the number of members for whom United was overpaid.

71.     One concrete example of the unreliability of Dr. Garthwaite's analysis comes from the members who overlap between the Garthwaite Deletes and the CON11-13 RADV audits.  As shown in **Figure 7** and discussed in Opinion 5 above, 23,231 members with alleged Part C financial impact related to the Garthwaite Deletes were covered under the 13 contracts that CMS found to have negative recovery amounts in the CON11-13 RADV audits.  Dr. Garthwaite has failed to explain how United could have been overpaid as a result of these members when the government has already determined that there was a negative recovery amount for the members' contract.  Had the government conducted RADV audits on additional contract  years, the results of the CON11-13 RADV audits strongly suggest that many more would similarly have had net negative recovery amounts.

---

[78] *See* Corrected Exhibit 11 from Errata to Expert Report of Craig Garthwaite, October 4, 2023.  Counting year-by-year means that a unique member is counted once for each year in which the member had alleged financial impact. For example, if unique member John Doe had alleged financial impact related to the Garthwaite Deletes in both 2013 and 2014, then the member would count once under each year and twice in total across the years.
[79] *See id.*
[80] *See* Errata to Expert Report of Craig Garthwaite, March 11, 2024, paras. 9-10. Dr. Garthwaite identified two separate issues. First, 10 members were inadvertently included because of an issue with rounding in his risk score calculations. Second, 6,159 members were inadvertently included because of an issue related to the calculation of negative financial impact.

35

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

72.    The above example, together with the broader failing of Dr. Garthwaite to establish that any of his purported Deletes were actually unsupported, makes clear the unreliability of his estimate of the number of individual members for whom United was allegedly overpaid.

## VI.    <u>CONCLUSION</u>

73.    This report presents a summary of my work and opinions to date.  I reserve the right to revise and refine these opinions as additional work is performed and additional information is received.  To the extent that any additional evidence becomes available as a result of the Court's reconsideration, I may modify or supplement my opinions as appropriate.

**Submitted by:** _____    **Dated:**  <u>March 18, 2024</u>
                **M. Timothy Renjilian, CPA**

CONFIDENTIAL, ATTORNEYS' EYES ONLY, & OUTSIDE COUNSEL EYES ONLY

**EXHIBIT D-66**



Thursday,
June 29, 2000

Part II

# Department of Health and Human Services

**Health Care Financing Administration**

**42 CFR Parts 417 and 422**
**Medicare Program; Medicare+Choice Program; Final Rule**

EXHIBIT

00164

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Health Care Financing Administration**

**42 CFR Parts 417 and 422**

**[HCFA–1030–FC]**

**RIN 0938–AI29**

## Medicare Program; Medicare+Choice Program

**AGENCY:** Health Care Financing Administration (HCFA), HHS.

**ACTION:** Final rule with comment period.

**SUMMARY:** This final rule with comment period responds to comments on the June 26, 1998 interim final rule that implemented the Medicare+Choice (M+C) program and makes revisions to those regulations where warranted. We also are making revisions to the regulations that are necessary to reflect the changes to the M+C program resulting from the Balanced Budget Refinement Act of 1999 (BBRA). Revisions to the regulations reflecting changes in the law made by the BBRA are subject to public comment. Issues discussed in this rule include eligibility, election, and enrollment policies; marketing requirements; access requirements; service area and benefit policy; quality improvement standards; payment rates, risk adjustment methodology, and encounter data submission; provider participation rules; beneficiary appeals and grievances; contractual requirements; and preemption of State law by Federal law.

This final rule also addresses comments on the interim final rule published on December 2, 1997, which implemented user fees for section 1876 risk contractors for 1998, and formed the basis for the M+C user fee provisions in the June 26, 1998 interim final rule, and the provider-sponsored organization (PSO) interim final rule published April 14, 1998.

**DATES:** *Effective date:* This final rule is effective July 31, 2000.

*Comment period:* Comments on provisions reflecting provisions of the Balanced Budget Refinement Act of 1999 will be considered if received at the appropriate address, as provided below, no later than August 28, 2000. We will not consider comments concerning regulatory provisions that remain unchanged or that are revised in this final rule based on previous public comment.

**ADDRESSES:** Mail written comments (one original and three copies) to the following address ONLY: Health Care Financing Administration, Department of Health and Human Services, Attention: HCFA–1030–FC, P.O. Box 8013, Baltimore, MD 21244–8013.

Since comments must be received by the date specified above, please allow sufficient time for mailed comments to be received timely in the event of delivery delays.

If you prefer, you may deliver by courier, your written comments (one original and three copies) to one of the following addresses: Room 443–G, Hubert H. Humphrey Building, 200 Independence Avenue, SW, Washington, DC 20201; or C5–14–03, Central Building, 7500 Security Boulevard, Baltimore, MD 21244–1850.

Comments mailed to the two above addresses may be delayed and received too late to be considered. Because of staffing and resource limitations, we cannot accept comments by facsimile (FAX) transmission. In commenting, please refer to file code HCFA–1030–FC.

Comments received timely will be available for public inspection as they are received, generally beginning approximately 3 weeks after publication of a document, in Room 443–G of the Department's offices at 200 Independence Avenue, SW, Washington, DC, on Monday through Friday of each week from 8:30 a.m. to 5 p.m. (Phone (202) 690–7890).

For comments that relate to information collection requirements, see section IV of the **SUPPLEMENTARY INFORMATION.**

**FOR FURTHER INFORMATION CONTACT:**
Marty Abeln (410) 786–1032 (for issues related to user fees, service area, point-of-service option, PSOs, and intermediate sanctions).

Wendy Burger (410) 786–1566 and Lynn Orlosky (410) 786–5930 (for issues related to eligibility, elections, and enrollment).

Carol Barnes (410) 786–5496 (for issues related to continuation areas and marketing).

Anne Manley (410) 786–1096 (for issues related to emergency and urgently needed services, provider participation rules, and Federal preemption).

Eileen Zerhusen (410) 786–7803 (for issues related to post-stabilization care).

Tony Hausner (410) 786–1093 (for issues related to access, discrimination, and physician incentive rules).

Amy Chapper (410) 786–0367 (for issues related to information disclosure and confidentiality).

Brian Agnew (410) 786–5964 (for issues related to quality assurance and accreditation).

Al D'Alberto (410) 786–1100 (for issues related to payments, premiums, and ACRs).

James Hart (410) 786–4474 (for issues related to risk adjustment and encounter data).

Chris Eisenberg (410) 786–5509 (for issues related to contracts and contract appeals).

Michele Edmondson (410) 786–6478 (for issues related to beneficiary appeals).

Anita Heygster (410) 786–4486 (for issues related to M+C private fee-for-service plans).

Cindy Mason (410) 786–6680 (for issues related to M+C MSA plans).

**SUPPLEMENTARY INFORMATION:** For the convenience of the reader, we are providing a complete outline of this final rule, including a topical listing of the major areas raised by the comments, along with numerical regulatory citations.

I. Background
  A. Balanced Budget Act of 1997
  B. Overview of M+C Regulations
  1. Interim Final Rule
  2. Correction Notice
  3. February 17, 1999 Final Rule
  C. M+C Provisions of the Balanced Budget Refinement Act of 1999
II. Analysis of and Responses to Public Comments
  A. Overview
  1. Comments on June 26, 1998 Interim Final Rule
  2. Issues in February 17, 1999 Final Rule
  3. Organization of this Final Rule
  4. General Comments and Subpart A Issues
  a. Administrative Procedure Act Issues
  b. Types of M+C Plans (§ 422.4)
  c. Application Requirements and Procedures (§§ 422.6 and 422.8)
  d. User Fees (§ 422.10)
  B. Eligibility, Election and Enrollment (Subpart B)
  1. Eligibility to Elect an M+C Plan (§ 422.50)
  2. Continuation of Enrollment (§ 422.54)
  3. Election Process (§ 422.60)
  4. Enrollment Capacity (§ 422.60(b))
  5. Election of Coverage Under an M+C Plan (§ 422.62)
  6. Information about the M+C Program (§ 422.64)
  7. Coordination of Enrollment and Disenrollment Through M+C Organizations (§ 422.66)
  8. Effective Dates of Coverage and Change of Coverage (§ 422.68)
  9. Disenrollment by the M+C Organization (§ 422.74)
  10. Approval of Marketing Materials and Election Forms (§ 422.80)
  C. Benefits and Beneficiary Protections (Subpart C)
  1. Introduction
  2. Emergency, Urgently Needed, and Post-Stabilization Care Services (§§ 422.2, 422.100, 422.112, and new § 422.113)
  a. Definitions
  b. Enforcement of Emergency Requirements

c. Access to Emergency and Urgently Needed Services
d. Post-Stabilization Care Services
3. Service Area Requirements (§§ 422.2, 422.100)
4. Benefits (§§ 422.2, 422.100, 422.101, 422.106)
5. Special Rules for Screening Mammography, Influenza Vaccine, and Pneumococcal Vaccine (§ 422.100(h))
6. Special Rules for Point-of-Service (POS) Option (§ 422.105)
7. Medicare Secondary Payer (MSP) Procedures (§ 422.108)
8. National Coverage Determinations (§ 422.109)
9. Discrimination Against Beneficiaries Prohibited (§ 422.110)
10. Disclosure Requirements (§ 422.111)
11. General Access Requirements (§ 422.112)
a. Introduction
b. Provider Network (§ 422.112(a)(1))
c. Primary Care Providers (PCP) Panels (§ 422.112(a)(2))
d. Specialty Care (§ 422.112(a)(3))
e. Serious Medical Conditions (§ 422.112(a)(4))
f. Written Standards (§ 422.112(a)(7))
g. Cultural Considerations (§ 422.112(a)(9))
12. Confidentiality and Accuracy of Enrollee Records (§ 422.118)
13. Information on Advance Directives (§ 422.128)
D. Quality Assurance (Subpart D)
1. Overview
2. Quality Assessment and Performance Improvement Requirements (§ 422.152)
3. External Review (§ 422.154)
4. Deemed Compliance Based on Accreditation (§ 422.156)
5. Accreditation Organizations (§ 422.157)
6. Procedures for Approval of Accreditation as a Basis for Deeming Compliance (§ 422.158)
E. Relationships With Providers (Subpart E)
1. Provider Participation Procedures (§§ 422.202(a), and 422.204(c))
2. Consultation Requirements (§ 422.202(b))
3. Treatment of Subcontracted Networks (§ 422.202(c))
4. Provider Antidiscrimination (§§ 422.100(j), 422.204(b), and new § 422.205)
5. Provider Credentialing (§ 422.204(a))
6. Prohibition on Interference with Health Care Professionals' Communication with Enrollees (§ 422.206)
7. Physician Incentive Plans (§§ 422.208 and 422.210)
8. Special Rules for Services Furnished by Noncontract Providers (§ 422.214)
9. Exclusion of Services Furnished Under a Private Contract (§ 422.220)
10. M+C Plans and the Physician Referral Prohibition
F. Payments to M+C Organizations (Subpart F)
1. General Provisions (§ 422.250)
2. Risk Adjustment and Encounter Data (§ 422.256 through § 422.258)
3. Special Rules for Hospice Care (§ 422.266)
G. Premiums and Cost-Sharing (Subpart G)

1. General Provisions (§ 422.300)
2. Rules Governing Premiums and Cost-Sharing (§ 422.304)
3. Submission Requirements of the Proposed Premiums and Related Information (§ 422.306)
4. Limits on Premiums and Cost-Sharing Amounts (§ 422.308)
5. Incorrect Collections of Premiums and Cost-Sharing Amounts (§ 422.309)
6. ACR Approval Process (§ 422.310)
7. Requirement for Additional Benefits (§ 422.312)
H. Provider-Sponsored Organizations (Subpart H)
I. Organization Compliance With State Law and Preemption by Federal Law (Subpart I)
1. State Licensure and Scope of Licensure (§ 422.400)
2. Federal Preemption of State Law (§ 422.402)
a. General Preemption (§ 422.402(a))
b. Specific Preemption (§ 422.402(b))
3. Prohibition on State Premium Taxes (§ 422.404)
4. Medigap
J. (Subpart J—Reserved)
K. Contracts with M+C Organizations (Subpart K)
1. Definitions (§ 422.500)
2. National Contracting (§ 422.501)
3. Compliance Plan (§ 422.501(b)(3)(vi))
4. Access to Facilities and Records (§ 422.502(e))
5. Disclosure of Information (§ 422.502(f)(2)(v))
6. Beneficiary Financial Protection (§ 422.502(g))
7. Requirements of Other Laws and Regulations (§ 422.502(h))
8. Contracting/Subcontracting Issues (§ 422.502(i))
9. Certification of Data that Determine Payment/Certification of Accuracy of ACR (§ 422.502(l))
10. Effective Date and Term of Contract (§ 422.504)
11. Nonrenewal of M+C Contracts (§ 422.506)
12. Provider Prior Notification and Disclosure (§§ 422.506(a), 422.508, 422.510(b), and 422.512)
13. Mutual Termination of a Contract (§ 422.508)
14. Termination of Contract by HCFA (§ 422.510)
15. Minimum Enrollment Requirements (§ 422.514)
16. Reporting Requirements (§ 422.516)
17. Prompt Payment by M+C Organization (§ 422.520)
L. Effect of Change of Ownership or Leasing of Facilities During Term of Contract (Subpart L)
M. Grievances, Organization Determinations, and Appeals (Subpart M)
1. Background and General Provisions (§§ 422.560, 422.561, and 422.562)
2. Grievance Procedures (§ 422.564)
3. Organization Determinations (§§ 422.566 through 422.576)
4. Reconsiderations by an M+C Organization or Independent Review Entity (§§ 422.578 through 422.616)

5. Effectuation of a Reconsidered Determination (§ 422.618)
6. Notification of Noncoverage in Inpatient Hospital Settings (§§ 422.620 and 422.622)
Subpart M—Comments and Responses
7. Definitions and General Provisions
8. Grievances
9. Organization Determinations
10. Written Notice
11. Time Frames
12. Expedited Organization/Reconsidered Determinations
13. Authorized Representatives
14. Other Appeal Rights
15. Inpatient Hospital Notice of Discharge
16. Other Comments
N. Medicare Contract Appeals (Subpart N)
O. Intermediate Sanctions (Subpart O)
P. Medicare+Choice MSA Plans
1. Background
2. General Provisions (Subpart A)
3. Eligibility, Election and Enrollment Rules (Subpart B)
a. Eligibility and Enrollment (§ 422.56)
b. Election (§ 422.62)
4. Benefits (Subpart C)
a. Basic Benefits Under an M+C MSA Plan (§ 422.102)
b. Supplemental Benefits (§§ 422.102 and 422.103)
5. Quality Assurance (Subpart D)
6. Relationships with Providers (Subpart E)
7. Payments Under MSA Plans (Subpart F)
8. Premiums (Subpart G)
9. Other M+C Requirements
10. Responses to Comments
Q. M+C Private Fee-for-Service Plans
1. Background and General Comments (§ 422.4(a)(3))
2. Beneficiary Issues
3. Provider Payment Issues
4. Noncontracting Provider
5. Quality Assurance (§§ 422.152 and 422.154)
6. Access to Services (§ 422.214)
7. Physician Incentive Plans (§§ 422.208)
8. Special Rules for M+C Private Fee-for-Service Plans (§ 422.216)
9. Deemed Contracting Providers
III. Provisions of this Final Rule (Changes to the M+C Regulations)
IV. Collection of Information Requirements—Paperwork Reduction Act
V. Regulatory Impact Statement
VI. Other Required Information
   A. Federalism Summary Impact Statement
   B. Waiver of Notice of Proposed Rulemaking
   C. Response to Comments

## I. Background

### A. Balanced Budget Act of 1997

Section 4001 of the Balanced Budget Act of 1997 (BBA) (Pub. L. 105–33), enacted August 5, 1997, added sections 1851 through 1859 to the Social Security Act (the Act) to establish a new Part C of the Medicare program, known as the "Medicare+Choice (M+C) Program." (The previous Part C of the statute, which included provisions in section 1876 of the Act governing existing Medicare health maintenance

organization (HMO) contracts, was redesignated as Part D.) Under section 1851(a)(1) of the Act, every individual entitled to Medicare Part A and enrolled under Part B, except for individuals with end-stage renal disease, may elect to receive benefits through either the existing Medicare fee-for-service program ("Original Medicare") or a Part C M+C plan, if one is offered where he or she lives.

As its name implies, the primary goal of the M+C program is to provide Medicare beneficiaries with a wider range of health plan choices through which to obtain their Medicare benefits. The M+C statute authorizes a variety of private health plan options for beneficiaries, including both the traditional managed care plans (such as those offered by HMOs) that traditionally have been offered under section 1876 of the Act, and new options that were not previously authorized. Specifically, section 1851(a)(2) of the Act describes three types of M+C plans authorized under Part C:

• M+C coordinated care plans, including HMO plans (with or without point of service options), provider-sponsored organization (PSO) plans, and preferred provider organization (PPO) plans.

• M+C medical savings account (MSA) plans (that is, combinations of a high-deductible M+C health insurance plan and a contribution to an M+C MSA).

• M+C private fee-for-service plans.
An entity contracting with us to offer any of the above plans to Medicare beneficiaries is called an "M+C organization."

In addition to expanding the types of health plans that can be offered to Medicare beneficiaries, the M+C program introduces several other fundamental changes to the managed care component of the Medicare program. These changes include:

• Establishment of an expanded array of quality assurance standards and other consumer protection requirements;

• Introduction of an annual coordinated enrollment period, in conjunction with the distribution by us of uniform, comprehensive information about M+C plans that is needed to promote informed choices by beneficiaries;

• Revisions in the way we calculate payment rates to M+C organizations that will narrow the range of payment variation across the country and increase incentives for organizations to offer M+C plans in diverse geographic areas; and

• Establishment of requirements concerning provider participation procedures.

*B. Overview of M+C Regulations*

1. Interim Final Rule

On June 26, 1998, we published in the **Federal Register** a comprehensive interim final rule (63 FR 34968) to implement the provisions of section 4001 of the BBA that established the M+C program. That interim final rule set forth the new M+C regulations in 42 CFR Part 422—Medicare+Choice Program. The major subjects covered in each subpart of part 422 are as follows:

• Subpart A—Definitions, including definitions of types of plans, application process, and user fees.

• Subpart B—Requirements concerning beneficiary eligibility, election, enrollment and disenrollment procedures, and plan information and marketing materials.

• Subpart C—Requirements concerning benefits, point of service options, access to services (including rules on enrollee assessments and notification upon termination of specialists), and others.

• Subpart D—Quality assurance standards, external review, and deeming of accredited organizations.

• Subpart E—Provider participation rules and the prohibition against interference with health care professionals' advice to enrollees.

• Subpart F—Payment methodology for M+C organizations, risk adjustment, and encounter data requirements.

• Subpart G—Requirements concerning premiums, cost-sharing, and determination of adjusted community rate.

• Subpart H—Requirements concerning PSOs.

• Subpart I—Organization compliance with State law and preemption by Federal law.

• Subpart K—Contract requirements.

• Subpart L—Change of ownership rules.

• Subpart M—Beneficiary grievances, organization determinations, and appeals.

• Subpart N—Contractor appeals of nonrenewals or terminations of contracts.

• Subpart O—Procedures for imposing intermediate sanctions.

2. Correction Notice

On October 1, 1998, we issued a correction notice in the **Federal Register** (63 FR 52610) to correct technical errors that appeared in the interim final rule. All references in this document to regulation text are to the corrected text unless otherwise noted.

3. February 17, 1999 Final Rule

Additionally, on February 17, 1999, we published a final rule in the **Federal Register** (64 FR 7968) that set forth limited changes to the M+C regulations published in the June 26, 1998 interim final rule. It specifically addressed only a limited number of issues raised by commenters on the June 26, 1998 interim final rule. We indicated in the preamble to the February 17, 1999 final rule that we intended to address all other issues raised by commenters on the M+C interim final rule in a comprehensive M+C final rule to be published at a later date. The types of comments we addressed in the February final rule are discussed in more detail in section II.A.2.

*C. M+C Provisions of the Balanced Budget Refinement Act of 1999*

On November 29, 1999, as we were completing the development of this final rule, the Balanced Budget Refinement Act of 1999 (Pub. L. 106–113) (BBRA) was enacted. The BBRA includes a number of provisions that affect the M+C program, and these provisions have necessitated a number of corresponding changes so that the changes in the law made by the BBRA are reflected in the text of the M+C regulations. For the most part, the statutory changes are self-explanatory, and have already taken effect. As noted above, we are accepting public comment on conforming changes to the M+C regulations made as a result of the BBRA provisions. We are revising the regulations to reflect the provisions of the BBRA as follows:

1. Changes in M+C Enrollment Rules (Section 501 of the BBRA)

*a. Enrollment in Alternative M+C Plans and Medigap Coverage After Involuntary Terminations*

Section 1851(e)(4) of the Act establishes special election periods during which M+C-eligible individuals may disenroll from an M+C plan or elect another M+C plan, including a special election period when an M+C organization or we have terminated a plan or the organization has otherwise discontinued providing the plan in the area in which the individual resides. Section 501(a)(1) of the BBRA revised section 1851(e)(4) to specify that this special election period now becomes available either upon termination or discontinuation or when the organization "has notified the individual of an impending termination or discontinuation of such a plan." We have revised § 422.62(b)(1) to reflect this earlier opportunity for an affected

enrollee to elect an alternative M+C plan or return to original Medicare. We note that section 501(b) of the BBRA set forth conforming amendments to section 1882(s)(3) of the Act (concerning beneficiary rights to guaranteed issue of a Medicare supplemental policy, that is, a Medigap policy) to allow an individual guaranteed issue rights to a Medigap policy within 63 days of an organization's notification of an impending termination or service area reduction.

*b. Open Enrollment for Institutionalized Individuals (Section 501(b))*

Section 1851(e) of the Act establishes the time frames, or election periods, for making or changing elections. Section 501(b) of the BBRA amended section 1851(e)(2) of the Act by adding a new subparagraph (D), which provides for continuous open enrollment for institutionalized individuals after 2001. Thus, on or after January 1, 2002 (which represents the first day when limitations are placed on an M+C-eligible individual's enrollment and disenrollment opportunities), M+C-eligible individuals who are institutionalized, as defined by HCFA, may continue to change from original Medicare to an M+C plan, from an M+C plan to original Medicare, or from one M+C plan to another. We have added § 422.62(a)(6) to reflect this provision, with conforming changes at § 422.62(a)(4)(i) and § 422.62(a)(5)(i). We intend to provide guidance on the meaning of the term "institutionalized" in due time to permit orderly implementation of this change before it takes effect in 2002.

*c. Continued Enrollment for Certain M+C Enrollees*

Section 1851(b)(1) of the Act establishes the residence requirements for eligibility to elect an M+C plan. Section 501(c) of the BBRA amended section 1851(b)(1) of the Act by adding a new subparagraph (C) to allow an individual to choose to continue enrollment in an M+C plan offered by the organization if (1) the M+C organization eliminates the M+C plan in the service area in which the individual resides and, (2) no other M+C plan is offered in the service area at the time of the elimination of the M+C plan in the service area and, (3) the M+C organization chooses to allow the option to continue enrollment in an M+C plan offered by the organization. If the individual chooses to retain his or her enrollment in the M+C plan, the M+C organization may require that he or she agree to obtain the full range of basic benefits (excluding emergency and

urgently needed care) through facilities designated by the organization within the plan's HCFA-approved service area. In the case of home health services, since this is a basic benefit that by its nature involves receipt of services in the home, while the provider of the home health services may be located in the service area, actual services would have to be offered in the beneficiary's home. We have reflected this provision in § 422.74(b)(3), with a conforming change made in § 422.66(e)(2).

2. Change in Effective Date of Elections (Section 502 of the BBRA)

Section 1851(f) of the Act establishes the effective dates for elections and changes to elections made during the various enrollment periods. Prior to enactment of the BBRA, section 1851(f)(2) stated that an election made during an open enrollment period was effective the first day of the following calendar month. Section of the 502 BBRA amended section 1851(f)(2) of the Act to state that an election made during an open enrollment period is effective the first day of the following calendar month, except that if the election or change in election is made after the 10th day of the calendar month, the election is effective the first day of the second calendar month following the date the election or change in election is made. We have revised § 422.68(c) to reflect this provision.

3. Extension of Reasonable Cost Contracts (Section 503 of the BBRA)

Section 503 of the BBRA amended section 1876(h)(5)(B) of the Act to permit the extension or renewal of Medicare cost contracts for an additional 2 years, that is, through December 31, 2004. We are revising § 417.402(b) to effect this change.

4. Phase-In of New Risk Adjustment Methodology (Section 511 of the BBRA)

Consistent with section 1853(a) of the Act, § 422.256 of the M+C regulations provides that M+C capitation payments are adjusted for age, gender, institutional status, and other appropriate factors, including health status, beginning January 1, 2000. In the January 15, 1999, Advance Notice of Methodological Changes for the CY 2000 M+C Payment Rates, we announced the risk adjustment methodology to implement this requirement. One element of the risk adjustment methodology we developed was a transition period during which M+C payments would be based on a blend of payment amounts under the previous system of demographic adjustments and payment amounts

based on principal inpatient hospital diagnoses (the PIP–DCG risk adjustment methodology). Under a blend, payment amounts for each enrollee are separately determined using the demographic and risk methodologies, respectively. Those payment amounts are then blended according to the percentages for the transition year. On January 15, 1999, we announced the following transition schedule:

| Year | Demographic method (percent) | Risk method (percent) |
|---|---|---|
| CY 2000 ........ | 90 | 10 |
| CY 2001 ........ | 70 | 30 |
| CY 2002 ........ | 45 | 55 |
| CY 2003 ........ | 20 | 80 |
| CY 2004 ........ | ..................... | 100 |

(Using encounter data from multiple sites of care.)

Section 511(a) of the BBRA revised the original transition schedule for 2000 and 2001 to provide that the blend percentages will be:

| Year | Demographic method (percent) | Risk method (percent) |
|---|---|---|
| CY 2000 ....... | 90 ................. | 10 |
| CY 2001 ....... | 90 ................. | 10 |
| CY 2002 ....... | at least 80 ..... | no more than 20 |

This provision does not require any changes in the existing M+C regulations, but we have described it here for the convenience of the reader.

5. Encouraging Offering of M+C Plans in Areas Without Plans (Section 512 of the BBRA)

Section 512 of the BBRA amended section 1853 of the Act by adding a new paragraph (i) to provide for "new entry bonus" payments to encourage M+C organizations to offer plans in payment areas (generally, counties) that currently do not have M+C plans serving the area. Under this provision, which we are incorporating into regulations under § 422.250(g), the amount of the monthly payment otherwise made to an M+C organization that offers the first M+C plan in a previously unserved county will be increased by 5 percent for the first 12 months that the plan is offered and by 3 percent for the second 12 months. These bonus payments will be available only for plans that are first offered during the 2-year period beginning January 1, 2000, and only in counties where no M+C plan has been offered, or where any plan offered was no longer offered as of January 1, 2000.

New section 1853(i)(3) specifies that if more than one M+C organization first

offers a plan in an uncovered area on the same date, the new entry bonus applies to the payments of both organizations. The BBRA does not expressly address situations in which an M+C organization or organizations begin offering more than one M+C plan simultaneously. Since the bonus is offered to the *organization* that first offers an M+C plan in an area, or to all *organizations* that do so on the same date, we interpret this to mean that the bonus would apply to all plans offered by a bonus-eligible organization on the same date. Thus, when an M+C organization offers two M+C plans simultaneously in a previously unserved county, the organization will receive the bonus payment for both plans. Similarly, if two or more M+C organizations first offer two M+C plans on the same date, each M+C organization will receive the bonus payments for each of its plans. Consistent with section 1853(i)(3) of the Act, the bonus payments are not available to M+C organizations offering a plan in a county that is already partially served by another plan, even if the new plan includes a portion of the payment area not previously covered by an existing plan. As we have stated in OPL 2000.117, a plan is considered to be offered when the sponsoring M+C organization has a contract in effect to serve beneficiaries in the previously unserved area and the plan is open for enrollment.

### 6. Modification of 5-Year Re-Entry Rule for Contract Terminations (Section 513 of the BBRA)

Section 513(a) of the BBRA amended section 1857(c)(4) of the Act to reduce from 5 to 2 years the period during which an M+C organization that has terminated its M+C contract at the organization's request is barred from re-entering into an M+C contract (absent our finding of special circumstances warranting an exception). Section 513(b)(1) further amended section 1857(c)(4) to provide for a new exception to this general exclusion period if, during the 6-month period after an M+C organization notified us of its intention to terminate an M+C contract, a legislative or regulatory change was adopted that resulted in increased Medicare payment amounts for the given payment area. In addition, section 513(b)(2) of the BBRA expressly states that the creation of the new exception does not affect our existing authority to grant an exception to this rule where "circumstances which warrant special consideration," including in the circumstances identified in OPL #103 (OPL 99.103).

OPL 99.103 states that we will grant an exception, for example, when an organization proposes to offer a different M+C plan type than it had previously offered, or an organization is proposing to introduce an M+C plan (1) in a geographic area currently served by two or fewer M+C plans, or (2) in an area other than that from which the organization had previously withdrawn when it ended its earlier contract with the Medicare program. We have incorporated the BBRA's revisions to section 1857(c)(4) of the Act into § 422.501(b)(5).

### 7. Flexibility to Tailor Benefits under M+C Plans (Section 515 of the BBRA)

Section 515 of the BBRA amended section 1854 of the Act to permit M+C organizations to elect to apply the premium and benefit provisions of section 1854 of the Act uniformly to separate segments of a service area, provided that the segments are composed of one or more M+C payment areas. This change, which is effective for contract years beginning on or after January 1, 2001, is largely consistent with our existing administrative policy, under which an M+C organization may offer multiple M+C plans, each with its own HCFA-approved service area, but must offer uniform benefits and premiums within each plan. For a full discussion of the implications of this change, and the conforming changes to the M+C regulations, we refer the reader to section II.C.3 of this preamble.

### 8. Delay in Deadline for Submission of Adjusted Community Rates (Section 516 of the BBRA)

Section 516 of the BBRA amended section 1854(a)(1) of the Act to delay the annual deadline for submission of adjusted community rate (ACR) proposals and information about enrollment capacity from May 1 to July 1. The statute provides that this change was effective for information submitted by M+C organizations in 1999 for benefits in calendar year 2000, and we are making changes to §§ 422.60(b)(1), 422.300(b)(2), and 422.306(a)(1) to reflect the new law.

### 9. Reduction in Adjustment in National Per Capita M+C Growth Percentage for 2002 (Section 517 of the BBRA)

An important element in the methodology used to calculate M+C payment rates involves the determination by the Secretary under section 1853(c)(6) of the Act of a "national per capita M+C growth percentage." Each year, when determining M+C capitation rates, as explained in detail in the June 1998

interim final rule (63 FR 35004), this national growth percentage is applied to the area-specific component of the blended rate and to the minimum amount, also referred to as the "floor". The national per capita growth percentage is HCFA's estimate of the per capita rate of growth in expenditures. Section 1853(c)(6)(B) of the Act provided that in years from 1998 through 2002, the national per capita M+C growth percentage would be reduced, by 0.8 percentage points in 1998 and 0.5 percentage points in 1999 through 2002. Section 517 of the BBRA amended section 1853(c)(6)(B)(v) of the Act to change the adjustment for 2002 from 0.5 percentage point reduction to a reduction of 0.3 percentage points, and we are revising § 422.254(b)(2) to reflect this change.

### 10. Deeming of M+C Organizations to Meet Requirements (Section 518 of the BBRA)

Section 518 of the BBRA amended section 1852(e)(4) of the Act to set forth several changes related to (1) the process by which an M+C organization can be deemed, based on an accreditation organization's findings, to meet M+C requirements and (2) the standards for which such deeming is permissible. Revised section 1852(e)(4) now includes the following among requirements that must be deemed met if an accreditation body applies and enforces standards at least as stringent as those in this part: those requirements derived from section 1852(b) (concerning antidiscrimination), section 1852(d) (concerning access to services), section 1852(i) (concerning information on advance directives), and section 1852(j) (concerning provider participation rules), in addition to the requirements under section 1852(e)(1) and (2) concerning an M+C organization's quality assurance program and under 1852(h) concerning the confidentiality and accuracy of enrollee records. We are revising § 422.156(b) to add these requirements. In addition, new section 1852(e)(4) specifies that the Secretary must make a determination within 210 days on a private accrediting organization's application to act as an accrediting organization for M+C requirements. This provision in effect mandates the same approval time frame that applies to original Medicare accreditation under section 1865(b) of the Act, and we are incorporating this requirement into § 422.158(e).

**11. Quality Assurance Requirements for PPO Plans (Section 520 of the BBRA)**

Section 520 of the BBRA amended section 1852(e)(2) of the Act to change the quality assurance requirements for PPO plans, effective for contract years beginning on or after January 1, 2000. In the past, PPO plans had been treated under the M+C statute and regulations in the same manner as all other M+C coordinated care plans. New section 1852(e)(2)(D) establishes that, for purposes of the M+C quality assurance requirements, a PPO plan is an M+C plan that (1) has a network of providers that have agreed to a contractually specified reimbursement for covered benefits with the organization offering the plan; (2) provides for reimbursement for all covered benefits regardless of whether such benefits are provided within such network of providers; and (3) is offered by an organization that is not licensed or organized under State law as a health maintenance organization. We are incorporating this definition into the M+C regulations at § 422.4. The quality assurance requirements that now will apply for PPO plans are identical to the existing requirements for non-network M+C MSA plans and M+C private fee-for-service plans. Thus, as set forth under revised § 422.152, M+C organizations are no longer required to conduct performance improvement projects relative to their PPO plans, or to have their PPO plans meet minimum performance levels. M+C organizations offering PPO plans must still report on standard measures, however, and continue to comply with the quality assessment and performance improvement requirements that apply to all plans, such as those relating to health information and program review. See section II.E of this preamble for further detail on the quality assurance requirements for various types of plans.

**12. User Fee for M+C Organizations Based on Number of Enrolled Beneficiaries (Section 522 of the BBRA)**

Under section 1857(e)(2) of the Act, the Secretary is directed to collect "user fees" from M+C organizations in order to pay for the costs associated with the enrollment and information distribution activities required for the M+C program under section 1851 of the Act and for the health insurance counseling and assistance programs under section 4360 of the Omnibus Budget Reconciliation Act of 1990 (Pub. L. 103–66). Before enactment of the BBRA, the aggregate amount to be collected from all M+C organizations was the lesser of (1) the estimated costs to be incurred by the Secretary in carrying out the applicable information dissemination activities or (2) an amount contingent upon the enactment of appropriations. An individual M+C organization's user fee was equal to its pro rata share of the aggregate amount of fees to be collected from all M+C organizations. Section 522 of the BBRA amended section 1857(e)(2) of the Act to provide that the aggregate amount of user fees to be collected from M+C organizations to carry out the required beneficiary education activities will be based on the lesser of the estimated costs of information dissemination or, for 2001 and thereafter, the "M+C portion" of $100 million, with the M+C portion representing the Secretary's estimate of the ratio of the average number of M+C enrollees for a fiscal year to the average total number of Medicare beneficiaries for the fiscal year. We are revising § 422.10 to reflect the new statutory provisions. Consistent with section 522(b) of the BBRA, these changes are effective for user fees charged on or after January 1, 2001, and the Secretary may not increase the user fees for the 3-month period beginning October 2000, above those in effect during the previous 9 months. While we will comply with this latter limitation, we are not including it in regulations text, just as Congress did not include it in the text of section 1857(e).

**13. Clarification Regarding Operation of M+C Plans by Religious Fraternal Benefit Societies (Section 523 of the BBRA)**

Section 523 of the BBRA amended section 1859(e)(2) of the Act to clarify that a religious fraternal benefit (RFB) society may offer any type of M+C plan, not just an M+C coordinated care plan. We are revising the definition of an RFB plan in § 422.2 to reflect this change.

**14. Rules Regarding Physician Referrals for M+C Program (Section 524 of the BBRA)**

Section 524 of the BBRA amended section 1877(b)(3) of the Act to specify that certain Medicare rules establishing prohibitions on physician referrals do not apply for purposes of M+C organizations offering M+C coordinated care plans, although they do apply for purposes of M+C MSA plans and private fee-for-service plans. As discussed in section II.E.10 of this preamble, this policy was incorporated into § 411.355(c)(5) of the Medicare regulations through our June 26, 1998 interim final rule.

**II. Analysis of and Responses to Public Comments**

*A. Overview*

**1. Comments on June 26, 1998 Interim Final Rule**

We received 87 items of correspondence containing hundreds of specific comments on the June 26, 1998 interim final rule. Commenters included managed care organizations and other industry representatives, representatives of physicians and other health care professionals, beneficiary advocacy groups, representatives of hospitals and other providers, insurance companies, States, accrediting and peer review organizations, members of the Congress, and others. Consistent with the scope of the June 26, 1998 rule, most of the comments addressed multiple issues, often in great detail. Listed below are the five areas of the regulation that generated the most concern:

• Access issues, including requirements concerning coordination of care, initial assessments of enrollees' health care needs, timely pre-approval of post-stabilization services, and notification responsibilities when an organization terminates its relationship with a specialist.

• Quality improvement standards.

• Payment rates and service area policy.

• Provider participation rules.

• Beneficiary appeals and grievances. Among the other issues that generated substantial numbers of comments were:

• Eligibility, election, and enrollment policies.

• Marketing restrictions.

• Risk adjustment methodology and encounter data submission.

• Contractual requirements.

• Preemption of State law by Federal law.

• Deadline for ACR submissions and capacity waivers.

**2. Issues in February 17, 1999 Final Rule**

In the February 17, 1999 final rule, we attempted to address those issues raised by public commenters where we were convinced that changes were needed and could quickly develop policies necessary to implement the changes. We also included policy clarifications for certain areas in which the material in the interim final rule had been misinterpreted. Also, to the extent possible, we addressed time-sensitive issues, such as those that needed to be resolved before publication of this comprehensive M+C final rule or those that could affect plans or beneficiaries in areas where Medicare risk contractors

**40176**    **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

initially chose not to participate in the M+C program. Some of the specific issues we addressed related to provider participation procedures, beneficiary enrollment options, and several access-related issues, including initial care assessment requirements, notification requirements when specialists are terminated from an M+C plan, and coordination of care requirements.

### 3. Organization of Final Rule With Comment Period

In this comprehensive M+C final rule with comment period, we address all comments received on the interim final rule that were not addressed in the February 17, 1999 final rule. (As noted above, we are also incorporating changes necessitated by the BBRA, subject to public comment.) For the most part, we will address issues according to the numerical order of the related regulation sections. However, many of the comments raise interrelated issues that involve multiple sections of the regulations. In these cases, we generally address all comments on these issues together, whenever the first relevant section of the regulations arises. Also, we note that all comments on the definitions set forth in § 422.2 are addressed in the context of the requirements with which the applicable definitions are associated.

### 4. General Comments and Subpart A Issues

#### a. Administrative Procedure Act Issues

We received two comments on various aspects of the M+C rulemaking process, as discussed below.

*Comment:* A commenter contended that the June 26, 1998 interim final rule did not conform to requirements in the Administrative Procedure Act (APA). First, the commenter alleged that HCFA did not engage in "reasoned decision making" because in certain instances cited by the commenter, the preamble contained "no discussion of * * * factual predicates, no discussion of alternatives that were evaluated and rejected, and no cost-benefit analysis." The commenter specifically cited requirements for a compliance plan and certifications by executives in connection with this contention. Second, the commenter contended that the regulations should have been subjected to prior notice and comment. The commenter argued that the authority in section 1856(b)(1) to issue interim final regulations only applied to existing standards under section 1876, and that failure to publish the rule by June 1 constituted "a failure to satisfy a condition precedent for issuance of an interim final rule without notice and comment." Finally, the commenter argued that the rule impermissibly provided for compliance with our instructions, contending that this was an attempt to require compliance with instructions that should themselves be subjected to notice and comment.

Another commenter commended us on our success in issuing comprehensive regulations for a complex new program in a short period of time.

*Response:* The interim final rule includes an extensive preamble that explains the basis and purpose of the regulations, and meets the cited requirements of the APA. We believe that this preamble more than satisfies the requirements in the law for explaining the reasoning behind the decisions we made in the interim final rule. In some cases when we actively considered alternative approaches and rejected them, we included discussion of this in the interim final rule preamble. For example, in the discussion of grievance procedures (63 FR 35022–35023), we indicated that "we considered" including detailed requirements for M+C organization grievance procedures in the interim final rule, and "we considered requiring certain time frames for addressing grievances." Our reasons for not doing so in that rule were also set out in detail.

We do not believe that the APA—or certain court decisions cited by the commenter—require us to discuss in the preamble every possible alternative that might have been considered to the approaches taken in the rule, but only to explain our reasons for the choices we made. To the extent we have received specific comments advocating alternative approaches, we explain in this final rule why we have not adopted these suggestions, where this is the case.

With respect to the specific requirement that M+C organizations have a plan in place for ensuring compliance with applicable State and Federal laws, we indicated in the preamble that we believe that such a plan was part of the administrative and managerial capabilities that should be in place to carry out the contract and *comply with* obligations under the contract. Many organizations agree with this conclusion, and had compliance plans in place before this requirement was adopted. We believe that this is an important component of proper management, like an accountable board of directors. We explained in the preamble that we were establishing this requirement as an M+C standard under our authority in section 1856(b)(1) to establish M+C standards by regulation.

As to the requirement for certifications as to the accuracy of data, we clearly explained in the preamble that we believed that since payments to M+C organizations are based on such data, the submission of the data is part of a "claim" for payment in the amount dictated by that data in question. We further explained that a certification of the accuracy of this information will help ensure accurate data submissions, and assist us and the DHHS Office of Inspector General in anti-fraud activities. We believe this is a clear and logical explanation of reasoned decision making in imposing this requirement.

We disagree with the commenter's contention that we were required to provide prior notice and comment before publishing final regulations. Section 1856(a)(1) gives the Secretary the authority to promulgate regulations establishing the standards that will apply under the M+C program, and that the Secretary is authorized to "promulgate regulations that *take effect* on an interim basis, after notice and *pending opportunity for public comment.*" (Emphasis added.) The commenter suggests that this authority only applies to requirements that are based on existing section 1876 standards. This is incorrect, and is contradicted by other BBA provisions citing this rulemaking authority. The reference to section 1876 merely provides that, "consistent with the requirements of this part" (meaning only to the extent that the BBA does not provide or authorize alternative approaches), "standards established under this subsection shall be *based on* standards established under section 1876 *to carry out analogous provisions* of such section." section 1856(b)(2). This provision thus only applies to the extent we determine that doing so would be "consistent with" the new Part C provisions, and only with respect to those provisions in Part C that are "analogous" to a section 1876 standard. Even in this case, the new standards need only be "based on" the 1876 standards, not necessarily identical to such standards.

The commenter's interpretation that section 1856(b)(1) of the Act applies only to the repromulgation of existing 1876 standards is also contradicted by other references in the BBA to this rulemaking authority. For example, section 1876(k)(2), added by section 4002 of the BBA, provides for rules dealing with "grandfathered" Part B only enrollees. Since Part B only enrollees were permitted under section 1876, there were no section 1876 standards addressing the treatment of "grandfathered" enrollees. Yet, section

1947

1876(k)(2) provides that such enrollees may "continue [grandfathered] enrollment in * * * accordance with *regulations described in section 1856(b)(1).*" Section 1876(k)(2). This makes clear that the rulemaking authority in section 1856(b)(1) is broader than the commenter contends.

The commenter's contention that we cannot avail ourselves of the interim final rule authority because the rule was not published by June 1, 1998, is illogical. If the Congress authorized interim final regulations because it wanted the rules to be in place by June 1, it would not wish regulations that have already missed this deadline to be delayed further by notice and comment rulemaking. Indeed, the fact that rules were not published by June 1 made the desirability and necessity of issuance in interim final form with an opportunity for public comment all the *more* urgent.

Finally, with respect to our instructions, we intend only to issue instructions that implement or interpret substantive provisions included in these regulations. To the extent the commenter believes that subsequent instructions are issued that should have been subjected to notice and comment, it can make this argument at that time. The fact that we require compliance with guidance we issue to implement these rules is fully consistent with the APA.

### b. Types of M+C Plans (§ 422.4)

#### i. M+C Coordinated Care Plans (§ 422.4(a)(1))

A coordinated care plan is a plan that includes a network of providers that are under contract or arrangement with the M+C organization to deliver the benefit package approved by us. The network is approved by us to ensure that all applicable requirements are met, including access and availability, service area, and quality. Coordinated care plans may include mechanisms to control utilization, such as referrals from a gatekeeper for an enrollee to receive services within the plan, and financial arrangements that offer incentives to providers to furnish high quality and cost-effective care. Coordinated care plans include plans offered by HMOs, PSOs, and PPOs, as well as other types of network plans (except network MSA plans). We received no comments on our definition of coordinated care plan.

#### ii. Religious and Fraternal Benefit Society Plan

One specific type of M+C plan authorized by the BBA is a religious and fraternal benefit society plan (RFB plan), which is defined in section 1859(e) of the Act. An RFB plan is a new plan that may be offered under the M+C program. In § 422.2, an RFB society is defined as an organization that (1) is described in section 501(c)(8) of the Internal Revenue Code of 1986 and is exempt from taxation under section 501(a) of that Act and (2) is affiliated with, carries out the tenets of, and shares a religious bond with, a church or convention or association of churches or an affiliated group of churches. As noted above, an RFB plan was defined in the BBA as a coordinated care plan that is offered by an RFB society. We received two comments regarding RFB plans.

*Comment:* Two commenters noted that the definition of religious and fraternal benefit (RFB) society found in § 422.2 of the regulations would be clearer if the word "benefit" were added to the beginning of this definition.

*Response:* We agree that the word "benefit" was inadvertently omitted and have added the word "benefit" after the words "religious and fraternal" in that section.

*Comment:* One commenter asked whether RFB society plans are limited to being a coordinated care plan, or whether an RFB society could also offer a private fee-for-service plan or an MSA plan. A related question asked by the commenter is whether RFB plans can include a point of service (POS) option.

*Response:* As noted above, under the BBA, a RFB society could only offer a coordinated care plan as a RFB plan. Section 523 of the BBRA, however, amended section 1859(e)(2) of the Act to provide that an RFB society may offer any type of M+C plan. An RFB plan that operates as an M+C coordinated care plan may include a POS option, as could any other M+C coordinated care plan.

#### iii. M+C MSA Plans (§ 422.4(a)(2))

The comments received regarding M+C MSA plans are discussed in section III of this preamble. iv. Multiple Plans (§ 422.4(b))

In the interim final rule, we specified that under its contract, an M+C organization may offer multiple plans, regardless of type, provided that the M+C organization is licensed or approved under State law to provide those types of plans (or, in the case of a PSO offering a coordinated care plan, has received from us a waiver of the State licensing requirement).

*Comment:* Noting that an M+C organization can offer multiple plans under a single contract with us, a commenter asked how multiple plans would work, and whether each would be required to have a separate health services delivery system. The commenter stated that in order to reduce the administrative cost of multiple plans, we should maximize assessment of compliance with Medicare requirements at the M+C organization level and minimize compliance assessment at the individual plan level.

*Response:* An M+C organization may offer multiple M+C plans under a single contract with us. Each M+C plan must have its own HCFA-approved service area, and a separate ACR submission that also must be approved by us. For coordinated care and network MSA plans, we will verify that each plan has a health care provider network under contract that meets M+C standards for access and availability to health care services for beneficiaries who enroll in the given plan. Although we will attempt to achieve all appropriate monitoring efficiencies when contractual elements are identical across plans, we have a responsibility to ensure compliance at the plan level when requirements are plan-specific, such as those noted above.

### c. Application Requirements and Procedures (§§ 422.6 and 422.8)

These sections set forth application requirements for entities that seek a contract as an M+C organization offering an M+C plan. One of the new requirements we set forth in the interim final rule was that organizations wishing to contract with us must submit documentation of their appropriate State licensure, or submit documentation of State certification that the entity is, in fact, able to offer health insurance or health benefits coverage meeting State fiscal solvency standards and is authorized to accept prepaid capitation for providing, arranging, or paying for comprehensive health care services. We further specified that entities meeting the definition of a PSO can be exempted from this requirement if they meet conditions for a waiver, which can be granted by us in accordance with subpart H of part 422. Section 422.8 of the interim final rule describes the application requirements for entities seeking to contract with us to offer M+C plans, as well as our application evaluation procedures.

*Comment:* One commenter suggested that our use of terms referring to entities that qualify for M+C contracts (M+C organization) and applicants for such contracts are inconsistent and confusing. For instance, at §§ 422.8(a)(3), 422.8(e), and 422.8(g), we use the term "entity" to refer to an organization applying to become an M+C organization, while at §§ 422.8(d)

1948

**40178** **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

and (f) we use the term "M+C organization."

*Response:* Clearly, we should not refer to an organization that has not obtained approval from us to become a contractor under the M+C program as an "M+C organization." Accordingly, we have revised § 422.8 to uniformly refer to organizations that apply to become M+C organizations as "contract applicants." This is consistent with our use of this term elsewhere in this final rule.

We likewise agree with the comment that organizations that have received approval to operate as an M+C organization should uniformly be called an "M+C organization." Accordingly, we have revised applicable subsections of § 422.8 to uniformly use the term "M+C organization" to refer to an existing contractor under the Medicare+Choice program.

### d. User Fees (§ 422.10)

This section implements section 1857(e)(2) of the Act, as revised by section 522 of the BBRA. Section 1857(e)(2) requires that M+C organizations share in costs associated with beneficiary enrollment in M+C plans, including the costs of providing information and counseling on plan choices. It sets forth the maximum amount of the aggregate "user fees" that can be collected from M+C organizations as well as the procedures that we follow to assess and collect these amounts from M+C organizations.

In the June 26, 1998 interim final rule, we referred to interim final regulations published on December 2, 1997, which implemented section 1857(e)(2) for risk contractors under section 1876. (Under section 1876(k)(4)(D), the obligation under section 1857(e)(2) applied to section 1876 contractors in 1998.) These December 1997 interim final regulations set forth a methodology for determining an individual organization's "pro rata share" of the beneficiary costs to be assessed (62 FR 63669). We also explained in the June 26, 1998 interim final rule that we were simply adopting at § 422.10, for purposes of the M+C program, the user fee provisions previously set forth in § 417.472(h) of the December 1997 interim final rule. As we indicated in the June 26, 1998 interim final rule, we are addressing the comments received on the substance of the December 1997 interim final rule in this comprehensive M+C final rule. (Since there are no remaining section 1876 risk contractors, § 417.472(h) itself no longer has any applicability.)

As described above, section 522 of the BBRA subsequently amended the user fee provisions set forth in section 1857(e)(2) of the Act, effective for user fees charged on or after January 1, 2001. Revised section 1857(e)(2) now establishes that beginning in the year 2001 the maximum amount of aggregate user fees that we may collect during a fiscal year from M+C organizations will be determined by the percentage of Medicare enrollees in M+C plans. Specifically, we will calculate: the annual average number of Medicare beneficiaries enrolled in M+C plans during a fiscal year divided by the average number of individuals entitled to benefits under part A, and enrolled under part B, during the fiscal year. This ratio will be multiplied by $100,000,000 to determine the maximum aggregate user fees we may collect from all M+C organizations in a given fiscal year. (Under section 1857(e)(2), we collect the lesser of (1) the actual costs of carrying out the required information dissemination activities or (2) the maximum aggregate amount permitted under the Act.)

We received five letters of comment regarding the interim final rule of December 2, 1997, which established the assessment method under which all M+C organizations are assessed the same fixed percentage of their total monthly Medicare payments, in order to collect the M+C user fee. Two commenters supported the user fee assessment methodology selected by us and considered that it was equitable both to organizations and beneficiaries; three commenters opposed the methodology. We also received six letters commenting on the same methodology in response to the interim final M+C regulation of June 26, 1998. Again, three commenters argued that the user fee was unfair to M+C organizations since it resulted in these organizations funding an information campaign for all Medicare beneficiaries, not just those enrolled in M+C organizations. These latter concerns are now moot in light of the BBRA amendments limiting M+C user fees to the percentage of information dissemination costs representing the percentage of total Medicare beneficiaries that are M+C enrollees. Comments that remain relevant are discussed below.

*Comment:* A commenter expressed concern about the costs of the education campaign implemented by us and how the funds collected from M+C organizations would be spent. The commenter asked that we make available detailed information on the budget, resource allocation, and past and projected expenditures for the beneficiary information campaign, in order to justify the user fee funding levels. The commenter also expressed concern that we should not collect more in user fees than established by law. Specifically, the commenter noted that at § 422.10(d), we are only entitled to collect the lesser of the estimated costs necessary to implement educational activities in that fiscal year or the appropriated amount. The commenter also stated that the reduction in M+C payments due to the assessment of the user fee will deter new organizations from entering the M+C program.

*Response:* Although not required under the statute or the BBA, we provide an annual report to the Congress that includes an assessment of the implementation of the M+C program. This report also provides budgetary information on the expenditures of the fees we have collected to fund the M+C information campaign. As stated in revised § 422.10(d)(2), beginning in fiscal year 2001, we will collect in a fiscal year the lesser of either the amount needed to implement the required information dissemination and other activities, or the amount equal to the M+C portion of $100 million. The fees collected from any one organization would represent a very small percentage of the total annual Medicare payments to that organization, and we do not believe that they would deter an organization from entering the M+C program.

*Comment:* A commenter argued that the assessment method adopted by us, under which a percentage of the monthly payment to an M+C organization is assessed, is unfair because it results in organizations in high capitation payment areas paying more (in total dollars) than organizations in lower payment areas. The commenter expressed the view that it is unfair to charge an organization in New York more than an organization in Nebraska.

*Response:* In selecting an assessment methodology, we sought an approach that is as financially equitable as possible regardless of an M+C organization's size or geographical location. We also wanted a methodology that would not present a barrier to participation for smaller and new M+C organizations. We adopted the percentage of payment approach because it bases each organization's assessment on the total Medicare dollars flowing to that particular organization. Thus, the fee each organization pays is directly proportional to the total dollars the organization receives from the Medicare program. M+C organizations that receive larger payments (based on monthly enrollment and payment levels) will pay more in total dollars

1949

than M+C organizations with less Medicare money coming in.

*Comment:* A commenter stated that the assessment of a user fee should be directly related to the costs of providing services. Since no evidence has been presented that the costs of a national mail campaign are higher in one county than another, the user fee should be even across all counties.

*Response:* While the fees collected from M+C organizations will be used primarily to fund a national information campaign designed to reach all Medicare beneficiaries, some funds will go to local efforts, where, as noted above, costs do vary. In any event, this assessment is not an organization-specific "user fee" such as those imposed under the user fee statute. The assessments are not based on specific costs associated with an individual M+C organization, but on a share of aggregate costs. Specifically, the statute provides for each M+C organization to pay its pro rata share "as determined by the Secretary" of the "aggregate amount" spent on the specified costs. Thus, data on actual costs associated with an individual organization are not relevant. Rather, we consider the fee as an assessment to be levied in a manner that, to the extent possible, equitably balances the financial impact on all organizations.

*Comment:* A commenter stated that we should not use the user fee assessment as a way to equalize Medicare managed care payments in different areas of the country. Noting that the Congress has provided for a minimum update in high payment areas, the commenter contended that we will be violating the spirit of the law by taking more from organizations offering M+C plans in these areas.

*Response:* No consideration was given to using the user fee assessment methodology as a tool to adjust the level of Medicare payment to M+C organizations in different parts of the country. In fact, since the percentage impact on all M+C Medicare payments is equal (a fixed percentage of total payment), this is the one approach that maintains the relative payment levels of all organizations.

*Comment:* Another commenter asserted that the user fee assessment method we selected—with fees based on percentage of an organization's M+C payment—has the effect of penalizing those M+C plan enrollees who reside in counties with higher payment rates. The commenter wrote that enrollees in high payment rate areas will pay much more for their existing benefits.

*Response:* In terms of total dollars, it is true that M+C organizations in high payment areas will pay more on a per member basis than organizations in lower payment areas. However, as previously noted, the assessment percentage is the same for all organizations. A method that does not take into account the total dollars flowing to each plan would be regressive and unfair, because it would have a disproportionately high financial impact on organizations (and their members) located in mid to lower payment areas and those with low enrollment.

*Comment:* One commenter recommended that all M+C organizations pay a minimum user fee amount and then, on top of that minimum amount, organizations should also pay a flat monthly amount for each member. The commenter stated that this approach would ensure that the user fee is reasonably related to the benefit that the organization will receive from the M+C program.

*Response:* We considered the approach suggested by the commenter but rejected it because, unless the flat fee were set at a very low level, it would present an entry barrier for organizations with relatively low enrollment levels. We also rejected a flat per member monthly assessment because it does not adjust for the geographic variation in our monthly capitation payments to M+C organizations.

## B. Eligibility, Election, and Enrollment

### 1. Eligibility to Elect an M+C Plan (§ 422.50)

Section 1851(a) of the Act sets forth the criteria for an individual to be eligible to elect an M+C plan. Consistent with the statute, § 422.50 specifies that an individual is eligible to elect an M+C plan if he or she:

• Is entitled to Medicare under Part A and enrolled in Part B (except that an individual entitled only to Part B and who was enrolled in an HMO or Competitive Medical Plan (CMP) with a risk contract under part 417 on December 31, 1998 may continue to be enrolled in the M+C organization as an M+C plan enrollee);

• Has not been medically determined to have end-stage renal disease, except that an individual who develops end-stage renal disease while enrolled in an M+C plan or other health plan offered by an M+C organization may continue to be enrolled in the M+C plan, or if enrolled in another health plan, may enroll in an M+C plan offered by the organization, if the individual is otherwise eligible to enroll in the M+C plan;

• Resides in the service area of the plan, except that an individual who resides in a continuation area of an M+C plan while enrolled in a health plan offered by the M+C organization may continue to be enrolled with the M+C organization as an M+C plan enrollee under the terms that apply to enrollees in the continuation area;

• Completes and signs an election form and gives information required for enrollment; and

• Agrees to abide by the rules of the M+C organization after they are disclosed to him or her in connection with the election process.

We specified in the interim final rule that an M+C-eligible individual may not be enrolled in more than one M+C plan at any given time. Comments on the M+C eligibility rules are discussed below.

*Comment:* Several commenters objected to the omission from the regulations of any provision permitting individuals to remain enrolled with an organization upon becoming Medicare eligible if they were enrolled with the organization as a commercial enrollee, but live outside the Medicare service area. In particular, commenters recommended that beneficiaries residing outside of an M+C plan's service area be allowed to remain enrolled with the M+C organization offering the M+C plan as an M+C plan enrollee upon becoming eligible for Medicare, even if they live outside the M+C service area. Commenters noted that the previous regulations in Part 417 that applied to section 1876 risk contracts allowed an individual enrolled with an organization as a commercial enrollee to remain enrolled with the organization as a Medicare enrollee upon becoming eligible for Medicare even if the individual did not live in the Medicare service area. Several commenters asserted that the continuation area option provided for in the BBA (discussed in further detail below) was not an adequate replacement for the previous option; they believe that prohibiting out-of-area members from voluntarily remaining enrolled in M+C plans unduly restricts the options available to beneficiaries and causes unnecessary disruptions in care. One commenter noted that section 1851(b)(1)(A) of the Act gives us the discretion to make an exception to the requirement that the individual reside in the M+C plan's geographic area.

*Response:* The last commenter is correct that section 1851(b)(1)(A) states that, "*Except as the Secretary may otherwise provide* (emphasis added), an individual is eligible to elect an M+C plan offered by the M+C organization

only if the plan serves the geographic area in which the individual resides.'' In accordance with the statute, existing § 422.250(a) generally limits eligibility to elect an M+C plan to individuals living in the plan's service area. The only discretion exercised by the Secretary in the M+C regulations was to permit individuals the option of continuing enrollment in the plan if they move out of the service area and into a plan's ''continuation area'' (which can be established pursuant to section 1851(b)(1)(B) of the statute and § 422.254 of the M+C regulations, as discussed in detail below.)

Based on the comments we received on the interim final rule, however, as well as the reluctance of M+C organizations to establish formal continuation areas, we have become convinced that the regulations should be amended to provide for additional choices for beneficiaries. Thus, we are amending § 422.50 (with conforming changes to §§ 422.66(d)(1) and 422.74(b)(2) and (b)(4)) to permit M+C organizations to offer a ''seamless conversion'' option to individuals who, upon becoming entitled to Medicare, live outside an M+C plan's service area but are already enrolled in a commercial health plan offered by the same organization. If an M+C organization chooses to offer this option, it must offer the option to all individuals who were enrolled in a commercial health plan offered by the organization at the time they become Medicare-eligible. We do not believe it is appropriate to limit the availability of this option only to beneficiaries who had previously been enrolled in employer group health care plans, but instead are providing that both individual and employer group members of commercial health plans may elect to remain enrolled with their organization under an M+C plan under an expanded ''seamless conversion'' option. Similarly, we note that this expanded eligibility requirement is not limited to situations in which an enrollee becomes eligible for Medicare by virtue of age (referred to in the past as ''age in'' enrollees), but will apply to all newly eligible Medicare beneficiaries, including the ESRD and disabled population. (As noted above, we previously determined, in the interim final rule, that people with ESRD who are enrolled with an organization before becoming Medicare eligible may remain enrolled with the organization as an M+C plan enrollee.) We note that organizations that wish to offer this option must meet the M+C access standards under § 422.112, and

must furnish the same benefits to these enrollees as to enrollees who reside in the plan service area. Such enrollees should be made aware by the M+C organization of the extent to which they will need to travel into the plan service area to obtain service.

*Comment:* One commenter pointed out that State-authorized managed long term care plans may identify a chronically ill target population to be served, while the M+C regulations at § 422.50 do not allow an M+C plan to discriminate within an approved service area among those who are eligible to enroll in M+C plans. The regulations also do not provide for plans to enroll special populations. The commenter asked whether these provisions are waivable to permit plans authorized as managed long-term care plans under State law to participate in the M+C program.

*Response:* There is no authority in the statute to ''waive'' the requirement that M+C organizations accept all M+C-eligible individuals in the service area who wish to enroll. However, we have approved demonstration projects under independent demonstration authority that involve managed care entities that restrict Medicare enrollment to long-term care populations. Long-term care plans may be able to participate in Medicare under such a demonstration.

*Comment:* One commenter asked for clarification regarding whether individuals who are enrolled only in Medicare Part B or who have ESRD, and were grandfathered into M+C plans as of January 1, 1999, can move from plan to plan in the same M+C organization or to another organization. The commenter supported allowing the individual to move between plans and organizations. Another commenter suggested that we allow an individual enrolled only in Medicare Part B who retained his or her enrollment in an M+C plan as of January 1, 1999, to enroll in another M+C organization for a period of time after disenrolling from an M+C plan. In addition, the commenter suggested that individuals enrolled only in Medicare Part B should be able to enroll in an M+C plan at any time until 2002.

*Response:* We agree that grandfathered Part B-only individuals and individuals with ESRD should be allowed to move between plans within an M+C organization, and have specified that this is permissible in OPL 99.084, issued on February 26, 1999. With respect to beneficiaries with ESRD, this policy is based on section 1851(a)(3)(B) of the Act, which we interpret as permitting an existing enrollee who develops ESRD while enrolled with an organization to remain

enrolled with that organization. This is an exception to the general rule that an individual medically determined to have ESRD is not eligible to enroll in an M+C plan. However, we do not have statutory authority to permit a beneficiary with ESRD to enroll in a plan offered by a different M+C organization. Similarly, under section 1851(a)(3) of the Act, Part B-only enrollees generally are ineligible to enroll in an M+C plan. Section 1876(k)(2) of the Act, however, permitted a Part B-only beneficiary enrolled with an organization under a section 1876 risk contract on December 31, 1998, to continue enrollment in that organization if the organization has entered into an M+C contract effective January 1, 1999. Again, we have no statutory authority to expand upon this exception by permitting that individual to enroll with a different M+C organization from the one in which he or she was enrolled on December 31, 1998, under a section 1876 risk contract.

*Comment:* One commenter stated that individuals enrolled only in Medicare Part B who disenroll from M+C should be permitted to immediately enroll in Medicare Part A, and the surcharge for late enrollment should be eliminated.

*Response:* Provisions affording such beneficiaries these protections have been in place for some time. The Omnibus Reconciliation Act of 1990 established the Transfer Enrollment Period (TEP) during which individuals who have Part B only and whose coverage in a Medicare managed care plan is terminated for any reason may immediately enroll in Premium Part A. This provision is found at section 1818(c)(7) of the Social Security Act, and § 406.21(f) of our regulations, which also provide for relief from the premium surcharge for late enrollment. Under the TEP provisions, individuals may enroll in Premium Part A during any month in which they are still enrolled in the managed care plan or during the 8–month period following the last month of coverage under the plan. Under certain circumstances enrollment may occur up to 3 months in advance. If the individual enrolls in Premium Part A while still enrolled in the managed care plan or during the first full month when not so enrolled, Part A coverage is effective with the month of enrollment or, at the individual's option, the first day of any of the following 3 months. If enrollment occurs during the 7 remaining months of the TEP, Part A coverage is effective the month after the month of enrollment.

*Comment:* One commenter suggested that the regulation be revised to permit individuals with ESRD who have been

enrolled in a commercial plan or a Medicare Cost HMO offered by the M+C organization to enroll in an M+C plan of that organization.

*Response:* Existing § 422.50(a)(2) provides this protection, stating that an individual who develops ESRD while enrolled in an M+C plan, or in a health plan offered by the M+C organization offering an M+C plan in the area in which the individual resides, may continue to be enrolled in an M+C organization as an M+C plan enrollee. Also, consistent with section 1851(a)(3)(B) of the Act, we have specified in OPL99.084 that individuals with ESRD may move among plans within an M+C organization. (We note that under this final rule, the individual may remain enrolled even if he or she does not live in the service area if new § 422.50(a)(3)(ii) applies.) For purposes of § 422.50(a)(2), "a health plan offered by the M+C organization" includes any commercial health plan and any cost contract held by that organization. In the case of an individual who develops ESRD while enrolled in a commercial plan offered by a cost contractor, the section 1876 rules similarly allow such an individual to remain enrolled with that organization under its cost contract after becoming eligible for Medicare.

*Comment:* One commenter believes that we are interpreting the phrase "entitled to benefits under Part A and enrolled in Part B" incorrectly.

*Response:* Our interpretation of this phrase is explained in detail in the interim final rule (63 FR 34979), and we would refer the commenter to that detailed explanation. To briefly reiterate our reasoning, we believe that the Congress intended that a newly eligible individual be given the opportunity to be enrolled in an M+C plan only after he or she is actually entitled to receive benefits under Part A and Part B. This view is supported by language in section 1851(e)(1) of the Act, which refers to "the time an individual first becomes entitled to benefits under Part A and enrolled under Part B," and provides for the Secretary to specify an initial coverage election period under which such an individual may elect coverage under an M+C plan "effective as of the first date on which the individual may *receive* such [Part A and Part B] coverage" (emphasis added). While an individual technically may have "enrolled" in Part B once an application has been completed, such an individual's right actually to "receive" coverage of services under Part B may not occur for a period of months. (See 63 FR 34979.) Since M+C organizations are paid in part from Part B trust funds, we do not believe it

would be appropriate for an individual to be enrolled in an M+C plan before he or she is entitled to "receive" Part B trust fund payments. We therefore have interpreted "enrolled in Part B" to mean entitled to receive Part B coverage. Consistent with section 1856(b)(2) of the Act (which provides for use of section 1876 standards to carry out analogous M+C provisions), this interpretation follows our longstanding interpretation of identical language in section 1876(d) of the Act.

2. Continuation of Enrollment (§ 422.54)

Section 1851(b)(1)(B) of the Act permits M+C organizations to offer enrollees the option of continued enrollment in an M+C plan when enrollees leave the plan's service area to reside elsewhere (that is, in the "continuation" area) on a permanent basis. M+C organizations that choose to offer a continuation of enrollment option must explain the option in marketing materials, and make it available to all enrollees in the service area of the plan. Enrollees may choose to exercise the option of continued enrollment when they move out of the plan's service area, or they may choose to disenroll.

An M+C organization must obtain our approval of the continuation area and related marketing materials, and meet the access requirements under section 1851(b)(1)(B) of the Act, before it may offer a continuation of enrollment option to Medicare beneficiaries.

The payment rate for the M+C organization is based on the rate and adjustment factors that correspond to the beneficiary's permanent residence. Under section 1851(b)(1)(B) of the Act, the M+C organization must, at a minimum, provide or arrange for the provision of Medicare-covered benefits under section 1852(a)(1)(A) of the Act in the continuation area. This does not include any additional benefits the organization is required to provide to noncontinuation area members under section 1852(a)(1)(B) of the Act.

Section 1851(b)(1)(B) of the Act requires that "reasonable access" be provided in the continuation area, and that enrollees be subject to "reasonable cost sharing." In the interim final rule, we required that M+C organizations satisfy the access requirements in § 422.112, and provide services either through written agreements with providers or by making payments that satisfy the requirements in § 422.100(b)(2).

We are defining "reasonable cost sharing" in the continuation area as limited to the cost-sharing amounts required in the M+C plan's service area

(in which the enrollee no longer resides).

The interim final rule also provides that appeals and grievances of enrollees in the continuation area must be handled in the same timely fashion as for other enrollees. The ultimate responsibility for the handling of appeals and grievances is with the organization that is receiving payment from us.

We received 11 comments requesting further guidance regarding the continuation of enrollment option. Generally, commenters endorsed the continuation of enrollment concept and urged us to define continuation areas broadly in order to enhance coverage options for enrollees.

*Comment:* One commenter asked whether the beneficiary may choose the continuation area option verbally or in writing.

*Response:* Our current policy, as outlined in OPL 99.100 (which was published August 9, 1999), requires that the beneficiary choose the continuation area in writing, so that there is documentation of this choice. We further believe that in the absence of an affirmative choice to remain enrolled in an M+C plan under the different terms that apply to continuation enrollees, a move out of an M+C service area should be treated as a decision to disenroll from the M+C plan. We accordingly have amended § 422.54(c)(2) to provide that a beneficiary's choice to continue enrollment in a continuation area must be made in a manner specified by us, and that in the absence of such a choice, the beneficiary will be considered to have chosen to disenroll from the M+C plan if he or she moves out of its service area.

*Comment:* Commenters recommended that the benefits in the continuation area should reflect the level of reimbursement the M+C organization receives, and thus should include any additional benefits.

*Response:* As the commenters point out, the existing continuation of enrollment regulations at § 422.54(d) require, at a minimum, that M+C plans provide Medicare-covered services in the continuation area. We recognize that this permits M+C plans to offer less generous benefits in the continuation area while still receiving the full Medicare payment. Section 1851(b)(1)(B) of the Act provides that individuals exercising the continuation of enrollment option have access to the "full range of basic benefits" described in section 1852(a)(1)(A) of the Act. However, section 1852(a)(1)(A) of the Act refers only to those benefits available under Parts A and B, and not

to additional benefits, which are described in section 1852(a)(1)(B) of the Act. Thus, although we agree that it would be preferable that M+C organizations be required to provide additional benefits to continuation area enrollees, the statute does not support this requirement. Therefore, we are considering a legislative proposal that would correct this inequity.

*Comment:* Several commenters inquired about the process for applying to us for a continuation area.

*Response:* We are adding a continuation area chapter to the M+C application for new M+C organization applicants. A separate application form will be available for current M+C contractors who wish to apply for a continuation area. Further guidance regarding the application process will be available in a forthcoming OPL.

*Comment:* One commenter asked whether a member must use only Medicare-certified facilities in the continuation area.

*Response:* The pertinent requirements in § 422.204(a)(3) apply equally to services furnished in a continuation area. Under § 422.204(a)(3), benefits must be provided through, or payments must be made to, providers that meet applicable title XVIII requirements. Further, a hospital, nursing home, home health agency, or other "provider of services" as defined in section 1861(u) of the Act, must have a provider agreement with us in place. (See section II.E of this preamble for further details on this requirement.) We believe these requirements help to assure the quality of care that is provided to beneficiaries.

*Comment:* Another commenter suggested that we allow M+C organizations a 1-year transition period to establish continuation areas and implement any continuation area requirements.

*Response:* We believe the regulations provide organizations with sufficient opportunity to implement continuation area requirements. M+C organizations are not required to establish a continuation area for their enrollees. Thus, an M+C organization may choose not to offer a continuation area until it is ready to implement the requirements outlined in § 422.54.

*Comment:* One commenter questioned whether State licensing regulations may supersede the potential advantages or enrollment flexibility of the continuation area.

*Response:* We believe the commenter is questioning how State licensing requirements will affect an M+C organization's ability to establish or offer the continuation of enrollment option. Section 422.400(a) states that an M+C organization must be licensed under State law, or otherwise authorized to operate under State law, as a risk-bearing entity eligible to offer health insurance or health benefits coverage. Therefore, an M+C organization may establish a continuation area only in a State in which it is licensed under State law or otherwise authorized to operate. The individual States have the authority to determine whether they are going to require licensure or, for example, permit the M+C organization to use the licensure of an affiliate if it wishes to establish an out-of-State continuation area. Although we are not aware of State laws that unduly restrict the establishment of continuation areas, we would refer the reader to section II.I of this preamble for a detailed discussion of situations in which State laws are preempted by M+C laws and regulations.

*Comment:* Some commenters contended that we interpreted section 1851(b)(1)(B) of the Act too restrictively. For example, commenters objected to the requirement in § 422.54 that an M+C plan's service area must be geographically distinct from its continuation area. Commenters also questioned whether enrollees who move to continuation areas in counties adjacent to the M+C plan's service area may continue to receive services in the M+C plan's service area.

*Response:* A continuation area, as defined at § 422.54(a), is an additional area outside the service area in which the M+C organization furnishes or arranges for furnishing services to its enrollees. The regulation does not prohibit continuation areas adjacent to the M+C plan's service area, as the commenter appears to believe. Further, we agree that enrollees residing in a continuation area adjacent to the M+C plan's service area may receive services in the M+C plan's service area, as long as the access and service requirements of § 422.112 are met.

*Comment:* One commenter suggested that we allow enrollees to obtain services in the continuation area, even if they are not living in the continuation area permanently.

*Response:* The continuation area is intended for those enrollees who reside permanently outside of the service area (and permanently inside the continuation area) and want to remain enrolled in the plan. We do not have the authority to direct M+C plans to offer enrollees, temporarily residing in the continuation area, benefits in excess of the urgent/emergent care required by the statute and those benefits

voluntarily offered by an M+C plan in its traveler/visitor policy.

*Comment:* One commenter requested clarification regarding whether the continuation of enrollment option is intended to replace current travel programs. The commenter also inquired whether an enrollee would remain enrolled for the first 12 months with coverage only for emergency and urgently needed care, and then convert to a continuation of enrollment option.

*Response:* The continuation of enrollment option is not designed to replace current travel programs. In general, the purpose of traveler/visitor programs is to allow enrollees the opportunity to continue obtaining health care services while traveling outside the service area of the M+C plan in which they are enrolled. In contrast, the continuation of enrollment option is intended to permit enrollees to remain enrolled with an M+C plan if they move permanently outside of the plan's service area. If the enrollee moves permanently into an area other than a continuation area, the member must be disenrolled as soon as the M+C organization is aware of the move and the enrollee has been notified. If an enrollee moves permanently into a geographic area designated as a continuation area, and chooses to remain a member of the M+C plan as a continuation of enrollment member, the enrollee must receive, at a minimum, Medicare-covered services. If an enrollee moves temporarily into the continuation area, or any area outside the service area, the M+C plan must provide coverage for emergency and urgently needed care. With respect to the question of whether an enrollee would remain enrolled for the "first 12 months" after a move, before converting to a continuation enrollment option, an individual can be a continuation enrollee as soon as he or she moves permanently to the continuation area. There is no waiting period.

### 3. Election Process (§ 422.60)

The general rule for acceptance of enrollees is that, except for the limitations on enrollment in an M+C MSA plan (§ 422.62(d)(1)), and for cases in which a plan has reached its enrollment capacity, each M+C organization must accept without restriction eligible individuals who elect an M+C plan during initial coverage election periods, annual election periods, and special election periods specified in §§ 422.62(a)(1), (a)(2), and (b).

Additionally, M+C organizations must accept elections during the open enrollment periods specified in

§§ 422.62(a)(3), (a)(4), (a)(5), and new (a)(6) if their M+C plans are open to new enrollees.

We stated in the interim final rule that the election form must comply with our instructions regarding content and format and have been approved by us as described in § 422.80. The form must be completed and signed by the M+C eligible individual (or the individual who will soon become entitled to Medicare benefits) and include authorization for disclosure and exchange of necessary information between the DHHS and its designees and the M+C organization. Persons who assist beneficiaries in completing forms must sign the form and indicate their relationship to the beneficiary.

We further stated that the M+C organization must file and retain election forms for the period specified in our instructions. An election in an M+C plan is considered to have been made on the date the election form is received by the M+C organization. Also, the M+C organization must have an effective system for receiving, controlling, and processing election forms that requires that each election form is dated as of the day it is received and election forms are processed in chronological order, by date of receipt. Additionally, the M+C organization must give the beneficiary prompt written notice of acceptance or denial in a format specified by us. We also provided that a notice of acceptance, in a format specified by us, informs the beneficiary of the date on which enrollment will be effective under § 422.68; and if the M+C plan is enrolled to capacity, explains the procedures that will be followed when vacancies occur. Also, a notice of denial explains the reasons for denial in a format specified by us. Within 30 days from receipt of the election form (or from the date a vacancy occurs for an individual who was accepted for future enrollment), the M+C organization transmits the information necessary for us to add the beneficiary to our records as an enrollee of the M+C organization.

*Comment:* Several commenters had concerns with allowing M+C organization representatives to assist individuals in completing any part of the election forms. One commenter believes that the common practice should be the beneficiary completing and signing his or her own form. Another commenter believes M+C organizations should be allowed to assist beneficiaries in completing the election forms only in limited circumstances, such as if the enrollee is disabled and needs assistance, and that organizations abusing this process

should be subjected to meaningful penalties. One commenter suggested that when assistance is provided to a beneficiary in completing the election form, a reason for the assistance also be documented on the form, especially if an M+C organization agent completes the form. In contrast, two commenters supported a provision that permits individuals to assist a Medicare beneficiary in completing an election form.

*Response:* As discussed in the preamble of the interim final rule (63 FR 34984), section 1851(h)(4)(B) of the Act indicates that the ''fair marketing standards'' may include a prohibition against an M+C organization (or agent of such an organization) completing any portion of any election form used to carry out elections on behalf of any individual. However, we have decided at this time not to prohibit an M+C organization (or agent of such an organization) from assisting beneficiaries in completing the election form. We recognize that we must provide accommodations for persons with disabilities and for situations in which such a prohibition could represent a potential physical burden to beneficiaries. We believe requiring the signature of the individual who assisted the beneficiary in completing the form and an indication of his or her relationship to the beneficiary is a fair compromise.

We agree that the M+C organization should be allowed to assist beneficiaries in completing the election form only under limited circumstances. For this reason, representatives should be assisting the beneficiary in completing the election forms only when assistance is needed, such as for a person who is disabled, illiterate, or otherwise impaired by age or health. In fact, in some circumstances assistance may be required to comply with civil rights requirements, for example, to ensure that individuals with disabilities or limited English proficiency have an equal opportunity to participate. Any M+C organization that unduly influences beneficiaries through this assistance should be identified by our monitoring procedures and subject to sanctions as specified in § 422.750.

We believe requiring the signature and identifying their relationship to the individual who is enrolling in the M+C plan is a sufficient beneficiary protection. It provides adequate information to monitor a beneficiary's understanding that the form is for enrollment. The reason why an individual needs assistance should not be included on the enrollment form because it could undermine a Medicare

beneficiary's right to privacy by disclosing health related information without his or her consent.

*Comment:* One commenter asked how enrollment and disenrollment requirements under Medicare compare to Medicaid rules, which the commenter erroneously believes allow the enrollee to enroll and disenroll at any time.

*Response:* Dually eligible individuals, that is, those individuals who are entitled to Medicare as well as Medicaid, have the same freedom of choice under Medicare as those who are entitled to Medicare only. M+C election provisions under section 1851(e) of the Act and § 422.62 of our regulations apply to all M+C-eligible individuals, and prior to 2002, permit Medicare enrollees to disenroll at any time. Under Medicaid rules, in contrast, managed care organizations (MCOs) are permitted to preclude Medicaid enrollees from disenrolling without cause for up to a year. MCOs are required only to permit disenrollment without cause in the first 90 days of enrollment, and annually thereafter. See section 1932(a)(4) of the Act.

*Comment:* One commenter requested clarification on when M+C organizations are required to be open for enrollment. In particular, the commenter expressed confusion over the meaning of the term ''open enrollment period.''

*Response:* We recognize the potential for confusion associated with the use of the term ''open enrollment period.'' In accordance with section 1851(e)(6)(A) of the statute, § 422.60(a)(1) specifies that M+C organizations must be ''open for enrollment'' (that is, must accept enrollments) during annual, initial coverage, or special election periods unless they have reached enrollment capacity. However, under section 1851(e)(6)(B) of the Act, an M+C organization may accept elections at *such other* times as the organization provides. These latter time periods, during which an M+C organization has the discretion to decide whether to be ''open'' for enrollment are frequently referred to as ''open enrollment'' periods. We note that, if an M+C organization chooses to be open to new enrollees during all or a portion of these discretionary ''open enrollment'' periods, it must be open for all M+C-eligible individuals.

*Comment:* One commenter found § 422.60(a)(2), which states that M+C organizations must accept elections during open enrollment periods if their plans are open to new enrollees, to be confusing and detrimental to newly eligible individuals. The commenter believes that new Medicare eligibles

should not be limited to these time frames.

*Response:* The new enrollees being referred to in § 422.60(a)(2) are individuals newly electing the M+C plan and not individuals newly eligible for Medicare. Individuals newly eligible to Medicare are given a different "open enrollment" period under which they may elect or change M+C plans. In particular, §§ 422.62(a)(4)(ii) and 422.62(a)(5)(ii) allow newly eligible individuals to make an election beginning the month the individual is entitled to Medicare Parts A and B and ending on the last day of the sixth month of entitlement (in 2002) or the third month of entitlement (in 2003 and thereafter) or on December 31, whichever is earlier. Therefore, we do not believe a regulatory change is necessary.

*Comment:* One commenter asked if we would be modifying our enrollment transmission schedule to account for the 30-day period in which the M+C organization must transmit the enrollment information as stated in § 422.60(e)(6).

*Response:* Based on this comment, we are amending § 422.60(e)(6) to state that "upon receipt of the election form (or from the date a vacancy occurs for an individual who has been accepted for enrollment), the M+C organization transmits the information, within time frames specified by us, necessary for us to add the beneficiary to our records as an enrollee of the M+C organization." We are also revising § 422.60(f)(3) to state that "upon receipt of the election form from the employer, the M+C organization must submit the enrollment within time frames specified by HCFA." These changes will allow us the flexibility to vary the time frames in the future, should technological or policy changes warrant it.

*Comment:* One commenter asked that we clarify and provide guidance as to when an election is considered to have been made.

*Response:* Section 1851(f)(2) of the Act, as revised by section 502 of the BBRA, states that the effective date of coverage during continuous open enrollment periods is the first day of the first calendar month following the date on which the "election is made," except that if the election or change of election is made after the 10th day of a calendar month, the election or change of election takes effect on the first day of the second calendar month following the date on which the election or change is made. As noted in the preamble of the interim rule, it was necessary to define when an election is made in order to establish the effective date of coverage

and to establish the date of our liability for payment. Therefore, the regulations at § 422.60(d) state that an election is considered to have been made on the date it is received by the M+C organization.

### 4. Enrollment Capacity (§ 422.60(b))

Sections 422.60(b) and 422.306(a) of the original M+C regulations required M+C organizations to submit information on the enrollment capacity of plans they offer by May 1 of each year. As noted in section I.C.8 of this preamble, section 516 of the BBRA amended section 1854(a)(1) of the Act to move the annual deadline for submission of ACR proposals and enrollment capacity data (if any) from May 1 to July 1, effective in 1999. If a plan reaches its HCFA-approved capacity limit, the M+C organization offering the plan generally is not obligated to accept new enrollees.

*Comment:* One commenter requested that we change the date that M+C organizations must notify us of the need for a capacity limit from May 1 to a date later in the year in order to allow the M+C organizations more time to analyze the previous year's capacity and better determine the need for a capacity waiver.

*Response:* While we had no discretion under the BBA to make the change in question, as just noted, Congress has done so. We have revised §§ 422.60(b)(1) and 422.306(a)(1) to reflect this BBRA change.

*Comment:* A commenter asked that we clarify our language on capacity limits within a service area. The commenter also asked what would happen if there are too many patients and too few providers.

*Response:* Section 422.60(b) allows an M+C organization to limit enrollment in the M+C plans it offers during any enrollment period, subject to our approval. If an M+C organization elects to establish a capacity limit for an M+C plan, the request normally must be submitted to us at the time the Adjusted Community Rate Proposal (ACRP) is submitted (except as provided in new § 422.60(b)(3)), as discussed below. This submission should take into account the number of providers, and how many patients they can serve. The situation described by the commenter, in which "there are too many patients and too few providers" generally should not occur if capacity is limited to the number submitted by the M+C organization on July 1.

As the commenter suggested, however, we recognize that under certain circumstances, there may be a legitimate need for an M+C organization

to request a capacity limit or a revision of a capacity limit for an M+C plan during the contract year. The circumstances under which a capacity limit will be approved after the ACRP date would likely occur when a portion of a provider network that furnishes services under an M+C plan becomes unavailable during the course of a contract year. We have provided for HCFA to consider enrollment capacity requests outside of the ACR process under new § 422.60(b)(3), which permits consideration of such requests only if the health and safety of beneficiaries is at risk, such as if the provider network is no longer available to serve enrollees in all or a portion of the service area. The requirements for a midyear capacity limit request are also described in OPL99.095.

### 5. Election of Coverage Under an M+C Plan (§ 422.62)

All M+C plans must be open to M+C-eligible enrollees residing in the service area served by the plan during initial coverage election periods, annual election periods, and special election periods, unless such enrollment in the plan is limited based upon a limit on enrollment capacity.

The initial coverage election period is the period during which a newly M+C-eligible individual may make an initial election. This period begins 3 months prior to the month the individual is first entitled to both Part A and Part B and ends the last day of the month preceding the month of entitlement. An election made during this period is effective when entitlement to Part A and Part B coverage begins.

The month of November is the annual election period for the following calendar year. During the annual election period, an individual eligible to enroll in an M+C plan may change his or her election from an M+C plan to original Medicare or to a different M+C plan, or from original Medicare to an M+C plan. This election is effective on January 1.

Special election periods are periods during which enrollment must be made open to certain beneficiaries, for various reasons specified in the statute, or by us. We specify the effective date of elections made during special election periods.

M+C plans may be open to new enrollees at other times of the year (that is, during open enrollment periods) at the discretion of the M+C organization offering the plan.

From 1998 through 2001, the number of elections or changes that an M+C-eligible individual may make is not limited (except for M+C MSA plans).

Subject to the M+C plan being open to enrollees as provided under § 422.60(a)(2), an individual eligible to elect an M+C plan may change his or her election from an M+C plan to original Medicare or to a different M+C plan, or from original Medicare to an M+C plan any number of times. In 2002, an individual who is eligible to elect an M+C plan in 2002 generally may elect an M+C plan or change his or her election from an M+C plan to original Medicare or to a different M+C plan only once during the first 6 months of that year. For 2003 and subsequent years, an individual who is eligible to elect an M+C plan generally may elect or change his or her election from an M+C plan to original Medicare or to a different M+C plan, or from original Medicare to an M+C plan only once during the first 3 months of the year. (Note that consistent with section 501(b) of the BBRA, the restrictions that begin in 2002 do not apply to institutionalized individuals.) Even after the above limitations on changes in elections are in place, if certain circumstances exist, an individual may discontinue the election of an M+C plan offered by an M+C organization and change his or her election to original Medicare or to a different M+C plan. These circumstances include:

• When the individual is no longer eligible to be enrolled in a certain plan due to a change of residence,

• When HCFA terminates the organization's contract for the plan, or the organization terminates the plan or discontinues offering the plan in the service or continuation area in which the individual resides,

• When the M+C organization has violated a material provision of its contract or materially misrepresented the plan's provisions in marketing the plan to the individual, or

• When the individual meets such other exceptional conditions as we may provide.

*Comment:* Several commenters expressed concern because the new M+C election periods do not coincide with the time frames under which M+C eligible individuals elect health benefit options through their employer group health plans. The commenters believe these individuals should not be subject to the M+C election periods. One commenter pointed out that employer groups will experience considerable disruption in their yearly enrollment process, and, as a result, may have to stop offering their retirees wrap-around coverage to M+C plans, or they will have to modify their entire enrollment process.

*Response:* Section 422.62(b) states that we may grant special election periods for individuals who meet exceptional conditions. We have determined that the dilemma addressed by the commenters presents an "exceptional condition" that justifies the establishment of a special election period for M+C-eligible individuals who are members of an employer group plan that has open enrollment at a time other than the month of November. This is because such an individual could only change one part of his or her coverage at a time, which effectively would lock the beneficiary into his or her existing plan. As set forth in OPL 99.100, such M+C-eligible individuals may choose to elect an M+C plan offered by their employer during their employer group's open season, which constitutes a special election period for these individuals, as well as during the other election periods established under section 1851(e) of the Act.

*Comment:* Several commenters were opposed to the establishment of "lock-in" requirements beginning in 2002. They believe it will eliminate competition created in an environment where managed care plans compete continuously for enrollments. Several commenters also wanted to know who will be responsible for keeping track of the number of elections made by an individual once lock-in takes effect in 2002. They noted that beneficiaries and M+C organizations may not be aware of the number of elections an individual has made during a particular election period. One commenter recommended that we develop a mechanism that will allow exceptions to the limit of one change under §§ 422.62(a)(4) and (5).

*Response:* Sections 1851(e)(2)(B) and (C) of the Act limit an individual's election to one change during the open enrollment periods in the first 6 months of 2002 and the first 3 months of subsequent years. This "lock-in" requirement represents a gradual transition from the current system, under which a beneficiary may make any number of elections during the continuous open enrollment periods outlined in section 1851(e)(2)(A) of the Act to a restrictive system of annual "lock-in." We do not have the authority to modify this requirement, or to provide for any exceptions to this limit. We are aware of the need for us to maintain a history of the number of times an individual has made an election during a specific election period. Such information will be necessary in order to determine whether an individual is eligible to elect an M+C plan at a given time.

*Comment:* One commenter believes that limiting the open enrollment and disenrollment opportunities defined in §§ 422.62(a)(4) and (5) to one election per period should not apply to plan changes within the same M+C organization.

*Response:* Section 1851(a)(1) of the Act requires that an M+C-eligible individual "elect" to receive benefits through the original Medicare fee-for-service program or through enrollment in an M+C "plan." That is, enrollment in an M+C "plan" constitutes an election under Part C. Section 1851(e) of the Act further limits the "election" of an M+C "plan" or of original Medicare to one change during open enrollment periods in the first 6 months of 2002 and the first 3 months of subsequent years. Therefore the law does not permit us to allow M+C-eligible individuals to move from plan to plan without considering it an election, even if the change in plans occurs among plans offered by the same M+C organization.

*Comment:* One commenter requested further clarification of enrollment and disenrollment periods, while another asked whether a beneficiary who defaults to original Medicare has the option to elect an M+C plan.

*Response:* An individual who defaults to original Medicare may elect another M+C plan during any election period during which the plan is accepting new enrollments. As discussed in detail above, section 1851(e) of the Act and § 422.62 of the M+C regulations describe the election periods in which individuals can enroll in and disenroll from an M+C plan. M+C-eligible individuals may make or change an election during an initial coverage election period, an annual election period, a special election period, or an "open enrollment" period. The initial coverage election period is the 3-month period prior to the month an individual becomes entitled to Medicare Part A and Part B. The annual election period is November of every year. Special election periods are also allowed when M+C-eligible individuals experience certain circumstances that warrant the need to make a change in election. These include our termination of the M+C plan contract or M+C organization termination or discontinuance of the M+C plan in the service or continuation area in which the individual resides, a change in place of residence to a place outside of the M+C plan's service or continuation area, demonstration by the individual that the M+C organization substantially violated a material provision of its contract or materially misrepresented the M+C plan's provisions in marketing materials, or

other exceptional conditions as provided by us. In addition, § 422.62(c) also provides for a special election period for individuals age 65. Beginning in 2002 individuals age 65 who elect an M+C plan during the initial enrollment period may disenroll from the M+C plan and elect coverage under original Medicare within 12 months of their enrollment in an M+C plan.

Through 2001, open enrollment periods are continuous, that is, every month through 2001. Beginning in 2002, the open enrollment periods are the first 6 months of the year, or the first 6 months of Medicare Part A and Part B entitlement (or December 31, 2002, whichever is earlier). In 2003 and in subsequent years, the open enrollment periods are the first 3 months of the year, or the first 3 months of Medicare Part A and Part B entitlement (or December 31, 2003, whichever is earlier). Again, open enrollment periods remain continuous for institutionalized individuals during and after 2002.

The election rules for M+C MSA plans (see § 422.62(d)) include some exceptions to the election periods described above. M+C-eligible individuals may only enroll in an MSA plan during an initial coverage election period or an annual election period. They may not make an election of an MSA plan during open enrollment periods or special election periods. M+C-eligible individuals may only disenroll from an MSA plan during annual election periods and special election periods, excluding special election periods for individuals age 65. In addition, if an individual elects an M+C MSA plan for the first time during the annual November election period, he/she may revoke that election by December 15 of that same year.

*Comment:* One commenter supported the special election period for individuals age 65 as outlined at § 422.62(c), and requested that the provision also apply to newly eligible individuals with disabilities.

*Response:* Section 422.62(c) implements the last sentence in section 1851(e)(4) of the Act, which applies only to individuals who enroll in an M+C plan upon turning 65. Congress chose to provide this opportunity to individuals who become eligible based on age, but did not provide for such a benefit in the case of individuals who become eligible based on disability or ESRD status. We thus cannot apply section 1851(e)(4) of the Act to individuals who are not 65, since they do not meet an explicit condition set forth in the statute.

*Comment:* One commenter noted that § 422.62(b)(3) allows an individual a

special election period if the M+C organization violates a material provision of its contract with the individual. However, it does not allow the M+C organization an opportunity to comment on the enrollee's assertion that the contract was violated. The commenter stated that we should be sensitive to the severity of this issue and should establish a timely and fair review process. Two other commenters stated that we should develop reasonable, consistent guidelines for establishing special election periods for exceptional conditions, as provided at § 422.62(b)(4).

*Response:* Section 1851(e)(4) of the Act gives us the authority to develop guidelines to establish special election periods for exceptional conditions and to establish the procedures for granting a special election period for contract violations that specify when individuals are entitled to disenroll from an M+C plan after disenrollment rights become limited in 2002. This authority provides us with the discretion and the time to develop beneficiary protection requirements that will be sensitive to the issues identified by the commenters. As we gradually transition from the current system of totally free movement to a restrictive system of annual "lock-in," we have every intention of developing reasonable and consistent guidelines as the need for these guidelines in the year 2002 approaches.

*Comment:* One commenter requested that we clarify at § 422.62(a)(2)(ii) that eligible beneficiaries may elect to enroll in managed care demonstrations, section 1876 cost plans, and health care prepayment plans during the annual election period.

*Response:* The annual election period is an election period for M+C organizations operating under section 1851 of the Act. Health care prepayment plans, section 1876 cost plans, and some managed care demonstrations do not fall under section 1851 of the Act. Therefore, we do not have the authority to require these plans and demonstrations to be open for enrollment during an annual election period. Although such plans and demonstrations have the option of being open for enrollment to eligible individuals during that same time frame, this regulation only addresses requirements under section 1851 of the Act.

### 6. Information About the M+C Program (§ 422.64)

*a. Overview*

Section 422.64 contains requirements related to information about M+C plans.

Paragraph (a) applies to M+C organizations, and requires that organizations annually provide to us, using a prescribed format and terminology, the information we need to carry out our annual information campaign for all Medicare beneficiaries. However, the remaining paragraphs of existing § 422.64 essentially reflect statutory provisions governing our information distribution activities.

*Comment:* Several commenters expressed confusion about whether we or M+C organizations were responsible for various information distribution requirements specified under § 422.64.

*Response:* We recognize the commenter's concerns and believe that the best means to avoid introducing confusion in this regard is to eliminate from the regulations the portions of § 422.64 that serve solely to delineate our responsibilities. Deleting these provisions from the Code of Federal Regulations in no way affects our information distribution responsibilities that had been reflected in these provisions, since these are set forth in the statute in sections 1851(d)(1) through (d)(4) of the Act. Also, we note that § 422.111 continues to list the information that M+C organizations are responsible for disseminating to their plan enrollees.

*Comment:* Two commenters were concerned that the many changes introduced by the M+C program to the plan enrollment and disenrollment process (for example, changes to the effective date, annual open enrollment, lock-in requirements) would lead to beneficiary confusion and disruption of the program, and stressed the need for improved communication with beneficiaries.

*Response:* We agree that the many changes necessary for the implementation of the M+C program will require that we carry out substantial educational efforts for beneficiaries and the health industry. We are strongly committed to keeping beneficiaries informed and educated about their choices, and have undertaken many efforts to accomplish this task. For example, we have created a toll-free line for M+C information (1–800–MEDICARE), developed the Medicare & You handbook, and have carried out special educational and publicity campaigns to inform M+C-eligible individuals about the availability of plans offered in different areas and about the election process. In 1999, we began conducting a nationally coordinated educational and publicity campaign about M+C plans and the election process that occurs every November. We also provide information

via our Internet website (www.Medicare.gov), which is a Medicare beneficiary-centered consumer website designed to provide a broad array of information on program benefits and health promotion. These are just a few of the many efforts we have begun to disseminate information to beneficiaries and prospective beneficiaries on their coverage options under the M+C program, and we believe that they should alleviate the potential confusion associated with the M+C program.

*b. Access*

*Comment:* A commenter recommended that § 422.64 specifically require notification and disclosure of Medicare's screening Pap smear benefit and of the ability of beneficiaries to directly access specialists to obtain this preventive service.

*Response:* The 2000 Medicare & You handbook includes a description of the new preventive benefits. With respect to direct access to a specialist who would perform a pap smear, § 422.112(a)(3) guarantees female M+C enrollees "direct access to a women's health specialist within the network for women's routine and preventive health care services," which would include Pap smears (see section II.C of this preamble for further details on this issue.)

*c. Performance Measures*

*Comment:* Several commenters expressed concerns about the validity, reliability, and comparability of information to be provided by us to Medicare beneficiaries, particularly through Medicare Compare, our Internet-based database of comparative information on M+C plans. The commenters want us to ensure that the information presented to beneficiaries is objective, accurate, and complete. They also emphasize the importance of recognizing the audience for particular types of information.

*Response:* Medicare Compare is our electronic database of health plan comparison information. The database is designed to educate beneficiaries and others about their health care options so they can make informed health care choices. The information for this database is compiled by us with cooperation from M+C organizations. The Medicare Compare database is also updated regularly to reflect changes in cost and benefits. We are continuing to implement enhancements to ensure that the data submitted by M+C organizations are valid and reliable. Medicare also collects quality-of-care information known as Health Plan Employer Data and Information Set

(HEDIS) from M+C organizations and we carefully check it for accuracy. This information should help beneficiaries compare the quality of health care that an M+C organization delivers by explaining how well the organization keeps enrollees healthy or treats them when they are sick. Medicare's Consumer Assessment of Health Plans Study (CAHPS), developed in collaboration with the Agency for Healthcare Research and Quality, is an initiative to collect and report information on beneficiaries' experience in receiving care through M+C organizations. We have also worked closely with the industry and researchers in order to provide the most accurate information for the Medicare & You 2000 handbook.

*d. Continuation and Improvements*

*Comment:* Commenters were concerned about the amount of information provided to Medicare beneficiaries by us. They recommend that the information specified in § 422.64 be included in the general information brochures and contain the customer service telephone numbers for each M+C organization. They also suggested that we need to differentiate between information provided to beneficiaries in written form, and that available to interested persons via the Internet. Written comparative information, which is to be available to all beneficiaries at specified intervals, should be easy to understand and focused in content.

*Response:* We provide access to information from a variety of sources. Beneficiaries, M+C organizations, providers, family members, and others can receive up-to-date information about the Medicare health plans available in their area, Medicare health benefits, fraud and abuse, nursing homes, appeals and grievances, patient rights, etc., at the following locations:

• Internet at www.Medicare.gov. Local libraries or senior centers may be able to help the person find the information on their computers.

• Medicare Choices Help line at 1–800–MEDICAR(E) and TTY for the speech and hearing impaired at 1–877–486–2048.

• State Health Insurance Assistance Program (SHIP) in the beneficiary's area.

• Local outreach events.

*Comment:* Several commenters encouraged us to evaluate all aspects of the information campaign in order to determine the most effective approach for reaching beneficiaries.

*Response:* We aim for timely distribution of all of our materials. We are legislatively mandated to mail

specified information on the M+C program and individual M+C plans to beneficiaries at least 15 days prior to the annual election period. We are evaluating the impact of this timing on beneficiary decision making. Our ongoing evaluation of National Medicare Education Program (NMEP) includes assessment of telephone referrals, including toll-free line and State Health Insurance Assistance Programs (SHIPs), which are entities jointly funded by us and by the States to provide information and counseling to Medicare beneficiaries. The toll-free line has been operational nationally since March 15, 1999.

*e. Beneficiary Input*

*Comment:* Several commenters noted that in developing any educational materials or activities, it is important to ensure that the information is meaningful to beneficiaries. These commenters believe that we need to convey information to beneficiaries in an organized, straightforward manner to assure as complete an understanding as possible. For example, the commenters suggest that materials should be reviewed to determine whether they will provide needed information or simply raise more questions among beneficiaries, or whether beneficiaries will understand that they do not need to make any changes. The commenters specifically recommended that we conduct focus groups to gauge beneficiary responses to the Medicare & You handbook, and would like us to revisit our future plans and communications.

*Response:* We have performed extensive evaluation of the Medicare & You handbook, including focus-testing the Medicare & You 1999, and customer-testing of the Medicare & You 2000. We also used the results of the NMEP evaluation, survey of beneficiaries, expert review, plain language review, and comments submitted to us by mail and the Internet. The results received from all of these sources were used in the development of the Medicare & You 2000 handbook. We will continue evaluating our efforts to improve beneficiary communication.

*Comment:* Two commenters offered suggestions on the public input approach outlined in the preamble of our June 26, 1998 interim final rule. (In that preamble, we discussed in detail the process of obtaining public input about data collection and dissemination of selected data. We addressed only those data elements that would be disseminated as part of Medicare Compare or as part of any beneficiary

information campaign efforts.) One commenter suggested ensuring that physicians are involved in determining data specifications for M+C organizations, and the other looked forward to seeing our strategy for public input.

*Response:* As discussed in the interim final rule, we recognize the importance of obtaining public input on data needed by beneficiaries to make health plan choices. We also agree that we need to ensure physician input, particularly in areas such as quality of care. Our strategy for obtaining public input into the process, which is well under way and wide ranging, includes the following:

• Obtaining public input through currently established communication activities (for example, committees, consultation avenues, public meetings, training seminars). Limited resources and time demands do not permit the establishment of separate or overlapping processes with those already established and working (such as industry council meetings). It may not always be possible to hold public meetings to invite interested individuals to comment and provide input on the process of determining data specifications.

• Obtaining public input through normal data collection clearance channels when we are the lead for the data collection activity. The OMB clearance process is a very effective and efficient way to obtain broad public comment on the content and format specifications for data collection (for example, the Plan Benefit Package). However, it may not always be possible to publish a notice or a summary of public processes regarding data elements to be collected.

• Obtaining public input through collaborative efforts with private industry, health care providers, researchers, and other interested parties. This approach allows the Federal government to be a partner with other experts (private and public) in the field of managed care and thereby not duplicate already successful and useful collaborative efforts (such as HEDIS).

Thus, our strategy strongly supports the use of efficient and effective methods of public input into the determination of information and specifications for beneficiary information campaign material. We also recognize the need to collaborate with organizations and individuals involved in the development of quality and performance measurements that support beneficiaries' increased understanding of managed care.

## 7. Coordination of Enrollment and Disenrollment Through M+C Organizations (§ 422.66)

An individual who wishes to elect an M+C plan offered by an M+C organization may make or change his or her election during the election periods specified in § 422.62 by filing the appropriate election form with the organization or through other mechanisms as determined by us.

Additionally, an individual who wishes to disenroll from an M+C plan may change his or her election during the election periods specified in § 422.62 by either electing a different M+C plan by filing the appropriate election form with the M+C organization or through other mechanisms as determined by us. Individuals may also disenroll by submitting a signed and dated request for disenrollment to the M+C organization in the form and manner prescribed by us or by filing the appropriate disenrollment form through other mechanisms as determined by us.

Under existing § 422.66(d)(1), an M+C plan offered by an M+C organization must accept any individual (residing in the service area or continuation area of the M+C plan) who is enrolled in a health plan offered by the M+C organization (regardless of whether the individual has end-stage renal disease—see §§ 422.50(a)(2) and (a)(3)) during the month immediately preceding the month in which he or she is entitled to both Part A and Part B. This is generally known as a "conversion" of enrollment for the enrollee (from commercial status to M+C enrollee status).

Subject to our approval, under § 422.66(d)(2), an M+C organization may set aside a reasonable number of vacancies in order to accommodate conversions. Any set aside vacancies that are not filled within a reasonable time must be made available to other M+C-eligible individuals.

If the individual enrolled in a health plan offered by an M+C organization chooses to remain enrolled with the organization as an M+C enrollee, the individual must complete and sign an election form as described in § 422.60(c)(1). In that case, the individual's conversion to an M+C enrollee is effective the month in which he or she is entitled to both Part A and Part B. The M+C organization may disenroll an individual who is converting from its commercial plan to M+C status only under the conditions specified in § 422.74. The M+C organization must transmit the information necessary for us to add the

individual to our records as specified in § 422.60(e)(6).

An individual who has made an election under this section is considered to have continued to have made that election until the individual changes the election under this section or the elected M+C plan is discontinued or no longer serves the service area in which the individual resides, and the organization does not offer, or the individual does not elect, the option of continuing enrollment, as provided in § 422.54, whichever occurs first.

*Comment:* Several commenters stated that they support procedures that would permit seamless continuation of coverage, under which an individual would be deemed to have elected an M+C plan at the time of the individual's initial coverage election period if they are enrolled in a commercial health plan that is offered by the same M+C organization. Several specific recommendations were made. One commenter recommended that we require M+C organizations to prospectively provide the necessary information that would allow us to default individuals into the M+C plan. One commenter recommended that M+C organizations notify individuals in their commercial plans who are about to become Medicare eligible that they are being enrolled in the M+C plan, and to transmit the necessary information to us. Another commenter suggested that we alert individuals through the mailing of the initial enrollment package. Two commenters were concerned about deeming an individual to have elected an M+C plan if the M+C organization offers more than one M+C plan from which he/she could receive benefits. One commenter suggested that if we decide to deem an individual to have elected an M+C plan, the organization should be required to provide the individual with a description of Medigap guaranteed issues and age rating policies. One commenter supported procedures that would permit seamless continuation of coverage, but expressed concerns about deeming an individual enrolled in an M+C plan if Medicare is a secondary payer.

*Response:* Although we have addressed an individual's right to choose to remain enrolled with an organization as an M+C enrollee upon becoming Medicare eligible (as discussed above), a default process through which an individual would be deemed by us to have elected a specific M+C plan would require that we identify M+C-eligible individuals, as well as their relevant health plan information before the individual's initial coverage election period. At

present we do not have access to information on the health plans in which specific individuals are enrolled, because such plans are private health plans, and do not have established linkages with our systems, nor is there a mechanism in our Medicare managed care data system to capture such information. While some M+C organizations may want to share this information with us, others may not. It should also be noted that enrollment in an M+C plan is contingent upon the individual's entitlement to Medicare Part A and Part B. Individuals that have not previously filed for Social Security and/or Medicare benefits will not have an entitlement record, nor will they receive an initial enrollment package from Medicare. Frequently, individuals in commercial plans who are about to "age in" to Medicare are still employed, and have not yet filed for Social Security or Medicare benefits. Individuals who have filed for benefits will receive general information on Medicare and comparative information on M+C plans available in their service area. They will have the opportunity to enroll in the M+C plan 3 months prior to their entitlement to Medicare Part A and Part B.

The expansion of the managed care provisions under the BBA has presented an extraordinary challenge to us and to the Medicare managed care data system that supports our information system business requirements. We anticipate that in the future, we will develop strategies to incorporate information collection activities in our managed care systems that will allow this kind of mechanism to be put in place. As we develop strategies that will incorporate additional information collection activities under our authority under section 1851(c)(2) of the Act, we will consider procedures necessary to identify in which plan a beneficiary wants to enroll if the M+C organization offers more than one M+C plan and also whether Medicare Secondary Payer rules apply. Until that time, and in accordance with § 422.66(d), an M+C plan offered by an M+C organization must accept enrollments from any eligible individual residing in the service area or continuation area of the M+C plan, who is enrolled in a commercial health plan offered by that same M+C organization during the month immediately preceding the month in which he/she is entitled to Medicare Part A and Part B.

*Comment:* Two commenters were opposed to the requirement in § 422.66(b)(3)(i) that disenrollment transactions be submitted within 15 days of receipt. Commenters pointed out

that we do not process disenrollments every 15 days and suggested the requirement be modified to coincide with the 30-day requirement for enrollment transactions outlined at § 422.60(d)(6).

*Response:* Our intent when establishing this requirement was to ensure that a beneficiary's choice to disenroll would be handled as expeditiously as possible. We are in the process of implementing a system that will be capable of processing these transactions more than once a month. However, we recognize that until the systems are modified, the requirement may not allow a sufficient amount of time to process a disenrollment action. Therefore, we have modified the regulations at § 422.66(b)(3)(i) to state that the time frame to submit disenrollment transactions will be "specified by HCFA," and have made a conforming change at § 422.66(f)(2). This will give us the flexibility to make changes as system enhancements are developed in the future. For the time being, we are specifying that disenrollment transactions be submitted within the same time frame as enrollment transactions.

*Comment:* Several commenters asked that we provide additional clarification in § 422.66(b)(5)(i) with respect to when an enrollment is not legally valid. Two of the commenters stated that we should clarify whether a lack of understanding would be included in the definition of a "legally valid enrollment," and whether it would result in a retroactive disenrollment. One commenter stated that we should clarify that an enrollment is not legally valid if it is determined at a later date that the individual did not meet eligibility requirements at the time of enrollment.

*Response:* There are a number of circumstances that would result in an enrollment not being considered "legally valid," and we agree that the lack of understanding of plan rules (such as the "lock-in") and ineligibility would be among these circumstances. However, a determination that an individual did not understand the terms of enrollment must be made on an individual basis. The criteria used in establishing evidence that an individual did not understand the terms of enrollment could include the following: continuing Medigap insurance coverage after receipt of the confirmation of enrollment letter from the M+C organization; an enrollment form signed by the member in situations where a legal representative should be signing for the member; enrolling in a supplemental insurance program immediately after enrolling in the M+C

plan; or receiving nonemergency or nonurgent services out-of-plan immediately after the effective date of coverage under the plan. OPL 99.100 sets forth specific guidelines to assist M+C organizations when making determinations about lack of understanding and incorrect eligibility determinations.

*Comment:* One commenter asked for clarification of our process for approving retroactive disenrollments (either voluntary or involuntary) and the subsequent effective dates.

*Response:* Section 422.66(b)(5) describes retroactive disenrollments, which are disenrollments with a retroactive effective date in cases in which we determine that there was never a legally valid enrollment, or in which a valid request for disenrollment was properly made but not processed or acted upon. In cases of involuntary disenrollments, such as disenrollment for disruptive behavior or failure to pay premiums, the disenrollment actions are prospective and would not be retroactive. In cases in which we find that an enrollment was not legally valid, the disenrollment results in cancellation of the enrollment as of the effective date of the enrollment. Therefore, the effective dates for these retroactive disenrollments are based upon the effective dates for elections, as provided under § 422.68. If the election subsequently found to be invalid was made during the annual election period in November, the effective date would be the first day of the following calendar year. If the election was made during an open enrollment period, the election would be effective the first day of the first calendar month following the month in which the election is made (or for elections made after the 10th day of a month, the first day of the 2nd calendar month following the date of the election). Effective dates for elections made during a special election period vary, dependent on the situation, and guidelines concerning these effective dates are provided in instructions to the M+C organizations. Elections made during special election periods for individuals age 65 would be effective the first day of the first calendar month following the month in which the election is made.

*Comment:* Section 422.66(d) states that an M+C organization must accept any eligible individual who is enrolled in a health plan offered by "an" M+C organization. One commenter stated that this section needs to clearly state that the M+C organization must accept any individual who is enrolled in a health plan offered by "the" M+C organization

**40190**    **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

offering the other plan in which the individual is enrolled.

*Response:* We agree that the use of the term "an" could imply that the requirement applies to any organization, such that all M+C organizations must accept all eligible individuals enrolled in any commercial health plan offered by any M+C organization. In fact, our intent is for the requirement to apply to a specific M+C organization, namely the organization that offers both the commercial health plan in which the individual is enrolled and the M+C plan in which the individual will be enrolling. Therefore, we are revising § 422.66(d)(1) to specify that a plan offered by an M+C organization must accept any eligible individual who is enrolled in a health plan offered by "the M+C organization."

*Comment:* One commenter believes there is a conflict between paragraphs (3) and (5) in § 422.66(d). The commenter reads § 422.66(d)(3) to provide that the individual will convert to the M+C plan unless he disenrolls, while § 422.66(d)(5) provides that the individual must fill out an election form in order to convert.

*Response:* We do not agree that there is a conflict between the two sections of the regulation, but recognize that some clarification is desirable to prevent confusion. We are revising § 422.66(d)(3) of the regulation to refer to the individual affirmatively choosing to remain enrolled with the organization as an M+C enrollee, and to state that conversion is effective the month of entitlement to both Medicare Part A and Part B "in accordance with the requirements in section § 422.66(d)(5)." We also have deleted a reference in § 422.66(e)(2) to an individual being "deemed" to have made an election, since this reference is inconsistent with the requirement in § 422.66(d)(5) that an election form be completed and signed. These revisions will clarify that while we have established the effective date of coverage under § 422.66(d)(3), the coverage may begin only if the individual completes and signs an election form, as required at § 422.66(d)(5).

*Comment:* One commenter believes that § 422.66(e)(2) (which states that an individual is considered to have continued an election in an M+C plan until the M+C plan is discontinued or no longer services the area in which the individual resides, and the organization does not offer or the individual does not elect the option of continuing enrollment) may be interpreted to absolve the M+C organization of any obligations when the person leaves the service area and has not selected a new

health plan or original Medicare. The commenter suggested that the regulations should make clear that an individual who leaves his or her M+C plan service area is entitled to a special election period, as is the case when the M+C plan ceases to serve the service area.

*Response:* If an M+C plan enrollee leaves the plan's service area, but has not informed the M+C organization offering the plan of a permanent move, the M+C organization does have continued obligations to cover emergency and urgent services that must be covered out of area. Once the M+C organization is made aware of such a permanent move, the organization is obligated under § 422.74(b)(2)(i) to disenroll the individual unless he or she has moved to a continuation area and requests to continue enrollment as a continuation area enrollee. With respect to the commenter's concern about a special election period being provided under these circumstances, § 422.62(b)(2) clearly provides an M+C plan enrollee who moves out of his or her M+C plan service area with the same right to a special election period that the enrollee gets under § 422.62(b)(1), cited by the commenter, in the case of an M+C plan termination.

*Comment:* One commenter was concerned about ensuring that all enrollees under a section 1876 risk contract—without regard to residence— be deemed to be enrollees of an M+C plan offered by the section 1876 contractor on January 1, 1999.

*Response:* We agree, and note that the interim final rule preamble states that we have interpreted the statute to allow an individual to transition from the section 1876 plan to an M+C plan "without regard to location of residence" (63 FR 34977). Our intent was to ensure that no individual enrolled in a section 1876 plan on December 31, 1998, would be adversely affected by the BBA changes, but instead would be able to maintain an established relationship with a Medicare contracting organization. Therefore, we clarified in the interim final rule that all individuals enrolled in a section 1876 plan on December 31, 1998 could convert to the corresponding M+C plan on January 1, 1999. We further clarified this "grandfathering policy" in OPL 99.084, dated February 26, 1999, which states that an individual who was enrolled in a section 1876 risk plan effective December 1, 1998 or earlier and remained with the risk plan on December 31, 1998, automatically continued to be enrolled in the M+C organization on January 1, 1999.

*Comment:* One commenter suggested that we include in the regulations text our operational policy recognizing State laws that govern who may sign election forms for beneficiaries. The commenter also believes we should clearly incorporate recognition of the State law, including health care consent laws.

*Response:* In general, and as previously discussed in the preamble of the June 26, 1998 interim final rule, we believe that the M+C-eligible individuals should personally complete and sign any election form or disenrollment request (referenced at § 422.66(b)) whenever possible. We also recognize that there may be times that an individual is unable to sign for himself or herself. Laws governing who may sign a health insurance application vary from State to State. Therefore, while the regulations provide for the beneficiary to sign an election form, we defer to State laws (for example, laws governing the exercise of a power of attorney) on who may sign on behalf of a beneficiary where a beneficiary signature is required. We do not believe it is necessary to make provision for this in the regulations text, because where State law permits another individual to sign for a beneficiary with respect to health care decisions, this authority would extend to cases in which the beneficiary's signature is required under Medicare regulations.

*Comment:* Section 422.66(d)(1) states that an M+C plan offered by an M+C organization must accept any eligible individual who is enrolled in a health plan offered by an M+C organization during the month immediately preceding the month in which the individual is entitled to Medicare Part A and Part B. One commenter asked us to clarify whether the use of the term "health plan" refers only to fully insured products, or whether the term would include self-funded members.

*Response:* The term "health plan" in § 422.66(d)(1) refers to any commercial health plan that the M+C organization offers. This may include fully insured products, self-funded products, and indemnity products.

### 8. Effective Dates of Coverage and Change of Coverage (§ 422.68)

An election made during an initial coverage election period as described in § 422.62(a)(1) is effective as of the first day of the month of entitlement to both Part A and Part B. Also, for an election or change of election made during an annual election period as described in § 422.62(a)(2), coverage is effective as of the first day of the following calendar year. For an election or change of election made during the open

enrollment periods described in § 422.62(a)(3) through (a)(6), coverage is effective as of the first day of the first calendar month following the month in which the election is made (except that if the election or change of election is made after the 10th day of a calendar month, the election takes effect on the first day of the second calendar month after the date of the election.)

For an election or change of election made during a special election period as described in § 422.62(b), we determine the effective date of coverage, to the extent practicable, in a manner consistent with protecting the continuity of health benefits coverage. For an election of coverage under original Medicare made during a special election period for an individual age 65 as described in § 422.62(c), coverage is effective as of the first day of the first calendar month following the month in which the election is made.

*Comment:* Several commenters objected to the effective date in the interim final rule for elections made during open enrollment periods, which was the first day of the month after the month the election is received. The commenters believe this effective date did not allow enough time to process the enrollment. They believed that this deadline would result in increased retroactive transactions and would be burdensome on M+C organizations. Commenters also expressed significant concerns over liability and access to services if Medicare entitlement is not verified expeditiously. Commenters also noted the need for us to make system changes to accommodate the new effective date requirements, and to clarify how we intend to implement the requirements with respect to M+C organization submission of data. The commenters recommended the effective dates be as they were under section 1876 of the Act which, under § 417.450(a)(2), may not be earlier than the first month after, nor later than the third month after, the month in which we receive the information necessary to include the beneficiary as a Medicare enrollee of the HMO or CMP in our records.

*Response:* Section 1851(f) of the Act supersedes all prior section 1876 requirements and specifically delineates the effective dates for elections made in the M+C program. Consistent with the changes to section 1851(f) of the Act made by section 502 of the BBRA, we are revising § 422.68(c) to provide that coverage is effective either on the first day of the calendar month after the date of an election or change of election or, for elections or changes of election made after the 10th day of a calendar

month, on the first day of the second calendar month after the date of the election or change of election. In addition, based on our authority to establish requirements that can reduce the potential for retroactive transactions, we have developed guidelines for M+C organizations that include requirements for M+C organization verification of Medicare entitlement before submission of enrollment data (see OPL 99.100). The verification policy should minimize the potential for retroactive enrollment situations. Additionally, the new effective dates outlined in section 1851(f) of the Act have resulted in the need to clarify a number of operational issues. While the expansion of managed care provisions under the BBA has presented an extraordinary challenge to us, we have successfully implemented the necessary systems requirements to support this change in effective dates. Additionally, we have issued other guidelines to M+C organizations (OPL 98.074, our November 17, 1999 Systems Informational Letter, and OPL 2000.113) that outline how to identify the correct effective date and process the enrollments through our systems.

*Comment:* Several commenters were concerned that the new effective date requirements will not allow the M+C organization to receive our confirmation of the enrollment before the effective date, which could in turn increase beneficiary confusion.

*Response:* Section 1851(f) of the Act clearly outlines the effective dates of enrollment in M+C plans. If an eligible individual has elected an M+C plan, the M+C organization must cover the individual beginning on the effective date of coverage, even if the organization has not yet received final confirmation from us. An M+C organization can take several actions to reduce the chance of beneficiary confusion, including verifying Medicare entitlement before submission of enrollment data to us. This should increase the likelihood that we will confirm the individual's enrollment.

*Comment:* One commenter stated that original Medicare should pay M+C organizations for services furnished to individuals for whom retroactive disenrollments were processed.

*Response:* If a retroactive disenrollment is processed for a beneficiary, the M+C organization in which the beneficiary was enrolled can always bill for Medicare covered services rendered to the beneficiary.

*Comment:* One commenter stated that the effective date of coverage for individuals who enroll during an open enrollment period (the first day of the first calendar month following the

month the election is made) is too rigid, and that delayed effective dates should be permitted.

*Response:* Again, section 501(b) of the BBRA provided for some relief in this regard by changing the effective dates for elections or changes in election made after the 10th day of a month. We also note that we have the authority under section 1851(f)(4) of the Act to establish effective dates for individuals who meet the condition for special election periods. We have provided for prospective effective dates for individuals electing benefits through their employer group health plans, and published this guidance on April 20, 1999 in OPL 99.087. We provided additional guidance on the effective dates of coverage for other special election periods authorized under § 422.62(b) in OPLs 99.098 and 99.100.

*Comment:* Two commenters questioned how M+C organizations will be expected to handle multiple transactions, given the new effective date requirements.

*Response:* As stated at § 422.50(b), an individual may not be enrolled in more than one M+C plan at any given time. Nevertheless, there are times when an individual will try to elect more than one plan for the same effective date, and it is not always clear with which plan the individual truly intends to be enrolled. On August 9, 1999, we issued OPL 99.100, which includes guidelines on what actions an M+C organization must take in the event of a multiple transaction in order to determine with which M+C plan the beneficiary should be enrolled.

*Comment:* One commenter stated that we should establish performance standards that take into account difficulties that we and M+C organizations will have in meeting effective date requirements.

*Response:* We recognize that section 1851 of the Act has resulted in significant changes to the Medicare program and that M+C organizations need time to prepare for the changes. We have provided additional guidance on implementation of M+C enrollment, eligibility, and elections to M+C organizations through various OPLs (98.072, 98.073, 99.083, 99.084, 99.087, 99.098, 99.100, 99.104, 99.105, 99.109, and 2000.113) and a November 17, 1998 Systems Informational Letter. These letters outline how to identify the correct effective date, how to process enrollments with the new effective dates, how to transition from section 1876 to M+C enrollment and disenrollment rules, and when grandfathered members must be disenrolled from M+C plans. As a result,

we believe we have given adequate time to modify operations and systems to implement the new M+C program. In addition, we continue to develop guidelines for M+C organizations on M+C entitlement, eligibility, and elections to M+C organizations. Any monitoring of performance will take into account the time M+C organizations have needed to implement the new program.

9. Disenrollment by the M+C Organization (§ 422.74)

The general rule for disenrollment by the M+C organization is that an M+C organization may not disenroll an individual from any M+C plan it offers; or request or encourage (orally or in writing, or by any action or inaction) an individual to disenroll. However, § 422.74(b) describes the conditions under which the M+C organization may either be permitted or required to disenroll an individual. Under § 422.74(b)(1), the M+C organization may choose to disenroll an individual based on that individual's (1) failure to pay premiums, (2) disruptive behavior, (3) provision of fraudulent information on his or her election form, or (4) having permitted his or her enrollment card to be abused. Section 422.74(b)(2) requires the M+C organization to disenroll the individual if the individual no longer resides in the M+C plan's service area, the individual loses entitlement to Medicare Part A or Part B benefits, or the individual dies. The M+C organization must follow the procedures specified at § 422.74(c) and (d) when disenrolling an individual. The procedures to be followed and the consequences of the disenrollment vary depending upon the cause of the disenrollment.

*Comment:* One commenter believes that the 90-day grace period that must be afforded to an enrollee before a disenrollment for nonpayment of premium could be financially burdensome in 1999 since ACRs that did not necessarily reflect these costs were filed before the M+C regulations were published.

*Response:* We recognize that 1999 was a transition year with many new requirements. With respect to 2000, however, M+C organizations were fully aware of all regulatory requirements before filing their ACRs.

*Comment:* Several commenters believed that the 90-day grace period for nonpayment of premiums is too long. Two commenters recommended a 30-day grace period rather than the 90-day grace period. They noted that if an organization has to wait 90 days before disenrolling an individual, this

potentially results in 4 months without the organization receiving payment, since organizations do not send notice to beneficiaries until the beginning of the month after payment is due. One commenter recommended that grace period extend until the last day of the third month following the date payment is due.

*Response:* Section 1851(g)(3)(B)(i) of the Act requires us to provide for a "grace period" before enrollment can be terminated for nonpayment of premiums. In determining the grace period, we adopted the grace period that Congress provided for in section 1836(b)(2) of the Act with respect to a termination for nonpayment of premiums for Supplementary Medical Insurance Benefits for the Aged and Disabled (that is, Part B). This results in consistent standards between the M+C program and the original Medicare program.

*Comment:* Several commenters believe that M+C organizations should be permitted to allow an enrollee to remain enrolled and eliminate only optional benefits if a member fails to pay premiums charged for such optional benefits. Some commenters believe that the option to disenroll for nonpayment of premiums implied that an organization could only disenroll the beneficiary from the plan, and could not simply eliminate the optional benefits. One commenter questioned whether under our rules, it might be necessary to disenroll the individual and re-enroll them as a "standard option" enrollee to accomplish this.

*Response:* We agree that providing the M+C organizations the option to retain an enrollee while eliminating an optional benefit for which premiums are not paid is a desirable and appropriate means of promoting continuity of care for beneficiaries. We are adding a provision to § 422.74(d)(1)(iv) that expressly provides an M+C organization the option to discontinue an optional supplemental benefit for which premiums are not paid, while retaining the beneficiary as an M+C enrollee.

Such an action would not affect the beneficiary's status as a member of the M+C plan, and would not constitute a new election. Therefore, the M+C organization does not have to formally disenroll and re-enroll the individual when downgrading the member's enrollment to the standard benefit package because the beneficiary fails to pay the plan premiums.

*Comment:* One commenter recommended that the M+C organization should be required to send notice to enrollees that premium payment is overdue within 10 days,

rather than 20 days. Another commenter supported the 20-day time frame.

*Response:* Section 1856(b)(2) of the Act provides for the use of standards established under section 1876 to implement analogous provisions of the M+C statute when those standards are consistent with standards established in the BBA for the M+C program. Section 417.460(c)(1)(iii) requires section 1876 contractors to send notices of disenrollment for nonpayment of premiums to the enrollee before it notifies us. In addition, § 417.460(c)(1)(i) requires that the contractor demonstrate to us that it made reasonable efforts to collect the unpaid amount. Section 422.74(d)(1) of the M+C regulations carries over both of these requirements and clarifies that "reasonable efforts" include sending a notice of nonpayment to the beneficiary within 20 days after the date the payment was due. The notice advises the beneficiary that he or she has 90 days from the date of the notice to provide payment. We continue to support this policy and believe that 20 days is a reasonable maximum time frame within which to make an effort to collect unpaid premiums. We note that an M+C organization may notify the individual as soon as the premium payments are past due (that is, send a notice before 20 days have passed), in which case the 90-day grace period would begin on the day the M+C organization sends the notice.

*Comment:* One commenter requested clarification of the effective date of disenrollments for nonpayment of premiums following the 90-day grace period. The commenter asked that we clarify for how long the organization is obligated to provide benefits and we will continue to pay capitation.

*Response:* The effective date of disenrollment for nonpayment of premiums is the first day of the month after the 90-day grace period ends.

The M+C organization must continue to provide benefits and we will continue to pay capitation until the disenrollment is effective. We clarified this policy in OPL 99.100, issued on August 9, 1999. We note that § 422.74(d)(1) erroneously refers to the possibility of disenrollment for an individual who fails to pay any "basic *or* supplementary premiums." Section 1851(g)(3)(B)(i) of the Act refers to "basic *and* supplementary premiums" and we are revising the regulations accordingly.

*Comment:* Two commenters requested clarification regarding the standards for disenrollment for disruptive behavior under the Health Insurance Portability and Accountability Act (HIPAA) and

BBA, unsure if the two statutes were in conflict in this area.

*Response:* For any issues for which there is a perceived conflict in the disenrollment standards established under the BBA (or the BBRA) and those established under HIPAA, the BBA standards (that is, the standards in § 422.74 pursuant to section 1851(e) of the Act) would control for M+C purposes.

*Comment:* One commenter recommended that disenrollments for fraud and abuse should include other fraudulent activities related to the delivery of health services, such as visiting multiple doctors for the purpose of obtaining specific drugs and/or using another enrollee's membership card when benefits have been exhausted.

*Response:* As noted above, section 1856(b)(2) of the Act provides for the use of section 1876 standards to implement analogous provisions of the M+C statute when those standards are consistent with standards established in the BBA for the M+C program. The regulations in section 1876 of the Act addressing disenrollments for fraud and abuse at § 417.460(d) have been largely adopted in § 422.74(d)(3), which permits disenrollment of a beneficiary for providing fraudulent information that affects eligibility to enroll or for permitting others to use his or her enrollment card to obtain services. Manual instructions implementing § 417.460(d) further clarified that any abuse relating to a membership card was included as a ground for disenrollment. Thus, using another member's card would constitute grounds for disenrollment, just as would loaning someone else a card. With respect to the commenter's other example about multiple visits to physicians to obtain drugs, an M+C organization's utilization review system should be able to identify these abuses.

*Comment:* One commenter requested that we add clarification regarding when a disenrollment is effective in cases of fraudulent behavior.

*Response:* Disenrollment of an individual who has committed fraud or who permits the abuse of his/her enrollment card is effective the first day of the calendar month after the month in which the M+C organization gives the member the written notice of his/her termination.

*Comment:* One commenter is concerned that our process for making disenrollment decisions related to disruptive behavior would result in numerous retroactive disenrollment situations. The commenter suggested that we clarify or revise the regulation to assure that any effective dates for

disenrollment be prospective in situations where an individual is being disenrolled for disruptive behavior.

*Response:* Section 422.74(d)(2)(v) establishes procedures for our review of an M+C organization's proposed disenrollment of an individual for disruptive behavior. Under these procedures, we review documentation submitted by the M+C organization within 20 working days, and notify the organization within 5 working days of whether it may disenroll the individual. Section 422.74(d)(2)(vi) then states that if we permit the disenrollment for disruptive behavior, the termination is effective the first day of the calendar month after the month in which the M+C organization gives the individual written notice of the disenrollment. Since these procedures do not allow an M+C organization to disenroll an individual for disruptive behavior until after we have approved the disenrollment, we believe the process provides only for prospective disenrollments.

*Comment:* Several commenters believe that 12 months is too long to wait before disenrolling an individual for being permanently out of the service area. Many commenters are concerned that the beneficiary will be able to receive only urgent and emergency care during this time, and that 12 months is too long without routine and coordinated care. They made several recommendations. One commenter recommended that 6 months would be reasonable to cover those individuals who live in different parts of the country during the year, while still maintaining contact with the primary care physician for preventive care. Two commenters recommended maintaining past policy of disenrollment of members that move outside of service area for more than 90 days, unless the plan has an affiliate. Another commenter also supported a return to a 3-month time frame. One commenter requested clarification regarding the requirements for disenrolling members from M+C organizations if they move permanently before the 12 months have expired. The commenter believes that if the request to disenroll was written or other acceptable evidence was presented, the M+C organization may disenroll the individual from the plan.

*Response:* We must first clarify that if an M+C organization determines that an individual has *permanently* left the service area of the M+C plan, it must disenroll the individual from that plan regardless of whether 12 months have passed, unless the individual chooses a continuation of enrollment option. This is outlined at §§ 422.74(b)(2)(i) and

422.74(d)(4). However, we believe that this point may not be entirely clear in the existing regulations and thus we are revising § 422.74(d) to specify that an individual who has "permanently" moved out of a plan's service area must be disenrolled. Note that this disenrollment requirement also applies to individuals who are enrolled in a plan under the expanded seamless conversion option for former commercial plan enrollees that is now set forth at §§ 422.50(a)(3)(ii) and (a)(4). That is, should the individual change his or her residence, he or she would be treated the same as any other enrollee who moves to a residence outside of the service area.

The 12-month rule set forth under existing § 422.74(d)(4) establishes the time limit for how long an individual who has left the service area on a temporary basis may remain a member of the M+C plan. That is, an M+C organization must disenroll an individual who has not permanently changed his or her address but has been out of the service area for over 12 months.

After considering the comments on this provision, we agree that 12 months is too long for a beneficiary to have access only to emergency and urgently needed care (based on our operational policy that when a member is out of the service area, the M+C organization is required to cover only emergency and urgently needed care). Therefore, we are further revising § 422.74(d)(4) to state that the M+C organization must disenroll an individual, unless he or she chooses the continuation option, if the individual leaves the plan's service area on a nonpermanent basis for over 6 months. This change is within the parameters of the previous requirement under section 1876 of the Act which, as provided in § 417.460(f)(2), allowed an uninterrupted absence from the geographic area for more than 90 days but less than 1 year. However, we believe it is appropriate to extend the time frame from 90 days to 6 months to accommodate the many beneficiaries who leave the service area for seasonal periods each year, which often last more than 90 days, but rarely more than 6 months.

We note that on August 9, 1999, we issued OPL 99.100, specifying that: (1) If an M+C organization receives notice of a permanent change of address from the member (or member's legal representative) at any time, then it must disenroll that individual from the plan if that change of address is outside the M+C plan's service area unless the member chooses the continuation of enrollment option; and (2) if a member

leaves the service area of the plan, then the M+C organization must disenroll the member if the absence extends beyond 12 months (now, 6 months).

*Comment:* One commenter asked whether an M+C plan can provide out-of-area coverage in excess of that required by Medicare for only part of the 12-month period when a member is out of the M+C plan's service area.

*Response:* We allow M+C organizations the flexibility to develop programs to continue benefits for those members who temporarily leave the service area. We have developed operational policies regarding visitor programs. Again, note that revised § 422.74(d)(4) requires an M+C organization to disenroll an individual, unless he or she chooses the continuation option, if the individual moves out of the plan's service area, for over 6 months.

*Comment:* One commenter asked for clarification of the effective date when an individual is disenrolled for being out of the area for over 12 months.

*Response:* Consistent with the change in § 422.74(d)(4), the effective date of disenrollment if a member is out of the area and has not informed the M+C organization that the move is permanent will be the first day of the calendar month after the 6 months has passed, and after appropriate written notice has been provided to the member. If the M+C organization is made aware of a permanent move out of the service area, disenrollment is effective the first day of the calendar month after the date the member begins residing outside of the M+C plan's service area, and after written notice has been provided to the member.

*Comment:* One commenter recommended that § 422.74(d)(7), which provides for disenrollment when a plan terminates services in the area in which the enrollee resides, explicitly states that disenrollment is automatic in this case.

*Response:* The effective date of a disenrollment based on an M+C plan termination or reduction in service area is the date that the M+C plan termination is effective, and disenrollment is automatic. Beneficiaries would have already received advance notice of such a termination as part of the nonrenewal requirements in § 422.506(a)(2). Accordingly, we have revised § 422.74(d)(7)(ii) to reference the time frames in § 422.506(a)(2).

*Comment:* One commenter recommended that notices for involuntary disenrollments should be mailed to individuals authorized to make elections on behalf of an enrollee as well as the enrollee.

*Response:* In general, and as indicated by our requirement that the beneficiary complete and sign the M+C enrollment form, we believe that an M+C-eligible individual should personally complete and sign any election form or disenrollment request whenever possible. If for some reason a beneficiary is unable to sign the election form and needs a surrogate, we defer to State law on who may sign for other persons. Legal representatives of such individuals who authorize the election of an individual must also sign the election form and specify their relationship with the enrollee. In instances of involuntary disenrollment, notifications of disenrollment occur before any action is taken, to ensure that the individual has adequate time to review his or her health care options. Since the legal representative has identified him/herself to the M+C organization, the M+C organization should ensure that both the legal representative and the enrollee subsequently receive, in a timely manner, any important information provided by the M+C organization related to the health care decisions of the beneficiary.

*Comment:* One commenter is concerned that the time frames for our review of an M+C organization's proposed disenrollment for disruptive behavior (20 working days for a determination and the subsequent 5 days to notify the M+C organization) are too long. The commenter believes that 5 days is reasonable for us to make our determination.

*Response:* Again, section 1856(b)(2) of the Act provides for the use of section 1876 standards to implement analogous provisions of the M+C statute when those standards are consistent with standards established in the BBA for the M+C program. Regulations at § 417.460(e)(5), which set forth the requirements for our review of an HMO's or CMP's proposed disenrollment for cause, addressed this issue. Under § 417.460(e)(5)(ii), we make this decision within 20 working days after receipt of the documentation material and notify the HMO or CMP within 5 working days after making our decision. We see no reason not to retain this standard under the M+C program, and have done so in § 422.74(d)(2)(v)(B). We believe that this period of time ensures that we can conduct a thorough review of all documentation submitted by the M+C organization and the beneficiary.

*Comment:* With respect to an M+C organization termination of an enrollee for disruptive behavior, one commenter asked for clarification of the process. For example, the commenter wanted to know who makes the determination, what appeal rights the beneficiary has, the time frame for a determination, and whether the beneficiary stays in the plan during the review of a determination. The commenter also asked if there is a possibility of coverage days lost while we are making the decision, and whether premiums would be refunded if the beneficiary is disenrolled.

*Response:* The M+C organization must make a serious effort to resolve the problems presented by the beneficiary, which includes the use of the M+C organization's grievance procedures. The M+C organization must notify the beneficiary of its intent to request such a disenrollment, as well as the beneficiary's rights under the M+C organization's grievance procedures. As described above, the final decision regarding the determination of disruptive behavior is made by us, as provided by § 422.74(d)(2)(v), which outlines our review authority of the M+C organization's proposed disenrollment. After reviewing the documentation submitted by the M+C organization and any information submitted by the beneficiary, we decide whether the M+C organization has met the disenrollment requirements. Until the disenrollment is effective, the beneficiary will continue to receive services from the M+C organization. Any premiums or other charges paid for coverage after the effective date would be refunded to the beneficiary; however, the beneficiary would be liable for the original Medicare cost-sharing and permitted balance billing in the case of any Medicare covered services provided by the M+C organization after the effective date of the disenrollment.

*Comment:* One commenter requested clarification regarding when to send out notices for disenrollments for cause.

*Response:* The basic requirement for notices is provided at § 422.74(c), which states that for any optional or required disenrollment (other than death or loss of entitlement), the organization must give the individual written notice of the disenrollment with an explanation of why the M+C organization is planning to disenroll. The notice must be mailed to the individual before submission of the disenrollment notice to us. Please note that we have amended §§ 422.74(c)(1) and (c)(2) to clarify that these notice provisions do not apply for disenrollments resulting from plan terminations or reduction of service or continuation areas, since there are no grievance rights provided in these

situations. The notice requirements for plan termination are outlined in §§ 422.74(d)(7) and 422.506(a)(2).

*Comment:* One commenter noted that § 422.74 only provides the opportunity for an individual to express a grievance to the M+C organization for an enrollment or disenrollment decision. The commenter believes that we should allow these decisions to be appealed because such decisions should not be left to the M+C organization.

*Response:* We agree with the commenter that decisions to disenroll for fraud or disruptive behavior should not be left solely to the M+C organization, which is why the regulations, at §§ 422.74(d)(2)(iv) and (3)(iii) provide for our role in these cases. However, in other cases, we believe that beneficiaries will be well-protected from a potentially wrongful disenrollment by the internal grievance procedures of the M+C organization. An M+C organization's decision to disenroll an individual does not meet the regulatory definition of an organization determination and thus, by definition, is not an issue that is eligible for the M+C reconsideration process.

10. Approval of Marketing Materials and Election Forms (§ 422.80)

Section 1851(h) of the Act outlines the requirements related to marketing by M+C organizations. These provisions are implemented in § 422.80 of the interim final rule. Section 422.80(a) implements the requirements in section 1851(h)(1) that all marketing material and application forms be submitted to us for approval 45 days before distribution, and that such materials may be used only if we do not disapprove such use by the end of the 45-day period. Section 422.80(b) defines the "marketing materials" that must be submitted for approval. We note that we have made a minor revision to this regulation to reflect the fact that HCFA does not review newsletters as marketing material. The reference to newsletters was included in the interim final rule because it appeared in the part 417 regulations governing marketing by section 1876 contractors. In fact, HCFA did not treat newsletters as marketing materials in the case of section 1876 contractors, and there was no intent in the interim final rule to change HCFA's practice on this point. The interim final rule thus should not have included the reference to newsletters, and we are correcting our error in doing so.

Section 1851(h)(2) of the Act requires that the M+C standards include guidelines for review of marketing materials and requires that the guidelines provide that the Secretary

will not approve materials that are inaccurate or misleading. Section 422.80(c) establishes the guidelines for our review of marketing materials. Consistent with the provision in section 1856(b)(2) of the Act for use of existing section 1876 standards, the guidelines in § 422.80(c) include existing marketing guidelines for HMOs and CMPs (from § 417.428), which have been in effect since the inception of the Medicare risk contract program.

Section 1851(h)(3) of the Act provides that if we have not disapproved the dissemination of marketing materials or forms with respect to an M+C plan in an area, we are deemed not to have disapproved the distribution in all other areas covered by the M+C plan and M+C organization except with regard to any portion of the material or form that is specific to the particular area. This "deemed approval" or "one-stop shopping" provision is implemented in § 422.80(d).

Section 1851(h)(4) of the Act provides that M+C organizations shall conform to "fair marketing standards" and requires that the fair marketing standards prohibit organizations from providing cash or other monetary inducements for enrollment. Section 422.80(e) outlines the fair marketing standards provided for under section 1851(h)(4) of the Act, and includes existing section 1876 standards as provided for in section 1856(b)(2) of the Act.

Finally, § 422.80(f) specifies that we may permit M+C organizations to develop and distribute marketing materials specifically designed for members of an employer group who are eligible for employer-sponsored benefits through the M+C organization. Although these materials must be submitted for approval under § 422.80(a), we do not review portions of these materials that relate only to employer group benefits, rather than to M+C plan benefits.

The public comments that addressed marketing issues governed by § 422.80 are discussed below.

*Comment:* Two commenters suggested that we consider lengthening the review and approval processing time for marketing material from 45 days to either 60 or 90 days. The commenters believe that we need additional time to perform adequate review of marketing material submitted by M+C organizations. Another commenter suggested that the processing time be reduced to 14 days and the deemed approval time period be 30 days. The commenter asserted that M+C contractors must complete obligations within 14–30 days; therefore, we should be held to the same standard. The

commenter also stated that 45 days for approval of marketing material is too long for effective marketing or to correct misinformation in the press.

*Response:* As noted above, section 1851(h)(1) of the Act establishes a 45-day limit for our review and approval of marketing materials. That is, absent our disapproval of such materials, the statute permits an M+C organization to distribute marketing materials 45 days after submitting the materials for review. Since any materials that are not affirmatively "disapproved" are effectively "approved" for distribution, we recognize the importance of completing our review of all marketing materials within 45 days. Accordingly, we are evaluating our marketing review procedures to identify ways we can promote greater efficiency in the marketing review process. We do not believe that reducing the marketing review and deemed approval periods would allow our staff adequate time to ensure that marketing material is accurate and not misleading to potential enrollees and beneficiaries.

*Comment:* Many commenters expressed concern regarding inconsistent review and treatment of marketing material by our different regional offices. A few commenters recommended that we consider centralized review of marketing material to promote greater consistency across the regions and central office. Several commenters also suggested that we require standard language and at a minimum, 12-point print, in all M+C marketing materials.

*Response:* We understand the concerns of M+C organizations regarding uniform application of marketing review and guidelines. To address these concerns, we have convened a team of representatives from our 10 regional offices and our central office that is responsible for addressing marketing issues which arise in policy and operationally. We recognize that centralized review may promote more consistent application of marketing review policy, and we are currently evaluating the feasibility of such review. Although we want to provide M+C organizations with the flexibility to develop marketing material that will distinguish their products and services from other organizations, we also believe that standardizing M+C marketing materials will facilitate beneficiary use and choice. Thus, we have taken steps to standardize beneficiary materials. Pursuant to our authority under § 422.80(c)(1) to require the use of "a format * * * and * * * standard terminology * * * specified by HCFA," we required M+C

organizations to use a standardized Summary of Benefits format in describing their 2000 benefits, beginning in the fall of 1999. This Summary of Benefits provides beneficiaries with information on M+C plans that is standardized in terms of format, language, and content. We also plan to identify other beneficiary notification materials for which standardization will be required. The current marketing guide already directs M+C organizations to use 12-point print. M+C organizations can obtain the marketing guide from our website (www.hcfa.gov).

*Comment:* One commenter suggested that we clarify that documents developed by pharmacies to conduct pharmacy compliance programs are not marketing and promotional materials. Another commenter recommended that we clarify that marketing materials intended to promote the M+C organization (distinct from its Medicare contracting function) should not be subject to the marketing review process.

*Response:* To the extent that "pharmacy compliance" documents are directly related to health care or quality, we do not review them as marketing materials. On the other hand, if the "pharmacy compliance" materials are used to market the program in pre-enrollment marketing materials and advertisements, we treat them as marketing materials subject to our review and verification.

We do not review materials that are directed solely at an HMO's commercial population. However, we believe that any materials targeted at the Medicare population, and designed to inform beneficiaries about benefits, or encourage beneficiaries to enroll or remain enrolled, should be subject to our review on their behalf. Thus, we are retaining the provision under § 422.80(b)(1) that calls for review of materials that "promote the M+C organization."

*Comment:* A few commenters, particularly those providing services in rural areas, urged that we require M+C organizations to include a list of subcontracted providers in their pre-enrollment marketing material. Others suggested that we require organizations to include a list of participating providers in their marketing materials.

*Response:* We understand that provider directories are generally available at sales presentations or when a beneficiary visits the M+C organization. Thus, we do not think it is necessary or appropriate to mandate that an M+C organization identify subcontractors or furnish provider directories in general marketing

materials or sales kits. We note that § 422.80(c)(1) directs M+C organizations to provide Medicare beneficiaries interested in enrolling in an M+C plan with a written description of plan rules (including any limitations on the providers from whom services can be obtained), procedures, basic benefits and services, and fees and other charges. M+C organizations also must meet the detailed disclosure requirements outlined in § 422.111, which include informing enrollees of the "number, mix, and distribution (addresses)" of available providers. We believe that these requirements adequately address beneficiary information needs.

*Comment:* Several commenters requested that we define "significant non-English speaking population." One commenter recommended that 5 percent of the Medicare-eligible population be the standard, while another recommended a standard of 25 percent.

*Response:* Section 422.80(c)(5) of the interim final regulation requires, for markets with a significant non-English speaking population, that M+C organizations provide marketing materials in the language of these individuals. The term "significant" can refer to either the number or percentage of the affected population. We note that the Office for Civil Rights within the Department of Health and Human Services is responsible for implementing standards and providing guidance concerning the obligations of Federal fund recipients (such as M+C organizations) to provide language assistance to individuals who have limited English proficiency. As more information becomes available to HCFA, we will provide further guidance on M+C organizations' responsibility in this regard.

*Comment:* Some commenters asked that we clarify the role of physicians in the marketing of M+C products to their patients. The commenters also requested further guidance regarding whether physicians are allowed to counsel patients about their health insurance choices. Commenters both supported and opposed allowing physicians to advise potential enrollees and beneficiaries about M+C plan options.

*Response:* We agree that the role of physicians should be clarified. Accordingly, we are amending the standards for marketing to add a new § 422.80(e)(1)(vi) that permits provider groups and individual providers to distribute health plan brochures (exclusive of applications) at a health fair or in their own offices. Physicians may discuss, in response to an individual patient's inquiry, the various

benefits in different health plans. While this discussion is entirely appropriate within the doctor-patient relationship, M+C organizations may not use providers/provider groups to distribute printed information comparing the benefits of different health plans, unless the materials have the concurrence of all organizations involved and have received prior approval from us. Physicians and other providers may not accept plan applications. We also are adding a new § 422.80(e)(1)(vii) that prohibits M+C organization representatives from accepting applications in provider offices or other places where health care is delivered.

*Comment:* One commenter recommended that we revise § 422.80(c)(4) to reflect a statutory reference in section 1851(h)(2) of the Act to marketing material that is "materially inaccurate or misleading or * * * makes a material misrepresentation." The commenter believed that the omission of the term "material" creates a more stringent standard of review than that intended by Congress.

*Response:* We concur with this recommendation. As noted, section 1851(h)(2) states that "the Secretary shall disapprove * * * such material or form if the material or form is materially inaccurate or misleading or otherwise makes a material misrepresentation." Therefore, we are modifying § 422.80(c)(4) to read as follows: "In reviewing marketing material or election forms under paragraph (a) of this section, HCFA determines that the marketing materials: * * *. (4) are not materially inaccurate or misleading or otherwise make material misrepresentations." This language is more consistent with the standard outlined in the statute, and we believe it can help avoid delays in the review and approval of marketing materials for immaterial or irrelevant errors.

*Comment:* Commenters also requested further guidance regarding the permissibility of offering "value-added services" to beneficiaries.

*Response:* In general, "value-added items and services" (VAIS) are items or services offered to beneficiaries by an M+C organization that do not meet the definition of a benefit as stated in § 422.2; that is, benefits are health care services for which the M+C organization incurs a cost under the M+C plan that are submitted and approved through the ACR process. Examples of VAIS may include but are not limited to discounts in restaurants, stores, entertainment, or travel; they could also include discounts on health club memberships and on insurance policy premiums.

1967

Because VAIS do not constitute a benefit under the M+C program, neither the actual costs of the VAIS nor associated administrative costs may appear in the ACR, nor are they subject to the Medicare appeals process. Nonetheless, VAIS may be of value to some enrollees, and we do not wish to deprive M+C enrollees of access to items and services commonly available to commercial enrollees. Therefore, M+C organizations may offer VAIS to Medicare enrollees, but materials describing VAIS must clearly distinguish between VAIS and M+C benefits, including clarifying that VAIS are not subject to the M+C appeal procedures. VAIS may not appear in the Beneficiary Information Form or the Plan Benefit Package. Further, VAIS may not be described in Medicare Compare, the Medicare and You handbook, or the Standardized Summary of Benefits. We will provide further guidance regarding VAIS in a forthcoming OPL.

*Comment:* One commenter inquired if the prohibition of monetary rebates to induce enrollment applies to the distribution of coupons.

*Response:* Cash or monetary rebates, including coupons that have more than a nominal cash value (if converted to cash) are prohibited under § 422.80(e)(1)(i). This prohibition does not apply to items of nominal value ($10 or less). The coupons, or the combined value of the coupons, must not exceed the nominal value standard. Coupons that offer discounts on premiums or copayments are not permitted, because they would violate the "uniform premium" provisions of the statute, as outlined in § 422.304. If coupons are for VAIS in excess of nominal value, they cannot be distributed or advertised pre-enrollment. However, these coupons may be used after enrollment.

*Comment:* Commenters objected to the fact that the regulations are silent regarding the consequences if an M+C organization violates the marketing standards. Two commenters recommended that we begin retrospective review of marketing materials, and pull the advertising campaign for those found to be egregiously inaccurate. Similarly, another commenter suggested that we nonrenew or terminate contracts with organizations that are substantially out of compliance with the marketing regulations.

*Response:* We recognize that marketing material distributed by M+C organizations must be accurate and not misleading to potential enrollees, and that M+C organizations should be subject to sanction for a substantial failure to comply with marketing rules. We accordingly are adding a new § 422.510(a)(12) to specify that a substantial failure to comply with marketing guidelines is a ground for termination, and thus also a ground for nonrenewal or intermediate sanction (consistent with §§ 422.506(b)(1)(iii) and 422.572(b)).

*Comment:* Several commenters requested that we provide additional guidance regarding the documentation necessary to demonstrate that marketing resources are allocated for marketing to both the disabled and beneficiaries age 65 and over.

*Response:* Section 422.80(e)(2)(i) requires M+C organizations to demonstrate to our satisfaction that marketing resources are allocated to marketing to the disabled Medicare population as well as beneficiaries age 65 and over. We plan to issue further guidance on this issue but, until then, we expect organizations to adopt their own procedures to implement these provisions. As a starting point, organizations may consider developing a formal marketing strategy that considers the needs of persons with disabilities and consulting with disability advocacy groups and outreach programs. We expect M+C organizations to avoid developing plans that could discourage the enrollment of persons with disabilities through the imposition of unusually large cost-sharing requirements for items and services frequently used by the disabled. M+C organizations are also expected to make their marketing materials accessible to persons with disabilities (including, for example, through use of alternative formats), and to establish mechanisms for making their marketing sessions accessible to the disabled Medicare population. Also, as discussed further in section II.C of this preamble, M+C organizations must comply with other applicable Federal statutes, including the Americans with Disabilities Act.

*Comment:* One commenter recommended that we revise or delete the heading "Employer Group Retiree Marketing" in § 422.80(f) to reflect marketing to Medicare-eligible employees of the employer.

*Response:* We believe that "Employer Group Retiree Marketing" is an appropriate heading. This provision addresses only marketing materials geared toward retirees of an employer group that reflect non-Medicare benefits offered to group members by that employer. These retirees generally would include individuals who have retired based on a disability rather than age. Thus, a reference to "retirees" is not necessarily limited to the over-65 Medicare market. Moreover, this provision in no way limits an M+C's obligation to market to both disabled and over-65 beneficiaries, both in a retiree group and otherwise.

*Comment:* Some commenters requested further clarification regarding the review of marketing material developed by employers for purposes of employer group marketing. One commenter inquired whether we will definitely permit M+C organizations to develop marketing materials for employer groups. Presently, § 422.80(f) states that we "may" permit M+C organizations to develop marketing materials for employer groups.

*Response:* Although we will not review all the specific benefits offered by the employer group, we will review those items that fall within the disclosure requirements of § 422.111. Further, we agree that the wording of § 422.80(f) may be unclear; thus we are revising the regulation to: (1) Specify that M+C organizations are permitted to develop marketing materials for employer groups; and (2) clarify that we will not review those portions of such marketing materials that relate solely to employer group benefits.

*Comment:* One commenter questioned whether it is appropriate to allow the term "senior" or the number "65" to appear in the name of an M+C plan. The commenter stated that including these terms could discourage some beneficiaries from enrolling in a particular M+C plan.

*Response:* We recognize that certain plan names may discourage enrollment by disabled beneficiaries. Accordingly, pursuant to our authority under section 1851(h)(4) of the Act to establish marketing standards, we have added a new § 422.80(e)(1)(viii) that will prohibit M+C plan names that suggest that a plan is available only to Medicare beneficiaries age 65 or over, rather than to all beneficiaries. This prohibition generally bars plan names involving terms such as "seniors," "65+," etc. In fairness to M+C organizations with an existing investment in a plan name, we are "grandfathering" existing M+C plan names, that is, plan names established before this final rule takes effect.

*Comment:* One commenter believes that tax dollars should not be spent on insurance counseling and assistance programs, such as State Health Insurance Assistance (SHIP) or Information Counseling and Assistance (ICA) programs. In the commenter's view, there are less expensive and better alternatives, such as licensed insurance agents. The commenter asserted that the licensure of these individuals assures public accountability, and that the

insurance professional is the best alternative for providing consumer information and expertise about the new M+C options. On the other hand, several commenters recommended that we not permit independent marketing agents to sell M+C products to potential enrollees.

*Response:* We believe that SHIPs and ICA programs are valuable, objective, and necessary resources for Medicare beneficiaries. These programs provide one-on-one counseling to beneficiaries on many complicated insurance issues and provide essential links to other important services and programs available to beneficiaries. SHIPs provide a service through a network of 10,000 trained volunteers. In addition, these programs effectively network with other key partners such as insurance carriers, departments of social services, and legal service agencies. SHIPs are able to provide assistance related to a broad spectrum of Medicare issues, and are required to conduct their programs with impartiality and confidentiality. While we strongly support these programs, which have been extremely valuable in educating beneficiaries on the new M+C provisions, we will continue to explore additional information mechanisms to ensure that beneficiaries receive information in the most efficient and effective manner.

We recognize that independent insurance agents may be able to provide a necessary service to Medicare beneficiaries who are considering enrolling in the M+C program. In the past, our position has been to strongly discourage, but not prohibit, Medicare managed care organizations from employing independent insurance agents to sell their products. Recently, we have engaged in extensive consultations on this issue with the DHHS Office of the Inspector General, and we intend to issue guidance to M+C organizations in the near future regarding the parameters for the participation of independent agents in marketing M+C plans.

### C. Benefits and Beneficiary Protections

1. Introduction

Subpart C of these regulations details the scope of benefits a Medicare beneficiary is entitled to receive when electing coverage through an M+C plan, as well as establishing a number of beneficiary protections in areas related to access rules, enrollee notification requirements, confidentiality and others. The statutory authority for most of the provisions of subpart C is found in section 1852 of the Act, which outlines benefit requirements and

provides authority for beneficiary protections under Medicare Part C. Many of the statutory provisions are the same as, or similar to, benefit provisions of section 1876 of the Act. Therefore, much of the regulatory language of part 417 is retained for purposes of establishing M+C standards, as provided for in section 1856(b)(2) of the Act (which provides for basing M+C standards on section 1876 standards implementing analogous provisions, where consistent with Part C).

All M+C organizations are required to cover the full range of Medicare benefits that are available under original Medicare to beneficiaries in the area who are not enrolled in an M+C plan, subject to certain rules regarding an accessible network of providers. M+C organizations are further required to cover Medicare preventive benefits with the same frequency that they are covered under original Medicare (for example, annual screening mammography examinations). Beneficiaries may be required to contribute to the cost of covered services in the form of cost sharing provided for under the M+C plan. Beneficiaries may have to cover all costs until a deductible is met (including the high deductible provided for under an MSA plan—see section III of this preamble), a percentage of costs in the form of coinsurance, or a fixed amount for services, in the form of a copayment. As discussed in section II.G below, there are limits that apply to the cost sharing that can be imposed on beneficiaries under M+C plans. For benefits that are covered under original Medicare, the benefits must be obtained through providers meeting the conditions of participation of the Medicare program.

This section of the preamble mainly discusses the requirements for network plans. Sections III and IV of the preamble provide more extensive information about benefit requirements applicable to non-network M+C MSA plans and to private fee-for-service plans, respectively. Organizations with network plans, which include coordinated care plans and network M+C MSA plans, are permitted to restrict enrollees to a specified network of providers in the case of non-emergency/urgent services if they have a network in place to provide these services directly or through arrangements (that is, written agreements with providers) that meet the availability and accessibility requirements of section 1852(d)(1) of the Act and § 422.112, discussed below.

2. Emergency, Urgently Needed, and Post-Stabilization Care Services (§§ 422.2, 422.100, 422.112, and new § 422.113)

In some situations, an M+C organization is required to assume liability for services provided to Medicare enrollees through noncontracting providers. In particular, under § 422.100(b), the organization is required to assume financial responsibility for the following items and services obtained from a provider that does not contract with the M+C organization:

• Emergency services;
• Urgently needed services;
• Renal dialysis services provided while the enrollee was temporarily outside the M+C plan's service area;
• Post-stabilization care services; and
• For both network and non-network plans, services denied by the M+C organization and found upon appeal (under subpart M of this part) to be services the enrollee was entitled to have furnished or paid for by the M+C organization.

The requirements that the M+C organization assume financial liability for renal dialysis services and post-stabilization care are new requirements introduced by the BBA that were not included in the requirements of section 1876 of the Act. The definitions of emergency services and urgently needed services in the M+C regulations are based on section 1852(d) of the Act, and thus differ from those used under the previous Medicare managed care program (see § 417.401). In accordance with section 1852(d)(3) of the statute, an "emergency medical condition" exists if a "prudent layperson" could reasonably expect the absence of immediate medical attention to result in serious jeopardy or harm to the individual. In addition, the new definition of "emergency services" includes emergency services provided both within and outside of the plan, while the definition of "urgently needed services" continues to encompass only services provided outside of the plan's service area (or continuation area, if applicable), except in extraordinary circumstances (as discussed below). Under section 1852(d)(1)(C)(i) of the Act, M+C organizations are required to pay for nonemergency services provided other than through the organization where the services are immediately required because of unforeseen illness, injury or condition, and it is not reasonable given the circumstances to obtain the services through the organization.

In the June 26, 1998 interim final rule, definitions of emergency services and

urgently needed services were provided at § 422.2; financial responsibility of the M+C organization for emergency, urgently needed, and post-stabilization care services provided outside of the organization was addressed at § 422.100; and special coverage rules for emergency services and urgently needed services were provided at § 422.112. In this final rule, general requirements for financial responsibility for services provided outside the M+C organization remain at § 422.100, while definitions and policies relating to all types of emergency episodes of care, including ambulance services, emergency services, urgently needed services, and post-stabilization care services, have been consolidated at § 422.113. Comments on these aspects of the subpart C regulations are discussed below.

*a. Definitions (§ 422.2 and new § 422.113)*

*Comment:* Two commenters requested that we specify in the definition of "urgently needed services" that these are not "emergency services."

*Response:* Section 1852(d)(1)(C)(i) of the Act specifies that urgently needed services are not emergency services. Thus, as the commenters suggested, we are revising the definition of urgently needed services to include the requested clarification.

*Comment:* One commenter expressed support for, while another commenter opposed, the inclusion of in-area unusual events in the definition of urgently needed services. The commenter opposing the inclusion of in-area urgently needed services suggested that if this provision is retained, M+C organizations should not be required to disclose it in member materials or that we give examples of circumstances in which this exception would apply. One commenter asked if this meant that beneficiaries could unilaterally obtain care out-of-plan if their M+C organization did not provide the care they requested. The commenter supporting our position provided the example of equipment failure as a case in which in-area services might not be available.

*Response:* As discussed in the preamble to the June 26, 1998 interim final rule (63 FR 34973), the inclusion of in-area unusual events in the definition of urgently needed services is based on the statutory language at section 1852(d)(1)(C)(i) of the Act, which does not specify that these services are covered only when the beneficiary is out-of-area. Rather, the statute provides for coverage of urgently needed services when "it was not reasonable given the circumstances to

obtain the services through the organization." As stated in the regulations, in-area coverage of urgently needed services applies only under unusual and extraordinary circumstances, for services provided when the enrollee is in the service or continuation area, but the organization's provider network is temporarily unavailable or inaccessible, and such services are medically necessary and immediately required. We believe that examples of when this could arise would include unusual events such as an earthquake or strike, if such events impede enrollee access to care through M+C plan providers. This regulatory definition of urgently needed services should be used in any materials that include a description of urgently needed services.

With regard to the request that the in-area exception in the definition of urgently needed services be interpreted to mean that beneficiaries could seek care out-of-plan if the particular services are not provided by an M+C organization, we believe that the commenter is asking about situations where an M+C organization has made a judgment that services are not necessary or not covered, rather than one in which the network is unavailable. There are other mechanisms in place to handle such situations. We may require a plan to take corrective action, where necessary, if a plan fails to provide services. In addition, services that the beneficiary believes he or she was entitled to receive from the M+C organization, but that the organization denied or otherwise did not provide, may be appealed under the regulations in subpart M of part 422. Whether situations involving equipment failures would be considered urgently needed services depends upon the clinical condition of the patient, and the M+C organization's ability to make services available notwithstanding the equipment failure.

We note that, inherent to the various requirements under § 422.112 relating to an M+C organization's responsibility to provide adequate access to covered services, is the obligation of an M+C organization to provide access to necessary care through out-of-network specialists when its network is inadequate or unavailable. That is, if in an individual case a plan's provider network is not adequate to meet an enrollee's health care needs (for example, the plan includes no specialist qualified to treat an enrollee's rare condition), the organization shall authorize the individual to go out of network to obtain the necessary care. We are revising § 422.112(a)(3) to make

this requirement explicit. As discussed in detail in section II.M.9 of this preamble, failure to authorize such care constitutes an adverse organization determination, with concomitant appeal rights.

*Comment:* One commenter requested further elaboration on what is meant by "prudent layperson" within the definition of emergency services.

*Response:* Section 1852(d)(3) of the Act provides the definition of emergency services that includes the prudent layperson standard. Specifically, section 1852(d)(3)(B) of the Act states that an emergency medical condition is a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part. This entire definition should be considered when making a determination of whether a beneficiary acted appropriately in seeking emergency care. This definition is what the independent review entity under contract with us will consider when making determinations on beneficiary appeals of emergency services that an M+C organization has denied. With respect to the term "prudent layperson," we believe that the term "prudent" has a commonly understood meaning, and would refer the reader to the general dictionary definition of this term. A layperson refers to an individual with an average knowledge of health and medicine, as the definition of "emergency medical condition" states. We do not believe that further elaboration of the term prudent layperson is necessary.

*b. Enforcement of Emergency Requirements (§§ 422.80, 422.100, 422.113)*

*Comment:* Commenters requested clarification of what steps we were taking to ensure that M+C organizations provide access to emergency services intended by law.

*Response:* One mechanism we use to ensure appropriate provision of covered services by M+C organizations is a review process of all organization materials provided to beneficiaries, including both pre-enrollment marketing materials provided to prospective enrollees and post-

enrollment member materials for enrollees. For example, § 422.80(b)(5)(v) lists examples of membership communication materials we review, including membership rules, subscriber agreements (evidence of coverage), and member handbooks. In considering our response to this comment, we have determined that ''wallet-sized'' instruction cards that might be used in the case of an emergency should also be expressly included as materials to be reviewed, because these cards may contain instructions to enrollees on how to access care, including instructions on what to do in an emergency. We, therefore, are adding wallet card instructions to the list of examples of marketing materials to be reviewed under § 422.80(b)(5)(v) to ensure that wallet card instructions to enrollees are consistent with the statute and regulations, particularly requirements that apply to emergency and urgently needed services. We note that, as part of our monitoring of the ''prudent layperson'' standard, we have asked our independent review entity to report, on a quarterly basis, each instance in which it overturns a denial of a claim for emergency services.

Also in response to this comment, we have decided to specify at § 422.100(b)(1)(i) that M+C organizations are required to cover ambulance services provided other than through the organization that are dispatched through 911 or its local equivalent. Section 422.113 specifies that the M+C organization bears financial responsibility for ambulance services where other means of transportation would endanger the beneficiary's health. This policy is consistent with original Medicare's coverage of ambulance services where other means of transportation would endanger the health of the beneficiary as provided by section 1861(s)(7) of the Act, as well as with the emergency coverage provisions of section 1852(c)(1)(E) of part C of the Act. In particular, we believe that the law's reference to use of the 911 telephone system indicates statutory intent for coverage of ambulance services whether provided through the organization or other than through the organization. Ambulance services provided through the organization would also be considered part of basic benefits under §§ 422.100(a) and 422.101. We note that nonemergency ambulance services generally would be covered only when provided through the organization, to the same extent the services are covered under the general Medicare principles set forth in section 1861(s)(7) of the Act

(that is, when use of other forms of transportation would endanger the health of the beneficiary.) Regulations on original Medicare coverage of ambulance services may be found at § 410.40.

*c. Access to Emergency and Urgently Needed Services (§§ 422.112(c) and 422.113)*

*Comment:* Commenters generally supported emergency services policies, such as the prudent layperson definition, the prohibition of prior authorizations, the requirement for out-of-plan coverage, and the requirement that the treating physician determine when the patient is stable. Commenters requested clarification of the prohibition on prior authorization.

*Response:* In considering our policy prohibiting prior authorization for emergency services as required under section 1852(d)(1)(E) of the Act, we have determined that the regulations should expressly reflect the fact that two parties are protected from prior authorization requirements, that is, the beneficiary and the emergency provider treating the beneficiary. We are clarifying at § 422.113(b)(2)(ii)(A) that prior authorization may not be required from the beneficiary in any materials furnished to enrollees (including wallet card instructions) and that, consistent with section 1852(c)(1)(E) of the Act, disclosure of an enrollee's right to coverage of services must include disclosure of the enrollee's right to use the 911 telephone system. Also, § 422.113(b)(2)(ii)(B) specifies that materials furnished to providers (including contracts with providers) may not include instructions to seek prior authorization before an enrollee has been stabilized.

We believe that these clarifications will promote compliance with the prohibition in section 1852(d)(1)(E) of the Act on prior authorization requirements for emergency services.

*Comment:* A commenter requested that we specify that retroactive denials should not be allowed based solely on a final diagnosis, and that the presenting condition from the perspective of the prudent layperson should determine coverage.

*Response:* As noted in our preamble discussion of the provisions of § 422.112 in the June 26, 1998 interim final rule, long-standing Medicare managed care manual policy (§ 2104) prohibited retrospective denial for services that appeared to be emergencies, but turned out not to be emergency in nature. This policy is consistent with the ''prudent layperson'' element of the definition of an emergency medical condition, in that

the perspective of the enrollee is a significant factor in determining whether an enrollee acted appropriately in seeking emergency care. As explained in the preamble to the interim final rule, we believe that the current regulations already require such coverage. However, in light of the commenter's concern, we are including in new § 422.113(b)(2)(iii) the explicit requirement that M+C organizations assume financial responsibility for services meeting the prudent layperson standard in the definition of emergency medical condition, regardless of final diagnosis.

*Comment:* We received a number of comments regarding the limit in § 422.112(c) on copayments for emergency services obtained outside the M+C plan's provider network (the lower of $50 or whatever the plan would charge for in-plan emergency care). Some commenters argued that significant copayments were necessary to deter unnecessary visits to the emergency room, and noted that commercial fee-for-service insurance plans have copayments for emergency care that may be higher than the $50 limit. Other commenters thought the $50 limit was a reasonable standard. Some commenters suggested that the copayment for an emergency room visit should be higher than that for a physician office visit. One commenter requested that a requirement for advance disclosure of the emergency room copayment amount be substituted for a dollar limit. One commenter requested clarification that the $50 limit be for the ''sum total'' for all care received for the emergency episode. Another commenter argued for a rule prohibiting copayments altogether, or at least for a reduced limit for low-income beneficiaries.

*Response:* We appreciate the commenters' responses to our request for public comment on the policy of limiting the amount that can be imposed as a copayment for emergency services. As we stated in the preamble to the June 26, 1998 interim final rule, our data showed that only 7 percent of Medicare managed care plans were charging more than $50 for emergency services. We believe that all of the above comments have some merit, but that, on balance, retaining the current policy (the lower of $50 or whatever the plan would charge for in-plan emergency care) is the best course of action. Although we agree that copayments can effectively deter unnecessary use of services, we believe that a $50 copayment accomplishes this objective, since 93 percent of M+C organizations do not exceed this amount. We also believe, however, that a copayment higher than this amount

could potentially deter an enrollee from receiving necessary emergency services. M+C organizations retain flexibility to set copayment amounts up to $50, including possible consideration for low-income beneficiaries, and organizations may provide for a substantial differential between copayments for physician office visits and emergency room visits. We believe that the difference between a $50 copayment for an emergency room visit and the typical $5 to $10 copayment for a physician's office visit is sufficient incentive to receive nonemergency services at a physician's office. With respect to the commenter who advocated disclosure of emergency room copayments, such copayments are already disclosed in the MedicareCompare database on the Internet at HCFA's website, www.hcfa.gov, and M+C organizations are required to disclose these amounts in membership materials provided to beneficiaries. Finally, we believe that the current language already conveys that $50 is the sum total limit for copayment for services defined as emergency services, and that further clarification beyond this response is not necessary.

*Comment:* One commenter suggested that beneficiaries be issued a single Medicare identification card that could be presented to their treating physicians and staffs, rather than one card issued by the M+C organization and one issued by Medicare. The commenter stated that beneficiaries frequently do not present the correct card denoting M+C plan coverage to their treating physicians. The commenters believe that the use of a single card would allow physicians and staffs to easily identify exact Medicare coverage and the appropriate administrative and billing procedures to be applied.

*Response:* The purpose of the Medicare card issued to the beneficiary is to serve as proof of entitlement to the Medicare program. We believe that the Medicare card and the M+C plan membership card serve two different purposes—to identify the individual as entitled to Medicare and to subsequently identify how the individual receives the services. Combining these elements into a single identification card would require the issuance of a new card each time the beneficiary chose a new plan or returned to original Medicare. Thus, although we welcome suggestions to improve the efficiency of our operations, we do not believe that a single card should be issued to the beneficiary.

### d. Post-Stabilization Care Services (§§ 422.100 and 422.113)

Section 1852 (d)(2) of the Act gives the Secretary express authority to establish requirements needed to promote the "efficient and timely coordination of appropriate maintenance and post-stabilization care" (hereafter together referred to as "post-stabilization care"). Section 1852(d)(1)(C)(iii) of the Act establishes an M+C organization's responsibility to provide reimbursement for these services. Implementing regulations at §§ 422.100(b)(1)(iii) and 422.113(c) specify that an M+C organization is financially responsible for post-stabilization care services obtained within or outside of the M+C organization. This requirement applies both to services pre-approved by the organization and services that were not pre-approved, under certain circumstances, including situations where an M+C organization fails to respond within 1 hour to a request for pre-approval from a provider of post-stabilization care services (as discussed in detail below). We received a number of comments regarding this section.

In this final rule, the special rules for post-stabilization care services are included under new § 422.113. The requirement for financial responsibility for post-stabilization care services provided outside the organization remains at § 422.100.

*Comment:* One commenter stated that after stabilization of the emergent medical condition, no immediate health risks should exist. This commenter asked why there is a need to change the time frame for obtaining approval of post-stabilization care, which the commenter apparently believed was 48 hours. Several commenters responded favorably to the 1-hour window for responding to a request for authorization of post-stabilization services, with one commenter suggesting that 30 minutes would be a better time frame.

*Response:* If no immediate health risks exist following an emergency episode, the patient would most likely be discharged. Post-stabilization care services are administered to ensure that the patient remains stabilized following an emergency episode. We agree with the majority of commenters who supported the 1-hour time frame. We believe that an untimely response to a request for post-stabilization care services would delay the delivery of these services, thereby compromising their effectiveness. We are not aware of the 48-hour time frame referenced by one commenter, as no such time frame exists under Medicare law.

*Comment:* Several commenters recommended that we require that the request for approval not be made until after the enrollee is stabilized, so that the organization will have the necessary information at its disposal. Commenters requested clarification as to what constitutes a response by the M+C organization to a call from the hospital. For instance, one commenter asked if an organization would be in compliance with the 1-hour rule if it calls back within the hour and states it needs more time to make a decision on post-stabilization care services. One of these commenters also stated that we should require that the emergency department treating the member contact the M+C organization within an hour of the point at which the member is stabilized. Another asked how the emergency provider would be held accountable for notification to the M+C organization once the patient is stable.

*Response:* Section 1852(d)(1)(E) of the Act states that the M+C organization must provide coverage for emergency services without regard to prior authorization or the emergency care provider's contractual relationship with the organization. Implicit in this requirement is the fact that the organization may not require the provider to call for approval of services prior to the point of stabilization. If the hospital chooses to notify the organization while the patient is still being stabilized, the organization will still need an update on the status of the patient at the point of stabilization, in order to make an informed decision. If the provider calls when the enrollee is stabilized, an organization which calls back within the hour should not need more time to make a decision. Therefore, we consider a response by the M+C organization to be when the M+C organization submits a decision to the provider about its request for post-stabilization care. While we believe it is reasonable to expect the emergency provider to contact the M+C organization within an hour of the point at which the member is stabilized, we do not believe that this final rule, which establishes and clarifies the requirements that M+C organizations must meet, is an appropriate vehicle to impose such a requirement on hospitals. (We are considering including such a requirement in future hospital provider agreements with Medicare, however.) It is clearly in the hospital's best interest to contact the organization as soon as a patient is stabilized in order to ensure plan coverage of post-stabilization services furnished by the hospital. In

addition, in order to be able to bill the beneficiary in circumstances where the plan is not liable for payment, the treating provider is expected to provide the stabilized patient with a notice of non-coverage, such as an Advance Beneficiary Notice.

*Comment:* A number of commenters asked for clarification of the definition of post-stabilization care services. The majority of these commenters requested that post-stabilization care services be linked to the emergency episode. Two commenters inquired if the term post-stabilization care replaces the pre-BBA term ''follow-up'' care, which includes only routine care following an out-of-area emergency medical episode.

*Response:* We agree that the concept of post-stabilization care services could be clarified further, and we have expanded on the definition, including the addition of language addressing services furnished while waiting for a response to a request for authorization from an M+C organization. We also agree with the commenter that post-stabilization services should be limited to services related to the emergency medical condition.

By post-stabilization care services, we generally mean covered services, related to an emergency episode, provided after the enrollee is considered to be stable (see new § 422.113(c)). Under the post-stabilization provisions set forth in the interim final rule, ''post-stabilization'' services were limited to services authorized by the M+C organization or services furnished when the organization cannot be reached, or fails to respond to a request for authorization within an hour. This definition did not address services that may be required during that hour to keep the patient stabilized. We believe that it is necessary to ensure that the patient continues to receive necessary treatment during the 1-hour time frame when the provider waits for the organization to respond. These services consist of those necessary to maintain the stable condition achieved through previously administered emergency services. Any period of instability that rises to the level of an emergency medical condition that occurs during this time would be covered under § 422.113(b).

Section 422.113(c) also establishes that if the M+C organization does not respond within the 1-hour time frame, the M+C organization cannot be reached, the treating physician can proceed with post-stabilization services that are administered not only to ensure stability, but also to improve or resolve the patient's condition. When an M+C organization representative who is a non-physician and the treating

physician cannot reach agreement on a course of treatment, the M+C organization must allow the treating physician to speak with a plan physician. By allowing the treating physician to proceed with care of the patient in these cases, we are ensuring that M+C enrollees receive the same standard of timely care as beneficiaries under original Medicare.

Accordingly, the revised definition of post-stabilization care services at § 422.113(c)(1) reads as follows:

''(c) Post-stabilization care services means covered services, related to an emergency medical condition, that are provided after the enrollee is stabilized in order to maintain the stabilized condition, or, under the circumstances described in paragraph (2)(iii) below, to improve or resolve the enrollee's condition.''

Section 422.113(c)(2) then describes the M+C organization's financial responsibility for post-stabilization care services. Specifically, ''the M+C organization is financially responsible (consistent with § 422.214) for post-stabilization care services obtained within or outside of the M+C organization that are— (i) Pre-approved by a plan provider or other M+C organization representative; (ii) Not pre-approved by a plan provider or other M+C organization representative, but administered to maintain the stabilized condition, within 1 hour of a request to the M+C organization for pre-approval of further post-stabilization services; or (iii) Not pre-approved by a plan provider or other M+C organization representative, but administered to maintain, improve, or resolve the enrollee's stabilized condition if—

(A) The M+C organization does not respond to a request for pre-approval within 1 hour;

(B) The M+C organization cannot be contacted; or

(C) The M+C organization representative and the treating physician cannot reach an agreement concerning the enrollee's care and a plan physician is not available for consultation. In this situation, the treating physician may continue with the care of the patient until a M+C organization physician is reached or one of the criteria in § 422.113 (c)(3) is met.''

To further clarify the above requirements, consider the following example: A patient is brought to the emergency department with the preliminary diagnosis of a seizure. The patient is screened and receives services to stabilize his condition. Thus far, the services that the patient has received are emergency services under § 422.113(b). Once the emergency room physician

considers the patient stabilized, the M+C organization is notified of the need to consult a neurologist in order to proceed with relevant diagnostic tests to determine the cause of the seizure, and to treat the cause of the seizure definitively. While the emergency provider waits 1 hour for a response from the organization, post-stabilization services necessary to maintain the stable condition achieved through previously administered emergency services are administered.

If the M+C organization responds within 1 hour, it can approve the request for additional post-stabilization services under § 422.113(c)(2)(i) or make other arrangements for additional services. If the organization did not respond within the 1-hour time frame, if the organization could not be contacted, or if the organization representative and the treating physician could not reach an agreement and a plan physician was not available for consultation during the hour, the treating physician can proceed with post-stabilization services administered not only to maintain the stabilized condition, but to improve or resolve the patient's condition. Again, if the organization representative and the treating physician cannot reach an agreement, the M+C organization must give the treating physician the opportunity to speak with a plan physician concerning the care of the patient. If a plan physician responds to a request for consultation outside the one hour time frame, the plan physician and the treating physician are expected to execute a plan for safe transfer of responsibility of the patient.

*Comment:* One commenter sought clarification as to when the M+C organization's liability to pay ends. This commenter does not believe that the M+C organization physician should have to ''arrive,'' as stated in the preamble of the June 26, 1998 interim final rule, in order to terminate the organization's responsibility to pay. This commenter also recommended that we explicitly state that even if the M+C organization does not respond within the hour, once it does respond, it should have the absolute right to control the care that is given to the member.

*Response:* We agree that the issue of when the M+C organization's financial responsibility ends needs further clarification. We also agree that the physician should not have to arrive in person at the hospital in order to assume responsibility for his or her patient. Therefore, we are incorporating the following language into § 422.113(c)(3): ''The M+C organization's financial responsibility

1973

for post-stabilization care services it has not pre-approved ends when—(i) A plan physician with privileges at the treating hospital assumes responsibility for the enrollee's care; (ii) A plan physician assumes responsibility for the enrollee through transfer; (iii) An M+C organization representative and the treating physician reach an agreement concerning the enrollee's care; or,(iv) The enrollee is discharged.''

We do not agree that the M+C organization should have the absolute right to control the care that is given to the member when it does eventually respond and the one hour time period has elapsed. For example, a late response could result in a scenario where post-stabilization care services may have already started, and in such a situation, we believe that interruption of a procedure in progress in order to transfer the enrollee to another facility could be harmful to the member. The M+C organization is financially responsible for post-stabilization services until the M+C organization and the treating physician execute a plan for safe transfer of responsibility. Safe transfer of responsibility should occur with the needs and the condition of the patient as the primary concern, so that the quality of care the patient receives is not compromised.

*Comment:* Several commenters asked that HCFA clarify that only an M+C plan physician with privileges at the treating hospital may assume responsibility for the M+C plan enrollee's care.

*Response:* Generally, only an M+C plan physician may assume long-term responsibility for care furnished to an enrollee of that M+C plan. However, if there are no M+C plan physicians with privileges at the treating hospital, we would expect the treating physician and the M+C organization to make arrangements for appropriate care to be provided. Thus, we do not agree that an M+C plan physician with privileges at the treating hospital must necessarily assume responsibility for a plan enrollee's care.

*Comment:* Several commenters asked that we address how disputes between M+C organizations and providers would be resolved. One commenter asked that we develop guidelines for notification of organizations. Another commenter wanted to know how we will determine if a call was made, or responded to within 1 hour, if the provider's and M+C organization's records do not agree. Still another commenter suggested a provision holding the patient harmless for disputes between M+C organizations and the emergency

provider regarding post-stabilization benefits and coverage.

*Response:* We believe that providers and M+C organizations will develop methods of documentation to ensure that calls are made and received in a timely manner, so that the 1-hour response requirement can be met and the possibility of disputes can be minimized. We do not believe the development of guidelines by HCFA to be necessary or appropriate. Complaints and disputes are addressed in the HCFA monitoring process, and resolution would depend on the circumstances encountered. Ultimately, if agreement cannot be reached, a dispute over whether the conditions for M+C coverage for post-stabilization care services under § 422.100 and § 422.113 have been met could be resolved in an enrollee's appeal of the M+C organization's denial of payment for post-stabilization services, or an appeal by a provider if the provider agrees not to charge the enrollee. (We note that the rules governing payment for services furnished by noncontracting providers would apply in post-stabilization cases, as set forth in § 422.214 and discussed in detail in section II.E of this preamble. We have made this explicit at § 422.113(c)(2).) Based on this comment, we agree that M+C enrollees should be protected from excessive charges for post-stabilization care services. Therefore, new § 422.113(c)(2)(iv) provides that cost-sharing for post-stabilization care services must not exceed cost-sharing amounts for services obtained through the organization.

*Comment:* One commenter stated that if an enrollee is admitted to a hospital for services that are later determined not to be emergency services, the M+C organization has no obligation to pay for services that a provider asserts are for post-stabilization care. In addition, a commenter asked whether, if there is a denial of post-stabilization care services, the treating physician can be given the right to speak with an M+C plan physician regarding the patient. Another commenter recommended we add protections against denials of post-stabilization care services.

*Response:* Section 1852(d)(3) of the statute states that the M+C organization is responsible for services required to treat an emergency medical condition under the prudent layperson standard. Organizations are not responsible for care sought by the enrollee when this standard is not met. Post-stabilization services are similarly covered only following treatment for an emergency (as noted above, we have revised the definition, at § 422.113(c)(1), to make

this explicit.) If the patient did meet the prudent layperson standard, but the condition did not turn out to be an actual threat to the health of the patient, the M+C organization would not be responsible for any services beyond those services provided as part of the medical screening to determine whether an emergency medical condition existed. In such a nonemergency situation, the treating physician is expected to provide the patient with an Advanced Beneficiary Notice (ABN) to inform the patient that further services will not be covered.

With respect to the comment concerning denials, if the organization representative and the treating physician cannot reach an agreement concerning the enrollee's care, the M+C organization must give the emergency physician an opportunity to consult with an M+C organization physician.

With respect to the request for further patient protections, as noted above, the enrollee (or, the provider, if the provider agrees not to charge the enrollee) has the right to appeal any decision by an M+C organization to deny payment for post-stabilization services.

*Comment:* One commenter asked that post-stabilization care services be limited to services that can be furnished at the facility at which the emergency treatment was provided. Another commenter recommended that we require M+C organization staff, including plan providers, to defer to an emergency provider's preference to keep an enrollee in an emergency facility after stabilization to prevent any needless disruption in the patient's care.

*Response:* We disagree that treatment decisions should be limited by what services a facility can provide. If a treating physician or facility is prepared to provide additional needed treatment to a patient, and the M+C organization cannot be reached, or has not responded within an hour, we do not believe that the patient should have to wait for this treatment until the organization responds, simply because it would not be provided in the same physical location as the emergency services. Section 422.113(b)(3) specifies that the physician treating the enrollee must decide when the enrollee may be considered stabilized for transfer or discharge and that decision is binding on the M+C organization. We would expect the M+C organization to allow the treating physician to speak with a plan physician if he or she is concerned about the care (for example, a transfer) planned for the patient.

*Comment:* One commenter asked which provider, the emergency provider

or the M+C plan provider, has the authority to establish a plan of care.

*Response:* In providing emergency services, the emergency provider has the authority to establish the plan of care. Once the enrollee has been stabilized, post-stabilization care services are provided in accordance with § 422.113(c). Thus, once the M+C provider assumes responsibility, then he or she has the authority to revise the plan of care or establish a new plan of care as long as the new plan of care is consistent with a safe transfer of responsibility.

*Comment:* One commenter recommended that the language in § 422.100(b)(iv)(A) be changed from "Pre-approved by the organization" to "Pre-approved by a plan provider or other M+C organization representative."

*Response:* In response to this comment, we have changed the language in question to read, "Pre-approved by a plan provider or other organization representative." (See § 422.113(c)(2)(i).)

3. Service Area Requirements (§§ 422.2, 422.100, 422.304(b)(2))

In the June 26, 1998 interim final rule, we defined the term 'service area' as a geographic area approved by us within which an M+C eligible individual may enroll in a particular M+C plan offered by an M+C organization. We specified that for coordinated care plans and network medical savings account (MSA) plans only, the service area also is the area within which a network of providers exists that meets the access standards in § 422.112. Existing regulations also require that an M+C plan's uniform benefit package must be available throughout a plan's service area (see the discussion below of modifications to this policy made by the BBRA). In deciding whether to approve a service area proposed by an M+C organization for an M+C plan, we consider the M+C organization's commercial service area for the type of plan in question (if applicable), community practices generally, whether the boundaries of the service area are discriminatory in effect, and, in the case of coordinated care and network MSA plans, the adequacy of the provider network in the proposed service area. As discussed in the interim final rule preamble, because of unique rules pertaining to the amount deposited in MSA plan accounts, we may approve single county M+C non-network MSA plans even if the M+C organization has a different commercial service area (63 FR 34971).

We note that since the publication of the interim final rule, we have issued

further guidance implementing the definition of service area set forth in § 422.2, including an affirmation of our longstanding policy of not approving less than full county service areas unless circumstances justify an exception to this rule. This policy, which we refer to as the "county integrity policy," is explained in detail in OPL 99.090 released April 23, 1999. The county integrity rule, which implements the reference in the service area definition to consideration of whether boundaries are discriminatory in effect, prevents the establishment of boundaries that could "game" the county-wide M+C payment system by excluding high cost areas of a county. (Note that M+C organizations are paid based on Medicare expenditures at the county level.) Under limited circumstances, as described in OPL 99.090, we will allow an M+C organization to establish a service area that includes a partial county. However, it is never acceptable for an M+C organization to devise an M+C plan service area that excludes portions of a county because it anticipates enrollees with higher health care needs.

Under § 422.100(f), an M+C organization may offer more than one M+C plan in the same service area subject to the conditions and limitations for each M+C plan set forth in subpart C of the M+C regulations. For example, § 422.100(g) provides that we review and approve each M+C plan to ensure that the service area boundaries do not promote discrimination (for example, that they do not include partial counties unless justified), discourage enrollment, steer specific subsets of Medicare beneficiaries to particular M+C plans, or inhibit access to services.

We received about 20 letters commenting on various aspects of M+C service area policy and an M+C organization's ability to offer multiple M+C plans.

*Comment:* Several commenters objected to the requirement that each M+C plan offered by an M+C organization must be offered to beneficiaries with a uniform benefit package and cost-sharing structure that cannot vary throughout each M+C plan's service area. Some of these commenters expressed concern that this requirement will make it difficult for M+C organizations to serve multi-county areas due to the differences in Medicare payment rates across counties, and that this could result in beneficiaries in low-payment or rural counties having decreased access to M+C plans.

*Response:* As noted by the commenters, existing M+C regulations

provide that each M+C plan offered by an M+C organization must be offered to all beneficiaries in an M+C plan's service area with a uniform benefit package and uniform cost-sharing arrangements. This requirement implemented the requirement of section 1854(c) of the Act for uniform premiums for all individuals enrolled in an M+C plan. Thus, under § 422.2, an M+C plan was defined as health benefits coverage offered under a policy or contract by an M+C organization that includes a specific set of health benefits offered at a uniform premium and uniform level of cost-sharing to all Medicare beneficiaries residing in the service area of the M+C plan. The BBA requirement that an M+C plan consist of a uniform benefit package that cannot vary in terms of benefits or price throughout the plan's HCFA-approved service area contrasted with our previous "flexible benefits" policy, which permitted HMOs and CMPs under section 1876 to vary premium and benefit offerings by county within a service area. As discussed in the preamble to the interim final rule, however, an M+C organization was able to achieve the same result as the flexible benefits policy by offering multiple M+C plans, either in the same or in different service areas. This administrative policy allowed an M+C organization great flexibility to offer M+C plans that take into account varying county payment rates and preferences of the Medicare population. (Each M+C plan offered by an M+C organization must have a HCFA-approved service area and meet access standards for health care services as described in our regulations at § 422.112.)

As noted in section I.C of this preamble, section 515 of the BBRA amended section 1854 of the Act by adding a new paragraph (h) to permit, effective for contract years beginning on or after January 1, 2001, the application of the uniformity rule to individual "segments" of an M+C plan service area, provided that each segment is composed of one or more M+C payment areas (that is, one or more counties), and a separate complete ACR is submitted for each such segment. The practical implications of this option are similar to our existing administrative policy, under which M+C organizations have the flexibility, by offering multiple plans in a given area or areas, to tailor the benefits offered under their M+C plans to the areas where the plans are offered. In practice, we anticipate that organizations will likely continue to offer multiple M+C plans, since they have already established such separate

plans, and they would have to submit the ACR information required under section 1854(a)(2) of the Act for each segment under the BBRA option, just as they do for each M+C plan now. However, the statute gives M+C organizations the alternative of choosing instead to establish a single M+C plan consisting of segmented service areas, with a separate ACR submission for each segment of the service area. In this final rule, we are adding a new § 422.304(b)(2) which reflects section 515 of the BBRA. We also are making needed conforming changes to the definitions of ''service area'' and ''M+C plan'' in § 422.2, and to § 422.100(d) concerning the structure of M+C plans.

*Comment:* A commenter asked that we clarify our requirements for approving the service area of M+C plans. The commenter stated that the discussion of service area in the preamble and the definition at § 422.2 did not provide specific guidance on what constitutes an acceptable service area for an M+C plan offered by an M+C organization.

*Response:* Although we believe that the service area definition in § 422.2 is fairly detailed and specific, we agree that some additional guidance and reorganization of the definition could be of value. Specifically, while our county integrity policy discussed above implements language in the current definition with regard to discriminatory boundaries, the current regulation text does not expressly reflect our longstanding county integrity policy. In response to this comment, and under our authority in section 1856(b)(1) of the Act to establish M+C standards, we are revising the service area definition to specify that in deciding whether to approve an M+C plan's proposed service area, we consider the following criteria:

(1) Whether the area meets the ''county integrity rule'' that a service area generally consists of a full county or counties. However, we may approve a service area that includes a portion of a county if we determine that the ''partial county'' area is necessary, nondiscriminatory, and in the best interests of the beneficiaries.

(2) The extent to which the proposed service area mirrors service areas of existing commercial health care plans or M+C plans offered by the organization.

(3) For M+C coordinated care plans and network M+C MSA plans, whether the contracting provider network meets the access and availability standards set forth in § 422.112. Although not all contracting providers must be located within the plan's service area, HCFA must determine that all services covered

under the plan are accessible from the service area.

(4) For non-network M+C MSA plans, we may approve single county non-network M+C MSA plans even if the M+C organization's commercial plans have multiple county service areas.

We believe that these revisions to the service area definition, although they do not constitute policy changes, should help to clarify for M+C organizations our method for determining whether a service area is acceptable.

*Comment:* A commenter supported the M+C standard that the delineation of an M+C plan's service area should not discriminate against beneficiaries through ''gerrymandering'' or ''red-lining'' to deliberately avoid particular areas (for example, to prevent the enrollment of poorer Medicare beneficiaries, or those known to be in poor health). The commenter asked that we also include cultural accommodations (for example, language access) as part of the requirements for service area designation.

*Response:* We are very concerned that the service areas for M+C plans be drawn in a manner that avoids discriminating against certain groups of beneficiaries who may be perceived as having higher than average health care needs. The general requirement that M+C plan service areas be made up of whole counties, as discussed in OPL 99.090, is intended in part to preclude any incentive to create M+C service areas that serve only the lowest cost population of a particular county. We believe that the revised service area definition, which continues to provide for our consideration of discriminatory effects, already provides sufficient authority to disapprove a service area if there is evidence that an M+C organization attempted to establish boundaries based upon cultural discrimination, or discrimination against non-English speaking beneficiaries.

*Comment:* A commenter pointed out that the definition of service area states that the service area also is ''the area within which a network of providers exists that meets the access standards in § 422.112.'' The commenter believes that this wording implies that all services must be provided in the service area itself, and that this requirement conflicts with § 422.101(a), which states that services obtained outside the geographic area are acceptable if it is common practice to refer patients to sources outside the geographic area. The commenter asked that we allow some services to be furnished outside of an M+C plan's service area if patients traditionally go outside the service area

to receive such services. Another commenter stated that the M+C organizations should be permitted the flexibility of structuring plan benefits and provider networks in accordance with local patterns of care regardless of political boundaries. The commenter believes this would afford a broader choice of health care options to beneficiaries.

*Response:* The intent of the cited language from the service area definition is to require that services are available to a plan's enrollees through an M+C plan provider network that is accessible from the service area. We have not interpreted this language to prohibit the inclusion in a plan's network of providers physically located outside the area. In fact, as noted above, we allow M+C coordinated care and network MSA plans to establish a provider network with contracting providers located outside of the M+C plan service area, provided that we determine that the M+C organization's contracted provider network meets Medicare access and availability standards at § 422.112. We believe that the revised service area definition described above should eliminate any implication that all network providers must be located within the service area.

Under both the former risk contracting program and the M+C program, we generally have required that M+C organizations make health care services available through a network of contracting providers located within the boundaries of the M+C plan service area. Under certain circumstances, however, we have always allowed exceptions to this policy, such as in rural areas when providers were not available in a plan's service area, when traveling outside the service area to obtain health care is not uncommon, and also when the services are still reasonably accessible and available. We have also allowed plans to provide certain specialist services outside of a plan's service area if the specialist services were not available in the plan's service area and if the specialist was reasonably accessible.

Another reason that we do not require an M+C plan's provider network to be located entirely within the plan's service area is to allow for multiple M+C plans in the same or close geographic areas that share the same provider network, as discussed in the next comment and response. However, we will continue to employ the same criteria in evaluating whether beneficiaries enrolling in an M+C plan are provided with the required access and availability to health care services. Generally, we will evaluate the provider

network supporting an M+C plan by considering the prevailing community patterns of care in obtaining health care services (for example, where people obtain care, the types of providers available in the community, reasonable travel times to obtain care) and the access standards at § 422.112.

*Comment:* A commenter notes that an M+C organization can offer multiple M+C plans under a single M+C contract with us. The commenter asks how multiple plans would work, and whether each would be required to have a separate health services delivery system.

*Response:* In order to respond to the commenter's question, we will briefly review the principal requirements that each M+C plan offered by an M+C organization must independently meet. We note that these M+C plan requirements also are discussed in greater detail in other parts of this preamble. Each M+C plan must be approved by us through the adjusted community rate (ACR) process, and each M+C plan must be offered to all beneficiaries in the given M+C plan's service area. An M+C organization can offer multiple M+C plans. Each M+C plan offered by an M+C organization must have a HCFA-approved service area that is generally made up of whole counties consistent with our county integrity policy discussed above, and reflected in OPL 99.090. The M+C plans offered by an M+C organization can have the same or different service areas. For example, an M+C organization may choose to offer more than one M+C plan in the same service area in order to provide beneficiaries with a choice of plan benefit packages and cost-sharing structures, including differing basic premium amounts. Also, each M+C coordinated care plan must provide enrolled beneficiaries access to health care service through a network of contracting providers. M+C plans may share the same provider network and portions of the provider network may be located outside of the plan's service area. However, the provider network supporting an M+C plan must meet M+C access standards with respect to all enrollees in that plan's service area (see § 422.112) as determined by HCFA. We note that under § 422.501(e), when an M+C organization includes several M+C plans under a single contract, the contract must provide for an amendment upon our request to remove an individual M+C plan from the contract, so that we have the flexibility to nonrenew or terminate only a single M+C plan if a problem is confined to one such plan.

4. Benefits (§§ 422.2, 422.100, 422.101, 422.106)

The regulations contained in subpart C describe the requirements for M+C organizations' benefit offerings. The statutory basis for these provisions generally can be found in section 1852 of the Act. The basic categories of benefits parallel those that applied under the section 1876 risk contracting program with the exception of the use of the term "basic benefits," which we now define as both original Medicare benefits and additional benefits. Despite the limited changes, we believe it is important to carefully define the different benefit categories, because, historically, organizations participating in the risk-contracting program often used different terminology in describing their benefit packages to beneficiaries and in structuring benefits under Medicare risk contracts.

Thus, in order to promote consistency, M+C organizations must use the benefit terminology specified in the M+C regulations and in instructions and operational policy letters. We intend to provide further instructions over the next several years to assist organizations in standardizing the structure and terminology used in describing their benefit offerings. In addition to issuing instructions, we will be reviewing benefit design closely to provide feedback to M+C organizations on ways they can improve their benefit descriptions and ensure that the benefits comply with our requirements. The use of consistent terminology in describing benefit categories will result in better information for Medicare beneficiaries to compare their Medicare options as well as help us to review both benefits paid for with Medicare capitation payments and benefits for which Medicare beneficiaries are charged a premium.

*Comment:* Several commenters asked for additional clarification regarding the new definitions of the benefit categories under the M+C program.

*Response:* We have been aware of confusion about the benefit terminology used in the Medicare risk contracting program, and have attempted to clarify the terminology in the M+C regulations. As noted above, a significant change under the M+C program involves the definition of the term "basic benefits." Under the M+C program, basic benefits means both benefits covered under original Medicare and additional benefits, not otherwise covered under original Medicare, that are paid for with Medicare payments. Additional benefits are grouped with original Medicare benefits because they are part of the package of basic benefits for which beneficiaries are not charged a premium, beyond any premium the M+C organization is permitted to charge for original Medicare benefits. As discussed more fully below in section II. D, the costs of additional benefits are funded by the difference between an organization's ACR for the original Medicare benefit package and the M+C payment plus any approved enrollee cost sharing.

Mandatory supplemental benefits are M+C plan benefits not otherwise covered under original Medicare for which anyone who enrolls in an M+C plan is charged a premium. Thus, additional benefits (included in the basic benefit package) and mandatory supplemental benefits are similar in that they are not covered by original Medicare, and *all* M+C enrollees receive them as part of their M+C plan. The difference is in the way these benefits are funded: additional benefits are funded with Medicare payments through the M+C payment rate, and mandatory supplemental benefits are fully paid for by M+C enrollees through a separate premium or cost sharing.

Like additional benefits and mandatory supplemental benefits, optional supplemental benefits are not covered by original Medicare. However, plan enrollees may choose whether to elect and pay for optional supplemental benefits. M+C organizations may offer M+C plans that have individual items or groups of items and services as optional supplemental benefits.

We are making several minor technical changes to improve the accuracy and consistency of the benefit-related definitions set forth in § 422.2. For example, we are clarifying under the definitions of "mandatory supplemental benefits" and "optional supplemental benefits" that these categories of benefits consist of "health care services" that may be paid through premiums "and/or" cost sharing. Also, we are clarifying in the definition of "benefits" that the costs an M+C organization incurs in providing benefits may not be solely an administrative processing cost and that benefits must be "submitted and approved through the ACR process."

*Comment:* Commenters suggested that we consider developing standardized definitions or descriptions for the individual items and services that make up a benefit package.

*Response:* The intent of the regulations is to clarify the meaning of the terms used in the statute, which reflect the funding source for various groups of benefits. We recognize the value of standardizing the definitions of

individual items and services that might be included as additional or supplemental benefits, such as a drug benefit. Both the annual Summary of Benefits and the Plan Benefit Package are important parts of our standardization efforts. As noted above, we intend to provide further instructions over the next several years to assist organizations in standardizing the terminology used in describing their benefit offerings. Work on defining individual items and services so that beneficiaries may compare benefit offerings is taking place predominantly within the context of our information campaign. We are not including standardized definitions in this final rule.

*Comment:* Several commenters asked for further clarification of the meaning of the requirement in § 422.101(a) that an M+C organization provide all Medicare-covered services that are available to beneficiaries residing in a plan's geographic area, including services obtained outside of the area if it is common practice to refer patients to sources outside the area. Two commenters noted that the term ''common practice'' might be misleading, and recommended that we revise the regulations to state that services may need to be provided outside the area, provided that the services are reasonably accessible to enrollees and such use is consistent with community practice patterns. One commenter recommended that we confirm in the final rule the basic premise that M+C organizations must provide all their enrollees with all services covered under original Medicare, including any needed out-of-area care. Another commenter questioned whether the requirement that an M+C organization provide all Medicare-covered services that are available to beneficiaries residing in the service area implies that the M+C organization's health care delivery patterns must mirror care delivery patterns in original Medicare.

*Response:* Consistent with section 1852(a)(1)(A) of the Act, § 422.101(a) establishes the principle that an M+C organization must provide its plan enrollees with all the Medicare-covered services available to other Medicare beneficiaries in the area served by the plan. We recognize that the existing regulatory language in this section creates some potential for confusion and are making several changes along the lines suggested by commenters in order to clarify the regulations. Revised § 422.101(a) continues to specify that an M+C organization must provide coverage of all Medicare-covered

services available to beneficiaries residing in a plan's service area. We are adding a provision to state explicitly that services may be provided outside of the service area of the plan if the services ''are accessible and available to enrollees in the same area.''

When we assess the capability of any proposed plan to serve an M+C service area, we consider the numbers, types, and locations of all providers needed to provide all Medicare-covered services or, in regulation terms, the access and availability of Medicare-covered services. We continue to believe that it is in the best interest of the Medicare program and Medicare beneficiaries to evaluate proposed M+C plan networks on a case-by-case basis taking into account the patterns of care and access to care in particular geographic areas. It is not unusual for services such as a dialysis center or transplant center not to be available in a county. If, for example, a Medicare beneficiary would normally have to travel to a different county for renal dialysis or a transplant, we believe it would not be unreasonable for an M+C plan enrollee to be required similarly to travel outside of a service area for access to such services. Such exceptions to in-area care access should, however, be limited in order to have a viable M+C plan.

The fundamental requirement under § 422.101(a) that an M+C organization provide coverage for all Medicare-covered services is not intended to dictate care delivery approaches for a particular service. For example, M+C organizations may furnish a given service using a defined network of providers, some of whom may not see patients in original Medicare. M+C organizations may also encourage patients to see more cost-effective provider types than would be the typical pattern in original Medicare (as long as those providers are working within the scope of care they are licensed to provide, and the M+C organization complies with the provider antidiscrimination rules now set forth under new § 422.205).

M+C organizations' flexibility to deliver care using cost-effective approaches should not be construed to mean that Medicare coverage policies do not apply to the M+C program. If original Medicare covers a service only when certain conditions are met, these conditions must be met in order for the service to be considered part of the Medicare benefits component of an M+C plan. M+C plans may cover the same service when the conditions are not met, but these benefits would then be defined as additional or supplemental.

In summary, each M+C plan must include all Medicare-covered services available in the service area served by the M+C plan, with the exception of hospice services. Our longstanding policy of allowing organizations flexibility in the provision of services (for example, in terms of who provides the service, what equipment is used, where the service is provided, and what procedure is used) has not been affected by the BBA. Organizations are required to provide services within the guidelines of Medicare national coverage policy and other Medicare rules and requirements that apply to the traditional Medicare fee-for-service system. When a health care service can be Medicare-covered and delivered in more than one way, or by more than one type of practitioner, we continue to recognize a managed care organization's right to choose how services will be provided. These decisions have been left to managed care organizations to allow them to maximize their value purchasing power, and use resulting savings to provide services not covered by the Medicare program.

*Comment:* Several commenters raised questions about the requirements in § 422.101(b) that M+C organizations comply with our national coverage decisions and with the coverage decisions of local carriers and intermediaries with jurisdiction for claims in an M+C plan's geographic area. Among the issues raised were the following.

• The national requirements which must be followed, and the meaning of ''HCFA's national coverage decisions''.

• General confusion about the relationship between national coverage decisions and local medical review policy.

• Need for additional guidance in situations when plan service areas extend over a geographic area involving multiple carriers or intermediaries, and thus potentially conflicting medical review policies.

• Difficulties in obtaining coverage decisions by local carriers and intermediaries, and the unwillingness of some carriers to permit M+C organizations to be represented on carrier advisory boards.

*Response:* As discussed in detail above, M+C organizations must provide their plan enrollees access to all Medicare covered services. However, there is a distinction between the general rule that a health care service is covered under Medicare and the decision that an individual patient fits the clinical criteria necessary for receipt of the service. National coverage determinations and local medical

review policies establish what could be a covered benefit under Medicare and the clinical criteria under which the benefit must be provided. The M+C organization must determine whether or not an individual patient fits this clinical criteria. This process at the plan level constitutes an organization determination. In making organization determinations, M+C organizations are required to follow all national coverage determinations and relevant local medical review policies.

It is important to note, that all M+C organization determinations must be made based on the individual circumstances of a given case, using the best and most relevant information available. All organization determinations are subject to enrollee appeals to the M+C organization and subsequently to an independent review entity. The fact that an M+C organization determination was applying a local medical review policy does not in itself ensure that an appeal to the independent review entity might not result in a determination that the service in question was medically necessary for the individual enrollee and therefore should be covered.

In this final rule, we are revising § 422.101(b)(1) to clarify that the requirement that M+C organizations comply with national coverage decisions includes following the general coverage guidelines included in original Medicare's manuals and instructions to contractors, unless superseded by the M+C regulations or operational policy letters. The Coverage Issues Manual is the primary resource for national coverage decisions. Additional guidance on coverage of hospital and skilled nursing services, home health services, physician services, and other Medicare services can be found in the instructions in the Carriers, Intermediaries, and other HCFA manuals. In the absence of a national standard, M+C organizations should follow local medical review policies in making medical necessity decisions.

We recognize the potential for conflicting local medical review policies when an M+C plan's service area extends across the jurisdictions of more than one carrier, for example. Our general rule under OPL 46 continues to be that the M+C organization should apply the medical review policy of the Medicare carrier in the area where the services are furnished, since that is the policy that would apply to those services under original Medicare. However, as one commenter pointed out, an M+C organization is not precluded from covering services that a local carrier may have determined are

not covered, if the organization's own utilization and quality management standards support the medical necessity of the service. Similarly, an organization may occasionally need to make a coverage determination in a situation when there is neither national coverage policy or relevant local review guidelines. In all such cases, an M+C organization's fundamental responsibility is to use the best information available to make an informed decision on the medical necessity of a given service, and then to provide the medically necessary service, even if doing so may conflict with local medical review policies.

One way for an M+C organization to attempt to pursue consistency in medical review policies is to participate on the review boards of local carriers or intermediaries. We are aware of the difficulties M+C organizations are encountering in some areas of the country in participating on these boards, and are actively working to address this issue. We remain committed to establishing more standardized procedures for developing medical review policies, and for increasing M+C representation in formulating these policies.

*Comment:* Several commenters requested clarification of our policy regarding employer groups and the coordination of benefits with employer group health plans (EGHPs). They asked for clarification as to whether members of an EGHP had to be offered the same benefits as other Medicare enrollees, and whether it would be acceptable to offer an actuarial equivalent package. Another commenter asked that § 422.106 be amended to address coordination of Medicaid benefits, as well as EGHP benefits.

*Response:* EGHPs that are offered by an M+C organization must provide Medicare-eligible EGHP members the same benefits provided to all other Medicare enrollees under the M+C plan in which the beneficiary is enrolled. The benefits in the M+C plan may not be reduced or otherwise changed, and actuarially equivalent benefits may not be substituted in place of the M+C plan benefits. As noted below in the next response, EGHP benefits beyond those benefits offered under the M+C plan are considered outside the purview of our regulatory authority under the M+C program. However, we retain the authority and responsibility to assure that all Medicare beneficiaries enrolled in organizations that have a contract with Medicare (even if they are dually entitled to coverage under another plan) receive the same benefits and

protections as other Medicare beneficiaries enrolled in the plan.

We recognize that the existing regulations describing these situations are somewhat unclear. Therefore, we are revising the language at § 422.106 by reorganizing its requirements for clarity. Revised § 422.106(a)(1) clarifies that if an M+C organization contracts with an EGHP that covers enrollees in an M+C plan, or contracts with a State Medicaid agency to provide Medicaid benefits to individuals who are eligible for both Medicare and Medicaid, and who are enrolled in an M+C plan, the enrollees must be provided the same benefits as all other enrollees in the M+C plan, with the EGHP or Medicaid benefits supplementing the M+C plan benefits. Section 422.106(a)(1) states that all M+C program requirements apply to the M+C plan coverage provided to enrollees eligible for benefits under an EGHP or Medicaid contract. We also are revising § 422.106 to delineate clearly that our review authority extends only to the M+C plan benefits provided to members of the EGHP, and the associated marketing materials, rather than to any other complementary benefits provided only under the EGHP. The rules contained in this regulation and the corresponding instructions and operational policy letters take precedence for benefits included in the M+C plan.

We are also adopting the commenter's suggestion that § 422.106 incorporate our requirements concerning the coordination of M+C and Medicaid benefits. These rules are conceptually identical to those governing EGHPs. Thus, for individuals dually eligible under Medicare and Medicaid who are enrolled in an M+C plan, the enrollees must be provided the same benefits as all other enrollees in the M+C plan, with the Medicaid benefits supplementing the M+C plan benefits.

*Comment:* One commenter questioned whether group health benefits offered by employers were considered to be supplemental benefits under the M+C program.

*Response:* Employer group health plan benefits paid by an employer on behalf of an employee or retiree, as well as Medicaid benefits furnished under a Medicaid State plan, are neither basic nor supplemental benefits. They are therefore outside the scope of M+C plan benefits regulated by the Medicare program. Other laws and regulations may apply to these benefits (such as ERISA requirements for EGHPs). We recognize in § 422.106 that M+C organizations may contract with employers to furnish benefits that complement those that an employee or

1979

retiree receives under an M+C plan. Such benefits may include M+C plan premiums, cost sharing, and additional services. M+C organizations may design an M+C plan with the expectation that an employer group will offer a particular set of complementary benefits. In such a case, however, the M+C plan must be offered to all Medicare beneficiaries in the service area, regardless of whether they are eligible for the employer group benefits, and meet all other M+C plan requirements.

*Comment:* Several commenters expressed confusion regarding the benefit-related implications of the ''conscience protection'' provision contained in section 1852(j)(3) of the Act, which is a new provision giving enrollees rights to unrestricted physician counseling and advice. Under the conscience protection provision in section 1852(j)(3)(B) of the Act, implemented in § 422.206(b), the prohibition on interference with provider advice to enrollees in section 1852(j)(3)(A) of the Act (reflected in § 422.206(a)) may not be construed to require an M+C organization to provide or pay for counseling or referrals if the organization objects on moral or religious grounds and notifies enrollees of its policies in this regard. Some commenters asked whether the conscience clause in section 1852(j)(3)(B) of the Act and § 422.206(b) would permit an M+C organization to refuse to include a Medicare-covered service in its M+C plan, as otherwise required under § 422.101.

*Response:* The conscience protection in section 1852(j)(3)(B) of the Act affects only obligations under section 1852(j)(3)(A) of the Act, not obligations that arise elsewhere in the statute, such as the obligation under section 1852(a)(1) of the Act to cover all Medicare-covered services available in the area served by the M+C plan. To the extent the operation of the right to advice and counseling under section 1852(j)(3)(A) of the Act would obligate an M+C organization to cover counseling or referral services that it would not otherwise be obligated to cover, section 1852(j)(3)(B) of the Act allows the organization to decline to provide such service on conscience grounds if appropriate notice is provided to beneficiaries. However, if the service is one that the organization is obligated to provide independent of section 1852(j)(3)(A) of the Act, it could not be affected by a provision that by its own terms affects only the way that ''[s]ubparagraph (A) [of section 1852(j)(3)] shall * * * be construed.'' It in no way affects obligations that arise

elsewhere in the statute. Therefore, an M+C organization could not rely upon section 1852(j)(3)(B) of the Act or § 422.206(b) in an attempt to avoid coverage of services that it is obligated under section 1852(a)(1) to cover.

We note, however, that in the case of abortion-related services, Congress has provided M+C organizations with conscience protections independent of that in section 1852(j)(3)(B) of the Act. Specifically, under section 211 of the fiscal year 2000 Department of Health and Human Services Appropriations Act, Pub. L. 106–113, we are prohibited from denying a M+C contract to an entity on the grounds that it refuses on conscience grounds to cover abortions. We are required, however, to make appropriate adjustments to such an entity's M+C capitation payments to cover our costs in providing Medicare-covered abortion services outside the M+C contract.

*Comment:* Commenters requested that copayments for outpatient psychiatric services be limited to the same percentages of copayments allowed for other services.

*Response:* With the sole exception of out-of-area emergency services, we have not prescribed limitations on copayments for individual Medicare services in the M+C regulations. In this case, the commenter's suggestion would impose a requirement on M+C organizations that is inconsistent with the cost-sharing structure of original Medicare. We do not believe this would be appropriate.

## 5. Special Rules for Screening Mammography, Influenza Vaccine, and Pneumococcal Vaccine (§ 422.100(h))

Section 422.100(h) establishes special rules for screening mammography, influenza vaccine, and pneumococcal vaccine. Enrollees of M+C organizations may directly access, through self-referral, screening mammography and influenza vaccine. In addition, M+C organizations may not impose cost sharing for influenza vaccine and pneumococcal vaccine.

*Comment:* Several commenters expressed concern that enrollees may directly access out-of-network providers through self-referral. They believe that self-referrals should be limited to in-network providers. Furthermore, they feared that an enrollee may self-refer to noncertified facilities or noncredentialed providers.

*Response:* The right to directly access screening mammography services and flu vaccines does not include accessing these services out of network. Section 422.112(a) specifies that an M+C organization ''may specify the networks

of providers from whom enrollees may obtain services'' if the organization meets a number of specified conditions. M+C organizations thus have the discretion under § 422.100(h)(1) to require that self-referrals be made to a provider within the M+C plan's network, as long as sufficient access is provided in that network. We note that if an M+C organization offers a point-of-service (POS) option under its M+C plan, an enrollee selecting this option could self-refer to an out-of-network provider, consistent with the payment rules established by the M+C organization.

*Comment:* One commenter stated that we should prohibit cost sharing for mammography as well as vaccines, noting that both health care services are preventive in nature and would be cost-effective measures for the Medicare program in the long term. The commenter pointed out that women constitute a substantial portion of the Medicare population, and asserted that allowing cost sharing for screening mammographies could be perceived as both gender-specific and discriminatory in nature.

*Response:* Various provisions of Title XVIII of the Social Security Act specify the coverage of mammography, influenza vaccine, and pneumococcal vaccine. The Act provides that there should be no deductible for any of these services. Further, while the Act indicates that there be no copayment for influenza and pneumococcal vaccine, it provides for a 20 percent coinsurance for mammography. (See, for example, section 1834(c) of Title XVIII and 42 CFR 410.152(h).) These are policies established by statute for the original Medicare program, and we see no basis for requiring M+C organizations to provide more favorable treatment to M+C enrollees than that provided to original Medicare beneficiaries.

*Comment:* A commenter requested that we clarify in the regulations that the prohibition on cost-sharing for influenza and pneumococcal vaccine applies to the imposition of cost-sharing on M+C plan enrollees.

*Response:* As requested by the commenter, we have added language to the regulation text to clarify that M+C organizations are prohibited from imposing cost sharing ''on their M+C plan enrollees'' for influenza and pneumococcal vaccines.

## 6. Special Rules for Point-of-Service (POS) Option (§ 422.105)

A POS benefit is an option that an M+C organization may offer under an M+C coordinated care plan, or network M+C MSA plan, to provide enrollees in

such plans with additional choice in obtaining specified health care services. A coordinated care plan may include a POS option as an additional benefit, a mandatory supplemental benefit, or an optional supplemental benefit. A network MSA plan may include a POS option only as a supplemental benefit.

Under a POS option, the M+C organization generally permits enrollees to obtain specified items and services outside of the M+C plan's normal prior authorization rules, but provides that enrollees will incur higher financial liability for such services. The enrollee may be required to pay a premium for the benefit unless the benefit is offered as an additional benefit. M+C organizations can establish what services are available under a POS benefit and the amount of member cost sharing subject to ACR limits. M+C organizations may also place other limits on the benefit; for example, a plan could offer a POS benefit as a travel benefit allowing members to access specified services when the member is traveling outside of the plan's service area.

*Comment:* Several commenters objected to the restriction in the interim final regulation at § 422.105(a) stating that a POS benefit can be used only to obtain services from providers that do not have a contract with the M+C organization. The commenters maintained that an important aspect of a POS benefit is that it allows beneficiaries who have reservations about joining a managed care plan the opportunity to enroll without following strict prior authorization requirements to access services, and that this consideration applies without regard to whether the provider is part of the M+C plan network. Some commenters also noted that the restriction against in-network use of a POS benefit was particularly unfair to M+C plans with large provider networks, since the likelihood of an in-network referral was much greater. Several commenters stated that if we are concerned about in-plan use of a POS benefit, the solution is monitoring rather than prohibiting beneficiary choice.

*Response:* In the interim final M+C regulations, we specified that an M+C POS benefit could be used by plan members only to obtain health care services from providers outside of the plan's contracted provider network (non-network providers). The intent of this restriction was to ensure that plan enrollees were not inappropriately induced to use a POS benefit to obtain services at higher cost from plan contracting providers that they could otherwise receive at lower cost by

following the plan authorization rules for obtaining health care services. However, we have reconsidered this position in response to the above comments, and in recognition of the fact that a number of organizations withdrew their POS benefit due to this restriction. We recognize that for some beneficiaries the ability to obtain health care services directly from providers without obtaining advance authorization is an important choice. Accordingly, in order to ensure that beneficiaries have the widest possible array of choices, we have decided to allow plans the option of offering a POS benefit that can be used by plan members to receive services from plan contracting providers.

We remain concerned about the potential for inappropriate cost-shifting to beneficiaries. To help guard against this possibility, we have revised § 422.105 to require that M+C organizations offering a POS benefit must track, and report to us upon request, POS utilization at the M+C plan level by both contracting providers and noncontracting providers. In monitoring use of the POS benefit, we will pay particular attention to potential over-utilization of the POS benefit by plan enrollees in obtaining services from the plan contracting provider network. We will attempt to verify that it is a matter of choice when a plan member uses a POS benefit to obtain services, rather than due to the member being inappropriately denied prompt access to the service by the plan. We note that an M+C organization still has the option of offering a POS benefit through an M+C plan that can be used by plan members only to obtain health care services from providers who do not contract with the plan.

*Comment:* A commenter asked if the POS regulations apply to POS benefits that are offered only for employer group members. The commenter noted that under § 422.106, employer group benefits that are designed to complement the Medicare benefits are exempted from our review.

*Response:* An employer may through negotiation with an M+C organization provide a POS benefit for members of an employer group who elect to join an M+C plan. As described in the regulations at § 422.106, such enhancements to the Medicare-approved benefit package are not subject to our review or approval.

*Comment:* A commenter expressed concern about the requirement at § 422.105(d)(2)(iv) that a POS benefit must have a maximum annual out-of-pocket cap on enrollee liability. The commenter questioned whether capping

enrollee out-of-pocket expenses would leave the plan at risk for all out-of-network care received by the enrollee once the cap was exceeded.

*Response:* As the commenter stated, M+C plans offering a POS benefit must place an annual maximum cap on an enrollee's financial liability in using a POS benefit. The reason for requiring a cap on beneficiary financial liability is to ensure that beneficiaries understand in advance what their maximum financial risk is in using a POS benefit. However, once the annual maximum for a POS benefit is reached (including the beneficiary cap), the plan does not have to continue paying for health care service under a POS benefit. For example, consider a plan that offers a POS benefit with a $5,000 annual maximum, and requires 20 percent coinsurance from the beneficiary using the POS benefit. In this example, the member's annual maximum financial liability under POS is $1,000 (20 percent of $5,000). Once the $5,000 overall POS annual maximum is reached, the beneficiary has paid the out-of-pocket maximum of $1,000 and the plan has contributed $4,000 of the $5,000 annual maximum for the POS benefit. At this point, the plan has no further obligation to cover services for the beneficiary under the POS benefit. Thus, any use of the POS benefit beyond this maximum would be at the enrollee's financial liability. We note that § 422.105(d)(2)(iii) specifies that an M+C organization must explain in the Evidence of Coverage the enrollee's financial responsibility for services that are not covered under the POS benefit or services beyond the maximum POS limit.

In general, we expect that organizations offering a POS benefit will be able to provide enrollees with timely information on the POS financial limits, coverage rules, and enrollee cost-sharing for a given service, including the capacity to provide enrollees with advance coverage information over the phone. For example, if the POS benefit has an annual dollar cap, enrollees should be able to phone the organization offering the POS benefit and be informed of how close they are to reaching the financial cap on the benefit. In addition, the plan should be able to advise an enrollee whether a particular service will be paid for under a POS benefit, how much the member will pay out-of-pocket, and how much the plan will contribute under the POS benefit.

## 7. Medicare Secondary Payer (MSP) Procedures (§ 422.108)

As stated in the June 26, 1998 interim final rule, Medicare does not pay for services to the extent that there is a third party that is to be the primary payer under the provisions in section 1862(b) of the Act and 42 CFR Part 411. The M+C organization must, for each M+C plan, identify payers that are primary to Medicare under section 1862(b) of the Act and part 411; determine the amounts payable by those payers; and coordinate its benefits to Medicare enrollees with the benefits of the primary payers.

The M+C organization may charge, or authorize a provider to charge, other individuals or entities for covered Medicare services for which Medicare is not the primary payer. If an enrollee receives from an M+C organization covered services that are also covered under State or Federal workers' compensation, any no-fault insurance, or any liability insurance policy or plan, including a self-insured plan, the M+C organization may charge, or authorize a provider to charge the insurance carrier, the employer, or any other entity that is liable for payment for the services under section 1862(b) of the Act and part 411 of this chapter, or the M+C enrollee, to the extent that he or she has been paid by the carrier, employer, or entity for covered medical expenses.

Where Medicare is a secondary payer to employer coverage in the case of certain working Medicare beneficiaries, an M+C organization may charge a group health plan (GHP) or large group health plan (LGHP) for services it furnishes to a Medicare enrollee who is also covered under the GHP/LGHP, and may charge the Medicare enrollee to the extent that he or she has been paid by the GHP/LGHP.

*Comment:* Two commenters requested that the M+C regulations provide that Medicare secondary payer regulations apply generally to M+C organizations. One of these commenters also favored a cross reference to the Medicare overpayment regulations.

*Response:* M+C organizations are to apply only the Medicare secondary payer (MSP) rules as found in section 1852(a)(4) of the Act and in § 422.108. Other MSP provisions do not apply to M+C organizations, and they do not have recourse to them. However, M+C organizations are expected, as provided under § 422.108(a), to look to section 1862(b) of the Act and 42 CFR Part 411 to determine whether Medicare or some other party is the primary payer.

Since section 1852(a)(4) of the Act and § 422.108 are the only MSP

provisions that apply in the M+C context, M+C organizations would pursue their Federally authorized claims under State law. Federal preemption of State laws in the MSP context would occur only to the extent a State law would prohibit an M+C organization from complying with what the Federal rules authorize (that is, from billing and recovering from specified third parties, and from beneficiaries to the extent they have received third party payments that are primary to Medicare under MSP rules). These recoveries are not made on behalf of the United States and, therefore, the Federal overpayment rules cited by the commenter do not apply.

*Comment:* One commenter requested that enrollees be given written notice of their right to appeal an M+C organization decision to withhold payment under MSP rules, or file a request for a waiver of recovery of the overpayment.

*Response:* Section 422.568 requires an M+C organization to give an enrollee written notice of any denial, in whole or in part, which includes a description of the enrollee's appeal rights. It is not necessary to create a separate requirement in the MSP context. With respect to a request for waiver of recovery of the overpayment, since any recoveries are not obtained on behalf of the United States, State laws rather than Federal overpayment rules would apply.

*Comment:* One commenter believes that if an M+C plan enrollee with coverage primary to Medicare obtained services from providers not participating in the M+C plan, the M+C organization should pay for the services. By paying nonplan providers first, and then seeking recovery from the primary payer, the beneficiary would not be held responsible for the bill.

*Response:* There is no statutory authority to require M+C organizations to make payments to nonplan providers, except in the circumstances set forth in § 422.100(b)(1) (for example, emergency or urgently needed services, out-of-area dialysis) and § 422.114(b) (for example, access to services under an M+C private fee-for-service plan).

*Comment:* Three commenters recommended that since some States have laws that do not allow HMOs and health insurers to seek payment from primary payers, the regulations should be clarified to indicate that MSP rules preempt any State laws that would prevent an M+C organization from complying with the Federal law and regulations.

*Response:* We are adding a new paragraph "f" to § 422.108 to clarify that a State cannot take away an M+C

organization's Federal rights to bill or authorize providers to bill for services for which Medicare is not the primary payer. However, nothing in section 1852(a)(4) of the Act would prohibit a State from limiting the amount of the recovery; therefore, State law could modify an M+C organization's rights in this regard, but could not deny them entirely.

*Comment:* One commenter believes that the use of the term "charge" in this section is not appropriate. The commenter pointed out that "charge" has a specific meaning in the Medicare context (as in "reasonable charge"), and the use of "charge" in this section is not consistent with the commenter's understanding of the common meaning of this term. The commenter recommended revising the regulations to use the term "bill" or "collect from." The same commenter also suggested that there was ambiguity in the use of the word "determine" in § 422.108(b)(2), because "determine" and "determinations" also have different specific meanings under Medicare. "Calculate" or "identify" was suggested as a replacement.

*Response:* The intended meaning of "charge" as used in this section is "the imposing of a pecuniary obligation on another entity." Although this usage is technically correct and consistent with statutory language, in the interest of clarity, we are adopting the commenter's request, and changing "charge" to "collect from" in the regulation headings, and to "bill" in the body of the regulation text. We also have changed "determining" to "identify" in subsection (b)(2).

## 8. National Coverage Determinations (§ 422.109)

Section 422.109 addresses how M+C organizations are paid when a new Medicare benefit is required under a national coverage determination, but payment for this benefit is not yet included in the organization's capitation rate. Frequently, we develop coverage policy on new procedures or technology during the year. M+C organizations must provide these benefits as soon as they are covered by Medicare, even if this occurs during the middle of a contract year. If the cost of such new benefits exceeds a specified threshold, we pay the M+C organization on a fee-for-service basis under original Medicare payment rules to cover the services in question.

*Comment:* Commenters requested that we include a definition of "national coverage determination" in the M+C regulations, and objected to the fact that beneficiaries would be liable for paying

the Part A deductible, when the beneficiary in most cases has already been charged premium or cost-sharing amounts based on the actuarial value of this deductible.

*Response:* The definition of ''national coverage determination'' was not included in the M+C regulations because it is already set forth in § 400.202 of title 42 of the CFR; however, for the convenience of users of the M+C regulations, we have now repeated this definition in § 422.2. With respect to the issue of the Part A deductible, section 1852(a)(5)(A) of the Act provides that services covered by a national coverage determination involving significant costs not included in M+C capitation payments are not covered as a service that must be provided under the M+C contract in exchange for capitation payments. Section 1852(a)(5)(B) of the Act provides that the normal rule that capitation payments are made in lieu of regular Medicare payments (section 1851(i)(1) of the Act) does not apply in the case of additional services covered under a national coverage determination. Thus, the services would be covered under original Medicare's coverage rules. Congress did not provide for a similar exception, however, to the rule in section 1851(i)(2) of the Act providing that ''only the M+C organization shall be entitled to receive payments from the Secretary under this title for services furnished to [an M+C enrollee of that organization].'' Read together, these provisions mean that the M+C organization will receive Medicare payment under original Medicare's payment rules for services covered by a national coverage determination that triggers the procedures in § 422.109.

Under these payment rules, a beneficiary is liable for deductible and cost-sharing amounts, which is why § 422.109(b)(5) provides that enrollees would pay these amounts. Although the enrollee has in most cases paid a premium and other cost sharing based on the actuarial value of Part A and Part B deductibles and cost sharing, this amount is for services covered under the contract. These services are covered outside the contract under original Medicare payment rules. However, since the general Part A deductible arguably would already have been satisfied for the beneficiary through M+C plan premiums and cost sharing, we are revising § 422.109(b)(5) in response to this comment to provide that M+C enrollees are responsible only for coinsurance amounts. Medicare payments will thus be made without regard to satisfaction of the Part A deductible.

### 9. Discrimination Against Beneficiaries Prohibited (§ 422.110)

Consistent with section 1852(b)(1) of the Act, § 422.110 establishes that an M+C organization may not discriminate among Medicare beneficiaries based on any factor that is related to health status, including, but not limited to the following factors: medical condition (including mental as well as physical illness), claims experience, receipt of health care, medical history, genetic information, evidence of insurability (including conditions arising out of acts of domestic violence), or disability. The only exception to this rule is that an M+C organization may not enroll an individual who has been medically determined to have end-stage renal disease (unless the individual is already enrolled with the organization under a different plan). M+C organizations are required to observe the provisions of the Civil Rights Act, Age Discrimination Act, Rehabilitation Act of 1973, and Americans with Disabilities Act.

*Comment:* One commenter suggested that we require M+C organizations to provide handicapped-accessible facilities for marketing presentations, full access to plan information and plan providers, as well as access to the M+C organization itself.

*Response:* This comment speaks to the practice of health screening and the allocation of marketing resources with respect to disabled populations. Section 422.110(c) requires M+C organizations to meet the requirements of the Americans with Disabilities Act (ADA). Consistent with ADA, an M+C organization must ensure that its providers and marketing presentations accommodate persons with disabilities, both in terms of physical accessibility and communication of information. Thus, the organization and providers must afford the same freedom of choice with respect to providers to all enrollees. Further, access to information must be provided in appropriate alternative formats upon request, such as Braille, enlarged font (at least 14 point), audio cassette, closed or open captioning, or formats that accommodate low-literacy beneficiaries. In providing information access to hearing-impaired individuals, M+C organizations must not rely on relay services but must make available TTY/TDD service as well. Again, these requirements are consistent both with the Americans with Disabilities Act and with the M+C provisions in § 422.80(e)(2) regarding marketing to the disabled population.

### 10. Disclosure Requirements (§ 422.111)

Section 1852(c) of the Act lists several areas where an M+C organization must disclose specific information to each M+C plan enrollee. These disclosure requirements are set forth in § 422.111 of the regulation. M+C organizations are required to provide to each M+C plan enrollee, at the time of enrollment and at least annually thereafter, in a clear, accurate, and standardized form (that is, through the Evidence of Coverage), the following information regarding the enrollee's M+C plan: Service area, benefits offered under the plan and under original Medicare, access to providers, out-of-area coverage, emergency coverage, supplemental benefits, prior authorization rules, grievance and appeals rights and procedures, quality assurance programs, and disenrollment rights and responsibilities.

M+C organizations are also required to provide additional information upon request of a beneficiary, including: General coverage and comparative plan information, information on the number and disposition of grievances and appeals, information on the financial condition of the M+C organization, the procedures the organization uses to control utilization of services and expenditures, and a summary of physician compensation arrangements. Section 422.111 also includes procedures for an M+C organization to follow when it intends to change its rules for an M+C plan, and describes the enrollee notification requirements when there are changes in a plan's provider network.

Finally, as discussed in section II.B of this preamble, § 422.64 no longer lists the information that we must provide to beneficiaries. However, because § 422.111 referred to this material in several places, we are revising § 422.111 to incorporate the necessary specifications into a new paragraph (f).

*Comment:* Several commenters acknowledged the importance of providing beneficiaries with information on their range of health care choices, so that they can make informed decisions about their Medicare coverage. However, they were concerned that duplication of efforts will result from our responsibilities to provide beneficiaries with the information formerly specified in § 422.64(c) (now set forth in § 422.111(f)) combined with the requirements in § 422.111 concerning information that an M+C organization must disclose to its enrollees. The commenters viewed these requirements

as an unnecessary overlap of information.

*Response:* We have no intention of burdening M+C organizations with unnecessary disclosure requirements that duplicate our efforts. However, just as section 1851(d) of the Act mandates our responsibilities for distributing information to all beneficiaries (including the requirement at section 1851(d)(7) of the Act that M+C organizations provide us with the information needed to carry out these responsibilities), section 1852(c) of the Act establishes several specific requirements for M+C organizations to disclose plan information to their enrollees, and to individuals eligible to enroll in their plans. The M+C regulations do not expand upon the disclosure requirements set forth in the M+C statute. In general, the plan-specific information that we collect from M+C organizations for Medicare Compare (our database of comparative plan information) can also be used by M+C organizations to meet their statutory information disclosure responsibilities. Thus, although the statute does mandate that M+C organizations report similar information both to us and to their plan enrollees, we do not believe that the M+C disclosure requirements should result in significant additional burdens for M+C organizations.

*Comment:* Commenters discussed the importance of conveying required information to beneficiaries in a culturally competent manner. They suggested that criteria be developed by us for use by M+C organizations.

*Response:* We agree that plan information needs to be provided to beneficiaries in a culturally competent manner, so that beneficiaries are provided with the opportunity to make fully informed health care choices. We note that § 422.80(c)(5) addresses this concern by specifying that, for markets with a significant non-English speaking population, marketing materials and election forms must be provided in the language of those individuals. In order for M+C organizations to provide beneficiaries with plan information in a culturally competent manner, we provide guidance for both developing and reviewing marketing materials through our managed care manual, marketing guidelines, and operational policy letters. M+C organizations are required to submit their marketing materials and election forms to us for review prior to distribution to Medicare beneficiaries. The Regional Offices (RO), with direction from Central Office, are involved in reviewing and approving plans' marketing materials. In carrying

out these efforts, the ROs balance the M+C organizations' needs for flexibility in developing beneficiary information with our responsibility to assure that materials are compliant with the regulation and are consistent nationwide. The ROs require that information be changed if it is inaccurate, misleading, or unclear.

Our plans for standardizing beneficiary enrollment and appeals notices, including the Evidence of Coverage (EOC), involve consulting with interested parties, including beneficiary advocacy groups. We are now in the process of consumer testing the enrollment and appeals notices to ensure that the message of each notice is clearly understood by beneficiaries. (For a further discussion of cultural competency issues as they pertain to the delivery of services, see section II.C.11 below.)

*Comment:* Commenters suggested that information should be disclosed in a standard format or model notice, including information that must be provided upon request of the beneficiary.

*Response:* We agree that standardized formats for M+C beneficiary notification materials are needed. Health care information that is provided in a well-designed standardized format, using consistent, descriptive terminology, assists beneficiaries in making important decisions about their health care.

We have initiated a two-phase Marketing Material Standardization Project that includes input from the managed care industry and beneficiary advocacy groups. In Phase I, we have implemented, beginning October 15, 1999, a standardized Summary of Benefits (SB), the key pre-enrollment marketing document provided to beneficiaries, so that they can compare the same benefits and costs across several M+C plans and original Medicare. Phase II will involve standardizing beneficiary enrollment and appeals notices. We are conducting consumer testing of these notices in preparation for the final phase of the standardization initiative.

Phase II of our standardization project includes the EOC, also known as the Subscriber Agreement and Member Contract. The EOC contains an explanation of plan benefits (covered services), member rights, and member/M+C plan contractual responsibilities and obligations. The EOC is provided to beneficiaries when they join the M+C plan and annually thereafter. As part of the standardization process for the EOC, we released a model EOC on December 1, 1999, for use in contract year 2000,

that M+C organizations are required to distribute to all enrolled members by May 15, 2000. In developing the model EOC, we consulted with managed care industry representatives and beneficiary advocacy groups, and we intend to use this model as a baseline for developing the standardized EOC. The process for standardizing a document as important and comprehensive as the EOC requires adequate time for input from the industry and beneficiary advocacy groups, for public review and comment, and for implementation of the standardized document. We plan to begin standardization of the EOC in the Spring of 2000 and to complete the process in time for the November 2001 annual election period for contract year 2002.

We also have provided guidance to M+C organizations on the manner and form for disclosing the information required under § 422.111(c) upon a beneficiary's request. For example, OPL 099.081, issued on February 10, 1999, addresses appeal and grievance data disclosure requirements, and further clarifying instructions were issued in OPL 2000.114. These disclosure requirements are consistent with the reporting units for the Health Plan Employer Data and Information Set (HEDIS), the Medicare Consumer Assessment of Health Plans Study (CAHPS), and the Medicare Health Outcomes Survey (HOS). We have also issued guidance on how M+C organizations can best provide information relating to compensation for physicians, specifically incentive arrangements. The guidance includes suggested language for marketing materials as well as suggested responses for requests from beneficiaries. Again, our ROs will review these materials as part of their usual responsibilities for pre-approving beneficiary materials.

*Comment:* Commenters expressed concern that information concerning the number and disposition of appeals and grievances from M+C plans with low enrollment may not be statistically valid, and suggested that reporting such data could be misleading to beneficiaries. They recommended that, if an M+C organization offers a number of different M+C plans in a single service area, the organization should report appeals and grievance data on an aggregate basis, rather than on a plan-specific basis.

*Response:* We assessed alternative ways to report this information and decided that the most meaningful way to report this information would be to make it consistent with the reporting unit for HEDIS, CAHPS, and the Medicare HOS. The reporting unit for

these instruments is the "contract market," which implies either reporting by contract or by a market area within a contract. M+C organizations must report for each contract unless we divide the contract service area into "market areas." We will assess all contract service areas to determine whether M+C organizations must report by market area, and will notify plans as soon as possible whether they must report by market area. Further details on subdividing the contract service area into market areas can be found in OPL 099–081. The OPL also describes the data collection periods and reporting periods that have been established in order for M+C organizations to report data consistently. We and our contractors are working with M+C organizations and consumer groups to determine additional information needed to develop a national managed care appeal and grievance data collection and reporting system, with data disclosure requirements to be built into this system.

*Comment:* Several commenters expressed concerns over the requirement for public reporting of quality improvement results. They feared that this reporting could result in: (1) M+C organizations altering their decision making to produce competitively attractive numbers" at the expense of good patient care, or (2) the dissemination of data that could easily be misinterpreted by Medicare beneficiaries, rather than of value in facilitating informed beneficiary choice.

*Response:* The reporting of plan-specific quality and performance indicators is based directly on the requirements of section 1851(d)(4)(D) of the Act. Moreover, we believe that it is essential for plan comparison purposes that M+C organizations report on standardized quality measures. The standardized measures that we are requiring, as discussed in detail in section II.D of this preamble, are largely those of HEDIS. These measures are predictive of health care outcomes, well-defined, and well-established in the private sector. Thus, we do not believe that the commenters' concerns that the reporting of these measures will negatively affect M+C organizations' decision making and lead to widespread public misinterpretation are justified.

*Comment:* We received several comments regarding notification of beneficiaries of changes in an M+C plan's provider network. Three commenters suggested that the requirement that written notification to the enrollee occur within 15 working days of the receipt or issuance of a notice of provider termination would be

confusing for enrollees and an administrative burden for M+C organizations. Another commenter suggested that the 15 working days be converted to calendar days to be consistent with the appeals requirements under Subpart M.

*Response:* We recognize that the requirement that written notice be provided "within 15 working days of receipt or issuance of a notice of termination" has the potential in some situations to cause confusion for beneficiaries and impose an unnecessary administrative burden on M+C organizations. For example, because contract negotiations with providers often extend beyond a 15-day period after initial notice of termination, an M+C organization may be unable to furnish definitive network information to its enrollees within the 15-day time frame. Therefore, we are revising § 422.111(e) to decouple the enrollee notice time frame from the "issuance or receipt" of a notice of termination and instead require that an M+C organization make a good faith effort to provide written notice at least 30 calendar days before the termination effective date. (As the commenter suggested, we agree that measuring this time frame by using calendar days, rather than working days, would improve the internal consistency of the M+C regulations, as well as eliminating any possible confusion over what constitutes a "working day.")

*Comment:* Two commenters suggested defining "regular basis" for purposes of § 422.111(e). Under this requirement, a M+C organization must notify "all enrollees who are patients seen on a regular basis by the provider whose contract is terminating." One commenter suggested that "regular basis" be defined as seeing a provider within the last 180 days or 6 months.

*Response:* Section 422.111(e) is clear that all enrollees who are patients of a primary care professional (PCP) must be notified by the M+C organization when a PCP's contract is terminated. We are not making any change in this regard. For other providers, the regulations establish the "regular basis" standard. Generally, we would interpret this standard to require the notification of all enrollees who have a referral to a specialist for an ongoing course of treatment, or of all regular patients of an OB/GYN, for example. In combination with the explicit requirement for notification of all patients of a PCP, we believe that the "regular basis" standard is sufficient for accomplishing the objective of notifying all enrollees who are likely to be affected by a provider termination. We note that this

requirement does not preclude the providers themselves from notifying M+C enrollees of the termination of their participation in an M+C plan's provider network.

## 11. General Access Requirements (§ 422.112)

### a. Introduction

Section 422.112 establishes a series of requirements aimed at ensuring that enrollees in M+C plans have adequate access to services. As discussed in our June 26, 1998 interim final rule (63 FR 34989), these requirements stem from section 1852(d) of the Act and existing regulations and policies under part 417, as well as addressing recommendations from the Consumer Bill of Rights and Responsibilities, and reflecting standards from the Quality Improvement System for Managed Care (QISMC).

On February 17, 1999, we published a final rule (64 FR 7968) that set forth limited changes to the M+C regulations published in the June 26, 1998 interim final rule. In the February 17, 1999 final rule, we made changes to several of the access provisions of this section. These changes involved the coordination of care requirements, provisions related to complex or serious medical conditions, notification requirements when specialists are terminated from an M+C plan, and initial care assessment requirements.

More specifically, for serious and complex conditions, the treatment plan may be updated by a health care professional other than the primary care provider. Furthermore, this section now requires that the M+C organization ensure adequate coordination of providers for persons with serious or complex medical conditions. Under the general coordination of care requirements, the responsibility for ensuring coordination of care is not limited to an individual provider. Instead, the organization must: (1) Establish policies to ensure coordination; and (2) offer each enrollee a primary source of care. Further, as to the initial assessment, each organization will be expected only to demonstrate a "best effort" attempt to complete the assessment of health care needs within 90 days of enrollment. Finally, we no longer require, when a specialist is involuntarily terminated from an M+C plan, that the M+C organization offer to provide enrollees with the names of other plans in the area that contract with the specialist. However, as discussed above, the general requirements regarding notification of affected patients upon provider

termination remain in effect. Comments on aspects of the access requirements that were not addressed in our February 17, 1999 final rule are discussed below.

### b. Provider Network (§ 422.112(a)(1))

Section 422.112(a)(1) requires M+C organizations that wish to limit an enrollee's choice of providers to maintain and monitor a network of appropriate providers that is supported by written agreements and is sufficient to provide adequate access to covered services to meet the needs of the population served. We received several comments regarding access standards and one comment regarding contracting with community pharmacies.

*Comment:* Several commenters asked us to elaborate on access standards by including time and distance travel standards, such as specifying a 30-mile standard except where travel is difficult.

*Response:* Both the Medicare managed care manual and the QISMC guidelines issued on September 28, 1998 specify that a 30-mile standard must be satisfied in order to meet access requirements, except where a different standard is justified by geographic factors. We believe the inclusion of this requirement in these documents provides sufficient guidance on this subject. Furthermore, because the community pattern of care in some rural areas is to travel further than 30 miles for care, we do not believe it would be appropriate to establish an absolute 30-mile standard in the regulations.

*Comment:* One commenter requested that we require M+C organizations to contract with community pharmacies that are easily accessible.

*Response:* Community pharmacies have a number of advantages, and thus, M+C organizations should consider this as an option in providing pharmacy services. However, other options, such as pharmacy benefit management companies or mail order pharmacies, may have other advantages that are appropriate for M+C organizations to consider, such as lower cost. In choosing among these options, the M+C organizations must ensure that the providers of pharmacy services meet the various access and quality standards required by these regulations, implementing manuals and guidelines. Given these criteria, we do not believe it appropriate to require that community pharmacies be mandated as the source of pharmacy services.

### c. Primary Care Provider Panel (§ 422.112(a)(2))

Section 422.112(a)(2) requires an M+C organization that wishes to limit an enrollee's choice of providers to

establish a panel of PCPs from which an enrollee may choose. We received two comments regarding the PCP panel.

*Comment:* One commenter specified that all PCPs should be licensed physicians or Doctors of Osteopathy.

*Response:* QISMC Standard 3.2.1.2 provides additional guidance with respect to our policies regarding PCPs. The guideline states:

An organization may permit licensed practitioners other than physicians to serve as primary care providers, consistent with requirements of applicable State laws. (Qualifications of such practitioners, and the degree of supervision required, are generally established under State law). If an organization designates nonphysician practitioners as primary care providers, it must still ensure that each enrollee has a right to direct access to a physician for primary medical care. This right may be ensured in either of two ways: (a) the enrollee may choose between a physician and nonphysician primary care provider, and may change this choice at any time; or (b) when the enrollee is not allowed such a choice, an enrollee with a nonphysician primary care provider may have timely access to a physician upon request.

The guideline further states: "An organization may allow an enrollee to select a physician group, clinic, federally qualified health center, or other facility with multiple practitioners as his or her primary source of care. To the extent feasible, the enrollee must be allowed to choose an individual primary care provider within the group or facility."

Thus, the QISMC guidelines do not limit enrollees to the use of physicians or Doctors of Osteopathy as PCPs. However, as indicated, an M+C organization must provide enrollees with access to physicians or Doctors of Osteopathy upon request. Furthermore, § 422.112(a)(1) requires that the M+C organization have an adequate network of providers and § 422.112(b)(2) requires the organization to offer each enrollee a source of primary care. In addition, consistent with the BBA provisions regarding antidiscrimination, and the Consumer Bill of Rights and Responsibilities, we intend to provide enrollees with freedom of choice in the selection of providers subject to the above constraints. Therefore, we are not adopting the commenter's suggestion. We note that an M+C organization's use of nonphysicians to deliver Medicare benefits must be consistent with Medicare coverage requirements, such as "incident to" supervision requirements. To the extent nonphysicians are providing non-Medicare covered services as an additional or supplemental benefit, these requirements do not apply.

### d. Specialty Care (§ 422.112(a)(3))

This section requires an M+C organization to provide or arrange for necessary specialty care, and gives women enrollees the option of direct access to a women's health specialist within the network for women's routine and preventive health care services, notwithstanding that the M+C organization maintains a PCP or some other means for continuity of care.

*Comment:* One commenter expressed concern that an M+C organization may prohibit enrollee access to a specialist without a referral from a PCP, even when not all enrollees will choose to select, or be provided, a PCP. This would effectively deny access to specialist care to such individuals.

*Response:* Again, all M+C organizations must provide an adequate network of providers (§ 422.112(a)(1)), offer to provide each enrollee with an ongoing source of primary care (§ 422.112(b)(2)), and provide a primary source of care to each enrollee who requests one. In addition, § 422.112(a)(3) requires an M+C organization to provide or arrange for necessary specialty care. (As discussed above in section II.C.1, we are revising § 422.112(a)(3) to clarify that an M+C organization shall authorize out-of-network specialty care when its plan network is unavailable or inadequate to meet an enrollee's medical needs.) If an M+C organization requires its enrollees to obtain a referral in most situations before receiving services from a specialist, specialty care is medically necessary, and the enrollee has not selected a PCP, the M+C organization must either assign a PCP for purposes of making the needed referral or make other arrangements to provide the necessary care. Accordingly, we have revised § 422.112(a)(2) to specify that the M+C organization must make specialty care available even if a plan enrollee has not selected a PCP.

*Comments:* Several commenters asked for clarification of the terms "routine" and "preventive" as they apply to women's health services. They asserted that routine services should include more than just preventive services, while the examples offered in the preamble to the June 26, 1998 interim final rule only were limited to preventive services. One commenter noted that there are many services that OB/GYNs are most appropriately qualified to provide that should not require a referral from another physician, such as hormonal replacement therapy, and treatment of osteoporosis, genital relaxation disorders, incontinence, abnormal uterine bleeding, urinary tract infections

1986

**40216**    **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

(UTI), and sexual dysfunction. Another commenter suggested that we clarify that even though women have direct access to women's health specialists, it was not intended that the PCP be bypassed.

*Response:* We consider routine and preventive women's health care services to mean: an exam that is provided on a regular, periodic basis, in the absence of presenting symptoms, diagnosis or complaints, for disease prevention and health maintenance. The examples from the commenter, therefore, are not routine and preventive.

In the setting of such an exam, abnormalities may be found, such as incidental vaginitis or UTI, or abnormal Pap smear. We would consider routine services to follow up on such gynecologic abnormalities to be included under this definition.

We agree that the provision is unclear about the role of PCPs, and have deleted from § 422.112(a)(3) the reference to "while the plan maintains a PCP or some other means for continuity of care."

Although the regulations require that M+C organizations allow women direct access (that is, without referrals or preauthorization) to a women's health care specialist within the network for women's routine and preventive services, if there is a PCP, he or she needs to be kept informed of the health care provided by such specialists. It is up to the M+C organization to develop appropriate strategies for assuring such an outcome.

We note that an M+C organization may place restrictions on enrollees as to the eligible universe of providers to whom they may "self-refer" for women's health services. Thus, QISMC guideline 2.2.3.2 provides for M+C organizations to create formal subnetworks. In these cases, an organization can require an enrollee at the time of initial selection of a PCP, to choose an entire subnetwork that may also include specialists, hospitals, or other providers. The enrollee may be required to obtain covered services, including routine and preventive women's health services through providers affiliated with the system. Under the QISMC guideline, an enrollee could change his or her choice of subnetwork at any time. (See the guidelines for further details, including an M+C organization's responsibilities to ensure that enrollees are aware of the implications of their choice of a PCP in terms of the available subnetworks associated with a given PCP.)

*Comment:* One commenter suggested that we allow OB/GYN specialists to serve as PCPs.

*Response:* Although such a practice is permissible under the M+C regulations, we believe that this is a decision that should be made by the M+C organizations, based upon the needs of their enrollees and available resources. This position is consistent with that adopted regarding use of specialists with respect to "serious and complex" medical conditions, as stated in the February 17, 1999 final rule.

*e. Serious Medical Conditions (§ 422.112(a)(4))*

Under § 422.112(a)(4), M+C organizations must have procedures that enable the organization to identify individuals with serious or complex medical conditions, assess and monitor those conditions, and establish and implement treatment plans.

*Comment:* Several commenters asked for clarification of what is meant by "serious or complex medical conditions."

*Response:* On August 31, 1999, the Institute of Medicine (IOM) submitted a final report to us, entitled "Definition of Serious and Complex Medical Conditions." This report is available through the Internet at "www.nas.edu".

A key recommendation made in the report is: "The committee recommends that the Health Care Financing Administration should provide guidance [emphasis added] to health plans to assist their efforts to identify patients with serious and complex medical conditions. Specifically, the committee recommends the following language be used to facilitate efforts of plans to identify their enrollees with "serious and complex conditions": A serious and complex condition is one that is persistent and substantially disabling or life-threatening that requires treatments and services across a variety of domains of care to ensure the best possible outcomes for each unique patient or member."

In view of the committee's recommendation that it is premature to establish an administrative definition of these terms, we have decided not to make any changes at this time to the regulations regarding serious medical conditions. We will provide further policy guidance on the meaning of this definition through a future OPL. For now, M+C organizations have the option of adopting the IOM definition or developing an alternative definition.

The committee also recommended that rather than focus on access to specialists, the treatment plans that M+C organizations develop should address access to specialty care. Furthermore, the committee recommended that M+C organizations

develop a care management strategy that integrates the participation of all those involved in the care of the patient, including primary care physicians; medical and surgical specialists; nurses and nurse specialists; behavioral and mental health specialists; physical, occupational, and speech therapists; social workers; allied health professionals; and community-based service providers. The forthcoming OPL will address these strategies, as well as provide guidance on implementation and monitoring procedures.

*f. Written Standards (§ 422.112(a)(7))*

Section 422.112(a)(7) (as recodified in the February 17, 1999 final rule) requires the establishment of written standards for specified areas of policy and procedures (coverage rules, practice guidelines, payment policies, and utilization management). This section is based on existing regulations and policies under part 417. We received two comments regarding this requirement.

*Comment:* In a comment cosigned by one hundred and fifty advocacy organizations, it was suggested that we amend the regulations regarding use of practice guidelines to specifically encourage or require contracting managed care plans to use Federally-developed practice guidelines, where appropriate.

*Response:* In general, we concur with the commenters that the use of Federally-developed practice guidelines, such as those produced by the Department of Health and Human Services, in the provision of services is a desirable objective. However, we believe that the commenter's suggestion that use of these guidelines be mandated by regulation would be inconsistent with section 1801 of the Act, which provides that the Medicare statute "shall [not] be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided. * * *" While we thus do not believe that mandating use of Federal guidelines is appropriate, we do encourage M+C organization health provider committees to explicitly consider such recommendations, particularly as they relate to care of enrollees with high-risk, complex care needs (such as those with HIV disease, cancer, *etc.*).

*Comment:* One commenter requested that we specify that the "responsible health professionals" be included in the development of practice guidelines and medical review criteria.

*Response:* We encourage M+C organizations to include the responsible health professionals in the development of such written standards. In some cases, however, a physician may be qualified to develop standards that apply to other health professionals, and it could impose an undue burden on M+C organizations to require that all responsible health care professionals always be consulted about standards. We therefore do not believe it would be appropriate to impose an absolute requirement that all health professionals always be included in developing written practice guidelines. We believe, however, that as a general matter, it is important that health care professionals such as physician assistants, advanced practice nurses, clinical psychologists and others integrally involved and knowledgeable regarding treatment planning and delivery, contribute to the process of standard development. We would thus expect that M+C organizations generally will consult with such professionals in developing guidelines in their areas, even though we are not imposing an absolute requirement for such consultation in all cases. For a further discussion of this issue, see the portion of the February 17, 1999 final rule dealing with provider participation rules.

*g. Cultural Considerations (§ 422.112(a)(9))*

Section 422.112(a)(9) (as recodified in the February 17, 1999 final rule) requires that services be provided in a culturally competent manner to all enrollees, including those with limited English proficiency or reading skills, diverse cultural and ethnic backgrounds, and physical or mental disabilities. We received many comments regarding this section.

*Comment:* Many commenters asked for clarification regarding the term ''culturally competent'' and our expectations with respect to the implementation and monitoring of this requirement. While some commenters asserted that the cultural competence requirement would be too burdensome and should be deleted, most supported the requirement, but requested additional detail and guidance regarding its interpretation.

*Response:* In reviewing the comments received, there were several recurrent themes: (1) Widespread support of the general requirement that all health care services be provided in a culturally competent fashion; and (2) a need for us to clarify our expectations with respect to acceptable activities undertaken to achieve that goal.

We do not believe that changes to the regulation text regarding the definition of cultural competence are needed, other than to delete the reference in the regulations to mental and physical disabilities (as discussed below). However, in this preamble, we will attempt to provide further guidance on this issue. We also intend to incorporate the principles discussed here into the QISMC guidelines as we revise the QISMC cultural competence standards.

We believe that the delivery of culturally competent health care and services requires health care providers and administrative staff to possess a set of attitudes, skills, behaviors, and policies that enables the organization to function effectively in cross-cultural situations. Appropriate care delivery should reflect an understanding of the importance of acquiring and using knowledge of the unique health-related beliefs, attitudes, practices and communication patterns of beneficiaries and their families to improve services, strengthen programs, increase community participation and eliminate disparities in health status among diverse population groups.

Activities to promote achievement of this objective fall under a variety of categories, including but not limited what we refer to as ''Organizational Readiness,'' ''Community Assessment,'' ''Program Development,'' and ''Performance Improvement,'' for example. Under Organizational Readiness, M+C organizations would conduct educational programs to increase the knowledge of their staff about the unique health care beliefs, attitudes, practices, and communication patterns of the populations served by their plan. Title VI of the Civil Rights Act (see 28 CFR § 42.405(d)(1)) specifically requires that M+C organizations provide assistance to persons with limited English proficiency, where a significant number or percentage of the eligible population is likely to be affected. These requirements may require the organization to take some of the following steps: assess the language needs of beneficiaries in their service area, provide sufficient access to proficient interpreters, and disseminate written policies on the use of interpreters. In addition, the M+C organization provider network should be capable of meeting the cultural, linguistic, and informational needs of the beneficiaries residing in the service area. Ideally, the racial and ethnic diversity of the service area would be reflected in the provider network and staff of the M+C organization. The literature has demonstrated that enrollees are more likely to seek and accept health care services when delivered by one of their own racial or ethnic group. The M+C organization must ensure that all employees have received education regarding the importance of providing clinically competent and culturally appropriate services.

Community Assessment entails conduct of a market assessment to identify the specific health care needs of the beneficiary population as they relate to enrollee groups' health problems (for example, some diseases are ethnically and genetically linked). Using existing and secondary data resources, organizations would collect data to the extent necessary to identify any special culturally-based health care needs among their beneficiaries. Program Development would entail implementation of formal programs and culturally sensitive patient education projects that reduce and eventually eliminate cultural, linguistic, and informational barriers known to deter or discourage health-seeking behavior.

Finally, Performance Improvement would entail addressing an identified need or opportunity for improvement, either through a quality improvement project or other formal program that seeks to resolve undesirable differences in utilization of services and outcomes of care across all relevant racial, ethnic and cultural groups served by the managed care organization.

The goal is to promote quality health care services, ensure effective dissemination of information, and enhance consumer rights and protections by fostering a demonstrated commitment to and establishing a coordinated and integrated system for, cultural competence. This approach is consistent with other Federal initiatives and recommendations from the President's Race Initiative and from the President's Advisory Commission on Consumer Protection and Quality in the Health Care Industry.

As achieving this objective is a M+C program requirement, M+C organizations will be monitored for compliance in this regard. We have developed additional implementation tools to assist M+C organizations in meeting the cultural competency requirement, such as operational specifications for five initial test measures and further steps which could be taken to improve, test, and expand on enrollee, disparity and standard-based inventories. The specifications for the five initial measures were developed based upon the recommendations of an expert panel and would require no new data collection on the part of the M+C

organization. We will soon be offering these measures to M+C organizations for use in their QAPI projects.

Finally, ensuring culturally competent care is congruent with our commitment to being a prudent purchaser of health care services. A growing body of knowledge demonstrates that when care is provided in a clinically competent and culturally appropriate fashion, it is more readily understood and accepted by the patient. As a result, patient compliance with treatment is enhanced, outcomes are improved, and health care costs and expenses are reduced as a result of diminished morbidity and mortality.

*Comment:* One commenter pointed out that physical and mental disabilities are unrelated to cultural competence issues. The commenter stated that including a reference in § 422.112(a)(9) to individuals with physical and mental disabilities was insensitive and inappropriate, noting that such disabilities are not a "culture".

*Response:* We believe that the principle objective underlying the requirement to provide services in a culturally competent manner is to address unique racial and ethnically-related health care concerns. Thus, we agree with this commenter, and are deleting the relevant language. We note that the special concerns and rights of individuals with physical or mental disabilities are addressed elsewhere in the M+C regulations (for example, under §§ 422.110(c) and 422.502(h)(1)(iii)).

*Comment:* One commenter believes that Federal law prohibits providing material below high school reading level.

*Response:* We were unable to locate any statutory citation in support of the commenter's view, and none was provided by the commenter. We believe that the commenter is mistaken that materials at a reading level below high school cannot be provided. Market research has shown that the majority of Medicare enrollees are able to most effectively comprehend the complex issues addressed in our literature when the information is targeted for those at a 4th–6th grade reading level. The Medicare Handbook accordingly is geared for individuals at precisely that level. Therefore, we believe that our current approach is both appropriate and well-justified.

## 12. Confidentiality and Accuracy of Enrollee Records (§ 422.118)

Consistent with section 1852(h) of the Act, § 422.118 requires M+C organizations to establish procedures that safeguard the confidentiality and accuracy of enrollee records that

identify a particular enrollee, including medical documents, administrative documents, and enrollment information. The regulations specify that information from these records may be released only to authorized individuals. Each M+C organization must establish procedures for complying with the confidentiality standards, including policies governing access to information within the organization as well as when and how information may be disclosed outside the organization without enrollee authorization. Additionally, the M+C organization must maintain accurate records and ensure timely access for enrollees who wish to examine their own records.

The M+C organization must abide by all applicable State and Federal laws regarding confidentiality and disclosure of health information and any other information about enrollees. In the existing regulations, "mental health records" are mentioned separately as subject to this requirement. However, because mental health records clearly constitute a subset of the other health records specified at § 422.118 (that is, "medical records, health information, and any other enrollee information"), we are revising the regulations via this final rule to eliminate the redundant separate reference. This has no effect on the substance of the requirement.

*Comment:* Several commenters have suggested that the industry needs one Federal standard for confidentiality, especially in light of the fact that State confidentiality laws would not be preempted unless they conflict with Federal requirements. One commenter stated that there thus could be 50 different sets of patient confidentiality standards.

*Response:* The M+C regulations are not the appropriate vehicle for establishing the balance between State and Federal confidentiality laws. This issue is under discussion in Congress, which is a more appropriate venue for making this determination. Further, because Federal standards for confidentiality and privacy of individually identifiable health information have recently been proposed by the Secretary (as discussed in some detail below), and because M+C organizations will be required to comply with those regulations once they are finalized, we have chosen not to make substantive changes in the existing M+C confidentiality regulations at this time. In the interests of clarification, however, we have made some technical changes in the existing requirements, including reorganizing them to (1) promote consistency with the confidentiality requirements under other Federal health

care programs (such as Medicaid) and (2) emphasize the importance of applicable Federal and State laws, while still ensuring that the privacy of M+C enrollees' health information is safeguarded in the absence of other applicable laws.

Pursuant to Section 264 of the Health Insurance Portability and Accountability Act (HIPAA) (Pub. L. 104–191), the Secretary of Health and Human Services was directed to promulgate regulations on the confidentiality and privacy of individually identifiable health information if confidentiality legislation governing electronic health information was not enacted by August 20, 1999. Such legislation was not enacted, and the Secretary published a notice of proposed rulemaking, Standards for Privacy of Individually Identifiable Health Information, in the **Federal Register** at 45 FR 160, *et seq.*, on November 3, 1999. (This proposed rule is available at the Administrative Simplification web site, http://aspe.hhs.gov/admnsimp/). As proposed, these regulations would apply to health information that has been maintained or transmitted electronically, or held by health plans, health care providers who engage in certain electronic transactions, and health care clearinghouses. M+C organizations would be considered health plans for the purposes of the proposed privacy regulation. The proposed rule would establish detailed standards for the use and disclosure of electronic health information.

*Comment:* Several commenters suggested that we develop procedures regarding the maintenance of confidentiality of patient records, and have said that these procedures should be provided to the beneficiary.

*Response:* As noted above, in light of the pending privacy regulations, we are not imposing any additional requirements here. The Secretary's proposal would require health plans (including M+C organizations) and other covered entities to develop procedures for maintaining the privacy of health information and to inform patients and enrollees of their confidentiality practices.

*Comment:* Several commenters asked for clarification of preamble language at 63 FR 34991, which they read to preclude M+C organizations from sharing patient information with outside contractor claims administrators without individual patient consent.

*Response:* The M+C regulations are not intended to prohibit the sharing of patient identifiable information within an M+C organization or between the

organization and its contractors for the purposes of payment, treatment or coverage decisions. Thus, an M+C organization may circulate such information within the organization, and externally, to the extent that such information is needed to coordinate or bill for the care of an M+C enrollee. However, M+C organizations generally are prohibited from selling or circulating patient identifiable data to outside organizations or entities that are not involved in payment, treatment, or coverage decisions, without specific authorization from the enrollee or an enrollee's authorized representative.

*Comment*: Several commenters asked us to specify that patient data may be shared for bona fide medical research, and to limit the extent to which patient identifiable information could be released for research purposes. One commenter asked for clarification as to whether information can be shared in the event of a court order or subpoena.

*Response*: As discussed above, we are not expanding on the existing M+C confidentiality requirements to address specific issues here, such as to whom and under what conditions release of patient identifiable information is authorized. To the extent that M+C organizations have proper safeguards in place and to the extent that State law authorizes the release of such information, this section of this regulation does not bar the use and disclosure of records for medical research. Section 422.118(a) expressly states that medical records may be released in accordance with "court orders or subpoenas." The Department's proposed privacy regulation would set forth specific standards for disclosing information in both of these situations, and when that regulation is finalized, M+C organizations will be permitted to disclose information only in accord with those standards. In the interim, M+C organizations could voluntarily use these proposed privacy standards as a guide in formulating their policies and making disclosure decisions.

13. Information on Advance Directives (§ 422.128)

Advance directives are documents recognized under State law, signed by a patient or his/her authorized representative that explain the patient's wishes concerning a given course of medical care should a situation arise when he or she is unable to make these wishes known. The M+C organization is legally responsible for providing enrollees with information on their rights under State law to establish advance directives, and ensuring that advance directives are documented in a prominent part of the beneficiary's medical record. The M+C organization is permitted to contract with other entities to furnish information concerning advance directives requirements. The M+C regulations retain for M+C organizations the requirements that applied to HMOs and CMPs under part 417, which state an HMO must maintain written policies and procedures concerning advance directives as defined in § 489.100 with respect to all adult individuals receiving medical services by or through HMOs.

*Comment*: Commenters asserted that M+C organizations should not be responsible for obtaining or documenting the existence of an advance directive, and that organizations should ensure that "responsible health care entities educate patients and document the existence of advanced directives." The commenters stated that an M+C organization cannot reasonably be held responsible for documenting whether an individual has elected an advance directive because the chart is in the control of the primary care physician.

*Response*: Our position that an M+C organization should be responsible for obtaining and documenting the existence of advance directives is consistent with the requirements of both State law and the Patient Determination Act of 1991, which we expanded upon in our final rule on June 27, 1995 (42 CFR § 489.100). Both the Act and the regulations include managed care organizations among the entities responsible for obtaining and documenting advance directives information. The BBA made these same standards applicable to M+C organizations.

*Comment*: A commenter asked for clarification as to what we will accept as evidence of best efforts and reasonable plan oversight. Another commenter suggested we should require M+C organizations to submit and receive approval on all advance directive documents. This commenter feared (and alleged that there is proof) that an M+C organization might lead beneficiaries down a path of less care in times of greatest need, and that advance directives could be used by an organization to coerce a beneficiary to forego care.

*Response*: The M+C advance directive requirements, which fee-for-service providers have been following for some years, are guidelines which refer to State law. Therefore, M+C organizations must comply with the advance directive requirements of the States which they serve, and we cannot give detailed guidelines as to what constitutes best efforts in each State. We believe the Medicare regulations give provider entities and States a great deal of flexibility, and we are prepared to work with them on specific entities.

Regarding the commenter's concerns about possible encouragement of inappropriate underutilization as the result of advance directives, we believe that the monitoring process will prevent and/or identify abuses of advance directives. For example, the M+C contractor interim monitoring guide states that an organization's policies must promote enrollee understanding of their conditions and facilitate the development of mutually agreed upon treatment goals. We have stated in QISMC and OPL 98–72, that with respect to advance directives, the M+C organization must meet several criteria, including that it may not make treatment conditional or otherwise discriminate on the basis of whether an individual has executed an advance directive. Underutilization patterns should be revealed by other aspects of the monitoring process, and, with regard to advance directives specifically, we are exploring the possibility of developing further monitoring criteria.

*D. Quality Assurance*

1. Overview

The quality assurance requirements for M+C organizations were addressed in subpart D of the June 26, 1998 interim final rule. These requirements implement and are based on the provisions of section 1852(e) of the Act. Further, they incorporate the requirements of section 1851(d)(4)(D) of the Act, which provides that the information made available to Medicare beneficiaries for plan comparison purposes must include plan quality and performance indicators, to the extent available. Section 1852(e)(1) of the Act sets forth the general rule that each M+C organization must establish an ongoing quality assurance program, consistent with implementing regulations, for the health care services it provides to enrollees in the organization's M+C plan or plans. The remaining portions of section 1852(e) of the Act contain the required elements of the quality assurance program, requirements for external review, and provisions concerning the use of accreditation organizations to determine compliance with the quality assurance requirements.

2. Quality Assessment and Performance Improvement Requirements (§ 422.152)

Section 422.152 incorporates each of the explicit statutory requirements of

sections 1852(e)(1) and (2) and section 1851(d)(4)(D) of the Act. Section 422.152 also includes additional detail to clarify what an M+C organization must do to meet the statutory requirements. Sections 422.152(b) through (d) of the interim final rule set forth requirements that M+C organizations must meet with respect to M+C coordinated care plans and network MSA plans.

Section 422.152(c) requires that the organization: (1) measure and report its performance to HCFA using measures required by HCFA; and (2) for M+C coordinated care plans, achieve any minimum performance levels that may be established locally, regionally, or nationally by HCFA.

Section 422.152(d) establishes the requirements for performance improvement projects, beginning with the requirement that performance improvement projects focus on specified areas of clinical and nonclinical services. It also explains that we will set M+C organizational and plan-specific requirements for the number and distribution of these projects among the required areas. In addition, it authorizes us to direct an M+C organization to undertake specific performance improvement projects and participate in national and state-wide performance improvement projects. Section 422.152(d) reflects many of the provisions of section 1852(e)(2) of the Act.

In enacting the quality assurance provisions of the BBA, Congress recognized that not all of the quality assessment and performance improvement activities that are appropriate for a plan with a defined provider network would be appropriate for an M+C non-network MSA plan or an M+C PFFS plan. The requirements specific to these types of plans are addressed in § 422.152(e). (Note that, as discussed below and in section I.C of the preamble, section 520 of the BBRA amended section 1852(e) of the Act to apply the non-network plan requirements to PPO plans as well.)

In order to support the measurement of performance levels and the conduct of performance improvement projects, if applicable, M+C organizations offering all types of M+C plans must maintain a health information system that collects, analyzes, integrates, and reports data. This requirement is covered at § 422.152(f)(1). Section 422.152(f)(2) requires that for each M+C plan an M+C organization offers, it has a process for formal evaluation, at a minimum annually, of the impact and effectiveness of the quality assessment and performance improvement program

strategy with respect to services under that plan.

*Comment:* A number of commenters asserted that the quality assessment and performance improvement (QAPI) requirements will be difficult for M+C organizations offering M+C plans with loosely organized provider networks to meet, and will discourage such organizations from participating in the M+C program. In particular, commenters were concerned that the QAPI requirements will deter organizations from offering MSA plans, PFFS plans, and PPO-type coordinated care plans. One commenter explained that organizations offering non-HMO plans cannot require physicians to track outcomes for these plans because the organizations do not have contracts with the physicians, making data collection and reporting infeasible. Four commenters specifically addressed the challenges facing PPOs in producing performance data and influencing provider practice patterns as required to demonstrate performance improvement. Two commenters complained that it is not appropriate to require reporting of all clinical performance indicators from the "Healthplan and Employer Data and Information Set" (HEDIS) in the case of a broad access PPO-type coordinated care plan. These and other commenters suggested that we instead establish quality standards that account for variation in organization capabilities.

*Response:* The BBA recognized that the structure of health plans has a direct impact on the degree to which the organizations that offer them can reasonably be expected to directly affect the health care services provided to their enrollees. As a result, the M+C statute and interim final regulations, as well as guidance implementing these provisions, have been tailored to the varying structural differences and associated capabilities of M+C organizations. As discussed in section I.C of this preamble, section 520 of the BBRA amended section 1852(e) of the Act to revise the quality assurance requirements for PPO plans. Consistent with the commenters' concerns, the quality assurance requirements for PPO plans are now the same requirements that apply to non-network M+C MSA plans and M+C PFFS plans. Thus, while PPO plans are still considered coordinated care plans, they are treated differently than other coordinated care plans for the purposes of the M+C quality assurance requirements of § 422.152, in recognition of the fact that their provider networks are subject to a lesser degree of control and accountability. The result is that M+C organizations are no longer required to

conduct performance improvement projects relative to their PPO plans, or to have their PPO plans meet minimum performance levels. M+C organizations offering PPO plans must still report on standard measures, however, and continue to comply with the QAPI requirements that apply to all plans, such as those relating to health information and program review. We are revising § 422.152 to implement these changes.

Section 520(a)(3) of the BBRA defined a PPO plan as an M+C plan that (1) has a network of providers that have agreed to a contractually specified reimbursement for covered benefits with the organization offering the plan; (2) provides for reimbursement for all covered benefits regardless of whether such benefits are provided within such network of providers; and (3) is offered by an organization that is not licensed or organized under State law as a health maintenance organization. This definition is being added to the regulation at § 422.4.

*Comment:* A few commenters addressed the costs associated with collecting and reporting QAPI data. They argued that the data required to M+C organization operations, with two commenters contending that most of the patient encounter data required for quality improvement projects go beyond the claims data currently collected and processed by organizations and Medicare fiscal intermediaries. Another commenter suggested that because the data collection and reporting costs will be so significant, we should make decisions as to what information to require only after much deliberation. One commenter expressed concern that M+C organizations will pass along the costs of data collection and reporting to hospitals.

*Response:* While not all M+C organizations are accredited, the majority are either seeking or have already been granted accreditation by national bodies such as the National Committee for Quality Assurance (NCQA). For those organizations in particular, the collection and reporting of standard measures does not constitute a new activity as it is a condition of the accreditation process. In addition, many managed care organizations have been voluntarily conducting a variety of quality improvement projects over the years, although they may not have routinely reported on standard measures. Again, for these organizations, the process of identifying quality of care concerns, selecting a patient population for study, implementing an intervention and

1991

collecting data on the outcomes of that intervention are not at all new. The quality improvement process under the M+C program is essentially comparable to current industry practice, with the slight addition of the requirement to report on specific types of indicators relevant to the condition in question. For these reasons, we do not believe that the data collection and reporting requirements established under the M+C regulations will impose unreasonable costs, and we believe that a great deal of deliberation has already gone into the establishment of these requirements (for example, the collection and reporting of HEDIS measures) at this time.

With respect to the issue of whether hospitals will be asked to bear costs associated with data collection, we do not expect these costs to be unreasonable, and we note that they are voluntarily assumed when the hospital decides to participate in the M+C organization's network.

*Comment:* A few commenters contended that the costs of implementing their QAPI programs would be excessive.

*Response:* We have given M+C organizations significant latitude in terms of designing their performance improvement projects, so that they can choose efforts that are relevant to their enrollees and that involve cost effective interventions To further reduce administrative and financial burden, M+C organizations may collaborate with entities such as the Peer Review Organizations (PROs) on their performance improvement projects.

*Comment:* Two commenters addressed the collection and reporting of HEDIS measures. These commenters were concerned that the HEDIS measures do not, in their view, adequately address the health issues of older adults in Medicare, and they do not track the experiences of people with chronic and disabling conditions.

*Response:* M+C organizations are required to report HEDIS measures for the purposes of §§ 422.152(c)(1) and (e)(1). Currently, the HEDIS measures offer the most comprehensive view of managed care performance available. We have been working with the Geriatric Measurement Advisory Panel to develop additional measures for people with chronic and disabling conditions. It is important to recognize that HEDIS is an evolving instrument, and as valid measures of other aspects of care are developed, they will be incorporated. For example, HEDIS 1999 added measures for cholesterol management after acute cardiovascular events, and HEDIS 2000 has added a

measure to assess whether blood pressure was controlled among people with diagnosed hypertension. Additionally, Medicare will be requiring six measures for people with diabetes. Additions such as these, plus others that will be added as valid measures are developed, should address the commenters' concerns.

*Comment:* Two commenters suggested that we add other areas for standard measures in § 422.152(e)(1) for M+C PFFS and non-network MSA plans. These commenters believe that the information collected for these types of plans should be as consistent as possible with that collected for other types of M+C plans to allow for comparison among them. The commenters recommended that if certain types of data are unavailable for non-network M+C MSAs and M+C PFFS plans, a statement should be made available to beneficiaries explaining the lack of information.

*Response:* We agree with commenters that for purposes of plan comparison, reporting on standard measures should be as consistent across plan types as possible. Therefore, we are revising § 422.152(e) to specify that the standard measures on which reporting will be required for M+C PFFS plans, non-network MSA plans and now PPO plans will relate to the same areas to which the measures required for M+C coordinated care plans (other than the PPO plans) and network M+C MSA plans relate. As stated in the preamble to the interim final rule, no M+C organization will be required to report information to which it does not reasonably have access under a plan. Where data on particular measures are not reasonably available with respect to a given plan, organizations will be allowed to report "not available."

*Comment:* A number of commenters addressed the form and content of the required standard measures. One commenter asked that we develop core measures not just at the M+C plan level, but also at the provider and facility level. Another commenter asked that we develop core measures for high-risk, low-incidence conditions. Another commenter asked that we develop measures for all persons with disabilities under age 65 that are comparable to the senior health status data that are being collected for a sample of Medicare beneficiaries over 65 in Medicare managed care plans as part of HEDIS 3.0.

*Response:* Each of these suggestions has merit; however, we are taking an incremental approach to implementation with respect to the QAPI activities under the M+C program

that includes working with private purchasers to expand the set of measures. We believe it is important to give M+C organizations time to adjust to the current standard measures before imposing further requirements. Our experience with the standard measures in place now will also be helpful in deciding whether additional measures are appropriate, and if so, which measures would be most effective.

*Comment:* Certain commenters asked that the standard measures we require be predictive of outcomes, and be established utilizing evidence-based medical research. One commenter asked that we establish a "data dictionary" that will give M+C organizations detailed and clear definitions of the required measures. Another commenter cautioned that the development of another set of core measures for M+C organizations will result in unnecessary duplication and lead to confusion if the measures are defined differently by accreditation organizations and by HCFA.

*Response:* As mentioned earlier, M+C organizations are required to report HEDIS data. The HEDIS measures are predictive of outcomes, are well defined, and are well established in the private sector. Our requirements may change in future years as the HEDIS instrument evolves and as other measurement instruments are developed.

*Comment:* One commenter asked what role, if any, JCAHO's ORYX performance indicators will have in meeting our data reporting requirements, and whether there would be duplication. One commenter asked that we consider the OASIS data set and OBQI system for home care (and eventually PACE) to be reasonable alternatives to HEDIS for managed long-term care plans.

*Response:* Again, our goals with respect to data management are to minimize burden and maximize effectiveness. We are working collaboratively with accrediting organizations like the JCAHO, with these goals in mind. The ORYX indicators are still in the developmental stage and, furthermore, since they focus specifically on hospitals, they cannot be used to measure much of the performance of managed care organizations. All home health agencies serving Medicare beneficiaries, whether in managed care or traditional Medicare, are required to provide information through OASIS. In general, we are not requiring managed long-term care plans to provide HEDIS information, with the exception of several demonstration sites. However, reporting requirements

1992

for long-term care entities may change in the future.

*Comment:* A few commenters addressed our intention to consider historical plan and original Medicare performance data and trends when establishing minimum performance levels. One asked for clarification as to the standards we will use. Two objected to basing minimum performance levels on historical performance data and trends, explaining that many Medicare program requirements, including those related to access to services, emergency services and due process, are not ideal targets, but rather legal requirements under Federal law. The commenters were concerned that looking to historical performance might result in establishing a minimum performance level that is less than what the law requires.

*Response:* We agree with commenters that it would not be appropriate to establish minimum performance levels for aspects of care or service for which required levels of performance have already been dictated by regulation or statute. However, there are many measures of care, such as mammography or immunization rates, for which no mandated minimum exists. In these areas, it is useful to know what historical performance has been, because while we are interested in establishing minimum performance levels that motivate improvement, we want those levels to be achievable. At this time, the process for establishing minimum performance levels has not been finalized, but we expect that we will set the minimum at a percentile of previous performance, and revise the minimum year by year as overall performance rises.

*Comment:* A number of commenters objected to our intention to establish minimum performance levels. One commenter said that it would be inconsistent with our statement in the preamble to the interim final rule that we would not adopt a ''one size fits all'' approach to performance measurement. Another commenter, although not opposed to minimum performance levels, asked that we take into consideration variation in the model of delivery, such as network-model or group-model, when establishing the levels.

*Response:* We believe that it is feasible and in the best interest of Medicare beneficiaries to require that the quality of care provided by M+C organizations offering network plans meet minimum standards. This is an additional protection above making performance information available to beneficiaries for the purpose of plan

selection. We believe that there would be a de facto requirement that organizations achieve minimum performance levels, even if there were no explicit requirement in the regulation. That is, even if the regulation required only that organizations report their performance on standard measures, we would still judge their performance by comparing it with some benchmark for the purpose of determining whether to take remedial action or continue contracting with the organization, which would have the same effect as applying a minimum performance level. We see no reason not to recognize this implicit requirement in the regulation.

As we stated in the preamble to the interim final rule, we are sensitive to the different structures of plans. We will consider the impact plan structure has upon the ability of an M+C organization to affect provider behavior. We will consider these issues when making our decisions regarding the standard measures for which it is appropriate to establish minimum levels of performance.

*Comment:* Two commenters addressed the possibility that some of the minimum performance levels HCFA establishes will be regional instead of national. One commenter objected to establishing non-national performance levels. The other supported the idea of establishing minimum performance levels with consideration for regional area variation.

*Response:* Because it is our intention to establish minimum performance levels that are meaningful as well as achievable, we must consider regional variation where it exists. It is our ultimate goal to have national minimum performance levels, but it may be necessary to move towards this goal incrementally by first establishing regional performance levels.

*Comment:* One commenter asked how we can require that M+C organizations meet minimum performance levels 1 year after the levels are established, if we recognize a 3-year cycle as the standard for performance improvement.

*Response:* The purpose of performance improvement projects is not to bring plan performance up to minimum performance levels, but rather to move it closer to national benchmarks. In most cases, we believe that plan performance would already surpass the ''minimum performance levels'' that we are now in the process of developing. An immediate intervention and not a lengthy performance improvement project would probably be called for if a plan

offered by an M+C organization failed to meet a minimum performance level.

*Comment:* One commenter asked that we establish some minimum performance levels related to the care of persons with disabilities.

*Response:* As noted above, we are still in the early stages of identifying the measures for which minimum performance levels will be established. When we do, we will consider the commenter's suggestion.

*Comment:* A number of commenters objected to the possibility that we will nonrenew an organization's contract on the basis of its failure to meet minimum performance levels. Two of these commenters complained that any organization might fall short of a specific numerical standard because of random events beyond its control. As an alternative to nonrenewal, one commenter asked that we impose intermediate sanctions. Another asked that we not impose sanctions at all if an organization is making a good faith effort to meet the requirements. Some commenters suggested that we work with organizations to improve their performance in lieu of nonrenewal. In particular, one commenter recommended that we require organizations to participate in PRO-sponsored improvement projects when minimum performance levels are not met.

*Response:* As a value-based purchaser, HCFA has a responsibility to implement requirements that promote accountability on the part of M+C organizations. Although we have the authority to nonrenew an organization's contract for failure to meet quality assurance requirements, we have stated that in most instances we will first offer technical assistance and/or require corrective action plans. Intermediate sanctions are also within HCFA's prerogative.

*Comment:* One commenter asked that we reward an organization that shows demonstrable improvement in the health status of beneficiaries by giving it a bonus payment such as a percentage of its capitation rate. The commenter contended that a bonus payment is necessary to ensure that organizations are equitably reimbursed, since under a risk-adjusted ACR, organizations will receive lower payments for healthy enrollees.

*Response:* It is appropriate that an M+C organization receive lower payments for healthy enrollees because the cost of caring for them is proportionately lower. Because an organization that successfully completes a performance improvement project will have reduced the incidence of negative

outcomes and the expenses associated with them, any reduction in Medicare payment as the result of risk adjustment should not adversely affect the organization's profitability. Indeed, the successful completion of performance improvement projects should bolster an organization's business. The information that an organization has successfully completed performance improvement projects will be shared with potential enrollees, and should help its market position.

*Comment:* One commenter asked that we establish public recognition awards at the state and national level for innovative and successful organization performance improvement projects.

*Response:* Although there has been much discussion around the issue of establishing performance incentives, we currently have no plans to develop an awards program for M+C organizations. However, they may wish to consider promoting their excellent performance themselves through the media and their marketing materials.

*Comment:* One commenter requested that we specify the nature and form of the documentation and data that organizations must make available to demonstrate compliance.

*Response:* With respect to monitoring compliance, we have completed the design of a revised M+C interim monitoring tool that follows the structure of both the M+C regulations and the Quality Improvement System for Managed Care (QISMC) Interim Standards and Guidelines (which provide interpretive guidance for both subpart D standards as well as standards relating to the delivery of health care and enrollee services). The monitoring tool specifies the documentation and data that we will look for in our compliance monitoring.

*Comment:* Many commenters emphasized the importance of collaboration between the managed care industry and HCFA as implementation of the regulation proceeds. One commenter recommended that we establish a formal advisory counsel composed of representatives of industry associations. Other commenters urged that we consult with physicians and accreditation organizations in selecting standard measures and setting minimum performance levels.

*Response:* Since we began developing QISMC 4 years ago, we have been engaged in an ongoing dialogue with representatives of the managed care industry, advocacy groups, various health care providers, and state regulatory bodies to ensure broad involvement in the document development process. We recognize the

value of this type of collaborative exchange and intend to continue this activity.

*Comment:* A number of commenters asked that we coordinate our quality improvement efforts with those of the private sector, particularly NCQA. One commenter was concerned that we are establishing an independent system of quality improvement requirements rather than building upon the collaborative public-private efforts that we have participated in, such as HEDIS.

*Response:* The QAPI requirements established in the regulation build upon a number of the public-private efforts mentioned by commenters. For instance, as noted above, the standard measures on which M+C organizations now are required to report to comply with § 422.152 (c)(1) and (e)(1) are the HEDIS measures; we have been collaborating with private sector group purchasers since 1994 to develop these measures, and we recognized the value of incorporating them into our QAPI strategy.

*Comment:* One commenter questioned HCFA's authority to require that performance improvement projects achieve "significant" improvement, pointing out that the statute requires only that M+C organizations "take action" to improve quality. Another commenter questioned our authority to impose as much structure on performance improvement projects as we have, asserting that by requiring that projects focus on specified areas of clinical and nonclinical services, and directing M+C organizations to undertake specific projects among the required areas, we have exceeded our statutory mandate.

*Response:* We believe that our responsibility as a value-based purchaser and duty as a trustee of Medicare funds includes requiring that M+C organizations provide high quality services, and the statute recognizes this responsibility. For instance, section 1852(e)(2)(A)(vi) of the Act requires that M+C organizations "provide the Secretary with such access to information collected as may be appropriate to monitor and ensure the quality of care provided under this part" (emphasis added). Requiring that M+C organizations conduct projects that achieve improvement that is significant and sustained over time is one way for us to meet our obligation under the statute. We also believe that the language quoted by the commenter, requiring that M+C organizations "take action" to improve quality can be reasonably interpreted to require that improvement actually occur. A requirement to "take action" to improve

quality clearly suggests that the M+C organization have an objective in mind in doing so. We believe that a significant improvement is a reasonable and logical objective for "action" to improve quality. While the structure imposed in the interim final rule is flexible, and grants M+C organizations broad discretion in many areas in designing their QAPI programs, we believe that some structure is necessary in order to ensure that the projects will be meaningful for Medicare enrollees. We believe that the M+C quality assurance requirements represent a reasonable interpretation of requirements in section 1852(e), and a reasonable exercise of our broad authority under section 1856(b)(1) to establish M+C standards by regulation.

*Comment:* Two commenters addressed the issue of the number of performance improvement projects M+C organizations are required to perform. One commenter explained that it is difficult to conduct valid and reliable performance improvement projects with a small number of participants, and asked that the number of required performance improvement projects be proportionate to the size of the plan. The second commenter asked that we limit the number of required performance improvement projects to one new project per year, and limit the number of projects required to be underway at any one time to four.

*Response:* QISMC requires that M+C organizations initiate two performance improvement projects a year. Given that projects are allowed 3 years in which to achieve significant improvement, once QISMC is fully implemented an organization will not need to have more than six projects underway at any one time: two in the initiation stage, two in the intervention stage, and two in the completion stage. We believe this is a reasonable burden for both large and small plans. Smaller plans are not at a disadvantage because organizations are not required to show statistically significant improvement on every topic affecting a small population. Statistical significance is only required in instances when an organization chooses to sample its population. For small populations, an organization has a strong incentive to measure the results of its project on the entire affected population, because, when the organization's project targets the entire affected population, only a 10 percent reduction in the "performance gap" is required, not statistical significance. For example, if an organization chose to study a condition that affected only 100 enrollees, and its current performance was 50 percent, to achieve a 10 percent

**40224** **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

reduction in the performance gap it would have to demonstrate that it improved the care to five enrollees. If the organization measured the results of its project on a sample of the population, it would have to show improvement for many more enrollees to achieve statistical significance.

We are aware that a number of technical issues relating to improvement project design remain to be resolved. For instance, we must decide what to do when a project population is so small that measurement of the results of the project is not meaningful or what to do if the baseline performance is so high that the sample size required for statistical significance is very large. We intend to resolve these issues in an updated version of QISMC.

*Comment:* One commenter pointed out that a significant period of time will be required following the intervention before improvements are observed at the population level, and the commenter was concerned that there appears to be no allowance for this time period.

*Response:* QISMC allows for such a time period. As mentioned earlier, QISMC does not require a performance improvement project to achieve significant improvement until the end of its third year. Experience has shown that there are many opportunities for an intervention to yield results within three years. QISMC makes an even more generous allowance for more complicated projects.

*Comment:* Many commenters addressed the requirement that performance improvement projects achieve significant improvement. The majority of these commenters opposed the 10 percent standard for reduction in the performance gap. As discussed above, this standard (which is specified in QISMC) requires that the organization reduce by at least 10 percent the percentage of cases in which the quality indicator that measures its performance in the project's focus area is failed. Several of these commenters complained that the standard is not realistic. One commenter explained that in many data situations, administrative claims may not be complete or be reliable to allow for a meaningful evaluation. Other commenters offered other examples of impediments to achieving significant improvement, including regional variation of utilization and imperfect provider and enrollee compliance. One commenter asked us to recognize that enrollee lifestyle choices, diet, and compliance with medical treatment will impact upon an organization's ability to achieve significant improvement in health status. Another commenter asked that

we recognize that it is the provider who actually has control of the care process. For these reasons, these commenters asked that we not hold organizations responsible for achieving significant improvement, but for initiating activities that, if followed by enrollees and providers, are likely to improve the health status of enrollees.

Two other commenters suggested that we take a different approach. They recommended that in lieu of requiring a 10 percent reduction in the performance gap, we follow NCQA's approach and require that managed care organizations provide meaningful evidence that they are making improvements in clinical care and service. One of these commenters suggested that to define ''meaningful,'' we consider whether the improvement resulted in a better outcome for the enrolled population, whether it is attributable to the organization's actions, and whether it affects high-volume, high-risk, and/or high-cost conditions or services. The commenter added that this would be more effective in encouraging complex or innovative projects that have a high risk of failure but that offer significant potential, a comment that was echoed by other commenters who were concerned that a rigid numerical significant improvement standard would encourage organizations to pursue performance goals that are easily attainable.

A third alternative to the 10 percent standard was submitted by a commenter concerned that certain characteristics of the Medicare population will complicate the achievement of significant improvement. This commenter pointed out that the elderly population is at a higher risk of illness and disease, and that a greater percentage of Medicare beneficiaries have multiple disabilities and comorbidities, which results in greater instability in their health status. This commenter recommended that we require only that organizations establish measurable goals for their interventions, and that we evaluate organizations on their ability to demonstrate the strength of their interventions and performance gains over time. Further support of this approach was offered by an additional commenter who was concerned that the 10 percent standard would encourage risk selection and discourage the enrollment of sicker beneficiaries with more complex health issues.

*Response:* We chose to make a 10 percent reduction in the performance gap the standard because we believe it is necessary to have an objective standard to assess whether an organization has achieved significant

improvement in health care quality, and because we have observed much higher percentage increases in performance than 10 percent. Therefore, 10 percent is a reasonable benchmark to use based on our observation of past organizational performance in improving health care quality. Nationally recognized standards that do not incorporate objective standards for determining if quality improvement has occurred have been criticized as being subjective and lacking in reliability and validity. We have learned from the lessons of such standards, and based on the strong evidence from the Medicare and Medicaid programs, have elected to implement a standard that is consistent with our knowledge of quality improvement in both the Medicare and Medicaid programs.

The 10 percent improvement standard is the best way we have at present to ensure that projects are meaningful, and that they translate into positive changes in enrollees' lives. In the long run, in order to mitigate the incentive to choose trivial projects, we will attempt to devise a way to measure and report the relative contribution of each performance improvement project, taking into account such factors as the number of enrollees affected by the improvement and the impact the improvement actually has upon enrollee health and satisfaction. Such a system is years away, but we have taken a first step towards it by starting to develop a common vocabulary for performance improvement projects.

As for the comment that requiring a 10 percent reduction in the performance gap will encourage risk selection, we believe that there exist numerous opportunities for M+C organizations to improve performance on measures relating to the care of sicker enrollees with complex health care needs. In fact, we believe the improvement potential associated with the care of sicker enrollees exceeds that associated with the care of healthier enrollees. In addition, the introduction of risk-adjusted payments to M+C organizations should further discourage risk selection.

*Comment:* One commenter was concerned that allowing an organization to set its own performance goals would be a disincentive to undertaking any project that might ''lower its status'' with us or with enrollees.

*Response:* We believe the commenter is referencing the QISMC standard that addresses projects in which data are collected on the entire population to be studied (that is, in which a census is involved). QISMC specifies that, in the case of a project developed by the

organization itself, significant improvement is demonstrated by achieving a benchmark level of performance that is defined in advance by the organization. However, the standard goes on to say that the organization's benchmark must reduce the opportunity for improvement by at least 10 percent, which is the same standard for HCFA specified projects. So, the commenter's concern is unfounded because the objective nature of the benchmark ensures an acceptable level of effort on the part of the organization.

*Comment:* One commenter noted that when multiple interventions are employed, they all would have the potential to bring about improvements in outcomes. The commenter asked how we will determine which intervention was responsible for the observed change.

*Response:* It is only necessary that an M+C organization show that its improvement was the result of its own actions and not chance. It is not necessary to determine to which of its interventions the improvement should be attributed, although we expect that the M+C organization will want to do so for its own management purposes.

*Comment:* A number of commenters addressed the issue of required participation in national or statewide performance improvement projects. Half of the commenters supported the idea of such projects. One commenter asked that we consider the identification and diagnosis of persons with Alzheimer's as a possible national performance improvement project, and another asked that we require organizations to participate in national improvement projects pertaining to persons with disabilities.

One of the commenters opposed to national or statewide performance improvement projects complained that mandated projects will detract from the flexibility organizations need to best care for their enrollees. This commenter pointed out that many organizations have already conducted projects addressing flu and pneumonia; consequently, it would be a poor use of resources for them to be required to conduct another such project. Another opponent argued that national or statewide performance improvement projects may prove to be inconsistent with local market considerations.

*Response:* In response to these concerns, we included in OPL 98–72 a statement that an M+C organization is not required to participate in the HCFA-sponsored national diabetes project but may, at its discretion, conduct another diabetes-focused project that utilizes the Diabetes Quality Improvement Program (DQIP) indicators, and meets the project requirements as outlined in QISMC Domain 1. For their second performance improvement project, M+C organizations were free to select a topic and focus area of their choice.

With respect to the concern that organizations may have already conducted projects addressing influenza and pneumonia, which have been selected as the national project topics for 2000, there are many aspects to the care and prevention of these diseases that organizations may not have fully addressed in previous projects that would lend themselves very well to further projects.

At this point, we have not selected national project topics beyond year 2000, but we will consider the care of enrollees with Alzheimer's and with disabilities when making future selections.

*Comment:* One commenter asked us how we will decide who must participate in national or statewide performance improvement projects.

*Response:* It is a contracting requirement for all M+C organizations offering coordinated care plans that they conduct a project addressing a topic that we have determined represents a national health care priority. At this time, although we have the authority to specify State-specific topics, we have not done so.

*Comment:* One commenter advocated that we explicitly include requirements in the regulation for organization participation in PRO-sponsored activities.

*Response:* There is no requirement that organizations participate in PRO-sponsored activities: there is only the requirement, as stated in QISMC, that one of the two performance improvement projects that an organization initiates per year relate to a topic and involve quality indicators chosen by us. The PRO is required to provide technical assistance on the national project (and on all other projects) if an organization requests it, but organizations are not required to work with the PROs on their projects. However, we expect that many organizations will choose to work with the PROs, because the PROs can provide clinical and biostatistical expertise; assistance in the design and conduct of projects; advice on sampling, data collection and analysis; and, review and analysis of project findings and interventions.

*Comment:* A few commenters opposed allowing organizations to select the topics of their performance improvement projects from within the specified clinical and nonclinical areas. One commenter was concerned that organizations will choose the disease with which they are most familiar, thereby neglecting low-incidence diseases. Two other commenters were concerned that organizations will avoid undertaking projects in areas that highlight poor performance or that relate to discrete, but vulnerable, cohorts of patients, such as those with disabilities or rare conditions. These commenters recommended that as alternatives to allowing organizations to select their own performance improvement project topics, we standardize the topics across all organizations; we standardize the topics across all organizations within a given service area, selecting the topics on the basis of the morbidity and mortality measures for seniors in the service area; or, we select the topics for each individual organization on the basis of needs identified through an annual onsite audit.

*Response:* We believe it is essential that M+C organizations be allowed to target at least some of their performance improvement activities to those areas they determine would be of most benefit to their enrollees. Balanced against this opportunity is the obligation to address areas that we consider to be of universal importance to the Medicare population. Between organization-specific projects and national projects, we expect that all significant improvement opportunities can be addressed. If upon review we find that an organization's performance in a particular aspect of care or service is poor and the organization has repeatedly failed to initiate action to improve it, we have the authority to direct that the organization do so.

*Comment:* Two commenters asked that we expand the required clinical focus areas. One asked that we include high-risk, low-incidence conditions and populations, and the other asked that we include laboratory and other diagnostic services.

*Response:* High-risk, low-incidence conditions are subsumed within the high-risk focus area. Although issues selected for study generally should affect a significant portion of the organization's Medicare enrollees (or a specified subpopulation of enrollees), organizations should target infrequent conditions or services if data indicate they warrant study. As for laboratory and other diagnostic services, they could fall under a number of the current focus areas. Therefore, we do not find it necessary to add to the current list of focus areas.

1996

*Comment:* One commenter asked how "high-volume services" and "high-risk services" are defined.

*Response:* We did not provide a definition of "high-volume" or "high-risk" services for several reasons. First, it was our intention to allow organizations discretion in developing their own definitions and criteria, consistent with the needs of their organizations. For the most part, both terms have commonly understood meanings, and therefore, we did not think they required explanations.

Since M+C organizations will be monitored on whether they conduct QAPI projects addressing these focus areas, and to respond to the request for further information, we suggest that organizations consult the QISMC Interim Standards and Guidelines (specifically, Standards 1.3.4.5 and 1.3.4.6) for further guidance as to our expectations. In selecting a quality improvement project focusing on high-risk or high-volume services, we note that the focus does not necessarily have to be on a clinical condition per se, but on a service and how it may be improved. In HEDIS 99, Volume 2, Technical Specifications, there are several clinical conditions for which suggested indicators are provided in assessing "High-Occurrence/High-Cost" DRGs. Congestive heart failure, angina pectoris, chronic obstructive pulmonary disease and other conditions which place the enrollee at risk of increased morbidity or mortality would certainly constitute appropriate conditions under the "high-risk" category. An organization may assess experiences of care received from specialized centers inside or outside of its network, such as burn centers, transplant centers, or cardiac surgery centers. With respect to "high-volume" services, an M+C organization may target quality improvement in a frequently performed surgical procedure, or across different surgical or invasive procedures.

*Comment:* One commenter asked how "clinical area" is defined. The commenter asked whether it is a clinical condition, such as diabetes, or, an opportunity within a clinical condition, such as the number of glycohemoglobin blood tests performed for diabetic enrollees.

*Response:* The answer is that it can be either. Standard 1.3.4 of the QISMC Interim Standards and Guidelines provides additional detail regarding the specific focus areas. It should be noted that in choosing the areas, we avoided a disease-specific focus, opting instead to define them in a broad sense and therefore allow M+C organizations maximum discretion in determining where their specific project might best fit. For example, performance of dilated eye exams in the diagnosis and treatment of diabetic retinopathy might best be placed under the clinical focus area of Secondary Prevention of a chronic condition (Standard 1.3.4.2), as it serves to identify and potentially control a diabetes-related condition.

*Comment:* One commenter recommended that the clinical area of "continuity and coordination of care" include an evaluation of whether the appropriate mix of services is being furnished, and of whether there is adequate access to specialty care.

*Response:* These are aspects of continuity and coordination of care that organizations may choose to select as project topics. However, we will not require these as topics because such specificity might serve to unduly restrict an organization in its efforts to identify those aspects of care and service most in need of a formal performance improvement project. General requirements and concepts relating to continuity of care and access to services are found at § 422.112.

*Comment:* Two commenters addressed the need to coordinate performance improvement projects. The first commenter asked that in areas where there are multiple M+C organizations, we require that organizations coordinate their selection of project topics so as to minimize the data gathering and reporting burden that will be imposed on hospitals. The second commenter asked that we allow M+C organizations serving in more than one region to partner in collaborative projects, perhaps under the aegis of a national organization such as the Blue Cross Blue Shield Association. This commenter also asked that we permit collaborative projects through the Agency for Health Care Policy and Research (now known as the Agency for Healthcare Research and Quality) or professional organizations/societies.

*Response:* We agree with these commenters. We have consistently stated that we encourage M+C organizations to collaborate across plans, with other organizations, and within their States and regions to promote reduction of administrative burden and to enhance the general applicability of study findings. Certainly, the PROs may serve in a convener/collaborator role with respect to promoting such activity. To further this effort, we co-sponsored a National Diabetes Conference in conjunction with the American Association of Health Plans and the American Diabetes Association to provide additional guidance and materials which may be used uniformly by M+C organizations in the conduct of their diabetes performance improvement projects. We expect other ad hoc collaborations to occur in the future.

*Comment:* One commenter asked that we encourage M+C organizations to work with their contracted providers, as well as other health care professionals and associations, in developing their performance improvement projects.

*Response:* As indicated in the previous response, we recognize the importance of collaboration. To that end, QISMC requires that an organization allow its providers (and enrollees) an adequate opportunity to provide input regarding the selection and prioritization of performance improvement projects.

*Comment:* Two commenters addressed the requirements relating to health information. One commenter claimed that without uniform collection methods, it is unreasonable to require organizations to ensure that the information they receive from providers of services is reliable and complete. This commenter believes that some organizations, especially those offering non-network M+C MSA plans and M+C PFFS plans, will be unable to meet this requirement. The other commenter asked that we clarify what level of organization oversight will be necessary for an organization to meet the requirement that it ensure the reliability and completeness of the information it receives from providers of services.

*Response:* To promote continuous quality improvement, it is essential that collection and management of meaningful statistical information be seen as means to that end. Statistically valid data that assist in explaining patterns of care and in justifying variations in care are as valuable as data that identify problems in the provision of care. Without good data, we cannot make scientifically defensible or financially meaningful health care decisions. Therefore, collection of appropriate and accurate data is both good science and good business. To the extent that a particular M+C organization currently is unable to meet these requirements, we believe that the answer is not to change the requirements, but for the organization to make the changes necessary to be able to meet these requirements.

As for oversight of the health information system, the organization is ultimately responsible for determining at what level within its structure there will be oversight which ensures the reliability and completeness of information received from providers.

1997

*Comment:* One commenter suggested that we require that organizations, in processing requests for initial or continued authorization of services, follow written policies and procedures that reflect scientifically sound and evidence-based medical guidelines, rather than reflect current standards of medical practice. The commenter contended that not all current standards reflect the best medical practices.

*Response:* Historically, current standards of medical practice have been the benchmark for care provided by managed care organizations. The purpose of using these standards has been to ensure that the quality of care delivered through managed care organizations was comparable to, or better than, that provided by fee-for-service entities. During the last decade, advances in quality measurement and the development of practice guidelines and improved mechanisms for assessing utilization management have been adopted as standard practice in many organizations.

We agree with the commenter that in processing requests for authorization of services, the organization should follow policies and procedures that are based on scientifically sound and evidence-based guidelines. Nevertheless, we recognize that in instances where such guidelines do not exist, individuals making authorization determinations may need to refer to current standards of medical practice. In those cases, an M+C organization must have in place written policies and procedures to ensure that all coverage decisions are designed to provide care in the safest, most beneficial and cost-effective fashion.

*Comment:* One commenter asked that we require organizations offering M+C PFFS and non-network MSA plans to use written protocols for utilization review, and to provide their utilization review findings to enrollees and providers at least annually.

*Response:* Section 1852(e)(2) of the Act does not require that M+C PFFS and non-network MSA plans (and under the BBRA, PPO plans) establish written protocols for utilization review. To the contrary, section 1852(e)(2)(B)(ii) imposes requirements "insofar as" an organization provides for such protocols, clearly contemplating that some M+C organizations may choose to do so, and some may not. Thus, we do not believe that such a requirement would be consistent with statutory intent.

*Comment:* Four commenters were concerned about the lack of an explicit requirement that organizations take immediate remedial action when individual quality problems are found. Two commenters explained that performance measurement and performance improvement projects result in the collection of data that can be used to establish baselines and track performance over time, but neither serves as a mechanism for ensuring that real problems experienced by current enrollees are systematically identified and corrected. These commenters recommended that we require that organizations "take appropriate remedial action whenever inappropriate or substandard services have been provided or services that ought to have been furnished have not been provided."

*Response:* Clearly, an essential component of any effective "ongoing quality assurance program" as required under section 1852(e) of the Act is the correction of identified problems. QISMC already requires that an organization correct significant systemic problems that come to its attention through internal surveillance, complaints or other mechanisms. As the commenters suggested, we are adding a modified version of this requirement under new § 422.152(f)(3) to require correction of all identified problems, because it is our intention that an organization take appropriate remedial action whenever a problem comes to its attention. Although § 422.152 generally focuses on systemic improvement, we believe it is appropriate to make our intention explicit. In monitoring this requirement, HCFA reviewers will operate by a "rule of reasonableness," taking into consideration factors including but not limited to the severity and prevalence of the complaints and the level of effort demonstrated by the organization in seeking to resolve the matter.

*Comment:* Many commenters addressed the relationship between QISMC and the M+C regulations. Two commenters asserted that it was premature to model the regulation on the QISMC requirements, arguing that the QISMC requirements should be tested and evaluated before being applied to M+C organizations. These commenters asked that we scale back the quality assurance requirements until after they have been tested and evaluated, and if appropriate, restore them to the regulation using the normal notice and comment process. Two other commenters also recommended deleting the QAPI requirements of QISMC from the final rule, explaining that there are areas within QISMC that should be refined before they are implemented, such as the number and kinds of performance improvement projects that will be required.

*Response:* As we mentioned earlier, we have developed a cross-walk between the QISMC requirements and the NCQA accreditation requirements, which are currently considered the industry standard. For the most part, QISMC requirements are either identical to or consistent with NCQA requirements. Therefore, we are confident that our expectations have not outpaced the state of the art. Also, the HEDIS measures on which M+C organizations must report have already been fully tested and adopted by the managed care industry.

Finally, in response to concerns raised by managed care organizations regarding the potential burden imposed by the QISMC performance improvement project requirements, we significantly scaled back the number of required projects per year from nine required projects to only two per year. To assist M+C organizations further in this effort, we are currently developing model performance improvement projects and other implementation tools.

*Comment:* Two commenters addressed the time frame for QAPI program implementation. The first commenter recommended that the regulation reflect the transition policy found in the QISMC document, which allows organizations a period of time in which to build and refine their quality assessment infrastructure before their quality improvement projects will be expected to achieve significant improvement. The second commenter echoed the need for a long implementation time frame.

*Response:* Implementation policy is more appropriately handled through the issuance of operational policy letters and program manuals than through regulation. In addition, we have stated publicly that we will "phase-in" both implementation and enforcement of these requirements, in recognition of the fact that many organizations are still navigating the performance improvement learning curve.

*Comment:* A few commenters objected to the statement in the preamble to the interim final rule that we would not make public the results of an organization's performance improvement projects. One commenter complained that such a policy would be contradictory to our commitment to informed consumer choice. Another commenter challenged our rationale for withholding results, which was that releasing them might compromise enrollee confidentiality as they might involve enrollee-specific information. This commenter suggested that we

**40228**     **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

redact enrollee-specific information, or direct organizations to report information in ways that protect enrollee identities. Another commenter also supported the notion of releasing pertinent, non-confidential information about organization quality gleaned from performance improvement projects.

One commenter praised the policy we put forth in the preamble, explaining that providing the results of performance improvement projects to Medicare beneficiaries could undermine the legal confidentiality of peer review activities and could make such information reported outside the organization discoverable in legal proceedings. Another commenter also expressed support for our disclosure policy, noting that performance improvement requirements are new and that a non-punitive atmosphere is most conducive to improvement. However, this commenter recommended that we reexamine our disclosure policy in the future, and make it our goal to provide public access to performance information that will not violate patient confidentiality.

*Response:* To promote collaboration, we believe that it is important where possible to share development of best practices and interventions that work. In addition, to provide the necessary information to assist enrollee decision-making as they choose among various health plans, it is essential that we inform the public generally as to whether an M+C organization has met its responsibility to achieve demonstrable improvement. M+C organizations are free to release the specific results of their performance improvement projects, and we encourage this, but we do not believe such release should be mandatory. We are concerned that M+C organizations might be reluctant to undertake projects addressing their areas of poorest performance, if that means that their poor performance will be highlighted. The natural progression of performance improvement projects will be to generate additional measures for inclusion in the HEDIS data set. At that point all organizations will be required to submit this information for public disclosure.

We note that we do make a substantial amount of information available to the public for research purposes, such as the HEDIS public use file on our website; moreover, there is nothing to preclude researchers from attempting to obtain information directly from the M+C organizations themselves as long as enrollee confidentiality is protected.

*Comment:* Certain commenters asked that we require M+C organizations to report their performance on standard measures and the results of their performance improvement projects to entities other than HCFA. One commenter asked that we require that organizations report their performance on standard measures to their designated external review entity. The commenter explained that this information would help optimize the effectiveness and timeliness of interventions by the PROs, which as the external review entities will be assisting organizations in meeting their QAPI requirements. Another commenter recommended that organizations be required to make information available to their State, in that the organization is licensed under State law. A third commenter asked that organizations be required to share the results of their performance improvement projects with the Agency for Health Care Policy and Research (now known as the Agency for Healthcare Research and Quality).

*Response:* We agree that it is essential that the PRO, in its role as independent quality review and improvement organization, have access to performance data, but it is preferable that the data not go directly from the M+C organization to the review organization (or State) for two reasons. First, the M+C organization's reporting burden would be doubled. Also, raw performance data are not useful to the review organization, State, or HCFA, which is why we have contracted with NCQA to analyze the data for us. M+C organizations will report the HEDIS measures to NCQA, and after its analysis, NCQA will report the measures to us. At this point, we will share summary data with the review organizations and States.

The same is true for the results of performance improvement projects. We again believe it preferable that performance improvement project data not go directly to the PRO. The data will be reported either to HCFA or to the specialized quality review organizations with which we have contracted to evaluate the success of performance improvement projects (the M+C/QROs). HCFA or the M+C/QROs will then present and interpret the results for the PROs.

### 3. External Review (§ 422.154)

Section 422.154 implements section 1852(e)(3) of the Act. Section 1852(e)(3) requires, subject to certain exceptions, that each M+C organization, for each M+C plan it operates, have an agreement with an independent quality review and improvement organization approved by us to perform functions of the type described in part 466 of chapter 42, which establishes review responsibilities for utilization and quality control Peer Review Organizations (PROs). This general requirement appears in § 422.154(a) of the interim final rule. The terms of the agreement are described in § 422.154(b), and the exceptions to the general requirement are stated in § 422.154(c).

*Comment:* One commenter expressed concern that organizations contracting with both Medicare and Medicaid would be burdened by dual external reviews.

*Response:* Sections 1932(c)(2)(B) and (C) of the Act specifically address this scenario. The first provision authorizes a State to exempt a Medicaid-contracting managed care organization (MCO) that is accredited by a private independent entity, or that has a Medicare review conducted under section 1852(e)(3) of the Act, from Medicaid review activities conducted under section 1932(c)(2)(A) of the Act that would be duplicative of the accreditation process or the Medicare review activities. The second provision provides a State with the option to exempt entirely from the external review requirements under section 1932(c)(2)(A) a Medicaid MCO that is also an M+C organization, as long as that organization has had a Medicaid contract under section 1903(m) for at least 2 years during which the new BBA external quality review procedures are in effect. On December 1, 1999, we published a separate notice of proposed rulemaking setting forth our proposed interpretation of these provisions of section 1932(c)(2) of the Act (64 FR 31101).

*Comment:* A number of commenters asked that the regulation identify distinct review organization functions. One commenter recommended the following functions: population-based surveillance monitoring of access, quality and outcomes of care in M+C plans; auditing and validating the results of performance improvement projects; sponsoring national and statewide performance improvement projects; investigating quality complaints; conducting reconsiderations of hospital notices of non-coverage and conducting expedited appeals; and collaborating with consumer assistance organizations to better understand and use national and statewide performance improvement information when counseling beneficiaries on plan selection. Another commenter asked that we define external review requirements in the regulation that align with the PRO contractual requirements delineated in the Sixth Scope of Work.

*Response:* As we explained in the preamble to the interim final rule, we have approved the PROs to serve as independent quality review and improvement organizations (review organizations) for the purpose of this section of the regulation. We believe that the functional specifics of review organization responsibility are more appropriately detailed in the PRO scope of work than in the regulation. As M+C organizations implement their QAPI programs, needs may become apparent that will suggest that the review approach of the PRO be refined. The scope of work process permits a more rapid response to changing circumstances than does the regulatory process, which we believe should be used only for purposes of making changes in substantive standards for review.

*Comment:* One commenter asked that we require review organizations to involve broad community interests, particularly representatives of the Medicare beneficiary and consumer communities, in policy making and review activities.

*Response:* Such a requirement already exists. As stated in the PRO manual, each PRO is obligated to have at least one consumer representative on its governing board, and that representative must be a Medicare beneficiary. In addition, the Sixth Scope of Work requires each PRO to conduct beneficiary outreach and to maintain a Medicare hotline to facilitate communication with beneficiaries within its State.

*Comment:* One commenter addressed the external review waiver, supporting our decision to delay rulemaking on the waiver until we have experience with the implementation of the QAPI program.

*Response:* We appreciate the commenter's support of our decision.

*Comment:* A few commenters addressed our intention to exempt M+C organizations from external review activities that duplicate our monitoring activities. Two commenters argued that such a policy has no statutory basis and advocated its elimination. These commenters believe that this policy is inconsistent with the fact that HCFA, as Medicare purchaser and regulator, is ultimately responsible for monitoring and overseeing all quality assurance functions including the work of both review organizations and accreditation organizations. The commenters stated that our work, by definition, necessarily duplicates the work of review organizations, and therefore they were concerned that we would use the duplication as a pretense to design a

PRO scope of work that is meaningless and insignificant. One commenter, although not opposed to exemption in principle, asked that any exemption of external review activities be subject to the notice and comment process.

*Response:* Section 1852(e)(3)(B) of the Act mandates that the Secretary ensure that the external review activities under section 1852(e)(3)(A) of the Act "are not duplicative of review activities conducted as part of the accreditation process." The commenter is correct that HCFA has overall responsibility for monitoring and overseeing quality assurance functions. We believe that this extends to our review of areas addressed in the accreditation process. In this sense, we believe that our quality monitoring activities constitute a part of an overall "accreditation process" in that they are relevant to the continuing accreditation of M+C organizations. We also believe that Congress intended in section 1852(e)(3)(B) of the Act to require that we ensure that external review activities are not duplicative generally. Because there is little value and much additional burden in having the review organization repeat monitoring activity already conducted by HCFA, we are interpreting section 1852(e)(3)(B) of the Act broadly to extend to review activities that would be duplicative of our own monitoring activities. We believe that this interpretation of the intent of section 1852(e)(3)(B) of the Act, combined with our broad authority under section 1856(b)(1) of the Act to establish M+C standards by regulation, supports our decision to ensure that external review activities are not duplicative of our own review.

With respect to the comment that our application of the "anti-duplication" policy in section 1852(e)(3)(B) of the Act be subjected to notice and comment, we believe that the process of determining whether review activities are duplicative in a given case represents "operational" implementation of the substantive standard set forth in the regulations. We believe it would be neither workable nor appropriate to subject such operational judgments to notice and comment rulemaking.

*Comment:* Two commenters complained that the regulation does not indicate how we will determine what constitute duplicative review activities. One commenter recommended that we place the burden on the M+C organization to demonstrate how the accrediting process duplicates a specific external review activity. The commenter advocated that such demonstration include full disclosure of the standards and protocols used by the accrediting

organization to reach accreditation decisions, a comparison of the actual survey data and reports, and information about the composition of the review teams. The commenter recommended that the M+C organization's enrollees be informed when the organization seeks exemption from external review activities, and that they be given an opportunity to comment upon the application for exemption. Finally, the commenter asked that the exemption not be granted for more than one year at a time, and not be granted if the accreditation results in nonpublic reports.

*Response:* We intend to make the decision as to which external review activities an M+C organization accredited by an approved accreditation organization is exempt from as part of the process of approving the accreditation organization. The accreditation organization will supply us with all the information necessary to determine where its activities overlap with those of the review organization. The exemption will be reviewed as the accreditation process or scope of work changes. We are revising § 422.154(b)(2) to make it clear that an exemption based on duplicative review under the accreditation process will be made only with respect to approved accreditation activities because these are the only activities we will be in a position to evaluate when determining whether there is duplication.

With respect to the commenter's advocating that we require "disclosure" by accreditation bodies of their protocols, and disclosure to beneficiaries of decisions on duplication (with an opportunity to comment), we do not believe these steps are warranted. The quality standards that apply to M+C organizations apply without regard to whether duplication has been found. A beneficiary has access to detailed information on these standards, which are all public. We believe that it should not make a difference to the beneficiary whether our judgment that these standards are being satisfied is based on the findings of an accreditation body, HCFA, or an external review entity, as long as HCFA is responsible for ensuring that they are met.

We do not see the point in limiting exemptions to a year, if there is no reason to believe that the factors we will consider in making a decision on duplication will be changing.

On the issue of "nonpublic reports," we expect that the public will have access to the same quality information for all M+C organizations, without regard to whether specific review activities were found to be duplicative.

*Comment:* One commenter asked that we designate the PROs as review organizations in the regulation text, and not simply in the preamble.

*Response:* We currently have the authority to contract with non-PRO entities to perform functions of the type described in part 466, and although we have not chosen to exercise this authority at this time, we believe that it is important to maintain it. There may come a time when we decide that it is desirable to allow other entities to serve as review organizations; thus, we are not designating the PRO as the review organization in the regulation text.

*Comment:* One commenter expressed concern that the regulation does not explicitly obligate M+C organizations to cooperate with review organizations' investigation of quality of care complaints. This commenter suggested that § 422.154(b)(1)(ii) be revised to require that the M+C organization provide to the review organization all pertinent data it needs to carry out its reviews and make its determinations, including assessments of beneficiary quality of care complaints.

*Response:* Because assessments of beneficiary quality of care complaints are among the determinations that the review organization makes, we believe the existing requirement as written is sufficient to compel M+C organizations to cooperate with any complaint investigations conducted by the review organization.

*Comment:* One commenter asked that M+C organizations not be responsible for the cost of the external review.

*Response:* HCFA pays the cost of the external review, not the M+C organization. The M+C organization might initially bear the cost of duplicating medical records requested by the review organization, but the organization will be reimbursed for that cost.

*Comment:* Two commenters stressed the importance of public access to external review results. One of the commenters specifically asked that we require review organizations to release an annual report to the public summarizing their activities and the results of M+C organization performance improvement projects.

*Response:* In the PRO manual, there are detailed requirements relating to an annual report, which the PRO is required to send to the State and local offices of aging, and to senior citizen groups. In addition, the PRO is obligated to make the report available to beneficiaries upon request. Because specialized quality review organizations (the M+C/QROs), rather than PROs, will be evaluating the results of M+C

organization performance improvement projects, the PRO annual report will not include this information. However, we will ensure that there is a vehicle to inform the public of whether M+C organizations have met the requirement for achieving significant improvement.

*Comment:* One commenter asked that the regulation require that the external review address each component of the health delivery system, including laboratory services.

*Response:* Our own monitoring will assess the adequacy of an organization's health delivery system, of which we acknowledge laboratory services are a part.

*Comment:* One commenter asked that we define the adequate space and data requirements in paragraph (b)(1).

*Response:* We are not defining "adequate space" because the PRO's need for room in which to work could vary with each review. As for data requirements, they are generally stated in § 476.102(c). This paragraph requires health care practitioners and providers to maintain evidence of the medical necessity and quality of health care services provided to Medicare patients as required by the PROs.

### 4. Deemed Compliance Based on Accreditation (§ 422.156)

Section 1852(e)(4) of the Act gives the Secretary the authority to deem that an M+C organization meets certain requirements if the M+C organization is accredited and periodically reaccredited by a private organization under a process that we have determined ensures that the M+C organization, as a condition of accreditation, meets standards that are no less stringent than the applicable HCFA requirements.

Section 422.156(a) of the M+C regulations specifies the conditions under which an M+C organization may be deemed to meet the HCFA requirements permitted to be deemed under section 1852(e)(4) of the Act.

The current version of § 422.156(b) specifies the requirements that could be deemed under the original BBA deeming provisions. In accordance with those BBA provisions, these included only the quality assessment and performance improvement requirements of § 422.152, and the requirements of § 422.118 related to confidentiality and accuracy of enrollee records. As discussed in section I.C. of this preamble, the BBRA amended section 1852(e)(4) of the Act to provide for deeming of additional requirements. An M+C organization accredited by an approved accreditation organization could be deemed to meet any or all of the requirements specified in section

1852(e)(4) of the Act, depending on the specific requirements for which its accreditation organization's request for approval was granted.

Section 422.156(c) establishes when deemed status is effective. Deemed status is effective on the later of the following dates: The date on which the accreditation organization is approved by us, or the date that the M+C organization is accredited by the accreditation organization.

Section 422.156(d) establishes the obligations of deemed M+C organizations. An M+C organization deemed to meet Medicare requirements must submit to surveys to validate its accreditation organization's accreditation process, and authorize its accreditation organization to release to us a copy of its most current accreditation survey, together with any information related to the survey that we may require (including corrective action plans and summaries of unmet HCFA requirements.)

Section 422.156(e) addresses removal of deemed status. We will remove part or all of an M+C organization's deemed status if: (1) We determine, on the basis of our own survey or the results of the accreditation survey, that the M+C organization does not meet the Medicare requirements for which deemed status was granted; (2) we withdraw our approval of the accreditation organization that accredited the M+C organization; or (3) the M+C fails to meet the requirements of paragraph (d) of this section.

Finally, § 422.156(f) explains that we retain the authority to initiate enforcement action against any M+C organization that we determine, on the basis of our own survey or the results of the accreditation survey, no longer meets the Medicare requirements for which deemed status was granted.

In addition to expanding the types of requirements that are deemable, section 518 of the BBRA also specified procedural changes to the accreditation process which are also discussed in section I.C above and in several responses below. As noted above, these changes have been reflected in a revised version of § 422.156.

The comments and responses regarding § 422.156 are discussed below.

*Comment:* Several commenters expressed general support for the deeming provisions as stated in the regulation.

*Response:* The M+C deeming provisions are modeled on those that have been used successfully in original Medicare, and commenters have validated our belief that these

provisions will work equally well in Medicare managed care.

*Comment:* One commenter was concerned that if we allow deeming, we will not be able to ensure access for disabled enrollees. This commenter recommended that we ensure that accreditation organizations include in their review an assessment of an organization's ability to treat members with disabilities and complex care needs.

*Response:* We appreciate this comment, and agree that it is important that the needs of disabled enrollees not be overlooked. In evaluating whether standards imposed by an accreditation organization are at least as stringent as HCFA's, specifically QISMC Standard 3.1, we will take into account whether these standards account for the needs of disabled enrollees.

*Comment:* Two commenters recommended that we expedite the implementation of the deeming program.

*Response:* We recognize the value of deeming to M+C organizations and intend to proceed with deeming at the earliest opportunity. As a first step in this process, we will require that accreditation organizations develop crosswalks between their standards and the QISMC standards relating to the M+C requirements for which the organizations are seeking deeming approval. Only after we have revised the interim QISMC standards to reflect the changes made in this final rule and the final rule published February 17, 1999, will we have an accurate set of standards for use by the accreditation organizations in completing their crosswalks. We expect to release a revised set of QISMC standards shortly after publication of this final rule. Thirty days after publication we will begin accepting applications from accreditation organizations. A **Federal Register** notice formally announcing this timetable is being published concurrently with this final rule.

*Comment:* Three commenters addressed the requirement that, as a condition of deemed compliance, an M+C organization be "fully accredited." The commenters believe this condition would be problematic, given that many accreditation organizations have multiple accreditation categories. One of the commenters, an accreditation organization, stated that this policy is " * * * a significant and substantive change from the current process under Medicare. At this time there exists a variety of accreditation levels * * *," not only within accreditation organizations but among them. A second accreditation organization

complained that restricting deeming to only M+C organizations that have been "fully accredited" contradicts the stated policy of deeming on a standard-by-standard basis. It explained that requiring an M+C organization to meet all of an accreditation organization's standards decreases the potential savings and efficiencies associated with deeming.

*Response:* Because accreditation categories differ among accreditation organizations, we expect that "fully accredited" will have to be defined on an organization by organization basis. Fully accredited will generally mean that all elements within all the accreditation standards for which the accreditation organization has been approved by HCFA have been surveyed and fully met or otherwise determined as acceptable without significant findings, recommendations, required actions or corrective actions. The commenter who complained that the requirement that an M+C organization be fully accredited is inconsistent with our intent to approve accreditation organizations on a standard-by-standard basis has misunderstood the requirement. The M+C organization must be fully accredited for only those standards for which the accreditation organization has been approved, not all of the accreditation organization's standards. We understand how the commenter misinterpreted the existing regulations, and we are revising § 422.156(a)(1) to clarify this requirement.

*Comment:* One commenter pointed out that if an M+C organization chooses not to be accredited, we will perform a complete audit of its functions. Because there is no cost to the M+C organization for our audit, the commenter believes it would be to an M+C organization's advantage not to be accredited, because it would avoid the cost of accreditation as well as duplicate reviews (for example, an accredited M+C organization's grievance and appeal program would be reviewed both by the accreditation organization and by HCFA because the grievance and appeal requirements are not deemable). The commenter asked whether this interpretation is correct.

*Response:* The commenter's interpretation is correct, although there are benefits associated with accreditation, such as improved marketability, that we believe make accreditation attractive.

*Comment:* Many commenters addressed the scope of deeming. The majority of commenters supported the limited deeming reflected in the interim final regulation. One of these

commenters cited as support for limited deeming a recent report regarding the problems associated with deeming based on private accreditation of hospitals. One commenter advocated the continued development and implementation of the "enhanced review" process begun several years ago. One commenter opposed limited deeming. This commenter, an accreditation organization, asserted that the regulation does a disservice to its clients as they are still subject to a our survey. Further, this accreditation organization complained that the regulation fosters "the very duplication of effort and stifling of innovation that the BBA sought to avoid by requiring deemed status."

*Response:* In recognition of the efficiencies associated with deeming, section 518 of the BBRA amended section 1852(e)(4) of the Act to provide for the deeming of additional requirements. Specifically, the additional deemable requirements are those related to the following sections of the Act: section 1852(b) (which relates to antidiscrimination); section 1852(d) (which relates to access to services), section 1852(i) (which relates to information on advance directives), and section 1852(j) (which relates to provider participation rules). We are revising § 422.156(b) to add these requirements.

We note that HCFA's oversight of managed care accreditors will be different from that of hospital accreditors, *i.e.*, the JCAHO. Deeming based on JCAHO accreditation is explicitly required by statute, whereas potential M+C accreditors must demonstrate their ability to apply and enforce standards at least as stringent as our own as a condition of approval. In the event that a managed care accreditor fails to perform as promised, we retain the authority to withdraw its approval. Therefore, there are safeguards in place to prevent the situation that has arisen in hospital deeming from repeating itself in managed care.

*Comment:* Four commenters addressed the topic of approving accreditation organizations on a standard by standard basis as outlined in the regulation. Three commenters were in favor. One commenter asked if approving on a standard by standard basis means that we will "* * * approve an accreditation organization for some standards but not for others." One commenter contended that our decision to approve accreditation organizations on a standard by standard basis is "inconsistent with the need to reduce the duplication of effort." This commenter, an accreditation

organization, recommended that accreditation organization standards be assessed to determine if overall they equal or exceed HCFA's requirements. This commenter continued to state that "* * * approving individual standards will lead to a stifling of innovations and improvements over time."

*Response:* Section 518 of the BBRA has caused us to revise our approach to approving accreditation organizations. Originally, section 1852(e)(4) of the Act stipulated that "the Secretary shall provide that a Medicare+Choice organization is deemed to meet requirements" of certain subsections of the Act if the organization were accredited by an approved organization. The BBRA changed the provision to read that "the Secretary shall provide that a Medicare+Choice organization is deemed to meet *all the* requirements" (emphasis added) of certain cites within the Act. The result of the change is this: it is still possible for us to approve an accreditation organization for a subset of the deemable requirements alone; for instance, we may approve an accreditation organization for the quality assurance subset (which includes the quality assessment and performance improvement program requirements of § 422.152) without approving it for any others. However, the accreditation organization must now have a comparable standard to every one of the M+C requirements within the quality assurance subset. Prior to enactment of the BBRA, an accreditation organization with only some quality assurance standards equivalent to the M+C requirements would have been permitted to participate in deeming; HCFA would have monitored for compliance with the M+C requirements for which no equivalent accreditation organization standards existed. Now, because the BBRA requires, in essence, that HCFA deem an accredited M+C organization by subset, rather than by requirement, we can approve an accreditation organization only if it has a standard that meets or exceeds each of the M+C requirements of the subset. While this policy could limit the extent to which an accreditation organization may be involved in deeming, it could be viewed as simplifying the oversight process, since there is no longer potential for HCFA and an accreditation organization to divide responsibility for monitoring an M+C organization's compliance with the requirements of the same subset. We have revised the introductory clause in § 422.157(a) (discussed below) to reflect this BBRA change.

*Comment:* One commenter requested that public notice be given if an M+C organization's deemed status is removed or an accreditation organization's approval is withdrawn.

*Response:* We agree that when we withdraw an accreditation organization's approval, HCFA should give public notice because the information may influence the choice of accreditation organization made by M+C organizations seeking accreditation. We expect to give this notice by posting it on our website.

When we withdraw an accreditation organization's approval, we also remove the deemed status of all M+C organizations accredited by the organization. Upon removal of an M+C organization's deemed status, HCFA immediately assumes responsibility for ensuring that the organization meets our standards. Because beneficiaries are not at risk, and because notifying them of the loss of their M+C organization's deemed status could cause them to be concerned that they are at risk, we do not believe it is necessary or appropriate to so notify beneficiaries.

*Comment:* A few commenters addressed our authority under § 422.156(e)(1) to remove deemed status on the basis of a review of accreditation survey results. One of the commenters, an accreditation organization, strongly disagreed with the provision, complaining that it "* * * would allow us to take the results of an accreditation survey and essentially ignore the decision of the accreditation organization without any independent data gathering." The commenter contended that the provision presumes that HCFA staff understand the accreditation requirements, and are better able to judge the performance of the M+C organization against those requirements than the accreditation organization's own surveyors. This commenter encouraged HCFA to conduct its own survey if we believe an M+C organization is not in compliance. If we reach a different conclusion than the accreditation organization after its own survey, then the commenter believes that we would be justified in removing deemed status. Another accreditation organization expressed similar concern with § 422.156(e)(1), stating that the regulation language could be used by us to "second guess the compliance determination using only the results of the accreditation survey." This commenter recommended limiting the removal authority to reflect this concern.

*Response:* We do not intend to overrule an accreditation organization's survey decision without doing our own investigation. If our own investigation reveals, however, that a condition is not met, we reserve the right to remove deemed status even when the accreditation organization has not removed accreditation with respect to that condition. In order to clarify the distinction between—(1) a removal of deemed status by HCFA, based on HCFA's own survey, and (2) a removal based on a determination of noncompliance by an accreditation organization as a result of its accreditation survey, we have revised § 422.156(a) to separate these two situations. This should make it clear that we will not "second guess" the accreditation organization's conclusions based on its review without doing our own independent investigation.

### 5. Accreditation Organizations (§ 422.157)

In § 422.157(a), we discuss three conditions for our approval of an accreditation organization. We may approve an accreditation organization if the organization applies and enforces standards for M+C organizations that are at least as stringent as Medicare requirements (as discussed above); the organization complies with the application and reapplication procedures set forth in § 422.158, "Procedures for approval of accreditation as a basis for deeming compliance;" and, the organization is not controlled by the managed care organizations it accredits, as defined at § 413.17.

Section 422.157(b) of the interim final rule describes notice and comment procedures. Because the approval of an accreditation organization could have broad impact upon large numbers of organizations, providers, and consumers, we are providing notice and comment opportunities similar to those provided in the fee-for-service arena.

Section 422.157(c) establishes ongoing accreditation organization responsibilities. These responsibilities largely parallel those currently imposed upon accreditors under original Medicare. One exception is the requirement at § 422.157(c)(4) that an accreditation organization notify us in writing within 3 days of identifying, with respect to an accredited M+C organization, a deficiency that poses immediate jeopardy to the M+C organization's enrollees or to the general public.

Section 422.157(d) establishes specific criteria and procedures for continuing oversight and for withdrawing approval of an accreditation organization. Oversight consists of equivalency review, validation review, and onsite observation.

2003

Section 422.157(d) states that an accreditation organization dissatisfied with a determination to withdraw our approval may request a reconsideration of that determination in accordance with subpart D of part 488 of this chapter. The comments and responses regarding § 422.157 are discussed below.

*Comment:* One commenter recommended that HCFA, when making a determination based on its own survey or the results of an accreditation survey that an M+C organization does not meet Medicare requirements, "define the requirements, data collection tools, and scoring (including relative weights) guidelines" used to make the determination. The commenter explained that disclosure of such information is consistent with assuring beneficiaries and providers that HCFA determinations and surveys are objective and based on criteria that are public, relevant and valid.

*Response:* We agree with the need to make our process for making determinations available to the public. That is why materials such as our monitoring protocol are available to the public on HCFA's website, www.hcfa.gov/medicare/mgdcar1.htm.

*Comment:* We received six comments requesting public disclosure of accreditation survey results. One commenter requested that we require in the regulation that enrollees be able to obtain from us their organization's accreditation survey results. An accreditation organization itself agreed with the need for public disclosure and stated that "If the accreditation is to be used for a public purpose, participation in Medicare, then we are accountable for the decision and the information upon which it was based."

*Response:* We agree that public disclosure of accreditation survey results is appropriate. If an accreditation organization does not have a policy for publicly disclosing accreditation survey results, it will be required to develop one as a condition of our approval.

*Comment:* An accreditation organization recommended that we provide accreditation organizations with quality-related information, for example, performance measurement data, quality improvement projects, etc.

*Response:* We concur with the importance of "two way communication," which is why we routinely publish or otherwise make available to interested parties the types of information referred to by the commenter, such as HEDIS results.

*Comment:* One accreditation organization contended that the monthly reporting requirements exceed our needs, and it recommended that the regulation reflect our right to receive the information but not specify a reporting frequency until after information use and need is determined.

*Response:* We believe the reporting requirements of § 422.157(c)(1) accurately reflect our need for information. The information that accreditation organizations are required to report and the time frames in which they are required to report it are based on requirements that have proven their usefulness and necessity in deeming under original Medicare. We have no reason to believe that the organizations that accredit M+C organizations should be held to a different standard.

*Comment:* Two commenters addressed the conflict-of-interest provision at § 422.157(a)(3). One commenter stated that the provision is "so broadly drawn as to preclude managed care organizations from serving on the boards of accreditation organizations, or otherwise participating in the accreditation development process." This commenter requested that we clarify that such activities are permissible. The second commenter also objected to the conflict-of-interest provision as written, recommending that we focus instead on whether the accreditation organization has policies in place that separate individuals affiliated with an M+C organization from an accreditation decision impacting that organization. This commenter asked for a definition of "controlled" that allows M+C organizations to participate in appropriate accreditation organization governance and policy making activities, but prohibits M+C organizations from having inappropriate influence on accreditation decisions affecting themselves.

*Response:* We believe it is important that no single or group of managed care organizations be allowed to exert undue influence over a private accreditation organization in any decision making process that would allow that single or group of organizations to benefit at the expense of others. However, we recognize the valuable role that representatives of managed care organizations may play in private accreditation organizations, and we agree that the regulation as written appears to prohibit a number of acceptable activities. Therefore, we are revising § 422.157(a)(3) to require that an accreditation organization ensures that: (1) Any individual associated with it who is also associated with an entity it accredits does not influence the accreditation decision concerning that entity; (2) the majority of the membership of its governing body is not comprised of managed care organizations or their representatives; and (3) its governing body has a broad and balanced representation of interests and acts without bias.

*Comment:* One commenter asked whether we must act on an accreditation organization's application for approval within 210 days, as is the case with respect to fee-for-service accreditation.

*Response:* The 210-day time frame that applies to accreditation under original Medicare is set forth in section 1865(b)(3) of the Act, and was not originally included by the Congress in section 1852(e)(4) of the Act. However, section 518 of the BBRA amended section 1852(e)(4) of the Act to add this requirement, and we are incorporating it into § 422.158(e).

In addition, because we are now required to make our decision on an accreditation organization's application within 210 days, we are revising § 422.157(b)(1) to restructure the provisions concerning timing and content of the **Federal Register** notice that solicits public comments on accreditation organization applications to allow for a comment period that is concurrent with HCFA's review. This process, also used by original Medicare, will give the public a meaningful opportunity to comment on the applications.

In the interim final rule, we modeled § 422.157(b)(1) on the original Medicare deeming regulation at § 488.8(b)(1). However, § 488.8(b)(1) was written before section 1865(b)(3)(A) of the Act was amended to require 210-day turnaround on accreditation organization applications, and we are now in the process of revising § 488.8 to conform with the Act. If we do not revise § 422.157(b)(1) to follow original Medicare's model, we are concerned that our review of the accreditation organization's standards will be so time consuming, there will be little time left within the 210 days for the public comment period. Therefore, revised § 422.157(b)(1) specifies that the **Federal Register** notice will announce our receipt of the accreditation organization's application for approval, describe the criteria we will use in evaluating the application, and provide at least a 30-day public comment period. Again, the timing and content of this notice are consistent with the way in which we solicit comments on accreditation organization applications in original Medicare deeming, pursuant to section 1865(b)(3)(A) of the Act.

*Comment:* One commenter argued that it is not appropriate for us to take action against an accreditation

organization "irrespective of the rate of disparity" between certification by the accreditation organization and certification by us or our agent. The commenter agreed that accreditation organizations are "accountable to us and the public for the decisions they make and failure to properly assess the performance of the organizations they accredit should be grounds for action." However, the commenter complained that open-ended authority to withdraw an accreditation organization's approval regardless of the rate of disparity is inappropriate.

*Response:* It is an approved accreditation organization's responsibility to ensure that accredited M+C organizations meet or exceed our standards. As per the regulation, if widespread or systematic problems are identified that indicate that an accreditation organization can no longer make that assurance, we reserve the right to take appropriate action, regardless of the disparity rate. However, we can assure the commenter that in Federal oversight of accreditation organizations, a variety of factors and measures are considered and utilized, only one of which is the disparity rate.

In response to the commenter's concern, we are requiring that accreditation organizations provide us annually with summary data relating to their accreditation activities and observed trends. These data will assist us in making a comprehensive assessment of accreditation organization performance, and will help ensure that our oversight decisions are well-informed and appropriate. This change appears at § 422.157(c)(6).

*Comment:* One commenter requested that we clarify the term "enforces" as it is used in §§ 422.157(a)(1) and 422.158(a)(3)(iii)(C).

*Response:* An approved accreditation organization must apply and enforce standards that are at least as stringent as HCFA's requirements. By that, we mean that we expect the accreditation organization to assess compliance with the approved standards, and where it finds that an M+C organization is not in compliance, to ensure that corrective action is taken.

### 6. Procedures for Approval of Accreditation as a Basis for Deeming Compliance (§ 422.158)

The requirements of § 422.158, which pertain to required application materials, the mechanics of the approval process, and the reconsideration of an adverse determination, are essentially restatements of the original Medicare requirements under § 488.4.

*Comment:* One commenter disagreed with the provision that prohibits an accreditation organization that has requested reconsideration of a denial from filing a new application while the reconsideration is pending. The commenter believes that this provision will discourage accreditation organizations from challenging a denial and result in a denial of due process.

*Response:* An accreditation organization may request a reconsideration if it receives a denial of its application. This may be done by submitting a request for reconsideration, the requisite supplemental information, and any necessary supporting documentation. In lieu of the reconsideration, an accreditation organization may select the option of submitting a new application that has been revised to address the deficient areas that led to the initial denial. Therefore, the prohibition against simultaneously submitting a request for reconsideration and a new application does not deprive an M+C organization of the right to submit a new application.

### E. Relationships With Providers

Part 422, subpart E of the M+C regulations focuses on requirements for relationships between M+C organizations and health care professionals with whom they contract to provide services to beneficiaries enrolled in an M+C plan. Many of these requirements stem from the rules regarding provider participation that are set forth in section 1852(j) of the Act. In our February 17, 1999 final rule, we addressed comments and made changes concerning several aspects of the provider participation requirements contained in subpart E, including the scope and applicability of the provider participation procedures. This final rule addresses comments on all other requirements in subpart E.

### 1. Provider Participation Procedures (§§ 422.202(a) and 422.204(c))

For the most part, we responded to comments on issues related to §§ 422.202(a) and 422.204(c) of the regulations in our February 17, 1999 final rule (64 FR 7975). In reviewing the comments on the interim final rule, however, we believe that additional clarification may be necessary on the applicability of the provider appeals procedures now set forth under § 422.204(c).

*Comment:* Several commenters objected to language in the preamble to the June 26, 1998 interim final rule that implied that health care professionals should have access to a formal appeals process when they viewed changes in

an M+C organization's provider participation policies as having an adverse effect. The commenters pointed out that these policies should be subject to the consultation rules set forth under § 422.204(b), but did not believe that changes in these policies warranted a formal appeals process.

*Response:* As discussed in the February 1999 rule, the appeals procedures set forth under existing § 422.204(c) apply only in cases of adverse participation decisions, that is, when an M+C organization suspends or terminates a physician's contract with the organization. We believe this policy is consistent with the intent of section 1852(j)(1) of the Act, which provides for a process for appealing "adverse decisions" relating to the "participation of physicians" under a plan. We did not intend to imply that a physician has a right to a formal hearing to appeal a participation policy adopted by the M+C organization, although we would expect physicians to have input on those polices through the consultation process required under § 422.202(b). Clearly, however, an M+C organization ultimately is legally entitled to adopt the policies necessary to govern its operations, as approved by its board of directors, provided they are consistent with applicable Federal requirements. Please note that as part of a minor restructuring of the M+C provider participation provisions, and to help clarify that the appeals procedures apply only for adverse participation decisions, we are redesigning the provider appeals procedures from § 422.204(c) to new § 422.202(d).

*Comment:* Two commenters objected to the requirement in existing § 422.204(c)(3) that an M+C organization must notify the appropriate licensure or disciplinary bodies when it suspends or terminates a contract because of deficiencies in the quality of care. These commenters suggested that we leave State reporting requirements to the States. Another commenter recommended that the appeals hearing panels (under § 422.202(c)(2)) be required to include physicians that did not contract with the M+C organization as a means of ensuring the "independence" of the panel's review.

*Response:* Existing statutes and regulations consistently establish the need for cooperation between Federal and State authorities in their administration of the Medicare program. A primary example is the requirement under section 1855(a)(1) of the Act that an M+C organization generally must be licensed under State law in order to qualify for participation in the M+C program. Thus, we believe it is wholly

appropriate to require in Federal regulations that the suspension or termination of a physician's contract with an M+C organization be reported to State licensing and disciplinary bodies.

With regard to the membership of appeals panels, an M+C organization is free to enlist non-contracting physicians on these panels if it chooses to do so. However, section 1852(j)(1)(C) of the Act refers to an appeals process "within the organization," and we do not believe it would be reasonable to require the participation of non-contracting physicians.

*Comment:* A commenter pointed out that at least one State has laws exempting an organization from the State's requirements for provider notification and review procedures in cases of imminent harm to a patient, determination of fraud, or final disciplinary action by a State licensing board. The commenter asked whether the notification and appeals provisions of subpart E would preclude exemption in these situations.

*Response:* As discussed in further detail below, section 1856(b)(3)(B) of the Act specifies that State "requirements relating to inclusion or treatment of providers" are superseded by the analogous Federal standards. Thus, State reporting exceptions to the M+C notification and appeals procedures are precluded under the existing M+C regulations. However, we do not believe that the general notice requirement under existing § 422.204(c)(1) and (3), which do not include specific time frames for notification, should present a conflict with the State law mentioned by the commenter. We note that 60-day time frame for termination notifications under § 422.204(c)(4) applies only for terminations "without cause," rather than in situations addressed by the law in question.

## 2. Consultation Requirements (§ 422.202(b))

In accordance with section 1852(j)(2) of the Act, § 422.202(b) specifies that an M+C organization must consult with physicians participating in its M+C plans regarding the organization's medical policies, quality assurance programs, and medical management procedures. Under the regulations set forth in our June 26, 1998 interim final rule, these provisions were applied to other health care professionals as well as physicians. However, in response to comments on the interim rule, we revised this section in our February 1999 final rule to limit the applicability of these requirements to physicians. We also received a number of comments on

other aspects of the consultation provisions, which are discussed below.

*Comment:* Commenters generally supported the objectives of the consultation requirements contained in § 422.202(b). However, several commenters representing physician groups suggested that the regulations should be expanded to establish a specific methodology for obtaining consultative input. For example, one commenter advocated requiring the establishment of a medical committee structure broken down into separate subcommittees focusing on various aspects of medical management policy (for example, professional relations, credentialing, quality improvement, *etc.*).

Other commenters representing M+C organizations asked for confirmation that the use of physician committees to obtain consultation was an acceptable means of satisfying the consultation requirements. Two M+C organizations suggested that we define "consultation" as "soliciting and considering advice from participating professionals through committees established by the M+C organization." Another commenter noted that local medical review procedures (LMRP) should be part of the consultation process, and could in some instances substitute for the consultative process. One commenter indicated that the consultative requirements could be read to require consultation with hundreds of individual physicians and expressed concern that the consultative requirements would interfere with an individual physician's judgement in treating patients.

*Response:* We agree that the most appropriate method for an M+C organization to consult with its contracting physicians is likely to be through the establishment of a committee structure. Rather than limit organizational flexibility by establishing a single model for consultation, however, we are revising § 422.202(b) to state that an M+C organization must "establish a formal mechanism" for consulting with the physicians who provide services under plans offered by the organization. As we monitor the types of consultative arrangements implemented by M+C organizations, we will consider whether more specific regulatory guidance is necessary.

Similarly, although we agree with the definition of consultation offered by the commenters, we believe that the term is sufficiently self-explanatory and that inserting a formal definition of the term into the regulations is unnecessary. We also agree that M+C organizations should take local medical review policies into consideration in

establishing and updating their medical review policies. However, we believe that the regulations need not include that degree of specificity concerning the evidence-based guidelines an M+C organization must consider in adopting practice guidelines. We will consider adding such policies to the list of guidelines now described in the QISMC standards on this subject (QISMC Guideline 3.4.1.1).

Finally, we do not agree that the consultation requirement infringes on the ability of an individual physician's judgement in the practice of medicine. As their name implies, practice "guidelines" are intended for general application rather than as procedures to be followed in every case independent of physician judgment.

## 3. Treatment of Subcontracted Networks (§ 422.202(c))

Under § 422.202(c), an M+C organization that uses subcontracted physician groups or other networks of health care professionals must provide M+C participation procedures that apply equally to these subcontracting groups.

*Comment:* Many commenters raised questions concerning the meaning and implications of the requirement under § 422.202(c), which states that when an M+C organization operates an M+C plan through subcontracted physician groups or other subcontracted networks, it must ensure that "the participation procedures in this section apply equally to physicians and other health care professionals within those subcontracted groups." (Note that this provision was amended in our February 1999 final rule to limit its applicability to physicians.) Although some commenters supported this requirement as written, others were concerned that the requirement was too broad in scope. Several commenters suggested that we clarify that an M+C organization can comply with this provision by requiring subcontracting networks to have their own procedures for consultation and for participation appeals. They believe that it would be imposing "unreasonable downstream responsibilities" to require that the subcontractor's consultation and appeals procedures establish participation rights equivalent to those required under § 422.202. Other commenters recommended that we require the subcontracts to include the same specific appeals procedures as required at the M+C organization level. Finally, several commenters asked whether appeal rights extend to all physicians in a terminated group practice or to individual physicians. They recommended that the

subcontracting group practice exercise appeal rights on behalf of its employees.

*Response:* M+C organizations are contractually obligated to meet all requirements contained in the M+C regulations. They may meet these requirements either by directly providing the requisite health or administrative services or by entering into contracts for the provision of these services. Although we recognize the need for further clarification of how the provider participation rules and other provisions of the M+C requirements apply to subcontracting entities, the presence of a subcontract does not alter the underlying substance of those requirements. Note that § 422.502(i) of the M+C regulations contains a great deal of general information regarding the delegation of responsibility under subcontracts as well as some specific requirements (for example, with respect to provider credentialing). Please see section II.K of this preamble for a further discussion of many related issues. In addition, readers may wish to consult OPL #77, released on December 8, 1998, which offers extensive guidance in this regard (available through the HCFA website at www.hcfa.gov).

As spelled out under § 422.502(i), under any type of subcontracting arrangement, the M+C organization retains ultimate responsibility for ensuring that its subcontractors achieve full compliance with all terms and conditions of the organization's contract with us. This includes ensuring that activities performed by its subcontractors are consistent and comply with the M+C organization's contractual obligations. For activities that are delegated to contractors (such as provider appeals), the contract must specify that the subcontractor must comply with all Medicare laws, regulations, and instructions. Thus, a physician who is employed by a group practice that contracts with an M+C organization would have the same fundamental consultation and appeal rights as a physician who contracts directly with the M+C organization. Whether that physician exercises those rights at the subcontractor level, or directly through the M+C organization, would be left to the discretion of the M+C organization and its subcontractors. For example, an M+C organization could enter into a contract with a physician group under which all individual appeals of adverse participation decisions were adjudicated at the subcontractor level. However, the subcontractor's appeals process would need to meet the requirements established under redesignated § 422.202(d), as discussed

above: all procedural rights established there would apply equally for the subcontracting physicians. For situations in which a subcontract with an entire group practice was terminated by an M+C organization, we would expect that the appeal rights would fall to the subcontracting group practice to exercise on its physicians' behalf.

Similarly, with respect to the consultation requirements, we can envision various ways in which the requirements could be met under subcontracting arrangements, such as through direct representation for the subcontractor's providers on M+C organization committees, or through committees convened by the subcontractor, with its consultative input channeled to the M+C organization. In either case, though, the underlying requirement must be met that practice and utilization management guidelines be developed in consultation with contracting physicians.

In general, our policy to date has been to afford extensive flexibility to M+C organizations in meeting subcontracting requirements. In 1999, for example, we required risk contractors that became M+C organizations to submit a plan demonstrating how they would work toward executing new or revised provider or administrative service contracts, with full compliance required by January 1, 2000. Again, for further information on the ways in which an organization can demonstrate compliance with provider contracting requirements, please see OPL 77.

4. Provider Antidiscrimination (§§ 422.100(j), 422.204(b), new 422.205)

Sections 422.100(j) and 422.204(b) both relate to the provision set forth in section 1852(b)(2) of the Act that precludes M+C organizations from discriminating against providers based on their licensure or certification. Section 422.204(b), for the most part, simply incorporates the statutory prohibitions on discrimination based on provider licensure or certification, but also provides that these prohibitions do not preclude the "use of different reimbursement amounts for different specialties." Section 422.100(j) states that if more than one type of practitioner is qualified to furnish a particular service, the M+C organization may select the type of practitioner to be used.

*Comment:* Numerous commenters addressed the provider antidiscrimination provisions set forth at §§ 422.100(j) and 422.204(b). Commenters generally believed that additional guidance beyond that offered

in the June 1998 interim final rule was necessary to clarify our interpretation of the antidiscrimination provisions of the statute (section 1852(b)(2) of the Act). Commenters differed in their views on how these provisions should be interpreted and implemented, however.

In general, commenters representing M+C organizations supported the inclusion of the choice-of-practitioners provision (§ 422.100(j)); they believe that this provision establishes that M+C organizations are not required to adopt an "any willing provider" policy, but rather have the flexibility to choose the practitioners that participate in an organization's provider network. In contrast, commenters representing physicians and other health care professionals believe that the choice-of-practitioners provision is unnecessary and confusing; they see the provision as undermining the antidiscrimination provisions of the statute and the M+C regulations. These commenters particularly objected to the wording in § 422.100(j) that allows an M+C organization to select the "type of practitioner" to be used. These commenters offered various recommendations, including: (1) delete the provision in its entirety; (2) add a requirement that an M+C organization employ a "representative range of providers" (comparable with the available range of providers under original Medicare); (3) amend the provision so that it would focus on the availability of all Medicare-covered "benefits" (many of which can be furnished only by qualified practitioners), rather than "services".

Commenters displayed similar perspectives with regard to the antidiscrimination prohibitions set forth under § 422.204(b). As noted above, the only portion of this section that is not taken directly from the statute is the provision under existing § 422.204(b)(2)(ii) that indicates that an M+C organization is not precluded from use of different reimbursement amounts for different specialties. Commenters representing M+C organizations generally supported the addition of this language, although one commenter believed that it unnecessarily restricted an M+C organization's ability to negotiate with physicians or other practitioners. This commenter stated that the regulations do not give an organization sufficient leeway to take into consideration the reputation, volume, or experience of a practitioner, or alternative payment methods, in establishing compensation.

Other commenters representing various types of physicians and other health care professionals objected to this

provision because they believe that it confers too much authority on M+C organizations. They argued that permitting an M+C organization to pay different amounts for different specialties is inconsistent with legislative intent. They also contended that this language was inconsistent with the Supreme Court's decision in *Bowen* v. *Michigan Academy of Family Physicians,* 476 U.S. 667 (1986), which they characterized as requiring that Medicare "reimburse similar services in an equal manner regardless of who performs the service." These commenters believed that we should require that payment rates be tied to the services provided, as under the fee schedules used in original Medicare. One commenter suggested that we revise § 422.204(b)(2)(ii) to clarify that payment differences are permissible only if they "result from competition or other legitimate factors," rather than differences based solely on licensure or certification.

*Response:* The statutory antidiscrimination provision is intended to ensure that health care providers are not arbitrarily excluded from participation under a managed care plan's provider network solely on the basis of their license or certification. We recognize that the existing regulations, which refer to this prohibition on discrimination in both §§ 422.100(j) and 422.204(b), have created the potential for confusion.

To assist in clarifying the relevant requirements, we believe it is appropriate to consolidate the regulations concerning antidiscrimination and choice of providers into a new, separate § 422.205, Provider antidiscrimination. This section will begin with the general rule prohibiting discrimination based solely on licensure or certification, consistent with the law. We then will specify that in choosing its practitioners, an M+C organization must ensure that all Medicare-covered services must be available to a plan's enrollees. We are also incorporating under § 422.205(a) a revised version of the existing provision regarding choice of practitioners that eliminates any reference to "type of practitioners." Thus, the general rule will continue to permit M+C organizations the flexibility to choose their practitioners, consistent with the statute's antidiscrimination constraints, which are set forth under § 422.205(b). At the same time, this provision will emphasize the mandatory availability of all Medicare-covered services (such as physical therapy or manual manipulation of the spine to correct a subluxation).

Finally, we are adding at, § 422.205, a requirement that when an M+C organization declines to include a given provider or group of providers in its network, it must notify the provider(s) of the reason for its decision. Although this provision does not impart any appeal rights, we believe it is both a reasonable business practice and a means of ensuring that such decisions are subject to our monitoring efforts.

Our goal in implementing these changes is to strike a balance between our responsibility to ensure that M+C organizations are employing all the types of health care professionals needed to ensure that required Medicare-covered services are available to their enrollees, and our aversion to limiting organizations' flexibility in providing these services. Over the next few years, we intend to closely monitor organization compliance with the antidiscrimination provisions, including examining encounter data as it becomes available and tracking organizational participation decisions, to determine the degree to which all Medicare-covered services are made available under different plans.

We believe that the statute is not intended to preclude an M+C organization from negotiating appropriate, market-based, payment rates with its providers. It is quite possible, for example, that the "market rate" that must be paid to get a particular type of specialist to participate in an M+C organization's network may be higher or lower than that dictated by the market with respect to another type of practitioner. Section 1852(b)(2) of the Act expressly provides that its antidiscrimination rule "shall not be construed to prohibit a plan from * * * measure[s] designed to * * * control costs. * * *" Paying no more than the market rate for a given provider is clearly a component of cost control. We believe that establishing requirements concerning the comparative rates M+C organizations pay for contracting provider services would be inconsistent with the overall design of the M+C program, under which we pay a fixed amount to ensure that Medicare beneficiaries receive the services to which they are entitled, but M+C organizations have wide discretion in managing enrollee care and establishing provider networks. Inherent to this design is the premise that payment rates should be established through negotiated contracts rather than micro-managed by the Federal government. Thus, new § 422.205(b) specifies that an organization may use different reimbursement amounts for

different specialties, or different practitioners within the same specialty.

Further, we do not agree with the commenter that the payment rules established under original Medicare's fee schedules necessarily represent the appropriate model for payment under the M+C program, or that it would be appropriate or feasible to establish a requirement that an M+C organization's provider network reflect the identical mix of providers participating in Medicare generally. Beneficiaries have the option of returning to original Medicare if they place a premium on being able to receive services from any provider they wish, or are not satisfied with being limited to a defined network established by an M+C organization.

In addition to addressing measures designed to control costs, section 1852(b)(2) of the Act also makes clear that the antidiscrimination rule therein shall not be construed to prevent an M+C organization from taking measures to "maintain quality" of services. For example, we would not want to preclude higher payments to providers for demonstrating quality improvement, or preclude an M+C organization from imposing quality-related requirements, such as using only board-certified physicians.

Finally, section 1852(b)(2) of the Act makes clear that its antidiscrimination provision "shall not be construed to prohibit a plan from including providers only to the extent necessary to meet the needs of the plan's enrollees." If an M+C organization can provide all physicians' services through a doctor of medicine, it may not "need" to contract with another practitioner who can provide only a discrete subset of physicians' services (such as a podiatrist or a chiropractor who under section 1861(r) of the Act are considered physicians under Medicare only for specified purposes). As long as all Medicare-covered services are available in the plan, there may be no "need" to assume the additional administrative costs of contracting with another practitioner when an existing contractor is able to perform the services the additional practitioner would be providing. This would not constitute discrimination based "solely" on the basis of license or certification, but rather, not contracting with practitioners not "needed" to provide the full Medicare range of benefits.

With respect to the choice-of-practitioners provision, this right has always been inherent in the managed care model of health care delivery. While a practitioner is not to be discriminated against *solely* due to his or her license, we believe that M+C

organizations must have the flexibility to deliver services through the most cost-effective practitioner who is qualified to perform the service in question. Again, this is a "cost control" measure authorized under the last sentence in section 1852(b)(2) of the Act.

We do not understand the commenter's reference to the Supreme Court's *Michigan Academy* decision, since this decision did not involve a ruling on the merits of any reimbursement issue. Rather, the issue in *Michigan Academy* was whether certain types of claims were subject to judicial review. Even if the decision did hold what the commenter suggested, rules that apply to payments under original fee-for-service Medicare do not apply to payments by M+C organizations to contracting providers.

*Comment:* Commenters asked how we intended to enforce the antidiscrimination requirements, noting that strong enforcement was particularly necessary in view of the specific preemption of State laws dealing with the inclusion of providers. Several commenters asked how a provider would pursue an antidiscrimination claim, and they urged us to establish an administrative review process for investigating allegations of discrimination based on licensure or certification. To facilitate the reviews, these commenters suggested that the regulations require that notices of adverse participation decisions include a statement of the reasons for the determination.

*Response:* Although we do not intend to establish a separate administrative review process for investigating allegations of discrimination against providers, we intend to place a strong emphasis on verifying that M+C organizations are in compliance with the antidiscrimination provisions. This will occur both through our scheduled monitoring activities and under our authority to conduct complaint investigations when we believe there is credible evidence of violations.

In addition, as noted above, § 422.205 will now incorporate the requirement that an M+C organization must state in writing its reasons for declining to include any given provider or group of providers in its provider network. This should enhance our ability to identify violations of the antidiscrimination requirements, for example, by detecting situations in which organizations exhibit a pattern of repeated refusal to contract with certain types of practitioners. If a prospective provider has evidence of discrimination on the basis of licensure, the appropriate

avenue to raise this concern is the HCFA regional office in the relevant area.

*Comment:* One commenter expressed concern that without further clarification, the choice-of-practitioners provision at existing § 422.100 could be construed as giving an M+C organization complete and final authority over an enrollee's choice of health care provider. The commenter recommended that we clarify that an enrollee may appeal a plan's decision not to allow access to a specialist, or a specific provider, that the enrollee believes is necessary to furnish adequate services.

*Response:* The regulations concerning choice of practitioners are not intended to limit in any way the appeal and grievance rights of enrollees under subpart M of the M+C regulations. If an enrollee is denied access to a specialist, the enrollee clearly has the right to a timely organization determination and, if necessary, a reconsideration of this determination. Situations involving whether a specific provider is necessary are more likely to be subject to either the organization's grievance procedures or possibly to external review by a PRO if quality issues are involved.

### 5. Provider Credentialing (§ 422.204(a))

Ensuring that providers have the proper credentials for the services they are providing is a key component of an overall "ongoing quality assurance program for health care services," as required under section 1852(e)(1) of the Act. Section 422.204(a) accordingly sets forth basic requirements that an M+C organization must follow with respect to the credentialing and recredentialing of the providers and suppliers with whom it enters into participation agreements. The M+C organization must ensure that providers and suppliers meet applicable State and Federal requirements. Basic benefits must be provided through, or payments must be made to, providers that meet applicable requirements of title XVIII and part A of title XI of the Act. Also, in the case of providers meeting the definition of "provider of services" in section 1861(u) of the Act, § 422.204(a)(3)(i) specifies that basic benefits may only be provided through such providers if they have a provider agreement with us permitting them to provide services under original Medicare. An M+C organization may not employ or contract with providers excluded from participation in Medicare.

*Comment:* Although commenters generally supported the flexibility built into the M+C credentialing provisions, several commenters suggested that the

credentialing standards used by the NCQA be incorporated into the M+C regulations because these commenters believe that they are clear and adequate to protect M+C beneficiaries. Several commenters contended that many of the M+C credentialing standards were somewhat vague; one commenter identified as particularly unclear the requirement under § 422.204(a)(2)(iii) to establish a process to "receive advice" from contracting health care professionals with respect to credentialing criteria. Another commenter asked if, in general, an M+C organization that complies with NCQA credentialing standards would also be in compliance with the M+C requirements. The commenter asked for confirmation that, like under the NCQA standards, the following categories of practitioners are not subject to the credentialing requirements: (1) hospital-based practitioners that provide care for an M+C organization's enrollees only as a result of members being directed to the hospital, and (2) practitioners who provide care only under the direct supervision of a contracting physician. Another commenter asked for additional clarity as to what types of practitioners must be credentialed and suggested following NCQA standards. One commenter argued that the credentialing provisions should include substantive criteria governing which physicians will be credentialed in the network, which excluded, and on what grounds.

*Response:* In view of these comments, we have reexamined the existing credentialing provisions and are making several changes. First, as discussed above, we have removed both the antidiscrimination and the provider appeals provisions from § 422.204. Section 422.204 will now be entitled "Provider selection and credentialing" and will include a new § 422.204(a) to establish the general rule that an organization must have written policies and procedures for the selection and evaluation of providers. These policies and procedures must conform with the existing credentialing requirements, which will be redesignated as § 422.204(b), as well as the antidiscrimination procedures now contained under new § 422.205. These changes do not impose new substantive requirements on M+C organizations, but we believe they constitute both a necessary reorganization of the existing requirements, and a means of clarifying in the regulations the inherent purpose of the credentialing rules—the need for a systematic approach to provider selection. We note that both the NCQA standards and our QISMC standards

already incorporate the underlying concept that an organization's credentialing requirements are an integral component of its provider selection policies.

This change in no way obviates our awareness that an organization's selection criteria, and thus its credentialing policies and procedures, should be tailored to take into account the individual characteristics of each M+C organization. The process of provider selection also should be integrated with the process of establishing and maintaining an adequate provider network to assure enrollee access to plan services. Thus, we do not intend to add to the regulations greater specificity concerning the procedures an M+C organization must follow for credentialing and recredentialing purposes, or establish detailed criteria as to what constitute adequate credentials. Instead, the regulations will continue to require that M+C organizations follow a "documented process" for these activities that meets the relatively flexible existing standards.

With respect to the question about whether meeting NCQA standards would constitute compliance with M+C requirements, we are currently evaluating this question in the context of the "deeming" provisions discussed in section II.D above. If we find that NCQA, or any other private accreditation organization, applies and enforces standards that are at least as stringent as those set forth in § 422.204, then satisfying NCQA standards would constitute compliance with M+C requirements. Until we make such a determination, however, meeting NCQA credentialing standards does not necessarily achieve compliance with the M+C requirements. We note that we agree with NCQA that credentialing is not required for health care professionals who are permitted to furnish services only under the direct supervision of a physician or other provider, or for hospital-based health care professionals (such as an emergency room physician, anesthesiologist, or certified registered nurse anesthetist (CRNA)) who provide services to enrollees only incident to hospital services. (This exception does not apply if the practitioner contracts independently with the M+C organization or is promoted by the organization as being part of its provider network.)

Finally, we agree that the requirement that an M+C organization's process include "receiving advice" from contracting health care professionals could be misconstrued. We are changing this requirement to indicate that the organization must have a process for consulting with its contracting health care professionals on its credentialing and recredentialing criteria.

*Comment:* Several commenters suggested technical changes to the regulations in subpart E. For example, one commenter recommended that the credentialing provisions consistently refer to suppliers as well as providers, noting that the subpart E basis and scope section (§ 422.200) explicitly mentions both providers and suppliers, while § 422.204(a)(3)(i) only refers to the furnishing of basic benefits through "providers." The commenter also recommended that pharmacies be considered as providers. Another commenter suggested that we add "or certification" to the licensure verification requirement under § 422.204(a)(2)(i), and asked whether Joint Commission on Accreditation of Health Care Organizations/Community Health Care Accreditation Program or Medicaid certification of an HHA was sufficient to meet the provider credentialing requirements, as has been the case in the past for Medicare managed care.

*Response:* The definition of providers that applies for purposes of the M+C program is found at § 422.2 and includes both entities that would be considered providers and suppliers for other Medicare purposes. However, to avoid any possible confusion, we are adopting the commenter's recommendation that suppliers be explicitly mentioned under existing § 422.204(a)(3)(i) (now redesignated as § 422.204(b)(3)(i), as discussed above). Pharmacies, thus, are considered "providers" for purposes of the M+C program. We are also amending the regulations to indicate that initial credentialing should include verification of licensure or certification.

Existing § 422.204(a)(3)(i) requires that in the case of providers of services that meet the original Medicare definition of "providers" under section 1861(u) of the Act (such as HHAs or SNFs), that provider must have a provider agreement with us in order to be permitted to furnish basic benefits under an M+C plan. Under this requirement, neither accreditation nor approval under the Medicaid program is necessarily sufficient to enable an HHA to furnish services under an M+C plan, unless the HHA is Medicare-certified. The objective of this policy is to ensure that M+C enrollees are guaranteed services of a quality level at least equal to that available to other Medicare beneficiaries. We continue to believe that the existence of a provider agreement with us is the best way to ensure that HHAs providing services to M+C enrollees meet uniform standards in all States and are subject to Federal enforcement authority. Thus, we believe it would be inappropriate to create an exception for HHAs to the general rule that "providers of services" as defined under section 1861(u) of the Act must have a provider agreement that permits them to furnish services under original Medicare.

*Comment:* One commenter stated that the credentialing requirements appeared to require individual credentialing for physicians in group practices. The commenter believed that this requirement is too inflexible and could delay a physician's inclusion in a network. Instead, the commenter recommended that an M+C organization have the option of credentialing a group practice as network participants, and then transferring the obligation to credential new members of the practice to the practice itself.

*Response:* When an M+C organization contracts with a group practice, it has an obligation to ensure that all members of that practice meet its credentialing standards. Consistent with the discussion of subcontracting rules above (and with the subcontracting requirements of § 422.502(i)(4)), subsequent credentialing may be carried out either by the M+C organization itself or be delegated to the subcontracting organization (that is, the group practice). If delegated, however, the M+C organization must review and approve the credentialing process, and audit the process on an ongoing basis.

*Comment:* One commenter objected to several aspects of the credentialing requirements, and urged that they be modified to take into account the varying characteristics of M+C networks such as PPOs. The commenter recommended that the requirement for site visits be eliminated for PPOs, and that the requirement for recredentialing every 2 years be modified in favor of permitting M+C organizations to determine when recredentialing was appropriate depending upon the size and stability of the provider network.

*Response:* Under the existing regulations, site visits are required "as appropriate" for initial credentialing; thus, sufficient flexibility already exists in this regard. We believe that recredentialing every 2 years is a reasonable time frame and note that it coincides with NCQA standards. We believe it would be inappropriate for each M+C organization to substitute its judgment for a national standard as to when it should recredential its practitioners. If the provider network is

**40240** **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

small and stable, the administrative burden associated with the recredentialing process should be relatively small.

*Comment:* One commenter noted that the prohibition on entering into contracts with providers that are excluded from participation in the Medicare program (under existing § 422.204(a)(3)(ii)) is impossible to implement unless the HCFA website includes a Social Security number (SSN).

*Response:* As noted in the interim final rule, M+C organizations are expected to consult the Office of Inspector General's (OIG) website (www.dhhs.gov/progorg/oig) to access the list of providers that are excluded from participation in the Medicare program. For privacy reasons, this listing does not include SSNs. However, we also maintain an internal excluded provider list (HCFA Publication 69) that includes unique identifying information for the providers in question. This publication generally is available to all of our contractors, including M+C organizations. We suggest that any M+C organization that needs this information contact either its regional or central office plan manager, or HCFA's Office of Issuances to obtain the latest version of Publication 69.

### 6. Prohibition on Interference With Health Care Professionals' Communication With Enrollees (§ 422.206)

Consistent with section 1852(j)(3)(A) of the Act, § 422.206(a) prohibits an M+C organization from interfering with the advice of a health care professional to an enrollee who is his or her patient. Thus the health professional may act within his or her scope of practice in advising the enrollee about his or her health status, all relevant medical or treatment options available regardless of whether care or treatment is provided under the plan. Section 422.206(b) incorporates the requirements of section 1852(j)(3)(B) of the Act. The regulations state that the prohibition against interference with the content of advice a health care provider has given to enrollees regarding medical treatment should not be construed as requiring counseling by a professional, if the M+C organization objects, based on moral or religious grounds, and fulfills certain notification requirements to prospective and current enrollees. The regulations incorporate the notification process and time frames included in the law and clarify that the plan must also notify us at the time of application and within 10 days of submitting its ACR proposal. We

received 12 comments addressing the provisions set forth under § 422.206.

*Comment:* The majority of the commenters simply expressed their support for this provision, which has been referred to as the "anti-gag rule." One commenter asserted that an M+C organization should not be forced to provide care that is not medically effective, approved by the Food and Drug Administration (FDA), or covered under the enrollee's plan. A commenter also suggested that M+C organizations be prohibited from requiring health care professionals to sign "gag rule" clauses that interfere with full disclosure of all treatment options, regardless of whether theses options are covered under a plan. Another commenter noted that § 422.206(d) states that an M+C organization is subject to intermediate sanctions for violations of these provisions, and recommended that the regulations also specify that we will not renew the contract of an M+C organization that substantially violates the provisions in § 422.206.

*Response:* As indicated in the June 1998 interim final rule, a health care professional's freedom to inform an enrollee about available treatment options in no way implies that all of the possible treatment options (for example, experimental or noncovered alternatives) are covered under the enrollee's M+C plan. In other words, the prohibition on interference with provider-enrollee communications does not affect the M+C benefit and coverage requirements. Clearly, these rules prohibit an M+C organization from requiring health care professionals to sign a "gag rule" clause, such as that mentioned by the commenter. Finally, we note that under § 422.506(b)(1)(iv) of the M+C contracting regulations, an M+C organization that commits any acts that can support the imposition of intermediate sanctions is also subject to nonrenewal of its contract.

*Comment:* One commenter representing health insurance agents recommended that the regulations include a prohibition on physicians "advising seniors on M+C plans." The commenter asserted that only individuals with health insurance licenses should be permitted to proffer such advice.

*Response:* Although we recognize that there are situations where it would be inappropriate for physicians or other health care professionals to "steer" beneficiaries to particular health care plans, we do not believe that prohibiting patients from seeking advice from physicians regarding insurance coverage choices is either necessary or practical. For example, a physician should be able

to disclose to a patient the M+C plans in which he or she is a network provider. (For additional discussion of this issue, please see the portion of section II.B of this preamble that discusses M+C marketing requirements at § 422.80.)

*Comment:* Two commenters recommended that we either delete or clarify the requirement in § 422.206(a)(2) that health care professionals provide information regarding treatment options in a "culturally competent manner."

*Response:* We recognize that the term "culturally competent" can be subject to various interpretations, as discussed in detail above in section II.C of this preamble concerning M+C access requirements. For the purposes of this provision, our intent is that M+C organizations establish and maintain effective communication with enrollees, including informing them of treatment options in a language they can understand.

*Comment:* Two commenters raised concerns related to the conscience protection exceptions set forth in § 422.206(b). One commenter strongly supported the provisions, but recommended that the final rule clarify that: (1) nothing in the conscience protection provisions be construed as limiting the range of services to which Medicare beneficiaries are entitled; (2) an enrollee may terminate enrollment and choose another M+C plan if he or she receives notification under this section that an M+C organization will not cover or pay for a particular counseling or referral service; and (3) like other disclosure requirements, notifications required under § 422.206(b)(2) must be provided in a clear, accurate, and standardized form, consistent with the special needs of individual enrollees.

Another commenter asserted that there was a potential conflict between the conscience protection provisions and the information disclosure rules in § 422.111 and recommended that we establish an exception to the advance disclosure rules for "duly adopted religious policies." The commenter noted that the conference agreement to the BBA indicates the Congress' intent that the Secretary not "impose burdensome regulatory, legal, or stylistic requirements with respect to this notice requirement." (House Report, 105–217, pg. 607.)

*Response:* As the commenter points out, the conscience protection provisions in no way diminish or otherwise affect the range of benefits or services to which Medicare beneficiaries are entitled. As discussed in section II.C

2011

above, the conscience protection in section 1852(j)(3)(B) of the Act affects only obligations under section 1852(j)(3)(A), not obligations that arise elsewhere in the statute, such as the obligation under section 1852(a)(1) to provide all Medicare-covered services available in the area served by the M+C plan. To the extent that the operation of the right to advice and counseling under section 1852(j)(3)(A) would obligate an M+C organization to cover counseling or referral services that it would not otherwise be obligated to cover, section 1852(j)(3)(B) allows the organization to decline to provide such service on conscience grounds if notice is provided to beneficiaries. However, if the service is one that the organization is obligated to provide independent of section 1852(j)(3)(A), it could not be affected by a provision that by its own terms affects only the way that "[s]ubparagraph (A) [of section 1852(j)(3)] shall * * * be construed." It in no way affects obligations that arise elsewhere in the statute. Therefore, an M+C organization could not rely upon section 1852(j)(3)(B) or § 422.206(b) in an attempt to avoid coverage of services that it is obligated under section 1852(a)(1) to cover. We note, however, that in the case of abortion-related services, the Congress has provided M+C organizations with certain conscience protections independent of that in section 1852(j)(3)(B) of the Act. Specifically, under section 216 of the fiscal year 1999 appropriations legislation (Pub. L. 105–277), we are prohibited from denying an M+C contract to an entity on the grounds that it refuses on conscience grounds to cover abortions. Beneficiaries, nevertheless, retain the right to such services, and Medicare must cover them. We are required, however, to make appropriate adjustments to such an entity's M+C capitation payments to cover our costs in providing Medicare-covered abortion services outside the M+C contract.

We agree that the disclosure provisions under § 422.206(b) should be read consistently with other disclosure provisions in the regulations, and thus M+C organizations must take into account the special needs of individuals who are blind, disabled, or cannot read or understand English. The notification requirements set forth in § 422.206(b)(2) are not intended to result in an M+C organization being put in the position of being required to furnish counseling or referral services that violate a duly adopted religious policy. Experience indicates that neither changes in Medicare coverage policies nor in "duly adopted" religious policies take place so

quickly as to preclude an M+C organization from providing advance notice to us, and then to enrollees, concerning service restrictions based on such policy changes. Thus, we believe that only very rarely, if ever, would a conflict exist between the advance disclosure requirement of § 422.111(d) and the provision that permits an organization to implement a conscience exception, provided that it notifies its enrollees of such changes within 90 days after adopting the change. Consequently, we do not view the advance disclosure procedure as a burdensome requirement.

## 7. Physician Incentive Plans (§§ 422.208 and 422.210)

Sections 422.208 and 422.210 outline the limitations and disclosure rules for physician incentive plans. Specifically, § 422.208 applies to an M+C organization and any of its subcontracting arrangements that use a physician incentive plan in their payment arrangements with individual physicians or physician groups. With the exception of the deletion of a requirement that information on expenditures of capitation payments be reported to us, the provisions in these sections are essentially the same as those that previously applied to Medicare risk plans under § 417.479. We received several comments regarding physician incentive rules.

*Comment:* A commenter contended that the 25 percent threshold for substantial financial risk is too high, noting that we have acknowledged that this represents an outlier approach, and that risk arrangements in the range of 10 to 15 percent are far more prevalent than those in excess of 25 percent. This commenter argued that the 25 percent threshold may render the rule irrelevant as applied to the majority of M+C organizations. In addition, the commenter is concerned that because the exemption level is set so high, the effect of the exemption may be to discriminate against plans that are in the process of growth, thus giving the larger plans a competitive advantage.

*Response:* As we indicated in the preamble to the physician incentive plan regulation published on March 27, 1996 (61 FR 13430), we believe that the 25 percent risk threshold is appropriate because of the outlier methodology that we used. The median withholds are in the 10 to 20 percent range. This was the best methodology in formulating the risk threshold. Actuarial analyses also supported the 25 percent risk threshold. Furthermore, many physicians typically give discounts in the 25 percent range.

The majority of arrangements that exceed the threshold are capitation arrangements, where 100 percent of the income is put at risk. For these arrangements, the precise amount at which we set the threshold will not make a difference, they will exceed any reasonable risk threshold.

*Comment:* One commenter pointed out a conflict in the regulatory language. At § 422.208(c)(2), the regulation specifies that the M+C organization provides stop-loss protection; while at § 422.208(f), it specifies that the M+C organization must assure that all physicians and physician groups have stop-loss protection.

*Response:* The commenter is correct and we are revising the incorrect language in § 422.208(c)(2) to eliminate this discrepancy. We note that paragraph (f) incorporates the language from § 417.479 (the physician incentive regulation that applied to section 1876 contracts) that we indicated in the preamble to the physician incentive regulation that we intended to adopt.

*Comment:* One commenter contended that the physician incentive plan requirements are excessively detailed, prescriptive, and confusing. The commenter argued that the detailed stop-loss insurance requirements impose additional costs on the delivery of health care, costs that are increasingly borne by the physician practices, not M+C organizations. The commenter urged us to monitor the stop-loss insurance market carefully, and provide prior review of panel size, and deductible limits set forth in the rule to ensure that they are not necessarily restrictive.

*Response:* In the preamble to the December 31, 1996 final rule (61 FR 69034) containing the section 1876 physician incentive requirements upon which §§ 422.208 and 422.210 were based, we presented a regulatory impact analysis. In that analysis, we concluded that only a small number of organizations and physician groups would need to increase their stop-loss protections, and that this increase would be small relative to the total amount of income. Furthermore, stop-loss insurance is required by statute where substantial financial risk is imposed, and it provides increased protection to physicians that helps reduce possible incentives to deny necessary care. These requirements have been in place for 3 years, and do not appear to have caused any significant problems for M+C organizations or their predecessors.

*Comment:* A commenter requested that these rules should apply to Federally Qualified Health Centers

(FQHCs) and all associated health care providers. The commenter pointed out that these rules appear limited to individual physicians, physician groups, and intermediate entities acting as subcontractors.

*Response:* If the FQHC is an intermediate entity, subcontractor, or a physician group as specified in these regulations, then the provisions apply.

*Comment:* One commenter wanted to know if we review disclosures for both the Medicare and Medicaid programs.

*Response:* The regulations require that M+C organizations that participate in the M+C program must disclose incentive plan arrangements to us, while managed care organizations that participate in the Medicaid program disclose incentive plan arrangements to the State Medicaid Agencies. We review the monitoring activities of State Medicaid Agencies.

*Comment:* One commenter indicated support for the methodology for disclosing incentive plans, but requested that we make clear that we do not require the precise formula and payment amounts be disclosed.

*Response:* Section 422.210(b) requires that an M+C organization must provide the following information to any Medicare beneficiary who requests it: (1) Whether the M+C organization uses a physician incentive plan that affects the use of referral services; (2) the type of incentive arrangement; (3) whether stop-loss protection is provided; and (4) if the M+C organization was required to conduct a survey, a summary of the survey results.

As we indicated in guidance provided in December 1996 to section 1876 contractors, M+C organizations do not have to disclose to beneficiaries the precise formula and payment amounts involved, nor do they have to provide incentive plan information for individual physicians or physician groups. Only summary information needs to be reported. However, the M+C organizations are required to report more detailed information to us or the State Medicaid Agencies.

## 8. Special Rules for Services Furnished by Noncontract Providers (§ 422.214)

Consistent with sections 1852(k)(1) and 1866(a)(1)(O) of the Act, § 422.214 requires that any health care provider that does not have in effect a contract establishing payment amounts for services furnished to a beneficiary enrolled in an M+C coordinated care plan must accept, as payment in full, the amounts that they could collect if the beneficiary were enrolled in original Medicare (less the amounts specified in §§ 412.105(g) and 413.86(d) of the

regulations on hospital graduate medical education payments, when applicable). Any statutory provisions (including penalty provisions) that apply to payment for services furnished to a beneficiary not enrolled in an M+C plan also apply to the payment described in § 422.214(a)(1) of our regulations. We received three comments regarding this section.

*Comment:* Several commenters suggested that we revise § 422.214 to provide that payment to a noncontracting provider must equal the amount that provider would be allowed to collect under original Medicare. These commenters believe that M+C organizations should only be permitted to pay the billed amount when this is the same amount that Medicare would pay under original Medicare.

*Response:* Section 422.214 implements section 1866(a)(1)(O) of the Act, with respect to services furnished by a "provider of services" as defined in section 1861(u), and section 1852(k)(1), with respect to other services. Neither of these provisions requires an M+C organization to pay a provider more than the amount of the provider's bill, or even impose obligations on M+C organizations at all. Rather, these provisions serve as a limit on the amount the provider can collect from the M+C organization. Specifically, each of these provisions states that a provider "shall accept as payment in full" the amount (less the amounts specified in §§ 412.105(g) and 413.86(d) of the regulations) that it would receive under original Medicare, including cost sharing and permitted balance billing ("the Medicare payment amount"). While this means that under these provisions the provider cannot collect *more* than the Medicare payment amount if its billed amount is *higher*, this obligation to "accept" the Medicare amount as payment in full does not obligate the M+C organization to pay this amount if the provider's bill is *lower.* Thus, in the case of emergency services and certain other services referred to in section 1852(d)(1)(C) of the Act furnished to an enrollee in a coordinated care plan, the provider or providers must accept the Medicare payment amount for the services if their billed amount is higher, but would have no right under sections 1852(k)(1) or 1866(a)(1)(O) to be paid more than the amount of their bill if the billed amount is lower than the Medicare payment amount.

We note, however, that a provision in the BBA does give providers furnishing services to coordinated care plan enrollees the right to be paid the Medicare payment amount under

certain circumstances. Section 1852(a)(2) provides that where an M+C organization chooses to furnish services through providers that do not have contracts with the organization in order to meet its obligation under section 1852(a)(1) to make Medicare services available, it must provide for payment "equal to at *least*" the Medicare payment amount. (Emphasis added.) This new provision, unlike section 1866(a)(1)(O) or section 1852(k)(1), establishes a "floor" for payment when it applies. This "floor," combined with the "ceilings" under sections 1866(a)(1)(O) and 1852(k)(1), essentially requires that the Medicare payment amount be paid where section 1852(a)(2) applies. Because section 1852(a)(2) refers to an M+C organization's furnishing services in fulfillment of its obligations under section 1852(a)(1), we are interpreting section 1852(a)(2), in the coordinated care plan context, as providing M+C organizations with the opportunity to arrange to provide nonemergency services through noncontracting providers. Under this interpretation, the "minimum payment" requirement in section 1852(a)(2) would only apply where the M+C organization has arranged for the services in question to be provided by a noncontracting provider. In the coordinated care plan context, therefore, payment for emergency services and those services referred to in section 1852(d)(1)(C) would continue to be subject only to the rules in sections 1852(k)(1) and 1866(a)(1)(O). In the private fee-for-service plan context, however, section 1852(k)(2)(B)(i) of the Act provides that all services furnished by noncontracting providers are subject to the "minimum payment rate" in section 1852(a)(2).

To summarize our position, in the case of services arranged by an M+C organization to be furnished by a noncontracting provider to a coordinated care plan enrollee, or any services furnished by a noncontracting provider to a private fee-for-service plan enrollee, section 1852(a)(2) applies, and the M+C organization must pay the Medicare payment amount. In the case of emergency services (referred to in section 1852(d)(1)(E)), urgently needed services (referred to in section 1852(d)(1)(C)(i)), renal dialysis services provided out of the M+C plan's service area (referred to in section 1852(d)(1)(C)(ii)), and maintenance care or poststabilization services (referred to in section 1852(d)(1)(C)(iii)) furnished to a coordinated care enrollee by a noncontracting provider, the provider is required to accept the Medicare

2013

payment amount as payment in full, but the M+C organization is not required to pay more than the billed amount.

*Comment:* One commenter suggested that we should clearly lay out the process and requirements for compliance with the provisions of § 422.214. In order to implement the payment limits in § 422.214 and not overpay noncontracting providers, M+C organizations will have to develop a process that would apply applicable Medicare payment limits to charges for services furnished to enrollees by noncontracting providers. M+C organizations will need detailed information from us describing each of Medicare's payment limits, how each limit is applied, and which limits apply to which provider.

*Response:* The comment addresses the need for a process to implement the payment limits contained in § 422.214. We understand that any process used to apply Medicare payment limits will require a significant amount of data and will be relatively complex. However, we do not feel that the requirements for such a process should be set forth in regulation. Each M+C organization should be allowed to develop a process that will satisfy that organization's needs.

As discussed in further detail in section II.Q of this preamble, we anticipate that the organizations offering M+C private fee-for-service (PFFS) plans may have a particular need for such a process, both to pay non-contracting providers who must be paid at least the amount they could collect under original Medicare, and to pay contracting and deemed contracting providers, assuming that the M+C organization offering the PFFS plan has chosen to meet access requirements by paying contracting providers ''no less than'' the amount paid under original Medicare. Therefore, we have decided to permit M+C organizations offering PFFS plans to establish ''proxies'' for use in paying services for which no Medicare prospective payment system or fee schedule exists, provided that the proxy methodology has been approved by us as not being less than the expected Medicare payment amount.

We emphasize that the proxy methodologies will be designed to provide an accurate estimate of the Medicare payment amount, including possible beneficiary cost-sharing under original Medicare. In some cases (for example, for Medicare-certified hospitals, SNFs, or HHAs, or for Medicare-participating physicians), this is the amount that a noncontracting provider is required to accept as payment in full from the M+C

organization. In other cases, the amount that a noncontracting provider may collect is not limited to the Medicare payment amount but could include allowable balance billing amounts under original Medicare. In such a case, the provider has a right to collect more from the M+C organization than the Medicare payment amount reflected in the proxy (and in the case of a non-contracting provider furnishing services to a PFFS plan enrollee, the M+C organization may have an obligation to pay more than the proxy amount).

*Comment:* One commenter asked whether the statement in the preamble that ''the M+C organization must hold beneficiaries harmless against any such balanced billing'' means that an M+C organization must pay billed charges to noncontracting providers regardless of the Medicare fee schedule.

*Response:* No. Section 422.214 clearly states that a noncontracting provider must accept as payment in full what the provider could collect under original Medicare (less any payments under §§ 412.105(g) and 413.86(d)). Please note that some providers may be entitled to receive an amount that is in excess of the Medicare fee schedules, but that does not exceed the limiting charge.

### 9. Exclusion of Services Furnished Under a Private Contract (§ 422.220)

An M+C organization may not pay, directly or indirectly, on any basis, for services (other than emergency or urgently needed services as defined in § 422.2) furnished to a Medicare enrollee by a physician (as defined in section 1861(r)(1) of the Act) or other practitioner (as defined in section 1842(b)(18)(C) of the Act) who has filed with the Medicare carrier an affidavit promising to furnish Medicare-covered services to Medicare beneficiaries only through private contracts with the beneficiary under section 1802(b) of the Act. An M+C organization must pay for emergency or urgently needed services furnished by a physician or practitioner who has not signed a private contract with the beneficiary.

*Comment:* One commenter contended that it is difficult to exclude private contracting physicians and practitioners from payment because there is no central list of private contractors. This commenter believes that we should list these physicians and practitioners on our website, and include unique identifiers, like the physician or practitioner's SSN.

*Response:* We recognize that it is difficult for M+C organizations to acquire timely and accurate information on ''opt out'' physicians with whom

they do not have a contract, and we are working on a way of making this information available to them as soon as possible. M+C organizations offering coordinated care plans could seek this information from the provider or supplier before they authorize the use of a noncontracting physician or practitioner. Moreover, we do not anticipate that the absence of such knowledge would be a problem in cases of emergency or urgent care since in those cases, the services of the opt-out physician or practitioner are covered (unless the enrollee/beneficiary has previously signed a private contract).

As part of our effort to streamline the flow of information on opt-out physicians and practitioners, we are also considering what information can be placed on a list or made available through a website. Some information such as the SSN cannot be disclosed under the Privacy Act.

Currently, M+C plans should contact the Medicare carrier with jurisdiction over the payment of claims under original Medicare in their service area to work out a mutually agreeable means of receiving this information on a timely basis. Disputes should be referred to the HCFA regional office for resolution.

With respect to contracting physicians, M+C organizations may, through their contracts, require contract providers to notify them immediately when they enter into private contracts under section 1802(b). This will provide the information more timely than any process that might be arranged with Medicare carriers or through a listing prepared by us, and will permit the M+C organization to cease payment immediately to the contracting physician or practitioner who has opted out of Medicare.

*Comment:* One commenter urged that we monitor the disease type and severity of diseases of beneficiaries who privately contract with physicians to determine what future program changes are appropriate.

*Response:* We are required by section 4507 of the BBA to provide a report to the Congress by October 1, 2001 on the effect of private contracting and to provide recommendations for legislation in this regard. We are conducting a broad study of claims data that will be used to prepare that report.

*Comment:* A commenter suggested that the private fee-for-service plan discussion of deemed and non-contracting providers be revised to indicate that these payment restrictions do not apply if the provider has opted out under § 422.220.

*Response:* We have included a clarification by cross reference.

*Comment:* A commenter believes that beneficiaries need to be advised in both HCFA and M+C plan information that no payment can be made by the M+C organization for services provided under private contract with a physician who has entered into a contract under section 1802(b).

*Response:* We agree that it is important that M+C plan enrollees know that no payment can be made under the M+C plan for services of physicians and practitioners who have entered into contracts under section 1802(b). Section 1802(b) and private contracting regulations at § 405.400 both require that a private contracting physician or practitioner have the beneficiary (enrollee in the case of M+C plans) sign a private contract that notifies him or her that no Medicare payment will be made for the services of the opt-out physician or practitioner, and that he or she accepts full responsibility for payment of the opt-out physician or practitioner's services (except in cases of emergency medical condition or urgent care in which the physician or practitioner cannot ask the beneficiary to sign a private contract and Medicare will pay for the care). Hence, the plan enrollee should be specifically aware of the effect of receiving services from an opt-out physician or practitioner before he or she receives these services. We will, however, also consider adding a discussion of private contracting to the model evidence of plan coverage.

## 10. M+C Plans and the Physician Referral Prohibition

The physician referral prohibition in section 1877 of the Act concerns M+C organizations, although the implementing regulations are located in subpart J of part 411 rather than in part 422. Under section 1877, if a physician or a member of a physician's immediate family has a financial relationship with a health care entity (through an ownership interest or a compensation relationship), the physician may not refer Medicare patients to that entity for any of 11 designated health services, unless an exception applies. Under section 1877(b)(3) of the Act and § 411.355(c) of the regulations, services furnished by section 1876 contractors to their enrollees were exempted from the physician referral prohibition. In the June 1998 interim final rule, we revised § 411.355(c) to similarly exclude from the physician referral prohibition services furnished under an M+C coordinated care plan to an enrollee. We did not exclude services furnished by private fee-for-service plans or MSA plans from the physician referral

prohibition. Subsequently, section 524 of the BBRA amended section 1877(b)(3) of the Act by adding a new subparagraph (E) to exempt an M+C organization offering an M+C coordinated care plan from the physician referral prohibition. The comments and responses regarding this subject are discussed below.

*Comment:* One commenter argued that services furnished under an MSA plan or private fee-for-service plan should also be excluded from the physician referral provisions. The commenter believed that while there are differences between these types of plans and coordinated care plans, patients who elect coverage under an MSA plan or a fee-for-service plan do so knowing that their out-of-pocket liabilities are not controlled to the same degree as in a coordinated care plan. In the commenter's view, concerns about beneficiaries should be addressed in the context of disclosures by the M+C organization offering the MSA plan or private fee-for-service plan, prior to enrollment, rather than by the section 1877 provisions. At most, this commenter would require only that M+C organizations offering plans of these types disclose financial interests in entities that furnish designated health services in return for an exception from the prohibition in section 1877.

*Response:* As we understand the argument, the commenter has suggested that we should exclude M+C private fee-for-service plans and M+C MSA plans from the prohibition on referrals under section 1877 because the concerns addressed by section 1877, that, in general, a physician should not profit from his or her referrals for certain services, has already been accommodated. The commenter believes that beneficiaries already understand that in these plans their out-of-pocket liabilities are not controlled to the same degree as in a coordinated care plan, and that any problems that still might exist can be addressed by more disclosure.

We do not understand why a beneficiary's knowledge of the differences between coordinated care plans and private fee-for-service/MSA plans addresses the concerns behind our decision not to exempt services furnished under the latter plans from the prohibition in section 1877. Under section 1877, we can create a new exception only if the Secretary determines, and specifies in regulations, that a financial relationship between a physician and an entity to which the physician refers does not pose a risk of program or patient abuse. Pursuant to this authority, we exempted services

furnished under coordinated care plans because the Congress had already exempted the identical type of arrangement when it exempted services furnished under section 1876 contracts, (and likely inadvertently failed to make a conforming change to this exception when M+C contracts replaced section 1876 contracts), and because we did not see a potential for program or patient abuse in the case of coordinated care plans. This latter conclusion was based on the facts that, as in the case of a section 1876 risk contractor: (1) A physician working with an M+C organization offering a coordinated care plan has no incentive to order unnecessary care, since physicians are not paid for ordering additional services; (2) the organization has control over its network of providers, and provides incentives for its network providers to avoid unnecessary care; and (3) incentives to deny necessary care are addressed by physician incentive plan requirements limiting the risk that can be imposed on physicians. These are the same physician incentive plan requirements that are incorporated in a section 1877 provision permitting certain risk arrangements that would otherwise be subject to the referral prohibition. (See section 1877(e)(3)(B) of the Act.)

In contrast, under M+C MSA plans or private fee-for-service plans, individual providers, including physicians, are paid on a fee-for-service basis for services provided, and thus have the same kind of incentives to provide unnecessary services that gave rise to the enactment of section 1877. Although this would not result in more Medicare funds being expended during the year in question, it could harm beneficiaries in two ways. First, it could result in higher cost-sharing paid by beneficiaries in the current year. Second, it could result in the M+C organization offering less in benefits the following year than it would otherwise be able to offer if its expenses were not as high. For these reasons, we do not believe that the exception from the physician referral prohibition that we have created for services furnished under coordinated care plans should apply to services under M+C private fee-for-service plans or MSA plans. We note that the Congress implicitly endorsed our position through the amendments to section 1877 included in section 524 of the BBRA. This section explicitly exempted M+C coordinated care plans from the physician referral prohibitions, but did not include any changes related to other types of plans.

2015

*F. Payments to M+C Organizations*

1. General Provisions

Part 422 Subpart F sets forth rules that govern payment to M+C organizations, including the methodology used to calculate M+C capitation rates. These rules are based primarily on section 1853 of the Act. (For a complete discussion of these requirements, see the June 26, 1998 interim final rule at 62 FR 35004.)

One of the more significant payment changes in section 1853 of the Act is a gradual transition from rates based on local Medicare costs to "blended" rates based on a 50/50 mix of local and national costs. Under the Adjusted Average Per Capita Cost (AAPCC) payment methodology that applied to section 1876 risk contracts, payment was based on Medicare fee-for-service expenditures in the county in which the enrollee resided. These fee-for-service expenditures were adjusted for demographic factors (that is, age; sex; institutional, welfare, and employment status).

The AAPCC was criticized for its wide range of payment rates among geographic regions: in some cases payment rates varied by over 20 percent between adjacent counties. It was also criticized for its poor risk adjustment capabilities and inappropriate provision of graduate medical education funds to some Medicare risk plans. Moreover, the AAPCC was criticized for setting erratic annual payment updates, which often made it difficult for contracting health plans to engage in long-term business planning. The BBA introduced a new payment methodology that addressed these and other concerns.

*"Greatest of" Payment Rate:* Since January 1, 1998 (when the M+C payment methodology under section 1853 was made applicable to section 1876 risk contractors pursuant to section 1876(k)(3) of the Act), the Medicare capitation rate for a given county has been the greatest of: (1) The above-referenced blended capitation rate; (2) a "minimum amount" rate established by statute; or (3) a minimum percentage increase. These county rates are then adjusted by demographic factors (and after 2000, by risk adjustment factors) to determine the actual payment amount.

• The blended capitation rate is a blend of the area-specific (local) rate and the national rate, with the latter adjusted for input prices. The blended capitation rate is then adjusted by a budget neutrality factor designed to ensure that payment is not higher than it would be under purely local rates.

• The minimum amount rate was $367 per month per enrollee in 1998 for all areas in the 50 States and the District of Columbia. Outside the 50 States and the District of Columbia, the rate was limited to 150 percent of the 1997 AAPCC for the area in question, if this amount was lower than $367. The minimum amount rate is adjusted each year using the update factors described in § 422.254(b).

• The minimum percentage increase is 2 percent. The minimum percentage increase rate for 1998 was 102 percent of the 1997 AAPCC. Thereafter, it is 102 percent of the prior year's capitation rate.

With the exception of payments under M+C MSA plans, we pay M+C organizations monthly payments for each enrollee in an M+C plan they offer $^{1}/_{12}$th of the annual M+C capitation rate for the payment area described in § 422.250(c). Except for ESRD enrollees, these payments are adjusted for such demographic risk factors as an individual's age, disability status, sex, institutional status, and other factors determined to be appropriate to ensure actuarial equivalence. Since January 1, 2000, these rates also have been adjusted for health status as provided in § 422.256(c). For 2000, only 10 percent of the capitation payment will be risk adjusted, with the other 90 percent determined based on the 1999 methodology.

*Comment:* Several commenters contended that section 1853(c) of the Act set forth artificial and arbitrary limits on capitation rate increases. Because the budget neutrality adjustment applies only to the "blended rate," and the final rate is based on the greatest of the three rates specified, it was not possible to achieve budget neutrality in 1998 or 1999. Once the blended rate was lowered below at least one of the other two rates in each county, no further savings could be achieved through a budget neutrality adjustment. As a result of the adjustments made in an attempt to achieve budget neutrality, however, capitation rates in 1998 and 1999 were all based either on the minimum percentage increase of 2 percent from the prior year, or the new minimum payment rate. The commenters argued that the effect of this would be that M+C organizations would withdraw from Medicare, either entirely or in low payment areas. These commenters suggested that we propose legislative changes to section 1853 of the Act in order to change the formula used to calculate the county payment rates.

*Response:* The commenter's suggestions concerning changes in

legislation are outside the scope of this rulemaking. In this rulemaking, we are charged with implementing the BBA as enacted (and in this final rule, as revised by the BBRA).

However, passage of the BBRA may alleviate some concerns of the commenters. The BBRA requires several modifications to the payment calculations set forth in the BBA, including: lowering the reduction of the national per capita growth percentage defined in § 422.254(b), offering bonus payments to eligible M+C organizations as described in § 422.250(g), and revising our original schedule for transitioning to risk-adjusted payments to providing for an even more gradual introduction of risk adjustment. (See Section I.C for a full discussion of the BBRA provisions.)

*Comment:* One commenter wanted to know if adjusted excess amounts (determined through the Adjusted Community Rate process identified in § 422.312) affect the computation of the county payment rates if these amounts are placed in a stabilization fund, described in § 422.252.

*Response:* Amounts deposited in a stabilization fund reduce the payment to the M+C organization for the year in which the funds are deposited (the organization gives up that amount to use it for benefits in a future year), but do not affect the county payment rates.

*Comment:* Some commenters argued that funding for the ESRD network (§ 422.250(a)(2)(B)) should not be taken from capitation payments to M+C organizations.

*Response:* Section 422.250(a)(2)(B) implements section 1853(a)(1)(B) of the Act, which specifically requires this reduction in payment rates for enrollees with ESRD. We have, however, changed the wording of our regulations to ensure that the amount taken from the capitation payments remains consistent with the amount required under section 1881(b)(7) of the Act. This does not change our current policy in any way; it merely allows that, if the amount mandated by changes in section 1881 of the Act changes for any reason, our regulations at § 422.250(a)(2)(B) will remain consistent with such a change.

*Comment:* One commenter requested clarification on the application of the budget neutrality adjustment contained in § 422.250(e)(3).

*Response:* Section 422.250(e)(1) allows a State's chief executive to request a geographic adjustment of the State's payment areas for the following calendar year. The chief executive may elect to change the area in which a uniform rate is paid from a county to one of the three alternative payment

**40246**    **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

areas identified in § 422.250(e)(1). Specifically, the governor may choose to have—(1) a single Statewide M+C payment area, (2) a single non-metropolitan payment area, with a separate payment area including metropolitan areas defined in one of two ways, or (3) consolidation of non-contiguous counties. Section 422.250(e)(3) requires us to make a budget neutrality adjustment to all payment areas within that state regardless of which payment area designation is selected by the chief executive. The budget neutrality adjustment is designed to limit the aggregate Medicare payment for Medicare enrollees residing in that state to what would have been paid absent any geographic adjustment.

*Comment:* One commenter proposed a statutory change that would permit a budget neutrality adjustment to be made to the final capitation rate, not just the "blended rate," as currently provided. Such a change could result in lower payment rates.

*Response:* The full impact of the BBA and the subsequent revisions included in the BBRA are not yet known; thus, it may be too soon to give Congress recommendations that would have a major effect on our payment to managed care organizations. Therefore, we are not pursuing such a statutory change at this time.

*Comment:* One commenter suggested that we provide for increased payments to an M+C organization for Part B services provided by contract with federally qualified health centers, and require the increased payment be passed on these centers.

*Response:* The statute does not authorize us to pay certain M+C organizations differently than others, other than the special rules that apply to determining payments made to an M+C organization offering an M+C MSA plan. Payment for services furnished by a contracting federally qualified health center is limited to the amount negotiated by the two entities.

*Comment:* One commenter suggested that payment rates should be structured on a regional basis instead of a county by county basis.

*Response:* Section 1853(d) of the Act defines what is considered an M+C payment area. For Medicare enrollees without ESRD, the payment area is a county. For Medicare enrollees with ESRD, the payment area is a State. The only exception to these rules would be a State that has exercised its right under section 1853(d)(3) of the Act to request an alternative payment area in accordance with § 422.252(e).

*Comment:* A commenter believes that it is important that M+C organizations have the opportunity to validate our calculations and methodology in calculating payment rates. The commenter accordingly suggested that we cooperate with interested parties by releasing sufficient data to allow those parties to validate our calculations.

*Response:* We agree. We have complied, and will continue to comply, with all reasonable requests for all relevant and releasable data. M+C organizations must keep in mind that we use a significant amount of confidential data that cannot be released to the public.

2. Risk adjustment and encounter data (§§ 422.256 through 422.258)

Section 1853(a)(3) of the Act required implementation of risk adjustment for payment periods beginning on or after January 1, 2000. In the June 26, 1998 rule, we provided for such risk adjustment in § 422.256(d). We also provided that, in the period prior to the implementation of risk adjustment, we would continue to apply the demographic adjustments used under the old AAPCC methodology.

On September 8, 1998, we published a **Federal Register** notice describing our preliminary risk adjustment methodology and requesting public comments (53 FR 173, pp. 47506 *et seq.*). On January 15, 1999, we published an advance notice, as provided under § 422.258(b) of the regulations, describing the risk adjustment methodology that we implemented for 2000. This advance notice included a detailed description of the new risk adjustment methodology that is in effect in 2000, and information on how risk adjustment will be implemented, including an explanation of the transition method that would be employed. It also responded to comments received in response to the September 8, 1998 **Federal Register** notice. Briefly, the approach we used to meet the year 2000 mandate for risk adjusted payments was:

(1) Based on inpatient data;

(2) Applied individual enrollee risk scores in determining fully capitated payments;

(3) Utilized a prospective PIP–DCG risk adjuster to estimate relative beneficiary risk scores;

(4) Applied separate demographic-only factors to new Medicare enrollees for whom no diagnostic history is available;

(5) Applied a rescaling factor to address inconsistencies between demographic factors in the rate book and the new risk adjusters;

(6) Used 6-month-old diagnostic data to assign PIP–DCG categories (the "time shift" model, as opposed to using the most recent data and making retroactive adjustments of payment rates part way through the year);

(7) Allowed for a reconciliation after the payment year to account for late submissions of encounter data;

(8) Phased-in the effects of risk adjustment, beginning with a blend of 90 percent of the demographically-adjusted payment rate, and 10 percent of the risk-adjusted payment rate in the first year (CY 2000); and

(9) Implemented processes to collect encounter data on additional services, and move to a full risk adjustment model as soon as is feasible.

On March 1, 1999, we published the annual Announcement of Calendar Year (CY) 2000 Medicare+Choice Payment Rates, as provided under § 422.266(a) of the regulations. In this announcement, we informed Medicare+Choice organizations of the county rates and factors that were employed for payment in calendar year 2000, including the rescaling factors for use with the risk adjusted portion of payment, and tables of risk and demographic adjustment factors. We also responded to questions and comments on the January 15 notice. (These notices are available on the HCFA Web site, at http://www.hcfa.gov/stats/hmorates/aapccpg.htm.)

Section 1853(a)(3)(B) of the Act provided for the collection from M+C organizations, of encounter data needed to implement the risk adjustment methodology. The BBA required the collection of inpatient hospital data for discharges beginning on or after July 1, 1997, and allowed the collection of other data for periods beginning on or after July 1, 1998. We were prohibited from requiring the actual submission of data before January 1, 1998. This data submission requirement appeared in section 1853(a)(3) of the Act, which was titled "Establishment of Risk Adjustment Factors." (See § 422.256(d).)

Requirements concerning collection of encounter data apply to M+C organizations with respect to all M+C plans, including private fee-for-service plans. Instructions for the collection of hospital encounter data were sent to M+C organizations in December 1997 (OPL 97.064) and May 1998 (OPL 98.71). Hospital discharges for the period July 1, 1997 through June 30, 1998 have been collected and used for estimating the impact of risk adjustment at the contract level and in the aggregate. We announced in the January 15, 1999 notice of methodological changes that comprehensive risk adjustment would be implemented for

2017

payments beginning on January 1, 2004. We will soon be providing M+C organizations with guidance concerning requirements for submission of outpatient, physician, and other non-inpatient encounter data.

There are two different ways encounter data are used for risk-adjustment purposes. To calculate payment rates, encounter data are necessary to tie payment to expected patient resource use using diagnosis codes. (The initial risk-adjusted payment will be based on inpatient hospital encounter data. However, we are developing a more comprehensive risk-adjustment methodology that uses diagnosis data from physician services and hospital outpatient department encounters.) Encounter data are also necessary to "recalibrate" any risk-adjusted payment model. Recalibration adjusts payment models for changes in resource requirements that derive from such factors as technological change and improved coding.

While these are the primary purposes collecting the encounter data, we discussed other possible uses of these data in the June 1998 interim final rule. These other uses include identification of quality improvement targets and monitoring the care received by M+C enrollees through targeted special studies (such as an examination of post-acute care utilization patterns). Encounter data will also be useful for program integrity functions, both by providing additional utilization norms for original Medicare billing and by providing additional information regarding M+C organizations' behavior.

As noted above, the notices of January 15, 1999, and March 1, 1999, contained detailed discussions of the risk adjustment methodology and responses to comments. Similar notices, reflecting BBRA changes, and our methodology and rates for 2001, were published in January and March of 2000. Here we respond formally to comments submitted on the June 26, 1998 rule.

*Comment:* A number of commenters recommended that we not adopt a risk adjustment system based solely on hospital encounter data. As a matter of public policy, the commenters objected that basing the initial risk adjustment methodology solely on inpatient data would create inappropriate incentives to hospitalize patients, skew payments toward plans with higher hospitalizations, and penalize plans that have appropriately reduced inpatient services by focusing on outpatient care. Other commenters requested a phase-in of the methodology to minimize the disruption on M+C organizations, and allow time to assess the impact of the new methodology.

*Response:* We do not believe it would be desirable to delay implementation of risk adjustment until data other than inpatient data are available. We have analyzed the PIP–DCG system sufficiently to be confident that it represents an improvement over the current system of demographic-only adjustment, that it provides an appropriate interim step toward a comprehensive risk adjustment model, and that it provides appropriate levels of payment for different classes of beneficiaries. We believe that the blend transition methodology should relieve concerns about disruption of payments, especially since the initial blend percentage for the risk-adjusted portion is 10 percent.

Even if we believed that delaying risk adjustment were desirable, we do not have the authority to do so. The Balanced Budget Act specifically required "implementation of a risk adjustment methodology * * * no later than January 1, 2000." In order to meet that deadline, we were constrained to employ a model based on hospital encounter data alone in the interim until the data to implement a comprehensive risk adjustment methodology can be provided by all plans and processed by us. The Medicare+Choice legislation (section 1853(a)(3)(B) of the Act) provided for the collection of non-inpatient data for periods beginning on or after July 1, 1998, a full year later than the date for which inpatient data would be collected. This provision envisioned

that a hospital-only system would be implemented initially, both because it seemed more feasible for M+C organizations to produce inpatient data only in the short term, and because the effect of a hospital-only system on payments would be smaller than a system based on comprehensive encounter data. (The Medicare+Choice regulations further provided that we would collect physician, outpatient hospital, SNF, or HHA data no earlier than October 1, 1999. See § 422.257(b)(2)(i).) However, the statute grants us broad authority to develop a risk adjustment methodology, and does not prohibit us from including a transition or "phase-in" period as a component of the methodology we develop.

We therefore included a transition period as a component of our risk adjustment methodology, initially using a blend of payment amounts under the current demographic system and the PIP–DCG risk adjustment methodology. Under a blend, payment amounts for each enrollee would be separately determined using the demographic and risk methodologies (that is, taking the separate demographic and risk rate books and applying the demographic and risk adjustments, respectively). Those payment amounts would then be blended according to the percentages for the transition year.

In order to provide adequate safeguards against abrupt changes in payment, our transition mechanism initially provided for a low blend percentage of the risk-adjusted payment rate. Specifically, first year blend percentages will be 90 percent of the demographically adjusted rates, and 10 percent of the risk-adjusted payment rate. We are also contemplating a five-year transition, which would culminate in full implementation of comprehensive risk adjustment, using all encounter data, in the fifth year. Our initial transition schedule, announced in the January 5, 1999, Advance Notice of Methodological Changes for the CY 2000 Medicare+Choice Payment Rates was:

| | Demographic method | Risk method |
|---|---|---|
| CY 2000 ..................... | 90 percent .................................................................................................. | 10 percent. |
| CY 2001 ..................... | 70 percent .................................................................................................. | 30 percent. |
| CY 2002 ..................... | 45 percent .................................................................................................. | 55 percent. |
| CY 2003 ..................... | 20 percent .................................................................................................. | 80 percent. |
| CY 2004 ..................... | 100 percent comprehensive risk adjustment (using encounter data from multiple sites of care). | |

Subsequently, passage of Section 511(a) of the BBRA has revised the original transition schedule, providing for an even more gradual introduction of risk adjustment. Specifically, the legislation provides that the blend percentages will be:

| | Demographic method | Risk method |
|---|---|---|
| CY 2000 ..................... | 90 percent ................................................................................................................................ | 10 percent. |
| CY 2001 ..................... | 90 percent ................................................................................................................................ | 10 percent. |
| CY 2002 ..................... | at least 80 percent .................................................................................................................... | no more than 20 percent. |

In order to implement comprehensive risk adjustment in CY 2004, we will soon be providing M+C organizations with guidance concerning requirements for submission of outpatient, physician, and other non-inpatient encounter data.

*Comment:* Some commenters emphasized that implementation of risk adjustment could inject uncertainty and reduce the predictability of payments to M+C plans.

*Response:* Our most recent estimate, based on the 285 organizations that were active in September, 1998, and that did not terminate their contracts with Medicare in 1999, (including 10 organizations that merged into other active M+C organizations as of January 1, 1999), was that aggregate payments would decrease 0.6 percent, taking into account the blend percentages in effect for 2000, (90 percent demographic adjusted amount, 10 percent risk adjusted amount). While the impact on specific organizations will vary, our analysis suggests that, except for highly unusual circumstances (for example, a high proportion of working aged enrollees), the maximum decrease in payment to any organization from risk adjustment alone will be less than 2 percent. The analysis did not suggest that smaller organizations, or any other specific category, would experience a disproportionate impact. We will, however, continue to monitor the impacts on organizations throughout the transition period. We believe that our transition mechanism should alleviate concerns about large and abrupt changes in payment.

*Comment:* One commenter expressed concern about the effect on people with Alzheimer's disease of a risk adjustment methodology based solely on hospital encounter data. Because Alzheimer's and dementia are often not included in the recorded diagnoses of hospitalized beneficiaries, hospital data alone cannot support accurate conclusions about the cost of hospital care for these beneficiaries. Several other commenters expressed similar concerns about the implications of the initial risk adjustment methodology for beneficiaries with other chronic conditions.

*Response:* Our validation tests on the PIP–DCG model actually show that this model offers a substantial improvement over the system of demographic-only

adjustments that has been previously in use. One measure of a model's accuracy is its ability to predict mean expenditures for groups correctly. Health Economics Research (HER), which served as a contractor to HCFA in developing the PIP–DCG model, measured the predictive ratios, (that is, the ratio of mean predicted expenditures to mean actual expenditures), for groups of Medicare beneficiaries that are of policy or technical interest. Among the groups used in this validation analysis were chronic condition groups, defined by ambulatory as well as inpatient diagnoses. HER found that, while the PIP–DCG model underpredicted for many chronic disease groups, this model performed better than the demographic model. For example, the predictive performance for persons with dementia (which includes individuals diagnosed with Alzheimer's) increased from 0.91 under the demographic system to 1.07 under the PIP–DCG model. Further detail on the validation analyses can be found in our "Report to Congress: Proposed Method of Incorporating Health Status Risk Adjusters into Medicare+Choice Payments," and in the HER report "Principal Inpatient Diagnostic Cost Models for Medicare Risk Adjustment," which is appended to it. The reports can be found on our Web site (http://www.hcfa.gov/ord/rpt2cong.pdf).

*Comment:* One commenter objected that the risk adjustment system does not account for secondary diagnoses. A patient with two acute diagnoses could be more ill and more costly than a patient with the same primary diagnosis, but a less severe secondary diagnosis. Another commenter supported the development of an initial risk adjustment methodology based on inpatient data alone, since inpatient costs represent the largest expense item of health plans. But this commenter recommended that such a methodology should account for both primary and secondary diagnoses, since secondary diagnoses are necessary to account for the higher costs of beneficiaries with multiple health problems and chronic conditions that are more expensive to treat.

*Response:* The analysis conducted in the early stages of developing an inpatient-based risk adjustment model

included consideration of incorporating secondary diagnoses. The analysis concluded that secondary diagnoses did not contribute significantly to predictive accuracy in the context of an inpatient model. As noted above, the inpatient hospital model represents a significant improvement in predictive accuracy over the demographic adjustments that have been in use. However, it is only an interim step toward a comprehensive risk adjustment system. We anticipate that the comprehensive risk adjustment model under development will base risk scores on multiple diagnoses from disparate sites of care.

*Comment:* One commenter recommended that we develop the capability to use diagnosis data from all sites of care as quickly as possible in the risk adjustment system. Other commenters expressed concern about the costs and burdens of collecting the physician, outpatient hospital, skilled nursing facility, and home health agency encounter data that will be necessary for the implementation of comprehensive encounter data in 2004. Several commenters objected that the time frame contemplated for the submission of these data is too short to allow M+C organizations to procure and install the required systems. One commenter urged that, in preparing for submission of encounter data from physician offices, mechanisms should be established for the transition from paper claims to electronic bills for those practices that "have not entered the electronic age."

*Response:* The PIP–DCG model represents a substantial improvement over the current system. Because it identifies a subset of seriously ill beneficiaries for increased payment and because the effect of a hospital-only system on payments is smaller than a system based on comprehensive encounter data, the PIP–DCG model is an appropriate interim step toward comprehensive risk adjustment. A comprehensive model is nevertheless preferable, and we plan to move toward implementing such a model as expeditiously as possible. However, implementation of the comprehensive risk adjustment model is not operationally feasible for 3 to 4 years, because of data constraints on both plans and on us. The transition plan announced in the January 15, 1999

2019

notice therefore provides for implementation of comprehensive risk adjustment in 2004, without ever reaching full payment under the PIP–DCG system. In the interim, the PIP–DCG model offers a substantial improvement over the current system.

In providing for payment under a comprehensive risk adjustment system in 2004, we have taken into account the costs and burdens necessary for organizations to develop the capacity for collecting and submitting physician, outpatient hospital, skilled nursing facility, and home health agency encounter data. This is the most ambitious schedule that we believe we can adopt consistent with allowing sufficient time for organizations and the agency to prepare.

*Comment:* A number of commenters objected that the collection of encounter data is burdensome and expensive. Some commenters asserted that this requirement may deter new managed care contractors, especially smaller organizations, from participating in the M+C program. Several commenters observed that not all the data required for submission of encounter data are necessary for computing risk adjustment. Another commenter urged us to monitor the trade-off between risk adjustment accuracy and risk adjustment data-collection requirements, and seek opportunities to streamline the burdens of encounter data collection. One commenter recommended that we explore alternatives to collection of all encounter data, such as survey-based approaches.

*Response:* We have made every effort to minimize the burden of collecting encounter data, and to assist M+C organizations with problems that have arisen in collecting and processing these data. In the initial stages of collecting encounter data, we are permitting organizations to use an abbreviated version of the standard UB–92 form employed in hospital billing. Data elements in the abbreviated UB–92 form have been restricted to those items necessary to calculating risk scores and pricing the discharge, as well as some document identification items that are normally generated automatically in electronic processing. (As we discuss below, pricing of discharges is necessary to allow recalibration of the model.) Use of the abbreviated UB–92 form will be allowed for discharges at least through June 30, 2001.

The legislation mandating risk adjustment also provides for the collection of inpatient and other encounter data. The legislation therefore contemplates a risk adjustment system

based on encounter data rather than surveys. We believe that the greater accuracy of a system based on full submission of encounter data justifies the additional burdens that this requirement entails.

A range of problems in the submission of encounter data have arisen. These problems have included: not following the required UB–92 format, difficulties in accurately tracking counts of discharges, failure to arrange hospital submission of encounter data, difficulties in understanding Fiscal Intermediary reports, and HCFA/FI and FSS processing problems. Plans themselves may have problematic data processing systems in-house. We have worked with Medicare+Choice organizations, managed care associations, and other parties to address many specific issues that have arisen concerning data transmission and processing, and we will continue to do so. We have taken a number of specific steps to facilitate and improve the encounter data submission process. These activities have included the following:

• Encounter Data Reconciliation Analyses—We have shared with M+C organizations analyses of their individual M+C plan level data. The data have been successfully posted at our offices. We have further conducted analyses upon request at the provider level and by the different methods of submission to help explain discrepancies. We are in the process of sharing these analyses with the plans. The detailed provider level analyses are requiring additional time to conduct, and the results of these analyses will be shared with plans over the coming weeks.

• Onsite Consultations—Our contractor conducted a series of onsite consultation visits to 20 M+C organizations in order to learn more about the process of data submission. The majority of the 20 organizations selected for the visits were those that experienced problems with encounter data submission. The information gained during these visits will be used to assist plans to identify and resolve problems.

• HCFA Data System Fixes—Processing problems have been identified that relate to beneficiaries who change from one M+C plan to another. The estimated number of affected encounters from all plans is less than 3,000. These problems will be fixed over the next 2 months, and they are not expected to impact the March 1 rate estimates, which, in any case, will not be used to make direct enrollee payments.

• Communication with the FIs—We have shared data problems raised by M+C organizations with the FIs. Furthermore, discussions between us, FI's, and plans have been encouraged in order to address problems.

*Comment:* Several commenters objected that we should not place the burden of collecting encounter data and assuring their accuracy solely on M+C organizations, but rather on the providers submitting the data to the organizations. Some of these commenters suggested imposition of a requirement on providers that they cooperate with M+C organizations in collecting encounter data.

*Response:* We did not include requirements on providers in the interim final rule because we traditionally have tried to minimize the adoption of measures that would insert our requirements into the contractual relationships between managed care organizations and providers. We therefore suggested to M+C organizations that they modify their contracts with hospitals to ensure that managed care discharges are identified, and the appropriate records are provided to the organization by the hospital. We also have taken every opportunity to inform hospitals and hospital associations of the encounter data requirements and the importance of collecting complete and accurate encounter data to assure correct payment. Collection of encounter data for the ''start up'' year of July 1997 through June 1998, which was the basis for estimating the impacts of risk adjustment, was quite successful, and we have every reason to believe that collection of data for the next year, which will be used to determine actual risk adjustments in 2000, will go at least as well.

However, M+C organizations have informed us that some providers are either failing to submit encounter data at all, or submitting data that do not conform to quality standards for submission to our systems (for example, that the coding often fails to meet standards required to pass the coding edits). To the extent usable data are not submitted, M+C organizations are denied the benefit of any risk adjustment that might be justified based on the costs in question. We are therefore proposing to make several changes to the rules that are designed to give M+C organizations greater leverage in obtaining adequate cooperation from providers to submit complete and accurate data.

First, we will make explicit in § 422.257 that M+C organizations are required to obtain from providers,

suppliers, physicians, or other practitioners information sufficient to submit the required encounter data. (Currently the regulation states that M+C organizations must submit encounter data, but leaves the requirement of obtaining the necessary information from providers and others to inference.)

Second, we will specifically state in the rules that M+C organizations may include a requirement for submission of complete and accurate encounter data, conforming to the format used under original Medicare, in their contracts with providers, suppliers, physicians, and other practitioners. Contracts with providers and others may impose financial penalties, including withholding payment, for failure to submit complete and accurate data conforming to all requirements for submission. We have revised § 422.257 of the regulations to reflect these two changes.

Third, as discussed below in section K, we have modified the definition of "clean claim" in § 422.500 to specify that a claim must include information necessary for purposes of encounter data requirements, and must conform to the requirements for a clean claim under original Medicare. This will exempt claims that do not, for example, meet accurate coding requirements from the application of the "prompt payment" standard that applies to claims submitted by non-contracting providers. This standard requires that "clean claims" submitted by non-contracting providers be paid within 30 days, or interest will be owed. M+C organizations will therefore be able to withhold payment in cases in which non-contracting providers submit claims with inadequate coding or other deficiencies that make the claims impossible to use for encounter data purposes.

Fourth, we are providing a reconciliation process which will give M+C organizations additional time to submit encounter data before final payment determinations are made. M+C organizations have approximately 3 months after the end of a data collection year to submit the encounter data that will be used to develop beneficiary risk scores to their fiscal intermediary. For example, M+C organizations must submit encounter data for the period July 1, 1998 through June 30, 1999 to their fiscal intermediary by September 17, 1999. If organizations submit encounters after this date, they will not be incorporated into payments for CY 2000. However, in response to concerns expressed by M+C organizations over this short time frame, we expect to

institute a reconciliation process that will take into account late data submissions. M+C organizations should attempt to have all data in by the annual deadline of September 10. However, if organizations receive UB–92s from hospitals after this date, they may submit the encounter to their fiscal intermediary and the data will be processed. M+C organizations should note that the deadline for submission of all data from a payment year will be June 30 of the payment year for the period ending the previous June 30 (for example, the final deadline for the period of July 1, 1998 to June 30, 1999, which is used for payment in 2000, will be June 30, 2000). After that date, the fiscal intermediary will no longer accept these data. After the payment year is completed, we will recalculate risk factors for individuals who have late encounters submitted. Then, we will determine any payment adjustments that are required. This reconciliation will be undertaken after the close of a payment year and will be a one-time only reconciliation for each payment year. We are adding § 422.256(g) to provide for this reconciliation process.

*Comment:* Some commenters expressed doubts about the completeness and accuracy of the encounter data submitted during the "start up year," which was used to develop estimates of the impact of risk adjustment. Some expressed concern that systems problems have impeded the posting of complete and accurate data. Several commenters expressed doubts that sufficiently complete and accurate encounter data could be available in time to begin risk-adjusted payment on January 1, 2000.

*Response:* Hospital encounter data were collected from managed care organizations for discharges between July 1, 1997 and June 30, 1998. Approximately 1.5 million encounters were submitted to us for over 5.7 million beneficiaries. The volume of data received is sufficient to generate an estimate of the impact of risk adjustment, and to conduct other analysis in order to prepare for implementation of risk adjustment. Based on this experience, we are confident that sufficient data will be generated to calculate beneficiary risk scores and other information necessary for implementation of the PIP-DCG model.

*Comment:* One commenter requested clarification of the statement in the preamble that encounter data may be used for purposes other than calculating risk adjustments.

*Response:* We commonly use data collected in the course of calculating

payments for other purposes. These purposes include monitoring program integrity, studying utilization patterns and quality of care, and a variety of research purposes. Our use of data is always governed by consideration of privacy concerns and confidentiality of business operations.

*Comment:* Several commenters asked for further information concerning how we intend to recalibrate risk-adjusted payments to account for upcoding. Another commenter questioned whether use of the full UB–92 is necessary for this recalibration, and suggested that we consider other approaches.

*Response:* As we discussed above, recalibration is necessary to adjust the payment models for changes in resource requirements that derive from such factors as technological change and improved coding. Upcoding may occur if plans improve coding of beneficiary diagnoses and, as a result, the average use of resources for enrollees in a particular category may be less than when the relative payment rates were determined. When this happens, the average actual expenditures per enrollee for these diagnoses may be less than the average expenditures used to assign the original payment weights. The result is overpayment for some diagnoses in the risk adjustment model. On the other hand, technological changes, which often result in more intensive use of resources for certain diagnoses, can lead to underpayment for certain diagnoses unless the model is recalibrated. Recalibration is a standard feature of well-established payment systems, such as the hospital prospective payment system. We have not yet developed a specific timetable for recalibrating the PIP–DCG model. We will not recalibrate the model until we have sufficient data from Medicare+Choice organizations to incorporate managed care practice patterns into the recalibration.

*Comment:* Several commenters expressed concern about the attestations required of M+C organizations, with respect to the accuracy and completeness of encounter data. One of these commenters expressed the view that the requirement for an attestation that submitted encounter data are "accurate, complete, and truthful" is designed more as a legal trap for those that might innocently submit incomplete or inaccurate data, than as good public policy. Another commenter recommended that the attestation allow for honest mistakes and unavoidable margins of error.

*Response:* Attestation of encounter data has been a contentious issue. Attestation of encounter data is essential for guaranteeing the accuracy and

completeness of data submitted for payment purposes, and to allow us to pursue penalties under the False Claim Act, where it can be proven that a plan knowingly submitted false data. However, in response to concerns from M+C organizations, we have restricted the attestation requirement to confirmation of the completeness of the data and the accuracy of coding. Since this is information that M+C organizations are, or should be, in the position to know, the attestation requirement is thus in no way a legal trap.

*Comment:* One commenter recommended that we develop mechanisms, with the assistance of consumer representatives, to make encounter data available to Medicare beneficiaries and their representatives.

*Response:* The commenter did not identify the ''beneficiary representatives'' to whom encounter data would be made available, nor the purposes for which the data would be used. We would consider specific requests for data in the light of privacy and other considerations which normally govern the use of data gathered for official purposes in the program.

*Comment:* Several commenters expressed concern about the short time frame for submission of Adjusted Community Rate proposals after the release of county rates, rescaling factors, and risk adjustment impact estimates on March 1. The commenter urged disclosure of key information such as the rescaling factors earlier in order to give plans the opportunity to base their rate and benefit submissions on more complete financial information.

*Response:* Section 516 of the BBRA extended the ACR deadline to July 1, and applied that extension retroactively to 1999. Therefore, we have changed our regulations at § 422.306(a)(1) to reflect this statutory change, which has addressed the commenter's concerns.

3. Special Rules for Hospice Care (§ 422.266)

*Comment:* One commenter requested clarification on reporting institutionalized members who have elected hospice care, and how the M+C organizations will determine whether a new member is in hospice care.

*Response:* Medicare enrollees who have elected hospice care should not be reported as institutionalized. Medicare beneficiaries that have elected hospice, and subsequently elect an M+C plan will be identified by our system.

*Comment:* One commenter requested clarification of the M+C organization's responsibility in arranging for the provision of hospice care for those enrollees who have elected hospice care.

*Response:* Section 422.266 requires the M+C organization to inform each Medicare enrollee eligible to elect hospice care about the availability of hospice care in the area or outside the area, if it is common practice to refer patients accordingly. An M+C organization is not required to arrange for hospice services when the hospice election has been made.

*Comment:* One commenter requested further clarification on our payment for a Medicare enrollee when the enrollee elects hospice.

*Response:* Our monthly capitation is reduced to the adjusted excess amount developed in the ACR. The amount of the reduction is the ACR value (less the actuarial value of Medicare's deductibles and co-insurance) for Medicare-covered items and services. For Medicare-covered items and services, the M+C organization or provider furnishing the service would bill us using Medicare's normal billing rules under original Medicare. Also, hospice services are billed under original Medicare rules.

*G. Premiums and Cost-Sharing*

1. General Provisions

Part 422, subpart G is based on the provisions found in section 1854 of the Act. These provisions were discussed in detail in the June 26, 1998 interim final rule (63 FR 35007). This subpart addresses how limits on M+C plan enrollee premiums and other cost-sharing are established through the Adjusted Community Rate (ACR) approval process. The ACR process is applicable to all M+C plans except M+C MSA plans. M+C organizations offering an M+C MSA plan are not required to submit an ACR for that plan, but they are required to submit other information for our review using the ACR process.

Section 422.300(b) provides that for contract periods beginning before January 1, 2002, M+C organizations may modify an M+C plan by adding benefits at no additional cost to the M+C plan enrollee; lowering the premiums approved through the ACR process; or lowering other cost-sharing amounts. Also prior to January 1, 2002, under § 422.504(d), contracts may be for a longer period than 12 months, and may begin on a date other than January 1. In the case of such contracts, under § 422.300(b)(2), ACRs must be submitted on the date specified by us. The transition rules for this period are found in § 422.300(b).

*Comment:* One commenter suggested a revision of the ACR form used to establish the pricing structure for an M+C plan. The commenter suggested that the new form produce more accurate information. The commenter urged that we monitor data submitted in the ACR form to determine whether established policies should be revisited.

*Response:* We agree. We are developing various systems to capture ACR data for policy analysis. We intend to use the data to determine the effect of established policies so that we can examine policies that need revision.

*Comment:* One commenter suggested that we consider alternatives to the ACR for private fee-for-service and MSA plans.

*Response:* Under the June 1998 interim final rule, we do not review or approve premium amounts submitted for private fee-for-service plans or MSA plans. In addition, in the case of an MSA plan, an M+C organization does not complete those parts of the ACR form that request cost information. Thus, in essence, there is an ''alternative'' arrangement in place for these types of plans.

*Comment:* One commenter suggested that we, in consultation with industry representatives, develop acceptable standards for cost accounting to be used by M+C organizations to complete its ACR form.

*Response:* We agree that M+C organizations should be using uniform cost accounting standards to complete the ACR form. Therefore, we specified in § 422.310(a)(5) that generally accepted accounting principles (GAAP) should be used instead of other accounting principles (for example, statutory). We have not ruled out the establishment of a standardized accounting system at this time. However, we feel that the existing accounting systems based on GAAP developed by M+C organizations should produce sufficiently accurate information for ACR purposes. We will monitor the accuracy of the ACR data produced by the M+C organizations' accounting systems through audit and other monitoring procedures.

*Comment:* One commenter suggested that we should either allow M+C organizations to modify their M+C plan after the M+C plan has been approved, or make the transition period rules described in § 422.300(b) permanent. The commenter felt this would benefit the Medicare beneficiary.

*Response:* After 2002, Medicare beneficiaries will be ''locked in'' to their M+C plan choice for the last 9 months of the year (6 months in the case of 2002 only). The beneficiary will be locked in

**40252**    **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

for the entire year if he or she wants to remain in the M+C program, and no other M+C plan in the area is open during January, February, and March. The choice of an M+C plan during the annual November open enrollment period thus will be extremely significant, since, in most cases, it will determine enrollment for the entire following calendar year. We believe that under this program design, it is important that beneficiaries have complete information in November about what the benefits will be in each M+C plan in their area for the full following calendar year. If M+C organizations were permitted to change plan benefits mid-year, this could result in a beneficiary deciding that an M+C plan that is changing benefits would have been a better choice had he or she known in November that this change would be made, but it would be too late for the beneficiary to enroll in that plan after April 1.

We accordingly believe that beginning in 2002, (when beneficiaries will be locked in for the last 6 months of the year), benefits for a given calendar year should be established in advance of the November open season. This will allow beneficiaries to make informed decisions about which M+C plan they will choose for the following calendar year. In order for this to happen, the benefits that will apply throughout the following calendar year must be included in the ACR submission filed with us, so that these benefits can be approved by us in time to provide reliable information to beneficiaries.

Our decision to require uniform benefits throughout the calendar year after a transition period is further supported by the nature of the ACR process under M+C. As under the section 1876 risk program, the ACR process under the M+C program serves three important purposes. First, we are required to examine an M+C organization's ACR proposal for each M+C plan to determine if Medicare beneficiaries are entitled to receive additional benefits as a result of Medicare payments that are higher than the organization's charge (adjusted for differences in utilization characteristics of the Medicare population) to a non-Medicare enrollee for a Medicare-covered benefit. Second, we are required to review ACR proposals to determine whether the pricing structure (premiums and cost-sharing charged to beneficiaries) is within the limits established by law as required under section 1854(b)(1) of the Act, and is applied uniformly to all Medicare enrollees as required under section 1854(c) of the Act. Third, we review

benefit package information to determine if the benefit package is in compliance with the requirements contained in subpart C. Once this process is complete, M+C organizations are allowed to market the M+C plan as approved.

Under the M+C program, we focus on an entire calendar year in performing the above tasks. Our approval of the pricing structure of an M+C plan is based on the appropriate actuarial value of furnishing the items and services for the entire calendar year. Limits on the amount of premiums (section 1854(b) of the Act), and on the liability of the Medicare beneficiary (section 1854(e) of the Act), are based on a 12 month period. In addition, the capitation payments that will be made to the M+C organization under section 1853(a) of the Act for the M+C plan is an integral part of establishing the value of additional benefits that must be offered under section 1854(f) of the Act. Capitation payments are based on the annual M+C capitation rate for the county (that is, the amount for the full calendar year), adjusted for various demographic and other risk factors. Section 1853(c)(1) of the Act clearly states that capitation rates are based on a contract year consisting of a calendar year. We believe that this entire scheme assumes that benefits will be the same over the 12 month period at issue. This is another reason why we believe our decision to eliminate mid-year changes after a transition period is appropriate.

## 2. Rules Governing Premiums and Cost-Sharing (§ 422.304)

This section implements provisions of the BBA relating to premiums paid by or on behalf of beneficiaries. The beneficiary in an M+C plan, other than an M+C MSA plan offered by an M+C organization, pays the monthly basic premium plus the monthly supplemental premium, if any. In the case of an M+C MSA plan, the beneficiary must pay the monthly supplemental premium, if any. The M+C monthly basic beneficiary premium, the M+C monthly supplemental premium, and the monthly MSA premium may not vary among individuals in the M+C plan, unless the M+C organization offering the plan has elected to apply this rule to individual segments of a plan service area, as provided in section 515 of the BBRA (See section I.C of this preamble). Also, the M+C organization cannot vary the level of cost-sharing (copayments, coinsurance, or deductibles) charged for the basic benefits or supplemental benefits, if any, among the individuals enrolled in the M+C plan, again unless

the M+C organization has elected to apply this rule to segments of the plan service area, as provided in section 515 of the BBRA.

As discussed in section I.C above, under section 515, the premium and cost-sharing uniformity requirements may be applied only within segments of an M+C plan's service area, with premiums or cost-sharing varying between such segments, provided: (1) a separate, and complete ACR is filed for each such segment; and (2) each segment is composed of one or more M+C payment areas. We have revised § 422.304(b) to add a new paragraph (b)(2) that provides for this option.

*Comment:* A commenter noted that some M+C organizations offer enrollees economic incentives to use mail-order pharmacies by imposing a copayment on all prescriptions dispensed in the community pharmacies, but do not charge a copayment if the same prescription is mailed to the enrollee. The commenter wanted to know whether this practice is prohibited under the uniform cost-sharing rule in § 422.304(b).

*Response:* The practice the commenter has described is not prohibited, since all enrollees under the plan would pay the same cost-sharing for drugs not ordered by mail, and the same cost-sharing for drugs ordered by mail. However, an M+C organization would not be permitted to impose a structure of cost-sharing that would have the effect of denying access, as described in section 1852(d) of the Act, to an item or service advertised by the organization as being available to the enrollee.

## 3. Submission Requirements for Proposed Premiums and Related Information (§ 422.306)

This section reflects the original BBA version of section 1854(a)(1) of the Act, which prior to the BBRA provided that each M+C organization, and any organization intending to contract as an M+C organization in the subsequent year, submit specified data for every plan it intends to offer no later than May 1 of each year.

*Comment:* Many commenters recommended that the May 1 deadline for the submission of the ACR proposal be changed.

*Response:* As discussed in section I.C above, section 516 of the BBRA extended the ACR deadline permanently to July 1, and applied that extension retroactively to 1999. Therefore, we have changed our regulations at § 422.306(a)(1) to reflect this statutory change.

2023

**4. Limits on Premiums and Cost-Sharing Amounts (§ 422.308)**

Section 422.308(a) imposes a limit on the amount that an M+C organization can charge as a basic beneficiary premium for a coordinated care plan, or impose as cost-sharing under such a plan. Specifically, the basic premium (multiplied by 12), the actuarial value of any cost-sharing, or a combination of these two forms of beneficiary liability, may not exceed the annual actuarial value of the deductibles and coinsurance that would be applicable on average to beneficiaries entitled to Medicare Part A and enrolled in Part B if they were not enrollees of an M+C organization. For those M+C enrollees who are enrolled in Medicare Part B only, the monthly basic premium (multiplied by 12), plus the actuarial value of cost-sharing, may not exceed the annual actuarial value of the deductibles and coinsurance that would be applicable to beneficiaries enrolled in Medicare Part B if they were not enrollees of an M+C organization. With respect to supplemental benefits under coordinated care plans, the monthly supplemental beneficiary premium (multiplied by 12) charged, plus the actuarial value of its cost-sharing, cannot exceed the ACR for such services.

In the case of a private fee-for-service plan, there is no limit on premium charges. However, under § 422.308(b), the actuarial value of any cost-sharing imposed under the plan may not exceed the actuarial value that would apply to beneficiaries entitled to Medicare Part A and enrolled in Part B if they were not enrolled in an M+C plan as determined in the ACR. In the case of supplemental benefits, the actuarial value of cost-sharing may not exceed the ACR amounts for the benefits. Additionally, if inadequate data is available to determine actuarial value, we can make the determination with respect to all M+C eligible individuals in the same geographic area or State or in the United States on the basis of other appropriate data.

*Comment:* One commenter suggested that the limits on premiums in § 422.308 should not apply in the case of dual eligibles, to the extent that the Medicaid program is paying the premiums.

*Response:* We do not agree. Section 422.308 limits the amount that can be charged to Medicare enrollees, or anyone on their behalf, for the M+C plan. However, we recognize that the Medicaid program may pay additional amounts for Medicaid-covered benefits not included in the M+C plan. Therefore, we have clarified our

jurisdiction over Medicaid benefits for dual eligibles in § 422.106. (See the discussion in section II.C of this preamble.)

*Comment:* One commenter requested clarification of the limit on charges to a Part B-only member for Part A services.

*Response:* If an M+C organization chooses to include in the B-only M+C plan an equivalent Part A benefit, it may do so as an additional, mandatory supplemental, or as an optional supplemental benefit. There is a limit on what is allowed to be charged for this benefit: the lesser of the ACR for the benefit, our payment amount, (or, in the case of a working individual (or spouse) for whom Medicare is secondary, the amount Medicare would pay if Medicare was not secondary, increased by the actuarial value of Medicare's Part A deductible and coinsurance, or the amount we charge for coverage of Part A services to those individuals that are not otherwise eligible for those services.

*Comment:* One commenter requested clarification of § 422.308, Limits on premiums and cost-sharing amounts, that the commenter believes to be a new provision. Another commenter asked about a limit on amounts actually collected in cost-sharing.

*Response:* The limit on premium and cost-sharing charges in section 1854(e) is not new, and in the case of coordinated care plans, is the same as the limit that applied in the case of prior 1876 risk contracts. As discussed above, in the case of a coordinated care plan, section 1854 of the Act specifically limits the amount, regardless of source, a Medicare beneficiary may be charged for the M+C plan elected. This would include premiums and cost-sharing collected by the M+C organization or any provider (either contracting or non-contracting with the M+C organization) furnishing services covered by the plan. This limit is applied to the actuarial value of the cost-sharing provided for under the M+C plan. Specifically, in the case of a coordinated care plan, the premium and the actuarial value of cost-sharing cannot exceed the actuarial value of original Medicare cost-sharing. Thus, as noted above, in approving the ACR, we will not approve of beneficiary cost-sharing for Medicare covered services if the actuarial value of the cost-sharing exceeds the actuarial value of the deductible and coinsurance imposed under original Medicare.

Once we have approved cost-sharing amounts specified in an ACR, however, an M+C organization is permitted to collect those amounts, even if the actual amount collected turns out to exceed the amount projected in the original

estimate of the cost-sharing's actuarial value. While some of our guidance has indicated that a "cap" would be imposed on the aggregate cost-sharing amount actually collected, we have determined, in examining the language in section 1854(e)(1) of the Act in response to this comment, that the limit on cost-sharing was intended to limit the amount of cost-sharing that can be provided for under an M+C plan, not on the amount that is actually collected. The statute provides that the "actuarial value" of M+C plan cost-sharing (and any premium charged) cannot exceed the "actuarial value" of cost-sharing under original Medicare. Since we do not keep track of cost-sharing actually collected under original Medicare, but instead rely only on the "actuarial value" projected up front, we believe that the same approach should apply to the M+C plan side of the equation.

We note that, as discussed above, in the case of private fee-for-service plans, the limit on beneficiary liability applies only to cost-sharing. The actuarial value of cost-sharing for Medicare services may not exceed the actuarial value of the deductible and coinsurance imposed under original Medicare.

*Comment:* One commenter suggested that we set a limit on the amount that may be charged to low-income beneficiaries and beneficiaries with disabilities.

*Response:* Section 1854(c) of the Act requires that premium charges be uniform for all enrollees in an M+C plan (or in a segment of a plan service area as provided for in section 515 of the BBRA). As a result, a separate limit for low income beneficiaries would not be permissible. The statute also specifies the overall limits on beneficiary liability, and we do not have the discretion to change them. We note, however, that M+C organizations may not design or market M+C plans in a manner that discriminates against low-income or disabled beneficiaries.

*Comment:* One commenter suggested that we should prohibit the imposition of a deductible for Federally qualified health center (FQHC) services.

*Response:* The actuarial value of the cost-sharing imposed by an M+C organization for Medicare-covered items and services cannot exceed the actuarial value of Medicare's deductible and coinsurance under original Medicare. We establish this amount using data on all Medicare beneficiaries that did not elect a managed care organization, regardless of where the beneficiary received the item or service. Therefore, data on items and services that do not have a deductible or coinsurance were taken into account, and M+C enrollees

2024

already have received the benefit of the fact that there is no deductible for FQHC services.

## 5. Incorrect Collections of Premiums and Cost-Sharing Amounts (§ 422.309)

Section 422.309 requires an M+C organization to refund all amounts incorrectly collected from its Medicare enrollees, or from others on behalf of the enrollees, and to pay any other amounts due the enrollees or others on their behalf. We further stated that amounts incorrectly collected include: (1) Exceeding the limits imposed by § 422.308 (that is, exceeding the amounts approved in the ACR as falling within these limits); (2) in the case of an M+C private fee-for-service plan, exceeding the M+C monthly basic premium or monthly supplemental premium; (3) in the case of an M+C MSA plan, exceeding the M+C monthly supplemental premium, or the deductible for basic benefits; and (4) amounts collected from an enrollee who was believed ineligible for Medicare benefits but was later found to be entitled. In addition, ''other amounts due'' include amounts due for services that were considered an emergency, urgently needed, or other services obtained outside the M+C plan; or initially denied, but upon appeal, found to be services that the enrollee was entitled to have furnished by the M+C organization.

*Comment:* A commenter believes that an M+C organization should be permitted to collect additional amounts if, as a result of utilization patterns, it collects less than the amount actuarially projected in its ACR. The commenter notes that if an M+C organization collects more than the amounts permitted in the M+C plan approved in the ACR process, it has to refund amounts to enrollees, and believed that this same principle should permit the organization to collect additional amounts if it collects less than the amount projected.

*Response:* We do not agree. There is no indication in section 1854 of the Act that the Congress intended to allow an M+C organization to collect additional amounts from Medicare enrollees when the amount it collects ends up being less than the amount projected in its ACR. An M+C organization, when it submits its ACR, should be providing its best estimate of its charges and collections within the confines of the statute. If we accept this estimate, the M+C organization should be held to the amounts estimated. As noted above, we agree that HCFA also should be held to an estimate we have approved in the ACR process, and will not attempt to

limit the aggregate amount an M+C organization can actually collect as long as it collects only approved cost-sharing amounts from any given enrollee. We believe there is a distinction between the process of projecting enrollee liability for the purpose of establishing a premium and cost-sharing structure and the question of whether charges are made in excess of this established structure. Once the premium and cost-sharing structure is established, a charge in excess of the amounts provided for under this structure is impermissible, and grounds for sanction. A refund is appropriate. If the organization inadvertently charged less than the cost-sharing amounts approved in the ACR, it could collect the balance of the approved charge from the beneficiary. To the extent the commenter was referring to our earlier guidance discussing a limit on the aggregate amount that an organization can collect in premiums, as noted above, we have decided not to impose such a limit. This premise of the commenter's point accordingly is no longer valid.

## 6. ACR Approval Process (§ 422.310)

The June 1998 interim final rule requires that, except M+C MSA plans, each M+C organization must compute a separate ACR for each coordinated care or private fee-for-service plan offered to Medicare beneficiaries. If an M+C organization opts to apply uniformity requirements to segments of an M+C plan service area, a separate ACR must also be submitted for each such segment. We also stated in the June 1998 interim final rule that, in computing the ACR for years beginning in 2000, the M+C organization calculates an initial rate according to the specifications in § 422.310(b), that represents the ''commercial premium'' that the M+C organization would charge its general non-Medicare enrollees for Medicare-covered benefits and any supplemental benefits covered by the M+C plan. The M+C organization would also calculate a separate ACR value for each optional supplemental benefit it offers under the plan. Then, the organization either adjusts the initial rate by the factors specified in § 422.310(c), or requests that we adjust the rate.

Section 422.310(b) dictates that the initial rate for each M+C plan is calculated on a 12-month basis for non-Medicare enrollees, using either a community rating system or a system approved by us, under which the M+C organization develops an aggregate premium for each M+C plan for all non-Medicare enrollees of that M+C plan that is weighted by the size of the

various enrolled groups and individuals that compose the M+C's enrollment in that plan. Regardless of the method the M+C organization uses to calculate its initial rate, the rate must equal the premium that the M+C organization would charge its non-Medicare enrollees on a yearly basis for services included in the M+C plan.

The June 1998 interim final rule also established special rules in § 422.310(d) for M+C organizations that do not have non-Medicare enrollees or sufficient Medicare enrollment experience to sufficiently calculate ACR values. We have amended § 422.310(d) because the interim final rule used incorrect citations in describing how such an M+C organization may estimate ACR values.

*Comment:* One commenter suggested that we test the new ACR methodology before implementation.

*Response:* We do not agree. The new ACR process requests data from organizations that should be readily available in an organization that has an adequate accounting system used to track the costs and revenues of the products it sells. In addition, we intend to develop a mechanism designed to identify unexpected problems. The form implementing the new ACR methodology allows M+C organizations to identify specific problems. We intend to gather information from our review, approval, and audit processes to develop manual instructions, clarify the ACR instructions, and modify the ACR form, if necessary.

*Comment:* One commenter suggested that the component of the ACR formula attributable to revenues in excess of expenses (''the additional revenue component,'' or ''profit'' in the case of a for-profit company) should be the same percentage of the Medicare ACR amount as it is in the case of the initial rate (the ''commercial premium'').

*Response:* We do not agree. Each product an organization offers may have a different additional revenue or profit margin. This would include each of the non-Medicare products included in the base cost figures and the initial rate. To use the same percentage of additional revenue margin included in the initial rate for the ACR for Medicare enrollees would apply an ''average'' additional revenue margin for non-Medicare enrollees to all Medicare enrollees. In addition, using a percentage method, as suggested, would increase the amount of the additional revenue margin for Medicare enrollees if Medicare health care costs were higher. (If costs are higher, the profit margin percentage can be lower while producing the same amount in profit.) We believe actual

additional revenues received in a prior period are the best measure of the amount of additional revenue an organization would expect in a future period, absent some changed circumstances or variables.

While we do not agree with the commenter's specific proposal, in light of this comment, we have reconsidered the relative cost ratio formula contained in the regulations at § 422.310(c)(3). Since additional revenues are produced when revenues exceed expenses, we believe the best way to project additional revenues for a benefit or group of benefits is to first project total revenues of that benefit or group of benefits and, then, subtract projected total expenses of that benefit or group of benefits. Therefore, we have modified the formula in § 422.310(c)(3) to project total revenues using a relative cost ratio of revenues charged in a base period for Medicare enrollees compared to revenues charges to non-Medicare enrollees of the same period and, then, subtracting projected expenses. We have used the calendar year prior to the calendar year the ACR is submitted as the "base year" for this purpose. If an M+C organization believes the computation produced under this formula does not adequately reflect the future period for an M+C plan, the organization may, with adequate justifying documentation, make an expected variation adjustment to the amount calculated.

*Comment:* One commenter interpreted § 422.310(c)(4) to provide that adjustments to additional revenues, after application of the relative ratios, are allowed to reduce the ACR value, but not increase the ACR value.

*Response:* The language of § 422.310(c)(4) was incorrect as published in our June 1998 interim final rule. On October 1, 1998, we published a technical revision to this section (63 FR 52614) to clarify that adjustments may increase or decrease the amount of additional revenue included in the ACR value of the service or services. These adjustments would be allowed as long as the organization submitted sufficient documentation to justify the need to increase or decrease the ACR values so calculated.

*Comment:* One commenter suggested that we allow M+C organizations to use representative data to develop ACR values for an M+C plan.

*Response:* The new ACR process requires M+C organizations to report the costs it incurs for an M+C plan using GAAP. Organizations in business routinely review the costs of each product it sells for various reasons, (for example, budget analysis, profitability).

The new ACR method does not create a new process to determine those costs. We have designed the ACR process to require the least amount of information needed to price an M+C plan without creating a new accounting process. We are relying on GAAP since these principles are widely known and are in use by most M+C organizations. We feel M+C organizations should not encounter significant problems in capturing the costs of the Medicare and non-Medicare populations of a prior period using accounting systems already in use to track each of the products it sells. Using representative data would not be as accurate as using costs actually incurred.

*Comment:* One commenter suggested that some group and staff model M+C organizations may not be able to provide cost data in the form and detail required in the ACR form.

*Response:* We do not agree. The regulations and the ACR form used to implement that regulations allow for a significant amount of flexibility. The instructions are very clear that there are a limited number of line items that must be reported. Most of the remaining entries will be dependent on the accounting system of the organization. Staff and group models may need to use an apportionment strategy to segregate costs between Medicare and non-Medicare enrollees. These apportionment strategies should be based on the same statistics currently being submitted for the ACR form under section 1876 of the Act.

Some organizations have argued that their accounting systems cannot segregate the revenues and cost of providing services to Medicare enrollees between different service areas and among various products sold. These organizations should discuss these matters with their HCFA-assigned plan manager. Since the M+C ACR process is still relatively new, we expect to grant some flexibility to M+C organizations. M+C organizations unable to comply with ACR requirements would be required to submit a plan of action designed to bring the organization in compliance with the regulations.

### 7. Requirement for Additional Benefits (§ 422.312)

Section 422.312(b) requires that the M+C organization provide additional benefits if there is an adjusted excess amount for the plan it offers. The actuarial value of these additional benefits, less the actuarial value of any cost-sharing associated with the benefit, must at least equal the adjusted excess amounts. We received no comments on this provision, but are making a

technical change to § 422.312(b) to use the term "cost-sharing" rather than copayment or coinsurance because the term cost-sharing has been previously defined in § 422.2 to include copayments and coinsurance.

### H. Provider-Sponsored Organizations (Subpart H)

Among the new options available to Medicare beneficiaries is enrollment in a provider-sponsored organization (PSO). A PSO is described in section 1855(d) of the Act as a public or private entity—

• That is established or organized, and operated, by a health care provider or group of affiliated health care providers;

• That provides a substantial portion of the health care items and services directly through the provider or affiliated group of providers; and

• With respect to which the affiliated providers share, directly or indirectly, substantial financial risk for the provision of these items and services, and have at least a majority financial interest in the entity.

The PSO regulations at §§ 422.350 through 422.390 include definitions, solvency standards (developed through negotiated rule making), and waiver requirements that have been established through three previous **Federal Register** publications. On April 14, 1999, we published an interim final rule with comment, titled "Definition of Provider-Sponsored Organization and Related Requirements" (63 FR 18124), setting forth the PSO definition, clarifying certain terms, and establishing related requirements. On May 7, 1998, we published an interim final rule with comment, titled "Waiver Requirements and Solvency Standards for Provider Sponsored Organizations" (63 FR 25360), establishing solvency requirements that apply to PSOs that obtain a waiver of the M+C State licensure requirements, and setting forth procedures and standards that apply to requests for the waivers. The solvency portion of the PSO regulation was based on the work of the PSO negotiated rulemaking committee, as required at section 1856(a) of the Act. On December 22, 1999, we published a final rule titled "Solvency Standards for Provider-Sponsored Organizations" (64 FR 71673), that addressed the comments we received on the PSO solvency standards and waiver requirements. In this final rule, we are responding to comments on the April 14, 1998 PSO definitions interim final rule.

*Comment:* A commenter believes that the interim final rule did not sufficiently ensure that a PSO is actually

controlled by providers. Another commenter thinks that effective control is defined too loosely in the regulation.

*Response:* We believe that the existing regulatory requirements are sufficient to ensure that PSOs are organizations that are owned and controlled by health care providers. Among the basic requirements for PSOs at § 422.352(a)(3) is the requirement that to be considered a PSO for purposes of the Medicare+Choice program, an organization must be controlled by a health care provider or, in the case of a group, by one or more of the affiliated providers that established and operate the PSO. Under the definitions at § 422.350(b), we define control as meaning "that an individual, group of individuals, or entity has the power, directly or indirectly, to direct or influence significantly the actions or policies of an organization or institution." This definition is essentially the same as the long-standing definition of control that is used for purposes of providers in the Medicare fee-for-service program (see § 413.17). We believe that the general definition for control we have adopted, which will result in case-by-case determinations by us, will ensure that PSOs are controlled by providers.

*Comment:* A commenter requested that we exempt PSOs formed by community health centers from the requirement in § 422.352(b)(1) that a non-rural PSO must deliver 70 percent of the health care services and items through the provider or affiliated providers responsible for running the PSO.

*Response:* We do not believe that a special exemption from § 422.352(b)(1) for community health centers is warranted. As we will note below, we do allow a lower percentage of health care services delivery for rural PSOs as compared to non-rural PSOs. However, because the percentage of health services delivery is in part designed to ensure that the PSO will remain solvent, we believe it would not be prudent to reduce the percentage for different types of organizations such as community health centers. To put our response in perspective, we will briefly discuss the PSO requirement that the PSO providers deliver a substantial proportion of health care services, and the reasons we have selected 70 percent for non-rural PSOs and 60 percent for rural PSOs.

The M+C regulations at § 422.352(b) specify that a PSO must deliver a substantial proportion of the health care items and services through the provider or affiliated group of providers responsible for operating the PSO. We have concluded that setting the

substantial proportion requirement at 70 percent for a non-rural PSOs and 60 percent for rural PSOs balances two key interests. These interests are, specifically: (1) That we not set the proportion of services so high as to prevent participation by all but the most sophisticated provider organizations; and (2) that the substantial proportion threshold be sufficient to ensure that a PSO have a well-developed capacity to deliver services, thus meeting the financial stability objective explicit in the statute, and increasing the prospects for successful development and solvent operation of a PSO. There is no indication in the PSO provisions in Part C that the Congress intended that a different standard be applied to community health centers, or any other entity. We see no basis for doing so.

*Comment:* A commenter recommends that we measure substantial proportion based on encounters rather than expenditures.

*Response:* As discussed in the previous response, § 422.352(b) requires that a PSO deliver a substantial proportion of the health care items and services through the providers or affiliated providers responsible for operating the PSO. In calculating the substantial proportion percentage, we considered what would be the best method for comparing the proportion of items and services furnished by a PSO-affiliated provider with the overall amount of items and services furnished through the PSO. The two possible approaches we identified involved either the use of Medicare encounter data or Medicare expenditure data. Based on discussions with the health care industry, we learned that using expenditure data generally would not be burdensome for PSOs, because it is already commonly collected for management purposes. Furthermore, expenditure data may also produce a measurement more in line with the intent of the substantial proportion requirement. For example, the expenditures associated with an acute hospital visit would reflect a higher draw upon the PSO's resources than a physician office visit. Likewise, with expenditure data, the dollar amounts associated with each physician office visit, home care visit, etc., will reflect resource use and the ability of PSO providers to manage medical utilization. Therefore, based upon its immediate availability and arguably greater relevance and significance, we have concluded that use of expenditure data is the better approach for determining compliance with the substantial proportion requirement.

*Comment:* A commenter recommended changing the language in § 422.376 from "the waiver is effective for 36 months, or through the end of the calendar year in which the 36 months period ends" to "the waiver is effective for 36 months."

*Response:* We do not believe it is appropriate, as suggested by the commenter, to change § 422.376(b) so that it reads, "the waiver is effective for 36 months." The reason we have chosen to allow a waiver to remain in effect until the end of the calendar year in which the 36 month period ends is that this ensures that the PSO's Medicare contract also remains in effect through the calendar year. To do otherwise could require a mid-year contract termination with significant disruption for beneficiaries enrolled in the PSO.

## I. Organization Compliance with State Law and Preemption of Federal Law

### 1. State Licensure and Scope of Licensure (§ 422.400)

Section 1855 of the Act requires that a potential M+C organization be organized and licensed under State law as a risk-bearing entity eligible to offer health insurance or health benefits in every State in which it wishes to offer an M+C plan. (An exception to the licensure requirement is made for PSOs, as provided for in part 422, subpart H.) Section 1855(b) of the Act specifies that, with limited exceptions, an M+C organization must assume full financial risk for the cost of the health services it provides under its contract. Thus, the licensure requirement is a two-pronged requirement, and any potential M+C organization must meet both prongs, such that it is licensed, and is assuming the appropriate risk level for its license.

To establish the licensure status of potential M+C organizations, and in particular to determine compliance with the requirement that the organization's M+C contract falls within the scope of its licensure, we require that new M+C applicants supply documentation from the appropriate State regulatory authorities that the organization meets both the licensure and scope of licensure requirements. In the case of noncommercially licensed entities, § 422.400(b) requires that they obtain a certification from the State that they meet appropriate solvency standards.

*Comment:* With regard to the scope of licensure requirements, one commenter has asked for clarification as to whether managed care organizations with enrollment limited to Medicaid beneficiaries are eligible for M+C contracts. Another is concerned about States licensing organizations to offer

more than one M+C plan, noting that States may not have the resources to monitor multiple plans from multiple organizations. Other commenters have asked for clarification as to what happens if a State does not license insurers to offer high-deductible MSA plans, or does not license preferred provider organizations (PPOs). These commenters wish to know how MSA and PPO plans would be available in States which do not authorize these types of options. A commenter also asked whether States may require, for licensure purposes, that M+C organizations offer only products with "gatekeepers." The commenter believes that these requirements should be preempted in order to permit managed care organizations to offer more choices to Medicare beneficiaries.

*Response:* Section 1855(a)(1) of the Act requires that an M+C organization be organized and licensed under State law as a risk-bearing entity eligible to offer health insurance or health benefits in any State in which it offers an M+C plan. As discussed in detail in the interim final rule (63 FR 35011), an entity does not have to have a commercial license to offer the type of M+C plan it seeks to offer under the M+C program. Rather, the entity must demonstrate that it is authorized by the State to assume the risk involved in offering the type of plan it wishes to offer. Thus, in the case of an organization that is authorized by the State to assume risk under a Medicaid contract, but is not commercially licensed, the State in which the organization wishes to offer an M+C plan would have to certify that the organization has authority to assume the risk involved in offering the M+C plan in question (*e.g.*, by meeting State solvency requirements). In some States, Medicaid-contracting managed care organizations are operated under the authority of the State Medicaid agency, and the State may take the position that this authority is limited to assuming risk for Medicaid beneficiaries. Since the statute requires that M+C organizations (with the exception of PSOs) be licensed by the State, the State has the discretion to make this decision.

With regard to State monitoring of M+C organizations that they license, we do not have the authority to second guess a State's judgment concerning the sufficiency of its resources to monitor M+C plans for which it has given authorization. The States have the sole authority for licensure of M+C organizations, and can set their own standards for monitoring conditions of licensure.

The question of availability of MSA plans in States that do not approve high-deductible plans again goes back to the question of licensure. An organization wishing to offer an MSA plan must be licensed as a risk-bearing entity eligible to offer health insurance or health benefits in the State in question. If the organization wishes to offer a high-deductible policy as part of an MSA plan, the organization must be authorized by the State to assume risk, and under § 422.400(c)(1), must demonstrate that it is authorized to offer a high-deductible policy to Medicare beneficiaries under an M+C contract. This does not mean that it must be authorized by the State to offer such a policy commercially in the State.

With regard to the availability of PPOs in States that do not have a category of licensure into which PPOs would fit, the organization again would have to demonstrate that it was licensed as a risk-bearing entity or otherwise authorized to assume risk, and that it was authorized by the State to offer a PPO product to Medicare enrollees. (We note that under new section 1852(e)(2)(D), for purposes of the applicability of certain quality assurance requirements, a PPO is defined as an entity that is not licensed as an HMO.) If a State does not have a category for a PPO product, an organization may not offer a PPO product in that State unless it is able to demonstrate that the State has authorized it to do so in the context of an M+C contract. This same analysis applies to the question of whether a State may only allow products with "gatekeepers." If the State only has licensure categories for "gatekeeper" products, then only those products may be offered in the State, absent State authorization of an alternative product in the M+C context.

The only exception to the above requirements that the State authorize the M+C organization to offer the type of plan at issue is the exception provided by Congress for PSOs that are unable to obtain a State license.

## 2. Federal Preemption of State Law (§ 422.402)

### a. General Preemption (§ 422.402(a))

Section 1856(b)(3)(A) of the Act reflects the general principle that under the supremacy clause of the constitution, State laws are "preempted" when they conflict with applicable Federal laws. Specifically, section 1856(b)(3)(A) of the Act provides that "any State law or regulation" with respect to M+C plans is superseded "to the extent such law or

regulation is inconsistent" with M+C standards. This general preemption authority does not extend to non-M+C enrollees or non-M+C lines of business or activities. We apply this provision in the same manner that Executive Order 12612 on Federalism was applied to managed care organizations with contracts under section 1876 of the Act prior to the BBA. Under that Executive Order (recently superseded by Executive Order 13132; see section VI.1 below), the requirements of section 1876 of the Act did not preempt a State law or standard unless the law or standard was in direct conflict with Federal law. Put another way, if a State law required a managed care organization to do something that it would be permitted to do under section 1876 of the Act, there was no preemption. As discussed below, new Executive Order 13132 (64 FR 43255) contains this same standard for general preemption. The general preemption rule in section 1856(b)(3)(A) of the Act is implemented in § 422.402(a).

*Comment:* A commenter asked whether State laws that are more restrictive than Federal laws are preempted under our general preemption authority at § 422.402(a).

*Response:* In its description of the House bill's provision for preemption of State laws "inconsistent with" the new BBA standards, the BBA Conference Report (H. Rept. 105–217, page 637) makes clear that this provision (which was retained in the conference agreement) "should not be construed as superseding a state law or regulation * * * that provides consumer protections in addition to, or more stringent than, those provided under [the BBA]." We thus believe it is clear that Congress expected the States, in some cases, to have more rigorous or more comprehensive standards for quality and consumer protection that would enhance, rather than be subsumed under, the M+C standards for quality and consumer protection. Except when one of the "specific preemptions" discussed below applies, State laws or standards that are more strict than the M+C standards would not be preempted unless they are in conflict with (for example, would preclude compliance with) M+C requirements.

*Comment:* One commenter representing many plans argues that our interpretation of general preemption is too narrow, and that it should be broadened to encompass State laws that the commenter believes serve as obstacles to the purposes and objectives of the M+C program. This commenter suggests that there are situations in which compliance with both a Federal

law and a State law is theoretically possible, but the administrative burdens associated with dual compliance would be tremendous, making compliance counterproductive in terms of meeting the goals of the M+C program. In these situations, the commenter believes that the State requirements should be preempted, thus relieving the burden of dual compliance.

*Response:* As just noted above, the legislative history of section 1856(b)(3)(A) of the Act makes clear that Congress contemplated that M+C organizations would be subject to State requirements that were "more stringent" than M+C standards. We believe that Congress intended in section 1856(b)(3)(A) of the Act to incorporate the basic principles of Federalism, as applied to section 1876 contractors at the time the BBA was passed. We do not believe that the fact that a burden may be involved in complying with State laws makes those laws "inconsistent" with Federal requirements. We therefore believe that under section 1856(b)(3)(A) of the Act, only State standards that prevent compliance with Federal standards are preempted under this general preemption provision. As noted earlier, this position is also consistent with new Executive Order 13132.

*Comment:* Many commenters sought clarification of the basic principles of general preemption, and asked whether specific issues are covered under the general preemption authority of section 1856 of the Act. Some of these commenters suggested that consumer protection standards should be left to the States. For example, a commenter representing many States believes that the following types of standards are not subject to general preemption: Market conduct evaluation; complaint handling (except to the extent specifically preempted by the BBA as discussed below); enforcement of unfair claim settlement practice standards (except to the extent specifically preempted by BBA); enforcement actions generally; filing and review of policy forms and rate filings; filing and review of advertising and marketing materials; provider access standards; credentialing standards; filing and review of provider contracts; utilization review programs and standards; quality assurance programs; supplemental benefits and cost-sharing arrangements; network adequacy; enforcement of loss ratio standards; standards and enforcement of commission limitations; and provider licensing and regulation. In addition, other commenters have asked for clarification as to whether or to what extent Medicare Secondary Payer mental health parity requirements are

preempted. Another commenter suggested that we interpret general preemption as covering all State laws except for financial solvency standards.

*Response:* We agree that the areas mentioned by the commenter would not be preempted under the general preemption rule in section 1852(b)(3)(A) of the Act, as long as the State law did not conflict with an M+C requirement. In most of the areas mentioned, if an M+C organization could comply with State law without compliance resulting in a violation of an M+C requirement, there would be no preemption. While the commenter has recognized that some of the above-referenced areas of State regulation are subject to the specific preemption provision discussed below (see the second and third items in the above list), there are other areas among those identified by the commenter that are subject to specific preemption as well. For example, State regulation of supplemental benefits would be preempted under the specific preemption of State laws relating to benefits. In addition, some "provider regulation" could be preempted under the specific preemption of laws relating to the inclusion or treatment of providers. Thus, while we agree with the commenter that laws in the specified areas would not be preempted under section 1856(b)(3)(A) of the Act absent a conflict with M+C standards, the commenter should consult the discussion below concerning specific preemption of State laws in the areas referenced in section 1856(b)(3)(B) of the Act. With respect to the comment that all areas should be subject to general preemption except solvency, we disagree with this comment. As noted above, we believe that general preemption would only apply in the case of a specific conflict with M+C requirements.

*Comment:* A commenter asked for clarification as to whether and how State M+C laws apply to employee groups.

*Response:* As noted in the preamble to the June 26, 1998 M+C interim final rule (63 FR 35013), there is neither general nor specific Federal preemption of State requirements that apply to arrangements between employers and M+C organizations for the provision of negotiated group benefits not covered under an M+C plan. These are purely private benefits that fall outside the scope of the M+C program and the ACR process. Thus, if there are applicable State laws not preempted by the Employee Retirement Income Security Act of 1974, these State laws could apply to employer group benefits, and would not be preempted by M+C

standards. M+C standards apply only to M+C plan benefits, including: (1) Medicare-covered benefits; (2) additional benefits paid for with Medicare payments; and (3) both optional and mandatory supplemental benefits for which a premium is charged.

*Comment:* A commenter asked whether State confidentiality laws are preempted.

*Response:* General preemption applies to confidentiality requirements. Thus, just as with other consumer protection standards, State requirements that are more stringent than the new M+C standards would not be preempted, unless compliance with the State confidentiality requirements made compliance with the Federal requirements impossible.

### b. Specific Preemption (§ 422.402(b))

There are three areas in which section 1856(b)(3) of the Act provides for specific (rather than general) Federal preemption of State law: benefit requirements; requirements relating to treatment and inclusion of providers; and coverage determinations (including related appeals and grievance processes.) In the BBA Conference Report (H. Rept. 105–217, page 638), the conferees noted that benefit requirements, provider participation requirements, and coverage determinations (and related appeals mechanisms) are governed exclusively by Medicare standards under original Medicare, and expressed their view that this should be the case under the M+C program as well. That is, under original Medicare, States cannot specify what must be included as a Medicare benefit; States do not specify the conditions of participation for Medicare providers (though they license providers and practitioners and determine their scope of practice); States may not specify how a coverage determination is made with respect to whether or not the Medicare program covers a benefit; and States do not determine the type of appeal mechanism that is used to appeal a coverage decision made by a Medicare carrier or intermediary with respect to a Medicare benefit. In the specific preemption provisions in section 1856(b)(3)(B) of the Act, Congress provided that States similarly cannot regulate M+C plans in these areas. As in the case of general preemption, these specific preemption provisions do not extend to non-M+C enrollees, activities, or lines of business of the managed care organization.

In the interim final rule (63 FR 35012), we stated our intention to adopt a narrow interpretation of the

applicability of the three areas of specific preemption, thus giving States maximum flexibility within the parameters of the statutory language. (As discussed below, this view is consistent with new Executive Order 13132 on Federalism.) We identified the following examples of areas in which State standards would be preempted:

• Benefit mandates (note that we did not interpret a limit on cost-sharing to be a "benefit").

• Appeals and grievances with respect to M+C coverage determinations.

• Requirements relating to the inclusion of providers (such as "any willing provider" laws or requirements to included specific types of providers within a plan's provider network). We note that State laws providing enrollees with a right to directly access providers are considered to provide a "benefit" to enrollees, and to affect the "inclusion" and the "treatment of" providers, and thus also are specifically preempted.

*Comment:* In the interim final rule, we solicited comments on whether the specific preemption of benefits should be extended to cost-sharing requirements, and if there were particular types of cost-sharing that should, or should not, be included under the benefits preemption. We received many comments on this issue. Most industry commenters recommended that we include all State cost-sharing standards within the benefit preemption. They believe that cost-sharing is an integral part of a benefit; that the cost to a beneficiary for a particular service weighs on how much of a benefit he or she is actually receiving; and that the cost-sharing formula is what gives a benefit its market value. Commenters also argued that preempting State cost-sharing requirements would reduce variation in benefit packages, thus making comparison easier for beneficiaries, and easing the administrative burden on organizations that offer plans across State lines. They asserted that not preempting State cost-sharing standards would severely impede M+C organization's efforts to offer national plans. Another commenter wrote that it was unclear whether a State could continue to apply some of its benefit-related provisions, such as limits on copayments, State coordination of benefits and subrogation rules, and required benefit differentials for PPOs.

In contrast, commenters representing the States and beneficiary advocacy groups recommended that we continue to construe the benefit preemption as narrowly as possible, and thus not change our policy to consider cost-sharing a part of a benefit for preemption purposes. They supported our existing policy of generally not preempting State cost-sharing requirements. One commenter believed that even benefit requirements should not be preempted, however, arguing that if States cannot mandate certain benefits, then beneficiaries in M+C plans might have different, lesser benefits than beneficiaries with original Medicare and a Medigap policy.

*Response:* In the interim final rule, we stated that the specific preemption of benefit requirements does not extend to State cost-sharing standards (63 FR 35013). As discussed in detail in that rule, our position was that a State law establishing limits on cost-sharing generally, or limits on cost-sharing that can be imposed for a particular benefit, would not fall under the benefit preemption as we have defined the term "benefit." We recognize that this is a narrow interpretation of the term "benefit," and that we could have interpreted "benefit requirements" to extend to limits on cost-sharing. However, we wanted to minimize the extent to which beneficiary protections enacted by a State were preempted by Federal law. This decision is consistent with our support for beneficiary rights, as well as new Executive Order 13132 on Federalism, which calls for granting States the maximum flexibility permitted under Federal law. If the benefit to which State cost-sharing limits apply is not a Medicare-covered benefit, the State standard would apply only if the M+C organization chooses to offer the benefit, since any State mandate that the benefit be offered would be specifically preempted. Thus, to the extent that limits on cost-sharing are linked to a benefit mandate, the State cost-sharing limits could be seen to be "indirectly" preempted, in that the obligation to provide the benefit to which they apply is preempted. To the extent that an M+C organization offers the benefit to which State cost-sharing limits apply (whether as part of the package of Medicare-covered services, or as an additional or supplemental benefit), State cost-sharing standards would remain in effect unless they would be preempted under the general preemption authority discussed above.

*Comment:* Several commenters representing the State of Massachusetts wrote to request that we reconsider our position that the BBA prohibits State-mandated benefit laws, particularly when such a benefit is neither required by, nor funded by, the Federal government. These commenters believe that where Federal money is not involved, there is no preemption of State law, and that the M+C regulations should be modified accordingly. These commenters were particularly concerned about the effect of Federal preemption on Massachusetts' mandated prescription drug benefit, and pointed out that M+C enrollees in the State will not have access to a comprehensive prescription drug benefit in the absence of the State mandate. The commenters noted both that there is no Federal prescription drug benefit, and that the cost of the Massachusetts benefit is borne in no way by the Federal government.

*Response:* Throughout the development of the interim final rule and during the summer of 1998, we discussed in depth with Massachusetts officials the effect that Federal preemption would have on the prescription drug benefit in Massachusetts. Although we recognized the State's concerns, we did not believe that the statute permitted any discretion on the issue, absent a legislative amendment. We believe that the reference to "benefit requirements" must refer to non-Medicare benefits like those at issue in Massachusetts, since, as noted above, States have never been permitted to mandate what is covered by Medicare. In September of 1998, the Massachusetts Association of Health Plans sued the Commonwealth of Massachusetts, in an attempt to resolve the apparent conflict between the State and Federal regulatory approaches. A Federal court ruled that the specific preemption in section 1856(b)(3)(B) of the Act did apply to the Massachusetts drug benefit. The State appealed, and on October 8, 1999, the ruling was affirmed by the United States Court of Appeals for the First Circuit. *Massachusetts Assn. of HMOs* v. *Ruthardt,* 194 F.3d 176 (1st Cir., Oct. 8, 1999). The Court found that the M+C regulations "dominate these particular fields, leaving no room therein for State standard-setting" for benefit requirements (194 F.3d, at 183). We agree with the Court's conclusions.

*Comment:* Several commenters have asked us to revise § 422.402 to exempt State "return home" laws from preemption under sections 1856(b)(3)(B)(i) or (ii) of the Act. These laws generally allow a hospitalized beneficiary, who lived in a retirement home that includes a Medicare-approved nursing facility, to return to this "home" facility for post-hospitalization skilled nursing services, even if that facility is not part of his/her managed care plan's network. Commenters argued that these types of provisions are not benefits requirements and are not related to treatment and

inclusion of providers, but rather are consumer protection requirements.

*Response:* As discussed above, section 1856(b)(3)(B)(ii) of the Act clearly establishes Federal preemption for requirements relating to the inclusion or treatment of providers. We believe that a law granting an enrollee the right to coverage from a particular provider would certainly have to be considered a requirement "relating to the inclusion or treatment of providers," since it requires that the provider in question be "included" in the network of providers through which covered services may be obtained.

As a matter of policy, we believe that return home laws have value for beneficiaries, families, and communities, and we encourage M+C organizations to offer a return home option where it would not adversely affect quality or continuity of care, and does not pose an unreasonable administrative burden. However, absent legislative change, we do not believe that the statutory preemption provisions permit any alternative interpretation that would allow enforcement of these State laws for M+C enrollees. We are exploring developing a legislative proposal to establish a limited exception to the M+C preemption provisions to accommodate State return home laws.

*Comment:* Several commenters offered differing opinions of our interpretation that section 1856(b)(3)(B) of the Act preempts direct access laws. Again, some commenters believe that these requirements are contract or consumer protection laws, and should not be subject to specific preemption; other commenters believe that direct access laws are clearly and specifically preempted. One commenter asked for clarification on the specific preemption of State standards related to the "treatment and inclusion of providers and suppliers." Specifically, this commenter asked for clarification on the following situations: (1) Whether the preemption applies to State standards on how providers are paid; (2) whether State standards that are more stringent than the M+C provider antidiscrimination provisions in existing § 422.204(b) are preempted; (3) whether State requirements that certain categories of health professionals must be treated the same as other providers by an HMO or insurer are preempted.

Another commenter asserted that "any willing provider laws," specific benefit requirements, and requirements for the inclusion of specific types of providers should not be preempted. This commenter believes that if State standards are more stringent than Federal standards and not inconsistent

with them, they should not be preempted, regardless of whether these standards relate to the areas specifically preempted by Congress.

*Response:* In the interim final rule, we indicated that direct access laws and any willing provider laws were illustrative of the types of laws that we believe Congress intended to preempt through the BBA's specific preemption provisions. Although we recognize that these types of State standards may be viewed as consumer protections, we believe that such standards clearly also involve both plan benefits and the treatment and inclusion of providers, and therefore are specifically preempted. With regard to the specific questions raised by the commenter, these standards all appear to involve the inclusion or treatment of providers. In order to make a final determination, however, we would have to review the specific State law in question.

*Comment:* A commenter asked for clarification regarding whether certain aspects of State law, such as State definitions of medical necessity, and requirements that subscribers be notified of the right to file complaints with State regulators, would be preempted under § 422.402(b)(3), which preempts State requirements for coverage determinations, including appeals and related grievances.

*Response:* For the purposes of coverage determinations, a State definition of "medical necessity" is preempted under § 422.402(b)(3) because any such definition is integral to the determination of coverage. A State's general complaint process, as distinct from a process for appealing coverage decisions, would be subject only to general preemption under § 422.402(a), not specific preemption under § 422.402(b)(3). The State should indicate, however, that its process is separate, and that if the complaint involves a coverage determination, the sole mechanism for resolution is the Federal appeals process outlined in subpart M of part 422. For more information on this issue, please see guidelines issued by the National Association of Insurance Commissioners (NAIC).

*Comment:* A commenter who was generally supportive of Federal preemption argued that the regulations fail to clarify the ramifications of such preemption at the State level. The commenter requested that we "formalize the process" with the relevant State entities, so that managed care organizations are not held liable by a State for noncompliance with a State mandate when the organization is acting in accordance with Federal regulations.

*Response:* The NAIC and our staff have developed guidelines for use by the States in developing and implementing their managed care regulations and operational policies. We believe that these guidelines should address the commenter's concerns about formalized guidance for States.

*Comment:* Many commenters support a broader interpretation of Federal preemption such that State law related to grievance procedures would be preempted. Other commenters believe that Congress intended to specifically preempt State grievance procedures.

*Response:* The statute says only that grievances related to coverage determinations are subject to specific preemption; therefore, we do not believe that Congress intended to preempt all State grievance procedures. We believe that Congress recognizes that many States use the term "grievance" to describe a complaint or define a process that constitutes an "appeal" under Medicare. Thus, we believe that the intent of the statute was to specifically preempt State requirements for grievances related only to coverage determinations, and to apply general preemption to State requirements for all other types of grievances. Thus, the State requirement would stand so long as it is not inconsistent with a Federal requirement, as discussed in detail above.

Since enrollees may have complaints that involve matters unrelated to coverage determinations, there needs to be a mechanism in place to address other types of complaints involving the manner in which enrollees receive care. Therefore, M+C organizations are required to have a grievance process in place to handle complaints unrelated to coverage determinations.

The preamble to the interim final rule alerted the public that we would establish a grievance procedure through proposed rulemaking, and sought comments on ways to make it meaningful. Until publication of that proposed rule, M+C organizations should look to State requirements for resolving complaints unrelated to coverage determinations.

*Comment:* A commenter asked for clarification as to whether a State law requiring the external review of all coverage determinations where the independent reviewer's decision would be binding on the M+C organization would be preempted under the specific preemption rules.

*Response:* Specific preemption would apply in that situation. The M+C appeals process is the only method that can result in a binding decision on the M+C organization. A State may choose

to require external review of coverage determinations for monitoring or licensure purposes, but the requirement would be preempted to the extent that it requires a decision by any entity other than one prescribed under the M+C appeals process.

*Comment:* A commenter asked that we revisit our position that State tort or contract remedies may be available to beneficiaries whose coverage determination dispute goes through the Medicare appeals process. This commenter believes that coverage determination cases are contract disputes, and therefore should be the sole province of the Medicare appeals process.

*Response:* In some cases, a case that is cast as a State contract claim may amount to a claim that services are covered under an organization's M+C contract. We agree with the commenter that in that case, the claim would be pre-empted. However, there are other tort or State contract law, or consumer protection-based claims that would be entirely independent of the issue of whether services are required under M+C provisions. For example, a State consumer protection law may provide that certain claims made by an HMO in advertising give rise to particular obligations under State law, that exist independent of the question of what the HMO's M+C contract requires. In other cases, a tort action may exist independent of the question of whether services are covered under an M+C contract. We believe that under principles of Federalism, and Executive Order 13132 on Federalism, which requires us to construe preemption narrowly, a beneficiary should still have State remedies available in cases in which the legal issue before the court is something other than the question of whether services are covered under the terms of an M+C contract.

### 3. Prohibition on State Premium Taxes (§ 422.404)

Section 1854(g) of the Act provides that "no State may impose a premium tax or similar tax with respect to payments to M+C organizations under section 1853." This prohibition does not apply to enrollee premium payments made to M+C plans, which are authorized under section 1854 of the Act. Section 402.404(a) sets forth the statutory provision, and specifies that the term "State" includes any political subdivision or other governmental authority within a State.

Section 422.404(b) clarifies the scope of what constitutes a prohibited premium tax, establishing that the prohibition generally does not apply to

a generally applicable tax on the net income or profits of any business. As noted in the preamble to the interim final rule, if the tax applies to premium revenue specifically, there is no exception to the prohibition of such a tax, based on the purpose of the tax.

*Comment:* One commenter agreed with our interpretation that the term "State" should include all political subdivisions, and recommended that we retain the regulatory language prohibiting State-levied taxes on payments made by Medicare to M+C organizations.

*Response:* We agree with the commenter. Since counties and other political subdivisions of a State derive their powers from the State, we believe this broad interpretation of the term "State" is the intended and necessary interpretation of the statutory provision. Thus, any prohibitions of State actions contained in Federal statute should be interpreted as prohibitions on actions at any level of State government or any State or local governmental body within the State.

*Comment:* One commenter noted that section 1854(g) of the Act prohibits only a "premium tax or other similar tax," and argued that this does not support our inclusion of "fees and other similar assessments" in the regulatory language at § 422.404(a). The commenter argued that assessments to fund State high risk pools should be permitted.

*Response:* We believe that any mandatory fee or assessment imposed on premium revenues clearly would fall within the reference to a premium tax or "other similar tax." As noted in the preamble to the interim final rule, we considered whether to exempt an assessment that is used for purposes of an insolvency insurance pool, but determined that if the assessment was mandatory, it amounted to a tax. We noted, however, that an M+C organization that wished to rely on the proceeds from such a pool as part of its plan for insolvency protection could voluntarily contribute to such a pool.

*Comment:* A commenter objected to statements in the preamble to the interim final rule (63 FR 35014) suggesting that an M+C organization may participate in a "guaranty fund" by paying premium taxes voluntarily. The commenter pointed out that the NAIC Life and Health Insurance Guaranty Association Model Act excludes managed care organizations from its definition of a "membered insurer." The commenter recommended that we clarify that State life and health insurance guaranty associations are excepted from the preamble discussion of "guaranty funds," or at least note that

under many States' life and health guaranty association laws, M+C organizations would not be considered member insurers.

*Response:* To the extent the commenter is referring to a guaranty fund operated by a private association, the prohibition on premium taxes would not apply. Our reference in the preamble to voluntary contribution to a guaranty fund involved a State mandated insurance pool established and operated by the government. In this case, the mandate to contribute premium revenue would be preempted, but an M+C organization could voluntarily participate.

### 4. Medigap

Section 1882 of the Act governs the sale of Medicare supplemental ("Medigap") policies, private health insurance policies that are designed to cover certain out-of-pocket costs incurred by Medicare beneficiaries. With minor exceptions, a Medigap policy cannot be sold in any State unless it conforms to one of ten standardized benefit packages, labeled plans "A" through "J".

Before enactment of the BBA, Federal law provided for only one opportunity for a Medicare beneficiary to purchase a Medicare supplemental ("Medigap") policy on a "guaranteed issue" basis. (Generally, this term means that the Medigap insurer cannot deny the application, delay the issuance or effective date of the policy, or charge an additional amount based on the individual's health status.) This opportunity occurs only during the 6-month period beginning with the date the beneficiary is both age 65 or older and enrolled in Medicare Part B.

Section 4031 of the BBA amended section 1882(s) of the Social Security Act to specify additional situations in which beneficiaries are able, as of July 1, 1998, to buy specific types of Medigap policies on a guaranteed issue basis, if they apply within 63 days of losing certain other types of health coverage, and if they submit evidence of the date that the prior coverage terminated. The law also requires that the entity that provided the prior coverage advise the beneficiary of these rights. While the M+C regulations do not implement the Medigap provisions of the BBA or the BBRA, it is important to understand the implications for M+C organizations, since some situations addressed by the Medigap provisions involve beneficiaries who leave M+C plans and return to original Medicare.

The situations that give rise to the obligation to notify the beneficiary include, for example, termination of

coverage by an M+C plan, reduction in an M+C plan's service area, termination of the M+C plan's contract by us, or loss of coverage under an M+C plan due to a change in the beneficiary's place of residence. As mentioned previously, section 501(a) of the BBRA amended section 1882(s)(3) of the Act to allow an individual to choose between two options: (1) Voluntarily disenrolling before coverage under the M+C plan is terminated involuntarily, and applying for a Medigap policy no later than 63 days after being *notified* by the M+C organization of the impending termination or service area reduction; or (2) waiting and applying no later than 63 days following the date of the involuntary termination or service area reduction. In these instances, the beneficiary is guaranteed the right to buy Medigap plans A, B, C, or F, subject to availability of those policies from insurers selling in the State.

With regard to availability, we note that not all 10 standardized Medigap plans may be available in all States, and all plans available in a State might not be offered by every insurer. Wisconsin, Minnesota, and Massachusetts have alternative forms of standardized policies under a waiver granted them by the Omnibus Budget Reconciliation Act of 1990 (OBRA). Federal law does not generally require sale of Medigap policies to beneficiaries under age 65 (eligible for Medicare by reason of disability or ESRD). However, State law may require insurers to sell to these populations under certain circumstances. Also, some insurers voluntarily sell policies to the disabled, usually on an underwritten basis. Where an insurer has filed in a State to sell to the under 65 population, these policies are subject to the BBA guaranteed issue protections.

The beneficiary may also have the right to guaranteed issue of a broader selection of Medigap policies if he or she either: (1) Directly enrolls in an M+C plan upon first becoming entitled to Medicare at age 65; or (2) enrolls for the first time in an M+C plan after previously having been covered under a Medigap policy, and, in both instances, later disenrolls from the M+C plan within 12 months of the effective date of the M+C enrollment. Beneficiaries who were previously enrolled in original Medicare and who purchased a Medigap policy, who disenroll from the M+C plan before the 12-month "trial" period has expired, are guaranteed the right to return to their old Medigap policy, if it is still available from their former insurer; (otherwise they have the choice of plans A, B, C, or F from any insurer). Alternatively, if an M+C plan

was their first choice as newly entitled Medicare beneficiaries at age 65, and they disenroll during the first 12 months after enrolling, they have their choice of all 10 Medigap plans, including plans H, I, and J, which provide some outpatient prescription drug coverage. This broader array of choices for beneficiaries who elected an M+C plan when they first became entitled to Medicare at 65, in effect, compensates them for having forgone their 6-month Medigap open enrollment opportunity, which began when they reached age 65.

In all these cases of voluntary or involuntary terminations from an M+C plan, beneficiaries must apply for the Medigap policy of their choice, from among the options available to them, within 63 days. If they fail to act within this time period, they lose both their guaranteed issue right to purchase the policy of their choice at the standard premium rate, and their protection from pre-existing exclusion periods. Outside of this guaranty issue period, they may be able to find some Medigap insurers who are willing to sell to them, but they may not be able to purchase the policy they want. Additionally, the insurer can apply a pre-existing condition exclusion period of up to 6 months and/or charge them an additional amount based on their health status.

Because the Medigap provisions establish specific deadlines for beneficiaries who wish to take advantage of these new rights, prompt action by the M+C organizations to notify beneficiaries of their rights, or by us to provide accurate evidence of recently terminated coverage, is essential. We are committed to providing beneficiaries whose M+C coverage is terminated with timely and accurate evidence of the recently terminated coverage. To this end, we will provide M+C plans with, among other things, a model final termination letter that must be sent 90 days prior to termination of a contract. This letter will contain detailed information about beneficiaries' rights to Medigap under BBA and the BBRA.

We urge M+C organizations to keep in mind that they are obligated to notify beneficiaries whose coverage terminates of their rights under the Medigap provisions. Those provisions are complex, and beneficiaries will be entitled to guaranteed issue of Medigap policies at standard premium rates and with no preexisting condition exclusion periods only under certain circumstances. As noted above, their choice of Medigap policies will depend on the precise reason for, and timing of, the termination of their coverage under the M+C plan. It also matters whether

they disenroll voluntarily or wait to be involuntarily disenrolled. However, if their initial 12-month trial period will expire before the M+C plan's contract will terminate, they have the option of disenrolling before the 12-month period has expired if they wish to obtain the broader selection of Medigap policies that may be available to them.

Further guidance is available to beneficiaries from their State Health Insurance Assistance Program (SHIP) or State insurance department.

*Comment:* A commenter has asked whether Medigap coverage is still applicable when a beneficiary chooses to privately contract for health services.

*Response:* Medigap policies cover two basic types of costs. The first includes costs such as deductibles and coinsurance that apply with respect to services *covered by Medicare.* The second includes costs of non-covered items and services such as outpatient prescription drugs. Medigap insurers are only required to make payment for the first type of services if a bill is submitted to and processed by Medicare. When a beneficiary privately contracts with a physician or practitioner under section 1802(b) of the Act to receive services that would otherwise be covered under Medicare, the services are excluded from Medicare payment under section 1862(a)(19) of the Act, and the beneficiary agrees not to submit a bill. As the beneficiary acknowledges in the private contract, as required by section 1802(b)(2)(B)(iv) of the Act, the Medigap policy will not pay for costs related to these services.

The policy may, however, be required to make payment with respect to the types of costs that are not otherwise covered by Medicare.

*Comment:* Commenters asked for clarification of the effective date of the BBA guaranteed issue requirements for Medigap A, B, C, and F plans, and for clarification of the rights of disabled beneficiaries with regard to guaranteed issue.

*Response:* As discussed above (and in greater detail in the **Federal Register** on December 4, 1998 and February 17, 1999, 63 FR 67078 and 64 FR 7968, respectively), the BBA's guaranteed issue provision took effect for all insurers on July 1, 1998. In addition, as noted previously, any Medigap policy that is available to beneficiaries under age 65 under any other circumstances must be offered to beneficiaries under age 65 who meet the criteria for BBA guaranteed issue protections.

*Comment:* One commenter was concerned about the wide variation in premiums of the 10 Medigap plans, and

was worried about beneficiaries being overcharged.

*Response:* It is true that there is wide variation in the premiums charged for the 10 standardized Medigap policies, both within States and from State to State. Regulation of Medigap insurance rates is ultimately within the discretion of the States, although federal Medigap law imposes some general requirements. In particular, Medigap policies must meet certain loss-ratio standards that are intended to ensure that policies provide refunds or credits if aggregate premiums exceed aggregate benefits by too high a margin. In addition, during the initial open enrollment period, and when the BBA guaranteed issue situations are in effect for a beneficiary, the insurer cannot increase the premium based on the beneficiary's health status.

*Comment:* Commenters voiced concern over the possibility of a beneficiary being penalized when a health plan terminates without timely enough notice for the beneficiary to find the appropriate Medigap insurance. Commenters also believe that we should provide plans with information as to which States have Medigap policies without pre-existing condition limitations as of January 1, 1999, and in general that plans need more information on Medigap.

*Response:* We have developed a clear termination policy and systems to provide for timely beneficiary notification, so that beneficiaries will be aware of their rights and protections if a plan terminates. In addition to developing internal processes, we are working with the States and M+C organizations to develop model language that will clearly and timely inform beneficiaries of their rights and protections.

In addition, we are working with the NAIC and the States to develop the Medigap Compare database, which will identify available Medigap policies and allow beneficiaries to compare costs and benefits. Beneficiaries and M+C plans will be able to access this database to gain the appropriate information a beneficiary needs when seeking Medigap insurance.

### *J. Subpart J, Part 422*

Subpart J of part 422 has been reserved for future use.

### *K. Contracts with M+C Organizations (Subpart K)*

Subpart K sets forth provisions relating to the contracts that are entered into by M+C organizations, including a description of terms that must be included in the contract, the duration of contracts, provisions regarding the

nonrenewal or termination of a contract, and minimum enrollment, reporting, and prompt payment requirements.

### 1. Definitions (§ 422.500)

*Comment:* As discussed above in section II.F.2, we received comments suggesting that we impose requirements on providers to cooperate with M+C organizations in their collection of encounter data to be used in implementing risk adjustment.

*Response:* As discussed in section II.F.2, in response to this comment, we have taken several steps to facilitate the cooperation of providers in supplying valid data that can be used by M+C organizations to comply with encounter data requirements. In the case of contracting providers, we have specified under § 422.257 that M+C organizations may include in their provider contracts provisions requiring submission of valid data. Therefore, an M+C organization could provide in its contract that it will not make payment if claims do not meet the standards specified. In the case of noncontracting providers, however, § 422.520 requires M+C organizations to pay 95 percent of "clean claims" within 30 days, or pay interest on the amount. Also, based on the existing definition of "clean claims," an M+C organization could not withhold payment based on a failure to submit a claim in the form required for use in complying with encounter data requirements. As noted in section II.F.2, we are revising the definition of "clean claim" in § 422.500 to require that clean claims include the substantiating documentation needed to meet the requirements for encounter data submission, and meet the original Medicare "clean claim" requirements. This change will, in effect, also require noncontracting providers submitting claims to an M+C organization to provide the organization with the information it needs to be able to use the claim in encounter data submissions, by exempting claims that do not meet these requirements from application of the 30-day "prompt payment" standards articulated at § 422.520. M+C organizations will therefore be able to withhold payment longer than the 30-day prompt payment standard in cases where noncontracting providers submit claims that do not contain substantiating documentation necessary for encounter data submissions or have other deficiencies (for example, inadequate coding). We believe that this clarification of the clean claim definition at § 422.500 is consistent with section 1957(f)(1) of the Act, which incorporates the Medicare fee-for-service prompt payment provisions in sections 1816(c)(2)(B) and

1842(c)(2)(B) of the Act, and simply fleshes out the concept in the existing definition that a claim is not clean if it lacks "any required substantiating documentation." Providers should note that submission of claims with complete and accurate encounter data is ultimately in their best interest, since M+C organizations must submit complete and accurate encounter data in order to get the full payment to which they are entitled under the risk adjustment system. While HCFA does not regulate payments to providers by M+C organizations, we believe that M+C organizations should share appropriately with providers any gains under the risk adjustment system.

### 2. National Contracting

The BBA does not specifically define or directly address the issue of national contracting. It facilitated such contracting, however, when it provided in section 1857(a) of the Act that an M+C contract "may cover more than 1 Medicare+Choice plan," and, in section 1851(h)(3) of the Act, provided that marketing material need only be approved once to the extent it is consistent from area to area. While we are interested in national contracting, we similarly have not expressly provided for it in the regulations. One national contracting approach we would be willing to consider would permit an M+C applicant to request that we enter into a national contract with the applicant if the applicant holds license as a risk-bearing entity in each State where it intends to operate. The applicant would have the option of adopting a single M+C plan across the country, with one service area and a national ACR proposal, or offering different M+C plans in different areas under the same national contract.

While we have not at this time entered into a national contract with any M+C organization, HCFA has entered into national "agreements" with national chain organizations that hold M+C contracts. These arrangements apply to those chain organizations that enter into separate contracts in multiple States. These agreements allow a chain organization to establish a uniform policy across all of its States as to marketing, quality assurance, utilization review, claims processing, etc. HCFA pre-approves these national policy procedures. We continue to contract separately with individual, albeit related, M+C organizations affiliated through common ownership or control. We likewise continue to monitor operational activities for each organization in each State, but, having approved national policy, the need for

**40264**    **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

review at the State and local level is reduced.

Nine commenters addressed national contracting for M+C organizations. While most of the public comments favored extending the option of national contracting to M+C organizations and applicant organizations, commenters generally linked their support for the concept to a request that we provide additional information on the specifics of any national contracting policy.

*Comment:* While several commenters that supported national contracting raised individual concerns, (in most instances related to the need for HCFA to provide additional information), one commenter raised concerns that national contracting would undermine our ability to adequately monitor the performance of M+C organizations. Another commenter raised concerns that national contracting would provide M+C organizations the ability to bypass existing limits pertaining to the provision of cross-state and national radiology services.

*Response:* We continue to believe that national contracting has potential advantages for Medicare beneficiaries, M+C organizations, and HCFA. Indeed, we have already observed the benefits of allowing M+C organizations that operate in many markets throughout the county to establish uniform operational functions in the areas of marketing, quality assurance and claims processing. However, some issues pertaining to national contracting, (for example, monitoring and oversight, enforcement actions, etc.), require additional study. While HCFA continues to explore these issues, we are not able to provide detailed guidance. At such time as additional guidance is developed, we anticipate notifying the public through an operational policy letter.

### 3. Compliance Plan (§ 422.501(b)(3)(vi))

As a condition for entering into an M+C contract with HCFA, applicant organizations must demonstrate that they have certain administrative and management arrangements in place. There are six specific administration and management requirements at § 422.501(b)(3). One of these requirements is that M+C organizations have in place a compliance plan for meeting all applicable Federal and State standards. The regulations list the required elements of the compliance plan, which generally follow the standards applied under the U.S. Sentencing Commission's Federal Sentencing Guidelines in determining whether the existence of a compliance plan should mitigate penalties. We

received nine public comments on the M+C compliance plan requirement.

*Comment:* Although some commenters agreed with the spirit of the compliance plan requirement, most objected to its mandatory nature, especially in light of OIG guidance on compliance plans for M+C organizations.

*Response:* We believe that the unique financial incentives and health care delivery systems of M+C organizations justify the compliance plan requirement. Medicare beneficiaries who enroll in plans are essentially "locked in" to that plan's benefit structure and provider network and may not obtain services under original Medicare. M+C organizations are responsible for a significantly broader range of program activities than original Medicare providers, including marketing, enrollment, appeals and grievances, utilization management, and claims payment. Each of these activities presents the potential for noncompliance that could directly and adversely affect a beneficiary's rights under the Medicare program. For example, an M+C organization's failure to report enrollment data properly to HCFA may result in incorrect payments to that organization.

While HCFA and the OIG conduct ongoing M+C program monitoring and enforcement activities, the number and variety of M+C operational requirements presents a significant regulatory challenge to both of these agencies. As a result, we believe that the additional level of scrutiny imposed by a compliance plan is a reasonable requirement.

While the OIG stated in its November 1999 guidance that the document was intended only to provide assistance for M+C organizations, the OIG did note that it "believes an effective compliance program provides a mechanism that brings the public and private sectors together to reach mutual goals of reducing fraud and abuse, improving operational quality, and ensuring the provision of high-quality cost-effective care." The OIG also stated that a compliance plan is a tool for an M+C organization "to ensure that it is not submitting false or inaccurate information to the Government or providing substandard care to Medicare beneficiaries  *  *  *.'' We agree with the OIG's judgement with respect to the utility of the compliance plan tool and have adopted this requirement to protect the integrity of the M+C program.

*Comment:* Several commenters asked when M+C organizations are responsible for meeting the compliance

plan requirements stated at § 422.501(b)(3)(vi), and noted that no detailed guidance on compliance has been issued by HCFA in connection with the interim final rule.

*Response:* The requirements in § 422.501(b)(3)(vi), as revised in this final rule, are in effect and must be met by M+C applicants and M+C organizations. Pending any further guidance, M+C organizations are free to reasonably interpret the provisions in § 422.501(b)(3)(vi), and should be prepared to demonstrate, upon request, how the organization meets each compliance plan element, as specified at § 422.501(b)(3)(vi), *et seq.*

*Comment:* Many commenters addressed the requirement at § 422.501(b)(3)(vi)(H) that M+C organizations develop "an adhered-to process for reporting to HCFA and/or the OIG credible information of violations of law by the M+C organization, plan, subcontractor, or enrollee for determination as to whether criminal, civil, or administrative action may be appropriate." Commenters generally stated that this requirement was too vague, and should be more clearly defined to enable organizations to demonstrate compliance to HCFA. Several commenters requested that we specify what "credible information" means within the context of requiring M+C organizations to submit information to HCFA and/or the OIG. Commenters also requested that we specify: (1) Exactly what information must be self-reported; (2) to which agency; and (3) pursuant to violations of which laws. Commenters also noted that while paragraphs (A) through (G) correspond to provisions found in the Federal Sentencing Guidelines, paragraph (H) appears to be an M+C requirement only. These commenters believe that it is unfair to subject M+C organizations to a self-reporting requirement that does not apply to other sectors of the health care industry.

*Response:* Commenters correctly point out that the first seven elements of the mandated compliance plan guidance at § 422.501(b)(3)(vi) *et seq.* reflect the areas identified in the U.S. Federal Sentencing Guidelines. We previously added the eighth element in an attempt to ensure an enhanced level of program safeguard through self-reporting. We recognize, however, that it is arguably unfair to impose a self-reporting requirement on M+C organizations but not on other types of health care providers and suppliers participating in the Medicare program, and we have eliminated any requirement of self-reporting.

Nevertheless, we believe that the existence of voluntary self-reporting procedures of potential misconduct is an appropriate part of an M+C organization's compliance program. While this rule does not make any type of self-reporting mandatory, M+C organizations may wish to consider the following suggestions, as a matter of voluntary good business practice. These suggestions are not mandatory. Where the M+C organization discovers evidence of misconduct related to payment or delivery of health care items or services under the M+C contract, the M+C organization may conduct a timely, reasonable inquiry into the misconduct. After the reasonable inquiry, if the organization has determined that the misconduct resulted in an overpayment, the M+C organization is encouraged voluntarily to report the overpayment to HCFA. If the M+C organization has determined that the misconduct may violate the statutes of direct concern to the HHS Office of Inspector General, it is encouraged voluntarily to report the existence of the misconduct to that office. Finally, the M+C organization is encouraged voluntarily to initiate and implement appropriate corrective actions to ensure the problem does not recur.

While we are withdrawing all requirements for self-reporting in this rule, we believe that the required reporting of overpayments is an effective tool for promoting Medicare program integrity generally. Accordingly, HCFA intends to develop policies through separate notice and comment rulemaking in cooperation with the HHS Office of Inspector General that would require all Medicare providers, suppliers and contractors to report overpayments to HCFA.

*Comment:* Some commenters considered the M+C compliance plan requirements at § 422.501(b)(3)(vi) to be overly prescriptive, and asserted that they would result in M+C organizations being forced to ''reinvent the wheel,'' even though they may have existing compliance structures in place that meet the intent of the regulations. Many of these same commenters questioned our authority to prescribe these requirements in the M+C final rules.

*Response:* It is not our intent through these rules to require M+C organizations with effective compliance plans in place to make major changes. We believe that the requirements in § 422.501(a)(3)(vi) based on the Federal Sentencing Guidelines are sufficiently broad and general in nature that an effective compliance plan currently in place should satisfy M+C requirements.

However, we do want some assurances that M+C organizations will have procedures in place to ensure compliance with Federal laws and requirements. We believe that our compliance plan requirements include the basic framework required for organizations to prevent and detect activities that will render the organization out of compliance. Moreover, the elements of the Federal Sentencing Guidelines from which these requirements are drawn are present in other guidances issued by the OIG over the last several years and should be familiar to most M+C compliance officials.

M+C organizations and contract applicants have broad discretion under § 422.501(b)(3)(vi) to design their compliance plan structure to meet the unique aspects of each organization. We recognize that there is no one best way for an organization to take steps to ensure that it is operating in compliance with all applicable regulations and requirements. Thus, we intend to work with M+C organizations and contract applicants to apply a flexible standard in reviewing M+C compliance plans, while still ensuring that these compliance plans serve their intended purpose: to detect and prevent compliance problems, in addition to identifying aspects of the organization that may be vulnerable to such problems.

We believe that one way for us to determine if an organization's corporate compliance plan is effective is to evaluate and audit the performance of the organization according to the M+C requirements articulated in the M+C contract and regulations. Since we have an established monitoring process for M+C organizations, we believe that the infrastructure is already established that may assist HCFA in its efforts to assess the effectiveness of organizations' compliance plans based in part on the results of our monitoring efforts.

### 4. Access to Facilities and Records (§ 422.502(e))

Under § 422.502(e) of the regulations, an M+C organization must agree to allow access to HHS or the Comptroller General to evaluate the quality, appropriateness, and timeliness of services furnished to Medicare enrollees under the contract; the facilities of the M+C organization; and the enrollment and disenrollment records for the current contract period, and 6 prior contract years. We received two comments regarding access to M+C organization records.

*Comment:* A commenter asked what an M+C organization's obligations are in relation to information concerning nonplan providers, with whom an M+C organization has no contract. The commenter questioned how M+C organizations could be expected to provide access to governmental entities for nonplan provider records in order to meet the requirements of § 422.502(e).

*Response:* We recognize that HHS, the Comptroller General or their designees can require only M+C organizations and their subcontractors to make available their facilities and records. If an M+C organization does not have a contract or other suitable written arrangement with a provider, it cannot compel the provider to provide the same access that an M+C organization or its subcontractors must provide under the terms of their M+C contract with HCFA. In order for HHS or the Comptroller General to gain access to the facilities and records of noncontracting providers, these agencies would be required to resort to other available legal remedies, such as subpoenas.

We would add, however, that as a general principle, if Federal funds are going to a provider of Medicare or Medicaid services, appropriate Federal officials have a right to review that provider's facility or books as a condition of receipt of those Federal funds.

*Comment:* A commenter suggested that the 6-year time period for which data must be retained under the regulations should be tied to the end of the year in question, and not the date of the completion of the audit, as provided in § 422.502(e)(4).

*Response:* The 6-year period specified for retention of records was established in reliance on the 6-year ''statute of limitations'' that generally governs the initiation of a civil action by the Government, either under the False Claims Act (FCA) or the Civil Monetary Penalties Law (CMPL). A statute of limitations specifies the time period during which the Government may initiate an action. Generally, a statute of limitations begins to run on the date that an audit was completed. For this reason, we are requesting that books and records be kept for at least 6 years from either the end of a contract or the completion of an audit, whichever is later.

For purposes of clarity, we also point out that the 6-year record retention requirement requires M+C organizations to keep a specific year's records for 6 years, after which the organization is free to dispose of any records they deem appropriate. This is to clarify one misconception that M+C organizations must maintain 6 years of records for an additional 6-year period. We instead

envision the obligation for M+C organizations to retain records to expire on a rolling basis, with M+C organizations having the right to discard each year the records from more than 6 years earlier. For example, in 2000, M+C organizations could discard records from 1993 or earlier. In 2001, M+C organizations could discard records from 1994, etc. Under this system of record retention, if the Government has not audited or determined any wrongdoing within a 6-year period following the year when records were developed, the Government would be otherwise precluded under law from taking any action against an M+C organization.

## 5. Disclosure of Information (§ 422.502(f)(2)(v))

Pursuant to authority at section 1851(d) of the Act, § 422.502(f)(2) describes the information that M+C organizations must submit to HCFA. We specify that this information is necessary for us to fulfill our responsibilities in evaluating and administering the program. Our dissemination of some of this information to current and prospective Medicare beneficiaries enables them to exercise informed choice in obtaining Medicare services. We received one comment on this section of the interim final rule.

*Comment:* One individual commented on the requirement in § 422.502(f)(2)(v) that M+C organizations submit to us information about beneficiary appeals and their disposition. The commenter recommended that we amend this section of the regulations to include the additional requirement that M+C organizations disclose to HCFA information regarding beneficiary grievances and their disposition.

*Response:* Consistent with section 1852(c)(2)(c) of the Act, § 422.111(c)(3) of the regulations distinguishes between information that an M+C organization must provide to a Medicare enrollee annually, and information that the M+C organization must disclose to any M+C eligible individual upon request. The requirement states that M+C organizations must disclose to M+C eligible individuals, upon request, the aggregate number of disputes, and their disposition, including both grievances and appeals. Thus, Medicare beneficiaries have access to information on M+C organization grievances.

Also, pursuant to both sections 1851(d)(3) and 1852(c)(2)(C) of the Act, § 422.502(f) requires that M+C organizations disclose to us the appeal data that they are required to disclose upon request to beneficiaries. We

believe that this is necessary so that we can begin to capture important baseline data on the appeals process. Our contractor (the Center for Health Disputes Resolution) is responsible for making reconsideration decisions when an enrollee files an appeal, and these decisions are appealed to HHS administrative law judges and the Departmental Appeals Board. In addition, HCFA enforces decisions made by these entities, which necessarily involve the critical question of whether services will be covered by the M+C organization.

While the regulations provide for beneficiary access to information on an M+C organization's grievance process, we do not at this time believe that it is necessary for HCFA to collect this information for administrative purposes. We would advise M+C organizations, however, that while we are not requiring that M+C organizations disclose grievance data to us at this time, we intend to propose additional requirements pertaining to M+C grievances, including quality of care grievances, in a notice of proposed rulemaking to be published later this year. Thus, we anticipate that M+C organizations may be required to report grievance data in the future.

## 6. Beneficiary Financial Protection (§ 422.502(g))

In the interim final rule, we addressed enrollee financial protection provisions at § 422.502(g). These provisions are designed to protect enrollees from incurring liability for payment of any fee for which M+C organizations are legally obligated. Section 422.502(g) incorporates enrollee financial protections that were in place before the BBA in § 417.122(a)(1), which applies to all section 1876 contractors under § 417.407(f). Section 422.502(g)(1) is intended to protect enrollees from being held financially responsible for fees for which the M+C organization is legally liable; § 422.502(g)(2) addresses M+C organizations' obligation to provide for continued coverage of health care benefits, and § 422.502(g)(3) sets forth the mechanisms M+C organizations can employ to provide the required enrollee protections. We received three comments regarding § 422.502(g).

*Comment:* A commenter suggested that we provide appropriate "hold harmless" language for inclusion in M+C organizations' contracts because different States have different requirements regarding hold harmless language. (By "hold harmless" language, the commenter is referring to language included in an M+C organization's contract with a provider that protects

enrollees from being charged for services, (other than pursuant to M+C plan provisions that allow for cost-sharing), furnished by the provider, even if the provider has not received payment from the M+C organization for the services.)

*Response:* Implicit in the commenter's request is recognition that many States have adopted hold harmless contract language requirements for managed care organizations operating within a given State. We generally recommend that M+C organizations adopt the National Association of Insurance Commissioners' (NAIC) model hold harmless language. However, given the wide variety of individual State requirements loosely categorized under member or enrollee protections, we do not believe that it is prudent to *require* M+C organizations to adopt the NAIC model language, because that requirement may well place some M+C organizations at odds with State provisions. The NAIC-approved language is available through most State insurance commissioners' offices, or by contacting the NAIC directly.

*Comment:* One commenter recommended that we strengthen the beneficiary protection provisions in subpart K by explicitly prohibiting providers from bringing "collection actions" against M+C enrollees, as a means of preventing providers from billing beneficiaries enrolled in M+C plans for fees that are the legal obligation of the M+C organization. The commenter also suggested that we define the word "fees" for purposes of this section of the regulations.

*Response:* Section 422.502(g)(1) is designed to ensure that beneficiaries are not held liable for fees for which the M+C organization is legally responsible. As discussed above, under § 422.502(g)(1)(i), contracts with M+C plan providers must contain language that prohibits these providers from holding beneficiary enrollees liable for payment of fees that are the obligation of the M+C organization. (This language is commonly referred to as "hold harmless" language.) Under § 422.502(g)(1)(ii), M+C organizations are responsible for indemnifying enrollees for payment of any fees that are the legal obligation of the M+C organization to pay when services are furnished by providers that do not have a contract or other acceptable written arrangement with the M+C organization. We believe that these two provisions are adequate to ensure that M+C enrollees are not held responsible for fees for which an M+C organization is liable.

In instances where providers do bill M+C enrollees for amounts beyond those approved in an M+C plan, we believe that it is the responsibility of the M+C organization to take appropriate steps, such as recovering these amounts from the providers, to see that beneficiary enrollees are made financially whole. If they fail to do so, we would take appropriate action against the M+C organization. We believe it would be inappropriate for us to engage in activities directed at individual providers.

We note, however, that even in situations, (such as insolvency or other financial difficulties), where an M+C organization fails to satisfy its responsibility to pay a provider for services furnished to an M+C enrollee, the principle that the beneficiary is protected still applies. Although we believe this principle is inherent in the existing regulations, to clarify this point, we are revising § 422.502(g)(1) to indicate that the applicable beneficiary financial protections apply in situations such as insolvency or other financial difficulties.

We believe that the term "fee" is commonly understood, and does not need a special definition. In this context, the term refers to the fees charged by a provider (for example, a physician's fee for services provided). M+C organizations are responsible for payment of such fees, except for applicable enrollee cost-sharing amounts specified under the M+C plan, which are the obligation of the Medicare enrollee.

*Comment:* A commenter contended that there is an inconsistency in the language in §§ 422.502(g)(2), (g)(3), and (i)(3)(i)(B). Section 422.502(g)(3) gives M+C organizations several options for meeting requirements in § 422.502(g) (other than the "hold harmless" requirement in § 422.502(g)(1)(i)), including the options of providing for continuation of benefits through contractual arrangements, insurance, financial reserves, or other arrangements acceptable to HCFA. Section 422.502(i)(3)(i)(B), however, effectively requires that continuation of benefits be provided for in contract language.

*Response:* We agree with the commenter that the language in these sections is inconsistent. Accordingly, we are revising §§ 422.502(i)(3)(i) to eliminate the requirement that the continuation of benefits protection be addressed through contractual arrangements. In conjunction with this technical change, we also are revising § 422.502(g)(3) to clarify that the alternative arrangements spelled out there are linked only to the

indemnification provision in § 422.502(g)(1)(ii) and to the continuation of benefits provision in § 422.502(g)(2).

## 7. Requirements of Other Laws and Regulations (§ 422.502(h))

Section 422.502(h) requires that contracts reflect the M+C organization's obligations under other laws, specifically, the Civil Rights Act of 1964, the Age Discrimination Act of 1975, the Americans with Disabilities Act, other laws applicable to recipients of Federal funds, and all other applicable laws and rules.

*Comment:* Several commenters wanted us to define "other laws applicable to recipients of Federal funds" and "other applicable laws and rules" as used in § 422.502(h).

*Response:* These references are intentionally broad and all-encompassing. We have already identified various specific laws. These references are intended to encompass laws that may be enacted in the future, or current laws that we might inadvertently omit if we were to attempt to be more specific in this regulation. It is important to note, however, that these references only apply to laws that are, by definition and by their own terms, "applicable" to an M+C organization. Thus, these provisions of the regulations do not result in an organization being required to comply with any laws that do not already apply to them. Rather, they simply call for a commitment to comply with these laws.

## 8. Contracting/Subcontracting Issues (§ 422.502(i))

The requirements found at § 422.502(i)(3) pertaining to M+C contracting requirements with providers, suppliers, and administrative service entities were developed pursuant to our authority under section 1856(b)(1) of the Act to "establish" M+C "standards." We developed these rules in recognition of the fact that managed care organizations commonly enter business relationships with entities that they place under contract to perform certain functions that would otherwise be the responsibility of the M+C organization. Section 422.502(i)(3) establishes these requirements in three broad categories: enrollee protection provisions, accountability provisions, and a provision that assures that services performed by other entities are carried out in a manner that complies with the M+C organization's contractual obligations to us. We received three comments concerning the subcontracting issues addressed in § 422.502(i)(3).

*Comment:* Two commenters believe that HCFA should provide additional guidance on its contracting/subcontracting requirements; they suggested that HCFA apply a flexible standard in holding M+C organizations accountable for meeting these requirements in a timely manner. A third commenter wanted to know if our subcontracting guidance would compel entities with whom M+C organizations contract to comply with HCFA's Y2K systems compliance requirements.

*Response:* We are cognizant of the importance of providing detailed contracting guidance to M+C organizations, and to individuals and entities that might choose to contract with them. We have issued significant guidance in the past and intend to continue doing so as needed in the future. For example, in OPL 98.077 we addressed two major issues. First, we clarified the contracting requirements that affect M+C organizations, applicant organizations, contractors, and subcontractors. Second, we addressed implementation guidance for organizations that wished to begin operation as an M+C-contracting organization. We believe that this OPL sufficiently addresses concerns raised by the managed care industry concerning the need for a higher degree of specificity regarding contracting and subcontracting requirements. We likewise believe that OPL 98.077 established flexible implementation standards in recognition of the labor-intensive nature inherent in activities aimed at amending or otherwise establishing contracts and subcontracts that follow the standards specified in the M+C regulations and elsewhere in OPL 98.077. Commenters and other interested parties may access OPL 98.077 on the Internet at http://www.hcfa.gov.

Regarding the question on Y2K requirements, this issue is moot, since all contracting M+C organizations appear to have succeeded in avoiding related problems. We would note, however, that to the extent an M+C organization provided services through subcontractors, it was responsible for ensuring the Y2K compliance of those subcontractors to the extent necessary to ensure overall Y2K compliance.

*Comment:* Some commenters expressed confusion regarding use of the terms "related entities, contractors, and subcontractors" in § 422.502(i)(1), and the applicability of these terms. Some have pointed out that although the term "related entity" is defined at § 422.500, the terms "contractor" and "subcontractor" are not defined.

*Response:* In response to the confusion suggested by this comment, we now recognize that the terms "contractor" and "subcontractor" are somewhat amorphous, and could mean different things to different parties. For instance, a contract between an M+C organization and members of an IPA might be considered a "contract" by one party and a "subcontract" by another party. Likewise, organizations or individuals might sometimes call a contract between the IPA and its member physicians a "subcontract," while in other instances call it a "provider participation agreement." We have consulted with the managed care industry about terms that may be universally recognized, and have also considered developing new terminology with clear definitions.

As a result, and in response to the comment, we have added two terms—"first tier" and "downstream"—to the list of definitions at § 422.500. We believe these definitions will clarify the types of entities to which the M+C contracting requirements described at § 422.502(i) apply. We began using the terms "first tier" and "downstream" in OPL 98.077, and believe that both terms satisfactorily enhance the description of entities or individuals that are the intended audience for satisfying the requirements found at § 422.502(i).

### 9. Certification of Data That Determine Payment/Certification of the Accuracy of ACR Information (§ 422.502(l))

Under § 422.502(l), M+C organizations must certify to the accuracy, completeness, and truthfulness of the data used to calculate payments to the organizations. These data include enrollment information, encounter data, and the information included in an M+C organization's ACR proposal. In the preamble to the interim final rule, we noted that in submitting these data, M+C organizations are making a "claim" for payment from HCFA, since this information directly affects the calculation of payment rates and amounts. We stated that the certifications would help ensure accurate data submissions and assist us in maintaining the integrity of the Medicare program.

*Comment:* Several commenters suggested that the certification requirement should include a "good faith" standard. Given the significance of the penalties that HCFA, OIG, and the Department of Justice (DoJ) may potentially impose in the case of a "false claim," and the complexity of the data required, these commenters believe that it would be unfair and unrealistic to hold M+C organizations to a "100 percent accuracy" certification standard.

*Response:* We first addressed this issue during the drafting of the 1999 M+C coordinated care plan contract. In developing the certification forms M+C organizations would use to meet the payment data certification requirement, we consulted with OIG and DoJ in drafting language that requires the M+C organization to certify the accuracy, completeness, and truthfulness of this data based on "best knowledge, information, and belief." This language was included in the 1999 contract forms in recognition of the fact that M+C organizations cannot reasonably be expected to know that every piece of data is correct, nor is that the standard that HCFA, the OIG, and DoJ believe is reasonable to enforce.

In presentations to industry, HHS representatives have emphasized that simple mistakes will not result in sanctions. Generally, the Federal government can bring an action only when one of three states of mind exists: (1) Actual knowledge of falsity of a claim or information; (2) reckless disregard; or (3) deliberate ignorance of information supporting the truth or falsity of a claim or other information (42 CFR 1003.101). However, no specific intent to defraud is required. The "best knowledge, information, and belief" standard of the M+C contract certification forms is consistent with these standards.

It is appropriate that the M+C regulations be consistent with the standard of knowledge reflected in Federal fraud statutes. Therefore, we are modifying § 422.502(l) as needed to reflect the "best knowledge, information, and belief" certification standard.

*Comment:* Several commenters suggested that the signatory authority for payment certifications should not be limited to the chief executive officer (CEO) and chief financial officer (CFO) of an M+C organization. The commenters noted that as a practical matter, it is difficult to obtain a CEO or CFO signature on a monthly basis, given the workload and travel obligations of these officers. Therefore, the regulations should permit a CEO or CFO to designate another individual in the M+C organization to sign the certifications.

*Response:* We agree that the CEO/CFO signature requirement can create operational difficulties for M+C organizations in their efforts to comply with the payment certification requirements of § 422.502(l). However, we believe that it is important that certifications be made by a high level individual who has authority to obligate the M+C organization, or someone who has been delegated the authority of such an individual. Therefore, we are modifying § 422.502(l) to require the "CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such an officer," to certify the M+C organization's enrollment data, encounter data, and ACR proposal information.

*Comment:* A commenter contended that M+C organizations should not be required to certify the accuracy of the encounter data they receive from third parties. Rather, this commenter believes that organizations should be required to certify only that they have not altered the data, and that they have transmitted it to HCFA as they received it from the provider. The commenter asserted that M+C organizations do not control the operations of those providing encounter data, and that the volume of data is such that no M+C organization has the resources to verify the accuracy of these submissions.

*Response:* Under the M+C program, encounter data will be used as a factor in calculating payments to M+C organizations. Therefore, encounter data submissions, like enrollment data and ACR information, represent a "claim" for payment. As such, M+C organizations have an obligation to take steps to ensure the accuracy, completeness, and truthfulness of the encounter data.

We acknowledge that encounter data come into M+C organizations in great volume and from a number of sources, presenting significant verification challenges for the organizations. However, we believe that M+C organizations have an obligation to undertake "due diligence" to ensure the accuracy, completeness, and truthfulness of encounter data submitted to HCFA. Therefore, they will be held to a "best knowledge, information, and belief" standard. Therefore, M+C organizations will be held responsible for making good faith efforts to certify the accuracy, completeness, and truthfulness of encounter data submitted.

### 10. Effective Date and Term of Contract (§ 422.504)

Section 1857(c)(3) of the Act provides that the effective date of an M+C contract is to be specified in the M+C contract, and section 1857(c)(1) requires that contracts be for a term of at least one year. The Secretary was provided the discretion under section 1857(c)(1) to provide for contracts to be "automatically" renewable in the absence of notice.

Section 1857(c)(2) of the Act authorizes us to terminate an M+C contract if we determine that an M+C organization substantially fails to carry out its M+C contract, carries out the contract in a manner that is inconsistent with the effective and efficient administration of the M+C program, or fails to continue to meet the M+C requirements.

Section 422.504 of the June 1998 interim final rule implements section 1857(c)(1) and (3) of the Act. Section 422.504(b) provides that contracts generally are for a 12-month period beginning January 1 and ending December 31. Section 422.504(d) provides for a limited exception to this rule, permitting HCFA the discretion, prior to January 1, 2002, to approve a contract for longer than 12 months beginning on a date other than January 1. This decision permits us to accept M+C applications on a continuous "flow" basis until the beginning of the lock-in periods contemplated under the BBA starting in 2002. We received one comment pertaining to the effective date and term of the M+C contract.

*Comment:* A commenter expressed concerns regarding the effect of open enrollment requirements on our requirements governing the effective date and term of M+C contracts. In particular, the commenter had concerns about the elimination of the right to disenroll (and enroll) in an M+C plan at any time. The commenter believes that this shift in enrollment policy contributed to our decision no longer to approve contract applications on a continuous "flow" basis after 2002, since most Medicare beneficiaries, (excluding newly eligible beneficiaries and those beneficiaries eligible to make an election based upon a special enrollment period), would not otherwise be able to enroll in the new M+C organization until the beginning of the next annual open enrollment period. The commenter suggested that M+C organizations retain the ability to enroll Medicare beneficiaries on an ongoing basis without regard to the annual lock-in periods contemplated by the BBA at section 1851(e).

*Response:* This comment raises two related issues. The first pertains to enrollment and disenrollment policies, and the second pertains to HCFA's rationale for considering a policy that would establish a cutoff date for making contracts effective on a date other than January 1. We believe the statute clearly indicates that continuous open enrollment and disenrollment may continue only through the end of 2001. Currently, M+C organizations are only required to be open for enrollment in

November of each year, to newly Medicare-eligible individuals, and during specified "special election periods." (See § 422.60(a).) Thus, it is not necessarily the case even now that there is "continuous" open enrollment, though the right to disenroll exists all year. During the first 6 months of the transition year of 2000, a beneficiary will be able to disenroll without cause, and enroll in any M+C plan open for enrollment, with a limit of one change in enrollment status during this period. This same situation will apply to the first 3 months of every year after 2002, with a limit of one change in elections during this 3-month period. Other than this, beneficiaries will only be permitted to enroll or disenroll during the annual November open enrollment period, a special election period, or upon first becoming eligible for Medicare (with the exception of institutionalized individuals, consistent with section 501 of the BBRA). These enrollment limitations will, in effect, limit the number of Medicare beneficiaries that an M+C organization can enroll mid-year. Yet, after considering the comments, we do not believe that the enrollment policies pursuant to the BBA necessarily preclude us from entering into contracts on dates other than January 1 beginning 2002. While we recognize the inherent enrollment limitations for M+C organizations that will result from a mid-year enrollment eligibility pool that will be comprised largely of individuals that become newly eligible for Medicare, we nevertheless believe that enrollment and the term of an M+C contract are distinct issues that can be considered independent of each other. Regarding the term of an M+C contract, we further believe that the statute permits us to continue to approve mid-year contracts post-2002. Since section 1857(c)(1) requires that contracts be for a term of at least one year, HCFA may continue to enter contracts that may begin on dates other than January 1 for terms longer than 12 months. We have modified § 422.504 to reflect this policy.

**11. Nonrenewal of M+C Contracts (§ 422.506)**

Section 422.506 specifies the process that M+C organizations and HCFA must use should HCFA decide not to renew the organization's contract, or should the organization give HCFA notice that it does not want its contract to be renewed. We received four comments addressing our M+C contract renewal policy.

*Comment:* Some commenters believe that requiring M+C organizations to notify HCFA of their intent to nonrenew

their M+C contract(s) by May 1 does not provide enough time for organizations to conduct the requisite analysis necessary to decide whether the organization should remain in the M+C program.

*Response:* We agree with the commenter that the May 1 deadline does not provide organizations enough time to decide whether to remain in the M+C program. We recognize that the May 1 deadline affords organizations only 60 days from the date such organizations received the upcoming year's M+C payment rates to make business decisions affecting their participation in the M+C program. Congress recently recognized this problem when it amended section 1854(a)(1) of the Act to change the deadline for submitting an ACR from May 1 to July 1. (See section 516 of the BBRA and section I.C of this preamble.) In light of the commenter's concern, and the change in the ACR deadline enacted by Congress, we are revising § 422.506(a)(2)(i) to permit an M+C organization until July 1 to notify us of its intent not to renew its M+C contract for the upcoming contract year. An M+C organization that does not signify its intent not to renew its M+C contract by July 1, and that has not otherwise been notified by HCFA of our intent not to renew the M+C organization's contract by May 1, will be obligated to contract for the upcoming contract year.

*Comment:* One commenter questioned our authority under § 422.506(b)(ii) to decide not to renew M+C contracts based on our assessment that an M+C organization's level of enrollment or growth in enrollment threatens the viability of the organization under the M+C program. This commenter likewise questioned the authority under which we could decide not to renew a contract based upon our assessment that lack of enrollment could be viewed as an implied measure of dissatisfaction with a particular M+C organization.

*Response:* We believe that HCFA should be a prudent purchaser of health care services on behalf of Medicare beneficiaries. This entails a fiduciary responsibility to Medicare beneficiaries and tax payers to maintain contracts with organizations that display a sustained and ongoing commitment toward meeting the highest quality standards, and that offer a product attractive enough to attract Medicare beneficiaries to enroll. In promulgating § 422.506(b)(1)(ii), we determined that it might not be worth the costs associated with contracting with an M+C organization if that organization fails to attract or keep at least some level of Medicare enrollment.

2040

**40270** **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

However, in response to the commenter's concern, we have determined that the standard outlined at § 422.506(b)(1)(ii) for declining to renew an M+C contract may be too vague to enforce; therefore, we are deleting § 422.506(b)(1)(ii).

**12. Provider Prior Notification and Disclosure (§§ 422.506(a), 422.508, 422.510(b), and 422.512)**

We address M+C contract determinations in several sections throughout subparts K and N of the M+C regulations. As noted above, § 422.506 contains provisions governing our decisions and M+C organization decisions concerning whether to renew an M+C contract. Section 422.508 specifies that HCFA and an M+C organization may together elect, upon mutual consent, to modify an M+C contract. Sections 422.510 and 422.512 describe M+C contract termination procedures when initiated by either HCFA or an M+C organization. When M+C contract determinations occur, either the organization initiating the determination, or the organization impacted by the determination, must meet certain notification requirements described in §§ 422.506, 422.508, 422.510, and 422.512. The notice requirements compel either HCFA or the M+C organization to notify: (1) The party affected by the contract determination (for example, if HCFA elects to terminate a contract, HCFA must notify the M+C organization of our determination); (2) the Medicare beneficiaries from the affected M+C organization's M+C plans; and (3) the general public.

*Comment:* Several commenters suggested that we consider developing a requirement that would compel HCFA and/or an M+C organization to notify providers affected by M+C contract determinations about the contract determination, regardless of which party initiates the contract determination action. The commenters contended that the notice is necessary to grant providers sufficient time to react to contract determinations that may adversely affect them. (A related section of regulations that the commenters did not reference, but would logically be affected by the recommendations of the commenters, is § 422.641 of subpart N.)

*Response:* We believe there are several reasons why separate provider disclosure and notification is unnecessary. First, we do not believe that notifying an M+C organization's network providers of an M+C contract determination is feasible for HCFA, since we do not routinely maintain this information at a level of specificity that

would be necessary to provide such notice. Further, we do not believe that it is necessary to require M+C organizations to provide such notice, since we believe that they would necessarily have to notify affected providers that their contracts were being nonrenewed.

In any event, since M+C organizations and/or HCFA are already required to disclose specified information to the general public, a subset of which are the M+C organization's providers, pursuant to an M+C contract determination, we believe that any additional notification requirements may be duplicative and unnecessary.

**13. Mutual Termination of a Contract (§ 422.508)**

Section 422.508 provides that M+C organizations and HCFA may mutually agree to modify or terminate an M+C contract. When a contract is terminated by mutual consent, M+C organizations must provide notice to affected Medicare enrollees and the general public. If the contract terminated by mutual consent is replaced on the following day by a new M+C contract, the notice requirements do not apply.

*Comment:* One commenter expressed concerns that our policy, as outlined at § 422.508, does not provide enough beneficiary protection, and may potentially compromise beneficiary continuity of care. Further, the commenter recommended that mutual contract termination should automatically trigger a special enrollment period for affected Medicare beneficiaries, as outlined at § 422.62(b).

*Response:* We believe that § 422.508 provides Medicare beneficiaries affected by mutual consent contract termination with the protections necessary for affected beneficiaries to choose new Medicare health service delivery options. In particular, the requirement that M+C organizations provide Medicare beneficiaries and the general public with a notice of termination to conform to the 60-day notice requirement in §§ 422.512(b)(2) and (3) should enable affected Medicare beneficiaries to arrange for alternative health care coverage, such as returning to original Medicare, or choosing a different M+C plan before the effective date of termination.

We agree with the commenter that a termination (and not modification) of an M+C contract by mutual consent should trigger a special election period as described at § 422.62(b), and we believe that the existing language at § 422.62(b)(1) supports this position. In stating "HCFA has terminated * * * or the organization has terminated * * *

the [M+C] plan in the service area or continuation area in which the [Medicare eligible] individual resides * * *," we believe that termination of a contract by mutual consent of the two aforementioned parties is consistent with the intent of the provision at § 422.62(b)(1). Thus, we believe that any change to the regulation language at § 422.508 or § 422.62(b)(1) is unnecessary.

**14. Termination of Contract by HCFA (§ 422.510)**

Section 422.510 implements the provisions in section 1857(c)(2) of the Act pertaining to our authority to terminate an M+C organization's contract if we determine that the organization: (1) Fails to substantially carry out the contract; (2) is carrying out the contract in a manner inconsistent with the efficient and effective administration of Medicare Part C; and/ or (3) no longer substantially meets the applicable conditions of Part C. In § 422.510(a), we set forth the above standards, as well as several specific circumstances that we believe constitute a substantial failure to carry out the contract, justifying termination. The procedures under which we would take action to terminate an M+C contract are described in section 1857(h) of the Act. In general, we may terminate an M+C contract after: (1) We provide the M+C organization with an opportunity to correct identified deficiencies; and (2) we provide the organization with notice and opportunity for a hearing, including the right to an appeal of an initial decision.

We received three comments on § 422.510. One commenter requested further explanation regarding the termination process, for which we refer the commenter to subpart N of the regulations. The other comments are addressed below.

*Comment:* Two commenters requested that we define what we mean by the term "substantially fails to comply," as used throughout § 422.510(a).

*Response:* In the June 1998 interim final rule, and at § 422.510(a)(4) through (11), we identify circumstances that we believe constitute examples of what the statute identifies as substantially failing to carry out an M+C contract. They are: the M+C organization commits or participates in fraudulent or abusive activities affecting the Medicare program; the M+C organization substantially fails to comply with requirements in subpart M relating to grievances and appeals; the M+C organization fails to provide us with valid encounter data as required under § 422.257; the M+C organization fails to

2041

implement an acceptable quality assessment and performance improvement program as required under subpart D; the M+C organization substantially fails to comply with the prompt payment requirements in § 422.520; the M+C organization substantially fails to comply with the service access requirements in §§ 422.112 or 422.114; or the M+C organization fails to comply with the requirements of § 422.208 regarding physician incentive plans.

We have longstanding compliance standards for Medicare managed care contractors. In addition to those set forth in the statute and regulations, compliance standards are set forth in our Medicare Managed Care Performance and Monitoring protocol. We use this document when conducting performance/monitoring evaluations of contracting Medicare managed care organizations, including M+C organizations. Pursuant to these reviews, each contracting organization must demonstrate that it again complies with all applicable statutory, regulatory and contract requirements that apply to M+C organizations. These reviews result in findings as to whether a failure to comply with requirements constitutes a "substantial failure" for purposes of § 422.510(a). In determining whether a failure is "substantial," we consider both the frequency and the seriousness of the noncompliance. In the case of a serious violation that could put the health of an enrollee at risk, even a single violation might be considered substantial. In the case of a less serious violation, the noncompliance would have to be more pervasive or systematic in order to be considered substantial.

*Comment:* Some comments reflected confusion regarding § 422.510(c), and its reference to subpart N of part 422. Section 422.510(c) indicates that if we make a determination to terminate an M+C contract, we must first allow the affected M+C organization the opportunity to submit a corrective action plan in accordance with "time frames specified at subpart N" of part 422. The commenter noted that subpart N does not contain any time frames that apply specifically to activities related to corrective actions.

*Response:* We agree that subpart N does not contain time frames that appear applicable to an opportunity to take corrective action, and that this reference is an error. We accordingly are deleting this reference from § 422.510(c).

### 15. Minimum Enrollment Requirements (§ 422.514)

Section 1857(b) of the Act specifies that we may not enter into a contract with an M+C organization unless the organization has at least 5,000 enrollees (or 1,500 if it is a PSO), or at least 1,500 enrollees (or 500 if it is a PSO) if the organization primarily serves individuals residing outside of urbanized areas. Section 1857(b)(3) creates a transition standard for meeting this requirement by allowing us to waive the minimum enrollment requirement during the M+C organization's first 3 years.

*Comment:* A commenter asked if we would consider a permanent minimum enrollment waiver for "smaller scale service models."

*Response:* A review of both the statute at section 1857(b) of the Act and the Conference Committee report indicates that the Congress intended for the minimum enrollment waiver to apply only during the first 3 contract years for any organizations. The minimum enrollment thresholds themselves are necessary to enable organizations to adequately spread risk across enrolled populations.

### 16. Reporting requirements (§ 422.516)

The M+C regulations contain various provisions that specify information disclosure requirements. The requirements address both information to be provided by M+C organizations to HCFA (see §§ 422.64, 422.502, and 422.512), by M+C organizations to beneficiaries (see §§ 422.80 and 422.111), and by HCFA to beneficiaries (under existing § 422.64). Section 422.516 specifies requirements that M+C organizations must meet regarding disclosure of statistics and information to HCFA, M+C enrollees, and the general public.

*Comment:* A commenter requested that we expand the reporting requirements specified at section § 422.516 to require M+C organizations to report the statistics and other information specified in § 422.516 *et seq.* directly to the organization's network health care providers.

*Response:* The commenter seeks to carve-out a separate category of individuals, providers, to receive statistics and other information that M+C organizations are already obligated to disclose to HCFA, to M+C plan enrollees, and to the general public. We believe that it is unnecessary for M+C organizations to report statistics and other information separately to providers. Since M+C organizations (or HCFA) are already required to disclose

specified information to the general public, (a subset of which is the M+C providers), any additional requirement to disclose information separately to an organization's providers is duplicative and unnecessary. Moreover, we are concerned about the administrative burden that such a requirement could impose upon M+C organizations, which may contract with thousands of providers. Further, we suspect that many organizations already voluntarily furnish providers with much of the information required under § 422.516, such as information on health plan benefits, premiums, quality and performance measurements, and utilization control mechanisms.

### 17. Prompt Payment by M+C Organization (§ 422.520(a))

Section 422.520 indicates that contracts between M+C organizations and HCFA must specify that the M+C organization agrees to provide prompt payment of claims that have been submitted by providers for services and supplies furnished to Medicare enrollees when these services and supplies are not furnished by an organization-contracted provider. Specifically, 95 percent of "clean claims" must be paid within 30 days of receipt. While this provision closely follows requirements already in place for section 1876 contractors, (including provisions pertaining to interest to be paid if timely payment is not made), section 1857(f) of the Act extends similar prompt payment requirements to claims submitted by Medicare beneficiaries enrolled in M+C private fee-for-service plans. Section 422.520(a) incorporates this requirement of new section 1857(f), as well as the general 30-day requirement that applied to noncontracting providers under section 1876. In the preamble to the June 1998 interim final rule, we indicated that pursuant to our authority under section 1856(b)(1) to establish standards under Part C, M+C organizations would be required to act upon (either approve or deny, not necessarily pay) all claims not subject to the 30-day standard within 60 calendar days from the date of request.

*Comment:* Commenters noted that the "approve or deny" language in § 422.520(a)(3) was inconsistent with rules regarding M+C organization determinations and reconsiderations as described in subpart M. Also, it has been brought to our attention that the requirement that "non-clean" claims (and up to 5 percent of clean claims) be "approved or denied," but not necessarily paid, within 60 calendar days from the date of the request for payment, is inconsistent with the

**40272**    **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

standard that applied to contractors under section 1876 of the Act. Under the Medicare risk program, HCFA traditionally required that HMOs or CMPs with Medicare risk contracts *pay* or deny non-clean claims within 60 calendar days from the date of the request for payment. The "approve or deny" language may permit gaps of time between when an organization approved a claim for payment and when the organization actually paid a claim.

*Response:* After further review of this issue, we agree that M+C organizations should be required to either pay or deny non-clean claims (and clean claims not subject to the 30-day standard) within 60 calendar days from the date of the payment request. This standard removes the possible ambiguity associated with "approving", but not necessarily paying, a claim for payment, and any related ambiguities pertaining to M+C organization determination and reconsideration policies articulated in subpart M of this final rule. Thus, we are revising § 422.520(a)(3) to indicate that claims for services that are not furnished under a written agreement between M+C organization and its network providers, and that are not paid within 30 days, must be either paid or denied within 60 calendar days from the date of the request.

*L. Effect of Change of Ownership or Leasing of Facilities During Term of Contract (Subpart L)*

The provisions set forth in subpart L of part 422 by the June 1998 interim final rule merely constituted a redesignation of the provisions in part 417 on change of ownership or leasing of facilities. However, since the June 1998 interim final rule was published, it has come to our attention that M+C organizations have serious concerns about language in the italicized title to § 422.550(a)(2) which has been construed to present an impediment to an asset sale by one corporation to another. Section 422.550(a) sets forth what constitutes a "change of ownership" for purposes of provisions in § 422.552 which permit an M+C contract to be transferred to a new owner under certain circumstances (for example, the new owner must meet the requirements to qualify as an M+C organization). Because this italicized title refers to an "unincorporated sole proprietor," it suggests that a "[t]ransfer of title and property to another party" does not constitute a change of ownership if the assets are transferred by a corporation, rather than a sole proprietor. This has presented problems in cases in which transactions that would benefit Medicare beneficiaries by

keeping a M+C plan option available do not appear to fall within the definition of change of ownership. If an M+C contract accordingly could not be transferred as part of an asset sale, this could prevent the sale from going forward, or limit the sale to commercial or Medicaid lines of business, in either case, potentially depriving Medicare beneficiaries of an M+C plan option they would otherwise have.

The italicized language in question was adopted from rules in section 1876 of the Act, which in turn were adopted from longstanding original fee-for-service Medicare change of ownership regulations containing identical language (see § 489.18(a)). These original Medicare change of ownership regulations apply to a change of ownership in the case of a Medicare provider, and address the assumption of a Medicare provider agreement, rather than an M+C contract. However, the language in § 489.18(a)(2) is identical to that in § 422.550(a)(2). In the original Medicare context, this language has consistently been interpreted to encompass an asset sale from one corporation to another. This interpretation was applied by the U.S. Court of Appeals for the Fifth Circuit in *U.S.* v. *Vernon Home Health Care Inc.,* 21 F.3d 693 (5th Cir.), *cert. denied,* 115 S. Ct. 575 (1994). While we have determined that the current M+C change of ownership regulation containing identical language should similarly be interpreted to encompass an asset sale by a corporation, we believe that it would be helpful to eliminate the reference in the title of § 422.550(a)(2) to a "sole proprietorship" in order to avoid confusion. We therefore are changing this title in this final rule to read "Asset sale."

*M. Grievances, Organization Determinations, and Appeals (Subpart M)*

1. Background and General Provisions (§§ 422.560 through 422.562)

Subpart M of part 422 implements sections 1852(f) and (g) of the Act, which set forth the procedures M+C organizations must follow with regard to grievances, organization determinations, and reconsiderations and other appeals. Under section 1852(f) of the Act, an M+C organization must provide meaningful procedures for hearing and resolving grievances between the organization (including any other entity or individual through which the organization provides health care services) and enrollees in its M+C plans. Section 1852(g) of the Act addresses the procedural requirements concerning

coverage ("organization") determinations and reconsiderations and other appeals. Only disputes concerning "organization determinations" are subject to the reconsideration and other appeal requirements under section 1852(g). In general, organization determinations involve whether an enrollee is entitled to receive a health service or the amount the enrollee is expected to pay for that service. All other disputes are subject to the grievance requirements under section 1852(f) of the Act. For purposes of this regulation, a reconsideration consists of a review of an adverse organization determination (a decision that is unfavorable to the M+C enrollee, in whole or in part) by either the M+C organization itself or an independent review entity. We use the term "appeal" to denote any of the procedures that deal with the review of organization determinations, including reconsiderations, hearings before administrative law judges (ALJs), reviews by the Departmental Appeals Board (DAB) and judicial review.

For the grievance, organization determination, and appeal requirements, an M+C organization must establish procedures that satisfy these requirements with respect to each M+C plan that it offers. These requirements generally are the same for each type of M+C plan—including M+C non-network MSA plans and M+C PFFS plans. (Please refer to the preamble material on M+C appeals and grievances in the June 26, 1998 interim final rule (63 FR 35021) for a detailed discussion of the specific requirements under Subpart M.)

Additional regulatory improvements to the M+C appeal and grievance processes are currently under development. We included in the M+C interim final rule those improvements that were practical within the short time frame allotted for completing that interim final rule. As we indicated in the preamble to the M+C interim final rule (63 FR 35030), we intend in the near future to publish a proposed rule implementing a variety of other improvements to the M+C dispute resolution process, including both appeals and grievances.

Sections 422.560 and 422.561 contain the basis and scope and the relevant definitions for subpart M. Section 422.562, General Provisions, provides an overview of the rights and responsibilities of M+C organizations and M+C enrollees with respect to grievances, organization determinations, and appeals. The responsibilities of M+C organizations, under § 422.562(a), essentially parallel those applicable to

HMOs under § 417.604(a), with the added provision that, if an M+C organization delegates any of its responsibilities under subpart M to another entity or individual through which the organization provides health care services, the M+C organization is ultimately responsible for ensuring that the applicable grievance and appeal requirements are still met.

Section 422.562(b) explains the basic rights of M+C enrollees under subpart M, and provides regulatory references to the sections that fully explain the relevant rights. This section does not establish any rights beyond those previously provided for HMO enrollees under part 417, but consolidates general information about enrollees' rights into a central location in the regulations.

Like the part 417 regulations, § 422.562(b) contains provisions addressing the applicability of other regulations that implement Social Security appeals procedures under title II of the Act.

### 2. Grievance Procedures (§ 422.564)

Section 1852(f) of the Act requires that each M+C organization provide "meaningful procedures for hearing and resolving grievances." We have defined this term in § 422.561 as any complaint or dispute other than one that involves an "organization determination" (as described under § 422.566(b)). (This definition retains the meaning of grievance used in part 417.) An enrollee might file a grievance if, for example, the enrollee received a service but believed that the demeanor of the person providing the service was insulting or otherwise inappropriate. Also, as specified under §§ 422.570(d)(2)(ii) and 422.584(d)(2)(ii), grievance procedures would apply when an enrollee disagrees with an M+C organization's decision not to grant an enrollee's request to expedite an organization determination or a reconsideration.

Under § 422.564(a), an M+C organization must resolve grievances in a timely manner using procedures that comply with any guidelines which we establish. Section 422.564(c) clarifies that the PRO complaint process under section 1154(a)(14) of the Act addresses quality issues, but is separate and distinct from the M+C organization's grievance procedures. Thus, there are three different complaint processes (grievance, appeals and PRO processes) available to an enrollee in an M+C organization.

### 3. Organization Determinations (§§ 422.566 through 422.576)

Section 1852(g) of the Act requires an M+C organization to establish procedures for hearing and resolving disputes between the organization and its Medicare enrollees concerning organization determinations. In accordance with section 1852(g)(1) of the Act, § 422.566 specifies that an M+C organization must have a procedure for making timely organization determinations regarding the benefits an enrollee is entitled to receive and the amount, if any, that an enrollee must pay for a health service. Also, an M+C organization's refusal to provide services that the enrollee believes should be furnished or arranged for by the M+C organization is an action that constitutes an organization determination. Disputes involving additional benefits, as well as mandatory and optional supplemental benefits, also constitute organization determinations and are subject to the appeals process.

Section 422.566(b) lists actions that are organization determinations, and with two exceptions, follows the previous HMO regulation at § 417.606(a). The exceptions involve the inclusion as organization determinations of decisions involving— (1) optional supplemental benefits, and (2) payment for post-stabilization services.

Section 422.568 includes the standard time frame and notice requirements for organization determinations. Under § 422.568(a), an M+C organization must make a determination with respect to an enrollee's request for service as expeditiously as the enrollee's health status requires, and in no case later than 14 calendar days after the organization receives the request. An M+C organization may extend the time frame by up to 14 calendar days if the enrollee requests the extension, or if the organization justifies a need for additional information and how the delay is in the interest of the enrollee; (for example, the receipt of additional medical evidence from noncontract providers may change an M+C organization's decision to deny). The M+C organization must include a written justification for the extension in the case file.

Section 422.568(b) specifies that time frames for requests for organization determinations on payment issues are identical to the "prompt payment" requirements set forth under § 422.520. Thus, for issues relating to payment, the requirements are as follows: (1) For "clean claims," an M+C organization

must make a determination regarding the claim within our current "clean claim" rules, that is, 95 percent of clean claims must be paid within 30 calendar days after receipt of the request for payment; (2) for all other claims, an M+C organization must make a determination regarding the claim within 60 calendar days after receipt of the request for payment. (Under existing § 422.500, "clean claims" are claims that have no defect, impropriety, lack of any required substantiating documentation, or particular circumstances requiring special treatment that prevents timely payment. See section II.K of this preamble for a further discussion of rules regarding clean claims and prompt payment.)

Consistent with section 1852(g)(1)(B) of the Act, § 422.568(c) and (d) require that an M+C organization issue written notification for all denials of a request for services, including the specific reasons for the denial in understandable language, information regarding the enrollee's right to either an expedited or standard reconsideration, and a description of both the expedited and standard review processes, as well as the rest of the appeals process.

Sections 422.570 and 422.572 set forth the requirements for M+C organizations with respect to expedited determinations. Sections 422.570(a) (for expedited organization determinations) and 422.584(a) (for expedited reconsiderations) allow either an enrollee or a physician to request an expedited organization determination or reconsideration, regardless of whether the physician is affiliated with the M+C organization. Under § 422.570(a), any physician can request an expedited organization determination. Section 422.584(a) provides that a physician who requests an expedited reconsideration must be acting on behalf of the enrollee as an authorized representative.

Section 422.570(b)(2) specifies that a physician may provide written or oral support for a request for expedition, and under § 422.570(c)(2)(ii), requests for expedited organization determinations that are made or supported by a physician must be granted by the M+C organization if the physician indicates that the enrollee's health could be jeopardized.

Under § 422.568(d)(1), an M+C organization must automatically transfer a denied request for an expedited organization determination to the standard 14-day time frame described in § 422.568(a), and § 422.570(d)(2)(ii) requires an M+C organization to inform the enrollee of the right to file a grievance if he or she disagrees with the

2044

M+C organization's decision not to expedite. We also require under § 422.570(c)(1) that an organization establish an efficient and convenient means for individuals to submit oral or written requests for expedited organization determinations and document any oral requests. We clarify under § 422.570(b)(1) that procedures may involve submitting a request to another entity responsible for making the determination, as "directed by the M+C organization."

Section 422.572(a) requires an M+C organization to notify the enrollee (and the physician involved, as appropriate) of an expedited determination as expeditiously as the enrollee's health condition requires but no later than 72 hours after receiving the request. Under § 422.572(b), an M+C organization may extend the 72-hour deadline for expedited review by up to 14 calendar days if the enrollee requests the extension or if the organization finds that additional information is needed and the delay is in the interest of the enrollee. Also under this section, an M+C organization must notify an enrollee of a determination as expeditiously as the enrollee's health care needs require but no later than upon expiration of the extension.

Provisions in both §§ 422.570(f) and 422.584(f) prohibit an M+C organization from taking or threatening to take any punitive action against a physician acting on behalf or in support of an enrollee in requesting an expedited organization determination or reconsideration.

Section 422.574 identifies the parties to an organization determination, which include the enrollee, certain physicians and other providers who are assignees of the enrollee, legal representatives of a deceased enrollee's estate, and any other entity (other than the M+C organization) determined to have an appealable interest in the proceeding.

**4. Reconsiderations by an M+C Organization or an Independent Review Entity (§§ 422.578 through 422.616)**

If a decision regarding a request for payment or service is unfavorable (in whole or in part) to the enrollee, the enrollee or any other party to an organization determination as listed in § 422.574 who is dissatisfied with the organization determination may request that the M+C organization reconsider the decision. Reconsiderations represent the first step in the appeals process. The reconsideration process encompasses both standard and expedited reconsiderations, as described under §§ 422.582 and 422.584. The time frame and notice requirements for

reconsiderations are set forth under § 422.590.

Section 422.590(a)(1) requires that, with respect to standard reconsiderations concerning requests for service, an M+C organization must issue any determination that is entirely favorable to the enrollee as expeditiously as the enrollee's health condition requires but no later than 30 calendar days after it receives the request for reconsideration. As with organization determinations, § 422.590(a) also provides that the M+C organization may extend the time frame by up to 14 calendar days if the enrollee requests the extension, or if the organization justifies a need for additional information, and how the delay is in the interest of the enrollee. Under § 422.590(b)(1), for standard reconsiderations involving requests for payment, the M+C organization must issue any fully favorable determination no later than 60 calendar days from the date it receives the request for the reconsideration.

In the case of expedited reconsiderations (which involve only requests for services), § 422.590(d)(1) requires that an M+C organization issue any determination that is entirely favorable to the enrollee as expeditiously as the enrollee's health condition requires but no later than 72 hours after it receives the request for expedited reconsideration, again with the possibility of a 14-day extension as described in § 422.590(d)(2). If, however, the M+C organization's reconsideration results in an affirmation, in whole or in part, of its original adverse organization determination, this decision is automatically subject to further review by an independent entity contracted by us. (Again, the time frame within which an M+C organization must reconsider a standard or expedited case has been tied to the enrollee's health needs for service requests, subject to either a 30-day or 72-hour maximum (with a possible 14-day extension), while the time frame remains at 60 days for reconsideration requests involving payment.)

Section 1852(g)(4) of the Act requires us to contract with an independent, outside entity to review and resolve in a timely manner reconsiderations that affirm, in whole or in part, an M+C organization's denial of coverage. Thus, unless an M+C organization completely reverses its coverage denial, it must prepare a written explanation, and refer the case to the independent review entity for a new and impartial determination concerning the payment or service at issue.

Section 422.590(a)(2) provides that for standard requests for services, an M+C organization that makes a reconsidered determination affirming, in whole or in part, its adverse organization determination, must send the case file to the independent review entity as expeditiously as the enrollee's health requires, but no later than 30 calendar days from the date the M+C organization receives the request for a standard reconsideration (or the date of an expiration of an extension). For standard requests for payment, § 422.590(b)(2) allows the M+C organization 60 calendar days from the date it receives the request to send the case to the independent review entity. In instances involving expedited requests for reconsideration, § 422.590(d)(5) requires that the M+C organization forward its decision to the independent entity as expeditiously as the enrollee's health condition requires, but not later than within 24 hours of its affirmation of the adverse expedited organization determination.

Section 422.590(g)(2) requires that any reconsideration that relates to a determination to deny coverage based on a lack of medical necessity must be made only by a physician with expertise in the field of medicine that is appropriate for the services at issue.

For the most part, the procedures outlined above were carried over into the M+C requirements from the existing part 417 standards. We also implemented several changes in the reconsideration requirements that are analogous to those described for organization determinations, such as the requirement under § 422.584(d)(1) that an M+C organization automatically transfer a denied request for an expedited reconsideration to the standard 30-day time frame described in § 422.590(a). In addition, § 422.590(e) requires that if an M+C organization refers a case to the independent entity, it must concurrently notify the enrollee of that action.

Consistent with section 1852(g)(4) of the Act, §§ 422.592 and 422.594 address reconsiderations by an independent entity. If the independent review entity's reconsidered determination is not fully favorable to the enrollee, subsequent review possibilities include ALJ and Departmental Appeals Board (DAB) hearings, as well as judicial review. Provisions addressing these forms of review are set forth in §§ 422.600 through 422.616.

**5. Effectuation of a Reconsidered Determination (§ 422.618)**

Section 422.618 established effectuation requirements for payments

and services. For reconsiderations of requests for payment, when an M+C organization reverses its adverse organization determination, it must pay for the service no later than 60 calendar days after the date that the M+C organization receives the request for reconsideration. For reconsiderations of requests for service, when an M+C organization reverses its adverse organization determination, it must authorize or provide the service under dispute as expeditiously as the enrollee's health condition requires, but no later than 30 calendar days after the M+C organization receives the request for reconsideration, or no later than upon expiration of a 14 calendar day extension. When the M+C organization is reversed by the independent review entity or higher review level, the M+C organization must pay for, authorize, or provide the service as expeditiously as the enrollee's health condition requires, but no later than 60 calendar days from the date the M+C organization receives notice reversing its organization determination.

6. Notification of Noncoverage in Inpatient Hospital Settings (§§ 422.620 and 422.622)

Sections 422.620 and 422.622 pertain to M+C organizations' responsibilities in connection with inpatient hospital care. The existing provisions clarify that inpatient services continue to be covered only until written notice of noncoverage in situations in which the hospital admission was authorized in the first instance by the M+C organization, or in which the admission constituted urgent or emergent care. This notice now is issued to enrollees by the M+C organization, either directly or through the hospital, with the concurrence of the attending physician responsible for the enrollee's hospital care. Section 422.622 provides enrollees with the right to seek PRO review by noon on the day after the receipt of the notice if the enrollee believes that he or she is being discharged too soon. The enrollee bears no additional financial liability for care furnished during the period of PRO review, regardless of the proposed date of discharge. If the enrollee misses the noon deadline for requesting PRO review, the enrollee may file an expedited appeal with the M+C organization. Unlike the PRO review process, there is no financial protection afforded to the beneficiary while the M+C organization conducts its review.

Subpart M   Comments and Responses

7. Definitions and General Provisions

*Comment*: One commenter suggested that the definition of appeal should read as follows: "Appeal means any of the procedures that deal with the review of adverse organization determinations on the health care or health care services an enrollee is entitled to receive, including delay in providing or approving the health care or health care services. * * *"

*Response*: We generally agree with the commenter and are revising the definition in § 422.561 to incorporate most of the commenter's suggested language. We are omitting "health care" as we believe the language duplicates and is inferred in the meaning of "health care services." We are adding the term "arranging for" to the definition. Therefore, we are adopting the following revision to the appeals definition: "Appeal means any of the procedures that deal with the review of adverse organization determinations on the health care services the enrollee believes he or she is entitled to receive, including delay in providing, arranging for, or approving the health care services (such that a delay would adversely affect the health of the enrollee), or on any amounts the enrollee must pay for a service, as defined under § 422.566(b). These procedures include reconsiderations by the M+C organization, and if necessary, an independent review entity, hearings before ALJs, review by the Departmental Appeals Board (DAB), and judicial review."

8. Grievances (§§ 422.564, 422.570, and 422.584)

*Comment*: Two commenters contended that we should not establish prescriptive grievance procedures, while several supported establishing standards. One commenter stressed that any grievance requirements we imposed should be consistent with those applied by accrediting organizations, so that M+C organizations would not have to change current procedures to a great extent. The commenter expressed concern about State privacy requirements, as M+C organizations currently are prevented under State law in some cases from providing specific information on how grievances have been resolved. Rather, in these cases, organizations are only allowed under State law to inform enrollees that the complaint has entered the tracking system. One commenter stated that grievance procedures should be flexible, given our interpretation of preemption provisions. One commenter strongly

encouraged establishing mandatory time frames for the resolution of grievances as soon as possible, and suggested that the time frames and notices mirror those applicable to organization determinations (including expedited time frames). Two commenters suggested a 30-calendar day time frame to render a grievance decision, with an opportunity for a 14-calendar day extension for peer review. Both commenters stated that for non-quality of care grievances, both oral and written, M+C organizations should be encouraged to provide personalized service. One commenter believes that if a denial of expedited consideration is considered a grievance, then the grievance procedure must have a mechanism to resolve the dispute within 24 hours, so that an inappropriately denied request for expedited consideration can proceed quickly. Additionally, a commenter asserted that M+C organizations should be required to provide clear, accurate and standardized information concerning grievance and appeal procedures. One commenter asked who will determine which route is more appropriate for the beneficiary in pursuing a remedy to a complaint, since we acknowledge that the same claim or circumstances that give rise to an appeal may have elements of a grievance. This may cause the beneficiary to be unclear as to which route is most appropriate.

*Response*: Currently, M+C organizations are required under section 1852(f) of the Act and § 422.564 to provide "meaningful procedures" for hearing and resolving grievances. In the interim final rule (63 FR 35030), we requested comments on whether to establish requirements for grievance procedures, and indicated that we would consider prescribing specific requirements for grievances through a forthcoming notice of proposed rulemaking. As anticipated, commenters indicated varying approaches to organization-level grievance procedures. As noted in the interim final rule, we believe that all parties would benefit from subjecting proposed grievance procedures to public notice and comment, and we will do so as part of the notice of proposed rulemaking we are in the process of developing. Thus, we are not including additional grievance requirements in this final rule.

*Comment*: One commenter disagreed with treating a denial of an expedited determination as a grievance rather than permitting an appeal of such a denial. The commenter argued that such a denial should be considered an adverse organization determination on the

health care services an enrollee is entitled to receive, and should be appealable. This commenter contended that denying a request for an expedited determination is not analogous to the example of a grievance provided in the preamble to the interim final rule.

*Response*: The preamble to the interim final rule cites the regulatory definition of a grievance at § 422.561—that is, a grievance is "any complaint or dispute other than one involving an organization determination." The revised definition of organization determination at § 422.566(b) (discussed in detail below) includes determinations regarding payment or services that the enrollee believes should be furnished or arranged for by the M+C organization, and discontinuations of a service if the enrollee believes that the service continues to be medically necessary. In this context, we believe that the term "services" clearly refers to health care services, as opposed to member or customer services, that the M+C organization provides under its contract. Expedited review is a process provided by the M+C organization versus a health care service which is subject to appeal, such as mandatory and optional supplemental benefits. We believe there is a clear distinction between a substantive decision whether benefits should be covered and a procedural decision as to the timing of making such a substantive decision. Indeed, we do not believe that the latter type of determination falls within the statutory language establishing the reconsideration and appeals process, which refers to situations in which the enrollee believes he or she is entitled to services, and to the amount of enrollee liability for services. Therefore, we will continue to require that an organization's denial of expedition generally will be subject to the organization's grievance procedures. We intend to monitor the frequency with which M+C organizations deny requests for expedited determinations.

*Comment:* One commenter believes that a beneficiary should be able to appeal a disenrollment by an M+C organization, rather than simply being able to utilize the grievance process, as provided in § 422.74(d)(2)(ii). In addition, the commenter asserted that decisions on disenrollment should not be left to the M+C organization. Another commenter suggested that we permit a beneficiary to appeal a decision as to whether he or she is entitled to a special enrollment period, and that an M+C organization's decision regarding enrollment or disenrollment, based on the circumstances in § 422.62, should be

considered an organization determination subject to appeal.

*Response:* While we do not believe all disenrollment decisions require an appeals process, we recognize the need in some instances, in particular, when a M+C organization disenrolls an individual for disruptive behavior. Accordingly, in § 422.74(d)(2), M+C organizations must forward all proposed disenrollments for disruptive behavior to HCFA for administrative review. M+C organizations may not disenroll an individual unless HCFA approves of the decision. With respect to the other, limited circumstances under which a M+C organization has the option to disenroll an individual (that is, failure to pay premiums, or fraud), the enrollee has a right to file a grievance if he or she disagrees with an M+C organization's decision. We believe that this approach to these issues has been proven to be sufficient over the years. As indicated above, we will monitor M+C organizations' implementation of their grievance procedures to ensure that they are meaningful. Our monitoring will include investigating a complaint from a beneficiary who believes that the M+C organization did not properly handle a complaint about one of the issues discussed by the commenters above.

### 9. Organization Determinations (§ 422.566)

*Comment:* We received numerous comments on various aspects of the definition of an organization determination, including requests for clarification of whether specific types of situations constitute organization determinations. For example, several commenters suggested that reductions in service should be included in the list of actions that constitute organization determinations. The commenters asserted that when services are reduced, beneficiaries receive no notice and are completely unaware of their ability to contest this reduction through the appeals process. Some commenters noted that the vacated 1997 *Grijalva* order expressly required written notice for a reduction of services. One commenter believes that notice of a reduction in services is of particular importance in the delivery of home care and therapy services. Some commenters believe that § 422.566(b)(4), which provides for notice of a termination only if the enrollee disagrees with the determination that the service is no longer medically necessary, is inconsistent with other Medicare regulations, which the commenter believes require written notice for discontinuation of inpatient services both in a hospital or a skilled nursing

facility, regardless of whether the beneficiary agrees with the decision. One commenter suggested that the regulations require M+C organizations to send notices one day in advance of termination, reduction, suspension or delay in services. One commenter suggested that § 422.566(b) should include a fifth category indicating that the failure of the M+C organization to approve or provide health care or health care services in a timely manner, or to provide the enrollee with timely notice of an organization determination, constitutes an organization determination. Additionally, some commenters suggested that if, in the future, we require that notices of appeal rights must be given in instances in which the current definition of organization determination is not met, we should incorporate the requirement into the regulations.

*Response:* As these commenters suggested, we believe there is a need to revise § 422.566(b) to provide additional clarity as to the types of situations that constitute an organization determination and thus give rise to the pursuant appeal rights. Therefore, we are revising § 422.566(b) as follows:

• Paragraph (b)(1), which concerns payment for out-of-plan services, is revised by adding payment for out-of-area renal dialysis to the existing list of such services (which already included emergency, urgently needed, and post-stabilization services);

• Paragraph (b)(3) includes additional language to clarify that an organization's refusal to pay for or provide services "in whole or in part, including the type or level of services" can constitute an organization determination if the enrollee believes they should be furnished or arranged for;

• Paragraph (b)(4) is restructured to indicate that a discontinuation of services when an enrollee believes that the services continue to be medically necessary constitutes an organization determination (thus eliminating any implication that an organization must make a formal determination as to medical necessity to give rise to appeal rights); and

• New paragraph (b)(5) is added to specify that another situation that constitutes an organization determination is an MC organization's failure to approve, furnish, arrange for, or provide payment for health care services in a timely manner, or failure to provide the enrollee with timely notice of a determination, if such a delay would adversely affect the health of the enrollee.

Thus, we agree that a reduction in services can be considered an

organizational determination that is subject to appeal. To the extent that a reduction results in an enrollee no longer receiving services to which the enrollee believes he or she is entitled, this would be subject to appeal under the language in the first sentence in section 1852(g)(5) of the Act, which addresses appeals based on failure to receive a health service. Also, since a reduction in services could constitute a "[d]iscontinuation" of services to the extent they were no longer being provided, these cases could fall within the language in § 422.566(b)(4). Finally, to the extent that the organization was refusing to continue to provide all or part of the services the enrollee believes should be furnished, and the enrollee has not received the services, this would also fall within the language in § 422.566(b)(3).

Examples of other situations that are intended to fall within the clarified definition of an organization determination include:

• A physician requests approval of 10 home health visits, but the organization approves only five visits (even though Medicare allows more than five visits);

• An organization approves a referral to a specialist, but the specialist it designates does not have experience in treating the enrollee's rare condition;

• A physician requests inpatient surgery for a patient because of the patient's history of complications with anesthesiology, but the organization will approve only outpatient surgery; or

• Although an organization agrees to pay for an in-network service, it imposes greater cost-sharing than the enrollee believes is permissible.

We believe that each of these examples fit within the statutory language at section 1852(g)(1)(A) and (B) of the Act that establishes that an M+C organization must have an appeals procedure for determinations as to whether an enrollee "is entitled to receive a health service under this section and the amount (if any) that the individual is required to pay with respect to such service." Thus, the purpose of the revisions to § 422.566(b) is not to expand on our interpretation of what types of situations constitute organization determinations but rather to provide additional insight into how we continue to interpret the intent of the applicable statutory provisions.

As we explained above, we are developing a proposed regulation that would provide additional specific guidance as to when a reduction in services gives rise to the obligation to provide a written notice. This has been an extremely difficult issue to resolve, and despite extensive consultations

with beneficiary advocates, industry representatives, and State officials, we still have not been able to reach conclusions as to standards beyond those already in the statute and regulations and quoted above. Again, we will address the issue in connection with a separate rulemaking that is being developed in close consultation with all affected groups. Finally, as commenters suggested, if in the future we believe that it is necessary to require notices of appeal or other rights for situations other than organization determinations, we would do so through notice and comment rulemaking.

*Comment:* Some commenters requested confirmation that a discontinuation on grounds other than medical necessity is not an organization determination.

*Response:* As noted above, we have made a minor change to § 422.566(b)(4) to clarify that any discontinuation situation in where the enrollee believes that the services continue to be medically necessary constitutes an organization determination, rather than only those situations where a formal medical necessity determination is involved. Moreover, § 422.566(b)(3) continues to cover any refusal to provide services (including a refusal to *continue* to provide services) that the enrollee believes should be provided. While many cases may involve a medical necessity judgment, others may involve a question of how a limit on benefits (including additional or supplemental benefits) applies to given facts. In some cases, the case for noncoverage on grounds other than medical necessity may be so clear-cut that an appeal would not be requested. For example, in a case in which a service is expressly limited to a fixed number of days, and there is no dispute as to how many days the service has been provided, it is unlikely that the enrollee would "believe" that the M+C organization is obligated to cover days beyond the limit. In other cases, however, there may be ambiguities as to how a limit on benefits is to be interpreted, or the application to a given set of facts, or there may be a dispute as to facts relevant to whether the benefit is covered. In these cases, the beneficiary should have the right to a reconsideration of a denial, so that these issues could be addressed on appeal.

10. Written Notice (§§ 422.566, 422.568, 422.572, and 422.620)

*Comment:* Several commenters believe that the regulations at §§ 422.566 and 422.568 do not make clear that a written notice is required for discontinuations of services.

*Response:* Except in the case of inpatient hospital care, written notice currently is not required for all discontinuations in services. We believe that our policies on what constitutes a denial in the case of a discontinuation of service (other than in the case of inpatient hospital care) are set forth in the regulations concerning organization determinations. According to revised § 422.566(b)(4), discontinuation of a service is considered to constitute an organization determination "if the enrollee believes that continuation of the services is medically necessary." Therefore, if an M+C organization discontinues coverage, and an enrollee indicates that he or she believes that the services continue to be necessary, this action would constitute an organization determination for which a written notice must be provided. We recognize that there may be circumstances that make it difficult to tell whether a written notice is required in a particular case. We therefore are developing a notice of proposed rulemaking that would address this issue, and clarify rules for M+C organizations and beneficiaries.

*Comment:* Several commenters suggested that written notice should take place in all instances where services are reduced or discontinued, not only in instances where the enrollee has indicated disagreement. One reason provided for this suggestion is that it would ensure that enrollees always would receive notice of their appeal rights, even if they have not formally objected to the reduction or discontinuation. Another reason given was that this would make the rule consistent with the rule that applies to hospital inpatient discharges. Other commenters suggested that M+C organizations should provide written notice when services actually terminate, or when services discontinue prior to the time for which the M+C organization initially authorized services. Two commenters suggested that we require notice when there are financial implications to the enrollee.

Other commenters supported the current requirement that the M+C organization provide notice when the enrollee disagrees that the services are no longer medically necessary. One commenter stated that where there is no disagreement, it is wholly inappropriate to provide notice and appeal rights. Instead, it is more appropriate to provide notice at the beginning of a course of treatment. One commenter recommended that we provide advance notice for reductions and terminations in writing, describing the basis for the decision and appeal rights. Some

commenters stated that providing detailed notice in all situations would be confusing, burdensome, and intrusive upon the physician/patient relationship. Two commenters recommended we include in this subpart notice requirements for discharge from a SNF.

*Response:* We recognize that the issue of when it is appropriate for M+C organizations to issue written notice for organization determinations that involve reductions and discontinuations of services is a controversial one. As stated in the preamble to the June 26, 1998 interim final rule (63 FR 35030), we are developing proposed regulations that would further clarify these requirements. At this time, however, we believe that the current regulations serve to balance the need for adequate notice with the potential for inappropriate burdens or beneficiary confusion that might ensue if notice were provided in all cases.

To eliminate confusion, we want to point out that written notice is always required for inpatient hospital discharges regardless of whether the enrollee agrees with the discharge decision. The issuance of a notice to an enrollee prior to an inpatient hospital discharge required under § 422.620 is a separate requirement that should not be confused with the provisions at §§ 422.566(b)(4) and 422.568(c). We will address the SNF issue in the forthcoming proposed rule.

Finally, as the commenters suggested, we recognize the potential compliance difficulties and burden associated with existing § 422.568(c), which requires that if an M+C organization denies services or payment, in whole or in part, it must give the enrollee a detailed written notice that meets the content requirements of § 422.568(d) (such as stating the specific reason for the denial and describing the available appeals procedures). We understand that in practice, plan practitioners generally are responsible on behalf of M+C organizations for issuing these detailed notices to their patients, given that most care decisions about future care are made at the practitioner level; and we agree that this practice may be unnecessarily burdensome and intrusive on the practitioner/patient relationship. Moreover, we can understand that requiring M+C organizations to ensure that appropriately detailed notices are given to enrollees in practitioners' offices may be difficult to monitor and enforce in all circumstances.

Therefore, we have revised the provisions at §§ 422.568(c) through (e) to establish a process under which—(1) practitioners routinely notify enrollees at each patient encounter of their right to receive a *detailed* notice about their services from the M+C organization itself, and (2) when an enrollee requests an M+C organization to provide a detailed notice of a practitioner's decision to deny a service in whole or in part, or if an M+C organization decides to deny service or payment in whole or in part, the M+C organization must give the enrollee a detailed written notice of the determination, consistent with existing content requirements.

The practitioner's notification must inform enrollees of their right to receive a detailed notice from the M+C organization and provide enrollees with all information necessary in order to contact the M+C organization. Consistent with other notification requirements set forth in subpart M (for example, under existing § 422.568(d)(4) or under § 422.572(e)(2)(ii)), we also specify that the content of the practitioner's notification must comply with any other requirements established by HCFA. We are now developing standardized language for use by affected practitioners, and will provide an opportunity for public comment through OMB's Paperwork Reduction Act process. Once that process is completed, we intend to provide further guidance on the content and form of the required practitioner notice. We believe that this requirement will serve to improve M+C organizations' ability to assure implementation of the requirement for detailed written notices while at the same time reducing the administrative burden on practitioners by freeing them from the obligation to routinely provide such detailed notices to their patients.

11. Time Frames (§§ 422.568, 422.572, 422.590, 422.592, 422.618)

*Comment:* Several commenters asserted that the standard determination time frames are too long, with some commenters specifically suggesting the time frame of 5 working days that was adopted by a district court judge in a since-vacated March 3, 1997 order in *Grijalva* v. *Shalala* (a class action lawsuit filed by Medicare HMO enrollees in 1993, challenging, among other things, the appeals procedures that applied under section 1876 of the Act and part 417). One commenter suggested that upon receipt of complete information, a decision should be rendered within 2 business days. Other commenters stated that the M+C time frames are too short. One commenter suggested that we require M+C organizations to make a good faith effort to meet time frames as opposed to a requirement that M+C organizations must meet absolute time frames. A number of other commenters supported the time frames established through the M+C interim final regulation.

*Response:* Before deciding to incorporate into the interim final rule reductions in the time frames within which M+C organizations are expected to render standard organization determinations and reconsiderations for service requests, we consulted with representatives of the managed care industry and beneficiary advocacy community, and conducted extensive research on the subject of organization-level resolution time frames. All groups with which we consulted agreed that the 60-day time frames provided for under the HMO regulations in part 417 were too long. Reports from independent organizations, such as the Physician Payment Review Commission, the General Accounting Office, and medical journals also advocated the reduction of standard time frames. Additionally, we realized the 60-day time frames in part 417 were based on the original fee-for-service Medicare appeals process, which is mostly retrospective. We were aware that new time frames needed to account for the fact that pre-service requests for organization determinations exceed the number of retrospective requests, and that reduced time frames are of critical importance when an individual is awaiting prior authorization for a service. Further, public comments received prior to publication of the M+C interim final rule indicated strong support for a reduction in time frames.

In view of the range of opinions contained in the comments on the M+C interim final rule, we believe that we succeeded in establishing an appropriate middle ground for the maximum time frames. It has also been reported to us that the majority of organizations make decisions within our reduced time frames. Only one commenter contended that the 14-day time frame could not be met as a general rule. We believe that the opportunity for up to a 14-day extension to the time frames for service-related requests allows the M+C organization adequate time in which to render a determination. We also believe that the new 14 and 30 calendar day time frames are appropriate from both consumer protection and industry feasibility standpoints. The medical exigency standard, which requires that decisions be rendered as expeditiously as an enrollee's health requires, provides for a quicker response where appropriate. Likewise, the opportunity for up to a 14-day extension for both organization determinations and reconsiderations

permits M+C organizations additional time to make a coverage decision when appropriate; for example, an M+C organization may extend the time frame at an enrollee's request, or if additional medical documentation is necessary and the M+C organization justifies the reason for the extension.

*Comment:* Another commenter who advocated reductions to reconsideration time frames suggested that we also reduce the time frame within which M+C organizations are permitted to forward case files to the independent review entity under the standard appeals process.

*Response:* M+C organizations must forward standard reconsideration cases to the independent review entity within the time frames permitted for resolution of standard requests. That is, when an M+C organization makes a reconsidered determination that affirms, in whole or in part, its adverse organization determination, it must make the determination and send the case file for external review as quickly as the enrollee's health condition requires but no later than within 30 calendar days for service requests, or within 60 calendar days for payment requests. Time frames begin on the date the organization received the request for a standard reconsideration. Since time frames for submitting case files to the independent entity are incorporated into the resolution time frames, and we are not reducing time frames for standard reconsiderations, it would not be appropriate to reduce the time frames for submitting information to the independent review entity.

*Comment:* One commenter stated that we should provide a definition of "good cause" for extensions of time frames. Another commenter suggested that we should clarify that a 14-day extension may be granted in any instance where an organization determination demonstrates a need for additional information.

*Response:* The regulations for both expedited and standard requests for organization determinations (§§ 422.568(a) and 422.572(b)) permit an M+C organization to obtain an extension "if the organization justifies a need for additional information and how the delay is in the interest of the enrollee". We believe that this standard is largely self-explanatory. As indicated in the preamble to the M+C interim final rule, the M+C organization must include written justification of the extension in the enrollee's case file. Although forthcoming operational instructions will provide further clarification of the M+C organization's ability to grant itself an extension, we would like to clarify

that a 14-day extension for service-related requests may be granted where an organization finds and notes in the enrollee's case file that it needs additional information to make a determination.

Moreover, to further clarify the grounds on which an M+C organization may seek an extension, and to ensure an enrollee is adequately advised of the M+C organization's use of an extension, we are adding language to both §§ 422.568(a) and 422.572(b) that requires an M+C organization to notify the enrollee in writing of the reasons for the extension, and to inform the enrollee of the right to file a grievance if he or she disagrees with the M+C organization's decision. Relatively few enrollees utilize the appeals process, and most organizations are able to make determinations on requests for services within 30 days. Therefore, we do not foresee that requiring M+C organizations to notify enrollees upon initiating an extension will create an undue burden on M+C organizations.

*Comment:* Some commenters supported the requirement that M+C organizations must make decisions "as expeditiously as the enrollee's health requires" (the "medical exigency" standard). In contrast, other commenters stated that the medical exigency standard was vague and uncertain, and likely to cause every reconsideration to become expedited.

*Response:* We believe that the "medical exigency" standard is needed to ensure that M+C organizations will not routinely avail themselves of the maximum time frames for all decisions. Although the expedited review process incorporates the medical exigency standard, this standard is separate and distinct from the process M+C organizations use to handle cases in which a physician or the M+C organization determines that an enrollee's life, health or ability to regain maximum function could be jeopardized in applying the standard time frames.

In our consultations with the public before publishing the M+C interim final rule, industry representatives advised us that each request is different; where some organization determinations are likely to require a 14-day time frame, and possibly 14 additional days, other decisions require less resolution time. Likewise, resolution of some reconsiderations will take up to 30 calendar days, and may require more time to gather additional information. The medical exigency standard requires M+C organizations to prioritize those cases where waiting for a decision is more likely to affect an enrollee

adversely. We interpret this standard as requiring that the M+C organization or the independent entity apply, at a minimum, established, accepted standards of medical practice in assessing an individual's medical condition. Evidence of the individual's condition can be demonstrated by indications from the treating provider or from the individual's medical record (including such information as the individual's diagnosis, symptoms, or test results). We established the medical exigency standard by regulation to ensure that M+C organizations would develop a system for determining the urgency of both standard and expedited requests for services, and give each request priority according to that system. That is, we intend that M+C organizations treat every case in a manner that is appropriate to its medical particulars or urgency, rather than systematically use the maximum time permitted for service-related decisions.

Also, as indicated in the preamble to the interim final rule (63 FR 35028), we continue to believe that the emphasis on the health needs of the individual enrollee is consistent with the statutory requirement that determinations be made on a timely basis. Thus, the fact that an organization makes a determination on a service-related issue within 14 days does not necessarily constitute compliance with the law or regulations if there is evidence that an earlier determination was necessary to prevent harm to the enrollee's health.

We intend to issue additional guidance on the medical exigency standards in a future operational policy letter.

*Comment:* Several commenters suggested shortening the maximum time frame for M+C organizations to pay for, or provide, services once the independent review entity has ruled in the beneficiary's favor. One commenter suggested the effectuation time frame should be reduced to 15 days. Another commenter expressed concern that the effectuation requirements in § 422.618 do not provide for shorter implementation periods for expedited appeals. One commenter observed that if an M+C organization completely reverses its organization determination on reconsideration of a request for service, the organization must authorize, or provide the service; however, given the fact that the enrollee must seek the service, it may prove difficult to ensure that the service has actually been provided. Thus, this commenter suggested that a letter authorizing the service should be sufficient.

*Response:* We agree with the commenters concerning the need for a reduction of effectuation time frames for both standard cases overturned upon review by the independent review entity, and expedited cases overturned by the M+C organization or the independent review entity. However, we believe that since M+C organizations are permitted to authorize, provide or pay for the service in order to effectuate the decision, there is no need to establish a separate requirement for an authorizing letter. Based on these comments, we are revising § 422.618 to reduce the time frame within which M+C organizations must pay for, authorize or provide services to enrollees following a decision rendered by the independent review entity. For service-related requests, the revised language states that "the M+C organization must authorize the service under dispute within 72 hours from the date it receives notice reversing the determination, or provide the service under dispute as expeditiously as the enrollee's health condition requires, but no later than 14 calendar days from that date." For requests regarding payment, we are reducing the time frame to effectuate the independent review entity's determination from "no later than 60 calendar days" to "no later than 30 calendar days." We continue to maintain a distinction for payment-related appeals because most billing practices are on a 30-day cycle.

We also agree with the comments that expedited effectuation requirements should be incorporated into the regulations. To promote consistency in implementation, and to ensure enrollees receive the services they need as quickly as possible, we are establishing a new § 422.619 to require M+C organizations to effectuate overturned, expedited determinations as quickly as necessary, but no later than within 72 hours. Under the new provision, if the M+C organization reverses its original adverse organization determination, in whole or in part, the M+C organization must authorize or provide the service under dispute as expeditiously as the enrollee's health condition requires, but no later than 72 hours from the date it receives the request for the determination.

Where the independent entity reverses, in whole or in part, the M+C organization's initial expedited determination, the M+C organization must authorize or provide the service under dispute as expeditiously as the enrollee's health condition requires, but no later than 72 hours from the date it receives notice reversing the determination. In instances where the independent review entity expedites certain cases on its own accord (for example, where an enrollee or physician did not originally request an expedited appeal at the M+C organization level, but the independent review entity determines an expedited appeal is warranted), the expedited effectuation requirements of § 422.619 still apply.

If the ALJ or higher level reviewer reverses the independent review entity's expedited reconsidered determination, the M+C organization must authorize or provide the service under dispute as expeditiously as the enrollee's health requires, but no later than 60 calendar days from the date of the decision.

*Comment:* Several commenters urged that we incorporate the review time frames for the independent review entity into the regulations text. Section 422.592(b) provides that an independent outside entity must conduct reconsideration reviews "as expeditiously as the enrollee's health condition requires but must not exceed the deadlines specified in the contract." One commenter noted that the contract with the independent outside entity may change each time it is negotiated, and that the general public is not informed of such negotiations, or the time frames produced by these negotiations. Thus, this commenter believes that regulations should specifically impose appropriate time limits on the independent review entity, and the time limits should be consistent with those specified in the vacated 1997 *Grijalva* order. One commenter expressed concern that the public has no remedy when the independent review entity fails to comply with time frames in the contract. This commenter added that the public plays no role in contract negotiation through which the independent review entity's time limits will be determined; and therefore, there is no assurance that an appropriate time limit will be imposed. One commenter recommended that we contract with PROs for the expedited review process instead of our current contractor, the Center for Health Dispute Resolution (CHDR). (PROs are organizations under contract with us to perform utilization and quality review of Medicare services generally, and review of the quality of services furnished by M+C organizations to their enrollees.) There was also concern about the notices provided by the independent review entity. Some commenters suggested that § 422.594 specify that the notice should be written in "understandable language," as provided in § 422.568. Additionally, these commenters believe that the notice should also inform the enrollee about the PRO complaint process under section 1154(a)(14) of the Act.

*Response:* The time frames for the independent review entity's review currently are the same as those time frames within which M+C organizations are required to decide standard and expedited cases, as detailed in the chart provided in the interim final rule (63 FR 35024). The time frames appear in our contract with the independent entity (as opposed to the regulation), however, to provide flexibility in the case of an unanticipated increase in the volume of appeal cases—since the independent contractor reviews cases from organizations nationwide. We have provided public notice of the time frames in the interim final rule and again in this rule. We agree with the commenters that beneficiaries should be informed of any changes that we might make to the current time frames, and will inform beneficiaries if these time frames are changed.

Additionally, we agree with one of the recommended changes to the independent entity's reconsideration notice, and are amending § 422.568 to require that the notice be written in "understandable language." We also will consider issuing instructions to require the independent entity to advise an enrollee of his or her right to review by the PRO for quality of care concerns; (the same requirement on M+C organizations is set forth via model notice instructions).

## 12. Expedited Organization/ Reconsidered Determinations (§§ 422.570, 422.572, 422.584, and 422.590)

*Comment:* Several commenters expressed concern with § 422.572(d), which provides that the 72-hour time period under § 422.572(a) does not begin until medical information is received from noncontract providers where such information is required. One commenter stated that such an open-ended requirement poses an unreasonable risk of delay for the enrollee; especially in cases where time is of the essence, this provision could allow a decision to be postponed indefinitely. Another commenter suggested that M+C organizations should be required, at a minimum, to contact the noncontract provider within 24 hours of the initial request for an expedited reconsideration in order to request the necessary information from the noncontract provider and provide a fax number where the information can be submitted. Additionally, the commenter suggested that the enrollee, the representative, and the physician should be contacted to: Explain the

delay, inform them of the information needed, and provide them with a fax number. One commenter stated that the regulations should place the burden on the M+C organization to make prompt, good faith efforts to communicate with the noncontract provider to obtain the needed information. Additionally, information from noncontract providers should be provided within the 14-day extension period and under the same conditions that an extension would be granted in other circumstances. However, one commenter stated allowing an M+C organization to grant itself a 14-day extension beyond the 72-hour time frame gives the M+C organization too much additional discretion. This commenter stressed that an M+C organization will always state that it needs more than 72 hours, particularly if treatment will be expensive.

*Response:* We largely agree with the commenters, and are revising the regulation text to ensure that M+C organizations must make determinations within the same expedited time periods for cases involving noncontract providers. Accordingly, we are revising §§ 422.572(d) and 422.590(d)(4) to eliminate the provisions indicating that the 72-hour period begins when the organization receives information from the noncontracting provider. Instead, the regulations will require the organization to meet the same time frames set forth in §§ 422.572(a), (b), and (f) for expedited organization determinations and §§ 422.590(d) and (f) for expedited reconsiderations regardless of whether the M+C organization must request information from noncontracting providers. We agree that in situations where either a physician or the M+C organization has already determined that an expedited decision is crucial, open-ended time frames may put the enrollee at risk. We likewise are incorporating into § 422.572(d) the recommended provision for expedited reviews that requires the M+C organization to request any necessary information from the noncontract provider within 24 hours of the initial request for expedition. We continue to require noncontract providers to make "reasonable and diligent efforts to expeditiously gather and forward all necessary information to assist the M+C organization in meeting the required time frames." We believe an opportunity for an M+C organization to take up to a 14-day extension under the 72-hour expedited review process provides the M+C organization with a reasonable opportunity to obtain information from non-contract providers. We will monitor M+C organizations to ensure M+C organizations do not routinely, or unnecessarily, avail themselves of the 14-day extensions. Where appropriate, M+C organizations must notify the physician involved; M+C organizations are always required to notify enrollees of the decision, whether the decision is adverse or favorable to the enrollee, in accordance with the regulation. However, we do not agree that the M+C organization must always contact or notify the enrollee's physician.

*Comment:* Several commenters stated that the criteria for deciding whether a determination must be expedited may be too rigorous. Some commenters suggested that we revise §§ 422.570(c)(2) and 422.584(c)(2) to reflect language from the district court's vacated order in the *Grijalva* case, under which reconsiderations were to be expedited "when services are urgently needed." The district court provided the examples of when acute care services are being denied or terminated, certain types of nursing facility care, certain types of home health and therapy services, and denials of certain types of non-cosmetic surgery. This commenter suggested that the regulation state that expedited consideration may be granted, in certain circumstances, upon lay evidence and without a request by the physician. One commenter contended that the regulations should clearly articulate what constitutes "seriously jeopardizing the enrollee's life, health, or ability to regain maximum function." The commenter argued that a more specific definition should be provided that takes into account both a substantial risk of an adverse outcome, and a small (but significant) risk of a serious and adverse outcome such as permanent disability or death. Some commenters expressed concern that if an enrollee does not obtain physician support to expedite a determination, the M+C organization has broad discretion in deciding whether to expedite.

*Response:* We do not believe that the adoption of the "urgently needed" standard from the vacated *Grijalva* order would be appropriate. First, we believe it is too broad and vague. Second, the term "urgent" is already used in connection with "urgently needed services" (for which enrollees do not need to obtain prior authorization). Using the same term here could cause unnecessary confusion. We also believe that the "serious jeopardy" standard is sufficiently clear. It is unclear how we could expand on what is meant by "serious jeopardy" to an enrollee's "life" (that is, could put his or her life in serious jeopardy), "health" (that is, could put his or her health in serious jeopardy), or "ability to regain maximum function" (that is, could put his or her ability to regain maximum function in serious jeopardy). We believe that the commenter's suggestion that the requirement to expedite a case in which there is a "significant" risk of a "serious and adverse outcome such as permanent disability" is already addressed in language referring to "seriously jeopardizing the enrollee's * * * ability to regain maximum function." With respect to the commenter's suggestion that the regulations provide for cases to be expedited based on "lay evidence" (that is, in the absence of the involvement of a physician), this is already required under section 1852(g)(3)(B)(ii) of the Act "if the request indicates that the application of the normal time frame for making a determination (or a reconsideration involving a determination) could seriously jeopardize the life or health of the enrollee or the enrollee's ability to regain maximum function." The interim final rule and this final rule similarly provide for expedition without the need for a physician's involvement. (*See* §§ 422.570(a) through (b), and 422.584(a) through (b).) Although this decision is made by the M+C organization in the absence of a physician's involvement, the decision is subject to the grievance process, and we will monitor M+C organizations closely to ensure that they are expediting cases where appropriate.

*Comment:* Several commenters strongly urged the removal of the requirement that physicians requesting an expedited appeal must be acting as an enrollee's authorized representative. Commenters contended that the regulation as written is inconsistent with their view of statutory intent, intrudes in the doctor-patient relationship, and could present a problem for incapacitated enrollees.

*Response:* We agree that a physician who requests an expedited reconsideration on behalf of an enrollee should not have to be formally appointed as the enrollee's authorized representative. We initially included this provision based on our belief that the physician served a different role in the context of an organization determination versus an appeal. In the case of an organization determination, we regarded the physician as a provider who is requesting a service for his or her patient. On the other hand, in the context of a reconsideration, we viewed the physician as serving as the enrollee's representative in the first

level of the appeals process. Thus, we believed the physician would need to be appointed by the enrollee in the same manner as any one else who served as a representative. However, in response to the above comments, we have reconsidered our position, and recognize the operational problems with requiring that physicians be authorized representatives when requesting expedited reconsiderations on an enrollee's behalf. For example, under the M+C program, each appeal request requires completion of a separate authorized representative form, which may cause an undue burden on physicians. For this reason and those set forth in the comment above, we have decided to revise § 422.584(a) by eliminating this requirement. Therefore, physicians may request expedited reconsiderations on a patient's behalf without being appointed as the enrollee's authorized representative.

We want to make clear, however, the distinction between a physician acting on behalf of the enrollee, and a physician who meets the conditions for being a party in his or her own right. When a physician seeks either a standard or expedited organization determination for services on behalf of the enrollee, the physician does not need to be an authorized representative. But, if the physician seeks a standard reconsidered determination for purposes of obtaining payment, then the physician must sign a waiver of liability, consistent with § 422.574(b).

*Comment:* One commenter suggested that the ability to request an expedited organization determination should be expanded. The commenter suggested the following options for expansion: (1) All health care professionals, (2) health care professionals that have been designated by a physician to carry out such tasks, or (3) all health professionals providing care in medically underserved areas. Another commenter suggested that we should permit an "authorized representative" to request an expedited determination.

*Response:* The statute explicitly lists enrollees and physicians as those permitted to request expedited organization determinations and expedited reconsiderations, (*see* sections 1852(g)(3)(a)(1) and (2) of the Act). We note that authorized representatives may request expedited determinations or reconsiderations, since the definition of "enrollee" in § 422.561 includes the enrollee's authorized representative. Therefore, the regulations already permit health care professionals who enrollees authorize as their representatives to request expedited organization

determinations and expedited appeals. As described in the previous comment, physicians now may make requests without being authorized representatives. We do not believe it would be appropriate, however, to grant health care professionals other than the enrollee's physician the right to make requests on the enrollee's behalf absent an authorization. There are so many potential health care professionals involved in a patient's care, this could create confusion, and potentially cause duplicate or conflicting requests.

*Comment:* One commenter suggested that we incorporate a separate notice requirement provision whereby, before deciding whether to expedite a determination, the M+C organization must notify the enrollee of the M+C organization's obligation to expedite any request for a determination that was accompanied by a physician's statement that "applying the standard time frame for making a determination could seriously jeopardize the life of the enrollee or the enrollee's ability to regain maximum function." Several commenters requested that we define "prompt oral notice" of a denied request for expedition, as provided in § 422.570(d)(2). This section provides that, if the M+C organization denies a request for an expedited determination, it must give the enrollee prompt oral notice of the denial and follow up within 2 working days with a written letter explaining their right to file a grievance. One commenter asked whether this meant the enrollee is supposed to receive the written notice within 2 working days of the decision, or that the organization is to mail it within 2 working days. Additionally, the commenters suggested that this section also specify that the enrollee be given the right to make an oral, immediate request for a reconsideration when given oral notice of denial, followed by written verification of the reconsideration request.

*Response:* M+C organizations are required under § 422.111(a)(8) to provide notice of grievance and appeal rights upon enrollment and at least annually thereafter. Thus, all enrollees should receive notice of the right to automatic expedition of determinations and reconsiderations when a physician supports the request. However, in a case in which an enrollee submits a request for an expedited organization determination or an expedited appeal, but does not indicate that the request was supported by a physician, we recognize that the enrollee may not have read the required notice carefully, and thus be unaware that a physician's support would make the expedition of

the request automatic. We therefore are revising §§ 422.570(d)(2) and 422.584(d)(2) to require that when an M+C organization denies a request for an expedited determination or reconsideration, its notification letter must inform the enrollee of the right to resubmit the request with a physician's support.

As noted above, upon denial of an enrollee's request for expedited review, existing regulations require an M+C organization to provide the enrollee with "prompt oral notice" of the denial, and follow up with a written letter within 2 working days. We believe that this is a reasonable requirement which indicates that an M+C organization must contact and advise the enrollee of the denial without delay. As suggested by the commenter, we are clarifying the regulations to indicate that subsequent to providing oral notice of the denial, M+C organizations must "deliver" to the enrollee, within 3 calendar days, a written letter that includes the information listed in the regulation at §§ 422.570(d)(2) and 422.584(d)(2). We interpret this provision as requiring an M+C organization to first orally notify an enrollee of a denial, and subsequently deliver written notice to the enrollee within 3 days after the decision. Note that we have revised the regulations at §§ 422.570(d)(2), 422.572(c), 422.584(d)(2), and 422.590(d)(3) to establish a requirement of 3 calendar days, rather than 2 working days. We believe this is a reasonable amount of time within which to require M+C organizations to deliver written notice enrollees (following the oral notice) of a denied expedited request, and that the change to calendar days will eliminate confusion over what constitutes a working day. This change is consistent with the general replacement of standards related to "working days" with "calendar day" standards throughout the M+C regulations.

We also wish to clarify that if an enrollee's request for an expedited organization determination is denied, the M+C organization will automatically transfer and process the enrollee's request under the standard process. If the M+C organization denies the request in whole or in part, the enrollee (or a physician on the enrollee's behalf) then has a right to orally request expedited reconsideration. The M+C organization continues to be responsible for documenting all oral requests in writing and maintaining the documentation in the case file.

### 13. Authorized Representative (§§ 422.561 and 422.574)

*Comment:* A commenter suggested that § 422.574, which addresses parties to the organization determination, should include surrogates under State law as a possible party to an organization determination. This commenter added that by excluding such surrogates, enrollees who are incapacitated and cannot appoint representatives may lack persons authorized to handle appeals on their behalf. Similarly, two other commenters stated that the "authorized representative" definition should be expanded to allow individuals who can act on behalf of an individual under State law to be authorized representatives. This commenter believes that the current definition is limited to an individual appointed under the Social Security Act, and requires completion of the Appointment of Representative form. The commenter believes that this requirement makes it difficult for those who have written Durable Power of Attorney to act in place of the beneficiary. Several commenters suggested that the definition of "enrollee" should not include an authorized representative. One commenter argued that an authorized representative is not the enrollee, since an enrollee is someone who is entitled to health services. Further, the commenter recommended that an authorized representative receive copies of all communications sent to the enrollee concerning the appeal.

*Response:* We agree with the commenters concerning the need to include those individuals appointed under State law (such as surrogates) in M+C requirements, as well as those with Durable Power of Attorney. For this reason, we are amending the definition of authorized representative at § 422.561 to include an individual authorized by an enrollee, "or under State law," to act on his or her behalf in obtaining an organization determination, or in dealing with any of the levels of the appeals process, subject to the rules described in 20 CFR part 404, subpart R, unless otherwise stated in subpart M. We believe that the revised definition of an authorized representative includes those individuals with Durable Power of Attorney. Therefore, an individual authorized to act as a surrogate of an enrollee and those who have written Durable Power of Attorney are permitted to act on behalf of an enrollee in the organization determination, reconsideration and appeal processes. By adding individuals authorized under

State law to the definition of authorized representative, such individuals are included as one of the parties to an organization determination listed at § 422.574, since the definition of an enrollee (who is a party) includes the enrollee's authorized representative. Thus, a surrogate authorized by the State is not only a party to the organization determination, but is permitted to act on behalf of the enrollee under all provisions of subpart M.

We disagree with the commenters who requested that the definition of "enrollee" exclude an authorized representative. Although we recognize that an authorized representative is not an enrollee in the literal sense of being entitled to health services, we believe that to ensure authorized representatives are always permitted to act on behalf of an enrollee, the regulations should include an authorized representative in the definition of "enrollee" under subpart M. We note that § 422.561, which sets forth the definitions used in the appeals regulations contained in subpart M, specifies that the definitions are only "as used in this subpart, unless the context indicates otherwise."). An authorized representative thus would not be considered an enrollee for general M+C program purposes, such as under enrollment or financial liability provisions, but would be able to exercise the rights available to an enrollee for appeal and grievance purposes, such as the right to act on behalf of an enrollee in requesting an appeal or to receive applicable notifications.

*Comment:* One commenter commended our appeal and grievance rights as providing substantial protection, yet expressed concern over access for enrollees with special health care needs (the disabled and/or chronically ill). One commenter stated that M+C organizations will face a challenge in serving the increasing population of beneficiaries with questionable, fluctuating or diminished capacity, and further stated that M+C organizations need to identify enrollees who have surrogates in order to keep them informed. This commenter stated that the regulation should require information and notices be sent to surrogates of incapacitated beneficiaries, and surrogates should be listed as requesters of expedited decisions.

*Response:* As noted above, to the extent that such a surrogate is authorized under State law to act on the beneficiary's behalf, he or she would be considered an authorized representative who is included in the definition of

enrollee and permitted to make requests on the beneficiary's behalf. With respect to other additional procedural protections for enrollees with special health care needs, we believe that such additional protections for enrollees with special health care needs should be included in a notice of proposed rulemaking to provide the public with ample opportunity for input on final standards. We plan in this rulemaking to address the issue of special protections for beneficiaries with limited capacity, and consider possible additional notice requirements for surrogates in such cases.

### 14. Other Appeal Rights (§§ 422.596, 422.600, 422.602, 422.608, 422.612, and 422.616)

*Comment:* One commenter suggested that we revise § 422.596 to clarify that an M+C organization cannot appeal to an Administrative Law Judge (ALJ). However, two commenters argued that M+C organizations should have the right to appeal to an ALJ.

*Response:* Section 422.600 addresses the "Right to a hearing." Section 422.600(a) provides that "any party to the reconsideration (*except the M+C organization*) who is dissatisfied with the reconsidered determination has the right to a hearing before an ALJ." (Emphasis added.) Section 422.600(a) then expressly states that "[t]he M+C organization does not have the right to request a hearing before an ALJ." While we believe that the regulations thus are already clear on this point, we have no objection to the commenter's suggestion that § 422.596 be revised to also reflect this restriction.

The policy limiting ALJ appeal rights to Medicare enrollees has been in place since the inception of the Medicare risk contracting program under section 1876 of the Act. As noted above, under section 1856(b)(2) of the Act, M+C standards are to be based on standards established under section 1876 of the Act to the extent consistent with M+C rules. More importantly, the M+C statute expressly grants a right to a hearing only to an enrollee, with the M+C organization given the right to: (1) Be made a party to such a hearing; and (2) appeal from an ALJ. Section 1852(g) of the Act sets forth a three step process for appeals of coverage determinations. Section 1852(g)(1) of the Act establishes the process for making initial organization determinations and providing notice of appeal rights. Section 1852(g)(2) of the Act provides for the reconsideration process, which is conducted initially by the M+C organization. (Section 1852(g)(3) of the Act provides for M+C organizations to

expedite certain organization determinations under section 1852(g)(1) of the Act and reconsiderations under section 1852(g)(2) of the Act; and section 1852(g)(4) of the Act provides for review by an independent review entity as part of the reconsideration process established under section 1852(g)(2) of the Act). It is section 1852(g)(5) of the Act which provides for the ALJ level of review if the amount in controversy is at least $100, and for ultimate judicial review. Under section 1852(g)(5) of the Act, "[a]n *enrollee* with a Medicare+Choice organization * * * is entitled (if the amount in controversy is $100 or more) to a hearing before the Secretary * * * and in any such hearing the Secretary shall *make the [M+C] organization a party.*"

*Comment:* A commenter suggested that some denied services that do not reach the $100 threshold represent legitimate disputes that could adversely affect patients. This commenter believes that patients should be able to request ALJ hearings for denials of services needed to maintain or regain health or physical functions, without regard to the cost involved. Another commenter similarly asserted that an enrollee's ability to obtain an ALJ hearing and seek judicial review should not be based on the amount in controversy, because this could arbitrarily prevent some enrollees with legitimate disputes from appealing. This commenter suggested modifying the provision to allow a decision to be appealed if the amount in controversy meets the identified threshold, or if the patient's life or health may be jeopardized as a consequence of the decision.

*Response:* Although we are sensitive to the concerns of the commenters, amount in controversy (AC) requirements in the case of appeals under the M+C program are set forth in the statute at section 1852(g)(5) of the Act. A statutory change would be required to alter the current threshold levels; therefore, we are not modifying the M+C regulations.

*Comment:* A commenter expressed concerns about the process for obtaining judicial review. The commenter also requested clarification as to what constitutes the "final decision of HCFA." The commenter believes that some enrollees may not have the resources to pursue their rights in court. This commenter recommended that the reimbursement of attorney fees or associated court costs be left to the discretion of the judge performing the judicial review.

*Response:* A decision by our agent, the independent review entity, becomes "final" and binding on all parties unless a party other than the M+C organization files a request for an ALJ hearing, or unless the decision is reopened and revised by the independent entity. This is the earliest "final" decision that involves us (through our agent), since organization determinations are made by M+C organizations. If this decision is not appealed or re-opened, it is in essence, a "final decision of HCFA." A failure to appeal this decision, however, would mean that the right to further administrative and judicial review has been forfeited. An ALJ decision is similarly final and binding if it is not appealed by a party; (unlike a reconsidered determination, an M+C organization has the right to appeal an ALJ decision). If a timely appeal is filed, the ALJ decision is subject to further review by the Departmental Appeals Board (DAB). At this point, if the DAB declines to review the case, under § 422.612(a), the ALJ's decision becomes a "final" decision for purposes of the right to judicial review. If the DAB agrees to hear the case on appeal, the DAB's decision is the "final decision of HCFA" for purposes of judicial review.

We believe that the commenter's confusion about what constitutes a "final decision of HCFA" may be due to some confusing regulatory text in § 422.612(b). Section 422.612(b) provides that a decision of the DAB may be appealed to Federal court if "(1) It is the final decision of HCFA; and (2) The amount in controversy is $1,000 or more." This implies that there is a distinction between a DAB decision and a "final HCFA decision." In fact, a DAB decision constitutes a "final decision" on our behalf, since it is not subject to any further administrative review. We therefore are revising § 422.612(b) to provide that a DAB decision may be appealed to district court if the amount in controversy is $1,000 or more.

*Comment:* One commenter suggested that we include other rights found in State managed care laws, such as requiring M+C organizations to provide beneficiaries, on request, with clinical guidelines upon which a denial is based.

*Response:* M+C organizations must provide enrollees with written notice of the reasons for a denial, as set forth at §§ 422.568(c) and (d). This includes providing all the information necessary for the beneficiary to understand why the service was denied, including any Medicare coverage criteria or policies applied in making the decision, as well as specific clinical rationales if applicable. To the extent that particular guidelines or screens are used in the determination process, but are not determinative of coverage (for example,

services falling outside certain screens will be given closer review, but still covered if coverage standards are met), we do not believe it is critical for beneficiaries to have access to these documents. We note that Medicare does not make similar documents used by carriers and intermediaries under the fee-for-service program available to the public.

### 15. Inpatient Hospital Notice of Discharge (§§ 422.580, 422.586, 422.620 and 422.622)

*Comment:* Two commenters urged that we simplify the language used in the notice of noncoverage (hereafter referred to as the Notice of Discharge & Medicare Appeal Rights (NODMAR)). One commenter suggested working with us to craft a notice outlining beneficiary rights of appeal while avoiding unnecessary paper work, especially since most of the NODMAR information is already contained in the "Important Message From Medicare" issued upon admission to a hospital. One commenter stated that the notice should be on a clear and readable form, in at least 12-point font, and in understandable language. One commenter stated that beneficiaries are confused by the content and intent of the notice, and that the notice should include a contact person at the M+C organization. Two commenters stated that this should be a form developed by HCFA.

*Response:* Shortly after the promulgation of the notice requirement, which is reiterated in § 422.620, we began receiving comments that the notices of noncoverage being issued to beneficiaries were confusing, contained a great deal of sophisticated "legalese," were too long (the notices were ranging from five to nine pages), and that the many variations of the document posed administrative burdens. Therefore, we committed to drafting a more comprehensive and beneficiary-friendly notice.

We began consulting with industry groups, beneficiary advocacy groups, and peer review organizations in support of drafting a notice that would serve the intended purpose. On February 11, 1999, we issued OPL 99.082. This OPL conveyed: (1) Our new notice, the NODMAR; (2) our intent to consumer test and standardize the model language; and (3) our continued effort to find the best balance of beneficiary protections with administrative burden. The model language conveyed in the OPL contains language that is in 12 and 14-point fonts, is written in understandable language, and is only three pages in length.

The Important Message from Medicare (IMM) and the NODMAR are two documents that contain similar information. The IMM is currently given to the Medicare beneficiary at or about the time of admission, while the NODMAR is given in advance of the patient's discharge. We recognized the burden associated with issuing two notices with similar information. Therefore, we have developed a single document and process that allows patients to be informed about their inpatient hospital rights at a time and in a form that will be most beneficial to them and in a manner that reduces administrative burden. This single document is a revision to the existing Important Message from Medicare.

Accordingly, we have revised the IMM to provide for the inclusion of information on patients' inpatient hospital discharge rights. All Medicare beneficiaries will receive a revised notice, the "Important Message About Medicare Rights: Admission, Discharge, & Appeals," as required under section 1866(a)(1)(M) of the Act.

This revised standardized form will be issued to all Medicare beneficiaries who are inpatients of a hospital at or about the time of their admission. Once a Medicare beneficiary's time of discharge is determined, an amended notice that includes the reasons for the discharge would again be provided to the beneficiary prior to his or her actual discharge. The revised Important Message About Medicare Rights: Admission, Discharge, & Appeals has been consumer-tested, and has received favorable feedback. (Pursuant to the Paperwork Reduction Act of 1995 (PRA), a notice outlining this document was published in the **Federal Register** on April 12, 2000, with public comments accepted through June 12, 2000. See 65 FR 19783.) The content of the revised notice (and amended follow-up notice) will meet the requirements of the PRA and section 1866(a)(1)(M) of the Act (the Important Message from Medicare), and the notice requirements set forth at § 422.620 that are now contained in the NODMAR.

*Comment:* One commenter stated that the notice should include standardized language that indicates that review by PROs is usually preferable to a plan review, and should clearly explain that the enrollee is obligated to make a request in this fashion under these tight time restraints in order to be protected from financial liability.

*Response:* As explained in the preamble to the June 26, 1998 interim final rule, there are advantages to filing for immediate PRO review. The most significant advantage in utilizing the

immediate PRO review process is protection from financial liability for a continued hospital stay until noon of the calendar day following the day the PRO notifies the enrollee of its review determination. In addition, the immediate PRO review process offered the enrollee direct communication with the PRO and a decision that is generally rendered more quickly than an M+C organization's determination.

Therefore, when the model language, NODMAR, was drafted, we included language that would allow the enrollee to understand the significance of meeting the immediate PRO review deadline. Likewise, the revised Important Message stipulates that if the enrollee meets the deadline for filing for immediate PRO review, the enrollee's M+C organization continues to be responsible for paying the costs of the enrollee's hospital stay until noon of the day after the PRO notifies the enrollee of its official decision.

In addition to stating that the enrollee has financial protection if he/she meets the immediate PRO review deadline, we have included a section that explains what happens to the enrollee if he/she misses the deadline and has to appeal to the M+C organization.

*Comment:* One commenter strongly supported the M+C regulations that improve notice requirements for hospital discharges. The commenter stated that the requirement that hospitals provide notice at the time of discharge instead of at admission gives M+C enrollees an additional protection against premature discharges. One commenter stressed the importance of always issuing a notice with respect to termination of any form of inpatient care, even when the enrollee has not expressed disagreement, because these are such significant changes in circumstances. The commenter suggested that these notices must be given in advance of the termination, and inpatient care must continue, without financial liability to the enrollee, until the appeal is resolved.

*Response:* We agree with the commenter that a notice of appeal rights should be issued at discharge without regard to whether the beneficiary expresses disagreement with the termination of care. Section 422.620(a) already provides that an M+C enrollee has the right to continued coverage of inpatient hospital services unless a proper discharge notice is provided. We are concerned that the commenter appears not have understood the existing regulations to require a notice in all cases. This misinterpretation of our current requirements is consistent with what we have heard from

beneficiaries discharged from hospitals during the year prior to consumer testing conducted on the NODMAR, who reported that they were unaware that they had the right to appeal the decision that it was time to leave the hospital, and left based on the belief that they had no choice in the matter. Given that the existing regulations text may not be sufficiently clear, we are responding to this comment by revising § 422.620(a) to expressly require that written notice be issued to enrollees in the case of all discharges and by revising the introductory clause in § 422.620(c) to provide that "In all cases in which a determination is made that inpatient hospital care is no longer necessary, no later than the day before hospital coverage ends, each enrollee must receive a written notice that includes the following * * * ."

With respect to the commenter's suggestion that the enrollee not be financially liable until an appeal is resolved, as noted above, if the enrollee disagrees with a discharge decision, the enrollee may file for immediate PRO review by noon the day after a discharge notice is received. If such a timely request for review is filed, the enrollee is protected from financial liability until at least noon on the day after notice of the PRO's decision, if the PRO upholds the decision to discharge the enrollee. If the PRO decides that hospital services are still necessary, coverage would continue until a new discharge notice is issued.

*Comment:* Several commenters did understand the current regulations to require issuing the NODMAR to every enrollee prior to being discharged from an inpatient hospital setting, and indicated that they found this requirement difficult to administer. One commenter believes that M+C organizations need the cooperation of hospitals to fulfill this requirement, and contended that such cooperation was not always possible to obtain. Therefore, this commenter suggested that we reconsider our decision to require that a NODMAR be provided to every M+C organization member prior to discharge, or that we at least articulate this requirement as a "good faith effort" versus an absolute requirement. Two commenters said that in cases in which the responsibility for providing the notice has not been delegated by the M+C organization to the hospital, or where hospitals refuse to assist in this process, M+C organization staff would have to be available to visit each hospital on an ongoing basis 7 days each week, thereby creating a significant increase in the level of staffing. One commenter reported that in some cases,

**40286**    **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

hospitals are demanding compensation from M+C organizations for providing the notice to enrollees. Another commenter contended that it is inappropriate and unhelpful for hospitals to issue the notice, since there is no reimbursement from M+C organizations or Medicare, and it is impossible for hospital staff to explain decisions they did not make.

*Response:* We understand the burdens associated with an M+C organization directly providing notices in a hospital setting, and agree with the commenters who stated that hospitals are in the best position to give the discharge notice required under § 422.620. In light of the above comments, we have completed development of a single document that combines the NODMAR with the ''Important Message.'' (The Important Message is the document we have determined that hospitals are already required, under section 1866(a)(1)(M) of the Act, to issue to all Medicare beneficiaries, including M+C enrollees.) While this regulation is not the appropriate vehicle to impose requirements on hospitals, some of which do not contract with M+C organizations, we intend, through a more appropriate vehicle, to require that all hospitals provide discharge notices for all Medicare patients. Thus, we are revising § 422.620 to eliminate the existing requirement that M+C organizations issue the notice of noncoverage to M+C enrollees.

Lastly, we note that it is the responsibility of the entity that made the discharge decision to ensure that an enrollee's questions about the discharge decision be directed to someone within that entity who can provide assistance. Thus, where a discharge decision is made by an M+C organization, that organization should be available to answer questions, even though the notice is issued on the organization's behalf by a hospital.

*Comment:* Several commenters suggested that the requirement to issue a NODMAR to all enrollees prior to discharge should be repealed or significantly modified. Four commenters suggested that the NODMAR should be given only if the enrollee or the physician disagrees with the hospital's decision to discharge. One commenter contended that issuing a notice in cases where the enrollee agrees with the discharge decision is unnecessary, will confuse the enrollee, and may result in the delay of appropriate discharge or the increase in hospital costs.

*Response:* The intent of the notice requirement set forth at § 422.620, as with all notice requirements, is to

provide enrollees with information that will help them make a health care at a time when it would be most needed and effectively received. The notice requirement is an important and necessary beneficiary protection.

Again, the revised Important Message has undergone extensive consumer testing. This has helped us to improve the content of the notice to make it less confusing to the beneficiary. Since the revised notice will be used to satisfy the requirement for notice of discharge/ termination of coverage, beneficiaries will have the benefit of the consumer testing in this context as well.

*Comment:* One commenter supported an extension of the notice requirement to original Medicare beneficiaries, that is, all Medicare beneficiaries would receive a notice prior to being discharged from the hospital regardless of whether the beneficiary agrees with the decision. The commenter stated that until this requirement is extended, it will be very difficult to achieve full compliance, and urged that we defer any evaluation of plan compliance with this requirement until such an extension is secured.

*Response:* We have received many inquiries as to whether the M+C policy of issuing NODMARs in all cases will also apply to original Medicare beneficiaries. Currently, the practice has not been for hospitals to issue notices (that is, the Hospital-Issued Notices of Noncoverage (HINN)) to all original Medicare beneficiaries in advance of their hospital discharge, but to do so only in cases in which the beneficiary disagrees. We believe that it is in the best interests of all Medicare beneficiaries and the entities responsible for distribution of such notices to implement a uniform policy for M+C program and original Medicare purposes, and we intend to provide for this through an appropriate vehicle. This final rule, however, sets forth only those requirements that apply in the case of M+C enrollees.

*Comment:* One commenter contended that our inpatient hospital notice requirement generates ill will among M+C organizations, contracting providers, and beneficiaries. Two commenters opposed the notice requirement because they believe it would raise costs to hospitals.

*Response:* The intent of the notice requirement is not to supplant the doctor/patient relationship nor to harm the working relationships among M+C organizations, contracting providers, and/or beneficiaries. We believe that standardized instructions, and the eventual implementation of a uniform

policy for original Medicare beneficiaries, will help to alleviate a great deal of contention between the various entities. In the long run, this should make the referenced relationships function more smoothly.

*Comment:* One commenter suggested that the regulation should make clear that if a notice is not issued, the M+C organization (not the hospital) is liable for services.

*Response:* We agree that if proper notice is not provided, the M+C organization is liable for coverage, unless the hospital has been delegated the authority to make coverage decisions on behalf of the M+C organization. This liability is provided for under § 422.622(c), which expressly addresses liability for services, and § 422.620(a), which makes clear that the enrollee is entitled to coverage until noon the day after notice is given.

*Comment:* One commenter suggested that the only information that should be reviewed in an appeal of a decision not to admit a patient to a hospital, or to discharge a patient, is that which was available at the time that the decision was made.

*Response:* We disagree with the commenter. We believe that the entity reviewing an inpatient hospital discharge decision, or decision not to admit an enrollee to the hospital, should base its review on all the facts and evidence available—regardless of whether such information was available at the time of the decision not to admit or to discharge. In particular, in the case of review by the M+C organization, § 422.586 provides the parties to the reconsideration with an opportunity to present related evidence and allegations of fact or law in person as well as in writing; (the regulation notes that such an opportunity may be limited in the case of expedited reconsideration). Further, § 422.580 defines a reconsideration as a review of an adverse organization determination, the evidence and findings upon which it was based, and any other evidence the parties submit or the M+C organization or we obtain. Thus, there is ample precedent for not limiting information to be reviewed in the case of an appeal, and we plan to continue that policy.

*Comment:* One commenter suggested that, in order to avoid stalemates, the M+C regulations (like the original Medicare regulations) should provide a process to resolve cases in which the physician and the M+C organization disagree about the discharge decision.

*Response:* We agree with the commenter that the existing regulations do not provide for a clear resolution process in situations where an M+C

organization determines that inpatient care is no longer necessary, but the physician who is responsible for the patient's hospital care does not agree. We are currently examining different methods to resolve these situations, such as a method comparable to the existing Medicare fee-for-service system. Under that system, if a hospital believes that an inpatient is ready for discharge, but cannot obtain the concurrence of the attending physician, the hospital may request PRO review of the case. We intend to discuss this issue in our forthcoming notice of proposed rulemaking.

16. Other Comments

*Comment:* As alluded to above, several commenters suggested that we modify the subpart M regulations to reflect the provisions of the 1997 district court order in *Grijalva* that was vacated by the Ninth Circuit on appeal in 1999. For example, several commenters suggested we provide for the continuation of coverage during the pendency of an expedited appeal as provided under that district court order. Two commenters suggested that we clarify the enrollee's right to submit evidence in person. Additionally, several commenters suggested that the regulation should state that the enrollee has the right to informal, in-person communication with the reconsideration decision maker and that telephone hearings could be conducted if appropriate. One commenter opposed the implementation of the provisions in the vacated *Grijalva* order as too burdensome on M+C organizations.

*Response:* In general, we intend to implement regulatory changes that stem from the *Grijalva* order through upcoming notice and comment rulemaking. Thus, several of the commenters' suggestions are not addressed here. We note, however, that in some respects, we believe that the improvements to the appeals process that have been made under the M+C program already incorporate several of the provisions in the vacated *Grijalva* order, and in many instances are stronger. For example, the *Grijalva* order would have required that organization determinations be rendered within 5 working days, with the possibility of a 60-day extension. Under this regulation, we require that when an enrollee requests a service, the M+C organization must respond as expeditiously as the enrollee's health condition requires, but no later than 14 calendar days. The M+C organization may not extend the time frame beyond an additional 14 calendar days. More significantly, unlike under the *Grijalva* order, the M+C program

provides an expedited 72-hour time frame for organization determinations in some cases that is shorter than the *Grijalva* time frame, and a similar expedited 72-hour time frame for the resolution of certain reconsiderations, while the *Grijalva* order provides neither. In another example illustrative of how our current M+C regulations meet or exceed the *Grijalva* order, at § 422.586, the M+C organization is required to provide parties to the reconsideration with a "reasonable opportunity to present evidence and allegations of fact or law * * * in person."

*Comment:* One commenter urged that we eliminate the phrase in § 422.574(b) which reads "and formally agrees to waive any right to payment from the enrollee for that service," because this language demeans the role of physicians as patient advocates for medically necessary services.

*Response:* We do not believe changes are needed in § 422.574(b), which requires a physician or other provider who has furnished a service to an enrollee to formally agree to waive any right to payment from the enrollee for that service. The waiver is only required in the case of retrospective payment denials, where an enrollee has *already* received medically necessary services, but the noncontract physician or provider is seeking payment for furnishing those services; therefore, this phrase does not affect the role of physicians as patient advocates for medically necessary services. In the context of receipt of payment, the role of the physician or provider is no longer as a patient advocate for medically necessary services. Therefore, the M+C regulation does not adversely affect or demean a physician's role as an advocate in prospective instances where an enrollee has not yet received health care services.

*Comment:* A commenter asked whether we would offer clarification of respective Medicare/Medicaid authorities, particularly with respect to New York State's existing 1115 Medicaid demonstration project. Additionally the commenter wondered if we will establish an administrative linkage between the States and the Medicare review authority for the provision of reports on reviews of adverse determinations in M+C organizations also operating as a State-defined managed long term care plan. (The commenter noted that managed long term care plans will predominantly serve the dually eligible.)

*Response:* We agree that access of dual eligibles to both the Medicare and Medicaid external hearing process

should be clarified. The external hearing process accessed depends upon the type of services being provided. For example, in original Medicare, enrollees who are dually eligible access Medicare services through the Medicare system. Therefore, appeals of Medicare services may be appealed through the Medicare external hearing process, if the beneficiary chooses to do so. Medicaid-only wraparound services (such as pharmacy services) must be accessed through Medicaid. Therefore, appeals of Medicaid-only services must be appealed through the Medicaid external hearing process. Likewise in capitated managed care, when a dually eligible enrollee is enrolled in a Medicaid MCO, the capitated rates are set based on an assumption that Medicare services are accessed through the Medicare system. Therefore, the Medicaid fair hearing system is accessed only for the Medicaid capitated services. The Medicare external hearing is accessed for the Medicare services outside of the Medicaid capitation contract. If a dually eligible individual is enrolled in an M+C organization, then the Medicare external hearing is accessed for the Medicare services within the capitation contract. The enrollee accesses the Medicaid State Fair Hearing only for services outside of the Medicare contract. The key to this example is that the enrollee and the M+C organization need to know whether the service provided is a Medicare- or Medicaid-covered service.

*Comment:* A commenter suggested that § 422.568(e), which addresses the effect of failure to provide timely notice of an organization determination, should be revised to specify that: (1) Failure to give timely and proper notice shall result in an automatic authorization/approval; and/or (2) failure to give timely and proper notice shall result in automatic sanctions by us. Furthermore, the commenter stressed that if an M+C organization fails to give proper notice, the M+C organization should be required to submit the file directly to an independent organization as described in § 422.590(c). Another commenter suggested that M+C organizations that fail to comply with grievance and appeal requirements should be subject to other intermediate sanctions.

*Response:* If we determine that an M+C organization substantially fails to comply with the notice requirements relating to grievances and appeals in subpart M, we have the option to terminate the contract under the requirements of § 422.510(b), impose intermediate sanctions as described in §§ 422.756(c)(1) and (c)(3), and/or

impose civil money penalties as described in § 422.758. We note that, depending on the seriousness of a violation (for example, in terms of the degree of risk to an enrollee's health), failure to comply with notice or appeal requirements in only one or two cases could constitute a substantial failure. Intermediate sanctions include the suspension of enrollment and marketing. We believe that these sanction requirements are most appropriately set forth in the sections of the M+C regulations dedicated to contract provisions (subpart K) and intermediate sanctions (subpart O).

We do not agree that we should add the requirement that an M+C organization's failure to give timely and proper notice shall result in an automatic authorization/approval, or that failure to give timely and proper notice shall result in *automatic* sanctions. In fact, we believe the first recommendation could seriously jeopardize the enrollee's health if, for example, an enrollee requested service that could be harmful to his or her health. We note that in the case of hospital and nursing home services already being provided, we have in part implemented the commenter's suggestion, in that the M+C organization is obligated to continue to cover the services until notice of noncoverage is provided. Also, as mentioned earlier, our sanction authority includes cases where we determine an M+C organization substantially fails to comply with the requirements relating to grievances and appeals in subpart M, including the organization's failure to provide the enrollee with timely and proper notice. Finally, where an M+C organization fails to give proper notice within the time frames required for resolution, § 422.590 requires the M+C organization to submit the file to the independent entity for review. We expect M+C organizations to provide enrollees with written notice for all denials (including the case of a discontinuation of a service where the enrollee disagrees (that?) the services are no longer medically necessary) according to the time frames and notice requirements set forth under subpart M and in operational instructions. However, we do not agree that it is practical, nor does the law mandate, that we require M+C organizations to automatically forward cases for independent review when content of the notice is at issue, and there has not been an adverse organization determination (that is, a coverage denial).

*Comment:* A commenter suggested that M+C organizations should be required to establish an independent appeals procedure for denials of care.

*Response:* The M+C statute requires that we contract with an independent review entity to independently review plan denials of care. We believe that this arrangement, along with the other M+C appeal requirements, provide Medicare enrollees with the rights they need, and the rights to which they are entitled.

*Comment:* Two commenters did not believe that the physician reviewing the reconsideration needed to be of the same specialty or sub-specialty as the treating physician. Requiring the same specialty as the treating physician unduly complicates the reconsideration process in this commenter's view. One commenter pointed out that the BBA Conference Report states that "It is not the conferees intent to require that a physician involved in the reconsideration process in all cases be of the same specialty or sub-specialty as the treating physician." One commenter suggested that *expertise* should be defined in terms of board certification in the specialty, years of experience practicing in the specialty, and active practice. One commenter also suggested that physicians have qualifications other than expertise in the field of medicine that is appropriate for the services at issue. The commenter believes that the reviewing physician should also be formally qualified in the specialty treatment (licensed and actively practicing in the same jurisdiction) as the practitioner providing (or who would provide) the services, and have the appropriate level of training and experience to judge the necessity of the service. To ensure greater professional accountability, a commenter recommended that the reviewing physician's identity be accessible to the physician who recommended, rendered, or would have rendered the treatment under review. One commenter suggested that we also include other rights found in State managed care laws, such as requiring initial (organization) determination denials to be made or approved by a physician.

*Response:* We agree that a physician involved in the reconsideration process need not in all cases be of the exact same specialty or sub-specialty as the treating physician; therefore, we are revising § 422.590(g)(2) to make this clear. For example, we believe that there may be situations where only one specialist practices in a rural area, and therefore, it would not be possible for the M+C organization to obtain a second reviewer with expertise in the same specialty. In addition, we recognize that there may be some situations where there are few practitioners in highly specialized fields of medicine. Under these circumstances, it would not be possible to get a physician of the same specialty or sub-specialty involved in the review of the adverse organization determination.

With respect to the commenter who specified training that the commenter believes reviewing physicians should have, we believe that our standard of "appropriate" expertise addresses this comment. Nor do we believe that it would be appropriate for the reviewing physician's identity to be provided to the treating physician being reviewed. The treating physician has the right to challenge the M+C organization's decision on the merits through several levels of an appeals process. We believe that sufficient accountability exists for reviewing physicians through the appeals process, since a physician whose decisions are reversed on appeal would be accountable to his or her M+C organization. Providing the name of the physician making the initial decision for the M+C organization could result in needless personal harassment of that physician by the physicians he or she reviews.

Finally, we do not agree with the comment that organization determinations should be made or approved by a physician. We do not believe that it is necessary to require physician involvement in all organization determinations that are adverse. Nevertheless, we expect that where adverse determinations are based on a lack of medical necessity, M+C organizations will ensure that appropriate health care professionals will be involved in the decision-making. For example, a nurse practitioner could render an adverse organization determination without the need to involve a physician. Furthermore, if an enrollee believes that the lack of physician involvement was a central factor in an adverse organization determination, then the enrollee need only request a reconsideration since the reconsideration requirements (§ 422.590(g)(2)) specify that a denial of coverage based on a lack of medical necessity must be made by a physician with expertise in the field of medicine that is appropriate for the services at issue. (We note that we have made a minor technical change to § 422.590(d) to clarify that the term "medical necessity" includes any substantively equivalent term used by an M+C organization to describe the concept of medical necessity.)

*Comment:* Several commenters provided suggestions on elements for grievance and appeal data.

2059

*Response:* We appreciate the variety of comments we received concerning categories of meaningful data elements. The comments have provided valuable insight as we continue to work with the public to develop collection and reporting requirements related to organization-level appeals and grievances. Please note that OPLs 99.081 and 2000.114 provide guidance on the manner and form in which M+C organizations will be expected to comply with the requirement under § 422.111 for disclosing grievance and appeal data upon request to M+C-eligible individuals. Collection began April 1, 1999, and the first reporting went into effect on January 1, 2000.

*N. Medicare Contract Appeals (Subpart N)*

Subpart N of Part 422 addresses M+C contract determinations. There are three types of contract determinations addressed under Subpart N: (1) A determination that a contract applicant is not qualified to enter into a contract with us under Part C of title XVIII of the Act; (2) a determination to terminate a contract with an M+C organization; and (3) a determination not to authorize a renewal of a contract with an M+C organization. Regarding item (1), above, this type of contract determination likewise applies to service area expansion applications.

As indicated in the June 1998 interim final rule, pursuant to section 1856(b)(2) of the Act, most of what comprises subpart N was drawn from regulations in part 417 governing similar contract determinations involving contracts under section 1876 of the Act. We received nine public comments concerning subpart N of the interim final rule.

*Comment:* We received one comment on § 422.641. The commenter objected to the fact that subpart N, and § 422.641 in particular, does not provide for an appeal mechanism when we and an M+C organization disagree over a term of the organization's M+C contract. The commenter believes that because the Federal Acquisition Regulations (FAR) and contract disputes procedure in Subpart 33.2 of that regulation do not apply to M+C contracts, the M+C final rule should address how these disputes or disagreements will be resolved.

*Response:* The M+C statute does not contemplate a contract disputes procedure akin to the contract disputes procedure contained in Subpart 33.2 of the FAR. Unlike acquisition contracts subject to the FAR, the terms of M+C contracts are dictated by statute and regulations. M+C organizations have an opportunity for input on the regulations

that govern what is included in M+C contracts through the notice and comment process. Ultimately, however, as a matter of Federal administrative law, we are charged with implementing the M+C statute in regulations, and with interpreting and applying its regulations. We attempt, through Operational Policy Letters and other means, to provide guidance to M+C organizations on our interpretations of regulatory provisions, and ultimately, M+C contract terms. In some cases, M+C organizations, or associations representing M+C organizations, have objected to our interpretations of the regulations or to M+C contract terms. In some of these cases, we have taken these objections into account, and we have made modifications. To the extent that an M+C organization remains uncomfortable with the terms of the M+C contract, or of our interpretation of these terms, it ultimately is free not to renew its contract for the following calendar year. We believe that this informal process has worked well, and that there is no need to create a formalized adjudicatory process for addressing disagreements between an M+C organization and us about an M+C contract issue.

*Comment:* We received several comments about the terminology used throughout subpart N. In particular, commenters noted that the terms used in describing the two categories of entities to which the subpart applies, that is, entities that hold M+C contracts and entities that apply to become M+C contractors, vary throughout the subpart. For example, §§ 422.650(c), 422.650(d), 422.656(a), and 422.660 use three different terms to describe contract applicants: "entity," "M+C contract applicant," and "applicant entity." The commenter recommended that we standardize our use of terminology concerning contract applicants.

*Response:* We agree with the commenter that the varied use of terms to describe contract applicants is confusing and unnecessary. Therefore, we are revising the regulation text throughout subpart N to refer to organizations applying to become M+C organizations as "contract applicants."

*Comment:* One commenter indicated that in some instances, subpart N refers only to M+C organizations when it presumably should refer to contract applicants as well. For example, § 422.648(b) states that we will reconsider a contract determination if the *M+C organization* files a written request. Presumably, this provision should likewise apply to contract applicants since we also afford these

organizations reconsideration rights under subpart N.

A similar issue exists at § 422.656 of the interim final rule. Paragraph (a) discusses giving both the M+C organization and the contract applicant written notice of the reconsidered determination, while paragraph (b)(1) refers only to the M+C organization. Paragraph (b)(3) returns to using both M+C organizations and contract applicants.

*Response:* We agree with the commenter that contract applicants are also entitled to seek reconsideration pursuant to a Medicare contract determination. Thus, we are revising § 422.648(b) to specify that we will reconsider a contract determination if a contract applicant or M+C organization files a written request for one. We likewise agree that § 422.656(b)(1) should be revised to specify that the provision applies to contract applicants as well as existing M+C organizations, and we are making the needed changes to the regulation text.

*Comment:* One commenter pointed out that subpart N appears to grant different rights to contract applicants than those available to M+C organizations. This is due, in part, to the provision at § 422.648(b) that states—in error—that we will reconsider contract determinations for M+C organizations, but not contract applicants. In conjunction with the § 422.660 citation mentioned above, this section indicates that applicant entities must seek reconsideration before requesting an appeal, while M+C organizations can appeal a termination or nonrenewal without first seeking a reconsideration. This too stands in contrast to the provision at § 422.662 that contemplates hearings taking place after the initial determination and reconsideration occur.

*Response:* As mentioned earlier, correcting the language at § 422.648(b) to include contract applicants correctly realigns the language in subpart N to convey that applicant entities and M+C organizations must first seek a reconsideration before proceeding to the hearing stage.

*Comment:* A commenter believes that the language provided at § 422.662(b) is confusing, because it appears to indicate that contract applicants who are denied a contract by us must file a request for a hearing within 15 days of the date of the contract determination without first receiving notice of our initial determination.

*Response:* We agree that the language at § 422.662(b) confuses our intent to provide for a contract appeals process that includes—in this order—(1) a

contract determination, (2) an opportunity for reconsideration of the initial contract determination, (3) a reconsidered determination, as necessary, (4) the right to a hearing, as applicable, and (5) for contract terminations, a review by our Administrator. We therefore are changing the language at § 422.662(b) to clearly specify that the affected party must file a request for a hearing within 15 days after the date of the reconsidered determination.

*Comment:* We received one comment on § 422.668 regarding the disqualification of a hearing officer. Paragraph (b) of this section states that the person designated to be the hearing officer must consider objections from any party to the hearing that relates to any potential bias of the hearing officer. The hearing officer may then proceed with the hearing or withdraw. The commenter suggested that allowing a hearing officer whose impartiality has been questioned the discretion to continue with the hearing is ill-advised. The commenter asserted that if a party believes that the officer is biased, it would be more expedient to resolve that issue immediately instead of proceeding with the hearing.

*Response:* We believe that in selecting an individual to serve as a hearing officer, the individual's ability to be fair and impartial would be taken into account. Should there be a suggestion of a possible bias, we believe that such an individual would be in a position to evaluate the situation, and determine whether he or she in fact could be impartial with regard to the case in question. Vesting the decisionmaker with this authority to make his or her own determination, subject to appeal only after the matter is heard on the merits, is the same approach used with respect to judges in court proceedings, and we believe is appropriate in this context as well. The alternative could permit an appealing party to delay hearings indefinitely by repeatedly challenging the impartiality of the hearing officer and appealing any rejection of such a challenge.

We believe that § 422.668 provides an adequate remedy to situations where bias of the hearing officer is questioned. This section states that the objecting party may, at the close of the hearing, present objections, request that the decision of the hearing officer be revised, or request a new hearing before a different hearing officer.

*Comment:* Commenters noted that § 422.692 limits the right to a review by our Administrator to situations involving M+C contract terminations. The commenters questioned whether we

intended to deny this level of review in instances in which we nonrenew an M+C contract, or we deny a contract application.

*Response:* The additional layer of review by our Administrator is intended to apply only to contract termination decisions. This extra level of administrative review was included in the case of termination decisions in order to implement the requirement in section 1857(h)(1)(B) of the Act that M+C organizations have the ''right to appeal an initial decision'' following a termination decision. In providing for review of a hearing officer's decision by our Administrator, we have adopted procedures similar to those used for the Administrator's review of decisions of the Provider Reimbursement Review Board found at § 405.1875.

*Comment:* A commenter questioned the provision at § 422.696 under which reopening a contract or reconsideration determination is limited to our discretion, the Administrator, or the hearing officer. The commenter asked if the aggrieved party can petition for reopening in any instance.

*Response:* If an applicant or M+C organization believes it has a basis for re-opening a decision, it may request that the decisionmaker re-open the matter. The decision whether to act on such a request, however, is committed to the decisionmaker's discretion, and is not subject to appeal or further review of any kind. This is consistent with our general policies on re-opening decisions. See, for example, 42 CFR Part 405, Subpart R.

### O. Intermediate Sanctions (§§ 422.750 through 422.760)

As stated in the interim final rule, M+C organization actions that are subject to intermediate sanctions include those specified at § 417.500 for contracts under section 1876 of the Act. The BBA also contained additional sanction authority not found in § 417.500, which we have implemented in subpart O. Specifically, section 1857(g)(3) of the Act provides that the Secretary can impose intermediate sanctions and civil money penalties based on a finding that the grounds in section 1857(c)(2) of the Act for terminating a contract are met. These grounds for termination are reflected in § 422.510(a), and are discussed in section II.K and II.N above. While intermediate sanctions based on the grounds for termination at § 422.510 generally are imposed on the same terms as sanctions for the violations specified in § 422.750(a), in the case of all grounds except a finding of fraud or abuse under § 422.510(a)(4), HCFA,

rather than the OIG, imposes civil money penalties.

We received 3 comments on subpart O.

*Comment:* A commenter contended that the intermediate sanctions provisions do not provide Medicare contracting organizations with sufficient appeal rights before intermediate sanctions are imposed. Another commenter argued that the Congress originally intended intermediate sanctions to be an intermediate step less severe than a termination, and that instead suspension of payment for enrollees can be a worse penalty than termination. This commenter believes that the use of intermediate sanctions and civil money penalties has been incorporated as a program management tool, rather than an intermediate step to termination, which the commenter believes should follow sanctions.

*Response:* In the case of the imposition of a civil money penalty, extensive appeal rights are afforded, including the right to a hearing before the departmental appeals board (DAB). In the case of an ''intermediate sanction,'' however, the entire point of this authority is to allow the Secretary to take swift action to respond to a finding of a serious violation of M+C requirements. Since the sanction is temporary, and only remains in place until corrective actions have been taken, elaborate appeal rights were not contemplated by the Congress, and would not be appropriate. The Congress has demonstrated in section 1857(h) of the Act that it knows how to require specific appeal rights when it wishes to do so. We believe that an M+C organization's interests are sufficiently protected by giving the organization an opportunity to seek reconsideration of a decision to impose intermediate sanctions by demonstrating that the basis for the decision is incorrect, and giving the organization an opportunity to have the sanctions lifted when corrective action is taken. This approach is consistent with what is provided with respect to intermediate sanctions in the nursing home enforcement area. With respect to the second comment, we believe that intermediate sanctions are an ''intermediate step'' between no action and the drastic step of termination, yet do not agree that termination necessarily would follow, unless the organization fails to take corrective action in response to sanctions. Our experience generally has been that organizations respond favorably to sanction letters. The commenter's opinion that an intermediate sanction could be worse than termination may be based on a

misunderstanding of the nature of the sanction referenced by the commenter. The option of suspending payment for enrollees, under section 1857(g)(2)(C) of the Act, applies only to payments for individuals who enroll after the effective date of the sanction. This sanction option, which is available with respect to the violations specified in § 422.752(a), would only apply in a case in which HCFA decided not to impose the sanction of a suspension of enrollment. Finally, the commenter is correct that we view intermediate sanction and civil money penalty authorities as a program management tool that HCFA can employ in the event an organization is not meeting Medicare regulations. Through the use of this tool, HCFA can ensure compliance with regulations without depriving beneficiaries who may be happy with the M+C plan in which they are enrolled of that enrollment option.

*Comment:* A commenter suggested that HCFA expand intermediate sanctions to include all aspects of grievance and appeals violations.

*Response:* HCFA has the authority to impose intermediate sanctions for a substantial failure to comply with any grievance and appeal requirement set forth in subpart M. Specifically § 422.752(b) provides that HCFA may impose intermediate sanctions for any violation under § 422.510(a). Section 422.510(a)(6) in turn specifies a substantial failure to "comply with the requirements in subpart M of this part relating to grievances and appeals" as a sanctionable violation.

*P. Medicare+Choice MSA Plans*

1. Background

Among the types of M+C options authorized under section 1851(a)(2) of the Act is an M+C medical savings account (MSA) option, that is, a combination of a high deductible M+C insurance plan (an M+C plan) and a contribution to an M+C MSA. Section 1859(b)(3)(A) of the Act defines an MSA plan as an M+C plan that:

• Provides reimbursement for at least all Medicare-covered items and services (except hospice services) after an enrollee incurs countable expenses equal to the amount of the plan's annual deductible.

• Counts for purposes of the annual deductible at least all amounts that would have been payable under original Medicare if the individual receiving the services in question was a Medicare beneficiary not enrolled in an M+C plan, including amounts that would be paid by the beneficiary in the form of deductibles or coinsurance.

• After the annual deductible is reached, provides a level of reimbursement equal to at least the lesser of actual expenses or the amount that would have been paid under original Medicare, if the individual receiving the services in question was a Medicare beneficiary not enrolled in an M+C plan, including amounts that would be paid by the beneficiary in the form of deductibles or coinsurance.

2. General Provisions (Subpart A)

Sections 422.2 and 422.4 set forth several definitions for terms connected with M+C MSA plans, including "M+C MSA," "M+C MSA plan," and "MSA trustee." We also distinguish between a "network" and a "non-network" M+C MSA plan. These definitions consist of general meanings for these terms as used in the BBA, and do not include specific requirements in the definitions themselves. The definition for an MSA does, however, reference the applicable requirements of sections 138 and 220 of the Internal Revenue Code, while the M+C MSA plan definition references the applicable requirements of part 422.

3. Eligibility, Election, and Enrollment Rules (Subpart B)

*a. Eligibility and Enrollment (§ 422.56)*

Any individual who is entitled to Medicare under Part A, is enrolled under Part B, and is not otherwise prohibited (such as an ESRD patient), is eligible to enroll in an M+C plan. However, the statute places several limitations on eligibility to enroll in an M+C MSA plan, and these limitations are set forth at § 422.56 of the regulations. Section 422.56(a) indicates that M+C MSA plans are authorized on a limited "demonstration" basis, and incorporates the statutory provisions of section 1851(b)(4), that is:

• No more than 390,000 individuals may enroll in M+C MSA plans.

• No individual may enroll on or after January 1, 2003, unless the enrollment is a continuation of an enrollment already in effect as of that date.

• No individual may enroll or continue enrollment for any year unless he or she can provide assurances of residing in the United States for at least 183 days during that year.

*b. Election (§ 422.62)*

Section 1851(e) of the Act establishes general rules concerning the time periods when a beneficiary could elect to enroll in an M+C plan (if one is offered in the beneficiary's area), with special rules for M+C MSA plans set forth at section 1851(e)(5) of the Act. Based on these provisions, § 422.62(d)

specifies that an individual may elect an MSA plan only during one of the following periods:

• An initial election period, that is, the 7-month period beginning 3 months before the individual is first entitled to parts A and B of Medicare.

• The annual coordinated election period in November of each year.

4. Benefits (Subpart C)

*a. Basic Benefits Under an M+C MSA Plan (§ 422.103)*

Section 422.103 incorporates the statutory requirements for M+C MSA plans defined under section 1859(b)(3) of the Act, as outlined above. Thus, § 422.103(a) specifies that an MSA organization offering an MSA plan must make available to an enrollee, or provide reimbursement for, at least all Medicare-covered services (except for hospice services) after the enrollee's countable expenses reach the plan's annual deductible. Further, § 422.103(b) then indicates that countable expenses must include the lesser of actual costs or all the amounts that would have been paid under original Medicare if the services were received by a Medicare beneficiary not enrolled in an M+C plan, including the amount that would have been paid by the beneficiary under his or her deductible and coinsurance obligation.

Section 422.103(c) provides that after the deductible is met, an M+C MSA plan pays the lesser of 100 percent of either the actual expense of the services, or of the amounts that would have been paid under original Medicare if the services were received by a Medicare beneficiary not enrolled in an M+C plan, including the amount that would have been paid by the beneficiary under his or her deductible and coinsurance obligation.

Section 422.103(d), concerning the annual deductible, is based on section 1859(b)(3)(B) of the Act. As the statute specifies, the maximum annual deductible for an MSA plan for contract year 1999 was $6,000. In subsequent contract years, the maximum deductible may not exceed the maximum deductible for the previous contract year increased by the national per capita M+C growth percentage for the year. Thus, based on a national per capita growth percentage of 5 percent, the maximum deductible for 2000 is $6,300. In calculating the maximum deductible for future years, HCFA will round the amount to the nearest multiple of $50.

*b. Supplemental Benefits (§§ 422.102 and 422.104)*

Section 422.102 addresses the general M+C rules on supplemental benefits.

**40292**    **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

Unlike other M+C plans, MSA plans are not permitted to include any mandatory supplemental benefits, and are limited in terms of the optional supplementary benefits that can be offered. In accordance with section 1852(a)(3)(B)(ii) of the Act, § 422.104(a) specifies that an M+C MSA plan generally may not provide supplemental benefits that cover expenses that count toward the annual deductible. In addition, section 4003(b) of the BBA added new section 1882 to the Act to prohibit the sale of most supplementary health insurance policies to individuals enrolled in M+C MSA plans. The only exceptions to this rule are spelled out in section 1882(u)(2)(B) of the Act. Further, these exceptions apply both for purposes of the prohibition on selling freestanding supplementary health insurance (or "Medigap" insurance), and for purposes of "optional supplemental benefits" offered under M+C MSA plans. These exceptions are reflected in § 422.103(b)(2).

### 5. Quality Assurance (Subpart D)

Consistent with section 1852(e)(2) of the Act, a network model M+C MSA plan must meet requirements similar to those that apply to all other M+C coordinated care plans (with the exception of the achievement of minimum performance levels); the statute and regulations establish different requirements for non-network M+C MSA plans. These requirements are discussed in detail in section II.D of this preamble.

### 6. Relationships With Providers (Subpart E)

For the most part, subpart E of new part 422 does not establish any requirements that are specific to MSA plans. However, § 422.214, "Special rules for services furnished by noncontract providers," does not apply to enrollees in MSA plans. Section 422.214 implements section 1852(k) of the Act, which contains limits on amounts providers can collect in the case of coordinated care plan enrollees (section 1852(k)(1) of the Act), and private fee-for-service plan enrollees (section 1852(k)(2) of the Act). As explained in the June 1998 interim final rule preamble, it is clear that Congress intended no such limits to apply to services provided to MSA plan enrollees.

### 7. Payments Under MSA Plans (Subpart F)

Section 1853 of the Act describes the method to be used to calculate the annual M+C capitation rate for a given payment area. We apply the same methodology in determining the annual capitation rate associated with each M+C MSA plan enrollee, though the actual amount paid to an M+C organization offering an M+C plan is not the amount determined under section 1853 of the Act.

The special rules concerning the allocation of the M+C capitated amount for individuals enrolled in M+C MSA plans are set forth at section 1853. In general, HCFA will allocate the capitated amount associated with each M+C MSA enrollee as follows:

• On a lump-sum basis at the beginning of the calendar year, pay into a beneficiary's M+C MSA an amount equal to the difference between the annual M+C capitation rate calculated under section 1853(c) of the Act for the county in which the beneficiary resides and the M+C MSA premium filed by the organization offering the MSA plan (this premium is uniform for all enrollees under a single M+C MSA plan, or segment of a plan service area, if authorized under section 1854(h). (See section I.C.7 for a discussion of the BBRA changes in this regard). This results in a uniform amount being deposited in an M+C MSA plan enrollee's M+C medical savings account(s) in a given county, since the uniform premium amount will be subtracted from the uniform county-wide capitation rate for every enrollee in that county.

• On a monthly basis, pay to the M+C organization an amount equal to one-twelfth of the difference, either positive or negative, between the risk adjusted annual M+C capitation payment for the individual and the amount deposited in the individual's M+C MSA.

Section 422.262 contains the regulations concerning the allocation of Medicare trust funds for enrollees in M+C MSA plans.

### 8. Premiums (Subpart G)

Section 1854 of the Act establishes the requirements for determination of the premiums charged to enrollees by M+C organizations. Like other M+C organizations, organizations offering M+C MSA plans in general must submit by July 1 of each year information concerning enrollment capacity and premiums. For M+C MSA plans, the information to be submitted includes the monthly M+C MSA plan premium for basic benefits and the amount of any beneficiary premium for supplementary benefits. These requirements are set forth under section 1854(a)(3) of the Act and § 422.306(c) of the regulations.

### 9. Other M+C Requirements

The remaining requirements under subpart 422 have few, if any, implications specific to M+C MSA plans. One issue that we discussed in the interim final rule, however, involves the provision of section 1856(b)(3)(B)(i) of the Act (and § 422.402(b)) that any State standards relating to benefit requirements are superseded. We recognize that this provision means that State benefit rules will not apply (for example, State laws that mandate first dollar coverage for particular benefits such as mammograms or other preventative services). Some States may not license entities to offer catastrophic coverage, and it is possible that M+C MSA plans could not be offered in that State. We invited public comment on this issue.

### 10. Responses to Comments

*Comment:* We had requested comments on the establishment of a minimum deductible for MSA plans. We had suggested the possibility of establishing the minimum deductible equal to the projected actuarial value of the average per capita copayment under original Medicare. For 1999, that amount would have been $1000. In response, we received three comments. One commenter supported a minimum deductible but recommended that it be higher, $2000—$3000. Two other commenters opposed the minimum deductible, stating that it would be counterproductive, and would preclude organizations from offering plans feasible for lower income beneficiaries.

*Response:* Since that there is neither clear consensus on the issue nor any actual experience under the demonstration, we do not believe it would be appropriate at this time to set a minimum deductible. Therefore, we will continue with only a maximum deductible as specified in the Act, but will include an analysis of the deductible issue in the evaluation of this program.

*Comment:* One commenter requested clarification of § 422.56 specifying how an MSA should be treated in the Medicaid eligibility process.

*Response:* We are not planning to address the issue of Medicaid eligibility in these regulations. However, this is a valid issue that needs to be addressed in Medicaid eligibility regulations.

*Comment:* One commenter expressed a concern that MSA enrollees may fail to pay physician claims, based upon experiences with existing deductibles under Medicare. Further, the commenter feared that enrollees might decrease their use of noncovered

elective services, such as elective screening and initial diagnostic examinations.

*Response:* Assuming that an M+C organization chooses to offer an MSA plan, beneficiaries would be advised before they enroll in the plan that they are responsible for initial medical expenses for the year, and each enrollee would have an MSA account to pay at least part of those expenses. Whether they would be able to meet all of their obligations would be considered in the evaluation. The purpose of the M+C MSA program is to permit beneficiaries to play a greater role in their health care purchasing decisions. The program does provide them with incentives to discourage the overutilization of health care services. We had considered requiring first-dollar coverage for services such as certain screening procedures, but decided that would be contrary to the intent of this demonstration.

*Comment:* One commenter stated that the maximum enrollment of 390,000 beneficiaries would be a disincentive for organizations to participate in the MSA demonstration. This would be too small a number to permit organizations to devote the resources to developing and marketing a high-deductible MSA policy.

*Response:* The limit of 390,000 enrollees over the course of the MSA demonstration was specified under section 1851(b)(4) of the Act. We are not at liberty to change that requirement by regulation. Nevertheless, as we previously stated, we do not believe that number would be reached over the course of the demonstration if an M+C organization chose to offer an MSA plan.

*Comment:* We had solicited comments regarding the issue of whether we should establish sample standardized MSA plans similar to the limited number of Medigap plans. Two organizations commented, both opposing standardized MSA plans as unnecessary and overly restrictive.

*Response:* We agree with the commenters that there is no need to establish standardized MSA plans under the demonstration.

*Comment:* Two organizations expressed concern that some States may not license insurers to provide high-deductible policies, thus limiting the availability of MSA plans.

*Response:* The Act requires that an M+C organization wishing to offer an MSA plan be licensed by the State as a risk-bearing entity, and that the State determine that it can reasonably assume the risk that it would assume under the M+C plan it proposes to offer. It does

not require that the organization be licensed commercially to offer a high deductible policy. Therefore, an M+C organization could offer an MSA plan in a State in which the State does not commercially license high deductible plans. The M+C organization must have the State's approval to do so, however.

*Comment:* Two commenters asserted that the requirement to submit encounter data would be unduly burdensome for M+C organizations offering MSA plans, particularly for non-network MSA plans. Further, M+C organizations may not have access to claims incurred under the MSA deductible.

*Response:* This issue was discussed at length during the development of the M+C regulations. Of particular concern was the fact that non-network MSA plans may not see enrollee claims should those claims not exceed the deductible. The possibility of requiring enrollees to submit claims regardless of whether the insurer would have liability was discussed, but dropped as burdensome for enrollees. We believe it is in the interest of the Medicare program that the encounter data submission requirement be maintained for all M+C plans, including MSAs. Should an organization approach HCFA about offering an MSA plan, we would work with the organization on its compliance with these requirements. (For example, enrollees who reach the deductible probably would be required to submit documentation of claims totaling the deductible amount. This documentation might be used to supply encounter data.)

*Comment:* Four commenters addressed the quality performance measures and the required data submissions. One commenter offered support for the performance improvement projects for MSAs and other M+C plans. Two commenters found the health data requirements for MSAs to be unrealistic, particularly for non-network plans, and likely to deter the offering of MSA and PFFS plans. A fourth commenter recommended that if certain quality assurance data are not available for certain categories for MSAs and PFFS plans, beneficiaries should be made aware of this lack of information.

*Response:* M+C organizations offering MSA plans are required by statute to adhere to specified quality standards. Quality performance standards in the June 1998 interim final rule have been modified to accommodate the particular characteristics of an MSA, and the fact that a report will be done on the MSA demonstration (assuming that an M+C organization chooses to offer an MSA plan). We recognize the fact that non-

network MSAs may not have access to an enrollee's claims unless that individual's total claims exceed the deductible. In addition, MSAs may not be structured to provide incentives to beneficiaries to obtain preventive and diagnostic services. HCFA is reviewing the quality requirements to make sure that they are feasible for the specific plan for which they are specified.

*Comment:* One commenter questioned the "community-rated" MSA contributions for all beneficiaries enrolled in an MSA plan, and the lack of balance billing protections for MSA enrollees. Another commenter described the payment methodology as arcane and confusing, and the possibility of a negative premium as absurd.

*Response:* After lengthy discussions with industry representatives and other officials, the fixed MSA contribution for all beneficiaries in a specific plan in a specific area seemed to be the approach most consistent with legislative intent. Also, HCFA made a point of clarifying that no balance billing restrictions were included in the statute, and that Congress intended that there be none. As has been previously stated, a negative premium is not impossible, but we would expect an MSA plan to set its premium in a given market at a level to avoid such a possibility.

### O. M+C Private Fee-for-Service Plans

#### 1. Background and General Comments

As noted above, one type of M+C option available under section 1851(a)(2) of the Act is an M+C private fee-for-service (PFFS) plan. Consistent with the statutory definition of an M+C private fee-for-service plan at 1859(b)(2)(A) of the Act, the regulations state that an M+C PFFS plan is an M+C plan that: Pays providers at a rate determined by the M+C organization offering the PFFS plan on a fee-for-service basis without placing the provider at financial risk; does not vary the rates for a provider based on the utilization of that provider's services; and does not restrict enrollees' choice among providers who are lawfully authorized to provide the services, and agree to accept the plan's terms and conditions of payment. The requirements M+C organizations must meet to contract with HCFA to offer an M+C PFFS plan generally are incorporated into the relevant sections of the M+C regulations. An M+C organization wishing to offer a PFFS plan must meet all of the requirements that apply with respect to offering any other type of M+C plan, except to the extent that there are special rules that apply to M+C PFFS plans.

2064

*Comment:* One commenter contended that HCFA should examine alternatives to the ACR process for ensuring good value under PFFS and MSA plans. The ACR restriction on the premium may conflict with the role envisioned for these plans as paying high fees to providers to ensure unrestricted access.

*Response:* The commenter is mistaken in the belief that there are restrictions on premiums for M+C MSA and PFFS plans. There is no restriction on the premiums that may be charged for these plans (see § 422.306(e)(2)).

*Comment:* A commenter noted that the regulations create a loosely defined option in which the organization offering a PFFS plan fills in the details of the plan. The commenter questioned whether many beneficiaries would be motivated to join such a plan, whether insurers would be motivated to offer an option that could have such limited appeal. As currently constructed, the commenter believes that M+C PFFS plans are not likely to be viable, and therefore are not likely to be made available to beneficiaries. This in the commenter's view mitigates against the espoused concept of offering a meaningfully expanded range of options. The commenter suggested that HCFA work with the physician community to do demonstrations to explore what features of the M+C PFFS statute should be changed so that Medicare can offer a viable M+C PFFS defined contribution plan.

*Response:* We recognize that the statute created a loose structure for M+C PFFS plans, and that therefore M+C plans may vary greatly from one another in how they function. This is a direct consequence of the law. However, we believe that, as currently constituted, M+C PFFS plans are viable. We have received an application for a 30-State, largely rural M+C PFFS plan, and have reason to expect to receive more applications within the next year.

## 2. Beneficiary Issues

*Comment:* A commenter objected to the M+C PFFS plan option on the basis that the commenter believes that it leaves the beneficiary vulnerable. The commenter's objections included the lack of a quality assurance program to protect beneficiaries, as well as the absence of a cap on premiums or out of pocket expenses, resulting in the possibility that beneficiaries could be charged up to 15 percent over the plan payment amounts. The commenter contended that beneficiaries would be better protected if the PFFS option were not offered.

*Response:* We recognize that some beneficiary protections provided for under the coordinated care plan option are not included for M+C PFFS plans. In some cases, such as certain quality assurance requirements, these protections may be less critical in an environment in which the enrollee has complete freedom of choice to use any provider in the country, and is not limited to a defined network of providers. We note that the quality assurance requirements that apply to coordinated care plans do not at this time apply to original Medicare either, which is also a "fee-for-service" arrangement. With regard to the absence of certain limits on beneficiary financial liability, we believe that this makes it particularly important that beneficiaries make a prudent consumer decision when choosing this option. However, we also believe that this alternative can provide a valuable alternative to original Medicare in areas that are not served by coordinated care plans, rural areas in particular. Moreover, we anticipate that, as we gain experience with M+C PFFS contracts, we will determine what changes we need to make to the regulations, or ask Congress to consider improving this M+C option, should we decide that such changes are needed. (We note that we have recently approved the first PFFS plan and intend to monitor its performance closely in order to identify and assess potential beneficiary protection issues.)

*Comment:* A commenter urged that marketing information to seniors and providers clearly differentiate between traditional Medicare and M+C PFFS plans, as there are substantially different payment schedules, balance billing rules, and premiums that can be charged for M+C PFFS purposes than for original Medicare.

*Response:* We agree that there is a significant potential for confusion between original Medicare and the M+C PFFS option, and we have tried to clarify the distinction between these options in our 1999 and 2000 Medicare handbooks (Medicare and You). We are also considering the best way to make this distinction clear in our model explanation of coverage for M+C PFFS plans. The model evidence of coverage document is created for an M+C organization to use as a model for the explanation they provide to beneficiaries about the plan's terms and conditions of coverage. We are currently adapting the existing Evidence of Coverage for coordinated care plans for use in the case of PFFS plans.

*Comment:* A commenter recommended that we require providers furnishing services to PFFS enrollees and MSA enrollees to give notice if they think the plan may not cover a service.

The commenter believes that the same limitations on liability protection that apply in original Medicare should apply to M+C PFFS plans and MSA plan beneficiaries. Moreover, the commenter suggested providers be required to give enrollees of M+C PFFS plans a notice of the expected balance billing amounts that exceed $250 or more (not just the more than $500 notice required of hospitals).

*Response:* Unlike under original Medicare, the statute does not provide any protection against enrollee or provider liability for services that a M+C PFFS plan determines are not medically necessary to treat illness or injury, and the law does not require providers to give an advance notice to enrollees of the likelihood of plan noncoverage. Therefore, there is no basis in law to require an M+C organization to offer such protection in its plan. Of course, the organization may, if it chooses, build such protection into its plan, and we believe that doing so may be necessary to attract and keep enrollees. Moreover, an enrollee and provider clearly may seek an advance determination of coverage from the M+C organization under the organization determination regulations in part 422 subpart M. Thus, the enrollee and provider have the opportunity to seek a plan determination of coverage before receiving the service, and we encourage them to avail themselves of this option.

With respect to the notice of anticipated cost sharing, the law requires such a notice for hospital services, but not for other services. The M+C organization could, however require that contracting and deemed contracting providers of other types furnish such a notice in advance of providing care as a term and condition of payment, and could set whatever tolerance they chose for such a notice.

We chose the $500 threshold for a notice of out-of-pocket expenses that a hospital may collect from the enrollee because it mirrors the $500 threshold long established by law at section 1842(m)(1) of the Act. Section 1842(m)(1) of the Act requires that a nonparticipating physician who does not accept assignment on the Medicare claim must give the beneficiary advance notice if the actual charges that will be collected from the beneficiary equal or exceed $500. While the benefit to which the threshold applies is different, the concept of advance notice of amounts to be collected from the enrollee is the same, and therefore use of the same threshold is justified.

3. Provider Payment Issues

*Comment:* A commenter urged that HCFA establish standard payment deadlines, and contended that those for M+C PFFS plans should mirror those for original Medicare.

*Response:* We believe that the prompt payment provisions of § 422.520 largely accomplish this, since they apply to all claims submitted ''by, or on behalf of an M+C private fee-for-service enrollee.'' Since the benefits under a PFFS plan are the enrollee's benefits, we believe that any claim submitted on behalf of a PFFS plan enrollee is subject to the clean claim standard in § 422.520. While written agreements with PFFS plan providers must address this issue, and better terms may be negotiated, we have interpreted the reference to fee-for-service enrollees in section 1857(f)(1) of the Act to cover all claims involving PFFS enrollees. Under this standard, the M+C organization must pay 95 percent of the ''clean claims'' within 30 days of receipt, if they are submitted by or on behalf of an enrollee of the M+C PFFS plan, and are not furnished under a written agreement between the M+C organization and the provider. Moreover, the M+C organization must pay interest on clean claims that are not paid within 30 days as required by sections 1816(c)(2)(B) and 1842(c)(2)(B) of the Act for original Medicare.

*Comment:* A commenter argued that the prompt payment rules at § 422.520 permit payers to ''game'' the clean claim policy by building in a float between the receipt of Medicare payment and the payment to the providers, and recommended that HCFA establish a standard that would apply for PFFS network providers where an organization offering an M+C PFFS plan effectively imposes a delay as a condition of getting the contract.

*Response:* The prompt payment provisions that apply to all PFFS plan claims ensure against a float of more than 30 days in the case of a ''clean'' claim.

*Comment:* A commenter suggested that HCFA require M+C organizations offering PFFS plans to give physicians 30 days notice of changes to fee schedules, and should require them to follow CPT coding conventions in the same manner as original Medicare.

*Response:* M+C organizations offering PFFS plans must pay noncontracting providers at least the amounts they would receive under original Medicare (less the enrollee's cost-sharing); therefore, there is no potential for changes to the payment rates other than through the annual Medicare fee schedule changes. Also, in order to meet

access requirements without having a network in place that satisfies coordinated care plan rules, an M+C organization offering a PFFS plan must pay contracting providers (both those with signed and deemed contracts) at least the Medicare payment rate. In this case, again, providers could count on Medicare payment notices. In all cases, however, providers either will negotiate rates in written and signed contracts, or have the opportunity to learn payment information before providing services under a deemed contract.

4. Noncontracting Provider Issues

*Comment:* A commenter contended that the regulations should clarify whether a noncontracting provider is precluded from balance billing beneficiaries, and must accept as payment in full rates that are no less than what would be paid under original Medicare. The commenter believes it is not clear: (1) If those rates would include the limiting charge of 115 percent; (2) if noncontracting providers are entitled to direct payment from the M+C organization; or (3) what amounts may be balance billed. The commenter suggested that enhanced balance billing should have been provided as an incentive to sign a contract, but because of the deemed contract provisions, this basic premise for contracting is lost.

*Response:* The law permits, but does not require, an M+C PFFS plan to permit contracting providers (with both signed and deemed contracts) to balance bill up to 15 percent of the PFFS plan payment rate for the service, in addition to the cost-sharing established under the plan. The statute expressly applies this to deemed contractors as well. Therefore, the balance billing that an M+C plan may permit contracting and deemed contracting providers to collect will be set by the organization offering the plan. The M+C organization will pay under its terms and conditions of payment, and the contracting or deemed contracting provider may collect the cost sharing and any balance billing permitted by the plan (which cannot exceed 15 percent of the PFFS plan payment rate).

In the case of noncontracting providers (that is, providers that neither have a written contract with the M+C organization offering the PFFS plan nor meet the criteria for a deemed contract), there is no balance billing permitted; by law, the provider may collect no more than the plan's cost sharing. Under section 1852(k)(2)(B) of the Act, the beneficiary liability limits governing payment to noncontracting providers are the same for M+C PFFS plans as for M+C coordinated care plans. We have

clarified this by indicating in § 422.214 that the special rules for payment to noncontracting providers that apply for M+C coordinated care plans also apply for M+C PFFS plans. Specifically, the provider must accept as payment in full the amount that it would be entitled to receive under original Medicare, and the plan must pay the provider the amount that the provider would collect if the beneficiary were enrolled in original Medicare, less the enrollee's cost-sharing. For example, if the physician participates in Medicare, the plan would pay the noncontracting physician the Medicare allowed amount less the plan's cost-sharing. In the case of a nonparticipating physician, the plan would pay the Medicare limiting charge less the enrollee's cost-sharing. In the case of an acute care hospital, the plan would pay the diagnosis-related group (DRG) payment less the enrollee's cost-sharing. In the case of a nonparticipating durable medical equipment, prosthetic and orthotics (DMEPOS) supplier, the plan would pay actual charges less the enrollee's cost-sharing.

While the law addresses the payments to providers and the payment liabilities of beneficiaries, it does not specify whether the M+C organization must pay the provider, or whether it may function as an indemnity plan and pay the enrollee, for services for which the enrollee has paid the provider. Moreover, the discussion of prompt payment by M+C plans at section 1857(f) of the Act contemplates that the M+C organization may make payment to the beneficiary. Hence, the M+C organization may determine to whom (provider or beneficiary) it will make payment for covered services. However, we anticipate that M+C organizations will want to make payment to providers of services, rather than to beneficiaries since we believe that minimizing beneficiary paperwork and confusion is necessary to attract and keep enrollees in the plan.

5. Quality Assurance (§§ 422.152 and 422.154)

As discussed in section II.D of this preamble concerning quality assurance requirements, M+C PFFS plans and non-network MSA plans (and now PPO plans) are exempt from some of the quality assurance requirements that apply to network model M+C plans. The statute also exempts these plans from external quality review if they do not have written utilization review protocols. As with all other requirements for M+C organizations and M+C plans, those provisions of regulations that are not identified as

**40296**    **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

limited to coordinated care plans or MSA plans also apply to M+C PFFS plans.

*Comment:* Commenters suggested that § 422.154 affirmatively states that M+C organizations, including those offering MSA plans and PFFS plans, must coordinate with an external entity's (that is, a PRO's) investigation of beneficiary quality of care complaints. These commenters believe that beneficiary complaints are an important indicator of quality of care problems, and that all M+C plans should have to cooperate in investigating them.

*Response:* The statute relieves an M+C organization offering a PFFS plan of responsibility for contracting for external quality review if it does not carry out utilization review with respect to services covered under the plan.

6. Access to Services (§ 422.214)

Like other M+C plans, an M+C private fee-for-service plan must offer sufficient access to health care. Section 422.114(a) specifies that an M+C organization that offers an M+C PFFS plan must demonstrate to HCFA that it has sufficient number and range of health care providers willing to furnish services under the plan. Pursuant to the specific instructions of the law, under § 422.114(a), HCFA will find that an M+C organization meets this requirement if, with respect to a particular category of provider, the plan has: Payment rates that are not less than the rates that apply under original Medicare for the provider in question; contracts or agreements with a sufficient number and range of providers to furnish the services covered under the plan; or a combination of the above. These access tests must be met for each category of service established by HCFA on the M+C organization application. Thus, if an M+C PFFS plan has payment rates that are no lower than Medicare, it need not address if it has a sufficient number of providers of services under written contract. However, where the plan's payment rates are less than the Medicare payment for that type of provider, the M+C organization must demonstrate that the plan has a sufficient number of providers of that type under written contract.

Medicare payment amounts are established in a variety of different ways. For many of the key services for which Medicare pays, Medicare has prospectively set payment amounts or fee schedules that are established by HCFA and published in the **Federal Register** each year. These include, but are not limited to, prospective payment systems for acute care hospital services, and skilled nursing care, and fee

schedules for physician services (which includes care by many nonphysician practitioners and diagnostic tests), durable medical equipment, and clinical laboratory services. Moreover, HCFA is currently developing prospective payment systems or fee schedules for other key services including home health care, ambulance services, and outpatient hospital care, which we expect to be implemented within the next year or two.

However, for some services, Medicare payments are set retrospectively or concurrently by Medicare carriers and intermediaries. For example, until the prospective payment systems or fee schedules are implemented, home health care, outpatient hospital care, and ambulance services will be paid by carriers and intermediaries based upon a HCFA-specified national methodology that they apply either upon receipt of the claim (for example, ambulance services paid on a reasonable charge basis) or long after the service is furnished (for example, retroactive cost report settlement). Moreover, there are some services for which reasonable cost and reasonable charge payment will continue indefinitely. Examples of these services are critical access hospital care (which by law must be paid actual cost without limits) and carrier priced physician services (for which the service is too new or too rare to support a national fee schedule value).

Clearly, where there are national prospective payment systems and fee schedules, M+C organizations offering PFFS plans should have no problem in paying amounts no less than the Medicare payment amount for covered services since those amounts are clearly and prospectively published by HCFA. However, the question arises as to how the access test based on Medicare payment levels can be met with regard to services that are paid by Medicare intermediaries or carriers on a reasonable cost or reasonable charge basis. Moreover, consistent with section 1852(d)(4) of the Act and § 422.214(b), M+C organizations offering PFFS plans cannot restrict providers from whom the beneficiary can acquire care. Therefore, the M+C organization must have the capacity to pay no less than the Medicare-allowed amounts for any Medicare-covered service furnished by any provider in any area of the nation. Acquiring the payment amounts from individual Medicare intermediaries and carriers would be a cumbersome and difficult task, and would be likely to result in unwanted payment delays. Therefore, we have decided to permit M+C organizations offering PFFS plans to establish proxies for use in paying

services for which no Medicare prospective payment system or fee schedule exists.

The law and regulations permit the use of HCFA-approved proxies as long as those proxies result in payment amounts that are "not less than" Medicare payment rates. If the payment amounts to be paid by the M+C organization are equal to or more than the Medicare payment amounts for those services, the requirement of the law and regulations are met and HCFA must find that the PFFS plan provides for adequate access to care for those categories of services. Therefore, in cases of services for which there is no prospective payment system or fee schedule amount, we will permit M+C organizations to pay proxy amounts under certain circumstances. These proxy amounts must be approved by HCFA as approximating as closely as possible what providers as a whole receive for certain services. Because we expect these payment proxies would be estimates, the M+C organization must also have a process for reviewing these amounts, if necessary, on a provider-by-provider basis. If a provider is able to demonstrate that the proxy amount is less than the amount Medicare would actually pay, the M+C organization must pay the latter amount.

Proxies will take different forms, depending upon what makes the most sense for the type of service being paid. For example, a hospital that is paid on reasonable costs subject to a limit may be paid a percent of charges that is taken from the provider's last settled Medicare cost report. Similarly, an ambulance supplier may be paid the prevailing charge adjusted for the IC that applies in the year in which the service is furnished. Where proxies are used, HCFA will require that a description of the proxy methodology must be included in the terms and conditions of plan payment for deemed contractors that must be made available to providers of services before they treat an PFFS enrollee (see § 422.216(h)(2)(iii)(B)). As nationally established prospective payment systems and fee schedules are developed and implemented by HCFA, the use of proxies should diminish. However, at this time, and for the foreseeable future, for a limited subset of Medicare-covered services, proxies will be necessary for organizations offering M+C PFFS plans that choose not to contract directly with providers. For the reasons discussed above, we believe that their use comports with both the spirit and intent of the law and regulations.

**Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations    **40297**

**7. Physician Incentive Plans (§ 422.208)**

In § 422.208(e), we specify that an M+C PFFS plan may not use capitated payment, bonuses, or withholds in the establishment of the terms and conditions of payment. This is necessary to implement that part of the definition of an M+C plan that specifies that the plan must pay without placing the provider at financial risk.

**8. Special Rules for M+C Private Fee-for-Service Plans (§ 422.216)**

As discussed in detail in our June 1998 interim final rule (63 FR 35040), § 422.216(a) addresses payment to providers. Specifically § 422.216(a)(1) provides that the M+C organization offering a PFFS plan must pay all contract providers (including those that are deemed to have contract under § 422.216(f)) on a fee-for-service basis at a rate, determined under the plan, that does not place the provider at financial risk. This reflects the statutory definition of an M+C PFFS plan. We also specify in § 422.216(a)(1) that the payment rate includes any deductibles, coinsurance, and copayment imposed under the plan, and must be the same for all providers paid pursuant to a contract whether or not the contract is signed or deemed to be in place. Section 422.216(a)(3) establishes the payment rate for noncontracting providers.

Section 422.216(b) addresses permissible provider charges to enrollees. Under § 422.216(b)(1), contracting providers (including deemed providers) may charge the enrollee no more than the deductible, coinsurance, copayment, and balance billing amounts permitted under the plan. Like payment rates, the plan deductible, coinsurance or copayments and other beneficiary liability must be uniform for services furnished by all contracting providers, whether contracts are signed or deemed to be in place. These two requirements are closely related, since permissible enrollee liability is linked by statute to the plan's payment rate. These cost-sharing amounts must be specified in the plan contract. The plan must have the same cost-sharing for deemed contract providers as for contract providers, and it may permit balance billing no greater than 15 percent of the payment rate for the service.

Other significant requirements set forth in § 422.216 address monitoring and enforcement of the payment and charge provisions (§ 422.216(c)), notifications to plan members concerning payment liability, including balance billing rules (§ 422.216(d)), and rules covering deemed contract providers, including enrollee and provider notification requirements associated with these providers regarding payment terms and conditions (§§ 422.216(f), (g), and (h)).

**9. Deemed Contracting Providers**

*Comment:* One commenter endorsed having the same standards for deemed and contracting providers so that an M+C PFFS plan does not become a PPO without the quality assurance standards of a PPO. Other commenters objected to the concept of deemed contracting providers, because they believe that it will reduce provider willingness to provide services in these plans, and because they believe it is unfair to physicians, particularly those who provide emergency care.

Specifically, a commenter indicated that M+C organizations offering PFFS plans will not be able to get providers to sign contracts because there is no incentive for a provider to bind itself to a contract when it is not promised a share of the market in the area, and when it will be paid like a contracting provider, whether it signs a contract or not, under the deemed contracting provisions. Commenters indicated that there will be problems determining the ''deemed contract'' vs. the noncontract status of providers, since it depends on what they knew at the time of service. A commenter said that HCFA should tighten the rules under which deeming can be presumed, and seek statutory modifications to limit the use of deeming.

Some commenters indicated that emergency department physicians should not be deemed contractors because the M+C organization could blanket an area with terms and conditions of plan payment, and thereby force them to accept terms and conditions with which they did not agree, since they must treat all patients who present in the emergency department. They commented that HCFA should stipulate that deeming is never presumed to have occurred when emergency services or urgent care are required, particularly when they are required under the Emergency Medical Treatment and Labor Act. Other commenters recommended that the deemed contract language should be amended to explicitly not apply to out of network service provided in an emergency department, and to require that all physicians who provide services in the emergency department be paid as noncontracting providers. Commenters believe that this is needed because, under the Medicare provider agreement anti-dumping rules, the hospital must ensure that all patients who present in the emergency room are seen and that, therefore, the physicians on duty have no ability to choose not to provide care to the enrollee. Under the deemed contracting provisions of the law, they are forced to accept the terms and conditions of plan payment when they treat the patient.

*Response:* We recognize that the law provides little or no incentive for a provider to sign a contract with an M+C PFFS plan because of the deemed contracting provisions. We also agree that the deemed contracting requirements of the law are problematic, particularly in emergency room settings, and will create disputes between M+C organizations and providers about what the provider knew and when it was known.

The statute specifies that the M+C organization must treat providers that do not have a contract with the plan as if they had such a contract, if the provider knew that the beneficiary was enrolled in the plan, and either knew the terms and conditions of plan payment, or had reasonable access to those terms and conditions.

In general, if the beneficiary has advised the provider of his or her plan enrollment (as is often requested by the provider before providing care), and the provider knows the terms and conditions of plan payment (for example, because the physician or the party to whom the physician has reassigned benefits has received the plan terms and conditions in writing), or has a reasonable opportunity to learn the terms and conditions of plan payment (for example, through a toll free phone number, a website, or by having been sent a copy of the terms and conditions of plan payment), in a manner reasonably designed to effect informed agreement by a provider, then the provider meets the statutory test of being a deemed contracting provider, and the law requires that he or she must be treated as such. The law and regulations presume that, if the provider meets the criteria as a deemed contracting provider and subsequently treats the enrollee, then the provider has implicitly demonstrated agreement to the terms and conditions of payment by treating the enrollee.

While the law does not provide an explicit exception to the deemed provider provisions for emergency or urgent care services, we acknowledge that there are special circumstances that surround services in an emergency department of a hospital that justify considering providers who have not signed a contract with the PFFS plan to be noncontracting providers when they furnish services in an emergency

department of a hospital. We have revised § 422.216(f) accordingly.

When a physician or hospital has not signed a contract with a PFFS plan but treats a plan enrollee in an emergency department of a hospital, the physician or hospital has no opportunity to refuse to treat the patient as the deemed contracting provisions of the law anticipate. Hence, we believe that it is appropriate to specify that a physician or hospital that furnishes services in the emergency department of a hospital on behalf of the hospital's obligations under the Emergency Medical Treatment and Active Labor Act (EMTALA) cannot be deemed to be a contracting provider. Of course, if the physician or hospital has previously signed a contract with the PFFS plan, the physician or hospital is a contracting provider, and is bound by the terms and conditions of that contract. Moreover, once the services furnished in the emergency department of a hospital cease to be required under § 489.24, the criteria that determine whether the providers are deemed contracting providers or noncontracting providers would then apply.

## III. Provisions of this Final Rule—Changes to the M+C Regulations

For the convenience of the reader, listed below are all significant changes to the M+C regulations that are set forth in this final rule. Please note that changes stemming from the BBRA, which—unlike those changes listed below—are subject to public comment, are all discussed in a discrete section of this preamble (section I.C) and thus are not listed here. In addition, we caution the reader that the list below is intended solely as a reference aid, rather than as a policy summary.

• In § 422.2, we are revising the definition of "service area," as well as making minor technical changes to several other definitions.

• We are revising § 422.50(a) to allow individuals and employer group members who become entitled to Medicare and live outside of the service area to convert to an M+C plan if they were previously enrolled in a commercial plan offered by the M+C organization, provided these individuals receive full plan benefits and M+C access and availability standards are met.

• To allow us the flexibility to vary the timeframes for the enrollment transmission schedule in the future, we are amending § 422.60(e)(6) to state "upon receipt of the election form or from the date a vacancy occurs for an individual who was accepted for future enrollment, the M+C organization transmits within time frames specified by HCFA, the information necessary for HCFA to add the beneficiary to its records as an enrollee of the M+C organization."

• We are revising § 422.60(f)(3) to state that "upon receipt of the election form from the employer, the M+C organization must submit the enrollment within time frames specified by HCFA."

• In order to avoid introducing confusion between responsibilities of M+C organizations and HCFA, we have eliminated material in § 422.64 concerning HCFA's information responsibilities and moved necessary material to § 422.111.

• We have modified § 422.66(b)(3)(i) to state that the timeframe to submit disenrollment transactions will be "specified by HCFA," and have made a conforming change at § 422.66(f)(2), as opposed to within 15 days.

• At § 422.66(d) we are clarifying that an M+C organization must accept any eligible individual who is enrolled in a health plan offered by "an" M+C organization to apply to a specific M+C organization, namely the organization that offers both the commercial health plan in which the individual is enrolled and the M+C plan in which the individual will be enrolling.

• At § 422.74(b)(3)(ii) we are permitting an M+C organization that has reduced an M+C plan's service area to offer continued enrollment in one of its M+C plans to enrollees in all or a portion of the reduced area if enrollees agree to receive "basic benefits" exclusively at designated facilities within the plan's new service area.

• We are adding a provision to § 422.74(d)(1)(iv) that expressly provides an M+C organization the option to discontinue an optional supplemental benefit for which premiums are not paid, while retaining the beneficiary as an M+C enrollee.

• We are changing the requirement at § 422.74(d)(4) to state that the M+C must disenroll an individual, unless he or she chooses the continuation option, if the individual moves out of the plan's service area for over 6 months, rather than 12 months.

• We are adding wallet card instructions to the list of examples of marketing materials at § 422.80(b)(5)(v), to ensure that wallet card instructions to enrollees are consistent with the statute and regulations, particularly requirements that apply to emergency and urgently needed services.

• We are revising § 422.80(e) to permit more flexibility for providers in distributing materials to M+C enrollees.

• We are adding a new § 422.80(e)(1)(viii) that prohibits new M+C plan names that exclude the disabled population.

• We are removing the definition of post-stabilization services in § 422.100(b)(1)(iv) and instead including all post-stabilization requirements in new § 422.113. See section II.C of this preamble for a full discussion of changes in the post-stabilization requirements.

• We are specifying at § 422.100(b)(1)(vi) and § 422.113 that M+C organizations are required to cover ambulance services dispatched through 911 or its local equivalent when use of other forms of transportation would endanger the health of the beneficiary.

• We are adding a provision at § 422.101(a) to state explicitly that services may be provided outside of the service area of the plan if the services are accessible and available to enrollees.

• To promote beneficiary freedom of choice among providers, § 422.105 is revised to permit use of the POS option for in-network providers, rather than only for providers outside the plan network.

• To clarify our existing policy, we are clearly delineating HCFA's review authority in § 422.106 for employer group health plans and Medicaid plans.

• We are adding a new § 422.108(f) to clarify that a State cannot take away an M+C organization's Federal rights to bill or authorize providers to bill for services for which Medicare is not the primary payer.

• We are revising § 422.109(b)(5) to provide that M+C enrollees are responsible only for coinsurance amounts.

• We are revising § 422.111(e) to decouple the enrollee notice time frame from the "issuance or receipt" of a notice of termination and instead require that an M+C organization make a good faith effort to provide written notice at least 30 calendar days before the termination effective date.

• We are revising § 422.112(a)(3) to clarify that an M+C organization shall authorize out-of-network specialty care when its plan network is unavailable or inadequate to meet an enrollee's medical needs.

• At new § 422.113(b) we are specifying that "urgently needed services" are not "emergency services."

• We are clarifying at § 422.113(b)(2)(ii) that prior authorization may not be required from the beneficiary in wallet card instructions or in other enrollee materials . We are also specifying that instructions on what to do in an emergency should include a statement

**Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations     **40299**

specifying that in the event of an immediate and serious threat to health, the enrollee may call 911.

• We are revising § 422.113(b)(2)(iii) to expressly set forth the requirement that M+C organizations assume financial responsibility for services meeting the prudent layperson definition of emergency at § 422.2 regardless of final diagnosis.

• In order to clarify the distinction between a removal of deemed status by HCFA based on HCFA's own survey and a removal based on a determination by an accreditation organization based on its accreditation survey, we are revising § 422.156(a) to separate these two situations.

• We are revising § 422.157(a)(3) to relax the prohibition on the participation of managed care organization representatives in private accreditation organization activities.

• We are revising § 422.158(e) to provide that we will act within the same timeframes that apply to fee-for-service deeming.

• To help clarify that the appeals procedures apply only for adverse participation decisions, we are redesignating the provider appeals procedures from § 422.204(c) to new § 422.202(d).

• Section 422.204 has been re-titled "Provider selection and credentialing" and contains the general rule that an organization must have written policies and procedures for the selection and evaluation of providers.

• We are consolidating the regulations concerning antidiscrimination and choice of providers into new § 422.205. We reaffirm that M+C organizations are prohibited from discriminating against providers based solely on their licensure or certification, and specify that when an M+C organization declines to include a provider in its network, it must notify the provider of the reason for its decision.

• We have revised § 422.214 to clarify the rules concerning payments to noncontracting providers.

• We have revised § 422.216(f) to indicate that, for PFFS purposes, "deemed contract" providers are considered to be noncontracting providers when they furnish services in an emergency department of a hospital.

• We are revising § 422.257 to permit M+C organizations to require that their contractors provide them with complete and accurate encounter data.

• We are adding two terms—"first tier" and "downstream"—to the list of definitions at § 422.500 that we believe clarify the types of entities to which the

M+C contracting requirements described at § 422.502(i) apply.

• We are revising the definition of "clean claim" in § 422.500 to require that claims include data for encounter data submission, and meet the original Medicare "clean claim" requirements in order to be considered a clean claim.

• In consultation with the Office of Inspector General, we are revising the compliance plan requirements under § 422.501 to eliminate mandatory self-reporting.

• In order to ensure that M+C enrollees are not put at financial risk in situations where provider groups or other entities "downstream" from an M+C organization become insolvent, we are revising § 422.502 to strengthen the protections for Medicare enrollees in situations where an M+C organization or its contractors encounter financial difficulties.

• Section 422.502(l), concerning certifications of the accuracy of payment data, has been modified to be consistent with the OIG's "good faith" standard, under which M+C organizations certify the accuracy of payment information to their "best knowledge, information, and belief." We are also permitting the delegation of this responsibility to individuals other than the CEO or CFO of the M+C organization.

• We are revising § 422.506(a)(2)(i) to permit an M+C organization until July 1 to notify us of its intent not to renew its M+C contract for the upcoming contract year.

• We are deleting § 422.506(b)(ii) in response to a concern that the standard for declining to renew an M+C contract was too vague to enforce.

• We are adding a new § 422.510(a)(12) that would specify that a substantial failure to comply with marketing guidelines is grounds for termination, non-renewal, or intermediate sanction.

• We are changing the language at section § 422.520(a)(3) to indicate that non-clean claims and the remaining 5 percent of clean claims not paid within 30 days must be either paid or denied within 60 calendar days from the date of the request.

• We are revising the definition of an organization determination under § 422.566 to provide additional clarity as to the types of situations that constitute an organization determination and thus give rise to the pursuant appeal rights.

• To further clarify the grounds on which an M+C organization may seek an extension, and to ensure an enrollee is adequately advised of the M+C organization's use of an extension, we are adding language to both

§§ 422.568(a) and 422.572(b) that requires an M+C organization to notify the enrollee in writing of the reasons for the extension, and to inform the enrollee of the right to file a grievance if he or she disagrees with the M+C organization's decision.

• We are revising § 422.568(c) and (d) to modify the requirement concerning written notification of M+C enrollees when a service is denied in whole or in part.

• We have added new § 422.619 concerning effectuation of expedited reconsideration determinations.

• We have revised § 422.620 to eliminate the requirement that M+C organizations distribute to enrollees the notification of noncoverage of inpatient hospital care.

We have also made many minor technical and conforming changes to the M+C regulations to ensure that citation references are accurate, use more consistent terminology, and correct typographical errors in the current regulations.

## IV. Collection of Information Requirements

Under the PRA, we are required to provide 30-day notice in the **Federal Register** and solicit public comment before a collection of information requirement is submitted to the Office of Management and Budget (OMB) for review and approval. In order to fairly evaluate whether an information collection should be approved by OMB, section 3506(c)(2)(A) of the PRA requires that we solicit comment on the following issues:

• The need for the information collection and its usefulness in carrying out the proper functions of our agency.

• The accuracy of our estimate of the information collection burden.

• The quality, utility, and clarity of the information to be collected.

• Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.

We are soliciting public comment on each of these issues for the sections that contain information collection requirements.

**Note:** Unless otherwise noted below, all information collection requirements in this rule are currently approved under OMB approval #0938–0753, which currently expires August 31, 2000.

### Section 422.60   Election Process

Paragraph (b) of this section states that M+C organizations may submit information on enrollment capacity of plans they offer by July 1 of each year as provided by § 422.306(a)(1). The

2070

burden associated with this reporting provision is captured under § 422.306.

## Section 422.74    Disenrollment by the M+C Organization

Paragraph (c) of this section requires that if the disenrollment is for any reason other than death or loss of entitlement to Part A or Part B, the M+C organization must give the individual a written notice of the disenrollment with an explanation of why the M+C organization is planning to disenroll the individual. Notices for reasons specified in paragraphs (b)(1) through (b)(2)(i) must include an explanation of the individual's right to a hearing under the M+C organization's grievance procedures. This requirement is currently approved under 0938–0763, which expires March 31, 2003.

## Section 422.111    Disclosure Requirements

Paragraph (e) requires the M+C organization to make a good faith effort to provide written notice of a termination of a contracted provider at least 30 calendar days (revised from 15 days) before the termination effective date to all enrollees who are patients seen on a regular basis by the provider whose contract is terminating. The burden associated with this requirement has not changed.

## Section 422.113    Special Rules for Ambulance Services, Emergency and Urgently Needed Services, and Maintenance and Post-Stabilization Care Services

Paragraph (b)(2) of this section requires that enrollees be informed of their right to call 911.

The burden associated with this disclosure provision is the time it takes an M+C organization to inform each beneficiary of his or her right. In addition, instructions to seek prior authorization for emergency services and/or before the enrollee has been stabilized may not be included in any materials furnished to the enrollee. We anticipate that these requirements will be provided as part of standard enrollment disclosures. Therefore, the burden associated with this requirement is contained in section 422.64.

## Section 422.152    Quality Assessment and Performance Improvement Program

Paragraph (e) of this section requires that an organization offering an M+C plan, non-network MSA plan, or private fee-for-service plan to measure performance under the plan using standard measures required by HCFA and report its performance to HCFA. The standard measures may be specified in uniform data collection and reporting instruments required by HCFA and will relate to clinical areas including effectiveness of care, enrollee perception of care, and use of services and to nonclinical areas including access to and availability of services, appeals and grievances, and organizational characteristics.

The burden associated with this reporting provision is the time it takes an M+C organization to gather and submit the information. ''All Medicare+Choice organizations and an organization offering an M+C non-network MSA plan or an M+C private fee-for-service plan will be required to measure performance under their plans, using standard measures required by HCFA, and report their performance to HCFA. Reporting will be required annually. Currently the standard measures that will be required will most likely be those already captured in HEDIS and CAHPS, approved under OMB #0938–0701. The currently approved annual per plan burden is estimated to be 400.53 hours. Therefore, the total burden associated with this requirement is 180,239 hours (400.53 hours × 450 plans (100 new/350 current)).

## Section 422.202    Participation Procedures

Paragraph (d) of this section requires that an M+C organization that suspends or terminates an agreement under which the physician provides services to M+C plan enrollees give the affected individual written notice as required by this section.

This section also requires that an M+C organization that suspends or terminates a contract with a physician because of deficiencies in the quality of care give written notice of that action to licensing or disciplinary bodies or to other appropriate authorities.

The burden associated with these reporting provisions is the time it takes an M+C organization to write the notice and give it to the practitioner and the appropriate licensing, or disciplinary bodies or to other appropriate authorities. We estimate that it will take 450 plans, 10 hours to produce and disclose 10 notices on an annual basis, for a national annual burden of 4,500 hours.

In addition this paragraph requires that an M+C organization and a contracting provider must provide at least 60 days written notice to each other before terminating the contract without cause.

The burden associated with this reporting provision is the time it takes an M+C organization and provider to write the notice and furnish it to the other party. We estimate that 450 entities will be required to write 10 notices, at 1 hour per notice, for a national annual burden of 4,500 hours.

## Section 422.205    Provider Antidiscrimination Rules

The reporting requirement of this section requires that, if an M+C organization declines to include a given provider or group of providers in its network, it furnish written notice to the affected provider(s) of the reason for the decision.

The burden associated with this reporting provision is the time it takes an M+C organization to write and provide the required notice. We estimate that it will take 450 plans, 30 minutes to produce and disclose 20 notices on an annual basis, for a national annual burden of 4,500 hours.

## Section 422.206    Interference With Health Care Professionals' Advice to Enrollees Prohibited

The reporting requirement in paragraph (b)(2) requires that, through appropriate written means, an M+C organization make available information on any conscience protected policies to HCFA, with its application for a Medicare contract, within 10 days of submitting its ACR proposal or, for policy changes, in accordance with § 422.80 (concerning approval of marketing materials and election forms) and with § 422.111. With respect to current enrollees, the organization is eligible for the exception provided in paragraph (b)(1) of this section if it provides notice within 90 days after adopting the policy at issue.

The revision to the information collection provisions requires the M+C organization to make available policy changes. We estimate that it will take 30 minutes for each of the 450 M+C organizations to comply, for a total of 2,225 hours nationally on an annual basis.

## Section 422.257    Encounter Data

Paragraph (d)(1) of this section requires that M+C organizations must submit data that conform to the requirements for equivalent data for Medicare fee-for-service, when appropriate, and to all relevant national standards. M+C organizations must obtain the encounter data required by HCFA from the provider, supplier, physician, or other practitioner that rendered the services. In addition, M+C organizations may include in their contracts with providers, suppliers, physicians, and other practitioners, provisions that require submission of

complete and accurate encounter data as required by HCFA.

The burden associated with this paragraph is currently approved under OMB approval #0938–0753.

*Section 422.568   Standard Timeframes and Notice Requirements for Organization Determinations*

Under paragraph (a) of this section, when a party has made a request for a service, the M+C organization must notify the enrollee of its determination as expeditiously as the enrollee's health condition requires, but no later than 14 calendar days after the date the organization receives the request for a standard organization determination. The M+C organization may extend the timeframe by up to 14 calendar days if the enrollee requests the extension or if the organization justifies a need for additional information and how the delay is in the interest of the enrollee. When the M+C organization extends the timeframe, it must notify the enrollee in writing of the reasons for the delay and inform the enrollee of the right to file a grievance if he or she disagrees with the M+C organization's decision to grant an extension. The M+C organization must notify the enrollee of its determination as expeditiously as the enrollee's health condition requires, but no later than upon expiration of the extension.

The revision to this provision is that requiring the M+C organization to notify the beneficiary of its reasons for delay and of the right to file a grievance.

We estimate that this requirement will add 40 hours for each of the 450 M+C organizations to the burden currently captured under 0938–0753, for an annual addition of 18,000 hours.

Under paragraph (c), at each patient encounter with an M+C enrollee, a practitioner must notify the enrollee of his or her right to receive, upon request, a detailed notice from the M+C organization regarding the enrollee's services. The practitioner must provide the enrollee with complete information, using approved notice language in a readable and understandable form, necessary to contact the M+C organization.

The burden associated with this reporting provision is the time it takes a practitioner to notify the beneficiary. We estimate that there will be 160 encounters per entity (450) and that each notification will take an average of 15 minutes to do so, for a national annual burden of 4,500 hours.

Under paragraph (d), if an enrollee requests an M+C organization to provide a detailed notice of a practitioner's decision to deny a service in whole or in part, or if an M+C organization

decides to deny service or payment in whole or in part, it must give the enrollee written notice of the determination.

In addition to the currently approved burden under 0938–0753, the burden associated with this reporting provision is the time it takes to write the detailed decision and provide it to the beneficiary. We estimate that there will be 160 occasions per entity (450) for which a detailed decision must be provided and that each notification will take an average of 15 minutes for a national annual burden of 4,500 hours.

Under paragraph (e), the notice of any denial under paragraph (d) of this section must, in addition to currently approved requirements, (1) for service denials, describe both the standard and expedited reconsideration processes, including the enrollee's right to, and conditions for, obtaining an expedited reconsideration and the rest of the appeal process; and (2) for payment denials, describe the standard reconsideration process and the rest of the appeal process.

The burden associated with this reporting provision is the time it takes an M+C organization to add the required information to a notice. We estimate that it will take 450 plans 1 hour to produce and disclose the necessary language on an annual basis, for a national annual burden of 450 hours.

*Section 422.570   Expediting Certain Organization Determinations*

The information collection requirement in this section ((d)(2)(iii)) that is not currently approved under 0938–0753 requires that, if an M+C organization denies a request for expedited determination, it must take give the enrollee prompt oral notice of the denial and subsequently deliver, within 2 calendar days (proposed as 2 working days), a written letter that informs the enrollee of the right to resubmit a request for an expedited determination with a physician's support. The currently approved burden, associated with this requirement has not changed.

*Section 422.572   Timeframes and Notice Requirements for Expedited Organization Determinations*

The information collection requirement change to paragraph (b) requires that, when the M+C organization extends the deadline, it notify the enrollee in writing of the reasons for the delay and inform the enrollee of the right to file a grievance if he or she disagrees with the M+C organization's decision to grant an extension.

The additional burden associated with this requirements set forth in this section is the time it takes an M+C organization to notify the beneficiary of the delay and the reasons for it. We estimate that 450 plans will provide extension notices to approximately 100 of their M+C enrollees on an annual basis and it will take an average of 5 minutes per notification. Therefore, the annual national burden is estimated to be 3,750 hours.

*Section 422.584   Expediting Certain Reconsiderations*

The information collection change to this section requires that, if an M+C organization denies a request for expedited reconsideration, it must give the enrollee prompt oral notice, and subsequently deliver, within 2 calendar days, a written letter that (in addition to currently approved disclosure requirements) informs the enrollee of the right to resubmit a request for an expedited reconsideration with a physician's support.

The one time burden associated with this disclosure requirement is the time it takes an M+C organization to add the requisite language to the letter it furnishes to the beneficiary. We estimate that it will take each M+C organization (450) an average of 30 minutes to add the language to its current letter for notifying beneficiaries, for a national annual burden of 2,250 hours.

*Section 422.620   How Enrollees of M+C Organizations Must Be Notified of Noncoverage of Inpatient Hospital Care.*

The information collection change to this section the clarification that in *all* cases in which a determination is made that inpatient hospital care is no longer necessary, no later than the day before hospital coverage ends, the hospital (as provided under paragraph (d) of this section) or M+C organization must provide written notice to the enrollee that includes the elements described in this section. The burden associated with this requirement is currently approved and captured under 422.622.

We have submitted a copy of this final rule to OMB for its review of the revised information collection requirements in §§ 422.60, 422.74, 422.111, 422.113, 422.152, 422.205, 422.206, 422.257, 422.568, 422.570, 422.572, 422.584, and 422.620. These revised requirements are not effective until they have been approved by OMB.

If you have any comments on any of these information collection and record keeping requirements, please mail the original and 3 copies within 30 days of

this publication date directly to the following:

Health Care Financing Administration, Office of Information Services, Information Technology Investment Management Group, Division of HCFA Enterprise Standards, Room N2–14–26, 7500 Security Boulevard, Baltimore, MD 21244–1850. Attn: John Burke HCFA–1030–FC. and,

Office of Information and Regulatory Affairs, Office of Management and Budget, Room 10235, New Executive Office Building, Washington, DC 20503, Attn: Allison Heron Eydt, HCFA Desk Officer.

## V. Regulatory Impact Statement

### A. Introduction

We have examined the impact of this rule as required by Executive Order 12866 and the Regulatory Flexibility Act (RFA) (Pub. L. 96–354). Executive Order 12866 directs agencies to assess all costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). The RFA requires agencies to analyze options for regulatory relief of small businesses. For purposes of the RFA, small entities include small businesses, non-profit organizations and governmental agencies. Most hospitals and most other providers and suppliers are small entities, either by nonprofit status or by having revenues of $5 million or less annually.

Section 1102(b) of the Act requires us to prepare a regulatory impact analysis for any rule that may have a significant impact on the operations of a substantial number of small rural hospitals. This analysis must conform to the provisions of section 603 of the RFA. For purposes of section 1102(b) of the Act, we define a small rural hospital as a hospital that is located outside a Metropolitan Statistical Area and has fewer than 50 beds.

As a result of changes to the M+C regulations to reflect provisions of the BBRA, this rule has been determined to be a major rule as defined in Title 5, United States Code, section 804(2). We consider a major rule to be one with economic effects of $100 million or more in a given year, and as noted below in section V.B.8 of this regulatory impact analysis, the effects of the BBRA changes reach this threshold. Generally, a major rule takes effect 60 days after the date the rule is published in the **Federal Register**. In this case, however,

as discussed in detail above in section I.C of this preamble, the BBRA included specific effective dates for its various M+C provisions. For the most part, the statutory changes are self-explanatory, and have already taken effect. Thus, except as provided under the BBRA, the provisions of this final rule with comment period take effect 30 days after publication in the **Federal Register**.

The Unfunded Mandates Reform Act of 1995 also requires (in section 202) that agencies prepare an assessment of anticipated costs and benefits before enacting any rule that may result in an expenditure in any one year by State, local, or tribal governments, in the aggregate, or by the private sector, of $100 million or more. This final rule with comment period will have no consequential effect on State, local, or tribal governments. We believe the private sector cost of this rule falls below these thresholds as well.

### 1. Summary of the Final Rule

As discussed in detail above, this rule implements only limited changes in the M+C regulations published June 26, 1998 (and further amended February 17, 1999). While we do not expect the changes contained in this final rule to have a significant economic impact, we believe that we have a responsibility to keep the public informed of the impact of inherent features of the M+C program, such as payment changes and the implementation of risk-adjusted payments. We attempted to describe the impacts of these payment changes in the interim final rule. However, after a year of experience administering the program, we now have a better understanding of the impact of the payment changes. This impact analysis will examine payment effects associated with these two items, and respond to public comments concerning the economic impact of M+C policies.

### 2. Summary of Comments on Impact of M+C Program

Although commenters on the interim final rule generally recognized that the payment methodology and rates associated with the M+C program were implemented as directed by the BBA, several commenters still expressed concern that resulting payments to M+C organizations were insufficient to keep pace with the costs of providing medical care. These commenters suggested that the new payment methodology, particularly when combined with the implementation of a risk adjustment mechanism in 2000, could have the unintended consequence of limiting, rather than expanding, the health plan choices available to Medicare

beneficiaries. M+C organizations have withdrawn from some areas, and many beneficiaries have experienced growing premium increases or benefit reductions. Commenters also asserted that the M+C regulations contained discretionary provisions that added unnecessarily to the administrative burden on M+C organizations. In particular, commenters identified quality standards, provider participation requirements, and attestation procedures as examples of what they considered overly proscriptive rules that had the potential to raise health plan costs. In general, commenters urged us to evaluate more carefully the cumulative impact of the changes introduced by the M+C program.

We noted in our February 17, 1999 limited M+C final rule that we needed a statistically-based model to evaluate the total impact of payment changes for M+C organizations. We have subsequently developed a model that estimates the impact of risk-adjusted payments on M+C organizations. This impact analysis focuses on results from this model. When possible, we provide detail on impacts by geographic area and by organization size.

We then discuss some of the concerns raised by commenters about likely withdrawals from the M+C program. Finally, our analysis examines available information concerning the administrative burden associated with selected M+C requirements.

### B. Payment Changes

#### 1. Background

Prior to the BBA, Medicare's capitation rates for managed care plans had been set at 95 percent of expected costs based on actual fee-for-service costs. Because of the variation in fee-for-service expenditures for different counties due to different utilization patterns and cost structures, the Medicare managed care rates for different counties were also quite divergent. In addition, there was significant evidence that Medicare had paid more for enrollees in the Medicare managed care programs than it would have paid in the fee-for-service program. This was due primarily to the favorable selection that these plans have experienced.

The BBA made a number of changes in Medicare payments to managed care plans including:

• Increasing payments in counties that historically had the lowest payment rates (and generally have not had risk-based Medicare managed care plans) through the use of a payment floor and by introducing a blended payment rate.

• Reducing the rate increases in counties that historically had higher payment rates.

• Reducing M+C capitation rates by phasing in the removal of direct and indirect medical education payments from M+C capitation rates beginning in 1998 (and phasing in direct payment of these "carved out" amounts to the institutions providing care to M+C enrollees).

Payment increases from year to year after 1997 are based on an update factor that is the rate of increase in projected Medicare expenditures each year, less a statutorily specified reduction (reducing the rate to .8 percent less in 1998 and .5 percent less each year thereafter through 2002). However, all counties are guaranteed a minimum payment increase of 2 percent over the preceding year's base rates.

The BBA also mandated the introduction, by the year 2000, of risk-adjusted payments in the M+C program. Risk adjustment will have the effect of reducing payments to plans because, as a number of studies have shown, relatively healthier Medicare beneficiaries enroll in M+C plans. Projections on reduced payments assume a stable mix of enrollees. However, we assume that organizations will respond appropriately to the incentives to attract more seriously ill beneficiaries. As a result, organizations

can do better under risk adjustment than they would if case mix stayed the same.

These M+C payment changes were intended to promote the three objectives which we discuss below in V.B.2, 3 and 4.

### 2. Promote the Availability of M+C Plans in Lower Payment Areas

The introduction of a "floor" on the payment rates for M+C organizations was intended to make the program financially viable in areas where the AAPCC appeared to be too low for any organization to recoup its costs. Beginning in 1998, the floor was set at $367 and was adjusted annually by the rate of growth of the overall Medicare program. By providing this floor payment level, M+C organizations are paid more than would otherwise be spent on the same beneficiaries in original Medicare.

Some county payment rates are raised through implementation of blended payments. These rates are calculated as a blend of national average rates adjusted for local input prices and area-specific rates. Area-specific rates are 1997 payment rates, adjusted for spending for graduate medical education, and updated using the national M+C update factor.

By raising the M+C payment levels higher than the spending amounts in original Medicare, it was hoped that M+C organizations would be attracted to these lower payment areas. In the chart

below, we have compared the M+C county payment rates for 2001 to the area-specific rate in each county. In 2001, 3,020 counties will receive a payment rate higher than their area-specific rate. The payment rate for Arthur, Nebraska, will be 77 percent or $175 higher, the greatest improvement for any county.

The payment floor and the phased in blended payments were also designed to raise the payment level for more than just the lowest payment counties. Raising payments above the levels determined by the pre-BBA methodology was intended to give organizations that have operated in lower payment counties the opportunity to enhance their benefit packages, thereby increasing enrollment.

The largest improvements in payments are for areas with relatively small numbers of beneficiaries, and are largely achieved in most cases by applying the payment floor. Many more beneficiaries live in counties where the improvements are more modest (up to a 5 percent difference). These counties were primarily those paid under the blend mechanism in 2000, whose payment improvements were safeguarded by the minimum increase component of the formula for 2001.

Following is a breakout of the 3,147 U.S. counties by percentage improvement over their area specific rate:

TABLE 1.—PERCENT DIFFERENCE BETWEEN M+C PAYMENT RATES AND AREA-SPECIFIC PAYMENT RATES, 2001

| Percentage difference | Number of counties | Number of beneficiaries (000s) | Payment is floor | Payment is blend | Payment is minimum increase |
|---|---|---|---|---|---|
| Negative | 127 | 1,318 | 0 | 0 | 127 |
| 0 to 5 | 1,000 | 15,741 | 0 | 0 | 1,000 |
| 5 to 10 | 946 | 9,848 | 62 | 0 | 884 |
| 10 to 20 | 572 | 4,133 | 401 | 0 | 171 |
| 20 to 30 | 264 | 888 | 264 | 0 | 0 |
| 30 to 40 | 131 | 408 | 131 | 0 | 0 |
| 40 to 50 | 68 | 142 | 68 | 0 | 0 |
| 50 to 60 | 26 | 52 | 26 | 0 | 0 |
| 60 to 70 | 9 | 18 | 9 | 0 | 0 |
| 70 to 80 | 4 | 5 | 4 | 0 | 0 |
| Total | 3,147 | 32,554 | 965 | 0 | 2,182 |

Source: HCFA, CHPP.

Counties where M+C payment rates are lower than their area-specific payment rate tend to be those that have received the minimum increase for each of the four years that the M+C payment formula has been in place, and also had relatively little medical education spending. The cumulative four-year increase of the national update was approximately 9.3 percent, only a

percentage point higher than the cumulative four-year increase of 8.2 percent for those counties receiving the minimum update each year. The area-specific payment rate in 2001 reflects a reduction to the 1997 rate of 80 percent of spending attributable to medical education. Thus, a county with relatively high medical education spending will have a higher M+C

payment rate than area-specific payment rate even if it also had received the minimum update each year.

### 3. Reduce the Wide Disparities in Payments Between High and Low Payment Areas

By changing how payment rates are calculated, the BBA also sought to even out the wide disparity in Medicare managed care payment rates across

**40304**    **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

counties, an issue that had been a concern for lower-payment areas. Table 2 shows the percentage of counties that received the floor, a blended rate, or the minimum 2 percent increase for each year calculated using the BBA methodology.

### TABLE 2.—PERCENT OF COUNTIES RECEIVING FLOOR, BLEND, OR 2 PERCENT INCREASE

| Year | Floor counties (percent) | Blend counties (percent) | 2 percent counties (percent) |
|---|---|---|---|
| 1998 | 33.8 | 00.0 | 66.2 |
| 1999 | 39.7 | 00.0 | 60.3 |
| 2000 | 29.1 | 63.1 | 7.8 |
| 2001 | 30.7 | 00.0 | 69.3 |

Source: HCFA, CHPP.

There were only limited payment increases for 1998 and 1999, with counties receiving either the floor payment or the minimum 2 percent update. This was due primarily to the combined effects of the amount of the national update and the budget neutrality provision affecting calculation of the blended rate. In 2000, however, well over half the counties are receiving the blended rate. The enrollment-weighted average increases in M+C payments nationwide in the year 2000 over 1999 is slightly more than 5 percent. For 2001, all counties will receive the floor payment or the minimum 2 percent update, again because of the budget neutrality provision and a national update that reflects the extremely low rate of spending in original Medicare in 1999. Although most counties will receive the minimum increase in 2001, many of these had enjoyed relatively large increases due to the blended rates in 2000, which the minimum increase essentially will preserve.

As illustrated in the graph below (1997 Medicare+Choice Payment Rates Compared with 2001 Payment Rates), the new payment formulas have changed the distribution of payment rates across counties, although perhaps not as quickly as the Congress envisioned because of the unusually low national increases in spending. In 1997, county payment rates for aged beneficiaries ranged from $221 to $767. Through the implementation of the payment floor, blended payment rates, and minimum update, payments have increased substantially at the low end of the distribution, and increases at the high end have slowed. The range of payment rates in 2001 is only somewhat smaller: between $415 and $831, but the 2001 payment curve is straighter than the 1997 curve, indicating a narrower distribution.

**BILLING CODE 4120–01–P**

**Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations    **40305**



Source:   HCFA, CHPP

BILLING CODE 4120–01–C

While national numbers show the overall pattern, the impact is highlighted when examining the effect of the BBA on the payment rates at the State level. Table 3 shows the effect of the payment changes on two States: Oregon and Florida. Both States have significant M+C enrollment penetration, but Oregon's rates are low, and Florida's are high.

The BBA payment changes have narrowed the regional difference. In 1997, prior to the BBA payment changes, Florida's weighted average payment rates were 149 percent higher than those of Oregon. (Florida's statewide average payments were at 114 percent of the national average, while Oregon's were at 76 percent.) In 2001, Florida's rates will be 136 percent of Oregon's, because many Florida

counties had benefited from blended payment rates in 2000, while many large Florida counties received the minimum update that year.

Lower-paid States such as Oregon receive relatively higher rates of payment increases than higher-paid States such as Florida. These differential payment increases will bring both States' average payments closer to the national average payment rate.

TABLE 3.—COMPARISON OF MEDICARE+CHOICE PAYMENT RATES IN OREGON AND FLORIDA

| State | Weighted average payment rate 2001 | Weighted average payment increase 97–01 (percent) | Payment rate as a percent of national 1997 (percent) | Payment rate as a percent of national 2001 (percent) |
|---|---|---|---|---|
| Oregon | $435.25 | 22.5 | 76 | 83 |
| Florida | 581.15 | 9.6 | 114 | 111 |
| National | 523.85 | 12.4 | 100 | 100 |

Despite the BBA changes, the levels of benefits and premiums between higher and lower payment counties continue to vary in 2000. In Oregon, for example, premiums range from $35 to $83 for benefit packages that do not include outpatient drug coverage, and between $81 and $123 for packages including drug coverage. In Florida the enrollment-weighted average monthly premium is $84 per month, and all enrollees in Florida M+C plans have drug coverage in their basic package. Over time, the BBA payment changes may narrow this difference.

4. Establish a Fairer Payment System

The BBA mandated that we "implement a risk adjustment methodology that accounts for variations in per capita costs based on health status and other demographic factors for payment [to M+C organizations] starting no later than January 1, 2000." The BBA also gives us the authority to collect inpatient hospital data for discharges occurring on or after July 1, 1997, and allows us to require additional data from M+C organizations for services occurring on or after July 1, 1998.

*a. Description of the Inpatient Risk Adjustment Model.* In implementing the BBA mandate, we selected the Principal Inpatient Diagnostic Cost Group (PIP–DCG) model as the risk adjustment method to implement in 2000. Under the PIP–DCG model, individuals are assigned to a single PIP–DCG group based on the principal inpatient diagnosis they were assigned during an inpatient stay, that has the greatest future cost implications. The model is prospectively based; in other words, base year inpatient diagnoses are used

in the model to predict payment year health expenditures. The model also uses age, sex, original reason for Medicare entitlement (such as age or disability), and entitlement to state payments for Medicaid to derive a predicted expenditure level. This predicted expenditure amount is then converted to beneficiary relative risk factors by dividing an individual's predicted expenditures by the national mean. Because this model was developed and calibrated using a year of inpatient diagnoses, a full year of data is essential for assigning beneficiary risk factors. Beneficiaries "new" to Medicare (for whom no prior diagnosis information exists) have their payments based on the average expenditures for their age group. To determine risk adjusted monthly payment amounts for each M+C enrollee, individual risk factors will be multiplied by the appropriate payment rate for their county of enrollment.

We decided to include a transition period as a component of our risk adjustment methodology, initially using a blend of payment amounts under the current demographic system and the PIP–DCG risk adjustment methodology. Under a blend, payment amounts for each enrollee will be separately determined using the demographic and risk methodologies (that is, taking the separate demographic and risk rate books and applying the demographic and risk adjustments, respectively). These payment amounts would then be blended according to the percentages for the transition year. This transition to full risk adjusted payment will be phased in over 5 years. Following is the transition schedule to comprehensive

risk adjusted payment as mandated by the BBRA:

| Calendar year | Demographic method (percent) | PIP–DCG method (percent) |
|---|---|---|
| 2000 | 90 | 10 |
| 2001 | 90 | 10 |
| 2002 | 80 | 20 |

*b. Impact of Risk Adjustment.* The impact analysis presented here employs a "point in time" approach. To estimate the payment impact of the risk adjustment change, we compared actual demographic-based payments to estimated risk adjusted payments for the exact same enrollees for September 1998. Aggregated to the M+C organization level, the difference in these amounts represents a reasonable estimate of change in payment due to risk adjustment. Projections on reduced payments assume a stable mix of enrollees. However, we assume that organizations will respond appropriately to the incentives to attract more seriously ill beneficiaries. As a result, organizations can do better under risk adjustment than they would if case mix stayed the same.

This analysis uses the best data available at this time. The data to be used for actual payments (beginning January 1, 2000) will be based on hospital discharge data for the calendar year beginning on July 1, 1998 and ending June 30, 1999. The actual impact of the risk adjustment system relative to the current demographic system at the time of implementation may differ, due primarily to potential changes in M+C organization enrollment profiles and possible improvement in the quality and completeness of M+C organization data.

**Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations     **40307**

The impacts presented here show estimated figures for both the full effects of the PIP–DCG based payment system (that is, with no transition period), and for the first implementation year during which a 10 percent phase-in was included as part of the methodology. To estimate impacts under the full impact results can be multiplied by the appropriate proportion of the risk adjustment payments. For example, the first year risk adjusted payment phase-in level is 10 percent. Therefore, to

estimate the impact under a 10 percent risk adjusted phase-in, the impacts can be multiplied by .10.

If our methodology did not include a transition period, payments to M+C organizations would decrease by approximately 5.7 percent. This is a revision over preliminary estimates of 7.6 percent, which were prepared using an earlier, more limited data set. The majority of M+C organizations would face payment decreases of between five and eight percent.

The table below presents the simulated impacts aggregated to our administrative regions. None of our regions will experience increased payments under the proposed system. The variation between regions is not considerable. Organizations in the Atlanta region will see an average .7 percent reduction, and organizations in the Seattle region will see less than a .4 percent reduction.

TABLE 4.—PAYMENT SUMMARY FOR SELECTED M+C ORGANIZATIONS BY HCFA REGION

| Region | Enrollees | Percent difference (phase-in) | Percent difference (full impact) |
|---|---|---|---|
| Boston | 359,819 | −0.55 | −5.50 |
| New York | 564,252 | −0.35 | −3.47 |
| Philadelphia | 583,740 | −0.66 | −6.61 |
| Atlanta | 895,021 | −0.70 | −7.00 |
| Chicago | 530,558 | −0.50 | −4.97 |
| Dallas | 472,627 | −0.69 | −6.93 |
| Kansas City | 154,223 | −0.61 | −6.14 |
| Denver | 128,069 | −0.62 | −6.25 |
| San Francisco | 1,710,117 | −0.57 | −5.69 |
| Seattle | 282,765 | −0.35 | −3.45 |
| Total | 5,681,191 | −0.57 | −5.74 |

In addition, we simulated impacts by M+C organization enrollment size. Table 5 reveals that the variation in impact between the small M+C

organizations and the large M+C organizations does not appear to be systematic. M+C organizations of all sizes are very close to the national

average, although smaller organizations will experience a slightly higher reduction.

TABLE 5.—PAYMENT SUMMARY FOR SELECTED M+C ORGANIZATIONS BY SIZE OF ENROLLMENT

| Enrollment size | Enrollees | Percent difference (phase-in) | Percent difference (full impact) |
|---|---|---|---|
| Less than 500 | 5,115 | −0.71 | −7.10 |
| 500–2,999 | 88,594 | −0.81 | −8.10 |
| 3,000–4,999 | 993,829 | −0.69 | −6.87 |
| 5,000–9,999 | 354,271 | −0.62 | −6.22 |
| 10,000–24,999 | 1,177,118 | −0.58 | −5.79 |
| 25,000–49,999 | 1,029,859 | −0.54 | −5.41 |
| 50,000–99,999 | 1,471,009 | −0.52 | −5.23 |
| 100,000 or more | 1,455,843 | −0.61 | −6.09 |
| Total | 5,681,843 | −0.57 | −5.74 |

5. M+C Organization Withdrawals

At the end of 1998, approximately 100 organizations dropped Medicare managed care contracts or reduced the number of counties in which a plan was offered. The result of these withdrawals

was that nearly 50,000 beneficiaries were left with no remaining M+C plan in their county. Likewise, the analysis of 1999 health plan departures shows that approximately 79,000 additional M+C beneficiaries were forced to leave the

program because there was no plan offered in their area.

Table 6 below shows the decline in beneficiaries' access to a M+C plan in their area (declining about 2 percentage points from the 1999 level of almost 70 percent).

TABLE 6.—PERCENT OF BENEFICIARIES WITH ACCESS TO M+C PLANS

| 1999 | | | 2000 | | |
|---|---|---|---|---|---|
| Urban | Rural | Total | Urban | Rural | Total |
| 84.2 | 22.5 | 69.7 | 82.0 | 20.8 | 67.7 |

**40308**    **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

Of the 71 counties that had an M+C plan in 1999 but will no longer have an M+C option in 2000, 11 were considered high payment counties. In fact, the average increase in 2000 for these 71 counties is 6.2 percent. The county in this situation with the greatest increase was Clallum County, in Washington State, which received a blended rate increase of 12.8 percent over its 1999 rate.

Plan decisions to withdraw from M+C do not appear to be caused only by changes in payment amounts. Payment is rising in all counties this coming year by an average of 5 percent, and will rise by as much as 18 percent in some areas. BBA payment reforms were designed to increase payment in counties that had the lowest rates, and therefore the fewest number of plans. Yet counties receiving the largest increases under the BBA payment system are experiencing

the most disruption. Plan withdrawals are affecting 11.1 percent of enrollees in counties where rates are rising by 10 percent, but affecting only 2.3 percent of enrollees where rates are rising by just 2 percent.

Table 7 shows the States with the largest percentage decrease since 1997 (the start of the M+C program) of Medicare beneficiaries with access to an M+C plan.

TABLE 7.—STATES WITH LARGEST PERCENT DECREASE IN ACCESS TO M+C OPTION IN 2000 FROM 1997

| State | Total Medicare population | Decrease in beneficiaries | Percent decrease in beneficiaries |
|---|---|---|---|
| Utah | 207,838 | 183,541 | 88 |
| Louisiana | 621,826 | 175,645 | 28 |
| Virginia | 894,573 | 246,274 | 28 |
| New Hampshire | 172,069 | 45,627 | 27 |
| South Carolina | 575,890 | 130,118 | 23 |
| Maryland | 652,599 | 119,392 | 18 |

While several States have experienced a significant loss of access to M+C plans, other States have seen access to M+C organizations increase. In addition, the M+C program continues to grow despite challenges that parallel those in the larger managed care market in the United States. As of January 2000, there were 6.2 million M+C enrollees representing over 16 percent of the more than 39 million seniors and disabled

Americans in Medicare. Total Medicare managed care enrollment has more than doubled in the past four years from 3.1 million enrollees at the end of 1995 to 6.9 million enrollees as of April 1, 2000. (Total managed care enrollees consist of M+C enrollees and enrollees in Medicare Managed Care Cost Plans, Health Care Prepayment Plans, and managed care demonstrations.) However, the rate of growth has

dropped significantly from earlier periods, and has grown by only 1 percent per month the last several months.

Table 8 below shows the States with the largest percentage increase since 1997 (the start of the M+C program) of Medicare beneficiaries with access to an M+C plan.

TABLE 8.—STATES WITH LARGEST PERCENT INCREASE IN ACCESS TO M+C OPTION IN 2000 FROM 1997

| State | Total Medicare population | Increase in beneficiaries | Percent increase in beneficiaries |
|---|---|---|---|
| Maine | 219,944 | 138,067 | 63 |
| Iowa | 488,180 | 171,017 | 62 |
| South Dakota | 122,220 | 118,493 | 29 |
| Oklahoma | 519,239 | 114,185 | 24 |
| West Virginia | 345,587 | 65,794 | 20 |
| North Carolina | 1,149,374 | 54,040 | 18 |

6. Premium Increases

In our Impact Analysis that accompanied the Interim Final Rule we stated that "Reductions in capitated payment amounts in what are now relatively higher payment areas may result in reduced benefits for beneficiaries." While higher premiums and reduced benefits were not intended effects of the BBA, they are also not surprising given the reduced payment increases in higher cost areas. While benefits, premiums, and cost sharing

remained relatively stable in 1999, year 2000 has been different.

Analysis of the Adjusted Community Rate proposals submitted in July show that premiums for 2000 have increased, especially in rural areas. For example, in 1999, the enrollment-weighted average premium for a basic plan was $5.35. For 2000, this amount will almost triple to $15.84.

Table 9 shows the percent of M+C beneficiaries living in the designated areas that have access to a plan with the

associated premium. While the percent of beneficiaries with access to zero dollar premium plans is expected to be reduced by more than 3 percentage points, the percent of beneficiaries that must pay a $40–$100 premium has more than doubled. In 1999, only 50,000 Medicare beneficiaries lived in an area where the minimum premium is in the $80 to $100 range; however, in 2000, the number will rise to 207,000. The majority of these individuals (60 percent) are residents of rural counties.

TABLE 9.—PERCENT OF BENEFICIARIES LIVING IN DESIGNATED AREAS HAVING ACCESS TO AN M+C PLAN WITH ASSOCIATED PREMIUM 1999

| Premium amount | 1999 | | | 2000 | | | Total percent change |
|---|---|---|---|---|---|---|---|
| | Urban (percent) | Rural (percent) | Total (percent) | Urban (percent) | Rural (percent) | Total (percent) | |
| $0 ............................ | 79 | 63 | 78 | 78 | 40 | 75 | −3 |
| $0.01–$19.99 ............ | 1 | 2 | 2 | 3 | 11 | 4 | 2 |
| $20.00–$39.99 .......... | 5 | 14 | 5 | 9 | 18 | 9 | 4 |
| $40.00–$59.99 .......... | 4 | 11 | 5 | 6 | 17 | 6 | 2 |
| $60.00–$79.99 .......... | 1 | 8 | 2 | 1 | 7 | 2 | 0 |
| $80.00–$99.99 .......... | 0 | 0 | 0 | 0 | 0 | 1 | 1 |

In addition, access to a zero premium plan for rural beneficiaries will be reduced by almost 50 percent. In 1999, 1.3 million rural beneficiaries (63 percent of those with any plan available) live in an area with at least one zero premium plan; in 2000, only 784,000 rural beneficiaries, (40 percent of those with any plan available), will have such an option. One-half million fewer rural beneficiaries will have access to a zero premium plan.

7. Premiums in Areas With Only One Plan

Medicare beneficiaries who live in areas with only one plan will be particularly affected by premium increases. Approximately 8 percent of M+C beneficiaries (just over three million) live in areas with only one plan. Note also in Table 10 that of the 207,000 beneficiaries who live in areas where the minimum monthly premium available is over $80, 94 percent (over 195,000) live in areas with only one plan available. There will be a nearly six-fold increase from 1.6 percent to 9.3 percent in the percentage of beneficiaries who live in an area where the sole M+C plan available has a monthly premium in the $80 to $100 range.

TABLE 10.—MEDICARE BENEFICIARY POPULATION (TOTAL), ACCESS TO ONLY ONE PLAN

| Minimum premium | Year 1999 | | Year 2000 | |
|---|---|---|---|---|
| | Beneficiaries | Percent | Beneficiaries | Percent |
| Zero ............................ | 803,162 | 31.6 | 599,553 | 28.4 |
| $0.01–$19.99 ............ | 17,614 | 0.7 | 0 | 0.0 |
| $20.00–$39.99 .......... | 467,284 | 18.4 | 410,662 | 19.5 |
| $40.00–$59.99 .......... | 716,662 | 28.2 | 683,029 | 32.4 |
| $60.00–$79.99 .......... | 499,095 | 19.6 | 220,237 | 10.4 |
| $80.00–$99.99 .......... | 39,742 | 1.6 | 195,432 | 9.3 |
| Total ...................... | 2,543,559 | 100 | 2,108,913 | 100 |

Premium increases in areas with only one plan will have the most pronounced impact in rural areas. From 1999 to 2000, roughly the same percentage of beneficiaries who live in rural areas will have only one plan available—28.4 percent and 29.6 percent in each year, respectively. However, Table 11 shows that zero premium plans are becoming less widely available in rural areas. It also shows that there will be a significant increase in the number of rural Medicare beneficiaries whose only M+C option is a relatively high cost plan.

TABLE 11.—MEDICARE BENEFICIARY POPULATION (RURAL ONLY) ACCESS TO ONLY ONE PLAN

| Minimum premium | Year 1999 | | Year 2000 | |
|---|---|---|---|---|
| | Beneficiaries | Percent | Beneficiaries | Percent |
| Zero ............................ | 271,833 | 37.7 | 174,956 | 28.1 |
| $0.01–$19.99 ............ | 17,614 | 2.4 | 0 | 0.0 |
| $20.00–$39.99 .......... | 96,131 | 13.3 | 104,796 | 16.8 |
| $40.00–$59.99 .......... | 135,440 | 18.8 | 146,425 | 23.5 |
| $60.00–$79.99 .......... | 160,647 | 22.3 | 81,774 | 13.1 |
| $80.00–$99.99 .......... | 39,742 | 5.5 | 115,669 | 18.5 |
| Total ...................... | 721,407 | 100 | 623,620 | 100 |

8. Impact of BBRA

The Balanced Budget Refinement Act (BBRA) made two changes to the payment methodology established by the BBA. First, Section 512 of the BBRA introduced bonus payments for M+C organizations that enter previously unserved counties. These organizations will receive an additional 5 percent payment for the first 12 months and an additional 3 percent for the subsequent 12 months. The second change in section 517 of the BBRA was to lower the reduction in the National per Capita Medicare +Choice Growth percentage

**40310**    **Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations

from a 5 percent reduction to a 3 percent reduction in calculating the 2002 payment rates.

The Congressional Budget Office (CBO) estimated that the bonus payments would amount to additional payments of $.1 billion over three years. Our experience to date suggests that this figure may be high, as currently there are only five M+C organizations receiving bonus payments and very few pending applications from prospective M+C organizations that would be eligible for the bonus. However, there is an application on file from a prospective M+C organization that envisions expanding into a large number of previously unserved counties. If this organization is extremely successful in enrolling beneficiaries, the CBO estimate could in fact be a low estimate.

We estimate that lowering the reduction of the National per Capita Medicare+Choice Growth percentage in the year 2002 will provide an additional $80 million in payments to plans in 2002, and an additional $560 million over 5 years. Payments to plans in all subsequent years will be higher because of the effect of lowering the reduction on the baseline.

*C. Response to Comments on Interim Final Rule*

Since the publication of our June 26, 1998 interim final rule, we have implemented several significant changes aimed at alleviating unnecessary administrative burdens. Examples of these changes include the less expansive provider participation requirements adopted in our February 17, 1999 rule, our December 1998 revisions to the QISMC standards as discussed below, and clarification of the attestation requirements through this final rule. Clearly the cumulative effect of these changes will be to reduce the administrative costs associated with these requirements. Although we continue to solicit quantifiable data that can help us to assess the costs of complying with particular provisions, we have not received any data in this regard. We remain particularly interested in detailed estimates of the administrative costs associated with the QISMC and HEDIS standards. Research of available literature/studies related to these administrative costs is presented below.

1. Quality Standards

The BBA codified many existing quality assurance requirements that had been established through operational policy letters and other guidance issued under the Medicare risk and cost contracting programs.

On September 28, 1998, we issued interim Quality Improvement Systems for Managed Care (QISMC) standards and guidance. QISMC is a system for ensuring that managed care organizations contracting with Medicare and Medicaid protect and improve the health and satisfaction of enrolled beneficiaries. It consists of a set of standards and guidelines developed around four domains—quality assessment and performance improvement, enrollee rights, health services management, and delegation.

QISMC was developed in conjunction with federal and state officials, beneficiary advocates and the managed care industry to develop a coordinated quality oversight system to reduce duplicative or conflicting efforts, emphasize demonstrable and measurable improvement, and avoid reinventing the wheel. QISMC standards represent the evolution of existing quality standards being used by commercial, Medicare and Medicaid health plans or managed care organizations. We believe QISMC incorporates the currently accepted quality assurance elements and provides safeguards for vulnerable Medicare and Medicaid populations enrolled in managed care.

We reviewed NCQA accreditation 1999 standards for their consistency with QISMC standards. This is an appropriate comparison because the National Committee for Quality Assurance has been recognized as a forerunner in assuring quality assurance in health plans through its accreditation processes, and development and implementation of HEDIS performance data reporting. Also, many Medicare+Choice organizations are NCQA accredited.

Our findings are provided in the table below, which was reviewed by NCQA representatives in order to assure the highest level of technical accuracy. In general, almost two-thirds of NCQA accreditation 1999 standards were determined to be either consistent with variation or highly consistent or identical to QISMC standards.

TABLE 12

[In percent]

| NCQA 1999 | Overall | Domain 1<br>Quality assessment and performance improvement | Domain 2<br>Enrollee rights | Domain 3<br>Health services management | Domain 4<br>Delegation |
|---|---|---|---|---|---|
| Substantially Greater Than QISMC | 12 | 4 | 11 | 17 | |
| Consistent with QISMC | 62 | 65 | 68 | 53 | 100 |
| Substantially Fewer Requirements | 26 | 30 | 21 | 29 | |

Beneficiaries will benefit significantly from information available to them about the performance of their health plans as well as through improvements in the delivery of care and services that evolve out of on-going quality improvement projects under QISMC. Beneficiaries already have access to health plan performance and consumer satisfaction measures about the M+C organizations available in their area through our beneficiary education campaign and individual plan marketing.

We expect that as consumers become increasingly familiar with health plan performance and consumer satisfaction information, it will become an integral part of their decision-making process, in addition to cost and benefits, for selecting their M+C organization. It is our intent that as consumers become better informed and decide not to select plans of lower quality, such plans will be motivated to initiate improvements in the quality of care they provide.

At the same time, we expect that plan's focus on one national and one plan-specific quality assessment and performance improvement project each year will improve the delivery of services to Medicare beneficiaries, especially beneficiaries suffering from chronic conditions. M+C organizations will need to be proactive in identifying and treating beneficiaries who suffer

**Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations    **40311**

from medical conditions which are the focus of their quality assessment and performance improvement projects in addition to their HEDIS measures. This will ultimately lead to improved care and services for Medicare beneficiaries through the institutionalization of these practices.

*a. QISMC Compliance.* Purchaser demands have driven many managed care organizations to become NCQA accredited, implement quality measurement and performance improvement strategies, and report performance and satisfaction data. This has resulted in many managed care organizations becoming NCQA accredited, especially on the east and west coasts. We estimate that the cost of becoming NCQA accredited ranges between $300,000–$500,000.

We do not believe that QISMC will present significant additional fixed costs for M+C organizations that have already received accreditation from the National Committee for Quality Assurance. While QISMC presents some subtle and significant differences from NCQA accreditation, we do not expect that organizations that have prepared for NCQA accreditation will incur significant additional costs to comply with QISMC. We recognize that there will be incremental costs associated with QISMC, such as costs associated with additional quality assessment and performance improvement projects, internal staff training expenses, and oversight and compliance.

In addition, we expect that some M+C organizations that are not NCQA accredited may incur higher costs to comply with QISMC than organizations in other parts of the country.

*b. HEDIS Reporting.* Since 1997, we have required M+C organizations to report HEDIS and consumer satisfaction data. Beginning in 1998, we required M+C organizations to begin reporting audited HEDIS data as a result of inconsistencies in HEDIS reporting.

We do not expect that requirements for reporting HEDIS and consumer satisfaction measures are inconsistent with expectations that private purchasers have access to health plan performance data (GAO, June 1998). As a result, we do not expect that organizations will incur significant new fixed costs as a result of requirements to report performance measurement and consumer satisfaction data, since we expect that M+C organizations will use audited HEDIS data. However, we do recognize that there may be incremental costs to reporting audited HEDIS data in terms of additional processes, audit fees, etc.

In addition, requirements for M+C organizations to report audit HEDIS data will likely yield improved processes for collecting and reporting complete, accurate and timely data as a result of an independent third party review of their data collection, warehousing and production/reporting processes.

*c. Quality Assessment and Performance Improvement Projects.* We recognize that a significant difference between QISMC and NCQA accreditation 1999 is that QISMC is much more prescriptive in defining the type, scope and measurement of quality assessment and performance improvement projects. In response to industry concerns, we have reduced the number and delayed the timeframe for implementing quality assessment and performance improvement projects.

At the same time, specifying beginning and ending dates for QAPIs will ensure that plans do not become mired in projects that do not end. We expect that plans will focus their efforts on achieving results and institutionalizing improvements in the delivery of care, data collection and reporting and information system improvements gained from successful QAPI projects. Even in instances where demonstrable improvements were not obtained, we expect that, in many cases, some improvement will result.

In addition, plans will have added incentives to initiate performance improvement projects that will lead to more cost-effective delivery of health care services, such as influenza immunization. For example, one national managed care organization increased the percentage of Medicare enrollees receiving flu shots from 27 percent to 55 percent in one year. The organization reported a reduction of about 30 percent in hospital admissions for pneumonia, savings of about $700,000, and fewer lives lost. (GAO, May 1996) We expect that investments in QAPI activities will lead to cost-savings over and above the initial investment.

We recognize that some high-performing managed care organizations will have less ability to achieve additional improvements in some areas. Some organizations will respond to incentives to select projects where results may be more easily obtainable. We continue to believe, however, that there are significant gains that remain to be made in the delivery of quality services.

We concur with industry comments that small plans may have difficulty in complying, since they may not have a statistically credible population for producing reliable and/or comparable

measures. For example, a small plan with a healthier population than average may not have sufficient instances of myocardial infarction for which beta-blocker treatment would be appropriate. We will work with these organizations to address these and other unique issues that may arise.

We believe that requiring plans to participate in at least one national and one plan-specific QAPI project annually and to demonstrate a 10 percent improvement in their QAPI is in the best interest of beneficiaries. These requirements will improve the quality of care and services delivered to Medicare and other populations served by the M+C organization, as performance improvement practices become routine.

*d. Deeming.* To avoid duplication of effort and unnecessary administrative burdens with respect to internal quality assurance requirements, we are recognizing accrediting by national, private accrediting organizations that we determine to be consistent with our QA requirements. We believe that this will significantly benefit a significant portion of M+C organizations that are already accredited, reducing costs, capitalizing on efficiencies, and avoiding duplicative processes.

### 2. Provider Procedures

Much less information is available about other requirements cited by some commenters as entailing significant administrative burdens. For example, we received many public comments regarding provider participation requirements. We responded to many of those comments in our February 17, 1999, final rule (64 FR 7968), under which we narrowed many of the requirements set forth in our June 26, 1998 interim final rule (63 FR 34968). Modifications to the interim final rule included:

• Applying the applicable notice and appeal rights and consultation requirements only to physicians, as defined under section 1861 of the Act;

• Adopting a narrower interpretation of what constitute "rules regarding participation" to focus on whether a physician can participate under a given M+C plan;

• Clarifying that an M+C organization need only have reasonable procedures for notifying potential participating physicians of participation rules, which may include providing the information upon request;

• Clarifying that an M+C organization is not required to release information that an organization considers proprietary information;

• Clarifying that in the event that immediate changes are mandated

through Federal law or regulation, an organization should be exempt from the requirement that written notice be provided before the changes are put into effect;

• Clarifying that there is no requirement that an organization obtain signatures acknowledging receipt of a notice of changes;

• Limiting the applicability of the appeals process to appealing adverse participation decisions;

• Clarifying that the availability of the provider appeals process applies only to cases involving suspension or termination of participation privileges, rather than including initial denials of an application to participate; and

• Clarifying that the information to be included in a notification of a decision to suspend or terminate an agreement with a physician is limited to information relevant to the decision.

Since publication of our February 17, 1999 final rule, we have subsequently communicated with several M+C organizations about the costs and benefits associated with the requirements included in this final rule. We believe that the steps taken in our February 17, 1999 final rule significantly reduced the burden on M+C organizations and also ensured that providers and beneficiaries receive the protections intended by Congress under the Act. For example, by narrowing the scope of the requirement for advance notice of changes in participation rules, an M+C organization need not prepare an advance notice for administrative and other changes that do not affect whether a physician can participate in a plan. Notification of most changes made by a M+C organization can be made via usual communication methods, such as regular newsletters, rather than through the preparation of special mailings or other more burdensome methods.

In addition, the M+C organization must consult with the physicians who have agreed to provide services under the M+C plan offered by the organization, regarding the organization's medical policy, quality assurance program, and medical management procedures, and ensure that the following standards are met. We understand that these requirements are consistent with current operational practices by M+C organizations and pose little additional burden, and that the costs associated with incremental changes would be marginal.

We also understand that our requirements concerning credentialing processes and prohibitions on discrimination reflect current practices and similar requirements from other

entities (for example, accrediting bodies) and do not impose additional burden.

## 3. Attestation Requirements

Similarly, commenters objected to attestation requirements as discussed in detail above (See Subpart K). To receive a monthly payment under subpart F, the chief executive officer (CEO) or chief financial officer (CFO) of a M+C organization must request payment under the contract on a document that certifies the accuracy, completeness, and truthfulness of relevant data that we request. Such data include specified enrollment information, encounter data, and other information that we may specify. The CEO or CFO must certify that each enrollee for whom the organization is requesting payment is validly enrolled in an M+C plan offered by the organization, and the information relied upon by us in determining payment is accurate. The CEO or CFO must certify that the encounter data it submits under § 422.257 are accurate, complete, and truthful. If such encounter data are generated by a related entity, contractor, or subcontractor of an M+C organization, such entity, contractor, or subcontractor must similarly certify the accuracy, completeness, and truthfulness of the data. In addition, the M+C organization must certify that the information in its ACR submission is accurate and fully conforms to the requirements in § 422.310 in order to retain payment amounts below the amount of its ACR.

We understand that the collection and dissemination of this information by M+C organizations is undertaken in a manner that reflects an M+C organization's best efforts to ensure its accuracy, completeness, and truthfulness. Accordingly, we do not believe that this requirement imposes significant new burdens on an M+C organization that operates in good faith to comply with requirements under the M+C program. We realize that mistakes and errors may occur even under an organization's best efforts, and these attestation requirements are not intended to penalize an M+C organization that operates in good faith. We believe these requirements are important to safeguard the integrity of the M+C program against those few M+C organizations that do not utilize the kind of business and operational practices of most M+C organizations. We also believe the requirements will provide an important tool for seeking out the few bad actors that could harm the M+C program, beneficiaries, providers, and other M+C organizations. As suggested by many commenters, we

have revised the requirements to establish a "good faith" compliance standard as opposed to requiring an attestation of 100 percent accuracy for encounters and enrollment (payment related) data. We believe this change should alleviate commenters concerns over the undue financial burdens associated with attestation requirements.

## VI. Other Required Information

### A. Federalism Summary Impact Statement

On August 4, 1999, the president signed Executive Order 13132 (effective November 2, 1999) establishing certain requirements that an agency must meet when it promulgates regulations that impose substantial direct compliance costs on State and local governments, preempt State law, or otherwise have federalism implications. Any such regulations must include a federalism summary impact statement that describes the agency's consultation with State and local officials and summarizes the nature of their concerns, the extent to which these concerns have been met, and the agency's position supporting the need to issue the regulation.

In this final rule, we are not promulgating any changes to the existing M+C regulations that meet any of the criteria mentioned above that would require the inclusion of a federalism impact statement under Executive Order 13132. However, the M+C interim final rule published on June 26, 1998 (63 FR 34968) did contain provisions that have a federalism impact, and we respond to comments on these provisions from States and other interested parties in this rule. Thus, in keeping with the intent of the Executive Order that we closely examine any policies that have federalism implications or would limit the policy making discretion of the States, we have prepared the following voluntary federalism impact statement.

In establishing the M+C program, the BBA included two provisions that have significant implications for States. First, under section 1855(a)(1) of the Act, an organization that wishes to participate in the M+C program generally is required to be organized and licensed under State law as a risk-bearing entity eligible to offer health benefits coverage in each State in which it offers an M+C plan. This statutory requirement is codified at § 422.400(a) and § 422.501(b)(1) of the M+C regulations, and we do not believe it interferes with State functions or limits their policy making discretion. The requirement does not imposes any significant

additional burdens on States, who for are already carrying out this licensing function. We received no comments from States on this provision.

The other aspect of the M+C statute and regulations that has significant federalism implications involves the Federal preemption provisions set forth under section 1856(b) of the Act and § 422.402. Section 1856(b)(3)(A) provides for Federal preemption of State laws, regulations, and standards affecting any M+C standard if the state provisions are inconsistent with Federal standards. As discussed in the preamble to the interim final rule (63 FR 35012), and in section II.I of this preamble, we are applying this ''general preemption'' in much the same way that we previously applied Executive Order 12612 on Federalism. That is, State laws or standards that are more strict than the M+C standards would not be preempted unless they prevented compliance with the M+C requirements.

In addition to this general preemption, the Congress also provided (under section 1856(b)(3)(B) for a ''specific preemption'' whereby M+C standards supersede any State laws and standards in the following three areas:
• Benefit requirements;
• Requirements relating to the inclusion or treatment of providers; and
• Coverage determinations (including related appeals and grievance processes).

During the development of the June 26, 1998 interim final rule, we consulted with the National Association of Insurance Commissioners (NAIC) regarding the proper interpretation of these provisions. (The NAIC is the organization of the chief insurance regulators from the 50 states, the District of Columbia, and four U.S. territories.) The interim final rule contained an extensive discussion of this subject, including providing examples both of State laws that would be preempted under the M+C statue (such as ''any willing provider laws'' that would mandate the inclusion of specific types of providers or practitioners) and of State requirements that would continue to apply (such as a requirement that all providers and practitioners be licensed by the State and comply with scope of practice laws). We asserted our intention to adopt a narrow interpretation of the applicability of the three areas of specific preemption in order to ensure that any regulatory preemption of State law would be restricted to the minimum level necessary consistent with the BBA. State and local officials then had an opportunity to participate in the rulemaking process through their public

comments on the M+C interim final rule.

For the most part, commenters representing State governments supported HCFA's narrow interpretation of the BBA's specific preemption provisions. (See section II.I of this final rule for a full discussion of comments on these provisions.) The most notable exception to this general support was the contention by one State that its mandatory drug benefit laws should not be preempted by the M+C benefit provisions; but we continue to believe that the specific preemption of ''benefit requirements'' under section 1856(b)(3)(B) of the Act clearly contradicts the State's contention. Moreover, we believe that our general approach is fully consistent with the ''Special Requirements for Preemption'' set forth in section 4 of Executive Order 13132. This section directs that an agency take action to preempt State law only where the exercise of State authority directly conflicts with the exercise of Federal authority under Federal law or there is other clear evidence (such as an express statutory preemption provision) to conclude that Congress intended the agency to have the authority to preempt State law. It also provides that any regulatory preemption of State law be restricted to the minimum level necessary to achieve the objectives of the relevant statute. In conclusion, we believe that the concerns of State and local officials have been met to the greatest possible extent, consistent with the BBA's preemption provisions.

### B. Waiver of Notice of Proposed Rulemaking

We ordinarily publish a notice of proposed rulemaking in the **Federal Register** to afford a period for public comments before issuing a regulation in final form. However, we may waive that procedure if we find good cause that prior notice and comment are impractical, unnecessary, or contrary to the public interest. In addition, section 1871(b)(2)(B) of the Act provides that a notice of proposed rulemaking is not required if a statute establishes a specific deadline for implementation of a provision that is less than 150 days after the enactment of the statute in which the deadline is contained. Finally, Congress provides in certain cases by statute for the publication of a final rule without prior notice and comment.

For the most part, the changes to the M+C regulations set forth in this final rule with comment period result from our review of the public comments on the June 26, 1998 interim final rule that

established the M+C program. Congress expressly authorized the publication of that final rule without prior notice and comment in section 1856(b)(1) of the Act. To the extent the provisions of this final rule respond to comments on that rule, they will have been subjected to prior notice and comment. However, as discussed in detail in section I.C of this preamble, this rule also makes conforming revisions to the regulations that are necessary to reflect changes to the M+C statute resulting from the BBRA (Pub. L. 106–113) which was enacted on November 29, 1999. These changes in requirements and new requirements or provisions were enacted by Congress, and would be in effect without regard to whether they are reflected in conforming changes to the regulations text, since a statute controls over a regulation. In this final rule, we merely have revised the regulations text to reflect these new statutory provisions, as we interpret them. In most cases, the BBRA provisions have merely been incorporated virtually verbatim, with no interpretation necessary. Examples of such provisions include: the earlier availability of alternative Medicare enrollment options and the elimination of the lock-in rules for institutionalized individuals under section 501 of the BBRA, changes in the effective date of elections under section 502, the extension of Medicare cost contracts under section 503, the modification of the 5-year re-entry rule after contract terminations under section 513, flexibility to tailor benefits under an M+C plan under section 515, the delay until July 1 in the deadline for ACR submissions under section 516, the reduction in the adjustment in the national per capita M+C growth percentage under section 517, the new deeming provisions in section 518, the revised quality assurance requirements for PPOs under section 520, and the user fee provisions in section 522. For these types of provisions, we do not believe that publishing a notice a proposed rulemaking is necessary, nor would it be practical given that a number of the provisions have already taken effect consistent with effective dates established under the BBRA. (For example, the changes in the effective date of elections and the new quality assurance requirements for PPOs took effect on January 1, 2000, and several other provisions were effective upon enactment of the BBRA.) In addition, we believe that it would be contrary to the public interest to delay implementation of these provisions until the process of publishing both a proposed and a final

rule could be completed. Finally, we note that the BBRA was enacted on November 29, 1999; thus publication of a notice of proposed rulemaking is not required under section 1871(b) of the Act before implementing any new statutory provisions that took effect upon enactment or on January 1, 2000. Thus, we find good cause to waive proposed rulemaking for these provisions. We are, however, providing a 60-day period for public comment on those provisions.

In the case of two BBRA provisions, we have reflected our interpretation of the provisions in the regulations text. This interpretation is already in effect, and has been applied, as the provisions in question are already in effect. These provisions are section 501(c) of the BBRA, which permits an M+C organization that has reduced a plan service area to offer continued enrollment to current enrollees in all or a portion of the reduced areas, and section 512 that introduces "bonus payments" to encourage organizations to offer M+C plans in areas without such plans. Both of these provisions are discussed in detail in section I.C of this preamble, and both required a limited amount of interpretation of the statute in order to implement the provisions on a timely basis. For example, with regard to the continuation of enrollment option (which was effective upon enactment of the BBRA), we have clarified that an M+C organization may offer enrollment in any plan it offers in the affected area, rather than solely the plan in which an individual was previously enrolled. This clarification results in greater flexibility for M+C enrollees and is consistent with our interpretation of a similar statutory provision affecting individuals with ESRD. Similarly, with regard to the bonus payment provisions (which took effect as of January 1, 2000), we have indicated that if an M+C organization or organizations offers two or more new plans simultaneously in a given area, the organization could receive the bonus payments for each new plan. We believe this interpretation of the statute clearly is consistent with legislative intent to promote the availability of more M+C alternatives for Medicare beneficiaries.

Policy clarifications of this limited nature were essential to implement these BBRA provisions in a clear and timely manner. Again, it would have been impractical and contrary to the public interest to proceed with proposed rulemaking before implementing the interpretive policies linked with these provisions, nor is such rulemaking required under section 1871(b) of the Act. Thus, we believe that the "good cause" exemption to notice and comment rulemaking is equally applicable for these BBRA provisions as for the others discussed above, and the same 60-day period for public comment applies.

### C. Responses to Comments

As discussed above, a limited number of the provisions set forth in this final rule are subject to a 60-day comment period. Because of the large number of items of correspondence we normally receive on a rule, we are not able to acknowledge or respond to them individually. We will, however, consider all comments that we receive by the date specified in the **DATES** section of this preamble and, if we proceed with subsequent rulemaking, we will respond to the comments in that document.

### List of Subjects

*42 CFR Part 417*

Administrative practice and procedure, Grant programs-health, Health care, health facilities, Health insurance, Health maintenance organizations (HMO), Loan programs-health, Medicare, Reporting and recordkeeping requirements.

*42 CFR Part 422*

Administrative practice and procedure, Health facilities, Health maintenance organizations (HMO), Medicare+Choice, Penalties, Privacy, Provider-sponsored organizations (PSO), Reporting and recordkeeping requirements.

For the reasons set forth in the preamble, HCFA amends 42 CFR chapter IV as set forth below:

## PART 417—HEALTH MAINTENANCE ORGANIZATIONS, COMPETITIVE MEDICAL PLANS, AND HEALTH CARE PREPAYMENT PLANS

1. The authority citation for part 417 continues to read as follows:

**Authority:** Secs. 1102 and 1871 of the Social Security Act (42 U.S.C. 1302 and 1395hh), secs. 1301, 1306, and 1310 of the Public Health Service Act (2 U.S.C. 300e, 300e–5, 300e–9), and 31 U.S.C. 9701.

2. Revise § 417.402(b) to read as follows:

### § 417.402    Effective date of initial regulations.

*    *    *    *    *

(b) The changes made to section 1876 of the Act by section 4002 of the Balanced Budget Act (BBA) of 1997 are incorporated in section 422 except for 1876 cost contracts. Upon enactment of the BBA (August 5, 1997) no new cost contracts or service area expansions are accepted by HCFA except for current Health Care Prepayment Plans that may convert to 1876 cost contracts. Also, 1876 cost contracts may not be extended or renewed beyond December 31, 2004.

## PART 422—MEDICARE+CHOICE PROGRAM

1. The authority citation for part 422 continues to read as follows:

**Authority:** Secs. 1102, 1851 through 1857, 1859, and 1871 of the Social Security Act (42 U.S.C. 1302, 1395w–21 through 1395w–27, and 1395hh ).

2. Section 422.2 is amended by:
A. Revising the definitions of "Basic benefits," "Benefits," "M+C plan," "Mandatory supplemental benefits," "Optional supplemental benefits," "Religious and fraternal (RFB) society," "RFB plan," and "Service area."
B. Adding the definition of "National coverage determination."
C. Removing the definitions of "Emergency medical condition," "Emergency services," and "Urgently needed services."

### § 422.2    Definitions.

*    *    *    *    *

*Basic benefits* means all Medicare-covered benefits (except hospice services) and additional benefits.

*Benefits* are health care services that are intended to maintain or improve the health status of enrollees, for which the M+C organization incurs a cost or liability under an M+C plan (not solely an administrative processing cost). Benefits are submitted and approved through the ACR process.

*    *    *    *    *

*M+C plan* means health benefits coverage offered under a policy or contract by an M+C organization that includes a specific set of health benefits offered at a uniform premium and uniform level of cost-sharing to all Medicare beneficiaries residing in the service area of the M+C plan (or in individual segments of a service area, under § 422.304(b)(2)).

*    *    *    *    *

*Mandatory supplemental benefits* are health services not covered by Medicare that an M+C enrollee must purchase as part of an M+C plan that are paid for in full, directly by (or on behalf of) Medicare enrollees, in the form of premiums or cost-sharing.

*    *    *    *    *

*National coverage determination* (NCD) means a national policy determination regarding the coverage status of a particular service that HCFA makes under section 1862(a)(1) of the

Act, and publishes as a **Federal Register** notice or HCFA ruling. (The term does not include coverage changes mandated by statute.)

\* \* \* \* \*

*Optional supplemental benefits* are health services not covered by Medicare that are purchased at the option of the M+C enrollee and paid for in full, directly by (or on behalf of) the Medicare enrollee, in the form of premiums or cost-sharing. These services may be grouped or offered individually.

\* \* \* \* \*

*Religious and fraternal benefit (RFB) society* means an organization that—

(1) Is described in section 501(c)(8) of the Internal Revenue Code of 1986 and is exempt from taxation under section 501(a) of that Act; and

(2) Is affiliated with, carries out the tenets of, and shares a religious bond with, a church or convention or association of churches or an affiliated group of churches.

*RFB plan* means an M+C plan that is offered by an RFB society.

*Service area* means a geographic area approved by HCFA within which an M+C-eligible individual may enroll in a particular M+C plan offered by an M+C organization. Each M+C plan must be available to all M+C-eligible individuals within the plan's service area. In deciding whether to approve an M+C plan's proposed service area, HCFA considers the following criteria:

(1) Whether the area meets the "county integrity rule" that a service area generally consists of a full county or counties. However, HCFA may approve a service area that includes a portion of a county if it determines that the "partial county" area is necessary, nondiscriminatory, and in the best interests of the beneficiaries.

(2) The extent to which the proposed services area mirrors service areas of existing commercial health care plans or M+C plans offered by the organization.

(3) For M+C coordinated care plans and network M+C MSA plans, whether the contracting provider network meets the access and availability standards set forth in § 422.112. Although not all contracting providers must be located within the plan's service area, HCFA must determine that all services covered under the plan are accessible from the service area.

(4) For non-network M+C MSA plans, HCFA may approve single county non-network M+C MSA plans even if the M+C organization's commercial plans have multiple county service areas.

3. In § 422.4, revise paragraph (a)(1)(iii) and add a new paragraph (a)(1)(iv), to read as follows:

**§ 422.4   Types of M+C plans.**

(a) \* \* \*

(1) \* \* \*

(iii) Coordinated care plans include plans offered by health maintenance organizations (HMOs), provider-sponsored organizations (PSOs), preferred provider organizations (PPOs) as specified in paragraph (a)(1)(iv) of this section, RFBs, and other network plans (except network MSA plans).

(iv) A PPO plan is a plan that has a network of providers that have agreed to a contractually specified reimbursement for covered benefits with the organization offering the plan; provides for reimbursement for all covered benefits regardless of whether the benefits are provided within the network of providers; and is offered by an organization that is not licensed or organized under State law as an HMO.

\* \* \* \* \*

4. Revise § 422.8 to read as follows:

**§ 422.8   Evaluation and determination procedures.**

(a) *Basis for evaluation and determination.* (1) HCFA evaluates an application for an M+C contract on the basis of information contained in the application itself and any additional information that HCFA obtains through on-site visits, public hearings, and any other appropriate procedures.

(2) If the application is incomplete, HCFA notifies the contract applicant and allows 60 days from the date of the notice for the contract applicant to furnish the missing information.

(3) After evaluating all relevant information, HCFA determines whether the contract applicant's application meets the applicable requirements of § 422.6.

(b) *Use of information from a prior contracting period.* If an M+C organization, HMO, competitive medical plan, or health care prepayment plan has failed to comply with the terms of a previous year's contract with HCFA under title XVIII of the Act, or has failed to complete a corrective action plan during the term of the contract, HCFA may deny an application from a contract applicant based on the contract applicant's failure to comply with that prior contract with HCFA even if the contract applicant meets all of the current requirements.

(c) *Notice of determination.* HCFA notifies each applicant that applies for an M+C contract under this part of its determination and the basis for the determination. The determination may be approval, intent to deny, or denial.

(d) *Approval of application.* If HCFA approves the application, it gives written notice to the contract applicant, indicating that it meets the requirements for an M+C contract.

(e) *Intent to deny.* (1) If HCFA finds that the contract applicant does not appear to meet the requirements for an M+C organization and appears to be able to meet those requirements within 60 days, HCFA gives the contract applicant notice of intent to deny the application for an M+C contract and a summary of the basis for this preliminary finding.

(2) Within 60 days from the date of the notice, the contract applicant may respond in writing to the issues or other matters that were the basis for HCFA's preliminary finding and may revise its application to remedy any defects HCFA identified.

(f) *Denial of application.* If HCFA denies the application, it gives written notice to the contract applicant indicating—

(1) That the contract applicant does not meet the contract requirements under part C of title XVIII of the Act;

(2) The reasons why the contract applicant does not meet the contract requirements; and

(3) The contract applicant's right to request reconsideration in accordance with the procedures specified in subpart N of this part.

(g) *Oversight of continuing compliance.* (1) HCFA oversees an M+C organization's continued compliance with the requirements for an M+C organization.

(2) If an M+C organization no longer meets those requirements, HCFA terminates the contract in accordance with § 422.510.

5. Revise § 422.10 to read as follows:

**§ 422.10   Cost-sharing in enrollment-related costs (M+C user fee).**

(a) *Basis and scope.* This section implements that portion of section 1857 of the Act that pertains to cost-sharing in enrollment-related costs. It sets forth the procedures that HCFA follows to determine the aggregate annual "user fee" to be contributed by M+C organizations and to assess the required user fees for M+C plans offered by M+C organizations.

(b) *Purpose of assessment.* Section 1857(e)(2) of the Act authorizes HCFA to charge and collect from each M+C plan offered by an M+C organization its pro rata share of fees for administering section 1851 of the Act, relating to dissemination of enrollment information; and section 4360 of the Omnibus Budget Reconciliation Act of 1990, relating to the health insurance counseling and assistance program.

(c) *Applicability.* The fee assessment also applies to those demonstrations for which enrollment is effected or coordinated under section 1851 of the Act.

(d) *Collection of fees.* (1) *Timing of collection.* HCFA collects the fees over 9 consecutive months beginning with January of each fiscal year.

(2) *Amount to be collected.* The aggregate amount of fees for a fiscal year is the lesser of—

(i) The estimated costs to be incurred by HCFA in that fiscal year to carry out the activities described in paragraph (b) of this section; or

(ii) For fiscal year 2000, $100 million and for fiscal year 2001 and each succeeding year, the M+C portion (as defined in paragraph (e) of this section) of $100 million.

(e) *M+C portion.* In this section, the term "M+C portion" means, for a fiscal year, the ratio, as estimated by the Secretary of the average number of individuals enrolled in M+C plans during the fiscal year to the average number of individuals entitled to benefits under part A, and enrolled under part B, during the fiscal year.

(f) *Assessment methodology.* (1) The amount of the M+C portion of the user fee each M+C organization must pay is assessed as a percentage of the total Medicare payments to each organization. HCFA determines this percentage rate using the following formula:

A times B divided by C where—
A is the total estimated January payments to all organizations subject to the assessment;
B is the 9-month (January through September) assessment period; and
C is the total fiscal year M+C user fee assessment amount determined in accordance with paragraph (d)(2) of this section.

(2) HCFA determines each organization's pro rata share of the annual fee on the basis of the organization's calculated monthly payment amount during the 9 consecutive months beginning with January. HCFA calculates each organization's monthly pro rata share by multiplying the established percentage rate by the total monthly calculated Medicare payment amount to the organization as recorded in HCFA's payment system on the first day of the month.

(3) HCFA deducts the organization's fee from the amount of Federal funds otherwise payable to the organization for that month under the M+C program.

(4) If assessments reach the amount authorized for the year before the end of September, HCFA discontinues assessment.

(5) If there are delays in determining the amount of the annual aggregate fees specified in paragraph (d)(2) of this section, or the fee percentage rate specified in paragraph (f)(2), HCFA may adjust the assessment time period and the fee percentage amount.

6. Revise § 422.50(a) to read as follows:

**§ 422.50    Eligibility to elect an M+C plan.**

(a) An individual is eligible to elect an M+C plan if he or she—

(1) Is entitled to Medicare under Part A and enrolled in Part B (except that an individual entitled only to Part B and who was enrolled in an HMO or CMP with a risk contract under part 417 of this chapter on December 31, 1998 may continue to be enrolled in the M+C organization as an M+C plan enrollee);

(2) Has not been medically determined to have end-stage renal disease, except that an individual who develops end-stage renal disease while enrolled in an M+C plan or in a health plan offered by the M+C organization is eligible to elect an M+C plan offered by that organization;

(3) Meets either of the following residency requirements:

(i) Resides in the service area of the M+C plan.

(ii) Resides outside of the service area of the M+C plan and is enrolled in a health plan offered by the M+C organization during the month immediately preceding the month in which the individual is entitled to both Medicare Part A and Part B, provided that an M+C organization chooses to offer this option and that HCFA determines that all applicable M+C access requirements of § 422.112 are met for that individual through the M+C plan's established provider network. The M+C organization must furnish the same benefits to these enrollees as to enrollees who reside in the service area;

(4) Has been a member of an Employer Group Health Plan (EGHP) that includes the elected M+C plan, even if the individual lives outside of the M+C plan service area, provided that an M+C organization chooses to offer this option and that HCFA determines that all applicable M+C access requirements at § 422.12 are met for that individual through the M+C plan's established provider network. The M+C organization must furnish the same benefits to all enrollees, regardless of whether they reside in the service area;

(5) Completes and signs an election form and gives information required for enrollment; and

(6) Agrees to abide by the rules of the M+C organization after they are disclosed to him or her in connection with the election process.

*    *    *    *    *

7. In § 422.54, the heading of paragraph (b) and paragraphs (c)(2), (d)(1), and (d)(3) are revised to read as follows:

**§ 422.54    Continuation of enrollment.**

*    *    *    *    *

(b) *Basic rule.* *  *  *

(c) *  *  *

(2) An enrollee who moves out of the service area into the geographic area designated as the continuation area has the choice of continuing enrollment or disenrolling from the plan. The enrollee must make the choice of continuing enrollment in a manner specified by HCFA. If no choice is made, the enrollee must be disenrolled from the plan.

*    *    *    *    *

(d) *  *  *

(1) *Continuation of enrollment benefits.* The M+C organization must, at a minimum, provide or arrange for the Medicare-covered benefits as described in § 422.101(a).

*    *    *    *    *

(3) *Reasonable cost-sharing.* For services furnished in the continuation area, an enrollee's cost-sharing liability is limited to the cost-sharing amounts required in the M+C plan's service area (in which the enrollee no longer resides).

*    *    *    *    *

8. Section § 422.60 is amended by:
A. Revising paragraph (b)(1).
B. Adding paragraph (b)(3).
C. Revising paragraphs (e)(6), (f)(1), and (f)(3).

**§ 422.60    Election process.**

*    *    *    *    *

(b) *Capacity to accept new enrollees.* (1) M+C organizations may submit information on enrollment capacity of plans they offer by July 1 of each year as provided by § 422.306(a)(1).

*    *    *    *    *

(3) HCFA considers enrollment limit requests for an M+C plan service area, other than those submitted with the adjusted community rate proposal, or for a portion of the plan service area, only if the health and safety of beneficiaries is at risk, such as if the provider network is not available to serve the enrollees in all or a portion of the service area.

*    *    *    *    *

(e) *  *  *

(6) Upon receipt of the election form or from the date a vacancy occurs for an individual who was accepted for future enrollment, the M+C organization transmits, within the timeframes

specified by HCFA, the information necessary for HCFA to add the beneficiary to its records as an enrollee of the M+C organization.

(f) * * *

(1) In cases in which an M+C organization has both a Medicare contract and a contract with an employer group health plan, and in which the M+C organization arranges for the employer to process election forms for Medicare-entitled group members, who wish to enroll under the Medicare contract, the effective date of the election may be retroactive. Consistent with § 422.250(b), payment adjustments based on a retroactive effective date may be made for up to a 90-day period.

* * * * *

(3) Upon receipt of the election form from the employer, the M+C organization must submit the enrollment within timeframes specified by HCFA.

9. Section 422.62 is amended by:

A. Removing, in paragraph (a)(3), the phrase "as provide under" and adding in its place the phrase "as provided under".

B. Revising paragraphs (a)(4)(i) and (a)(5)(i).

C. Adding new paragraph (a)(6).

D. Revising paragraph (b)(1).

### § 422.62   Election of coverage under an M+C plan.

(a) * * *

(4) * * *

(i) Except as provided in paragraphs (a)(4)(ii), (a)(4)(iii), and (a)(6) of this section, an individual who is eligible to elect an M+C plan in 2002 may elect an M+C plan or change his or her election from an M+C plan to original Medicare or to a different M+C plan, or from original Medicare to an M+C plan, but only once during the first 6 months of the year.

* * * * *

(5) * * *

(i) For 2003 and subsequent years, except as provided in paragraphs (a)(5)(ii), (a)(5)(iii), and (a)(6) of this section, an individual who is eligible to elect an M+C plan may elect an M+C plan, change his or her election from an M+C plan to original Medicare or to a different M+C plan, or from original Medicare to an M+C plan, but only once during the first 3 months of the year.

* * * * *

(6) *Open enrollment period for institutionalized individuals.* After 2001, an individual who is eligible to elect an M+C plan and who is institutionalized, as defined by HCFA, is not limited (except as provided for in

paragraph (d) of this section for M+C MSA plans) in the number of elections or changes he or she may make. Subject to the M+C plan being open to enrollees as provided under § 422.60(a)(2), an M+C eligible institutionalized individual may at any time elect an M+C plan or change his or her election from an M+C plan to original Medicare, to a different M+C plan, or from original Medicare to an M+C plan.

(b) * * *

(1) HCFA or the organization has terminated the organization's contract for the plan, discontinued the plan in the area in which the individual resides, or the organization has notified the individual of the impending termination of the plan, or the impending discontinuation of the plan in the area in which the individual resides.

* * * * *

10. Section 422.64 is revised to read as follows:

### § 422.64   Information about the M+C program.

Each M+C organization must provide, on an annual basis, and in a format and using standard terminology that may be specified by HCFA, the information necessary to enable HCFA to provide to current and potential beneficiaries the information they need to make informed decisions with respect to the available choices for Medicare coverage.

11. Section 422.66 is amended by:

A. Republishing the heading of paragraph (b) and the introductory text for paragraph (b)(3).

B. Revising paragraphs (b)(3)(i), (d)(1), (d)(3), the introductory text for paragraph (e), and paragraphs (e)(2), and (f).

### § 422.66   Coordination of enrollment and disenrollment through M+C organizations.

* * * * *

(b) *Disenrollment*—

* * * * *

(3) *Responsibilities of the M+C organization.* The M+C organization must—

(i) Submit a disenrollment notice to HCFA within timeframes specified by HCFA;

* * * * *

(d) * * *

(1) *Basic rule.* An M+C plan offered by an M+C organization must accept any individual (regardless of whether the individual has end-stage renal disease) who is enrolled in a health plan offered by the M+C organization during the month immediately preceding the month in which he or she is entitled to both Part A and Part B, and who meets the eligibility requirements at § 422.50.

* * * * *

(3) *Effective date of conversion.* If an individual chooses to remain enrolled with the M+C organization as an M+C enrollee, the individual's conversion to an M+C enrollee is effective the month in which he or she is entitled to both Part A and Part B in accordance with the requirements in paragraph (d)(5) of this section.

* * * * *

(e) *Maintenance of enrollment.* An individual who has made an election under this section is considered to have continued to have made that election until either of the following, which ever occurs first:

* * * * *

(2) The elected M+C plan is discontinued or no longer serves the area in which the individual resides, the organization does not offer, or the individual does not elect, the option of continuing enrollment, as provided under either § 422.54 or § 422.74(b)(3)(ii).

(f) *Exception for employer group health plans.* (1) In cases when an M+C organization has both a Medicare contract and a contract with an employer group health plan, and in which the M+C organization arranges for the employer to process election forms for Medicare-entitled group members who wish to disenroll from the Medicare contract, the effective date of the election may be retroactive. Consistent with § 422.250(b), payment adjustments based on a retroactive effective date may be made for up to a 90-day period.

(2) Upon receipt of the election form from the employer, the M+C organization must submit a disenrollment notice to HCFA within timeframes specified by HCFA.

12. Revise § 422.68(c) to read as follows:

### § 422.68   Effective dates of coverage and change of coverage.

* * * * *

(c) *Open enrollment periods.* For an election, or change in election, made during an open enrollment period as described in § 422.62(a)(3) through (a)(6), coverage is effective as of the first day of the first calendar month following the month in which the election is made, except that, if the election or change in election is made after the 10th day of any calendar month, then the election shall not take effect until the first day of the second calendar month following the date on which the election is made.

* * * * *

13. Section 422.74 is amended by revising paragraphs (b)(2)(i), (b)(3), (c),

(d)(1), the heading of paragraph (d)(3), (d)(4), and (d)(7) to read as follows:

## §422.74  Disenrollment by the M+C organization.

*    *    *    *    *

(b) * * *

(2) * * *

(i) The individual no longer resides in the M+C plan's service area as specified under paragraph (d)(4) of this section, is no longer eligible under §422.50(a)(3)(ii), and optional continued enrollment has not been offered or elected under §422.54.

*    *    *    *    *

(3) *Plan termination or reduction of area where plan is available.* (i) *General rule.* An M+C organization that has its contract for an M+C plan terminated, that terminates an M+C plan, or that discontinues offering the plan in any portion of the area where the plan had previously been available, must disenroll affected enrollees in accordance with the procedures for disenrollment set forth at paragraph (d)(7) of this section, unless the exception in paragraph (b)(3)(ii) of this section applies.

(ii) *Exception.* When an M+C organization discontinues offering an M+C plan in a portion of its service area, the M+C organization may elect to offer enrollees residing in all or portions of the affected area the option to continue enrollment in an M+C plan offered by the organization, provided that there is no other M+C plan offered in the affected area at the time of the organization's election. The organization may require an enrollee who chooses to continue enrollment to agree to receive the full range of basic benefits (excluding emergency and urgently needed care) exclusively through facilities designated by the organization within the plan service area.

(c) *Notice requirement.* If the disenrollment is for any of the reasons specified in paragraphs (b)(1), (b)(2)(i), or (b)(3) of this section (that is, other than death or loss of entitlement to Part A or Part B) the M+C organization must give the individual a written notice of the disenrollment with an explanation of why the M+C organization is planning to disenroll the individual. Notices for reasons specified in paragraphs (b)(1) through (b)(2)(i) must—

(1) Be mailed to the individual before submission of the disenrollment notice to HCFA; and

(2) Include an explanation of the individual's right to a hearing under the M+C organization's grievance procedures.

(d) * * *

(1) *Monthly basic and supplementary premiums are not paid timely.* An M+C organization may disenroll an individual from the M+C plan for failure to pay any basic and supplementary premiums under the following circumstances:

(i) The M+C organization makes a reasonable effort to collect unpaid premium amounts by sending a written notice of nonpayment to the enrollee within 20 days after the date the delinquent charges were due—

(A) Alerting the individual that the premiums are delinquent;

(B) Providing the individual with an explanation of the disenrollment procedures and any lock-in requirements of the M+C plan; and

(C) Advising that failure to pay the premiums within the 90-day grace period will result in termination of M+C coverage;

(ii) The M+C organization only disenrolls a Medicare enrollee when the organization has not received payment within 90 days after the date it has sent the notice of nonpayment to the enrollee.

(iii) The M+C organization gives the individual a written notice of disenrollment that meets the requirement set forth in paragraph (c) of this section.

(iv) If the enrollee fails to pay the premium for optional supplemental benefits (that is, a package of benefits that an enrollee is not required to accept), but pays the basic premium and any mandatory supplemental premium, the M+C organization has the option to discontinue the optional supplemental benefits and retain the individual as an M+C enrollee.

*    *    *    *    *

(3) *Individual commits fraud or permits abuse of enrollment card.* * * *

*    *    *    *    *

(4) *Individual no longer resides in the M+C plan's service area.* (i) *Basis for disenrollment.* Unless continuation of enrollment is elected under §422.54, the M+C organization must disenroll an individual if the M+C organization establishes, on the basis of a written statement from the individual or other evidence acceptable to HCFA, that the individual has permanently moved out of a plan's service area. If the individual has not moved from the M+C plan's service area, but has left the plan's service area for more than 6 months, the M+C organization must disenroll the individual.

(ii) *Special rule.* The M+C organization must disenroll an individual who is enrolled in the M+C

plan, under the eligibility requirements at §422.50(a)(3)(ii) or (a)(4), if the organization establishes, on the basis of a written statement from the individual or other evidence acceptable to HCFA, that the individual has permanently moved from the residence in which she or he resided at the time of enrollment in the M+C plan, to an area outside the M+C plan service area (unless continuation of enrollment is elected under §422.54). If the individual has not permanently moved from the residence in which she or he resided at the time of enrollment in the M+C plan, but has left the residence for over 6 months, the M+C organization must disenroll the individual.

(iii) *Notice of disenrollment.* The M+C organization must give the individual a written notice of the disenrollment that meets the requirements set forth in paragraph (c) of this section.

*    *    *    *    *

(7) *Plan termination or area reduction.* (i) When an M+C organization has its contract for an M+C plan terminated, terminates an M+C plan, or discontinues offering the plan in any portion of the area where the plan had previously been available, the M+C organization must give each affected M+C plan enrollee a written notice of the effective date of the plan termination or area reduction and a description of alternatives for obtaining benefits under the M+C program.

(ii) The notice must be sent before the effective date of the plan termination or area reduction, and in the timeframes specified in §422.506(a)(2).

*    *    *    *    *

14. Section 422.80 is amended by:

A. Republishing the introductory text in paragraph (b)(5).

B. Revising paragraph (b)(5)(v).

C. Republishing the introductory text in paragraph (c).

D. Revising paragraph (c)(4).

E. Adding new paragraphs (e)(1)(vi), (e)(1)(vii), and (e)(1)(viii).

F. Revising paragraph (f).

## §422.80  Approval of marketing materials and election forms.

*    *    *    *    *

(b) * * *

(5) Examples of marketing materials include, but are not limited to:

*    *    *    *    *

(v) Membership communication materials such as membership rules, subscriber agreements (evidence of coverage), member handbooks and wallet card instructions to enrollees.

*    *    *    *    *

(c) *Guidelines for HCFA review.* In reviewing marketing material or election

forms under paragraph (a) of this section, HCFA determines that the marketing materials:

* * * * *

(4) Are not materially inaccurate or misleading or otherwise make material misrepresentations.

* * * * *

(e) * * *

(1) * * *

(vi) Use providers or provider groups to distribute printed information comparing the benefits of different health plans unless the materials have the concurrence of all M+C organizations involved and have received prior approval by HCFA. Physicians or providers may distribute health plan brochures (exclusive of application forms) at a health fair or in their offices. Physicians may discuss, in response to an individual patient's inquiry, the various benefits in different health plans.

(vii) Accept plan applications in provider offices or other places where health care is delivered.

(viii) Employ M+C plan names that suggest that a plan is not available to all Medicare beneficiaries. This prohibition shall not apply to M+C plan names in effect on July 31, 2000.

* * * * *

(f) *Employer group retiree marketing.* M+C organizations may develop marketing materials designed for members of an employer group who are eligible for employer-sponsored benefits through the M+C organization, and furnish these materials only to the group members. While the materials must be submitted for approval under paragraph (a) of this section, HCFA will not review portions of these materials that relate to employer group benefits.

15. Revise § 422.100 to read as follows:

§ 422.100  General requirements.

(a) *Basic rule.* Subject to the conditions and limitations set forth in this subpart, an M+C organization offering an M+C plan must provide enrollees in that plan with coverage of the basic benefits described in paragraph (c) of this section (and, to the extent applicable, the benefits described in § 422.102) by furnishing the benefits directly or through arrangements, or by paying for the benefits. HCFA reviews these benefits subject to the requirements of § 422.100(g) and the requirements in subpart G of this part.

(b) *Services of noncontracting providers and suppliers.* (1) An M+C organization must make timely and reasonable payment to or on behalf of the plan enrollee for the following services obtained from a provider or supplier that does not contract with the M+C organization to provide services covered by the M+C plan:

(i) Ambulance services dispatched through 911 or its local equivalent as provided in § 422.113.

(ii) Emergency and urgently needed services as provided in § 422.113.

(iii) Maintenance and post-stabilization care services as provided in § 422.113.

(iv) Renal dialysis services provided while the enrollee was temporarily outside the plan's service area.

(v) Services for which coverage has been denied by the M+C organization and found (upon appeal under subpart M of this part) to be services the enrollee was entitled to have furnished, or paid for, by the M+C organization.

(2) An M+C plan (other than an M+C MSA plan) offered by an M+C organization satisfies paragraph (a) of this section with respect to benefits for services furnished by a noncontracting provider if that M+C plan provides payment in an amount the provider would have received under original Medicare (including balance billing permitted under Medicare Part A and Part B).

(c) *Types of benefits.* An M+C plan includes at a minimum basic benefits, and also may include mandatory and optional supplemental benefits.

(1) Basic benefits are all Medicare-covered services, except hospice services, and additional benefits as defined in § 422.2 and meeting all requirements in § 422.312.

(2) Supplemental benefits, which consist of—

(i) Mandatory supplemental benefits are services not covered by Medicare that an M+C enrollee must purchase as part of an M+C plan that are paid for in full, directly by (or on behalf of) Medicare enrollees, in the form of premiums or cost-sharing.

(ii) Optional supplemental benefits are health services not covered by Medicare that are purchased at the option of the M+C enrollee and paid for in full, directly by (or on behalf of) the Medicare enrollee, in the form of premiums or cost-sharing. These services may be grouped or offered individually.

(d) *Availability and structure of plans.* An M+C organization offering an M+C plan must offer it—

(1) To all Medicare beneficiaries residing in the service area of the M+C plan;

(2) At a uniform premium, with uniform benefits and cost-sharing throughout the plan's service area, or segment of service area as provided in § 422.304(b)(2).

(e) *Terms of M+C plans.* Terms of M+C plans described in instructions to beneficiaries, as required by § 422.111, will include basic and supplemental benefits and terms of coverage for those benefits.

(f) *Multiple plans in one service area.* An M+C organization may offer more than one M+C plan in the same service area subject to the conditions and limitations set forth in this subpart for each M+C plan.

(g) *HCFA review and approval of M+C benefits.* HCFA reviews and approves M+C benefits using written policy guidelines and requirements in this part, operational policy letters, and other HCFA instructions to ensure that—

(1) Medicare-covered services meet HCFA fee-for-service guidelines;

(2) M+C organizations are not designing benefits to discriminate against beneficiaries; and

(3) Benefit design meets other M+C program requirements.

(h) *Benefits affecting screening mammography, influenza vaccine, and pneumoccal vaccine.* (1) Enrollees of M+C organizations may directly access (through self-referral) screening mammography and influenza vaccine.

(2) M+C organizations may not impose cost-sharing for influenza vaccine and pneumococcal vaccine on their M+C plan enrollees.

(i) *Requirements relating to Medicare conditions of participation.* Basic benefits must be furnished through providers meeting the requirements in § 422.204(b)(3).

(j) *Provider networks.* The M+C plans offered by an M+C organization may share a provider network as long as each M+C plan independently meets the access and availability standards described at § 422.112, as determined by HCFA.

16. Revise § 422.101 to read as follows:

§ 422.101  Requirements relating to basic benefits.

Except as specified in § 422.264 (for entitlement that begins or ends during a hospital stay) and § 422.266 (with respect to hospice care), each M+C organization must meet the following requirements:

(a) Provide coverage of, by furnishing, arranging for, or making payment for, all services that are covered by Part A and Part B of Medicare (if the enrollee is entitled to benefits under both parts) or by Medicare Part B (if entitled only under Part B) and that are available to beneficiaries residing in the plan's

service area. Services may be provided outside of the service area of the plan if the services are accessible and available to enrollees.

(b) Comply with—

(1) HCFA's national coverage determinations;

(2) General coverage guidelines included in original Medicare manuals and instructions unless superseded by operational policy letters or regulations in this part; and

(3) Written coverage decisions of local carriers and intermediaries with jurisdiction for claims in the geographic area in which services are covered under the M+C plan.

17. Revise § 422.102 to read as follows:

### § 422.102 Supplemental benefits.

(a) *Mandatory supplemental benefits.* (1) Subject to HCFA's approval, an M+C organization may require Medicare enrollees of an M+C plan other than an MSA plan to accept and pay for services in addition to Medicare-covered services described in § 422.101 and additional benefits described in § 422.312.

(2) If the M+C organization imposes mandatory supplemental benefits, it must impose them on all Medicare beneficiaries enrolled in the M+C plan.

(3) HCFA approves mandatory supplemental benefits if the benefits are designed in accordance with HCFA's guidelines and requirements as stated in this part and instructions and operational policy letters.

(b) *Optional supplemental benefits.* Except as provided in § 422.104 in the case of MSA plans, each M+C organization may offer (for election by the enrollee and without regard to health status) services that are not included in the basic benefits as described in § 422.100(c) and any mandatory supplemental benefits described in paragraph (a) of this section. Optional supplemental benefits are purchased at the discretion of the enrollee and must be offered to all Medicare beneficiaries enrolled in the M+C plan.

(c) *Payment for supplemental services.* All supplemental benefits are paid for in full, directly by (or on behalf of) the enrollee of the M+C plan.

(d) *Marketing of supplemental benefits.* M+C organizations may offer enrollees a group of services as one optional supplemental benefit, offer services individually, or offer a combination of groups and individual services.

18. Section 422.105 is amended by:
A. Revising the introductory text for paragraph (a).

B. Revising paragraph (f).

### § 422.105 Special rules for point of service option.

(a) *General rule.* A POS benefit is an option that an M+C organization may offer in an M+C coordinated care plan or network M+C MSA plan to provide enrollees with additional choice in obtaining specified health care services. The organization may offer a POS option—

\*    \*    \*    \*    \*

(f) *POS-related data.* An M+C organization that offers a POS benefit through an M+C plan must report enrollee utilization data at the plan level by both plan contracting providers (in-network) and by non-contracting providers (out-of-network) including enrollee use of the POS benefit, in the form and manner prescribed by HCFA.

19. Revise § 422.106 to read as follows:

### § 422.106 Coordination of benefits with employer group health plans and Medicaid.

(a) *General rule.* If an M+C organization contracts with an employer group health plan (EGHP) that covers enrollees in an M+C plan, or contracts with a State Medicaid agency to provide Medicaid benefits to individuals who are eligible for both Medicare and Medicaid, and who are enrolled in an M+C plan, the enrollees must be provided the same benefits as all other enrollees in the M+C plan, with the EGHP or Medicaid benefits supplementing the M+C plan benefits. Jurisdiction regulating benefits under these circumstances is as follows:

(1) All requirements of this part that apply to the M+C program apply to the M+C plan coverage provided to enrollees eligible for benefits under an EGHP or Medicaid contract.

(2) Employer benefits that complement an M+C plan, and the marketing materials associated with the benefits, are not subject to review or approval by HCFA. M+C plan benefits provided to members of the EGHP, and the associated marketing materials, are subject to HCFA review and approval.

(3) Medicaid benefits are not reviewed under this part, but are subject to appropriate HCFA review under the Medicaid program. M+C plan benefits provided to individuals entitled to Medicaid benefits provided by the M+C organization under a contract with the State Medicaid agency are subject to M+C rules and requirements.

(b) *Examples.* Employer/Medicaid benefits, permissible EGHP or Medicaid plan benefits include the following:

(1) Payment of a portion or all of the M+C basic and supplemental premiums.

(2) Payment of a portion or all of other cost-sharing amounts approved for the M+C plan.

(3) Other employer-sponsored benefits that may require additional premium and cost-sharing, or other benefits provided by the organization under a contract with the State Medicaid agency.

20. Section 422.108 is amended by:
A. Republishing the introductory text for paragraph (b).

B. Revising paragraphs (b)(2), (c), the introductory text in paragraph (d), and paragraph (e).

C. Adding a new paragraph (f).

### § 422.108 Medicare secondary payer (MSP) procedures.

\*    \*    \*    \*    \*

(b) Responsibilities of the M+C organization. The M+C organization must, for each M+C plan—

\*    \*    \*    \*    \*

(2) Identify the amounts payable by those payers; and \* \* \* \* \*

\*    \*    \*    \*    \*

(c) *Collecting from other entities.* The M+C organization may bill, or authorize a provider to bill, other individuals or entities for covered Medicare services for which Medicare is not the primary payer, as specified in paragraphs (d) and (e) of this section.

(d) *Collecting from other insurers or the enrollee.* If a Medicare enrollee receives from an M+C organization covered services that are also covered under State or Federal workers' compensation, any no-fault insurance, or any liability insurance policy or plan, including a self-insured plan, the M+C organization may bill, or authorize a provider to bill any of the following—

\*    \*    \*    \*    \*

(e) *Collecting from group health plans (GHPs) and large group health plans (LGHPs).* An M+C organization may bill a GHP or LGHP for services it furnishes to a Medicare enrollee who is also covered under the GHP or LGHP and may bill the Medicare enrollee to the extent that he or she has been paid by the GHP or LGHP.

(f) *MSP rules and State laws.* Consistent with § 422.402 concerning the Federal preemption of State law, the rules established under this section supersede any State laws, regulations, contract requirements, or other standards that would otherwise apply to M+C plans only to the extent that those State laws are inconsistent with the standards established under this part. A State cannot take away an M+C organization's right under Federal law and the MSP regulations to bill, or to authorize providers and suppliers to

bill, for services for which Medicare is not the primary payer. Section 1852(a)(4) of the Social Security Act does not prohibit a State from limiting the amount of the recovery; thus, State law could modify, but not negate, an M+C organization's rights in this regard.

21. In 422.109, the introductory text for paragraph (b) and paragraph (b)(5) are revised to read as follows:

### § 422.109  Effect of national coverage determinations (NCDs).

\*     \*     \*     \*     \*

(b) The M+C organization must furnish, arrange or pay for an NCD "significant cost" service before the adjustment of the annual M+C capitation rate. The following rules apply to these services:

\*     \*     \*     \*     \*

(5) Beneficiaries are liable for any applicable coinsurance amounts, but are not responsible for the Part A deductible.

\*     \*     \*     \*     \*

22. Revise § 422.110(c) to read as follows:

### § 422.110  Discrimination against beneficiaries prohibited.

\*     \*     \*     \*     \*

(c) *Additional requirements.* An M+C organization is required to observe the provisions of the Civil Rights Act, Age Discrimination Act, Rehabilitation Act of 1973, and Americans with Disabilities Act (see § 422.502(h)).

23. Section 422.111 is amended by:
A. Revising the introductory text in paragraph (a).
B. Revising paragraphs (b)(2)(i), (b)(4), and (b)(5)(i).
C. Republishing the introductory text in paragraph (c) and revising paragraph (c)(1).
D. Revising paragraph (e).
E. Adding new paragraph (f).

### § 422.111  Disclosure requirements.

(a) *Detailed description.* An M+C organization must disclose the information specified in paragraph (b) of this section—

\*     \*     \*     \*     \*

(b) \*  \*  \*
(2) \*  \*  \*
(i) The benefits offered under original Medicare, including the content specified in paragraph (f)(1) of this section;

\*     \*     \*     \*     \*

(4) Out-of-area coverage provided under the plan, including coverage provided to individuals eligible to enroll in the plan under § 422.50(a)(3)(ii).
(5) \*  \*  \*

(i) Explanation of what constitutes an emergency, referencing the definitions of emergency services and emergency medical condition at § 422.113;

\*     \*     \*     \*     \*

(c) *Disclosure upon request.* Upon request of an individual eligible to elect an M+C plan, an M+C organization must provide to the individual the following information:

(1) The information required paragraph (f) of this section.

\*     \*     \*     \*     \*

(e) *Changes to provider network.* The M+C organization must make a good faith effort to provide written notice of a termination of a contracted provider at least 30 calendar days before the termination effective date to all enrollees who are patients seen on a regular basis by the provider whose contracted is terminating, irrespective of whether the termination was for cause or without cause. When a contract termination involves a primary care professional, all enrollees who are patients of that primary care professional must be notified.

(f) *Disclosable information*—(1) *Benefits under original Medicare.* (i) Covered services.

(ii) Beneficiary cost-sharing, such as deductibles, coinsurance, and copayment amounts.

(iii) Any beneficiary liability for balance billing.

(2) *Enrollment procedures.* Information and instructions on how to exercise election options under this subpart.

(3) *Rights.* A general description of procedural rights (including grievance and appeals procedures) under original Medicare and the M+C program and the right to be protected against discrimination based on factors related to health status in accordance with § 422.110.

(4) *Medigap and Medicare Select.* A general description of the benefits, enrollment rights, and requirements applicable to Medicare supplemental policies under section 1882 of the Act, and provisions relating to Medicare Select policies under section 1882(t) of the Act.

(5) *Potential for contract termination.* The fact that an M+C organization may terminate or refuse to renew its contract, or reduce the service area included in its contract, and the effect that any of those actions may have on individuals enrolled in that organization's M+C plan.

(6) *Comparative information.* A list of M+C plans that are or will be available to residents of the service area in the following calendar year, and, for each

available plan, information on the aspects described in paragraphs (c)(7) through (c)(11) of this section, presented in a manner that facilitates comparison among the plans.

(7) *Benefits.* (i) Covered services beyond those provided under original Medicare.

(ii) Any beneficiary cost-sharing.

(iii) Any maximum limitations on out-of-pocket expenses.

(iv) In the case of an M+C MSA plan, the amount of the annual MSA deposit and the differences in cost-sharing, enrollee premiums, and balance billing, as compared to M+C plans.

(v) In the case of an M+C private fee-for-service plan, differences in cost-sharing, enrollee premiums, and balance billing, as compared to M+C plans.

(vi) The extent to which an enrollee may obtain benefits through out-of-network health care providers.

(vii) The types of providers that participate in the plan's network and the extent to which an enrollee may select among those providers.

(viii) The coverage of emergency and urgently needed services.

(8) *Premiums.* (i) The M+C monthly basic beneficiary premiums.

(ii) The M+C monthly supplemental beneficiary premium.

(9) *The plan's service area.*

(10) *Quality and performance indicators* for benefits under a plan to the extent there are available as follows (and how they compare with indicators under original Medicare):

(i) Disenrollment rates for Medicare enrollees for the 2 previous years, excluding disenrollment due to death or moving outside the plan's service area, calculated according to HCFA guidelines.

(ii) Medicare enrollee satisfaction.

(iii) Health outcomes.

(iv) Plan-level appeal data.

(v) The recent record of plan compliance with the requirements of this part, as determined by the Secretary.

(vi) Other performance indicators.

(11) *Supplemental benefits.* Whether the plan offers mandatory supplemental benefits or offers optional supplemental benefits and the premiums and other terms and conditions for those benefits.

24. Section 422.112 is amended by:
A. Republishing the introductory text to paragraph (a).
B. Revising paragraphs (a)(2), (a)(3) and (a)(9).
C. Adding new paragraph (a)(10).
D. Removing paragraph (c).

### § 422.112  Access to services.

(a) *Rules for coordinated care plans and network M+C MSA plans.* An M+C

organization that offers an M+C coordinated care plan or network M+C MSA plan may specify the networks of providers from whom enrollees may obtain services if the M+C organization ensures that all covered services, including additional or supplemental services contracted for by (or on behalf of) the Medicare enrollee, are available and accessible under the plan. To accomplish this, the M+C organization must meet the following requirements:

\*    \*    \*    \*    \*

(2) *PCP panel.* Establish a panel of PCPs from which the enrollee may select a PCP. If an M+C organization requires its enrollees to obtain a referral in most situations before receiving services from a specialist, the M+C organization must either assign a PCP for purposes of making the needed referral or make other arrangements to ensure access to medically necessary specialty care.

(3) *Specialty care.* Provide or arrange for necessary specialty care, and in particular give women enrollees the option of direct access to a women's health specialist within the network for women's routine and preventive health care services provided as basic benefits (as defined in § 422.2). The M+C organization arranges for specialty care outside of the plan provider network when network providers are unavailable or inadequate to meet an enrollee's medical needs.

\*    \*    \*    \*    \*

(9) *Cultural considerations.* Ensure that services are provided in a culturally competent manner to all enrollees, including those with limited English proficiency or reading skills, and diverse cultural and ethnic backgrounds.

(10) *Ambulance services, emergency and urgently needed services, and post-stabilization care services coverage.* Provide coverage for ambulance services, emergency and urgently needed services, and post-stabilization care services in accordance with § 422.113.

\*    \*    \*    \*    \*

25. Add new § 422.113 to read as follows:

### § 422.113  Special rules for ambulance services, emergency and urgently needed services, and maintenance and post-stabilization care services.

(a) *Ambulance services.* The M+C organization is financially responsible for ambulance services, including ambulance services dispatched through 911 or its local equivalent, where other means of transportation would endanger the beneficiary's health.

(b) *Emergency and urgently needed services.* (1) *Definitions.*

(i) *Emergency medical condition* means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, with an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in—

(A) Serious jeopardy to the health of the individual or, in the case of a pregnant woman, the health of the woman or her unborn child;

(B) Serious impairment to bodily functions; or

(C) Serious dysfunction of any bodily organ or part.

(ii) *Emergency services* means covered inpatient and outpatient services that are—

(A) Furnished by a provider qualified to furnish emergency services; and

(B) Needed to evaluate or stabilize an emergency medical condition.

(iii) *Urgently needed services* means covered services that are not emergency services as defined this section, provided when an enrollee is temporarily absent from the M+C plan's service (or, if applicable, continuation) area (or, under unusual and extraordinary circumstances, provided when the enrollee is in the service or continuation area but the organization's provider network is temporarily unavailable or inaccessible) when the services are medically necessary and immediately required—

(A) As a result of an unforeseen illness, injury, or condition; and

(B) It was not reasonable given the circumstances to obtain the services through the organization offering the M+C plan.

(2) *M+C organization financial responsibility.* The M+C organization is financially responsible for emergency and urgently needed services—

(i) Regardless of whether the services are obtained within or outside the M+C organization;

(ii) Regardless of whether there is prior authorization for the services.

(A) Instructions to seek prior authorization for emergency or urgently needed services may not be included in any materials furnished to enrollees (including wallet card instructions), and enrollees must be informed of their right to call 911.

(B) Instruction to seek prior authorization before the enrollee has been stabilized may not be included in any materials furnished to providers (including contracts with providers);

(iii) In accordance with the prudent layperson definition of *emergency*

*medical condition* regardless of final diagnosis;

(iv) For which a plan provider or other M+C organization representative instructs an enrollee to seek emergency services within or outside the plan; and

(v) With a limit on charges to enrollees for emergency services of $50 or what it would charge the enrollee if he or she obtained the services through the M+C organization, whichever is less.

(3) *Stabilized condition.* The physician treating the enrollee must decide when the enrollee may be considered stabilized for transfer or discharge, and that decision is binding on the M+C organization.

(c) *Maintenance care and post-stabilization care services* (hereafter together referred to as ''post-stabilization care services'').

(1) *Definition. Post-stabilization care services* means covered services, related to an emergency medical condition, that are provided after an enrollee is stabilized in order to maintain the stabilized condition, or, under the circumstances described in paragraph (c)(2)(iii) of this section, to improve or resolve the enrollee's condition.

(2) *M+C organization financial responsibility.* The M+C organization—

(i) Is financially responsible (consistent with § 422.214) for post-stabilization care services obtained within or outside the M+C organization that are pre-approved by a plan provider or other M+C organization representative;

(ii) Is financially responsible for post-stabilization care services obtained within or outside the M+C organization that are not pre-approved by a plan provider or other M+C organization representative, but administered to maintain the enrollee's stabilized condition within 1 hour of a request to the M+C organization for pre-approval of further post-stabilization care services;

(iii) Is financially responsible for post-stabilization care services obtained within or outside the M+C organization that are not pre-approved by a plan provider or other M+C organization representative, but administered to maintain, improve, or resolve the enrollee's stabilized condition if—

(A) The M+C organization does not respond to a request for pre-approval within 1 hour;

(B) The M+C organization cannot be contacted; or

(C) The M+C organization representative and the treating physician cannot reach an agreement concerning the enrollee's care and a plan physician is not available for consultation. In this situation, the M+C

organization must give the treating physician the opportunity to consult with a plan physician and the treating physician may continue with care of the patient until a plan physician is reached or one of the criteria in § 422.113(c)(3) is met; and

(iv) Must limit charges to enrollees for post-stabilization care services to an amount no greater than what the organization would charge the enrollee if he or she had obtained the services through the M+C organization.

(3) *End of M+C organization's financial responsibility.* The M+C organization's financial responsibility for post-stabilization care services it has not pre-approved ends when—

(i) A plan physician with privileges at the treating hospital assumes responsibility for the enrollee's care;

(ii) A plan physician assumes responsibility for the enrollee's care through transfer;

(iii) An M+C organization representative and the treating physician reach an agreement concerning the enrollee's care; or

(iv) The enrollee is discharged.

26. Revise § 422.118 to read as follows:

**§ 422.118   Confidentiality and accuracy of enrollee records.**

For any medical records or other health and enrollment information it maintains with respect to enrollees, an M+C organization must establish procedures to do the following:

(a) Abide by all Federal and State laws regarding confidentiality and disclosure of medical records, or other health and enrollment information. The M+C organization must safeguard the privacy of any information that identifies a particular enrollee and have procedures that specify—

(1) For what purposes the information will be used within the organization; and

(2) To whom and for what purposes it will disclose the information outside the organization.

(b) Ensure that medical information is released only in accordance with applicable Federal or State law, or pursuant to court orders or subpoenas.

(c) Maintain the records and information in an accurate and timely manner.

(d) Ensure timely access by enrollees to the records and information that pertain to them.

27. Section 422.152 is amended by:
A. Revising the heading and introductory text for paragraph (b).
B. Revising the heading and introductory text for paragraph (e).
C. Revising paragraph (e)(1).

D. Republishing the heading of paragraph (f).
E. Adding new paragraph (f)(3).

**§ 422.152   Quality assessment and performance improvement program.**

*       *       *       *       *

(b) *Requirements for network M+C MSA plans and M+C coordinated care plans other than PPO plans.* An organization offering a network M+C MSA plan or M+C coordinated care plan other than a PPO plan must do the following:

*       *       *       *       *

(e) *Requirements for M+C PPO plans, non-network MSA plans, and M+C private fee-for-service plans.* An organization offering an M+C plan, non-network MSA plan, or private fee-for-service plan must do the following:

(1) Measure performance under the plan using standard measures required by HCFA and report its performance to HCFA. The standard measures may be specified in uniform data collection and reporting instruments required by HCFA and will relate to—

(i) Clinical areas including effectiveness of care, enrollee perception of care, and use of services; and

(ii) Nonclinical areas including access to and availability of services, appeals and grievances, and organizational characteristics.

*       *       *       *       *

(f) *Requirements for all types of plans*—

*       *       *       *       *

(3) *Remedial action.* For each plan, the organization must correct all problems that come to its attention through internal surveillance, complaints, or other mechanisms.

28. In § 422.154, the introductory text for paragraph (b) is republished, and paragraph (b)(2) is revised to read as follows:

**§ 422.154   External review.**

*       *       *       *       *

(b) *Terms of the agreement.* The agreement must be consistent with HCFA guidelines and include the following provisions:

*       *       *       *       *

(2) Except in the case of complaints about quality, exclude review activities that HCFA determines would duplicate review activities conducted as part of an approved accreditation process or as part of HCFA monitoring.

*       *       *       *       *

29. Revise paragraphs (a) and (b) in § 422.156 to read as follows:

**§ 422.156   Compliance deemed on the basis of accreditation.**

(a) *General rule.* An M+C organization is deemed to meet all of the requirements of any of the areas described in paragraph (b) of this section if—

(1) The M+C organization is fully accredited (and periodically reaccredited) for the standards related to the applicable area under paragraph (b) of this section by a private, national accreditation organization approved by HCFA; and

(2) The accreditation organization used the standards approved by HCFA for the purposes of assessing the M+C organization's compliance with Medicare requirements.

(b) *Deemable requirements.* The requirements relating to the following areas are deemable:

(1) Quality assurance.
(2) Antidiscrimination.
(3) Access to services.
(4) Confidentiality and accuracy of enrollee records.
(5) Information on advance directives.
(6) Provider participation rules.

*       *       *       *       *

30. Section 422.157 is amended by republishing the introductory text for paragraph (a) and revising paragraphs (a)(3) and (b)(1) to read as follows:

**§ 422.157   Accreditation organizations.**

(a) *Conditions for approval.* HCFA may approve an accreditation organization with respect to a given standard under this part if it meets the following conditions:

*       *       *       *       *

(3) It ensures that:

(i) Any individual associated with it, who is also associated with an entity it accredits, does not influence the accreditation decision concerning that entity.

(ii) The majority of the membership of its governing body is not comprised of managed care organizations or their representatives.

(iii) Its governing body has a broad and balanced representation of interests and acts without bias.

*       *       *       *       *

(b) *Notice and comment*—(1) Proposed notice. HCFA publishes a notice in the **Federal Register** whenever it is considering granting an accreditation organization's application for approval. The notice—

(i) Announces HCFA's receipt of the accreditation organization's application for approval;

(ii) Describes the criteria HCFA will use in evaluating the application; and

(iii) Provides at least a 30-day comment period.

\* \* \* \* \*

31. Revise the introductory text of § 422.158(e) to read as follows:

**§ 422.158   Procedures for approval of accreditation as basis for deeming compliance.**

\* \* \* \* \*

(e) *Notice of determination.* HCFA gives the accreditation organization, within 210 days of receipt of its completed application, a formal notice that—

\* \* \* \* \*

32. Section 422.202 is amended by:
A. Revising the introductory text of paragraph (b).
B. Adding a heading to paragraph (c).
C. Adding a new paragraph (d)

**§ 422.202   Participation procedures.**

\* \* \* \* \*

(b) *Consultation.* The M+C organization must establish a formal mechanism to consult with the physicians who have agreed to provide services under the M+C plan offered by the organization, regarding the organization's medical policy, quality assurance programs and medical management procedures and ensure that the following standards are met:

\* \* \* \* \*

(c) *Subcontracted groups.* \* \* \*

\* \* \* \* \*

(d) *Suspension or termination of contract.* An M+C organization that operates a coordinated care plan or network MSA plan providing benefits through contracting providers must meet the following requirements:

(1) *Notice to physician.* An M+C organization that suspends or terminates an agreement under which the physician provides services to M+C plan enrollees must give the affected individual written notice of the following:

(i) The reasons for the action, including, if relevant, the standards and profiling data used to evaluate the physician and the numbers and mix of physicians needed by the M+C organization.

(ii) The affected physician's right to appeal the action and the process and timing for requesting a hearing.

(2) *Composition of hearing panel.* The M+C organization must ensure that the majority of the hearing panel members are peers of the affected physician.

(3) *Notice to licensing or disciplinary bodies.* An M+C organization that suspends or terminates a contract with a physician because of deficiencies in the quality of care must give written

notice of that action to licensing or disciplinary bodies or to other appropriate authorities.

(4) *Timeframes.* An M+C organization and a contracting provider must provide at least 60 days written notice to each other before terminating the contract without cause.

33. Revise § 422.204 to read as follows:

**§ 422.204   Provider selection and credentialing.**

(a) *General rule.* An M+C organization must have written policies and procedures for the selection and evaluation of providers. These policies must conform with the credential and recredentialing requirements set forth in paragraph (b) of this section and with the antidiscrimination provisions set forth in § 422.205.

(b) *Basic requirements.* An M+C organization must follow a documented process with respect to providers and suppliers who have signed contracts or participation agreements that—

(1) For providers (other than physicians and other health care professionals) requires determination, and redetermination at specified intervals, that each provider is—

(i) Licensed to operate in the State, and in compliance with any other applicable State or Federal requirements; and

(ii) Reviewed and approved by an accrediting body, or meets the standards established by the organization itself;

(2) For physicians and other health care professionals, including members of physician groups, covers—

(i) Initial credentialing that includes written application, verification of licensure or certification from primary sources, disciplinary status, eligibility for payment under Medicare, and site visits as appropriate. The application must be signed and dated and include an attestation by the applicant of the correctness and completeness of the application and other information submitted in support of the application;

(ii) Recredentialing at least every 2 years that updates information obtained during initial credentialing and considers performance indicators such as those collected through quality assurance programs, utilization management systems, handling of grievances and appeals, enrollee satisfaction surveys, and other plan activities, and that includes an attestation of the correctness and completeness of the new information; and

(iii) A process for consulting with contracting health care professionals

with respect to criteria for credentialing and recredentialing.

(3) Specifies that basic benefits must be provided through, or payments must be made to, providers and suppliers that meet applicable requirements of title XVIII and part A of title XI of the Act. In the case of providers meeting the definition of ''provider of services'' in section 1861(u) of the Act, basic benefits may only be provided through these providers if they have a provider agreement with HCFA permitting them to provide services under original Medicare.

(4) Ensures compliance with the requirements at § 422.752(a)(8) that prohibit employment or contracts with individuals (or with an entity that employs or contracts with such an individual) excluded from participation under Medicare and with the requirements at § 422.220 regarding physicians and practitioners who opt out of Medicare.

34. Add § 422.205 to read as follows:

**§ 422.205   Provider antidiscrimination rules.**

(a) *General rule.* Consistent with the requirements of this section, the policies and procedures concerning provider selection and credentialing established under § 422.204, and with the requirement under § 422.100(c) that all Medicare-covered services be available to M+C plan enrollees, an M+C organization may select the practitioners that participate in its plan provider networks. In selecting these practitioners, an M+C organization may not discriminate, in terms of participation, reimbursement, or indemnification, against any health care professional who is acting within the scope of his or her license or certification under State law, solely on the basis of the license or certification. If an M+C organization declines to include a given provider or group of providers in its network, it must furnish written notice to the effected provider(s) of the reason for the decision.

(b) *Construction.* The prohibition in paragraph (a)(1) of this section does not preclude any of the following by the M+C organization:

(1) Refusal to grant participation to health care professionals in excess of the number necessary to meet the needs of the plan's enrollees (except for M+C private-fee-for-service plans, which may not refuse to contract on this basis).

(2) Use of different reimbursement amounts for different specialties or for different practitioners in the same specialty.

(3) Implementation of measures designed to maintain quality and

control costs consistent with its responsibilities.

35. In § 422.206, the heading for paragraph (b) is republished and paragraph (b)(2) is revised to read as follows:

### § 422.206 Interference with health care professionals' advice to enrollees prohibited.

\* \* \* \* \*

(b) *Conscience protection.* \* \* \*
(2) Through appropriate written means, makes available information on these policies as follows:

(i) To HCFA, with its application for a Medicare contract, within 10 days of submitting its ACR proposal or, for policy changes, in accordance with § 422.80 (concerning approval of marketing materials and election forms) and with § 422.111.

(ii) To prospective enrollees, before or during enrollment.

(iii) With respect to current enrollees, the organization is eligible for the exception provided in paragraph (b)(1) of this section if it provides notice of such change within 90 days after adopting the policy at issue; however, under § 422.111(d), notice of such a change must be given in advance.

\* \* \* \* \*

36. Section 422.208 is amended by:
A. Republishing the introductory text for paragraph (c).
B. Revising paragraph (c)(2).
C. Adding a heading to paragraph (e).

### § 422.208 Physician incentive plans: requirements and limitations.

\* \* \* \* \*

(c) *Basic requirements.* Any physician incentive plan operated by an M+C organization must meet the following requirements:

\* \* \* \* \*

(2) If the physician incentive plan places a physician or physician group at substantial financial risk (as determined under paragraph (d) of this section) for services that the physician or physician group does not furnish itself, the M+C organization must assure that all physicians and physician groups at substantial financial risk have either aggregate or per-patient stop-loss protection in accordance with paragraph (f) of this section, and conduct periodic surveys in accordance with paragraph (h) of this section.

\* \* \* \* \*

(e) *Prohibition for private M+C fee-for-service plans.* \* \* \*

\* \* \* \* \*

37. In § 422.214, the heading for paragraph (a) is republished and paragraphs (a)(1) and (b) are revised to read as follows:

### § 422.214 Special rules for services furnished by noncontract providers.

(a) *Services furnished by non-section 1861(u) providers.* (1) Any provider (other than a provider of services as defined in section 1861(u) of the Act) that does not have in effect a contract establishing payment amounts for services furnished to a beneficiary enrolled in an M+C coordinated care plan or M+C private fee-for-service plan must accept, as payment in full, the amounts that the provider could collect if the beneficiary were enrolled in original Medicare.

\* \* \* \* \*

(b) *Services furnished by section 1861(u) providers of service.* Any provider of services as defined in section 1861(u) of the Act that does not have in effect a contract establishing payment amounts for services furnished to a beneficiary enrolled in an M+C coordinated care plan or M+C private fee-for-service plan must accept as payment in full the amounts (less any payments under §§ 412.105(g) and 413.86(d)) of this chapter that it could collect if the beneficiary were enrolled in original Medicare. (Section 412.105(g) concerns indirect medical education payment to hospitals for managed care enrollees. Section 413.86(d) concerns calculating payment for direct graduate medical education costs.)

38. In § 422.216, paragraphs (a)(4), (b)(2), (c)(2), and the introductory text for paragraph (f) are revised to read as follows:

### § 422.216 Special rules for M+C private fee-for-service plans.

(a) \* \* \*
(4) *Service furnished by providers of service.* Any provider of services as defined in section 1861(u) of the Act that does not have in effect a contract establishing payment mounts for services furnished to a beneficiary enrolled in an M+C private fee-for-service plan must accept as payment in full the amounts (less any payments under §§ 412.105(g) and 413.86(d) of this chapter) that it could collect if the beneficiary were enrolled in original Medicare.

(b) \* \* \*
(2) *Noncontract providers.* A noncontract provider may not collect from an enrollee more than the cost-sharing established by the M+C private fee-for-service plan as specified in § 422.308(b), unless the provider has opted out of Medicare as described in part 405, subpart D of this chapter.

(c) \* \* \*
(2) *Noncontract providers.* An M+C organization that offers an M+C private

fee-for-service plan must monitor the amount collected by noncontract providers to ensure that those amounts do not exceed the amounts permitted to be collected under paragraph (b)(2) of this section, unless the provider has opted out of Medicare as described in part 405, subpart D of this chapter. The M+C organization must develop and document violations specified in instructions and must forward documented cases to HCFA.

\* \* \* \* \*

(f) *Rules describing deemed contract providers.* Any provider furnishing health services, except for emergency services furnished in a hospital pursuant to § 489.24 of this chapter, to an enrollee in an M+C private fee-for-service plan, and who has not previously entered into a contract or agreement to furnish services under the plan, is treated as having a contract in effect and is subject to the limitations of this section that apply to contract providers if the following conditions are met:

\* \* \* \* \*

39. Section 422.250 is amended by:
A. In paragraph (a)(1), removing the phrase "in paragraph (a)(2)" and adding in its place the phrase "in paragraphs (a)(2) or (f)".
B. Revising paragraph (a)(2)(i)(B).
C. Adding new paragraph (g).

### § 422.250 General provisions.

(a) \* \* \*
(2) \* \* \*
(i) \* \* \*
(B) HCFA reduces the payment rate for each renal dialysis treatment by the same amount that the Secretary is authorized to reduce the amount of each composite rate payment for each treatment as set forth in section 1881(b)(7) of the Act. These funds are to be used to help pay for the ESRD network program in the same manner as similar reductions are used in original Medicare.

\* \* \* \* \*

(g) *Bonus payments.* (1) HCFA provides bonus payments to the M+C organization(s) that first offers a plan in a previously unserved county on or after January 1, 2000 and no later than December 31, 2001. The bonus payment amounts equal—

(i) For the first 12 months after a plan is offered in a previously unserved county, 5 percent of the monthly capitation rate otherwise payable under this section; and

(ii) For the subsequent 12 months, 3 percent of the monthly capitation rate otherwise payable under this section.

(2) A previously unserved county is defined as—

(i) A county in which no M+C plan has been offered; or

(ii) A county in which an M+C plan or plans has been offered, but where any M+C organization offering an M+C plan notified HCFA by October 13, 1999, that it will no longer offer plans in the county as of January 1, 2000.

(3) A plan is considered to be offered when—

(i) The M+C organization sponsoring the plan has a contract in effect to serve beneficiaries in the previously unserved area; and

(ii) The M+C plan is open for enrollment.

40. Revise § 422.254(b)(2) to read as follows:

### § 422.254   Calculation and adjustment factors.

*    *    *    *    *

(b) * * *

(2) The percentage points that HCFA uses to reduce its estimates are as follows:

(i) For 1998, 0.8 percentage points.

(ii) For years 1999 through 2001, 0.5 percentage points.

(iii) For 2002, 0.3 percentage points.

(iv) For years after 2002, 0 percentage points.

*    *    *    *    *

41. In § 422.257, revise paragraph (d) and add paragraph (g) to read as follows:

### § 422.257   Encounter data.

*    *    *    *    *

(d) *Other data requirements.* (1) M+C organizations must submit data that conform to the requirements for equivalent data for Medicare fee-for-service when appropriate, and to all relevant national standards.

(2) The data must be submitted electronically to the appropriate HCFA contractor.

(3) M+C organizations must obtain the encounter data required by HCFA from the provider, supplier, physician, or other practitioner that rendered the services.

(4) M+C organizations may include in their contracts with providers, suppliers, physicians, and other practitioners, provisions that require submission of complete and accurate encounter data as required by HCFA. These provisions may include financial penalties for failure to submit complete data, or for failure to submit data that conform to the requirements for equivalent data for Medicare fee-for-service.

*    *    *    *    *

(g) *Deadlines for submission of encounter data.* Risk adjustment factors for each payment year are based on encounter data submitted for services furnished during the 12 month period ending 6 months before to the payment year (for example, risk adjustment factors for CY 2000 are based on data for services furnished during the period July 1, 1998 through June 30, 1999).

(1) The annual deadline for encounter data submission is September 10 for encounter data reflecting services furnished during the 12 month period ending the prior June 30 (for example, the deadline for submission of data for the period July 1, 1998 through June 30, 1999 is September 10, 1999).

(2) HCFA allows a reconciliation process to account for late data submissions. HCFA continues to accept encounter data submitted after the September 10 deadline until June 30 of the payment year (for example, until June 30, 2000 for data from the period July 1, 1998 through June 30, 1999). After the payment year is completed, HCFA recalculates the risk factors for affected individuals to determine if adjustments to payments are necessary.

42. Revise § 422.300(b)(2) to read as follows:

### § 422.300   Basis and scope.

*    *    *    *    *

(b) * * *

(2) For contracts beginning on a date other than January 1 (according to § 422.504(d)), M+C organizations may submit ACRs on a date other than July 1 approved by HCFA.

43. Revise § 422.304(b) to read as follows:

### § 422.304   Rules governing premiums and cost-sharing.

*    *    *    *    *

(b) *Uniformity.* (1) *General rule.* The M+C monthly basic beneficiary premium, the M+C monthly supplemental beneficiary premiums, and the M+C monthly MSA premium of an M+C organization may not vary among individuals enrolled in an M+C plan (or segment of the plan as provided under paragraph (b)(2) of this section). In addition, the M+C organization may not vary the level of cost-sharing charged for basic benefits or supplemental benefits (if any), among individuals enrolled in an M+C plan (or segment of the plan as provided under paragraph (b)(2) of this section).

(2) *Segmented service area option.* An M+C organization may apply the uniformity requirements in paragraph (b)(1) of this section to segments of an M+C plan service area (rather than to the entire service area) as long as any such segment is composed of one or more M+C payment areas, and the information specified under § 422.306 is submitted separately, as provided in that section, for each such segment.

*    *    *    *    *

44. Revise the introductory text in § 422.306(a)(1) to read as follows:

### § 422.306   Submission of proposed premiums and related information.

(a) *General rule.* (1) Not later than July 1 of each year, each M+C organization and any organization intending to contract as an M+C organization in the subsequent year must submit to HCFA, in the manner and form prescribed by HCFA, for each M+C plan (or service area segment, under § 422.304(b)(2)) it intends to offer in the following year—

*    *    *    *    *

45. Section 422.310 is amended by:

A. In the introductory text for paragraph (d), removing the phrase "paragraphs (a)(1) and (a)(2) of this section" and adding in its place the phrase "paragraphs (d)(1) and (d)(2) of this section".

B. Revising paragraph (c)(3).

### § 422.310   Adjusted community rate (ACR) approval process.

*    *    *    *    *

(c) * * *

(3) *Additional revenues.* The relative cost ratio for total revenues for an M+C plan is determined by comparing the total revenues charged on an accrual basis during the most recently ended calendar year prior to submission of the ACR for Medicare enrollees (including payments from HCFA without any needed offsets or reductions, such as, those required by § 422.250(a)(2)(i)(B) for ESRD enrollees) that elected the M+C plan to the total revenues charged for non-Medicare enrollees over the same period. The non-Medicare enrollees included in this computation must be consistent with the non-Medicare enrollees included in the initial rate computation. When the relative cost ratio for total revenues is applied to the total initial rate, the value of additional revenues is the remaining value after removing the value of direct medical costs (as adjusted by paragraph (c)(1) of this section) and the value of Administration (as adjusted by paragraph (c)(2) of this section).

46. In § 422.312, the introductory text for paragraph (b) is republished and paragraph (b)(1) is revised to read as follows:

### § 422.312   Requirement for additional benefits.

*    *    *    *    *

(b) *Requirement for additional benefits.* If there is an adjusted excess amount for the plan it offers, the M+C organization must—

**Federal Register** / Vol. 65, No. 126 / Thursday, June 29, 2000 / Rules and Regulations    **40327**

(1) Provide additional benefits with an actuarial value (less the actuarial value of any cost-sharing associated with the benefit) which HCFA determines is at least equal to the adjusted excess amount; and

\* \* \* \* \*

47–50. In § 422.352, the introductory text for paragraph (a) is republished and paragraph (a)(1) is revised to read as follows:

**§ 422.352    Basic requirements.**

(a) *General rule.* An organization is considered a PSO for purposes of an M+C contract if the organization—

(1) Has obtained a waiver of State licensure as provided for under § 422.370;

\* \* \* \* \*

51. Section 422.500 is amended by:
A. Revising the definition of "clean claim."
B. Adding definitions for "downstream entity" and "first tier entity."

**§ 422.500    Definitions.**

\* \* \* \* \*

*Clean claim* means—
(1) A claim that has no defect, impropriety, lack of any required substantiating documentation (consistent with § 422.257(d)) or particular circumstance requiring special treatment that prevents timely payment; and
(2) A claim that otherwise conforms to the clean claim requirements for equivalent claims under original Medicare.

*Downstream entity* means any party that enters into an acceptable written arrangement below the level of the arrangement between an M+C organization (or contract applicant) and a first tier entity. These written arrangements continue down to the level of the ultimate provider of both health and administrative services.

*First tier entity* means any party that enters into an acceptable written arrangement with an M+C organization or contract applicant to provide administrative services or health care services for a Medicare eligible individual.

\* \* \* \* \*

52. Section 422.501 is amended by:
A. Republishing the introductory text in paragraphs (b), (b)(3), and (b)(3)(vi).
B. Revising paragraphs (b)(3)(vi)(G) and (b)(5).
C. Removing paragraph (b)(3)(vi)(H).
D. Republishing the introductory text in (d)(2) and (d)(2)(iii).
E. Revising paragraph (d)(2)(iii)(A).

**§ 422.501    General provisions.**

\* \* \* \* \*

(b) *Conditions necessary to contract as an M+C organization.* Any entity seeking to contract as an M+C organization must:

\* \* \* \* \*

(3) Have administrative and management arrangements satisfactory to HCFA, as demonstrated by at least the following:

\* \* \* \* \*

(vi) A compliance plan that consists of the following:

\* \* \* \* \*

(G) Procedures for ensuring prompt response to detected offenses and development of corrective action initiatives relating to the organization's M+C contract.

\* \* \* \* \*

(5) The M+C organization's contract must not have been terminated by HCFA under § 422.510 within the past 2 years unless—
(i) During the 6-month period beginning on the date the organization notified HCFA of the intention to terminate the most recent previous contract, there was a change in the statute or regulations that had the effect of increasing M+C payments in the payment area or areas at issue; or
(ii) HCFA has otherwise determined that circumstances warrant special consideration.

\* \* \* \* \*

(d) \* \* \*
(2) Each contract under this section must provide that HCFA, or any person or organization designated by HCFA has the right to:

\* \* \* \* \*

(iii) Audit and inspect any books, contracts, and records of the M+C organization that pertain to—
(A) The ability of the organization or its first tier or downstream providers to bear the risk of potential financial losses; or

\* \* \* \* \*

53. Section 422.502 is amended by:
A. In paragraph (a)(12), removing the phrase "To comply will all requirements" and adding in its place the phrase "To comply with all requirements".
B. Republishing the introductory text for paragraph (g).
C. Revising the introductory text for paragraph (g)(1) and the introductory text for paragraph (g)(3).
D. Revising paragraph (i)(3).
E. Revising paragraph (l).

**§ 422.502    Contract provisions.**

\* \* \* \* \*

(g) *Beneficiary financial protections.* The M+C organization agrees to comply with the following requirements:
(1) Each M+C organization must adopt and maintain arrangements satisfactory to HCFA to protect its enrollees from incurring liability (for example, as a result of an organization's insolvency or other financial difficulties) for payment of any fees that are the legal obligation of the M+C organization. To meet this requirement, the M+C organization must—

\* \* \* \* \*

(3) In meeting the requirements of this paragraph, other than the provider contract requirements specified in paragraph (g)(1)(i) of this section, the M+C organization may use—

\* \* \* \* \*

(i) \* \* \*
(3) All contracts or written arrangements between M+C organizations and providers, related entities, contractors, subcontractors, first tier and downstream entities must contain the following:
(i) Enrollee protection provisions that provide, consistent with paragraph (g)(1) of this section, arrangements that prohibit providers from holding an enrollee liable for payment of any fees that are the obligation of the M+C organization.
(ii) Accountability provisions that indicate that—
(A) The M+C organization oversees and is accountable to HCFA for any functions or responsibilities that are described in these standards; and
(B) The M+C organization may only delegate activities or functions to a provider, related entity, contractor, or subcontractor in a manner consistent with requirements set forth at paragraph (i)(4) of this section.
(iii) A provision requiring that any services or other activity performed by a related entity, contractor, subcontractor, or first-tier or downstream entity in accordance with a contract or written agreement are consistent and comply with the M+C organization's contractual obligations.

\* \* \* \* \*

(1) *Certification of data that determine payment.* As a condition for receiving a monthly payment under subpart F of this part, the M+C organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy,

completeness, and truthfulness of relevant data that HCFA requests. Such data include specified enrollment information, encounter data, and other information that HCFA may specify.

(1) The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer, must certify that each enrollee for whom the organization is requesting payment is validly enrolled in an M+C plan offered by the organization and the information relied upon by HCFA in determining payment (based on best knowledge, information, and belief) is accurate, complete, and truthful.

(2) The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must certify (based on best knowledge, information, and belief) that the encounter data it submits under § 422.257 are accurate, complete, and truthful.

(3) If such encounter data are generated by a related entity, contractor, or subcontractor of an M+C organization, such entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data.

(4) The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer, must certify (based on best knowledge, information, and belief) that the information in its ACR submission is accurate, complete, and truthful and fully conforms to the requirements in § 422.310.

54. In § 422.504, revise paragraph (b) and remove paragraph (d) to read as follows:

### § 422.504   Effective date and term of contract.

*     *     *     *     *

(b) *Term of contract.* Each contract is for a period of at least 12 months.

*     *     *     *     *

55. Section 422.506 is amended by:
A. Republishing the introductory text of paragraph (a)(2).
B. Revising paragraph (a)(2)(i) and the introductory text of paragraph (a)(3).
C. Removing paragraph (b)(1)(ii).
D. Redesignating paragraphs (b)(1)(iii) and (b)(1)(iv) as (b)(1)(ii) and (b)(1)(iii), respectively.

### § 422.506   Nonrenewal of contract.

(a) *  *  *
(2) If an M+C organization does not intend to renew its contract, it must notify—

(i) HCFA in writing, by July 1 of the year in which the contract would end;
*     *     *     *     *

(3) HCFA may accept a nonrenewal notice submitted after July 1 if—
*     *     *     *     *

56. Section 422.510 is amended by adding paragraph (a)(12) and revising paragraph (c)(1) to read as follows:

### § 422.510   Termination of contract by HCFA.

(a) *  *  *
(12) The M+C organization substantially fails to comply with the marketing requirements in § 422.80.

*     *     *     *     *

(c) *  *  *
(1) *General.* Before terminating a contract for reasons other than the grounds specified in paragraph (a)(5) of this section, HCFA provides the M+C organization with reasonable opportunity to develop and receive HCFA approval of a corrective action plan to correct the deficiencies that are the basis of the proposed termination.

57. Revise § 422.514(b)(1) to read as follows:

### § 422.514   Minimum enrollment requirements.

*     *     *     *     *

(b) *  *  *
(1) For a contract applicant or M+C organization that does not meet the applicable requirement of paragraph (a) of this section at application for an M+C contract or during the first 3 years of the contract, HCFA may waive the minimum enrollment requirement as provided for below. To receive a waiver, a contract applicant or M+C organization must demonstrate to HCFA's satisfaction that it is capable of administering and managing an M+C contract and is able to manage the level of risk required under the contract. Factors that HCFA takes into consideration in making this evaluation include the extent to which—

(i) The contract applicant or M+C organization's management and providers have previous experience in managing and providing health care services under a risk-based payment arrangement to at least as many individuals as the applicable minimum enrollment for the entity as described in paragraph (a) of this section, or

(ii) The contract applicant or M+C organization has the financial ability to bear financial risk under an M+C contract. In determining whether an organization is capable of bearing risk, HCFA considers factors such as the organization's management experience as described in paragraph (b)(1)(i) of this

section and stop-loss insurance that is adequate and acceptable to HCFA; and

(iii) The contract applicant or M+C organization is able to establish a marketing and enrollment process that allows it to meet the applicable enrollment requirement specified in paragraph (a) of this section before completion of the third contract year.

*     *     *     *     *

58. Revise § 422.520(a)(3) to read as follows:

### § 422.520   Prompt payment by M+C organization.

*     *     *     *     *

(a) *  *  *
(3) All other claims must be paid or denied within 60 calendar days from the date of the request.

*     *     *     *     *

### § 422.550   [Amended]

59. In § 422.550(a)(2), the heading "Unincorporated sole proprietor" is removed and the heading "Asset Sale" is added in its place.

60. In § 422.561, the introductory text is republished and the definitions of "Appeal" and "Authorized representative" are revised to read as follows:

### § 422.561   Definitions.

As used in this subpart, unless the context indicates otherwise—

*Appeal* means any of the procedures that deal with the review of adverse organization determinations on the health care services the enrollee believes he or she is entitled to receive, including delay in providing, arranging for, or approving the health care services (such that a delay would adversely affect the health of the enrollee), or on any amounts the enrollee must pay for a service, as defined under § 422.566(b). These procedures include reconsiderations by the M+C organization, and if necessary, an independent review entity, hearings before ALJs, review by the Departmental Appeals Board (DAB), and judicial review.

*Authorized representative* means an individual authorized by an enrollee, or under State law, to act on his or her behalf in obtaining an organization determination or in dealing with any of the levels of the appeal process, subject to the rules described in 20 CFR part 404, subpart R, unless otherwise stated in this subpart.

*     *     *     *     *

61. Section 422.562 is amended by republishing the introductory text for paragraphs (a) and (a)(1) and revising paragraph (a)(1)(ii).

## §422.562   General provisions.

(a) *Responsibilities of the M+C organization.* (1) An M+C organization, with respect to each M+C plan that it offers, must establish and maintain—

\*      \*      \*      \*      \*

(ii) A procedure for making timely organization determinations;

\*      \*      \*      \*      \*

62. Revise §422.566(b) to read as follows:

## §422.566   Organization determinations.

\*      \*      \*      \*      \*

(b) *Actions that are organization determinations.* An organization determination is any determination made by an M+C organization with respect to any of the following:

(1) Payment for temporarily out of the area renal dialysis services, emergency services, post-stabilization care, or urgently needed services.

(2) Payment for any other health services furnished by a provider other than the M+C organization that the enrollee believes—

(i) Are covered under Medicare; or

(ii) If not covered under Medicare, should have been furnished, arranged for, or reimbursed by the M+C organization.

(3) The M+C organization's refusal to provide or pay for services, in whole or in part, including the type or level of services, that the enrollee believes should be furnished or arranged for by the M+C organization.

(4) Discontinuation of a service if the enrollee believes that continuation of the services is medically necessary.

(5) Failure of the M+C organization to approve, furnish, arrange for, or provide payment for health care services in a timely manner, or to provide the enrollee with timely notice of an adverse determination, such that a delay would adversely affect the health of the enrollee.

\*      \*      \*      \*      \*

63. Section 422.568 is revised to read as follows:

## §422.568   Standard timeframes and notice requirements for organization determinations.

(a) *Timeframe for requests for service.* When a party has made a request for a service, the M+C organization must notify the enrollee of its determination as expeditiously as the enrollee's health condition requires, but no later than 14 calendar days after the date the organization receives the request for a standard organization determination. The M+C organization may extend the timeframe by up to 14 calendar days if the enrollee requests the extension or if

the organization justifies a need for additional information and how the delay is in the interest of the enrollee (for example, the receipt of additional medical evidence from noncontract providers may change an M+C organization's decision to deny). When the M+C organization extends the timeframe, it must notify the enrollee in writing of the reasons for the delay, and inform the enrollee of the right to file a grievance if he or she disagrees with the M+C organization's decision to grant an extension. The M+C organization must notify the enrollee of its determination as expeditiously as the enrollee's health condition requires, but no later than upon expiration of the extension.

(b) *Timeframe for requests for payment.* The M+C organization must process requests for payment according to the ''prompt payment'' provisions set forth in §422.520.

(c) *Written notification by practitioners.* At each patient encounter with an M+C enrollee, a practitioner must notify the enrollee of his or her right to receive, upon request, a detailed written notice from the M+C organization regarding the enrollee's services, consistent with paragraph (d) of this section. The practitioner's notification must—

(1) Provide the enrollee with the information necessary to contact the M+C organization; and

(2) Comply with any other requirements specified by HCFA.

(d) *Written notice for M+C organization denials.* If an enrollee requests an M+C organization to provide a detailed notice of a practitioner's decision to deny a service in whole or in part, or if an M+C organization decides to deny service or payment in whole or in part, it must give the enrollee written notice of the determination.

(e) *Form and content of the M+C organization notice.* The notice of any denial under paragraph (d) of this section must—

(1) Use approved notice language in a readable and understandable form;

(2) State the specific reasons for the denial;

(3) Inform the enrollee of his or her right to a reconsideration;

(4)(i) For service denials, describe both the standard and expedited reconsideration processes, including the enrollee's right to, and conditions for, obtaining an expedited reconsideration and the rest of the appeal process; and

(ii) For payment denials, describe the standard reconsideration process and the rest of the appeal process; and

(5) Comply with any other notice requirements specified by HCFA.

(f) *Effect of failure to provide timely notice.* If the M+C organization fails to provide the enrollee with timely notice of an organization determination as specified in this section, this failure itself constitutes an adverse organization determination and may be appealed.

64. Section 422.570 is amended by:
A. Revising paragraph (a).
B. Republishing the introductory text for paragraph (d).
C. Revising the introductory text to paragraph (d)(2) and revising paragraph (d)(2)(iii).
D. Adding a new paragraph (d)(2)(iv).

## §422.570   Expediting certain organization determinations.

(a) *Request for expedited determination.* An enrollee or a physician (regardless of whether the physician is affiliated with the M+C organization) may request that an M+C organization expedite an organization determination involving the issues described in §422.566(b)(3) and (b)(4). (This does not include requests for payment of services already furnished.)

\*      \*      \*      \*      \*

(d) *Actions following denial.* If an M+C organization denies a request for expedited determination, it must take the following actions:

\*      \*      \*      \*      \*

(2) Give the enrollee prompt oral notice of the denial and subsequently deliver, within 3 calendar days, a written letter that—

\*      \*      \*      \*      \*

(iii) Informs the enrollee of the right to resubmit a request for an expedited determination with any physician's support; and

(iv) Provides instructions about the grievance process and its timeframes.

\*      \*      \*      \*      \*

65. In §422.572, revise paragraphs (b), (c), and (d) to read as follows:

## §422.572   Timeframes and notice requirements for expedited organization determinations.

\*      \*      \*      \*      \*

(b) *Extensions.* The M+C organization may extend the 72-hour deadline by up to 14 calendar days if the enrollee requests the extension or if the organization justifies a need for additional information and how the delay is in the interest of the enrollee (for example, the receipt of additional medical evidence from noncontract providers may change an M+C organization's decision to deny). When the M+C organization extends the deadline, it must notify the enrollee in writing of the reasons for the delay and

2100

inform the enrollee of the right to file a grievance if he or she disagrees with the M+C organization's decision to grant an extension. The M+C organization must notify the enrollee of its determination as expeditiously as the enrollee's health condition requires, but no later than upon expiration of the extension.

(c) *Confirmation of oral notice.* If the M+C organization first notifies an enrollee of its expedited determination orally, it must mail written confirmation to the enrollee within 3 calendar days of the oral notification.

(d) *How the M+C organization must request information from noncontract providers.* If the M+C organization must receive medical information from noncontract providers, the M+C organization must request the necessary information from the noncontract provider within 24 hours of the initial request for an expedited organization determination. Noncontract providers must make reasonable and diligent efforts to expeditiously gather and forward all necessary information to assist the M+C organization in meeting the required timeframe. Regardless of whether the M+C organization must request information from noncontract providers, the M+C organization is responsible for meeting the timeframe and notice requirements of this section.

\*     \*     \*     \*     \*

66. Section 422.584 is amended by:
A. Revising paragraph (a).
B. Republishing the introductory text to paragraph (d).
C. Revising paragraph (d)(2).

**§ 422.584   Expediting certain reconsiderations.**

(a) *Who may request an expedited reconsideration.* An enrollee or a physician (regardless of whether he or she is affiliated with the M+C organization) may request that an M+C organization expedite a reconsideration of a determination that involves the issues described in § 422.566(b)(3) and (b)(4). (This does not include requests for payment of services already furnished.)

\*     \*     \*     \*     \*

(d) *Actions following denial.* If an M+C organization denies a request for expedited reconsideration, it must take the following actions:

\*     \*     \*     \*     \*

(2) Give the enrollee prompt oral notice, and subsequently deliver, within 3 calendar days, a written letter that—
(i) Explains that the M+C organization will process the enrollee's request using the 30-day timeframe for standard reconsiderations;
(ii) Informs the enrollee of the right to file a grievance if he or she disagrees

with the organization's decision not to expedite;
(iii) Informs the enrollee of the right to resubmit a request for an expedited reconsideration with any physician's support; and
(iv) Provides instructions about the grievance process and its timeframes.

\*     \*     \*     \*     \*

67. Section 422.590 is amended by:
A. Republishing the heading for paragraph (a) and revising paragraph (a)(1).
B. Republishing the heading for paragraph (d) and revising paragraphs (d)(2), (d)(3), and (d)(4).
C. Republishing the heading for paragraph (g) and revising paragraph (g)(2).

**§ 422.590   Timeframes and responsibility for reconsiderations.**

(a) *Standard reconsideration: Request for services.* (1) If the M+C organization makes a reconsidered determination that is completely favorable to the enrollee, the M+C organization must issue the determination (and effectuate it in accordance with § 422.618(a)) as expeditiously as the enrollee's health condition requires, but no later than 30 calendar days from the date it receives the request for a standard reconsideration. The M+C organization may extend the timeframe by up to 14 calendar days if the enrollee requests the extension or if the organization justifies a need for additional information and how the delay is in the interest of the enrollee (for example, the receipt of additional medical evidence from noncontract providers may change an M+C organization's decision to deny). When the M+C organization extends the timeframe, it must notify the enrollee in writing of the reasons for the delay, and inform the enrollee of the right to file a grievance if he or she disagrees with the M+C organization's decision to grant an extension. For extensions, the M+C organization must issue and effectuate its determination as expeditiously as the enrollee's health condition requires, but no later than upon expiration of the extension.

\*     \*     \*     \*     \*

(d) *Expedited reconsideration—* \*   \*   \*
(2) *Extensions.* The M+C organization may extend the 72-hour deadline by up to 14 calendar days if the enrollee requests the extension or if the organization justifies a need for additional information and how the delay is in the interest of the enrollee (for example, the receipt of additional medical evidence from noncontract providers may change an M+C organization's decision to deny). When

the M+C organization extends the timeframe, it must notify the enrollee in writing of the reasons for the delay, and inform the enrollee of the right to file a grievance if he or she disagrees with the M+C organization's decision to grant an extension. The M+C organization must notify the enrollee of its determination as expeditiously as the enrollee's health condition requires but no later than upon expiration of the extension.

(3) *Confirmation of oral notice.* If the M+C organization first notifies an enrollee of a completely favorable expedited reconsideration, it must mail written confirmation to the enrollee within 3 calendar days.

(4) *How the M+C organization must request information from noncontract providers.* If the M+C organization must receive medical information from noncontract providers, the M+C organization must request the necessary information from the noncontract provider within 24 hours of the initial request for an expedited reconsideration. Noncontract providers must make reasonable and diligent efforts to expeditiously gather and forward all necessary information to assist the M+C organization in meeting the required timeframe. Regardless of whether the M+C organization must request information from noncontract providers, the M+C organization is responsible for meeting the timeframe and notice requirements.

\*     \*     \*     \*     \*

(g) *Who must reconsider an adverse organization determination.* \*   \*   \*
(2) When the issue is the M+C organization's denial of coverage based on a lack of medical necessity (or any substantively equivalent term used to describe the concept of medical necessity), the reconsidered determination must be made by a physician with expertise in the field of medicine that is appropriate for the services at issue. The physician making the reconsidered determination need not, in all cases, be of the same specialty or subspecialty as the treating physician.

68. In § 422.594, the introductory text for paragraph (b) is republished, and paragraph (b)(1) is revised to read as follows:

**§ 422.594   Notice of reconsidered determination by the independent entity.**

\*     \*     \*     \*     \*

(b) *Content of the notice.* The notice must—
(1) State the specific reasons for the entity's decisions in understandable language;

\*     \*     \*     \*     \*

69. Revise § 422.596 to read as follows:

**§ 422.596   Effect of a reconsidered determination.**

A reconsidered determination is final and binding on all parties unless a party other than the M+C organization files a request for a hearing under the provisions of § 422.602, or unless the reconsidered determination is revised under § 422.616.

70. Revise § 422.612(b) to read as follows:

**§ 422.612   Judicial review.**

\*     \*     \*     \*     \*

(b) *Review of Board decision.* Any party, including the M+C organization, may request judicial review (upon notifying the other parties) of the Board decision if it is the final decision of HCFA and the amount in controversy is $ 1,000 or more.

\*     \*     \*     \*     \*

71. Section 422.618 is amended by:
A. Revising the section heading.
B. Redesignating paragraph (b) as paragraph (c).
C. Adding a new paragraph (b).
D. Revising newly designated paragraph (c).

**§ 422.618   How an M+C organization must effectuate standard reconsidered determinations or decisions.**

\*     \*     \*     \*     \*

(b) *Reversals by the independent outside entity.* (1) *Requests for service.* If, on reconsideration of a request for service, the M+C organization's determination is reversed in whole or in part by the independent outside entity, the M+C organization must authorize the service under dispute within 72 hours from the date it receives notice reversing the determination, or provide the service under dispute as expeditiously as the enrollee's health condition requires, but no later than 14 calendar days from that date. The M+C organization must inform the independent outside entity that the organization has effectuated the decision.

(2) *Requests for payment.* If, on reconsideration of a request for payment, the M+C organization's determination is reversed in whole or in part by the independent outside entity, the M+C organization must pay for the service no later than 30 calendar days from the date it receives notice reversing the organization determination. The M+C organization must inform the independent outside entity that the organization has effectuated the decision.

(c) *Reversals other than by the M+C organization or the independent outside entity.* If the independent outside entity's determination is reversed in whole or in part by the ALJ, or at a higher level of appeal, the M+C organization must pay for, authorize, or provide the service as expeditiously as the enrollee's health condition requires, but no later than 60 calendar days from the date it receives notice reversing the determination. The M+C organization must inform the independent outside entity that the organization has effectuated the decision.

72. Add new § 422.619 to read as follows:

**§ 422.619   How an M+C organization must effectuate expedited reconsidered determinations.**

(a) *Reversals by the M+C organization.* If on reconsideration of an expedited request for service, the M+C organization completely reverses its organization determination, the M+C organization must authorize or provide the service under dispute as expeditiously as the enrollee's health condition requires, but no later than 72 hours after the date the M+C organization receives the request for reconsideration (or no later than upon expiration of an extension described in § 422.590(d)(2)).

(b) *Reversals by the independent outside entity.* If the M+C organization's determination is reversed in whole or in part by the independent outside entity, the M+C organization must authorize or provide the service under dispute as expeditiously as the enrollee's health condition requires but no later than 72 hours from the date it receives notice reversing the determination. The M+C organization must inform the independent outside entity that the organization has effectuated the decision.

(c) *Reversals other than by the M+C organization or the independent outside entity.* If the independent review entity's expedited determination is reversed in whole or in part by the ALJ, or at a higher level of appeal, the M+C organization must authorize or provide the service under dispute as expeditiously as the enrollee's health condition requires, but no later than 60 days from the date it receives notice reversing the determination. The M+C organization must inform the independent outside entity that the organization has effectuated the decision.

73. Section 422.620 is revised to read as follows:

**§ 422.620   How enrollees of M+C organizations must be notified of noncoverage of inpatient hospital care.**

(a) *Enrollee's entitlement.* Where an M+C organization has authorized coverage of the inpatient admission of an enrollee, either directly or by delegation (or the admission constitutes emergency or urgently needed care, as described in §§ 422.2 and 422.113), written notice of noncoverage under paragraph (c) of this section must be provided to each enrollee. An enrollee is entitled to coverage until at least noon the day after such notice is provided. If PRO review is requested under § 422.622, coverage is extended as provided in that section.

(b) *Physician concurrence required.* Before notice of noncoverage is provided as described in paragraph (c) of this section, the entity that makes the noncoverage/discharge determination (that is, the hospital by delegation or the M+C organization) must obtain the concurrence of the physician who is responsible for the enrollee's hospital care.

(c) *Notice to the enrollee.* In all cases in which a determination is made that inpatient hospital care is no longer necessary, no later than the day before hospital coverage ends, written notice must be provided to the enrollee that includes the following elements:

(1) The reason why inpatient hospital care is no longer needed.

(2) The effective date and time of the enrollee's liability for continued inpatient care.

(3) The enrollee's appeal rights.

(4) Additional information specified by HCFA.

74. Revise § 422.648(b) to read as follows:

**§ 422.648   Reconsideration: Applicability.**

\*     \*     \*     \*     \*

(b) HCFA reconsiders the specified determinations if the contract applicant or the M+C organization files a written request in accordance with § 422.650.

75. In § 422.650, paragraphs (c) and (d) are revised to read as follows:

**§ 422.650   Request for reconsideration.**

\*     \*     \*     \*     \*

(c) *Proper party to file a request.* Only an authorized official of the contract applicant or M+C organization that was the subject of a contract determination may file the request for reconsideration.

(d) *Withdrawal of a request.* The M+C organization or contract applicant who filed the request for a reconsideration may withdraw it at any time before the notice of the reconsidered determination is mailed. The request for

withdrawal must be in writing and filed with HCFA.

76. Revise § 422.652 to read as follows:

### § 422.652  Opportunity to submit evidence.

HCFA provides the M+C organization or contract applicant and the HCFA official or officials who made the contract determination reasonable opportunity, not to exceed the timeframe in which an M+C organization could choose to request a hearing as described at § 422.662, to present as evidence any documents or written statements that are relevant and material to the matters at issue.

77. Revise § 422.656 to read as follows:

### § 422.656  Notice of reconsidered determination.

(a) HCFA gives the M+C organization or contract applicant written notice of the reconsidered determination.

(b) The notice—

(1) Contains findings with respect to the contract applicant's qualifications to enter into, or the M+C organization's qualifications to remain under, a contract with HCFA under Part C of title XVIII of the Act;

(2) States the specific reasons for the reconsidered determination; and

(3) Informs the M+C organization or contract applicant of its right to a hearing if it is dissatisfied with the determination.

78. In § 422.660, the introductory text is republished and paragraph (a) is revised to read as follows:

### § 422.660  Right to a hearing.

The following parties are entitled to a hearing:

(a) A contract applicant that has been determined in a reconsidered determination to be unqualified to enter into a contract with HCFA under Part C of title XVIII of the Act.

\*    \*    \*    \*    \*

79. In § 422.662, paragraphs (a) and (b) are revised to read as follows:

### § 422.662  Request for hearing.

(a) *Method and place for filing a request.* A request for a hearing must be made in writing and filed by an authorized official of the contract applicant or M+C organization that was the party to the determination under appeal. The request for a hearing must be filed with any HCFA office.

(b) *Time for filing a request.* A request for a hearing must be filed within 15 days after the date of the reconsidered determination.

(Catalog of Federal Domestic Assistance Program No. 93.773, Medicare—Hospital Insurance; and Program No. 93.774, Medicare—Supplementary Medical Insurance Program)

Dated: June 15, 2000.

**Nancy-Ann Min DeParle,**
*Administrator, Health Care Financing Administration.*

Approved: June 16, 2000.

**Donna E. Shalala,**
*Secretary.*

[FR Doc. 00–15648 Filed 6–19–00; 12:00 pm]

**BILLING CODE 4120–01–P**