LATHAM & WATKINS LLP
  David J. Schindler (Bar No. 130490)
  *david.schindler@lw.com*
  Manuel A. Abascal (Bar No. 171301)
  *manny.abascal@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234;
Facsimile: +1.213.891.8763

*Attorneys for United Defendants*

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
ROSS M. CUFF
JACK D. ROSS (CBN 265883)
HUNTER B. THOMSON (CBN 330533)
Assistant United States Attorneys
300 N. Los Angeles Street, Room 7516
Los Angeles, California 90012
Tel: (213) 894-6379; Fax: (213) 894-7819
Email: *hunter.thomson@usdoj.gov*

*Attorneys for the United States of America*

[Additional Counsel Listed on Next Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>Plaintiff,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC. *et al.*,<br><br>Defendants. | CASE NO. 2:16-cv-08697-FMO-PVCx<br><br>**JOINT EVIDENTIARY APPENDIX**<br><br>**VOLUME 8 OF 14**<br>**EXHIBITS D-67 THROUGH D-82**<br>**PAGES 2104 THROUGH 2367**<br><br>Hon. Fernando M. Olguin<br><br>Hearing Date:  September 5, 2024<br>Hearing Time:  10:00 a.m.<br> Courtroom:  6D |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

LATHAM & WATKINS LLP
    Daniel Meron (appearing *pro hac vice*)
     daniel.meron@lw.com
    Abid R. Qureshi (appearing *pro hac vice*)
     abid.qureshi@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

BARTLIT BECK LLP
    Philip S. Beck (appearing *pro hac vice*)
     philip.beck@bartlitbeck.com
    Sean W. Gallagher (appearing *pro hac vice*)
     sean.gallagher@bartlitbeck.com
    Cindy L. Sobel (appearing *pro hac vice*)
     cindy.sobel@bartlitbeck.com
    Nicolas Martinez (appearing *pro hac vice*)
     nicolas.martinez@bartlitbeck.com
    Benjamin R. Montague (appearing *pro hac vice*)
     benjamin.montague@bartlitbeck.com
54 W. Hubbard Street, Suite 300
Chicago, Illinois 60654-8174
Telephone: +1.312.494.4400
Facsimile: +1.312.494.4440

BARTLIT BECK LLP
    Andrew C. Baak (appearing *pro hac vice*)
     andrew.baak@bartlitbeck.com
    Jameson R. Jones (appearing *pro hac vice*)
     jameson.jones@bartlitbeck.com
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202-6318
Telephone: +1.303.592.3100
Facsimile: +1.303.592.3140

*Attorneys for United Defendants*


JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
        Email:  robert.mcauliffe@usdoj.gov
TRINI E. ROSS
United States Attorney

1  DAVID CORIELL
   Assistant United States Attorney
2          138 Delaware Avenue
           Buffalo, New York 14201
3          Tel: (716) 843-5830; Fax: (716) 551-3052
           Email:  david.coriell@usdoj.gov
4
   *Attorneys for the United States of America*
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT D-67**

# What is medical coding?

 aapc.com/resources/what-is-medical-coding



Medical coding is the transformation of healthcare diagnosis, procedures, medical services, and equipment into universal medical alphanumeric codes. The diagnoses and procedure codes are taken from medical record documentation, such as transcription of physician's notes, laboratory and radiologic results, etc. Medical coding professionals help ensure the codes are applied correctly during the medical billing process, which includes abstracting the information from documentation, assigning the appropriate codes, and creating a claim to be paid by insurance carriers.

Medical coding happens every time you see a healthcare provider. The healthcare provider reviews your complaint and medical history, makes an expert assessment of what's wrong and how to treat you, and documents your visit. That documentation is not only the patient's ongoing record, it's how the healthcare provider gets paid.

**Medical coders translate documentation into standardized codes that tell payers the following:**

- Patient's diagnosis

- Medical necessity for treatments, services, or supplies the patient received

- Treatments, services, and supplies provided to the patient

- Any unusual circumstances or medical condition that affected those treatments and services

EXHIBIT
1582
2105

Like a musician who interprets the written music and uses their instrument to produce what's intended, medical coding requires the ability to understand anatomy, physiology, and details of the services, and the rules and regulations of the payers to succeed. Check out our webinar to learn more — <u>Guidelines: The Foundation of Coding</u>.

Medical coding derives from public bills of mortality posted in London in the 18th century. It was through correlating these that doctors determined the cause of a cholera epidemic. It is even more <u>vital now as the data gathered</u> through medical coding is used to improve healthcare overall. The results are submitted to payers for reimbursement, but the data derived from the codes also are used to determine utilization, manage risk, identify resource use, build actuarial tables, and support public health and actions.

Medical coding requires a particular discipline. Medical coders are considered part of the medical team, often working very closely with providers, management, and payers. A scholar, detective, educator, and problem solver, medical coders possess particular skills.

The medical coder and biller process a variety of services and claims on a daily basis. <u>Medical codes</u> must tell the whole story of the patient's encounter with the physician and must be as specific as possible in capturing reimbursement for rendered services. To better understand what a coding transaction looks like, read the article: <u>What does a medical coder do?</u>

The main task of a medical coder is to review clinical statements and assign standard codes using <u>CPT</u>®, <u>ICD-10-CM</u>, and <u>HCPCS Level II</u> classification systems. Medical billers, on the other hand, process and follow up on claims sent to health insurance companies for reimbursement of services rendered by a healthcare provider.

The medical coder and medical biller may be the same person or may work with each other to ensure invoices are paid properly. To help promote a smooth coding and billing process, the coder checks the patient's medical record (i.e., the transcription of the doctor's notes, ordered laboratory tests, requested imaging studies, and other sources) to verify the work that was done. Both work together to avoid insurance payment denials.

## Why is medical coding needed?

The <u>healthcare revenue stream</u> is based on the documentation of what was learned, decided, and performed.

A patient's diagnosis, test results, and treatment must be documented, not only for reimbursement but to <u>guarantee high quality care</u> in future visits. A patient's personal health information follows them through subsequent complaints and treatments, and they must be easily understood. This is especially important considering the hundreds of millions of visits, procedures, and hospitalizations annually in the United States.

2106

The challenge, however, is that there are thousands of conditions, diseases, injuries, and causes of death. There are also thousands of services performed by providers and an equal number of injectable drugs and supplies to be tracked. Medical coding classifies these for easier reporting and tracking. And in healthcare, there are multiple descriptions, acronyms, names, and eponyms for each disease, procedure, and tool. Medical coding standardizes the language and presentation of all these elements so they can be more easily understood, tracked, and modified.

This common language, mandated by the <u>Health Information Portability and Accountability Act (HIPAA)</u>, allows hospitals, providers, and payers to communicate easily and consistently. Nearly all private health information is kept digitally and rests on the codes being assigned.

## Types of codes used

Medical coding is performed all over the world, with most countries using the International Classification of Diseases (ICD). ICD is maintained by the World Health Organization and modified by each member country to serve its needs. In the United States, there are six official HIPAA-mandated code sets serving different needs.

### ICD-10-CM (International Classification of Diseases, 10th Edition, Clinically Modified)

ICD-10-CM includes codes for anything that can make you sick, hurt you, or kill you. The 69,000-code set is made up of codes for conditions and disease, poisons, neoplasms, injuries, causes of injuries, and activities being performed when the injuries were incurred. Codes are "smart codes" of up to seven alphanumeric characters that specifically describe the patient's complaint.

ICD-10-CM is used to establish medical necessity for services and for tracking. It also makes up the foundation of the MS-DRG system below.

### CPT® (Current Procedure Terminology)

This code set, owned and maintained by the American Medical Association, includes more than 8,000 five-character alphanumeric codes describing services provided to patients by physicians, paraprofessionals, therapists, and others. Most outpatient services are reported using the CPT® system. Physicians also use it to report services they perform in inpatient facilities. Here's a little behind the scene on the <u>making of CPT® codes</u>.

### ICD-10-PCS (International Classification of Diseases, 10th Edition, Procedural Coding System)

2107

ICD-10-PCS is a 130,000 alphanumeric code set used by hospitals to describe surgical procedures performed in operating, emergency department, and other settings. Don't let the procedural coding intimidate you by taking the right approach to ICD-10-PCS coding.

## HCPCS Level II (Health Care Procedural Coding System, Level II)

Developed originally for use by Medicare, Medicaid, Blue Cross/Blue Shield, and other providers to report procedures and bill for supplies, HCPCS Level II's 7,000-plus alphanumeric codes are used for many more purposes, such as quality measure tracking, outpatient surgery billing, and academic studies.

## CDT® (Code on Dental Procedures and Nomenclature)

CDT® codes are owned and maintained by the American Dental Association (ADA). The five-character codes start with the letter D and used to be the dental section of HCPCS Level II. Most dental and oral procedures are billed using CDT® codes.

## NDC (National Drug Codes)

The Federal Drug Administration's (FDA) code set is used to track and report all packages of drugs. The 10-13 alphanumeric character smart codes allow providers, suppliers, and federal agencies to identify drugs prescribed, sold, and used.

## Modifiers

CPT® and HCPCS Level II codes use hundreds of alphanumeric two-character modifier codes to add clarity. They may indicate the status of the patient, the part of the body on which a service is being performed, a payment instruction, an occurrence that changed the service the code describes, or a quality element.

## MS-DRG and APC

Two federal code sets used to facilitate payment deriving from those above systems are MS-DRG and APCs. They rely on existing codes sets but indicate the resources consumed by the facility to perform the service.

## MS-DRG (Medical Severity Diagnosis Related Groups)

MS-DRGs are reported by a hospital to be reimbursed for a patient's stay. The MS-DRG is based on the ICD-10-CM and ICD-10-PCS codes reported. They are defined by a particular set of patient attributes which include principal diagnosis, specific secondary diagnoses, procedures, sex, and discharge status. The Centers for Medicare & Medicaid Services (CMS) work with 3M HIS to maintain this data set.

## APC (Ambulatory Payment Categories)

2108

APCs are maintained by the Centers for Medicare & Medicaid Services (CMS) to support the Hospital Outpatient Prospective Payment System (OPPS). Some outpatient services in a hospital, such as minor surgery and other treatments, are reimbursed through this system.

## How is medical coding done?

Medical coding is best performed by trained and certified medical coders. The following example outlines what a typical day in the life of a Medical Coder may look like.

After settling into the office and grabbing a cup of coffee, a medical coder usually begins the workday by reviewing the previous day's batch of patient notes for evaluation and coding. The type of records and notes depends on the clinical setting (outpatient or facility) and may require a certain degree of specialization (Healthcare systems may have individuals who focus on medical specialties while coders who work in smaller, or more general offices, may have a broad range of patients and medical conditions.).

Selecting the top patient note or billing sheet on the stack, the coder begins reviewing the documentation to understand the patient's diagnoses assigned and procedures performed during their visit. Coders also abstract other key information from the documentation, including physician names, dates of procedures, and other information.

Coders rely on ICD-10 and  CPT® code books to begin translating the physician's notes into useful medical codes. An example of basic procedure documentation and subsequently assigned codes can be seen below.

Many cases are simple to code. Individual medical coders develop a detailed understanding of the procedures and commonality of their specific clinic or facility. Coders occasionally encounter a difficult note requiring in-depth research, taking more time to code correctly. Even among the more commonly used codes are significant gray areas open for examination among coders. With very complex or unusual cases, coding guidelines may be confusing to interpret. Experienced coders will rely on their network of peers and professionals to discuss nuances in online forums, networking with specialists they have met at national conferences, or consulting with co-workers to help understand the issue and determine the proper codes. Ongoing training and current coding-related periodicals such as AAPC the Magazine also provide important opportunities to advance understanding and professionalism.

Finally, the coder completes the chart and begins the next patient record. This cycle of reading, note taking, assigning codes, and computer entry repeats with each chart. Most coders will spend the majority of their day sitting at the computer reading notes and using their computer to enter data into a billing system or search for information to clarify the documentation in the notes.

2109

**Here's an example of a case:**

*This is a 40-year-old male with rectal pain, rectal bleeding, and some left-sided lower abdominal pain. The colonoscopy procedure and the risks, not limited to bleeding, perforation, infection, side effects from medication, need for surgery, etc., and were fully explained to the patient. An informed consent was taken.*

**Instrument Used:** CF-Q160.

**Sedation:** Versed 5 mg IV in incremental doses and Demerol 100 mg IV in incremental doses performed by the anesthesia team.

**Extent of Exam:** Up to cecum as identified by ileocecal valve and appendiceal orifice.

**Length of Scope Insertion:** 110 cm.

**Postop Diagnoses/Impression:**

1. Moderate-sized, internal hemorrhoids.
2. Mild diverticulosis.

**Description of Procedure:** With the patient being in the left lateral position, first digital examination of the rectum was done, which was unremarkable. Then, the CF-Q160 was passed through the rectum under direct visualization and advanced all the way to cecum. The cecum was identified by ileocecal valve and appendiceal orifice. There were a couple of tics/diverticula seen on the left side of the colon. A careful look was taken while withdrawing the scope. Retroflex view in the rectum showed moderate-sized internal hemorrhoids.

**Plan:**

1. Anusol-HC suppositories for hemorrhoids.
2. High-fiber diet.
3. If there is no family history, a follow-up colonoscopy in 10 years.

**CPT® Code: 45378**

**ICD-10-CM Codes: K64.8, K57.30**

## How do you become a medical coder?

Successful medical coders know anatomy, physiology, medical procedures, and payer rules and policies. To become a medical coder, you must attend training via a coding-specific training program or college. Afterward, finding a job in the field is easier if you have a professional credential, such as AAPC's.

There are several medical coding certifications available, depending on the area of the revenue cycle you wish to pursue. The baseline for most is the Certified Professional Coder (CPC) , which certifies the coder's ability to work in outpatient settings. Facility coders should pursue the Certified Inpatient Coder (CIC) for inpatient coding and Certified Outpatient Coder (COC) for hospital patients receiving in-and-out services. Here's an

infographic to help you <u>chose the right hospital credential</u>. There are several programs available both for <u>online training on medical coding</u> and physical <u>medical coding training classes</u>.

Today more than 200,000 medical professionals are members of <u>AAPC</u>. AAPC elevates the standards of medical coding by developing training, professional certification, opportunities to <u>network</u> with other related medical professionals and providing a variety of <u>job search</u> and career building opportunities.

Professional coders largely work independently. However, interaction with coding staff, medical billers, physicians, and ancillary office staff is essential. Medical coders are usually placed on tight production schedules and expected to complete a determined number of notes each day or to keep their lag days at a specified timeframe. Lag days are the number of days it takes for the notes to be documented to the actual claims submission date. The prime date is usually between two to five days.

Depending on the clinical setting, internal or external auditors periodically perform audits of the coding and documentation for accuracy and completeness. The results of these coding audits are maintained by the <u>compliance</u> department or the department supervisor and are a significant part of job evaluations.

## How much does a medical coder make in a year?

AAPC-certified medical coders make $60,917 per year on average — 29% more than uncertified health information technicians who earn approximately $47,200 annually. Where you live, what role you play in the revenue cycle, and how much education and credentials you have can influence your pay. Coders who pursue career advancement, earning their Certified Professional Medical Auditor (CPMA), Certified Physician Practice Manager (CPPM), or Certified Documentation Expert Outpatient (CDEO) make average salaries of $71,646 annually, according to <u>AAPC's 2023 Medical Coding Salary Survey</u>.

<u>Charting your career</u> requires curiosity, continuing education, and imagination. Achieving the credential is the <u>beginning of a lifetime</u> of new experiences and knowledge.

2111

**EXHIBIT D-68**

Message

| | |
|---|---|
| **To:** | Cheri.Rice@cms.hhs.gov |
| **CC:** | Johnson, Thad C [/O=UHG-EXCHANGEMAIL/OU=First Administrative Group/cn=Recipients/cn=21ebe185-77aa00ab-85256887-56b2c8]; Schumacher, Daniel J [/O=UHG-EXCHANGEMAIL/OU=First Administrative Group/cn=Recipients/cn=f1aa3511-1c428dc-852567cc-520b3e]; Erickson, Karen L [/O=UHG-EXCHANGEMAIL/OU=First Administrative Group/cn=Recipients/cn=2f9c139c-fe81e069-85256977-61819f]; Jennifer.harlow@cms.hhs.gov |
| **BCC:** | Nelson, Steve H [/O=UHG-EXCHANGEMAIL/OU=First Administrative Group/cn=Recipients/cn=snels59]; Cosgriff, John W [/O=UHG-EXCHANGEMAIL/OU=First Administrative Group/cn=Recipients/cn=46fd8f6b-8eb0d608-8525702f-68fb35] |
| **Subject:** | 2012 Attestation and follow-up from yesterday's meeting |

Cheri,

Thanks for your email, and please let us know if you need any additional information.

Steve

-----Original Message-----
**From:** Rice, Cheri M. (CMS/CM) [Cheri.Rice@cms.hhs.gov]
**Sent:** Friday, May 02, 2014 05:14 PM Central Standard Time
**To:** Nelson, Steve H
**Cc:** Johnson, Thad C; Schumacher, Daniel J; Erickson, Karen L; Harlow, Jennifer A. (CMS/CM)
**Subject:** RE: 2012 Attestation and follow-up from yesterday's meeting

Steve,

Thank you for your email and for our discussion earlier this week.  With respect to your fifth point, I would note that regardless of the effective date of the proposed requirement related to medical record reviews, there are other laws that do impose standards, requirements and responsibilities on MA plans in connection with the federal payments they receive from CMS.  We cannot provide advice to United about the scope of those other laws.  Nor can we provide advice on whether United□s plan course of action and/or purported limits on the scope of its attestation are compliant with such other laws.  Your statement concerning the data submissions that have already been made and United□s plans for future action will be included in our records and we will proceed with our evaluation and use of the risk adjustment data consistent with 42 CFR □ 422.308, □ 422.310, and other applicable law.

Thanks again,

Cheri

**From:** Nelson, Steve H [mailto:steve_nelson@uhc.com]
**Sent:** Wednesday, April 30, 2014 9:55 AM
**To:** Rice, Cheri M. (CMS/CM)
**Cc:** Johnson, Thad C; Schumacher, Daniel J; Erickson, Karen L; Nelson, Steve H
**Subject:** 2012 Attestation and follow-up from yesterday's meeting

Dear Cheri,

I wanted to thank you and your colleagues for taking the time to meet with us yesterday.  We appreciate the time and attention that you and others in CMS leadership have provided on the issue of our 2012 risk adjustment data

EXHIBIT
00324

2113

MAPL000497870

submissions and our annual risk adjustment data certifications. As we mentioned, prior annual certifications have been on paper, and we have thus had the ability to add notes explaining our understanding of the certifications and our ongoing data remediation efforts. This year, however, the certifications are electronic, and there does not appear to be an opportunity to reflect our understanding. The purpose of our meeting yesterday and this email is to explain our understanding of the certifications.

First, as with our past certifications, the 2012 certifications are based on facts reasonably available or made available to us as of the date of the certifications. As we receive additional information, we may be required to modify the data to which the certifications relate.

Second, the certifications use the phrase   best knowledge, information, and belief,   which is based on our ordinary business practices.

Third, the certifications only cover risk adjustment data for 2012 dates of service that were submitted to CMS and not subsequently deleted prior to the date of the certifications.

Fourth, as we have mentioned to you previously, we are engaged in an ongoing review of our risk adjustment processes and submission system. This review has identified areas for improvement and, as a result, we will be deleting all risk adjustment data for 2012 dates of service that we ultimately determine should be deleted consistent with this email.

Fifth, as we discussed yesterday, CMS recently issued a proposed rule that would, if finalized, require MA plans to design any medical record reviews to determine the accuracy of risk adjustment diagnoses associated with those records. During our conversation yesterday and other recent conversations, CMS confirmed to us that these requirements do not apply until the effective date of the rule, and that MA plans are thus not currently required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses. We currently have a process through which we review certain medical records to determine the accuracy of risk adjustment diagnoses and submit appropriate deletes. This process already has resulted in the identification of and, in some instances, the submission of deletes for 2012 dates of service. But based on the proposed rule, including the preamble, and recent conversations with CMS, we suspended that process for 2012 dates of service while we consider whether to make changes. Pursuant to our discussion, however, we will soon submit for deletion those diagnosis codes that have undergone a complete review and that we have therefore identified as appropriate deletes. In the near future, we will determine whether to continue our review process for the diagnosis codes which were still under review at the time we suspended our process. In the meantime, we will not delete these codes.

The certifications that we submit today are made subject to these clarifications. Please let us know if you have any questions. Again, thank you for your time and attention on this matter.

2114

CONFIDENTIAL

MAPL000497871

**EXHIBIT D-69**





Risk Adjustment Team Introductions and Services to M&R

February 12, 2014

**EXHIBIT**

608

2116

# Meeting Agenda

- Introductions / Roles / Areas of Responsibility
  - Paul Barringer (Relationship Office)
    - Kimberly Fadden
  - Jeff Dumcum (Business / Strategy)
    - Patty Brennan
    - Nancy Freeman
    - Ramesh Jayasuriya
  - Tim Trujillo (Operations)
    - Lori Meyer
- Organizational Areas
- Risk Adjustment Overview / 2014 Initiatives: Jeff
- Retrospective Programs:  Patty
- Prospective Programs:  Nancy
- HEDIS:  Jeff / Ramesh
- Medicare Revenue Reconciliation : Lori Meyer



2117

# Relationship Office

## RELATIONSHIP OFFICE

**M&R Provider**
**Business Solutions:**
Kimberly Fadden
Alex Kasyjanski
Paul Kaufman
Chris Sangster
**Physician / Behavioral**:
Ann Swink
**Consumer:**
Katie Croxdale

**Relationship Office Team:**
RO Leader — David Orbuch
Clinical/Affordability – Mureen Allen
Network — Brian Jeffrey
Stars/Quality — Troy Jelinek
Benefit Ops — Steve Gelinske
C&S — Susan Hames
M&R — Paul Barringer
M&V — Perry Sekus
E&I — Katie Valentini

**Optum Support for UnitedHealthcare Shared Services**

| | |
| --- | --- |
| Clinical/ Affordability | • Strategic partners for UnitedHealthcare shared services leaders<br>• Embedded in UnitedHealthcare and aligned at a senior level<br>• Expertise and accountability to drive integrated strategy, coordinate resources and provide support<br>• Ensure tight linkage with Optum Businesses |
| Network | |
| Stars/Quality | |
| Benefit Operations | |

**Optum Support for UnitedHealthcare Business Segments**

| C&S | M&R | M&V | E&I |
| --- | --- | --- | --- |

• Strategic partners: single point of accountability
• Aligned to and "embedded" in E&I, M&R, C&S, M&V to enable Optum/UnitedHealthcare partnership
• Partner with Optum Business Leaders to represent Optum

**Optum Employer Support**

**Large Employer; EGEL; Direct/Stop Loss**

• Aligned to UnitedHealthcare to partner more effectively in large employer segment
• Drive external growth by also serving direct-to-employer

**Client Solutions Group**
• Non-client facing, highly functional personnel with specialized knowledge, established relationships and appropriate up-training and resources
• Track issues, provide trend analysis and identify root cause
• Coordinate and manage reporting to UnitedHealthcare and employer clients



2118

Proprietary and Confidential. Do not distribute.

# Risk Adjustment Organizational Teams - Bird





Proprietary and Confidential. Do not distribute.    4

# Risk Adjustment Organizational Teams - Dumcum





Proprietary and Confidential. Do not distribute.
5

# Risk Adjustment Organizational Teams - Trujillo



Operations
Tim Trujillo

| Katie Baker | Mark VanErt | Lori Meyer | Charles Marshall | Rebecca Martin |
| Chart Ops | Operations General Management /RACCR/RADV | MSP | EDPS | Encounter Operations |



Proprietary and Confidential. Do not distribute.



# Risk Adjustment Overview

Jeff Dumcum

# Optum: The Health Services Partner

*Optum is the leading partner for stakeholders across the complex and dynamic health system.*

One of the largest **health information, technology and consulting** companies in the world

The leader in **population health management** serving the physical, mental and financial needs of both individuals and organizations

The **pharmacy management** leader in service, affordability and clinical quality





Market leaders within a dynamic health services market



2123

Proprietary and Confidential. Do not distribute.

# Optum Services focused on the Payer Value Chain

*The payer value chain serves as a strategic framework to organize ideas and actions in three key areas critical to successfully meeting stakeholder requirements.*

## Payer Value Chain

| Acquisition & Retention | | | Clinical Management | | | Operations & Administration | | |
|---|---|---|---|---|---|---|---|---|
| Sales & Marketing | Benefit Design | Pricing & Underwr. | Network Management | Health Management | Quality Improvement | Claims & Pay Management | Constituent Service | Corporate Admin |

**Acquisition & Retention**

***Grow profitably by retaining members and winning in new markets***

*Acquiring & Retaining Members
Enter New Markets & Geographies
Succeeding on Exchanges
Managing Medical loss Ratio (MLR)
Ensure Compliance*

**Clinical Management**

***Improve medical cost, quality and stakeholder satisfaction***

*Manage Medical Cost Trend
Delivery High Quality Care
Promote Wellness
Meet Quality / STARS / HEDIS Objectives
Ensure Compliance*

**Operations & Administration**

***Drive down administrative costs while ensuring stakeholder satisfaction***

*Operational Efficiency
Payment Accuracy
ICD-10 Optimization
Connectivity of Health Stakeholders
Ensure Compliance*

***Payers are seeing challenges across all aspects***



2124

Proprietary and Confidential. Do not distribute.

# Optum Population Health Management Portfolio

> Optum's **_population health management solution_** addresses quality, risk adjustment and utilization in an integrated manner using a framework that leverages our advanced analytic capabilities to provide a holistic view of a population to provide the right intervention at the right time to drive change in  member and provider behavior across lines of business.

## Risk Adjustment Solution
Assists in the improvement of accuracy and timeliness of risk adjusted revenue reimbursement.
- Data capture, reconciliation and submission services
- Coordinated chart retrieval and abstraction
- Professionals who engage providers in their offices to improve assessment, documentation and gap closure for members
- Individual assessment services with a unique  clinical orientation to improve care management

| Medicare/HCC Program | RAPS & Encounter Submission Services |
| Medicaid/CDPS Program | Exchange HHS/HCC Program |
| Market/Provider Consultation Representatives | Chart Retrieval Abstraction & Management |

## Quality Solution
**Solution** helps to improve  quality ratings through a combination of expert consulting, services and technology that: support:
- Quality gap identification
- Improvement in Medication Adherence
- Member profiles and registries
- Provider profiles and registries
- Facilitate member and provider outreach & engagement activities
- Capture quality data and submits it with certified software

| Stars/HEDIS Gaps in Care | NCQA Certified HEDIS Software |
| Stars Management and Modeling Software | Evidence Based Medicine Gap ID Software |
| CAHPS & HOS Surveys and Improvement | Medical Record Abstraction & Management |

## Integrated Member Support Solution
improves health outcomes, increases member satisfaction, reduces costs and improve retention by:
- Supporting healthy behaviors
- Improving access and setting appointments
- Providing comprehensive HRAs that cover physical, behavioral and environmental assessments
- Providing or partnering in direct care and assessments
- Managing chronic & acute medical, social and behavioral needs
- Medicare, Medicaid, MME, Employer, and Exchange oriented programs

| Special Population Management | Transition Management |
| Complex Care Management | Quality and Risk Assessments (Clinic & Home) |
| Care Coordination & Facilitation | Medication Adherence |

**Optum Consulting**



2125

Proprietary and Confidential. Do not distribute.

10

# Point of View on a Best Practice Framework

*There are five key steps that every Plan must consider when running their Risk/Quality Business, each of these steps plays a factor in achieving your desired results.*

Identify risk, quality, & gaps in care

Member outreach & engagement

Engage providers with actionable intelligence

Capture & submit accurate & compliant data

Manage Financial Performance



Proprietary and Confidential. Do not distribute.

2126

# Population Health Management

*Integrated risk adjustment, clinical gaps & performance reporting identify the right intervention strategy*



- PCP RAF Report
- Group & Provider Summaries
- Disease Prevalence
- HCC Prevalence & Recapture Rates
- Population Metrics
- Member Analytics
- Members With Declining RAF
- Members Without Office Visits
- Medication Adherence
- Healthcare Quality Patient Assessment Form
- Revenue Projections & Financial Management
- Member & Plan Level Revenue Projections
- Program Attribution Analysis
- Restatement of MMR Retroactivity



2127

Proprietary and Confidential. Do not distribute.

# Analytics:  Population Metrics and Characteristics

*Plan and Provider Level Reports That Address Performance Levels and Identify Opportunities for Intervention and Additional Emphasis*





Proprietary and Confidential. Do not distribute.

# Analytics:  Targeted Members & Conditions

*Member Level Reports Identify Specific Members & Conditions in Need of Attention and Outreach and Provide Actionable Tools at the Point of Service*





Proprietary and Confidential. Do not distribute.

