1  LATHAM & WATKINS LLP
   David J. Schindler (Bar No. 130490)
2    *david.schindler@lw.com*
   Manuel A. Abascal (Bar No. 171301)
3    *manny.abascal@lw.com*
   355 South Grand Avenue, Suite 100
4  Los Angeles, California 90071-1560
   Telephone: +1.213.485.1234;
5  Facsimile: +1.213.891.8763

6  *Attorneys for United Defendants*

7  MICHAEL D. GRANSTON
   Deputy Assistant Attorney General, Civil Division
8  E. MARTIN ESTRADA
   United States Attorney
9  DAVID M. HARRIS
   ROSS M. CUFF
10 JACK D. ROSS (CBN 265883)
   HUNTER B. THOMSON (CBN 330533)
11 Assistant United States Attorneys
   300 N. Los Angeles Street, Room 7516
12 Los Angeles, California 90012
   Tel: (213) 894-6379; Fax: (213) 894-7819
13 Email: *hunter.thomson@usdoj.gov*

14 *Attorneys for the United States of America*

15 [Additional Counsel Listed on Next Page]

16          **UNITED STATES DISTRICT COURT**
17          **CENTRAL DISTRICT OF CALIFORNIA**

18 UNITED STATES OF AMERICA *ex rel.*    CASE NO. 2:16-cv-08697-FMO-PVCx
   BENJAMIN POEHLING,
19                                        **JOINT EVIDENTIARY APPENDIX**
              Plaintiff,
20                                        **VOLUME 9 OF 14**
      v.                                  **EXHIBITS D-83 THROUGH D-110**
21                                        **PAGES 2368 THROUGH 2878**
   UNITEDHEALTH GROUP, INC. *et al.*,
22                                        Hon. Fernando M. Olguin
              Defendants.
23
24                                        Hearing Date:  September 5, 2024
25                                        Hearing Time:  10:00 a.m.
26                                        Courtroom:  6D
27
28

LATHAM & WATKINS LLP
  Daniel Meron (appearing *pro hac vice*)
   daniel.meron@lw.com
  Abid R. Qureshi (appearing *pro hac vice*)
   abid.qureshi@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

BARTLIT BECK LLP
  Philip S. Beck (appearing *pro hac vice*)
   philip.beck@bartlitbeck.com
  Sean W. Gallagher (appearing *pro hac vice*)
   sean.gallagher@bartlitbeck.com
  Cindy L. Sobel (appearing *pro hac vice*)
   cindy.sobel@bartlitbeck.com
  Nicolas Martinez (appearing *pro hac vice*)
   nicolas.martinez@bartlitbeck.com
  Benjamin R. Montague (appearing *pro hac vice*)
   benjamin.montague@bartlitbeck.com
54 W. Hubbard Street, Suite 300
Chicago, Illinois 60654-8174
Telephone: +1.312.494.4400
Facsimile: +1.312.494.4440

BARTLIT BECK LLP
  Andrew C. Baak (appearing *pro hac vice*)
   andrew.baak@bartlitbeck.com
  Jameson R. Jones (appearing *pro hac vice*)
   jameson.jones@bartlitbeck.com
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202-6318
Telephone: +1.303.592.3100
Facsimile: +1.303.592.3140

*Attorneys for United Defendants*


JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
    P.O. Box 261, Ben Franklin Station
    Washington, D.C. 20044
    Tel: (202) 307-0486; Fax: (202) 307-3852
    Email:  robert.mcauliffe@usdoj.gov
TRINI E. ROSS
United States Attorney

DAVID CORIELL
Assistant United States Attorney
    138 Delaware Avenue
    Buffalo, New York 14201
    Tel: (716) 843-5830; Fax: (716) 551-3052
    Email:  david.coriell@usdoj.gov

*Attorneys for the United States of America*

**EXHIBIT D-83**

| HMOID | CON Year | Parent Org | Coding Intensity Group | Recovery Amount |
|---|---|---|---|---|
| H0543 | 11 | UnitedHealth Group, Inc. | HI | ($91,884,129.00) |
| R5287 | 12 | UnitedHealth Group, Inc. | HI | ($69,295,194.00) |
| H4590 | 11 | UnitedHealth Group, Inc. | HI | ($51,017,738.00) |
| R5342 | 13 | UnitedHealth Group, Inc. | HI | ($14,309,264.00) |
| H0251 | 12 | UnitedHealth Group, Inc. | HI | ($10,348,919.00) |
| H2931 | 13 | UnitedHealth Group, Inc. | HI | ($10,078,497.00) |
| H4514 | 13 | UnitedHealth Group, Inc. | HI | ($9,302,996.00) |
| H0151 | 13 | UnitedHealth Group, Inc. | HI | ($7,790,780.00) |
| H5652 | 12 | UnitedHealth Group, Inc. | HI | ($4,740,216.00) |
| H4522 | 11 | UnitedHealth Group, Inc. | LOW | ($4,622,640.00) |
| R7444 | 12 | UnitedHealth Group, Inc. | HI | ($3,962,831.00) |
| H2226 | 11 | UnitedHealth Group, Inc. | HI | ($2,068,360.00) |
| H3107 | 13 | UnitedHealth Group, Inc. | HI | ($1,581,972.00) |
| R9896 | 13 | UnitedHealth Group, Inc. | HI | $4,065,269.00 |
| H5420 | 12 | UnitedHealth Group, Inc. | HI | $15,735,769.00 |
| | | | | ($261,202,498.00) |

Total UHG Net
Underpayment for
PYs 2011 to 2013

EXHIBIT
1501

**EXHIBIT D-84**

**UNITED STATE EX REL. POEHLING V. UNITEDHEALTH GROUP. INC. [LATHAM & WATKINS]**

**ELECTRONIC FILE EXHIBIT PLACEHOLDER**

*This document is a placeholder for an electronic file used as an exhibit in the AgileLaw system.*
*The details of the file are below and the file has been "marked" with the same number as the stamp on this page.*

File Type: application/vnd.openxmlformats-officedocument.spreadsheetml.sheet

File Size: 4,055 KB

File Name: CON14 CMS RADV Results Summary.xlsx

MD5 Checksum†: 78764c73e9b849a4c2569978e79e24b3

File attachment‡:



**NONPAPER PHYSICAL EXHIBIT LODGED PURSUANT TO
L.R. 11-5.1 AND CONCURRENTLY FILED NOTICE OF LODGING**

†**Checksum Instructions.** The checksum can be used to verify the document's contents. To verify that your document matches the document used in the deposition you may use this tool. If the checksum on that tool matches the one shown above then the files are identical.

NOTE: If you open the file and then save it again you will change the file's metadata, which will alter the checksum. To avoid changing the checksum you must right-click on the attachment and save it. Depending on your PDF reader the command may vary. With Adobe Reader the option is Save Embedded File to Disk.

‡**File attachment instructions.** Various PDF readers will allow you to right-click on the file icon to save the native file. Some readers (such as Mac Preview) do not have this feature. Adobe Reader is a free program you can use to extract the native file from the PDF.

EXHIBIT
**1521**
2371

**EXHIBIT D-85**

**UNITED STATE EX REL. POEHLING V. UNITEDHEALTH GROUP. INC. [LATHAM & WATKINS]**

**ELECTRONIC FILE EXHIBIT PLACEHOLDER**

*This document is a placeholder for an electronic file used as an exhibit in the AgileLaw system.*
*The details of the file are below and the file has been "marked" with the same number as the stamp on this page.*

File Type: application/vnd.openxmlformats-officedocument.spreadsheetml.sheet

File Size: 5,704 KB

File Name: CON15_CDAT_Detail Report_01092023.xlsx

MD5 Checksum[†]: c22471eb9c7451ed6305e4ec5d81230e

File attachment[‡]:



**NONPAPER PHYSICAL EXHIBIT LODGED PURSUANT TO
L.R. 11-5.1 AND CONCURRENTLY FILED NOTICE OF LODGING**

[†]**Checksum Instructions.** The checksum can be used to verify the document's contents. To verify that your document matches the document used in the deposition you may use this tool. If the checksum on that tool matches the one shown above then the files are identical.

NOTE: If you open the file and then save it again you will change the file's metadata, which will alter the checksum. To avoid changing the checksum you must right-click on the attachment and save it. Depending on your PDF reader the command may vary. With Adobe Reader the option is Save Embedded File to Disk.

[‡]**File attachment instructions.** Various PDF readers will allow you to right-click on the file icon to save the native file. Some readers (such as Mac Preview) do not have this feature. Adobe Reader is a free program you can use to extract the native file from the PDF.

**EXHIBIT
1522**
~~2373~~

**EXHIBIT D-86**


For Authors  Products & Access  Free Newsletters  Subscribe  Renew    ☐ Cart    ☐ Login

Institutional Access



☐ ☐ ☐ ☐ ☐

HEALTH AFFAIRS FOREFRONT

RELATED TOPICS:
MEDICARE ADVANTAGE  | TRADITIONAL MEDICARE
 | MEDICARE SAVINGS PROGRAMS  | PAYMENT
 | ADVERSE SELECTION  | DEFICIT REDUCTION ACT OF 2005
 | PREMIUMS  | RISK ADJUSTMENT
 | ADJUSTED AVERAGE PER CAPITA COST  | BUDGET-NEUTRALITY

# Why Medicare Advantage Plans Are Being Overpaid By $200 Billion And What To Do About It

Richard Kronick

**JANUARY 29, 2020**    10.1377/forefront.20200127.293799



Advertisement

"The Future of COVID-1
Vaccine Development"

By Dr. Florian Krammer

To read this Health Affairs Forefront
article, please click here.

Icahn School
of Medicine at
Mount
Sinai

Advertisement

February 2024 | Housing & He

?

## Article Metrics



EXHIBIT

1535

2375

## Related

**CONTENT**

Medicare

**TOPICS**

Medicare Advantage

Traditional Medicare

Medicare Savings Programs

Payment

Adverse Selection

Deficit Reduction Act Of 2005

Premiums

Risk Adjustment

Adjusted Average Per Capita Cost

Budget-Neutrality

In the Deficit Reduction Act of 2005, Congress gave the Centers for Medicare and Medicaid Services (CMS) the statutory authority and obligation to implement a "coding intensity adjustment" for Medicare Advantage (MA) plans, to adjust for differences in patterns of diagnosis coding between MA and traditional Medicare.

Under both the Obama and Trump administrations, the coding intensity adjustment implemented by CMS has consistently been substantially smaller than justified by the data. The fiscal problem created by inadequate adjustment for coding intensity is large. Under reasonable assumptions about the rate of growth of MA coding, CMS will overpay MA plans by $200 billion over the next decade if the coding intensity adjustment remains at 5.91 percent, its current level.

Why does this overpayment persist? The annual decision about the size of the coding intensity adjustment is made by political appointees at CMS, the Department of Health and Human Services, and the White House, and the political benefits from implementing a smaller than empirically justified coding intensity adjustment far outweigh the potential political gains from protecting the taxpayers and creating a stable and level playing field between MA and traditional Medicare. To fix this problem, Congress should remove discretion from CMS and specify in statute an even-handed method of computing coding intensity. A statutory formula for measuring coding intensity would bring MA payment more in line with payment for other providers, in which Congress, not CMS, decides how much providers will be paid.

Below, I offer suggestions regarding what a statutory coding intensity adjustment formula should look like. Of course, Congress, like CMS, is subject to political pressures that will make enacting such a formula difficult. But unlike CMS, Congress could use the $200 billion in

## Cite As

"Why Medicare Advantage Plans Are Being Overpaid By $200 Billion And What To Do About It", Health Affairs Blog, January 29, 2020.

DOI: 10.1377/hblog20200127.

293799

avoided MA overpayments to fund other priorities, offering countervailing political incentives for legislators to save taxpayer money and level the playing field between MA and traditional Medicare by adopting a statutory measure of relative coding intensity.

## The Problem

CMS pays MA plans based on the health status of the beneficiaries who enroll, paying more for older and sicker enrollees and less for younger and healthier enrollees. This "risk adjusted" payment mechanism is intended to encourage MA plans to develop systems of care that are attractive to beneficiaries most in need and to prevent MA plans from profiting by attracting only good risks.

The health status of MA enrollees is measured using diagnostic information submitted by the MA plans themselves. As a result, MA plans have strong incentives to identify and report as many diagnoses as can be supported by the medical record, incentives that are not present in traditional Medicare. Although some MA plans may have used fraudulent strategies to inflate enrollee risk scores, many legitimate strategies are available to MA to increase risk scores. The incompleteness of diagnostic coding in traditional Medicare provides ample opportunities for MA plans to increase the identification and reporting of diagnoses. For example, in traditional Medicare, approximately 40 percent of beneficiaries coded with quadriplegia in a 12-month period do not have a diagnosis of quadriplegia appear on any claim in the subsequent 12 months.

## Discretion For CMS

Recognizing the likelihood that MA plans will report diagnostic information differently than is reported in traditional Medicare, in the Deficit Reduction Act of 2005, Congress gave CMS the authority to implement a "coding

intensity adjustment" to adjust for differences in coding patterns between MA and traditional Medicare. In 2010, CMS implemented a 3.41 percent coding intensity adjustment, reducing MA risk scores by that amount. The Affordable Care Act, and subsequently the American Taxpayers Relief Act of 2012, created a schedule of minimum adjustments, starting at 4.71 percent in 2014, increasing to 5.91 percent in 2018.

CMS retained the authority and obligation to implement adjustments larger than the statutory minimum if the data indicated that a larger adjustment was needed. However, it has not yet done so, despite strong evidence that a larger adjustment is needed to compensate for differences between MA and traditional Medicare in coding patterns. The measured risk of MA enrollees relative to traditional Medicare increased from 95.0 percent in 2007 to 106.2 percent in 2015 (exhibit 1).

Exhibit 1: Average risk score of Medicare Advantage enrollees as a percentage of average risk score of traditional Medicare beneficiaries, 2007–15



*Source: Richard Kronick and Pete Welch, 2014; Paul Jacobs and Richard Kronick, 2018.*

MA enrollment grew substantially from 2007 to 2015, and it is theoretically possible that the increase in relative risk reflects real changes in the relative health of MA enrollees. However, analyses of other data sources—including mortality rates, survey data from the Medicare Current Beneficiary Survey, data on switchers from traditional Medicare to MA, and prescription drug use data—show conclusively that there was little, if any, change in real relative risk over this time period. The 11-percentage-point increase in measured relative risk from 2007 to 2015 appears largely to be the result of differences in coding patterns between MA and traditional Medicare.

Perverse Political Incentives

The main reason that CMS has not implemented a larger

coding intensity adjustment is that there is little political gain from doing so, and the decision about the coding intensity adjustment is, ultimately, made by political appointees. If CMS were to implement an adjustment that is larger than the statutory minimum, MA plans would make their displeasure known to members of Congress. Furthermore, an adjustment larger than the statutory minimum might result in higher MA premiums or fewer extra benefits for enrollees, raising the likelihood of constituent dissatisfaction.

In even numbered years, information on MA premiums and benefits is made public soon before the November elections. Members of Congress (and, every four years, the president) are concerned that voters, likely encouraged by information fed to them by MA plans, may blame incumbents for increased premiums or reduced benefits. This is not a merely theoretical argument: Federal legislators have repeatedly exerted strong bipartisan pressure on CMS in response to industry and constituent concerns about MA payment policy.

The political cost of more aggressive action by CMS on coding intensity is clear. The political benefits are much less clear: The deficit would be slightly smaller but not enough to change interest rates or anything else that voters would notice. Given this imbalance between political costs and benefits, it is not surprising that CMS has stuck with the statutory minimum, despite strong evidence that larger adjustments are warranted.

## Proposed Solution: Specify The Coding Intensity Adjustment Formula By Statute

This problem could be solved by removing discretion from CMS when calculating the coding intensity adjustment, which Congress could do by writing a method for calculating the adjustment into statute. This approach would make payment for MA plans more like

payment for other providers—Congress typically tells CMS how to set payment rates, leaving relatively little discretion to CMS.

## MedPAC's Method

There are several reasonable options for specification of a formula to calculate the coding intensity adjustment. For example, Congress could direct CMS to adopt the approach used by the Medicare Payment Advisory Commission (MedPAC) in the past few years to estimate the magnitude of differential MA coding. That method compares the rate of growth in risk scores for MA enrollees with the rate of growth in risk scores for similar beneficiaries in traditional Medicare. For 2015, MedPAC estimated coding intensity increased MA risk scores by 10 percent. The MedPAC estimates for 2016 and 2017 are slightly lower—8 percent and 7 percent respectively —largely because of changes in the model used to calculate beneficiary risk scores. However, further changes in that model in 2018 and subsequent years are likely to increase the estimated coding intensity effect.

The MedPAC method is reasonable but requires complex calculations, would be difficult to audit, and is somewhat difficult to explain. It would be extraordinarily difficult to write into statute in enough detail to remove discretion from CMS in implementation.

## A Better, More Practical Approach

An alternative, and, in my view, preferable approach would be to require CMS to calculate the coding intensity adjustment using a method that CMS floated as a trial balloon in the Advance Notice for 2016 MA rates. First, CMS would calculate the relative risk of MA using the diagnostic risk adjustment system, which, as noted above, was 106.2 percent in 2015.

Second, CMS would calculate the relative risk of MA

using information on the age, gender, Medicaid status, and institutional status of enrollees—that is, using the Adjusted Area Per Capita Cost (AAPCC) system that was used prior to the introduction of diagnosis-based risk adjustment. In 2015, MA relative risk using these four factors was 97 percent. That statistic is less than 100 percent primarily because MA enrollees were less likely than traditional Medicare beneficiaries to be institutionalized, and institutionalized enrollees have high risk scores.

Third, CMS would divide the second number by the first, and subtract the quotient from 1.0. The result, which would have been 8.7 percent in 2015, would be the coding intensity adjustment.

This is a simple approach to explain and write into statute. It assumes that MA enrollees are no healthier and no sicker than demographically similar traditional Medicare beneficiaries. This assumption of no favorable or adverse selection is likely still a bit generous to MA— although the extent of favorable selection for MA appears to have declined over the past decade, there is no evidence to suggest that MA enrollees are, on average, sicker than demographically similar traditional Medicare beneficiaries, and some evidence to suggest they are a bit healthier.

The method of calculating coding intensity suggested above would return to the "budget neutrality" method that CMS, under the leadership of Tom Scully, implemented when the CMS-HCC (hierarchical condition category) risk adjustment model began to be phased in in 2004. At that time, MA relative risk, using the CMS-HCC model, was well below 1.0, and MA revenues would have been reduced if the CMS-HCC model had been implemented without adjustment. To avoid this outcome, CMS implemented a "budget neutrality adjustment," increasing CMS-HCC scores by the ratio suggested above. In the

Deficit Reduction Act of 2005, Congress directed CMS to phase out the budget neutrality adjustment by 2008. Ironically, in 2008, the measured relative risk of MA using the CMS-HCC model became greater than the measured relative risk using the AAPCC model, so if budget neutrality had been left in place, it would have resulted in decreases in payments to MA.

One potential substantive disadvantage to this approach is that at some point in the future it is theoretically possible that MA enrollees will, on average, be sicker than demographically similar traditional Medicare beneficiaries, and that the formula will unfairly penalize MA contracts. At the risk of giving CMS discretion that might be abused, CMS could be given the authority to use other data—such as data on mortality rates, prescription drug use, and the Medicare Current Beneficiary Survey—to analyze whether there is adverse selection against MA. Under this option, if CMS certifies that there is strong evidence of adverse selection against MA, then it would have the authority to adjust the statutory formula to reflect that adverse selection. Political influence on this decision could be lessened by requiring the CMS Office of the Actuary (OACT), not the agency's Center for Medicare, to make the certification. OACT has traditionally been less responsive than other parts of CMS to the preferences of political appointees.

A second potential concern about the proposed approach, as well as about the status quo adjustment of 5.91 percent, is that there is substantial variation across MA plans in how aggressively they have increased risk scores. Any industrywide adjustment will pay too much to plans that have been most aggressive in coding, too little to plans that have been least aggressive, and leave in place the incentive to code as many diagnoses as legally permissible. Consideration could be given to contract-specific adjustments, but it is far more important to first get the coding intensity adjustment, on average, correct.

After first fixing the $200 billion problem, Congress and CMS could then consider whether and how to implement contract-specific adjustments.

## Summing Up

Under reasonably conservative assumptions about the rate of growth of coding intensity, using the budget neutrality method to calculate coding intensity would likely result in approximately $200 billion in savings to Medicare over the next decade compared to current policy in which the coding intensity adjustment remains at 5.91 percent. Just as CMS is reluctant to anger the MA industry and its enrollees, members of Congress will be reluctant as well. However, unlike CMS, which does not get to spend any of the savings generated by more appropriate actions on coding intensity, Congress can choose to use the $200 billion in savings for additional spending or tax cuts, providing reason to hope that legislators will, at some point, do the right thing.



## HealthAffairs

1220 19th Street, NW, Suite 800
Washington, DC 20036
T 202 408 6801
F 301 654 2845
customerservice@healthaffairs.org

**TOPICS**
Access & Use
Costs & Spending
COVID-19
Health Equity
Health Reform
Leading To Health
More Topics

**CONTENT**
Journal
Forefront
Scholar
Briefs
Events
Podcasts
Collected Works

**INFORMATION FOR**
Authors
Request For Abstracts
Reviewers
Subscribers
Advertisers
Media News Room
Funders
Event Attendees

**SERVICES & RESOURCES**
Submit Content
Subscribe
Renew Membership
Manage My Account
Purchase Content
Permissions
Alerts
Newsletter Sign Up
Advertising Kit

**HEALTH AFFAIRS**
About
Impact
Report
Terms & Conditions
Privacy Policy
Jobs At Health Affairs
Fellowships
Contact Us

     

Terms and conditions | Privacy | Project HOPE

Health Affairs is pleased to offer Free Access for low-income countries. Health Affairs gratefully acknowledges the support of many funders.

*Health Affairs* is an official journal of AcademyHealth.

 

Project HOPE is a global health and humanitarian relief organization that places power in the hands of local health care workers to save lives across the globe. Project HOPE has published Health Affairs since 1981.

Copyright 1995 - 2024 by Project HOPE: The People-to-People Health Foundation, Inc., eISSN 1544-5208.

**EXHIBIT D-87**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA ex    :

rel., BENJAMIN POEHLING,        :

        Plaintiffs,        :   Case No.:

        VS.                :   CV-16-08697 FMO

UNITED HEALTH GROUP, INC.,      :

et al.,                         :

        Defendants.        :   Page 1-362


- - -

Friday, March 22, 2024

- - -


Videotaped deposition of JEAN ACEVEDO

taken at Latham & Watkins, 555 Eleventh Street, Suite

1000, Washington, DC commencing at 9:50 a.m., before

Sherry L. Brooks, Certified LiveNote Reporter and

Notary Public, in and for the District of Columbia.

- - -

MAGNA LEGAL SERVICES

WWW.MAGNALS.COM



2387

Page 96

1      A.    Correct.

2      Q.    You have not reviewed the details of

3  United Health Group's chart review programs, correct?

4      A.    Correct.

5      Q.    You're not familiar with the details of

6  those -- of United Health's chart review programs,

7  correct?

8      A.    Correct.

9      Q.    In connection with the expert testimony

10  you're offering in this case, you have not reviewed

11  any of the medical records underlying the diagnosis

12  codes that are in dispute between the Department of

13  Justice and United Health Group, right?

14      A.    Correct.

15          MS. KRIEG:  Object to form.

16          BY MR. BAAK:

17      Q.    And, in fact, you have not reviewed any

18  specific medical records in connection with the

19  expert testimony you're offering in this case,

20  correct?

21          MS. KRIEG:  Object to form.  Foundation.

22      A.    Correct.



2388

Page 97

1          BY MR. BAAK:

2      Q.    If you had been asked by the Department of

3    Justice to review the medical records underlying the

4    diagnosis codes that the two parties are disagreeing

5    about to see whether the codes were, in fact,

6    supported, would you have been qualified to do so?

7      A.    Yes.

8      Q.    The Department of Justice, though,

9    however, has not asked you to do so, correct?

10     A.    Correct.

11          MS. KRIEG:  Object to form.  And, again, I

12   caution the witness not to reveal any attorney/client

13   privileged communications.

14          BY MR. BAAK:

15     Q.    I mentioned earlier an expert for the

16   Department of Justice, Craig Garthwaite.  And I think

17   you indicated you had not looked at his report; is

18   that correct?

19     A.    That's correct.

20     Q.    Have you heard of Mr. Garthwaite?

21     A.    No.

22     Q.    I don't want to march through his report.



2389

Page 98

1    So I'm just going to represent a couple things to

2    you, and I trust your counsel will object if I get

3    them wrong.

4              Mr. Garthwaite offers an opinion on a list

5    of diagnosis codes that he refers to as his potential

6    deletes.  You have not reviewed any medical records

7    related to Professor Garthwaite's potential deletes

8    list, right?

9        A.    Correct.

10       Q.    Similarly, you have not reviewed any

11   medical records related to Professor Garthwaite's

12   final delete list, right?

13       A.    Correct.

14       Q.    And you're not offering any opinions, one

15   way or the other, on whether or not the diagnosis

16   codes on Dr. Garthwaite's final deletes list are, in

17   fact, supported, right?

18       A.    Correct.

19       Q.    Let's come back to paragraph 26 of your

20   report.  You're discussing the purpose of the

21   Medicare Advantage risk adjustment payment model in

22   paragraph 26.



Page 116

1        A.    Correct.

2        Q.    So, for example, in my blood draw

3    hypothetical they may say that I was having certain

4    routine blood testing done, for example, correct?

5        A.    Yes.

6        Q.    Or part of an annual exam?

7        A.    Yes, and there would be an ICD code for

8    that.

9        Q.    In your experience what are providers

10   typically paid for, the CPT codes, the procedures

11   they've done, or the diagnosis codes that are

12   submitted?

13       A.    So in a non -- in an organization that is

14   not primarily Medicare Advantage risk basis, it's the

15   CPT and HCPCS codes.

16            Even in a risk environment they're

17   actually not paid on the diagnosis.  The diagnosis

18   can have an impact on their payment, which does not

19   typically happen -- I have to say typically -- in a

20   fee-for-service environment where the physician is

21   billing -- being paid for the CPT or HCPCS codes.

22       Q.    Outside of the circumstances where the



Page 117

 1    provider is sharing in risk adjustment payments, the

 2    providers are typically being paid instead for the

 3    procedures they perform; is that correct?

 4         A.    Correct.

 5         Q.    In your experience, is that the vast

 6    majority of providers?

 7              MS. KRIEG:  Object to form.

 8         A.    It depends on where you are in the

 9    country.

10              BY MR. BAAK:

11         Q.    What about the providers you consult for?

12    Are they primarily compensated for the procedures

13    they perform?

14         A.    Some yes; some no.

15         Q.    If a provider is being compensated based

16    solely on the procedures they submit, they would not

17    have a financial incentive to submit a complete set

18    of diagnosis codes, right?

19         A.    Right.

20              MS. KRIEG:  Object to form.

21              BY MR. BAAK:

22         Q.    That's one reason why providers sometimes



Page 118

1    fail to submit a complete set of the diagnosis codes

2    that are, in fact, supported by the medical record,

3    right?

4              MS. KRIEG:  Object to form.

5        A.    Failed to submit or submit codes that

6    aren't supported, sure.

7              BY MR. BAAK:

8        Q.    Well, that wasn't my question.  We'll get

9    to that in a second.  But since providers are often

10   not paid for the diagnosis codes, that's one reason

11   why -- and are instead paid for the procedures,

12   that's one reason that providers often fail to submit

13   a complete set of the diagnosis codes that are

14   supported by the medical records, right?

15       A.    Correct.

16             MS. KRIEG:  Object to form.

17             BY MR. BAAK:

18       Q.    And I think you suggested that there are

19   also cases where the providers submit codes that you

20   believe that are unsupported.  That also is something

21   that you've seen in your practice, correct?

22       A.    Correct.



2393

Page 119

1    Q.    And, again, it's because the providers are

2    maybe having a little less attention to detail on the

3    diagnosis codes if it's not impacting their pay,

4    correct?

5    A.    Yes.

6    Q.    Would you agree with me that it's

7    beneficial from a patient management standpoint to

8    have an accurate capture of what the patient's

9    diagnoses are?

10         MS. KRIEG:  Object to form.

11   A.    What do you mean by patient management

12   perspective?

13         BY MR. BAAK:

14   Q.    Just care for the patient, to have an

15   accurate picture of which diagnosis codes have

16   actually been assigned.  Does that help the care of

17   the patient?

18   A.    Care of the patient by their provider?

19   Q.    By the provider or by the plan.

20         MS. KRIEG:  Object to form.

21   A.    It's two very different circumstances.  So

22   for the provider having an accurate list of the



Page 131

1          MS. KRIEG:  Object to form.

2     A.    Yes.  My certified coders are expected to

3  get it right almost all the time, and they do nicely.

4          BY MR. BAAK:

5     Q.    So you used the phrase in your opinion

6  that there should be little variance between two

7  coders.

8          What does almost 100 percent mean in your

9  view?  Do you have a benchmark you use internally

10 that you grade your coders against?

11    A.    As a small organization -- you know, as

12 you can imagine, we don't have a big formal program

13 -- everybody is -- is counseled on any errors, and

14 any errors or disagreements are extremely rare.

15         So if I had to create a benchmark, I'd

16 probably use for diagnosis coding the 95 percent.

17    Q.    So just to make sure I understand that,

18 you don't have a numerical internal benchmark for

19 measuring whether your coders should agree with one

20 another that you use internally at Acevedo

21 Consulting?

22    A.    No.  As part of a formal program, no.



Page 132

1        Q.    Are you aware of any formal studies that

2    show that two experienced coders when looking at the

3    same medical record should reach the same conclusion

4    about the appropriate diagnosis codes 95 percent of

5    the time?

6        A.    Formal studies, no.

7        Q.    Not aware of any studies showing that

8    that's realistic or that -- or any CMS guidance

9    saying that's the requirement, correct?

10            MS. KRIEG:  Object to form.

11       A.    Not that I'm aware of.

12            BY MR. BAAK:

13       Q.    I want to talk about some of the reasons

14   that two coders reviewing the same medical record --

15   and I'm going to set aside circumstances where

16   they're reviewing different medical records and come

17   back to that.

18            So I want to talk about the circumstances

19   where two experienced coders reviewing the same

20   medical record might disagree about the appropriate

21   diagnosis codes.  Okay?

22       A.    Okay.



Page 133

1        Q.    You've touched on one of these already.

2    But one reason two medical -- two coders might reach

3    different conclusions about what diagnosis codes to

4    assign to a given medical record could be impacted by

5    the particular coder's level of experience, correct?

6        A.    Correct.

7        Q.    Another reason that two experience coders

8    could reach different conclusions about what

9    diagnosis codes to assign to a given medical record

10   is the particular skill of the coder, correct?

11           MS. KRIEG:  Object to form.

12       A.    I would put skill and experience in the

13   same bucket.

14           BY MR. BAAK:

15       Q.    But you can be experienced and bad at

16   life, unfortunately.  So just -- I want to separate

17   them for a second.

18       A.    Aha.

19       Q.    So some people are just better at the

20   coding exercise than others, right?

21       A.    Oh, I'm sure.

22       Q.    So that's what I mean by skill.  So in



Page 134

1    addition to experience, skill is another factor that

2    can affect whether -- sorry -- can create a

3    circumstance where two coders might disagree on

4    whether to assign a diagnosis code, right?

5         A.    I'm sure that would be the case, a good

6    reason for certification.

7         Q.    I noticed that you have a certification

8    specific to ENT; is that correct?

9         A.    Correct.

10        Q.    What is ENT?

11        A.    Otolaryngology.  Did that help?  Ear,

12   nose, and throat.

13        Q.    Ear, nose, and throat.  Okay.  What was

14   the purpose of obtaining your certification in ear,

15   nose, and throat?

16        A.    So, actually, the AAPC had reached out to

17   me when they wanted to develop a certification for

18   ENT coders because I have quite a bit of experience

19   in that specialty area.

20              And I was one of the members of the

21   steering committee that then wrote the national exam.

22   So I didn't desire or have an intent or a goal to



Page 135

1   become certified as an ENT coder.  But I was

2   understandably, I think, given the designation since

3   I couldn't take the test that I helped to write.

4        Q.    Does the AAPC, the coding organization we

5   talked about earlier -- does it offer certification

6   specific to other medical clinical subspecialties?

7        A.    Yes.

8        Q.    How many, approximately, certifications

9   for particular areas of medicine do they offer

10   certifications?

11        A.    So it's a fairly lengthy list.  I'm going

12   to say conservatively probably ten.

13        Q.    Why does AAPC offer these certifications

14   that are specific to particular clinical specialties?

15        A.    So I've not been part of their thought

16   process, but I do know that I have actually

17   recommended to some single specialty practices that I

18   work with who want to get one or more of their coders

19   who are not yet certified certified.

20             I've recommended that they not take a CPC

21   exam, that maybe they take if it's an orthopedic

22   practice an orthopedic coding exam because they



Page 136

1   wouldn't have the depth of knowledge or experience to

2   pass the CPC.

3           So I'm sure that was part of the thought

4   process in the AAPC in having specialty designations

5   in addition to the CPC.

6       Q.    Coming back to my scenarios where two

7   experienced coders might reach a different conclusion

8   on whether to assign a diagnosis code, you agree, I

9   think based on what you said in your report, that

10  experience in a particular clinical specialty can

11  impact why two coders might reach different

12  conclusions, right?

13          MS. KRIEG:  Object to form.

14      A.    Yeah, because the one in a specialty that

15  isn't what he or she is looking at wouldn't have the

16  experience for that.

17          BY MR. BAAK:

18      Q.    I think you touch on this, if you want to

19  look at paragraph 55 of your report.  You say at the

20  end of paragraph 55:  "Coders should be exposed to

21  different medical specialties during training if they

22  previously only worked in one specialty."



Page 137

1          Do you see that?

2     A.    Yes.

3     Q.    And why is -- why do you think that's

4 preferable?

5     A.    So that they gain experience and as part

6 of their training if they have questions, and you can

7 more closely check their accuracy.  I do that myself

8 since -- if I have someone that's working and has not

9 worked with, say, just to use orthopedics again, an

10 orthopedic practice.

11          Even if they're an experienced coder but

12 they have not worked with an orthopedist, they're

13 going to be closely monitored and mentored until they

14 have the knowledge necessary to be on their own.

15    Q.    Whether the particular coder has expertise

16 in a particular clinical area can impact whether or

17 not they assign the appropriate diagnosis codes,

18 right?

19          MS. KRIEG:  Object to form.

20    A.    Yeah, it could.  It could, because even

21 though the rules are the same, regardless of what

22 area of the code book they're looking at, they may



Page 152

1    experienced coders might assign different diagnosis

2    codes based on the same medical record, another

3    reason is the ability to read the handwriting on a

4    medical record, right?

5         A.    Correct.

6         Q.    Do you agree, Ms. Acevedo, that we can

7    have a circumstance where you might be able to read

8    someone's handwriting but I cannot?

9         A.    Oh, yes.

10        Q.    A coder in a provider group who has

11   familiarity with a doctor's handwriting might be more

12   able to read the handwriting than someone who does

13   not have that familiarity, correct?

14        A.    Yes.

15        Q.    A coder in a doctor's office might also

16   have greater familiarity with the particular

17   abbreviations that a doctor uses, correct?

18             MS. KRIEG:  Object to form.

19        A.    They might.

20             BY MR. BAAK:

21        Q.    For example, if I'm a coder in a doctor's

22   office and I know that the particular doctor always



2402

Page 153

1    uses PE to mean physical exam, that familiarity might

2    allow me to understand what a particular abbreviation

3    meant, correct?

4              MS. KRIEG:  Object.  Object to form.

5         A.    That familiarity will allow you to assume

6    what that meant in that instance and you might be

7    correct because of your knowledge.

8              BY MR. BAAK:

9         Q.    Well, it might not necessarily be an

10   assumption.  If I know the doctor always uses PE to

11   be physical exam, that might allow me to understand

12   that the medical record reflected that a physical

13   examination occurred, correct?

14             MS. KRIEG:  Object to form.

15        A.    So I'm going to assume that the PE then

16   has a colon after it and is followed by the actual

17   physical exam and that, yes, she might make a correct

18   assumption that the PE in that instance relates to a

19   physical exam.

20             BY MR. BAAK:

21        Q.    So ability to read handwriting is another

22   reason that two experienced coders might reach



Page 154

1  different conclusions based on the same medical

2  record, correct?

3      A.    Correct.

4      Q.    We've talked a little bit about judgment

5  calls.  You agree that judgment calls for what I

6  think you referred to as difficult cases also might

7  be another reason that two experienced coders assign

8  different diagnosis codes based on the same medical

9  record, right?

10     A.    Different levels of experience of the

11  coders, yes.

12     Q.    Human error, the fact that people make

13  mistakes, is another reason that two experienced

14  coders could assign different diagnosis codes based

15  on the same medical record, right?

16     A.    Of course.

17     Q.    Everybody makes mistakes, right?

18     A.    Yes.

19           MS. KRIEG:  Object to form.

20           BY MR. BAAK:

21     Q.    That's true of experienced certified

22  coders, correct?



Page 155

1          MS. KRIEG:  Object to form.

2     A.    Yes.

3          BY MR. BAAK:

4     Q.    Coders encounter situations that require

5  in-depth research and take more time to code

6  correctly on occasion, correct?

7     A.    I'm sure, yes.  Um-hum.

8     Q.    Even among the more commonly used codes

9  are significant gray areas open for examination among

10 coders, right?

11         MS. KRIEG:  Object to form.

12    A.    I don't think I agree with that.  Can you

13 give me an example of a significant gray area?

14         BY MR. BAAK:

15    Q.    Well, you know what the phrase "gray area"

16 means, right?

17    A.    Yes.

18    Q.    So let me just ask my question again.  How

19 would you define gray area?

20    A.    So I really don't find gray areas in

21 diagnosis coding.  That's why I asked and I couldn't

22 agree with your question.  I was hoping that maybe



Page 156

1   there was something else that you could add to that.

2           So to me the requirements -- the

3   guidelines are pretty straightforward and objective.

4   The gray areas have to do with clinical

5   documentation, the handwriting that's illegible that

6   you just mentioned, et cetera.

7       Q.    Let me come back to my question:  Even

8   among the more commonly used codes are significant

9   gray areas open for examination among coders.

10          Do you agree?

11          MS. KRIEG:  Object to form.

12      A.    No.

13          BY MR. BAAK:

14      Q.    With very complex or unusual cases, coding

15  guidelines may be confusing to interpret --

16          MS. KRIEG:  Object to form.

17          BY MR. BAAK:

18      Q.    -- correct?

19      A.    To an inexperienced coder who hasn't come

20  across that before, quite possibly sure.

21          BY MR. BAAK:

22      Q.    What about to an experienced coder?



Page 186

1    that does not mean the code is, in fact, unsupported

2    in the medical record, right?

3              MS. KRIEG:  Object to form.

4        A.    So I don't agree with the totality of your

5    -- how you're phrasing it.  So from my perspective as

6    all the guidelines are really clear, it has to be

7    documented in the medical record for anybody to see

8    it.  Any coder should be able to find it.

9              One coder may have missed it for one

10   reason or another, but if it's not in the medical

11   record, then it's not been missed and it should not

12   be coded.

13             BY MR. BAAK:

14       Q.    I may have made my hypothetical more

15   confusing than I intended it to be, in part because

16   people make mistakes as we talked about a second ago.

17   Also because of potential errors of disagreement.

18   But just because a diagnosis code isn't found by a

19   coder in a blind review that doesn't mean with 100

20   percent certainty that the code is, in fact, not

21   supported in the medical record, right?

22             MS. KRIEG:  Object to form.



Page 187

1     A.     Yeah, because in the way you phrase it now

2     the coder missed it.

3            BY MR. BAAK:

4     Q.     Have you ever been involved in your

5     consulting practice doing chart retrieval, whether

6     it's for plans or for providers?

7     A.     Define "chart retrieval."

8     Q.     The act of obtaining medical records from

9     providers.

10    A.     So electronically we do that all the time

11    now.  I have access to more electronic medical

12    records, as do my team, than we care to ever have.

13    And we often are the ones that will go in and find

14    the records.

15            There haven't been many paper records

16    since about 2011, but I can picture myself standing

17    in a primary care office and literally going and

18    pulling the charts off the shelves myself, so yes.

19    Q.     In what context does Acevedo Consulting do

20    the actual retrieval of the medical records?  Is this

21    in advance of your chart audits?

22    A.     So it's part of the chart audit.



Page 188

1      Q.    When you go to retrieve medical records as

2  part of the chart audit, it is not always possible to

3  obtain a complete set of the medical records, right?

4            MS. KRIEG:  Object to form.

5      A.    It depends on how you define a complete

6  set of the medical records.

7            BY MR. BAAK:

8      Q.    Right.  You talked about the difficulty of

9  paper records.  But sometimes providers don't

10  respond.  Sometimes they don't have the full record.

11  These are all things that can happen in the real

12  world when you try to go retrieve medical records,

13  right?

14      A.    Yes, any of that could happen.

15      Q.    If a blind -- if in a blind review a coder

16  is only looking at a portion of the patient's medical

17  records, would that allow them to draw any

18  conclusions about what was in other medical records

19  that are not in front of them?

20      A.    No.

21      Q.    In a blind chart review if the coder only

22  has a portion of the patient's medical records in



2409

Page 189

1    front of them, that would not allow them to draw a

2    conclusion about the totality of the appropriate

3    diagnosis codes for that given patient, correct?

4        A.    Correct.  They could only assign diagnosis

5    codes for the medical records they had at hand.

6        Q.    Do you have any experience with what -- or

7    do you track what percentage of time in the chart

8    retrieval process you're able to obtain a complete

9    set of the patient's medical records?

10       A.    I don't track it, but I will tell you that

11   it's the overwhelming majority of the time with

12   electronic medical records.

13       Q.    When did most practices switch to

14   electronic medical records?

15       A.    Beginning in 2011, probably the majority

16   of -- because that's when the meaningful use program

17   and some government funding for implementing

18   electronic medical records started.  And the adoption

19   -- I'm trying to think when seeing paper charts at

20   all for medical records was suddenly so very uncommon

21   for us.  I can't picture when.

22       Q.    Can you estimate just approximately when



Page 190

1    -- you know, the transition started in 2011 -- but

2    when most providers had moved from paper records to

3    electronic medical records in your experience?

4        A.    So by most you mean more than half.  Yes?

5        Q.    Yes.

6        A.    So I'm going to hazard a pretty probably

7    informed guess that by 2015, 2016 more than half of

8    providers were on electronic medical records.  If

9    we're talking hospital providers, it's probably

10   higher.  But for physician -- community-based

11   physician practices, probably sometime around there.

12       Q.    If you look at your opening report -- give

13   me a second to find the right section.  Paragraph 8,

14   the scope of your assignment, you state that the

15   relevant time period from the report covers dates of

16   service 2008 through 2016, correct?

17       A.    Yes.

18       Q.    Given the testimony you just gave me about

19   the adoption of medical records, it sounds --

20   electronic medical records, rather, for most of the

21   relevant time period for your report paper medical

22   records were more commonly used than electronic



Page 191

1    medical records, right?

2              MS. KRIEG:  Object to form.

3         A.    Well, I mean in the community-based

4    provider setting that I really referred to, so from

5    2008, 2011 would be three years, another two, five,

6    11 -- so it's about half and half -- no, no.  No, no.

7    I take it back.  Bad math.  Bad math.

8              So, yeah, probably the last maybe three

9    years would have been more EMRs, around 2013, yeah.

10        Q.    You said as late as 2015 or 2016 in the

11   provider space it was still around -- was it around

12   50/50 between paper and electronic?

13        A.    No.  By 2015 and '16 most providers were

14   on electronic medical records.

15        Q.    But having done the math again it sounds

16   like that paper records were predominant -- more than

17   half --

18        A.    Yeah, a little more than half --

19        Q.    -- for the relevant period for your report

20   in this case, right?

21        A.    Yes, um-hum.

22        Q.    In your experience is it more difficult to



360

1                    C E R T I F I C A T E

2

3            I do hereby certify that I am a Notary
   Public in good standing, that the aforesaid testimony
4  was taken before me, pursuant to notice, at the time
   and place indicated; that said deponent was by me
5  duly sworn to tell the truth, the whole truth, and
   nothing but the truth; that the testimony of said
6  deponent was correctly recorded in machine shorthand
   by me and thereafter transcribed under my supervision
7  with computer-aided transcription; that the
   deposition is a true and correct record of the
8  testimony given by the witness; and that I am neither
   of counsel nor kin to any party in said action, nor
9  interested in the outcome thereof.

10

11           WITNESS my hand and official seal this

12  _____ day of _____, 2024.

13

14

15  _____

16                 Notary Public

17

18

19

20

21

22

2413

**EXHIBIT D-88**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA ex  )

rel. BENJAMIN POEHLING,     )

                        )

        Plaintiffs,    )

vs.                   ) CASE NO.

                        ) CV 16-08697 FMO

UNITEDHEALTH GROUP, INC. et )

al.,                   )

                        )

        Defendants.    )


        VIDEOTAPED DEPOSITION of KATHLEEN BAKER taken by Plaintiffs, held at Riley, Warnock & Jacobson, 1906 West End Avenue, Nashville, Tennessee, commencing at 8:19 A.M., on July 12, 2022, before Gary Schneider, RPR, CRR, RMR, TLCR and Notary Public within and for the State of Tennessee.

Page 2

```
 1              A P P E A R A N C E S:
 2     For the Plaintiffs:
 3         WENDY ZUPAC, ESQ.
           MARTHA GLOVER, ESQ. (remotely)
 4         United States Department of Justice
           Civil Division
 5         175 N Street NE
           Washington, D.C. 20002
 6         202.307.0486
           wendy.zupac@usdoj.gov
 7         martha.n.glover@usdoj.gov
 8     For the Defendants:
 9         MORGAN L. MADDOUX, ESQ.
           KRISTEN MARIE HAIGHT, ESQ.
10         Latham & Watkins, LLP
           555 Eleventh Street, NW, Suite 1000
11         Washington, D.C. 20004
           202.637.3318
12         morgan.maddoux@lw.com
           kristen.haight@lw.com
13
           LAUREN HADIARIS, ESQ.  (remotely)
14         Latham & Watkins, LLP
           200 Clarendon Street
15         Boston, MA 02116
           617.880.4661
16         lauren.hadiaris@lw.com
17     For the Relator:
18         HALLIE NOECKER, ESQ.
           Constantine Cannon
19         150 California Street, Suite 1600
           San Francisco, CA 94111
20         415.426.5660
           hnoecker@constantinecannon.com
21
       Also Present:
22
           Jessica Sweeney, Paralegal Specialist,
23           United States Department of Justice
24         Timothy Hargadon, Optum Associate General
             Counsel (remotely)
25
```



2416

Page 35

1          A.     Yes.

2          Q.     Okay.  And how is Optum

3    affiliated with UnitedHealth Group?

4                 MS. MADDOUX:  Objection.  Form.

5                 You can answer.

6                 THE WITNESS:  Sorry.  I just --

7                 it is a subsidiary of UnitedHealth

8                 Group.

9    BY MS. ZUPAC:

10          Q.     And before Ingenix purchased

11    Aim, so actually I'm going back to your time at

12    Aim, did you work for UnitedHealth Group or any

13    United subsidiaries?

14          A.     Like, can you -- meaning, like,

15    was I employed by them?

16          Q.     No.  I just mean did you do any

17    work for United and any United subsidiary as a

18    client of yours when you were employed by Aim?

19          A.     I don't recall personally

20    working on any UHC subsidiaries, but Aim had UHC

21    business.

22          Q.     Okay.  All right.  So then

23    turning back to Exhibit 261.  So your LinkedIn

24    profile states that you were the vice president,

25    risk adjustment and STARS operations from



1    December 2004 to February 2016.  So I just want to

2    make sure that we're all on the same page.  That

3    particular entry covers your work with Aim,

4    Ingenix, and Optum during those years, correct?

5             A.    It does.  And it only signifies

6    that last role versus all of the roles --

7             Q.    Right.

8             A.    -- that I had at the time.

9             Q.    Okay.  So focusing on the first

10   paragraph under that entry, though, the middle of

11   page 2, it mentions here responsible for 800

12   million dollar plus global coding operation with

13   $150 million plus expense budget.  Lead, 2300 plus

14   global resources including FTEs and contractors.

15             Is that right?

16             A.    That is what it states.

17             Q.    Is this referring to Optum's

18   medical coders?

19             MS. MADDOUX:  Objection.  Form.

20   BY MS. ZUPAC:

21             Q.    You can answer.

22             A.    It -- in part.

23             Q.    Okay.  So I guess I'll ask it a

24   different way.  What -- what are you referring to

25   here with the $800 million plus global coding



1    operation?

2            A.    I can't recall the $800 million

3    plus, what that tied to.

4            Q.    What about the global coding

5    operation?

6            A.    That would be the having coders

7    in US, India, and Philippines.

8            Q.    Okay.  And did the coders in

9    India and Philippines, were they also referred to

10   as offshore coders?

11           A.    Yes.

12           Q.    And did they include medical

13   coders employed directly by Optum as well as by

14   vendors?

15                 MS. MADDOUX:  Objection.  Form.

16   BY MS. ZUPAC:

17           Q.    You can answer.

18           A.    Yes.

19           Q.    And what were the vendors that

20   employed certain of those coders?

21           A.    PI International.

22           Q.    Okay.  Is PI the only one?

23           A.    It's the only one -- it's the

24   only one I recall.

25           Q.    Do you recall working with a



Page 38

1    vendor or contractor called "iCodify"?

2                  A.    Yes.

3                  Q.    Okay.  And were you responsible

4    for overseeing Optum's relationship with iCodify?

5                  A.    No.

6                  Q.    Do you recall who was

7    responsible for that relationship?

8                  A.    I do not.

9                  Q.    So we'll come back to discussing

10   this role, but I just want to quickly address the

11   other more recent entries on your LinkedIn.

12                     So it looks like it states that

13   you were the senior director of compliance program

14   operations from February 2016 to July 2021,

15   correct?

16                  A.    Correct.

17                  Q.    Okay.  And what was the nature

18   of that role at Optum?

19                  A.    I led the external audit team

20   for regulatory or client audits, the internal

21   compliance audit team in the risk assessment

22   program.

23                  Q.    And in this role, did you have

24   oversight over Optum's risk adjustment programs?

25                  A.    No.



Page 39

```
 1              Q.    And it looks like your current
 2   role at Optum, which you began in August 2021, is
 3   vice president, risk adjustment operations and
 4   transformation, correct?
 5              A.    Correct.
 6              Q.    Is that, in fact, your current
 7   role at Optum?
 8              A.    Yes.
 9              Q.    And what are your
10   responsibilities in this role?
11              A.    I manage the retrospective chart
12   review program, lead, I should probably say, the
13   national coding team for risk adjustment, and the
14   AS submissions team.
15              Q.    And how is this role different
16   from the one you served in previously, the vice
17   president of risk adjustment and STARS operations?
18              A.    It's in a different business
19   unit, and so, you know, it's kind of a
20   different -- it's on the provider's side, and it's
21   a broader role from the perspective that working
22   with coders that do more than just retrospective
23   chart review.  They're doing other types of
24   programs.
25              Q.    All right.  And who do you
```



Page 40

1    report to now?

2              A.     Jon Bird.

3              Q.     Jon Bird?

4                     Okay.  All right.  So as

5    promised, I'm going to go back to your prior role.

6    So at some point in your prior role, this 2004 to

7    2016 role, did you begin working with Optum's

8    chart review operations?

9              A.     Yes.

10             Q.     Okay.  So we've been using the

11   term "chart review" or discussing it, so I just

12   want to stop and ask what your understanding of

13   the term "chart review" is.

14             A.     It's retrospective chart review

15   of a member's chart where you retrieve and code

16   the chart.

17             Q.     And what is the purpose of doing

18   chart review?

19                    MS. MADDOUX:  Objection.  Form.

20   BY MS. ZUPAC:

21             Q.     You can answer.

22             A.     It is to code diagnosis codes

23   that are documented within the medical record that

24   were previously not submitted.

25             Q.     Would you agree that the purpose



Page 41

1    of chart review is to provide a complete and

2    accurate recording of a member's diagnosis codes

3    to CMS?

4                    MS. MADDOUX:  Objection.  Form.

5                    THE WITNESS:  That is not my

6            understanding.

7    BY MS. ZUPAC:

8            Q.    Okay.  So can you go back to

9    Exhibit 258.

10           A.    I am there.

11           Q.    Okay.  All right.  Can you go to

12   PDF page 8.  And you can get there by clicking on

13   the gray box at the bottom.

14           A.    Mm-hmm.

15           Q.    And typing it "8."  That might

16   be easier than scrolling.

17           A.    I am there.

18           Q.    Okay.  And so I am on deposition

19   page 24, and you'll probably see a highlighted

20   section which starts on line 11 reading "Q:  Okay.

21   What is your understanding of the purpose of chart

22   review?"

23                    "Answer:  Chart review is to

24   provide a complete and accurate reporting of a

25   member's diagnosis codes to CMS."



Page 42

```
 1                    Do you recall previously

 2    testifying that the purpose of chart review was to

 3    provide a complete and accurate recording of a

 4    member's diagnosis codes to CMS?

 5                    MS. MADDOUX:  Objection.  Form.

 6    BY MS. ZUPAC:

 7           Q.     You can answer.

 8           A.     I see it written in this

 9    document.

10           Q.     Okay.  And is your testimony

11    today that you disagree with your prior testimony?

12           A.     I think my thoughts on that is

13    that there should have been additional words after

14    "to CMS."

15           Q.     Okay.  And what are those

16    additional words?

17           A.     It's to provide a complete and

18    accurate recording of member diagnosis code to CMS

19    that have been coded from the retrospective chart

20    review.

21                    MS. MADDOUX:  And, Wendy, the

22                    yellow highlighting, are you

23                    representing this was added --

24                    MS. ZUPAC:  Yes.

25                    MS. MADDOUX:  -- by the
```



Page 93

1    frame in which you worked in operations, so I'm

2    focusing on 2012 to 2014.

3              A.     It depends.  Like, meaning at

4    that time we had a dependency on vendors, PI, like

5    we referenced earlier.

6              Q.     Sure.

7              A.     And then I was given the

8    instruction to start building out an internal

9    coding competency.  And so if you ask me the

10   question of during that time frame did Optum

11   employ coders, it would be yes and no.

12             Q.     Okay.

13             A.     Or maybe, more importantly, no

14   and yes --

15             Q.     Okay.  Sure, sure.

16             A.     -- to some the extent.

17             Q.     Sure.

18             A.     So it kind of depends.

19             Q.     Yeah, so I can step back and

20   just ask it a different way.

21                    At different points in time,

22   Optum utilized coders employed by vendors,

23   correct, including PI, correct?

24             A.     Correct.

25             Q.     And then at other points in



Page 94

1    time, Optum also directly employed coders,

2    correct?

3              A.    Yes.

4              Q.    Okay.  And are you aware if at

5    any point Optum used coders either employed by a

6    vendor or internally that were not certified

7    medical coders?

8              A.    I don't recall that

9    specifically, but I do recall having conversations

10   around making sure that the coders were certified.

11             Q.    Okay.  And did you believe that

12   Optum's medical coders, whether the ones employed

13   internally or by a vendor, were skilled medical

14   coders?

15                   MS. MADDOUX:  Objection.  Form.

16             Calls for speculation.

17   BY MS. ZUPAC:

18             Q.    And to be clear, I'm asking for

19   your belief.

20             A.    Skilled in what?

21             Q.    Skilled in medical coding.

22             A.    They -- if a coder is certified

23   and met the requirements of certification, so,

24   yes.

25             Q.    And did you believe that the



Page 95

1    coders that Optum used, whether employed by a

2    vendor or by Optum directly, had the appropriate

3    level of training?

4                   MS. MADDOUX:  Objection.  Form.

5    BY MS. ZUPAC:

6           Q.     You can answer.

7           A.     Our coders were given training,

8    and our training was consistent with our policies

9    and practices, and so yes.

10          Q.     Okay.  And did you have

11   confidence in Optum's coders' ability to code

12   charts accurately?

13                  MS. MADDOUX:  Objection.  Form.

14   BY MS. ZUPAC:

15          Q.     You can answer.

16          A.     Can you repeat the question

17   again, please?

18          Q.     Sure.

19                  Did you have confidence in

20   Optum's coders' ability to code charts accurately?

21                  MS. MADDOUX:  Same objection.

22                  THE WITNESS:  I had confidence

23             that every coder was competent in doing

24             their role.  Does that mean that every

25             coder was right 100 percent of the



Page 251

1    3:49.)

2                        THE VIDEOGRAPHER:  The time is

3              now 3:49 and we are back on the record.

4                    E X A M I N A T I O N

5    BY MS. MADDOUX:

6              Q.    So, Ms. Baker, we have a few

7    questions for you.  Earlier today do you recall

8    testifying about claims verification?

9              A.    Yes.

10             Q.    What was your involvement in

11   designing the scope of Optum's claims verification

12   program?

13             A.    I did not have involvement in

14   designing it.

15             Q.    What was your involvement in

16   managing Optum's claims verification program?

17             A.    I had people within my hierarchy

18   that worked on the claims verification program,

19   but I was not necessarily involved day to day in

20   it.

21             Q.    What was your involvement in

22   making decisions about Optum's claims verification

23   program?

24             A.    I had no decision-making in

25   that.



Page 252

1              Q.    What was your involvement in

2    making decisions about whether to submit deletes

3    from Optum's CV program?

4              A.    I made no decisions regarding

5    that.

6              Q.    What was your involvement in

7    decisions regarding whether a claims verification

8    program should be implemented?

9              A.    I was not involved in those

10   conversations or decisions.

11             Q.    Earlier today do you recall that

12   you testified that you used chart retrieval

13   vendors to retrieve charts for Optum's

14   retrospective chart review program?

15             A.    Yes.

16             Q.    In your experience, did these

17   chart retrieval vendors retrieve all charts for a

18   member for a given date of service year?

19             A.    No, that's not possible.

20             Q.    When you say it's not possible,

21   what do you mean?

22             A.    Meaning there's just so many

23   charts for members.  So, like, you know, if we go

24   back to, like, my -- well, actually, where we're

25   positioned right now, like, my cancer diagnosis is



Page 253

1    that, you know, a member can have multiple charts

2    across different locations, across different

3    providers.  So, like, here we sit in -- you know,

4    I had services done at Saint Thomas Ascension that

5    also has a private ambulatory surgery center that

6    also houses a medical -- a medical building that

7    housed my breast surgeon and my plastic surgeon,

8    and then also Vanderbilt where I had some

9    procedures done.

10                   You know, even if I just go back

11   to the date where I had, you know, surgery done at

12   the ASC, I would have, you know, four different

13   visits from separate doctors regarding my date of

14   service that day, but they're all different charts

15   or, you know, Vanderbilt's in their charts.  If I

16   would go to one location to grab a chart, it

17   doesn't mean I would have grabbed all charts for

18   that member because it would've only been what was

19   available that day.  But even if I -- you know,

20   for instance, for Vanderbilt or maybe personal

21   experience, we've all been to doctors, where

22   Monday -- well, here, I mean, I'll say Vanderbilt,

23   like, Monday and Wednesdays they're here downtown

24   or Midtown here at Vanderbilt.  But then on, you

25   know, Tuesdays and Thursdays, they're out in



Page 254

1    Franklin office location.  And so depending upon

2    how their medical charts are, those could be

3    different locations for charts for that member.

4    And so, you know, it's just charts -- a chart for

5    a member doesn't contain every single encounter

6    that that member has had, nor is it possible to

7    say whether or not it's always a complete chart

8    because it's based upon what was available at that

9    time or if the provider sent it and what the

10    provider sent to us.

11              Q.    Did Optum review all of the

12    charts for a member in a particular date of

13    service year in its retrospective chart review

14    program?

15              A.    Did we review all?  No, it's

16    not -- I mean, we didn't have all of the data.  We

17    didn't have all of the medical charts for them.

18              Q.    Earlier today do you recall

19    testifying about blind -- blind chart reviews?

20              A.    Yes.

21              Q.    Do you know what a blind chart

22    review is?

23              A.    Yes.

24              Q.    What is it?

25              A.    It's when the coders are not



Page 255

1    given any information about that member at a

2    member level.

3              Q.    So does the coder conducting a

4    blind review of a chart know what diagnosis codes

5    the provider reported on the claim for that

6    beneficiary?

7              A.    No.  It's not possible to tie it

8    back because we don't know what the chart

9    contains.

10             Q.    So, hypothetically, a provider

11   submits diagnosis codes A, B, and C on the claim

12   for a beneficiary, the coder conducting a blind

13   review of the chart for that beneficiary

14   identifies codes B, C, and D.  Do you understand

15   the hypothetical?

16             A.    I do.

17             Q.    If a coder conducting a blind

18   review of the chart identifies diagnosis codes B,

19   C, and D, does that mean that code A is not

20   documented in the medical record?

21             MS. ZUPAC:  Object to form.

22   BY MS. MADDOUX:

23             Q.    You can answer.

24             A.    No.  I mean, it means -- it

25   could mean that we don't have all of the pages in



Page 256

1    that chart.  It could be that that chart -- that

2    chart was in circulation and, therefore, what we

3    were -- that what we had is not complete.  It

4    could be that that happens to be a practice where

5    it multiple chart locations.  And so, you know,

6    out of convenience, sometimes you go to the 100

7    Oaks location, and another time you go to the

8    Franklin Road location.  It's just kind of

9    dependent upon where that chart is.  And so

10   it's -- it's possible to not have the full chart

11   when you're reviewing it.

12            Q.    What would Optum need to do to

13   determine whether or not code A may, in fact, be

14   documented in the medical record?

15                 MS. ZUPAC:  Object to form.

16   BY MS. MADDOUX:

17            Q.    You can answer.

18            A.    To be able to take a look at --

19   say that again, please.

20            Q.    What would Optum need to do to

21   determine whether or not code A may, in fact, be

22   documented in the medical record?

23                 MS. ZUPAC:  Object to form.

24                 Calls for speculation.

25



Page 257

1  BY MS. MADDOUX:

2          Q.    You can answer.

3          A.    You know, a lot of research, a

4  lot of rework, being able to open up the chart to

5  see do we have the right rendering provider,

6  did -- do we have the right -- does that provider

7  have any other locations, does that provider

8  have -- going through an EMR transition, do we

9  think we have all that information.  I mean,

10  it's -- it's -- you got to be able to do a lot of

11  research and opening up that chart, none of which

12  is insignificant tasks.

13          Q.    Earlier today do you recall

14  Ms. Zupac asked you some questions about

15  completeness as it relates to retrospective chart

16  reviews?

17          A.    Yes.

18          Q.    Do you recall testifying about

19  how chart review coders may not identify every

20  diagnosis code that is documented in the medical

21  record?

22          A.    Yes.

23          Q.    In your experience, what are

24  some reasons for this?

25          A.    Some reasons for that just have



2434

Page 258

1    to do with specialties in terms of what you're

2    coding.  Like, you may have the right -- may have

3    all the same training, but, like, you're all, I

4    think, litigators here, you wouldn't necessarily

5    go to an environmental lawyer for litigation,

6    right?  So -- or it could be experience.  It could

7    be coding direction or coding policy applications.

8    It could be skill sets, you know, because there is

9    a variation of coding across 95 percent accuracy,

10   right?  But, you know, a lot of it has to do with

11   how you look at the application.

12                  Again, I'd go back to my example

13   where I was diagnosed with cancer.  I had the same

14   set of data presented to two oncologists, and I

15   got one answer from one oncologist that didn't

16   have something, we can't -- with the same

17   training, everything.  Another one had more

18   experience doing it and interpreted it another way

19   for me to be able to say that the application of

20   what the chemotherapy I needed had to be X, Y, and

21   Z.

22                  In case you're wondering, this

23   is 16 months of hair growth, so...

24          Q.      In your experience, how does the

25   legibility of a medical record impact whether a



Page 259

```
 1    coder may miss a diagnosis code that's supported

 2    in the medical record?

 3                    MS. ZUPAC:  Object to the form.

 4              Calls for speculation.  Ms. Baker

 5              testified that she has no training in

 6              medical coding.

 7    BY MS. MADDOUX:

 8              Q.    You can answer.

 9              A.    I mean, legibility, forms,

10    templates.  I mean, a lot of times if a doctor --

11    I mean, we've all heard the joke about, you know,

12    a doctor's handwriting signature and it being

13    rough to read, right?  But, like, it's really --

14    you know, if you're looking at the differences in

15    medications and trying to understand when the one

16    adherence, you know, the difference between having

17    an E there or an A there, you know, and being able

18    to look at what type of wording it is is really

19    important.  And so, again, depending upon an

20    individual's skill set being able to read

21    handwritten charts, it would certainly make a

22    difference.

23              Q.    In your experience, how does the

24    length of the medical record impact whether a

25    coder may miss a diagnosis code that is supported
```



Page 260

1    on medical record?

2                    MS. ZUPAC:  Object to form.

3            Calls for speculation.  Again,

4            Ms. Baker testified that she does not

5            have training in medical coding.

6    BY MS. MADDOUX:

7            Q.    You can answer.

8            A.    I mean, operationally, I would

9    say, and we -- just like we would do anything is,

10   like, as you read a document that maybe is, you

11   know, ten pages, that's different that reading a

12   document that's 200 pages, that by the time you

13   get to -- you know, midway, a quarter way, you get

14   some level of fatigue in there.  And so, you know,

15   the length of a medical record does have to do

16   with it.  I mean, we -- we all probably personally

17   experience reading longer documents and -- and

18   remember what that fatigue looks like.

19           Q.    And in your role working in

20   chart operations, did you oversee medical record

21   coders?

22           A.    Yes, I had medical coders on my

23   team.

24           Q.    And did you through overseeing

25   the medical record coders, did you learn of



2437

Page 261

1    different reasons that coders may miss diagnosis

2    codes that are supported in the medical records?

3                    MS. ZUPAC:  Object to form.

4    BY MS. MADDOUX:

5            Q.    You can answer.

6            A.    Yes.

7            Q.    Earlier today do you recall

8    testifying regarding informed coding?

9            A.    Yes.

10           Q.    What do you understand informed

11   coding to mean?

12                   MS. ZUPAC:  Objection.  Asked

13           and answered.

14   BY MS. MADDOUX:

15           Q.    You can answer.

16           A.    Informed coding means diagnosis

17   codes collected from multiple or any data sources

18   that we had that were at a member level, so not at

19   a provider level or not a provider date of service

20   level, but a member level and presenting that to

21   the coder in order to improve efficiency and

22   productivity.

23           Q.    So when you say they're not at a

24   provider date of service level, what do you mean

25   by that?



Page 262

1                A.     The information is aggregated

2    across from multiple data sources and presented.

3    It's not -- I mean, when you open up a chart, you

4    don't know what's in the chart.  I mean, you don't

5    know what date of service it is there.  You don't

6    know what information was there exactly.  And so

7    when we're looking at it, we're trying -- when

8    we're doing informed coding from a productivity

9    perspective, we're trying to provide a large data

10   set to the coders in order to improve their

11   productivity.

12               Q.     Earlier today do you recall

13   testifying about a CAT form?

14               A.     Yes.

15               Q.     What do you understand the CAT

16   form to be?

17               MS. ZUPAC:  Objection.  Asked

18          and answered.

19   BY MS. MADDOUX:

20               Q.     You can answer.

21               A.     The CAT form was a template that

22   we used to -- for the coders to handwrite in their

23   coding results because ChartSync was slow.

24               Q.     Do you recall testifying that

25   the CAT form was used for the recode project



Page 263

1    conducted for charts in 2012 and 2013?

2              A.    Yes.

3              Q.    Can you describe how the coders

4    were instructed to use the CAT form as part of the

5    recode project?

6              A.    They were instructed to -- well,

7    we gave them informed coding, and they were

8    instructed to not have to document those HCCs on

9    the form in order to speed them up from a

10   production perspective, and then they were to

11   document the dates of services and HCC or

12   diagnosis codes that they saw in there.

13             Q.    Earlier today do you recall

14   testifying that the CAT forms included information

15   regarding previously reported HCCs for a member?

16             A.    As part of that informed coding,

17   yes.

18             Q.    Were the HCCs listed on the CAT

19   forms specific to the chart being reviewed?

20             A.    They were not.  It wouldn't be

21   possible to know everything that was in that

22   chart.

23             Q.    And is that for the reason you

24   gave earlier, that you don't know what information

25   is in the chart?



Page 264

1          A.     Correct.

2                 MS. ZUPAC:  Object to form.

3    BY MS. MADDOUX:

4          Q.     Were the diagnosis codes listed

5    on the CAT forms specific to the date of service

6    being reviewed in the chart?

7          A.     I'm sorry.  Can you repeat that

8    question?

9          Q.     Were the diagnosis codes listed

10   on the CAT forms specific to the date of service

11   being reviewed in the chart?

12         A.     The coders would -- would

13   document the dates of services that were in the

14   chart.  But when you open the chart, you have no

15   idea what's in there until you go through it.

16         Q.     So did the HCCs provided to the

17   coder on the CAT form before they started coding

18   the chart, were they specific to a date of service

19   that was also in the chart?

20                MS. ZUPAC:  Object to form.

21                THE WITNESS:  No.

22   BY MS. MADDOUX:

23         Q.     Why did you provide the

24   previously reported HCCs to the coders?

25                MS. ZUPAC:  Object to form.



Page 267

1  STATE OF TENNESSEE    )

2  COUNTY OF DAVIDSON    )    SS:

3          I, Gary Schneider, TLCR No. 676, in and

4  for the State of Tennessee, do hereby certify:

5          That, prior to being examined, the

6  witness named in the foregoing deposition was by

7  me duly sworn to testify the truth, the whole

8  truth and nothing but the truth;

9          That said deposition was taken down by

10  me stenographically at the time and place therein

11  named, and thereafter transcribed via

12  computer-aided transcription under my direction,

13  and the same is a true, correct and complete

14  transcript of said proceedings;

15          Before completion of the deposition,

16  review of the transcript was not requested.  If

17  requested, any changes made by the deponent (and

18  provided to the reporter) during the period

19  allowed are appended hereto.

20          I further certify that I am not

21  interested in the outcome of the action.

22          Witness my hand this July 15, 2022.

23

24  *Gary Schneider*

    GARY SCHNEIDER, TLCR No. 676

25  Certified Shorthand Reporter

    State of Tennessee

    State of Tennessee



2442

**EXHIBIT D-89**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - - - - - - - - - - - - - - - - -x
                                   :
                                   :
UNITED STATES OF AMERICA, ex rel.:
BENJAMIN POEHLING,                 :
                                   :
          Plaintiff,               :
                                   : Case No.
vs.                                : 2:16-cv-08697-FMO-SS
                                   :
UNITEDHEALTH GROUP, INC., et al.,:
                                   :
          Defendants.              :
                                   :
- - - - - - - - - - - - - - - - - -x


VOLUME I

VIDEOTAPED RULE 30(b)(6)DEPOSITION OF

OPTUMINSIGHT, INC. AND UNITEDHEALTHCARE, INC.,

BY THEIR DESIGNEE, KATHLEEN O. BAKER


Washington, D.C.

May 30, 2023


Reported by:

Misty Klapper, RMR, CRR

Job No.: 982005



Page 33

1    are you referring to?

2         A.      UnitedHealthcare's risk adjustment

3    health plan members, Medicare Advantage health

4    plan members.

5         Q.      And you're here today to testify

6    about certain aspects of Optum's chart review

7    program; is that right?

8         A.      The retrospective chart review

9    program, yes.

10        Q.      Okay.  So broadly speaking, what is

11   Optum's retrospective chart review program?

12        A.      Optum's retrospective chart review

13   program is a program where we submit a more

14   complete health status from medical records

15   collected on a member for appropriate payment

16   from CMS.

17        Q.      Okay.  So what is the purpose of

18   Optum's chart review program?

19        A.      To submit more complete health

20   statuses to CMS on risk adjustment members.

21        Q.      Okay.  And what do you -- what do you

22   mean when you say more complete risk adjustment



Page 34

1    information?

2         A.    So members, Medicare Advantage

3    members, can see multiple different providers,

4    either in network, out of network,

5    fee-for-service, non-fee-for-service.

6              Data can be submitted to CMS, you

7    know, through various different channels, claims,

8    encounter.  And all of that data from different

9    sources at different points of time, you know,

10   potentially at different health plan memberships

11   with different providers are consolidated by CMS

12   to create a full health status.  But that health

13   status is never, ever fully complete.  So with

14   retrospective chart review, we're trying to

15   provide more complete health status for

16   appropriate payment.

17        Q.    Okay.  And when you see -- when you

18   say more complete health status, do you mean that

19   Optum tries to submit all of the risk

20   adjustment -- risk adjusting diagnosis codes

21   supported by the member's medical record?

22              MS. MADDOUX:  Objection, form.



Page 35

1              THE WITNESS:  So in my personal

2         opinion, when I say more complete health

3         status, it's the recognition that

4         there's -- we may not ever be able to

5         submit 100 percent of a person's medical

6         status, but it's -- in context of the

7         retrospective chart review program, it's

8         being able to say based upon a chart that

9         we have on a member, knowing that a member

10        may have multiple charts from different

11        providers that contain different providers

12        within those charts on different dates of

13        services that we're, you know, attempting

14        for one of those charts to provide

15        information.

16             BY MS. ZUPAC:

17        Q.    So Ms. Baker, you understand that

18   you're here today to testify on behalf of Optum

19   and UnitedHealthcare, Inc., correct?

20        A.    Yes.

21        Q.    And you understand that one of the

22   topics that you've been designated on to testify



2447

Page 36

1    on behalf of these entities is the purpose of the

2    chart review program, correct?

3        A.      Yes.

4        Q.      Okay.  When I'm asking you questions

5    about the purpose of Optum and UnitedHealthcare

6    Inc.'s chart review program, you understand that

7    you need to answer on behalf of the entities,

8    correct?

9        A.      Yes.

10       Q.      Okay.  So let's try this question

11   again.

12              Was the purpose -- was one of the

13   purposes of Optum's chart review program to

14   submit complete diagnosis data for Medicare

15   Advantage members to CMS?

16       A.      No.

17       Q.      Okay.  Why not?

18       A.      It's not possible to do so for

19   several reasons.  And some of the reasons include

20   things such as when we are looking at a medical

21   record, a coder could have different experiences,

22   different levels of ability to be able to code



Page 37

1    that chart.

2              They may have a background in

3    cardiology, but they're looking at an oncology

4    chart.  They could be looking at a chart that is

5    handwritten in cursive and font smaller than

6    college ruled paper and are unable to be able to

7    be able to make all those connections.

8              There could be other components of

9    the chart where it is, again, based upon a

10   coder's experience and decision making,

11   potentially unable to be able to make those

12   connections.  It could be that, you know, when

13   we're looking at the chart itself, we're only

14   looking at the pieces of information that are in

15   front of them at that time.

16             And there's -- you know, on that

17   piece of paper it could have been a three-page

18   date of service and it may not have had all the

19   pieces of data from that date of service in front

20   of them.

21        Q.    All right.  So Ms. Baker, you've

22   offered a laundry list of reasons why a member's



Page 38

```
 1    health information may not be 100 percent

 2    complete, correct?

 3              MS. MADDOUX:  Objection,

 4         mischaracterizes testimony.

 5              THE WITNESS:  I've offered some

 6         reasons that I can recall right now on --

 7         on when we're looking at a chart why

 8         not -- why not 100 percent of what's on

 9         that chart could be captured.

10              BY MS. ZUPAC:

11    Q.    Okay.  But that's not quite getting

12    at the -- my question, which my question is

13    whether it was the purpose of Optum and

14    UnitedHealthcare's Inc.'s chart review programs

15    to submit complete diagnosis data for Medicare

16    Advantage members.

17              MS. MADDOUX:  Objection, asked and

18         answered.

19              BY MS. ZUPAC:

20    Q.    You can answer.

21    A.    I would refer back to my prior

22    statement then, where we -- it, as part of
```



Page 39

1    retrospective chart review, look to -- look to be

2    able to collect more complete health status on a

3    member to -- for submission.

4         Q.    Okay.  And when you say more complete

5    health status information, what are you referring

6    to?

7         A.    The recognition that it may not be

8    100 percent complete.  I mean, from the

9    perspective that even from an industry standard,

10   we say that coders should be 95 percent accurate.

11   Right?  And that's a standard that is permeated

12   throughout the industry and it's just part of the

13   going in position when looking at work.

14        Q.    Okay.  Was one purpose of Optum's

15   chart review program to submit accurate diagnosis

16   data for Medicare Advantage members to CMS?

17        A.    For retrospective chart review our QA

18   program is designed around what the QA of what

19   our coders coded from that and it would never be

20   100 percent -- was the term used complete or

21   accurate?

22        Q.    Accurate.



Page 40

 1          A.       -- accurate, again with the

 2     understanding that the industry standard is

 3     95 percent.

 4          Q.       Okay.  So is it fair to say that

 5     Optum's purpose in its retrospective chart review

 6     program is to submit accurate data to CMS, but

 7     there may be reasons why the information

 8     submitted may not be 100 percent accurate?

 9               MS. MADDOUX:  Objection, form.

10               THE WITNESS:  I think, as I was

11          stating previously, you know, the -- did

12          you say purpose?

13               BY MS. ZUPAC:

14          Q.       The purpose, yes.

15          A.       The purpose of retrospective chart

16     review is to submit more complete health statuses

17     on our members from medical records.

18          Q.       So is it your testimony on behalf of

19     Optum and UnitedHealthcare, Inc. today that the

20     purpose of these entities' chart review programs

21     does not include the submission of accurate

22     diagnosis information to CMS?



Page 41

1            MS. MADDOUX:  Objection,

2        mischaracterizes testimony.

3            THE WITNESS:  As part of the

4        retrospective chart review program we have

5        quality assurance's programs that look at

6        what our coders code and ensure -- to

7        ensure or to work towards a 95 percent

8        industry standard, which is what we all

9        do.

10           BY MS. ZUPAC:

11       Q.    A 95 industry -- a 95 percent

12   industry standard in terms of accuracy?

13       A.    Correct.

14       Q.    Okay.

15       A.    For what our coders code.

16       Q.    Okay.  I just want to make sure that

17   we're operating under the same definition of

18   accurate.

19           What is -- what is Optum's

20   understanding of the term accurate?

21       A.    For -- for -- well, it -- it would

22   vary.  And if I could go to my --



Page 42

1       Q.      Sure.

2       A.      -- binder, if that's okay.

3       Q.      Just let me know what tab you're

4   going to --

5       A.      Yep.

6       Q.      -- look at.

7       A.      Okay.  Just for expediency, accurate

8   can mean different things in different levels.

9   And so in risk adjustment, you know, depending

10  upon the time -- and this is just an

11  approximate -- you know, there were about, like,

12  15,000, I think, like ICD-9 codes that mapped to

13  approximately 70-something HCC codes at some

14  point in time, right?  So just using that kind of

15  as my example.

16              And in doing that, we were looking at

17  QA.  There are different ways to look at QA.  And

18  so you could look at QA on an HCC level where,

19  you know, our coder may have said something like

20  the -- said a diagnosis code that mapped an HCC

21  to a -- or with a diagnosis code to, like, the

22  lower arm, but really, when they're looking at



Page 47

1          Q.      Right.

2          A.      -- it -- it's approximate.  About

3     15,000 ICD-9 codes map to 70-something HCC codes.

4          Q.      Okay.

5          A.      But not all ICD-9 codes map to a risk

6     adjustment code.

7          Q.      Okay.  And so then I'm focusing now

8     on the HCC accuracy piece that you testified

9     about.  Okay?

10         A.      Okay.

11         Q.      Okay.  So is it fair to say that an

12    HCC submitted to CMS is accurate if the HCC maps

13    to an ICD-9 diagnosis code that is, in fact,

14    supported by that member's medical record?

15              MS. MADDOUX:  Objection, form.

16              THE WITNESS:  Can you please

17         restate that.

18              MS. ZUPAC:  Can you read back my

19         question, please.

20              (The record was read as requested.)

21              MS. MADDOUX:  Same objection.

22              THE WITNESS:  From -- I'm sorry.



Page 48

1          Can you just read the last part of that

2          again.

3                    MS. ZUPAC:  Yes.

4                    (The record was read as requested.)

5                    MS. MADDOUX:  And same objection.

6                    THE WITNESS:  So our chart review

7          program and its quality assurance program

8          is designed around our looking at what our

9          coders are coding at 95 percent accuracy.

10         It's not designed around looking at what

11         the provider may have coded within that

12         medical record itself.

13                  So when we're looking at

14         submissions as result chart review, our

15         quality assurance program is looking at

16         a -- is designed for looking at the codes

17         that our coders are looking at to make

18         sure that we're meeting the 95 percent

19         HCC.

20                  BY MS. ZUPAC:

21         Q.    All right.  So I don't believe that

22    that was responsive to my question.  So let me



2456

Page 49

1    try to --

2         A.     Okay.

3         Q.     -- rephrase this.

4                You testified earlier that one

5    measure of accuracy is the accuracy of HCCs; is

6    that right?

7                MS. MADDOUX:  Objection,

8         mischaracterizes testimony.

9                THE WITNESS:  That one measure for

10        our chart review program and the codes

11        that our -- that our coders code from the

12        chart is HCC accuracy, yes.

13               BY MS. ZUPAC:

14        Q.     So then what are you measuring

15   when -- what is Optum measuring when it is

16   measuring HCC accuracy?

17        A.     It is measuring whether the diagnosis

18   code that our coder inputted into our coding tool

19   is accurate at the HCC level based upon their

20   understanding of how they're looking at the

21   chart.

22        Q.     And what does it mean for a code to



2457

Page 67

1            Then, when we send it over to the
2       retrieval provider, the retrieval -- or the
3       retrieval vendor, the vendor will -- could
4       further consolidate.  They could find that maybe
5       this chart, as far as we knew, belonged to three
6       locations, but really, as part of a supergroup
7       that had seven other locations for ten locations.
8       So then they combined them into a site ID.  So
9       then all of a sudden you have this provider
10      consolidation effect, where you keep rolling up
11      charts associated with the retrieval of a chart
12      underneath one provider, right, but you just keep
13      consolidating because you just know it's there
14      and typically it is.
15            And then as you're retrieving the
16      chart, what the vendor will do is they'll call up
17      the provider.  They'll do some sort of provider
18      verification, like asking are there X number of
19      providers and their ID there to make sure they've
20      got the right area.  Then they'll go through a
21      member verification to say hey, do you have these
22      members with this information.



Page 68

1              And then once we get validation from

2       there, typically we either fax or we would secure

3       E-mail the complete list of the members.  And

4       then, based upon the number, we'd work with them

5       to schedule either on site or they could

6       themselves decide to send us the charts them --

7       back because they don't want people -- or they

8       wouldn't want somebody on site or various

9       permutations of that.

10          Q.     Okay.  And prior to this retrieval

11      process that you just described, there is a chart

12      targeting process, correct?

13          A.     Correct.

14          Q.     Okay.  So Optum began by targeting

15      certain charts to pull, correct?

16          A.     Began chart review?

17          Q.     Yes.

18          A.     We would -- actually, as part of the

19      targeting -- targeting was one of the first

20      steps, yes, not the -- not the first, first step,

21      because there's suspecting that you have to do

22      and then out of suspecting you go into targeting.



Page 69

1    But, yes, it was part of that.

2        Q.    Okay.  So we can actually go

3    backwards in time.

4            You mentioned that the first step

5    that Optum did was suspecting.

6        A.    Um-hmm.

7        Q.    And what is suspecting?

8        A.    You know, part of suspecting was just

9    taking a look at the whole universe of -- of

10   members.  And so you think about that, it's like

11   the whole universe and then targeting as you're

12   picking specific ones, right?

13           And so, like, from a suspecting

14   perspective, we'd take a look at information that

15   we have from CMS on -- on -- like, for instance

16   from the MOR, the Model Output Report, or other

17   CMS documentation that would tell us what health

18   statuses a member has, had either in the prior

19   year or the current year.

20           We would look at lab information.

21   We'd look at medications.  We'd look at encounter

22   information or claims information if we had it,



Page 70

1    knowing that, again, this information, especially

2    if it comes from an MOR, could have come from

3    other health plans, right, because the member

4    could have not been in our health plan the prior

5    year.

6                    You know, we take a look at

7    information such as, like, disease management

8    programs that our members belong to.  So, like,

9    you know, if someone was in diabetes, they would

10   probably be in a diabetes program; cancer, an

11   oncology program.  You know we take a look at

12   certain information like that.

13                   And then, you know, as we look at

14   information regarding the different types of --

15   of health statuses that member either previously

16   had or currently has or how they interact with

17   one another, we would then compare that to the

18   claims information that we would have.

19                   Or, in some cases, if we didn't have

20   claims information -- because, again -- I mean,

21   again, we -- we may not -- get a capitated

22   provider, a provider that -- or somehow we don't



Page 71

1    have information on that member, we may have just

2    made a request to a -- an assigned provider

3    panel, if that makes sense, patient panel to a

4    provider.

5              And then once we get to the universe

6    of what member-provider combinations there could

7    be, then we would go through a -- a -- you know,

8    a targeting process of saying okay, let's look

9    for these member-provider combinations based upon

10   health statuses, based upon their -- their health

11   risk status.

12        Q.    Okay.

13             MS. ZUPAC:  I'm going to pull up a

14        new exhibit, Tab 4.  So this exhibit will

15        be marked 608.

16                  (Exhibit 608 was marked for

17             identification.)

18             THE WITNESS:  Thank you.

19             BY MS. ZUPAC:

20        Q.    So this exhibit was produced in

21   native, so the individual slides don't have Bates

22   numbers.  But the Bates number of the document is



Page 72

1      MAPL000684019.

2              And I'll give you a chance to review

3      the slide deck, but I'll be directing you to

4      specific pages.  And for the record, I'll go

5      ahead and identify that this is a slide deck with

6      the cover slide showing the Optum logo and the

7      title Risk Adjustment Team Introductions and

8      Services to M&R, dated February 12th 2014.  And

9      my first question is simply a clarification:

10             Does M&R refer to Medicare and

11     Retirement?

12        A.      It does.

13        Q.      And what was Medicare and Retirement?

14        A.      Medicare and Retirement is the

15     business unit within UnitedHealthcare that

16     provides health insurance benefits to Medicare

17     Advantage or Medicare patients.

18        Q.      And that included Medicare Advantage

19     members?

20        A.      Yes.

21        Q.      Okay.  So I'll direct your attention

22     to slide 17.  So the slide number is on the



Page 92

1          Q.      Okay.  And so go ahead and look at

2     that chart on the right.  This lays out the

3     percentage of charts that fall within each chart

4     score group, correct?

5          A.      Yes.  That's what it says.

6          Q.      And then there is a heading on --

7     under the next -- or over the next column stating

8     Average Value Per Chart, 1 Year Date of Service,

9     correct?

10         A.      That is what is written, yes.

11         Q.      Okay.  So what is this average value

12    per chart, 1 year date of service measuring?

13         A.      It -- it's measuring the -- once

14    HCCs -- it's measuring the -- the -- all of the

15    different HCCs on a member and after hierarchical

16    conditions are -- are taken into account.

17                 And so it's the average number of

18    HCCs and their corresponding value.

19         Q.      And by value, do you mean the payment

20    that the Medicare Advantage organization receives

21    for that member from CMS?

22         A.      The -- the appropriate reimbursement



2464

Page 93

1    from CMS.

2         Q.    And we've been discussing Optum's

3    suspecting and targeting processes, correct?

4         A.    Yes.

5         Q.    Okay.  Did -- did UnitedHealthcare,

6    Inc. -- was UnitedHealthcare, Inc. aware that

7    Optum was using suspecting logic to target

8    particular charts for retrieval?

9         A.    We would have conversations with

10   UnitedHealthcare on the logic we would use and

11   targeting to make sure we were generally aligned.

12        Q.    Okay.  And did UnitedHealthcare, Inc.

13   sign off on or approve the suspect logic that

14   Optum used?

15        A.    We would have conversations with them

16   and we would generally receive their approval on

17   the -- on the logic that we would deploy.

18        Q.    Okay.  And did Optum decide which

19   charts to target for retrieval based on their

20   chart score group?

21        A.    Chart score group was a consideration

22   on doing retrievals, but it was not the only



Page 94

1    consideration.

2              So, for instance, timing was a

3    consideration, like meaning -- the way the risk

4    adjustment program works, you have only until

5    January of the following year after the year that

6    the data collection period ended to submit that.

7    So you have about 13 months, you know, to submit

8    it.

9              And so with claims, if we're using it

10   for targeting and claims lag and -- and run out,

11   sometimes targeting wouldn't start until May of a

12   year and retrievals wouldn't start until summer.

13   So you had less time to do retrievals.  Right?

14   So just the timing of things would have had a

15   consideration.  Other things would have been

16   operational capacity.

17             So, you know, you could retrieve all

18   the charts you want, but if you can't code the

19   charts, then there's no -- you can't -- you can't

20   code them.  And so we would also have to take a

21   look at seeing if we only had the ability to code

22   1,000 charts, you know, you know, which 1,000



Page 95

1    does it make sense for us to look after.

2              And there could have been other

3    constraints, such as onshore/offshore

4    restrictions.  So not all charts could be sent

5    offshore for coding.  And so there is kind of

6    business rules that we had to take a look at, if

7    that makes sense.

8              So there's other things that we took

9    a look at as well.

10    Q.    Um-hmm.  The one thing you mentioned

11    is that Optum may have limited resources or

12    certain resources to code charts, correct?

13    A.    We have -- we had operational

14    considerations when you're looking at it,

15    production plans and operational capacity plans,

16    yes.

17    Q.    Okay.  So did Optum use the chart

18    score group information as part of its

19    consideration for which charts to retrieve?

20    A.    We -- chart score group was one of

21    the considerations, but not the only

22    consideration.



Page 96

1        Q.      And was that true for the entirety of

2    the period for 2008 to 2016 date of service chart

3    review?

4        A.      No.  Chart score group generally came

5    into consideration around this time frame of this

6    presentation.

7        Q.      Meaning February 2014?

8        A.      We piloted it in, like, 2013 and --

9    and took a look at it, but 2013, 2014.

10       Q.      Okay.  And what date of service

11   years, then, was -- did chart score groups start

12   to be a -- a consideration for chart retrieval?

13       A.      In a kind of rudimentary form in

14   20 -- in 2012 we -- which is -- ran into that

15   January time frame, if we -- kind of

16   December/January would have been 2011 dates of

17   services and then 2013 would have been 2012.  And

18   I think these here are -- yeah.  Actually, that's

19   what it says.  It's 2013 project/2012.

20       Q.      So then before the 2012 date of

21   service chart review, did Optum use suspect

22   logic?



Page 97

1        A.        In a -- yes.  But, again, you -- you

2    evolve suspect logic over time but recapture.

3              So again, using this example of Mary,

4    it could have been that Mary's information from

5    the prior year said she was diabetic, right?  And

6    so in the current data collection period, the

7    suspect logic was more like a recapture, if that

8    makes sense, and that's the predominant.

9        Q.    Okay.  So was the policy before the

10   2012 date of service chart review to review a

11   chart for each member every two years?

12       A.        Can you restate that?  I -- I -- I

13   think I know what you're saying, but I just want

14   to make sure I understand, so ...

15       Q.    Okay.  So before the chart review for

16   the 2012 date of service, was Optum's policy to

17   review member charts every two years?

18       A.        And so I -- I believe that we started

19   changing the targeting approach -- so really, the

20   targeting approach of looking at a member once

21   every two years -- sorry, just saying it a little

22   bit differently -- like starting in 2011-ish.



Page 98

```
 1              So -- so we would -- we -- we started
 2      making that change then.
 3         Q.     And I just want to clarify, since we
 4      are obviously talking about date of service years
 5      and calendar years.
 6         A.     Yeah.  Yeah.
 7         Q.     So when you say 2011-ish, are you
 8      referring to the 2011 date of service or are you
 9      referring to the 2011 calendar year?
10         A.     I'm -- the -- talking about the --
11      about the 2011 -- as -- as I recall, about the
12      2011 project year, which would have been 2010
13      dates of services.
14         Q.     Okay.  So what was Optum's approach
15      for targeting charts for the 2008 to 2011 date of
16      service chart reviews?
17         A.     It -- it was what you just described,
18      which was looking at about half of the membership
19      every other year.
20         Q.     Okay.  And so then is it accurate to
21      say that for the 2012 date of service, Optum
22      shifted to an approach that used suspect logic?
```



Page 99

1           MS. MADDOUX:  Objection, form.

2           THE WITNESS:  So we always use

3       suspect logic.  It just evolves over time,

4       you know, if you would.  So, you know,

5       here we're taking a look at -- as you can

6       see, back in 20, on slide 20, looking at

7       specialties and encounters.

8           BY MS. ZUPAC:

9       Q.    Um-hmm.

10      A.    And so it's, you know, based upon the

11  fact that we were seeing information that -- that

12  members that maybe would have only been looked at

13  every other year were still being looked at

14  within that same -- sorry -- would -- had an

15  encounter in the data collection period in

16  question for that submission year and so there

17  was information here to say it would make sense

18  to retrieve a chart.

19      Q.    So then am I understanding you

20  correctly that the sorting of charts into --

21  chart into the seven chart score groups that

22  we've been discussing started with the 2012 date



2471

Page 100

1    of service chart review?

2         A.    That is where I'd say it was

3    productionalized.

4         Q.    Okay.  And so then can you describe

5    the -- the way suspect logic was used from the

6    2008 to 2011 date of service chart reviews?

7         A.    Sure.  It -- you know, it was -- you

8    know, suspect logic is a very wide term.  Right?

9         Q.    Um-hmm.

10        A.    So, you know, it would have included

11   things such as, you know, membership in the

12   current year, membership in the data collection

13   period year.  It could have included information

14   such as -- and you're only asking suspecting now,

15   right?

16        Q.    Yes.

17        A.    Okay.  Suspecting.

18             You know, if we had information on

19   a -- again, a -- some sort of CMS report saying

20   that the member had a disease condition the prior

21   year and looking to see if there is any other

22   information that had that disease progression or



Page 101

1      correlation.  So, like, some diseases happen in

2      correlation with one another.  And so -- and

3      those are listed also on the -- on the actual HCC

4      categories, the interactions, I think.

5           Q.     Are you referring to comorbidities?

6           A.     I would refer to them as

7      interactions.

8           Q.     And then is it accurate that for each

9      of the years, each of the date of service years

10     from 2008 to 20 -- to 2016, UnitedHealthcare was

11     aware of the suspect logic that Optum was using

12     to target charts?

13               MS. MADDOUX:  Objection, form.

14               THE WITNESS:  We would discuss with

15          UnitedHealthcare our suspect logic that we

16          used and, you know, generally talk about

17          process improvements or -- and then we

18          would get general approval on what we were

19          going to implement for that current year.

20               BY MS. ZUPAC:

21          Q.     Okay.  And did ever -- did Optum ever

22     proceed with a suspect logic program that



2473

Page 102

1  UnitedHealthcare did not agree with?

2          MS. MADDOUX:  Objection, form.

3          THE WITNESS:  Not that I recall,

4      but let me research that and get back to

5      you on that.

6          BY MS. ZUPAC:

7      Q.    You're not aware of an instance in

8  which -- sitting here today, in which Optum

9  proceeded with a --

10     A.    I am not.  Your -- the way you asked

11 that question I was like, I -- no, I -- I am not

12 aware of that.

13     Q.    Okay.  And so at any point was the --

14 at -- at any point between the 2008 and 2016 date

15 of service years, was the chart targeting process

16 in the -- that Optum used seeking charts

17 randomly?

18     A.    Can you say that one more time?

19     Q.    Sure.  I can try to rephrase.

20          At any point did -- between the 2008

21 to 2016 date of service years did Optum use chart

22 targeting to target charts at random?



Page 118

1           MS. MADDOUX:  Objection, form.

2           THE WITNESS:  It is retrieval

3    provider information that has been

4    consolidated to avoid provider abrasion

5    based upon the provider information that

6    we had on hand.

7           MS. MADDOUX:  Counsel, we've been

8    going for a little over an hour, so I

9    don't know if there's a good breaking

10   point soon.

11          MS. ZUPAC:  Yeah, I can --

12          Ms. Baker, do you need a break

13   right now?

14          THE WITNESS:  Sure.

15          MS. ZUPAC:  Okay.  Why don't we

16   take a five-minute break.

17          MS. MADDOUX:  Okay.

18          VIDEO OPERATOR:  Off the record.

19   The time is 11:20.

20          (Thereupon, a brief recess was

21   taken.)

22          VIDEO OPERATOR:  On the record.



2475

Page 119

1          The time is 11:35.

2               MS. ZUPAC:  Okay.

3               BY MS. ZUPAC:

4          Q.    So, Ms. Baker, we were talking about

5     the -- about Optum's consolidation process with

6     respect to provider ID, correct?

7          A.    In respect to retrieval provider

8     associated with a chart.

9          Q.    Yes.  And all of my questions today

10    about this topic are -- are related to the

11    retrospective chart review program, to be clear.

12         A.    Okay.

13         Q.    Okay.  So as a result of Optum's

14    consolidation process for that retrieval --

15    retrieval provider ID, was it possible to collect

16    charts for members that included encounters with

17    multiple providers?

18               MS. MADDOUX:  Objection, form.

19               THE WITNESS:  So after we -- after

20          we released the charts to the retrieval

21          vendor and they did their consolidation

22          and they did their validation and we



2476

Page 120

1            retrieved the chart under that method, it

2            could include multiple providers.  But we

3            don't know which providers they are --

4                  BY MS. ZUPAC:

5            Q.      Um-hmm.

6            A.      -- and we also can't tell you if it's

7      complete.

8                  So, like, for example, you know, if

9      it was a -- a site that had paper-based charts

10     and we only went to, you know, Site 1 and it was

11     a two-site one, we would only receive the part of

12     the chart that was there for the doctors that saw

13     there -- there.  But that doctor, let's say --

14     call it Dr. A, could have been at Site 1 on

15     Monday, Wednesday, Friday but went to Site 2 on

16     Thursday -- Tuesday and Thursday and we didn't

17     have that component of the chart.

18                  Or, you know, another example could

19     be that the provider themselves, the

20     representative at the provider, right, could have

21     said I want to send you the chart.  And so at

22     that point in time we catch the ball of whatever



Page 121

1    information that they send --

2         Q.    Um-hmm.

3         A.    -- right?

4              And so it -- the chart itself could

5    have multiple information, but we also wouldn't

6    know for sure if it was complete.

7         Q.    Sure.  Sure.  But the -- my question

8    basically was whether or not that -- whether or

9    not a chart retrieved for a particular member

10   could include encounters with, for example,

11   Dr. A., as you noted, but also Dr. B. and maybe

12   also Dr. C.

13             MS. MADDOUX:  Objection, asked and

14        answered.

15             THE WITNESS:  To -- to clarify on

16        that one, we wouldn't know if the chart

17        was supposed to have Drs. A, B and C in

18        your example in that one.  But, you know,

19        if -- if we, you know, retrieve the chart

20        or if they sent us a chart, it could

21        contain multiple providers.  But, again,

22        we wouldn't be able to tell you if that



2478

Page 122

1           chart should be A, B or C.

2                BY MS. ZUPAC:

3           Q.    Okay.  But the -- the chart that

4     included the encounters with potentially multiple

5     providers would all be -- would be assigned one

6     retrieval provider ID, correct?

7           A.    It would be assigned one retrieval

8     provider ID for that specific member-provider

9     group location, but that member could have seen,

10    you know, five different doctors.  So, like, for

11    instance, like in Nashville, you could see

12    Vanderbilt Health group, which is distinctly

13    different than the -- you know, the St. Thomas

14    Health group, right, which is distinctly

15    different than the Heritage Medical group.

16                And so that example, that's three

17    different charts, but within Vanderbilt you could

18    have seen, you know, five doctors.  At Heritage

19    you could have seen two.  At St. Thomas you've

20    seen seven.  So you have had consolidation within

21    those three, but you'd still have three different

22    charts --



Page 251

1      QA coders provided?

2          A.    The -- again, it -- it -- it was date

3      of service, the chart information, the member

4      information, the date of service, the diagnosis,

5      any EO codes.  But, you know, rendering provider

6      wasn't picked up, so there -- no information on

7      rendering provider.

8          Q.    The QA coders were informed, though,

9      or given information about what the production

10     coder had coded, correct, the ICD-9 and EO codes

11     that the production coder had coded?

12              MS. MADDOUX:  Objection, form.

13              THE WITNESS:  The QA coder --

14         coders were given the coding results from

15         a production coder.

16              BY MS. ZUPAC:

17         Q.    QA coders were not informed of what

18     diagnosis codes had been submitted by the

19     provider for a particular member, correct?

20         A.    That's not possible as part of the

21     retrospective chart review program because, for

22     most of those years described, rendering provider



Page 252

1    was not picked up.  It wasn't a -- it was not

2    a -- a data element for -- for RAPS and the -- I

3    mean, closer to, I think, the 2013 -- or no.

4    Actually, I think it was more like the 2014 year

5    we started saying does rendering provider equal

6    retrieval provider and then we started building

7    that out.

8         Q.    Um-hmm.

9         A.    But most of those years there's no

10   way -- we didn't pick up rendering provider.

11        Q.    So I just have a couple more

12   questions.  Then we'll take a break.

13        A.    Okay.

14        Q.    So we have been talking about

15   ChartSync a lot.  ChartSync's gotten a lot of

16   attention.  But at some point ChartSync was

17   phased out, correct?

18        A.    Yes.

19        Q.    Okay.  And it was replaced with a

20   tool called the Medical Record Manager or MRM?

21             MS. MADDOUX:  Objection, out of

22             scope.



Page 253

1                    THE WITNESS:  Um-hmm.

2                    BY MS. ZUPAC:

3        Q.      And was MRM also referred to as

4    Emerald?

5                    MS. MADDOUX:  Objection, out of

6            scope.

7                    THE WITNESS:  In the beginning,

8            yes.

9                    BY MS. ZUPAC:

10       Q.      Okay.  So what date of service years

11   was the Medical Record Manager operational?

12                   MS. MADDOUX:  Objection, out of

13           scope.

14                   THE WITNESS:  MRM was implemented

15           in the 2014 calendar year and so that

16           would have contained some 2013 dates of

17           services.

18                   BY MS. ZUPAC:

19       Q.      Okay.  And then was it operational

20   for the 2014, 2015 and 2016 dates of service?

21                   MS. MADDOUX:  Objection, out of

22           scope.



Page 254

1                   You can answer.

2                   THE WITNESS:  Yes.

3                   BY MS. ZUPAC:

4          Q.      Okay.  And did MRM have certain

5      features that were unavailable in ChartSync?

6                   MS. MADDOUX:  Objection, out of

7          scope.

8                   THE WITNESS:  It started off with

9          being able to collect information on

10         rendering provider.  It had some

11         additional work queues where -- I think

12         earlier I gave the example you'd give them

13         a member ID and say go do this.  Like we

14         were able to do that.  It had some

15         additional capabilities regarding coding

16         organizations to be able to say who was

17         going to code the chart, who's going to

18         retrieve the chart.

19                  So a lot of the capabilities were,

20         like, kind of systematic like that.  Also

21         the ability to save a chart -- no, that

22         was on -- yeah.  No, that was the -- a



Page 255

1          summary of some of them.

2                  BY MS. ZUPAC:

3          Q.     Okay.  And did MRM include the

4    capability of conducting Q -- QA processes within

5    MRM?

6                  MS. MADDOUX:  Objection, out of

7          scope.

8                  MS. ZUPAC:  So I'll just note for

9          the out-of-scope objections related to

10         questions about QA that one of the

11         subtopics that this witness is designated

12         on is additional reviews of charts

13         reviewed in the program, including recode,

14         second level review, quality assurance and

15         overread.

16                 MS. MADDOUX:  And I'll also note

17         for the record that the government

18         actually noticed separate topics around

19         databases and use of databases.  I mean,

20         they also have a topic around databases

21         used for specific programs but did not

22         include that in the scope of the quality



Page 256

1        assurance topic, so it is clearly out of

2        scope.

3               MS. ZUPAC:  Okay.  So it's the --

4        it's defendants' position that a topic

5        about quality assurance cannot include any

6        questions about any programs used to

7        conduct quality assurance?

8               MS. MADDOUX:  The government knows

9        how to write a topic when it wants to ask

10       about databases or --

11              MS. ZUPAC:  That's a yes or --

12              MS. MADDOUX:  -- programs used.

13              MS. ZUPAC:  -- question, Counsel.

14              MS. MADDOUX:  I'm answering your

15       question, Ms. Zupac.

16              The government knows how to write a

17       topic.  When they want to ask about the

18       database of the programs used for a

19       program, they did it in topic 12 slash --

20       or I guess 13 slash 18 from the combined

21       notice and they didn't do it here.

22              MS. ZUPAC:  Okay.  So I'm asking



2485

Page 257

1          about QA processes and certain QA

2          processes are different, depending on the

3          date of service here.  And the -- that is

4          in part because the programs used for

5          those date of service years were

6          different.  So I'm trying to get

7          clarification so that the record is clear

8          as to which program was in effect for a

9          date of service year and, therefore, how

10         that affected the QA processes used for

11         that date of service year.

12              MS. MADDOUX:  Except you're asking

13         very broad questions about what different

14         databases are without tying it to QA and

15         then trying to tie it to QA.  They're out

16         of scope.

17              MS. ZUPAC:  I am currently asking

18         the witness whether Medical Record Manager

19         included the ability to conduct QA within

20         Medical Record Manager.

21              MS. MADDOUX:  And I will maintain

22         my objection out of scope.



Page 258

1              MS. ZUPAC:  Okay.  And we disagree.

2              BY MS. ZUPAC:

3         Q.     Go ahead.

4              MS. MADDOUX:  You can answer.

5              THE WITNESS:  We tried to build out

6         QA within Medical Record Manager.  But

7         ultimately it wasn't possible to do in a

8         timely manner, so we continued with new --

9         because at that -- by that point in time

10        we were moving to new and unique QA --

11        unique QA outside of --

12             MS. REPORTER:  Moving to what?

13        Sorry.

14             THE WITNESS:  New and unique QA

15        outside of MRM.

16             BY MS. ZUPAC:

17        Q.     Okay.  So let's go on a break and

18   when we come back we will discuss new and unique

19   QA.

20             VIDEO OPERATOR:  Off the record.

21        The time is 2:57.

22



2487

Page 259

1                (Thereupon, a brief recess was

2         taken.)

3                VIDEO OPERATOR:  On the record.

4         The time is 3:21.

5                BY MS. ZUPAC:

6         Q.    Okay.  Welcome back, Ms. Baker.

7                So certain of the topics that you are

8    designated on relate to blind coding versus

9    informed coding, correct?

10        A.    Yes.

11        Q.    And so I asked you earlier about your

12   understanding of the term blind coding, correct?

13        A.    Yes.

14        Q.    Okay.  And what -- what is your

15   understanding of the term blind coding?

16        A.    It's where a coder codes a -- the

17   medical record in front of them.

18        Q.    And that coder is not provided with

19   any information about that member outside of

20   what's in the chart, correct?

21        A.    They're -- about that member?

22        Q.    Um-hmm.



Page 260

```
 1          A.      I mean, the member name and that --
 2      that -- correct.  I mean, it's industry standard
 3      to start with blind coding.
 4          Q.      But I just want to make sure I
 5      understand what exactly blind coding entails.
 6          A.      Um-hmm.
 7          Q.      So -- so in blind coding a coder
 8      would not be informed, for example, about
 9      diagnoses that the member is suspected to have,
10      correct?
11              MS. MADDOUX:  Objection, form.
12              THE WITNESS:  The -- in blind
13          coding a coder's given no additional
14          information, other than the image of the
15          chart to -- to code to the best of their
16          ability.
17              BY MS. ZUPAC:
18          Q.      And in blind coding a coder would not
19      be informed about diagnosis codes previously
20      submitted by a provider for that member, correct?
21          A.      The -- the -- in blind coding a
22      coder's is given no information.
```



Page 261

1          Q.      And so in contrast to blind coding,

2    there's informed coding, correct?

3          A.      Yes.

4          Q.      Okay.  And so what is your

5    understanding of the term informed coding?

6          A.      I just want to read the definition,

7    if that's okay.  See if I can find it.

8          Q.      Are you referring to a particular

9    tab, Ms. Baker?

10         A.      I will be.

11         Q.      Okay.  Just let me know the tab --

12         A.      Yep.

13         Q.      -- when you get to it.

14         A.      Still looking.  Sorry.

15         Q.      Okay.  Are you by any chance looking

16   for United's first supplemental responses and

17   objections to the sixth set of interrogatories --

18         A.      I -- I think --

19         Q.      -- Tab 23?

20         A.      Is it Tab 23?  Thank you.

21         Q.      If that's what you're looking for.

22         A.      Let me look.



Page 262

1        Q.      Suggesting.

2        A.      I -- I may be too far back.

3                Yes.  Thank you very much.

4        Q.      All right.

5                MS. ZUPAC:  So I'll go ahead and

6        reveal that as -- or mark that as

7        Exhibit 611.

8                     (Exhibit 611 was marked for

9                identification.)

10               BY MS. ZUPAC:

11       Q.      And are you on page 10 of

12    Exhibit 611?

13       A.      I am.

14       Q.      Okay.  And so what part are you

15    looking at now?

16       A.      Line 21, starting with line 21.

17       Q.      Okay.  So I'm looking -- I'm looking

18    at line 20 where it states, For the purposes of

19    responding to this interrogatory, UnitedHealth

20    interprets the term informed manner to refer to

21    an informed coding process whereby the coder

22    conducting a review of a medical record as part



Page 263

1    of UnitedHealth's chart review program was

2    provided with diagnoses previously coded or

3    received from an acceptable data source across

4    all providers associated with the member and/or

5    non-UnitedHealth MA plan submissions for the

6    member associated with the appropriate data

7    collection period.

8              Do you see those lines?

9        A.    I do.

10       Q.    Is -- is that what you were referring

11   to?

12       A.    That was what I was -- thank you very

13   much.

14       Q.    Good, because it was a very long

15   sentence to read if that wasn't what you were

16   referring to.

17             Okay.  So --

18       A.    I mean, I would maybe also just

19   continue that further informed coding, as

20   UnitedHealth uses the term to respond to this

21   interrogatory was not specific to the rendering

22   provider or date of service as the charts



Page 297

1    denotes whether a chart was coded in

2    UnitedHealth's chart reviewing using informed

3    coding, as UnitedHealth interprets this term.

4            Correct?

5        A.    I see that.

6        Q.    Okay.  And so is it your

7    understanding that the only charts that were

8    coded in the defendants' chart review program

9    using informed coding are those that are marked

10   with the recode flag discussed in this response?

11       A.    Yes.

12       Q.    Okay.  And so you're not aware of any

13   other instances of charts coded using informed

14   coding that have not been marked with the recode

15   flag discussed in this response?

16       A.    As part of the chart -- retrospective

17   chart review program?

18       Q.    Correct.

19       A.    We tried to do it in the -- to do it

20   again in the project year 2013, but it was not

21   successful.

22       Q.    Right.  And so the -- so the charts



Page 298

1    that you're mentioning that you tried to do

2    informed coding on in the 2013 date of service

3    year were not ultimately coded using informed

4    coding, correct?

5        A.    Correct.

6        Q.    Okay.  So then -- so then I -- I

7    guess I can modify my question to ask, are there

8    any other instances of charts successfully coded

9    using informed coding in the retrospective chart

10   review program that have not been marked with the

11   recode flag?

12           MS. MADDOUX:  Objection, form.

13           THE WITNESS:  Not that I'm aware of

14       in regards to the retrospective chart

15       review program.

16           BY MS. ZUPAC:

17       Q.    Okay.  Okay.  So aside from the

18   charts marked with the recode flag discussed

19   here, Optum coded charts for UnitedHealthcare's

20   chart review program using blind coding for the

21   2008 to 2016 dates of service, correct?

22       A.    Yes.



Page 299

1          Q.      Okay.  And why is that?  Why were

2     the -- why were charts other than those subject

3     to the recode program coded using blind coding?

4          A.      It's just how it organically evolved.

5     I mean, from the very beginning, there weren't --

6     there wasn't tools or processes or even claims

7     information available to be able to provide that

8     information from a blind -- or sorry -- from a --

9     from a -- a -- from a non-blind perspective.

10             And then as chart review --

11     retrospective chart review became industry

12     standard, it also just became industry standard

13     to do blind coding as part of its natural method

14     for doing it.

15          Q.      I believe you testified about --

16     at -- at the beginning there wasn't -- there

17     weren't other data sources to -- used to use

18     informed coding, correct?

19             MS. MADDOUX:  Objection, form.

20             THE WITNESS:  There weren't --

21          there wasn't an ability to tie, you know,

22          a -- like a -- a claim to a -- a chart,



Page 300

1          because when you do a chart, you don't

2          know what's in the chart until you, you

3          know, see what's in the chart.  And even

4          then, once we saw it, you're -- we didn't

5          have the ability to pick up a rendering

6          provider information until further on in

7          the program.

8                    BY MS. ZUPAC:

9          Q.    Okay.  So what date of service years

10   are your -- are -- are you referring to, during

11   that time period when it wasn't possible to pick

12   up this information?

13                    MS. MADDOUX:  Objection, form.

14                    THE WITNESS:  What information?

15                    BY MS. ZUPAC:

16         Q.    The information that you testified to

17   as being required to perform informed coding.

18                    MS. MADDOUX:  Objection, form.

19                    THE WITNESS:  Informed coding where

20          its diagnosis previously coded or received

21          from acceptable data source across all

22          providers?



Page 410

1                    CERTIFICATE OF NOTARY

2              I, MISTY KLAPPER, the officer before whom

3    the foregoing deposition was taken, do hereby

4    certify that the witness whose testimony appears in

5    the foregoing deposition was duly sworn by me; that

6    the testimony of said witness was taken by me in

7    shorthand and thereafter reduced to typewriting by

8    me; that said deposition is a true record of the

9    testimony given by said witness; that I am neither

10   counsel for, related to, nor employed by any of the

11   parties to the action in which this deposition was

12   taken; and, further, that I am not a relative or

13   employee of any attorney or counsel employed by the

14   parties hereto, nor financially or otherwise

15   interested in the outcome of this action.

16

17   _____
                  *Misty Klapper*

                 Misty Klapper, RMR, CRR

18               Notary Public in and for

                 the District of Columbia

19

20

21

22



**EXHIBIT D-90**

Page 410

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - - - - - - - - - - - - - - - -x
                                 :

UNITED STATES OF AMERICA, ex rel.:

BENJAMIN POEHLING,              :

                                 :

       Plaintiff,        :

                                 : Case No.

vs.                      : 2:16-cv-08697-FMO-SS

                                 :

UNITEDHEALTH GROUP, INC., et al.,:

                                 :

       Defendants.       :

                                 :

- - - - - - - - - - - - - - - - -x


VOLUME II

CONTINUATION OF VIDEOTAPED

RULE 30(b)(6)DEPOSITION OF

OPTUMINSIGHT, INC. AND UNITEDHEALTHCARE, INC.,

BY THEIR DESIGNEE, KATHLEEN O. BAKER


Washington, D.C.

May 31, 2023


Reported by:

Misty Klapper, RMR, CRR

Job No.: 982006



2499

Page 418

1              P R O C E E D I N G S

2              VIDEO OPERATOR:  We are on the

3       record.  This begins videotape number 1 in

4       the deposition of Katie Baker in the

5       matter of United States of America,

6       ex rel. Benjamin Poehling, Plaintiff,

7       versus UnitedHealth Group, Inc., et al.

8       Defendants, Case Number CV 16-08697-FMO,

9       in the United States District Court for

10      the Central District of California,

11      Western Division.

12              Today's -- is May 31st 2023, and

13      the time on the monitor is 9:13 a.m.

14              This deposition is being taken at

15      555 11th Street, Northwest, Washington,

16      D.C. 20004, at the request of Department

17      of Justice.  The videographer is Robyn

18      Ellis of Magna Legal Services and the

19      court reporter is Misty Klapper of Magna

20      Legal Services.

21              Counsel appearances will be on

22      stenographic record only.



Page 419

1              Will the court reporter please

2         swear in the witness.

3              MS. REPORTER:  One moment.

4              KATHLEEN O. BAKER, AS DESIGNEE

5              The witness herein, called for

6    further examination by counsel for the

7    Plaintiffs, having been duly sworn, was

8    further examined and further testified as

9    follows:

10    FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS

11              BY MS. ZUPAC:

12         Q.    All right.  Welcome back, Ms. Baker.

13              I'm going to start by following up on

14    some items that we discussed yesterday, starting

15    with the question of whether coders were

16    instructed to record all RxHCCs in the medical

17    records.

18              Do you recall that we discussed this

19    yesterday?

20         A.    I do.

21         Q.    Okay.  And do you recall that you did

22    not remember at the time whether or not that



2501

Page 420

1    instruction changed over the years for the chart

2    review projects for dates of service 2008-2016?

3              MS. MADDOUX:  Objection, form.

4              THE WITNESS:  I -- I wanted to

5         clarify.

6              BY MS. ZUPAC:

7         Q.    Sure.  Go ahead and give that

8    clarification.

9         A.    So we did not do RxHCCs during recode

10   and for part of 2013, but then we started doing

11   RxHCCs again.

12        Q.    Okay.  So let's start with the recode

13   project.  So this is the recode project that we

14   discussed yesterday that covered dates of service

15   2011?

16        A.    Yes.

17        Q.    Okay.  And so during the recode

18   project were the recode coders instructed not to

19   record ICD-9 diagnosis codes that mapped only to

20   an RxHCC?

21        A.    They were instructed to pick up --

22   well, they -- they could write down RxHCCs.



Page 551

 1                    If, in fact, the factual basis

 2          underlying the denial includes facts drawn

 3          from the medical records, then I am

 4          entitled to know that.  And so I'm asking

 5          as a yes or no question whether the

 6          factual basis underlying the denial

 7          includes any review of the underlying

 8          medical records.  I'm not asking for the

 9          details of -- of that review.  I'm just

10          asking the yes or no question.

11                    MS. MADDOUX:  And we -- we'll still

12          instruct the witness not to answer.  It's

13          outside the scope and premature expert

14          discovery and it is not properly within

15          the topic that you noticed nor within the

16          parties' agreement.

17                    MS. ZUPAC:  Okay.

18                    BY MS. ZUPAC:

19          Q.    So are you going to follow

20    instruction -- your counsel's instruction not to

21    answer my question?

22          A.    I am.



Page 552

1          Q.      Okay.  And so then I believe that you

2      do have some information underlying the factual

3      basis for the denial or refutation by you of the

4      United States' contention that the diagnosis

5      codes identified by the United States in its

6      response to UHC of California's interrogatory

7      response -- Interrogatory 1 are not supported by

8      charts, correct?

9          A.      I have information, yes.

10         Q.      Okay.  And so would you like to

11     provide that information now?

12         A.      Please.

13         Q.      Go ahead.

14         A.      Okay.  Thanks.

15                 You know, there are several parts of

16     the process where there -- about completeness and

17     about whether or not we have adequate data

18     elements.

19                 So, for instance, within the chart

20     targeting process, we talked about the fact that

21     providers are consolidated at different levels.

22     And so the retrieval providers' information gets



2504

Page 553

1    consolidated based upon locations, groups, the --

2    based on number of providers, and then when we

3    send that information over to the provider

4    vendors, that there could be further provider

5    consolidations.

6              And so charts could be located at

7    multiple different locations.  Charts could be --

8    for different providers could be at different

9    locations.  Some charts may be provider specific.

10             And when we go to retrieve that

11   chart, not all dates of services or encounters

12   for that provider or provider group are able to

13   be picked up.  When the -- some other items could

14   also include if the provider themselves sent us

15   the chart, they could have not included all of

16   the dates of services.  And a member has multiple

17   different charts across different locations and

18   we may not have all that information.

19             You know, if we also just step -- as

20   we talked about in this process, just within

21   coding that coders have different types of skill

22   sets and different types of experiences, that



Page 554

1    they have -- you know, that they have different

2    levels of problem-solving skills and ability to

3    make connections within chart.

4              Coders could have, again, different

5    background experiences.  They could have a -- one

6    type of specialty experience like cardiology.

7    They could be looking at an oncology chart.  And

8    those personal experiences do also influence the

9    type of different problem-solving and ability to

10   look at the chart.

11             We also have, you know, other

12   information that, you know, coding clinics have

13   changed over time, that we, you know, looked at

14   that information and that we also look at, you

15   know, other metrics such as RADV results and

16   other types of audits like that where our overall

17   results have been generally aligned with the

18   expectations of the government.

19        Q.    Okay.  And so, Ms. Baker, is that a

20   complete description of the factual basis

21   underlying any denial or refutation by you of the

22   United States' contention that the diagnosis



Page 576

                    CERTIFICATE OF NOTARY

1

2           I, MISTY KLAPPER, the officer before whom

3   the foregoing deposition was taken, do hereby

4   certify that the witness whose testimony appears in

5   the foregoing deposition was duly sworn by me; that

6   the testimony of said witness was taken by me in

7   shorthand and thereafter reduced to typewriting by

8   me; that said deposition is a true record of the

9   testimony given by said witness; that I am neither

10  counsel for, related to, nor employed by any of the

11  parties to the action in which this deposition was

12  taken; and, further, that I am not a relative or

13  employee of any attorney or counsel employed by the

14  parties hereto, nor financially or otherwise

15  interested in the outcome of this action.

16

17  _____

                    Misty Klapper, RMR, CRR

18                  Notary Public in and for

                    the District of Columbia

19

20

21

22


2507

**EXHIBIT D-91**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


_____
                            )
UNITED STATES OF AMERICA    )
ex rel. BENJAMIN POEHLING,  )
                            )
        Plaintiff,          )      No. CV 16-08697 FMO
                            )
vs.                         )
                            )
UNITEDHEALTH GROUP, INC.,   )
et al.,                     )
                            )
        Defendants.         )
_____)


CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER


Volume 1
DEPOSITION OF JON H. BIRD
As 30(b)(6) Designee 2 of
OptumInsight, Inc.
UnitedHealthcare, Inc.
Washington, DC
June 22, 2023


Reported by:  John L. Harmonson, RPR
Job No. 988356



Page 48

 1    you abstracted.  Can you clarify what you mean by

 2    that?

 3              MR. QURESHI:  Objection to form.  This

 4    continues to be outside the scope.

 5              THE WITNESS:  The actual diagnosis/date

 6    of service combinations would have been documented

 7    based on a review of the medical record.

 8    BY MR. MASON:

 9        Q.    But is abstracting -- when you're saying

10    abstracting, is that different than the activity

11    done by the coder?

12        A.    No, it's the same thing.  It's just a

13    term that's used.

14        Q.    And so you're saying that for a period

15    of time, the coders were instructed not to identify

16    all of the diagnoses documented in the medical

17    record but only to identify diagnosis codes that

18    were new for that six-month period for that

19    beneficiary?

20              MR. QURESHI:  Objection to form.

21    Mischaracterizes testimony.  And remains out of

22    scope for this designee.

23              You can answer in your personal

24    capacity, Mr. Bird.

25              THE WITNESS:  Not necessarily new.  I



Page 49

1    mean the way the payment process works, as you

2    know, it's really every six months.  So one code

3    per six months is sufficient.  So if a -- if an

4    individual saw the doctor ten times and had

5    diabetes documented ten times during the six-month

6    period, you would only need one code to be

7    submitted to CMS for that to map to an HCC.

8              So in the early stages of the program,

9    which I think was the early stages -- and again

10   this is my personal capacity and is based upon my

11   recollection -- it wasn't a requirement to code

12   everything that was in the medical record.

13   BY MR. MASON:

14        Q.    Okay.  And when you're saying that this

15   was in the early stages of the chart review

16   program, what time period are you talking about?

17        A.    I can't remember when everything

18   changed.  You know, I think -- and I think the

19   scope covers what, 2008 through 2016.  So probably

20   in that 2008 to 2010, '11 time frame.

21        Q.    During that three-year time period,

22   you're saying the coders were instructed to only

23   find a code once per six months?

24              MR. QURESHI:  Objection to form.

25   Mischaracterizes testimony.  And outside of scope



Page 50

1    for this designee.

2            You can answer in your personal

3    capacity.

4            THE WITNESS:  For some of that period.

5    I don't know exactly what, whether it was our

6    coders or whether it was external coders.  But I

7    just recall that being part of the program for a

8    period of time.

9    BY MR. MASON:

10        Q.    And so -- why don't we move on.

11            But just to recap, aside from those two

12   clarifications, then, my description previously

13   about the chart review program is accurate; right?

14            MR. QURESHI:  Objection to form.

15   Mischaracterizes testimony, and ignores the last

16   five minutes of responses.  Outside the scope as

17   well.

18            THE WITNESS:  Subject to the corrections

19   that I made, then I think the rest of your

20   description around retrieve, codes, that is -- it's

21   fair.

22   BY MR. MASON:

23        Q.    Okay.  And Optum performed the chart

24   review program for its clients which were MAO --

25   Medicare Advantage organizations; is that right?



Page 51

 1        A.    For certain clients, correct.

 2        Q.    Okay.  Optum didn't perform it for all

 3   of its clients, but it did perform it for some of

 4   its Medicare Advantage organization clients?

 5        A.    Correct.

 6        Q.    And one of those Medicare Advantage

 7   organization clients was UnitedHealthcare; right?

 8             MR. QURESHI:  Objection to form.

 9   Outside of scope.

10             THE WITNESS:  That's correct.

11   BY MR. MASON:

12        Q.    And during what time period did Optum

13   perform the chart review program for

14   UnitedHealthcare?

15             MR. QURESHI:  Objection to form.

16   Outside of scope for this designee.

17             You can answer in your personal

18   capacity, Mr. Bird.

19             THE WITNESS:  I know it does today.  I

20   don't know which year it started doing that.  I

21   mean the earliest I saw in my personal capacity,

22   chart review results, would have been around the

23   2008 date of service time frame.  That's not to say

24   that it wasn't done prior to that, but that's when

25   I started with the organization.



Page 100

1    workstream owner of this attribution process;

2    right?

3                MR. QURESHI:  Objection to form.

4                THE WITNESS:  My name is listed in

5    "Workstream Owner," correct.

6    BY MR. MASON:

7        Q.    And the target completion dates for the

8    retrospective attribution dataset analysis is

9    October 29th, and then the target completion date

10   for the attribution logic validation analysis is

11   November 2nd.  Do you see that?

12       A.    I do.

13       Q.    And is that consistent with your

14   testimony about when the attribution process was

15   developed and implemented?

16       A.    I don't see a year.  What year is this?

17       Q.    Fair enough.  Let's go back to 713A,

18   which is the cover email.  Do you see that this was

19   sent on October 29, 2012?

20       A.    I see that.

21       Q.    And so is this essentially a task

22   manager for the process of developing the

23   attribution logic and attribution analysis that

24   you've testified about?

25                MR. QURESHI:  Objection to form.



Page 101

```
 1              THE WITNESS:  Yeah, I think I indicated
 2    earlier the process evolved over time.  So it looks
 3    like there was additional analysis and logic being
 4    developed in this time frame of October of 2012.  I
 5    think the documentation that we looked at earlier
 6    indicated that that began earlier in 2012.
 7    BY MR. MASON:
 8         Q.    Okay.  And then for the -- following the
 9    development of the attribution process, attribution
10    analysis was done consistently since then?
11              MR. QURESHI:  Objection to form.
12              THE WITNESS:  You mean that attribution
13    process we described has continued in some form
14    since then?
15    BY MR. MASON:
16         Q.    Yeah.
17         A.    Yeah, I believe so.  Yes.
18         Q.    And you're saying in some form.  Are you
19    referencing that it's changed?
20         A.    You have a culture of continuous
21    improvement, so I'm sure the platforms have
22    probably changed since this early time.  There's
23    perhaps different kinds of features and functions
24    that are part of the product.  But I think the
25    essence of establishing valuation related to
```



Page 102

1  programs continues.

2      Q.    Okay.

3            MR. MASON:  Why don't we go off the

4  record and take a break.

5            THE VIDEOGRAPHER:  Going off the record

6  at 11:53.

7            (Recess taken.)

8            THE VIDEOGRAPHER:  We are back on the

9  record at 12:11.

10  BY MR. MASON:

11     Q.    Mr. Bird, another risk adjustment

12  program that Optum performed for UnitedHealthcare

13  was called claims verification; right?

14     A.    Correct.

15     Q.    Can you explain what the claims

16  verification program is?

17     A.    It was a program that we operated during

18  a certain time frame that identified and reviewed

19  exclusive HCCs that were submitted by providers

20  that were part of the chart review program.

21     Q.    And Optum performed that program for

22  UnitedHealthcare?

23     A.    That's correct.

24     Q.    When?

25     A.    The program was in phases.  The first



2516

Page 103

1    phase of the program was 2010 calendar year for

2    2009 dates of service that was limited to Ovations,

3    which was UnitedHealthcare population, and also

4    limited to one member one provider.

5            The second phase was a similar one

6    member one provider.  It was moved from a manual

7    process into one that was within a system, and that

8    was in 2011 for 2010 dates of service.

9            And then Phase 3 of CV was for 2011 and

10   '12 dates of service.  And that was looking at

11   multiple provider as opposed to one member one

12   provider criteria.

13       Q.    And when was Phase 3 conducted?

14       A.    Phase 3 -- and I may need to refer to

15   kind of a timeline on that.  But typically it would

16   be done on a retrospective basis.  So if we're

17   looking at 2011 dates of service, we would have

18   commenced that in 2012.  And then it was ongoing

19   for 2011 and in 2012 until the program was

20   suspended and ultimately discontinued, which was

21   the spring of 2014.

22       Q.    When specifically was it suspended?

23       A.    There was -- so there was operational

24   suspensions from time to time based upon -- but in

25   terms of suspension leading to discontinuation of



Page 104

1    the program, my understanding is it was around the

2    middle of April that there was -- I think I've seen

3    within the documentation I reviewed some

4    notification for the delete process to be put on

5    hold around April of -- on or around April 18th of

6    2014.

7         Q.    And when you say suspended, you just

8    said that you suspended the delete process.  Did

9    you suspend all of CV, or just the delete process?

10        A.    The notification that I saw was in

11   relation to deletes.  But my understanding is the

12   entire CV process was suspended at or around that

13   time.

14        Q.    And it was terminated when?

15        A.    The decision for termination, which is

16   based on the memorandum that came from Steve Nelson

17   to Scott Theisen, I think that was dated on

18   June 11th, and he references in there the decision

19   for termination of the program was made on

20   May 27th.

21        Q.    And so is that your testimony as the

22   designee for UnitedHealthcare and Optum, that the

23   suspension of CV went into place on April 18, 2014,

24   and the termination of CV went into place on

25   May 27, 2014?



Page 105

1        A.    Yeah, my testimony is on or around

2    April 18th is when I saw notification of delete

3    processing, and I believe the program was also

4    suspended on or around that date.

5            And yeah, based upon the -- we have the

6    exhibit in here which is Steve Nelson's email or

7    memorandum to Scott Theisen.  He indicates in there

8    that the decision was made to terminate on

9    May 27th, and then that memorandum was dated with

10   notification to Scott and others that was on

11   June 11th.

12       Q.    And the dates that you were just

13   speaking of are in regards to the CV program that

14   Optum performed for UnitedHealthcare; right?

15       A.    That's correct.

16       Q.    Optum also performed CV for other MAO

17   clients; right?

18       A.    That is correct.

19       Q.    During what time period?

20       A.    I don't actually -- within the materials

21   that I kind of reviewed, I didn't look at the

22   specific timelines related to commercial customers

23   or non-UHC customers.  There were claims

24   verification processes in place for some MAO

25   clients as well as some HHS, you know, ACA risk



Page 106

1    adjustment services also.  Unfortunately, I don't

2    think I have materials that set out the time frame

3    of which those services were provided to

4    commercial.

5        Q.    Okay.  And to be clear, today I'm not

6    asking you anything about ACA -- you're referring

7    to the Affordable Care Act -- plans or services

8    that were performed for any of those plans.  I'm

9    only talking about Medicare Advantage.  Okay?

10       A.    Okay.

11       Q.    So with that in mind, can you tell me

12   during what time period Optum performed claims

13   verification for MA organization clients other than

14   UnitedHealthcare?

15            MR. QURESHI:  Objection to form.  And

16   it's also outside the scope of the designated

17   topics for this particular witness.

18            THE WITNESS:  I don't have exact dates.

19   And I did, through the process of my review, I did

20   look at some internal presentations to external

21   customers, I think one of which was Aetna at the

22   time.  I just can't say with any certainty at what

23   point, if any, the services were actually delivered

24   to that customer.

25            I've also seen reference in my research



Page 107

1    on Health Net of California as one of the clients

2    that at least the service was discussed with.

3            But unfortunately, I can't determine for

4    what time frame and what dates of service the

5    service would have been provided to those external

6    clients.

7    BY MR. MASON:

8        Q.    Do you know whether Optum ever actually

9    performed CV for any commercial -- when I say

10   commercial clients, I mean MA organizations other

11   than UnitedHealth?

12           MR. QURESHI:  Same objection.  This is

13   outside the scope of the topics on which this

14   witness has been designated.

15           THE WITNESS:  I believe we did.

16   BY MR. MASON:

17       Q.    And what can you tell me about when that

18   occurred?

19           MR. QURESHI:  Objection; asked and

20   answered.  And this is outside the scope.

21           THE WITNESS:  Yeah, I don't --

22   unfortunately, I don't know the dates.

23   BY MR. MASON:

24       Q.    Okay.  Did Optum stop offering claims

25   verification as a service at some point?



Page 108

1          MR. QURESHI:  Objection to form.  To

2    United or to other commercial clients?

3    BY MR. MASON:

4          Q.    Do you understand my question?

5          A.    I understand your question.  You know,

6    it's not part of the review I did and I wasn't

7    personally involved in selling services to external

8    customers.  So yeah, I know it was an offering for

9    a period of time.  Yeah, I believe at least one

10   commercial client took those services.  I don't

11   know how those services evolved when I was not part

12   of that organization.

13         Q.    So you don't know the answer to my

14   question?

15         A.    I don't know --

16         MR. QURESHI:  Objection to form.

17         THE WITNESS:  I don't know the answer.

18         MR. QURESHI:  Objection to form.  Your

19   question, if you were asking about commercial

20   clients, is outside the scope.

21   BY MR. MASON:

22         Q.    You don't know the answer to my

23   question?

24         A.    I don't know the service offering to

25   commercial clients at this time.



Page 109

1          Q.     What's the purpose of the claims

2     verification program?

3          A.     The purpose is to identify exclusive

4     HCCs and review those that were submitted by

5     providers that were part of the chart review

6     program.

7          Q.     What do you mean, and review them?

8          A.     They would be subject to medical coder

9     review.  So the CVA people that we spoke about

10    earlier, CV analysts.

11         Q.     And when you say the purpose was to

12    identify exclusive -- did you say exclusive HCCs or

13    exclusive codes?

14         A.     Exclusive HCCs.

15         Q.     And what do you mean by that?

16         A.     It would be an HCC or diagnoses that

17    mapped to an HCC and that HCC is submitted by one

18    and only one provider.

19         Q.     So why?

20                MR. QURESHI:  Objection to form.

21    BY MR. MASON:

22         Q.     I was asking the purpose; right?  And

23    you're telling me what CV did.  CV looked at

24    exclusive codes and then had a CV analyst review

25    the chart associated with it to determine if it was



Page 353

```
 1              C E R T I F I C A T E

 2

 3   DISTRICT OF COLUMBIA

 4              I, JOHN L. HARMONSON, a Notary Public

 5   within and for the District of Columbia, do hereby

 6   certify that JON H. BIRD, the witness whose

 7   deposition is hereinbefore set forth, was duly

 8   sworn by me and that such deposition is a true

 9   record of the testimony given by such witness.

10              That before completion of the

11   proceedings, review and signature of the transcript

12   was not requested.

13              I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17              IN WITNESS WHEREOF, I have hereunto set

18   my hand this 26th day of June, 2023.

19

20   _____

21        JOHN L. HARMONSON, RPR

             My commission expires: 04/14/26

22

23

24

25
```



**EXHIBIT D-92**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )


Videotaped Deposition of

JON HARVEY BIRD

Given Remotely

Wednesday, August 10, 2022


Reported by:  Karen K. Kidwell, RMR, CRR


Magna Legal Services
866-624-6221
www.MagnaLS.com



2526

Page 46

1          piece in here which -- I probably wouldn't use

2          exactly the same words today -- is for accounts

3          to be acceptable for risk adjustment, the

4          documentation needs to meet certain standards.

5                 The -- I think, for risk adjustment

6          purposes, you know, with information encounters

7          received directly from providers, they need to

8          meet submission criteria, which is a

9          face-to-face encounter with an acceptable

10         provider, and we develop filter logic in our

11         submission platforms to ensure that.

12                I think in the context of the claims

13         verification program, we are looking for the

14         appropriate support in the -- in the medical

15         record.  And to the extent that it was not

16         found, and we concluded that the condition was

17         not supported in the medical record, we did

18         process deletes.

19     BY MR. MASON:

20         Q.   So you agree that -- that the claims

21     verification program, when you say "validated," it

22     was looking to see whether the conditions were

23     appropriately documented in the medical record.

24     Correct?

25                MR. QURESHI:  Objection.  Asked and



2527

Page 47

 1          answered.

 2                 THE WITNESS:  The way the claims

 3          verification program was designed was to look

 4          for the appropriate documentation in the medical

 5          record, and feel certain we would be able to

 6          conclude that that document -- documentation

 7          does not exist.  And to the extent that it

 8          didn't, then deletes were processed.

 9    BY MR. MASON:

10        Q.    Okay.  In other words -- well, I won't say

11    another word.  Strike that.

12                 So if Optum determined that it had

13    submitted diagnosis codes that were not appropriately

14    documented in the medical record, it -- it deleted

15    them from CMS's risk adjustment system; is that what

16    you're saying?

17                 MR. QURESHI:  Objection to form.

18          Mischaracterizes testimony.

19                 THE WITNESS:  I say a year through to

20          process, if Optum was able to conclude that the

21          record is not -- that diagnosis is not supported

22          in the available -- in all the medical records.

23                 You know, so there's -- yeah, there's

24          complexity, right, in terms of whether you got

25          the right medical record, whether you got the



Page 48

1          entire medical record, you know, and

2          obviously -- you know, to process a delete,

3          we're overturning what a provider has actually

4          submitted for their patient.

5               So that's why I use the word "conclude."

6          You know, there's a -- a level of diligence

7          required to draw that conclusion.  But when that

8          conclusion is drawn, then the delete is

9          processed.

10   BY MR. MASON:

11        Q.   Okay.  And throughout the deposition, I

12   might refer to that type of delete as a "CV delete,"

13   or a "claims verification delete."  Do you understand

14   that terminology?

15        A.   I do.

16        Q.   And you've described the claims

17   verification process.  Do you have any understanding

18   of -- of why Optum submitted claims verification

19   deletes?

20        A.   It was not part of the decision to

21   implement the program or to design the initial

22   program.

23               And I apologize, but could you repeat the

24   second -- so any understanding of --

25        Q.   Yes.  Sorry.



Page 49

1        A.    I -- I don't -- yeah, was it why we
2   implemented the program, or why we processed the
3   deletes?
4        Q.    Let's start with -- do you have any
5   understanding of why Optum implemented the claims
6   verification program?
7        A.    Yeah.  Yeah.  Like I previously testified,
8   I was not involved in the decision to implement the
9   program.  But, you know, my understanding is we were
10  operating, you know, in an environment of -- a
11  regulatory environment that was unclear and
12  ambiguous.  And you know, to err on the side of
13  caution, United decided to implement the CV program.
14            I think, as far as processing deletes
15  related to the CV program, it was our policy to do
16  so.  So, you know, our policy is when we concluded
17  that a code was not supported in the medical record,
18  we would delete.  And we did in this program along
19  with other programs as well.
20       Q.    And do you have any understanding of why
21  that was the policy?
22       A.    Yeah.  I'm no lawyer, and I don't read the
23  regulations or determine obligations, but I do
24  understand the policy that we had in place at that
25  time.



Page 50

1          Q.   So is the answer you don't -- you don't

2     have an understanding of why it was the policy?

3               MR. QURESHI:  Objection.  Asked and

4          answered.

5               THE WITNESS:  I don't.

6     BY MR. MASON:

7          Q.   And when you said that your understanding

8     for why the claims verification program was

9     implemented was related to your understanding that

10    you were operating in a regulatory program that was

11    unclear and ambiguous -- did I hear that right?

12              MR. QURESHI:  Objection to form.

13    BY MR. MASON:

14         Q.   Sorry.  I didn't hear your answer.

15         A.   You did hear that correctly.

16         Q.   And what was the basis for that

17    understanding?

18         A.   It was kind of general vibe within the

19    organization, discussions with people that -- that

20    may have been associated with compliance, or people

21    discussing, yeah, requirements for the organization.

22         Q.   Did you say it was the "general vibe"?

23    Did I hear that right?

24         A.   Correct.

25         Q.   So you can't remember specifically anybody



Page 51

1    telling you that, but it was something that you just

2    generally understood?

3         A.   I'd say something I generally understood.

4         Q.   And -- okay.  And can you explain how

5    CV deletes reduced the amount of revenue that

6    MA plans received from CMS?

7              MR. QURESHI:  Objection to form.

8              THE WITNESS:  So CV deletes don't always

9         impact the revenue that the health plan will

10        receive.  CV deletes are taken into

11        consideration with all other submission data by

12        CMS in order to calculate a risk score.  And the

13        risk score is the basis for the payment to the

14        health plan.

15             So some CV deletes will have no impact.

16        They could be nonrisk-adjusting diagnoses.  They

17        could be multiple diagnosis of whatever the HCC

18        is seeing.  There could be other HCCs in the

19        hierarchy that trump the deleted code.

20             So really, it just depends on -- on the

21        data, and how the data impacts the model.

22   BY MR. MASON:

23        Q.   So it's not as simple as saying if

24   there's, you know, X number of deletes, and each

25   delete costs Y dollars, so then the total reduction



Page 52

1    in revenue is X times Y dollars; it's not that

2    simple?

3            MR. QURESHI:  Objection to form.

4            THE WITNESS:  It's not that simple to do

5        a -- an accurate calculation of the impact of

6        the program.  There could be models created that

7        might estimate potential impacts used in a more

8        simplistic approach.

9    BY MR. MASON:

10       Q.   At OptumInsight, you and your team had a

11   way of -- of doing that type of modeling, right?

12           MR. QURESHI:  Objection to form.

13           THE WITNESS:  My team developed models

14       that we designed to try and estimate impacts for

15       the purpose of informing accrual estimates with

16       M&R.

17   BY MR. MASON:

18       Q.   Did anyone at -- did anyone at M&R ever

19   express concern about the revenue that M&R was losing

20   due to the claims verification deletes?

21           MR. QURESHI:  Objection to form.

22           THE WITNESS:  I don't recall.

23   BY MR. MASON:

24       Q.   You don't recall anyone at M&R ever

25   expressing concern about the revenue that it was



2533

Page 83

1          In the meantime, I'd ask that no one look

2     at this document, and for us to take it off the

3     screen.

4          But with that, yes, may we go off the

5     record?

6          MR. MASON:  We'll go off the record.

7          VIDEOGRAPHER:  We are off the record at

8     1:50 p.m.

9          (A recess transpired from 1:50 p.m. until

10          1:55 p.m.)

11          VIDEOGRAPHER:  We're back on the record

12     at 1:55 p.m.

13          MR. QURESHI:  After conferring, Mr. Mason,

14     the Defendants are clawing back the document

15     that had been designated Exhibit 404, on the

16     basis of it's privileged; and as I remarked

17     before the break, we believe that the United

18     States should have alerted to its existence as a

19     potential clawback.

20          MR. MASON:  And -- and as I said during

21     the break, we disagree with United's position,

22     and -- and we'll reserve rights to handle this

23     after the deposition.  And if -- if we need to

24     leave it open after this deposition, then we

25     will.



Page 84

1            MR. QURESHI:  Okay.  Well, I understand.

2            MR. MASON:  Okay.

3  BY MR. MASON:

4        Q.  Mr. Bird, we've testified a little bit

5  about the CV program -- or, sorry, "we've testified";

6  sorry about that.

7            You've testified a little bit about the CV

8  program, and we've talked about the CV financial

9  projections that you did.  I'd like to ask you if you

10  can explain, as best you can, how the CV program

11  worked.

12        A.  Any particular aspects of the program?

13        Q.  Just -- why don't you start with just a

14  high level of how the CV program worked, from start

15  to finish.

16        A.  So my -- you know, my understanding -- I

17  didn't, you know, design the program; I was involved

18  in certain operational analytic components, so I can

19  provide, you know, my understanding.

20            There -- it's -- for the providers that

21  were engaged in the chart review program, we -- the

22  organization sought to identify claims that were --

23  and encounters that were submitted by those same

24  providers.

25            There was a very complex process to try



Page 85

1   and link provider information from a -- chart review

2   data and from the provider data, the existed -- the

3   claim data that existed -- that existed within the

4   various claim systems.

5              When that process was -- you know, when

6   the -- the match was attempted, there would be a

7   comparison of what was in a claim to what was in the

8   initial chart review information.  Anything that met

9   a certain criteria around not matching would go

10  through a process of review with medical coders, and

11  an expert level of review also.

12             And then, after the expert-level review

13  was complete, any codes where the organization

14  concluded that support was not in the medical record,

15  a delete would be processed.

16      Q.   When you said "anything that met a

17  criteria of not matching," you're referring to

18  diagnosis codes there; is that right?

19      A.   The -- I don't recall actually whether the

20  matching process was at the diagnosis or the HCC

21  level.

22      Q.   Okay.  You don't recall if it was at

23  the -- the dx level or the HCC level, but in -- but

24  in either case, it was matching the conditions shown

25  on both sides.  Is that right?



Page 86

 1          A.   Correct.

 2          Q.   Okay.  Can I show you the next exhibit.

 3               MR. MASON:   This is Tab N, Jesse.  And so

 4          I suppose this will be -- I don't know if this

 5          is going to come up -- okay.  Exhibit 405.  So

 6          we have a -- we have a blank there, due to the

 7          clawback document from before.

 8   BY MR. MASON:

 9          Q.   So Exhibit 405 should now be in front of

10   you.  Let me know when you see that.

11          (Exhibit 405 was marked for identification.)

12               MR. MASON:   And -- and Tab N1 can go up,

13          too, which will be Exhibit 405-1.

14          (Exhibit 405-1 was marked for identification.)

15   BY MR. MASON:

16          Q.   And do you see Exhibit 405, Mr. Bird?

17          A.   I do.

18          Q.   And this is an e-mail from Chris Webb to

19   yourself, dated February 20th, 2014, with the subject

20   "Claims Verification Overview for MBM."  Right?

21          A.   Yeah.

22          Q.   And Mr. Webb was one of your team members

23   at OptumInsight who reported to you at the time?

24          A.   He was, yes.

25          Q.   And "MBM" there, do you understand that to



Page 101

1          Q.   And if we look at the attachment, and in

2     407 -- sorry, 407-1 is the attachment.  And do you

3     see there were some changes to the "Overview"

4     section, at the top?

5               MR. QURESHI:  Objection to form.

6               THE WITNESS:  I'd need to read and

7          compare.

8     BY MR. MASON:

9          Q.   Yeah, can you compare this with

10    Exhibit 405-1, and see if there are any differences

11    in the "Overview" section?

12              You don't need to look at the whole

13    document; I'm just asking about the "Overview"

14    section.

15         A.   I didn't review it word for word, but I

16    can see where there's differences.

17         Q.   And one of the differences is that in

18    407-1, the section ends by saying, "Claims associated

19    with exclusive HCCs not supported in the

20    corresponding medical record are deleted."  Right?

21              That was an addition that was made after

22    your feedback; is that correct?

23              MR. QURESHI:  Objection to form.

24              THE WITNESS:  So, I mean, the original

25         document said, "This service will also include a



Page 102

1          submission of deletes to CMS, where

2          appropriate."

3     BY MR. MASON:

4          Q.   Right.  The original document said it will

5     include submission of deletes wherever appropriate;

6     but the final document, that was sent to Marybeth

7     Meyer, after your feedback, says, "Claims associated

8     with exclusive HCCs not supported in the

9     corresponding medical record are deleted."

10              Is that correct?

11              MR. QURESHI:  Objection to form.  Document

12          speaks for itself.

13              THE WITNESS:  Yeah, that's what the

14          document says.

15              You know, what I can't determine from the

16          previous exhibit, if I was the only person to

17          provide feedback.  You know, or how that

18          feedback was delivered, whether it was me or

19          inclusion of other people.

20              I can see the -- the language has changed

21          in the second version.

22     BY MR. MASON:

23          Q.   And -- and the language being changed, you

24     agree that that sentence is -- is different?

25              MR. QURESHI:  Objection to form.  The



Page 103

1          document speaks for itself.

2               MR. MASON:  Withdrawn.

3    BY MR. MASON:

4          Q.   Another thing, you'll notice that in

5    Exhibit 405-1, you drew attention to the language

6    that gave you some pause, I think you said, which was

7    where it says, "in accordance with CMS guidelines."

8               Do you see that that language is still

9    in 407-1?

10         A.   I see that.

11              MR. QURESHI:  Objection to form.

12         Mischaracterizes testimony.

13              THE WITNESS:  I see that.

14   BY MR. MASON:

15         Q.   Do you see --

16              And is it fair to conclude, then, that in

17   2014, when you reviewed this document, you didn't

18   have any concerns with the language "in accordance

19   with CMS guidelines"?

20              MR. QURESHI:  Objection to form.

21              THE WITNESS:  I don't know what I can

22         conclude from -- from that.  You know, reading

23         it today, I think there's lack of clarity around

24         what "CMS guidelines" would mean, whether that's

25         coding or something other.  So I don't know



2540

Page 104

1    whether I had those same -- exact same concerns

2    back in 2014, or whether I would have voiced

3    them.

4         But I can see that the document didn't

5    change.

6         MR. MASON:  We -- you know, we've been

7    going for a little over an hour.  Why don't we

8    go off the record for a break?

9         MR. QURESHI:  Okay.  Thank you.

10        VIDEOGRAPHER:  We are off the record at

11   2:25 p.m.

12        (A recess transpired from 2:25 p.m. until

13        2:37 p.m.)

14        VIDEOGRAPHER:  We are back on the record

15   at 2:37 p.m.

16   BY MR. MASON:

17        Q.   Mr. Bird, you're familiar with a group at

18   UHG referred to as the UHG Risk Adjustment Advisory

19   Board?

20        A.   I am.

21        Q.   What is it?

22        A.   In my understanding, recollection of that

23   group was it was a kind of legal-led organized group

24   of people that were involved in risk, and it also

25   included individuals that were involved in risk



2541

Page 108

1              MR. MASON:  We need to go off the record

2         so that the witness can discuss an issue of

3         privilege with counsel.

4              VIDEOGRAPHER:  We are off the record at

5         2:42 p.m.

6              (A recess transpired from 2:42 p.m. until

7              2:44 p.m.)

8              VIDEOGRAPHER:  We are back on the record

9         at 2:44 p.m.

10  BY MR. MASON:

11      Q.   Mr. Bird, do you remember my pending

12  question?

13      A.   Could you repeat it for me, please?

14      Q.   Sure.  And I wasn't asking about any

15  specific request, but just trying to understand the

16  general nature of your role on the board.

17           And is it accurate to say that the board

18  would ask you specific requests for information; you

19  would use your data and analytics at OptumInsight to

20  provide information to inform the board in response

21  to those requests?

22      A.   So from my recollection, there was no role

23  and responsibility specifically assigned to people

24  within the -- within the group.  It's my

25  understanding I was invited to attend the meetings



Page 109

1    based upon my knowledge of risk adjustment, and --

2    yeah, the programs that we ran, and analytics.

3          I -- you know, I believe the request would

4    have come -- come to me, but I don't recall any

5    specific request that came to me during that period,

6    or whether indeed any request came to me during that

7    period.

8        Q.   Will you agree that your role on the board

9    was to use data and analytics to respond to specific

10   requests for information from the board?  Right?

11          MR. QURESHI:  Objection.  Asked and

12       answered.

13          THE WITNESS:  I don't -- we didn't have --

14       I didn't have a role description provided.  My

15       understanding is, you know, the knowledge and

16       skills I brought to the -- the team was around

17       analytics and program knowledge.

18   BY MR. MASON:

19       Q.   Analytics and program knowledge regarding

20   risk adjustment?

21       A.   That's correct.

22       Q.   And whether you had a specific defined

23   role or not, the way that you understood your role

24   was it to use those data and analytics related to

25   risk adjustment to respond to specific requests from



Page 110

1    the board?

2          MR. QURESHI:  Objection to form.  Asked

3       and answered.

4          THE WITNESS:  That -- that sounds very

5       specific, and I -- I don't recall that they had

6       any specific description of role.

7    BY MR. MASON:

8       Q.   Okay.  Can we go back to Exhibit 399,

9    which you'll recall was your CID transcript?  And I'd

10   like you to go to page 52.  And you recall you can do

11   that just by punching in the number "52" in that

12   little box?

13          And I'd like you to go to line 22.

14          Oh, I might be on the wrong -- sorry, it

15   should be on page -- oh, you know, it's confusing,

16   because -- it's page 52 of the transcript, but you

17   actually have to type in -- you have to type in the

18   number "53."  There's an extra page in the PDF.

19          So if you type in 53, you'll see it says

20   "page 52" at the very top.  Do you see that?

21      A.   Yeah.

22      Q.   Yeah.  And then if you scroll down to

23   line 22.

24          And it says:  "Did you have any particular

25   responsibilities on the board?



Page 228

```
 1              MR. QURESHI:  I'm sorry.  United's counsel
 2       has some redirect, please.
 3              VIDEOGRAPHER:  Apologies.
 4                    EXAMINATION
 5  BY MR. QURESHI:
 6       Q.   Good afternoon, Mr. Bird.
 7       A.   Good afternoon.
 8       Q.   Earlier today you discussed your
 9  background briefly.  Please remind us how long you've
10  worked for the UnitedHealth Group group of companies.
11       A.   So I -- I commenced an appointment with
12  Ingenix in October of 2008, so approximately
13  14 years.
14       Q.   And in the time period that has been under
15  focus of the government's questions, 2010 to
16  approximately 2015, what role did you hold?
17       A.   So, you know, my role changed over time.
18  Initially it was a -- a financial role, including
19  kind of some pricing exercises.  And, you know, over
20  time, I took on additional responsibility for kind of
21  program analytics and some kind of operational
22  responsibility also.
23       Q.   And in these various responsibilities that
24  you have described, how have you approached these
25  responsibilities throughout your tenure?
```



Page 229

1          A.    You know, with -- really doing the best

2   job I can, you know, with integrity.  My background,

3   chartered accountant; we have strong, you know,

4   professional ethics, and I abide by them, and I

5   definitely take them seriously and -- into the --

6   into work I do.

7          Q.    Throughout the day you testified about a

8   few different risk adjustment programs.  I'd like to

9   understand what role you played in each of those

10  programs.

11              I'll start with chart review:  What is

12  chart review?

13         A.    So chart review is a -- a program that

14  involves the retrieval of medical records, the

15  extraction of codes from those medical records, and

16  submission of those codes to CMS.

17         Q.    In your role at Ingenix, and later Optum,

18  what was your understanding of the purpose of chart

19  review?

20         A.    So my -- my understanding of the -- the

21  purpose of chart review was to enable us to report

22  the complete health status of the member.

23         Q.    And in order to report the complete health

24  status of the member, what process was used by

25  individuals involved in chart review?



Page 230

1       A.    Typically we would target certain medical

2    records for retrieval.  You know, once those medical

3    records are retrieved, they would be reviewed by

4    certified coders.  There would be QA processes in

5    place to ensure the -- the codes are appropriately

6    supported in the medical record.  And then those

7    codes would be submitted.

8       Q.    You talked about certified coders who

9    abstracted medical records.  What was the entire

10   universe of information provided to the certified

11   coders who abstract the medical records?

12      A.    Yeah, those reviews would have been --

13   yeah, so the information that would have been

14   provided to the -- the coders at the time would be an

15   image of the -- the medical record, so it is what we

16   would refer to as a blind interview, you know, where

17   we're not getting any additional information related

18   to codes that were previously submitted; just a blind

19   abstraction, looking at the documentation provided in

20   the record, and assigning the appropriate ICD

21   diagnosis codes to that documentation.

22      Q.    In this chart review process that you've

23   described, what attempt was made to compare diagnoses

24   codes abstracted by certified coders with diagnoses

25   codes that might have been identified by a coder



2547

Page 231

1    working for a hospital or a provider?

2        A.    That -- that comparison would not have

3    been completed at, you know, through the chart review

4    program, but, you know, as we, you know, as I

5    testified earlier, there was a claims verification

6    process, you know, where there was an attempt to

7    match the diagnosis submitted by providers; they're

8    also part of the chart review program.

9            You know, I call it an attempt because it

10   a very complex process; it has, you know, several

11   challenges, you know, in particular related to the

12   quality of data around the provider IDs across

13   various systems.  And also, you know, the

14   completeness of the medical records that would have

15   been reviewed as part of the chart review process.

16       Q.    You talked a little bit about the

17   complexity of the process.  What additional

18   information would be required in order to undertake a

19   comparison between diagnoses codes identified by

20   United's certified coders with codes that might have

21   been identified by coders working for a hospital or a

22   provider?

23           MR. MASON:  Objection to form.

24   Foundation.

25           THE WITNESS:  So, you know, the first



Page 232

1          thing is understanding that you have a match

2          between the -- you know, the same provider in

3          the claims system is the same provider in the

4          medical record review system.

5               And that's always a challenge within the

6          industry around the quality of provider data, in

7          particular with, you know, providers; they may

8          be assigned an ID.  They could have multiple

9          IDs, based on where they may -- which locations

10         they practice in, or which IPA they're part of,

11         or which provider group they may be part of.

12         Those IDs would typically change over time.

13         They may not be unique.

14              And then the same applies in the health

15         plan side.  You know, typically health plans

16         grow through acquisition.  There's multiple

17         claims platforms.  The same providers may

18         have -- they may need to present in multiple

19         systems, you know, with different IDs.

20              So that's the -- that's the big -- you

21         know, one of the big challenges, you know,

22         related to matching, you know, the data.

23    BY MR. QURESHI:

24         Q.   Mr. Bird, what conclusions, if any, would

25    you draw from a circumstance in which a certified



Page 251

1                         CERTIFICATE

2

3        I, KAREN K. KIDWELL, Registered Merit Reporter,

4   and Certified Realtime Reporter, do hereby certify

5   that prior to the commencement of the examination,

6   the deponent was remotely sworn to testify to the

7   truth, the whole truth under penalty of perjury.

8        I DO FURTHER CERTIFY that the foregoing is a

9   verbatim transcript of the testimony as taken

10  stenographically by me at the time, place and on the

11  date hereinbefore set forth, to the best of my

12  ability.

13       I DO FURTHER CERTIFY that I am neither a

14  relative nor employee nor attorney nor counsel of any

15  of the parties to this action, and that I am neither

16  a relative nor employee of such attorney or counsel,

17  and that I am not financially interested in this

18  action.

19

20                    _Karen K. Kidwell_____

21                    Karen K. Kidwell
                      Registered Merit Reporter
22                    Certified Realtime Reporter
                      Notary Public
23

24

25



**EXHIBIT D-93**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


CASE NO.   CV 16-08697 FMO


UNITED STATES OF AMERICA ex rel.,

BENJAMIN POEHLING,

    Plaintiffs,

vs.

UNITED HEALTH GROUP, INC., et al.,

    Defendants.

_____/


DEPOSITION OF BARBARA BLAIR

WEDNESDAY, APRIL 3, 2024

9:48 a.m. - 7:37 p.m.


TWO SOUTH BISCAYNE BOULEVARD, SUITE 1850

MIAMI, FLORIDA


-   -   -


Reported By:

Katiana Louis

Notary Public, State of Florida

Miami Office #1100998

Magna Legal Services

866-624-6221

Www.MagnaLS.com



2552

Page 99

1    others at FTI in publications related to any of

2    these topics?

3        A.    I may have.  I may have been asked about

4    a specific subject, but I can't specifically

5    point to any publisher.

6        Q.    And you also did not list any

7    presentations from the past 10 years relevant to

8    the issues in your expert report; is that

9    correct?

10       A.    That is correct.

11       Q.    So, in the past 10 years, you have not

12   made or drafted any presentations related to

13   diagnosis coding; is that correct?

14       A.    I performed internal presentations to

15   clients pretty regularly, but they are all under

16   privilege.

17       Q.    But no external presentations?

18       A.    No external.

19           MS. LIKOFF:  Okay.  I think we can

20       go ahead and take a break.

21           (A brief break was had.)

22   BY MS. LIKOFF:

23       Q.    Ms. Blair, in connection with the

24   opinions you're offering in this case, you have

25   not reviewed any medical records; is that



Page 100

1    correct?

2         A.    That is correct.

3         Q.    So, I'd like to now turn back to

4    Exhibit 812, which is a copy of your expert

5    report.  We can keep this out because we'll spend

6    time going through it now.

7              You offer two main opinions in your

8    report; is that correct?

9         A.    That is correct.

10        Q.    And we'll discuss them in detail, but I

11   just want to start off with making sure I

12   understand at a high level the two opinions that

13   you are offering.  You first opine that the

14   identification of diagnosis codes supported by

15   documentation in a medical record is a complex

16   process, informed by a variety of coding guidance

17   dependent on the coder's training, experience,

18   and judgment; is that correct?

19        A.    That is correct.

20        Q.    And what is the basis for this opinion?

21        A.    My 25-plus years of working in the

22   diagnosis and coding space, as well as my

23   education and experience that I've had in the

24   industry.

25        Q.    Is there anything else that you're



Page 101

1    relying on as the basis for this opinion?

2        A.    The resources as I've quoted them.

3        Q.    We'll discuss some of those as we go

4    throughout the day.

5              And then you offer a second opinion;

6    correct?

7        A.    I do.

8        Q.    And I think that appears on -- that

9    appears on page 27 of your report; correct?

10       A.    Correct.

11       Q.    And what's the basis for this second

12   opinion that you offer?

13       A.    This is based on my 25 years of

14   experience in looking at many, many medical

15   records.

16       Q.    Is it based on anything else?

17       A.    No, it is not.

18       Q.    And I think we may have covered this,

19   but I just want to make sure the record is clear,

20   what information were you given in order to form

21   your opinions in this case?

22       A.    These are my opinions.

23       Q.    Were you given any information or

24   resources on which to base your opinions?

25       A.    No.    The resources are mine and this is



Page 180

```
 1    education, but I don't believe I talk about
 2    undercoding or overcoding.  I talk about
 3    potentially missed because of their background
 4    or, you know, that -- that's the reason for the
 5    additional reviews.  But undercoding, overcoding,
 6    that is all just part of my discussion on the
 7    complexity of coding.
 8         Q.   Well, I recognize that, I don't believe,
 9    you used the words "undercoding" or "overcoding"
10    in your report, but as we just talked about, I
11    believe there are a number of examples, but I'll
12    point to the one again in paragraph 24 you do
13    ultimately describe a scenario in which
14    undercoding might take place due to coder
15    experience and training?
16         A.   They may be less effective, yes, in
17    identifying all the diagnosis codes.
18         Q.   So, I'm just trying to understand
19    whether you believe that those same concerns with
20    respect to coder experience, coder training could
21    lead to overcoding or miscoding?
22         A.   Again, in my report, I do speak to that.
23    I speak to human error.  I speak to miscoding.  I
24    speak to that.
25         Q.   Do you agree that coder certification,
```



Page 181

1    ongoing coder training and quality control

2    results in coding that is more accurate?

3         A.    I can opine to training, certifications

4    that may -- as you can see, that may assist a

5    coder in being more proficient in their job.  As

6    to accurate, I can't truly assign what accuracy

7    is, but I can say that training and certification

8    does assist the coder as a rule into better being

9    able to identify diagnoses in the record.

10        Q.    I'd like to move on to the next sort of

11   six points that you make which relate to the

12   availability, legibility, and variability of

13   provider documentation.  In paragraph 26 you

14   state, "In addition to varied coder backgrounds,

15   the provider documentation available to coders

16   during chart review varies greatly."

17              Is that your opinion?

18        A.    It is.

19        Q.    And what is the basis for your opinion

20   that provider documentation during chart review

21   varies greatly?

22        A.    In any type of chart review, I will say

23   that in my experience, that's been one of the

24   more challenging aspects of chart review is

25   getting a complete record and all the record that



Page 182

1    you request.

2        Q.   Are you basing your opinion on anything

3    other than your experience?

4        A.   No, that is my experience.

5        Q.   Can you point to any studies or

6    published articles that support your opinion that

7    provider documentation available to coders during

8    chart review varies greatly?

9        A.   No, I cannot.

10        Q.   So, I'd like to specifically focus for a

11    couple of minutes on paragraph 29 in which I

12    believe you discuss the legibility and clarity of

13    available documentation.  And you opine that this

14    can also "affect a coder's ability to identify

15    diagnosis codes."  Is that correct?  Is that your

16    opinion?

17        A.   Yes, that is my opinion.

18        Q.   And what is the basis for your opinion

19    that "the legibility and clarity of documentation

20    can affect a coder's ability to identify

21    diagnosis codes"?

22        A.   As you can see, a coder who can't read a

23    provider's handwriting may not identify the

24    diagnosis code during a chart review.  But

25    another coder who is in the provider's office is



Page 183

1    familiar with that documentation and knows that

2    that says "diabetes" and they assign the diabetes

3    code.

4        Q.   Do you believe that there is any

5    requirement for documentation to be legible to

6    the extent that it is readable to any coder

7    looking at the documentation?

8        A.   I believe, based on the role of a coder,

9    is if you know what that documentation is, you

10   assign the code appropriately.  If someone else

11   is unable to read that record, that coder that

12   assigned that code who can, assigned it

13   appropriately.

14            MS. LIKOFF:  All right.  I'd like

15        to take a look at another exhibit.  And

16        I think this will be Exhibit 815.

17            And Lauren, this is Tab 11.  And

18        I'll note that there is some yellow

19        highlighting -- it's not even

20        highlighting.  It's yellowness that

21        appears on the document.  And just on

22        the courtesy copy that we're going to

23        provide on hard copy, but this is not

24        highlighting that we made and it does

25        not have any significance and I don't



Page 184

 1          believe it appears on the official

 2          exhibit on AgileLaw.

 3                MS. SOBEL:  So just to confirm, the

 4          exhibit in AgileLaw is the same as the

 5          exhibit that we're seeing here?

 6                MS. LIKOFF:  It is.

 7                MS. SOBEL:  Just without the yellow

 8          highlights?

 9                MS. LIKOFF:  It is, yes.  And I

10          believe it's now up in AgileLaw as 815,

11          if you want to take a look at it.

12                (Defendant's Exhibit No. 815 was

13          marked for identification.)

14     BY MS. LIKOFF:

15          Q.   So, I'm handing you, Ms. Blair, an

16     article from AAPC entitled, "Medical Record

17     Entries:  What Is Timely and Reasonable?"  And I

18     believe this was cited in footnote 16 of your

19     report.

20                MS. SOBEL:  Take your time to

21          review it.

22     BY MS. LIKOFF:

23          Q.   My first question will just be:  Whether

24     this article is familiar to you?

25                MS. SOBEL:  You said it was



2560

Page 324

```
 1              REPORTER'S DEPOSITION CERTIFICATE
 2      STATE OF FLORIDA
        COUNTY OF MIAMI-DADE
 3
 4              I, Katiana Louis, do hereby certify that
 5      I was authorized to and did stenographically
 6      report the foregoing deposition; and that the
 7      transcript is a true and correct transcription of
 8      the testimony given by the witness; and that the
 9      reading and signing of the deposition were not
10      waived.
11
12              I further certify that I am not a
13      relative, employee, attorney or counsel of any of
14      the parties, nor am I a relative or employee of
15      any of the parties' attorney or counsel connected
16      with the action, nor am I financially interested
17      in the action.
18
19              Dated this 8th day of April 2024.
20
21
                         _____
                                  Katiana Louis
22                       Katiana Louis
23
24
25
```



**EXHIBIT D-94**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
        Plaintiffs,               )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
        Defendants.               )
_____ )




Videotaped Deposition of

MARY BONNER

Given Remotely

Friday, May 13, 2022




Reported by:  Karen K. Kidwell, RMR, CRR




Magna Legal Services
866-624-6221
www.MagnaLS.com



2563

Page 19

1        Q.    Is this often referred to as "MA"?

2        A.    Yes.

3        Q.    What is Medicare Advantage?

4        A.    It's Part C of the Medicare program.

5        Q.    And how did you learn about Medicare

6    Advantage?

7        A.    I learned about it just before I worked at

8    CMS, just through general awareness of Medicare

9    programs.  And then I've learned about it directly

10   through my work on the RADV project.

11       Q.    And while at CMS, did you receive any

12   specific training related to Medicare Advantage and

13   how it worked?

14       A.    No.  Not formal training, no.

15       Q.    So you -- more of a learn-on-the-job type

16   thing?

17       A.    Yes.  About the program, yes.

18       Q.    And what is your current job title at CMS?

19       A.    I'm a communications specialist.

20       Q.    And how long have you had that position?

21       A.    Since 2013.

22       Q.    Okay.  And if you scroll back up to page 1

23   of Exhibit 1196, next to "Work Experience," it lists

24   "Communications Specialist."  Is that your current

25   position?



Page 20

1         A.    Yes.

2         Q.    And what do you do in this role?

3         A.    I do writing and editing related to

4    Medicare, and marketplace messaging, mainly for

5    beneficiaries and consumers, those programs.

6         Q.    And is it related to Medicare Advantage?

7         A.    There are references to Medicare Advantage

8    in the work that I do, yes.

9         Q.    Is it also related to the Affordable Care

10   Act?

11        A.    Yes.

12        Q.    Is it related to the RADV project that you

13   mentioned earlier?

14        A.    No.

15        Q.    Okay.  And who do you report to now?

16        A.    Valerie Perkins is the director at the

17   Division of Content Development.

18        Q.    And just -- did you say "Perkins"?

19        A.    Yes.  Valerie Perkins.

20        Q.    Okay.  Great.  Thank you.  I wanted to

21   make sure I heard correctly.

22              Did anything that you -- does anything in

23   your current role relate to audits of Medicare

24   Advantage plans?

25        A.    No.



Page 74

1          Calls for speculation.

2                 THE WITNESS:  Could I ask you to repeat

3          the question again?

4    BY MS. MADDOUX:

5          Q.   Would the senior coder review 100 percent

6    of the additional HCCs because the primary coder may

7    have erroneously identified it during their review?

8                 MS. OBEREMBT:  Objection.  Foundation.

9          Calls for speculation.

10                THE WITNESS:  No, I think that it would be

11         for -- they would be reviewing for an IC- -- you

12         know, a missing ICD-9 code -- an ICD-9 code that

13         wasn't identified.

14   BY MS. MADDOUX:

15         Q.   So the senior -- yeah, go ahead.

16         A.   No, no, go ahead.

17         Q.   The senior coder was conducting a review

18   of 100 percent of both the discrepant and additional

19   HCCs to check the primary coder's work?

20                MS. OBEREMBT:  Objection.  Foundation.

21         Calls for speculation.

22                THE WITNESS:  That's not my memory, that

23         they were checking their work.  They were --

24         they were checking to see -- they were checking

25         to see if there was an ICD-9 code present that



Page 75

1          would validate an HCC, requested HCC.

2     BY MS. MADDOUX:

3          Q.    The senior coder was?

4          A.    Yes.

5          Q.    So if the primary coder had not identified

6     it, the senior coder was doing a second review to

7     confirm if it was in fact there?

8          A.    Correct.

9               MS. OBEREMBT:  Objection.  Foundation.

10         Calls for speculation.

11    BY MS. MADDOUX:

12         Q.    Number 5 on page 25 of Exhibit 1197 says,

13    "Initial review of approximately 25 medical records

14    prior to beginning 'live' review of medical records

15    for any coders."  Do you see that?

16         A.    Yes.

17         Q.    A few sentences later, it says, "An IRR

18    report generated by the Tool will indicate

19    proficiency at 95 percent or greater; in the event

20    that the coder achieves less than 95 percent

21    proficiency, that coder shall be restricted from

22    coding of the live medical records until a subsequent

23    review of another 25 medical records results in

24    proficiency of 95 percent or greater."

25               Do you see that?



Page 76

```
 1          A.    I do.

 2          Q.    Is this the IRR process we discussed

 3    earlier?

 4          A.    Yes.

 5          Q.    It then says, "The contractor shall

 6    continue to monitor IRR of all coders and provide

 7    appropriate remediation or dismissal."

 8                Do you see that?

 9          A.    Yes.

10          Q.    Did the IRR evaluation take place on a

11    continual basis throughout the medical record review

12    process?

13                MS. OBEREMBT:  Objection.  Vague.

14                THE WITNESS:  I'm taking a minute just to

15          reread this and try to remember if it -- if it

16          did continue.

17    BY MS. MADDOUX:

18          Q.    Take as much time as you need.

19          A.    I -- I clearly remember the initial IRR

20    period.  I believe that it continued throughout, you

21    know, a specific coding period, but I can't remember

22    details about that.

23          Q.    And what is a 95 percent proficiency?

24          A.    My memory is that -- that coders would

25    accurately code the record 95 percent of the time.
```



Page 77

1          Q.    Do you know why the standard was

2    95 percent?

3          A.    No.

4          Q.    The IRR activity described here, would

5    that involve comparing the diagnosis codes identified

6    by the primary coder to the diagnosis codes

7    identified by the senior coder?

8          A.    I don't remember that.

9          Q.    Does it involve a situation where one

10   coder said the -- the other code was not supported by

11   the medical record, but the senior coder said that

12   the code is supported by medical record?

13              MS. OBEREMBT:  Objection.  Foundation.

14        Calls for speculation.

15              THE WITNESS:  That's a reasonable way to

16        describe the -- that check.

17   BY MS. MADDOUX:

18         Q.    Does the 95 percent threshold acknowledge

19   that coders may not agree about whether a diagnosis

20   code is supported by medical record?

21              MS. OBEREMBT:  Objection.  Foundation.

22        Calls for speculation.

23              THE WITNESS:  I don't know the answer to

24        that.

25



Page 78

1    BY MS. MADDOUX:

2        Q.    In your experience as the government task

3    leader or contracting officer's representative, were

4    you aware that coders did not always agree about what

5    other diagnosis code was supported by medical record?

6        A.    Yes.

7        Q.    Does the 95 percent threshold acknowledge

8    that coders may make mistakes?

9            MS. OBEREMBT:  Objection.  Foundation.

10        Calls for speculation.  Asked and answered, too.

11            THE WITNESS:  I don't remember that

12        definition, that the IRR step acknowledges that

13        coders might make mistakes.  But it's -- so I

14        kind of don't have more to say there.

15    BY MS. MADDOUX:

16        Q.    Why not have a 100 percent standard?

17            MS. OBEREMBT:  Objection.  Foundation.

18        Calls for speculation.

19            THE WITNESS:  I don't remember ever

20        talking about -- or talking to my colleagues

21        about the percent -- the acceptable percentage

22        for the standard.

23    BY MS. MADDOUX:

24        Q.    What are some reasons why a primary

25    coder's IRR may be 95 percent or less?



2570

Page 82

1            Do you see that?

2        A.    Yes.

3        Q.    If you skip to the second paragraph, it

4    says, "The contractor's team of certified trained

5    medical record reviewers shall" -- excuse me.  Strike

6    that.

7            Do you see -- do you see the paragraph

8    that starts, "The contractor's team of certified

9    trained medical record reviewers"?

10        A.    Yes.

11        Q.    Midway through this paragraph, it says,

12    "There shall be one lead (senior coder) reviewer for

13    every five primary reviewers, and the lead reviewer

14    shall be qualified to mediate coding decisions as

15    appropriate between senior and primary coders."

16            Do you see this?

17        A.    Yes.

18        Q.    What does "mediate coding decisions" mean?

19        A.    So the record would go to the senior coder

20    if the primary review didn't show the ICD-9 code.

21    And so if the senior coder could find it and the

22    primary coder would disagree, there would be an

23    opportunity to -- to mediate that decision.

24            I think that's one example of the

25    mediation of a coding decision.  And that's not



Page 83

1    something that I would have -- yeah, I -- and -- and

2    that would be work that's happening on their end.  So

3    that's my memory of it.

4         Q.   So one scenario may be -- one scenario

5    necessitating a mediation of coding decision may be

6    where the two coders, the primary and senior coder,

7    disagreed about whether it was supported by the

8    medical record?

9         A.   Yes.

10        Q.   In your experience as the contracting

11   officer's representative, or the -- the government

12   task leader provide the audit, did you have an

13   understanding that coding was subjective?

14             MS. OBEREMBT:  Objection.  Vague.

15             THE WITNESS:  I don't know that that's a

16        term I would have heard used to describe coding,

17        but -- yeah, I -- I don't know -- I don't know

18        the answer to that, but it's not -- I don't

19        remember it being a term that would be used.

20   BY MS. MADDOUX:

21        Q.   In your experience as the contracting

22   officer representative or government task leader

23   provide the audit, do you agree that two coders may

24   have different interpretations of the coding

25   guidance?



Page 84

1            MS. OBEREMBT:  Objection.  Calls for

2        speculation.

3            THE WITNESS:  I think that's accurate, to

4        say that coders could have different

5        interpretations of the coding guidance.

6   BY MS. MADDOUX:

7        Q.   In your experience working with trained

8   coders, did you think it was not uncommon for two

9   certified coders to disagree on whether or not a

10  particular diagnosis code was supported by a medical

11  record?

12            MS. OBEREMBT:  Objection.  Foundation.

13            THE WITNESS:  I don't remember that it was

14        common.  But again --

15  BY MS. MADDOUX:

16        Q.   Do you recall --

17        A.   Sorry.  I was going to say, again, it's

18  been a long time since I've worked on that.  But I

19  don't remember that it was common.

20        Q.   Do you recall that disagreements among two

21  certified coders occurred?

22            MS. OBEREMBT:  Objection.  Foundation.

23            THE WITNESS:  I don't remember specific

24        instances, but I do know that, yes, there could

25        be disagreements about coding.



2573

Page 85

1    BY MS. MADDOUX:

2         Q.   And do you know why two certified coders

3    could reach different results?

4              MS. OBEREMBT:  Objection.  Foundation.

5         Calls for speculation.

6              THE WITNESS:  No.  It's something that I

7         would have been more aware of when I was working

8         on this project, and I -- I don't remember that

9         right now.

10   BY MS. MADDOUX:

11        Q.   In situations where two certified coders

12   disagreed, would the mediation exercise work to

13   resolve those disagreements?

14             MS. OBEREMBT:  Objection.  Calls for

15        speculation.

16             THE WITNESS:  I -- I don't remember the

17        outcome of that kind of mediation.

18   BY MS. MADDOUX:

19        Q.   In the situation where two certified

20   coders have a difference of opinion, would you agree

21   that neither one is right or wrong?

22             MS. OBEREMBT:  Objection.  Vague.  Calls

23        for speculation.  Lack of foundation.

24             THE WITNESS:  Sorry, can you repeat the

25        question?



Page 86

1   BY MS. MADDOUX:

2        Q.   In a situation where two certified coders

3   have a difference of opinion about whether or not a

4   diagnosis code is supported by the medical record,

5   would you agree that neither one is necessarily right

6   or wrong?

7             MS. OBEREMBT:  Repeat the objections.

8             THE WITNESS:  I -- I don't think I know

9        enough about coding to answer that question.  I

10       think it would depend on the coders and the code

11       in question.

12  BY MS. MADDOUX:

13       Q.   The last sentence --

14            MS. OBEREMBT:  We've been -- excuse me.

15            We've been going another hour, and I think

16       it's time for a break.

17            MS. MADDOUX:  Yeah, I just have one more

18       question on this document.  If we can just

19       finish this page, it should take less than two

20       minutes --

21            MS. OBEREMBT:  Sure.

22            MS. MADDOUX:  -- if that's okay, Laurie.

23            MS. OBEREMBT:  Yeah.  Sounds good.

24  BY MS. MADDOUX:

25       Q.   So the last sentence of -- if you turn --



Page 89

 1        A.   Yes.

 2        Q.   Do you know if this document was submitted

 3   to you as the contracting officer's representative,

 4   or COTR, for HMS's contract for payment year 2009

 5   RADV audit?

 6             MS. OBEREMBT:  Objection.  Asked and

 7        answered.

 8             THE WITNESS:  We -- we saw an earlier

 9        document that showed Sam Jenkins as the COR for

10        the contract.  I -- I don't remember if this

11        predates or -- predates that.

12   BY MS. MADDOUX:

13        Q.   Under the "Submitted By," it says it was

14   submitted by Jeanne Cress, or Jeanne Cress, at HMS.

15   Do you see that?

16        A.   I do, yes.

17        Q.   And then this is a monthly progress report

18   for the time period August 1st, 2011, to August 30th,

19   2011, correct?

20        A.   Yes.

21        Q.   Do you know what the purpose of this

22   document is?

23        A.   The progress report for the work that HMS

24   had done in August.

25        Q.   Were you responsible for reviewing the



2576

Page 90

```
 1    monthly progress report?
 2         A.   Yes.  I usually shared them with others on
 3    our team as well.
 4         Q.   I want to direct you to page 4 of
 5    Exhibit 1198.
 6         A.   Mm-hmm.
 7         Q.   In the last row, it says "3.B.5."  Do you
 8    see that?
 9         A.   I do.
10         Q.   And that says "Medical record review
11    (second level initial validation review) including
12    weekly IRR testing, coding discussions, and findings
13    reports."  Do you see that?
14         A.   I do, yes.
15         Q.   And then in the next box, if you scroll to
16    page 5, the box continues, and it says, "The final
17    overall HMS IRR is 94.97 percent for the national
18    2009 audit."  Do you see that?
19         A.   I do.
20         Q.   Does this suggest that the IRR was lower
21    than the 95 percent threshold we talked about
22    earlier?
23         A.   It's not 95 percent.  I don't know -- yes,
24    it's a different number than 95 percent.
25         Q.   Does the fact that the agreement rate is
```



Page 91

1    lower than 95 percent surprise you?

2         A.   Does it surprise me?  It's -- it's notable

3    here that it's different.  But I -- I don't remember

4    how -- how it was addressed in 2011.

5              MS. MADDOUX:  And we're going to post a

6         new document to AgileLaw:  Tab 37, please.  And

7         this document, for the record, is Bates-labeled

8         USBP000045745.

9              And this will be Exhibit 1199.

10        (Exhibit 1199 was marked for identification.)

11   BY MS. MADDOUX:

12        Q.   Do you see this document up on the screen?

13        A.   I do.

14        Q.   And this appears to be a June 22nd, 2010,

15   e-mail from you to Lateefah Hughes, copying Jennifer

16   Harlow and Bryant Hall at HMS.  Is that correct?

17        A.   Yes.

18        Q.   And the "Subject" line reads, "Primary

19   coder inability to view coversheet."  Do you see

20   that?

21        A.   Yes.

22        Q.   Do you know what the coversheet is?

23        A.   I don't remember now.  I -- I would

24   have -- I don't remember now, and in this context.

25   It's something I would have known then.



Page 92

1          Q.   In the second paragraph of your e-mail, it

2     says, "Primary coders have no access to coversheets,

3     which may otherwise help lead them to the HCC being

4     validated."  Do you see that?

5          A.   Yes.

6          Q.   Do you recall if the coversheets included

7     information about what HCC the plan had submitted?

8          A.   I don't recall what the coversheet

9     displayed.

10         Q.   Do you remember this issue with the

11    primary coders not having access to the coversheets?

12         A.   I don't recall it.

13         Q.   You then write:  "Example:  At first

14    glance, a record was illegible to the primary coder,

15    escalation reviewer, and senior coder.  However, when

16    the senior coder checked the cover sheet she or he

17    was able to locate the HCC on the record."  Do you

18    see that?

19         A.   I do.

20         Q.   Do you recall what you mean by this?

21         A.   I don't recall this specific episode.

22    I -- I think the sentence seems self-explanatory.

23         Q.   So does this mean that the primary coder,

24    doing their blind review of the record, was unable to

25    find the diagnosis code in the medical record?



Page 116

1                    CERTIFICATE OF REPORTER

2           I, Karen K. Kidwell, Registered Merit Reporter

3    and Notary Public for the State of Maryland at Large,

4    do hereby certify:

5           That the foregoing deposition was taken

6    remotely before me on the date and at the time stated

7    on page 1 of this transcript; that the deponent was

8    duly sworn to testify to the truth, the whole truth

9    and nothing but the truth; that the testimony of the

10   deponent and all objections made at the time of the

11   examination were recorded stenographically by me and

12   were thereafter transcribed; that the foregoing

13   deposition as typed is a true, accurate and complete

14   record of the testimony of the deponent and of all

15   objections made at the time of the examination to the

16   best of my ability.

17          I further certify that I am neither related to

18   nor counsel for any party to the cause pending or

19   interested in the events thereof.

20          Witness my hand this 17th day of May, 2022.

21

22   _____
                Karen K. Kidwell,
23              Registered Merit Reporter
                Notary Public
24              State of Maryland at Large
                My Commission expires:
25              April 14, 2025



2580

**EXHIBIT D-95**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel.,)

BENJAMIN POEHLING,                )

                                  )

            Plaintiffs,           )

                                  )

vs.                               ) Civil Action No.

                                  ) 16-08697 FMO

UNITEDHEALTH GROUP, INC., et al., )

                                  )

            Defendants.           )

_____/


VIDEOTAPED DEPOSITION OF PATRICIA BRENNAN

(Taken Virtually by Plaintiff)

Tuesday, September 12th, 2023

11:34 a.m. EDT


Reported Stenographically by



2582

Page 130

1        Q.    What is IRADS?

2        A.    It was Optum's submission system for

3   RAPS submissions.

4        Q.    And was this also the system to which

5   providers would submit claims data to Optum?

6        A.    I don't think that's accurate.  I think

7   the claims data that providers submitted went to

8   the plan, and then the plan submitted that data to

9   Optum, which then got put into IRADS.

10       Q.    Okay.  And then Optum would use IRADS

11   to submit that data through RAPS to CMS?

12       A.    Correct.

13       Q.    And you never would refer to these as

14   "provider-reported diagnosis codes"; is that

15   correct?

16       A.    I don't know what that refers to.

17       Q.    Okay.  Beyond diagnosis codes that came

18   to the plan from providers, were there other

19   sources of diagnosis codes submitted by Optum on

20   behalf of M&R?

21       A.    Yes.

22       Q.    And what other sources of -- what were

23   the other sources of diagnosis codes that Optum

24   submitted on behalf of M&R to CMS?

25       A.    Codes that came from retrospective



2583

Page 131

1    chart review and codes that came from prospective

2    programs.

3          Q.    Okay.

4          MS. LIKOFF:  Since we promised our

5          videographer that we would take a break, and

6          I don't want to sort of move into a whole new

7          topic, this may be a good time for us to

8          break for lunch.  So if we could go off the

9          record.

10          THE VIDEOGRAPHER:  Off the record,

11          2:54 p.m.

12                (Recess taken.)

13          THE VIDEOGRAPHER:  On the record,

14          3:42 p.m.

15          MS. LIKOFF:  Thank you.

16    BY MS. LIKOFF:

17          Q.    Welcome back, Ms. Brennan.

18                We were just starting -- before the

19    break, I was just starting to ask you about Optum's

20    chart review program.

21                Is it correct that chart review is a

22    process that Optum employed to collect medical

23    records from providers, employ coders to review

24    those medical records to identify all diagnoses

25    documented in those medical records, and then



Page 132

1    submit additional diagnoses to CMS for risk

2    adjustment payments?

3              Is that an accurate description of the

4    chart review process?

5         A.    Yes.

6         Q.    And throughout our conversation this

7    afternoon, I may refer to the chart review program

8    as "CR."  You'll understand that I'm talking about

9    the chart review program?

10        A.    Yes.

11        Q.    Great.

12             And you'd agree that the goal of the

13   chart review program was to identify additional

14   diagnosis codes in beneficiaries' medical records

15   to submit to CMS?

16        A.    Yes.

17        Q.    And it's correct that those additional

18   diagnosis codes would lead to increased

19   reimbursement from CMS to the MAO?

20        A.    In some instances, yes.

21        Q.    Were there instances in which those

22   additional diagnosis codes would not increase

23   reimbursement to the MAO?

24        A.    Yeah.  Sometimes you could find a code

25   and it would already be reported somewhere else, so



Page 133

1    then it wouldn't generate any additional revenue.

2         Q.    Okay.

3         A.    Only if it was new.

4         Q.    And Optum performed the chart review

5    program for its clients; is that correct?

6         A.    Yes, if a client purchased that

7    service, yes.

8         Q.    And one of those clients was M&R,

9    correct?

10        A.    Correct.

11        Q.    Do you remember what time period Optum

12   performed the chart review program for M&R?

13        A.    I mean, since I started until I left.

14        Q.    Okay.  And did Optum perform chart

15   review for any non-UnitedHealth claims?

16        A.    Yes.

17        Q.    I know that when we were speaking about

18   your background earlier this morning, you explained

19   that there was a time period in which you had

20   involvement with the chart review program.

21             Can you explain in a little bit more

22   detail what your involvement with the chart review

23   program was?

24        A.    You mean when I was leading

25   retrospective chart review, is that what you're



Page 134

1    referring to?

2         Q.    Let's start there.

3         A.    Yes.  So my involvement was, you know,

4    as I mentioned earlier, like working with our

5    existing clients on launching their program because

6    it was an annual program that happened every year,

7    and I would work with them on launching, talk to

8    them about what they wanted to achieve, and present

9    options to them.  They would select what they

10   wanted to pursue, and then we would launch the

11   program.  And then I would monitor the program to

12   see if it was in line with what we expected it to

13   be and report out to them periodically on the

14   program performance.

15             Oh, sorry.

16        Q.    No, no, please finish your answer.

17        A.    That was for existing clients that

18   already purchased the service.

19             And then I would also go out with our

20   sales team to prospective clients and explain the

21   program to them, how it worked, because they were

22   interested in potentially purchasing the program.

23        Q.    I'd like to break down what you just

24   said a little bit.  When we were talking about your

25   work with respect to existing clients, you



Page 147

1    recall for sure.

2         Q.    Okay.  During your time at Optum, did

3    you come to have any understanding regarding the

4    general rate of unsupported codes and diagnostic

5    data submitted by providers?

6              MR. ABASCAL:  Object to form.

7              THE WITNESS:  I think that the general

8         error rate was published by CMS as part of

9         the national sample of the -- what they call

10        the "IPM audit" that they did across plans.

11        So I remember being aware of that at the

12        time.

13   BY MS. LIKOFF:

14        Q.    Do you recall what that sort of

15   published rate was?

16        A.    I don't recall what the rate was.

17        Q.    Do you recall whether there were any

18   other sources for your understanding regarding the

19   general rate of unsupported codes in diagnostic

20   data submitted by providers?

21        A.    No, I don't recall.

22        Q.    Another one of the risk adjustment

23   programs that Optum performed, at least for a

24   period of time, was a program called "claims

25   verification," correct?



Page 148

1         A.    Correct.

2         Q.    And you're familiar with claims

3    verification?

4         A.    Yes.

5         Q.    And today I may refer to the claims

6    verification as "CV."  If I refer to it as "CV" or

7    the "CV program," you'll understand that I'm

8    referring to claims verification?

9         A.    Yes.

10        Q.    Great.

11              And claims verification was a program

12   that was implemented to identify diagnosis codes

13   that were previously submitted to CMS but were not

14   documented in the medical record for that

15   corresponding date of service for charts reviewed

16   as part of the chart review program.  Is that an

17   accurate description?

18        A.    Yes.

19        Q.    And ultimately, if a code, a diagnosis

20   code went through the CV process and a CV coder did

21   not find support for the code in the medical

22   record, then Optum would submit those codes as "CV

23   deletes"; is that correct?

24        A.    Correct.

25        Q.    I'd like to understand a little bit



Page 149

1    more about what your role was with respect to the

2    claims verification program.

3         A.    So I participated in the development

4    and enhancements that came with Phase II and III,

5    and then discussing it with clients, reporting out

6    on the results and monitoring the program.

7         Q.    Would you describe yourself as the

8    leader on CV during at least some period of time?

9         A.    I would say I was working with our

10   legal team on developing the program, continuing to

11   enhance and develop the program.

12        Q.    Do you recall who from the legal team?

13             THE WITNESS:  Can I answer that?

14             MR. ABASCAL:  You can just provide the

15        names.  Just don't provide any substance of

16        communications.

17             THE WITNESS:  So Tim Trujillo,

18        Keith Dobbins, Dave Thomas.

19   BY MS. LIKOFF:

20        Q.    Were there nonlawyers that you were

21   working with in developing the CV program?

22        A.    Not in developing it, but in

23   communicating, you know, the approach.  Once we

24   finalized an approach, then I would work with our

25   other teams to develop the process and what needed



```
 1                CERTIFICATE OF NOTARY PUBLIC

 2

 3          I, Amy A. Brauser, RPR RMR CRR, the officer

 4    before whom the foregoing deposition was taken, do

 5    hereby certify that the witness was duly sworn by me

 6    prior to the taking of the foregoing deposition; that

 7    the testimony of said witness was taken by me to the

 8    best of my ability and thereafter reduced to

 9    typewriting under my direction; that I am neither

10    counsel for, related to, nor employed by any of the

11    parties to the action in which this deposition was

12    taken, and further that I am not a relative or

13    employee of any attorney or counsel employed by the

14    parties thereto, nor financially or otherwise interest

15    in the outcome of the action.

16

17       This is the 15th day of September, 2023.

18

19              Amy A Brauser

20              Amy A. Brauser, RPR RMR CRR

                Notary Public

21              for the Commonwealth of Virginia

22

23    Notary Registration No.: 7675529

24    My Commission Expires:  January 31, 2024

25
```



**EXHIBIT D-96**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )



CONFIDENTIAL

Videotaped Rule 30(b)(6) Deposition of United States

Designee 5 by CHRISTOPHER GILES BRESETTE

Given Remotely

Wednesday, May 31, 2023

10:34 a.m. Eastern




Reported by:  Karen K. Kidwell, RMR, CRR




Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 17

1          Q.    Okay.  And you're prepared to testify

2     about Topic 19 on behalf of the government today?

3          A.    Yes.

4          Q.    If you move down to page 27 of the PDF, I

5     want you to take a look at Topic 22, please.

6                And do you recognize Topic 22 as one of

7     the topics you've been designated to testify on

8     behalf of the OIG today?

9          A.    Yes.

10         Q.    And you're prepared to testify on that

11    topic on OIG's behalf?

12         A.    I am.

13         Q.    So, Mr. Bresette, you have not been

14    deposed in this litigation -- or at all, correct?

15         A.    Correct.

16         Q.    Just want to do a little bit -- get a

17    little bit of background on your -- your role.  What

18    is your -- what is your current role, your current

19    position?

20         A.    My current role with OIG, I am the

21    director of Medicare Part C audits.

22         Q.    And who are your -- what are your

23    responsibilities as it relates to the topics that

24    you're prepared to testify about today?

25         A.    I have to ask you --



Page 18

```
 1              MS. OBEREMBT:  Objection.  Vague.
 2    BY MS. SCHEFFLER DO:
 3         Q.   What are some of your responsibilities as
 4    the OIG director of Medicare Part C audits at OIG?
 5         A.   All of the audits for Medicare Part C,
 6    from beginning to end.  I hope --
 7         Q.   That would -- I'm sorry.  Go ahead.
 8         A.   No, I got ahead of myself.  My apologies.
 9         Q.   And that would include the OIG RADV,
10    audits as that's term's been defined in Exhibit 1435?
11         A.   Yes.
12         Q.   Who are your direct reports, if any?
13         A.   You said director before me?
14         Q.   I'm sorry.  Your direct reports?
15         A.   And my apologies.  I honestly have bad
16    ears, so I do not mean any offense.  Could you
17    rerepeat that question again, please?  We're going to
18    turn up the volume a little too.
19         Q.   Sure.  And I'll try to keep my voice up as
20    well.
21              Who are your direct reports, if any?
22         A.   Who I report to?
23         Q.   Who reports to you?
24         A.   Reports to me?  Steve Garrison reports to
25    me.
```



Page 167

1          am not aware of any CMS requirement to -- for

2          the MAOs to review all of the diagnosis codes

3          prior to submission.

4     BY MS. SCHEFFLER DO:

5          Q.   Let's move on to Topic 18.  And if it's

6     helpful, you can look at Exhibit 1435, which is again

7     the amended notice, 30(b)(6) notice that you are

8     testifying pursuant to today.

9               Topic 18 is on page 25 of the PDF of

10    Exhibit 1435.

11         A.   Okay.

12         Q.   Okay.  Are you prepared to testify on

13    behalf of OIG on Topic 18 today?

14         A.   Is your understanding that Topic 18

15    conforms to the relevant time period of 2004 to May

16    of 2017?  May 16th of 2017?

17         Q.   It does, yes.

18         A.   Yes, I am prepared to testify on that.

19         Q.   You understand what Topic 18 covers?

20         A.   I believe I do.

21         Q.   We've already confirmed that "MAOs" stands

22    for Medicare Advantage Organizations, right?

23         A.   Could you repeat that, please?  My bad

24    ears again, please.  Sorry.

25         Q.   We've already established that "MAOs"



Page 168

1    refers to Medicare Advantage Organizations, right?

2         A.   Yes.  Yes.

3         Q.   And do you understand that "diagnosis

4    codes" refers to ICD-9 or ICD-10 diagnosis codes?

5         A.   I'm -- I thank you for your patience.

6    It's -- I'm having -- there's a -- it's on me; it's

7    on my ears.  Could you say that question one more

8    time, please?  I don't mean any offense.

9         Q.   No problem.

10             Do you understand that "diagnosis codes,"

11   as used in Topic 18, refers to ICD-9 or ICD-10 --

12        A.   Yes, I do.

13        Q.   -- diagnosis codes?

14        A.   Yes.

15        Q.   So outside of the audits discussed

16   earlier, has the OIG analyzed whether the diagnosis

17   codes reported by providers, the MAOs, are supported

18   by medical records in the relevant time period?

19        A.   Outside of the audits that we performed,

20   that we've discussed, am I aware -- is the OIG aware

21   that -- about the accuracy of diagnosis codes as

22   reported by providers?  In order to do that, we would

23   have to review the medical records supporting them to

24   determine whether they are accurate or not.  And

25   outside of those audits, we did not perform reviews



Page 169

1    of medical records to determine whether diagnosis

2    were supported or not.

3              At least I'm not aware of any.

4         Q.    Okay.  So the answer to my question

5    is "no," then?

6         A.    The answer to your question is -- is no.

7         Q.    Okay.

8         A.    Based upon the answer -- the qualification

9    that I provided.

10        Q.    And apart from, again, the audits we've

11   already discussed, the RADV audits we've already

12   discussed, did OIG consider any analysis of whether

13   the diagnoses codes reported by providers to MAOs are

14   supported by medical records?

15        A.    Did we consider -- did you ask, did we

16   consider whether the -- the diagnosis were reported

17   by MAOs -- reported by providers to MAOs were

18   accurate?

19        Q.    I asked whether OIG considered any

20   analysis of whether the diagnosis codes reported by

21   providers to MAOs are supported by medical records.

22        A.    Make sure I answer this correctly, and all

23   questions.

24        Q.    Appreciate that.

25        A.    -- regarding the accuracy.



Page 185

```
 1                        CERTIFICATE

 2

 3        I, KAREN K. KIDWELL, Registered Merit Reporter,

 4    and Certified Realtime Reporter, do hereby certify

 5    that prior to the commencement of the examination,

 6    the deponent was remotely sworn to testify to the

 7    truth, the whole truth under penalty of perjury.

 8        I DO FURTHER CERTIFY that the foregoing is a

 9    verbatim transcript of the testimony as taken

10    stenographically by me at the time, place and on the

11    date hereinbefore set forth, to the best of my

12    ability.

13        I DO FURTHER CERTIFY that I am neither a

14    relative nor employee nor attorney nor counsel of any

15    of the parties to this action, and that I am neither

16    a relative nor employee of such attorney or counsel,

17    and that I am not financially interested in this

18    action.

19

20                        Karen K Kidwell

21                        Karen K. Kidwell
                          Registered Merit Reporter
22                        Certified Realtime Reporter
                          Notary Public
23

24

25
```



2599

**EXHIBIT D-96A**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

_____
                          )
UNITED STATES OF AMERICA   )
ex rel. BENJAMIN POEHLING, )
                          )
        Plaintiff,         )    No. CV 16-08697 FMO
                          )
vs.                        )
                          )
UNITEDHEALTH GROUP, INC.,  )
et al.,                    )
                          )
        Defendants.        )
_____)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Volume 2
DEPOSITION OF CHRISTOPHER BRESETTE
As 30(b)(6) Designee 5 of
The United States

(Via Zoom Videoconference)
August 9, 2023

Reported by:  John L. Harmonson, RPR
Job No. 1001591



Page 30

1    coder to take another look to determine whether

2    they agreed with the first senior coder who

3    identified a new HCC that had not been submitted by

4    the MAO; correct?

5        A.    Correct.

6        Q.    Why was the second senior coder -- why

7    wasn't that reviewed blind as well?

8        A.    This was a process that we believed was

9    reasonable to accomplish our audit objective.

10       Q.    Would you agree that coders can

11   sometimes miss diagnosis codes on a blind review?

12           MS. OBEREMBT:  Objection; calls for

13   speculation.

14           THE WITNESS:  I would have to speculate

15   on that.  We've asked the senior coders to

16   determine whether they believe something is -- if a

17   diagnosis is supported or not.

18   BY MS. SCHEFFLER DO:

19       Q.    In your preparation for today and

20   reviewing all of these audits, you're not aware of

21   any instances where the first senior coder

22   conducting a blind review determined that an HCC



Page 31

1  was not validated but OIG ultimately determined

2  that it in fact was validated?

3       A.    I'm not going to say that it did or did

4  not happen.  It very well may have happened.  I did

5  not study the results of the first senior coder and

6  the second senior coder.

7       Q.    We can go back to that and look at some

8  specific examples to refresh your recollection.

9       A.    Absolutely.

10      Q.    So if the second senior coder determines

11 that the HCC that the first senior coder -- let me

12 restart that.

13           If the second senior coder determines

14 that a particular HCC is validated despite the

15 first senior coder determining that it was not

16 supported, then it escalated to a physician to

17 independently review the medical record and make a

18 final determination.  Is that right?

19      A.    It's mostly correct.  There were

20 oftentimes where the senior coders -- I shouldn't

21 say often.  There was the opportunity and there

22 were times that existed that either the first



Page 32

1   senior coder or the second senior coder asked for

2   assistance with that physician reviewer to make the

3   determination.

4            There were, as you say, instances in

5   which the physician reviewer would review that.  I

6   believe independently, but I don't want to say that

7   it was exclusively independently.  A lot of times I

8   believe it was in consultation with the senior

9   coder to make that determination.

10       Q.    So are you saying that the example that

11  I gave, that's not the only time a physician would

12  weigh in?

13       A.    Correct.

14       Q.    But you're not -- you're agreeing that

15  if the second senior coder found support in that

16  example, then a physician would independently

17  review the medical record to make the final

18  determination?

19       A.    I would agree with that.

20       Q.    Was the physician review blind as well?

21       A.    No, it was not.  And independently is

22  correct.  So my apologies.  I see "independently"



Page 33

1    written in the report.  There's a lot of steps to

2    this, and so I did not want to mislead you by any

3    means.  So my apologies.

4         Q.    No problem.

5              Okay.  I'm going to shift gears just a

6    little bit.  So in May, you had testified that for

7    each OIG audit, OIG issues a draft report to the

8    MAO being audited.  Is that correct?

9         A.    That is correct.

10        Q.    And OIG permits the MAO to point to

11   documentation that it believes supports the HCCs at

12   issue.  Is that right?

13        A.    That is correct.

14        Q.    And OIG also allows the MAOs to submit

15   additional medical records or documentation that it

16   believes supports the HCCs.  Is that right?

17        A.    Yes, that is correct.  They can

18   submit --

19        Q.    And is it correct --

20        A.    I'm sorry.  I did not mean to speak over

21   you.

22              Yeah, it is correct that we allow the



Page 122

1                    C E R T I F I C A T E

2

3    DISTRICT OF COLUMBIA

4              I, JOHN L. HARMONSON, a Notary Public

5    within and for the District of Columbia, do hereby

6    certify that CHRISTOPHER BRESETTE, the witness

7    whose deposition is hereinbefore set forth, was

8    duly sworn by me and that such deposition is a true

9    record of the testimony given by such witness.

10             That before completion of the

11   proceedings, review and signature of the transcript

12   was reserved.

13             I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17             IN WITNESS WHEREOF, I have hereunto set

18   my hand this 11th day of August, 2023.

19

                    *John L. Harmonson*

20        _____

21        JOHN L. HARMONSON, RPR

          My commission expires: 04/14/26

22



**EXHIBIT D-97**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA ex rel.  ) No. 16-08697 FMO

BENJAMIN POEHLING,                )

                                  )

        Plaintiffs,               )

                                  )

v.                                )

                                  )

UNITEDHEALTH GROUP, INC., et al., )

                                  )

        Defendants.               )

_____  )



CONTAINS PORTIONS OF ATTORNEYS' EYES ONLY


Videotaped Deposition of

SEAN CAVANAUGH

Given Remotely

Thursday, February 17, 2022

9:02 a.m.



Reported by:  Karen K. Kidwell, RMR, CRR



Magna Legal Services

866-624-6221

www.MagnaLS.com



2608

Page 23

1    Medicare Advantage plans?

2          A.    No.

3          Q.    Nothing to do with what's known as the

4    coding intensity adjustment, the -- or the

5    fee-for-service adjustment for the RADV audits?  None

6    of that was within your purview at the Innovation

7    Center?

8          A.    No.

9          Q.    How long were you at the Innovation

10   Center?

11         A.    February 2011 to March or April of 2014.

12         Q.    What was your next role -- what was the --

13   what was the role that you took in March or April of

14   2014 at CMS?

15         A.    I became deputy administrator and director

16   of the Center for Medicare.

17         Q.    What is the Center for Medicare?

18               MS. KRIEG:  Object to form.

19               THE WITNESS:  Center for Medicare is one

20         of several centers within CMS.  It specifically

21         has responsibility for the rule-making around

22         payment and regulation of Part A, B, C, and D of

23         Medicare.

24   BY MR. GALLAGHER:

25         Q.    Who was your predecessor as the director



Page 24

1    of the Center for Medicare?

2         A.    Jon Blum.

3               (Reporter requests clarification.

4         A.    Jon Blum, J-o-n, B-l-u-m.

5         Q.    And did you take over directly for him, or

6    was there an interim director between you?

7         A.    I believe the -- a woman named Elizabeth

8    Richter, who was a career civil servant, acted as the

9    acting center director between when Jon was appointed

10   and when I was appointed.

11        Q.    Okay.  Explain how it is you made the move

12   to be the director of the Center for Medicare.  What

13   was the reason for that change in position?

14        A.    Jon had been promoted from his position at

15   the Center for Medicare, so it created a vacancy.  As

16   I said, it is common, if there isn't an immediate

17   successor -- these are political -- excuse me --

18   politically appointed positions.  If there's not an

19   immediate successor, it's often common to have a

20   career civil servant fill in, which is what happened.

21              I threw my name in the hat, and I

22   interviewed with the administrator, Secretary's

23   Office with the White House, and I was selected for

24   the position.

25        Q.    So your position as the director of the



Page 25

1   Center for Medicare was a political appointment,

2   essentially, from the president, right?

3        A.   That's correct.  The presidential --

4   Presidential Personnel Office had to approve it, yes.

5        Q.   And then you were confirmed by the Senate?

6        A.   No, it's not a Senate confirm.  It's

7   political, but not Senate confirm.

8        Q.   As the director for the Center for

9   Medicare, were you responsible for overseeing the

10  regulation and payment of Medicare fee-for-service

11  providers, privately administered Medicare health

12  plans, and the Medicare prescription drug program?

13       A.   Yes.

14            MS. KRIEG:  Object to form.

15            THE WITNESS:  Sorry.

16            Yes.

17  BY MR. GALLAGHER:

18       Q.   And basically -- I listened to a podcast

19  you did at Aledade, and I think you described your

20  job as essentially running Medicare.  Is that how you

21  would describe it?

22       A.   That's how I describe it to lay people.

23  Technically, there are other aspects of the program.

24  There's a Center for Program Integrity, a Center for

25  Clinical Standards and Quality.  But what most people



Page 26

1    perceive as Medicare was mostly under my

2    jurisdiction.

3         Q.    And as the director for the Center for

4    Medicare, there you did have responsibility for

5    regulation and oversight of the payment mechanisms

6    for Medicare Advantage plans, that's the subject of

7    this litigation.  Right?

8         A.    Yes.

9         Q.    Things like risk adjustment, and the

10   models that are used to achieve it?

11        A.    Yes.

12        Q.    When did you leave government employment

13   at the Center -- at CMS?

14        A.    January of 2017, whatever date was

15   inauguration date.  Noon on the day of inauguration

16   date, January 2017.

17        Q.    As a -- as a political appointment, your

18   appointment ended with the administration?

19        A.    That's correct.

20        Q.    So some of your colleagues have returned

21   to CMS under the new administration.  Have you

22   considered doing that?  Or do you have any plans to

23   do that?

24        A.    I did consider it.  I no longer have

25   plans.



Page 27

1       Q.   So you're happy at Aledade, and that's

2   where you are going to stay for the near term?

3       A.   Yes.

4       Q.   When you took the position as the -- as

5   the director for the Center for Medicare, did you

6   receive any kind of transition briefing on things

7   like the -- the risk-adjustment audits that are

8   conducted by the Center for Medicare, or CMS, or --

9   or the coding intensity, or coding intensity

10  adjustment, or things like that?

11           MS. KRIEG:   Object to form.

12           THE WITNESS:   Yes.

13  BY MR. GALLAGHER:

14      Q.   What was the nature of that -- that

15  transition briefing?  Who gave it to you, and what

16  form did it take?

17      A.   Specifically on those issues you

18  enumerated?  Because I had numerous transitional

19  briefings.

20      Q.   Yes.  Specifically on issues around the

21  payment programs for Medicare Advantage plan and --

22  and things associated with risk adjustment.

23           MS. KRIEG:   Object to form.

24           THE WITNESS:   They would have been

25      organized by my back then acting deputy director



Page 28

1          on that side, Cynthia Tudor.  So she would have

2          scheduled and arranged them and prepared them.

3               Most things related to Medicare Advantage

4          payment, the actual briefing would have been

5          conducted by Cheri Rice, or one of her staff

6          under her direction.

7     BY MR. GALLAGHER:

8          Q.   And would the briefing -- or did the

9     briefing involve, you know, PowerPoint presentations,

10    or written briefing memos?

11         A.   I have no specific recollection, but it --

12    yes.

13         Q.   Just to get a sense of the -- of the

14    organizational structure you had at the Center for

15    Medicare, you were the director, and then you had

16    some deputy directors who served with you that had

17    specific areas of responsibility; is that right?

18         A.   Yes.

19         Q.   And you mentioned Cynthia Tudor.  What was

20    her area of responsibility at the deputy director?

21         A.   Everything under Part C and Part D.

22         Q.   So that would include everything that had

23    to do with payment programs for Medicare Advantage

24    plans under Part C?

25         A.   Yes.



2614

Page 29

1        Q.   And then you mentioned that Cheri Rice is

2   somebody who had some responsibility for payment

3   programs for Medicare Advantage plans.  What was her

4   role?

5        A.   She was a group director for MPPG,

6   which -- I don't remember what it stands for exactly,

7   but it's Medicare Plan Payment Group, or something

8   like that -- under Cynthia Tudor.

9        Q.   So in terms of direct responsibility for

10   payment programs, that really fell to Cheri Rice?

11        A.   Yes.

12        Q.   While you were at CMS, did you have any

13   responsibilities in connection with lawsuits like

14   this one?

15             MS. KRIEG:  Object to form.

16             THE WITNESS:  I'm not sure what you

17        meant -- what you mean.  Did I have

18        responsibilities for them?  I'm not an attorney,

19        if that's what you're asking.

20   BY MR. GALLAGHER:

21        Q.   Well, while you were at CMS -- and in

22   particular, I'll focus on your -- your tenure as the

23   director of the Center for Medicare -- did you have

24   any responsibility for coordinating with the lawyers

25   who are pursuing this litigation on behalf of the



Page 30

1   government?

2        A.   Again, I'm not sure I understand the

3   question.  I didn't -- I did -- I was informed of the

4   litigation by counsel.

5        Q.   And as the director for the Center for

6   Medicare from 2014 to early 2017, did you coordinate

7   with the lawyers handling this litigation for the

8   government?

9             MS. KRIEG:  Object to form.

10            THE WITNESS:  Yeah.  I apologize.  I'm

11        struggling with the word "coordinate."  I'm not

12        an attorney.  I would not have coordinated a

13        litigation strategy, if that's what you're

14        asking.

15   BY MR. GALLAGHER:

16        Q.   Let me ask a related question, then.

17             As the director for the Center for

18   Medicare from 2014 to early 2017, did you meet with

19   the lawyers who were handling this litigation for the

20   government?

21        A.   I do recall having met with attorneys from

22   DOJ to be informed of this litigation, yes.

23        Q.   And did you provide support or materials

24   to the lawyers handling this litigation for the

25   government?



Page 31

1         A.    I -- I believe -- so I don't --

2              MS. KRIEG:  I'm just going to again

3         caution you not to reveal any privileged

4         information that was sought or received from

5         counsel.

6              THE WITNESS:  Thank you.

7              I will solely say that my understanding

8         was any records I had were to be made available,

9         to be retained and made available for the

10        litigation.  But I didn't need to do anything in

11        that regard.  I never destroyed records, so I

12        never had to provide things.  I think they

13        had -- they or the agency had access to them

14        without me -- my -- my intervening.

15   BY MR. GALLAGHER:

16        Q.    I'm asking a slightly different question,

17   and it may be that I -- that I wasn't -- wasn't clear

18   about it.

19              What I'd like to know is, you know, during

20   your tenure as the director for the Center for

21   Medicare, did you meet with the lawyers who are

22   pursuing this litigation on behalf of the government

23   and provide them with support, whether it was

24   briefings on the underlying payment programs, or CMS

25   policies and procedures, or CMS plans for



Page 32

1    rule-making, or anything to support them in the

2    litigation effort?

3                (Instruction not to answer.)

4                MS. KRIEG:  I'm going to object and

5           instruct him not to answer any privileged

6           information sought or received with counsel.

7                And object to form also.

8                THE WITNESS:  So I'm going to answer the

9           first half again, and on advice of counsel not

10          answer the second half.

11               Yes, I met with counsel.  But as far as

12          what we discussed or provided, I'm going to

13          follow my counsel's advice and not to go

14          further.

15   BY MR. GALLAGHER:

16         Q.   Did you have -- as the director for the

17   Center for Medicare, did you have any decision-making

18   authority with respect to this litigation, positions

19   that would be taken or arguments that would be made?

20         A.   No, not that I was aware of.

21         Q.   You indicated that you were briefed, while

22   you were at CMS as the director for the Center for

23   Medicare, on the nature of the case and the claims

24   being asserted.  Is that correct?

25               MS. KRIEG:  Object to form.  Misstates



2618

Page 48

```
 1          A.   Yes.

 2          Q.   So to walk through how the program works,

 3     at a high level, am I right that CMS first

 4     establishes a benchmark, the highest monthly payment

 5     that CMS will pay for an average fee-for-service

 6     beneficiary?

 7          A.   I'd characterize it somewhat differently.

 8     It is -- it is a benchmark up against which health

 9     plans will -- Medicare Advantage plans will bid.

10          Q.   And is that benchmark based on -- is it in

11     fact the highest monthly payment that CMS will pay

12     for an average beneficiary, using the fee-for-service

13     data as the basis for that determination?

14          A.   Yes.

15          Q.   And then plans bid.  And does that bid

16     establish their base rate per beneficiary?

17          A.   Yes.  I mean, we're simplifying here, but

18     yes.

19          Q.   And then the -- and then the plans are

20     paid either the base rate or the benchmark, whichever

21     is lower, right?

22          A.   Well, they're paid their bid plus the --

23     you know, there's a rebate function, or -- skipping

24     that part, or --

25          Q.   Let me be more specific.  Before taking
```



Page 49

1   into account risk adjustment or rebates or other
2   considerations, the plans are paid a base rate --
3       A.   Okay.
4       Q.   -- that is equal to their base rate or the
5   benchmark, whichever is lower, right?
6       A.   Correct.
7       Q.   I'm sorry.  I couldn't hear you.
8   "Correct"?
9       A.   Correct.
10      Q.   Okay.  And then CMS makes some adjustments
11  to that base rate, including an adjustment to reflect
12  enrollees' risk scores.  Right?
13      A.   That's correct.
14      Q.   So there are various risk adjustments that
15  are taken into account, including demographic
16  information and where people live.  But what we're
17  going to be talking about here is the adjustment
18  that's made based on diagnostic coding.
19           Is that one of the risk adjustments that
20  CMS makes to the base rate?
21      A.   It is.
22      Q.   Okay.  And that risk adjustment, based on
23  diagnostic coding, is meant to ensure that Medicare
24  Advantage plans are paid more for beneficiaries with
25  conditions that are -- that make them riskier or



Page 50

1    higher-cost, and less for beneficiaries that are

2    relatively less risky than the average

3    fee-for-service beneficiary.  Is that a fair

4    statement?

5        A.    That is.

6        Q.    And the risk adjustment, the diagnostic

7    coding risk adjustment, is based on the hierarchical

8    condition categories that we discussed earlier,

9    right?

10        A.    Correct.

11        Q.    So just to use some examples, a

12    beneficiary with diabetes is likely to require more

13    medical care, and therefore will cost more than

14    someone who does not have diabetes; and they would

15    therefore have a higher risk score and a higher

16    risk-adjustment factor in the model.  Right?

17        A.    Yes.

18        Q.    And the same thing would be --

19        A.    All -- all other things held equal, yes.

20        Q.    Right.  So there would be a factor, a

21    risk-adjustment factor, associated with just the fact

22    you have diabetes.  And then you would add that

23    factor to all the others for the beneficiary to come

24    to their total risk score.  Right?

25        A.    That's right.



Page 51

1          Q.    And the same thing is true for other

2     conditions that signal higher health care costs for a

3     beneficiary, like hypertension, or cancer, or heart

4     failure, or the fact that they're a quadriplegic.

5     Right?

6              MS. KRIEG:  Object to form.

7              THE WITNESS:  That's correct.

8     BY MR. GALLAGHER:

9          Q.    All of those things would have a

10    risk-adjustment factor associated with them, if that

11    condition existed for a beneficiary and was actually

12    included in their records.  Right?

13         A.    That's correct.

14         Q.    Or associated with them in the -- in the

15    database at CMS, right?

16         A.    I'm not sure what you mean by "associated

17    with them in the database."

18         Q.    Well, there's two steps that are involved,

19    right?  First, somebody has to -- has to determine

20    that the beneficiary has the condition, whether it be

21    diabetes or hypertension or cancer, and actually code

22    that in the claims data that's submitted for the

23    beneficiary, right?

24         A.    Yes.  First, it -- it should be reflected

25    appropriately in the medical record.  Then make



Page 63

1    fee-for-service providers and Medicare Advantage

2    plan?

3              MS. KRIEG:  Object to form.

4              THE WITNESS:  I did.

5    BY MR. GALLAGHER:

6         Q.  And did you understand that both the

7    fee-for-service claims data and the Medicare

8    Advantage plans submitted data that was -- was

9    incomplete, because providers missed diagnostic codes

10   that were appropriately associated with the

11   beneficiary?

12             MS. KRIEG:  Object to form.

13             THE WITNESS:  Are you asking in the

14        traditional Medicare side, or the Medicare

15        Advantage side at this point?

16   BY MR. GALLAGHER:

17        Q.  I'm asking both, basically, unless there's

18   a difference between them, in your recollection.

19        A.  Yes, I'm sure I was aware at the time that

20   there were often omitted diagnoses.  I think I was

21   also aware that at times, since we're talking about

22   both sides of the diagnosis that had been supported,

23   that submitted that maybe could not be supported in

24   the medical record.

25        Q.  And that was true for both the



Page 64

1    fee-for-service, traditional claims data, and the

2    Medicare Advantage plans data, right?

3         A.   Well, I think it was much more common, if

4    it was unsupported, to be on the side where it drove

5    financial advantage and Medicare Advantage.  And if

6    it was omitted, it was much more likely to happen on

7    the fee-for-service side, where it didn't cause any

8    financial harm.

9         Q.   Setting aside your belief about the extent

10   to which it occurred, you agree that both fee for

11   service and Medicare Advantage, you know, submitted

12   data included codes that were not supported by the

13   medical records, and omitted diagnostic codes that

14   would be supported by the medical records?  Right?

15            MS. KRIEG:  Object to form.

16            THE WITNESS:  Yes, it was my understanding

17        that that was true.

18   BY MR. GALLAGHER:

19        Q.   And you could refer to that as overcoding

20   and undercoding, right?  Overcoding being assigning

21   codes that are not supported by the medical record,

22   and undercoding being omitting codes that would be

23   supported by the medical records.  Fair?

24        A.   Yes.  They frequently -- they are

25   frequently referred to that way.



Page 65

1          Q.   And it was your understanding, as the

2   director for the Center for Medicare in 2014, 2017,

3   in that time frame, that overcoding and undercoding

4   was to some degree an issue with both traditional,

5   fee-for-service data and the data submitted by

6   Medicare Advantage plans.  Right?

7                MS. KRIEG:  Object to form.

8                THE WITNESS:  Yes.

9   BY MR. GALLAGHER:

10         Q.   Bear with me one second.  I have an

11   outline, and I've covered some of it already.  I

12   don't want to waste time, so -- just bear with me one

13   second.

14               So I want to direct your attention to the

15   article that we've marked as Exhibit 1002, and in

16   particular to page 5, at the top.

17               Are you on page 5?

18         A.   I am.

19         Q.   So do you see at the top, where

20   Mr. Kronick and Mr. Welch write in their article that

21   "However, fee-for-service coding is known to be both

22   incomplete and variable."  Do you see that?

23         A.   Yes.

24         Q.   And this article was written in two

25   thousand -- or published in 2014.  Do you agree with



Page 66

1    their statement?

2            MS. KRIEG:  Object to form.

3            THE WITNESS:  Yes, that's my

4        understanding, fee-for-service coding.

5    BY MR. GALLAGHER:

6        Q.   And did you understand that back in 2014,

7    when you were the -- after you were the director for

8    the Center for Medicare?

9        A.   Yes.

10       Q.   All right.  Now, the article gives an

11   example that I'd like to ask you about.  It's on

12   page 3.

13           Actually, before we go to page 3, stay on

14   page 5.  I apologize.

15       A.   Uh-huh.

16       Q.   So on page 5 of the Kronick and Welch

17   article, under the statement we just looked at, where

18   it says:  "Fee-for-service coding is known to be both

19   incomplete and variable" --

20       A.   Uh-huh.

21       Q.   -- they write:  "For instance, among

22   Medicare beneficiaries diagnosed with quadriplegia in

23   one year, only 61 percent had a diagnosis of

24   quadriplegia reported in the subsequent year."

25           Do you see that?



Page 73

1      A.    Yes.

2      Q.    And that would -- that would have the

3   effect of ensuring a complete record of diagnostic

4   codes, and also increasing the risk score for

5   beneficiaries and payment under the program, right?

6      A.    Well, I want to be clear that that's the

7   only thing that happened.  The question is, you know,

8   in my mind, were they looking to make sure things

9   were not just complete, but complete and fully

10  accurate?

11          So yes, if the only thing they found was a

12  condition that hadn't been properly documented, and

13  they did document it, that would be appropriate.  If

14  they found things that had -- had been

15  inappropriately documented and -- and didn't follow

16  through on that, I don't think it would be

17  appropriate.

18     Q.    On your example there, first just let me

19  break it down.  If the medical record review

20  conducted by a Medicare Advantage plan found a

21  diagnostic condition that was not reflected in the

22  claims data, there was no code reflected in the

23  claims data, perfectly appropriate to supplement with

24  that diagnostic code in order to have a complete

25  record of supported conditions for the beneficiary,



Page 74

```
 1   right?

 2        A.   Yes.

 3        Q.   And what you're talking about is a

 4   situation where in conducting that review, if a

 5   Medicare Advantage plan discovered that there were --

 6   there were codes that were not supported, you had

 7   questions about what they should do in that

 8   situation.  Right?

 9        A.   No, I had no questions.  I think they had

10   an affirmative obligation to correct the records and

11   not be paid inappropriately.

12        Q.   Right.  So if they knew that the code was

13   not supported, they should withdraw it, right?

14        A.   Yes.

15        Q.   When you took over as the director for the

16   Center for Medicare, was there any rule or regulation

17   in place that affirmatively required Medicare

18   Advantage plans to proactively review medical

19   records, to audit them, and determine which, if any,

20   codes were not supported?

21        A.   Not that I'm aware of.

22        Q.   So what you're talking about is if they

23   did review the medical records and discover that the

24   codes were not supported, then the plans had an

25   obligation to withdraw them.  Right?
```



Page 75

1        A.   If in any way a plan was aware of

2   inaccurate data, they had an obligation, because

3   their obligation was to submit complete and accurate

4   data.

5        Q.   Well, everyone knew -- including you,

6   right? -- that the data submitted for fee-for-service

7   under traditional -- traditional model, and for

8   Medicare Advantage plans, had some errors and

9   inaccuracies in it, right?

10            MS. KRIEG:  Object to form.

11            THE WITNESS:  Yes.

12  BY MR. GALLAGHER:

13       Q.   That was your baseline understanding at

14  CMS when you took over as the director for the Center

15  for Medicare, and it was widely understood that the

16  data had inaccuracies in it, because of the way

17  coding is done at the point of care.  Right?

18            MS. KRIEG:  Object to form.

19            THE WITNESS:  Yes, we understood that.

20  BY MR. GALLAGHER:

21       Q.   So it wasn't the case that -- that if you

22  had some idea that there might be a code in there

23  somewhere that was not supported, that you, as a

24  Medicare Advantage plan, had to do something.  It was

25  that if you knew that a specific code was not



Page 152

1    the -- at the -- at the administrator's office level?

2         A.   Yes.

3         Q.   Did anybody on your team have input on

4    whether to finalize this rule?  Like Cheri Rice or

5    Cynthia Tudor, who we discussed earlier?

6         A.   I wouldn't think so.

7         Q.   Can you describe the purpose and intent of

8    this proposed rule, as you understood it?

9              MS. KRIEG:  Object to form.

10             THE WITNESS:  When I was briefed on the

11        provision, it seemed redundant to me, as why are

12        we doing this?  You know.  Don't the plans

13        already have an affirmative obligation to attest

14        that the data are complete and accurate?

15             And I was told this is being done in an

16        excess of -- "caution" is the wrong word -- you

17        know, to go above and beyond on clarity.  And I

18        thought that seemed harmless enough.

19   BY MR. GALLAGHER:

20        Q.   So you're saying you thought that this

21   rule specifically requiring that any medical record

22   review conducted by an organization must be designed

23   to determine the accuracy of diagnoses -- diagnoses

24   submitted, you're saying you thought that was

25   redundant --



Page 153

1      A.    Yeah, it was --

2      Q.    -- to the attestation requirement?

3      A.    At that time, I'm not sure I would have

4   cited necessarily the attestation requirement.  My

5   belief at the time, and it was not contradicted by

6   the staff, that they must have an obligation to

7   make -- you know, to -- to affirm that to the best of

8   their belief and knowledge, these data are accurate,

9   and they're like, "They do."

10          And I said, "Okay.  I'm not sure why we're

11  doing this, but it's out there.  It's fine with me."

12     Q.    Can you point to any existing regulation

13  or rule that predates this proposed rule that

14  specifically dictated the form of the medical record

15  review that Medicare Advantage plans would conduct?

16  Or had to conduct?

17     A.    No, I can't do that.

18     Q.    Is there anything in the attestation

19  requirement that creates a proactive obligation for a

20  Medicare Advantage plan to audit the claims data

21  provided -- the coding provided in the claims data

22  that providers have keyed in?

23     A.    Just to be clear, my thinking at the time,

24  and remains to be so today, is that if they're

25  engaged in any activity where they come upon



Page 154

1    knowledge of something that's inaccurate, to be

2    compliant with their attestation, they have to

3    correct that.  It just seemed plain on its face.

4        Q.   Well, so let's -- let's explore that.

5             We discussed earlier that everybody knew

6    that the data submitted by Medicare Advantage plans

7    and by fee-for-service providers and the claims data,

8    everybody knew that there was some degree of

9    inaccuracy in that data.  Right?

10            MS. KRIEG:  Object to form.

11            THE WITNESS:  Yes.

12   BY MR. GALLAGHER:

13       Q.   You certainly knew it, as the director of

14   the Center for Medicare, that that was the case,

15   right?

16       A.   We understood it.  But everything we did

17   sought to eliminate it.  And, you know, I used to

18   work in a hospital.  We submitted cost reports.  We

19   made an attestation that we did the best we could,

20   that -- you know, not that -- that everything we were

21   submitting was true and accurate, and we tried hard

22   to make sure that was true.

23       Q.   When you say that there was a requirement

24   of attestation that -- that if you came across

25   knowledge that a code was not supported, or that it



2632

Page 155

1    was inaccurate, you had to do something, what did you

2    mean by "came across that knowledge"?

3         A.   If by any mechanism, whether it's medical

4    record review or other -- I don't want to run through

5    hypothetical scenarios.  I don't know everything that

6    goes into how they run their plans and their audits

7    and so forth.  But they had an affirmative obligation

8    to make it correct.

9         Q.   So are you saying that an affirmative

10   obligation, if they knew, from whatever mechanism,

11   that a code was not supported, to withdraw it?

12        A.   Absolutely if they knew.  I'm

13   less conversant in law and regulation on if they had

14   an affirmative obligation to take reasonable steps to

15   find out.

16        Q.   Sitting here today, you can't identify any

17   rule or regulation that created an affirmative

18   obligation to audit the claims data submitted by

19   providers, or to proactively review medical records,

20   to ensure that the codes selected by providers were

21   supported?

22        A.   I cannot.  But I'm not an expert in the

23   area and don't work in that area.

24        Q.   This rule that we're looking at in

25   Exhibit 1006, the medical records review rule that



Page 156

1    was proposed and withdrawn, that would have created a

2    proactive obligation on the part of Medicare

3    Advantage plans to conduct medical record reviews in

4    a particular way.  Right?

5         A.   I mean, it -- to my reading of it is

6    that -- yeah, that you had to -- you had to be, you

7    know, looking for "adds and deletes," is the

8    shorthand we used.  You couldn't turn a blind eye to

9    data just because it disadvantaged you.

10        Q.   And you say you withdrew; that one of the

11   reasons that this was withdrawn is that you believed

12   it was redundant?

13             MS. KRIEG:  Object to form.  I think that

14        misstates prior testimony.

15             THE WITNESS:  Yeah.  I was going to say, I

16        didn't say that.  What I said was my

17        understanding, from the directions I received

18        from the administrator's office, was the rule

19        writ large, meaning all the other -- not just

20        this, but all the other provisions had drawn

21        significant flak, and that a decision had been

22        made to pare it down significantly and only

23        finalize certain provisions.

24             And that's the -- those are the marching

25        orders that I executed.



Page 178

1    specifically comply with the law, that's more

2    appropriately posed to your own counsel.

3         Q.   Do you recall that there was -- there were

4    actually a couple of issues raised by United about

5    their -- about what the rule -- what the rules were;

6    that it wasn't just whether the medical record review

7    rule would be finalized, but also what to do with

8    their as-yet-not-completed medical record review that

9    they had been conducting for the 2012 year?

10        A.   I -- in the vaguest sense, I do recall

11   something like that, yes.

12        Q.   So you recall that there was discussion

13   about how United had been -- unlike other plans, had

14   been conducting medical record reviews and looking

15   for deletes, that they had a whole process around

16   that, and that they had not yet really completed it?

17             MR. LANGHAM:   Objection.   Form.

18   BY MR. GALLAGHER:

19        Q.   Do you recall that?

20        A.   I have a recollection that they did

21   describe their medical record review process in

22   some -- I forget how much detail, but they were

23   describing it.

24        Q.   If you would look at Exhibit 1060, which

25   is the exchange you had with Cynthia Tudor and



Page 179

1   Cheri Rice in advance of the meeting on April 28th,

2   2014.

3            Do you see where in her e-mail in the

4   middle of the page on page 1, Cynthia Tudor says,

5   "However, we now have a disclosure that says they

6   have wrongly sent some diagnoses.  So legally I think

7   they need to carry through on this regardless of the

8   rule, if the attestation does not give them an out."

9            Do you see that?

10       A.   I see that.

11       Q.   And do you recall that what she was

12   referring to there was United's disclosure, in

13   Mr. Renfro's e-mail on page 2 of this exhibit, that

14   they had a medical record review under way that had

15   looked for deletes and not just things to add?

16            MS. KRIEG:  Object to form.

17            THE WITNESS:  I would not say, then or

18       now, that I knew that that's what she was

19       referring to.

20   BY MR. GALLAGHER:

21       Q.   All right.  And so -- and we talked about

22   this earlier, but to refer you to Ms. Rice's e-mail,

23   where she says that there's an obligation for

24   correcting data that they know is wrong, did you

25   understand that to be a reference to the disclosure



Page 180

1    by Mr. Renfro, in his opening e-mail on this topic,

2    that United had conducted medical record reviews,

3    looked for deletes, and at some stage of the

4    proceedings, found some things that might need to be

5    deleted?

6            MS. KRIEG:  Object to form.

7            THE WITNESS:  That's how I read Cheri's

8        e-mail.

9    BY MR. GALLAGHER:

10       Q.   Right.  So there was on the one hand the

11   issue of what to do, given that United had

12   conducted -- had conducted a medical record review

13   looking for deletes for the 2012 year, and a separate

14   question about whether they were required to conduct

15   that type of medical record review under the rules.

16           Do you recall that being a distinction

17   drawn in the conversation you had with United?

18           MS. KRIEG:  Objection.  Form.

19           THE WITNESS:  I do not have a

20       recollection.

21   BY MR. GALLAGHER:

22       Q.   Do you recall that in the meeting, United

23   did describe its medical record review program that

24   it had been following for the 2012 year, specifically

25   in response to questions from Cheri Rice?



Page 181

```
 1        A.    I do recall them describing the program.
 2   I do not recall whether it was in response to Cheri's
 3   questions or whether they volunteered.
 4        Q.    Do you recall that United described for
 5   you the status of their medical record review,
 6   including, you know, how many documents had
 7   progressed to the final stage and how many were still
 8   being -- how many medical records had progressed to
 9   the final stage and how many were still being
10   reviewed at the various levels of review that were in
11   place?
12        A.    I don't recall.
13             MS. KRIEG:  Object to form.
14             THE WITNESS:  I don't recall.
15   BY MR. GALLAGHER:
16        Q.    Do you recall you or Ms. Rice saying, in
17   sum and substance, that under current rules, you
18   don't have to delete diagnostic codes unless you know
19   they are inaccurate?
20        A.    I don't recall anybody saying that.  And
21   again, we had agreed ahead of time to stay -- say the
22   thing I've been telling you, so that seems
23   inconsistent with what we agreed to say.
24        Q.    So you deny saying that?
25        A.    I certainly did not say it.
```



Page 182

1          Q.    And you deny that Cheri Rice said that?

2          A.    I -- yes.  I deny that she said that.  It

3    seems -- it's totally inconsistent with the approach

4    we took into that meeting, and what we agreed to say.

5          Q.    So you claim that rather than saying that,

6    you stuck to the script that you gave us earlier, and

7    just repeated that mantra?

8          A.    When it came to articulating any

9    obligation and duty, or duty they had, that was the

10   response we gave.

11         Q.    Did you give that response more than once

12   in the meeting?  Like multiple times?

13         A.    Oh, yes.  Yes.

14         Q.    So it was a mantra that you repeated, you

15   claim, multiple times in response to questions from

16   United?

17         A.    Yes.

18         Q.    And you deny saying anything else besides

19   the mantra on the subject of what United's

20   obligations were before finalization of the medical

21   record review rule?

22              MR. LANGHAM:  Objection.  Form.

23              THE WITNESS:  I deny saying anything else

24         about what their obligations were under either

25         the probes reg or existing requirements.



Page 183

 1   BY MR. GALLAGHER:

 2        Q.   Did you or Ms. Rice say, in the meeting

 3   with United, that until the proposed rule on medical

 4   record review is finalized, Medicare Advantage plans

 5   do not have a -- any proactive obligation to confirm

 6   whether diagnosis codes submitted by physicians are

 7   correct?

 8        A.   I don't recall anybody saying that.

 9        Q.   Do you deny that that was said by you or

10   Ms. Rice?

11        A.   I deny it was said by me, certainly.  And

12   I'll stop just short of denying Cheri said it.  It

13   just seems so inconceivable.  But I -- my

14   recollection of the meeting is, you know, eight years

15   ago.

16        Q.   You don't -- you don't actually recall one

17   way or the other whether Ms. Rice said it?

18        A.   Not with certainty.

19             MR. GALLAGHER:  Let's -- let's share

20        Tab 22.

21        (Exhibit 1061 was marked for identification.)

22   BY MR. GALLAGHER:

23        Q.   Do you have that, Document 13?

24             I'm sorry, Mr. Cavanaugh.  I think you're

25   on mute.



Page 184

1          A.    I'm sorry.  By accident.

2                Yes, I have the document.

3          Q.    Okay.  So Exhibit 1061 is a two-page

4    document that has Bates number starting with MARA and

5    ending with 57039.  It's a set of notes entitled "CMS

6    Meeting Notes," dated -- and has the date in the

7    upper right-hand corner, under attorney stamp

8    April 29th, 2014.  Do you see that?

9          A.    I see that.

10         Q.    Do you recall or -- or could you tell,

11   during the meeting you had over video with United,

12   could you tell whether they, the United participants,

13   were taking notes?

14         A.    I do recall someone on the United side was

15   taking notes.

16         Q.    You don't recall anybody on your side

17   taking notes, but you do recall folks on the United

18   side taking notes during the meeting, right?

19                MS. KRIEG:  Object to form.

20                THE WITNESS:  That is -- that is how I

21           recall.  I do not recall whether someone on our

22           side took notes.  I do specifically recall

23           seeing someone on their side taking notes,

24           though.

25



Page 280

1                               CERTIFICATE

2

3          I, KAREN K. KIDWELL, Registered Merit Reporter,

4    and Certified Realtime Reporter, do hereby certify

5    that prior to the commencement of the examination,

6    SEAN CAVANAUGH was remotely sworn to testify to the

7    truth, the whole truth and nothing but the truth.

8          I DO FURTHER CERTIFY that the foregoing is a

9    verbatim transcript of the testimony as taken

10   stenographically by me at the time, place and on the

11   date hereinbefore set forth, to the best of my

12   ability.

13         I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of any

15   of the parties to this action, and that I am neither

16   a relative nor employee of such attorney or counsel,

17   and that I am not financially interested in this

18   action.

19

20

                     _____

21                   Karen K. Kidwell
                     Registered Merit Reporter
22                   Certified Realtime Reporter
                     Notary Public
23                   Dated:  February 28, 2022

24

25


2642

**EXHIBIT D-98**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

```
UNITED STATES OF AMERICA      )   No. 16-08697 FMO
ex rel. BENJAMIN POEHLING,    )
                              )
              Plaintiffs,     )
                              )
v.                            )
                              )
UNITEDHEALTH GROUP, INC.,     )
et al.,                       )
                              )
              Defendants.     )
_____)
```

*** CONFIDENTIAL ***

CONTAINS ATTORNEYS' EYES ONLY PORTIONS

Videoconference Videotaped Deposition OF

ILINA CHAUDHURI

(Taken virtually)

10:34 a.m. Eastern

Wednesday, August 10, 2022

REPORTED BY:  Christine A. Taylor, RPR

Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 23

1      approximately three years and eight months; is

2      that correct?

3              A.    That's correct.

4              Q.    Can you please describe at a general

5      level what kind of work is handled by the Division

6      of Payment Validation?

7                    MR. BULAND:  Object to form.

8                    THE WITNESS:  This was one of the

9                    divisions that made up the Medicare Plan

10                   Payment Group, and it was responsible for a

11                   number of items related to payment

12                   validation for Medicare Advantage and the

13                   Part D program.

14     BY MS. KOPPEL:

15             Q.    By Medicare Advantage, you mean

16     Medicare Part C?

17             A.    Medicare Part C.

18             Q.    And you said it was responsible for a

19     number of items relating to payment validation.

20     Can you describe those items?  What was the

21     Division of Payment Validation responsible for?

22                   MS. KRIEG:  Object to form.  Vague.

23                   THE WITNESS:  So one of the items was

24                   validating through a process called

25                   beneficiary payment validation.  It was



2645

Page 24

1          recalculating at a beneficiary level agreed

2          prospective payments that we were going to

3          make that was routine work that recurred

4          every month.

5               That division at that time was

6          responsible for two types of risk

7          adjustment data validation activities.  It

8          was responsible -- and this is going back a

9          number of years now.  And it was

10         responsible for coordinating and

11         collaborating with the -- with the other

12         divisions in the group or, you know, as

13         needed outside of the group as well in the

14         agency.

15    BY MS. KOPPEL:

16         Q.   You said the division at that time was

17    responsible for two types of risk adjustment data

18    validation activities.  What were those

19    activities?

20         A.   One was a contract-level RADV audit

21    and the other one was for the purpose of

22    calculating a national error estimate for the

23    Part C and the Part D program.

24         Q.   What is a RADV audit?

25         A.   I'm sorry.  So which RADV activity are



Page 25

1    you referring to?

2         Q.   You said one of the activities of the

3    Division of Payment Validation was responsible for

4    was a contract-level RADV audit.  And I'm

5    wondering what you meant by contract-level RADV

6    audit.

7         A.   Sure.  So the contract-level RADV

8    audits were the primary corrective action in order

9    to address the Part C payment error.

10        Q.   What do you mean by the Part C payment

11   error?

12        A.   So from what I recall there's an

13   improper payment reporting statute.  So by law,

14   CMS is required to estimate what a payment error

15   rate is every year and -- and to report that

16   amount.  So that's what I was referring to.

17        Q.   We're going to come back to RADV

18   audits in a bit.  But I'm wondering as the

19   director of this division, what were your

20   responsibilities?

21             MS. KRIEG:  Object to form.

22             THE WITNESS:  So I was responsible for

23             managing the team of people who was in my

24             division.  So doing all of that managerial

25             work.  And then whatever items were in



Page 26

```
 1            my -- in my portfolio.  I was also, you
 2            know, responsible for managing and
 3            shepherding the work to help further that
 4            work.
 5     BY MS. KOPPEL:
 6            Q.    What items were in your portfolio?
 7            A.    Some of the main ones that I recall
 8     are the ones that I just mentioned, the
 9     beneficiary payment validation work, payment error
10     work, contract-level RADV work.
11            Q.    Thank you.
12            So you meant beneficiary payment
13     validation work.  By payment error work, you mean
14     the national payment error?
15            A.    Yes.
16            Q.    As director, who did you report to?
17            MS. KRIEG:  Object to form.
18            Foundation.
19     BY MS. KOPPEL:
20            Q.    You can answer.
21            A.    My -- I reported to Cheri Rice.
22            Q.    And she was your direct report?  There
23     was no one in between you and Ms. Rice?
24            A.    I was her direct report.  There was
25     nobody between me and her.
```



2648

Page 27

1          Q.   Thank you.  Thank you.

2               How long did you work directly for

3     Ms. Rice?

4          A.   Directly, it would have been from 2015

5     until I left that position.

6          Q.   Okay.  So the entire time you were

7     director of division -- of the Division for

8     Payment Validation, Ms. Rice -- you reported to

9     Ms. Rice directly?

10         A.   That's correct.

11         Q.   You said you were responsible for

12    managing your team as the Division of Payment --

13    at the Division of Payment Validation.  Who was

14    your team?  What were their names?

15         A.   I'm not going to be able to remember

16    all of them, and over the course of that time

17    people came and went as well.  So I don't -- I

18    don't recall all of their names.

19         Q.   Do you recall some of their names?

20         A.   Yes.

21         Q.   Who do you recall being a member of

22    your team?

23         A.   Okay.  So at some point during my time

24    managing that division I remember Sue Billet,

25    David Winchell, Carolyn Kapustij, Mary Anne



Page 28

```
 1    Brewer, Esmail Essajee.
 2         Q.   I'm sorry, I'm getting a video error.
 3    Is anyone else seeing that as well?
 4         A.   No.
 5              MS. KRIEG:  I think there's a little
 6         bit of a delay.
 7              MS. KOPPEL:  Okay.  If the --
 8              THE VIDEOGRAPHER:  I have her frozen on
 9         my screen.
10              THE WITNESS:  It looks like my
11         connection -- my video connection came out,
12         but it sounds like you can hear me okay.
13              MS. KOPPEL:  Yeah.  Can we go off the
14         record while we see if we can get
15         Ms. Chaudhuri's video back?
16              THE VIDEOGRAPHER:  Sure.  The time is
17         11:01 a.m.  We're going off the record.
18    (Recess taken from 11:01 a.m. until 11:06 a.m.)
19              THE VIDEOGRAPHER:  The time is
20         11:06 a.m.  We are back on the record.
21              MS. KOPPEL:  While we were off the
22         record, defendants asked the government to
23         produce Ms. Chaudhuri's notes, and I
24         understand that they are objecting on the
25         basis of privilege.  Is that correct,
```



Page 29

```
 1          Ms. Krieg?
 2              MS. KRIEG:  That's correct.  The notes
 3          are attorney-client privileged, and we are
 4          not going to produce the notes taken during
 5          Ms. Chaudhuri's meeting with her attorneys.
 6          So they are attorney-client privileged and
 7          we are not going to produce them.
 8              MS. KOPPEL:  Thank you for your
 9          objection.  That's noted.  Just objecting
10          on the basis of privilege is fine.
11              MS. KRIEG:  Okay.
12  BY MS. KOPPEL:
13          Q.  Ms. Chaudhuri, before we popped off
14  the record for the technical problem, you were
15  listing the individuals who worked for you when
16  you were a director of the Division of Payment
17  Validation.  I think the last name I was able to
18  get was Esmail Essajee?
19          A.  Yes, that's right.
20          Q.  Who else worked for you while you were
21  a director of the Division of Payment Validation?
22          A.  Ron Thompson, Ronald Thompson.  I
23  think Maricruz Bonfante, Joanne Davis.  I may have
24  said that already.  I don't recall.  Those are the
25  names that are coming to mind right now.
```



Page 30

1           Q.   That first name I think you said was

2     Dew Billet -- Drew Billet, is that correct?

3           A.   Sue.  S-u-e.

4           Q.   S-u-e.  Thank you for that.

5           Okay.  And before you were the

6     director for Division of Payment Validation, you

7     were the deputy director of the Division of

8     Payment Policy; is that correct?

9           A.   That's correct.

10          Q.   How long did you work as the deputy

11    director for the Division of Payment Policy?

12          A.   From 2012 to 2015.

13          Q.   So three years?  Two, three years?

14          A.   Yes.

15          Q.   Can you describe what kind of work is

16    handled by the Division of Payment Policy?

17          A.   They are responsible for the risk

18    adjustment payment policy.

19          Q.   What do you mean by risk adjustment

20    payment policy?

21          A.   So for both the Part C and the Part D

22    programs, they're paid based on risk adjustment,

23    and the Division of Payment Policy oversees that

24    work.

25          Q.   What is risk adjustment?



Page 31

```
 1              MS. KRIEG:  Object to form.
 2              THE WITNESS:  It's a payment
 3         methodology.
 4    BY MS. KOPPEL:
 5         Q.   Okay.  Payment methodology based on
 6    what?
 7              MS. KRIEG:  Object to form.
 8              THE WITNESS:  Yeah, could you make that
 9         question a little more specific, please?
10    BY MS. KOPPEL:
11         Q.   Sure.  You said that the Division of
12    Payment Policy is responsible for the risk
13    adjustment payment policy.  And I am trying to
14    figure out what you mean when you say risk
15    adjustment.
16              MR. BULAND:  Objection.  If that's a
17         question.
18              MS. KRIEG:  Yeah.  I join that
19         objection.
20    BY MS. KOPPEL:
21         Q.   What do you mean by risk adjustment?
22              MS. KRIEG:  Object to form.  Vague.
23              THE WITNESS:  I mean it's a broad
24         question.  It's a payment methodology
25         that's used in many areas including in
```



Page 32

```
 1              Part C and D.
 2      BY MS. KOPPEL:
 3         Q.    How is it used in Medicare Part C?
 4              MS. KRIEG:  Object to form.  Vague.
 5              THE WITNESS:  Really broadly speaking,
 6         it's -- it's used to calculate how payments
 7         are made to Medicare Advantage plans and
 8         Part D sponsors.
 9      BY MS. KOPPEL:
10         Q.    How does it calculate payment for
11      Medicare Advantage plans?
12              MR. BULAND:  Objection.
13              MS. KOPPEL:  You can answer.
14              THE WITNESS:  So, sorry, can you repeat
15         or specify what -- what exactly you're
16         asking?
17      BY MS. KOPPEL:
18         Q.    Yeah.  So you said the risk
19      adjustment -- risk adjustment is used to calculate
20      how plans -- how payments are made to Medicare
21      Advantage plans and Part D sponsors.  And I'm
22      asking you how does it calculate payment?
23              MS. KRIEG:  Object to form.
24              THE WITNESS:  Yeah, I mean, it's a
25         really big question that, you know, one --
```



Page 33

```
 1              one could take years to study and to
 2              explain.  So I'm unsure how to like answer
 3              that question completely right now.
 4   BY MS. KOPPEL:
 5         Q.   Okay.  Let me try a different way.
 6   What is your understanding of the methodology used
 7   to pay Medicare Advantage organizations in the
 8   risk adjustment system?
 9              MS. KRIEG:  Object to form.
10              THE WITNESS:  Well, again, that's --
11              that's a hard question to answer in a sound
12              byte.  Every single year CMS proposes the
13              specific payment policies for a particular
14              year and then finalizes them.  So --
15   BY MS. KOPPEL:
16         Q.   Okay.
17         A.   The broad parameters are set out in
18   statutes, you know, the specifics of the
19   methodology are laid out every single year.
20         Q.   Okay.  Sorry for stepping on you
21   there.  I didn't realize you hadn't finished your
22   question.
23              I'm going to ask my colleague to pull
24   up what's been previously marked as Exhibit 1174.
25   I'm going to state for the record that
```



Page 34

1    Exhibit 1174 is Bates Stamped USBP069103470.

2              Let me know when that's visible to

3    you.

4         A.    Yes, I can see it.

5         Q.    Okay.  And that's -- that first page

6    of Exhibit 1174, you see your name listed there?

7         A.    Yes, I do.

8         Q.    And do you recognize this document?

9         A.    I recognize some of the content of it.

10   I don't know about like the specific, you know,

11   version of the specific document.

12        Q.    Sure.  What is it?

13             MS. KRIEG:  Object to form.

14             THE WITNESS:  The -- the title reads

15             "Medicare Part C Payment Training."

16   BY MS. KOPPEL:

17        Q.    Do you recall providing trainings when

18   you were the deputy director of the Division of

19   Payment Policy?

20        A.    I do.

21        Q.    Was this -- to whom was this training

22   directed?

23        A.    Give me a second.  Let me see if it

24   says.

25             I flipped through the slides quickly,



Page 35

1    and I don't see that the slides specify to whom
2    this training was directed.
3          Q.   Well, when you provided trainings as
4    the deputy director of the Division of Payment
5    Policy, who did you provide those trainings to?
6          A.   I don't recall specifically the
7    trainings, but, generally speaking, we would train
8    internally to the division, to the group, other
9    areas in the agency.  We would train -- we would
10   conduct like learning type sessions, I don't know,
11   training sessions I suppose is fine, to, you know,
12   others also in the plan community.
13         Q.   When you say others in the plan
14   community, who do you mean?
15         A.   Plans primarily.
16         Q.   I'm going to ask you to turn to
17   slide 14 of Exhibit 1174.
18         A.   Yes.
19         Q.   And the slide is titled "Risk
20   Adjustment," and it says, "A method used to adjust
21   payment based on the health status and demographic
22   characteristics of an enrollee."
23              Do you see that?
24         A.   Yes.
25         Q.   Is that true?  Risk adjustment is a



Page 36

1    method used to adjust payment based on the health

2    status and demographic characteristics of an

3    enrollee?

4            A.    Yes.

5            Q.    Okay.  And CMS uses diagnoses to

6    measure health status; is that accurate?

7                 MR. BULAND:  Objection.

8                 MS. KRIEG:  Objection.  Object to form.

9    BY MS. KOPPEL:

10           Q.    You can answer.

11           A.    Yes, CMS does use diagnostic data.

12           Q.    It does use diagnostic data to measure

13   the health status of enrollees?

14           A.    Yes.  I mean, on this slide I just

15   think it's -- I'm not entirely sure what is

16   entirely encapsulated by health status.  So what I

17   can say for sure is that diagnostic data is used

18   in risk adjustment.

19           Q.    To adjust payment?

20           A.    To calculate the payment, yes.

21           Q.    Okay.  Thank you.

22                 What is a risk score?

23                 MS. KRIEG:  Object to form.

24                 THE WITNESS:  A risk score is a sum of

25             individual coefficients that is roughly --



Page 167

```
 1              the text as it's written that there is a
 2              documentation standard of the medical
 3              record, it's set forth in the regulation,
 4              it's consistent with other Medicare
 5              prospective payment systems.  And that the
 6              number of diagnoses may not indicate --
 7              what does it say?  Are not sufficient for
 8              indicating the plan has undertaken the risk
 9              of incurring expected costs.
10   BY MS. KOPPEL:
11         Q.   So that's in MA.  And the next
12   sentence starts with "In FFS Medicare, the actual
13   risk of providing a benefit is assumed regardless
14   of its -- of the diagnosis indicated by the
15   claim -- or on a claim"; is that correct?
16         A.   That's what it says, yes.
17         Q.   And "Providers are reimbursed for the
18   services provided, which are dictated by the
19   beneficiary's actual condition"; correct?
20         A.   That's what it says, yes.
21         Q.   Okay.  This is what we were discussing
22   earlier the differences between the payment
23   mechanisms between Medicare Advantage and
24   fee-for-service Medicare; is that correct?
25         A.   Yes.
```



Page 168

1          Q.    Okay.  So the next paragraph says

2     "Study Approach" -- or actually --

3          A.    Yes.

4          Q.    Sorry.  I want to go up for a second.

5     After this paragraph discusses how fee-for-service

6     claims are paid, it says, "The claim may or may

7     not indicate the diagnosis code for which the

8     beneficiary was treated, but regardless, the

9     annual cost of treating the beneficiary is

10    accurately captured."

11               Do you see that?

12         A.    I see that, yes.

13         Q.    Do you agree with that statement?

14         A.    I had a little bit of trouble

15    following it.  So "Providers are reimbursed for

16    services provided which are dictated by the

17    beneficiary's actual conditions.  The claim may or

18    may not indicate the diagnosis code for which the

19    beneficiary was treated, but regardless, the

20    annual cost of treating the beneficiary is

21    accurately captured."

22               Yeah, I mean I understand this to

23    say -- when it's talking about the claim, I'm

24    understanding it to mean the claim from the

25    provider to the plan.  I'm not 100 percent sure



Page 169

```
 1     I'm interpreting the way that the author intended.

 2     That's the way I would interpret this.

 3              Q.   So this is in FFS Medicare, so this

 4     would be from the provider to CMS?

 5                   MS. KRIEG:  Object to form.

 6                   THE WITNESS:  Okay.  So read in that

 7              way seem -- yeah, that the claim may or may

 8              not -- this is -- again, I have some

 9              limitations in terms of my understanding in

10              how things work in fee-for-service.  But

11              the way I understand the sentence is that

12              when the provider is seeking reimbursement

13              in fee-for-service that the diagnosis code

14              may or may not be on there, but their costs

15              are.

16     BY MS. KOPPEL:

17              Q.   And that's because they're reimbursed

18     for the actual services, so the services have to

19     be represented on the claim?

20              A.   That makes sense to me.

21              Q.   Okay.  The next sentence says, "Thus,

22     we can assume that the CMS risk adjustment model

23     is predicting the average cost for beneficiary

24     accurately."

25                   Do you see that?
```



Page 170

1          A.    I do.

2          Q.    Do you agree that the CMS risk

3    adjustment model is predicting the average cost

4    for beneficiary accurately?

5          A.    I think that the CMS risk adjustment

6    model does what it is intended to do of predicting

7    the average cost per beneficiary, and I do believe

8    that it does -- it does that accurately.

9          Q.    Okay.  Says, "Any variation in cost

10   not explained by the HCCs and interaction terms

11   will be explained by the demographic factors -- or

12   sorry -- demographic components of the model."

13              Do you see that?

14         A.    I do.

15         Q.    Says, "By changing the documentation

16   standards for FFS data from claim to the medical

17   record, the expected costs of each model component

18   would change, but the annual cost for beneficiary

19   would not change."

20              Do you see that?

21         A.    I do.

22         Q.    Do you agree with that statement?

23         A.    I'm not 100 percent sure here in terms

24   of what model component is being referred to.

25   I -- I do agree -- to the extent that this



Page 202

1              CERTIFICATE OF REPORTER

2

3          I, Christine A. Taylor, Certified
   Court Reporter within and for the State of
   Georgia, do hereby certify:

4

5          That the foregoing deposition was
   taken before me on the date and at the time and
   location stated on Page 1 of this transcript; that

6  the deponent was duly sworn to testify to the
   truth, the whole truth and nothing but the truth;

7  that the testimony of the deponent and all
   objections made at the time of the examination

8  were recorded stenographically by me and were
   thereafter transcribed; that the foregoing

9  deposition as typed is a true, accurate and
   complete record of the testimony of the deponent

10 and of all objections made at the time of the
   examination to the best of my ability.

11

12         I further certify that I am neither
   related to nor counsel for any party to the cause
   pending or interested in the events thereof.

13 Witness my hand, this 14th day of August, 2022.

14

15

16 _____

17    Christine A. Taylor, RPR
      CCR-4736

18

19

20

21

22

23

24

25



**EXHIBIT D-99**

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

```
_____ )
                                )
UNITED STATES OF AMERICA        )
ex rel. BENJAMIN POEHLING,      )
                                )
         Plaintiff,             )    No. CV 16-08697 FMO
                                )
vs.                             )
                                )
UNITEDHEALTH GROUP, INC.,       )
et al.,                         )
                                )
         Defendants.            )
_____ )
```

SUBJECT TO PROTECTIVE ORDER

Volume 1

DEPOSITION OF SEAN CREIGHTON

Washington, DC

March 23, 2022

Reported by:  John L. Harmonson, RPR

Job No. 798205



Page 32

1   services akin to what was happening at Verscend?

2       A.    No.   They're very different companies.

3   Avalere is -- I don't know -- more akin to a think

4   tank than an operational organization.

5       Q.    Got it.

6       A.    You know, it only has 240 employees.

7   It's a very different organization than Verscend.

8       Q.    So when you mention a think tank,

9   Avalere from time to time would produce work

10  product that was designed to advise the industry

11  or provide commentary associated with issues that

12  were relevant to the Medicare Advantage insurance

13  plans, for example?

14      A.    Sure.   There's a couple ways that

15  happens.   A primary one is on a routine basis we

16  produce something called Avalere insights which

17  are publicly available, they're on the website,

18  where we will have looked at a particular issuance

19  from the government, a policy pronouncement or

20  proposed rule or so on.   We would offer our

21  summary of it, and then some indication of what it

22  might imply for those businesses on a go-forward

23  basis.   And generally the purpose of that is to

24  elicit further conversation and more in-depth

25  conversation.



Page 33

1            But then, of course, the second part is
2    when that actually happens with our clients, we do
3    dive pretty deep into those issues and advise them
4    on the impact of regulatory events on their
5    business.
6        Q.    Got it.
7            So let's circle back now and talk a
8    little bit about your time at CMS.  Okay?  And
9    we're going to get in a few moments to some of the
10   concepts that you talked about when you were
11   giving us your background before.  But I really
12   just want to start with some structure.
13           During that time frame from 2000 to
14   2012, I think I heard you say that you were the
15   director for payment policy and risk adjustment.
16   Was that your title?
17       A.    The division went through a number of
18   title changes during my time there.  First we were
19   the Division of Risk Adjustment Operations, DRAO I
20   believe.  And then at some point we became the
21   Division of Payment Policy and Risk Adjustment or
22   something like that.  So we had a variety of
23   titles.
24           But the bottom line was from -- I don't
25   remember the exact date.  Sometime around 2006 or



Page 34

1    2007 I became the division director, and we were

2    given responsibility for putting together the

3    advance notice, which is the governing document

4    for payment to MA and Part D plans for the

5    forthcoming year.  And at that point, yeah, I

6    suppose that defined the job from there on out.

7         Q.    Okay.  And as director, who did you

8    report to?

9         A.    I reported to the director of our

10   group, which is the Medicare Plan Payment Group.

11        Q.    And who was the director of the

12   Medicare Plan Payment Group?

13        A.    Initially in that formulation, it was

14   Tom Hutchinson, and then later on Cheri Rice.

15        Q.    And I gather that either Mr. Hutchinson

16   or Ms. Rice in turn reported up.

17        A.    Sure.  All the group directors report

18   directly to the center director for the Center for

19   Medicare which is responsible for both

20   fee-for-service and Medicare Advantage.

21        Q.    Okay.  And you mentioned the expression

22   "fee-for-service."  And for purposes of the court

23   and jury, what do you mean by fee-for-service?

24        A.    Fee-for-service, sometimes referred to

25   as traditional Medicare or original Medicare, is



Page 35

1    the system which Medicare started out with,

2    essentially where CMS is the direct payer to

3    providers, hospitals, physicians, durable medical

4    equipment, you know, the whole gamut, hospice and

5    so on, home health.

6              So in that instance, typically the

7    government puts out a fee schedule which these

8    providers agree to abide by.  They provide

9    services to beneficiaries who are enrolled in

10   Medicare.  They bill the government directly, and

11   those bills are paid directly by the government.

12       Q.    And so when you say "fee-for-service,"

13   is it fair to say that what you're referring to is

14   the fact that providers are paid for a particular

15   service rather than based upon the illness that

16   the particular patient might have?

17       A.    Yes.

18             MS. McMAHON:  Objection; vague.

19             You can answer.

20             THE WITNESS:  Yes.  I mean the way the

21   system evolved is that each -- excuse me.  Each

22   procedure is codified that the providers do, I

23   suppose for want of a better term, and then a

24   payment rate that's associated with that procedure

25   once it's conducted during the course of a visit



Page 40

```
 1   and doing procedures on their various parts.

 2        Q.    What are the other advantages to the

 3   Medicare Advantage, to the MA plan program as a

 4   whole that you are familiar with?

 5        A.    My understanding, it's gone -- it's a

 6   historical arc.  Right?  So in the early days, the

 7   advantage for companies like Kaiser in the West

 8   or --

 9        Q.    Let me stop you.  I want to focus on

10   advantages to patients as well.

11        A.    Yeah, that's where I was going.

12             The idea was obviously you are looking

13   after your enrolled population holistically and

14   providing all the services, and you could do that

15   in a more coordinated way within this managed care

16   environment.  And there were companies on the East

17   Coast doing the same kind of thing too.

18             I think at that point managed care was

19   relatively small but it had a model of looking

20   after the whole patient and providing all these

21   services, sometimes at the same site.  They would

22   have everything available so the person didn't

23   have to run all over the place going to 20

24   different procedures and testing facilities and so

25   on and so forth.
```



Page 41

```
 1                I think at some point the managed care

 2     model grew or it became more, I would say,

 3     insurance-oriented.  It was more a risk-taking

 4     exercise where the companies were, I think to be

 5     frank, more in the business of controlling

 6     utilization than holistically managing care.  I

 7     think now it's evolved again to where the

 8     companies have become pretty sophisticated in

 9     terms of analytics around the patient.  Right?

10     How is the patient interacting with the

11     organization?  Has the patient interacted with the

12     healthcare system?  They've become sophisticated

13     in analytics in terms of signaling where things

14     might be going wrong and closing gaps for people.

15     And they provide a whole range of supplemental

16     services that you can't get in fee-for-service.

17                So I would say there has been an arc

18     here.  We're not quite at the end of the patient's

19     interest of the arc yet but we're getting there,

20     you know.

21     Q.   So if you were going to identify for us

22     the advantages to the patients, you mentioned the

23     fact that there are some services that are

24     available on the Medicare Advantage side that are

25     not available in fee-for-service.  What are some
```



Page 42

1    other advantages?

2         A.    Yeah, there are lots of other ones

3    beyond that.  One of the big ones, obviously, from

4    the early days was paperwork.  Right?  Simple as

5    that.  You know, people were getting all sorts of

6    statements and explanations of benefits and so on

7    and so forth, getting bills they didn't understand

8    from multiple providers and so on and so forth.

9    Typically that doesn't happen in the managed care

10   environment.  So the healthcare company -- so

11   that's one major advantage.

12            Another one is Medicare Advantage has a

13   concept called the maximum out-of-pocket, which

14   means that in any given year the amount that a

15   beneficiary can spend out of pocket is capped.  It

16   was around 6,800 recently, like that; it might be

17   a little higher now.

18            That does not exist in fee-for-service.

19   There's unlimited liability.  So in

20   fee-for-service, Medicare people either have to

21   buy a supplemental insurance to cap their

22   liability, or a lot of people in traditional

23   fee-for-service still have supplemental insurance

24   through either a Medicaid program or an employer

25   program.  So about 80 percent of



Page 43

1    fee-for-service -- people in fee-for-service have

2    or must have -- you know, kind of have to have

3    some other program to control the cost.  You don't

4    need that in Medicare Advantage because of this

5    concept of the maximum out-of-pocket.

6         Q.    Got it.

7         A.    The other advantage is obviously that

8    the medical and the drug benefit are integrated

9    typically in Medicare Advantage.  So these plans

10   are both Part C, meaning Part A plus B equals C

11   plans, and Part D plans.  And within that there is

12   a whole other level of advantage, too, because the

13   Part C plans can use their rebate to reduce cost

14   sharing for drugs under Part D, and generally do,

15   and generally have better -- they typically have

16   co-pays rather than coinsurance for drugs under

17   Part D, particularly for preferred drugs, generics

18   or preferred brands.

19              So there's a whole range of additional

20   benefits that accrue from joining a Medicare

21   Advantage plan for a beneficiary.

22        Q.    So senior citizens will potentially get

23   their drugs at a cheaper cost under the MA plan?

24        A.    Absolutely.

25        Q.    Okay.  Any other advantages to the



Page 44

1    patients that you can think of as you sit here?

2         A.    Well, the other big one in more recent

3    times has been an explosion in what are called

4    supplemental benefits.  There are different

5    categories of supplemental benefits ranging -- so

6    supplemental benefits can be categorized in a

7    number of different ways.  So there's five

8    different types of supplemental benefit that

9    people get access to.

10              The first one is a reduced Part C

11   premium, but to actually activate this Part C

12   plans typically don't have any premiums so that's

13   not a biggy.

14              You can also use the -- Part C plans

15   can use their money to reduce Part D premium.

16              They can provide Part C supplemental

17   benefits, which means in addition to everything

18   else, they can provide preferential cost sharing

19   for medical benefits relative to fee-for-service.

20   In fee-for-service, typically cost sharing, unless

21   it's capped in some other way, is typically

22   20 percent.  That could be a coinsurance rate.  So

23   they can reduce that.

24              They can, as I said, do the Part D

25   cost-sharing reductions.  And then there are other



Page 45

1    supplemental benefits which can be mandatory or --

2    mandatory or optional supplemental benefits which

3    can comprise things such as transportation to

4    medical visits, housing, gym membership.  There's

5    social isolation programs.  But the big ones, the

6    three biggies which people take advantage of

7    typically are dental, vision and hearing, which

8    are not provided in traditional fee-for-service

9    and are routine at this point.  I mean some kind

10   of dental benefit is almost table stakes for a

11   Medicare Advantage plan.

12        Q.    Okay.  So just to summarize,

13   beneficiaries or senior citizens who participate

14   in Medicare Advantage programs have an array of

15   additional benefits that are not available to them

16   in fee-for-service, and a number of those include

17   reduced costs and additional benefits that you

18   have been describing to us.  Is that a fair

19   summary, Mr. Creighton?

20        A.    That is.  And if I have time to put

21   notes together, I could lay it out more

22   systematically, but I think I covered most of

23   them.

24        Q.    Thank you.  Okay.

25              Now, sticking with your time at CMS,



Page 46

1    you mentioned that part of your responsibility was

2    developing something called the risk adjustment

3    model.  And if you could explain to us, what do

4    you mean by the risk adjustment model?

5         A.    Sure.  Risk adjustment models are

6    models that essentially predict a number of

7    outcomes.  Right?  So you can have risk adjustment

8    models that predict mortality, probability of a

9    hospital visit, or cost, right, among other

10   outcomes.

11             So any model that's used to predict

12   some level of risk in the population can be

13   referred to as a risk adjustment model.  So the

14   ones that we're talking about here, right, there

15   are a range of risk adjustment models that are

16   constructed or calibrated to estimate predicted

17   cost, healthcare cost.  Right?  And there are a

18   variety of these models.  Some of them are used

19   more commonly in one sphere rather than another.

20             So there is one called CDPS that's most

21   common in Medicaid.  There's an ACG model that's

22   sometimes used in Medicaid as well.  There's the

23   DXCG which is the parent of the CMS HCC model

24   that's used in Medicare.  3M has a model.

25             So there are a variety of these models



Page 94

1    this fact that in the fee-for-service side there

2    is not as an incentive to find and report all of

3    the diagnoses associated with a particular

4    patient.  Is that a fair statement?

5         A.    That's fair.

6         Q.    And he goes on to write:  "If, for

7    example, a fee-for-service patient with

8    quadriplegia and a urinary tract infection has an

9    office visit for treatment of the UTI, the payment

10   to the physician will be no more if the UTI and

11   quadriplegia are reported on the claim than if

12   only the UTI is reported.  Coding guidelines

13   specify that the quadriplegia can legitimately be

14   coded if it contributes to the complexity of care,

15   but unlike the situation for MA plans, in

16   fee-for-service there is no incentive to report

17   more than one diagnosis."

18              Do you agree with that?

19        A.    Correct.

20        Q.    Okay.  It goes on to say:  "In

21   contrast, MA plans have a strong incentive to do

22   so."  And it says that "In addition to the

23   incentives to report more completely, the method

24   of collecting diagnostic information also provides

25   MA plans additional opportunities to increase risk



Page 95

1    scores."

2            Do you agree with that proposition?

3        A.    If you incorporate sort of what he's

4    written below.  You know, MA plans may also review

5    medical records and can report all diagnoses that

6    are supported in the record.

7            So I think what it really probably

8    should say is that the allowed methods of

9    collecting the allowed and sort of, if you like, I

10   don't know, routine methods of collecting

11   diagnoses.  But yeah, obviously these mechanisms

12   are actually available in fee-for-service too.  So

13   a physician could potentially review a medical

14   record and submit an amended claim even if their

15   first claim only said UTI.  If they wanted to put

16   in paraplegia on it, they could submit an amended

17   Part B claim too, but there is no incentive to do

18   so.

19       Q.    Okay.  And you were going exactly to

20   the portion of this paragraph that I wanted to get

21   to, Mr. Creighton, which is that the notion that

22   MA plans may also review medical records and can

23   report all diagnoses that are supported in the

24   record, including those that were not reported by

25   physicians on any healthcare claim or Encounter



Page 96

1    record.  Right?

2         A.    Correct.

3         Q.    And there is nothing illegal or

4    improper about that, is there?

5         A.    No.

6         Q.    Okay.  And in fact, when you were at

7    Verscend, I think you were testifying earlier that

8    part of the coding review that Verscend provided

9    to its clients was that exact exercise, reviewing

10   medical records to report additional diagnosis

11   codes that appeared on those medical records;

12   correct?

13        A.    Correct.

14        Q.    Okay.  And nothing fraudulent about

15   that exercise, was there?

16        A.    No, it's standard.  It's fairly

17   standard industry procedure.

18        Q.    Okay.  Now, if we go to the next page,

19   E4, Dr. Kronick writes:  "As noted" -- on the top

20   of E4.  "As noted, payment to MA plans is

21   calibrated based on coding patterns in

22   fee-for-service.  If, for example, Jane Doe would

23   have a risk score of 1.0 if she were in

24   fee-for-service, the implicit assumption in the

25   design of the MA payment system is that she would



Page 99

1    therefore the pattern, the relationship between

2    particular factors in the model, particularly

3    diseases, and the incremental cost would be the

4    same in MA as in fee-for-service.

5    BY MR. SCHINDLER:

6         Q.    Okay.

7         A.    Yeah.

8         Q.    And he goes on to say in that second

9    paragraph on that left column there on page E4, if

10   you go towards the bottom, the last sentence,

11   Dr. Kronick writes:  "The goal of the risk

12   adjustment system is to assure that MA plans that

13   enroll sicker-than-average beneficiaries are paid

14   appropriately, but not to increase payment for an

15   average beneficiary."

16             Do you see that?

17        A.    Yes.

18        Q.    And would you agree with that, that the

19   goal of the risk adjustment system is to do what

20   Dr. Kronick has outlined here?

21        A.    Except that I would say it's not just

22   to ensure that plans that enrolled

23   sicker-than-average beneficiaries are paid

24   appropriately, it's to ensure that plans that

25   enroll any beneficiary whether they're sicker or



Page 100

1  healthier are paid appropriately.

2      Q.   Okay, that's fair.  And that's based

3  upon what you've testified earlier, that part of

4  the goal of this whole risk adjustment model was

5  designed to achieve; correct?

6      A.   Correct.

7      Q.   Okay.  Now, if you note over on

8  page E5, at the top of E5, at the very beginning

9  there is a sentence that begins:  "However,

10 fee-for-service coding is known to be both

11 incomplete and variable."

12          Do you see that?

13     A.   Yes, indeed.

14     Q.   Okay.  And that's consistent with what

15 you testified about earlier, that you discovered

16 at CMS that this fee-for-service coding was in

17 fact both incomplete and variable.  That's what

18 you told us about earlier; correct?

19     A.   Correct.

20     Q.   Okay.  And he noticed -- he notes that

21 "Incomplete coding is evidenced by lack of

22 persistence in coding of chronic conditions."  And

23 he gives an example that "For instance, among

24 Medicare beneficiaries diagnosed with quadriplegia

25 in one year, only 61 percent had a diagnosis of



Page 101

1    quadriplegia reported in the subsequent year."

2            Do you see that?

3        A.    Yeah.

4        Q.    What he's saying is that a person who

5    was a quadriplegic in one year likely does not

6    magically not become a quadriplegic in the next

7    year, that nevertheless, only 61 percent of them

8    end up with that diagnosis in the following year;

9    correct?

10       A.    Correct.

11       Q.    And in the context of this

12   fee-for-service model we've been talking about,

13   what would be the payment impact in terms of --

14   for the MA plan that insured this population of

15   quadriplegics if in the subsequent year 61 --

16   almost 40 percent of them effectively no longer

17   appeared as quadriplegics?  What would that impact

18   be?

19           MS. McMAHON:  Objection; calls for

20   speculation.

21           THE WITNESS:  So when the model is

22   calibrated, it's calibrated on the 61 percent of

23   fee-for-service beneficiaries who are coded.

24   Right?  So that means that the costs associated

25   with that incremental coefficient, you know,



Page 102

1    really are the costs for this 61 percent and the

2    other 39 percent aren't there.  Right?  Their

3    costs are not -- they're there, they're in the

4    model, they're just somewhere else.  They're in a

5    different coefficient, they're in a different

6    disease.

7              So really the answer to that question,

8    it's a rate question.  So if you've got a health

9    plan, and let's say it's got a thousand

10   quadriplegics, which would be a lot but let's say

11   it did.  If 610 of them are diagnosed as

12   quadriplegics, that plan would generally be okay.

13             So it's not just the coefficient.  It's

14   the proportion of -- you know.  Now, if the

15   implied rate -- as I say, it's just not that

16   incremental coefficient.  It's the implied

17   proportion of quadriplegics.  If the health plan

18   essentially has the same proportion in reality as

19   fee-for-service and codes more than 61 percent,

20   they will do better.  If they find less than that

21   rate, they will do worse.

22   BY MR. SCHINDLER:

23        Q.    Okay.  So let's talk about this in the

24   context of over-coding.

25        A.    Sure.



Page 125

 1   those available to the public.  Okay?  So

 2   obviously the advance notice is one.  The rate

 3   announcement itself.  Sometimes prior to that,

 4   based on consultation with industry or depending

 5   on whether we want to -- we at the time being

 6   CMS -- elicit comment, there might be white papers

 7   put out in advance, so on and so forth.

 8              In this case, what had happened here I

 9   believe is that we had gone out with a proposal

10   for coding intensity I believe in 2008, '09.  We

11   did not finalize that if memory serves me

12   correctly.

13              But the purpose of this paper would

14   have been to fully elucidate the methodology

15   behind the development of the coding intensity

16   factor and let people know -- give people more

17   detail on how it was done.

18              And publishing this type of

19   information, the Healthcare Financing Review,

20   which previously had been in paper format as well

21   as electronic, was sort of just a fairly standard

22   way of doing this, the same as any number of

23   articles in this journal over the years, just

24   elaborating on methodological changes.

25        Q.    Okay.  Got it.



1          If you turn to what's been marked at

2     the bottom, the last three digits 588, the

3     introduction page.

4          A.    Okay, here we go.

5          Q.    And this is the introductory paragraph

6     of this paper.  And you wrote, or you and your

7     colleagues wrote:  "Payments to Medicare Advantage

8     plans are risk adjusted to account for the

9     relative health resources needed to provide care

10    for each beneficiary."  And there is a citation

11    there to somebody named Pope.  I take it, is that

12    Greg Pope?

13         A.    That is Greg Pope.

14         Q.    And who was Greg Pope?

15         A.    Greg Pope worked for a company I

16    mentioned earlier, RTI, which back in the day was

17    called Health Economics Research.  He is one of

18    the original developers of the DXCG model which is

19    the forerunner of the CMS HCC model and a major

20    figure in risk adjustment, pay-for-performance,

21    all things payment-related when it comes to the

22    fee-for-service system.

23         Q.    Got it.

24               And you go on to write:  "Payment for

25    MA enrollees is based on the diagnoses that are



Page 127

1    reported for them by the plans in which they are

2    enrolled.  If an MA plan reports more or more

3    serious diagnoses for a beneficiary, the plan is

4    paid more than if fewer or less serious diagnoses

5    are reported."

6            I take it you agree with that

7    statement.

8        A.    That is correct in general.

9        Q.    Okay.  And then you write:  "The

10   Medicare payment system provides strong incentives

11   for MA plans to identify and report diagnostic

12   information as completely as possible."

13           Now, you and your colleagues recognized

14   that the MA plans had an incentive to ensure that

15   all diagnoses for the beneficiaries they insured

16   were captured; right?

17       A.    Absolutely.

18       Q.    And you understood that the MA plans

19   were engaged in these reviews of medical records

20   to look for additional diagnoses codes; right?

21       A.    True.

22       Q.    And that was something that was

23   generally known within your division at CMS; is

24   that correct?

25       A.    Yes.



Page 128

```
 1            MS. McMAHON:  Objection; calls for
 2   speculation.
 3   BY MR. SCHINDLER:
 4        Q.    And there was nothing illegal or
 5   improper about plans looking for additional codes
 6   to ensure that the risk scores for the
 7   beneficiaries accurately reflected their true
 8   medical conditions; right?
 9            MS. McMAHON:  Objection to extent it
10   calls for a legal conclusion.
11   BY MR. SCHINDLER:
12        Q.    You can answer.
13        A.    The activity on its face is not
14   contrary to statute or regulation as far as I
15   could tell.  Whether every element of it was
16   proper or not, I couldn't opine on.
17        Q.    Okay.  Well, for purposes of the jury
18   and laymen right here, when you say that "the
19   activity on its face is not contrary to statute or
20   regulation as far as I could tell," is that just
21   another way of saying that the conduct was not
22   illegal as far as you knew?
23            MS. McMAHON:  Objection; calls for a
24   legal conclusion.
25            THE WITNESS:  I think it's another way
```



Page 129

1   of saying that doing this -- or engaging in these

2   type of activities was perfectly proper.  However,

3   I have no knowledge at that time that every aspect

4   of what each company out there in the marketplace

5   was doing was either legal or proper.

6   BY MR. SCHINDLER:

7       Q.    Okay, fair enough.  You weren't privy

8   to all the different review exercises?

9       A.    Correct.

10      Q.    But the concept itself of MA plans

11  looking for additional diagnosis codes for the

12  beneficiaries to augment their risk scores itself

13  was not improper, to use your words?

14      A.    No, it was not improper, and it was

15  most likely a foreseeable consequence of the

16  incentives built into the model.

17      Q.    Just give me one second here.

18          If you turn to page 589, the next page,

19  this is a carryover of the "Background" section of

20  the paper, if you will, that starts on 588.

21      A.    Sure.

22      Q.    And I will start on page 588,

23  Mr. Creighton.  You'll see that last paragraph

24  says:  "The critical question in determining

25  whether MA risk scores are calculated



Page 154

```
 1                C E R T I F I C A T E

 2

 3    DISTRICT OF COLUMBIA

 4            I, JOHN L. HARMONSON, a Notary Public

 5    within and for the District of Columbia, do hereby

 6    certify that SEAN CREIGHTON, the witness whose

 7    deposition is hereinbefore set forth, was duly

 8    sworn by me and that such deposition is a true

 9    record of the testimony given by such witness.

10            That before completion of the

11    proceedings, review and signature of the

12    transcript was requested.

13            I further certify that I am not related

14    to any of the parties to this action by blood or

15    marriage; and that I am in no way interested in

16    the outcome of this matter.

17            IN WITNESS WHEREOF, I have hereunto set

18    my hand this 29th day of March, 2022.

19

20            _____

21            JOHN L. HARMONSON, RPR

22            My commission expires: 04/14/26

23

24

25
```



**EXHIBIT D-100**

UNITED STATES DISTRICT COURT

FOR THE CENTAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

----------------------------------------

United States of America, ex rel.

Benjamin Poehling,

          Plaintiffs,

vs.                         No. 16-08697

UnitedHealth Group, Inc., et al.,

          Defendants.


-----------------------------------------


DEPOSITION


of Sean Creighton, taken pursuant to
notice to take oral deposition, given
remotely on the 4th day of October,
2022, before Nathan D. Engen, a notary
public in and for the State of
Minnesota.



Page 21

```
 1            Fee-for-Service Adjuster accounts for
 2            difference in documentation
 3            standards..."  Do you see that?
 4    A      Yes.
 5    Q      All right.  And that's the -- it is
 6            your summary of what the
 7            Fee-for-Service Adjuster accounts for;
 8            is that correct?
 9                   MS. MCMAHON:  Objection.
10                   THE WITNESS:  That is
11            correct.
12
13            By Mr. Schindler:
14    Q      And as you note here, "Because
15            Fee-for-Service claims data are not
16            audited to determine if the diagnosis
17            are supported by medical record, there
18            are undocumented errors in
19            Fee-for-Service data as research
20            shows."  Do you see that?
21    A      Yes.
22    Q      And that's something that you believed
23            in 2019; correct?
24    A      That is correct.
25    Q      And still believe today; correct?
```



Page 22

```
 1   A     That's correct.

 2   Q     Okay.  And you indicate that, "Absent

 3         an adjuster to account for such errors,

 4         RADV audits would be contrary to the

 5         statutory requirements."

 6               And then you cite to statute

 7         provision of Title 42 the United States

 8         Code.  And I'm quoting you here,

 9         "...which states that risk adjustment

10         must achieve actuarial equivalence

11         between Fee-for-Service and Medicare

12         Advantage."  Correct?

13   A     That's correct.

14   Q     All right.  And you still believe that

15         today; correct?

16   A     Yes.

17   Q     Okay.  And at the -- toward the top of

18         Page 3 of your article, it's a carry-on

19         paragraph from the bottom of Page 2

20         which talks about the revised payment

21         methodology that would remove the

22         Fee-for-Service Adjuster -- if you look

23         on the carry-on.

24   A     (Indicating).

25   Q     And at the top of Page 3 you note that
```



Page 23

```
 1          "...that you, we..." this is in the

 2          context of this article at Avalere

 3          "...have previously critiqued."  Is

 4          that correct?

 5                    MS. MCMAHON:  Objection.

 6                    THE WITNESS:  So...

 7                    MR. SCHINDLER:  Let me

 8          correct.

 9                    THE WITNESS:  Yeah.

10

11          By Mr. Schindler:

12   Q      Let me rephrase.  Let me rephrase.

13          Let's go back to the bottom of Page 2,

14          to make this easier.

15                    At the bottom of Page 2 you

16          wrote, "CMS has proposed that the

17          Fee-for-Service Adjuster is not

18          warranted based on the study."  Then

19          there's a long citation --

20   A      Sure.

21   Q      -- for the study.  And it continues,

22          "That we," and the 'we' here is

23          Avalere; correct?

24   A      (Indicating).

25   Q      "...have previously critiqued."  And
```



Page 24

```
 1          there's citations to some other Avalere
 2          publications.  Is that an accurate
 3          description?
 4                    MS. MCMAHON:  Objection --
 5                    THE WITNESS:  Give me one
 6          moment.
 7                    MS. MCMAHON:  -- vague.
 8                    THE WITNESS:  (Witness
 9          reading to self).  (Chuckling).  It's
10          actually correct.  What I don't see is
11          where it says, "We previously
12          critiqued."  I may be --
13
14          By Mr. Schindler:
15    Q     -- it's at the bottom of --
16    A     -- missing that.
17    Q     -- Page 2.
18    A     Bottom of Page 2.
19    Q     "The revised payment methodology..."
20          Do you see the paragraph at the bottom
21          of Page 2?
22    A     Yeah, yeah.
23    Q     Okay.  "The revised payment
24          methodology..." continues, "CMS has
25          proposed that the Fee-for-Service --
```



Page 25

```
 1   A     Correct.

 2   Q     -- is not warranted based on a study,"

 3         that's in bold.  Do you --

 4   A     Yeah, yeah.

 5   Q     -- see that?

 6   A     Sure.

 7   Q     And there's a reference to the -- to

 8         the --

 9   A     Yep.

10   Q     -- and then at the bottom, "That we,"

11         and it carries over to Page 3, "...have

12         previously critiqued."

13   A     I'm gonna show you Page 2 and if you

14         would be so kind to show me where it

15         says, "We," because I am missing it

16         entirely.

17               REPORTER'S NOTE:  Whereupon,

18               a discussion is conducted

19               off the record.

20               MS. MCMAHON:  I'm actually

21         missing it, too, in fairness.

22         (Laughing).

23

24         By Mr. Schindler:

25   Q     In -- in your -- okay.  It's because --
```



Page 26

```
 1           I'm sorry, if you look a little further

 2           up in the paragraph --

 3    A      Okay.  Got it.

 4    Q      -- it's not a carryover to Page 2 or 3.

 5           For some reason my version of the

 6           printout is printed differently.

 7    A      Okay.

 8    Q      At the bottom full paragraph on Page 2.

 9    A      Okay.

10    Q      Okay?  And it starts with, "The revised

11           payment methodology..."  Right?

12    A      Yep.

13    Q      Are we together now?

14    A      We have been except for the bit about

15           the, "We."

16    Q      (Laughing).

17                   MS. MCMAHON:  (Laughing).

18

19           By Mr. Schindler:

20    Q      I'm the one -- I'm one who wasn't

21           there, so apologies, Mr. Creighton.

22           All right.

23                   So you indicate there that

24           Avalere has previously critiqued that

25           study; is that an accurate description
```



Page 27

```
 1          of what you wrote there?
 2    A     It's an accurate description; I don't
 3          know what I wrote there because it's
 4          not on the piece of paper. (Laughing)
 5          Sorry to be a pain.  (Laughing).
 6    Q     (Laughing).
 7    A     Oh, geez.
 8    Q     All right.  Let's get to the same
 9          place.  If you go to --
10    A     (Indicating).
11    Q     -- bottom paragraph, Paragraph 2?
12    A     (Indicating).
13    Q     The first sentence, "The revised --
14    A     Yeah.
15    Q     -- methodology..."
16    A     Yeah, yeah.  Got all that.
17    Q     Okay.  And it continues in the middle
18          there, "The revised payment
19          methodology --"
20    A     -- ah, "that we have previously
21          critiqued."  Okay.  Got it.  We're on
22          the same page.
23                   REPORTER'S NOTE:  Whereupon,
                     a discussion is conducted
24                   off the record.
25
```



Page 28

```
 1        By Mr. Schindler:
 2    Q   Let's slow down and though we've had
 3        confusion, let's clear it up.
 4                You wrote at the bottom of
 5        Page 2 that, "The revised payment
 6        methodology removed the Fee-for-Service
 7        Adjuster, CMS has proposed that the
 8        Fee-for-Service Adjuster is not
 9        warranted based on the study," which
10        you cite there, "that we, and the 'we'
11        here is Avalere, have previously
12        critiqued," and that's in bold, in
13        reference to some other studies.
14                Is that an accurate
15        description of what you wrote?
16    A   Absolutely.
17    Q   Okay.  All right.  Now, you go on to
18        write that, "CMS suggests that it
19        assessed" -- sorry.  Let me start
20        again.
21                "CMS suggests it assessed
22        the difference in risk scores that
23        would occur from a model based on
24        unaudited Fee-for-Service data (the
25        current model), versus a model
```



Page 31

```
 1            group HCCs, and the costs; right?
 2                      So you would expect, at a
 3            minimum, if you -- the -- the general
 4            expectation would be if you take out
 5            diagnosis that are in error, you have
 6            the true population.
 7                      So the co -- the -- the
 8            prediction for the true population
 9            should differ from the prediction with
10            the population that says, "Error
11            embedded."
12   Q   Okay.  Can I stop you?  Because I want
13       to break that down.  When you say 'if
14       you remove the errors --
15   A   Right.
16   Q   -- and have the true population,' is
17       what you're saying that if you remove
18       the errors, you will have the true
19       population of the beneficiaries who
20       suffer from that condition?
21   A   Correct.
22   Q   And you, therefore, would have the
23       accurate population upon which to
24       distribute the cost associated -- the
25       incremental costs associated.
```



Page 32

```
 1    A    Ab -- absolutely, yeah.

 2    Q    Okay.  And -- go ahead and continue.

 3    A    So when that happens you expect either

 4         (chuckling), you're gonna take out

 5         people most likely who differ from the

 6         population with the error.

 7              And there's all sorts of

 8         reasons for that, but, you know.  So it

 9         can cause coefficients to either go up

10         or go down, but the chances they stay

11         more or less exactly the same seems

12         pretty low; right?

13    Q    And going back to that notion of

14         removing from the population the

15         erroneous diagnosis codes so that you

16         have the true population that suffer

17         from the conditions, you would expect

18         the costs, the incremental costs, of

19         caring for that condition to rise?

20    A    That has --

21              MS. MCMAHON:  -- objection

22         to form.  You can go ahead.

23              THE WITNESS:  That -- that

24         has been my expectation.  The -- our

25         study showed that it was a bit more
```



Page 33

1          complicate than that.

2                    So, yeah, that's normally

3          the expectation.  If you think about a

4          population who actually have cancer,

5          you know, and you measure them very

6          accurately and you look of the cost

7          versus somehow you've got a bunch of

8          miscodes and they really have something

9          else.

10                   Cancer is expensive, so you

11         would expect the coefficients for the

12         true population to be higher than one

13         with a bunch of other miscellaneous

14         stuff mixed in there.

15                   However, it turns out it's

16         not, like a lot of statistical stuff,

17         it's not quite as simple as that.  So

18         we found in our studies, sometimes they

19         rise, sometimes they go down.

20                   But on -- on average what

21         you do know is they're gonna be

22         different, they're... You know.  So I

23         agree with your initial hypothesis, it

24         was my hypothesis, too.

25                   Turns out it's not true for



Page 34

```
 1          all conditions across the model.

 2                    MR. SCHINDLER:  Okay.

 3

 4          By Mr. Schindler:

 5    Q     But -- but fundamentally the concern

 6          you had here with the study that CMS

 7          had conducted is that ultimately the

 8          methodology they employed seemed to be

 9          flawed to you; correct?

10    A     That is correct.

11                    MS. MCMAHON:  Objection.

12                    THE WITNESS:  And I can tell

13          you why.

14                    MR. SCHINDLER:  All right.

15                    THE WITNESS:  If you want.

16

17          By Mr. Schindler:

18    Q     In fact, I want to -- if you go a

19          couple pages back, you'll get to a -- a

20          section, and unfortunately your -- it's

21          -- it's not numbered.

22                    But if you continue back to

23          probably about the 6th page, you'll get

24          to a section were the header that says,

25          "The methodology includes steps that
```



Page 35

```
 1          minimize the impact of the

 2          Fee-for-Service Adjuster regardless of

 3          the error rate in the underlying data."

 4    A     Right.

 5    Q     Tell me when you're there.

 6    A     I'm there.

 7    Q     Okay.  And you wrote here that, "CMS

 8          applied the IPARS adjustment factor."

 9               And let's stop for a moment.

10          What -- what is IPARS adjustment factor

11          in -- in plain English?

12    A     That is a great question.  I'm not sure

13          that even to this day I can explain

14          what it is in plain English, or any

15          other language really.  Um...

16          (Laughing).

17               You know, essentially it was

18          an adjustment factor that once the

19          initial study had been critiqued, CMS

20          went back and, you know, they had to re

21          -- reestimate their initial study

22          because they'd lost the initial data

23          sets.

24               But they went back and they

25          did that.  And then they came up with
```



Page 36

1          this other factor which is based on

2          some theory I still, for the life of

3          me, don't understand.

4                    Um... But, basically, there

5          needed to be a correction to the model

6          coefficients that essentially removed

7          their own finding of the necessity for

8          a Fee-for-Service Adjuster.

9                    And they called this thing

10         the IPARS.  I'm -- I'm gonna tell you

11         this is some differential between the

12         corrected and uncorrected models.

13                    I still don't understand

14         what this thing is.  All I know is that

15         it basically mathematically reversed

16         the finding that they had just created,

17         magically, and they called it the IPARS

18         adjuster.

19    Q    Okay.  Let's go on and talk more about

20         that.  You wrote that the IPARS

21         adjustment factor -- that, "CMS applied

22         the IPARS adjustment factor to the

23         coefficients of each of the 50 model

24         simulations, normalizing them such that

25         the average predicted risk from each of



Page 39

1            whatever number you pick, but to 1.0

2            typically, you just divide through by

3            the mean.

4                    You divide everything -- all

5            these coefficients through by the

6            average and then it turns the dollars

7            into, you know, they're based on 1 and

8            if something's higher than 1 it's

9            bigger and if it's lower than one it's

10           smaller; right?

11                   So it's normal -- it's

12           called normalization.  So doing

13           something like that is quite normal

14           with model coefficients; it's not

15           unheard of.

16                   Sometimes you have to make

17           adjustments; right?  After you've done

18           the model to normalize to whatever

19           population you might want to normalize

20           to; right?

21                   That's, again, not totally

22           unheard of, there's lots of techniques

23           for doing that kind of thing, you know

24           to make sure you've got your 1.0.

25                   This is very important when



Page 40

```
 1          it comes to actuary equivalence and
 2          that sort of thing.
 3                    However, what CMS was doing
 4          here essentially was saying,
 5          (chuckling), "We're gonna normalize
 6          everything back to the -- the costs on
 7          the theory that somehow or other the,"
 8          I still don't get this one honestly,
 9          "On the theory that somehow or other if
10          you normalize everything back to the
11          actual cost" -- which should be the
12          same as the prediction from the model,
13          then I don't know what the heck they
14          were trying to do honestly.  But that's
15          -- that's essentially what they did.
16                    The problem is, the cost
17          doesn't vary whether you've corrected
18          data or uncorrected data; right?
19                    So they just basically
20          normalized this corrected model back to
21          the uncorrected model.  And I'm like,
22          "Okay.  Well, why?"  Right?
23                    It's still under -- like
24          let's -- sure you can do this, but like
25          it makes no sense and all you're doing
```



Page 41

```
 1            is eliminating the results you just
 2            found; right?
 3                    So you've corrected it and
 4            now you've normalized it back and
 5            uncorrected it again, so...
 6    Q     Well, let's try to break that down a
 7            little bit if we can and put it into --
 8    A     Sure.
 9    Q     -- to -- to English if we can.
10    A     (Laughing).
11    Q     If you go to the -- it continues, or
12            you continue, you wrote in -- in the
13            next paragraph down, it starts with,
14            "CMS describes the IPARS adjustment..."
15            Do you see that paragraph?
16    A     Yes.
17    Q     Okay.  Then you go down to the bottom
18            there you wrote, "The implementation of
19            the IPARS -- of the IPARS, amounts to a
20            complete negation of the findings of
21            the study because CMS normalized the
22            coefficient resulting from audited data
23            by using the mean expenditures of the
24            uncorrected data set."
25    A     Correct.
```



Page 42

```
 1   Q    Okay.  And is that essentially a
 2        summary of what you were just
 3        explaining to us a moment ago?
 4   A    Yes, it is.
 5   Q    And is it fair to say, Mr. Creighton,
 6        that before application of the IPARS
 7        adjuster, the CMS study found that
 8        about 80 percent, or at least a
 9        substantial majority of the
10        coefficients, had gone up when
11        calibrating --
12                 MS. MCMAHON:  Object.
13
14        By Mr. Schindler:
15   Q    -- a data set with the errors removed?
16                 MS. MCMAHON:  Objection --
17                 THE WITNESS:  I --
18                 MS. MCMAHON:  -- calls for
19        speculation.
20                 THE WITNESS:  And I actually
21        at this point in time, without
22        reviewing it, do not recall the
23        percentages or the results of their
24        study in that level of detail.
25                 MR. SCHINDLER:  Okay.
```



Page 43

 1

 2          By Mr. Schindler:

 3    Q     But, in fact, the majority of them had

 4          gone up even if you don't recall the

 5          exact percentage?

 6    A     That --

 7                   MS. MCMAHON:  Objection.

 8                   THE WITNESS:  -- would not

 9          surprise me.  I don't recall the exact

10          percentage right now.

11                   MR. SCHINDLER:  Okay.

12

13          By Mr. Schindler:

14    Q     So just to be clear, you were talking

15          over --

16    A     Oh.

17    Q     -- Ms. McMahon so, again, I just want

18          to make clear for the record that, even

19          if you don't recall the exact number

20          whether it was 80 percent or 70

21          percent, the substantial majority or a

22          majority of the coefficients had gone

23          up when calibrating on a data set with

24          the errors removed; right?

25                   MS. MCMAHON:  Objection.



Page 44

1           THE WITNESS:  I could

2      confirm that if I had the numbers in

3      front of me right now, but I do not,

4      so...

5

6      By Mr. Schindler:

7    Q    If you go down to the very next

8      paragraph, it begins with, "The IPARS

9      formula produces..."  Do you see that?

10   A    Yeah.

11   Q    All right.  You say, "The IPARS formula

12     produces a factor that, when applied,

13     reduces the risk score produced from

14     the audited model on average to be

15     equal to the risk score --

16   A    Yeah.

17   Q    -- from the unaudited model.

18           With such an adjustment in

19     place, the revised model will never

20     show a difference from the original

21     model.

22           Indeed, as the result of the

23     IPARS adjustment, even extraordinarily

24     high Fee-for-Service error rates would

25     be effectively negated and would have



Page 45

```
 1          no impact on the model CMS used for its
 2          study."  Do you see that?
 3    A     Yes, I do.
 4    Q     And do you agree with what you wrote in
 5          2019?
 6    A     I do.
 7    Q     And so as a practical matter, even if
 8          there were 90-percent error rates in
 9          the Fee-for-Service population data set
10          under -- using this IPARS formula that
11          was employed in the CMS study, there
12          would be no need for Fee-for-Service
13          Adjusters; is that correct?
14    A     That is my opinion, yes.
15    Q     Now on -- you indicated that you knew
16          that Mr. Smith and others within CMS
17          had undertaken the study and had
18          published the study.
19                    After you published your
20          2019 critique, that we're looking at
21          here, Exhibit 1111, did anyone at CMS
22          ever reach out to you to discuss your
23          critique?
24    A     No.
25    Q     Did anyone associated with the study
```



Page 46

```
 1           ever contest your findings that the
 2           study was flawed?
 3    A      No.
 4    Q      Did anyone at CMS ever present you with
 5           any evidence to suggest that your
 6           criticism was unwarranted?
 7    A      No.
 8    Q      Okay.  Nobody at CMS called you up and
 9           said, "Mr. Creighton, you just don't
10           understand the -- the underlying --
11    A      (Chuckling).
12    Q      -- statistical analysis"?  Or, "Mr.
13           Creighton, you -- you don't understand
14           what we did; here's the explanation"?
15                   MS. MCMAHON:  Objection --
16                   THE WITNESS:  No.
17                   MS. MCMAHON:  -- asked and
18           answered.
19                   THE WITNESS:  (Laughing).
20           No -- no, they did not.
21                   MR. SCHINDLER:  Okay.
22
23           By Mr. Schindler:
24    Q      And you stand by your critique of the
25           study to this day; do you not?
```



Page 47

```
 1   A     Absolutely.

 2   Q     Are you aware of any further studies

 3         being conducted by CMS on whether a

 4         Fee-for-Service Adjuster is necessary

 5         to account for the errors in the

 6         Fee-for-Service claims data that CMS

 7         uses to calibrate the risk adjustment

 8         model?

 9              MS. MCMAHON:  Objection;

10         calls for speculation.

11              THE WITNESS:  I am not aware

12         of such studies.  The -- the revised

13         study and -- and data sets were

14         published.

15              I'm not aware of anything

16         from CMS since then.

17              MR. SCHINDLER:  All right.

18

19         By Mr. Schindler:

20   Q     Let's see if we can switch gears.  All

21         right.  You can put those to one side.

22              Now, do you recall

23         testifying last time, that you were

24         aware that Medicare Advantage plans

25         were performing reviews of medical
```



Page 62

1   A    Yes.

2   Q    Okay.  And is this the proposed medical

3        record review rule that you were just

4        talking about?

5   A    Just give me one second.

6   Q    Sure.

7   A    (Witness reading to self).  Yes, it is.

8   Q    Okay.  And is it fair to say you

9        reviewed this proposed rule when it

10       came out in January of 2014?

11  A    That is not correct because at that

12       time I was working on the ACA.

13              And actually, yeah, given

14       this particular case, I absolutely did

15       not review this.  I was aware of this

16       however.

17  Q    Okay.  And to be clear, prior to

18       January of 2014, CMS had no such rule

19       in place for Medicare Advantage plans

20       conducting medical record reviews;

21       correct?

22  A    That is correct.

23              MS. MCMAHON:  Objection;

24       vague.

25



Page 63

```
 1        By Mr. Schindler:
 2   Q    And ultimately the medical record
 3        review ruled that was proposed in
 4        January of 2014 was withdrawn by CMS;
 5        correct?
 6   A    That is correct.
 7   Q    It never went in effect -- into effect;
 8        did it?
 9   A    It was not finalized.
10   Q    Okay.  And as you sit here today, is it
11        fair to say that you're unaware of any
12        other regulation that CMS promulgated
13        that would've directed Medicare
14        Advantage plans to determine the
15        accuracy of diagnosis codes being
16        submitted by the MA plans?
17             MS. MCMAHON:  Objection.
18             THE WITNESS:  That's
19        interesting.  The -- there's no direct
20        regulation that says thou shalt confirm
21        the accuracy of all codes being
22        submitted.
23             However, that being said,
24        there are multiple regulations and laws
25        covering a governing payment; right?
```



Page 64

1                    That, you know, clearly

2        indicate that a health plan has got to

3        have a, you know, a comprehensive

4        compliance rating.

5                    There's the requirement that

6        the -- that what is submitted is

7        documented in the medical record.

8                    However, there is certainly

9        not a requirement that MA plans

10       validate every code that is passed

11       across the CMS because literally there

12       are billions of them.

13                   And it would be technically

14       unfeasible -- infeasible, not feasible.

15       You know, so... You know, so there's

16       kind of a layer of the law regulation,

17       sub-regulatory guidance, that governors

18       this.

19                   But there's no specific

20       regulation that says you must look, you

21       know, validate every code.

22                   It's -- it's assumed that

23       the providers -- that it's the

24       providers job.

25                   It's done at hospitals; it's



Page 65

1          done at provider offices and what comes

2          from those sources on the record is --

3          unless there's some reason to suspect

4          otherwise, represents the provider's

5          evaluation of the diagnosis.

6                    MR. SCHINDLER:  Okay.

7

8          By Mr. Schindler:

9    Q    But to be clear as it relates to the

10         proposed medical record review that we

11         were looking at a moment ago, which

12         essentially says that if -- if a

13         Medicare Advantage plan undertakes a

14         medical record review, chart review --

15   A    (Indicating).

16   Q    -- that it must confirm the diagnosis,

17         the accuracy of the diagnosis, that had

18         been submitted; correct?

19                    There was no regulation, no

20         sub-regulatory guidance, no guidance,

21         no specific provision that CMS put out

22         that specifically directed an MA plan

23         that if it was gonna conduct a chart

24         review, it was required to undertake to

25         determine the accuracy of the diagnosis



Page 66

1      codes that had previously been

2      submitted?

3                MS. MCMAHON:  Objection --

4                THE WITNESS:  That is

5      correct.

6                MS. MCMAHON:  -- asked and

7      answered.  Sorry.  Objection; asked and

8      answered.  And compound.

9

10     By Mr. Schindler:

11  Q  You can answer.

12  A  That's a -- that is correct.

13  Q  Okay.  Now, you -- I want to switch

14     gears with you for a moment because you

15     -- you mentioned the fact that during

16     this time in 2014, for example, you

17     were working on the Affordable Care

18     Act --

19  A  Correct.

20  Q  -- side of CMS.  So I want to talk a

21     little bit about that.  I want to talk

22     about the health plans that

23     participated in the Affordable Care

24     market; okay?

25  A  (Indicating).



2719

Page 67

```
1    Q    And, again, for purpose of

2         nomenclature, if I talk about health

3         plans that participated in the ACA

4         exchange --

5    A    (Indicating).

6    Q    -- do you know what I'm talking about?

7    A    Yes, I do.  (Chuckling).

8    Q    Okay.

9              MS. MCMAHON:  Objection.

10

11        By Mr. Schindler:

12   Q    All right.  Now, in addition to

13        administering the Medicare Advantage

14        plans, CMS was also responsible for

15        overseeing the health plans that were

16        participating in the ACA exchange;

17        correct?

18   A    Correct.

19   Q    In fact, you were working on that;

20        right?

21   A    (Indicating).

22   Q    I think you told us between 2012 and

23        2015 you were working on the --

24   A    -- correct.

25   Q    We have to make sure, we don't talk
```



Page 68

```
 1              over each other --
 2   A    Yeah.
 3   Q    -- or the court reporter is gonna get
 4        mad at both of us.
 5                   All right.  Between 2012 and
 6        2015 you were working on the ACA
 7        exchange program; correct?
 8   A    That's correct.
 9   Q    All right.  And there were a whole
10        series of requirements that health
11        plans participating in the ACA exchange
12        were required to follow; is that
13        correct?
14   A    Yes, there were.
15   Q    And those requirements included
16        provisions regarding data submission;
17        right?
18   A    Correct.
19   Q    All right.  And those provisions also
20        included provisions pertaining to
21        compliance and (inaudible) maintaining
22        a compliance plan; correct?
23   A    Correct.
24   Q    All right.  Now among other things, do
25        you recall that the ACA health plans
```



Page 93

```
 1            codes in the Fee-for-Service claims

 2            data do not have a meaningful impact on

 3            risk adjustment model estimation and,

 4            further, do not bias MA plan payment."

 5            Right?

 6    A       Correct.

 7    Q       Okay.  Now in that last paragraph you

 8            go on, you and your colleagues at

 9            Avalere, go on to summarize that a,

10            "New analysis from Avalere suggests

11            that certain key assumptions embedded

12            in the CMS's analysis do not

13            appropriately capture the full

14            variation in the data and minimized the

15            impacted documentation error."

16            Correct?

17    A       Correct.

18    Q       And Avalere performed -- tested three

19            alternatives; correct?

20    A       Yes.

21    Q       And, "Avalere's analysis finds that

22            audit miscalibration bias yields under

23            payments of nearly 8 percent."

24            Correct?

25    A       Correct.
```



Page 94

1   Q    All right.  So at least as of 2019 the

2        work that you and your colleague had

3        done at Avalere had indicated under

4        payments of nearly 8 percent; correct?

5   A    Correct.

6   Q    All right.  Now going back to the IPARS

7        adjustment that CMS employed in the

8        context of the study; okay?  Do you

9        have that in mind?

10  A    Yes.

11  Q    The IPARS adjustment was a downward

12       adjustment; correct?

13              MS. MCMAHON:  Objection.

14              THE WITNESS:  Correct.

15              MR. SCHINDLER:  Okay.

16

17       By Mr. Schindler:

18  Q    And in fact CMS's own analysis had

19       determined that when using --

20       correcting for the errors in the

21       audited data, it would've resulted in a

22       higher coefficient; correct?

23              MS. MCMAHON:  Objection;

24       calls for speculation.

25              THE WITNESS:  So the --



Page 95

1          yeah, the audited model produced

2          different coefficients than the

3          unaudited model.

4                    MR. SCHINDLER:  Right.

5

6          By Mr. Schindler:

7     Q    And it produced higher coefficients

8          before application of that IPARS

9          adjustment; correct?

10                   MS. MCMAHON:  Objection.

11                   THE WITNESS:  Again, I have

12         no specific recollection of the exact

13         table of results, so I'm gonna take

14         your word for that.

15                   MR. SCHINDLER:  Okay.

16

17         By Mr. Schindler:

18    Q    But going back your own Avalere

19         analysis had produced -- (inaudible)

20         the results of the own -- of your own

21         Avalere analysis had -- had indicated

22         that a correction for the errors in the

23         data used to calibrate the model

24         would've resulted in under payment --

25    A    -- yes, of higher risk cores and...



Page 96

```
 1          Yes.
 2    Q     All right.  And, in fact, the fact that
 3          the IPARS adjustment was a downward
 4          adjustment tells you that the results
 5          CMS originally came up with would've
 6          resulted in a higher coefficient;
 7          correct?
 8    A     Correct.
 9              MS. MCMAHON:  Objection;
10          calls for speculation.
11              MR. SCHINDLER:  All right.
12
13          By Mr. Schindler:
14    Q     Let's switch gears.  Do you recall
15          testifying last time about something
16          called the, "Coding intensity
17          adjustment"?
18    A     I do.
19    Q     Okay.  You recall that the coding
20          intensity adjustment was a way to
21          account for the fact that MA plans have
22          a differential rate of increasing
23          coding relative to Fee-for-Service
24          plans -- relative to Fee-for-service;
25          correct?
```



Page 97

```
 1   A   Correct.

 2   Q   And you agree that the Medicare

 3       Advantage plans had a greater incentive

 4       to code more completely than the

 5       Fee-for-Service providers; correct?

 6   A   Yes.

 7   Q   And did you participate in attempting

 8       to calculate the coding intensity

 9       adjustment while you were at CMS?

10   A   Yes, I did.

11   Q   All right.  And did the rate of the

12       coding intensity adjustment change over

13       time?

14   A   (Chuckling).  So there's two different

15       things there.  The differential in the

16       rate of coding between Fee-for-Service

17       and MA changes over time; it fluctuates

18       slightly.

19              The coding intensity --

20       intensity adjuster, which is in the

21       payment system, is determined by law

22       and by regulation.

23              So it has been statutorily

24       -- sort of there's a statutory minimum

25       that has been in place for -- I can't
```



Page 125

```
 1   A     Correct.

 2   Q     And is -- is that what you understand

 3         the standard to continue to be?

 4   A     That is correct.

 5   Q     Okay.  And if we can just move to one

 6         other page here.  If you go back to

 7         Page 85 in this document -- oops.

 8                   Page 86; I'm sorry.  Page

 9         86.  Which is Section 4.16, "MA

10         Organization Responsibility Regarding

11         Deletions Slide 21."

12   A     Okay.

13   Q     Okay.  And that -- the indication Slide

14         21 next to that heading, is that what

15         you were referring to that CMS would

16         put together training slides for the MA

17         industry?

18   A     Yeah; correct.  So the -- so what the

19         participant guide is, if you can

20         imagine a auditorium or space, so we're

21         up there on the stage presenting the

22         slides which, you know, help present

23         the information we want the plans to

24         have.

25                   There's lots of people in
```



Page 126

```
 1            the audience.  And this is a sort of a
 2            read along, if you like, with the
 3            slides.  So when it refers to Slide 21,
 4            there's a slide deck that accompanies
 5            this.
 6    Q       I see.  Okay.  And if you look at the
 7            first bullet under Section 4.16 it
 8            says, "MA organizations must submit
 9            delete records when an erroneous
10            diagnosis cluster has been accepted by
11            RAPS and stored in the RAPS data base."
12            Correct?
13    A       (Indicating).  That's correct.
14    Q       And it is -- it's you're understanding
15            that that's an accurate statement of
16            what CMS's rules were?
17    A       It's a plan to become aware of the
18            diagnosis that was incorrect.  They're
19            required to delete it using the
20            instructions provided here.
21    Q       Okay.  Great.
22                   MS. MCMAHON:  All right.
23            Let's go -- let's go to a different
24            document.  We're going to pull up --
25            Martha, if you can pull up Exhibit 164,
```



Page 127

```
 1          previously marked 164.

 2                    THE WITNESS:  Okay.

 3                    MR. SCHINDLER:  You have --

 4          okay.

 5

 6          By Ms. McMahon:

 7    Q     And this is a Federal Register dated

 8          June 29th, 2000.  Are you -- just

 9          looking at these -- just looking at the

10          cover of this, are you familiar with

11          this particular Federal Register?

12    A     Now that I see it in front of me I

13          can't say that I've been holding it in

14          my memory since then.

15    Q     That's fine.  Okay.  Let's -- well, I

16          guess, if you could just turn to the

17          second page?

18    A     Sure.

19    Q     And if you just look -- you see that

20          it's dated June 29th, 2000; correct?

21    A     Correct.

22    Q     And if you just look at the -- the

23          summary the -- the very first entry on

24          the left-hand column in this document?

25    A     (Indicating).
```



Page 128

```
 1   Q    And just -- if you could like just
 2        glance through it just to remind
 3        yourself what this might be?
 4   A    (Witness reading to self).  Sure.  So
 5        it refers to CFR 422 and -- which is
 6        our favorite section, so...
 7   Q    Okay.  Understood.  And this is -- is
 8        -- do you understand this to be just
 9        the -- the implementing regulation of
10        the Medicare Advantage program?
11   A    Sure.  For that time period.
12   Q    Okay.  And did you -- are you aware
13        that initially the Medicare Advantage
14        program was referred to as the Medicare
15        Plus Choice program?
16   A    Yes, I'm aware.
17   Q    Okay.  And are you also aware that CMS
18        at this time used to be referred to as
19        the Health Care Financing
20        Administration?
21   A    Indeed.
22   Q    Yes.  And that's when you first started
23        working for CMS; correct?
24   A    Yeah, it was HCFA for a number of
25        months after I joined it.  And then our
```



Page 129

```
 1          good friend, Tom Skully, decided it
 2          needed a re-branding so we became CMS.
 3    Q     (Laughing).  All right.  Okay.  And
 4          let's see here... If you can turn to
 5          Page 100 of this document.
 6    A     Okay.
 7    Q     Okay.  All right.  And I think earlier
 8          when Mr. Schindler was asking you some
 9          questions about certifications, are you
10          -- are you aware that Medicare
11          Advantage organizations were required
12          to submit certifications or
13          attestations attesting to the
14          truthfulness, accuracy and completeness
15          of the data they're submitting?
16    A     I am.
17    Q     Okay.  And do you understand that this
18          Point 9, it starts on the left hand
19          column, titled, "Certification of Data
20          That Determine Payment/Certification of
21          the Accuracy ACR Information."
22                That that is referring to
23          the -- the attestation that we just
24          mentioned?
25    A     In fact it refers to more than that
```



Page 148

1      STATE OF MINNESOTA )

2                         )   ss.

3      CROW WING COUNTY   )

4

5           I, Nathan D. ENGEN do hereby

6      certify that the foregoing transcript in

7      the matter of United States of America,

8      ex rel. Benjamin Poehling vs.

9      Unitedhealth Group, Inc., et al is true,

10     correct and accurate:

11          That said transcript was prepared

12     under my direction and control from my

13     stenographic shorthand notes.

14          That I am not related to any of

15     the parties in this matter, nor am I

16     interested in the outcome of this

17     action.

18

19     Witness my hand and seal this 6th day of

20     October, 2022.

21

22

23                    *Nathan D. Engen*

24                    Nathan D. Engen

25



2732

**EXHIBIT D-101**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
        Plaintiffs,               )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
        Defendants.               )
_____ )



CONFIDENTIAL

Videotaped Deposition of

JOANNE DAVIS

Given Remotely

Thursday, September 8, 2022

9:02 a.m. Eastern



Reported by:  Karen K. Kidwell, RMR, CRR



Magna Legal Services

866-624-6221

www.MagnaLS.com



2734

Page 37

1      Q.   As -- we previously saw that the cover

2  e-mail was dated September 14th, 2016; that's the

3  date on Exhibit 1315.  Do you have any reason to

4  believe that this document was not accurate as of

5  September 14th, 2016?

6      A.   No, I don't.

7      Q.   I believe you mentioned you started

8  at the -- at the predecessor to CPI in 2008; is that

9  right?

10      A.   That's correct.

11      Q.   What were your job responsibilities at

12  that time?

13      A.   At that time I worked in Medicaid.  There

14  were -- started out on the audit resolution team.  I

15  would look at audit findings conducted by people in

16  field offices.  In 2010, when the Affordable Care Act

17  passed, the responsibility for writing a reg and --

18  and doing the outreach for the rollout of that reg

19  and that -- the implementation of the -- that

20  particular program.

21      Q.   When you say "that particular program,"

22  are you speaking exclusively about Medicaid?

23      A.   Yes.

24      Q.   What was your job title when you started

25  at the predecessor to CPI in 2008?



Page 38

1          A.    I was a health insurance specialist.

2          Q.    Did your title remain health insurance

3    specialist for the entire time that you worked at CPI

4    or its predecessor?

5          A.    Yes.

6          Q.    At some point while you were working in

7    CPI, did your role involve Part C Medicare Advantage?

8          A.    So there was a break in between.  I left

9    CPI in 2013 to go work in CM, which was Medicare

10   Advantage.  Prior to 2013, I worked exclusively on

11   Medicaid issues.

12         Q.    Was that October of 2013 that you moved?

13         A.    Yes.

14         Q.    In October of 2013, did you join the

15   Medicare Plan Payment Group?

16         A.    Yes.

17         Q.    Will you understand if I refer to the

18   Medicare Plan Payment Group as "MPPG"?

19         A.    Yes.

20         Q.    Did you join the Division of Payment

21   Validation at that time?

22         A.    Yes, I did.

23         Q.    Was your title health insurance specialist

24   when you joined MPPG?

25         A.    Yes.



Page 39

1          Q.    How long did you work with MPPG?

2          A.    I was there from October 2013 through

3    January 2017.

4          Q.    Did your title remain health insurance

5    specialist throughout that time?

6          A.    Yes, it did.

7          Q.    Where did you go in January 2017, with

8    respect to your career?

9          A.    I was reassigned --

10               MS. GLOVER:  Go ahead.

11               THE WITNESS:  I was reassigned to CPI.

12    BY MS. BLAKEMAN:

13          Q.    In January 2017, when you were reassigned

14    to CPI, what was your job title?

15          A.    Was health insurance specialist.

16          Q.    When did you leave CPI following your

17    transition there in January of 2017?

18               MS. GLOVER:  Objection.  Asked and

19          answered.

20               THE WITNESS:  I left CPI in October 2019.

21    BY MS. BLAKEMAN:

22          Q.    Let's focus on your role at MPPG from

23    October 2013 to January of 2017 for now.  Could you

24    describe your job responsibilities at that time?

25          A.    I joined CM -- or I joined MPPG, or DPV,



Page 40

1    to be on the RADV legal appeals team.

2         Q.    What does the RADV legal appeals team do?

3         A.    It was anticipated that -- that the team

4    would litigate the Medicare Advantage organization

5    appeals that would result as a -- as a -- that would

6    come as a result of the RADV audits.

7         Q.    Is that what the team ultimately did?

8         A.    Yes.

9         Q.    What was your particular role on the RADV

10   legal appeals team?

11        A.    To litigate the appeals that came in front

12   of the Office of Hearings and Inquiries.

13        Q.    Were you litigating those appeals in your

14   capacity as an attorney?

15             MS. GLOVER:  Objection.  Form.  Asked and

16        answered.

17             THE WITNESS:  I was a trained attorney;

18        however, my official classification was health

19        insurance specialist.

20   BY MS. BLAKEMAN:

21        Q.    So is it fair to say you were not

22   litigating in your capacity as an attorney?

23             MS. GLOVER:  Objection.  Asked and

24        answered.

25             THE WITNESS:  I have legal training, but I



Page 41

1      was classified as a health insurance specialist.

2    BY MS. BLAKEMAN:

3      Q.    What did you do as a health insurance

4    specialist with respect to litigating the appeals?

5      A.    I wrote briefs.  I argued cases in front

6    of the administrative law judge.  I did -- I held

7    prehearing conferences with the administrative law

8    judge and other parties.  I sent communications to

9    the attorneys involved, and managed the case load

10   docket.  And I tried the cases.

11     Q.    Do you know whether or not a person must

12   have a license to practice law to appear before an

13   administrative law judge?

14     A.    I don't know that.

15     Q.    Did you litigate any RADV appeals with

16   respect to UnitedHealth?

17     A.    Yes.

18     Q.    How many times?

19     A.    I don't remember.

20     Q.    Could you give me a ballpark?

21     A.    Under the United umbrella, there may have

22   been between four and eight contracts that had

23   numerous appeals within their contracts.

24     Q.    Turning to -- turning back to your résumé,

25   I'm on the first page of Exhibit 1315-1.  And I'm



2739

Page 46

1    up, you know, audio lines.  So there -- there were a

2    number of activities that -- that needed to -- to be

3    completed in order to -- to put on a -- a successful

4    teleconference.

5        Q.   The third bullet on the first page begins:

6    "CY 2011 Contract-Level RADV."  Do you see that?

7        A.   Yes.

8        Q.   What did you do for CY 2011 Contract-Level

9    RADV?

10        A.   So again I was a government task lead,

11    which is not the same as a contractor office

12    representative.  And we met with the medical record

13    review contractors and the analytic contractors,

14    doing the same type of production activities,

15    preproduction, post production activities, to put on

16    a teleconference.

17        Q.   Is the CY 2011 contract-level RADV

18    sometimes referred to as "CON11"?

19        A.   Yes.

20        Q.   The first sentence in that third bullet

21    reads:  "Serves as GTL for the contract-level RADV

22    reconsideration/appeals process, overseeing the work

23    of medical record review contractors, coordinating

24    industry training logistics, preparing instructions,

25    slides, and other written materials."



Page 47

1          Did I read that correctly?

2      A.    Yes.

3      Q.    What is meant by "reconsideration/appeals

4  process"?

5      A.    So in the RADV regulation, there is an

6  opportunity for MAOs to dispute their medical record

7  findings, called reconsideration.  And it's a

8  precursor to the appeals process.

9      Q.    Did your role involve both reconsideration

10 and the appeals process?

11     A.    Yes.

12     Q.    Was that true just for CON11, or was that

13 true for other RADV audits as well?

14     A.    CON11 was the first year that the

15 reconsideration step was -- was -- was in -- in reg.

16 Prior to CON11, would have been the 2007 audits, it

17 was a process called "medical record dispute."  The

18 reconsideration became a separate step.

19     Q.    And you had involvement in the medical

20 record dispute step for the 2007 RADV audits; is that

21 right?

22     A.    Yes.

23     Q.    While you were at MPPG, what role did you

24 have in overseeing the work of medical record review

25 contractors?



Page 48

1          MS. GLOVER:  Objection.  Vague.

2          THE WITNESS:  I was a GTL, which is

3      government task lead.  So I, with others, met

4      with the medical review contractors weekly, and

5      on an ad hoc basis.

6  BY MS. BLAKEMAN:

7      Q.   Did your work in overseeing the medical

8  record review contractors relate solely to

9  reconsideration appeals or medical record dispute, or

10 did it also relate to the RADV audits themselves?

11     A.   So I was on the legal team, so my role

12 would have been primarily limited to medical record

13 dispute and the appeals.  On a general basis, the

14 team did meet with the -- the MRRCs.  But my work was

15 limited to the appeals.

16     Q.   What contractors did you work with while

17 at MPPG?

18     A.   All of them?  Do you want me to list all

19 of them?

20     Q.   Yes.

21     A.   There was the -- the Signature.  There was

22 Deloitte.  I'm not remembering the names of the

23 medical record -- the MRRCs at the time.  There were

24 two.  There was Deloitte, and there was NewWave.

25 Yes.



Page 107

1                C E R T I F I C A T E

2

3        I, KAREN K. KIDWELL, RMR, CRR, Notary Public

4    for the Commonwealth of Virginia, do hereby certify

5    that the witness whose deposition is hereinbefore set

6    forth, was virtually sworn under penalty of perjury

7    by me and that such deposition is a true record of

8    the testimony given by such witness.

9

10        I further certify that I am not related to any

11   of the parties to this action by blood or marriage;

12   and that I am in no way interested in the outcome of

13   this matter.

14

15

16   _____

                     KAREN K. KIDWELL, RMR, CRR

17                   Registered Merit Reporter

                     Certified Realtime Reporter

18                   Registration #7625774

                     My Commission expires:

19                   September 30, 2023

20

21

22

23

24

25



**EXHIBIT D-102**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA      )   No. 16-08697 FMO
ex rel. BENJAMIN POEHLING,    )
                              )
              Plaintiffs,     )
                              )
v.                            )
                              )
UNITEDHEALTH GROUP, INC.,     )
et al.,                       )
                              )
              Defendants.     )
_____)




*** CONFIDENTIAL ***


VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

TAMMY DICKEY

(Taken virtually)

9:02 a.m. Eastern

Tuesday, May 24, 2022



REPORTED BY:  Christine A. Taylor, RPR


Magna Legal Services

866-624-6221

www.MagnaLS.com


2745

1    may be documented, but it doesn't mean that it

2    should be coded according to guidelines.

3          Q.   So is the distinction that you're

4    making that it has to be documented in accordance

5    with guidelines?

6          A.   In order to make the code assignment

7    for the diagnosis that is documented, it has to be

8    documented in a way that meets the guideline to

9    code that diagnosis.

10         Q.   Is there a way that you can phrase

11   that that kind of going forward throughout the day

12   that you and I will both understand what you mean

13   by documented in a way that, you know, meets the

14   guidelines?

15         A.   Is there -- I'm sorry, is there a way?

16         Q.   Is it fair for us to say going forward

17   throughout today, based on the explanation that

18   you just gave, to say documented in the medical

19   record in accordance with guidelines?

20         A.   I'm not sure because -- we're not --

21   the providers document the way they document.  So

22   it's the coder's review of the record and

23   interpretation of that to make the code

24   assignment.

25         Q.   So what you're saying is that in chart

Page 76

1    review a coder is making code assignments based on

2    what's documented in the medical record, but those

3    coding assignments are made in accordance with

4    guidelines?

5                MS. MADDOUX:  Objection.  Form.

6                THE WITNESS:  I believe that sounds

7           correct.

8    BY MS. GLOVER:

9        Q.    Okay.  So is it your -- is it your

10   understanding that in chart review coders were

11   tasked or are tasked with identifying or making

12   coding assignments for a medical record in

13   accordance with guidelines?

14               MS. MADDOUX:  Objection.  Form.

15               THE WITNESS:  I would say that is

16          generally correct.

17   BY MS. GLOVER:

18       Q.    Okay.  Ms. Dickey, are you familiar

19   with the term "blind review" as the term was used

20   at Optum?

21       A.    I am.

22       Q.    What is blind review of a medical

23   record?

24       A.    So at Optum a blind review means the

25   coder opens the record and assign -- you know,

2747

Page 77

1    reviews and assigns codes without any information

2    or knowledge of what that member may previously

3    have had.

4           Q.   And when you say have had, do you mean

5    have had in previous date of service years?

6           A.   In previous date of service years or

7    even that date of service year, I guess.  They

8    just have no information.  They're not informed

9    that maybe the patient had a knee amputation the

10   year before.  They don't know that.

11          Q.   So in that -- in a blind review, is a

12   coder -- they're looking at a medical record, but

13   they have no additional information about what the

14   beneficiary has had previously or even information

15   about diagnoses that a provider has submitted for

16   the current date of service year; is that right?

17          A.   That's correct.

18          Q.   And they -- and their task then is

19   to -- is to assign codes based on guidelines and

20   see what is documented in the medical record based

21   on those guidelines?

22              MS. MADDOUX:  Objection.  Form.

23          Confusing.

24              THE WITNESS:  Their -- will you repeat

25          that?

Page 78

```
 1   BY MS. GLOVER:
 2        Q.   Why don't we just move on.  I think --
 3   in Optum's blind chart review -- scratch that.
 4             Does Optum -- since you've been at
 5   Optum, has Optum used a blind chart review
 6   approach?
 7             MS. MADDOUX:  Objection.  Form.
 8             THE WITNESS:  All -- for certain time
 9        frames or like -- so they're, I think,
10        during -- if something is privileged, am
11        I -- I can't --
12             MS. MADDOUX:  Need to take a break?
13             MS. GLOVER:  Do you need to consult
14        with your attorney?
15             THE WITNESS:  I think so, yes.
16             MS. GLOVER:  Okay.  Why don't we go off
17        the record.
18             THE VIDEOGRAPHER:  Time is now
19        10:58 a.m.  We are going off the record.
20      (Recess taken from 10:58 a.m. until 11:06 a.m.)
21             THE VIDEOGRAPHER:  The time is now
22        11:06 a.m.  We are back on the record.
23   BY MS. GLOVER:
24        Q.   And, Ms. Dickey, are you able to
25   answer my question?
```

Page 251

1                    CERTIFICATE OF REPORTER

2

              I, Christine A. Taylor, Certified
3    Court Reporter within and for the State of
     Georgia, do hereby certify:

4

              That the foregoing deposition was
5    taken before me on the date and at the time and
     location stated on Page 1 of this transcript; that
6    the deponent was duly sworn to testify to the
     truth, the whole truth and nothing but the truth;
7    that the testimony of the deponent and all
     objections made at the time of the examination
8    were recorded stenographically by me and were
     thereafter transcribed; that the foregoing
9    deposition as typed is a true, accurate and
     complete record of the testimony of the deponent
10   and of all objections made at the time of the
     examination to the best of my ability.

11

              I further certify that I am neither
12   related to nor counsel for any party to the cause
     pending or interested in the events thereof.
13   Witness my hand, this 26th day of May, 2022.

14

15
                    *Christine A. Taylor*
16   _____

17            Christine A. Taylor, RPR
              CCR-4736

18

19

20

21

22

23

24

25

**EXHIBIT D-103**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. CV 16-086FMO

BENJAMIN POEHLING,                )      FMO (SSx)

                                  )

         Plaintiffs,              )

                                  )

v.                                )

                                  )

UNITEDHEALTH GROUP, INC., et al., )

                                  )

         Defendants.              )

_____ )



CONFIDENTIAL

Videotaped Deposition of MARK DUGGAN, Ph.D.

Given Remotely

Friday, March 29, 2024

8:31 a.m. Pacific




Reported by:  Karen K. Kidwell, RMR, CRR


Magna Legal Services

866-624-6221

www.MagnaLS.com



Page 222

1   into the model using -- I forget what the function is

2   that he used in Excel to introduce the randomness.

3   But he did introduce some randomness for sure, but it

4   was thoughtfully introduced.

5        Q.   Okay.  You'll have no disagreement from me

6   on the thoughtfulness of Dr. Ingber's work.

7             So is your -- the point that you pointed

8   out here where Dr. Ingber said:  "Essentially,

9   Lambert and Duggan's analysis is misleading because

10  it fails to recognize the different impacts

11  unsupported codes have in the TM data versus the MA

12  data."  And then he explains -- the following

13  sentence he explains what he opines is the

14  difference.

15            Are -- well, I'm just going to ask you

16  straight up.  Do you -- do you agree with Dr. Ingber

17  that you failed to recognize the different impact

18  unsupported codes have in the TM data versus the MA

19  data or do you disagree with Dr. Ingber on that

20  point?

21       A.   I disagree with him in the sense that I --

22  as I -- I'm drawing on my many years of experience

23  studying Medicare and Medicare Advantage and so

24  forth, I recognize that in one case, the thought --

25  the quote "thought experiment" -- I don't know if



2753

Page 223

1    that's the exact phrase that he uses -- but of

2    removing a code from someone in MA or deleting an HCC

3    for someone in MA, that will mechanically lower

4    reimbursement by the government to that -- on behalf

5    of that person.  Whereas, in the -- and suppose you

6    did that same deletion in the traditional Medicare

7    case, that would not influence reimbursement for that

8    person.  Traditional Medicare is fee for service and

9    reimbursement is based on services, not on diagnoses.

10   So it would -- it would not influence reimbursement

11   for that person, but it would estimate -- influence

12   model coefficients.

13            And those model coefficient estimates

14   might be small, but aggregated across a big

15   population of people, it's not just affecting that

16   one person.  It's not affecting that person's

17   spending actually at all.  It's affecting spending

18   for this different group of people in MA and

19   that's -- that is a big -- that's a potentially big

20   effect.  And so it is, I think, the -- I recognize

21   that there's those two things aren't identical by any

22   means.

23            In one case it affects reimbursement for

24   the individual with the unsupported code.  And in

25   one -- and in the other case, it would not for that



Page 224

1    person.  It would affect it for many other people

2    potentially.

3         Q.   Right.  Okay.  Understood.  I understand

4    your point.

5              So -- so you don't have any disagreement

6    that where he states that -- that:  "The effective

7    added unsupported codes in MA data when a TM

8    estimated model is being applied to determine payment

9    to the MA is quite different and increases payment.

10   There is no averaging out or redistribution of costs

11   to other HCCs or demographic factors."

12             You would agree with that statement?

13             MR. BAAK:  Objection.  Mischaracterizes

14        prior testimony.  Form.

15             THE WITNESS:  That is -- I -- I agree that

16        it is different, but not for the -- the things

17        that I would flag when I was talking about why

18        it is different would be what I just described

19        with which is in one case it affects payment for

20        one individual.  In another case it affects

21        payment for many -- not that individual but many

22        other people.  And aggregating that out -- it

23        tends to be the case that if you're removing

24        HCCs from the model used to estimate fee for

25        service, it tends to be the case not in every



Page 242

1                    CERTIFICATE

2

3         I, KAREN K. KIDWELL, Registered Merit Reporter,

4    and Certified Realtime Reporter, do hereby certify

5    that prior to the commencement of the examination,

6    the deponent was remotely sworn to testify to the

7    truth, the whole truth under penalty of perjury.

8         I DO FURTHER CERTIFY that the foregoing is a

9    verbatim transcript of the testimony as taken

10   stenographically by me at the time, place and on the

11   date hereinbefore set forth, to the best of my

12   ability.

13        I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of any

15   of the parties to this action, and that I am neither

16   a relative nor employee of such attorney or counsel,

17   and that I am not financially interested in this

18   action.

19

20                 _____

21                 Karen K. Kidwell
                   Registered Merit Reporter
22                 Certified Realtime Reporter
                   Notary Public

23

24

25



2756

**EXHIBIT D-104**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. BENJAMIN POEHLING, | ) ) ) | No. 16-08697 FMO |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITEDHEALTH GROUP, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

CONFIDENTIAL INFORMATION, SUBJECT TO PROTECTIVE ORDER

VIDEOTAPED VIDEOCONFERENCE ZOOM DEPOSITION OF
KAREN ERICKSON

August 2, 2022

9:32 a.m. Eastern Standard Time

Magna Legal Services          Prepared by:

(866) 624-6221               Marcella Daughtry, RPR, RMR

www.MagnaLS.com              CA CSR 14315

                            GA No. 6595-1471-3597-5424



2758

Page 105

1    to become -- just started to work with that business.  I

2    talked to a lot of the experts and staff that we had in

3    that area.

4         Q    Who did you talk to?

5         A    I don't recall everyone's name at the time.  I

6    would say -- I'm sure I talked to Jeff Dumcum, Jon Bird,

7    Katie Baker.  I'm not sure -- I'm not sure who else.

8         Q    Did you talk to Stephanie Will?

9         A    I don't recall.

10        Q    Have you ever heard the term "blind chart

11   review"?

12        A    Yes, I have heard the term.

13        Q    Do you have an understanding of what a blind

14   chart review is?

15        A    My understanding of a blind chart review, it

16   would be a review by a coder without an understanding of

17   anything that might have been coded from that chart

18   before.

19        Q    And when you say "anything that might have been

20   coded by that chart before," what do you -- what do you

21   mean by "coded from that chart before"?

22        A    Well, providers -- providers send the codes in,

23   so providers provide services to the patients, and then

24   the provider's office submits the codes related to the

25   diagnosis that the provider -- and that -- that visit,



2759

Page 106

1    what codes were there.  So those would be codes submitted

2    by a provider.

3        Q    Okay.  And so in the blind chart review, the

4    coders don't know what codes were already submitted by

5    the provider; is that right?

6        A    That's my understanding.

7        Q    And earlier I asked you a question about

8    whether providers submit codes, and I was unclear on your

9    answer.  So it sounds like we agree that providers do

10   submit codes from their visits with beneficiaries; is

11   that right?

12            MS. SOBEL:  Objection to form.  Vague.

13            THE WITNESS:  I don't -- I don't recall the

14   exact processes, and I'm not sure -- I'm not sure you can

15   say all providers submit all codes and to whom.  I don't

16   know that I can put all of that together.

17       Q    BY MS. KRIEG:  Uh-huh.  So some providers,

18   then, submit risk adjusting codes from their visits with

19   beneficiaries to Optum?

20            Do you agree with that?

21            MS. SOBEL:  Objection to form.

22            THE WITNESS:  I don't know the answer to that.

23       Q    BY MS. KRIEG:  Sitting here today, you don't

24   know the answer to that?

25       A    Sitting here today, I don't know the answer to



Page 107

1    that.

2        Q   Okay.  But you agree that in a blind chart

3    review at least, that coders don't have access to

4    information about diagnosis codes that providers have

5    previously submitted for a beneficiary?

6        A   Yes.  In my -- in my recollection in a blind

7    coding, the coders would not know what has previously

8    been submitted.

9        Q   Have you ever heard the term "informed chart

10   review"?

11       A   I don't know if I have heard "informed chart

12   review."  I'm going to say no, I don't -- I'm not sure if

13   I understand the meaning of that term.

14       Q   Okay.  Have you ever heard of a chart review

15   where the providers -- strike that.

16           Have you ever heard of a chart review where the

17   coders are told to code only codes that have not already

18   been submitted by a provider?

19           MS. SOBEL:  Objection to form.

20           THE WITNESS:  No, I don't think so, because I'm

21   not -- I don't know how they would have known that.

22       Q   BY MS. KRIEG:  Okay.  Are you familiar with --

23   okay, let me ask you this.  When you became familiar with

24   Optum's chart review in the fall of 2012, did you gain an

25   understanding of whether the Chart Review program was a



Page 108

1    blind chart review?

2        A    Yeah, it was my understanding it was a blind

3    Chart Review program.

4        Q    And is it correct that the charts were reviewed

5    retrospectively?

6            MS. SOBEL:  Objection to form.

7            THE WITNESS:  I don't understand that word,

8    when you say "retrospectively."

9        Q    BY MS. KRIEG:  So the charts that were reviewed

10   were not from the contemporaneously date of service; it

11   was, you know, previously, previous year's date of

12   service.

13           MS. SOBEL:  Objection to form.

14           THE WITNESS:  I think I would have understood

15   that at the time, but at this point I don't remember how

16   the calendar part of it worked.

17       Q    BY MS. KRIEG:  Okay.  Because you haven't

18   worked in this area for so long?

19       A    Yes.

20       Q    Are you familiar with something called the

21   recode project?

22           THE COURT REPORTER:  Recode?

23           MS. KRIEG:  Recode.  R-e-c-o-d.

24           THE WITNESS:  Yes.

25       Q    BY MS. KRIEG:  What is the recode project?



Page 109

 1              MS. SOBEL:  And I just want to caution the

 2    witness not to reveal any aspect of the project that you

 3    are familiar with that's privileged, but to the extent

 4    you are able to answer and not reveal privileged

 5    information, go ahead.

 6              THE WITNESS:  Can we -- can we consult for a

 7    minute?

 8              MS. SOBEL:  Yeah, can we go off the record for

 9    one minute?

10              MS. KRIEG:  Of course.  Yes.  Take your time.

11              THE VIDEOGRAPHER:  The time is 12:27 p.m.  We

12    are off the record.

13              (The deposition was at recess from 12:27 p.m.

14    to 12:34 p.m.)

15              THE VIDEOGRAPHER:  The time is 12:34 p.m., and

16    we are on the record.

17              MS. KRIEG:  I don't -- I actually don't

18    remember the last question before the break.  Could we

19    have it read back.

20              (The requested portion of the record was read

21    by the court reporter as follows:  "What is the recode

22    project?")

23              MS. SOBEL:  I will just give the same

24    cautionary language not to reveal the content of any

25    privileged conversations you had, but to the extent you



Page 292

1   STATE OF GEORGIA            )
                               )      ss:
2   COUNTY OF DEKALB           )

3

4            I HEREBY CERTIFY that the foregoing deposition

5   was taken before me; that I was then and there a

6   Registered Professional Reporter and Registered Merit

7   Reporter, License No. 6595-1471-3597-5424 for the State

8   of Georgia, and License No. 14315 in the State of

9   California; that the witness before testifying was duly

10  sworn by me to testify to the whole truth; that the

11  questions propounded by counsel and the answers of the

12  witness thereto were taken down by me in shorthand and

13  thereafter transcribed under my direction; and that the

14  foregoing pages contain a full, true, and accurate

15  transcript of all deposition testimony and proceedings

16  had, all done to the best of my skill and ability.

17           Signature requested.

18           I FURTHER CERTIFY that I am in no way related

19  to, nor employed by any of the parties hereto, nor am I

20  in any way interested in the outcome.

21           DATED at Dunwoody, Georgia, this 8th day of

22  August, 2022.

23

24           MARCELLA L. DAUGHTRY, RPR, RMR
             GA License No. 6595-1471-3597-5424
25           CA CSR 14315



**EXHIBIT D-105**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )




Videotaped Deposition of

DANIEL FARMER

Given Remotely

Friday, March 18, 2022

10:04 a.m.




Reported by:  Karen K. Kidwell, RMR, CRR




Magna Legal Services
866-624-6221
www.MagnaLS.com



2766

Page 31

1    BY MS. BLAKEMAN:

2         Q.   Yes.  I believe you stated that you

3    worked -- well, I'll just restart.

4              Can you describe the typical work that you

5    would -- that Ms. Bella would do, for which you would

6    support her logistically?

7         A.   Ms. Bella did something different every

8    day.  If your question is about what work she did day

9    to day, there's not a single answer to that question.

10   I could speak broadly about some of the work of the

11   Medicare-Medicaid Coordination Office during that

12   time, but I -- I can't characterize Ms. Bella's work

13   day to day.

14        Q.   Did any of the work that Ms. Bella

15   performed while you were her special assistant touch

16   upon or relate to Medicare Advantage?

17        A.   Yes.

18        Q.   What about risk adjustment?

19        A.   Yes.

20        Q.   I believe you became the special assistant

21   to Sean Cavanaugh in May of 2014; is that right?

22        A.   I believe that's correct.

23        Q.   Why did you change positions from being

24   the special assistant to Ms. Bella to being the

25   special assistant to Mr. Cavanaugh?



Page 32

1              MS. LIKOFF:  Object to form.

2              THE WITNESS:  I was interested in getting

3        a different experience during my time at CMS.

4    BY MS. BLAKEMAN:

5        Q.   Did you become the special assistant to

6    Mr. Cavanaugh immediately upon his taking the

7    position of deputy administrator and director?

8              MS. LIKOFF:  Object to form.  Vague.

9              THE WITNESS:  Can you clarify?

10   BY MS. BLAKEMAN:

11       Q.   Certainly.  What position did

12   Mr. Cavanaugh hold at CMS when you became the special

13   assistant to Mr. Cavanaugh?

14       A.   When I became Mr. Cavanaugh's special

15   assistant, he was the deputy administrator at CMS and

16   the director of the Center for Medicare.

17       Q.   How long had he held those positions when

18   you became his special assistant?

19       A.   I don't know.

20       Q.   What were your job duties in your position

21   as special assistant to Mr. Cavanaugh?

22       A.   My responsibilities for Mr. Cavanaugh as

23   his special assistant were primarily logistical.  I

24   was responsible for making sure the day-to-day, his

25   calendar was up to date for meetings that he had



Page 33

1    planned on the calendar, making sure that the correct

2    staff were included and were able to attend.  If

3    there were external meetings, making sure that

4    Mr. Cavanaugh had received materials that the

5    external folks would have submitted.  Some -- or

6    excuse me -- that wasn't specific to external

7    meetings.  That would have been all meetings.  Making

8    sure that Mr. Cavanaugh had materials for those

9    meetings before he attended.

10            If we were going to be using video

11   teleconferencing, I was responsible for making sure

12   the video teleconferencing was working.  If we were

13   having an audio-only call, making sure that the

14   conference call was working.

15            Was also responsible for making sure that

16   Mr. Cavanaugh was notified if other parts of CMS were

17   looking to get in touch with him on an urgent or --

18   on an urgent matter, if need be.

19            So, again, helping to coordinate

20   Mr. Cavanaugh's day and his schedule.

21      Q.   Were you responsible for drafting any

22   briefing materials for Mr. Cavanaugh at that time?

23            MS. LIKOFF:  Object to form.  Vague.

24            THE WITNESS:  Could you clarify what you

25       mean by "briefing materials"?



Page 34

1    BY MS. BLAKEMAN:

2         Q.   Certainly.  Were you responsible for

3    drafting for Mr. Cavanaugh any background materials

4    or policy summaries for Mr. Cavanaugh in advance of

5    the meetings that you helped coordinate?

6         A.   No.

7         Q.   Were you responsible for writing any first

8    drafts for Mr. Cavanaugh, that he would then adopt as

9    his own?

10             MS. LIKOFF:  Object to form.  Vague.

11             THE WITNESS:  First drafts of -- of what,

12        exactly?

13   BY MS. BLAKEMAN:

14        Q.   Well, I'm starting broad because I'm not

15   sure, so I'm trying to get that information from you.

16             Were you responsible for drafting any

17   documents that Mr. Cavanaugh would then edit?

18             MS. LIKOFF:  Same objection.

19             THE WITNESS:  So I would first say I was

20        never responsible for drafting policy documents

21        that were intended to inform Mr. Cavanaugh.

22        Those responsibilities -- that responsibility

23        for drafting that material rested with other

24        staff and policy experts within the Center for

25        Medicare, and those documents were routinely



Page 35

1           provided to him in advance of internal meetings.

2                 Does that answer your question?

3    BY MS. BLAKEMAN:

4           Q.    I -- it answers an earlier question.

5                 The next question is whether or not you

6    would draft for Mr. Cavanaugh documents that he would

7    then send out to colleagues.

8                 MS. LIKOFF:  Object to form.

9                 THE WITNESS:  So can you clarify what you

10          mean by "colleagues"?

11   BY MS. BLAKEMAN:

12          Q.    Other CMS employees.

13          A.    So, broadly, I had a responsibility at

14   times to draft summaries of the work of Center for

15   Medicare, either representing policy decisions or

16   policy recommendations for other parts of CMS and

17   HHS.  When I would draft those materials, they had to

18   be reviewed, typically by Mr. Cavanaugh, and also

19   policy staff within the Center for Medicare, to

20   verify accuracy and narrative description.

21          Q.    Did any of those summaries that you

22   drafted relate to Medicare Advantage?

23                MS. LIKOFF:  Object to form.

24                THE WITNESS:  I don't know.

25



Page 36

1    BY MS. BLAKEMAN:

2         Q.   Did any of the summaries you drafted

3    relate to risk adjustment?

4              MS. LIKOFF:  Object to form.

5              THE WITNESS:  I don't know.

6    BY MS. BLAKEMAN:

7         Q.   Who did you report to as special assistant

8    to Mr. Cavanaugh?

9         A.   I reported to Mr. Cavanaugh.

10        Q.   Did you report to anyone else?

11        A.   No.

12        Q.   Did anyone report to you while you were in

13   that position?

14        A.   No.

15        Q.   Who else besides Mr. Cavanaugh at CMS

16   would you work with regularly -- I'll say weekly

17   again -- while you were in this position?

18        A.   Say there were many, many people.  Within

19   the Center for Medicare, I would have worked

20   regularly with other special assistants; again, for

21   coordinating materials and scheduling purposes.

22   Outside of the Center for Medicare, I would again be

23   working with representatives from other offices, when

24   Mr. Cavanaugh needed to have conversations or

25   meetings with them.  I would have been in touch with



Page 37

1    the press office, the legislative office, the Office

2    of Strategic and Regulatory Affairs.  Those are a few

3    examples.

4          Q.   Would you take notes in meetings that

5    Mr. Cavanaugh attended while you were in that

6    position?

7          A.   I don't -- I don't know.  No, I don't

8    know.  I would say typically not.

9          Q.   In April of 2016, you became the director

10   of division of payment services in the Medicare Plan

11   Payment Group at CMS.  Is that right?

12         A.   Yes.

13         Q.   Why did you change from being the special

14   assistant to Mr. Cavanaugh to being the director of

15   division of payment services?

16         A.   It was an opportunity to do different

17   work.

18         Q.   And what did your work entail in that

19   position?

20              MS. LIKOFF:  Objection to form.  Vague.

21              THE WITNESS:  Could you be more specific?

22   BY MS. BLAKEMAN:

23         Q.   Sure.  What does the Medicare Plan Payment

24   Group do?

25         A.   The Medicare Plan Payment Group, broadly,



Page 67

1              MS. LIKOFF:  Object to form.

2              THE WITNESS:  I didn't know that she

3        didn't attend.

4    BY MS. BLAKEMAN:

5         Q.   Are you aware of any other CMS employees

6    who attended the meeting, other than yourself,

7    Mr. Cavanaugh, and Ms. Rice?

8         A.   No.

9         Q.   So is it fair to say there were no other

10   CMS attendees of the meeting?

11             MS. LIKOFF:  Object to form.

12        Mischaracterizes the witness's testimony.

13             THE WITNESS:  It's not correct.  I don't

14        recall any other CMS employees attending the

15        meeting.

16   BY MS. BLAKEMAN:

17        Q.   Do you remember why the meeting was held?

18             MS. LIKOFF:  Object to form.  Vague.

19             THE WITNESS:  No.

20   BY MS. BLAKEMAN:

21        Q.   What do you recall was said in the

22   meeting?

23             MS. LIKOFF:  Object to form.  Vague.

24             THE WITNESS:  Could you be more specific?

25



2774

Page 68

1    BY MS. BLAKEMAN:

2         Q.   Do you recall anything that was discussed

3    at this meeting?

4         A.   I do not.

5         Q.   Do you recall any questions posed to CMS

6    from United or Optum?

7              MS. LIKOFF:  Object to form.  Vague.

8              THE WITNESS:  No.

9    BY MS. BLAKEMAN:

10        Q.   Do you recall any statements from United

11   or Optum at this meeting?

12             MS. LIKOFF:  Object to form.  Vague.

13             THE WITNESS:  No.

14   BY MS. BLAKEMAN:

15        Q.   Do you recall any questions from yourself,

16   Mr. Cavanaugh, or Ms. Rice to the United/Optum folks

17   on the line at this meeting?

18        A.   No.

19        Q.   Do you recall any statements that

20   yourself, Mr. Cavanaugh, or Ms. Rice said at this

21   meeting?

22             MS. LIKOFF:  Object to form.  Vague.

23             THE WITNESS:  No.

24   BY MS. BLAKEMAN:

25        Q.   Do you recall any topics that were



Page 69

1    discussed at this meeting?

2              MS. LIKOFF:  Object to form.  Vague.

3              THE WITNESS:  No.

4    BY MS. BLAKEMAN:

5         Q.   Do you recall whether anyone at United or

6    Optum asked yourself, Mr. Cavanaugh, or Ms. Rice for

7    clarification about whether United or Optum had a

8    proactive obligation to review diagnoses codes --

9    diagnosis codes, excuse me.

10             MS. LIKOFF:  Object to form.  Lacks

11        foundation.  Vague.

12             THE WITNESS:  Would you repeat that

13        question?

14   BY MS. BLAKEMAN:

15        Q.   Do you recall at the meeting whether

16   anyone at United or Optum asked yourself, Ms. Rice,

17   or Mr. Cavanaugh for clarification about whether

18   United or Optum had a proactive obligation to review

19   diagnoses codes -- diagnosis codes -- that were

20   submitted?

21        A.   No.

22             MS. LIKOFF:  Object to form.  Lacks

23        foundation.  Vague.  Compound.

24             THE WITNESS:  No.

25



Page 70

1    BY MS. BLAKEMAN:

2        Q.    Do you recall any indication from

3    yourself, Mr. Cavanaugh, or Ms. Rice that United had

4    no proactive obligation to confirm whether diagnosis

5    codes submitted by physicians are correct?

6            MS. LIKOFF:   Object to form.   Lacks

7        foundation.   Vague.   Compound.

8            THE WITNESS:   No.

9    BY MS. BLAKEMAN:

10       Q.    Do you recall any indication from

11   yourself, Mr. Cavanaugh, or Ms. Rice that United did

12   have a proactive obligation to confirm diagnosis

13   codes submitted by physicians that -- excuse me --

14   that diagnosis codes submitted by physicians are

15   correct?

16           MS. LIKOFF:   Object to form.   Vague.

17       Compound.   Lacks foundation.

18           THE WITNESS:   Could you repeat that

19       question?

20   BY MS. BLAKEMAN:

21       Q.    Do you recall whether yourself,

22   Mr. Cavanaugh, or Ms. Rice indicated to United at

23   this meeting that United did have a proactive

24   obligation to confirm whether diagnosis codes

25   submitted by physicians are correct?



Page 168

1                          CERTIFICATE

2

3          I, KAREN K. KIDWELL, Registered Merit Reporter,

4     and Certified Realtime Reporter, do hereby certify

5     that prior to the commencement of the examination,

6     DANIEL FARMER was remotely sworn to testify to the

7     truth, the whole truth and nothing but the truth.

8          I DO FURTHER CERTIFY that the foregoing is a

9     verbatim transcript of the testimony as taken

10    stenographically by me at the time, place and on the

11    date hereinbefore set forth, to the best of my

12    ability.

13         I DO FURTHER CERTIFY that I am neither a

14    relative nor employee nor attorney nor counsel of any

15    of the parties to this action, and that I am neither

16    a relative nor employee of such attorney or counsel,

17    and that I am not financially interested in this

18    action.

19

20                         _Karen Kidwell_____

21                         Karen K. Kidwell
                           Registered Merit Reporter
22                         Certified Realtime Reporter
                           Notary Public
23                         Dated:  March 30, 2022

24

25



2778

**EXHIBIT D-106**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____  )



Videotaped Deposition of

MELISSA FERRON

Given Remotely

Wednesday, July 27, 2022

11:13 a.m. Eastern




Reported by:  Karen K. Kidwell, RMR, CRR



Magna Legal Services
866-624-6221
www.MagnaLS.com



2780

Page 217

1    together into an HCC?

2         A.   Yes.   A subgroup of diagnostic codes are

3    grouped into HCCs, yes.

4         Q.   So a single HCC, that's composed of

5    several ICD-9 or ICD-10 diagnosis codes?

6         A.   Correct.

7         Q.   I want to back up for a minute and talk

8    about where these codes are documenting, how they're

9    documented, and where they come from.

10             So I'm going to use an example.   Let's say

11   there's a primary care doctor who has a patient who

12   comes in for her annual checkup.   How does that

13   primary care doctor memorialize the medical

14   conditions that that patient has?

15             MS. CHEN:   Objection.

16   BY MS. SOBEL:

17        Q.   You can answer.

18        A.   The provider would document in the medical

19   record, in a somewhat standardized form, for the

20   medical record, various components of the patient's

21   health and social status, and the diagnosis would be

22   documented in the medical record and then signed by

23   the provider.

24        Q.   So would you agree with me that medical

25   providers record their findings about their patients



Page 218

1    in their medical record?

2        A.    Yes.

3            MS. CHEN:   Objection.   Leading.

4    BY MS. SOBEL:

5        Q.    Historically, was this done by hand, by

6    the medical providers?   In other words, they make the

7    medical records by writing -- you know, with a pen or

8    pencil in an actual chart?

9        A.    Yes.   There's a combination of handwriting

10   as well as dictation.

11       Q.    And in more recent times, is this all done

12   electronically?   In other words, medical records are

13   now done by doctors or medical providers with a

14   computer and in an electronic format?

15       A.    Yes, that's more common now.

16           MS. CHEN:   Ms. Sobel, I'm actually having

17       a really hard time hearing you.   It's a little

18       bit fuzzy.   Is there any way you could speak a

19       little bit closer to your microphone?

20           MS. SOBEL:   Yeah.   Let me figure out where

21       my microphone is.   We're in a room where that's

22       not clear.

23           Yeah, let me -- let me switch places here.

24       I think I can make this better.   Hold on, okay?

25           MS. CHEN:   Thank you.



Page 219

1              Yeah, you're -- you're sounding kind of

2         like you're on a speaker phone.  I'm having a

3         hard time differentiating.

4              MS. SOBEL:  No problem.

5              Is this better?

6              MS. CHEN:  Can you say something else?

7              MS. SOBEL:  Can you hear me?

8              MS. CHEN:  I think it's a little bit

9         better.  I'll let you know if I'm still having

10        the same problem.

11             MR. McNAMARA:  Okay.

12             MS. CHEN:  Please proceed.

13             MR. McNAMARA:  Okay.

14    BY MS. SOBEL:

15        Q.   We talked about this a little earlier,

16    Ms. Ferron.  How does the information from a

17    patient's medical records get transformed into these

18    diagnosis codes, which we've been talking about most

19    of today?

20             MS. CHEN:  Objection.  Form.

21             THE WITNESS:  The -- in context of what

22        we've been talking about today, a coder would

23        review the medical record and assign codes that

24        are documented in the medical record.  That's

25        one way.



Page 220

```
 1              Other ways, you talked about the
 2         electronic medical records.  Often the physician
 3         assigns the codes as they're documenting in the
 4         medical record.
 5    BY MS. SOBEL:
 6         Q.   So within a doctor's office, either the
 7    physician or medical provider themselves provides the
 8    actual diagnostic coding, or a coder in their office
 9    does that?
10         A.   Yes.
11              MS. CHEN:  Object to form.
12    BY MS. SOBEL:
13         Q.   I want to switch now and talk about coding
14    guidelines, which we touched upon earlier.
15              What are the various sources for coding
16    guidelines that coders like yourself use when coding
17    medical records?
18         A.   Okay.  They are the three that I mentioned
19    earlier:  The actual ICD-10 or ICD-9 books has rules
20    for coding.  And then there's the official guidelines
21    for coding and reporting that the CDC publishes.  And
22    then there's Coding Clinic that the American Hospital
23    Association publishes.
24         Q.   In the course of your career in coding
25    over the last 45 years, have you encountered
```



Page 221

1   instances where these three sources, these three

2   guidelines, don't address the coding issue in medical

3   record?

4           A.   All the time.

5                MS. CHEN:  Object to form.

6   BY MS. SOBEL:

7           Q.   Your answer was "all the time"?

8           A.   All the time.

9           Q.   Can you explain to me how this happens?

10  You can use examples, whatever would best explain how

11  this happens, that these three guidelines don't

12  provide a clear answer to a coding issue in the

13  medical record.

14               MS. CHEN:  Object to form.

15               THE WITNESS:  The -- the official -- so

16         let me just sort of describe what each of the

17         guidelines do for coding.

18               So the books themselves have conventions,

19         they're called coding conventions, that when

20         you -- gives you instruction how to look up a

21         code, and also gives you information on when an

22         additional code might be needed, when a -- a

23         code might be needing additional digits to be a

24         complete code.  So that's what the ICD-10 book

25         would give you.



Page 222

```
 1              Then the official guidelines for coding
 2        and reporting from the CDC -- it's only about --
 3        I don't even know now, a 110-page document, so
 4        it's very -- it's not very detailed.  It gives
 5        high-level guidelines.
 6              And then Coding Clinic, which first
 7        started providing guidelines in 1984, is more of
 8        a question/answer type of publication, published
 9        quarterly, where Coding Clinic decides what
10        questions they will answer and publish in their
11        publication.
12              But unfortunately, between all of those
13        three documents, there is not clear guidance for
14        many -- most scenarios.  Only the easiest
15        scenarios can be coded.
16              Not only are they, in my opinion,
17        insufficient for the documentation in today's
18        world -- and what I mean by that, the verbiage
19        used by -- excuse me -- the verbiage used by
20        physicians aren't always in alignment with
21        the -- the coding -- the words in the coding
22        books.  So they don't stay on top of changing
23        medical terminology.
24              As medical terminology evolves and
25        diseases evolve, the coding guidelines don't
```



Page 226

1    either coded on that chart within previous years and

2    what may be a suspected condition.

3         Q.   So when a coder is conducting a blind

4    coding review of a medical chart, she doesn't know

5    what codes the provider submitted on a claim to that

6    for a beneficiary?

7         A.   Correct.

8              MS. CHEN:  Objection.  Form.  Leading.

9    BY MS. SOBEL:

10        Q.   I want to --

11             MS. YEVTUKHOVA:  Objection.  Form.

12   BY MS. SOBEL:

13        Q.   I want to use another example.

14             Now, assume a provider has submitted

15   diagnosis codes for a beneficiary for diabetes and

16   heart failure.  This is for a Medicare Advantage

17   beneficiary.  Okay?

18             Now, in a blind review, as part of a chart

19   review program, the coder would not know that those

20   diagnosis codes were submitted, correct?

21        A.   Correct.

22             MS. CHEN:  Objection.  Form.  Leading.

23   BY MS. SOBEL:

24        Q.   Assume the coder reviews the medical chart

25   and -- medical record, I should say -- and identifies



Page 227

1    diabetes and hypertension as two diagnosis codes

2    documented in the medical record.

3           A.    Okay.

4           Q.    If the coder conducting his blind review

5    does not identify heart failure, does that mean that

6    heart failure is not documented in that patient's

7    medical record?

8           A.    No.

9                 MS. CHEN:  Objection.  Form.

10                MS. YEVTUKHOVA:  Object to form.

11   BY MS. SOBEL:

12          Q.    What would that coder need to do to

13   determine whether or not heart failure is in fact

14   documented in the patient's medical record?

15          A.    The coder would need to know to go back to

16   the record, re-review the record, and look for the

17   diagnosis of congestive heart failure, do a more

18   thorough review of the medical record for congestive

19   heart failure.

20          Q.    And have you seen instances in the course

21   of your career where a coder doesn't identify a

22   diagnosis code in a blind review, but other coders

23   subsequently find a code in a patient's medical

24   record?

25          A.    It happens --



Page 228

1              MS. CHEN:  Object to form.

2              MS. YEVTUKHOVA:  Object to form.

3              THE WITNESS:  It happens all the time.

4              MS. SOBEL:  Thank you, Ms. Ferron.  I have

5        no more questions.

6              MS. CHEN:  All right.  I have a couple

7        follow-up questions, but -- can we take a quick

8        break?

9              MS. SOBEL:  Sure.  Yes.

10             VIDEOGRAPHER:  We're now going off the

11       record.  It's 6:19 p.m.

12             (A recess transpired from 6:19 p.m. until

13             6:27 p.m.)

14             VIDEOGRAPHER:  We're back on the record.

15       It's 6:27 p.m.

16                  FURTHER EXAMINATION

17       BY MS. CHEN:

18        Q.   All right, Ms. Ferron, I just had a few

19       follow-up questions on the topics you discussed with

20       counsel for United.

21             First, you discussed your opinion that

22       there are gray areas in coding.  Do you remember

23       that?

24        A.   Yes.

25        Q.   And so given these gray areas, how do



Page 236

```
 1                        CERTIFICATE

 2

 3         I, KAREN K. KIDWELL, Registered Merit Reporter,

 4    and Certified Realtime Reporter, do hereby certify

 5    that prior to the commencement of the examination,

 6    the deponent was remotely sworn to testify to the

 7    truth, the whole truth under penalty of perjury.

 8         I DO FURTHER CERTIFY that the foregoing is a

 9    verbatim transcript of the testimony as taken

10    stenographically by me at the time, place and on the

11    date hereinbefore set forth, to the best of my

12    ability.

13         I DO FURTHER CERTIFY that I am neither a

14    relative nor employee nor attorney nor counsel of any

15    of the parties to this action, and that I am neither

16    a relative nor employee of such attorney or counsel,

17    and that I am not financially interested in this

18    action.

19

20                        Karen Kidwell
                          _____
21                        Karen K. Kidwell
                          Registered Merit Reporter
22                        Certified Realtime Reporter
                          Notary Public
23

24

25
```



**EXHIBIT D-107**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. ) | No. 16-08697 FMO |
| BENJAMIN POEHLING, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITEDHEALTH GROUP, INC., et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |


Videotaped Deposition of

RICHARD SHAW FOSTER

Given Remotely

Thursday, March 31, 2022

11:01 a.m. Eastern Time



Reported by:  Karen K. Kidwell, RMR, CRR

Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 19

1    to -- pardon me, to depose you in this case?

2         A.    Oh, I guess it would have been last summer

3    sometime.

4         Q.    And how did you learn about that?

5         A.    Through a call from Martha Glover.

6         Q.    When did you first learn about this

7    litigation?

8         A.    I remember reading about it in the

9    newspapers some time back.  I don't remember exactly

10   when.

11        Q.    And have you discussed this deposition

12   with anyone other than your counsel?

13        A.    My wife understands that I'm being deposed

14   in a case, but we never discussed the specifics or

15   what it's about or anything.

16        Q.    All right.  I should have said putting

17   aside your wife or your counsel, have you talked to

18   anyone else about the fact that you're being deposed

19   today?

20        A.    No.

21        Q.    Have you talked to anyone other than your

22   wife and counsel about this litigation?

23        A.    No.

24        Q.    Other than your wife and counsel, does

25   anybody else know that you're being deposed today, to



Page 20

1    your knowledge?

2          A.    No.   Nobody knows.

3          Q.    Mr. Foster, I'd like to go over your

4    background briefly.   Could you tell us your

5    educational background?

6          A.    Sure.   I went to the College of Wooster in

7    Ohio and majored in mathematics.   Then I went to the

8    University of Maryland at Baltimore County, to

9    graduate school in applied mathematics.   Then I

10   undertook a series of national examinations to become

11   a member of the Society of Actuaries.   Those exams

12   are educational in nature.   They require substantial

13   studying to learn the information that you are then

14   tested on.   I've studied various things on my own

15   from time to time, particularly statistics, some

16   economics.

17               I think that sums it up.

18         Q.    And what was your first job after the

19   University of Maryland?

20         A.    I got a job as a -- as an entry-level

21   actuary at the Social Security Administration.

22         Q.    And when was that?

23         A.    Either late January 1973 or early

24   February.   I don't remember exactly.

25         Q.    How long did you work at the Social



Page 21

1    Security Administration?

2         A.    Until February 1995.

3         Q.    And you rose to the level of deputy chief

4    actuary there, correct?

5         A.    That's correct.

6         Q.    Did you leave the Social Security

7    Administration to join CMS -- or HCFA at the time?

8         A.    Yes, HCFA at the time.

9         Q.    And what job did you obtain at HCFA

10   in '95?

11        A.    The position of chief actuary became open,

12   and I applied for that and was selected for that

13   position.

14        Q.    And you served as chief actuary for

15   17 years, right?

16        A.    I think it was actually 18 years.

17        Q.    I didn't mean to chop off that 18.

18              Through December 2012, correct?

19        A.    Through January 2013, approximately.

20        Q.    Now, during your time, you prided yourself

21   on your independence, correct?

22        A.    Yes.  You've been doing your homework, I

23   can see.  That's correct.

24        Q.    In fact, you had some political pressure

25   from both sides of the aisle.  Wouldn't that be



Page 22

1   accurate?

2        A.   Yes, that's fair.

3        Q.   And in each case, you tried to do the

4   right thing?

5        A.   Yes.

6        Q.   Tell us how big the Office of the Actuary

7   was when you worked there.

8        A.   When I first started, in 1995, the office

9   had a -- I think about 90 people in it.  And

10  subsequently one -- one component of the office,

11  during a reorganization of CMS -- well, HCFA back

12  then, at large -- was broken off, and that group went

13  to the Office of Research and Demonstrations.  So the

14  office size went down to maybe 70 or 75, in that

15  neighborhood.  And it generally varied, while I was

16  there, between 70 and 90, over time.

17       Q.   And how were those people organized within

18  the office?

19       A.   Well, the office itself -- and it didn't

20  start this way immediately, but it -- before long, it

21  became the way I'll describe -- has three groups.

22  There's the Medicare and Medicaid Cost Estimates

23  Group.  There is the Parts C and D Actuarial Group.

24  And there is the National Health Statistics Group.

25            And there is no further subdivision, no



Page 23

1   formal subdivision within the groups.

2          Q.   Approximately how large was each group

3   during your tenure there?

4          A.   Well, I don't remember exactly, but each

5   group would have been in the range of 20 to

6   25 people.

7               I should add that the Parts C and D

8   Actuarial Group was not formed until after the

9   legislation that -- the Medicare Improvement Act in

10  2003.

11         Q.   So Parts C and D were not in place during

12  the Balanced Budget Act of '97?

13         A.   Part D was not.  Part C was in place

14  already before then, or the equivalent of it; in

15  other words, a private sector managed-care operation.

16  And Part D didn't come along until the Improvement

17  Act.

18         Q.   Fair enough.  My question maybe wasn't

19  clear.  I meant to say the Parts C and D Actuarial

20  Group within the Office of the Actuary didn't come

21  into place in '97.  It first came into place in 2003.

22  Is that correct?

23         A.   Technically it came into place as a result

24  of that legislation, and that happened in 2004.

25         Q.   Understood.  Okay.



Page 61

1         There will be claims that have not yet been

2         processed or paid, and we won't know about those

3         until two or three or six months later.

4     BY MR. ABASCAL:

5         Q.   But one method or one characteristic that

6     may be incomplete in fee-for-service data is the

7     diagnosis of the patient, correct?

8         A.   I would say yes, there can be incomplete

9     records.

10        Q.   And that's in part because in a

11    fee-for-service environment, the provider is paid

12    based on a procedure, correct?

13        A.   Yes, that's right.

14        Q.   And so that provider may not have the

15    incentive to code every diagnosis that that patient

16    has, when they're not being paid based on a

17    diagnosis, correct?

18        A.   I would like to think that providers, as a

19    rule, follow the guidelines about what a claim has to

20    include, which includes a diagnosis.

21             And we do a pretty good job of it.  Do

22    they always do a perfect job?  Obviously the answer

23    is no.

24        Q.   But you understood that the provider in

25    the fee-for-service environment was not obligated to



Page 62

1    code every diagnosis that the patient has, correct?

2            MS. ZUPAC:  Objection.  Vague as to the

3        time frame you're referring to.

4            THE WITNESS:  Did you want to clarify

5        that, Manny?  Or should I go ahead?

6    BY MR. ABASCAL:

7        Q.   Well, if you understand the question, you

8    can answer, or if you -- if you don't, I'm happy to

9    clarify it for you.

10       A.   Well, would you mind just repeating the

11   question for me, please?

12       Q.   Sure.  You understand that a provider in

13   the fee-for-service environment is not obligated to

14   code every diagnosis that the patient has when

15   submitting a claim?

16       A.   Well, that's correct.  They're not only

17   not obligated to do that, but they're not supposed to

18   do that.  They're supposed to include the diagnosis

19   that relates to the service that they performed on

20   that particular visit.

21       Q.   Correct.  So one of the pluses and

22   minuses -- a minus, if you will -- of using

23   fee-for-service data, is that it may not capture all

24   of the diagnoses that a patient has, correct?

25            MS. ZUPAC:  Object to form.



Page 63

```
 1              THE WITNESS:  I wouldn't call it a plus or
 2         minus.  It's more of a fact of life.  They're
 3         trying to set up a risk-adjustment model that
 4         will reflect diagnoses from the prior year.  And
 5         you work with the data you have.
 6              And then the results of that model, when
 7         it's applied to calculate risk scores for
 8         whatever group of beneficiaries is relevant, you
 9         then also use the diagnoses you have, which
10         hopefully the completeness and the accuracy
11         would be very or fairly similar to the case, as
12         in the fee-for-service source of the data.  So
13         that's the process, how it's intended to work.
14              If you end up with a more complete record
15         or a less complete record when calculating some
16         individual's risk score, that could adjust or
17         affect the calculated risk score up or down
18         accordingly.  But the hope would be that on
19         average, over a sizeable group of people, those
20         kinds of differences in coding practice would
21         average out compared to fee-for-service.
22    BY MR. ABASCAL:
23         Q.   But the fact of life is that the model is
24    calibrated on data that may be incomplete or
25    inaccurate with respect to the diagnoses of the
```



2800

Page 152

1                    CERTIFICATE OF REPORTER

2          I, Karen K. Kidwell, Registered Merit Reporter

3    and Notary Public for the State of Maryland at Large,

4    do hereby certify:

5          That the foregoing deposition was taken

6    remotely before me on the date and at the time stated

7    on page 1 of this transcript; that the deponent was

8    duly sworn to testify to the truth, the whole truth

9    and nothing but the truth; that the testimony of the

10   deponent and all objections made at the time of the

11   examination were recorded stenographically by me and

12   were thereafter transcribed; that the foregoing

13   deposition as typed is a true, accurate and complete

14   record of the testimony of the deponent and of all

15   objections made at the time of the examination to the

16   best of my ability.

17         I further certify that I am neither related to

18   nor counsel for any party to the cause pending or

19   interested in the events thereof.

20         Witness my hand this 4th day of April, 2022.

21

22   _____
     Karen K. Kidwell,
23   Registered Merit Reporter
     Notary Public
24   State of Maryland at Large
     My Commission expires:
25   April 14, 2025



2801

**EXHIBIT D-108**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA    )   No. 16-08697 FMO
ex rel. BENJAMIN POEHLING,   )
                             )
            Plaintiffs,      )
                             )
v.                           )
                             )
UNITEDHEALTH GROUP, INC.,    )
et al.,                      )
                             )
            Defendants.      )
_____)

*** CONFIDENTIAL ***

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

JANET FRY

(Taken virtually)

9:02 a.m. Eastern

Thursday, June 2, 2022

REPORTED BY:  Christine A. Taylor, RPR

Magna Legal Services
866-624-6221
www.MagnaLS.com



2803

Page 19

1          Q.    You are also a certified professional

2     coder, or CPC, through the AAPC; correct?

3          A.    Yes.

4          Q.    You've been a CPC since 2009; correct?

5          A.    That's correct.

6          Q.    And did you also end that when you

7     retired?

8          A.    Yes.

9          Q.    What is AAPC?

10          A.    American Association of Professional

11     Coders.

12          Q.    And what is a certified professional

13     coder?

14          A.    That, again, is a certification that --

15     a test that shows you're competent in the skills of

16     coding, particularly physician records.  So there's

17     not the emphasis of inpatient rules and Medicare

18     rules that there is in the clinical -- the CCS.  So

19     the CPC is more physician related.

20          Q.    You're also an AHIMA approved ICD-10

21     trainer; correct?

22          A.    Correct.

23          Q.    What does this entail?

24          A.    So this was a certification and mostly

25     online classes and the ICD-10, the change to ICD-10



```
 1    from ICD-9.  So it was a complete overhaul of the
 2    coding system, so I took the course to not only
 3    learn the system, but be able to teach it.
 4             Q.   And to make sure we're on the same
 5    page, ICD-10, does that refer to the International
 6    Statistical Classification of Diseases?
 7             A.   Yes, International Classification of
 8    Diseases, 10th revision.
 9             Q.   And what is ICD-10?
10             A.   ICD-10 is the coding system that is
11    approved for use in all environments through the
12    World Health Organization and also the CMS.  So
13    it's the only coding system that is approved for
14    use.  10 is the more recent reiteration of it,
15    whereas ICD-9 is mostly what has covered my
16    particular involvement in RADV.  10 didn't start
17    until after -- pretty much after I had already
18    retired.  Because of the way audits are, you're
19    reviewing one, two, or three years after the fact.
20    So that was one reason I retired when I did because
21    there was this change that there was a good
22    stopping point.
23             Q.   Understood.  And are ICD-10 a set of
24    diagnosis codes?
25             A.   Yes.
```



Page 21

1          Q.   So if you turn to page 3 of the

2     Exhibit 1212 in front of you, there -- at the

3     bottom of the page, there are sort of underlined

4     text.  The second underlined line reads, "Member

5     American Health Information Management Association,

6     AHIMA."

7               Do you see that?

8          A.   Yes.

9          Q.   How long have you been a member of

10    AHIMA?

11         A.   Since 1981.

12         Q.   Are you still a member?

13         A.   No.

14         Q.   The next underlined line reads "Member

15    American Association for Professional Coders."

16              Do you see that?

17         A.   Yes.

18         Q.   How long have you been a member of

19    AAPC?

20         A.   Just since -- was it 2009 that I took

21    their test?  Yes.

22         Q.   And are you still a member?

23         A.   No.

24         Q.   Okay.  Do you have any degrees or

25    certificates that are not listed on your resum??



Page 22

```
 1              A.   No.

 2              Q.   Do you have any other training in

 3      medical coding?

 4              A.   Any other training in medical coding?

 5              Q.   Yes.

 6              A.   Just what I have mentioned.  Just in

 7      order to maintain your RHIA, you have to take

 8      continuing education credits every two years.  So

 9      yes, I've kept up with the industry, but as far as

10      a formal like college course, I taught coding, but

11      I didn't take coding.

12              Q.   Understood.  Do you have any medical

13      training?

14              A.   No.

15              Q.   Are you familiar with the term

16      "Medicare Advantage"?

17              A.   Yes.

18              Q.   Is this term often referred to as MA?

19              A.   Yes.

20              Q.   What is Medicare Advantage?

21              A.   Medicare Advantage is Part C of the

22      options that are available for Medicare

23      participants.  A being the inpatient care, B being

24      medical, and then C is a combination of those two

25      which is a contracted organization, insurance
```



Page 23

1    company, if you will, that contracts with Medicare

2    to cover their patients in a combined manner for

3    inpatient and outpatient services.

4            Q.   How did you learn about Medicare

5    Advantage?

6            A.   I was one of the original trainers for

7    Medicare Advantage back in 2000 when I worked for

8    Aspen Systems.  So Medicare taught us Aspen and we

9    taught the industry.  So I don't know.  That's how

10   I learned from it, directly from Medicare.

11           Q.   Got it.  So I want to walk through your

12   different roles as a subcontractor or contractor

13   for CMS.  So before you retired, were you

14   contractor for CMS?

15           A.   Subcontractor, yes.

16           Q.   Subcontractor, okay.  If you can turn

17   back to page 1 of Exhibit 1212, there's a section

18   titled "Employment Experience."  Do you see that?

19           A.   Yes.

20           Q.   So under employment experience on the

21   first page, it says, "Self-employed contractor,

22   Janet Fry, RHIA, LLC."  Do you see that?

23           A.   Yes.

24           Q.   Was Janet Fry, RHIA, LLC, your company?

25           A.   Yes.



Page 24

1          Q.    Were you the sole employee?

2          A.    Yes.

3          Q.    Did your company Janet Fry, RHIA, LLC,

4     contract with CMS?

5          A.    I contracted with Signature Consultant

6     and different contractors for CMS, but I also had a

7     period of time where I was directly a contractor

8     with CMS.

9          Q.    Did your company ever contract with any

10    other federal government agencies?

11         A.    Federal government?  No.

12         Q.    Did you do any sort of subcontracting

13    with an entity that did contract with other federal

14    government agencies?

15         A.    No, I don't think so.

16         Q.    So under this, as you pointed out, it

17    says Signature Consulting Group.  What is Signature

18    Consulting Group?

19         A.    That is a -- how can I say this?  It's

20    a group, a organization that does various work for

21    different clients.  So it's like -- it's a

22    consulting group that does work for various

23    clients.

24         Q.    And did you have a subcontract with

25    Signature Consulting Group?



Page 25

```
 1              A.   Yes.

 2              Q.   Were you ever an employee of Signature

 3    Consulting Group?

 4              A.   No.

 5              Q.   Under this it says "Independent

 6    Statistical Consulting, ISC, contract."  Do you see

 7    that?

 8              A.   Yes.

 9              Q.   What is the independent statistical

10    consulting contract?

11              A.   That was a portion of the total RADV

12    picture that CMS contracted with Signature to

13    provide services.

14              Q.   So this contract was between CMS and

15    Signature Consulting?

16              A.   Yes.

17              Q.   And you were a subcontractor under this

18    contract?

19              A.   Yes.

20              Q.   This says next to it "August 2013 to

21    present."  Do you see that?

22              A.   Oh, yes.

23              Q.   Do you recall this starting or starting

24    this role in August 2013?

25              A.   Yes.
```



Page 26

1          Q.    Do you know when this role ended?

2          A.    That would be January 2020.

3          Q.    Okay.  Did you have any other roles as

4    a contractor or subcontractor to CMS with Signature

5    Consulting Group?

6          A.    No.

7          Q.    So then the next -- or under the

8    independent statistical consulting it says,

9    "Independent coding contractor (ICC) providing

10   subject matter expertise (SME) and training in

11   medical documentation, project guidance, ICD-9-CM

12   and CMS-HCC coding for the CMS Risk Adjustment

13   Validation medical record review team and Medicare

14   Advantage, MA, organization participants."

15               Do you see that?

16         A.    Yes.

17         Q.    What is an independent coding

18   contractor, ICC?

19         A.    That is a term that CMS came up with to

20   describe a person who is -- would help them with

21   official coding guidance, documentation.  The

22   statement of work that I have, it talks about the

23   ICC will conduct training, facilitate discussions,

24   develop written communication, guidance and

25   briefing material to document and assist CMS in



Page 27

 1    making decisions.

 2            Q.   And were you the ICC?

 3            A.   Yes.

 4            Q.   What did -- in addition to what you

 5    just mentioned, is there anything else that you did

 6    in this role?

 7            A.   That pretty much covers everything.

 8            Q.   Okay.  Who did you report to in this

 9    role?

10            A.   The -- let's see, I had a couple of

11    different supervisors.  The last one was Cora

12    Hutchinson.

13            Q.   And -- go ahead.

14            A.   Project manager, yes.

15            Q.   And is she at CMS?

16            A.   I'm sorry.  She's with Signature, yes.

17            Q.   Okay.  So did you report to CMS at all

18    as the ICC?

19            A.   I did communicate with them directly,

20    yes.

21            Q.   How long were you the ICC related to

22    this contract?  It was 2013 to 2020; is that

23    correct?

24            A.   Related to the Signature portion of the

25    contract, yes.



Page 28

```
 1              Q.   Okay.  When you say subject matter
 2      expertise here, was the subject matter expertise in
 3      coding?
 4              A.   Coding and documentation and medical
 5      record guidance.
 6              Q.   Did you consider yourself a subject
 7      matter expert in coding?
 8              A.   Yes.
 9              Q.   And then I know you've mentioned this a
10      few times, but just so it's clear, CMS Risk
11      Adjustment Data Validation here refers to RADV
12      audits?
13              A.   That's correct.
14              Q.   What are RADV audits?
15              A.   RADV audits are the method by which CMS
16      validates that the information they receive from MA
17      organizations can be tracked back to documentation
18      that was made in a medical record at or near the
19      time of the service that was provided.
20              Q.   And who is the medical record review
21      team referred to here?
22              A.   Okay.  So there's -- in order to
23      conduct these RADV audits, there's two -- one, two,
24      or three different teams of contractors, medical
25      record review contractors, sometimes abbreviated
```



Page 29

1    MRRC, that are working to review medical records

2    independently, and then -- but the decisions in all

3    of that CMS needs to make and policies that are

4    need to make were filtered through the independent

5    coding contractor so that everybody was kind of

6    doing things the same way on the same page.  That's

7    the team.

8         Q.   Go ahead.  So the medical record review

9    team, were those other contractors to CMS?

10        A.   Yes.  They would include other

11   contractors and CMS representation.

12        Q.   And do you remember the names of any of

13   the other -- the medical record review contractors?

14        A.   We've had a few over the years.

15   Strategic was one.  Rely Group was one.  They used

16   to be called BDS.  So there's different names have

17   changed over the course of the project as the

18   contracts are released.  Organizations sometimes do

19   some shifting around to get the contract to fit

20   what they're currently doing.  So that makes sense.

21             Another team member would be the group

22   that does all the technical work.  The -- we had a

23   tool in order to review records.  So that tool had

24   to be developed by another contractor, but we

25   needed -- they needed our input as coders to



Page 30

1    develop that tool.  That's why we call it a team

2    because it was a lot of different contractors

3    working together to get the best result.

4         Q.   Understood.  If you can turn back to

5    page 1 of Exhibit 1212 on your screen, there's a

6    position midway down, it says Centers for

7    Medicaid -- Medicare and Medicaid.  Do you see

8    that?

9         A.   Yes.

10         Q.   And underneath it reads, "Independent

11    coding contractor, ICC, providing consulting

12    services for Risk Adjustment Data Validation team

13    including SME, MA organization, and review

14    contractor project training, resource development,

15    abstraction tool development, consultation and

16    testing."

17              Do you see that?

18         A.   Yes.

19         Q.   This states you were in this role from

20    August of 2009 to July 2013; is that correct?

21         A.   That's correct.

22         Q.   Is the ICC role here the same as the

23    one we just discussed?

24         A.   Yes.

25         Q.   Were there any differences?



Page 31

1          A.    Just said I was reporting directly to

2    CMS instead of through a contractor.

3          Q.    So did you contract with CMS directly

4    to be the ICC?

5          A.    Yes.  During that time period the

6    vehicle for the contract allowed for direct

7    contracting with CMS.  And when that changed, then

8    I went and moved to Signature.

9          Q.    Who did you report to at CMS related to

10   this role?

11         A.    At this point of time I think it was

12   Carolyn Kapustij.  Maybe Lateefah Hughes may have

13   been involved too.  I had several different task

14   people over the years.  So that's -- those are a

15   couple of names I recall.

16         Q.    And when you say consulting services

17   for the RADV team including SME, you're referring

18   to the same RADV audits we talked about earlier?

19         A.    Yes.

20         Q.    And does SME also still refer to

21   subject matter expertise?

22         A.    Yes.

23         Q.    Was the subject matter expertise also

24   coding here?

25         A.    Yes, coding and documentation.



Page 32

1          Q.   Okay.  What does review contractor

2     project training refer to?

3          A.   I was tasked with providing training to

4     the review contractors regarding each year's review

5     that we were doing, whether it was 2007 or 2008,

6     whatever the year was.  So each year, each time we

7     got a new review cycle started, there would be a

8     training.  So the coders from each of the MRRCs,

9     medical record review contractors, each of them

10     would come together and we would conduct a

11     training.  It would be an overview of what the

12     project was about, any new coding changes that

13     occurred nationally, any lessons learned from the

14     prior audit, and then we would typically -- again,

15     it changed over the years, but typically we would

16     end with some kind of an assessment that the coders

17     understood the instructions.  And then they would

18     go to their own MRRCs and continue internal

19     training from there.  So it was kind of bringing

20     everybody together and then they could go and

21     adjust the information on their own.  And if they

22     had any questions, then they could -- we would meet

23     fairly regularly, almost weekly or biweekly, we

24     would meet fairly regularly to discuss any

25     questions they had, any project concerns.  And I



Page 33

1    would, you know, help with any particular coding

2    question that came up or documentation issue that

3    came up that couldn't be answered in their own --

4    you know -- they had professional coders, so they

5    could answer their own questions.  But sometimes

6    just odd things came up that they wanted another

7    opinion on, so that's where I came in.

8         Q.   Got it.  Okay.  And the review

9    contractors were the MRRCs, as you called them, the

10   medical record review contractors?

11        A.   Yes.

12        Q.   And did the medical record review

13   contractors review medical records as part of the

14   RADV audits?

15        A.   Yes.

16        Q.   The abstraction tool that's mentioned

17   here, is that the tool you mentioned earlier that

18   would be used to review the medical records?

19        A.   That's correct.

20        Q.   So if you look at the very bottom of

21   the exhibit on page 1 of Exhibit 1212, it says

22   "Ascellon Corporation" and then September 2006 to

23   August 2010.  Do you see that?

24        A.   Yes.

25        Q.   And then if you skip to page 2, it



Page 52

```
 1                   Meanwhile or subsequently -- so, again,
 2        different projects we did it differently -- a
 3        secondary validation contractor was reviewing that
 4        record and doing the same process, coding it first,
 5        sending it to a senior coder if there was a
 6        discrepancy.  And, you know, finding the -- the
 7        tool doing the work behind the scenes to do the
 8        comparisons.  And, yeah, so that's -- that's the
 9        process -- the initial process.
10                   Now, along the way there's a -- what's
11        called an escalation process in most of the review
12        years.  And that would be when a coder comes across
13        a record that, for some reason, they question
14        whether that record should be coded because it
15        doesn't fit the guidelines set for the risk
16        adjustment program.  It might be out of the year.
17        It might not be signed.  There's no credential.
18        There's different evaluation things that happen
19        while you code.
20                   So those are the type things they would
21        escalate to a senior coder and that coder could
22        then escalate it to the QA panel which I was in
23        charge of.  So basically it's escalating it to me.
24                   Other types of questions that could
25        come up, each of the medical record review
```



Page 53

1    organizations had their own internal experts.  So,

2    you know, they tried to handle anything they could

3    on their own based on the professional coders that

4    they had hired.  But, again, there comes times when

5    there's questions.  So those -- if a coding

6    question came up with how do we handle this

7    particular code in relation to this project or this

8    particular document or some kind of a discrepancy

9    of some kind, those could also get escalated to the

10   QA panel, me basically with -- you know, I would

11   look at the question and then we would talk about

12   it in the panel.

13        Q.   Got it.

14        A.   So that's kind of the process.  Does

15   that help?

16             Again, there's different ways it was

17   done, but bottom line is at least four professional

18   coders were looking at every record.  Likely more

19   than that if a supervisor is involved or myself.

20   So the run of the mill records, ones that were just

21   easy straight up coding, this is what the person

22   has, it's well documented, it's signed.  Boom, it's

23   done.  Those went through bought trouble.

24             But there was a percentage of records,

25   I don't know what percentage, but that for whatever



Page 54

```
 1    reason, those reasons I've mentioned, had to be
 2    escalated and looked at by yet another set of eyes
 3    or a physician or if the -- if it was a overarching
 4    policy kind of thing, then I would need to bring
 5    the whole issue up to CMS.  So those were the kind
 6    of things that happened during a regular medical
 7    record review audit.  Okay.  Sorry.
 8         Q.   Very helpful.  So one follow-up
 9    question on the -- so you mentioned a percentage of
10    the records would need multiple years of review and
11    you didn't know a percentage.  Do you have a sense
12    of how often that occurred?
13              MS. ZUPAC:  Object to form.
14    BY MS. MADDOUX:
15         Q.   You can answer.
16         A.   Okay.  I don't have that information
17    right in front of me.  I mean, just from memory,
18    the code -- the panel met in the heighth of a
19    review project.  We met almost weekly reviewing
20    maybe 10 records.  So we're talking 10 out of
21    thousands that were being reviewed that week.  So
22    it wasn't a huge percentage.
23         Q.   And I think we'll show some documents
24    in a little while.  We can talk through more pieces
25    of the explanation you just provided.  But do
```



Page 82

```
 1              but to make it the most correct review
 2              possible.
 3      BY MS. MADDOUX:
 4              Q.   What is an additional HCC?
 5              A.   That would be a -- a HCC that was never
 6      reported for that particular patient client member
 7      for the whole year of review.  Risk adjustment is
 8      something that's not reported each time the person
 9      goes to the hospital but it's more of like a
10      quarterly reporting or such.  So if they've never
11      reported that particular diagnosis that triggered
12      that particular HCC, that would be -- and we found
13      it during the audit, that's an additional HCC.
14              Q.   So the additional HCC is the diagnosis
15      code that the primary coder identified but had not
16      been submitted to CMS by the MA plan?
17              A.   Yes.  Primary or it could be the senior
18      also.  It could be either one that identifies
19      something new.
20              Q.   So the next paragraph in this section
21      reads, "MRRC senior level coders and/or other
22      designated coding supervisors monitor the IRR and
23      make recommendations to the project manager
24      regarding corrective action, workflow coordination,
25      and continuing education based on trends observed
```



Page 83

1     during the review.

2                 Do you see that?

3          A.   Yes.

4          Q.   How does the senior coder monitor the

5     IRR?

6          A.   Again, this is up to each individual

7     MRRC, how they've set up their quality control

8     program.  So we didn't -- I didn't give them

9     direction on how to do that.  That's -- that was

10    their choice on how to monitor it.

11         Q.   The next paragraph in this section

12    reads, "Senior coders have the option to reverse --

13    refer situations in which they disagree with either

14    the primary or another senior coder to the ICC for

15    another opinion.  The ICC coding advice often will

16    result in clarification or addition to the coder

17    guidance document."

18                Do you see that?

19         A.   Yes.

20         Q.   Why would a senior coder disagree the

21    primary coder or with another senior coder?

22                MS. ZUPAC:  Object to form.

23                THE WITNESS:  The coders' opinions

24          could differ because of the documentation

25          that was presented.  The coding is a



Page 84

1              discipline that is based on multiple --
2              multiple documentation by multiple people in
3              the medical record.  So one coder may have
4              seen something in a particular note that he
5              or she felt was important to pick up whereas
6              another coder might either just decided that
7              wasn't appropriate to code at that point or
8              maybe was a historical condition that the
9              person doesn't have anymore.
10                  So there's these types of decisions
11             that are made every time you open up a
12             medical record to determine whether to
13             include the condition or not.
14   BY MS. MADDOUX:
15             Q.   So this situation is describing a
16   scenario where the senior coder may disagree about
17   whether a medical record documentation supported a
18   diagnosis code or HCC?
19             A.   Yes.
20             Q.   And in addition to the reasons you just
21   gave, are there any other reasons two certified
22   coders may disagree about whether a medical record
23   documentation supports a diagnosis or HCC?
24                  MS. ZUPAC:  Object to form.
25                  THE WITNESS:  Just in general.  I don't



Page 85

```
 1                have any specific examples to give you, but
 2                that's just a known fact.  That's why we do
 3                audits, because people disagree with the
 4                information that's in the medical record.
 5     BY MS. MADDOUX:
 6           Q.   In your experience working with trained
 7     coders, do you think it was not uncommon for two
 8     certified coders to disagree on whether or not a
 9     particular diagnosis code is supported in the
10     medical record?
11                MS. ZUPAC:  Object to form.
12                THE WITNESS:  I can't really put a
13                percentage whether to say it's common or not
14                common.  I believe I mentioned before that
15                we only saw a -- we didn't see the whole --
16                100 percent of the records did not come
17                through as discrepant.  So, therefore, some
18                did, but I don't have numbers as far as
19                which ones -- what the numbers were to give
20                you.
21     BY MS. MADDOUX:
22           Q.   While you were the ICC, do you recall
23     senior coders raising situations with you where the
24     senior coder disagreed with a primary coder or
25     senior coder?
```



Page 86

```
 1              A.    Yes.

 2              Q.    Do you know how often this occurred?

 3                    MS. ZUPAC:  Object to form.

 4                    THE WITNESS:  Same response.  I don't

 5              have a percentage or a number for you.

 6      BY MS. MADDOUX:

 7              Q.    How would you resolve the disagreement?

 8              A.    The case would be discussed with the

 9      es- -- the -- how do I say it?

10                    The -- I would review the medical

11      record and look at what both -- the notes that both

12      coders gave to say what the problem was, where were

13      they having issues, you know, why did they

14      disagree, that sort of thing.  And then, again,

15      since I was kind of the -- at the top as far as the

16      buck stops here, I would -- we would make a

17      decision on the guidance that we have.  I'd either

18      agree with the primary or agree with the senior.

19      We may have to bring in a physician if we wanted to

20      look at it a little further, if it was a clinical

21      issue that they were disagreeing on.  But primarily

22      between discussion of the -- myself plus other

23      professional coders that were on the QA panel, we

24      could typically come up with a good decision as far

25      as what the medical record documented.
```



Page 87

1            Q.   Did you ever need to reach out to the

2    Coding Clinic or another coding expert for

3    guidance?

4            A.   Yes, absolutely.  Yeah, the Coding

5    Clinic was in -- I'm not sure if it was in our tool

6    this early.  But later on we actually could --

7    while we were reviewing records, we could look up

8    things on Coding Clinic.  And so what I did before

9    that time was when these particular kind of cases

10   came up, I would see if there's any Coding Clinic

11   information on that particular condition, and I

12   kept like a spreadsheet of that information.  So

13   that coders would have it for the next time that

14   particular issue came up.  So it's all part of our

15   ongoing training.

16           Q.   And is that the coder guidance document

17   mentioned here?

18           A.   Yes.  That's part of it, yes.

19           Q.   So we've also been going about an

20   another hour, if we can maybe take another

21   five-minute break and go off the record.

22                THE VIDEOGRAPHER:  We are going off the

23           record.  The time is 11:06 a.m.

24     (Recess taken from 11:06 a.m. until 11:13 a.m.)

25                THE VIDEOGRAPHER:  We are back on the



Page 88

```
 1            record.  The time is 11:13 a.m.
 2      BY MS. MADDOUX:
 3            Q.    So if you can look back at Exhibit 1213
 4      in AgileLaw, and we're still on page 10, but now if
 5      you can sort of scroll to the right-hand side of
 6      the page.
 7            A.    Okay.
 8            Q.    And the top header says "4.4.2 coder
 9      guidance document"?
10            A.    Correct.
11            Q.    The second sentence of this section
12      reads "RADV experience has shown that provider
13      documentation varies widely in legibility, clinical
14      terminology, format, and authentication practices."
15                  Do you see this?
16            A.    Yes.
17            Q.    Can you explain what this means?
18            A.    So the documentation that is submitted
19      to support the HCCs, again it varies widely.
20      They're coming from different physician offices,
21      outpatient facilities, inpatient facilities, parts
22      of inpatient records.  So there's lots of documents
23      that are coming in with -- some are electronic.  At
24      this early stage, a lot of them were handwritten.
25      The formats differed.  Some would have a lovely
```



Page 89

1    summary with all of the diagnoses neatly listed.

2    Some would have no summary and you would have to

3    sort through 100 pages of progress notes to find

4    the diagnoses.  Format, kind of self explanatory.

5    And then authentication practices, we want to make

6    sure that all of the medical records that came in

7    were actually from a -- they were from a provider

8    that was a Medicare supported provider, so a

9    physician or a physician extender.  It couldn't

10   just be a lab report because that's not a supported

11   specialty for this -- for the RADV projects.

12           So all of this when we did the intake

13   of the medical records was -- was quite an

14   undertaking.  So what we did -- well, go ahead.

15   You can go with your next question then.  Does that

16   help?

17           Q.   Yes.  So how would legibility impact

18   medical record review?

19           A.   Oh, quite a bit.  Legibility and the

20   date; legibility and the diagnosis; legibility and

21   physician's signature, credential; very --

22   legibility is always an issue when you're coding

23   both currently and -- but especially

24   retrospectively since you can't go back and ask the

25   physician to interpret their handwriting.



Page 90

```
 1            Q.   So the legibility of a medical record
 2   may impact whether a primary or senior coder was
 3   able to identify a diagnosis?
 4            A.   Yes.
 5            Q.   Could legibility be a reason that two
 6   coders may review the same medical record and reach
 7   different results?
 8            A.   Yes.
 9            Q.   How would variances in clinical
10   terminology impact medical record review?
11            Wendy, sorry, I think you're on mute.
12   I want to make sure --
13            A.   There she is.
14            MS. ZUPAC:  Thanks.  Sorry.
15   BY MS. MADDOUX:
16            Q.   So I can repeat the question.
17            How would variance in clinical
18   terminology impact medical record review?
19            MS. ZUPAC:  Object to form.  Thank you.
20            THE WITNESS:  The differences in
21            clinical terminology again based on the type
22            of record we received, it may be very
23            detailed or it may be not, or it could be an
24            abbreviation form or some kind of truncated
25            form.  So the clinical terminology for a --
```



Page 91

1                  like a heart center teaching facility would

2                  be different than the terminology used for a

3                  physical done by someone who doesn't even

4                  know the patient.

5                       So there's different terminology that

6                  could be listed.  And so, again, there's

7                  differences that typically these type things

8                  would get escalated to a senior person to

9                  sort out as would legibility actually.

10    BY MS. MADDOUX:

11         Q.    Would variances in clinical terminology

12    be one reason why two coders reviewing the same

13    medical record may reach different results?

14                  MS. ZUPAC:  Object to form.

15                  THE WITNESS:  Yes.

16    BY MS. MADDOUX:

17         Q.    So then the next section on this page

18    of Exhibit 11 -- excuse me, 1213 states in part,

19    "In addition to documentation issues, the Coder

20    Guidance summarizes selected official coding

21    guidelines for ICD-9-CM and AHA Coding Clinic for

22    ICD-9-CM sources for consistent interpretation

23    across RADV coders.  These issues have been raised

24    by RADV coders as challenging coding situations

25    that impact common conditions in the Medicare



Page 97

1            A.   Yes.

2            Q.   Why would the medical record review

3      contractor do an IRR evaluation on a test sample

4      prior to reviewing actual project records?

5                 MS. ZUPAC:  Object to form.

6                 THE WITNESS:  This would be part of the

7                 hiring process.  These are contractors that

8                 have -- they could have several other

9                 contracts going on.  So in order to select

10                the coders best qualified, they do some

11                internal assessment and this is one of it.

12                They do a test sample of records to see that

13                that -- that coder is -- fully understands

14                inpatient, outpatient, physician coding

15                rules, and compare it to the -- like a gold

16                standard of records that they have set up,

17                like a test you would take for employment.

18     BY MS. MADDOUX:

19            Q.   Why does the primary coder need to meet

20     a 95 percent reliability score?

21                MS. ZUPAC:  Object to form.

22                THE WITNESS:  This would be -- the

23                number itself, I'm not sure exactly where

24                that came from.  I assume it's in the

25                medical record review contractor's contract.



Page 98

```
 1              But, again, it's just showing that the
 2              most -- the best coders are one that agree
 3              to the gold standard of coding.  So it's
 4              keeping the most experienced coders that
 5              understand the project the best in the --
 6              for consistency purposes.
 7    BY MS. MADDOUX:
 8         Q.   Does the 95 percent threshold
 9    acknowledge that coders may not agree about whether
10    a diagnosis code is supported by a medical record
11    100 percent of the time?
12              MS. ZUPAC:  Object to form.
13              THE WITNESS:  That's correct.
14    BY MS. MADDOUX:
15         Q.   Does this 95 percent threshold
16    acknowledge that coders may make mistakes and miss
17    diagnosis codes that are, in fact, supported in the
18    medical record?
19              MS. ZUPAC:  Object to form.
20              THE WITNESS:  True.
21    BY MS. MADDOUX:
22         Q.   What are some reasons why a primary
23    coder's IRR may be 95 percent or less?
24              MS. ZUPAC:  Object to form.
25              THE WITNESS:  All of the examples I've
```



Page 99

1           given you previously with the documentation

2           issues, the coding, interpreting the coding

3           rules differently, experience, those are all

4           things that can contribute to the

5           95 percent.

6    BY MS. MADDOUX:

7           Q.   Was one reason the primary coder may

8    have missed a diagnosis code that was supported by

9    the medical record because the primary coder was

10   conducting a blind review?

11              MS. ZUPAC:  Object to form.

12              THE WITNESS:  I -- I don't really -- I

13          can't really answer that yes or no.

14   BY MS. MADDOUX:

15          Q.   If a primary coder did not identify a

16   diagnosis code in their blind review, does that

17   mean that a diagnosis code is not supported in the

18   medical record?

19              MS. ZUPAC:  Object to form.

20              THE WITNESS:  Well, I think we pretty

21          much already answered that with there's a

22          secondary review by a senior coder, so yes.

23   BY MS. MADDOUX:

24          Q.   What are coding errors?

25          A.   Coding error would be one that -- in an



Page 126

```
 1          Q.   Then it says two bullets later,
 2     "conflicting documentation within the same record,"
 3     what does that refer to?
 4          A.   That would be the example I gave you
 5     earlier where like a specialist might say the
 6     person has one thing, but the attending physician
 7     doesn't feel that that's important or hasn't
 8     included that in his final list of -- his or her
 9     final list of diagnoses.  That's where there's some
10     disagreement.
11          Q.   How are coders supposed to resolve
12     conflicting documentation within the same record?
13          A.   Our instructions were that the -- for
14     instance, in the inpatient record, the attending
15     physician has the final say of what the condition
16     is.  So if they've included it in their final
17     progress note or summary, that would be -- that
18     would trump anything that happened earlier in the
19     process of determining the condition.
20          Q.   And then why would coder education and
21     experience contribute to coder disagreement?
22          A.   The coders, of course, were hired for
23     different projects and different -- they had
24     different abilities and years of experience.  They
25     all met the minimum requirements.  But,
```



Page 127

1    particularly, if they had a lot of experience in

2    the hospital where the regulations are much more

3    strict, and there's a lot of use of Coding Clinic

4    whereas a physician-based coder whose -- most of

5    their career has just worked for physicians

6    wouldn't have that same level of experience with

7    coder clinic -- Coding Clinic because it's not

8    really used in physician offices, which is more of

9    a service-based coding instead of a diagnosis-based

10   coding.  So theirs have levels of difference.

11            They all met the minimum requirements,

12   but through education and training, we get them all

13   up to the same speed.  But there could be -- this

14   could be, as I said, this was just a subjective

15   maybe this could be a problem that the MRRCs could

16   identify and add to their quality control.

17            Q.  And then the couple later it says coder

18   fatigue productivity standards.  Why would coder

19   fatigue contribute to coder disagreement?

20            A.  This again was just a guess on industry

21   standards and industry, you know, doing research to

22   find different reasons for coder disagreement and

23   coder fatigue is one of them.

24            Q.  And why would productivity standards

25   potentially lead to coder disagreement?



Page 128

1          A.   Again, if it's potentially they -- and

2     I don't even know if there were productivity

3     standards at the MRRCs.  But, again, if the coder

4     felt stressed to work faster, they might forget or

5     miss a particular diagnosis, which is why we have

6     the various levels so that the next person could

7     pick it up.

8          Q.   And looking at this list today, are

9     there any other factors that you can think of that

10    may contribute to coder disagreement?

11         A.   No.  I think it's pretty -- you know,

12    can pretty much generalize because of documentation

13    and signatures and guidance.  That's pretty much

14    what the -- subjectively, what we think causes

15    differences in coding.

16              MS. MADDOUX:  So I think if we can go

17         off the record.

18              THE VIDEOGRAPHER:  We are going off the

19         record.  The time is 12:09 p.m.

20     (Recess taken from 12:09 p.m. until 12:40 p.m.)

21              THE VIDEOGRAPHER:  We are back on the

22         record.  The time is 12:40 p.m.

23              (Exhibit 1215 marked for

24         identification.)

25    BY MS. MADDOUX:



Page 129

1          Q.   Okay.  So I'm going to direct your

2     attention back to AgileLaw.  We're going to load a

3     new document.  Tab 7.  This will be Exhibit 1215.

4     And for the record, it is Bates stamped

5     USBP001210260.  Do you see a document up on your

6     screen?

7          A.   Yes.

8          Q.   If you can take a minute to scroll

9     through and if you need to zoom, do that.

10          And this be appears to be an e-mail

11     chain dated April 1, 2010, between you Linda Small,

12     you, and others; is that correct?

13          A.   Yes.

14          Q.   Who is Linda Small?

15          A.   She was a senior coder at -- or maybe

16     project manager, I'm not sure, at BDS, one of the

17     MRRCs.

18          Q.   And, now, you can scroll to the bottom

19     of page 1 of Exhibit 1215, her e-mail starts there,

20     and it says, "In reviewing the 25 national CY 08

21     sample of records to be used for generating IRR

22     data on our coders, we had some difficulty with

23     three of the records," and then it continues to

24     page 2, "in establishing the final answers due to

25     gray areas, that can create inconsistency among



Page 130

```
 1    even the best coders.  This coder interpretation
 2    and discretion to weigh in on code assignment could
 3    influence their final IRR score and ultimately
 4    could result in falling below 95 percent.  Since
 5    coding -- code guidance instructs primary coders to
 6    seek senior coder guidance in these situations.
 7    The primary coder is denied their right in the IRR
 8    sample test.  We would like to get your input on
 9    these records before they are forwarded to the rest
10    of the coders for IRR review."
11            Do you see that?
12       A.   Yes.
13       Q.   Is the IRR referred to here the same
14    inter reliability -- inter-rater reliability we
15    discussed earlier?
16       A.   Yes.  At the MRRC level, yes.
17       Q.   And when Ms. Small says -- refers to
18    coding gray areas that can create inconsistency
19    even among the best coders, are those the same gray
20    areas you testified about earlier?
21            MS. ZUPAC:  Object to form.
22            THE WITNESS:  Yes.
23            MS. ZUPAC:  Calls for speculation.
24    BY MS. MADDOUX:
25       Q.   Do you --
```



Page 140

1                    CERTIFICATE OF REPORTER

2

3              I, Christine A. Taylor, Certified Court
   Reporter within and for the State of Georgia, do
   hereby certify:

4

5              That the foregoing deposition was taken
   before me on the date and at the time and location
   stated on Page 1 of this transcript; that the

6  deponent was duly sworn to testify to the truth,
   the whole truth and nothing but the truth; that the

7  testimony of the deponent and all objections made
   at the time of the examination were recorded

8  stenographically by me and were thereafter
   transcribed; that the foregoing deposition as typed

9  is a true, accurate and complete record of the
   testimony of the deponent and of all objections

10 made at the time of the examination to the best of
   my ability.

11

12             I further certify that I am neither
   related to nor counsel for any party to the cause
   pending or interested in the events thereof.

13 Witness my hand, this 6th day of June, 2022.

14

15

16  _____
    _Christine Taylor_

17  Christine A. Taylor, RPR
    CCR-4736

18

19

20

21

22

23

24

25


2840

**EXHIBIT D-109**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )

Videotaped Deposition of

STEPHANIE DAWN GARDNER

Given Remotely

Wednesday, June 30, 2021

9:04 a.m. Eastern Time

Reported by:  Karen K. Kidwell, RMR, CRR

Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 97

1        Q.    Did anyone direct you to pioneer the chart
2    review program at PacifiCare?
3            MS. DO:  Object to form.
4            THE WITNESS:  I don't recall specifically,
5        but in my role, I -- I would have received
6        direction around that.
7    BY MS. KRIEG:
8        Q.    Okay.  Who did you report to during the
9    period that you worked on the chart review program at
10   PacifiCare?
11       A.    I -- I believe Jim Higgins and Jeff
12   Dumcum.
13       Q.    During the period that you worked at
14   PacifiCare on chart review, did you ever have a
15   conversation with anyone at CMS about the chart
16   review program?
17       A.    I don't recall.
18       Q.    Do you have an understanding of the term
19   "blind chart review"?
20       A.    Yes.
21       Q.    What do you understand a blind chart
22   review to mean?
23       A.    My understanding is in a blind chart
24   review, you would have coders looking at charts
25   without any other -- any information as to what was



Page 98

1    already found in those charts.

2         Q.   Do you have an understanding that in a

3    blind chart review, the coders would not have any

4    information about what a provider has already

5    submitted in terms of --

6         A.   Yes.

7         Q.   Okay.

8         A.   Sorry.

9         Q.   And do you have an understanding of what

10   an informed chart review is?

11        A.   Yes.

12        Q.   And what is your understanding of what an

13   informed chart review is?

14        A.   An informed chart review would be one

15   where the coders have information as to what was

16   previously submitted by the physician.

17        Q.   Did PacifiCare's chart review program go

18   out and collect medical records from providers to

19   review?

20        A.   Yes.  The PacifiCare program collected

21   medical records from providers.

22        Q.   Did PacifiCare's chart review program use

23   vendors to review medical records from providers?

24        A.   That's my recollection, yes.

25        Q.   Okay.  At the time PacifiCare -- strike



2844

Page 99

1   that.

2           Did PacifiCare's chart review program

3   review medical records for completeness?

4           MS. DO:  Objection.  Objection to form.

5           THE WITNESS:  I'm sorry, could you repeat

6       the question?

7   BY MS. KRIEG:

8       Q.   Did PacifiCare's chart review program

9   review medical records for completeness?

10      A.   That's my understanding.

11      Q.   And using the definitions of

12  "completeness" and "accuracy," as we discussed

13  earlier, did PacifiCare's chart review program review

14  medical records for accuracy?

15          MS. DO:  Objection to form.

16          THE WITNESS:  My recollection is that as a

17      blind coding chart review program, it did not

18      review records for accuracy.

19  BY MS. KRIEG:

20      Q.   Okay.  At the time you were involved in

21  developing the PacifiCare chart review, were you

22  involved in any discussions that discussed doing a

23  chart review for completeness, but also creating a

24  process that would review medical records to review

25  whether a provider's submitted codes were correctly



Page 228

1                          CERTIFICATE

2

3        I, KAREN K. KIDWELL, Registered Merit Reporter,

4   and Certified Realtime Reporter, do hereby certify

5   that prior to the commencement of the examination,

6   STEPHANIE GARDNER was duly remotely sworn by me to

7   testify to the truth, the whole truth and nothing but

8   the truth.

9        I DO FURTHER CERTIFY that the foregoing is a

10   verbatim transcript of the testimony as taken

11   stenographically by me at the time, place and on the

12   date hereinbefore set forth, to the best of my

13   ability.

14        I DO FURTHER CERTIFY that I am neither a

15   relative nor employee nor attorney nor counsel of any

16   of the parties to this action, and that I am neither

17   a relative nor employee of such attorney or counsel,

18   and that I am not financially interested in this

19   action.

20

21

                    _____
22                  Karen K. Kidwell
                    Registered Merit Reporter
23                  Certified Realtime Reporter
                    Notary Public
24                  Dated:  July 13, 2021

25



**EXHIBIT D-110**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
---o0o---


UNITED STATES OF AMERICA, ex     )
rel., BENJAMIN POEHLING,         )
                                 )
                Plaintiff,       )
                                 )    Case No.
        vs.                      )    16-08697 FMO
                                 )
UNITEDHEALTH GROUP, INC., et     )
al.,                             )
                                 )
                Defendants.      )
                                 )



---o0o---

TUESDAY, APRIL 2, 2024

VIDEOTAPED DEPOSITION OF CRAIG GARTHWAITE, PH.D.

CONFIDENTIAL TRANSCRIPT

---o0o---




REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR



2848

Page 44

1    work done searching and comparing data across large

2    datasets, from claims data, chart review data,

3    different databases over eight different years and

4    different sources and different formats.

5         Was there work that had to be done to get    09:14:58

6    that material into a form where you could, you

7    know, do your analysis on -- with that data?

8    A.    Certainly there's data processing and

9    cleaning and things like that.  I am not sure

10   exactly what you're asking about the work done to    09:15:18

11   get the data in the process to do the analysis.  It

12   was all -- the project is done together, but

13   certainly there were steps taken to clean and

14   process the data into our servers.

15   Q.    Did you have to create a comprehensive    09:15:31

16   database of your own that integrated all the

17   materials into one place?

18   A.    They all exist on a server.  They are not

19   all in a single database.  They refer to each other

20   in query in the code.    09:15:47

21   Q.    Did you have to normalize and standardize

22   the data in some fashion?

23   A.    There were certainly instances where the

24   data had to be normalized to compare across.

25   Q.    And did you have to write code to search    09:15:57



Page 45

1  across these different datasets on the server to

2  get the information out of it that you wanted to?

3      A.   I should note up front that I directed the

4  sort of writing of the code.  I did not write the

5  code.  But yes, there was code written to sort of      09:16:12

6  search across and compare different tables as we

7  described in the report and the type of walk-on

8  effects.

9      Q.   So that sort of precisely gets at my

10  question.  What role did you play in the            09:16:23

11  collection, normalization of data, standardization

12  of data, construction of consolidated databases and

13  writing of code to do the analysis that's required

14  for your report?

15          MR. MASON:  Objection to form.             09:16:38

16      Q.   BY MR. GALLAGHER:  As opposed to Analysis

17  Group?

18          MR. MASON:  Objection to form.

19          THE WITNESS:  So working with a team at

20  Analysis Group, I got -- I sort of instructed what   09:16:45

21  I wanted to be done.  And then not dissimilar from

22  sort of how we work with -- or how I work with and

23  other academics work with research assistants and

24  predoctoral students, sometimes postdoctoral

25  students, had that work completed by them under my   09:17:02



Page 46

1    direction.

2         And then it is sort of an iterative

3    process back and forth as we look at the sort of

4    results to make sure things are operating in the

5    way we want in the model.                    09:17:13

6    Q.   BY MR. GALLAGHER:  Did you get to see

7    interim results?

8    A.   When you say "interim results," what do

9    you mean?

10   Q.   Well, you said that it was an iterative    09:17:19

11   process and we look at the results to make sure

12   things are operating in the way we want in the

13   model.  Did you get to actually look at results of

14   searches on an interim basis as you were preparing

15   your report?                                   09:17:34

16   A.   So I guess that's where I was asking this

17   phrase "results" I want to be clear.  As we are

18   looking through, there were times where we did a

19   number of rechecks to make sure that things were

20   happening in the way that we want.             09:17:45

21        I was very involved in that process, both

22   requesting what checks I would want to see to see

23   that things were working well.  And also sort of

24   discussing how we were going to move forward with

25   that.                                          09:17:57



Page 47

1      Q.   Did you get to see interim results, for

2    example, of the final deletes list that you -- let

3    me ask that more clearly.

4           Did you see a deletes list that was the

5    result of your -- all the searching and comparing      09:18:17

6    that you did as part of your analysis before the

7    final version that was attached to your expert

8    report?

9      A.   I don't know if we compiled what would be

10    sort of the final version, but throughout the         09:18:34

11    process there were steps where we were thinking

12    about the technique and thinking about ways we

13    could develop it, and I was involved in every step

14    of that process.

15      Q.   So did you run searches, see the results,      09:18:45

16    and then refine the searches?

17      A.   I think that the distinction where we

18    might be talking past each other a bit here is the

19    idea of seeing the results.  There wasn't sort of a

20    focus on sort of what an end number was to look        09:18:59

21    like.  It was more sort of interim steps.  So are

22    we able to replicate the CMS risk score using sort

23    of the data we have to match the actual risk score.

24    Like that's a place where we are trying to think of

25    a validity check.                                      09:19:17



Page 75

1    codes and ran the analysis -- and ran risk

2    adjustment with those codes deleted, right?

3        A.    We identified those codes that lack

4    support in United's chart review and risk

5    adjustment data.  If those were removed, we figured    10:08:19

6    out what the payment would be from them being

7    removed at the time period that we looked at it,

8    compared that to the actual payment and then

9    calculated the difference.

10       Q.    So you conceptually, as well as actually,    10:08:31

11   did not calculate the effect of deleting the

12   potential deletes list, or codes that meet your

13   definition in your report of a potential delete?

14           MR. MASON:  Objection to form.

15           THE WITNESS:  What we did is we deleted    10:08:55

16   those codes that we believe lack support in the

17   chart review and risk adjustment data.  As part of

18   that process, we identified those that were not

19   initially supported in chart review, and then set

20   at the same sort of time remove codes that had    10:09:12

21   other support in United's data it looked like, and

22   we wanted to sort of be as cautious and careful as

23   we could to remove those codes.

24       Q.    BY MR. GALLAGHER:  I am asking just a more

25   like just definitional question.  The flow of --    10:09:26



Page 76

1  the opinion you're offering about the flow of funds

2  is not an opinion about what would happen if you

3  took a list that corresponds to what you describe

4  as the potential deletes and were to delete that?

5      A.   By definition, we remove things -- we        10:09:48

6  don't -- there are some things that initially lack

7  support from chart review that we are giving United

8  credit for.  We are not saying that they have

9  support.  We are saying there's enough evidence

10  there in United's data that could have been relied    10:10:01

11  upon for support that we don't feel comfortable

12  saying that those are unsupported codes in United's

13  chart review and risk adjustment data.

14      Q.   I think my question is simpler.  You are

15  not offering an opinion about what -- how the flow    10:10:12

16  of funds would change if you took a list of codes

17  that corresponds to what you call potential deletes

18  in your report and deleted them?  That's not the

19  analysis you're offering?

20          MR. MASON:  Objection; asked and answered.    10:10:26

21      Q.   BY MR. GALLAGHER:  Right?

22      A.   It is -- it's -- everything on --

23  everything that we do delete is identified in that

24  unsupported data.  So it would be sort of a related

25  but not identical exercise.                           10:10:37



2854

Page 77

1     Q.   It's not the exercise you undertook?

2     A.   No.  We gave credit to United for codes

3  that they had evidence for that they also, I would

4  note, could have identified in their data or could

5  have said the reason why we're not going to delete      10:10:52

6  that code is that there's other evidence.

7          So it is not a question of them changing

8  their behavior, but a question about sort of the

9  knowledge they had at the time.

10    Q.   And you also are not offering an opinion        10:11:03

11 on what would traditionally be called but-for

12 damages, right?

13         MR. MASON:  Objection to form.

14         THE WITNESS:  Or answering the question as

15 of what would have happened as of 2019 -- I           10:11:14

16 shouldn't say 2019.  The time period I am sort of

17 looking at this question, which is given the sort

18 of COVID and the length of this from '19 to '23,

19 pick a date in there, what would happen if the

20 codes were removed.                                    10:11:29

21    Q.   BY MR. GALLAGHER:  That's not a -- you are

22 not offer -- sorry.  Let me clarify.

23         You are offering an opinion about what

24 would happen if after the fact, in like 2019 or

25 2020, you removed the codes, what the flow of funds   10:11:40



Page 78

1   would look like in that -- that scenario?

2       A.   If it is a question about as of 2019 what

3   would happen if we removed the codes then, yes.

4       Q.   You are not offering an opinion about what

5   would happen if United had done something different   10:11:58

6   in 2008 or 2009 or 2010 or 2011 at the time?

7       A.   Yeah, I'm not offering an opinion about

8   how contemporaneously they would have changed their

9   other behavior.

10      Q.   And you are not offering an opinion about   10:12:15

11  what would happen in a but-for world where United

12  had done the analysis you did in 2008, 2009, 2010

13  and had changed its submission of codes accordingly

14  in those years at the time?

15          MR. MASON:  Objection to form.              10:12:31

16          THE WITNESS:  No, I think we are very

17  clear in the report that the question we are trying

18  to answer is how would the flow of funds have

19  changed if as of the time period we're asking the

20  question, the code that lacks support in United's    10:12:41

21  chart review and risk adjustment data were removed

22  from the system.

23      Q.   BY MR. GALLAGHER:  Effectively giving away

24  the payments on contract years, you're effectively

25  offering an opinion about what would happen if you   10:12:54



2856

Page 79

1   were to remove the codes today or at the time you

2   testify at trial?

3       A.   Yes.

4       Q.   I want to step aside and ask a question

5   about just your compensation.                          10:13:13

6            What is your hourly rate?

7       A.   The time I worked on the report it was

8   $900 an hour.

9       Q.   And was it more than that or less than

10  that before you started working on the report?         10:13:23

11      A.   I think it went up incrementally during

12  that time, a period of five years.

13      Q.   What was it when you started in 2018?

14      A.   I don't remember.  It might have been 850

15  or something like that.                                10:13:35

16      Q.   Do you charge a different hourly rate for

17  testimony than you do for reading materials and

18  writing a report?

19      A.   No.

20      Q.   You also get 20 percent of the billings    10:13:41

21  that are submitted by Analysis Group, do you not?

22      A.   Yes, I do.

23      Q.   And do you get a cut of everything that

24  Analysis Group bills for their work in relation to

25  this matter, or is it some defined portion of it?     10:13:54



Page 80

```
 1      A.    I believe it's for everything related.

 2      Q.    So if there was work done by Analysis

 3  Group at the direction of the DOJ, you would get 20

 4  percent of the billings for that?

 5      A.    I believe so, but there could be other        10:14:10

 6  relationships between United and the DOJ related to

 7  the case that I am not aware of.

 8      Q.    What we are talking about here is your

 9  relationship between you and Analysis Group, right?

10      A.    I don't believe that's what you were          10:14:21

11  talking about, no.

12      Q.    You get 20 percent of the billings by

13  Analysis Group.  Under what agreement are you

14  entitled to that 20 percent?  Is it an agreement

15  with the DOJ or is it an agreement with the           10:14:31

16  Analysis Group?

17      A.    So it is an agreement with Analysis Group.

18  The question I was answering was you said if

19  Analysis Group did other work for DOJ on this

20  matter, would I get 20 percent of that.  I believe    10:14:41

21  so, though I don't know if there are instances

22  where AG has done work for DOJ on this that I did

23  not get 20 percent of.

24      Q.    Right.  Your entitlement to your 20

25  percent would be something that would be defined by   10:14:55
```



2858

Page 81

1  your agreement with Analysis Group, right?

2      A.   Yes.

3      Q.   And whether or not you get 20 percent of

4  what they are billing the DOJ or relaters' counsel,

5  you know, whether or not you get that 20 percent          10:15:08

6  would depend on whether it qualifies for, you know,

7  under your agreement with Analysis Group for what

8  you get 20 percent of?

9          MR. MASON:  Objection to form.

10         THE WITNESS:  Yes, I believe so.                   10:15:19

11     Q.   BY MR. GALLAGHER:  So do you or do you not

12 get 20 percent of the work that Analysis Group has

13 done, for example, on the first interrogatory

14 response?

15     A.   I believe I did.                                 10:15:33

16     Q.   And how is that paid to you, that 20

17 percent cut of Analysis Group's billings?

18     A.   I'm confused.  Do you mean like how it's

19 paid?

20     Q.   Do you get a check from Analysis Group?          10:15:47

21     A.   I get a direct deposit from Analysis

22 Group.

23     Q.   And how often do you get that payment?  Is

24 it calculated monthly, quarterly, yearly?

25     A.   It's, I believe, whenever payment is             10:15:59



Page 119

1    Q.    BY MR. GALLAGHER:   Let me go back to

2    something you said.   In your prior answer you said

3    it is my understanding that experts would say if

4    you have two blind reviewers that both say the code

5    doesn't exist, it would lack support.   What expert      11:05:12

6    are you referring to there?

7    A.    So in preparation for the deposition, I

8    read the deposition of -- I believe it is a

9    Mr. Renjilian from FTI who also wrote a rebuttal

10   report.                                                  11:05:27

11   Q.    So you're referring to Mr. Renjilian as

12   the support for your statement that experts would

13   say that if you have two blind reviewers that both

14   say that the code doesn't exist, it would lack

15   support?                                                 11:05:39

16   A.    Yes.

17   Q.    And by the way, the blind reviewers,

18   again, in this process of chart review, they are

19   not being asked whether there is or is not support

20   for a particular code; they're being asked to           11:05:53

21   simply code what they think is there, right?

22   MR. MASON:   Objection; form, compound,

23   asked and answered.

24   THE WITNESS:   So blind reviewers are

25   supposed to create a full and accurate record --        11:06:05



Page 120

1  representation of the medical record.  That is what

2  they are doing.

3      Q.   BY MR. GALLAGHER:  Is there an error rate

4  to that for the blind reviewers in chart review?

5          MR. MASON:  Objection to form.                   11:06:23

6          THE WITNESS:  I would imagine that like

7  all processes in life, there are error rates.  If

8  United believed there were an error made when their

9  chart review didn't find support for a diagnosis

10 code, they had the ability to go back and                11:06:39

11 investigate it further.  Second-level review would

12 be an example of that.

13         The claims -- the CV program would also be

14 an example of that.  So United had the ability if

15 it wanted to to investigate further the record that     11:06:51

16 was created by their trained, certified medical

17 coders.

18     Q.   BY MR. GALLAGHER:  So the answer is yes,

19 there is an error rate for the blind reviewers

20 doing chart review?                                      11:07:02

21         MR. MASON:  Objection to form;

22 argumentative, asked and answered.

23         THE WITNESS:  Much like our earlier

24 conversation about error rates, I would believe

25 that it is possible that a certified coder would        11:07:12



2861

Page 121

```
 1   both add codes inappropriately if they made an

 2   error and find a lack of support for codes if they

 3   made an error.

 4        Q.   BY MR. GALLAGHER:  What is the error rate

 5   for the line reviewers in chart review as it          11:07:24

 6   relates to, you know, missing codes that are, in

 7   fact, supported?

 8        A.   I can't remember.  I know I have seen it

 9   at some point.

10        Q.   Where do you think you saw an error rate    11:07:38

11   for blind reviewers missing code?

12        A.   I believe it's possibly in the Renjilian

13   -- Mr. Renjilian's rebuttal report, but I read that

14   at a pretty high level.  So it's possible I saw it

15   in that or in other conversations.                    11:07:52

16        Q.   Do you have any basis to dispute

17   Mr. Renjilian's, you know, statements in his report

18   about what the error rate would be?

19             MR. MASON:  Objection to form; vague,

20   foundation.                                           11:08:05

21        Q.   BY MR. GALLAGHER:  Do you have any

22   opinions about that?

23             MR. MASON:  Objection to form; vague,

24   compound, foundation.

25             THE WITNESS:  I don't have a particular     11:08:12
```



Page 132

1   databases, yes.

2        Q.    And risk adjustment database, remind us if

3   that includes the claims databases or is that

4   limited to the data from which submissions were or

5   were not made?                                    11:43:03

6        A.    So I would ask that we go from Paragraph

7   37 and then skip forward to Paragraph 40.  It came

8   to our attention during deposition testimony -- I

9   will just read it.  "Deposition testimony indicates

10  that a technical issue may have impacted            11:43:19

11  transmission of data from certain Provider-Reported

12  Claims Databases to IRADS during the at-issue

13  period.  I therefore also check the

14  Provider-Reported Claims Databases to ensure that

15  there is just one provider associated with the date  11:43:32

16  of service in those databases before I match a

17  provider-reported encounter from IRADS to chart

18  review using this method."

19        Q.    Okay.  So you took steps to ensure that,

20  in fact, there was only one provider-reported --     11:43:45

21  there's only one provider-reported codes on that

22  day in any of the databases?

23        A.    That was our intent, yes.

24        Q.    In terms of validation other than what

25  might be inherent in your methodology for defining   11:44:19



Page 133

1    a match in the first place, you mentioned looking

2    at whether there are overlapping codes in the

3    databases on that day.  Is there anything else you

4    did by way of validation of a match?

5         A.   I don't recall a specific example right        11:44:39

6    now.  What I will say is this was a consistent

7    focus of our effort, to look at places where the

8    data were lining up correctly.

9         Q.   By "our effort," you mean work done by

10   Analysis Group?                                           11:44:55

11        A.   Work done by my team under my direction.

12        Q.   So what other directions did you give in

13   terms of validation besides looking for overlapping

14   codes for your match methodology?

15        A.   I guess I would turn back to my answer         11:45:05

16   from a minute ago, which I can't recall a specific

17   example, but I do remember multiple conversations

18   with the team together thinking about ways that

19   this might fail, but I don't remember the specific

20   validations.                                             11:45:19

21        Q.   As part of the validation process, you

22   never asked to look at any sample charts to

23   determine whether there was, in fact, a

24   correspondence between what was reviewed in chart

25   review and the -- what -- that what was reviewed in      11:45:51



Page  134

1   chart review was the same medical records for the

2   same encounter from which the code was submitted?

3       A.   I did not look at any medical records.

4       Q.   So I think we established, but I'll just

5   confirm.  You agree that there would be some error       11:46:14

6   rate to United's chart review, and in particular

7   some error rate where coders doing that review

8   missed codes that were, in fact, supported by a

9   chart?

10      A.   I think that there are error rates that       11:46:28

11  exist.  I don't know if there's a specific estimate

12  of a United error rate with respect to their

13  coders, whether that would be the average, it would

14  be above or below average.  I think of United as a

15  sophisticated organization, one of the largest       11:46:48

16  health insurers -- the largest health insurer in

17  the country.

18          So I wouldn't want to extrapolate from

19  known error rates to what they have, but the idea

20  that there could be some error in this process I       11:47:02

21  think is possible.

22          It's also, I would note, something that

23  United would also see in their data, and they had

24  the ability to go and investigate, and at times

25  did, right.  So they did the claims verification       11:47:13



Page 135

1    program where they did match things together.  They

2    did second-level review.  There were times where

3    United tried to solve these problems.  With respect

4    to deletes I would know, not as much with respect

5    to adds.                                    11:47:30

6        Q.   Now, the only way to know if there's an

7    error rate to a -- to either a provider-reported

8    code, the system of having provider-reported codes,

9    or a chart review system, the only way to know if

10   there's an error rate to that would be to go and    11:47:51

11   see if you could validate, by looking at the

12   charts, whether the code is or is not supported,

13   right?

14           MR. MASON:  Objection to form.

15           THE WITNESS:  When you say the only way to    11:48:06

16   know there's an error rate?

17       Q.   BY MR. GALLAGHER:  Right.  When we are

18   talking about error rate -- I am just talking

19   conceptually here.  If we are going to define an

20   error rate for -- let's start with               11:48:17

21   provider-reported codes.  If we wanted to define --

22   or determine the rate at which providers missed

23   codes that were, in fact, supported by medical

24   records, one way to do that would be to review the

25   medical records with an eye toward validating    11:48:44



Page 164

```
1          THE WITNESS:  I will be offering an

2  opinion as to whether there is support in United's

3  chart review and risk adjustment data for that, and

4  that will include evidence from their second-level

5  review.  It will include evidence from their claims     12:22:44

6  verification.  It will include evidence from

7  unsubmitted charts, and it will be an estimate of

8  what United knew at the time when it made its claim

9  to CMS or failed to reverse its claim to CMS.

10     Q.  BY MR. GALLAGHER:  What percentage of          12:23:00

11  codes on your potential deletes list would be found

12  supported in the relevant medical record if you

13  were to go and look at that record?

14          MR. MASON:  Objection to form; asked and

15  answered.                                               12:23:26

16          THE WITNESS:  To be clear, and really I do

17  apologize we are having this sort of back and forth

18  again and again.  When you say "relevant medical

19  record," do you mean the record from that

20  face-to-face encounter, that it went through chart      12:23:37

21  review?

22     Q.  BY MR. GALLAGHER:  I am trying to avoid

23  the mouthful.  I am using "relevant" to what you

24  consider to be relevant medical records.

25          So what percentage of codes on your            12:23:45
```



Page 165

1  potential deletes list would be found supported in

2  the relevant medical record, what you consider to

3  be a relevant medical record, if you were to go and

4  look at that record?

5      A.   As an academic, my life is full of          12:23:55

6  mouthfuls.  So I'll stick with the discussion of

7  the relevant medical record being the record from

8  that face-to-face encounter.  And I think that's

9  what we're going to limit our testimony to.

10     Q.   So tell me the percentage.                   12:24:08

11     A.   The percentage what?

12     Q.   Well, what percentage of the codes on your

13 potential deletes list will be found supported in

14 the relevant medical record, as you defined it, if

15 you were to go and look at that record?              12:24:24

16         MR. MASON:  Objection to form; asked and

17 answered.

18         THE WITNESS:  I don't have an opinion to

19 that, but I do know that United had the ability and

20 at times undertook the ability to go and answer     12:24:32

21 that question at the time.  So my opinion is

22 limited to what United knew at the time in their

23 risk adjustment and chart review data.

24     Q.   BY MR. GALLAGHER:  So to get to the

25 question we started this on, you don't have an      12:24:45



Page 166

1   opinion and you're not going to be testifying to

2   the percentage of the codes on your potential

3   deletes list that would be found supported in the

4   relevant medical record as you defined it if you

5   were to go and look at that record, do you?          12:25:00

6          MR. MASON:  Objection.  Objection to form;

7   misstates the testimony.

8          THE WITNESS:  I will testify to what

9   United knew through the variety of ways in which

10  they tried to find information about the level of   12:25:11

11  support for those codes.

12     Q.   BY MR. GALLAGHER:  Do you have an opinion

13  on that topic or not?

14         MR. MASON:  Objection to form; asked and

15  answered, argumentative.                             12:25:20

16         MR. GALLAGHER:  We can move on.  I'll

17  withdraw it.

18     Q.   I want to look at Appendix D,

19  Paragraph 44, and then what I want to understand is

20  your definition of "support," okay.                  12:25:52

21         This section of your appendix talks about

22  identification of supported diagnosis codes.  Do

23  you see that?

24     A.   Yes, I see that.

25     Q.   And you say, "I consider an instance of a   12:26:02



Page 180

1   beneficiary, yes.

2       Q.   It was -- the encounters and the codes

3   identified in chart review, those were both by

4   beneficiary, specific to a beneficiary?

5       A.   Yes.                                       01:52:09

6       Q.   And the identification of codes that were

7   submitted to CMS, that was also specific to a

8   beneficiary, right?

9       A.   Yes.

10      Q.   So the deletes list is specific -- when it   01:52:20

11  references codes, it's specific to a beneficiary?

12      A.   I'm not sure what you mean by "specific."

13  It is a diagnosis for a beneficiary.

14      Q.   It's an instance associated with a

15  particular beneficiary?                             01:52:43

16      A.   It is a record of a face-to-face,

17  risk-adjustment-eligible encounter for a

18  beneficiary that lacks support in United's chart

19  review and risk adjustment data.

20      Q.   And that delete on your deletes list is    01:52:54

21  specific to that beneficiary and does not apply to

22  other beneficiaries, does it?

23      A.   I believe, yes.

24      Q.   Deleting the code for -- that's on your

25  deletes list will only have an impact on the risk    01:53:07



2870

Page 181

```
 1   score for that beneficiary and not anybody else,

 2   right?

 3        A.   At the time period in which these deletes

 4   are happening, it would -- those that are on the

 5   list would affect that because that list does take      01:53:26

 6   into account things like risk orders and things

 7   like that, which then could have an effect on not

 8   the diagnosis for someone else, but the payment for

 9   someone else.

10        Q.   Risk corridors is a concept that only         01:53:41

11   applies for the part D element of your analysis,

12   right?

13        A.   In the program, yes.  Because it only

14   applies in the part D program.

15        Q.   And are you saying that -- let me make        01:54:09

16   sure I ask the question correctly.

17             How would deleting a code for, you know,

18   one beneficiary affect the risk score for another

19   beneficiary?

20             MR. MASON:  Objection to form; misstates      01:54:41

21   testimony.

22             THE WITNESS:  I did not say it would

23   affect the risk score for another beneficiary.

24        Q.   BY MR. GALLAGHER:  Maybe you misread my

25   question because I said deleting the code that's on    01:54:50
```



Page 182

1   your deletes list will only have an impact on the

2   risk score for that beneficiary and not anybody

3   else, right?

4       A.   Yeah, sorry.  I didn't interpret you meant

5   the risk score for anybody else, just an impact on   01:55:03

6   anybody else.  The risk score, yes, I believe so.

7       Q.   So if your -- deleting -- at least with

8   part D, the way you've taken into account risk

9   corridors, deleting the code for one beneficiary

10  might have some impact on the payment associated     01:55:34

11  with another beneficiary?

12      A.   Well, it could have a payment -- effect on

13  the payment at the plan level.

14      Q.   The risk corridors is only -- that only

15  has an impact at the plan level?                     01:55:48

16      A.   Yeah, and then it could filter down.  You

17  said any impact on anyone is how I heard it.  So I

18  was trying to be complete and accurate.

19      Q.   Risk corridors, that concept when it comes

20  to calculating payments, that's something that's     01:56:01

21  taken into account at the plan level, not the

22  individual level?

23      A.   Yes.

24      Q.   In that regard, it is like the medical

25  loss ratio for part C, which is also taken into      01:56:10



Page 183

1   account at the plan level, right?

2       A.   There are some important differences, but

3   the plan level point is a similarity.

4       Q.   You did not take into account the medical

5   loss ratio in your calculations?                          01:56:28

6       A.   At the time period -- for the question I'm

7   answering, which is at the time period of the

8   report, let's say, what would be the effect of

9   removing risk codes on the flow of funds between

10  the parties, medical loss ratio would not have been     01:56:42

11  an issue.

12      Q.   The reason you didn't take into account

13  medical loss ratio is that you're calculating the

14  financial impact as if though you submit deletes as

15  of the date of your report, September 29, 2023, not     01:56:56

16  a but-for world back in the day like 2008, 2009,

17  right?

18      A.   I don't want to talk about -- you use the

19  term "but-for world." Because as of 2019 I am

20  accounting for those things that could change at        01:57:09

21  that point, and the medical loss ratio is not

22  revisited at that point.

23      Q.   Had you looked at the impact of deleting

24  the codes as if though they had been deleted at the

25  time in during the contract year, you would have        01:57:28



Page 320

1   around that.

2          Again, I don't mean to upset you.  I know

3   it's late in the day, but I am trying to be as

4   complete and accurate as I can think about with the

5   data -- with the terminology we are using and don't      06:01:51

6   want to sort of give an inaccurate answer because

7   we are not being precise about the language.

8      Q.   BY MR. GALLAGHER:  Okay.  So I will be as

9   precise as I can be.  You can't tell us what

10  percentage of instances of diagnostic -- of             06:02:05

11  diagnosis codes not reported in chart review or not

12  found in chart review, what percentage of those

13  were removed in the generation of your final

14  deletes list --

15         MR. MASON:  Objection.                            06:02:22

16     Q.   BY MR. GALLAGHER:  -- because you're

17  giving credit for other instances in United's data

18  where there could be evidence around that code,

19  either submitted or unsubmitted?

20         MR. MASON:  Objection to form --                  06:02:34

21     Q.   BY MR. GALLAGHER:  Right?

22         MR. MASON:  -- vague, compound, confusing.

23         THE WITNESS:  Given that the purpose of

24  what we were doing there was not to sort of have an

25  opinion about whether the codes that we don't           06:02:44



Page 321

```
 1   include on the final deletes list were supported,

 2   but instead just trying to give United credit, that

 3   is not a calculation that we created.

 4         We also don't want to give the impression

 5   that a removal of a diagnosis code instance that      06:02:56

 6   showed such that it does not appear on the final

 7   deletes list would be a part of my opinion that

 8   that code has support in United's chart review and

 9   risk adjustment data in the time period we're

10   speaking about.                                        06:03:12

11   Q.    BY MR. GALLAGHER:  At what point in your

12   analysis for any given code that ends up on your

13   final deletes list, at what point in that analysis

14   can you say that deleting the code would have an

15   impact on payment?                                     06:03:35

16   A.    So to definitively say it has an impact on

17   payment, I think you would need to input it into

18   the CMS risk adjustment model.  Though I'll note

19   that importantly I think this is the point that if

20   United were to delete the list of codes that I had,   06:04:17

21   and as we talked about, there's 1.9 million codes

22   that I identify lack support in their data, if they

23   were to remove those codes, the change of funds

24   would automatically be done -- the change in the

25   flow of funds would automatically be calculated by    06:04:34
```



Page 322

1    CMS.  And it's reasonable to assume, given the

2    number of codes that we're talking about, that

3    there would be an overpayment there.

4           And as evidence of that first, we would

5    note that given this large number of codes, it          06:04:47

6    almost certainly affects payment as determined at

7    the HCC level.

8           In United's own behavior, as we talked

9    about earlier with the CV program, was to withhold

10   revenue back with the idea that because they would      06:04:59

11   be removing codes as part of CV, then we would end

12   up having a reduction in payments from CMS.

13       Q.   Do you remember what my question was?

14       A.   You asked what I believe -- it would be

15   great if you just read it back, I guess.                06:05:14

16       Q.   I just want to know what question do you

17   think you were answering there?

18           MR. MASON:  Objection to form;

19   argumentative.

20           THE WITNESS:  I don't think I want to          06:05:22

21   characterize your question.  I am happy to have it

22   read back to me if you'd like.

23       Q.   BY MR. GALLAGHER:  You gave a long answer,

24   and I just want to know what question do you think

25   you were answering?                                      06:05:31



Page 335

1            DEPOSITION OFFICER'S CERTIFICATE

             (Civ.Proc. § 2025.520(e))

2

STATE OF CALIFORNIA      )

3                        )  Ss.

COUNTY OF SAN FRANCISCO )

4

5            I, Balinda Dunlap, hereby

6   certify:

7        I am the deposition officer that

8   stenographically recorded the testimony in the

9   foregoing deposition.

10       Written notice pursuant to Code of Civil

11   Procedure, Section 2025.520(a), having been sent,

12   the deponent took the following action within the

13   allotted period with respect to the transcript of

14   the deposition:

15       (  ) In person, at the office of the

16   deposition officer, made the changes set forth on

17   the original of the transcript.  (The parties

18   attending the deposition have been notified of said

19   changes.)

20       (  ) Approved the transcript by signing

21   it.

22       (  ) Refused to approve the transcript by

23   not signing it.

24       (  ) By means of a signed letter, made the

25   changes and approved or refused to approve the



2877

Page 336

1  transcript as set forth therein.  (Said letter has

2  been attached to the original transcript and copies

3  thereof mailed to all parties attending the

4  deposition.)

5          (  ) Failed to approve the transcript

6  within the allotted time period.

7  Dated _____.

8

9

10  _____*Balinda Dunlap*_____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

