1    LATHAM & WATKINS LLP
         David J. Schindler (Bar No. 130490)
2         *david.schindler@lw.com*
         Manuel A. Abascal (Bar No. 171301)
3         *manny.abascal@lw.com*
     355 South Grand Avenue, Suite 100
4    Los Angeles, California 90071-1560
     Telephone: +1.213.485.1234;
5    Facsimile: +1.213.891.8763

6    *Attorneys for United Defendants*

7    MICHAEL D. GRANSTON
     Deputy Assistant Attorney General, Civil Division
8    E. MARTIN ESTRADA
     United States Attorney
9    DAVID M. HARRIS
     ROSS M. CUFF
10   JACK D. ROSS (CBN 265883)
     HUNTER B. THOMSON (CBN 330533)
11   Assistant United States Attorneys
     300 N. Los Angeles Street, Room 7516
12   Los Angeles, California 90012
     Tel: (213) 894-6379; Fax: (213) 894-7819
13   Email: *hunter.thomson@usdoj.gov*

14   *Attorneys for the United States of America*

15   [Additional Counsel Listed on Next Page]

16              **UNITED STATES DISTRICT COURT**
17              **CENTRAL DISTRICT OF CALIFORNIA**

18   UNITED STATES OF AMERICA *ex rel.*       CASE NO. 2:16-cv-08697-FMO-PVCx
     BENJAMIN POEHLING,
19                                            **JOINT EVIDENTIARY APPENDIX**
                    Plaintiff,
20                                            **VOLUME 11 OF 14**
         v.                                   **EXHIBITS D-142 THROUGH D-160**
21                                            **PAGES 3590 THROUGH 3973**
     UNITEDHEALTH GROUP, INC. *et al.*,
22
                    Defendants.               Hon. Fernando M. Olguin
23
24                                            Hearing Date:  September 5, 2024
25                                            Hearing Time:  10:00 a.m.
26                                             Courtroom:  6D

27           **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED**
28                             **UNDER SEAL**

LATHAM & WATKINS LLP
    Daniel Meron (appearing *pro hac vice*)
     daniel.meron@lw.com
    Abid R. Qureshi (appearing *pro hac vice*)
     abid.qureshi@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

BARTLIT BECK LLP
    Philip S. Beck (appearing *pro hac vice*)
     philip.beck@bartlitbeck.com
    Sean W. Gallagher (appearing *pro hac vice*)
     sean.gallagher@bartlitbeck.com
    Cindy L. Sobel (appearing pro hac vice)
     cindy.sobel@bartlitbeck.com
    Nicolas Martinez (appearing pro hac vice)
     nicolas.martinez@bartlitbeck.com
    Benjamin R. Montague (appearing *pro hac vice*)
     benjamin.montague@bartlitbeck.com
54 W. Hubbard Street, Suite 300
Chicago, Illinois 60654-8174
Telephone: +1.312.494.4400
Facsimile: +1.312.494.4440

BARTLIT BECK LLP
    Andrew C. Baak (appearing *pro hac vice*)
     andrew.baak@bartlitbeck.com
    Jameson R. Jones (appearing *pro hac vice*)
     jameson.jones@bartlitbeck.com
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202-6318
Telephone: +1.303.592.3100
Facsimile: +1.303.592.3140

*Attorneys for United Defendants*

JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
        Email: robert.mcauliffe@usdoj.gov
TRINI E. ROSS
United States Attorney

DAVID CORIELL
Assistant United States Attorney
    138 Delaware Avenue
    Buffalo, New York 14201
    Tel: (716) 843-5830; Fax: (716) 551-3052
    Email:  david.coriell@usdoj.gov

*Attorneys for the United States of America*

**EXHIBIT D-142**

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF CALIFORNIA

2

3   - - - - - - - - - - - - - -+
                               |
4   UNITED STATES OF AMERICA,  |
                               |
5          Plaintiff,          |   Civil Action No.
                               |
6     vs.                      |   2:16-cv-08697-
                               |
7   UNITEDHEALTH GROUP, INC.,  |   MWF-SS
    et al,                     |
8                              |
           Defendants.         |
9                              |
    - - - - - - - - - - - - - -+

10

11     Videotaped Deposition of Marilyn B. Tavenner

12               Washington, D.C.

13          Wednesday, February 28, 2018

14                 9:06 a.m.

15

16

17

18

19

20

21

22

23

24   Reported by: Laurie Donovan, RPR, CRR, CSR

25   Job No: 137792

Page 27

| | | |
|---|---|---|
| 1 | A    I don't know what it's titled, so I | 9:19AM |
| 2 | can't go there. | 9:19AM |
| 3 | Q    Based on the review of those articles, | 9:19AM |
| 4 | did you form any opinions about whether this | 9:19AM |
| 5 | lawsuit has merit? | 9:19AM |
| 6 | A    I did not. | 9:19AM |
| 7 | Q    So let's switch gears a little bit. | 9:19AM |
| 8 | Can you give me a general background, | 9:19AM |
| 9 | your education? | 9:19AM |
| 10 | A    Sure.  I started -- my first career was | 9:19AM |
| 11 | in nursing.  I went to a three-year diploma school | 9:19AM |
| 12 | of nursing in Roanoke, Virginia and worked as a | 9:19AM |
| 13 | nurse for several years while I went back and | 9:20AM |
| 14 | continued my education, getting a degree in | 9:20AM |
| 15 | nursing by 1983. | 9:20AM |
| 16 | Q    Okay. | 9:20AM |
| 17 | A    And continued working in nursing and | 9:20AM |
| 18 | nursing management until the early '90s, by which | 9:20AM |
| 19 | time I had finished graduate school and moved into | 9:20AM |
| 20 | administration, hospital administration. | 9:20AM |
| 21 | Most of my career was with the Hospital | 9:20AM |
| 22 | Corporation of America, about 25 years' worth, and | 9:20AM |
| 23 | then I went into public service, working for | 9:20AM |
| 24 | Governor Tim Kaine.  I then moved into federal | 9:20AM |
| 25 | service, working for President Obama. | 9:20AM |

Page 28

| | | | |
|---|---|---|---|
| 1 | Q | And can you tell us, when did you go | 9:20AM |
| 2 | into federal service? | | 9:20AM |
| 3 | A | February of 2010. | 9:20AM |
| 4 | Q | And was that, was that at CMS? | 9:20AM |
| 5 | A | It was. | 9:20AM |
| 6 | Q | Okay, and what was your title at CMS at | 9:20AM |
| 7 | that point? | | 9:20AM |
| 8 | A | At that point it was chief deputy | 9:20AM |
| 9 | administrator. | | 9:20AM |
| 10 | Q | And how long were you the chief deputy | 9:21AM |
| 11 | administrator? | | 9:21AM |
| 12 | A | On and off from February of 2010 until | 9:21AM |
| 13 | May of 2013. | | 9:21AM |
| 14 | Q | Okay. | 9:21AM |
| 15 | A | I had several titles during that time. | 9:21AM |
| 16 | Q | What titles did you have? | 9:21AM |
| 17 | A | I had that title, chief deputy | 9:21AM |
| 18 | administrator and chief operating officer, and | | 9:21AM |
| 19 | then I also was acting administrator at different | | 9:21AM |
| 20 | points, prior to Don Berwick coming on board and | | 9:21AM |
| 21 | after Don Berwick left -- | | 9:21AM |
| 22 | Q | Okay. | 9:21AM |
| 23 | A | -- until I was confirmed in May of 2013. | 9:21AM |
| 24 | Q | And you were confirmed as administrator | 9:21AM |
| 25 | in May of 2013, and how long did you serve as the | | 9:21AM |

Page 29

| | | |
|---|---|---|
| 1 | administrator? | 9:21AM |
| 2 | A    Until February of 2015. | 9:21AM |
| 3 | Q    Okay, and can you describe your | 9:21AM |
| 4 | responsibilities as the administrator of CMS? | 9:21AM |
| 5 | A    Well, CMS is a large organization that | 9:21AM |
| 6 | is located both in -- well, has regions throughout | 9:21AM |
| 7 | the country, but chief headquarters are in | 9:21AM |
| 8 | Baltimore, and there's also an office in | 9:21AM |
| 9 | Washington, D.C. | 9:22AM |
| 10 | So your first responsibility is to run | 9:22AM |
| 11 | the organization, so everything from hiring, | 9:22AM |
| 12 | firing, staffing sort of thing, and second would | 9:22AM |
| 13 | be you obviously worked -- it was a political | 9:22AM |
| 14 | position, so you worked at the pleasure of the | 9:22AM |
| 15 | President and for the Secretary of Health, so a | 9:22AM |
| 16 | big part of your job was working with the White | 9:22AM |
| 17 | House and HHS and also with members of Congress. | 9:22AM |
| 18 | Q    Okay. | 9:22AM |
| 19 | A    And then probably the third part was | 9:22AM |
| 20 | taking the laws that were enacted by Congress and | 9:22AM |
| 21 | converting those into regulation, policy, kind of | 9:22AM |
| 22 | taking what was a statute and making it workable | 9:22AM |
| 23 | for those in the health field. | 9:22AM |
| 24 | Q    Okay.  So is it fair to say that you | 9:22AM |
| 25 | oversaw the development of policies that were | 9:22AM |

Page 30

| | |
|---|---|
| 1 | adopted by CMS while you were the administrator? | 9:22AM |
| 2 |        MR. FREEBORNE:  Objection to form. | 9:22AM |
| 3 | You can answer. | 9:22AM |
| 4 |        THE WITNESS:  I think it's fair to | 9:23AM |
| 5 | say that I oversaw policy development, but I | 9:23AM |
| 6 | was not involved in the day-to-day policy | 9:23AM |
| 7 | development.  The agency is much too large to | 9:23AM |
| 8 | have a hands-on CEO, if you will. | 9:23AM |
| 9 | BY MR. SCHINDLER: | 9:23AM |
| 10 | Q    Understood, but to the extent that a | 9:23AM |
| 11 | policy was developed within the agency before it | 9:23AM |
| 12 | was ultimately adopted, is it something that you | 9:23AM |
| 13 | would have to review and approve before it became | 9:23AM |
| 14 | agency policy? | 9:23AM |
| 15 | A    If it was a formal policy, that would be | 9:23AM |
| 16 | yes, and then it would go to the Secretary.  There | 9:23AM |
| 17 | was quite an elaborate approval process. | 9:23AM |
| 18 | Q    And what about regulations that were | 9:23AM |
| 19 | issued by CMS? | 9:23AM |
| 20 | A    For regulations, again if it was a | 9:23AM |
| 21 | formal regulation, usually that would go to the -- | 9:23AM |
| 22 | come to me ultimately after it was developed and | 9:23AM |
| 23 | went through several departments inside CMS, and | 9:23AM |
| 24 | then I would sign it, and ultimately the Secretary | 9:23AM |
| 25 | would sign it before it became a regulation, | 9:24AM |

Page 31

1    proposed regulation that would then go into the                9:24AM

2    Federal Register for consumers to read and give                9:24AM

3    input.                                                          9:24AM

4        Q    Got it, and what about rules?  To the                 9:24AM

5    extent that CMS would issue proposed rules or                   9:24AM

6    actual rules, again understanding that you had                  9:24AM

7    people below you who developed them, would they                 9:24AM

8    come by you before they would actually be                       9:24AM

9    published or issued?                                            9:24AM

10       A    Not always.  Not for rules and                        9:24AM

11   sub-regulatory guidance.  It would be wrong for me              9:24AM

12   to say that I saw all of those.  That would not --              9:24AM

13   it didn't have quite the formal process.                        9:24AM

14       Q    Could rules then be issued without your                9:24AM

15   approval or without your knowledge?                             9:24AM

16            MR. FREEBORNE:  Objection to form.                     9:24AM

17       You can answer.                                             9:24AM

18            THE WITNESS:  Again, it would                          9:24AM

19       probably be more guidance, not rules.                       9:24AM

20   BY MR. SCHINDLER:                                               9:24AM

21       Q    Okay.                                                  9:24AM

22       A    I'm really talking some pretty technical              9:24AM

23   terms.                                                          9:24AM

24       Q    Understood, and you're going to have to               9:24AM

25   help me with some of those, because you know it                 9:24AM

Page 32

| | |
|---|---|
| 1 | better than I do, but guidance is separate from | 9:24AM |
| 2 | rules; is that a fair -- | 9:25AM |
| 3 | MR. FREEBORNE:  Objection to form. | 9:25AM |
| 4 | You can answer. | 9:25AM |
| 5 | THE WITNESS:  So you would propose | 9:25AM |
| 6 | regulations and they would go through a | 9:25AM |
| 7 | public process, and then those regulations | 9:25AM |
| 8 | would be modified, adopted or not adopted. | 9:25AM |
| 9 | Once the regulations were out and in the | 9:25AM |
| 10 | public domain, there were usually guidance -- | 9:25AM |
| 11 | probably "guidance" is a better word than | 9:25AM |
| 12 | rules -- that went out to help people with | 9:25AM |
| 13 | their interpretation. | 9:25AM |
| 14 | BY MR. SCHINDLER: | 9:25AM |
| 15 | Q    But there was something called "rules" | 9:25AM |
| 16 | as well, right, in the course of your time as | 9:25AM |
| 17 | administrator of CMS -- | 9:25AM |
| 18 | A    So it's been four years since I was at | 9:25AM |
| 19 | CMS.  If we're going to start to define rules and | 9:25AM |
| 20 | guidance and policy, I'll probably have to say I | 9:25AM |
| 21 | can't remember all of that. | 9:25AM |
| 22 | Q    Let me just ask you this:  Were there | 9:25AM |
| 23 | instances as you sit here where you recall rules | 9:25AM |
| 24 | being issued by CMS during the time that you were | 9:25AM |
| 25 | administrator? | 9:25AM |

Page 33

```
 1       A    If by "rules" you mean "regulations"?        9:25AM

 2   If you're calling rules and regulations the same      9:25AM

 3   thing?                                                9:25AM

 4       Q    Well, I'm, I'm asking if you draw any        9:25AM

 5   distinction in your mind whether there were           9:26AM

 6   instances where there were rules as opposed to        9:26AM

 7   regulations.                                          9:26AM

 8                MR. FREEBORNE:  Objection to form.       9:26AM

 9       You can answer.                                   9:26AM

10                THE WITNESS:  I don't, I don't           9:26AM

11       remember enough detail to talk about the         9:26AM

12       difference.  I would say that I was              9:26AM

13       responsible for signing and approving            9:26AM

14       regulations.                                      9:26AM

15   BY MR. SCHINDLER:                                     9:26AM

16       Q    Okay.                                        9:26AM

17       A    And I'd have to leave it at that level.      9:26AM

18       Q    Let me switch gears with you for a          9:26AM

19   moment.                                               9:26AM

20           Are you familiar with the concept of a       9:26AM

21   "litigation hold"?  Have you heard that expression    9:26AM

22   before?  Do you know what that means?                 9:26AM

23       A    I've heard the term "litigation hold" in    9:26AM

24   various -- you'd have to give me the definition       9:26AM

25   you're talking about.                                 9:26AM
```

Page 109

| | | | |
|---|---|---|---|
| 1 | strengthen existing regulations related to the | 11:14AM |

```
 1   strengthen existing regulations related to the      11:14AM

 2   accuracy of risk adjustment data by amending         11:14AM

 3   section 422.310 on risk adjustment data              11:14AM

 4   validation."                                         11:14AM

 5            Do you see that?                            11:14AM

 6      A    I do.                                        11:14AM

 7      Q    Okay, and if you continue reading and go     11:14AM

 8   up to the third column on that page, at the top of   11:14AM

 9   that third column you'll get to the first sentence   11:14AM

10   that begins, "Under our proposal, medical record     11:14AM

11   reviews conducted by an MA organization cannot be    11:14AM

12   designed only to identify diagnoses that would       11:14AM

13   trigger additional payments by CMS to the MA         11:14AM

14   organization; and medical record review             11:14AM

15   methodologies must be designed to identify errors    11:14AM

16   in diagnoses submitted to CMS as risk adjustment     11:14AM

17   data, regardless of whether the data errors would    11:15AM

18   result in positive or negative payment               11:15AM

19   adjustments."                                        11:15AM

20            Do you see that?                            11:15AM

21      A    I do.                                        11:15AM

22      Q    Okay, and this was a proposed rule that      11:15AM

23   you signed off on, correct?                          11:15AM

24      A    Correct.                                     11:15AM

25      Q    And do you recall that, in fact, this        11:15AM
```

Page 110

| | | |
|---|---|---|
| 1 | rule was never finalized? | 11:15AM |
| 2 | A    I do. | 11:15AM |
| 3 | Q    Now, do you recall that in April of | 11:15AM |
| 4 | 2014, you were approached by Larry Renfro of | 11:15AM |
| 5 | United to discuss whether or not MA plans were | 11:15AM |
| 6 | required to conduct reviews that would look not | 11:15AM |
| 7 | only for diagnosis codes to add but for diagnosis | 11:15AM |
| 8 | codes to be deleted? | 11:16AM |
| 9 | MR. FREEBORNE:  Objection to form. | 11:16AM |
| 10 | THE WITNESS:  I remember being | 11:16AM |
| 11 | approached by Larry to discuss a concern he | 11:16AM |
| 12 | had about the process that involved review of | 11:16AM |
| 13 | charts. | 11:16AM |
| 14 | BY MR. SCHINDLER: | 11:16AM |
| 15 | Q    And tell me what you recall about that. | 11:16AM |
| 16 | A    That he was asking me about something | 11:16AM |
| 17 | that was in the proposed rule that related to | 11:16AM |
| 18 | chart review, and giving me his ideas on what he | 11:16AM |
| 19 | thought it meant, and I listened to him, and then | 11:16AM |
| 20 | I referred him to our staff. | 11:16AM |
| 21 | Q    Do you recall telling Mr. Renfro that | 11:16AM |
| 22 | because this proposed rule was not yet in effect, | 11:16AM |
| 23 | that there was no requirement for United to go | 11:17AM |
| 24 | back to look at charts in order to look for codes | 11:17AM |
| 25 | to delete? | 11:17AM |

Page 111

| | | |
|---|---|---|
| 1 | A    No. | 11:17AM |
| 2 | Q    Okay.  Do you recall telling him that | 11:17AM |
| 3 | two-way looks were not required because this | 11:17AM |
| 4 | proposed rule was not yet in effect? | 11:17AM |
| 5 | A    No.  I recall sending him to the staff | 11:17AM |
| 6 | to ask that question. | 11:17AM |
| 7 | Q    Okay.  Well, as you sit here, do you | 11:17AM |
| 8 | recall whether he, in fact, went to the staff or | 11:17AM |
| 9 | whether the staff met with Mr. Renfro or anybody | 11:17AM |
| 10 | at United to discuss this question? | 11:17AM |
| 11 | MR. FREEBORNE:  Objection to form. | 11:17AM |
| 12 | You can answer. | 11:17AM |
| 13 | THE WITNESS:  So I recall that I | 11:18AM |
| 14 | recommended that he meet with the staff and | 11:18AM |
| 15 | ask the staff to make that happen. | 11:18AM |
| 16 | BY MR. SCHINDLER: | 11:18AM |
| 17 | Q    That you asked the staff to meet with | 11:18AM |
| 18 | him, okay, and when you asked the staff to make | 11:18AM |
| 19 | that happen, did they follow your instructions? | 11:18AM |
| 20 | A    I don't know the answer to that, because | 11:18AM |
| 21 | I handed it off to them to manage, which is the | 11:18AM |
| 22 | way I handled everything in the agency. | 11:18AM |
| 23 | Q    Okay. | 11:18AM |
| 24 | (Exhibit 1007 was marked for | 11:18AM |
| 25 | identification.) | 11:18AM |

Page 138

1

2

3

4

5      CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

6                    I, Laurie Donovan, Registered
        Professional Reporter, Certified Realtime
7       Reporter, the officer before whom the
        foregoing deposition was taken, do hereby
8       certify that the foregoing transcript is a
        true and correct record of the testimony
9       given; that said testimony was taken by me
        stenographically and thereafter reduced to
10      typewriting under my supervision; and that I
        am neither counsel for, related to, nor
11      employed by any of the parties to this case
        and have no interest, financial or otherwise,
12      in its outcome.

13                   IN WITNESS WHEREOF, I have hereunto
        set my hand and affixed my notarial seal this
14      1st day of March, 2018.

15      My commission expires:  March 14th, 2021

16      DATED: MARCH 2, 2018

17

18      _____

19          LAURIE DONOVAN
            NOTARY PUBLIC IN AND FOR
20          THE DISTRICT OF COLUMBIA

21

22

23

24

25

**EXHIBIT D-143**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO

BENJAMIN POEHLING,                )

                                  )

        Plaintiffs,               )

                                  )

v.                                )

                                  )

UNITEDHEALTH GROUP, INC., et al., )

                                  )

        Defendants.               )

_____ )




Videotaped Deposition of

GIFT TEE

Given Remotely

Wednesday, November 30, 2022




Reported by:  Karen K. Kidwell, RMR, CRR



Magna Legal Services

866-624-6221

www.MagnaLS.com

REMOTELY APPEARING



3604

Page 19

1   whether anyone collected any handwritten notes from

2   you; is that right?

3        A.   Correct.

4        Q.   Okay.  Do you maintain like a file of

5   these hard copy notes that you keep, or is there a

6   central sort of repository where you store them?

7        A.   I wish I were that organized.  I just go

8   through notebooks, and then over time, I lose the

9   notebooks.

10       Q.   Okay.  Great.

11            So we can shift gears a little bit, and I

12  just sort of want to start with a little bit of

13  background on your job history and your roles that

14  you've held at CMS.

15            I understand you currently work for the

16  Centers for Medicare and Medicaid Services; is that

17  correct?

18       A.   Yes.

19       Q.   Okay.  If I call it "CMS," will you

20  understand that I mean the Centers for Medicare and

21  Medicaid Services?

22       A.   Yes.

23       Q.   Great.  Is CMS within -- is CMS a part of

24  the Department of Health and Human Services?

25       A.   Yes.



Page 20

1          Q.    Okay.  And if I call that "HHS," you'll

2    understand I mean the Department of Health and Human

3    Services?

4          A.    Yes.

5          Q.    So let's turn back to AgileLaw, please.

6                MR. RYDBERG:  I'm going to mark the next

7          document, which I believe should be

8          Exhibit 1426.

9                Nayan, that's Tab 1.

10         (Exhibit 1426 was marked for identification.)

11               MR. RYDBERG:  For the record, this

12         document is Bates-stamped USBP006995062.

13   BY MR. RYDBERG:

14         Q.    So you know, the Bates stamp is -- is that

15   number in the bottom right-hand corner.  It's just a

16   sort of consecutive pagination that lawyers use in

17   litigation.

18               Do you see Exhibit 1426 up on your screen?

19         A.    Yes.

20         Q.    Okay.  Great.  Do you recognize this

21   document?

22         A.    Yes.

23         Q.    It's a copy of your résumé, right?

24         A.    From days gone by, yes.

25         Q.    That was my next question.  The metadata



Page 21

1   for this document suggests it was created in or

2   around 2014.  Does that seem correct to you?

3        A.   Yes.

4        Q.   Okay.  So obviously it's been a few years.

5   But sitting here today, is it an accurate summation

6   of your professional education -- excuse me, of your

7   education and professional history through 2014?

8        A.   From 2014, you said?

9        Q.   Yeah.  So as of 2014, is this sort of an

10  accurate summation of your educational background and

11  your professional experience?

12       A.   Yes.

13       Q.   And you actually drafted this document; is

14  that right?

15       A.   Yes.

16       Q.   Let's start with your education.  If you

17  turn to page 4 of the résumé, which is the last page,

18  there's a section called "Education."  Do you see

19  that?

20       A.   Yes.

21       Q.   So it looks like you earned a bachelor of

22  science degree in biology from SUNY Albany in May --

23  May 2000; is that right?

24       A.   Yes.

25       Q.   And then you also earned an MPH, with a



Page 22

1  concentration in health policy and management.

2  That's again from SUNY Albany, in December 2002; is

3  that right?

4       A.   Yes.

5       Q.   Okay.  Are there any other degrees or

6  certificates that you've earned that aren't listed on

7  this?

8       A.   No.

9       Q.   Okay.  Let's turn, then, to your

10  professional history.

11           You currently work at CMS.  What is your

12  current job title at CMS?

13       A.   I am currently the director of the

14  division of practitioner services in the Center for

15  Medicare.

16       Q.   The division of practitioner services,

17  okay.  And what is the division of practitioner

18  services responsible for?

19       A.   We are responsible for the development of

20  policy, implementation of what is known as the

21  physician fee schedule, how Medicare pays physicians

22  and nonphysician practitioners.

23       Q.   And so that would relate, then, to Part A

24  of the Medicare program; is that correct?

25       A.   No.  That would relate to Part B,



Page 23

1    professional services.

2         Q.    Part B.  Okay.  Thank you.  That's a good

3    correction.

4              It does not, however, relate to Part C,

5    Medicare Advantage; is that correct?

6         A.    Correct.

7         Q.    Okay.  And how long have you held that

8    role?

9         A.    Four years and 55 days, just about.

10        Q.    Extremely precise.  I appreciate that.

11             So that would be, if my math is correct,

12   October 1st, 2018?

13        A.    You know what?  Maybe I'm not as precise.

14   Whatever today's date is, back up to September or

15   August, end of August, and -- just say four years.

16        Q.    Okay, okay.  Sounds good.  So late summer,

17   early fall 2018, you take on this role?

18        A.    Uh-huh.

19        Q.    Okay.  And so as the division director,

20   what exactly are your responsibilities?

21        A.    Fall guy, leader, cheerleader, analyst,

22   all of those things.  But to boil it down, just

23   responsible for managing the work of approximately

24   17 analysts to develop, implement all the different

25   policies that fall into the professional Part B



Page 24

1    policy space for -- for physicians and nonphysician

2    practitioners.

3        Q.    So you have 17 direct reports in that

4    role?

5        A.    If I'm counting correctly, yes.

6        Q.    Okay.  I won't hold you to it.

7              So before that role, were you the director

8    of the department of -- were you the director of the

9    division of encounter data and risk adjustment

10   operations?

11       A.    Yes.

12       Q.    Okay.  And if we turn back to page 1 of

13   your résumé, it lists you as -- January 2013, says

14   "to present," but we'll understand that means to

15   2018 -- as a supervisory health insurance specialist.

16   And then underneath it, it has your I guess

17   functional titles.  Is that a fair description?

18       A.    Yes.

19       Q.    Okay.  So you were first the deputy

20   director of the division of encounter data and risk

21   adjustment operations from January 2013 to

22   April 2014; is that right?

23       A.    Yes.

24       Q.    Okay.  And then you assumed the director

25   position, first as acting director, and then I assume



3610

Page 25

1    no longer acting, in April 2014; is that right?

2        A.   Yes.

3        Q.   Okay.  When you were the deputy director,

4    who did you report to at that time?

5        A.   Greg McGuigan.

6        Q.   And is that spelled -- how do you spell

7    that?

8        A.   M-c-G-u-i-g-a-n, McGuigan.  Yes.

9        Q.   McGuigan.  Okay.  I would not have gotten

10   that right.  So thank you.

11             So in this role, your position was the

12   director -- first the deputy director and then the

13   director -- of -- how many people did you oversee in

14   the director position?  Do you recall?

15       A.   I'm going to say eight.  Approximately

16   eight.

17       Q.   Eight, okay.  And were those analysts as

18   well?

19       A.   Yes.

20       Q.   Okay.  And when you were in the director

21   position, who did you report to?

22       A.   I reported to the director of the Medicare

23   Plan Payment Group, Cheri Rice.

24       Q.   And was that Cheri Rice the entire time

25   that you were the director?



3611

Page 26

1        A.    No.   For the last -- for the last year, I

2    reported to Jennifer Harlow, who was the acting

3    director at the time, because Cheri Rice was now the

4    acting deputy center director.

5        Q.    Okay, okay.   And am I correct that during

6    the time that Cheri Rice was the director of the

7    Medicare Plan Payment Group, Jennifer Harlow was the

8    deputy director?

9        A.    Yes.   Correct.

10        Q.    And is it okay with you if I call the

11    Medicare Plan Payment Group "MPPG"?

12        A.    Yes.

13        Q.    Okay.   So this role that you held within

14    the division of encounter data and risk adjustment

15    operations, that was related to the Medicare

16    Advantage program; is that right?

17        A.    Yes.

18        Q.    Okay.   So you are familiar with the

19    Medicare Advantage program, then?

20        A.    "The Medicare Advantage program" is pretty

21    broad.   I'm familiar with what I was responsible for

22    in MPPG.

23        Q.    Okay.   How would you describe Medicare

24    Advantage?

25        A.    Medicare Advantage is a program



Page 27

1  administered by Medicare that involves relationships

2  with private health plans, to enroll Medicare

3  beneficiaries and provide services under the MA

4  program.

5      Q.   And it's an alternative to the traditional

6  Medicare program; is that right?

7      A.   Yes.

8      Q.   Okay.  I think you just referred to it

9  as "MA."  So I assume that -- it's okay if I refer to

10  it as "MA," you'll understand I mean Medicare

11  Advantage?

12      A.   Yes.

13      Q.   Okay.  And the division of encounter data

14  and risk adjustment operations:  That's a long name.

15  Is it okay if I refer to that as "DEDRAO"?  Is that

16  what you typically call it, D-E-D-R-A-O?

17      A.   No, that's not okay.  It's DEDRAO.

18      Q.   DEDRAO.  Oh, my gosh.  I've been

19  pronouncing it wrong this whole time.  Okay, DEDRAO.

20          What is DEDRAO responsible for?

21      A.   DEDRAO is responsible for -- or was

22  responsible for, if I'm to pin it to my specific role

23  there, the capture of encounter data, and also risk

24  adjustment data -- which encounter data is risk

25  adjustment data -- but risk adjustment, RAPS data,



3613

Page 28

1    processing data, to support the calculation of risk

2    scores that factor into MA payment.

3        Q.    So let's drill down a little bit there, if

4    that's okay.

5            You said one of the things that -- that

6    DEDRAO was responsible for was the capture of

7    encounter data.  What is encounter data?

8        A.    One can think of encounter data as Part C

9    claims, right?  Essentially, what services were

10   furnished to enrollees, plan enrollees, and also the

11   diagnostic information that came along with those

12   services.  So the equivalent of Part A, Part B

13   claims.

14       Q.    Okay.  And you also mentioned something

15   called "RAPS data."  What is RAPS data?

16       A.    Risk adjustment processing system data is

17   really the capture of diagnostic information for

18   enrollees in -- in the health plan that was used to

19   capture -- that is used to capture that information

20   and calculate risk scores for MA payment.

21       Q.    Okay.  And how does RAPS data differ from

22   encounter data?

23       A.    RAPS data is really just a diagnostic

24   information for those enrollees, versus encounter

25   data being a more robust capture of the services and



Page 29

1   the diagnostic information related to the services

2   furnished.

3        Q.   So is it fair to say that encounter data

4   is similar to RAPS data, but it just includes more;

5   it's got more information than RAPS data does?

6        A.   Yes.

7        Q.   Okay.  You also mentioned that the RAPS

8   data -- and I think encounter data as well -- is used

9   to capture information that's used to calculate risk

10  scores for MA payment.  What is a risk score?

11       A.   A risk score is a -- a calculated variable

12  that suggests just how healthy or unhealthy an

13  enrollee is relative to -- relative -- that is used

14  to adjust payments to the plans.

15            I can go into more detail if you want, but

16  at a high level, think of it that way.

17       Q.   Okay.  And how exactly is it used to

18  adjust payment to the plans?

19       A.   So payment under the MA program is

20  capitated.  In other words, some acknowledgment of a

21  cost per bene per month.  The risk scores are really

22  an acknowledgment that not every enrollee is of the

23  same health profile, and so diagnostic information is

24  used to adjust those payments, recognizing where

25  benes are healthier or less healthy relative to the



Page 30

1    plan's enrollees and -- and what their costs are.

2        Q.    All right.  And we've used the phrase

3    "diagnostic information" a few times.  What exactly

4    does that mean?

5        A.    Just diagnoses that are captured in an

6    encounter, or in an interaction between provider

7    and -- and enrollee.

8        Q.    Okay.  And how does that diagnosis

9    information get to CMS, in the Medicare Advantage

10   program?

11       A.    That information is submitted to CMS

12   through the RAPS system, and then processed in -- in

13   subsequent systems.

14       Q.    And is it submitted by the provider, or by

15   the MA plan, or -- who is the one doing that

16   submitting?

17       A.    Good question.  It's submitted by the

18   MA plan.

19       Q.    Okay.  And presumably the MA plan gets it,

20   then, from the providers?

21       A.    Presumably.

22       Q.    Okay.  Let's turn back to your résumé, if

23   possible.  We can talk in a little bit more detail

24   about what you did in the -- the deputy director

25   and -- and director roles at DEDRAO.



Page 31

1         So if you turn back to page 1 of your

2    résumé, do you see there's a section that says -- and

3    it's in italics -- "Roles and Responsibilities

4    (Summary)"?

5         A.   Yes.

6         Q.   Okay.  Underneath that, it says:

7    "Developed and implemented operational payment policy

8    on highly complex and politically sensitive health

9    care financing issues for Medicare Advantage

10   organizations (MAOs) under the Medicare Advantage

11   program, including risk adjustment of plan payments

12   and the collection and analysis of encounter data."

13        Did I read that correctly?

14        A.   Yes.

15        Q.   Okay.  And that's a little bit about what

16   we were just talking about now, right, that payment

17   under the MA plan is capitated based on the risk

18   scores that are calculated from diagnostic

19   information, in part; is that right?

20        A.   Let me say that slightly differently.

21   Payment under the MA plan is capitated, but that

22   payment is adjusted by diagnostic information that

23   are used to calculate risk scores suggesting the

24   health profile of the enrollees.

25        Q.   Okay.  So you wrote here that the health



Page 32

1    care financing issues that you developed and

2    implemented were "highly complex and politically

3    sensitive."  What does that mean?

4         A.   It's -- it's résumé jargon, suggesting

5    that of course we are making payments under the

6    Medicare program, and deliberations that go into

7    those payments are complex and -- and sensitive;

8    i.e., we work through a process to develop those

9    payments and -- and policies, and all of that can

10   have impact.

11        Q.   We talked a little bit about the risk

12   adjustment plan payments already.  But were you

13   actually, yourself, involved in calculating plan

14   payments?

15        A.   Help me understand your question a bit

16   more.

17        Q.   Sure.  So your résumé says that you

18   "developed and implemented payment policy ...

19   including risk adjustment of plan payments."

20             So what was your involvement in developing

21   and implementing policy for the risk adjustment plan

22   payments?

23        A.   So my role was specifically on the

24   operational side of the house.  But.  Right?  If one

25   is to think about plan payment as a continuum,



Page 33

1    there's certainly role -- there's a role that I

2    played in -- in getting to the end, right?  In other

3    words, there's development of payment policies, and

4    then the implementation of those payment policies,

5    which, to a certain extent, means you understand

6    parts of what you are doing versus just blindly doing

7    things, and then ultimately handing off to another

8    component that actually makes those payments.

9              So think of, you know, policy

10   developments, policy operationalizing and then actual

11   implementation, i.e., payment through our systems.

12   The next bullet point -- no, it's not a bullet point,

13   excuse me.  The next sentence in that same paragraph

14   says you "Provided oversight and technical direction

15   to division staff responsible for the development,

16   deployment, and maintenance of the encounter data

17   processing system (EDPS) and the risk adjustment

18   suite of systems (RASS)."

19             Did I read that correctly?

20        A.   Yes.

21        Q.   Okay.  What is the encounter data

22   processing system?

23        A.   The encounter data processing system,

24   which I actually miss, was CMS's attempt to capture

25   what I described earlier as Part C claims.  Right?



Page 34

1    Really capturing more information than what we had

2    had before, to help inform future policy development,

3    or just frankly have more information on -- on what

4    we were paying.

5         Q.    Okay.   And -- and the EDPS system, or I

6    guess just EDPS, was implemented sometime in the

7    2014, 2015 time frame; is that right?  Or was it

8    earlier than that?

9         A.    A little earlier than that.  When I came

10   on, it had just been implemented and -- and was just

11   starting to get going.

12        Q.    Okay.   And so that would have been the

13   2013 time frame?

14        A.    Around then.  Around then.  Maybe earlier.

15        Q.    Okay.   Risk adjustment suite of systems,

16   RASS, what is that?

17        A.    It's a collection of systems -- we talked

18   about RAPS before, the risk adjustment processing

19   system, which falls into RASS, which really captures

20   information and then processes the information to --

21   to get to the risk scores.

22        Q.    Okay.   So RAPS is one of, but not the only

23   system, within the risk adjustment suite of systems?

24        A.    Correct.

25        Q.    What are the names of some of the other



Page 35

1  systems in the -- the suite?  Do you remember?

2       A.   Well, RASS is really the system, but it

3  has -- let's just call it a front end and a back end,

4  with RAPS being the front end and then RASS just

5  being the collection of processes within a back end.

6            In other words, a plan submits information

7  to RAPS, and then the information goes through a

8  whole bunch of processes that at the end are turned

9  into risk scores.

10      Q.   Okay.  Have you heard of something called

11 the front end risk adjustment system, FERAS?

12      A.   Yes, FERAS.

13      Q.   FERAS, okay.  Is that also part of the

14 suite, the risk adjustment suite of systems?

15      A.   Yes.  Yes.  So forgive me, my -- my -- the

16 way I normally tell this story is really dated.  But

17 FERAS is truly the front end to RAPS, and then RAPS

18 sort of feeds into, right, the processes I described.

19 But it's just a front end for capturing that, the

20 RAPS information.

21      Q.   And so we talked a little bit about plans

22 submitting data to RAPS.  Do they actually submit to

23 RAPS, or do they submit to FERAS?

24      A.   They submit to FERAS.  FERAS feeds into

25 RAPS.  And then there's a whole bunch of processes



Page 36

1    after that.

2         Q.    Okay.  That makes sense.

3              The next sentence in your résumé, the last

4    sentence in that sort of full paragraph there, it

5    then says, "Managing all activities related to the

6    calculation of Medicare Part C and Part D risk

7    adjustment factors that are used to adjust capitated

8    payments to MAOs, including the deployment of

9    resources relevant to this effort."

10             Do you see that?

11        A.    Yes.

12        Q.    Okay.  So we talked a little bit about

13   the -- the ways that risk scores are used to adjust

14   capitated payments to MAOs.  Is a -- is a risk

15   adjustment factor the same as a risk score?  Or is

16   there a difference there?

17        A.    There's a difference.

18             How weedy do you want me to get?

19        Q.    As weedy as you think you need to be to

20   help me understand.

21        A.    All right.  I'll try to stay surface

22   level.

23             Again, remember, my -- my information may

24   be dated.  I'm going off of memory, you know, days

25   gone by, but think of information flowing into RAPS,



Page 37

1  right, diagnostic information, that are then used as

2  inputs to various risk scoring models, right?  The

3  idea that you take such information and acknowledge

4  that there are different characteristics that are in

5  play for different sections of a population.

6           Think about folks that have ESRD, folks

7  that don't have ESRD, and other considerations as

8  well, too.

9           Those models are designed to use that

10  information to generate what are called risk factors,

11  right, that are then also processed into risk scores.

12           And now that's a very high generalization

13  of -- of the process, but think of factors as the

14  things that come before the scores.

15      Q.   Okay.  So the score is sort of the end

16  result of -- of calculations that are done using risk

17  factors; is that right?

18      A.   Correct.

19      Q.   Okay.

20      A.   At a high level, yes.

21      Q.   Okay.  If I'm ever oversimplifying to the

22  point that you think it's wrong, please jump in and

23  let me know.  I'm sure you have much more

24  in-the-weeds knowledge than I do about this.

25           So, you also said here that you manage



Page 38

1    activities and resources related to the collection

2    and analysis of encounter data.  What sort of

3    analyses were you running on encounter data?

4         A.    Really working to determine the -- the

5    quantity, the appropriate quantity and quality of the

6    data.  CMS did not have Medicare Part C claims in

7    that form or fashion prior to encounter data really

8    getting rolling.  So really understanding what we

9    were capturing and -- and what it looked like and

10   felt like was -- was really the basis for the

11   analysis.  Or analyses.

12        Q.    And let's go back to the -- the risk

13   adjustment factors and the risk scores for a second.

14   Because we've talked about the adjustment of -- of

15   payments to plans, but the -- the way that -- well,

16   let me ask it this:  What is your understanding of

17   how the risk scores were used to adjust payments to

18   MA plans?

19        A.    At a high level, once you had calculated a

20   risk score for a beneficiary, right?  Again, applying

21   that risk score to the capitated payment amount --

22   think per bene per month -- was how -- how it was

23   implemented through our payment systems.

24        Q.    Okay.  And at a high level, the idea is

25   that MA plans are paid based on sort of historical



Page 39

1    diagnostic information in a way that's used to

2    predict their future risk score expenses for that

3    particular beneficiary; is that right?

4        A.    Let me say it slightly differently.    I

5    think you nailed it, but let me just say it slightly

6    differently.

7             MA plans were capturing information on

8    their enrollees that they submitted to CMS, which was

9    used to calculate risk scores that would be used to

10   adjust payment.

11       Q.    And the idea behind sort of risk adjusting

12   payments to plans was that if you didn't do this, a

13   plan might not want to enroll sicker beneficiaries,

14   because they may not be paid sufficient -- paid

15   sufficiently to cover their future risks?

16       A.    Well, that's a -- that's -- that's a

17   packed statement.

18             That's a tough one.    Ask your question

19   again a different way.

20       Q.    Okay.    Why -- why would CMS risk -- why

21   implement the risk adjustment system for the payment

22   to Medicare Advantage plans?    What's the rationale

23   behind that?

24             MR. DYAL:    Objection.    Form.

25



Page 40

1   BY MR. RYDBERG:

2       Q.   And you can still answer.

3       A.   So I would say -- and this is just me

4   riffing -- that CMS was recognizing that, you know,

5   there may be characteristics of the enrollees that

6   should be taken into account, factored into payment,

7   given that, you know, again, the idea of the healthy

8   versus the less healthy enrollee being a true thing.

9       Q.   And the characteristics that we're talking

10  about, that includes both demographic characteristics

11  and then also diagnostic coding; is that right?

12      A.   That is right.

13      Q.   Okay.  Let's turn back to your résumé.

14  And we can skip down to -- two bullets -- there's a

15  bullet -- I believe it's the fourth from the top.  It

16  says:  "Providing oversight of the research,

17  analysis, and plan communication related to the

18  operational aspects of risk adjustment and encounter

19  data."  Do you see that?

20      A.   Yes.

21      Q.   Okay.  What sort of plan communication

22  were you responsible for?

23      A.   "Related to the operational aspects of

24  risk adjustment and encounter data."  So consider

25  submission, communications, announcements of when



Page 41

1  plans should submit, if plans were having issues,

2  communicating with the plans globally, right, through

3  memos -- communications like that.

4       Q.   Okay.  And that would be sort of -- that

5  would be both formal communications, like memos that

6  go out to the whole industry, but also if a

7  particular plan was having a problem, you might deal

8  with them one on one and help them with that issue;

9  is that right?

10      A.   Yes, that is right.

11      Q.   Okay.  And then if we turn to the next

12  page of your résumé, the last bullet point above

13  "Health Insurance Specialist," it says:  "Maintaining

14  relationships with, and providing technical

15  assistance to internal and external stakeholders

16  including other state and federal government

17  agencies, professional associations, and MAOs on MA

18  risk adjustment and encounter data operational/policy

19  issues."

20           Is that sort of the same thing that we

21  were just talking about, that you would communicate

22  with MA plans on operational and policy issues?  Or

23  is this different?

24      A.   This -- this goes a little broader.  It's

25  the same -- same thought, but the idea that we were,



3627

Page 42

1    quote/unquote, the operational experts for MA

2    encounter data, and really having to work internally

3    and externally with folks that had questions or, you

4    know, needed -- needed help with -- with technical

5    aspects of what we were doing.

6         Q.    And so that obviously, I think it says

7    here, includes other state and federal government

8    agencies, and also professional associations.

9    What -- what professional associations did you -- do

10   you have any specific professional associations in

11   mind when you drafted this?

12        A.    There are a couple of professional

13   associations out there.  AHIP comes to mind.  Again,

14   you know, within the realm of MA, you know, the idea

15   that this is -- an association like AHIP was really

16   representing a collection of MA plans wanting more

17   information on, I don't know, submission timelines,

18   or, you know, if there were an issue with our

19   systems, being able to broadly communicate were

20   really I guess typical conversations that we would

21   have.

22        Q.    Okay.  That makes sense.

23             And then if we turn down on that same sort

24   of same page of your résumé, you then have another

25   role, that's health insurance specialist CM -- I



Page 43

1    assume that's "Center for Medicare"; is that right?

2        A.    Yes.

3        Q.    Okay.  And that's November 2004 to

4    January 2013.

5            What did you do in this role?  And was it

6    multiple roles within the same -- within that overall

7    time period, or was it just a single role?

8        A.    Multiple roles within that time period.

9        Q.    Okay.  Were any of those roles related to

10   Medicare Advantage?

11       A.    These were fun times, and a lot less

12   responsibility.

13           I would say that -- no, there was some

14   overlap in risk adjustment.  Let's say, for example,

15   the physician value program.  But that was more as an

16   input into how we were thinking about patient

17   profile, but it was really just leveraging risk

18   adjustment scores.

19       Q.    Okay.  So when you came into the DEDRAO

20   position in 2013, did you have any background with

21   risk adjustment?  Did you understand what risk

22   adjustment was?

23       A.    At a high level, yes.  You know, just the

24   accounting of diagnostic information to suggest a

25   healthy versus a less healthy beneficiary.  But that



Page 44

1   was it.

2          Q.   Okay.  So how did you go about learning

3   about risk adjustment once you took on that role at

4   DEDRAO?

5          A.   Like anyone learns something new, you

6   start from the beginning and try to work your way to

7   the end.

8          Q.   And what's the beginning?  Is it -- are

9   there documents that you read?  Statutes?  Did you

10  talk to people?

11         A.   Yeah, yeah.  You know, you sort of start

12  with, what is a risk score?  And, you know, how is it

13  calculated?  And what information feeds into it?

14              And, you know, I -- I wasn't the first

15  person to step into that role, so thankfully I -- I

16  had a whole group around that was invested in -- in

17  getting me up to speed.

18         Q.   So you -- you relied on your colleagues at

19  DEDRAO to sort of teach you informally about risk

20  adjustment?

21         A.   That's what -- yes.  Yes.

22         Q.   Okay.  Were there any colleagues outside

23  of DEDRAO that you relied on?

24         A.   Well, outside of the DEDRAO, to be -- yes,

25  MPPG, as a whole.  Right?



Page 48

1                VIDEOGRAPHER:  The time is 9:58 a.m.

2        We're off the record.

3                (A recess transpired from 9:58 a.m. until

4                10:08 a.m.)

5                VIDEOGRAPHER:  The time is now 10:08 a.m.

6        We're on record.

7    BY MR. RYDBERG:

8        Q.   Welcome back, Mr. Tee.

9             I want to shift gears a little bit and

10   just ask you a series of background questions about

11   Medicare Advantage.  It's going to be high level but

12   designed to figure out sort of your -- your knowledge

13   and involvement in a variety of different topics.

14             So you talked about this sort of

15   indirectly, I think, but have you heard of something

16   called the "CMS-HCC risk adjustment model"?

17       A.   Yes.

18       Q.   Okay.  CMS, Centers for Medicare and

19   Medicaid Services.  What does the "HCC" stand for,

20   though?

21       A.   Hierarchical condition categories.

22       Q.   Okay.  And what is that?

23       A.   That's an imposed hierarchy on -- on --

24   how do I -- how do I say this at a high level?

25             You know what?  I -- I don't know.



Page 49

1          Q.    Okay.  Let me ask it this way:  If --

2     let's say you have two diseases, diabetes without

3     complications and diabetes with complications.  Would

4     those two diseases fall in the same hierarchical

5     condition category?

6          A.    No.  There would be a hierarchy imposed.

7     And I -- I didn't want to get into that level of

8     detail, which is why I defaulted to -- you know, my

9     knowledge is stale at this point, so being nuanced

10    and -- and precise are probably not within my

11    capability.

12         Q.    And that's okay.  It has been a long time,

13    and this isn't a memory test.  So -- really just

14    looking for your best recollection as you recall.  So

15    no worries there.

16              We talked a little bit about this already,

17    but traditional Medicare is Parts A and B of the

18    Medicare program; is that right?

19         A.    Correct.

20         Q.    And is that sometimes called

21    fee-for-service Medicare?

22         A.    Yes.

23         Q.    And is that because the providers, the

24    rendering providers, are paid on a per-service basis

25    by the Medicare program?



3632

Page 50

```
 1        A.    Generally, yes.

 2        Q.    Okay.  Fee for service, is that sometimes

 3   called "FFS," as an abbreviation?

 4        A.    Yes.

 5        Q.    Okay.  Have you heard of -- have you heard

 6   the phrase "chart review" before?

 7        A.    Yes.

 8        Q.    What does it mean?

 9        A.    Different concepts for different

10   scenarios, but if we're asking about under the MA

11   program, it's consideration of diagnostic information

12   in an enrollee's chart.

13        Q.    Okay.  Have you heard the phrase "one-way

14   look" before?

15        A.    "One-way look."  "One-way look."  No.

16        Q.    Okay.  Did your position at DEDRAO involve

17   chart review in any way?

18        A.    Yes.

19        Q.    How so?

20        A.    Well, we were responsible for capturing

21   information.  So there was the idea that the plans

22   were submitting information that they either gathered

23   through their systems for capturing such information,

24   or through some subsequent or concurrent chart review

25   process by which they were also capturing that
```



Page 51

1    information to submit to us.

2         Q.   Okay.  So sometimes plans would submit

3    diagnostic data that flowed directly from a provider,

4    and other times they would submit data that was the

5    result of these chart reviews; is that fair?

6         A.   They were submitting data all the time,

7    but it was clear to us in some instances that there

8    was information that was captured as a direct flow,

9    right, of the services being furnished into a system,

10   versus some additional work to capture additional

11   information, or different information.

12        Q.   And you said it was clear to you.  What --

13   was it a timing thing?  Why was it clear to you?

14        A.   Maybe that was being overoptimistic, but

15   there was just a cadence to -- well, that's not even

16   true.  Because, you know, all the plans did things

17   differently.  There were certainly plans that looked

18   the same and others that just looked different, so --

19   who knows exactly when they were capturing

20   information.

21             But there was a lot of work to try to

22   understand the flow and cadence.  I don't know if we

23   ever truly got there, and it's been a while, so -- I

24   don't know where those -- that crew got to.  But the

25   capture of information was nuanced, and we tried to



3634

Page 146

1                    CERTIFICATE

2

3       I, KAREN K. KIDWELL, Registered Merit Reporter,

4    and Certified Realtime Reporter, do hereby certify

5    that prior to the commencement of the examination,

6    GIFT TEE was remotely sworn and/or affirmed by me to

7    testify to the truth, the whole truth and nothing but

8    the truth.

9       I DO FURTHER CERTIFY that the foregoing is a

10   verbatim transcript of the testimony as taken

11   stenographically by me at the time, place and on the

12   date hereinbefore set forth, to the best of my

13   ability.

14      I DO FURTHER CERTIFY that I am neither a

15   relative nor employee nor attorney nor counsel of any

16   of the parties to this action, and that I am neither

17   a relative nor employee of such attorney or counsel,

18   and that I am not financially interested in this

19   action.

20

21                    _Karen K. Kidwell_
                      _____

22                    Karen K. Kidwell

                      Registered Merit Reporter

23                    Certified Realtime Reporter

                      Notary Public

24                    Dated:  November 30, 2022

25



**EXHIBIT D-144**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
         Plaintiffs,              )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
         Defendants.              )
_____ )


CONFIDENTIAL
Videotaped Rule 30(b)(6) Deposition of
UnitedHealthcare, Inc. and OptumInsight, Inc.,
Designee 4, by SCOTT THEISEN
Given Remotely
Tuesday, June 6, 2023
10:08 a.m. Eastern


Reported by:  Karen K. Kidwell, RMR, CRR

Magna Legal Services
866-624-6221
www.MagnaLS.com



3637

Page 129

1          did was in complete good faith, and designed to

2          work in a transparent, collaborative way with

3          CMS.  So anything and everything we did from a

4          control, and compliance, as well as just our

5          internal controls, our operating controls, the

6          integrity and expectations of our employees, the

7          way in which we behaved, our culture, was all

8          centered around doing the right thing.  So we

9          would never intentionally disregard or

10         purposefully, you know, not take sufficient

11         actions to identify errors.

12    BY MS. McMAHON:

13         Q.  So if you had some information or belief

14    that some of the diagnosis codes that you had

15    submitted might not be accurate, did you check to see

16    if they were?

17              MR. BAAK:  Objection.  Form.  Way beyond

18         the scope.  Incomplete hypothetical.

19              THE WITNESS:  Yeah, I think there's -- you

20         know, I think I'd probably want you to define

21         for me what you mean by "knowledge of

22         information," because one could take the

23         position that knowing that there's a material

24         error rate in fee-for-service claims data, as

25         documented by CMS, that depending upon your view



Page 130

```
 1          of things, one could argue that that is
 2          knowledge.  Does that -- would that knowledge
 3          then imply a requirement to audit every claim
 4          and diagnoses back to the medical record?  No.
 5          So I just want to be careful about the scope of
 6          what that question relates to.
 7     BY MS. McMAHON:
 8          Q.   So if you had some information or concern
 9     that there were diagnoses codes -- let's say after
10     you had done a chart review, and you had some -- some
11     reason to believe that there were diagnoses codes
12     that -- in those charts that had been reviewed, that
13     you -- that might not be supported by medical
14     records, did you take it upon yourself to check to
15     see if any of those -- to see if those diagnosis
16     codes were, in fact, supported before you submitted
17     these attestations?
18          MR. BAAK:  Objection.  Form.  Beyond the
19          scope of today's topics.  We're really far
20          afield here.
21          THE WITNESS:  Yeah, I would describe that
22          as the company's practices.  For a period of
23          time, we were performing what we call claims
24          verification, and then as part of the
25          discussions with CMS, and the proposed rule and
```



3639

Page 131

 1          when that rule was rescinded, and the clarity

 2          they provided around us, the decision to not

 3          perform claims verification, which I think is

 4          what you're describing in your question, is a

 5          decision that was based on our understanding of

 6          CMS's guidance, which was that it was no longer

 7          required because the rule itself was not

 8          published.

 9                And the fact that the rule was published

10          in the first place, proposed rule, you know,

11          from a deductive reasoning standpoint, also

12          would indicate that those specific practices

13          with regard to medical record review would not

14          have been required by CMS prior to that date.

15          Otherwise, there would have been no need to

16          propose a rule.

17     BY MS. McMAHON:

18          Q.    Prior to -- prior to May of 2014, did you

19     rely on your claims verification program to -- as

20     part of your knowledge, information, and belief, that

21     your data was accurate, complete, and truthful when

22     you submitted these attestations?

23                MR. BAAK:  Objection.  Form.  Beyond the

24          scope.

25                THE WITNESS:  I would say that, no, I did



Page 132

```
 1           not rely on claims verification as a basis for
 2           being able to certify and attest.  My view, and
 3           the company's view, that claims verification was
 4           a business practice we deployed as a result of
 5           some ambiguity with regard to what the view of
 6           CMS and rules and regulations are, and we
 7           deployed it in the interest of being
 8           conservative.
 9                Did I feel it was necessary and required
10           for me to be able to attest to the accuracy of
11           the information we submitted?  No, it was not.
12           And I would say that's because, essentially, we
13           were auditing fee-for-service claims data,
14           which -- back to medical records, which was not
15           a requirement or an expectation of CMS.  So, no,
16           I don't believe it was necessary for me to
17           certify, nor do I -- nor does the company
18           believe that.
19 BY MS. McMAHON:
20      Q.   That claims verification process did
21 identify a lot of unsupported codes that had been
22 submitted, did it not?
23           MR. BAAK:  Objection.  Beyond the scope.
24           Linda, I've given you at lot of rope, but we
25           have witnesses on claims verification, and
```



Page 133

1          Mr. Theisen is not it, so...

2               MS. McMAHON:  But we're talking about the

3          certification of accuracy, which is exactly

4          what's in here.  I am sure you will not let the

5          CV witness talk about that because it would be

6          beyond the scope of that topic.

7               MR. BAAK:  The last question you asked had

8          nothing to do with certification.  It was just

9          claims verification.  So I'll give you a little

10          more rope, but we're not -- we're not taking

11          another deposition today.

12               THE WITNESS:  We did process some deletes

13          of diagnosis codes as a result of the claims

14          verification process when it was -- when it was

15          being deployed.

16     BY MS. McMAHON:

17          Q.   And as part of submitting an attestation

18     to CMS, certifying that the data it submitted was

19     accurate, complete, and truthful, the data that it

20     had submitted was accurate, complete, and truthful,

21     did you consider it important to seek to identify or

22     confirm any potential inaccuracies that might be in

23     the data that you knew about?

24               MR. BAAK:  Objection.  Form.  Beyond the

25          scope.  Asked and answered.



Page 265

1                           CERTIFICATE

2

3        I, KAREN K. KIDWELL, Registered Merit Reporter,

4   and Certified Realtime Reporter, do hereby certify

5   that prior to the commencement of the examination,

6   the deponent was remotely sworn to testify to the

7   truth, the whole truth under penalty of perjury.

8        I DO FURTHER CERTIFY that the foregoing is a

9   verbatim transcript of the testimony as taken

10  stenographically by me at the time, place and on the

11  date hereinbefore set forth, to the best of my

12  ability.

13       I DO FURTHER CERTIFY that I am neither a

14  relative nor employee nor attorney nor counsel of any

15  of the parties to this action, and that I am neither

16  a relative nor employee of such attorney or counsel,

17  and that I am not financially interested in this

18  action.

19

20               _____

                     Karen K. Kidwell

21                   Karen K. Kidwell

                     Registered Merit Reporter

22                   Certified Realtime Reporter

                     Notary Public

23

24

25



3643

**EXHIBIT D-145**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA ex rel.  ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )

Videotaped Deposition of
CYNTHIA G. TUDOR, Ph.D.
Given Remotely
Tuesday, August 23, 2022
9:59 a.m. Eastern Time

Reported by:  Cindy A. Hayden, RMR, CRR

Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 18

1    am not at will to tell you that.

2          Q.    Did you --

3          A.    I was just complaining about it.

4          Q.    Understood.

5                Let's talk a little bit about what

6    you're doing today.  You are the -- currently, the

7    president of The Tudor Group; is that correct?

8          A.    Yes.

9          Q.    What is The Tudor Group?

10         A.    It's me, myself and I.  And I am a

11   consultant for Medicare Advantage Part D plans,

12   some consulting firms, some law firms, some trade

13   associations.

14         Q.    Does The Tudor Group have any employees

15   other than yourself?

16         A.    No.

17         Q.    And do you work at The Tudor Group

18   full-time?

19         A.    Not now.  I used to.

20         Q.    About how many hours a week are you

21   presently consulting through The Tudor Group?

22         A.    Somewhere around five.

23         Q.    You've been at The Tudor Group since

24   you left the Center for Medicare in 2017; is that

25   correct?



Page 19

```
 1          A.   Yes.
 2          Q.   Have you done any consulting for the
 3   government since you left the Center for Medicare
 4   in 2 -- in 2017?
 5          A.   I believe that I did some consulting
 6   for a contract that someone had with the
 7   government, yes.
 8          Q.   Did that contract relate to risk
 9   adjustment?
10          A.   I -- not that I recall.
11          Q.   Have your clients, either current or
12   former, at The Tudor Group included Medicare
13   Advantage plans?
14          A.   Yes.
15          Q.   What is the nature of the consulting
16   advice, your -- your work you've done for Medicare
17   Advantage plans?
18          A.   It's -- can be things related to
19   compliance actions that the government is taking,
20   quality ratings.  It can be around risk adjustment,
21   risk adjustment data.  But I don't remember any
22   specifics that I've done that.  But it could be
23   anything related to Part C and Part D.
24          Q.   Do you have any current Medicare
25   Advantage plans that you're advising related to
```



Page 20

1    risk adjustment or compliance?

2        A.    Yes.

3        Q.    Who are those Medicare Advantage plans?

4        A.    I have nondisclosure agreements, and I

5    would have to clear that I'm revealing their name

6    to you with each of the clients before I do so.

7        Q.    Without revealing the particulars, are

8    these major Medicare Advantage plans that I would

9    have heard of?

10       A.    Yes.

11       Q.    Are these Medicare Advantage plans that

12   are currently dealing with actions by CMS related

13   to compliance issues?

14       A.    Well, these things come up all the

15   time.  So I'm not really sure what you're getting

16   at.  Over time, there have been issues around

17   compliance.  The issues that I talked with these

18   clients about in the last couple of weeks have not

19   been about risk adjustment, encounter data or any

20   of that.

21       Q.    Have you provided advice through

22   The Tudor Group to Medicare Advantage plans on what

23   their requirements are related to the submission of

24   risk adjustment data?

25       A.    Not that I recall.



Page 21

1          Q.    Have you provided advice through
2    The Tudor Group to Medicare Advantage plans related
3    to the design of their compliance programs?
4          A.    Not that I recall.
5          Q.    Have you provided advice through
6    The Tudor Group to Medicare Advantage plans related
7    to the design of their medical record review
8    programs?
9          A.    I provide -- no.  I did provide
10   assistance to a law firm that was being -- that was
11   the -- I forget the relationship of the different
12   parties.  But there was a whistleblower that
13   accused a plan of -- of false claims because of
14   their medical record review process in terms of
15   appeals.
16         Q.    You were retained by the law firm that
17   represented the whistleblower or the defendant?
18         A.    The defendant.
19         Q.    What's the name of the law firm?
20         A.    Again, I'm under nondisclosure.  This
21   was about appeals.  This was for services.  This
22   was not about encounter data.
23         Q.    When you say "appeals," can you explain
24   what you mean?
25         A.    Yeah, the -- the patient got denied a



3649

Page 22

1    service.  It went to the plan.  The plan used an

2    automated sort of criteria review, denied the claim

3    again, and it went to second-level review.

4              So it was about whether those -- and

5    this was on the Part C side -- whether those

6    denials at that first level were consistent with

7    what Medicare said or not.  And, again, these were

8    Part C.

9         Q.   Did you provide an expert report in

10   connection with that case?

11        A.   I -- I -- no.  I was on -- just sort of

12   on the side.  I refuse to do expert testimony.

13        Q.   Have you ever done expert testimony,

14   Dr. Tudor?

15        A.   No.

16        Q.   Other than that example you just gave

17   me where you were retained by the defendant's

18   counsel in a whistleblower case, have you done any

19   other litigation consulting?

20        A.   Yes.  Early on, I did some around

21   Part D, in a whistleblower on the Part D side.

22        Q.   Other than that case, are there any

23   other instances where The Tudor Group and you have

24   provided litigation support?

25        A.   Not that I recall.



Page 23

```
 1              Q.    In the example you just mentioned on
 2      the Part D side, were you retained by the
 3      defendant's counsel in that whistleblower case?
 4              A.    No.
 5              Q.    In the Part D example you gave, you
 6      were retained by the whistleblower's counsel?
 7              A.    Yes, sir.
 8              Q.    Do you know what the ultimate
 9      disposition of that case was?
10              A.    I got an email about it, but I pretty
11      much ignored it.  I -- I think that they won at an
12      early stage.  I'm not sure that the whole thing is
13      over with yet.
14              Q.    And what about --
15              A.    But I'm not involved in it.
16              Q.    Sorry for interrupting you.
17                    What about the other case where you
18      were retained by the defendant's counsel?  Do you
19      know what the ultimate disposition of that case
20      was?
21              A.    I believe they won that.  I, again --
22      you could read it -- read something about it and
23      say it's not still over, but in my opinion, they
24      won.
25              Q.    Your work for The Tudor Group, have you
```



Page 24

1    provided any consulting to Medicare Advantage plans

2    related to the submission of their bids?

3          A.    You know, it's -- I think there might

4    have been questions that related to bids.  I don't

5    remember what the specifics are, though.

6          Q.    In your work for The Tudor Group, have

7    you ever advised any of your Medicare Advantage

8    plan clients that a compliance program required

9    them to design their medical record review to look

10   for codes to delete in addition to add?

11         A.    Not that I recall.

12         Q.    And stepping more broadly, not just

13   your Tudor work, but at any point during your work

14   for the Center for Medicare or The Tudor Group, do

15   you ever recall telling a Medicare Advantage plan

16   that as part of their compliance program they were

17   required to design their medical review -- medical

18   reviews to look for codes -- diagnosis codes to

19   delete in addition to add?

20              MS. CHEN:  Object to form.

21              THE REPORTER:  I'm sorry.  Who was

22   that?

23              MS. CHEN:  This is Geng Chen, counsel

24   for relator.

25   BY MR. BAAK:



Page 25

1          Q.    You can answer, Dr. Tudor.

2          A.    The answer is:  Probably.

3          Q.    Can you --

4          A.    In general -- in general, I would say

5    that you have to design medical record review to

6    look for both adds and deletes.

7          Q.    Dr. Tudor, sitting here today, can you

8    identify any Medicare Advantage plan that you

9    advised that they had to design their chart-review

10   programs to look to delete diagnosis codes in

11   addition to add?

12         A.    I don't remember which specific

13   plans --

14               MS. CHEN:  Object to form.

15   BY MR. BAAK:

16         Q.    The answer to my question, Dr. Tudor,

17   is:  Sitting here today, you can't identify any

18   Medicare Advantage plan that you recall telling

19   that they needed to design their chart review to

20   look to delete diagnosis codes in addition to add,

21   correct?

22         A.    That's correct.

23         Q.    I want to back up in time.  When did

24   you first join CMS?

25         A.    1992.



Page 26

1          Q.    And when did you leave CMS?

2          A.    2017.

3          Q.    What was your last position at CMS?

4          A.    Deputy director for the Center for

5    Medicare.

6          Q.    During what period were you the deputy

7    director at the Center for Medicare?

8          A.    I was acting from, I think, early 2013

9    to some point in 2014, and I couldn't really tell

10   you when.  And then I was the director from that

11   point in 2014 through when I left in July of 2017.

12         Q.    Before you were the deputy director at

13   the Center of Medicare, what position did you hold

14   at CMS?

15         A.    The one prior to that would have been

16   the director of the Medicare Drug Benefit Group.

17         Q.    Is that also the Data -- referred to as

18   the Data Group?

19         A.    No.  I don't know what the Data Group

20   is.

21         Q.    Was the -- your position director

22   Medicare Drug Benefit and C & D Data Group?

23         A.    Yes.  That probably was -- I think

24   the -- the C & D Data Group probably got dropped

25   later, and it was the Medicare Drug Benefit Group.



Page 27

1          Q.    And how long did you hold that
2    position?

3          A.    Well, I don't have my r?sum? in front
4    of me, so I can't really tell you whether these
5    dates are exactly right.  But that would have been
6    somewhere from about 2005 in an acting position to
7    when I -- to 2013.  So I would have been acting for
8    a while and then permanent director.

9          Q.    During your time as the director of the
10   Drug -- Medicare Drug Benefit and C & D Data Group,
11   did you have responsibility for Medicare Advantage
12   plans?

13         A.    I would say that the answer to that
14   question is no, that the Medicare Advantage plans
15   were under the Medicare Contract Administration
16   Group, also called MCAG, which had the policy --
17   the policy for Part C.  And then there was a
18   Payment Group that had control over the encounter
19   data and ultimately the PDE data for Part D.

20         Q.    So just so the jury understands, so
21   when you say "Part C," you're referring to Medicare
22   Advantage, right?

23         A.    That's correct.

24         Q.    And so during the time you were the
25   director of the Medicare Drug Benefit and C & D



3655

Page 28

1    Data Group, what responsibilities, if any, did you

2    have related to Medicare Advantage?

3         A.    I really -- I couldn't tell you the

4    specifics.  I mean, that -- I don't remember the

5    difference between the Medicare Drug Benefit and

6    C & D Data Group and the Medicare Drug Benefit

7    Group.

8              But basically, the division of labor

9    was around policy, which for Part C would have been

10   through the MCAG Group, which I referenced earlier.

11   I would have had control over Part D policy.  I

12   also had the Health Plan Management System, HPMS,

13   and -- and the star ratings in my group.

14             Some other groups -- the Plan Payment

15   Group had the encounter data and the PDE data.

16   Another group had compliance, and the other group

17   had sort of enrollment and different policies

18   around that.

19        Q.    So during the time that you were the

20   director of the Medicare Drug Benefit and C & D

21   Data Group, it sounds like you had some

22   responsibilities related to Medicare Advantage,

23   including the HPMS and star ratings, but not sole

24   responsibility or overall oversight for Medicare

25   Advantage; is that correct?



Page 29

1           A.    That's correct.

2           Q.    Before you became the director of the

3    Medicare Drug Benefit Group, what role did you hold

4    at CMS?

5           A.    So I'm not -- I may not get the

6    sequence right, but I was a division director in

7    part there where we were collecting encounter data

8    for risk adjustment.

9                 And that -- and then prior to that, I

10   was in something called the Office of Research and

11   Demonstrations.  Maybe we just start there.  I was

12   hired into the Office of Research and

13   Demonstrations.  Worked first on Medicaid

14   financing.  And then worked on the demo side where

15   I was special assistant in other things.  And then

16   got moved to a position where I was the chief

17   technical in charge of making risk adjustment,

18   getting it into legislation and then get it

19   implemented for Medicare.

20          Q.    I want to focus on that last piece.

21   When were you -- when did you first start working

22   on risk adjustment for Medicare?

23          A.    You know, it's really hard to remember.

24   But I think it was some point around 1992 or -- I'm

25   sorry -- 1994, something like that.



Page 30

1                    And it was in the Office of Research,

2     which was in the Office of Research and

3     Demonstrations.  And it essentially was helping the

4     research group decide which of many risk adjustment

5     methodologies should be -- become the method for

6     payment for managed care plans.

7          Q.   Were you involved in the design of the

8     risk adjustment system that's used today by -- by

9     CMS?

10         A.   Yes.

11         Q.   I meant to cover this earlier, but I

12    want to just briefly discuss your educational

13    background, and then I'm going to come back to your

14    CMS experience.

15                   Where is your undergraduate degree

16    from?

17         A.   Georgia State University.

18         Q.   You have a Ph.D. in sociology from

19    Johns Hopkins University?

20         A.   Yes.

21         Q.   Do you have any legal training?

22         A.   No.

23         Q.   Any other degrees beyond the --

24         A.   I did a postdoc at University of

25    Maryland Medical School.  I have a master's degree



Page 31

1    from Georgia State as well.

2         Q.   What was your master's from Georgia

3    State?

4         A.   Also in sociology.

5              MR. BAAK:  Let's go ahead and mark our

6    first exhibit today, which, Jordan, let's go to

7    Tab 27 -- 67, rather.

8              MS. MCMAHON:  Can I interrupt for one

9    second?  Dr. Tudor, are you signed on to AgileLaw

10   yet?

11             THE WITNESS:  I don't think so.  Let me

12   see if I can find it.  Let's see.  There's

13   AgileLaw.  Let's try to join now.

14             MS. MCMAHON:  I did email the PIN to

15   you, but if you need me --

16             THE WITNESS:  Yeah.  This says "Waiting

17   to be authenticated."

18             MS. MCMAHON:  Okay.  Perfect.

19             MR. GOLDS:  You should be in now,

20   Dr. Tudor.

21             THE WITNESS:  It still hasn't given me

22   anything to click on yet.  It says on -- it says

23   "Tudor, Cynthia" on it, but it doesn't -- I don't

24   have anything showing up.

25             MS. MCMAHON:  Oh, yes, I think they



Page 88

1    to go through the formal rulemaking procedure as

2    opposed to more informal subregulatory guidance?

3              MS. MCMAHON:  Objection.  Form.

4              THE WITNESS:  I -- I'm -- I'm not

5    really familiar with that.  I'm -- and I'm talking

6    about putting out on a website something.  I'm not

7    really familiar with what they put out on websites

8    on that issue.

9    BY MR. BAAK:

10         Q.   Fair.

11              More generally, during your time at

12   CMS, do you remember any sort of written policy

13   that was administered by CMS that told you we need

14   to go through the formal Administrative Procedure

15   Act route versus something more informal?

16         A.   I don't really remember that.  I -- I

17   can remember conversations where someone -- and I

18   can't remember the name of the office -- might say

19   you need to put out a rule.  And our answer was, we

20   have -- under this statute, we have the right to

21   publish an Advance Notice and then a Final Rates

22   Notice, and then it will go in that.

23         Q.   I think you indicated you had some

24   familiarity with the Allina Health case the supreme

25   court issued several years ago.  Is it your



Page 89

1    understanding that that has influenced when CMS

2    thinks it needs to pursue formal regulation as

3    opposed to subregulatory guidance?

4         A.    I think that --

5              MS. MCMAHON:  Objection.  Calls for

6    speculation.

7              THE WITNESS:  I -- I don't think I

8    could answer that.  That happened, really, when I

9    was leaving -- either after I had left or when I

10   was leaving.  So I didn't pay a lot of attention to

11   it.

12   BY MR. BAAK:

13        Q.    Understood.

14              I mentioned, Dr. Tudor, earlier -- I

15   asked earlier who you recalled meeting with from

16   UnitedHealth.  And you mentioned Steve Nelson as

17   somebody you remember.  What do you remember just

18   in general about your interactions with Mr. Nelson?

19        A.    He was a pleasant man.

20              MS. MCMAHON:  Objection.  Vague.

21   BY MR. BAAK:

22        Q.    Did you have a good working

23   relationship with Steve Nelson?

24        A.    Yes.

25        Q.    Do you recall meeting with Steve Nelson



Page 90

1    and other executives from United in April of 2014?

2         A.   No.

3         Q.   Can you recall just -- I know it

4    sounded like you met with Mr. Nelson somewhat

5    regularly; is that correct?

6         A.   Yes.

7         Q.   Do you recall the specifics about what

8    was discussed at any of those meetings with

9    Mr. Nelson?

10        A.   No.

11        Q.   Do you recall the specifics of any

12   meeting you had with anyone from UnitedHealth,

13   Mr. Nelson or otherwise?

14        A.   The specifics, I would say no.

15        Q.   Do you recall the subject matters of

16   any of the meetings you had with Mr. Nelson or

17   anyone else from United?

18        A.   Well, a lot of times, United would come

19   in and talk to us about clinical programs they had

20   for one purpose or another.  Sometimes they would

21   talk about their marketing.  Those are -- those are

22   the ones that sort of -- in general, that's what

23   plans talked to us about.

24        Q.   I asked about the -- an April 2014

25   meeting with Mr. Nelson, and I think you just said



Page 91

1  you don't recall the specifics.  Do you recall in

2  general the April 2014 meeting you had with Steve

3  Nelson?

4          A.    Well, only because people had asked for

5  what was in my Day-Timer at the time.  And I looked

6  at my Day-Timer, and it told me that there had been

7  a meeting.

8          Q.    You're referring to your Day-Timer.

9  Dr. Tudor, did you take notes at the meeting you

10  had with Steve Nelson and others from United in

11  April of 2014?

12              MS. CHEN:  Object to form.

13              THE WITNESS:  I don't know about the

14  date, but I know that there was a piece of paper

15  that had something on it.

16  BY MR. BAAK:

17          Q.    Was it your practice to take notes of

18  meetings with -- your meetings with Steve Nelson?

19          A.    No.  Not necessarily.  It'd depend upon

20  what the subject of the meeting was.  It'd depend

21  upon who else was there, what role I was serving.

22  It's all sort of situational.

23          Q.    Did reviewing the notes you took of the

24  April 2014 meeting in your Day-Timer, the meeting

25  with Steve Nelson and others from United, did it



Page 92

1   refresh your recollection at all about what the

2   subject matter of that meeting was?

3           A.   Well, my -- the way I remember that

4   piece of paper, it was pretty vague.  And it -- you

5   know, there were other people there who knew more

6   than I did about these subjects.  So I -- as my

7   general practice was, those people should take the

8   lead.

9           Q.   And the subjects you just referenced,

10  what were the subjects of that April 2014 meeting,

11  as you recall?

12          A.   I don't -- I don't --

13          MS. CHEN:  Object to form.

14          THE WITNESS:  I don't really remember

15  this April '14 meeting, so I don't think I can

16  answer that.

17  BY MR. BAAK:

18          Q.   Do you recall how it was determined

19  that you would attend the April 2014 meeting with

20  Mr. Nelson and others from United?

21          A.   Well, I was the deputy director, so I

22  was there.  Because I'm sure that whoever was the

23  director -- I think it was Sean Cavanaugh at that

24  point -- told me to come, so I came.

25          Q.   Do you recall what you said, if



Page 93

1    anything, at the April 2014 meeting?

2          A.   No.

3          Q.   Do you recall what Mr. Cavanaugh said

4    at the April 2014 meeting with UnitedHealth?

5          A.   No.

6          Q.   Do you recall what Cheri Rice said at

7    the April 2014 meeting with UnitedHealth --

8          A.   No.

9          Q.   -- executives?

10         A.   No.

11         Q.   Do you remember saying anything at the

12   April 2014 meeting with Steve Nelson and the other

13   United executives?

14         A.   No.

15         Q.   In your experience, who would have been

16   the person who would normally take a lead in a

17   meeting like that --

18              MS. MCMAHON:   Objection.   Vague.

19   BY MR. BAAK:

20         Q.   -- from the CMS side?

21         A.   Well, if Sean Cavanaugh was there, it

22   would have been the -- the director would have

23   started, unless the director said somebody take the

24   lead, and they would have done that.

25         Q.   Do you recall anything that Steve



Page 94

1    Nelson said at the April 2014 meeting that you had

2    with him?

3         A.    No.

4         Q.    Do you recall anything that anyone from

5    the UnitedHealth -- do you remember any of the

6    other -- let me withdraw that.

7              Do you remember any of the other

8    attendees, beyond Mr. Nelson, at the April 2014

9    meeting you had?

10        A.    I don't.

11        Q.    Do you recall anything that anyone from

12   the -- the group that came from UnitedHealth said

13   at the April 2014 meeting you had?

14        A.    I don't remember the meeting.  Again, I

15   remember the piece of paper, but I don't really

16   remember the meeting.

17        Q.    Let me show you the meeting invite,

18   which is Tab 26, and it's previously been marked as

19   Exhibit 1059.

20              (EXHIBIT 1059, Appointment dated

21   4/29/14, Subject:  Meet with Optum, Bates

22   USBP051354814, was previously marked for

23   identification.)

24   BY MR. BAAK:

25        Q.    Tell me when that is in front of you.



3666

Page 95

 1          A.    I have it.

 2          Q.    Great.

 3                Exhibit 1059 is Bates-stamped ending in

 4    4814.  And it is an appointment from Outlook, it

 5    appears.  And it's to you.  It's sent from

 6    Alyssa [sic] Simpkins.  Do you see that?

 7          A.    Yes.

 8          Q.    Who is Alyssa [sic] Simpkins?

 9          A.    I don't remember.  My guess is that she

10    was the -- the administrative assistant for Sean,

11    but I could be wrong.

12          Q.    And the recipients include you, Cheri

13    Rice, Jennifer Harlow, Julia [sic] Uebersax and

14    Robert Ahern, correct?

15          A.    Ahern, yes.

16          Q.    Ahern.

17                Do you recall which of the recipients,

18    other than yourself and Cheri Rice, attended the

19    meeting?

20          A.    No.  I don't know whether the special

21    assistants were there.  That's -- Julie Uebersax at

22    that point and Rob Ahern were both special

23    assistants.  I -- I don't know who was there,

24    though.

25          Q.    Do you see down below it says meeting



Page 109

```
 1              That's what it says.  I don't know what
 2    it means.
 3         Q.   Do you recall who provided the
 4    information that you wrote down in the bottom
 5    left-hand corner of your notes about the obligation
 6    to stop review or tell us what they found?
 7         A.   No.
 8         Q.   Do you recall who -- do you surmise
 9    that this is also information that came from
10    United, at least in part?
11              MS. MCMAHON:  Objection.  Calls for
12    speculation.
13    BY MR. BAAK:
14         Q.   Actually, let me withdraw that.
15              Do you recall who at the meeting,
16    whether it was someone from CMS or United, said
17    stop work at the -- at the end?
18         A.   I don't -- I don't know who said it.
19         Q.   The date 2012 -- so this meeting is
20    taking place in 2014.  Did you understand that 2012
21    date to refer to the dates of service for which the
22    attestation was -- was coming up?
23              MS. MCMAHON:  Objection.  Calls for
24    speculation.
25              THE WITNESS:  I don't -- I don't really
```



Page 110

1    remember.

2    BY MR. BAAK:

3        Q.    And what does -- in your experience,

4    what does "chart review" refer to?

5            MS. MCMAHON:  Objection.  Vague.

6            THE WITNESS:  Well, in general, chart

7    review is looking at a chart to see what's in it,

8    what's documented.

9    BY MR. BAAK:

10       Q.    During your time at CMS, did you come

11   to understand that Medicare Advantage plans

12   conducted chart reviews to look for diagnosis

13   codes -- to look for diagnoses that maybe the

14   provider failed to include?

15           MS. MCMAHON:  Objection.  Vague.

16           THE WITNESS:  Well, that's one reason

17   for chart review.

18   BY MR. BAAK:

19       Q.    And if I use the -- in part, to keep

20   things simple, if I -- if I use the term "chart

21   review" to that process by which a chart is

22   reviewed to potentially add diagnosis codes, do you

23   understand what I'm referring to?

24       A.    Yes.

25       Q.    Do you recall who -- who said -- the



Page 111

1    section on the obligation to stop review or tell us

2    what they found, do you recall whether someone from

3    CMS said that to United?

4           A.    No, I don't remember.

5           Q.    Based on the context, does that look

6    like something that came from CMS?

7           A.    I don't remember.

8           Q.    Just stepping back from the notes a

9    little bit, there's a reference to "attestation."

10   What do you understand "attestation" to refer to?

11          A.    Well, the attestation is a requirement

12   that either the CEO or the CFO attests to the

13   reliability of the risk adjustment data being

14   submitted to CMS.

15          Q.    Is that an annual process?

16          MS. MCMAHON:   Objection.

17          THE WITNESS:   I believe it's more than

18   an annual process.   I believe that monthly they're

19   supposed to do this.   But I'd have to go look at

20   what the requirements are.

21   BY MR. BAAK:

22          Q.    You can set the notes aside or -- or --

23   electronically or otherwise.   I want to just ask

24   the follow-up on your answer on chart review a

25   second ago.



3670

Page 172

1          Q.    Just take a second to review this.

2          A.    Okay.

3                (Witness peruses document.)

4          Q.    And I'm going to focus just on the top

5    section.

6          A.    Okay.

7          Q.    And this is under the category of

8    improving payment accuracy, and it says:    To

9    strengthen existing regulations on Medicare

10   Advantage organizations' accountability for valid

11   risk adjustment data validation prior to

12   submission, we recommend proposing that -- and then

13   there's a colon.  Do you see that?

14         A.    Yes.

15         Q.    Let's go through.  There's two bullets

16   after -- just so we're clear on the context, these

17   are proposals that CMS was thinking about offering;

18   is that accurate?

19               MS. MCMAHON:  Objection.  Vague.

20               THE WITNESS:  I -- I don't know.  I --

21   given the time, the date of this presentation, my

22   guess is it was some sort of briefing document for

23   internal CMS use.

24   BY MR. BAAK:

25         Q.    Right.  I can show you an email later



Page 173

1    if it'd help refresh your recollection.  But, yes,

2    this is an internal -- you understood this is an

3    internal CMS document that's talking about various

4    policy proposals that CMS might adopt, correct?

5          A.   Yes.

6          Q.   So these are not -- this is

7    forward-looking.  These are new rules that CMS is

8    thinking about implementing, correct?

9          A.   Yes.

10             MS. MCMAHON:  Object.

11   BY MR. BAAK:

12         Q.   And one of the new rules -- let's just

13   start with the bullet -- the first bullet here

14   that -- this is what CMS is thinking about

15   proposing.

16             And CMS is thinking about proposing

17   here in 2013 that MA organizations -- that's

18   Medicare Advantage, right?

19         A.   Yes.

20         Q.   -- Medicare Advantage organizations

21   that conduct internal medical record review for the

22   purposes of submitting risk adjustment data to CMS

23   would have to identify overpayments as well as

24   underpayments, correct?

25         A.   Yes.



Page 174

1          Q.    So this is something that CMS is
2    contemplating proposing through regulation in 2013,
3    correct?
4          A.    I don't know whether they proposed it
5    in 2013, but yes.  They were propose -- they were
6    thinking about proposing.
7          Q.    I think it was actually proposed in
8    2014, but we'll get to the rule in a little bit.
9          A.    Okay.
10         Q.    But as of 2013, CMS is deliberating
11   internally about whether to impose this new
12   requirement on Medicare Advantage plans, correct?
13         A.    Yes.  Yes.
14               MS. MCMAHON:  Objection.  Form.
15   BY MR. BAAK:
16         Q.    And then the second bullet says -- this
17   is another change that's being contemplated --
18   Medicare Advantage organizations would not be able
19   to submit additional diagnoses for the payment year
20   after payment reconciliation.  And then it says, in
21   parentheses, (codifies current practice).  Correct?
22         A.    Yes.
23         Q.    The "codifies current practice"
24   language, that's not in the prior bullet on the --
25   the new proposal for medical record reviews,



Page 175

1    correct?

2          A.    Yes.

3          Q.    Does this situate you back in time that

4    in 2013 CMS was contemplating a new proposal -- a

5    new obligation for Medicare Advantage plans on how

6    they conduct chart review?

7                MS. MCMAHON:  Objection.  Form.

8                THE WITNESS:  Well, it doesn't require

9    them to do it, at least the way this is written.

10   It only requires that they do it both ways if they

11   do it.

12   BY MR. BAAK:

13         Q.    Thank you for that clarification.

14               So the first bullet I'm just focusing

15   on is just a recognition that Medicare Advantage

16   plans, you know, may conduct chart review, not --

17         A.    Right.

18         Q.    -- that they have to, correct?

19         A.    Right.

20         Q.    And the rule -- the new rule in 2013

21   that CMS was thinking about is telling plans that

22   if you do that kind of chart review for risk

23   adjustment, you have to look for overpayments as

24   well as underpayments.  That's what was being

25   contemplated, correct?



Page 211

1    they're unlikely to affect your year two cost

2    because the flu or in a broken arm is gone.

3    BY MR. BAAK:

4         Q.   And so if I'm a Medicare Advantage

5    plan, and I learn that a particular code was just

6    submitted in error, I might delete that code, but

7    it might not have any impact on the ultimate risk

8    adjustment payment, correct?

9         A.   That's correct.

10             MS. CHEN:  Objection.

11   BY MR. BAAK:

12        Q.   And another reason that might be true

13   is, let's say I do a chart review and I don't find

14   a particular diagnosis code that was submitted in

15   one record, and so I delete it.  But, in fact, it's

16   supported by another record.  That's another

17   example, right, where a deletion of a code doesn't

18   impact the risk adjustment payment, right?

19             MS. MCMAHON:  Objection.  Calls for

20   speculation.

21             THE WITNESS:  Yes, generally.

22   BY MR. BAAK:

23        Q.   If a Medicare Advantage plan then finds

24   a diagnosis code and deletes it -- actually, let me

25   step back and rephrase that.



Page 212

 1            Another reason that if you delete a
 2   particular unsupported code, it might not be --
 3   have an impact on risk adjustment payment is that
 4   it rolls up into -- that you have another diagnosis
 5   that rolls up into the same hierarchical condition
 6   code, correct?
 7        A.   That's -- that's true.
 8            MS. CHEN:  Objection.
 9   BY MR. BAAK:
10        Q.   So if I'm a Medicare Advantage plan,
11   and I'm looking at charts and I -- or I get wind
12   from the provider who tells me, "Hey, we made a
13   mistake.  This code was wrong," that doesn't
14   necessarily tell me, if I'm the plan, that I've
15   been overpaid, correct?
16            MS. MCMAHON:  Objection to form.
17            THE WITNESS:  You have enough
18   information to determine whether you've been
19   overpaid, but you have to run that person through a
20   risk adjustment methodology to find out if you
21   have.
22   BY MR. BAAK:
23        Q.   Right.  The plan might go delete the
24   code, but just knowing that there was a single code
25   that was unsupported, that alone wouldn't tell you



Page 213

1    you've been overpaid if you're the plan, right?

2              MS. MCMAHON:  Objection.

3              THE WITNESS:  Probably.

4    BY MR. BAAK:

5         Q.  You would need to know, for example, if

6    another record supported the code, correct?

7         A.  Yes.  Yes.

8              MS. CHEN:  Objection.

9    BY MR. BAAK:

10        Q.  A few minutes ago, you were talking

11   about, sort of in general, your view of how plans

12   ought to run down areas where they thought they had

13   some indication that the code might be wrong.

14             Do you ever articulate -- do you recall

15   ever articulating kind of what -- what percentage

16   or what degree of suspicion a plan had to have to

17   go investigate a code?

18        A.  No.

19             MS. MCMAHON:  Objection.

20             MS. CHEN:  Objection.

21   BY MR. BAAK:

22        Q.  And as someone who continues to consult

23   in the industry, sitting here today, do you have a

24   view as to how much information a plan would have

25   to have that a code might be unsupported to go do



3677

Page 214

1   further investigation?

2          MS. MCMAHON:  Objection.

3          THE WITNESS:  You know, if you asked me

4   as -- as somebody who knows how to research topics,

5   I could ponder it.  But I haven't really

6   articulated that.

7   BY MR. BAAK:

8      Q.   What I'm trying to get at is, given

9   that we know there's a certain number of codes in

10  the data that just are going to be wrong, right, a

11  certain number of diagnosis codes that are going to

12  be unsupported, correct?

13     A.   Yes, some number.

14     Q.   And CMS has never said you've got to go

15  check every code, correct?

16     A.   Correct.

17     Q.   In your view, would a plan need to know

18  that it's sort of -- that any given code is more or

19  less -- more likely than not to have resulted in an

20  overpayment to go investigate?

21          MS. MCMAHON:  Objection.

22          THE WITNESS:  Say again.

23  BY MR. BAAK:

24     Q.   Yeah, it was -- it was confusing.  Let

25  me try that again.



Page 220

1    investigate a code or not, would it be appropriate

2    to take into account whether a given code is more

3    likely than any random code to have resulted in an

4    overpayment?

5              A.   Well --

6                   MS. MCMAHON:  Objection.

7                   THE WITNESS:  -- I think my -- my

8    answer stands.  I still think there's other issues

9    they have to look at.

10   BY MR. BAAK:

11             Q.   During your time at CMS, did you ever

12   supervise folks that -- for CMS who were doing

13   reviews of medical records to look for diagnosis

14   codes?

15             A.   Well, part of the Medicare Plan Payment

16   Group was the national error rate, which was, what

17   is the percentage of payments made incorrectly to

18   Medicare Advantage plans under -- under that

19   system.

20                  So they were doing some medical record

21   reviews there, and I supervise -- I -- people who

22   did that reported to people who reported to me.

23             Q.   Understood.

24                  So, Dr. Tudor, it sounds like you were

25   not reviewing medical records, but --



Page 221

```
 1          A.   Correct.
 2          Q.   -- somewhere down in the CMS
 3   organization, there were folks that were
 4   reviewing --
 5          A.   Yes.
 6          Q.   -- medical records --
 7          A.   Yes.
 8          Q.   -- that reported up to you, correct?
 9          A.   Yes.  And there were studies
10   occasionally of -- of things like Part D
11   prescribing where we got medical records to look at
12   what was going on and various things.  But I'm not
13   a physician, so I generally don't review medical
14   records.
15          Q.   There was one point I wanted to circle
16   back on.  We talked about situations where a
17   Medicare Advantage plan might delete a code that
18   does risk adjust, but there's no overpayment
19   because that code was supported by another provider
20   record.  Do you recall those questions?
21          A.   Yes.
22          Q.   In that scenario, if the plan did not
23   delete the code, there still would be no
24   overpayment, right, because even the deletion of
25   the code did not impact payment?
```



Page 222

1           MS. MCMAHON:  Objection.  Form.

2           THE WITNESS:  Yes.

3    BY MR. BAAK:

4           Q.  And similarly -- so the plan deletes --

5    if the plan finds a code that if it deleted would

6    not impact payment, it's also the case that the --

7    the identification of that particular unsupported

8    code, the inclusion of that in the risk adjustment

9    data in the first place did not cause an

10   overpayment, right?

11          MS. MCMAHON:  Objection.  Vague.

12          THE WITNESS:  I don't know how to

13   answer that question.

14   BY MR. BAAK:

15          Q.  Well, let me just see if I can be a

16   little more precise with the hypothetical.

17          If -- if a plan determines that a

18   particular diagnosis code is not supported --

19   right?

20          A.  Right.

21          Q.  -- but if they -- but that code is

22   supported, for example, by another record in my

23   hypothetical --

24          A.  Right.

25          Q.  Do you have me -- with me so far?



Page 223

1          A.   Yes.  Yes.

2          Q.   -- on those facts, the plan might go

3     ahead and delete the code that they found that was

4     unsupported, but the initial submission of that

5     code did not result in any overpayment because

6     there was no impact on risk adjustment, right?

7          A.   Right.

8               MS. MCMAHON:  Objection.

9     BY MR. BAAK:

10         Q.   I have questions -- a couple questions

11    on chart review, and we won't spend a lot of time

12    on them.

13              But, you know, in your experience,

14    like -- particularly today, if you're advising a

15    plan, if it goes and looks -- it's doing chart

16    review, and it doesn't find a code that was

17    submitted, but it doesn't have the complete medical

18    record, in your view, should the plan delete that

19    code?

20              MS. MCMAHON:  Objection.

21              THE WITNESS:  Well, I think from a

22    business standpoint, the plan needs to try to get

23    the medical record, whatever part of it they think

24    they're missing.

25              And if they can't, then they need to --



Page 224

1    I mean, again, I'm protecting the business in the

2    answer to this question -- they should be doing

3    other things to see whether clinically -- it could

4    have disappeared, whether or not there are drugs

5    that indicate the person does have that problem,

6    just other things they could do to validate

7    whether -- in the absence of the right medical

8    record, this could be sustained.

9    BY MR. BAAK:

10        Q.   So I guess the way you would approach

11   this, it would depend on the context, right?

12        A.    Absolutely.

13        Q.   If you can't get the complete medical

14   record, and you know you don't have the complete

15   medical record, the mere fact the diagnosis code

16   isn't there doesn't tell you the diagnosis code is

17   wrong and needs to be deleted.  You'd have to look

18   at sort of other information, correct?

19            MS. MCMAHON:   Objection.

20            THE WITNESS:   Right.  But, you know, if

21   you're looking -- if you're missing the -- the

22   dermatologist's record and you're looking for

23   congestive heart failure, my belief is that

24   dermatologist records are not going to help you,

25   and truly, you have the records that are important



Page 306

1              CERTIFICATE OF REPORTER

2

3              I, Cindy A. Hayden, Registered Merit

4      Reporter and Notary Public for the State of

5      Maryland at Large, do hereby certify that the

6      foregoing transcript is a true, accurate, and

7      complete record.

8              I further certify that I am neither

9      related to nor counsel for any party to the cause

10     pending or interested in the events thereof.

11             Witness my hand, I have hereunto

12     affixed my official seal this 26th day of August,

13     2022.

14

15

16

17

18

19

20

21

22

                    _____
                         *Cindy A. Hayden*
23                  Cindy A. Hayden, RMR, CRR

                    My Commission expires
24                  April 26, 2025

25



3684

**EXHIBIT D-146**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )




Videotaped Deposition of

JULIE UEBERSAX

Given Remotely

Wednesday, June 29, 2022

10:05 a.m. Eastern




Reported by:  Karen K. Kidwell, RMR, CRR

Magna Legal Services
866-624-6221
www.MagnaLS.com



3686

Page 16

1    the -- like I said, over the years at CMS, and -- and

2    differing -- conversations with differing Department

3    of Justice attorneys over the years.

4         Q.   So other than the conversations with

5    Department of Justice attorneys, did those

6    conversations involve discussing the merits of this

7    case?

8         A.   Not that I can recall.

9         Q.   Is it your testimony that the

10   conversations were more, where does this case stand,

11   for example?

12        A.   Correct.  Right.  It's an ongoing matter.

13        Q.   Okay.  I'd like to turn to your

14   educational background briefly.  Did you graduate

15   from an undergraduate institution?

16        A.   I did.

17        Q.   Which one?

18        A.   Towson.  Towson State University.

19        Q.   What was your major there?

20        A.   Psychology.

21        Q.   And when did you graduate?

22        A.   1998.

23        Q.   Did you attend graduate school?

24        A.   I did.

25        Q.   Where?



3687

Page 17

```
 1        A.    University of Baltimore.

 2        Q.    And what did you study there?

 3        A.    Law.

 4        Q.    Did you receive your JD?

 5        A.    I did.

 6        Q.    What year?

 7        A.    2002.

 8        Q.    I missed that.  Was it 2002?  Is that what

 9   you said?

10        A.    Correct.  2002.

11        Q.    Are you currently admitted to any bars?

12        A.    I am.

13        Q.    Which?

14        A.    At the State of Maryland.

15        Q.    When were you first admitted to the

16   Maryland bar?

17        A.    In 2002.

18        Q.    And have you maintained active membership

19   in the Maryland bar since 2002?

20        A.    I have.

21        Q.    Have you practiced as an attorney at any

22   point in your career after graduating?

23        A.    I did.

24        Q.    And when was that?

25        A.    Immediately following my being sworn in, I
```



Page 18

1    was an attorney practicing law until I joined the

2    government in October of 2010.

3         Q.   What type of law did you practice?

4         A.   I worked at a law firm that I refer to as

5    sort of a boutique firm, where we represented general

6    business clientele, for which we performed services

7    in that nature.  So it was kind of a -- I'd say a

8    broad base of contract law, employment law, you know,

9    some real estate, leases, transactions of those

10   nature -- of that nature.

11        Q.   And how long were you a practicing

12   attorney?

13        A.   From the time I was sworn in, in 2002,

14   until I -- until I left that job and became employed

15   by the government in October of 2010.

16        Q.   Have you ever been employed in a legal

17   capacity during your time at the government?

18        A.   No.

19        Q.   So you don't provide legal advice as part

20   of your job?

21        A.   No.  Not on the government's behalf.  I'm

22   sorry.

23        Q.   My apologies.

24             And is it -- is it accurate that you never

25   have, since joining the government?



3689

Page 19

 1        A.    That's correct.  I do not represent the

 2    government.

 3        Q.    When you first joined the government, did

 4    you join CMS?

 5        A.    I did.

 6        Q.    And you said that was October 2010, right?

 7        A.    That's correct.

 8        Q.    What was your first job at CMS, starting

 9    in October of 2010?

10        A.    As a health insurance specialist in one of

11    the divisions of the Medicare Plan Payment Group.

12        Q.    Is that abbreviated MPPG?

13        A.    Correct.

14        Q.    Was there a specific division that you

15    were working when you first joined?

16        A.    Yes.  The acronym was DRAPP.  I believe it

17    stood for Division of Risk Adjustment and Payment

18    Policy.  It was something like that.  DRAPP was the

19    acronym.

20        Q.    And how long did you work as a health

21    insurance specialist in DRAPP for?

22        A.    For approximately a year and a half to

23    two years.

24        Q.    Who did you directly report to, as a

25    health insurance specialist at DRAPP --



Page 20

```
 1        A.    Sean --
 2        Q.    -- when you first started?
 3        A.    I'm sorry.
 4              Sean Creighton was my immediate supervisor
 5   at that time.
 6        Q.    And what were your job responsibilities at
 7   that time?
 8        A.    So it was -- I was brought on board to
 9   facilitate payment -- the development of payment
10   policy.  The ACA, the Affordable Care Act, had
11   recently passed, and there were a number of statutory
12   changes being made at that time, so my responsibility
13   was to engage in those activities and the policy
14   development underlying those changes.
15        Q.    So your focus was ACA-related work?
16        A.    Primarily, yes.
17        Q.    What other areas -- you said "primarily,"
18   so what other areas were there that you worked on?
19        A.    There was ad hoc -- you know, other
20   related areas of -- being new to the government and
21   new to the work, I was given, you know, broad
22   training and responsibility to sort of learn all
23   the -- the foundational elements of Medicare
24   Advantage, the historical payment policies and such,
25   so . . .
```



3691

Page 21

1          Q.    Did any of your work involve risk
2    adjustment?
3          A.    Some of it.
4          Q.    What types of work did you do related to
5    risk adjustment?
6          A.    So when I was first coming to the
7    government, one of the areas I was learning was, what
8    is risk adjustment?  How does it function generally
9    within the Medicare Advantage program?  What is a
10   risk adjustment model?  What are the principles of
11   risk adjustment?  Some -- you know, some of those
12   basic elements, and how it relates to payment.
13         Q.    Do you have any -- can you think of any
14   examples of projects you worked on related to risk
15   adjustment at that time?
16         A.    I don't know that I could recall very a
17   specific project.  I can say generally that there
18   were pieces of risk adjustment.  As I said, sort of
19   learning how the model functions and what -- how it
20   impacts payment.  But off the top of my head, I can't
21   remember a specific project, no.
22         Q.    What was your next job, after health
23   insurance specialist at DRAPP?
24         A.    So after that, there was a brief time that
25   I was on detail as special assistant.  That



Page 22

1   ultimately became a permanent position.  Special

2   assistant to Cheri Rice, who was the group director

3   for the Medicare Plan Payment Group.

4        Q.   How long did you serve as a special

5   assistant to Cheri Rice?

6        A.   From approximately two thousand --

7   sometime in 2012 to sometime -- I want to say in

8   2015, roughly.

9        Q.   Had you worked with Cheri Rice before

10  becoming her special assistant?

11       A.   She had -- she was the group director at

12  the time that I reported to Sean Creighton, so she

13  has been -- she was in my management chain.  So I did

14  not work for her directly, but indirectly, yeah.

15       Q.   Had you interacted with her before

16  becoming her special assistant?

17       A.   Yes.

18       Q.   You said that was approximately 2012 to

19  sometime in 2015, right?

20       A.   Right, approximately.  I don't remember

21  the specific dates, but that's about right.

22       Q.   And why did you -- why did you leave the

23  special assistant role in roughly 2015?

24       A.   To take a different position in the

25  Medicare Plan Payment Group, in a different division.



Page 23

1    And it was a promotion.

2           Q.   And what was that new role?

3           A.   The title of the job was also health

4    insurance specialist, but it was in, I -- I believe,

5    division of -- I don't remember the name of the

6    division.  I apologize.  But it was in a different

7    division.  One of the divisions in the Medicare Plan

8    Payment Group.

9           Q.   Was it Division of Payment Systems?

10          A.   Yes, that's correct.

11          Q.   And you said that was a promotion from the

12   special assistant role; is that right?

13          A.   Correct.  Correct.

14          Q.   And how long did you work as a health

15   insurance specialist at DPS?

16          A.   Until I left the Medicare Plan Payment

17   Group to take a job as Cheri's senior advisor in her

18   current role.  I want to say that was approximately

19   sometime in the summer of 2019, I believe.

20          Q.   And what did your job responsibilities

21   entail while serving as a health insurance specialist

22   at DPS?

23          A.   Sure.  I was a senior advisor in -- or a

24   senior technical advisor in that division, where that

25   division has primary responsibility for developing



Page 24

1    policies, payment policies related to Part C and D

2    payment that are unrelated to risk adjustment.

3              So that's the easiest way I can define it.

4    So it was everything but risk adjustment under Part C

5    in the payment policy.

6        Q.    And what types of policies, specifically,

7    were you helping develop?

8        A.    So there are a lot of underlying payment

9    mechanisms in the Medicare Advantage in Part D

10   programs.  And so in Medicare Advantage, for example,

11   there are the benchmarks that need to be calculated

12   in conjunction with the Office of the Actuary.  There

13   are various other payment policies that need to be,

14   you know, considered; how to pay employer group

15   waiver plans, and developing Part D policies, like

16   for the Advance Notice rate announcement process,

17   like the benefit parameters and such.

18       Q.    And then you said approximately summer

19   2019, you left that role and became a senior advisor

20   working with Cheri Rice again?

21       A.    Correct.

22       Q.    Is that your current role as well?

23       A.    That's true, yes.  That's accurate.

24       Q.    What's your official title?

25       A.    Health insurance specialist.



Page 25

1          Q.    And what does your current role involve?

2          A.    So it's -- it's hard to describe, but I

3    describe it as a lot of strategic planning, which is

4    anything from facilitating policy development to

5    perhaps researching, you know, independent projects,

6    communicating with the office of legislation on

7    technical assistance, things of that nature.

8          Q.    So one thing you mentioned was

9    facilitating policy development.

10         A.    Yes.

11         Q.    What does that entail?

12         A.    It's also pretty broad.  Some of that is

13   coordinating efforts between our leadership, Cheri,

14   each of the underlying groups, understanding when a

15   question comes down who to ask, how to ask it, how to

16   make sure that we're being responsive.  Also things

17   like how to put forward policies in a way that makes

18   sense in, you know, a strategic way, you know, when

19   to talk about certain things and in a -- in a

20   rule-making cycle or an Advance Notice rate

21   announcement-type cycle of our, you know, processes,

22   and how those things operate within the agency.

23         Q.    Are you responsible for drafting

24   substantive policies?

25         A.    No, not in my current role.



Page 26

1        Q.   Have you previously been responsible for

2    drafting substantive policies?

3        A.   In the past I have participated in the

4    development of substantive policies, yes.

5        Q.   Which substantive policies have you

6    participated in the development of?

7              MS. ZUPAC:  Objection.  Vague.

8              You can answer.

9              THE WITNESS:  One example would be when I

10             was a health insurance specialist in the

11             Medicare Plan Payment Group in the DPS position.

12             One thing that I worked on was the development

13             of a Part C employer group waiver plan payment

14             policy.  That was something that I worked

15             closely with -- with the Office of the Actuary

16             to develop, propose, and finalize.

17   BY MR. ROWE:

18       Q.   What other examples can you think of?

19       A.   At one point in time I was involved in

20   helping develop the policy with regard to Part D

21   payment, with DIR and pharmacy price concessions, and

22   how that should or could be reported to the

23   government.

24       Q.   Any other examples you can think of?

25       A.   I mean, there's been a wide range over the



Page 27

1    years of different policies.  I've been involved

2    in -- either ancillarily or -- you know, I don't know

3    that I could specifically articulate some -- those --

4    those two that I mentioned are -- are some that are

5    reasonably recent and where I had some significant

6    involvement.

7         Q.   Have any of the policies related to risk

8    adjustment?

9         A.   Not that I can recall, in having a

10   significant role.

11        Q.   Going back to your time as special

12   assistant to Cheri Rice, which you said was

13   approximately 2012 to approximately 2015, right?

14        A.   In that range, correct.

15        Q.   What did your job as a special assistant

16   entail?

17        A.   Again, it's -- it's kind of a hard job to

18   describe; but again, as a sort of a facilitator

19   between Cheri and the divisions, and also as a

20   liaison to our business office staff, and to

21   coordinate, you know, requests that we would get from

22   other areas of the agency or other, you know,

23   higher-ups, if you will, about requests and -- and

24   how to answer requests, and that nature.

25              So it was a role where a lot of -- a lot



Page 28

1    of items would come through me in order to get

2    coordinated and responded to.

3          Q.    Did your responsibilities change over

4    time?  Or were they roughly the same during your

5    tenure as special assistant to Cheri Rice?

6          A.    I would say roughly the same.

7          Q.    Did you attend meetings with Ms. Rice?

8          A.    I did.

9          Q.    Did you regularly attend meetings with

10   Mrs. Rice -- Ms. Rice?

11         A.    Yes.  Not every meeting, but regularly.

12         Q.    Did you ever attend meetings on behalf of

13   Ms. Rice?

14         A.    Occasionally, in -- as special assistant.

15   Not often.

16         Q.    When you attended meetings with Ms. Rice,

17   what would your role be in those meetings?

18         A.    It would vary.  Sometimes it's just to be

19   present and listen.  Sometimes it would be to take on

20   follow-up actions as -- as needed.

21         Q.    Would you typically take notes during

22   meetings?

23         A.    It would depend on the nature or type of

24   the meeting.  Sometimes I would, and -- and sometimes

25   it would not be my practice to do so, depending on



Page 91

1        Q.    Did you discuss this meeting with anyone

2   beforehand?

3        A.    Not that I recall.

4        Q.    Do you recall preparing for this meeting

5   in any way?

6        A.    Not that I can recall.

7        Q.    Do you recall discussing the meeting with

8   Cheri Rice in advance?

9        A.    Not that I can recall.

10       Q.    Do you recall preparing Cheri Rice in any

11  way before this meeting?

12       A.    No, not that I can remember.  No.

13       Q.    Do you recall how you first found out

14  about this meeting?

15       A.    No.  I don't remember.

16       Q.    Do you recall whether you knew, heading

17  into the meeting, that the proposed rule was not

18  going to be finalized?

19       A.    I don't remember anything about that, no.

20       Q.    You said the meeting took place in Sean

21  Cavanaugh's office, correct?

22       A.    That's my recollection.

23       Q.    Do you recall whether everybody was there

24  in person?

25       A.    To the best of my recollection, the CMS



3700

Page 92

1    people were in person.  The United folks were on VTC

2    or television screen at a different location.

3         Q.    Do you know why they were in a different

4    location?

5         A.    No, I don't know.

6         Q.    Do you recall how long the meeting lasted?

7         A.    No.  I don't remember.

8         Q.    During the meeting, United raised various

9    issues, correct?

10        A.    As I said, I don't recall specifically

11   much about the contents of the meeting.  I generally

12   remember that it was for them to talk about a risk

13   adjustment program that they had.

14        Q.    Do you recall them talking about claims

15   verification program?

16        A.    I don't remember those specific words, no.

17        Q.    Did you understand that United at that

18   time was doing two-way looks?

19        A.    I don't --

20             MS. ZUPAC:  Objection to form.

21             THE WITNESS:  I don't remember anything

22        about that.

23   BY MR. ROWE:

24        Q.    Do you recall that United during the

25   meeting was trying to understand whether the "look



Page 93

1   both ways" rule would be finalized?

2          MS. ZUPAC:  Object to form.

3          THE WITNESS:  I don't -- I don't remember

4      that level of specificity about the discussion.

5   BY MR. ROWE:

6      Q.   Do you recall that they were seeking to

7   understand their current obligations in light of that

8   proposed rule?

9      A.   Again, I don't remember that level of

10  detail.

11     Q.   Do you recall United describing the risk

12  adjustment program that they had in place?

13     A.   Again, I have a general recollection that

14  they were discussing their risk adjustment program.

15  I don't remember any details about their description,

16  the discussion.

17     Q.   You don't recall that they told you they

18  were currently doing two-way looks as part of that

19  program?

20     A.   I don't recall that level of detail, no.

21     Q.   Do you recall United discussing deletes

22  that it had already submitted for 2012 dates of

23  service?

24     A.   I don't remember that level of detail.

25     Q.   Do you recall that United told CMS that it



Page 94

1   had suspended its two-way look program?

2        A.   I don't remember.

3        Q.   Do you recall that Cheri Rice told United

4   that until the proposed rule was finalized, MA plans

5   did not have a proactive obligation to confirm

6   whether diagnoses submitted by providers were

7   correct?

8        A.   I don't remember that level of detail of

9   the meeting, no.

10       Q.   Do you recall Cheri Rice saying that if a

11  plan had actual knowledge that a specific code

12  submitted by a provider was unsupported, that a plan

13  should delete the code?

14       A.   I don't remember that level of detail.

15       Q.   Do you recall anyone from CMS telling

16  United that existing rules did not require MA plans

17  to design their chart review programs to identify

18  unsupported codes submitted by providers?

19       A.   I don't remember that level of detail.

20       Q.   Do you recall anything that anyone from

21  CMS said at that meeting?

22       A.   I don't recall any specific phrases,

23  conversations, no.

24       Q.   Do you recall generally?

25       A.   No.



```
 1                            CERTIFICATE

 2

 3         I, KAREN K. KIDWELL, Registered Merit Reporter,

 4    and Certified Realtime Reporter, do hereby certify

 5    that prior to the commencement of the examination,

 6    the deponent was remotely sworn to testify to the

 7    truth, the whole truth under penalty of perjury.

 8         I DO FURTHER CERTIFY that the foregoing is a

 9    verbatim transcript of the testimony as taken

10    stenographically by me at the time, place and on the

11    date hereinbefore set forth, to the best of my

12    ability.

13         I DO FURTHER CERTIFY that I am neither a

14    relative nor employee nor attorney nor counsel of any

15    of the parties to this action, and that I am neither

16    a relative nor employee of such attorney or counsel,

17    and that I am not financially interested in this

18    action.

19

20                          _____

21                          Karen K. Kidwell
                            Registered Merit Reporter
22                          Certified Realtime Reporter
                            Notary Public
23

24

25
```



**EXHIBIT D-147**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO

BENJAMIN POEHLING,                )

                                  )

          Plaintiffs,             )

                                  )

v.                                )

                                  )

UNITEDHEALTH GROUP, INC., et al., )

                                  )

          Defendants.             )

_____ )




Videotaped Deposition of

MARYBETH MEYER

Given Remotely

Tuesday, June 7, 2022




Reported by:  Karen K. Kidwell, RMR, CRR




Magna Legal Services

866-624-6221

www.MagnaLS.com



3706

Page 26

1    and accurate diagnoses, or do you think they can do

2    less than that?

3         A.   I think physicians need to comply with

4    what CMS is asking.

5         Q.   Okay.  That's all I'm asking.

6              Right below, it says, "Physicians must

7    report the ICD-9-CM diagnosis codes to the highest

8    level of specificity and report these codes

9    accurately."  Do you see that?

10        A.   Yes.

11        Q.   Do you agree that physicians must report

12   the diagnosis codes with the highest level of

13   specificity and report these codes accurately?

14        A.   Again, this -- CMS is making this

15   requirement.  I don't have an opinion on how they

16   define their requirements.

17        Q.   Well, as -- as an experienced executive of

18   United, you have some involvement in dealing with CMS

19   requirements, correct?

20        A.   In my role, I didn't have direct

21   responsibility for regulatory or CMS requirements.

22        Q.   But you did have responsibilities relating

23   to the accurate reporting of diagnosis codes with

24   CMS, correct?

25        A.   I had responsibility to ensure that we



3707

Page 27

1  submitted the codes that we received from the

2  providers.

3      Q.   Did you have any responsibility at all

4  with respect to the accuracy of the codes that were

5  submitted to CMS?

6      A.   No.  I would say my responsibility was to

7  submit the codes as we received them from the

8  provider.

9      Q.   If you were to learn that a code that was

10  submitted was inaccurate, you had no responsibilities

11  at all with respect to inaccurate codes?

12      A.   If a provider told us that a code was

13  inaccurate, we would delete those codes.

14      Q.   Okay.  And that was because there was an

15  obligation to delete inaccurate codes, correct?

16      A.   Again, I am not the one who defined the

17  obligations or the requirements.

18      Q.   Well, you understood that that's what CMS

19  expected?

20      A.   Well, I understand that that's what CMS

21  has specified in this technical guide, that providers

22  need to submit accurate diagnosis codes.

23      Q.   And it was the responsibility of MAOs and

24  providers to submit accurate codes, right?

25      A.   It was the provider's responsibility to



Page 28

1   submit accurate codes.  I think the Medicare

2   Advantage organization's responsibility was to submit

3   the data as they received it from the provider.

4         Q.   Did the Medicare Advantage organization

5   have any responsibility at all to check the accuracy

6   of provider-submitted codes?

7         A.   That would not have been something within

8   my scope to define.

9         Q.   Is it your understanding that MAOs could

10  submit any and all codes that were given by providers

11  without any regard to the accuracy of the codes?

12        A.   It's my understanding that MAOs were

13  responsible to submit the codes that we received from

14  the providers.

15        Q.   Did MAOs have any obligation to ensure

16  that the codes provided by the providers were

17  accurate?

18        A.   Again --

19             MR. MERON:  Objection.  Asked and

20        answered.

21             THE WITNESS:  -- defining that obligation

22        was not something within my scope of

23        responsibility.

24  BY MR. LEE:

25        Q.   Right.  I'm not asking you to define it,



Page 29

1    but I'm asking you if you understood it to be an
2    obligation of MAOs.
3                MR. MERON:  Asked and answered.
4                THE WITNESS:  Have an opinion on that.  It
5         was not something that was within my scope of
6         responsibilities.
7    BY MR. LEE:
8         Q.   Did -- did United delete inaccurate codes
9    out of the goodness of its heart or because it felt
10   that it was an obligation owed to CMS?
11        A.   Again, the process for deleting codes
12   was -- other than -- if a provider came to us and
13   told us they submitted the data inaccurately, we
14   would delete the codes.  Other reasons for deleting
15   the codes were outside of my scope of responsibility.
16        Q.   Why did United delete inaccurate codes?
17        A.   If the provider told us they made a
18   submission error, we would delete those codes.
19        Q.   But why?  Because it was an obligation,
20   correct?
21                MR. MERON:  Objection.
22                THE WITNESS:  Again, I am not the one who
23        defined the obligations.  I can't answer that
24        question.
25



Page 144

1                 For claim verification --

2        Q.    And how -- I'm sorry.  Go ahead.

3        A.    So for -- and for claim verification --

4    say it was really a lot of the same input factors.

5    We would have received information from Optum on HCCs

6    that they were suggesting be deleted, information on

7    whether or not that was the only instance of that HCC

8    for the member.  Those -- those types of inputs would

9    have been provided to -- primarily Mark -- Mark

10   Beckmann was the actuary on my team that would have

11   calculated those analytics.

12       Q.    And how often would United obtain those

13   estimates?

14       A.    We refreshed our estimates at least, for

15   chart review, monthly.  I don't know how often the

16   claim verification estimates were refreshed.

17       Q.    Was it -- do you think it was monthly or

18   something less frequent than that?

19       A.    I just -- I don't -- I don't recall.

20       Q.    Was it every quarterly at least?

21       A.    I don't recall.

22             MR. LEE:  I'm still not seeing 196 up.  Is

23        anybody else seeing 196 up yet?

24             THE WITNESS:  No, it's not displayed.

25             MR. LEE:  Yeah, let's -- I think we may be



3711

Page 145

1          having some technical issues.  Let's take a

2          quick break and see if we can get this resolved.

3               Go off the record.

4               MR. MERON:  Okay.

5               VIDEOGRAPHER:  The time is 2:44.  We're

6          going off the record.

7               (A recess transpired from 2:44 p.m. until

8               2:47 p.m.)

9               VIDEOGRAPHER:  The time is 2:47 p.m.  We

10         are on the video report.

11    BY MR. LEE:

12         Q.   Okay.  Exhibit 196 is an e-mail chain from

13    you to Tim Trujillo, dated August 8, 2014.  Do you

14    have that up, Ms. Meyer?

15         A.   Yes, I do.

16         Q.   Okay.  Take a look at that.  I'm going to

17    ask you about this e-mail.

18               Have you had a chance to look at the

19    e-mail?

20         A.   I'm just about done.  I need another

21    minute.

22         Q.   Okay.

23         A.   Okay.

24         Q.   All right.  About the middle of the page,

25    it says, under "Chart Review," "The chart review



Page 146

1    program targets members' charts based on member and

2    provider information.  We plan to conduct chart

3    review for over half of M&R's membership during this

4    program year.  The selection of the charts is

5    dependent upon chart review selection criteria and is

6    not designed to ensure that a member's chart is

7    reviewed every year."  Did I read that correctly?

8         A.   Yes.

9         Q.   Is that an accurate description of the

10   chart review program?

11             MR. MERON:  Objection.  Lack of

12        foundation.

13             THE WITNESS:  To the best of my

14        recollection, that's accurate for the program.

15   BY MR. LEE:

16        Q.   And up at the top, you responded to

17   Mr. Trujillo, who wrote this, and said, "It looks

18   accurate to me; thanks," did you not?

19        A.   Yes, I did.

20        Q.   Okay.  And that was because you felt that

21   it was accurate at that time?

22        A.   I don't recall this memo, but that's

23   certainly how I responded.

24        Q.   Do you have any reason to believe that

25   it's inaccurate today?



Page 147

```
 1         A.   Today?  I -- since I'm no longer an

 2    employee, I couldn't comment on what the chart review

 3    program is today.

 4         Q.   No, not -- not what the program is today,

 5    but do you today have any reason to believe that that

 6    statement was inaccurate when it was written in 2014?

 7         A.   No.

 8         Q.   All right.  What's the -- what's meant by

 9    the selection criteria that's referenced in the

10    second sentence of that paragraph?  In other words,

11    what I'm asking, what is the chart review selection

12    criteria that's referenced there?

13         A.   Well, the member had to have a clinical

14    encounter during the calendar year in order to be

15    targeted for the chart program.

16         Q.   Okay.  Anything else involved in the

17    selection criteria for the chart review program?

18         A.   Not that I recall.

19         Q.   Are you familiar with the phrase "suspect

20    logic"?

21         A.   Yes.

22         Q.   What does that mean?

23         A.   Well, suspect logic is the first -- the

24    first thing in suspect logic is does the member have

25    a clinical encounter during that calendar year.  And
```



3714

Page 158

1                  THE WITNESS:  This is saying that $245

2         would be the incremental risk adjustment revenue

3         that we were forecasting to receive per chart.

4    BY MR. LEE:

5         Q.   How is that different from the average

6    yield per chart of $221?

7         A.   I -- I don't know.

8         Q.   Does that mean that for every chart that

9    United would review, it was estimating revenues of

10   $245?

11                 MR. MERON:  Objection.  Lack of

12        foundation.  Calls for speculation.

13                 THE WITNESS:  That's -- that's what this

14        is saying, yes, that we would expect $245 in a

15        yield per chart.

16   BY MR. LEE:

17        Q.   Okay.  For every chart on average that

18   United would review, United would generate revenues

19   of $245, correct?

20        A.   Yes.  That's what this is saying.

21        Q.   Do you know how the yield per chart was

22   calculated?

23        A.   Well, when a diagnosis or a HCC was

24   identified in the chart that was new and unique, it

25   had not been received from a claim, that HCC would be



Page 159

1    worth a certain risk adjustment value.  HCCs -- they

2    all have a different value, so this is just saying --

3    and not all charts found new HCCs, so this is

4    saying --

5         Q.   Let me direct your attention -- I'm sorry.

6         A.    -- take your total number of charts that

7    are reviewed and the total value of the HCCs that

8    you're finding on those charts to arrive at an

9    average value.

10        Q.   Okay.  Let me direct your attention to the

11   second page toward the bottom under the heading

12   "Deletes."  Let me know when you're on that page.

13        A.   Yes.

14        Q.   Under the fourth bullet point, it says,

15   "Action Item:  Provide MBM with proposed 2012 deletes

16   per review (done 12-4)."  Is MBM you?

17        A.   Yes, it is.

18        Q.   Okay.  Were you provided with the proposed

19   2012 CV deletes for review?

20        A.   I don't remember.

21        Q.   Was that customary for you to be provided

22   with deletes for review?

23             MR. MERON:  Objection.  Asked and

24        answered.

25             THE WITNESS:  Yes.  I think I testified



3716

Page 160

1          earlier that towards the end of 2013, Scott

2          Theisen, who was my boss, asked me to review the

3          proposed CV deletes.

4    BY MR. LEE:

5          Q.    And in accordance with that instruction

6    from Scott Theisen, you would review deletes and

7    instruct Optum to submit them after you reviewed

8    them?

9          A.    We reviewed the -- the CV deletes.  Yes.

10          Q.    And was that for the purpose of

11    instructing Optum to delete them when appropriate?

12          A.    We were asked to review the CV deletes

13    because we were receiving complaints from providers

14    that transactions were being deleted inappropriately.

15    We received those complaints through the RACCR

16    program specifically.

17              So when Scott asked me to start reviewing

18    and approving CV deletes, we were finding the same --

19    we were finding similar logic errors in Optum's

20    proposed deletes.  So I don't recall how many deletes

21    were approved for Optum to process.

22              MR. LEE:  Okay.  Let me ask my colleague

23          to put up Tab 14, which will be Exhibit 198.

24          (Exhibit 198 was marked for identification.)

25



Page 161

1    BY MR. LEE:

2         Q.   I'll ask you to take a look at that.  You

3    see 197, Ms. Meyer?

4         A.   Yes, I do.  Yes, I do.

5         Q.   198, I mean.  Do you have 198 up yet?

6         A.   Yes, I do.

7         Q.   Okay.  198 is an e-mail chain.

8              MR. LEE:  For the record it's

9         MAPL001453589.

10   BY MR. LEE:

11        Q.   It's series of e-mails.  Up at the top, it

12   says Kimberly Fadden, addressed to you, March 24,

13   2014.  The subject is "Chart Meeting."  Toward the

14   bottom of that first page, there's an e-mail from you

15   to Scott Theisen, dated March 24, 2014.  Do you see

16   the e-mail I'm referring to?

17        A.   Yes, I do.

18        Q.   The second paragraph there says, "We know

19   that we need 2013 DOS chart review to deliver same

20   revenue as we are estimating for 2012 DOS charts."

21   "DOS" refers to date of service?

22        A.   Yes, it does.

23        Q.   How did you know that you needed the 2013

24   DOS chart review to deliver the same revenues as

25   2012?



```
 1                          CERTIFICATE
 2
 3        I, KAREN K. KIDWELL, Registered Merit Reporter,
 4   and Certified Realtime Reporter, do hereby certify
 5   that prior to the commencement of the examination,
 6   the deponent was remotely sworn to testify to the
 7   truth, the whole truth under penalty of perjury.
 8        I DO FURTHER CERTIFY that the foregoing is a
 9   verbatim transcript of the testimony as taken
10   stenographically by me at the time, place and on the
11   date hereinbefore set forth, to the best of my
12   ability.
13        I DO FURTHER CERTIFY that I am neither a
14   relative nor employee nor attorney nor counsel of any
15   of the parties to this action, and that I am neither
16   a relative nor employee of such attorney or counsel,
17   and that I am not financially interested in this
18   action.
19
20
                         _____
                              Karen K. Kidwell
21                       Karen K. Kidwell
                         Registered Merit Reporter
22                       Certified Realtime Reporter
                         Notary Public
23
24
25
```



3719

**EXHIBIT D-148**

Case 2:16-cv-08697-FMO-PVC    Document 616-12    Filed 08/06/24    Page 135 of 301
UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners,..., 2023 WL 2241806...
Page ID #:22593

2023 WL 2241806 (U.S.) (Appellate Brief)
Supreme Court of the United States.

UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners,

v.

SUPERVALU INC., et al.;

United States, ex rel. Thomas Proctor, Petitioner,

v.

Safeway, Inc.

Nos. 21-1326, 22-111.
February 24, 2023.

On Writs of Certiorari to the United States Court of Appeals for the Seventh Circuit

**Brief for the United States as amicus curiae supporting petitioners**

Elizabeth B. Prelogar, Solicitor General Counsel of Record, Brian M. Boynton, Principal Deputy Assistant Attorney General, Malcolm L. Stewart, Deputy Solicitor General, Benjamin W. Snyder, Assistant to the Solicitor General, Michael S. Raab, Charles W. Scarborough, Joshua Dos Santos, Attorneys, Department of Justice, Washington, D.C. 20530-0001, SupremeCtBriefs @usdoj.gov, (202) 514-2217.

**\*i  QUESTION PRESENTED**

The False Claims Act (FCA), 31 U.S.C. 3729 *et seq.*, imposes civil liability on persons who "knowingly" submit false claims for payment to government programs or "knowingly" make false statements in support of such claims. 31 U.S.C. 3729(a)(1)(A) and (B). The FCA defines "knowingly" to mean that a person (i) has "actual knowledge" of the falsity of information in the claim or statement; (ii) "acts in deliberate ignorance of the truth or falsity of" such information; or (iii) "acts in reckless disregard of the truth or falsity of" such information. 31 U.S.C. 3729(b)(1)(A). The question presented is as follows:

Whether a person who submitted a claim or statement that falsely asserted compliance with applicable legal requirements, and who subjectively believed or had strong reason to believe that the claim or statement was false, can establish that he did not act "knowingly" by showing during the FCA litigation that the claim or statement was consistent with an incorrect but objectively reasonable interpretation of those legal requirements.

[Note: Page ii missing in original document]

**\*iii  TABLE OF CONTENTS**

Interest of the United States ................................................................................................... 1
Statement:
A. Legal background .............................................................................................................. 2
B. Facts and procedural history ............................................................................................. 4
Summary of argument ............................................................................................................ 12
Argument:
The Seventh Circuit adopted an overly demanding standard for proving scienter under the FCA ................ 15

Case 2:16-cv-08697-FMO-PVC    Document 616-12    Filed 08/06/24    Page 136 of 301
Page ID #:22594
UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners,..., 2022 WL 2241806...

A. The FCA's text, history, and common-law background demonstrate that scienter under the Act turns on the defendant's state of mind at the time of its false claims or statements ........................................................... 16

B. The court of appeals erred in treating respondents' post hoc rationales for their conduct as negating scienter under the FCA ........................................................... 21

1. This Court's decision in *Safeco* provides no sound basis for the court of appeals' construction of the FCA's scienter requirement ........................................................... 22

2. Additional arguments advanced by the court of appeals and respondents do not support adoption of an "objective reasonableness" standard here ........................................................... 28

C. The court of appeals erred in treating contractual language and warnings from non-governmental actors as irrelevant to the scienter analysis ........................................................... 32

D. Petitioners' evidence demonstrates material disputes of fact regarding knowledge ................................... 34

Conclusion ........................................................... 35

Appendix - Statutory provision ........................................................... 1a

*iv  **TABLE OF AUTHORITIES**

Cases:

*Farmer v. Brennan*, 511 U.S. 825 (1994) ........................ 18, 23

*Global-Tech Appliances, Inc. v. SEB S. A.*, 563 U.S. 754 (2011) ........................................................... 17

*Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201 (9th Cir. 2019) ........................................................... 18

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93 (2016) ........................................................... 14, 19, 26-30

*Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51 (1984) ........................................ 13, 25, 31

*Intel Corp. Investment Policy Committee v. Sulyma*, 140 S. Ct. 768 (2020) ........................................................... 17

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L. P., A.*, 559 U.S. 573 (2010) ........................................ 16, 23

*Rock Island, Arkansas & Louisiana Railroad Co. v. United States*, 254 U.S. 141 (1920) ................................. 32

*Safeco Insurance Co. v. Burr*, 551 U.S. 47 (2007) ........... 10, 14, 22-25, 33

*United States v. Aerodex, Inc.*, 469 F.2d 1003 (5th Cir. 1972) ........................................................... 16

*United States v. Ricard*, 922 F.3d 639 (5th Cir. 2019) ...... 17

*United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148 (11th Cir. 2017) .......................................... 18

*United States ex rel. Polukoff* v. *St. Mark's Hospital*, 895 F.3d 730 (10th Cir. 2018), cert. dismissed, 138 S. Ct. 2690 (2019) ........................................................... 18

*Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016) .......................................... 20, 21

Statutes and regulations:

Dictionary Act, 1 U.S.C. 1 ........................................ 19

*v  Fair Credit Reporting Act, 15 U.S.C. 1681 *et seq.* .... 22

15 U.S.C. 1681m(a) ................................................ 22

15 U.S.C. 1681n(a) ................................................ 10, 14, 22, 24

False Claims Act, 31 U.S.C. 3729 *et seq.* ........................ 1

31 U.S.C. 3729(1) (1982 & Supp. III 1985) ................... 16

Case 2:16-cv-08697-FMO-PVC    Document 616-12    Filed 08/06/24    Page 137 of 301
UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners,..., 2022 WL 2241806...
Page ID #:22595

31 U.S.C. 3729(a)(1)(A) ......................................... 2, 15, 19, 20, 35, la

31 U.S.C. 3729(a)(1)(B) ......................................... 2, 15, 19, 35, la

31 U.S.C. 3729(a)(1)(G) ......................................... 19, la

31 U.S.C. 3729(b)(1)(A) ......................................... 2, 13, 16, 17, 20, 2a

31 U.S.C. 3729(b)(1)(A)(i) ...................................... 17, 19, 24, 2a

31 U.S.C. 3729(b)(1)(A)(i)-(iii) ............................... 19, 2a

31 U.S.C. 3729(b)(1)(A)(ii) ..................................... 17, 24, 2a

31 U.S.C. 3729(b)(1)(A)(iii) .................................... 17, 29, 2a

31 U.S.C. 3729(b)(1)(B) ......................................... 17, 2a

31 U.S.C. 3729(b)(2)(A)(i) ...................................... 2

31 U.S.C. 3729(b)(2)(A)(ii) ..................................... 2, 33

31 U.S.C. 3729(b)(4) ............................................ 15

31 U.S.C. 3730(a) ............................................... 2

31 U.S.C. 3730(b) ............................................... 2

31 U.S.C. 3730(b)(2) ............................................ 2

31 U.S.C. 3730(b)(3) ............................................ 2

31 U.S.C. 3730(b)(4)(B) ......................................... 2

31 U.S.C. 3730(d) ............................................... 2

False Claims Amendments Act of 1986, Pub. L. No. 99-562, 100 Stat. 3153:
§ 2(7), 100 Stat. 3153-3154 .................................... 17
§ 2(7), 100 Stat. 3154 ......................................... 17

Medicaid Act, 42 U.S.C. 1396 et seq ............................ 2

42 U.S.C. 1396d(a)(12) .......................................... 2

Medicare Act, 42 U.S.C. 1395 et seq ............................ 3

Pt. D, 42 U.S.C. 1395w-101 et seq. ............................. 2, 3, 5, 6, 9, 15

*vi 42 U.S.C. 1395w-111(i) ..................................... 4

42 C.F.R.:
Pt. 423:
Section 423.30 .................................................. 3
Section 423.32 .................................................. 3
Section 423.100 ................................................. 4
Section 423.315 ................................................. 3
Section 423.329 ................................................. 3
Section 423.343 ................................................. 3
Pt. 447:
Section. 447.512(b)(2) .......................................... 3

Miscellaneous:
Black's Law Dictionary:
(5th ed. 1979) ................................................. 17
(11th ed. 2019) ................................................ 29

Medicaid.gov, Centers for Medicare & Medicaid
Services, Medicaid Covered Outpatient Prescription
Drug Reimbursement Information by State, Quarter
Ending September 2022 (last updated Nov.
16, 2022), https://www.medicaid.gov/medicaid/prescription-
drugs/state-prescription-drug-resources/medicaid-covered-

outpatient-prescription-drug-reimbursementinformation-
state/index.html ...................................................................
Restatement (Second) of Torts:
(1965) ..................................................................................... 25, 27
(1977) ..................................................................................... 20, 21
Antonin Scalia & Bryan A. Garner, *Reading Law: The* 21
*Interpretation of Legal Texts* (2012) ......................................
1 Joseph Story, *Commentaries on Equity Jurisprudence* (6th 21
ed. 1853) ..............................................................................

## **\*1 INTEREST OF THE UNITED STATES**

These cases present important questions concerning the scienter requirements of the False Claims Act (FCA or Act), 31 U.S.C. 3729 *et seq.* The FCA is the primary tool by which the federal government combats fraud in federal contracts and programs. The United States therefore has a substantial interest in proper **\*2** interpretation of the Act. At the Court's invitation, the United States filed a brief at the petition stage in No. 21-1326.

## **STATEMENT**

### **A. Legal Background**

1. The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment" to a government spending program (whether directly to a federal official or through a third-party contractor or grantee), or who "knowingly makes, uses, or causes to be made or used" a "false * * * statement" material to such a claim. 31 U.S.C. 3729(a)(1)(A) and (B); see 31 U.S.C. 3729(b)(2)(A)(i) and (ii). The Act defines "knowingly" to "mean that a person, with respect to information," (i) "has actual knowledge of the information"; (ii) "acts in deliberate ignorance of the truth or falsity of the information"; or (iii) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. 3729(b)(1)(A).

Either the Attorney General or a private party (known as a relator) may sue under the FCA. 31 U.S.C. 3730(a) and (b). When a relator files a "qui tam" suit, the government may "elect to intervene." 31 U.S.C. 3730(b)(2) and (3). If the government declines to intervene, the relator may proceed with the litigation and share in any judgment. 31 U.S.C. 3730(b)(4)(B) and (d).

2. These cases concern claims for payment submitted to government healthcare programs including Medicaid and Medicare Part D.

a. The Medicaid Act, 42 U.S.C. 1396 *et seq.*, establishes a cooperative federal-state program that provides medical assistance to certain low-income individuals. States may offer outpatient prescription-drug coverage as part of their Medicaid plans. **\*3** 42 U.S.C. 1396d(a)(12). Regulations promulgated by the Centers for Medicare and Medicaid Services (CMS) limit reimbursement for many drugs to the lower of (1) a pharmacy's "usual and customary charges to the general public" or (2) the drug's actual acquisition cost plus a reasonable dispensing fee. 42 C.F.R. 447.512(b)(2).

Consistent with those federal regulations, state Medicaid agencies typically calculate reimbursement amounts to be paid to pharmacies as the lesser of various payment amounts, one of which is often the pharmacy's "usual and customary charge" to the general public. See Medicaid.gov, CMS, *Medicaid Covered Outpatient Prescription Drug Reimbursement Information by State, Quarter Ending September 2022* (last updated Nov. 16, 2022), https://www.medicaid.gov/medicaid/prescription-drugs/state-

Case 2:16-cv-08697-FMO-PVC    Document 616-12    Filed 08/06/24    Page 139 of 301
Page ID #:22597

UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners,..., 2023 WL 2241806...

prescription-drugresources/medicaid-covered-outpatient-prescription-drugreimbursement-information-state/index.html. State Medicaid agencies may issue program guidance to further define "usual and customary charges." See 11-cv-3290 D. Ct. Doc. 172-1, at 12 (May 21, 2018).

b. The Medicare Act, 42 U.S.C. 1395 *et seq.*, provides federally funded health-insurance coverage to individuals who are age 65 or older or are disabled. Through Medicare Part D, 42 U.S.C. 1395w-101 *et seq.*, beneficiaries can obtain prescription-drug coverage through private plan sponsors. See 42 C.F.R. 423.30, 423.32. CMS makes ongoing payments to a plan sponsor and at the end of the year reconciles those payments with the sponsor's actual costs to determine whether the sponsor is owed additional funds or instead must return excess payments. See 42 C.F.R. 423.315, 423.329, 423.343.

Part D beneficiaries typically obtain prescription drugs from retail or mail-order pharmacies, which then **\*4** seek reimbursement from the plan sponsors (or from intermediary organizations known as pharmacy benefit managers). Plan sponsors and pharmacies negotiate the price to be paid for each drug. See 42 U.S.C. 1395w-111(i); 42 C.F.R. 423.100. Plan sponsors often contract to pay the lesser of a negotiated price or the amount that the pharmacy reports as its "usual and customary" price for cash (*i.e.*, non-insurance) sales to the general public, with that term sometimes further defined in the contract. See 21-1326 Pet. App. 8a; 22-111 Pet. App. 4a, 10a-lla.

### B. Facts And Procedural History

In these consolidated cases, petitioners filed FCA qui tam suits against respondents, which operate hundreds of retail drug pharmacies nationwide. Petitioners alleged that respondents had submitted to government healthcare programs claims that knowingly overstated respondents' "usual and customary" prices, leading to reimbursements substantially greater than what respondents were lawfully entitled to receive. The cases were assigned to the same district court, which granted summary judgment to respondents in separate decisions. 21-1326 Pet. App. 59a-87a; 22-111 Pet. App. 42a-105a. The court of appeals affirmed both judgments. 21-1326 Pet. App. 1a-58a; 22-111 Pet. App. 1a-41a.

1. Petitioners' allegations pertain to pricing programs that respondents adopted to compete with steep discounts announced in 2006 by other pharmacies such as Walmart, which began offering 30-day supplies of many drugs for just $4. 21-1326 Pet. App. 6a-7a; 22-111 Pet. App. 5a. Respondents in No. 21-1326 (collectively, SuperValu) adopted a price-match program in which SuperValu's pharmacies would match a competitor's lower price at a customer's request, and would then **\*5** automatically apply that price to future refills. 21-1326 Pet. App. 7a. Respondent in No. 22-111 (Safeway) adopted a similar price-match program, and also adopted a "membership" discount program that operated during most of the same period. 22-111 Pet. App. 5a-7a. Under Safeway's membership program, customers could receive steeply discounted generic drug prices (typically $4 for a 30-day supply) by filling out a form with basic information (*e.g.*, name, address, date of birth) that petitioner asserts Safeway usually already had. *Id.* at 6a-7a.

Respondents' discount programs were sufficiently popular that the discounted prices comprised a majority of non-insurance sales for many drugs during the period when respondents offered the discounts. In 2012, a majority of SuperValu's cash sales for 44 of its 50 topselling drugs were made at discounted price-matched prices. 21-1326 Pet. App. 8a & n.3, 35a (Hamilton, J., dissenting). For 30 of those drugs, more than 80% of cash sales were at the lower price-matched prices. *Id.* at 35a. Discounted prices accounted for 75%-88% of cash sales for Safeway's top 20 drugs during the last five years of the program, and 56%-66% of all such sales. 22-111 Pet. App. 35a (Hamilton, J., dissenting). The discounts were substantial, with customers sometimes paying six to 16 times less than respondents' retail prices. 21-1326 Pet. App. 35a; 22-111 Pet. App. 39a.

Despite the widespread use of respondents' discount programs, respondents disregarded sales under those programs when reporting their "usual and customary" cash prices to state Medicaid agencies, Medicare Part D sponsors, and other third-party payors. Respondents instead reported only their higher retail prices, even for drugs for which a majority of sales occurred at

**\*6** substantially discounted prices. 21-1326 Pet. App. 35a (Hamilton, J., dissenting); 22-111 Pet. App. 38a-39a (Hamilton, J., dissenting). Between 2008 and 2012, for example, Safeway charged just $10 in 94% of its cash sales for a 90-day supply of lovastatin, a "high-volume drug" used to reduce cholesterol. 22-111 Pet. App. 38a-39a. But rather than reporting $10 as its "usual and customary" price for a 90-day supply of lovastatin, Safeway instead reported prices ranging from $81.42 to $108.99 during that period. *Id.* at 39a (citation omitted).

2. Discovery in both cases revealed evidence that respondents hid their discounted prices from third-party payors (including Medicaid programs and Medicare Part D sponsors) despite respondents' awareness that they were expected to report their discounted prices as their "usual and customary" prices.

a. Petitioner in No. 22-111 identified multiple instances in which third-party payors, including Medicare Part D sponsors and state Medicaid agencies, told Safeway that its "usual and customary" price reporting was required to reflect its discounted prices. In 2006, Safeway received a reminder from Medco Health Solutions, a pharmacy benefit manager working with many Medicare Part D plans, stating that "by contract," the "usual and customary" price is "the lowest net price a cash patient would have paid on the day that the prescription was dispensed inclusive of all applicable discounts. These discounts include ... a competitor's matched price, or other discounts offered to customers." 22-111 Pet. App. 10a-11a (brackets omitted). [1] Notices from **\*7** other pharmacy benefit managers in January and February 2007 conveyed similar messages. *Id.* at 11a; see *id.* at 69a (quoting notice from pharmacy benefit manager stating that "usual and customary" prices included "Promotional Pricing program[s]" such as "membership[s]"); see also *id.* at 32a-33a (Hamilton, J., dissenting), 50a-51a, 72a, 82a. Forwarding one such notice, a Safeway director wrote: "Another Example of how plans are reacting, ie, any modified price needs to be offered to the 3rd party if meets U&C definition. Received a similar [notice] from Medco." *Id.* at 33a (Hamilton, J., dissenting).

Several state Medicaid agencies communicated the same message. In 2008, one Safeway pharmacy manager told corporate headquarters that Nebraska's Medicaid program had informed him that "by matching a price, it becomes our usual & customary." 22-111 Pet. App. 33a (Hamilton, J., dissenting) (citation omitted); see *id.* at 52a, 57a (describing similar instructions from other state Medicaid agencies). A few days later, a Safeway executive e-mailed a senior vice president to advise that "[w]e may have some issues with U&C and state medicaids with price matching." *Id.* at 33a (Hamilton, J., dissenting) (citation omitted). That executive explained that "if you [match a] price offer, that becomes your usual and customary for that day and that pricing needs to be extended to medicaid"-something he acknowledged Safeway was not doing. *Ibid.* (citation omitted; brackets in original).

The evidence suggests that Safeway sought to conceal its discount practices from third-party payors rather than change its price reporting. The executive who **\*8** expressed concern about "issues with U&C and state medicaids," for example, indicated that Safeway "need[ed] to keep a low profile" with its discounts, because "[i]f we advertise this price match-it is going to Alert the medicaid programs to start looking." 22-111 Pet. App. 33a-34a (Hamilton, J., dissenting) (citations and emphasis omitted). Another executive responded to the information about the Nebraska Medicaid program's understanding of "usual and customary price" by asking "how the state of Nebraska will know that we offered to match any price out there." *Id.* at 33a (citation and emphasis omitted). And consistent with a desire to maintain "'stealth'" around its discount pricing, *id.* at 29a (citation omitted), Safeway instructed employees not to "'put any of this in writing'" and not to admit to price-matching "if an unidentified customer calls in," so that Safeway could "avoid trouble with the media or competitors." *Id.* at 31a (citation and emphases omitted).

A final example captures Safeway's apparent thinking. In 2009, a Safeway executive inquired about the reason for adopting a membership program rather than simply offering a $4 price, noting that "it seems like * * * this whole thing revolves @ the insurance angle to get the $10 per item from them vs the $4 cash price." 22-111 Pet. App. 36a (Hamilton, J., dissenting) (citation omitted). A director responded that "[o]ff the record that is exactly the angle," "getting the maximum we can from the insurance." *Ibid.* (citation and emphasis omitted).

b. Petitioners in No. 21-1326 presented similar evidence about SuperValu. SuperValu received the same 2006 notice from Medco about SuperValu's contractual obligation to report "all applicable discounts," including **\*9** a "competitor's matched price."

Case 2:16-cv-08697-FMO-PVC    Document 616-12    Filed 08/06/24    Page 141 of 301
Page ID #:22599

UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners,..., 2022 WL 2241806...

21-1326 Pet. App. 66a. A SuperValu executive forwarded the notice and stated: "Note the comment about price matching. Theoretically, they could audit." 11-cv-3290 D. Ct. Doc. 169, at 9-10 (May 21, 2018) (citation omitted).

Later, when a different pharmacy benefit manager asked about SuperValu's price-match practices, one of SuperValu's managers stated that she was "concerned about any response where we acknowledge doing it." 11-cv-3290 D. Ct. Doc. 327, at 7 (Dec. 10, 2019) (citation omitted). An executive replied that "[w]e should not respond unless we know what they are going to do with this information," and directed the manager to "[m]ake sure [one of SuperValu's attorneys] can defend our price match policy as not being our U and C if they are pressing for a response." *Ibid.* (citation omitted). And in another exchange, SuperValu executives weighed the risks of running advertisements for its price-match program, noting that "damage control" would be necessary if pharmacy benefit managers saw the ads but determining that it was "[u]nlikely anyone [at a third-party payor] will really see" them. 11-cv-3290 D. Ct. Doc. 191-1, at 39 (June 11, 2018) (citation omitted).

3. The district court granted summary judgment to respondents in both cases.

a. In an initial decision, the district court found that SuperValu's price-matched "prices * * * are the usual and customary prices for their drugs," and therefore should have been reported with SuperValu's claims for payment from Medicare Part D and Medicaid. 2019 WL 3558483, at *8. But in a subsequent ruling, the court held that SuperValu was still entitled to summary judgment on the ground that it had not acted "knowingly." 21-1326 Pet. App. 59a-87a. Relying on this Court's **\*10** decision in *Safeco Insurance Co. v. Burr,* 551 U.S. 47 (2007), which had interpreted the term "willfully" in the Fair Credit Reporting Act, 15 U.S.C. 1681n(a), the district court construed the FCA to require a showing that SuperValu's submissions were inconsistent with any "objectively reasonable" interpretation of "usual and customary" price. 21-1326 Pet. App. 75a. Because petitioners could not meet that standard, the court held that SuperValu was entitled to summary judgment "regardless of [SuperValu's] subjective beliefs" about the accuracy of its submissions. *Id.* at 83a.

b. The district court applied the same analysis in granting summary judgment to Safeway. 22-111 Pet. App. 42a-105a. The court concluded that, "if a defendant adopts one of multiple reasonable interpretations, its 'subjective intent' is legally irrelevant." *Id.* at 81a (quoting *Safeco,* 551 U.S. at 71 n.20). Despite the evidence of Safeway's subjective understanding that it should report its discounted prices, the court held that "Safeway is entitled to summary judgment under *Safeco." Id.* at 103a.

4. The court of appeals affirmed in separate divided decisions.

a. The court of appeals decided SuperValu's case first. 21-1326 Pet. App. la-58a. The court held that *Safeco* controlled the interpretation of the FCA term "knowingly." *Id.* at 11a-20a. On that understanding, the court held that an FCA "defendant who acted under an incorrect interpretation" of governing legal requirements will avoid liability "if (1) the interpretation was objectively reasonable and (2) no authoritative guidance cautioned defendants against it." *Id.* at 12a.

The court of appeals explained that, under its reading of *Safeco,* "a defendant's subjective intent does not **\*11** matter." 21-1326 Pet. App. 27a. The court stated that "it is not enough that a defendant suspect or believe that its claim was false" because the standard is "objective" and turns on whether the defendant *"know[s]"* that its claims are false. *Id.* at 26a-27a. The court found it "irrelevant" to that inquiry whether the defendant had actually "held [an objectively reasonable exculpatory interpretation] at the time that it submitted its false claim" or instead was "concocting 'post-hoc arguments.'" *Id.* at 26a.

Applying its two-step analysis, the court of appeals affirmed the grant of summary judgment. 21-1326 Pet. App. 22a-31a. It first held that SuperValu's conduct was consistent with an objectively reasonable understanding of "usual and customary" price because no statute or regulation squarely foreclosed SuperValu's approach. *Id.* at 22a-26a. It then determined that no authoritative guidance had warned SuperValu away from that understanding. *Id.* at 27a-31a. The court held that, for these purposes, only "circuit court precedent or guidance from the relevant agency" can qualify as "authoritative guidance," so that the contractual guidance provided by pharmacy benefit managers was "automatically exclude[d]." *Id.* at 28a.

Judge Hamilton dissented. 21-1326 Pet. App. 31a-58a. In his view, the majority's reliance on *Safeco* ignored the FCA's text, history, and common-law background, which he viewed as indicating that "subjective bad faith" can establish the necessary scienter. *Id.* at 42a. Judge Hamilton concluded that the district court's grant of summary judgment should be reversed because the evidence would allow "[a] reasonable jury [to] find that SuperValu either actually knew or deliberately **\*12** chose to keep itself in ignorance that it was submitting false, hugely inflated claims." *Id.* at 37a-38a.

b. The court of appeals subsequently affirmed the district court's grant of summary judgment to Safeway "[f]or the same reasons" it had identified in SuperValu's case. 22-111 Pet. App. 17a; see *id.* at 1a-41a. The court recognized that "Safeway effectively used its [membership program] as a fig leaf to disguise a Wal-Mart-style generics program without reporting those prices as U&C." *Id.* at 17a. It concluded, however, that no authoritative guidance had rendered that practice "objectively unreasonable at the time." *Id.* at 18a. The court held that the notices from pharmacy benefit managers, as well as definitions in specific contracts, were "irrelevant" to the scienter analysis "because they did not come from the agency." *Ibid.* And because Safeway's actions were consistent with an objectively reasonable understanding of "usual and customary" price, the court refused to consider "evidence of the defendant's subjective awareness that its interpretation might be wrong." *Id.* at 14a-15a (citation omitted).

Judge Hamilton again dissented. 22-111 Pet. App. 25a-41a. In his view, the court of appeals' analysis erroneously disregarded "egregious" facts demonstrating "Safeway's fraudulent intent at the time it was submitting false claims to the government." *Id.* at 26a, 28a (Hamilton, J., dissenting).

## SUMMARY OF ARGUMENT

A. The FCA includes a three-pronged definition of "knowingly," which covers a person who (i) has "actual knowledge" of the falsity of information in a claim or statement that the person submits to a government program; (ii) "acts in deliberate ignorance of the truth or falsity of" such information; or (iii) "acts in reckless **\*13** disregard of the truth or falsity of" such information. 31 U.S.C. 3729(b)(1)(A). The ordinary meaning of those words, along with their statutory context and the historical background of common-law fraud, makes clear that the FCA's scienter standard encompasses circumstances in which persons subjectively believe they are submitting false claims or statements to the government; are subjectively aware of a substantial risk that their claims or statements are false but deliberately avoid taking readily available steps to obtain clarification; or act in reckless disregard of known or objectively obvious facts indicating a high likelihood of falsity.

The court of appeals erred in adopting a narrower scienter standard, under which a defendant's subjective bad faith at the time the defendant acted becomes irrelevant if the defendant (or the defendant's lawyers) can later identify an exculpatory theory that is wrong but objectively reasonable. That approach disregards Congress's three-pronged statutory definition, which focuses on a defendant's subjective state of mind when submitting the false claims or statement. See 31 U.S.C. 3729(b)(1)(A) (referring to "actual knowledge" and "deliberate ignorance"). It likewise ignores common-law principles of fraudulent misrepresentation that Congress drew on in enacting the FCA, which focus on a defendant's subjective bad faith. And it would allow defendants who *intentionally* submit false claims for payment to the government to escape FCA liability based on concededly incorrect post hoc justifications, flouting the principle that "those who seek public funds" must "act with scrupulous regard for the requirements of law." *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 63 (1984).

**\*14** B. This Court's decision in *Safeco Insurance Co. v. Burr*, 551 U.S. 47 (2007), does not support the court of appeals' result. *Safeco* involved a provision of the Fair Credit Reporting Act that imposed penalties for "willfully" violating that statute's requirements. 15 U.S.C. 1681n(a). In interpreting the "willfully" requirement to there establish an objective-reasonableness defense, *ibid.*, the Court did not address a three-pronged statutory definition, like the one in the FCA, that expressly focuses on a defendant's subjective state of mind. Moreover, the Court relied on common-law standards relating to physical safety, not

Case 2:16-cv-08697-FMO-PVC    Document 616-12    Filed 08/06/24    Page 143 of 301
Page ID #:22601

UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners,..., 2022 WL 2418086...

the common law of fraud that is relevant here. And *Safeco* concerned a general regulatory requirement, rather than conditions specifically imposed on those who choose to do business with the government. Just as this Court has declined to extend *Safeco* to the patent context, see ⚑ *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93 (2016), so too should the Court decline to extend it here to protect those who intentionally submit false claims for payment to the government.

The other arguments put forward by the court of appeals or respondents likewise lack merit. The fact that a defendant who believes she is submitting false claims might not be *certain* about the claims' falsity does not absolve her of culpability under the FCA's statutory standard. Similarly, defendants who intend to submit false claims, or who deliberately avoid inquiries that would confirm whether their claims are false, cannot complain about a lack of fair notice.

C. The court of appeals further erred in holding that only circuit-court precedents or guidance from the relevant agency is sufficiently authoritative to give notice of a claim's falsity. That standard, which the court **\*15** purported to derive from *Safeco*, would be particularly inappropriate under the FCA. The FCA applies to claims submitted under contracts with non-federal intermediaries who help to administer federal spending programs like Medicare Part D and Medicaid. No sound basis exists for allowing participants in those programs to disregard guidance from, or contracts with, the very entities that Congress has designated to administer their claims.

D. Under the appropriate scienter standard, respondents are not entitled to summary judgment in either case. The evidence petitioners presented would allow a reasonable factfinder to conclude that respondents "knowingly" submitted false claims or statements to government healthcare programs. ⚑ 31 U.S.C. 3729(a)(1)(A) and (B). The Court therefore should reverse the court of appeals' judgments and remand for further proceedings.

### ARGUMENT

### THE SEVENTH CIRCUIT ADOPTED AN OVERLY DEMANDING STANDARD FOR PROVING SCIENTER UNDER THE FCA

The FCA imposes liability on those who "knowingly" present false claims for payment to government programs, or who "knowingly" submit false statements in support of such claims. ⚑ 31 U.S.C. 3729(a)(1)(A) and (B); see ⚑ 31 U.S.C. 3729(b)(4). Under the Act's definition, construed in light of common-law background principles, that standard is satisfied when a person (1) is subjectively aware that a claim or statement is false; (2) subjectively recognizes a substantial risk that the claim or statement is false but deliberately avoids taking readily available steps to obtain clarification; or (3) acts with reckless disregard of known or objectively obvious **\*16** facts indicating a high likelihood that the claim or statement is false. See ⚑ 31 U.S.C. 3729(b)(1)(A).

The court of appeals adopted a substantially narrower view of the Act's scienter requirement, under which a person who submits false claims or statements can categorically escape liability by identifying a post hoc rationale for its prior representations that, while legally wrong, is "objectively reasonable." *E.g.*, 21-1326 Pet. App. 22a. That standard, which respondents liken to "qualified immunity" for FCA defendants, 21-1326 Resp. Supp. Br. 4, is untethered to the statute's text, context, or history. Under the proper standard, the relators in both cases here presented sufficient evidence that respondents knowingly submitted false claims and statements. The court of appeals' judgments should be reversed.

### A. The FCA's Text, History, And Common-Law Background Demonstrate That Scienter Under The Act Turns On The Defendant's State Of Mind At The Time Of Its False Claims Or Statements

Case 2:16-cv-08697-FMO-PVC    Document 616-12    Filed 08/06/24    Page 144 of 301
Page ID #:22602

UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners,..., 2022 WL 2241806...

1. This Court has "taken [care] to construe" words like "'knowing,' 'intentional,' or 'willful' * * * in their particular statutory context." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L. P. A.*, 559 U.S. 573, 585 (2010). Until 1986, the FCA imposed liability for "knowingly" presenting "a false or fraudulent claim for payment or approval," without defining the term "knowingly." 31 U.S.C. 3729(1) (1982 & Supp. III 1985). Some courts interpreted that provision to require proof of a specific "purpose on the part of [the defendant] to cheat the Government." *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (5th Cir. 1972) (citation omitted; brackets in original). As part of wide-ranging FCA amendments, Congress rejected that interpretation as **\*17** unduly narrow. See False Claims Amendments Act of 1986 (1986 Amendments), Pub. L. No. 99-562, § 2(7), 100 Stat. 3153-3154. The 1986 Amendments stated that "no proof of specific intent to defraud is required," and added a new three-pronged definition of "knowingly." § 2(7), 100 Stat. 3154; see 31 U.S.C. 3729(b)(1)(B). Under that definition, a person acts "knowingly" if she (i) has "actual knowledge" of the falsity of information in a claim or statement the person submits to the government or a designated intermediary; (ii) "acts in deliberate ignorance of the truth or falsity of" such information; or (iii) "acts in reckless disregard of the truth or falsity of" such information. 31 U.S.C. 3729(b)(1)(A).

The first two terms within that statutory definition cover distinct species of subjective bad faith. The first, "actual knowledge," 31 U.S.C. 3729(b)(1)(A)(i), refers to a "state of mind that one considers that he knows." *Black's Law Dictionary* 784 (5th ed. 1979) (defining "knowledge"). That generally means that the defendant was subjectively "aware of" a violation. *Intel Corp. Investment Policy Committee v. Sulyma*, 140 S. Ct. 768, 776 (2020). The second, "deliberate ignorance," 31 U.S.C. 3729(b)(1)(A)(ii), covers a defendant who is "subjective[ly] aware[]" of a substantial risk that his statement may be false, and intentionally avoids taking steps to confirm the statement's truth or falsity. *United States v. Ricard*, 922 F.3d 639, 656 (5th Cir. 2019); see *Global-Tech Appliances, Inc. v. SEB S. A.*, 563 U.S. 754, 769 (2011) (same definition for "willful blindness"); *Black's Law Dictionary* 672 (5th ed. 1979) ("Voluntary ignorance exists when a party might, by taking reasonable efforts, have acquired the necessary knowledge.") (emphasis omitted). The third term, "reckless disregard," 31 U.S.C. 3729(b)(1)(A)(iii), **\*18** describes circumstances in which a defendant disregards a "high risk" of falsity "that is either known or so obvious that it should be known," *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Unlike the first two clauses, the third clause does not require proof of the defendant's subjective awareness, but can be satisfied through evidence that the risk of falsity was objectively apparent.

By covering all three states of mind, Congress cast a net broad enough to reach those who act in subjective bad faith with respect to claims that implicate ambiguous legal conditions, as well as those who act with a grossly substandard degree of care. If a defendant believes (correctly) that it is violating a legal requirement that makes its claims false and ineligible for payment, the defendant acts with "actual knowledge" if it submits the false claims-even if its lawyers later identify an objectively reasonable (but incorrect) exculpatory interpretation. See *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154-1156 (11th Cir. 2017) (considering evidence of defendant's belief in illegality). If a defendant is subjectively aware of a substantial risk that its submissions are false, but chooses not to make readily available inquiries that could clarify their accuracy, that defendant acts with "deliberate ignorance" even if the underlying law is ambiguous. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1212 (9th Cir. 2019). And if a defendant disregards warnings about likely falsity from knowledgeable sources such as attorneys, internal compliance officers, or government contractors, or fails to consult objectively obvious sources that would have provided such warnings, that defendant acts with "reckless disregard" of the truthfulness of its claims. See **\*19** *United States ex rel. Polukoff* v. *St. Mark's Hospital*, 895 F.3d 730, 744 (10th Cir. 2018), cert. dismissed, 138 S. Ct. 2690 (2019).

2. Each of the three prongs of the FCA's definition of "knowingly" addresses the "culpability" of the person's state of mind "at the time of the challenged conduct." *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93, 105 (2016). Each prong uses the present tense, with the first prong looking to what knowledge the person "has," while the second and third

Case 2:16-cv-08697-FMO-PVC    Document 616-12    Filed 08/06/24    Page 145 of 301
Page ID #:22603

UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners,..., 2022 WL 2241806....

look to whether the person "acts in" the specified mental states. 31 U.S.C. 3729(b)(1)(A)(i)-(iii). Within the Act's operative prohibitions, the adverb "knowingly" modifies such verbs as "presents," "makes," and "uses." 31 U.S.C. 3729(a)(1)(A) and (B). That phrasing makes clear that the state of mind that matters is the person's state of mind when she "presents," "makes," or "uses" the false claim or statement. The ability of that person (or her lawyer) to identify wrong-but-reasonable exculpatory theories or interpretations after those events occur cannot retroactively alter the state of mind with which the person engaged in the specified conduct. [2]

The Act's focus on the defendant's state of mind at the time of the challenged conduct is essential to protect potential defendants from unwarranted FCA liability. After a person submits claims for payment that it reasonably believes are legitimate, new agency guidance or **\*20** intervening judicial decisions may make clear that the claims rested on an incorrect view of the law. New information likewise may make clear that previously submitted claims rested on factual misunderstandings. If the defendant's knowledge at the time of the FCA litigation were decisive, the government or qui tam relators could seek treble damages and civil penalties in those circumstances. The pertinent FCA provisions are carefully worded to preclude that untoward result. But just as such intervening developments cannot support the imposition of FCA liability on persons who acted without the requisite knowledge, post hoc identification of wrong-but-reasonable exculpatory legal theories cannot negate scienter. [3]

3. The FCA's primary focus on a defendant's subjective bad faith at the time of the relevant act is consistent with the Act's common-law background. Cf., *e.g.*, *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016) (construing the FCA term "false or fraudulent claims" to incorporate the common-law rule that "fraud" includes some "misrepresentations by omission"). As Judge Hamilton observed below, "the most authoritative summary of the common law's treatment of fraudulent scienter," found in Section 526 of the Restatement (Second) of Torts, "makes subjective bad faith central." 21-1326 Pet. App. 41a-42a **\*21** (Hamilton, J., dissenting). That summary explains that, for purposes of the common-law tort of fraudulent misrepresentation, a speaker acts with a culpable state of mind if he "(a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies." Restatement (Second) of Torts § 526 (1977) (emphasis omitted); accord, *e.g.*, 1 Joseph Story, *Commentaries on Equity Jurisprudence* § 193 (6th ed. 1853). Each of those categories focuses unmistakably on the speaker's subjective bad faith.

Given the subjective criteria that historically were used to identify "common-law fraud," *Escobar*, 579 U.S. at 187, Congress could be expected to speak clearly if it wished to make the defendant's subjective intent irrelevant to scienter under the FCA. See Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 318 (2012) ("[S]tatutes will not be interpreted as changing the common law unless they effect the change with clarity."). By enacting the third ("reckless disregard") prong of the FCA's definition of "knowingly," Congress made clear that an extreme lack of due care can provide an *additional* basis for liability, even when subjective bad faith is absent. But nothing in the FCA's text, context, history, or structure suggests that Congress intended to displace the common-law approach altogether.

## B. The Court Of Appeals Erred In Treating Respondents' Post Hoc Rationales For Their Conduct As Negating Scienter Under The FCA

The contrary arguments adopted by the court of appeals or advanced by respondents lack merit.

### **\*22** *1. This Court's decision in Safeco provides no sound basis for the court of appeals' construction of the FCA's scienter requirement*

The court of appeals viewed this Court's decision in *Safeco Insurance Co. v. Burr*, 551 U.S. 47 (2007), as dictating that a defendant's subjective state of mind is "irrelevant" under the FCA. 21-1326 Pet. App. 26a. Based on its reading of *Safeco*, the

court held that an FCA defendant cannot be found to have acted "knowingly" if its conduct was consistent with an objectively reasonable interpretation that had not previously been rejected by an appellate court or agency guidance-whether or not "the defendant * * * held that view at the time that it submitted its false claim." *Ibid.* That approach is erroneous.

a. In *Safeco*, several insurers failed to notify consumers that the insurers had taken "adverse action[s]" based on the consumers' credit reports. 551 U.S. at 52 (quoting 15 U.S.C. 1681m(a)). A provision of the Fair Credit Reporting Act (FCRA), 15 U.S.C. 1681 *et seq.*, imposed penalties for "willfully" failing to provide such notifications. 15 U.S.C. 1681n(a). This Court granted review to decide whether that provision "reache[d] reckless disregard of" FCRA's requirements and, if so, whether the insurers' violations had been "reckless." *Safeco*, 551 U.S. at 52, 56.

Based on "clue[s] in the text" and statutory context, the Court held that FCRA violations committed "willfully" included both knowing and reckless violations. *Safeco*, 551 U.S. at 59. The Court further held that Safeco had not acted recklessly because its interpretation of the notice provisions was "not objectively unreasonable." *Id.* at 69. The Court stated that Safeco had not had "the benefit of guidance from the courts of **\*23** appeals or the Federal Trade Commission (FTC) that might have warned it away from the view it took," and observed that an "'informal staff opinion'" suggesting that Safeco's practice was incorrect had explicitly stated it was not "'binding.'" *Id.* at 70 & n.19 (citation omitted). Under those circumstances, the Court concluded that Safeco had not run an "unjustifiably high risk of violating the statute." *Id.* at 70 (internal quotation marks omitted).

In a closing footnote, the Court addressed an argument that, "for purposes of [ Section] 1681n(a)," "evidence of subjective bad faith must be taken into account." *Safeco*, 551 U.S. at 70 n.20. The Court stated that "[w]here, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." *Ibid.* The Court concluded that "Congress could not have intended such a result for those who followed an interpretation that could reasonably have found support in the courts, whatever their subjective intent may have been." *Id.* at 71 n.20.

b. As discussed, p. 16, *supra*, terms like "knowing" and "willful" must be "construe[d] * * * in their particular statutory context." *Jerman*, 559 U.S. at 585; see *Safeco*, 551 U.S. at 68 (emphasizing that a recklessness standard is "not self-defining" and depends on the context in which it appears) (quoting *Farmer*, 511 U.S. at 836). For four reasons, *Safeco's* analysis of willfulness under FCRA does not support the Seventh Circuit's holding that a wrong-but-reasonable post hoc exculpatory theory precludes a finding of scienter under the FCA.

**\*24** First, it is far from clear that such post hoc rationales are sufficient to defeat willfulness even under FCRA. The *Safeco* Court stated that "Safeco did not give [the plaintiffs] any notice because it thought [the notice requirement] did not apply to initial applications." 551 U.S. at 68. That description indicates that the Court understood Safeco to have actually based its decision not to send notices on the specific legal rationale that the Court described as "not objectively unreasonable." *Id.* at 69.

Second, and in any event, the FCRA and FCA scienter provisions contain significantly different language. FCRA imposes penalties on anyone who "willfully fails to comply" with the statute's requirements, without defining the term "willfully." 15 U.S.C. 1681n(a). The FCA, in contrast, imposes liability on persons who "knowingly" submit false claims or statements, and it defines that term to include mental states that turn on the defendant's subjective knowledge or intent at the time of those submissions. 31 U.S.C. 3729(b)(1)(A)(i) ("actual knowledge"); 31 U.S.C. 3729(b)(1)(A)(ii) ( "deliberate ignorance"); see pp. 17, 19, *supra*. Mechanically importing into the FCA's scienter provision an approach that incorporates new legal theories

UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners,..., 2023 WL 2241806...

Case 2:16-cv-08697-FMO-PVC    Document 616-12    Filed 08/06/24    Page 147 of 301
Page ID #:22605

developed after the claims were submitted would disregard that statutory language. Indeed, the *Safeco* Court emphasized the need to give distinct meaning to different terms like "knowing" and "willfully," and it noted that "knowing" action does "not simultaneously fall within * * * reckless[ness]." 551 U.S. at 59-60.

Third, *Safeco* involved a consumer-protection statute unrelated to the FCA's common-law antecedents. Lacking a common-law tradition directly analogous to FCRA's consumer-protection objectives, this Court **\*25** looked to the section of the Restatement (Second) of Torts that "define[d] reckless disregard of a person's physical safety." *Safeco*, 551 U.S. at 69. The Court concluded that, in that context, "the essence of recklessness at common law" was a "high risk of harm, *objectively* assessed." *Ibid.* (emphasis added). But as discussed, pp. 20-21, *supra*, common-law decisions addressing fraudulent misrepresentation-the foundation for the FCA-have long recognized the sufficiency of *subjective* intent in the context of that distinct tort. See 21-1326 Pet. App. 41a-42a & n.1 (Hamilton, J., dissenting). The court of appeals' approach does not account for those materially different background legal standards.

Fourth, the FCA applies specifically to claims for government money or property, and accordingly implicates the principle that "those who seek public funds" have a heightened duty to "act with scrupulous regard for the requirements of law." *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 63 (1984). Holding contractors liable when they submit claims in subjective bad faith is thus consistent with "history and current thinking" about the obligations of those who do business with the government, *Safeco*, 551 U.S. at 71 n.20, in a way that imposing liability for the credit-report-related violations in *Safeco* was not. [4]

**\*26** c. This Court's decision in *Halo Electronics, supra*, confirms that a claimant's wrong-but-reasonable post hoc rationale for its billing practices cannot negate scienter under the FCA.

In *Halo Electronics*, the defendant in a patentinfringement suit had "all-but instructed its design team to copy" existing patented technology, "opting to worry about the potential legal consequences later." 579 U.S. at 102 (brackets and citations omitted). This Court ultimately considered whether the defendant could be held liable for enhanced damages for "willful" patent infringement. *Id.* at 103; see *id.* at 97. Relying on *Safeco*, the Federal Circuit had required plaintiffs seeking enhanced patent-infringement damages to make two distinct showings. The first, which the Federal Circuit had described as a showing of "[o]bjective recklessness," required "clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Id.* at 100 (citations omitted). The Federal Circuit had made clear that a finding of "objective recklessness" was precluded if the defendant offered a wrong-but-reasonable defense at trial, "even if the defendant was unaware of the arguable defense when he acted." *Ibid.* "Second, after establishing objective recklessness," the plaintiff was required to "showagain by clear and convincing evidence-that the risk of infringement 'was either known or so obvious that it should have been known to the accused infringer.'" *Id.* at 101 (citation omitted).

Applying that standard in *Halo Electronics*, the Federal Circuit held that enhanced damages were **\*27** unavailable because the defendant could identify, after the fact, an objectively reasonable argument that the patent-in-suit was invalid. 579 U.S. at 100; see *id.* at 100-102. This Court reversed, explaining that "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct." *Id.* at 105 (citing, *inter alia*, Restatement (Second) of Torts § 8A (1965)). The Court explained that the Federal Circuit had strayed from that principle by allowing "someone who plunders a patent * * * without any reason to suppose his conduct is arguably defensible" to "nevertheless escape any comeuppance * * * solely on the strength of his attorney's ingenuity." *Ibid.* The Court clarified that, in determining whether a particular defendant's conduct was sufficiently egregious to justify enhanced damages, "[n]othing in *Safeco* suggests that we should look to facts that the defendant neither knew nor had reason to know at the time he acted." *Id.* at 106. The Court also rejected an expansive reading of

UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners..., 2023 WL 2241806...

*Safeco's* footnote 20, explaining that while "a showing of bad faith" is not relevant under FCRA, courts in patent infringement suits had long recognized that subjective bad faith could warrant "enhancing patent damages." ⚑ *Id.* at 106 n.*.

Respondents attempt to distinguish *Halo Electronics* by arguing that it arose "[i]n the historical context of patent law," where proof of "bad-faith infringement" was sufficient to establish the necessary scienter. 21-1326 Resp. Supp. Br. 7 (citation omitted). But that argument simply reinforces the oddity of transplanting FCRA's scienter standard into the current statutory setting. As discussed above, pp. 17, 20-21, *supra*, the FCA's text and the traditional contours of common-law fraud strongly indicate that proof of "subjective **\*28** faith" is sufficient to establish scienter under the Act, just as it is in patent cases. ⚑ *Halo Electronics*, 579 U.S. at 105.

### 2. Additional arguments advanced by the court of appeals and respondents do not support adoption of an "objective reasonableness" standard here

a. The court of appeals concluded that, even if a defendant "suspect[s], believe[s], or intend[s]" that its claim is false, the defendant "cannot *know* that its claim is false" unless the position it adopts is objectively unreasonable in light of statutory or regulatory text and "authoritative guidance." 21-1326 Pet. App. 21a-22a.

That sort of "radical epistemological doubt" provides no defense in "any other areas of law," and it would be particularly inappropriate in construing a fraud statute. 21-1326 Pet. App. 39a (Hamilton, J., dissenting). A courier who correctly believes he is transporting drugs cannot disprove his knowledge of that fact by showing that he never opened the package (or performed a field test) to be sure. See *ibid.* A chief financial officer who intends to cook the books does not escape liability by insisting that she never double-checked the math herself and therefore "did not 'know'-not *really-that* the earnings reports were inflated." *Ibid.;* cf. pp. 20-21, *supra* (discussing common-law fraud). The same principle applies here.

b. At the certiorari stage, SuperValu stated that, under the third prong of the FCA's definition of "knowingly," a defendant can defeat a showing of recklessness-"the most capacious form of scienter" by establishing that its conduct was "objectively reasonable." See 21-1326 Resp. Supp. Br. 4. SuperValu argued that a showing of objective reasonableness should likewise be sufficient to disprove the additional forms of **\*29** scienter (actual knowledge and deliberate ignorance) set out separately in the FCA. *Id.* at 4-5; see 21-1326 Pet. App. 16a (similar). SuperValu described that approach to the FCA's "knowingly" standard as creating a defense "analogous to qualified immunity." 21-1326 Resp. Supp. Br. 4.

Even under the third prong of the FCA's definition, SuperValu is mistaken in suggesting that a wrong-but reasonable post hoc rationale can defeat a finding of scienter. That third prong encompasses a claimant who "acts in reckless disregard of the truth or falsity of the information" contained in a claim or statement. ⚑ 31 U.S.C. 3729(b)(1)(A)(iii). The "reckless disregard" prong is partly objective, since it encompasses circumstances where a reasonable person would perceive a high risk of falsity, even if the actual claimant does not. But the present-tense phrase "acts in," and the definition's relationship to the Act's operative prohibitions, make clear that "reckless disregard" depends on the information available to the defendant at the time false claims or statements are submitted, not later-acquired information. See p. 19, *supra;* cf. *Black's Law Dictionary* 594 (11th ed. 2019) (definitions of "reckless disregard" that focus on the defendant's actual or constructive knowledge at the time of the relevant act).

The *Halo Electronics* Court drew the term "objective recklessness" from the Federal Circuit's own opinions, see ⚑ 579 U.S. at 100, and the Court used the term as shorthand to distinguish that requirement from the second prong of the Federal Circuit's two-part test for enhanced patent damages, see ⚑ *id.* at 101; p. 26, *supra.* But this Court's reference to (and rejection of) the particular conception of "objective recklessness" that the Federal Circuit had adopted does not suggest that a **\*30** post hoc rationale for challenged conduct can *generally* preclude a finding of recklessness. To the contrary, the *Halo Electronics* Court observed that "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct." ⚑ 579 U.S. at 105.

Case 2:16-cv-08697-FMO-PVC    Document 616-12    Filed 08/06/24    Page 149 of 301
Page ID #:22607

UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners,..., 2022 WL 2241806...

In any event, extending SuperValu's proposed "qualified immunity" defense to the first two prongs of the FCA's scienter definition would be particularly unsound. In *Halo Electronics*, the Court held that the Federal Circuit was wrong to "require[] a finding of objective recklessness in every case" because "intentional or knowing" conduct can exist "without regard to whether [the] infringement was objectively reckless." ⚑ 579 U.S. at 104-105. The Court found that subjective bad faith could be a sufficient predicate for enhanced damages even though "such damages are generally reserved for egregious cases of culpable behavior." ⚑ *Id.* at 104. Where defendants subjectively intend to submit false claims for payment, their conduct is highly culpable even if a later-identified ambiguity in the governing requirements could plausibly be resolved in their favor. The same is true of defendants who submit claims that they strongly (and correctly) suspect are false, rather than invoking readily available avenues for obtaining clarification.

c. Respondents also defend the court of appeals' approach as necessary to force "agencies to speak clearly," contending that "considerations of due process and fair notice" preclude liability for conduct that is consistent with an objectively reasonable reading of the applicable statute, regulation, or contract. 22-111 Br. in Opp. 27-28; see 21-1326 Resp. Supp. Br. 8-9 (similar). That contention fails for two reasons.

**\*31** First, those who affirmatively believe that they are submitting false claims, or who deliberately avoid inquiries that would either confirm or dispel that suspicion, cannot justifiably complain about a lack of fair notice. Such a state of mind has always been sufficient to establish scienter under the common law of fraudulent misrepresentation, even in circumstances where the falsity of the defendant's representation was not objectively clear at the time of the challenged conduct. And those who act based on a subjective, good-faith belief in a "reasonable interpretation of an uncertain legal obligation later determined to be erroneous," 21-1326 Br. in Opp. 30, will not be liable under any prong of the FCA's "knowingly" definition. Adoption of respondents' proposed defense is thus unnecessary to protect the dueprocess values they invoke.

Second, respondents' argument ignores the specific context in which all FCA claims arise. Respondents object to any standard that would require companies to "affirmatively seek 'clarification' * * * from the government when the law is ambiguous," insisting that dueprocess principles make the government responsible for "proactively clarif[ying] regulatory ambiguities." 21-1326 Resp. Supp. Br. 8-9 (citation omitted). But whatever force that objection might have in the context of general regulatory laws, it does not apply to those who request federal funds. "[W]hen a private party seeks to spend the Government's money," it can "expect no less than to be held to the most demanding standards." ⚑ *Heckler*, 467 U.S. at 63.

Given its limited resources and the administrative complexity of many federal funding programs, the government cannot feasibly address in advance every potential ambiguity that motivated attorneys might later **\*32** identify. The government therefore relies on its contracting partners to approach the inevitable ambiguities in good faith, following what they understand to be the best interpretation and seeking clarification when necessary. By allowing claimants for government funds to escape FCA liability simply by identifying wrongbut-reasonable post hoc justifications for their conduct if and when litigation occurs, the decisions below substantially reduce contractors' incentives to seek clarification before claims are submitted. That approach cannot be reconciled with this Court's longstanding recognition that "[m]en must turn square corners when they deal with the Government." ⚑ *Rock Island, Arkansas & Louisiana Railroad Co. v. United States*, 254 U.S. 141, 143 (1920).

### C. The Court Of Appeals Erred In Treating Contractual Language And Warnings From Non-Governmental Actors As Irrelevant To The Scienter Analysis

The court of appeals further erred in holding that only "circuit court precedent or guidance from the relevant agency" is sufficiently "authoritative" to give notice of a claim's falsity. 21-1326 Pet. App. 28a; see 22-111 Pet. App. 18a ("[W]e may only consider binding precedent from the courts of appeals or appropriate guidance from the relevant agency."). On the court's view, even "contract definitions" in the very contract under which a defendant seeks payment are apparently irrelevant to the

Case 2:16-cv-08697-FMO-PVC    Document 616-12    Filed 08/06/24    Page 150 of 301
Page ID #:22608
UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners,..., 2022 WL 2241806...

reasonableness of the defendant's interpretation if they originate from a source other than the agency itself. 21-1326 Pet. App. 28a. The Court should reject that unwarranted limitation on the types of evidence that may bear on whether an FCA defendant acted with a culpable state of mind.

**\*33**  The court of appeals derived its "authoritative guidance" limitation from a single paragraph in *Safeco*. See 21-1326 Pet. App. 27a-28a. There, this Court observed that "no court of appeals had spoken" on the disputed legal question when the defendant insurance companies acted, and "no authoritative guidance ha[d] yet come from the" relevant agency. *Safeco*, 551 U.S. at 70. "Given this dearth of guidance and the less-than-pellucid statutory text," the Court held that "Safeco's reading was not objectively unreasonable." *Ibid.*

That short discussion of the specific circumstances present in *Safeco* provides no basis for categorically foreclosing courts and juries from considering additional materials in assessing scienter under the FCA. The *Safeco* Court did not expressly adopt such limits even with respect to FCRA. And in any event, the FCA differs from FCRA in ways that would make the extension of such a rule particularly inappropriate.

The FCA applies not just to claims submitted directly to federal officials, but also to claims submitted "under a contract or otherwise" to a government "contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest." 31 U.S.C. 3729(b)(2)(A)(ii). The Act thus contemplates that deceptive conduct vis-à-vis non-federal intermediaries can give rise to FCA liability. Such non-federal actors play an integral role in the implementation of many federal funding programs, including Medicare Part D and Medicaid, in a way that has no usual analogue under ordinary regulatory laws. It would flout the congressional design to grant claimants in such programs *carte blanche* to ignore guidance from, or **\*34**  contracts with, the very entities that Congress has designated to administer their claims. [5]

### D. Petitioners' Evidence Demonstrates Material Disputes Of Fact Regarding Knowledge

Under the appropriate standard, the district court should not have granted summary judgment to respondents in either case. As discussed above, petitioners identified evidence indicating that respondents were subjectively aware of a high risk that they were misleading government-funded healthcare programs by submitting false "usual and customary" prices, but chose to hide their conduct for as long as possible rather than make inquiries to ensure compliance. See pp. 6-9, *supra.* Petitioners pointed to emails from executives and managers demonstrating awareness of likely illegality and a desire to keep government-funded programs from learning of their practices. *Ibid.* Petitioners also offered notices from pharmacy benefit managers and contract language strongly suggesting that respondents were reporting false "usual and customary" prices to at least some of those programs. *Ibid.* Finally, petitioners identified a stark disconnect between the amounts that respondents claimed were "usual and customary" prices for cash sales of particular prescription drugs and the amounts that respondents actually charged for most such cash sales. *Ibid.* That evidence would allow reasonable factfinders to conclude that respondents "knowingly" submitted false claims or **\*35**  statements to government healthcare programs. 31 U.S.C. 3729(a)(1)(A) and (B).

The Court therefore should reverse the court of appeals' decisions affirming the grants of summary judgment as to knowledge, and remand for further proceedings. At a minimum, the Court should vacate and remand for the court of appeals to evaluate petitioners' evidence of scienter under the appropriate legal standard.

### CONCLUSION

The judgments of the court of appeals should be reversed.

Respectfully submitted.

Case 2:16-cv-08697-FMO-PVC    Document 616-12    Filed 08/06/24    Page 151 of 301
Page ID #:22609
UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners,..., 2023 WL 2241806...

ELIZABETH B. PRELOGAR

*Solicitor General*

BRIAN M. BOYNTON

*Principal Deputy Assistant Attorney General*

MALCOLM L. STEWART

*Deputy Solicitor General*

BENJAMIN W. SNYDER

*Assistant to the Solicitor General*

MICHAEL S. RAAB

CHARLES W. SCARBOROUGH

JOSHUA DOS SANTOS

*Attorneys*

FEBRUARY 2023

## Footnotes

1    Much of the evidence concerning Safeway's knowledge of its usual-and-customary price obligations was filed under seal at Safeway's request. See 11-cv-3406 D. Ct. Doc. 189 (Dec. 23, 2019). This brief accordingly relies on descriptions of that evidence in the lower courts' opinions.

2    The Dictionary Act, 1 U.S.C. 1, provides that "unless the context indicates otherwise * * * words used in the present tense include the future as well." *Ibid.* Here, however, "context indicates otherwise." *Ibid.* A defendant who submits a false claim that she reasonably believes to be true, for example, is not subject to FCA liability merely because she later acquires "actual knowledge" that the claim was false, though that defendant may become liable if she then "knowingly conceals" an obligation to return funds. ⚑ 31 U.S.C. 3729(a)(1)(G) and ⚑ (b)(l)(A)(i); see pp. 19-20, *infra*.

3    A claimant who intends to cheat the government *can* escape FCA liability if his trial attorney identifies a post hoc legal rationale for the claims that is not only reasonable but correct. Such a showing would mean that the defendant did not submit "*false or fraudulent* claims" in the first place. ⚑ 31 U.S.C. 3729(a)(1)(A) (emphasis added). That would preclude FCA liability, even if the defendant in submitting his claims had acted with one of the forms of scienter identified in ⚑ 31 U.S.C. 3729(b)(1)(A).

Case 2:16-cv-08697-FMO-PVC    Document 616-12    Filed 08/06/24    Page 152 of 301
UNITED STATES, ex rel. Tracy Schutte, et al., Petitioners,..., 2022 WL 2241806...
Page ID #:22610

4    As these cases illustrate, moreover, companies that seek funds from the government (particularly on a recurring basis) often have ready avenues for resolving ambiguity about payment rules-for example, by consulting their contacts in state Medicaid agencies, or contractual intermediaries like pharmacy benefit managers. See, *e.g.*, 21-1326 Br. in Opp. 8-9 (arguing that SuperValu asked for clarification from certain state Medicaid agencies and pharmacy benefit managers). When such avenues for clarification are readily available, a contractor's failure to invoke those mechanisms while seeking public funds may be evidence of deliberate ignorance or recklessness under the FCA.

5    More generally, no textual or logical reason exists why the FCA's scienter provisions would preclude a factfinder from considering warnings that a defendant received from other knowledgeable non-governmental sources, such as attorneys, compliance officers, or government-contracting experts.

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

**EXHIBIT D-149**

March 28, 2003

**NOTE TO:** Medicare+Choice Organizations and Other Interested Parties

**SUBJECT:** Advance Notice of Methodological Changes for Calendar Year (CY) 2004
Medicare+Choice (M+C) Payment Rates

In accordance with Section 1853(b)(2) of the Social Security Act (the Act), we are notifying you
of proposed changes in the M+C capitation rate methodology and risk adjustment methodology
for CY 2004. Preliminary estimates of the various national per capita M+C growth percentages
and the methodology changes for CY 2004 are also attached. For 2004 and 2005, CMS will
announce the M+C rates on the second Monday in May before the calendar year concerned, in
accordance with Section 532 of P.L. 107-188, the Public Health Security and Bioterrorism
Response Act of 2002. This Advance Notice is published 45 days before that date.

Attachment I shows the preliminary estimates of the national per capita growth percentage for
both the blend rates and the floor amount. Attachment II of this Notice includes a detailed
discussion of the new CMS-HCC risk adjustment model that will be in effect for CY 2004, the
new ESRD payment approach, and various implementation issues affecting CY 2004 payments.

We will continue paying M+C organizations in 2004 on a fee-for-service basis for covered
clinical trial items and services provided to their members.

Comments or questions may be addressed to:
Ms. Anne Hornsby
Centers for Medicare & Medicaid Services
7500 Security Boulevard
C4-01-22
Baltimore, Maryland 21244

In order to receive consideration prior to the May 12, 2003 announcement of M+C capitation
rates, comments must be received by April 14, 2003.

/ s /
Gail Pardue McGrath
Director
Center for Beneficiary Choices


/ s /
Solomon Mussey, A.S.A.
Director
Medicare and Medicaid Cost Estimates Group
Office of the Actuary
Attachments

3740

**Attachment 1**
**Preliminary Estimate of the National Per Capita Growth Percentage for Calendar Year (CY) 2004**

Payments to Medicare+Choice (M+C) organizations are based on the highest of three amounts specified in statute for each payment area (generally a county): (1) a "blended rate" based on both national and local data; (2) a "floor" amount specified in statute; and (3) an amount representing 102 percent of the prior year's rate. Both the blended rate and the floor amount are annually adjusted based on the national per capita M+C growth percentage defined in Section 1853(c)(6) of the Social Security Act (the Act), while the blend amount is subject to a separate adjustment under section 1853(c)(5) intended to make aggregate payments the same as they would be if area-specific rates were used. In this notice, we provide preliminary estimates of the national per capita M+C growth percentages in CY 2004, and the increase in the floor payment rates in CY 2004. Each of these estimates reflects the components required by the BBA: an underlying trend change for CY 2004; and an adjustment for changes in the estimates of prior years' growth percentages.  The underlying trend change for CY 2004 and the revision to the CY 2003 estimate reflect changes made by the Consolidated Appropriations Resolution, 2003, (Public Law 108-7) enacted on February 20, 2003.

The current estimate of the change in the national per capita M+C growth percentage for aged enrollees in CY 2004 is 9.5 percent. This estimate reflects an underlying trend change for CY 2004 in per capita costs of 3.7 percent and an adjustment for the fact that the current estimate of prior years' cumulative aged M+C growth percentages (for CYs 1998 through 2003) is 5.6 percent higher than the estimates actually used in calculating the CY 2003 capitation rate book that was published March 1, 2002 (as required by Section 1853(c)(6)(C) of the Act).

The table below shows the increases in the national per capita growth percentages for the aged, disabled, ESRD, and the combined aged + disabled.

The preliminary estimate of the floor for aged beneficiaries in CY 2004 is $592.29 for any area in an MSA within the 50 States and the District of Columbia with a population of more than 250,000, and $535.88 for all other areas within the 50 States. In both cases this represents a 8.2 percent increase over the respective CY 2003 floors of $547.54 and $495.39. As with the estimate of the national per capita M+C growth percentage, this estimate reflects an underlying trend change for CY 2004 in per capita costs of 3.7 percent. The total change for the floors includes an adjustment of 4.3 percent for revised estimates of prior years' aged M+C growth percentages only for 2002 and 2003, since legislation reestablished the base floor amounts in 2001.

The following tables summarize the estimates for the change in the national per capita M+C growth percentage and the floor increase.

3741

**National Per Capita Growth Percentage (for Blend)**

|                             | Aged  | Disabled | ESRD  | Aged+Disabled |
|-----------------------------|-------|----------|-------|---------------|
| 2004 Trend Change           | 3.7%  | 3.8%     | 2.9%  | 3.7%          |
| Revision to CY 1998 Estimate | 0.1%  | -0.4%    | -1.8% | 0.0%          |
| Revision to CY 1999 Estimate | 0.4%  | 0.8%     | -0.9% | 0.5%          |
| Revision to CY 2000 Estimate | -0.3% | 0.0%     | 3.7%  | -0.3%         |
| Revision to CY 2001 Estimate | 1.1%  | 3.1%     | -4.7% | 1.3%          |
| Revision to CY 2002 Estimate | 2.1%  | 1.4%     | 6.2%  | 1.9%          |
| Revision to CY 2003 Estimate | 2.2%  | 3.4%     | 1.2%  | 2.4%          |
| Total Change                | 9.5%  | 12.7%    | 6.3%  | 9.8%          |

**National Per Capita Growth Percentage (for Floor)**

|                             | Aged | Disabled | ESRD  | Aged+Disabled |
|-----------------------------|------|----------|-------|---------------|
| 2004 Trend Change           | 3.7% | 3.8%     | 2.9%  | 3.7%          |
| Revision to CY 2002 Estimate | 2.1% | 1.4%     | 6.2%  | 1.9%          |
| Revision to CY 2003 Estimate | 2.2% | 3.4%     | 1.2%  | 2.4%          |
| Total Change                | 8.2% | 8.8%     | 10.6% | 8.2%          |

Note: The above percentages are multiplicative not additive.
These estimates are preliminary and could change before the final rates are announced on May 12, 2003. Further details on the derivation of the national per capita M+C growth percentage will also be presented in the May 12 announcement.

3742

**Attachment 2**
**Changes in Methodology Since Calendar Year (CY) 2003 Rates**

There are a number of changes in M+C payment methodology for CY 2004. Section A discusses the new risk adjustment model to be implemented in 2004, Section B describes refinements to this model for the ESRD population, and Section C discusses the frailty adjuster to be introduced in the PACE program and certain other demonstrations. Section D reviews a range of implementation issues. Section E discusses Medicare as Secondary Payer, and Section F describes the new method for estimating costs of National Coverage Determinations and other legislative changes in benefits. Section G provides an overview of public comments on the February 3, 2003 public meeting on risk adjustment.

**A. The new CMS-HCC risk adjustment model.**

Background. The Balanced Budget Act of 1997 (BBA) mandated that a risk adjustment payment methodology, incorporating information on beneficiaries' health status, be implemented in the Medicare+Choice (M+C) program no later than January 2000. The BBA timelines for data collection indicated that initially risk adjustment of M+C payments should be based only on data from enrollees' inpatient hospital stays, with later implementation of risk adjustment based on data from additional sites of care. CMS (formerly the Health Care Financing Administration) selected the Principal Inpatient Diagnostic Cost Group (PIP-DCG) model as the risk adjustment method to be implemented in 2000. This model recognizes diagnoses for which inpatient care is most frequently appropriate and which are predictive of higher future costs. Until October 2002 M+C organizations submitted to CMS encounter data on enrollees' inpatient hospitalizations only (analogous to claims), which CMS processed through the PIP-DCG model to calculate payments to M+C organizations.

To assist managed care organizations, CMS provided for a gradual phase-in of the effects of risk-adjustment, initially adjusting only a portion of the total payment based on the new PIP-DCG methodology, with the remainder still adjusted under the pre-BBA method based only on demographic information. This element of the risk adjustment methodology provided a safeguard against abrupt changes in payments to M+C organizations. For 2000, the transition schedule called for basing 90 percent of the prospective monthly payment per enrollee on the demographic-only method and 10 percent on the PIP-DCG risk adjustment method. The demographic-only portion of the payment was adjusted for age, gender, Medicaid eligibility, institutional status, and working aged status. The risk adjusted portion of the payment, under the PIP-DCG model, was adjusted for age, gender, Medicaid eligibility, whether originally entitled to Medicare due to disability, and working aged status, as well as health status.

The Balanced Budget Refinement Act of 1999 adopted CMS's "phase in" concept in statutory language, but altered CMS's proposed timing by mandating that the 90/10 blend would continue through 2001. Most recently, the Benefits Improvement and Protection Act of 2000 (BIPA) again modified the phase-in schedule to further soften the financial impact of risk adjustment on M+C organizations. Under BIPA, the 90/10 blend continues through 2003. In 2004 the risk

4

3743

adjusted portion of the M+C payment increases to 30 percent, in 2005 to 50 percent, in 2006 to 75 percent, and in 2007 to 100 percent.

Although the PIP-DCG model was an improvement over the previous demographic payment model, CMS recognized that its utility was limited by only using inpatient hospital data and providing additional payment for only a small number of high cost seriously ill beneficiaries. Subsequently, BIPA required the implementation of a model using not only diagnoses from inpatient hospital stays, but also from ambulatory settings beginning in 2004. To prepare for implementation in 2004 of a risk adjustment model based on multiple sites of care, in 2001 CMS required M+C organizations to begin submitting data on enrollees' hospital outpatient and physician office encounters. Although these encounters would have provided additional data for quality measures and re-estimation of payment weights for future risk adjustment models, CMS was concerned about the administrative data burden on M+C organizations.

Physician encounter data collection began in October 2000 and hospital outpatient encounter data collection began in April 2001. In response to concerns of M+C organizations, in May 2001 Secretary Thompson suspended the requirement for submission of hospital outpatient and physician office encounter data in order to allow CMS the opportunity to "explore and implement a risk adjustment process for M+C payments that balances accuracy and administrative burden."

As a result, we have selected a new risk adjustment model for 2004 (described below) as well as significantly reducing the administrative burden on M+C organizations. By redesigning our data collection and processing systems, we now require that only a few data elements besides diagnoses be submitted for payment purposes. Fewer diseases will be used by the new model (compared to other comprehensive risk adjustment models) and the requirement to report each encounter has been removed. In addition, CMS requires that relevant diagnoses be submitted for each beneficiary only once during a data collection period. Also, M+C organizations may choose to submit diagnoses on a quarterly basis.

Selection of the new CMS-HCC risk adjustment model.   Our goal was to select a clinically sound risk adjustment model that improved payment accuracy while minimizing the administrative data burden on M+C organizations. CMS worked with a number of outside researchers to develop a more comprehensive risk adjustment model using inpatient and ambulatory data. We also sought public input on model selection via consultations with industry trade groups and staff from different M+C organizations, a public meeting (conducted on January 16, 2002), publication of a Federal Register notice, and solicitation of public comments on the meeting and Notice. (For information CMS published during 2002 on the development of the more comprehensive risk adjustment model, see the Risk Adjustment web page at http://www.cms.hhs.gov/healthplans/riskadj/.)

The payment models CMS considered used only demographic and diagnosis data to avoid incentives related to tying payment to treatment modalities. CMS chose one of the comprehensive models that would lend itself most easily to necessary modifications that would be clear to analysts and physicians. The resulting model is a CMS modification of the comprehensive model created by Health Economics Research (now a division of RTI), which

also developed the PIP-DCG model currently being used for M+C payment. We will refer to this model as the CMS-HCC model.

CMS-HCC Model Characteristics

The CMS-HCC model is a selected significant disease type of model because it incorporates a selected subset of ICD-9-CM diagnosis codes and places them into approximately 64 disease groups called Hierarchical Condition Categories (HCCs). Each disease group includes conditions that are related clinically and have similar cost implications. (See **Exhibit 1** for a draft list of coefficients for each disease group. A final list of disease groups, their coefficients, and a crosswalk to the required ICD-9 codes will be available in the May 12 Announcement of M+C Payment Rates and on the CMS website. These annual coefficients will be used to calculate per person per month payments to M+C organizations. At that time, CMS will also make available for public use risk adjustment payment software that will appropriately assign diagnoses to CMS-HCC groups to identify relevant disease hierarchies and calculate risk scores for each enrollee.)

The model is prospective in the sense that it uses diagnosis information from a base year to predict costs and adjust payments for the next year. Models of this type are largely driven by the costs associated with chronic diseases, and they capture the systematic risk (costs) associated with Medicare populations. CMS will make available a full report on the CMS-HCC model. For a description of the underlying principles and development methods for the selected model, see the report on earlier versions of the HCC model, "Diagnostic Cost Group Hierarchical Condition Category Models for Medicare Risk Adjustment (Final Report); December 2000", available from the CMS website at http://www.cms.hhs.gov/researchers/projects/.

As in the PIP-DCG model, there are demographic variables for age and sex, Medicaid eligibility, and originally disabled status. There is also an adjustment for working-aged status. The recognition of the additional costliness to the Medicare program of people characterized by Medicaid eligibility is maintained as it was in the PIP-DCG model. Note, however, that this variable has less importance (less incremental cost) in models that recognize health status using disease groups because more of the dollars in the model are associated with specific diseases rather than demographic categories. As in PIP-DCG, the Medicaid payment adjustment is triggered by a beneficiary having Medicaid status any one month in the data collection year.

We also continue to recognize that those eligible for Medicare due to disability continue to be more expensive for their age after 65. There are variables in the model capturing that the original reason for Medicare entitlement was disability.

Unlike the PIP-DCG model, which does not have an institutional status adjuster, the CMS-HCC model has a modification that distinguishes the community-dwelling Medicare population from the long-term institutionalized populations. This long-term institutional adjuster differs from the institutional factor used in the demographic-only payment model. The new institutional adjuster is explained at the end of this section.

Clinical Features of the CMS-HCC Model

HCCs are disease groups broadly organized into body systems, somewhat analogous to the ICD-9-CM major diagnostic categories.  Unlike the ICD-9-CM categories, however, the diagnoses within each disease group are related clinically and in terms of cost to the Medicare program.

Whereas the PIP-DCG model places a person in only a single cost group based on his/her principal inpatient diagnosis with the greatest cost implications, the CMS-HCC model is structured so that each disease group contributes its incremental predicted cost to payment amounts.  Conceptually, disease groups are not mutually exclusive because unrelated disease processes each contribute to the predicted costs of care.  The CMS-HCC model uses diagnoses from physician visits and hospital inpatient and outpatient stays  to assign each beneficiary to none, one, or more than one disease group.  For example, an M+C enrollee with heart disease, cerebrovascular disease, and cancer would be assigned to three separate disease groups, and CMS's payment for this enrollee will reflect increments for each of these conditions.  We refer to this as an additive model because, in general, each additional diagnosis results in an increased payment.

In some cases, however, an additional diagnosis does not trigger an additional payment increment because a more severe diagnosis supercedes a less serious one.  That is, the CMS-HCC model also can characterize a beneficiary's illness level <u>within</u> a disease process.  In some disease groups the diagnoses are clinically related and ranked by (cost) severity in a hierarchy, since the more severe manifestations of a disease process principally define the impact of that disease group on cost.

An example is the diabetes hierarchy.   Diabetes diagnoses are organized into four severity groups, ranked from uncomplicated diabetes to diabetes with renal manifestations (highest cost implications).  A person may be coded with diagnoses in any or all of the four severity groups, but only the highest code in the hierarchy is used to increment payment for diabetes.  There are similar hierarchies among cancers and cardiac diseases.  In short, costs are additive across hierarchies and disease groups, but not within hierarchies.  (See **Exhibit 2** for a draft list of the disease groups that have hierarchies.)

CMS-HCC Model Refinement.

In the original HCC model developed by Health Economics Research, there were approximately 5,000 ICD-9 codes grouped into about 100 disease clusters used for payment, which is about a third of the approximately 15,000 possible codes in ICD-9-CM.  The developers isolated and excluded codes that were vaguely defined, only represented signs or symptoms, and did not contribute significantly to the predictive power of the model.  They made decisions about how to cluster codes and which to exclude in consultation with a panel of physicians using statistical information and clinical input.

CMS was able to reduce further the size of the original HCC model, with only a modest effect on the power of the model to predict costs, by taking into account the clinical and cost significance of various disease groups relative to the model's overall performance and clinical coherence. The CMS-HCC model categorizes a reduced set of ICD-9-CM diagnosis codes (approximately  3,300 codes grouped into a reduced set of about 800 codes) into approximately 64 disease groups

(HCCs). (The draft list of the reduced code set that triggers payment in the CMS-HCC model was published in April 2002 on the CMS website at http://www.cms.hhs.gov/healthplans/riskadj/. The final list of codes for 2004 will be published May 12, 2003 in the Announcement of M+C Payment Rates. Each year we will issue a list of required diagnoses to take into account new ICD-9 codes.) CMS analysts used both statistical information and clinical input from physicians to trim the original HCC model. The general principles for trimming the model included: retaining disease categories from each body system; not disrupting hierarchies; removing the categories with the smallest cost and predictive power implications; removing categories with very few people unless very costly; removing marginal categories that require a large number of codes; and including categories based on clinical judgment.

The clear structure of the original HCC model allowed us to associate diseases categories with incremental costs and construct tables to show how often certain disease groups occur in the Medicare population (based on a 5 percent fee-for-service sample of Medicare beneficiaries). We used stepwise regression, a technique that ranks the variables by their predictive power, to identify the disease groups that were weakest from a statistical point of view, i.e., the groups with the least predictive power.[1] Based on the results of this analysis, we produced a range of possible models from one with very few disease groups to a full comprehensive model, and discussed the advantages and disadvantages of each with a panel of physicians from within and outside CMS. Most of the panelists preferred the more comprehensive models because they were more clinically defensible and less subject to gaming. However, they found that a model such as the CMS-HCC version presented here was a reasonable compromise, given the need to balance improved payment accuracy with minimizing administrative data burden.

Since the initial selection of the CMS-HCC model, CMS has continued to refine the model, addressing concerns about coding practices and model performance. CMS contracted with an independent group to study issues of coding practice and its effect on how the model would perform when applied. Based on the findings, CMS modified the cancer and diabetes hierarchies. For example, metastatic (secondary site) cancer codes are not reported as frequently as they should be in fee-for-service claims data, so the distinction between multiple primary sites and metastases is poor in the Medicare data. Reflecting this, the secondary site codes have been merged with other costly primary cancers. For diabetes, further study of the costs and coding resulted in a reordering of the codes within the diabetes hierarchy. We will continue to assess the need for improvements in the model in 2004 and beyond.

CMS also incorporated some interactive terms in the model to capture the combined effects on cost of certain diseases. In most instances, simply adding the incremental costs of multiple diseases captures the combined effect that individual diseases have on costs. However, research

---

[1] Regression analysis is a technique used to predict outcomes, measure the strength of the association between independent variables (predictors, e.g., demographic variables) and the dependent variable (outcome, i.e. Medicare expenditures), and, to identify the subset of independent variables that are most effective for estimating the outcome. Stepwise regression is a form of this technique that is used to identify the subset of variables that is most effective for estimating the outcome. It works by eliminating those independent variables from the regression that contribute least to explaining the outcome.

3747

has shown that some combinations of diseases are more or less costly to treat than the sum of the costs of individual diseases. Thus, interactive terms representing combined effects are in the model. The diseases involved are diabetes, congestive heart failure, chronic obstructive pulmonary disease, cerebrovascular disease, renal failure, and coronary artery disease. There are also terms in the model that distinguish the costs of the disabled (under 65) from the aged for specific diseases. These are disorders that typically have more expensive treatment patterns in the younger population, e.g., drug and alcohol psychosis and dependence, opportunistic infections, and cystic fibrosis.

See the end of this section for information on another CMS refinement of the HCC model – the addition of an adjuster for long-term institutional status.

Estimation methods. The fee-for-service data used to calibrate the models are from 1999 and 2000. The diagnoses and Medicaid status are from 1999, and the total costs for each beneficiary are from 2000. ESRD patients were excluded from calibration of the CMS-HCC model. They will be paid under an alternative payment methodology to reflect their unique costs, described in Section B.

Decedents in 2000 are included and treated as they were in the previous payment models. First, their costs were annualized, i.e., inflated to correspond to a full 12-month period. Then, when the model was estimated, the decedents were assigned a weight according to the proportion of the year they were alive. M+C enrollees and hospice patients are treated similarly: their costs are included until they enter hospice or enroll in an M+C organization. All claim types were used to compute costs. Hospital inpatient, outpatient and clinical practitioner claims were used to collect diagnoses. Principal and secondary diagnoses were used from institutional bills and the diagnoses from claim headers were used from the practitioner bills. Fully denied claims were not used. However, diagnoses were accepted from claims that had Medicare Secondary Payer as the reason for denial.

The estimation was done using the weighted least squares method. The cost variable was annualized and weights were set to the fraction of the year in months that each person was alive and not in a hospice or M+C organization. Annualization and weighting was also done to reflect a beneficiary's time and expenditures in the community or institutionalized status category. The expenditures in each status were summed separately. Statistical formulations more elaborate than weighted linear regression have been researched but did not improve the performance of risk adjustment models significantly or consistently.

When models are estimated using the regression method, each characteristic (demographic or diagnostic) is estimated to determine its marginal costliness to the Medicare program. Use of the regression method produces a coefficient for each variable (characteristic), which represents the marginal (additional) effect of each variable in predicting program costs. These coefficients are then converted to relative cost factors, because in order to use the model as an adjuster to a base rate, costs must be converted to relative costs – i.e., risk adjustment factors. This is done by dividing the marginal costs by the average per capita costs in fee-for-service Medicare. For example, if the average per capita cost in Medicare is $5000, a marginal cost of $1000 for some characteristic becomes a relative risk factor of 0.2. To arrive at a beneficiary's total risk

3748

adjustment factor, add the factors associated with each applicable demographic characteristic and each applicable disease group.

Adjustment for coding intensity and population changes.  We believe that there have been sufficient changes in the national average predicted expenditures from 1997 to 2004 that it may not be appropriate to use the 1997 national average predicted expenditures to calculate the relative risk factors for the 2004 CMS-HCC model. These changes are related to changes in fee-for-service-population data attributable to changing demographics, average disease burdens, and coding patterns (i.e., later data tends to reflect more precise coding).

The CMS-HCC risk adjustment model is calibrated on expenditures and disease patterns for 1999 and 2000.  When the coefficients from that calibration are used to predict expenditures from earlier or later periods, the model would predict the same mean were it not for the factors above.  However, the predicted means from earlier years tend to be lower than those from later years.  Fee-for-service coding intensity and specificity, particularly in physician claims, has increased over time. In other words, if we created relative risk factors for our 2004 CMS-HCC model using 2000 claims data on a sample of fee-for-service beneficiaries and then used these risk factors to calculate the risk scores for a 2004 sample fee-for-service beneficiaries with exactly the same demographic and actual disease profile as the 2000 sample, the 2004 group would still have higher risk scores than the 2000 group.

When calculating the ratebook for 1997, we are exploring using the national means from each of three years to compute the relative risk scores for the counties.  This method would make the mean relative risk factor for fee-for-service equal to 1.0 for that period.  It is desirable that the mean relative score stay at this value, so CMS will consider an actuarial adjustment to the national mean predicted expenditures used to calculate relative risk factors so that the mean relative risk factor in fee-for-service remains close to 1.0 for the payment period.  Note that any changes in population demographics and rising coding intensity are happening in the fee-for-service population, which is the basis for the risk adjustment model.

Adjustment for long-term institutionalization.  In the course of our research addressing other characteristics distinguishing cost among beneficiaries, we found further evidence for differences in cost between the community population and the long-term institutionalized (defined as those in institutions more than 90 days) within the same disease groups.  The direct recognition of health status in the model results in a large overprediction for the long-term institutionalized if not controlled for in the model. We also found that the costs for the short-term institutionalized resemble the costs for beneficiaries with similar health status residing in the community.[2]  These findings do not show that the long-term institutionalized are not expensive to Medicare.  What we are recognizing is that people in the community are even more expensive to the program than equally ill people (in the same disease groups) who are long-term institutionalized.

Institutional status is recognized in the payment year, not the prior year. To implement an adjuster without creating burden for the M+C organizations, CMS is using the Minimum Data Set (MDS) collected routinely from nursing homes to identify the population of long-term

---

[2] Hereafter, the term "community" will be used to refer to community-based and short-term institutionalized populations.

institutionalized.  MDS assessments are sent to the States and CMS on at least a quarterly basis.
CMS is using the presence of a 90-day assessment in the payment year to identify the long-term
residents for payment purposes.  Payment at the long-term rate would start in the month
following the assessment.  Once persons are so identified, they remain in long-term status until
discharged home for more than fourteen days.  Note that this marker is different from the
institutionalized marker used in the demographic system.  That marker largely captured the
higher costs of older and sicker people who go into skilled or unskilled levels of care.  In  the
risk adjustment model, the health status markers capture most of these characteristics.  We are
concentrating on long-term residents and their cost patterns, after controlling for disease.

The CMS-HCC model has been calibrated separately for the community and long-term
institutionalized populations.  Disease-related incremental payments for the community
population are generally higher than those for the institutionalized.  The age/sex payments are
higher for the institutionalized than the community population.  The costs associated with high
mortality rates in the long-term institutionalized group are all captured in this calibration, which
included only the institutional months for this population.  The CMS-HCC model for the
institutionalized has been simplified even further than the community model.  The same diseases
are captured, but many disease groups have been merged to assure stable coefficients.  The
resulting model is similar to some of the reduced models that were researched for the whole
population.

## B.  New payment methodology for M+C ESRD enrollees.

Simultaneous with the implementation of the CMS-HCC model for risk adjustment, we are
implementing a new approach to improve payments on behalf of enrollees with End Stage Renal
Disease (ESRD).  Section 605 of BIPA required CMS to adjust our approach to computing
ESRD payment rates to reflect the method used in the ESRD social HMO (S/HMO)
demonstration then in place.  We interpret this to mean that ESRD payments to M+C
organizations should employ the same basic approach as under the ESRD demonstration
referenced in section 605. To implement the BIPA provision for 2002, CMS increased the base
rates by three percent and began adjusting payments with age and sex factors, while continuing
to review other options.  Effective January 2004, M+C enrollees with ESRD will be incorporated
into diagnosis-based risk adjustment using a different version of the CMS-HCC model. (See
**Exhibit 3** for a draft list of coefficients for each disease group.) The new ESRD payment model
will align us further with the method used in the ESRD S/HMO demonstration by allowing us to
capture co-morbidity information in addition to demographic information and basic disease
markers for ESRD beneficiaries.  ESRD status is recognized in the payment year. The data for
100 percent of ESRD beneficiaries were used to develop the model. The three parts of the ESRD
CMS-HCC model are:

    1. A full risk adjustment model for people on dialysis that is calibrated only on this
population, so the payment weights are unique to these beneficiaries. A rescaled state-
level ratebook will be created to reflect this population's program costs.
    2. A series of lump-sum payments to reflect costs associated with transplant procedures.
Transplant costs associated with the month of transplant and two following months are
carved out of expenditures for the ESRD population to allow CMS to make larger

11

3750

transplant-specific payments (outside of the risk adjustment model) over a three-month window.

3. A modified version of the regular CMS-HCC model for people who have successful kidney transplants.  The model has an additional term to recognize the extra costs of immunosuppressive drugs and higher intensity of care for this group.

We developed this three-part model in response to our findings on expenditures patterns for ESRD beneficiaries.  Dialysis patients have high ongoing costs, while transplant patients incur a very high one-time cost.  Functioning graft patients are much more similar to the general population than they are to dialysis patients.  Using the same payment weights for all three groups would lead to over- or underpayments to M+C organizations that do not have enough ESRD enrollees to have an average mix.  To address this problem, CMS developed separate payment approaches for these three populations.

<u>Risk adjustment model for dialysis patients</u>.  The dialysis model has the same HCC categories as the CMS-HCC model for the non-ESRD population, except that HCCs with kidney disease diagnoses are excluded (HCC128 to HCC132).  The model is calibrated only on dialysis patients, so the disease weights used for payment recognize disease and expenditure patterns unique to this population.

The data used for calibrating the ESRD models were 1999 (diagnostic) and 2000 (cost) data on fee-for-service ESRD beneficiaries. For example, expenditures for a fee-for-service beneficiary on dialysis from January through August 2000 who received a transplant in September 2000 are included in the dialysis group for eight months, but then are excluded.  From September through November 2000, this beneficiary's costs are included in the transplant data to determine estimated average transplant costs.  As of December 2000, this beneficiary is included in the functioning graft model.

<u>Transplant patients</u>.  To pay more accurately for the high costs of kidney transplants, CMS will make transplant-specific payments to M+C organizations for three months for each member who received a transplant, beginning in the month of transplant.  CMS calculated a national average cost for three months (the transplant month and two subsequent months) and divided the average for the three months by three to get the average monthly cost.  CMS converted the average monthly cost to a relative factor.  The ratio of this monthly cost to the national average monthly cost for dialysis patients is the factor.  This factor multiplies the rates in the dialysis ratebook to determine payment.  No additional ratebook is needed, as this method produces a payment that is the national rate, geographically adjusted.

For example, assuming that the national average three-month program cost for a transplant is $40,000 and that the national average monthly cost for a dialysis patient is $3,500, the relative factor would be 3.81 (i.e., [40,000/3]/3500).  Payments for a transplant for a resident of a nationally average county would be 3.81 x 3,500 = $13,335 for each of three months.  Payments in higher or lower cost counties would vary.

See Section D.6 for information on a new option M+C organizations may choose to adopt for reporting dialysis and transplant status of members.

Functioning graft beneficiaries.   The model for functioning graft enrollees is based on the model for the general population, except that HCCs for kidney transplant status, dialysis status and renal failure are excluded.  This means that for their members with functioning grafts, M+C organizations will be paid in 2004 based on the diseases reported for functioning graft members recorded in 2003 (the reporting year for 2004).  However, CMS also will make an add-on payment for each functioning graft enrollee to recognize the extra costs associated with immunosuppressive drugs and additional intensity of services for this population. The payment model is a slight modification of the regular model; all the coefficients are the same (with the exclusions above) but a term with a factor for the average additional costs of these beneficiaries is included.

The functioning graft payment automatically begins the month after the third transplant payment unless CMS hears from the M+C organization or the CMS data system that the member has returned to dialysis. Anytime a functioning graft patient returns to dialysis, payment is made using that model.

Since Section 605 of BIPA required CMS to adjust our approach to computing ESRD payment rates to reflect the method used in the ESRD social HMO (S/HMO) demonstration then in place, we interpret this to mean that the new three-part model will be implemented at 100 percent of payments for 2004, just as the 2002 changes to the ESRD methodology per BIPA were implemented at 100 percent. See Section E for a discussion of Medicare Secondary Payer status.


## C. Changes in Methodology for PACE and certain Demonstrations

Background.
*Overview:* CMS has developed a Medicare payment approach that adjusts the payment to an organization according to the frailty of an organization's enrollees.  The frailty adjustment approach will be applied to the PACE program in 2004.  The current PACE demonstrations are expected to transition to PACE program status during 2003.  New PACE demonstrations will be paid under the same approach as the PACE program in 2004.

The current social HMO (S/HMO) demonstration is scheduled to end by December 31, 2003.  In the absence of a legislative extension, we plan to continue the S/HMO demonstration with the risk adjusted payment methodology incorporating the frailty adjustment approach.  The current waiver for the Wisconsin Partnership Program (WPP) demonstration expires on December 31, 2003.  Pending a decision on the extension of the waivers, we intend to apply the frailty adjustment approach to the WPP demonstration in 2004.  The adjustment approach will also apply to the Minnesota Senior Health Options (MSHO) and the Minnesota Disability Health Options (MnDHO) demonstrations in 2004.

The Balanced Budget Act of 1997 (BBA) mandated that Medicare capitated payments to PACE organizations be based on M+C payment rates, adjusted to account for the comparative frailty of PACE enrollees.  The payment approach described herein is a further refinement to risk

3752

adjustment to ensure that capitated payments to organizations that serve frail community-based populations are accurate.

The frailty adjustment approach is to be applied in conjunction with the CMS-HCC risk adjustment model. As mentioned above, the CMS-HCC model has been designed to pay appropriately for the long-term institutionalized population. Therefore, the frailty adjustment approach will apply only to community-based and short-term institutionalized enrollees[3] (i.e., the frailty adjustment for long-term institutionalized enrollees is zero). Risk adjustment predicts (or explains) the future Medicare expenditures of individuals based on diagnoses and demographics. But risk adjustment may not explain all of the variation in expenditures for frail community populations. The purpose of frailty adjustment is to predict the Medicare expenditures of community populations with functionally impairments that are unexplained by risk adjustment.

*Basic Approach*: The first step in the estimation of an adjuster was determining the measures that were candidates for frailty adjustment. Certain measures of functional impairment (such as activities of daily living (ADLs)) were considered to be the most meaningful for purposes of payment. Beneficiary characteristics (such as age and gender) were also considered. In order to develop the frailty adjustor, CMS needed a database that linked measures of functional impairment to Medicare expenditures at the individual level. The Medicare Current Beneficiary Survey (MCBS) included the necessary linked information. Therefore, the candidate functional impairment measures were selected from among those collected by MCBS.

The next step was finding the relationship between the above measures or characteristics and the Medicare expenditures that were unexplained by risk adjustment. For example, the actual Medicare expenditures for each group of people with similar functional impairments were compared to the expenditures predicted by the CMS-HCC model for that group. As described below, the frailty adjustor was designed to explain (or adjust for) the average difference between the predicted and actual expenditures for each group.

The final step in the estimation was to select the appropriate measures from among the candidates. The selection process considered a number of criteria such as face validity, reliability, appropriate incentives, fairness, simplicity, and gameability. The measures(s) that best met the criteria were to be included in the frailty approach. The frailty model was to consist of a set of factors (one factor for each group) for the measure(s) that were selected.

Consistent with the way diagnosis data are used in risk adjustment, the frailty adjuster was designed to be prospective. That is, prior-year functional impairment data were used to predict the next-year's payment adjustment.

Estimating the Frailty Model
*Calibration of Frailty Factors*: The draft frailty factors were developed using the MCBS cost and use files for 1994 through 1997. Since the model was prospective, information from the "base year" was used to predict payment in the following year. Prior-year diagnosis and functional impairment information were linked to next-year Medicare expenditures to create

---

[3] Hereafter, the term "community" will be used to refer to community-based and short-term institutionalized populations.

3753

three data sets with person-year observations: 1994-95, 1995-96, and 1996-97. These data sets were pooled, and Medicare payments were predicted for these person-years using the CMS-HCC model. The difference of actual payments and predicted payments for each person-year (residual expenditures) was then related to beneficiary functional and institutional status using regression modeling. The frailty factors were derived from these regression coefficients and reflect the mean Medicare payments related to functional status that are not explained by the CMS-HCC model.

The residual expenditures for the MCBS institutionalized population were virtually zero. That is, the CMS-HCC model accurately predicted the average expenditures for this population. Therefore, the frailty adjuster applies only to the community population.

The frailty model was based on Activities of Daily Living (ADLs) as the core measure of functional impairment. Individuals were grouped according to their difficulty with 0 ADLs, 1 to 2 ADLs, 3 to 4 ADLs, and 5 to 6 ADLS. CMS considered whether the frailty model could be improved by including other measures and characteristics interacting with ADLs. Among other things, these included demographics, self-reported health status, chronic conditions, needing help or special equipment with ADLs, and physical measures of impairment (such as walking 2-3 blocks). In general, adding other measures did not appear to improve the frailty model. Some interaction terms were not statistically significant. That is, they did not improve the explanatory power of the model once ADLs were taken into account. Some measures lacked face validity, i.e., greater functional impairment failed to be associated with greater expenditures. Others were not considered reliable in that they could potentially suffer from a large degree of random variation due to small sample sizes. And still others were potentially gameable or provided incentives for inappropriate utilization. Therefore, CMS decided to base the frailty model on ADL groupings only.

*Frailty Factor for the Under-55 Disabled:* CMS analyzed the residual expenditures for the Medicare disabled population in MCBS. For the 55-and-over population, the residuals were significantly different from zero for all ADL groups. But for the under-55 population, the residuals were not significantly different from zero regardless of the degree of functional impairment. That is, the CMS-HCC model appears to adequately predict the expenditures of the under-55 population without the need for an additional frailty adjuster. Therefore, the frailty factor for this population is zero.

*Mortality:* The MCBS observations included persons who died in the payment year. The higher expenditures of these persons were included in the frailty model, using the same approach for treating the deceased as was used for the CMS-HCC model. Each ADL group in MCBS has an inherent mortality rate. To test whether the inherent mortality rates were reasonable, CMS investigated whether these mortality rates were representative of the mortality rates for the PACE program. The MCBS mortality rates for each ADL group were applied to the distribution of PACE enrollees by ADL group. This yielded a predicted mortality rate for PACE (i.e., the mortality rate that PACE would have experienced if it had the same rate of mortality as the MCBS population). The predicted mortality was similar to the actual mortality rate across all PACE organizations. That is, once ADLs were accounted for, the PACE mortality rate was

15

3754

similar to the MCBS mortality rate.   Frailty adjustment appears to adequately account for the rate of mortality for frail populations.

*Draft Frailty Factors*:  The draft frailty factors for the 55-and-over community populations are as follows:

| Difficulty in ADLs | Frailty Factors |
|---|---|
| 0 | -0.14 |
| 1-2 | 0.17 |
| 3-4 | 0.34 |
| 5-6 | 1.09 |

The final factors will be  published in the May 12, 2003 Announcement of M+C Payment Rates.


## D.  CMS-HCC Model Implementation Issues

CMS will implement the CMS-HCC risk adjustment model following the approach used to estimate the model (as described above).  The model will apply to M+C organizations  and PACE organizations.  The Evercare Demonstration is currently scheduled to end December 31, 2003. Pending a decision on the extension of the waivers, we intend to implement the CMS-HCC model for Evercare in 2004. The CMS-HCC model will also apply to the S/HMOs, WPP, MSHO, and MnDHO demonstrations, as mentioned in Section C.  In determining a risk score for a beneficiary, we will determine the status of each variable included in the model based on the same definitions used to estimate the model. For example, in determining a beneficiary's Medicaid status, we will determine whether the beneficiary was eligible for Medicaid for at least one month during the data collection period.  Then, the beneficiary's status on each variable in the model (i.e., age, sex, original reason for entitlement, Medicaid eligibility, institutional status (long-term versus community and short-term), and diagnoses) will be used to determine his/her risk factor.  The risk factor (and frailty factor, if applicable) is then multiplied by the correct rate book amount to determine the risk adjusted payment. The demographic portion of the payment will continue to incorporate demographic variables such as age, sex, Medicaid eligibility, and institutional status. The final step is to implement the correct transition blend (see section D.7).

1.  New Enrollee Factor.
If a beneficiary has less than 12 months of enrollment in Part A and Part B during the data collection period, then he/she will be assigned a new enrollee factor.  During the payment year, a new enrollee factor will also be assigned to any beneficiary whose risk score is not available.   In this case, the beneficiary's correct risk score will be determined during the next reconciliation. For ESRD payments, the dialysis and functioning graft models will have new enrollee factors for enrollees whose risk scores are not available.

2.  Addressing Age Weights
In the past, CMS has recognized that people have birthdays that put them into age groups during a given year by either switching the payment group during the year in the demographic payment model or by paying a weighted average of the 2 groups each month to avoid having to switch age

groups during the year (as the PIP-DCG model does).  In response to industry feedback, CMS will now base payments on the age an enrollee attains as of February 1st of each year.  This change will help simplify the M+C payment system.

3. Reporting Institutional Status.

As described above, CMS is incorporating institutional status into the CMS-HCC risk adjustment model.  Under risk adjustment, institutional status will be determined from information included in the Minimum Data Set (MDS) that is reported by Medicare certified nursing homes.  As described in the previous section, presence in the MDS of the 90-day assessment for an individual will be used to determine his/her long-term institutional status.

Under risk adjustment, M+C organizations will not have to report the institutional status of their enrollees monthly as they do for the institutional adjustment under the demographic-only method.  Thus, under risk adjustment the reporting burden on M+C organizations will not be increased.  Note that M+C organizations may continue to track the institutional status of their enrollees to ensure that CMS correctly identifies institutional status.

Currently, most M+C organizations have a small proportion of long-term institutionalized enrollees.  In fact, less than 20 organizations currently have more than 5 percent long-term institutionalized.  In order to minimize the number of adjustments to monthly payments, CMS will assume that all enrollees in most M+C organizations are community-based.  Payments will be based during the payment year on the community version of the risk adjustment model.   The final reconciliation for 2004 will determine the correct institutional status for each enrollee for each month.

For the small number of M+C organizations who have a larger proportion of long term institutionalized enrollees (e.g., between 5 and 75 percent), we will determine the enrollees who are long-term institutionalized as of a point in time in the prior year (e.g. June 30, 2003 for the 2004 payment year).  We are still determining the appropriate approach for applying the institutional adjuster for this group of enrollees.  We would appreciate comments on this issue.

Finally, for M+C organizations or demonstrations where a majority of enrollees are long-term institutionalized persons, we will assume that all of their enrollees are institutionalized during the payment year.  Again, in reconciliation, these M+C organizations will receive an adjustment reflecting the correct monthly institutional status for each person for each month for 2004 as reported through the MDS.

4. Elimination of the Data Lag.

The CMS-HCC risk adjustment model was calibrated using diagnostic data from the prior calendar year to predict resource use for the subsequent calendar year. While CMS's initial PIP-DCG risk adjustment model was calibrated on a calendar year basis, it was implemented with a six month "lag" between the data collection year and the payment year. This implementation approach was preferred (at that time) by M+C organizations.  However, risk adjustment models estimated with no lag are more accurate in predicting payments than those models that incorporate a lag because the prediction period is closer to the data collection period.  Therefore,

beginning in 2004 CMS will eliminate the lag to improve the accuracy of payments under the CMS-HCC model.

CMS will initially implement payments in 2004 based on diagnoses occurring between July 1, 2002 and June 30, 2003. Beneficiaries' statuses on all variables will also be determined based on that data collection period. Initially in 2004, M+C organizations will be paid based on this lagged data collection period. Then, in order to eliminate the data lag, CMS will recalculate risk factors for all enrollees, moving the data collection period to the immediate preceding calendar year (i.e., for 2004, the immediately preceding calendar year is January 1, 2003 to December 31, 2003). This process will eliminate the lag. During 2004, CMS also expects to reconcile payments back to January 2004 based on these new factors.

5. Reconciliation of Late Risk Adjustment Data.
Because M+C organizations have only three months after the end of a data collection year to submit the diagnostic data that is used to develop risk factors, the final reconciliation for a year allows all the late diagnostic data to be incorporated into the enrollee's risk score. For example, M+C organizations must submit risk adjustment data from the January 1, 2003 through December 31, 2003 data collection period by March 5, 2004 in order for the data to be included in the preliminary risk factor based on non-lagged data for 2004. Diagnostic data submitted after this date will not be incorporated into initial payments based on this data collection period. However, CMS will accept late data for the 2003 calendar year through March 31, 2005. After this date, CMS will no longer accept data for risk adjustment for CY 2004.

The reconciliation incorporates all the diagnoses from the correct data collection period in addition to other changes in enrollee's status (e.g., age, gender, Medicaid eligibility) to be factored into each enrollee's risk factor. Then, adjustments are made to ensure that M+C organizations' final payments for a year are correct. There is a single final reconciliation for each payment year. The final reconciliation for 2004 payments will be conducted in the spring of 2005, with final reconciled payments for 2004 provided to M+C organizations in the August 2005 payments.

6. Reporting Timely End-Stage Renal Disease (ESRD) Status.
In moving to the implementation of the new ESRD risk adjustment method, CMS will utilize the existing systems for identification of enrollees receiving dialysis services. Currently, M+C enrollees are assigned ESRD status as a result of a physician certifying their ESRD status on CMS Form 2728, the End Stage Renal Disease Medical Evidence Report. The ESRD facility sends Form 2728 to the Renal Network, which then transmits the status to CMS systems where various databases are updated to record the ESRD status. Payments for dialysis are triggered by this system.

The ESRD information system would also remain the standard for identifying enrollees who received a transplant. However, M+C organizations would be given the opportunity to notify CMS directly of a transplant in order to receive more timely payments for a transplant. We are examining different ways of implementing more timely reporting of transplant status and will provide information on this process soon. Ultimately, M+C organization-reported ESRD status

will be reconciled against CMS's existing ESRD information reporting system to determine final ESRD status for payment.

## 7. Transition Payment Blends.

For M+C organizations, in 2004 the CMS-HCC model will be implemented at a 30 percent risk adjusted payment, with the remaining 70 percent being a demographic payment. The portion of risk adjusted payment will increase to 50 percent in 2005, to 75 percent in 2006 and finally to 100 percent in 2007. However, the ESRD models for dialysis, transplant, and functioning graft payments will be implemented at a 100 percent level. See Section B for further information.

The same 30 percent risk adjusted and 70 percent demographic payment schedule will apply to EverCare and S/HMOs, but the non-risk adjusted portion of the payment will be based upon their current payment methodology rather than the demographic payment. For S/HMOs a frailty adjuster will also be applied.

For PACE organizations and certain demonstrations, i.e. WPP, MSHO and MnDHO, an alternative transition payment blend will be used, so that full implementation of risk/frailty adjustment for PACE and these demonstrations will occur in 2008 instead of 2007. In 2004, the CMS-HCC model with a supplemental frailty adjustor will be implemented at a 10 percent risk adjusted payment, with the remaining 90 percent being based on the plan's current payment methodology. The transition blends for PACE and certain demonstrations are discussed in more detail in Section D.9 below. See **Exhibit 4** for a chart summarizing the transition payment blends being used for various plans.

## 8. Budget Neutrality.

In 2004, risk adjustment will be implemented in a budget neutral manner in an effort to further stabilize the M+C program. The implementation of risk adjustment budget neutral to the M+C program will ensure that risk adjustment does not reduce the aggregate amount of payments to M+C organizations. The Office of the Actuary (OACT) will estimate the amount of adjustment to be incorporated into the rescaling factor, which for 2004 redistributes estimated payment reductions that would result from risk adjustment without this adjustment. The estimate is the difference between the aggregate M+C payments that would be made using the demographic-only method for 100 percent of payments versus the aggregate payments that would be made using 100 percent of risk adjusted payments.  The budget neutrality estimate is a multiplier applied to the rescaling factor.

M+C organizations will be required to reflect budget neutrality payments for 2004 in their 2004 Adjusted Community Rate Proposals (ACRPs).  The ACRPs for 2004 are due by statute in September 2003.  M+C organizations will see payments that reflect this budget neutral approach in the beneficiary-level amounts that are shown on the Monthly Membership Reports (MMR.), beginning in January 2004.  The reports for January 2004 will be available for downloading in late December 2003.

## 9. Application of Frailty Model

To apply the frailty adjuster, it was necessary to develop an approach for collecting functional impairment data for an organization's enrollees.  Initially, the Health Outcomes Survey (HOS)

was considered as a potential source of the data for PACE.  However, the historical HOS response rates for PACE (generally under 50 percent) have been considered too low to be useful for payment adjustment.  Therefore, CMS developed an alternative survey instrument that was much shorter than the HOS.  This instrument was pilot tested on a sample of the PACE population in 2002, resulting in substantially higher response rates (68 percent).  The PACE Health Survey (PHS) will be administered in 2003 to support PACE payment adjustment in 2004.

*9a. PACE*

The PHS will  be administered in 2003 to support PACE payment adjustment in 2004.   The PHS will be administered to PACE organizations that were active as of January 1, 2002.  Responses from participants residing in the community will be used to determine the organization-level frailty scores.  Once the data are collected, they will be applied to the frailty model to determine a frailty "score" for each organization.  The organization-level frailty score will be calculated as the weighted average frailty factor across all community survey respondents for that organization, as follows. The number of community respondents with difficulty in 0 ADLs, 1 to 2 ADLs, 3 to 4 ADLs, and 5 to 6 ADLs will be counted.  These counts will be multiplied by the corresponding frailty factor.  The resulting products will be summed for each organization.  This sum will be divided by the number of community respondents, yielding a weighted average factor (or frailty score) for each PACE organization.  The same frailty score will be used for all respondents and nonrespondents who reside in the community.  This frailty score will be added to the risk score of each community enrollee in the organization (including only those ESRD beneficiaries in post-transplant status), resulting in a risk+frailty score for each individual.  Payments to these plans will be the product of this score and the risk adjusted county rate.

For new PACE organizations not active as of January 1, 2002, the frailty score will be the weighted average factor across all community respondents of all PACE organizations.

**Exhibit 5** illustrates how the payment for each PACE organization will be calculated.  Each enrollee's risk score will be determined based on demographics, diagnoses and residence (community or institutional).  The organization-level frailty score (calculated as above) will be added to each 55-and-over community enrollee's risk score, while zero will be added to the risk score of each institutional enrollee.  This "risk+frailty" score will be multiplied by the restandardized county rate to produce the frailty-adjusted payment for each enrollee.  This approach will be similarly applied to the demonstrations below.

To lessen the initial negative impact of frailty adjustment on some organizations, the phase-in schedule for frailty adjustment will lag the phase-in of M+C risk adjustment by one year.  In 2004, the PACE Medicare capitation payment will be a blended payment consisting of 90 percent of the current payment (i.e., 2.39 times the demographic ratebook amount) plus 10 percent of the frailty adjusted payment.  In 2005, the blend will be 70 percent current payment and 30 percent frailty adjustment.  The blend will be 50/50 in 2006 and 25/75 in 2007.  In 2008, frailty adjustment will be fully phased in for PACE.

*Pace Health Survey (PHS) Nonresponse Bias:* During the pilot test there was no evidence of significant survey nonresponse bias.  Based on assessment data from the medical records, the

20

functional status of survey respondents was similar to that of nonrespondents. After the 2003 PHS has been administered, CMS will again examine nonresponse bias for PACE. If significant nonresponse bias is detected, PACE payments in 2004 could be adjusted as part of reconciliation.

*9b. Other Demonstrations.*
*S/HMO Demonstrations:* CMS intends to collect HOS data in 2003 to support frailty adjustment for Social HMO organizations (S/HMOs) in 2004. The project's 2001 Report to Congress indicated that S/HMO members were not significantly different than beneficiaries enrolled in M+C organizations. Therefore, the phase-in schedule for S/HMOs will be consistent with the M+C program. The blend in 2004 will be 70 percent current payment and 30 percent frailty adjustment. The blend will be 50/50 in 2005 and 25/75 in 2006. In 2007, frailty adjustment will be fully phased in for S/HMOs.

*WPP Demonstrations:* CMS intends to collect PHS data in 2003 to support frailty adjustment for WPP organizations in 2004. The WPP demonstration has a health care delivery model that is similar to PACE and serves a population that is identical to the PACE population. Therefore, the phase-in schedule for WPP will be consistent with the PACE phase-in schedule. That is, the blend will be 90/10 in 2004 and will continue to lag the M+C phase-in schedule by one year through 2008.

*MSHO and MnDHO Demonstrations:* CMS intends to collect PHS data in 2003 to support frailty adjustment for MSHO and MnDHO in 2004. These are dual eligible demonstrations that have community-frail populations that are similar to PACE but also serve community-well and institutionalized beneficiaries. We are considering approaches for determining the frailty score for new demonstrations. The phase-in schedule will be consistent with the PACE phase-in schedule. The blend will be 90/10 in 2004, and will lag the M+C phase-in schedule by one year through 2008.

*9c. Biases in Survey Responses*
The frailty factors were estimated using MCBS. They will be applied to payment using the PHS or the HOS. Differences in survey questions of mode of administration between MCBS and PHS or HOS could result in biased payments. Preliminary research indicates that HOS respondents may report a significantly greater degree of functional impairment than MCBS respondents. This disparity suggests that the organization-level frailty scores should be adjusted downward for HOS respondents to account for this effect. CMS intends to study this issue further, as well as HOS nonresponse bias. We welcome any comments on this issue.


**E. Medicare Secondary Payer status in M+C payments.**

CMS currently makes beneficiary-level adjustments to M+C payments based on whether members are working aged or not. We will continue to work with the industry on approaches to adjusting for working aged status. For example, we are considering whether to replace the monthly beneficiary level adjustment with an annual, plan-specific prospective factor representing the proportion of working aged in the plan.

3760

We are still determining the appropriate approach for handling Medicare as Secondary Payer (MSP) status for M+C ESRD beneficiaries when calibrating the new ESRD payment models.  To date, we have conducted a separate analysis to ensure we did not underestimate average transplant costs. When identifying the population used to calculate average transplant costs, we excluded any beneficiaries with MSP during their transplant period and any beneficiaries with transplant costs that were too low even if they were not identified as MSP in our system.

We would appreciate comments on this issue. After reviewing public comments, we may announce working aged/MSP policies in the May 12 Announcement of M+C rates

## F.  New approach to accounting for costs of National Coverage Determinations.

When "the Secretary makes a determination with respect to [Medicare] coverage or there is a [statutory] change in benefits required to be provided [by M+C organizations] that the Secretary projects will result in a significant increase in. . .costs," section 1853(c)(7) of the Act requires the Secretary to "adjust appropriately" M+C payments to reflect these new significant costs.  CMS has interpreted what constitutes "significant" costs for these purposes in regulations at 42 C.F.R. §422.109.  Under these provisions, the costs of a coverage change are considered significant if the average cost of providing the service exceeds as specified threshold, or if the total cost exceeds an aggregate cost threshold.  Currently, the costs of newly covered services are taken into account annually when OACT estimates the M+C growth rate.  The costs of new benefits thus are built into the M+C growth rate. However, the growth rate is only used to update the floor rates and blended rates.  Changes in the growth rate do not affect payment in counties where the payment amount is based on the minimum two percent update to the prior year's rate.

CMS has determined that payments in counties in which payment is based on the minimum two percent update rate is not appropriately adjusted to reflect new coverage costs as required by section 1853(c)(7).  Historically, most M+C enrollees have lived in counties receiving the two percent rate, and in 2003 all counties in the country but six received the two percent rate.

Beginning in 2004, CMS will apply a "bundled NCD factor" to the two percent minimum update rates each year.  OACT would calculate a factor representing the percent of total Medicare costs attributed to the aggregate costs of all significant NCDs and legislative changes in benefits in a given year.  For example, for those counties that will be minimum update counties in 2004, we would apply the 2002 bundled NCD factor to the 2003 minimum update rates, and then update the rates by two percent.  We expect to provide details on the calculation and application of the NCD factor in the May 12 Announcement of M+C rates.  Also, we are considering changing the definition of "significant cost" in the regulation to include all NCDs in the prior year.  Should CMS's definition of significant cost change in 2003, the new policy would automatically apply to M+C payments for CY 2004.

## G. Responses to Public Comments

We solicited comments to the proposed approach for 2004 from interested parties via a <u>Federal Register</u> notice (67 FR 79122), posted on December 27 and at our public meeting conducted on February 3. We received 21 comments by the end of the two-week comment period, which ended on February 19. The comments included six from PACE plans, two from SHMO plans, two from WPP plans, one from MSHO, one from EverCare, three from M+C organizations and six from other interested parties.

Most of the comments related to the implementation of a frailty adjustor for PACE, SHMO, and certain other specialty demonstration sites and the proposed payment blend schedule. Many of these comments appeared to indicate the need for more discussions with the affected plans. CMS intends to conduct additional outreach with these plans to provide more information. Three commenters were concerned about the elimination of the lag between the data collection period and the payment year and were concerned about the increased administrative burden of this approach, as well as the possible impacts on plan revenues as the data collection period on which the risk factor was based is moved. CMS will address issues related to the lag at the time of the final notice. Other commenters requested additional information regarding the proposed ESRD payment methodology. We have provided draft coefficients for that model in this notice. Other general issues raised by these commenters (e.g., inclusion of the institutional factor, measurement of Medicaid status) will be addressed in the final notice.

23

3762

**EXHIBIT 1.  Draft Community And Institutional Annual Coefficients for the CMS-HCC Model with Constraints And Demographic/Disease Interactions, used in Calculation of Monthly M+C Payments[1]**

| Variable | Disease Group | Community Estimate | Institutional Estimate |
|---|---|---|---|
| **Age/Sex Coefficients** | | | |
| Female0-34 | | $600 | $5,500 |
| Female35-44 | | 1,000 | 5,500 |
| Female45-54 | | 1,100 | 5,500 |
| Female55-59 | | 1,400 | 5,500 |
| Female60-64 | | 1,900 | 5,500 |
| Female65-69 | | 1,600 | 6,000 |
| Female70-74 | | 2,000 | 6,000 |
| Female75-79 | | 2,500 | 5,100 |
| Female80-84 | | 2,900 | 4,800 |
| Female85-89 | | 3,400 | 4,500 |
| Female90-94 | | 4,100 | 4,000 |
| Female95+ | | 4,100 | 3,000 |
| Male0-34 | | 300 | 5,700 |
| Male35-44 | | 600 | 5,700 |
| Male45-54 | | 1,000 | 5,700 |
| Male55-59 | | 1,400 | 5,700 |
| Male60-64 | | 1,800 | 5,700 |
| Male65-69 | | 1,800 | 7,400 |
| Male70-74 | | 2,300 | 6,400 |
| Male75-79 | | 3,000 | 6,200 |
| Male80-84 | | 3,400 | 6,200 |
| Male85-89 | | 4,100 | 6,400 |
| Male90-94 | | 4,600 | 5,400 |
| Male95+ | | 5,300 | 4,300 |
| | | | |
| **Medicaid & Originally Disabled Interactions with Age & Sex** | | | |
| Medicaid Female, Disabled | | 1,100 | 0 |
| Medicaid Female, Aged | | 900 | 0 |
| Medicaid Male, Disabled | | 600 | 0 |
| Medicaid Male, Aged | | 900 | 0 |

| Variable | Disease Group | Community Estimate | Institutional Estimate |
|---|---|---:|---:|
| Originally-Disabled Female | | 1,200 | 0 |
| Originally-Disabled Male | | 800 | 0 |
| | | | |
| **Disease Group Coefficients**[2] | | | |
| HCC1 | HIV/AIDS | 3,500 | 6,900 |
| HCC2 | Septicemia/Shock | 4,600 | 4,900 |
| HCC5 | Opportunistic Infections | 3,300 | 6,900 |
| HCC7 or 8 | Metastatic Cancer, Acute Leukemia, and Other Severe Cancers | 7,500 | 2,800 |
| HCC9 | Lymphatic, Head and Neck, Brain, and Other Major Cancers | 3,500 | 2,300 |
| HCC10 | Breast, Prostate, Colorectal and Other Cancers and Tumors | 1,200 | 1,300 |
| HCC15 | Diabetes with Renal or Peripheral Circulatory Manifestation | 3,900 | 3,100 |
| HCC16 | Diabetes with Neurologic or Other Specified Manifestation | 2,800 | 3,100 |
| HCC17 | Diabetes with Acute Complications | 2,000 | 3,100 |
| HCC18 | Diabetes with Ophthalmologic or Unspecified Manifestation | 1,800 | 3,100 |
| HCC19 | Diabetes without Complication | 1,000 | 1,300 |
| HCC21 | Protein-Calorie Malnutrition | 4,700 | 2,200 |
| HCC25 | End-Stage Liver Disease | 4,600 | 1,400 |
| HCC26 | Cirrhosis of Liver | 2,600 | 1,400 |
| HCC27 | Chronic Hepatitis | 1,800 | 1,400 |
| HCC31 | Intestinal Obstruction/Perforation | 2,100 | 1,400 |
| HCC32 | Pancreatic Disease | 2,300 | 1,400 |
| HCC33 | Inflammatory Bowel Disease | 1,600 | 1,400 |
| HCC37 | Bone/Joint/Muscle Infections/Necrosis | 2,500 | 2,500 |
| HCC38 | Rheumatoid Arthritis and Inflammatory Connective Disease Tissue | 1,700 | 1,500 |
| HCC44 | Severe Hematological Disorders | 5,200 | 2,300 |
| HCC45 | Disorders of Immunity | 4,300 | 2,300 |

3764

| Variable | Disease Group | Community Estimate | Institutional Estimate |
|---|---|---|---|
| HCC51 | Drug/Alcohol Psychosis | 1,800 | 1,100 |
| HCC52 | Drug/Alcohol Dependence | 1,400 | 1,100 |
| HCC54 | Schizophrenia | 2,800 | 1,100 |
| HCC55 | Major Depressive, Bipolar, and Paranoid Disorders | 2,200 | 1,100 |
| HCC67 or 68 | Quadriplegia/Paraplegia/Extensive Paralysis | 6,100 | 500 |
| HCC69 | Spinal Cord Disorders/Injuries | 2,500 | 500 |
| HCC70 | Muscular Dystrophy | 2,000 | 500 |
| HCC71 | Polyneuropathy | 1,400 | 500 |
| HCC72 | Multiple Sclerosis | 2,700 | 500 |
| HCC73 | Parkinsons and Huntingtons Diseases | 2,400 | 500 |
| HCC74 | Seizure Disorders and Convulsions | 1,400 | 500 |
| HCC75 (applies only to institutional) | Coma, Brain Compression/Anoxic Damage | NA | 500 |
| HCC75 or 154 (applies only to community) | Severe Head Injury, Coma, Brain Compression/ orAnoxic Damage | 2,900 | NA |
| HCC77 | Respirator Dependence/Tracheostomy Status | 10,800 | 7,300 |
| HCC78 | Respiratory Arrest | 7,300 | 7,300 |
| HCC79 | Cardio-Respiratory Failure and Shock | 3,500 | 1,500 |
| HCC80 | Congestive Heart Failure | 2,100 | 900 |
| HCC81 or 82 | Acute Myocardial Infarction/ or Unstable Angina and Other Acute Ischemic Heart Disease | 1,800 | 1,500 |
| HCC83 | Angina Pectoris/Old Myocardial Infarction | 1,200 | 1,500 |
| HCC92 | Specified Heart Arrhythmias | 1,400 | 1,000 |
| HCC95 | Cerebral Hemorrhage | 2,000 | 800 |
| HCC96 | Ischemic or Unspecified Stroke | 1,600 | 800 |
| HCC100 | Hemiplegia/Hemiparesis | 2,200 | 500 |
| HCC101 | Cerebral Palsy and Other Paralytic Syndromes | 800 | 500 |
| HCC104 | Vascular Disease with Complications | 3,500 | 2,600 |
| HCC105 | Vascular Disease | 1,800 | 600 |

26

| Variable | Disease Group | Community Estimate | Institutional Estimate |
|---|---|---:|---:|
| HCC107 or 108 | Chronic Obstructive Pulmonary Disease/ or Cystic Fibrosis | 1,900 | 1,200 |
| HCC111 | Aspiration and Specified Bacterial Pneumonias | 3,600 | 2,400 |
| HCC112 | Pneumococcal Pneumonia, Empyema, Lung Abscess | 1,000 | 2,400 |
| HCC119 | Proliferative Diabetic Retinopathy and Vitreous Hemorrhage | 1,800 | 5,100 |
| HCC130 | Dialysis Status | 15,800 | 16,000 |
| HCC131 | Renal Failure | 3,000 | 2,200 |
| HCC132 | Nephritis | 1,400 | 2,200 |
| HCC148 | Decubitus Ulcer of Skin | 5,300 | 1,600 |
| HCC149 | Chronic Ulcer of Skin, Except Decubitus | 2,500 | 1,300 |
| HCC150 | Extensive Third-Degree Burns | 4,900 | 1,300 |
| HCC154 (institutional only) | Severe Head Injury | NA | 1,300 |
| HCC155 | Major Head Injury | 1,200 | 1,300 |
| HCC157 | Vertebral Fractures without Spinal Cord Injury | 2,500 | 500 |
| HCC158 | Hip Fracture/Dislocation | 2,000 | 0 |
| HCC161 or 177 | Traumatic Amputation/ or Amputation Status, Lower Limb/Amputation Complications | 4,300 | 1,300 |
| HCC164 | Major Complications of Medical Care and Trauma | 1,300 | 1,300 |
| HCC174 | Major Organ Transplant Status | 3,700 | 4,500 |
| HCC176 | Artificial Openings for Feeding or Elimination | 4,100 | 4,500 |
| | | | |
| **Disabled/Disease Interactions** | | | |
| D-HCC5 | Disabled*Opportunistic Infections | 4,000 | 0 |
| D-HCC44 | Disabled*Severe Hematological Disorders | 4,600 | 0 |
| D-HCC51 | Disabled*Drug/Alcohol Psychosis | 2,600 | 0 |
| D-HCC52 | Disabled*Drug/Alcohol Dependence | 2,100 | 0 |
| D-HCC107 | Disabled*Cystic Fibrosis | 9,500 | 0 |

27

3766

| Variable | Disease Group | Community Estimate | Institutional Estimate |
|---|---|---:|---:|
|  |  |  |  |
| **Disease Interactions** |  |  |  |
| INT1 | DM*CHF[4] | 1,300 | 1,100 |
| INT2 | DM*CVD | 600 | 0 |
| INT3 | CHF*COPD | 1,200 | 1,900 |
| INT4 | COPD*CVD*CAD | 400 | 0 |
| INT5 | RF*CHF[4] | 1,200 | 0 |
| INT6 | RF*CHF*DM[4] | 4,400 |  |

**NOTES**

[1] The dollar amounts in this table will be converted to relative risk scores for the May 12 Announcement of M+C Rates. That is, these dollar amounts will be divided by the national average predicted expenditures to get relative risk scores we will report May 12.

[2] All estimates are rounded to the nearest hundred dollars.

[3] Beneficiaries with HCC128 Kidney Transplant Status were excluded from the sample because they will be included in the ESRD model sample.

[4] Beneficiaries with the three-way interaction RF*CHF*DM are excluded from the two-way interactions DM*CHF and RF*CHF. Thus, the three-way interaction term RF*CHF*DM is not additive to the two-way interaction terms DM*CHF and RF*CHF. Rather, it is hierarchical to, and excludes these interaction terms. A beneficiary with all three conditions is not "credited" with the two-way interactions. All other interaction terms are additive.

DM= diabetes mellitus (HCCs 15-19)

CHF= congestive heart failure (HCC 80)

COPD= chronic obstructive pulmonary disease (HCC 108)

CVD= cerebrovascular disease (HCCs 95-96, 100-101)

CAD= coronary artery disease (HCCs 81-83)

RF= renal failure (HCC 131)

**Source:** RTI Analysis of 1999/2000 Medicare 5% Sample

3767

**EXHIBIT 2.    Draft List Of Disease Groups (HCCs) with Hierarchies**

| DRAFT DISEASE HIERARCHIES | | |
|---|---|---|
| If the Disease Group is Listed in This Column… | | …Then Drop the Associated Disease Group(s) Listed in This Column |
| Disease Group (HCC) | Disease Group Label | |
| 5 | Opportunistic Infections | 112 |
| 7/8 | Metastatic Cancer, Acute Leukemia, and Other Severe Cancers | 9,10 |
| 9 | Lymphatic, Head and Neck, Brain and Other Major Cancers | 10 |
| 15 | Diabetes with Renal Manifestations | 16,17,18,19 |
| 16 | Diabetes with Neurologic or Other Specified Manifestation | 17,18,19 |
| 17 | Diabetes with Acute Complications | 18,19 |
| 18 | Diabetes with Ophthalmologic Manifestations | 19 |
| 25 | End-Stage Liver Disease | 26,27 |
| 26 | Cirrhosis of Liver | 27 |
| 51 | Drug/Alcohol Psychosis | 52 |
| 54 | Schizophrenia | 55 |
| 67/68 | Quadriplegia/Paraplegia/Extensive Paralysis | 69,100,101,157 |
| 69 | Spinal Cord Disorders/Injuries | 157 |
| 77 | Respirator Dependence/ Tracheostomy Status | 78,79 |
| 78 | Respiratory Arrest | 79 |
| 81 | Acute Myocardial Infarction | 82,83 |
| 82 | Unstable Angina and Other Acute Ischemic Heart Disease | 83 |
| 95 | Cerebral Hemorrhage | 96 |
| 100 | Hemiplegia/Hemiparesis | 101 |
| 104 | Vascular Disease with Complications | 105,149 |
| 111 | Aspiration and Specified Bacterial Pneumonias | 112 |
| 130 | Dialysis Status | 131,132 |
| 131 | Renal Failure | 132 |
| 148 | Decubitus Ulcer of the Skin | 149 |
| 154 | Severe Head Injury, Coma, Brain Compression/Anoxic Damage | 75,155 |
| **How Payments are Made with a Disease Hierarchy** | | |
| **EXAMPLE:**    If a beneficiary triggers Disease Groups 148 (Decubitus Ulcer of the Skin) and 149 (Chronic Ulcer of Skin, Except Decubitus), then DG 149 will be dropped.  In other words, payment will always be associated with the DG in column 1, if a DG in column 3 also occurs during the same collection period.  Therefore, the M+C organization's payment will be based on DG 148 rather than DG 149. | | |

29

3768

**EXHIBIT 3. Draft Annual Coefficients for CMS-HCC End Stage Renal Disease Model for Dialysis Patients**

| Variable | Disease Group | Estimates |
|---|---|---|
| **Age/Sex Coefficients** | | |
| Male, 0 to 34 | | 28,600 |
| Male, 35 to 44 | | 28,300 |
| Male, 45 to 54 | | 29,600 |
| Male, 55 to 59 | | 30,200 |
| Male, 60 to 64 | | 31,100 |
| Male, 65 to 69 | | 31,000 |
| Male, 70 to 74 | | 31,300 |
| Male, 75 to 79 | | 32,000 |
| Male, 80 to 84 | | 33,400 |
| Male, 85 to 89 | | 34,800 |
| Male, 90 to 94 | | 33,400 |
| Male, 95 and older | | 35,900 |
| Female, 0 to 34 | | 30,200 |
| Female, 35 to 44 | | 30,600 |
| Female, 45 to 54 | | 31,400 |
| Female, 55 to 59 | | 32,100 |
| Female, 60 to 64 | | 33,100 |
| Female, 65 to 69 | | 32,500 |
| Female, 70 to 74 | | 33,300 |
| Female, 75 to 79 | | 34,500 |
| Female, 80 to 84 | | 34,400 |
| Female, 85 to 89 | | 34,900 |
| Female, 90 to 94 | | 37,800 |
| Female, 95 and older | | 33,000 |
| | | |
| **Medicaid & Originally Disabled** | | |
| Medicaid status in 1996 | | 3,200 |
| Originally entitled due to disability | | 1,800 |
| | | |
| **Disease Coefficients** | | |
| HCC1 | HIV/AIDS | 8200 |
| HCC2 | Septicemia/Shock | 5400 |
| HCC5 | Opportunistic Infections | 2800 |
| HCC7 or 8 | High Cancer | 6600 |
| HCC9 | Medium Cancer | 3300 |
| HCC10 | Low Cancer | 1600 |
| HCCDIAB1 | Diabetes: Renal and Circulatory Complications | 5900 |
| HCCDIAB2 | Diabetes: Neurological and Other And Specified Complications | 3800 |

3769

| Variable | Disease Group | Estimates |
|---|---|---|
| HCCDIAB3 | Diabetes:Ketoacidosis and Other Ophthalmologic Complications | 2300 |
| HCCDIAB4 | Diabetes: Uncomplicated | 1900 |
| HCC21 | Protein-Calorie Malnutrition | 5300 |
| HCC25 | End-Stage Liver Disease | 7600 |
| HCC26 or 27 | Cirrhosis Liver/Chronic Hepatitis | 3900 |
| HCC31 | Intestinal Obstruction/Perforation | 4400 |
| HCC32 | Pancreatic Disease | 3800 |
| HCC33 | Inflammatory Bowel Disease | 4200 |
| HCC37 | Bone/Joint/Muscle Infections/Necrosis | 5600 |
| HCC38 | Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | 2500 |
| HCC44 | Severe Hematological Disorders | 1400 |
| HCC45 | Disorders of Immunity | 200 |
| HCC51 or 52 | Drug/Alcohol/Psychosis/Dependence | 4200 |
| HCC54 or 55 | Schizo.& Major Depressive Disorders | 5000 |
| HCC67 or 68 | Quad & Paraplegia | 8500 |
| HCC69 | Spinal Cord Disorders/Injuries | 4900 |
| HCC70 | Muscular Dystrophy | 2700 |
| HCC71 | Polyneuropathy | 3000 |
| HCC72 | Multiple Sclerosis | 6700 |
| HCC73 | Parkinson's and Huntington's Diseases | 4100 |
| HCC74 | Seizure Disorders and Convulsions | 3800 |
| HCC75 | Coma, Brain Compression/Anoxic Damage | 8300 |
| HCC77 or 78 | Resp. Depend / Resp. Arrest | 10600 |
| HCC79 | Cardio-Respiratory Failure and Shock | 5700 |
| HCC80 | Congestive Heart Failure | 3500 |
| HCC81 or 82 or 83 | AMI Angina Isch Heart Disease Ang Pect | 3500 |
| HCC92 | Specified Heart Arrhythmies | 3400 |
| HCC95 or 96 | Cerebral Hemorrhage/Ischemic or Uns. Stroke | 2800 |
| HCC100 | Hemiplegia/Hemiparesis | 5300 |
| HCC101 | Diplegia (Upper), Monoplegia, and Other Paralytic Syndromes | 1600 |
| HCC104 | Vascular Disease with Complications | 8100 |
| HCC105 | Vascular Disease | 4200 |
| HCC107 or 108 | CF/COPD | 1000 |
| HCC111 | Aspiration and Specified Bacterial Pneumonias | 4000 |
| HCC112 | Pneumococcal Pneumonia, Empyema, Lung Abscess | 3000 |
| HCC119 | Proliferative Diabetic Retinopathy and Vitreous Hemorrhage | 1300 |
| HCC128 | Kidney Transplant Status | NA[1] |
| HCC130 | Dialysis Status | NA[1] |

31

3770

| Variable | Disease Group | Estimates |
|---|---|---|
| HCC131 | Renal Failure | NA[1] |
| HCC132 | Nephritis | NA[1] |
| HCC148 | Decubitus Ulcer of Skin | 9800 |
| HCC149 | Chronic Ulcer of Skin, Except Decubitus | 5700 |
| HCC150 | Extensive Third-Degree Burns | 6800 |
| HCC154 | Severe Head Injury | 6000 |
| HCC155 | Major Head Injury | 3600 |
| HCC157 | Vertebral Fractures | 5300 |
| HCC158 | Hip Fracture/Dislocation | 5100 |
| HCC161 or 177 | Traumatic/Lower Limb Amputation | 5500 |
| HCC164 | Major Complications of Medical Care and Trauma | 3800 |
| HCC174 | Major Organ Transplant Status | 1100 |
| HCC176 | Artificial Openings for Feeding or Elimination | 3600 |
| | | |
| **Disabled & Disease Interactions[2]** | | |
| D-HCC107 | Disabled with Cystic Fibrosis | 10200 |
| DM * CHF | Diabetes and Congestive Heart Failure | 1500 |
| DM * CVD | Diabetes and Cardiovascular Disease | 1800 |
| CHF * COPD | CHF and chronic obstructive pulmonary disease | 1900 |
| COPD*CVD *CAD | COPD, CVD, and Coronary Artery Disease | 500 |

Notes

[1] The dialysis model has the same HCC categories as the CMS-HCC model for the non-ESRD population, except that HCCs with kidney disease diagnoses are excluded (HCC128 to HCC132). The model is calibrated only on dialysis patients, so the disease weights used for payment recognize disease and expenditure patterns unique to this population.

[2] DM= diabetes mellitus (HCCs 15-19)
  CHF= congestive heart failure (HCC 80)
  COPD= chronic obstructive pulmonary disease (HCC 108)
  CVD= cerebrovascular disease (HCCs 95-96, 100-101)
  CAD= coronary artery disease (HCCs 81-83)

3771

**Exhibit 4.  Summary Chart of Transition Payment Blends
For Risk/Frailty Adjustment in 2004**

| | Risk adjustment with a frailty adjuster? | Is there a need to further adjust aggregate risk adjusted payments? | Transition Blend- representing the percentage of current versus risk adjusted payment to be used in 2004 |
|---|---|---|---|
| **Medicare+Choice organizations** | No, risk adjustment only | No | 70/30% |
| **Program of All-inclusive Care For the Elderly (PACE)** | Yes | No, but CMS will evaluate on an annual basis. | 90/10% |
| **Wisconsin Partnership Program (WPP)** | Yes | No | 90/10% |
| **Minnesota Senior Care Options (MSHO) and Disability Health Options (MnDHO)** | Yes | No | 90/10% |
| **Massachusetts Senior Care Options** | Yes | No | 90/10% |
| **Social Health Maintenance Organizations (S/HMOs)** | Yes | No | 70/30% |
| **Evercare** | No, risk adjustment only | No | 70/30% |

**Includes only those ESRD members in post-transplant status

3772

**Exhibit 5.  Payment Methodology under Frailty Adjustment**



34

**EXHIBIT D-150**

**FILED UNDER SEAL IN ITS
ENTIRETY**

**EXHIBIT D-151**

**1. Please provide copies of all policies and procedures (P&P) relevant to obtaining, processing, and submitting risk adjustment data for the CY 2006 data collection period (i.e., the CY 2007 payment period).**

Historically, our encounter operations process has been largely automated. We did not have a formal, written P&P for that process during data collection period for 2006 dates of service. Please refer to our response to Question 4 of the second set of questions for a more detailed explanation of our 2006 practices related to obtaining, processing, and submitting risk adjustment data.

**2. Please provide any quality assurance policies and procedures relevant to H4590 and H0543's risk adjustment processes.**

Please see our response to Question 1.

**3. For contracts H4590 and H0543, please provide the names, titles, and locations of personnel responsible for obtaining risk adjustment data from providers, processing data at the plan level, and submitting the data to CMS.**

Numerous employees had responsibility in this area over the past four years. Some of the key employees with responsibility in this area include:

>Jeff Dumcum
>Senior Vice-President and General Manager
>Clinical Assessment Solutions
>Eden Prairie, MN

>Stephanie Will
>Vice-President, Program Delivery
>Clinical Assessment Solutions
>Eden Prairie, MN

>Pam Leal
>Vice-President, Market Consultation
>Clinical Assessment Solutions
>Santa Ana, CA

>Randy Myers
>Associate Director of Encounter Collection, Submission & Controls
>Clinical Assessment Solutions
>Phoenix, AZ

**EXHIBIT**

**1124-2**

3862

USBP064584712

**4.  What systems are used to generate and/or store encounter data at the plan level?**

For 2006 dates of service, we used several systems to generate and/or store claims and encounter data, including (i) our core claims transaction system for medical claims, called NICE, (ii) our core claims transaction systems for behavioral health claims, called FACETS, and (iii) our professional encounter system or "PES," which processed encounter data received from capitated providers.  We also received encounter data through our provider portal that was subsequently loaded to our risk adjustment processing system.

**5.  For the current and the CY 2006 data collection periods, please provide your instructions to providers for coding and submitting risk adjustment data.**

For the 2006 plan year, we used a provider manual that was implemented in 2005. Attached as Attachment A are the portions related to RAF data submission.  Attached as Attachment B are the portions of the current provider manual related to RAF data submission.

**6.  How do providers submit risk adjustment data to the plan?**

For 2006 dates of service, providers submitted risk adjustment data to the plan through (i) claims and/or encounter data sent electronically through a claims clearinghouse, (ii) encounter data sent electronically through a "direct connection" that allowed some capitated providers to submit encounters directly, bypassing a clearinghouse, (iii) claims and/or encounter data sent through paper claims and/or encounter forms submitted by providers not yet able to submit claims electronically, and (iv) risk adjustment data sent electronically via our provider portal.

**7.  Does the plan participate in the Healthcare Effectiveness Data and Information Set (HEDIS)?**

Yes.

**8.  Do providers submit claims to the plan indicating diagnoses (whether for risk adjustment, HEDIS, or other purposes)?**

Yes.

**9.  Who is responsible for reviewing provider-coded diagnoses for accuracy?  What is the process for reviewing these diagnoses?**

Providers are responsible for the accuracy of the diagnosis codes they send to the health plan. The plan is not in a position to review such codes for accuracy because it does not have the medical chart for each claim.  The plan's automated systems do, however, review provider-submitted codes to ensure such codes correspond to a valid ICD-9 code. Upon this review, any codes that our systems determine do not correspond to a valid ICD-9 code are flagged within our risk adjustment processing system for review and logged in a work queue with an "invalid diagnosis" error.

3863

CONFIDENTIAL    USBP064584713

Codes logged in the "invalid diagnosis" work queue are reviewed by a team of error correction analysts. Error correction analysts determine whether the code can be corrected by either reviewing the original claim image (in case of a keying error in the initial entry of the claim in our system) or by contacting the rendering provider directly. If an error correction analyst is able to identify a valid code through one of the two processes identified above, the analyst corrects the code in the system and removes the error flag, which then clears the code to be sent to CMS. If no valid code can be identified, the error flag is retained and the invalid code is not submitted to CMS. As described more fully below, the plan also reviews codes for accuracy through chart validations.

**10.  Please describe or provide any documentation you may have in support of provider training or outreach performed with respect to coding diagnoses for risk adjustment.**

Please see the information provided by Brian Lund on June 10, 2009, relating to provider training and outreach during the data collection period for 2006 dates of service.

**11.  Please provide a copy of the standards you have established with providers for maintaining enrollee health records.**

Our provider contracts require the retention of medical records. We have numerous agreements with provider groups. Our template California capitated provider agreement contains the following language:

2.7 <u>Medical Records</u>.  Medical Group and its Participating Providers shall maintain all patient medical records relating to Covered Services provided to Members, in such form and containing such information as required by the QI Program, Accreditation Organizations and State and Federal Law. Medical records shall be maintained in a manner that is current, detailed, organized and permits effective patient care and quality review by Medical Group and PacifiCare pursuant to the QI Program. Medical records shall be maintained in a form and physical location which is accessible to Medical Group's Participating Providers, PacifiCare, Government Agencies and Accreditation Organizations. Upon request and within the time frame requested, Medical Group and its Participating Providers shall provide to PacifiCare, at Medical Group's or Participating Provider's expense, copies of Member medical records for purposes of conducting quality assurance, case management and utilization reviews, credentialing and peer review, claims processing, verification and payment, resolving Member grievances and appeals and other activities reasonably necessary for the proper administration of the Managed Care Plans consistent with State and Federal Law. If Medical Group or its Participating Providers do not provide copies of Member medical records to PacifiCare within the time frame requested, Medical Group and its Participating Providers shall allow PacifiCare immediate access to such medical records for onsite copying and shall reimburse PacifiCare for the actual copying expense. Medical Group and its Participating Providers shall maintain the confidentiality of all Member medical records and treatment information in accordance with State and Federal Law and maintain

- 3 -

3864

USBP064584714

procedures that specify the purpose for which the information will be used within Medical Group's organization and to whom and for what purposes Medical Group may disclose the information outside of Medical Group. Medical records shall be retained by Medical Group and its Participating Providers for at least six (6) years following the provision of Covered Services and as required by State and Federal Law. The provisions of this Section shall survive termination of this Agreement for the period of time required by State and Federal Law.

Our template PCP contract in Texas is largely the same, containing the following language:

2.6 <u>Medical Records</u>. Physician shall maintain all patient medical records relating to Primary Care Services provided to Members, in such form and containing such information as required by the QI Program, Accreditation Organizations and State and Federal Law. Medical records shall be maintained in a manner that is current, detailed, organized and permits effective patient care and quality review by Physician and PacifiCare pursuant to the QI Program. Medical records shall be maintained in a form and physical location which is accessible to Physician, PacifiCare, Government Agencies, and Accreditation Organizations. Upon request and within the time frame requested, Physician shall provide to PacifiCare, at Physician's expense, copies of Member medical records for purposes of conducting quality assurance, case management and medical management, credentialing and peer review, claims processing, verification and payment, resolving Member grievances and appeals, and other activities reasonably necessary for the proper administration of the Managed Care Plans consistent with State and Federal Law. If Physician does not provide copies of Member medical records to PacifiCare within the time frame requested, Physician shall allow PacifiCare immediate access to such medical records for onsite copying and shall reimburse PacifiCare for the actual copying expense. Physician shall maintain the confidentiality of all Member medical records and treatment information in accordance with State and Federal Law and have procedures in place that specify the purpose for which the information will be used within Physician's organization and to whom and for what purposes Physician may disclose the information outside of Physician's organization. The provisions of this Section shall survive termination of this Agreement for the period of time required by State and Federal Law.

**"INGENIX Clinical Assessments Solutions Encounter Operations" Follow-up Questions**

**Please answer the following questions with respect to H4590 and H0543.**

**1. Please explain the role, responsibilities, and relationship to PacifiCare of INGENIX?**

Ingenix is a wholly-owned subsidiary of UnitedHealth Group ("UHG"). PacifiCare of Texas and PacifiCare of California are indirect, wholly-owned subsidiaries of UHG.

- 4 -

3865

CONFIDENTIAL

Among other things, Ingenix provides an assortment of healthcare related information and technology services to health plans operated by Ovations, one of four business families that constitute UHG. H4590 and H0543 are operated by Ovations and were acquired by UHG in December 2005 as part of UHG's acquisition of PacifiCare Health Systems.

Clinical Assessment Solutions ("CAS") is a business unit of Ingenix that provides clinical quality and risk scoring analytic services to Ovations. The services that CAS provides Ovations include:

a.   Provider engagement and education around accurate and complete diagnostic coding

b.   Oversight of encounter collection, submission and reconciliation

c.   Clinical support programs to encourage early assessment and on-going evaluation of chronic disease

d.   Monitoring the appropriateness and accuracy of provider coding

e.   Revenue reconciliation / analysis of payments received from CMS

f.   Annual working aged survey

g.   Financial and risk score projections

h.   Ad hoc reporting and analyses relating to Medicare Advantage revenue and risk scores

i.   Data mining and tool development to support these services

**2.  Was INGENIX involved in the operations of H4590 and H0543 during the CY 2006 data collection period?**

Yes. The personnel group that comprises CAS today was part of Ovations in the beginning of the data collection period for 2006 dates of service. In June or July of 2007, personnel who performed clinical quality and risk scoring analytic services transitioned from Ovations to Ingenix to form the initial CAS team.

**3.  Where is INGENIX located?**

Ingenix is headquartered in Eden Prairie, Minnesota.

**4.  May we obtain copies of the P&P that were in effect during CY 2006? If these P&P are not available, please explain any differences between the 1/1/2009 revision (version 1.0) and what was in effect during 2006.**

As mentioned above, we did not have a formal, written P&P for obtaining, processing, and submitting risk adjustment data to CMS during the data collection period for 2006 dates of service. This process is and has been largely automated and has changed since

- 5 -

3866

2006 because we moved to a new risk adjustment processing system. The system we used for 2006 dates of service was called BEST. We have since changed to a system called IRADS. The main difference between BEST and IRADS is the point in time at which each filters data for bill type, revenue code, CPT code and provider specialties. The Encounter Operations P&P that we provided to you on May 5, 2009 focuses on the process embedded in IRADS.

In other respects, our processes for 2006 dates of service are similar to our current processes. At that time, our encounter operations group submitted risk adjustment data to CMS based on, among other things, (1) chart validations, (2) chart reviews, and (3) other reporting mechanisms. A chart validation involved the review of a provider's patient charts to determine whether they supported certain codes that the provider had reported. We selected a provider for chart validation based principally on whether the provider's coding was unusually high compared to a national benchmark established by our risk adjustment system. The chart validation tested the provider's deviation from that benchmark. Codes found to be inaccurate or incomplete through chart validations were deleted. During a chart validation, we did not seek to verify other codes reported to CMS or to capture other diagnoses that were documented in the chart but not reported to CMS. In contrast, a chart review involved review of the diagnoses reflected in a selected provider's patient charts to determine if any documented diagnoses had not been reported to CMS. Following a chart review, we submitted to CMS any new codes documented in the medical chart but did not determine whether the codes previously reported to CMS were documented in the medical record. Our encounter operations group also received other reports of inaccurate codes from providers and deleted any such code found to be inaccurate. With respect to our current practices, we have begun conducting chart validations for 2008 dates of service on the IRADS system using criteria similar to that used for 2006 dates of service and are conducting chart reviews in substantially the same manner as we did for 2006 dates of service. The P&P we provided to you should not be read to suggest that we follow or have followed a different process.

Finally, we would like to make clear that although the P&P we provided to you reflects current practice as described above, that policy is a working draft. We plan to formally adopt and implement a final policy later this year.

**5.  The P&P were approved by Randall Myers. Who is Randall Myers? Who would have approved the P&P that were in place during CY 2006?**

Randy Myers is the Associate Director of Encounter Collection, Submission, and Controls within CAS. Randy has been in this role since September 2007. As discussed above, there were no written P&Ps regarding encounter collection and submission during the data collection period for 2006 dates of service.

- 6 -

3867

CONFIDENTIAL

USBP064584717

**6.  Please describe the "core transaction systems" (i.e., the claims and encounter systems; see p. 2).  What data are included in each system and how does that data get there?**

As discussed above, for 2006 dates of service, our "core transaction systems" included NICE, FACETS, PES and a provider portal.  As mentioned above, during the data collection period for 2006 dates of service, providers submitted risk adjustment data to the plan through (i) claims and/or encounter data sent electronically through a claims clearinghouse, (ii) encounter data sent electronically through a "direct connection" that allowed some capitated providers to submit encounters directly, bypassing a clearinghouse, (iii) claims and/or encounter data sent through paper claims and/or encounter forms submitted by providers not yet able to submit claims electronically, and (iv) risk adjustment data sent electronically via our provider portal.

**7.  What filter/extract logic is applied to extract data from the core transactions systems before they are submitted to RAPS (see 4.2)?**

As discussed above, during the data collection period for 2006 dates of service, the core transaction systems performed filtering on bill types, revenue codes, CPT codes, and provider specialties.

**8.  Can the systems generate reports showing invalid diagnoses identified during data extraction?**

During the data collection period for 2006 dates of service, the BEST system could generate reports showing codes that the BEST system identified as not corresponding to a valid ICD-9 code.

**9.  Please clarify the data processing described in 4.14:  "Diagnosis codes that are determined to be invalid before being submitted to CMS are flagged in our risk adjustment system and are worked through that application. If the code is later found to be valid, it is submitted via the CMS RAPS submission process. If the code is later found to be invalid, the code is never submitted to CMS."**

**a.  Why would a code be flagged as invalid?**

A code would be flagged as invalid if our systems determine that the code does not correspond to a valid ICD-9 code.  For example, 250.43 would not be flagged as invalid because it is a valid ICD-9 code, but 250.48 would be flagged as invalid because it does not correspond to a valid ICD-9 code.

**b.  What does "worked through that application" mean?**

As discussed above, codes that our systems determine do not correspond to a valid ICD-9 code are flagged within our risk adjustment processing system for review and logged in a work queue with an "invalid diagnosis" error.  Such codes are reviewed by a team of error correction analysts.  Error correction analysts determine whether the code can be corrected by either reviewing the original claim image (in case of a keying error in the

- 7 -

3868

CONFIDENTIAL

USBP064584718

initial entry of the claim in our system) or by contacting the rendering provider directly. If an error correction analyst is able to identify a valid code through one of the two processes identified above, the analyst corrects the code in the system and removes the error flag, which then clears the code to be sent to CMS.  If no valid code can be identified, the error flag is retained and the invalid code is not submitted to CMS.  As described more fully below, the plan also reviews codes for accuracy through chart validations.

**10.  Do you have a database that includes the diagnosis codes that were changed as a result of chart review? (See 4.15.)**

We do not have such a database.  As discussed above, for 2006 dates of service, risk adjustment data submitted to CMS was managed and stored on several databases.  In order to answer your question, we would have to (i) access those databases, which have been archived, (ii) build custom queries and (iii) manually trace and research the reason underlying each changed diagnosis codes.  Because this process is so labor-intensive, we would like to explore with you potentially less-burdensome avenues for us to assist you in this area.

3869

CONFIDENTIAL

USBP064584719

**EXHIBIT D-152**

# Chapter 4: Diagnosis Documentation & Coding

Documentation is the key influence on proper diagnosis code selection. For years we have seen diagnosis codes misused across many levels of care and in various settings. Healthcare professionals have in general become lazy with regard to documentation of diagnoses. In fact, one of the largest drivers of diagnosis code selection in real-world scenarios continues to be those diagnoses that support the procedure codes being billed to show medical necessity.

Diagnosis coding guidelines state that providers should document all diagnoses that are a part of the medical decision making (MDM) for each visit.

### Example

A patient comes in for a possible strep pharyngitis and has known diabetic neuropathy; it would be appropriate to choose the pharyngitis as the primary diagnosis code (or main reason for the visit) and include codes for the diabetic neuropathy. Those diagnoses are taken into consideration when treating the presenting problem.

Coding professionals consistently have seen a decline in the accuracy of diagnosis coding. Often the quickest code found on the superbill/encounter form is reported even though it may not accurately describe the patient's condition. Another common error is to only report the primary diagnosis without reporting all the applicable diagnosis codes for the encounter. Providers and coders are equally guilty of choosing generic, non-specific codes because they are memorized and easier to code than stopping to look up a more specific diagnosis code supported by documentation.

Documenting complications and comorbidities is important for risk adjustment purposes. Many providers still do not realize the coding guidelines largely prohibit medical coders from assuming any cause and effect relationships and if these are not clearly documented in the medical record, they are lost in translation.

Diabetes is one of the biggest challenges. Many providers have memorized the basic diabetes code, yet that primary unspecified diabetic code should only be used for diabetics who have no complications from their diabetes. Overall, this is often not the case for many diabetics, and complications of diabetes, which are rated higher in risk adjustment

models, are left undocumented. This not only skews the reality of the state of health of each patient, but it also skews data being collected and how the United States compares by reported diagnosis codes to the health of other nations.

Another example of diagnosis coding challenges is hypertension, which similar to diabetes has potential cause and effect conditions that might lead to a different diagnosis code selection. An example is hypertensive heart disease.

Many providers still are not aware there are coding guidelines for coding a stroke. Once a patient has been discharged from an inpatient treatment for a stroke, it is no longer appropriate to use the stroke diagnosis code. Instead, a history of stroke code and any residual late effect diagnosis should be documented and coded. These examples help support the value of having certified medical coders.

Certified coders are not automatically knowledgeable on every topic, and most coders have particular strengths in certain specialties. There is a slightly different mindset for the risk adjustment coder.

Coders are accustomed to submitting diagnosis codes on claims for the purposes of reimbursement validation for services already rendered. In the risk adjustment models, coders are not submitting codes for services rendered, but instead submitting codes to properly calculate each patient's risk score, which affects the financial and disease management resources that will go toward future treatments necessary to treat the existing diagnoses.

Collecting these diagnoses is not for the purpose of submitting a claim, but rather to send the diagnoses in a supplemental file to account for all the conditions the patient has documented as a current condition each year. These diagnosis codes are converted to a risk adjustment factor (eg, HCC value or CDPS value) and the patient's risk score is steadily and yearly adjusted according to those risk adjustment-associated diagnosis codes. The end result is not the storage of a group of diagnosis codes, but instead, their affiliated diagnosis values, such as HCC value or CDPS value as documented and reported.

As discussed earlier, these values establish the budgeting for the care of each patient for each following year. Some argue that risk adjustment is inflating previously unreported diagnoses; however, the truth is that risk adjustment is finally requiring providers and health plans to pay close

attention to the diagnoses being documented and this has, in turn, caused a surge in more specific diagnosis codes being captured correctly. While coders must use caution to avoid over-coding or up-coding of any diagnoses, they also must ensure diagnosis code selection is as specific as possible. This attention to detail in recent years has created what might appear to be a surge in diagnosis reporting, but in reality diagnosis code selection is becoming more accurate than ever before.

Note that the acronym "ICD" is used here to reference diagnosis codes in general to include ICD-9-CM, as well as the ICD-10-CM codes implemented October 1, 2014. The general coding guidelines that instruct the reporting of all coexisting diagnosis codes for each encounter do not change from ICD-9-CM to ICD-10-CM.

## Coding For All Diagnoses Noted in a Date Of Service (DOS)

Medicare defaults much of its risk adjustment diagnosis coding guidance to the official coding guidelines and American Hospital Association (AHA) *Coding Clinic®* determinations. In risk adjustment coding in accordance with the Official Coding and Reporting Guidelines, it is appropriate to document and code for all coexisting conditions in all dates of service for each calendar year.

In DRG coding, which is familiar with many hospital-based coders, diagnosis codes are only selected when they are identified as part of the reason for the visit, treatment, or procedure. Diagnoses not currently being treated are avoided. The focus here is choosing those codes directly related to services rendered to help explain the why of the encounter(s). This rule does not apply to risk adjustment diagnosis coding, where the goal is to correctly capture all diagnosis codes for all current conditions without regard to current treatment, as risk adjustment values will largely apply to future needed treatment related to those diagnoses.

Risk adjustment models tend to shy away from using diagnosis codes for diagnostic testing, and with good reason. Often providers might choose to list a diagnosis he or she is ruling out as the reason for the test instead of the correct selection of the signs and symptoms as the reason for the test. In risk adjustment models, providers are expected to update any diagnostic findings such as a newly confirmed diagnosis from laboratory or X-ray findings in an addendum to the DOS when the test was ordered, or in the next face-to-face encounter with the patient. It is appropriate for coders to capture such diagnostic findings when they have been updated in the addendum or the next follow-up encounter documentation, not directly from reports.

When reviewing 1995 and 1997 documentation guidelines for E/M services, diagnoses must be documented to include how they have been evaluated or addressed. The focus here is solely on choosing the appropriate level of E/M service. These guidelines are in relation to the procedure code assignment and are not diagnosis coding guidelines or rules, but rather rules to be followed when using diagnoses to support a level of service. A coder should got give credit for the time and attention of a diagnosis not listed on the DOS and certainly not use its existence to bump up the level of service when choosing the E/M procedure code.

When coding diagnoses for risk adjustment purposes, the goal is to honestly report all current diagnoses a patient has in face-to-face encounters by approved provider types during each calendar year (January–December). There is not a justification in only reporting those diagnoses that were treated or addressed or explain a level or service. Following ICD guidelines, it is appropriate to code for all coexisting diagnoses and this should not be curbed by only those addressed or treated in the visit, but all which were a part of the medical decision making of the visit or encounter. Any diagnoses previously treated, no longer existing, or are truly only historical in nature are not coded.

Coders and providers have developed improper diagnosis coding and billing habits derived from the Fee-For-Service (FFS) model and insurance carrier denials. If one were to ask any coder, biller, or provider how a diagnosis code is chosen for a particular visit, the answer will likely be the diagnosis code that will get the procedure code paid, or the diagnosis that exists and is supported in an Local Coverage Determination (LCD). While this has evolved from various payment methodologies across the country, this is not what is instructed in the Official Guidelines for Coding and Reporting. The coding guidelines instruct to select a primary code (main reason for the visit/encounter) and additional codes for other coexisting conditions.

Coders rely on coding guidelines to support coding decisions. Excerpts from the ICD-9-CM and ICD-10-CM Official Coding Guidelines for Coding and Reporting are provided as support for the coding advice covered in this chapter.

## Guideline Excerpt

### Selection of primary diagnosis and first-listed diagnosis

**ICD-9-CM:**
**Section II. Selection of a Principal Diagnosis**
*These circumstances of inpatient admission always govern the selection of principal diagnosis. The principal diagnosis is defined in the Uniform Hospital Discharge Data Set (UHDDS) as "that condition established after study to be chiefly responsible for occasioning the admission of the patient to the hospital for care."*

*The UHDDS definitions are used by hospitals to report inpatient data elements in a standardized manner. These data elements and their definitions can be found in the July 31, 1985, Federal Register (Vol. 50, No, 147), pp. 31038-40.*

*Since that time the application of the UHDDS definitions has been expanded to include all non-outpatient settings (acute care, short term, long term care, and psychiatric hospitals; home health agencies; rehab facilities; nursing homes, etc).*

*In determining principal diagnosis the coding conventions in the ICD-9-CM, Volumes 1 & 2 take precedence over these official coding guidelines.*

*(See Section I.A., Conventions for the ICD-9-CM)*

*The importance of consistent, complete documentation in the medical record cannot be over emphasized. Without such documentation the application of all coding guidelines is a difficult, if not impossible task. (ICD-9-CM, 2014)*

**ICD-10-CM:**
**Section II. Selection of a Principal Diagnosis**
*These circumstances of inpatient admission always govern the selection of principal diagnosis. The principal diagnosis is defined in the Uniform Hospital Discharge Data Set (UHDDS) as "that condition established after study to be chiefly responsible for occasioning the admission of the patient to the hospital for care."*

*The UHDDS definitions are used by hospitals to report inpatient data elements in a standardized manner.*

*These data elements and their definitions can be found in the July 31, 1985, Federal Register (Vol. 50, No, 147), pp. 31038-40.*

*Since that time the application of the UHDDS definitions has been expanded to include all non-outpatient settings (acute care, short term, long term care, and psychiatric hospitals; home health agencies; rehab facilities; nursing homes, etc).*

*In determining principal diagnosis the coding conventions in the ICD-10-CM, the Tabular List and the Alphabetic Index take precedence over these official coding guidelines.*

*(See Section I.A., Conventions for the ICD-10-CM)*

*The importance of consistent, complete documentation in the medical record cannot be over emphasized. Without such documentation the application of all coding guidelines is a difficult, if not impossible task. (ICD-10-CM, 2014 Draft)*

**ICD-9-CM:**
**Section IV. Diagnostic Coding and Reporting Guidelines for Outpatient Services**
**A. Selection of first-listed condition**
*In the outpatient setting, the term first-listed diagnosis is used in lieu of principal diagnosis.*

*In determining the first-listed diagnosis the coding conventions of ICD-9-CM, as well as the general and disease specific guidelines take precedence over the outpatient guidelines.*

*Diagnoses often are not established at the time of the initial encounter/visit. It may take two or more visits before the diagnosis is confirmed.*

*The most critical rule involves beginning the search for the correct code assignment through the Alphabetic Index. Never begin searching initially in the Tabular List as this will lead to coding errors. (ICD-9-CM, 2014)*

**ICD-10-CM:**
**Section IV. Diagnostic Coding and Reporting Guidelines for Outpatient Services**
**A. Selection of first-listed condition**
*In the outpatient setting, the term first-listed diagnosis is used in lieu of principal diagnosis.*

*In determining the first-listed diagnosis the coding conventions of ICD-10-CM, as well as the general and disease specific guidelines take precedence over the outpatient guidelines.*

*Diagnoses often are not established at the time of the initial encounter/visit. It may take two or more visits before the diagnosis is confirmed.*

*The most critical rule involves beginning the search for the correct code assignment through the Alphabetic Index. Never begin searching initially in the Tabular List as this will lead to coding errors. (ICD-10-CM, 2014 Draft)*

## Guideline Excerpt

Selecting codes for coexisting conditions

**ICD-9-CM:**
**Section IV. Diagnostic Coding and Reporting Guidelines for Outpatient Services**
**H. ICD-9-CM code for the diagnosis, condition, problem, or other reason for encounter/visit**
*List first the ICD-9-CM code for the diagnosis, condition, problem, or other reason for encounter/visit shown in the medical record to be chiefly responsible for the services provided. List additional codes that describe any coexisting conditions. In some cases the first-listed diagnosis may be a symptom when a diagnosis has not been established (confirmed) by the physician. (ICD-9-CM, 2014)*

**K. Code all documented conditions that coexist**
*Code all documented conditions that coexist at the time of the encounter/visit and require or affect patient care treatment or management. Do not code conditions that were previously treated and no longer exist. However, history codes (V10-V19) may be used a secondary codes if the historical condition or family history has an impact on current care or influences treatment. (ICD-9-CM, 2014)*

**ICD-10-CM:**
**Section IV. Diagnostic Coding and Reporting Guidelines for Outpatient Services**
**G. ICD-10-CM code for the diagnosis, condition, problem, or other reason for encounter/visit**
*List first the ICD-10-CM code for the diagnosis, condition, problem, or other reason for encounter/visit shown in the medical record to be chiefly responsible for the services provided. List additional codes that describe any coexisting conditions. In some cases the first-listed diagnosis may be a symptom when a diagnosis has not been established (confirmed) by the physician. (ICD-10-CM, 2014 Draft)*

**J. Code all documented conditions that coexist**
*Code all documented conditions that coexist at the time of the encounter/ visit and require or affect patient care treatment or management. Do not code conditions that were previously treated and no longer exist. However, history codes (categories Z80-Z87) may be used as secondary codes if the historical condition or family history has an impact on current care or influences treatment. (ICD-10-CM, 2014 Draft)*

The CMS Risk Adjustment Participant Guide specifically directs us to follow the Official Guidelines for Coding and Reporting and determinations provided in the AHA Coding Clinic®.

**Excerpt from the Medicare/**
**CMS Risk Adjustment Participant Guide:**
**6.4.1 Co-Existing and Related Conditions**
*The instructions for risk adjustment implementation refer to the official coding guidelines for ICD-9-CM, published at www.cdc.gov/nchs/icd9.htm and in the Coding Clinic®. Physicians should code all documented conditions that co-exist at the time of the encounter/visit, and require or affect patient care treatment or management. Do not code conditions that were previously treated and no longer exist. However, history codes (V10-V19 not in HCC model) may be used as secondary codes if the historical condition or family history has an impact on current care or influences treatment.*

*Co-existing conditions include chronic, ongoing conditions such as diabetes (250.XX, HCCs 15-19),*

*congestive heart failure (428.0, HCC 80), atrial fibril-lation (427.31, HCC 92), chronic obstructive and pulmonary disease (496, HCC 108). These diseases are generally managed by ongoing medication and have the potential for acute exacerbations if not treated properly, particularly if the patient is experiencing other acute conditions. It is likely that these diagnoses would be part of a general overview of the patient's health when treating co-existing conditions for all but the most minor of medical encounters.*

*Co-existing conditions also include ongoing conditions such as multiple sclerosis (340, HCC 72), hemi-plegia (342.9X, HCC 100), rheumatoid arthritis (714.0, HCC 38) and Parkinson's disease (332.0, HCC 73). Although they may not impact every minor health-care episode, it is likely that patients having these conditions would have their general health status evaluated within a data reporting period, and these diagnoses would be documented and reportable at that time.*

*MA organizations must submit each required diag-nosis at least once during a risk adjustment reporting period. Therefore, these co-existing conditions should be documented by one of the allowable provider types at least once within the data reporting period. (CMS Participant Guide, 2008)*

***Use of "history of."*** *In ICD-9-CM, "history of" means the patient no longer has the condition and the diagnosis often indexes to a V code not in the HCC models. A physician can make errors in one of two ways with respect to these codes. One error is to code a past condition as active. The opposite error is to code as "history of" a condition when that condi-tion is still active. Both of these errors can impact risk adjustment. (CMS Participant Guide, 2008)*

Because the purpose is to code for all known diagnoses for each patient in risk adjustment models, diagnoses from any portion of the record should be reported, provided that they are accurately documented as current diagnoses.

## Coding Diagnoses from Chief Complaint (CC) or History of Present Illness (HPI)

Entries from the CC and HPI portion of any record should be carefully evaluated for the wording used by the treating provider. All documented diagnoses should be coded and any that are only noted as historical should be left as Past Medical History (PMH) or questionable, which is covered later in this chapter.

In the two examples below, diagnoses highlighted in green would be appropriate to code as current diagnoses and those in yellow would be PMH or questionable.

**Example**

**Example 1:** CC: Ms. Jones is a 70-year-old female who comes in today for follow up of her diabetes and COPD. She has a history of DVT and periph-eral vascular disease. She has had no issues or complaints since her last visit to the office.

**Rationale:** The CC clearly states the patient is here for the diabetes and COPD. The DVT and PVD are mentioned as historical in nature and are not clear to be current conditions. Additionally, these two conditions are not known to be permanent and life-long and therefore should not be coded as current.

**Example 2:** CC: Ms. Jones is a 70-year-old female with a history of diabetes and COPD and she is here today for a follow up on her blood sugar control and to evaluate her inhaler effectiveness.

**Rationale:** This CC lists both conditions as "histor-ical" yet it also affirms that they are current condi-tions being treated and therefore are appropriate to code as current. Cardiovascular: Patient reports she had an MI at age 50

# Coding Diagnoses from PMH and other Historical Lists

PMH is one of the biggest areas of contention when reviewing medical records. As stated in the Medicare/CMS Risk Adjustment Participant Guide, CMS recognizes that providers may sometimes incorrectly list a current diagnosis as PMH or vice versa. "One error is to code a past condition as active. The opposite error is to code "history of" a condition when that condition is still active" (CMS Participant Guide, 2008).

Coders see a plethora of documentation variations that can be challenging to even the most skilled. While it is evident that one should report all current diagnoses (regardless of treatment), there are some diagnoses, which may only be listed as historical in nature. According to the coding guidelines, as well as CMS guidance, coders cannot code for conditions previously treated and that no longer exist.

PMH is loosely used in clinical documentation, sometimes as a stand-alone listing of diagnoses and sometimes as a separately identifiable true listing of past conditions. Because of varying methods of documentation used by providers across the country, there must be a standardized way to interpret these lists. This is also true when the words *history of* are included in other portions of the documentation.

Coders cannot make assumptions. Even if a diagnosis may be commonly known as a condition that once diagnosed, is life-long and does not go away. If such a condition is not listed as current and only as historical, there must be a way to identify those diagnoses that are still valid separate from those that are truly historical. In an ideal situation, it would be appropriate to query the treating provider for clarification; however, risk adjustment coding work may be done remotely by coders representing the health plan who do not have interactions with the provider. Sometimes risk adjustment coding work is done by trusted vendors who hire coders with no communication with the documenting provider(s).

The Official Coding and Reporting guidelines instruct coders on the appropriate coding of previous or historical conditions for inpatient as well as outpatient settings.

## Guidelines Excerpt

Selecting codes for previously treated or historical diagnoses:

**ICD-9-CM:**
**Section IV. Diagnostic Coding and Reporting Guidelines for Outpatient Services**
**K. Code all documented conditions that coexist**
*Code all documented conditions that coexist at the time of the encounter/visit and require or affect patient care treatment or management. Do not code conditions that were previously treated and no longer exist. However, history codes (V10-V19) may be used as secondary codes if the historical condition or family history has an impact on current care or influences treatment. (ICD-9-CM, 2014)*

**ICD-10-CM:**
**Section IV. Diagnostic Coding and Reporting Guidelines for Outpatient Services**
**J. Code all documented conditions that coexist**
*Code all documented conditions that coexist at the time of the encounter/ visit and require or affect patient care treatment or management. Do not code conditions that were previously treated and no longer exist. However, history codes (categories Z80-Z87) may be used as secondary codes if the historical condition or family history has an impact on current care or influences treatment. (ICD-10-CM, 2014 Draft)*

Many in the coding profession are familiar with the acronym MEAT, which stands for Monitor, Evaluate, Assess, or Treat as a reminder of scenarios where diagnoses can be coded in normal fee-for-service models or when choosing supporting diagnosis codes for procedures or other services already rendered. This acronym does not address all diagnoses that can be reported in risk adjustment coding because there are more scenarios that would qualify a diagnosis code as current or active for risk adjustment purposes. The MEAT acronym supports diagnosis code selection to support E/M services.

IonHealthcare, LLC, has created a new trademarked acronym specifically to address those diagnoses in question. If a coder believes any diagnosis is current, but it is only listed as PMH or historical, coders should ask themselves: "Did the provider TAMPER™ (Treatment, Assessment, Monitor/Medicate, Plan, Evaluate, or Referral) with the

diagnosis on the DOS? If the answer is yes, then the diagnosis can be considered current, and if the answer is no, then do not report the code as current and consider the diagnosis as a PMH (historical) diagnosis which is not normally submitted or shared for risk adjustment purposes.

Some health plans record historical diagnoses that lack ongoing evidence of treatment or medical decision making in an effort to identify additional suspect conditions that may be present elsewhere. These are usually stored for evaluation purposes, but not captured or reported officially for risk adjustment purposes. Some health plans feel uncomfortable reporting any diagnosis not currently being treated or addressed and may choose to only include those diagnoses that are in the assessment portions of the encounter documentation. This is a very conservative approach, and may become difficult to manage because of the many diagnoses which may never be documented in those areas but are pertinent to risk adjustment such as old MI, amputations, ostomy status, etc.

Because many of these diagnoses are permanent and lifelong, many carriers have identified a select listing of diagnoses, which when even if only listed as historical, may be overridden and submitted for risk adjustment purposes. This is at the discretion of the client/carrier and is not recommended as proper coding guidelines for risk adjustment.

### Figure 2—TAMPER™ Decision Flow



Source: IonHealthcare, LLC

There are many diagnoses in risk adjustment models that have medication therapy, where those medications are only used for those diagnoses alone, and these are often utilized to establish a diagnosis as current or valid to submit. In such cases, it is important to be sure that the medication is current, and prescribed for the diagnosis to make it a current diagnosis. Medications documented that can be used for several different diagnoses or conditions do not help support an active diagnosis if they are not linked in some manner to the diagnosis itself. Query of the treating provider is the best method to validate the codes; however, coders may justify the codes if self-evident.

Special caution is advised for those records where diagnoses appear to be continually repeated or "cut and pasted" into each subsequent DOS and caution should be taken to only include those diagnoses which meet the TAMPER™ criteria above when diagnoses are listed as historical.

The following diagnoses are examples that are often improperly coded as current. Some organizations utilize a system of code harvesting that allows for a historical or PMH only flagging to identify codes which seem to be unclear as to whether they are current or prior history items. Such practice should be used very carefully as many of these codes should not be reported as historical, or they may have a more specific "history of" code such as a V code that might be more accurate.

- **Fractures**—Fractures are not coded once they are repaired. However, compression fractures of the vertebrae are often not treated in the elderly, and if a vertebral fracture appears to be a current diagnosis, it may be coded.
- **Cancers**—There are 'history of' diagnosis codes to express this, and these may or may not risk adjust (they do for come commercial plans, but do not for CMS HCC purposes.).
- **CVA**—Coding guidelines state a CVA may not be coded once a patient is discharged for this problem, instead a history of code should be used.
- **Myocardial Infarction**—There is a specific code for old MI (412) which does risk adjust in most models.
- **HIV**—This diagnosis has no cure and could never be merely historical.
- **Amputations**—Amputated body parts are permanent.
- Anything that is listed as: repaired, resolved, fixed, or managed through prophylaxis.

When PMH is listed as a separately identifiable list of true historical conditions, coders are required to find evidence within that same date of service (DOS) to substantiate that particular PMH diagnosis as actually current unless it is a condition that never goes away, such as HIV infection. This would include medication, which is irrefutable for the condition or shows other evidence of "TAMPER™", including notation of the condition being current, stable, active, reviewed, unchanged, etc.

When coders are presented with documentation where there are PMH listings separated from another listing noted as active, current, ongoing, etc., they are instructed to treat all those listed as current, active, ongoing, etc. as current, within reason, and to follow the above rule for those listed in the separate PMH only listing. Providers need to be reminded of the importance of list headers and to categorize diagnoses appropriately.

## Coding from Lists

Use caution when given diagnosis lists. While it is appropriate to code for all known current diagnoses, exercise caution to avoid improperly coding any diagnosis in a list which could not be current, is not believed to be current, or appears to be mistakenly brought forward from a past visit documentation. Some of these lists have columns designating diagnoses as current or resolved, but even with this level of detail, use caution to avoid coding any old diagnoses no longer present or those which the coder knows could not possibly still be true.

In general, if diagnoses are listed as current, ongoing, active, chronic, etc., they may be coded, especially if there is another specific separate listing of PMH diagnoses. Conditions that resolve and have no additional mention in the record should not be coded unless TAMPER™ guidance is met.

### Example: Chronic Problems:

- *A-Fib (on Coumadin)*
- *Acute Pancreatitis (admitted 2002)*
- *Old MI*
- *CVA (2000)*
- *CKD (Followed by Dr. Jones, nephrology)*
- *Prostate CA*

**RATIONALE:** *The above list may be titled as "chronic conditions, but not all of the conditions listed are current. This is a common problem for coders. The A-fib is clearly current as there is medical treatment. The acute pancreatitis appears to be historical only. The old MI may be coded as factual, and the CVA is not only historical (one could code a history of code and any related residual conditions if noted), but an active CVA code cannot be coded once a patient has been discharged for the CVA. CKD is clearly still under treatment, and prostate CA lacks any current ongoing treatment that would be necessary to code a cancer as current.*

## Coding Diagnoses from Review of Systems (ROS)

Some coders have voiced concerns about coding diagnoses from the ROS portion of the record and this hesitation can be related back to the E/M coding guidelines. When choosing a level of service for E/M purposes, coders are instructed that the ROS area is used in meeting the history taking element toward the E/M selection. This portion of the medical record documentation is intended to document the provider's questioning of the patient for feedback regarding how they are doing by systems. Many providers will document accurate diagnoses in this section of the record. The main warning in this area is to avoid coding for any patient-stated conditions. Conditions or diagnoses that are only reported by the patient as recounting to the current provider are not acceptable without provider validation.

In the two examples below, those diagnoses highlighted in green would be appropriate to code and those in yellow would be PMH or questionable.

### Example

**Example 1:** ROS: Respiratory: COPD, Hypoxia, on inhaler and home oxygen Cardiovascular: no complaints of SOB, no palpitations, MI 1992

**Rationale:** The above ROS annotates that the patient is on current treatment for the COPD and there is a valid Old MI noted during the ROS as well that is valid.

**Example 2:** ROS: Respiratory: patient states her PCP told her she has COPD

**Rationale:** The above ROS merely annotates a patient stated condition that is not confirmed by the current treating provider. It is 'diagnosis hearsay' and should not be coded.

## Coding Diagnoses from the Exam Portion of a Record

The exam portion of the medical record is where the provider documents the objective findings from the actual physical exam portion of the encounter with the patient. Many providers may list valid diagnoses in this section of the record and any diagnoses documented, as current should be coded appropriately.

### Example

**Example 1:** Exam: Extremities: Good Lt. pedal pulses; Rt. above knee amputation (2006).

**Rationale:** In the above exam, the provider merely uses the exam portion to annotate that there is an above the knee amputation. The code for amputation status would be appropriate to code.

**Example 2:** Exam: Appearance: Appears cachectic.

**Rationale:** In the above exam, the provider is merely annotating an appearance and not making a diagnosis of cachexia. "Appears" is the same as "likely" which is not a diagnosis.

## Coding from Assessment and Plan

The assessment and plan portions of any record are the final portions of documentation for each encounter. The diagnoses documented in the assessment and plan should generally always be coded, with one word of caution-many providers will list items in the assessment, which have resolved or are no longer current.

Examples of assessment documentations that should not be coded:

- **Stroke**—When the patient is not having or being treated for a stroke it is improper to code this diagnosis.
- **Cancers**—Cancers may only be coded when they are current and not current by the above definitions, as they have their own rule. Cancers must only be coded as current when there is evidence of current treatment toward the cancer (or the patient has refused treatment, or "watchful waiting" is being followed). Special caution must be taken by the coder when reviewing records for follow up of old cancers which have resolved, been eradicated, or are no longer being actively treated and avoid coding those incorrectly as current.

**EXHIBIT D-153**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Medicare & Medicaid Services

**42 CFR Parts 422, 423, 438, and 498**

**[CMS–4185–P]**

**RIN 0938–AT59**

### Medicare and Medicaid Programs; Policy and Technical Changes to the Medicare Advantage, Medicare Prescription Drug Benefit, Program of All-Inclusive Care for the Elderly (PACE), Medicaid Fee-for-Service, and Medicaid Managed Care Programs for Years 2020 and 2021

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Proposed rule.

**SUMMARY:** This proposed rule would revise the Medicare Advantage (MA) program (Part C) regulations and Prescription Drug Benefit program (Part D) regulations to implement certain provisions of the Bipartisan Budget Act of 2018; improve quality and accessibility; clarify certain program integrity policies; reduce burden on providers, MA plans, and Part D sponsors through providing additional policy clarification; and implement other technical changes regarding quality improvement. This proposed rule would also revise the appeals and grievances requirements for Medicaid managed care and MA special needs plans for dually eligible individuals to implement certain provisions of the Bipartisan Budget Act of 2018.

**DATES:** To be assured consideration, comments must be received at one of the addresses provided below, no later than 5 p.m. on December 31, 2018.

**ADDRESSES:** In commenting, please refer to file code CMS–4185–P. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

Comments, including mass comment submissions, must be submitted in one of the following three ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the "Submit a comment" instructions.

2. *By regular mail.* You may mail written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–4185–P, P.O. Box 8013, Baltimore, MD 21244–8013.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–4185–P, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:**
Theresa Wachter, (410) 786–1157, or Cali Diehl, (410) 786–4053, MA/Part C Issues.
Elizabeth Goldstein, (410) 786–6665, Parts C and D Quality Ratings Issues.
Mark Smith, (410) 786–8015, Prescription Drug Plan Access to Parts A and B Data Issues.
Vanessa Duran, (410) 786–8697, D–SNP Issues.
Frank Whelan, (410) 786–1302, Preclusion List Issues.
Jonathan Smith (410) 786–4671, or Joanne Davis, (410) 786–5127, MA RADV Issues.

**SUPPLEMENTARY INFORMATION:** *Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. We post all comments received before the close of the comment period on the following website as soon as possible after they have been received: *http://www.regulations.gov.* Follow the search instructions on that website to view public comments.

Comments received timely will also be available for public inspection as they are received, generally beginning approximately 3 weeks after publication of a document, at the headquarters of the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, Maryland 21244, Monday through Friday of each week from 8:30 a.m. to 4 p.m. To schedule an appointment to view public comments, phone 1–800–743–3951.

### I. Executive Summary

#### A. Purpose

The primary purposes of this proposed rule are to: make revisions to the Medicare Advantage (MA) program (Part C) and Prescription Drug Benefit Program (Part D) regulations based on our continued experience in the administration of the Part C and Part D programs and to implement certain

provisions of the Bipartisan Budget Act of 2018. The proposed changes are necessary to—
• Implement the Bipartisan Budget Act of 2018 provisions;
• Improve program quality and accessibility;
• Clarify program integrity policies; and
• Implement other changes.

This proposed rule would meet the Administration's priorities to reduce burden across the Medicare program by reducing unnecessary regulatory complexity, and improve the regulatory framework to facilitate development of Part C and Part D products that better meet the individual beneficiary's healthcare needs. Because the Bipartisan Budget Act of 2018 requires the Secretary to establish procedures, to the extent feasible, for integration and unification of the appeals and grievance processes for dually eligible beneficiaries who are enrolled in Medicaid and in MA special needs plans for dually eligible individuals, this proposed rule also includes proposals to revise the appeals and grievances requirements for Medicaid managed care and MA special needs plans for dually eligible individuals. We note CMS plans to release a proposed Medicare rule in the near future to further the President's agenda of reducing drug costs.

#### B. Summary of the Major Provisions

1. Requirements for Medicare Advantage Plans Offering Additional Telehealth Benefits (§§ 422.100, 422.135, 422.252, 422.254, and 422.264)

Section 50323 of the Bipartisan Budget Act of 2018 (Pub. L. 115–123) created a new section 1852(m) of the Social Security Act (the Act), which allows MA plans to provide "additional telehealth benefits" to enrollees starting in plan year 2020 and treat them as basic benefits for purposes of bid submission and payment by CMS. The statute limits these authorized additional telehealth benefits to services for which benefits are available under Medicare Part B, but that are not payable under section 1834(m) of the Act and have been identified for the applicable year as clinically appropriate to furnish through electronic information and telecommunications technology (section 1852(m)(2)(A)(i) of the Act). Under this proposal, MA plans would be permitted to offer—as part of the basic benefit package—additional telehealth benefits beyond what is currently allowable under the original Medicare telehealth benefit. In addition, we propose to continue authority for

3881

**Federal Register** / Vol. 83, No. 212 / Thursday, November 1, 2018 / Proposed Rules    **54983**

MA plans to offer supplemental benefits (that is, benefits not covered by original Medicare) via remote access technologies and/or telemonitoring for those services that do not meet the requirements for additional telehealth benefits.

Section 1852(m)(4) of the Act mandates that enrollee choice is a priority. If an MA plan covers a Part B service as an additional telehealth benefit, then the MA plan must also provide access to such service through an in-person visit and not only as an additional telehealth benefit. The enrollee must have the option whether to receive such service through an in-person visit or as an additional telehealth benefit. In addition, section 1852(m)(2)(A)(ii) of the Act excludes from additional telehealth benefits any capital and infrastructure costs and investments relating to such benefits. These statutory provisions have guided our proposal.

We propose to establish regulatory requirements that would allow MA plans to cover Part B benefits furnished through electronic exchange as "additional telehealth benefits"—and as part of the basic benefits defined in § 422.101—instead of separate supplemental benefits. We believe additional telehealth benefits would increase access to patient-centered care by giving enrollees more control to determine when, where, and how they access benefits. We are soliciting comments from stakeholders on various aspects of our proposal, which would help inform CMS's next steps related to implementing the additional telehealth benefits.

2. Dual Eligible Special Needs Plans Provisions (§§ 422.2, 422.60, 422.102, 422.107, 422.111, 422.560 Through 422.562, 422.566, 422.629 Through 422.634, 422.752, 438.210, 438.400, and 438.402)

Section 50311(b) of the Bipartisan Budget Act of 2018 amends section 1859 of the Act to require integration of the Medicare and Medicaid benefits provided to enrollees in Dual Eligible Special Needs Plans (D–SNPs). In particular, the statute requires: (1) Development of unified grievance and appeals processes for D–SNPs; and (2) establishment of new standards for integration of Medicare and Medicaid benefits for D–SNPs.

The statute specifies a number of key elements for unified D–SNP grievance and appeals processes and grants the Secretary discretion to determine the extent to which unification of these processes is feasible. In particular, the unified processes must adopt the provisions from section 1852(f) and (g) of the Act (MA grievances and appeals) and sections 1902(a)(3) and (5), and 1932(b)(4) of the Act (Medicaid grievances and appeals, including managed care), take into account differences in state Medicaid plans to the extent necessary, be easily navigable by an enrollee, include a single written notification of all applicable grievance and appeal rights, provide a single pathway for resolution of a grievance or appeal, provide clear notices, employ unified timeframes for grievances and appeals, establish requirements for how the plan must process, track, and resolve grievances and appeals, and with respect to benefits covered under Medicare Parts A and B and Medicaid, incorporate existing law that provides continuation of benefits pending appeal for items and services covered under Medicare and Medicaid. The statute requires the Secretary to establish unified grievance and appeals procedures by April 1, 2020 and requires D–SNP contracts with state Medicaid agencies to use the unified procedures for 2021 and subsequent years.

With respect to the establishment of new standards for integration of Medicare and Medicaid benefits, the statute requires that all D–SNPs meet certain new minimum criteria for such integration for 2021 and subsequent years, either by covering Medicaid benefits through a capitated payment from a state Medicaid agency or meeting a minimum set of requirements as determined by the Secretary. The law also stipulates that for the years 2021 through 2025, if the Secretary determines that a D–SNP failed to meet one of these integration standards, the Secretary may impose an enrollment sanction, which would prevent the D–SNP from enrolling new members. In describing the "additional minimum set of requirements" established by the Secretary, the statute directs the Federally Coordinated Health Care Office in CMS to base such standards on "input from stakeholders." We intend to use this rulemaking to solicit input from stakeholders on the implementation of these new statutory provisions as well as to clarify definitions and operating requirements for D–SNPs.

3. Medicare Advantage and Part D Prescription Drug Plan Quality Rating System (§§ 422.162(a) and 423.182(a), §§ 422.166(a) and 423.186(a), §§ 422.164 and 423.184, and §§ 422.166(i)(1) and 423.186(i)(1))

In the Medicare Program; Contract Year 2019 Policy and Technical Changes to the Medicare Advantage, Medicare Cost Plan, Medicare Fee-for-Service, the Medicare Prescription Drug Benefit Programs, and the PACE Program Final Rule (hereafter referred to as the April 2018 final rule), CMS codified at §§ 422.160, 422.162, 422.164, and 422.166 (83 FR 16725 through 16731) and §§ 423.180, 423.182, 423.184, and 423.186 (83 FR 16743 through 16749) the methodology for the Star Ratings system for the MA and Part D programs, respectively. This was part of the Administration's effort to increase transparency and advance notice regarding enhancements to the Part C and D Star Ratings program. That final rule included mechanisms for the removal of measures for specific reasons (low statistical reliability and when the clinical guidelines associated with the specifications of measures change such that the specifications are no longer believed to align with positive health outcomes) but, generally, removal of a measure for other reasons would also occur through rulemaking.

At this time, we are proposing enhancements to the cut point methodology for non-Consumer Assessment of Healthcare Providers and Systems (CAHPS) measures. We are also proposing substantive updates to the specifications for a few measures for the 2022 and 2023 Star Ratings, and rules for calculating Star Ratings in the case of extreme and uncontrollable circumstances. Unless otherwise stated, data would be collected and performance measured using these proposed rules and regulations for the 2020 measurement period and the 2022 Star Ratings.

4. Preclusion List Requirements for Prescribers in Part D and Individuals and Entities in MA, Cost Plans, and PACE (§§ 422.222 and 423.120(c)(6))

In the April 2018 final rule, CMS removed several requirements pertaining to MA and Part D provider and prescriber enrollment that were to become effective on January 1, 2019. We stated in that final rule our belief that the best means of reducing the burden of the MA and Part D provider and prescriber enrollment requirements without compromising our payment safeguard objectives would be to focus on providers and prescribers that pose an elevated risk to Medicare beneficiaries and the Trust Funds. That is, rather than require the enrollment of MA providers and Part D prescribers regardless of the level of risk they might pose, we would prevent payment for MA items or services and Part D drugs that are, as applicable, furnished or prescribed by demonstrably problematic

**55038**    **Federal Register** / Vol. 83, No. 212 / Thursday, November 1, 2018 / Proposed Rules

process. Risk adjustment discrepancies can be aggregated to determine an overall level of payment error. In turn, payment error for a sample of contract enrollees can be extrapolated to calculate a contract-level payment error estimate. Although we have the authority to extrapolate from a statistically valid sample to calculate a contract-level audit recovery, we have not yet done so.

From 1999 until 2003, our payment validation activity for the MA program had both an educational and audit focus and was intended to improve the accuracy of the risk adjustment data that was being submitted to CMS for payment. Payment adjustments were limited to enrollee-level adjustments for those enrollees sampled in the payment validation audit. At the time, only 10 percent of the MA payment amount was risk adjusted. As a result, payment recovery amounts for the small number of plans audited was very small. Since payment year 2004 was the first year for which MA payments were based on the current HCC risk adjustment model, we considered payment years 2004 through 2006 as pilot years for the purpose of RADV and no payment recovery activity occurred.

Payment recovery resumed for payment year 2007, when we audited 37 MA contracts and recouped $13.7 million. Payment adjustments were again limited to enrollee-level adjustments for those enrollees sampled in the payment validation audit. (Although we suggested that we would make contract-level payment adjustments for the payment year 2007 audits, we did not ultimately do so.) In the course of that audit process, as in previous years, we reviewed medical record documentation provided by each audited MA organization to substantiate conditions reported by the organization for beneficiaries in each audit sample. After CMS' findings were reported to each MA organization, any organization that disagreed with CMS' determinations could challenge them through a three-stage administrative process established by regulation in 2010. (See 42 CFR 422.311). This dispute and appeals process is currently ongoing.

No payment validation audits were conducted for payment years 2008, 2009, or 2010. In those years, we were considering the development of a methodology for calculating payment adjustments based on statistical RADV MA contract-level payment error audit findings. The development of contract-level RADV audits would enable us to make contract-level payment adjustments rather than simply

adjusting payments for specific enrollees from an audit sample, as we had done previously.

On December 20, 2010, we proposed a methodology on the CMS website for selecting a statistically-valid sample of enrollees from each audited MA contract and extrapolating from the results of that sample audit to calculate a contract-level payment adjustment. We invited public comment on this proposed methodology, and received more than 500 comments, which we carefully reviewed. On February 24, 2012, we published what we described as the final methodology for RADV contract-level payment error calculation.[24] That methodology described sampling techniques and the statistical calculation to be used to extrapolate from the sample selected. In brief, up to 201 enrollees from each audited MA contract would be selected according to certain criteria, including their continuous enrollment in the contract for the entire data collection year and January of the payment year; their lack of end-stage renal disease (ESRD) status and hospice status for that entire period; their enrollment in Medicare Part B coverage for the entire data collection year; and their submission of at least one diagnosis during the data collection year leading to at least one CMS–HCC assignment in the payment year. The RADV-eligible enrollees would be ranked by risk score and then divided into three equal strata. An equal number of enrollees would then be randomly selected from each stratum (67 enrollees per stratum in the case of an audit of 201 enrollees). After medical records were reviewed, payment errors would be calculated for each selected enrollee based on the number of months the person was enrolled in the selected MA contract (and was not in ESRD or hospice status) during the payment year. A payment error rate for each stratum would be calculated, and then an overall payment error rate for the audited contract, computed at a ninety-nine percent confidence interval. We stated that this methodology would be applied to the next round of RADV audits, which would be conducted on payment year 2011. Audits for payment years 2011, 2012, and 2013 have been conducted according to this methodology, at a total cost of approximately $150 million to

---

[24] Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits, *available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Other-Content-Types/RADV-Docs/RADV-Methodology.pdf.*

the agency, but have not yet been finalized. These audits are in addition to RADV and related MA audits conducted by the Office of Inspector General, which are conducted pursuant to OIG's independent authorities at sections 2(1) and 4(a)(1) of the Inspector General Act.

We also stated in 2012 that, after using this methodology to calculate a preliminary payment recovery amount, we would apply a FFS Adjuster as an offset before finalizing the audit recovery. The FFS Adjuster was intended to account for any effect of erroneous diagnosis codes in the data from Medicare Parts A and B (often referred to as "Fee-For-Service" Medicare) that are used to calibrate the MA risk adjustment model. We stated that the FFS Adjuster would calculate a permissible level of payment error (for example, a percentage of the total payments made on an MA contract in a given year) and limit RADV audit recovery to payment errors above that level. The FFS Adjuster was never intended to set a permissible rate for the submission of erroneous diagnosis codes. We stated that the FFS Adjuster would be calculated based on a RADV-like review of records submitted to support the Medicare Part A and B diagnosis codes. That review is now complete, and will be discussed later.

c. Discussion of Proposals

(1) Extrapolation

The Secretary intends to recover overpayments based on extrapolated audit findings through the use of statistically valid random sampling techniques. Although we described our February 2012 publication as the final methodology to be used to calculate contract-level RADV audit recoveries for payment year 2011, it has never been implemented. As we stated earlier, audits for payment years 2011, 2012, and 2013 have been conducted according to this methodology, but contract-level recoveries have not yet been sought. We are now providing additional notice and again welcoming public input on the agency's methodology for calculating a contract-level payment error in RADV audits, including the sample sizes used in these contract-level audits. CMS is not required to set forth the methodology for calculating an extrapolated payment error through regulatory provisions (it does not do so in Parts A and B, where Medicare Administrative Contractors (MACs) may use any statistically valid sampling and extrapolation methodology they determine to be appropriate), however, in the interest of transparency, we are updating

stakeholders on our plans to use various sampling and extrapolation methodologies in RADV audits, as CMS deems appropriate.[25] All audits will be based on statistically valid sampling and extrapolation methodologies.

In addition to the contract-level methodology described earlier, we have identified other potential methodologies for sampling and extrapolation, which would calculate improper payments made on the audited MA contract for a particular sub-cohort or sub-cohorts in a given payment year, and the agency may also use such a methodology to calculate improper payments made to the audited MA contract. For example, a sub-cohort could be the enrollees for whom a particular HCC or one of a related set of HCCs (such as the three diabetes HCCs) was reported. After choosing an MA contract and a sub-cohort or sub-cohorts to audit, we would select a statistically significant sample of enrollees for the sub-cohort or sub-cohorts. After reviewing the medical records of those enrollees, we would use statistical extrapolation to calculate and recoup the improper payments made to the audited MA contract for covering enrollees for the sub-cohort or sub-cohorts in that payment year. We would use the same statistical calculation for this sub-cohort-level extrapolation as we do for the contract-level extrapolation (although we welcome comment as to whether to stratify the sample population for the sub-cohort audits, as we currently anticipate doing for the contract-level audits).

We believe that, because any sub-cohort is necessarily a subset of the enrollees covered through a particular MA contract, we could often use a much smaller sample size to calculate a statistically significant extrapolated recovery for a sub-cohort than would be required to calculate a contract-level recovery (up to 201 enrollees, according to our anticipated contract-level methodology). This smaller sample size would allow us to spread our audit resources across a wider range of MA contracts, while still generating statistically significant recoveries. This sub-cohort-based audit methodology would allow us to focus on cohorts of enrollees that appear to raise programmatic concerns.

We invite comment on both the contract-level audit methodology published in February 2012, and our proposal for an extrapolated audit methodology based on sub-cohorts of enrollees. We also seek comment on whether there are particular situations in which one methodology may be preferable to the other, and whether the agency should revise the contract-level audits that have been conducted but not finalized for payment years 2011, 2012, and 2013. Neither proposed methodology is meant to displace our longstanding authority to audit the medical records of particular enrollees who we believe may be associated with improper payments or to use any statistically valid audit methodology.[26]

If we finalize one or more sampling and extrapolation methodologies through this rulemaking, we would make any future changes to that methodology (or those methodologies) through the Health Plan Management System.

We are also considering whether to explicitly expand the MA organizations' RADV appeal rights, particularly in light of the upcoming auditing and recoveries in the MA program. One option would be to permit appeal of the RADV payment error calculation methodology used in a RADV audit similar to practices in the Part A and Part B space of Medicare FFS. We invite comments on this matter.

### (2) Application to Payment Year 2011 and Subsequent Years

We intend to apply the finalized RADV payment error methodology or methodologies to payment year 2011, and all subsequent years. (However, we do not expect to use a sub-cohort-based methodology, if finalized, for any payment year before 2014.) Section 1871(e)(1)(A) of the Act authorizes retroactive application of rules where ''(i) such retroactive application is necessary to comply with statutory requirements; or (ii) failure to apply the change would be contrary to the public interest.'' We are considering whether application of the finalized methodology or methodologies to payment year 2011, and all subsequent years, would require the exercise of this statutory authority to engage in retroactive rulemaking. We invite comment on the subject.

In any case, we believe that failure to apply the finalized RADV payment error methodology or methodologies to those payment years would be contrary to the public interest. The public has a substantial interest in the recoupment of millions of dollars of public money improperly paid to private insurers. The public also has a significant interest in providing incentives for those insurers to claim only proper payments in the future, which would be promoted by the recoupment of funds improperly paid in the past. Given the amount of improper payments identified under the MA program (estimated to be $14.35 billion in FY 2017,[27] the $650 million in recovered improper payments represents, if this policy was finalized, 3 years improper payment for 30 plans), the interest in determining an accurate recovery amount for each audited MA plan, and the importance of protecting the overall integrity of the program, we believe that it is in the public interest for CMS to apply the RADV payment error methodology or methodologies adopted through this rulemaking to payment year 2011 and all subsequent years. In applying this methodology (or these methodologies) to those payment years, CMS would be acting in compliance with the IPERIA statute[28] as

---

[25] The Office of the Inspector General, which is required by law to conduct audits and follow generally accepted government auditing standards, does not seek comment on its methodology for risk adjustment audit work that may lead to overpayment recoveries from MA organizations.

[26] We may begin to conduct RADV audits for payment years 2014 and 2015 before this proposal is finalized, pursuant to our longstanding authority to review the medical records of any MA enrollee and recoup any improper payments identified. Although we would design these audits so that the individuals selected would form a statistically significant sample that would support an extrapolated recovery, we would not seek to recover on an extrapolated basis until the rule is final. At the very least, these audits would support enrollee-level recoveries.

[27] CMS has historically reported high levels of payment error in the Part C program. The Part C error rate has ranged between 11 percent and 9 percent between fiscal years (FY) 2011 and 2014, respectively. In FY 2017, the reported Part C error rate was 8.31 percent or $14.35 billion.

[28] Improper Payments Elimination and Recovery Improvement Act of 2012 (IPERIA, Pub. L. 112–248). The RADV program is a corrective audit activity developed by CMS to address provisions included in the IPIA of 2002, as amended by the IPERA of 2010, and further amended by IPERIA. These statutes require that government agencies annually estimate and report improper payments. RADV audits were initiated because Part C payment error was out of compliance with IPIA. The IPERIA requires the Office of Management and Budget (OMB) to annually identify agencies for greater levels of oversight and review, and with that agency ''establish annual targets and semi-annual or quarterly actions for reducing improper payments associated with each high-priority program.'' In November 2009, Executive Order (E.O.) 13520 was signed in an effort to reduce improper payments by increasing transparency in government and holding agencies accountable for reducing improper payments. In March 2010, OMB issued guidance for agencies regarding the implementation of E.O. 13520 entitled Part III to OMB Circular A–123, Appendix C (Appendix C). Appendix C outlines the responsibilities of agencies, determines the programs subject to E.O. 13520, defines supplemental measures and targets for high priority programs, and establishes reporting requirements under E.O. 13520 and procedures to identify entities with outstanding payments. One of those remedies is payment recapture audits, a requirement that any program that expends at least $1 million must implement payment recapture audits. A recovery audit, or payment recapture audit, is a review process designed to identify erroneous payments. Additionally, it is a corrective
Continued

3884

**55040**    **Federal Register**/Vol. 83, No. 212/Thursday, November 1, 2018/Proposed Rules

well as its own fiduciary responsibility to recover funds due and owing to the Medicare Trust Funds. We note also that our February 2012 publication put MA organizations on notice that CMS expected to calculate a contract-level payment error for payment year 2011 and beyond by extrapolating from its review of a statistically valid sample of enrollees, and that (as explained earlier) MA organizations have never been entitled to receive or retain payments associated with HCCs that cannot be validated by medical records. Application of the finalized RADV payment error methodology or methodologies to payment year 2011 and all subsequent years therefore would not upset any settled interest.

If the finalized contract-level audit methodology differs from the one we published in February 2012, we will also consider whether to apply the new contract-level payment error methodology to payment years 2011, 2012, and 2013, or to only apply it to payment year 2014 and subsequent years, and to finalize the audits for those earlier payment years according to the methodology published in February 2012. We invite comment on this subject, as well. In any event, and however audits for prior years are ultimately handled, we believe that it is vitally important for the health of the MA program to have extrapolated recoveries available for future audit years.

(3) Implementation

This proposal would announce CMS' intention to recover improper payments based on extrapolation of payment error from RADV audit samples to MA organization specified populations. CMS would calculate and recover improper payments based on extrapolation methodologies. MA organizations would be required to remit extrapolated recovery amounts from audit findings as calculated by CMS through its payment system, Medicare Advantage and Prescription Drug system (MARx). MARx is the CMS system that makes monthly payments and payment adjustments to the MA organizations and Part D sponsors. Overpayment recoveries of all types are considered payment adjustments which are done as offsets to the plans' monthly payments. RADV recovery amounts are included in this category. In the month the plan has been notified that the recovery amount will be offset, the MARx system makes an offset to the

plans monthly payment equal to the amount of the recovery amount. In the event the recovery amount exceeds the payment in 1 month, the recovery will be spread across adjustments for multiple months until the full amount is recovered. CMS may likewise require MA organizations to remit such recovery amounts based upon audit findings by OIG.

(4) Recoupment of Improper Payments in Part C

Improper payments identified by CMS outside of the RADV audit process or self-identified by the MA organization that are not returned in accordance with §§ 422.330, and are identified and/or estimated through extrapolation or other estimation methodologies as a result of CMS audits will be recovered following CMS audit processes including payment offset. We propose that MA organizations be required to remit funds that CMS calculates as improper payments through the extrapolated RADV audit findings in accordance with §§ 422.310(e). RADV audit results can be appealed by MA organizations using the regulatory administrative appeals process outlined in § 422.311.

(5) FFS Adjuster

After our 2012 RADV publication, we conducted an extensive study regarding the presence and impact of diagnosis error in FFS claims data. Our study suggests that errors in FFS claims data do not have any systematic effect on the risk scores calculated by the CMS–HCC risk adjustment model, and therefore do not have any systematic effect on the payments made to MA organizations.[29] The study began by auditing 8,630 outpatient claims paid through Medicare Part B in a given year. We reviewed the medical records associated with each claim (a small subset of the medical records associated with each beneficiary) to determine whether the diagnosis associated with the claim was supported by medical record documentation. A discrepancy rate for each CMS–HCC was then calculated. For example, the data set contained 484 claims submitted with a diagnosis of chronic obstructive pulmonary disease, which is CMS–HCC 108. Of those diagnoses, 388 were supported by medical record documentation, and 96 were not, for a discrepancy rate of 19.8

percent. To account for the fact that the data set contained extremely small samples of many CMS–HCCs—for example, one diagnosis of extensive third degree burns and two diagnoses of severe head injury—we calculated a high, low, and baseline discrepancy rate. Each CMS–HCC was assigned one of these three mean discrepancy rates depending on its relationship to the bassline discrepancy rate: CMS–HCCs with a discrepancy rate significantly higher than the baseline were assigned to the high category, and those with a discrepancy rate significantly lower than the baseline were assigned to the low category. All other CMS–HCCs were assigned the baseline discrepancy rate. These rates were 46.2 percent, 33.8 percent, and 20.9 percent.

In a given year, multiple claims are submitted for Medicare Part B services received by a given beneficiary and associated with a given diagnosis. For example, an average beneficiary with metastatic cancer or acute leukemia, which is CMS–HCC 7, has seven claims associated with that diagnosis. Because we were interested in determining whether a given beneficiary had a documented diagnosis in a given year, and not whether any particular claim was associated with medical record documentation, we used the claim-level discrepancy rates described above to calculate beneficiary-level discrepancy rates.[30]

After calculating this beneficiary-level discrepancy rate for each HCC, we ran fifty simulations in which we removed diagnoses from a data set of more than 1.4 million Medicare Part A and B beneficiaries at the beneficiary-level discrepancy rate.[31] After removing diagnoses at the indicated rates, we used each simulated "corrected" data set to recalibrate the CMS–HCC risk adjustment model, applied the recalibrated risk coefficients to a data set of MA beneficiaries, and compared their original risk scores to the risk

---

[29] We are aware of the district court's recent ruling in *United HealthCare Insurance Co.* v. *Azar*, No. 16-cv-157 (D.D.C. September 7, 2018), and the government is reviewing that decision and considering its response. In any event, that ruling was made on the basis of the administrative record before the court, which did not include the results of our study.

[30] For example, metastatic cancer or acute leukemia was assigned the baseline discrepancy rate of 33.8%. We therefore reasoned that each of the seven claims associated with the average beneficiary for whom such a diagnosis was reported had a 66.2% chance of being supported by medical record documentation, and only one instance of medical record support was necessary to make the diagnosis valid for that year. If each beneficiary with such a reported diagnosis has 7 claims associated with that diagnosis, and each claim has a 66.2% chance of being supported by medical record documentation, then 99.95% of all beneficiaries will have at least one instance of medical record support, and only 0.05% of beneficiaries will lack any medical record documentation of their reported diagnosis.

[31] For metastatic cancer and acute leukemia, 1 in 2,000 diagnoses was removed (corresponding to an error rate of 0.05%).

---

control activity designed to identify and recapture erroneous payments, and, as such, is a management function and responsibility.

scores calculated with the recalibrated model. We found that the difference between the risk scores was very small, and that the recalibrated risk scores tended to be slightly lower than the original risk scores. Therefore, we concluded that diagnosis error in FFS claims data does not lead to systematic payment error in the MA program.

An executive summary of the findings and a technical appendix describing the data and methodology can be found at *https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Resources.html.* Because it appears that diagnosis error in FFS claims data does not lead to systematic payment error in the MA program, we propose not to include an FFS Adjuster in any final RADV payment error methodology.

Moreover, even if we had found that diagnosis error led to systematic payment error in the MA program, we no longer believe that a RADV-specific payment adjustment would be appropriate. RADV audits are used to recover payments based on diagnoses that are not supported by medical record documentation, which thus should not have been reported to CMS. If a payment has been made to an MA organization based on a diagnosis code that is not supported by medical record documentation, that entire payment is in error and should be recovered in full, because the payment standard has not been met, and the MA organization is not entitled to any payment for that diagnosis. RADV audits do not address issues with the accuracy of payments based on diagnosis codes that are supported by medical record documentation. Consequently, an adjustment to RADV recoveries to remedy payment accuracy concerns is inappropriate. For this reason, we believe that it would not be appropriate to correct any systematic payment error in the MA program through a payment adjustment that was only applied to audited contracts. Doing so would introduce inequities between audited and unaudited plans, by only correcting the payments made to audited plans.

Because our study suggests that diagnosis error in FFS claims data does not lead to systematic payment error in the MA program and because we believe it would be inequitable to correct any systematic errors in the payments made to audited plans only, we would not include an FFS Adjuster in any RADV extrapolated audit methodology. We welcome public comments on this study.

### d. Proposed Changes

In this section, we discuss the proposed changes to the regulation in Parts 422 and 423 governing the MA Program. We are proposing to apply extrapolation to plan year audits for payment year 2011 forward.

The following is a summary of the proposed changes included in this proposed revision:

We propose to revise § 422.300 to include "collection of improper payments."

We propose to amend § 422.310(e) Validation of risk adjustment data, to apply extrapolation to plan year audits for payment year 2011 forward.

We propose to amend § 422.310(e) Validation of risk adjustment data, by adding a requirement to set forth the provision for MA organizations to remit improper payments based on RADV audits and established in accordance with stated methodology, in a manner specified by CMS.

We propose to amend § 422.311, the RADV audit dispute and appeal process section, by adding language to clarify that recovery of improper payments from MA organizations will be conducted according to the Secretary's payment error extrapolation and recovery methodologies and that CMS will apply extrapolation to plan year audits for payment year 2011 forward.

### D. Implementing Other Changes

#### 1. Clarification Regarding Accreditation for Quality Improvement Programs

Section 1852(e) of the Act requires each MA organization to have an ongoing quality improvement program to improve the quality of care provided to its enrollees and establishes the requirements for the quality improvement programs. Section 1852 (4) of the Act requires the Secretary to deem that an MA Organization has met all of the requirements for any one out of the six program areas listed in section 1852(e)(4)(B) of the Act if the MA Organization is accredited in that area by an accrediting organization that has been approved by CMS and that uses the same (or stricter) standards than CMS uses to evaluate compliance with the applicable requirements. Section 1852(e)(4)(B)(i) of the Act references the quality improvement programs in section 1852(e) of the Act. Thus, an MA Organization could be deemed to meet CMS' requirements related to quality improvement programs by a CMS-approved accrediting organization.

Section 722(a) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the MMA) revised the quality improvement

program requirements in the Act. Section 1852(e) of the Act was revised by adding a new clause "(2) Chronic Care Improvement Programs" and renumbering the existing clauses accordingly (that is, existing clause "(2) Data" became "(3) Data"). Section 722(a) of the MMA also revised section 1852(e)(4)(B)(i) of the Act. Prior to the MMA, section 1852(e)(4)(B)(i) of the Act indicated that the requirements in clauses (e)(1) (general requirements for quality improvement programs) and (e)(2) (the collection, analysis, and reporting of data related to quality improvement programs) could be deemed. Consistent with the changes made to section 1852(e) of the Act described earlier, section 722(a) of the MMA amended section 1852(e)(4)(B)(i) of the Act to provide, "(i) Paragraphs (1) through (3) of this subsection (relating to quality improvement programs)." However, the printed and online versions of section 1852(e)(4)(B)(i) of the Act continue to cross-reference clauses (e)(1) and (e)(2) erroneously. Therefore, we are clarifying in this proposed rule that the requirements in section 1852(e)(3) of the Act and the subsections of § 422.152 related to section 1852(e)(3) of the Act may be deemed.

#### 2. Delete the Reference to Quality Improvement Projects in § 422.156(b)(1)

Section 1852(e) of the Act requires each MAO to have an ongoing Quality Improvement (QI) Program for the purpose of improving the quality of care provided to its enrollees. Our regulations at § 422.152 outline the QI Program requirements MA Organizations. Section 422.152(a)(3) requires each MA Organization to conduct quality improvement projects (QIPs) for its enrollees, and § 422.152(d) establishes the requirements for the QIPs. Effective January 1, 2019, CMS eliminated the requirements for QIPs in §§ 422.152(a)(3) and 422.152(d) in the April 2018 final rule (83 FR 16440). However, the reference to QIPs was not deleted in § 422.156(b)(1), which says QIPs are exempt from the process for deeming compliance based on accreditation. Therefore, we are proposing a technical correction in this rule that would delete the phrase "the quality improvement projects (QIPs) and" from § 422.156(b)(1).

### III. Collection of Information Requirements

Under the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3501 *et seq.*), we are required to provide 60-day notice in the **Federal Register** and solicit public comment before a collection of

section, a prescriber who is revoked under § 424.535 of this chapter will be included on the preclusion list for the same length of time as the prescriber's reenrollment bar.

(B) Except as provided in paragraphs (c)(6)(vii)(C) and (D) of this section, a prescriber who is not enrolled in Medicare will be included on the preclusion list for the same length of time as the reenrollment bar that CMS could have imposed on the prescriber had the prescriber been enrolled and then revoked.

(C) Except as provided in paragraph (c)(6)(vii)(D) of this section, a prescriber, regardless of whether the prescriber is or was enrolled in Medicare, that is included on the preclusion list because of a felony conviction will remain on the preclusion list for a 10-year period, beginning on the date of the felony conviction, unless CMS determines that a shorter length of time is warranted. Factors that CMS considers in making such a determination are—

(1) The severity of the offense;

(2) When the offense occurred; and

(3) Any other information that CMS deems relevant to its determination.

(D) In cases where a prescriber is excluded by the OIG, the prescriber must remain on the preclusion list until the expiration of the CMS-imposed preclusion list period or reinstatement by the OIG, whichever occurs later.

(viii) Payment denials under paragraph (c)(6) of this section that are based upon the prescriber's inclusion on the preclusion list are not appealable by beneficiaries.

\*    \*    \*    \*    \*

■ 30. Section 423.153 is amended by revising the section heading and adding paragraph (g) to read as follows:

### § 423.153   Prescription drug plan sponsors' access to Medicare Parts A and B claims data extracts.

\*    \*    \*    \*    \*

(g) *Parts A and B claims data extracts*—(1) *General rule.* (i) Beginning in plan year 2020, a PDP sponsor may submit a request to CMS for the data described in paragraph (g)(2) of this section about enrollees in its prescription drug plans.

(ii) CMS will make the data requested in paragraph (g)(1)(i) of this section available to eligible PDP sponsors, in accordance with all applicable laws. The data will be provided at least quarterly on a specified release date, and in an electronic format to be determined by CMS.

(iii) If CMS determines or has a reasonable belief that the PDP sponsor has violated the requirements of this paragraph (g) or that unauthorized uses,

reuses, or disclosures of the Medicare claims data have taken place, at CMS' sole discretion, the PDP sponsor may be denied further access to the data described in paragraph (g)(2) of this section.

(2) *Data described.* The data that may be requested under paragraph (g)(1) of this section are standardized extracts of claims data under Medicare parts A and B for items and services furnished under such parts to beneficiaries who are enrolled in a plan offered by the PDP sponsor at the time of the disclosure.

(3) *Purposes.* A PDP sponsor must comply with all laws that may be applicable to data received under this provision, including state and federal privacy and security laws, and, furthermore subject to the limitations in paragraph (g)(4) of this section may only use or disclose the data provided by CMS under paragraph (g)(1) of this section for the following purposes:

(i) To optimize therapeutic outcomes through improved medication use, as such phrase is used in paragraph (d)(1)(i) of this section.

(ii) To improve care coordination so as to prevent adverse health outcomes, such as preventable emergency department visits and hospital readmissions.

(iii) For activities falling under paragraph (1) of the definition of "health care operations" under 45 CFR 164.501.

(iv) For activities falling under paragraph (2) of the definition of "health care operations" under 45 CFR 164.501.

(v) For "fraud and abuse detection or compliance activities" under 45 CFR 164.506(c)(4)(ii).

(vi) For disclosures that qualify as "required by law" disclosures at 45 CFR 164.103.

(4) *Limitations.* A PDP sponsor must comply with the following requirements regarding the data provided by CMS under this paragraph (g):

(i) The PDP sponsor will not use the data to inform coverage determinations under Part D;

(ii) The PDP sponsor will not use the data to conduct retroactive reviews of medically accepted indications determinations;

(iii) The PDP sponsor will not use the data to facilitate enrollment changes to a different prescription drug plan or an MA–PD plan offered by the same parent organization;

(iv) The PDP sponsor will not use the data to inform marketing of benefits.

(v) The PDP sponsor will contractually bind its contractors that have access to the Medicare claims data, and any other potential downstream

data recipients, to the terms and conditions imposed on the PDP Sponsor under this paragraph (g).

(5) *Ensuring the privacy and security of data.* As a condition of receiving the requested data, the PDP sponsor must attest that it will adhere to the permitted uses and limitations on the use of the Medicare claims data listed in paragraphs (g)(3) and (4) of this section.

■ 31. Section 423.182 is amended in paragraph (a) by adding the definitions of "Absolute percentage cap", "Cut point cap", "Guardrail", "Mean resampling", "Restricted range", and "Restricted range cap" in alphabetical order to read as follows:

### § 423.182   Part D Prescription Drug Plan Quality Rating System.

(a) \*    \*    \*

*Absolute percentage cap* is a cap applied to non-CAHPS measures that are on a 0 to 100 scale that restricts movement of the current year's measure-threshold-specific cut point to no more than the stated percentage as compared to the prior year's cut point.

\*    \*    \*    \*    \*

*Cut point cap* is a restriction on the change in the amount of movement a measure-threshold-specific cut point can make as compared to the prior year's measure-threshold-specific cut point. A cut point cap can restrict upward movement, downward movement, or both.

\*    \*    \*    \*    \*

*Guardrail* is a bidirectional cap that restricts both upward and downward movement of a measure-threshold-specific cut point for the current year's measure-level Star Ratings as compared to the prior year's measure-threshold-specific cut point.

\*    \*    \*    \*    \*

*Mean resampling* refers to a technique where measure-specific scores for the current year's Star Ratings are randomly separated into 10 equal-sized groups. The hierarchal clustering algorithm is done 10 times, each time leaving one of the 10 groups out. The method results in 10 sets of measure-specific cut points. The mean cut point for each threshold per measure is calculated using the 10 values.

\*    \*    \*    \*    \*

*Restricted range* is the difference between the maximum and minimum measure score values using the prior year measure scores excluding outer fence outliers (first quartile $-3$ * Interquartile Range (IQR) and third quartile $+3$ * IQR).

*Restricted range cap* is a cap applied to non-CAHPS measures that restricts movement of the current year's

**EXHIBIT D-154**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA ex

rel. BENJAMIN POEHLING,

    Plaintiffs,

vs.                                    No. CV 16-08697 FMO

UNITEDHEALTH GROUP, INC., et al,

    Defendants.

_____/




REMOTE VIDEOCONFERENCE DEPOSITION OF

BRIAN THOMPSON

March 1, 2022




Reported by:

Anne E. Vosburgh, CSR-6804, RPR, CRR

Job No. 792085



Page 150

1                        B. THOMPSON

2              MR. LEE:  How long of a lunch break

3         would you like?

4              MR. QURESHI:  30 minutes, please.

5              MR. PRESTES:  At a minimum.

6              MR. LEE:  Let's come back at

7         11:15 Pacific, which would be 1:15

8         Central, I think.

9              MR. QURESHI:  Okay.  We'll work on

10             the math over the break, but we'll see

11             you in 30.

12             THE VIDEOGRAPHER:  The time is 1:45

13             p.m. and we are off the record.

14             (Lunch recess taken.)

15             -----------------------

16                AFTERNOON SESSION

17             -----------------------

18             THE VIDEOGRAPHER:  The time

19             is 2:35 p.m. and we are back on the

20             record.

21        BY MR. LEE:

22             Q.   Good afternoon, Mr. Thompson.

23                  Earlier today you testified about

24        certain contradictions and discussions that

25        you had within United I believe starting in



3890

Page 151

```
                          B. THOMPSON
 1
 2    January 2014 with the medical record rule.
 3              Do you remember that testimony?
 4         A.   Yes.
 5         Q.   What in particular were the
 6    contradictions that you were referring to?
 7         A.   Yes.  Thank you.
 8              In January of 2014 a proposed rule
 9    came out that to my recollection had a
10    requirement that was similar to that of claims
11    verification as a process, that had a proposed
12    implementation date that was forward-looking,
13    meaning it had not yet been implemented.
14              That led to a lot of confusion on
15    our part inside UnitedHealthcare.  As you
16    know, we had a claims verification process in
17    place at the time, and we sought clarity with
18    respect to the proposed rule and whether or
19    not it was required prior to implementation.
20    It seemed contradictory, and we sought clarity
21    from CMS on that in that regard.
22         Q.   What in particular was contradictory,
23    the obligation that the proposed rule would
24    impose?
25         A.   Yes.  In particular, what the
```



Page 152

1                          B. THOMPSON

2        requirements were prior to the implementation

3        of the rule.

4            Q.   And what was your understanding of

5        what the requirements were prior to the

6        implementation of the rule?

7            A.   Well, that is specifically the

8        questions by which we sought counsel from CMS.

9        And we specifically said that given this rule

10       is a proposal, it seems to us that it is not

11       yet a requirement.

12              And is it clear to you, like it

13       appears to us, that it is not yet a

14       requirement until implemented.

15              And then we went further to explain

16       our existing process, meaning claims

17       verification, and also got clarity in the

18       affirmative from CMS by the four executives I

19       mentioned that until the implementation date

20       of the proposed rule, the processes associated

21       with claims verification were not required.

22              And that was a clarity that I was

23       seeking as CFO prior to the attestation at the

24       end of April of 2014.

25           Q.   So as I understand it, your



Page 153

                              B. THOMPSON
1
2    understanding of the contradiction is that
3    there was some belief that the medical record
4    rule as implemented would impose some
5    obligation to look back that was contradictory
6    to United's practice before then?
7               MR. QURESHI:  Objection to form.
8         Mischaracterizes testimony.
9         A.    Yeah.  I'll just summarize it again
10   to try to clarify.
11              We were seeking clarity about the
12   timing of the proposed rule and the
13   requirements to which it promulgated, if you
14   will, prior to implementation of proposed
15   rule.
16              And that was the question that we
17   asked of CMS on several occasions, what are
18   our requirements prior to implementation,
19   specifically informing them of our claims
20   verification process.
21              And it came back in the affirmative
22   from that conversation that until
23   implementation of rule, claims verification
24   was not a requirement.
25              And that was the clarity that I



Page 154

1                          B. THOMPSON

2        sought and we sought as a company prior to

3        attestation.

4        BY MR. LEE:

5             Q.   Were there any other areas of

6        inconsistency or contradictions that you saw?

7                     MR. QURESHI:  Objection to form.

8             A.    In that specific meeting, that was

9        the primary focus.  There have been many other

10       inconsistencies around the need for an error

11       rate as a comparison to determine overpayment,

12       but the specific contradiction to which I'm

13       referencing related, to my recollection,

14       particularly around this concept of claims

15       verification, as I remember it.

16       BY MR. LEE:

17            Q.   Okay.  You mentioned a need for an

18       error rate.

19                     What exactly do you mean by that?

20            A.   Yes.  Medicare Advantage is paid on

21       a basis of consistency, actuarial equivalence,

22       with fee-for-service Medicare.

23                     The rate structure upon which

24       Medicare Advantage is reimbursed is based on

25       the same processes and protocols of



Page 155

```
 1                          B. THOMPSON
 2      fee-for-service.  And it's been important that
 3      the alignment of processes be consistent with
 4      fee-for-service.
 5                When a process is introduced to one
 6      or the other, fee-for-service or
 7      Medicare Advantage, without accommodation in
 8      the rate structure, there's no longer
 9      consistency and the payment structure upon
10      which it's founded is no longer consistent.
11           Q.    And what is that contradictory to?
12           A.    To the fee-for-service baseline upon
13      which reimbursement for Medicare Advantage is
14      based and founded.
15           Q.    And tell me what your understanding
16      is of contradiction and why it exists.
17                MR. QURESHI:  Objection to form.
18           Asked and answered.
19           A.    Yes.  I just explained error rate
20      and why, if there's a new process introduced,
21      it would create a contradiction.  And I just
22      explained the contradiction in the proposed
23      rule with its implementation date being
24      prospective.
25                Those are the two contradictions
```



Page 156

1                          B. THOMPSON

2          that I'm talking about, sir.

3          BY MR. LEE:

4               Q.   All right.  Let's take those one at a

5          time.

6                    The contradictions relating to the

7          proposed medical records rule, was the

8          contradiction that you didn't know when and if

9          the rule would go into effect or something

10         else?

11                   MR. QURESHI:  Objection to form.

12              Mischaracterizes testimony.

13              A.   I think there were several --

14         BY MR. LEE:

15              Q.   Tell me what --

16              A.   I'm sorry.  I spoke over you, sir.

17              Q.   I'm sorry.  I spoke over you.

18                   Tell me what the contradictions were

19         specifically.

20              A.   Yes.  I apologize that my

21         recollection might not be as strong, but I

22         will do my best.

23                   I remember being confused on at

24         least one topic, and I will explain that

25         first.  The topic being, we had a process in



Page 157

```
 1                      B. THOMPSON
 2      place called claims verification, to which we
 3      spoke earlier.
 4              There was a proposed rule that came
 5      out in January that suggested the potential
 6      for the implementation of a rule that would
 7      include requirements very consistent with the
 8      processes and procedures that we were
 9      deploying at that time in claims verification.
10              So our confusion was around whether
11      or not, before implementation of proposed
12      rule, there was a requirement on behalf of
13      Medicare Advantage plans to do what was in the
14      proposal.  That was -- that was where we
15      lacked clarity and sought clarity directly
16      from CMS.
17              Because it was very important to me
18      and to our organization that that confusion
19      not be satisfied only with our own
20      interpretation, but be directly handled
21      through communication with CMS, given our
22      confusion.
23          Q.  Was there any discussion of any
24      contradictions before the proposed medical
25      records rule was discussed?
```



Page 287

```
 1                      B. THOMPSON

 2              So, yeah, I would assume that they

 3      are potentially linked but, again, I don't

 4      recall this document.

 5          Q.   All right.  Let's take a look at the

 6      second page.  Under 9, it says "Policy Review,

 7      necessity of CV, attestations, and chart

 8      selection logic."

 9              Do you see that?

10          A.   I do see that.

11          Q.   Okay.  What's your understanding of

12      what that means, "necessity of CV"?

13              MR. QURESHI:  Objection to form.

14          A.   I have no idea, sir.  I didn't write

15      this document.  I don't recall this document.

16      I can tell you, again, my broad framing of CV

17      and what we talked about, but I didn't write

18      this document.

19      BY MR. LEE:

20          Q.   Well, is it your recollection that

21      around April 29th of 2014, some policy review

22      concerning whether CV was necessary was being

23      discussed by management?

24              MR. QURESHI:  Objection to form.

25          A.   We certainly were seeking clarity
```



Page 288

```
 1                    B. THOMPSON
 2      from CMS around April 29th, as we had
 3      discussed, with the four senior leaders who
 4      had visited with CMS directly.
 5      BY MR. LEE:
 6           Q.   And this is on the date of the CMS
 7      meeting, correct?
 8           A.   This meeting here or this document?
 9           Q.   This document.
10           A.   I don't know.  We'll have to look
11      back to the date that it was sent.
12                Yeah.  It appears that it was.
13           Q.   Do you agree that the necessity of CV
14      as a policy matter was being considered on
15      April 29th -- at least on April 29, 2014?
16                MR. QURESHI:  Objection to form.
17           A.   I'm not sure what your question is.
18      I have told you now several times that there
19      were conversations had with CMS around this
20      time.  So, yes, of course, these conversations
21      were being had with CMS.
22                Haven't I been clear on that point?
23      BY MR. LEE:
24           Q.   Yes, you have been very clear on that
25      point.  My point is -- my question is somewhat
```



Page 289

```
 1                    B. THOMPSON

 2      different.

 3                And my question specifically is:

 4      Would you agree that the prospect of whether

 5      CV was necessary was being considered by

 6      management as a policy matter, at the latest,

 7      by April 29, 2014?

 8                MR. QURESHI:  Objection to form.

 9                Mr. Lee, I think you said that the

10           email was sent on April 29th, but 85A is

11           dated May 2nd.  So I'm not sure if you

12           misspoke or if I'm missing something.

13                MR. LEE:  Abid, you can just say

14           objection to form.

15                MR. QURESHI:  I'm just trying to

16           clarify the date, Mr. Lee.

17                MR. LEE:  I'm talking about the date

18           on 85C, which shows April 29th.

19                MR. QURESHI:  Okay.  I thought you

20           used the word "the date sent" and that's

21           why I looked at the email.  I'm sorry.

22           A.    What's your question, Mr. Lee?

23      BY MR. LEE:

24           Q.    Would you agree that as of

25      April 29th, the necessity of CV was being
```



Page 290

```
 1                    B. THOMPSON
 2    considered by United as a policy matter?
 3              MR. QURESHI:  Objection to form.
 4         A.   I can't get specific to the dates.
 5    What I can assure you is that as we approached
 6    CMS, yes, UnitedHealthcare was assessing the
 7    necessity of claims verification.  And I've
 8    been very clear about that throughout this
 9    dialogue today.
10    BY MR. LEE:
11         Q.   And it was considered as part of the
12    M&R $200 million challenge.  It was part of the
13    brainstorming ideas that were being thrown
14    around at that time, correct?
15              MR. QURESHI:  Objection, asked and
16              answered.
17         A.   I would not put claims verification
18    in a category of brainstorming and being
19    thrown around at that time.  I would say that
20    our concerted effort to contact CMS was much
21    more formal than that at this time.
22    BY MR. LEE:
23         Q.   Well, you may not do it, but this
24    document does, doesn't it?  It says
25    "Brainstorming Ideas, M&R
```



Page 291

```
 1                        B. THOMPSON
 2      $200 Million Challenge."  And then number 9 of
 3      those ideas is "necessity of CV."
 4               Isn't that consistent with your read
 5      of this document?
 6               MR. QURESHI:  Objection to form.
 7          A.   I didn't put this document together.
 8      I can't speak on behalf of why it's on this
 9      document.  But certainly, if we are talking
10      about our business at this time, clearly we
11      were trying to get clarity on the CV policy.
12      I don't find that out of the ordinary or
13      unusual, sir.
14               MR. LEE:  Okay.  I'm going to ask my
15               colleague to put up Document 22 --
16               actually, strike that.  I think we did
17               look at 22.
18               Okay.  I'm going to ask my colleague
19               to put up Document 23, which is going to
20               be Exhibit 119.
21               (05/05/2014 Email chain, beginning
22               Bates MARA1920588, marked as
23               Exhibit 119.)
24               MR. QURESHI:  Mr. Lee, if we're
25               going to leave Exhibit 85, I'll just note
```



Page 292

                              B. THOMPSON

1
2           that I think it's incomplete.

3                  We have an 85A and C.  I don't know

4           if there is a B, but it seems to be

5           lacking from introduction in this

6           deposition.

7                  MR. LEE:  I think 85B is one of the

8           other attachments that's indicated in the

9           cover memo.

10                 MR. QURESHI:  And will we be -- do

11          you intend to introduce it?

12                 MR. LEE:  It's part of Mr. Theisen's

13          transcript, I believe.  I think it's a

14          spreadsheet.

15     BY MR. LEE:

16          Q.   Mr. Thompson, do you see Exhibit 119

17     in front of you?

18          A.   Is it this claw-back button?

19                 MR. QURESHI:  No.  I don't think

20          it's the claw-back button.  If you scroll

21          further --

22                 THE WITNESS:  One moment, sir.  I

23          just opened it up.

24     BY MR. LEE:

25          Q.   Okay.  119 is an email from you to



Page 293

```
 1                        B. THOMPSON
 2      Jay Matushak.
 3              Who is Jay Matushak?
 4      A.   At this time Jay would have been in
 5      charge of financial planning and analysis on
 6      my team and finance for Medicare and
 7      Retirement.
 8      Q.   Okay.  And it says in the body:
 9              "Just for clarity, we have not
10              made a final determination to our
11              CV policy.  Our RAF counsel" --
12              Is that Risk Adjustment Factor
13      counsel?
14      A.   I assume so.  I don't recall writing
15      this, sir.
16      Q.   Do you know what the RAF counsel is?
17      A.   It's been eight years.  I don't
18      recall specifics.
19      Q.   Do you know who was on that counsel?
20      A.   I don't, eight years later.
21      Q.   It goes on to say:
22              "Our RAF counsel will make that
23              determination and it will be
24              predicated on several items, one
25              key item of which is our stage of
```



Page 294

```
 1                     B. THOMPSON

 2             progress to date."

 3             Do you see that?

 4       A.    I do.

 5       Q.    And what were the several items upon

 6    which that final determination would be made?

 7       A.    Sir, I don't remember writing this

 8    email.  Would you rather I contextualize my

 9    memory of the situation?  I think I can be

10    more helpful.

11       Q.    Yes.

12       A.    I do remember that after the

13    affirmative from CMS that we can stop claims

14    verification, that we needed to decide

15    formally how to complete that program and

16    sunset it, and also had discussions with CMS

17    about the program as it was in flight --

18    meaning when we talked to CMS, claims

19    verification was an ongoing program.

20             And we sought clarity from CMS after

21    they were affirmative that we could stop, how

22    we stopped mid-process on those in review.

23    That's my recollection.

24             I can only assume this is related to

25    that, sir.
```



Page 295

1                       B. THOMPSON

2          Q.   When it says "One key item of which

3     is our stage of progress to date," what does

4     that mean?

5          A.   I don't know, sir.  Again, I just

6     gave you my general recollection.  I don't

7     remember writing this email.  I thought that

8     would be helpful.

9          Q.   Is it your understanding that CV had

10    various stages to it?

11         A.   Yes.  I think that's a fair

12    representation, sir.

13         Q.   And what's your understanding of what

14    the stages were?

15         A.   Yes.  As I said earlier, I'm not a

16    claims expert.  I just know it is a process.

17         Q.   And it was a process by which a chart

18    would be looked at multiple times by different

19    coders with different levels of expertise?

20              MR. QURESHI:  Objection to form.

21         Asked and answered.

22         A.   Yeah.  I can't talk to the different

23    levels of expertise.  I just know that it was

24    a process that was not just a one-time review

25    that is very black and white.  I know it



Page 296

```
 1                      B. THOMPSON
 2      included elements of a process.  And our
 3      questions related to those that had not yet
 4      completed the process.
 5              If you want specifics on the process
 6      itself, sir, I would point to either John Bird
 7      or Marybeth Meyer.  I certainly don't
 8      recollect and believe I probably never knew
 9      the specifics of that process.
10      BY MR. LEE:
11          Q.   Did your understanding of the
12      generalities of that process include the
13      understanding that there were multiple reviews
14      of the same medical chart by different people?
15              MR. QURESHI:  Objection, asked and
16          answered.
17          A.   Again, I don't know the elements of
18      the process so I don't want to speak as if I
19      do.
20              What I do know is that there was a
21      process, and my general recollection is that
22      until the process is complete, the claims
23      verification is incomplete.
24              The elements of the process, again,
25      I will state I don't recall or know if I ever
```



Page 297

```
 1                      B. THOMPSON

 2     knew.

 3     BY MR. LEE:

 4          Q.   Okay.  But you did have the

 5     understanding that claims verification was not

 6     complete until all of the stages of the process

 7     was completed, correct?

 8          A.   That is correct, sir.

 9          Q.   Further down in that email is an

10     email from Jay Matushak to Jeffrey Putnam and

11     others, including yourself.

12               And it says, under "Full Year

13     Implications":

14               "M&R CV delete good guy is around

15               $250 million for the year."

16               Do you see that?

17          A.   I do, sir.

18          Q.   And then it says:

19               "Note this is just the M&R piece

20               and there is an incremental

21               component at C&S."

22               Did I read that correctly?

23          A.   You did, sir.

24          Q.   What does that indicate to you about

25     the $250 million for the year?  What does that
```



Page 430

1                        B. THOMPSON

2                   C E R T I F I C A T E

3

4          I, ANNE E. VOSBURGH, Certified Shorthand

5     Reporter, Registered Professional Reporter,

6     Certified Realtime Reporter, and Closed

7     Captioner, hereby certify:

8          That BRIAN THOMPSON, via remote

9     videoconference, solemnly affirmed and agreed to

10    testify to the truth, the whole truth and

11    nothing but the truth; that all counsel

12    stipulated to this process, notwithstanding the

13    location of reporter or witness at time of

14    deposition; and that this transcript is a true

15    and correct record of testimony given.

16          I further certify that I am not related

17    to any of the parties to this action and that I

18    am in no way interested in the outcome of this

19    matter.

20

21    _____

22          ANNE E. VOSBURGH

23          Certified Shorthand Reporter No. 6804

24          Registered Professional Reporter

25          Certified Realtime Reporter



3909

**EXHIBIT D-155**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA ex

rel. BENJAMIN POEHLING,

    Plaintiffs,

vs.                    No. CV 16-08697 FMO

UNITEDHEALTH GROUP, INC., et al,

    Defendants.

_____/



** CONTAINS CONFIDENTIAL PORTIONS **



REMOTE VIDEOCONFERENCE DEPOSITION OF

JONATHAN BLUM

March 4, 2022



Reported by:

Anne E. Vosburgh, CSR-6804, RPR, CRR

Job No. 789903



Page 153

```
 1                         J. BLUM
 2              MS. LIKOFF:  Object to form.  Vague.
 3        A.    The purpose of the audit was to
 4   review the individual plan submissions for the
 5   risk-adjustment codes.
 6   BY MR. SUMMERS:
 7        Q.    Right.  And was the objective to
 8   determine the extent to which reported
 9   diagnostic codes could not be validated based
10   on the medical record that was submitted?
11              MS. LIKOFF:  Object to form.
12        A.    The purpose was to review a sample
13   of submitted diagnoses and determine the
14   accuracy based upon that sample.
15   BY MR. SUMMERS:
16        Q.    And then through the RADV program,
17   did you seek to make adjustments on a
18   plan-specific basis to adjust the payments
19   provided to each plan?
20              MS. LIKOFF:  Objection to form.
21   Vague.
22        A.    I thought of it as to collect
23   payments that were made in error to plans.
24   BY MR. SUMMERS:
25        Q.    To recover payments that were made in
```



Page 154

```
 1                        J. BLUM
 2      error?
 3           A.   "Recover" is a better word.  Thank
 4      you.
 5                MR. SUMMERS:  Heather, let's go
 6           ahead and -- let me ask, Heather, if you
 7           can go ahead and start pulling up Tab 7,
 8           I'm going to go ahead and ask another
 9           question or two while you're doing that.
10      BY MR. SUMMERS:
11           Q.   Mr. Blum, by 2010, you were well
12      aware that the data submitted provided by MA
13      plans often contained diagnostic codes reported
14      by the healthcare providers that were not
15      always supported by the underlying medical
16      records, were you not?
17                MS. LIKOFF:  Objection to form.
18           Lacks foundation.  Vague.
19           A.   I was aware that the Agency faced
20      vulnerabilities in its program, part of which
21      being diagnosis codes that were submitted that
22      weren't documented by medical record.
23      BY MR. SUMMERS:
24           Q.   And when you say "faced
25      vulnerabilities," you knew that it was an
```



Page 155

```
 1                    J. BLUM
 2    issue, correct?
 3            MS. LIKOFF:  Objection to form.
 4        A.  Yes.
 5    BY MR. SUMMERS:
 6        Q.  Okay.  Let's go ahead and pull up
 7    what Heather has marked as Exhibit 1094.
 8            (12/07/2010 Memorandum, Bates
 9            USBP000543752, marked as
10            Exhibit 1094.)
11    BY MR. SUMMERS:
12        Q.  Mr. Blum, do you have Exhibit 1094 in
13    front of you?
14        A.  Not yet.  Just pulling up.
15            Yes.
16        Q.  Great.  Feel free to take a look at
17    it.  It's only a two-page exhibit.
18            Can you please tell us what
19    Exhibit 1094 is.
20        A.  It's a memo written to me from the
21    OIG documenting their findings of their own
22    audits with the plans' risk-adjustment
23    submissions.
24        Q.  Okay.  If we look at the top of the
25    memorandum, do you see it's dated December 7,
```



Page 288

```
 1                       J. BLUM

 2               C E R T I F I C A T E

 3

 4        I, ANNE E. VOSBURGH, Certified Shorthand

 5   Reporter, Registered Professional Reporter,

 6   Certified Realtime Reporter, and Closed

 7   Captioner, hereby certify:

 8           That JONATHAN BLUM, via remote

 9   videoconference, solemnly affirmed and agreed to

10   testify to the truth, the whole truth and

11   nothing but the truth; that all counsel

12   stipulated to this process, notwithstanding the

13   location of reporter or witness at time of

14   deposition; and that this transcript is a true

15   and correct record of testimony given.

16           I further certify that I am not related

17   to any of the parties to this action and that I

18   am in no way interested in the outcome of this

19   matter.

20

21   _____

22           ANNE E. VOSBURGH

23           Certified Shorthand Reporter No. 6804

24           Registered Professional Reporter

25           Certified Realtime Reporter
```



3915

**EXHIBIT D-156**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA
ex rel., BENJAMIN POEHLING,    NO. CV 16-08697 FMO

      Plaintiffs,


UNITED HEALTHGROUP, INC.,
et al.,
      Defendants.



*** CONTAINS ATTORNEYS' EYES ONLY PORTIONS

BOUND SEPARATELY ***



* * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF THE VIDEOTAPED DEPOSITION

BY VIDEOCONFERENCE OF:

JENNIFER HARLOW,

TAKEN ON BEHALF OF DEFENDANTS, REPORTED IN THE ABOVE

ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

* * * * * * * * * * * * * * * * * * * * * * * * * *


COMMENCING AT 10:03 A.M. EST, ON AUGUST 5, 2022



3917

Page 17

1        Q.    And according to Exhibit 1253, around February

2    of 2007, you became a division director within MPPG.

3    Is that consistent with your recollection?

4        A.    So I -- I would caveat that with I did become

5    the division director in the Medicare Plan Policy

6    Group.  I don't remember the exact dates, so, you know,

7    I couldn't speak to February 2007.  And when we say

8    "MPPG," that would be the Medicare Plan Policy Group.

9    So I became a division director in the Medicare Plan

10   Policy Group to start with.

11       Q.    Okay.  And at some point in time, did the

12   Medicare Plan Policy Group change its name to the

13   Medicare Plan Payment Group?

14       A.    Yes, that's correct.

15       Q.    Do -- do you know when that happened?

16       A.    I don't remember.

17       Q.    Okay.  Do you know who -- why it happened?

18       A.    I -- I don't -- I don't remember.

19       Q.    And what, generally, were the functions of the

20   Medicare Plan Policy Group?

21       A.    I -- I would go back to my original answer,

22   which was generally to address policy and Medicare

23   Advantage.  I -- I don't remember beyond that, at this

24   point, what the, you know, more specific functions of

25   the group were.



Page 18

1      Q.   And the reference to division director, do you

2   recall what division you were directing in or around

3   February of 2007?

4      A.   So I don't remember the exact name.  I think

5   it was division of payment validation.  So that was it.

6      Q.   And sometimes abbreviated as DPV?

7      A.   Correct, yes.

8      Q.   And at some point, subsequently, you became

9   the deputy director for the Medicare Plan Payment

10  Group?

11     A.   Correct, yes.  Yeah.

12     Q.   Ms. Harlow, you -- you refer to the Medicare

13  Advantage or Medicare Part C program.  What's your

14  understanding of what that program does?

15     A.   The -- the -- the Medicare Advantage program

16  provides managed care to Medicare beneficiaries.

17     Q.   And what's your understanding of the phrase

18  "risk adjustment"?

19          MR. MASON:  Objection; vague.

20     A.   Could -- could you please provide more framing

21  around "risk adjustment" and what -- where that

22  question is directed?

23  BY MR. QURESHI:

24     Q.   Sure.  I'm trying to understand what you

25  believe "risk adjustment" refers to in connection with



3919

Page 19

1    the Medicare Advantage program.

2         A.    Risk -- I'm sorry.  Are you asking me what the

3    definition of "risk adjustment" is -- or can -- can you

4    just frame it a little bit more?

5         Q.    Sure.  I'm just trying to ascertain how best

6    you understand that phrase, "risk adjustment," as it

7    applies to the Medicare Advantage program.

8         A.    Risk adjustment is a policy that we apply to

9    payments in the Medicare Advantage program.

10        Q.    And when you say "payments," you're referring

11   to payments that are made by Medicare to Medicare

12   Advantage plans?

13        A.    Correct, yes.

14        Q.    How did you familiarize yourself with the

15   Medicare Advantage program during your time with either

16   the Medicare Plan Policy Group or the Medicare Plan

17   Payment Group?

18             MR. MASON:  Objection.

19        A.    So I'd just like to clarify.  Is this question

20   directing -- directed at sort of starting with no

21   understanding of Medicare Advantage when I started

22   working with the Medicare Plan Policy Group?

23   BY MR. QURESHI:

24        Q.    I'm trying to understand what your base of

25   knowledge was about the Medicare Advantage program,



Page 188

1                    REPORTER'S CERTIFICATE

2        I, YOLANDA J. PENA, Certified Court Reporter in
   and for the State of Louisiana, Registered
3  Professional Reporter, and as the officer before whom
   this testimony was taken, do hereby certify that
4  JENNIFER HARLOW, after having been duly sworn by me
   upon authority of R.S. 37:2554, did testify as set
5  forth in the foregoing 187 pages.
        I further certify that said testimony was reported
6  by me in the Stenotype reporting method, was prepared
   and transcribed by me or under my direction and
7  supervision, and is a true and correct transcript to
   the best of my ability and understanding.
8        I further certify that the transcript has been
   prepared in compliance with transcript format
9  guidelines required by statute or by rules of the
   board and that I have been informed about the complete
10 arrangement, financial or otherwise, with the person
   or entity making arrangements for deposition services.
11       I further certify that I have acted in compliance
   with the prohibition on contractual relationships, as
12 defined by Louisiana Code of Civil Procedure Article
   1434, and in rules and advisory opinions of the board.
13       I further certify that I am not an attorney or
   counsel for any of the parties, that I am neither
14 related to nor employed by any attorney or counsel
   connected with this action, and that I have no
15 financial interest in the outcome of this matter.
        This certificate is valid only for this
16 transcript, accompanied by my original signature and
   original raised seal on this page.
17
        Baton Rouge, Louisiana, this 10th day of August,
18 2022.

19

20

21

22           _____
           YOLANDA J. PENA, CCR, RPR
23         CCR NO. 2017002, RPR NO. 907346

24

25



**EXHIBIT D-157**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA     )   No. 16-08697 FMO
ex rel. BENJAMIN POEHLING,   )
                             )
             Plaintiffs,     )
                             )
v.                           )
                             )
UNITEDHEALTH GROUP, INC.,    )
et al.,                      )
                             )
             Defendants.     )
_____)


*** CONFIDENTIAL ***


VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

MARICRUZ BONFANTE

(Taken virtually)

10:33 a.m.

Monday, March 21, 2022


REPORTED BY:   Christine A. Taylor, RPR


Magna Legal Services

866-624-6221

www.MagnaLS.com



Page 17

1    from occurring.

2          Q.   I'm sorry, that last part of your

3    sentence cut out.  You said prevent fraud, waste,

4    and abuse in our --

5          A.   Oh, from occurring.

6          Q.   From occurring, okay.

7               What are your responsibilities?

8               MS. YEVTUKHOVA:  Object to form.

9    BY MS. KOPPEL:

10         Q.   You may answer.

11         A.   My responsibilities, I guess I have

12   several.  We have a process in which the different

13   groups within our center for program integrity may

14   bring forward certain areas where they've seen an

15   uptick in fraud, waste, or abuse.  And my division

16   basically processes those instances and we triage

17   them.  So we basically try to find out more

18   information about each incident, find out, like,

19   what the common denominators are and then try to

20   find out which programs may assist in trying to

21   mitigate or address the different types of

22   vulnerabilities.

23         Q.   Okay.  And this was for the Medicare

24   Part C program?

25         A.   I'm sorry, I couldn't hear you.



Page 18

1            Q.   I'm sorry.  This relates to the

2    Medicare Part C program?

3                 MS. YEVTUKHOVA:  Object to form.

4                 THE WITNESS:  No.  It relates to all

5            programs.

6    BY MS. KOPPEL:

7            Q.   All programs including Medicare

8    Part C?

9            A.   Yes and no.  We haven't really touched

10   on any Medicare Part C issues.  We've been most

11   focused on fee for service and Medicare Part D.

12           Q.   Ms. Bonfante, who do you currently

13   report to directly?

14           A.   Directly, Dennis Sendros and Laura

15   Minassian-Kiefel.

16           Q.   How long have you reported directly to

17   those individuals?

18           A.   For the last two years.

19           Q.   Is there anybody else, since you've

20   held this position, that you've reported directly

21   to?

22           A.   They're my direct supervisors.  But at

23   one point I was on a detail with -- as a special

24   assistant for Jennifer Dupee and Steven Ferraina,

25   and they're in the front office of the audits and



Page 19

```
 1     vulnerabilities group.
 2             Q.   And you said prior to the
 3     reorganization you worked in a similar capacity
 4     for three years.  Who did you report directly to
 5     during those three years?
 6             A.   Reported to Samantha Richardson.
 7             Q.   Have you held any other positions
 8     within CMS?
 9             A.   Well, the one I held previously when I
10     was working for the Center for Medicare.
11             Q.   When was that?
12             A.   Well, it would have been between 2010
13     and 2016, I think.
14             Q.   Do you recall what your position was
15     at that time?
16             A.   It was a health insurance specialist.
17             Q.   So it was just for a different
18     division?
19             A.   Yes.
20             MS. YEVTUKHOVA:  Object to form.
21     BY MS. KOPPEL:
22             Q.   And what were your responsibilities as
23     a health insurance specialist while you were
24     working for center for -- you said --
25             A.   Well, it depended on the position I
```



Page 20

```
 1    was in.  I was in two different divisions when I
 2    worked for the Center for Medicare.  But within my
 3    position with the Medicare plan payment group
 4    under the Division of Payment Validation, my
 5    responsibilities were primarily to help develop an
 6    appeals process that would be used when and if we
 7    were able to start auditing and issue findings
 8    against plans based on any kind of -- of erroneous
 9    coding or -- erroneous payment.  And then I had
10    several other roles as well.  I helped -- I was
11    the contracting officer's representative for two
12    or three different coding contracts during the
13    time that I was with the division of payment
14    validation.  And then I left the Division of
15    Payment Validation and started working for the
16    division of -- and the acronym is what sticks out
17    in my head, I don't know if I'm going to get this
18    right, but it's the Division of Encounter Data and
19    Risk Adjustment Operations, yes.  And for them, I
20    worked primarily on advising on contracts that
21    they were going to enter into for the front end
22    encounter data system, and I don't remember what
23    that system was called, but -- and then I also
24    handled other things such as systems of record
25    notices, preparing those notifications, and I
```



Page 136

1          Q.   Yes.

2          A.   I may have, but I don't recall.

3          Q.   You understood when you e-mailed

4     Ms. Davis and Ms. Kapustij that these were the

5     final slides used for the White House briefing?

6               MS. YEVTUKHOVA:  Object to form.

7               THE WITNESS:  Well, the e-mail I sent

8               in 2018, I mean, I don't know how I would

9               know personally that these were final.  I

10              probably just looked -- I mean, I don't

11              know.  I don't remember the circumstances

12              behind that, but I definitely wasn't

13              working in RADV at that time and I may have

14              just, you know, looked for something that

15              said final on it and saw John Scott's

16              e-mail.

17     BY MS. KOPPEL:

18          Q.   I'm sorry, I didn't mean to jump on

19     you there.  But you used the word "finalized"

20     there?

21          A.   That may have been my understanding

22     when I sent the e-mail, but I don't recall the

23     specifics of this.

24          Q.   So are you saying that sitting here

25     today you don't know whether these were final, but



Page 137

1    you believed them to be final when you sent this

2    e-mail in 2018?

3         A.   I don't know whether they were final.

4    I can presume that because John Scott sent me an

5    e-mail that had an attachment that said final on

6    it that it was a final document.  But I -- I don't

7    recall ever reviewing this.

8         Q.   Is it your practice to send along

9    things without reviewing them?

10        A.   Well, again, I don't know the context

11   of the discussion or why it was being sent, but --

12   and the circumstances around it being sent, but if

13   I was no longer working in the RADV program and

14   I -- if I had perhaps -- again, this is a

15   hypothetical, this may not explain the

16   circumstances.  But if I had to reached out to

17   John Scott who used to be the special assistant

18   for the group director, I would trust that

19   whatever he sent me, if it said final on it, it

20   was probably final.  And if all I was doing was

21   taking the document and sending it to the people

22   who are actually working on that program, then I

23   would not reviewed it.  I would have just

24   forwarded it to them because it would not have

25   been my -- as someone that works in CPI, that's



Page 138

1     not part of my role.

2           Q.   And trusting that the documents were,

3     in fact, final because you trusted John Scott's

4     work?

5           A.   Yes.  Absolutely.

6           Q.   Okay.  So sitting here today, is it

7     your understanding that the slide deck in

8     Exhibit 1147-3 were the final slides that were

9     used for the White House briefing in January of

10    2012?

11              MS. YEVTUKHOVA:  Object to form.

12              THE WITNESS:  Again, my understanding

13              today based on the e-mail chain that's

14              provided seems to show that this was a

15              final document.

16    BY MS. KOPPEL:

17          Q.   And it includes a discussion -- or,

18    rather, a recommendation that CMS apply the

19    fee-for-service adjuster to offset any amounts

20    owed to account for the underlying error in the

21    traditional FFS program; correct?

22              MS. YEVTUKHOVA:  Object to form.

23              THE WITNESS:  I'm sorry, which slide

24              was that again?  I just want to --

25    BY MS. KOPPEL:



Page 172

1                    CERTIFICATE OF REPORTER

2

3           I, Christine A. Taylor, Certified
    Court Reporter within and for the State of
    Georgia, do hereby certify:

4

5           That the foregoing deposition was
    taken before me on the date and at the time and
    location stated on Page 1 of this transcript; that

6   the deponent was duly sworn to testify to the
    truth, the whole truth and nothing but the truth;

7   that the testimony of the deponent and all
    objections made at the time of the examination

8   were recorded stenographically by me and were
    thereafter transcribed; that the foregoing

9   deposition as typed is a true, accurate and
    complete record of the testimony of the deponent

10  and of all objections made at the time of the
    examination to the best of my ability.

11

12          I further certify that I am neither related
    to nor counsel for any party to the cause pending
    or interested in the events thereof.  Witness my

13  hand, this 1st day of April, 2022.

14

15

16  _____
    *Christine Taylor*

17         Christine A. Taylor, RPR
           CCR-4736

18

19

20

21

22

23

24

25



**EXHIBIT D-158**

DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

7500 Security Boulevard

Baltimore, Maryland 21244-1850



## CENTER FOR DRUG AND HEALTH PLAN CHOICE

TO:  Medicare Advantage Organizations
    Medicare Advantage-Prescription Drug Organizations
    Cost-Based Contractors
    Prescription Drug Plan Sponsors
    Employer/Union-Sponsored Group Health Plans
    Programs of All-Inclusive Care for the Elderly Organizations

FROM:  Jonathan Blum, Acting Director, Center for Drug and Health Plan Choice

RE:   Issuance of the 2010 Call Letter

DATE:  March 30, 2009

I am pleased to provide you with the 2010 Call Letter for Medicare Advantage (MA) organizations (MAOs); section 1876 cost-based contractors; prescription drug plan (PDP) sponsors; demonstrations; Programs of All-Inclusive Care for the Elderly (PACE) organizations; and employer and union-sponsored group plans, including employer/union-only group waiver plans (EGWPs). The Call Letter contains information these organizations will find useful as they prepare their bids for the upcoming contract year.

We received approximately 190 comments from plan sponsors and plan sponsor associations; advocacy organizations and consumer groups; pharmaceutical manufacturers and their associations; members of Congress; States and State associations; pharmacists and pharmacy associations; providers and provider associations; and other individuals on the draft Call Letter we issued for public comment on February 23, 2009. We carefully considered all comments we received and have made revisions and clarifications in response to these comments in this final 2010 Call Letter.

In some areas, we received a number of constructive comments which we will consider addressing for future contract years. For example, we requested comments regarding whether, and if so, how we should calculate and disseminate information about plans' medical loss ratios. Given this issue's complexity, we will continue evaluating methodologies for possible future implementation. We will also continue to study the issue of our reassignment processes for low-income subsidy (LIS) eligible individuals for potential future improvements that are consistent with our statutory authority. We will also continue to work with plans that are losing members to identify appropriate ways to reach out to these members to explain how they can remain in their current plan and what their premium liability will be if they choose to do so.

3933

USBP000012972

2

As we indicated in the draft document, the 2010 Call Letter focuses on new guidance necessary for preparing for contract year 2010.  Sponsoring organizations continue to remain responsible for familiarizing themselves with statutory requirements, regulations, and guidance governing the MA and Part D programs, including the Medicare Managed Care and Prescription Drug Benefit Manuals. CMS will separately issue technical and procedural clarifications regarding bid and formulary submissions, benefits, HPMS data, CMS marketing models, and other operational issues of interest to sponsoring organizations.

We hope this information helps you implement and comply with CMS policies and procedures as you prepare either to offer a plan for the first time or continue offering plans under the MA and/or Part D programs.

3934

USBP000012973

# 2010 Call Letter

**HOW TO USE THIS DOCUMENT** .................................................................4

**SECTION A – 2010 MA, MA-PD, AND COST PLAN SECTIONS** ..................................5

**SECTION B – 2010 PRESCRIPTION DRUG PLAN SECTIONS** .................................49

**SECTION C - MARKETING/BENEFICIARY COMMUNICATIONS** ...........................88

**SECTION D – APPENDICES** ..................................................................95

USBP000012974

# How to Use this Document

The 2010 Call Letter contains information on the Part C, cost-based, and Part D programs combined into one document.  Also, we indicate when sections apply to PACE and employer and union-sponsored group health plans. Section A provides MA, MA-PD, and cost plan guidance; Section B provides information for Part D sponsors; Section C contains marketing-related information that applies to all plan types; and Section D contains attachments to the material contained in Sections A-C.

If you have questions concerning this Call Letter, please contact Vanessa Duran at Vanessa.Duran@cms.hhs.gov or Rosetta Hicks at Rosetta.Hicks@cms.hhs.gov.

USBP000012975

# Section A – 2010 MA, MA-PD, and COST PLAN SECTIONS

Note on 2010 MA, MA-PD, and Cost Plan portion of the Call Letter ........................6

2010 MA, MA-PD, and Cost Plan Calendar.................................................................6

I. Contracting Process ...............................................................................................11

II. Benefit Design ......................................................................................................13

III. Bidding.................................................................................................................21

IV. Quality and Performance Measures ...................................................................23

V. Compliance and Monitoring.................................................................................25

VI. Enrollment ...........................................................................................................29

VII. Payment..............................................................................................................29

VIII. Grievances, Organization Determinations, and Appeals .................................31

IX. Special Needs Plans ...........................................................................................31

X. Private Fee-For-Service Plans ............................................................................42

XI. Medical Savings Account (MSA) Plans .............................................................45

XII. Section 1876 Cost Plans ...................................................................................46

XIII. Employer and Union-Sponsored Group Health Plans .....................................48

3937

USBP000012976

## APPENDIX II – Risk Adjustment Implementation

### 1. Risk Adjustment Data Submission Schedule

*Table 1. Risk Adjustment Implementation Calendar* (below) provides the updated submission schedule for all diagnosis data submitted for all risk adjustment models.  This includes data for both the Part C CMS-HCC and ESRD models and the Part D Drug risk adjustment model.

**Table 1. Risk Adjustment Implementation Calendar**

| CY | Dates of Service | Initial Submission Deadline* | First Payment Date | Final Submission Deadline |
|---|---|---|---|---|
| 2008 | July 1, 2006 through June 30, 2007 | September 7, 2007 | January 1, 2008 | N/A** |
| 2008 | January 1, 2007 through December 31, 2007 | March 7, 2008 | July 1, 2008 | January 31, 2009 |
| 2009 | July 1, 2007 through June 30, 2008 | September 5, 2008 | January 1, 2009 | N/A** |
| 2009 | January 1, 2008 through December 31, 2008 | March 6, 2009 | July 1, 2009 | January 31, 2010 |
| 2010 | July 1, 2008 through June 30, 2009 | September 4, 2009 | January 1, 2010 | N/A** |

3938

USBP000013071

| 2010 | January 1, 2009 through December 31, 2009 | March 5, 2010 | July 1, 2010 | January 31, 2011 |
| 2011 | July 1, 2009 through June 30, 2010 | September 3, 2010 | January 1, 2011 | N/A** |
| 2011 | January 1, 2010 through December 31, 2010 | March 4, 2011 | July 1, 2011 | January 31, 2012 |

*March and September dates reflect the first Friday of the respective month.

**All risk adjustment data for a given payment year (CY) must be submitted by January 31st of the subsequent year.

Changes in payment methodology for 2010, including Part C and Part D payment and risk adjustment, are described in the February 20, 2009, *Advance Notice of Methodological Changes for Calendar Year (CY) 2010 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies* and the April 6, 2009, *Announcement of CY 2010 MA Capitation Rates and MA and Part D Payment Policies* (which will be available at http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/).

## 2. Part A Risk Adjustment Factor Options

**Determinations of Risk Status**

As stated in the April 3, 2006 Announcement of Calendar Year (CY) 2007 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies (available at http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/), plans subject to risk adjusted payments have the option of treating beneficiaries with 12 months of Part A data but less than 12 months of Part B enrollment in a data collection year.

3939

USBP000013072

**Table 2. Which Risk Adjustment Factors to Apply to Payment\***

| Time Period Beneficiary Has Been Enrolled in Part B Medicare\*\* | Time Period Beneficiary Has Been Entitled to Benefits under Part A Medicare\*\* | |
|---|---|---|
| | 0 – 11 months | ≥ 12 months |
| 0 – 11 months | New enrollee factors | Plan's option: New enrollee or full risk adjustment factors |
| ≥ 12 months | Full risk adjustment factors | Full risk adjustment factors |

\*Applies to Part C and D payments for MA plans, demonstrations, and PACE organizations. Note that MA enrollees must be entitled to benefits under Part A and enrolled in Part B.

\*\*During data collection period (previous calendar year).

***Table 2.*** *Which Risk Adjustment Factors to Apply to Payment* (above) illustrates that beneficiaries with 12 or more months of Medicare Part B enrollment during the data collection period (previous calendar year) are considered full risk enrollees. The new enrollee factors do not apply.

Beneficiaries with less than 12 months of entitlement to benefits under Part A and less than 12 months of Part B enrollment during the data collection period will be treated as new enrollees, as they are now.

Currently beneficiaries with 12 or more months of entitlement to benefits under Part A and less than 12 months of Part B enrollment during the data collection period (referred to as "Part A-only" enrollees) are considered new enrollees for the purpose of risk adjusted payments. Because of concerns expressed by some sponsors of demonstration plans that "Part A only" enrollees are always considered to be new enrollees, CMS has created an option for how the risk adjustment payments for this category of enrollees are determined. Effective as of 2006 payments, organizations may elect to have CMS determine payments for all "Part A-only" enrollees using either new enrollee factors or full risk adjustment factors. The organization's decision will be applied to all "Part A-only" enrollees in the plan. Plans may not elect to move some eligible "Part A-only" enrollees into risk adjustment, while retaining others as new enrollees.

***Option to Elect Full Risk Option for "Part A-only" Enrollees***

3940

USBP000013073

**EXHIBIT D-159**

**Attestations**
**Internal Approval Form**
**Version date: 12.29.09**

The management of Ovations and AmeriChoice is responsible for establishing and maintaining adequate internal controls over completion of attestations. Please refer to the XXX Policy & Procedure for the details of this internal control process.

This form is used to confirm that the appropriate legal, regulatory, and business owners have reviewed the attestation. This completed form and any additional attached documentation provides the needed confirmation that it is appropriate for the designated Executive to sign the attestation (or this form). The final signed document, including the signature sheet below with appropriate signatures from approvers, should be scanned and retained by PSMG Regulatory Affairs.

| Attestation Information | |
|---|---|
| **Name of Attestation** | Calendar Year 2009 Risk Adjustment Attestation |
| **Brief Description of Attestation** | Annually CMS requires Medicare Advantage Organizations to attest to the previous submitted risk adjustment data for it's complete and accuracy. |
| **Attestation to be Submitted to: (CMS, State, etc.)** | CMS |
| **Designated Executive for Signature:** | Jack Larson, CFO of PSMG |
| **Segment or Product Line (Ovations, SecureHorizons, Evercare, AmeriChoice, etc.)** | Ovations, AmeriChoice, Unison, and Sierra |
| **Due Date for Designated Executive Signature:** | March 26, 2010 |
| **Due Date for Submissions to Regulating Body:** | March 26, 2010 |
| **Approver Signoff(s)** | |
| **Business Owner(s) – The following business owners have reviewed the content of the attestation and confirmed that the attestation is factually accurate and that the business segment is meeting the stated requirements in the attestation. The attached internal attestations (or emails) serve as approval in place of signature on this form.** | |
| Name & Title: Sharon Theut, Michigan HPO | Date: 3/26/2010 |
| Signature: See Attached signature | |
| Notes: Great Lakes Health Plan | |
| **Business Owner(s) – The following business owners have reviewed the content of the attestation and confirmed that the attestation is factually accurate and that the business segment is meeting the stated requirements in the attestation. The attached internal attestations (or emails) serve as approval in place of signature on this form.** | |
| Name & Title: Jeff Dumcum, General Manager, Clinic Assessment Solutions | Date: 3/26/2010 |
| Signature: See attached electronic signature | |
| Notes: Ingenix | |
| **Business Owner(s) – The following business owners have reviewed the content of the attestation and confirmed that the attestation is factually accurate and that the business segment is meeting the stated requirements in the attestation. The attached internal attestations (or emails) serve as approval in place of signature on this form.** | |
| Name & Title: Michael Goffinet, Vice President, Operations | Date: 3/26/2010 |

1

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

| Signature: See attached electronic signature | |
|---|---|
| Notes: Sierra Health Plans | |
| Legal (Confidential Attorney Client Communication) Lead– Based on the acknowledgement above from the business owner that we are meeting the stated requirements, the individual signing below acknowledges that he/she has reviewed the content of the attestation to confirm that it complies with applicable *legal* requirements and determined that it is appropriate for the designated executive to proceed with signature.   Please insert any notes. | |
| Name & Title: Keith Dobbins, Sr. General Counsel | Date: 3/26/2010 |
| Signature: | |
| Notes: | |
| Corporate Responsibility & Compliance Lead– Based on the acknowledgement above from the business owner that we are meeting the stated requirements, the individual signing below acknowledges that he/she has reviewed the content of the attestation to confirm that it complies with applicable *regulatory* requirements and determined that it is appropriate for the designated executive to proceed with signature.   Please insert any notes. | |
| Name & Title: Rebecca Feyder, Manager Regulatory Affairs | Date: 3/30/10 |
| Signature: | |
| Notes: | |

## INSTRUCTIONS TO DESIGNATED EXECUTIVE

**Paper Copy Signatures:** Please review this form, the attached internal attestations (if applicable) and the attached attestation itself.

And

**Electronic Submissions:** Please review this form, the attached internal attestations (if applicable) and the attached attestation itself [or description of the attestation, if too long to attach]. If this attestation is submitted electronically to the regulating body (and therefore a "wet signature" is not required), the responsible executive should sign below, acknowledging approval of the attestation statement and agreeing that the attestation may be submitted to the regulating body electronically.

If you have any questions, please contact  Emily Vue, 952-931-4677 or emily_e_vue@uhc.com

Please sign below and this form to _____ Emily Vue _____  by _03/26/2010_

RESPONSIBLE EXECUTIVE – By signing below, I give the authority to submit this attestation to the regulating body or its designee.

| Name & Title: John Larson, Chief Financial Officer of Public & Senior Market Group | Date: 3/26/10 |
|---|---|
| Signature | |

2

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

| Signature: See attached electronic signature | |
|---|---|
| **Notes:** Sierra Health Plans | |
| **Legal (Confidential Attorney Client Communication) Lead- Based on the acknowledgement above from the business owner that we are meeting the stated requirements, the individual signing below acknowledges that he/she has reviewed the content of the attestation to confirm that it complies with applicable *legal* requirements and determined that it is appropriate for the designated executive to proceed with signature. Please insert any notes.** | |
| **Name & Title:** Keith Dobbins, Sr. General Counsel | **Date:** 3/26/2010 |
| **Signature:** | |
| **Notes:** | |
| **Corporate Responsibility & Compliance Lead– Based on the acknowledgement above from the business owner that we are meeting the stated requirements, the individual signing below acknowledges that he/she has reviewed the content of the attestation to confirm that it complies with applicable *regulatory* requirements and determined that it is appropriate for the designated executive to proceed with signature. Please insert any notes.** | |
| **Name & Title:** Rebecca Feyder, Manager Regulatory Affairs | **Date:** 3/26/10 |
| **Signature:** | |
| **Notes:** | |

## INSTRUCTIONS TO DESIGNATED EXECUTIVE

**Paper Copy Signatures:** Please review this form, the attached internal attestations (if applicable) and the attached attestation itself.

And

**Electronic Submissions:** Please review this form, the attached internal attestations (if applicable) and the attached attestation itself [or description of the attestation, if too long to attach]. If this attestation is submitted electronically to the regulating body (and therefore a "wet signature" is not required), the responsible executive should sign below, acknowledging approval of the attestation statement and agreeing that the attestation may be submitted to the regulating body electronically.

If you have any questions, please contact  Emily Vue, 952-931-4677 or emily_e_vue@uhc.com

Please sign below and this form to _____ Emily Vue _____ by _03/26/2010_

**RESPONSIBLE EXECUTIVE** – By signing below, I give the authority to submit this attestation to the regulating body or its designee.

| Name & Title: John Larson, Chief Financial Officer of Public & Senior Market Group | Date: 3/26/10 |
|---|---|
| Signature | |

2

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

MARA2092268

USBP060624236

Mar-26-2010 09:39 AM UnitedHealth Group 2406328192                           2/4

**Attestations**
**Internal Approval Form**
Version date: 12.29.09

The management of Ovations and AmeriChoice is responsible for establishing and maintaining adequate internal controls over completion of attestations.  Please refer to the XXX Policy & Procedure for the details of this internal control process.

This form is used to confirm that the appropriate legal, regulatory, and business owners have reviewed the attestation. This completed form and any additional attached documentation provides the needed confirmation that it is appropriate for the designated Executive to sign the attestation (or this form).  The final signed document, including the signature sheet below with appropriate signatures from approvers, should be scanned and retained by PSMG Regulatory Affairs.

| Attestation Information | |
|---|---|
| Name of Attestation | Calendar Year 2009 Risk Adjustment Attestation |
| Brief Description of Attestation | Annually CMS requires Medicare Advantage Organizations to attest to the previous submitted risk adjustment data for it's complete and accuracy. |
| Attestation to be Submitted to: (CMS, State, etc.) | CMS |
| Designated Executive for Signature: | Jack Larson, CFO of PSMG |
| Segment or Product Line (Ovations, SecureHorizons, Evercare, AmeriChoice, etc.) | Ovations, AmeriChoice, Unison, and Sierra |
| Due Date for Designated Executive Signature: | March 26, 2010 |
| Due Date for Submissions to Regulating Body: | March 26, 2010 |

| Approver Signoff(s) | |
|---|---|
| Business Owner(s): The following business owners have reviewed the content of the attestation and confirmed that the attestation is factually accurate and that the business segment is meeting the stated requirements in the attestation. The attached internal attestations (or emails) serve as approval in place of signature on this form. | |
| Name & Title: Sharon Theut  Michigan HPO | Date: 8/26/10 |
| Signature: *Sharon C. Theut* | |
| Notes: Great Lakes Health Plan | |
| Business Owner(s): The following business owners have reviewed the content of the attestation and confirmed that the attestation is factually accurate and that the business segment is meeting the stated requirements in the attestation. The attached internal attestations (or emails) serve as approval in place of signature on this form. | |
| Name & Title: Jeff Dumcum, General Manager, Clinic Assessment Solutions | Date: |
| Signature: | |
| Notes: Ingenix | |
| Business Owner(s): The following business owners have reviewed the content of the attestation and confirmed that the attestation is factually accurate and that the business segment is meeting the stated requirements in the attestation. The attached internal attestations (or emails) serve as approval in place of signature on this form. | |

1

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

MARA2092269
3945

USBP060624237

Mar-26-2010 09:40 AM UnitedHealth Group 2406328192                                    3/4

| Name & Title: Michael Goffinet, Vice President, Operations | Date: |
|---|---|
| Signature: | |
| Notes: Sierra Health Plans | |

Legal/Confidential Attorney Client Communication Lead - Based on the acknowledgement above from the business owner that we are meeting the stated requirements, the individual signing below acknowledges that he/she has reviewed the content of the attestation to confirm that it complies with applicable legal requirements and determined that it is appropriate for the designated executive to proceed with signature. Please insert any notes.

| Name & Title: Keith Dobbins, Sr. General Counsel | Date: |
|---|---|
| Signature: | |
| Notes: | |

Corporate Responsibility & Compliance Lead - Based on the acknowledgement above from the business owner that we are meeting the stated requirements, the individual signing below acknowledges that he/she has reviewed the content of the attestation to confirm that it complies with applicable regulatory requirements and determined that it is appropriate for the designated executive to proceed with signature. Please insert any notes.

| Name & Title: David Walsh, Director of Regulatory Affairs | Date: |
|---|---|
| Signature: | |
| Notes: | |

## INSTRUCTIONS TO DESIGNATED EXECUTIVE

**Paper Copy Signatures:** Please review this form, the attached internal attestations (if applicable) and the attached attestation itself.

And

**Electronic Submissions:** Please review this form, the attached internal attestations (if applicable) and the attached attestation itself [or description of the attestation, if too long to attach]. If this attestation is submitted electronically to the regulating body (and therefore a "wet signature" is not required), the responsible executive should sign below, acknowledging approval of the attestation statement and agreeing that the attestation may be submitted to the regulating body electronically.

If you have any questions, please contact ___Emily Vue, 952-931-4677 or emily_e_vue@uhc.com___

Please sign below and this form to ___Emily Vue___ by ___03/26/2010___

RESPONSIBLE EXECUTIVE – By signing below, I give the authority to submit this attestation to the regulating body or its designee.

| Name & Title: John Larson, Chief Financial Officer of Public & Senior Market Group | Date: |
|---|---|

2

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

3946

MARA2092270

USBP060624238

## Vue, Emily E

| | |
|---|---|
| **From:** | Vue, Emily E |
| **Sent:** | Friday, March 26, 2010 11:23 AM |
| **To:** | Vue, Emily E |
| **Subject:** | FW: Risk Adjustment attestation |
| **Importance:** | High |

**Attachments:** 2009 attestation (risk adjusters) final w.o contracts.doc; CY 2009 Internal Attestation.doc

---

**From:** Dumcum, Jeff S
**Sent:** Friday, March 26, 2010 10:03 AM
**To:** Vue, Emily E
**Subject:** FW: Risk Adjustment attestation
**Importance:** High

Please accept this as my electronic signature for the internal attestation.

---

**From:** Vue, Emily E
**Sent:** Friday, March 26, 2010 8:14 AM
**To:** Theut, Sharon; Dumcum, Jeff S; Goffinet, Michael
**Cc:** Dobbins, Keith E
**Subject:** Risk Adjustment attestation
**Importance:** High

Good morning,

Attached are two documents:

1. the adjusted language for the CMS Risk Adjustment attestation that ultimately Jack Larsen will be attesting to for your review and
2. the internal attestation that you are attesting to the language in #1 to Jack for the accuracy of the Risk Adjustment data

Please review the language and if you have a sub-attestation prepared please provide that to me to present to Jack as well. I would prefer that we all sign the same internal executive attestation so please wait until I forward you the Attesestation with the appropriate order of signers. **We must have this completed before 2pm today because Jack Larsen will be leaving at 3pm.**

-Sharon Theut please sign first (also please add your title) to get this process rolling.

Thank you.

*Emily Vue*
Sr. Regulatory Affairs Analyst
Ovations - PSMG
UnitedHealth Group, Inc.
952-931-4677
emily_e_vue@uhc.com

3/26/2010

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

MABA2092271

USBP060624239

**Vue, Emily E**

| | |
|---|---|
| **From:** | Goffinet, Michael |
| **Sent:** | Friday, March 26, 2010 10:53 AM |
| **To:** | Vue, Emily E |
| **Cc:** | Campbell, Michelle |
| **Subject:** | CY 2009 Internal Attestation.doc |
| **Attachments:** | CY 2009 Internal Attestation.doc |

Here is my electronically signed attestation.

3/26/2010

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

3948

MABA2092272



Emily Vue
Regulatory Affairs
UnitedHealth Group
MN006-W800
9701 Data Park Drive
Minnetonka, MN 55343

March 19, 2009

Ms. Marilyn Hunter
Centers for Medicare & Medicaid Services
7500 Security Blvd.
Mailstop C4-22-04
Baltimore, MD 21244

Re: 2008 Risk Adjustment Attestation

Dear Ms. Hunter:

Please find attached the signed 2008 Risk Adjustment Attestations for: SecureHorizons,
Evercare, and AmeriChoice on behalf of the UnitedHealth Group.

If you have any questions, I may be reached via email at emily_e_vue@uhc.com or by
telephone at 952/931-4677.

Sincerely,

Emily Vue
Regulatory Affairs Analyst
PSMG Regulatory Affairs

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

MARA2092273

USBP060624241



11931 Foundation Pl, D
Rancho Cordova, CA 95670

March 22, 2010

Ms. Marilyn Hunter
The Centers for Medicare and Medicaid Services
Mailstop C4-21-26
7500 Security Blvd.
Baltimore, MD  21244

**Subject:  Risk Adjustment Attestation form for Health Net**

Dear Ms. Hunter:

Attached, please find the completed attestation from Health Net.

If you have any questions about this document, please feel free to contact me at
916-935-1459.

Sincerely,

*Janet L. Fina*

Janet L. Fina
Medicare Director
Health Net, Inc.

www.healthnet.com
602-794-1400

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

3950

MARA2092274

USBP060624242

## ATTACHMENT B

### ATTESTATION OF RISK ADJUSTMENT DATA INFORMATION RELATING TO CMS PAYMENT TO A MEDICARE ADVANTAGE ORGANIZATION

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and Health Net, Inc., hereafter referred to as the MA Organization, governing the operation of the following Medicare Advantage and Medicare Advantage-Prescription Drug plans including:

H0351 – Health Net of Arizona, Inc.
H0562 – Health Net of California, Inc.
H0755 – Health Net of Connecticut, Inc.
H5439 – Health Net Life Insurance Company
H5520 – Health Net Life Insurance Company
H5721 – Health Net Insurance of New York, Inc.
H5996 – Health Net Life Insurance Company
R5863 – Health Net Life Insurance Company

the MA Organization hereby requests payment under the contract, and in doing so, makes the following attestation concerning CMS payments to the MA Organization. The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentation to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.

The MA Organization has reported to CMS for the period of January 1, 2009, to December 31, 2009, all risk adjustment data (*INPATIENT HOSPITAL, OUTPATIENT HOSPITAL, AND PHYSICIAN*) available to the MA Organization as of December 31, 2009, with respect to the above-stated MA and MA-PD plans. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

Kristina Cournoyer
VP, Medicare Operations
Health Net, Inc.

March 16, 2010
DATE

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

## ATTESTATION OF RISK ADJUSTMENT DATA INFORMATION RELATING TO
## CMS PAYMENT TO A MEDICARE ADVANTAGE ORGANIZATION

Pursuant to the contracts between the Centers for Medicare & Medicaid Services (CMS) and the UnitedHealth Group affiliate listed in Attachment 1, hereafter referred to as the MA Organization, governing the operation of the Medicare Advantage and Medicare Advantage-Prescription Drug plans listed in Attachment 1, the MA Organization hereby requests payment under the contract and, in doing so, makes the following attestation concerning CMS payments to the MA Organization.*  The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.

The MA Organization has reported to CMS for the period of January 1, 2008 to December 31, 2008 all risk adjustment data available to the MA Organization as of December 31, 2008, with respect to the MA and MA-PD plans listed in Attachment 1.  Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

_Kara Rios_

Kara Rios, Chief Financial Officer, AmeriChoice
On behalf of the UnitedHealth Group
entities listed in Attachment 1

3/18/09

DATE

* This Certification is based on facts reasonably available or made available to the MA Organization as of the date of this Certification and is not to be construed as a representation by the entities listed in Attachment 1, their affiliates, officers, representatives, or agents that the data to which the Certification relate may not require subsequent modification should additional information become available. Best knowledge, information, and belief means based on normal business practices.  In addition, the scope of this Certification does not include risk adjustment data related to "long-term institutionalized" or "community," which the MA Organization is not required to report to or otherwise verify for CMS.  Such designations are made by CMS based on a CMS data source and are subject to reconciliation by CMS in accordance with Section 91.4.2 of Chapter 7 of the Medicare Managed Care Manual.  As previously communicated to CMS, we believe these designations are materially inaccurate.  However, we acknowledge CMS' position that such designations are generally accurate.

Annual Risk Adjustment Attestation/SecureHorizons

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

MA2092276

USBP060624244

Attachment I

| Contract | Contracting Party |
|----------|-------------------|
| H0321 | Arizona Physicians IPA, Inc |
| H3164 | AmeriChoice of New Jersey, Inc |
| H3387 | UnitedHealth Care of New York, Inc. |
| H4837 | UnitedHealth Care of Wisconsin |
| H0251 | UnitedHealth Care Plan of the River Valley, Inc. |

Annual Risk Adjustment Attestation/SecureHorizons

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

3953

MARA2092277



PO Box 15645  Las Vegas, NV 89114-5645  Tel 702 242-7000

March 2, 2009

VIA UPS EXPRESS OVERNIGHT MAIL

Ms. Marilyn Hunter
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Mail Stop C4-22-07
Baltimore, Maryland 21244

**REFERENCE:**    *Sierra Health and Life Insurance Company, Inc.*
*H2905, H4449, R5674*
*2008 Risk Adjustment Attestation*

Dear Ms. Hunter:

Enclosed please find the annual Risk Adjustment Attestation for the period January 1, 2008 – December 31, 2008, signed by Jonathon W. Bunker, President of Sierra Health and Life Insurance Company, Inc.

If you have any questions regarding this submission, or if you need any additional information, please feel free to contact me. I can be reached at (702) 242-7173 or by email at shelley.cranley@uhc.om.

Sincerely,

Shelley Cranley
Director, Regulatory Affairs

Enclosure

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

MABA2092278

USBP060624246



## SIERRA HEALTH AND LIFE
A UnitedHealthcare Company

### ATTACHMENT B

### ATTESTATION OF RISK ADJUSTMENT DATA INFORMATION RELATING TO CMS PAYMENT TO A MEDICARE ADVANTAGE ORGANIZATION

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and Sierra Health and Life Insurance Company, Inc., hereafter referred to as the MA Organization, governing the operation of the following Medicare Advantage and Medicare Advantage-Prescription Drug plans H2905, H4449, and R5674, the MA Organization hereby requests payment under the contract, and in doing so, makes the following attestation concerning CMS payments to the MA Organization. The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentation to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.

The MA Organization has reported to CMS for the period of January 1, 2008, to December 31, 2008, all risk adjustment data (*INPATIENT HOSPITAL, OUTPATIENT HOSPITAL, AND PHYSICIAN*) available to the MA Organization as of December 31, 2008, with respect to the above-stated MA and MA-PD plans. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

Jonathon W. Bunker, President

On behalf
of Sierra Health and Life Insurance Company, Inc.

3/2/09

Date

P.O Box 15645 · Las Vegas, Nevada 89114-5645 · (702) 242-7400

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

MARA2092279

USBP060624247



P.O. Box 15645 Las Vegas, NV 89114-5645  Tel 702 242 7002

March 2, 2009

VIA UPS EXPRESS OVERNIGHT MAIL

Ms. Marilyn Hunter
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Mail Stop C4-22-07
Baltimore, Maryland 21244

**REFERENCE:**    *Health Plan of Nevada, Inc.*
*H2931 and H2961*
*2008 Risk Adjustment Attestation*

Dear Ms. Hunter:

Enclosed please find the annual Risk Adjustment Attestation for the period January 1, 2008 – December 31, 2008, signed by Jonathon W. Bunker, President of Health Plan of Nevada, Inc.

If you have any questions regarding this submission, or if you need any additional information, please feel free to contact me. I can be reached at (702) 242-7173 or by email at shelley.cranley@uhc.com.

Sincerely,

Shelley Cranley
Director, Regulatory Affairs

Enclosure

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

MARA2092280



## HEALTH PLAN OF NEVADA

A UnitedHealthcare Company

### ATTACHMENT B

### ATTESTATION OF RISK ADJUSTMENT DATA INFORMATION RELATING TO CMS PAYMENT TO A MEDICARE ADVANTAGE ORGANIZATION

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and Health Plan of Nevada, Inc., hereafter referred to as the MA Organization, governing the operation of the following Medicare Advantage and Medicare Advantage-Prescription Drug plans H2931 and H2961, the MA Organization hereby requests payment under the contract, and in doing so, makes the following attestation concerning CMS payments to the MA Organization. The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentation to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.

The MA Organization has reported to CMS for the period of January 1, 2008, to December 31, 2008, all risk adjustment data (*INPATIENT HOSPITAL, OUTPATIENT HOSPITAL, AND PHYSICIAN*) available to the MA Organization as of December 31, 2008, with respect to the above-stated MA and MA-PD plans. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

Jonathon W. Bunker, President

On behalf
of Health Plan of Nevada, Inc.

3/2/09

Date

Good health takes a good plan.℠

P.O. Box 15645 ● Las Vegas, Nevada 89114-5645 ● (702) 242-7200

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

MARA2092281

USBP060624249

**ATTACHMENT B**

**ATTESTATION OF RISK ADJUSTMENT DATA INFORMATION PROVIDED BY A
MEDICARE SECTION 1876 COST ORGANIZATION**

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services
(CMS) and (INSERT NAME OF MEDICARE SECTION 1876 COST ORGANIZATION),
hereafter referred to as the Cost Organization, governing the operation of the following Medicare
Cost plans (INSERT PLAN IDENTIFICATION NUMBERS HERE), the Cost Organization
makes the following attestation concerning risk adjustment data provided to CMS by the Cost
Organization.

The Cost Organization has reported to CMS for the period of January 1, 2008, to
December 31, 2008, all risk adjustment data (*INPATIENT HOSPITAL (if applicable),
OUTPATIENT HOSPITAL(if applicable), AND PHYSICIAN*) available to the Cost Organization
as of December 31, 2008, with respect to the above-stated Cost plans.  Based on best knowledge,
information, and belief as of the date indicated below, all information submitted to CMS in this
report is accurate, complete, and truthful. The Cost Organization acknowledges that
misrepresentations to CMS regarding the accuracy of such information may result in Federal
civil action and/or criminal prosecution.


_____
(INDICATE TITLE [CEO, CFO, or
delegate])on behalf of

_____
(INDICATE COST ORGANIZATION)

_____
DATE

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

MARA2092282

USBP060624250

## ATTESTATION OF RISK ADJUSTMENT DATA INFORMATION RELATING TO
## CMS PAYMENT TO A MEDICARE ADVANTAGE ORGANIZATION

Pursuant to the contracts between the Centers for Medicare & Medicaid Services (CMS) and the UnitedHealth Group affiliate listed in Attachment 1, hereafter referred to as the MA Organization, governing the operation of the Medicare Advantage and Medicare Advantage-Prescription Drug plans listed in Attachment 1, the MA Organization hereby requests payment under the contract and, in doing so, makes the following attestation concerning CMS payments to the MA Organization.* The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.

The MA Organization has reported to CMS for the period of January 1, 2008 to December 31, 2008 all risk adjustment data available to the MA Organization as of December 31, 2008, with respect to the MA and MA-PD plans listed in Attachment 1. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

_____
John Way, Chief Financial Officer, SecureHorizons
On behalf of the UnitedHealth Group
entities listed in Attachment 1

3/19/09
_____
DATE

\* This Certification is based on facts reasonably available or made available to the MA Organization as of the date of this Certification and is not to be construed as a representation by the entities listed in Attachment 1, their affiliates, officers, representatives, or agents that the data to which the Certification relate may not require subsequent modification should additional information become available. Best knowledge, information, and belief means based on normal business practices. In addition, the scope of this Certification does not include risk adjustment data related to "long-term institutionalized" or "community," which the MA Organization is not required to report to or otherwise verify for CMS. Such designations are made by CMS based on a CMS data source and are subject to reconciliation by CMS in accordance with Section 91.4.2 of Chapter 7 of the Medicare Managed Care Manual. As previously communicated to CMS, we believe these designations are materially inaccurate. However, we acknowledge CMS' position that such designations are generally accurate.

Annual Risk Adjustment Attestation/SecureHorizons

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

Attachment 1

| Contract | Contracting Party |
|----------|-------------------|
| H0151 | United HealthCare of Alabama, Inc. |
| H0303 | PacifiCare of Arizona, Inc |
| H0316 | United HealthCare of Arizona Inc |
| H0401 | United HealthCare of Arkansas, Inc. |
| H0543 | PacifiCare of California |
| H0609 | PacifiCare of Colorado, Inc. |
| H0752 | Oxford Health Plans (CT), Inc. |
| H1080 | United HealthCare of Florida, Inc. |
| H1111 | United HealthCare of Georgia, Inc. |
| H1303 | United HealthCare Insurance Company |
| H1509 | United HealthCare Insurance Company |
| H1717 | United HealthCare Insurance Company |
| H2001 | United HealthCare Insurance Company |
| H2408 | United HealthCare Insurance Company |
| H2654 | United HealthCare of the Midwest, Inc. |
| H2802 | United HealthCare of the Midlands, Inc. |
| H2803 | United HealthCare Insurance Company |
| H2949 | PacifiCare of Nevada, Inc. |
| H3107 | Oxford Health Plans (NJ), Inc. |
| H3307 | Oxford Health Plans (NY) Inc. |
| H3379 | United HealthCare of New York, Inc. |
| H3456 | United HealthCare of North Carolina, Inc. |
| H3659 | United HealthCare of Ohio, Inc. |
| H3749 | PacifiCare of Oklahoma, Inc. |
| H3805 | PacifiCare of Oregon, Inc. |
| H3812 | United HealthCare Insurance Company |
| H3921 | United HealthCare Insurance Company |
| H4102 | United HealthCare of New England, Inc. |
| H4406 | United HealthCare of Tennessee, Inc. |
| H4456 | United HealthCare Plan of the River Valley, Inc. |
| H4522 | United HealthCare Insurance Company |
| H4590 | PacifiCare of Texas, Inc. |
| H4604 | United HealthCare of Utah |
| H4720 | United HealthCare Insurance Company of New York |
| H5005 | PacifiCare of Washington, Inc. |
| H5253 | United HealthCare of Wisconsin, Inc. |
| H5417 | United HealthCare Insurance Company |
| H5424 | United HealthCare Insurance Company |
| H5435 | PacifiCare Life & Health Insurance Company |
| H5507 | United HealthCare Insurance Company |
| H5516 | United HealthCare Insurance Company |
| H5532 | United HealthCare Insurance Company |
| H9011 | United HealthCare of Florida Inc. |
| R3175 | United HealthCare Insurance Company |
| R5287 | United HealthCare Insurance Company |
| R5342 | United HealthCare Insurance Company of New York |

Annual Risk Adjustment Attestation/SecureHorizons

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

3960

MARA2092284

## ATTESTATION OF RISK ADJUSTMENT DATA INFORMATION RELATING TO
## CMS PAYMENT TO A MEDICARE ADVANTAGE ORGANIZATION

Pursuant to the contracts between the Centers for Medicare & Medicaid Services (CMS) and the UnitedHealth Group affiliate listed in Attachment 1, hereafter referred to as the MA Organization, governing the operation of the Medicare Advantage and Medicare Advantage-Prescription Drug plans listed in Attachment 1, the MA Organization hereby requests payment under the contract and, in doing so, makes the following attestation concerning CMS payments to the MA Organization.* The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.

The MA Organization has reported to CMS for the period of January 1, 2008 to December 31, 2008 all risk adjustment data available to the MA Organization as of December 31, 2008, with respect to the MA and MA-PD plans listed in Attachment 1. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

_____

Justin Roth, Chief Financial Officer, Evercare
On behalf of the UnitedHealth Group
entities listed in Attachment 1

_____
3/19/2009
DATE

* This Certification is based on facts reasonably available or made available to the MA Organization as of the date of this Certification and is not to be construed as a representation by the entities listed in Attachment 1, their affiliates, officers, representatives, or agents that the data to which the Certification relate may not require subsequent modification should additional information become available. Best knowledge, information, and belief means based on normal business practices. In addition, the scope of this Certification does not include risk adjustment data related to "long-term institutionalized" or "community," which the MA Organization is not required to report to or otherwise verify for CMS. Such designations are made by CMS based on a CMS data source and are subject to reconciliation by CMS in accordance with Section 91.4.2 of Chapter 7 of the Medicare Managed Care Manual. As previously communicated to CMS, we believe these designations are materially inaccurate. However, we acknowledge CMS' position that such designations are generally accurate.

Annual Risk Adjustment Attestation/Evercare

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

3961

MARA2092285

USBP060624253

Attachment 1

| Contract | Contracting Party |
|----------|-------------------|
| H0319 | UNITED HEALTHCARE INSURANCE COMPANY |
| H0408 | UNITED HEALTHCARE INSURANCE COMPANY |
| H0410 | UNITED HEALTHCARE INSURANCE COMPANY |
| H0620 | UNITED HEALTHCARE INSURANCE COMPANY |
| H0624 | UNITED HEALTHCARE INSURANCE COMPANY |
| H0710 | UNITED HEALTHCARE INSURANCE COMPANY |
| H1108 | UNITED HEALTHCARE INSURANCE COMPANY |
| H1286 | UNITED HEALTHCARE INSURANCE COMPANY |
| H2003 | UNITED HEALTHCARE INSURANCE COMPANY |
| H2111 | UNITED HEALTHCARE INSURANCE COMPANY |
| H2226 | UNITED HEALTHCARE INSURANCE COMPANY |
| H2228 | UNITED HEALTHCARE INSURANCE COMPANY |
| H2406 | UNITED HEALTHCARE INSURANCE COMPANY |
| H3113 | OXFORD HEALTH PLANS OF NEW JERSEY, INC |
| H3209 | UNITED HEALTHCARE INSURANCE COMPANY |
| H3435 | UNITED HEALTHCARE INSURANCE COMPANY |
| H3887 | UNITED HEALTHCARE INSURANCE COMPANY |
| H3912 | UNITED HEALTHCARE INSURANCE COMPANY |
| H4106 | UNITED HEALTHCARE INSURANCE COMPANY |
| H4514 | EVERCARE OF TEXAS, LLC |
| H4779 | UNITED HEALTHCARE INSURANCE COMPANY |
| H5008 | UNITED HEALTHCARE INSURANCE COMPANY |
| H5440 | UNITED HEALTHCARE INSURANCE COMPANY |
| H5598 | UNITED HEALTHCARE INSURANCE COMPANY |
| H5652 | UNITED HEALTHCARE INSURANCE COMPANY |
| H5678 | UNITED HEALTHCARE INSURANCE COMPANY |
| H5697 | UNITED HEALTHCARE INSURANCE COMPANY |
| H5754 | UNITED HEALTHCARE INSURANCE COMPANY |
| H5918 | UNITED HEALTHCARE INSURANCE COMPANY |
| H7187 | UNITED HEALTHCARE INSURANCE COMPANY |
| H7274 | UNITED HEALTHCARE INSURANCE COMPANY |

Annual Risk Adjustment Attestation/Evercare

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

MARA2092286

USBP060624254

**EXHIBIT D-160**

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
ROSS M. CUFF
JACK D. ROSS (CBN 265883)
HUNTER B. THOMSON (CBN 330533)
PAUL LA SCALA (CBN 186939)
Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
        Tel: (213) 894-6739; Fax: (213) 894-7819
        Email: hunter.thomson@usdoj.gov
JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
        Email: robert.mcauliffe@usdoj.gov
TRINI E. ROSS
United States Attorney
DAVID CORIELL
Assistant United States Attorney
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5830; Fax: (716) 551-3052
        Email: david.coriell@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

1  UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,

2              Plaintiffs,

3                  v.

4  UNITEDHEALTH GROUP, INC., *et al.*,

5              Defendants.

No. CV 16-08697 FMO-PVCx

JOINT STIPULATION RE EDI AGREEMENTS, MA CONTRACTS, MA-PD ADDENDA, AND ATTESTATIONS AND RELATED ENTITIES

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

For the purposes of the above captioned case only, the parties hereby agree and stipulate to the following:

1.    The Medicare Advantage Organizations named as Defendants in this case are identified on Exhibit A to this Stipulation and are referred to as the "UnitedHealth MAOs."

2.    Each of the UnitedHealth MAOs executed a Medicare Advantage ("MA") Contract, Medicare Advantage – Prescription Drug ("MA-PD") Addendum, and an Attestation, and had an Electronic Data Interchange ("EDI") Agreement in place with Centers for Medicare and Medicaid Services ("CMS"), for each year in which that UnitedHealth MAO had submitted a diagnosis code to CMS that is listed as a delete on Attachment 1 to Dr. Garthwaite's expert report, and Optum, Inc. executed an EDI Agreement applicable to that MA or MA-PD plan with respect to each such year.

3.    Each of the diagnosis codes listed on Attachment 1 to Dr. Garthwaite's expert report is associated with a UnitedHealth MAO that executed an applicable MA Contract, MA-PD Addendum, EDI Agreement and an Attestation, and for which Optum executed an EDI Agreement.

4.    Each of the Contract Numbers listed on Attachment 2 to Dr. Garthwaite's expert report refer to MA Contracts entered into by a UnitedHealth MAO.

5.    MAPL008081457 is an exemplar of an EDI Agreement executed by the UnitedHealth MAOs.  All other EDI Agreements executed by the UnitedHealth MAOs contained identical terms.

6.    MAPL007637301 is an exemplar of an EDI Agreement executed by Optum, Inc. All other EDI Agreements executed by Optum, Inc. applicable to the other UnitedHealth MAOs contained identical terms.

7.    Exemplars of the MA Contracts, MA-PD Addenda, and Attestations are included, by year, in the table below.  All of the MA-PD Addenda and Attestations executed by the UnitedHealth MAOs contained identical terms to the exemplar from the same year.

3966

With the exception of the specific UnitedHealth MAOs identified in paragraphs 8-10 below, all of the MA Contracts executed by the UnitedHealth MAOs contained identical terms to the exemplar MA Contract from the same year.

| Year | MA Contract | MA-PD Addendum | Attestation |
|------|-------------|----------------|-------------|
| 2009 | MAPL003539599 | USBP008083344 | USBP060624234 at USBP060624253-USBP060624254 |
| 2010 | MARA263031 | USBP009865279 | USBP008083511 |
| 2011 | USBP009428514 | USBP009428508 | USBP060623193 at USBP060623193-USBP060623195 |
| 2012 | USBP009426552 | USBP009426546 | USBP060623193 at USBP060623223 - USBP060623225 |
| 2013 | USBP009424556 | USBP009424550 | USBP009417769 |
| 2014 | USBP009422773 | USBP009422767 | USBP009417676 |
| 2015 | USBP009421065 | USBP009421059 | USBP009417590 |
| 2016 | USBP009419597 | USBP009419590 | USBP009417505 |
| 2017 | USBP009418488 | USBP009418481 | USBP009417433 |

8.      For CY 2009-2017, H5435 CARE IMPROVEMENT PLUS SOUTH CENTRAL INSURANCE COMPANY entered into Private Fee-for-Service ("PFFS") contracts. The PFFS contracts had the terms included in the documents in the table below:

| Year | Bates Number |
|------|--------------|
| 2009 | USBP009866901 |
| 2010 | USBP009866901 |
| 2011 | USBP009427636 |
| 2012 | USBP009425668 |

2

3967

| 2013 | USBP009423731 |
|------|---------------|
| 2014 | USBP009422007 |
| 2015 | USBP009420324 |
| 2016 | USBP009419115 |
| 2017 | USBP009418065 |

9.  For CY 2014-2017, H2531 UNITEDHEALTHCARE COMMUNITY PLAN OF

OHIO, INC. entered into Medicare-Medicaid Plan ("MMP") contracts.  The MMP

contracts had the terms included in the documents in the table below:

| Year | Bates Number |
|------|--------------|
| 2014 | USBP009865290 |
| 2015 | USBP009865290 |
| 2016 | USBP009865495 |
| 2017 | USBP009866017 |

10.   For CY 2015-2017, H7833 UNITEDHEALTHCARE COMMUNITY PLAN OF

TEXAS, LLC entered into MMP contracts.  The MMP contracts had the terms included

in the documents in the table below:

| Year | Bates Number |
|------|--------------|
| 2015 | USBP009866581 |
| 2016 | USBP009866233 |
| 2017 | USBP009865709 |

11.   For 2013-2017 Contract Years ("CY"), UnitedHealth sent emails to Cheri Rice in

conjunction with the execution of its Attestations.  CMS employees responded to each of

those emails.

- MARA1296257 is an accurate record of the email sent by Steve Nelson in

  conjunction with UnitedHealth's 2013 CY Attestation and Cheri Rice's response

  to that email from Steve Nelson.

3968

- USBP001354165 is an accurate record of the email sent by Steve Nelson in conjunction with UnitedHealth's 2014 CY Attestation and Cheri Rice's response to that email from Steve Nelson.
- USBP001354107 is an accurate record of the email sent by Steve Nelson in conjunction with UnitedHealth's 2015 CY Attestation and Cheri Rice's response to that email from Steve Nelson.
- USBP058101090 is an accurate record of the email sent by Brian Thompson in conjunction with UnitedHealth's 2016 and 2017 CY Attestations.
- USBP009866579 is an accurate record of the letter sent from Jennifer Shapiro to Brian Thompson in response to Mr. Thompson's email found at USBP058101090.

**Related Entities**

12.    The UnitedHealth MAOs are all owned by UnitedHealth Group, Inc., either directly or through one or more subsidiaries.

13.    United HealthCare Services, Inc. is also owned by UnitedHealth Group, Inc., either directly or through one or more subsidiaries.

14.    United HealthCare Services, Inc. performed management functions for the UnitedHealth MAOs pursuant to management services agreements with those MAOs.

15.    United HealthCare Services, Inc. is a "Related Entity" to the each of the UnitedHealth MAOs, as defined by 42 C.F.R. §§ 422.2 & 422.500.

16.    United Healthcare Services, Inc., in turn delegated some management functions for the UnitedHealth MAOs to its subsidiary Optum, Inc., either directly or through OptumInsight, Inc.

17.    Optum, Inc. is owned by UnitedHealth Group, Inc., either directly or through one or more subsidiaries.

18.    Optum, Inc. is a "Related Entity" to the each of the UnitedHealth MAOs, as defined by 42 C.F.R. §§ 422.2 & 422.500.

4

19.    OptumInsight, Inc. is owned by UnitedHealth Group, Inc., either directly or through one or more subsidiaries.

20.    OptumInsight, Inc. is a "Related Entity" to the each of the UnitedHealth MAOs, as defined by 42 C.F.R. §§ 422.2 & 422.500.

Dated: May 28, 2024

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil
Division
E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
ROSS M. CUFF
JACK D. ROSS
HUNTER B. THOMSON
PAUL LA SCALA
Assistant United States Attorneys

JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Civil Division, Department of Justice

TRINI E. ROSS
United States Attorney
DAVID CORIELL
Assistant United States Attorney

_Martha Glover_
Martha N. Glover

Attorneys for the United States of America

3970

Dated: May 29, 2024

LATHAM & WATKINS LLP
David J. Schindler (Bar No. 130490)
*david.schindler@lw.com*
Manuel A. Abascal (Bar No. 171301)
*manny.abascal@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

LATHAM & WATKINS LLP
Daniel Meron (appearing *pro hac vice*)
*daniel.meron@lw.com*
Abid R. Qureshi (appearing *pro hac vice*)
*abid.qureshi@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

BARTLIT BECK LLP
Philip S. Beck (appearing *pro hac vice*)
*philip.beck@bartlit-beck.com*
Sean W. Gallagher (appearing *pro hac vice*)
*sean.gallagher@bartlitbeck.com*
Cindy L. Sobel (appearing *pro hac vice*)
*cindy.sobel@bartlitbeck.com*
Nicolas L. Martinez (Bar No. 297996)
*nicolas.martinez@bartlitbeck.com*
54 W. Hubbard Street, Suite 300
Chicago, Illinois 60654-8174
Telephone: +1.312.494.4400
Facsimile: +1.312.494.4440

BARTLIT BECK LLP
Andrew C. Baak (appearing *pro hac vice*)
*andrew.baak@bartlitbeck.com*
Jameson Jones (appearing *pro hac vice*)
*jameson.jones@bartlitbeck.com*
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202-6318
Telephone: +1.303.592.3100
Facsimile: +1.303.592.3140

By_____
Daniel Meron

Attorneys for UnitedHealth Defendants

6

3971

Exhibit A

| UnitedHealth MAOs |
| --- |
| AmeriChoice of New Jersey, Inc. |
| AmeriChoice of New York, Inc.[1] |
| Arizona Physicians  IPA, Inc. |
| Care Improvement Plus of Maryland, Inc.[2] |
| Care Improvement Plus of Texas Insurance Company |
| Care Improvement Plus South Central Insurance Company |
| Care Improvement Plus Wisconsin Insurance Company |
| Citrus Health Care, Inc.[3] |
| Health Plan of Nevada, Inc. |
| Preferred Care Network, Inc. f/k/a Medica HealthCare Plans, Inc. |
| Oxford Health Plans (CT), Inc. |
| Oxford Health Plans (NJ), Inc. |
| Oxford Health Plans (NY), Inc. |
| PacifiCare Life and Health Insurance Company |
| PacifiCare of Arizona, Inc. |
| UnitedHealthcare of the Rockies f/k/a PacifiCare of Nevada, Inc. |
| PacifiCare of Colorado, Inc. |
| Physicians Health Choice of Texas, LLC |
| Preferred Care Partners, Inc. |
| Sierra Health and Life Insurance Company |
| UnitedHealthcare Insurance Company of American f/k/a Symphonix Health Insurance Inc. |
| UHC of California |
| Unison Health Plan of Tennessee[4] |
| UnitedHealthcare Benefits of Texas, Inc. |
| UnitedHealthcare Community Plan, Inc. |
| UnitedHealthcare Community Plan of Ohio, Inc. |
| UnitedHealthcare Community Plan of Texas, LLC |
| UnitedHealthcare Insurance Company |
| UnitedHealthcare Insurance Company of New York |
| UnitedHealthcare of Alabama, Inc. |
| UnitedHealthcare of Arizona, Inc. |
| UnitedHealthcare of Arkansas, Inc. |
| UnitedHealthcare of Florida, Inc. |
| UnitedHealthcare of Georgia, Inc. |
| UnitedHealthcare of New England, Inc. |

[1] AmeriChoice of New York, Inc. merged with and into Defendant UnitedHealthcare of New York, Inc. on December 31, 2007.

[2] Care Improvement Plus of Maryland, Inc. merged with and into UnitedHealthcare of the Mid-Atlantic, Inc. on December 29, 2015.

[3] Citrus Health Care, Inc. merged with and into UnitedHealthcare of Florida, Inc. on December 31, 2014.

[4] Unison Health Plan of Tennessee merged with and into Three Rivers Holdings, Inc. on August 10, 2012.

| **UnitedHealth MAOs** |
|---|
| UnitedHealthcare of New York, Inc. |
| UnitedHealthcare of North Carolina, Inc. |
| UnitedHealthcare of Ohio, Inc. |
| UnitedHealthcare of Oklahoma, Inc. |
| UnitedHealthcare of Oregon, Inc. |
| UnitedHealthcare of Pennsylvania, Inc. |
| UnitedHealthcare of Tennessee, Inc.[5] |
| UnitedHealthcare Plan of the River Valley, Inc. |
| UnitedHealthcare of the Mid-Atlantic, Inc. |
| UnitedHealthcare of the Midlands, Inc. |
| UnitedHealthcare of the Midwest, Inc. |
| UnitedHealthcare of Utah, Inc. |
| UnitedHealthcare of Washington, Inc. |
| UnitedHealthcare of Wisconsin, Inc. |

---

[5] UnitedHealthcare of Tennessee, Inc. merged with and into UnitedHealthcare Plan of the River Valley, Inc. on June 30, 2011.

3973