1   LATHAM & WATKINS LLP
      David J. Schindler (Bar No. 130490)
2       *david.schindler@lw.com*
      Manuel A. Abascal (Bar No. 171301)
3       *manny.abascal@lw.com*
    355 South Grand Avenue, Suite 100
4   Los Angeles, California 90071-1560
    Telephone: +1.213.485.1234;
5   Facsimile: +1.213.891.8763

6   *Attorneys for United Defendants*

7   MICHAEL D. GRANSTON
    Deputy Assistant Attorney General, Civil Division
8   E. MARTIN ESTRADA
    United States Attorney
9   DAVID M. HARRIS
    ROSS M. CUFF
10  JACK D. ROSS (CBN 265883)
    HUNTER B. THOMSON (CBN 330533)
11  Assistant United States Attorneys
    300 N. Los Angeles Street, Room 7516
12  Los Angeles, California 90012
    Tel: (213) 894-6379; Fax: (213) 894-7819
13  Email: *hunter.thomson@usdoj.gov*

14  *Attorneys for the United States of America*

15  [Additional Counsel Listed on Next Page]

16          **UNITED STATES DISTRICT COURT**
17          **CENTRAL DISTRICT OF CALIFORNIA**

18  UNITED STATES OF AMERICA *ex rel.* | CASE NO. 2:16-cv-08697-FMO-PVCx
    BENJAMIN POEHLING,
19                                     | **JOINT EVIDENTIARY APPENDIX**
            Plaintiff,
20                                     |
        v.                             | **VOLUME 12 OF 14**
21                                     | **EXHIBITS P-1 THROUGH P-34**
    UNITEDHEALTH GROUP, INC. *et al.*, | **PAGES 3974 THROUGH 4427**
22
            Defendants.               |
23                                     | Hon. Fernando M. Olguin
24                                     |
25                                     | Hearing Date:  September 5, 2024
                                       | Hearing Time:  10:00 a.m.
26                                     |  Courtroom:  6D

27

28

LATHAM & WATKINS LLP
　　Daniel Meron (appearing *pro hac vice*)
　　　daniel.meron@lw.com
　　Abid R. Qureshi (appearing *pro hac vice*)
　　　abid.qureshi@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

BARTLIT BECK LLP
　　Philip S. Beck (appearing *pro hac vice*)
　　　philip.beck@bartlitbeck.com
　　Sean W. Gallagher (appearing *pro hac vice*)
　　　sean.gallagher@bartlitbeck.com
　　Cindy L. Sobel (appearing *pro hac vice*)
　　　cindy.sobel@bartlitbeck.com
　　Nicolas Martinez (appearing *pro hac vice*)
　　　nicolas.martinez@bartlitbeck.com
　　Benjamin R. Montague (appearing *pro hac vice*)
　　　benjamin.montague@bartlitbeck.com
54 W. Hubbard Street, Suite 300
Chicago, Illinois 60654-8174
Telephone: +1.312.494.4400
Facsimile: +1.312.494.4440

BARTLIT BECK LLP
　　Andrew C. Baak (appearing *pro hac vice*)
　　　andrew.baak@bartlitbeck.com
　　Jameson R. Jones (appearing *pro hac vice*)
　　　jameson.jones@bartlitbeck.com
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202-6318
Telephone: +1.303.592.3100
Facsimile: +1.303.592.3140

*Attorneys for United Defendants*


JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
　　　P.O. Box 261, Ben Franklin Station
　　　Washington, D.C. 20044
　　　Tel: (202) 307-0486; Fax: (202) 307-3852
　　　Email:  robert.mcauliffe@usdoj.gov
TRINI E. ROSS
United States Attorney

DAVID CORIELL
Assistant United States Attorney
    138 Delaware Avenue
    Buffalo, New York 14201
    Tel: (716) 843-5830; Fax: (716) 551-3052
    Email:  david.coriell@usdoj.gov

*Attorneys for the United States of America*

**EXHIBIT P-1**

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
ROSS M. CUFF
JACK D. ROSS (CBN 265883)
HUNTER B. THOMSON (CBN 330533)
PAUL LA SCALA (CBN 186939)
Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
        Tel: (213) 894-6739; Fax: (213) 894-7819
        Email: hunter.thomson@usdoj.gov
JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
        Email: robert.mcauliffe@usdoj.gov
TRINI E. ROSS
United States Attorney
DAVID CORIELL
Assistant United States Attorney
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5830; Fax: (716) 551-3052
        Email: david.coriell@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,

Plaintiffs,

v.

UNITEDHEALTH GROUP, INC., *et al.*,

Defendants.

No. CV 16-08697 FMO-PVCx

JOINT STIPULATION RE EDI AGREEMENTS, MA CONTRACTS, MA-PD ADDENDA, AND ATTESTATIONS AND RELATED ENTITIES

3976

For the purposes of the above captioned case only, the parties hereby agree and stipulate to the following:

1.      The Medicare Advantage Organizations named as Defendants in this case are identified on Exhibit A to this Stipulation and are referred to as the "UnitedHealth MAOs."

2.      Each of the UnitedHealth MAOs executed a Medicare Advantage ("MA") Contract, Medicare Advantage – Prescription Drug ("MA-PD") Addendum, and an Attestation, and had an Electronic Data Interchange ("EDI") Agreement in place with Centers for Medicare and Medicaid Services ("CMS"), for each year in which that UnitedHealth MAO had submitted a diagnosis code to CMS that is listed as a delete on Attachment 1 to Dr. Garthwaite's expert report, and Optum, Inc. executed an EDI Agreement applicable to that MA or MA-PD plan with respect to each such year.

3.      Each of the diagnosis codes listed on Attachment 1 to Dr. Garthwaite's expert report is associated with a UnitedHealth MAO that executed an applicable MA Contract, MA-PD Addendum, EDI Agreement and an Attestation, and for which Optum executed an EDI Agreement.

4.       Each of the Contract Numbers listed on Attachment 2 to Dr. Garthwaite's expert report refer to MA Contracts entered into by a UnitedHealth MAO.

5.      MAPL008081457 is an exemplar of an EDI Agreement executed by the UnitedHealth MAOs.  All other EDI Agreements executed by the UnitedHealth MAOs contained identical terms.

6.      MAPL007637301 is an exemplar of an EDI Agreement executed by Optum, Inc. All other EDI Agreements executed by Optum, Inc. applicable to the other UnitedHealth MAOs contained identical terms.

7.      Exemplars of the MA Contracts, MA-PD Addenda, and Attestations are included, by year, in the table below.  All of the MA-PD Addenda and Attestations executed by the UnitedHealth MAOs contained identical terms to the exemplar from the same year.

3

With the exception of the specific UnitedHealth MAOs identified in paragraphs 8-10 below, all of the MA Contracts executed by the UnitedHealth MAOs contained identical terms to the exemplar MA Contract from the same year.

| Year | MA Contract | MA-PD Addendum | Attestation |
|------|-------------|----------------|-------------|
| 2009 | MAPL003539599 | USBP008083344 | USBP060624234 at USBP060624253-USBP060624254 |
| 2010 | MARA263031 | USBP009865279 | USBP008083511 |
| 2011 | USBP009428514 | USBP009428508 | USBP060623193 at USBP060623193-USBP060623195 |
| 2012 | USBP009426552 | USBP009426546 | USBP060623193 at USBP060623223 - USBP060623225 |
| 2013 | USBP009424556 | USBP009424550 | USBP009417769 |
| 2014 | USBP009422773 | USBP009422767 | USBP009417676 |
| 2015 | USBP009421065 | USBP009421059 | USBP009417590 |
| 2016 | USBP009419597 | USBP009419590 | USBP009417505 |
| 2017 | USBP009418488 | USBP009418481 | USBP009417433 |

8.     For CY 2009-2017, H5435 CARE IMPROVEMENT PLUS SOUTH CENTRAL INSURANCE COMPANY entered into Private Fee-for-Service ("PFFS") contracts. The PFFS contracts had the terms included in the documents in the table below:

| Year | Bates Number |
|------|--------------|
| 2009 | USBP009866901 |
| 2010 | USBP009866901 |
| 2011 | USBP009427636 |
| 2012 | USBP009425668 |

3978

| 2013 | USBP009423731 |
| 2014 | USBP009422007 |
| 2015 | USBP009420324 |
| 2016 | USBP009419115 |
| 2017 | USBP009418065 |

9.  For CY 2014-2017, H2531 UNITEDHEALTHCARE COMMUNITY PLAN OF

OHIO, INC. entered into Medicare-Medicaid Plan ("MMP") contracts.  The MMP

contracts had the terms included in the documents in the table below:

| Year | Bates Number |
| --- | --- |
| 2014 | USBP009865290 |
| 2015 | USBP009865290 |
| 2016 | USBP009865495 |
| 2017 | USBP009866017 |

10.    For CY 2015-2017, H7833 UNITEDHEALTHCARE COMMUNITY PLAN OF

TEXAS, LLC entered into MMP contracts.  The MMP contracts had the terms included

in the documents in the table below:

| Year | Bates Number |
| --- | --- |
| 2015 | USBP009866581 |
| 2016 | USBP009866233 |
| 2017 | USBP009865709 |

11.    For 2013-2017 Contract Years ("CY"), UnitedHealth sent emails to Cheri Rice in

conjunction with the execution of its Attestations.  CMS employees responded to each of

those emails.

- MARA1296257 is an accurate record of the email sent by Steve Nelson in

  conjunction with UnitedHealth's 2013 CY Attestation and Cheri Rice's response

  to that email from Steve Nelson.

3979

- USBP001354165 is an accurate record of the email sent by Steve Nelson in conjunction with UnitedHealth's 2014 CY Attestation and Cheri Rice's response to that email from Steve Nelson.

- USBP001354107 is an accurate record of the email sent by Steve Nelson in conjunction with UnitedHealth's 2015 CY Attestation and Cheri Rice's response to that email from Steve Nelson.

- USBP058101090 is an accurate record of the email sent by Brian Thompson in conjunction with UnitedHealth's 2016 and 2017 CY Attestations.

- USBP009866579 is an accurate record of the letter sent from Jennifer Shapiro to Brian Thompson in response to Mr. Thompson's email found at USBP058101090.

**Related Entities**

12.    The UnitedHealth MAOs are all owned by UnitedHealth Group, Inc., either directly or through one or more subsidiaries.

13.    United HealthCare Services, Inc. is also owned by UnitedHealth Group, Inc., either directly or through one or more subsidiaries.

14.    United HealthCare Services, Inc. performed management functions for the UnitedHealth MAOs pursuant to management services agreements with those MAOs.

15.    United HealthCare Services, Inc. is a "Related Entity" to the each of the UnitedHealth MAOs, as defined by 42 C.F.R. §§ 422.2 & 422.500.

16.    United Healthcare Services, Inc., in turn delegated some management functions for the UnitedHealth MAOs to its subsidiary Optum, Inc., either directly or through OptumInsight, Inc.

17.    Optum, Inc. is owned by UnitedHealth Group, Inc., either directly or through one or more subsidiaries.

18.    Optum, Inc. is a "Related Entity" to the each of the UnitedHealth MAOs, as defined by 42 C.F.R. §§ 422.2 & 422.500.

3980

19.     OptumInsight, Inc. is owned by UnitedHealth Group, Inc., either directly or through one or more subsidiaries.

20.     OptumInsight, Inc. is a "Related Entity" to the each of the UnitedHealth MAOs, as defined by 42 C.F.R. §§ 422.2 & 422.500.

Dated: May 28, 2024

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
ROSS M. CUFF
JACK D. ROSS
HUNTER B. THOMSON
PAUL LA SCALA
Assistant United States Attorneys

JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Civil Division, Department of Justice

TRINI E. ROSS
United States Attorney
DAVID CORIELL
Assistant United States Attorney

_Martha Glover_
Martha N. Glover

Attorneys for the United States of America

3981

Dated: May 29, 2024

LATHAM & WATKINS LLP
David J. Schindler (Bar No. 130490)
*david.schindler@lw.com*
Manuel A. Abascal (Bar No. 171301)
*manny.abascal@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

LATHAM & WATKINS LLP
Daniel Meron (appearing *pro hac vice*)
*daniel.meron@lw.com*
Abid R. Qureshi (appearing *pro hac vice*)
*abid.qureshi@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

BARTLIT BECK LLP
Philip S. Beck (appearing *pro hac vice*)
*philip.beck@bartlit-beck.com*
Sean W. Gallagher (appearing *pro hac vice*)
*sean.gallagher@bartlitbeck.com*
Cindy L. Sobel (appearing *pro hac vice*)
*cindy.sobel@bartlitbeck.com*
Nicolas L. Martinez (Bar No. 297996)
*nicolas.martinez@bartlitbeck.com*
54 W. Hubbard Street, Suite 300
Chicago, Illinois 60654-8174
Telephone: +1.312.494.4400
Facsimile: +1.312.494.4440

BARTLIT BECK LLP
Andrew C. Baak (appearing *pro hac vice*)
*andrew.baak@bartlitbeck.com*
Jameson Jones (appearing *pro hac vice*)
*jameson.jones@bartlitbeck.com*
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202-6318
Telephone: +1.303.592.3100
Facsimile: +1.303.592.3140

By_____
Daniel Meron

Attorneys for UnitedHealth Defendants

8

3982

**EXHIBIT P-1A**

**CONTRACT WITH ELIGIBLE MEDICARE ADVANTAGE (MA) ORGANIZATION
PURSUANT TO SECTIONS 1851 THROUGH 1859 OF THE SOCIAL SECURITY ACT
FOR THE OPERATION OF A MEDICARE ADVANTAGE COORDINATED CARE PLAN(S)**

CONTRACT (H2226)

Between

Centers for Medicare & Medicaid Services (hereinafter referred to as CMS)

and

UNITEDHEALTHCARE INSURANCE COMPANY
(hereinafter referred to as the MA Organization)

CMS and the MA Organization, an entity which has been determined to be an eligible Medicare Advantage Organization by the Administrator of the Centers for Medicare & Medicaid Services under 42 CFR §422.503, agree to the following for the purposes of §§ 1851 through 1859 of the Social Security Act (hereinafter referred to as the Act):

(NOTE: Citations indicated in brackets are placed in the text of this contract to note the regulatory authority for certain contract provisions. All references to Part 422 are to 42 CFR Part 422.)

**Article I
Term of Contract**

The term of this contract shall be from the date of signature by CMS' authorized representative through December 31, 2017, after which this contract may be renewed for successive one-year periods in accordance with 42 CFR §422.505(c) and as discussed in Paragraph A of Article VII below. **[422.505]**

This contract governs the respective rights and obligations of the parties as of the effective date set forth above, and supersedes any prior agreements between the MA Organization and CMS as of such date. MA organizations offering Part D benefits also must execute an Addendum to the Medicare Managed Care Contract Pursuant to §§ 1860D-1 through 1860D-43 of the Social Security Act for the Operation of a Voluntary Medicare Prescription Drug Plan (hereafter the "Part D Addendum"). For MA Organizations offering MA-PD plans, the Part D Addendum governs the rights and obligations of the parties relating to the provision of Part D benefits, in accordance with its terms, as of its effective date.

**Article II
Coordinated Care Plan**

A. The MA Organization agrees to operate one or more coordinated care plans as defined in 42 CFR §422.4(a)(1)(iii)), including at least one MA-PD plan as required under 42 CFR 422.4(c), as described in its final Plan Benefit Package (PBP) bid submission (benefit and price bid) proposal as approved by CMS and as attested to in the Medicare Advantage Attestation of Benefit Plan and Price, and in compliance with the requirements of this contract and applicable Federal statutes, regulations, and policies (e.g., policies as described in the Call Letter, Medicare Managed Care Manual, etc.).

B. Except as provided in paragraph (C) of this Article, this contract is deemed to incorporate any changes that are required by statute to be implemented during the term of the contract and any regulations or policies implementing or interpreting such statutory provisions.

C. CMS will not implement, other than at the beginning of a calendar year, requirements under 42 CFR Part 422 that impose a new significant cost or burden on MA organizations or plans, unless a different effective date is required by statute. **[422.521]**

D. If the MA Organization had a contract with CMS for Contract Year 2016 under the contract ID number designated above, this document is considered a renewal of the existing contract. While the terms of this document supersede the terms of the 2016 contract, the parties' execution of this contract does not extinguish or interrupt any pending obligations or actions that may have arisen under the 2016 or prior year contracts.

E. This contract is in no way intended to supersede or modify 42 CFR, Part 422. Failure to reference a regulatory requirement in this contract does not affect the applicability of such requirements to the MA organization and CMS.

**Article III
Functions To Be Performed By Medicare Advantage Organization**

A. PROVISION OF BENEFITS

   1. The MA Organization agrees to provide enrollees in each of its MA plans the basic benefits as required under 42 CFR §422.101 and, to the extent applicable, supplemental benefits under 42 CFR §422.102 and as established in the MA Organization's final benefit and price bid proposal as approved by CMS and listed in the MA Organization Plan Attestation of Benefit Plan and Price, which is attached to this contract. The MA Organization agrees to provide access to such benefits as required under subpart C in a manner consistent with professionally recognized standards of health care and according to the access standards stated in 42 CFR §422.112.

   2. The MA Organization agrees to provide post-hospital extended care services, should an MA enrollee elect such coverage, through a home skilled nursing facility, as defined at 42 CFR §422.133(b), according to the requirements of § 1852(l) of the Act and 42 CFR §422.133. **[422. 133; 422.504(a)(3)]**

B. ENROLLMENT REQUIREMENTS

   1. The MA Organization agrees to accept new enrollments, make enrollments effective, process voluntary disenrollments, and limit involuntary disenrollments, as provided in 42 CFR Part 422, Subpart B.

   2. The MA Organization shall comply with the provisions of 42 CFR §422.110 concerning prohibitions against discrimination in beneficiary enrollment, other than in enrolling eligible beneficiaries in a CMA-approved special needs plan that exclusively enrolls special needs individuals as consistent with 42 CFR §§422.2, 422.4(a)(1)(iv) and 422.52. **[422.504(a)(2)]**

C. BENEFICIARY PROTECTIONS

   1. The MA Organization agrees to comply with all requirements in 42 CFR O Part 422, Subpart M governing coverage determinations, grievances, and appeals. **[422.504(a)(7)]**

   2. The MA Organization agrees to comply with the confidentiality and enrollee record accuracy requirements in 42 CFR §422.118.

   3. Beneficiary Financial Protections. The MA Organization agrees to comply with the following requirements:

      (3.a) Each MA Organization must adopt and maintain arrangements satisfactory to CMS to protect its enrollees from incurring liability for payment of any fees that are the legal obligation of the MA Organization. To meet this requirement the MA Organization must—

         (3.a.i) Ensure that all contractual or other written arrangements with providers prohibit the Organization's providers from holding any beneficiary enrollee liable for payment of any fees that are the legal obligation of the MA Organization; and

         (3.a.ii) Indemnify the beneficiary enrollee for payment of any fees that are the legal obligation of the MA Organization for services furnished by providers that do not contract, or that have not otherwise entered into an agreement with the MA Organization, to provide services to the organization's beneficiary enrollees.

H2226

**3984**    1/9

    USBP009418488

**[422.504(g)(1)]**

(3.b) The MA Organization must provide for continuation of enrollee health care benefits-

(3.b.i) For all enrollees, for the duration of the contract period for which CMS payments have been made; and

(3.b.ii) For enrollees who are hospitalized on the date its contract with CMS terminates, or, in the event of the MA Organization's insolvency, through the date of discharge. **[422.504(g)(2)]**

(3.c) In meeting the requirements of this paragraph, other than the provider contract requirements specified in subparagraph 3(a) of this paragraph, the MA Organization may use—

(3.c.i) Contractual arrangements;

(3.c.ii) Insurance acceptable to CMS;

(3.c.iii) Financial reserves acceptable to CMS; or

(3.c.iv) Any other arrangement acceptable to CMS. **[422.504(g)(3)]**

D. PROVIDER PROTECTIONS

1. The MA Organization agrees to comply with all applicable provider requirements in 42 CFR Part 422 Subpart E, including provider certification requirements, anti-discrimination requirements, provider participation and consultation requirements, the prohibition on interference with provider advice, limits on provider indemnification, rules governing payments to providers, and limits on physician incentive plans. **[422.504(a)(6)]**

2. Prompt Payment.

(2.a) The MA Organization must pay 95 percent of "clean claims" within 30 days of receipt if they are claims for covered services that are not furnished under a written agreement between the organization and the provider.

(i) The MA Organization must pay interest on clean claims that are not paid within 30 days in accordance with §§ 1816(c)(2) and 1842(c)(2) of the Act.

(ii) All other claims from non-contracted providers must be paid or denied within 60 calendar days from the date of the request. **[422.520(a)]**

(2.b) Contracts or other written agreements between the MA Organization and its providers must contain a prompt payment provision, the terms of which are developed and agreed to by both the MA Organization and the relevant provider. **[422.520(b)]**

(2.c) If CMS determines, after giving notice and opportunity for hearing, that the MA Organization has failed to make payments in accordance with subparagraph (2)(a) of this paragraph, CMS may provide-

(2.c.i) For direct payment of the sums owed to providers; and

(2.c.ii) For appropriate reduction in the amounts that would otherwise be paid to the MA Organization, to reflect the amounts of the direct payments and the cost of making those payments. **[422.520(c)]**

E. QUALITY IMPROVEMENT PROGRAM

1. The MA Organization agrees to operate, for each plan that it offers, an ongoing quality improvement program as stated in accordance with § 1852(e) of the Social Security Act and 42 CFR §422.152.

2. The MA Organization agrees to develop and operate a chronic care improvement program in accordance with the requirements of 42 CFR §422.152(c).

3. Performance Measurement and Reporting: The MA Organization shall measure performance under its MA plans using standard measures required by CMS, and report (at the organization level) its performance to CMS. The standard measures required by CMS during the term of this contract will be uniform data collection and reporting instruments, to include the Health Plan and Employer Data Information Set (HEDIS), Consumer Assessment of Health Plan Satisfaction (CAHPS) survey, and Health Outcomes Survey (HOS). These measures will address clinical areas, including effectiveness of care, enrollee perception of care and use of services; and non-clinical areas including access to and availability of services, appeals and grievances, and organizational characteristics. **[422.152(b)(1), (e)]**

4. Utilization Review.

(4.a) An MA Organization for an MA coordinated care plan must use written protocols for utilization review and policies and procedures must reflect current standards of medical practice in processing requests for initial or continued authorization of services and have in effect mechanisms to detect both underutilization and over utilization of services. **[422.152(b)]**

(4.b) For MA regional preferred provider organizations (RPPOs) and MA local preferred provider organizations (PPOs) that are offered by an organization that is not licensed or organized under State law as an HMOs, if the MA Organization uses written protocols for utilization review, those policies and procedures must reflect current standards of medical practice in processing requests for initial or continued authorization of services and include mechanisms to evaluate utilization of services and to inform enrollees and providers of services of the results of the evaluation. **[422.152(e)]**

5. Information Systems:

(5.a) The MA Organization must:

(5.a.i) Maintain a health information system that collects, analyzes and integrates the data necessary to implement its quality improvement program;

(5.a.ii) Ensure that the information entered into the system (particularly that received from providers) is reliable and complete;

(5.a.iii) Make all collected information available to CMS. **[422.152(f)(1)]**

6. External Review: The MA Organization will comply with any requests by Quality Improvement Organizations to review the MA Organization's medical records in connection with appeals of discharges from hospitals, skilled nursing facilities, and home health agencies.

7. The MA Organization agrees to address complaints received by CMS against the MA Organization as required in 42 CFR §422.504(a)(15) by:

(7.a) Addressing and resolving complaints in the CMS complaint tracking system; and

(7.b) Displaying a link to the electronic complaint form on the Medicare.gov Internet Web site on the MA plan's main Web page.

F. COMPLIANCE PLAN

The MA Organization agrees to implement a compliance plan in accordance with the requirements of 42 CFR §422.503(b)(4)(vi). **[422.503(b)(4)(vi)]**

G. COMPLIANCE DEEMED ON THE BASIS OF ACCREDITATION

CMS may deem the MA Organization to have met the quality improvement requirements of §1852(e) of the Act and 42 CFR §422.152, the confidentiality and accuracy of enrollee records requirements of §1852(h) of the Act and 42 CFR §422.118, the anti-discrimination requirements of §1852(b) of the Act and 42 CFR §422.110, the access to services requirements of §1852(d) of the Act and 42 CFR §422.112, the advance directives requirements of §1852(i) of the Act and 42 CFR §422.128, the provider participation requirements of §1852(j) of the Act and 42 CFR Part 422, Subpart E, and the applicable requirements described in 42 CFR §423.156, if the MA Organization is fully accredited (and periodically reaccredited) by a private, national accreditation organization approved by CMS and the accreditation organization used the standards approved by CMS for the purposes of assessing the MA Organization's compliance with Medicare requirements. The

H2226

3985   2/9

provisions of 42 CFR §422.156 shall govern the MA Organization's use of deemed status to meet MA program requirements.

H. PROGRAM INTEGRITY

1. The MA Organization agrees to provide notice based on best knowledge, information, and belief to CMS of any integrity items related to payments from governmental entities, both federal and state, for healthcare or prescription drug services. These integrity items include any investigations, legal actions or matters subject to arbitration brought involving the MA Organization (or MA Organization's firm if applicable) and its subcontractors (excluding contracted network providers), including any key management or executive staff, or any major shareholders (5% or more), by a government agency (state or federal) on matters relating to payments from governmental entities, both federal and state, for healthcare and/or prescription drug services. In providing the notice, the sponsor shall keep the government informed of when the integrity item is initiated and when it is closed. Notice should be provided of the details concerning any resolution and monetary payments as well as any settlement agreements or corporate integrity agreements.

2. The MA Organization agrees to provide notice based on best knowledge, information, and belief to CMS in the event the MA Organization or any of its subcontractors is criminally convicted or has a civil judgment entered against it for fraudulent activities or is sanctioned under any Federal program involving the provision of health care or prescription drug services.

I. MARKETING

1. The MA Organization may not distribute any marketing materials, as defined in 42 CFR §422.2260 and in the Marketing Materials Guidelines for Medicare Advantage-Prescription Drug Plans and Prescription Drug Plans (Medicare Marketing Guidelines), unless they have been filed with and not disapproved by CMS in accordance with 42 CFR §422.2264. The file and use process set out at 42 CFR §422.2262 must be used, unless the MA organization notifies CMS that it will not use this process.

2. CMS and the MA Organization shall agree upon language setting forth the benefits, exclusions and other language of the Plan. The MA Organization bears full responsibility for the accuracy of its marketing materials. CMS, in its sole discretion, may order the MA Organization to print and distribute the agreed upon marketing materials, in a format approved by CMS. The MA Organization must disclose the information to each enrollee electing a plan as outlined in 42 CFR §422.111.

3. The MA Organization agrees that any advertising material, including that labeled promotional material, marketing materials, or supplemental literature, shall be truthful and not misleading. All marketing materials must include the Contract number. All membership identification cards must include the Contract number on the front of the card.

4. The MA Organization must comply with the Medicare Marketing Guidelines, as well as all applicable statutes and regulations, including and without limitation § 1851(h) of the Act and 42 CFR § 422.111, 42 CFR Part 422 Subpart V and 42 CFR Part 423 Subpart V. Failure to comply may result in sanctions as provided in 42 CFR Part 422 Subpart O.

**Article IV**
**CMS Payment to MA Organization**

A. The MA Organization agrees to develop its annual benefit and price bid proposal and submit to CMS all required information on premiums, benefits, and cost sharing, as required under 42 CFR Part 422 Subpart F. **[422.504(a)(10)]**

B. METHODOLOGY

CMS agrees to pay the MA Organization under this contract in accordance with the provisions of § 1853 of the Act and 42 CFR Part 422 Subpart G. **[422.504(a)(9)]**

C. ELECTRONIC HEALTH RECORDS INCENTIVE PROGRAM PAYMENTS

The MA Organization agrees to abide by the requirements in 42 CFR §§495.200 et seq. and §1853(l) and (m) of the Act, including the fact that payment will be made directly to MA-affiliated hospitals that are certified Medicare hospitals through the Medicare FFS hospital incentive payment program.

D. ATTESTATION OF PAYMENT DATA (Attachments A, B, and C).

As a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the MA Organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest to *(based on best knowledge, information and belief, as of the date specified on the attestation form)* the accuracy, completeness, and truthfulness of the data identified on these attachments. The Medicare Advantage Plan Attestation of Benefit Plan and Price must be signed and attached to the executed version of this contract.
**(NOTE: The forms included as attachments to this contract are for reference only. CMS will provide instructions for the completion and submission of the forms in separate documents. MA Organizations should not take any action on the forms until appropriate CMS instructions become available.)**

1. Attachment A requires that the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest based on best knowledge, information, and belief that each enrollee for whom the MA Organization is requesting payment is validly enrolled, or was validly enrolled during the period for which payment is requested, in an MA plan offered by the MA Organization. The MA Organization shall submit completed enrollment attestation forms to CMS, or its contractor, on a monthly basis.

2. Attachment B requires that the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest to *(based on best knowledge, information and belief, as of the date specified on the attestation form)* that the risk adjustment data it submits to CMS under 42 CFR §422.310 are accurate, complete, and truthful. The MA Organization shall make annual attestations to this effect for risk adjustment data on Attachment B and according to a schedule to be published by CMS. If such risk adjustment data are generated by a related entity, contractor, or subcontractor of an MA Organization, such entity, contractor, or subcontractor must also *attest to (based on best knowledge, information, and belief, as of the date specified on the attestation form)* the accuracy, completeness, and truthfulness of the data. **[422.504(f)]**

3. The Medicare Advantage Plan Attestation of Benefit Plan and Price (an example of which is attached hereto as Attachment C) requires that the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest *(based on best knowledge, information and belief, as of the date specified on the attestation form)* that the information and documentation comprising the bid submission proposal is accurate, complete, and truthful and fully conforms to the Bid Form and Plan Benefit Package requirements; and that the benefits described in the CMS-approved proposed bid submission agree with the benefit package the MA Organization will offer during the period covered by the proposed bid submission. This document is being sent separately to the MA Organization and must be signed and attached to the executed version of this contract, and is incorporated herein by reference. **[422.504(f)]**

4. The MA Organization must certify based on best knowledge, information, and belief, that the information provided for the purposes of reporting and returning of overpayments under 42 CFR §422.326 is accurate, complete, and truthful. The form for this certification will be determined by CMS. **[422.504(l)]**

**Article V**
**MA Organization Relationship with Related Entities, Contractors, and Subcontractors**

A. Notwithstanding any relationship(s) that the MA Organization may have with related entities, contractors, or subcontractors, the MA Organization maintains full responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS. **[422.504(i)(1)]**

B. The MA Organization agrees to require all related entities, contractors, or subcontractors to agree that—

1. HHS, the Comptroller General, or their designees have the right to audit, evaluate, collect, and inspect any books, contracts, computer or other electronic systems, including medical records and documentation of the first tier, downstream, and related entities related to CMS' contract with the MA organization;

H2226

**3986**    3/9

    USBP009418490

2. HHS, the Comptroller General, or their designees have the right to audit, evaluate, collect, and inspect any records under paragraph B (1) of this Article directly from any first tier, downstream, or related entity;

3. For records subject to review under paragraph B(2) of this Article, except in exceptional circumstances, CMS will provide notification to the MA organization that a direct request for information has been initiated; and

4. HHS, the Comptroller General, or their designees have the right to inspect, evaluate, and audit any pertinent information for any particular contract period for 10 years from the final date of the contract period or from the date of completion of any audit, whichever is later. **[422.504(I)(2)]**

C. The MA Organization agrees that all contracts or written arrangements into which the MA Organization enters with providers, related entities, contractors, or subcontractors (first tier and downstream entities) shall contain the following elements:

1. Enrollee protection provisions that provide—

(1.a) Consistent with Article III, paragraph C, arrangements that prohibit providers from holding an enrollee liable for payment of any fees that are the legal obligation of the MA Organization; and

(1.b) Consistent with Article III, paragraph C, provision for the continuation of benefits.

2. Accountability provisions that indicate that the MA Organization may only delegate activities or functions to a provider, related entity, contractor, or subcontractor in a manner consistent with requirements set forth at paragraph D of this Article.

3. A provision requiring that any services or other activity performed by a first tier, downstream, or related entity in accordance with a contract or written agreement will be consistent and comply with the MA Organization's contractual obligations.**[422.504(I)(3)]**

D. If any of the MA Organization's activities or responsibilities under this contract with CMS is delegated to other parties, the following requirements apply to any first tier, downstream, or related entity:

1. Each and every contract must specify delegated activities and reporting responsibilities.

2. Each and every contract must either provide for revocation of the delegation activities and reporting requirements or specify other remedies in instances where CMS or the MA Organization determine that such parties have not performed satisfactorily.

3. Each and every contract must specify that the performance of the parties is monitored by the MA Organization on an ongoing basis.

4. Each and every contract must specify that either-

(4.a) The credentials of medical professionals affiliated with the party or parties will be either reviewed by the MA Organization; or

(4.b) The credentialing process will be reviewed and approved by the MA Organization and the MA Organization must audit the credentialing process on an ongoing basis.

5. Each and every contract must specify that the first tier, downstream, or related entity comply with all applicable Medicare laws, regulations, and CMS instructions. **[422.504(I)(4)]**

E. If the MA Organization delegates selection of the providers, contractors, or subcontractors to another organization, the MA Organization's contract with that organization must state that the CMS-contracting MA Organization retains the right to approve, suspend, or terminate any such arrangement. **[422.504(I)(5)]**

F. As of the date of this contract and throughout its term, the MA Organization

1. Agrees that any physician incentive plan it operates meets the requirements of 42 CFR §422.208, and

2. Has assured that all physicians and physician groups that the MA Organization's physician incentive plan places at substantial financial risk have adequate stop-loss protection in accordance with 42 CFR §422.208(f). **[422.208]**

**Article VI**
**Records Requirements**

A. MAINTENANCE OF RECORDS

1. The MA Organization agrees to maintain for 10 years books, records, documents, and other evidence of accounting procedures and practices that-

(1.a) Are sufficient to do the following:

(1.a.i) Accommodate periodic auditing of the financial records (including data related to Medicare utilization, costs, and computation of the benefit and price bid) of the MA Organization.

(1.a.ii) Enable CMS to inspect or otherwise evaluate the quality, appropriateness and timeliness of services performed under the contract, and the facilities of the MA Organization.

(1.a.iii) Enable CMS to audit and inspect any books and records of the MA Organization that pertain to the ability of the organization to bear the risk of potential financial losses, or to services performed or determinations of amounts payable under the contract.

(1.a.iv) Properly reflect all direct and indirect costs claimed to have been incurred and used in the preparation of the benefit and price bid proposal.

(1.a.v) Establish component rates of the benefit and price bid for determining additional and supplementary benefits.

(1.a.vi) Determine the rates utilized in setting premiums for State insurance agency purposes and for other government and private purchasers; and

(1.b) Include at least records of the following:

(1.b.i) Ownership and operation of the MA Organization's financial, medical, and other record keeping systems.

(1.b.ii) Financial statements for the current contract period and ten prior periods.

(1.b.iii) Federal income tax or informational returns for the current contract period and ten prior periods.

(1.b.iv) Asset acquisition, lease, sale, or other action.

(1.b.v) Agreements, contracts (including, but not limited to, with related or unrelated prescription drug benefit managers) and subcontracts.

(1.b.vi) Franchise, marketing, and management agreements.

(1.b.vii) Schedules of charges for the MA Organization's fee-for-service patients.

(1.b.viii) Matters pertaining to costs of operations.

(1.b.ix) Amounts of income received, by source and payment.

(1.b.x) Cash flow statements.

H2226

**3987**    4/9

(1.b.xi) Any financial reports filed with other Federal programs or State authorities.**[422.504(d)]**

2. Access to facilities and records. The MA Organization agrees to the following:

(2.a) The Department of Health and Human Services (HHS), the Comptroller General, or their designee may evaluate, through inspection or other means—

(2.a.i) The quality, appropriateness, and timeliness of services furnished to Medicare enrollees under the contract;

(2.a.ii) Compliance with CMS requirements for maintaining the privacy and security of protected health information and other personally identifiable information of Medicare enrollees;

(2.a.iii) The facilities of the MA Organization; and

(2.a.iv) The enrollment and disenrollment records for the current contract period and ten prior periods.

(b) HHS, the Comptroller General, or their designees may audit, evaluate, or inspect any books, contracts, medical records, documents, papers, patient care documentation, and other records of the MA Organization, related entity, contractor, subcontractor, or its transferee that pertain to any aspect of services performed, reconciliation of benefit liabilities, and determination of amounts payable under the contract, or as the Secretary may deem necessary to enforce the contract.

(c) The MA Organization agrees to make available, for the purposes specified in paragraph A of this Article, its premises, physical facilities and equipment, records relating to its Medicare enrollees, and any additional relevant information that CMS may require, in a manner that meets CMS record maintenance requirements.

(2.d) HHS, the Comptroller General, or their designee's right to inspect, evaluate, and audit extends through 10 years from the final date of the contract period or completion of audit, whichever is later unless–

(2.d.i) CMS determines there is a special need to retain a particular record or group of records for a longer period and notifies the MA Organization at least 30 days before the normal disposition date;

(2.d.ii) There has been a termination, dispute, or fraud or similar fault by the MA Organization, in which case the retention may be extended to 10 years from the date of any resulting final resolution of the termination, dispute, or fraud or similar fault; or

(2.d.iii) HHS, the Comptroller General, or their designee determines that there is a reasonable possibility of fraud, in which case they may inspect, evaluate, and audit the MA Organization at any time. **[422.504(e)]**

B. REPORTING REQUIREMENTS

1. The MA Organization shall have an effective procedure to develop, compile, evaluate, and report to CMS, to its enrollees, and to the general public, at the times and in the manner that CMS requires, and while safeguarding the confidentiality of the doctor patient relationship, statistics and other information as described in the remainder of this paragraph. **[422.516(a)]**

2. The MA Organization agrees to submit to CMS certified financial information that must include the following:

(2.a) Such information as CMS may require demonstrating that the organization has a fiscally sound operation, including:

(2.a.i) The cost of its operations;

(2.a.ii) A description, submitted to CMS annually and within 120 days of the end of the fiscal year, of significant business transactions (as defined in 42 CFR §422.500) between the MA Organization and a party in interest showing that the costs of the transactions listed in subparagraph (2)(a)(v) of this paragraph do not exceed the costs that would be incurred if these transactions were with someone who is not a party in interest; or

(2.a.iii) If they do exceed, a justification that the higher costs are consistent with prudent management and fiscal soundness requirements.

(2.a.iv) A combined financial statement for the MA Organization and a party in interest if either of the following conditions is met:

(2.a.iv.aa) Thirty five percent or more of the costs of operation of the MA Organization go to a party in interest.

(2.a.iv.bb) Thirty five percent or more of the revenue of a party in interest is from the MA Organization. **[422.516(b)]**

(2.a.v) Requirements for combined financial statements.

(2.a.v.aa) The combined financial statements required by this subparagraph must display in separate columns the financial information for the MA Organization and each of the parties in interest.

(2.a.v.bb) Inter-entity transactions must be eliminated in the consolidated column.

(2.a.v.cc) The statements must have been examined by an independent auditor in accordance with generally accepted accounting principles and must include appropriate opinions and notes.

(2.a.v.dd) Upon written request from the MA Organization showing good cause, CMS may waive the requirement that the organization's combined financial statement include the financial information required in this subparagraph with respect to a particular entity. **[422.516(c)]**

(2.a.vi) A description of any loans or other special financial arrangements the MA Organization makes with contractors, subcontractors, and related entities. **[422.516(e)]**

(2.b) Such information as CMS may require pertaining to the disclosure of ownership and control of the MA Organization. **[422.504(f)]**

(2.c) Patterns of utilization of the MA Organization's services. **[422.516(a)(2)]**

3. The MA Organization agrees to participate in surveys required by CMS and to submit to CMS all information that is necessary for CMS to administer and evaluate the program and to simultaneously establish and facilitate a process for current and prospective beneficiaries to exercise choice in obtaining Medicare services. This information includes, but is not limited to:

(3.a) The benefits covered under the MA plan;

(3.b) The MA monthly basic beneficiary premium and MA monthly supplemental beneficiary premium, if any, for the plan.

(3.c) The service area and continuation area, if any, of each plan and the enrollment capacity of each plan;

(3.d) Plan quality and performance indicators for the benefits under the plan including —

(3.d.i) Disenrollment rates for Medicare enrollees electing to receive benefits through the plan for the previous 2 years;

(3.d.ii) Information on Medicare enrollee satisfaction;

(3.d.iii) The patterns of utilization of plan services;

(3.d.iv) The availability, accessibility, and acceptability of the plan's services;

(3.d.v) Information on health outcomes and other performance measures required by CMS;

H2226

3988    5/9

CONFIDENTIAL    USBP009418492

(3.d.vi) The recent record regarding compliance of the plan with requirements of this part, as determined by CMS; and

(3.d.vii) Other information determined by CMS to be necessary to assist beneficiaries in making an informed choice among MA plans and traditional Medicare;

(3.d.viii) Information about beneficiary appeals and their disposition;

(3.d.ix) Information regarding all formal actions, reviews, findings, or other similar actions by States, other regulatory bodies, or any other certifying or accrediting organization;

(3.d.x) Any other information deemed necessary by CMS for the administration or evaluation of the Medicare program. **[422.504(f)(2)]**

4. The MA Organization agrees to provide to its enrollees and upon request, to any individual eligible to elect an MA plan, all informational requirements under 42 CFR §422.64 and, upon an enrollee's, request, the financial disclosure information required under 42 CFR §422.516. **[422.504(f)(3)]**

5. Reporting and disclosure under ERISA —

(5.a) For any employees' health benefits plan that includes an MA Organization in its offerings, the MA Organization must furnish, upon request, the information the plan needs to fulfill its reporting and disclosure obligations (with respect to the MA Organization) under the Employee Retirement Income Security Act of 1974 (ERISA).

(5.b) The MA Organization must furnish the information to the employer or the employer's designee, or to the plan administrator, as the term "administrator" is defined in ERISA. **[422.516(d)]**

6. Electronic communication. The MA Organization must have the capacity to communicate with CMS electronically. **[422.504(b)]**

7. Risk Adjustment data. The MA Organization agrees to comply with the requirements in 42 CFR §422.310 for submitting risk adjustment data to CMS. **[422.504(a)(8)]**

8. The MA Organization acknowledges that CMS releases to the public summary reconciled Part D Payment data after the reconciliation of Part C and Part D Payments for the contract year as provided in 42 CFR §422.504(n) and, for Part D plan sponsors, 42 CFR §423.505(o).

9. The MA Organization agrees that it must subject information collected pursuant to 42 CFR §422.516(a) to a yearly independent audit to determine their reliability, validity, completeness, and comparability in accordance with specifications developed by CMS. [422.516(g)]

## Article VII
## Renewal of the MA Contract

A. RENEWAL OF CONTRACT

In accordance with 42 CFR §422.505, following the initial contract period, this contract is renewable annually only if-

1. The MA Organization has not provided CMS with a notice of intention not to renew; **[422.506(a)]**

2. CMS and the MA Organization reach agreement on the bid under 42 CFR Part 422, Subpart F; and **[422.505(d)]**

3. CMS informs the MA Organization that it authorizes a renewal.

B. NONRENEWAL OF CONTRACT

1. Nonrenewal by the Organization.

(1.a) In accordance with 42 CFR §422.506, the MA Organization may elect not to renew its contract with CMS as of the end of the term of the contract for any reason, provided it meets the time frames for doing so set forth in this subparagraph.

(1.b) If the MA Organization does not intend to renew its contract, it must notify—

(1.b.i) CMS, in writing, by the first Monday in June of the year in which the contract would end, pursuant to 42 CFR §422.506

(1.b.ii) Each Medicare enrollee by mail, at least 90 calendar days before the date on which the nonrenewal is effective. This notice must include a written description of all alternatives available for obtaining Medicare services within the service area including alternative MA plans, MA-PD plans, Medigap options, and original Medicare and prescription drug plans and must receive CMS approval prior to issuance.

(1.c) CMS may accept a nonrenewal notice submitted after the applicable annual non-renewal notice deadline if -

(1.c.i) The MA Organization notifies its Medicare enrollees and the public in accordance with subparagraph (1)(b)(ii) of this paragraph; and

(1.c.ii) Acceptance is not inconsistent with the effective and efficient administration of the Medicare program.

(1.d) If the MA Organization does not renew a contract under this subparagraph, CMS may deny an application for a new contract or a service area expansion from the Organization or with any organization whose covered persons, as defined at 42 CFR §422.506(a)(5), also served as covered persons for the non-renewing MA Organization for 2 years unless there are special circumstances that warrant special consideration, as determined by CMS. This prohibition may apply regardless of the product type, contract type, or service area of the previous contract. **[422.506(a)]**

2. CMS decision not to renew.

(2.a) CMS may elect not to authorize renewal of a contract for any of the following reasons:

(2.a.i) For any of the reasons listed in 42 CFR §422.510(a) which would also permit CMS to terminate the contract.

(2.a.ii) The MA Organization has committed any of the acts in 42 CFR §422.752(a) that would support the imposition of intermediate sanctions or civil money penalties under 42 CFR Part 422 Subpart O.

(2.a.iii) The MA Organization did not submit a benefit and price bid or the benefit and price bid was not acceptable **[422.505(d)]**

(2.b) Notice. CMS shall provide notice of its decision whether to authorize renewal of the contract as follows:

(2.b.i) To the MA Organization by August 1 of the contract year, except in the event described in subparagraph (2)(a)(iii) of this paragraph, for which notice will be sent by September 1.

(2.b.ii) To the MA Organization's Medicare enrollees by mail at least 90 days before the end of the current calendar year.

(2.c) Notice of appeal rights. CMS shall give the MA Organization written notice of its right to reconsideration of the decision not to renew in accordance with 42 CFR §422.644.**[422.506(b)]**

## Article VIII
## Modification or Termination of the Contract

A. MODIFICATION OR TERMINATION OF CONTRACT BY MUTUAL CONSENT

H2226

3989    6/9

1. This contract may be modified or terminated at any time by written mutual consent.

(1.a) If the contract is modified by written mutual consent, the MA Organization must notify its Medicare enrollees of any changes that CMS determines are appropriate for notification within time frames specified by CMS. **[422.508(a)(2)]**

(1.b) If the contract is terminated by written mutual consent, except as provided in subparagraph 2 of this paragraph, the MA Organization must provide notice to its Medicare enrollees and the general public as provided in paragraph B, subparagraph 2(b) of this Article. **[422.508(a)(1)]**

2. If this contract is terminated by written mutual consent and replaced the day following such termination by a new MA contract, the MA Organization is not required to provide the notice specified in paragraph B of this Article.**[422.508(b)]**

3. As a condition of the consent to a mutual termination, CMS will require as a provision of the termination agreement language prohibiting the MA organization from applying for new contracts or service area expansions for a period of 2 years, absent circumstances warranting special consideration. This prohibition may apply regardless of the product type, contract type, or service area of the previous contract. **[422.508(c)]**

B. TERMINATION OF THE CONTRACT BY CMS OR THE MA ORGANIZATION

1. Termination by CMS.

(1.a) CMS may at any time terminate a contract if CMS determines that the MA Organization meets any of the following:

(1.a.i) has failed substantially to carry out the terms of its contract with CMS.

(1.a.ii) is carrying out its contract in a manner that is inconsistent with the efficient and effective implementation of 42 CFR Part 422.

(1.a.iii) no longer substantially meets the applicable conditions of 42CFR Part 422.

(1.b) CMS may make a determination under paragraph B(1)(a)(i), (ii), or (iii) of this Article if the MA Organization has had one or more of the following occur:

(1.b.i) based on creditable evidence, has committed or participated in false, fraudulent or abusive activities affecting the Medicare, Medicaid or other State or Federal health care program, including submission of false or fraudulent data.

(1.b.ii) experiences financial difficulties so severe that its ability to make necessary health services available is impaired to the point of posing an imminent and serious risk to the health of its enrollees, or otherwise fails to make services available to the extent that such a risk to health exists.

(1.b.iii) substantially failed to comply with the requirements in 42 CFR Part 422 Subpart M relating to grievances and appeals.

(1.b.iv) failed to provide CMS with valid data as required under 42 CFR §§422.310.

(1.b.v) failed to implement an acceptable quality assessment and performance improvement program as required under 42 CFR Part 422 Subpart D.

(1.b.vi) substantially failed to comply with the prompt payment requirements in 42 CFR §422.520.

(1.b.vii) substantially failed to comply with the service access requirements in 42 CFR §422.112.

(1.b.viii) failed to comply with the requirements of 42 CFR §422.208 regarding physician incentive plans.

(1.b.ix) substantially failed to comply with the marketing requirements in 42 CFR Part 422 Subpart V.

(1.b.x) Failed to comply with regulatory requirements contained in 42 CFR Parts 422 or 423 or both.

(1.b.xi) Failed to meet CMS performance requirements in carrying out the regulatory requirements contained in 42 CFR Parts 422 or 423 or both.

(1.b.xii) Achieves a Part C summary plan rating of less than 3 stars for 3 consecutive contract years.

(1.b.xiii) Has failed to report MLR data in a timely and accurate manner in accordance with 42 CFR §422.2460.

(1.c) Notice. If CMS decides to terminate a contract, it will give notice of the termination as follows:

(1.c.i) CMS will notify the MA Organization in writing at least 45 calendar days before the intended date of the termination.

(1.c.ii) The MA Organization will notify its Medicare enrollees of the termination by mail at least 30 calendar days before the effective date of the termination.

(1.c.iii) The MA Organization will notify the general public of the termination at least 30 calendar days before the effective date of the termination by releasing a press statement to news media serving the affected community or county and posting the press statement prominently on the organization's Web site.

(1.d) Expedited termination of contract by CMS.

(1.d.i) For terminations based on violations prescribed in subparagraph 1(b)(i) or (b)(ii) of this paragraph or if CMS determines that a delay in termination would pose an imminent and serious threat to the health of the individuals enrolled with the MA Organization, CMS will notify the MA Organization in writing that its contract has been terminated on a date specified by CMS. If a termination is effective in the middle of a month, CMS has the right to recover the prorated share of the capitation payments made to the MA Organization covering the period of the month following the contract termination.

(1.d.ii) CMS will notify the MA Organization's Medicare enrollees in writing of CMS' decision to terminate the MA Organization's contract. This notice will occur no later than 30 days after CMS notifies the plan of its decision to terminate this contract. CMS will simultaneously inform the Medicare enrollees of alternative options for obtaining Medicare services, including alternative MA Organizations in a similar geographic area and original Medicare.

(1.d.iii) CMS will notify the general public of the termination no later than 30 days after notifying the MA Organization of CMS' decision to terminate this contract. This notice will be published in one or more newspapers of general circulation in each community or county located in the MA Organization's service area.

(1.e) Corrective action plan

(1.e.i) General. Before providing a notice of intent to terminate a contract for reasons other than the grounds specified in subparagraph 1(a)(iv) or (v) of this paragraph, CMS will provide the MA Organization with notice specifying the MA Organization's deficiencies and a reasonable opportunity of at least 30 calendar days to develop and implement an approved corrective action plan to correct the deficiencies that are the basis of the proposed termination.

(1.e.ii) Exceptions. If a contract is terminated under subparagraph 1(a)(iv) or (v) of this paragraph, the MA Organization will not be provided with the opportunity to develop and implement a corrective action plan.

(1.f) Appeal rights. If CMS decides to terminate this contract, it will send written notice to the MA Organization informing it of its termination appeal rights in accordance with 42 CFR Part 422 Subpart N. **[422.510(d)]**

2. Termination by the MA Organization

(2.a) Cause for termination. The MA Organization may terminate this contract if CMS fails to substantially carry out the terms of the contract.

(2.b) Notice. The MA Organization must give advance notice as follows:

(2.b.i) To CMS, at least 90 days before the intended date of termination. This notice must specify the reasons why the MA Organization is requesting

H2226

**3990**    7/9

USBP009418494

contract termination.

(2.b.ii) To its Medicare enrollees, at least 60 days before the termination effective date. This notice must include a written description of alternatives available for obtaining Medicare services within the service area, including alternative MA and MA-PD plans, PDP plans, Medigap options, and original Medicare and must receive CMS approval.

(2.b.iii) To the general public at least 60 days before the termination effective date by publishing a CMS-approved notice in one or more newspapers of general circulation in each community or county located in the MA Organization's geographic area.

(2.c) Effective date of termination. The effective date of the termination will be determined by CMS and will be at least 90 days after the date CMS receives the MA Organization's notice of intent to terminate.

(2.d) CMS' liability. CMS' liability for payment to the MA Organization ends as of the first day of the month after the last month for which the contract is in effect, but CMS shall make payments for amounts owed prior to termination but not yet paid.

(2.e) Effect of termination by the organization. CMS (2.e) may deny an application for a new contract or service area expansion from the MA Organization or with an organization whose covered persons, as defined in 42 CFR §422.512(e)(2), also served as covered persons for the terminating MA Organization for a period of two years from the date the Organization has terminated this contract, unless there are circumstances that warrant special consideration, as determined by CMS. This prohibition may apply regardless of the product type, contract type, or service area of the previous contract. **[422.512]**

### Article IX
### Requirements of Other Laws and Regulations

A. The MA Organization agrees to comply with—

1. Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 USC §§3729 et seq.), and the anti-kickback statute (§ 1128B(b) of the Act): and

2. HIPAA administrative simplification rules at 45 CFR Parts 160, 162, and 164.**[422.504(h)]**

B. Pursuant to § 13112 of the American Recovery and Reinvestment Act of 2009 (ARRA), the MA Organization agrees that as it implements, acquires, or upgrades its health information technology systems, it shall utilize, where available, health information technology systems and products that meet standards and implementation specifications adopted under § 3004 of the Public Health Service Act, as amended by § 13101 of the ARRA.

C. The MA Organization maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS, notwithstanding any relationship(s) that the MA Organization may have with related entities, contractors, or subcontractors. **[422.504(i)]**

D. In the event that any provision of this contract conflicts with the provisions of any statute or regulation applicable to an MA Organization, the provisions of the statute or regulation shall have full force and effect.

E. The MA Organization agrees to comply with the requirements relating to Nondiscrimination in Health Programs and Activities in 45 CFR Part 92, including submitting assurances that the MA Organization's health programs and activities will be operated in compliance with the nondiscrimination requirements, as required in 45 CFR §92.5.

### Article X
### Severability

The MA Organization agrees that, upon CMS' request, this contract will be amended to exclude any MA plan or State-licensed entity specified by CMS, and a separate contract for any such excluded plan or entity will be deemed to be in place when such a request is made. **[422.504(k)]**

### Article XI
### Miscellaneous

A. DEFINITIONS

Terms not otherwise defined in this contract shall have the meaning given to such terms in 42 CFR Part 422.

B. ALTERATION TO ORIGINAL CONTRACT TERMS

The MA Organization agrees that it has not altered in any way the terms of this contract presented for signature by CMS. The MA Organization agrees that any alterations to the original text the MA Organization may make to this contract shall not be binding on the parties.

C. APPROVAL TO BEGIN MARKETING AND ENROLLMENT

The MA Organization agrees that it must complete CMS operational requirements prior to receiving CMS approval to begin Part C marketing and enrollment activities. Such activities include, but are not limited to, establishing and successfully testing connectivity with CMS systems to process enrollment applications (or contracting with an entity qualified to perform such functions on the MA Organization's Sponsor's behalf) and successfully demonstrating capability to submit accurate and timely price comparison data. To establish and successfully test connectivity, the MA Organization must, 1) establish and test physical connectivity to the CMS data center, 2) acquire user identifications and passwords, 3) receive, store, and maintain data necessary to perform enrollments and send and receive transactions to and from CMS, and 4) check and receive transaction status information.

D. MA Organization agrees to maintain a fiscally sound operation by at least maintaining a positive net worth (total assets exceed total liabilities) as required in 42 CFR § 422.504(a)(14).

E. MA Organization agrees to maintain administrative and management capabilities sufficient for the organization to organize, implement, and control the financial, marketing, benefit administration, and quality improvement activities related to the delivery of Part C services as required by 42 CFR §422.504(a)(17).

F. MA Organization agrees to maintain a Part C summary plan rating score of at least 3 stars as required by 42 CFR §422.504(a)(18).

G. CMS may determine that an MA organization is out of compliance with a Part C requirement when the organization fails to meet performance standards articulated in the Part C statutes, regulations, or guidance. If CMS has not already articulated a measure for determining noncompliance, CMS may determine that an MA organization is out of compliance when its performance in fulfilling Part C requirements represents and outlier relative to the performance of other MA organizations. **[422.504(m)]**

H. **Business Continuity:** The MA organization agrees to develop, maintain, and implement a business continuity plan as required by 42 CFR §422.504(o).

**ATTACHMENT A**

### ATTESTATION OF ENROLLMENT INFORMATION
### RELATING TO CMS PAYMENT
### TO A MEDICARE ADVANTAGE ORGANIZATION

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and (INSERT NAME OF MA ORGANIZATION), hereafter referred to as the MA Organization, governing the operation of the following Medicare Advantage plans (INSERT PLAN IDENTIFICATION NUMBERS HERE), the MA Organization hereby requests payment under the contract, and in doing so, makes the following attestation concerning CMS payments to the MA Organization. The MA Organization

H2226

3991    8/9

CONFIDENTIAL    USBP009418495

acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution. This attestation shall not be considered a waiver of the MA Organization's right to seek payment adjustments from CMS based on information or data which does not become available until after the date the MA Organization submits this attestation.

    1. The MA Organization has reported to CMS for the month of (INDICATE MONTH AND YEAR) all new enrollments, disenrollments, and appropriate changes in enrollees' status with respect to the above-stated MA plans. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

    2. The MA Organization has reviewed the CMS monthly membership report and reply listing for the month of (INDICATE MONTH AND YEAR) for the above-stated MA plans and has reported to CMS any discrepancies between the report and the MA Organization's records. For those portions of the monthly membership report and the reply listing to which the MA Organization raises no objection, the MA Organization, through the certifying CEO/CFO, will be deemed to have attested, based on best knowledge, information, and belief as of the date indicated below, to its accuracy, completeness, and truthfulness.

**ATTACHMENT B**

### ATTESTATION OF RISK ADJUSTMENT DATA INFORMATION RELATING TO
### CMS PAYMENT TO A MEDICARE ADVANTAGE ORGANIZATION

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and (INSERT NAME OF MA ORGANIZATION), hereafter referred to as the MA Organization, governing the operation of the following Medicare Advantage plans (INSERT PLAN IDENTIFICATION NUMBERS HERE), the MA Organization hereby requests payment under the contract, and in doing so, makes the following attestation concerning CMS payments to the MA Organization. The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.

The MA Organization has reported to CMS during the period of (INDICATE DATES) all (INDICATE TYPE - DIAGNOSIS/ENCOUNTER) risk adjustment data available to the MA Organization with respect to the above-stated MA plans. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

**ATTACHMENT C** - Medicare Advantage Plan Attestation of Benefit Plan and Price

In witness whereof, the parties hereby execute this contract.

This document has been electronically signed by:

FOR THE MA ORGANIZATION

LISA IVERSON

_____

Contracting Official Name

8/30/2016 11:45:56 AM

_____

Date

UNITEDHEALTHCARE INSURANCE COMPANY

_____

Organization

185 Asylum Street
Hartford, CT 061030450

_____

Address

FOR THE CENTERS FOR MEDICARE & MEDICAID SERVICES



_____

Kathryn A. Coleman
Director
Medicare Drug and Health
Plan Contract Administration Group,
Center for Medicare

9/15/2016 3:03:52 PM

_____

Date

H2226

3992    9/9

**EXHIBIT P-1B**



Medicare Advantage Organization

Electronic Data Interchange Agreement Form

MANAGED CARE ELECTRONIC DATA INTERCHANGE (EDI) AGREEMENT FORM

ONLY for the Collection of Encounter Data and/or

With Medicare Advantage Eligible Organizations

The eligible organization agrees to the following provisions for submitting Medicare encounter data electronically to The Centers for Medicare & Medicaid Services (CMS) or to CMS contractors.

A.   **The Eligible Organization Agrees:**

1.   That it will be responsible for all Medicare encounter data submitted to CMS by itself, its employees, or its agents.

2.   That it will not disclose any information concerning a Medicare beneficiary to any other person or organization, except CMS and/or its contractors, without the express written permission of the Medicare beneficiary or his/her parent or legal guardian, or where required for the care and treatment of a beneficiary who is unable to provide written consent, or to bill insurance primary or supplementary to Medicare, or as required by State or Federal law.

3.   That it will ensure that every electronic entry can be readily associated and identified with an original source document.

4.   That the Secretary of Health and Human Services or his/her designee and/or the contractor has the right to audit and confirm information submitted by the eligible organization and shall have access to all original source documents and medical records related to the eligible organization's submissions, including the beneficiary's authorization and signature.

5.   Based on best knowledge, information, and belief, that it will submit encounter data that are accurate, complete, and truthful.

6.   That it will retain all original source documentation and medical records pertaining to any such particular Medicare encounter data for a period of at least 6 years, 3 months after the encounter data is received and processed.

7.   That it will affix the CMS-assigned unique identifier number of the eligible organization on each encounter data electronically transmitted to the contractor.

8.   That the CMS-assigned unique identifier number constitutes the eligible organization's legal electronic signature.

9.   That it will use sufficient security procedures to ensure that all transmissions of documents are authorized and protect all beneficiary-specific data from improper access.

10.  That it will establish and maintain procedures and controls so that information concerning Medicare beneficiaries, or any information obtained from CMS or its contractor, shall not be used by agents, officers, or employees of the billing service except as provided by the contractor (in accordance with § 1106(a) of the Act).

11.  That it will research and correct encounter data discrepancies.

12.  That it will notify CMS or its contractor within 2 business days if any transmitted data are received in an unintelligible or garbled form.

~ 1 ~

3994

CONFIDENTIAL

MAPI 007637301



B.  Underline: **The Centers for Medicare & Medicaid Services Agrees To:**

1.  Transmit to the eligible organization an acknowledgment of encounter data receipt.

2.  Affix the intermediary/carrier number, as its electronic signature, on each response/report sent to the eligible organization.

3.  Ensure that no CMS contractor may require the eligible organization to purchase any or all electronic services from the CMS contractor or from any subsidiary of the CMS contractor or from any company for which the CMS contractor has an interest.

4.  The contractor will make alternative means available to any electronic biller to obtain such services.

5.  Ensure that all Medicare electronic transmitters have equal access to any services that CMS requires Medicare contractors to make available to eligible organizations or their billing services, regardless of the electronic billing technique or service they choose. Equal access will be granted to any services the contractor sells directly, indirectly, or by arrangement.

6.  Notify the provider within 2 business days if any transmitted data are received in an unintelligible or garbled form.

**NOTICE:**
Federal law shall govern both the interpretation of this document and the appropriate jurisdiction and venue for appealing any final decision made by CMS under this document

This document shall become effective when signed by the eligible organization. The responsibilities and obligations contained in this document will remain in effect as long as Medicare encounter data are submitted to CMS or the contractor. Either party may terminate this arrangement by giving the other party (30) days written notice of its intent to terminate. In the event that the notice is mailed, the written notice of termination shall be deemed to have been given upon the date of mailing, as established by the postmark or other appropriate evidence of transmittal.

C.  Underline: **Signature:**

- 2 -

CONFIDENTIAL

3995

MAPI 007637302



I am authorized to sign this document on behalf of the indicated party and I have read and agree to the foregoing provisions and acknowledge same by signing below.

| Contract Number: | R9329 |
| Eligible Organization's Name: | Optum |
| Address: | |
| City/State/ZIP: | |
| Phone: | 612 632 5017 |
| Email: | lisa_beck @ optum.com |
| Signature: | |
| Printed Name: | Lisa D. Beck |
| Title: | Manager E.O.I |
| Date: | 10/4/16 |

cc: Regional Offices

Please retain a copy of all forms submitted for your records.

Complete and mail this form with original signature to:

Medicare Advantage EDI Agreement
CSSC Operations AG-570
2300 Springdale Drive Bldg. One
Camden, SC 29020-1728

Phone (877) 534-2772
www.csscoperations.com

- 3 -

3996

CONFIDENTIAL

MAPL007637303



Medicare Advantage Organization

Electronic Data Interchange Enrollment Form

MANAGED CARE ELECTRONIC DATA INTERCHANGE (EDI) ENROLLMENT FORM

ONLY for the Collection of Risk Adjustment Data and/or

With Medicare Advantage Eligible Organizations

The eligible organization agrees to the following provisions for submitting Medicare risk adjustment data electronically to The Centers for Medicare & Medicaid Services (CMS) or to CMS's contractors.

A.   **The Eligible Organization Agrees:**

1.   That it will be responsible for all Medicare risk adjustment data submitted to CMS by itself, its employees, or its agents.

2.   That it will not disclose any information concerning a Medicare beneficiary to any other person or organization, except CMS and/or its contractors, without the express written permission of the Medicare beneficiary or his/her parent or legal guardian, or where required for the care and treatment of a beneficiary who is unable to provide written consent, or to bill insurance primary or supplementary to Medicare, or as required by State or Federal law.

3.   That it will ensure that every electronic entry can be readily associated and identified with an original source document. Each source document must reflect the following information:
     * Beneficiary's name,
     * Beneficiary's health insurance claim number,
     * Date(s) of service,
     * Diagnosis/nature of illness

4.   That the Secretary of Health and Human Services or his/her designee and/or the contractor has the right to audit and confirm information submitted by the eligible organization and shall have access to all original source documents and medical records related to the eligible organization's submissions, including the beneficiary's authorization and signature.

5.   Based on best knowledge, information, and belief, that it will submit risk adjustment data that are accurate, complete, and truthful.

6.   That it will retain all original source documentation and medical records pertaining to any such particular Medicare risk adjustment data for a period of at least 6 years, 3 months after the risk adjustment data is received and processed.

7.   That it will affix the CMS-assigned unique identifier number of the eligible organization on each risk adjustment data electronically transmitted to the contractor.

8.   That the CMS-assigned unique identifier number constitutes the eligible organization's legal electronic signature.

9.   That it will use sufficient security procedures to ensure that all transmissions of documents are authorized and protect all beneficiary-specific data from improper access.

10.  That it will establish and maintain procedures and controls so that information concerning Medicare beneficiaries, or any information obtained from CMS or its contractor, shall not be used by agents, officers, or employees of the billing service except as provided by the contractor (in accordance with §1106(a) of the Act).

11.  That it will research and correct risk adjustment data discrepancies.

3997

MAPL007637304



12. That it will notify the contractor or CMS within 2 business days if any transmitted data are received in an unintelligible or garbled form.

B. **The Centers for Medicare & Medicaid Services Agrees To:**

    1. Transmit to the eligible organization an acknowledgment of risk adjustment data receipt.

    2. Affix the intermediary/carrier number, as its electronic signature, on each response/report sent to the eligible organization.

    3. Ensure that no contractor may require the eligible organization to purchase any or all electronic services from the contractor or from any subsidiary of the contractor or from any company for which the contractor has an interest.

    4. The contractor will make alternative means available to any electronic biller to obtain such services.

    5. Ensure that all Medicare electronic transmitters have equal access to any services that CMS requires Medicare contractors to make available to eligible organizations or their billing services, regardless of the electronic billing technique or service they choose. Equal access will be granted to any services the contractor sells directly, indirectly, or by arrangement.

    6. Notify the provider within 2 business days if any transmitted data are received in an unintelligible or garbled form.

**NOTICE:**
Federal law shall govern both the interpretation of this document and the appropriate jurisdiction and venue for appealing any final decision made by CMS under this document.

This document shall become effective when signed by the eligible organization. The responsibilities and obligations contained in this document will remain in effect as long as Medicare risk adjustment data are submitted to CMS or the contractor. Either party may terminate this arrangement by giving the other party (30) days written notice of its intent to terminate. In the event that the notice is mailed, the written notice of termination shall be deemed to have been given upon the date of mailing, as established by the postmark or other appropriate evidence of transmittal.

C. **Signature:**

I am authorized to sign this document on behalf of the indicated party and I have read and agree to the foregoing provisions and acknowledge same by signing below.

Eligible Organization's Name: _Optum_

Contract Number: _R5329_

Signature: _Lake_

Name: _Lisa D Berk_

Title: _Manager, COPS_

3998



Address: _____

_____

City/State/ZIP: _____

Phone: _612-632-5017_

Email: _Lisa.Becko@Optum.com_

Date: _11/4/16_

cc: Regional Offices

Please retain a copy of all forms submitted for your records.

Complete and mail this form with original signature to:

**Medicare Advantage EDI Enrollment**
**CSSC Operations AG-570**
**2300 Springdale Drive Bldg. One**
**Camden, SC 29020-1728**

Phone (877) 534-2772
www.cssoperations.com

3999

CONFIDENTIAL

**EXHIBIT P-1C**

4001

CONFIDENTIAL

MAPL008081457



**CMS**
CENTERS for MEDICARE & MEDICAID SERVICES

**Medicare+Choice Organization**

**Electronic Data Interchange Enrollment Form**

MANAGED CARE ELECTRONIC DATA INTERCHANGE (EDI) ENROLLMENT FORM

**ONLY** for the Collection of Risk Adjustment Data and/or

With Medicare+Choice Eligible Organizations

The eligible organization agrees to the following provisions for submitting Medicare risk adjustment data electronically to The Centers for Medicare & Medicaid Services (CMS) or to CMS's contractors.

A. **The Eligible Organization Agrees:**

   1. That it will be responsible for all Medicare risk adjustment data submitted to CMS by itself, its employees, or its agents.

   2. That it will not disclose any information concerning a Medicare beneficiary to any other person or organization, except CMS and/or its contractors, without the express written permission of the Medicare beneficiary or his/her parent or legal guardian, or where required for the care and treatment of a beneficiary who is unable to provide written consent, or to bill insurance primary or supplementary to Medicare, or as required by State or Federal law.

   3. That it will ensure that every electronic entry can be readily associated and identified with an original source document. Each source document must reflect the following information:
      - Beneficiary's name,
      - Beneficiary's health insurance claim number,
      - Date(s) of service,
      - Diagnosis/nature of illness

   4. That the Secretary of Health and Human Services or his/her designee and/or the contractor has the right to audit and confirm information submitted by the eligible organization and shall have access to all original source documents and medical records related to the eligible organization's submissions, including the beneficiary's authorization and signature.

   5. Based on best knowledge, information, and belief, that it will submit risk adjustment data that are accurate, complete, and truthful.

   6. That it will retain all original source documentation and medical records pertaining to any such particular Medicare risk adjustment data for a period of at least 6 years, 3 months after the risk adjustment data is received and processed.

   7. That it will affix the CMS-assigned unique identifier number of the eligible organization on each risk adjustment data electronically transmitted to the contractor.

   8. That the CMS-assigned unique identifier number constitutes the eligible organization's legal electronic signature.

   9. That it will use sufficient security procedures to ensure that all transmissions of documents are authorized and protect all beneficiary-specific data from improper access.

   10. That it will establish and maintain procedures and controls so that information concerning Medicare beneficiaries, or any information obtained from CMS or its contractor, shall not be used by agents, officers, or employees of the billing service except as provided by the contractor (in accordance with §1106(a) of the Act).

   11. That it will research and correct risk adjustment data discrepancies.

   12. That it will notify the contractor or CMS within 2 business days if any transmitted data are received in an unintelligible or garbled form.

http://www.mcoservice.com/new/rapformat/Raps/raps-edi-agreement_120805.htm                7/6/2006

CONFIDENTIAL

MAPL008081458

B.   **The Centers for Medicare & Medicaid Services Agrees To:**

1.   Transmit to the eligible organization an acknowledgment of risk adjustment data receipt.

2.   Affix the intermediary/carrier number, as its electronic signature, on each response/report sent to the eligible organization.

3.   Ensure that no contractor may require the eligible organization to purchase any or all electronic services from the contractor or from any subsidiary of the contractor or from any company for which the contractor has an interest.

4.   The contractor will make alternative means available to any electronic biller to obtain such services.

5.   Ensure that all Medicare electronic transmitters have equal access to any services that CMS requires Medicare contractors to make available to eligible organizations or their billing services, regardless of the electronic billing technique or service they choose. Equal access will be granted to any services the contractor sells directly, indirectly, or by arrangement.

6.   Notify the provider within 2 business days if any transmitted data are received in an unintelligible or garbled form.

**NOTICE:**
Federal law shall govern both the interpretation of this document and the appropriate jurisdiction and venue for appealing any final decision made by CMS under this document.

This document shall become effective when signed by the eligible organization. The responsibilities and obligations contained in this document will remain in effect as long as Medicare risk adjustment data are submitted to CMS or the contractor. Either party may terminate this arrangement by giving the other party (30) days written notice of its intent to terminate. In the event that the notice is mailed, the written notice of termination shall be deemed to have been given upon the date of mailing, as established by the postmark or other appropriate evidence of transmittal.

C.   **Signature:**

I am authorized to sign this document on behalf of the indicated party and I have read and agree to the foregoing provisions and acknowledge same by signing below.

Eligible Organization's Name: ___PACIFICARE LIFE & HEALTH___
___A UNITED HEALTHCARE COMPANY___

Contract Number: ___H5435___

Signature: _____

Name: ___JIM HIGGINS___

Title: ___DIRECTOR___

Address: ___3100 LAKE CENTER DR___
___SANTA ANA, CA 92704___

City/State/ZIP: _____

Phone: ___714-825-5979___

Email: ___JIM.HIGGINS @ PHS.COM___

CONFIDENTIAL

Date: _JULY 6, 2006_____

cc: Regional Offices

Please retain a copy of all forms submitted for your records.

Complete and mail this form with original signature to:

**M+CO EDI Enrollment**
**CSSC Operations AG-570**
**P.O. Box 100275**
**Columbia, SC 29202-3275**

**Phone (877) 534-2772**
**http://www.cssoperations.com/**

CONFIDENTIAL                                                    MAPL008081460



**MEDICARE**
CSSC OPERATIONS

### CSSC Risk Adjustment Data Submitter Application

| | |
|---|---|
| Plan Number (Hnnnn): | H5435 |
| Plan Name: | PACIFICARE LIFE a HEALTH |
| Address: | 3100 LAKE CENTER, SANTA ANA, CA 92704 |
| Fax Number : | 714-825-5979 |
| Operations Contact Person: | JIM HIGGINS |
| E-Mail address: | JIM.HIGGINS@PHS.COM |
| Phone Number: | 714-825-5425 |
| Technical Contact Person: | PAT RASMUSSEN |
| E-Mail address: | PAT.RASMUSSEN@PHS.COM |
| Phone Number: | 972-866-1553 |

What format do you plan to use to submit Risk Adjustment Data?

- (RAPS Format)
- M+CO NSF Format
- UB 92 version 6.0
- ANSI 837 4010

What Connection Type is established via the Medicare Data Communications Network (MDCN)?

Lease Line _____

(IP) _____    FOR SH0151

NDM _____

Dial up / Modem _____

file://C:\Data\BBA\BEST\feras-submitterapp_052203.htm

7/6/2006

4005

CONFIDENTIAL

feras-submitterapp_052203    Page 2 of 2
Case 2:16-cv-08697-FMO-PVC    Document 616-13    Filed 08/06/24    Page 36 of 457
Page ID #:22795

Please list any additional Plan numbers your organization will submit data for:

Plan _____    Plan _____    Plan_____

Plan _____    Plan _____    Plan_____

Plan _____    Plan _____    Plan_____

Please return the completed submitter application, EDI Agreement and NDM specifications to CSSC Operations at the address below.

1-877-534-CSSC

www.mcoservice.com

FAX: 1-803-935-0171

4006

CONFIDENTIAL    MAPL008081462

**EXHIBIT P-1D**

Message

---

**From:**      Rice, Cheri M. (CMS/CM) [/O=HHS EES/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=CHERI.RICE.CMS59728027]
**Sent:**      7/30/2015 9:56:36 PM
**To:**        steve_nelson@uhc.com
**Subject:**   RE: 2013 CMS RAF Attestation

Steve,

With this email, we are acknowledging receipt of your email dated 6/26/15. However, neither the receipt of your email nor any acknowledgment of such receipt should be interpreted as acquiescence by the Government to any purported modification to the Attestations of Risk Adjustment Data submitted by United or to any of the arrangements described in or statements made in your email, or as a release of any of United's present or future liability to the Government. As you know, both regulation and the MA organizations' contracts with CMS prescribe the specific language of this Attestation, and the MA organizations' execution and submission of the Attestation as specified is a condition of payment by the Medicare Program.

With respect to your fifth point, as we noted last year in response to a similar email from you, there are laws and contractual provisions that impose standards, requirements and responsibilities on MA organizations in connection with federal payments, including risk adjustment payments, they receive from the Medicare Program. We cannot provide legal advice to United about whether its current or proposed courses of action are compliant with such laws and obligations, but we do wish to remind you that MA organizations are required to implement effective compliance programs that prevent, detect and correct non-compliance with CMS program requirements, to exercise reasonable diligence in identifying overpayments, and to report and return such overpayments to the Medicare Program within 60 days. MA organizations cannot delegate these legal obligations to others.

Cheri Rice
Director, Medicare Plan Payment Group
Centers for Medicare and Medicaid Services

---

**From:** Nelson, Steve H [mailto:steve_nelson@uhc.com]
**Sent:** Friday, June 26, 2015 12:42 PM
**To:** Rice, Cheri M. (CMS/CM)
**Subject:** 2013 CMS RAF Attestation

Cheri,

Similar to last year, we are reaching out to you, to reiterate our approach to the electronic annual risk adjustment certifications. As you know, annual risk adjustment data certifications before 2014 were submitted on paper, enabling companies to add notes explaining their understanding of these certifications (including any remediation efforts). As we discussed with you last year, because the certifications are now electronic, companies are unable to include explanatory notes. As such, we informed you in writing our understanding of these certifications.

EXHIBIT

648

4008

USBP001354165

Because the certifications remain electronic with no ability to add explanatory notes, we feel it would again be helpful, and appropriate, to capture our discussion and understanding regarding the certifications.

- As with our past certifications, the 2013 certifications are based on facts reasonably available or made available to us as of the date of the certifications.  As we receive additional information, we may be required to modify the data to which the certifications relate
- The certifications use the phrase "best knowledge, information, and belief," which is based on our ordinary business practices.
- The certifications only cover risk adjustment data for 2013 dates of service that were submitted to CMS and not subsequently deleted prior to the date of the certifications.
- As we have mentioned to you previously, we are engaged in an ongoing review of our risk adjustment processes and submission system.  This review has identified areas for improvement and, as a result, we will be deleting all risk adjustment data for 2013 dates of service that we ultimately determine should be deleted consistent with this email.
- CMS issued a proposed rule last year that would have required MA plans to design any medical record reviews to determine the accuracy of risk adjustment diagnoses associated with those records.  In May 2014, CMS withdrew the proposed rule.  During our conversations last year before the proposed rule was withdrawn, CMS confirmed to us that the proposed requirements would not apply until the effective date of the rule, and that MA plans were thus not required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses. As we discussed last year, we previously had a process through which we reviewed certain medical records to determine the accuracy of risk adjustment diagnoses and submitted appropriate deletes.  Based on our conversations with CMS last year, CMS's withdrawal of the proposed rule, and CMS's ongoing consideration of a FFS Adjuster to address diagnoses not supported by a medical record in the context of RADV, we ended this process and informed you of that decision.  That decision remains operative for 2013 dates of service.  In particular, we did not use our previous process to determine whether diagnosis codes submitted through claims are unsupported in the medical record.  We do have a quality assurance process that deletes codes initially identified during chart review and that are later determined to be unsupported.

The certifications we submit this year are made subject to these clarifications.  Please let me know if you have any questions.  As always, we appreciate your time and attention on this matter.


Steve Nelson
Chief Executive Officer
UnitedHealthcare Medicare & Retirement


This e-mail, including attachments, may include confidential and/or proprietary information, and may be used only by the person or entity to which it is addressed. If the reader of this e-mail is not the intended recipient or his or her authorized agent, the reader is hereby notified that any dissemination, distribution or copying of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender by replying to this message and delete this e-mail immediately.

4009

**EXHIBIT P-1E**

Message

| | |
|---|---|
| **Sent**: | 8/22/2016 1:54:59 AM |
| **To**: | Nelson, Steve H [steve_nelson@uhc.com] |
| **BCC**: | Harlow, Jennifer A. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=jennifer.harlow.cms20728073]; Chaudhuri, Ilina (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=Ilina.Chaudhuri.CMS]; Reed-Asante, Monica (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=Monica.Reed.CMS]; Paul, Rebecca (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=rebecca.paul.cms55708697]; Simons, Kellie M. (CMS/CM) [/O=HHS EES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Kellie.Gombeski.CMS]; Kreisel, Johanna (OS/OGC) [/O=HHS EES/OU=EXTernal (FYDIBOHF25SPDLT)/cn=Recipients/cn=b191e47b8d7d42b8a6a6460de4a4eabb]; Burke, Sherry Lynn (HHS/OGC) [/O=HHS EES/OU=EXTernal (FYDIBOHF25SPDLT)/cn=Recipients/cn=65433f2bbb034833b76096f08ab6184f] |
| **Subject**: | RE: 2014 CMS RAF Attestation |

Steve,

With this email, we are acknowledging receipt of your email dated 6/7/16.  However, neither the receipt of your email nor any acknowledgment of such receipt should be interpreted as acquiescence by the Government to any purported modification to the Attestations of Risk Adjustment Data submitted by United or to any of the arrangements described in or statements made in your email, or as a release of any of United's present or future liability to the Government.  As you know, both regulation and the MA organizations' contracts with CMS prescribe the specific language of this Attestation, and the MA organizations' execution and submission of the Attestation as specified is a condition of payment by the Medicare Program.

With respect to your fifth point, as we noted last year in response to a similar email from you, there are laws and contractual provisions that impose standards, requirements and responsibilities on MA organizations in connection with federal payments, including risk adjustment payments, they receive from the Medicare Program.  We cannot provide legal advice to United about whether its current or proposed courses of action are compliant with such laws and obligations, but we do wish to remind you that MA organizations are required to implement effective compliance programs that prevent, detect and correct non-compliance with CMS program requirements, to exercise reasonable diligence in identifying overpayments, and to report and return such overpayments to the Medicare Program within 60 days.  MA organizations cannot delegate these legal obligations to others.

Cheri Rice
Director, Medicare Plan Payment Group
Centers for Medicare and Medicaid Services

---

**From:** Nelson, Steve H [mailto:steve_nelson@uhc.com]
**Sent:** Tuesday, June 7, 2016 10:21 AM
**To:** Rice, Cheri M. (CMS/CM) <Cheri.Rice@cms.hhs.gov>
**Subject:** 2014 CMS RAF Attestation

Cheri,

EXHIBIT
649
4011
USBP001354107

As we have done the past several years, we are reaching out to you, to reiterate our approach to the electronic annual risk adjustment certifications. As you know, annual risk adjustment data certifications before 2014 were submitted on paper, enabling companies to add notes explaining their understanding of these certifications (including any remediation efforts). As we discussed with you in the past, because the certifications are now electronic, companies are unable to include explanatory notes. As such, we informed you in writing regarding our understanding of these certifications.

Because the certifications remain electronic with no ability to add explanatory notes, we feel it would again be helpful, and appropriate, to capture our prior discussion and understanding regarding the certifications.

- As with our past certifications, the 2014 certifications are based on facts reasonably available or made available to us as of the date of the certifications. As we receive additional information, we may be required to modify the data to which the certifications relate
- The certifications use the phrase "best knowledge, information, and belief," which is based on our ordinary business practices.
- The certifications only cover risk adjustment data for 2014 dates of service that were submitted to CMS and not subsequently deleted prior to the date of the certifications.
- As we have mentioned to you previously, we are continuously engaged in the ongoing review of our risk adjustment processes and submission system. This review has identified areas for improvement and, as a result, we will be deleting all risk adjustment data for 2014 dates of service that we ultimately determine should be deleted consistent with this email.
- CMS issued a proposed rule two years ago that would have required MA plans to design any medical record reviews to determine the accuracy of risk adjustment diagnoses associated with those records. In May 2014, CMS withdrew the proposed rule. During our conversations before the proposed rule was withdrawn, CMS confirmed to us that the proposed requirements would not apply until the effective date of the rule, and that MA plans were thus not required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses. As we discussed at that time, we previously had a process through which we reviewed certain medical records to determine the accuracy of risk adjustment diagnoses and submitted appropriate deletes. Based on our conversations with CMS two years ago, CMS's withdrawal of the proposed rule, and CMS's announced plans to use a FFS Adjuster to address diagnoses not supported by a medical record in the context of RADV, we ended this process and informed you of that decision at the time. That decision remains operative for 2014 dates of service. In particular, we did not use our previous process to determine whether diagnosis codes submitted through claims are unsupported in the medical record. We do have a quality assurance process that deletes codes initially identified during chart review and that are later determined to be unsupported.

The certifications we submit this year are made subject to these clarifications. Please let me know if you have any questions. As always, we appreciate your time and attention on this matter.


Steve Nelson
Chief Executive Officer
UnitedHealthcare Medicare & Retirement

4012

USBP001354108

This e-mail, including attachments, may include confidential and/or
proprietary information, and may be used only by the person or entity
to which it is addressed. If the reader of this e-mail is not the intended
recipient or his or her authorized agent, the reader is hereby notified
that any dissemination, distribution or copying of this e-mail is
prohibited. If you have received this e-mail in error, please notify the
sender by replying to this message and delete this e-mail immediately.

4013

USBP001354109

**EXHIBIT P-1F**

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



**MEDICARE PLAN PAYMENT GROUP**

May 28, 2020

Brian Thompson
Chief Executive Officer
United Healthcare
Medicare & Retirement
9800 Health Care Lane
MN006-E010
Minnetonka, MN 55343

Dear Mr. Thompson:

Thank you for your communications regarding Medicare Advantage risk adjustment. We
appreciate your taking time to share your views. This letter is in response to all correspondence
related to Medicare Advantage risk adjustment data certifications and the Electronic Data
Interchange (EDI) enrollment forms that the Medicare Plan Payment Group has received from
your organization to date.

In CMS' view any caveats that United sends are non-binding and do not alter any existing
agreements or any other statutory, regulatory, and contractual obligations. To the extent that your
communication seeks "advice" regarding United's legal obligations, it is not CMS' practice to
modify the established legal and contractual obligations of MA organizations through informal
"advice."

We remind you that there are existing laws and contractual provisions that impose standards,
requirements, and responsibilities on MA organizations in connection with federal payments,
including risk adjustment payments, they receive from the Medicare Program. As you know, the
decision in 2014 by CMS not to finalize the proposed amendment to 42 CFR § 422.310(e) did
"not change CMS' existing contractual requirement that MA organizations must certify (based
on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the
risk adjustment data they submit to CMS." 79 Fed. Reg. 29,844, 29,926 (May 23, 2014). Nor did
it change the requirement that all diagnosis codes submitted for risk adjustment payments must
be documented in the beneficiaries' medical records pursuant to the ICD-9 and -10 Guidelines
for Coding and Reporting with which HHS and Medicare regulations require compliance. CMS
has not stated otherwise to United.

Furthermore, the agency's positions on the issues raised in your communications also are public
and can be found in, among other places, the government's briefs in the *UnitedHealth Group*
cases pending in the District of Columbia and in California. CMS reserves all its rights and
remedies associated with United's submission of invalid risk adjustment data. The agency's

1

CONFIDENTIAL

receipt of United's communications and the acknowledgement of such receipt should not be interpreted as a release of any administrative, civil, or criminal liability arising from United's failure to comply with its legal and regulatory obligations relating to the submission of risk adjustment data to and receipt of risk adjustment payments from the Medicare Program (including, without limitation, any potential liability arising from the matters currently under DOJ investigation).

Sincerely,

Jennifer R. Shapiro
Director

Cc: Kristin Lehrke, Benjamin Eklo, Joshua Streich, Jean Benson

2

USBP009866580

4016

**EXHIBIT P-1G**



## Health Plan Management System

# Risk Adjustment Certification Reports - Payment Year 2017 (Dates of Service 2016)

**Confirmation #:** 422

**ATTACHMENT B**

**ATTESTATION OF RISK ADJUSTMENT DATA INFORMATION RELATING TO CMS PAYMENT TO A MEDICARE ADVANTAGE ORGANIZATION, MEDICARE MEDICAID PLAN OR PACE ORGANIZATION**

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and UNITEDHEALTHCARE INSURANCE COMPANY (H2226), hereafter referred to as the MA Organization, governing the operation of the following Medicare Advantage and Medicare Advantage-Prescription Drug plans 001, the MA Organization hereby requests payment under the contract, and in doing so, makes the following attestation concerning CMS payments to the MA Organization. The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentation to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.

The MA Organization has reported to CMS for the period of January 1, 2016, to December 31, 2016, all risk adjustment data (*inpatient hospital, outpatient hospital, and physician*) available to the MA Organization, Medicare Medicaid Plan or PACE Organization as of the applicable deadline(s), with respect to the above-stated MA, MMP, and MA-PD plans. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

TIMOTHY NOEL on behalf of

UNITEDHEALTHCARE INSURANCE COMPANY (H2226)

10/12/2018

Close

4018

CONFIDENTIAL                                                    USBP009417433

**EXHIBIT P-2**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


_____ )
UNITED STATES OF AMERICA    )
ex rel. BENJAMIN POEHLING,  )
                            )
        Plaintiff,          )    No. CV 16-08697 FMO
                            )
vs.                         )
                            )
UNITEDHEALTH GROUP, INC.,   )
et al.,                     )
                            )
        Defendants.         )
_____)


CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER


Volume 1

DEPOSITION OF BIGGS T. CANNON, III

As 30(b)(6) Designee 6 of UHC of California, Inc.,
OptumInsight, Inc.
UnitedHealthcare, Inc.

Washington, DC
June 6, 2023


Reported by:  John L. Harmonson, RPR

Job No. 983690



Page 30

1   to answer.
2           MS. GLOVER:  You're going to instruct
3   him not to answer based on -- his company has been
4   paid a certain amount for him to appear here today,
5   and he's still being paid by his company.  It is
6   relevant in calculating the number of hours and how
7   much, approximately, his time is worth to be here
8   today.
9           MS. DO:  He's already testified twice
10  now that he's paid a salary that is not impacted by
11  the hourly rate.  It has no relevance.  It's
12  outside the scope.
13          MS. GLOVER:  It goes to his credibility
14  and bias.
15          MS. DO:  It's outside the scope.
16          MS. GLOVER:  Relevance is not an
17  appropriate basis for instructing him not to
18  answer.
19          MS. DO:  You have an hourly rate.  Move
20  on.
21  BY MS. GLOVER:
22      Q.   Are you going to answer my question?
23      A.   Counsel has instructed me not to answer
24  that question.
25          MS. GLOVER:  And I will say for the

Page 31

1   record that it is an inappropriate instruction not
2   to answer because it is not on the basis of
3   privilege.
4   BY MS. GLOVER:
5       Q.   Okay.  So let's -- we will move on for
6   now.  All right.  So just so that I understand, you
7   are here to testify on behalf of those three
8   entities that we've discussed, OptumInsight, UHC of
9   California, and UnitedHealthcare, Inc.; correct?
10      A.   Yes.
11      Q.   And at a high level, Optum submits risk
12  adjustment data on behalf of UnitedHealthcare,
13  Inc.'s Medicare Advantage plans; is that correct?
14      A.   It's a portion of their business, yes.
15      Q.   Okay.  And UHC of California, Inc., is
16  one of those plans on whose behalf Optum submits
17  risk adjustment data to CMS.  Is that correct?
18      A.   Yes.
19      Q.   All right.  And is it your understanding
20  that UnitedHealthcare retains Optum to manage and
21  process data submitted by providers to
22  UnitedHealthcare -- to UnitedHealthcare's plans?
23          MS. DO:  Object to form.  Vague.
24          THE WITNESS:  Can you repeat the
25  question?

Page 32

1   BY MS. GLOVER:
2       Q.   Sure.
3           Is it your understanding that
4   UnitedHealthcare retains Optum to manage and
5   process the data that providers submit to
6   UnitedHealthcare, UnitedHealthcare's plans?
7           MS. DO:  Outside the scope, and also
8   vague.
9           THE WITNESS:  UnitedHealthcare -- Optum
10  supports UnitedHealthcare through the submissions
11  of a portion of their Medicare Advantage
12  beneficiaries.
13  BY MS. GLOVER:
14      Q.   Does Optum process data submitted by
15  providers to UnitedHealthcare, Inc.?
16      A.   What do you mean by process?
17      Q.   Receive the data and assimilate it into
18  a system.
19          MS. DO:  Outside the scope.  Object to
20  form.
21          THE WITNESS:  United providers do not
22  submit directly to Optum, no.
23  BY MS. GLOVER:
24      Q.   Do they submit to systems, systems that
25  you've been asked to prepare on today, that

Page 33

1   ultimately load data into OptumInsight systems?
2           MS. DO:  Outside the scope.  And object
3   to form.
4           THE WITNESS:  Yes, some data received by
5   providers of Medicare Advantage -- to Medicare
6   Advantage beneficiaries can end up in Optum
7   systems.
8   BY MS. GLOVER:
9       Q.   And some of those Medicare beneficiaries
10  are enrolled in UnitedHealthcare, Inc.'s plans;
11  correct?
12      A.   Medicare Advantage beneficiaries.
13      Q.   Yes.
14      A.   Yes.
15      Q.   And Medicare Part D beneficiaries as
16  well; right?
17          MS. DO:  Outside the scope.  And object
18  to form.
19          THE WITNESS:  I believe Optum may
20  receive part -- a portion of Part D data related to
21  Medicare Advantage beneficiaries.
22  BY MS. GLOVER:
23      Q.   And a portion of data which includes
24  ICD-9 or 10 codes, diagnosis codes; right?
25          MS. DO:  Object to form.  Also outside

9 (Pages 30 to 33)



4021

Page 310

1  chart review data that may have been extracted from
2  ChartSync during that time.
3  BY MS. GLOVER:
4      Q.   And what was the purpose of the compare?
5      MS. DO:  Objection; outside the scope.
6  And objection to the form.
7      THE WITNESS:  I'm not sure I can speak
8  to why they ran the analysis they did.  Just a
9  comparison was done between the two datasets.
10     MS. DO:  We've gone well over an hour.
11 I believe we're also hitting the seven-hour mark.
12     Would you like a break?
13     THE WITNESS:  Ideally.  I don't know if
14 we're close to seven hours.
15     MS. GLOVER:  Let's go off the record.
16     THE VIDEOGRAPHER:  Off the record.  The
17 time is 7:27.
18     (Off the record.)
19     THE VIDEOGRAPHER:  This concludes
20 today's video deposition.  We are recessing until
21 9:00 a.m. tomorrow morning.
22     (Deposition recessed at 7:29 p.m., to be
23  reconvened on June 7, 2023, at 9:00 a.m.)
24
25

Page 311

1          ACKNOWLEDGMENT OF DEPONENT
2
3      I, BIGGS T. CANNON, III, have read or have had
4  the foregoing testimony read to me and hereby
5  certify that it is a true and correct transcription
6  of my testimony with the exception of any attached
7  corrections or changes.
8
9
10 _____
11 BIGGS T. CANNON, III
12 [ ] No corrections
13 [ ] Correction sheet(s) enclosed
14
15     SUBSCRIBED AND SWORN TO BEFORE ME, the
16 undersigned authority, by the witness, BIGGS T.
17 CANNON, III, on this the _____ day of
18 _____, _____.
19
20
21
22
23
24
25

Page 312

1          C E R T I F I C A T E
2
3  DISTRICT OF COLUMBIA
4      I, JOHN L. HARMONSON, a Notary Public
5  within and for the District of Columbia, do hereby
6  certify that BIGGS T. CANNON, III, the witness
7  whose deposition is hereinbefore set forth, was
8  duly sworn by me and that such deposition is a true
9  record of the testimony given by such witness.
10     That before completion of the
11 proceedings, review and signature of the transcript
12 was reserved.
13     I further certify that I am not related
14 to any of the parties to this action by blood or
15 marriage; and that I am in no way interested in the
16 outcome of this matter.
17     IN WITNESS WHEREOF, I have hereunto set
18 my hand this 8th day of June, 2023.
19
20     _____
21     JOHN L. HARMONSON, RPR
       My commission expires: 04/14/26
22
23
24
25

Page 313

1          ERRATA SHEET
2  CASE:    USA v. UnitedHealthcare Group, et al.
   DATE:    June 6, 2023
3  WITNESS:  BIGGS T. CANNON, III, Vol. 1
4  Reason Codes:
5      1. To clarify the record.
       2. To conform to the facts.
6      3. To correct transcription errors.
7  Pg. Ln. Now Reads     Should Read     Reason
8  ___ ___ _____  _____  _____
9  ___ ___ _____  _____  _____
10 ___ ___ _____  _____  _____
11 ___ ___ _____  _____  _____
12 ___ ___ _____  _____  _____
13 ___ ___ _____  _____  _____
14 ___ ___ _____  _____  _____
15 ___ ___ _____  _____  _____
16 ___ ___ _____  _____  _____
17 ___ ___ _____  _____  _____
18 ___ ___ _____  _____  _____
19
20     _____
       Signature of Deponent
21
22 SUBSCRIBED AND SWORN BEFORE ME
23 THIS ___ DAY OF _____, _____
24 _____
   (Notary Public) MY COMMISSION EXPIRES:_____
25

79 (Pages 310 to 313)



**EXHIBIT P-3**



Case 2:16-cv-08697-FMO-PVC    Document 616-13    Filed 08/06/24    Page 54 of 457
Page ID #:22813

**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**TABLE OF CONTENTS**

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................. I-1

**MODULE 1 – RISK ADJUSTMENT METHODOLOGY** ........................................... 1-1
1.1      Risk Adjustment History ....................................................... 1-1
1.2      Calculating Payments............................................................ 1-4
1.2.1    Payments for 2004 and 2005.................................................. 1-4
1.2.2    MA Capitation Rates for 2006 through 2008............................. 1-6
1.2.3    Risk Ratebook ..................................................................... 1-6
1.2.3.1  Adjustment for Budget Neutrality............................................ 1-7
1.2.3.2  Change in the Budget Neutrality Calculation to Account for Different Payment
         Methodologies for Local MA Plans Versus Regional MA Plans .......... 1-8
1.2.3.3  Phase Out of Budget Neutrality.............................................. 1-8
1.2.4    Payment Blends ................................................................... 1-8
1.2.5    Fee-for-Service Normalization Adjustment ............................... 1-10
1.2.6    Payments for 2006 and Beyond ............................................. 1-11
1.2.6.1  Bidding Background.............................................................. 1-11
1.2.7    Intra-Service Area Rate (ISAR) Adjusted County Payment Rates.... 1-11
1.2.8    Plan Payments .................................................................... 1-12
1.3      Risk Adjustment Payment Models for Payment.......................... 1-13
1.3.1    Components of the Risk Score in the CMS-HCC Model ................. 1-16
1.3.1.1  Demographic Factors............................................................ 1-16
1.3.1.2  Disease Groups/HCCs ........................................................... 1-16
1.3.1.3  Disease Hierarchies ............................................................. 1-17
1.3.1.4  Disease Interactions ............................................................ 1-17
1.3.1.5  Disabled/Disease Interactions................................................ 1-18
1.3.2    New Enrollee Factors ........................................................... 1-18
1.3.3    Community and Long-Term Institutional Model Distinctions........... 1-19
1.3.4    Frailty Adjuster .................................................................. 1-21
1.3.4.1  Why is There a Frailty Adjuster? ............................................ 1-21
1.3.4.2  Which Organizations Are Currently Being Paid Under Frailty Adjustment? ...... 1-21
1.3.4.3  How Does the Frailty Adjuster Work Under the CMS-HCC Model?.... 1-22
1.3.4.4  Frailty Model Development..................................................... 1-22
1.3.4.5  Frailty Payment Implementation ............................................ 1-23
1.3.4.6  ADL Information Collection and Frailty Adjuster Development ........ 1-24
1.3.4.7  Calculating the Frailty Score for Payment................................. 1-25
1.3.5    Payment Methodology for ESRD Enrollees ................................ 1-26
1.3.5.1  Risk Adjustment Model for Dialysis Patients ............................. 1-27
1.3.5.2  Transplant Model ................................................................ 1-27
1.3.5.3  Functioning Graft Model ....................................................... 1-27
1.3.5.4  Model Comparison of Coefficients ........................................... 1-28
1.3.5.5  New Enrollee Factor ............................................................ 1-28
1.3.5.6  Reporting of ESRD Status...................................................... 1-28
1.3.6    Medicare Part D .................................................................. 1-28
1.3.6.1  Part D Risk Adjustment Model ............................................... 1-29
1.3.6.2  Low Income and Long Term Institutionalization Multipliers........... 1-30

**EXHIBIT**
**00030B**

4024
MARA1576299

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**TABLE OF CONTENTS**

1.4     Parts C and D Final Submission of Risk Adjustment Data (Reconciliation) ....................... 1-32
1.4.1   Parts C and D Risk Adjustment Schedule & Elimination of the Payment Lag .................. 1-32
1.5     Updating Diagnosis Codes in the Parts C and D Risk Adjustment Models ........................ 1-33

**MODULE 2– RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW** ..................................... 2-1
2.1     Common Risk Adjustment Terms ................................................................. 2-1
2.2     Risk Adjustment Process Overview ............................................................... 2-2
2.2.1   Risk Adjustment Data Requirements ............................................................. 2-2
2.2.2   Risk Adjustment Data Collection ................................................................. 2-2
2.2.3   Risk Adjustment Data Submission ................................................................ 2-3
2.2.4   Risk Adjustment Dataflow ........................................................................ 2-4
2.2.5   Important Information About Risk Adjustment Processing .................................... 2-5
2.3     Submission Schedule ............................................................................... 2-6
2.4     Training and Support .............................................................................. 2-7

**MODULE 3 – DATA COLLECTION** .............................................................................. 3-1
3.1     Required Risk Adjustment Data Elements ...................................................... 3-1
3.1.1   HIC Number ....................................................................................... 3-1
3.1.2   ICD-9-CM Diagnosis Code ........................................................................ 3-2
3.1.2.1 Description of Diagnosis Code Files
3.1.3   Service From and Through Dates ................................................................. 3-2
3.1.4   Provider Type ...................................................................................... 3-2
3.2     Data Sources ....................................................................................... 3-3
3.2.1   Hospital Inpatient ................................................................................. 3-3
3.2.2   Hospital Outpatient ............................................................................... 3-4
3.2.2.1 Determining Whether Facilities Are Acceptable for Risk Adjustment ..................... 3-5
3.2.2.2 National Provider Identifier ...................................................................... 3-6
3.2.3   Physician Data ..................................................................................... 3-10
3.2.4   Alternative Data Sources ......................................................................... 3-12
3.2.5   Excluded Providers ................................................................................ 3-12
3.3     Data Collection Formats and Considerations .................................................. 3-12
3.3.1   Data Collection Formats .......................................................................... 3-12
3.3.2   Collection Format Features ....................................................................... 3-13
3.3.3   Collecting Data from Physicians Using a Superbill ........................................... 3-13
3.3.4   Factors Affecting Data Collection Method ..................................................... 3-17
3.3.4.1 Contractual Relationships and Implications for Data Collection ........................... 3-17
3.4     Health Information Portability and Accountability Act (HIPAA) ........................... 3-18
3.5     Provider Communication and Risk Adjustment ................................................ 3-18
3.5.1   Key Messages ...................................................................................... 3-18
3.5.2   Characteristics of Effective Communication ................................................... 3-19
3.5.3   Communication Methods .......................................................................... 3-20

**MODULE 4 – DATA SUBMISSION** ............................................................................. 4-1
4.1     Submission Process Requirements .............................................................. 4-1
4.2     Connectivity Options .............................................................................. 4-2
4.3     Relevant Diagnosis ................................................................................ 4-2
4.4     Submission Formats ............................................................................... 4-3
4.5     Submission File Layout Logic .................................................................... 4-3

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT



| | | |
|---|---|---|
| 4.6 | Diagnosis Cluster | 4-5 |
| 4.7 | Provider Type | 4-5 |
| 4.8 | From and Through Dates | 4-5 |
| 4.9 | Diagnosis Code | 4-6 |
| 4.10 | RAPS Format | 4-6 |
| 4.11 | Filtering Risk Adjustment Data | 4-11 |
| 4.12 | Modifying Risk Adjustment Data | 4-11 |
| 4.13 | Deleting Diagnosis Clusters | 4-12 |
| 4.14 | Reasons to Delete a Diagnosis Cluster | 4-12 |
| 4.15 | Steps for Deleting a Diagnosis Cluster | 4-12 |
| 4.16 | MA Organization Responsibilities Regarding Deletions | 4-13 |
| 4.17 | Direct Data Entry | 4-13 |
| | | |
| **MODULE 5 – EDITS AND REPORTS** | | **5-1** |
| 5.1 | Data Flow and Reporting | 5-1 |
| 5.2 | FERAS System | 5-5 |
| 5.2.1 | FERAS Error Code Logic | 5-5 |
| 5.2.2 | FERAS Error Code Ranges | 5-6 |
| 5.2.3 | FERAS Response Report | 5-9 |
| 5.3 | RAPS System | 5-11 |
| 5.3.1 | RAPS Edits Rules | 5-12 |
| 5.3.2 | RAPS Processing Reports | 5-16 |
| 5.3.2.1 | RAPS Return File | 5-16 |
| 5.3.2.2 | RAPS Transaction Error Report | 5-18 |
| 5.3.2.3 | RAPS Transaction Summary Report | 5-20 |
| 5.3.2.4 | Relationships Between Values in Report | 5-22 |
| 5.3.2.5 | Informational Error Messages | 5-23 |
| 5.3.2.5.1 | Duplicate Diagnosis Cluster Error and 5 Percent Benchmark | 5-24 |
| 5.3.2.6 | RAPS Duplicate Diagnosis Cluster Report | 5-24 |
| 5.4 | Resolving Errors | 5-27 |
| 5.4.1 | Resolution Steps | 5-27 |
| 5.4.2 | Common Errors | 5-29 |
| 5.4.2.1 | File Name Duplicates Another File Accepted Within Last 12 Months | 5-29 |
| 5.4.2.2 | Delete Error, Diagnosis Cluster Previously Deleted | 5-29 |
| 5.4.2.3 | Diagnosis Cluster Not Successfully Deleted. Another Diagnosis Cluster With the Same Attributes Was Already Deleted From the RAPS Database On This Date | 5-30 |
| 5.4.2.4 | Service From Date is Not Within MA Organization Enrollment | 5-31 |
| 5.4.2.5 | Beneficiary is Not Enrolled In Plan On or After Service From Date | 5-32 |
| 5.5 | RAPS Management Reports | 5-33 |
| 5.5.1 | RAPS Monthly Plan Activity Report | 5-33 |
| 5.5.2 | RAPS Cumulative Plan Activity Report | 5-41 |
| 5.5.3 | Correcting Rejected Data | 5-46 |
| 5.5.4 | RAPS Error Frequency Reports | 5-46 |
| 5.6 | Analysis of Reports | 5-50 |
| 5.6.1 | Collecting Sufficient Accurate Data | 5-50 |
| 5.6.2 | External Issues Affecting Data Collection | 5-51 |
| 5.6.3 | Internal Processes Supporting Data Submissions | 5-52 |
| 5.7 | Report Naming Conventions | 5-52 |

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4026
MARA1576301



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 5.8 | Plan Monitoring Process | 5-53 |

**MODULE 6 – DIAGNOSIS CODES & RISK ADJUSTMENT** ......................................................... 6-1

| | | |
|---|---|---|
| 6.1 | Introduction | 6-1 |
| 6.1.1 | Benefit to the MA Organization and Physician | 6-2 |
| 6.2 | Structure and Terminology of ICD-9-CM | 6-2 |
| 6.2.1 | Special Notes and Abbreviations | 6-3 |
| 6.2.2 | Supplemental Classifications and Tables | 6-3 |
| 6.3 | ICD-9-CM Updates | 6-4 |
| 6.3.1 | Diagnosis Codes Phase-in Schedule | 6-4 |
| 6.3.2 | International Classification of Diseases 10th Revision, Clinical Modification (ICD-10-CM) | 6-5 |
| 6.4 | Coding Guidelines Impacting the CMS-HCC Model | 6-5 |
| 6.4.1 | Co-Existing and Related Conditions | 6-5 |
| 6.4.1.1 | Combination Codes | 6-6 |
| 6.4.2 | Unconfirmed Diagnoses | 6-7 |
| 6.4.3 | Clinical Specificity in Documentation | 6-8 |
| 6.4.3.1 | History and Physical (H&P), and Lab and Pathology Reports – Guidance | 6-9 |
| 6.4.4 | Coding to the Highest Specificity-Fourth and Fifth Digits | 6-11 |
| 6.4.5 | V Codes | 6-11 |
| 6.4.6 | E Codes | 6-11 |
| 6.5 | Supporting Documentation Summary | 6-12 |
| 6.6 | Provider and Staff Training | 6-12 |

**MODULE 7 – RISK ADJUSTMENT DATA VALIDATION** ......................................................... 7-1

| | | |
|---|---|---|
| 7.1 | Risk Adjustment Data Validation (RADV) | 7-1 |
| 7.1.1 | RADV – Purpose, Method, and Objectives | 7-1 |
| 7.1.2 | RADV – New Approaches | 7-2 |
| 7.1.3 | RADV – 2007 Parameters | 7-2 |
| 7.1.4 | RADV – Core Concept | 7-3 |
| 7.1.5 | RADV – Guiding Principle | 7-3 |
| 7.1.6 | Risk Adjustment Discrepancy | 7-3 |
| 7.1.7 | Medical Record Review Overview | 7-3 |
| 7.1.8 | RADV – Process | 7-4 |
| 7.2 | RADV Stages | 7-6 |
| 7.2.1 | Sampling Selection and Medical Record Request STAGE 1 | 7-6 |
| 7.2.1.1 | Sampling | 7-6 |
| 7.2.1.2 | Medical Record Request | 7-6 |
| 7.2.2 | Medical Record Submission | 7-9 |
| 7.2.3 | Medical Record Receipt by the MRRC and Reimbursement | 7-12 |
| 7.2.4 | Medical Record Review STAGE 2 | 7-12 |
| 7.2.4.1 | Unacceptable Documentation | 7-15 |
| 7.2.4.2 | Physician Signatures, Physician Credentials, and Dates of Service | 7-15 |
| 7.2.4.3 | Additional Guidance | 7-17 |
| 7.2.4.4 | Risk Adjustment Discrepancies | 7-19 |
| 7.3 | MRR Findings and Contract-Level Payment Adjustments STAGE 3 | 7-21 |
| 7.4 | Documentation Disputes STAGE 4 | 7-21 |
| 7.5 | Post Documentation Dispute – Payment Adjustment  STAGE 5 | 7-22 |
| 7.6 | Appeals STAGE 6 | 7-22 |

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**TABLE OF CONTENTS**

7.7      Recommendations & Lessons Learned to Date ............................................................. 7-22
7.8      Technical Assistance ................................................................................................. 7-23
7.9      CMS Data Validation Team Contacts.......................................................................... 7-23
7.10     Next Steps.............................................................................................................. 7-23

**MODULE 8 – VERIFYING RISK SCORES**.............................................................................. 8-1
8.1      Calculating Risk Scores ........................................................................................... 8-1
8.2      Risk Score Verification Tools..................................................................................... 8-4
8.2.1    RAPS Return File/RAPS Transaction Error Report........................................................ 8-5
8.2.2    RAPS Management Reports........................................................................................ 8-7
8.2.3    CMS-HCC Risk Adjustment Model Software ................................................................ 8-9
8.2.4    Monthly Membership Reports (MMR) ....................................................................... 8-10
8.2.4.1  Monthly Membership Summary Reports.................................................................... 8-11
8.2.4.2  Monthly Membership Detail Reports ........................................................................ 8-11
8.2.4.2.1 Non-Drug Monthly Membership Report.................................................................... 8-11
8.2.4.2.2 Drug Monthly Membership Report........................................................................... 8-11
8.2.5    Risk Adjustment Model Output Reports (MOR) .......................................................... 8-20
8.2.5.1  Part C Risk Adjustment MOR ................................................................................... 8-20
8.2.5.2  RAS RxHCC MOR................................................................................................... 8-21

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4028
MARA1576303



# LIST OF TABLES

Table A    Training Tools......................................................................................................I-2
Table B    Organization Description ....................................................................................I-3
Table C    Risk Adjustment Process Points of Contact.......................................................I-4
Table 1A   Risk Adjustment Model Implementation for Payment ...................................... 1-7
Table 1B   Phase-Out Schedule for Budget Neutral Risk Adjustment Payments ................. 1-8
Table 1C   Risk Adjustment Implementation Schedule for MA Organizations and for MA-PDs and
           PDPs for Drug Benefit .................................................................................... 1-9
Table 1D   Payment Blend Schedule for Specialty Organizations ...................................... 1-9
Table 1E   Dialysis and Transplant Risk Score Normalization Phase-in Schedule ............... 1-10
Table 1F   Characteristics of the Risk Adjustment Models.............................................. 1-15
Table 1G   Which Risk Adjustment Factors Apply to Payment .......................................... 1-19
Table 1H   Community Versus Long-Term Institutionalized Populations ........................... 1-20
Table 1I   Plans Receiving Frailty Adjustment................................................................ 1-21
Table 1J   2008 and 2009 Frailty Factors ..................................................................... 1-23
Table 1K   Frailty Payment Implementation Schedule for PACE and Dual Demonstration
           Organizations................................................................................................ 1-24
Table 1L   Range of Frailty Score by Type of Organization ............................................. 1-24
Table 1M   New ESRD Dialysis and Transplant Payment Transition ................................... 1-27
Table 1N   Definition of the Low Income Multipliers for Part D Benefit............................. 1-31
Table 2A   Risk Adjustment Common Terms ..................................................................... 2-1
Table 2B   Submission Timetable..................................................................................... 2-6
Table 2C   Training and Support...................................................................................... 2-7
Table 3A   Structure of HIC Numbers ............................................................................. 3-2
Table 3B   Hospital Inpatient.......................................................................................... 3-4
Table 3C   Hospital Outpatient........................................................................................ 3-5
Table 3D   Determining Covered Hospital Entity Provider Numbers .................................. 3-6
Table 3E   Provider Number State Assignments ............................................................... 3-7
Table 3F   Hospital Inpatient Covered Entities ................................................................ 3-8
Table 3G   Hospital Outpatient Covered Entities .............................................................. 3-8
Table 3H   Acceptable Physician Specialties ................................................................. 3-11
Table 3I   Data Collection Formats ............................................................................... 3-12
Table 3J   Collection Format Features .......................................................................... 3-13
Table 3K   Contractual Payment Relationships .............................................................. 3-17
Table 4A   Connectivity Options...................................................................................... 4-2
Table 4B   Provider Types............................................................................................... 4-5
Table 4C   From and Through Dates ................................................................................ 4-6
Table 4D   RAPS File Layout............................................................................................ 4-7
Table 5A   Accessing and Printing Reports...................................................................... 5-3
Table 5B   Reports Overview........................................................................................... 5-4
Table 5C   FERAS Error Code Logic ................................................................................. 5-6
Table 5D   Error Code Ranges ........................................................................................ 5-6
Table 5E   FERAS Error Codes ........................................................................................ 5-7
Table 5F   Explanation of Error and Consequences........................................................ 5-14
Table 5G   RAPS Error Codes ....................................................................................... 5-14
Table 5H   Informational Edits ...................................................................................... 5-15
Table 5I   Duplicate Diagnosis Cluster Edit.................................................................. 5-16

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT



Table 5J    RAPS Record Layout ................................................................................................ 5-17
Table 5K    Informational Message Codes ................................................................................. 5-23
Table 5L    502 Benchmark Comparison Examples .................................................................. 5-24
Table 5M    Tips for Ensuring Compliance With the 5 Percent Benchmark for Duplicate
            Diagnosis Cluster Error Guidance ........................................................................... 5-26
Table 5N    Report Naming Conventions .................................................................................. 5-53
Table 6A    Benefits to MA Organizations and Physicians.......................................................... 6-2
Table 6B    Risk Adjustment Phase-In Schedule for New Lists of Diagnosis Codes .................... 6-5
Table 6C    Documentation Considerations ............................................................................. 6-12
Table 6D    Documentation and Coding Resources .................................................................. 6-13
Table 7A    Enrollee List.......................................................................................................... 7-8
Table 7B    Types of Acceptable Physician Signatures and Credentials.................................... 7-16
Table 7C    Types of Unacceptable Physician Signatures and Credentials................................ 7-17
Table 7D    CMS Staff ............................................................................................................ 7-23
Table 8A    Risk Score Calculation Steps ................................................................................. 8-3
Table 8B    Risk Score Verification Tools.................................................................................. 8-5
Table 8C    Software-Provided Files........................................................................................ 8-10
Table 8D    User Supplied Files ............................................................................................. 8-10
Table 8E    Summary of the MMR Detail Record Layout Field Ranges....................................... 8-11
Table 8F    Monthly Membership Report (MMR) (Drug and Non-Drug Fields)............................ 8-12
Table 8G    Part C Risk Adjustment MOR Field Summary ......................................................... 8-21
Table 8H    RxHCC MOR Field Summary ................................................................................. 8-21
Table 8I    Part C Risk Adjustment Model Output Data File...................................................... 8-22
Table 8J    RAS RxHCC MOR Record Format........................................................................... 8-32

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4030
MARA1576305



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**TABLE OF CONTENTS**

## LIST OF FIGURES

Figure 1A   Calculation of Risk Adjusted Payment for Plans ............................................. 1-13
Figure 1B   Frailty Adjustment Calculation ...................................................................... 1-25
Figure 1C   Calculation of Part D Direct Subsidy ............................................................. 1-32
Figure 2A   Risk Adjustment Dataflow ............................................................................ 2-4
Figure 3A   WPC-EDE.COM ............................................................................................ 3-9
Figure 3B   American Hospital Directory .......................................................................... 3-10
Figure 3C   Sample Fee-for-Service Superbill .................................................................. 3-15
Figure 3D   Sample Risk Adjustment Superbill ................................................................ 3-16
Figure 3E   Communication Methods ............................................................................... 3-21
Figure 4A   RAPS File Structure Summary ....................................................................... 4-4
Figure 4B   DDE 1 ........................................................................................................ 4-14
Figure 4C   DDE 2 ........................................................................................................ 4-14
Figure 4D   DDE 3 ........................................................................................................ 4-15
Figure 4E   DDE 4 ........................................................................................................ 4-15
Figure 4F   DDE 5 ........................................................................................................ 4-16
Figure 4G   DDE 6 ........................................................................................................ 4-16
Figure 5A   Data Flow ................................................................................................... 5-2
Figure 5B   Rejected FERAS Response Report ................................................................. 5-10
Figure 5C   FERAS Response Report ............................................................................... 5-11
Figure 5D   Flow of Data for Eligibility Checks ................................................................ 5-13
Figure 5E   RAPS Return File ......................................................................................... 5-18
Figure 5F   RAPS Transaction Error Report ..................................................................... 5-19
Figure 5G   RAPS Transaction Error Report ..................................................................... 5-20
Figure 5H   RAPS Transaction Summary Report ............................................................... 5-21
Figure 5I   Transaction Summary Report ......................................................................... 5-23
Figure 5J   Duplicate Diagnosis Cluster Report ............................................................... 5-25
Figure 5K   Resolution Steps ......................................................................................... 5-27
Figure 5L   Analysis of Management Reports ................................................................... 5-33
Figure 5M   RAPS Monthly Plan Activity Report Layout ..................................................... 5-34
Figure 5N   RAPS Monthly Plan Activity Report ............................................................... 5-37
Figure 5O   RAPS Cumulative Plan Activity Report Layout ................................................ 5-41
Figure 5P   RAPS Cumulative Plan Activity Report ........................................................... 5-43
Figure 5Q   RAPS Monthly Error Frequency Report Layout ................................................ 5-47
Figure 5R   RAPS Monthly Error Frequency Report ........................................................... 5-49
Figure 5S   Analysis of Cumulative Plan Activity Report .................................................... 5-51
Figure 7A   Data Validation Process ................................................................................ 7-5
Figure 8A   Risk Score Calculation Process ...................................................................... 8-2
Figure 8B   RAPS Return File ......................................................................................... 8-6
Figure 8C   Internal Diagnosis Cluster Database .............................................................. 8-6
Figure 8D   RAPS Cumulative Plan Activity Report ........................................................... 8-8
Figure 8E   MMR Report Format – Non-Drug .................................................................... 8-18
Figure 8F   MMR Report Format – Drug ........................................................................... 8-19
Figure 8G   Part C MOR Report Format ........................................................................... 8-48
Figure 8H   RAS RxHCC MOR Report Format .................................................................... 8-49

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4031
MARA1576306



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

disabled and smaller perhaps than some people expect because the final measure is plan liability rather than spending.

Figure 1C illustrates the calculation of the Part D Direct Subsidy.

**Figure 1C – Calculation of Part D Direct Subsidy**



## 1.4    Parts C and D Final Submission of Risk Adjustment Data (Reconciliation)

Reconciliation is used to complete the implementation of payments, with CMS calculating final risk adjustment factors and beneficiary status based on complete data. CMS continues to allow a period (approximately 13 months after the data collection year) for submitting final RAPS data for the appropriate data collection period. Data not received or submitted by the initial submission deadline for a data collection period can be submitted by the final submission deadline (reconciliation). In addition to incorporating new RAPS and fee-for-service diagnoses, reconciliation takes into account necessary adjustments to institutional status and demographic data for enrollees.

**Note:** CMS reconciles risk-adjusted payments for a calendar year only one time. When submitting risk adjustment data for reconciliation, plans may submit as well as correct data that was previously submitted.

### 1.4.1   Parts C and D Risk Adjustment Schedule & Elimination of the Payment Lag

Risk adjusted payments were originally implemented with a 6-month payment lag from the end of the collection period to the start of revised payments, based on the data collected.

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4032
MARA1576342



2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide

**RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW**

# MODULE 2 – RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW

## Purpose

The success of Medicare Advantage (MA) risk adjustment is dependent upon organizations understanding the process of collecting and submitting accurate risk adjustment data. The purpose of this module is to provide participants with important terms, key resources, and schedule information that will provide the foundation for this training.

## Learning Objectives

At the completion of this module, participants will be able to:

- Define common risk adjustment terminology.
- Demonstrate knowledge in interpreting key components of the risk adjustment process.
- Interpret the risk adjustment schedule.
- Identify the Centers for Medicare & Medicaid Services (CMS) outreach efforts available to organizations.



| ICON KEY | |
|---|---|
| Example | ⊠ |
| Reminder | ✎ |
| Resource | 📖 |

## 2.1    Common Risk Adjustment Terms (Slide 7)

Table 2A provides descriptions of common risk adjustment terminology.

**TABLE 2A – RISK ADJUSTMENT COMMON TERMS**

| TERM | DESCRIPTION |
|---|---|
| **FERAS** | Risk adjustment submitters send data to Palmetto through the **Front-End Risk Adjustment System**. |
| **RAPS** | Risk adjustment data are processed by the **Risk Adjustment Processing System.** |
| **RAS** | The **Risk Adjustment System** calculates the risk score. |
| **MARx** | The **Medicare Advantage Prescription Drug System** calculates the risk payment. |
| **Common UI** | The **Common UI** maintains Medicare beneficiary eligibility data. |
| **HPMS** | The **Health Plan Management System** is a CMS MA information system that contains health plan-level data. |
| **Required Diagnosis** | ICD-9-CM diagnosis codes required to be submitted for the CMS-Hierarchical Condition Category (HCC) model and for future model development. |

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4033
MARA1576344



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW**

## 2.2    Risk Adjustment Process Overview

Hospital inpatient, hospital outpatient, and physician risk adjustment data must be submitted at least quarterly. Risk adjustment data are processed through RAPS.

### 2.2.1   Risk Adjustment Data Requirements (Slide 8)

- The data required under the risk adjustment process include:

  - Health Insurance Claim (HIC) number.
  - Diagnosis code.
  - Service from date.
  - Service through date.
  - Provider type (hospital inpatient, hospital outpatient, physician).

- MA organizations must submit data at least quarterly to CMS.

- Each quarterly submission should represent approximately one-fourth of the data that the MA organization will submit during a data collection year. MA organizations will be monitored to ensure compliance.

- All beneficiary ICD-9-CM diagnosis codes required for the CMS-HCC risk adjustment model must be reported at least once per enrollee in the data collection period.

### 2.2.2   Risk Adjustment Data Collection (Slide 9)

- MA organizations may choose to collect data from providers in a variety of formats:

  - Standard fee-for-service claim or encounter formats
    - Uniform Billing Form (UB-04)
    - HCFA 1500
    - National Standard Format (NSF) v3.01
    - American National Standards Institute (ANSI) X12 837 v30.51 or v40.10. Health Insurance Portability and Accountability Act (HIPAA) mandated transactions must use v40.10.

  - Superbill

  - RAPS format
    - HIC number
    - Provider type
    - Diagnosis code
    - Service from date
    - Service through date

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4034
MARA1576345



## 2.2.4  Risk Adjustment Dataflow (Slide 11)

- Hospital/physician submits data to MA organization via:
  - Full or abbreviated UB-04, HCFA 1500, NSF v3.01, ANSI x837 v30.51 or v40.10, Superbill or RAPS format.

- The MA organization submits these data at least quarterly to Palmetto GBA.

- The MA organization submits the data via Direct Data Entry or in the RAPS format.

- The data are sent to FERAS for processing where the file-level data, batch-level data, and first and last detail records are checked.

- If any data are rejected, then data are reported on the FERAS Response Report.

- After passing the FERAS checks, the file is submitted to RAPS where detail editing is performed.

- The RAPS Return File is returned daily and shows all records approved and where errors occurred.

- The RAPS Transaction Error Report displays records on which errors occurred.

- The RAPS Transaction Summary Report is sent to the MA organization daily and identifies data that have been finalized in RAPS database.

- The Duplicate Diagnosis Cluster Report identifies diagnosis clusters submitted with information that duplicates a stored cluster.

- The RAPS Monthly Plan Activity Report and Cumulative Plan Activity Report provides a summary of all diagnoses stored for a given time period.

- Distributed monthly and quarterly, the Error Frequency Report provides an overview of all errors associated with files submitted in test and production.

- RAPS database stores all finalized diagnosis clusters.

- RAS calculates the Risk Adjuster Factors by executing the CMS-HCC model.

- MARx is used in the calculation of payments and determination of plan payments. MARx replaced Medicare Managed Care System (MMCS) on November 15, 2005.

**Figure 2A – Risk Adjustment Dataflow**



CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4035
MARA1576347



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**DATA COLLECTION**

### 3.2.4  Alternative Data Sources

Alternative data sources (ADS) include diagnostic data from sources other than hospital inpatient, hospital outpatient, and physician services. MA organizations may use ADS as a *check* to ensure that all required diagnoses have been submitted to CMS for risk adjustment purposes, such as pharmacy records and information provided to national or state cancer registries. The MA organization may not, however, use ADS as substitutes for documenting diagnoses from a hospital/physician. As in all diagnoses submitted, there must be medical record documentation to support the diagnosis as having been documented as a result of a hospital inpatient stay, a hospital outpatient visit, or a physician face-to-face visit during the data collection period.

For example, a prescription for an ACE inhibitor, alone, is not considered sufficient for the sole data source of "clinical evidence" of congestive heart failure (CHF); instead, the medical record needs to document an appropriate clinician's diagnosis of CHF during the data collection period (e.g., where an "appropriate clinician" is a physician/nurse practitioner/physician assistant). A laboratory test showing one reading of high blood sugar is not considered sufficient "clinical evidence" of diabetes–the medical record needs to document a clinician's diagnosis of diabetes during the data collection period.

### 3.2.5  Excluded Providers

Medicare will not pay for items or services rendered to beneficiaries and recipients by an excluded provider or by entities owned or managed by an excluded provider. Providers are excluded for the following reasons: a program related crime, patient abuse or neglect, health care fraud in any health care program, and convictions relating to controlled substances.

&#128214;     The HHS monthly exclusion notification can be found at http://oig.hhs.gov/fraud/exclusions.html.

### 3.3     Data Collection Formats and Considerations

There are several formats that MA organizations can accept when collecting data from medical providers. Table 3I lists the formats by provider type.

### 3.3.1  Data Collection Formats (Slide 16)

For facility services, the standard billing format is UB-04 (Uniform Billing Form–2004 version). The HCFA 1500 form is the standard format for physician services.

**TABLE 3I – DATA COLLECTION FORMATS**

| HOSPITAL INPATIENT/HOSPITAL OUTPATIENT | <ul><li>UB-04</li><li>ANSI X12 837 4010</li><li>RAPS Format</li></ul> |
|---|---|
| PHYSICIAN | <ul><li>HCFA 1500</li><li>NSF 3.01</li><li>ANSI X12 837 4010</li><li>RAPS Format</li><li>Superbill</li></ul> |

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4036
MARA1576362



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**DATA SUBMISSION**

## 4.13   Deleting Diagnosis Clusters (Slide 16)

Each diagnosis cluster ("Diagnosis Code," "From Date," "Through Date," and "Provider Type") is stored separately as a unique cluster associated with a beneficiary's HIC number. If a diagnosis was submitted in error and needs to be corrected, the original diagnosis cluster must be resubmitted with a delete indicator in the appropriate field. **Delete transactions may only be submitted using the RAPS format or the DDE function.** When a delete record is received, CMS maintains the original diagnosis cluster on file and adds a delete indicator to it and the date of the deletion.

## 4.14   Reasons to Delete a Diagnosis Cluster (Slide 17)

There are three reasons MA organizations may delete a diagnosis cluster:

- Diagnosis cluster submitted erroneously (e.g., data from an interim bill was submitted for hospital inpatient).
- Incorrect HIC number used for submission of a beneficiary's diagnostic information.
- An error in a diagnosis cluster field (i.e., "Provider Type," "Dates of Service," "Diagnosis Code").

MA organizations submit deletions within a file, batch, or record containing previously submitted risk adjustment data.

## 4.15   Steps for Deleting a Diagnosis Cluster (Slides 18-20)

   Before deleting an error, verify that the diagnosis cluster appears on the RAPS Return File. Only diagnosis clusters accepted by RAPS and stored in the RAPS database may be deleted.

There are two methods for deleting diagnosis clusters:

**Method 1 for Deleting Clusters**
1. Submit RAPS format using normal submission process with appropriate HIC number included.
2. Enter information in the diagnosis cluster fields (9.0, 9.1, 9.2, 9.4, 9.5) exactly as it appeared in the original submission.
3. In field 9.3 enter a "D" for delete.
4. Enter the appropriate information in all other records to ensure the submission file is complete.
5. Transmit the file to FERAS. (See www.csscoperations.com for details.)

**Method 2 for Deleting Clusters**
1. Create a file using the DDE screens available through FERAS at Palmetto (detailed information about the DDE process is located in Section 4.20).
2. Enter information exactly as it appeared in the original submission.
3. In the DDE "CCC" record screen, hit the down arrow key and select "D."
4. Proceed with entering all appropriate information.
5. Upload the file created in DDE to FERAS at Palmetto.

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4037
MARA1576383



2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide

**DATA SUBMISSION**

## 4.16   MA Organization Responsibilities Regarding Deletions (Slide 21)

- MA organizations must submit delete records when an erroneous diagnosis cluster has been accepted by RAPS and stored in the RAPS database.

- If a diagnosis cluster is deleted for the purpose of correcting data, the MA organization is responsible for submitting the correct diagnosis cluster. Conversely, if the MA organization submits corrected data, the MA organization must submit the appropriate deletion record. That is, if the correct diagnosis cluster is submitted, the erroneous diagnosis cluster cannot be ignored.

- If a correction applies to the same beneficiary as the deletion, the correction may be included in the same "CCC" record as the deletion. (Do not exceed 10 diagnosis clusters per "CCC" record.)

- If only one of several clusters within the CCC record requires modification, do not resubmit all other associated clusters.  If clusters are resubmitted exactly the same without the delete indicator, the plans will generate a duplicate cluster error.

- If the corrected diagnosis cluster belongs to a different beneficiary than the deleted diagnosis cluster, the correct diagnosis cluster may be submitted in the same file as the deletion.

   MA organizations should not delete a diagnosis code or record repeatedly on the same day and on the same record. MA organizations should implement a process to ensure that only one instance of a specific diagnosis cluster (either add or delete) is submitted on a given day.

## 4.17   Direct Data Entry (Slide 22)

MA organizations have the option of manually entering diagnostic information via the DDE application offered by Palmetto. DDE instructions are illustrated in the screen shots below. DDE is available in FERAS at Palmetto via the Medicare Data Communications Network (MDCN).

- DDE entries allow for deletion of records for corrections even if another submission format was used.
- The DDE screens, as shown in Figures 4B through 4G, automatically prevent the placement of incorrect data characters (e.g., alpha characters will not be accepted in the "From" or "Through Date" fields).
- After the user has entered all relevant data, the user will click on the "Create File" button in FERAS. This will create a file on the user's local PC.
- After the file is created on the local PC, the user must upload the file to FERAS in order to complete the process.
- Files created in DDE and uploaded to FERAS will receive a FERAS Response Report, which may be downloaded from the MA organization's electronic mailbox.

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT



2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide

**DIAGNOSIS CODES & RISK ADJUSTMENT**

The source medical record documentation that supports each coded diagnosis must be obtainable and demonstrate adherence to official coding guidelines.

 Required diagnoses are defined as those diagnoses collected from one of the three provider types that are used in the Risk Adjustment models (i.e., CMS-HCC, ESRD, and RxHCC models), and those diagnoses required for payment simulation.

This module emphasizes physician documentation and reporting of diagnosis codes. Historically, physician reimbursement in fee-for-service is primarily based on procedures or services rather than diagnoses, and physicians are very familiar with documentation guidelines for procedures and services. Physicians generally are not as familiar with diagnosis codes and their associated documentation guidelines as they are with procedure coding rules. The Risk Adjustment models depend upon accurate diagnosis coding, which means that physicians must fully understand and comply with documentation and coding guidelines for reporting diagnoses.

### 6.1.1 Benefit to the MA Organization and Physician

Benefits to the MA organization and physician are illustrated in Table 6A.

**TABLE 6A – BENEFITS TO MA ORGANIZATIONS AND PHYSICIANS**

| A basic understanding of ICD-9-CM process and guidelines assists MA organizations in: |
|---|
| • Interpreting and designing management reports. |
| • Determining possible causes of ICD-9-CM errors. |
| • Communicating diagnosis-related collection issues to the provider staff. |
| Developing and maintaining information systems that meet the clinical data collection needs of the organization. |
| • Understanding clinical issues important to beneficiaries. |
| • Planning for future MA organization services. |
| **Medical record documentation and coding impact several issues important to the physician and MA organization including:** |
| • Accurate reimbursement.<br> – ICD-9-CM codes are the basis of the Risk Adjustment models.<br> – Accurate diagnosis codes are a result of clear, consistent, and complete documentation.<br> – CMS may verify the accuracy of the diagnoses submitted relative to the medical record documentation. |
| • Communication among all members of the health care team. |
| • Evaluation of the care provided. |
| • Research and education. |
| • Practice patterns. |

## 6.2 Structure and Terminology of ICD-9-CM

ICD-9-CM diagnosis codes are 3- to 5-digit codes used to describe the clinical reason for a patient's treatment. They do not describe the service performed, just the patient's medical condition. For any

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4039
MARA1576442



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

---

**DIAGNOSIS CODES & RISK ADJUSTMENT**

classification system to be reliable, the application of the codes must be consistent across users. Therefore, CMS, the American Hospital Association (AHA), the American Health Information Management Association (AHIMA), and the National Center for Health Statistics (NCHS) together have developed official coding guidelines. These guidelines are available on: http://www.cdc.gov/nchs/datawh/ftpserv/ftpicd9/icdguide07.pdf. The diagnosis portion of ICD-9-CM consists of two volumes: the Disease Tabular and the Disease Index.

- **The Disease Tabular (Numeric)** is also known as Volume I of ICD-9-CM. It is a numeric listing of codes organized primarily by body system. The Disease Tabular provides much more detail than the Alphabetic Index on conditions included and excluded in the code selected. Another code in the same category may represent the diagnostic description better than the one indicated in the Disease Index.

- **The Disease Index (Alphabetic)** is also known as Volume II of ICD-9-CM. It is an index of all diseases and injuries categorized in ICD-9-CM. When a code is listed after the description, it means the reader should look up that code in the Disease Tabular section to determine if that is the most specific code to describe the diagnosis. The index is organized by main terms and subterms that further describes or specifies the main term. In general, the main term is the condition, disease, symptom, or eponym (i.e., disease named after a person), not the organ or body system involved.

### 6.2.1  Special Notes and Abbreviations

Throughout the ICD-9-CM publication, there are notes and cross references to assist the coder in arriving at the most accurate code according to official coding guidelines. Examples include:

*Excludes* notes: Informs the coder which diagnosis codes are not included in the code selected.

*Use Additional Code* notes:  Informs the coder that more than one code is needed to fully describe the condition and gives examples of common associated conditions.

*Not otherwise specified (NOS)*: Basically means "unspecified." The documentation does not provide additional information to assign a more specific code in the particular category. In many (but not all) code categories, the fourth digit "9" signifies an unspecified code.

*Not elsewhere classified (NEC)*: Also is present in ICD-9-CM. It is used when the medical record documents a condition to a level of specificity not identified by a specific ICD-9-CM code. In some cases the fifth digit "8" represents an NEC code.

### 6.2.2  Supplemental Classifications and Tables

Included in Volumes I and II are supplemental classifications and special tables that provide additional guidance in determining the most accurate code.

- **V codes** are a section of ICD-9-CM diagnosis codes that represent factors that influence health status or describe contact with health services. They are used to describe those circumstances or reasons for encounter other than for disease or injury. Selected V codes are included in the Risk Adjustment models and are described later in this module.

---

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4040
MARA1576443



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DIAGNOSIS CODES & RISK ADJUSTMENT**

## 6.5    Supporting Documentation Summary

Accurate coding begins with complete documentation. Characteristics of effective documentation include quality documentation as a team effort that may require some intervention by the MA organization. Table 6C lists documentation considerations.

### TABLE 6C – DOCUMENTATION CONSIDERATIONS

| Documentation Guidelines |
| --- |
| • Reported diagnoses must be supported with medical record documentation. <br> • Medical records and codes are subject to CMS validation. <br> • Characteristics of acceptable documentation include: <br>    – Clear. <br>    – Concise. <br>    – Consistent. <br>    – Complete. <br>    – Legible. |
| **Physician Documentation and Communication Tips** |
| • Document and report co-existing diagnoses. <br> • Communicate issues regarding inadequate documentation. <br> • Adhere to proper methods for appending (late entries) or correcting inaccurate data entries. <br>    – Lab/Radiology results. <br>    – Strike through, initial, and date. Do not obliterate. <br> • Use only standard abbreviations. <br> • Identify patient and date on each page of the record. |
| **SOAP Notes** |
| • SOAP note format assists both the physician and record reviewer/coder in identifying key documentation elements. SOAP stands for: <br>    – **S**ubjective:  How the patients describe their problem or illness. <br>    – **O**bjective:  Data obtained from examinations, lab results, vital signs, etc. <br>    – **A**ssessment:  Listing of the patient's current condition and status of all chronic conditions. How the objective data relate to the patient's acute problem. <br>    – **P**lan:  Next steps in diagnosing problem further, prescriptions, consultation referrals, patient education, and recommended time to return for followup. |

## 6.6    Provider and Staff Training

Remaining current on medical record documentation and coding guidelines is important to ensure accurate risk adjustment payment. Table 6D provides examples of resources available for medical record documentation and coding guidelines.

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4041
MARA1576452



# MODULE 7 — RISK ADJUSTMENT DATA VALIDATION (MEDICAL RECORD REVIEW)

## Presentation Purpose (Slide 2)

To provide participants with an understanding of:
- The risk adjustment data validation (RADV) process AND
- CMS' approaches for:
  - Identifying risk adjustment discrepancies,
  - Estimating payment error, and
  - Conducting contract-level payment adjustments

## Presentation Objectives (Slide 3)

Define
- Purpose and objectives of risk adjustment data validation (RADV)
- New RADV policies and parameters
- RADV stages and requirements
- Documentation Dispute
- Payment adjustment implementation approach
- Appeals



| ICON KEY | |
|---|---|
| Example | ☒ |
| Reminder | ✎ |
| Resource | 📖 |

## 7.1    Risk Adjustment Data Validation (RADV)

### 7.1.1  RADV — Purpose, Method, and Objectives (Slide 4)

Risk adjustment data validation (RADV) occurs after the final risk adjustment data submission deadline for the MA contract payment year. The purpose of RADV is to ensure risk adjusted payment integrity and accuracy. CMS reviews medical records from hospital (inpatient and outpatient) and physician providers to validate enrollee CMS-HCCs that were assigned based on risk adjustment diagnoses submitted by MA organizations for payment. As a basic risk adjustment rule, all risk adjustment diagnosis codes submitted by MA organizations must be supported by medical record documentation.

The primary objectives of RADV are to:
- Verify enrollee CMS-HCCs used for payment
- Identify risk adjustment discrepancies
- Calculate enrollee-level payment error
- Estimate national and contract-level payment errors
- Implement contract-level payment adjustments

---

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4042
MARA1576454



2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide

**VERIFYING RISK SCORES**

## MODULE 8– VERIFYING RISK SCORES

### Purpose (Slide 2)

The risk score calculation is based on data captured from a variety of systems. To ensure that accurate payments are made, Medicare Advantage (MA) organizations may verify the components of the risk score calculation throughout the year. This module is designed to explain the systems involved in the risk score calculations and introduce MA organizations to a variety of verification tools available to them.

### Learning Objectives (Slide 3)

At the completion of this module, participants will:

- Understand the systems and processes used to calculate the risk scores.
- Determine how the organization can use risk adjustment processing and management reports to ensure the accuracy of payment.
- Identify the components and uses of the Non-Drug and Drug Monthly Membership Reports (MMRs).
- Explain the Part C Risk Adjustment and New RXHCC Model Output Report (MOR).



### 8.1    Calculating Risk Scores (Slides 5-7)

The risk score used in calculating payments under the Centers for Medicare & Medicaid Services (CMS)-HCC model includes demographics as part of the risk model as well as different disease groups or HCCs. The risk score calculation gathers the critical data from a variety of systems, including risk adjustment data from the Risk Adjustment Processing System (RAPS) database, Fee-For-Service (FFS) information from the National Medicare Utilization Database (NMUD), and demographic data captured from the Common Tables.

The risk score calculation considers the following:

- Demographics
- Disease groups
- Disease interactions
- Disease hierarchies
- Disabled indicators
- Residence in a long-term care institution
- End-Stage Renal Disease (ESRD) Status

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4043
MARA1576479



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

Figure 8A illustrates the flow of data used to calculate the risk score.

**Figure 8A - Risk Score Calculation Process**



CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4044
MARA1576480



Table 8A describes the eight steps in the risk score calculation.

**TABLE 8A - RISK SCORE CALCULATION STEPS**

| STEP | DESCRIPTION |
|---|---|
| **1 Define Cohort** | Each year CMS defines a cohort of beneficiaries for whom risk scores will be calculated and used for making payments beginning the following January. Typically, CMS calculates scores for all Medicare beneficiaries. |
| **2 Obtain Beneficiary Specific Information** | For this cohort, CMS obtains beneficiary-specific information from Medicare's enrollment databases. Beneficiary information includes the months of enrollment in Part A and Part B, age, sex, original reason for Medicare entitlement, etc. for each beneficiary in the cohort. Medicaid information is obtained from the third party payor file. In addition, plan-submitted Medicaid status information is included and beneficiaries with an ESRD flag are identified. CMS ensures that all Health Insurance Claim (HIC) numbers associated with each individual in the file have been identified. CMS uses all of this information to create a beneficiary demographic input file. |
| **3 Extract Long-term Institutional Information from MDS** | Next, for this cohort, CMS extracts assessments from the Minimum Data Set (MDS). CMS identifies the beneficiaries who have resided in a long-term institution for 90 days or more and classifies these individuals as long-term institutional beneficiaries. CMS passes beneficiary long-term institutional file to the RAS system. |
| **4 Obtain Diagnosis Information** | Next, CMS obtains all diagnostic information from Medicare data files for the cohort. These data include all diagnoses for the data collection period from the three types of data sources: physician services, hospital outpatient, and hospital inpatient. These diagnoses come from the RAPS database as well as Medicare fee-for-service files. From these data, CMS creates a beneficiary diagnosis input file. |
| **5 Run the Model** | The beneficiary demographic and beneficiary diagnosis input files are used to run the CMS-HCC and ESRD models and the Prescription Drug HCC (RxHCC) model. The ESRD model is run only on those beneficiaries with ESRD flags from the Common Tables. Each model determines a new enrollee factor for individuals who had fewer than 12 months of Part B enrollment during the data collection period. The model filters out diagnoses that do not correlate, such as ovarian cancer in a male patient. For individuals with 12 months of Part B enrollment, the software produces two risk scores: one based on the community model and one on the institutional model. In addition, for individuals with ESRD, the ESRD model will create additional risk scores appropriate to that model. The software also shows which HCC group (as well as which demographics, interactions, etc.) is associated with the risk scores. Only the most severe disease classification within a hierarchy is shown in the output. Based on this information, an output file is created and sent to the payment system. |

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4045
MARA1576481



**TABLE 8A – RISK SCORE CALCULATION STEPS (CONTINUED)**

| STEP | DESCRIPTION |
|------|-------------|
| **6**<br>**Send Model Output to MARx** | The output from the CMS-HCC model is provided to MARx for use in making payments to plans. In addition, the model output serves as the basis for the MMR reports provided to plans and the risk adjustment MOR. |
| **7**<br>**Apply Additional Payment Factors** | Plan-level instructions are provided to MARx to determine which factors should be used in actually making payments. |
| **8**<br>**Calculate Payment** | MARx identifies individuals enrolled in an organization for a particular month. Then it accesses the risk factor file to retrieve the appropriate risk factor for each individual. MARx uses the individual's state and county code to determine the correct county capitation rate and then multiplies the risk factor by that rate. After calculating the correct demographic payment for the same individual, MARx then calculates the correct payment by blending the appropriate proportion of risk and demographic payments. Then the demographic and risk adjusted amounts are totaled. |

**Note**: For each risk adjustment model run, the process is repeated, updating the data used for the model to include new diagnoses received for the data collection period, as well as changes in any of the demographic factors. During final reconciliation, long-term institutional status is determined for each month during the payment year, and ESRD status is reconciled to obtain the most precise month-by-month status.

## 8.2    Risk Score Verification Tools (Slide 8)

CMS offers a variety of tools that MA organizations can use at various stages in the risk adjustment process to ensure that the risk score reported by CMS is in close alignment with the score that the organization expects to receive. This section of the training module describes each of the tools, identifies the method of access and timeframe, and provides information on how an organization can use the tool to increase the accuracy of payment projections.

The verification tools include:

- RAPS Return File/RAPS Transaction Error Report
- RAPS Monthly and Cumulative Plan Activity Reports
- SAS CMS-HCC Model Program
- MMR
- Part C MOR (Non-Drug) and the new RAS RxHCC MOR

Information on the tools are illustrated in Table 8B

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4046
MARA1576482

**EXHIBIT P-4**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA     )   No. 16-08697 FMO

ex rel. BENJAMIN POEHLING,   )

                             )

            Plaintiffs,      )

                             )

v.                           )

                             )

UNITEDHEALTH GROUP, INC.,    )

et al.,                      )

                             )

            Defendants.      )

_____)



*** CONFIDENTIAL ***


VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

TAMMY DICKEY

(Taken virtually)

9:02 a.m. Eastern

Tuesday, May 24, 2022



REPORTED BY:  Christine A. Taylor, RPR


Magna Legal Services

866-624-6221

www.MagnaLS.com

4048

Page 32

1     recall exactly.  Somewhere in there, 2010, '11 to

2     I think the end of 2012 --

3            Q.   Okay.

4            A.   -- early 2013.

5            Q.   Okay.  And when did you -- sorry, I

6     think I missed this.

7                 When did you first starting working at

8     AIM?

9            A.   2008.

10           Q.   Okay.  And prior to working as a coder

11    for a contractor for AIM, did you have experience

12    as a medical record coder?

13           A.   I did.

14           Q.   Okay.  And how long had you worked as

15    a medical record coder prior to becoming a

16    contractor for AIM?

17           A.   Probably 2001 or '02 until 2007.  I

18    worked in a physician's office.

19           Q.   Okay.  And you mentioned the word "QA"

20    when you were describing some of your roles and

21    responsibilities.  Does that stand for quality

22    assurance?

23           A.   Yes.

24           Q.   Okay.  And what is QA for -- what's

25    the QA process for coding at Optum?

4049

Page 49

1    also referring to Ingenix which was sort of the

2    forerunner for Optum?

3            A.    Yes.

4            Q.    Okay.  And if you need to clarify at

5    any point that something applies to Ingenix but

6    does not apply to Optum, please let me know.  I

7    want to make sure the record is clear on that.

8            A.    Okay.

9            Q.    Okay.  Ms. Dickey, are you -- are you

10   familiar with the program called Medicare

11   Advantage?

12           A.    I am.

13           Q.    It's sometimes called Part C; right?

14           A.    Yes.

15           Q.    Are you familiar with Part D of

16   Medicare?

17           A.    Yes.

18           Q.    And Part D includes drug benefits for

19   beneficiaries enrolled in the Part D program; is

20   that correct?

21           A.    To my knowledge, yes.

22           Q.    So as a certified coder, you are

23   certified to assess whether an ICD-9 or ICD-10

24   diagnosis code is documented in a medical record;

25   right?

Page 50

1              MS. MADDOUX:  Objection.  Form.

2              THE WITNESS:  No, that's not correct.

3    BY MS. GLOVER:

4         Q.   Oh, can you tell me what is correct

5    about what your certification means?

6         A.   Well, the ICD-9 or 10, it is not

7    documented in the medical record.  The diagnosis

8    is documented in the medical record.

9         Q.   That's a valid point.  So is it -- is

10   it helpful instead of saying ICD-9 or ICD-10,

11   which I understand to be the code, is it better --

12   would it be more understandable to you to say that

13   the diagnosis code is documented in the medical

14   record?

15        A.   It's not -- that's not correct, the

16   diagnosis is documented in the medical record.  A

17   coder then translates that diagnosis into the

18   ICD-9 or ICD-10 code.

19        Q.   Understood.  So is it fair to say then

20   that as a certified coder you're certified to

21   assess whether a diagnosis is documented in a

22   medical record and translate that diagnosis to an

23   ICD-9 or ICD-10 code as applicable?

24        A.   That's correct.

25             MS. GLOVER:  Okay.  And, actually,

Page 145

1    supported by medical record documentation.  And we

2    talked about some guidance, whether it was from

3    CMS or the coding clinic or the ICD guidelines.

4    Is this -- this statement here that reported

5    diagnoses must be supported with medical record

6    documentation some of the guidance that you were

7    thinking about earlier?

8                MS. MADDOUX:  Objection.  Form.

9                THE WITNESS:  Not specifically this,

10          but more just the -- I would say like

11          golden rule of coding, that if it's not

12          documented, then you don't code it.

13   BY MS. GLOVER:

14        Q.   Have you ever heard the phrase used at

15   Optum if it's not in the medical record, it didn't

16   happen?

17                MS. MADDOUX:  Objection.  Form.

18                THE WITNESS:  I don't know if I -- I've

19          heard that before, but not specifically at

20          Optum.  I know I've heard it at my other

21          roles and just in the coding world.

22   BY MS. GLOVER:

23        Q.   Understood.  But you agree that

24   reported diagnoses must be supported with medical

25   record documentation?

Page 165

1    been -- since that was implemented that there's

2    always been something in place.

3           Q.   Okay.  And do you know why Optum

4    requires new coders to do practice chart audits

5    before they can move into production?

6                MS. MADDOUX:  Objection.  Form.  Calls

7           for speculation.

8                THE WITNESS:  So generally coders, when

9           coming onboard, they may not have had risk

10          adjustment coding experience and may have

11          only coded in a provider's office or

12          radiology or things like that and may not

13          be used to reading a full medical record

14          and coding from that medical record.  A lot

15          of coders may be coding like an operative

16          note, why did the patient come in for an

17          operation.  They don't necessarily read

18          that full note to make the code assignment.

19          And that's just an example.

20   BY MS. GLOVER:

21          Q.   And at Optum in the chart review

22   program, you instruct the coders to read the full

23   record when conducting a chart review; is that

24   right?

25                MS. MADDOUX:  Objection.  Form.  Vague.

Page 251

1                    CERTIFICATE OF REPORTER

2

               I, Christine A. Taylor, Certified
3    Court Reporter within and for the State of
     Georgia, do hereby certify:

4

               That the foregoing deposition was
5    taken before me on the date and at the time and
     location stated on Page 1 of this transcript; that
6    the deponent was duly sworn to testify to the
     truth, the whole truth and nothing but the truth;
7    that the testimony of the deponent and all
     objections made at the time of the examination
8    were recorded stenographically by me and were
     thereafter transcribed; that the foregoing
9    deposition as typed is a true, accurate and
     complete record of the testimony of the deponent
10   and of all objections made at the time of the
     examination to the best of my ability.

11

               I further certify that I am neither
12   related to nor counsel for any party to the cause
     pending or interested in the events thereof.
13   Witness my hand, this 26th day of May, 2022.

14

15                    _Christine A. Taylor_

16   _____

17             Christine A. Taylor, RPR
               CCR-4736

18

19

20

21

22

23

24

25

**EXHIBIT P-5**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

_____
                           )
UNITED STATES OF AMERICA    )
ex rel. BENJAMIN POEHLING,  )
                           )
        Plaintiff,          )    No. CV 16-08697 FMO
                           )
vs.                         )
                           )
UNITEDHEALTH GROUP, INC.,   )
et al.,                     )
                           )
        Defendants.         )
_____)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
(With Redactions)

DEPOSITION OF MELISSA SEDOR
As 30(b)(6) Designee 1 of
OptumInsight, Inc.
UnitedHealthcare, Inc.
Washington, DC
June 29, 2023

Reported by:  John L. Harmonson, RPR
Job No. 988356



Page 59

1              THE WITNESS:  The actual payment is

2    based on the actual risk score of each member and

3    that 1.0 bid that we submitted in the bid filing.

4    BY MS. GLOVER:

5         Q.    Okay.  And so if -- are you familiar

6    with the term "benchmark"?

7         A.    I've heard the term.  I probably

8    couldn't define it for you.

9         Q.    Okay.  I know earlier you mentioned the

10   county rates.

11        A.    Uh-huh.

12        Q.    And how do county rates factor in to

13   payment in Medicare Advantage?

14        A.    This is probably a little more detailed

15   than I'm prepared to speak to, but my understanding

16   is on the Part C side the county rates are not as

17   impactful or included in our bids but they are

18   included on the D side as well as the ESRD bids.

19        Q.    Okay.  Now, you spoke a little bit about

20   timing earlier, and I said we would do it in a few

21   minutes.  You submit diagnosis codes to CMS at

22   various intervals in order to receive payment under

23   the risk adjustment payment process; right?

24        A.    That's correct.

25        Q.    Okay.  And there's an initial



Page 60

1    calculation of a beneficiary's risk score, a

2    midyear calculation, and then a final calculation;

3    correct?

4        A.    That's correct.

5        Q.    Okay.  And for the initial calculation,

6    you are actually submitting six months of

7    diagnostic data from a prior date of service year

8    as well as six months of diagnostic information

9    from the current date of service year to calculate

10   that initial payment; correct?

11       A.    I would say it is six months and six

12   months.  I maybe am unsure how you're using prior

13   and current because they're actually both prior to

14   the year the payment is being based on.

15       Q.    That's very fair.  Let's clarify.  Maybe

16   an example will help.

17             So let's say that for 2011 payment year,

18   to calculate the initial risk score you would use

19   six months of diagnostic data from 2009 and six

20   months of diagnostic data from 2010; is that

21   correct?

22       A.    That's correct.  You use the last six

23   months of 2009 and the first six months of 2010 for

24   the initial payment.

25       Q.    Okay.  And then for the midyear



Page 61

1    calculation, you use actually in this example the

2    full 2010 date of service year data; correct?

3         A.    Yes, correct.

4         Q.    Okay.  And then for the final -- the

5    final calculation of the risk score, you also use

6    the full date of service year, in this example 2010

7    worth of data, to calculate that score; correct?

8         A.    Yes.

9         Q.    Okay.  And the final -- the final

10   calculation is sometimes called the final

11   reconciliation; right?

12        A.    Yes.

13        Q.    Okay.  And in advance of the final

14   reconciliation, there is a couple of things that

15   have to happen including, one, the submission of

16   data; correct?

17        A.    Yes.

18        Q.    And two, there is a final submission

19   deadline that happens in advance of that.  Are you

20   familiar with that term?

21        A.    Yes, I am.

22        Q.    Okay.  And in advance of the final

23   submission deadline, you had to submit all of the

24   diagnostic data for a given beneficiary by that

25   date; is that right?



Page 62

1        A.    That is correct.

2        Q.    And generally that date is set for 13

3    months after the conclusion of a given date of

4    service year.  So in this example, it may be

5    January 31 or beyond of 2012 when the final

6    submission deadline occurs; is that right?

7        A.    Correct.

8        Q.    Okay.  And sometimes CMS has moved -- in

9    the past, has moved the final submission deadline

10   forward and given plans additional time to submit

11   data; is that correct?

12       A.    That's correct.

13       Q.    And after the final submission deadline,

14   plans are no longer able to submit additional

15   codes, diagnosis codes, that might increase a

16   beneficiary's risk score; right?

17       A.    That's correct.

18       Q.    Okay.  But they are able to delete

19   diagnosis codes that were previously submitted that

20   the plan has determined were submitted in error;

21   right?

22            MR. JONES:  Objection; form.

23            THE WITNESS:  Correct.  CMS's process

24   allows for what they would call as a closed period

25   delete which occurs after that sweep window has



Page 63

1    closed, or reconciliation window has closed.

2    BY MS. GLOVER:

3        Q.    And that's actually helpful.

4              Today as we talk about things, are you

5    comfortable if I use the term "open period" to

6    define the period prior to the final submission

7    deadline, and the "closed period" to apply to

8    information or things happening after the final

9    submission deadline?

10       A.    Yes, I'm fine with that.

11       Q.    Okay.  And before -- after the final

12   submission deadline but before the final

13   reconciliation that CMS does, plans also submit

14   something called an annual attestation; correct?

15       A.    Yes.

16       Q.    And that attestation is something that's

17   required by the contract that they had entered into

18   with CMS the prior September; right?

19             MR. JONES:  Objection; outside the

20   scope.

21             THE WITNESS:  Yes, it's an attestation

22   required by the contract.

23   BY MS. GLOVER:

24       Q.    Okay.  And the attestation is a request

25   for payment under the Medicare Advantage payment



Page 72

1    knowledge our risk adjustment submissions were

2    accurate, complete and truthful.

3    BY MS. GLOVER:

4         Q.    Okay.  And you also understood that you

5    as the Medicare Advantage organization had the

6    ultimate responsibility for the accuracy of the

7    data that you submitted to CMS; right?

8              MR. JONES:  Objection; outside the scope

9    as to her responsibilities.

10             THE WITNESS:  Yes.

11   BY MS. GLOVER:

12        Q.    And that's true specifically for

13   diagnosis codes that you submitted for payment to

14   CMS; right?

15        A.    That it was our responsibility to --

16        Q.    To ensure the accuracy of the data, the

17   diagnosis codes that you submitted to CMS.

18             MR. JONES:  Objection; outside the scope

19   of the notice.

20             THE WITNESS:  Yes.  With regard to

21   diagnosis codes submitted, it was our

22   responsibility to ensure that they were accurate

23   and complete to the best of our knowledge.

24   BY MS. GLOVER:

25        Q.    Okay.  And are you familiar with



Page 73

1    something called a hierarchical condition category,

2    sometimes called an HCC?

3         A.    I am.

4         Q.    Okay.  And what, at a high level, is an

5    HCC?

6         A.    An HCC is, I would say, the mechanism

7    CMS uses to group like diagnosis codes using either

8    ICD-9 or ICD-10.  There are, I think, tens of

9    thousands of diagnosis codes, and rather than

10   giving us a risk score component for tens of

11   thousands of ICD codes, they group them into HCCs,

12   and then that HCC is what dictates the component or

13   the numerical value that goes into your risk score.

14        Q.    Okay.  And earlier you mentioned a

15   couple of things that make up a risk score.  One of

16   those things is demographics; is that correct?

17        A.    Yes, that's correct.

18        Q.    Okay.  And demographics includes things

19   like age, sex, disability status, Medicaid status,

20   et cetera; right?

21        A.    Correct.

22        Q.    Okay.  And then there is also a health

23   status portion of the risk score; right?

24        A.    Correct.

25        Q.    And do HCCs make up the health status



Page 74

1    portion of the risk score?

2        A.    Yes, they do.

3        Q.    Okay.  And so you understood that in

4    calculating the payments that you received from CMS

5    for the beneficiaries enrolled in your Medicare

6    Advantage and Medicare Advantage Part D plans that

7    CMS would use the HCCs to calculate the payments

8    that you received; right?

9        A.    Yes, they use the HCC to calculate the

10   risk score, which is a component of the payment we

11   receive.

12       Q.    Okay.  And we talked a little bit about

13   the diagnosis codes that make up those HCCs.  The

14   CMS HCC risk adjustment model as well as the Part D

15   model applies something called a hierarchy; right?

16       A.    Yes.

17       Q.    What does that mean?

18       A.    A hierarchy describes -- it dictates

19   which condition you'll get paid for if there are

20   instances where two conditions are similar.  An

21   example would be I believe one HCC would be for

22   diabetes while another HCC is diabetes with

23   complications.  The hierarchy table explains which

24   one of them trumps the other one.  You're not going

25   to get paid for both diabetes and diabetes with



Page 75

1    complications.  The hierarchy table explains to

2    you, if the member has two or three, which one is

3    the highest one that they're going to get paid on

4    instead of getting paid on all of them.

5         Q.    Okay.  And so for example, if you submit

6    a diagnosis code that maps to, let's say, HCC 19,

7    which is sort of garden-variety diabetes, as well

8    as HCC 15, which is diabetes with some severe

9    complications, in that scenario you would only be

10   paid for the diagnosis code that you submitted for

11   HCC 15 because it is the more severe form of

12   diabetes; is that right?

13        A.    Correct.

14        Q.    Okay.  And so sometimes when you submit

15   a diagnosis code, it doesn't actually impact the

16   risk score in that it doesn't raise it higher

17   because a diagnosis code mapping to an HCC higher

18   in the hierarchy has also been submitted; is that

19   right?

20        A.    That's correct.

21        Q.    Okay.  So as we're talking, if I say --

22   if I ask you questions with the premise that it's

23   something that impacts the risk score, you'll

24   understand what I mean?

25        A.    Yes.



Page 76

1          Q.    Okay.  Now, the CMS HCC risk adjustment

2     model as well as the Part D model account for

3     interactions between conditions as well; right?

4          A.    Yes, that's correct.

5          Q.    And you receive additional payments if

6     there are certain interactions of conditions;

7     right?

8          A.    Correct.  Certain interactions give you

9     an additional lift in your risk score.

10         Q.    Okay.  And so that piece of it is an

11    additional component to the risk score; is that

12    right?

13         A.    Yes.

14         Q.    It falls within health status, but let's

15    say that your risk score is 2.0.  It may be that

16    disease interactions accounts for .2, but it's a

17    portion of it?

18         A.    Correct, yes.

19         Q.    Does that make sense?

20         A.    Yes.

21         Q.    All right.  And you understood that the

22    CMS HCC risk adjustment model as well as the Part D

23    model are prospective models; right?

24              MR. JONES:  Objection; form.

25    BY MS. GLOVER:



Page 77

1          Q.    And if you don't understand what I mean

2    by prospective, I can explain.

3          A.    Yeah, can you explain?

4          Q.    Certainly.

5                What I mean is that they use diagnoses

6    submitted from a prior date of service year to

7    anticipate the cost of caring for the beneficiary

8    in the next year.

9          A.    Yes, I would agree with that.

10         Q.    Okay.  And so we've sort of talked about

11   this a little bit.  But the way that the model

12   worked is that you would use information from one

13   year to calculate the payments that you received in

14   the next year?

15         A.    That is correct.

16         Q.    Okay.  And earlier with Mr. Voldman you

17   referred to per member per month payments; right?

18         A.    Yes.

19         Q.    And what are per member per month

20   payments?

21         A.    It would be the average -- if you're

22   looking at each individual member, it is the

23   premium that you are getting paid for that member

24   for one month of coverage.

25         Q.    Okay.  And when we spoke about the



Page 78

1    timing of the initial risk score calculation, the

2    midyear calculation and the final reconciliation,

3    what happens in each of those calculations is

4    essentially your -- CMS is calculating how much you

5    will be paid for a given beneficiary on a per

6    member per month basis; right?

7        A.    That's correct.

8        Q.    And in the midyear run, for example,

9    based on the information that has been submitted

10   for the entire date of service year at issue, CMS

11   retroactively adjusts the per member per month

12   payments that were received by the plan based on

13   the initial calculation; right?

14       A.    Correct.  They go back and adjust your

15   payments for, generally speaking, January through

16   June is usually the timing.

17       Q.    And then for the final reconciliation,

18   what CMS is doing is it's a similar process but

19   essentially what CMS does is they retroactively

20   adjust the payments that were received for the

21   entire payment year based on what was submitted for

22   the full date of service year; right?

23       A.    That's correct.

24       Q.    Okay.  Are you familiar with something

25   called a rerun?



Page 79

1      A.    Yes, I am.

2      Q.    What is a rerun?

3      A.    In my experience, CMS has used rerun to

4   refer to when they're truing up the risk scores for

5   a payment year after that final reconciliation has

6   been received, which usually means that they're

7   processing closed period deletes and then rerunning

8   that payment year.

9      Q.    Okay.  And when you say their processing

10  closed period deletes, that is because you can't

11  submit additional codes after the final submission

12  deadline, but I think as you testified earlier you

13  can submit deletes; right?

14     A.    Correct.

15     Q.    Okay.  And functionally, what the rerun

16  does is it's a rerun of that final reconciliation;

17  is that right?

18     A.    Yes.

19     Q.    Okay.  So functionally, it's

20  retroactively adjusting the per member per month

21  payments that the plan received for a given

22  beneficiary in a given payment year; right?

23     A.    Yes, that's correct.

24     Q.    Okay.  Now, sometimes those reruns don't

25  happen immediately; right?



Page 80

1      A.    They usually do not happen immediately,

2   yes.

3      Q.    They can take a couple of years or a few

4   years; right?

5      A.    Yes.

6           MR. JONES:  Objection; form.

7           THE WITNESS:  Yes.  In my experience,

8   they usually take a number of years before the

9   reruns occur.

10  BY MS. GLOVER:

11     Q.    Okay.  And CMS announces a rerun in

12  advance of performing that rerun; correct?

13          MR. JONES:  Objection; form.  Outside

14  the scope.

15          THE WITNESS:  That has been their

16  process of probably the past three to five years.

17  I don't know that in the time frame in question

18  that they were always announcing when they were

19  making reruns.

20          MS. GLOVER:  I'm going to mark another

21  exhibit here.  This is going to be marked

22  Exhibit 733, and the attachment will be 733-1.

23          (Exhibit 733 and 733-1 marked for

24      identification and attached hereto.)

25  BY MS. GLOVER:



Page 81

```
 1        Q.    Feel free to take a look at that.  I
 2   don't know if you've seen this document, but let me
 3   know if you have.
 4        A.    Okay.
 5        Q.    And the cover email, for the record, is
 6   MAPL000172139, and the attachment is MAPL000172140.
 7              Do you see that this is an announcement
 8   of a rerun?
 9        A.    Yes, I do.
10        Q.    And it's from September 18, 2013?
11        A.    Yes.
12        Q.    Does that refresh your memory that rerun
13   announcements were made during the relevant time
14   period?
15              MR. JONES:  Objection; form.
16              THE WITNESS:  I guess I would look at
17   this and say they're telling us on September 18th
18   that they're taking a rerun on September 30th and
19   not necessarily view that as advance notice.  I
20   mean, that was less than two weeks, give or take,
21   of notice.  Whereas their new process, they publish
22   it probably a year in advance.  They say this is
23   what we're going to do.
24   BY MS. GLOVER:
25        Q.    Oh, I see what you're saying.  So they
```



Page 82

1    may have always given notice but it may not have

2    had as much of a lead time as it does now?

3        A.    Correct.

4        Q.    All right.  And so in -- I guess I want

5    to understand a little bit more about what happens

6    in the rerun.

7              So if you submit deletes -- closed

8    period deletes I think you referred to them as --

9    after the final reconciliation but before the

10   rerun, the new per member per month payment after

11   the rerun accounts for the new universe of HCCs

12   that apply to that beneficiary; is that right?

13             MR. JONES:  Objection; form.

14             THE WITNESS:  The rerun would create a

15   new risk score for each beneficiary based on the

16   most up-to-date information, which would include

17   the closed period deletes that we submitted.

18   BY MS. GLOVER:

19       Q.    Okay.  And if the closed period deletes

20   that you made impact the risk score, then that will

21   reduce the per member per month payments; correct?

22       A.    That is correct.

23       Q.    Okay.  Similarly, in the open period, if

24   you submit diagnosis codes that increase the risk

25   score, that will increase the per member per month



Page 83

1    payments that you receive from CMS; right?

2         A.    If they are new and unique diagnosis

3    codes to that member and not a repeat of something

4    they're already getting paid on, then yes, that

5    would increase the risk score.

6         Q.    Okay.  And let's talk about that a

7    little bit.  You do have to submit a diagnosis code

8    that maps to an HCC that impacts the risk score

9    once every year, right, at least?

10        A.    Correct, at least once a year you have

11   to submit the diagnosis code.

12        Q.    Okay.  So you can't use diagnosis codes

13   that were submitted in prior years to determine the

14   payment that's going to be -- that's going to be

15   received for a date of service year that follows

16   it?  Does that make sense?

17        A.    Yes, that makes sense.  And that is

18   correct.  You have to recapture that diagnosis code

19   and submit it to CMS every year to get payment for

20   it.

21        Q.    Okay.  And so for example, if you submit

22   a diagnosis code that maps up to HCC 19, which we

23   established was diabetes, and you submit that based

24   on an encounter in date of service year 2010, you

25   have to resubmit it for 2011 as well; right?



Page 84

1    A.    That is correct.

2    Q.    When you resubmit it for 2011, can it

3    still be based on the encounter that took place in

4    2010?

5    A.    No.

6         MR. JONES:  Objection; form.

7         THE WITNESS:  No, it has to be based on

8    an encounter that happened in 2011.

9    BY MS. GLOVER:

10   Q.    Okay.  So there has to be separate

11   documentation in a medical record each year if

12   you're going to submit a diagnosis code to CMS?

13        MR. JONES:  Objection; form.

14        THE WITNESS:  There has to be a separate

15   submission from the physician or provider each year

16   on, say, a claim in order for us to resubmit it to

17   CMS.

18   BY MS. GLOVER:

19   Q.    Okay.  And in submitting diagnosis codes

20   for payment to CMS, sometimes you submitted

21   diagnosis codes based on a claim or an encounter

22   that you received from a physician or a hospital;

23   right?

24   A.    Correct.

25   Q.    And sometimes you submitted diagnosis



Page 85

1    codes that were based on a review of medical

2    records; correct?

3        A.    Correct.

4        Q.    Okay.  And either one of those sources

5    could be a source for a diagnosis code that you

6    submitted for payment; right?

7        A.    That's correct.

8        Q.    Okay.  Now, were there certain diagnosis

9    codes that you couldn't submit based on the source

10   of that diagnosis code?

11              MR. JONES:  Objection to form.  Vague.

12              THE WITNESS:  Yeah, I'm not sure I fully

13   know the answer to that, and it's very broad.  I

14   would say with RAPS, with the RAPS submissions

15   versus EDS that we've started to shift to, there

16   were requirements by CMS such as the visit had to

17   be face-to-face with a provider.  So if the visit

18   was not face-to-face, we would not or could not

19   submit it.  I'm not sure if that's what you were

20   asking.

21   BY MS. GLOVER:

22       Q.    That's exactly what I was asking.  You

23   read my mind.

24              So for example, you couldn't submit a

25   diagnosis code that was based on a lab or a



Page 86

1    radiology visit.  It had to be a face-to-face visit

2    with a provider; right?

3        A.    Correct.

4        Q.    Okay.  And every diagnosis code that you

5    submitted for payment to CMS, in order for CMS to

6    pay for it it had to be supported by documentation

7    in the medical record; correct?

8              MR. JONES:  Objection; form.  Vague.

9              THE WITNESS:  The expectation is that

10   every diagnosis code is supported in the medical

11   record, yes.

12   BY MS. GLOVER:

13       Q.    Okay.  And so similarly, just the

14   converse of that, the expectation was that you were

15   not going to be paid for diagnosis codes that were

16   not supported by the medical record; right?

17             MR. JONES:  Objection; form.  Outside

18   the scope.

19             THE WITNESS:  The expectation is that

20   every diagnosis code we submit is supported by a

21   medical record, so we would expect to only get paid

22   on a diagnosis supported by a medical record.

23   BY MS. GLOVER:

24       Q.    Okay.  And you can't just make up a

25   diagnosis code and submit it to CMS for payment;



4076

Page 87

 1   right?

 2        A.    Correct.

 3        Q.    Did you also understand that diagnosis

 4   codes that you submitted for payment, the medical

 5   record that supported them had to be signed or have

 6   the credential for the physician included on the

 7   face of the medical record?

 8              MR. JONES:  Objection; form.

 9              THE WITNESS:  Yes, it's my understanding

10   that a medical record has to be signed by a

11   physician to be adequate documentation.

12   BY MS. GLOVER:

13        Q.    Okay.  We've covered some of this, so I

14   just want to speed things along.

15              Earlier, you mentioned CMS's model

16   software.

17        A.    Uh-huh.

18        Q.    Did you utilize the model software?

19        A.    Not personally, but as an organization

20   we used the model software, yes.

21        Q.    And I should be clear, every time I say

22   "you," I'm actually referring to the organizations.

23   But thank you for the clarification.

24        A.    Yes, we utilize their model software.

25   We download it and utilize it.



Page 88

1          Q.     And what does the model software allow

2      you to do?

3          A.     The model software assists with

4      projecting a member's risk score based on the

5      diagnosis codes that are being submitted to CMS.

6          Q.     So essentially the model software, if

7      you put in the components for a given beneficiary,

8      will spit out what the anticipated risk score will

9      be for that beneficiary?

10         A.     That's correct.

11         Q.     Okay.  And did you utilize that to

12     determine what your expected payments would be from

13     CMS for the beneficiaries enrolled in your MA and

14     MAPD plans?

15         A.     Yes.  As standard accounting principles,

16     we needed to attempt to accrue for the midyear and

17     final reconciliation in the coverage period that

18     they were occurring.  So we used that tool and

19     would use that as one of the components to look at

20     what was submitted that we hadn't been paid on yet

21     and estimate what our accrual needed to be for the

22     CMS risk adjustment true-ups.

23         Q.     And you understood which diagnosis codes

24     were risk adjusting for a given date of service

25     year; correct?



Page 89

1          A.     Correct.  That was published by CMS.

2          Q.     Okay.  And you utilized the information

3     published by CMS so that you were aware of which

4     diagnosis codes could be used for risk adjustment

5     purposes and for which you could receive payment?

6          A.     Yes.

7          Q.     And we've talked about diagnosis codes.

8     Diagnosis codes can map to an HCC but they can also

9     map to something called an RxHCC; right?

10         A.     That's correct.  That's the Part D

11    component of it, yes.

12         Q.     And there are some diagnosis codes that

13    map to both an RxHCC and an HCC; correct?

14         A.     Yes, there's overlap.

15         Q.     And then there's some that only map to

16    an HCC or only map to an RxHCC; right?

17         A.     That's correct.

18         Q.     Okay.  So if you submit a diagnosis code

19    that maps to an HCC and an RxHCC and it impacts the

20    risk score under both models, then you could

21    receive additional payment under both models;

22    correct?

23         A.     Yes, that's correct.

24         Q.     Okay.  And similarly, if you delete a

25    diagnosis code that maps to both an HCC and an



Page 91

1    service or traditional side of Medicare; right?

2         A.    Yes.

3         Q.    And that was always true during the

4    relevant time period; right?

5         A.    Yes.  CMS utilizes the fee for service

6    data to arrive at their coefficients.

7         Q.    Okay.  So in the advance notice and rate

8    announcement that we talked about, as well as other

9    information provided by CMS, it was clear that CMS

10   was using fee for service data to calculate the

11   factors that would be used in a given risk score;

12   right?

13        A.    Yes.

14        Q.    Okay.  Now, the final submission

15   deadline, you are supposed to make efforts to

16   submit all of the data that you have for a given

17   beneficiary before that deadline; right?

18        A.    Yes.

19        Q.    But CMS allows for submission of

20   deletions after that deadline; right?

21        A.    Correct.

22        Q.    And you understood that if you

23   identified something that needed to be deleted, you

24   were supposed to delete that after the final

25   submission deadline even though that deadline had



Page 92

1    passed; right?

2           MR. JONES:  Objection; form.  Outside

3    the scope.

4           THE WITNESS:  Yes.  If we identified

5    something that we had submitted erroneously, it was

6    the expectation that we would submit a delete.

7    BY MS. GLOVER:

8       Q.    Okay.  And when you say "erroneously,"

9    what do you mean?

10          MR. JONES:  Objection; form.

11          THE WITNESS:  If as an organization we

12    had knowledge that we submitted a risk -- I'm

13    sorry, a diagnosis code that was in error, if we

14    had knowledge that the diagnosis code was in error

15    and unsupported, we would submit a delete.

16    BY MS. GLOVER:

17      Q.    What do you mean by unsupported?

18      A.    In an instance where we looked for

19    documentation or support for that diagnosis code

20    and could not find it, that's what I mean by

21    unsupported.

22      Q.    I see.  So in instances where you looked

23    at, like, the medical record documentation and you

24    couldn't find documentation for that specific

25    diagnosis code, it was your understanding that you



Page 94

1   BY MS. GLOVER:

2        Q.    Okay.  And you were responsible for the

3   accuracy of your data, and so you felt that you

4   needed to correct it based on that as well?

5                MR. JONES:  Objection; form as to

6   obligations.  Outside the scope.  And calls for a

7   legal conclusion.

8                THE WITNESS:  Yeah, I can't speak

9   legally to what obligations we had to do.  I can

10  just say as our practice, as our good business

11  practice, we felt we had to correct something that

12  we found was in error.

13  BY MS. GLOVER:

14       Q.    Okay.  And we spoke briefly about RAPS.

15  RAPS includes five different fields; right?

16       A.    Yes.

17       Q.    What fields does RAPS contain?

18       A.    I believe they contain a provider ID, a

19  from date, through date, the member identifier, and

20  the diagnosis code.

21       Q.    Okay.  And you had to submit all five

22  elements into RAPS in order to get paid for a

23  diagnosis code that impacted a beneficiary's risk

24  score; right?

25       A.    Correct.



Page 95

1    Q.    Okay.  And if one of those fields was

2    missing, the CMS system would reject that code;

3    right?

4    A.    That's correct.

5    Q.    And did you submit diagnosis codes to a

6    system called FERAS, F-E-R-A-S?

7    A.    I'm honestly not sure about that.

8    Q.    I think it stands for Front End Risk

9    Adjustment System and feeds into RAPS.

10    A.    Yes, then we did submit to that.

11    Q.    Okay.  And if CMS was rejecting a given

12    diagnosis code as well as the other elements that

13    you mentioned, it sent you an error message saying

14    that it could not accept that code; right?

15    A.    Correct.

16    Q.    And similarly, if it accepted a given

17    diagnosis code and the other RAPS elements, it

18    would send a message saying that it had accepted

19    that code; right?

20    A.    Correct.

21    Q.    And for purposes of maybe ease, are you

22    familiar with the term "diagnosis cluster"?

23    A.    I am.

24    Q.    What is a diagnosis cluster?

25    A.    My understanding is that the term



Page 96

1    "diagnosis cluster" refers to the combination of

2    the five fields on the RAP submission.

3         Q.    Okay.  And so if it's okay with you,

4    I'll just refer to the RAP submission as a

5    diagnosis cluster.

6         A.    Okay.

7         Q.    So you submitted diagnosis clusters to

8    CMS into the FERAS system, which fed into the RAP

9    system.  And then is it your understanding that

10   after being processed in the RAP system it would go

11   into a system to calculate the risk score based on

12   the diagnosis codes that had been -- the diagnosis

13   clusters that had been submitted for the given

14   beneficiary?

15        A.    Yes, that's my understanding.

16        Q.    Are you familiar with a system called

17   RAS, R-A-S?

18        A.    I am not.

19        Q.    Do you know the name of the system that

20   calculated the risk score for the given

21   beneficiary?

22        A.    No.  On the CMS side?

23        Q.    Yes.

24        A.    No, I do not.

25        Q.    Are you familiar with a system called



Page 97

1   MARX, M-A-R-X?

2        A.    Yes.

3        Q.    And what is that system used for?

4        A.    The MARX system is a CMS system that

5   they utilize to generate the payments on a monthly

6   basis.

7        Q.    Okay.  And so after a risk score is

8   calculated for a given beneficiary, was it your

9   understanding that MARX would then take that risk

10  score and calculate the payment that should be paid

11  to the plan based on that risk score?

12       A.    Yes, that was my understanding.

13       Q.    Are you familiar with something called a

14  RAPS return file?

15       A.    Yes.

16       Q.    What is a RAPS return file?

17       A.    The RAPS return files were the -- when

18  we would submit something to CMS, when we would

19  submit a RAPS submission to CMS, the RAPS return

20  file would come back telling us if that submission

21  was accepted or if it errored out.

22       Q.    So you were able to tell or you were

23  able to know what diagnosis clusters CMS had

24  accepted and which it had rejected; correct?

25       A.    Correct.



Page 98

1        Q.    Now, if you were going to delete a

2    diagnosis cluster, you had to submit a delete flag

3    with that cluster; is that right?

4        A.    Correct.

5        Q.    Okay.  And that delete flag or -- I

6    don't know what term you used -- an indicator would

7    signify to CMS that that particular cluster had to

8    be deleted; right?

9        A.    That's correct.

10       Q.    Okay.  Now, if you submitted a diagnosis

11   cluster and later learned that it was an error and

12   needed to submit a new diagnosis cluster, you

13   understood that you first had to delete the

14   original diagnosis cluster that was submitted in

15   error and then replace it with the new diagnosis

16   cluster; right?

17              MR. JONES:  Objection; outside the

18   scope.  Calls for a legal conclusion.

19              THE WITNESS:  Yes, my understanding --

20   our understanding and practice would be to delete

21   the one that was in error before we submitted the

22   other one, assuming that we're in an open period.

23   BY MS. GLOVER:

24       Q.    Okay.  And that was because you couldn't

25   just leave the -- you couldn't leave the incorrect



Page 99

1    diagnosis cluster in the system and simply replace

2    it without indicating a delete first; right?

3          A.    Correct.

4          Q.    Okay.  And I want to talk briefly about

5    EDPS.

6          A.    Okay.

7          Q.    And when I say EDPS, I mean the

8    Encounter Data Processing System.  Are you familiar

9    with that term?

10         A.    Yes.

11         Q.    And you're aware that in approximately

12   2014, CMS started using encounter data to calculate

13   payments that it was making to Medicare Advantage

14   organizations for the beneficiaries enrolled in

15   their MA or MAPD plans; right?

16         A.    Yes.

17         Q.    Okay.  Now, as opposed to the five RAPS

18   fields, there are a lot of fields that are

19   submitted into EDPS; right?

20         A.    Correct.

21         Q.    But you still submit diagnosis codes

22   into EDPS; right?

23         A.    Yes, that's correct.

24         Q.    And similar to the RAP system, there was

25   a way that you could delete previously submitted



Page 120

1      Q.    Okay.  And then the non-allowable data

2    sources, I think we talked about these.  Earlier,

3    you confirmed that you couldn't identify diagnosis

4    codes based on labs; right?

5      A.    That's correct.  It has to be a

6    face-to-face visit.

7      Q.    And do you know what it means by

8    diagnostic?

9            MR. JONES:  Objection; form.  Outside

10    the scope.

11            THE WITNESS:  I'm not a hundred percent

12    certain.  I believe in this instance, diagnostic

13    would mean like a radiology technician kind of

14    saying to you:  Oh, I think everything looks good,

15    or I think you have a problem.  You know, that's

16    kind of their diagnostic opinion, but they're not a

17    certified provider from a CMS standpoint to allow

18    you to submit that information.

19    BY MS. GLOVER:

20      Q.    Understood.

21            And similarly, you couldn't submit

22    diagnosis codes for payment to CMS under the risk

23    adjustment payment process for Part D if it was

24    like a rule-out or probable condition but hadn't

25    been confirmed by the provider; right?



Page 121

1              MR. JONES:  Objection; form.

2              THE WITNESS:  I'm not -- I'm not sure

3     how we would even know of a probable condition

4     until it was confirmed by the provider.

5     BY MS. GLOVER:

6         Q.    I see.  I see what you're saying.

7              So if in the medical record

8     documentation the condition hasn't yet been

9     confirmed, you couldn't code that or submit that

10    diagnosis code for the probable condition until it

11    was confirmed; right?

12             MR. JONES:  Objection; outside the

13    scope.

14             THE WITNESS:  That's correct.

15    BY MS. GLOVER:

16        Q.    Okay.  And similarly, if an individual

17    had a history of a condition and it wasn't

18    currently documented in their medical record as a

19    current condition, you couldn't submit a diagnosis

20    code based on that for payment to CMS in the risk

21    adjustment payment process; right?

22        A.    In our process around chart review, if

23    the member had -- if it's listed in the medical

24    record as a prior condition that is a lifelong

25    condition or a chronic condition that you cannot



Page 122

1   get rid of, our process is to use that medical

2   record to submit the diagnosis code.

3          Q.    Okay.  So if it's documented -- if it's

4   documented in a -- earlier we talked about you had

5   to have an encounter each date of service year --

6          A.    Correct.

7          Q.    -- on which a diagnosis was based;

8   right?

9          A.    Correct.

10         Q.    Okay.  So you couldn't base -- if it

11  said they have this diagnosis in 2010 but they

12  don't say they have it in 2011 when you look at the

13  medical record, you can't just submit the code

14  because there was a history of that condition

15  documented in 2010; right?

16              MR. JONES:  Objection; outside the

17  scope.  Form.

18              THE WITNESS:  That is correct.  You

19  would need a medical record with a visit from 2011

20  to document that that person had a provider visit

21  and had that condition.

22  BY MS. GLOVER:

23         Q.    Okay.  Let's go to the last page that

24  we'll do today, which is page 36.  And you can go

25  directly to the page if you use the numbers at the



Page 127

```
 1      Q.    Okay.  And in a self-conducted chart
 2  review they sometimes identified deletes; is that
 3  right?
 4      A.    They could identify deletes through a
 5  self-conducted chart review, yes.
 6      Q.    Do you know how those self-conducted
 7  reviews were conducted?
 8           MR. JONES:  Outside the scope.
 9           THE WITNESS:  I have a general sense,
10  although I imagine every provider group could be a
11  little different.  But from a general sense,
12  they're conducted by our capitated providers.  And
13  the reason for that is the capitated providers do
14  not submit claims to us.  So we're not getting
15  diagnosis codes from the claims themselves because
16  they don't submit the claims to us.  They're in a
17  separate payment arrangement.
18           We require them to submit encounter data
19  to us to provide the diagnosis codes.  The
20  providers often towards the end of a sweep window
21  closing, so either the midyear or the final
22  deadline approaching, the providers will look at
23  their systems and their medical records to ensure
24  that they did in fact provide us all the diagnosis
25  codes from their patients as an encounter record.
```



Page 133

1    providers were supported or otherwise validated by

2    documentation in the associated medical records?

3                MR. JONES:  Objection; form.  Outside

4    the scope.

5                THE WITNESS:  I'm not aware of -- if we

6    did conduct them I'm not aware of them.  So I'm not

7    prepared to talk about them.

8    BY MS. GLOVER:

9        Q.    Okay.  How about the RACCR program?

10   What is that?

11       A.    RACCR is the Risk Adjustment Coding

12   Compliance Review, and that is a risk adjustment

13   program that we use to monitor both our capitated

14   providers as well as our providers that were in an

15   accountable care organization.

16       Q.    Okay.  Was it used to monitor diagnosis

17   codes submitted by fee for service providers?

18       A.    The accountable care organization

19   component of it would be considered a fee for

20   service provider.  The capitation side of it would

21   not be.

22       Q.    What is an accountable care

23   organization?

24       A.    It is a provider network that we have

25   entered into some sort of risk sharing or gain



Page 134

1    sharing arrangement where if they're able to manage

2    the member's care to decrease kind of the overall

3    spend by doing a better job managing it, we will

4    share in the savings with them.

5        Q.    Okay.  And did RACCR -- did RACCR review

6    diagnosis codes submitted by just your everyday fee

7    for service provider who was not involved in an

8    accountable care organization?

9        A.    No.  The RACCR program was intended to

10   monitor provider groups that potentially had an

11   incentive to over-submit because they were paid

12   some component of the percentage of revenue.

13       Q.    Okay.  And if you identified diagnosis

14   codes that weren't supported by the medical record

15   in the RACCR program, you deleted those codes;

16   correct?

17       A.    That is correct.

18       Q.    Now, the other program listed here is

19   CV, which I think you've mentioned today.  Claims

20   verification; right?

21       A.    Correct.

22       Q.    And was that a program that was -- that

23   falls under Topic 10 here as a program to determine

24   whether diagnosis codes that were submitted to you

25   by fee for service providers were supported or



Page 180

1        A.    Yes.

2        Q.    So I specifically want to talk to you

3   about the first part of that definition just as it

4   relates to Topic 10.  Was chart review another

5   program where you were assessing whether diagnosis

6   codes submitted by providers were supported by

7   medical record documentation?

8        A.    No.

9        Q.    So in the chart review program, there

10  were some diagnosis codes that were identified as

11  being supported by the medical record that had

12  already been submitted by the provider; right?

13            MR. JONES:  Objection; form.

14            THE WITNESS:  Yes, that is correct.

15  BY MS. GLOVER:

16       Q.    Okay.  So in that way, chart review was

17  confirming diagnosis codes that had been submitted

18  by providers were supported by the medical record

19  documentation; right?

20       A.    No.  They were two separate and distinct

21  processes, and the results of chart review were not

22  necessarily bumped up against the claim to confirm

23  whether or not they matched.

24       Q.    Are you familiar with something called a

25  new and unique HCC?



Page 181

```
 1        A.    I am.

 2        Q.    Okay.  And do you understand that a new

 3   and unique HCC was identified if a chart reviewer

 4   identified a diagnosis code that mapped to a new

 5   and unique HCC that had not been submitted by a

 6   provider before?

 7        A.    Yes.

 8        Q.    Okay.  And so in that process to

 9   identify a new and unique HCC, isn't it correct

10   that you were comparing the diagnosis codes that

11   had been submitted by a provider with what had been

12   found in the chart review?

13             MR. JONES:  Objection; form.

14   BY MS. GLOVER:

15        Q.    And the delta there, if it hadn't been

16   submitted by a provider, was a new and unique HCC?

17        A.    So I would say that the chart review

18   process identified all HCCs, and then a separate

19   process that was not part of the chart review

20   program itself but was part of the submission

21   process would identify which of those codes from a

22   chart review were new and unique for submission.

23        Q.    Okay.  So do you understand what is

24   meant here when it says that "chart review is

25   performed at least once every two years to validate
```



Page 187

1        Q.    Okay.  And so if you delete a diagnosis

2   code -- and by delete I mean you submit it to CMS

3   as a deletion -- and that diagnosis code impacts

4   the risk score and moves it down, is it correct

5   that when CMS accounts for that, they are

6   essentially -- like the plan is essentially paying

7   money back to CMS to account for the change in risk

8   score?

9        A.    Yes.  When a deletion results in a lower

10  risk score and, for example, they process a rerun,

11  the plan is -- CMS is recouping money back from the

12  plan.  The plan is paying that money to CMS.

13       Q.    I see.  Okay.

14            All right.  I want to move on to

15  Topic 11 which, from the sounds of your background,

16  may be very much in your wheelhouse.

17            And I know that the parties have made an

18  agreement to narrow this topic, and so one of the

19  things that you're prepared to testify about is the

20  quarterly roll forward schedules showing the total

21  CV-related accruals recorded and the reserves

22  released for the four quarters of 2013 and the

23  first two quarters of 2014 and their supporting

24  schedules, as well as the specific CV accruals that

25  were released in or around April and May of 2014,



Page 188

1    including information regarding the release of

2    those reserves, their amounts, their inclusion in

3    the general ledger and monthly close reports

4    related to the release of CV reserves for April,

5    May and June of 2014.

6              Is that a correct description of what

7    you're prepared on?

8         A.   Yes, it is.

9         Q.   Okay.  And as we sort of discuss this, I

10   want to make sure that I understand terms that are

11   used in this description just so that we can talk

12   about things a bit more freely.

13        A.   Okay.

14        Q.   So first of all, what is an accrual?

15        A.   An accrual is an amount you would post

16   into the general ledger where cash has not settled

17   yet.  So you're awaiting -- it could be you're

18   awaiting revenue and you haven't received that cash

19   yet.  It could be that you're waiting to pay a

20   legal bill and you're accruing for it but you have

21   not received the bill and paid the cash out yet.

22              An accrual is something you post in the

23   general ledger to try to follow your accounting

24   principles and post it when you've accrued it even

25   though the cash has not come in or gone out yet.



Page 189

1        Q.    So it's almost like a placeholder so

2   that you know if you have money coming in or money

3   that's going to go out based on an event that has

4   happened now?

5        A.    Correct.

6        Q.    Okay.  And what is a reserve?

7        A.    A reserve is the same thing but in the

8   opposite direction.  So from a revenue standpoint,

9   an accrual would be if you're expecting revenue in.

10  A reserve would be if you're expecting to pay

11  revenue out.  On your balance sheet, you would call

12  that a reserve instead of an accrual just because

13  it's going the opposite direction.

14       Q.    Okay.  So with claims verification, is

15  it actually more accurate to say that there were

16  reserves given that you were making deletions based

17  on claims verification?

18       A.    Yes, we would have called them reserves

19  within our general ledger and all our

20  documentation.

21       Q.    Okay.  So I know that you are prepared

22  to testify about CV-related accruals recorded and

23  reserves released.  Were there accruals recorded

24  for CV?

25       A.    No.  Technically, it should probably say



Page 190

1    CV reserves record and released.

2        Q.    Okay.  And then you mentioned something

3    called a general ledger.  What is a general ledger?

4        A.    A general ledger is your -- anybody's

5    accounting system that tracks their monthly profit

6    and loss statements.  So your revenue in, your

7    income and expenses -- sorry, your revenue in, your

8    expenses out.  They are all part of a financial

9    statement, and the general ledger is just a system

10   that manages your financial statements.

11       Q.    Okay.  And did you use a general ledger

12   to manage your financial statements?

13       A.    Yes.

14       Q.    Okay.  And in order to make a reserve,

15   you mentioned something about accounting

16   principles.

17       A.    Uh-huh.

18       Q.    What were you referencing there?

19       A.    Well, overarching, it's called GAAP,

20   Generally Accepted Accounting Principles, and

21   there's hundreds of them I would say that dictate

22   your rules of what you are and are not supposed to

23   do to follow standard accounting within your

24   general ledger.

25       Q.    And is one of the principles that in



Page 191

1    order to -- and maybe I should correct this.  Is it

2    book a reserve?

3         A.    Sure, you could say that.

4         Q.    In order to book a reserve, that the

5    amount you'll have to -- that you are anticipating

6    paying out is probable and estimable?

7         A.    Estimatable, yes.  Yes, that is correct.

8    Part of the rule if you're booking a reserve is

9    that it's probable and -- it might be estimable.

10        Q.    Estimable?

11        A.    Yes.  I always struggle with that word.

12   Estimable, estimatable, I'm not sure which it is.

13   But you have to be able to estimate it.

14        Q.    I love that.  Okay.

15              And basically, like that means that it's

16   probable or estimable that more likely than not

17   you're going to have to pay that money out; is that

18   right?

19        A.    Correct.

20        Q.    Okay.  And are you familiar with the

21   term "contra revenue"?

22        A.    Yes.

23        Q.    What is that?

24        A.    It's an accounting term for sort of a

25   reduction to your revenue.  You could refer to a



Page 192

1    delete reserve as a contra revenue.  We just

2    internally refer to it as a reserve versus

3    contra revenue.  But really it's revenue that's

4    going out.  It's the direction.  It's reducing

5    revenue instead of increasing revenue.

6         Q.    Okay.  So a reserve and a contra revenue

7    are conceptually the same in that both mean that

8    money will be paid out?

9         A.    Correct.

10        Q.    Okay.  And then I'm still in the

11   definition of what we're going to be talking about.

12        A.    Okay.

13        Q.    I'm not an accountant.

14              What is a quarterly roll forward

15   schedule?

16        A.    A quarterly roll forward schedule is

17   usually prepared on a balance sheet account, which

18   is sort of your running total of items you owe out

19   or receivables that are owed in to you.  Your

20   balance sheet is that running total from month to

21   month to month.  It just increases or decreases.

22              And a roll forward is usually a summary

23   of the activity that occurred in that account.  For

24   example, if you started -- ended a year

25   December 31st with balance of zero and then the end



Page 193

1    of the first quarter your balance was a hundred,

2    the roll forward details the activity that got you

3    to a hundred.  It could be that you accrued 200 but

4    paid 100.  You know, that net activity gets you to

5    your ending balance, but the roll forward details

6    that activity as it occurs to explain what happened

7    in that account.

8        Q.    Does the roll forward -- if you take a

9    reserve on something, does the roll forward show

10   that as having happened?  Or is there some

11   indication that it's a placeholder but the money

12   has not been taken out or accounted for yet?

13       A.    A roll forward is a more general term,

14   and you can -- internally, someone creating a roll

15   forward can kind of make it do whatever they want.

16   As long as in concept it's showing your beginning

17   balance and your ending balance and what has

18   occurred, you can set it up to show any kind of

19   activity that you want, whether you want to show

20   that you put up a reserve or that a reserve paid

21   out or anything like that.  It's really at the

22   discretion of who's creating it.

23       Q.    I see.

24             Now, you're here to talk about the

25   claims verification roll forward schedules for



Page 194

1    certain quarters in 2013 and 2014.  How did you use

2    the roll forward schedules?

3        A.    The roll forward schedule was created on

4    our entire risk adjustment receivable account which

5    is at times, depending on the time of year, could

6    be a very large account.  Within that risk

7    adjustment receivable account we're accruing for

8    the midyear reconciliation, the final

9    reconciliation.  We have reserves against it for

10   possible deletes that we're paying out.  So across

11   our entire Medicare Advantage business, that

12   balance can be pretty large.

13            So the roll forward is actually

14   detailing that entire RAF receivable account and

15   then breaking it down into subcategories of what is

16   in that account based on the supporting schedules

17   that add up to those balances.

18       Q.    What do you mean by supporting

19   schedules?

20       A.    The schedules that -- within any account

21   reconciliation you really should have support for a

22   balance.  You can't just accrue a million dollars

23   without some sort of support.  So within the RAF

24   receivable account, as I said, at any given time

25   you could have multiple types of accruals.  Let's



Page 195

1    say it's March and you have a midyear accrual, plus

2    a final accrual, plus the final accrual from the

3    year previous because that hasn't settled yet, plus

4    a delete reserve, each one of those is going to

5    have a different supporting schedule.

6           Q.    I see.

7                 So does claims verification have its own

8    supporting schedule?

9           A.    It was part of supporting schedules

10   depending on the payment type.

11          Q.    What does that mean?

12          A.    If -- when we were in an open period, it

13   would have been part of our overall accrual for

14   the, say, 2013 final reconciliation payment.  So

15   within that support for the 2013 final

16   reconciliation payment, there would be a column or

17   something in the spreadsheet specific to claims

18   verification.

19          Q.    Okay.  And if there is a column in

20   claims verification -- sorry, in the roll forward

21   schedule for claims verification, is that

22   indicating a reserve for deletes that you

23   anticipate needing -- or sorry.  No.

24                Is that a reserve for money that you

25   anticipate CMS taking back based on deletes?



Page 196

1          A.    It is the estimated anticipated payment

2     back to CMS for deletes related to the claims

3     verification program.  But at any given time not

4     all of those deletes have yet been submitted.

5     There could be a subset of them that have or have

6     not been submitted based on the time of year and

7     where we sit within a reconciliation.

8          Q.    I see.

9                So because some deletes identified

10    pursuant to claims verification were in fact

11    submitted to CMS, some portion of the roll forward

12    schedule line devoted to CV is -- could be

13    attributable to deletes that have already been

14    submitted and you're waiting for CMS to take the

15    money back, and some portion could be attributable

16    to deletes that you anticipate needing to make the

17    probable and estimable but you haven't submitted

18    them to CMS yet.  Is that right?

19         A.    Generally, yes.  I guess I would add

20    that even for the ones not submitted to CMS, I

21    would add a distinction that not only have they not

22    been submitted but there is some subset of a

23    balance where the work hasn't even occurred yet.

24    We're just estimating future work that will occur.

25         Q.    I see.  I see.



Page 197

1              So for example, work in claims

2    verification on 2013 date of service had not yet

3    begun when the program was canceled by

4    UnitedHealth; right?  UnitedHealthcare?

5         A.    So 2013 dates of service, May 2014

6    payment year?

7         Q.    Correct.

8         A.    Yes, that's correct.

9         Q.    And so did the roll forward schedules

10   for the time that you're testifying about have

11   reserves in place for 2013 date of service?

12        A.    Up until the month where we would have

13   released the accruals, there was an inherent

14   balance for claims verification on our roll

15   forwards, yes.

16        Q.    And specifically for claims verification

17   for 2013 date of service?

18        A.    Yes.  As of -- so as of the quarters in

19   question for 2013, there would be nothing for 2014

20   payment year because we haven't hit that year yet.

21   So each quarter of 2013 would not have had any

22   reserve for '14 payment year because we haven't hit

23   '14 yet.  But then for Q1 and Q2 of 2014 there

24   would be a balance for claims verification.

25        Q.    I see.



Page 198

```
 1              So when did you -- what had to happen
 2      before you put a reserve in place for -- or what
 3      had to happen in order for you to put a reserve in
 4      place for 2013 date of service in 2014 payment
 5      year?
 6              MR. JONES:  Objection; form.
 7              THE WITNESS:  In the beginning of the
 8      year, the way it works for the first quarter of any
 9      year, because at that point minimal data has been
10      submitted because of the timing of the different
11      sweep periods.  The first quarter of any year is
12      using an estimated PMPM based on what had occurred
13      the year prior.  So in your question, in the first
14      quarter of 2014 we would have been using PMPMs from
15      2013 which baked into them had a reserve for claims
16      verification.
17              So by using a number that had claims
18      verification inside of it, we were basically
19      accruing to a claims verification balance in Q1 of
20      2014 as well even though no work had started yet.
21      BY MS. GLOVER:
22         Q.   I see.
23              How did you know how much to put in the
24      estimated reserve for 2013 date of service CV?
25              MR. JONES:  Objection; form.
```



Page 250

1    your question, you're asking me if we did claims

2    verification before we did claims verification.  So

3    I'm not sure I understand the question.

4    BY MS. McMAHON:

5        Q.    Well, I certainly did see the look of

6    confusion on your face, so I do want to clear it

7    up.

8            My question is prior to -- prior to

9    implementation of the claims verification, did you

10   do any other process that would have served the

11   same purpose as you just described it, that would

12   have served the same purpose that CV served?

13           MR. JONES:  Objection; outside the scope

14   of Judge Segal's order.

15           THE WITNESS:  We complied with all

16   audits such as RADV audits and they're now called

17   improper payment audits, IPM -- I'm blanking on the

18   name it was years ago.  But we complied with all

19   CMS audits which would have asked us to produce

20   medical records to support diagnosis codes.  So

21   that would have been what we would have done to

22   compare diagnosis to medical records.

23   BY MS. McMAHON:

24       Q.    But you didn't do anything in particular

25   with respect to the charts that had gone through



Page 251

1    chart review, right, to make sure that anything

2    that the coders did not find as supported to try to

3    validate any of those codes; correct?

4              MR. JONES:  Objection; outside the

5    scope.

6              THE WITNESS:  Correct.

7    BY MS. McMAHON:

8        Q.    And I would say by definition, if you

9    didn't have that type of process, then you were not

10   submitting deletes that would have -- that would

11   have resulted; correct?

12             MR. JONES:  Objection; outside the scope

13   of Judge Segal's order.

14             THE WITNESS:  Correct.  Without a

15   program to identify the deletes, we would not have

16   been submitting deletes.

17   BY MS. McMAHON:

18       Q.    Right, of course.

19             So my question is what was your -- what

20   was your decision to not submit deletes for codes

21   that were not identified in chart review but that

22   were on the provider's claim on the charts that

23   went through claims verification -- I mean, I'm

24   sorry, that went through chart review, what was

25   your decision based on to not have a program that



Page 331

1               C E R T I F I C A T E

2

3    DISTRICT OF COLUMBIA

4               I, JOHN L. HARMONSON, a Notary Public

5    within and for the District of Columbia, do hereby

6    certify that MELISSA SEDOR, the witness whose

7    deposition is hereinbefore set forth, was duly

8    sworn by me and that such deposition is a true

9    record of the testimony given by such witness.

10              That before completion of the

11   proceedings, review and signature of the transcript

12   was not requested.

13              I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17              IN WITNESS WHEREOF, I have hereunto set

18   my hand this 3rd day of July, 2023.

19

20              *John L Harmonson*

21              JOHN L. HARMONSON, RPR

                My commission expires: 04/14/26

22

23

24

25



**EXHIBIT P-6**

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA, ex rel.
BENJAMIN POEHLING,

      Plaintiffs,

vs.

                                         No.
UNITEDHEALTH GROUP, INC., et al.,    16-08697 FMO

      Defendants.

VIDEOTAPED DEPOSITION OF TIMOTHY RENJILIAN
March 21, 2024, 9:07 a.m.
Alston & Bird
One Atlantic Center
1201 West Peachtree Street
Suite 3800
Atlanta, Georgia

Michelle R. Lowe, RPR, CCR-2748



Page 32

1    can't just make up diagnosis codes and report them

2    because they want to.

3    BY MR. MASON:

4         Q    They can only submit what you call

5    appropriate diagnosis codes?

6         A    Yeah.  Again, not speaking as a lawyer,

7    but, yes, that's consistent with my understanding.

8         Q    Okay.  And diagnosis codes submitted for

9    risk adjustment must be adequately documented in a

10   medical record from a face-to-face encounter with a

11   medical provider; right?

12        A    I'm sorry.  Are you reading from my

13   report, or was that --

14        Q    I'm just asking you a question.

15        A    Oh.

16        Q    Diagnosis codes submitted for risk

17   adjustment must be adequately documented in a

18   medical record from a face-to-face encounter with a

19   medical provider; right?

20             MR. JONES:  Objection.  Form.

21        A    Well, again, I'm not speaking as a lawyer.

22             So I understand that ultimately if a code

23   is reviewed, it should have appropriate medical

24   record support.  The MAO doesn't gather underlying

25   medical record data or retain it for all codes and



Page 33

1  so it wouldn't necessarily have that kind of data,

2  you know, at its immediate disposal.  But

3  ultimately, to the extent that codes are being

4  reviewed, they should have adequate support.

5  BY MR. MASON:

6      Q    In a medical record from a face-to-face

7  encounter?

8      A    Correct.

9      Q    Okay.  And you said that -- Paragraph 35,

10  when you use appropriate clinical diagnosis codes,

11  you're referring to the statements that you made in

12  the preceding paragraphs; right?

13      A    I believe so.  Let me just make sure we're

14  clear.  Let me take a second and just take a look to

15  make sure.

16          Yes.  I -- I think that I'm using that

17  term there as -- as a bit of a catchall for the

18  various criteria that are expressed in the preceding

19  several paragraphs, at least back up through

20  Paragraph 31.  So appropriate is referring to

21  those -- those preceding paragraphs.

22      Q    Okay.  And let's look at Paragraph 31.  In

23  Paragraph 31, you say:  Diagnosis codes -- sorry.

24          You say:  According to the CMS 2012 Risk

25  Adjustment Regional Technical Assistance Participant



Page 34

1   Guide.

2           I might refer to that just as the

3   participant guide.  Is that okay with you?

4       A   Yeah, that -- that's fine.  I think, just

5   as a caution, there may be a couple of different

6   participant guides that are that referred to across

7   the different reports.

8       Q   Fair point.  So I will refer to that as

9   the 2012 participant guide.

10      A   Okay.  Thank you.

11      Q   So what you say in Paragraph 31 is:

12  According to the 2012 participant guide, diagnosis

13  codes included in risk adjustment data must be based

14  on clinical medical record documentation from a

15  face-to-face encounter, coded according to the

16  applicable coding guidelines, paren, ICD-9-CM or

17  ICD-10, closed paren, assigned based on dates of

18  service within the data collection period, and

19  submitted to the MAO from an acceptable source and

20  acceptable provider type.

21          Did I read that correctly?

22      A   Yes.  You read that very well.

23      Q   Okay.  And that requirement is part of

24  what makes a diagnosis code appropriate, as you use

25  it in your report; right?



Page 35

1          MR. JONES:  Objection.  Form.

2      A    That's what the participant guide says.  I

3   understand there could be different views of

4   requirements.  And I'm not opining as a lawyer, but,

5   yes, what -- what we read is consistent with my

6   understanding of the 2012 participant guide.

7   BY MR. MASON:

8      Q    And it's part of what you meant when you

9   said appropriate diagnosis codes in Paragraph 35?

10     A    As a general proposition, yes.  I mean,

11   I -- we're probably focusing more attention on the

12   specific word appropriate than I did at the time

13   that I selected that.

14          But, yeah, what I'm intending to do in

15   this section is to provide a general overview just

16   for background-setting purposes.  It's not meant to

17   be an exhaustive recitation of legal or other

18   requirements associated with the submission of

19   codes.  It's really intended just to be sort of a

20   foundation-setting discussion.

21     Q    Right.  This section -- well, what is the

22   purpose of this section?

23     A    As I said, just to provide some

24   foundational background for understanding my report.

25     Q    And -- and this section accurately sets



4116

Page 36

1   forth what your understanding of how the program

2   works; right?

3           MR. JONES:  Objection.  Form.

4       A    Well, again, as I said, it's meant to

5   be -- not meant to be an exhaustive recitation of

6   all of the requirements or nuances inside of those.

7   It's a -- meant to be a simplified background

8   explanation of my understanding.

9   BY MR. MASON:

10      Q    And you reference here the 2012

11  participant guide.  Can you explain what that is.

12      A    Yes.  That -- that was a guide that was

13  put out by CMS that just, you know, provided

14  additional training and guidance around the use of

15  risk assessment and the submission of codes and that

16  sort of thing.

17      Q    You said risk assessment.  Do you mean

18  risk adjustment?

19      A    I'm sorry.  Risk adjustment, yeah.  Thank

20  you.  Sorry.

21      Q    I'm just trying to make sure the

22  transcript is clear.

23      A    I appreciate that.  Sorry.  I do a lot of

24  risk assessment work as well so that just flowed a

25  little too naturally.



Page 50

1    supported or not appropriate for submission, you

2    know, my recommendation from a compliance standpoint

3    would typically be to delete that code.

4    BY MR. MASON:

5          Q    Go on.  Sorry.

6          A    No.  I'm sorry.  Go ahead.

7          Q    Why would that be a recommendation?

8          A    I think that's the -- you know, probably

9    the safest course of action.  It's not necessarily

10   the legal requirement, which I know that's the next

11   part of your question -- and I'll tell you now, I

12   don't know strictly from a legal standpoint what the

13   actual technical requirement would be.

14             But if you have definitive knowledge that

15   a code is not correct and, you know, impacts

16   payment, et cetera, et cetera, then I would say, you

17   know, the safest course from a compliance standpoint

18   is to delete it.

19         Q    You would only recommend that MAOs delete

20   codes if they've learned that it impacted the

21   payment?

22         A    No, not necessarily, because, frankly,

23   determining whether a code impacted payment, you

24   know, may be unknowable for quite some period of

25   time.



Page 51

1           So, yeah, again, I mean, I think it's

2    probably a facts and circumstances determination

3    rather than an abstract discussion.  But, generally

4    speaking, if -- if, you know, I had a client who

5    said they had identified codes as being not

6    supported, I would suggest that they delete those

7    codes.

8        Q    And you said -- when I asked you why, you

9    said because that would be the safest course of

10   action.  What do you mean by that?

11       A    Well, I think it would be hard for anybody

12   to object to the deletion of codes, whereas not

13   deleting them at least opens you up to, you know,

14   additional questioning in those circumstances.

15       Q    What type of additional questioning are

16   you referring to?

17           MR. JONES:  Objection.  Form.

18       A    Could be any kind of form, you know,

19   coming out of an OIG audit, a CMS audit, an internal

20   audit, et cetera.  I mean, there are all sorts of

21   people who are scrutinizing what happens in the

22   healthcare industry.

23   BY MR. MASON:

24       Q    And you said you don't know what the

25   participant guide says as to this question?



4119

Page 67

1    Q    And what CMS does is they calculate the

2    risk score for the beneficiary, excluding whatever

3    diagnosis code submission was deleted?

4         MR. JONES:  Objection.

5    A    That's right.

6         MR. JONES:  Form.

7    BY MR. MASON:

8    Q    Sorry.  I didn't catch the answer.

9    A    I'm sorry.  Yeah.  Again, some -- I have

10   not reviewed in detail the internal mechanics of

11   CMS's process, but that would be my general

12   understanding.

13   Q    Okay.  So, in other words, the next time

14   CMS calculates a risk score -- wherever we are in

15   the year, the next time CMS calculates a risk score

16   that specific submission that was deleted won't be

17   included in that calculation?

18   A    Presumably.

19   Q    And that would generally result in a

20   downward adjustment in the payment that the MAO

21   receives; right?

22   A    No.

23   Q    And are you saying no because it depends

24   on whether the diagnosis code that's deleted maps to

25   a risk adjusting HCC is duplicated by another



Page 68

1    diagnosis code that was submitted or is duplicated

2    at the HCC level by another diagnosis code that was

3    submitted?

4        A    Yes, all of those reasons, at least within

5    the initial processing of -- you know, by CMS.

6            It's also possible, of course, that, you

7    know, if a code is deleted there was another

8    unsubmitted code that was appropriate that -- that

9    could have been submitted that might take the place

10   of that or that other records are found if the -- a

11   code is, you know, audited and reviewed.

12           But in the strict sort of mechanical

13   processing, you know, if a code is taken out of

14   CMS's RAS system at that level, you know, the HCC

15   impact would flow from there in whatever way is

16   appropriate, but there may not be an HCC impact.

17       Q    And you mentioned unsubmitted codes.

18   Those unsubmitted codes can never be part of the

19   risk score that's calculated by CMS; right?

20           MR. JONES:  Objection.  Form.  Foundation.

21   Incomplete hypothetical.

22       A    If they weren't submitted, they would not

23   be considered as part of the -- the basic RAPS and

24   RAS processing, you know, flow that we just

25   discussed.  But they may ultimately come into play



Page 69

1    at some point, for example, through an audit process

2    or if a -- you know, a code is deleted and it's

3    found that another unsubmitted code that could

4    properly be submitted can be submitted in its place.

5    BY MR. MASON:

6        Q    We're going to talk about RADV and audits

7    later.

8             Right now I'm just talking about what

9    happens in the ordinary payment model --

10        A    Okay.

11        Q    -- the CMS-HCC model when MAOs submit adds

12    or submit deletes.  Okay?

13        A    Okay.

14        Q    So in the ordinary CMS-HCC model

15    unsubmitted codes are never part of the calculation

16    of a risk score; right?

17             MR. JONES:  Objection.  Form.  Foundation.

18    Asked and answered.

19        A    If a code hasn't been submitted, CMS won't

20    know about it.

21    BY MR. MASON:

22        Q    And therefore it can't be part of the

23    calculation of a risk score; right?

24        A    If it's not been submitted, it wouldn't be

25    factored into that initial risk score calculation.



Page 70

1        Q    Or the final risk score calculation?

2             MR. JONES:  Objection.  Form.  Incomplete

3    hypothetical.

4        A    Yeah.  Again, at the risk score

5    calculation level if a code is not submitted, an

6    unsubmitted code would not be considered in that

7    calculation process.

8    BY MR. MASON:

9        Q    And you mentioned that if the diagnosis

10   code is duplicated either at the HCC level or at the

11   diagnosis code level by another submitted code, then

12   the deletion would not have a financial impact in

13   the calculation of risk scores in the ordinary

14   CMS-HCC model; right?

15            MR. JONES:  Objection.  Form.  Incomplete

16   hypothetical.

17       A    That's one example of why a deleted code

18   might not have a payment impact at the beneficiary

19   level.

20   BY MR. MASON:

21       Q    And does CMS undertake any extra steps to

22   account for or search for or identify whether codes

23   are duplicated at the diagnosis code or HCC level?

24            MR. JONES:  Objection.  Form.  Incomplete

25   hypothetical.  Foundation.



Page 94

1        A    Okay.

2        Q    Do you understand?

3        A    Okay.  Yes.

4        Q    So you haven't offered an expert opinion

5    that the methodology that Dr. Garthwaite used to

6    identify which encounters had charts go through

7    Chart Review was flawed, have you?

8        A    I have not offered such an expert opinion.

9        Q    And you haven't offered an expert opinion

10    that the conclusions that Dr. Garthwaite reached

11    regarding which provider encounters had charts go

12    through Chart Review was incorrect -- or were

13    incorrect?

14            MR. JONES:  Objection.  Form.

15        A    That's not a question that I felt I needed

16    to evaluate in detail for purposes of my opinion.

17    So it's not that I don't have thoughts on that, but

18    I have not expressed an expert opinion on that.

19    BY MR. MASON:

20        Q    Okay.  And you -- you haven't identified

21    any specific encounters that Dr. Garthwaite says

22    their charts went through Chart Review that you say

23    he got it wrong; right?

24        A    Not something that I sought to do as part

25    of my expert reports.



Page 95

1          Q     You have an understanding of the
2    methodology that Dr. Garthwaite used to identify
3    which diagnosis codes were submitted by United to
4    CMS for risk adjustment by analyzing United's IRADS
5    and EDPS data?
6          A     We're talking just about his analysis of
7    what codes were submitted irrespective of whether
8    they link to Chart Review?
9          Q     Yeah.
10         A     Generally I understand that he was looking
11   at the same sorts of data that I was.
12         Q     And you're not offering an expert opinion
13   that Dr. Garthwaite did that part incorrectly, are
14   you?
15              MR. JONES:  Objection.  Form.
16         A     Again, I don't think that my opinions go
17   down to that level of detailed mechanics.  So I
18   didn't seek to identify where he may have gotten
19   that wrong.
20              I do point out, I think as I described his
21   methodology, some of the assumptions inherent in
22   that process, but I haven't expressed specific
23   expert opinions as to the degree to which he may
24   have gotten it wrong.
25   BY MR. MASON:



Page 96

1        Q    And you're familiar with the methodology

2   that Dr. Garthwaite used to identify which diagnosis

3   codes were recorded by Chart Review coders in the

4   Chart Review databases?

5             MR. JONES:  Objection.  Form.

6        A    Yes, generally I'm -- I'm familiar with

7   how he did that.

8   BY MR. MASON:

9        Q    And have you analyzed whether the

10  diagnosis codes that Dr. Garthwaite identifies as

11  found in Chart Review were, in fact, recorded in the

12  Chart Review databases?

13            MR. JONES:  Objection.  Form.

14       A    Again, not a question that I sought to

15  answer for purposes of my expert report; so I don't

16  have an opinion on that.

17  BY MR. MASON:

18       Q    Okay.  So you're -- you don't have an

19  expert opinion that Dr. Garthwaite misidentifies or

20  makes an error in identifying the diagnosis codes

21  that the Chart Review coders found?

22       A    I haven't expressed an opinion on that.

23            You know, again, I'd say that, you know, I

24  think he had to employ a number of significant

25  assumptions in that process, but I haven't sought



Page 97

1    exhaustively to rebut those assumptions or formed

2    a -- or expressed a particular expert opinion about

3    the extent to which those assumptions may drive his

4    calculations.

5         Q    And you're not offering an expert opinion

6    that -- that any of the diagnosis codes that he

7    identifies as found in Chart Review -- that -- that

8    he made any errors in identifying codes that were

9    found in Chart Review?

10        A    I haven't expressed opinions, one way or

11   the other.  So it shouldn't be meant to -- to

12   suggest that I agree --

13        Q    That's --

14        A    -- with him.  It's -- but I have not

15   expressed direct opinions saying that I disagree

16   with those -- those analyses.

17        Q    Sorry for interrupting.

18             Fair point.  I'm not trying to put words

19   in your mouth.  I'm just trying to close off, like,

20   what you did and did not an analyze.  So I'm not

21   trying to suggest that you have agreed with

22   Dr. Garthwaite on any of these things.  I'm just

23   trying to understand and make sure that I understand

24   what you have and haven't opined on.

25             So when I say you don't have an expert



Page 98

1  opinion on something, I'm not -- I'm not suggesting

2  that you have an expert opinion that it's correct.

3  Okay?

4      A    Okay.  No.  That's fair and I appreciate

5  that.  I also just want to make sure --

6      Q    Yeah.

7      A    -- the record is clear after the fact --

8      Q    Sure.

9      A    -- so --

10      Q    You have a familiarity with the

11  methodology that Dr. Garthwaite used to compare the

12  diagnosis codes that United submitted associated

13  with the provider claim to the diagnosis codes that

14  United chart reviewers found in a Chart Review of

15  the corresponding chart; right?

16      A    Again, he employs a bunch of assumptions

17  in there; so I don't want to say that -- that

18  there's a definitive way of knowing which chart --

19  which diagnoses were actually reviewed in Chart

20  Review, but I have not expressed opinions about the

21  mechanics of his specific analyses in that regard.

22      Q    You don't have an expert opinion that

23  Dr. Garthwaite performed that comparison

24  incorrectly?

25          MR. JONES:  Objection.  Form.



Page 99

1          A     Well, I have not expressed opinions on

2     that, one way or the other.

3     BY MR. MASON:

4          Q     Are you familiar with how -- are you

5     familiar with the fact that FTI supported United in

6     execute -- or implementing the claims verification

7     program?

8                MR. JONES:  Objection.  Form.  Foundation.

9          A     Actually, I don't think I was aware of

10    that, no.

11    BY MR. MASON:

12         Q     Do you know what the claims verification

13    program is?

14         A     I do.

15         Q     Can you just describe it at a high level.

16         A     Sure.  At a high level, it was a program

17    that was in effect from 2011 to 2012, I believe, in

18    which the intent was to try to identify what I think

19    United referred to as exclusive codes that had gone

20    through Chart Review and not been independently

21    identified in the course of that chart review.  That

22    was the subjective intent.

23                I think the -- I further understand that

24    the implementation of that was -- was difficult and

25    not always precise, but that's, at a high level, my



Page 123

1    that leads you to believe that.

2              MR. JONES:  Objection.  Form.

3         A    So I'm looking at -- as one example, I'm

4    looking at Paragraph 6 of my initial report from

5    December 3rd:  The first interrogatory requested

6    that the government identify certain information

7    related to each and every diagnosis code the

8    government alleges United knowingly and improperly

9    failed to delete or otherwise return to Medicare --

10   to the Medicare program as an overpayment.

11             And then the government produced data

12   tables comprising of approximately 28 million

13   records of data.

14             That's one example.

15   BY MR. MASON:

16        Q    And that doesn't say anything about the

17   methodology that the government used to compile the

18   diagnosis codes on the first interrogatory response,

19   does it?

20             MR. JONES:  Objection.  Form.  Misstates

21   the testimony.

22        A    So I'm not -- I don't know what other way

23   the government could have done that, but to try to

24   come up with some way of matching datasets to figure

25   out which charts may have been subjected to Chart



Page 124

1    Review and which codes from those charts may have

2    been identified or not identified by chart reviewers

3    and which chart -- and which codes had or had not

4    been deleted.

5           I mean, there is some sort of matching

6    mechanism that I believe has to be inherent to that

7    process and that would be consistent with my

8    understanding of all the data requests and the data

9    that was produced.

10          If you're telling me that there was some

11   other way the government did that, okay.  But I --

12   you know, the government hasn't disclosed its

13   methodology for compiling the first interrogatory

14   response, but from everything I've seen I believe

15   that's how it had to have been done in some form or

16   fashion.

17   BY MR. MASON:

18      Q    So just to make sure that we're clear on

19   the record, you don't have any knowledge of the

20   methodology that the government used; right?

21      A    The government --

22          MR. JONES:  Objection.

23      A    -- has not disclosed its methodology.

24   BY MR. MASON:

25      Q    So therefore you don't have any knowledge



Page 125

1    of how the -- how the codes on Interrogatory Number

2    1 were compiled; right?

3            MR. JONES:  Objection.  Form.  Misstates

4    the testimony.

5        A    You know, I -- I have my insights based on

6    my understanding of the data and the objective of

7    the exercise and the way the government has

8    characterized it.  I have not seen anything from the

9    government that says, this is exactly how we did it.

10   BY MR. MASON:

11       Q    And those insights are that the only way

12   to answer this question being asked in Interrogatory

13   Number 1 would be to evaluate through matching data

14   elements what charts went through Chart Review and

15   identify what codes were submitted based on provider

16   claims that weren't subsequently found in Chart

17   Review?

18           MR. JONES:  Objection.  Form.  Misstates

19   the testimony.

20       A    I'm saying it's the only way that I can

21   discern the government could have come up with the

22   FIR, based on the information that's been produced.

23   BY MR. MASON:

24       Q    Just going back to how you've written it

25   here in the Opinion 1 section on Page 8 of your



Page 126

1    rebuttal report.  Do you see the sentence that

2    begins with specifically?

3         A    I do.

4         Q    Specifically, the data available from

5    CMS's RADV audits in payment years 2011 to 2015

6    shows that 91 percent of the diagnosis codes in the

7    government's first interrogatory response -- which

8    are diagnosis codes the government alleges should

9    have deleted -- United should have deleted as

10   overpayments because they were not found in Chart

11   Review -- mapped to health conditions that were

12   confirmed to be supported by the government in the

13   RADV audits.

14            Did I read that correctly?

15        A    You read that correctly.

16        Q    And the way that you've written this,

17   you've said that the RADV data shows that 91 percent

18   of the diagnosis codes on the government's first

19   interrogatory response map to health conditions that

20   were confirmed to be supported by the government in

21   RADV audits; right?

22        A    Yes, that is what it says there.  I think

23   I make the basis for that 91 percent clearer in the

24   subsequent paragraphs of the report itself, which

25   makes clear that what I'm referring to is the codes



Page 127

1    from the FIR that overlap with RADV audits.

2         Q    Right.  What you've referred to as the

3    RADV overlap?

4         A    Correct.

5         Q    So this 91 -- as it's written, this isn't

6    quite correct; right?

7              MR. JONES:  Objection.  Form.

8    BY MR. MASON:

9         Q    When I say this, I mean the -- the last

10   sentence in your Opinion 1.

11             MR. JONES:  Objection.  Form.  Misstates

12   the testimony.

13        A    I think the basis of the opinion becomes

14   clearer, but I -- I agree that it would be clearer

15   in this bolded section of Opinion 1 if it said 91

16   percent of the diagnosis codes in the government's

17   first interrogatory response which overlapped with

18   the RADV audits, and then continued on from there.

19   BY MR. MASON:

20        Q    And -- and we'll talk about this later,

21   but I -- I think we're going to -- you're using

22   shorthand, and I've used it to, what you referred to

23   as the RADV overlap.  Can you explain what you mean

24   by a RADV overlap.

25        A    Sure.  Those would be diagnosis codes that



Page 128

1    are included in whatever relevant body of diagnosis

2    codes we're talking about, whether it's the FIR or

3    the Garthwaite deletes, that map to HCCs that were

4    reviewed by auditors as part of the RADV audit

5    program, which was in effect across -- or for which

6    we have relevant data across five years from the

7    audit years 2011 through 2015.

8         Q    So the diagnosis codes on the first

9    interrogatory response and the Garthwaite's delete

10   list are diagnosis code instances; right?

11        A    Yes.  The --

12             MR. JONES:  Objection.  Form.

13             THE WITNESS:  I apologize.

14        A    Yes.  The individual line items in the FIR

15   or in the Garthwaite deletes are expressed as

16   diagnosis codes, that's right.

17   BY MR. MASON:

18        Q    But they're not just the diagnosis codes.

19   They're the instances of the diagnosis codes.

20             In other words, the corresponding date of

21   service, provider information, et cetera.

22        A    So --

23             MR. JONES:  Objection.  Form.

24        A    Yes.  So they are expressed as instances

25   of a given diagnosis code.  There's multiple fields



Page 129

1    there:  Member, provider, year, and I think HCC as

2    well.

3    BY MR. MASON:

4        Q    And so it's not that -- it's not that that

5    whole -- that that specific diagnosis code instance

6    was reviewed in RADV.  It's just that the specific

7    diagnosis code itself maps to an HCC that CMS RADV

8    audits analyzed?

9        A    The -- the basis of the RADV audits was

10   the HCC.  And so -- yes, so when we're looking at

11   what the RADV auditors reviewed, they reviewed at

12   the HCC level.  And I have linked the diagnoses from

13   the different lists to those HCCs to identify which

14   diagnoses mapped to the HCCs that were reviewed by

15   the RADV auditors.

16       Q    I think I'm asking this question in a way

17   that's not clear; so I -- I'm going to try again.

18   I'm sorry.

19            What's set forth on both the first

20   interrogatory response and the Dr. Garthwaite delete

21   list are not just diagnosis codes; right?  They're

22   rows that include a diagnosis code, a date, a

23   provider, a member, a specific instance of a

24   diagnosis code that United submitted to CMS; right?

25       A    Generally speaking, yeah, that's a fair



Page 130

1   characterization.

2       Q    And when you say that there's a RADV

3   overlap, just to be clear, you're not saying that --

4   that that entire -- or that exact diagnosis code

5   instance -- the date of service, the provider, that

6   encounter that's associated with all of that -- was

7   reviewed in RADV; right?

8           MR. JONES:  Objection.  Form.

9       A    Yeah, what I'm saying is that those

10  diagnoses mapped to an HCC that was reviewed by the

11  RADV auditors.

12          And -- yeah, so that's right.

13  BY MR. MASON:

14      Q    Okay.  You're not offering an opinion that

15  that 91 percent rate that you've calculated at which

16  you -- you've concluded that the RADV overlap

17  resulted in finding a validation of the HCC --

18  you're not offering an expert opinion that that rate

19  should apply to the entire population of the first

20  interrogatory response, are you?

21      A    Well, certainly not as a statistical

22  matter.  I'm not saying that that 91 percent rate

23  can be extrapolated out to any full population of

24  claims or of diagnoses.

25          The way I'm using the RADV information,



4137

Page 131

1    you know, in particular here is as rebutting the

2    presumption that diagnosis codes not independently

3    identified by a chart reviewer were necessarily

4    unsupported.

5         Q    Okay.  And, likewise, you're not offering

6    an expert opinion that the 55 percent that you

7    calculated for the Garthwaite RADV overlap should be

8    applied to the entire population of the Garthwaite

9    delete list; right?

10        A    Again, I'm using that principally to rebut

11   Dr. Garthwaite's presumption that the codes on his

12   delete list were necessarily unsupported.

13        Q    So you agree then that you're not offering

14   an expert opinion that the 55 percent rate that you

15   calculated for the Garthwaite delete list should be

16   applied across the entire Garthwaite delete

17   population?

18        A    Well, when you say should be applied, I

19   mean, I think it's -- as I've, I think, termed it in

20   my report -- it's an instructive basis on which to

21   think about that grouping, but it's not a

22   statistically valid extrapolarable [sic] rate that

23   you could say with any sort of mathematical

24   confidence reflects, you know, anything about the

25   larger population of Garthwaite deletes.



Page 132

1      Q    If one were to opine that the validation

2   rate of 55 percent from the Garthwaite RADV overlap

3   that you calculated should be applied to the entire

4   Garthwaite delete list, then that would also mean

5   that 45 percent of the diagnosis codes on

6   Garthwaite's list map to member-HCC combinations

7   that would not be validated in RADV; right?

8            MR. JONES:  Objection.  Form.

9      A    Well, as I've said, I don't think the RADV

10  overlap can statistically or mathematically be

11  extrapolated to any population, which means just as

12  I wouldn't assert that that means that some certain

13  percentage of the codes are supported, it would be

14  inappropriate to conclude that that definitively

15  means that some certain percentage of the codes were

16  not supported.  And that's -- I think that's

17  important.

18            Nonetheless, my view, just based on what

19  we have in the RADV overlap, that some of the HCCs

20  to which the questioned diagnoses map were found to

21  be validated definitively rebuts Dr. Garthwaite's

22  presumption that the codes on his list are

23  necessarily unsupported, but you can't do the

24  converse and say, and here's the percentage that is

25  or is not supported.



Page 133

1           I think the other thing I would just throw

2      in there is that the RADV results, you know, are

3      also subject to appeal.  So we don't know whether or

4      to what extent the RADV audit findings might be

5      changed by appeals that United might pursue, and I

6      haven't seen that data.

7      BY MR. MASON:

8           Q    In your experience, is 45 percent of a

9      RADV audit not validating considered high?

10          MR. JONES:  Objection.  Form.  Foundation.

11     Misstates the testimony.

12          A    I don't -- I don't think there's enough

13     information here to make a judgment about that, one

14     way or the other.

15          I mean, at some level, right, if you did

16     enough work, you could find a population that had an

17     error rate of 100 percent, right, if you went all

18     the way through and did everything you needed to do.

19     That, to me, probably isn't the relevant way to

20     think about an error rate and there's not an

21     absolute standard as to what sort of error is too

22     high or not high enough.  There's judgment inherent

23     in those determinations.

24          So I don't have a clear answer for you on

25     that.



Page 134

1    BY MR. MASON:

2        Q    You said a minute ago if you did

3    everything you needed to do you could find a

4    population with 100 percent.  Can you explain what

5    you meant by that.

6            MR. JONES:  Objection.  Form.  Misstates

7    the testimony.  Incomplete hypothetical.

8        A    Sure.  So conceptually if you took a group

9    of -- well, let's just say, you know, emergency

10    department admissions and you did a 100 percent

11    thorough audit of every admission and you -- or on

12    every encounter and you ended up finding 20 that

13    were coded incorrectly.  The error rate associated

14    with those 20 is 100 percent.  Those 20 may be a

15    small percentage of the body that you looked at.

16            So as a framing device, there's 100

17    percent error rate associated with 20, but if that's

18    out of 100,000 emergency department encounters, say,

19    that's a -- I would probably -- you know, again in

20    my hypothetical -- characterize that as a low error

21    rate.

22            But as you tighten the lens, you can

23    artificially construct smaller and smaller

24    subpopulations that would logically have higher and

25    higher error rate percentages.



Page 135

1           So the framing, I think, is important.

2           MR. MASON:  Okay.  You know what?  This is

3    a decent breaking spot.  Why don't we go off the

4    record?

5           THE VIDEOGRAPHER:  We are going off the

6    record.  The time is 12:06 p.m.

7           (Recess taken from 12:06 p.m. to 1:19

8    p.m.)

9           THE VIDEOGRAPHER:  We are now back on the

10   record.  The time is 1:19 p.m.

11   BY MR. MASON:

12       Q    Good afternoon, Mr. Renjilian.

13           When we left off before lunch, we were

14   discussing your Opinion 1 in your rebuttal report;

15   right?

16       A    Right.

17       Q    And I'd like to pick up there,

18   specifically discussing your opinions regarding the

19   diagnosis codes in the RADV overlap that, as you put

20   it, were validated in RADV.  Okay?

21       A    Okay.

22       Q    And when you say that a diagnosis code

23   is -- was validated in RADV, what you mean is that

24   the RADV of the member-HCC combination that maps to

25   the same as the diagnosis code in the RADV



Page 136

1    overlap -- that that RADV found some diagnosis that

2    maps to the same HCC.  Did I get that right?

3         A    I think so, yeah.  So what -- what I mean,

4    just to rephrase, is that the HCC to which a

5    diagnosis mapped was a HCC that was validated by the

6    RADV auditor.  So in that circumstance, in my

7    tallies on a diagnosis basis, I -- I think I sort of

8    shorthand described that as a validated diagnosis.

9         Q    And so a diagnosis code can be validated

10   under those terms in RADV by any diagnosis code that

11   maps to the same HCC; right?

12        A    Yes.  It's really saying that the HCC is

13   validated, because we don't know specifically what

14   diagnosis the RADV auditor looked at.  And they

15   wouldn't necessarily look at all of the diagnoses.

16   They would stop when they got to one that supported

17   the HCC.

18        Q    Okay.  And so RADV does not actually

19   assess whether the specific diagnosis codes

20   submitted by an MAO are supported by medical

21   records?

22             MR. JONES:  Objection.  Form.

23        A    Yeah.  I don't think we know, one way or

24   the other, which specific diagnosis was found by the

25   RADV auditors to be supported, but it's just that



Page 137

1    the HCC was supported.  And therefore then in my

2    analysis any of those diagnoses that I sort of

3    describe as validated had no payment impact and, you

4    know, couldn't have affected the -- the -- the risk

5    scoring of the -- of the member affected.

6    BY MR. MASON:

7        Q    And there are multiple diagnosis codes

8    that map to each of the HCCs in the CMS-HCC model;

9    right?

10       A    Certainly at least for most.  I don't

11   remember if every one of them has multiple, but

12   probably so.

13       Q    Sometimes hundreds of diagnosis codes that

14   map to the same HCC?

15       A    There can certainly be many.

16       Q    And so RADV does not assess whether the

17   specific diagnosis code that the MAO submitted was

18   supported?

19           MR. JONES:  Objection.  Form.  Misstates

20   the testimony.

21       A    Again, the RADV audit is focused on the

22   condition level -- on the HCC and the condition code

23   and -- and they are looking at the diagnoses

24   underneath that, but we don't know from the data

25   which specific diagnosis the RADV auditors may have



Page 148

1          What I'm looking at is the impact of the

2     codes that were submitted and that are alleged here

3     to have been problematic.

4     BY MR. MASON:

5          Q    Okay.  But I'm just trying to see if you

6     agree that it's possible for a code that is

7     validated at the RADV -- in a RADV audit or

8     validated at the HCC level, as you're putting it,

9     to -- nevertheless, that specific diagnosis code is

10    not adequately documented in the medical record from

11    the face-to-face encounter that it's associated

12    with?

13         MR. JONES:  Objection.  Form.  Asked and

14    answered.  Calls for a legal conclusion.

15         A    It is certainly possible, for example, if

16    multiple codes were submitted that all mapped to the

17    same HCC, that some of those weren't supported.

18         That's certainly possible.  It's not

19    something I've evaluated.  Well, it's certainly

20    possible and I don't know that it's relevant to my

21    conclusions, but it's certainly possible.

22    BY MR. MASON:

23         Q    Okay.  And so it would be incorrect to

24    state that the RADV results confirmed that the

25    specific diagnosis codes that the MAO submitted were



Page 149

1  documented in any medical record; right?

2          MR. JONES:  Objection.  Form.  Asked and

3  answered.

4      A    We can't know or don't know which specific

5  diagnoses the RADV auditors reviewed to get to their

6  conclusion that a given HCC was supported; so we

7  don't know, one way or the other.

8          What we can say is that diagnoses that map

9  to an HCC that was found to be validated by the RADV

10 auditors is either supported or had no impact.

11 BY MR. MASON:

12     Q    Can you say that again.

13     A    Sure.

14     Q    What we can say is?

15     A    We can say that for all of the diagnoses

16 that map to an HCC that was validated by the RADV

17 auditors -- those codes were either supported or

18 they had no impact.

19     Q    When -- when you say they had no impact,

20 that's -- that's not true in terms of the impact to

21 the CMS payment process; right?

22         MR. JONES:  Objection.  Form.  Asked and

23 answered.

24     A    It is completely true.

25         You only need one code -- one diagnosis



Page 150

 1   that maps to a given HCC in order for that HCC to be

 2   calculated within CMS's system.

 3   BY MR. MASON:

 4        Q     Right.

 5        A     If you submitted five codes that map to

 6   the same HCC and four of them turned out to have

 7   been a problem for some reason, if the fifth one is

 8   okay, the other four didn't have an impact --

 9        Q     What if you only --

10        A     -- on that calculation.

11        Q     But what if you only submitted one

12   diagnosis code?

13            MR. JONES:  Objection.  Form.  Asked and

14   answered.

15        A     And I think that's a different

16   hypothetical.  We were talking about a hypothetical

17   where the HCC has been validated, but we don't know

18   which diagnosis code.

19            If -- is your question what happens if a

20   diagnosis code that uniquely supports an HCC was

21   determined definitively to be incorrect, would that

22   affect the payment model of CMS?  Is that your

23   question?

24   BY MR. MASON:

25        Q     Well, go ahead and answer that one.



Page 151

1           MR. JONES:  Objection.  Form.  Incomplete

2   hypothetical.

3       A    So within the confines of the -- the RAPS

4   and RAS model and without considering things like

5   the impact of unsubmitted but supported codes and

6   all of that and what actually constitutes an

7   overpayment, which are a couple of other levels of

8   consideration here -- strictly within the mechanics

9   of the model, if a single diagnosis code uniquely

10  supported an HCC and that diagnosis code was

11  definitively determined not to be supported or to be

12  inappropriate, then re -- the removal of that

13  diagnosis code would presumably affect the risk

14  calculation score that comes out of CMS's system.

15  BY MR. MASON:

16      Q    And that answer could hold true even if a

17  RADV found the HCC that that diagnosis code maps to

18  as supported by some other chart?

19          MR. JONES:  Objection.  Form.  Asked and

20  answered.

21      A    No.  Because in that scenario that code

22  wouldn't have mattered.  That diagnosis wouldn't

23  have mattered, because if that diagnosis maps to the

24  HCC and there's another supported diagnosis that

25  maps to that HCC, the HCC is supported and therefore



Page 152

1    the problematic code couldn't have had an impact.

2    BY MR. MASON:

3        Q    But in the CMS payment model there's no

4    opportunity to add additional diagnosis codes that

5    were unsubmitted after the final submission

6    deadline?

7        A    I don't think that's --

8             MR. JONES:  Objection.

9        A    -- what we're talking about.  I think

10   we're talking --

11            THE COURT REPORTER:  Was that an

12   objection?

13            THE WITNESS:  I'm sorry.

14            MR. JONES:  Objection.  Form.

15       A    I think we were talking about a scenario

16   where multiple codes support an HCC or multiple

17   codes were submitted and -- I'm sorry.

18            Please clarify your question, because I

19   think we got something lost there.

20   BY MR. MASON:

21       Q    Why don't we come back to that?

22            A diagnosis code can be validated in RADV

23   by any medical record that's presented by the MAO

24   for RADV; right?

25       A    You mean an HCC can be validated?



Page 153

1    Q    Fair enough.

2    A    Yes.  So an HCC can be validated by any of

3    the -- I think up to five different records that a

4    MAO may provide to the RADV auditors.

5    Q    You -- you object to the phrase a

6    diagnosis code being validated in RADV?

7         MR. JONES:  Objection.  Form.

8    A    Well, what I'm saying is that submissions

9    aren't made to support individual diagnoses

10   necessarily.  Support -- submissions are made to

11   support the HCC, because the level at which the RADV

12   audit is being performed.

13   BY MR. MASON:

14   Q    But you consider a diagnosis code to be

15   validated in RADV if RADV auditors find any other

16   diagnosis code that maps to the same HCC; right?

17        MR. JONES:  Objection.  Form.  Asked and

18   answered.

19   A    Yeah.  I tried to be clear on what my

20   calculations are saying.  They're saying that when

21   I'm calculating what we've called a validation rate

22   at the diagnosis code level, if the HCC to which the

23   diagnosis maps is validated, then I count that in

24   that rubric as a validated diagnosis.

25        I'm not saying that that specific -- any



4150

Page 154

1    specific diagnosis code from a specific provider on

2    a specific date was validated.

3            What I'm saying is that either all of

4    those diagnoses were supported or had no impact on

5    payment.

6    BY MR. MASON:

7        Q    Okay.  So CMS allows MAOs to go and

8    investigate all of the members' medical records for

9    the whole year and submit up to five medical records

10   that the MAO believes supports the HCC; right?

11           MR. JONES:  Objection.  Form.

12       A    That's generally consistent with my

13   understanding.  Again, not something I studied in

14   detail, but that sounds right.

15   BY MR. MASON:

16       Q    Even if none of those medical records are

17   associated with any RAPS submission that the MAO

18   made?

19           MR. JONES:  Objection.  Form.  Asked and

20   answered.

21       A    Yes.  My understanding is that the MAO can

22   support -- can submit any medical records in support

23   of the HCC and they don't necessarily need to relate

24   to a specific diagnosis that was submitted.  So

25   there could be another record that supports an



Page 155

1    unsubmitted diagnosis code that gets submitted by

2    the MAO and therefore yields a validated HCC from

3    the RADV auditors.

4    BY MR. MASON:

5        Q    So it's possible to be validated in RADV

6    even if no diagnosis codes that map to that HCC were

7    adequately documented in the specific medical record

8    that was associated with the RAPS submission?

9            MR. JONES:  Objection.  Form.  Asked and

10   answered.

11       A    It is possible that -- that a RADV auditor

12   considers a record that is not associated with a

13   submitted diagnosis code and finds that record to

14   support the HCC.

15   BY MR. MASON:

16       Q    And did you do anything to analyze whether

17   the RADV audits that you reference in your opinion

18   made any finding about the specific medical record

19   from the face-to-face encounter associated with

20   United's submission to CMS?

21       A    As I think we've discussed, we can't know

22   which specific diagnosis codes the RADV auditors

23   looked at.  What I know is that the RADV auditors

24   validated the HCC.

25       Q    Sorry.  No.  I'm not asking about which



Page 156

1   specific --

2        A    Oh.

3        Q    -- diagnosis code here.

4             I'm asking about --

5        A    Sorry.

6        Q    -- which specific medical record.

7             So my question is:  Did you do anything to

8   analyze whether the RADV audits that you reference

9   in your opinion made any finding about the specific

10  medical record from the face-to-face encounter that

11  was associated with United's submission to CMS?

12       A    I have not looked at the medical records

13  that the HCC -- I'm sorry -- that the RADV reviewers

14  reviewed at all.  I mean, that's really not relevant

15  to my analysis.

16       Q    Okay.  So you haven't looked at the

17  medical records; right?

18       A    That's correct, yeah, nor has

19  Dr. Garthwaite.

20       Q    But have you done anything to analyze

21  whether the RADV audits that you reference in your

22  opinion made any finding about the specific medical

23  record from the face-to-face encounter associated

24  with United's submission to CMS?

25       A    I haven't looked on a specific basis.  I



Page 157

1    have to conclude that the RADV auditors saw a

2    medical record that they agreed supported the HCC.

3    I don't know which one they saw.

4         Q    You don't know which one they saw and so

5    you don't know whether it was the same -- whether it

6    was the same one that was associated with United's

7    submission?

8              MR. JONES:   Objection.  Form.

9         A    There could be dozens that were associated

10   with United's submission.  So I don't know which one

11   you're talking about when you say one.

12   BY MR. MASON:

13        Q    But you don't even know if it was any of

14   those dozens?

15        A    That's correct.  I -- as I've said, I

16   don't know which medical record the RADV auditors

17   relied on to conclude that the HCC was supported.

18             And, again, that wasn't relevant to my

19   analysis which is really about whether or not these

20   diagnoses had any payment impact.

21        Q    And so you're not making an opinion

22   that -- you're not offering an expert opinion that

23   the RADV results show that United's chart reviewers

24   missed codes that were actually supported by the

25   charts that they were looking at; right?



Page 158

1           MR. JONES:  Objection.  Misstates the

2    testimony.  Form.

3       A    Yeah.  I don't think I know on that front.

4    I know that the RADV auditors found codes that were

5    supported but not submitted.  I don't know the

6    extent to which those may have been ones that were

7    on charts that were reviewed as part of chart

8    review.

9    BY MR. MASON:

10      Q    So it could be that the chart reviewers

11   didn't miss anything on the chart that they

12   reviewed, but that RADV reviewers found it on some

13   other chart?

14      A    I think that's one possibility.

15      Q    Okay.  And you don't know -- it's one

16   possibility and you don't know, one way or the

17   other, whether it's correct?

18           MR. JONES:  Objection.  Form.

19      A    Yeah.  I don't think anybody knows which

20   charts the RADV -- I'm sorry -- yeah -- the RADV

21   auditors reviewed and -- and concluded on.

22   BY MR. MASON:

23      Q    And you've also mentioned, I think a

24   couple of times, that RADV accounts for or credits

25   MAOs for additional supported and unsubmitted HCCs



Page 159

1    that they identify in the charts that they look at

2    in RADV; right?

3        A    Yes, that's right.

4        Q    You agree that that's not part of the CMS

5    payment process; right?

6            MR. JONES:  Objection.  Form.  Asked and

7    answered.

8        A    When you say CMS payment process, can you

9    just be more specific what you mean there?

10   BY MR. MASON:

11       Q    I'm referring to the process by which

12   we -- that we discussed earlier today by which CMS

13   pays monthly payments to MAOs based on the diagnosis

14   data and demographic information that MAOs submit to

15   CMS for risk adjustment.

16       A    To my knowledge, the -- the mechanics of

17   that system do not consider diagnoses that haven't

18   been submitted.  But I do think that the RADV

19   findings with respect to supported but unsubmitted

20   diagnoses and their related impact is relevant to an

21   evaluation of whether an MAO has been paid too much.

22       Q    And so the question you were assessing was

23   not how would -- the payments had been computed

24   differently had the diagnosis codes that were

25   unsupported been deleted, understanding you have



Page 219

1    about to make sure that we get to the right

2    determinations on those.

3    BY MR. MASON:

4        Q    So walk me through how that -- how that

5    works.

6        A    I think I just did.  Sorry.  That's the --

7        Q    Oh, can you add any more specificity to

8    how -- to how -- how that process ultimately arrives

9    at a conclusion whether the provider -- the codes

10   recorded by the provider are documented or

11   supported?

12       A    Sure.  And, again, I -- I thought I

13   covered this.

14            But so -- you know, as one example, if I

15   have the parallel review process:  One coder looks

16   at it; another coder looks at it.  It may be the

17   case that one coder says, I don't think this code

18   was supported.  And the other one thinks that was

19   supported.

20            In that circumstance then I would convene

21   the coders and say, let's -- you know, let's go

22   through the medical record as a group and let's

23   figure out, you know, why one of you found it and

24   one of you didn't, to make sure that we've actually

25   got it right.



Page 220

1          And then through that process -- with me

2     essentially as facilitator, but not as coder -- we

3     would reach the conclusion as to whether or not the

4     code that we were reviewing was actually supported.

5          MR. MASON:  Okay.  Good time for a break.

6     Why don't we go off the record here?

7          THE VIDEOGRAPHER:  We are going off the

8     record.  The time is 3:19 p.m.

9          (Recess taken from 3:19 p.m. to 3:44 p.m.)

10          THE VIDEOGRAPHER:  We are now back on the

11     record.  The time is 3:44 p.m.

12     BY MR. MASON:

13     Q    Mr. Renjilian, before the break we were

14     talking about your experience supervising teams and

15     conducting inter-rater reliability.

16     A    Yes.

17     Q    Is that -- am I saying that right?

18     A    You are, yes.

19     Q    When you -- in your experience in IRR --

20     can I call it that?

21     A    Sure.

22     Q    Are -- are the reviews being done blind?

23          MR. JONES:  Objection.  Form.  Foundation.

24     A    So there -- there are going to be sort of

25     different approaches, but one of the approaches I



Page 221

1    discussed was -- I think what I would characterize

2    as a blind approach to the extent that I would have

3    two different reviewers independently reviewing the

4    same record and then comparing the results that they

5    each independently came up with.  And that's one of

6    those quality control techniques that I utilized.

7    BY MR. MASON:

8        Q    Okay.  And you mentioned that if those

9    reviewers disagree, then you have a process for

10   convening them together and working out the

11   disagreement; right?

12       A    Correct.

13       Q    And if both of them agree that a code is

14   supported, what happens?

15       A    Then we would conclude that it was

16   supported.

17       Q    And if neither of them record a code is

18   supported, what happens?

19       A    Then we would conclude that -- that

20   whatever the code is and whatever kind of claim

21   is -- is not supported or --

22       Q    Without any other steps?

23            MR. JONES:  Objection.  Form.

24       A    Again, I'm speaking in general terms.

25            There -- there can be other steps, you



Page 222

1   know, in theory.

2          So, for example, if we presented the

3   interim results of our work to the client and the

4   client said, well, hold on a second, you know, that

5   can't be right, or, look, we found in this cabinet

6   another medical record.

7          That kind of thing could get considered in

8   the process as well.

9          But, yeah, generally speaking, part of the

10  point of that kind of parallel process is that if

11  they both agree on a finding, you can be pretty

12  comfortable that that's the appropriate finding and

13  if they disagree, you need to figure that out.

14  BY MR. MASON:

15      Q    We're still in your rebuttal report.  I'd

16  like to go to Paragraph 37.  You say:  The notion

17  that valid diagnosis codes can nonetheless be missed

18  by Chart Review coders is further supported by

19  the --

20          And then you refer to the RADV

21  underpayments; right?

22      A    Yes, yeah.  That's a summary of the -- of

23  that first couple of lines of Paragraph 37.

24      Q    And can you identify any result from the

25  RADV overlap that shows that a Chart Review coder



Page 238

1      A      This was the publicly disseminated result

2  of their audits.

3      Q      Your understanding is that these results

4  were publicly disseminated?

5      A      Well, I know that they were reflected

6  within a RADV audit summary that -- that I have

7  referenced in my report.  I don't actually recall

8  whether that was generally publicly available,

9  available only through a FOYA request.  I don't

10 recall exactly how it was obtained.

11     Q      Why -- why did you refer to it as publicly

12 disseminated?

13     A      Well, I apologize if that's a

14 misstatement.  My understanding was that that

15 information is available and it's been incorporated

16 into my work.

17     Q      Okay.  So your understanding is that this

18 was a finding by CMS?

19     A      Yes, that the results of their RADV audits

20 showed that 13 of those 15 contracts had negative

21 net recovery amounts or negative recovery amounts.

22     Q      And do you have an understanding whether

23 that result was finalized by CMS?

24            MR. JONES:  Objection.  Form.

25     A      I don't know what the current status is or



4161

Page 239

1    whether any appeals that United may have pursued

2    with respect to the findings of that -- of those

3    audits, you know, may also impact those results.  So

4    I don't know.

5    BY MR. MASON:

6        Q    You don't know that CMS considers those

7    preliminary results?

8            MR. JONES:  Objection.  Form.

9        A    I do under -- I guess I do understand that

10   they are not final-final.  My corresponding

11   understanding would be that they're not likely to

12   get worse from the MAO's perspective, but, rather,

13   that they are open to an appeal process that can be

14   initiated by the MAOs which may reverse some of the

15   adverse findings from those audits.

16   BY MR. MASON:

17       Q    So let me just back up.

18            Do -- do you have an under --

19   understanding whether these results were finalized

20   by CMS?

21            MR. JONES:  Objection.  Form.  Asked and

22   answered.

23       A    I don't believe that they were

24   final-final.

25   BY MR. MASON:



Page 253

1    whether the financial impact of deletes should be

2    offset by recalculating MLR remittances?

3              MR. JONES:  Objection.  Form.

4        A    Not necessarily, because I think what

5    we're looking at here is, in some respects, a

6    but-for world.

7              So, in other words, modeling -- I think in

8    Dr. Garthwaite's work he's modeled what he believes

9    reimbursement might have looked like had these

10   things been deleted.  And in that process, among

11   other things, as we discussed earlier, has taken

12   into account unsubmitted codes that were never

13   submitted, by definition, but that he's factored

14   those into his analysis because they could have been

15   taken into account at the time, had things

16   progressed the way he believes they should have

17   progressed.

18             So the basis for my MLR calculation here

19   is similar to say, you know, had all of that

20   happened, then also there would have been this

21   impact on the MLR calculation.

22             It's similar, I think, in many respects to

23   the work that he did around the risk corridors in

24   Part D, taking that into account in his work.  So

25   this is predicated on the notion of if at the time



Video Deposition                    357

1          DISCLOSURE OF COURT REPORTER

2

3          Pursuant to Article 10.B of the Rules and

4    Regulations of the Board Of Court Reporting of the

5    Judicial Council of Georgia, I make the following

6    disclosures:

7          That I am not disqualified for a

8    relationship of interest under the provisions of

9    OCGA Section 9-11-28(c); that I am a Georgia

10   Certified Court Reporter; that I am a representative

11   of MLowe Reporting, LLC; that MLowe Reporting, LLC,

12   was contacted by Regency-Brentano, Inc. to provide

13   court reporting services for this deposition; that

14   all financial arrangements beyond the usual and

15   customary rates have been disclosed and offered to

16   all parties; and that I will not be taking this

17   deposition under any contract prohibited by Georgia

18   law.

19

20         This the 22st day of March 2024.

21

22

23   _____

24         MICHELLE LOWE, RPR, CCR-2748

25

**EXHIBIT P-7**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - - - - - - - - - - - - - - - - -x

                                  :

UNITED STATES OF AMERICA, ex rel.:

BENJAMIN POEHLING,             :

                                  :

        Plaintiff,        :

                                  : Case No.

vs.                            : 2:16-cv-08697-FMO-SS

                                  :

UNITEDHEALTH GROUP, INC., et al.,:

                                  :

        Defendants.      :

                                  :

- - - - - - - - - - - - - - - - - -x

VOLUME I

VIDEOTAPED RULE 30(b)(6)DEPOSITION OF

OPTUMINSIGHT, INC. AND UNITEDHEALTHCARE, INC.,

BY THEIR DESIGNEE, KATHLEEN O. BAKER

Washington, D.C.

May 30, 2023

Reported by:

Misty Klapper, RMR, CRR

Job No.: 982005



Page 33

1    are you referring to?

2        A.    UnitedHealthcare's risk adjustment

3    health plan members, Medicare Advantage health

4    plan members.

5        Q.    And you're here today to testify

6    about certain aspects of Optum's chart review

7    program; is that right?

8        A.    The retrospective chart review

9    program, yes.

10        Q.    Okay.  So broadly speaking, what is

11    Optum's retrospective chart review program?

12        A.    Optum's retrospective chart review

13    program is a program where we submit a more

14    complete health status from medical records

15    collected on a member for appropriate payment

16    from CMS.

17        Q.    Okay.  So what is the purpose of

18    Optum's chart review program?

19        A.    To submit more complete health

20    statuses to CMS on risk adjustment members.

21        Q.    Okay.  And what do you -- what do you

22    mean when you say more complete risk adjustment



Page 41

```
1                    MS. MADDOUX:  Objection,
2            mischaracterizes testimony.
3                    THE WITNESS:  As part of the
4            retrospective chart review program we have
5            quality assurance's programs that look at
6            what our coders code and ensure -- to
7            ensure or to work towards a 95 percent
8            industry standard, which is what we all
9            do.
10                   BY MS. ZUPAC:
11           Q.     A 95 industry -- a 95 percent
12   industry standard in terms of accuracy?
13           A.     Correct.
14           Q.     Okay.
15           A.     For what our coders code.
16           Q.     Okay.  I just want to make sure that
17   we're operating under the same definition of
18   accurate.
19                   What is -- what is Optum's
20   understanding of the term accurate?
21           A.     For -- for -- well, it -- it would
22   vary.  And if I could go to my --
```



Page 68

1              And then once we get validation from

2       there, typically we either fax or we would secure

3       E-mail the complete list of the members.  And

4       then, based upon the number, we'd work with them

5       to schedule either on site or they could

6       themselves decide to send us the charts them --

7       back because they don't want people -- or they

8       wouldn't want somebody on site or various

9       permutations of that.

10         Q.    Okay.  And prior to this retrieval

11      process that you just described, there is a chart

12      targeting process, correct?

13         A.    Correct.

14         Q.    Okay.  So Optum began by targeting

15      certain charts to pull, correct?

16         A.    Began chart review?

17         Q.    Yes.

18         A.    We would -- actually, as part of the

19      targeting -- targeting was one of the first

20      steps, yes, not the -- not the first, first step,

21      because there's suspecting that you have to do

22      and then out of suspecting you go into targeting.



Page 69

1    But, yes, it was part of that.

2        Q.    Okay.  So we can actually go

3    backwards in time.

4             You mentioned that the first step

5    that Optum did was suspecting.

6        A.    Um-hmm.

7        Q.    And what is suspecting?

8        A.    You know, part of suspecting was just

9    taking a look at the whole universe of -- of

10   members.  And so you think about that, it's like

11   the whole universe and then targeting as you're

12   picking specific ones, right?

13            And so, like, from a suspecting

14   perspective, we'd take a look at information that

15   we have from CMS on -- on -- like, for instance

16   from the MOR, the Model Output Report, or other

17   CMS documentation that would tell us what health

18   statuses a member has, had either in the prior

19   year or the current year.

20            We would look at lab information.

21   We'd look at medications.  We'd look at encounter

22   information or claims information if we had it,



4170

Page 70

1    knowing that, again, this information, especially

2    if it comes from an MOR, could have come from

3    other health plans, right, because the member

4    could have not been in our health plan the prior

5    year.

6              You know, we take a look at

7    information such as, like, disease management

8    programs that our members belong to.  So, like,

9    you know, if someone was in diabetes, they would

10   probably be in a diabetes program; cancer, an

11   oncology program.  You know we take a look at

12   certain information like that.

13             And then, you know, as we look at

14   information regarding the different types of --

15   of health statuses that member either previously

16   had or currently has or how they interact with

17   one another, we would then compare that to the

18   claims information that we would have.

19             Or, in some cases, if we didn't have

20   claims information -- because, again -- I mean,

21   again, we -- we may not -- get a capitated

22   provider, a provider that -- or somehow we don't



Page 71

1    have information on that member, we may have just

2    made a request to a -- an assigned provider

3    panel, if that makes sense, patient panel to a

4    provider.

5              And then once we get to the universe

6    of what member-provider combinations there could

7    be, then we would go through a -- a -- you know,

8    a targeting process of saying okay, let's look

9    for these member-provider combinations based upon

10   health statuses, based upon their -- their health

11   risk status.

12        Q.    Okay.

13             MS. ZUPAC:  I'm going to pull up a

14        new exhibit, Tab 4.  So this exhibit will

15        be marked 608.

16                  (Exhibit 608 was marked for

17             identification.)

18             THE WITNESS:  Thank you.

19             BY MS. ZUPAC:

20        Q.    So this exhibit was produced in

21   native, so the individual slides don't have Bates

22   numbers.  But the Bates number of the document is



Page 76

1    of go, so that the question is not compound, and

2    talk about each one.

3            Generally speaking, I -- I'm trying

4    to ask whether or not Optum targeted charts for

5    outpatient provider visits, inpatient charts from

6    hospital admissions, nursing homes or any other

7    type of chart.  So that's generally what I'm

8    getting at.

9        A.    We would look at the CMS level

10   face-to-face encounter types, which are -- which

11   do include some of the examples that you just

12   gave or the examples that you just gave.

13       Q.    Okay.  So what's -- what -- what

14   types of visits specifically did the face-to-face

15   encounters include?

16       A.    Physician encounters, in-office

17   encounters or provider encounters, let's say,

18   like if it's a nurse practitioner, and then,

19   like, hospital reviews like you were just

20   describing.  Those are some of the examples.

21       Q.    Are there any other examples that you

22   can think of?



Page 93

1    from CMS.

2        Q.    And we've been discussing Optum's

3    suspecting and targeting processes, correct?

4        A.    Yes.

5        Q.    Okay.  Did -- did UnitedHealthcare,

6    Inc. -- was UnitedHealthcare, Inc. aware that

7    Optum was using suspecting logic to target

8    particular charts for retrieval?

9        A.    We would have conversations with

10   UnitedHealthcare on the logic we would use and

11   targeting to make sure we were generally aligned.

12       Q.    Okay.  And did UnitedHealthcare, Inc.

13   sign off on or approve the suspect logic that

14   Optum used?

15       A.    We would have conversations with them

16   and we would generally receive their approval on

17   the -- on the logic that we would deploy.

18       Q.    Okay.  And did Optum decide which

19   charts to target for retrieval based on their

20   chart score group?

21       A.    Chart score group was a consideration

22   on doing retrievals, but it was not the only



Page 94

1    consideration.

2              So, for instance, timing was a

3    consideration, like meaning -- the way the risk

4    adjustment program works, you have only until

5    January of the following year after the year that

6    the data collection period ended to submit that.

7    So you have about 13 months, you know, to submit

8    it.

9              And so with claims, if we're using it

10   for targeting and claims lag and -- and run out,

11   sometimes targeting wouldn't start until May of a

12   year and retrievals wouldn't start until summer.

13   So you had less time to do retrievals.  Right?

14   So just the timing of things would have had a

15   consideration.  Other things would have been

16   operational capacity.

17             So, you know, you could retrieve all

18   the charts you want, but if you can't code the

19   charts, then there's no -- you can't -- you can't

20   code them.  And so we would also have to take a

21   look at seeing if we only had the ability to code

22   1,000 charts, you know, you know, which 1,000



Page 95

1     does it make sense for us to look after.

2              And there could have been other

3     constraints, such as onshore/offshore

4     restrictions.  So not all charts could be sent

5     offshore for coding.  And so there is kind of

6     business rules that we had to take a look at, if

7     that makes sense.

8              So there's other things that we took

9     a look at as well.

10        Q.    Um-hmm.  The one thing you mentioned

11    is that Optum may have limited resources or

12    certain resources to code charts, correct?

13        A.    We have -- we had operational

14    considerations when you're looking at it,

15    production plans and operational capacity plans,

16    yes.

17        Q.    Okay.  So did Optum use the chart

18    score group information as part of its

19    consideration for which charts to retrieve?

20        A.    We -- chart score group was one of

21    the considerations, but not the only

22    consideration.



Page 166

1          going to be 100 percent complete in what

2          they pick up.

3              BY MS. ZUPAC:

4          Q.     And then with all the caveats that

5     you've mentioned on multiple answers, was it also

6     UnitedHealthcare, Inc.'s expectation that coders

7     working on its retrospective chart review

8     programs would code as accurately as possible?

9              MS. MADDOUX:  Objection, form,

10         asked and answered.

11             THE WITNESS:  Can you maybe

12         restate?

13             MS. ZUPAC:  Can you read back my

14         question.

15             (The record was read as requested.)

16             THE WITNESS:  I'd say UHC's

17         expectations were aligned with Optum's

18         with the fact that, you know, we both knew

19         that, you know, theory versus practice,

20         100 percent is never going to be the case.

21         But for what we -- for what our individual

22         risk adjustment coders were doing in the



Page 167

1              context of retrospective chart review,

2              that our program was designed to have what

3              they were coding to be at 95 percent or

4              above accuracy.

5                        BY MS. ZUPAC:

6              Q.      Okay.  And both Optum and HCC,

7          under -- or sorry.

8                        Both Optum and UHC understood that

9          the HCCs for members submitted to CMS were used

10         to determine risk adjustment payments to the

11         Medicare Advantage organization, correct?

12                       MS. MADDOUX:  Objection, out of

13             scope.

14                       THE WITNESS:  The risk adjustment

15             model underlying it is health statuses

16             tied to HCCs for appropriate payment.  But

17             not all HCCs submitted to CMS are there to

18             establish appropriate payment.  I mean,

19             like when -- let me clarify that.

20                       It's like you could send the same

21             HCC 15 times and not -- it -- it's only

22             one of those occurrence that matters.  So



Page 175

1          only worked in a paper and had not

2          navigated EM&R -- sorry -- EMR, so just

3          kind of, you know, various as a good

4          practice in terms of those types of sets

5          that we'd show to them.

6               BY MS. ZUPAC:

7          Q.     And in order for coders going through

8     training to move into production, they had to

9     achieve certain chart audit or quality audit

10    standards, correct?

11         A.     We would -- again, in terms of

12    retrospect chart review, release a coder into

13    production after they had demonstrated their

14    ability to meet or exceed that 95 percent

15    accuracy based upon what they coded.

16         Q.     And that was true of all date of

17    service years from 2008 to 2016?

18         A.     The 95 percent industry standard has

19    been in effect that time frame.

20         Q.     But I'm specifically asking was it

21    always Optum's policy that coders had to meet a

22    certain quality standard before they could be



Page 188

1           THE WITNESS:  We required that our

2       coders be certified coders.  And then from

3       there, we provided them training on risk

4       adjustment coding.

5           But every coder came with varying

6       degrees of -- of experience coding and

7       then experience coding diagnosis coding.

8       Right?

9           And so when a coder started with

10      us, they may have only done

11      fee-for-service coding and done CPT and

12      REV code coding, where they only have to

13      provide, like, the primary diagnosis code

14      or something like that in order for the

15      provider to get reimbursement.  Or they

16      could have been a -- again, a coder like

17      I -- I described earlier, that was more

18      familiar with cardiology.  Or they could

19      have been a coder that did radiology

20      billing, which has a very finite set.

21          And so our goal of our program for

22      training was to give them a baseline so



Page 189

1          that everybody was hearing the same thing,

2          to have the same training, you know, to be

3          able to get them to get them prepared to

4          be able to do their job.

5                But in regards to what your

6          question is, you know, all coders met our

7          job requirements, but they also come with

8          different levels of experience and skill

9          sets.

10               MS. ZUPAC:  All right.  Why don't

11         we break for lunch now.  Go off the

12         record.

13               VIDEO OPERATOR:  Off the record.

14         The time is 12:49.

15               (Thereupon, at 12:49 p.m. EDT, a

16                lunch recess was taken.)

17

18

19

20

21

22



Page 221

1          A.      I see that.

2          Q.      And as you've testified, ChartSync

3    was the program used to conduct retrospective

4    chart review for dates of service 2010, 2011,

5    2012 and some of 2013, correct?

6          A.      Yes.

7          Q.      All right.  So down at the bottom

8    there's a heading 2.5, Standard Operating

9    Procedure, and 2.5.1, Review ChartSync specific

10   coding guidelines.

11              Do you see that?

12         A.      I do.

13         Q.      All right.  All right.  So there are

14   certain instructions or notes here in bullet

15   points.  So that first bullet point states one

16   date of service, DOS, is considered an encounter,

17   correct?

18         A.      I see that.

19         Q.      Okay.  So charts could, and often

20   did, include multiple encounters or dates of

21   service, correct?

22              MS. MADDOUX:  Objection, form.



Page 222

1              THE WITNESS:  A chart could contain

2         multiple dates of services.

3              BY MS. ZUPAC:

4         Q.     Okay.  So I just want to go over the

5    setup in ChartSync for coding a chart, including

6    the -- multiple dates of service.  So that's what

7    we're going to be going over in the next few --

8         A.     Okay.

9         Q.     -- set of questions.

10             This SOP also notes that an encounter

11   can have multiple diagnoses, right?

12        A.     That's what it states.

13        Q.     Okay.  And it can also have multiple

14   error and admission codes, correct?

15        A.     That's what it states.

16        Q.     Okay.  So this third bullet point

17   notes that coders will only code ICD-9 codes that

18   map to HCC or RxHCC codes, correct?

19        A.     That's what it states.

20        Q.     Because, as you've testified, there

21   were something like 15,000 ICD-9 diagnosis codes

22   and not all of them mapped to an HCC, correct?



Page 260

1           A.      I mean, the member name and that --

2      that -- correct.  I mean, it's industry standard

3      to start with blind coding.

4           Q.      But I just want to make sure I

5      understand what exactly blind coding entails.

6           A.      Um-hmm.

7           Q.      So -- so in blind coding a coder

8      would not be informed, for example, about

9      diagnoses that the member is suspected to have,

10     correct?

11              MS. MADDOUX:  Objection, form.

12              THE WITNESS:  The -- in blind

13          coding a coder's given no additional

14          information, other than the image of the

15          chart to -- to code to the best of their

16          ability.

17              BY MS. ZUPAC:

18          Q.      And in blind coding a coder would not

19     be informed about diagnosis codes previously

20     submitted by a provider for that member, correct?

21          A.      The -- the -- in blind coding a

22     coder's is given no information.



Page 268

1          do it.

2                    BY MS. ZUPAC:

3          Q.     Okay.  And so we've been talking

4     about the recode project, but at a high level,

5     what was the recode project?

6          A.     The recode project was a project

7     where we had to take another look at our charts

8     due to a new coding policy application.

9          Q.     And which charts specifically were

10    subject to the recode project?

11         A.     The 2012 project year charts.  So

12    they are the 2011 dates of services due that

13    January 2013.

14         Q.     Okay.  And so the recode project

15    entailed taking charts that were coded in the

16    2012 project year and coding them again with a

17    changed coding policy?

18                    MS. MADDOUX:  Objection, form.

19                    THE WITNESS:  With a new coding

20          policy application.

21                    BY MS. ZUPAC:

22         Q.     Okay.  And those -- those charts from



Page 298

1    that you're mentioning that you tried to do

2    informed coding on in the 2013 date of service

3    year were not ultimately coded using informed

4    coding, correct?

5        A.    Correct.

6        Q.    Okay.  So then -- so then I -- I

7    guess I can modify my question to ask, are there

8    any other instances of charts successfully coded

9    using informed coding in the retrospective chart

10   review program that have not been marked with the

11   recode flag?

12            MS. MADDOUX:  Objection, form.

13            THE WITNESS:  Not that I'm aware of

14       in regards to the retrospective chart

15       review program.

16            BY MS. ZUPAC:

17       Q.    Okay.  Okay.  So aside from the

18   charts marked with the recode flag discussed

19   here, Optum coded charts for UnitedHealthcare's

20   chart review program using blind coding for the

21   2008 to 2016 dates of service, correct?

22       A.    Yes.



Page 299

1          Q.    Okay.  And why is that?  Why were

2     the -- why were charts other than those subject

3     to the recode program coded using blind coding?

4          A.    It's just how it organically evolved.

5     I mean, from the very beginning, there weren't --

6     there wasn't tools or processes or even claims

7     information available to be able to provide that

8     information from a blind -- or sorry -- from a --

9     from a -- a -- from a non-blind perspective.

10               And then as chart review --

11    retrospective chart review became industry

12    standard, it also just became industry standard

13    to do blind coding as part of its natural method

14    for doing it.

15         Q.    I believe you testified about --

16    at -- at the beginning there wasn't -- there

17    weren't other data sources to -- used to use

18    informed coding, correct?

19               MS. MADDOUX:  Objection, form.

20               THE WITNESS:  There weren't --

21          there wasn't an ability to tie, you know,

22          a -- like a -- a claim to a -- a chart,



Page 351

1    second-level review, quality assurance and

2    overread, correct?

3         A.    Yes.

4         Q.    Okay.  So what is your understanding

5    of second-level review?

6         A.    Because we, you know, established

7    that every -- that not every coder -- that coders

8    won't get to 100 percent completeness and that,

9    based upon the coder's own individual skill sets

10   and experience and the complexity of the chart,

11   we would have that chart coded by a second coder

12   for a second level of review.

13        Q.    Okay.  And when did -- when did you

14   start performing second-level review?

15        A.    In recode we started coding 2LR or

16   second-level review.

17        Q.    Okay.  Let me make sure I understand

18   that.

19              During the recode project that

20   you've --

21        A.    During the recode project, yes.

22        Q.    Okay.  And then subsequent to the



Page 352

1    recode project, did Optum start sending some

2    charts to second-level review automatically?

3          A.      We would send charts to second-level

4    review based upon the information that we saw,

5    where again, depending upon the coder's

6    experience -- the complexity of the chart, the

7    type of chart, if it was EMR or if it was

8    handwritten -- that we would send it to

9    second-level review.

10         Q.      Okay.  And so the basic process for

11   second-level review is a chart was reviewed and

12   coded once by a production coder, correct?

13                 Step one, sorry.  Let's -- let's put

14   it that way.

15         A.      Okay.

16         Q.      All right.  So step one of the

17   second-level review process was that a chart was

18   reviewed and coded by a production coder once,

19   correct?

20         A.      First-time coding.

21         Q.      Okay.  It was referred to as

22   first-time coding?



Page 353

1           A.      First-time coding --

2           Q.      Okay.  All right.

3           A.      -- FTC, yes --

4           Q.      Okay.

5           A.      -- or 1LR.

6           Q.      1LR, okay.

7                   So the first step was to conduct --

8    for the -- for a coder to conduct first-time

9    coding or basically just review the code the

10   first time and using the normal blind coding

11   process, correct?

12               MS. MADDOUX:  Objection, form.

13               THE WITNESS:  We would code the

14         chart using our standard process, which

15         was the -- a -- a blind code.

16               BY MS. ZUPAC:

17         Q.      Okay.  And then a chart that was

18   subject to second-level review would be assigned

19   to a different coder; is that right?

20         A.      It would be assigned to a different

21   coder.

22         Q.      And that -- that second-level



Page 354

1    reviewer, that second-level coder, would then

2    conduct a second blind review of that chart?

3        A.    A second blind review of that chart.

4        Q.    Okay.  And so did -- did Optum

5    perform second-level review on charts at a time

6    when ChartSync was operational?

7        A.    I mean, while technically ChartSync

8    was operational during recode, we just didn't use

9    ChartSync.

10       Q.    Okay.  So I -- I -- I guess let me

11   ask my question a different way.

12             Was second-level review performed

13   using ChartSync at all?

14       A.    Not that I recall.

15       Q.    Okay.  So what was the general

16   process for conducting second-level review?  Was

17   it conducted on paper with results later uploaded

18   to a database or some other method?

19       A.    In the 2013 project year it was based

20   upon the -- the paper and spreadsheet process,

21   yes.

22       Q.    Um-hmm.



Page 386

1          So then let's move on to the next

2     quality score, which is the completeness quality

3     score.

4               What does that refer to?

5          A.     So the completeness quality score is

6     in -- if, in their review of the encounter

7     information, that the QA auditor identified

8     another diagnosis code that could have been coded

9     by the production coder because it would have

10    been picked up -- or sorry -- because the

11    documentation supported it, they would have noted

12    that diagnosis code and that would have been

13    noted on their -- the coder's QA feedback.

14         Q.     Okay.  So again, just trying to

15    figure out mechanically how this would work and

16    be calculated.

17              So start -- again, back to Mary, the

18    production coder identified diagnosis code or

19    codes that mapped to HCC 15 for diabetes.

20         A.     Um-hmm.

21         Q.     Okay?

22              And then the QA coder is reviewing



4192

Page 410

1                    CERTIFICATE OF NOTARY

2            I, MISTY KLAPPER, the officer before whom

3    the foregoing deposition was taken, do hereby

4    certify that the witness whose testimony appears in

5    the foregoing deposition was duly sworn by me; that

6    the testimony of said witness was taken by me in

7    shorthand and thereafter reduced to typewriting by

8    me; that said deposition is a true record of the

9    testimony given by said witness; that I am neither

10   counsel for, related to, nor employed by any of the

11   parties to the action in which this deposition was

12   taken; and, further, that I am not a relative or

13   employee of any attorney or counsel employed by the

14   parties hereto, nor financially or otherwise

15   interested in the outcome of this action.

16

17          _____
              *Misty Klapper*

             Misty Klapper, RMR, CRR

18           Notary Public in and for

             the District of Columbia

19

20

21

22



**EXHIBIT P-8**

# Medicare Managed Care Manual
## Chapter 7 – Risk Adjustment

**Table of Contents**
*(Rev. 118, 09-19-14)*

### Transmittals for Chapter 7

10 – Introduction
20 – Purpose of Risk Adjustment
30 – Statutory and Regulatory Authority for Risk Adjustment
40 – Role and Responsibilities of Plan Sponsors
50 – History of Risk Adjustment
60 - Annual Schedule
70 – Risk Adjustment Models- Overview
  70.1 – Calibration of the CMS-HCC Risk Adjustment Models
  70.2 – CMS-HCC Risk Adjustment Model
    70.2.1 – Community, Institutional, and New Enrollee Segments
    70.2.2 – Risk Score for Long Term Institutionalized Beneficiaries
    70.2.3 – Demographic Factors in the CMS-HCC Model
    70.2.4 – Original Reason for Entitlement Code (OREC)
    70.2.5 – Medicaid
    70.2.6 – Disease Hierarchy
    70.2.7 – Disease and Disabled Interactions
  70.3 – End Stage Renal Disease (ESRD)
    70.3.1 – Dialysis
    70.3.2 – Transplant
    70.3.3 – Post-Transplant (Functioning Graft)
    70.3.4 – New Enrollee Factors for Beneficiaries in ESRD Status
  70.4 – Prescription Drug Hierarchical Condition Categories (RxHCC)
    70.4.1 – RxHCC Risk Adjustment Model Segments
    70.4.2 – Low Income Status
    70.4.3 – Long Term Institutional Status
  70.5 – CMS RxHCC Risk Adjustment Model Compared with the CMS-HCC Risk Adjustment Model
    70.5.1 – Model Similarities
    70.5.2 – Model Differences
80 – Frailty Adjuster
90 – Normalization Factor

100 - MA Coding Adjustment

110 – Risk Adjustment Process and Payment

120 – Operations

    120.1 – Data Collection to Support Risk Adjustment

        120.1.1 – Sources of Data

    120.2 – Submission and Flow of Risk Adjustment Data

        120.2.1 – Data Exchange Requirements

        120.2.2 – Format

        120.2.3 – Diagnosis Cluster

        120.2.4 – Valid Diagnosis Codes

        120.2.5 – Tips for Reducing Duplicate Diagnosis Cluster Errors

        120.2.6 – Health Insurance Portability and Accountability Act (HIPAA)

        120.2.7 – Submission Timeline

        120.2.8 – Status Reports of Risk Adjustment Submissions

    120.3 – Risk Score Verification Tools

        120.3.1 – RAPS Reports

        120.3.2 – MARx Reports

        120.3.3 – Risk Adjustment Model Software

130 - Glossary of Terms

## 10 - Introduction
**(Rev. 114, Issued; 06-07-13, Effective: 06- 07-13, Implementation: 06-07-13)**

This manual chapter addresses the policies and operations related to the data collection for, calculation of, and use of risk scores in Part C and Part D payments through 2011.  For detailed information on payment policies and formulas, refer to Chapter 8 for Part C payment (a chapter for Part D payment is forthcoming).  CMS risk adjusts Part C payments made to Medicare Advantage (MA) plans and Program of All Inclusive Care for The Elderly (PACE) organizations, and Part D payments made to Part D sponsors, including Medicare Advantage-Prescription Drug plans (MA-PDs) and standalone Prescription Drug Plans (PDPs).

## 20 - Purpose of Risk Adjustment
**(Rev. 114, Issued; 06-07-13, Effective: 06- 07-13, Implementation: 06-07-13)**

Risk adjustment allows CMS to pay plans for the risk of the beneficiaries they enroll, instead of an average amount for Medicare beneficiaries.  By risk adjusting plan payments, CMS is able to make appropriate and accurate payments for enrollees with differences in expected costs.  Risk adjustment is used to adjust bidding and payment based on the health status and demographic characteristics of an enrollee.  Risk scores measure individual beneficiaries' relative risk and risk scores are used to adjust payments for each beneficiary's expected expenditures.  By risk adjusting plan bids, CMS is able to use standardized bids as base payments to plans.

## 30 - Statutory and Regulatory Authority for Risk Adjustment
**(Rev. 114, Issued; 06-07-13, Effective: 06- 07-13, Implementation: 06-07-13)**

The Medicare Advantage (MA) program provides Parts A and B services under Part C of Title XVIII of the Social Security Act ("the Act").  CMS administers risk adjusted payments to MA organizations in accordance with Subpart G of 42 CFR §422.304.  This regulatory provision is based on sections 1853, 1854, and 1858 of the Act.  CMS risk adjusts Part C payments made to MA plans under Section 1853(a) (3) of the Act; these rules are codified at 42 CFR 422.310.  CMS risk adjusts payments to PACE organizations under 1894(d) (2).

MA plans include MA-only plans, MA-PD plans, regional plans, employer group health plans, and Special Needs Plans (SNPs).  CMS risk adjusts certain demonstration plan payments, such as the Part C payments made to the dual demonstration plans (Wisconsin Partnership Program, MassHealth Senior Care Options, and Minnesota Senior Health Options and Minnesota Disability Health Options), and Social Health Maintenance Organizations (SHMOs).

CMS risk adjusts Part D payments to Medicare Advantage Prescription Drugs plans (MA-PDs), standalone Prescription Drug Plans (PDPs), and PACE organizations under 1860(d); these rules are codified at 42 CFR 423.

## 40 - Role and Responsibilities of Plan Sponsors
*(Rev. 118; Effective: ICD-10: Upon Implementation of ICD-10, ASC X12: January 1, 2012 (for ASC X12 5010); Implementation: ICD-10: Upon Implementation of ICD-10, ASC X12: January 1, 2012 (for ASC X12 5010))*

MA organizations, PACE organizations, 1876 Cost HMOs/Competitive Medical Plans (CMPs), and starting in 2012, Health Care Prepayment Plans (HCPPs) like the United Mine Workers of America Health and Retirement Funds, must submit risk adjustment data, as required by CMS.

This section provides a high-level checklist of plan requirements. Detailed information about risk adjustment data collection, submission, reporting, and validation are outlined in later sections within this chapter.

**Risk Adjustment Data Submission Requirements** – Plan Sponsors (Medicare Advantage Organizations (MAOs), PACE organizations, and 1876 Cost HMO/CMPs) must:

- Ensure the accuracy and integrity of risk adjustment data submitted to CMS. All diagnosis codes submitted must be documented in the medical record and must be documented as a result of a face-to-face visit. The diagnosis must be coded according to *International Classification of Diseases, (ICD) Clinical Modification Guidelines for Coding and Reporting*.

- Implement procedures to ensure that diagnoses are from acceptable data sources. The only acceptable data sources are hospital inpatient facilities, hospital outpatient facilities, and physicians. Plan sponsors are responsible for determining provider type based on the source of the data.

- Submit the required data elements from acceptable data sources according to the coding guidelines.

- Submit all required diagnosis codes for each beneficiary and submit unique diagnoses at least once during the risk adjustment data-reporting period. Submitters must filter diagnosis data to eliminate the submission of duplicate diagnosis clusters.

  o For Part B-only beneficiaries enrolled in a plan, the plan sponsor must submit diagnosis codes under the same rules as for a beneficiary with both Parts A and B. The plan should also submit *diagnosis* codes for Part A services provided under a non-Medicare contract.

  If upon conducting an internal review of submitted diagnosis codes, the plan sponsor determines that any diagnosis codes that have been submitted do not meet risk adjustment submission requirements, the plan sponsor is responsible for deleting the submitted diagnosis codes as soon as possible.

- Receive and reconcile CMS Risk Adjustment Reports in a timely manner. Plan sponsors must track their submission and deletion of diagnosis codes on an ongoing basis.

- Once CMS calculates the final risk scores for a payment year, plan sponsors may request a recalculation of payment upon discovering the submission of inaccurate diagnosis codes that CMS used to calculate a final risk score for a previous payment year and that

had an impact on the final payment.  Plan sponsors must inform CMS immediately upon such a finding.

## 50 - History of Risk Adjustment
**(Rev. 114, Issued; 06-07-13, Effective: 06- 07-13, Implementation: 06-07-13)**

The Balanced Budget Act of 1997 (BBA) mandated that a risk adjustment payment methodology, incorporating information on beneficiaries' health status, be implemented in the Medicare+Choice (M+C) program (now the Medicare Advantage program) no later than January 2000.  Under the BBA, risk adjustment of M+C payments was initially to be based only on data from enrollees' inpatient hospital stays, with later implementation of risk adjustment based on data from additional sites of care.  CMS selected the Principal Inpatient Diagnostic Cost Group (PIP-DCG) model as the risk adjustment method to be implemented in 2000.  This model recognizes diagnoses for which inpatient care is most frequently appropriate and which are predictive of higher future costs.

To assist managed care organizations, CMS provided for a gradual phase-in of risk adjusted payment, initially adjusting only a portion of the total payment based on the PIP-DCG methodology - and later the CMS Hierarchical Condition Category (HCC) methodology - with the remainder still adjusted under the pre-BBA method based only on demographic information. This phase in was intended to provide more stable payments to M+C organizations.

The phase in schedule was as follows:

| Payment year | MA plans | Evercare* | SHMO* | PACE and dual demonstrations* |
|---|---|---|---|---|
| 2000-2003 | 10% risk/90% demographic | 100% demographic | 100% demographic | 100% demographic |
| 2004 | 30% risk/70% demographic | | | 10% risk/90% demographic |
| 2005 | 50% risk/50% demographic | | 30% risk/70% demographic | |
| 2006 | 75% risk/25% demographic | | 50% risk/50% demographic | |
| 2007 | 100% risk/0% demographic | | 75% risk/25% demographic | |
| 2008 and later | | | 100% risk/0% demographic | |

*Note:  For MA plans (formerly M+C plans), the demographic-only portion of the payment was adjusted for age, gender, Medicaid eligibility, institutional status, and working aged status.  For certain demonstrations, the non-risk portion of the payment may have involved a demonstration-specific payment methodology.

ESRD risk adjustment was implemented at 100% in 2005.  Part D risk adjustment was implemented at 100% in 2006.

4199

## 120.2 - Submission and Flow of Risk Adjustment Data
**(Rev. 114, Issued; 06-07-13, Effective: 06- 07-13, Implementation: 06-07-13)**

The following outlines the flow of risk adjustment data:

- Hospital/Physician submits data to MA organization using standard claims formats, or through review of medical records.

- The MA organization submits required data at least quarterly to FERAS via Direct Data Entry (DDE) or RAPS format.

- FERAS checks the file-level data, batch-level data, and first and last detail records on each Batch Record within the file.

- If any data are rejected, the rejections are reported on the FERAS Response Report.

- After passing the FERAS checks, the file is submitted to RAPS where detail editing is performed and applicable reports are generated.

- The RAPS Return File contains the entire submitted transaction and identifies errors.

- The RAPS Transaction Error Report communicates errors found in CCC records during processing.

- The RAPS Transaction Summary Report summarizes the disposition of the diagnosis clusters.

- The Duplicate Diagnosis Cluster Report identifies diagnosis clusters with the 502-error message.  Duplicate clusters are accepted but not stored.

- The RAPS Monthly Plan Activity Report and Cumulative Plan Activity Report provides a summary of the status of submissions by submitter ID and plan number.

- Distributed monthly and quarterly, the Error Frequency Report provides an overview of all errors associated with files submitted in test and productions.

- RAPS database stores all finalized diagnosis clusters.

- RAS calculates the Risk Adjuster Factors by executing the CMS-HCC model.

- MARx is used in the calculation of payments and determination of plan payments.

## 120.2.1 - Data Exchange Requirements
**(Rev. 114, Issued; 06-07-13, Effective: 06- 07-13, Implementation: 06-07-13)**

Prior to submitting risk adjustment data to CMS, CMS requires MAOs to:

- Complete and submit an Electronic Data Interchange (EDI) Agreement to the Customer Service and Support Center (CSSC) within 1 month of their contract's HPMS effective date.

    o The EDI Agreement is a contract between the MAO and CMS attesting to the accuracy of the data submitted.

    o An officer (e.g., CEO) that represents the MAO must sign the EDI Agreement

- Submit test data within three months of the HPMS effective date.

- Submit production files within four months of the HPMS effective date and continue to submit at least one time per quarter.

If the MAO uses a third party submitter:

- A Letter of Authorization on company letterhead from the plan is required indicating that the third party vendor is going to submit on their behalf.

- The MAO must complete the EDI Agreement.

- The third party submitter must complete the Submitter ID Application Form.

If the MAO establishes a new contract number, the MAO must submit a new EDI agreement. If the submitter's system successfully submitted test data previously, CMS does not require additional testing.

Note: CMS holds the MA organization accountable for the content of submissions regardless of who submits the data.

## 120.2.2 – Format
*(Rev. 118; Effective: ICD-10: Upon Implementation of ICD-10, ASC X12: January 1, 2012 (for ASC X12 5010); Implementation: ICD-10: Upon Implementation of ICD-10, ASC X12: January 1, 2012 (for ASC X12 5010))*

In accordance with CMS' 2008 Call Letter, MA organizations must submit risk adjustment data electronically using one of two formats to enable CMS to more efficiently process the data at CSSC and ensure appropriate payment under the risk adjustment payment models. MA organizations must submit data electronically using either the RAPS format or the Direct Data Entry (DDE) option. Both of these formats are used for all provider types.

Table 20 describes each field of the current RAPS file layout.

4201

**EXHIBIT P-9**

# CMS Manual System

## Pub. 100-16 Medicare Managed Care

**Department of Health & Human Services (DHHS)**
**Centers for Medicare & Medicaid Services (CMS)**

| Transmittal: 57 | Date: AUGUST 13, 2004 |
|---|---|

## I. SUMMARY OF CHANGES:

**NEW/REVISED MATERIAL - EFFECTIVE DATE:  August 13, 2004**

**Table of Contents** - Added new line for new Exhibit 30.

**Section 55 - Coverage of Clinical Trials:**

In first paragraph, updated years "2002 through 2003" to read "2002 through 2005."

In second paragraph, updated reference to the Medicare National Coverage Determinations manual and the web address.

Deleted previously fourth and fifth paragraphs regarding payment of clinical trail items and services on a fee-for-fee service basis.

Added fifth paragraph referring reader to Exhibit 2, the Medicare National Coverage Determinations Manual, and Program Memorandum AB-01-142 for information on billing for clinical trial services.

Deleted the previously last two paragraphs which together provided reference to Program Memorandum and instructions on submitting claims for clinical trail services.

Miscellaneous changes throughout section.

**Section 111.1 - Hospital Inpatient Data** - Updated citation in last sentence to read "Exhibit 30" for new exhibit instead of "the section of these instructions titled Coexisting Conditions."

**Exhibit 30 - Diagnostic Coding and Guidelines for Data Collection from Provider Networks -** Added new exhibit.

***Disclaimer for manual changes only:  The revision date and transmittal number apply only to red italicized material.  Any other material was previously published and remains unchanged.  However, if this revision contains a table of contents, you will only receive the new/revised information and not the entire table of contents.***

MAPL000180135

To aid in determining whether or not a provider is a Medicare-certified hospital inpatient facility, the M+C organization may refer to the Medicare provider number.  The Medicare provider number has a two-digit state code followed by four digits that identify the type of provider and the specific provider number.  Exhibit 25 outlines the number ranges for all facility types that CMS considers to be Medicare hospital inpatient facilities.  If the facility's Medicare provider number is unknown, the M+C organization may verify the provider number with the facility's billing department.

Some hospitals also operate Skilled Nursing Facilities (SNFs) as separate components within the hospital or have components with "swing beds" that can be used for either hospital inpatient or SNF stays.  The M+C organizations shall not submit any diagnoses for stays in the SNF component of a hospital or from swing bed stays when the swing beds were utilized as SNF beds.  Stays in both of these circumstances qualify as SNF stays and do not qualify as hospital inpatient stays.  If the Medicare provider number is on the incoming transaction from the facility, the M+C organization may distinguish the SNF or SNF swing-bed stays by the presence of a U, W, Y, or Z in the third position of the Medicare provider number (e.g., 11U001).

**Principal Hospital Inpatient and Other Hospital Inpatient Diagnoses**

The M+C organizations must differentiate between the principal hospital inpatient diagnosis and all other hospital inpatient diagnoses when coding the provider type on the risk adjustment transaction.  According to the Official ICD-9 CM Guidelines for Coding and Reporting, the principal diagnosis is defined in the Uniform Hospital Discharge Data Set (UHDDS) as "that condition established after study to be chiefly responsible for occasioning the admission of the patient to the hospital for care."  The principal diagnosis as reported by the hospital shall be coded as Provider Type 01, Principal Hospital Inpatient.  The CMS strongly recommends that M+C organizations continue to collect electronic encounter data or claims from hospital inpatient stays to ensure the proper identification of the principal diagnosis.

The remaining diagnoses from a hospital inpatient stay shall be coded as Provider Type 02, Other Hospital Inpatient.  The guidance for coding other conditions appears in Official ICD-9 CM Guidelines for Coding and Reporting, as well as in _Exhibit 30_.

-------------------------------------------------------------------------------------------------

## *Exhibit 30 – Diagnostic Coding and Guidelines for Data Collection from Provider Networks*

*(Rev. 57, 08-13-04)*

*Medicare utilizes ICD-9-CM as the official diagnosis code set for all lines of business. The "Official ICD-9 CM Guidelines for Coding and Reporting" provides guidance on diagnosis coding. This document provides guidelines for hospital inpatient, hospital outpatient and physician services. In accordance with this policy, CMS will utilize ICD-9*

4204

MAPL000180139

*diagnosis codes in the determination of risk adjustment factors. M+C organizations must submit for each beneficiary all relevant ICD-9 codes that are utilized in the risk adjustment model. M+C organizations must submit each relevant diagnosis at least once during a risk adjustment data reporting period, with the first period being July 1, 2002 – June 30, 2003. See  http://www.cms.hhs.gov/paymentsystems/icd9/default.asp for information regarding ICD-9-CM codes.*

*At a minimum, the submitted ICD-9 codes must be sufficiently specific to allow appropriate grouping of the diagnoses in the risk adjustment model. For the complete list of diagnoses used in the risk adjustment model, as well as the list of minimal ICD-9 codes required to group diagnoses for risk adjustment, see http://www.cms.hhs.gov/healthplans/riskadj/.  In all cases, coding to the highest degree of specificity provides the most accurate coding and ensures appropriate grouping in the risk adjustment model.*

*M+C organizations must apply the following guidelines when collecting data from their provider networks. If the M+C organization utilizes an abbreviated method of collecting diagnoses, such as a superbill, the diagnoses may be coded to the highest level of specificity or to the level of specificity necessary to group the diagnosis appropriately for risk adjusted payments. If the M+C organization collects data using an encounter or claim format, the codes should already be at the highest level of specificity. CMS encourages M+C organizations to utilize the full level of specificity in submitting risk adjustment data. Regardless of the level of specificity of submitted diagnoses, a medical record must substantiate all diagnostic information provided to CMS.*

***Coexisting Conditions***

*Physicians and providers should use the "Official ICD –9-CM Guidelines for Coding and Reporting" (found at http://www.cms.hhs.gov/paymentsystems/icd9/default.asp) and Medicare fee-for-service rules when submitting risk adjustment data to M+C organizations. The official guidelines that govern those coexisting conditions that may be coded and reported by hospital inpatient, hospital outpatient and physician providers are summarized below. The guidelines for inpatient hospital stays are as follows:*

> *"...all conditions that coexist at the time of admission, that develop subsequently, or that affect the treatment received and/or length of stay. Diagnoses that relate to an earlier episode which have no bearing on the current hospital stay are to be excluded."*

*The guidelines for coexisting conditions that should be coded for hospital outpatient and physician services are as follows:*

> *"Code all documented conditions that coexist at time of the encounter/visit, and require or affect patient care treatment or management. Do not code conditions that were previously treated and no longer exist. However, history codes (V10-V19) may be used as secondary*

MAPL000180140

> codes if the historical condition or family history has an impact on current
> care or influences treatment."

*Physicians and hospital outpatient departments shall not code diagnoses documented as "probable," "suspected," "questionable," "rule out," or "working" diagnosis. Rather, physicians and hospital outpatient departments shall code the condition(s) to the highest degree of certainty for that encounter/visit, such as symptoms, signs, abnormal test results, or other reason for the visit.*

-------------------------------------------------------------------------------------------------

4206

MAPL000180141

**EXHIBIT P-10**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
        Plaintiffs,               )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
        Defendants.               )
_____ )



CONFIDENTIAL

CONTAINS ATTORNEYS' EYES ONLY PORTIONS

Videotaped Deposition of

CHERI RICE

Given Remotely

Wednesday, August 3, 2022

9:01 a.m. Eastern



Reported by:  Karen K. Kidwell, RMR, CRR



Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 54

1           reading this e-mail, saying that we could define

2           specific steps that a plan must take to meet

3           that requirement; for example, we could

4           self-audit -- require them to self-audit their

5           own RADV audits, or we could revive the NPRM

6           proposal we had, that if a plan is checking a

7           medical record for underpayments, they must also

8           look for overpayments.

9   BY MR. GALLAGHER:

10      Q.   All right.  So you -- you don't have

11  anywhere in this e-mail any reference to

12  subregulatory guidance that defines this requirement,

13  do you?

14           MS. McMAHON:  Objection.

15           THE WITNESS:  No, I don't reference the

16           reasonable diligence standard, because that

17           was -- that was in regulation.

18  BY MR. GALLAGHER:

19      Q.   Right.  And -- and you also don't say,

20  "Well, we don't need to" -- sorry, my light keeps

21  turning off.

22           You also don't say in here, "Well, we

23  don't need regulation on this to define what we mean

24  by 'reasonable diligence,' or define what the

25  requirements are, because we have manuals and -- and



Page 55

1    technical guidance and other subregulatory guidance

2    out there."  Right?

3          MS. McMAHON:  Objection.  The document

4       speaks for itself.

5          MR. GALLAGHER:  I actually need the

6       witness to speak, because I can't hear the

7       document.

8          MS. McMAHON:  That's interesting.  Love

9       your colleagues can when they make that

10      objection.

11         THE WITNESS:  So there are general

12      requirements for plans in terms of -- or

13      expectations around submitting accurate data,

14      right?  So we have -- we have to have a

15      compliance program.  We have attestations.  We

16      have language in the managed care manual.

17         So setting aside this reasonable diligence

18      standard, there still is overall framework about

19      specifying that -- the various requirements for

20      diagnosis to be valid and, you know, what our

21      expectations are generally about plans'

22      obligations to -- to use a good faith effort to

23      submit accurate data.

24         I think what I'm talking about here is

25      specifying specific steps that we would



Page 56

1          prescribe for plans to meet that obligation, and

2          whether that's requiring them to do their sort

3          of own RADV audits or reviving the medical

4          record review regulation that we -- that we had

5          not finalized.

6    BY MR. GALLAGHER:

7          Q.    Right.  And these were all -- so the

8    things you mention here -- and I'll go through

9    them -- are all things that you -- that would require

10   a regulation change if you wanted to set those as

11   specific requirements for plans, right?

12              MR. BULAND:  Objection.

13              MS. McMAHON:  Objection.

14              THE WITNESS:  No, I don't think we would

15          need to do it through regulation.  I suggested

16          doing it through regulation, but we had

17          specified other requirements outside of

18          regulation that were expectations for plans.

19              So it's -- we can enforce manual chapters,

20          subregulatory guidance; so it -- it doesn't just

21          have to be through regulation.

22   BY MR. GALLAGHER:

23         Q.    So let's -- let's take a look at one of

24   these.  You say you could, through regulation, define

25   specific steps a plan must take, at a minimum, to



Page 76

1    the part of plans.

2         A.    Uh-huh.

3         Q.    So with that framework, is the -- was the

4    fact that -- that audits demonstrated some error rate

5    in the -- in Medicare Advantage diagnosis codings and

6    the support for codes and the support for them, was

7    that enough, in your mind, to trigger an obligation

8    to conduct medical record review, or to confirm the

9    support for diagnosis codes, above and beyond the

10   general requirement that you think exists?

11              MS. McMAHON:  Objection.  Vague.

12              THE WITNESS:  No, I don't think so.  I

13         think -- I mean, there's an understanding that

14         some subset of Medicare Advantage codes are --

15         are not going to be valid in a medical record,

16         most likely.  And so the -- the fact that a plan

17         was RADV'd in one year wouldn't really change

18         that.

19              But again, it doesn't -- it's not

20         necessarily holding those plans to a higher

21         standard in subsequent years, but it doesn't --

22         it also doesn't change the underlying

23         expectation that when we're not RADV, that their

24         plan has to do -- has some proactive

25         responsibilities to take a good faith effort to



Page 77

1      make sure that -- that the data that they're

2      submitting are correct.

3  BY MR. GALLAGHER:

4      Q.   So earlier, you were -- you were

5  mentioning some -- I think you called it obligation

6  to -- to investigate whether codes were supported,

7  based on some knowledge a plan might have.  So I want

8  to go back to that question and the process you were

9  talking about.

10          So -- so I understand it, you believe

11  that -- that in some -- in some way, if a plan has

12  reason to believe, I'll call it, that -- that codes

13  might not be supported, they have an obligation, a

14  more specific obligation to do something about that.

15  Is that right?  Is that your belief?

16      A.   Yes.

17      Q.   And what triggers that obligation?  What

18  sort of knowledge triggers this obligation, in your

19  mind?  What do they have to know in order to have

20  this obligation to do more?

21      A.   So we do not specify the details of what

22  "knowledge" means in our -- at least in our Medicare

23  Advantage regulations.  But if -- if a plan is, for

24  example, looking at a medical record, and they don't

25  see a diagnosis that they had previously supported



Page 78

1    for that medical record, that, to me, would indicate

2    there could be a problem here, and would warrant

3    additional follow-up by the plan to determine whether

4    that -- that code was actually valid or not.

5         Q.   At what point in that process, if they're

6    following up, at what point does a plan have to

7    delete the code?

8              MS. McMAHON:  Objection.  Vague.

9    BY MR. GALLAGHER:

10        Q.   Let me ask it this way:  Under -- under

11   your rules, as you understand them --

12        A.   Uh-huh?

13        Q.   -- at what point in that process does a

14   plan have to delete the code?

15        A.   So again, we have not been specific about

16   that.  But if the plan has information that suggests

17   that perhaps this code is not documented, that they

18   need to take steps to double-check on whether that is

19   accurate or not.  And if -- if there is still an

20   issue with it not being valid, then they need to

21   correct it.

22             So we don't -- we aren't prescriptive

23   about the five steps that the plan needs to take,

24   because you -- you can't regulate all the different

25   scenarios, the universe's scenarios.  So we don't --



Page 79

1    we don't get into being prescriptive there.

2         Q.    Earlier I asked you about the example of

3    sort of RADV audits and whether the knowledge of --

4    of the results of those might create some obligation

5    in subsequent years.  If a -- if a plan, for whatever

6    reason, has done its own internal audit for one year,

7    and -- and appreciated from that that there was a

8    certain rate at which their providers had, you know,

9    coded things that were not supported by the medical

10   records, does that, in your view, create an

11   obligation in subsequent years to do something?

12             MR. BULAND:  Objection.

13             MS. McMAHON:  Objection.

14             THE WITNESS:  I think there -- again,

15        the -- there is -- regardless of whether they --

16        what they found in the particular year, there's

17        a general requirement and expectation that

18        they're going to take a good faith effort to

19        validate the validity of the -- of the diagnoses

20        that they submit.

21   BY MR. GALLAGHER:

22        Q.    I'm -- I'm sort of setting aside what

23   you've described as a general expectation that --

24   that you believe exists for plans, and I -- I want to

25   ask more specifically:  Do you at CMS -- let me put



Page 84

1    have to delete it because it's not supported by the

2    radiology record, but it would still be available for

3    risk adjustment purposes?

4         A.   Yes.

5         Q.   And -- and therefore deleting it wouldn't

6    affect payment?

7         A.   Correct.

8         Q.   Do you agree that there's a difference

9    between knowing that a code is not supported by a

10   particular set of medical records and knowing that

11   that has resulted in an overpayment?

12             MS. McMAHON:  Objection.

13             THE WITNESS:  Yes.  But our -- our

14        requirements are plans need to correct their

15        diagnosis data regardless of whether there's a

16        payment impact or not.  So it's not up to them

17        to decide, "I'm not going to -- I'm not going to

18        correct this one because there's no payment

19        impact."

20             The data need to be corrected, and then it

21        will flow through our payments, and it may or

22        may not change, you know, the payment to the

23        plan.  But the -- the plan needs to submit the

24        accurate diagnosis data, and then it flows

25        through our -- you know, our payment



Page 85

```
 1        methodology.
 2   BY MR. GALLAGHER:
 3        Q.    Right.  What I'm getting at is the
 4   question that's kind of at issue in this lawsuit,
 5   which is whether there's an overpayment.  And that's
 6   a different issue than whether you need to correct
 7   the data, right?
 8             MS. McMAHON:  Objection.
 9   BY MR. GALLAGHER:
10        Q.    You can answer.
11        A.    So -- I'm sorry, can you state your
12   question again?
13        Q.    Yeah.  What I'm trying to get at is that
14   there's a difference between whether there's an
15   overpayment, which is the -- which is what is alleged
16   to have happened in this lawsuit, and whether there
17   is simply a data correction that needs to be made for
18   a particular code or -- or set of data.
19             MS. McMAHON:  Objection.
20   BY MR. GALLAGHER:
21        Q.    Do you understand that, that distinction?
22        A.    Yes.  So there will be -- there could be
23   some set -- set of codes that get corrected and don't
24   have a payment impact.
25        Q.    Yeah.  Put another way, you can have data
```



Page 109

1          A.    Yes.

2          Q.    So if you go to the next page, the bottom

3     section, "Model Calibration Factor," this is the

4     section where you're discussing that issue, the

5     extrapolation methodology and whether to apply a

6     fee-for-service adjuster, right?

7          A.    Correct.

8          Q.    And a fee-for-service adjuster, if you

9     could, just explain to us what that is.

10         A.    So the -- the concept of the

11    fee-for-service adjuster is that in -- when we audit

12    a plan for RADV, we were taking a sample, reviewing

13    that sample of beneficiaries, reviewing the medical

14    records for all the diagnoses for those

15    beneficiaries, computing an error rate, and

16    extrapolating those results to the entire payment for

17    the plan.

18              So we were, in that context, basically

19    enforcing a -- what I call a perfection standard, of

20    100 percent enforcement of the -- all the risk

21    adjustment rules that -- that we have.

22              Plans had raised concerns, when we

23    announced that we were launching the RADV audits and

24    began them, that the data that we used to calibrate

25    the risk adjustment model is based on fee-for-service



Page 110

1    spending and diagnostic information from the

2    fee-for-service program.

3            Plans raised the concern that we were not

4    subjecting the fee-for-service data that we were

5    using in the model calibration to a RADV-like audit.

6    So the model would include diagnoses that --

7    presumably some subset, that if we were to RADV-audit

8    those data, we would determine, don't -- you know,

9    requirements aren't -- aren't valid for risk

10   adjustment purposes.

11           And so the plans made -- raised that

12   concern, and made the argument that that -- because

13   there was this disconnect in the documentation

14   standard that we were applying and enforcing,

15   effectively through this extrapolation in RADV, and

16   the documentation and lack of auditing of that

17   documentation for the model calibration, that there

18   was a difference there; and that there was a -- there

19   would be a payment impact if you were to recalibrate

20   the model based on a RADV-like audit instead of

21   fee-for-service data.

22           So within the context of RADV, we

23   concluded that -- that conceptual argument made

24   sense, and that we should include a fee-for-service

25   adjuster.  That was our recommendation, to include a



Page 111

1    fee-for-service adjuster to take into account that

2    different enforcement of the documentation standard

3    between the two data sets in the extrapolation

4    methodology as part of the RADV program.

5         Q.   All right.  So to unpack that just a

6    little bit -- and I won't try to get the technical

7    details right.  But for reasons having to do with the

8    fact that you were not conducting a RADV-type audit

9    of the fee-for-service data, the objection was raised

10   that if you were to extrapolate from the RADV audit

11   to change the payment to Medicare Advantage programs,

12   you would be disadvantaging them because of that

13   difference in documentation standard, right?

14            MS. McMAHON:  Objection.

15            THE WITNESS:  I'm not sure I would say

16        "disadvantaging."  I think it's -- it's that we

17        should take into account, if we're applying this

18        standard uniformly throughout the whole payment

19        to the plan, that the recovery amount will be

20        different if we --

21   BY MR. GALLAGHER:

22        Q.   Right.

23        A.   -- were to audit the data.

24            And so this is an adjustment to take that

25   into account.



Page 134

1   validates the accuracy of codes already submitted.

2           We did not finalize that regulation.  So

3   we do not have a specific recipe for how plans are

4   supposed to meet their obligation of -- under the

5   False Claims Act, and our various requirements about

6   making sure their data are accurate.  But we don't

7   have a specification that says you have to do

8   chart -- specifically, you have to do chart review,

9   and you have to do a specific kind of claims

10  verification program.

11      Q.   Right.  You've never specified in any

12  guidance, rule, regulation, subregulatory document,

13  that plans are required to look both ways?

14          MR. BULAND:  Objection.

15          MS. McMAHON:  Objection.

16          THE WITNESS:  I would say -- well, that's

17      very broad.  I would say there's a requirement

18      that plans have a good -- good faith compliance

19      program to validate the accuracy of diagnoses.

20      Doesn't have to be 100 percent; we're not saying

21      they have to do like a RADV of everything.  But

22      they have to have some kind of protocols,

23      procedures in place to assess the accuracy of

24      the data that they're submitting.

25



Page 135

1    BY MR. GALLAGHER:

2        Q.   Doesn't even have to be a chart review,

3    though, I think you said earlier, right?  You don't

4    require chart review?

5        A.   Not specifically, no.

6        Q.   And so a plan of deciding how to meet the

7    obligation that you say exists, you know, generally,

8    doesn't have any guidance from CMS that says

9    specifically, you have to look both ways, or design a

10   chart review program to validate the diagnoses

11   reported by --

12            MS. McMAHON:  Objection.

13   BY MR. GALLAGHER:

14       Q.   Right?

15       A.   We don't say specifically, "Here are the

16   steps that you need to take."  But we -- but we do

17   say, "If you have information that suggests that a

18   diagnosis isn't valid, that you've already submitted,

19   you need to take steps to correct it; to find out if

20   it's right or wrong, and to correct it if it's not.

21       Q.   What sort of -- what sort of information

22   have you told plans triggers that obligation?

23       A.   So we have not been specific, because

24   there are all sorts of circumstances and scenarios,

25   and didn't -- we didn't want to be prescriptive.  And



4222

Page 136

1    so we have not done that.  So there's general

2    obligation.  We have not specified, "Here's the, you

3    know, the specific steps in all various scenarios

4    that you have to follow to meet your obligations

5    under the False Claims Act, or the other requirements

6    that we have, and specific to the MA program."

7        Q.    Right.  So you've not -- CMS has not

8    specified what type of information a plan might have

9    that would trigger an obligation to do some

10   additional assessment, right?  You have not --

11            MS. McMAHON:  Objection.

12   BY MR. GALLAGHER:

13       Q.    You have not been specific in saying,

14   "Here's the type of thing that would trigger this

15   obligation to do something more"?  Right?

16            MR. BULAND:  Objection.

17            MS. McMAHON:  Objection.

18            THE WITNESS:  That's correct.  We have not

19       been that specific.

20   BY MR. GALLAGHER:

21       Q.    Have you -- have you generally informed

22   plans that there is such an obligation?  And if so,

23   where?

24       A.    Yes.  So first we have in our regs that

25   the plans have to have a compliance program to do



Page 137

1    internal monitoring.

2            We also have the managed care manual,

3    where we say they have to implement procedures to

4    make sure that the data that they submit for -- the

5    encounter data, which includes the diagnosis data --

6    have to be accurate.

7            We also have plans attest, every time they

8    submit data, that the data are accurate to their best

9    knowledge, information, and belief.

10           So there's -- and then we have participant

11   guides for encounter data submission, where we also

12   flag that if you're looking -- if you're looking at

13   records, and you're seeing additional codes, and

14   you're not -- you need to make sure that you're

15   correcting anything that isn't documented.

16           So we've said in multiple places, the

17   standard for an accurate diagnosis data is -- it has

18   to be documented in the medical record.  And we've

19   said in multiple places, and I think including in the

20   contract for the plan, there is -- you can't just do

21   nothing.  You have to do something.  We have not been

22   specific about -- "Here's the precise formula"; but

23   you must take steps, good faith steps, to ensure that

24   the data that you're submitting is accurate.

25       Q.   So just a few follow-up questions on that.



Page 147

1    have identified that a code is not supported when

2    they know that there's no support for it in the

3    medical records, right?

4             MS. McMAHON:  Objection.

5    BY MR. GALLAGHER:

6        Q.   Let me see if it helps if I direct your

7    attention to the last full sentence on the -- in the

8    left-hand column:  "Under this provision, the day

9    after the date on which the organization has

10   confirmed and identified overpayment -- because the

11   organization knows that the diagnosis is not

12   supported by documentation -- is the first day of the

13   60-day period for reporting."  Right?

14       A.   Right.  So I -- I would say there that our

15   intention there was not to say you don't have to

16   correct diagnosis data because there's another

17   similar diag for that condition elsewhere.

18            Our point with this was, if you have a

19   payment -- a payment diagnosis -- or a diagnosis that

20   feeds into a payment HCC, you don't have to put a

21   dollar amount on it; that's -- that needs to be

22   corrected.

23            And not trying to make this nuanced

24   interpretation of -- "Well, yeah, it's a payment HCC,

25   but there's another diagnosis, so I don't have to



Page 148

1    correct it."

2          Like that's -- that wasn't our intent in

3    this preamble language.

4          Q.   Just focusing on the -- the obligation to

5    delete or correct the diagnosis code, without regard

6    to that.

7          A.   Uh-huh.

8          Q.   What you're telling -- the guidance you're

9    giving to plans here is that that obligation to

10   delete the code arises when they've confirmed and

11   know that there is no support for the code in the

12   medical records.  Right?

13         MS. McMAHON:  Objection.

14         THE WITNESS:  Yes.

15   BY MR. GALLAGHER:

16         Q.   Not when they suspect it might be,

17   but when they --

18         A.   Well, no, I'm sorry.  When -- we weren't

19   getting into what it means to know here.  It was the

20   circumstances where there's a risk adjustment

21   diagnosis that's problematic, our point with this was

22   we're not going to have -- you don't need to do the

23   math of how it might affect payment.  That -- that is

24   enough to say that needs to be corrected, and that's

25   when the clock starts.  That was our intent with this



Page 159

1   those comments in the preamble.

2       Q.   And -- and to the extent that there is any

3   decision made about whether to finalize the rule or

4   withdraw it, do you have to then go through the same

5   chain of command of policymakers that you went

6   through to propose the rule in the first place?

7       A.   So, yes.  The final rule then goes through

8   the clearance process, where policy officials are

9   briefed on the comments, and any recommendations for

10  finalizing or modifying or -- however, you know,

11  whatever the scope of options for the final rule are.

12      Q.   And you have the opportunity in that

13  process to make a recommendation about whether the

14  rule should be finalized, whether it should be

15  modified, or whether it should be withdrawn?

16      A.   Uh-huh.

17           MS. McMAHON:  Objection.

18           THE WITNESS:  Yes.

19  BY MR. GALLAGHER:

20      Q.   In the case of the medical record review

21  rule, what was your recommendation after the comment

22  period?

23      A.   So we did not make a recommendation,

24  because a -- a decision was made that -- as I

25  mentioned, this -- this was a provision in a much



4227

Page 160

1    larger rule that had some provisions that were -- got

2    a lot of stakeholder concern and pushback.  And so

3    the direction that we received was that the rule --

4    the final rule needed to include only those

5    provisions that had wide -- you know, widespread

6    stakeholder support.

7            So we did not move forward then with the

8    medical record review provision, not because we

9    didn't think it was the right thing to do or the

10   right policy, but because it had mixed reactions from

11   stakeholders.  It didn't meet those criteria, and so

12   we didn't include it in the final rule.

13       Q.   So you didn't withdraw -- you didn't make

14   the determination that the rule wasn't necessary?

15           MS. McMAHON:  Objection.

16   BY MR. GALLAGHER:

17       Q.   You made the determination that -- or

18   somebody made the determination, as a policy matter,

19   that they weren't going to go forward with it because

20   it had faced opposition?

21           MR. BULAND:  Objection.

22           MS. McMAHON:  Objection.

23           THE WITNESS:  So we didn't make a

24       recommendation one way or the other, because of

25       the decision about what the scope of the final



Page 197

1    BY MR. GALLAGHER:

2         Q.    Now, there's a reference in -- still on

3    Exhibit 1061, on that first page, there's a reference

4    in that same Bullet Number 4, under "Meeting

5    Summary," to UHG representatives indicating that "in

6    light of the proposed rule and other discussions with

7    CMS, UHC had suspended its claims verification

8    process pending a decision by the company of whether

9    it was appropriate to submit additional deletes to

10   CMS that have been identified through the company's

11   claims verification process."

12             You see that?

13        A.    Yes.

14        Q.    Do you recall being informed by

15   UnitedHealth that they had in fact suspended this

16   program?

17        A.    Not in the meeting, no.

18        Q.    Do you recall being informed that later?

19        A.    So there was an e-mail the next day, that

20   Steve Nelson sent me, where I believe he said that in

21   the e-mail.

22        Q.    Right.  So if we could have Exhibit 1063,

23   which is Tab 12.  I think that's the e-mail you're

24   referring to.

25             (Exhibit 1063 was marked for identification.)



Page 198

1    BY MR. GALLAGHER:

2        Q.    So Exhibit 1063 is an e-mail exchange that

3    starts at the bottom of the first page with an e-mail

4    from Steve Nelson to you, on Wednesday, April 30th,

5    at 9:55 in the morning.

6              Is this the e-mail you're referring to?

7        A.    Yes.

8        Q.    And if you go to the next page, in the --

9    in the paragraph that starts, "Fifth," is -- is it in

10   this paragraph that you were informed -- or that

11   UnitedHealth had in fact suspended or stopped this

12   program, the claims verification or chart review

13   program looking for deletes?

14       A.    Yes.  Just rereading it again here.

15             Yes, so we suspended the process, yes,

16   right.

17       Q.    So you were aware of that in -- in April

18   of 2014, that whatever process UnitedHealth had, that

19   it was asking for guidance on in this meeting, it had

20   decided to suspend that process?

21       A.    Yes.

22       Q.    What do you recall learning about what,

23   you know -- actually, let me ask this differently.

24             Do you recall ever learning what

25   UnitedHealth's decision was with respect to claims



Page 200

1    obligations were with respect to conducting medical

2    record review or confirming the support for diagnosis

3    codes?

4         A.    I don't remember the conversation.  All I

5    can tell you is I remember feeling very uncomfortable

6    in the meeting, and -- and then when I saw

7    Mr. Nelson's e-mail the following day, I was very

8    concerned about how things were characterized.

9              And -- but again, I don't remember

10   specifically what was said in the -- in the meeting.

11        Q.    So, for example, you don't recall anybody

12   from CMS informing UnitedHealth at this meeting that

13   they haven't any obligation, outside of whatever

14   might be imposed by the proposed medical record

15   review, to conduct medical record review looking for

16   deletes, or to design their compliance program to

17   conduct medical record review looking for deletes?

18              MR. BULAND:  Objection.

19              THE WITNESS:  The only thing I --

20              MS. McMAHON:  Objection.

21              THE WITNESS:  The only thing I -- I

22        remember feeling very uncomfortable, and I

23        believe I said something along the --

24        referencing the False Claims Act.

25              And -- and, you know, the -- that that is



Page 201

1          still -- you know, is still in play, even

2          regardless of the medical record review rule,

3          but -- other than that, no.

4     BY MR. GALLAGHER:

5          Q.   So tell me everything you recall saying

6     about the False Claims Act and how it came to bear

7     here, during this meeting in April of 2014.

8          A.   I -- I honestly don't recall,

9     specifically.  I just remember feeling very

10    uncomfortable with the conversation, and reminding

11    United about the False Claims Act.  But the details,

12    I don't recall.

13         Q.   With reference to the e-mail exchange you

14    had with Cynthia Tudor and Mr. Cavanaugh before the

15    meeting, which is Exhibit 1060 --

16         A.   Uh-huh.

17         Q.   -- do you recall that there was -- as part

18    of that exchange, discussion of -- of deleting or

19    correcting data that you know is wrong?

20         A.   Yes.

21         Q.   Was your reference to the False Claims

22    Act, if you remember, a reference to that obligation

23    or some obligation with respect to the -- the data

24    that was in review already?

25              MR. BULAND:  Objection.



Page 202

1           THE WITNESS:  What was particularly

2      concerning to me was the data that had been

3      reviewed and not found, at that point in the

4      process, to be documented in medical records.

5      And that was very concerning to me, that they

6      appeared to be saying, "We're not going to do

7      anything more with that," and that was

8      concerning.

9  BY MR. GALLAGHER:

10      Q.   So -- I'm sorry.  I didn't mean to

11  interrupt you.  Were you --

12      A.   No, that's okay.  Go ahead.

13      Q.   The -- so do you think that when you were

14  -- that whatever it is you recall about saying about

15  the False Claims Act, it was in reference to that

16  data that was in review and some potential for the

17  need to delete had been identified for it?

18      A.   Again, I don't -- I don't recall.

19      Q.   Do you recall whether you had any --

20  whether you had any thought, even, that the False

21  Claims Act had any bearing on the decision whether to

22  stop the program and not continue it in further -- in

23  future years?

24           MR. BULAND:  Objection.

25           THE WITNESS:  Yeah, I don't recall.



Page 205

1              inference that somehow CMS was blessing this --

2              these next steps that United was suggesting.

3              And so -- I was frankly alarmed by the e-mail,

4              and wanted to make -- respond in writing that we

5              were not blessing what they were suggesting they

6              were doing in Bullet 5, and that there were

7              other laws and requirements beyond the medical

8              record review rule that they needed to be in

9              compliance with.

10                   And so I, again, was very, very concerned

11             with this e-mail.

12   BY MR. GALLAGHER:

13       Q.   My question was, you don't dispute, in

14   your responsive e-mail, Mr. Nelson's characterization

15   of what was said by CMS and confirmed by CMS at the

16   meeting on the 29th?

17                   MR. BULAND:  Objection.

18                   MS. McMAHON:  Objection.  Asked and

19             answered.

20                   THE WITNESS:  I think it is making clear

21             that they should not take away from that meeting

22             that we had said that it was okay to stop the

23             claims verification program, or that it was okay

24             not to continue to review and determine whether

25             those questionable diagnoses were accurate or



Page 206

1        not.

2    BY MR. GALLAGHER:

3        Q.    In April of 2014, had you issued any --

4    had CMS issued any guidance, rules, requirements,

5    subregulatory or otherwise, that required plans to

6    conduct any medical record review?

7            MS. McMAHON:  Objection.  Asked and

8        answered.

9            THE WITNESS:  Again, not specifically.  We

10       had general requirements about compliance

11       programs, language in our managed care manual,

12       et cetera.  But in terms of a specific procedure

13       that plans were to follow to -- to meet their

14       obligations to submit correct data, no, we did

15       not have specific procedures that we were

16       telling plans to follow.

17   BY MR. GALLAGHER:

18       Q.    And in your response to Mr. Nelson, do you

19   identify any rule, regulation, subregulatory

20   guidance, you know, communication from CMS that

21   imposes an obligation to conduct medical record

22   review specifically to look for deletes?

23       A.    No.

24       Q.    Do you know -- do you identify any

25   requirements with specificity in your response?



Page 232

1    and communicate to them your expectations?

2              MR. BULAND:  Objection.

3              MS. McMAHON:  Objection.

4              THE WITNESS:  Again, I think that not

5         knowing all the details, for example, of

6         United's claim verification program, for us to

7         be able to say, "Yes, it's fine," or "No, it's

8         not," or "What are all the steps that you went

9         through," we would have to have a lot more

10        information to be able to -- to weigh in, even

11        if that were appropriate, to be able to say

12        "Yes, it's okay," or "No, it's not."

13             And my purpose in sending that e-mail was

14        to make clear we're not -- we're not giving you

15        a blessing one way or the other; you need to

16        make that determination based on the laws and

17        requirements.

18   BY MR. GALLAGHER:

19        Q.   All right.  So -- I'm sorry.  Go ahead.

20        A.   I'm sorry.  While we try to be as specific

21   and as helpful as we can, we can't always give a

22   specific yes or no.  In this case, it would have

23   taken a lot more information to know exactly what the

24   scope is of what United was doing, what information

25   they had, how much due diligence they had done, and



Page 233

1    wanted to make clear to them that they had an

2    obligation -- they might have an obligation under --

3    you know, setting aside the medical record review

4    rule, to follow up on those -- certainly on those --

5    on those diagnoses that, at least through the process

6    to date, didn't look like they were going to be

7    valid.  So . . .

8        Q.    So looking at your response to Mr. Nelson

9    in Exhibit 1063, the e-mail of May 2nd, 2014 --

10       A.    Uh-huh.

11       Q.    -- as we discussed earlier, you -- you

12   mentioned -- you say there are other laws that do

13   impose standards, requirements, and responsibilities,

14   but you don't identify what those laws are.  Right?

15       A.    That's correct.

16       Q.    In Interrogatory Number 24, when

17   identifying the ways in which CMS would communicate

18   requirements that you believe are imposed by the --

19   by the regulation concerning a compliance program, or

20   due diligence generally, you indicate that you would

21   provide guidance -- provide that guidance in e-mails

22   and in-person communications.  Right?

23            MS. McMAHON:  Objection.  Misstates the

24       witness's testimony, and the document.

25



Page 236

1    specific set of circumstances, and that we were not

2    giving them an answer of up or down, but that they

3    needed to think carefully about whether their

4    proposed course of action was consistent with those

5    other laws and regs.

6    BY MR. GALLAGHER:

7        Q.   Without identifing what those laws and

8    regs were with any specificity?

9            MR. BULAND:  Objection.

10           THE WITNESS:  (Nodding head up and down.)

11   BY MR. GALLAGHER:

12       Q.   If you -- if, in May of 2014, you thought

13   there was some specific guidance, rule, regulation,

14   or requirement that United's proposed course of

15   action that they discussed with you would run afoul

16   of, why didn't you tell them what that rule was?

17           MR. BULAND:  Objection.

18           MS. McMAHON:  Objection.

19           THE WITNESS:  And so we didn't know all

20       the details of their program, and all the

21       details of the work that they had done in terms

22       of the review of the diagnoses that they had --

23       at least initially -- identified as not being

24       supported in the medical record, so we didn't

25       have enough information to say, at that point,



Page 237

1          it definitively is or is not in compliance with

2          these other laws and regulations.

3    BY MR. GALLAGHER:

4          Q.    They -- they did tell you, United did, at

5    the meeting in April of 2014, or in Mr. Nelson's

6    e-mail following, that they were stopping the program

7    entirely, right?

8                MS. McMAHON:  Objection.

9    BY MR. GALLAGHER:

10         Q.    That they weren't going to continue with a

11   claims verification process that involved looking for

12   deletes?

13         A.    Yes.

14         Q.    And if you thought that violated some

15   requirement that you -- that CMS had imposed on

16   plans, by rule or regulation or otherwise, why didn't

17   you tell United that?

18               MR. BULAND:  Objection.

19               MS. McMAHON:  Objection.  Asked and

20          answered.  Argumentative.

21               THE WITNESS:  Again, they're very well

22          aware we have these requirements, specifically

23          with reference laws and regs in their contract

24          they have to comply with.  And so while we

25          didn't put a laundry list in there, we did say



Page 239

1          A.   Yes.

2          Q.   And then it says, "During our

3    conversations last year before the proposed rule was

4    withdrawn, CMS confirmed to us that the proposed

5    requirements would not apply until the effective date

6    of the rule, and that MA plans were thus not required

7    to design their medical record reviews to determine

8    the accuracy of risk adjustment diagnoses."

9               Do you recognize that as basically the

10   same language that was in the 2014 e-mail that you

11   responded to on May 2nd, 2014?

12         A.   Yes.

13         Q.   And am I right that you never responded to

14   this e-mail from Mr. Nelson disputing that

15   characterization of the advice provided by CMS?

16         A.   I don't recall if I responded or not.  I

17   don't believe I did, but I don't recall.

18         Q.   Right.  But you don't recall ever

19   disputing it one way or the other?

20         A.   Right.  Yeah, that's correct.

21         Q.   And then there's a sentence that begins

22   later, "Based on."  It says, "Based on our

23   conversations with CMS last year, CMS's withdrawal of

24   the proposed rule, and CMS's ongoing consideration of

25   a fee-for-service adjuster to address diagnoses not



4240

Page 290

 1          A.   Yes.

 2          Q.   And then following that, it says,

 3     "However, we emphasize that our decision to not

 4     finalize this regulatory proposal does not change

 5     CMS' existing contractual requirement that MA

 6     organizations must certify (based on best knowledge,

 7     information, and belief) the accuracy, completeness,

 8     and truthfulness of the risk adjustment data they

 9     submit to CMS.  Further, this decision does not

10     change the longstanding risk adjustment data

11     requirement that a diagnosis submitted to CMS by an

12     MA organization for payment purposes must be

13     supported by medical record documentation."

14          Did I read that correctly?

15          A.   Yes.

16          Q.   And is -- is that a true statement?

17          A.   Yes.

18          Q.   And that is -- your understanding is that

19     despite not finalizing the medical record review

20     rule, you -- you are in agreement that -- that it

21     does not change CMS's longstanding existing

22     contractual requirements that MA organizations have,

23     correct?

24          MR. GALLAGHER:  Objection.  Leading.

25          THE WITNESS:  Correct.  Yes.



Page 297

1                         CERTIFICATE

2

3          I, KAREN K. KIDWELL, Registered Merit Reporter,

4    and Certified Realtime Reporter, do hereby certify

5    that prior to the commencement of the examination,

6    the deponent was remotely sworn to testify to the

7    truth, the whole truth under penalty of perjury.

8          I DO FURTHER CERTIFY that the foregoing is a

9    verbatim transcript of the testimony as taken

10   stenographically by me at the time, place and on the

11   date hereinbefore set forth, to the best of my

12   ability.

13         I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of any

15   of the parties to this action, and that I am neither

16   a relative nor employee of such attorney or counsel,

17   and that I am not financially interested in this

18   action.

19

20                    _Karen Kidwell_____

21                    Karen K. Kidwell
                      Registered Merit Reporter
22                    Certified Realtime Reporter
                      Notary Public
23

24

25



4242

**EXHIBIT P-11**

1   LATHAM & WATKINS LLP
        David J. Schindler (Bar No. 130490)
2        *david.schindler@lw.com*
        Manuel A. Abascal (Bar No. 171301)
3        *manny.abascal@lw.com*
    355 South Grand Avenue, Suite 100
4   Los Angeles, CA 90071-1560
    Telephone: +1.213.485.1234
5   Facsimile: +1.213.891.8763

6   LATHAM & WATKINS LLP
        Daniel Meron (appearing *pro hac vice*)
7        *daniel.meron@lw.com*
        Abid R. Qureshi (appearing *pro hac vice*)
8        *abid.qureshi@lw.com*
    555 Eleventh Street NW, Suite 1000
9   Washington, DC 20004-1304
    Telephone: +1.202.637.2200
10  Facsimile: +1.202.637.2201

11  Attorneys for Defendants

12

13                    **UNITED STATES DISTRICT COURT**

14            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

15  UNITED STATES OF AMERICA *ex*        CASE NO. CV 16-08697 (SSx)
    *rel.* BENJAMIN POEHLING,
16                                       **UNITEDHEALTH'S FIRST**
                    Plaintiffs,          **SUPPLEMENTAL RESPONSES AND**
17                                       **OBJECTIONS TO PLAINTIFF**
            v.                           **UNITED STATES' SIXTH SET OF**
18                                       **INTERROGATORIES**
    UNITEDHEALTH GROUP, INC. *et*
19  *al.*,

20                  Defendants.

21

22

23

24

25

26                                              ┌─────────────────────┐
                                                │     **EXHIBIT**      │
27                                              │                     │
                                                │      00381          │
28                                              └─────────────────────┘

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITEDHEALTH'S SUPP. RESPONSES AND OBJECTIONS
TO UNITED STATES' SIXTH SET OF INTERROGATORIES
2:16-cv-08697-FMO-SSx
4244

1    information from multiple providers and multiple dates of services across different

2    data collection years and different provider encounters.

3        Subject to and without waiving the foregoing Specific and General

4    Objections, UnitedHealth states that it has previously produced information

5    responsive to this Interrogatory. Pursuant to Fed. R. Civ. P. 33(d), UnitedHealth

6    directs the government to UnitedHealth's prior productions of chart review data in

7    response to document request 4C. The relevant data is bates labeled:

8    MARA2160495, MARA2157337, and MARA2152918. There is a "Recode_Flag"

9    column in each document that denotes whether a chart was coded in UnitedHealth's

10   Chart Review program using "informed coding," as UnitedHealth interprets this

11   term.  UnitedHealth is not aware of additional data responsive to this Interrogatory

12   that has not already been produced to the United States. The burden of determining

13   or ascertaining the answer is substantially the same for the United States as it is for

14   the United States.

15   **INTERROGATORY NO. 18:**

16       For each year, Identify the total amount of revenue Your MA Organizations

17   received from CMS as a result of Diagnoses submitted to CMS as a result of the

18   Chart Review Program.

19   **RESPONSE TO INTERROGATORY NO. 18:**

20       UnitedHealth incorporates by reference each of its General Objections and

21   Specific Objections to Definitions set forth above. UnitedHealth objects to this

22   Interrogatory on the grounds that it calls for UnitedHealth to provide information

23   already provided to the United States in connection with the *Poehling* Investigation

24   and to the extent it seeks information already in the possession of the United States.

25   UnitedHealth also objects to this Interrogatory as duplicative of discovery requests

26   issued during the *Poehling* Investigation, including but not limited to Interrogatory

27   1K.

28

11    UNITEDHEALTH'S SUPP. RESPONSES AND
OBJECTIONS  TO UNITED STATES' SIXTH SET OF
INTERROGATORIES

UnitedHealth additionally objects to this Interrogatory to the extent it calls for UnitedHealth to prepare documents and/or perform data analysis that does not already exist.

UnitedHealth also objects to this Interrogatory as overly broad to the extent "each year" is undefined and seeks information related to UnitedHealth's Chart Review program—and the chart review data UnitedHealth has produced—beyond the date of service years at issue in the litigation. For the purpose of responding to this Interrogatory, UnitedHealth interprets the request to seek information related to UnitedHealth's Chart Review program for date of service years 2008–2016.

UnitedHealth further objects to this Interrogatory to the extent the term "Diagnoses," as defined is unclear, mis-leading, confusing, vague, and ambiguous. For the purposes of responding to this Interrogatory, UnitedHealth interprets the term "Diagnoses" to refer to multiple diagnosis codes.

Subject to and without waiving the foregoing Special and General Objections, UnitedHealth states that, as the government is well aware, during the Poehling Investigation, it issued Interrogatory 1(K), which sought the "total monetary amount of the RA payments made by CMS to UHG's MA Plans based on the diagnosis codes that were submitted to CMS based on CRs." UnitedHealth responded to Interrogatory 1(K) in 2015 and 2016 and provided the requested information for date of service years 2009 through a portion of 2014. As UnitedHealth confirmed in a December 21, 2015 cover letter, UnitedHealth "does not have sufficient data available to provide a similar estimate for years prior to 2009 DOS." UnitedHealth's response remains the same, and therefore UnitedHealth cannot perform the analysis or provide the relevant data in response to this Interrogatory.

Subject to and without waiving the foregoing Specific and General Objections, UnitedHealth further states that it has previously produced information responsive to this Interrogatory related to UnitedHealth's Chart Review program for date of service years 2009 through part of 2014, including in a May 2, 2016 cover

ATTORNEYS AT LAW
LOS ANGELES, CA

12

UNITEDHEALTH'S SUPP. RESPONSES AND
OBJECTIONS TO UNITED STATES' SIXTH SET OF
INTERROGATORIES

4246

letter and supplemental response to the government's Interrogatory 1(K) issued during the *Poehling* Investigation. Nonetheless, UnitedHealth has included below a table that provides revised estimates of the total amount of revenue attributable to UnitedHealth's Chart Review program for date of services years 2009 through 2013, which reflect the impact of closed period deletes. Given that UnitedHealth previously provided partial information for date of service year 2014 because the period was still open at the time of UnitedHealth's May 2, 2016 response, UnitedHealth has also included below a revised estimate of the total amount of revenue attributable to UnitedHealth's Chart Review program for date of service year 2014. Finally, UnitedHealth has provided in the table below the estimates of the total amount of revenue attributable to UnitedHealth's Chart Review program for date of services years 2015 and 2016.

| Date of Service Year | Total |
|---|---|
| 2009 DOS | $152,546,622 |
| 2010 DOS | $421,010,415 |
| 2011 DOS | $581,369,966 |
| 2012 DOS | $713,432,228 |
| 2013 DOS | $757,396,026 |
| 2014 DOS | $1,466,271,322 |
| 2015 DOS | $1,581,139,269 |
| 2016 DOS | $1,864,349,540 |

**INTERROGATORY NO. 19:**

For each year, Identify all Diagnoses Deleted as part of or as a result of Claims Verification You performed for Your MA Organizations.

Attorneys At Law
Los Angeles, CA

13

UNITEDHEALTH'S SUPP. RESPONSES AND
OBJECTIONS TO UNITED STATES' SIXTH SET OF
INTERROGATORIES

4247

**RESPONSE TO INTERROGATORY NO. 19:**

UnitedHealth incorporates by reference each of its General Objections and Specific Objections to Definitions set forth above. UnitedHealth objects to this Interrogatory on the grounds that it calls for UnitedHealth to provide information already provided to the United States in connection with the *Poehling* Investigation and to the extent it seeks information already in the possession of the United States. UnitedHealth also objects to this Interrogatory as duplicative of discovery requests issued during the *Poehling* Investigation, including but not limited to document request 4C.vii.m.

UnitedHealth additionally objects to this Interrogatory to the extent it calls for UnitedHealth to prepare documents and/or perform data analysis that does not already exist.

UnitedHealth also objects to this Interrogatory as overly broad to the extent "each year" is undefined and seeks information for the entire time period of January 1, 2004 to May 16, 2017 when the Claims Verification program did not exist during the entirety of the time period. For the purposes of responding to this Interrogatory, UnitedHealth interprets the term "each year" to refer to the years during which UnitedHealth had a Claims Verification program.

UnitedHealth further objects to this Interrogatory to the extent the term "Diagnoses," as defined is unclear, mis-leading, confusing, vague, and ambiguous. For the purposes of responding to this Interrogatory, UnitedHealth interprets the term "Diagnoses" to refer to multiple diagnosis codes.

Subject to and without waiving the foregoing Specific and General Objections, UnitedHealth states that it has previously produced information responsive to this Interrogatory. Pursuant to Fed. R. Civ. P. 33(d), UnitedHealth directs the government to UnitedHealth's prior productions of chart review data in response to document request 4C. The relevant data is bates labeled: MARA2160498, MARA2157342, and MARA2152923. MARA2160498 is a

UNITEDHEALTH'S SUPP. RESPONSES AND
OBJECTIONS TO UNITED STATES' SIXTH SET OF
INTERROGATORIES

standalone file with the diagnosis codes that were deleted through UnitedHealth's Claims Verification program for date of service year 2010. There is a "Delete_Flag" column in MARA2157342 and MARA2152923 that denotes the diagnosis codes that were deleted through UnitedHealth's Claims Verification program for date of service years 2011 and 2012, respectively. UnitedHealth is not aware of additional data responsive to this Interrogatory that has not already been produced to the United States. The burden of determining or ascertaining the answer is substantially the same for the United States as it is for the United States.

**INTERROGATORY NO. 20:**

For each year, Identify what You understood to be the total monetary value of Diagnoses Deleted as part of or as a result of Claims Verification You performed for Your MA Organizations.

**RESPONSE TO INTERROGATORY NO. 20:**

UnitedHealth incorporates by reference each of its General Objections and Specific Objections to Definitions set forth above. UnitedHealth objects to this Interrogatory on the grounds that it calls for UnitedHealth to provide information already provided to the United States in connection with the *Poehling* Investigation and to the extent it seeks information already in the possession of the United States. UnitedHealth also objects to this Interrogatory as duplicative of discovery requests issued during the *Poehling* Investigation, including but not limited to document request 4C.

UnitedHealth additionally objects to this Interrogatory to the extent it calls for UnitedHealth to prepare documents and/or perform data analysis that does not already exist.

UnitedHealth also objects to this Interrogatory as overly broad to the extent "each year" is undefined and seeks information for the entire time period of January 1, 2004 to May 16, 2017 when the Claims Verification program did not exist during the entirety of the time period. For the purposes of responding to this Interrogatory,

ATTORNEYS AT LAW
LOS ANGELES, CA

15

UNITEDHEALTH'S SUPP. RESPONSES AND
OBJECTIONS TO UNITED STATES' SIXTH SET OF
INTERROGATORIES

4249

1  UnitedHealth interprets the term "each year" to refer to the years during which

2  UnitedHealth had a Claims Verification program.

3      UnitedHealth further objects to this Interrogatory to the extent the term

4  "Diagnoses," as defined is unclear, mis-leading, confusing, vague, and ambiguous.

5  For the purposes of responding to this Interrogatory, UnitedHealth interprets the

6  term "Diagnoses" to refer to multiple diagnosis codes.

7      UnitedHealth also objects to this Interrogatory to the extent the term "You

8  understood" is vague and ambiguous as to the time period. Specifically, the term

9  "You understood" is vague and ambiguous because it uses the past tense but is

10  unclear as to what specific time period is at issue. For example, it is unclear if the

11  government is requesting information related to UnitedHealth's understanding in a

12  particular year, at the time diagnoses were submitted for deletion, or at a different

13  time period. For the purposes of responding to this Interrogatory, UnitedHealth is

14  providing information currently available to it.

15      Subject to and without waiving the foregoing Specific and General

16  Objections, UnitedHealth has provided below a table with the total monetary value

17  of diagnosis codes it submitted for deletion as part of or as a result of its Claims

18  Verification program for date of service years 2010, 2011, and 2012.

| Date of Service Year | Total |
|---|---|
| 2010 DOS | $1,264,751 |
| 2011 DOS | $183,375,164 |
| 2012 DOS | $42,800,053 |

23  ]**INTERROGATORY NO. 21**:

24      Excluding Deletes made as part of the Claims Verification You performed for

25  Your MA Organizations or the Chart Review Quality Assurance process, for each

26  year, Identify all Diagnoses Deleted because the Diagnosis Codes were not

27  supported by Chart documentation.

Attorneys At Law
Los Angeles, CA

16

UNITEDHEALTH'S SUPP. RESPONSES AND
OBJECTIONS TO UNITED STATES' SIXTH SET OF
INTERROGATORIES

4250

1       Given the breadth of the information sought by this Interrogatory,

2   UnitedHealth in good faith requested a meet and confer with the government to

3   discuss its current response to Interrogatory 25 and whether the government would

4   agree to narrow the scope of the interrogatory. On the parties' July 5, 2022 meet and

5   confer, UnitedHealth explained that it has already identified the relevant individuals

6   who may have provided risk adjustment services to the UnitedHealth MAOs,

7   including in its Initial Disclosures and on its custodian list, but that further

8   identification of all such employees for every year is overly burdensome because it

9   calls for every individual who may have provided broad categories of risk

10  adjustment services to UnitedHealth's MAOs over a 13-year time period. In light of

11  the parties' July 5, 2022 meet and confer, UnitedHealth understands that the

12  government plans to provide UnitedHealth with a proposal for narrowing the scope

13  of Interrogatory 25. UnitedHealth agrees to consider the government's proposal in

14  good faith and will, if appropriate, supplement its response to Interrogatory 25.

15  UnitedHealth is in receipt of and assessing the government's proposal in its July 15,

16  2022 email.

17

18  Dated: July 19, 2022

19                                      LATHAM & WATKINS LLP

20                                      DAVID J. SCHINDLER
                                        MANUEL ABASCAL

21                                      DANIEL MERON
                                        ABID R. QURESHI

22

23

24                  By _____

25                         David J. Schindler
                           Attorneys for UnitedHealth
                           Defendants

26

27

28

Attorneys At Law
Los Angeles, CA

28

UNITEDHEALTH'S SUPP. RESPONSES AND
OBJECTIONS TO UNITED STATES' SIXTH SET OF
INTERROGATORIES

4251

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to this action. My business address is Latham & Watkins LLP, 355 South Grand Avenue, Suite 100, Los Angeles, CA 90071-1560.

On **July 19, 2022**, I caused the service of a true copy of the following document described as:

**UNITEDHEALTH'S FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF UNITED STATES' SIXTH SET OF INTERROGATORIES TO DEFENDANTS**

to be served in the following manner:

### BY ELECTRONIC MAIL

The above-described document was transmitted via electronic mail to the following party pursuant to written consent under Federal Rule of Civil Procedure 5(b)(2)(E) on **July 19, 2022**:

### SEE ATTACHED SERVICE LIST

I declare that I am employed in the office of a member of the Bar of, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**July 19, 2022**, at Los Angeles, California.

_____
David J. Schindler

**EXHIBIT P-12**

# Optum Medicare Risk Adjustment Operations

| **Policy Name:** Chart Review Services for Medicare Advantage Plan Clients | **Issue Date:** 6/30/2014 | **Pages:** 5 |
|---|---|---|

| Approvals | | | | |
|---|---|---|---|---|
| **Approved By:** | | | **Status** | **Date:** |
| Dave Thomas | Optum Legal | 5/26/2015 | Approved | 6/9/2015 |
| Name | Title | Date | Effective | 6/9/2015 |
| | | | Retired | NA |
| **Approved By:** | | | | |
| Sean Heath | Dir Compliance | 5/26/2015 | **Applicable To:** | |
| Name | Title | Date | ☒ Chart Review Services | |
| **Approved By:** | | | | |
| Tim Trujillo | VP Risk Adjustment | 6/9/2015 | | |
| Name | Title | Date | | |

## PURPOSE

Optum Medicare Advantage Risk Adjustment Operations provides Chart Review services to Medicare Advantage Organizations (MAO) Clients that support risk adjustment submissions in accordance with CMS risk adjustment regulations, the Medicare Managed Care Manual and the CMS Risk Adjustment Participant Guide. This policy addresses standards for the review of medical record documentation that supports the diagnoses submitted to CMS for Medicare program risk adjustment.

## SCOPE

This policy addresses Optum Medicare Advantage Risk Adjustment Operations Chart Review services.

## DEFINITIONS

| TERM | DESCRIPTION |
|---|---|
| **Hierarchical Condition Category (HCC)** | HCC is a disease group broadly organized into body systems. The HCC assigned to a disease group is determined by the ICD-CM diagnosis code. |
| **MAO Client** | Medicare Advantage Organization that holds a Medicare Advantage contract. |
| **PCP** | Primary Care Physician |

---

Confidential property of Optum.  Do not distribute or reproduce without express permission from O

**EXHIBIT**
**00265-1**
4,254

**POLICY**

Where Optum Medicare Advantage Risk Adjustment Operations performs Chart Review services on behalf of its MAO Clients, it will do so in accordance with CMS standards. Optum Medicare Advantage Risk Adjustment Operations will abide by instructions in the applicable Medicare regulations, CMS Risk Adjustment Participant Guides and Medicare Managed Care Manual, CH. 7 addressing medical record documentation sources and content, coding review, coding standards and quality activities.

**CHART REVIEW SERVICES**

Chart Review services, which will be conducted if and as specified in the contract with the Client, include a number of programs that are designed to collect, assess and evaluate documentation that supports health plan risk adjustment submissions. Chart Review services are designed to review individual medical records to identify and capture risk adjusted member diagnoses and chronic conditions based on review of the member's medical record. Chart Review services include:

**A. Standard Chart Review :**

The standard chart review includes retrieval, review, coding and confirming signature and credential requirements of the medical record to capture the risk adjusted diagnosis information from the member's medical record documentation for a specific date of service or timeframe.

**B. Attestations:**

An optional Medicare risk adjustment chart review service a client may select to retrieve attestations from providers. Attestations capture a providers signature or credentials when absent from the chart documentation. The provider states in writing that the pre-exisitng medical record accurately reflects the care of a member in a given encounter.

Optum Medicare Advantage Risk Adjustment Chart Review Operations Team will follow Optum coding guidelines for Risk Adjustment submissions when reviewing medical record documentation as outlined in the Retrospective Services Standards section of this policy.

**1. Standards for Reviewing Medical Records for Chart Review Services:**

Optum Medicare Advantage Risk Adjustment Operations has developed standards for reviewing medical records based on CMS risk adjustment instructions. These standards include:

**A.** The diagnosis must be coded in accordance with the ICD-CM Coding Guidelines as mandated by CMS and Optum coding guidelines;

---

Confidential property of Optum. Do not distribute or reproduce without express permission from Optum

**4255**

CONFIDENTIAL                                                                 MAPL000814083

    **B.** The medical record documentation meets the CMS medical records guidelines and includes the following risk adjustment information:

- The service was provided by an acceptable risk adjustment provider and physician type.
- Dates of service are within the data collection period.
- Diagnoses are supported by medical record documentation.
- A provider signature and credentials are documented for each note.
  - Client may exercise discretion, consistent with CMS guidance on attestation, as to how to address records that have not yet been fully authenticated by the treating practitioner at the time of chart review.
- Coding level specificity – 3-5 digit codes

## 2. Coding Review Requirements:

To meet this standard, Optum Medicare Advantage Risk Adjustment Operations has developed requirements for coding reviews based on the Medicare Advantage regulations, the Medicare Managed Care Manual and CMS Risk Adjustment Participant Guide. These requirements include:

**A.** Optum Medicare Advantage Risk Adjustment Operations will utilize certified medical coders.

**B.** The certified coders will use ICD-CM Diagnosis Codes Guidelines as mandated by CMS, Optum coding guidelines, and Coding Clinics published by American Hospital Association (AHA), and comply with Optum Medicare Advantage Diagnostic Coding Standards and any other applicable Optum Coding Compliance Policies when evaluating assigned medical charts.

**C.** Certified coders will review medical records to identify risk adjusting conditions supported in the medical record documentation.   When performing chart reviews, the certified coders will apply CMS standards for Medicare Risk Adjustment submissions as detailed above.

**D.** Optum Medicare Advantage Risk Adjustment Operations will document and implement a procedure for receipt, research and response to coding questions from internal coders or its vendors.

**E.** Optum Medicare Advantage Risk Adjustment Operations will provide training to its internal coding staff that specifically addresses the above standards.  This training will be conducted for all new coding staff before they begin coding charts and on-going thereafter for all coding staff.

**F.** Optum Medicare Advantage Risk Adjustment Operations will conduct coding accuracy reviews of its internal coding staff to validate that data is coded correctly and meets CMS standards

---

3

Confidential property of Optum.  Do not distribute or reproduce without express permission from Optum

**4256**

CONFIDENTIAL

3. **Chart Review Vendor Engagement and Oversight**

Optum Medicare Advantage Risk Adjustment Operations will conduct reasonable due diligence on potential vendors that conduct chart reviews and may engage vendors to conduct chart reviews pursuant to a written agreement that meets business, legal and regulatory requirements.  Optum Medicare Advantage Risk Adjustment Operations will follow appropriate procurement processes when engaging chart review vendors.  When Optum Medicare Advantage Risk Adjustment Operations engages a vendor to conduct chart reviews, Optum Medicare Advantage Risk Adjustment Operations will follow the following standards:

A. **Contract Standards:**

The terms of a vendor agreement with Optum Medicare Advantage Risk Adjustment Operations will include: the specific retrospective program activities, measurement or performance standards, if applicable, auditing and monitoring rights and payment terms. The vendor agreement will also include a Business Associate Agreement (BAA) or other appropriate terms that describe the permitted and required uses of protected health information.

B. **Coding Standards:**

See coding standards guidelines from Section 1 Standards for Reviewing Medical Records.

4. **Vendor Oversight:**

Optum Medicare Advantage Risk Adjustment Operations will design and execute appropriate coding reviews for its external vendors as part of its overall quality review program.  Optum Medicare Advantage Risk Adjustment Operations will establish performance measurements, corrective action and disciplinary action guidelines for vendors that do not meet the quality review standards.

5. **Provider Communications Standards**

Optum Medicare Advantage Risk Adjustment Operations will obtain prior review as required by Optum Legal and Compliance and prior approval from the Client for all provider correspondence related to the chart review process.

6. **Privacy Standards**

Optum Medicare Advantage Risk Adjustment Operations will only receive, use and disclose Protected Health Information pursuant to the Optum privacy and security standards, including the use of secure transmission methods.

---

Confidential property of Optum.  Do not distribute or reproduce without express permission from Optum

CONFIDENTIAL                                                                 MAPL000814085

## 7. Standards Management

The Director of Chart Review Programs is responsible for collaborating with Optum Compliance to identify changes to the standards for all risk adjustment data collection and submission and ensuring implementation of any new requirements.

- The policy will be reviewed for updates periodically or when changes are indicated by CMS.
- All policy changes will be approved by the policy owner, Compliance and Legal.

Version control will apply to all policies.

## CHANGE CONTROL LOG

| Date | Brief Description of Change | Author | Approver(s) |
|------|----------------------------|--------|-------------|
| 6/30/2014 | Create new document | Baker | Thomas, Pettersen-Scott, Trujillo and Fabrizio |
| 5/20/2015 | 2015 review and updates. | Baker | Thomas, Heath, Trujillo |

Confidential property of Optum.  Do not distribute or reproduce without express permission from Optum

4258

CONFIDENTIAL                                                                MAPL000814086

**EXHIBIT P-13**



## Medicare Advantage Coding Guide
Training and Reference Material



7/13/2012



CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT



## Quality Audit Standard

Provided s an outline of the quality standard that each coder must achieve to successful y comp ete the Medicare Advantage HCC Coding Training Program.

If a coder <u>does not</u> successfully sat sfy the quality standard as outlined in the timeframe allotted, termination could be considered.

| Practice Chart Audit Results | HCC Accuracy QA Score | Missed ICD-9 QA Score | EO Accuracy QA Score | Submission Accuracy QA Score |
|---|---|---|---|---|
| 2nd audit | 90% or higher | 90% or higher | 90% or higher | 90% or higher |
| 3rd audit | 92% or higher | 90% or higher | 92% or higher | 92% or higher |
| 4th audit | 93% or higher | 90% or higher | 93% or higher | 93% or higher |
| 5th audit | 94% or higher | 90% or higher | 94% or higher | 94% or higher |
| 6th audit | 95% or higher | 93% or higher | 95% or higher | 95% or higher |

## Quality Audit

### Audit Process

Each coder will receive audit results based on the coding results reported during the coding process.

Each aud t will note the audit score for each category and any applicable feedback based on the discrepancies dent fied during the audit process.

Each coder will have the opportun ty to review the audit results and provide a rebuttal based on the discrepancies identified during the aud t process.

Each coder will have a quality consultation with the auditor that conducted the audit. The qua ity consultation will allow the auditor the opportunity to mentor the coder on the d screpancies identified during the audit process. The quality consultation will also allow the coder the opportunity to provide any feedback necessary to support the coding results, ask questions, etc.

The coder should capitalize on the quality consultation w th the auditor. The coder should ask quest ons, etc. to ensure their success on the next audit and overall success in their pos tion.

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

4261

MARA1262854

**EXHIBIT P-14**



12125 Technology Drive
Eden Prairie, MN 55344

T  888-445-8745
F  952-833-7201
www.optum.com

# Table of Contents

Introduction .................................................................................................... 3
Compliance ................................................................................................... 4
    Protected Health Information .................................................................... 5
    Acknowledgment Form ........................................................................... 6
Optum Coding Guidelines ............................................................................. 7
    Frequently Asked Questions .................................................................... 8
    Optum Abbreviation List ....................................................................... 18
    Optum Error and Omission (E&O) Codes  .............................................. 36
Appendix A ................................................................................................. 38



Optum Coding Policy

1
CONFIDENTIAL & PROPRIETARY

EXHIBIT

00034B

4263

MARA1546907

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT



12125 Technology Drive
Eden Prairie, MN 55344

T  888-445-8745
F  952-833-7201
www.optum.com

For example: If the documentation states the patient has diabetes with neurological manifestation and is on gabapentin, you would code 250.60. .

---

**Question 10:**    Can results off of ancillary reports such as lab/x-rays be used as documentation for diagnosis coding?

**Answer:**    Ancillary reports such as lab/x-rays are unacceptable sources of documentation.  Any diagnoses from these reports must be confirmed by the provider in the medical record before it can be coded.

**Reference:**    Appendix A.  7. CMS Participant Guide Module 7.2.4.3 - Additional Guidance, Lab and Pathology Reports Guidance

**Further Clarification:**

Abnormal findings (laboratory, x-ray, pathologic, and other diagnostic results) are not coded and reported unless the physician indicated their clinical significance.

---

**Question 11:**    Does OptumInsight code all HCCs, Rx HCCs and PACE HCCs on every date of service?

**Answer:**    All ICD-9s that map to medical and/or Rx HCC will be coded for every date of service for that patient.

**Reference:**    OptumInsight Coding Manual

**Further Clarification:**

OptumInsight coding practice instructs those coding on its behalf to code all medical and Rx HCCs for every date of service of each patient.

---

**Question 12:**    Does OptumInsight consider hierarchy while coding?

**Answer:**    OptumInsight does not instruct the coder to consider hierarchy during the coding process.

---

14

CONFIDENTIAL & PROPRIETARY

Revised 1/8/13

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

**EXHIBIT P-15**

Page 410

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - - - - - - - - - - - - - - - -x

                                   :

UNITED STATES OF AMERICA, ex rel.:

BENJAMIN POEHLING,              :

                                   :

       Plaintiff,       :

                                 : Case No.

vs.                            : 2:16-cv-08697-FMO-SS

                                 :

UNITEDHEALTH GROUP, INC., et al.,:

                                 :

       Defendants.      :

                                 :

- - - - - - - - - - - - - - - - -x

VOLUME II

CONTINUATION OF VIDEOTAPED

RULE 30(b)(6)DEPOSITION OF

OPTUMINSIGHT, INC. AND UNITEDHEALTHCARE, INC.,

BY THEIR DESIGNEE, KATHLEEN O. BAKER

Washington, D.C.

May 31, 2023

Reported by:

Misty Klapper, RMR, CRR

Job No.: 982006



Page 422

1     when in that project year you reverted back to

2     instructing coders to record all RxHCCs?

3              MS. MADDOUX:  Objection, form.

4              THE WITNESS:  Going into then --

5         after our first attempt at the CAT form,

6         we reverted back to the standard process

7         of coding all.

8              BY MS. ZUPAC:

9         Q.    Okay.  Was that approximately in July

10    of 2013?

11        A.    Approximately.

12        Q.    Okay.  And then going forward for

13    subsequent date of service years, so date of --

14    dates of service 2013, 2014, 2015 and 2016, were

15    coders consistently instructed to record all

16    RxHCCs?

17             MS. MADDOUX:  Objection, form.

18             THE WITNESS:  They were asked to

19        code all HCCs and RxHCCs that they could

20        identify in the chart according to their

21        ability, according to the chart difficulty

22        levels.



Page 576

CERTIFICATE OF NOTARY

1

2          I, MISTY KLAPPER, the officer before whom

3   the foregoing deposition was taken, do hereby

4   certify that the witness whose testimony appears in

5   the foregoing deposition was duly sworn by me; that

6   the testimony of said witness was taken by me in

7   shorthand and thereafter reduced to typewriting by

8   me; that said deposition is a true record of the

9   testimony given by said witness; that I am neither

10  counsel for, related to, nor employed by any of the

11  parties to the action in which this deposition was

12  taken; and, further, that I am not a relative or

13  employee of any attorney or counsel employed by the

14  parties hereto, nor financially or otherwise

15  interested in the outcome of this action.

16

17  _____

                    Misty Klapper, RMR, CRR

18                  Notary Public in and for

                    the District of Columbia

19

20

21

22



**EXHIBIT P-16**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


_____
                             )
UNITED STATES OF AMERICA     )
ex rel. BENJAMIN POEHLING,   )
                             )
        Plaintiff,           )     No. CV 16-08697 FMO
                             )
vs.                          )
                             )
UNITEDHEALTH GROUP, INC.,    )
et al.,                      )
                             )
        Defendants.          )
_____)


CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER


Volume 1
DEPOSITION OF JON H. BIRD
As 30(b)(6) Designee 2 of
OptumInsight, Inc.
UnitedHealthcare, Inc.
Washington, DC
June 22, 2023




Reported by:  John L. Harmonson, RPR
Job No. 988356



Page 102

1    programs continues.

2         Q.    Okay.

3              MR. MASON:  Why don't we go off the

4    record and take a break.

5              THE VIDEOGRAPHER:  Going off the record

6    at 11:53.

7              (Recess taken.)

8              THE VIDEOGRAPHER:  We are back on the

9    record at 12:11.

10   BY MR. MASON:

11        Q.    Mr. Bird, another risk adjustment

12   program that Optum performed for UnitedHealthcare

13   was called claims verification; right?

14        A.    Correct.

15        Q.    Can you explain what the claims

16   verification program is?

17        A.    It was a program that we operated during

18   a certain time frame that identified and reviewed

19   exclusive HCCs that were submitted by providers

20   that were part of the chart review program.

21        Q.    And Optum performed that program for

22   UnitedHealthcare?

23        A.    That's correct.

24        Q.    When?

25        A.    The program was in phases.  The first



Page 103

1    phase of the program was 2010 calendar year for

2    2009 dates of service that was limited to Ovations,

3    which was UnitedHealthcare population, and also

4    limited to one member one provider.

5             The second phase was a similar one

6    member one provider.  It was moved from a manual

7    process into one that was within a system, and that

8    was in 2011 for 2010 dates of service.

9             And then Phase 3 of CV was for 2011 and

10   '12 dates of service.  And that was looking at

11   multiple provider as opposed to one member one

12   provider criteria.

13        Q.    And when was Phase 3 conducted?

14        A.    Phase 3 -- and I may need to refer to

15   kind of a timeline on that.  But typically it would

16   be done on a retrospective basis.  So if we're

17   looking at 2011 dates of service, we would have

18   commenced that in 2012.  And then it was ongoing

19   for 2011 and in 2012 until the program was

20   suspended and ultimately discontinued, which was

21   the spring of 2014.

22        Q.    When specifically was it suspended?

23        A.    There was -- so there was operational

24   suspensions from time to time based upon -- but in

25   terms of suspension leading to discontinuation of



Page 104

1    the program, my understanding is it was around the

2    middle of April that there was -- I think I've seen

3    within the documentation I reviewed some

4    notification for the delete process to be put on

5    hold around April of -- on or around April 18th of

6    2014.

7        Q.    And when you say suspended, you just

8    said that you suspended the delete process.  Did

9    you suspend all of CV, or just the delete process?

10       A.    The notification that I saw was in

11   relation to deletes.  But my understanding is the

12   entire CV process was suspended at or around that

13   time.

14       Q.    And it was terminated when?

15       A.    The decision for termination, which is

16   based on the memorandum that came from Steve Nelson

17   to Scott Theisen, I think that was dated on

18   June 11th, and he references in there the decision

19   for termination of the program was made on

20   May 27th.

21       Q.    And so is that your testimony as the

22   designee for UnitedHealthcare and Optum, that the

23   suspension of CV went into place on April 18, 2014,

24   and the termination of CV went into place on

25   May 27, 2014?



Page 105

1        A.      Yeah, my testimony is on or around

2    April 18th is when I saw notification of delete

3    processing, and I believe the program was also

4    suspended on or around that date.

5            And yeah, based upon the -- we have the

6    exhibit in here which is Steve Nelson's email or

7    memorandum to Scott Theisen.  He indicates in there

8    that the decision was made to terminate on

9    May 27th, and then that memorandum was dated with

10   notification to Scott and others that was on

11   June 11th.

12       Q.    And the dates that you were just

13   speaking of are in regards to the CV program that

14   Optum performed for UnitedHealthcare; right?

15       A.    That's correct.

16       Q.    Optum also performed CV for other MAO

17   clients; right?

18       A.    That is correct.

19       Q.    During what time period?

20       A.    I don't actually -- within the materials

21   that I kind of reviewed, I didn't look at the

22   specific timelines related to commercial customers

23   or non-UHC customers.  There were claims

24   verification processes in place for some MAO

25   clients as well as some HHS, you know, ACA risk



Page 109

1          Q.     What's the purpose of the claims

2    verification program?

3          A.     The purpose is to identify exclusive

4    HCCs and review those that were submitted by

5    providers that were part of the chart review

6    program.

7          Q.     What do you mean, and review them?

8          A.     They would be subject to medical coder

9    review.  So the CVA people that we spoke about

10   earlier, CV analysts.

11         Q.     And when you say the purpose was to

12   identify exclusive -- did you say exclusive HCCs or

13   exclusive codes?

14         A.     Exclusive HCCs.

15         Q.     And what do you mean by that?

16         A.     It would be an HCC or diagnoses that

17   mapped to an HCC and that HCC is submitted by one

18   and only one provider.

19         Q.     So why?

20                MR. QURESHI:  Objection to form.

21   BY MR. MASON:

22         Q.     I was asking the purpose; right?  And

23   you're telling me what CV did.  CV looked at

24   exclusive codes and then had a CV analyst review

25   the chart associated with it to determine if it was



Page 110

1    supported; right?

2              MR. QURESHI:  Objection to form.

3    Mischaracterizes testimony.

4              THE WITNESS:  It's the operational

5    purpose that the program was to identify and review

6    codes.

7    BY MR. MASON:

8        Q.    Okay.  Why was that the operational

9    purpose?

10             MR. QURESHI:  Objection to form.

11   Outside the scope.  He's answered the question

12   about purpose.

13             You can answer in your personal capacity

14   if you know the answer, Mr. Bird.

15             MR. MASON:  That's an inappropriate

16   assertion.  Please refrain from instructing the

17   witness how to answer.  I'm allowed to ask

18   questions, and the witness can answer those to the

19   best of his ability.  You can assert all the

20   objections you want out of scope, but it's

21   inappropriate to tell the witness how he should

22   answer.

23             MR. QURESHI:  Once again I'm going to

24   object to your question as being outside the

25   scope --



Page 118

1    supported in the corresponding medical chart

2    documentation.  All diagnosis codes determined to

3    be adequately documented within the chart will" --

4    sorry, "not adequately documented within the chart

5    will be deleted."

6         Q.    Is this statement a correct description

7    of the claims verification program?

8              MR. QURESHI:  Objection to form.

9              THE WITNESS:  They were the words of

10   whoever authored this document chose to describe it

11   at that particular time.  As I kind of break it

12   down based upon my understanding of the program, I

13   see the programs between chart review and claims

14   verification as being separate programs as opposed

15   to part of the chart review program.  It could have

16   been described or positioned in that way.  But it

17   wasn't something that was part of a single program.

18              This does not mention exclusive HCCs.

19   But I think, yeah, my description, the purpose was

20   to identify exclusive HCCs.  This doesn't mention

21   exclusive HCCs, but it does mention review of

22   diagnosis.  I did mention review.  And it would be

23   reviewed by a coder.

24              And to the extent that we've been

25   through every step of the claims verification



Page 119

1    process as defined at any point in time, and we can

2    determine that the -- we have all of the

3    appropriate medical records and we have sufficient

4    evidence to overturn the diagnosis that was

5    submitted by the provider that takes care of the

6    patient, then they would be deleted.

7              It doesn't provide all of that detail

8    but a summarized version that they provide outside

9    of claims verification seems to cover most of the

10   main aspects of the program.

11   BY MR. MASON:

12        Q.   So I'm just trying to make sure I

13   understand your answer.  My question was:  Is this

14   a correct description of the claims verification

15   program?  You've mentioned some things, but I'm not

16   sure that you've answered my question.

17              MR. QURESHI:  Objection to form.

18   Argumentative.  And asked and answered.

19              THE WITNESS:  What I'm trying to say is

20   there's a lot of different descriptions and

21   different documents written by different people.

22   BY MR. MASON:

23        Q.   I'm asking about this one, though.

24              MR. QURESHI:  Let him finish his answer.

25   If you're going to ask him questions, give him the



4278

Page 179

 1    words than just "reviews chart."

 2    BY MR. MASON:

 3         Q.    Okay.  And I'm just trying to make sure

 4    that I understand all of your knowledge.

 5              So other than the disposition codes, is

 6    there anything else that you know about as a step

 7    in the coding review process?

 8              MR. QURESHI:  Objection to form.

 9    Outside the scope.

10              THE WITNESS:  I'm just going to refer to

11    some documents.

12    BY MR. MASON:

13         Q.    Sure.  Just let me know which ones,

14    please.

15         A.    Yeah.  Let me see if I can find -- so

16    this is process documentation titled "Claims

17    Verification, Business Requirements."  It's Tab 4.

18    And I don't think the pages --

19         Q.    So this is your Tab 4.  So for the

20    record, we're looking at Exhibit 712-4.

21              MR. QURESHI:  I think he was still

22    responding.  I know you're trying to clarify the

23    record, but I think he's in the middle of

24    something.

25              THE WITNESS:  Yeah.  I was just about to



4279

Page 180

1    say these pages don't seem to be numbered.  So the

2    section I was looking at goes to Section 10, "Chart

3    Review Discrepancies."  So there is a Step 2.0,

4    which I think is one thing I mentioned, validate

5    member and providers listed in the chart.

6    BY MR. MASON:

7        Q.    Sorry.  Can you point me to where?

8        A.    So under Section 10.0, review -- "Chart

9    Review Discrepancies," the second box, process box

10   in that diagram, "Validate member and provider

11   listed in chart match CV inventory list."  So

12   that's one step to look at.

13             There were steps related to HCCs on the

14   chart, and hierarchy, which are kind of covered

15   further down in the process documentation.

16             There was steps related to E&O codes,

17   which is also in the process documentation.

18             There's querying ChartSync for

19   additional charts.

20             So I think what I was trying to depict

21   is on the chart view provided, it said review

22   medical record, which is very high level, and

23   within this document there's two and a half pages'

24   worth of process flows that describe some of the

25   steps that would have been taken at that point in



Page 181

1    time.

2           So the point I was trying to make is

3    review is a step in the process, but that process

4    is actually quite detailed.

5      Q.    Quite detailed.  And the detail can be

6    found here on page 13 -- sorry, 12, 13 and 14 of --

7    sorry.  Let me try that again.  Can be found on

8    page 12, 13, 14 and 15 of Exhibit 712-4?

9           MR. QURESHI:  Objection to form.

10   Mischaracterizes testimony.  And outside the scope.

11          THE WITNESS:  This was the process as

12   documented at the time that this business

13   requirements document was put together.  As I

14   indicated earlier, things evolved and changed over

15   time.

16   BY MR. MASON:

17     Q.    But this was accurate as of the time it

18   was written?

19          MR. QURESHI:  Same objection to form and

20   scope.

21          THE WITNESS:  I have no reason to

22   believe not.

23   BY MR. MASON:

24     Q.    Okay.  And you said this would describe

25   some of the steps.  Are you aware of any other



Page 185

1      A.    "After a chart review is complete and it

2   has been determined that the member associated with

3   the chart is a candidate for claims verification,

4   the system will pull the member's claims data from

5   IRADS.  The system will then determine if there are

6   discrepancies between the claims information in

7   IRADS and the data from chart review."

8      Q.    And is that an accurate description of

9   the claims verification process as of 2010?

10      A.    It's a high-level description of the

11   matching process, not the entire claims

12   verification process.

13      Q.    I'm not asking if it covers everything

14   about the claims verification process.  I'm just

15   asking whether it's accurate as to how the claims

16   verification process worked at this time.

17           MR. QURESHI:  Objection to form.

18   Mischaracterizes testimony.

19           THE WITNESS:  But I don't think this

20   describes the claims verification process.  It's a

21   component of the claims verification process it's

22   describing.  So if your question is is this --

23   BY MR. MASON:

24      Q.    My question wasn't does this describe

25   the claims verification process.  It was:  Is this



Page 253

1        Q.    Okay.  Why don't you go to page 3.  Do

2    you see at the top under "Claims Verification -

3    Purpose"?

4        A.    I see that.

5        Q.    Can you read what's below that out loud,

6    please.

7        A.    "The purpose of the claims verification

8    is twofold: (1)  Enable the submission of 'delete

9    transactions' to CMS if HCCs that were supposed to

10   be evidenced in a chart were either not evidenced

11   in the chart, or not appropriately evidenced in the

12   chart, and

13            "(2) Enable the submission of 'add

14   transactions' to CMS if HCCs are evidenced in the

15   chart but are not evidenced in IRADS."

16       Q.    So putting aside numeral 2, because I

17   think we have already spoken about the fact that

18   the add component was changed early on in the

19   implementation of CV.  So putting aside part 2, do

20   you agree with the statement of the purpose of

21   claims verification in part 1?

22            MR. QURESHI:  Objection to form.

23            THE WITNESS:  I think it's consistent

24   with the explanation that I previously provided

25   outside of the detail related to exclusive HCCs.



Page 255

1              MR. QURESHI:  Objection to form.

2              THE WITNESS:  It depends on which --

3       where the discrepancy exists, because this doesn't

4       make it clear in here whether this is post-CVA

5       review or pre-CVA review.  So I think the words

6       "potential delete" were used interchangeably with

7       CV inventory.  So where there was no match, as we

8       discussed earlier there would be a review and

9       coding process.  Then once the delete had been

10      identified through this multistep process, such a

11      process, that would probably be called a delete.

12              So this doesn't make it clear in this

13      document of what point in the process it's

14      referring to.

15      BY MR. MASON:

16         Q.    Right.  So you don't know in this

17      definition whether you're talking about just after

18      the matching logic or after the CVA analysis?

19         A.    Yeah, correct.

20         Q.    And so if it's just after the matching

21      logic but before the CV analysis, you would call

22      that a potential delete?

23         A.    That's what many people referred to it

24      as at the time.

25         Q.    And after the CV analysis, you would



4284

Page 256

1    call it a delete?

2        A.    I mean, it could be a -- it could be --

3    yeah, an identified delete and an actual process

4    delete.  So typically there's some kind of

5    qualification to what stage in the process it's in.

6        Q.    Okay.  And if the stage of the process

7    it's in is after the CVA analysis, then you would

8    call it a delete?

9        A.    If it's been through the steps of the

10   process, yeah.

11       Q.    Okay.  And so with that clarification in

12   mind, this definition is otherwise consistent with

13   how Optum and UHC used the term "delete" at the

14   time?

15            MR. QURESHI:  Objection to form.  Asked

16   and answered.

17            THE WITNESS:  Well, I think the things

18   that I added in there kind of change it

19   fundamentally.  So I wouldn't call this consistent

20   with our understanding of what a delete is.  I

21   think it lacks detail to describe which part of the

22   process it's in.

23   BY MR. MASON:

24       Q.    Okay.  You have a different

25   understanding of what delete means than what's



Page 282

1    So I wasn't going back to determine whether the

2    data elements that were available for CV 3 were

3    also available during the earlier dates of service

4    years.

5         Q.    You don't know one way or the other?

6              MR. QURESHI:  Objection; asked and

7    answered.  And argumentative.

8              THE WITNESS:  Yeah, I don't know what

9    data elements would have been available in earlier

10   years.

11   BY MR. MASON:

12        Q.    Okay.  And let's go down to Number 12,

13   "Matching Logic."  This bullet refers to the fact

14   that the matching logic was done at the HCC level;

15   right?

16        A.    That's correct.

17        Q.    And we've talked about this, but

18   matching logic is looking for a match in diagnoses

19   between the claim and the chart review?

20        A.    HCC, not diagnosis.

21        Q.    Thank you.  Matching logic is looking

22   for a match in the HCC between the claim and the

23   chart review?

24        A.    Correct.

25        Q.    Okay.  And what you mean by at the HCC



Page 348

1          THE WITNESS:  It looks higher than my
2     recollection, actually.
3     BY MR. MASON:
4          Q.    Your recollection is that the percentage
5     that made the exclusive HCC rule is lower than
6     that?
7          A.    Yes, it is.
8          Q.    Okay.  And then the inner circle,
9     approximately 360,000 charts contains HCCs
10    requiring CV coding review.  Do you see that?
11         A.    I do.
12         Q.    What would that refer to?
13              MR. QURESHI:  Objection to form.
14              THE WITNESS:  To be honest, I'm not
15    familiar with this particular slide or the way that
16    the data was put together.  So it's -- I'm
17    struggling to interpret it.
18    BY MR. MASON:
19         Q.    Okay.  Why don't we zoom out just a
20    little bit.  Just at a high level, you agree that
21    the number of charts that were eligible for the CV
22    program under Optum's rules was a small subset of
23    the overall number of charts that went through the
24    chart review program?
25              MR. QURESHI:  Objection to form.



4287

Page 349

1            THE WITNESS:  In terms of what

2    qualifies -- so the universe of charts and which

3    ones went through the eligibility and matching and

4    resulted in a review?

5    BY MR. MASON:

6        Q.    Just that made it to the matching step.

7        A.    To or through the matching step?

8        Q.    Let's do to the matching step first and

9    then through the matching step.

10        A.    The way I understand the process works

11    is all of the charts would be considered for CV

12    eligibility.  Then it would be eligibility applied

13    in terms of which of those charts had an exclusive

14    HCC associated with them where there is a match and

15    whether you're able to see I've got a provider ID

16    match between the chart data and the claim data and

17    that the member is eligible and there is an

18    exclusive HCC.

19            So all of the charts are considered in

20    that step to try and get to what is going to be

21    eligible.  And then from eligibility, all of the

22    ones that are eligible are considered for matching.

23    And then after the matching, anything that didn't

24    match would move on into the CV review process.

25        Q.    Okay.  And the number of charts that



Page 350

1    were eligible was a small subset of the overall

2    number of charts that went through the chart review

3    program; right?

4              MR. QURESHI:  Objection to form.  Asked

5    and answered.

6              THE WITNESS:  I don't know what the

7    percentage is exactly at the eligible level.  But,

8    you know, it's a portion of the overall charts.  I

9    don't know exactly what the percentage is, but it's

10   not all of the charts that make it through

11   eligibility.

12   BY MR. MASON:

13        Q.    Less than 25 percent?

14              MR. QURESHI:  Objection to form.

15              THE WITNESS:  That's my recollection.

16   BY MR. MASON:

17        Q.    Less than 10 percent?

18              MR. QURESHI:  Same objection.

19              THE WITNESS:  You know, I can say less

20   than 25 percent.  I don't know whether it's less

21   than 10 percent.

22   BY MR. MASON:

23        Q.    Okay.  Let's go to slide 8.

24        A.    Just to be clear on that, they're all in

25   process for analysis of eligibility.  So it's the



Page 353

```
 1                    C E R T I F I C A T E

 2

 3   DISTRICT OF COLUMBIA

 4              I, JOHN L. HARMONSON, a Notary Public

 5   within and for the District of Columbia, do hereby

 6   certify that JON H. BIRD, the witness whose

 7   deposition is hereinbefore set forth, was duly

 8   sworn by me and that such deposition is a true

 9   record of the testimony given by such witness.

10              That before completion of the

11   proceedings, review and signature of the transcript

12   was not requested.

13              I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17              IN WITNESS WHEREOF, I have hereunto set

18   my hand this 26th day of June, 2023.

19

20   _____

21              JOHN L. HARMONSON, RPR

             My commission expires: 04/14/26

22

23

24

25
```



4290

**EXHIBIT P-17**

OPTUM™

## PRODUCT SCORECARD
# Clinical Performance & Compliance

| | |
|---|---|
| **Growth Lever:** | Business Services |
| **Product Type:** | Service |
| **Markets Served:** | Payer and Provider |

## Solution Description

Integrated Risk Adjustment, Clinical Quality and Care Coordination Solutions to drive the complete and accurate assessment and reporting of health status and clinical outcomes to ensure appropriate revenues and demonstrate quality of care

## Key Priorities

1  Population Health – Integrated Member/Provider Engagement
- Integrated Assessments (In Office/In Home)
- Integrated Member Engagement (Assessments, Drug Adherence, CM/DM, etc.)
- Big 4 Opportunities (Aetna/Coventry, Humana, Cambia and Health Net Duals)

2  Global Chart Management
- Outcomes and Efficiency Improvements (MA Risk)
- Workflow (Medicaid, PAF, Attestations, RADV/IDV, HEDIS, Hospital, Other Global)
- Client Enablement and Transparency
- Innovation: Clinical and embedded reviews linked to prospective

3  Submission and Compliance
- MA Submissions (RAPs, EDPS)
- Risk Adjustment Compliance (CV, RADV, IDV, etc.)
- Other Compliance (Part C & D data validation, other consulting)

4  Quality/STARs
- HEDIS Measurement and Chart Abstraction
- STARs Enterprise Reporting and Other Quality Consulting

5  Integrated Platforms
- Clinical Analytics (Risk, Quality, Utilization and Cost)
- Campaign Management (Tracking Interventions)
- Provider Data Sharing (One source of truth)

**EXHIBIT**
**508A**
4292

Risk Adjustment Compliance Services

---

**PRODUCT DETAILS**

1. **What is this product's history (how and why did Optum enter into this business)?** The heading of compliance services covers a few different segments of services, as follows:

   - RADV/IDV - Generally speaking, some limited compliance offerings have been in place since 2006, however, CMS's move toward targeted RADV audits and increased oversight on compliance with MA plans caused an expansion of the compliances services. In 2008, CMS initiated its first targeted RADV and announced their intent to extrapolate finding based on the 201 member sample to all members within the selected H# This announcement caused an increased desire by health plans to initiate compliance programs designed to identify incorrect codes and correct the codes.

   - Claims Verification - Additionally, in late 2009, OIG became involved in the RADV reviews and issued findings for several plans. Recently, CMS announced a settlement with SCAN health plan which outlined the expectation that when plans conduct chart review, they should be correcting/removing codes that were submitted on claims and not supported in the corresponding charts, which is the sole purpose of our Claims Verification offering. This settlement spurred additional market interest in a product that Optum had already developed and initiated in stages with UHC. In addition, CMS changed submission process from RAPS to EDPS beginning with 2012 dates of service. As a result, Optum developed that capability in 2011 and 2012.

   - Submissions – RAPS submission has been in existence since the onset of the risk adjustment model. We have provided this service by building our own tool, IRADS. Starting with 2012 dates of service, CMS instituted a new submission methodology which includes submitting full 5010 data to CMS. In 2011 and 2012, Optum built this capability and we are currently submitting in both processes for UHC and Healthnet.

   - Part C & D Data Validation

2. **What role does this product play in this business's portfolio?**
   The Compliance Offerings, including RADV/RACCR and Claims Verification, are all products that support our overall risk adjustment activities with our clients. These products are designed to provide a balanced approach at helping to improve the accuracy of data submitted to CMS. In our submission offerings, RAPS and EDPS, it is critical to ensure that data submitted to CMS is complete.

3. **Is this product being actively sold?** RADV/RACCR are actively sold. However, claims verification is currently limited to UHC. Our plan is to offer to commercial clients this year. RAPS and EDPS are proposed on a limited basis, as requested by clients. However, the core of our submission services is with UHC and HealthNet who have both RAPS and EDPS and Tufts who has only RAPS submissions with Optum.

4. **Who are this product's top 10 clients by revenue? Who are this product's top 10 client prospects by potential contract size?** By product, the client base is as follows:

   UHC, HealthNet, Tufts, UCare

5. **Who are the top competitors?** Most vendors in the space offer RADV and submission (RAPS and EDPS) services.

6. **What additional opportunities exist to enhance this product's financials?** If OptumInsight wanted to be in this business, it would need to invest in automating the process for RADV/IDV services.

7. **What would be the impacts of discontinuing this product?**
   For our full service clients, these services are integral to their overall risk adjustment program.

CONFIDENTIAL

**EXHIBIT P-18**

# No tiff included for this record.

**EXHIBIT**

00201

4295

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

MARA2036153





Claims Verification Overview – March 7, 2013
John Martinez/Patty Brennan/Jim Colhour

Attorney Client Privilege

# Current Industry Environment

- $322M Settlement Agreement (August 2012)
- Page 3-4*:

"SCAN provided to the United States Centers for Medicare and Medicaid Services ("CMS"), as corrections, the diagnosis codes that the SCAN coding consultants had identified and that the physicians had not identified.

As to the diagnosis codes that the physicians had previously identified, but that the SCAN coding consultants had failed to identify, SCAN failed to inform CMS that such codes might have needed to be *withdrawn from SCAN's prior submissions* to CMS for the Encounters.

*Had SCAN provided that information to CMS, Medicare Part C's capitated rate payments to SCAN based on the Encounters allegedly would have been lower than they were.*"

*Source: http://oag.ca.gov/system/files/attachments/press_releases/SCAN-Settlement%20Agreement_0.pdf



**EXHIBIT P-19**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA ex rel.  ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )


Videotaped Deposition of

United States' 30(b)(6) Designee 1

CONTAINS ATTORNEYS' EYES ONLY PORTIONS

At the Law Offices of Latham & Watkins

Thursday, May 25, 2023

10:24 a.m. Eastern



4299

Page 74

1   I'll put on that list is the June -- the response to

2   the comment in June of 2000, which is in Exhibit 164

3   at, you know, Page 40286.

4           Are there any other documents that should go

5   on this list that --

6           MS. LIKOFF:  Object to --

7           BY MR. GALLAGHER:

8   Q    -- you say support the rule you say exists?

9           MS. LIKOFF:  Object to form.  Objection.

10  Outside the scope of Topic 21.  Topic 21 did not ask

11  the witness to prepare to identify all instances of

12  any communications.

13          THE DEPONENT:  I would say that CMS has been

14  very clear, including in Ms. Rice's deposition, that

15  CMS does not provide recipes about how MAOs should

16  conduct their chart review programs.  So CMS is not

17  going to provide a threshold for what information is

18  or a threshold for what best knowledge is.  That is

19  the responsibility of the MAO when designing an

20  effective compliance program that ensures that it --

21  that the -- the organization is fulfilling all program

22  requirements including the payment ones and that



Page 75

1    ensures that it is -- identified the key risks and is

2    monitoring them and auditing.  So that -- it's the

3    MAO's responsibility.

4            So you're asking for something that M- --

5    that CMS has been clear they, on purpose, are not

6    doing.  They are not providing a detailed series of

7    steps or a recipe for how to conduct and organize and

8    design a chart review program.  CMS requires that

9    diagnoses be accurate, complete, and truthful.  It's

10   the MAO's responsibility to figure out how to make

11   that truth which allows them to certify every year.

12           MR. GALLAGHER:  I'm going to move to strike

13   that as not responsive.

14           BY MR. GALLAGHER:

15   Q    My question is just, can you give me a list

16   of the documents you rely upon for the assertion that

17   there exists a duty for MAOs to investigate if they

18   have any information that a set of codes is not

19   supported?

20           MS. LIKOFF:  Object to form.  Asked and

21   answered.

22           Counsel, the fact that you don't like her



Page 131

1    Because -- because CMS doesn't specify how to validate

2    risk adjustment data.  I mean, you're using the word

3    "audit," so I guess you mean auditing risk adjustment

4    data.  CMS doesn't tell MAOs how to audit risk

5    adjustment data.  So the specificity -- you're looking

6    for a very specific link that doesn't make sense

7    because under the risk adjustment program, there is no

8    specific requirement for an audit.  Under 422.503,

9    audit could mean something very general, even for risk

10   adjustment data.  It doesn't have to be on diagnosis

11   codes.

12           BY MR. GALLAGHER:

13       Q    My question is not whether you communicated

14   how you think they should conduct an audit.

15           My question is, can you point to anywhere

16   that CMS communicated to MAOs that there's an

17   obligation under 422.503(b)(4)(vi) to audit risk

18   adjustment data at all?

19           MS. LIKOFF:  Objection to form.

20           THE DEPONENT:  There's an obligation to have

21   accurate data, which is also under 422.504.  So when

22   you go look at that one step in the compliance



Page 132

1    programs, there are series of obligations described,

2    you know, monitoring audit, et cetera.  So you're

3    looking for one very specific link when it -- that's

4    just not how CMS operates with this.

5            BY MR. GALLAGHER:

6        Q    Earlier you testified that it's CMS's view

7    that 422.503(b)(4)(vi) creates an obligation for plans

8    to audit risk adjustment data to confirm the support

9    for codes.

10           And my question is just, can you point me

11   anywhere where CMS has communicated that view to

12   plans?

13           MS. LIKOFF:  Objection to form.

14           THE DEPONENT:  And I did -- I did not say

15   just audit.  I was talking about the entire paragraph,

16   which is there should procedures for monitoring and

17   audit and -- oh, goodness, where is it?  I want to

18   read --

19           BY MR. GALLAGHER:

20       Q    I -- I don't need you to read it.

21       A    -- that section.

22           Anyway, I didn't say just audit.  I said the



Page 133

1    whole kit and caboodle.  There's a requirement to do a

2    risk assessment and then develop procedures to deal

3    with the problems at hand or areas that are always at

4    risk of error such as payment.  And that you need to

5    develop monitoring protocols, select some audits in or

6    out, if that's useful, and just make sure that the

7    program is in full compliance with all of the program

8    guidelines, which is a statement at the beginning of

9    Paragraph -- Subparagraph 6.

10        Q    Can -- can you point to me anywhere where

11    CMS has told plans that it's your view that

12    422.503(b)(4)(vi) imposes on them an obligation to

13    audit risk adjustment data?

14        A    You know --

15            MS. LIKOFF:  Objection to form.

16            THE DEPONENT:  Yeah.  You said my view, and

17    I'm -- I'm just not going to say anything else beside

18    what I said.  I answered the question by saying the

19    implementation of that Subparagraph 6 depends on the

20    risk assessment results and on what the MAO decides

21    under 422.310 to do to validate its data, its risk

22    adjustment data.



Page 134

1              BY MR. GALLAGHER:

2        Q    Right.

3              And so the requirement is to do a risk

4    assessment; right?

5        A    That's part of it.

6        Q    And -- and what plans do, based on that risk

7    assessment, and -- and frankly whether they've done an

8    appropriate risk assessment, is something that the

9    government audits through MOEG; yes?

10             MS. LIKOFF:  Objection to form.  Objection.

11    Outside the scope to the extent you included the --

12    the term "government."

13             THE DEPONENT:  What MOEG audits for CPE,

14    compliance program effectiveness, is, is there a

15    process in place?  And then they find certain problems

16    that came up, and they track them through the process.

17    They don't comment on the nature of the process that

18    the MAOs put in place.

19             BY MR. GALLAGHER:

20        Q    Right.

21             They -- they -- they -- but they will

22    comment if they find problems; right?



Page 199

1          Here you're referring to your own personal

2    view, not something that you ascertained with advice

3    of counsel or with somebody higher up in the -- in

4    the -- in the chain of command at CMS; right?

5          A    You mean the sentence I just said?

6          Q    Yeah.  The -- the --

7          A    That -- the sentence I just said is CMS's

8    position on -- on using -- on the limits of using

9    group level -- level memos that are internal to a

10   group that never see the light of day anywhere outside

11   the group.  And that CMS would say they're very --

12   there are limits to using that to mean anything.

13         Q    Right.  Right.

14         My -- my point is just that when -- when I

15   asked the best authority for the medical record review

16   rule that you referenced here, when you write this in

17   this email, you're referring to what you, Anne

18   Hornsby, think, not something that you have vetted

19   through the process at CMS or gotten advice of counsel

20   on; right?

21         A    Of course not.  This is just my memo done

22   with Jennifer that just reflects two people of the



Page 200

1    many people within MPPG to present some approaches to

2    Cheri, the di- -- the group director.  So this memo is

3    really not particularly meaningful from CMS's point of

4    view.  It's -- you know, it's just a little staff

5    memo.

6         Q    You say in the next sentence, "And I gather

7    we don't want to use that," referring to the

8    contracting requirement to have a routine process for

9    monitoring compliance risk; right?  That's what you

10   say in the next sentence?

11        A    That's what's written there.

12        Q    Yeah.

13             Why -- why didn't you -- and -- and the "we"

14   there is a reference to MPPG not wanting to use that

15   contracting requirement as the authority for the

16   medical record review rule?

17             MS. LIKOFF:  Objection to form.

18             THE DEPONENT:  Speaking as Anne Hornsby, I

19   do not remember that.  I -- I just don't.

20             BY MR. GALLAGHER:

21        Q    So then you say, "So I've tried to write the

22   authority for requiring this using the contractual



Page 266

1          BY MR. GALLAGHER:

2          Q    Have you ever specified for plans the

3    circumstances in which you believe at CMS they are

4    obligated to investigate whether codes are or are not

5    supported by the medical records?  Have you ever given

6    that specific guidance to plans whether it's in a rule

7    or regulation or any -- some regulatory guidance?

8               MS. LIKOFF:  Objection to form.

9               THE DEPONENT:  If CMS says, and for many

10    forms of this guidance you've listed, is that the data

11    has to be accurate and complete and truthful.  So when

12    an MAO is doing chart reviews or medical record

13    reviews, they have a protocol, presumably.  CMS knows

14    nothing about the MAO chart review protocols, but they

15    have a protocol presumably which gives them results.

16    And this is not rocket science.  If there's something

17    that quacks like a duck, it probably is a duck, an

18    unsupported diagnosis.  And the MAO knows that that

19    violates the regulation to submit accurate data.

20          Q    Have you ever given MAOs specific guidance

21    on when it is you think they have to conduct a medical

22    record review or do further investigation to determine



Page 356

1    REPORTER'S CERTIFICATE

2    DISTRICT OF COLUMBIA

3

4            I, Jeaninn Y. Alexis, a Notary Public of the

5    District of Columbia, do hereby certify that the

6    with-named witness personally appeared before me at

7    the time and place herein set out, and after having

8    been duly sworn by me, according to law, was examined

9    by counsel.

10            I further certify that the examination was recorded

11    stenographically by me, and that this transcript is a true

12    record of the proceedings.

13            I further certify that I am not of counsel to any of

14    the parties, nor an employee of counsel, nor related to any of

15    the parties nor in any way interested in the outcome of the

16    action.

17    As witness my hand and seal this 5th day of June, 2023.

18

19            _Jeaninn Y Alexis_

20            JEANINN ALEXIS
             My Commission Expires: 11/30/2023

21

22



**EXHIBIT P-20**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA ex rel.  ) No. 16-08697 FMO

BENJAMIN POEHLING,                )

                                  )

        Plaintiffs,               )

                                  )

v.                                )

                                  )

UNITEDHEALTH GROUP, INC., et al., )

                                  )

        Defendants.               )

_____  )



CONTAINS PORTIONS OF ATTORNEYS' EYES ONLY


Videotaped Deposition of

SEAN CAVANAUGH

Given Remotely

Thursday, February 17, 2022

9:02 a.m.



Reported by:  Karen K. Kidwell, RMR, CRR



Magna Legal Services

866-624-6221

www.MagnaLS.com



Page 64

1    fee-for-service, traditional claims data, and the

2    Medicare Advantage plans data, right?

3        A.   Well, I think it was much more common, if

4    it was unsupported, to be on the side where it drove

5    financial advantage and Medicare Advantage.  And if

6    it was omitted, it was much more likely to happen on

7    the fee-for-service side, where it didn't cause any

8    financial harm.

9        Q.   Setting aside your belief about the extent

10   to which it occurred, you agree that both fee for

11   service and Medicare Advantage, you know, submitted

12   data included codes that were not supported by the

13   medical records, and omitted diagnostic codes that

14   would be supported by the medical records?  Right?

15           MS. KRIEG:  Object to form.

16           THE WITNESS:  Yes, it was my understanding

17       that that was true.

18   BY MR. GALLAGHER:

19       Q.   And you could refer to that as overcoding

20   and undercoding, right?  Overcoding being assigning

21   codes that are not supported by the medical record,

22   and undercoding being omitting codes that would be

23   supported by the medical records.  Fair?

24       A.   Yes.  They frequently -- they are

25   frequently referred to that way.



Page 65

1        Q.   And it was your understanding, as the

2   director for the Center for Medicare in 2014, 2017,

3   in that time frame, that overcoding and undercoding

4   was to some degree an issue with both traditional,

5   fee-for-service data and the data submitted by

6   Medicare Advantage plans.  Right?

7              MS. KRIEG:  Object to form.

8              THE WITNESS:  Yes.

9   BY MR. GALLAGHER:

10       Q.   Bear with me one second.  I have an

11  outline, and I've covered some of it already.  I

12  don't want to waste time, so -- just bear with me one

13  second.

14             So I want to direct your attention to the

15  article that we've marked as Exhibit 1002, and in

16  particular to page 5, at the top.

17             Are you on page 5?

18       A.   I am.

19       Q.   So do you see at the top, where

20  Mr. Kronick and Mr. Welch write in their article that

21  "However, fee-for-service coding is known to be both

22  incomplete and variable."  Do you see that?

23       A.   Yes.

24       Q.   And this article was written in two

25  thousand -- or published in 2014.  Do you agree with



Page 155

1   was inaccurate, you had to do something, what did you

2   mean by "came across that knowledge"?

3        A.   If by any mechanism, whether it's medical

4   record review or other -- I don't want to run through

5   hypothetical scenarios.  I don't know everything that

6   goes into how they run their plans and their audits

7   and so forth.  But they had an affirmative obligation

8   to make it correct.

9        Q.   So are you saying that an affirmative

10   obligation, if they knew, from whatever mechanism,

11   that a code was not supported, to withdraw it?

12        A.   Absolutely if they knew.  I'm

13   less conversant in law and regulation on if they had

14   an affirmative obligation to take reasonable steps to

15   find out.

16        Q.   Sitting here today, you can't identify any

17   rule or regulation that created an affirmative

18   obligation to audit the claims data submitted by

19   providers, or to proactively review medical records,

20   to ensure that the codes selected by providers were

21   supported?

22        A.   I cannot.  But I'm not an expert in the

23   area and don't work in that area.

24        Q.   This rule that we're looking at in

25   Exhibit 1006, the medical records review rule that



4314

Page 157

1   BY MR. GALLAGHER:

2       Q.   Right.  And the provision of the medical

3   record review rule that would have required Medicare

4   Advantage organizations to design their medical

5   record reviews to determine the accuracy of

6   diagnoses -- in other words, to look for deletes --

7   that was one of -- that was the part that was

8   withdrawn and never finalized, right?

9           MS. KRIEG:  Object to form.

10          THE WITNESS:  This provision you referred

11      me to, 422.3.0 was not finalized.

12  BY MR. GALLAGHER:

13      Q.   And you're not aware of any other rule or

14  regulation that imposes this requirement, are you?

15      A.   Again, my understanding of the attestation

16  would cover similar ground.  And in fact, you know, I

17  was always careful to tell United that, you know,

18  there are multiple rules and statutes that may apply,

19  and you should be careful to comply with all of them,

20  and you shouldn't focus solely on this proposed rule.

21      Q.   There was no other -- there is no other

22  rule or regulation that specifically instructs

23  Medicare Advantage plans that they must conduct

24  medical record reviews to look for deletes, right?

25      A.   I'm -- I'm not the right person to ask



Page 163

1              Do you agree that you and Ms. Rice were

2    the appropriate people to be talking about this issue

3    with United?

4         A.    Yes, among others.

5         Q.    All right.  So then -- let's go back to

6    the first page of Exhibit 1060, now that we have the

7    background for the meeting.  And -- and do you see --

8    well, actually, first, I'm sorry, go back to page 2.

9    There's something I forgot to ask about.

10        A.    Uh-huh.

11        Q.    So Mr. Renfro indicates that "other

12   Medicare Advantage plans do not look for possible

13   deletions when reviewing medical records."

14             Did you know that in 2014?  That

15   medical -- Medicare Advantage plans were conducting

16   medical record reviews, and for the most part, not

17   looking for deletes?

18        A.    I did not know that.

19        Q.    Did that surprise you --

20             MS. KRIEG:  Object to form.

21   BY MR. GALLAGHER:

22        Q.    -- when you learned?

23             MS. KRIEG:  Object to form.

24             THE WITNESS:  I don't recall how I reacted

25        to it.



Page 176

1    What do you recall about who said what, if anything?

2           MS. KRIEG:  Object to form.

3    BY MR. GALLAGHER:

4       Q.   Actually, let me -- let me ask it

5    differently.

6           Do you have a specific recollection of who

7    said what at the meeting?

8       A.   My recollections are much stronger on what

9    CMS said, because it was something we practiced and

10   something we agreed upon prior to going into the

11   meeting.

12          I am much weaker on my recollections of

13   specifically what United said and asked.  But as I

14   told you previously, we had agreed that we would

15   consistently say that -- that, you know, they should

16   stay tuned to find out whether the proposed

17   regulation was finalized or not.  However, that was

18   not the only applicable requirement on them to make

19   sure they submitted complete and accurate data in --

20   for risk adjustment, and that to the degree they were

21   posing questions to us that sought legal advice on

22   their obligations under the statute and regulations,

23   they should instead rely on their own counsel, and

24   not this meeting.

25      Q.   Was that a mantra that you practiced in



Page 177

1    advance?  I mean, did you have a script for that?

2           A.    I -- I probably would have had notes of

3    some sort, but it -- it was something -- it was

4    certainly something we talked amongst ourselves and

5    agreed to.  I think -- you know, I think, as you read

6    from the e-mails, there was a concern that they might

7    be trying to get us to say something other than that.

8           Q.    Can you give me the answer again, like

9    what -- what you recall about the meeting?

10                MS. KRIEG:  Object to form.

11                THE WITNESS:  About what I recall about

12          the meeting?  Or --

13    BY MR. GALLAGHER:

14          Q.    No, what you recall CMS said, because you

15    practiced it.

16          A.    Yeah.  I was better at this eight years

17    ago than I am now, but my recollection is it was

18    along the lines of, yes, there's a proposed

19    regulation.  It may or may not be finalized.  We

20    can't tell you one way or the other.  However, if

21    you're solely focused on that, you should be aware

22    there are other statutes, regulations, requirements

23    that apply to your obligation to submit complete and

24    accurate data.  You should make sure you're aware of

25    them, and if you're asking us questions about how to



Page 178

1  specifically comply with the law, that's more

2  appropriately posed to your own counsel.

3       Q.   Do you recall that there was -- there were

4  actually a couple of issues raised by United about

5  their -- about what the rule -- what the rules were;

6  that it wasn't just whether the medical record review

7  rule would be finalized, but also what to do with

8  their as-yet-not-completed medical record review that

9  they had been conducting for the 2012 year?

10      A.   I -- in the vaguest sense, I do recall

11 something like that, yes.

12      Q.   So you recall that there was discussion

13 about how United had been -- unlike other plans, had

14 been conducting medical record reviews and looking

15 for deletes, that they had a whole process around

16 that, and that they had not yet really completed it?

17           MR. LANGHAM:  Objection.  Form.

18 BY MR. GALLAGHER:

19      Q.   Do you recall that?

20      A.   I have a recollection that they did

21 describe their medical record review process in

22 some -- I forget how much detail, but they were

23 describing it.

24      Q.   If you would look at Exhibit 1060, which

25 is the exchange you had with Cynthia Tudor and



Page 182

1        Q.   And you deny that Cheri Rice said that?

2        A.   I -- yes.  I deny that she said that.  It

3   seems -- it's totally inconsistent with the approach

4   we took into that meeting, and what we agreed to say.

5        Q.   So you claim that rather than saying that,

6   you stuck to the script that you gave us earlier, and

7   just repeated that mantra?

8        A.   When it came to articulating any

9   obligation and duty, or duty they had, that was the

10  response we gave.

11       Q.   Did you give that response more than once

12  in the meeting?  Like multiple times?

13       A.   Oh, yes.  Yes.

14       Q.   So it was a mantra that you repeated, you

15  claim, multiple times in response to questions from

16  United?

17       A.   Yes.

18       Q.   And you deny saying anything else besides

19  the mantra on the subject of what United's

20  obligations were before finalization of the medical

21  record review rule?

22            MR. LANGHAM:  Objection.  Form.

23            THE WITNESS:  I deny saying anything else

24       about what their obligations were under either

25       the probes reg or existing requirements.



Page 191

1   firsthand.

2        Q.   So you actually don't recall one way or

3   the other whether Ms. Rice said this about what you

4   have to do if you have knowledge?

5        A.   I don't have a specific recollection, as I

6   said, but it did seem more consistent with how we

7   prepared for the meeting.

8        Q.   Okay.  Let's go to page 2, and in -- and

9   in particular, the second bullet point.

10        A.   The second bullet point?

11        Q.   Yeah, that begins, "Cheri Rice then asked

12   some follow-up questions."  Do you see that?

13        A.   Yes, I see that.

14        Q.   And do you see the sentence that reads,

15   near the end of that paragraph, "Sean Cavanaugh

16   stated that, under current rules, if UHG doesn't know

17   codes are inaccurate the company would not have to

18   delete them.  He went on to state that if UHC does

19   not know until the end of its claims verification

20   process that a code is incorrect then there is no

21   requirement to delete the code until the effective

22   date of CMS's final rule."  Do you see that?

23        A.   I see that.

24        Q.   You -- you deny saying that?

25        A.   I deny it, absolutely.



Page 201

1    BY MR. GALLAGHER:

2         Q.   In the next sentence of his e-mail,

3    Mr. Nelson writes, "During our conversation yesterday

4    and other recent conversations, CMS confirmed to us

5    that these requirements do not apply until the

6    effective date of the rule."  Do you see that?

7         A.   I see that.

8         Q.   And do you agree that the requirements of

9    the medical record review rule did not apply, or

10   would not apply, until the effective date of the

11   rule?

12        A.   I agreed that -- well, actually, I think

13   I -- yes, I think I agree.

14        Q.   And do you agree that that's something

15   that -- that somebody from CMS told United during

16   your meeting on April 29th, 2014?

17        A.   I think if we'd been asked about the reg,

18   we would have said, again, what you see Cheri says,

19   what I called my mantra.  But you also see in Cheri's

20   response, which is, you know, there are other

21   applicable laws that impose standards requirements

22   and responsibilities.  I don't know that we would

23   have specifically given that response to him.

24             And the --

25        Q.   So you deny that -- you deny -- sorry.  Go



4322

Page 202

1    ahead.

2         A.    No, go ahead, please.

3         Q.    You deny confirming that the requirements

4    of the medical -- the proposed medical record review

5    rule do not apply until the effective date of the

6    rule, because you believe that instead of answering

7    that, you would have simply repeated the mantra that

8    you agreed to deliver at the meeting?

9         A.    Correct.  And as I told you previously, my

10   only specific recollection around this sort of topic

11   was in the abstract, about a regulation that is not

12   finalized.

13        Q.    All right.  Mr. Nelson writes that "CMS

14   confirmed to us that these requirements do not apply

15   until the effective date of the rule, and that

16   Medicare Advantage plans are thus not currently

17   required to design their medical record reviews to

18   determine the accuracy of risk adjustment diagnoses."

19             Do you see that?

20        A.    I see that.

21        Q.    And you deny saying that anybody from CMS

22   said that at the meeting, right?

23        A.    Absolutely.

24        Q.    All right.  So let's -- let's look at --

25   because you had agreed to deliver the mantra, and



Page 203

1   that's all you did, as you recall it?

2       A.   But also, as phrased here, the reason why

3   my memory is so crystal clear, none of us would say,

4   if you're doing a medical record review, you

5   shouldn't -- you wouldn't be held to a standard of

6   trying to be accurate.  Like that -- that's just not

7   a posture CMS would take.

8       Q.   All right.  So on page 1 -- well, sorry.

9   So there's two reasons you say you deny that you said

10  that.

11           One is because, as you said a few times,

12  you agreed to deliver the same mantra in response to

13  questions like that.  And the second is, you believe

14  you would never have said such a thing because it's

15  not consistent with what, you know, your

16  understanding was?

17      A.   Correct.

18      Q.   Okay.  All right.  So on the first page of

19  Exhibit 1063, you have Mrs. Rice responding to

20  Mr. Nelson's e-mail, on May 2nd, 2014.  Right?

21      A.   Yes.

22      Q.   Anywhere in this e-mail does she deny that

23  CMS confirmed, as Mr. Nelson set forth, that the

24  requirements of the medical record review rule do not

25  apply until the effective date of the rule, and that



Page 280

1                          CERTIFICATE

2

3          I, KAREN K. KIDWELL, Registered Merit Reporter,

4    and Certified Realtime Reporter, do hereby certify

5    that prior to the commencement of the examination,

6    SEAN CAVANAUGH was remotely sworn to testify to the

7    truth, the whole truth and nothing but the truth.

8          I DO FURTHER CERTIFY that the foregoing is a

9    verbatim transcript of the testimony as taken

10   stenographically by me at the time, place and on the

11   date hereinbefore set forth, to the best of my

12   ability.

13         I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of any

15   of the parties to this action, and that I am neither

16   a relative nor employee of such attorney or counsel,

17   and that I am not financially interested in this

18   action.

19

20                          _Karen Kidwell_____

21                          Karen K. Kidwell
                            Registered Merit Reporter
22                          Certified Realtime Reporter
                            Notary Public
23                          Dated:  February 28, 2022

24

25



**EXHIBIT P-21**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

_____
                          )
UNITED STATES OF AMERICA   )
ex rel. BENJAMIN POEHLING, )
                          )
        Plaintiff,         )    No. CV 16-08697 FMO
                          )
vs.                        )
                          )
UNITEDHEALTH GROUP, INC.,  )
et al.,                    )
                          )
        Defendants.        )
_____)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Volume 3
DEPOSITION OF ANNE HORNSBY
As 30(b)(6) Designee 1 of
The United States

Washington, DC
November 21, 2023

Reported by:  John L. Harmonson, RPR



Page 22

1    Mr. Gardner during the Zoom session -- one of the

2    Zoom sessions that you had with him; correct?

3                MS. LIKOFF:  Object to form.  Asked and

4    answered.

5                THE WITNESS:  Yes, that was an adequate

6    preparation because of what the answer was.  The

7    fact that the answer was no results have been

8    released, the answer is there is nothing else to do

9    to prepare.  I focused on preparing for CON14 and

10   CON15.

11   BY MR. MARTINEZ:

12       Q.    Are you aware that CMS has released I

13   believe what it referred to as preliminary results

14   of the payment year 2011 through 2013 RADV audits

15   to MA plans?

16               MS. LIKOFF:  Objection.  Outside the

17   scope in terms of the time frame the witness has

18   been designated for.

19               THE WITNESS:  I'm not prepared to

20   testify on behalf of CMS on this topic.  It is out

21   of my scope.

22   BY MR. MARTINEZ:

23       Q.    So my question is are you aware -- and

24   let me step back, because what you're telling me

25   now is that Mr. Gardner told you that the results,



Page 23

1   the audit results for years prior to CON14 had not

2   been released as of the time you spoke to him.  Is

3   that right?

4           MS. LIKOFF:  Objection; asked and

5   answered.

6           THE WITNESS:  That is a correct summary

7   of what Mr. Gardner said to me.

8   BY MR. MARTINEZ:

9       Q.   Okay.  And so then my follow-up question

10  is:  Are you aware whether any results, whether

11  preliminary or final, have been released to MA

12  plans concerning the payment year 2011 through 2013

13  audits?

14          MS. LIKOFF:  Objection; outside the

15  scope.  Again, this witness was prepared on this

16  limited topic with respect to only the time period

17  post July 2021.

18          THE WITNESS:  I'm not prepared to

19  testify on behalf of CMS for these previous audit

20  years with which I was not tasked.

21  BY MR. MARTINEZ:

22      Q.   All right.  You reviewed the deposition

23  testimonies you've indicated of the government's

24  Designee Witness 6 in preparation for today;

25  correct?



4329

Page 34

1    That's the system that the medical reviewers, the

2    reviewers look at.

3              So I asked -- so, you know, there is a

4    process within CDAT that gives MAOs continuous

5    report feedback.  They can log in any time and see

6    where their medical record reviews are in the

7    process in CDAT.  So that's all part of medical

8    record review.

9              That's separate from the analytical

10   piece of the RADV audit where you take all those

11   results, build all these massive datasets, crunch

12   them, and then eventually have a result for each

13   contract.

14        Q.    So that second piece of analyzing all of

15   the results from the medical record reviews for

16   payment years 2014 and 2015, that piece has not

17   happened yet; correct?

18        A.    That is correct.  I asked Dave, and he

19   said there are no preliminary results for '14 or

20   '15 at this point.

21        Q.    Who is the lead analytic contractor for

22   the payment year 2014 and 2015 RADVs?

23        A.    Deloitte.

24        Q.    All right.  We've talked about some of

25   the documents that you reviewed in preparation for



Page 105

1    from the provider or was instead added by the MAO

2    through chart review?

3         A.    CMS does not know what kind of data

4    exists in MAOs, in the parent organizations.  It

5    does not know; does not have that information.  So

6    that means -- also, it means that with the RAPS

7    system, the abbreviated dataset, CMS cannot

8    distinguish between a provider-submitted diagnosis

9    and an additional diagnosis added by the MAO from

10   its own chart review.  CMS cannot distinguish that.

11            With encounter data, you could partly

12   distinguish but not completely.  So it's still not

13   something that could be relied on if that were of

14   interest.

15        Q.    Is RADV, the RADV process that CMS is

16   performing, is it designed to separate inaccurate

17   codes that originate with providers as opposed to

18   inaccurate codes that were potentially added by the

19   plans themselves?

20        A.    That is not CMS's intention.  And as

21   I've explained, CMS cannot make that distinction in

22   any systematic way.

23        Q.    If I was to look at the results of any

24   given RADV audit performed by CMS, then, it would

25   not tell me what percentage of the



Page 106

1    provider-submitted codes were accurate?

2            MS. LIKOFF:  Objection to form.  Vague.

3            THE WITNESS:  CMS is interested in

4    determining whether or not the HCC on which the MA

5    contract was paid is supported in the medical

6    record.  That's what accurate is.  Accurate means

7    supported, the diagnosis is supported in the

8    medical record.

9    BY MR. BAAK:

10       Q.    To my question, though, if I look at the

11   results of any given RADV audit performed on a

12   contract by CMS, the purpose of that is not trying

13   to identify what percentage of the

14   provider-submitted codes were inaccurate on that

15   plan; right?

16       A.    The purpose of the RADV audit is to

17   determine what enrollee HCCs are not validated by

18   coder review.  That's -- that's it.  That's what

19   CMS is looking for.

20       Q.    And CMS is making no distinction in that

21   process between codes that originated with the

22   providers themselves versus codes that were added

23   downstream by the plans through chart review;

24   correct?

25       A.    CMS doesn't have that information so it



Page 107

1    would not be possible to incorporate it in the

2    sampling frame.

3        Q.    You mentioned as your second category

4    the IPIA and IPERIA requirements.  What is IPIA?

5        A.    The Improper Payment Improvements Act,

6    which was the initial one in 2002.  There are

7    amendments, I believe, to Department of Treasury

8    U.S. Code.  And then Congress subsequently made two

9    more versions of it in the time frame of this

10   litigation.  So the most recent, 2013, is IPERIA.

11   And I don't even remember what all the extra

12   letters stand for.

13            But the point was federal

14   government-wide to have programs that expend over a

15   certain dollar limit conduct a risk adjustment and

16   then every year conduct an analysis to come up with

17   an improper payment error rate for that program.

18            So CMS, being a very large organization,

19   has to do an improper payment error analysis for a

20   number of its programs:  Medicare Advantage,

21   fee-for-service, Part D, Medicaid, SCHIP, so on.

22   That's where the term "improper payment" came into

23   common discourse in CMS.  It's from those laws.

24       Q.    Has CMS calculated an improper payment

25   amount on Medicare Advantage for every year from



Page 205

1    to their medical record reviews in January of 2014?

2         A.    That is correct.

3         Q.    And then ultimately CMS opted not to

4    finalize this new proposed requirement on MA plans

5    related to how they conduct their medical record

6    reviews; right?

7         A.    CMS opted not to finalize over 40

8    provisions in the proposed rule.

9         Q.    And one of them --

10        A.    And one of them was medical record

11   review proposal, yeah.

12        Q.    So coming back to the attachment to your

13   email, the bottom part of the email says Issue 6.B,

14   and then it says:  "Amend Section 422.310 to

15   require MA organizations conducting medical record

16   reviews to focus" -- "to not focus only on

17   identifying underpayments."

18             Do you see that?

19        A.    I do see that sentence.

20        Q.    So this is the section that's on what

21   ultimately became the proposed medical record

22   review rule; right?

23        A.    Yes.  This is an early draft.

24        Q.    And you say -- this next statement under

25   6.B is that "Under existing regulation, there is no



Page 280

1                    C E R T I F I C A T E

2

3    DISTRICT OF COLUMBIA

4              I, JOHN L. HARMONSON, a Notary Public

5    within and for the District of Columbia, do hereby

6    certify that ANNE HORNSBY, the witness whose

7    deposition is hereinbefore set forth, was duly

8    sworn by me and that such deposition is a true

9    record of the testimony given by such witness.

10              That before completion of the

11   proceedings, review and signature of the transcript

12   was reserved.

13              I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17              IN WITNESS WHEREOF, I have hereunto set

18   my hand this 27th day of November, 2023.

19

20

21              JOHN L. HARMONSON, RPR

                 My commission expires: 04/14/26

22

23

24

25



**EXHIBIT P-22**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA      )   No. 16-08697 FMO
ex rel. BENJAMIN POEHLING,    )
                              )
              Plaintiffs,     )
                              )
v.                            )
                              )
UNITEDHEALTH GROUP, INC.,     )
et al.,                       )
                              )
              Defendants.     )
_____)


*** CONFIDENTIAL ***


VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

ANNE HORNSBY

(Taken virtually)

10:03 a.m. Eastern

Wednesday, May 18, 2022


REPORTED BY:  Christine A. Taylor, RPR


Magna Legal Services
866-624-6221
www.MagnaLS.com



4337

Page 116

```
 1                have been a new obligation in the sense

 2                that a continuous adequate compliance

 3                review process conducted during the routine

 4                course of business of an MAO should include

 5                looking for diagnoses that are not

 6                supported by the medical record and looking

 7                for diagnoses that could be submitted for

 8                payment that had been missed.  So that

 9                should have been seen as part of a rigorous

10                compliance process.  And, in fact, you

11                know, CMS has a contract termination

12                requirement that if you don't submit valid

13                risk adjustment data, we can stop your --

14                terminate your contract.  But, you know, a

15                lot of times people find that specifying

16                guidance more precisely, you know, is

17                helpful.  So it's -- did that answer your

18                question?

19     BY MR. LEE:

20                Q.   Yes.  Even though the medical record

21     rule as proposed ultimately was not passed, was it

22     your understanding that MAOs had obligations to

23     CMS?

24                A.   Yes.

25                     MS. SCHEFFLER DO:  Objection.  Vague.
```



Page 117

```
 1                    THE WITNESS:  Do I --
 2    BY MR. LEE:
 3         Q.   And were part of the obligations to
 4    submit accurate, truthful, and complete data to
 5    CMS?
 6         A.   Yeah, absolutely.
 7              MS. SCHEFFLER DO:  Objection.  Lacks
 8         foundation.
 9              THE WITNESS:  So I don't answer?
10    BY MR. LEE:
11         Q.   You can answer.
12              MS. SCHEFFLER DO:  You can -- yeah, let
13         me get my objection out, please, and then
14         you can go ahead and answer.
15    BY MR. LEE:
16         Q.   And was it your understanding as part
17    of the obligations that MAOs had, that they were
18    required to delete submitted codes that they knew
19    were inaccurate?
20              MS. SCHEFFLER DO:  Objection.  Form.
21              THE WITNESS:  Absolutely.  Absolutely.
22              MS. SCHEFFLER DO:  Lacks foundation.
23              THE WITNESS:  That's part of the
24         compliance.
25    BY MR. LEE:
```



4339

Page 128

1                    CERTIFICATE OF REPORTER

2

3              I, Christine A. Taylor, Certified
        Court Reporter within and for the State of
        Georgia, do hereby certify:

4

5              That the foregoing deposition was
        taken before me on the date and at the time and
        location stated on Page 1 of this transcript; that
6       the deponent was duly sworn to testify to the
        truth, the whole truth and nothing but the truth;
7       that the testimony of the deponent and all
        objections made at the time of the examination
8       were recorded stenographically by me and were
        thereafter transcribed; that the foregoing
9       deposition as typed is a true, accurate and
        complete record of the testimony of the deponent
10      and of all objections made at the time of the
        examination to the best of my ability.

11

12             I further certify that I am neither
        related to nor counsel for any party to the cause
        pending or interested in the events thereof.
13      Witness my hand, this 22nd day of May, 2022.

14

15

16      _____

17      Christine A. Taylor, RPR
        CCR-4736

18

19

20

21

22

23

24

25



4340

**EXHIBIT P-23**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA ex

rel. BENJAMIN POEHLING,

    Plaintiffs,

vs.                                    No. CV 16-08697 FMO

UNITEDHEALTH GROUP, INC., et al,

    Defendants.

_____/



** CONTAINS CONFIDENTIAL PORTIONS **



REMOTE VIDEOCONFERENCE DEPOSITION OF

JONATHAN BLUM

March 4, 2022




Reported by:

Anne E. Vosburgh, CSR-6804, RPR, CRR

Job No.  789903



Page 95

```
 1                        J. BLUM
 2    seeing code growth was the behavior the
 3    plans -- plans' different behaviors and
 4    different tactics.
 5    BY MR. SUMMERS:
 6         Q.   Right.  And one of those behaviors
 7    was one-way chart review, correct?
 8              MS. LIKOFF:  Objection to form.
 9         Asked and answered.  Vague.
10         A.   I cannot speak to the operations
11    that a plan had.  I can speak to the policy
12    that CMS set.
13    BY MR. SUMMERS:
14         Q.   Okay.  I know you can't speak with
15    firsthand knowledge to what MA plans were
16    doing.  But at the risk of extreme repetition,
17    I'm asking you, did you have a general
18    awareness that one of the things that was
19    driving the increased coding was one-sided
20    chart review by MA plans?
21              MS. LIKOFF:  Objection to form.
22         Asked and answered.  Vague.
23         A.   Again, chart review takes multiple
24    forms.  There's not one common terminology
25    that I'm aware of.
```



Page 258

```
 1                      J. BLUM
 2              Typically CMS would finalize
 3     regulations, then produce materials to
 4     describe those final regulations.  But, again,
 5     I was not involved with the final
 6     determination of that regulation.
 7     BY MR. SUMMERS:
 8         Q.   And there were no regulations
 9     explicitly requiring medical record reviews to
10     be two ways, right?
11              MS. LIKOFF:  Object to form.
12     BY MR. SUMMERS:
13         Q.   That's not controversial, is it?
14              MS. LIKOFF:  Object to form.  Vague.
15         Asked and answered.
16         A.   My understanding of the regulations
17     that were in place, the plans had an
18     obligation to submit accurate diagnosis codes
19     to the Agency.
20     BY MR. SUMMERS:
21         Q.   I'll take that as a no, there were no
22     such requirements explicitly, unless you'd like
23     to amend your remarks.
24              The --
25              MS. LIKOFF:  Object to form.
```



Page 288

```
 1                         J. BLUM

 2                  C E R T I F I C A T E

 3

 4          I, ANNE E. VOSBURGH, Certified Shorthand

 5    Reporter, Registered Professional Reporter,

 6    Certified Realtime Reporter, and Closed

 7    Captioner, hereby certify:

 8          That JONATHAN BLUM, via remote

 9    videoconference, solemnly affirmed and agreed to

10    testify to the truth, the whole truth and

11    nothing but the truth; that all counsel

12    stipulated to this process, notwithstanding the

13    location of reporter or witness at time of

14    deposition; and that this transcript is a true

15    and correct record of testimony given.

16          I further certify that I am not related

17    to any of the parties to this action and that I

18    am in no way interested in the outcome of this

19    matter.

20

21    _____

22          ANNE E. VOSBURGH

23          Certified Shorthand Reporter No. 6804

24          Registered Professional Reporter

25          Certified Realtime Reporter
```



4345

**EXHIBIT P-24**

Message

| To: | Cheri.Rice@cms.hhs.gov |
|---|---|
| CC: | Johnson, Thad C [/O=UHG-EXCHANGEMAIL/OU=First Administrative Group/cn=Recipients/cn=21ebe185-77aa00ab-85256887-56b2c8]; Schumacher, Daniel J [/O=UHG-EXCHANGEMAIL/OU=First Administrative Group/cn=Recipients/cn=f1aa3511-1c428dc-852567cc-520b3e]; Erickson, Karen L [/O=UHG-EXCHANGEMAIL/OU=First Administrative Group/cn=Recipients/cn=2f9c139c-fe81e069-85256977-61819f]; Jennifer.harlow@cms.hhs.gov |
| BCC: | Nelson, Steve H [/O=UHG-EXCHANGEMAIL/OU=First Administrative Group/cn=Recipients/cn=snels59]; Cosgriff, John W [/O=UHG-EXCHANGEMAIL/OU=First Administrative Group/cn=Recipients/cn=46fd8f6b-8eb0d608-8525702f-68fb35] |
| Subject: | 2012 Attestation and follow-up from yesterday's meeting |

Cheri,

Thanks for your email, and please let us know if you need any additional information.

Steve

-----Original Message-----
**From:** Rice, Cheri M. (CMS/CM) [Cheri.Rice@cms.hhs.gov]
**Sent:** Friday, May 02, 2014 05:14 PM Central Standard Time
**To:** Nelson, Steve H
**Cc:** Johnson, Thad C; Schumacher, Daniel J; Erickson, Karen L; Harlow, Jennifer A. (CMS/CM)
**Subject:** RE: 2012 Attestation and follow-up from yesterday's meeting

Steve,

Thank you for your email and for our discussion earlier this week.  With respect to your fifth point, I would note that regardless of the effective date of the proposed requirement related to medical record reviews, there are other laws that do impose standards, requirements and responsibilities on MA plans in connection with the federal payments they receive from CMS.  We cannot provide advice to United about the scope of those other laws.  Nor can we provide advice on whether United s plan course of action and/or purported limits on the scope of its attestation are compliant with such other laws.  Your statement concerning the data submissions that have already been made and United s plans for future action will be included in our records and we will proceed with our evaluation and use of the risk adjustment data consistent with 42 CFR � 422.308, � 422.310, and other applicable law.

Thanks again,

Cheri

**From:** Nelson, Steve H [mailto:steve_nelson@uhc.com]
**Sent:** Wednesday, April 30, 2014 9:55 AM
**To:** Rice, Cheri M. (CMS/CM)
**Cc:** Johnson, Thad C; Schumacher, Daniel J; Erickson, Karen L; Nelson, Steve H
**Subject:** 2012 Attestation and follow-up from yesterday's meeting

Dear Cheri,

I wanted to thank you and your colleagues for taking the time to meet with us yesterday.  We appreciate the time and attention that you and others in CMS leadership have provided on the issue of our 2012 risk adjustment data

> EXHIBIT
> 00324

4347

CONFIDENTIAL

submissions and our annual risk adjustment data certifications. As we mentioned, prior annual certifications have been on paper, and we have thus had the ability to add notes explaining our understanding of the certifications and our ongoing data remediation efforts. This year, however, the certifications are electronic, and there does not appear to be an opportunity to reflect our understanding. The purpose of our meeting yesterday and this email is to explain our understanding of the certifications.

First, as with our past certifications, the 2012 certifications are based on facts reasonably available or made available to us as of the date of the certifications. As we receive additional information, we may be required to modify the data to which the certifications relate.

Second, the certifications use the phrase    best knowledge, information, and belief,   which is based on our ordinary business practices.

Third, the certifications only cover risk adjustment data for 2012 dates of service that were submitted to CMS and not subsequently deleted prior to the date of the certifications.

Fourth, as we have mentioned to you previously, we are engaged in an ongoing review of our risk adjustment processes and submission system. This review has identified areas for improvement and, as a result, we will be deleting all risk adjustment data for 2012 dates of service that we ultimately determine should be deleted consistent with this email.

Fifth, as we discussed yesterday, CMS recently issued a proposed rule that would, if finalized, require MA plans to design any medical record reviews to determine the accuracy of risk adjustment diagnoses associated with those records. During our conversation yesterday and other recent conversations, CMS confirmed to us that these requirements do not apply until the effective date of the rule, and that MA plans are thus not currently required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses. We currently have a process through which we review certain medical records to determine the accuracy of risk adjustment diagnoses and submit appropriate deletes. This process already has resulted in the identification of and, in some instances, the submission of deletes for 2012 dates of service. But based on the proposed rule, including the preamble, and recent conversations with CMS, we suspended that process for 2012 dates of service while we consider whether to make changes. Pursuant to our discussion, however, we will soon submit for deletion those diagnosis codes that have undergone a complete review and that we have therefore identified as appropriate deletes. In the near future, we will determine whether to continue our review process for the diagnosis codes which were still under review at the time we suspended our process. In the meantime, we will not delete these codes.

The certifications that we submit today are made subject to these clarifications. Please let us know if you have any questions. Again, thank you for your time and attention on this matter.

4348

CONFIDENTIAL                                                                                          MAPL000497871

**EXHIBIT P-25**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____  )




Videotaped Deposition of

STEVEN HALE NELSON

Given Remotely

Tuesday, July 26, 2022

10:10 a.m.




Reported by:  Karen K. Kidwell, RMR, CRR




Magna Legal Services
866-624-6221
www.MagnaLS.com



4350

Page 145

1    and we said, "Okay."

2            I mean, that's how I remember it.

3        Q.   Okay.  And we -- we are going to talk now

4    about sort of the substance of what took place at

5    that meeting, best we can.

6        A.   Okay.

7        Q.   So why don't we start out -- can you tell

8    me right now, sitting here today, what you remember

9    about what transpired at that meeting on

10   April 14th -- I'm sorry, April 29th, 2014, with CMS?

11           MR. SUMMERS:  I'm just going to object to

12       form, since it's such an open-ended question.

13           But you can go ahead and do your best to

14       answer.

15           THE WITNESS:  Okay.

16           Yeah, so I -- I remember opening up the

17       meeting, talking about what we wanted to

18       accomplish and what the objectives were of the

19       meeting, to get clarification on the proposed

20       rule, the timing of it, and -- and that we were

21       evaluating and trying to make a decision on our

22       claims verification program, and was that

23       required.

24   BY MS. McMAHON:

25       Q.   Okay.



Page 206

1      Q.   Okay.

2      A.   Yeah.

3      Q.   And did you understand that she was making

4  clear that she was not providing you advice on that

5  course of action?

6           MR. SUMMERS:  Objection.  Form.

7      Mischaracterizes.

8           THE WITNESS:  Yeah, I -- not -- I mean,

9      other than what I just said, I just think she

10     was trying to limit, you know, where -- where

11     she would weigh in on.  But I -- it's hard to

12     completely -- you know, like interpret what --

13     what she meant by the "advice" word, if that's

14     what -- if that's the word you're specifically

15     focused on.

16 BY MS. McMAHON:

17     Q.   Did you have an understanding, after the

18 meeting you had with CMS and after this

19 correspondence that you had with Ms. Rice, that CMS

20 was confirming or concurring with your potential

21 decision to not submit diagnosis codes that -- that

22 had been identified during your chart review program?

23          MR. SUMMERS:  Objection.  Form.

24          THE WITNESS:  Yeah, the -- just to remind

25     you, the question we were there to discuss was



Page 207

1    the status of the proposed rule and potential

2    timing, if they could give us any insight about

3    that.  And then our question about the

4    requirement or not to have a claims verification

5    program.

6         And the -- the conclusion we reached after

7    the conversation was that we had no obligation

8    to proactively delete codes, or have a program

9    like the claims verification program.

10        So that was the -- that was the answer we

11    got.  That's what we heard.  We gave -- we were

12    super clear in our follow-up:  This is what we

13    heard.  This is what we intend to do.  There's

14    no -- no -- no vagueness in -- in our letter

15    back.

16        And then -- and what we got this letter

17    was -- said, you know, "Thanks for your e-mail."

18    And -- and then, "I'd just like to remind you

19    that this" -- I'm paraphrasing her:  "I'd like

20    to remind you that regardless of the

21    conversation we had, there's other laws you

22    should pay attention to, and you should be

23    thinking about that too."

24        And I take that as -- you know, whether

25    she meant it as advice or not, good advice; and



Page 209

1    that's written right here, is an agreement that --

2    that CMS or she agreed with the information you put

3    in your fifth point, that she was somehow giving you

4    the -- her understanding that you could go ahead, and

5    CMS was okay with the -- the course of action that

6    you describe in your Point 5?

7         A.   I think -- again, it -- sorry, but it's --

8    your -- your characterization is I think simplistic,

9    but how I -- I'll just try this again.

10              We went there seeking very specific

11   information and to very specific questions about

12   claims verification program, the -- and the entirety

13   of that conversation, that we've talked about several

14   times here.  And in addition, the time -- timeliness

15   and -- and their thoughts about the proposed rule,

16   and the finalization or possibility of finalization

17   of that rule.

18              We had a discussion during the meeting

19   that -- that we concluded that they agreed with us

20   that it did not -- that MA plans did not need to

21   do -- have a program -- again, people probably called

22   it different things -- but our claims verification

23   program.

24              We then put that in a memo.  We were very

25   specific about our plans.  And we got this response



Page 311

1    hitting a budget.  I mean, that's -- that's just how

2    we have to run our business.  There's no way around

3    that.

4              And then you have to find -- you know,

5    continue to run the business in a proper way.  But

6    the compliance and consistent with CMS regulations,

7    there's no negotiation on that.

8        Q.   After your meeting with CMS on April 29 of

9    2014, after that point in time, did CMS ever come to

10   you and say that you needed to reinstate claim

11   verification or risk being sued?

12       A.   Not to my knowledge.

13            MR. SUMMERS:  I have no further questions.

14       Thank you for your time.

15            MS. McMAHON:  All right.  I just -- give

16       me five minutes to see if I have any follow-up.

17       I think we have ten minutes left on record.

18            MR. SUMMERS:  I think you only had like

19       two minutes left, according to our count.  And

20       the count -- the witness has a -- a flight to

21       catch, so be as fast as you can, please.

22            MS. McMAHON:  Well, I will go as fast as I

23       can, but I believe I have ten minutes, and I

24       believe that was made clear at the end of

25       Mr. Havian's --



Page 323

1                           CERTIFICATE

2

3        I, KAREN K. KIDWELL, Registered Merit Reporter,

4   and Certified Realtime Reporter, do hereby certify

5   that prior to the commencement of the examination,

6   the deponent was remotely sworn to testify to the

7   truth, the whole truth under penalty of perjury.

8        I DO FURTHER CERTIFY that the foregoing is a

9   verbatim transcript of the testimony as taken

10  stenographically by me at the time, place and on the

11  date hereinbefore set forth, to the best of my

12  ability.

13       I DO FURTHER CERTIFY that I am neither a

14  relative nor employee nor attorney nor counsel of any

15  of the parties to this action, and that I am neither

16  a relative nor employee of such attorney or counsel,

17  and that I am not financially interested in this

18  action.

19

20

21       Karen K. Kidwell
         Registered Merit Reporter
22       Certified Realtime Reporter
         Notary Public

23

24

25



**EXHIBIT P-26**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA,     ) No. 16-08697 FMO
ex rel. BENJAMIN POEHLING,    )
                              )
                              )
          Plaintiffs,         )
                              )
v.                            )
                              )
UNITEDHEALTH GROUP, INC.,     )
et al.,                       )
                              )
                              )
          Defendants.         )

_____


CONFIDENTIAL

CONTAINS ATTORNEYS' EYES ONLY PORTIONS

Videotaped Deposition of

ANNE HORNSBY

VOLUME I


Friday, May 19, 2023


Reported by:  Traci M. Mertens, RDR, CRR, CSR


MAGNA LEGAL SERVICES
866-624-6221
www.MagnaLS.com



Page 104

1    more, to find more diagnosis codes and hopefully to

2    find sicker beneficiaries to enroll.

3            What I said is there wasn't a general

4    awareness in -- among CM leadership -- and Cynthia

5    Tutor also said this in her deposition.  There

6    wasn't a general awareness that plans were -- were

7    going to medical records and only looking for

8    additionals.

9            CMS supported the idea of chart review.

10   That -- that means confirming the accuracy of the

11   diagnoses you submit for payment and -- and

12   confirming that they are supported in the medical

13   record, and it can mean also, but not only, that you

14   find diagnoses that were -- had not been submitted

15   for payment.

16       Q.   If you look at the middle of this page E4,

17   there's a paragraph that starts:  "If we find that

18   MA plans code with high intensity, that does not

19   provide information about whether MA plans are

20   overcoding or whether fee-for-service providers are

21   undercoding.  Similarly, one cannot infer whether MA

22   coding is any more or less accurate than

23   fee-for-service."

24           Do you see that?

25       A.   I do.



Page 186

1  compliance actions for marketing issues because

2  that's the -- the policy area for which they're

3  responsible.

4          And MDBG, M-D-B-G, will take some

5  compliance actions for issues related to the Part C

6  and D reporting because that's what they're

7  responsible for.

8          So that -- and then MOAG has its own set

9  of responsibilities for, for example, audits, audits

10  of plans to see if they're complying with CMS'

11  requirements.  So I learned that from them, and I

12  learned about CMS' policy about termination from

13  them.

14     Q.   What did you learn about CMS' policy for

15  termination from John Scott and Jerry Mulcahey?

16     A.   I learned that CMS will terminate for

17  reasons of beneficiary harm.  That is CMS' focus.

18  That is the goal.  They want beneficiaries to have

19  continuity of coverage and to be protected and to

20  make sure that plans are handling the appeals and

21  grievances and determinations correctly, and that is

22  CMS' focus regarding termination.

23          (Exhibit 1446 was marked for

24  identification and attached hereto.)

25     Q.   (By Mr. Jones) Ms. Hornsby, we're handing



4360

Page 190

1    Swoben case about United's risk adjustment practices

2    and the chart review practices, correct?

3          A.    Some people in CMS, yes.  Not everyone.

4          Q.    Okay.  And after finding out about those

5    issues, CMS continued to contract with United and

6    these United Health plans for the purposes of

7    providing services as Medicare -- as Medicare

8    Advantage organizations, right?

9          A.    Yes.  CMS' position is that beneficiary

10   harm is the overarching reason for termination and

11   that CMS has two other remedies for MAOs that are

12   not ensuring that they submit accurate data to CMS,

13   and those two remedies are RADV audits and -- and

14   the False Claims Act.

15         Q.    Does CMS consider conducting one-way chart

16   reviews looking for codes that are supported by

17   medical records to add to risk adjustment payments,

18   does it consider that to be fraud?

19               MS. KRIEG:  Object to form.

20         A.    So the question is whether one-way review

21   is fraud?

22         Q.    Sure.  Does CMS consider United looking

23   for codes to add by looking at medical records as

24   part of chart review but not looking for deletes,

25   does it consider that to be fraud?



Page 210

 1        A.   I'm just going to repeat myself.  I mean,
 2   CMS believes this is being handled by the Department
 3   of Justice.
 4        Q.   So --
 5        A.   That is the appropriate way to handle
 6   this.
 7        Q.   So instead of invoking the power to
 8   terminate or the choice not to contract with United
 9   plans, CMS has chosen to support the Department of
10   Justice's lawsuit instead of ending the
11   relationship?
12        A.   Yes.  United is the largest single MAO in
13   the program.  You terminate all those beneficiaries
14   which fall outside of their provider networks, it's
15   not likely they could find new providers easily.
16   CMS is interested in protecting continuity of care
17   for beneficiaries.
18        Q.   And so under CMS' view, CMS decided to
19   continue contracting with United plans
20   notwithstanding the allegations that CMS' risk
21   adjustment practices have cost the government
22   billions of dollars?
23        A.   CMS' position is that this is being
24   handled by the Department of Justice.
25        Q.   And you can't tell me one way or another



Page 219

1      Q.   The next sentence says:  "In particular,

2    we did not use our previous process to determine

3    whether diagnosis codes submitted through claims are

4    unsupported in the medical record."

5           Do you see that?

6      A.   Yeah, but that doesn't say anything.

7      Q.   You don't think that -- well, CMS knew

8    that United was not using the previous process

9    discussed with Ms. Rice to review medical records to

10   determine whether diagnosis codes submitted through

11   claims are unsupported.

12     A.   My understanding is that CMS' entire

13   discussion with United, with Steve Nelson in

14   particular, started with that April 2014 meeting and

15   is still continuing here, and CMS still doesn't know

16   exactly what United was doing.  You know, were they

17   targeting a population?  Were they doing blind

18   coding or not, you know?  Who knows what that claims

19   verification program was?  Who knows if there are

20   other parts of United, other MAOs that are still

21   doing some kind of review?

22           So CMS doesn't give specific

23   recommendations to MAOs in meetings like that.  CMS

24   will restate CMS' position, and -- and that's it.

25     Q.   Did CMS ask for any clarity on what



Page 225

1    with Medicare Advantage plans about rules of the

2    road on chart review?

3         A.    Could you tell me what transparent means?

4         Q.    We just got a -- seen the email where

5    United is telling CMS what it's doing.  Do you have

6    any view one way or another about whether CMS should

7    be transparent with MA plans and give guidance about

8    the rules of the road with respect to chart review

9    programs?

10             MS. KRIEG:  Object to form and scope.

11        A.    Well, first, I would say the fifth bullet

12   really has no information in it about United's

13   claims verification program.  It's very vague.  So

14   there's really -- it's -- even if CMS were to

15   respond in a meeting like that, there would be

16   nothing to respond to.

17             Secondly, CMS would not tell one company

18   special guidance that none of the others had access

19   to and give them that kind of leg up and advance.

20        Q.    Here in this Exhibit 330, we already

21   established that United was asking for guidance from

22   CMS, that it was telling CMS what it was doing, and

23   CMS didn't ask for any clarification, right?

24        A.    Exactly, because that's not what CMS would

25   do.



Page 249

```
 1                    CERTIFICATE

 2

 3        I, TRACI M. MERTENS, Registered Diplomate

 4    Reporter and Certified Realtime Reporter, do hereby

 5    certify that prior to the commencement of the

 6    examination, the deponent was placed under oath to

 7    testify to the truth and nothing but the truth under

 8    penalty of perjury.

 9        I DO FURTHER CERTIFY  that the foregoing is a

10    verbatim transcript of the testimony as taken

11    stenographically by me at the time, place, and on

12    the date hereinbefore set forth, to the best of my

13    ability.

14        I DO FURTHER CERTIFY that I am neither a

15    relative nor employee nor counsel for any of the

16    parties to this action in which this proceeding was

17    taken, and further that I am not financially or

18    otherwise interested in the outcome of this action.

19        Certified to by me on this 24th day of May,

20    2023.

21

22                      _____
                        Traci Mertens, RDR, CRR, CSR
23                      Registered Diplomate Reporter
                        Certified Realtime Reporter
24                      Certified Shorthand Reporter

25
```



**EXHIBIT P-27**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA ex rel.  ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )



Videotaped Deposition of
CYNTHIA G. TUDOR, Ph.D.
Given Remotely
Tuesday, August 23, 2022
9:59 a.m. Eastern Time



Reported by:  Cindy A. Hayden, RMR, CRR



Magna Legal Services
866-624-6221
www.MagnaLS.com



4367

Page 91

1    you don't recall the specifics.  Do you recall in

2    general the April 2014 meeting you had with Steve

3    Nelson?

4         A.   Well, only because people had asked for

5    what was in my Day-Timer at the time.  And I looked

6    at my Day-Timer, and it told me that there had been

7    a meeting.

8         Q.   You're referring to your Day-Timer.

9    Dr. Tudor, did you take notes at the meeting you

10   had with Steve Nelson and others from United in

11   April of 2014?

12             MS. CHEN:  Object to form.

13             THE WITNESS:  I don't know about the

14   date, but I know that there was a piece of paper

15   that had something on it.

16   BY MR. BAAK:

17        Q.   Was it your practice to take notes of

18   meetings with -- your meetings with Steve Nelson?

19        A.   No.  Not necessarily.  It'd depend upon

20   what the subject of the meeting was.  It'd depend

21   upon who else was there, what role I was serving.

22   It's all sort of situational.

23        Q.   Did reviewing the notes you took of the

24   April 2014 meeting in your Day-Timer, the meeting

25   with Steve Nelson and others from United, did it



Page 92

1    refresh your recollection at all about what the

2    subject matter of that meeting was?

3         A.   Well, my -- the way I remember that

4    piece of paper, it was pretty vague.  And it -- you

5    know, there were other people there who knew more

6    than I did about these subjects.  So I -- as my

7    general practice was, those people should take the

8    lead.

9         Q.   And the subjects you just referenced,

10   what were the subjects of that April 2014 meeting,

11   as you recall?

12        A.   I don't -- I don't --

13             MS. CHEN:  Object to form.

14             THE WITNESS:  I don't really remember

15   this April '14 meeting, so I don't think I can

16   answer that.

17   BY MR. BAAK:

18        Q.   Do you recall how it was determined

19   that you would attend the April 2014 meeting with

20   Mr. Nelson and others from United?

21        A.   Well, I was the deputy director, so I

22   was there.  Because I'm sure that whoever was the

23   director -- I think it was Sean Cavanaugh at that

24   point -- told me to come, so I came.

25        Q.   Do you recall what you said, if



Page 100

1              MS. MCMAHON:  Objection.  Vague.

2              THE WITNESS:  So my stance as deputy

3     director was my experts were the leads, and I was

4     there to elevate them and to sort of understand

5     whether CMS needed to do something.  That's

6     generally where I stood.

7     BY MR. BAAK:

8          Q.  My question is a little different,

9     Dr. Tudor.  Just -- just in general, was it your

10    practice when you took notes at meetings,

11    recognizing you didn't take notes at all meetings,

12    to try to take accurate notes, to the best of your

13    ability?

14             MS. CHEN:  Object to form.

15             THE WITNESS:  Well, for example, I -- I

16    don't really -- the trouble with my notes -- and it

17    isn't just here -- is it's not clear sometimes who

18    said what and the sort of context of what they

19    said.

20             So I can't -- where -- I can't really

21    say whether or not they were accurate and whether

22    or not you can read anything into them.

23             Generally, my note-taking -- the only

24    thing that was really important to me for my

25    note-taking was whether CMS committed to do



Page 101

```
 1    something for a plan, and if so, it was a next

 2    step.

 3              And so, generally, the next steps, if I

 4    put them in there, which I didn't here, would be

 5    reliable.  I wouldn't say that I would judge

 6    anything else to be necessarily the verdict.

 7              I tried to -- for example, on the

 8    right-hand side of this, I tried to get their

 9    numbers down.  But they were going very fast, and

10    I'm not sure that they are even close to being

11    right.

12    BY MR. BAAK:

13         Q.   In general, you tried to take accurate

14    notes, though, Dr. Tudor, at meetings when you

15    elected to take notes, right?

16              MS. MCMAHON:  Objection.

17              MS. CHEN:  Object to form.

18              THE WITNESS:  I don't know what else I

19    can say on this.  It -- it -- you know, I'm

20    admitting that my mind wasn't necessarily on

21    everything these people were saying --

22    BY MR. BAAK:

23         Q.   Dr. Tudor, we'll talk about these

24    particular notes in just a second.

25              I'm asking, in general, it was your
```



Page 112

1          During your time as the deputy director

2    of the Center for Medicare, did you understand that

3    Medicare Advantage plans were conducting chart

4    review to add diagnosis codes for the submission of

5    risk adjustment data?

6          MS. CHEN:  Object to form.

7          THE WITNESS:  I understood they were

8    doing chart reviews.  To the extent to which they

9    were only adding and not -- not validating, if you

10   will, to what they had already submitted, I was not

11   aware.  Chart review means both ways to me, but --

12   when it comes to encounter data, it means both

13   ways.

14   BY MR. BAAK:

15        Q.   Let me just unpack that a little.  Did

16   you understand, during the time you were the deputy

17   director of the Center for Medicare, that Medicare

18   Advantage plans were reviewing charts to add

19   diagnosis codes?

20          MS. MCMAHON:  Objection.  Asked and

21   answered.

22   BY MR. BAAK:

23        Q.   You can answer it.

24        A.   I think it's the same that I said

25   before.  I -- I don't see how plans can attest the



Page 136

1    hundreds of insurers at the time.

2    BY MR. BAAK:

3           Q.   If a plan comes to CMS, its regulator,

4    and says, "Is what we're about to do permissible

5    under CMS rules and regulations?" do you agree that

6    it's reasonable of the plan to expect a clear

7    answer from CMS?

8           A.   That --

9                MS. MCMAHON:  Objection.

10               THE WITNESS:  -- that's -- that's not

11   the way CMS operated.

12   BY MR. BAAK:

13          Q.   So it would have been -- during your

14   time at CMS, if a plan came and had a question

15   about whether its course of action was permissible,

16   CMS, in your experience, did not feel like it owed

17   a clear answer to the plan, right?

18          A.   That's not what I would --

19               MS. MCMAHON:  Objection.  Misstates.

20               THE WITNESS:  That's not what I said.

21   And what -- CMS's practice was that they would

22   state the requirements.  Here are the requirements.

23   It's up to you to make sure that those requirements

24   are consistent with CMS's requirements.

25   BY MR. BAAK:



Page 306

1                CERTIFICATE OF REPORTER

2

3          I, Cindy A. Hayden, Registered Merit

4    Reporter and Notary Public for the State of

5    Maryland at Large, do hereby certify that the

6    foregoing transcript is a true, accurate, and

7    complete record.

8          I further certify that I am neither

9    related to nor counsel for any party to the cause

10   pending or interested in the events thereof.

11         Witness my hand, I have hereunto

12   affixed my official seal this 26th day of August,

13   2022.

14

15

16

17

18

19

20

21

22
                    _Cindy A. Hayden_
                    _____
23                  Cindy A. Hayden, RMR, CRR

                    My Commission expires
24                  April 26, 2025

25



**EXHIBIT P-28**

CMS MTG. — Attorney/client privileged & Confidential    8/29/14

CHERI    • FAIL TO SAY until FEB proposal, do not have Prospective
PII    responsibility    proposed

    • 1st time lazing out diligence

CHERI    • Universe for not
    — NOT acceptable to not delete what we KNOW
    — if you have knowledge of SECRETS, you SH delete

CHERI    • Statutory obligation to report & Repay

    False claims acts implications,    Haven't

    [known] Enough process to list or feedback on our judgments

CHERI    — Certification Done in writing, so no option to express our understanding.
    └→ CHERI — Dealing on w/ other plans and will run letter by generale
    counsel to see if OK. Others have work underway that
    Also needs to be caveated


DSS notes

**EXHIBIT**
00317

4376
MARA2156615

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

**EXHIBIT P-29**

UNITED STATES DISTRICT COURT

FOR THE CENTAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

----------------------------------------

United States of America, ex rel.
Benjamin Poehling,

      Plaintiffs,

vs.              No. 16-08697 FMO

UnitedHealth Group, Inc., et al.,

      Defendants.


----------------------------------------


DEPOSITION


of Thad Johnson, taken pursuant to

notice to take oral deposition, at

Dorsey & Whitney LLP, 50 South Sixth

Street, Minneapolis, Minnesota 55402 on

the 17th day of November, 2022, before

Nathan D. Engen, a notary public in and

for the State of Minnesota.

      (Confidential information,

       subject to protective order)



4378

Page 117

1   A     No.

2   Q     When Ms. Rice talked about knowledge,

3         did you understand what she was saying?

4               MR. BAAK:  Objection.  I

5         instruct the witness not to answer his

6         mental impressions of Ms. Rice's

7         statements in the meeting.  It calls

8         for privilege information.

9

10        By Mr. Buland:

11  Q     But you certainly didn't ask her at the

12        meeting, 'What do you mean by

13        knowledge?'

14              MR. BAAK:  Objection; asked

15        and answered.

16              THE WITNESS:  I did not ask

17        her.

18              MR. BULAND:  Okay.

19

20        By Mr. Buland:

21  Q     Now, the next thing in Mr. Schumacher's

22        notes is, "Statutory obligation to

23        report and repay."  Do you see that?

24  A     Yes, I do.

25  Q     Okay.  And it says, "False Claims Act



Page 118

```
 1          implications."  Do you see that?

 2    A     Yes, I do.

 3    Q     Okay.  And did Ms. Rice say at the

 4          meeting about -- in response to your

 5          question about claims verification, and

 6          by 'you,' I mean UnitedHealthcare, if

 7          there were false claims identifications

 8          to be issued?

 9                    MR. BAAK:  Objection; form.

10                    THE WITNESS:  She said this

11          in response to the second part of the

12          conversation I was talking about where

13          we had the -- some deletes we

14          submitted, some were through the

15          process, some were in the middle of the

16          process.

17

18          By Mr. Buland:

19    Q     So you're telling me that the false

20          claims identifications Ms. Rice talked

21          about were only in reference to the

22          buckets of codes already in the claims

23          verification process?

24    A     That's how I understood the

25          conversation, yes.
```



Page 304

1        STATE OF MINNESOTA )

2                          )   ss.

3        CROW WING COUNTY   )

4

5

6            I, Nathan D. Engen do hereby

7        certify that the foregoing transcript in

8        the matter of United States of America,

9        ex rel. Benjamin Poehling vs.

10       Unitedhealth Group, Inc., et al is true,

11       correct and accurate:

12           That said transcript was prepared

13       under my direction and control from my

14       stenographic shorthand notes.

15           That I am not related to any of

16       the parties in this matter, nor am I

17       interested in the outcome of this

18       action.

19

20       Witness my hand and seal this 29th day

21       of November, 2022.

22

23

24                          *Nathan D. Engen*

25                          Nathan D. Engen



4381

**EXHIBIT P-30**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA ex    :

rel., BENJAMIN POEHLING,        :

        Plaintiffs,        :    Case No.:

        VS.            :    CV-16-08697 FMO

UNITED HEALTH GROUP, INC.,      :

et al.,                :

        Defendants.        :    Page 1-362


- - -

Friday, March 22, 2024

- - -


Videotaped deposition of JEAN ACEVEDO

taken at Latham & Watkins, 555 Eleventh Street, Suite

1000, Washington, DC commencing at 9:50 a.m., before

Sherry L. Brooks, Certified LiveNote Reporter and

Notary Public, in and for the District of Columbia.

- - -

MAGNA LEGAL SERVICES

WWW.MAGNALS.COM



4383

Page 95

1  logical that any contracted entity should be aware of

2  what's expected of them.

3           BY MR. BAAK:

4       Q.    We covered earlier some of your experience

5  in the consulting work you do in compliance.  But

6  you're not offering any opinions in this case on the

7  compliance obligations of Medicare Advantage

8  organizations, right?

9       A.    Correct.

10      Q.    You are not offering any opinions in this

11 case about whether or not the Department of Justice's

12 allegations against United are, in fact, true, right?

13      A.    Correct.

14      Q.    And to get a little more specific, you're

15 not offering any opinions related to the design or

16 operation of United Health Group's chart review

17 program?

18      A.    Correct.

19      Q.    You're not offering any opinions about

20 whether United Health Group have been overpaid in any

21 way in connection with the Medicare Advantage

22 program?



Page 96

1        A.    Correct.

2        Q.    You have not reviewed the details of

3   United Health Group's chart review programs, correct?

4        A.    Correct.

5        Q.    You're not familiar with the details of

6   those -- of United Health's chart review programs,

7   correct?

8        A.    Correct.

9        Q.    In connection with the expert testimony

10  you're offering in this case, you have not reviewed

11  any of the medical records underlying the diagnosis

12  codes that are in dispute between the Department of

13  Justice and United Health Group, right?

14       A.    Correct.

15             MS. KRIEG:  Object to form.

16             BY MR. BAAK:

17       Q.    And, in fact, you have not reviewed any

18  specific medical records in connection with the

19  expert testimony you're offering in this case,

20  correct?

21             MS. KRIEG:  Object to form.  Foundation.

22       A.    Correct.



Page 173

1    ultimate outcome, correct?

2           MS. KRIEG:  Object to form.

3       A.    To improve the accuracy -- oh, of the

4    coder, yes.  Um-hum.

5           BY MR. BAAK:

6       Q.    When you have chart audits at Acevedo

7    Consulting that are designed with multiple layers of

8    coder review, do you set up a procedure for resolving

9    when the two coders disagree?

10          MS. KRIEG:  Object to form.  Foundation.

11      A.    So I don't think the procedure would vary

12   based on a project versus how we work in general,

13   which is to reach out to someone.

14              And if, indeed, there were two assigned

15   coders to a project because of the checks and

16   balances that you just asked me about, having a

17   second coder review, invalidate or not the first

18   coder's work, they would still follow the same

19   guidelines that we would use at any particular time,

20   check the guidelines, what -- depending on what the

21   -- what was the cause of the disagreement.

22              Maybe query the provider, seek further



4386

Page 174

1    advice, use another resource.  So all of those

2    options are always available.

3                BY MR. BAAK:

4        Q.    Let me unpack that a little bit more.

5        A.    Sure.

6        Q.    So if you have two providers -- let me try

7    again.

8                If you have two coders who are reviewing a

9    chart as part of a chart audit, do you -- you don't

10   always assume that the second reviewer is the one who

11   got the correct answer?

12       A.    No, not if that reviewer has at all -- so

13   if, indeed, that reviewer is darn certain, no, no,

14   this is it and I'll show you why, he or she has to be

15   able to say I'll show you why so that the first coder

16   sees the why and has his or her, what I call, aha

17   moment -- aha, forgot about that; aha, missed that;

18   misinterpreted that -- then of course not.  That's

19   the whole idea of the second check.

20       Q.    I'm going to try to simplify this, but I

21   want to get it right.  It sounds like that when the

22   two coders in one of your chart audits disagree about



Page 175

1    whether a code should be assigned, how that

2    disagreement is resolved depends on the

3    circumstances.

4            Is that accurate?

5    A.    Yes.

6    Q.    It is also, in fact, the case that when

7    you have more than one coder reviewing a medical

8    record you do have disagreements about whether a

9    diagnosis code is appropriately assigned, right?

10            MS. KRIEG:  Object to form.

11    A.    Yes.  That can happen and does.

12            BY MR. BAAK:

13    Q.    The first step at Acevedo Consulting when

14    you have such a disagreement, is that a dialogue

15    between the two coders about why they disagree about

16    whether a diagnosis code should be assigned?

17    A.    Yes.

18    Q.    If that process doesn't produce agreement,

19    what are the next steps at Acevedo Consulting for you

20    to resolve a disagreement between two of your coders

21    as to whether a diagnosis code should be assigned?

22    A.    So one would be to make sure that they



Page 176

1   have reviewed all of the available resources.

2   Depending on what's their root cause of any

3   disagreement such as if it happens to be

4   documentation in the clinical record that is unclear

5   to one or both of them or could be interpreted in

6   more than one way, then they should be eliciting a

7   physician query to get the clarification from the

8   provider.

9          They can always go to a more senior person

10  such as myself, use other resources that they hadn't

11  used before.

12         There was one -- one instance in my 25

13  years where none of that resolved and it was a mental

14  health code.  And I actually brought in a

15  psychiatrist that would be able to explain to the

16  person who was resistant what that mental health

17  condition actually meant so that she could actually

18  have what I call her aha moment and say aha, got it,

19  I just didn't understand that.

20     Q.    How frequently -- well, let me ask just to

21  follow up there.

22         In discussing how you resolve a



4389

Page 177

1   disagreement between two of your coders about whether

2   or not a code should be assigned, sometimes you're

3   brought in to break the tie between the two coders;

4   is that correct?

5        A.    Yes.

6        Q.    How frequently does that happen?

7        A.    Not very frequently at all.  I mean, these

8   things just don't happen very often in my

9   organization.

10       Q.    Do you track how often when you have two

11  levels of coder review on a given medical record

12  there is disagreement?

13       A.    It would only be tracked per project.

14       Q.    Would you keep statistics on a given

15  project, the rate of disagreement between two coders?

16       A.    Yes, I would keep -- yes.

17       Q.    You mentioned potentially using other

18  resources that the coder didn't have before to

19  resolve a disagreement.  And then I also see in

20  paragraph 54 a reference to providing coders with

21  resources to address coding questions.

22             What kind of resources do you have in mind



Page 178

1    there?

2        A.    So, again, the Coding Clinic, you know,

3    would be an example.

4        Q.    The Coding Clinic is one example of a

5    resource that a coder might consult when there's

6    disagreement.  Is there anything -- other guidance or

7    resource, rather, that you can identify that the

8    coder -- the coders might consult to resolve a

9    disagreement?

10       A.    So, obviously, it would depend on what the

11   project actually was.  But if we are speaking risk

12   adjustment, then they would also be encouraged if

13   they didn't do it on their own to use the participant

14   guide or the managed care manual.

15       Q.    I want to come back to blind coding we

16   talked about a little bit earlier.  But before we get

17   into blind coding, are you familiar with the term

18   "informed coding" or an "informed coding review"?

19       A.    I've not used that term, so I wouldn't

20   want to guess at a definition.

21       Q.    Well, I'm going to try my best to give us

22   a definition to use just so we can speak the same



4391

Page 189

1    front of them, that would not allow them to draw a

2    conclusion about the totality of the appropriate

3    diagnosis codes for that given patient, correct?

4         A.    Correct.  They could only assign diagnosis

5    codes for the medical records they had at hand.

6         Q.    Do you have any experience with what -- or

7    do you track what percentage of time in the chart

8    retrieval process you're able to obtain a complete

9    set of the patient's medical records?

10        A.    I don't track it, but I will tell you that

11   it's the overwhelming majority of the time with

12   electronic medical records.

13        Q.    When did most practices switch to

14   electronic medical records?

15        A.    Beginning in 2011, probably the majority

16   of -- because that's when the meaningful use program

17   and some government funding for implementing

18   electronic medical records started.  And the adoption

19   -- I'm trying to think when seeing paper charts at

20   all for medical records was suddenly so very uncommon

21   for us.  I can't picture when.

22        Q.    Can you estimate just approximately when



Page 193

1    there's an interface between the practice, if they

2    don't do in-house lab and the outside laboratory,

3    that the lab results just come into the practice

4    through an integration process.

5              So there's a lot of those issues, the most

6    important one being that one doesn't know where the

7    chart is, is eliminated in the electronic medical

8    records because it's always in the electronic medical

9    record.

10    Q.    Even with the improvements in electronic

11   medical records over paper medical records, assuming

12   you agree that's an improvement, are there still

13   circumstances where you're unable to retrieve and a

14   complete set of a patient's electronic medical

15   records for various reasons?

16             MS. KRIEG:  Object to form.

17    A.    I would say that's extremely uncommon,

18   extremely uncommon.

19             BY MR. BAAK:

20    Q.    Is it the case that providers always

21   respond to every request for medical records that you

22   make?



Page 194

1          MS. KRIEG:  Object to form.

2     A.    The overwhelming majority of the time,

3  yes.  Most definitely, yes.

4          BY MR. BAAK:

5     Q.    But not always?  Not all providers respond

6  to all requests for medical records, right?

7     A.    No, but it's probably about 99 percent.  I

8  mean, it's really rare that we don't have a provider

9  that provides to us what we need, even if what we

10 need, they say let me get you access to the EMR and

11 we find it ourselves.  So yeah.

12    Q.    Turn to paragraph 41 of your opening

13 report -- sorry -- paragraph 51.

14    A.    51?

15    Q.    Yes.  In paragraph 51 you discuss some of

16 the difficult coding scenarios that a coder might

17 encounter in assigning the appropriate diagnosis

18 code, correct?

19    A.    Correct.

20    Q.    And you list a couple things that we've

21 already covered.  The first is skill level and

22 experience among the coders, right?



Page 234

1    documentation in that, yes, that would be proper.

2              I don't know what you meant by --

3        Q.    Maybe my question is a little confusing.

4    I'll try again.  So I'll use your phrase.  I think

5    you said available?

6        A.    No.  I don't think --

7        Q.    Well, let me ask a more simple version.

8    Is it possible to determine whether a given diagnosis

9    code is supported without looking at any medical

10   records in your experience?

11       A.    So I hope you don't mind, I'm going to

12   reverse it to hopefully say -- what I'm comfortable

13   saying is that the only way a diagnosis code can be

14   reported is if you have clinical documentation to

15   support it.

16       Q.    And so the converse, though -- I want to

17   press on this because it's important.

18       A.    All right.

19       Q.    The converse is also true.  You can't make

20   a determination in your experience of whether a

21   diagnosis code is unsupported without access to the

22   clinical documentation, right?



Page 235

1          MS. KRIEG:  Object to form.

2     A.    So that statement infers that the

3  documentation exists and I just haven't been provided

4  with it.  And until I'm provided with it, I can't

5  support the code.

6          BY MR. BAAK:

7     Q.    And you can't determine that a code is

8  unsupported either, right?

9     A.    Well, it's not supported until you provide

10  me with the documentation.

11     Q.    Well, what if a code has been submitted by

12  a provider already?  So I'm asking, can you

13  invalidate that code in your experience without

14  looking at the underlying clinical documentation?

15     A.    If you cannot provide me with that

16  documentation, correct.

17     Q.    Or you elect not to look at the

18  documentation.  That would be another circumstance

19  where you would be unable to invalidate a provider's

20  submitted diagnosis code, right?

21     A.    I want to go back for a second, because

22  the way I worded it, I want to make sure that what I



Page 295

1    physician queries as a way to resolve uncertainty as

2    to whether or not to assign a diagnosis code?

3         A.    Correct.

4         Q.    Just explain briefly what a physician

5    query is.

6         A.    A physician query is a -- just that, a

7    query, a question submitted to the provider of the

8    service asking for clarification.

9              It is not asking for any additional

10   documentation, et cetera.  It's for the actual

11   provider who made the documentation in the clinical

12   record to clarify something that might, indeed, in

13   the record not be clear.

14        Q.    Are physician queries something you use in

15   your consulting practice at Acevedo Consulting?

16        A.    Yes.

17        Q.    In your view, is it appropriate for a

18   Medicare Advantage plan when it's doing a coding

19   review itself to submit a physician query to try to

20   seek clarity?

21             MS. KRIEG:  Object to form.

22        A.    Assuming that that's something that



360

1                    C E R T I F I C A T E

2

3            I do hereby certify that I am a Notary
Public in good standing, that the aforesaid testimony
4   was taken before me, pursuant to notice, at the time
and place indicated; that said deponent was by me
5   duly sworn to tell the truth, the whole truth, and
nothing but the truth; that the testimony of said
6   deponent was correctly recorded in machine shorthand
by me and thereafter transcribed under my supervision
7   with computer-aided transcription; that the
deposition is a true and correct record of the
8   testimony given by the witness; and that I am neither
of counsel nor kin to any party in said action, nor
9   interested in the outcome thereof.

10

11           WITNESS my hand and official seal this

12   _____ day of _____, 2024.

13

14

15   _____

16                    Notary Public

17

18

19

20

21

22

4398

**EXHIBIT P-31**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


CASE NO.  CV 16-08697 FMO


UNITED STATES OF AMERICA ex rel.,

BENJAMIN POEHLING,

    Plaintiffs,

vs.

UNITED HEALTH GROUP, INC., et al.,

    Defendants.

_____/


DEPOSITION OF BARBARA BLAIR

WEDNESDAY, APRIL 3, 2024

9:48 a.m. - 7:37 p.m.


TWO SOUTH BISCAYNE BOULEVARD, SUITE 1850

MIAMI, FLORIDA


- - -


Reported By:

Katiana Louis

Notary Public, State of Florida

Miami Office #1100998

Magna Legal Services

866-624-6221

Www.MagnaLS.com



4400

Page 41

1      A.   Yes, that is what I would have been

2   doing.

3      Q.   And had you done any work for

4   UnitedHealth prior to your employment with FTI?

5      A.   Not that I'm aware of.

6      Q.   And since the 2012 time frame you

7   provided, have you done any work for UnitedHealth

8   other than your work in this particular matter?

9      A.   No, not that I'm aware of.

10      Q.   Are you aware that UnitedHealth conducts

11   a chart review program by which it reviews the

12   medical records of its beneficiary he's to

13   identify additional codes that were not

14   previously submitted by providers?

15           MS. SOBEL:  Objection to form.

16           THE WITNESS:  I'm not aware of

17       United's program, no.

18   BY MS. LIKOFF:

19      Q.   So, you have no familiarity with

20   UnitedHealth's chart review program; is that

21   correct?

22      A.   That's correct.

23      Q.   Do you have any familiarity with a

24   UnitedHealth program called Claims Verification?

25      A.   I do.



Page 87

1          Q.    And would you advise your client on

2     whether those unsupported codes should be

3     deleted?

4          A.    Again, my results go to my FTI team, and

5     the client and whoever else.  I don't advise on

6     what gets added or what gets deleted.

7          Q.    Do you know whether there's anyone on

8     the FTI team that provides that type of advice to

9     FTI's clients?

10              MS. SOBEL:  Objection to form.

11         Lacks foundation.  Calls for

12         speculation.

13              THE WITNESS:  I would be

14         speculating.  I honestly don't know what

15         our final is with the client.

16    BY MS. LIKOFF:

17         Q.    I'm looking back to your CV, I think the

18    second page of your CV -- strike that.

19              During your time at FTI, have you done

20    any work for the United States government?

21         A.    For the government, not that I'm aware

22    of.

23         Q.    Now turning back to your second page of

24    your CV, I think you've mentioned this a couple

25    of times but I just want to unpack it a little



Page 108

    1            MS. SOBEL:  Objection to form.
    2        Asked and answered.
    3            MS. LIKOFF:  You can go ahead and
    4        answer.
    5            THE WITNESS:  As I said before, to
    6        assign a diagnosis code, it must be in
    7        the medical record that you've received.
    8    BY MS. LIKOFF:
    9        Q.   All right.  And this was a principle
   10    that you learned during your 25 years of
   11    experience as a coder; correct?
   12        A.   Yes.
   13        Q.   And would you agree that this is a
   14    principle that coders receive training on?
   15            MS. SOBEL:  Objection to form.
   16            THE WITNESS:  Again, I can't opine
   17        to what training they received, but if I
   18        were going to offer my experience, then
   19        I would say that if they've received
   20        formal training, they may have received
   21        that.
   22    BY MS. LIKOFF:
   23        Q.   And would you agree that ICD guidelines
   24    require that all diagnosis codes that are
   25    reported be based on documentation that shows



4403

Page 169

1          A.    More often than not, yes.

2          Q.    Can you think of any specific examples

3     in which you were not able to assign a code?

4          A.    If I didn't have access to all of the

5     documentation, I would have to -- I wouldn't be

6     able to assign that code at that time.

7          Q.    But in that case that you've just

8     described, the dispute would be resolved and it

9     would be resolved in determining that there was

10    no code that could be supported; correct?

11         A.    No, I wouldn't be able to -- I guess,

12    one of the ways -- I couldn't -- I couldn't be

13    the determination on the two coders if I didn't

14    have access to the documentation to make that

15    determination.

16         Q.    So what would happen in those cases?

17         A.    Then, again, I would attempt to get the

18    documentation.  So, that would be like the

19    initial immediate -- based on my e-mail, I'd have

20    to ask for more information.  But ultimately

21    based on what I have, I would make a decision as

22    to which one -- which diagnosis code was

23    supported.

24         Q.    So, based on your experience can you

25    think of any instance in which a coder



Page 170

1    disagreement was not able to be resolved?

2         A.   Not at this time.

3         Q.   Turn back to paragraph 22 of your

4    report, you then opine that there are a variety

5    of reasons why coders may reach different

6    conclusions and you list six specific reasons in

7    your report; correct?

8         A.   Correct.

9         Q.   And we'll go through a number of these,

10   but first I just want to make sure that your

11   report provides a complete list of the reasons

12   you believe coders may reach different

13   conclusions.  So in paragraph 22, I believe, you

14   list six of them.

15              So my question is:  Whether there are

16   any other reasons you believe that coders may

17   disagree?

18        A.   Well, there may be, but these are what

19   my opinion is upon.  I can't opine to all of

20   them.  I said, "including, but not limited to."

21   These are the ones I'm making the opinion on.

22        Q.   I'm just trying to understand exactly

23   what you honed in on in the "including but not

24   limited to."  So, I'm just trying to understand

25   if there are any other reasons that you are



Page 214

1        A.    Yes.

2        Q.    And what is the basis for your opinion?

3        A.    Again, my years of experience and myself

4    assigning a code in error.

5        Q.    Can you point to any data regarding the

6    prevalence of human error in diagnosis coding?

7        A.    I cannot.

8        Q.    So you cannot point to any data

9    regarding the prevalence of human error in

10   diagnosis coding?

11       A.    No.

12       Q.    Can you point to any studies regarding

13   the prevalence of human error in diagnosis

14   coding?

15       A.    I'm not aware of any.

16       Q.    And can you point to any published

17   article regarding the prevalence of human error

18   in diagnosis coding?

19       A.    I'm not aware of any.

20       Q.    You then provided a number of factors

21   that you believe make human error more likely,

22   including long days, voluminous records, and

23   fatigue among coders; is that correct?

24       A.    Correct.

25       Q.    And you opine that all of these factors



Page 215

1    can result in mistakes, including missed

2    diagnosis codes; is that correct?

3        A.    Actually, I opine here that they may

4    miss records, mistakes including missed diagnosis

5    codes.  So, mistakes meaning transposed,

6    assigning the wrong diagnosis code, and including

7    missed diagnoses, as I said.

8        Q.   So, you would agree that human error in

9    coding could also lead a coder to assign codes

10   that are not in fact supported by the medical

11   record; correct?

12       A.   I do speak to them assigning the wrong

13   code in that sentence.  I do speak to that in my

14   report.  I believe it's in paragraph 43 where I

15   say it's a simple transposition of a number, and

16   the code gets reported in error.

17       Q.   Well, I understand in paragraph 43

18   you -- you're referring to mistyped codes;

19   correct?

20       A.    Correct.

21       Q.   So, separate from typographical errors,

22   I'm trying to understand whether you believe the

23   factors we mentioned before, long days,

24   voluminous records, fatigue among coders, could

25   also lead coders to assign codes that are not



Page 216

1    supported by medical record documentation?

2        A.   As I said, it states right there, "which

3    can result in mistakes."

4        Q.   And you believe that these mistakes,

5    include missed diagnosis codes as well as

6    diagnosis codes that are not supported by the

7    medical record; is that correct?

8        A.   Yes.  Diagnosis codes that may not be

9    supported in the medical record, again because

10   they typed something wrong, they didn't read

11   through the entire 100 pages.  It can happen,

12   yes.

13       Q.   So, other than mistakes that involve

14   mistyping a diagnosis code, you are agreeing that

15   human error can lead to coders reporting codes

16   that are unsupported; correct?

17       A.   Like I said, that can result in

18   mistakes.  The code that would be reported would

19   more than likely be in error.  It does not

20   necessarily mean that the documentation was not

21   there.  They may have, again, misread something,

22   not read something further, but it could be that

23   they put something in error.  Yes, there can be

24   mistakes.

25       Q.   Again, I'm just trying to understand the



Page 321

1                REPORTER'S DEPOSITION CERTIFICATE

2         STATE OF FLORIDA

          COUNTY OF MIAMI-DADE

3

4                I, Katiana Louis, do hereby certify that

5         I was authorized to and did stenographically

6         report the foregoing deposition; and that the

7         transcript is a true and correct transcription of

8         the testimony given by the witness; and that the

9         reading and signing of the deposition were not

10        waived.

11

12               I further certify that I am not a

13        relative, employee, attorney or counsel of any of

14        the parties, nor am I a relative or employee of

15        any of the parties' attorney or counsel connected

16        with the action, nor am I financially interested

17        in the action.

18

19               Dated this 5th day of April 2024.

20

21                    _Katiana Louis_____

22                    Katiana Louis

23

24

25



4409

**EXHIBIT P-32**

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
ROSS M. CUFF
JACK D. ROSS (CBN 265883)
HUNTER B. THOMSON (CBN 330533)
Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
        Tel: (213) 894-6739; Fax: (213) 894-7819
        Email: hunter.thomson@usdoj.gov
JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
        Email: robert.mcauliffe@usdoj.gov
TRINI E. ROSS
United States Attorney
DAVID CORIELL
Assistant United States Attorney
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5830; Fax: (716) 551-3052
        Email: david.coriell@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>Plaintiffs,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC., *et al.*,<br><br>Defendants. | No. CV 16-08697 FMO-PVCx<br><br>DECLARATION OF Steven Ferraina |

I, Steven Ferraina, declare and state as follows:

1.      I am the Deputy Director for CMS' Center for Program Integrity (CPI), Audits and Vulnerabilities Group.  I have been in this position since September 2020.  My responsibilities include overseeing and implementing the Medicare Advantage Risk Adjustment Data Validation (RADV) program in CPI.  I submit this Declaration in support of the United States' Opposition to UnitedHealth's Motion for Summary Judgment.  I have personal knowledge of the matters set forth herein and, if called to testify, could and would testify competently thereto.

2.      In connection with RADV Audits for Contract Year (CY) 2011 through CY 2013, the Centers for Medicare &Medicaid Services (CMS) issued Plan Feedback Reports (PFRs) to the plans being audited.  The PFRs communicated initial feedback of the agency's medical record reviews and provided an initial estimate of the portion of the audited Hierarchical Condition Categories (HCCs) that were not found to be supported by medical records submitted by the given plan.

3.      CMS provided UnitedHealth initial access to PFRs for the UnitedHealth plans included in CYs 2011, 2012, and 2013 RADV Audits beginning in April 2019.

4.      CMS did not provide UnitedHealth with PFRs for plans included in the CYs 2014 and 2015 RADV Audits.

5.      When conducting RADV Audits for CY 2014 and CY 2015, CMS gave the plans being audited access to a portal to view the initial feedback of the agency's medical record reviews, which CMS added to the portal as they became available.

6.      CMS provided UnitedHealth with access to the portal for CY 2014 in April 2019.

7.      CMS provided UnitedHealth with access to the portal for CY 2015 in January 2020.

8.      The RADV Audits for CY 2011 through CY 2015 are not final.  The initial results of medical record reviews and estimates of the portion of the audited HCCs that were

found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change.  The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 12, 2024, Washington, D.C.

Steven J.
Ferraina -S

Digitally signed by Steven J.
Ferraina -S
Date: 2024.07.12 10:41:19 -04'00'

Steven Ferraina

2

**EXHIBIT P-33**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                 )
                                   )
           Plaintiffs,             )
                                   )
v.                                 )
                                   )
UNITEDHEALTH GROUP, INC., et al., )
                                   )
           Defendants.             )
_____  )


CONFIDENTIAL
Videotaped Rule 30(b)(6) Deposition of
UnitedHealthcare, Inc. and OptumInsight, Inc.,
Designee 4, by SCOTT THEISEN
Given Remotely
Tuesday, June 6, 2023
10:08 a.m. Eastern


Reported by:  Karen K. Kidwell, RMR, CRR

Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 63

1          Q.   Yes.   Exactly.   So there, CMS indicates

2     that it addressed that concern in developing the

3     Medicare Advantage contract requirement by mandating

4     that the MA organizations certify the accuracy,

5     completeness, and truthfulness of its data based on

6     its best knowledge, information, and belief.   Do you

7     see?   Do you see that?

8          A.   I do.

9          Q.   Okay.   And so this is -- do you understand

10    that this is where, and in response to what the best

11    knowledge, information, and belief standard was --

12    was adopted by CMS?

13               MR. BAAK:   Objection.   Calls for a legal

14          conclusion.   Foundation.

15               THE WITNESS:   Can you restate the

16          question, Linda?

17    BY MS. McMAHON:

18          Q.   So do you understand that this is where

19    CMS was announcing this standard that it was creating

20    of best knowledge, information, and belief that was

21    applying to -- that applied to MA organizations'

22    obligation to certify the accuracy, completeness, and

23    truthfulness of their risk adjustment data?

24               MR. BAAK:   Objection.   Form.   Calls for a

25          legal conclusion.



Page 64

1            THE WITNESS:  I do.  I think it's
2       important to read the sentence following, for
3       context, which also says:  "This language was
4       included in the 1999 contract forms in
5       recognition of the fact that the Medicare Plus
6       Choice organizations cannot reasonably be
7       expected to know that every piece of data is
8       correct, nor is the standard that HCFA, the OIG,
9       and DOJ believe is reasonable to enforce."
10   BY MS. McMAHON:
11       Q.   Perfect.  Yes.  I -- thank you for
12   pointing that out.
13            So you did understand, as a result of
14   these requirements that are being developed right
15   here, you understood that you, indeed, were not being
16   asked to certify to the accuracy of every single
17   diagnosis code you submitted, correct?
18       A.   Yes, that I would interpret this to mean
19   that there's a best efforts, good-faith,
20   reasonableness standard with regard to a plan's need
21   or ability to submit complete, accurate, and truthful
22   information, that there would be some limitations in
23   the plan's ability to -- to support that in a way
24   that's -- would not be requiring 100 percent
25   accuracy, but reasonable -- you know, not absolute,



Page 65

1    but assurance of 100 percent of the data.  But, yes,

2    I understand the concept.

3         Q.    Okay.  And what CMS is saying right here

4    is that in order to address that, in order to make --

5    to address the plan's concerns that you just

6    articulated, that it would be too difficult or maybe

7    impossible to certify every single piece of data;

8    that instead what they were asking you to do is to

9    certify based on your best knowledge, information,

10   and belief, correct?

11        A.    That is correct.

12        Q.    Okay.  And then -- see.  And CMS defines

13   for you here, correct, that the best knowledge,

14   information, and belief standard encompasses the

15   concept that you don't actually know or deliberately

16   ignore or recklessly disregard the fact that your

17   risk adjustment data submitted to CMS for payment was

18   not accurate, complete, and truthful, correct?

19             MR. BAAK:  Objection.  Mischaracterizes

20        the document.  Calls for a legal conclusion.

21             THE WITNESS:  I would just acknowledge how

22        it's written here.  Generally, the federal

23        government can bring an action only when one of

24        three states of mind exist: actual knowledge of

25        falsity of a claim or information, reckless



Page 66

1          disregard, or deliberate ignorance of

2          information supporting the truth or falsity of a

3          claim or other information.  However, no

4          specific intent to defraud is required.  The

5          best knowledge, information, and belief standard

6          of the Medicare Plus Choice contract

7          certification forms is consistent with these

8          standards.

9    BY MS. McMAHON:

10         Q.   Okay.  Thank you.

11              And that is something you, as an

12   organization, understood throughout your time

13   participating in the program, correct?

14              MR. BAAK:  Object to the form.

15              THE WITNESS:  Yeah, I would say the

16         company understands the terms and conditions of

17         the CMS regulations.

18   BY MS. McMAHON:

19         Q.   Okay.  And of course you did understand

20   that you had an obligation to take some steps to

21   ensure that the risk adjustment data you were

22   submitting was accurate, complete, and truthful,

23   correct?

24              MR. BAAK:  Objection.  Calls for a legal

25         conclusion.



Page 93

1          We have an entire witness designated on the

2          RACCR program.

3    BY MS. McMAHON

4          Q.   Sorry.  Did you -- did you answer the

5    question?  I couldn't hear.

6          A.   Yeah, I read this -- I read this.  And at

7    the time, can't speak specifically to the RACCR

8    program, but we certainly had a RACCR program in

9    place at the time of this letter.

10          Q.   Right.  And what I'm specifically asking

11    you now is, do you agree, sitting here today, that by

12    seeking to identify and delete diagnosis codes that

13    are not supported in the medical record, that you are

14    improving the accuracy of the data you submit to CMS?

15               MR. BAAK:  Objection.  Beyond the scope.

16               THE WITNESS:  Yes, I would agree with

17          that.  I would add that the RACCR program was

18          really -- was designed and -- to audit and have

19          quality assurance around capitated provider

20          groups, so those provider groups would be

21          different than a fee-for-service provider group,

22          just to be clear.

23               And the reason it was important to analyze

24          and do some analytical reviews and some auditing

25          of those records is that the value-based care



Page 94

```
 1        reimbursement to these providers was based upon
 2        the revenue and medical costs of the members
 3        they managed.  So implicit in that could be --
 4        is some level of potential incentive to code
 5        completely and accurately.
 6              And the purpose of the RACCR program was
 7        to look at diagnoses, understand where a
 8        particular provider might be an outlier to their
 9        peers, and then there were subsequent audits
10        back to medical records on a select basis.
11              So I just wanted to be clear that as we're
12        talking about this letter, it's really the --
13        this subgroup of physicians we're talking about
14        are those that -- and this procedure and this
15        audit procedure was designed and specifically
16        targeted at those that were paid on a capitated
17        percentage of revenue basis for the members they
18        served.
19   BY MS. McMAHON:
20        Q.   Okay.  And I want to ask you, separate and
21   apart from the RACCR program, I am asking you if,
22   sitting here today, as a general proposition, that
23   seeking to identify and delete diagnosis codes that
24   are not supported in the medical record, that you are
25   improving the accuracy of the data that you submit to
```



Page 265

```
 1                      CERTIFICATE

 2

 3        I, KAREN K. KIDWELL, Registered Merit Reporter,

 4   and Certified Realtime Reporter, do hereby certify

 5   that prior to the commencement of the examination,

 6   the deponent was remotely sworn to testify to the

 7   truth, the whole truth under penalty of perjury.

 8        I DO FURTHER CERTIFY that the foregoing is a

 9   verbatim transcript of the testimony as taken

10   stenographically by me at the time, place and on the

11   date hereinbefore set forth, to the best of my

12   ability.

13        I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of any

15   of the parties to this action, and that I am neither

16   a relative nor employee of such attorney or counsel,

17   and that I am not financially interested in this

18   action.

19

20                    Karen K. Kidwell
                      _____

21                    Karen K. Kidwell
                      Registered Merit Reporter

22                    Certified Realtime Reporter
                      Notary Public

23

24

25
```



4422

**EXHIBIT P-34**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. BENJAMIN POEHLING, | ) ) ) | No. 16-08697 FMO |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITEDHEALTH GROUP, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |


CONFIDENTIAL INFORMATION, SUBJECT TO PROTECTIVE ORDER


VIDEOTAPED VIDEOCONFERENCE ZOOM DEPOSITION OF
KAREN ERICKSON

August 2, 2022

9:32 a.m. Eastern Standard Time


Magna Legal Services          Prepared by:

(866) 624-6221                Marcella Daughtry, RPR, RMR

www.MagnaLS.com               CA CSR 14315

                             GA No. 6595-1471-3597-5424



4424

Page 261

1          MS. KRIEG:  I had it in here as 320.  If -- if

2     we have 319 prepared, we can pull it up.

3          MS. SOBEL:  We can take a look.  My notes could

4     be wrong, too.

5          MS. KRIEG:  Let's see, we have 319 in here.

6     Okay.  Here we go.  So here is 319.

7     Q    BY MS. KRIEG:  319 is from Thad Johnson to

8     Steve Nelson, Daniel Schumacher, Karen Erickson.  I think

9     that's it.  "Subject:  Meeting Minutes.  Attachment:  CMS

10    meeting notes 4/29/14.

11         "Privileged and Confidential.

12         "Please let me know of any

13    corrections/clarifications or changes you may have to my

14    notes from the meeting today.  Thanks."

15         Did I read that correctly?

16    A    Yes.

17    Q    And I think you have testified that you

18    received this e-mail?

19    A    Yes.

20    Q    Okay.  Let's go to 320.  And these are the

21    notes that you reviewed in anticipation of your

22    deposition today?

23    A    Yes.

24    Q    Okay.  And again, you have no independent

25    recollection of the meeting, correct?



4425

Page 262

1      A    I don't remember the specifics.  I remember the

2    meeting itself and some of the -- some of the big topics,

3    but I don't remember the specifics.

4      Q    And the big topics are?

5      A    The rule that was proposed in January of 2014

6    and whether or not the Claims Verification program of

7    United was -- what their guidance would be in terms of

8    whether that was required or not.

9      Q    Okay.  And I want to direct you to the fourth

10   bullet from the top.  And it says:  "Cheri Rice added

11   that there is a False Claims Act requirement that plans

12   not knowingly keep overpayments so if you do not know

13   that there is an overpayment, you do not need to delete a

14   code."

15         Did I read that correctly?

16     A    Which -- I'm sorry, which bullet are you on?

17     Q    The fourth from the bottom on page 2.

18         MS. SOBEL:  Oh, on page 2.

19         THE WITNESS:  Oh, on page 2.

20     Q    BY MS. KRIEG:  I'm sorry, on page 2.

21     A    Okay.  Yes.

22     Q    And do you agree that the inverse of this is

23   true, right?  If you know there is an overpayment, you do

24   need to delete the code, right?

25         MS. SOBEL:  Objection.  Calls for a legal



Page 292

1   STATE OF GEORGIA              )
                                  )       ss:
2   COUNTY OF DEKALB              )

3

4           I HEREBY CERTIFY that the foregoing deposition

5   was taken before me; that I was then and there a

6   Registered Professional Reporter and Registered Merit

7   Reporter, License No. 6595-1471-3597-5424 for the State

8   of Georgia, and License No. 14315 in the State of

9   California; that the witness before testifying was duly

10  sworn by me to testify to the whole truth; that the

11  questions propounded by counsel and the answers of the

12  witness thereto were taken down by me in shorthand and

13  thereafter transcribed under my direction; and that the

14  foregoing pages contain a full, true, and accurate

15  transcript of all deposition testimony and proceedings

16  had, all done to the best of my skill and ability.

17          Signature requested.

18          I FURTHER CERTIFY that I am in no way related

19  to, nor employed by any of the parties hereto, nor am I

20  in any way interested in the outcome.

21          DATED at Dunwoody, Georgia, this 8th day of

22  August, 2022.

23

24                      MARCELLA L. DAUGHTRY, RPR, RMR
                        GA License No. 6595-1471-3597-5424
25                      CA CSR 14315