2129

14

# Analytics:  Actionable Tools at the Point of Care

*Member and Condition Specific Tools Used at the Point of Care*

| Preventative Screenings to Consider Completing | Reason Suspected | Outcome | Date of Last Screening or Referral | Reason for Exclusion (if applicable) |
|---|---|---|---|---|
| Colorectal Cancer Screening | No claims for fecal occult screening in the last 12 months; sigmoidoscopy in last 5 years; nor colonoscopy in the last 10 years | ☐ Completed<br>☐ Referred<br>☐ Excluded | __/__/__<br>Screening Type:<br>_____ | |
| Specification: Yearly fecal occult blood test (FOBT), or every 5 years flexible sigmoidoscopy, or every 10 years colonoscopy. | | | | |
| Adult Body Mass Index | Recommended for adults 18-74 at each outpatient visit | BMI:_____ | Height(in):_____<br>Weight(lbs):_____ | |
| Specification: Calculate using height & weight to monitor relative body mass over time. BMI = Weight(lbs)x703/Height(in)◆ | | | | |

| Office Visit and Hospitalization History | | |
|---|---|---|
| Last Office Visit:<br>Office Visits in 2013: | Admit Date | Discharge Date |

**Ongoing Assessment and Evaluation**

Instructions: If the suspected condition is being assessed or treated AND IS DOCUMENTED IN THE MEDICAL RECORD, please supply the diagnosis code, the date of service, sign the attestation provided, submit all diagnosis codes.

| Potential Diagnosis | Risk Factors and/or Co-morbid Conditions | Last Reported | Times Reported | Can the Condition be Diagnosed Currently? | DOS | Dx Code |
|---|---|---|---|---|---|---|
| CHF (402.x1, 404.x1, 404.x3, 415.0, 416.x, 417.x, 425.x, 428.x, 429.0, and 429.1) | Previously Coded | 2012 | 13 | ☐ Yes ☐ No | _____ | _____ |
| Diabetes without Complication (250.0x and V58.67) | Previously Coded | 2012 | 12 | ☐ Yes ☐ No | _____ | _____ |
| Disorders of Lipoid Metabolism | Previously Coded | 2012 | 4 | ☐ Yes ☐ No | _____ | _____ |
| Hypertension | Previously Coded | 2012 | 13 | ☐ Yes ☐ No | _____ | _____ |
| Specified Heart Arrhythmias (426.0, 427.0 - 427.32, and 427.81) | Previously Coded | 2012 | 16 | ☐ Yes ☐ No | _____ | _____ |
| Supply Indicating Diagnosis | Member is taking LANTUS INJ 100 U/ML | 2012 | 13 | ☐ Yes ☐ No | _____ | _____ |
| Supply Indicating Diagnosis | Member is taking WARFARIN SODIUM TAB 5 MG | 2012 | 12 | ☐ Yes ☐ No | _____ | _____ |
| Vascular Disease | Previously Coded | 2012 | 1 | ☐ Yes ☐ No | _____ | _____ |

**Managing Chronic Illness**



Proprietary and Confidential. Do not distribute.
15



Retrospective Programs

Patty Brennan

# Retrospective Services

**Chart Review**

**Claims Verification**

**RADV**

**RACCR**

**Appendix**

**Submission (EDPS and RAPS)**

**Hospital Data Capture**



2132



# Standard Chart Review

Patty Brennan

2133

# End-to-End Chart Review Solution

*Optum delivers end-to-end services to identify accurate reimbursements & performance.*



**Retrieval**
- 65,000 provider & facility retrieval locations
- 1.5 million charts retrieved

**Alternate Submission**
- RAPS submission
- EDPS certified systems & submission processes

Suspecting Analytics → Retrieval → Coding → Quality Assurance → Submission → Reporting & Attribution

**Suspecting & Targeting**
- Clinically driven predictive modeling

**Coding / QA**
- Certified coders
- Multipronged approach to QA
  - Review of N&U
  - Benchmarking
  - Interrater reliability

**Reporting & Attribution**
- Average $500 recovery per chart reviewed - certain cohorts much higher
- Comprehensive weekly, monthly & End of Project reporting



2134

# Chart Scoring Example

*Mary is an 85 year old, high-risk diabetic. She has had a number of visits with her PCP (Dr. Smith), and one visit with her rheumatologist (Dr. Jones).*



**Utilizing multiple risk factors in evaluating charts provides better predictability of potential chart values**

**Individual Member and Provider Profiles**

Proprietary and Confidential. Do not distribute.

# Illustration of 2013 Project/2012 Dates of Service Outcomes

**Approach:**

- Member profile created for each unique member

- Clinical analysis of each member profile is grouped into 7 stratified priority groups based on level of risk

- Each priority group includes multiple probability factors in addition to the member's clinical risk factors

**Suspecting Results:**

- Detailed front end analysis **driven by data intelligence** that aligns to Health Plan goals & initiatives

- Enhanced focused on clinical & administrative data ensures **greater accuracy & conversion** of suspected charts to actual diagnosis

| % of Charts | Average Value Per Chart 1 Year DOS | Priority Grouping |
|---|---|---|
| 3% | $714 | 1 |
| 5% | $463 | 2 |
| 9% | $400 | 3 |
| 15% | $330 | 4 |
| 21% | $242 | 5 |
| 27% | $190 | 6 |
| 20% | $57 | 7 |

Chart Score Value



2136

Proprietary and Confidential. Do not distribute.

# 2014 Chart Opportunity Logic

**Members**
- Active members as of Jan 1st of current year
- New enrollees are considered included unless otherwise directed to exclude
- Evidence of a qualifying CMS face to face visit in the prior year

**Providers**
- Primary Care Physicians
- Selected Specialists

**Location**
- Professional Setting

**Group Name**
- Clean up for inopportune settings (pharmacies, sleep center, etc.)
- Qualitative judgment

**Market based**
- Market level provider exclusions due to known contract or network issues
- Collaboration with client network teams

**Charts to pursue**

- Logic applied to remove 'duplicate' charts reviewed in the prior period
- Remaining charts are stratified and prioritized

# 2013 Filtering & Targeting Waterfall

| | |
|---|---:|
| Total membership active as of 1/1/2013 | 2,596,515 |
| Cap members | (530,634) |
| MWOV, or visit at a non-targeted speciality or invalid POS | (436,969) |
| Net members eilgible for Optum coordinated chart review | 1,628,912 |
| | |
| **Available charts** | **3,122,650** |
| | |
| Prioritzation of available charts | |
| (1) | 42,730 |
| (2) | 192,056 |
| (3) | 299,724 |
| (4) | 459,142 |
| (5) | 418,849 |
| (6) | 377,661 |
| (7) | 1,332,488 |
| **Exclusions** | |
| Charts with no new DOS | (499,563) |
| Non targeted due to market exclusions | (31,227) |
| Provider group clean up charts | (48,542) |
| Low value specialities | (202,704) |
| Low value charts | (471,847) |
| Total Exclusions | (1,253,883) |
| | |
| Targeted Charts to Pursue | **1,868,768** |



2138

Proprietary and Confidential. Do not distribute.

# Medical Record Retrieval Process

✓ Provider pull list is generated by the Health Plan or by Optum using our NCQA certified HEDIS engine.

✓ The pull list is reviewed & approved by the Health Plan in advance of contacting physician offices.

✓ Health Plan is informed of historical accounts of Providers Not Participating (PNPs) & works with Healthcare Advocates to determine retrieval strategies.

✓ Providers approved for inclusion in chart review receive letters by mail or direct delivery.

✓ Provider is contacted by phone to schedule an appointment & discuss preferred method & workflow for retrieving medical record data.

✓ Real-time tracking of record request status via Chart Review Portal. Weekly project tracking, meeting, reporting, and issue resolution reporting provided to Health Plan.

**On-site Scanning**      **Fax & Mail** 

**Secure Email**      **EMR Retrieval** 

**Direct to Optum**
**(Provider Submits Electronic Records)**  

Proprietary and Confidential. Do not distribute.

# Handling Provider Resistance

**Approach:**

- Sophisticated management process of identifying Providers Not Participating (PNPs)

- Leverage Healthcare Advocates to engage with providers to resolve issues

- Escalation path defined by Optum & UHC

- Year over year analysis of PNPs & engagement strategies for each Chart Review project period

**Results:**

- Weekly PNP reporting by reason code including days pending to resolution

- Joint Optum|UHC escalation process to resolve provider PNP's

| Provider Not Participating Summary | | |
|---|---|---|
| **PNP Reason Code** | **Site ID Count** | **Total Charts** |
| PNP001: Provider Office Not Responding | 70 | 2304 |
| PNP002: Provider Refused Chart Review | 24 | 1303 |
| PNP007: Requesting Chart Reduction | 1 | 488 |
| PNP009: Requesting Payment | 37 | 368 |
| PNP004: Phone/Address Data Invalid | 39 | 134 |
| PNP016: Requesting Legal Consent | 1 | 96 |
| PNP003: Provider No Longer At Address Given | 8 | 36 |
| PNP012: Provider Data Fails Verification | 6 | 32 |
| PNP010: Member Data Fails Verification | 4 | 8 |
| PNP015: Requesting Member Consent | 2 | 6 |
| PNP013: Refusing Provider Verification | 2 | 2 |
| Grand Total | 194 | 4777 |

| Top PNPs By Medical Group |
|---|
| **PRIMECARE MEDICAL** |
| PNP12: Phone/Address Data Invalid |
| PNP13: No Longer at Address |
| PNP14: Office Not Responding |
| PNP18: Past Due - Provider Unresponsive After Commitment |
| PNP4: Refuses to Participate |
| PNP6: Requests Payment |
| **VALLEY PHYSICIANS** |
| PNP14: Office Not Responding |
| PNP18: Past Due - Provider Unresponsive After Commitment |
| PNP6: Requests Payment |


**OPTUM**™

Proprietary and Confidential. Do not distribute.

# Suite of Reports

1. Weekly client dashboard

   • UHC M&R / C-S Summary
   • Provider group drill down
   • Plan/PBP drill down

2. PNP reporting

3. Provider End of Project reporting



**Report Date: 3/3/2013**
**Contract and PBP Summary**

| Contract # | PBP | Total Completed | Coding Completed |
|---|---|---|---|
| H0151 | 001 | 20,068 | 20,068 |
| H0151 | 015 | 7,752 | 7,752 |

| PNP Code | PNP Reason Code Description | Site ID Count | Total Charts |
|---|---|---|---|
| PNP001 | PNP001: Failed Member Data Verification | 27 | 213 |
| PNP002 | PNP002: Refusing Member Verification | 134 | 4,747 |
| PNP003 | PNP003: Failed Provider Data Verification | 2,181 | 21,707 |
| PNP004 | PNP004: Refuses to Participate | 2,579 | 58,360 |
| PNP005 | PNP005: Refuses Provider Verification | 469 | 2,594 |
| PNP006 | PNP006: Requests Payment | 4,367 | 76,051 |
| PNP007 | PNP007: Requesting Chart Reduction | 207 | 21,976 |
| PNP008 | PNP008: Requests Health Plan Confirmation | 237 | 5,335 |
| PNP009 | PNP009: Requests On-Site Coding | 15 | 601 |
| PNP010 | PNP010: Requires Member Consent | 270 | 2,195 |
| PNP011 | PNP011: Requires Legal Contract | 63 | 1,499 |
| PNP012 | PNP012: Phone/Address Data Invalid | 2,367 | 16,029 |
| PNP013 | PNP013: No Longer at Address | 375 | 2,284 |
| PNP014 | PNP014: Office Not Responding | 5,786 | 74,941 |
| PNP015 | PNP015: Project Scheduling Issues | 182 | 5,196 |
| PNP016 | PNP016: Informed that CR was Cancelled | 3,904 | 99,688 |
| PNP017 | PNP017: Prior Year PNP | 3,539 | 87,311 |
| PNP018 | PNP018: Past Due - Provider Unresponsive After Commitment | 9,907 | 78,907 |
| PNP019 | PNP019: Member's Chart at Different Location | 0 | 0 |
| PNP020 | PNP020: Provider Utilizes Copy Service, Requesting Payment | 0 | 0 |
| PNP021 | PNP021: Provider Not Participating Due to Health Plan Specific Issu | 0 | 0 |
| | **Grand Total** | **36,609** | **559,634** |

**Completed**

| Client | Total Comp |
|---|---|
| UHC M&R | |
| UHC C&S | |
| PSMG Total | |

**Retrieval Pipeline**

**Health Plan and Produ**

| Health Plan | | | |
|---|---|---|---|
| UHG | | | |
| UHG | | | |
| UHG | | | |
| UHG | | | |
| UHG | | | |
| UHG | | | |
| UHG | | | |
| UHG | | | |
| UHG | | | |
| UHG | | | |
| UHG | | | |
| Totals | | | |

| | | | |
|---|---|---|---|
| H0543 | 070 | 86 | 86 |

2141

OPTUM™

# Chart Review Service Level Agreement (SLA)

- The **SLA** is the contracted number of charts Optum is obligated to complete for UHC (M&R | C&S) as part of the service pmpm fee

- Measure period is January sweeps to January sweeps

- Charts completed above and beyond the SLA is incremental (buy-up) and charged @ $30/chart

- M&R and C&S SLA's are derived by taking the September restated membership of the current CY year and running it through a series of specific calculations



2142

# Chart Review Project

## Chart Review Timing & Targeting:



### Drivers of May release

- Necessary runway needed to retrieve and code by sweeps deadline
- Creation and delivery of end of project chart review provider reports
- Early chart entry into claim verification & attestation process
- Coordinate provider chart reviews to minimize provider disruption (attempt chart retrieval for risk adjustment one time per year)



2143

Proprietary and Confidential. Do not distribute.



Claims Verification

Patty Brennan

# Claims Verification Overview

| Reporting | Provide Submission File | Coding QA | CVA Coding | System Matching | Chart Eligibility | Chart Review |
| --- | --- | --- | --- | --- | --- | --- |



**Manage Financial Performance**

- Process of reviewing claims data with corresponding chart review coding results

- Verifies that the indicated medical record properly documents the condition in accordance with CMS guidelines

- Focused on risk mitigation for single source, single instance HCCs which drive payment



2145

# Definition & Methodology of Exclusive HCC

- **Defined as an HCC reported by a single provider for a unique member during the collection period.**

- **Targeting charts that contain only exclusive HCCs allows for:**
  - Review of HCC conditions that drive payment
  - Risk Mitigation in case of RADV

| Reporting Provider | HCC Reported | Exclusive HCC? |
|---|---|---|
| A | HCC 19<br>HCC 80 | NO<br>**YES** |
| B | HCC 21 | **YES** |
| C | HCC 19 | NO |
|  |  |  |



2146

Proprietary and Confidential. Do not distribute.

# Claims Verification – System Matching Overview





2147

Proprietary and Confidential. Do not distribute.



RADV

Patty Brennan

# CMS RADV – What we know?

- 30 MA contracts selected
  - M&R four contracts selected.
  - 201 members sampled within each contract selected
- Extrapolation methodology will be applied for next round of RADV - 2011 Payment Year (2010 dates of service)
  - Fee for service adjuster will be applied

- Multiple medical records can be submitted in support of each member/HCC combination (up to five medical records)
- Attestations will be accepted to address signature/credential issues
- Expanded submission deadline to 16 weeks (previously 12 weeks)
- Medical Record Dispute process



Proprietary and Confidential. Do not distribute.    34

Medical Record
Dispute Process

Reporting and
Financial
Analysis

Prioritization of
Validation
Issues

Coding and
Scoring of
Medical Records

Record
Retrieval

Data Analysis
and Chart Chase

CMS Release
Member
Sample

Case 2:16-cv-08697-FMO-PVC   Document 616-9   Filed 08/06/24   Page 50 of 267
Page ID #:21013

# CMS Targeted RADV Overview



RADV End to End Support

- Dedicated Project Manager
- Extensive Experience with CMS Targeted RADV, OIG "RADV Like" Reviews, CMS National Sample Reviews
- Expedited retrieval process
- Focused on identifying the best medical records for submission to CMS
- Frequent reporting and status



2150





# RADV Workflow

OPTUM™
Proprietary and Confidential. Do not distribute.



RACCR

Patty Brennan

# RACCR Goals

## Goals of RACCR Audits

- Identify and test aberrant coding patterns
- Remove errant codes from claims

- Improve accuracy of data submitted by providers via claims and encounters through education

## Targeted Provider Groups

- Tier 1 (capitated/gainshare providers)

- Groups with over 500 members

- Groups/HCC combinations that are 2 SD from the mean

## Basis for Provider Selection

- Reimbursed on diagnosis code basis

- Large enough for reporting to identify statistically valid patterns

- Greatest likelihood for engagement in improvement efforts



2153

Proprietary and Confidential. Do not distribute.

# Risk Adjustment Coding and Compliance Reviews

## RACCR  Process

| | | |
|---|---|---|
| Analyze prevalence and compare Tier 1 groups to other tier 1 groups | Select outlier provider/HCC combinations | Select a sample of members |
| Review medical records for sampled members | Produce Validation reporting/results to discuss with providers | Coding Training for providers, when necessary |
| Corrective Action Plans (including 100% lookback) | Process Deletes to CMS based on audit results | |



Proprietary and Confidential. Do not distribute.

2154



Prospective Programs

Nancy Freeman

# Program Overview

- Healthcare Quality Patient Assessment Program
  - HQPAF
  - Provider Engagement/Healthcare Advocates
  - Deployment Channels, Provider Compensation, HQPAF Return Management
  - Form Features, History & Enhancements
- Provider Segmentation & Waterfall
- Monthly Program Reporting
- MA-PCPi – Quality Incentive Program



# HQPAF – **Form History**



2008    2010    2012    2013

2157



# HQPAF – **Features**

- Risk & Quality Combined

- Member Specific

- Provider Centric
  - Standardized Forms Across Health Plans
  - Typically One Page to Return
  - Maximize Patient Data
  - Relies on Existing Medical Record
  - Limited to Open Suspects & Gaps

- Distribution Channels Tailored to Group Attributes





Proprietary and Confidential. Do not distribute.

2158

43

# HQPAF – **Form Contents**

- Early Detection of Chronic Illness

- Preventive Medicine Screening

- Ongoing Assessment & Evaluation

- Managing Chronic Illness

- Patient Status Exceptions

- Medical History
  - Care Team, ER & Acute visits
  - Three-Year Condition List
  - High-Risk Medications
  - Medication Adherence
  - Other Prescriptions





Proprietary and Confidential. Do not distribute.

2159

44

# HQPAF – SNP Form

- Care for Older Adults
  - Advanced Care Planning
  - Medication Review
  - Functional Status Review
  - Comprehensive Pain Screening

- Automatically Appears for SNP Member Only

- Production Begins Mid-March





2160
Proprietary and Confidential. Do not distribute.

# 2014 HQPAF Form Enhancements

| | | | |
|---|---|---|---|
| **Depression Screening** | Added to Early Detection of Chronic Illness section | Promotes screening for depression in the primary care setting using readily available formal screening tools | Prompt providers to perform depression screening on all patients |
| **Cognitive Function Screening** | Added to Early Detection of Chronic Illness section | Promotes screening for cognitive impairment, in the primary care setting, using readily available formal screening tools | Prompt providers to perform cognitive function screening on all patients |
| **Morbid Obesity** | Added to Early Detection of Chronic Illness section | In the CMS V22 HCC model, morbid obesity is a risk-adjusting condition. | Asks provider to consider coding morbid obesity when BMI is >40. |
| **Annual Exam** | Added to Office Visits section | Informs provider of the date of the patient's most recent annual exam | Allows providers to easily identify patients who are overdue for an annual exam. |
| **Diabetes Treatment** | New section added within the Medication History | Alignment with STAR measure | Alerts providers if patients who are diabetic, and also have high blood pressure, have not been prescribed, or are not taking, an appropriate medication for either condition. |
| **2014 HEDIS and CMS STAR measures** | Updating patient identification logic, as appropriate, based on changes to HEDIS and STAR measures | | |



2161

Proprietary and Confidential. Do not distribute.

# HQPAF – Provider Segmentation & Waterfall
## 2014 Modeling

### Membership

| | Total | Tier1 Organized & Aligned | Tier 2 High Mbr Density | Tier 3 Low Mbr Density | U/U Unassigned/ Unrendered |
|---|---|---|---|---|---|
| **Total Members[1]** | 2,507,469 | 768,398 | 1,290,080 | 327,178 | 121,813 |
| *% of Total* | 100% | 31% | 51% | 13% | 5% |
| **Membership Carve-outs** | | | | | |
| (1) Provider excluded by client[2] | (717,054) | (663,412) | (50,639) | (3,003) | - |
| *(2) Not engaged/escalated to client[3]* | - | - | - | - | - |
| (3) No PCP association[4] | (209,404) | - | (64,504) | (35,268) | (109,632) |
| (4) Member-level exclusion[5] | (156,883) | (10,499) | (117,494) | (28,891) | - |
| **Total Carve-outs** | (1,083,341) | (673,911) | (232,637) | (67,162) | (109,632) |
| *% Carved-out* | 43% | 88% | 18% | 21% | 90% |
| **Available Members** | 1,424,128 | 94,487 | 1,057,443 | 260,016 | 12,181 |
| *% Available* | 57% | 12% | 82% | 79% | 10% |

### PAF Modeling

| | | Tier1 Organized & Aligned | Tier 2 High Mbr Density | | | Tier 3 Low Mbr Density | | | U/U Unassigned/ Unrendered |
|---|---|---|---|---|---|---|---|---|---|
| *Modeled Activity* | Total | MC | MC | SOPAF | Combined | MC | SOPAF | Combined | |
| **Deployed** | 1,047,779 | 31,181 | 719,061 | 63,447 | 782,508 | 36,402 | 187,212 | 223,614 | 10,476 |
| Deployment Rate | 74% | 33% | 68% | 6% | 74% | 14% | 72% | 86% | 86% |
| **Returned** | 495,507 | 16,838 | 413,460 | 8,248 | 421,708 | 13,469 | 41,187 | 54,655 | 2,305 |
| Return Rate | 47% | 54% | 58% | 13% | 54% | 37% | 22% | 24% | 22% |



Proprietary and Confidential. Do not distribute.

2162

47

# Deployment – Distribution Channels

**Market Consultation**

| | MC Ordered | Insite | OptumPAF | Small Office (SOPAF) |
|---|---|---|---|---|
| | | | | |
| **Targeting** | Typically 50+ member groups | Large collaborative & aligned groups | Technology friendly & paperless FFS groups | 1 to 49 member groups Outlying groups |
| **Deployment** | Annual delivery Secure email, encrypted CD, or paper delivery Face-to-face engagement & training | On-demand access Perpetual deployment Monthly Updates to Suspects & Gaps Download & print Typically face-to-face engagement & training | On-demand access Perpetual deployment Monthly Updates to Suspects & Gaps Download/print options Typically face-to-face engagement & training Tablet or Web completion | Annual delivery Secure email, encrypted CD, or paper delivery Telephonic engagement & training |
| **Submission** | Fax or mail | Fax or mail | Online, fax or mail Monitor & manage submitted forms | Fax or mail |
| **2013 Generated** | 736K (72%) | 27K (3%) | 27K (3%) | 227K (22%) |



2163

Proprietary and Confidential. Do not distribute.

48

# OptumPAF – Data Flow





**PROVIDERS**

2164

# HQPAF – HCA Process

| Provider Targeting & Engagement | HQPAF Generation and Delivery | Deployment & Completion | Processing, Reimbursement & Submission |
|---|---|---|---|

**Targeting**
Typically 50+ groups
90+ Healthcare Advocates
Managing carve-outs
  (traditional ACPs, Tier
  1s, WellMed FL)

**Engagement**
Collaboration with UHN at
  market level
Issue resolution &
  workflow consulting
Year-over-year momentum
Coding & clinical training
Additional reporting
Program support

**Order**
Provider Verification
Membership options
Long form/short form
Member level PDFs for
  EMR attachment

**Production**
Forms generated by
  informatics
Tracking file populated

**Quality Assurance**
Checked by HCA

**Delivery & Verification**
Secure email
Encrypted CD
Paper delivery

**Deployment**
Password delivery
Print & file assistance
EMR attachment
Setup finalized (account
  setup form, signature log,
  etc.)

**Completion**
Patient scheduling (often
  supported by HQSMR)
Form completion
Chart notes attached
Fax or mail submission to
  Optum

**Support**
HCA
Provider Support Line

**Processing**
Scanning & attachment
Risk & quality coding
Provider reimbursement

**Rejected forms**
Rejected in Prep vs
  Rejected in Coding
Provider outreach &
  resolution
Resubmission

**Submission**
HCC data submitted via
  ASM
Quality data prepared for
  pseudo claims
  submission

**Analytics & Reporting**



2165

Proprietary and Confidential. Do not distribute.

# Deployment – Market Consultation Volume YoY



- 2014 Deployment Strategy
  - Early deployment prioritizing based on engagement and volume
  - 2014 initial volumes reduced by blank HQPAF suppression
  - Additional deployments expected in 2014Q3 and Q4



2166

Proprietary and Confidential. Do not distribute.

# Returns – Market Consultation Return Percentage



– 2013 MC return percentage currently 40%, on track to exceed previous years



Proprietary and Confidential. Do not distribute.

# Returns – Market Consultation Volume



- 323K total returned thru 12/31, currently 35% favorable to 2012 project year
  - Significant additional returns expected



# Returns – **Market Consultation Return Trend**

•Early deployments tend to return more consistent volumes each month.

•Returns tend to spike in December regardless of month generated.







# HQPAF – **Variable Reimbursement**

## General
- All requests approved by RVPs using standard form
- Approvals expire at year end and must be reviewed & reapproved

## State Level
- Permits client to set variable rate for a particular market based on the provider state
- Rate change should be set before deployment begins
- Compatible with all deployment channels
- 2012 Performance – No Variable State level rates for UHC M&R

## Group Level
- Permits variable rate for a specific group
- Rate change must be set before deployment
- Currently compatible with PAFs ordered by PVF only
- 2012 Performance
  - 35.8K PAFs generated, 96 orders,  June – November
  - 28% returned outperforms 40% model on average *(see graph for variability)*
  - 7% CNA rate (vs 15% average)



Proprietary and Confidential. Do not distribute.

2170

# HQPAF – **Variable Reimbursement**

## Forms generated
9 States
64% at $100

| State | 100 | 125 | 150 | Total |
|-------|-----|-----|-----|-------|
| AZ | 13,049 | | | 13,049 |
| VA | | 5,643 | | 5,643 |
| NV | 5,055 | | | 5,055 |
| OH | 3,471 | | | 3,471 |
| AL | | 79 | 2,950 | 3,029 |
| TN | | 2,898 | | 2,898 |
| GA | | | 1,234 | 1,234 |
| IN | 1,177 | | | 1,177 |
| NC | 258 | | | 258 |
| Total | 23,010 | 8,620 | 4,184 | 35,814 |
| % | 64% | 24% | 12% | |

## Performance vs Lag Model



PAFs Generated vs Returned by Lag Month - UHC M&R

Legend: PAFs Generated | Percent Returned | Lag Model

X-axis (Lag Period): 3/4 to 4/2, 4/3 to 5/2, 5/3 to 6/1, 6/2 to 7/1, 7/2 to 7/31, 8/1 to 8/30, 8/31 to 9/29, 9/30 to 10/29, 10/30 to 11/28, 11/29 to 12/28, 12/29 to 1/27, 1/28 to 2/27



2171

Proprietary and Confidential. Do not distribute.

56

# HQPAF – **Managing Rejected Forms**

Provider reports available for top rejects:

- D02: Provider signature not included in documentation
- D04: Document is partially or totally ineligible
- D05: Date of service not included in documentation
- D06: No patient name on progress note
- D09: Provider credentials missing from documentation
- D14: Chronic Condition Not Documented
- D27: EMR signature verbiage is invalid for authentication



Proprietary and Confidential. Do not distribute.

# HQPAF – **Managing Rejected Forms**



UHC Reject Reasons

Permanent Reject 0%

Signature Issues 20%

Missing 0%

Coversheet only 44%

Administrative Issues 36%

## Administrative Issues

- Member name and DOS visible on all pages of progress note
- DOS exceeds 60 day run date threshold
- Fax viewing error
- Need all pages of progress note
- EMR authentication issues

## Signature Issues

- Need signature log
- No provider signature
- EMR signature noncompliant



Proprietary and Confidential. Do not distribute.

# HQPAF – **Monthly Reporting**

## 1. Operational Report

– Provides summary of PAF volumes by channel, including point-in-time generated, returned, and returned disposition (CNA, In Process, Coding Complete)

– Includes catalog of all groups with PAFs generated and early warning engagement indicators

## 2. Trend Report

– Monthly trend of PAFs generated and returned by channel

– Includes point-in-time breakdown of returned PAF disposition & reject reasons

## 3. Invoice Support File

– One record per PAF received, including current disposition, provider, group, processing dates, max date of service, and provider reimbursement

## 4. HQSMR

– Summary and member level detail for early detection and HEDIS/Quality screenings using all claims sources (lab & rx where available) and data coded from medical records returned with HQPAFs

– Includes prospective view of screenings needed

– Member-level data published to Health Plan

– Provider version available

## 5. Gap Analysis

– Details gap closures resulting from returned HQPAFs based on coding of attached medical records, including gaps triggered, percentage completed

– Shows by measure gaps triggered as well as percentages completed, referred and closed including validly documented numerator-compliant screenings.

– Recent Enhancements

• Includes additional non-closure reasons (e.g, invalid documentation, numerator specification not met)

• Provider group version of the report is being developed



2174

Proprietary and Confidential. Do not distribute.

# MA-PCPi: Overview

- What is MA-PCPi?

  - Medicare Advantage Primary Care Physician Incentive Program

  - Pay for Performance incentive supporting CMS HEDIS & Star Quality Rating programs

  - Requires a contract amendment; automatically renews

  - Utilizes HQPAF
    - Member specific clinical data
    - Captures Risk Adjustment and Stars data
    - Established submission pathways
    - Rapid reimbursement
    - Permits provider control of member population

  - Unprecedented national collaboration between Optum & UHN to engage providers

  - Scalable – deployed to over 1,100 groups in 2013



Proprietary and Confidential. Do not distribute.

# Stars Measures

## 2013

| | Measure | HEDIS Measure | HEDIS Compliance % Target |
|---|---|---|---|
| 1 | C01 | Breast Cancer Screening | 74% |
| 2 | C02 | Colorectal Cancer Screening | 58% |
| 3 | C03 | Cardiovascular Care - Cholesterol Screening | 85% |
| 4 | C04 | Diabetes Care - Cholesterol Screening | 85% |
| 5 | C05 | Glaucoma Testing | 70% |
| 6 | DMC12 | Access to Primary Care Doctor Visits | 85% |
| 7 | C14 | Osteoporosis Mgt in women w/ fracture | 60% |
| 8 | C15 | Diabetes Care - Eye exam | 64% |
| 9 | C16 | Diabetes Care - Kidney disease monitoring | 85% |
| 10 | C17 | Diabetes Care - Blood sugar controlled | 80% |
| 11 | C18 | Diabetes Care - Cholesterol Controlled | 53% |
| 12 | C20 | Rheumatoid Arthritis Mgt | 78% |

## 2014

| 2013 CMS ID | 2014 CMS ID | HEDIS Measure | HEDIS Compliance Target % |
|---|---|---|---|
| C01 | C01 | Breast Cancer Screening | 74% |
| C02 | C02 | Colorectal Cancer Screening | 58% |
| C03 | C03 | Cardiovascular Care - Cholesterol Screening | 87% |
| C04 | C04 | Diabetes Care - Cholesterol Screening | 85% |
| C05 | C05 | Glaucoma Testing | 70% |
| C10 | C10 | Adult BMI Assessment | 83% |
| C14 | C14 | Osteoporosis Mgt in women w/ fracture | 60% |
| C15 | C15 | Diabetes Care - Eye exam | 64% |
| C16 | C16 | Diabetes Care - Kidney disease monitoring | 85% |
| C20 | C20 | Rheumatoid Arthritis Mgt | 78% |
| D14 | D11 | High Risk Medication | <12% |
| D15 | D12 | Diabetes Treatment | 87% |
| D16 | D13 | Medication Adherence for Diabetes Mediciations | 78% |
| D17 | D14 | Medication Adherence for Hypertension (RAS antagonists) | 79% |
| D18 | D15 | Medication Adherence for Cholesterol (Statins) | 74% |
| C17 | C17 | Diabetes Care - Blood sugar controlled | 80% |
| C18 | C18 | Diabetes Care - Cholesterol Controlled | 53% |



# Incentives

## 2013

| # of MA-PCPi Measures Met | Bonus Amount per Assessed MA-PCPi Customer |
|---|---|
| 12 | $100 |
| 11 | $90 |
| 10 | $80 |
| 9 | $70 |
| 8 | $60 |
| 7 | $50 |
| 6 | $40 |

## 2014

| # of MA-PCPi Measures Met | Bonus Amount per Assessed MA-PCPi Customer | | |
|---|---|---|---|
| | Met Requirements for both C17 and C18 | Met Requirements for either C17 or C18 | Did Not Meet Requirements for either C17 or C18 |
| 17 | $300 | n/a | n/a |
| 16 | $230 | $215 | n/a |
| 15 | $215 | $200 | $185 |
| 14 | $200 | $185 | $175 |
| 13 | $185 | $175 | $130 |
| 12 | $175 | $130 | $120 |
| 11 | $130 | $120 | $110 |
| 10 | $120 | $110 | $100 |
| 9 | $110 | $100 | $90 |
| 8 | $100 | $90 | $80 |
| 7 | $90 | $80 | $70 |
| 6 | $80 | $70 | $60 |

In addition to the inclusion of the pharmacy measures, we will double the payment for achieving 4 Star on the outcomes measures (C17 and C18) and include an additional $10 per assessed customer for each measure where the provider hits the 5 Star stretch goal.

Example, if they hit 12 measures including C17 and C18, they would earn $175 per Assessed Customer. If they hit the stretch goal on 3 measures, we would add an additional $30 for a total of ($175 + ($10 * 3)) = $205 per assessed customer.



62

# Data & Reporting: 2014

MA-PCPi Database

- UHN SharePoint

- Provider Targeting

- HQPAF Weekly Dataset

- HQSMR Monthly Dataset

- Pharmacy Data

Program
Reporting

PCOR
Baseline/Interim
Reporting



Proprietary and Confidential. Do not distribute.

2178

63

# MA-PCPi: Provider Engagement

| | North Carolina | ▾ Select Market | | Color Key: | On Track for 60% completion rate | | Off Track for 60% completion rate | | New deployment | | Point-in-time achieved 6+ measures | | Measure Achieving Target | |

**Top 50 Health Systems by Status**  Count of Health Systems: 25

| Health System Data | | | MaxRunDate | Generated | Returned | CNA+Comp | On Track | HQPAF & Measure Data | | | | | | | | | | | | | | | | UHN/Contract Data | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | ID | Target Mbrs | | | | | | Measures | DMC12 | C01 | C05 | C02 | C20 | C14 | C03 | C17 | C04 | C18 | C15 | C16 | Owner | Type | Mailed | Delivered | Executed | Effective | Baseline |
| Kernodle Clinic Inc | 560520990 | 2,727 | 02/13/13 | 2,839 | 1,839 | 1,766 | 552 | 6 | 100% | 83% | 62% | 46% | 72% | 3% | 8% | 90% | 87% | 73% | 45% | 89% | Deitz, William R | Bilateral | | 07/16/13 | | | 08/06/13 |
| Bethany Medical Center Pa | 561564485 | 940 | 04/08/13 | 879 | 786 | 600 | 253 | 6 | 100% | 70% | 46% | 47% | 89% | 0% | 44% | 88% | 97% | 87% | 38% | 95% | Taft, Deborah D | Bilateral | | 07/02/13 | 09/01/13 | 09/01/13 | 07/26/13 |
| Regional Physicians Llc | 562120765 | 1,217 | 03/28/13 | 874 | 621 | 565 | 214 | 6 | 100% | 79% | 64% | 52% | 75% | 11% | 0% | 84% | 65% | 80% | 62% | 97% | Edgar, Julie D | Bilateral | | 06/25/13 | 10/28/13 | 09/01/13 | 07/17/13 |
| Blue Ridge Cardiology & Int Med | 561907582 | 850 | 02/21/13 | 855 | 587 | 579 | 217 | 5 | 100% | 75% | 56% | 44% | 78% | 43% | 8% | 87% | 78% | 69% | 36% | 87% | Deitz, William R | Bilateral | | 08/20/13 | 08/29/13 | 08/20/13 | 08/06/13 |
| Whitley Lothian Mcgough Cresenzo | 560860057 | 541 | 02/21/13 | 597 | 551 | 537 | 284 | 6 | 100% | 79% | 63% | 41% | 100% | 50% | 4% | 90% | 82% | 75% | 48% | 91% | Hawkins, Marian N | Bilateral | | 09/01/13 | | 09/01/13 | 08/20/13 |
| Raleigh Durham Med Grp Pa | 201582408 | 751 | 03/13/13 | 577 | 316 | 253 | 15 | 7 | 100% | 71% | 62% | 40% | 100% | 100% | 100% | 97% | 83% | 69% | 51% | 91% | Sturdevant, Seth | Bilateral | | 07/17/13 | 09/17/13 | 09/01/13 | 09/02/13 |
| Pardee | 999999035 | 589 | 09/16/13 | 464 | 171 | 136 | 82 | 9 | 100% | 78% | 55% | 26% | 100% | 100% | 100% | 100% | 89% | 78% | 39% | 86% | Hawkins, Charita | Bilateral | | 06/28/13 | | 08/11/13 | 10/17/13 |
| Northwest Medical Partners Pa | 562194655 | 428 | 02/21/13 | 416 | 277 | 211 | 35 | 5 | 100% | 70% | 62% | 49% | 67% | 50% | 20% | 86% | 92% | 76% | 62% | 95% | Hawkins, Marian N | Bilateral | | 07/07/13 | 09/06/13 | 09/01/13 | 08/20/13 |
| Midway Medical Center Pa | 561903161 | 299 | 02/20/13 | 403 | 363 | 304 | 133 | 5 | 100% | 49% | 50% | 37% | 100% | 0% | 33% | 88% | 69% | 58% | 27% | 96% | Jenkins-Clowse, Vicky | Bilateral | | 07/22/13 | | | |
| High Rock Internal Medicine Pa | 562185972 | 305 | 02/21/13 | 327 | 311 | 309 | 171 | 7 | 100% | 87% | 62% | 73% | 43% | 25% | 25% | 83% | 89% | 67% | 56% | 95% | Harmon, Charita | Bilateral | | 07/12/13 | 08/29/13 | 09/01/13 | 08/08/13 |
| Rockingham Internal Med Assoc | 561309131 | 267 | 02/21/13 | 248 | 206 | 194 | 89 | 6 | 100% | 61% | 73% | 56% | 100% | 50% | 73% | 63% | 92% | 61% | 47% | 92% | Edgar, Julie D | Bilateral | | 06/24/13 | 09/16/13 | 08/01/13 | 08/14/13 |
| Internal Medicine Asc/raleigh | 562266181 | 193 | 03/04/13 | 187 | 139 | 130 | 52 | 8 | 100% | 33% | 78% | 58% | 100% | 0% | 100% | 88% | 88% | 50% | 63% | 88% | Edgar, Julie D | Bilateral | | 07/25/13 | 10/28/13 | 09/01/13 | 08/09/13 |
| Piedmont Health Services Inc | 560952737 | 738 | 08/27/13 | 694 | 13 | 1 | (128) | | | | | | | | | | | | | | Edgar, Julie D | Bilateral | | 07/22/13 | 10/28/13 | 10/21/13 | 10/28/13 |
| Uncpa | 999999039 | 3,048 | 07/26/13 | 443 | 27 | 20 | (101) | 11 | 100% | 100% | 71% | 88% | 100% | 100% | 100% | 100% | 100% | 33% | 100% | | Edgar, Julie D | Bilateral | | 09/12/13 | | | |
| Eden Internal Medicine Assoc Pllc | 561208305 | 451 | 07/16/13 | 440 | 10 | 9 | (115) | 11 | 100% | 100% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 0% | Taft, Deborah D | Bilateral | | 07/09/13 | | 09/01/13 | 08/13/13 |
| Bomray | 561976679 | 339 | 02/21/13 | 354 | 172 | 144 | (6) | 6 | 100% | 90% | 33% | 33% | 75% | 50% | 0% | 84% | 95% | 84% | 32% | 100% | Alcott, Sandra B | Bilateral | | 06/27/13 | 09/01/13 | 09/01/13 | 08/06/13 |
| Pleasant Garden Family Practice | 561107828 | 273 | 02/27/13 | 325 | - | - | (136) | | | | | | | | | | | | | | Edgar, Julie D | Bilateral | | 07/15/13 | | | |
| Blue Ridge Family Physicians P | 562280794 | 325 | 05/30/13 | 320 | - | - | (111) | | | | | | | | | | | | | | Edgar, Julie D | Bilateral | | 07/15/13 | | | |
| Rowan Diagnostic Clinic Pa | 999999429 | 297 | 09/16/13 | 298 | 30 | - | (35) | | | | | | | | | | | | | | Harmon, Charita | Bilateral | | 08/02/13 | 09/23/13 | 10/01/13 | 10/29/13 |
| Alpha Medical Clinics Pa | 030428236 | 238 | 03/15/13 | 271 | 50 | 46 | (65) | 9 | 100% | 100% | 20% | 29% | 100% | 100% | 100% | 100% | 100% | 100% | 0% | 0% | Taft, Deborah D | Unilateral | 06/28/13 | | | | |
| Cedar Creek Family Med Pllc | 562197985 | 228 | 02/21/13 | 228 | 67 | 32 | (64) | 8 | 100% | 57% | 63% | 68% | 100% | 0% | 100% | 100% | 100% | 57% | 86% | | Harmon, Charita | Bilateral | | 07/22/13 | 10/17/13 | 09/01/13 | 08/12/13 |
| Angus G Mcinnis Md | 562204846 | 203 | 02/20/13 | 214 | 106 | 79 | (12) | 5 | 100% | 82% | 32% | 46% | 0% | 0% | 0% | 92% | 77% | 62% | 23% | 89% | Edgar, Julie D | Bilateral | | 06/25/13 | 08/01/13 | 08/01/13 | |
| Piedmont Healthcare | 561965983 | 321 | 10/28/13 | 319 | - | - | - | | | | | | | | | | | | | | York, Michele D | Bilateral | | 07/24/13 | 10/16/13 | 11/01/13 | |
| Hma | 999999030 | 306 | 10/16/13 | 289 | - | - | - | | | | | | | | | | | | | | Harmon, Charita | Bilateral | | 07/25/13 | 10/17/13 | | |
| Novant | 999999034 | 9,415 | 10/24/13 | 89 | - | - | - | | | | | | | | | | | | | | Murthy, Mala K | | | | | | |

– Provider status key to prioritization, engagement, performance under the program

– Provider on-track status, measures achieved, and UHN engagement



2179

Proprietary and Confidential. Do not distribute.

# Baseline & Interim Report - Summary

- HQPAF Summary
- Status of total HQPAF activity including
  - Forms Generated
  - Status of Forms Submitted
  - % Completed vs Incentive Threshold
  - Indicators for Diabetic Forms

- Incomplete Forms
- Summary of Stars performance to target for members where HQPAF has not been completed.

- Complete Forms
- Summary of Stars performance for completed HQPAFs. If 60% total completion thresholds met, indicates measures "on track" to meet target.



Proprietary and Confidential. Do not distribute.



# Baseline & Interim Report - Detail

**MA-PCPi Member Detail**

Group ID: 0123456789
Group: Sample Family Practice
Report Run Date: 10/10/13
PAF Activity Refreshed: 10/09/13
Clinical Data Refreshed: 09/11/13

PAF Status: PSE/CNA=Patient Status Exceptions - Can Not Assess
X=Needs Screening / Test
C=Screening Completed. For HbA1c, DM LDL-C, Cardiovascular LDL-C, CBP & DM HTN: Completed w/normal result, or value not available
H=High HbA1c, DM LDL-C, Cardiovascular LDL-C, CBP & DM HTN value
Blank=Not Applicable

| | | | | | | Last Clinical Measure Refresh | HQPAF Activity | | | | | | Measures | | | | | | | Measures - Diabetes | | | |
| PCP Name | Member Name | Member ID | DOB | Phone | Diabetic | | Generated | Returned | Status | Date Rejected | Rejection Reason | Date Completed | Access to Care | Breast Cancer | Glauco ma | Colorect al Cancer | RA/DMA RD | Osteo/B MD or Rx | Cardio LDL | HbA1c | LDL-C | Eye Exam | Nephrop athy |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | | | | | | | | C | X | | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | 9/19/2013 | Completed | | | 09/23/13 | C | | | | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | | | | | | | | X | | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | 7/23/2013 | Completed | | | 08/01/13 | C | | X | C | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | 6/18/2013 | Completed | | | 06/25/13 | C | | | C | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | 6/11/2013 | Completed | | | 06/22/13 | C | C | | C | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | | | | | | | | C | C | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | Y | 09/11/13 | 02/28/13 | 7/23/2013 | Completed | | | 08/01/13 | C | | | X | | | | C | C | X | C |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | 8/30/2013 | Completed | | | 09/05/13 | C | | C | C | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | Y | 09/11/13 | 02/28/13 | 7/23/2013 | Completed | | | 08/01/13 | C | | X | X | | | | C | C | X | C |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | Y | 09/11/13 | 02/28/13 | 6/18/2013 | Completed | | | 06/25/13 | C | C | | C | | | | C | C | C | C |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | | | | | | | | | X | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | | | | | | | X | X | X | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | 6/19/2013 | Completed | | | 06/25/13 | C | | C | X | | | X | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | Y | 09/11/13 | 02/28/13 | 5/23/2013 | Completed | | | 06/13/13 | C | | | C | | | | C | C | X | C |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | 9/19/2013 | Completed | | | 09/23/13 | C | | X | | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | | | | | | | | C | | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | | | | | | | X | X | X | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | 7/25/2013 | Completed | | | 08/04/13 | C | C | C | X | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | 7/25/2013 | Completed | | | 08/04/13 | C | | X | C | | | | | C | X | C |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | Y | 09/11/13 | 02/28/13 | | | | | | | | | X | | | | C | X | C | C |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | | | | | | | X | | X | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | | | | | | | | | X | | | | | | | |
| Sample, Sample MD | Sample, Sample | 123456789 | MM/DD/YY | ###-###-#### | | 09/11/13 | 02/28/13 | 6/19/2013 | Completed | | | 06/25/13 | C | | C | C | | | | | | | |

- Member Identifiers & Contact Info
- Diabetic Status
- HQPAF Activity Data
- Stars Measure Status



Proprietary and Confidential. Do not distribute.

# 2013 Early Indicators – Incentive Estimates



## Accrual Summary

PAF activity thru: 01/08/2014
HQSMR updated thru: 12/13/2013

| | Total | |
| --- | --- | --- |
| | # | % |
| Incentive Accrual ($) - Point-In-Time Model | $ 1,978,270 | |
| Incentive Accrual ($) - End-of-Year Model | $ 2,804,876 | |
| *Projects forms completed at end of measurement period based on current completion rates, holding all other variables constant.* | | |
| Incremental Potential #1 ($) - End-of-Year Model | $ 2,129,614 | |
| *Estimates incremental incentive potential if On-Track HS's close gaps at a higher rate (+2 measures).* | | |
| Incremental Potential #2 ($) - End-of-Year Model | $ 1,352,844 | |
| *Estimates incremental incentive potential if slightly Off-Track HS's shift to On-Track & close gaps at a higher rate (+2 measures).* | | |





# 2013 Early Indicators – HQPAF performance & MA-PCPi



• Data thru 12/18/13



# MA-PCPi 2014 – Changes

1. **Earlier Deployment**
   – Targeting by Tier based on 2013 engagement

2. **New Measures**
   – Remove Access to Care
   – Add BMI
   – Add Rx Measures

3. **New Incentive Model**
   – Higher potential payout
   – More complex tiers to drive provider behavior

4. **Reporting thru PCOR**
   – Client requests integration with PCOR as report delivery engine



2184

Proprietary and Confidential. Do not distribute.

# HQPAF & MA-PCPi 2014 – Opportunities & Challenges

## OPPORTUNITIES

### 1. Growth in Engagement, Volumes, Outcomes

- Enhanced Provider Targeting
- YoY engagement growth at the provider level
- Incentives for quality submission
- Blank PAF suppression
- Earlier SOPAF deployment (17% of M&R mbrs associate with small groups)

### 2. Continued RA & Stars Impact

### 3. Supplemental Submission

- Provider ability to close gaps with submission subsequent to HQPAF

### 4. Full Year MA-PCPi Campaign

## CHALLENGES

1. **Compressed Production/Deployment Calendar**

2. **Enticing Providers to Portals**
   - Insite
   - OptumPAF

3. **PCOR Alignment/Integration**

4. **Provider Data Alignment w/ UHN**
   - Alignment between Contracted Entities (Health Systems) & Point-of-Care Providers



2185

Proprietary and Confidential. Do not distribute.



# HEDIS Programs

Ramesh Jayasuriya

# Clinical Quality – Financial Impact

**Financial performance of payers are increasingly dependent on the ability to accurately measure and improve quality of care**

### Healthcare reform has attached a significant dollar value to quality of care

❖ Increased use of sanctions with stringent corrective action plans
❖ The industry as a whole has transitioned from routine retrospective measurements to real-time data driven issue identification and follow-through to operations
❖ Focus on the member experience when interacting with the health plan, its delegates and its network





### Quality-based bonus payments are increasingly important to operating margins

❖ STARS          ❖ State bonuses

❖ ACO            ❖ PCMH







2187

Proprietary and Confidential. Do not distribute.

# Quality Spending has Grown Dramatically

*Payers have demonstrated a financial commitment to quality, increasing their investment in this area at nearly double the rate of the next closest administrative spend category*



**Growth Rate of Admin Spend**

*Blue Cross Blue Shield Admin Spend Benchmark*
*CAGR of Admin Spend Category from 2005 to 2008*

**PMPM Growth in Admin Spend**

*Blue Cross Blue Shield Admin Spend Benchmark*
*Increase in PMPM Spend from 2005 to 2008*

| Category | % CAGR | $PMPM Growth |
|---|---|---|
| Medical Management & Quality Assurance | 11.5% | $0.63 |
| Enrollment & Billing | 6.1% | $0.13 |
| Advertising & Promotion | 6.0% | $0.10 |
| Rating & Underwriting | 5.5% | $0.05 |
| Corporate / Executive | 5.0% | $0.09 |
| Corporate Services | 4.9% | $0.40 |
| Actuarial | 4.6% | $0.02 |
| Provider Network Management | 4.3% | $0.11 |
| Commissions | 4.3% | $0.55 |
| Claims Adjudication | 3.6% | $0.32 |
| Customer Service | 2.6% | $0.10 |
| Product Development / Research | 2.5% | $0.01 |
| Sales & Marketing (Non-Adv.) | 1.3% | $0.06 |
| Finance & Accounting | -0.1% | $0.00 |

14%    9%    4%    -1%
*% CAGR in PMPM Spend*

($0.05)  $0.15  $0.35  $0.55  $0.75
*$PMPM Growth in Spend*

*Notes: Based on Median PMPM expense level of surveyed BCBS plans from 2005 to 2008.*
*Source: Sherlock SEER Data- 2009; Optum Analysis*



Proprietary and Confidential. Do not distribute.

# Our Solution At-A-Glance

| Best Practices and Thought Leadership | Identify Risk, Quality and Care Gaps |
|---|---|

| Member Outreach and Engagement | Engage Providers with Actionable Information |
|---|---|

| Capture and Submit Accurate and Compliant Data | Manage Financial Performance |
|---|---|

**Best Practices and Thought Leadership**
- Benchmarking and Best Practices Assessments
- Improvement Roadmap Development
- Operations Implementation Assistance – PMs, IT Support, SMEs
- Compliance Reviews and Corrective Action Plan Assistance

**Identify Risk, Quality and Care Gaps**
- Impact Intelligence Suite
- Symmetry and EBM Connect

**Member Outreach and Engagement**
- Care Facilitation – Member/Provider Visit Scheduling
- In Office and In Home Clinical Assessments
- Medication Adherence
- Member Outreach Calls & Care Management
- Satisfaction and Outcome Surveys – CAHPS & HOS

**Engage Providers with Actionable Information**
- Chart Retrieval and Abstraction
- In Office Clinical Assessments and Care Planning
- Provider Performance Reporting
- Market Consultants

**Capture & Submit Accurate and Compliant Data**
- NCQA Certified HEDIS Software System
- NCQA Certified CAHPS

**Manage Financial Performance**
- Quality Enterprise Reporting Tool
- Stars Enterprise Reporting Tool

 **OPTUM™**

 Near term service to UHC

 Current service to UHC

2189

Proprietary and Confidential. Do not distribute.

# HEDIS Medical Record Review

**Key highlights:**

✓  Year 1 of a 2-3 year plan to in-source HEDIS medical record review
✓  In 2014 we will handle about 30% of total volume – about 150k charts between all 3 lines of business
✓  Goal is to offer a high quality internal solution & minimize the reliance on external vendors

**Key Components to Optum's HEDIS solutions**

- Efficient Record Retrieval
- High Quality Abstraction
- Dynamic Reporting and Monitoring
- NCQA Certified  Engine and Reporting Front End
- Best in class team that has ample industry and direct UHC experience

**Key Business Benefits**

- Internal solution that has a proven track record of supporting large projects & maintaining high quality standards
- Minimize the reliance on external vendors
- Working with a trusted and experienced team that is directly impacted by, and committed to, the success of UHC

**UHC/Optum HEDIS MRR Partnership**

✓  Opportunity to insource medical record review for HEDIS within UHG
✓  Rely on trusted HEDIS professionals to carry the burden of HEDIS medical record review
✓  Align QMP & Optum quality goals



2190

Proprietary and Confidential. Do not distribute.

# Award Winning Certified HEDIS Reporting



Gartner Appoints Optum HEDIS Reporting

*"Best in Class*
*Healthcare Payer Dashboards"*

**Gartner.**  *World's leading information technology research and advisory company.*

*Author of the "Magic Quadrant"*

Internal Announcement:  http://inside.optum.com/data/news-articles/optum/payer-market-news/12102013-hedis



2191

# Stars Management Reporting – Intent of Design

To empower the client/user with a "***prospective***" solution that allows them to make informed decisions regarding "***where***" their organization can affect the care, services and satisfaction being received "***today***" by their members/provider in order to achieve their "***goal***(s)" - Evaluate the response to their intervention on those services that will be measured and reimbursed in the future thru the CMS 5 Star Rating program



- Business goals:
  - ➢ Evaluate progression to the plan's goal "are we on track
    - ➢ Where are we strong, where do we have opportunities to improve
  - ➢ Project the impact if the plan's goal were achieved
  - ➢ Drill into identify and priorities area of focus – who to engage
  - ➢ Measure response to intervention
  - ➢ Promote a easy, intuitive and mature reporting solution the analyzes across all Stars domains and measures



2192

Proprietary and Confidential. Do not distribute.



# Medicare Revenue Reconciliation Programs

Lori Meyer

# What we do

The key objective of the MRR Team is to ensure CMS has the most accurate and complete information for special status categories for each member that impact payment.

*Copy and paste this text box to enter notations/source information. 7pt type. Aligned to bottom. No need to move or resize this box.

2194



Proprietary and Confidential. Do not distribute.

79

# MRR Reconciliation Processes

- ## Current Medicaid Status
  - To ensure plan and CMS records are as accurate as possible, the MRR Team identifies Medicaid suspects; verifies the member's eligibility with state data; reconciles the Medicaid and Medicaid Add-On statuses with CMS; submits status adjustments if needed; and tracks until resolved.

- ## MAO (Medicaid Add On)
  - All members with at least one month of Medicaid status in the prior year are identified on an annual basis. This list is compared to the MMR payment dates for the following year. Any member without the expected MAO flag or payment adjustment is sent to CMS for correction and tracked until resolved.

- ## ESRD (End Stage Renal Disease)
  - To ensure plan and CMS records are as accurate as possible, the MRR Team identifies ESRD enrollees; verifies the enrollees' status with Dialysis Facilities or with the Renal Networks; reconciles the ESRD status with the CMS Monthly Membership Report (MMR); submits status adjustment requests; and tracks until resolved.

- ## ESRD MSP (End Stage Renal Disease, Medicare as Secondary Payer)
  - The MRR team identifies ESRD Members with other health insurance that is primary to Medicare and works directly with the Coordination of Benefits Contractor (COBC) to ensure CMS records are accurate.

*Copy and paste this text box to enter notations/source information. 7pt type. Aligned to bottom. No need to move or resize this box.

2195

Proprietary and Confidential. Do not distribute.

80



# MRR Reconciliation Processes

- ## MSP (Medicare as Secondary Payer)

  - To ensure plan and CMS records are as accurate as possible, the MRR Team identifies MSP members;  verifies the members' status with member, employer and/or other insurer;  reconciles the MSP status with the CMS Monthly Membership Report (MMR); submits status adjustment requests;  and tracks until resolved.

- ## Hospice

  - To ensure plan and CMS records are as accurate as possible, the MRR Team identifies hospice members; verifies status with hospice agencies; reconciles the hospice flag with the Daily Transaction Reply Report (DTRR), Monthly Membership Report (MMR), and internal systems; works with agencies to ensure they submit status adjustment requests to CMS timely;  and tracks until resolved.

*Copy and paste this text box to enter notations/source information. 7pt type. Aligned to bottom. No need to move or resize this box.



2196

Proprietary and Confidential. Do not distribute.

81

# Appendix

## Hospital Data Capture

## Submissions



Proprietary and Confidential. Do not distribute.

# Hospital Data Capture Solution Overview

| Hospital Data Capture | CPC retrospective service designed to capture additional member diagnoses codes from hospitals not submitted through the normal claim/encounter process.  Due to both payer and hospital system limitations, some hospital diagnoses may be omitted via the normal claim stream. |
|---|---|





Proprietary and Confidential. Do not distribute.    **83**

# Hospital Data Capture Logic

**Admit population**
- Bill type 111
- Count of unique member inpatient stays

**Client Limitation**
- Determine maximum diagnoses limitation that can be accepted on a payer claim
- Flag all admits that meet maximum diagnoses limit

**Extract Report**
- Create hospital extract report which includes only admits that meet maximum diagnoses level

**Submission**
- Hospitals populate submit report w/a member diagnoses yet data from the hospital HIM system using specific member identifiers (Patient Account Number)
- Hospitals can program and create queries directly pulling from their HIM systems
- Hospitals can also submit member relevance coding submissions

| **2012 Preliminary results** | • 2,466 facilities identified w/an admit to pursue<br>• 1,746 facilities w / a submission to Optum |
|---|---|



# Outreach Timing

| Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|
| • Create hospital admission reports<br>• Review program collateral<br>• Analyze prior year results<br>• Enhance operational reporting<br>• Assess 2013 and 2014 strategy | • UHC review of plan<br>• Segment facilities<br>• Provide list of outreach facilities<br>• Initiate facility outreach | • Process hospital submissions<br>• Track returns vs. plan<br>• Follow up on non-engaged facilities | |



# 2013 Strategy

## Market Opportunity

| | |
|---|---|
| **Health Plan Business Challenge** | • <u>**Hospitals capture and submit to Health Plans between 18 - 24 Dx Codes during an inpatient encounter**</u> when in <u>**fact a patient may have as many as 80 Dx Codes**</u> during the encounter. |
| | • This presents a <u>**gap in the number of Dx Codes being documented**</u> in the Hospital's Health Information System and the <u>**number of codes that are being transmitted to the Health Plan.**</u> |
| | • Health Plans need to <u>**ensure complete and accurate coding**</u> is represented in the risk adjustment data submissions to CMS. |
| **Business Opportunity & Client Value** | • Currently, Optum offers a **Hospital Data Capture** service as part of the retrospective risk adjustment service offering. According to Optum's interpretation of the CMS EPDS guidelines, <u>**CMS will not accept hospital based diagnoses codes submitted as part of Optum's 'current' Hospital Data Capture (HDC**</u>) |
| | • Only 'chart review type' data will be accepted by CMS as part of the EDPS submission. |
| | • In order to maintain customer expectations, <u>**we are evaluating the HDC service under EDPS**</u> |



Proprietary and Confidential. Do not distribute.

# CMS definition of 'chart review type'

**August 2012 CMS Participation Guide:**

### 3.5.7    Chart Reviews

Historically, chart reviews have been performed by MAOs and other entities for the purpose of obtaining diagnosis codes that were either not originally submitted by the provider or were submitted by the provider in error. Based on this information, CMS collects chart review data as a part of the encounter data process. All chart review encounter data must be from an appropriate provider "specialty," from an allowed provider type (inpatient, outpatient, physician), and within 25 months of the data collection period. Further, all diagnoses codes submitted through chart review must be based on a face-to-face visit and supported by a medical record.

Because not all chart reviews are able to be linked back to a previously adjudicated claim in the MAOs adjudication system, CMS allows for MAOs and other entities to submit chart review encounters that are linked to a previously submitted and accepted encounter (linked ICN) and chart review encounters that are not linked to a previously submitted and accepted encounter (unlinked ICN). All chart reviews, whether linked to an ICN or unlinked, must be able to be validated through the medical record.

 The term "chart review" refers to all medical reviews



# 2013 Strategy

- Continue with HDC 'business as usual' as follows:
  - Target 2012 DOS and submit via RAPS to drive CY 2013 payment
  - Evaluate the Optum HDC service in the context of EPDS submission guidelines

- Consider how **Optum's** HDC program will co-exist with **XL Health's** hospital abstract program (Hospital Chart Review)
  - Coordinated approach
  - Identify overlapping facilities & members
  - Information sharing between XL hospital abstract program and Optum HDC program



Proprietary and Confidential. Do not distribute.

**EXHIBIT D-70**



**29** TUESDAY

APRIL, 2014 • 119th Day, 246 Days Left • 18th Week

APPOINTMENTS & SCHEDULED EVENTS          DIARY AND WORK RECORD

Steve
Velen
Don Shoemaker

*[handwritten notes, partially illegible]*
CFO
UHC & Maud
Third person
legal
Unilen

8   0800    No prior notice
9   0900    to confirm
10  1000    accuracy of dx
11  1100
12  1200    Claims re deleted 13K
1   1300    from 2012
2   1400    8k – completed
3   1500    steps – will delete
4   1600    Unilese in process
5   1700    41 K
6   1800    review steps
7   1900    not freund
8   2000

2012 – client review, "stopped" to sign attestates

TO BE DONE TODAY (ACTION LIST)          EXPENSE & REIMBURSEMENT RECORD

Obligation to
Stop review or
tell us about
whatever they found.
"Addidos" – eventually
accuracy
Stop ≠ us,

Imps

EXHIBIT
1062
2205

USBP000548071

**EXHIBIT D-71**

**To:** Burke, Sherry Lynn (HHS/OGC)[Sherry.Lynn.Burke@hhs.gov]; Uebersax, Julie (CMS/CM)[Julie.Uebersax@cms.hhs.gov]; Harlow, Jennifer A. (CMS/CM)[Jennifer.Harlow@cms.hhs.gov]; Paul, Rebecca (CMS/CM)[REBECCA.PAUL@CMS.HHS.GOV]; Chaudhuri, Ilina (CMS/CM)[Ilina.Chaudhuri@cms.hhs.gov]; Nolan, Janet (HHS/OGC)[Janet.Nolan@hhs.gov]; Kornfield, Thomas (CMS/CM)[Thomas.Kornfield@cms.hhs.gov]; Abrams, Jill (HHS/OGC)[Jill.Abrams@HHS.GOV]; Tudor, Cynthia G. (CMS/CM)[cynthia.tudor@cms.hhs.gov]; Cavanaugh, Sean (CMS/CMMI)[Sean.Cavanaugh@cms.hhs.gov]
**From:** Rice, Cheri M. (CMS/CM)
**Sent:** Fri 5/2/2014 10:16:17 PM
**Importance:** Normal
**Subject:** FW: 2012 Attestation and follow-up from yesterday's meeting
**Received:** Fri 5/2/2014 10:16:19 PM


FYI

---

**From:** Rice, Cheri M. (CMS/CM)
**Sent:** Friday, May 02, 2014 6:15 PM
**To:** 'Nelson, Steve H'
**Cc:** Johnson, Thad C; Schumacher, Daniel J; Erickson, Karen L; Harlow, Jennifer A. (CMS/CM)
**Subject:** RE: 2012 Attestation and follow-up from yesterday's meeting


Steve,

Thank you for your email and for our discussion earlier this week.  With respect to your fifth point, I would note that regardless of the effective date of the proposed requirement related to medical record reviews, there are other laws that do impose standards, requirements and responsibilities on MA plans in connection with the federal payments they receive from CMS.  We cannot provide advice to United about the scope of those other laws.  Nor can we provide advice on whether United's plan course of action and/or purported limits on the scope of its attestation are compliant with such other laws.  Your statement concerning the data submissions that have already been made and United's plans for future action will be included in our records and we will proceed with our evaluation and use of the risk adjustment data consistent with 42 CFR § 422.308, § 422.310, and other applicable law.


Thanks again,


Cheri

---

**From:** Nelson, Steve H [mailto:steve_nelson@uhc.com]
**Sent:** Wednesday, April 30, 2014 9:55 AM
**To:** Rice, Cheri M. (CMS/CM)
**Cc:** Johnson, Thad C; Schumacher, Daniel J; Erickson, Karen L; Nelson, Steve H
**Subject:** 2012 Attestation and follow-up from yesterday's meeting


Dear Cheri,

I wanted to thank you and your colleagues for taking the time to meet with us yesterday.  We appreciate the time and attention that you and others in CMS leadership have provided on the issue of our 2012 risk adjustment data submissions and our annual risk adjustment data certifications.  As we mentioned, prior annual certifications have been on paper, and we have thus had the ability to add notes explaining our understanding of the certifications and our ongoing data remediation efforts.  This year, however, the certifications are electronic, and there does not appear to be an opportunity to reflect our understanding.  The purpose of our meeting yesterday and this email is to explain our understanding of the certifications.

First, as with our past certifications, the 2012 certifications are based on facts reasonably available or made available to us as of the date of the certifications.  As we receive additional information, we may be required to modify the data to which the certifications relate.

Second, the certifications use the phrase "best knowledge, information, and belief," which is based on our practices.

Third, the certifications only cover risk adjustment data for 2012 dates of service that were submitted to CM[S] subsequently deleted prior to the date of the certifications.



EXHIBIT

1063

2207

USBP000197069

Fourth, as we have mentioned to you previously, we are engaged in an ongoing review of our risk adjustment processes and submission system. This review has identified areas for improvement and, as a result, we will be deleting all risk adjustment data for 2012 dates of service that we ultimately determine should be deleted consistent with this email.

Fifth, as we discussed yesterday, CMS recently issued a proposed rule that would, if finalized, require MA plans to design any medical record reviews to determine the accuracy of risk adjustment diagnoses associated with those records. During our conversation yesterday and other recent conversations, CMS confirmed to us that these requirements do not apply until the effective date of the rule, and that MA plans are thus not currently required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses. We currently have a process through which we review certain medical records to determine the accuracy of risk adjustment diagnoses and submit appropriate deletes. This process already has resulted in the identification of and, in some instances, the submission of deletes for 2012 dates of service. But based on the proposed rule, including the preamble, and recent conversations with CMS, we suspended that process for 2012 dates of service while we consider whether to make changes. Pursuant to our discussion, however, we will soon submit for deletion those diagnosis codes that have undergone a complete review and that we have therefore identified as appropriate deletes. In the near future, we will determine whether to continue our review process for the diagnosis codes which were still under review at the time we suspended our process. In the meantime, we will not delete these codes.

The certifications that we submit today are made subject to these clarifications. Please let us know if you have any questions. Again, thank you for your time and attention on this matter.

This e-mail, including attachments, may include confidential and/or proprietary information, and may be used only by the person or entity to which it is addressed. If the reader of this e-mail is not the intended recipient or his or her authorized agent, the reader is hereby notified that any dissemination, distribution or copying of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender by replying to this message and delete this e-mail immediately.

2208

USBP000197070

**EXHIBIT D-72**

Message

| | |
|---|---|
| **From:** | Rice, Cheri M. (CMS/CM) [/O=HHS EES/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=CHERI.RICE.CMS59728027] |
| **Sent:** | 10/26/2015 4:05:26 PM |
| **To:** | Cavanaugh, Sean (CMS/CM) [/O=HHS EES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Sean.Cavanaugh.CMS]; Harlow, Jennifer A. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=jennifer.harlow.cms20728073] |
| **CC:** | Tudor, Cynthia G. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=cynthia.tudor.cms06246732] |
| **Subject:** | RE: RADV |

Another thought is getting more help supporting DOJ whistleblower activity.   The volume of these cases is increasing and they often need significant technical assistance from MPPG to evaluate whether to intervene and to support cases they choose to prosecute. We think the whistleblower activity could be as effective – or even more effective – than CMS audits in getting plans to do more to prevent and identify risk adjustment overpayments.

**From:** Rice, Cheri M. (CMS/CM)
**Sent:** Monday, October 26, 2015 12:01 PM
**To:** Cavanaugh, Sean (CMS/CM); Harlow, Jennifer A. (CMS/CM)
**Cc:** Tudor, Cynthia G. (CMS/CM)
**Subject:** RE: RADV

Our regs say that plans must use reasonable diligence to identify overpayments.  We have not yet defined what that means.

We could, through regulation, define specific steps a plan must take, at a minimum, to meet that requirement.  For example, we could require them to self-audit (i.e., their own RADV audits).  We could also revive the NPRM proposal we had that if a plan is checking a medical record for underpayments, they must also look for overpayments.

On the attestation language, we are working now to tighten it up.  But without a reg change (as described above), we are limited in how high we set the bar.

We're developing contract-specific coding adjustor options, but those don't address diagnosis error.

**From:** Cavanaugh, Sean (CMS/CM)
**Sent:** Monday, October 26, 2015 11:36 AM
**To:** Rice, Cheri M. (CMS/CM); Harlow, Jennifer A. (CMS/CM)
**Cc:** Tudor, Cynthia G. (CMS/CM)
**Subject:** RADV

What would a list of proposals to strengthen RADV include?
1. Stronger attestation language.
2. Limitations around home visits.
3. Anything else?

Sean Cavanaugh
Center for Medicare
202-690-6301|sean.cavanaugh@cms.hhs.gov

**EXHIBIT**
1067
~~2210~~

USBP001891973

**EXHIBIT D-73**

DRAFT

## EXECUTIVE SUMMARY
### [Please see body of report.]

**BACKGROUND**

The Balanced Budget Act of 1997, P.L. No. 105-33, established Medicare Part C to offer beneficiaries managed care options through the Medicare+Choice program. Section 201 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, P.L. No. 108-173, revised Medicare Part C and renamed the program the Medicare Advantage (MA) program. Organizations that participate in the MA program (MA organizations) include health maintenance organizations, preferred provider organizations, provider-sponsored organizations, and private fee-for-service plans.

Section 1853(a)(3) of the Social Security Act requires that the Secretary of Health and Human Services adjust payments to MA organizations based on the health status of beneficiaries. As a result, the Centers for Medicare and Medicaid Services (CMS) pays MA organizations less for beneficiaries who are expected to incur lower health care costs and more for beneficiaries who are expected to incur higher health care costs.

Pursuant to 42 CFR § 422.310(b): "Each MA organization must submit to CMS (in accordance with CMS instructions) the data necessary to characterize the context and purposes of each service provided to a Medicare enrollee by a provider, supplier, physician, or other practitioner. CMS may also collect data necessary to characterize the functional limitations of enrollees of each MA organization." The *2007 Risk Adjustment Data Training For Medicare Advantage Organizations Participant Guide* (the Participant Guide) section 8.7.3, states that "MA organizations are responsible for the accuracy of the data submitted to CMS." These data are commonly known as risk adjustment data. Among other information, risk adjustment data include beneficiaries' diagnoses.

CMS calculates risk-adjusted payments to MA organizations using the CMS Hierarchical Condition Category model (the model). Under the model, MA organizations collect beneficiary diagnoses from hospital inpatient facilities, hospital outpatient facilities, and physicians during a data collection period. MA organizations review the data, identify diagnoses relevant to the model, and submit the relevant diagnoses to CMS. CMS categorizes these diagnoses into groups of clinically related diseases called Hierarchical Condition Categories (HCC). CMS uses these HCCs and demographic characteristics to calculate a risk score for each MA organization beneficiary. Beneficiaries' risk scores are used to adjust the monthly capitation payments that CMS makes to MA organizations.

PacifiCare of Texas (PacifiCare), an indirect, wholly owned subsidiary of UnitedHealth Group located in Cypress, California, is an MA organization. For calendar year (CY) 2007, PacifiCare had multiple contracts with CMS, including contract number H4590, which we refer to in this report as "the contract." Under the contract, CMS paid PacifiCare approximately $1.3 billion to administer health care plans for approximately 118,000 beneficiaries.

[ PAGE ]

EXHIBIT

1133-2

2212

**DRAFT**

**OBJECTIVE**

Our objective was to determine whether the risk adjustment data that PacifiCare submitted to CMS complied with requirements set forth in the Participant Guide.

**SUMMARY OF FINDINGS**

The risk adjustment data that PacifiCare submitted to CMS did not always comply with requirements set forth in the Participant Guide. As a result, PacifiCare did not always receive accurate payments from CMS. Risk scores calculated using the diagnosis codes for 56 of the 100 beneficiaries in our sample were valid. The risk scores for the remaining beneficiaries were invalid because each of the 44 beneficiaries had at least 1 HCC that was not supported by documentation. Based on our sample results, we estimated that PacifiCare was overpaid at least $88,546,120.

PacifiCare did not have written policies and procedures in place for obtaining, processing, and submitting risk adjustment data to CMS. Furthermore PacifiCare's quality assurance practices focused primarily on ensuring that all relevant risk adjustment data were submitted to CMS rather than ensuring that the data it submitted were accurate. Contrary to CMS requirements, UnitedHealth Group officials stated that providers are responsible for the accuracy of risk adjustment data that PacifiCare submitted to CMS.

**RECOMMENDATIONS**

We recommend that PacifiCare:

- refund to the Medicare program $88,546,120 in overpayments;

- implement formal policies and procedures for obtaining, processing, and submitting risk adjustment data; and

- create a more robust chart validation process by periodically selecting a random sample of all providers and using this data to ensure that PacifiCare is in compliance with the requirements set forth in the Participant Guide.

[ PAGE ]

2213

CONFIDENTIAL

**DRAFT**

**TABLE OF CONTENTS**

                                                                                  **Page**

**INTRODUCTION** ...................................................................................................1

    BACKGROUND ...................................................................................................1
        Medicare Advantage Program ....................................................................1
        The Risk Adjustment Process .....................................................................1
        Risk Adjustment Data Requirements...........................................................2
        PacifiCare of Texas.....................................................................................2

    OBJECTIVE, SCOPE, AND METHODOLOGY ...........................................2
        Objective......................................................................................................2
        Scope............................................................................................................2
        Methodology ................................................................................................3

**FINDINGS AND RECOMMENDATIONS** ...........................................................4

    RISK ADJUSTMENT DATA VALIDATION REQUIREMENTS ................5
        Diagnosis Coding ........................................................................................5
        Medical Record Documentation ..................................................................6

    UNSUPPORTED HIERARCHICAL CONDITION CATEGORIES ..............6
        Unsupported Diagnosis Coding ...................................................................6
        Missing Signatures and Credentials.............................................................7
        Unconfirmed Diagnoses...............................................................................7
        No Face-to-Face Visits ................................................................................7

    CAUSES OF OVERPAYMENTS ...................................................................8
        No Written Policies and Procedures ............................................................8
        Insufficient Practices...................................................................................8

    ESTIMATE OF UNALLOWABLE PAYMENTS ...........................................9

    RECOMMENDATIONS ...................................................................................9

**APPENDIXES**

    A:  SAMPLE RISK-ADJUSTED PAYMENTS TO PACIFICARE, ACTUAL
        AMOUNTS OWED, AND OVERPAYMENTS/UNDERPAYMENTS

    B:  SAMPLE DESIGN AND METHODOLOGY

    C:  SAMPLE RESULTS AND ESTIMATES

[ PAGE ]

2214

**DRAFT**

D:  REASONS FOR INVALID SAMPLES

[ PAGE ]

2215

USBP067856802

DRAFT

## INTRODUCTION

**BACKGROUND**

**Medicare Advantage Program**

The Balanced Budget Act of 1997, P.L. No. 105-33, established Medicare Part C to offer beneficiaries managed care options through the Medicare+Choice program.  Section 201 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, P.L. No. 108-173, revised Medicare Part C and renamed the program the Medicare Advantage (MA) program.  Organizations that participate in the MA program (MA organizations) include health maintenance organizations, preferred provider organizations, provider-sponsored organizations, and private fee-for-service plans. -The Centers for Medicare & Medicaid Services (CMS), which administers the Medicare program, makes monthly capitation payments to MA organizations for services provided to beneficiaries enrolled in the organizations' plans.

Section 1853(a)(3) of the Social Security Act requires that the Secretary of the Department of Health and Human Services adjust payments to MA organizations based on the health status of beneficiaries.  As a result, the Centers for Medicare and Medicaid Services (CMS) pays MA organizations less for beneficiaries who are expected to incur lower health care costs and more for beneficiaries who are expected to incur higher health care costs.

Pursuant to 42 CFR § 422.310(b), "Each MA organization must submit to CMS (in accordance with CMS instructions) the data necessary to characterize the context and purposes of each service provided to a Medicare enrollee by a provider, supplier, physician, or other practitioner. CMS may also collect data necessary to characterize the functional limitations of enrollees of each MA organization."  The *2007 Risk Adjustment Data Training For Medicare Advantage Organizations Participant Guide* (the Participant Guide), section 8.7.3, states that "MA organizations are responsible for the accuracy of the data submitted to CMS."  These data are commonly known as risk adjustment data.  Among other information, risk adjustment data include beneficiaries' diagnoses.[1]

**The Risk Adjustment ProcessRisk-Adjusted Payments**

Pursuant to section 1853(a)(3) of the Social Security Act, CMS is required to adjust payments to MA organizations based on the health status of each beneficiary.  In calendar year 2004, CMS implemented the calculates risk-adjusted payments to MA organizations using the CMS Hierarchical Condition Category model (the model) to calculate these risk-adjusted payments.

Under the model, MA organizations collect risk adjustment data, including beneficiary diagnoses, from hospital inpatient facilities, hospital outpatient facilities, and physicians during a

---

[1] Risk adjustment data also includes the following information: health insurance claim number, provider type, and service from and through dates.

[ PAGE ]

2216

USBP067856803

DRAFT

data collection period.[2]  MA organizations review the data, identify diagnoses relevant to the model, and submit the relevant diagnoses to CMS.  CMS categorizes these diagnoses into groups of clinically related diseases called Hierarchical Condition Categories (HCC).  CMS uses HCCs and demographic characteristics to calculate a risk score for each MA organization beneficiary.  CMS then uses the risk scores to adjust the monthly capitation payments ~~that it makes~~ to MA organizations for the next payment period.[3]

**Risk Adjustment Data Requirements**

CMS's *2007 Risk Adjustment Data Training for Medicare Advantage Organizations Participant Guide* (the Participant Guide)~~In the Participant Guide, CMS~~ established ~~guidelines~~ requirements for valid risk adjustment data.  Diagnoses included in risk adjustment data must be "based on clinical medical record documentation from a face-to-face encounter, coded according to the *ICD-9-CM [International Classification of Disease, 9th Revision, Clinical Modification] Guidelines for Coding and Reporting*, assigned based on dates of service within the data collection period, and submitted to the MA organization from an appropriate risk adjustment provider type and an appropriate risk adjustment physician data source."[4]  The Participant Guide ~~addresses~~ sets forth requirements for both hospital inpatient documentation and hospital outpatient and physician documentation~~, including such issues as requirements for physician signatures and credentials and the allowability of unconfirmed diagnoses.  The Participant Guide also specifies unacceptable sources of medical records (such as medical records from skilled nursing facilities and freestanding ambulatory surgical centers) and unacceptable types of medical record documentation (such as physician-signed attestations and uninterpreted diagnostic reports).~~

CMS ~~engages in~~conducts an annual risk adjustment data validation ~~process~~in which it verifies that ~~the~~ diagnosis codes that submitted by MA organizations ~~submit to CMS~~ are supported by beneficiaries' medical record documentation.  The purpose of risk adjustment data validation is to ensure payment integrity and accuracy.

**PacifiCare of Texas**

PacifiCare of Texas (PacifiCare~~,~~) is an MA organization ~~an indirect wholly~~owned ~~subsidiary of~~by UnitedHealth Group ~~located in Cypress, California, is an MA organization~~.  For CY 2007, PacifiCare had multiple contracts with CMS, including contract number H4590, which we refer to in this report as "the contract."  Under the contract, CMS paid PacifiCare approximately $1.3 billion to administer health care plans for approximately 118,000 beneficiaries.

---

[2] Risk adjustment data also includes ~~the following information:~~ the health insurance claim number, provider type, and service from and through dates.

[3] For example, CMS used diagnoses that MA organizations submitted for the calendar year (CY) 2006 data collection period to determine payments for the CY 2007 payment period.

[4] ~~The risk adjustment data that MA organizations submit to CMS are required to be supported by medical record documentation.  MA organizations should take steps to ensure that they have, or have access to, this documentation.~~

[ PAGE ]

2217

Formatted: Font: Not Italic

**DRAFT**

**OBJECTIVE, SCOPE, AND METHODOLOGY**

**Objective**

Our objective was to determine whether the ~~risk adjustment data~~diagnoses that PacifiCare submitted to CMS for use in CMS's risk score calculations complied with ~~the~~ requirements ~~set forth in~~of the Participant Guide.

**Scope**

Our review covered $827 million of CY 2007 MA payments that CMS made to PacifiCare on behalf of 62,987 beneficiaries. These payments were based on risk adjustment data that PacifiCare submitted to CMS for CY 2006 dates of service for beneficiaries who (1) were continuously enrolled under the contract during all of CY 2006 and January of CY 2007[5] and (2) had a risk score that was based on at least one HCC. We limited ~~Our objective did not require us to~~our review of PacifiCare's ~~overall~~internal control structure to controls over the collection, processing, and submission of risk adjustment data.

~~We~~ Consistent with CMS's risk adjustment data validation process, we did not request all medical records associated with a beneficiary. Instead, we limited our request to the portion of the sampled beneficiary's medical record associated with an encounter that, in PacifiCare's judgment, best supported the ~~risk adjustment data~~HCCs that ~~it submitted to~~ CMS used to calculate risk scores. ~~During our fieldwork, we allowed PacifiCare two opportunities to provide supporting medical record documentation.  For the purpose of this report, w~~We refer to ~~this medical record documentation~~ that portion of the medical record as "documentation."

~~We did not validate the demographic components of the risk scores.~~

We performed our fieldwork at UnitedHealth Group in Minnetonka, Minnesota, and at CMS in Baltimore, Maryland, from October 2008 through December 2009.

**Methodology**

To accomplish our objective, we did the following:

- We reviewed applicable Federal laws, regulations, and guidance regarding payments to MA organizations.

- We interviewed CMS officials to obtain an understanding of the model.

- We obtained the services of a medical review contractor to determine whether the documentation that PacifiCare submitted supported the HCCs in our sample.

---

[5] We limited our sampling frame to continuously enrolled beneficiaries to ensure that PacifiCare was responsible for submitting the risk adjustment data that resulted in the risk scores ~~subject to~~covered by our review.

[ PAGE ]

2218

**DRAFT**

- We interviewed UnitedHealth Group officials to gain an understanding of PacifiCare's internal controls for obtaining risk adjustment data from providers, processing the data, and submitting the data to CMS.

- We obtained enrollment data, CY 2007 beneficiary risk score data, and CY 2006 risk adjustment data from CMS.

- We and identified 62,987 beneficiaries associated with the $827 million in our review. These beneficiaries who (1) were continuously enrolled under the contract during all of CY 2006 and January of CY 2007[6] and (2) had a risk score that included was based on at least one HCC.

- We selected a simple random sample of 100 beneficiaries with 214 HCCs. (See Appendix B A for more information about our sample design and methodology.) For each sampled beneficiary, we:

  - o We analyzed the CY 2007 beneficiary risk score data to identify the HCC(s) that CMS assigned to each beneficiary in our sample.

  - o We analyzed the CY 2006 risk adjustment data to identify the diagnoses that PacifiCare submitted to CMS and that were associated with the sampled beneficiaries's HCC(s).

  - o For the sampled beneficiaries, we requested that PacifiCare provide us with documentation associated with an encounter that, in PacifiCare's judgment, best supported the risk adjustment data that it submitted to CMS HCC(s) that CMS used to calculate the beneficiary's risk score,[7] and

  - o obtained PacifiCare's certification that the documentation provided represented "the one best medical record to support the HCC."

- We then submitted the PacifiCare's documentation and a list of the beneficiaries' HCCs to our medical review contractor for a first round of medical review.

- For HCCs that were determined to be unsupported during the first round of medical review, we requested additional documentation from PacifiCare and submitted the documentation provided to our medical review contractor for a second round of medical review.

- For the sampled beneficiaries, we evaluated the final medical review results to determine the impact of (1) unsupported HCCs on the beneficiaries' risk scores and (2) incorrect

---

[6] We limited our sampling frame to continuously enrolled beneficiaries to ensure that PacifiCare was responsible for submitting the risk adjustment data that resulted in the risk scores subject to our review.

[7] PacifiCare certified that the medical records provided represented "the one best medical record to support the HCC."

[ PAGE ]

2219

CONFIDENTIAL                    USBP067856806

DRAFT

~~risk scores on CY 2007 payments.  For the sampled beneficiaries that we determined to have unsupported or incorrect risk scores, we calculated (1) the beneficiaries' new risk scores based on the medical review, (2) the total payments made on behalf of these beneficiaries for CY2007 using the adjusted risk scores, and (3) the overpayments/underpayments, which are based on the difference between the old and new risk scores.~~**[Although the language you suggested is more detailed, we believe it is too imprecise.  As indicated, we recommend reverting to the more general language included in the prior version.  If you disagree, let's discuss.]**

- We estimated the total ~~amount~~ value of overpayments based on our sample results.  (See Appendix ~~C~~B for our sample results and estimates.)

We conducted this performance audit in accordance with generally accepted government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective.

## FINDINGS AND RECOMMENDATIONS

The ~~risk adjustment data~~diagnoses that PacifiCare submitted to CMS for use in CMS's risk score calculations did not always comply with the requirements ~~set forth in~~of the Participant Guide.  ~~The~~ As a result, PacifiCare did not always receive accurate payments from CMS.  ~~R~~risk scores calculated using the diagnosis ~~codes~~es that PacifiCare submitted for 56 of the 100 beneficiaries in our sample were valid.  The risk scores for the remaining 44 beneficiaries were invalid because the diagnoses that PacifiCare submitted were not supported ~~because each of the 44 beneficiaries had at least one HCC that was not supported by documentation.  In total, 214 HCCs were included in the risk scores of the 100 sampled beneficiaries.  Sixty-two of those HCCs were not supported.  Based on our sample results, we estimated that PacifiCare was overpaid at least $88,546,120.~~

~~Each of the 62 unsupported HCCs identified in our review was determined to be unsupported~~ for one or more of the following reasons.[8]

- The documentation did not support the associated diagnosis. ~~that would have supported the HCC.~~
- The documentation did not include **an appropriate [Was our issue whether the signature and credentials were appropriate, or was it that they were missing?  If the latter, we suggest changing "an" to "a" and deleting "appropriate."]** provider **[physician?]** signature and credentials.

- The diagnosis ~~submitted to CMS~~ was ~~unacceptable for risk adjustment purposes~~unconfirmed.

---
[8] The total number of unsupported HCCs discussed in the findings exceeds 62 because some HCCs were determined to be unsupported for more than one reason.

[ PAGE ]

2220

DRAFT

- 

> Formatted: Indent: Before: 0.38"

- The documentation was of an unacceptable type.documentation did not support that a face-to-face visit had occurred with a physician or an acceptable physician extender.[9]

As a result of these unsupported diagnoses, PacifiCare received $199,672 in net overpayments from CMS (see Appendix C). Based on our sample results, we estimated that PacifiCare was overpaid at least $88,546,120. See Appendix D for an analysis of unsupported HCCs, including the reason(s) for each error.

> Formatted: Font: Bold

PacifiCare did not have written policies and procedures in place for obtaining, processing, and submitting risk adjustment datadiagnoses to CMS. Furthermore, PacifiCare's quality assurance practices were not effective for ensuring that the diagnoses it submitted to CMS complied with the requirements of the Participant Guide. focused primarily on ensuring that all relevant risk adjustment data were submitted to CMS rather than ensuring that the data it submitted were accurate. UnitedHealth Group officials stated that providers were responsible for the accuracy of the risk adjustment datadiagnoses that PacifiCare submitted to CMS, which is contrary to CMS requirements.

**RISK ADJUSTMENT DATA VALIDATION REQUIREMENTS**

Pursuant to 42 CFR § 422.310(b), "Each MA organization must submit to CMS (in accordance with CMS instructions) the data necessary to characterize the context and purposes of each service provided to a Medicare enrollee by a provider, supplier, physician, or other practitioner. CMS may also collect data necessary to characterize the functional limitations of enrollees of each MA organization." The Participant Guide, section 8.7.3, states that "MA organizations are responsible for the accuracy of the data submitted to CMS."

**Diagnosis Coding**

Pursuant to section 7.1.4 of the Participant Guide, a diagnosis submitted to CMS for risk adjustment purposes must be coded according to the *International Classification of Disease, 9th Revision, Clinical Modification Guidelines for Coding and Reporting* (the Coding Guidelines). According to sSection III of the Coding Guidelines, states that for each hospital inpatient stay, the hospital's medical record reviewer should code the principal diagnosis and "… all conditions that coexist at the time of admission, that develop subsequently, or that affect the treatment received and/or length of stay. Diagnoses that relate to an earlier episode which have no bearing on the current hospital stay are to be excluded."

For outpatient and physician services, sSection IV of the Coding Guidelines states that for each outpatient and physician service, the providers should "[c]ode all documented conditions that

---

[9] A physician extender is a health care provider who is not a physician but who performs medical activities typically performed by a physician, generally a nurse practitioner or physician assistant.

[ PAGE ]

2221

USBP067856808

**DRAFT**

coexist at the time of the encounter/visit, and require or affect patient care treatment or management." The Coding Guidelines also state that conditions should not be coded if they "… were previously treated and no longer exist. However, history codes … may be used as secondary codes if the historical condition or family history has an impact on current care or influences treatment." Additionally, diagnoses that are "probable," "suspected," "questionable," "working," or "ruled out," should not be coded.

**Medical Record Documentation**

The Participant Guide requires that documentation support ~~the HCCs assigned to beneficiaries~~diagnoses that MA organizations submit for use in CMS's risk score calculations.

Specifically, the Participant Guide ~~requires~~ established the following ~~with respect to documentation that MA organizations submit to CMS to validate beneficiary risk scores~~requirements:,:

- ~~The documentation must be based on a face-to-face visit with one of the three provider types covered under risk adjustment: hospital inpatient, hospital outpatient, or physician.~~

<span style="float:right; border:1px solid #000; font-size:smaller;">**Formatted:** Indent: Before: -0.25"<br>**Formatted:** Bullets and Numbering</span>

  - The documentation must include an acceptable physician signature and specialty credentials. Examples of acceptable physician signatures include handwritten signatures or initials, signature stamps that comply with State regulations, and electronic signatures with authentications by the respective providers. Typed names, signatures of nonphysicians or nonphysician extenders (e.g., medical students), and signatures without credentials are unacceptable for risk adjustment purposes (section 7.2.4.5).

<span style="float:right; border:1px solid #000; font-size:smaller;">**Formatted:** Indent: Before: 0.25"<br>**Formatted:** Bullets and Numbering</span>

  - The documentation must be of an acceptable type. Unacceptable types of documentation include physician-signed attestations, lists of patient conditions, diagnostic reports that have not been interpreted, and any documentation for dates of service outside the data collection period (section 7.2.4.4).

~~Additionally, the Participant Guide, section 7.2.4.4, specifies several sources of documentation that are not acceptable for risk adjustment data validation:~~

- ~~skilled nursing facilities,~~

<span style="float:right; border:1px solid #000; font-size:smaller;">**Formatted:** Bullets and Numbering</span>

- ~~freestanding ambulatory surgical centers;~~

<span style="float:right; border:1px solid #000; font-size:smaller;">**Formatted:** Bullets and Numbering</span>

- ~~alternative data sources (e.g., pharmacies),~~

<span style="float:right; border:1px solid #000; font-size:smaller;">**Formatted:** Bullets and Numbering</span>

- ~~certain physician extenders (e.g., nutritionists), and~~

<span style="float:right; border:1px solid #000; font-size:smaller;">**Formatted:** Bullets and Numbering</span>

[ PAGE ]

2222

**DRAFT**

• durable medical equipment suppliers. **[Note:  We deleted these criteria because we don't have a related finding.  Please inform the assist regions that do have a related finding to add these criteria to their reports.]**    ← Formatted: Bullets and Numbering

**UNSUPPORTED HIERARCHICAL CONDITION CATEGORIES**

In calculating beneficiary risk scores and risk-adjusted payments to MA organizations, CMS must first convert diagnoses to HCCs.  During our audit period, PacifiCare submitted to CMS at least one diagnosis associated with each HCC included in each sampled beneficiary's risk score.  The risk scores for 44 sampled beneficiaries were invalid because the diagnoses that PacifiCare submitted to CMS were not supported.  These unsupported diagnoses were associated with 62 unsupported HCCs.  Appendix D provides a breakdown of the reasons for these unsupported HCCs.  These reasons include unsupported diagnosis coding, missing signatures and credentials, unconfirmed diagnoses, and no face-to-face visits.

**Unsupported Diagnosis Coding**

The documentation that PacifiCare submitted to CMS did not provide documentation that supported the diagnoses associated with 57 HCCs.  For 5 of the 57 HCCs, for which documentation did not support the diagnosis associated with the assigned HCC, other diagnoses were determined to be more appropriate.  In these instances, we determined that the documentation supported different HCCs from those used by that CMS used in determining the beneficiaries' risk scores.  The following are examples of documentation that did not support the diagnoses PacifiCare submitted to CMS HCCs that were not supported by PacifiCare's documentation.

• For one of its beneficiaries, PacifiCare submitted a the diagnosis code indicating for "major depressive disorder, recurrent episode, moderate."  As a result, CMS used included the associated HCC associated with this diagnosis in calculating the beneficiary's risk score.  However, the documentation that PacifiCare provided stated that the patient had complained of leg pain and difficulty walking.  The documentation did not mention depression or indicate that depression had affected the care, treatment, or management provided during the encounter.    ← Formatted: Bullets and Numbering

• For another second beneficiary, PacifiCare submitted a the diagnosis code indicating for "peripheral vascular disease (PVD)."  As a result, CMS included used the associated HCC HCC associated with this diagnosis in calculating the beneficiary's risk score.  However, the documentation that PacifiCare provided indicated that the patient's chief complaint on the date of service was pain in her right foot, which was caused by a heavy can that fell on ither foot.  The documentation did not mention the beneficiary's PVD or indicate that PVD had affected the care, treatment, or management provided during the encounter.    ← Formatted: Indent: First line:  0.04"  ← Formatted: Bullets and Numbering

[ PAGE ]

2223

DRAFT

- For ~~one~~ a third beneficiary, PacifiCare submitted ~~a~~ the diagnosis code ~~indicating for~~ "malignant neoplasm of the brain, cerebrum, except for lobes and ventricles." ~~As a result,~~ CMS ~~included~~ used the HCC associated with this diagnosis ~~associated HCC~~ in calculating the beneficiary's risk score.  However, the documentation that PacifiCare provided ~~regarded~~ referenced benign prostatic hypertrophy.  The documentation did not mention ~~the beneficiary's~~ brain cancer or indicate that brain cancer had affected the care, treatment, or management provided during the encounter.

**Missing Signatures and Credentials**

Fourteen HCCs were unsupported because the documentation that PacifiCare provided did not include the physicians' signatures and credentials.

For example, for one beneficiary PacifiCare submitted ~~a~~ the diagnosis code ~~for one beneficiary indicating~~ for "congestive heart failure, unspecified." ~~As a result,~~ CMS ~~included~~ used the HCC associated with this diagnosis ~~associated HCC~~ in calculating the beneficiary's risk score.  However, the documentation that PacifiCare submitted was not signed by the ~~provider~~ physician [?].  The documentation stated:  "This report has been dictated but not proofread and is subject to correction of transcription variances & edit."

**Unconfirmed Diagnoses**

Three HCCs were unsupported because the diagnoses submitted to CMS were ~~not~~ unconfirmed.

For example, for one beneficiary PacifiCare submitted ~~a~~ the diagnosis code for ~~one beneficiary indicating~~ "chronic airway obstruction, not elsewhere classified." ~~As a result,~~ CMS ~~included~~ used the HCC associated with this diagnosis ~~associated HCC~~ in calculating the beneficiary's risk score.  The ~~physician's impression was~~ documentation that PacifiCare submitted noted ~~as~~ a "history of smoking with possible mild chronic obstructive pulmonary disease."  **[For this example, please confirm and indicate that this was a physician or outpatient hospital encounter.  (The criteria do not apply to inpatient encounters.)]** Diagnoses that are "probable," "suspected," "questionable," or "working," ~~or "ruled out"~~ should not ~~have been~~ be coded.

**~~No Face-to-Face Visits~~ Unacceptable Documentation**

Two HCCs were unsupported because ~~the~~ PacifiCare ~~documentation~~ provided diagnostic reports which had not been interpreted by a physician.  No other documentation was provided to support these two HCCs.   An uninterpreted diagnostic report is not an acceptable type of documentation. ~~did not support that a physician or an acceptable physician extender had seen the patients.~~

For example, for one beneficiary PacifiCare submitted ~~a~~ the diagnosis code for ~~one beneficiary indicating~~ "inflammatory and toxic neuropathy, unspecified." ~~As a result,~~ CMS ~~included~~ used the HCC associated with this diagnosis ~~associated HCC~~ in calculating the beneficiary's risk score.  The documentation showed the results of a nerve conduction study.  However, the

[ PAGE ]

2224

CONFIDENTIAL

DRAFT

documentation ~~that PacifiCare provided regarded a nerve conduction test that did not include a face-to-face encounter with a physician~~did not indicate that the study had been interpreted by a physician.

**CAUSES OF OVERPAYMENTS**

~~No Written Policies and Procedures~~

During our audit period, PacifiCare did not have written policies and procedures for obtaining, processing, and submitting risk adjustment data.  PacifiCare informed us that it had since developed formal policies and procedures but had not implemented them as of December 2, 2009.

~~Insufficient Practices~~

~~Although PacifiCare did not have written policies and procedures in place, it did have practices~~PacifiCare officials explained that PacifiCare had quality assurance practices in place ~~for~~ to obtaining, processing, and submitting risk adjustment data ~~to CMS~~verify the accuracy of the diagnoses that it submitted to CMS.  However, ~~These~~ practices, ~~which included error correction, chart review, and chart validation, focused primarily on ensuring that all relevant risk adjustment data were submitted to CMS rather than ensuring that the data were accurate.  UnitedHealth Group officials stated that providers were responsible for the accuracy of the diagnosis codes they sent to PacifiCare, which is contrary to CMS requirements.~~

*~~Error Correction~~*

~~PacifiCare's automated systems reviewed provider-submitted codes to ensure that such codes corresponded to valid ICD-9 diagnosis codes.[10]  Any codes that did not correspond to valid diagnosis codes were flagged in the risk adjustment processing system for review and logged in a work queue with an "invalid diagnosis" error.  These errors were then reviewed by a team of error correction analysts who determined whether the codes could be corrected by reviewing the original claim images or by contacting the provider directly.  If a valid code was not identified for a claim, the error flag was retained and the invalid code was not submitted to CMS.  PacifiCare officials indicated that in 2008 and 2009, 0.19 percent of diagnosis codes were rejected as invalid and manually corrected.  The officials said that they thought the 2007 rate of rejection was similar.  PacifiCare's error correction system was effective for identifying and correcting invalid diagnosis codes.  However, as indicated by the low percentage of invalid diagnosis codes PacifiCare identified, invalid codes were a minor cause of risk adjustment data errors.~~

---

[10] ICD-9 is a medical acronym that stands for *International Classification of Diseases, ninth revision*.  The publication provides standard classifications of diseases for health records.  Current classifications are alphanumeric codes that represent any known disease, condition, or circumstance that has or could cause a person's death.

[ PAGE ]

2225

**DRAFT**

*Chart Reviews*

~~During chart reviews, the reviewer looked at medical records to determine what conditions documented in the records may not have been properly coded when the providers submitted claims or other documentation that included beneficiaries' diagnoses. The purpose of the reviews was to ensure that all diagnoses that were included in the documentation had been submitted to CMS. PacifiCare's chart reviews did not ensure the accuracy of the data.~~

*Chart Validation*

~~During chart validation, the diagnosis codes submitted by providers were reviewed to determine whether they were supported and valid. PacifiCare said that it initiated chart validation in response to CMS data validation reviews and OIG audits and for internal audit purposes. PacifiCare's chart validations were not routinely used for quality assurance purposes. When chart validations were used for quality assurance purposes, the chart validations involved only those providers that received capitated payments.[11]~~those practices were limited in scope. Furthermore, as demonstrated by the significant error rate found in our sample, PacifiCare's practices were not effective in ensuring that the diagnoses submitted to CMS complied with the requirements of the Participant Guide. PacifiCare officials stated that providers were responsible for the accuracy of the diagnosis codes that they submitted to PacifiCare.

## ESTIMATE OF UNALLOWABLE PAYMENTS

Based on our sample results, we estimated that PacifiCare was overpaid at least $88,546,120 because the diagnoses that PacifiCare submitted to CMS were not supported.

## RECOMMENDATIONS

We recommend that PacifiCare:

- refund to the Federal Government $88,546,120 in overpayments;

- implement formal policies and procedures for obtaining, processing, and submitting valid risk adjustment data; and

- ~~create~~ establish a more robust ~~chart validation~~quality assurance process by periodically selecting and reviewing a random sample of ~~all providers~~ medical records to ensure that the diagnoses that it submits to CMS are supportable ~~and using this data to ensure that~~ PacifiCare ~~is~~ in compliance with the requirements ~~set forth in~~of the Participant Guide. **[Let's discuss whether we can support this recommendation]**

---

[11] PacifiCare pays providers for medical services on both a fee-for-service and a capitated basis.

[ PAGE ]

2226

DRAFT

# APPENDIXES

2227

CONFIDENTIAL

**DRAFT**

**APPENDIX AC:  SAMPLE RISK-ADJUSTED PAYMENTS TO PACIFICARE, ACTUAL
AMOUNTS OWED, AND OVERPAYMENTS/UNDERPAYMENT**
[Please rearrange the appendixes for consistency with the way they are introduced in the
report.]

| Sample Number | Payment to PacifiCare | Adjusted Amount | Overpayment/ (Underpayment) |
|---|---|---|---|
| 2 | $20,001.10 | $13,958.63 | $6,042.47 |
| 4 | 21,421.68 | 14,574.48 | 6,847.20 |
| 5 | 10,714.92 | 7,138.32 | 3,576.60 |
| 7 | 4,093.86 | 2,992.70 | 1,101.16 |
| 8 | 1,475.48 | 1,015.06 | 460.42 |
| 10 | 65,519.16 | 64,106.64 | 1,412.52 |
| 11 | 25,798.32 | 7,778.40 | 18,019.92 |
| 13 | 16,202.76 | 12,626.16 | 3,576.60 |
| 16 | 11,127.12 | 8,581.56 | 2,545.56 |
| 17 | 28,083.84 | 25,244.16 | 2,839.68 |
| 18 | 8,283.00 | 4,706.40 | 3,576.60 |
| 20 | 12,860.52 | 7,242.48 | 5,618.04 |
| 21 | 10,081.28 | 8,523.84 | 1,557.44 |
| 25 | 7,431.36 | 4,392.48 | 3,038.88 |
| 26 | 17,858.28 | 13,961.04 | 3,897.24 |
| 27 | 16,210.16 | 9,487.84 | 6,722.32 |
| 29 | 12,308.16 | 9,021.24 | 3,286.92 |
| 35 | 10,137.24 | 6,062.64 | 4,074.60 |
| 38 | 7,241.88 | 5,655.48 | 1,586.40 |
| 39 | 12,580.92 | 7,243.44 | 5,337.48 |
| 41 | 5,338.80 | 2,826.09 | 2,512.71 |
| 42 | 7,584.24 | 4,233.96 | 3,350.28 |
| 45 | 7,411.32 | 5,132.16 | 2,279.16 |
| 49 | 7,919.64 | 5,583.60 | 2,336.04 |
| 50 | 8,544.00 | 4,940.16 | 3,603.84 |
| 51 | 8,234.04 | 7,497.84 | 736.20 |
| 53 | 11,025.60 | 8,036.04 | 2,989.56 |
| 54 | 15,578.52 | 7,347.84 | 8,230.68 |
| 55 | 7,276.80 | 4,940.64 | 2,336.16 |
| 57 | 38,051.52 | 28,944.84 | 9,106.68 |
| 62 | 40,112.40 | 27,878.16 | 12,234.24 |
| 65 | 9,362.52 | 6,697.08 | 2,665.44 |
| 66 | 14,808.24 | 11,778.00 | 3,030.24 |
| 68 | 26,079.12 | 17,585.76 | 8,493.36 |
| 74 | 29,098.44 | 8,606.16 | 20,492.28 |
| 75 | 6,430.20 | 4,835.04 | 1,595.16 |
| 77 | 10,752.12 | 3,771.00 | 6,981.12 |
| 81 | 36,744.84 | 37,706.52 | (961.68) |
| 85 | 18,843.00 | 18,014.28 | 828.72 |
| 86 | 6,834.33 | 3,429.42 | 3,404.91 |
| 91 | 7,193.52 | 4,274.64 | 2,918.88 |
| 92 | 7,936.32 | 5,096.64 | 2,839.68 |
| 94 | 16,055.64 | 11,112.24 | 4,943.40 |

2228

**DRAFT**

|       |    |             |             |              |
|-------|----|-------------|-------------|--------------|
|       | 99 | 12,650.04   | 5,043.00    | 7,607.04     |
| **Total** | 44 | $679,296.25 | $479,624.10 | $199,672.15  |

2229

DRAFT

**APPENDIX B̶A:  SAMPLE DESIGN AND METHODOLOGY**

**POPULATION**

The population included beneficiaries who (1) were continuously enrolled under H4590 during all of calendar year (CY) 2006 (the data collection period) and January of CY 2007 (CY 2007 was the payment period) and (2) had at least one diagnosis relevant to the CY 2007 Centers for Medicare & Medicaid Services Hierarchical Condition Category payment model (the model).

**SAMPLING FRAME**

The sampling frame included 62,987 beneficiaries on whose behalf CMS paid PacifiCare of Texas approximately $827 million for CY 2007.

**SAMPLE UNIT**

The sample unit is a continuously enrolled beneficiary who had one or more diagnoses relevant to the model.

**SAMPLE DESIGN**

We used a simple random sample.

**SAMPLE SIZE**

We selected a sample of 100 beneficiaries.

**SOURCE OF THE RANDOM NUMBERS**

We generated the random numbers using the Office of Inspector General, Office of Audit Services, RAT-STATS statistical sampling software.

**METHOD OF SELECTING SAMPLE ITEMS**

We consecutively numbered the sample units in the frame from 1 to 62,987.  After generating 100 random numbers, we selected the corresponding frame items.

**ESTIMATION METHODOLOGY**

We used RAT-STATS to estimate the amount of incorrect payments.

2230

CONFIDENTIAL

USBP067856817

**DRAFT**

**APPENDIX ~~C~~B:  SAMPLE RESULTS AND ESTIMATES**

**Sample Results**

| Sampling Frame Size | Sample Size | Value of Sample | Number of Beneficiaries with Incorrect Payments | Value of Overpayments |
|---|---|---|---|---|
| 62,987 | 100 | $1,143,851 | 44 | $199,672 |

**Estimates**
*(Limits Calculated for a 90-Percent Confidence Interval)*

| | Estimated Overpayments |
|---|---|
| Point estimate | $125,767,226 |
| Lower limit | $88,546,120 |
| Upper limit | $162,988,333 |

2231

USBP067856818

DRAFT

### APPENDIX D:  REASONS FOR INVALID SAMPLES

[Please delete columns 2, 3, 5, 7, and 9 and adjust the Xs such that the total number of Xs in each of the remaining four columns agree with the number of unsupported HCCs in each of the four findings.  Also, please add a column at the right indicating the total number of deficiencies for each HCC.]

<div style="float:right">Formatted: Left</div>

| 1 | Unsupported Diagnosis Coding |
| 2 | Unsupported Diagnosis Coding and Other Reasons |
| 3 | Unsupported Diagnosis Coding Changed to Another Hierarchical Condition Category |
| 4 | Missing Signature and Credentials |
| 5 | Missing Signature and Credentials and Other Reasons |
| 6 | Unconfirmed Diagnoses |
| 7 | Unconfirmed Diagnoses and Other Reasons |
| 8 | ~~No Face-to-Face Visits~~Unacceptable Documentation |
| 9 | No Face-to-Face Visits and Other Reasons |

| Sample No. – Hierarchical Condition Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| 2-21 | X | | | | | | | | |
| 2-105 | | X | | | X | | | | X |
| 4-55 | | X | | | X | | | | |
| 4-105 | | X | | | X | | | | |
| 5-80 | X | | | | | | | | |
| 7-96 | | X | | | | | X | | |
| 7-105 | X | | | | | | | | |
| 8-74 | X | | | | | | | | |
| 10-15 | X | | X | | | | | | |
| 11-55 | | X | | | X | | | | |
| 11-80 | | | | X | | | | | |
| 11-83 | | | | X | | | | | |
| 11-108 | | | | X | | | | | |
| 13-80 | | X | | | | | X | | |
| 16-10 | | | | X | | | | | |
| 17-71 | X | | | | | | | | |
| 18-80 | X | | | | | | | | |
| 20-16 | X | | X | | | | | | |
| 20-55 | | X | | | X | | | | |
| 21-10 | X | | | | | | | | |
| 25-71 | X | | | | | | | | |
| 26-80 | X | | | | | | | | |

2232

USBP067856819

**DRAFT**

| Sample No. – Hierarchical Condition Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| 27-80 | X | | | | | | | | |
| 27-96 | X | | | | | | | | |
| 27-105 | X | | | | | | | | |
| 29-38 | | X | | | X | | | | |
| 35-158 | X | | | | | | | | |
| 38-19 | X | | | | | | | | |
| 39-15 | X | | X | | | | | | |
| 39-132 | X | | | | | | | | |
| 41-55 | X | | | | | | | | |
| 42-55 | X | | | | | | | | |
| 45-83 | | X | | | X | | | | |
| 49-10 | X | | | | | | | | |
| 50-108 | X | | | | | | | | |
| 51-18 | X | | X | | | | | | |
| 53-96 | X | | | | | | | | |
| 54-16 | X | | X | | | | | | |
| 54-71 | | X | | | | | | | X |
| 54-108 | X | | | | | | | | |
| 55-10 | | X | | | X | | | | |
| 57-80 | X | | | | | | | | |
| 57-105 | X | | | | | | | | |
| 62-96 | X | | | | | | | | |
| 62-108 | | | | | | X | | | |
| 65-71 | X | | | | | | | | |
| 66-92 | X | | | | | | | | |
| 68-105 | X | | | | | | | | |
| 68-108 | X | | | | | | | | |
| 74-8 | X | | | | | | | | |
| 74-31 | | X | | | X | | | | |
| 75-132 | X | | | | | | | | |
| 77-9 | X | | | | | | | | |
| 81-96 | X | | | | | | | | |
| 85-18 | X | | | | | | | | |
| 86-37 | X | | | | | | | | |
| 86-105 | | X | | | X | | | | |
| 86-149 | X | | | | | | | | |

2233

CONFIDENTIAL                    USBP067856820

**DRAFT**

| Sample No. – Hierarchical Condition Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| 91-105 | X | | | | | | | | |
| 92-105 | X | | | | | | | | |
| 94-37 | X | | | | | | | | |
| 99-9 | X | | | | | | | | |
| **Totals** | **44** | **13** | **5** | **4** | **10** | **1** | **2** | **0** | **2** |

2234

CONFIDENTIAL                                    USBP067856821

**EXHIBIT D-74**

# Risk Adjustment Data Validation (RADV) Contract-Level Audits

Center for Medicare

## January 13, 2012

EXHIBIT

1143-1

**INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:**
*This information has not been publicly disclosed and may be privileged and confidential.  It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information.  Unauthorized disclosure may result in prosecution to the full extent of the law.*

2236

# Agenda

- Background on RADV audits

- Current status of audits

- Policy issues

    1. Timing of audits

    2. Model Calibration Factor

    3. Number of annual audits and selection criteria   [[reversed #3 and #4]]

    4. Audit documentation standards – One Best Medical Record policy

# Background

- Of approximately $112.2 billion in Medicare Advantage payments in CY 2009, approximately 11.0%, or $12.4 billion are estimated to be improper payments (gross dollars in error, as reported in FY 2011 AFR for CY 2009 payment year).

- Most of the CY 2009 improper payments are due to MA organizations' submitting diagnoses to CMS for enhanced payment and not being able to document these diagnoses in a medical record.

- CMS developed its Risk Adjustment Data Validation (RADV) audits as its primary corrective action to recoup these improper payments.

2238

# Basic RADV Audit Methodology

- Sample beneficiaries enrolled in MA plans

- Request medical records for their Hierarchical Condition Codes (HCCs)

- Review medical records for supporting diagnosis information

- Correct HCCs and risk score

- Recalculate correct payment

- Estimate contract-level error using extrapolation

2239

4

# Current Status

- On December 21, 2010, CMS released a proposed RADV contract-level audit methodology for public comment.

- CMS solicited comments on two issues in particular:

  - RADV sampling methodology

  - RADV payment error calculation methodology

- CMS received over 500 comments from health plans, trade associations, law firms, and the public.

- Health plan industry is eagerly awaiting CMS's final methodology, and has raised significant concerns with CMS's proposed methodology.

- CMS plans to publish the final RADV methodology at the time the MA/Part D Advance Notice is released (February 2012).

2240

5

# Policy Issue #1:  Timing of First RADV Audits Using Payment Recovery Based on Extrapolation

- <u>Issue</u>: Medicare Advantage plans most recently have argued that RADV payment recovery based on extrapolation should begin with plan year 2011 rather than 2007 as CMS originally proposed.

  Plans argue they did not have sufficient information on RADV audits to 1) understand the implications of RADV and build their plan operations accordingly; or 2) bid appropriately.

- <u>CMS Recommendation</u>:

  – RADV audits start with payment year 2011 and will be conducted every calendar year thereafter.  Recovery would start in Jan. 2014.

Note that the RADV proposal in the President's Plan for Economic Growth and Deficit Reduction begins with payment year 2008.

2241

# Policy Issue #2:  Model Calibration Factor (MCF)

- <u>Issue:</u>   Medicare Advantage plans argue that they are being held to a standard of coding perfection that is greater than observed for the traditional fee-for-service program.

- <u>CMS Recommendation</u>:   CMS will apply an MCF adjustment to payment error estimates to account for the underlying error in the traditional fee-for-service program.

  Applying the MCF adjustment accounts for the fact that the documentation standard used in RADV audits to determine a plan's payment error (medical records) is different from the documentation standard used to develop the Part C risk-adjustment model (FFS claims).

2242

# Policy Issue #3:  Number of Plans to Audit and Selection Criteria

Issue:   How many plans should be subject to RADV audits each year, and what criteria should be used to select plans for audit?

CMS Recommendation:

- CMS should audit 30 plans per year.    [deleted other text]

- Select plans for audit based on their coding intensity scores, targeting more plans with higher levels of coding intensity.

2243

8

# Policy Issue #4: Audit Documentation Standards

- <u>Issue:</u>  Medicare Advantage plans object to CMS's current documentation standards for plans to select the "one best medical record" to validate their risk adjustment scores.

  - Plans want to submit more than one medical record, documentation other than medical records, and documentation from outside of the collection period to validate HCCs.

- <u>CMS Recommendation</u>:

  - Allow unlimited submission of medical records.  Recognize underpayment from the first medical record that validates the diagnosis being audited.
    - (Alternative) Maintain current policy, recently modified in response to industry comments (with a proposed increase for submission time, medical record selection support, and interactive submission process) while still requiring plans to document a patient's risk score with at least one medical record from the collection period.
    - (Alternative) Increase the number of medical records the plan can submit, e.g., to two records, and recognize underpayment on all medical records submitted.

2244

# CMS Responses to Industry Concerns about RADV Policies

<u>CMS' previous responses to industry concerns:</u>

- Permit attestations to allow for physicians signatures and credentials in instances where medical records lacked either for outpatient and physician records
- Provide specific guidance in the form of Best Practices to Medicare Advantage plans to help MA contracts identify valid medical records for submission and address problems regarding diagnosis documentation
- Provide additional time to gather and submit medical records, representing a change in policy from 12 to 16 weeks
- Provide an interactive electronic CMS-HCC coversheet to prompt MA contract to confirm that medical record meets RADV guidelines and to guide the MA contracts through the submission process
- Credit additionals identified during medical record review
- Medical Record Dispute process permits plan to request subsequent review of medical record and may reduce payment error

<u>CMS continues to demonstrate its willingness to assist the industry in conducting RADV audit activity:</u>

- Begin with CY2011 audit year allows plan/provider more timely access to medical records
- Allow multiple records to assist MA contract with selection of OBMR
- Apply Model Calibration Factor (FFS Adjustor) to account for appropriate level of coding accuracy

2245

10

**EXHIBIT D-75**

**REDACTED VERSION OF
DOCUMENT PROPOSED TO BE
FILED UNDER SEAL**

# CON11 RADV Results



**MPPG**

**May 26, 2016**

**EXHIBIT**

1187-1
2217

# Introduction

- Today we present preliminary results of the CON11 RADV audit.
- We audited 201 enrollees in each of 30 MA contracts for PY 2011 (2010 dates of service).  Contracts were selected based on coding intensity: 20 from the "High" group, 5 from "Medium," and 5 from "Low."
- MAOs were allowed 20 weeks to submit medical records, and we received over 42,000 submissions for over 6,000 beneficiaries.
- Certified medical record coders review and code the medical records, with independent verification of the results by other coders.
- Payment error amounts are reduced by:
  - "Additionals," which are HCCs found during medical record review that are not among the audited HCC(s) for the enrollee.
  - RADV finding a more severe manifestation of an audited HCC than what the MAO submitted for payment.
- The total preliminary CON11 recovery amount is $98,178,040 (lower bound of a 99% confidence interval [CI]) without a Fee-for-Service Adjuster (FFSA).
  - "Preliminary" means before a FFSA and before appeals.

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2248

# Audit Methodology

- Our audit methodology for CON11 is detailed in a publicly available white paper.

- We select 201 enrollees from the RADV-eligible population in each contract: 67 from each of three strata based on risk scores for the payment year.

- After medical record review, we determine preliminary recovery amounts by calculating a point estimate of the payment error for each contract and then computing a 99% confidence interval (CI) around the point estimate. The lower bound of the confidence interval for each contract is the recovery amount unless the lower bound is negative, in which case the recovery amount is constrained to $0.

  – Preliminary recovery amounts are subject to change based on the FFSA and appeals, which are triggered by regulation upon release of the audit reports.

  – Using the lower bound of a 95% confidence interval would increase recoveries by about 40%, from $98,178,040 to $138,238,562. This would constitute a methodological change.

  – Using the lower bound of a 90% confidence interval would increase recoveries by about 66%, from $98,178,040 to $163,363,801. This would also constitute a methodological change.

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2249

# Preliminary Recovery Amounts

| Contract ID | Parent Org | Total PY 2011 Contract Payment | Weighted Net Payment Error (Point Estimate) | Recovery Amount (99% CI) | Recovery Amount (95% CI) | Recovery Amount (90% CI) |
|---|---|---|---|---|---|---|
| | | | | | | |

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2250   4

# Preliminary Recovery Amounts (cont.)

| Contract ID | Parent Org | Total PY 2011 Contract Payment | Weighted Net Payment Error (Point Estimate) | Recovery Amount (99% CI) | Recovery Amount (95% CI) | Recovery Amount (90% CI) |
|---|---|---|---|---|---|---|
| H0543 | UnitedHealth Group, Inc. | $3,606,115,507 | $32,363,041 | – | – | – |
| H2226 | UnitedHealth Group, Inc. | $94,201,539 | $524,117 | – | – | – |
| H4522 | UnitedHealth Group, Inc. | $132,156,899 | ($1,142,040) | – | – | – |
| H4590 | UnitedHealth Group, Inc. | $2,002,635,960 | ($3,943,825) | – | – | – |

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

# Contracts with Net Underpayments

| At 99% CI | At 95% CI | At 90% CI |
|:---:|:---:|:---:|
| 16 | 13 | 11 |

- Per our published methodology, a contract has a net underpayment if the lower bound of the confidence interval around the payment error point estimate is a negative amount.
- Based on point estimates of payment error alone, six CON11 contracts had net underpayments.
  - Compare this with TAR07, which had two contracts with net underpayments based on point estimates and four contracts with net underpayments based on the lower bound of the 99% CI.

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

# Contracts with Net Underpayments at 99% CI

| Contract ID | Parent Org | Total PY 2011 Contract Payment | Lower Bound of 99% CI | Underpayment as % of Total Payment | HCC Discrepancy Rate[3] |
|---|---|---|---|---|---|
| | | | | -6.15% | 17.60% |
| | | | | -5.60% | 17.50% |
| | | | | -4.79% | 16.00% |
| H4522 | UnitedHealth Group, Inc. | $132,156,899 | ($4,622,640) | -3.50% | 19.00% |
| H0543 | UnitedHealth Group, Inc. | $3,606,115,507 | ($91,884,129) | -2.55% | 16.20% |
| H4590 | UnitedHealth Group, Inc. | $2,002,635,960 | ($51,017,738) | -2.55% | 11.90% |
| | | | | -2.53% | 12.90% |
| H2226 | UnitedHealth Group, Inc. | $94,201,539 | ($2,068,360) | -2.20% | 16.80% |
| | | | | -1.65% | 17.70% |
| | | | | -1.58% | 14.10% |
| | | | | -1.52% | 20.70% |
| | | | | -1.49% | 22.50% |
| | | | | -1.15% | 19.70% |
| | | | | -0.73% | 21.90% |
| | | | | -0.59% | 16.90% |
| | | | | -0.44% | 13.80% |

[1] Contract does not have a net underpayment at the 95% CI

[2] Contract does not have a net underpayment at the 90% CI

[3] Discrepancy rate is calculated as (discrepant HCCs for sampled enrollees / total audited HCCs for sampled enrollees)

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2253

# Notes on Underpayments

- All four (4) UnitedHealth Group contracts have net underpayments at the 99%, 95%, and 90% CI.
- Total PY 2011 payments to the 16 contracts on the previous slide were $10,347,596,161, which is 67.8% of total PY 2011 payments to all 30 selected contracts.



Outliers include H2226 (UnitedHealth Group) with 99 additionals,

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2254

# Average Number of Valid MRs per HCC<sup>*</sup>



<sup>*</sup> Valid MRs are those not invalidated due to missing DOS, missing signature/credential, or other issues.  RADV policy generally allows up to five medical records per HCC.

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2255      9

# HCC Discrepancy Rates for Major Parent Orgs

| Parent Org | CON11 Discrepancy Rate | TAR07 Discrepancy Rate |
|---|---|---|
| | 25.8% | 45.3% |
| | 23.5% | 32.0% |
| | 20.5% | 30.7% |
| | 15.0% | – |
| UnitedHealth Group | 12.3% | 38.7% |

Note: Discrepancy rate is calculated as (discrepant HCCs for sampled enrollees / total audited HCCs for sampled enrollees)

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2256    10

# HCC Discrepancies by Final Error Type

| Final Error Type | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---|---|---|---|---|
| Coding/Incomplete | 2,424 | 79.11% | 2,424 | 79.11% |
| Invalid (non-Signature/non-Credential) | 136 | 4.44% | 2,560 | 83.55% |
| Missing | 248 | 8.09% | 2,808 | 91.64% |
| Invalid (Signature/Credential) | 256 | 8.36% | 3,064 | 100% |

**Coding/Incomplete**: The medical record(s) reviewed for the audited CMS-HCC did not provide sufficient documentation of a diagnosis, in accordance with ICD-9 coding guidelines, to support the CMS-HCC being audited.

**Invalid (non-Signature/non-Credential)**: The medical record(s) submitted for the audited CMS-HCC were invalid for reasons other than signature/credential issues.

**Missing**: No medical record was submitted for the audited CMS-HCC, and no other record submitted for the enrollee could confirm the CMS-HCC.

**Invalid (Signature/Credential)**: The medical record submitted was ruled invalid because it did not contain a valid signature and/or credential.

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2257

# Top 10 HCCs by Discrepancy Rate*

| HCC | HCC Name | HCCs Sampled | Discrepancy Rate |
|---|---|---|---|
| HCC96 | Ischemic or Unspecified Stroke | 286 | 62.6% |
| HCC112 | Pneumococcal Pneumonia, Emphysema, Lung Abscess | 28 | 57.1% |
| HCC82 | Unstable Angina and Other Acute Ischemic Heart Disease | 166 | 53.6% |
| HCC69 | Spinal Cord Disorders/Injuries | 41 | 46.3% |
| HCC104 | Vascular Disease with Complications | 179 | 44.7% |
| HCC51 | Drug/Alcohol Psychosis | 35 | 42.9% |
| HCC95 | Cerebral Hemorrhage | 26 | 42.3% |
| HCC37 | Bone/Joint/Muscle Infections/Necrosis | 73 | 38.4% |
| HCC18 | Diabetes with Ophthalmologic or Unspecified Manifestation | 189 | 37.6% |
| HCC101 | Cerebral Palsy and Other Paralytic Syndromes | 24 | 37.5% |
| **ALL†** | **–** | **16,263** | **18.8%** |

* Includes only HCCs sampled for at least 20 enrollees

† Includes all HCCs sampled for CON11

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

# Top 10 Additional HCCs by Frequency

| HCC | HCC Name | CON11 Rank | Mean Rank* |
|---|---|---|---|
| HCC19 | Diabetes without Complication | 1 | 1.5 |
| HCC105 | Vascular Disease | 2 | 2.5 |
| HCC71 | Polyneuropathy | 4 †̲ | 3.7 |
| HCC83 | Angina Pectoris/Old Myocardial Infarction | 4 †̲ | 2.7 |
| HCC16 | Diabetes with Neurologic or Other Specified Manifestation | 5 | 5.7 |
| HCC15 | Diabetes with Renal or Peripheral Circulatory Manifestation | 6 | 8 |
| HCC80 | Congestive Heart Failure | 7 | 7.3 |
| HCC108 | Chronic Obstructive Pulmonary Disease | 8 | 7.8 |
| HCC18 | Diabetes with Ophthalmologic or Unspecified Manifestation | 9 | 9 |
| HCC131 | Renal Failure | 10 | 9 |

* Average rank across NAT08–NAT12 and CON11
†̲ Tie

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

# Top 10 Additionals by Total Underpayment Amount

| HCC | HCC Name | CON11 Rank | Mean Rank[*] |
|---|---|---|---|
| HCC7 | Metastatic Cancer and Acute Leukemia | 1 | 4.8 |
| HCC105 | Vascular Disease | 2 | 1.7 |
| HCC71 | Polyneuropathy | 3 | 3.8 |
| HCC16 | Diabetes with Neurologic or Other Specified Manifestation | 4 | 5 |
| HCC15 | Diabetes with Renal or Peripheral Circulatory Manifestation | 5 | 6 |
| HCC19 | Diabetes without Complication | 6 | 6 |
| HCC77 | Respirator Dependence/ Tracheostomy Status | 7 | 8.5 |
| HCC83 | Angina Pectoris/Old Myocardial Infarction | 8 | 4.2 |
| HCC104 | Vascular Disease with Complications | 9 | 9 |
| HCC80 | Congestive Heart Failure | 10 | 7.6 |

[*] Average rank across NAT08–NAT12 and CON11

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2260    14

# Top 10 Additionals by Average Underpayment Amount per HCC

Release 1 to CGI per Dan Evans by email dated 8/05/14 - Trade Secret 2260/
Page ID #:21124

| HCC | HCC Name | CON11 Average | Average for all Samples* |
|------|----------|---------------|--------------------------|
| HCC7 | Respirator Dependence/Tracheostomy Status | $18,131 | $17,388 |
| HCC77 | Lung, Upper Digestive Tract, and Other Severe Cancers | $15,457 | $10,914 |
| HCC130 | Dialysis Status | $10,171 | $10,721 |
| HCC8 | Decubitus Ulcer of Skin | $9,204 | $9,029 |
| HCC25 | End-Stage Liver Disease | $8,970 | $8,259 |
| HCC1 | HIV/AIDS | $8,308 | $8,308 |
| HCC44 | Severe Hematological Disorders | $8,006 | $8,339 |
| HCC68 | Metastatic Cancer and Acute Leukemia | $7,809 | $8,134 |
| HCC45 | Paraplegia | $7,796 | $8,198 |
| HCC148 | Decubitus Ulcer of Skin | $7,583 | $7,139 |

* Average underpayment amount per HCC across NAT08–NAT12 and CON11

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

# OIG 2007 Audit Results vs. CON11 Results

| Contract ID | Parent Org | OIG 2007 Payment Error Point Estimate* | OIG 2007 Lower Bound of 99% CI | CON11 Payment Error Point Estimate* | CON11 Lower Bound of 99% CI |
|---|---|---|---|---|---|
| H0543 | UnitedHealth Group, Inc. | $423,709,068 | $288,232,331 | $32,363,041 | ($91,884,129) |
| H4590 | UnitedHealth Group, Inc. | $115,422,084 | $82,129,887 | ($3,943,825) | ($51,017,738) |

\* Point estimate is calculated as (payment error for sampled enrollees / sampling weight)

- In 2007, HHS OIG audited six contracts to estimate the payment error.  All six of these contracts were also selected for CON11.
- All but one of the six contracts had a net underpayment for CON11 at the 99% CI.  This may have been due to internal plan measures taken to delete inaccurate diagnoses in response to the OIG 2007 audit.

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

# TAR07 Recovery Amounts

| Contract ID | Parent Org | Recovery Amount | Contract ID | Parent Org | Recovery Amount |
|---|---|---|---|---|---|
| H0609 | UnitedHealth Group, Inc. | $406,738 | | | |
| H0151 | UnitedHealth Group, Inc. | $362,527 | | | |

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2263    17

# Key Differences Between CON11 and TAR07

- CMS' February 24, 2012, press release estimated the CON11 recovery amount at $370M, based on extrapolating TAR07 results with a Fee-for-Service Adjuster applied.
- Unlike in TAR07, MAOs used routine CMS processes to self-report and return overpayments for PY 2011 data, which may have impacted overpayments identified by RADV.  Total deletes submitted for PY 2011 for all contracts are ($227,246,080.99).
- Five medical records per HCC were allowed for CON11, providing more opportunity for validating the audited HCC and finding additional HCCs; only one medical record per HCC was allowed for TAR07 (actual CON11 average was 2.5 records/HCC)
- Submissions for TAR07 occurred outside CDAT (MAOs filled out hardcopy Coversheets)
- Greater use of EMRs during time of CON11

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

# Next Steps

- Issue  proposed FFSA methodology for comment

- Issue CON11 audit reports to MAOs
  - Triggers the first set of administrative appeals, known as Reconsideration, which is comprised of re-reviewing medical records for disputed HCCs and the payment error calculation appeal
  - Using the extrapolated estimates at the lower bound of the 99% CI, about 10% of HCCs are eligible for the reconsideration phase of appeals (1,644 of ~16,000)
  - Next phase of appeals is with the Office of Hearings, and the third and final phase of appeals is with the Adminsitrator

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

**EXHIBIT D-76**

**DOJ's February 11, 2022 Attachment B: The United States' Custodians Employment Chart**

| Jennifer Harlow | CM/MPPG | Deputy Director | July 2012-present |
|---|---|---|---|
| | | Division Director | Feb. 2007-July 2012 |
| | CM/Medicare Plan Policy Group | Special Assistant and Senior Advisor | Sept. 2005-Feb. 2007 |
| | CM/Health Plan Policy Group | Social Science Research Analyst | 2000-2004 |
| | | Social Science Research Analyst | 1998-2000 |

EXHIBIT

1253

2267

**EXHIBIT D-77**





# CY 2011 CMS Risk Adjustment
# Data Validation Overview

## October 9, 2012

**EXHIBIT**

1306

2269

# Welcome

- Introductions
  - Cheri Rice
    - Director, Medicare Plan Payment Group
  - Jonathan Smith
    - Director, Division of Payment Validation
  - Tobi Pulley
    - Acting Deputy Director, Division of Payment Validation

2270

# RADV Team Members

Maricruz Bonfante

Stacey Deiter

Esmail Essajee

Ashley Franzel

Kellie Gombeski

Carolyn Kapustij

Steve Ludwig

# Objectives

- Presentation will provide information about the risk adjustment data validation (RADV) contract-level audits for payment year 2011

- Information geared toward the contract-level sample, not the national sample conducted annually for error rate reporting

- At the conclusion of the presentation, CMS will respond to questions that have been submitted in advance

2272

# Agenda

- What is RADV?

- Final Payment Error Calculation Methodology

- RADV Process: Selection for Audit through Appeals

- What Happens After My Contract is Selected for an Audit?

- Answers to Submitted Questions

2273

# CY 2011 CMS Risk Adjustment Data Validation Overview

# What Is RADV?

# Terminology

- AROF – Audit Report of Findings
- CDAT - Central Data Abstraction Tool
- CMS - HCC – Center for Medicare and Medicaid Services Hierarchical Condition Category
- INV - Invalid
- MRD - Medical Record Dispute
- MRR - Medical Record Review
- RADV - Risk Adjustment Data Validation
- RAPS – Risk Adjustment Processing System

2275

# Risk Adjustment Data Validation (RADV) Overview

- RADV validates diagnoses submitted for payment.
- RADV is a corrective action to help reduce the Part C error rate.
  - Each year CMS reports a National Payment Error Estimate to comply with the Improper Payments Elimination and Recovery Act (IPERA) of 2010
- CMS expects that RADV will have a sentinel effect on quality of risk adjustment data submitted for payment going forward.

2276

# Risk Adjustment and Data Accuracy

- MA organizations are responsible for submitting accurate data to CMS for payment

- RADV is a method of evaluating the accuracy of the diagnoses submitted for payment

2277

# RADV Verifies Diagnoses Submitted for Payment

- MAO-submitted risk adjustment diagnoses must be:
  - Based on clinical medical record documentation from a face-to-face encounter (patient and provider)
  - Coded in accordance with the *ICD-9-CM Guidelines for Coding and Reporting*
  - Assigned based on dates of service within the data collection period
  - Submitted to the MA contracts by acceptable:
    - RA provider type
    - RA provider data source

2278    10

# CY 2011 CMS Risk Adjustment Data Validation Overview

# Final Payment Error Calculation Methodology

# Final Payment Error Calculation Methodology

- On Feb 24, 2012 CMS released the

  *Notice of Final Payment Error Calculation Methodology for Part C  Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits.*

  - Notice available at: www.cms.gov/Medicare/Medicare-Advantage/Plan-Payment/PaymentValidation.html/

- Revised from the December 20, 2010 document CMS released for comment entitled

  *Medicare Advantage Risk Adjustment Data Validation Notice of Payment Error Calculation Methodology for Part C Organizations Selected for Contract-Level RADV Audits- Request for Comment*

  - CMS reviewed all comments received and considered them when finalizing the methodology

2280

# Final Payment Error Calculation Methodology

- Methodology will be applied to next round of contract level audits conducted on payment year 2011
- Extrapolation will begin with payment year 2011
- Approximately 30 contracts will be selected for audit
- Contracts will be able to submit multiple medical records per CMS-HCC
- Fee-for-Service Adjuster will be applied to payment recovery amounts

2281    13

# CY 2011 CMS Risk Adjustment Data Validation Overview

RADV Process:

Selection for Audit through Appeals

# RADV Process -Sampling

- ## Step 1: Select MA Contracts eligible for RADV audits
  - Active contracts that received risk adjusted payments

- ## Step 2:  Select enrollees eligible for sampling
  - Selection based on enrollment data for January of the payment year
  - Eligible enrollees:
    - 12 months of Part B during data collection year (i.e., Full Risk)
    - Continuously enrolled in the same contract from January of the data collection year through January of the payment year
    - Non-ESRD in status from January of the data collection year through January of the payment year;
    - No hospice-only status from January of the data collection year through January of the payment year;
    - At least one CMS-HCC assigned
      - All CMS-HCCs for selected enrollees will be reviewed

2283

# RADV Process – Sampling Size and Strata

- 201 enrollees will be selected from the contract's RADV eligible population

- Stratified, random sample
  - 67 in each stratum

- Sampling weights
  - Enrollee sample weight computed as the total number divided by the number of enrollees sampled from that stratum (N/n).
    - For RADV contract level samples n= 67

2284

16

# RADV Process – Medical Record Review

- Every valid submitted record is evaluated by coders according to the *ICD-9-CM Guidelines for Coding and Reporting*

- Contracts should adhere to the RADV rules and provide documentation as prescribed in the audit instructions
  - Failure to do so may render the contract's subsequent appeals invalid and impact the payment recovery amount.

- CMS uses the Central Data Abstraction Tool (CDAT) to facilitate the RADV process

2285

# RADV Process – Medical Record Review

- Effective with the CY 2011 RADV audits, CMS will allow audited MA contracts to submit up to five medical records for each audited CMS-HCC per enrollee.

- A CDAT management function will allow MA contracts to add, re-order, and delete medical records for each enrollee up until the submission deadline.

- CMS will consider individual hardship requests if an MA contract identifies the need to submit more than five medical records per sampled CMS - HCC.

# RADV Process – Medical Record Review

- CMS will consider hardship requests in the extraordinary circumstance that a contract will need to submit more than five medical records to support a CMS-HCC for an enrollee

- Guidance pertaining to the hardship request will be included in the instructions packet issued to audited contracts

2287

# RADV Process – Medical Record Review

- Records submitted for RADV first undergo an intake evaluation

- For outpatient and physician records, a CMS-Generated Attestation may be submitted with a record that is missing a provider's signature and/or credential

- Only valid records go forward for coding

2288    20

# RADV Process – Medical Record Review

- CMS created the *Risk Adjustment Data Validation (RADV) Medical Record Checklist and Guidance* to assist contracts in selecting appropriate medical records
    - o  The guidance is based on issues CMS observed with medical records submitted for previous RADV audits
    - o The guidance addresses issues observed during intake (incorrect date of service, unacceptable provider type, etc) and coding (diagnosis cannot be verified using ICD-9 guidelines).

- List available at http://www.cms.gov/Medicare/Medicare-Advantage/Plan-Payment/Downloads/radvchecklist.pdf

2289    21

# RADV Process – Medical Record Review

- All diagnoses will be abstracted from the priority medical record that supports the CMS-HCC under review.

- Priority is based on the order in which medical records are arranged by the MA contract.

# RADV Process - Payment Error Estimate and Payment Recovery Amount

- The medical record review (MRR) results feed the payment error estimate

- Enrollee Level Error =  Original Payment – Post RADV Payment

- Apply the sampling weights to the enrollee level payment error to determine contract level error

# RADV Process: Payment Error Estimate and Payment Recovery Amount

- Total all enrollee payment errors

- Calculate 99% confidence interval

- Payment Error Estimate is lower bound of 99% confidence interval

- Application of FFS Adjuster

- Payment Recovery Amount
  - Payment recovery will occur after all steps of medical record review have been completed, including medical record dispute
    - Recovery amounts will be deducted from a contract's monthly payment

2292

24

# RADV Process - Payment Error Estimate and Payment Recovery Amount

- ## Step One: calculate difference in payment based on MRR results for each sampled enrollee.

   Actual payment – Post MRR payment = Enrollee level payment error

- ## Step two: apply sampling weights.

   Un-weighted payment error X strata specific sampling weight (N/n) = Extrapolated payment error for MA contract (point estimate)

2293

25

# RADV Process – Payment Error Estimate and Payment Recovery Amount

- Step three: calculate 99% confidence interval (CI) around payment error estimate

- Step four: determine payment recovery amount
  - If the CI for the point estimate includes zero or is below zero, payment recovery amount is constrained to zero
  - If CI is above zero, preliminary payment recovery amount is set at lower bound of 99% CI
  - Final payment recovery amount determined by applying a fee-for-service (FFS) adjuster to lower bound
    - If FFS adjuster amount is greater than preliminary payment recovery amount, final recovery is constrained to zero
    - Details on the FFS Adjuster will be shared in the future
      - Calculated by CMS based on a RADV-like review of records submitted to support FFS claims data.

2294

26

# RADV Process - Findings

- At the conclusion of the initial medical record review process, results will be issued to audited contracts

- Contracts will receive their Preliminary Audit Report of Findings (AROF)
  - For each audited CMS- HCC the Preliminary AROF will detail the validation outcome, error type (if applicable), and eligibility for medical record dispute
  - For each enrollee, the preliminary AROF will detail calculation of the corrected risk score and payment, based on initial medical record review results

- Contracts will receive information and instructions on medical record dispute (MRD) with the preliminary AROF

2295

27

# RADV Process - Medical Record Dispute

- MRD occurs after the initial medical record review results have been released to contracts

- Allows MA contracts an opportunity to dispute certain types of RADV-related errors

- Errors may be overturned through the MRD process

- For MRD, MA contracts will be allowed to select the "one best medical record" from the medical records it previously submitted for each audited CMS-HCC

2296

# RADV Process – MRD Findings

- At the conclusion of MRD, audited contracts will receive their finding through the Audit Report Post Medical Record Review

- Similar to the Preliminary AROF, the Audit Report Post Medical Record Review will detail CMS - HCC validation outcomes, error types, eligibility for appeal, as well as payment error recovery amounts

- Contracts will also receive instructions on filing appeals

2297    29

# Appeals

- Per 42 CFR § 422.311, MA contracts are afforded  two types of appeals:

  – Medical Record Review Determination Appeal

  – Payment Error Calculation Appeal

- Full appeal rights are detailed in the regulation

2298

# CY 2011 CMS Risk Adjustment Data Validation Overview

## What Happens After My Contract Is Selected for an Audit?

2299

# What happens after my contract is selected for audit?

- The CEO and MCO for your MA contract will:
  - Receive a CMS notification message via email containing:
    - Information about training and instructions availability
    - Directions on establishing three users for the Central Data Abstraction Tool (CDAT)
- Training will include
  - CDAT Access Training Teleconference
  - CMS Audit-Specific Teleconference, including CDAT submission training

2300    32

# What happens after my contract is selected for audit?

- CDAT is the secure system through which data related to RADV audits is transferred.
  - MA contracts download enrollee data and audit instructions
  - MA contracts upload medical records to CDAT
  - Medical record review is conducted within the CDAT

2301

# What happens after my contract is selected for audit?

- Two types of training will be held prior to the start of the audit
  - CDAT access training
    - Will instruct users on how to access and login to the system
  - Audit specific training
    - Will instruct users on how to upload records to CDAT
    - Will also provide information and instructions for the audit

2302    34

# What happens after my contract is selected for audit?

- Enrollee data is available on CDAT following the CMS Audit-Specific Teleconference

- Medical record submission deadline will be 16 weeks after the data identifying sampled enrollees is released to contracts

- CMS will provide technical assistance regarding the submission process

2303

# CY 2011 CMS Risk Adjustment Data Validation Overview

# Answers to Submitted Questions

# Questions and Answers

- CMS will answer questions that were submitted through radv@cms.hhs.gov
- If you have additional questions, please submit them to the RADV mailbox

**EXHIBIT D-78 INTENTIONALLY BLANK**

**EXHIBIT D-79**

June 4, 2013

### DRAFT
### Affordable Care Act Section 6402(a):
### Reporting and Returning Overpayments
### by Medicare Advantage Organizations and Part D Sponsors

**PURPOSE:**

The goal of the proposed regulatory changes described in this paper is to codify the Affordable Care Act requirement that Medicare Advantage organizations and Part D sponsors identify and return Medicare overpayments . This paper addresses six key issues related to this report and repay requirement..

**BACKGROUND:**

The Affordable Care Act (the Act) makes a number of changes to the Medicare program that enhance CMS' efforts to recover overpayments and combat fraud, waste and abuse. Section 6402(a) of the Act established 1128J(d) of the Social Security Act entitled "Reporting and Returning of Overpayments." Section 1128J(d)(1) of the Social Security Act requires a person who has received an overpayment under Titles XVIII and XIX to report and return the overpayment to the Secretary, the State, an intermediary, a carrier, or a contractor and to provide written documentation explaining the reason for the overpayment.

Section 1128J(d)(2) of the Social Security Act further requires that an overpayment must be reported and returned by the later of -- (1) the date which is 60 days after the date on which the overpayment was identified; or (2) the date any corresponding cost report is due, if applicable.

The Center for Program Integrity (CPI) issued a proposed rule in February 2012 that proposed several provisions regarding reporting and returning overpayments under section 6402 by providers in FFS Medicare. We propose to use the upcoming proposed Part C and D regulation for plan year 2015, which will be published this fall, as the vehicle for codifying the report and return requirement for MA organizations and Part D sponsors.

**DISCUSSION:**

This paper discusses six issues that will be addressed in the upcoming regulation and where decisions are needed for Medicare Parts C and D:

- **Issue 1.** Defining *Overpayment* for Medicare Parts C and D;
- **Issue 2.** Defining *Identified* for Medicare Parts C and D;
- **Issue 3.** Determining what the term *Applicable Reconciliation* means for Medicare Parts C and D;
- **Issue 4:** Determining the process for reporting and returning overpayments;
- **Issue 5**: Establish a look-back period for reporting Medicare Parts C and D overpayments; and
- **Issue 6:** Amending current payment regulations for Parts C and D to align with the new overpayment provisions.



[ PAGE \* MERGEFORMAT ]

**INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:** This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2308
USBP077689850

June 4, 2013

A number of the overpayment decisions apply equally to Part C and Part D payments; however, in several places a separate approach is needed for each program.

Due to the fact that this proposed overpayment rule will be released before CPI's final rule on overpayments, we must be cognizant not to refer in preamble to any element of our proposed policies as a CPI or Parts A and B final policy. Throughout this paper, differences and similarities in the two sets of proposals are noted.

## ISSUE 1: Defining *Overpayment* for Medicare Part C and Medicare Part D

Section 1128J(d)(4)(B) of the Act defines the term "*overpayment*" as "any funds that a person receives or retains under title XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such title." (In this paper we use the term entity instead of person.) In the regulation text, should CMS adhere to the more general statutory definition of an *overpayment* in implementing this provision for Parts C and D or should CMS tailor the definition to Medicare Parts C and D?

## OPTIONS:

*Option 1:* **Propose the statutory definition.** Under this approach, CMS would propose the statutory definition of *overpayment*, which provides CMS with maximum flexibility, and then provide in preamble some examples of overpayments specific to Medicare Parts C and D. CMS would further specify in sub-regulatory documents what constitutes Medicare Parts C and D overpayments. However, the downside to adopting this approach is that MA organizations and Part D sponsors may argue that the broad statutory definition of *overpayment* is not specific enough to be actionable. Of note, CPI proposed adopting the statutory definition of overpayment in their proposed rule, and received very few comments objecting to this definition.

*Option 2:* **Further specify the statutory definition by incorporating parameters unique to Medicare Parts C and D.** Under this approach, CMS would identify the universe of examples that would constitute an overpayment. The advantage in adopting this approach is that it clarifies in more detail what is and is not an overpayment in Medicare Parts C and D. The disadvantage with taking a more specific approach in defining overpayment in the regulations text is that CMS could unintentionally fail to cover all possibilities, thus creating exceptions that the industry could exploit, and the need for ongoing updates to regulation.

## RECOMMENDATION:

Adopt the more general statutory definition of an *overpayment*. This would avoid the situation where we unintentionally omit from regulation an area of Medicare Part C or D payment for which MA organizations and Part D sponsors would have responsibility, thus creating loopholes. Also, in the event new laws change Medicare Parts C or D payment provisions in a way that impacts the regulation, we would not have to amend the definition of *overpayment*. We understand that CPI intends to utilize the statutory definition of *overpayment* in the Medicare Parts A and B final rule.

**INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:** This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2309
USBP077689851
CONFIDENTIAL

June 4, 2013

We would, however, recommend that we discuss in the preamble the general principle that the obligation to report and repay overpayments under Section 6402 applies in those circumstances in which the overpayment is the result of the use of data submitted to CMS by the plans. Plan-submitted payment data generally fall into three categories: enrollment transactions, risk adjustment data, and Prescription Drug Event/ Direct and Indirect Remuneration data. Plans have complete control over submitting and then correcting data that fall into these three categories.

There are other payment data that could lead to an overpayment that MA organizations and Part D sponsors do not control because these elements are submitted to CMS by the SSA, States, and other sources such as ESRD dialysis networks. The accuracy of these other data are ultimately the responsibility of the entity that controls the relevant system of record. We would clarify in preamble that plans have an obligation to report what they believe might be errors in these data, but the final determination of the accuracy of the data is responsibility of the entity that controls the system of record. As a result, we would clarify that, in these situations, a determination by the plan of whether an overpayment occurred is not possible and, therefore, would not be governed by Section 6402.

### ISSUE 2. Defining *Identified* for Medicare Parts C and D

Section 1128J of the Act does not include a definition of the term "*identified*." Our understanding from CPI is that the definition of "*identified*" proposed in their proposed rule will likely be amended for the final rule, in response to public comments[1]. The Center for Program Integrity's final definition of "identification" of overpayments may be refined to indicate that the person/entity has identified an overpayment if there was (or should have been) an exercise of "reasonable diligence" to determine whether they did receive an overpayment and if so, to quantify the amount with a reasonable degree of certainty. Further, we understand that CPI's approach to defining "reasonable diligence" is to indicate it includes both proactive activities to monitor payments and reactive activities to investigate a possible overpayment based on credible information the person/entity received about an overpayment.

### RECOMMENDATION:

Redacted

---

[1] In CPI's NPRM, identified means that "a person has actual knowledge of the existence of the overpayment or acts in reckless disregard or deliberate ignorance of the existence of the overpayment." CPI mentioned that commenters indicated confusion about this definition (e.g., how persons are to identify potential overpayments and whether persons must take proactive steps).

[ PAGE \* MERGEFORMAT ]

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2310
USBP077689852

June 4, 2013

# Redacted

**ISSUE 3.** Determining what the term *"applicable reconciliation"* means for Medicare Part C and D

*Applicable Reconciliation.* Section 1128J(d)(4)(B) of the Act defines the term *overpayment* as "any funds that a person receives or retains under title XVIII or XIX to which the person, after *applicable reconciliation*, is not entitled under such title." Since Medicare Parts C and D payments go through elaborate reconciliation processes, CMS must determine what the term means within the context of the definition of *overpayment*, for MA organizations and Part D sponsors.

**Risk Adjustment Reconciliation.** Medicare makes "estimated" interim capitated payments to MA organizations and Part D sponsors for each enrollee each month with the knowledge that a reconciliation of those payments will be done when the actual costs or correct payment information, such as risk adjustment data, becomes available, usually at a later date. The initial "estimated" payments are based on the approved bids and preliminary risk adjustment data submitted by MA organizations and Part D sponsors. CMS makes prepayments at the beginning of the month based on the most current information available. Over time, as additional payment information becomes available, interim payments that were made throughout the payment year are reconciled. Final risk adjustment data are due by January 31st following the payment year. Overpayments are currently recognized and accepted after this point, but MA organizations cannot submit additional diagnoses for additional payment after the January 31st deadline. Therefore, January 31st provides a logical *applicable reconciliation*.

**Annual Part D Reconciliation.** In addition to the direct subsidy, Medicare Part D makes prospective payments to plans that cover the low-income cost-sharing subsidy (LICS) and the reinsurance subsidy. During the annual Part D payment reconciliation, CMS compares the finalized prospective payments and the corresponding actual costs reported on prescription drug events (PDEs) and makes payment adjustment according to the rules for LICS and reinsurance. In addition, after year-end (and after reconciliation of the direct subsidy payment), CMS compares actual covered drug costs to direct subsidy payments, and if they differ by legislatively specified percentages, CMS calculates a risk sharing payment adjustment. Plans have an additional reporting requirement to submit DIR data for the year-end reconciliation. Prior to performing the reinsurance reconciliation and risk sharing, the Net Part D Covered DIR amount is determined. The cost-based reconciliations for the LICS and the reinsurance subsidy (described at 42 CFR 423.343 (c) and (d), respectively) are the last reconciliation processes for the annual Part D payment reconciliation, and therefore provide a logical *applicable reconciliation* for Medicare Part D.

## RECOMMENDATION:

We recommend adopting separate definitions of *applicable reconciliation* for risk adjustment data and for Part D payment data.

[ PAGE  \* MERGEFORMAT ]

**INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:** This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2311
USBP077689853

June 4, 2013

**Risk Adjustment:** For risk adjustment data, a*pplicable reconciliation*, for the purposes of this rule, means

> *- after the deadline for submitting diagnoses that will be used to calculate the risk scores that will be used in the final reconciliation of risk adjusted payments to MA organizations within the timeframes established within applicable MA regulations or other sub-regulatory guidance. See 42 CFR 310 (g) (2) for the annual deadline for risk adjustment data submission.*

**Part D:** For Medicare Part D, a*pplicable reconciliation*, for the purposes of this rule, means

> *- The annual Part D payment reconciliation referred to in 42 CFR 423.343 (c) and (d).*

## ISSUE 4. Determining the process for reporting and returning overpayments.

Section 1128J(d)(1) of the Social Security Act requires a person who has received an overpayment to report and return the overpayment. Section 1128J of the Act also provides that an overpayment must be reported and returned by the later of—(i) the date which is 60 days after the date on which the overpayment was identified; or (ii) the date any corresponding cost report is due, if applicable. The statute does not define what *return* means in terms of the Secretary's responsibility. We believe the statute provides flexibility in the length of time, within reason, for CMS to process the overpayment returned by the MA organization or Part D sponsor. We do not believe the statute requires CMS to process the overpayment in the system within the 60 days after the date on which the overpayment was identified. This would be impossible to accomplish due to operational resource constraints. We would discuss this in the preamble.

## RECOMMENDATION:

We recommend generally that MA organizations and Part D sponsors submit corrected data related to overpayments to CMS and that CMS then recoup overpayments through the routine payment adjustment processes. Therefore, a plan's obligation to "return" the overpayment would be met by reporting corrected data related to the overpayment and the timing of the actual overpayment recoupment would depend on the timing of when CMS performs the relevant payment update or reconciliation.

## ISSUE 5. Look-back Period for Reporting Medicare Parts C and D Overpayments

After the applicable reconciliation, the look-back period is the timeframe within which MA organizations and Part D sponsors will be held accountable for both identifying and reporting overpayments. The question is how long should the look-back period be.

**Current Policy for Finalizing Medicare Part C Payments.** The applicable reconciliation and deadline for finalizing Medicare Part C payments is final risk adjustment reconciliation. However, payment adjustments are routinely conducted after this reconciliation in order to incorporate changes to plan and beneficiary information which impact the payment calculation. These changes to plan and beneficiary information can be discovered well after the final payment reconciliation and some necessitate special system runs to accommodate payment recalculations. Changes to beneficiaries risk score information generally trigger the larger payment adjustments.

[ PAGE  \* MERGEFORMAT ]

**INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:** This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

CONFIDENTIAL                                            USBP077689854

June 4, 2013

Recently, with RADV, plans have been paying more attention to submitting 'deletes' which essentially remove diagnoses from risk scores and result in payments being recouped from plans. Once risk adjusted payment are finalized, CMS only updates risk scores to address overpayments (e.g., "adds" are not taken and there are no "underpayments"). The timeframe for conducting a final risk adjustment reconciliation is established at 42 CFR 422.310(g) (2) as January 31st after the payment year. Payment adjustments based on final risk scores are typically made in August after the payment year has ended.

**Current Policy for Finalizing Medicare Part D Payments.** The timing for when the direct subsidy part of the Medicare Part D payment is final follows that for the Medicare Part C risk score final reconciliation, and the discussion above generally applies to the Medicare Part D direct subsidy payments. Medicare Part D regulations and Medicare Part D guidance do not define a time at which the cost-based reconciliations for a given contract year is considered final. To the contrary, 42 CFR 423.346(a) (2) contemplates a reopening 4 years after the date of the notice of the initial *or* reconsidered determination and at 42 CFR 423.346(a) (3) contemplate a reopening at *any time* for fraud or similar fault of the Part D sponsor.

Multiple factors can cause overpayment related to the cost-based reconciliations, such as:

- An overstatement in the LICS, covered plan-paid amounts (CPP), Gross Covered Drug Cost Above the OOP Threshold (GDCA);
- An overstatement in of the TrOOp eligible fields (e.g., patient pay, LICS, reported gap discount, other TrOOP amount), which can lead to an overstatement in GDCA;
- Beneficiary is retroactively disenrolled, and the plan fails to delete the PDEs;
- Plan submitted a claim as if Medicare was primary when they were secondary;
- Underlying claim issue where the plan should have never submitted a PDE in the first place;
- Plan submits a duplicate PDE;
- Plan under-reports DIR, which could result in inflated reinsurance and risk-sharing payments; and
- Inaccuracies in bid data resulting in a plan being miscategorized for reconciliation.

As stated in Issue 3 above, the proposed "*applicable reconciliation*" for Medicare Part D is to be the annual Part D payment reconciliations referred to in 42 CFR 423.343 (c) and (d). Part D sponsors will continue to submit PDEs and DIR data after the applicable reconciliation due to audit and other post reconciliation oversight activity. As a result, CMS will perform global reopenings of the reconciled contract years to reconcile payments with the new data received. To date, contract years 2006, 2007, and 2008 have been reopened, and CMS has released guidance stating that we intend to eventually perform a global reopening of 2011 once there is stability in the data for that year. This experience indicates to us that we will likely have to perform a reopening for every contract year. However, in light of the statutory overpayment provision that we plan to codify in this regulation, we do not believe that it is necessary do a reopening for a contract year anymore than once. We, therefore, propose that CMS may do one reopening 5 years from the initial cost-based reconciliations. This is approximately 6 years from the close of a contract year.

[ PAGE \* MERGEFORMAT ]

**INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:** This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

June 4, 2013

**CPI Proposed Rule for FFS.** In CMS-6037-P, CPI proposed a 10 year look-back period. However, it is expected that the final regulation will move to a 6 year look-back period. This is because a 6 year period will not pose enforcement obstacles for the Department of Justice, and is consistent with the statute of limitations related to the False Claims Act and Civil Monetary Penalty provisions.

**OPTIONS:**

The following options address the look-back period for which MA organizations and Part D sponsors will need to ensure accurate payments.

*Option 1: 10 year lookback period*- MA organizations and Part D sponsors would be required to ensure accurate payments for 10 years after applicable reconciliation. This timeframe is consistent with the outer limit of the False Claims Act statute of limitations. This is also consistent with the record keeping requirements for the MA and Part D contracts and allows MA organizations and Part D sponsors to close their books and not have ongoing liability associated with an overpayment.

*Option 2: 6 year lookback period*- MA organizations and Part D sponsors would be required to ensure accurate payments for 6 years after applicable reconciliation. This option would be consistent with what we understand will be the final FFS policy. In CMS-6037-P, CPI proposed a 10 year look-back period. However, it is expected that the final regulation will move to a 6 year look-back period. This is because a 6 year period will not pose enforcement obstacles for the Department of Justice, and is consistent with the statute of limitations related to the False Claims Act and Civil Monetary Penalty provisions.

**RECOMMENDATIONS:**

We recommend Option 2. The 6 year look-back period allows MA organizations and Part D sponsors to ensure accurate payments within a reasonable amount of time. It takes into consideration the resource burden on MA organizations, Part D sponsors and CMS. For Part D sponsors, a 6 year look-back period also makes sense in light of the proposed changes to the reopening provision.

This approach is consistent with the maintenance of records requirements in MA and Part D contracts. There would be exceptions pertaining to fraud-related overpayments.

**ISSUE 6.** **Amending current payment regulations for Parts C and D to align with the new overpayment provisions.**

**Issue 6.A.** Currently the Part C regulation at 422.310(g)(2) states that CMS will not accept risk adjustment data after the annual January 31 late data submission deadline:

> CMS allows a reconciliation process to account for late data submissions. CMS continues to accept risk adjustment data.... until January 31 of the year following the payment year. After the payment year is completed, CMS recalculates the risk factors for affected individuals to determine if adjustments to payments are necessary. Risk adjustment data

[ PAGE \* MERGEFORMAT ]

**INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:** This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

June 4, 2013

that are received after the annual January 31 late data submission deadline will not be
accepted for the purposes of reconciliation.

This paragraph also applies to Part D, by reference at 423.343(b), which states that adjustments
to payments to account for updated risk adjustment data are made as provided in the Part C
regulation at 422.310(g)(2).

CMS has not enforced this late deadline, especially given numerous requests in recent years from
MA organizations that CMS allow them to submit updated risk adjustment records that delete
diagnoses previously submitted for payment. Adjustments for overpayments after the deadline
have been allowed, but not for underpayments (except in a very limited number of
circumstances).

The proposed overpayment regulation will require organizations that identify overpayments
under a look-back period of six years to submit corrected data to allow CMS to correct payment
amounts.

**RECOMMENDATION:** We would propose to replace the final sentence in paragraph
422.310(g)(2) with the following sentence that references 422.326, the proposed new section
with the Part C overpayment provisions.

> CMS will determine the timeline and conditions under which risk adjustment data can be
> corrected for purposes of 422.326. However, additional diagnoses for the payment year
> cannot be submitted after the annual late data submission deadline.

**Issue 6.B.   Amend §422.310 to require MA organizations conducting medical record
reviews to focus not only on identifying underpayments.**

Under existing regulation, there is no requirement to for plans to audit medical records for
overpayments. If a plan is conducting medical record reviews to identify underpayments, we
recommend that they be required to audit as well for overpayments. We believe that CMS
should codify this requirement, and now would be an effective time to make this change, as part
of implementing the overpayment provisions of Section 6402(a) of the Act.

# Redacted

(l) *Certification of data that determine payment.* As a condition for receiving a monthly
payment under subpart G of this part, the MA organization agrees that its chief executive

[ PAGE  \* MERGEFORMAT ]

**INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:** This information has not been publicly
disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to
persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2315

June 4, 2013

> officer (CEO), chief financial officer (CFO), or an individual delegated the authority to
> sign on behalf of one of these officers, and who reports directly to such officer, **must
> request payment under the contract on a document that certifies** (based on best
> knowledge, information, and belief) **the accuracy, completeness, and truthfulness of
> relevant data that CMS requests.** Such data include specified enrollment information,
> encounter data, and other information that CMS may specify.....
> (2) The CEO, CFO, or an individual delegated with the authority to sign on behalf of one
> of these officers, and who reports directly to such officer, must certify (based on best
> knowledge, information, and belief) **that the data it submits under §422.310 are
> accurate, complete, and truthful.**

The requirement would apply to those MA organizations that conduct medical record reviews for
the purpose of evaluating their payments (i.e., evaluating the diagnosis data that they submit to
CMS for payment). "Accurate and complete" risk adjustment data for a beneficiary should
obligate an MA organization to identify and delete diagnoses it submitted to CMS systems but
later found to not be supported by the medical record, as a part of any medical record review it
undertakes.

**RECOMMENDATION:**

We recommend adding a new paragraph §422.310(e)(1)[2], stating:

> "For any MA organization that conducts reviews of enrollee medical records (including
> reviews conducted by a related entity, contractor, or subcontractor), if any aspect of such
> reviews informs the MA organization's decisions on what risk adjustment data to submit
> or resubmit to CMS (including encounter data) for purposes of amending CMS'
> payments to the MA organization under §422.304, the methodology and implementation
> of such reviews cannot focus only on identification of underpayments. Such reviews
> must focus on the identification of any payment that was made by CMS in an incorrect
> amount, including both underpayments and overpayments."

---

[2] We would propose to renumber current 422.310(e)(1), which addresses RADV audits, as (e)(2), and then add this
paragraph as (e)(1).

[ PAGE \* MERGEFORMAT ]

**INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:** This information has not been publicly
disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to
persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

2316
USBP077689858

**EXHIBIT D-80**

February 24, 2012

## Notice of Final Payment Error Calculation Methodology for
## Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits

### Introduction

On December 21, 2010 the Centers for Medicare and Medicaid Services (CMS) posted on its website the "Medicare Advantage Risk Adjustment Data Validation (RADV) Notice of Payment Error Calculation Methodology for Part C Organizations Selected for RADV Audit – Request for Comment". CMS invited public comment on the proposed methodology, with such comments to be submitted in writing by Friday, January 21, 2011.

CMS carefully reviewed the more than 500 comments received on the draft methodology. This Notice responds to the analytic concerns raised relating to extrapolation and payment recovery and presents the final methodology for the RADV payment error calculation.

Following the background section, this Notice provides a general walkthrough of the RADV payment error calculation methodology in two sections: (A) sampling; and (B) payment error calculation.

This methodology will be applied to the next round of RADV contract-level audits, which will be conducted on payment year 2011. Payment year 2011 is the first year for which payment recovery based on extrapolated estimates will be conducted for Medicare Advantage (MA). Note that sampling for RADV audits will occur after the close of final reconciliation for the payment year being audited.

CMS' RADV audit initiative is the Agency's primary strategy to address the national payment error rate for the MA program, which is currently estimated to be 11 percent for FY 2011. In addition to recovery of overpayments through RADV audits, CMS also expects that these contract-level audits will have a sentinel effect on the quality of risk adjustment data submitted for payment by MA organizations.

### Background

Section 1853(a)(3) of the Social Security Act requires that CMS risk adjust payments to Medicare Advantage (MA) organizations. In general, the current risk adjustment methodology relies on enrollee diagnoses, as specified by the International Classification of Disease, Ninth Revision Clinical Modification guidelines (ICD-9-CM), to prospectively adjust capitation payments for a given enrollee based on the health status of the enrollee. Diagnosis codes submitted by MA organizations are used to determine beneficiary risk scores, which in turn determine the risk-adjusted reimbursement.

RADV audits determine whether the diagnosis codes submitted by MA organizations can be validated by supporting medical record documentation. This medical record documentation must meet certain criteria and standards specified in RADV materials that CMS provides to audited contracts. Diagnoses that cannot be validated contribute to a payment error rate. This document describes the sampling methodology that CMS will use for RADV audits and the methodology for calculating the payment error for each audited Medicare Advantage contract.

EXHIBIT

1497-10
~~2318~~

## A. **Sampling**

To conduct these audits, CMS selects a set of MA contracts for each RADV audit cycle. Enrollees are sampled from each selected MA contract for the purpose of estimating payment error related to risk adjustment.

*Sampling Frame*

First, CMS identifies all beneficiaries under each MA contract who are "RADV-eligible" because they meet the following criteria:

1. Enrolled in an MA contract (H-number, E-number, or R-number) in January of the payment year— based on CMS' monthly member enrollment files;
2. Continuously enrolled in the same MA contract (as identified in step (1) above) from January of the data collection year through January of the payment year;
3. Non-End Stage Renal Disease (non-ESRD) status from January of the data collection year through January of the payment year;
4. Non-hospice status from January of the data collection year through January of the payment year;
5. Enrolled in Medicare Part B coverage for all 12 months during the data collection year (i.e., defined as full risk enrollees for risk adjusted payment); and
6. Had at least one risk adjustment diagnosis (ICD-9-CM code) submitted during the data collection year that led to at least one CMS-Hierarchical Condition Category (HCC) assignment for the payment year.

*Sample Size and Strata*

Next, CMS selects a sample of beneficiaries from each contract's cohort of RADV-eligible enrollees. Enrollee-based stratification will be used in the process of sampling enrollees. In order to derive the strata, the RADV-eligible enrollees in each contract will be ranked from lowest to highest based on their community risk score. The enrollees will then be divided into three equal groups based on the total number of eligible enrollees, where the first group will include the third of enrollees with the highest risk scores and the third group will include the third of enrollees with the lowest risk scores. The remaining enrollees will be in the middle stratum.

CMS will select up to 201 enrollees for medical record review from each contract selected for a contract-level audit. For smaller contracts, i.e., those with fewer than 1,000 RADV-eligible enrollees, CMS will individually adjust their sample sizes by using the finite population correction factor. The sample sizes for these smaller contracts will be 201 or fewer enrollees.

To achieve a sample size of 201 enrollees per contract, sixty-seven (67) enrollees will be randomly sampled from each group or stratum. The corresponding stratum-based enrollee weights will be computed as the number of RADV-eligible enrollees in the population grouping (or stratum) divided by the number of enrollees selected from that grouping for the sample, i.e., $N_h/n_h$, where $h$ represents the corresponding stratum.

2

2319

ATTORNEYS' EYES ONLY    USBP066789952

For example, if a contract has 3,000 RADV-eligible enrollees, the enrollees would be ranked by risk score, then divided into three equal groups of 1,000 enrollees each (to represent high, medium, and low strata).  An equal number of enrollees will be randomly selected from each group.  The weight for each sampled enrollee will equal 14.925 (i.e., 1,000/67).

For small contracts with fewer than 1,000 RADV-eligible enrollees, the same enrollee-based stratification process will be applied;  however, a proportionally smaller number of enrollees will be randomly sampled from each group or stratum.

The enrollee sampling weights will be used as multipliers to scale-up (or extrapolate) the sample payment error findings to the population it represents.

Once enrollees have been selected, the MA contract will be required to submit medical records to support all CMS-HCCs represented in the sampled beneficiaries' risk scores for the payment year.

Effective with the CY 2011 RADV audit, CMS will allow audited MA contracts to submit multiple medical records for each CMS-HCC being validated.  All diagnoses will be abstracted from the first medical record that validates the CMS-HCC under review.  The one best medical record policy will continue to apply to the RADV audit dispute and appeal processes outlined in 42 CFR §422.311.  CMS will provide more detailed information in the RADV audit procedures that will be distributed to audited MA contracts.

## B.  <u>Payment Error Calculation</u>

*Enrollee-level Payment Error Calculation*

CMS will calculate each contract's payment error based on the validation results.  For each sampled enrollee, the RADV-corrected risk score and corrected payment will be calculated based on the CMS-HCCs that are supported by RADV medical record review findings for the enrollee.  Enrollee-level payment errors will be defined as the difference between the original payment and the RADV-corrected payment (per member per month).  The payment error for each enrollee will be either positive (representing a net overpayment), or negative (representing a net underpayment).  An annual payment error amount will be calculated for each sampled enrollee based on the number of months the person was enrolled in the selected MA contract (and was not in ESRD or hospice status) during the payment year.

*Payment Error Extrapolation Calculation*

To derive the payment error estimate for each MA contract, the annual payment error for each sampled enrollee will be multiplied by the enrollee's sampling weight (computed for each stratum [h] during the sampling phase as $N_h/n_h$, where N represents the number of enrollees in the RADV-eligible population and n is the number of enrollees sampled). The weighted enrollee annual payment error will be summed across all enrollees in the sample to determine an estimated payment error for the MA contract (the "point estimate").  A 99 percent confidence interval (CI) will then be calculated for the estimated payment error for each audited MA contract.

2320

ATTORNEYS' EYES ONLY

USBP066789953

The following formulas illustrate computation of a 99 percent CI around the payment error estimate for one contract, assuming a sample size of 201, with 67 enrollees selected from each of three strata groupings.

The lower bound of the 99 percent CI is computed as the estimated payment error for the contract (PE) minus (2.575 multiplied by the standard error), or (PE – (2.575 * SE)).  The standard error (SE) can be calculated as follows:

1. Derive the variance, $v_h$, (standard deviation squared) of the unweighted enrollee payment errors across the sample enrollees within each of the three strata ($h$).
2. Calculate the variance of the estimated total ($V_{\hat{T}}$) payment error, where N represents the number of enrollees in the RADV-eligible population of the $h^{th}$ (1st, 2nd, 3rd) stratum:

$$V_{\hat{T}} = \sum_{h=1}^{3} \frac{N_h^2}{67} v_h$$

3. The standard error is $SE_{\hat{T}} = \sqrt{V_{\hat{T}}}$

Payment Recovery Amount and the Fee-For-Service Adjuster

If the CI for the point estimate includes zero or is below zero, the contract will have the payment recovery amount constrained to zero.

If the CI for the point estimate is above zero, the payment recovery amount for the contract will be determined as follows.  First, a preliminary payment recovery amount will be set at the lower bound of the 99 percent CI for the contract's point estimate.  Second, to determine the final payment recovery amount, CMS will apply a Fee-for-Service Adjuster (FFS Adjuster) amount as an offset to the preliminary recovery amount.  If the FFS Adjuster amount is greater than the preliminary recovery amount, the final recovery amount is equal to zero.

The FFS adjuster accounts for the fact that the documentation standard used in RADV audits to determine a contract's payment error (medical records) is different from the documentation standard used to develop the Part C risk-adjustment model (FFS claims).  The actual amount of the adjuster will be calculated by CMS based on a RADV-like review of records submitted to support FFS claims data.

2321

ATTORNEYS' EYES ONLY

USBP066789954

**EXHIBIT D-81**

**REDACTED VERSION OF
DOCUMENT PROPOSED TO BE
FILED UNDER SEAL**

PRODUCED IN NATIVE FORMAT

**EXHIBIT**

1497-18
2323

CONFIDENTIAL

USBP068691383

# CMS RADV

– Comparison and Analysis of CON11, CON12 & CON13

December 8, 2017

# Sampling Differences for Contract Samples



|  | CON11 | CON12 | CON13 |
|---|---|---|---|
| RADV-eligible enrollee threshold | 1,000 | 2,000 | 5,000 |
| Number of Contracts selected: | 30 | 30 | 30 |
| High Coding Intensity Stratum | 20* | 20 | 25 |
| Medium Coding Intensity Stratum | 5** | 5 | 5 |
| Low Coding Intensity Stratum | 5 | 5 | 0 |
| Number of RADV-eligible enrollees in 30 Sampled Contracts | 778,808 | 838,373 | 902,451 |
| Parent Organization Analysis | 4 United HealthGroup plans account for 0.0% of total recovery amount | 5 United HealthGroup plans account for 5.0% of total recovery amount | 6 United Health Group plans account for 1.4% of total recovery amount |

\* includes 5 OIG-selected plans
\*\* includes 1 OIG-selected plan

2325

# Recovery Amount/Eligible Population

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

*Recovery amount is the extrapolated payment error amount based on the lower bound of the 99% confidence interval for the total.
*Only those MA contracts with greater than $0 recovery amount are included; there were 14 such contracts in CON11, 17 contracts in CON12 and 12 contracts in CON13.

# Recovery Amount and Eligible Population by Parent Organization



*Recovery amount is the extrapolated payment error incorporating the lower bound of the 99% confidence interval.
*All MA contracts in the sample are included in this analysis.

# Medical Record Submission Summary

**Medical Record (MR) Submission per CMS-HCC- Overall**

| MR validity | CON11 | | | | | CON12 | | | | | CON13 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total MRs | MEAN | STD | MIN | MAX | Total MRs | MEAN | STD | MIN | MAX | Total MRs | MEAN | STD | MIN | MAX |
| Invalid | 1,805 | 1.38 | 0.79 | 1 | 6 | 1,842 | 1.47 | 1.01 | 1 | 5 | 1,426 | 1.46 | 0.98 | 1 | 5 |
| Valid | 35,499 | 2.91 | 2.13 | 1 | 26 | 37,979 | 2.75 | 1.76 | 1 | 13 | 41,203 | 2.78 | 1.85 | 1 | 15 |
| Overall | 37,304 | 2.99 | 2.21 | 1 | 26 | 39,821 | 2.81 | 1.8 | 1 | 13 | 42,629 | 2.83 | 1.88 | 1 | 15 |

- ➢ The number of MRs submitted increased year over year, with CON13 having the most submissions
- ➢ The average number of MR submission per CMS-HCC is similar between CON12 and CON13, and slightly higher in CON11
- ➢ There were ~400 fewer invalid records submitted in CON13 compared to CON11 and CON12

**Summary of Valid MRs Used for MRR CMS-HCC by Contract**

| Sample | Total Valid MRs submitted | MRs used after applying MRR result selection logic* | | | |
|---|---|---|---|---|---|
| | | MRs - additionals allowed | MRs - additionals Not allowed | Total | Percentage |
| CON11 | 35,499 | 8,679 | 212 | 8,891 | 25.05% |
| CON12 | 37,979 | 8,364 | 213 | 8,577 | 22.58% |
| CON13 | 41,203 | `8,849 | 168 | 9,017 | 21.88% |

- ➢ The percentage of total valid MRs used for MRR decreased year over year with the lowest percentage of valid MR used in CON13

*MRR Result Selection Logic:
- For each non-hierarchical audited CMS-HCC: The highest ranked MR that confirmed the audited CMS-HCC is selected. Any additionals found on the selected MR are used.
- For each hierarchical audited CMS-HCC: The highest ranked MR that had a higher manifestation of the audited CMS-HCC is selected. If the selected MR confirm/confirm higher then additionals found on the MR, if any, are used.  If the selected MR confirmed-lower then additionals found on the MR, if any, are not used.
**Full details of MRR results selection criteria can be found in LAC-Oriented data creation document.

# HCC Discrepancy Rate Summary

**Discrepancy Rate by Sample - Overall**

| Sample | Audited HCCs | Confirmed* HCCs | Discrepant** HCCs | Additional HCCs | | | | | Discrepancy Rate |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Confirmed Higher | Confirmed Lower | New Hierarchy | Non Hierarchy | Total | |
| CON11 | 16,263 | 13,199 | 3,064 | 439 | 475 | 678 | 462 | 2,054 | 18.84% |
| CON12 | 16,842 | 13,241 | 3,601 | 329 | 473 | 696 | 414 | 1,912 | 21.38% |
| CON13 | 17,863 | 15,099 | 2,764 | 362 | 393 | 710 | 410 | 1,875 | 15.47% |

\* Discrepant confirmed higher CMS-HCCs were counted as confirmed.
\*\* Discrepant confirmed lower CMS-HCCs were counted as discrepant.

➢ CON13 has lowest discrepancy rate
   ➢ Highest number of audited HCCs
   ➢ ~900 fewer discrepant HCCs compared to CON12
➢ CON13 has fewer additional HCCs

**Discrepant CMS-HCC Summary by Error Type - Overall**

| Sample | Discrepant HCCs | Error Type | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Coding Incomplete | | Signature Credential Issues | | Invalid | | Missing | |
| | | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| CON11 | 3,064 | 2,424 | 79.11% | 256 | 8.36% | 136 | 4.44% | 248 | 8.09% |
| CON12 | 3,601 | 2,764 | 76.76% | 303 | 8.41% | 161 | 4.47% | 373 | 10.35% |
| CON13 | 2,764 | 2,344 | 84.80% | 162 | 5.86% | 105 | 3.80% | 153 | 5.54% |

➢ Percentage of discrepant HCCs due to incomplete coding is higher in CON13
➢ Percentage of discrepant HCCs due to signature credential issues, invalid MR, and missing MR is lower in CON13

*All MA contracts in the sample are included in this analysis.

2329

# HCC Discrepancy Rate by Contract

[redacted]

*MA contracts are in the descending order (from left to right) by recovery amount (based on lower 99% Confidence Interval).
** Discrepant confirmed higher CMS-HCCs were counted as discrepant.

# Sampled Enrollees Distribution by Gender/Age Group



➢ The number of sampled enrollees per group appears to be close among the three samples

*All MA contracts in the sample are included in this analysis.

2331

# Sampled Enrollees Payment Error by Gender/Age Group



> ➤ The average **unweighted** payment error is lower for CON13 in many of the groups
> ➤ The Male 0-34 yrs and Male ≥95 yrs groups show underpayments on average for CON11

> ➤ CON11 has more groups with average **weighted** underpayments

*All MA contracts in the sample are included in this analysis.

2332

# Sampled Enrollees Average Unweighted Payment Error and Risk Score Change by Contract

**Average Unweighted Payment Error by Contract**



➢ Higher average risk score changes are aligned with the higher average unweighted payment errors

*Only MA contracts with greater than $0 recovery amount are included.
**Average Risk Score Change is based on unadjusted/un-normalized risk scores.

2333

10

# Sampled Enrollees Average Weighted Payment Error and Risk Score Change by Contract

**Average Weighted Payment Error by Contract**



*Only MA contracts with greater than $0 recovery amount are included.
**MA contracts are in descending order (from left to right) by **underlined** payment error.
***Average risk score change is based on unadjusted/un-normalized risk scores.

2334

11

# Sampled Enrollees Average Unweighted Payment Error by Contract

**Average Unweighted Payment Error by Contract – by Stratum**





➢ Average unweighted payment error is lower in Stratum 1 for most contracts

➢ Average unweighted payment error is higher in Stratum 3 for all contracts

➢ 

\*Only MA contracts with greater than $0 recovery amount are included.

# Sampled Enrollees Average Weighted Payment Error by Contract

**Average Weighted Payment Error by Contract – by Stratum**



\*Only MA contracts with greater than $0 recovery amount are included.

\*\*MA contracts are in descending order (from left to right) by **unweighted** payment error.

2336

# Sampled Enrollees Average Risk Score Change by Contract

**Average Risk Score Change by Contract – by Stratum**



> Stratum 3 has the highest average risk score change for most contracts in all samples
>

\*Only MA contracts with greater than $0 recovery amount are included.

\*\*MA contracts are in descending order (from left to right) by **unweighted** payment error.

\*\*\*Average risk score change is based on unadjusted/un-normalized risk scores.

# Top 10 CMS-HCCs by Discrepancy Count*

| | | Top 10 Discrepant HCCs | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | CON11 | | | CON12 | | | CON13 | | |
| # | HCC | # Discrepant | % Total Discrepant | HCC | # Discrepant | % Total Discrepant | HCC | # Discrepant | % Total Discrepant |
| 1 | HCC105 | 139 | 7.54% | HCC105 | 234 | 8.70% | HCC105 | 139 | 8.59% |
| 2 | HCC10 | 104 | 5.64% | HCC80 | 165 | 6.13% | HCC96 | 98 | 6.06% |
| 3 | HCC80 | 104 | 5.64% | HCC108 | 153 | 5.69% | HCC92 | 91 | 5.62% |
| 4 | HCC96 | 101 | 5.48% | HCC92 | 150 | 5.57% | HCC131 | 88 | 5.44% |
| 5 | HCC108 | 100 | 5.43% | HCC10 | 141 | 5.24% | HCC15 | 87 | 5.38% |
| 6 | HCC92 | 85 | 4.61% | HCC96 | 135 | 5.02% | HCC10 | 85 | 5.25% |
| 7 | HCC15 | 81 | 4.40% | HCC15 | 130 | 4.83% | HCC80 | 85 | 5.25% |
| 8 | HCC71 | 77 | 4.18% | HCC19 | 125 | 4.65% | HCC55 | 68 | 4.20% |
| 9 | HCC131 | 74 | 4.02% | HCC83 | 117 | 4.35% | HCC108 | 67 | 4.14% |
| 10 | HCC19 | 71 | 3.85% | HCC131 | 114 | 4.24% | HCC71 | 67 | 4.14% |



* Only MA contracts with greater than $0 recovery amount are included in this analysis.

2338

# Top 10 CMS-HCCs by Payment Error*

| Top 10 Discrepant HCCs | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CON11 | | | CON12 | | | CON13 | | |
| # | HCC | Payment Error | PE Rate | HCC | Payment Error | PE Rate | HCC | Payment Error | PE Rate |
| 1 | HCC80 | $ 232,768 | 6.23% | HCC80 | $ 432,535 | 7.14% | HCC92 | $ 197,608 | 6.78% |
| 2 | HCC96 | $ 224,810 | 6.02% | HCC108 | $ 399,938 | 6.60% | HCC96 | $ 190,097 | 6.52% |
| 3 | HCC15 | $ 222,912 | 5.97% | HCC105 | $ 391,275 | 6.46% | HCC105 | $ 173,185 | 5.94% |
| 4 | HCC108 | $ 209,896 | 5.62% | HCC15 | $ 387,222 | 6.39% | HCC131 | $ 153,303 | 5.26% |
| 5 | HCC79 | $ 206,924 | 5.54% | HCC92 | $ 320,202 | 5.29% | HCC7 | $ 132,003 | 4.53% |
| 6 | HCC104 | $ 196,807 | 5.27% | HCC96 | $ 278,847 | 4.60% | HCC10 | $ 122,055 | 4.19% |
| 7 | HCC10 | $ 177,664 | 4.75% | HCC131 | $ 262,446 | 4.33% | HCC80 | $ 121,007 | 4.15% |
| 8 | HCC92 | $ 172,308 | 4.61% | HCC55 | $ 256,185 | 4.23% | HCC55 | $ 118,243 | 4.06% |
| 9 | HCC38 | $ 149,132 | 3.99% | HCC79 | $ 240,443 | 3.97% | HCC15 | $ 115,827 | 3.97% |
| 10 | HCC131 | $ 140,375 | 3.76% | HCC10 | $ 238,194 | 3.93% | HCC79 | $ 114,663 | 3.93% |



* Non-normalized, unadjusted, unweighted payment error
* Only MA contracts with greater than $0 recovery amount are included in this analysis.

2339

# Payment Error by Disease Group*

| Hierarchy | Payment Error | | |
|---|---|---|---|
| | CON11 | CON12 | CON13 |
| TOTAL | $ 3,736,489 | $ 6,056,084 | $ 2,914,685 |
| NONE (NO HIERARCHY) | $ 1,230,887 | $ 1,815,030 | $ 955,665 |
| VASCULAR | $ 405,410 | $ 691,622 | $ 318,243 |
| DIABETES | $ 297,372 | $ 547,968 | $ 189,497 |
| NEOPLASM | $ 265,759 | $ 494,770 | $ 348,527 |
| RESPIRATORY ARREST | $ 246,532 | $ 199,874 | $ 138,367 |
| CVD1 | $ 232,485 | $ 290,707 | $ 209,308 |
| LUNG1 | $ 213,696 | $ 396,702 | $ 109,617 |
| PSYCHIATRIC | $ 178,582 | $ 323,112 | $ 130,216 |
| INTERACTION | $ 156,607 | $ 414,685 | $ 168,605 |
| HEART | $ 139,357 | $ 295,718 | $ 98,325 |
| URINARY | $ 109,679 | $ 267,122 | $ 134,561 |
| INFECTION5/LUNG5 | $ 89,442 | $ 68,666 | $ 37,412 |
| SPINAL | $ 68,441 | $ 147,447 | $ 40,329 |
| LIVER | $ 45,436 | $ 55,658 | $ 51,715 |
| SUBSTANCE ABUSE | $ 39,979 | $ 29,194 | $ 2,226 |
| INJURY1 | $ 18,168 | $ 14,429 | $ 6,930 |
| INJURY8 | $ (1,344) | $ 3,381 | $ (24,857) |



* Non-normalized, unadjusted, unweighted payment error

2340

# Discrepancy Rates by Disease Group

| Disease Group | CON11 | | | CON12 | | | CON13 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sampled | Discrepant | Discrepancy Rate | Sampled | Discrepant | Discrepancy Rate | Sampled | Discrepant | Discrepancy Rate |
| CVD1 | 312 | 190 | 60.90% | 311 | 204 | 65.59% | 298 | 181 | 60.74% |
| DIABETES | 2,583 | 392 | 15.18% | 2,625 | 510 | 19.43% | 2,733 | 383 | 14.01% |
| HEART | 951 | 210 | 22.08% | 1,019 | 279 | 27.38% | 1,012 | 181 | 17.89% |
| INFECTION5/LUNG5 | 123 | 49 | 39.84% | 89 | 31 | 34.83% | 86 | 27 | 31.40% |
| INJURY1 | 50 | 17 | 34.00% | 70 | 18 | 25.71% | 53 | 20 | 37.74% |
| INJURY8 | 53 | 16 | 30.19% | 42 | 12 | 28.57% | 66 | 13 | 19.70% |
| LIVER | 126 | 29 | 23.02% | 114 | 31 | 27.19% | 113 | 20 | 17.70% |
| LUNG1 | 1,399 | 149 | 10.65% | 1,460 | 196 | 13.42% | 1,466 | 120 | 8.19% |
| NEOPLASM | 990 | 245 | 24.75% | 829 | 276 | 33.29% | 840 | 248 | 29.52% |
| NONE (NO HIERARCHY) | 5,145 | 942 | 18.31% | 5,099 | 1,034 | 20.28% | 5,578 | 836 | 14.99% |
| PSYCHIATRIC | 689 | 132 | 19.16% | 918 | 180 | 19.61% | 895 | 135 | 15.08% |
| RESPIRATORY ARREST | 369 | 100 | 27.10% | 330 | 89 | 26.97% | 349 | 74 | 21.20% |
| SPINAL | 316 | 59 | 18.67% | 346 | 87 | 25.14% | 363 | 63 | 17.36% |
| SUBSTANCE ABUSE | 186 | 49 | 26.34% | 203 | 53 | 26.11% | 250 | 23 | 9.20% |
| URINARY | 1,251 | 117 | 9.35% | 1,538 | 171 | 11.12% | 1,760 | 143 | 8.13% |
| VASCULAR | 1,720 | 368 | 21.40% | 1,849 | 430 | 23.26% | 2,001 | 297 | 14.84% |



2344

# Summary Statistics CON11 (Sorted by Descending Recovery Amount)

| | | | | | CON11 | |
|---|---|---|---|---|---|---|
| HMOID | Parent Org | Coding Intensity Group | Net Payment Error | RADV Eligible Population | Recovery Amount | Recovery Amount Per RADV Eligible Enrollee |
| | | | $355,028 | | | |
| | | | $198,283 | | | |
| | | | $206,760 | | | |
| | | | $151,598 | | | |
| | | | $192,131 | | | |
| | | | $477,849 | | | |
| | | | $271,056 | | | |
| | | | $408,266 | | | |
| | | | $130,357 | | | |
| | | | $235,896 | | | |
| | | | $164,324 | | | |
| | | | $175,719 | | | |
| | | | $251,829 | | | |
| | | | $192,128 | | | |
| | | | $76,998 | | | |
| H2226 | UnitedHealth Group, Inc. | HI | $37,933 | 2,773 | ($2,068,360.00) | ($745.89) |
| | | | $88,994 | | | |
| | | | $113,827 | | | |
| | | | $81,595 | | | |
| | | | $45,006 | | | |
| | | | $89,809 | | | |
| H4522 | UnitedHealth Group, Inc. | LOW | ($38,104) | 6,023 | ($4,622,640.00) | ($767.50) |
| | | | $47,311 | | | |
| | | | $76,600 | | | |
| | | | ($1,662) | | | |
| | | | ($39,035) | | | |
| | | | ($53,277) | | | |
| | | | ($54,856) | | | |
| H4590 | UnitedHealth Group, Inc. | HI | ($8,630) | 91,850 | ($51,017,738.00) | ($555.45) |
| H0543 | UnitedHealth Group, Inc. | HI | $35,126 | 185,186 | ($91,884,129.00) | ($496.17) |

# Summary Statistics CON12 (Sorted by Descending Recovery Amount)

| HMOID | Parent Org | Coding Intensity Group | Net Payment Error | RADV Eligible Population | Recovery Amount | Recovery Amount Per RADV Eligible Enrollee |
|-------|-----------|----------------------|-------------------|------------------------|----------------|-------------------------------------------|
| | | | $202,609 | | | |
| | | | $341,198 | | | |
| | | | $367,086 | | | |
| | | | $316,883 | | | |
| | | | $1,197,584 | | | |
| | | | $232,536 | | | |
| | | | $571,738 | | | |
| | | | $466,263 | | | |
| H5420 | UnitedHealth Group, Inc. | HI | $290,803 | 19,923 | $15,735,769 | $789.83 |
| | | | $174,147 | | | |
| | | | $189,414 | | | |
| | | | $199,820 | | | |
| | | | $187,043 | | | |
| | | | $150,526 | | | |
| | | | $171,730 | | | |
| | | | $230,838 | | | |
| | | | $131,073 | | | |
| | | | $1,902 | | | |
| | | | $103,752 | | | |
| | | | $54,707 | | | |
| | | | $11,023 | | | |
| R7444 | UnitedHealth Group, Inc. | HI | $40,516 | 9,559 | ($3,962,831) | ($414.57) |
| H5652 | UnitedHealth Group, Inc. | HI | ($141,220) | 3,414 | ($4,740,216) | ($1,388.46) |
| | | | ($22,584) | | | |
| | | | $20,132 | | | |
| | | | $133,204 | | | |
| | | | ($155,487) | | | |
| H0251 | UnitedHealth Group, Inc. | HI | ($73,921) | 11,357 | ($10,348,919) | ($911.24) |
| | | | ($8,445) | | | |
| R5287 | UnitedHealth Group, Inc. | HI | ($32,705) | 84,014 | ($69,295,194) | ($824.81) |

# Summary Statistics CON13 (Sorted by Descending Recovery Amount)

| HMOID | Parent Org | Coding Intensity Group | Net Payment Error | RADV Eligible Population | Recovery Amount | Recovery Amount Per RADV Eligible Enrollee |
|---|---|---|---|---|---|---|
| | | | $272,003 | | | |
| | | | $337,112 | | | |
| | | | $315,529 | | | |
| | | | $337,267 | | | |
| | | | $171,454 | | | |
| | | | $162,436 | | | |
| | | | $129,630 | | | |
| | | | $138,336 | | | |
| R9896 | UnitedHealth Group, Inc. | HI | $144,939 | 43,114 | $4,065,269 | $94.29 |
| | | | $238,417 | | | |
| | | | $274,061 | | | |
| | | | $217,529 | | | |
| | | | $98,606 | | | |
| | | | $64,631 | | | |
| H3107 | UnitedHealth Group, Inc. | HI | $107,627 | 27,753 | ($1,581,972) | ($57.00) |
| | | | $55,312 | | | |
| | | | $51,785 | | | |
| | | | $13,962 | | | |
| | | | $66,409 | | | |
| | | | ($59,194) | | | |
| | | | $94,339 | | | |
| H0151 | UnitedHealth Group, Inc. | HI | $47,142 | 21,671 | ($7,790,780) | ($359.50) |
| H4514 | UnitedHealth Group, Inc. | HI | ($5,954) | 13,265 | ($9,302,996) | ($701.32) |
| | | | $24,887 | | | |
| H2931 | UnitedHealth Group, Inc. | HI | $15,457 | 31,364 | ($10,078,497) | ($321.34) |
| | | | ($34,668) | | | |
| R5342 | UnitedHealth Group, Inc. | HI | ($32,110) | 23,226 | ($14,309,264) | ($616.09) |
| | | | ($52,137) | | | |
| | | | ($33,582) | | | |
| | | | ($125,921) | | | |

**EXHIBIT D-82**

**REDACTED VERSION OF
DOCUMENT PROPOSED TO BE
FILED UNDER SEAL**

PRODUCED IN NATIVE FORMAT

**EXHIBIT**

1498

2346

CONFIDENTIAL

USBP068691383

# CMS RADV

 – Comparison and Analysis of CON11, CON12 & CON13

December 8, 2017

# Sampling Differences for Contract Samples

|  | CON11 | CON12 | CON13 |
|---|---|---|---|
| RADV-eligible enrollee threshold | 1,000 | 2,000 | 5,000 |
| Number of Contracts selected: | 30 | 30 | 30 |
| High Coding Intensity Stratum | 20* | 20 | 25 |
| Medium Coding Intensity Stratum | 5** | 5 | 5 |
| Low Coding Intensity Stratum | 5 | 5 | 0 |
| Number of RADV-eligible enrollees in 30 Sampled Contracts | 778,808 | 838,373 | 902,451 |
| Parent Organization Analysis | 4 United HealthGroup plans account for 0.0% of total recovery amount | 5 United HealthGroup plans account for 5.0% of total recovery amount | 6 United Health Group plans account for 1.4% of total recovery amount |

\* includes 5 OIG-selected plans
\*\* includes 1 OIG-selected plan

2348

# Recovery Amount/Eligible Population

[redacted]

[redacted]

[redacted]

*Recovery amount is the extrapolated payment error amount based on the lower bound of the 99% confidence interval for the total.

*Only those MA contracts with greater than $0 recovery amount are included; there were 14 such contracts in CON11, 17 contracts in CON12 and 12 contracts in CON13.

# Recovery Amount and Eligible Population by Parent Organization



*Recovery amount is the extrapolated payment error incorporating the lower bound of the 99% confidence interval.
*All MA contracts in the sample are included in this analysis.

2350

# Medical Record Submission Summary

**Medical Record (MR) Submission per CMS-HCC- Overall**

| MR validity | CON11 | | | | | CON12 | | | | | CON13 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total MRs | MEAN | STD | MIN | MAX | Total MRs | MEAN | STD | MIN | MAX | Total MRs | MEAN | STD | MIN | MAX |
| Invalid | 1,805 | 1.38 | 0.79 | 1 | 6 | 1,842 | 1.47 | 1.01 | 1 | 5 | 1,426 | 1.46 | 0.98 | 1 | 5 |
| Valid | 35,499 | 2.91 | 2.13 | 1 | 26 | 37,979 | 2.75 | 1.76 | 1 | 13 | 41,203 | 2.78 | 1.85 | 1 | 15 |
| Overall | 37,304 | 2.99 | 2.21 | 1 | 26 | 39,821 | 2.81 | 1.8 | 1 | 13 | 42,629 | 2.83 | 1.88 | 1 | 15 |

➢ The number of MRs submitted increased year over year, with CON13 having the most submissions
➢ The average number of MR submission per CMS-HCC is similar between CON12 and CON13, and slightly higher in CON11
➢ There were ~400 fewer invalid records submitted in CON13 compared to CON11 and CON12

**Summary of Valid MRs Used for MRR CMS-HCC by Contract**

| Sample | Total Valid MRs submitted | MRs used after applying MRR result selection logic* | | | |
|---|---|---|---|---|---|
| | | MRs - additionals allowed | MRs - additionals Not allowed | Total | Percentage |
| CON11 | 35,499 | 8,679 | 212 | 8,891 | 25.05% |
| CON12 | 37,979 | 8,364 | 213 | 8,577 | 22.58% |
| CON13 | 41,203 | `8,849 | 168 | 9,017 | 21.88% |

➢ The percentage of total valid MRs used for MRR decreased year over year with the lowest percentage of valid MR used in CON13

*MRR Result Selection Logic:
 - For each non-hierarchical audited CMS-HCC: The highest ranked MR that confirmed the audited CMS-HCC is selected. Any additionals found on the selected MR are used.
 - For each hierarchical audited CMS-HCC: The highest ranked MR that had a higher manifestation of the audited CMS-HCC is selected. If the selected MR confirm/confirm higher then additionals found on the MR, if any, are used.  If the selected MR confirmed-lower then additionals found on the MR, if any, are not used.
**Full details of MRR results selection criteria can be found in LAC-Oriented data creation document.

# HCC Discrepancy Rate Summary

## Discrepancy Rate by Sample - Overall

| Sample | Audited HCCs | Confirmed* HCCs | Discrepant** HCCs | Additional HCCs | | | | | Discrepancy Rate |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Confirmed Higher | Confirmed Lower | New Hierarchy | Non Hierarchy | Total | |
| CON11 | 16,263 | 13,199 | 3,064 | 439 | 475 | 678 | 462 | 2,054 | 18.84% |
| CON12 | 16,842 | 13,241 | 3,601 | 329 | 473 | 696 | 414 | 1,912 | 21.38% |
| CON13 | 17,863 | 15,099 | 2,764 | 362 | 393 | 710 | 410 | 1,875 | 15.47% |

\* Discrepant confirmed higher CMS-HCCs were counted as confirmed.
\*\* Discrepant confirmed lower CMS-HCCs were counted as discrepant.

➤ CON13 has lowest discrepancy rate
  ➤ Highest number of audited HCCs
  ➤ ~900 fewer discrepant HCCs compared to CON12
➤ CON13 has fewer additional HCCs

## Discrepant CMS-HCC Summary by Error Type - Overall

| Sample | Discrepant HCCs | Error Type | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Coding Incomplete | | Signature Credential Issues | | Invalid | | Missing | |
| | | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| CON11 | 3,064 | 2,424 | 79.11% | 256 | 8.36% | 136 | 4.44% | 248 | 8.09% |
| CON12 | 3,601 | 2,764 | 76.76% | 303 | 8.41% | 161 | 4.47% | 373 | 10.35% |
| CON13 | 2,764 | 2,344 | 84.80% | 162 | 5.86% | 105 | 3.80% | 153 | 5.54% |

➤ Percentage of discrepant HCCs due to incomplete coding is higher in CON13
➤ Percentage of discrepant HCCs due to signature credential issues, invalid MR, and missing MR is lower in CON13

*All MA contracts in the sample are included in this analysis.

2352

# HCC Discrepancy Rate by Contract

[redacted]

*MA contracts are in the descending order (from left to right) by recovery amount (based on lower 99% Confidence Interval).
** Discrepant confirmed higher CMS-HCCs were counted as discrepant.

# Sampled Enrollees Distribution by Gender/Age Group



> The number of sampled enrollees per group appears to be close among the three samples

2354

*All MA contracts in the sample are included in this analysis.

# Sampled Enrollees Payment Error by Gender/Age Group



> ➤ The average **unweighted** payment error is lower for CON13 in many of the groups
> ➤ The Male 0-34 yrs and Male ≥95 yrs groups show underpayments on average for CON11

> ➤ CON11 has more groups with average **weighted** underpayments

2355

*All MA contracts in the sample are included in this analysis.

# Sampled Enrollees Average Unweighted Payment Error and Risk Score Change by Contract

**Average Unweighted Payment Error by Contract**



> Higher average risk score changes are aligned with the higher average unweighted payment errors

*Only MA contracts with greater than $0 recovery amount are included.
**Average Risk Score Change is based on unadjusted/un-normalized risk scores.

2356

10

# Sampled Enrollees Average Weighted Payment Error and Risk Score Change by Contract

**Average Weighted Payment Error by Contract**



*Only MA contracts with greater than $0 recovery amount are included.
**MA contracts are in descending order (from left to right) by __unweighted__ payment error.
***Average risk score change is based on unadjusted/un-normalized risk scores.

2357

11

# Sampled Enrollees Average Unweighted Payment Error by Contract

**Average Unweighted Payment Error by Contract – by Stratum**





> ➢ Average unweighted payment error is lower in Stratum 1 for most contracts
> ➢ Average unweighted payment error is higher in Stratum 3 for all contracts
> ➢



*Only MA contracts with greater than $0 recovery amount are included.

2358

# Sampled Enrollees Average Weighted Payment Error by Contract

**Average Weighted Payment Error by Contract – by Stratum**



*Only MA contracts with greater than $0 recovery amount are included.
**MA contracts are in descending order (from left to right) by **underlined**unweighted** payment error.

2359

# Sampled Enrollees Average Risk Score Change by Contract

**Average Risk Score Change by Contract – by Stratum**



> Stratum 3 has the highest average risk score change for most contracts in all samples

>

*Only MA contracts with greater than $0 recovery amount are included.
**MA contracts are in descending order (from left to right) by **unweighted** payment error.
***Average risk score change is based on unadjusted/un-normalized risk scores.

2360

# Top 10 CMS-HCCs by Discrepancy Count*

| Top 10 Discrepant HCCs | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CON11 | | | CON12 | | | CON13 | | |
| # | HCC | # Discrepant | % Total Discrepant | HCC | # Discrepant | % Total Discrepant | HCC | # Discrepant | % Total Discrepant |

| # | HCC | # Discrepant | % Total Discrepant | HCC | # Discrepant | % Total Discrepant | HCC | # Discrepant | % Total Discrepant |
|---|---|---|---|---|---|---|---|---|---|
| 1 | HCC105 | 139 | 7.54% | HCC105 | 234 | 8.70% | HCC105 | 139 | 8.59% |
| 2 | HCC10 | 104 | 5.64% | HCC80 | 165 | 6.13% | HCC96 | 98 | 6.06% |
| 3 | HCC80 | 104 | 5.64% | HCC108 | 153 | 5.69% | HCC92 | 91 | 5.62% |
| 4 | HCC96 | 101 | 5.48% | HCC92 | 150 | 5.57% | HCC131 | 88 | 5.44% |
| 5 | HCC108 | 100 | 5.43% | HCC10 | 141 | 5.24% | HCC15 | 87 | 5.38% |
| 6 | HCC92 | 85 | 4.61% | HCC96 | 135 | 5.02% | HCC10 | 85 | 5.25% |
| 7 | HCC15 | 81 | 4.40% | HCC15 | 130 | 4.83% | HCC80 | 85 | 5.25% |
| 8 | HCC71 | 77 | 4.18% | HCC19 | 125 | 4.65% | HCC55 | 68 | 4.20% |
| 9 | HCC131 | 74 | 4.02% | HCC83 | 117 | 4.35% | HCC108 | 67 | 4.14% |
| 10 | HCC19 | 71 | 3.85% | HCC131 | 114 | 4.24% | HCC71 | 67 | 4.14% |



* Only MA contracts with greater than $0 recovery amount are included in this analysis.

2361

# Top 10 CMS-HCCs by Payment Error*

| Top 10 Discrepant HCCs | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CON11 | | | CON12 | | | CON13 | | |
| # | HCC | Payment Error | PE Rate | HCC | Payment Error | PE Rate | HCC | Payment Error | PE Rate |

| # | HCC | Payment Error | PE Rate | HCC | Payment Error | PE Rate | HCC | Payment Error | PE Rate |
|---|---|---|---|---|---|---|---|---|---|
| 1 | HCC80 | $ 232,768 | 6.23% | HCC80 | $ 432,535 | 7.14% | HCC92 | $ 197,608 | 6.78% |
| 2 | HCC96 | $ 224,810 | 6.02% | HCC108 | $ 399,938 | 6.60% | HCC96 | $ 190,097 | 6.52% |
| 3 | HCC15 | $ 222,912 | 5.97% | HCC105 | $ 391,275 | 6.46% | HCC105 | $ 173,185 | 5.94% |
| 4 | HCC108 | $ 209,896 | 5.62% | HCC15 | $ 387,222 | 6.39% | HCC131 | $ 153,303 | 5.26% |
| 5 | HCC79 | $ 206,924 | 5.54% | HCC92 | $ 320,202 | 5.29% | HCC7 | $ 132,003 | 4.53% |
| 6 | HCC104 | $ 196,807 | 5.27% | HCC96 | $ 278,847 | 4.60% | HCC10 | $ 122,055 | 4.19% |
| 7 | HCC10 | $ 177,664 | 4.75% | HCC131 | $ 262,446 | 4.33% | HCC80 | $ 121,007 | 4.15% |
| 8 | HCC92 | $ 172,308 | 4.61% | HCC55 | $ 256,185 | 4.23% | HCC55 | $ 118,243 | 4.06% |
| 9 | HCC38 | $ 149,132 | 3.99% | HCC79 | $ 240,443 | 3.97% | HCC15 | $ 115,827 | 3.97% |
| 10 | HCC131 | $ 140,375 | 3.76% | HCC10 | $ 238,194 | 3.93% | HCC79 | $ 114,663 | 3.93% |



* Non-normalized, unadjusted, unweighted payment error
* Only MA contracts with greater than $0 recovery amount are included in this analysis.

2362

# Payment Error by Disease Group*

| Hierarchy | Payment Error | | |
|---|---|---|---|
| | CON11 | CON12 | CON13 |
| TOTAL | $ 3,736,489 | $ 6,056,084 | $ 2,914,685 |
| NONE (NO HIERARCHY) | $ 1,230,887 | $ 1,815,030 | $ 955,665 |
| VASCULAR | $ 405,410 | $ 691,622 | $ 318,243 |
| DIABETES | $ 297,372 | $ 547,968 | $ 189,497 |
| NEOPLASM | $ 265,759 | $ 494,770 | $ 348,527 |
| RESPIRATORY ARREST | $ 246,532 | $ 199,874 | $ 138,367 |
| CVD1 | $ 232,485 | $ 290,707 | $ 209,308 |
| LUNG1 | $ 213,696 | $ 396,702 | $ 109,617 |
| PSYCHIATRIC | $ 178,582 | $ 323,112 | $ 130,216 |
| INTERACTION | $ 156,607 | $ 414,685 | $ 168,605 |
| HEART | $ 139,357 | $ 295,718 | $ 98,325 |
| URINARY | $ 109,679 | $ 267,122 | $ 134,561 |
| INFECTION5/LUNG5 | $ 89,442 | $ 68,666 | $ 37,412 |
| SPINAL | $ 68,441 | $ 147,447 | $ 40,329 |
| LIVER | $ 45,436 | $ 55,658 | $ 51,715 |
| SUBSTANCE ABUSE | $ 39,979 | $ 29,194 | $ 2,226 |
| INJURY1 | $ 18,168 | $ 14,429 | $ 6,930 |
| INJURY8 | $ (1,344) | $ 3,381 | $ (24,857) |



2363

* Non-normalized, unadjusted, unweighted payment error

# Discrepancy Rates by Disease Group

| Disease Group | CON11 | | | CON12 | | | CON13 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sampled | Discrepant | Discrepancy Rate | Sampled | Discrepant | Discrepancy Rate | Sampled | Discrepant | Discrepancy Rate |
| CVD1 | 312 | 190 | 60.90% | 311 | 204 | 65.59% | 298 | 181 | 60.74% |
| DIABETES | 2,583 | 392 | 15.18% | 2,625 | 510 | 19.43% | 2,733 | 383 | 14.01% |
| HEART | 951 | 210 | 22.08% | 1,019 | 279 | 27.38% | 1,012 | 181 | 17.89% |
| INFECTION5/LUNG5 | 123 | 49 | 39.84% | 89 | 31 | 34.83% | 86 | 27 | 31.40% |
| INJURY1 | 50 | 17 | 34.00% | 70 | 18 | 25.71% | 53 | 20 | 37.74% |
| INJURY8 | 53 | 16 | 30.19% | 42 | 12 | 28.57% | 66 | 13 | 19.70% |
| LIVER | 126 | 29 | 23.02% | 114 | 31 | 27.19% | 113 | 20 | 17.70% |
| LUNG1 | 1,399 | 149 | 10.65% | 1,460 | 196 | 13.42% | 1,466 | 120 | 8.19% |
| NEOPLASM | 990 | 245 | 24.75% | 829 | 276 | 33.29% | 840 | 248 | 29.52% |
| NONE (NO HIERARCHY) | 5,145 | 942 | 18.31% | 5,099 | 1,034 | 20.28% | 5,578 | 836 | 14.99% |
| PSYCHIATRIC | 689 | 132 | 19.16% | 918 | 180 | 19.61% | 895 | 135 | 15.08% |
| RESPIRATORY ARREST | 369 | 100 | 27.10% | 330 | 89 | 26.97% | 349 | 74 | 21.20% |
| SPINAL | 316 | 59 | 18.67% | 346 | 87 | 25.14% | 363 | 63 | 17.36% |
| SUBSTANCE ABUSE | 186 | 49 | 26.34% | 203 | 53 | 26.11% | 250 | 23 | 9.20% |
| URINARY | 1,251 | 117 | 9.35% | 1,538 | 171 | 11.12% | 1,760 | 143 | 8.13% |
| VASCULAR | 1,720 | 368 | 21.40% | 1,849 | 430 | 23.26% | 2,001 | 297 | 14.84% |



2364

# Summary Statistics CON11 (Sorted by Descending Recovery Amount)

| | | | | | | |
|---|---|---|---|---|---|---|
| **CON11** | | | | | | |
| HMOID | Parent Org | Coding Intensity Group | Net Payment Error | RADV Eligible Population | Recovery Amount | Recovery Amount Per RADV Eligible Enrollee |
| | | | $355,028 | | | |
| | | | $198,283 | | | |
| | | | $206,760 | | | |
| | | | $151,598 | | | |
| | | | $192,131 | | | |
| | | | $477,849 | | | |
| | | | $271,056 | | | |
| | | | $408,266 | | | |
| | | | $130,357 | | | |
| | | | $235,896 | | | |
| | | | $164,324 | | | |
| | | | $175,719 | | | |
| | | | $251,829 | | | |
| | | | $192,128 | | | |
| | | | $76,998 | | | |
| H2226 | UnitedHealth Group, Inc. | HI | $37,933 | 2,773 | ($2,068,360.00) | ($745.89) |
| | | | $88,994 | | | |
| | | | $113,827 | | | |
| | | | $81,595 | | | |
| | | | $45,006 | | | |
| | | | $89,809 | | | |
| H4522 | UnitedHealth Group, Inc. | LOW | ($38,104) | 6,023 | ($4,622,640.00) | ($767.50) |
| | | | $47,311 | | | |
| | | | $76,600 | | | |
| | | | ($1,662) | | | |
| | | | ($39,035) | | | |
| | | | ($53,277) | | | |
| | | | ($54,856) | | | |
| H4590 | UnitedHealth Group, Inc. | HI | ($8,630) | 91,850 | ($51,017,738.00) | ($555.45) |
| H0543 | UnitedHealth Group, Inc. | HI | $35,126 | 185,186 | ($91,884,129.00) | ($496.17) |

# Summary Statistics CON12 (Sorted by Descending Recovery Amount)

| HMOID | Parent Org | Coding Intensity Group | Net Payment Error | RADV Eligible Population | Recovery Amount | Recovery Amount Per RADV Eligible Enrollee |
|-------|-----------|------------------------|-------------------|-------------------------|-----------------|--------------------------------------------|
| | | | $202,609 | | | |
| | | | $341,198 | | | |
| | | | $367,086 | | | |
| | | | $316,883 | | | |
| | | | $1,197,584 | | | |
| | | | $232,536 | | | |
| | | | $571,738 | | | |
| | | | $466,263 | | | |
| H5420 | UnitedHealth Group, Inc. | HI | $290,803 | 19,923 | $15,735,769 | $789.83 |
| | | | $174,147 | | | |
| | | | $189,414 | | | |
| | | | $199,820 | | | |
| | | | $187,043 | | | |
| | | | $150,526 | | | |
| | | | $171,730 | | | |
| | | | $230,838 | | | |
| | | | $131,073 | | | |
| | | | $1,902 | | | |
| | | | $103,752 | | | |
| | | | $54,707 | | | |
| | | | $11,023 | | | |
| R7444 | UnitedHealth Group, Inc. | HI | $40,516 | 9,559 | ($3,962,831) | ($414.57) |
| H5652 | UnitedHealth Group, Inc. | HI | ($141,220) | 3,414 | ($4,740,216) | ($1,388.46) |
| | | | ($22,584) | | | |
| | | | $20,132 | | | |
| | | | $133,204 | | | |
| | | | ($155,487) | | | |
| H0251 | UnitedHealth Group, Inc. | HI | ($73,921) | 11,357 | ($10,348,919) | ($911.24) |
| | | | ($8,445) | | | |
| R5287 | UnitedHealth Group, Inc. | HI | ($32,705) | 84,014 | ($69,295,194) | ($824.81) |

# Summary Statistics CON13 (Sorted by Descending Recovery Amount)

| | | | CON13 | | | |
|---|---|---|---|---|---|---|
| HMOID | Parent Org | Coding Intensity Group | Net Payment Error | RADV Eligible Population | Recovery Amount | Recovery Amount Per RADV Eligible Enrollee |
| | | | $272,003 | | | |
| | | | $337,112 | | | |
| | | | $315,529 | | | |
| | | | $337,267 | | | |
| | | | $171,454 | | | |
| | | | $162,436 | | | |
| | | | $129,630 | | | |
| | | | $138,336 | | | |
| R9896 | UnitedHealth Group, Inc. | HI | $144,939 | 43,114 | $4,065,269 | $94.29 |
| | | | $238,417 | | | |
| | | | $274,061 | | | |
| | | | $217,529 | | | |
| | | | $98,606 | | | |
| | | | $64,631 | | | |
| H3107 | UnitedHealth Group, Inc. | HI | $107,627 | 27,753 | ($1,581,972) | ($57.00) |
| | | | $55,312 | | | |
| | | | $51,785 | | | |
| | | | $13,962 | | | |
| | | | $66,409 | | | |
| | | | ($59,194) | | | |
| | | | $94,339 | | | |
| H0151 | UnitedHealth Group, Inc. | HI | $47,142 | 21,671 | ($7,790,780) | ($359.50) |
| H4514 | UnitedHealth Group, Inc. | HI | ($5,954) | 13,265 | ($9,302,996) | ($701.32) |
| | | | $24,887 | | | |
| H2931 | UnitedHealth Group, Inc. | HI | $15,457 | 31,364 | ($10,078,497) | ($321.34) |
| | | | ($34,668) | | | |
| R5342 | UnitedHealth Group, Inc. | HI | ($32,110) | 23,226 | ($14,309,264) | ($616.09) |
| | | | ($52,137) | | | |
| | | | ($33,582) | | | |
| | | | ($125,921) | | | |