1   LATHAM & WATKINS LLP
      David J. Schindler (Bar No. 130490)
2       david.schindler@lw.com
      Manuel A. Abascal (Bar No. 171301)
3       manny.abascal@lw.com
      355 South Grand Avenue, Suite 100
4   Los Angeles, California 90071-1560
    Telephone: +1.213.485.1234;
5   Facsimile: +1.213.891.8763

6     *Attorneys for United Defendants*

7   MICHAEL D. GRANSTON
    Deputy Assistant Attorney General, Civil Division
8   E. MARTIN ESTRADA
    United States Attorney
9   DAVID M. HARRIS
    ROSS M. CUFF
10  JACK D. ROSS (CBN 265883)
    HUNTER B. THOMSON (CBN 330533)
11  Assistant United States Attorneys
    300 N. Los Angeles Street, Room 7516
12  Los Angeles, California 90012
    Tel: (213) 894-6379; Fax: (213) 894-7819
13  Email: *hunter.thomson@usdoj.gov*

14    *Attorneys for the United States of America*

15  [Additional Counsel Listed on Next Page]

16              **UNITED STATES DISTRICT COURT**
17              **CENTRAL DISTRICT OF CALIFORNIA**

18  UNITED STATES OF AMERICA *ex rel.*  |  CASE NO. 2:16-cv-08697-FMO-PVCx
    BENJAMIN POEHLING,
19                                       |  **JOINT EVIDENTIARY APPENDIX**
                  Plaintiff,
20                                       |
         v.                              |  **VOLUME 13 OF 14**
21                                       |  **EXHIBITS P-35 THROUGH P-94**
    UNITEDHEALTH GROUP, INC. *et al.*,   |  **PAGES 4428 THROUGH 5057**
22                                       |
                  Defendants.            |
23                                       |  Hon. Fernando M. Olguin
24                                       |
25                                       |  Hearing Date:  September 5, 2024
                                         |  Hearing Time:  10:00 a.m.
26                                       |  Courtroom:  6D

27       **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED**
28                          **UNDER SEAL**

LATHAM & WATKINS LLP
  Daniel Meron (appearing *pro hac vice*)
    daniel.meron@lw.com
  Abid R. Qureshi (appearing *pro hac vice*)
    abid.qureshi@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

BARTLIT BECK LLP
  Philip S. Beck (appearing *pro hac vice*)
    philip.beck@bartlitbeck.com
  Sean W. Gallagher (appearing *pro hac vice*)
    sean.gallagher@bartlitbeck.com
  Cindy L. Sobel (appearing *pro hac vice*)
    cindy.sobel@bartlitbeck.com
  Nicolas Martinez (appearing *pro hac vice*)
    nicolas.martinez@bartlitbeck.com
  Benjamin R. Montague (appearing *pro hac vice*)
    benjamin.montague@bartlitbeck.com
54 W. Hubbard Street, Suite 300
Chicago, Illinois 60654-8174
Telephone: +1.312.494.4400
Facsimile: +1.312.494.4440

BARTLIT BECK LLP
  Andrew C. Baak (appearing *pro hac vice*)
    andrew.baak@bartlitbeck.com
  Jameson R. Jones (appearing *pro hac vice*)
    jameson.jones@bartlitbeck.com
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202-6318
Telephone: +1.303.592.3100
Facsimile: +1.303.592.3140

*Attorneys for United Defendants*

JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
    P.O. Box 261, Ben Franklin Station
    Washington, D.C. 20044
    Tel: (202) 307-0486; Fax: (202) 307-3852

Email:  robert.mcauliffe@usdoj.gov
TRINI E. ROSS
United States Attorney
DAVID CORIELL
Assistant United States Attorney
138 Delaware Avenue
Buffalo, New York 14201
Tel: (716) 843-5830; Fax: (716) 551-3052
Email:  david.coriell@usdoj.gov

*Attorneys for the United States of America*

**EXHIBIT P-35**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA ex rel.  ) No. 16-08697 FMO
BENJAMIN POEHLING,                 )
                                   )
         Plaintiffs,               )
                                   )
v.                                 )
                                   )
UNITEDHEALTH GROUP, INC., et al., )
                                   )
         Defendants.               )
_____  )

Videotaped Deposition of
DANIEL J. SCHUMACHER
Given Remotely
Tuesday, September 20, 2022
9:04 a.m. Eastern Time

Reported by:  Cindy A. Hayden, RMR, CRR

Magna Legal Services
866-624-6221
www.MagnaLS.com



4429

Page 200

1    then articulated, as I mentioned, at the outset,

2    what the intent of it was, and then the fundamental

3    question we were there to ask, which was, "Boy, it

4    sure sounds like you're proposing that people might

5    need to start doing something.  And that would

6    imply that we are doing more than we need to be

7    doing here."  And that's what we were there to ask.

8         Q.   So nobody at United suggested or gave

9    the impression that the chart review program and

10   the claims verification program were related in any

11   way?

12        A.   I think we were clear to -- we were --

13   you know, my recollection was that we were clear to

14   say, "We have a chart review program.  There's a

15   quality assurance around that."  Because there was

16   a conversation about a meeting prior.  So after we

17   did the general description, then we went into more

18   specific description.

19             Then Cheri Rice was in a meeting with

20   some folks from our organization.  And I think she

21   was asking for a distinction between this meeting

22   and that meeting.  And we were clear to say that,

23   you know, "Chart program is one thing.  It has its

24   own QA process.  We're not asking about that right

25   now.  We're asking you about our claims



Page 201

1    verification process."

2          Q.    So, in other words, the chart review

3    program and the quality assurance related to the

4    chart review program, that's not -- that's not the

5    reason for the meeting today?

6                MR. SUMMERS:  Objection.  Form.

7                THE WITNESS:  We were -- we were there

8    to ask the three things that I articulated before,

9    the first of which was:  Do we have a proactive

10   obligation to do a two-way look when we're

11   reviewing a medical chart given that there was a

12   proposed rule that would -- if -- if and when

13   finalized, would then require it?  And we were

14   already doing it, so we had suspended it.  So we

15   wanted to know the answer to that question.

16               We also wanted to know:  Okay.  Then

17   what should we be doing with things that had

18   initiated the claims verification process and had

19   not gone through all the steps?

20               And then, lastly, we were quickly going

21   to be submitting bids for the 2015 bid year, and we

22   wanted to understand how we should be treating --

23   how we should be thinking about that in light of

24   this, you know, proposed regulation that says we

25   might have to start doing something that we were



Page 262

1          Q.   Do you have a memory of Sean Cavanaugh

2     saying what is attributed to him here?  Aside from

3     what's written in the notes, do you remember him

4     saying it?

5          A.   I have a recollection of Sean saying

6     something very closely to this effect.  Whether or

7     not it's word for word, I -- I cannot recall.

8          Q.   What does that mean, very -- something

9     very close to this?

10         A.   I'm saying that the spirit of what is

11    reflected here is what was conveyed to us.  Whether

12    he used every single word exactly as it's expressed

13    in this note, I cannot tell you.

14         Q.   Okay.  And so what's written here in

15    Thad Johnson's notes comports with your memory is

16    what you're saying?

17         A.   Yes, it does.

18         Q.   And it comports with your memory that

19    Cheri Rice raised the False Claims Act shortly

20    after the comment from Sean Cavanaugh?

21              MR. SUMMERS:  Objection.  Form.

22              THE WITNESS:  That is a piece that

23    is -- in terms of timing, I -- I don't -- I don't

24    have a chronology in my notes, because it's -- my

25    notes are just not a comprehensive record.  So



Page 263

1    that's a question I have in my mind about whether

2    or not she said that after this or it was said

3    earlier.

4    BY MR. MASON:

5         Q.   Well, okay.  You agree that the way

6    Thad Johnson's notes set it forth, she -- she

7    said -- it -- it says:  Cheri Rice added that there

8    is a False Claims Act requirement.

9              So you agree that Thad Johnson's notes

10   indicate that Cheri Rice made the False Claims Act

11   comment, adding onto Sean Cavanaugh's statement,

12   right?

13        A.   Thad's notes reflect that.

14        Q.   But you don't remember if that is

15   accurate or not?

16        A.   I read this shortly after the meeting,

17   and I gave verbal and then written feedback that

18   it -- it comported with my recollection of the

19   meeting.

20        Q.   Okay.  Do you -- and -- and is that

21   still the case?  As you read Thad Johnson's notes

22   today, do you find anything in there that is

23   inaccurate or incorrect?

24        A.   I think that Thad's notes are a very

25   good reflection, a faithful reflection of -- of how



Page 357

1             CERTIFICATE OF REPORTER

2

3             I, Cindy A. Hayden, Registered Merit

4    Reporter and Notary Public, do hereby certify that

5    the foregoing transcript is a true, accurate, and

6    complete record.

7             I further certify that I am neither

8    related to nor counsel for any party to the cause

9    pending or interested in the events thereof.

10            Witness my hand, this 23rd day of

11   September, 2022.

12

13

14

15

16

17

18

19

20
                    _Cindy Hayden_____

21             Cindy A. Hayden, RMR, CRR

22

23

24

25



4434

**EXHIBIT P-36**

Message

| | |
|---|---|
| **From:** | Cavanaugh, Sean (CMS/CM) [/O=HHS EES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SEAN.CAVANAUGH.CMS] |
| **Sent:** | 6/26/2015 5:18:53 PM |
| **To:** | Rice, Cheri M. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=cheri.rice.cms59728027]; Tudor, Cynthia G. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=cynthia.tudor.cms06246732]; Harlow, Jennifer A. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=jennifer.harlow.cms20728073] |
| **Subject:** | Re: 2013 CMS RAF Attestation |

I disagree that we stated the last part of this sentence beginning "...and that MA plans..."

"During our conversations last year before the proposed rule was withdrawn, CMS confirmed to us that the proposed requirements would not apply until the effective date of the rule, and that MA plans were thus not required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses."

**From:** Rice, Cheri M. (CMS/CM)
**Sent:** Friday, June 26, 2015 12:49 PM
**To:** Tudor, Cynthia G. (CMS/CM); Cavanaugh, Sean (CMS/CM); Harlow, Jennifer A. (CMS/CM)
**Subject:** Fw: 2013 CMS RAF Attestation

--------------------------
Sent from my BlackBerry Wireless Device

**From:** Nelson, Steve H [mailto:steve_nelson@uhc.com]
**Sent:** Friday, June 26, 2015 12:41 PM
**To:** Rice, Cheri M. (CMS/CM)
**Subject:** 2013 CMS RAF Attestation

Cheri,

Similar to last year, we are reaching out to you, to reiterate our approach to the electronic annual risk adjustment certifications. As you know, annual risk adjustment data certifications before 2014 were submitted on paper, enabling companies to add notes explaining their understanding of these certifications (including any remediation efforts). As we discussed with you last year, because the certifications are now electronic, companies are unable to include explanatory notes. As such, we informed you in writing our understanding of these certifications.

Because the certifications remain electronic with no ability to add explanatory notes, we feel it would again be helpful, and appropriate, to capture our discussion and understanding regarding the certifications.

- As with our past certifications, the 2013 certifications are based on facts reasonably available or made available to us as of the date of the certifications. As we receive additional information, we may be required to modify the data to which the certifications relate
- The certifications use the phrase "best knowledge, information, and belief," which is based on our ordinary business practices.

EXHIBIT

00331
4436

USBP000619443

- The certifications only cover risk adjustment data for 2013 dates of service that were submitted to CMS and not subsequently deleted prior to the date of the certifications.

- As we have mentioned to you previously, we are engaged in an ongoing review of our risk adjustment processes and submission system. This review has identified areas for improvement and, as a result, we will be deleting all risk adjustment data for 2013 dates of service that we ultimately determine should be deleted consistent with this email.

- CMS issued a proposed rule last year that would have required MA plans to design any medical record reviews to determine the accuracy of risk adjustment diagnoses associated with those records. In May 2014, CMS withdrew the proposed rule. During our conversations last year before the proposed rule was withdrawn, CMS confirmed to us that the proposed requirements would not apply until the effective date of the rule, and that MA plans were thus not required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses. As we discussed last year, we previously had a process through which we reviewed certain medical records to determine the accuracy of risk adjustment diagnoses and submitted appropriate deletes. Based on our conversations with CMS last year, CMS's withdrawal of the proposed rule, and CMS's ongoing consideration of a FFS Adjuster to address diagnoses not supported by a medical record in the context of RADV, we ended this process and informed you of that decision. That decision remains operative for 2013 dates of service. In particular, we did not use our previous process to determine whether diagnosis codes submitted through claims are unsupported in the medical record. We do have a quality assurance process that deletes codes initially identified during chart review and that are later determined to be unsupported.

The certifications we submit this year are made subject to these clarifications. Please let me know if you have any questions. As always, we appreciate your time and attention on this matter.

Steve Nelson
Chief Executive Officer
UnitedHealthcare Medicare & Retirement

This e-mail, including attachments, may include confidential and/or proprietary information, and may be used only by the person or entity to which it is addressed. If the reader of this e-mail is not the intended recipient or his or her authorized agent, the reader is hereby notified that any dissemination, distribution or copying of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender by replying to this message and delete this e-mail immediately.

4437

USBP000619444

**EXHIBIT P-37**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, <br><br> Plaintiffs, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC., et al, <br><br> Defendants. | Case No. 16-cv-08697 FMO |

## EXPERT DISCLOSURE OF PAUL SPITALNIC
### JANUARY 29, 2024

1

4439

Expert Disclosure by Paul Spitalnic

I have been the Chief Actuary for the Centers for Medicare & Medicaid Services since 2013 where I am responsible for overseeing all actuarial work in the Agency including for the Medicare Advantage (MA) program. Prior to this role, I was the Director of the Parts C & D Actuarial Group where I was specifically responsible for overseeing all work related to the Medicare Advantage program, including the rate development and bidding processes. I have a Bachelor of Arts degree in Mathematics from Binghamton University and am an Associate of the Society of Actuaries and a member of the American Academy of Actuaries. I have not been retained or specially employed to provide expert testimony in this case, nor do my routine duties as an employee of CMS involve giving expert testimony. I am not being compensated in any way for this report, or any testimony I may give in this case, other than the salary I earn from my current position with CMS. I have prepared this expert opinion in response to statements in Julia Lambert's expert opinion. Attached as Appendix 1 is a list of the documents I relied on in forming these expert opinions.

Ms. Lambert claims that "Removing MAO payments related to unsupported codes fundamentally changes the application of the risk model. Whether or not an MAO was overpaid cannot be determined solely by the presence of unsupported medical conditions in its data. Rather, an MAO is overpaid only if its level of unsupported diagnosis codes exceeds or is not reasonably consistent with the level of unsupported diagnosis codes in the TM data used to develop the risk model.[1]" She adds that "A decision that retrospectively removes a significant amount of UHG revenue related to unsupported diagnosis codes would materially change the payment rules and nullify the actuarial certification UHG submitted with the filing of MA plan benefits and premiums.[2]"

Based on my roles and years of experience as an actuary working on the MA program and my knowledge of the Actuarial Standards of Practice (ASOPs) and the statute and regulations governing the MA program, it is my opinion that these statements are inaccurate. Specifically, (i) there is no actuarial soundness issue with the requirement that bids are to be prepared and certified in a manner consistent with the various published payment policies, (ii) MAOs would be overpaid if they are reimbursed for unsupported diagnoses and, (iii) the actuarial certification submitted by the actuary requires that they have complied with the

---

[1] Expert Report of Julia Lambert, dated September 29, 2023 ("Lambert Report") at P. 2.
[2] *Id.* at 3.

applicable laws, rules, bid instructions and CMS guidance and necessitates that they only include diagnoses that are expected to be included in payment. The following describes how I've reached these conclusions.

1. The risk adjustment model used in MA payment is proposed through the Advance Notice of Methodological Changes for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies; is subject to comment[3]; and is finalized in the Announcement of Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies, prior to the bid submission deadline[4].

2. MA bids must be prepared with projected risk scores that represent what the actuary reasonably expects to be used for payment. Since diagnoses submitted to CMS by an MA organization for payment purposes must be supported by medical record documentation, the actuary must exclude from the bid development any knowingly unsupported codes that will not be included for payment. While the actuary does not have an obligation to audit the data used in the risk score projection development, they are obligated to review this data to ensure that the data is reasonable and consistent for purposes of the assignment[5]

3. The risk adjustment model development and the MA bidding and payment process does follow the data consistency standard described in ASOP #45 – The Use of Health Status Based Risk Adjustment Methodologies[6]. The ASOP considers two areas of consistent treatment consideration.

   a. The first is that "The actuary should consider if the population and program to which the model is being applied are reasonably consistent with those used to develop the model." Since both the development and application of the model are applicable to Medicare beneficiaries, this standard has been satisfied[7].

---

[3] For example, USBP067351461 is the Advance Notice of Methodological Changes for the Calendar Year (CY) 2015 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies.
[4] USBP067351609 is the Announcement Medicare Advantage (MA) Capitation Rates of Calendar Year (CY) 2015 and Part C and Part D Payment Policies
[5] American Academy of Actuaries, Actuarial Standard of Practice ("ASOP") No. 23, https://www.actuarialstandardsboard.org/wp-content/uploads/2017/01/asop023_185.pdf.
[6] American Academy of Actuaries, Actuarial Standard of Practice ("ASOP") No. 45, https://www.actuarialstandardsboard.org/wp-content/uploads/2014/02/asop045_164.pdf.
[7] *Id.* at § 3.1.4.

4441

b. The second is that "The type of input data that is used in the application of risk adjustment should be reasonably consistent with the type of data used to develop the model. Also, the type of input data should be reasonably consistent across organizations, populations, and time periods." The risk model development and the application of the risk model in the bid and payment processes both rely on health care diagnoses which are wholly consistent. The reliance on unaudited Traditional Medicare (using the same terminology as used by Ms. Lambert -an inter-changeable term is Medicare Fee-for-Service) data for determining the relative and predictive values of the various condition categories used in the risk model doesn't invalidate the reasonability of those values. The risk model development process is subject to public comment and there have been no substantive comments rejecting the model development because of the unaudited nature of the underlying data nor have there been reasonable suggestions of alternative data sources that would provide for better predictability. Relying on unaudited data for the risk model development and requiring support for diagnoses submitted for payment does not result in an unreasonable or inconsistent application of risk adjustment[8].

4. As stated above, it is my opinion that the data consistency standard described in ASOP #45 is followed in the application of the risk adjustment model to Medicare Advantage payments. Even if an actuary believed that there was an inconsistency between the data used as the basis of the risk model development and the data used for plan payment, the Actuarial Standards allow for the actuary to depart from the guidance set forth in the prescribed standard in order to comply with applicable law (statutes, regulations, and other legally binding authority) and to disclose if any material assumption or method was prescribed by applicable law (statutes, regulations, and other legally binding authority)[9]. Thus, the Actuarial Standards of Practice allow the actuary to perform their work in a manner prescribed by the law, regulations and other guidance related to the Medicare Advantage program, including the requirement that payment will only be made for diagnoses that are supported by a medical record.

5. Once again, it is my opinion that the data consistency standard described in ASOP #45 is followed in the application of the risk adjustment model to

---

[8] *Id.* at § 3.2.
[9] *Id.* at §§ 4.1-4.2.

Medicare Advantage payments. However, even if there were data inconsistencies resulting from the reliance on unaudited diagnosis data used in the development of the risk adjustment model, this potential inconsistency would not result in an underpayment to Medicare Advantage plans. Specifically:

- An audit of the medical records for the Traditional Medicare diagnoses used in the risk model development would result in unsupported diagnoses being eliminated and unrecorded diagnoses being added.

- If the risk model was recalibrated based on the audited Traditional Medicare data, it is uncertain if this would lead to a net increase or decrease in cumulative diagnoses codes as the audit would result in some codes being added and others being deleted.

- If this change resulted in a change in average Traditional Medicare risk scores, the calibration of the model coefficients will change, and the calculated normalization factor would also need to change to return the average Traditional Medicare risk score to 1.0 in the payment year since normalization always gets back to a projected 1.0 score for the average Traditional Medicare beneficiary.

- Similarly, such a recalibration of the risk adjustment model would result in a change to the measure of coding intensity, or roughly the difference between average MA and Traditional Medicare risk scores. Even if just unsupported claims were removed, as in Ms. Lambert's illustration, the measured coding intensity adjustment would increase commensurately.

- As described in the preceding bullets, any change in a theorized risk adjustment model based on audited Traditional Medicare data would directly affect the risk model coefficient values, normalization, and coding intensity factors, all of which affect MA plan payments. A more complete consideration of any potential effects of including unsupported diagnoses in the calibration of the risk adjustment model would negate most, if not all, of any potential payment difference identified in Ms. Lambert's illustration.

- All these considerations are theoretical as the program is dependent on the finalization of the published risk adjustment model that serves as the foundation for the bidding and payments of the Medicare Advantage program.

4443

- Once the bid is finalized, even if there are known changes that would materially affect the assumptions underlying the bid development, no changes to the bid are permitted.

6. Actuaries preparing bids are required to be familiar with the laws, regulations, and instructions of the program. They are required to include in their certification[10] that "the actuary is familiar with the requirements for preparing Medicare Advantage and Prescription Drug bid submissions and meets the Academy's qualification standards for doing so[11]" and that they attest "that the bid was prepared in compliance with the current standards of practice, as promulgated by the Actuarial Standards Board of the American Academy of Actuaries, and that the bid complies with the appropriate ASOPs".[12]

Based on the considerations summarized in points 1-6 above, it is my opinion that there is no actuarial soundness issue with the requirement that bids are to be prepared and certified in a manner consistent with the various published payment policies. Specifically, (i) there is no actuarial soundness issue with the requirement that bids are to be prepared and certified in a manner consistent with the various published payment policies, (ii) MAOs would be overpaid if they are reimbursed for unsupported diagnoses and, (iii) the actuarial certification submitted by the actuary requires that they have complied with the applicable laws, rules, bid instructions and CMS guidance and necessitates that they only include diagnoses that are expected to be included in payment.

Now, I'll respond to a few other statements in Ms. Lambert's report.

7. Ms. Lambert's report states that "retrospectively removing unsupported diagnosis codes and the associated revenue would materially change the assumed payment methodology relied on in the bid submission process, nullify the actuarial certification, and underpay MAOs for the benefits offered.[13]" Ms. Lambert's opinion that "retrospectively removing unsupported diagnosis codes and the associated revenue would … nullify the actuarial certification" is incorrect. The actuarial certification is not affected by events that occur after the

---

[10] The CMS Bid pricing tool instructions for the Calendar Year (CY) 2015 was produced in this litigation as USBP057538571.
[11] USBP057538571 at p. 100.
[12] USBP057538571 at p. 101.
[13] Lambert Report at P. 30.

4444

certification. Actual results may vary from the assumptions and projections. The actuarial certification remains in effect based on what was known at that time.  As noted above, the certifying actuary is required to prepare the bid in accordance with compliance with the applicable laws, rules, bid instructions, and guidance. This requirement should preclude an actuary from certifying a bid when they are aware of unsupported diagnoses included in the projected risk scores.

8. Ms. Lambert's report also states that "UHG projected risk scores without validating them in the medical record, and CMS accepted those bids under these assumptions.[14]" Given this statement, I believe it is relevant to note that acceptance of the bid submission by CMS is not a justification or guarantee that the bid submission is entirely correct or without issues. The certifying actuary is responsible for the assumptions, methodologies, and inputs for each bid pricing submission. To emphasize this position, the bid pricing instructions state that: "The objective of obtaining an actuarial certification is to place greater responsibility on the actuary's professional judgment and to hold him/her accountable for the reasonableness of the assumptions and projections.[15]The following assertions cited by Ms. Lambert do not diminish the certifying actuary's and MA organization's responsibility because CMS may (i) not have reviewed this specific information or (ii) only reviewed this information to check compliance with disclosure requirements in the ASOPs:
   - In every year during the Review Period: "As part of the preparation of the bids, we did not attempt to validate any actual or projected risk scores through a review of applicable medical records or of the systems used to submit RAF data to CMS."
   - And starting with the BPT submissions in 2015: "We also adjusted projected risk scores to account for changes in our medical record review processes. Specifically, based on multiple conversations with CMS and CMS's treatment of medical record review in its recent rulemaking process, the health plan has decided to cease one of its prior processes that identified and deleted certain diagnoses codes through the medical record review process."[16]

---

[14] *Id.* at P. 39.
[15] USBP067812968 at P. 99.
[16] Lambert Report at P. 32.

An actuary cannot disclaim that they are knowingly violating the rules of the program. The actuarial certification requires that they are familiar with the laws, regulations, and instructions of the program.

9. Finally, Ms. Lambert's report includes the following statement, "In addition, approximately one third of the bids go through a rigorous audit procedure where an actuary hired by CMS reviews the calculations and checks the bid information, including the supporting data and assumptions for compliance with CMS's instructions, guidance, and regulations (called "Bid Audits").[17]" This statement is incorrect. The CMS audit of "one third of the bids" is a process that is independent of and separate from the "Bid Audits." The Bid Audits are significantly smaller in scope than one third of the bids. Regardless of the number of bid audits performed, the actuarial certification requirement that a bid is to be prepared in accordance with the applicable law, regulations and guidance, including the requirement that diagnoses provided by the plan for payment purposes to be supported by a medical record, is unchanged.

Paul
Spitalnic -S

Digitally signed by
Paul Spitalnic -S
Date: 2024.01.25
16:48:16 -05'00'

_____
Paul I. Spitalnic
Director and Chief Actuary,
Centers for Medicare &
Medicaid Services

_____
Date

---

[17] *Id* at 5.

4446

## Appendix 2

## Materials Relied Upon

*Produced in Litigation*
USBP067351461
USBP067351609
USBP057538571
USBP067812968

*Publicly Available*
American Academy of Actuaries, Actuarial Standard of Practice ("ASOP") No. 23,
  https://www.actuarialstandardsboard.org/wp-
  content/uploads/2017/01/asop023_185.pdf
American Academy of Actuaries, Actuarial Standard of Practice ("ASOP") No. 45,
  https://www.actuarialstandardsboard.org/wp-
  content/uploads/2014/02/asop045_164.pdf

4447

**EXHIBIT P-38**

Page 1

UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF            )

AMERICA, ex rel.            )    Case No.:

BENJAMIN POEHLING,          )    No. 16-08697-FMO

      Plaintiffs,       )

V.                          )

UNITEDHEALTH GROUP,         )

INC., et al.,               )

      Defendants.       )

_____/


CONFIDENTIAL

CONTAINS ATTORNEYS' EYES ONLY PORTIONS


      The Videotaped, In-Person, Remote

deposition of KIRK LIMMER was held on Wednesday,

June 21, 2023, commencing at 10:40 a.m., at the

Law Offices of DLA Piper, 650 South Exeter Street,

Suite 1100, Baltimore, Maryland 21202 before Susan

Wootton, Notary Public.


REPORTED BY:  Susan Wootton, RPR, CLR



4449

Page 217

1    risk scores to account for changes in our medical

2    record review processes, specifically based on

3    multiple conversations with CMS and CMS's

4    treatment of medical record review in its

5    reasonable making process.

6              The health plan has decided to cease

7    one of its prior processes that identified and

8    deleted certain diagnosis codes through the

9    medical record review process.  Do you see that?

10       A    Yes.

11       Q    So what this paragraph is saying is

12   that the plan has adjusted its projected risk

13   score to account for cessation of a prior process

14   that identified and deleted certain diagnosis

15   codes, correct?

16             MS. ZUPAC:  Object to form.

17       A    It says they've decided to cease one

18   of its prior processes that identified and deleted

19   certain diagnoses codes.  Yes.  It does say that.

20       Q    And it also says that it adjusted its

21   projected risk scores to account for that.

22       A    It says:  We also adjusted projected

23   risk scores to account for changes in our medical

24   review process.

25       Q    And then it says:  Specifically,



Page 218

1    we've -- the plan has decided to cease one of its

2    prior processes and delete codes.  Correct?

3              MS. ZUPAC:  Object to form.

4         A    Yes.  It does say that.

5         Q    And CMS understands, right, that an

6    adjustment to a projected risk score -- to account

7    for cessation of a process to identify and delete

8    diagnosis codes -- would be an upward adjustment

9    in the risk score, correct?

10             MS. ZUPAC:  Object to form.

11        Q    All else being equal?

12        A    So given the -- the brief context of

13   what is provided here, I don't know if I would

14   know the -- the scope of the entire -- the entire

15   change or the magnitude.

16             I think that the -- and there --

17   there's -- there's very little information in here

18   in terms -- to make an assessment on what -- you

19   know, the -- the entirety of what's happening

20   here.

21             This doesn't really state any

22   quantitative assessment.  But that's not required.

23   I mean, the Standards of Practice don't

24   necessarily require that the actuary quantify some

25   of these coding things.



Page 222

1    there may be a number of different changes going

2    on simultaneously during the course of the year

3    which are projected for the next year.

4         A    Yes.

5         Q    And those changes might cumulatively

6    point in various different directions.

7         A    Okay.

8         Q    Is that right?

9         A    Yes.

10        Q    That's what you're saying?  But what

11   I'm asking is -- holding all the others constant,

12   whatever those others are -- the incremental

13   impact -- CMS would understand, right, that the

14   incremental impact of ceasing a process of

15   identifying and deleting diagnosis codes -- in

16   terms of the risk score -- would have to be in an

17   upward direction, correct?

18              MS. ZUPAC:  Object to form.

19        A    So you're asking for this -- under

20   this bid submission under this here, whether CMS

21   would have known about that question you just

22   asked?

23              So -- so I did inquire -- so I have

24   maybe some background.  I did inquire with Tova

25   Labell, the one, the one from -- from Korn Ferry.



Page 223

1                    I checked with her, and I checked with

2      other -- the points of contact in 2015 and 2012,

3      if they recalled a review of this, and I was not

4      able to confirm that anyone ever recalled or heard

5      or saw it.

6                    I also checked under -- so under this

7      one, 2015, I did check the documentation that was

8      uploaded to HPMS as part of the Korn Ferry's

9      review and their documentation, and I was unable

10     to find any reference to this.

11                   So in -- in doing that, I -- I

12     searched on, like, key words, like the word --

13     words that would stand out in here, like the word

14     "cease" and the word "process," I believe, RAD --

15     the RADV, and the word "adjustor."

16                   So I did try to find if this was

17     reviewed.  I was not able to find any of that in

18     the -- in the -- the contractor's documentation

19     that they necessarily looked at this.

20         Q    So just to understand, so your

21     testimony is that CMS is not sure whether or not,

22     one way or another, this particular language was

23     reviewed by a bid reviewer as part of the review

24     of United's bids; is that your testimony?

25         A    Correct.  I was not able to confirm



Page 224

1   it, whether or not it was actually -- it wasn't

2   documented, and no one -- no one had a

3   recollection.

4            It's kind of -- it was kind of hard

5   too, because the people at Korn Ferry, that staff

6   is gone.

7            So they -- they weren't able to

8   really -- talking to them, to them directly, I

9   wasn't able to provide any information there.

10      Q    So they may have reviewed it and found

11  it was okay, but you just don't know one way or

12  the other?

13      A    Correct.

14      Q    Okay.  And then -- my question,

15  though, was a little different, which is -- my

16  original question, which was:  Do you agree -- do

17  you understand that, that an up -- an adjustment

18  to a risk score projection -- everything else held

19  constant -- an adjustment to a risk score

20  projection to account for the cessation of a

21  program to identify and delete diagnosis codes

22  would be an upward adjustment?

23            MS. ZUPAC:  Object to form.

24      A    I believe that depends on which codes

25  are being deleted in that, that hierarchal



Page 260

1   State of Maryland

2   County of Baltimore, to wit:

3           I, Susan M. Wootton, a Notary Public of the

4   State of Maryland, County of Baltimore, do hereby

5   certify that the within-named witness personally

6   appeared before me at the time and place herein set

7   out, and after having been duly sworn by me, according

8   to law, was examined by counsel.

9           I further certify that the examination was

10  recorded stenographically by me and this is a verbatim

11  transcript of the testimony, as taken stenographically

12  by me, to the best of my ability.

13

14  As witness my hand this _____ day of

15  _____, 2023.

16                      _Susan M Wootton_

                        SUSAN WOOTTON

17                      Notary Public

18

19  My Commission Expires:

20  June 12, 2027

21

22

23

24

25



4455

**EXHIBIT P-39**



# About Us

CMS is the federal agency that provides health coverage to more than 160 million through Medicare, Medicaid, the Children's Health Insurance Program, and the Health Insurance Marketplace. CMS works in partnership with the entire health care community to improve quality, equity and outcomes in the health care system.

## About CMS Topics

Who we are

## Who we are

### CMS Organizational Chart

CMS Organizational Chart (PDF)  see more

### Administrator

Chiquita Brooks-LaSure is the Administrator for the Centers for Medicare and Medicaid... see more

### CMS Brand Identity

4457

CMS Brand Identity Overview see more

## History

CMS' program history Medicare & Medicaid On July 30, 1965, President Lyndon B. Johnson... see more

## Connect with us

### Contact us

Get phone numbers and resources

**Contact us**

### Leadership

Learn about our leaders and how the agency is organized.

**Meet our leaders**

### Careers at CMS

We're hiring! Explore what CMS has to offer, and how you can make an impact.

**Work with us**

4458

# Recent Articles

Press Releases    **07/15/2024**

Statement Attributable to CMS Administrator, Chiquita Brooks-LaSure

---

News Alert    **07/12/2024**

CMS Announces Resources and Flexibilities to Assist with the Public Health Emergency in the State of Texas

---

Fact Sheets    **07/10/2024**

CY 2025 Medicare Hospital Outpatient Prospective Payment System and Ambulatory Surgical Center Payment System Proposed Rule (CMS 1809-P)

---

Press Releases    **07/10/2024**

Biden Harris Administration Proposes Policies to Reduce Maternal Mortality, Advance Health Equity, and Support Underserved Communities

---

**Visit the newsroom  →**


    

A federal government website managed and paid for by the U.S. Centers for Medicare & Medicaid Services.

Case 2:16-cv-08697-FMO-PVC    Document 616-14    Filed 08/06/24    Page 36 of 633
Page ID #:23252

7500 Security Boulevard, Baltimore, MD 21244

4460

**EXHIBIT P-40**

Abid R. Qureshi
Direct Dial: 202.637.2240
abid.qureshi@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, DC 20004-1304
Tel: +1.202.637.2200 Fax: +1.202.637.2201
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Milan |
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New Jersey |
| Brussels | New York |
| Chicago | Orange County |
| Doha | Paris |
| Dubai | Riyadh |
| Düsseldorf | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

July 1, 2014

**VIA E-MAIL**

Carol Wallack
Trial Attorney
Civil Division, Fraud Section
U.S. Department of Justice
601 D Street, NW, Room 9128
Washington, D.C. 20004

Re:    **UnitedHealth Group Updates**

Dear Ms. Wallack:

I write to update you on several issues concerning UnitedHealth Group ("UHG").

*First*, we received your June 16, 2014 email with suggested revisions to the search term proposal outlined in our May 16, 2014 letter. We are reviewing the proposed revisions and analyzing how the changes may impact the amount of potentially responsive documents subject to review. We appreciate the fact that you offered to prioritize certain searches and custodians, and we are focusing our collection and production efforts accordingly. We plan to produce additional documents to you shortly, and on a rolling basis, for all custodians for whom we have active data. This includes all the additional custodians identified by the government except the following individuals: Ken Burdick, Ken Fasola, Ronnie Grower, Pamela Leal, and Kathleen Linder. Each of these individuals ended their respective employment with UHG before the government issued its first request for documents. Nonetheless, UHG intends to produce any responsive communications that any of these individuals had with other custodians for whom active data exists.

*Second*, on June 13, 2014, UHG provided the government with a catalogue of documents and audio recordings subject to the attorney-client privilege and/or attorney work product protection. We are confident that the government will remain mindful of its ethical obligations and associated policies regarding the treatment of privileged materials and will report on any developments regarding this issue so UHG may take appropriate steps. We appreciate your candor with respect to this issue thus far.

EXHIBIT

00327

4462

LATHAM&WATKINS LLP

  *Third*, I wanted to provide you with an update on the Claims Verification program OptumInsight developed to analyze certain diagnosis codes submitted in provider claims data. This program was described during our September 14, 2012 meeting with your colleagues Dick Nicholson, Gretchen Wylegala, Peggy Glynn, Teresa Tetlow, Peggy McFarland, and Jessica Rogers. As Claims Verification has continued to evolve, and based on a number of factors, UnitedHealthcare recently decided to discontinue its utilization of the program. We would be pleased to discuss this development with you or your colleagues if you have any questions or concerns, including as part of a broader discussion of this matter.

<div align="center">*  *  *  *</div>

  Thank for your continued courtesies. Please do not hesitate to contact me if you have any questions or concerns.

          Very truly yours,

          Abid R. Qureshi
          of LATHAM & WATKINS LLP

cc:  Gretchen Wylegala
   Peggy B. Glynn
   Roger S. Goldman
   Daniel Meron

4463

**EXHIBIT P-41**

**(d) Hospice care; election; waiver of rights; revocation; change of election**

(1) Payment under this part may be made for hospice care provided with respect to an individual only during two periods of 90 days each and an unlimited number of subsequent periods of 60 days each during the individual's lifetime and only, with respect to each such period, if the individual makes an election under this paragraph to receive hospice care under this part provided by, or under arrangements made by, a particular hospice program instead of certain other benefits under this subchapter.

(2)(A) Except as provided in subparagraphs (B) and (C) and except in such exceptional and unusual circumstances as the Secretary may provide, if an individual makes such an election for a period with respect to a particular hospice program, the individual shall be deemed to have waived all rights to have payment made under this subchapter with respect to-

(i) hospice care provided by another hospice program (other than under arrangements made by the particular hospice program) during the period, and

(ii) services furnished during the period that are determined (in accordance with guidelines of the Secretary) to be-

(I) related to the treatment of the individual's condition with respect to which a diagnosis of terminal illness has been made or

(II) equivalent to (or duplicative of) hospice care;

except that clause (ii) shall not apply to physicians' services furnished by the individual's attending physician (if not an employee of the hospice program) or to services provided by (or under arrangements made by) the hospice program.

(B) After an individual makes such an election with respect to a 90-day period or a subsequent 60-day period, the individual may revoke the election during the period, in which case-

(i) the revocation shall act as a waiver of the right to have payment made under this part for any hospice care benefits for the remaining time in such period and (for purposes of subsection (a)(4) of this section and subparagraph (A)) the individual shall be deemed to have been provided such benefits during such entire period, and

(ii) the individual may at any time after the revocation execute a new election for a subsequent period, if the individual otherwise is entitled to hospice care benefits with respect to such a period.

(C) An individual may, once in each such period, change the hospice program with respect to which the election is made and such change shall not be considered a revocation of an election under subparagraph (B).

(D) For purposes of this subchapter, an individual's election with respect to a hospice program shall no longer be considered to be in effect with respect to that hospice program after the date the individual's revocation or change of election with respect to that election takes effect.

4465

**EXHIBIT P-42**

<div style="border:1px solid black">

**42 USC 1395x: Definitions**
Text contains those laws in effect on June 27, 2024

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
  CHAPTER 7-SOCIAL SECURITY
  SUBCHAPTER XVIII-HEALTH INSURANCE FOR AGED AND DISABLED
  Part E-Miscellaneous Provisions
**Jump To:**
  **Source Credit**
  **Miscellaneous**
  **References In Text**
  **Amendments**
  **Change of Name**
  **Effective Date**
  **Termination Date**
  **Regulations**
  **Executive Documents**

</div>

# §1395x. Definitions

For purposes of this subchapter-

**(a) Spell of illness**

The term "spell of illness" with respect to any individual means a period of consecutive days-

(1) beginning with the first day (not included in a previous spell of illness) (A) on which such individual is furnished inpatient hospital services, inpatient critical access hospital services or extended care services, and (B) which occurs in a month for which he is entitled to benefits under part A, and

(2) ending with the close of the first period of 60 consecutive days thereafter on each of which he is neither an inpatient of a hospital or critical access hospital nor an inpatient of a facility described in section 1395i–3(a)(1) of this title or subsection (y)(1).

**(b) Inpatient hospital services**

The term "inpatient hospital services" means the following items and services furnished to an inpatient of a hospital and (except as provided in paragraph (3)) by the hospital-

(1) bed and board;

(2) such nursing services and other related services, such use of hospital facilities, and such medical social services as are ordinarily furnished by the hospital for the care and treatment of inpatients, and such drugs, biologicals, supplies, appliances, and equipment, for use in the hospital, as are ordinarily furnished by such hospital for the care and treatment of inpatients; and

(3) such other diagnostic or therapeutic items or services, furnished by the hospital or by others under arrangements with them made by the hospital, as are ordinarily furnished to inpatients either by such hospital or by others under such arrangements;

excluding, however-

(4) medical or surgical services provided by a physician, resident, or intern, services described by subsection (s)(2)(K), certified nurse-midwife services, qualified psychologist services, and services of a certified registered nurse anesthetist; and

(5) the services of a private-duty nurse or other private-duty attendant.

Paragraph (4) shall not apply to services provided in a hospital by-

(6) an intern or a resident-in-training under a teaching program approved by the Council on Medical Education of the American Medical Association or, in the case of an osteopathic hospital, approved by the Committee on Hospitals of the Bureau of Professional Education of the American Osteopathic Association, or, in the case of services in a hospital or osteopathic hospital by an intern or resident-in-training in the field of dentistry, approved by the Council on Dental Education of the American Dental Association, or in the case of services in a hospital or osteopathic hospital by an intern or resident-in-training in the field of podiatry, approved by the Council on Podiatric Medical Education of the American Podiatric Medical Association; or

(7) a physician where the hospital has a teaching program approved as specified in paragraph (6), if (A) the hospital elects to receive any payment due under this subchapter for reasonable costs of such services, and (B) all physicians in such hospital agree not to bill charges for professional services rendered in such hospital to individuals covered under the insurance program established by this subchapter.

**(c) Inpatient psychiatric hospital services**

4467

individual who is an outpatient of a comprehensive outpatient rehabilitation facility under a plan (for furnishing such items and services to such individual) established and periodically reviewed by a physician-

    (A) physicians' services;

    (B) physical therapy, occupational therapy, speech-language pathology services, and respiratory therapy;

    (C) prosthetic and orthotic devices, including testing, fitting, or training in the use of prosthetic and orthotic devices;

    (D) social and psychological services;

    (E) nursing care provided by or under the supervision of a registered professional nurse;

    (F) drugs and biologicals which cannot, as determined in accordance with regulations, be self-administered;

    (G) supplies and durable medical equipment; and

    (H) such other items and services as are medically necessary for the rehabilitation of the patient and are ordinarily furnished by comprehensive outpatient rehabilitation facilities,

excluding, however, any item or service if it would not be included under subsection (b) if furnished to an inpatient of a hospital. In the case of physical therapy, occupational therapy, and speech pathology services, there shall be no requirement that the item or service be furnished at any single fixed location if the item or service is furnished pursuant to such plan and payments are not otherwise made for the item or service under this subchapter.

    (2) The term "comprehensive outpatient rehabilitation facility" means a facility which-

    (A) is primarily engaged in providing (by or under the supervision of physicians) diagnostic, therapeutic, and restorative services to outpatients for the rehabilitation of injured, disabled, or sick persons;

    (B) provides at least the following comprehensive outpatient rehabilitation services: (i) physicians' services (rendered by physicians, as defined in subsection (r)(1), who are available at the facility on a full- or part-time basis); (ii) physical therapy; and (iii) social or psychological services;

    (C) maintains clinical records on all patients;

    (D) has policies established by a group of professional personnel (associated with the facility), including one or more physicians defined in subsection (r)(1) to govern the comprehensive outpatient rehabilitation services it furnishes, and provides for the carrying out of such policies by a full- or part-time physician referred to in subparagraph (B)(i);

    (E) has a requirement that every patient must be under the care of a physician;

    (F) in the case of a facility in any State in which State or applicable local law provides for the licensing of facilities of this nature (i) is licensed pursuant to such law, or (ii) is approved by the agency of such State or locality, responsible for licensing facilities of this nature, as meeting the standards established for such licensing;

    (G) has in effect a utilization review plan in accordance with regulations prescribed by the Secretary;

    (H) has in effect an overall plan and budget that meets the requirements of subsection (z);

    (I) provides the Secretary on a continuing basis with a surety bond in a form specified by the Secretary and in an amount that is not less than $50,000; and

    (J) meets such other conditions of participation as the Secretary may find necessary in the interest of the health and safety of individuals who are furnished services by such facility, including conditions concerning qualifications of personnel in these facilities.

The Secretary may waive the requirement of a surety bond under subparagraph (I) in the case of a facility that provides a comparable surety bond under State law.

**(dd) Hospice care; hospice program; definitions; certification; waiver by Secretary**

    (1) The term "hospice care" means the following items and services provided to a terminally ill individual by, or by others under arrangements made by, a hospice program under a written plan (for providing such care to such individual) established and periodically reviewed by the individual's attending physician and by the medical director (and by the interdisciplinary group described in paragraph (2)(B)) of the program-

    (A) nursing care provided by or under the supervision of a registered professional nurse,

    (B) physical or occupational therapy, or speech-language pathology services,

    (C) medical social services under the direction of a physician,

    (D)(i) services of a home health aide who has successfully completed a training program approved by the Secretary and (ii) homemaker services,

    (E) medical supplies (including drugs and biologicals) and the use of medical appliances, while under such a plan,

    (F) physicians' services,

    (G) short-term inpatient care (including both respite care and procedures necessary for pain control and acute and chronic symptom management) in an inpatient facility meeting such conditions as the Secretary determines to be appropriate to provide such care, but such respite care may be provided only on an intermittent, nonroutine, and occasional basis and may not be provided consecutively over longer than five days,

    (H) counseling (including dietary counseling) with respect to care of the terminally ill individual and adjustment to his death, and

    (I) any other item or service which is specified in the plan and for which payment may otherwise be made under this subchapter.

The care and services described in subparagraphs (A) and (D) may be provided on a 24-hour, continuous basis only during periods of crisis (meeting criteria established by the Secretary) and only as necessary to maintain the terminally

4468

ill individual at home.

(2) The term "hospice program" means a public agency or private organization (or a subdivision thereof) which-

(A)(i) is primarily engaged in providing the care and services described in paragraph (1) and makes such services available (as needed) on a 24-hour basis and which also provides bereavement counseling for the immediate family of terminally ill individuals and services described in section 1395d(a)(5) of this title,

(ii) provides for such care and services in individuals' homes, on an outpatient basis, and on a short-term inpatient basis, directly or under arrangements made by the agency or organization, except that-

(I) the agency or organization must routinely provide directly substantially all of each of the services described in subparagraphs (A), (C), and (H) of paragraph (1), except as otherwise provided in paragraph (5), and

(II) in the case of other services described in paragraph (1) which are not provided directly by the agency or organization, the agency or organization must maintain professional management responsibility for all such services furnished to an individual, regardless of the location or facility in which such services are furnished; and

(iii) provides assurances satisfactory to the Secretary that the aggregate number of days of inpatient care described in paragraph (1)(G) provided in any 12-month period to individuals who have an election in effect under section 1395d(d) of this title with respect to that agency or organization does not exceed 20 percent of the aggregate number of days during that period on which such elections for such individuals are in effect;

(B) has an interdisciplinary group of personnel which-

(i) includes at least-

(I) one physician (as defined in subsection (r)(1)),

(II) one registered professional nurse, and

(III) one social worker, marriage and family therapist, or mental health counselor,

employed by or, in the case of a physician described in subclause (I), under contract with the agency or organization, and also includes at least one pastoral or other counselor,

(ii) provides (or supervises the provision of) the care and services described in paragraph (1), and

(iii) establishes the policies governing the provision of such care and services;

(C) maintains central clinical records on all patients;

(D) does not discontinue the hospice care it provides with respect to a patient because of the inability of the patient to pay for such care;

(E)(i) utilizes volunteers in its provision of care and services in accordance with standards set by the Secretary, which standards shall ensure a continuing level of effort to utilize such volunteers, and (ii) maintains records on the use of these volunteers and the cost savings and expansion of care and services achieved through the use of these volunteers;

(F) in the case of an agency or organization in any State in which State or applicable local law provides for the licensing of agencies or organizations of this nature, is licensed pursuant to such law; and

(G) meets such other requirements as the Secretary may find necessary in the interest of the health and safety of the individuals who are provided care and services by such agency or organization.

(3)(A) An individual is considered to be "terminally ill" if the individual has a medical prognosis that the individual's life expectancy is 6 months or less.

(B) The term "attending physician" means, with respect to an individual, the physician (as defined in subsection (r)(1)), the nurse practitioner (as defined in subsection (aa)(5)), or the physician assistant (as defined in such subsection), who may be employed by a hospice program, whom the individual identifies as having the most significant role in the determination and delivery of medical care to the individual at the time the individual makes an election to receive hospice care.

(4)(A) An entity which is certified as a provider of services other than a hospice program shall be considered, for purposes of certification as a hospice program, to have met any requirements under paragraph (2) which are also the same requirements for certification as such other type of provider. The Secretary shall coordinate surveys for determining certification under this subchapter so as to provide, to the extent feasible, for simultaneous surveys of an entity which seeks to be certified as a hospice program and as a provider of services of another type.

(B) Any entity which is certified as a hospice program and as a provider of another type shall have separate provider agreements under section 1395cc of this title and shall file separate cost reports with respect to costs incurred in providing hospice care and in providing other services and items under this subchapter.

(5)(A) The Secretary may waive the requirements of paragraph (2)(A)(ii)(I) for an agency or organization with respect to all or part of the nursing care described in paragraph (1)(A) if such agency or organization-

(i) is located in an area which is not an urbanized area (as defined by the Bureau of the Census);

(ii) was in operation on or before January 1, 1983; and

(iii) has demonstrated a good faith effort (as determined by the Secretary) to hire a sufficient number of nurses to provide such nursing care directly.

(B) Any waiver, which is in such form and containing such information as the Secretary may require and which is requested by an agency or organization under subparagraph (A) or (C), shall be deemed to be granted unless such

request is denied by the Secretary within 60 days after the date such request is received by the Secretary. The granting of a waiver under subparagraph (A) or (C) shall not preclude the granting of any subsequent waiver request should such a waiver again become necessary.

(C) The Secretary may waive the requirements of paragraph (2)(A)(i) and (2)(A)(ii) for an agency or organization with respect to the services described in paragraph (1)(B) and, with respect to dietary counseling, paragraph (1)(H), if such agency or organization-

    (i) is located in an area which is not an urbanized area (as defined by the Bureau of Census), and

    (ii) demonstrates to the satisfaction of the Secretary that the agency or organization has been unable, despite diligent efforts, to recruit appropriate personnel.


(D) In extraordinary, exigent, or other non-routine circumstances, such as unanticipated periods of high patient loads, staffing shortages due to illness or other events, or temporary travel of a patient outside a hospice program's service area, a hospice program may enter into arrangements with another hospice program for the provision by that other program of services described in paragraph (2)(A)(ii)(I). The provisions of paragraph (2)(A)(ii)(II) shall apply with respect to the services provided under such arrangements.

(E) A hospice program may provide services described in paragraph (1)(A) other than directly by the program if the services are highly specialized services of a registered professional nurse and are provided non-routinely and so infrequently so that the provision of such services directly would be impracticable and prohibitively expensive.

**(ee) Discharge planning process**

(1) A discharge planning process of a hospital shall be considered sufficient if it is applicable to services furnished by the hospital to individuals entitled to benefits under this subchapter and if it meets the guidelines and standards established by the Secretary under paragraph (2).

(2) The Secretary shall develop guidelines and standards for the discharge planning process in order to ensure a timely and smooth transition to the most appropriate type of and setting for post-hospital or rehabilitative care. The guidelines and standards shall include the following:

    (A) The hospital must identify, at an early stage of hospitalization, those patients who are likely to suffer adverse health consequences upon discharge in the absence of adequate discharge planning.

    (B) Hospitals must provide a discharge planning evaluation for patients identified under subparagraph (A) and for other patients upon the request of the patient, patient's representative, or patient's physician.

    (C) Any discharge planning evaluation must be made on a timely basis to ensure that appropriate arrangements for post-hospital care will be made before discharge and to avoid unnecessary delays in discharge.

    (D) A discharge planning evaluation must include an evaluation of a patient's likely need for appropriate post-hospital services, including hospice care and post-hospital extended care services, and the availability of those services, including the availability of home health services through individuals and entities that participate in the program under this subchapter and that serve the area in which the patient resides and that request to be listed by the hospital as available and, in the case of individuals who are likely to need post-hospital extended care services, the availability of such services through facilities that participate in the program under this subchapter and that serve the area in which the patient resides.

    (E) The discharge planning evaluation must be included in the patient's medical record for use in establishing an appropriate discharge plan and the results of the evaluation must be discussed with the patient (or the patient's representative).

    (F) Upon the request of a patient's physician, the hospital must arrange for the development and initial implementation of a discharge plan for the patient.

    (G) Any discharge planning evaluation or discharge plan required under this paragraph must be developed by, or under the supervision of, a registered professional nurse, social worker, or other appropriately qualified personnel.

    (H) Consistent with section 1395a of this title, the discharge plan shall-

        (i) not specify or otherwise limit the qualified provider which may provide post-hospital home health services, and

        (ii) identify (in a form and manner specified by the Secretary) any entity to whom the individual is referred in which the hospital has a disclosable financial interest (as specified by the Secretary consistent with section 1395cc(a)(1)(S) of this title) or which has such an interest in the hospital.


(3) With respect to a discharge plan for an individual who is enrolled with a Medicare+Choice organization under a Medicare+Choice plan and is furnished inpatient hospital services by a hospital under a contract with the organization-

    (A) the discharge planning evaluation under paragraph (2)(D) is not required to include information on the availability of home health services through individuals and entities which do not have a contract with the organization; and

    (B) notwithstanding subparagraph (H)(i) [9], the plan may specify or limit the provider (or providers) of post-hospital home health services or other post-hospital services under the plan.

**(ff) Partial hospitalization services; intensive outpatient services**

(1) The term "partial hospitalization services" means the items and services described in paragraph (2) prescribed by a physician for an individual determined (not less frequently than monthly) by a physician to have a need for such services for a minimum of 20 hours per week and provided under a program described in paragraph (3) under the

4470

**EXHIBIT P-43**

**Risk Model Diagnoses for 2012 Payment Year (2011 data collection year)**
CMS-HCC (MA), CMS-HCC (ESRD, PACE) and RxHCC models (updated March 26, 2012)

Note: Includes Fiscal Year 2012 ICD-9-CM code revisons.
Note: Cost plans include §1876 cost HMOs/CMPs and §1833 HCPPs.

| ICD-9-CM Code | ICD-9-CM Description | CMS-HCC Model Category (MA and cost plans aged/disabled) | CMS-HCC Model Category (ESRD, PACE) | RxHCC Model Category | CMS-HCC Model -- MA and cost plans. Calendar Year 2012 Payment | CMS-HCC Model -- ESRD, PACE. Calendar Year 2012 Payment | RxHCC Model Calendar Year 2012 Payment |
|---|---|---|---|---|---|---|---|
| 0031 | Salmonella septicemia | 2 | 2 | | Yes | Yes | No |
| 00322 | Salmonella pneumonia | 112 | 115 | | Yes | Yes | No |
| 00323 | Salmonella arthritis | 37 | 39 | | Yes | Yes | No |
| 00324 | Salmonella osteomyelitis | 37 | 39 | | Yes | Yes | No |
| 0064 | Amebic lung abscess | 112 | 115 | 106 | Yes | Yes | Yes |
| 0074 | Cryptosporidiosis | 5 | 6 | 5 | Yes | Yes | Yes |
| 0202 | Septicemic plague | 2 | 2 | | Yes | Yes | No |
| 0203 | Primary pneumonic plague | 112 | 115 | | Yes | Yes | No |
| 0204 | Secondary pneumon plague | 112 | 115 | | Yes | Yes | No |
| 0205 | Pneumonic plague NOS | 112 | 115 | | Yes | Yes | No |
| 0212 | Pulmonary tularemia | 112 | 115 | | Yes | Yes | No |
| 0221 | Pulmonary anthrax | 112 | 115 | | Yes | Yes | No |
| 0223 | Anthrax septicemia | 2 | 2 | | Yes | Yes | No |
| 0310 | Pulmonary mycobacteria | 5 | 6 | 5 | Yes | Yes | Yes |
| 0312 | DMAC bacteremia | 5 | 6 | 5 | Yes | Yes | Yes |
| 03283 | Diphtheritic peritonitis | 31 | 33 | | Yes | Yes | No |
| 0362 | Meningococcemia | 2 | 2 | | Yes | Yes | No |
| 0363 | Meningococc adrenal synd | | 23 | 19 | No | Yes | Yes |
| 03682 | Meningococc arthropathy | 37 | 39 | | Yes | Yes | No |
| 0380 | Streptococcal septicemia | 2 | 2 | | Yes | Yes | No |
| 03810 | Staphylcocc septicem NOS | 2 | 2 | | Yes | Yes | No |
| 03811 | Meth susc Staph aur sept | 2 | 2 | | Yes | Yes | No |
| 03812 | MRSA septicemia | 2 | 2 | | Yes | Yes | No |
| 03819 | Staphylcocc septicem NEC | 2 | 2 | | Yes | Yes | No |
| 0382 | Pneumococcal septicemia | 2 | 2 | | Yes | Yes | No |
| 0383 | Anaerobic septicemia | 2 | 2 | | Yes | Yes | No |
| 03840 | Gram-neg septicemia NOS | 2 | 2 | | Yes | Yes | No |
| 03841 | H. influenae septicemia | 2 | 2 | | Yes | Yes | No |
| 03842 | E coli septicemia | 2 | 2 | | Yes | Yes | No |
| 03843 | Pseudomonas septicemia | 2 | 2 | | Yes | Yes | No |
| 03844 | Serratia septicemia | 2 | 2 | | Yes | Yes | No |
| 03849 | Gram-neg septicemia NEC | 2 | 2 | | Yes | Yes | No |
| 0388 | Septicemia NEC | 2 | 2 | | Yes | Yes | No |
| 0389 | Septicemia NOS | 2 | 2 | | Yes | Yes | No |
| 0391 | Pulmonary actinomycosis | 112 | 115 | | Yes | Yes | No |
| 0400 | Gas gangrene | 104 | 106 | | Yes | Yes | No |
| 0402 | Whipple's disease | 32 | | 31 | Yes | No | Yes |
| 04082 | Toxic shock syndrome | 2 | 2 | | Yes | Yes | No |
| 042 | Human immuno virus dis | 1 | 1 | 1 | Yes | Yes | Yes |
| 0460 | Kuru | | 52 | 55 | No | Yes | Yes |
| 04611 | Varnt Creutzfeldt-Jakob | | 52 | 55 | No | Yes | Yes |
| 04619 | Creutzfldt-Jakob NEC/NOS | | 52 | 55 | No | Yes | Yes |
| 0462 | Subac scleros panenceph | | 52 | 55 | No | Yes | Yes |
| 0463 | Prog multifoc leukoencep | | 52 | 55 | No | Yes | Yes |
| 04671 | Gerstmn-Straus-Schnk syn | | 52 | 55 | No | Yes | Yes |
| 04672 | Fatal familial insomnia | | 52 | 55 | No | Yes | Yes |
| 04679 | Prion dis of CNS NEC/NOS | | 52 | 55 | No | Yes | Yes |
| 0468 | Cns slow virus infec NEC | | 52 | 55 | No | Yes | Yes |
| 0469 | Cns slow virus infec NOS | | 52 | 55 | No | Yes | Yes |
| 0522 | Postvaricella myelitis | | 72 | 72 | No | Yes | Yes |
| 05310 | H zoster nerv syst NOS | | | 83 | No | No | Yes |

| 05311 | Geniculate herpes zoster | | | 83 | No | No | Yes |
|-------|--------------------------|---|---|----|-----|-----|-----|
| 05312 | Postherpes trigem neural | | | 83 | No | No | Yes |
| 05313 | Postherpes polyneuropath | | | 83 | No | No | Yes |
| 05314 | Herpes zoster myelitis | | 72 | 72 | No | Yes | Yes |
| 05319 | H zoster nerv syst NEC | | | 83 | No | No | Yes |
| 0545 | Herpetic septicemia | 2 | 2 | | Yes | Yes | No |
| 05474 | Herpes simplex myelitis | | 72 | 72 | No | Yes | Yes |
| 05671 | Arthritis due to rubella | 37 | 39 | | Yes | Yes | No |
| 07022 | Hpt B chrn coma wo dlta | 27 | 29 | 25 | Yes | Yes | Yes |
| 07023 | Hpt B chrn coma w dlta | 27 | 29 | 25 | Yes | Yes | Yes |
| 07032 | Hpt B chrn wo cm wo dlta | 27 | 29 | 25 | Yes | Yes | Yes |
| 07033 | Hpt B chrn wo cm w dlta | 27 | 29 | 25 | Yes | Yes | Yes |
| 07044 | Chrnc hpt C w hepat Coma | 27 | 29 | 25 | Yes | Yes | Yes |
| 07054 | Chrnc hpt C wo hpat Coma | 27 | 29 | 25 | Yes | Yes | Yes |
| 0723 | Mumps pancreatitis | 32 | | | Yes | No | No |
| 0785 | Cytomegaloviral disease | 5 | 6 | 5 | Yes | Yes | Yes |
| 0786 | Hem nephrosonephritis | 132 | 141 | 126 | Yes | Yes | Yes |
| 07953 | Hiv-2 infection oth dis | 1 | 1 | 1 | Yes | Yes | Yes |
| 09487 | Syph rupt cereb aneurysm | 95 | 99 | | Yes | Yes | No |
| 09850 | Gonococcal arthritis | 37 | 39 | | Yes | Yes | No |
| 09851 | Gonococcal synovitis | 37 | 39 | | Yes | Yes | No |
| 09852 | Gonococcal bursitis | 37 | 39 | | Yes | Yes | No |
| 09853 | Gonococcal spondylitis | 37 | 39 | | Yes | Yes | No |
| 09859 | Gc infect joint NEC | 37 | 39 | | Yes | Yes | No |
| 09886 | Gonococcal peritonitis | 31 | 33 | | Yes | Yes | No |
| 0993 | Reiter's disease | | 40 | 41 | No | Yes | Yes |
| 1026 | Yaws of bone & joint | 37 | 39 | | Yes | Yes | No |
| 1124 | Candidiasis of lung | 5 | 6 | 5 | Yes | Yes | Yes |
| 1125 | Disseminated candidiasis | 5 | 6 | 5 | Yes | Yes | Yes |
| 11284 | Candidal esophagitis | 5 | 6 | 5 | Yes | Yes | Yes |
| 1140 | Primary coccidioidomycos | 112 | 115 | 106 | Yes | Yes | Yes |
| 1144 | Ch pl coccidioidomycosis | 112 | 115 | 106 | Yes | Yes | Yes |
| 1145 | Pl cocidioidomycosis NOS | 112 | 115 | 106 | Yes | Yes | Yes |
| 11505 | Histoplasm caps pneumon | 112 | 115 | 106 | Yes | Yes | Yes |
| 11515 | Histoplasm dub pneumonia | 112 | 115 | 106 | Yes | Yes | Yes |
| 11595 | Histoplasmosis pneumonia | 112 | 115 | 106 | Yes | Yes | Yes |
| 1173 | Aspergillosis | 5 | 6 | 5 | Yes | Yes | Yes |
| 1175 | Cryptococcosis | 5 | 6 | 5 | Yes | Yes | Yes |
| 1177 | Zygomycosis | 5 | 6 | 5 | Yes | Yes | Yes |
| 118 | Opportunistic mycoses | | 6 | 5 | No | Yes | Yes |
| 1212 | Paragonimiasis | 112 | 115 | 106 | Yes | Yes | Yes |
| 1221 | Echinococc granul lung | 112 | 115 | 106 | Yes | Yes | Yes |
| 1300 | Toxoplasm meningoenceph | 5 | 6 | 5 | Yes | Yes | Yes |
| 1304 | Toxoplasma pneumonitis | 112 | 6 | 5 | Yes | Yes | Yes |
| 1308 | Multisystem toxoplasmos | 5 | 6 | 5 | Yes | Yes | Yes |
| 135 | Sarcoidosis | | 112 | | No | Yes | No |
| 1361 | Behcet's syndrome | 38 | 40 | 41 | Yes | Yes | Yes |
| 1363 | Pneumocystosis | 5 | 6 | 5 | Yes | Yes | Yes |
| 1410 | Mal neo tongue base | 9 | 11 | | Yes | Yes | No |
| 1411 | Mal neo dorsal tongue | 9 | 11 | | Yes | Yes | No |
| 1412 | Mal neo tip/lat tongue | 9 | 11 | | Yes | Yes | No |
| 1413 | Mal neo ventral tongue | 9 | 11 | | Yes | Yes | No |
| 1414 | Mal neo ant 2/3 tongue | 9 | 11 | | Yes | Yes | No |
| 1415 | Mal neo tongue junction | 9 | 11 | | Yes | Yes | No |
| 1416 | Mal neo lingual tonsil | 9 | 11 | | Yes | Yes | No |
| 1418 | Malig neo tongue NEC | 9 | 11 | | Yes | Yes | No |
| 1419 | Malig neo tongue NOS | 9 | 11 | | Yes | Yes | No |
| 1420 | Malig neo parotid | 9 | 11 | | Yes | Yes | No |
| 1421 | Malig neo submandibular | 9 | 11 | | Yes | Yes | No |
| 1422 | Malig neo sublingual | 9 | 11 | | Yes | Yes | No |
| 1428 | Mal neo maj salivary NEC | 9 | 11 | | Yes | Yes | No |
| 1429 | Mal neo salivary NOS | 9 | 11 | | Yes | Yes | No |
| 1430 | Malig neo upper gum | 9 | 11 | | Yes | Yes | No |
| 1431 | Malig neo lower gum | 9 | 11 | | Yes | Yes | No |

4473

| 1438 | Malig neo gum NEC | 9 | 11 | | Yes | Yes | No |
|------|-------------------|---|----|--|-----|-----|-----|
| 1439 | Malig neo gum NOS | 9 | 11 | | Yes | Yes | No |
| 1440 | Mal neo ant floor mouth | 9 | 11 | | Yes | Yes | No |
| 1441 | Mal neo lat floor mouth | 9 | 11 | | Yes | Yes | No |
| 1448 | Mal neo mouth floor NEC | 9 | 11 | | Yes | Yes | No |
| 1449 | Mal neo mouth floor NOS | 9 | 11 | | Yes | Yes | No |
| 1450 | Mal neo cheek mucosa | 9 | 11 | | Yes | Yes | No |
| 1451 | Mal neo mouth vestibule | 9 | 11 | | Yes | Yes | No |
| 1452 | Malig neo hard palate | 9 | 11 | | Yes | Yes | No |
| 1453 | Malig neo soft palate | 9 | 11 | | Yes | Yes | No |
| 1454 | Malignant neoplasm uvula | 9 | 11 | | Yes | Yes | No |
| 1455 | Malignant neo palate NOS | 9 | 11 | | Yes | Yes | No |
| 1456 | Malig neo retromolar | 9 | 11 | | Yes | Yes | No |
| 1458 | Malig neoplasm mouth NEC | 9 | 11 | | Yes | Yes | No |
| 1459 | Malig neoplasm mouth NOS | 9 | 11 | | Yes | Yes | No |
| 1460 | Malignant neopl tonsil | 9 | 11 | | Yes | Yes | No |
| 1461 | Mal neo tonsillar fossa | 9 | 11 | | Yes | Yes | No |
| 1462 | Mal neo tonsil pillars | 9 | 11 | | Yes | Yes | No |
| 1463 | Malign neopl vallecula | 9 | 11 | | Yes | Yes | No |
| 1464 | Mal neo ant epiglottis | 9 | 11 | | Yes | Yes | No |
| 1465 | Mal neo epiglottis junct | 9 | 11 | | Yes | Yes | No |
| 1466 | Mal neo lat oropharynx | 9 | 11 | | Yes | Yes | No |
| 1467 | Mal neo post oropharynx | 9 | 11 | | Yes | Yes | No |
| 1468 | Mal neo oropharynx NEC | 9 | 11 | | Yes | Yes | No |
| 1469 | Malig neo oropharynx NOS | 9 | 11 | | Yes | Yes | No |
| 1470 | Mal neo super nasopharyn | 9 | 11 | | Yes | Yes | No |
| 1471 | Mal neo post nasopharynx | 9 | 11 | | Yes | Yes | No |
| 1472 | Mal neo lat nasopharynx | 9 | 11 | | Yes | Yes | No |
| 1473 | Mal neo ant nasopharynx | 9 | 11 | | Yes | Yes | No |
| 1478 | Mal neo nasopharynx NEC | 9 | 11 | | Yes | Yes | No |
| 1479 | Mal neo nasopharynx NOS | 9 | 11 | | Yes | Yes | No |
| 1480 | Mal neo postcricoid | 9 | 11 | | Yes | Yes | No |
| 1481 | Mal neo pyriform sinus | 9 | 11 | | Yes | Yes | No |
| 1482 | Mal neo aryepiglott fold | 9 | 11 | | Yes | Yes | No |
| 1483 | Mal neo post hypopharynx | 9 | 11 | | Yes | Yes | No |
| 1488 | Mal neo hypopharynx NEC | 9 | 11 | | Yes | Yes | No |
| 1489 | Mal neo hypopharynx NOS | 9 | 11 | | Yes | Yes | No |
| 1490 | Mal neo pharynx NOS | 9 | 11 | | Yes | Yes | No |
| 1491 | Mal neo waldeyer's ring | 9 | 11 | | Yes | Yes | No |
| 1498 | Mal neo oral/pharynx NEC | 9 | 11 | | Yes | Yes | No |
| 1499 | Mal neo orophryn ill-def | 9 | 11 | | Yes | Yes | No |
| 1500 | Mal neo cervical esophag | 8 | 9 | | Yes | Yes | No |
| 1501 | Mal neo thoracic esophag | 8 | 9 | | Yes | Yes | No |
| 1502 | Mal neo abdomin esophag | 8 | 9 | | Yes | Yes | No |
| 1503 | Mal neo upper 3rd esoph | 8 | 9 | | Yes | Yes | No |
| 1504 | Mal neo middle 3rd esoph | 8 | 9 | | Yes | Yes | No |
| 1505 | Mal neo lower 3rd esoph | 8 | 9 | | Yes | Yes | No |
| 1508 | Mal neo esophagus NEC | 8 | 9 | | Yes | Yes | No |
| 1509 | Mal neo esophagus NOS | 8 | 9 | | Yes | Yes | No |
| 1510 | Mal neo stomach cardia | 8 | 9 | 10 | Yes | Yes | Yes |
| 1511 | Malignant neo pylorus | 8 | 9 | 10 | Yes | Yes | Yes |
| 1512 | Mal neo pyloric antrum | 8 | 9 | 10 | Yes | Yes | Yes |
| 1513 | Mal neo stomach fundus | 8 | 9 | 10 | Yes | Yes | Yes |
| 1514 | Mal neo stomach body | 8 | 9 | 10 | Yes | Yes | Yes |
| 1515 | Mal neo stom lesser curv | 8 | 9 | 10 | Yes | Yes | Yes |
| 1516 | Mal neo stom great curv | 8 | 9 | 10 | Yes | Yes | Yes |
| 1518 | Malig neopl stomach NEC | 8 | 9 | 10 | Yes | Yes | Yes |
| 1519 | Malig neopl stomach NOS | 8 | 9 | 10 | Yes | Yes | Yes |
| 1520 | Malignant neopl duodenum | 8 | 9 | 11 | Yes | Yes | Yes |
| 1521 | Malignant neopl jejunum | 8 | 9 | 11 | Yes | Yes | Yes |
| 1522 | Malignant neoplasm ileum | 8 | 9 | 11 | Yes | Yes | Yes |
| 1523 | Mal neo meckel's divert | 8 | 9 | 11 | Yes | Yes | Yes |
| 1528 | Mal neo small bowel NEC | 8 | 9 | 11 | Yes | Yes | Yes |
| 1529 | Mal neo small bowel NOS | 8 | 9 | 11 | Yes | Yes | Yes |

| 1530 | Mal neo hepatic flexure | 10 | 11 | | Yes | Yes | No |
| 1531 | Mal neo transverse colon | 10 | 11 | | Yes | Yes | No |
| 1532 | Mal neo descend colon | 10 | 11 | | Yes | Yes | No |
| 1533 | Mal neo sigmoid colon | 10 | 11 | | Yes | Yes | No |
| 1534 | Malignant neoplasm cecum | 10 | 11 | | Yes | Yes | No |
| 1535 | Malignant neo appendix | 10 | 11 | | Yes | Yes | No |
| 1536 | Malig neo ascend colon | 10 | 11 | | Yes | Yes | No |
| 1537 | Mal neo splenic flexure | 10 | 11 | | Yes | Yes | No |
| 1538 | Malignant neo colon NEC | 10 | 11 | | Yes | Yes | No |
| 1539 | Malignant neo colon NOS | 10 | 11 | | Yes | Yes | No |
| 1540 | Mal neo rectosigmoid jct | 10 | 11 | | Yes | Yes | No |
| 1541 | Malignant neopl rectum | 10 | 11 | | Yes | Yes | No |
| 1542 | Malig neopl anal canal | 10 | 11 | | Yes | Yes | No |
| 1543 | Malignant neo anus NOS | 10 | 11 | | Yes | Yes | No |
| 1548 | Mal neo rectum/anus NEC | 10 | 11 | | Yes | Yes | No |
| 1550 | Mal neo liver, primary | 8 | 9 | 10 | Yes | Yes | Yes |
| 1551 | Mal neo intrahepat ducts | 8 | 9 | 10 | Yes | Yes | Yes |
| 1552 | Malignant neo liver NOS | 8 | 9 | 10 | Yes | Yes | Yes |
| 1560 | Malig neo gallbladder | 8 | 9 | 11 | Yes | Yes | Yes |
| 1561 | Mal neo extrahepat ducts | 8 | 9 | 11 | Yes | Yes | Yes |
| 1562 | Mal neo ampulla of vater | 8 | 9 | 11 | Yes | Yes | Yes |
| 1568 | Malig neo biliary NEC | 8 | 9 | 11 | Yes | Yes | Yes |
| 1569 | Malig neo biliary NOS | 8 | 9 | 11 | Yes | Yes | Yes |
| 1570 | Mal neo pancreas head | 8 | 9 | 10 | Yes | Yes | Yes |
| 1571 | Mal neo pancreas body | 8 | 9 | 10 | Yes | Yes | Yes |
| 1572 | Mal neo pancreas tail | 8 | 9 | 10 | Yes | Yes | Yes |
| 1573 | Mal neo pancreatic duct | 8 | 9 | 10 | Yes | Yes | Yes |
| 1574 | Mal neo islet langerhans | 8 | 9 | 10 | Yes | Yes | Yes |
| 1578 | Malig neo pancreas NEC | 8 | 9 | 10 | Yes | Yes | Yes |
| 1579 | Malig neo pancreas NOS | 8 | 9 | 10 | Yes | Yes | Yes |
| 1580 | Mal neo retroperitoneum | 8 | 9 | 11 | Yes | Yes | Yes |
| 1588 | Mal neo peritoneum NEC | 8 | 9 | 11 | Yes | Yes | Yes |
| 1589 | Mal neo peritoneum NOS | 8 | 9 | 11 | Yes | Yes | Yes |
| 1590 | Malig neo intestine NOS | 10 | 11 | | Yes | Yes | No |
| 1591 | Malignant neo spleen NEC | 10 | 11 | | Yes | Yes | No |
| 1598 | Mal neo gi/intra-abd NEC | 10 | 11 | | Yes | Yes | No |
| 1599 | Mal neo GI tract ill-def | 10 | 11 | | Yes | Yes | No |
| 1600 | Mal neo nasal cavities | 9 | 11 | | Yes | Yes | No |
| 1601 | Malig neo middle ear | 9 | 11 | | Yes | Yes | No |
| 1602 | Mal neo maxillary sinus | 9 | 11 | | Yes | Yes | No |
| 1603 | Mal neo ethmoidal sinus | 9 | 11 | | Yes | Yes | No |
| 1604 | Malig neo frontal sinus | 9 | 11 | | Yes | Yes | No |
| 1605 | Mal neo sphenoid sinus | 9 | 11 | | Yes | Yes | No |
| 1608 | Mal neo access sinus NEC | 9 | 11 | | Yes | Yes | No |
| 1609 | Mal neo access sinus NOS | 9 | 11 | | Yes | Yes | No |
| 1610 | Malignant neo glottis | 9 | 11 | | Yes | Yes | No |
| 1611 | Malig neo supraglottis | 9 | 11 | | Yes | Yes | No |
| 1612 | Malig neo subglottis | 9 | 11 | | Yes | Yes | No |
| 1613 | Mal neo cartilage larynx | 9 | 11 | | Yes | Yes | No |
| 1618 | Malignant neo larynx NEC | 9 | 11 | | Yes | Yes | No |
| 1619 | Malignant neo larynx NOS | 9 | 11 | | Yes | Yes | No |
| 1620 | Malignant neo trachea | 8 | 9 | 10 | Yes | Yes | Yes |
| 1622 | Malig neo main bronchus | 8 | 9 | 10 | Yes | Yes | Yes |
| 1623 | Mal neo upper lobe lung | 8 | 9 | 10 | Yes | Yes | Yes |
| 1624 | Mal neo middle lobe lung | 8 | 9 | 10 | Yes | Yes | Yes |
| 1625 | Mal neo lower lobe lung | 8 | 9 | 10 | Yes | Yes | Yes |
| 1628 | Mal neo bronch/lung NEC | 8 | 9 | 10 | Yes | Yes | Yes |
| 1629 | Mal neo bronch/lung NOS | 8 | 9 | 10 | Yes | Yes | Yes |
| 1630 | Mal neo parietal pleura | 8 | 9 | 10 | Yes | Yes | Yes |
| 1631 | Mal neo visceral pleura | 8 | 9 | 10 | Yes | Yes | Yes |
| 1638 | Malig neopl pleura NEC | 8 | 9 | 10 | Yes | Yes | Yes |
| 1639 | Malig neopl pleura NOS | 8 | 9 | 10 | Yes | Yes | Yes |
| 1640 | Malignant neopl thymus | 9 | 11 | | Yes | Yes | No |
| 1641 | Malignant neopl heart | 9 | 11 | | Yes | Yes | No |

| 1642 | Mal neo ant mediastinum | 9 | 11 | | Yes | Yes | No |
|------|-------------------------|---|----|---|-----|-----|-----|
| 1643 | Mal neo post mediastinum | 9 | 11 | | Yes | Yes | No |
| 1648 | Mal neo mediastinum NEC | 9 | 11 | | Yes | Yes | No |
| 1649 | Mal neo mediastinum NOS | 9 | 11 | | Yes | Yes | No |
| 1650 | Mal neo upper resp NOS | 9 | 11 | | Yes | Yes | No |
| 1658 | Mal neo thorax/resp NEC | 9 | 11 | | Yes | Yes | No |
| 1659 | Mal neo resp system NOS | 9 | 11 | | Yes | Yes | No |
| 1700 | Mal neo skull/face bone | 9 | 10 | 11 | Yes | Yes | Yes |
| 1701 | Malignant neo mandible | 9 | 10 | 11 | Yes | Yes | Yes |
| 1702 | Malig neo vertebrae | 9 | 10 | 11 | Yes | Yes | Yes |
| 1703 | Mal neo ribs/stern/clav | 9 | 10 | 11 | Yes | Yes | Yes |
| 1704 | Mal neo long bones arm | 9 | 10 | 11 | Yes | Yes | Yes |
| 1705 | Mal neo bones wrist/hand | 9 | 10 | 11 | Yes | Yes | Yes |
| 1706 | Mal neo pelvic girdle | 9 | 10 | 11 | Yes | Yes | Yes |
| 1707 | Mal neo long bones leg | 9 | 10 | 11 | Yes | Yes | Yes |
| 1708 | Mal neo bones ankle/foot | 9 | 10 | 11 | Yes | Yes | Yes |
| 1709 | Malig neopl bone NOS | 9 | 10 | 11 | Yes | Yes | Yes |
| 1710 | Mal neo soft tissue head | 9 | 10 | 10 | Yes | Yes | Yes |
| 1712 | Mal neo soft tissue arm | 9 | 10 | 10 | Yes | Yes | Yes |
| 1713 | Mal neo soft tissue leg | 9 | 10 | 10 | Yes | Yes | Yes |
| 1714 | Mal neo soft tis thorax | 9 | 10 | 10 | Yes | Yes | Yes |
| 1715 | Mal neo soft tis abdomen | 9 | 10 | 9 | Yes | Yes | Yes |
| 1716 | Mal neo soft tis pelvis | 9 | 10 | 10 | Yes | Yes | Yes |
| 1717 | Mal neopl trunk NOS | 9 | 10 | 10 | Yes | Yes | Yes |
| 1718 | Mal neo soft tissue NEC | 9 | 10 | 10 | Yes | Yes | Yes |
| 1719 | Mal neo soft tissue NOS | 9 | 10 | 10 | Yes | Yes | Yes |
| 1720 | Malig melanoma lip | 10 | 12 | | Yes | Yes | No |
| 1721 | Malig melanoma eyelid | 10 | 12 | | Yes | Yes | No |
| 1722 | Malig melanoma ear | 10 | 12 | | Yes | Yes | No |
| 1723 | Mal melanom face NEC/NOS | 10 | 12 | | Yes | Yes | No |
| 1724 | Mal melanoma scalp/neck | 10 | 12 | | Yes | Yes | No |
| 1725 | Malig melanoma trunk | 10 | 12 | | Yes | Yes | No |
| 1726 | Malig melanoma arm | 10 | 12 | | Yes | Yes | No |
| 1727 | Malig melanoma leg | 10 | 12 | | Yes | Yes | No |
| 1728 | Malig melanoma skin NEC | 10 | 12 | | Yes | Yes | No |
| 1729 | Malig melanoma skin NOS | 10 | 12 | | Yes | Yes | No |
| 1740 | Malig neo nipple | 10 | 12 | 10 | Yes | Yes | Yes |
| 1741 | Mal neo breast-central | 10 | 12 | 10 | Yes | Yes | Yes |
| 1742 | Mal neo breast up-inner | 10 | 12 | 10 | Yes | Yes | Yes |
| 1743 | Mal neo breast low-inner | 10 | 12 | 10 | Yes | Yes | Yes |
| 1744 | Mal neo breast up-outer | 10 | 12 | 10 | Yes | Yes | Yes |
| 1745 | Mal neo breast low-outer | 10 | 12 | 10 | Yes | Yes | Yes |
| 1746 | Mal neo breast-axillary | 10 | 12 | 10 | Yes | Yes | Yes |
| 1748 | Malign neopl breast NEC | 10 | 12 | 10 | Yes | Yes | Yes |
| 1749 | Malign neopl breast NOS | 10 | 12 | 10 | Yes | Yes | Yes |
| 1750 | Mal neo male nipple | 10 | 12 | 10 | Yes | Yes | Yes |
| 1759 | Mal neo male breast NEC | 10 | 12 | 10 | Yes | Yes | Yes |
| 1760 | Skin - kaposi's sarcoma | 9 | 10 | 10 | Yes | Yes | Yes |
| 1761 | Sft tisue - kpsi's srcma | 9 | 10 | 10 | Yes | Yes | Yes |
| 1762 | Palate - kpsi's sarcoma | 9 | 10 | 10 | Yes | Yes | Yes |
| 1763 | GI sites - kpsi's srcoma | 9 | 10 | 10 | Yes | Yes | Yes |
| 1764 | Lung - kaposi's sarcoma | 9 | 10 | 10 | Yes | Yes | Yes |
| 1765 | Lym nds - kpsi's sarcoma | 9 | 10 | 10 | Yes | Yes | Yes |
| 1768 | Spf sts - kpsi's sarcoma | 9 | 10 | 10 | Yes | Yes | Yes |
| 1769 | Kaposi's sarcoma NOS | 9 | 10 | 10 | Yes | Yes | Yes |
| 179 | Malig neopl uterus NOS | 10 | 12 | | Yes | Yes | No |
| 1800 | Malig neo endocervix | 10 | 11 | | Yes | Yes | No |
| 1801 | Malig neo exocervix | 10 | 11 | | Yes | Yes | No |
| 1808 | Malig neo cervix NEC | 10 | 11 | | Yes | Yes | No |
| 1809 | Mal neo cervix uteri NOS | 10 | 11 | | Yes | Yes | No |
| 181 | Malignant neopl placenta | 9 | 10 | | Yes | Yes | No |
| 1820 | Malig neo corpus uteri | 10 | 12 | | Yes | Yes | No |
| 1821 | Mal neo uterine isthmus | 10 | 12 | | Yes | Yes | No |
| 1828 | Mal neo body uterus NEC | 10 | 12 | | Yes | Yes | No |

| 1830 | Malign neopl ovary | 9 | 10 | | Yes | Yes | No |
|------|-------------------|---|----|--|-----|-----|----|
| 1832 | Mal neo fallopian tube | 9 | 10 | | Yes | Yes | No |
| 1833 | Mal neo broad ligament | 9 | 10 | | Yes | Yes | No |
| 1834 | Malig neo parametrium | 9 | 10 | | Yes | Yes | No |
| 1835 | Mal neo round ligament | 9 | 10 | | Yes | Yes | No |
| 1838 | Mal neo adnexa NEC | 9 | 10 | | Yes | Yes | No |
| 1839 | Mal neo adnexa NOS | 9 | 10 | | Yes | Yes | No |
| 1840 | Malign neopl vagina | 10 | 11 | | Yes | Yes | No |
| 1841 | Mal neo labia majora | 10 | 11 | | Yes | Yes | No |
| 1842 | Mal neo labia minora | 10 | 11 | | Yes | Yes | No |
| 1843 | Malign neopl clitoris | 10 | 11 | | Yes | Yes | No |
| 1844 | Malign neopl vulva NOS | 10 | 11 | | Yes | Yes | No |
| 1848 | Mal neo female genit NEC | 10 | 11 | | Yes | Yes | No |
| 1849 | Mal neo female genit NOS | 10 | 11 | | Yes | Yes | No |
| 185 | Malign neopl prostate | 10 | 12 | 11 | Yes | Yes | Yes |
| 1860 | Mal neo undescend testis | 10 | 12 | | Yes | Yes | No |
| 1869 | Malig neo testis NEC | 10 | 12 | | Yes | Yes | No |
| 1871 | Malign neopl prepuce | 10 | 12 | | Yes | Yes | No |
| 1872 | Malig neo glans penis | 10 | 12 | | Yes | Yes | No |
| 1873 | Malig neo penis body | 10 | 12 | | Yes | Yes | No |
| 1874 | Malig neo penis NOS | 10 | 12 | | Yes | Yes | No |
| 1875 | Malig neo epididymis | 10 | 12 | | Yes | Yes | No |
| 1876 | Mal neo spermatic cord | 10 | 12 | | Yes | Yes | No |
| 1877 | Malign neopl scrotum | 10 | 12 | | Yes | Yes | No |
| 1878 | Mal neo male genital NEC | 10 | 12 | | Yes | Yes | No |
| 1879 | Mal neo male genital NOS | 10 | 12 | | Yes | Yes | No |
| 1880 | Mal neo bladder-trigone | 10 | 11 | | Yes | Yes | No |
| 1881 | Mal neo bladder-dome | 10 | 11 | | Yes | Yes | No |
| 1882 | Mal neo bladder-lateral | 10 | 11 | | Yes | Yes | No |
| 1883 | Mal neo bladder-anterior | 10 | 11 | | Yes | Yes | No |
| 1884 | Mal neo bladder-post | 10 | 11 | | Yes | Yes | No |
| 1885 | Mal neo bladder neck | 10 | 11 | | Yes | Yes | No |
| 1886 | Mal neo ureteric orifice | 10 | 11 | | Yes | Yes | No |
| 1887 | Malig neo urachus | 10 | 11 | | Yes | Yes | No |
| 1888 | Malig neo bladder NEC | 10 | 11 | | Yes | Yes | No |
| 1889 | Malig neo bladder NOS | 10 | 11 | | Yes | Yes | No |
| 1890 | Malig neopl kidney | 10 | 11 | 10 | Yes | Yes | Yes |
| 1891 | Malig neo renal pelvis | 10 | 11 | 10 | Yes | Yes | Yes |
| 1892 | Malign neopl ureter | 10 | 11 | | Yes | Yes | No |
| 1893 | Malign neopl urethral | 10 | 11 | | Yes | Yes | No |
| 1894 | Mal neo paraurethral | 10 | 11 | | Yes | Yes | No |
| 1898 | Mal neo urinary NEC | 10 | 11 | | Yes | Yes | No |
| 1899 | Mal neo urinary NOS | 10 | 11 | | Yes | Yes | No |
| 1900 | Malign neopl eyeball | 10 | 12 | | Yes | Yes | No |
| 1901 | Malign neopl orbit | 10 | 12 | | Yes | Yes | No |
| 1902 | Mal neo lacrimal gland | 10 | 12 | | Yes | Yes | No |
| 1903 | Mal neo conjunctiva | 10 | 12 | | Yes | Yes | No |
| 1904 | Malign neopl cornea | 10 | 12 | | Yes | Yes | No |
| 1905 | Malign neopl retina | 10 | 12 | | Yes | Yes | No |
| 1906 | Malign neopl choroid | 10 | 12 | | Yes | Yes | No |
| 1907 | Mal neo lacrimal duct | 10 | 12 | | Yes | Yes | No |
| 1908 | Malign neopl eye NEC | 10 | 12 | | Yes | Yes | No |
| 1909 | Malign neopl eye NOS | 10 | 12 | | Yes | Yes | No |
| 1910 | Malign neopl cerebrum | 9 | 10 | 11 | Yes | Yes | Yes |
| 1911 | Malig neo frontal lobe | 9 | 10 | 11 | Yes | Yes | Yes |
| 1912 | Mal neo temporal lobe | 9 | 10 | 11 | Yes | Yes | Yes |
| 1913 | Mal neo parietal lobe | 9 | 10 | 11 | Yes | Yes | Yes |
| 1914 | Mal neo occipital lobe | 9 | 10 | 11 | Yes | Yes | Yes |
| 1915 | Mal neo cereb ventricle | 9 | 10 | 11 | Yes | Yes | Yes |
| 1916 | Mal neo cerebellum NOS | 9 | 10 | 11 | Yes | Yes | Yes |
| 1917 | Mal neo brain stem | 9 | 10 | 11 | Yes | Yes | Yes |
| 1918 | Malig neo brain NEC | 9 | 10 | 11 | Yes | Yes | Yes |
| 1919 | Malig neo brain NOS | 9 | 10 | 11 | Yes | Yes | Yes |
| 1920 | Mal neo cranial nerves | 9 | 10 | 11 | Yes | Yes | Yes |

| 1921 | Mal neo cerebral mening | 9 | 10 | 11 | Yes | Yes | Yes |
|------|------------------------|----|----|----|-----|-----|-----|
| 1922 | Mal neo spinal cord | 9 | 10 | 11 | Yes | Yes | Yes |
| 1923 | Mal neo spinal meninges | 9 | 10 | 11 | Yes | Yes | Yes |
| 1928 | Mal neo nervous syst NEC | 9 | 10 | 11 | Yes | Yes | Yes |
| 1929 | Mal neo nervous syst NOS | 9 | 10 | 11 | Yes | Yes | Yes |
| 193 | Malign neopl thyroid | 10 | 12 | 11 | Yes | Yes | Yes |
| 1940 | Malign neopl adrenal | 9 | 10 | 11 | Yes | Yes | Yes |
| 1941 | Malig neo parathyroid | 10 | 12 | 11 | Yes | Yes | Yes |
| 1943 | Malig neo pituitary | 9 | 10 | 11 | Yes | Yes | Yes |
| 1944 | Malign neo pineal gland | 9 | 10 | 11 | Yes | Yes | Yes |
| 1945 | Mal neo carotid body | 10 | 12 | 11 | Yes | Yes | Yes |
| 1946 | Mal neo paraganglia NEC | 10 | 12 | 11 | Yes | Yes | Yes |
| 1948 | Mal neo endocrine NEC | 10 | 12 | 11 | Yes | Yes | Yes |
| 1949 | Mal neo endocrine NOS | 10 | 12 | 11 | Yes | Yes | Yes |
| 1950 | Mal neo head/face/neck | 10 | 12 | | Yes | Yes | No |
| 1951 | Malign neopl thorax | 10 | 12 | | Yes | Yes | No |
| 1952 | Malig neo abdomen | 10 | 12 | | Yes | Yes | No |
| 1953 | Malign neopl pelvis | 10 | 12 | | Yes | Yes | No |
| 1954 | Malign neopl arm | 10 | 12 | | Yes | Yes | No |
| 1955 | Malign neopl leg | 10 | 12 | | Yes | Yes | No |
| 1958 | Malig neo site NEC | 10 | 12 | | Yes | Yes | No |
| 1960 | Mal neo lymph-head/neck | 7 | 8 | | Yes | Yes | No |
| 1961 | Mal neo lymph-intrathor | 7 | 8 | | Yes | Yes | No |
| 1962 | Mal neo lymph intra-abd | 7 | 8 | | Yes | Yes | No |
| 1963 | Mal neo lymph-axilla/arm | 7 | 10 | 11 | Yes | Yes | Yes |
| 1965 | Mal neo lymph-inguin/leg | 7 | 8 | | Yes | Yes | No |
| 1966 | Mal neo lymph-intrapelv | 7 | 8 | | Yes | Yes | No |
| 1968 | Mal neo lymph node-mult | 7 | 8 | | Yes | Yes | No |
| 1969 | Mal neo lymph node NOS | 7 | 10 | 11 | Yes | Yes | Yes |
| 1970 | Secondary malig neo lung | 7 | 8 | 10 | Yes | Yes | Yes |
| 1971 | Sec mal neo mediastinum | 7 | 8 | 10 | Yes | Yes | Yes |
| 1972 | Second malig neo pleura | 7 | 8 | 10 | Yes | Yes | Yes |
| 1973 | Sec malig neo resp NEC | 7 | 8 | 10 | Yes | Yes | Yes |
| 1974 | Sec malig neo sm bowel | 7 | 8 | 10 | Yes | Yes | Yes |
| 1975 | Sec malig neo lg bowel | 7 | 8 | 10 | Yes | Yes | Yes |
| 1976 | Sec mal neo peritoneum | 7 | 8 | 10 | Yes | Yes | Yes |
| 1977 | Second malig neo liver | 7 | 8 | 10 | Yes | Yes | Yes |
| 1978 | Sec mal neo GI NEC | 7 | 8 | 10 | Yes | Yes | Yes |
| 1980 | Second malig neo kidney | 7 | 8 | 11 | Yes | Yes | Yes |
| 1981 | Sec malig neo urin NEC | 7 | 8 | 11 | Yes | Yes | Yes |
| 1982 | Secondary malig neo skin | 7 | 10 | | Yes | Yes | No |
| 1983 | Sec mal neo brain/spine | 7 | 8 | | Yes | Yes | No |
| 1984 | Sec malig neo nerve NEC | 7 | 8 | | Yes | Yes | No |
| 1985 | Secondary malig neo bone | 7 | 8 | 10 | Yes | Yes | Yes |
| 1986 | Second malig neo ovary | 7 | 8 | 11 | Yes | Yes | Yes |
| 1987 | Second malig neo adrenal | 7 | 8 | 11 | Yes | Yes | Yes |
| 19881 | Second malig neo breast | 7 | 10 | | Yes | Yes | No |
| 19882 | Second malig neo genital | 7 | 10 | | Yes | Yes | No |
| 19889 | Secondary malig neo NEC | 7 | 8 | 11 | Yes | Yes | Yes |
| 1990 | Malig neo disseminated | 7 | 8 | 11 | Yes | Yes | Yes |
| 1991 | Malignant neoplasm NOS | 10 | 12 | | Yes | Yes | No |
| 1992 | Malig neopl-transp organ | 10 | 12 | | Yes | Yes | No |
| 20000 | Retclsrc unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20001 | Reticulosarcoma head | 9 | 10 | | Yes | Yes | No |
| 20002 | Reticulosarcoma thorax | 9 | 10 | | Yes | Yes | No |
| 20003 | Reticulosarcoma abdom | 9 | 10 | | Yes | Yes | No |
| 20004 | Reticulosarcoma axilla | 9 | 10 | | Yes | Yes | No |
| 20005 | Reticulosarcoma inguin | 9 | 10 | | Yes | Yes | No |
| 20006 | Reticulosarcoma pelvic | 9 | 10 | | Yes | Yes | No |
| 20007 | Reticulosarcoma spleen | 9 | 10 | | Yes | Yes | No |
| 20008 | Reticulosarcoma mult | 9 | 10 | | Yes | Yes | No |
| 20010 | Lymphsrc unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20011 | Lymphosarcoma head | 9 | 10 | | Yes | Yes | No |
| 20012 | Lymphosarcoma thorax | 9 | 10 | | Yes | Yes | No |

| 20013 | Lymphosarcoma abdom | 9 | 10 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 20014 | Lymphosarcoma axilla | 9 | 10 | | Yes | Yes | No |
| 20015 | Lymphosarcoma inguin | 9 | 10 | | Yes | Yes | No |
| 20016 | Lymphosarcoma pelvic | 9 | 10 | | Yes | Yes | No |
| 20017 | Lymphosarcoma spleen | 9 | 10 | | Yes | Yes | No |
| 20018 | Lymphosarcoma mult | 9 | 10 | | Yes | Yes | No |
| 20020 | Brkt tmr unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20021 | Burkitt's tumor head | 9 | 10 | | Yes | Yes | No |
| 20022 | Burkitt's tumor thorax | 9 | 10 | | Yes | Yes | No |
| 20023 | Burkitt's tumor abdom | 9 | 10 | | Yes | Yes | No |
| 20024 | Burkitt's tumor axilla | 9 | 10 | | Yes | Yes | No |
| 20025 | Burkitt's tumor inguin | 9 | 10 | | Yes | Yes | No |
| 20026 | Burkitt's tumor pelvic | 9 | 10 | | Yes | Yes | No |
| 20027 | Burkitt's tumor spleen | 9 | 10 | | Yes | Yes | No |
| 20028 | Burkitt's tumor mult | 9 | 10 | | Yes | Yes | No |
| 20030 | Margnl zone lym xtrndl | 9 | 10 | | Yes | Yes | No |
| 20031 | Margin zone lym head | 9 | 10 | | Yes | Yes | No |
| 20032 | Margin zone lym thorax | 9 | 10 | | Yes | Yes | No |
| 20033 | Margin zone lym abdom | 9 | 10 | | Yes | Yes | No |
| 20034 | Margin zone lym axilla | 9 | 10 | | Yes | Yes | No |
| 20035 | Margin zone lym inguin | 9 | 10 | | Yes | Yes | No |
| 20036 | Margin zone lym pelvic | 9 | 10 | | Yes | Yes | No |
| 20037 | Margin zone lymph spleen | 9 | 10 | | Yes | Yes | No |
| 20038 | Margin zone lymph multip | 9 | 10 | | Yes | Yes | No |
| 20040 | Mantle cell lym xtrrndl | 9 | 10 | | Yes | Yes | No |
| 20041 | Mantle cell lymph head | 9 | 10 | | Yes | Yes | No |
| 20042 | Mantle cell lymph thorax | 9 | 10 | | Yes | Yes | No |
| 20043 | Mantle cell lymph abdom | 9 | 10 | | Yes | Yes | No |
| 20044 | Mantle cell lymph axilla | 9 | 10 | | Yes | Yes | No |
| 20045 | Mantle cell lymph inguin | 9 | 10 | | Yes | Yes | No |
| 20046 | Mantle cell lymph pelvic | 9 | 10 | | Yes | Yes | No |
| 20047 | Mantle cell lymph spleen | 9 | 10 | | Yes | Yes | No |
| 20048 | Mantle cell lymph multip | 9 | 10 | | Yes | Yes | No |
| 20050 | Primary CNS lymph xtrndl | 9 | 10 | | Yes | Yes | No |
| 20051 | Primary CNS lymph head | 9 | 10 | | Yes | Yes | No |
| 20052 | Primary CNS lymph thorax | 9 | 10 | | Yes | Yes | No |
| 20053 | Primary CNS lymph abdom | 9 | 10 | | Yes | Yes | No |
| 20054 | Primary CNS lymph axilla | 9 | 10 | | Yes | Yes | No |
| 20055 | Primary CNS lym inguin | 9 | 10 | | Yes | Yes | No |
| 20056 | Primary CNS lymph pelvic | 9 | 10 | | Yes | Yes | No |
| 20057 | Primary CNS lymph spleen | 9 | 10 | | Yes | Yes | No |
| 20058 | Primary CNS lymph multip | 9 | 10 | | Yes | Yes | No |
| 20060 | Anaplastic lymph xtrndl | 9 | 10 | | Yes | Yes | No |
| 20061 | Anaplastic lymph head | 9 | 10 | | Yes | Yes | No |
| 20062 | Anaplastic lymph thorax | 9 | 10 | | Yes | Yes | No |
| 20063 | Anaplastic lymph abdom | 9 | 10 | | Yes | Yes | No |
| 20064 | Anaplastic lymph axilla | 9 | 10 | | Yes | Yes | No |
| 20065 | Anaplastic lymph inguin | 9 | 10 | | Yes | Yes | No |
| 20066 | Anaplastic lymph pelvic | 9 | 10 | | Yes | Yes | No |
| 20067 | Anaplastic lymph spleen | 9 | 10 | | Yes | Yes | No |
| 20068 | Anaplastic lymph multip | 9 | 10 | | Yes | Yes | No |
| 20070 | Large cell lymph xtrndl | 9 | 10 | | Yes | Yes | No |
| 20071 | Large cell lymphoma head | 9 | 10 | | Yes | Yes | No |
| 20072 | Large cell lymph thorax | 9 | 10 | | Yes | Yes | No |
| 20073 | Large cell lymph abdom | 9 | 10 | | Yes | Yes | No |
| 20074 | Large cell lymph axilla | 9 | 10 | | Yes | Yes | No |
| 20075 | Large cell lymph inguin | 9 | 10 | | Yes | Yes | No |
| 20076 | Large cell lymph pelvic | 9 | 10 | | Yes | Yes | No |
| 20077 | Large cell lymph spleen | 9 | 10 | | Yes | Yes | No |
| 20078 | Large cell lymph multip | 9 | 10 | | Yes | Yes | No |
| 20080 | Oth varn unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20081 | Mixed lymphosarc head | 9 | 10 | | Yes | Yes | No |
| 20082 | Mixed lymphosarc thorax | 9 | 10 | | Yes | Yes | No |
| 20083 | Mixed lymphosarc abdom | 9 | 10 | | Yes | Yes | No |

| 20084 | Mixed lymphosarc axilla | 9 | 10 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 20085 | Mixed lymphosarc inguin | 9 | 10 | | Yes | Yes | No |
| 20086 | Mixed lymphosarc pelvic | 9 | 10 | | Yes | Yes | No |
| 20087 | Mixed lymphosarc spleen | 9 | 10 | | Yes | Yes | No |
| 20088 | Mixed lymphosarc mult | 9 | 10 | | Yes | Yes | No |
| 20100 | Hdgk prg unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20101 | Hodgkins paragran head | 9 | 10 | | Yes | Yes | No |
| 20102 | Hodgkins paragran thorax | 9 | 10 | | Yes | Yes | No |
| 20103 | Hodgkins paragran abdom | 9 | 10 | | Yes | Yes | No |
| 20104 | Hodgkins paragran axilla | 9 | 10 | | Yes | Yes | No |
| 20105 | Hodgkins paragran inguin | 9 | 10 | | Yes | Yes | No |
| 20106 | Hodgkins paragran pelvic | 9 | 10 | | Yes | Yes | No |
| 20107 | Hodgkins paragran spleen | 9 | 10 | | Yes | Yes | No |
| 20108 | Hodgkins paragran mult | 9 | 10 | | Yes | Yes | No |
| 20110 | Hdgk grn unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20111 | Hodgkins granulom head | 9 | 10 | | Yes | Yes | No |
| 20112 | Hodgkins granulom thorax | 9 | 10 | | Yes | Yes | No |
| 20113 | Hodgkins granulom abdom | 9 | 10 | | Yes | Yes | No |
| 20114 | Hodgkins granulom axilla | 9 | 10 | | Yes | Yes | No |
| 20115 | Hodgkins granulom inguin | 9 | 10 | | Yes | Yes | No |
| 20116 | Hodgkins granulom pelvic | 9 | 10 | | Yes | Yes | No |
| 20117 | Hodgkins granulom spleen | 9 | 10 | | Yes | Yes | No |
| 20118 | Hodgkins granulom mult | 9 | 10 | | Yes | Yes | No |
| 20120 | Hdgk src unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20121 | Hodgkins sarcoma head | 9 | 10 | | Yes | Yes | No |
| 20122 | Hodgkins sarcoma thorax | 9 | 10 | | Yes | Yes | No |
| 20123 | Hodgkins sarcoma abdom | 9 | 10 | | Yes | Yes | No |
| 20124 | Hodgkins sarcoma axilla | 9 | 10 | | Yes | Yes | No |
| 20125 | Hodgkins sarcoma inguin | 9 | 10 | | Yes | Yes | No |
| 20126 | Hodgkins sarcoma pelvic | 9 | 10 | | Yes | Yes | No |
| 20127 | Hodgkins sarcoma spleen | 9 | 10 | | Yes | Yes | No |
| 20128 | Hodgkins sarcoma mult | 9 | 10 | | Yes | Yes | No |
| 20140 | Lym-hst unsp xtrndl orgn | 9 | 10 | | Yes | Yes | No |
| 20141 | Hodg lymph-histio head | 9 | 10 | | Yes | Yes | No |
| 20142 | Hodg lymph-histio thorax | 9 | 10 | | Yes | Yes | No |
| 20143 | Hodg lymph-histio abdom | 9 | 10 | | Yes | Yes | No |
| 20144 | Hodg lymph-histio axilla | 9 | 10 | | Yes | Yes | No |
| 20145 | Hodg lymph-histio inguin | 9 | 10 | | Yes | Yes | No |
| 20146 | Hodg lymph-histio pelvic | 9 | 10 | | Yes | Yes | No |
| 20147 | Hodg lymph-histio spleen | 9 | 10 | | Yes | Yes | No |
| 20148 | Hodg lymph-histio mult | 9 | 10 | | Yes | Yes | No |
| 20150 | Ndr sclr unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20151 | Hodg nodul sclero head | 9 | 10 | | Yes | Yes | No |
| 20152 | Hodg nodul sclero thorax | 9 | 10 | | Yes | Yes | No |
| 20153 | Hodg nodul sclero abdom | 9 | 10 | | Yes | Yes | No |
| 20154 | Hodg nodul sclero axilla | 9 | 10 | | Yes | Yes | No |
| 20155 | Hodg nodul sclero inguin | 9 | 10 | | Yes | Yes | No |
| 20156 | Hodg nodul sclero pelvic | 9 | 10 | | Yes | Yes | No |
| 20157 | Hodg nodul sclero spleen | 9 | 10 | | Yes | Yes | No |
| 20158 | Hodg nodul sclero mult | 9 | 10 | | Yes | Yes | No |
| 20160 | Mxd celr unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20161 | Hodgkins mix cell head | 9 | 10 | | Yes | Yes | No |
| 20162 | Hodgkins mix cell thorax | 9 | 10 | | Yes | Yes | No |
| 20163 | Hodgkins mix cell abdom | 9 | 10 | | Yes | Yes | No |
| 20164 | Hodgkins mix cell axilla | 9 | 10 | | Yes | Yes | No |
| 20165 | Hodgkins mix cell inguin | 9 | 10 | | Yes | Yes | No |
| 20166 | Hodgkins mix cell pelvic | 9 | 10 | | Yes | Yes | No |
| 20167 | Hodgkins mix cell spleen | 9 | 10 | | Yes | Yes | No |
| 20168 | Hodgkins mix cell mult | 9 | 10 | | Yes | Yes | No |
| 20170 | Lym dplt unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20171 | Hodg lymph deplet head | 9 | 10 | | Yes | Yes | No |
| 20172 | Hodg lymph deplet thorax | 9 | 10 | | Yes | Yes | No |
| 20173 | Hodg lymph deplet abdom | 9 | 10 | | Yes | Yes | No |
| 20174 | Hodg lymph deplet axilla | 9 | 10 | | Yes | Yes | No |

| 20175 | Hodg lymph deplet inguin | 9 | 10 | | Yes | Yes | No |
| 20176 | Hodg lymph deplet pelvic | 9 | 10 | | Yes | Yes | No |
| 20177 | Hodg lymph deplet spleen | 9 | 10 | | Yes | Yes | No |
| 20178 | Hodg lymph deplet mult | 9 | 10 | | Yes | Yes | No |
| 20190 | Hdgk dis unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20191 | Hodgkins dis NOS head | 9 | 10 | | Yes | Yes | No |
| 20192 | Hodgkins dis NOS thorax | 9 | 10 | | Yes | Yes | No |
| 20193 | Hodgkins dis NOS abdom | 9 | 10 | | Yes | Yes | No |
| 20194 | Hodgkins dis NOS axilla | 9 | 10 | | Yes | Yes | No |
| 20195 | Hodgkins dis NOS inguin | 9 | 10 | | Yes | Yes | No |
| 20196 | Hodgkins dis NOS pelvic | 9 | 10 | | Yes | Yes | No |
| 20197 | Hodgkins dis NOS spleen | 9 | 10 | | Yes | Yes | No |
| 20198 | Hodgkins dis NOS mult | 9 | 10 | | Yes | Yes | No |
| 20200 | Ndlr lym unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20201 | Nodular lymphoma head | 9 | 10 | | Yes | Yes | No |
| 20202 | Nodular lymphoma thorax | 9 | 10 | | Yes | Yes | No |
| 20203 | Nodular lymphoma abdom | 9 | 10 | | Yes | Yes | No |
| 20204 | Nodular lymphoma axilla | 9 | 10 | | Yes | Yes | No |
| 20205 | Nodular lymphoma inguin | 9 | 10 | | Yes | Yes | No |
| 20206 | Nodular lymphoma pelvic | 9 | 10 | | Yes | Yes | No |
| 20207 | Nodular lymphoma spleen | 9 | 10 | | Yes | Yes | No |
| 20208 | Nodular lymphoma mult | 9 | 10 | | Yes | Yes | No |
| 20210 | Mycs fng unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20211 | Mycosis fungoides head | 9 | 10 | | Yes | Yes | No |
| 20212 | Mycosis fungoides thorax | 9 | 10 | | Yes | Yes | No |
| 20213 | Mycosis fungoides abdom | 9 | 10 | | Yes | Yes | No |
| 20214 | Mycosis fungoides axilla | 9 | 10 | | Yes | Yes | No |
| 20215 | Mycosis fungoides inguin | 9 | 10 | | Yes | Yes | No |
| 20216 | Mycosis fungoides pelvic | 9 | 10 | | Yes | Yes | No |
| 20217 | Mycosis fungoides spleen | 9 | 10 | | Yes | Yes | No |
| 20218 | Mycosis fungoides mult | 9 | 10 | | Yes | Yes | No |
| 20220 | Szry dis unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20221 | Sezary's disease head | 9 | 10 | | Yes | Yes | No |
| 20222 | Sezary's disease thorax | 9 | 10 | | Yes | Yes | No |
| 20223 | Sezary's disease abdom | 9 | 10 | | Yes | Yes | No |
| 20224 | Sezary's disease axilla | 9 | 10 | | Yes | Yes | No |
| 20225 | Sezary's disease inguin | 9 | 10 | | Yes | Yes | No |
| 20226 | Sezary's disease pelvic | 9 | 10 | | Yes | Yes | No |
| 20227 | Sezary's disease spleen | 9 | 10 | | Yes | Yes | No |
| 20228 | Sezary's disease mult | 9 | 10 | | Yes | Yes | No |
| 20230 | Mlg hist unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20231 | Mal histiocytosis head | 9 | 10 | | Yes | Yes | No |
| 20232 | Mal histiocytosis thorax | 9 | 10 | | Yes | Yes | No |
| 20233 | Mal histiocytosis abdom | 9 | 10 | | Yes | Yes | No |
| 20234 | Mal histiocytosis axilla | 9 | 10 | | Yes | Yes | No |
| 20235 | Mal histiocytosis inguin | 9 | 10 | | Yes | Yes | No |
| 20236 | Mal histiocytosis pelvic | 9 | 10 | | Yes | Yes | No |
| 20237 | Mal histiocytosis spleen | 9 | 10 | | Yes | Yes | No |
| 20238 | Mal histiocytosis mult | 9 | 10 | | Yes | Yes | No |
| 20240 | Lk rctl unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20241 | Hairy-cell leukem head | 9 | 10 | | Yes | Yes | No |
| 20242 | Hairy-cell leukem thorax | 9 | 10 | | Yes | Yes | No |
| 20243 | Hairy-cell leukem abdom | 9 | 10 | | Yes | Yes | No |
| 20244 | Hairy-cell leukem axilla | 9 | 10 | | Yes | Yes | No |
| 20245 | Hairy-cell leukem inguin | 9 | 10 | | Yes | Yes | No |
| 20246 | Hairy-cell leukem pelvic | 9 | 10 | | Yes | Yes | No |
| 20247 | Hairy-cell leukem spleen | 9 | 10 | | Yes | Yes | No |
| 20248 | Hairy-cell leukem mult | 9 | 10 | | Yes | Yes | No |
| 20250 | Ltr-siwe unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20251 | Letterer-siwe dis head | 9 | 10 | | Yes | Yes | No |
| 20252 | Letterer-siwe dis thorax | 9 | 10 | | Yes | Yes | No |
| 20253 | Letterer-siwe dis abdom | 9 | 10 | | Yes | Yes | No |
| 20254 | Letterer-siwe dis axilla | 9 | 10 | | Yes | Yes | No |
| 20255 | Letterer-siwe dis inguin | 9 | 10 | | Yes | Yes | No |

| 20256 | Letterer-siwe dis pelvic | 9 | 10 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 20257 | Letterer-siwe dis spleen | 9 | 10 | | Yes | Yes | No |
| 20258 | Letterer-siwe dis mult | 9 | 10 | | Yes | Yes | No |
| 20260 | Mlg mast unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20261 | Mal mastocytosis head | 9 | 10 | | Yes | Yes | No |
| 20262 | Mal mastocytosis thorax | 9 | 10 | | Yes | Yes | No |
| 20263 | Mal mastocytosis abdom | 9 | 10 | | Yes | Yes | No |
| 20264 | Mal mastocytosis axilla | 9 | 10 | | Yes | Yes | No |
| 20265 | Mal mastocytosis inguin | 9 | 10 | | Yes | Yes | No |
| 20266 | Mal mastocytosis pelvic | 9 | 10 | | Yes | Yes | No |
| 20267 | Mal mastocytosis spleen | 9 | 10 | | Yes | Yes | No |
| 20268 | Mal mastocytosis mult | 9 | 10 | | Yes | Yes | No |
| 20270 | Periph T cell lym xtrndl | 9 | 10 | | Yes | Yes | No |
| 20271 | Periph T cell lymph head | 9 | 10 | | Yes | Yes | No |
| 20272 | Periph T cell lym thorax | 9 | 10 | | Yes | Yes | No |
| 20273 | Periph T cell lym abdom | 9 | 10 | | Yes | Yes | No |
| 20274 | Periph T cell lym axilla | 9 | 10 | | Yes | Yes | No |
| 20275 | Periph T cell lym inguin | 9 | 10 | | Yes | Yes | No |
| 20276 | Periph T cell lym pelvic | 9 | 10 | | Yes | Yes | No |
| 20277 | Periph T cell lym spleen | 9 | 10 | | Yes | Yes | No |
| 20278 | Periph T cell lym multip | 9 | 10 | | Yes | Yes | No |
| 20280 | Oth lymp unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20281 | Lymphomas NEC head | 9 | 10 | | Yes | Yes | No |
| 20282 | Lymphomas NEC thorax | 9 | 10 | | Yes | Yes | No |
| 20283 | Lymphomas NEC abdom | 9 | 10 | | Yes | Yes | No |
| 20284 | Lymphomas NEC axilla | 9 | 10 | | Yes | Yes | No |
| 20285 | Lymphomas NEC inguin | 9 | 10 | | Yes | Yes | No |
| 20286 | Lymphomas NEC pelvic | 9 | 10 | | Yes | Yes | No |
| 20287 | Lymphomas NEC spleen | 9 | 10 | | Yes | Yes | No |
| 20288 | Lymphomas NEC mult | 9 | 10 | | Yes | Yes | No |
| 20290 | Unsp lym unsp xtrndl org | 9 | 10 | | Yes | Yes | No |
| 20291 | Lymphoid mal NEC head | 9 | 10 | | Yes | Yes | No |
| 20292 | Lymphoid mal NEC thorax | 9 | 10 | | Yes | Yes | No |
| 20293 | Lymphoid mal NEC abdom | 9 | 10 | | Yes | Yes | No |
| 20294 | Lymphoid mal NEC axilla | 9 | 10 | | Yes | Yes | No |
| 20295 | Lymphoid mal NEC inguin | 9 | 10 | | Yes | Yes | No |
| 20296 | Lymphoid mal NEC pelvic | 9 | 10 | | Yes | Yes | No |
| 20297 | Lymphoid mal NEC spleen | 9 | 10 | | Yes | Yes | No |
| 20298 | Lymphoid mal NEC mult | 9 | 10 | | Yes | Yes | No |
| 20300 | Mult mye w/o achv rmson | 9 | 9 | 9 | Yes | Yes | Yes |
| 20301 | Mult myelm w remission | 9 | 9 | 9 | Yes | Yes | Yes |
| 20302 | Mult myeloma in relapse | 9 | 9 | 9 | Yes | Yes | Yes |
| 20310 | Pls cl leu w/o achv rmsn | 9 | 9 | 9 | Yes | Yes | Yes |
| 20311 | Plsm cell leuk w rmson | 9 | 9 | 9 | Yes | Yes | Yes |
| 20312 | Plsm cel leuk in relapse | 9 | 9 | 9 | Yes | Yes | Yes |
| 20380 | Oth imno npl wo ach rmsn | 9 | 9 | 9 | Yes | Yes | Yes |
| 20381 | Oth imnprfl npl w rmsn | 9 | 9 | 9 | Yes | Yes | Yes |
| 20382 | Oth imnprlf neo-relapse | 9 | 9 | 9 | Yes | Yes | Yes |
| 20400 | Ac lym leuk wo achv rmsn | 7 | 8 | 11 | Yes | Yes | Yes |
| 20401 | Act lym leuk w rmson | 7 | 8 | 11 | Yes | Yes | Yes |
| 20402 | Act lymp leuk in relapse | 7 | 8 | 11 | Yes | Yes | Yes |
| 20410 | Ch lym leuk wo achv rmsn | 9 | 10 | | Yes | Yes | No |
| 20411 | Chr lym leuk w rmsion | 9 | 10 | | Yes | Yes | No |
| 20412 | Chr lymp leuk in relapse | 9 | 10 | | Yes | Yes | No |
| 20420 | Sbac lym leu wo ach rmsn | 9 | 10 | | Yes | Yes | No |
| 20421 | Sbac lym leuk w rmsion | 9 | 10 | | Yes | Yes | No |
| 20422 | Sbac lym leuk in relapse | 9 | 10 | | Yes | Yes | No |
| 20480 | Oth lym leu wo achv rmsn | 9 | 10 | | Yes | Yes | No |
| 20481 | Oth lym leuk w rmsion | 9 | 10 | | Yes | Yes | No |
| 20482 | Oth lym leuk in relapse | 9 | 10 | | Yes | Yes | No |
| 20490 | Uns lym leu wo ach rmsn | 9 | 10 | | Yes | Yes | No |
| 20491 | Uns lym leuk w rmsion | 9 | 10 | | Yes | Yes | No |
| 20492 | Lymp leuk NOS relapse | 9 | 10 | | Yes | Yes | No |
| 20500 | Ac myl leuk wo achv rmsn | 7 | 8 | | Yes | Yes | No |

| 20501 | Act myl leuk w rmsion | 7 | 8 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 20502 | Act myel leuk in relapse | 7 | 8 | | Yes | Yes | No |
| 20510 | Ch myl leuk wo achv rmsn | 8 | 9 | 8 | Yes | Yes | Yes |
| 20511 | Chr myl leuk w rmsion | 8 | 9 | 8 | Yes | Yes | Yes |
| 20512 | Chr myel leuk in relapse | 8 | 9 | 8 | Yes | Yes | Yes |
| 20520 | Sbac myl leu wo ach rmsn | 8 | 9 | 8 | Yes | Yes | Yes |
| 20521 | Sbac myl leuk w rmsion | 8 | 9 | 8 | Yes | Yes | Yes |
| 20522 | Sbac myl leuk in relapse | 8 | 9 | 8 | Yes | Yes | Yes |
| 20530 | Myl sarcoma wo achv rmsn | 8 | 9 | 8 | Yes | Yes | Yes |
| 20531 | Myl srcoma w rmsion | 8 | 9 | 8 | Yes | Yes | Yes |
| 20532 | Myel sarcoma in relapse | 8 | 9 | 8 | Yes | Yes | Yes |
| 20580 | Oth my leuk wo achv rmsn | 8 | 9 | 8 | Yes | Yes | Yes |
| 20581 | Oth myl leuk w rmsion | 8 | 9 | 8 | Yes | Yes | Yes |
| 20582 | Oth myel leuk in relapse | 8 | 9 | 8 | Yes | Yes | Yes |
| 20590 | Uns my leu wo ach rmsn | 8 | 9 | 8 | Yes | Yes | Yes |
| 20591 | Uns myl leuk w rmsion | 8 | 9 | 8 | Yes | Yes | Yes |
| 20592 | Myel leuk NOS in relapse | 8 | 9 | 8 | Yes | Yes | Yes |
| 20600 | Ac mono leu wo achv rmsn | 7 | 8 | 11 | Yes | Yes | Yes |
| 20601 | Act mono leuk w rmsion | 7 | 8 | 11 | Yes | Yes | Yes |
| 20602 | Act mono leuk in relapse | 7 | 8 | 11 | Yes | Yes | Yes |
| 20610 | Ch mono leu wo achv rmsn | 8 | 9 | 8 | Yes | Yes | Yes |
| 20611 | Chr mono leuk w rmsion | 8 | 9 | 8 | Yes | Yes | Yes |
| 20612 | Chr mono leuk in relapse | 8 | 9 | 8 | Yes | Yes | Yes |
| 20620 | Sbac mno leu wo ach rmsn | 8 | 9 | 8 | Yes | Yes | Yes |
| 20621 | Sbac mono leuk w rmsion | 8 | 9 | 8 | Yes | Yes | Yes |
| 20622 | Sbac mono leu in relapse | 8 | 9 | 8 | Yes | Yes | Yes |
| 20680 | Ot mono leu wo achv rmsn | 8 | 9 | 8 | Yes | Yes | Yes |
| 20681 | Oth mono leuk w rmsion | 8 | 9 | 8 | Yes | Yes | Yes |
| 20682 | Oth mono leuk in relapse | 8 | 9 | 8 | Yes | Yes | Yes |
| 20690 | Uns mno leu wo ach rmsn | 8 | 9 | 8 | Yes | Yes | Yes |
| 20691 | Uns mono leuk w rmsion | 8 | 9 | 8 | Yes | Yes | Yes |
| 20692 | Mono leuk NOS relapse | 8 | 9 | 8 | Yes | Yes | Yes |
| 20700 | Ac erth/erlk wo ach rmsn | 7 | 8 | 11 | Yes | Yes | Yes |
| 20701 | Act erth/erylk w rmson | 7 | 8 | 11 | Yes | Yes | Yes |
| 20702 | Ac erth/erylk in relapse | 7 | 8 | 11 | Yes | Yes | Yes |
| 20710 | Chr erythrm w/o ach rmsn | 8 | 9 | 8 | Yes | Yes | Yes |
| 20711 | Chr erythrm w remision | 8 | 9 | 8 | Yes | Yes | Yes |
| 20712 | Chr erythrmia in relapse | 8 | 9 | 8 | Yes | Yes | Yes |
| 20720 | Mgkrcyt leuk wo ach rmsn | 8 | 9 | 8 | Yes | Yes | Yes |
| 20721 | Mgkrycyt leuk w rmsion | 8 | 9 | 8 | Yes | Yes | Yes |
| 20722 | Mgkrycyt leuk in relapse | 8 | 9 | 8 | Yes | Yes | Yes |
| 20780 | Oth leuk w/o achv rmsn | 8 | 9 | 8 | Yes | Yes | Yes |
| 20781 | Oth spf leuk w remsion | 8 | 9 | 8 | Yes | Yes | Yes |
| 20782 | Oth spf leuk in relapse | 8 | 9 | 8 | Yes | Yes | Yes |
| 20800 | Ac leu un cl wo ach rmsn | 7 | 8 | 11 | Yes | Yes | Yes |
| 20801 | Act leuk uns cl w rmson | 7 | 8 | 11 | Yes | Yes | Yes |
| 20802 | Ac leuk uns cl relapse | 7 | 8 | 11 | Yes | Yes | Yes |
| 20810 | Ch leu un cl wo ach rmsn | 9 | 10 | | Yes | Yes | No |
| 20811 | Chr leuk uns cl w rmson | 9 | 10 | | Yes | Yes | No |
| 20812 | Ch leu uns cl in relapse | 9 | 10 | | Yes | Yes | No |
| 20820 | Sbc leu un cl wo ah rmsn | 9 | 10 | | Yes | Yes | No |
| 20821 | Sbac leuk uns cl w rmson | 9 | 10 | | Yes | Yes | No |
| 20822 | Sbac leu uns cl-relapse | 9 | 10 | | Yes | Yes | No |
| 20880 | Ot leu un cl wo ach rmsn | 9 | 10 | | Yes | Yes | No |
| 20881 | Oth leuk uns cl w rmson | 9 | 10 | | Yes | Yes | No |
| 20882 | Oth leuk uns cl-relapse | 9 | 10 | | Yes | Yes | No |
| 20890 | Leuk NOS w/o achv rmsn | 9 | 10 | | Yes | Yes | No |
| 20891 | Leukemia NOS w remission | 9 | 10 | | Yes | Yes | No |
| 20892 | Leukemia NOS in relapse | 9 | 10 | | Yes | Yes | No |
| 20900 | Mal crenoid sm intst NOS | 10 | 12 | 11 | Yes | Yes | Yes |
| 20901 | Malig carcinoid duodenum | 10 | 12 | 11 | Yes | Yes | Yes |
| 20902 | Malig carcinoid jejunum | 10 | 12 | 11 | Yes | Yes | Yes |
| 20903 | Malig carcinoid ileum | 10 | 12 | 11 | Yes | Yes | Yes |
| 20910 | Mal crenoid lg intst NOS | 10 | 12 | 11 | Yes | Yes | Yes |

| 20911 | Malig carcinoid appendix | 10 | 12 | 11 | Yes | Yes | Yes |
| 20912 | Malig carcinoid cecum | 10 | 12 | 11 | Yes | Yes | Yes |
| 20913 | Mal crcnoid ascend colon | 10 | 12 | 11 | Yes | Yes | Yes |
| 20914 | Mal crcnoid transv colon | 10 | 12 | 11 | Yes | Yes | Yes |
| 20915 | Mal carcinoid desc colon | 10 | 12 | 11 | Yes | Yes | Yes |
| 20916 | Mal carcinoid sig colon | 10 | 12 | 11 | Yes | Yes | Yes |
| 20917 | Malig carcinoid rectum | 10 | 12 | 11 | Yes | Yes | Yes |
| 20920 | Mal crcnd prim site unkn | 10 | 12 | 11 | Yes | Yes | Yes |
| 20921 | Mal carcinoid bronc/lung | 10 | 12 | 11 | Yes | Yes | Yes |
| 20922 | Malig carcinoid thymus | 10 | 12 | 11 | Yes | Yes | Yes |
| 20923 | Malig carcinoid stomach | 10 | 12 | 11 | Yes | Yes | Yes |
| 20924 | Malig carcinoid kidney | 10 | 12 | 11 | Yes | Yes | Yes |
| 20925 | Mal carcnoid foregut NOS | 10 | 12 | 11 | Yes | Yes | Yes |
| 20926 | Mal carcinoid midgut NOS | 10 | 12 | 11 | Yes | Yes | Yes |
| 20927 | Mal carcnoid hindgut NOS | 10 | 12 | 11 | Yes | Yes | Yes |
| 20929 | Malig carcinoid oth site | 10 | 12 | 11 | Yes | Yes | Yes |
| 20930 | Malig neuroendo ca NOS | 10 | 12 | 11 | Yes | Yes | Yes |
| 20931 | Merkel cell ca-face | 10 | 12 | 11 | Yes | Yes | Yes |
| 20932 | Merkel cell ca-sclp/neck | 10 | 12 | 11 | Yes | Yes | Yes |
| 20933 | Merkel cell ca-up limb | 10 | 12 | 11 | Yes | Yes | Yes |
| 20934 | Merkel cell ca-low limb | 10 | 12 | 11 | Yes | Yes | Yes |
| 20935 | Merkel cell ca-trunk | 10 | 12 | 11 | Yes | Yes | Yes |
| 20936 | Merkel cell ca-oth sites | 10 | 12 | 11 | Yes | Yes | Yes |
| 20970 | Sec neuroend tumor NOS | 7 | 8 | 11 | Yes | Yes | Yes |
| 20971 | Sec neuroend tu dist lym | 7 | 8 |  | Yes | Yes | No |
| 20972 | Sec neuroend tumor-liver | 7 | 8 | 10 | Yes | Yes | Yes |
| 20973 | Sec neuroend tumor-bone | 7 | 8 | 10 | Yes | Yes | Yes |
| 20974 | Sec neuroendo tu-periton | 7 | 8 | 10 | Yes | Yes | Yes |
| 20975 | Secondary Merkel cell ca | 7 | 8 | 11 | Yes | Yes | Yes |
| 20979 | Sec neuroend tu oth site | 7 | 8 | 11 | Yes | Yes | Yes |
| 2250 | Benign neoplasm brain | 10 | 12 | 11 | Yes | Yes | Yes |
| 2251 | Benign neo cranial nerve | 10 | 12 | 11 | Yes | Yes | Yes |
| 2252 | Ben neo cerebr meninges | 10 | 12 | 11 | Yes | Yes | Yes |
| 2253 | Benign neo spinal cord | 10 | 12 | 11 | Yes | Yes | Yes |
| 2254 | Ben neo spinal meninges | 10 | 12 | 11 | Yes | Yes | Yes |
| 2258 | Benign neo nerv sys NEC | 10 | 12 | 11 | Yes | Yes | Yes |
| 2259 | Benign neo nerv sys NOS | 10 | 12 | 11 | Yes | Yes | Yes |
| 2273 | Benign neo pituitary | 10 | 12 | 11 | Yes | Yes | Yes |
| 2274 | Ben neopl pineal gland | 10 | 12 | 11 | Yes | Yes | Yes |
| 22802 | Hemangioma intracranial | 10 | 12 | 11 | Yes | Yes | Yes |
| 2370 | Unc behav neo pituitary | 10 | 12 |  | Yes | Yes | No |
| 2371 | Unc behav neo pineal | 10 | 12 |  | Yes | Yes | No |
| 2373 | Unc behav neo paragang | 10 | 12 |  | Yes | Yes | No |
| 2375 | Unc beh neo brain/spinal | 10 | 12 |  | Yes | Yes | No |
| 2376 | Unc behav neo meninges | 10 | 12 |  | Yes | Yes | No |
| 23770 | Neurofibromatosis NOS | 10 | 12 |  | Yes | Yes | No |
| 23771 | Neurofibromatosis type I | 10 | 12 |  | Yes | Yes | No |
| 23772 | Neurofibromatosis typ II | 10 | 12 |  | Yes | Yes | No |
| 23773 | Schwannomatosis | 10 | 12 |  | Yes | Yes | No |
| 23779 | Neurofibromatosis NEC | 10 | 12 |  | Yes | Yes | No |
| 2379 | Unc beh neo nerv sys NEC | 10 | 12 |  | Yes | Yes | No |
| 2384 | Polycythemia vera |  | 48 |  | No | Yes | No |
| 2386 | Plasmacytoma NOS |  |  | 9 | No | No | Yes |
| 23871 | Essntial thrombocythemia |  | 48 |  | No | Yes | No |
| 23872 | Low grde myelody syn les | 44 | 46 | 48 | Yes | Yes | Yes |
| 23873 | Hi grde myelodys syn les | 44 | 46 | 9 | Yes | Yes | Yes |
| 23874 | Myelodyspls syn w 5q del | 44 | 46 | 9 | Yes | Yes | Yes |
| 23875 | Myelodysplastic synd NOS | 44 | 46 | 48 | Yes | Yes | Yes |
| 23876 | Myelofi w myelo metaplas |  | 46 | 9 | No | Yes | Yes |
| 23877 | Post tp lymphprolif dis |  | 48 | 50 | No | Yes | Yes |
| 23879 | Lymph/hematpoitc tis NEC |  | 48 | 50 | No | Yes | Yes |
| 2396 | Brain neoplasm NOS | 10 | 12 |  | Yes | Yes | No |
| 2400 | Simple goiter |  |  | 20 | No | No | Yes |
| 2409 | Goiter NOS |  |  | 20 | No | No | Yes |

| 2410 | Nontox uninodular goiter | | | 20 | No | No | Yes |
|---|---|---|---|---|---|---|---|
| 2411 | Nontox multinodul goiter | | | 20 | No | No | Yes |
| 2419 | Nontox nodul goiter NOS | | | 20 | No | No | Yes |
| 24200 | Tox dif goiter no crisis | | | 20 | No | No | Yes |
| 24201 | Tox dif goiter w crisis | | | 20 | No | No | Yes |
| 24210 | Tox uninod goit no cris | | | 20 | No | No | Yes |
| 24211 | Tox uninod goit w crisis | | | 20 | No | No | Yes |
| 24220 | Tox multnod goit no cris | | | 20 | No | No | Yes |
| 24221 | Tox multnod goit w cris | | | 20 | No | No | Yes |
| 24230 | Tox nod goiter no crisis | | | 20 | No | No | Yes |
| 24231 | Tox nod goiter w crisis | | | 20 | No | No | Yes |
| 24240 | Thyrotox-ect nod no cris | | | 20 | No | No | Yes |
| 24241 | Thyrotox-ect nod w cris | | | 20 | No | No | Yes |
| 24280 | Thyrtox orig NEC no cris | | | 20 | No | No | Yes |
| 24281 | Thyrtox orig NEC w cris | | | 20 | No | No | Yes |
| 24290 | Thyrotox NOS no crisis | | | 20 | No | No | Yes |
| 24291 | Thyrotox NOS w crisis | | | 20 | No | No | Yes |
| 243 | Congenital hypothyroidsm | | | 20 | No | No | Yes |
| 2440 | Postsurgical hypothyroid | | | 20 | No | No | Yes |
| 2441 | Postablat hypothyr NEC | | | 20 | No | No | Yes |
| 2442 | Iodine hypothyroidism | | | 20 | No | No | Yes |
| 2443 | Iatrogen hypothyroid NEC | | | 20 | No | No | Yes |
| 2448 | Acquired hypothyroid NEC | | | 20 | No | No | Yes |
| 2449 | Hypothyroidism NOS | | | 20 | No | No | Yes |
| 2450 | Acute thyroiditis | | | 20 | No | No | Yes |
| 2451 | Subacute thyroiditis | | | 20 | No | No | Yes |
| 2452 | Chr lymphocyt thyroidit | | | 20 | No | No | Yes |
| 2453 | Chr fibrous thyroiditis | | | 20 | No | No | Yes |
| 2454 | Iatrogenic thyroiditis | | | 20 | No | No | Yes |
| 2458 | Chr thyroiditis NEC/NOS | | | 20 | No | No | Yes |
| 2459 | Thyroiditis NOS | | | 20 | No | No | Yes |
| 2460 | Dis thyrocalciton secret | | | 20 | No | No | Yes |
| 2461 | Dyshormonogenic goiter | | | 20 | No | No | Yes |
| 2462 | Cyst of thyroid | | | 20 | No | No | Yes |
| 2463 | Hemorr/infarc thyroid | | | 20 | No | No | Yes |
| 2468 | Disorders of thyroid NEC | | | 20 | No | No | Yes |
| 2469 | Disorder of thyroid NOS | | | 20 | No | No | Yes |
| 24900 | Sec DM wo cmp nt st uncn | 19 | 19 | 15 | Yes | Yes | Yes |
| 24901 | Sec DM wo comp uncontrld | 19 | 19 | 15 | Yes | Yes | Yes |
| 24910 | Sec DM keto nt st uncntr | 17 | 17 | 14 | Yes | Yes | Yes |
| 24911 | Sec DM ketoacd uncntrld | 17 | 17 | 14 | Yes | Yes | Yes |
| 24920 | Sec DM hpros nt st uncnr | 17 | 17 | 14 | Yes | Yes un | Yes |
| 24921 | Sec DM hprosmlr uncntrld | 17 | 17 | 14 | Yes | Yes | Yes |
| 24930 | Sec DM ot cma nt st uncn | 17 | 17 | 14 | Yes | Yes un | Yes |
| 24931 | Sec DM oth coma uncntrld | 17 | 17 | 14 | Yes | Yes | Yes |
| 24940 | Sec DM renl nt st uncntr | 15 | 18 | 14 | Yes | Yes | Yes |
| 24941 | Sec DM renal uncontrld | 15 | 18 | 14 | Yes | Yes | Yes |
| 24950 | Sec DM ophth nt st uncn | 18 | 18 | 14 | Yes | Yes | Yes |
| 24951 | Sec DM ophth uncontrld | 18 | 18 | 14 | Yes | Yes | Yes |
| 24960 | Sec DM neuro nt st uncn | 16 | 18 | 14 | Yes | Yes | Yes |
| 24961 | Sec DM neuro uncontrld | 16 | 18 | 14 | Yes | Yes | Yes |
| 24970 | Sec DM circ nt st uncntr | 15 | 18 | 14 | Yes | Yes | Yes |
| 24971 | Sec DM circ uncontrld | 15 | 18 | 14 | Yes | Yes | Yes |
| 24980 | Sec DM oth nt st uncontr | 16 | 18 | 14 | Yes | Yes | Yes |
| 24981 | Sec DM other uncontrld | 16 | 18 | 14 | Yes | Yes | Yes |
| 24990 | Sec DM unsp nt st uncon | 18 | 18 | 14 | Yes | Yes | Yes |
| 24991 | Sec DM unsp uncontrold | 18 | 18 | 14 | Yes | Yes | Yes |
| 25000 | DMII wo cmp nt st uncntr | 19 | 19 | 15 | Yes | Yes | Yes |
| 25001 | DMI wo cmp nt st uncntrl | 19 | 19 | 15 | Yes | Yes | Yes |
| 25002 | DMII wo cmp uncntrld | 19 | 19 | 15 | Yes | Yes | Yes |
| 25003 | DMI wo cmp uncntrld | 19 | 19 | 15 | Yes | Yes | Yes |
| 25010 | DMII keto nt st uncntrld | 17 | 17 | 14 | Yes | Yes | Yes |
| 25011 | DMI keto nt st uncntrld | 17 | 17 | 14 | Yes | Yes | Yes |
| 25012 | DMII ketoacd uncontrold | 17 | 17 | 14 | Yes | Yes | Yes |

| 25013 | DMI ketoacd uncontrold | 17 | 17 | 14 | Yes | Yes | Yes |
|-------|------------------------|----|----|----|-----|-----|-----|
| 25020 | DMII hprsm st st uncntrl | 17 | 17 | 14 | Yes | Yes | Yes |
| 25021 | DMI hprsm nt st uncntrld | 17 | 17 | 14 | Yes | Yes | Yes |
| 25022 | DMII hprosmlr uncontrold | 17 | 17 | 14 | Yes | Yes | Yes |
| 25023 | DMI hprosmlr uncontrold | 17 | 17 | 14 | Yes | Yes | Yes |
| 25030 | DMII o cm nt st uncntrld | 17 | 17 | 14 | Yes | Yes | Yes |
| 25031 | DMI o cm nt st uncntrld | 17 | 17 | 14 | Yes | Yes | Yes |
| 25032 | DMII oth coma uncontrold | 17 | 17 | 14 | Yes | Yes | Yes |
| 25033 | DMI oth coma uncontrold | 17 | 17 | 14 | Yes | Yes | Yes |
| 25040 | DMII renl nt st uncntrld | 15 | 18 | 14 | Yes | Yes | Yes |
| 25041 | DMI renl nt st uncntrld | 15 | 18 | 14 | Yes | Yes | Yes |
| 25042 | DMII renal uncntrld | 15 | 18 | 14 | Yes | Yes | Yes |
| 25043 | DMI renal uncntrld | 15 | 18 | 14 | Yes | Yes | Yes |
| 25050 | DMII ophth nt st uncntrl | 18 | 18 | 14 | Yes | Yes | Yes |
| 25051 | DMI ophth nt st uncntrld | 18 | 18 | 14 | Yes | Yes | Yes |
| 25052 | DMII ophth uncntrld | 18 | 18 | 14 | Yes | Yes | Yes |
| 25053 | DMI ophth uncntrld | 18 | 18 | 14 | Yes | Yes | Yes |
| 25060 | DMII neuro nt st uncntrl | 16 | 18 | 14 | Yes | Yes | Yes |
| 25061 | DMI neuro nt st uncntrld | 16 | 18 | 14 | Yes | Yes | Yes |
| 25062 | DMII neuro uncntrld | 16 | 18 | 14 | Yes | Yes | Yes |
| 25063 | DMI neuro uncntrld | 16 | 18 | 14 | Yes | Yes | Yes |
| 25070 | DMII circ nt st uncntrld | 15 | 18 | 14 | Yes | Yes | Yes |
| 25071 | DMI circ nt st uncntrld | 15 | 18 | 14 | Yes | Yes | Yes |
| 25072 | DMII circ uncntrld | 15 | 18 | 14 | Yes | Yes | Yes |
| 25073 | DMI circ uncntrld | 15 | 18 | 14 | Yes | Yes | Yes |
| 25080 | DMII oth nt st uncntrld | 16 | 18 | 14 | Yes | Yes | Yes |
| 25081 | DMI oth nt st uncntrld | 16 | 18 | 14 | Yes | Yes | Yes |
| 25082 | DMII oth uncntrld | 16 | 18 | 14 | Yes | Yes | Yes |
| 25083 | DMI oth uncntrld | 16 | 18 | 14 | Yes | Yes | Yes |
| 25090 | DMII unspf nt st uncntrl | 18 | 18 | 14 | Yes | Yes | Yes |
| 25091 | DMI unspf nt st uncntrld | 18 | 18 | 14 | Yes | Yes | Yes |
| 25092 | DMII unspf uncntrld | 18 | 18 | 14 | Yes | Yes | Yes |
| 25093 | DMI unspf uncntrld | 18 | 18 | 14 | Yes | Yes | Yes |
| 2510 | Hypoglycemic coma | | 23 | | No | Yes | No |
| 2514 | Abn secretion glucagon | 32 | | 31 | Yes | No | Yes |
| 2515 | Abnorm secretion gastrin | 32 | | 31 | Yes | No | Yes |
| 2518 | Pancreatic disorder NEC | 32 | | 31 | Yes | No | Yes |
| 2519 | Pancreatic disorder NOS | 32 | | 31 | Yes | No | Yes |
| 25200 | Hyperparathyroidism NOS | | 23 | 19 | No | Yes | Yes |
| 25201 | Primary hyperparathyroid | | 23 | 19 | No | Yes | Yes |
| 25202 | Sec hyprprthyrd nonrenal | | 23 | 19 | No | Yes | Yes |
| 25208 | Hyperparathyroidism NEC | | 23 | 19 | No | Yes | Yes |
| 2521 | Hypoparathyroidism | | 23 | 19 | No | Yes | Yes |
| 2528 | Parathyroid disorder NEC | | 23 | 19 | No | Yes | Yes |
| 2529 | Parathyroid disorder NOS | | 23 | 19 | No | Yes | Yes |
| 2530 | Acromegaly and gigantism | | 23 | 18 | No | Yes | Yes |
| 2531 | Ant pituit hyperfunc NEC | | 23 | 18 | No | Yes | Yes |
| 2532 | Panhypopituitarism | | 23 | 18 | No | Yes | Yes |
| 2533 | Pituitary dwarfism | | 23 | 18 | No | Yes | Yes |
| 2534 | Anter pituitary dis NEC | | 23 | 18 | No | Yes | Yes |
| 2535 | Diabetes insipidus | | 23 | 18 | No | Yes | Yes |
| 2536 | Neurohypophysis dis NEC | | 23 | 19 | No | Yes | Yes |
| 2537 | Iatrogenic pituitary dis | | 23 | 19 | No | Yes | Yes |
| 2538 | Pituitary disorder NEC | | 23 | 19 | No | Yes | Yes |
| 2539 | Pituitary disorder NOS | | 23 | 19 | No | Yes | Yes |
| 2540 | Persist hyperplas thymus | | 23 | 19 | No | Yes | Yes |
| 2541 | Abscess of thymus | | 23 | 19 | No | Yes | Yes |
| 2548 | Diseases of thymus NEC | | 23 | 19 | No | Yes | Yes |
| 2549 | Disease of thymus NOS | | 23 | 19 | No | Yes | Yes |
| 2550 | Cushing's syndrome | | 23 | 19 | No | Yes | Yes |
| 25510 | Hyperaldosteronism NOS | | 23 | 19 | No | Yes | Yes |
| 25511 | Glucrtcod-rem aldsternsm | | 23 | 19 | No | Yes | Yes |
| 25512 | Conn's syndrome | | 23 | 19 | No | Yes | Yes |
| 25513 | Bartter's syndrome | | 23 | 19 | No | Yes | Yes |

| 25514 | Secondry aldosternsm NEC | | 23 | 19 | No | Yes | Yes |
|---|---|---|---|---|---|---|---|
| 2552 | Adrenogenital disorders | | 23 | 19 | No | Yes | Yes |
| 2553 | Corticoadren overact NEC | | 23 | 19 | No | Yes | Yes |
| 25541 | Glucocorticoid deficient | | 23 | 19 | No | Yes | Yes |
| 25542 | Mineralcorticoid defcnt | | 23 | 19 | No | Yes | Yes |
| 2555 | Adrenal hypofunction NEC | | 23 | 19 | No | Yes | Yes |
| 2556 | Medulloadrenal hyperfunc | | 23 | 19 | No | Yes | Yes |
| 2558 | Adrenal disorder NEC | | 23 | 19 | No | Yes | Yes |
| 2559 | Adrenal disorder NOS | | 23 | 19 | No | Yes | Yes |
| 25801 | Mult endo neoplas type I | | 23 | 19 | No | Yes | Yes |
| 25802 | Mult endo neop type IIA | | 23 | 19 | No | Yes | Yes |
| 25803 | Mult endo neop type IIB | | 23 | 19 | No | Yes | Yes |
| 2581 | Comb endocr dysfunct NEC | | 23 | 19 | No | Yes | Yes |
| 2588 | Polyglandul dysfunc NEC | | 23 | 19 | No | Yes | Yes |
| 2589 | Polyglandul dysfunc NOS | | 23 | 19 | No | Yes | Yes |
| 2592 | Carcinoid syndrome | 10 | 12 | 11 | Yes | Yes | Yes |
| 260 | Kwashiorkor | 21 | 21 | | Yes | Yes | No |
| 261 | Nutritional marasmus | 21 | 21 | | Yes | Yes | No |
| 262 | Oth severe malnutrition | 21 | 21 | | Yes | Yes | No |
| 2630 | Malnutrition mod degree | 21 | 21 | | Yes | Yes | No |
| 2631 | Malnutrition mild degree | 21 | 21 | | Yes | Yes | No |
| 2632 | Arrest devel d/t malnutr | 21 | 21 | | Yes | Yes | No |
| 2638 | Protein-cal malnutr NEC | 21 | 21 | | Yes | Yes | No |
| 2639 | Protein-cal malnutr NOS | 21 | 21 | | Yes | Yes | No |
| 2680 | Rickets, active | | | 45 | No | No | Yes |
| 2682 | Osteomalacia NOS | | | 45 | No | No | Yes |
| 2700 | Amino-acid transport dis | | 23 | 19 | No | Yes | Yes |
| 2701 | Phenylketonuria - pku | | 23 | 19 | No | Yes | Yes |
| 2702 | Arom amin-acid metab NEC | | 23 | 19 | No | Yes | Yes |
| 2703 | Bran-chain amin-acid dis | | 23 | 19 | No | Yes | Yes |
| 2704 | Sulph amino-acid met dis | | 23 | 19 | No | Yes | Yes |
| 2705 | Dis histidine metabolism | | 23 | 19 | No | Yes | Yes |
| 2706 | Dis urea cycle metabol | | 23 | 19 | No | Yes | Yes |
| 2707 | Straig amin-acid met NEC | | 23 | 19 | No | Yes | Yes |
| 2708 | Dis amino-acid metab NEC | | 23 | 19 | No | Yes | Yes |
| 2709 | Dis amino-acid metab NOS | | 23 | 19 | No | Yes | Yes |
| 2710 | Glycogenosis | | 23 | 18 | No | Yes | Yes |
| 2711 | Galactosemia | | 23 | 19 | No | Yes | Yes |
| 2714 | Renal glycosuria | | 23 | 19 | No | Yes | Yes |
| 2718 | Dis carbohydr metab NEC | | 23 | 19 | No | Yes | Yes |
| 2719 | Dis carbohydr metab NOS | | 23 | 19 | No | Yes | Yes |
| 2720 | Pure hypercholesterolem | | | 23 | No | No | Yes |
| 2721 | Pure hyperglyceridemia | | | 23 | No | No | Yes |
| 2722 | Mixed hyperlipidemia | | | 23 | No | No | Yes |
| 2723 | Hyperchylomicronemia | | | 23 | No | No | Yes |
| 2724 | Hyperlipidemia NEC/NOS | | | 23 | No | No | Yes |
| 2725 | Lipoprotein deficiencies | | | 23 | No | No | Yes |
| 2727 | Lipidoses | | 23 | | No | Yes | No |
| 2728 | Lipoid metabol dis NEC | | | 23 | No | No | Yes |
| 2729 | Lipoid metabol dis NOS | | | 23 | No | No | Yes |
| 2732 | Paraproteinemia NEC | | 23 | | No | Yes | No |
| 2733 | Macroglobulinemia | | 23 | | No | Yes | No |
| 2734 | Alpha-1-antitrypsin def | | 23 | 18 | No | Yes | Yes |
| 27501 | Heredit hemochromatosis | | 23 | 19 | No | Yes | Yes |
| 27503 | Hemochromatosis NEC | | | 19 | No | No | Yes |
| 27509 | Disord iron metablsm NOS | | | 19 | No | No | Yes |
| 2751 | Dis copper metabolism | | | 19 | No | No | Yes |
| 2753 | Dis phosphorus metabol | | | 19 | No | No | Yes |
| 27700 | Cystic fibros w/o ileus | 107 | 110 | 103 | Yes | Yes | Yes |
| 27701 | Cystic fibrosis w ileus | 107 | 110 | 103 | Yes | Yes | Yes |
| 27702 | Cystic fibros w pul man | 107 | 110 | 103 | Yes | Yes | Yes |
| 27703 | Cystic fibrosis w GI man | 107 | 110 | 103 | Yes | Yes | Yes |
| 27709 | Cystic fibrosis NEC | 107 | 110 | 103 | Yes | Yes | Yes |
| 2771 | Dis porphyrin metabolism | | 23 | 19 | No | Yes | Yes |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2772 | Purine/pyrimid dis NEC | | 23 | 19 | No | Yes | Yes |
| 27730 | Amyloidosis NOS | | 23 | | No | Yes | No |
| 27731 | Fam Mediterranean fever | | 23 | | No | Yes | No |
| 27739 | Amyloidosis NEC | | 23 | | No | Yes | No |
| 2775 | Mucopolysaccharidosis | | 23 | 18 | No | Yes | Yes |
| 2776 | Defic circul enzyme NEC | | 23 | 18 | No | Yes | Yes |
| 27781 | Primary carnitine defncy | | 23 | 19 | No | Yes | Yes |
| 27782 | Crnitne def d/t nb met | | 23 | 19 | No | Yes | Yes |
| 27783 | Iatrogenic carnitine def | | 23 | 19 | No | Yes | Yes |
| 27784 | Sec carnitine defncy NEC | | 23 | 19 | No | Yes | Yes |
| 27785 | Disorders acid oxidation | | 23 | 19 | No | Yes | Yes |
| 27786 | Peroxisomal disorders | | 23 | 19 | No | Yes | Yes |
| 27787 | Dis mitochondrial metab | | 23 | 19 | No | Yes | Yes |
| 27789 | Metabolism disorder NEC | | 23 | 19 | No | Yes | Yes |
| 27801 | Morbid obesity | | 22 | 21 | No | Yes | Yes |
| 27803 | Obesity hypovent synd | | 22 | 21 | No | Yes | Yes |
| 27900 | Hypogammaglobulinem NOS | 45 | 47 | 49 | Yes | Yes | Yes |
| 27901 | Selective iga immunodef | 45 | 47 | 49 | Yes | Yes | Yes |
| 27902 | Selective IgM immunodef | 45 | 47 | 49 | Yes | Yes | Yes |
| 27903 | Selective ig defic NEC | 45 | 47 | 49 | Yes | Yes | Yes |
| 27904 | Cong hypogammaglobulinem | 45 | 47 | 49 | Yes | Yes | Yes |
| 27905 | Immunodefic w hyper-igm | 45 | 47 | 49 | Yes | Yes | Yes |
| 27906 | Common variabl immunodef | 45 | 47 | 49 | Yes | Yes | Yes |
| 27909 | Humoral immunity def NEC | 45 | 47 | 49 | Yes | Yes | Yes |
| 27910 | Immundef t-cell def NOS | 45 | 47 | 49 | Yes | Yes | Yes |
| 27911 | Digeorge's syndrome | 45 | 47 | 49 | Yes | Yes | Yes |
| 27912 | Wiskott-aldrich syndrome | 45 | 47 | 49 | Yes | Yes | Yes |
| 27913 | Nezelof's syndrome | 45 | 47 | 49 | Yes | Yes | Yes |
| 27919 | Defic cell immunity NOS | 45 | 47 | 49 | Yes | Yes | Yes |
| 2792 | Combined immunity defic | 45 | 47 | 49 | Yes | Yes | Yes |
| 2793 | Immunity deficiency NOS | 45 | 47 | 49 | Yes | Yes | Yes |
| 27941 | Autoimmun lymphprof synd | 45 | 47 | 49 | Yes | Yes | Yes |
| 27949 | Autoimmune disease NEC | 45 | 47 | 49 | Yes | Yes | Yes |
| 27950 | Graft-versus-host NOS | 45 | 47 | 49 | Yes | Yes | Yes |
| 27951 | Ac graft-versus-host dis | 45 | 47 | 49 | Yes | Yes | Yes |
| 27952 | Chronc graft-vs-host dis | 45 | 47 | 49 | Yes | Yes | Yes |
| 27953 | Ac on chrn grft-vs-host | 45 | 47 | 49 | Yes | Yes | Yes |
| 2798 | Immune mechanism dis NEC | 45 | 47 | 49 | Yes | Yes | Yes |
| 2799 | Immune mechanism dis NOS | 45 | 47 | 49 | Yes | Yes | Yes |
| 2820 | Hereditary spherocytosis | | 48 | | No | Yes | No |
| 2821 | Heredit elliptocytosis | | 48 | | No | Yes | No |
| 2822 | Glutathione dis anemia | | 48 | | No | Yes | No |
| 2823 | Enzyme defic anemia NEC | | 48 | | No | Yes | No |
| 28241 | Thlasema Hb-S w/o crisis | 44 | 46 | 50 | Yes | Yes | Yes |
| 28242 | Thlassemia Hb-S w crisis | 44 | 46 | 50 | Yes | Yes | Yes |
| 28243 | Alpha thalassemia | | 48 | | No | Yes | No |
| 28244 | Beta thalassemia | | 48 | | No | Yes | No |
| 28245 | Delta-beta thalassemia | | 48 | | No | Yes | No |
| 28247 | Hgb E-beta thalassemia | | 48 | | No | Yes | No |
| 28249 | Thalassemia NEC | | 48 | | No | Yes | No |
| 2825 | Sickle-cell trait | | 48 | | No | Yes | No |
| 28260 | Sickle cell disease NOS | 44 | 46 | 50 | Yes | Yes | Yes |
| 28261 | Hb-SS disease w/o crisis | 44 | 46 | 47 | Yes | Yes | Yes |
| 28262 | Hb-SS disease w crisis | 44 | 46 | 47 | Yes | Yes | Yes |
| 28263 | Hb-SS/hb-C dis w/o crsis | 44 | 46 | 50 | Yes | Yes | Yes |
| 28264 | Hb-S/Hb-C dis w crisis | 44 | 46 | 50 | Yes | Yes | Yes |
| 28268 | Hb-S dis w/o crisis NEC | 44 | 46 | 50 | Yes | Yes | Yes |
| 28269 | Hb-SS dis NEC w crisis | 44 | 46 | 50 | Yes | Yes | Yes |
| 2827 | Hemoglobinopathies NEC | | 48 | | No | Yes | No |
| 2828 | Hered hemolytic anem NEC | | 48 | | No | Yes | No |
| 2829 | Hered hemolytic anem NOS | | 48 | | No | Yes | No |
| 2830 | Autoimmun hemolytic anem | 44 | 46 | 50 | Yes | Yes | Yes |
| 28310 | Nonauto hem anemia NOS | 44 | 46 | 50 | Yes | Yes | Yes |
| 28311 | Hemolytic uremic synd | 44 | 46 | 50 | Yes | Yes | Yes |

| 28319 | Oth nonauto hem anemia | 44 | 46 | 50 | Yes | Yes | Yes |
|---|---|---|---|---|---|---|---|
| 2832 | Hemolytic hemoglobinuria | 44 | 46 | 50 | Yes | Yes | Yes |
| 2839 | Acq hemolytic anemia NOS | 44 | 46 | 50 | Yes | Yes | Yes |
| 28401 | Constitution RBC aplasia | 44 | 46 | 50 | Yes | Yes | Yes |
| 28409 | Const aplastc anemia NEC | 44 | 46 | 50 | Yes | Yes | Yes |
| 2841 | Pancytopenia | 44 | 46 | 50 | Yes | Yes | Yes |
| 28411 | Antin chemo indcd pancyt | 45 | 47 | | Yes | Yes | No |
| 28412 | Oth drg indcd pancytopna | 45 | 47 | | Yes | Yes | No |
| 28419 | Other pancytopenia | 45 | 47 | | Yes | Yes | No |
| 2842 | Myelophthisis | 44 | 46 | 50 | Yes | Yes | Yes |
| 28481 | Red cell aplasia | 44 | 46 | 50 | Yes | Yes | Yes |
| 28489 | Aplastic anemias NEC | 44 | 46 | 50 | Yes | Yes | Yes |
| 2849 | Aplastic anemia NOS | 44 | 46 | 50 | Yes | Yes | Yes |
| 2850 | Sideroblastic anemia | | 48 | 50 | No | Yes | Yes |
| 2860 | Cong factor viii diord | 44 | 46 | 50 | Yes | Yes | Yes |
| 2861 | Cong factor IX disorder | 44 | 46 | 50 | Yes | Yes | Yes |
| 2862 | Cong factor xi disorder | | 48 | | No | Yes | No |
| 2863 | Cong def clot factor NEC | | 48 | | No | Yes | No |
| 2864 | Von willebrand's disease | | 48 | | No | Yes | No |
| 2865 | Intr circul anticoag dis | | 48 | | No | Yes | No |
| 28652 | Acquired hemophilia | | 48 | | No | Yes | No |
| 28653 | Antiphospholipid w hemor | | 48 | | No | Yes | No |
| 28659 | Ot hem d/t circ anticoag | | 48 | | No | Yes | No |
| 2866 | Defibrination syndrome | | 48 | | No | Yes | No |
| 2867 | Acq coagul factor defic | | 48 | | No | Yes | No |
| 2869 | Coagulat defect NEC/NOS | | 48 | | No | Yes | No |
| 2870 | Allergic purpura | | 48 | | No | Yes | No |
| 2871 | Thrombocytopathy | | 48 | | No | Yes | No |
| 2872 | Purpura NOS | | 48 | | No | Yes | No |
| 28730 | Prim thrombocytopen NOS | | 48 | | No | Yes | No |
| 28731 | Immune thrombocyt purpra | | 48 | | No | Yes | No |
| 28732 | Evans' syndrome | | 48 | | No | Yes | No |
| 28733 | Cong/herid thromb purpra | | 48 | | No | Yes | No |
| 28739 | Prim thrombocytopen NEC | | 48 | | No | Yes | No |
| 2875 | Thrombocytopenia NOS | | 48 | | No | Yes | No |
| 2878 | Hemorrhagic cond NEC | | 48 | | No | Yes | No |
| 2879 | Hemorrhagic cond NOS | | 48 | | No | Yes | No |
| 28800 | Neutropenia NOS | 45 | 47 | | Yes | Yes | No |
| 28801 | Congenital neutropenia | 45 | 47 | | Yes | Yes | No |
| 28802 | Cyclic neutropenia | 45 | 47 | | Yes | Yes | No |
| 28803 | Drug induced neutropenia | 45 | 47 | | Yes | Yes | No |
| 28804 | Neutropenia d/t infectn | 45 | 47 | | Yes | Yes | No |
| 28809 | Neutropenia NEC | 45 | 47 | | Yes | Yes | No |
| 2881 | Function dis neutrophils | 45 | 47 | | Yes | Yes | No |
| 2882 | Genetic anomaly leukocyt | 45 | 47 | | Yes | Yes | No |
| 2884 | Hemophagocytic syndromes | 45 | 47 | | Yes | Yes | No |
| 28952 | Splenic sequestration | 44 | 46 | 50 | Yes | Yes | Yes |
| 28981 | Prim hypercoagulable st | | 48 | 50 | No | Yes | Yes |
| 28982 | Sec hypercoagulable st | | 48 | 50 | No | Yes | Yes |
| 28983 | Myelofibrosis | | 46 | 9 | No | Yes | Yes |
| 28984 | Heparin-indu thrombocyto | | 48 | | No | Yes | No |
| 2900 | Senile dementia uncomp | | 52 | 55 | No | Yes | Yes |
| 29010 | Presenile dementia | | 52 | 55 | No | Yes | Yes |
| 29011 | Presenile delirium | | 51 | 55 | No | Yes | Yes |
| 29012 | Presenile delusion | | 51 | 55 | No | Yes | Yes |
| 29013 | Presenile depression | | 51 | 55 | No | Yes | Yes |
| 29020 | Senile delusion | | 51 | 55 | No | Yes | Yes |
| 29021 | Senile depressive | | 51 | 55 | No | Yes | Yes |
| 2903 | Senile delirium | | 51 | 55 | No | Yes | Yes |
| 29040 | Vascular dementia,uncomp | | 52 | 55 | No | Yes | Yes |
| 29041 | Vasc dementia w delirium | | 51 | 55 | No | Yes | Yes |
| 29042 | Vasc dementia w delusion | | 51 | 55 | No | Yes | Yes |
| 29043 | Vasc dementia w depressn | | 51 | 55 | No | Yes | Yes |
| 2908 | Senile psychosis NEC | | 52 | 55 | No | Yes | Yes |

| 2909 | Senile psychot cond NOS | | 52 | 55 | No | Yes | Yes |
|---|---|---|---|---|---|---|---|
| 2910 | Delirium tremens | 51 | 54 | | Yes | Yes | No |
| 2911 | Alcohol amnestic disordr | 51 | 54 | | Yes | Yes | No |
| 2912 | Alcohol persist dementia | 51 | 54 | | Yes | Yes | No |
| 2913 | Alcoh psy dis w hallucin | 51 | 54 | | Yes | Yes | No |
| 2914 | Pathologic alcohol intox | 51 | 54 | | Yes | Yes | No |
| 2915 | Alcoh psych dis w delus | 51 | 54 | | Yes | Yes | No |
| 29181 | Alcohol withdrawal | 51 | 54 | | Yes | Yes | No |
| 29182 | Alcoh induce sleep disor | 51 | 54 | | Yes | Yes | No |
| 29189 | Alcohol mental disor NEC | 51 | 54 | | Yes | Yes | No |
| 2919 | Alcohol mental disor NOS | 51 | 54 | | Yes | Yes | No |
| 2920 | Drug withdrawal | 51 | 54 | | Yes | Yes | No |
| 29211 | Drug psych disor w delus | 51 | 54 | | Yes | Yes | No |
| 29212 | Drug psy dis w hallucin | 51 | 54 | | Yes | Yes | No |
| 2922 | Pathologic drug intox | 51 | 54 | | Yes | Yes | No |
| 29281 | Drug-induced delirium | 51 | 54 | | Yes | Yes | No |
| 29282 | Drug persisting dementia | 51 | 54 | | Yes | Yes | No |
| 29283 | Drug persist amneste dis | 51 | 54 | | Yes | Yes | No |
| 29284 | Drug-induced mood disord | 51 | 54 | | Yes | Yes | No |
| 29285 | Drug induced sleep disor | 51 | 54 | | Yes | Yes | No |
| 29289 | Drug mental disorder NEC | 51 | 54 | | Yes | Yes | No |
| 2929 | Drug mental disorder NOS | 51 | 54 | | Yes | Yes | No |
| 2940 | Amnestic disord oth dis | | 52 | 55 | No | Yes | Yes |
| 29410 | Dementia w/o behav dist | | 52 | 55 | No | Yes | Yes |
| 29411 | Dementia w behavior dist | | 51 | 55 | No | Yes | Yes |
| 29420 | Demen NOS w/o behv dstrb | | 52 | 55 | No | Yes | Yes |
| 29421 | Demen NOS w behav distrb | | 51 | 55 | No | Yes | Yes |
| 2948 | Mental disor NEC oth dis | | 52 | 55 | No | Yes | Yes |
| 2949 | Mental disor NOS oth dis | | 52 | 55 | No | Yes | Yes |
| 29500 | Simpl schizophren-unspec | 54 | 57 | 58 | Yes | Yes | Yes |
| 29501 | Simpl schizophren-subchr | 54 | 57 | 58 | Yes | Yes | Yes |
| 29502 | Simple schizophren-chr | 54 | 57 | 58 | Yes | Yes | Yes |
| 29503 | Simp schiz-subchr/exacer | 54 | 57 | 58 | Yes | Yes | Yes |
| 29504 | Simpl schizo-chr/exacerb | 54 | 57 | 58 | Yes | Yes | Yes |
| 29505 | Simpl schizophren-remiss | 54 | 57 | 58 | Yes | Yes | Yes |
| 29510 | Hebephrenia-unspec | 54 | 57 | 58 | Yes | Yes | Yes |
| 29511 | Hebephrenia-subchronic | 54 | 57 | 58 | Yes | Yes | Yes |
| 29512 | Hebephrenia-chronic | 54 | 57 | 58 | Yes | Yes | Yes |
| 29513 | Hebephren-subchr/exacerb | 54 | 57 | 58 | Yes | Yes | Yes |
| 29514 | Hebephrenia-chr/exacerb | 54 | 57 | 58 | Yes | Yes | Yes |
| 29515 | Hebephrenia-remission | 54 | 57 | 58 | Yes | Yes | Yes |
| 29520 | Catatonia-unspec | 54 | 57 | 58 | Yes | Yes | Yes |
| 29521 | Catatonia-subchronic | 54 | 57 | 58 | Yes | Yes | Yes |
| 29522 | Catatonia-chronic | 54 | 57 | 58 | Yes | Yes | Yes |
| 29523 | Catatonia-subchr/exacerb | 54 | 57 | 58 | Yes | Yes | Yes |
| 29524 | Catatonia-chr/exacerb | 54 | 57 | 58 | Yes | Yes | Yes |
| 29525 | Catatonia-remission | 54 | 57 | 58 | Yes | Yes | Yes |
| 29530 | Paranoid schizo-unspec | 54 | 57 | 58 | Yes | Yes | Yes |
| 29531 | Paranoid schizo-subchr | 54 | 57 | 58 | Yes | Yes | Yes |
| 29532 | Paranoid schizo-chronic | 54 | 57 | 58 | Yes | Yes | Yes |
| 29533 | Paran schizo-subchr/exac | 54 | 57 | 58 | Yes | Yes | Yes |
| 29534 | Paran schizo-chr/exacerb | 54 | 57 | 58 | Yes | Yes | Yes |
| 29535 | Paranoid schizo-remiss | 54 | 57 | 58 | Yes | Yes | Yes |
| 29540 | Schizophreniform dis NOS | 54 | 57 | 58 | Yes | Yes | Yes |
| 29541 | Schizophrenic dis-subchr | 54 | 57 | 58 | Yes | Yes | Yes |
| 29542 | Schizophren dis-chronic | 54 | 57 | 58 | Yes | Yes | Yes |
| 29543 | Schizo dis-subchr/exacer | 54 | 57 | 58 | Yes | Yes | Yes |
| 29544 | Schizophr dis-chr/exacer | 54 | 57 | 58 | Yes | Yes | Yes |
| 29545 | Schizophrenic dis-remiss | 54 | 57 | 58 | Yes | Yes | Yes |
| 29550 | Latent schizophren-unsp | 54 | 57 | 58 | Yes | Yes | Yes |
| 29551 | Lat schizophren-subchr | 54 | 57 | 58 | Yes | Yes | Yes |
| 29552 | Latent schizophren-chr | 54 | 57 | 58 | Yes | Yes | Yes |
| 29553 | Lat schizo-subchr/exacer | 54 | 57 | 58 | Yes | Yes | Yes |
| 29554 | Latent schizo-chr/exacer | 54 | 57 | 58 | Yes | Yes | Yes |

| 29555 | Lat schizophren-remiss | 54 | 57 | 58 | Yes | Yes | Yes |
|-------|------------------------|----|----|----|-----|-----|-----|
| 29560 | Schizophr dis resid NOS | 54 | 57 | 58 | Yes | Yes | Yes |
| 29561 | Schizoph dis resid-subch | 54 | 57 | 58 | Yes | Yes | Yes |
| 29562 | Schizophr dis resid-chr | 54 | 57 | 58 | Yes | Yes | Yes |
| 29563 | Schizo resid subchr/exac | 54 | 57 | 58 | Yes | Yes | Yes |
| 29564 | Schizoph resid-chro/exac | 54 | 57 | 58 | Yes | Yes | Yes |
| 29565 | Schizoph dis resid-remis | 54 | 57 | 58 | Yes | Yes | Yes |
| 29570 | Schizoaffective dis NOS | 54 | 57 | 58 | Yes | Yes | Yes |
| 29571 | Schizoaffectv dis-subchr | 54 | 57 | 58 | Yes | Yes | Yes |
| 29572 | Schizoaffectv dis-chr | 54 | 57 | 58 | Yes | Yes | Yes |
| 29573 | Schizoaff dis-subch/exac | 54 | 57 | 58 | Yes | Yes | Yes |
| 29574 | Schizoafftv dis-chr/exac | 54 | 57 | 58 | Yes | Yes | Yes |
| 29575 | Schizoaffectve dis-remis | 54 | 57 | 58 | Yes | Yes | Yes |
| 29580 | Schizophrenia NEC-unspec | 54 | 57 | 58 | Yes | Yes | Yes |
| 29581 | Schizophrenia NEC-subchr | 54 | 57 | 58 | Yes | Yes | Yes |
| 29582 | Schizophrenia NEC-chr | 54 | 57 | 58 | Yes | Yes | Yes |
| 29583 | Schizo NEC-subchr/exacer | 54 | 57 | 58 | Yes | Yes | Yes |
| 29584 | Schizo NEC-chr/exacerb | 54 | 57 | 58 | Yes | Yes | Yes |
| 29585 | Schizophrenia NEC-remiss | 54 | 57 | 58 | Yes | Yes | Yes |
| 29590 | Schizophrenia NOS-unspec | 54 | 57 | 58 | Yes | Yes | Yes |
| 29591 | Schizophrenia NOS-subchr | 54 | 57 | 58 | Yes | Yes | Yes |
| 29592 | Schizophrenia NOS-chr | 54 | 57 | 58 | Yes | Yes | Yes |
| 29593 | Schizo NOS-subchr/exacer | 54 | 57 | 58 | Yes | Yes | Yes |
| 29594 | Schizo NOS-chr/exacerb | 54 | 57 | 58 | Yes | Yes | Yes |
| 29595 | Schizophrenia NOS-remiss | 54 | 57 | 58 | Yes | Yes | Yes |
| 29600 | Bipol I single manic NOS | 55 | 58 | 59 | Yes | Yes | Yes |
| 29601 | Bipol I single manc-mild | 55 | 58 | 59 | Yes | Yes | Yes |
| 29602 | Bipol I single manic-mod | 55 | 58 | 59 | Yes | Yes | Yes |
| 29603 | Bipol I sing-sev w/o psy | 55 | 58 | 59 | Yes | Yes | Yes |
| 29604 | Bipo I sin man-sev w psy | 55 | 58 | 59 | Yes | Yes | Yes |
| 29605 | Bipol I sing man rem NOS | 55 | 58 | 59 | Yes | Yes | Yes |
| 29606 | Bipol I single manic rem | 55 | 58 | 59 | Yes | Yes | Yes |
| 29610 | Recur manic dis-unspec | 55 | 58 | 59 | Yes | Yes | Yes |
| 29611 | Recur manic dis-mild | 55 | 58 | 59 | Yes | Yes | Yes |
| 29612 | Recur manic dis-mod | 55 | 58 | 59 | Yes | Yes | Yes |
| 29613 | Recur manic dis-severe | 55 | 58 | 59 | Yes | Yes | Yes |
| 29614 | Recur manic-sev w psycho | 55 | 58 | 59 | Yes | Yes | Yes |
| 29615 | Recur manic-part remiss | 55 | 58 | 59 | Yes | Yes | Yes |
| 29616 | Recur manic-full remiss | 55 | 58 | 59 | Yes | Yes | Yes |
| 29620 | Depress psychosis-unspec | 55 | 58 | 60 | Yes | Yes | Yes |
| 29621 | Depress psychosis-mild | 55 | 58 | 60 | Yes | Yes | Yes |
| 29622 | Depressive psychosis-mod | 55 | 58 | 60 | Yes | Yes | Yes |
| 29623 | Depress psychosis-severe | 55 | 58 | 60 | Yes | Yes | Yes |
| 29624 | Depr psychos-sev w psych | 55 | 58 | 60 | Yes | Yes | Yes |
| 29625 | Depr psychos-part remiss | 55 | 58 | 60 | Yes | Yes | Yes |
| 29626 | Depr psychos-full remiss | 55 | 58 | 60 | Yes | Yes | Yes |
| 29630 | Recurr depr psychos-unsp | 55 | 58 | 60 | Yes | Yes | Yes |
| 29631 | Recurr depr psychos-mild | 55 | 58 | 60 | Yes | Yes | Yes |
| 29632 | Recurr depr psychos-mod | 55 | 58 | 60 | Yes | Yes | Yes |
| 29633 | Recur depr psych-severe | 55 | 58 | 60 | Yes | Yes | Yes |
| 29634 | Rec depr psych-psychotic | 55 | 58 | 60 | Yes | Yes | Yes |
| 29635 | Recur depr psyc-part rem | 55 | 58 | 60 | Yes | Yes | Yes |
| 29636 | Recur depr psyc-full rem | 55 | 58 | 60 | Yes | Yes | Yes |
| 29640 | Bipol I currnt manic NOS | 55 | 58 | 59 | Yes | Yes | Yes |
| 29641 | Bipol I curnt manic-mild | 55 | 58 | 59 | Yes | Yes | Yes |
| 29642 | Bipol I currnt manic-mod | 55 | 58 | 59 | Yes | Yes | Yes |
| 29643 | Bipol I manc-sev w/o psy | 55 | 58 | 59 | Yes | Yes | Yes |
| 29644 | Bipol I manic-sev w psy | 55 | 58 | 59 | Yes | Yes | Yes |
| 29645 | Bipol I cur man part rem | 55 | 58 | 59 | Yes | Yes | Yes |
| 29646 | Bipol I cur man full rem | 55 | 58 | 59 | Yes | Yes | Yes |
| 29650 | Bipol I cur depres NOS | 55 | 58 | 59 | Yes | Yes | Yes |
| 29651 | Bipol I cur depress-mild | 55 | 58 | 59 | Yes | Yes | Yes |
| 29652 | Bipol I cur depress-mod | 55 | 58 | 59 | Yes | Yes | Yes |
| 29653 | Bipol I curr dep w/o psy | 55 | 58 | 59 | Yes | Yes | Yes |

| 29654 | Bipol I currnt dep w psy | 55 | 58 | 59 | Yes | Yes | Yes |
|---|---|---|---|---|---|---|---|
| 29655 | Bipol I cur dep rem NOS | 55 | 58 | 59 | Yes | Yes | Yes |
| 29656 | Bipol I currnt dep remis | 55 | 58 | 59 | Yes | Yes | Yes |
| 29660 | Bipol I currnt mixed NOS | 55 | 58 | 59 | Yes | Yes | Yes |
| 29661 | Bipol I currnt mix-mild | 55 | 58 | 59 | Yes | Yes | Yes |
| 29662 | Bipol I currnt mixed-mod | 55 | 58 | 59 | Yes | Yes | Yes |
| 29663 | Bipol I cur mix w/o psy | 55 | 58 | 59 | Yes | Yes | Yes |
| 29664 | Bipol I cur mixed w psy | 55 | 58 | 59 | Yes | Yes | Yes |
| 29665 | Bipol I cur mix-part rem | 55 | 58 | 59 | Yes | Yes | Yes |
| 29666 | Bipol I cur mixed remiss | 55 | 58 | 59 | Yes | Yes | Yes |
| 2967 | Bipolor I current NOS | 55 | 58 | 59 | Yes | Yes | Yes |
| 29680 | Bipolar disorder NOS | 55 | 58 | 59 | Yes | Yes | Yes |
| 29681 | Atypical manic disorder | 55 | 58 | 59 | Yes | Yes | Yes |
| 29682 | Atypical depressive dis | 55 | 58 | 59 | Yes | Yes | Yes |
| 29689 | Bipolar disorder NEC | 55 | 58 | 59 | Yes | Yes | Yes |
| 29690 | Episodic mood disord NOS | 55 | 58 | 59 | Yes | Yes | Yes |
| 29699 | Episodic mood disord NEC | 55 | 58 | 59 | Yes | Yes | Yes |
| 2970 | Paranoid state, simple | 55 | 58 | | Yes | Yes | No |
| 2971 | Delusional disorder | 55 | 58 | | Yes | Yes | No |
| 2972 | Paraphrenia | 55 | 58 | | Yes | Yes | No |
| 2973 | Shared psychotic disord | 55 | 58 | | Yes | Yes | No |
| 2978 | Paranoid states NEC | 55 | 58 | | Yes | Yes | No |
| 2979 | Paranoid state NOS | 55 | 58 | | Yes | Yes | No |
| 29900 | Autistic disord-current | | | 65 | No | No | Yes |
| 29901 | Autistic disord-residual | | | 65 | No | No | Yes |
| 29910 | Childhd disintegr-active | | | 65 | No | No | Yes |
| 29911 | Childhd disintegr-resid | | | 65 | No | No | Yes |
| 29980 | Pervasv dev dis-cur NEC | | | 65 | No | No | Yes |
| 29981 | Pervasv dev dis-res NEC | | | 65 | No | No | Yes |
| 29990 | Pervasv dev dis-cur NOS | | | 65 | No | No | Yes |
| 29991 | Pervasv dev dis-res NOS | | | 65 | No | No | Yes |
| 30001 | Panic dis w/o agorphobia | | | 63 | No | No | Yes |
| 30002 | Generalized anxiety dis | | | 63 | No | No | Yes |
| 30010 | Hysteria NOS | | | 63 | No | No | Yes |
| 30011 | Conversion disorder | | | 63 | No | No | Yes |
| 30012 | Dissociative amnesia | | | 61 | No | No | Yes |
| 30013 | Dissociative fugue | | | 61 | No | No | Yes |
| 30014 | Dissociatve identity dis | | | 61 | No | No | Yes |
| 30015 | Dissociative react NOS | | | 61 | No | No | Yes |
| 30016 | Factitious dis w symptom | | | 63 | No | No | Yes |
| 30019 | Factitious ill NEC/NOS | | | 63 | No | No | Yes |
| 30020 | Phobia NOS | | | 63 | No | No | Yes |
| 30021 | Agoraphobia w panic dis | | | 63 | No | No | Yes |
| 30022 | Agoraphobia w/o panic | | | 63 | No | No | Yes |
| 30023 | Social phobia | | | 63 | No | No | Yes |
| 30029 | Isolated/spec phobia NEC | | | 63 | No | No | Yes |
| 3003 | Obsessive-compulsive dis | | | 61 | No | No | Yes |
| 3004 | Dysthymic disorder | | | 62 | No | No | Yes |
| 3006 | Depersonalization disord | | | 61 | No | No | Yes |
| 3007 | Hypochondriasis | | | 63 | No | No | Yes |
| 30081 | Somatization disorder | | | 63 | No | No | Yes |
| 30082 | Undiff somatoform disrdr | | | 63 | No | No | Yes |
| 30089 | Somatoform disorders NEC | | | 63 | No | No | Yes |
| 30110 | Affectiv personality NOS | | | 62 | No | No | Yes |
| 30111 | Chronic hypomanic person | | | 62 | No | No | Yes |
| 30112 | Chr depressive person | | | 62 | No | No | Yes |
| 30113 | Cyclothymic disorder | | | 62 | No | No | Yes |
| 3013 | Explosive personality | | | 61 | No | No | Yes |
| 3014 | Obsessive-compulsive dis | | | 61 | No | No | Yes |
| 30183 | Borderline personality | | | 61 | No | No | Yes |
| 30300 | Ac alcohol intox-unspec | 52 | 55 | | Yes | Yes | No |
| 30301 | Ac alcohol intox-contin | 52 | 55 | | Yes | Yes | No |
| 30302 | Ac alcohol intox-episod | 52 | 55 | | Yes | Yes | No |
| 30303 | Ac alcohol intox-remiss | 52 | 55 | | Yes | Yes | No |

| 30390 | Alcoh dep NEC/NOS-unspec | 52 | 55 | | Yes | Yes | No |
|-------|--------------------------|----|----|--|-----|-----|-----|
| 30391 | Alcoh dep NEC/NOS-contin | 52 | 55 | | Yes | Yes | No |
| 30392 | Alcoh dep NEC/NOS-episod | 52 | 55 | | Yes | Yes | No |
| 30393 | Alcoh dep NEC/NOS-remiss | 52 | 55 | | Yes | Yes | No |
| 30400 | Opioid dependence-unspec | 52 | 55 | | Yes | Yes | No |
| 30401 | Opioid dependence-contin | 52 | 55 | | Yes | Yes | No |
| 30402 | Opioid dependence-episod | 52 | 55 | | Yes | Yes | No |
| 30403 | Opioid dependence-remiss | 52 | 55 | | Yes | Yes | No |
| 30410 | Sed,hyp,anxiolyt dep-NOS | 52 | 55 | | Yes | Yes | No |
| 30411 | Sed,hyp,anxiolyt dep-con | 52 | 55 | | Yes | Yes | No |
| 30412 | Sed,hyp,anxiolyt dep-epi | 52 | 55 | | Yes | Yes | No |
| 30413 | Sed,hyp,anxiolyt dep-rem | 52 | 55 | | Yes | Yes | No |
| 30420 | Cocaine depend-unspec | 52 | 55 | | Yes | Yes | No |
| 30421 | Cocaine depend-contin | 52 | 55 | | Yes | Yes | No |
| 30422 | Cocaine depend-episodic | 52 | 55 | | Yes | Yes | No |
| 30423 | Cocaine depend-remiss | 52 | 55 | | Yes | Yes | No |
| 30430 | Cannabis depend-unspec | 52 | 55 | | Yes | Yes | No |
| 30431 | Cannabis depend-contin | 52 | 55 | | Yes | Yes | No |
| 30432 | Cannabis depend-episodic | 52 | 55 | | Yes | Yes | No |
| 30433 | Cannabis depend-remiss | 52 | 55 | | Yes | Yes | No |
| 30440 | Amphetamin depend-unspec | 52 | 55 | | Yes | Yes | No |
| 30441 | Amphetamin depend-contin | 52 | 55 | | Yes | Yes | No |
| 30442 | Amphetamin depend-episod | 52 | 55 | | Yes | Yes | No |
| 30443 | Amphetamin depend-remiss | 52 | 55 | | Yes | Yes | No |
| 30450 | Hallucinogen dep-unspec | 52 | 55 | | Yes | Yes | No |
| 30451 | Hallucinogen dep-contin | 52 | 55 | | Yes | Yes | No |
| 30452 | Hallucinogen dep-episod | 52 | 55 | | Yes | Yes | No |
| 30453 | Hallucinogen dep-remiss | 52 | 55 | | Yes | Yes | No |
| 30460 | Drug depend NEC-unspec | 52 | 55 | | Yes | Yes | No |
| 30461 | Drug depend NEC-contin | 52 | 55 | | Yes | Yes | No |
| 30462 | Drug depend NEC-episodic | 52 | 55 | | Yes | Yes | No |
| 30463 | Drug depend NEC-in rem | 52 | 55 | | Yes | Yes | No |
| 30470 | Opioid/other dep-unspec | 52 | 55 | | Yes | Yes | No |
| 30471 | Opioid/other dep-contin | 52 | 55 | | Yes | Yes | No |
| 30472 | Opioid/other dep-episod | 52 | 55 | | Yes | Yes | No |
| 30473 | Opioid/other dep-remiss | 52 | 55 | | Yes | Yes | No |
| 30480 | Comb drug dep NEC-unspec | 52 | 55 | | Yes | Yes | No |
| 30481 | Comb drug dep NEC-contin | 52 | 55 | | Yes | Yes | No |
| 30482 | Comb drug dep NEC-episod | 52 | 55 | | Yes | Yes | No |
| 30483 | Comb drug dep NEC-remiss | 52 | 55 | | Yes | Yes | No |
| 30490 | Drug depend NOS-unspec | 52 | 55 | | Yes | Yes | No |
| 30491 | Drug depend NOS-contin | 52 | 55 | | Yes | Yes | No |
| 30492 | Drug depend NOS-episodic | 52 | 55 | | Yes | Yes | No |
| 30493 | Drug depend NOS-remiss | 52 | 55 | | Yes | Yes | No |
| 3071 | Anorexia nervosa | | | 61 | No | No | Yes |
| 30723 | Tourette's disorder | | | 61 | No | No | Yes |
| 3073 | Stereotypic movement dis | | | 61 | No | No | Yes |
| 30751 | Bulimia nervosa | | | 61 | No | No | Yes |
| 3091 | Prolong depressive react | | | 62 | No | No | Yes |
| 30981 | Posttraumatic stress dis | | | 61 | No | No | Yes |
| 311 | Depressive disorder NEC | | | 62 | No | No | Yes |
| 31200 | Unsocial aggress-unspec | | | 61 | No | No | Yes |
| 31201 | Unsocial aggression-mild | | | 61 | No | No | Yes |
| 31202 | Unsocial aggression-mod | | | 61 | No | No | Yes |
| 31203 | Unsocial aggress-severe | | | 61 | No | No | Yes |
| 31210 | Unsocial unaggress-unsp | | | 61 | No | No | Yes |
| 31211 | Unsocial unaggress-mild | | | 61 | No | No | Yes |
| 31212 | Unsocial unaggress-mod | | | 61 | No | No | Yes |
| 31213 | Unsocial unaggr-severe | | | 61 | No | No | Yes |
| 31220 | Social conduct dis-unsp | | | 61 | No | No | Yes |
| 31221 | Social conduct dis-mild | | | 61 | No | No | Yes |
| 31222 | Social conduct dis-mod | | | 61 | No | No | Yes |
| 31223 | Social conduct dis-sev | | | 61 | No | No | Yes |
| 31230 | Impulse control dis NOS | | | 61 | No | No | Yes |

| 31231 | Pathological gambling | | | 61 | No | No | Yes |
|---|---|---|---|---|---|---|---|
| 31232 | Kleptomania | | | 61 | No | No | Yes |
| 31233 | Pyromania | | | 61 | No | No | Yes |
| 31234 | Intermitt explosive dis | | | 61 | No | No | Yes |
| 31235 | Isolated explosive dis | | | 61 | No | No | Yes |
| 31239 | Impulse control dis NEC | | | 61 | No | No | Yes |
| 3124 | Mix dis conduct/emotion | | | 61 | No | No | Yes |
| 31281 | Cndct dsrdr chldhd onst | | | 61 | No | No | Yes |
| 31282 | Cndct dsrdr adlscnt onst | | | 61 | No | No | Yes |
| 31289 | Other conduct disorder | | | 61 | No | No | Yes |
| 3129 | Conduct disturbance NOS | | | 61 | No | No | Yes |
| 31381 | Opposition defiant disor | | | 61 | No | No | Yes |
| 31400 | Attn defic nonhyperact | | | 61 | No | No | Yes |
| 31401 | Attn deficit w hyperact | | | 61 | No | No | Yes |
| 3141 | Hyperkinet w devel delay | | | 61 | No | No | Yes |
| 3142 | Hyperkinetic conduct dis | | | 61 | No | No | Yes |
| 3148 | Other hyperkinetic synd | | | 61 | No | No | Yes |
| 3149 | Hyperkinetic synd NOS | | | 61 | No | No | Yes |
| 317 | Mild intellect disabilty | | | 68 | No | No | Yes |
| 3180 | Mod intellect disability | | | 67 | No | No | Yes |
| 3181 | Sev intellect disability | | | 66 | No | No | Yes |
| 3182 | Profnd intellect disablty | | | 66 | No | No | Yes |
| 319 | Intellect disability NOS | | | 68 | No | No | Yes |
| 3210 | Cryptococcal meningitis | 5 | 6 | 5 | Yes | Yes | Yes |
| 32302 | Myelitis-oth viral dis | | 72 | 72 | No | Yes | Yes |
| 32342 | Oth myelitis ot inf else | | 72 | 72 | No | Yes | Yes |
| 32352 | Myelitis follwg immune | | 72 | 72 | No | Yes | Yes |
| 32363 | Postinfectious myelitis | | 72 | 72 | No | Yes | Yes |
| 32372 | Toxic myelitis | | 72 | 72 | No | Yes | Yes |
| 32382 | Myelitis cause NEC | | 72 | 72 | No | Yes | Yes |
| 3300 | Leukodystrophy | | 52 | 55 | No | Yes | Yes |
| 3301 | Cerebral lipidoses | | 52 | 55 | No | Yes | Yes |
| 3302 | Cereb degen in lipidosis | | 52 | 55 | No | Yes | Yes |
| 3303 | Cerb deg chld in oth dis | | 52 | 55 | No | Yes | Yes |
| 3308 | Cereb degen in child NEC | | 52 | 55 | No | Yes | Yes |
| 3309 | Cereb degen in child NOS | | 52 | 55 | No | Yes | Yes |
| 3310 | Alzheimer's disease | | 52 | 54 | No | Yes | Yes |
| 33111 | Pick's disease | | 52 | 55 | No | Yes | Yes |
| 33119 | Frontotemp dementia NEC | | 52 | 55 | No | Yes | Yes |
| 3312 | Senile degenerat brain | | 52 | 55 | No | Yes | Yes |
| 3313 | Communicat hydrocephalus | | 51 | | No | Yes | No |
| 3314 | Obstructiv hydrocephalus | | 51 | | No | Yes | No |
| 3315 | Norml pressure hydroceph | | 51 | | No | Yes | No |
| 3316 | Corticobasal degneration | | 52 | 55 | No | Yes | Yes |
| 3317 | Cereb degen in oth dis | | 52 | 55 | No | Yes | Yes |
| 33181 | Reye's syndrome | | 52 | 55 | No | Yes | Yes |
| 33182 | Dementia w Lewy bodies | | 52 | 55 | No | Yes | Yes |
| 33189 | Cereb degeneration NEC | | 52 | 55 | No | Yes | Yes |
| 3319 | Cereb degeneration NOS | | 52 | 55 | No | Yes | Yes |
| 3320 | Paralysis agitans | 73 | 78 | 76 | Yes | Yes | Yes |
| 3321 | Secondary parkinsonism | 73 | 78 | 76 | Yes | Yes | Yes |
| 3330 | Degen basal ganglia NEC | 73 | 78 | | Yes | Yes | No |
| 3334 | Huntington's chorea | 73 | 78 | | Yes | Yes | No |
| 33371 | Athetoid cerebral palsy | 101 | 74 | | Yes | Yes | No |
| 3340 | Friedreich's ataxia | 69 | 72 | 72 | Yes | Yes | Yes |
| 3341 | Hered spastic paraplegia | 69 | 72 | 72 | Yes | Yes | Yes |
| 3342 | Primary cerebellar degen | 69 | 72 | 72 | Yes | Yes | Yes |
| 3343 | Cerebellar ataxia NEC | 69 | 72 | 72 | Yes | Yes | Yes |
| 3344 | Cerebel atax in oth dis | 69 | 72 | 72 | Yes | Yes | Yes |
| 3348 | Spinocerebellar dis NEC | 69 | 72 | 72 | Yes | Yes | Yes |
| 3349 | Spinocerebellar dis NOS | 69 | 72 | 72 | Yes | Yes | Yes |
| 3350 | Werdnig-hoffmann disease | 67 | 72 | 72 | Yes | Yes | Yes |
| 33510 | Spinal muscl atrophy NOS | 67 | 72 | 72 | Yes | Yes | Yes |
| 33511 | Kugelberg-welander dis | 67 | 72 | 72 | Yes | Yes | Yes |

4494

| 33519 | Spinal muscl atrophy NEC | 67 | 72 | 72 | Yes | Yes | Yes |
|---|---|---|---|---|---|---|---|
| 33520 | Amyotrophic sclerosis | 67 | 73 | 71 | Yes | Yes | Yes |
| 33521 | Prog muscular atrophy | 67 | 73 | 71 | Yes | Yes | Yes |
| 33522 | Progressive bulbar palsy | 67 | 73 | 71 | Yes | Yes | Yes |
| 33523 | Pseudobulbar palsy | 67 | 73 | 71 | Yes | Yes | Yes |
| 33524 | Prim lateral sclerosis | 67 | 73 | 71 | Yes | Yes | Yes |
| 33529 | Motor neuron disease NEC | 67 | 73 | 71 | Yes | Yes | Yes |
| 3358 | Ant horn cell dis NEC | 67 | 72 | 72 | Yes | Yes | Yes |
| 3359 | Ant horn cell dis NOS | 67 | 72 | 72 | Yes | Yes | Yes |
| 3360 | Syringomyelia | 69 | 72 | 72 | Yes | Yes | Yes |
| 3361 | Vascular myelopathies | 69 | 72 | 72 | Yes | Yes | Yes |
| 3362 | Comb deg cord in oth dis | 69 | 72 | 72 | Yes | Yes | Yes |
| 3363 | Myelopathy in oth dis | 69 | 72 | 72 | Yes | Yes | Yes |
| 3368 | Myelopathy NEC | 69 | 72 | 72 | Yes | Yes | Yes |
| 3369 | Spinal cord disease NOS | 69 | 72 | 72 | Yes | Yes | Yes |
| 33700 | Idio perph auto neur NOS | 71 | 75 | 74 | Yes | Yes | Yes |
| 33701 | Carotid sinus syndrome | | 75 | 74 | No | Yes | Yes |
| 33709 | Idio perph auto neur NEC | 71 | 75 | 74 | Yes | Yes | Yes |
| 3371 | Aut neuropthy in oth dis | 71 | 75 | 74 | Yes | Yes | Yes |
| 33720 | Unsp rflx sympth dystrph | 71 | 75 | 74 | Yes | Yes | Yes |
| 33721 | Rflx sym dystrph up limb | 71 | 75 | 74 | Yes | Yes | Yes |
| 33722 | Rflx sym dystrph lwr limb | 71 | 75 | 74 | Yes | Yes | Yes |
| 33729 | Rflx sym dystrph oth st | 71 | 75 | 74 | Yes | Yes | Yes |
| 3373 | Autonomic dysreflexia | 71 | 75 | 74 | Yes | Yes | Yes |
| 3379 | Autonomic nerve dis NEC | 71 | 75 | 74 | Yes | Yes | Yes |
| 340 | Multiple sclerosis | 72 | 77 | 75 | Yes | Yes | Yes |
| 3410 | Neuromyelitis optica | 72 | 77 | 75 | Yes | Yes | Yes |
| 3411 | Schilder's disease | 72 | 77 | 75 | Yes | Yes | Yes |
| 34120 | Acute myelitis NOS | | 72 | 72 | No | Yes | Yes |
| 34121 | Acute myelitis oth cond | | 72 | 72 | No | Yes | Yes |
| 34122 | Idiopathc trans myelitis | | 72 | 72 | No | Yes | Yes |
| 3418 | Cns demyelination NEC | 72 | 77 | | Yes | Yes | No |
| 3419 | Cns demyelination NOS | 72 | 77 | | Yes | Yes | No |
| 34200 | Flccd hmiplga unspf side | 100 | 103 | | Yes | Yes | No |
| 34201 | Flccd hmiplga domnt side | 100 | 103 | | Yes | Yes | No |
| 34202 | Flccd hmiplga nondmnt sde | 100 | 103 | | Yes | Yes | No |
| 34210 | Spstc hmiplga unspf side | 100 | 103 | 98 | Yes | Yes | Yes |
| 34211 | Spstc hmiplga domnt side | 100 | 103 | 98 | Yes | Yes | Yes |
| 34212 | Spstc hmiplga nondmnt sde | 100 | 103 | 98 | Yes | Yes | Yes |
| 34280 | Ot sp hmiplga unspf side | 100 | 103 | | Yes | Yes | No |
| 34281 | Ot sp hmiplga domnt side | 100 | 103 | | Yes | Yes | No |
| 34282 | Ot sp hmiplg nondmnt side | 100 | 103 | | Yes | Yes | No |
| 34290 | Unsp hemiplga unspf side | 100 | 103 | | Yes | Yes | No |
| 34291 | Unsp hemiplga domnt side | 100 | 103 | | Yes | Yes | No |
| 34292 | Unsp hmiplga nondmnt sde | 100 | 103 | | Yes | Yes | No |
| 3430 | Congenital diplegia | 68 | 74 | | Yes | Yes | No |
| 3431 | Congenital hemiplegia | 100 | 74 | | Yes | Yes | No |
| 3432 | Congenital quadriplegia | 67 | 74 | | Yes | Yes | No |
| 3433 | Congenital monoplegia | 101 | 74 | | Yes | Yes | No |
| 3434 | Infantile hemiplegia | 100 | 74 | | Yes | Yes | No |
| 3438 | Cerebral palsy NEC | 101 | 74 | | Yes | Yes | No |
| 3439 | Cerebral palsy NOS | 101 | 74 | | Yes | Yes | No |
| 34400 | Quadriplegia, unspecifd | 67 | 70 | | Yes | Yes | No |
| 34401 | Quadrplg c1-c4, complete | 67 | 70 | | Yes | Yes | No |
| 34402 | Quadrplg c1-c4, incomplt | 67 | 70 | | Yes | Yes | No |
| 34403 | Quadrplg c5-c7, complete | 67 | 70 | | Yes | Yes | No |
| 34404 | Quadrplg c5-c7, incomplt | 67 | 70 | | Yes | Yes | No |
| 34409 | Other quadriplegia | 67 | 70 | | Other | Yes | No |
| 3441 | Paraplegia NOS | 68 | 71 | | Yes | Yes | No |
| 3442 | Diplegia of upper limbs | 101 | 104 | | Yes | Yes | No |
| 34430 | Monplga lwr lmb unsp sde | 101 | 104 | | Yes | Yes | No |
| 34431 | Monplga lwr lmb dmnt sde | 101 | 104 | | Yes | Yes | No |
| 34432 | Mnplg lwr lmb nondmnt sd | 101 | 104 | | Yes | Yes | No |
| 34440 | Monplga upr lmb unsp sde | 101 | 104 | | Yes | Yes | No |

| 34441 | Monplga upr lmb dmnt sde | 101 | 104 | | Yes | Yes | No |
|-------|--------------------------|-----|-----|---|-----|-----|-----|
| 34442 | Mnplg upr lmb nondmnt sd | 101 | 104 | | Yes | Yes | No |
| 3445 | Monoplegia NOS | 101 | 104 | | Yes | Yes | No |
| 34460 | Cauda equina synd NOS | 69 | 72 | 72 | Yes | Yes | Yes |
| 34461 | Neurogenic bladder | 69 | 72 | 72 | Yes | Yes | Yes |
| 34481 | Locked-in state | 67 | 104 | | Yes | Yes | No |
| 34489 | Oth spcf paralytic synd | 101 | 104 | | Yes | Yes | No |
| 3449 | Paralysis NOS | 101 | 104 | | Yes | Yes | No |
| 34500 | Gen noncv ep w/o intr ep | 74 | 79 | 79 | Yes | Yes | Yes |
| 34501 | Gen nonconv ep w intr ep | 74 | 79 | 78 | Yes | Yes | Yes |
| 34510 | Gen cnv epil w/o intr ep | 74 | 79 | 79 | Yes | Yes | Yes |
| 34511 | Gen cnv epil w intr epil | 74 | 79 | 78 | Yes | Yes | Yes |
| 3452 | Petit mal status | 74 | 79 | 79 | Yes | Yes | Yes |
| 3453 | Grand mal status | 74 | 79 | 79 | Yes | Yes | Yes |
| 34540 | Psymotr epil w/o int epi | 74 | 79 | 79 | Yes | Yes | Yes |
| 34541 | Psymotr epil w intr epil | 74 | 79 | 78 | Yes | Yes | Yes |
| 34550 | Part epil w/o intr epil | 74 | 79 | 79 | Yes | Yes | Yes |
| 34551 | Part epil w intr epil | 74 | 79 | 78 | Yes | Yes | Yes |
| 34560 | Inf spasm w/o intr epil | 74 | 79 | 79 | Yes | Yes | Yes |
| 34561 | Inf spasm w intract epil | 74 | 79 | 78 | Yes | Yes | Yes |
| 34570 | Epil par cont w/o int ep | 74 | 79 | 79 | Yes | Yes | Yes |
| 34571 | Epil par cont w intr epi | 74 | 79 | 78 | Yes | Yes | Yes |
| 34580 | Epilep NEC w/o intr epil | 74 | 79 | 79 | Yes | Yes | Yes |
| 34581 | Epilepsy NEC w intr epil | 74 | 79 | 78 | Yes | Yes | Yes |
| 34590 | Epilep NOS w/o intr epil | 74 | 79 | 79 | Yes | Yes | Yes |
| 34591 | Epilepsy NOS w intr epil | 74 | 79 | 78 | Yes | Yes | Yes |
| 34600 | Mgrn w aura w ntrc mgrn | | 81 | | No | No | Yes |
| 34601 | Mgrn w aura w ntrc mgrn | | 81 | | No | No | Yes |
| 34602 | Mgrn w aur wo ntrc mgrn | | 81 | | No | No | Yes |
| 34603 | Mgrn w aura w ntrc mgrn | | 81 | | No | No | Yes |
| 34610 | Mgrn wo aura wo ntrc mgr | | 81 | | No | No | Yes |
| 34611 | Mgrn wo aura w ntrc mgrn | | 81 | | No | No | Yes |
| 34612 | Mgrn wo aura wo ntrc mgr | | 81 | | No | No | Yes |
| 34613 | Mgrn wo aura w ntrc mgrn | | 81 | | No | No | Yes |
| 34620 | Vrnt mgrn wo ntr mgr NEC | | 81 | | No | No | Yes |
| 34621 | Vrnt mgrn w ntrc mgr NEC | | 81 | | No | No | Yes |
| 34622 | Var mgr NEC w ntc mgr | | 81 | | No | No | Yes |
| 34623 | Var mgrn NEC w ntrc mgr | | 81 | | No | No | Yes |
| 34630 | Hmplg mgr wo ntrc wo st | | 81 | | No | No | Yes |
| 34631 | Hmplg mgrn w ntrc wo st | | 81 | | No | No | Yes |
| 34632 | Hemplg mgr wo ntrc w st | | 81 | | No | No | Yes |
| 34633 | Hmplg mgrn w ntrc w st | | 81 | | No | No | Yes |
| 34640 | Menst mgr wo ntrc wo st | | 81 | | No | No | Yes |
| 34641 | Menstl mgrn w ntrc wo st | | 81 | | No | No | Yes |
| 34642 | Menstl mgr wo ntrc w st | | 81 | | No | No | Yes |
| 34643 | Menstl mgrn w ntrc w st | | 81 | | No | No | Yes |
| 34650 | Prst aura wo inf/ntr/st | | 81 | | No | No | Yes |
| 34651 | Prs ara w ntr wo inf/st | | 81 | | No | No | Yes |
| 34652 | Prs ara wo inf/ntr w st | | 81 | | No | No | Yes |
| 34653 | Prs ara wo inf w ntr/st | | 81 | | No | No | Yes |
| 34660 | Prs ara w inf wo ntr/st | | 81 | | No | No | Yes |
| 34661 | Prs ara w/inf/ntr wo st | | 81 | | No | No | Yes |
| 34662 | Prs ara wo ntr w inf/st | | 81 | | No | No | Yes |
| 34663 | Prst ara w inf w ntr/st | | 81 | | No | No | Yes |
| 34670 | Ch mgr wo ar wo nt wo st | | 81 | | No | No | Yes |
| 34671 | Ch mgr wo ara w nt wo st | | 81 | | No | No | Yes |
| 34672 | Ch mgr wo ara wo nt w st | | 81 | | No | No | Yes |
| 34673 | Ch mgr wo ara w ntr w st | | 81 | | No | No | Yes |
| 34680 | Othr migrne wo ntrc mgrn | | 81 | | No | No | Yes |
| 34681 | Othr migrne w ntrc mgrne | | 81 | | No | No | Yes |
| 34682 | Oth mgr wo ntrc w st mgr | | 81 | | No | No | Yes |
| 34683 | Oth mgr w ntrc w st mgr | | 81 | | No | No | Yes |
| 34690 | Migrne unsp wo ntrc mgrn | | 81 | | No | No | Yes |
| 34691 | Mgrn unsp w ntrc mgr std | | 81 | | No | No | Yes |

| 34692 | Mgr NOS wo ntrc w st mgr | | | 81 | No | No | Yes |
|---|---|---|---|---|---|---|---|
| 34693 | Mgrn NOS w ntrc w st mgr | | | 81 | No | No | Yes |
| 34700 | Narcolepsy w/o cataplexy | | | 156 | No | No | Yes |
| 34701 | Narcolepsy w cataplexy | | | 156 | No | No | Yes |
| 34710 | Narclpsy w/o cat oth dis | | | 156 | No | No | Yes |
| 34711 | Narcolepsy w cat oth dis | | | 156 | No | No | Yes |
| 3481 | Anoxic brain damage | 75 | 80 | | Yes | Yes | No |
| 3484 | Compression of brain | 75 | 80 | | Yes | Yes | No |
| 3485 | Cerebral edema | 75 | 80 | | Yes | Yes | No |
| 3491 | Complication cns device | 164 | 176 | | Yes | Yes | No |
| 3501 | Trigeminal neuralgia | | | 83 | No | No | Yes |
| 3502 | Atypical face pain | | | 83 | No | No | Yes |
| 3508 | Trigeminal nerve dis NEC | | | 83 | No | No | Yes |
| 3509 | Trigeminal nerve dis NOS | | | 83 | No | No | Yes |
| 3536 | Phantom limb (syndrome) | 177 | 189 | | Yes | Yes | No |
| 3560 | Hered periph neuropathy | 71 | 75 | 74 | Yes | Yes | Yes |
| 3561 | Peroneal muscle atrophy | 71 | 75 | 74 | Yes | Yes | Yes |
| 3562 | Hered sensory neuropathy | 71 | 75 | 74 | Yes | Yes | Yes |
| 3563 | Refsum's disease | 71 | 75 | 74 | Yes | Yes | Yes |
| 3564 | Idio prog polyneuropathy | 71 | 75 | 74 | Yes | Yes | Yes |
| 3568 | Idio periph neurpthy NEC | 71 | 75 | 74 | Yes | Yes | Yes |
| 3569 | Idio periph neurpthy NOS | 71 | 75 | 74 | Yes | Yes | Yes |
| 3570 | Ac infect polyneuritis | 71 | 75 | 74 | Yes | Yes | Yes |
| 3571 | Neurpthy in col vasc dis | 71 | 75 | 74 | Yes | Yes | Yes |
| 3572 | Neuropathy in diabetes | 71 | 75 | 74 | Yes | Yes | Yes |
| 3573 | Neuropathy in malig dis | 71 | 75 | 74 | Yes | Yes | Yes |
| 3574 | Neuropathy in other dis | 71 | 75 | 74 | Yes | Yes | Yes |
| 3575 | Alcoholic polyneuropathy | 71 | 75 | 74 | Yes | Yes | Yes |
| 3576 | Neuropathy due to drugs | 71 | 75 | 74 | Yes | Yes | Yes |
| 3577 | Neurpthy toxic agent NEC | 71 | 75 | 74 | Yes | Yes | Yes |
| 35781 | Chr inflam polyneuritis | 71 | 75 | 74 | Yes | Yes | Yes |
| 35782 | Crit illness neuropathy | 71 | 75 | 74 | Yes | Yes | Yes |
| 35789 | Inflam/tox neuropthy NEC | 71 | 75 | 74 | Yes | Yes | Yes |
| 3579 | Inflam/tox neuropthy NOS | 71 | 75 | 74 | Yes | Yes | Yes |
| 35800 | Mysthna grvs w/o ac exac | 71 | 75 | 71 | Yes | Yes | Yes |
| 35801 | Myasthna gravs w ac exac | 71 | 75 | 71 | Yes | Yes | Yes |
| 3581 | Myasthenia in oth dis | 71 | 75 | 71 | Yes | Yes | Yes |
| 3582 | Toxic myoneural disorder | 71 | 75 | 71 | Yes | Yes | Yes |
| 35830 | Lambert-Eaton synd NOS | 71 | 75 | 71 | Yes | Yes | Yes |
| 35831 | Lambert-Eaton synd neopl | 71 | 75 | 71 | Yes | Yes | Yes |
| 35839 | Lambert-Eaton syn ot dis | 71 | 75 | 71 | Yes | Yes | Yes |
| 3588 | Myoneural disorders NEC | 71 | 75 | 71 | Yes | Yes | Yes |
| 3589 | Myoneural disorders NOS | 71 | 75 | 71 | Yes | Yes | Yes |
| 3590 | Cong hered musc dystrphy | 70 | 76 | | Yes | Yes | No |
| 3591 | Hered prog musc dystrphy | 70 | 76 | | Yes | Yes | No |
| 35921 | Myotonic musclr dystrphy | 70 | 76 | | Yes | Yes | No |
| 35922 | Myotonia congenita | 71 | 75 | 74 | Yes | Yes | Yes |
| 35923 | Myotonic chondrodystrphy | 71 | 75 | 74 | Yes | Yes | Yes |
| 35924 | Drug induced myotonia | 71 | 75 | 74 | Yes | Yes | Yes |
| 35929 | Myotonic disorder NEC | 71 | 75 | 74 | Yes | Yes | Yes |
| 3593 | Periodic paralysis | 71 | 75 | 74 | Yes | Yes | Yes |
| 3594 | Toxic myopathy | 71 | 75 | 74 | Yes | Yes | Yes |
| 3595 | Myopathy in endocrin dis | 71 | 75 | 74 | Yes | Yes | Yes |
| 3596 | Infl myopathy in oth dis | 71 | 75 | 74 | Yes | Yes | Yes |
| 35971 | Inclusion body myositis | 71 | 75 | 74 | Yes | Yes | Yes |
| 35979 | Inflm/immune myopath NEC | 71 | 75 | 74 | Yes | Yes | Yes |
| 35981 | Critical illness myopthy | 71 | 75 | 74 | Yes | Yes | Yes |
| 35989 | Myopathies NEC | 71 | 75 | 74 | Yes | Yes | Yes |
| 3599 | Myopathy NOS | 71 | 75 | 74 | Yes | Yes | Yes |
| 36201 | Diabetic retinopathy NOS | | 18 | 111 | No | Yes | Yes |
| 36202 | Prolif diab retinopathy | 119 | 122 | 111 | Yes | Yes | Yes |
| 36203 | Nonprolf db retnoph NOS | | 18 | 111 | No | Yes | Yes |
| 36204 | Mild nonprolf db retnoph | | 18 | 111 | No | Yes | Yes |
| 36205 | Mod nonprolf db retnoph | | 18 | 111 | No | Yes | Yes |

4497

| 36206 | Sev nonprolf db retinoph | | 18 | 111 | No | Yes | Yes |
| 36207 | Diabetic macular edema | | 18 | 111 | No | Yes | Yes |
| 36252 | Exudative macular degen | | 124 | | No | Yes | No |
| 36510 | Open-angle glaucoma NOS | | | 113 | No | No | Yes |
| 36511 | Prim open angle glaucoma | | | 113 | No | No | Yes |
| 36512 | Low tension glaucoma | | | 113 | No | No | Yes |
| 36513 | Pigmentary glaucoma | | | 113 | No | No | Yes |
| 36514 | Glaucoma of childhood | | | 113 | No | No | Yes |
| 36515 | Residual opn ang glaucma | | | 113 | No | No | Yes |
| 36641 | Diabetic cataract | | 18 | 14 | No | Yes | Yes |
| 37923 | Vitreous hemorrhage | 119 | 122 | | Yes | Yes | No |
| 39891 | Rheumatic heart failure | | 85 | 87 | No | Yes | Yes |
| 4010 | Malignant hypertension | | | 88 | No | No | Yes |
| 4011 | Benign hypertension | | | 88 | No | No | Yes |
| 4019 | Hypertension NOS | | | 88 | No | No | Yes |
| 40200 | Mal hyp ht dis w/o hf | | | 88 | No | No | Yes |
| 40201 | Mal hypert hrt dis w hf | 80 | 85 | 87 | Yes | Yes | Yes |
| 40210 | Benign hyp ht dis w/o hf | | | 88 | No | No | Yes |
| 40211 | Benign hyp ht dis w hf | 80 | 85 | 87 | Yes | Yes | Yes |
| 40290 | Hyp hrt dis NOS w/o hf | | | 88 | No | No | Yes |
| 40291 | Hyp ht dis NOS w ht fail | 80 | 85 | 87 | Yes | Yes | Yes |
| 40300 | Mal hy kid w cr kid I-IV | | 139 | 125 | No | Yes | Yes |
| 40301 | Mal hyp kid w cr kid V | 131 | 136 | 122 | Yes | Yes | Yes |
| 40310 | Ben hy kid w cr kid I-IV | | 139 | 125 | No | Yes | Yes |
| 40311 | Ben hyp kid w cr kid V | 131 | 136 | 122 | Yes | Yes | Yes |
| 40390 | Hy kid NOS w cr kid I-IV | | 139 | 125 | No | Yes | Yes |
| 40391 | Hyp kid NOS w cr kid V | 131 | 136 | 122 | Yes | Yes | Yes |
| 40400 | Mal hy ht/kd I-IV w/o hf | | 139 | 125 | No | Yes | Yes |
| 40401 | Mal hyp ht/kd I-IV w hf | 80 | 139 | 125 | Yes | Yes | Yes |
| 40402 | Mal hy ht/kd st V w/o hf | 131 | 136 | 122 | Yes | Yes | Yes |
| 40403 | Mal hyp ht/kd stg V w hf | 131 | 136 | 122 | Yes | Yes | Yes |
| 40410 | Ben hy ht/kd I-IV w/o hf | | 139 | 125 | No | Yes | Yes |
| 40411 | Ben hyp ht/kd I-IV w hf | 80 | 139 | 125 | Yes | Yes | Yes |
| 40412 | Ben hy ht/kd st V w/o hf | 131 | 136 | 122 | Yes | Yes | Yes |
| 40413 | Ben hyp ht/kd stg V w hf | 131 | 136 | 122 | Yes | Yes | Yes |
| 40490 | Hy ht/kd NOS I-IV w/o hf | | 139 | 125 | No | Yes | Yes |
| 40491 | Hyp ht/kd NOS I-IV w hf | 80 | 139 | 125 | Yes | Yes | Yes |
| 40492 | Hy ht/kd NOS st V w/o hf | 131 | 136 | 122 | Yes | Yes | Yes |
| 40493 | Hyp ht/kd NOS st V w hf | 131 | 136 | 122 | Yes | Yes | Yes |
| 40501 | Mal renovasc hypertens | | | 88 | No | No | Yes |
| 40509 | Mal second hyperten NEC | | | 88 | No | No | Yes |
| 40511 | Benign renovasc hyperten | | | 88 | No | No | Yes |
| 40519 | Benign second hypert NEC | | | 88 | No | No | Yes |
| 40591 | Renovasc hypertension | | | 88 | No | No | Yes |
| 40599 | Second hypertension NEC | | | 88 | No | No | Yes |
| 41000 | AMI anterolateral,unspec | 82 | 87 | 89 | Yes | Yes | Yes |
| 41001 | AMI anterolateral, init | 81 | 86 | 89 | Yes | Yes | Yes |
| 41002 | AMI anterolateral,subseq | 82 | 87 | 89 | Yes | Yes | Yes |
| 41010 | AMI anterior wall,unspec | 82 | 87 | 89 | Yes | Yes | Yes |
| 41011 | AMI anterior wall, init | 81 | 86 | 89 | Yes | Yes | Yes |
| 41012 | AMI anterior wall,subseq | 82 | 87 | 89 | Yes | Yes | Yes |
| 41020 | AMI inferolateral,unspec | 82 | 87 | 89 | Yes | Yes | Yes |
| 41021 | AMI inferolateral, init | 81 | 86 | 89 | Yes | Yes | Yes |
| 41022 | AMI inferolateral,subseq | 82 | 87 | 89 | Yes | Yes | Yes |
| 41030 | AMI inferopost, unspec | 82 | 87 | 89 | Yes | Yes | Yes |
| 41031 | AMI inferopost, initial | 81 | 86 | 89 | Yes | Yes | Yes |
| 41032 | AMI inferopost, subseq | 82 | 87 | 89 | Yes | Yes | Yes |
| 41040 | AMI inferior wall,unspec | 82 | 87 | 89 | Yes | Yes | Yes |
| 41041 | AMI inferior wall, init | 81 | 86 | 89 | Yes | Yes | Yes |
| 41042 | AMI inferior wall,subseq | 82 | 87 | 89 | Yes | Yes | Yes |
| 41050 | AMI lateral NEC, unspec | 82 | 87 | 89 | Yes | Yes | Yes |
| 41051 | AMI lateral NEC, initial | 81 | 86 | 89 | Yes | Yes | Yes |
| 41052 | AMI lateral NEC, subseq | 82 | 87 | 89 | Yes | Yes | Yes |
| 41060 | True post infarct,unspec | 82 | 87 | 89 | Yes | Yes | Yes |

| 41061 | True post infarct, init | 81 | 86 | 89 | Yes | Yes | Yes |
| 41062 | True post infarct,subseq | 82 | 87 | 89 | Yes | Yes | Yes |
| 41070 | Subendo infarct, unspec | 82 | 87 | 89 | Yes | Yes | Yes |
| 41071 | Subendo infarct, initial | 81 | 86 | 89 | Yes | Yes | Yes |
| 41072 | Subendo infarct, subseq | 82 | 87 | 89 | Yes | Yes | Yes |
| 41080 | AMI NEC, unspecified | 82 | 87 | 89 | Yes | Yes | Yes |
| 41081 | AMI NEC, initial | 81 | 86 | 89 | Yes | Yes | Yes |
| 41082 | AMI NEC, subsequent | 82 | 87 | 89 | Yes | Yes | Yes |
| 41090 | AMI NOS, unspecified | 82 | 87 | 89 | Yes | Yes | Yes |
| 41091 | AMI NOS, initial | 81 | 86 | 89 | Yes | Yes | Yes |
| 41092 | AMI NOS, subsequent | 82 | 87 | 89 | Yes | Yes | Yes |
| 4110 | Post MI syndrome | 82 | 87 | 89 | Yes | Yes | Yes |
| 4111 | Intermed coronary synd | 82 | 87 | 89 | Yes | Yes | Yes |
| 41181 | Acute cor occlsn w/o MI | 82 | 87 | 89 | Yes | Yes | Yes |
| 41189 | Ac ischemic hrt dis NEC | 82 | 87 | 89 | Yes | Yes | Yes |
| 412 | Old myocardial infarct | 83 | | 89 | Yes | No | Yes |
| 4130 | Angina decubitus | 83 | 88 | 89 | Yes | Yes | Yes |
| 4131 | Prinzmetal angina | 83 | 88 | 89 | Yes | Yes | Yes |
| 4139 | Angina pectoris NEC/NOS | 83 | 88 | 89 | Yes | Yes | Yes |
| 41400 | Cor ath unsp vsl ntv/gft | | | 89 | No | No | Yes |
| 41401 | Crnry athrscl natve vssl | | | 89 | No | No | Yes |
| 41402 | Crn ath atlg vn bps grft | | | 89 | No | No | Yes |
| 41403 | Crn ath nonatlg blg grft | | | 89 | No | No | Yes |
| 41404 | Cor ath artry bypas grft | | | 89 | No | No | Yes |
| 41405 | Cor ath bypass graft NOS | | | 89 | No | No | Yes |
| 41406 | Cor ath natv art tp hrt | | | 89 | No | No | Yes |
| 41407 | Cor ath bps graft tp hrt | | | 89 | No | No | Yes |
| 41410 | Aneurysm of heart | | | 89 | No | No | Yes |
| 41411 | Aneurysm coronary vessel | | | 89 | No | No | Yes |
| 41412 | Dissection cor artery | | | 89 | No | No | Yes |
| 41419 | Aneurysm of heart NEC | | | 89 | No | No | Yes |
| 4142 | Chr tot occlus cor artry | | | 89 | No | No | Yes |
| 4143 | Cor ath d/t lpd rch plaq | | | 89 | No | No | Yes |
| 4144 | Cor ath d/t calc cor lsn | | | 89 | No | No | Yes |
| 4148 | Chr ischemic hrt dis NEC | | | 89 | No | No | Yes |
| 4149 | Chr ischemic hrt dis NOS | | | 89 | No | No | Yes |
| 4150 | Acute cor pulmonale | 80 | 85 | 86 | Yes | Yes | Yes |
| 41511 | Iatrogen pulm emb/infarc | 104 | 107 | 100 | Yes | Yes | Yes |
| 41512 | Septic pulmonary embolsm | 104 | 107 | 100 | Yes | Yes | Yes |
| 41513 | Saddle embol pulmon art | 104 | 107 | 100 | Yes | Yes | Yes |
| 41519 | Pulm embol/infarct NEC | 104 | 107 | 100 | Yes | Yes | Yes |
| 4160 | Prim pulm hypertension | 80 | 85 | 86 | Yes | Yes | Yes |
| 4161 | Kyphoscoliotic heart dis | 80 | 85 | 86 | Yes | Yes | Yes |
| 4162 | Chr pulmonary embolism | 104 | 107 | 100 | Yes | Yes | Yes |
| 4168 | Chr pulmon heart dis NEC | 80 | 85 | 86 | Yes | Yes | Yes |
| 4169 | Chr pulmon heart dis NOS | 80 | 85 | 86 | Yes | Yes | Yes |
| 4170 | Arterioven fistu pul ves | 80 | 85 | 86 | Yes | Yes | Yes |
| 4171 | Pulmon artery aneurysm | 80 | 85 | 86 | Yes | Yes | Yes |
| 4178 | Pulmon circulat dis NEC | 80 | 85 | 86 | Yes | Yes | Yes |
| 4179 | Pulmon circulat dis NOS | 80 | 85 | 86 | Yes | Yes | Yes |
| 4250 | Endomyocardial fibrosis | 80 | 85 | 87 | Yes | Yes | Yes |
| 4251 | Hypertr obstr cardiomyop | 80 | 85 | 87 | Yes | Yes | Yes |
| 42511 | Hyprtrophc obst cardiomy | 80 | 85 | 87 | Yes | Yes | Yes |
| 42518 | Oth hyprtrophic cardiomy | 80 | 85 | 87 | Yes | Yes | Yes |
| 4252 | Obsc afric cardiomyopath | 80 | 85 | 87 | Yes | Yes | Yes |
| 4253 | Endocard fibroelastosis | 80 | 85 | 87 | Yes | Yes | Yes |
| 4254 | Prim cardiomyopathy NEC | 80 | 85 | 87 | Yes | Yes | Yes |
| 4255 | Alcoholic cardiomyopathy | 80 | 85 | 87 | Yes | Yes | Yes |
| 4257 | Metabolic cardiomyopathy | 80 | 85 | 87 | Yes | Yes | Yes |
| 4258 | Cardiomyopath in oth dis | 80 | 85 | 87 | Yes | Yes | Yes |
| 4259 | Second cardiomyopath NOS | 80 | 85 | 87 | Yes | Yes | Yes |
| 4260 | Atriovent block complete | 92 | 96 | | Yes | Yes | No |
| 4270 | Parox atrial tachycardia | 92 | 96 | 93 | Yes | Yes | Yes |
| 4271 | Parox ventric tachycard | 92 | 96 | | Yes | Yes | No |

| 4272 | Parox tachycardia NOS | 92 | 96 | 93 | Yes | Yes | Yes |
|------|----------------------|----|----|----|-----|-----|-----|
| 42731 | Atrial fibrillation | 92 | 96 | 93 | Yes | Yes | Yes |
| 42732 | Atrial flutter | 92 | 96 | 93 | Yes | Yes | Yes |
| 42741 | Ventricular fibrillation | 79 | 84 | | Yes | Yes | No |
| 42742 | Ventricular flutter | 79 | 84 | | Yes | Yes | No |
| 4275 | Cardiac arrest | 79 | 84 | | Yes | Yes | No |
| 42781 | Sinoatrial node dysfunct | 92 | 96 | | Yes | Yes | No |
| 4280 | CHF NOS | 80 | 85 | 87 | Yes | Yes | Yes |
| 4281 | Left heart failure | 80 | 85 | 87 | Yes | Yes | Yes |
| 42820 | Systolic hrt failure NOS | 80 | 85 | 87 | Yes | Yes | Yes |
| 42821 | Ac systolic hrt failure | 80 | 85 | 87 | Yes | Yes | Yes |
| 42822 | Chr systolic hrt failure | 80 | 85 | 87 | Yes | Yes | Yes |
| 42823 | Ac on chr syst hrt fail | 80 | 85 | 87 | Yes | Yes | Yes |
| 42830 | Diastolc hrt failure NOS | 80 | 85 | 87 | Yes | Yes | Yes |
| 42831 | Ac diastolic hrt failure | 80 | 85 | 87 | Yes | Yes | Yes |
| 42832 | Chr diastolic hrt fail | 80 | 85 | 87 | Yes | Yes | Yes |
| 42833 | Ac on chr diast hrt fail | 80 | 85 | 87 | Yes | Yes | Yes |
| 42840 | Syst/diast hrt fail NOS | 80 | 85 | 87 | Yes | Yes | Yes |
| 42841 | Ac syst/diastol hrt fail | 80 | 85 | 87 | Yes | Yes | Yes |
| 42842 | Chr syst/diastl hrt fail | 80 | 85 | 87 | Yes | Yes | Yes |
| 42843 | Ac/chr syst/dia hrt fail | 80 | 85 | 87 | Yes | Yes | Yes |
| 4289 | Heart failure NOS | 80 | 85 | 87 | Yes | Yes | Yes |
| 4290 | Myocarditis NOS | 80 | 85 | 87 | Yes | Yes | Yes |
| 4291 | Myocardial degeneration | 80 | 85 | 87 | Yes | Yes | Yes |
| 4295 | Chordae tendinae rupture | 81 | 86 | 89 | Yes | Yes | Yes |
| 4296 | Papillary muscle rupture | 81 | 86 | 89 | Yes | Yes | Yes |
| 430 | Subarachnoid hemorrhage | 95 | 99 | | Yes | Yes | No |
| 431 | Intracerebral hemorrhage | 95 | 99 | | Yes | Yes | No |
| 4320 | Nontraum extradural hem | 95 | 99 | | Yes | Yes | No |
| 4321 | Subdural hemorrhage | 95 | 99 | | Yes | Yes | No |
| 4329 | Intracranial hemorr NOS | 95 | 99 | | Yes | Yes | No |
| 43300 | Ocl bslr art wo infrct | | | 97 | No | No | Yes |
| 43301 | Ocl bslr art w infrct | 96 | 100 | 97 | Yes | Yes | Yes |
| 43310 | Ocl crtd art wo infrct | | | 97 | No | No | Yes |
| 43311 | Ocl crtd art w infrct | 96 | 100 | 97 | Yes | Yes | Yes |
| 43320 | Ocl vrtb art wo infrct | | | 97 | No | No | Yes |
| 43321 | Ocl vrtb art w infrct | 96 | 100 | 97 | Yes | Yes | Yes |
| 43330 | Ocl mlt bi art wo infrct | | | 97 | No | No | Yes |
| 43331 | Ocl mlt bi art w infrct | 96 | 100 | 97 | Yes | Yes | Yes |
| 43380 | Ocl spcf art wo infrct | | | 97 | No | No | Yes |
| 43381 | Ocl spcf art w infrct | 96 | 100 | 97 | Yes | Yes | Yes |
| 43390 | Ocl art NOS wo infrct | | | 97 | No | No | Yes |
| 43391 | Ocl art NOS w infrct | 96 | 100 | 97 | Yes | Yes | Yes |
| 43400 | Crbl thrmbs wo infrct | | | 97 | No | No | Yes |
| 43401 | Crbl thrmbs w infrct | 96 | 100 | 97 | Yes | Yes | Yes |
| 43410 | Crbl emblsm wo infrct | | | 97 | No | No | Yes |
| 43411 | Crbl emblsm w infrct | 96 | 100 | 97 | Yes | Yes | Yes |
| 43490 | Crbl art oc NOS wo infrc | | | 97 | No | No | Yes |
| 43491 | Crbl art ocl NOS w infrc | 96 | 100 | 97 | Yes | Yes | Yes |
| 4350 | Basilar artery syndrome | | | 97 | No | No | Yes |
| 4351 | Vertebral artery syndrom | | | 97 | No | No | Yes |
| 4352 | Subclavian steal syndrom | | | 97 | No | No | Yes |
| 4353 | Vertbrobaslr artery synd | | | 97 | No | No | Yes |
| 4358 | Trans cereb ischemia NEC | | | 97 | No | No | Yes |
| 4359 | Trans cereb ischemia NOS | | | 97 | No | No | Yes |
| 436 | Cva | 96 | 100 | 97 | Yes | Yes | Yes |
| 4370 | Cerebral atherosclerosis | | | 97 | No | No | Yes |
| 4371 | Ac cerebrovasc insuf NOS | | | 97 | No | No | Yes |
| 4372 | Hypertens encephalopathy | | | 88 | No | No | Yes |
| 4374 | Cerebral arteritis | | | 97 | No | No | Yes |
| 4375 | Moyamoya disease | | | 97 | No | No | Yes |
| 4376 | Nonpyogen thrombos sinus | | | 97 | No | No | Yes |
| 4378 | Cerebrovasc disease NEC | | | 97 | No | No | Yes |
| 4379 | Cerebrovasc disease NOS | | | 97 | No | No | Yes |

4500

| 43820 | Late ef-hemplga side NOS | 100 | 103 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 43821 | Late ef-hemplga dom side | 100 | 103 | | Yes | Yes | No |
| 43822 | Late ef-hemiplga non-dom | 100 | 103 | | Yes | Yes | No |
| 43830 | Late ef-mplga up lmb NOS | 101 | 104 | | Yes | Yes | No |
| 43831 | Late ef-mplga up lmb dom | 101 | 104 | | Yes | Yes | No |
| 43832 | Lt ef-mplga uplmb nondom | 101 | 104 | | Yes | Yes | No |
| 43840 | Lte ef-mplga low lmb NOS | 101 | 104 | | Yes | Yes | No |
| 43841 | Lte ef-mplga low lmb dom | 101 | 104 | | Yes | Yes | No |
| 43842 | Lt ef-mplga lowlmb nondm | 101 | 104 | | Yes | Yes | No |
| 43850 | Lt ef oth paral side NOS | 101 | 104 | | Yes | Yes | No |
| 43851 | Lt ef oth paral dom side | 101 | 104 | | Yes | Yes | No |
| 43852 | Lt ef oth parals non-dom | 101 | 104 | | Yes | Yes | No |
| 43853 | Lt ef oth parals-bilat | 101 | 104 | | Yes | Yes | No |
| 4400 | Aortic atherosclerosis | 105 | 108 | 101 | Yes | Yes | Yes |
| 4401 | Renal artery atheroscler | 105 | 108 | 101 | Yes | Yes | Yes |
| 44020 | Athscl extrm ntv art NOS | 105 | 108 | 101 | Yes | Yes | Yes |
| 44021 | Ath ext ntv at w claudct | 105 | 108 | 101 | Yes | Yes | Yes |
| 44022 | Ath ext ntv at w rst pn | 105 | 108 | 101 | Yes | Yes | Yes |
| 44023 | Ath ext ntv art ulcrtion | 104 | 106 | | Yes | Yes | No |
| 44024 | Ath ext ntv art gngrene | 104 | 106 | | Yes | Yes | No |
| 44029 | Athrsc extrm ntv art oth | 105 | 108 | 101 | Yes | Yes | Yes |
| 44030 | Athscl extrm bps gft NOS | 105 | 108 | 101 | Yes | Yes | Yes |
| 44031 | Ath ext autologs bps gft | 105 | 108 | 101 | Yes | Yes | Yes |
| 44032 | Ath ext nonautlg bps gft | 105 | 108 | 101 | Yes | Yes | Yes |
| 4404 | Chr tot occl art extrem | 105 | 108 | 101 | Yes | Yes | Yes |
| 44100 | Dsct of aorta unsp site | 104 | 107 | | Yes | Yes | No |
| 44101 | Dsct of thoracic aorta | 104 | 107 | | Yes | Yes | No |
| 44102 | Dsct of abdominal aorta | 104 | 107 | | Yes | Yes | No |
| 44103 | Dsct of thoracoabd aorta | 104 | 107 | | Yes | Yes | No |
| 4411 | Ruptur thoracic aneurysm | 104 | 107 | | Yes | Yes | No |
| 4412 | Thoracic aortic aneurysm | 105 | 108 | | Yes | Yes | No |
| 4413 | Rupt abd aortic aneurysm | 104 | 107 | | Yes | Yes | No |
| 4414 | Abdom aortic aneurysm | 105 | 108 | | Yes | Yes | No |
| 4415 | Rupt aortic aneurysm NOS | 104 | 107 | | Yes | Yes | No |
| 4416 | Thoracoabd aneurysm rupt | 104 | 107 | | Yes | Yes | No |
| 4417 | Thracabd anurysm wo rupt | 105 | 108 | | Yes | Yes | No |
| 4419 | Aortic aneurysm NOS | 105 | 108 | | Yes | Yes | No |
| 4420 | Upper extremity aneurysm | 105 | 108 | | Yes | Yes | No |
| 4421 | Renal artery aneurysm | 105 | 108 | | Yes | Yes | No |
| 4422 | Iliac artery aneurysm | 105 | 108 | | Yes | Yes | No |
| 4423 | Lower extremity aneurysm | 105 | 108 | | Yes | Yes | No |
| 44281 | Aneurysm of neck | 105 | 108 | | Yes | Yes | No |
| 44282 | Subclavian aneurysm | 105 | 108 | | Yes | Yes | No |
| 44283 | Splenic artery aneurysm | 105 | 108 | | Yes | Yes | No |
| 44284 | Visceral aneurysm NEC | 105 | 108 | | Yes | Yes | No |
| 44289 | Aneurysm NEC | 105 | 108 | | Yes | Yes | No |
| 4429 | Aneurysm NOS | 105 | 108 | | Yes | Yes | No |
| 4431 | Thromboangiit obliterans | 105 | 108 | 101 | Yes | Yes | Yes |
| 44321 | Dissect carotid artery | 104 | 107 | | Yes | Yes | No |
| 44322 | Dissection iliac artery | 104 | 107 | | Yes | Yes | No |
| 44323 | Dissection renal artery | 104 | 107 | | Yes | Yes | No |
| 44324 | Dissect vertebral artery | 104 | 107 | | Yes | Yes | No |
| 44329 | Dissection artery NEC | 104 | 107 | | Yes | Yes | No |
| 44381 | Angiopathy in other dis | 105 | 108 | 101 | Yes | Yes | Yes |
| 44382 | Erythromelalgia | 105 | 108 | 101 | Yes | Yes | Yes |
| 44389 | Periph vascular dis NEC | 105 | 108 | 101 | Yes | Yes | Yes |
| 4439 | Periph vascular dis NOS | 105 | 108 | 101 | Yes | Yes | Yes |
| 4440 | Abd aortic embolism | 104 | 107 | | Yes | Yes | No |
| 44401 | Saddle embolus abd aorta | 104 | 107 | | Yes | Yes | No |
| 44409 | Ot art emb/thrm abd aort | 104 | 107 | | Yes | Yes | No |
| 4441 | Thoracic aortic embolism | 104 | 107 | | Yes | Yes | No |
| 44421 | Upper extremity embolism | 104 | 107 | | Yes | Yes | No |
| 44422 | Lower extremity embolism | 104 | 107 | | Yes | Yes | No |
| 44481 | Iliac artery embolism | 104 | 107 | | Yes | Yes | No |

4501

| 44489 | Arterial embolism NEC | 104 | 107 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 4449 | Arterial embolism NOS | 104 | 107 | | Yes | Yes | No |
| 44501 | Atheroembolism,upper ext | 104 | 107 | | Yes | Yes | No |
| 44502 | Atheroembolism,lower ext | 104 | 107 | | Yes | Yes | No |
| 44581 | Atheroembolism, kidney | 104 | 107 | | Yes | Yes | No |
| 44589 | Atheroembolism, site NEC | 104 | 107 | | Yes | Yes | No |
| 4460 | Polyarteritis nodosa | 38 | 40 | 42 | Yes | Yes | Yes |
| 4461 | Mucocutan lymph node syn | 38 | 40 | 42 | Yes | Yes | Yes |
| 44620 | Hypersensit angiitis NOS | 38 | 40 | 42 | Yes | Yes | Yes |
| 44621 | Goodpasture's syndrome | 38 | 40 | 42 | Yes | Yes | Yes |
| 44629 | Hypersensit angiitis NEC | 38 | 40 | 42 | Yes | Yes | Yes |
| 4463 | Lethal midline granuloma | 38 | 40 | 42 | Yes | Yes | Yes |
| 4464 | Wegener's granulomatosis | 38 | 40 | 42 | Yes | Yes | Yes |
| 4465 | Giant cell arteritis | 38 | 40 | 42 | Yes | Yes | Yes |
| 4466 | Thrombot microangiopathy | 38 | 40 | 42 | Yes | Yes | Yes |
| 4467 | Takayasu's disease | 38 | 40 | 42 | Yes | Yes | Yes |
| 4470 | Acq arterioven fistula | 105 | 108 | | Yes | Yes | No |
| 4471 | Stricture of artery | 105 | 108 | | Yes | Yes | No |
| 4472 | Rupture of artery | 105 | 108 | | Yes | Yes | No |
| 4473 | Renal artery hyperplasia | 105 | 108 | | Yes | Yes | No |
| 4474 | Celiac art compress syn | 105 | 108 | | Yes | Yes | No |
| 4475 | Necrosis of artery | 105 | 108 | | Yes | Yes | No |
| 4476 | Arteritis NOS | 105 | 108 | | Yes | Yes | No |
| 44770 | Aortic ectasia, site NOS | 105 | 108 | | Yes | Yes | No |
| 44771 | Thoracic aortic ectasia | 105 | 108 | | Yes | Yes | No |
| 44772 | Abdominal aortic ectasia | 105 | 108 | | Yes | Yes | No |
| 44773 | Thoracoabd aortic ectasia | 105 | 108 | | Yes | Yes | No |
| 4478 | Arterial disease NEC | 105 | 108 | | Yes | Yes | No |
| 4479 | Arterial disease NOS | 105 | 108 | | Yes | Yes | No |
| 4480 | Heredit hemorr telangiec | 105 | 108 | | Yes | Yes | No |
| 449 | Septic arterial embolism | 104 | 107 | | Yes | Yes | No |
| 45111 | Femoral vein phlebitis | 105 | 108 | 100 | Yes | Yes | Yes |
| 45119 | Deep phlebitis-leg NEC | 105 | 108 | 100 | Yes | Yes | Yes |
| 45181 | Iliac thrombophlebitis | 105 | 108 | 100 | Yes | Yes | Yes |
| 45183 | Phlbts deep vn up extrm | 105 | 108 | 100 | Yes | Yes | Yes |
| 4530 | Budd-chiari syndrome | 105 | 108 | 100 | Yes | Yes | Yes |
| 4532 | Oth inf vena cava thromb | 105 | 108 | 100 | Yes | Yes | Yes |
| 4533 | Renal vein thrombosis | 105 | 108 | 100 | Yes | Yes | Yes |
| 45340 | Ac DVT/embl low ext NOS | 105 | 108 | 100 | Yes | Yes | Yes |
| 45341 | Ac DVT/emb prox low ext | 105 | 108 | 100 | Yes | Yes | Yes |
| 45342 | Ac DVT/emb distl low ext | 105 | 108 | 100 | Yes | Yes | Yes |
| 45350 | Ch DVT/embl low ext NOS | 105 | 108 | 100 | Yes | Yes | Yes |
| 45351 | Ch DVT/embl prox low ext | 105 | 108 | 100 | Yes | Yes | Yes |
| 45352 | Ch DVT/embl dstl low ext | 105 | 108 | 100 | Yes | Yes | Yes |
| 45372 | Ch DVT/embl up ext | 105 | 108 | 100 | Yes | Yes | Yes |
| 45374 | Ch emblsm axillary veins | 105 | 108 | 100 | Yes | Yes | Yes |
| 45375 | Ch emblsm subclav veins | 105 | 108 | 100 | Yes | Yes | Yes |
| 45376 | Ch embl internl jug vein | 105 | 108 | 100 | Yes | Yes | Yes |
| 45377 | Ch embl thorac vein NEC | 105 | 108 | 100 | Yes | Yes | Yes |
| 45382 | Ac DVT/embl up ext | 105 | 108 | 100 | Yes | Yes | Yes |
| 45384 | Ac emblsm axillary veins | 105 | 108 | 100 | Yes | Yes | Yes |
| 45385 | Ac embl subclav veins | 105 | 108 | 100 | Yes | Yes | Yes |
| 45386 | Ac embl internl jug vein | 105 | 108 | 100 | Yes | Yes | Yes |
| 45387 | Ac embl thorac vein NEC | 105 | 108 | 100 | Yes | Yes | Yes |
| 4540 | Leg varicosity w ulcer | | 107 | | No | Yes | No |
| 4542 | Varicos leg ulcer/inflam | | 107 | | No | Yes | No |
| 4560 | Esophag varices w bleed | 25 | 27 | | Yes | Yes | No |
| 4561 | Esoph varices w/o bleed | 25 | 27 | | Yes | Yes | No |
| 45620 | Bleed esoph var oth dis | 25 | 27 | | Yes | Yes | No |
| 45621 | Esoph varice oth dis NOS | 25 | 27 | | Yes | Yes | No |
| 45911 | Postphlebtc synd w ulcer | | 107 | | No | Yes | No |
| 45913 | Postphl syn w ulc&inflam | | 107 | | No | Yes | No |
| 45931 | Chr venous hyper w ulcer | | 107 | | No | Yes | No |
| 45933 | Chr ven hyp w ulc&inflam | | 107 | | No | Yes | No |

| 481 | Pneumococcal pneumonia | 112 | 115 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 4820 | K. pneumoniae pneumonia | 111 | 114 | 106 | Yes | Yes | Yes |
| 4821 | Pseudomonal pneumonia | 111 | 114 | 106 | Yes | Yes | Yes |
| 4822 | H.influenzae pneumonia | 112 | 115 | | Yes | Yes | No |
| 48230 | Streptococcal pneumn NOS | 112 | 115 | | Yes | Yes | No |
| 48231 | Pneumonia strptococcus a | 112 | 115 | | Yes | Yes | No |
| 48232 | Pneumonia strptococcus b | 112 | 115 | | Yes | Yes | No |
| 48239 | Pneumonia oth strep | 112 | 115 | | Yes | Yes | No |
| 48240 | Staphylococcal pneu NOS | 111 | 114 | 106 | Yes | Yes | Yes |
| 48241 | Meth sus pneum d/t Staph | 111 | 114 | 106 | Yes | Yes | Yes |
| 48242 | Meth res pneu d/t Staph | 111 | 114 | 106 | Yes | Yes | Yes |
| 48249 | Staph pneumonia NEC | 111 | 114 | 106 | Yes | Yes | Yes |
| 48281 | Pneumonia anaerobes | 111 | 114 | 106 | Yes | Yes | Yes |
| 48282 | Pneumonia e coli | 111 | 114 | 106 | Yes | Yes | Yes |
| 48283 | Pneumo oth grm-neg bact | 111 | 114 | 106 | Yes | Yes | Yes |
| 48284 | Legionnaires' disease | 111 | 114 | 106 | Yes | Yes | Yes |
| 48289 | Pneumonia oth spcf bact | 111 | 114 | 106 | Yes | Yes | Yes |
| 4841 | Pneum w cytomeg incl dis | 5 | 6 | 5 | Yes | Yes | Yes |
| 4846 | Pneum in aspergillosis | 112 | 6 | 5 | Yes | Yes | Yes |
| 4847 | Pneum in oth sys mycoses | 112 | 115 | 106 | Yes | Yes | Yes |
| 4910 | Simple chr bronchitis | 108 | 111 | 104 | Yes | Yes | Yes |
| 4911 | Mucopurul chr bronchitis | 108 | 111 | 104 | Yes | Yes | Yes |
| 49120 | Obst chr bronc w/o exac | 108 | 111 | 104 | Yes | Yes | Yes |
| 49121 | Obs chr bronc w(ac) exac | 108 | 111 | 104 | Yes | Yes | Yes |
| 49122 | Obs chr bronc w ac bronc | 108 | 111 | 104 | Yes | Yes | Yes |
| 4918 | Chronic bronchitis NEC | 108 | 111 | 104 | Yes | Yes | Yes |
| 4919 | Chronic bronchitis NOS | 108 | 111 | 104 | Yes | Yes | Yes |
| 4920 | Emphysematous bleb | 108 | 111 | 104 | Yes | Yes | Yes |
| 4928 | Emphysema NEC | 108 | 111 | 104 | Yes | Yes | Yes |
| 49300 | Extrinsic asthma NOS | | | 104 | No | No | Yes |
| 49301 | Ext asthma w status asth | | | 104 | No | No | Yes |
| 49302 | Ext asthma w(acute) exac | | | 104 | No | No | Yes |
| 49310 | Intrinsic asthma NOS | | | 104 | No | No | Yes |
| 49311 | Int asthma w status asth | | | 104 | No | No | Yes |
| 49312 | Int asthma w (ac) exac | | | 104 | No | No | Yes |
| 49320 | Chronic obst asthma NOS | 108 | 111 | 104 | Yes | Yes | Yes |
| 49321 | Ch ob asthma w stat asth | 108 | 111 | 104 | Yes | Yes | Yes |
| 49322 | Ch obst asth w (ac) exac | 108 | 111 | 104 | Yes | Yes | Yes |
| 49381 | Exercse ind bronchospasm | | | 104 | No | No | Yes |
| 49382 | Cough variant asthma | | | 104 | No | No | Yes |
| 49390 | Asthma NOS | | | 104 | No | No | Yes |
| 49391 | Asthma w status asthmat | | | 104 | No | No | Yes |
| 49392 | Asthma NOS w (ac) exac | | | 104 | No | No | Yes |
| 4940 | Bronchiectas w/o ac exac | | 112 | 105 | No | Yes | Yes |
| 4941 | Bronchiectasis w ac exac | | 112 | 105 | No | Yes | Yes |
| 4950 | Farmers' lung | | 112 | | No | Yes | No |
| 4951 | Bagassosis | | 112 | | No | Yes | No |
| 4952 | Bird-fanciers' lung | | 112 | | No | Yes | No |
| 4953 | Suberosis | | 112 | | No | Yes | No |
| 4954 | Malt workers' lung | | 112 | | No | Yes | No |
| 4955 | Mushroom workers' lung | | 112 | | No | Yes | No |
| 4956 | Mapl bark-stripprs' lung | | 112 | | No | Yes | No |
| 4957 | "ventilation" pneumonit | | 112 | | No | Yes | No |
| 4958 | Allerg alveol/pneum NEC | | 112 | | No | Yes | No |
| 4959 | Allerg alveol/pneum NOS | | 112 | | No | Yes | No |
| 496 | Chr airway obstruct NEC | 108 | 111 | 104 | Yes | Yes | Yes |
| 500 | Coal workers' pneumocon | | 112 | | No | Yes | No |
| 501 | Asbestosis | | 112 | | No | Yes | No |
| 502 | Silica pneumocon NEC | | 112 | | No | Yes | No |
| 503 | Inorg dust pneumocon NEC | | 112 | | No | Yes | No |
| 504 | Dust pneumonopathy NEC | | 112 | | No | Yes | No |
| 505 | Pneumoconiosis NOS | | 112 | | No | Yes | No |
| 5060 | Fum/vapor bronc/pneumon | | 112 | | No | Yes | No |
| 5061 | Fum/vapor ac pulm edema | | 112 | | No | Yes | No |

| 5062 | Fum/vapor up resp inflam | | 112 | | No | Yes | No |
|------|--------------------------|---|-----|---|----|-----|----|
| 5063 | Fum/vap ac resp cond NEC | | 112 | | No | Yes | No |
| 5064 | Fum/vapor chr resp cond | | 112 | | No | Yes | No |
| 5069 | Fum/vapor resp cond NOS | | 112 | | No | Yes | No |
| 5070 | Food/vomit pneumonitis | 111 | 114 | | Yes | Yes | No |
| 5071 | Oil/essence pneumonitis | 111 | 114 | | Yes | Yes | No |
| 5078 | Solid/liq pneumonit NEC | 111 | 114 | | Yes | Yes | No |
| 5080 | Ac pul manif d/t radiat | | 112 | 105 | No | Yes | Yes |
| 5081 | Chr pul manif d/t radiat | | 112 | 105 | No | Yes | Yes |
| 5082 | Resp cond dt smoke inhal | | 112 | 105 | No | Yes | Yes |
| 5088 | Resp cond: ext agent NEC | | 112 | 105 | No | Yes | Yes |
| 5089 | Resp cond: ext agent NOS | | 112 | 105 | No | Yes | Yes |
| 5100 | Empyema with fistula | 112 | 115 | 106 | Yes | Yes | Yes |
| 5109 | Empyema w/o fistula | 112 | 115 | 106 | Yes | Yes | Yes |
| 5130 | Abscess of lung | 112 | 115 | 106 | Yes | Yes | Yes |
| 5131 | Abscess of mediastinum | 112 | 115 | 106 | Yes | Yes | Yes |
| 515 | Postinflam pulm fibrosis | | 112 | 105 | No | Yes | Yes |
| 5160 | Pul alveolar proteinosis | | 112 | 105 | No | Yes | Yes |
| 5161 | Idio pulm hemosiderosis | | 112 | 105 | No | Yes | Yes |
| 5162 | Pulm alveolar microlith | | 112 | 105 | No | Yes | Yes |
| 5163 | Idio fibros alveolitis | | 112 | 105 | No | Yes | Yes |
| 51630 | Idiopath inters pneu NOS | | 112 | 105 | No | Yes | Yes |
| 51631 | Idiopath pulmon fibrosis | | 112 | 105 | No | Yes | Yes |
| 51632 | Idio non-spec inter pneu | | 112 | 105 | No | Yes | Yes |
| 51633 | Acute interstitial pneum | | 112 | 105 | No | Yes | Yes |
| 51634 | Resp brncio interst lung | | 112 | 105 | No | Yes | Yes |
| 51635 | Idiopth lym interst pneu | | 112 | 105 | No | Yes | Yes |
| 51636 | Cryptogenic organiz pneu | | 112 | 105 | No | Yes | Yes |
| 51637 | Desquamatv interst pneu | | 112 | 105 | No | Yes | Yes |
| 5164 | Lymphangioleiomyomatosis | | 112 | 105 | No | Yes | Yes |
| 5165 | Adlt pul Langs cell hist | | 112 | 105 | No | Yes | Yes |
| 51661 | Neuroend cell hyprpl inf | | 112 | 105 | No | Yes | Yes |
| 51662 | Pulm interstitl glycogen | | 112 | 105 | No | Yes | Yes |
| 51663 | Surfactant mutation lung | | 112 | 105 | No | Yes | Yes |
| 51664 | Alv cap dysp w vn misaln | | 112 | 105 | No | Yes | Yes |
| 51669 | Oth intrst lung dis chld | | 112 | 105 | No | Yes | Yes |
| 5168 | Alveol pneumonopathy NEC | | 112 | 105 | No | Yes | Yes |
| 5169 | Alveol pneumonopathy NOS | | 112 | 105 | No | Yes | Yes |
| 5171 | Rheumatic pneumonia | | 112 | 105 | No | Yes | Yes |
| 5172 | Syst sclerosis lung dis | | 112 | 105 | No | Yes | Yes |
| 5173 | Acute chest syndrome | 44 | 46 | 50 | Yes | Yes | Yes |
| 5178 | Lung involv in oth dis | | 112 | 105 | No | Yes | Yes |
| 5181 | Interstitial emphysema | 108 | 111 | 104 | Yes | Yes | Yes |
| 5182 | Compensatory emphysema | 108 | 111 | 104 | Yes | Yes | Yes |
| 5183 | Pulmonary eosinophilia | | 112 | | No | Yes | No |
| 5184 | Acute lung edema NOS | 79 | 84 | | Yes | Yes | No |
| 5185 | Post traum pulm insuffic | 79 | 84 | | Yes | Yes | No |
| 51851 | Ac resp flr fol trma/srg | 79 | 84 | | Yes | Yes | No |
| 51852 | Ot pul insuf fol trm/srg | 79 | 84 | | Yes | Yes | No |
| 51853 | Ac/chr rsp flr fol tr/sg | 79 | 84 | | Yes | Yes | No |
| 5186 | Alrgc brncpul asprglosis | | 112 | 105 | No | Yes | Yes |
| 51881 | Acute respiratry failure | 79 | 84 | | Yes | Yes | No |
| 51882 | Other pulmonary insuff | 79 | 84 | | Yes | Yes | No |
| 51883 | Chronic respiratory fail | 79 | 84 | | Yes | Yes | No |
| 51884 | Acute & chronc resp fail | 79 | 84 | | Yes | Yes | No |
| 51900 | Tracheostomy comp NOS | 77 | 82 | | Yes | Yes | No |
| 51901 | Tracheostomy infection | 77 | 82 | | Yes | Yes | No |
| 51902 | Tracheostomy - mech comp | 77 | 82 | | Yes | Yes | No |
| 51909 | Tracheostomy comp NEC | 77 | 82 | | Yes | Yes | No |
| 5300 | Achalasia & cardiospasm | | | 33 | No | No | Yes |
| 53010 | Esophagitis, unspecified | | | 33 | No | No | Yes |
| 53011 | Reflux esophagitis | | | 33 | No | No | Yes |
| 53012 | Acute esophagitis | | | 33 | No | No | Yes |
| 53013 | Eosinophilic esophagitis | | | 33 | No | No | Yes |

4504

| 53019 | Other esophagitis | | | 33 | No | No | Yes |
|---|---|---|---|---|---|---|---|
| 5303 | Esophageal stricture | | | 33 | No | No | Yes |
| 5304 | Perforation of esophagus | | | 33 | No | No | Yes |
| 5305 | Dyskinesia of esophagus | | | 33 | No | No | Yes |
| 5306 | Acq esophag diverticulum | | | 33 | No | No | Yes |
| 53081 | Esophageal reflux | | | 33 | No | No | Yes |
| 53083 | Esophageal leukoplakia | | | 33 | No | No | Yes |
| 53084 | Tracheoesophageal fstula | | | 33 | No | No | Yes |
| 53085 | Barrett's esophagus | | | 33 | No | No | Yes |
| 53086 | Esophagostomy infection | 176 | 188 | | Yes | Yes | No |
| 53087 | Mech comp esophagostomy | 176 | 188 | | Yes | Yes | No |
| 53089 | Other dsrders esophagus | | | 33 | No | No | Yes |
| 5309 | Esophageal disorder NOS | | | 33 | No | No | Yes |
| 53110 | Ac stomach ulcer w perf | 31 | 33 | | Yes | Yes | No |
| 53111 | Ac stom ulc w perf-obst | 31 | 33 | | Yes | Yes | No |
| 53120 | Ac stomac ulc w hem/perf | 31 | 33 | | Yes | Yes | No |
| 53121 | Ac stom ulc hem/perf-obs | 31 | 33 | | Yes | Yes | No |
| 53150 | Chr stomach ulcer w perf | 31 | 33 | | Yes | Yes | No |
| 53151 | Chr stom ulc w perf-obst | 31 | 33 | | Yes | Yes | No |
| 53160 | Chr stomach ulc hem/perf | 31 | 33 | | Yes | Yes | No |
| 53161 | Chr stom ulc hem/perf-ob | 31 | 33 | | Yes | Yes | No |
| 53210 | Ac duodenal ulcer w perf | 31 | 33 | | Yes | Yes | No |
| 53211 | Ac duoden ulc perf-obstr | 31 | 33 | | Yes | Yes | No |
| 53220 | Ac duoden ulc w hem/perf | 31 | 33 | | Yes | Yes | No |
| 53221 | Ac duod ulc hem/perf-obs | 31 | 33 | | Yes | Yes | No |
| 53250 | Chr duoden ulcer w perf | 31 | 33 | | Yes | Yes | No |
| 53251 | Chr duoden ulc perf-obst | 31 | 33 | | Yes | Yes | No |
| 53260 | Chr duoden ulc hem/perf | 31 | 33 | | Yes | Yes | No |
| 53261 | Chr duod ulc hem/perf-ob | 31 | 33 | | Yes | Yes | No |
| 53310 | Ac peptic ulcer w perfor | 31 | 33 | | Yes | Yes | No |
| 53311 | Ac peptic ulc w perf-obs | 31 | 33 | | Yes | Yes | No |
| 53320 | Ac peptic ulc w hem/perf | 31 | 33 | | Yes | Yes | No |
| 53321 | Ac pept ulc hem/perf-obs | 31 | 33 | | Yes | Yes | No |
| 53350 | Chr peptic ulcer w perf | 31 | 33 | | Yes | Yes | No |
| 53351 | Chr peptic ulc perf-obst | 31 | 33 | | Yes | Yes | No |
| 53360 | Chr pept ulc w hem/perf | 31 | 33 | | Yes | Yes | No |
| 53361 | Chr pept ulc hem/perf-ob | 31 | 33 | | Yes | Yes | No |
| 53410 | Ac marginal ulcer w perf | 31 | 33 | | Yes | Yes | No |
| 53411 | Ac margin ulc w perf-obs | 31 | 33 | | Yes | Yes | No |
| 53420 | Ac margin ulc w hem/perf | 31 | 33 | | Yes | Yes | No |
| 53421 | Ac marg ulc hem/perf-obs | 31 | 33 | | Yes | Yes | No |
| 53450 | Chr marginal ulc w perf | 31 | 33 | | Yes | Yes | No |
| 53451 | Chr margin ulc perf-obst | 31 | 33 | | Yes | Yes | No |
| 53460 | Chr margin ulc hem/perf | 31 | 33 | | Yes | Yes | No |
| 53461 | Chr marg ulc hem/perf-ob | 31 | 33 | | Yes | Yes | No |
| 53640 | Gastrostomy comp NOS | 176 | 188 | | Yes | Yes | No |
| 53641 | Gastrostomy infection | 176 | 188 | | Yes | Yes | No |
| 53642 | Gastrostomy comp - mech | 176 | 188 | | Yes | Yes | No |
| 53649 | Gastrostomy comp NEC | 176 | 188 | | Yes | Yes | No |
| 5550 | Reg enteritis, sm intest | 33 | 35 | 32 | Yes | Yes | Yes |
| 5551 | Reg enteritis, lg intest | 33 | 35 | 32 | Yes | Yes | Yes |
| 5552 | Reg enterit sm/lg intest | 33 | 35 | 32 | Yes | Yes | Yes |
| 5559 | Regional enteritis NOS | 33 | 35 | 32 | Yes | Yes | Yes |
| 5560 | Ulcerative enterocolitis | 33 | 35 | 32 | Yes | Yes | Yes |
| 5561 | Ulcerative ileocolitis | 33 | 35 | 32 | Yes | Yes | Yes |
| 5562 | Ulcerative proctitis | 33 | 35 | 32 | Yes | Yes | Yes |
| 5563 | Ulcertve prctosigmoidtis | 33 | 35 | 32 | Yes | Yes | Yes |
| 5564 | Pseudopolyposis colon | 33 | 35 | 32 | Yes | Yes | Yes |
| 5565 | Lftsded ulcertve colitis | 33 | 35 | 32 | Yes | Yes | Yes |
| 5566 | Univrsl ulcertve colitis | 33 | 35 | 32 | Yes | Yes | Yes |
| 5568 | Other ulcerative colitis | 33 | 35 | 32 | Yes | Yes | Yes |
| 5569 | Ulceratve colitis unspef | 33 | 35 | 32 | Yes | Yes | Yes |
| 5570 | Ac vasc insuff intestine | 104 | 107 | | Yes | Yes | No |
| 5571 | Chr vasc insuff intest | 105 | 108 | | Yes | Yes | No |

| 5579 | Vasc insuff intest NOS | 105 | 108 | | Yes | Yes | No |
|------|------------------------|-----|-----|--|-----|-----|-----|
| 5600 | Intussusception | 31 | 33 | | Yes | Yes | No |
| 5601 | Paralytic ileus | 31 | 33 | | Yes | Yes | No |
| 5602 | Volvulus of intestine | 31 | 33 | | Yes | Yes | No |
| 56030 | Impaction intestine NOS | 31 | 33 | | Yes | Yes | No |
| 56031 | Gallstone ileus | 31 | 33 | | Yes | Yes | No |
| 56032 | Fecal impaction | 31 | 33 | | Yes | Yes | No |
| 56039 | Impaction intestine NEC | 31 | 33 | | Yes | Yes | No |
| 56081 | Intestinal adhes w obstr | 31 | 33 | | Yes | Yes | No |
| 56089 | Intestinal obstruct NEC | 31 | 33 | | Yes | Yes | No |
| 5609 | Intestinal obstruct NOS | 31 | 33 | | Yes | Yes | No |
| 5670 | Peritonitis in infec dis | 31 | 33 | | Yes | Yes | No |
| 5671 | Pneumococcal peritonitis | 31 | 33 | | Yes | Yes | No |
| 56721 | Peritonitis (acute) gen | 31 | 33 | | Yes | Yes | No |
| 56722 | Peritoneal abscess | 31 | 33 | | Yes | Yes | No |
| 56723 | Spontan bact peritonitis | 31 | 33 | | Yes | Yes | No |
| 56729 | Suppurat peritonitis NEC | 31 | 33 | | Yes | Yes | No |
| 56731 | Psoas muscle abscess | 31 | 33 | | Yes | Yes | No |
| 56738 | Retroperiton abscess NEC | 31 | 33 | | Yes | Yes | No |
| 56739 | Retroperiton infect NEC | 31 | 33 | | Yes | Yes | No |
| 56781 | Choleperitonitis | 31 | 33 | | Yes | Yes | No |
| 56782 | Sclerosing mesenteritis | 31 | 33 | | Yes | Yes | No |
| 56789 | Peritonitis NEC | 31 | 33 | | Yes | Yes | No |
| 5679 | Peritonitis NOS | 31 | 33 | | Yes | Yes | No |
| 56960 | Colstomy/enter comp NOS | 176 | 188 | | Yes | Yes | No |
| 56961 | Colosty/enterost infectn | 176 | 188 | | Yes | Yes | No |
| 56962 | Colosty/enter comp-mech | 176 | 188 | | Yes | Yes | No |
| 56969 | Colstmy/enteros comp NEC | 176 | 188 | | Yes | Yes | No |
| 56971 | Pouchitis | 176 | 188 | | Yes | Yes | No |
| 56979 | Comp intest pouch NEC | 176 | 188 | | Yes | Yes | No |
| 56983 | Perforation of intestine | 31 | 33 | | Yes | Yes | No |
| 5712 | Alcohol cirrhosis liver | 26 | 28 | | Yes | Yes | No |
| 5713 | Alcohol liver damage NOS | 26 | 28 | | Yes | Yes | No |
| 57140 | Chronic hepatitis NOS | 27 | 29 | | Yes | Yes | No |
| 57141 | Chr persistent hepatitis | 27 | 29 | | Yes | Yes | No |
| 57142 | Autoimmune hepatitis | 27 | 29 | | Yes | Yes | No |
| 57149 | Chronic hepatitis NEC | 27 | 29 | | Yes | Yes | No |
| 5715 | Cirrhosis of liver NOS | 26 | 28 | | Yes | Yes | No |
| 5716 | Biliary cirrhosis | 26 | 28 | | Yes | Yes | No |
| 5722 | Hepatic encephalopathy | 25 | 27 | | Yes | Yes | No |
| 5723 | Portal hypertension | 25 | 27 | | Yes | Yes | No |
| 5724 | Hepatorenal syndrome | 25 | 27 | | Yes | Yes | No |
| 5728 | Oth sequela, chr liv dis | 25 | 27 | | Yes | Yes | No |
| 5735 | Hepatopulmonary syndrome | 25 | 27 | | Yes | Yes | No |
| 5770 | Acute pancreatitis | 32 | | | Yes | No | No |
| 5771 | Chronic pancreatitis | 32 | 34 | 30 | Yes | Yes | Yes |
| 5772 | Pancreat cyst/pseudocyst | 32 | | 31 | Yes | No | Yes |
| 5778 | Pancreatic disease NEC | 32 | | 31 | Yes | No | Yes |
| 5779 | Pancreatic disease NOS | 32 | | 31 | Yes | No | Yes |
| 5790 | Celiac disease | 32 | | 31 | Yes | No | Yes |
| 5791 | Tropical sprue | 32 | | 31 | Yes | No | Yes |
| 5792 | Blind loop syndrome | 32 | | 31 | Yes | No | Yes |
| 5793 | Intest postop nonabsorb | 32 | | 31 | Yes | No | Yes |
| 5794 | Pancreatic steatorrhea | 32 | | 31 | Yes | No | Yes |
| 5798 | Intest malabsorption NEC | 32 | | 31 | Yes | No | Yes |
| 5799 | Intest malabsorption NOS | 32 | | 31 | Yes | No | Yes |
| 5800 | Ac proliferat nephritis | 132 | 141 | 126 | Yes | Yes | Yes |
| 5804 | Ac rapidly progr nephrit | 132 | 141 | 126 | Yes | Yes | Yes |
| 58081 | Ac nephritis in oth dis | 132 | 141 | 126 | Yes | Yes | Yes |
| 58089 | Acute nephritis NEC | 132 | 141 | 126 | Yes | Yes | Yes |
| 5809 | Acute nephritis NOS | 132 | 141 | 126 | Yes | Yes | Yes |
| 5810 | Nephrotic syn, prolifer | 132 | 141 | 126 | Yes | Yes | Yes |
| 5811 | Epimembranous nephritis | 132 | 141 | 126 | Yes | Yes | Yes |
| 5812 | Membranoprolif nephrosis | 132 | 141 | 126 | Yes | Yes | Yes |

| 5813 | Minimal change nephrosis | 132 | 141 | 126 | Yes | Yes | Yes |
|------|--------------------------|-----|-----|-----|-----|-----|-----|
| 58181 | Nephrotic syn in oth dis | 132 | 141 | 126 | Yes | Yes | Yes |
| 58189 | Nephrotic syndrome NEC | 132 | 141 | 126 | Yes | Yes | Yes |
| 5819 | Nephrotic syndrome NOS | 132 | 141 | 126 | Yes | Yes | Yes |
| 5820 | Chr proliferat nephritis | 132 | 141 | 126 | Yes | Yes | Yes |
| 5821 | Chr membranous nephritis | 132 | 141 | 126 | Yes | Yes | Yes |
| 5822 | Chr membranoprolif nephr | 132 | 141 | 126 | Yes | Yes | Yes |
| 5824 | Chr rapid progr nephrit | 132 | 141 | 126 | Yes | Yes | Yes |
| 58281 | Chr nephritis in oth dis | 132 | 141 | 126 | Yes | Yes | Yes |
| 58289 | Chronic nephritis NEC | 132 | 141 | 126 | Yes | Yes | Yes |
| 5829 | Chronic nephritis NOS | 132 | 141 | 126 | Yes | Yes | Yes |
| 5830 | Proliferat nephritis NOS | 132 | 141 | 126 | Yes | Yes | Yes |
| 5831 | Membranous nephritis NOS | 132 | 141 | 126 | Yes | Yes | Yes |
| 5832 | Membranoprolif nephr NOS | 132 | 141 | 126 | Yes | Yes | Yes |
| 5834 | Rapidly prog nephrit NOS | 132 | 141 | 126 | Yes | Yes | Yes |
| 5836 | Renal cort necrosis NOS | 132 | 141 | 126 | Yes | Yes | Yes |
| 5837 | Nephr NOS/medull necros | 132 | 141 | 126 | Yes | Yes | Yes |
| 58381 | Nephritis NOS in oth dis | 132 | 141 | 126 | Yes | Yes | Yes |
| 58389 | Nephritis NEC | 132 | 141 | 126 | Yes | Yes | Yes |
| 5839 | Nephritis NOS | 132 | 141 | 126 | Yes | Yes | Yes |
| 5845 | Ac kidny fail, tubr necr | 131 | 135 | | Yes | Yes | No |
| 5846 | Ac kidny fail, cort necr | 131 | 135 | | Yes | Yes | No |
| 5847 | Ac kidny fail, medu necr | 131 | 135 | | Yes | Yes | No |
| 5848 | Acute kidney failure NEC | 131 | 135 | | Yes | Yes | No |
| 5849 | Acute kidney failure NOS | 131 | 135 | | Yes | Yes | No |
| 5851 | Chro kidney dis stage I | 131 | 139 | 125 | Yes | Yes | Yes |
| 5852 | Chro kidney dis stage II | 131 | 139 | 125 | Yes | Yes | Yes |
| 5853 | Chr kidney dis stage III | 131 | 138 | 124 | Yes | Yes | Yes |
| 5854 | Chr kidney dis stage IV | 131 | 137 | 123 | Yes | Yes | Yes |
| 5855 | Chron kidney dis stage V | 131 | 136 | 122 | Yes | Yes | Yes |
| 5856 | End stage renal disease | 131 | 136 | 121 | Yes | Yes | Yes |
| 5859 | Chronic kidney dis NOS | 131 | 139 | 125 | Yes | Yes | Yes |
| 586 | Renal failure NOS | 131 | 140 | | Yes | Yes | No |
| 5880 | Renal osteodystrophy | | | 45 | No | No | Yes |
| 5881 | Nephrogen diabetes insip | | 23 | 18 | No | Yes | Yes |
| 58881 | Sec hyperparathyrd-renal | | 23 | 19 | No | Yes | Yes |
| 59381 | Renal vascular disorder | 104 | 107 | | Yes | Yes | No |
| 59681 | Infection of cystostomy | 164 | 176 | | Yes | Yes | No |
| 59682 | Mech comp of cystostomy | 164 | 176 | | Yes | Yes | No |
| 59683 | Other comp of cystostomy | 164 | 176 | | Yes | Yes | No |
| 62931 | Eros imp vag mesh in tis | 164 | 176 | | Yes | Yes | No |
| 6944 | Pemphigus | | | 145 | No | No | Yes |
| 69513 | Stevens-Johnson syndrome | | 162 | | No | Yes | No |
| 69514 | Stevens-Johnson-TEN syn | | 162 | | No | Yes | No |
| 69515 | Toxic epidrml necrolysis | | 162 | | No | Yes | No |
| 6960 | Psoriatic arthropathy | | 40 | 40 | No | Yes | Yes |
| 6961 | Other psoriasis | | | 147 | No | No | Yes |
| 6962 | Parapsoriasis | | | 147 | No | No | Yes |
| 70700 | Pressure ulcer, site NOS | 148 | 160 | | Yes | Yes | No |
| 70701 | Pressure ulcer, elbow | 148 | 160 | | Yes | Yes | No |
| 70702 | Pressure ulcer, upr back | 148 | 160 | | Yes | Yes | No |
| 70703 | Pressure ulcer, low back | 148 | 160 | | Yes | Yes | No |
| 70704 | Pressure ulcer, hip | 148 | 160 | | Yes | Yes | No |
| 70705 | Pressure ulcer, buttock | 148 | 160 | | Yes | Yes | No |
| 70706 | Pressure ulcer, ankle | 148 | 160 | | Yes | Yes | No |
| 70707 | Pressure ulcer, heel | 148 | 160 | | Yes | Yes | No |
| 70709 | Pressure ulcer, site NEC | 148 | 160 | | Yes | Yes | No |
| 70710 | Ulcer of lower limb NOS | 149 | 161 | 142 | Yes | Yes | Yes |
| 70711 | Ulcer of thigh | 149 | 161 | 142 | Yes | Yes | Yes |
| 70712 | Ulcer of calf | 149 | 161 | 142 | Yes | Yes | Yes |
| 70713 | Ulcer of ankle | 149 | 161 | 142 | Yes | Yes | Yes |
| 70714 | Ulcer of heel & midfoot | 149 | 161 | 142 | Yes | Yes | Yes |
| 70715 | Ulcer other part of foot | 149 | 161 | 142 | Yes | Yes | Yes |
| 70719 | Ulcer oth part low limb | 149 | 161 | 142 | Yes | Yes | Yes |

| 70720 | Pressure ulcer,stage NOS | 148 | 160 | | Yes | Yes | No |
| 70721 | Pressure ulcer, stage I | 148 | 160 | | Yes | Yes | No |
| 70722 | Pressure ulcer, stage II | 148 | 159 | | Yes | Yes | No |
| 70723 | Pressure ulcer,stage III | 148 | 158 | | Yes | Yes | No |
| 70724 | Pressure ulcer, stage IV | 148 | 157 | | Yes | Yes | No |
| 70725 | Pressure ulcer,unstagebl | 148 | 158 | | Yes | Yes | No |
| 7078 | Chronic skin ulcer NEC | 149 | 161 | 142 | Yes | Yes | Yes |
| 7079 | Chronic skin ulcer NOS | 149 | 161 | 142 | Yes | Yes | Yes |
| 7100 | Syst lupus erythematosus | 38 | 40 | 42 | Yes | Yes | Yes |
| 7101 | Systemic sclerosis | 38 | 40 | 42 | Yes | Yes | Yes |
| 7102 | Sicca syndrome | 38 | 40 | 42 | Yes | Yes | Yes |
| 7103 | Dermatomyositis | 38 | 40 | 42 | Yes | Yes | Yes |
| 7104 | Polymyositis | 38 | 40 | 42 | Yes | Yes | Yes |
| 7105 | Eosinophilia myalgia snd | 38 | 40 | 42 | Yes | Yes | Yes |
| 7108 | Diff connect tis dis NEC | 38 | 40 | 42 | Yes | Yes | Yes |
| 7109 | Diff connect tis dis NOS | 38 | 40 | 42 | Yes | Yes | Yes |
| 71100 | Pyogen arthritis-unspec | 37 | 39 | | Yes | Yes | No |
| 71101 | Pyogen arthritis-shlder | 37 | 39 | | Yes | Yes | No |
| 71102 | Pyogen arthritis-up/arm | 37 | 39 | | Yes | Yes | No |
| 71103 | Pyogen arthritis-forearm | 37 | 39 | | Yes | Yes | No |
| 71104 | Pyogen arthritis-hand | 37 | 39 | | Yes | Yes | No |
| 71105 | Pyogen arthritis-pelvis | 37 | 39 | | Yes | Yes | No |
| 71106 | Pyogen arthritis-l/leg | 37 | 39 | | Yes | Yes | No |
| 71107 | Pyogen arthritis-ankle | 37 | 39 | | Yes | Yes | No |
| 71108 | Pyogen arthritis NEC | 37 | 39 | | Yes | Yes | No |
| 71109 | Pyogen arthritis-mult | 37 | 39 | | Yes | Yes | No |
| 71110 | Reiter arthritis-unspec | 37 | 40 | 41 | Yes | Yes | Yes |
| 71111 | Reiter arthritis-shlder | 37 | 40 | 41 | Yes | Yes | Yes |
| 71112 | Reiter arthritis-up/arm | 37 | 40 | 41 | Yes | Yes | Yes |
| 71113 | Reiter arthritis-forearm | 37 | 40 | 41 | Yes | Yes | Yes |
| 71114 | Reiter arthritis-hand | 37 | 40 | 41 | Yes | Yes | Yes |
| 71115 | Reiter arthritis-pelvis | 37 | 40 | 41 | Yes | Yes | Yes |
| 71116 | Reiter arthritis-l/leg | 37 | 40 | 41 | Yes | Yes | Yes |
| 71117 | Reiter arthritis-ankle | 37 | 40 | 41 | Yes | Yes | Yes |
| 71118 | Reiter arthritis NEC | 37 | 40 | 41 | Yes | Yes | Yes |
| 71119 | Reiter arthritis-mult | 37 | 40 | 41 | Yes | Yes | Yes |
| 71120 | Behcet arthritis-unspec | 37 | 40 | 41 | Yes | Yes | Yes |
| 71121 | Behcet arthritis-shlder | 37 | 40 | 41 | Yes | Yes | Yes |
| 71122 | Behcet arthritis-up/arm | 37 | 40 | 41 | Yes | Yes | Yes |
| 71123 | Behcet arthritis-forearm | 37 | 40 | 41 | Yes | Yes | Yes |
| 71124 | Behcet arthritis-hand | 37 | 40 | 41 | Yes | Yes | Yes |
| 71125 | Behcet arthritis-pelvis | 37 | 40 | 41 | Yes | Yes | Yes |
| 71126 | Behcet arthritis-l/leg | 37 | 40 | 41 | Yes | Yes | Yes |
| 71127 | Behcet arthritis-ankle | 37 | 40 | 41 | Yes | Yes | Yes |
| 71128 | Behcet arthritis NEC | 37 | 40 | 41 | Yes | Yes | Yes |
| 71129 | Behcet arthritis-mult | 37 | 40 | 41 | Yes | Yes | Yes |
| 71130 | Dysenter arthrit-unspec | 37 | 39 | | Yes | Yes | No |
| 71131 | Dysenter arthrit-shlder | 37 | 39 | | Yes | Yes | No |
| 71132 | Dysenter arthrit-up/arm | 37 | 39 | | Yes | Yes | No |
| 71133 | Dysenter arthrit-forearm | 37 | 39 | | Yes | Yes | No |
| 71134 | Dysenter arthrit-hand | 37 | 39 | | Yes | Yes | No |
| 71135 | Dysenter arthrit-pelvis | 37 | 39 | | Yes | Yes | No |
| 71136 | Dysenter arthrit-l/leg | 37 | 39 | | Yes | Yes | No |
| 71137 | Dysenter arthrit-ankle | 37 | 39 | | Yes | Yes | No |
| 71138 | Dysenter arthrit NEC | 37 | 39 | | Yes | Yes | No |
| 71139 | Dysenter arthrit-mult | 37 | 39 | | Yes | Yes | No |
| 71140 | Bact arthritis-unspec | 37 | 39 | | Yes | Yes | No |
| 71141 | Bact arthritis-shlder | 37 | 39 | | Yes | Yes | No |
| 71142 | Bact arthritis-up/arm | 37 | 39 | | Yes | Yes | No |
| 71143 | Bact arthritis-forearm | 37 | 39 | | Yes | Yes | No |
| 71144 | Bact arthritis-hand | 37 | 39 | | Yes | Yes | No |
| 71145 | Bact arthritis-pelvis | 37 | 39 | | Yes | Yes | No |
| 71146 | Bact arthritis-l/leg | 37 | 39 | | Yes | Yes | No |
| 71147 | Bact arthritis-ankle | 37 | 39 | | Yes | Yes | No |

| 71148 | Bact arthritis NEC | 37 | 39 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 71149 | Bact arthritis-mult | 37 | 39 | | Yes | Yes | No |
| 71150 | Viral arthritis-unspec | 37 | 39 | | Yes | Yes | No |
| 71151 | Viral arthritis-shlder | 37 | 39 | | Yes | Yes | No |
| 71152 | Viral arthritis-up/arm | 37 | 39 | | Yes | Yes | No |
| 71153 | Viral arthritis-forearm | 37 | 39 | | Yes | Yes | No |
| 71154 | Viral arthritis-hand | 37 | 39 | | Yes | Yes | No |
| 71155 | Viral arthritis-pelvis | 37 | 39 | | Yes | Yes | No |
| 71156 | Viral arthritis-l/leg | 37 | 39 | | Yes | Yes | No |
| 71157 | Viral arthritis-ankle | 37 | 39 | | Yes | Yes | No |
| 71158 | Viral arthritis NEC | 37 | 39 | | Yes | Yes | No |
| 71159 | Viral arthritis-mult | 37 | 39 | | Yes | Yes | No |
| 71160 | Mycotic arthritis-unspec | 37 | 39 | | Yes | Yes | No |
| 71161 | Mycotic arthritis-shlder | 37 | 39 | | Yes | Yes | No |
| 71162 | Mycotic arthritis-up/arm | 37 | 39 | | Yes | Yes | No |
| 71163 | Mycotic arthrit-forearm | 37 | 39 | | Yes | Yes | No |
| 71164 | Mycotic arthritis-hand | 37 | 39 | | Yes | Yes | No |
| 71165 | Mycotic arthritis-pelvis | 37 | 39 | | Yes | Yes | No |
| 71166 | Mycotic arthritis-l/leg | 37 | 39 | | Yes | Yes | No |
| 71167 | Mycotic arthritis-ankle | 37 | 39 | | Yes | Yes | No |
| 71168 | Mycotic arthritis NEC | 37 | 39 | | Yes | Yes | No |
| 71169 | Mycotic arthritis-mult | 37 | 39 | | Yes | Yes | No |
| 71170 | Helminth arthrit-unspec | 37 | 39 | | Yes | Yes | No |
| 71171 | Helminth arthrit-shlder | 37 | 39 | | Yes | Yes | No |
| 71172 | Helminth arthrit-up/arm | 37 | 39 | | Yes | Yes | No |
| 71173 | Helminth arthrit-forearm | 37 | 39 | | Yes | Yes | No |
| 71174 | Helminth arthrit-hand | 37 | 39 | | Yes | Yes | No |
| 71175 | Helminth arthrit-pelvis | 37 | 39 | | Yes | Yes | No |
| 71176 | Helminth arthrit-l/leg | 37 | 39 | | Yes | Yes | No |
| 71177 | Helminth arthrit-ankle | 37 | 39 | | Yes | Yes | No |
| 71178 | Helminth arthrit NEC | 37 | 39 | | Yes | Yes | No |
| 71179 | Helminth arthrit-mult | 37 | 39 | | Yes | Yes | No |
| 71180 | Inf arthritis NEC-unspec | 37 | 39 | | Yes | Yes | No |
| 71181 | Inf arthritis NEC-shlder | 37 | 39 | | Yes | Yes | No |
| 71182 | Inf arthritis NEC-up/arm | 37 | 39 | | Yes | Yes | No |
| 71183 | Inf arthrit NEC-forearm | 37 | 39 | | Yes | Yes | No |
| 71184 | Inf arthritis NEC-hand | 37 | 39 | | Yes | Yes | No |
| 71185 | Inf arthritis NEC-pelvis | 37 | 39 | | Yes | Yes | No |
| 71186 | Inf arthritis NEC-l/leg | 37 | 39 | | Yes | Yes | No |
| 71187 | Inf arthritis NEC-ankle | 37 | 39 | | Yes | Yes | No |
| 71188 | Inf arthrit NEC-oth site | 37 | 39 | | Yes | Yes | No |
| 71189 | Inf arthritis NEC-mult | 37 | 39 | | Yes | Yes | No |
| 71190 | Inf arthritis NOS-unspec | 37 | 39 | | Yes | Yes | No |
| 71191 | Inf arthritis NOS-shlder | 37 | 39 | | Yes | Yes | No |
| 71192 | Inf arthritis NOS-up/arm | 37 | 39 | | Yes | Yes | No |
| 71193 | Inf arthrit NOS-forearm | 37 | 39 | | Yes | Yes | No |
| 71194 | Inf arthrit NOS-hand | 37 | 39 | | Yes | Yes | No |
| 71195 | Inf arthrit NOS-pelvis | 37 | 39 | | Yes | Yes | No |
| 71196 | Inf arthrit NOS-l/leg | 37 | 39 | | Yes | Yes | No |
| 71197 | Inf arthrit NOS-ankle | 37 | 39 | | Yes | Yes | No |
| 71198 | Inf arthrit NOS-oth site | 37 | 39 | | Yes | Yes | No |
| 71199 | Inf arthritis NOS-mult | 37 | 39 | | Yes | Yes | No |
| 7140 | Rheumatoid arthritis | 38 | 40 | 41 | Yes | Yes | Yes |
| 7141 | Felty's syndrome | 38 | 40 | 41 | Yes | Yes | Yes |
| 7142 | Syst rheum arthritis NEC | 38 | 40 | 41 | Yes | Yes | Yes |
| 71430 | Juv rheum arthritis NOS | 38 | 40 | 41 | Yes | Yes | Yes |
| 71431 | Polyart juv rheum arthr | 38 | 40 | 41 | Yes | Yes | Yes |
| 71432 | Pauciart juv rheum arthr | 38 | 40 | 41 | Yes | Yes | Yes |
| 71433 | Monoart juv rheum arthr | 38 | 40 | 41 | Yes | Yes | Yes |
| 7144 | Chr postrheum arthritis | 38 | 40 | 41 | Yes | Yes | Yes |
| 71481 | Rheumatoid lung | 38 | 40 | 41 | Yes | Yes | Yes |
| 71489 | Inflamm polyarthrop NEC | 38 | 40 | 41 | Yes | Yes | Yes |
| 7149 | Inflamm polyarthrop NOS | 38 | 40 | 41 | Yes | Yes | Yes |
| 7200 | Ankylosing spondylitis | 38 | 40 | 42 | Yes | Yes | Yes |

| 7201 | Spinal enthesopathy | 38 | 40 | 42 | Yes | Yes | Yes |
|------|---------------------|----|----|----|-----|-----|-----|
| 7202 | Sacroiliitis NEC | 38 | 40 | 42 | Yes | Yes | Yes |
| 72081 | Spondylopathy in oth dis | 38 | 40 | 42 | Yes | Yes | Yes |
| 72089 | Inflam spondylopathy NEC | 38 | 40 | 42 | Yes | Yes | Yes |
| 7209 | Inflam spondylopathy NOS | 38 | 40 | 42 | Yes | Yes | Yes |
| 725 | Polymyalgia rheumatica | 38 | 40 | | Yes | Yes | No |
| 72886 | Necrotizing fasciitis | 37 | 39 | | Yes | Yes | No |
| 73000 | Ac osteomyelitis-unspec | 37 | 39 | | Yes | Yes | No |
| 73001 | Ac osteomyelitis-shlder | 37 | 39 | | Yes | Yes | No |
| 73002 | Ac osteomyelitis-up/arm | 37 | 39 | | Yes | Yes | No |
| 73003 | Ac osteomyelitis-forearm | 37 | 39 | | Yes | Yes | No |
| 73004 | Ac osteomyelitis-hand | 37 | 39 | | Yes | Yes | No |
| 73005 | Ac osteomyelitis-pelvis | 37 | 39 | | Yes | Yes | No |
| 73006 | Ac osteomyelitis-l/leg | 37 | 39 | | Yes | Yes | No |
| 73007 | Ac osteomyelitis-ankle | 37 | 39 | | Yes | Yes | No |
| 73008 | Ac osteomyelitis NEC | 37 | 39 | | Yes | Yes | No |
| 73009 | Ac osteomyelitis-mult | 37 | 39 | | Yes | Yes | No |
| 73010 | Chr osteomyelitis-unsp | 37 | 39 | | Yes | Yes | No |
| 73011 | Chr osteomyelit-shlder | 37 | 39 | | Yes | Yes | No |
| 73012 | Chr osteomyelit-up/arm | 37 | 39 | | Yes | Yes | No |
| 73013 | Chr osteomyelit-forearm | 37 | 39 | | Yes | Yes | No |
| 73014 | Chr osteomyelit-hand | 37 | 39 | | Yes | Yes | No |
| 73015 | Chr osteomyelit-pelvis | 37 | 39 | | Yes | Yes | No |
| 73016 | Chr osteomyelit-l/leg | 37 | 39 | | Yes | Yes | No |
| 73017 | Chr osteomyelit-ankle | 37 | 39 | | Yes | Yes | No |
| 73018 | Chr osteomyelit NEC | 37 | 39 | | Yes | Yes | No |
| 73019 | Chr osteomyelit-mult | 37 | 39 | | Yes | Yes | No |
| 73020 | Osteomyelitis NOS-unspec | 37 | 39 | | Yes | Yes | No |
| 73021 | Osteomyelitis NOS-shlder | 37 | 39 | | Yes | Yes | No |
| 73022 | Osteomyelitis NOS-up/arm | 37 | 39 | | Yes | Yes | No |
| 73023 | Osteomyelit NOS-forearm | 37 | 39 | | Yes | Yes | No |
| 73024 | Osteomyelitis NOS-hand | 37 | 39 | | Yes | Yes | No |
| 73025 | Osteomyelitis NOS-pelvis | 37 | 39 | | Yes | Yes | No |
| 73026 | Osteomyelitis NOS-l/leg | 37 | 39 | | Yes | Yes | No |
| 73027 | Osteomyelitis NOS-ankle | 37 | 39 | | Yes | Yes | No |
| 73028 | Osteomyelit NOS-oth site | 37 | 39 | | Yes | Yes | No |
| 73029 | Osteomyelitis NOS-mult | 37 | 39 | | Yes | Yes | No |
| 73030 | Periostitis-unspec | 37 | 39 | | Yes | Yes | No |
| 73031 | Periostitis-shlder | 37 | 39 | | Yes | Yes | No |
| 73032 | Periostitis-up/arm | 37 | 39 | | Yes | Yes | No |
| 73033 | Periostitis-forearm | 37 | 39 | | Yes | Yes | No |
| 73034 | Periostitis-hand | 37 | 39 | | Yes | Yes | No |
| 73035 | Periostitis-pelvis | 37 | 39 | | Yes | Yes | No |
| 73036 | Periostitis-l/leg | 37 | 39 | | Yes | Yes | No |
| 73037 | Periostitis-ankle | 37 | 39 | | Yes | Yes | No |
| 73038 | Periostitis NEC | 37 | 39 | | Yes | Yes | No |
| 73039 | Periostitis-mult | 37 | 39 | | Yes | Yes | No |
| 73070 | Polio osteopathy-unspec | 37 | 39 | | Yes | Yes | No |
| 73071 | Polio osteopathy-shlder | 37 | 39 | | Yes | Yes | No |
| 73072 | Polio osteopathy-up/arm | 37 | 39 | | Yes | Yes | No |
| 73073 | Polio osteopathy-forearm | 37 | 39 | | Yes | Yes | No |
| 73074 | Polio osteopathy-hand | 37 | 39 | | Yes | Yes | No |
| 73075 | Polio osteopathy-pelvis | 37 | 39 | | Yes | Yes | No |
| 73076 | Polio osteopathy-l/leg | 37 | 39 | | Yes | Yes | No |
| 73077 | Polio osteopathy-ankle | 37 | 39 | | Yes | Yes | No |
| 73078 | Polio osteopathy NEC | 37 | 39 | | Yes | Yes | No |
| 73079 | Polio osteopathy-mult | 37 | 39 | | Yes | Yes | No |
| 73080 | Bone infect NEC-unspec | 37 | 39 | | Yes | Yes | No |
| 73081 | Bone infect NEC-shlder | 37 | 39 | | Yes | Yes | No |
| 73082 | Bone infect NEC-up/arm | 37 | 39 | | Yes | Yes | No |
| 73083 | Bone infect NEC-forearm | 37 | 39 | | Yes | Yes | No |
| 73084 | Bone infect NEC-hand | 37 | 39 | | Yes | Yes | No |
| 73085 | Bone infect NEC-pelvis | 37 | 39 | | Yes | Yes | No |
| 73086 | Bone infect NEC-l/leg | 37 | 39 | | Yes | Yes | No |

4510

| 73087 | Bone infect NEC-ankle | 37 | 39 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 73088 | Bone infect NEC-oth site | 37 | 39 | | Yes | Yes | No |
| 73089 | Bone infect NEC-mult | 37 | 39 | | Yes | Yes | No |
| 73090 | Bone infec NOS-unsp site | 37 | 39 | | Yes | Yes | No |
| 73091 | Bone infect NOS-shlder | 37 | 39 | | Yes | Yes | No |
| 73092 | Bone infect NOS-up/arm | 37 | 39 | | Yes | Yes | No |
| 73093 | Bone infect NOS-forearm | 37 | 39 | | Yes | Yes | No |
| 73094 | Bone infect NOS-hand | 37 | 39 | | Yes | Yes | No |
| 73095 | Bone infect NOS-pelvis | 37 | 39 | | Yes | Yes | No |
| 73096 | Bone infect NOS-l/leg | 37 | 39 | | Yes | Yes | No |
| 73097 | Bone infect NOS-ankle | 37 | 39 | | Yes | Yes | No |
| 73098 | Bone infect NOS-oth site | 37 | 39 | | Yes | Yes | No |
| 73099 | Bone infect NOS-mult | 37 | 39 | | Yes | Yes | No |
| 73300 | Osteoporosis NOS | | | 45 | No | No | Yes |
| 73301 | Senile osteoporosis | | | 45 | No | No | Yes |
| 73302 | Idiopathic osteoporosis | | | 45 | No | No | Yes |
| 73303 | Disuse osteoporosis | | | 45 | No | No | Yes |
| 73309 | Osteoporosis NEC | | | 45 | No | No | Yes |
| 73310 | Path fx unspecified site | | | 45 | No | No | Yes |
| 73311 | Path fx humerus | | | 45 | No | No | Yes |
| 73312 | Path fx dstl radius ulna | | | 45 | No | No | Yes |
| 73313 | Path fx vertebrae | 157 | 169 | 45 | Yes | Yes | Yes |
| 73314 | Path fx neck of femur | 158 | 170 | 45 | Yes | Yes | Yes |
| 73315 | Path fx oth spcf prt fmr | 158 | 170 | 45 | Yes | Yes | Yes |
| 73316 | Path fx tibia fibula | | | 45 | No | No | Yes |
| 73319 | Path fx oth specif site | | | 45 | No | No | Yes |
| 73340 | Asept necrosis bone NOS | 37 | 39 | 38 | Yes | Yes | Yes |
| 73341 | Aseptic necrosis humerus | 37 | 39 | 38 | Yes | Yes | Yes |
| 73342 | Aseptic necrosis femur | 37 | 39 | 38 | Yes | Yes | Yes |
| 73343 | Asept necro femur condyl | 37 | 39 | 38 | Yes | Yes | Yes |
| 73344 | Aseptic necrosis talus | 37 | 39 | 38 | Yes | Yes | Yes |
| 73345 | Aseptic necrosis of jaw | 37 | 39 | 38 | Yes | Yes | Yes |
| 73349 | Asept necrosis bone NEC | 37 | 39 | 38 | Yes | Yes | Yes |
| 7400 | Anencephalus | 69 | 72 | 72 | Yes | Yes | Yes |
| 7401 | Craniorachischisis | 69 | 72 | 72 | Yes | Yes | Yes |
| 7402 | Iniencephaly | 69 | 72 | 72 | Yes | Yes | Yes |
| 74100 | Spin bif w hydroceph NOS | 69 | 72 | 72 | Yes | Yes | Yes |
| 74101 | Spin bif w hydrceph-cerv | 69 | 72 | 72 | Yes | Yes | Yes |
| 74102 | Spin bif w hydrceph-dors | 69 | 72 | 72 | Yes | Yes | Yes |
| 74103 | Spin bif w hydrceph-lumb | 69 | 72 | 72 | Yes | Yes | Yes |
| 74190 | Spina bifida | 69 | 72 | 72 | Yes | Yes | Yes |
| 74191 | Spina bifida-cerv | 69 | 72 | 72 | Yes | Yes | Yes |
| 74192 | Spina bifida-dorsal | 69 | 72 | 72 | Yes | Yes | Yes |
| 74193 | Spina bifida-lumbar | 69 | 72 | 72 | Yes | Yes | Yes |
| 7420 | Encephalocele | 69 | 72 | 72 | Yes | Yes | Yes |
| 7421 | Microcephalus | 69 | 72 | 72 | Yes | Yes | Yes |
| 7422 | Reduction deform, brain | 69 | 72 | 72 | Yes | Yes | Yes |
| 7423 | Congenital hydrocephalus | 69 | 72 | 72 | Yes | Yes | Yes |
| 7424 | Brain anomaly NEC | 69 | 72 | 72 | Yes | Yes | Yes |
| 74251 | Diastematomyelia | 69 | 72 | 72 | Yes | Yes | Yes |
| 74253 | Hydromyelia | 69 | 72 | 72 | Yes | Yes | Yes |
| 74259 | Spinal cord anomaly NEC | 69 | 72 | 72 | Yes | Yes | Yes |
| 7428 | Nervous system anom NEC | 69 | 72 | 72 | Yes | Yes | Yes |
| 7429 | Nervous system anom NOS | 69 | 72 | 72 | Yes | Yes | Yes |
| 74685 | Coronary artery anomaly | | | 89 | No | No | Yes |
| 75314 | Polycyst kid-autosom rec | 131 | 139 | 125 | Yes | Yes | Yes |
| 75683 | Ehlers-danlos syndrome | | | 42 | No | No | Yes |
| 7581 | Patau's syndrome | | | 68 | No | No | Yes |
| 7582 | Edwards' syndrome | | | 68 | No | No | Yes |
| 75831 | Cri-du-chat syndrome | | | 68 | No | No | Yes |
| 75832 | Velo-cardio-facial synd | | | 68 | No | No | Yes |
| 75833 | Microdeletions NEC | | | 68 | No | No | Yes |
| 75839 | Autosomal deletions NEC | | | 68 | No | No | Yes |
| 7585 | Autosomal anomalies NEC | | | 68 | No | No | Yes |

| Code | Description | | | | | | |
|---|---|---|---|---|---|---|---|
| 7595 | Tuberous sclerosis | 10 | 12 | 10 | Yes | Yes | Yes |
| 7596 | Hamartoses NEC | 10 | 12 | 10 | Yes | Yes | Yes |
| 75981 | Prader-willi syndrome | | | 68 | No | No | Yes |
| 75982 | Marfan syndrome | | | 42 | No | No | Yes |
| 75983 | Fragile x syndrome | | | 68 | No | No | Yes |
| 77181 | NB septicemia [sepsis] | 2 | 2 | | Yes | Yes | No |
| 78001 | Coma | 75 | 80 | | Yes | Yes | No |
| 78003 | Persistent vegtv state | 75 | 80 | | Yes | Yes | No |
| 78031 | Febrile convulsions NOS | 74 | 79 | 80 | Yes | Yes | Yes |
| 78032 | Complx febrile convulsns | 74 | 79 | 80 | Yes | Yes | Yes |
| 78033 | Post traumatic seizures | 74 | 79 | 80 | Yes | Yes | Yes |
| 78039 | Convulsions NEC | 74 | 79 | 80 | Yes | Yes | Yes |
| 78072 | Functional quadriplegia | 67 | 70 | | Yes | Yes | No |
| 7854 | Gangrene | 104 | 106 | | Yes | Yes | No |
| 78550 | Shock NOS | 79 | 84 | | Yes | Yes | No |
| 78551 | Cardiogenic shock | 79 | 84 | | Yes | Yes | No |
| 78552 | Septic shock | 2 | 2 | | Yes | Yes | No |
| 78559 | Shock w/o trauma NEC | 2 | 2 | | Yes | Yes | No |
| 7980 | Sudden infant death synd | 79 | 84 | | Yes | Yes | No |
| 7981 | Instantaneous death | 79 | 84 | | Yes | Yes | No |
| 7982 | Death within 24 hr sympt | 79 | 84 | | Yes | Yes | No |
| 7989 | Unattended death | 79 | 84 | | Yes | Yes | No |
| 79901 | Asphyxia | 79 | | | Yes | No | No |
| 79902 | Hypoxemia | 79 | | | Yes | No | No |
| 7991 | Respiratory arrest | 78 | 83 | | Yes | Yes | No |
| 7994 | Cachexia | 21 | 21 | | Yes | Yes | No |
| 80000 | Closed skull vault fx | 155 | 167 | | Yes | Yes | No |
| 80001 | Cl skull vlt fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80002 | Cl skull vlt fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80003 | Cl skull vlt fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80004 | Cl skl vlt fx-proln coma | 154 | 166 | | Yes | Yes | No |
| 80005 | Cl skul vlt fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80006 | Cl skull vlt fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80009 | Cl skl vlt fx-concus NOS | 155 | 167 | | Yes | Yes | No |
| 80010 | Cl skl vlt fx/cerebr lac | 155 | 167 | | Yes | Yes | No |
| 80011 | Cl skull vlt fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80012 | Cl skull vlt fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80013 | Cl skl vlt fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80014 | Cl skl vlt fx-proln coma | 154 | 166 | | Yes | Yes | No |
| 80015 | Cl skul vlt fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80016 | Cl skull vlt fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80019 | Cl skl vlt fx-concus NOS | 155 | 167 | | Yes | Yes | No |
| 80020 | Cl skl vlt fx/mening hem | 155 | 167 | | Yes | Yes | No |
| 80021 | Cl skull vlt fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80022 | Cl skull vlt fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80023 | Cl skl vlt fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80024 | Cl skl vlt fx-proln coma | 154 | 166 | | Yes | Yes | No |
| 80025 | Cl skul vlt fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80026 | Cl skull vlt fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80029 | Cl skl vlt fx-concus NOS | 155 | 167 | | Yes | Yes | No |
| 80030 | Cl skull vlt fx/hem NEC | 155 | 167 | | Yes | Yes | No |
| 80031 | Cl skull vlt fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80032 | Cl skull vlt fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80033 | Cl skl vlt fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80034 | Cl skl vlt fx-proln coma | 154 | 166 | | Yes | Yes | No |
| 80035 | Cl skul vlt fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80036 | Cl skull vlt fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80039 | Cl skl vlt fx-concus NOS | 155 | 167 | | Yes | Yes | No |
| 80040 | Cl skl vlt fx/br inj NEC | 155 | 167 | | Yes | Yes | No |
| 80041 | Cl skull vlt fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80042 | Cl skull vlt fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80043 | Cl skull vlt fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80044 | Cl skl vlt fx-proln coma | 154 | 166 | | Yes | Yes | No |
| 80045 | Cl skul vlt fx-deep coma | 154 | 166 | | Yes | Yes | No |

| 80046 | Cl skull vlt fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80049 | Cl skl vlt fx-concus NOS | 155 | 167 | | Yes | Yes | No |
| 80050 | Opn skull vault fracture | 155 | 167 | | Yes | Yes | No |
| 80051 | Opn skul vlt fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80052 | Opn skul vlt fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80053 | Opn skul vlt fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80054 | Opn skl vlt fx-proln com | 154 | 166 | | Yes | Yes | No |
| 80055 | Opn skl vlt fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80056 | Opn skul vlt fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80059 | Op skl vlt fx-concus NOS | 155 | 167 | | Yes | Yes | No |
| 80060 | Opn skl vlt fx/cereb lac | 155 | 167 | | Yes | Yes | No |
| 80061 | Opn skul vlt fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80062 | Opn skul vlt fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80063 | Opn skul vlt fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80064 | Opn skl vlt fx-proln com | 154 | 166 | | Yes | Yes | No |
| 80065 | Opn skl vlt fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80066 | Opn skul vlt fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80069 | Op skl vlt fx-concus NOS | 155 | 167 | | Yes | Yes | No |
| 80070 | Opn skl vlt fx/menin hem | 155 | 167 | | Yes | Yes | No |
| 80071 | Opn skul vlt fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80072 | Opn skul vlt fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80073 | Opn skul vlt fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80074 | Opn skl vlt fx-proln com | 154 | 166 | | Yes | Yes | No |
| 80075 | Opn skl vlt fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80076 | Opn skul vlt fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80079 | Op skl vlt fx-concus NOS | 155 | 167 | | Yes | Yes | No |
| 80080 | Opn skull vlt fx/hem NEC | 155 | 167 | | Yes | Yes | No |
| 80081 | Opn skul vlt fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80082 | Opn skul vlt fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80083 | Opn skul vlt fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80084 | Opn skl vlt fx-proln com | 154 | 166 | | Yes | Yes | No |
| 80085 | Opn skl vlt fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80086 | Opn skul vlt fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80089 | Op skl vlt fx-concus NOS | 155 | 167 | | Yes | Yes | No |
| 80090 | Op skl vlt fx/br inj NEC | 155 | 167 | | Yes | Yes | No |
| 80091 | Opn skul vlt fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80092 | Opn skul vlt fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80093 | Opn skul vlt fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80094 | Opn skl vlt fx-proln com | 154 | 166 | | Yes | Yes | No |
| 80095 | Op skul vlt fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80096 | Opn skul vlt fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80099 | Op skl vlt fx-concus NOS | 155 | 167 | | Yes | Yes | No |
| 80100 | Clos skull base fracture | 155 | 167 | | Yes | Yes | No |
| 80101 | Cl skul base fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80102 | Cl skul base fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80103 | Cl skul base fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80104 | Cl skl base fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80105 | Cl skl base fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80106 | Cl skul base fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80109 | Cl skull base fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80110 | Cl skul base fx/cereb lac | 155 | 167 | | Yes | Yes | No |
| 80111 | Cl skul base fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80112 | Cl skul base fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80113 | Cl skl base fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80114 | Cl skl base fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80115 | Cl skul base fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80116 | Cl skul base fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80119 | Cl skull base fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80120 | Cl skl base fx/menin hem | 155 | 167 | | Yes | Yes | No |
| 80121 | Cl skul base fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80122 | Cl skul base fx/brf coma | 155 | 167 | | Yes | Yes | No |
| 80123 | Cl skul base fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80124 | Cl skl base fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80125 | Cl skl base fx-deep coma | 154 | 166 | | Yes | Yes | No |

| 80126 | Cl skul base fx-coma NOS | 155 | 167 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 80129 | Cl skull base fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80130 | Cl skull base fx/hem NEC | 155 | 167 | | Yes | Yes | No |
| 80131 | Cl skul base fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80132 | Cl skul base fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80133 | Cl skul base fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80134 | Cl skl base fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80135 | Cl skl base fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80136 | Cl skul base fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80139 | Cl skull base fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80140 | Cl sk base fx/br inj NEC | 155 | 167 | | Yes | Yes | No |
| 80141 | Cl skul base fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80142 | Cl skul base fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80143 | Cl skul base fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80144 | Cl skl base fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80145 | Cl skl base fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80146 | Cl skul base fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80149 | Cl skull base fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80150 | Open skull base fracture | 155 | 167 | | Yes | Yes | No |
| 80151 | Opn skl base fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80152 | Opn skl base fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80153 | Opn skl base fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80154 | Op skl base fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80155 | Op skl base fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80156 | Opn skl base fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80159 | Opn skul base fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80160 | Op skul base fx/cereb lac | 155 | 167 | | Yes | Yes | No |
| 80161 | Opn skl base fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80162 | Opn skl base fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80163 | Opn skl base fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80164 | Op skl base fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80165 | Op skl base fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80166 | Opn skl base fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80169 | Opn skul base fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80170 | Op skl base fx/menin hem | 155 | 167 | | Yes | Yes | No |
| 80171 | Opn skl base fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80172 | Opn skl base fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80173 | Opn skl base fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80174 | Op skl base fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80175 | Op skl base fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80176 | Opn skl base fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80179 | Opn skul base fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80180 | Opn skul base fx/hem NEC | 155 | 167 | | Yes | Yes | No |
| 80181 | Opn skl base fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80182 | Opn skl base fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80183 | Opn skl base fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80184 | Op skl base fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80185 | Op skl base fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80186 | Opn skl base fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80189 | Opn skul base fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80190 | Op sk base fx/br inj NEC | 155 | 167 | | Yes | Yes | No |
| 80191 | Op skul base fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80192 | Opn skl base fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80193 | Opn skl base fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80194 | Op skl base fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80195 | Op skl base fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80196 | Opn skl base fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80199 | Opn skul base fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80220 | Mandible fx NOS-closed | 155 | 167 | | Yes | Yes | No |
| 80221 | Fx condyl proc mandib-cl | 155 | 167 | | Yes | Yes | No |
| 80222 | Subcondylar fx mandib-cl | 155 | 167 | | Yes | Yes | No |
| 80223 | Fx coron proc mandib-cl | 155 | 167 | | Yes | Yes | No |
| 80224 | Fx ramus NOS-closed | 155 | 167 | | Yes | Yes | No |
| 80225 | Fx angle of jaw-closed | 155 | 167 | | Yes | Yes | No |

4514

| 80226 | Fx symphy mandib body-cl | 155 | 167 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 80227 | Fx alveolar bord mand-cl | 155 | 167 | | Yes | Yes | No |
| 80228 | Fx mandible body NEC-cl | 155 | 167 | | Yes | Yes | No |
| 80229 | Mult fx mandible-closed | 155 | 167 | | Yes | Yes | No |
| 80230 | Mandible fx NOS-open | 155 | 167 | | Yes | Yes | No |
| 80231 | Fx condyl proc mand-open | 155 | 167 | | Yes | Yes | No |
| 80232 | Subcondyl fx mandib-open | 155 | 167 | | Yes | Yes | No |
| 80233 | Fx coron proc mandib-opn | 155 | 167 | | Yes | Yes | No |
| 80234 | Fx ramus NOS-open | 155 | 167 | | Yes | Yes | No |
| 80235 | Fx angle of jaw-open | 155 | 167 | | Yes | Yes | No |
| 80236 | Fx symphy mandib bdy-opn | 155 | 167 | | Yes | Yes | No |
| 80237 | Fx alv bord mand bdy-opn | 155 | 167 | | Yes | Yes | No |
| 80238 | Fx mandible body NEC-opn | 155 | 167 | | Yes | Yes | No |
| 80239 | Mult fx mandible-open | 155 | 167 | | Yes | Yes | No |
| 8024 | Fx malar/maxillary-close | 155 | 167 | | Yes | Yes | No |
| 8025 | Fx malar/maxillary-open | 155 | 167 | | Yes | Yes | No |
| 8026 | Fx orbital floor-closed | 155 | 167 | | Yes | Yes | No |
| 8027 | Fx orbital floor-open | 155 | 167 | | Yes | Yes | No |
| 8028 | Fx facial bone NEC-close | 155 | 167 | | Yes | Yes | No |
| 8029 | Fx facial bone NEC-open | 155 | 167 | | Yes | Yes | No |
| 80300 | Close skull fracture NEC | 155 | 167 | | Yes | Yes | No |
| 80301 | Cl skull fx NEC w/o coma | 155 | 167 | | Yes | Yes | No |
| 80302 | Cl skull fx NEC-brf coma | 155 | 167 | | Yes | Yes | No |
| 80303 | Cl skull fx NEC-mod coma | 154 | 166 | | Yes | Yes | No |
| 80304 | Cl skl fx NEC-proln coma | 154 | 166 | | Yes | Yes | No |
| 80305 | Cl skul fx NEC-deep coma | 154 | 166 | | Yes | Yes | No |
| 80306 | Cl skull fx NEC-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80309 | Cl skull fx NEC-concuss | 155 | 167 | | Yes | Yes | No |
| 80310 | Cl skl fx NEC/cerebr lac | 155 | 167 | | Yes | Yes | No |
| 80311 | Cl skull fx NEC w/o coma | 155 | 167 | | Yes | Yes | No |
| 80312 | Cl skull fx NEC-brf coma | 155 | 167 | | Yes | Yes | No |
| 80313 | Cl skull fx NEC-mod coma | 154 | 166 | | Yes | Yes | No |
| 80314 | Cl skl fx NEC-proln coma | 154 | 166 | | Yes | Yes | No |
| 80315 | Cl skul fx NEC-deep coma | 154 | 166 | | Yes | Yes | No |
| 80316 | Cl skull fx NEC-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80319 | Cl skull fx NEC-concuss | 155 | 167 | | Yes | Yes | No |
| 80320 | Cl skl fx NEC/mening hem | 155 | 167 | | Yes | Yes | No |
| 80321 | Cl skull fx NEC w/o coma | 155 | 167 | | Yes | Yes | No |
| 80322 | Cl skull fx NEC-brf coma | 155 | 167 | | Yes | Yes | No |
| 80323 | Cl skull fx NEC-mod coma | 154 | 166 | | Yes | Yes | No |
| 80324 | Cl skl fx NEC-proln coma | 154 | 166 | | Yes | Yes | No |
| 80325 | Cl skul fx NEC-deep coma | 154 | 166 | | Yes | Yes | No |
| 80326 | Cl skull fx NEC-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80329 | Cl skull fx NEC-concuss | 155 | 167 | | Yes | Yes | No |
| 80330 | Cl skull fx NEC/hem NEC | 155 | 167 | | Yes | Yes | No |
| 80331 | Cl skull fx NEC w/o coma | 155 | 167 | | Yes | Yes | No |
| 80332 | Cl skull fx NEC-brf coma | 155 | 167 | | Yes | Yes | No |
| 80333 | Cl skull fx NEC-mod coma | 154 | 166 | | Yes | Yes | No |
| 80334 | Cl skl fx NEC-proln coma | 154 | 166 | | Yes | Yes | No |
| 80335 | Cl skul fx NEC-deep coma | 154 | 166 | | Yes | Yes | No |
| 80336 | Cl skull fx NEC-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80339 | Cl skull fx NEC-concuss | 155 | 167 | | Yes | Yes | No |
| 80340 | Cl skl fx NEC/br inj NEC | 155 | 167 | | Yes | Yes | No |
| 80341 | Cl skull fx NEC w/o coma | 155 | 167 | | Yes | Yes | No |
| 80342 | Cl skull fx NEC-brf coma | 155 | 167 | | Yes | Yes | No |
| 80343 | Cl skull fx NEC-mod coma | 154 | 166 | | Yes | Yes | No |
| 80344 | Cl skl fx NEC-proln coma | 154 | 166 | | Yes | Yes | No |
| 80345 | Cl skul fx NEC-deep coma | 154 | 166 | | Yes | Yes | No |
| 80346 | Cl skull fx NEC-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80349 | Cl skull fx NEC-concuss | 155 | 167 | | Yes | Yes | No |
| 80350 | Open skull fracture NEC | 155 | 167 | | Yes | Yes | No |
| 80351 | Opn skul fx NEC w/o coma | 155 | 167 | | Yes | Yes | No |
| 80352 | Opn skul fx NEC-brf coma | 155 | 167 | | Yes | Yes | No |
| 80353 | Opn skul fx NEC-mod coma | 154 | 166 | | Yes | Yes | No |

| 80354 | Opn skl fx NEC-prol coma | 154 | 166 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 80355 | Opn skl fx NEC-deep coma | 154 | 166 | | Yes | Yes | No |
| 80356 | Opn skul fx NEC-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80359 | Opn skull fx NEC-concuss | 155 | 167 | | Yes | Yes | No |
| 80360 | Opn skl fx NEC/cereb lac | 155 | 167 | | Yes | Yes | No |
| 80361 | Opn skul fx NEC w/o coma | 155 | 167 | | Yes | Yes | No |
| 80362 | Opn skul fx NEC-brf coma | 155 | 167 | | Yes | Yes | No |
| 80363 | Opn skul fx NEC-mod coma | 154 | 166 | | Yes | Yes | No |
| 80364 | Opn skl fx NEC-proln com | 154 | 166 | | Yes | Yes | No |
| 80365 | Opn skl fx NEC-deep coma | 154 | 166 | | Yes | Yes | No |
| 80366 | Opn skul fx NEC-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80369 | Opn skull fx NEC-concuss | 155 | 167 | | Yes | Yes | No |
| 80370 | Opn skl fx NEC/menin hem | 155 | 167 | | Yes | Yes | No |
| 80371 | Opn skul fx NEC w/o coma | 155 | 167 | | Yes | Yes | No |
| 80372 | Opn skul fx NEC-brf coma | 155 | 167 | | Yes | Yes | No |
| 80373 | Opn skul fx NEC-mod coma | 154 | 166 | | Yes | Yes | No |
| 80374 | Opn skl fx NEC-prol coma | 154 | 166 | | Yes | Yes | No |
| 80375 | Opn skl fx NEC-deep coma | 154 | 166 | | Yes | Yes | No |
| 80376 | Opn skul fx NEC-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80379 | Opn skull fx NEC-concuss | 155 | 167 | | Yes | Yes | No |
| 80380 | Opn skull fx NEC/hem NEC | 155 | 167 | | Yes | Yes | No |
| 80381 | Opn skul fx NEC w/o coma | 155 | 167 | | Yes | Yes | No |
| 80382 | Opn skul fx NEC-brf coma | 155 | 167 | | Yes | Yes | No |
| 80383 | Opn skul fx NEC-mod coma | 154 | 166 | | Yes | Yes | No |
| 80384 | Opn skl fx NEC-prol coma | 154 | 166 | | Yes | Yes | No |
| 80385 | Opn skl fx NEC-deep coma | 154 | 166 | | Yes | Yes | No |
| 80386 | Opn skul fx NEC-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80389 | Opn skull fx NEC-concuss | 155 | 167 | | Yes | Yes | No |
| 80390 | Op skl fx NEC/br inj NEC | 155 | 167 | | Yes | Yes | No |
| 80391 | Opn skul fx NEC w/o coma | 155 | 167 | | Yes | Yes | No |
| 80392 | Opn skul fx NEC-brf coma | 155 | 167 | | Yes | Yes | No |
| 80393 | Opn skul fx NEC-mod coma | 154 | 166 | | Yes | Yes | No |
| 80394 | Opn skl fx NEC-prol coma | 154 | 166 | | Yes | Yes | No |
| 80395 | Opn skl fx NEC-deep coma | 154 | 166 | | Yes | Yes | No |
| 80396 | Opn skul fx NEC-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80399 | Opn skull fx NEC-concuss | 155 | 167 | | Yes | Yes | No |
| 80400 | Cl skul fx w oth bone fx | 155 | 167 | | Yes | Yes | No |
| 80401 | Cl skl w oth fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80402 | Cl skl w oth fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80403 | Cl skl w oth fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80404 | Cl skl/oth fx-proln coma | 154 | 166 | | Yes | Yes | No |
| 80405 | Cl skul/oth fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80406 | Cl skl w oth fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80409 | Cl skul w oth fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80410 | Cl sk w oth fx/cereb lac | 155 | 167 | | Yes | Yes | No |
| 80411 | Cl skl w oth fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80412 | Cl skl w oth fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80413 | Cl skl w oth fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80414 | Cl skl/oth fx-proln coma | 154 | 166 | | Yes | Yes | No |
| 80415 | Cl skul/oth fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80416 | Cl skl w oth fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80419 | Cl skul w oth fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80420 | Cl skl/oth fx/mening hem | 155 | 167 | | Yes | Yes | No |
| 80421 | Cl skl w oth fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80422 | Cl skl w oth fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80423 | Cl skl w oth fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80424 | Cl skl/oth fx-proln coma | 154 | 166 | | Yes | Yes | No |
| 80425 | Cl skul/oth fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80426 | Cl skl w oth fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80429 | Cl skul w oth fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80430 | Cl skul w oth fx/hem NEC | 155 | 167 | | Yes | Yes | No |
| 80431 | Cl skl w oth fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80432 | Cl skl w oth fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80433 | Cl skl w oth fx-mod coma | 154 | 166 | | Yes | Yes | No |

| 80434 | Cl skl/oth fx-proln coma | 154 | 166 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 80435 | Cl skul/oth fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80436 | Cl skl w oth fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80439 | Cl skul w oth fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80440 | Cl skl/oth fx/br inj NEC | 155 | 167 | | Yes | Yes | No |
| 80441 | Cl skl w oth fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80442 | Cl skl w oth fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80443 | Cl skl w oth fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80444 | Cl skl/oth fx-proln coma | 154 | 166 | | Yes | Yes | No |
| 80445 | Cl skul/oth fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80446 | Cl skl w oth fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80449 | Cl skul w oth fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80450 | Opn skull fx/oth bone fx | 155 | 167 | | Yes | Yes | No |
| 80451 | Opn skul/oth fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80452 | Opn skul/oth fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80453 | Opn skul/oth fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80454 | Opn skl/oth fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80455 | Opn skl/oth fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80456 | Opn skul/oth fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80459 | Opn skull/oth fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80460 | Opn skl/oth fx/cereb lac | 155 | 167 | | Yes | Yes | No |
| 80461 | Opn skul/oth fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80462 | Opn skul/oth fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80463 | Opn skul/oth fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80464 | Opn skl/oth fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80465 | Opn skl/oth fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80466 | Opn skul/oth fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80469 | Opn skull/oth fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80470 | Opn skul/oth fx/menin hem | 155 | 167 | | Yes | Yes | No |
| 80471 | Opn skul/oth fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80472 | Opn skul/oth fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80473 | Opn skul/oth fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80474 | Opn skl/oth fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80475 | Opn skl/oth fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80476 | Opn skul/oth fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80479 | Opn skull/oth fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80480 | Opn skl w oth fx/hem NEC | 155 | 167 | | Yes | Yes | No |
| 80481 | Opn skul/oth fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80482 | Opn skul/oth fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80483 | Opn skul/oth fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80484 | Opn skl/oth fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80485 | Opn skl/oth fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80486 | Opn skul/oth fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80489 | Opn skull/oth fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80490 | Op skl/oth fx/br inj NEC | 155 | 167 | | Yes | Yes | No |
| 80491 | Opn skul/oth fx w/o coma | 155 | 167 | | Yes | Yes | No |
| 80492 | Opn skul/oth fx-brf coma | 155 | 167 | | Yes | Yes | No |
| 80493 | Opn skul/oth fx-mod coma | 154 | 166 | | Yes | Yes | No |
| 80494 | Opn skl/oth fx-prol coma | 154 | 166 | | Yes | Yes | No |
| 80495 | Opn skl/oth fx-deep coma | 154 | 166 | | Yes | Yes | No |
| 80496 | Opn skul/oth fx-coma NOS | 155 | 167 | | Yes | Yes | No |
| 80499 | Opn skull/oth fx-concuss | 155 | 167 | | Yes | Yes | No |
| 80500 | Fx cervical vert NOS-cl | 157 | 169 | | Yes | Yes | No |
| 80501 | Fx c1 vertebra-closed | 157 | 169 | | Yes | Yes | No |
| 80502 | Fx c2 vertebra-closed | 157 | 169 | | Yes | Yes | No |
| 80503 | Fx c3 vertebra-closed | 157 | 169 | | Yes | Yes | No |
| 80504 | Fx c4 vertebra-closed | 157 | 169 | | Yes | Yes | No |
| 80505 | Fx c5 vertebra-closed | 157 | 169 | | Yes | Yes | No |
| 80506 | Fx c6 vertebra-closed | 157 | 169 | | Yes | Yes | No |
| 80507 | Fx c7 vertebra-closed | 157 | 169 | | Yes | Yes | No |
| 80508 | Fx mult cervical vert-cl | 157 | 169 | | Yes | Yes | No |
| 80510 | Fx cervical vert NOS-opn | 157 | 169 | | Yes | Yes | No |
| 80511 | Fx c1 vertebra-open | 157 | 169 | | Yes | Yes | No |
| 80512 | Fx c2 vertebra-open | 157 | 169 | | Yes | Yes | No |

4517

| 80513 | Fx c3 vertebra-open | 157 | 169 | | Yes | Yes | No |
|-------|--------------------|-----|-----|--|-----|-----|-----|
| 80514 | Fx c4 vertebra-open | 157 | 169 | | Yes | Yes | No |
| 80515 | Fx c5 vertebra-open | 157 | 169 | | Yes | Yes | No |
| 80516 | Fx c6 vertebra-open | 157 | 169 | | Yes | Yes | No |
| 80517 | Fx c7 vertebra-open | 157 | 169 | | Yes | Yes | No |
| 80518 | Fx mlt cervical vert-opn | 157 | 169 | | Yes | Yes | No |
| 8052 | Fx dorsal vertebra-close | 157 | 169 | | Yes | Yes | No |
| 8053 | Fx dorsal vertebra-open | 157 | 169 | | Yes | Yes | No |
| 8054 | Fx lumbar vertebra-close | 157 | 169 | | Yes | Yes | No |
| 8055 | Fx lumbar vertebra-open | 157 | 169 | | Yes | Yes | No |
| 8056 | Fx sacrum/coccyx-closed | 157 | 169 | | Yes | Yes | No |
| 8057 | Fx sacrum/coccyx-open | 157 | 169 | | Yes | Yes | No |
| 8058 | Vertebral fx NOS-closed | 157 | 169 | | Yes | Yes | No |
| 8059 | Vertebral fx NOS-open | 157 | 169 | | Yes | Yes | No |
| 80600 | C1-c4 fx-cl/cord inj NOS | 69 | 72 | | Yes | Yes | No |
| 80601 | C1-c4 fx-cl/com cord les | 67 | 70 | | Yes | Yes | No |
| 80602 | C1-c4 fx-cl/ant cord syn | 69 | 72 | | Yes | Yes | No |
| 80603 | C1-c4 fx-cl/cen cord syn | 69 | 72 | | Yes | Yes | No |
| 80604 | C1-c4 fx-cl/cord inj NEC | 69 | 72 | | Yes | Yes | No |
| 80605 | C5-c7 fx-cl/cord inj NOS | 69 | 72 | | Yes | Yes | No |
| 80606 | C5-c7 fx-cl/com cord les | 67 | 70 | | Yes | Yes | No |
| 80607 | C5-c7 fx-cl/ant cord syn | 69 | 72 | | Yes | Yes | No |
| 80608 | C5-c7 fx-cl/cen cord syn | 69 | 72 | | Yes | Yes | No |
| 80609 | C5-c7 fx-cl/cord inj NEC | 69 | 72 | | Yes | Yes | No |
| 80610 | C1-c4 fx-op/cord inj NOS | 69 | 72 | | Yes | Yes | No |
| 80611 | C1-c4 fx-op/com cord les | 67 | 70 | | Yes | Yes | No |
| 80612 | C1-c4 fx-op/ant cord syn | 69 | 72 | | Yes | Yes | No |
| 80613 | C1-c4 fx-op/cen cord syn | 69 | 72 | | Yes | Yes | No |
| 80614 | C1-c4 fx-op/cord inj NEC | 69 | 72 | | Yes | Yes | No |
| 80615 | C5-c7 fx-op/cord inj NOS | 69 | 72 | | Yes | Yes | No |
| 80616 | C5-c7 fx-op/com cord les | 67 | 70 | | Yes | Yes | No |
| 80617 | C5-c7 fx-op/ant cord syn | 69 | 72 | | Yes | Yes | No |
| 80618 | C5-c7 fx-op/cen cord syn | 69 | 72 | | Yes | Yes | No |
| 80619 | C5-c7 fx-op/cord inj NEC | 69 | 72 | | Yes | Yes | No |
| 80620 | T1-t6 fx-cl/cord inj NOS | 69 | 72 | | Yes | Yes | No |
| 80621 | T1-t6 fx-cl/com cord les | 68 | 71 | | Yes | Yes | No |
| 80622 | T1-t6 fx-cl/ant cord syn | 69 | 72 | | Yes | Yes | No |
| 80623 | T1-t6 fx-cl/cen cord syn | 69 | 72 | | Yes | Yes | No |
| 80624 | T1-t6 fx-cl/cord inj NEC | 69 | 72 | | Yes | Yes | No |
| 80625 | T7-t12 fx-cl/crd inj NOS | 69 | 72 | | Yes | Yes | No |
| 80626 | T7-t12 fx-cl/com crd les | 68 | 71 | | Yes | Yes | No |
| 80627 | T7-t12 fx-cl/ant crd syn | 69 | 72 | | Yes | Yes | No |
| 80628 | T7-t12 fx-cl/cen crd syn | 69 | 72 | | Yes | Yes | No |
| 80629 | T7-t12 fx-cl/crd inj NEC | 69 | 72 | | Yes | Yes | No |
| 80630 | T1-t6 fx-op/cord inj NOS | 69 | 72 | | Yes | Yes | No |
| 80631 | T1-t6 fx-op/com cord les | 68 | 71 | | Yes | Yes | No |
| 80632 | T1-t6 fx-op/ant cord syn | 69 | 72 | | Yes | Yes | No |
| 80633 | T1-t6 fx-op/cen cord syn | 69 | 72 | | Yes | Yes | No |
| 80634 | T1-t6 fx-op/cord inj NEC | 69 | 72 | | Yes | Yes | No |
| 80635 | T7-t12 fx-op/crd inj NOS | 69 | 72 | | Yes | Yes | No |
| 80636 | T7-t12 fx-op/com crd les | 68 | 71 | | Yes | Yes | No |
| 80637 | T7-t12 fx-op/ant crd syn | 69 | 72 | | Yes | Yes | No |
| 80638 | T7-t12 fx-op/cen crd syn | 69 | 72 | | Yes | Yes | No |
| 80639 | T7-t12 fx-op/crd inj NEC | 69 | 72 | | Yes | Yes | No |
| 8064 | Cl lumbar fx w cord inj | 69 | 72 | | Yes | Yes | No |
| 8065 | Opn lumbar fx w cord inj | 69 | 72 | | Yes | Yes | No |
| 80660 | Fx sacrum-cl/crd inj NOS | 69 | 72 | | Yes | Yes | No |
| 80661 | Fx sacr-cl/cauda equ les | 69 | 72 | | Yes | Yes | No |
| 80662 | Fx sacr-cl/cauda inj NEC | 69 | 72 | | Yes | Yes | No |
| 80669 | Fx sacrum-cl/crd inj NEC | 69 | 72 | | Yes | Yes | No |
| 80670 | Fx sacrum-op/crd inj NOS | 69 | 72 | | Yes | Yes | No |
| 80671 | Fx sacr-op/cauda equ les | 69 | 72 | | Yes | Yes | No |
| 80672 | Fx sacr-op/cauda inj NEC | 69 | 72 | | Yes | Yes | No |
| 80679 | Fx sacrum-op/crd inj NEC | 69 | 72 | | Yes | Yes | No |

| 8068 | Vert fx NOS-cl w crd inj | 69 | 72 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 8069 | Vert fx NOS-op w crd inj | 69 | 72 | | Yes | Yes | No |
| 8080 | Fracture acetabulum-clos | 158 | 170 | | Yes | Yes | No |
| 8081 | Fracture acetabulum-open | 158 | 170 | | Yes | Yes | No |
| 8082 | Fracture of pubis-closed | 158 | 170 | | Yes | Yes | No |
| 8083 | Fracture of pubis-open | 158 | 170 | | Yes | Yes | No |
| 80841 | Fracture of ilium-closed | 158 | 170 | | Yes | Yes | No |
| 80842 | Fracture ischium-closed | 158 | 170 | | Yes | Yes | No |
| 80843 | Pelv fx-clos/pelv disrup | 158 | 170 | | Yes | Yes | No |
| 80844 | Pelv fx-cl w/o plv disrp | 158 | 170 | | Yes | Yes | No |
| 80849 | Pelvic fracture NEC-clos | 158 | 170 | | Yes | Yes | No |
| 80851 | Fracture of ilium-open | 158 | 170 | | Yes | Yes | No |
| 80852 | Fracture of ischium-open | 158 | 170 | | Yes | Yes | No |
| 80853 | Pelv fx-open/pelv disrup | 158 | 170 | | Yes | Yes | No |
| 80854 | Pelv fx-opn w/o pelv dis | 158 | 170 | | Yes | Yes | No |
| 80859 | Pelvic fracture NEC-open | 158 | 170 | | Yes | Yes | No |
| 8088 | Pelvic fracture NOS-clos | 158 | 170 | | Yes | Yes | No |
| 8089 | Pelvic fracture NOS-open | 158 | 170 | | Yes | Yes | No |
| 82000 | Fx femur intracaps NOS-cl | 158 | 170 | | Yes | Yes | No |
| 82001 | Fx up femur epiphy-clos | 158 | 170 | | Yes | Yes | No |
| 82002 | Fx femur, midcervic-clos | 158 | 170 | | Yes | Yes | No |
| 82003 | Fx base femoral nck-clos | 158 | 170 | | Yes | Yes | No |
| 82009 | Fx femur intracaps NEC-cl | 158 | 170 | | Yes | Yes | No |
| 82010 | Fx femur intracap NOS-opn | 158 | 170 | | Yes | Yes | No |
| 82011 | Fx up femur epiphy-open | 158 | 170 | | Yes | Yes | No |
| 82012 | Fx femur, midcervic-open | 158 | 170 | | Yes | Yes | No |
| 82013 | Fx base femoral nck-open | 158 | 170 | | Yes | Yes | No |
| 82019 | Fx femur intracap NEC-opn | 158 | 170 | | Yes | Yes | No |
| 82020 | Trochanteric fx NOS-clos | 158 | 170 | | Yes | Yes | No |
| 82021 | Intertrochanteric fx-cl | 158 | 170 | | Yes | Yes | No |
| 82022 | Subtrochanteric fx-close | 158 | 170 | | Yes | Yes | No |
| 82030 | Trochanteric fx NOS-open | 158 | 170 | | Yes | Yes | No |
| 82031 | Intertrochanteric fx-opn | 158 | 170 | | Yes | Yes | No |
| 82032 | Subtrochanteric fx-open | 158 | 170 | | Yes | Yes | No |
| 8208 | Fx neck of femur NOS-cl | 158 | 170 | | Yes | Yes | No |
| 8209 | Fx neck of femur NOS-opn | 158 | 170 | | Yes | Yes | No |
| 82100 | Fx femur NOS-closed | 158 | 170 | | Yes | Yes | No |
| 82101 | Fx femur shaft-closed | 158 | 170 | | Yes | Yes | No |
| 82110 | Fx femur NOS-open | 158 | 170 | | Yes | Yes | No |
| 82111 | Fx femur shaft-open | 158 | 170 | | Yes | Yes | No |
| 82120 | Fx low end femur NOS-cl | 158 | 170 | | Yes | Yes | No |
| 82121 | Fx femoral condyle-close | 158 | 170 | | Yes | Yes | No |
| 82122 | Fx low femur epiphy-clos | 158 | 170 | | Yes | Yes | No |
| 82123 | Supracondyl fx femur-cl | 158 | 170 | | Yes | Yes | No |
| 82129 | Fx low end femur NEC-cl | 158 | 170 | | Yes | Yes | No |
| 82130 | Fx low end femur NOS-opn | 158 | 170 | | Yes | Yes | No |
| 82131 | Fx femoral condyle-open | 158 | 170 | | Yes | Yes | No |
| 82132 | Fx low femur epiphy-open | 158 | 170 | | Yes | Yes | No |
| 82133 | Supracondyl fx femur-opn | 158 | 170 | | Yes | Yes | No |
| 82139 | Fx low end femur NEC-opn | 158 | 170 | | Yes | Yes | No |
| 83500 | Dislocat hip NOS-closed | 158 | 170 | | Yes | Yes | No |
| 83501 | Posterior disloc hip-cl | 158 | 170 | | Yes | Yes | No |
| 83502 | Obturator disloc hip-cl | 158 | 170 | | Yes | Yes | No |
| 83503 | Ant disloc hip NEC-clos | 158 | 170 | | Yes | Yes | No |
| 83510 | Dislocation hip NOS-open | 158 | 170 | | Yes | Yes | No |
| 83511 | Posterior disloc hip-opn | 158 | 170 | | Yes | Yes | No |
| 83512 | Obturator disloc hip-opn | 158 | 170 | | Yes | Yes | No |
| 83513 | Ant disloc hip NEC-open | 158 | 170 | | Yes | Yes | No |
| 8502 | Concussion-moderate coma | 155 | 167 | | Yes | Yes | No |
| 8503 | Concussion-prolong coma | 155 | 167 | | Yes | Yes | No |
| 8504 | Concussion-deep coma | 155 | 167 | | Yes | Yes | No |
| 85100 | Cerebral cortx contusion | 155 | 167 | | Yes | Yes | No |
| 85101 | Cortex contusion-no coma | 155 | 167 | | Yes | Yes | No |
| 85102 | Cortex contus-brief coma | 155 | 167 | | Yes | Yes | No |

| 85103 | Cortex contus-mod coma | 154 | 166 | | Yes | Yes | No |
| 85104 | Cortx contus-prolng coma | 154 | 166 | | Yes | Yes | No |
| 85105 | Cortex contus-deep coma | 154 | 166 | | Yes | Yes | No |
| 85106 | Cortex contus-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85109 | Cortex contus-concus NOS | 155 | 167 | | Yes | Yes | No |
| 85110 | Cortex contusion/opn wnd | 155 | 167 | | Yes | Yes | No |
| 85111 | Opn cortx contus-no coma | 155 | 167 | | Yes | Yes | No |
| 85112 | Opn cort contus-brf coma | 155 | 167 | | Yes | Yes | No |
| 85113 | Opn cort contus-mod coma | 154 | 166 | | Yes | Yes | No |
| 85114 | Opn cort contu-prol coma | 154 | 166 | | Yes | Yes | No |
| 85115 | Opn cort contu-deep coma | 154 | 166 | | Yes | Yes | No |
| 85116 | Opn cort contus-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85119 | Opn cortx contus-concuss | 155 | 167 | | Yes | Yes | No |
| 85120 | Cerebral cortex lacerat | 155 | 167 | | Yes | Yes | No |
| 85121 | Cortex lacerat w/o coma | 155 | 167 | | Yes | Yes | No |
| 85122 | Cortex lacera-brief coma | 155 | 167 | | Yes | Yes | No |
| 85123 | Cortex lacerat-mod coma | 154 | 166 | | Yes | Yes | No |
| 85124 | Cortex lacerat-prol coma | 154 | 166 | | Yes | Yes | No |
| 85125 | Cortex lacerat-deep coma | 154 | 166 | | Yes | Yes | No |
| 85126 | Cortex lacerat-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85129 | Cortex lacerat-concuss | 155 | 167 | | Yes | Yes | No |
| 85130 | Cortex lacer w opn wound | 155 | 167 | | Yes | Yes | No |
| 85131 | Opn cortex lacer-no coma | 155 | 167 | | Yes | Yes | No |
| 85132 | Opn cortx lac-brief coma | 155 | 167 | | Yes | Yes | No |
| 85133 | Opn cortx lacer-mod coma | 154 | 166 | | Yes | Yes | No |
| 85134 | Opn cortx lac-proln coma | 154 | 166 | | Yes | Yes | No |
| 85135 | Opn cortex lac-deep coma | 154 | 166 | | Yes | Yes | No |
| 85136 | Opn cortx lacer-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85139 | Opn cortx lacer-concuss | 155 | 167 | | Yes | Yes | No |
| 85140 | Cerebel/brain stm contus | 155 | 167 | | Yes | Yes | No |
| 85141 | Cerebell contus w/o coma | 155 | 167 | | Yes | Yes | No |
| 85142 | Cerebell contus-brf coma | 155 | 167 | | Yes | Yes | No |
| 85143 | Cerebell contus-mod coma | 154 | 166 | | Yes | Yes | No |
| 85144 | Cerebel contus-prol coma | 154 | 166 | | Yes | Yes | No |
| 85145 | Cerebel contus-deep coma | 154 | 166 | | Yes | Yes | No |
| 85146 | Cerebell contus-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85149 | Cerebell contus-concuss | 155 | 167 | | Yes | Yes | No |
| 85150 | Cerebel contus w opn wnd | 155 | 167 | | Yes | Yes | No |
| 85151 | Opn cerebe cont w/o coma | 155 | 167 | | Yes | Yes | No |
| 85152 | Opn cerebe cont-brf coma | 155 | 167 | | Yes | Yes | No |
| 85153 | Opn cerebe cont-mod coma | 154 | 166 | | Yes | Yes | No |
| 85154 | Opn cerebe cont-prol com | 154 | 166 | | Yes | Yes | No |
| 85155 | Opn cerebe cont-deep com | 154 | 166 | | Yes | Yes | No |
| 85156 | Opn cerebe cont-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85159 | Opn cerebel cont-concuss | 155 | 167 | | Yes | Yes | No |
| 85160 | Cerebel/brain stem lacer | 155 | 167 | | Yes | Yes | No |
| 85161 | Cerebel lacerat w/o coma | 155 | 167 | | Yes | Yes | No |
| 85162 | Cerebel lacer-brief coma | 155 | 167 | | Yes | Yes | No |
| 85163 | Cerebel lacerat-mod coma | 154 | 166 | | Yes | Yes | No |
| 85164 | Cerebel lacer-proln coma | 154 | 166 | | Yes | Yes | No |
| 85165 | Cerebell lacer-deep coma | 154 | 166 | | Yes | Yes | No |
| 85166 | Cerebel lacerat-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85169 | Cerebel lacer-concussion | 155 | 167 | | Yes | Yes | No |
| 85170 | Cerebel lacer w open wnd | 155 | 167 | | Yes | Yes | No |
| 85171 | Opn cerebel lac w/o coma | 155 | 167 | | Yes | Yes | No |
| 85172 | Opn cerebel lac-brf coma | 155 | 167 | | Yes | Yes | No |
| 85173 | Opn cerebel lac-mod coma | 154 | 166 | | Yes | Yes | No |
| 85174 | Opn cerebe lac-prol coma | 154 | 166 | | Yes | Yes | No |
| 85175 | Opn cerebe lac-deep coma | 154 | 166 | | Yes | Yes | No |
| 85176 | Opn cerebel lac-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85179 | Opn cerebell lac-concuss | 155 | 167 | | Yes | Yes | No |
| 85180 | Brain laceration NEC | 155 | 167 | | Yes | Yes | No |
| 85181 | Brain lacer NEC w/o coma | 155 | 167 | | Yes | Yes | No |
| 85182 | Brain lac NEC-brief coma | 155 | 167 | | Yes | Yes | No |

4520

| 85183 | Brain lacer NEC-mod coma | 154 | 166 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 85184 | Brain lac NEC-proln coma | 154 | 166 | | Yes | Yes | No |
| 85185 | Brain lac NEC-deep coma | 154 | 166 | | Yes | Yes | No |
| 85186 | Brain lacer NEC-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85189 | Brain lacer NEC-concuss | 155 | 167 | | Yes | Yes | No |
| 85190 | Brain lac NEC w open wnd | 155 | 167 | | Yes | Yes | No |
| 85191 | Opn brain lacer w/o coma | 155 | 167 | | Yes | Yes | No |
| 85192 | Opn brain lac-brief coma | 155 | 167 | | Yes | Yes | No |
| 85193 | Opn brain lacer-mod coma | 154 | 166 | | Yes | Yes | No |
| 85194 | Opn brain lac-proln coma | 154 | 166 | | Yes | Yes | No |
| 85195 | Open brain lac-deep coma | 154 | 166 | | Yes | Yes | No |
| 85196 | Opn brain lacer-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85199 | Open brain lacer-concuss | 155 | 167 | | Yes | Yes | No |
| 85200 | Traum subarachnoid hem | 155 | 167 | | Yes | Yes | No |
| 85201 | Subarachnoid hem-no coma | 155 | 167 | | Yes | Yes | No |
| 85202 | Subarach hem-brief coma | 155 | 167 | | Yes | Yes | No |
| 85203 | Subarach hem-mod coma | 154 | 166 | | Yes | Yes | No |
| 85204 | Subarach hem-prolng coma | 154 | 166 | | Yes | Yes | No |
| 85205 | Subarach hem-deep coma | 154 | 166 | | Yes | Yes | No |
| 85206 | Subarach hem-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85209 | Subarach hem-concussion | 155 | 167 | | Yes | Yes | No |
| 85210 | Subarach hem w opn wound | 155 | 167 | | Yes | Yes | No |
| 85211 | Opn subarach hem-no coma | 155 | 167 | | Yes | Yes | No |
| 85212 | Op subarach hem-brf coma | 155 | 167 | | Yes | Yes | No |
| 85213 | Op subarach hem-mod coma | 154 | 166 | | Yes | Yes | No |
| 85214 | Op subarach hem-prol com | 154 | 166 | | Yes | Yes | No |
| 85215 | Op subarach hem-deep com | 154 | 166 | | Yes | Yes | No |
| 85216 | Op subarach hem-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85219 | Opn subarach hem-concuss | 155 | 167 | | Yes | Yes | No |
| 85220 | Traumatic subdural hem | 155 | 167 | | Yes | Yes | No |
| 85221 | Subdural hem w/o coma | 155 | 167 | | Yes | Yes | No |
| 85222 | Subdural hem-brief coma | 155 | 167 | | Yes | Yes | No |
| 85223 | Subdural hemorr-mod coma | 154 | 166 | | Yes | Yes | No |
| 85224 | Subdural hem-prolng coma | 154 | 166 | | Yes | Yes | No |
| 85225 | Subdural hem-deep coma | 154 | 166 | | Yes | Yes | No |
| 85226 | Subdural hemorr-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85229 | Subdural hem-concussion | 155 | 167 | | Yes | Yes | No |
| 85230 | Subdural hem w opn wound | 155 | 167 | | Yes | Yes | No |
| 85231 | Open subdur hem w/o coma | 155 | 167 | | Yes | Yes | No |
| 85232 | Opn subdur hem-brf coma | 155 | 167 | | Yes | Yes | No |
| 85233 | Opn subdur hem-mod coma | 154 | 166 | | Yes | Yes | No |
| 85234 | Opn subdur hem-prol coma | 154 | 166 | | Yes | Yes | No |
| 85235 | Opn subdur hem-deep coma | 154 | 166 | | Yes | Yes | No |
| 85236 | Opn subdur hem-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85239 | Opn subdur hem-concuss | 155 | 167 | | Yes | Yes | No |
| 85240 | Traumatic extradural hem | 155 | 167 | | Yes | Yes | No |
| 85241 | Extradur hem w/o coma | 155 | 167 | | Yes | Yes | No |
| 85242 | Extradur hem-brief coma | 155 | 167 | | Yes | Yes | No |
| 85243 | Extradur hem-mod coma | 154 | 166 | | Yes | Yes | No |
| 85244 | Extradur hem-proln coma | 154 | 166 | | Yes | Yes | No |
| 85245 | Extradur hem-deep coma | 154 | 166 | | Yes | Yes | No |
| 85246 | Extradural hem-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85249 | Extadural hem-concuss | 155 | 167 | | Yes | Yes | No |
| 85250 | Extradural hem w opn wnd | 155 | 167 | | Yes | Yes | No |
| 85251 | Extradural hemor-no coma | 155 | 167 | | Yes | Yes | No |
| 85252 | Extradur hem-brief coma | 155 | 167 | | Yes | Yes | No |
| 85253 | Extradural hem-mod coma | 154 | 166 | | Yes | Yes | No |
| 85254 | Extradur hem-proln coma | 154 | 166 | | Yes | Yes | No |
| 85255 | Extradur hem-deep coma | 154 | 166 | | Yes | Yes | No |
| 85256 | Extradural hem-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85259 | Extradural hem-concuss | 155 | 167 | | Yes | Yes | No |
| 85300 | Traumatic brain hem NEC | 155 | 167 | | Yes | Yes | No |
| 85301 | Brain hem NEC w/o coma | 155 | 167 | | Yes | Yes | No |
| 85302 | Brain hem NEC-brief coma | 155 | 167 | | Yes | Yes | No |

| 85303 | Brain hem NEC-mod coma | 154 | 166 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 85304 | Brain hem NEC-proln coma | 154 | 166 | | Yes | Yes | No |
| 85305 | Brain hem NEC-deep coma | 154 | 166 | | Yes | Yes | No |
| 85306 | Brain hem NEC-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85309 | Brain hem NEC-concussion | 155 | 167 | | Yes | Yes | No |
| 85310 | Brain hem NEC w opn wnd | 155 | 167 | | Yes | Yes | No |
| 85311 | Brain hem opn w/o coma | 155 | 167 | | Yes | Yes | No |
| 85312 | Brain hem opn-brf coma | 155 | 167 | | Yes | Yes | No |
| 85313 | Brain hem open-mod coma | 154 | 166 | | Yes | Yes | No |
| 85314 | Brain hem open-proln coma | 154 | 166 | | Yes | Yes | No |
| 85315 | Brain hem open-deep coma | 154 | 166 | | Yes | Yes | No |
| 85316 | Brain hem opn-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85319 | Brain hem opn-concussion | 155 | 167 | | Yes | Yes | No |
| 85400 | Brain injury NEC | 155 | 167 | | Yes | Yes | No |
| 85401 | Brain injury NEC-no coma | 155 | 167 | | Yes | Yes | No |
| 85402 | Brain inj NEC-brief coma | 155 | 167 | | Yes | Yes | No |
| 85403 | Brain inj NEC-mod coma | 154 | 166 | | Yes | Yes | No |
| 85404 | Brain inj NEC-proln coma | 154 | 166 | | Yes | Yes | No |
| 85405 | Brain inj NEC-deep coma | 154 | 166 | | Yes | Yes | No |
| 85406 | Brain inj NEC-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85409 | Brain inj NEC-concussion | 155 | 167 | | Yes | Yes | No |
| 85410 | Brain injury w opn wnd | 155 | 167 | | Yes | Yes | No |
| 85411 | Opn brain inj w/o coma | 155 | 167 | | Yes | Yes | No |
| 85412 | Opn brain inj-brief coma | 155 | 167 | | Yes | Yes | No |
| 85413 | Opn brain inj-mod coma | 154 | 166 | | Yes | Yes | No |
| 85414 | Opn brain inj-proln coma | 154 | 166 | | Yes | Yes | No |
| 85415 | Opn brain inj-deep coma | 154 | 166 | | Yes | Yes | No |
| 85416 | Open brain inj-coma NOS | 155 | 167 | | Yes | Yes | No |
| 85419 | Opn brain inj-concussion | 155 | 167 | | Yes | Yes | No |
| 8870 | Amput below elb, unilat | 161 | 173 | | Yes | Yes | No |
| 8871 | Amp below elb, unil-comp | 161 | 173 | | Yes | Yes | No |
| 8872 | Amput abv elbow, unilat | 161 | 173 | | Yes | Yes | No |
| 8873 | Amput abv elb, unil-comp | 161 | 173 | | Yes | Yes | No |
| 8874 | Amputat arm, unilat NOS | 161 | 173 | | Yes | Yes | No |
| 8875 | Amput arm, unil NOS-comp | 161 | 173 | | Yes | Yes | No |
| 8876 | Amputation arm, bilat | 161 | 173 | | Yes | Yes | No |
| 8877 | Amputat arm, bilat-compl | 161 | 173 | | Yes | Yes | No |
| 8950 | Amputation toe | 161 | 173 | | Yes | Yes | No |
| 8951 | Amputation toe-complicat | 161 | 173 | | Yes | Yes | No |
| 8960 | Amputation foot, unilat | 161 | 173 | | Yes | Yes | No |
| 8961 | Amput foot, unilat-compl | 161 | 173 | | Yes | Yes | No |
| 8962 | Amputation foot, bilat | 161 | 173 | | Yes | Yes | No |
| 8963 | Amputat foot, bilat-comp | 161 | 173 | | Yes | Yes | No |
| 8970 | Amput below knee, unilat | 161 | 173 | | Yes | Yes | No |
| 8971 | Amputat bk, unilat-compl | 161 | 173 | | Yes | Yes | No |
| 8972 | Amput above knee, unilat | 161 | 173 | | Yes | Yes | No |
| 8973 | Amput abv kn, unil-compl | 161 | 173 | | Yes | Yes | No |
| 8974 | Amputat leg, unilat NOS | 161 | 173 | | Yes | Yes | No |
| 8975 | Amput leg, unil NOS-comp | 161 | 173 | | Yes | Yes | No |
| 8976 | Amputation leg, bilat | 161 | 173 | | Yes | Yes | No |
| 8977 | Amputat leg, bilat-compl | 161 | 173 | | Yes | Yes | No |
| 9050 | Late effec skull/face fx | 155 | 167 | | Yes | Yes | No |
| 9059 | Late eff traumat amputat | 177 | 189 | | Yes | Yes | No |
| 9070 | Lt eff intracranial inj | 155 | 167 | | Yes | Yes | No |
| 9072 | Late eff spinal cord inj | 69 | 72 | | Yes | Yes | No |
| 94811 | 10-19% bdy brn/10-19% 3d | 150 | 162 | | Yes | Yes | No |
| 94821 | 20-29% bdy brn/10-19% 3d | 150 | 162 | | Yes | Yes | No |
| 94822 | 20-29% bdy brn/20-29% 3d | 150 | 162 | | Yes | Yes | No |
| 94831 | 30-39% bdy brn/10-19% 3d | 150 | 162 | | Yes | Yes | No |
| 94832 | 30-39% bdy brn/20-29% 3d | 150 | 162 | | Yes | Yes | No |
| 94833 | 30-39% bdy brn/30-39% 3d | 150 | 162 | | Yes | Yes | No |
| 94841 | 40-49% bdy brn/10-19% 3d | 150 | 162 | | Yes | Yes | No |
| 94842 | 40-49% bdy brn/20-29% 3d | 150 | 162 | | Yes | Yes | No |
| 94843 | 40-49% bdy brn/30-39% 3d | 150 | 162 | | Yes | Yes | No |

| 94844 | 40-49% bdy brn/40-49% 3d | 150 | 162 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| 94851 | 50-59% bdy brn/10-19% 3d | 150 | 162 | | Yes | Yes | No |
| 94852 | 50-59% bdy brn/20-29% 3d | 150 | 162 | | Yes | Yes | No |
| 94853 | 50-59% bdy brn/30-39% 3d | 150 | 162 | | Yes | Yes | No |
| 94854 | 50-59% bdy brn/40-49% 3d | 150 | 162 | | Yes | Yes | No |
| 94855 | 50-59% bdy brn/50-59% 3d | 150 | 162 | | Yes | Yes | No |
| 94861 | 60-69% bdy brn/10-19% 3d | 150 | 162 | | Yes | Yes | No |
| 94862 | 60-69% bdy brn/20-29% 3d | 150 | 162 | | Yes | Yes | No |
| 94863 | 60-69% bdy brn/30-39% 3d | 150 | 162 | | Yes | Yes | No |
| 94864 | 60-69% bdy brn/40-49% 3d | 150 | 162 | | Yes | Yes | No |
| 94865 | 60-69% bdy brn/50-59% 3d | 150 | 162 | | Yes | Yes | No |
| 94866 | 60-69% bdy brn/60-69% 3d | 150 | 162 | | Yes | Yes | No |
| 94871 | 70-79% bdy brn/10-19% 3d | 150 | 162 | | Yes | Yes | No |
| 94872 | 70-79% bdy brn/20-29% 3d | 150 | 162 | | Yes | Yes | No |
| 94873 | 70-79% bdy brn/30-39% 3d | 150 | 162 | | Yes | Yes | No |
| 94874 | 70-79% bdy brn/40-49% 3d | 150 | 162 | | Yes | Yes | No |
| 94875 | 70-79% bdy brn/50-59% 3d | 150 | 162 | | Yes | Yes | No |
| 94876 | 70-79% bdy brn/60-69% 3d | 150 | 162 | | Yes | Yes | No |
| 94877 | 70-79% bdy brn/70-79% 3d | 150 | 162 | | Yes | Yes | No |
| 94881 | 80-89% bdy brn/10-19% 3d | 150 | 162 | | Yes | Yes | No |
| 94882 | 80-89% bdy brn/20-29% 3d | 150 | 162 | | Yes | Yes | No |
| 94883 | 80-89% bdy brn/30-39% 3d | 150 | 162 | | Yes | Yes | No |
| 94884 | 80-89% bdy brn/40-49% 3d | 150 | 162 | | Yes | Yes | No |
| 94885 | 80-89% bdy brn/50-59% 3d | 150 | 162 | | Yes | Yes | No |
| 94886 | 80-89% bdy brn/60-69% 3d | 150 | 162 | | Yes | Yes | No |
| 94887 | 80-89% bdy brn/70-79% 3d | 150 | 162 | | Yes | Yes | No |
| 94888 | 80-89% bdy brn/80-89% 3d | 150 | 162 | | Yes | Yes | No |
| 94891 | 90% + bdy brn/10-19% 3rd | 150 | 162 | | Yes | Yes | No |
| 94892 | 90% + bdy brn/20-29% 3rd | 150 | 162 | | Yes | Yes | No |
| 94893 | 90% + bdy brn/30-39% 3rd | 150 | 162 | | Yes | Yes | No |
| 94894 | 90% + bdy brn/40-49% 3rd | 150 | 162 | | Yes | Yes | No |
| 94895 | 90% + bdy brn/50-59% 3rd | 150 | 162 | | Yes | Yes | No |
| 94896 | 90% + bdy brn/60-69% 3rd | 150 | 162 | | Yes | Yes | No |
| 94897 | 90% + bdy brn/70-79% 3rd | 150 | 162 | | Yes | Yes | No |
| 94898 | 90% + bdy brn/80-89% 3rd | 150 | 162 | | Yes | Yes | No |
| 94899 | 90% + bdy brn/90% + 3rd | 150 | 162 | | Yes | Yes | No |
| 95200 | C1-c4 spin cord inj NOS | 69 | 72 | | Yes | Yes | No |
| 95201 | Complete les cord/c1-c4 | 67 | 70 | | Yes | Yes | No |
| 95202 | Anterior cord synd/c1-c4 | 69 | 72 | | Yes | Yes | No |
| 95203 | Central cord synd/c1-c4 | 69 | 72 | | Yes | Yes | No |
| 95204 | C1-c4 spin cord inj NEC | 69 | 72 | | Yes | Yes | No |
| 95205 | C5-c7 spin cord inj NOS | 69 | 72 | | Yes | Yes | No |
| 95206 | Complete les cord/c5-c7 | 67 | 70 | | Yes | Yes | No |
| 95207 | Anterior cord synd/c5-c7 | 69 | 72 | | Yes | Yes | No |
| 95208 | Central cord synd/c5-c7 | 69 | 72 | | Yes | Yes | No |
| 95209 | C5-c7 spin cord inj NEC | 69 | 72 | | Yes | Yes | No |
| 95210 | T1-t6 spin cord inj NOS | 69 | 72 | | Yes | Yes | No |
| 95211 | Complete les cord/t1-t6 | 68 | 71 | | Yes | Yes | No |
| 95212 | Anterior cord synd/t1-t6 | 69 | 72 | | Yes | Yes | No |
| 95213 | Central cord synd/t1-t6 | 69 | 72 | | Yes | Yes | No |
| 95214 | T1-t6 spin cord inj NEC | 69 | 72 | | Yes | Yes | No |
| 95215 | T7-t12 spin cord inj NOS | 69 | 72 | | Yes | Yes | No |
| 95216 | Complete les cord/t7-t12 | 68 | 71 | | Yes | Yes | No |
| 95217 | Anterior cord syn/t7-t12 | 69 | 72 | | Yes | Yes | No |
| 95218 | Central cord syn/t7-t12 | 69 | 72 | | Yes | Yes | No |
| 95219 | T7-t12 spin cord inj NEC | 69 | 72 | | Yes | Yes | No |
| 9522 | Lumbar spinal cord injur | 69 | 72 | | Yes | Yes | No |
| 9523 | Sacral spinal cord injur | 69 | 72 | | Yes | Yes | No |
| 9524 | Cauda equina injury | 69 | 72 | | Yes | Yes | No |
| 9528 | Spin cord inj-mult site | 69 | 72 | | Yes | Yes | No |
| 9529 | Spinal cord injury NOS | 69 | 72 | | Yes | Yes | No |
| 9580 | Air embolism | 164 | 173 | | Yes | Yes | No |
| 9581 | Fat embolism | 164 | 173 | | Yes | Yes | No |
| 9582 | Secondary/recur hemorr | 164 | 173 | | Yes | Yes | No |

4523

| 9583 | Posttraum wnd infec NEC | 164 | 173 | | Yes | Yes | No |
|------|------------------------|-----|-----|--|-----|-----|-----|
| 9584 | Traumatic shock | 164 | 173 | | Yes | Yes | No |
| 9585 | Traumatic anuria | 164 | 173 | | Yes | Yes | No |
| 9586 | Volkmann's isch contract | 164 | 173 | | Yes | Yes | No |
| 9587 | Traum subcutan emphysema | 164 | 173 | | Yes | Yes | No |
| 9588 | Early complic trauma NEC | 164 | 173 | | Yes | Yes | No |
| 95890 | Compartment syndrome NOS | 164 | 173 | | Yes | Yes | No |
| 95891 | Trauma comp synd up ext | 164 | 173 | | Yes | Yes | No |
| 95892 | Trauma comp synd low ext | 164 | 173 | | Yes | Yes | No |
| 95893 | Trauma compart synd abd | 164 | 173 | | Yes | Yes | No |
| 95899 | Trauma compart synd NEC | 164 | 173 | | Yes | Yes | No |
| 99590 | SIRS, NOS | | 2 | | No | Yes | No |
| 99591 | Sepsis | | 2 | | No | Yes | No |
| 99592 | Severe sepsis | | 2 | | No | Yes | No |
| 99593 | SIRS-noninf w/o ac or ds | | 2 | | No | Yes | No |
| 99594 | SIRS-noninf w ac org dys | | 2 | | No | Yes | No |
| 99600 | Malfunc card dev/grf NOS | 164 | | | Yes | No | No |
| 99601 | Malfunc cardiac pacemake | 164 | | | Yes | No | No |
| 99602 | Malfunc prosth hrt valve | 164 | | | Yes | No | No |
| 99603 | Malfunc coron bypass grf | 164 | | | Yes | No | No |
| 99604 | Mch cmp autm mplnt dfbrl | 164 | | | Yes | No | No |
| 99609 | Malfunc card dev/grf NEC | 164 | | | Yes | No | No |
| 9961 | Malfunc vasc device/graf | 164 | 176 | | Yes | Yes | No |
| 9962 | Malfun neuro device/graf | 164 | 176 | | Yes | Yes | No |
| 99630 | Malfunc gu dev/graft NOS | 164 | 176 | | Yes | Yes | No |
| 99631 | Malfunc urethral cath | 164 | 176 | | Yes | Yes | No |
| 99632 | Malfunction iud | 164 | | | Yes | No | No |
| 99639 | Malfunc gu dev/graft NEC | 164 | 176 | | Yes | Yes | No |
| 99640 | Cmp int orth dev/gft NOS | 164 | 176 | | Yes | Yes | No |
| 99641 | Mech loosening pros jt | 164 | 176 | | Yes | Yes | No |
| 99642 | Dislocate prosthetic jt | 164 | 176 | | Yes | Yes | No |
| 99643 | Broke prosthtc jt implnt | 164 | 176 | | Yes | Yes | No |
| 99644 | Periprosthetc fx-pros jt | 164 | 176 | | Yes | Yes | No |
| 99645 | Periprosthetc osteolysis | 164 | 176 | | Yes | Yes | No |
| 99646 | Articular wear prosth jt | 164 | 176 | | Yes | Yes | No |
| 99647 | Mech com pros jt implant | 164 | 176 | | Yes | Yes | No |
| 99649 | Mech com orth dev NEC | 164 | 176 | | Yes | Yes | No |
| 99651 | Corneal grft malfunction | 164 | | | Yes | No | No |
| 99652 | Oth tissue graft malfunc | 164 | | | Yes | No | No |
| 99653 | Lens prosthesis malfunc | 164 | | | Yes | No | No |
| 99654 | Breast prosth malfunc | 164 | | | Yes | No | No |
| 99655 | Comp-artificial skin grf | 164 | | | Yes | No | No |
| 99656 | Comp-periton dialys cath | 130 | 134 | 121 | Yes | Yes | Yes |
| 99657 | Complcation-insulin pump | 164 | | | Yes | No | No |
| 99659 | Malfunc oth device/graft | 164 | | | Yes | No | No |
| 99660 | Reaction-unsp devic/grft | 164 | 176 | | Yes | Yes | No |
| 99661 | React-cardiac dev/graft | 164 | 176 | | Yes | Yes | No |
| 99662 | React-oth vasc dev/graft | 164 | 176 | | Yes | Yes | No |
| 99663 | React-nerv sys dev/graft | 164 | 176 | | Yes | Yes | No |
| 99664 | React-indwell urin cath | 164 | 176 | | Yes | Yes | No |
| 99665 | React-oth genitourin dev | 164 | 176 | | Yes | Yes | No |
| 99666 | React-inter joint prost | 164 | 176 | | Yes | Yes | No |
| 99667 | React-oth int ortho dev | 164 | 176 | | Yes | Yes | No |
| 99668 | React-periton dialy cath | 130 | 134 | 121 | Yes | Yes | Yes |
| 99669 | React-int pros devic NEC | 164 | 176 | | Yes | Yes | No |
| 99670 | Comp-unsp device/graft | 164 | | | Yes | No | No |
| 99671 | Comp-heart valve prosth | 164 | | | Yes | No | No |
| 99672 | Comp-oth cardiac device | 164 | | | Yes | No | No |
| 99673 | Comp-ren dialys dev/grft | 130 | 134 | 121 | Yes | Yes | Yes |
| 99674 | Comp-oth vasc dev/graft | 164 | 176 | | Yes | Yes | No |
| 99675 | Comp-nerv sys dev/graft | 164 | 176 | | Yes | Yes | No |
| 99676 | Comp-genitourin dev/grft | 164 | 176 | | Yes | Yes | No |
| 99677 | Comp-internal joint pros | 164 | 176 | | Yes | Yes | No |
| 99678 | Comp-oth int ortho devic | 164 | 176 | | Yes | Yes | No |

| 99679 | Comp-int prost devic NEC | 164 | | | Yes | No | No |
|---|---|---|---|---|---|---|---|
| 99681 | Compl kidney transplant | | | 120 | No | No | Yes |
| 99682 | Compl liver transplant | 174 | 186 | 167 | Yes | Yes | Yes |
| 99683 | Compl heart transplant | 174 | 186 | 167 | Yes | Yes | Yes |
| 99684 | Compl lung transplant | 174 | 186 | 166 | Yes | Yes | Yes |
| 99685 | Compl marrow transplant | 174 | 186 | 167 | Yes | Yes | Yes |
| 99686 | Compl pancreas transplnt | 174 | 186 | 168 | Yes | Yes | Yes |
| 99687 | Comp intestine transplnt | 174 | 186 | 167 | Yes | Yes | Yes |
| 99688 | Comp tp organ-stem cell | 174 | 186 | 167 | Yes | Yes | Yes |
| 99690 | Comp reattach extrem NOS | 161 | 173 | | Yes | Yes | No |
| 99691 | Compl reattached forearm | 161 | 173 | | Yes | Yes | No |
| 99692 | Compl reattached hand | 161 | 173 | | Yes | Yes | No |
| 99693 | Compl reattached finger | 161 | 173 | | Yes | Yes | No |
| 99694 | Compl reattached arm NEC | 161 | 173 | | Yes | Yes | No |
| 99695 | Compl reattached foot | 161 | 173 | | Yes | Yes | No |
| 99696 | Compl reattached leg NEC | 161 | 173 | | Yes | Yes | No |
| 99699 | Compl reattach part NEC | 161 | 173 | | Yes | Yes | No |
| 99700 | Nervous syst complc NOS | 164 | | | Yes | No | No |
| 99701 | Surg complication - cns | 164 | | | Yes | No | No |
| 99702 | Iatrogen CV infarc/hmrhg | 164 | 100 | 97 | Yes | Yes | Yes |
| 99709 | Surg comp nerv systm NEC | 164 | | | Yes | No | No |
| 9971 | Surg compl-heart | 164 | | | Yes | No | No |
| 9972 | Surg comp-peri vasc syst | 164 | | | Yes | No | No |
| 99731 | Ventltr assoc pneumonia | 164 | 114 | | Yes | Yes | No |
| 99732 | Postproc aspiration pneu | 164 | | | Yes | No | No |
| 99739 | Respiratory comp NEC | 164 | | | Yes | No | No |
| 9974 | Surg comp-digestv system | 164 | | | Yes | No | No |
| 99749 | Oth digestv system comp | 164 | | | Yes | No | No |
| 9975 | Surg compl-urinary tract | 164 | | | Yes | No | No |
| 99760 | Amputat stump compl NOS | 177 | 189 | | Yes | Yes | No |
| 99761 | Neuroma amputation stump | 177 | 189 | | Yes | Yes | No |
| 99762 | Infection amputat stump | 177 | 189 | | Yes | Yes | No |
| 99769 | Amputat stump compl NEC | 177 | 189 | | Yes | Yes | No |
| 99771 | Vasc comp mesenteric art | 164 | | | Yes | No | No |
| 99772 | Vasc comp renal artery | 164 | | | Yes | No | No |
| 99779 | Vascular comp vessel NEC | 164 | | | Yes | No | No |
| 9980 | Postoperative shock | 164 | | | Yes | No | No |
| 99800 | Postoperative shock, NOS | 164 | | | Yes | No | No |
| 99801 | Postop shock,cardiogenic | 79 | 84 | | Yes | Yes | No |
| 99802 | Postop shock, septic | 2 | 2 | | Yes | Yes | No |
| 99809 | Postop shock, other | 164 | | | Yes | No | No |
| 9986 | Persist postop fistula | 164 | | | Yes | No | No |
| E9500 | Poison-analgesics | 55 | 58 | | Yes | Yes | No |
| E9501 | Poison-barbiturates | 55 | 58 | | Yes | Yes | No |
| E9502 | Poison-sedat/hypnotic | 55 | 58 | | Yes | Yes | No |
| E9503 | Poison-psychotropic agt | 55 | 58 | | Yes | Yes | No |
| E9504 | Poison-drug/medicin NEC | 55 | 58 | | Yes | Yes | No |
| E9505 | Poison-drug/medicin NOS | 55 | 58 | | Yes | Yes | No |
| E9506 | Poison-agricult agent | 55 | 58 | | Yes | Yes | No |
| E9507 | Poison-corrosiv/caustic | 55 | 58 | | Yes | Yes | No |
| E9508 | Poison-arsenic | 55 | 58 | | Yes | Yes | No |
| E9509 | Poison-solid/liquid NEC | 55 | 58 | | Yes | Yes | No |
| E9510 | Poison-piped gas | 55 | 58 | | Yes | Yes | No |
| E9511 | Poison-gas in container | 55 | 58 | | Yes | Yes | No |
| E9518 | Poison-utility gas NEC | 55 | 58 | | Yes | Yes | No |
| E9520 | Poison-exhaust gas | 55 | 58 | | Yes | Yes | No |
| E9521 | Poison-co NEC | 55 | 58 | | Yes | Yes | No |
| E9528 | Poison-gas/vapor NEC | 55 | 58 | | Yes | Yes | No |
| E9529 | Poison-gas/vapor NOS | 55 | 58 | | Yes | Yes | No |
| E9530 | Injury-hanging | 55 | 58 | | Yes | Yes | No |
| E9531 | Injury-suff w plas bag | 55 | 58 | | Yes | Yes | No |
| E9538 | Injury-strang/suff NEC | 55 | 58 | | Yes | Yes | No |
| E9539 | Injury-strang/suff NOS | 55 | 58 | | Yes | Yes | No |
| E954 | Injury-submersion | 55 | 58 | | Yes | Yes | No |

| E9550 | Injury-handgun | 55 | 58 | | Yes | Yes | No |
|---|---|---|---|---|---|---|---|
| E9551 | Injury-shotgun | 55 | 58 | | Yes | Yes | No |
| E9552 | Injury-hunting rifle | 55 | 58 | | Yes | Yes | No |
| E9553 | Injury-military firearm | 55 | 58 | | Yes | Yes | No |
| E9554 | Injury-firearm NEC | 55 | 58 | | Yes | Yes | No |
| E9555 | Injury-explosives | 55 | 58 | | Yes | Yes | No |
| E9556 | Self inflict acc-air gun | 55 | 58 | | Yes | Yes | No |
| E9557 | Self inj-paintball gun | 55 | 58 | | Yes | Yes | No |
| E9559 | Injury-firearm/expl NOS | 55 | 58 | | Yes | Yes | No |
| E956 | Injury-cut instrument | 55 | 58 | | Yes | Yes | No |
| E9570 | Injury-jump fm residence | 55 | 58 | | Yes | Yes | No |
| E9571 | Injury-jump fm struc NEC | 55 | 58 | | Yes | Yes | No |
| E9572 | Injury-jump fm natur sit | 55 | 58 | | Yes | Yes | No |
| E9579 | Injury-jump NEC | 55 | 58 | | Yes | Yes | No |
| E9580 | Injury-moving object | 55 | 58 | | Yes | Yes | No |
| E9581 | Injury-burn, fire | 55 | 58 | | Yes | Yes | No |
| E9582 | Injury-scald | 55 | 58 | | Yes | Yes | No |
| E9583 | Injury-extreme cold | 55 | 58 | | Yes | Yes | No |
| E9584 | Injury-electrocution | 55 | 58 | | Yes | Yes | No |
| E9585 | Injury-motor veh crash | 55 | 58 | | Yes | Yes | No |
| E9586 | Injury-aircraft crash | 55 | 58 | | Yes | Yes | No |
| E9587 | Injury-caustic substance | 55 | 58 | | Yes | Yes | No |
| E9588 | Injury-NEC | 55 | 58 | | Yes | Yes | No |
| E9589 | Injury-NOS | 55 | 58 | | Yes | Yes | No |
| E959 | Late eff of self-injury | 55 | 58 | | Yes | Yes | No |
| V08 | Asymp hiv infectn status | 1 | 1 | 1 | Yes | Yes | Yes |
| V420 | Kidney transplant status | | | 120 | No | No | Yes |
| V421 | Heart transplant status | 174 | 186 | 167 | Yes | Yes | Yes |
| V426 | Lung transplant status | 174 | 186 | 166 | Yes | Yes | Yes |
| V427 | Liver transplant status | 174 | 186 | 167 | Yes | Yes | Yes |
| V4281 | Trnspl status-bne marrow | 174 | 186 | 167 | Yes | Yes | Yes |
| V4282 | Trspl sts-perip stm cell | 174 | 186 | 167 | Yes | Yes | Yes |
| V4283 | Trnspl status-pancreas | 174 | 186 | 168 | Yes | Yes | Yes |
| V4284 | Trnspl status-intestines | 174 | 186 | 167 | Yes | Yes | Yes |
| V4321 | Heart assist dev replace | 174 | 186 | | Yes | Yes | No |
| V4322 | Artficial heart replace | 174 | 186 | | Yes | Yes | No |
| V440 | Tracheostomy status | 77 | 82 | | Yes | Yes | No |
| V441 | Gastrostomy status | 176 | 188 | | Yes | Yes | No |
| V442 | Ileostomy status | 176 | 188 | | Yes | Yes | No |
| V443 | Colostomy status | 176 | 188 | | Yes | Yes | No |
| V444 | Enterostomy status NEC | 176 | 188 | | Yes | Yes | No |
| V4450 | Cystostomy status NOS | 176 | 188 | | Yes | Yes | No |
| V4451 | Cutaneous-vesicos status | 176 | 188 | | Yes | Yes | No |
| V4452 | Appendico-vesicos status | 176 | 188 | | Yes | Yes | No |
| V4459 | Cystostomy status NEC | 176 | 188 | | Yes | Yes | No |
| V446 | Urinostomy status NEC | 176 | 188 | | Yes | Yes | No |
| V448 | Artif open status NEC | 176 | 188 | | Yes | Yes | No |
| V449 | Artif open status NOS | 176 | 188 | | Yes | Yes | No |
| V4511 | Renal dialysis status | 130 | 134 | 121 | Yes | Yes | Yes |
| V4512 | Noncmplnt w renal dialys | 130 | 134 | 121 | Yes | Yes | Yes |
| V4611 | Respirator depend status | 77 | 82 | | Yes | Yes | No |
| V4612 | Resp depend-powr failure | 77 | 82 | | Yes | Yes | No |
| V4613 | Weaning from respirator | 77 | 82 | | Yes | Yes | No |
| V4614 | Mech comp respirator | 77 | 82 | | Yes | Yes | No |
| V4970 | Status amput lwr lmb NOS | 177 | 189 | | Yes | Yes | No |
| V4971 | Status amput great toe | 177 | 189 | | Yes | Yes | No |
| V4972 | Status amput othr toe(s) | 177 | 189 | | Yes | Yes | No |
| V4973 | Status amput foot | 177 | 189 | | Yes | Yes | No |
| V4974 | Status amput ankle | 177 | 189 | | Yes | Yes | No |
| V4975 | Status amput below knee | 177 | 189 | | Yes | Yes | No |
| V4976 | Status amput above knee | 177 | 189 | | Yes | Yes | No |
| V4977 | Status amput hip | 177 | 189 | | Yes | Yes | No |
| V521 | Fitting artificial leg | 177 | 189 | | Yes | Yes | No |
| V550 | Atten to tracheostomy | 77 | 82 | | Yes | Yes | No |

| V551 | Atten to gastrostomy | 176 | 188 | | Yes | Yes | No |
|------|----------------------|-----|-----|---|-----|-----|-----|
| V552 | Atten to ileostomy | 176 | 188 | | Yes | Yes | No |
| V553 | Atten to colostomy | 176 | 188 | | Yes | Yes | No |
| V554 | Atten to enterostomy NEC | 176 | 188 | | Yes | Yes | No |
| V555 | Atten to cystostomy | 176 | 188 | | Yes | Yes | No |
| V556 | Atten to urinostomy NEC | 176 | 188 | | Yes | Yes | No |
| V558 | Attn to artif open NEC | 176 | 188 | | Yes | Yes | No |
| V559 | Attn to artif open NOS | 176 | 188 | | Yes | Yes | No |
| V560 | Renal dialysis encounter | 130 | 134 | 121 | Yes | Yes | Yes |
| V561 | Ft/adj xtrcorp dial cath | 130 | 134 | 121 | Yes | Yes | Yes |
| V562 | Fit/adj perit dial cath | 130 | 134 | 121 | Yes | Yes | Yes |
| V5631 | Hemodialysis testing | 130 | 134 | 121 | Yes | Yes | Yes |
| V5632 | Peritoneal dialysis test | 130 | 134 | 121 | Yes | Yes | Yes |
| V568 | Dialysis encounter, NEC | 130 | 134 | 121 | Yes | Yes | Yes |
| V5867 | Long-term use of insulin | 19 | 19 | 15 | Yes | Yes | Yes |
| V8541 | BMI 40.0-44.9, adult | | 22 | 21 | No | Yes | Yes |
| V8542 | BMI 45.0-49.9, adult | | 22 | 21 | No | Yes | Yes |
| V8543 | BMI 50.0-59.9, adult | | 22 | 21 | No | Yes | Yes |
| V8544 | BMI 60.0-69.9, adult | | 22 | 21 | No | Yes | Yes |
| V8545 | BMI 70 and over, adult | | 22 | 21 | No | Yes | Yes |

**EXHIBIT P-44**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA     *
ex rel, BENJAMIN POEHLING,   *
                             *
        Plaintiffs,          *
                             *
vs.                          *   CASE NO:
                             *
UNITEDHEALTHCARE GROUP,       *   CV 16-08697 FMO
et al,                       *
                             *
        Defendants.          *
                             *
*    *    *    *    *    *    *    *    *    *

        VIDEOTAPED 30(b)(6) DEPOSITION OF:

                CONNIE LYNN LEONARD,

was held on Friday, May 26, 2023, commencing

at 10:04 a.m., at Latham & Watkins, 555 11th

Street, Washington, D.C., reported by

Barbara Moore, CRR, RMR.

                *    *    *

MAGNA LEGAL SERVICES
866-624-6221
www.MagnaLS.com



4529

Page 241

1     identified for that given year?

2               MS. GLOVER:  Objection.  Form.

3     Scope.

4               THE WITNESS:  So a claim comes in

5     to Medicare fee for service.  The claim

6     processes through the system that I talked

7     about, the claim is paid.  Somewhere down

8     the road a Medicare review contractor

9     decides to review the claim and maybe they

10    review it on its face.  That doesn't matter

11    one way or the other.

12              And they review the claim, and

13    the -- they adjust the claim in some form.

14    Maybe they downcode.  They change the

15    diagnosis code.  We will stick to the

16    diagnosis codes.  Maybe they changed the

17    diagnosis code.

18              If that was a post-claim claim,

19    what happens is that claim is adjusted and

20    the provider gets a demand letter to send

21    back whatever the difference between the



Page 242

1    actual payment was and what the new payment

2    amount would be.  And that claim is

3    adjusted.  And when that claim is adjusted,

4    that claim, that final adjustment goes into

5    the claim, claims history, into the claims

6    data.  If it was a prepaid claim, then that

7    adjustment happens, and then when the claim

8    goes into the national claims history,

9    that's the final claim action.

10           So whenever they pull that data,

11   June 30 is the date that they pulled the

12   data, all they're pulling is the current

13   status of that claim.  So when I use the

14   term "adjustment," I mean that the claim has

15   actually been adjusted, the medical record

16   has been reviewed, or somebody has adjusted

17   it, but somebody has reviewed the claim and

18   wanted to make a change to the previous

19   final action and they reopen the claim.  The

20   claim was adjusted, and now it's a new final

21   form.



Page 283

1            CERTIFICATE OF COURT REPORTER

2            I, BARBARA MOORE, do hereby

3    certify that the proceedings were recorded

4    by me stenographically and electronically at

5    the time and place mentioned on the cover

6    sheet thereof, and, thereafter, transcribed;

7    that said hearing is a true record of the

8    statements made; that I am neither counsel

9    for, related to, nor employed by any of the

10   parties to this proceeding;

11            And further, that I am not

12   financially or otherwise interested in the

13   outcome of this matter.

14            As Witnessed by my hand and

15   signature as indicated below.

16

17

18

19   _____
                       *Barbara Moore*
     BARBARA MOORE, CRR, RMR

20

21   My Commission Expires:  July 31, 2023



4532

**EXHIBIT P-45**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA


UNITED STATES OF AMERICA ex rel.    )
BEN POEHLING,                       )
                                    )
              Plaintiffs,           )
                                    )
       VS.                          ) CASE NO.
                                    ) 2:16-08687 FMO
                                    )
UNITED HEALTH GROUP, INC., et al.,  )
                                    )
              Defendants.           )
_____)



VIDEOTAPED DEPOSITION OF JANICE REDMOND

Costa Mesa, California

Friday, July 29, 2022




Job No.: 835270

Reported by:

Shirley R. Lynn, C.S.R. NO. 13784



4534

Page 80

1       A     I've heard of it.

2       Q     Did you ever attend any ICE events?

3       A     No.

4       Q     Do you know who at Optum did attend ICE

5    events?

6             MS. ZUCKERMAN:  Objection.  Calls for

7    speculation.

8             THE WITNESS:  Pam Leal that reported to me

9    was active in that organization.

10    BY MS. GLOVER:

11      Q     Okay.  I'm going to mark another exhibit

12   here.

13            This is 358.  You can let me know when it's on

14   your screen.  This is a two-page e-mail, although I

15   think all the text is on the first page.  So if you want

16   to give a read to the e-mail chain, and we'll talk about

17   it in a minute.

18            (Exhibit 358 was marked for

19            identification.)

20            THE WITNESS:  Okay.

21    BY MS. GLOVER:

22      Q     Okay.  Ms. Redmond, are you familiar with

23   the term "capitated provider"?

24      A     Yes.

25      Q     How about "gainsharing provider"?



4535

Page 81

 1     A    Yes.

 2     Q    What is a capitated provider?

 3     A    A provider that gets paid per member per

 4  month.

 5     Q    To care for certain beneficiaries?

 6     A    Yes.

 7     Q    Okay.  And what is a gainsharing provider?

 8          (Court reporter clarification.)

 9          MS. GLOVER:  Gain, like g-a-i-n, yeah.

10  Yeah.

11          THE WITNESS:  I'm familiar with the term.

12  I don't recall the specifics of the gainshare.

13   BY MS. GLOVER:

14     Q    Are you familiar with the term

15  "fee-for-service" --

16     A    Yes.

17     Q    -- "provider"?

18     A    Yes.

19     Q    What's a fee-for-service provider?

20     A    A provider that gets paid transactionally

21  as a member comes through the door, so based on

22  every encounter separately.

23     Q    And in market consultation, did -- did you

24  work with capitated and gainsharing providers?

25     A    Yes.



Page 185

1                        CERTIFICATE

2                            OF

3                   SHORTHAND REPORTER

4                     *    *    *    *

5

6         I, Shirley Lynn, CSR No. 13784, a Certified

7   Shorthand Reporter in and for the State of California,

8   do hereby certify:

9         That prior to being examined, the witness

10  named in the foregoing proceedings declared under

11  penalty of perjury to testify to the truth, the whole

12  truth, and nothing but the truth;

13        That said proceedings were taken by me in

14  shorthand at the time and place herein named and were

15  thereafter transcribed into typewriting under my

16  direction, said transcript being a true and correct

17  transcription of my shorthand notes;

18        Pursuant to Federal Rule 30(e), transcript

19  review was requested;

20        I further certify that I have no interest in

21  the outcome of this action.

22

23

24  _____
    SHIRLEY LYNN
    CSR NO. 13784

25



4537

**EXHIBIT P-46**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA ex   :

rel., BENJAMIN POEHLING,       :

         Plaintiffs,        :   Case No.:

         VS.                :   CV-16-08697 FMO

UNITED HEALTH GROUP, INC.,     :

et al.,                        :

         Defendants.        :   Page 1-258


- - -

Thursday, March 14, 2024

- - -


Videotaped deposition of MELVIN JULES

INGBER, PH.D. taken at DLAPiper, 650 South Exeter

Street, Suite 1100, Baltimore, MD commencing at 9:42

a.m., before Sherry L. Brooks, Certified LiveNote

Reporter and Notary Public, in and for the State of

Maryland.

- - -

MAGNA LEGAL SERVICES

WWW.MAGNALS.COM



4539

Page 74

1    take into account that -- I'm sorry.  Are you saying

2    providers?  I'm sorry.  I need to understand the

3    question.  Can you repeat it?  I'm missing a word.

4         Q.    Right.  So do you know what percentage of

5    Medicare Advantage providers are paid by -- or have

6    increased payments based upon their diagnosis coding?

7         A.    I do not have a study that gives me that

8    percentage.

9         Q.    And you don't have any empirical analysis

10   or any basis to say what portion of Medicare

11   Advantage payments or Medicare Advantage providers

12   are based on diagnosis codes as opposed to

13   procedures?

14        A.    I cannot quantify it.

15        Q.    Are any providers in the fee-for-service

16   side of Medicare compensated at all based upon

17   diagnoses that are coded?

18             MS. MCMAHON:  Objection.  Calls for

19   speculation.

20        A.    If we're talking in fee-for-service, the

21   hospital fee-for-service claims are paid partly on

22   procedures and partly on which diagnosis they put



4540

Page 75

1    first on a claim.

2              So hospitals have an incentive to choose

3    among the diagnoses they have for the patient which

4    one they put first because that is a basic part of

5    the DRG payment system, diagnostic-related group

6    payment system for hospitals.

7              BY MR. JONES:

8       Q.    And as part of the DRG payment system for

9    hospitals, the diagnosis being put first matters

10   because more cost-intensive diagnoses lead to higher

11   reimbursement rates for those hospitals, right?

12      A.    In the fee-for-service side they -- how

13   they order them would determine the amount that

14   they're paid, yes.  But I want to just add that in

15   risk adjustment we don't care what order they're in.

16   But for what you said, it is true.

17      Q.    Sure.  And so those hospitals have

18   incentives to code first the most cost intensive

19   diagnosis that a patient they are seeing in the

20   fee-for-service Medicare has, right?

21      A.    You could, indeed, say that they have an

22   incentive and also that the work is being done by



Page 76

1    certified coders who have rules for themselves.  So,

2    yes, there is an incentive but also the people doing

3    the coding are libel in some sense for fudging.

4         Q.    Okay.  And -- but you don't know, one way

5    or another, whether there is more compensation on the

6    MA side of the house for diagnosis coding compared to

7    the fee-for-service payments that are tied to DRGs

8    and diagnoses in hospital stays, do you?

9         A.    Yes.

10              MS. MCMAHON:  Objection.  Form.

11        A.    The hospitals are a relatively small

12   contributor to the diagnosis coding.  And, as I said,

13   that would increase their payments so that the

14   fee-for-service costs might go up.  When we do the

15   model and add up all the dollars, the fee-for-service

16   costs might go up.

17              However, as far as the risk adjustment is

18   concerned, it takes them in any order.  On the side

19   of Medicare Advantage it is a lot of the time the

20   physicians who are in the position and not just

21   hospitals who do it for an entirely different reason.

22              And I can tell you that my experience in



Page 77

1    talking with physicians who are in large systems,

2    they -- when they do their coding, the ones that do

3    have electronic systems are reminded of codes

4    particularly because of the HCC model that they

5    should be coding.

6            They literally when they sit down to code

7    a patient -- and I have (sic) this from personal

8    conversation that we've had over the years with

9    consulting physicians -- they are prodded to and

10   let's say reminded that this person also has

11   something.

12           But the guidelines, of course, for normal

13   fee-for-service is not just to code anything that the

14   person has.  The guidelines are a bit different

15   there.  It's supposed to be relevant.

16           So yeah, there's something going on with

17   physicians just the way the electronic systems work

18   today, specifically oriented towards HCCs to remind

19   people to code thoroughly.  Let's put it that way.

20           BY MR. JONES:

21       Q.   Sir, my question, respectfully, didn't

22   have anything to do with reminders.



Page 78

1          What I'm interested in -- you mentioned

2    incentives for coding.

3       A.    You mean paid --

4       Q.    For payment.

5       A.    Yeah.

6       Q.    In terms of the differences in -- or the

7    -- let me -- let me start over.

8          You don't have any basis to quantify the

9    difference between payments in providers for Medicare

10   Advantage that are tied to diagnoses compared to

11   payments for providers in the fee-for-service side

12   that are tied to diagnoses?

13      A.    I cannot quantify that.

14      Q.    And you can't say whether the payments on

15   the MA side are materially higher than the payments

16   for diagnoses as part of the DRG payments for

17   Medicare fee-for-service are (sic), right?

18          MS. MCMAHON:  Objection.  Form.

19      A.    When I use the term "payments," I want to

20   be very specific because the payments that are put on

21   encounter records, which are the source of the

22   diagnoses used, they're like claims that are



4544

Page 79

1    submitted by managed care plans.  Those payments are

2    not the payments I'm talking about.

3            And the payments I'm talking about do not

4    appear anywhere that would make it possible to

5    quantify it.  If a payment is made by somebody

6    writing a check to somebody, there's no record of

7    that.  So the payments on claims are not affected.

8    So that, yes, I can't quantify that at all.

9            BY MR. JONES:

10    Q.    Okay.  And just to have the -- make sure I

11    got the question and answer right, you can't say

12    whether payments to providers who see MA patients

13    that are tied to diagnoses are any different or

14    materially higher than the payments to

15    fee-for-service hospitals that are tied to DRGs or

16    diagnoses, right?

17            MS. MCMAHON:  Objection.  Form.

18    A.    The payments that I can talk about in a

19    quantitative way are payments on the encounter

20    records similar to claims.  I can't say anything

21    about comparing payments that are made not through

22    the standard payment system for providers.



Page 80

1          BY MR. JONES:

2          Q.    So is the answer to my question no, that

3    you can't say whether payments from MA plans to

4    providers that are tied to diagnoses like the example

5    you provided are materially higher than the payments

6    to fee-for-service hospitals from the government that

7    are tied to DRGs or diagnoses?

8          A.    I would like to answer the question, but I

9    have to keep saying that the word "payments" is a

10   little bit -- has a double meaning because there are

11   -- you're saying payments tied to diagnoses.  And

12   payments tied to diagnoses means payments made

13   without a record of them.

14              I cannot talk about that.  Payments made

15   in fee-for-service based on diagnoses are almost

16   entirely related to the actual payment system and are

17   on the records, the claims.  The payments I'm talking

18   about based on diagnoses are not on the claims at

19   all.  So I just want to be careful about the word

20   "payments."  That's all.

21         Q.    Sure.  Is there another term that would --

22   that I should -- that would be better for me to use



Page 81

1    to compare?  I just want to make sure I know what

2    your testimony is in terms of that -- the example

3    that you gave of the provider who suggested that he

4    was compensated or that his group was compensated

5    because of more complete coding, what is the kind of

6    payment term that you'd prefer me to use so that I

7    can get the -- your -- your testimony?

8        A.   It would be payments not related to the

9    claims, per se, because payments are made to

10   providers based on whatever system -- usually a

11   fee-for-service type system for most managed care

12   plans with the risk capitation.

13            But those payments of record are not the

14   ones we're speaking of, and it's only the payments

15   made to providers based on diagnoses that are beyond

16   those that are external to what is paid on claims.

17   So those are the payments that I would be talking

18   about that I cannot quantify at all.

19       Q.   Okay.  So let me try this again:  You

20   don't have any way of saying whether the payments for

21   diagnosis coding that are not based on claims are any

22   -- materially higher in the Medicare Advantage world



Page 82

1    than payments to hospitals on the fee-for-service

2    side that are based on diagnoses for DRGs, for

3    example?

4        A.    I'm sorry.  We're -- on one side or the

5    other we have hospitals and then we have a more vague

6    term on the Medicare Advantage side.

7            The hospital claims on both sides may or

8    may not be paid similarly based on diagnoses.  I

9    don't know what a particular plan does.  We do know

10   what Medicare fee-for-service does.  The diagnosis

11   matters and so do the procedures.  Okay?

12           On the managed care side, they may or may

13   not pay on DRGs.  So the diagnosis may or may not

14   matter on the claim itself because there are many

15   ways to pay hospitals.

16           So, you know, not knowing the specifics of

17   any case, I couldn't say.  But then there is the

18   other payment which can be made outside of the

19   hospital world all together and having some sort of a

20   -- on the one hand physicians who are not paid --

21   physicians provide the diagnosis codes for most

22   beneficiaries because hospitalizations are relatively



Page 83

1    rare.

2              So most people get only physician-based

3    codes with some hospitals also.  So if we're talking

4    about the other half of the world, which is not a

5    hospital, for physicians -- physicians there in

6    fee-for-service, the diagnoses are not a basis of

7    payment.

8              On the managed care side what they pay

9    physicians on a claim may or may not have anything to

10   do with the diagnoses they put on.  But if there is a

11   -- an additional on top of that for increasing the

12   diagnoses, I cannot quantify that.  I just know that

13   it exists.  I can't quantify that.

14             Bonus payment -- let's go with the bonus

15   payment to make it clearer.

16        Q.   Okay.  But in terms of the comparison of

17   any payment that depends on a diagnosis as opposed to

18   a procedure, can you say, one way or another, whether

19   the payments on the Medicare Advantage side as a

20   general matter are materially higher that depend on a

21   diagnosis rather than a procedure than the payments

22   on the Medicare fee-for-service side that depend on a



Page 84

1    diagnosis rather than a procedure?

2        A.    If we're looking on the claim itself I

3    can't say that the hospitals -- and that's exactly

4    what we're talking about at this point -- that the

5    hospitals are coding differently for their own

6    benefit depending on how they're being paid by the

7    plan.

8            But if they were getting paid by DRGs,

9    they would have the same incentives.  And if there

10   was a bonus payment, I can't see that at all in

11   there.  So I'm not saying that in hospitals there's a

12   big difference because if the plan does pay with DRGs

13   based on diagnoses -- if they don't pay -- I know

14   from history that there are hospitals that have been

15   paid per diems, and it's an entirely different

16   situation from DRGs.

17           So, no, I can't speak too specifically

18   what's on the claim.  I don't think there's a big

19   difference there.

20           But if there's any bonus for coding more

21   comorbidities or something like that outside of the

22   claim, which doesn't affect the payment on the claim,



Page 85

1    I cannot say firmly how much that is.

2        Q.    Sir, I'm just trying to understand whether

3    you have any data or quantification that would

4    suggest, one way or another, whether payments to

5    providers based on diagnoses for MA plans are any

6    materially different than payments to providers based

7    on diagnoses, not procedures, in the fee-for-service

8    side of Medicare.

9            MS. MCMAHON:    Objection.    Asked and

10    answered.

11        A.    For hospitals -- that is the group you're

12    referring to -- I cannot quantify that there is a

13    difference, correct.

14            BY MR. JONES:

15        Q.    And can you quantify that there is any

16    difference overall including hospitals or all

17    providers with respect to payments tied to diagnoses

18    for MA plans as opposed to payments tied to diagnoses

19    in the fee-for-service Medicare?

20        A.    I cannot quantify that, no.

21            MR. JONES:    We've been going about an

22    hour.    Do you want to take a break now or do you want



256

1                    C E R T I F I C A T E

2

3            I do hereby certify that I am a Notary
Public in good standing, that the aforesaid testimony
4  was taken before me, pursuant to notice, at the time
and place indicated; that said deponent was by me
5  duly sworn to tell the truth, the whole truth, and
nothing but the truth; that the testimony of said
6  deponent was correctly recorded in machine shorthand
by me and thereafter transcribed under my supervision
7  with computer-aided transcription; that the
deposition is a true and correct record of the
8  testimony given by the witness; and that I am neither
of counsel nor kin to any party in said action, nor
9  interested in the outcome thereof.

10

11           WITNESS my hand and official seal this

12  _____ day of _____, 2024.

13

14

15  _____

16                 Notary Public

17

18

19

20

21

22

4552

**EXHIBIT P-47**

1   CHAD A. READLER
    Principal Deputy Assistant Attorney General, Civil Division
2   SANDRA R. BROWN
    Acting United States Attorney
3   DOROTHY A. SCHOUTEN
    DAVID K. BARRETT
4   JOHN E. LEE (CBN 128696)
    Assistant United States Attorneys
5        300 N. Los Angeles Street, Room 7516
         Los Angeles, California 90012
6        Tel: (213) 894-3995; Fax: (213) 894-7819
         Email: john.lee2@usdoj.gov
7   MICHAEL D. GRANSTON
    DANIEL R. ANDERSON
8   CAROL L. WALLACK
    JESSICA KRIEG
9   JUSTIN DRAYCOTT
    PAUL PERKINS
10  Attorneys, Civil Division
    United States Department of Justice
11       P.O. Box 261, Ben Franklin Station
         Washington, D.C. 20044
12       Tel: (202) 307-0486; Fax: (202) 307-3852
         E-mail: carol.wallack@usdoj.gov
13  JAMES P. KENNEDY, JR.
    Acting United States Attorney
14  KATHLEEN ANN LYNCH
    Assistant United States Attorney (Admitted PHV)
15       138 Delaware Avenue
         Buffalo, New York 14201
16       Tel: (716) 843-5830; Fax: (716) 551-3052
         E-mail: kathleen.lynch@usdoj.gov
17  Attorneys for the United States of America

18              UNITED STATES DISTRICT COURT

19          FOR THE CENTRAL DISTRICT OF CALIFORNIA

20                   WESTERN DIVISION

21  UNITED STATES OF AMERICA *ex*          No. CV 16-08697 MWF (SSx)
    *rel.* BENJAMIN POEHLING,
22                                         UNITED STATES' AMENDED
              Plaintiffs,                  COMPLAINT-IN-PARTIAL-
23                                         INTERVENTION AND DEMAND FOR
                   v.                      JURY TRIAL
24
    UNITEDHEALTH GROUP, INC., a
25  Delaware corporation; UNITED
    HEALTHCARE SERVICES, INC., a
26  Minnesota corporation; UNITED
    HEALTHCARE, INC., a Delaware
27  corporation; OVATIONS, INC., a
    Delaware corporation; OPTUM, INC., a
    Delaware corporation;
28  OPTUMINSIGHT, INC., a Delaware
    corporation; AMERICHOICE OF NEW

                                                                    4554

Case 2:16-cv-08697-FMO-PVC    Document 616-14    Filed 08/06/24    Page 131 of 633
Page ID #:23347
Case 2:16-cv-08697-MWF-SS    Document 179    Filed 11/17/17    Page 2 of 1609   Page ID #:2104

JERSEY, INC., a New Jersey corporation; ARIZONA PHYSICIANS IPA, INC., an Arizona corporation; CARE IMPROVEMENT PLUS OF MARYLAND, INC., a Maryland corporation; CARE IMPROVEMENT PLUS OF TEXAS INSURANCE COMPANY, a Texas insurance company; CARE IMPROVEMENT PLUS SOUTH CENTRAL INSURANCE CO., an Arkansas insurance company; CARE IMPROVEMENT PLUS WISCONSIN INSURANCE COMPANY, a Wisconsin insurance company; OPTUM INSURANCE CO., an Ohio corporation; CITRUS HEALTH CARE, INC., a Florida corporation; HEALTH PLAN OF NEVADA, INC., a Nevada corporation; MEDICA HEALTHCARE PLANS, INC., a Florida corporation; OXFORD HEALTH PLANS (CT), INC., a Connecticut corporation; OXFORD HEALTH PLANS (NJ), INC., a New Jersey corporation also known as Oxford Health Plans of New Jersey, Inc.; OXFORD HEALTH PLANS (NY), INC., a New York corporation; PACIFICARE LIFE AND HEALTH INSURANCE COMPANY, an Indiana insurance company; PACIFICARE OF ARIZONA, INC., an Arizona corporation; PACIFICARE OF COLORADO, INC., a Colorado corporation; PACIFICARE OF NEVADA, INC., a Nevada corporation also known as PacifiCare/UHC of Nevada; PHYSICIANS HEALTH CHOICE OF TEXAS, LLC, a Texas limited liability company; PREFERRED CARE PARTNERS, INC., a Florida corporation; ROCKY MOUNTAIN HEALTH MAINTENANCE ORGANIZATION, INC., a Colorado company; SIERRA HEALTH AND LIFE INSURANCE COMPANY, INC., a Nevada corporation; SYMPHONIX HEALTH INSURANCE, INC., an Illinois insurance company; UNITEDHEALTHCARE OF CALIFORNIA, INC., a California corporation also known as UHC of California, Inc. and formerly known as PacifiCare of California, Inc. and PacifiCare of California/Secure Horizons; UNISON HEALTH PLAN OF

2

4555

Case 2:16-cv-08607-FMO-PVC   Document 616-14   Filed 08/06/24   Page 132 of 633
Case 2:16-cv-08607-MWF-SS   Document 117   Filed 11/17/17   Page 3 of 1609   Page ID #:2105
Page ID #:23348

1  TENNESSEE, INC., a Tennessee
corporation; UNITED HEALTH CARE
2  INS. CO. AND UNITED NEW YORK, a
New York insurance company;
3  UNITEDHEALTHCARE BENEFITS
OF TEXAS, INC., a Texas corporation
4  formerly known as PacifiCare of Texas,
Inc.; UNITEDHEALTHCARE
5  COMMUNITY PLAN OF OHIO, INC.,
an Ohio corporation formerly known as
6  Unison Health Plan of Ohio, Inc.;
UNITEDHEALTHCARE
7  COMMUNITY PLAN OF TEXAS,
L.L.C., a Texas limited liability company
8  formerly known as Evercare of Texas,
LLC; UNITEDHEALTHCARE
9  COMMUNITY PLAN, INC., a Michigan
corporation also known as Great Lakes
10  Health Plan, Inc. and UnitedHealthcare
of the Great Lakes Health Plan, Inc.;
11  UNITEDHEALTHCARE INSURANCE
COMPANY, a Connecticut insurance
12  company also known as United
Healthcare Insurance Company;
13  UNITEDHEALTHCARE INSURANCE
COMPANY OF NEW YORK, a New
14  York insurance company also known as
United Healthcare Insurance Company of
15  New York; UNITEDHEALTHCARE OF
ALABAMA, INC., an Alabama
16  corporation also known as United
HealthCare of Alabama, Inc.;
17  UNITEDHEALTHCARE OF
ARIZONA, INC., an Arizona
18  corporation also known as United
HealthCare of Arizona, Inc.;
19  UNITEDHEALTHCARE OF
ARKANSAS, INC., an Arkansas
20  corporation also known as United
Healthcare of Arkansas, Inc.;
21  UNITEDHEALTHCARE OF
FLORIDA, INC., a Florida corporation
22  also known as United Healthcare of
Florida, Inc.; UNITEDHEALTHCARE
23  OF GEORGIA, INC., a Georgia
corporation also known as United
24  Healthcare of Georgia, Inc.;
UNITEDHEALTHCARE OF NEW
25  ENGLAND, INC., a Rhode Island
corporation also known as United
26  HealthCare of New England, Inc. and
United Health Plans of New England,
27  Inc.; UNITEDHEALTHCARE OF NEW
YORK, INC., a New York corporation
28  also known as AmeriChoice of New
York, Inc. and United Healthcare of New

3

1  York, Inc.; UNITEDHEALTHCARE OF
   NORTH CAROLINA, INC., a North
2  Carolina corporation also known as
   United Healthcare of North Carolina,
3  Inc.; UNITEDHEALTHCARE OF
   OHIO, INC., an Ohio corporation also
4  known as United Healthcare of Ohio,
   Inc.; UNITEDHEALTHCARE OF
5  OKLAHOMA, INC., an Oklahoma
   corporation formerly known as
6  PacifiCare of Oklahoma, Inc.;
   UNITEDHEALTHCARE OF OREGON,
7  INC., an Oregon corporation formerly
   known as PacifiCare of Oregon, Inc.;
8  UNITEDHEALTHCARE OF
   PENNSYLVANIA, INC., a
9  Pennsylvania corporation formerly
   known as Unison Health Plan of
10 Pennsylvania, Inc.;
   UNITEDHEALTHCARE OF
11 TENNESSEE, INC., a Tennessee
   corporation also known as United
12 Healthcare of Tennessee, Inc.;
   UNITEDHEALTHCARE OF THE
13 MIDLANDS, INC., a Nebraska
   corporation also known as United
14 Healthcare of the Midlands, Inc.;
   UNITEDHEALTHCARE OF THE
15 MIDWEST, INC., a Missouri
   corporation also known as United
16 Healthcare of the Midwest, Inc.;
   UNITEDHEALTHCARE OF UTAH,
17 INC., a Utah corporation also known as
   United Healthcare of Utah, Inc.;
18 UNITEDHEALTHCARE OF
   WASHINGTON, INC., a Washington
19 corporation formerly known as
   PacifiCare of Washington, Inc.;
20 UNITEDHEALTHCARE OF
   WISCONSIN, INC., a Wisconsin
21 corporation also known as United
   Healthcare of Wisconsin, Inc.;
22 UNITEDHEALTHCARE PLAN OF
   THE RIVER VALLEY, INC., an Illinois
23 corporation also known as United
   Healthcare Plan of the River Valley, Inc.,
24 UnitedHealth Care Plan of the River
   Valley, Inc., and United HealthCare of
25 the River Valley, Inc.,

26               Defendants.

27

28

4

4557

1    This is a civil fraud action brought by the United States of America ("United
2    States" or "Government") to recover treble damages and civil penalties under the False
3    Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, as well as for restitution and common
4    law damages, for monies unlawfully obtained and retained by Defendant UnitedHealth
5    Group Inc. and various of its direct and indirect subsidiaries ("Defendants") involved in
6    Parts C and D of the Medicare Program.  Defendants knowingly submitted false claims
7    and made false statements to the Medicare Program.  Moreover, Defendants have
8    knowingly and improperly avoided their obligations to repay significant sums of money
9    to the Medicare Program.

10    Having filed a notice of intervention pursuant to 31 U.S.C. § 3730(b)(4), the
11    United States alleges for its amended complaint-in-partial-intervention (the "Amended
12    Complaint") as follows:

## **INTRODUCTION**

14    1.    Millions of elderly and disabled individuals throughout the United States receive
15    their Medicare benefits through Parts C and D of the Medicare Program, hereinafter
16    referred to as the Medicare Advantage (MA) Program, which is administered by the
17    Government agency called the Centers for Medicare and Medicaid Services ("CMS").  A
18    central, distinguishing feature of the MA Program is the provision of Medicare benefits
19    by private healthcare insurance organizations, which are called Medicare Advantage
20    Organizations ("MA Organizations").  Medicare beneficiaries enroll in managed
21    healthcare insurance plans called Medicare Advantage Plans ("MA Plans") and
22    prescription drug plans ("PD Plans") that are offered by these MA Organizations.  The
23    MA Plans are packages of healthcare insurance benefits and the PD Plans are packages
24    of prescription drug benefits.  Hereinafter MA Plans and PD Plans are collectively
25    referred to as "Plans."

26    2.    The Government pays each MA Organization a fixed monthly payment for each
27    Medicare beneficiary enrolled in its Plans.  The Government adjusts these payments for
28    various risk factors that affect expected healthcare expenditures, including the age,

4558

gender, and health status of each beneficiary. The adjustments are intended to ensure that MA Organizations are paid more for beneficiaries whose healthcare expenses are *expected* to be more and less for beneficiaries whose health care expenses are *expected* to be less. However, these adjustments to the fixed monthly payments are made regardless of the actual services provided to the beneficiaries and, thus, regardless of whether those beneficiaries expected to need more or more costly services actually obtain more or more costly services, and whether those beneficiaries expected to need less or less costly services actually obtain less or less costly services.

3.      To obtain payments based on adjustments for health status, MA Organizations submit diagnosis codes to the Government for the beneficiaries in their Plans. These diagnosis codes are from the beneficiaries' medical encounters with healthcare providers (*e.g.*, physician office visits and hospital stays) during the year prior to the actual payment year (often referred to as the "data collection" year or the "date of service" year). Payments are based on diagnoses from the prior year because they are used to predict the *expected* needs of a beneficiary for more or less costly healthcare services during the payment year. Using these diagnosis codes submitted by or on behalf of MA Organizations, the Government calculates a risk score for each beneficiary. The beneficiary's risk score is then used to calculate monthly payments to the MA Organization for that beneficiary for the payment year. In general, the more numerous and severe the conditions identified by the diagnosis codes, the higher the risk score for a beneficiary and, thus, the greater the risk adjustment payments made to the MA Organization for that beneficiary for the payment year.

4.      This payment model creates powerful incentives for MA Organizations and their owners and operators to exaggerate the expected healthcare costs for the beneficiaries in their Plans by submitting invalid diagnosis codes and failing to comply with their obligation to retract invalid diagnoses. In order to combat these incentives and protect the Government from overpaying MA Organizations, the Government requires that submitted diagnoses be unambiguously supported and, thus, validated by the

4559

Case 2:16-cv-08697-FMO-PVC   Document 616-14   Filed 08/06/24   Page 136 of 633   Page ID #:32109
Case 2:16-cv-08697-MWF-SS   Document 191   Filed 11/17/17   Page 7 of 1609   Page ID #:23352
Page ID #:23352

1    beneficiaries' medical records for medical encounters during the data collection year.

2    Medical records are the "source of truth" for the purpose of receiving and retaining risk

3    adjustment payments.

4    5.      The medical records that must support the diagnosis codes are not provided to the

5    Government as part of the payment process.  Instead, the Government requires that each

6    MA Organization expressly certify that the diagnosis codes it has submitted for risk

7    adjustment payments are accurate and truthful based on best knowledge, information,

8    and belief.  42 C.F.R. § 422.504(*l*)(2).  Each MA Organization must exercise due

9    diligence in order to make this express certification.  Each MA Organization must also

10   "[a]dopt and implement an effective compliance program, which must include measures

11   that prevent, detect, and correct non-compliance with [the Government's] program

12   requirements as well as measures that prevent, detect, and correct fraud, waste, and

13   abuse."  42 C.F.R. § 422.503(b)(4)(vi).

14   6.      As explained by the United States Court of Appeals for the Ninth Circuit, CMS, in

15   2000, made clear that

16              Medicare Advantage organizations have always had "an obligation to take

17              steps to ensure the accuracy, completeness, and truthfulness of the

18              [medical] encounter data" [*i.e.*, diagnoses] and "an obligation to undertake

19              'due diligence' to ensure the accuracy, completeness, and truthfulness of

20              encounter data submitted to [CMS]."  . . .  CMS made perfectly clear that

21              Medicare Advantage organizations would be "held responsible for making

22              good faith efforts to certify the accuracy, completeness, and truthfulness of

23              encounter data submitted."

24   *United States ex rel. Swoben v. UnitedHealthcare Ins. Co.*, 848 F.3d 1161, 1174 (9th Cir.

25   2016) (quoting 65 Fed. Reg. 40,170, 40,268 (June 29, 2000)).  The Ninth Circuit further

26   explained that the requirement that MA Organizations take affirmative steps to address

27   errors in their data is further demonstrated by "§ 422.503, which since 2005 has required

28   Medicare Advantage organizations to have effective compliance programs in place,

4560

including '[p]rocedures for internal monitoring and auditing' and 'for ensuring prompt response to detected offenses'." *Id.* (quoting 42 C.F.R. § 422.503(b)(4)(vi), (vi)(F), (vi)(G) (2005)).

7.     For many years, Defendant UnitedHealth Group Inc. ("UHG") has been the nation's largest owner of MA Organizations.  These organizations offer MA and PD Plans throughout the country.  Millions of elderly and disabled Medicare beneficiaries throughout the United States are enrolled in MA and PD Plans that are offered by UHG and the MA Organizations owned by it.  In March 2017, approximately 229,000 Medicare beneficiaries in the Central District of California were enrolled in MA Plans offered by Defendants UnitedHealthcare of California, Inc. (previously known as PacifiCare of California, Inc.) and Sierra Health and Life Insurance Company, Inc.

8.     UHG manages and operates the Defendant MA Organizations itself and through its business divisions which, depending on the time period, were or are part of Defendants UnitedHealthcare, Inc.; United HealthCare Services, Inc.; Ovations, Inc.; Optum, Inc.; and OptumInsight, Inc.  Hereinafter, UHG, UnitedHealthcare, Inc.; United HealthCare Services, Inc.; Ovations, Inc.; Optum, Inc.; and OptumInsight, Inc. are sometimes collectively referred to as the "UHG Managing Defendants," based on their roles in managing and operating the Defendant MA Organizations, as described more fully herein.  When the term "UHG Managing Defendants" is used in this Amended Complaint in reference to specific facts (*e.g.*, meetings and communications), it refers to those Defendants that managed and operated the Defendant MA Organizations at the time relating to the facts alleged.

9.     The Government pays billions of taxpayer dollars each year to the Defendant MA Organizations for the Medicare beneficiaries enrolled in the Defendant MA Organizations' Plans.  Risk adjustment payments account for a substantial percentage of these dollars.  The diagnoses submitted to the Government by the UHG Managing Defendants on behalf of the Defendant MA Organizations drive a large percentage of the payments that the Defendant MA Organizations receive from the Government.

4561

Case 2:16-cv-08697-FMO-PVC   Document 616-14   Filed 08/06/24   Page 138 of 632   Page ID #:23111
Case 2:16-cv-08697-MWF-SS   Document 1   Filed 11/17/17   Page 9 of 1600   Page ID #:2111
Page ID #:23354

1    Accordingly, it is not surprising that the UHG Managing Defendants and the Defendant

2    MA Organizations are not passive conduits of diagnoses from healthcare providers to the

3    Government.  Rather, for many years, the UHG Managing Defendants have conducted

4    programs and engaged in other activities to increase the amount of risk adjustment

5    payments from the Government to the Defendant MA Organizations.  This includes

6    programs and other efforts to directly influence both the number of diagnoses and the

7    severity of the medical conditions reported by providers (such as educating physicians

8    about diagnoses associated with greater risk adjustment payments).  This also includes

9    programs and efforts that do not involve providers but nonetheless materially increase

10   the number of diagnoses submitted to the Government and, thus, the amount of risk

11   adjustment payments to the Defendant MA Organizations.  Since 2005, the UHG

12   Managing Defendants and/or their predecessors have worked jointly to conduct these

13   programs and perform these activities.

14   10.    In particular, since 2005, the UHG Managing Defendants have conducted a very

15   large national Chart Review Program to significantly increase the risk adjustment

16   payments that the Defendant MA Organizations receive from the Government.  For

17   many years, this was their biggest effort aimed at increasing risk adjustment payments.

18   During the last ten years, they significantly increased the amount of risk adjustment

19   payments that the Defendant MA Organizations received from the Government by

20   collecting millions of medical records (also known as "charts") from providers and then

21   employing diagnosis coders (also known as "chart reviewers") to review the medical

22   records in order to mine them for diagnoses that the providers themselves did not report

23   to the Defendant MA Organizations for the beneficiaries in their Plans.  The UHG

24   Managing Defendants then submitted these additional diagnosis codes ("ADDS") to the

25   Government for billions of dollars of additional risk adjustment payments.

26   11.    The UHG Managing Defendants' national Chart Review Program was strictly a

27   one-sided revenue-generating program.  The UHG Managing Defendants did not review

28   the beneficiaries' medical records in good faith in order to obtain a true and accurate

9

picture of the health status of the beneficiaries in the Defendant MA Organizations' Plans or to submit truthful and accurate risk adjustment data to the Government. They used the results of the chart reviews to only increase payments, *i.e.*, to submit additional diagnoses not reported by the providers. At the same time, they systematically ignored the results of chart reviews that would have led to decreased payments, *i.e.*, results showing that diagnoses reported by providers to them and then submitted by them to the Government were not supported by the beneficiaries' medical records.

12.     Moreover, since at least 2005, the UHG Managing Defendants and/or their predecessors have known that a significant percentage of diagnoses reported by providers to them (hereinafter "provider-reported diagnoses") are invalid because the beneficiaries' medical records do not substantiate that the beneficiaries had the medical conditions identified by the diagnosis codes reported by the providers. They knew this from audits conducted by the Government and from their own internal medical record reviews. Despite this knowledge, they knowingly avoided "looking both ways" as part of their national Chart Review Program, except for a very limited time period when they "looked both ways" at some of the chart review results as part of their Claims Verification ("CV") Program. That is, they knowingly and improperly avoided comparing the diagnoses reported by the providers and submitted by them to the Government with the results of the coders' chart reviews to identify those provider-reported diagnoses that were not supported by the beneficiaries' medical records. They could and should have done this comparison and withdrawn their prior submission of these unsupported diagnoses, that is, made "DELETES." If they had done so, the Government would not have made risk adjustment payments based on these unsupported diagnoses or, if it had already made the payments, it would have recovered them from the Defendant MA Organizations or the other Defendants.

13.     By failing to "look both ways," the UHG Managing Defendants generated and reported skewed data artificially inflating beneficiaries' risk scores, avoided negative payment adjustments, and caused the Defendant MA Organizations to retain payments to

4563

which they were not entitled. They did this "knowingly," as that term is defined in the FCA. The Government has conservatively estimated that, if the UHG Managing Defendants had "looked both ways," they would not have submitted on behalf of the Defendant MA Organizations or, if submitted, they would have withdrawn hundreds of thousands of invalid diagnoses on behalf of the Defendant MA Organizations, and the Government would not have erroneously paid or would have recovered substantial sums of money (*e.g.*, potentially over a billion dollars in risk adjustment payments for four payment years) to which the Defendant MA Organizations were not entitled.

14.     By failing to "look both ways," the UHG Managing Defendants and the Defendant MA Organizations knowingly submitted false certifications about the accuracy and truthfulness of their data and knowingly and improperly avoided or decreased obligations to repay (*i.e.*, return) monies owed to the Government in violation of the FCA.

15.     In addition, Defendants engaged in other conduct (unrelated to their Chart Review Program) that violated the FCA. Defendants deliberately ignored or recklessly disregarded information from their Risk Adjustment Coding Compliance Review ("RACCR") Program about invalid diagnoses. This information showed that significant percentages of the diagnoses reported to the UHG Managing Defendants and the Defendant MA Organizations by certain "financially incentivized" providers, including certain capitated and gainsharing providers, were unsubstantiated by their patients' medical records.

16.     The UHG Managing Defendants and the Defendant MA Organizations paid providers who cared for the beneficiaries in the Defendant MA Organizations' MA Plans through a variety of arrangements. They paid some healthcare providers on a fee-for-service basis for each service (*e.g.*, office visit) they provided to a beneficiary. However, they negotiated payment arrangements with large provider groups that were intended to more closely align their financial interests. For example, the UHG Managing Defendants and the Defendant MA Organizations paid many large provider groups a

11

4564

"fixed" fee for each beneficiary cared for by these providers. These "capitated" fees generally were not dependent on the amount of services rendered by these providers. Instead, the "capitated" fees were often based on a percentage share of the payments that the Defendant MA Organizations received from the Government for the beneficiaries cared for by the providers. The UHG Managing Defendants and the Defendant MA Organizations also entered into "gainsharing" agreements whereby they made incentive payments to some of their fee-for-service providers. These incentive payments were based in whole or part on total revenues that the Defendant MA Organizations received from the Government for the beneficiaries cared for by these gainsharing providers.

17.    The UHG Managing Defendants' and the Defendant MA Organizations' agreements with capitated and gainsharing providers incentivized these providers to increase the number of diagnoses that they reported to the UHG Managing Defendants and the Defendant MA Organizations and to report diagnoses for more severe medical conditions. The more risk adjustment payments obtained by the Defendant MA Organizations for the beneficiaries cared for by these providers, the more money the UHG Managing Defendants and the Defendant MA Organizations paid to these providers pursuant to the capitation and gainsharing agreements.

18.    The UHG Managing Defendants knew that these capitated and gainsharing providers had a financial incentive to report invalid diagnoses in order to increase their own revenues. In fact, based on the results of their own data analyses and medical record reviews conducted as part of their RACCR Program, they knew which incentivized providers were actually or likely engaged in over-reporting diagnoses, including a significant number of providers located in this District. But the UHG Managing Defendants knowingly continued to submit diagnoses from these incentivized providers to the Government and knowingly and improperly avoided repaying the Government for risk adjustment payments based on invalid diagnoses from these providers, all in violation of the FCA.

4565

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 because the United States is the Plaintiff.  In addition, the Court has subject matter jurisdiction over the FCA claims for relief under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a)-(b) and supplemental jurisdiction to entertain the common law and equitable claims for relief under 28 U.S.C. § 1367(a).

20.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, transacts business in, or has committed the alleged acts in the Central District of California.

21.     Venue also lies in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, and transacts business in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and/or all of the Defendants are subject to the Court's personal jurisdiction under the FCA.

## PARTIES

### I.     Plaintiffs

22.     Plaintiff is the United States of America, suing on behalf of the United States Department of Health and Human Services ("HHS"), which includes its operating division, the Centers for Medicare and Medicaid Services ("CMS").  At all times relevant to this Complaint, CMS administered and supervised the MA Program and made risk adjustment payments to MA Organizations, including the Defendant MA Organizations in this action, under Parts C and D of the Program.  The United States filed its notice of partial intervention in this action on February 14, 2017.

23.     The *qui tam* plaintiff ("Relator") is Benjamin Poehling, a former employee of United HealthCare Services, Inc. who was the Director of Finance for Ovations, the group that managed the Defendant MA Organizations until approximately 2010 and, after that, the Director of Finance for UnitedHealthcare Medicare & Retirement, which was the group at UnitedHealthcare, Inc. that succeeded Ovations in managing the

13

4566

Defendant MA Organizations. From mid-2007 until he left at the end of 2012, Poehling ran the risk adjustment team at Ovations and then at UnitedHealthcare Medicare & Retirement, where he was one of the management employees responsible for the submission of claims (*i.e.*, diagnoses) by the UHG Managing Defendants to the Government for risk adjustment payments to the Defendant MA Organizations. He was also one of the management employees responsible for risk adjustment revenue-generating activities, including, but not limited to, the UHG Managing Defendants' national Chart Review Program. Poehling expressed concerns to fellow executives about the failure of the UHG Managing Defendants' Chart Review Program to "look both ways." In March 2011, Poehling initiated this action by filing a complaint pursuant to the *qui tam* provisions of the FCA. 31 U.S.C. § 3730(b)(1).

## II. Defendants

24. Defendant UnitedHealth Group, Inc. ("UHG") is a publicly traded Delaware corporation. It is the parent company for all other Defendants in this action. UHG, the other Defendants, and their affiliates have offices in various locations throughout the United States, including in the Central District of California. UHG offers a broad spectrum of products and services through two distinct primary direct corporate subsidiaries (each of which has numerous direct and indirect subsidiaries of its own): (1) UnitedHealthcare, Inc., a health benefits (i.e., insurance) company, and (2) Optum, Inc., a health services company. Accordingly, UHG's healthcare insurance products, including those under Parts C and D of the Medicare Program, are offered by, and UHG's MA and PD Plans are managed by, various entities that are UHG's direct or indirect subsidiaries, including, but not limited to, the other Defendants identified below. UHG controls all of these entities.

25. UHG and its direct and indirect subsidiaries and affiliates operate MA Organizations in all fifty states and the District of Columbia. Each of these MA Organizations offers one or more MA Plans, that is, one or more packages of healthcare insurance benefits under Part C of the Medicare Program. Many, if not all, of these MA

Organizations also offer PD Plans, that is, drug benefit packages under Part D of the Medicare Program.  As of December 31, 2008, UHG had approximately 1.5 million Medicare beneficiaries enrolled in its MA Plans under Part C of the Medicare Program and millions of additional beneficiaries enrolled in its PD Plans.  As of December 31, 2009, UHG had approximately 1.8 million Medicare beneficiaries enrolled in its MA and millions of additional beneficiaries enrolled in its PD Plans.  As of December 31, 2010, UHG had approximately 2.1 million beneficiaries in its MA Plans and millions of additional beneficiaries in its PD Plans.  As of December 31, 2011, UHG had 2.2 million beneficiaries in its MA Plans and millions of additional beneficiaries in its PD Plans.  As of December 31, 2012, UHG had approximately 2.6 million beneficiaries in its MA Plans and millions of additional beneficiaries in its PD Plans.  In 2013, 2014, and 2015 United had approximately 3 million beneficiaries in its MA Plans and approximately 8 million in its PD Plans.  In 2016, UHG had approximately 3.6 million beneficiaries in its MA Plans, and approximately 8.6 million beneficiaries in its PD Plans.  Annually, UHG's revenues from the MA Program have been in the tens of billions of dollars.

26.     All Defendant MA Organizations entered into one or more agreements with the Government during the relevant time period to offer MA Plans and/or PD Plans to Medicare beneficiaries under Parts C and D of the Medicare Program, presented or had the UHG Managing Defendants present on their behalf claims to the Government for risk adjustment payments under Parts C and D of the Medicare Program, submitted or had the UHG Managing Defendants submit on their behalf one or more Risk Adjustment Attestations to the Government for risk adjustment payments from the Medicare Program, and received risk adjustment payments from the Government.  These Defendant MA Organizations include all MA Organizations acquired, owned, and controlled directly or indirectly by UHG after 2005, including:

       a.     AmeriChoice of New Jersey, Inc., a New Jersey corporation, doing business as AmeriChoice Personal Care Plus and UnitedHealthcare Community Plan.

15

b. Arizona Physicians IPA, Inc., an Arizona corporation, doing business as APIPA Personal Care Plus and UnitedHealthcare Community Plan.

c. Care Improvement Plus of Maryland, Inc., which is or was a Maryland corporation, doing business as Care Improvement Plus.

d. Care Improvement Plus of Texas Insurance Company, which is a Texas insurance company, doing business as Care Improvement Plus.

e. Care Improvement Plus South Central Insurance Co., which is an Arkansas insurance company, doing business as Care Improvement Plus and UnitedHealthcare.

f. Care Improvement Plus Wisconsin Insurance Company, which is a Wisconsin insurance company, doing business as Care Improvement Plus and UnitedHealthcare.

g. Optum Insurance Co., which is an Ohio corporation.

h. Citrus Health Care, Inc., which is or was a Florida corporation.

i. Health Plan of Nevada, Inc., which is a Nevada corporation.

j. Medica HealthCare Plans, Inc., which is a Florida corporation.

k. Oxford Health Plans (CT), Inc., which is a Connecticut corporation, doing business as AARP MedicareComplete from SecureHorizons; Oxford Medicare Advantage; SecureHorizons; SecureHorizons by UnitedHealthCare; and UnitedHealthcare.

l. Oxford Health Plans (NJ), Inc., which is a New Jersey corporation, also known as Oxford Health Plans of New Jersey, Inc., doing business as AARP MedicareComplete from SecureHorizons; AARP MedicareComplete provided by SecureHorizons; Evercare; Evercare by UnitedHealthcare; Evercare Health Plans; Evercare Plan H; SecureHorizons; SecureHorizons by UnitedHealthCare; and UnitedHealthcare.

4569

m.     Oxford Health Plans (NY), Inc. which is a New York corporation, doing business as Oxford Medicare Advantage; SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

n.     PacifiCare Life and Health Insurance Company, which is an Indiana insurance company, doing business as SecureHorizons Direct and SecureHorizons MedicareDirect.

o.     PacifiCare of Arizona, Inc., which is an Arizona corporation doing business as SecureHorizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

p.     PacifiCare of Colorado, Inc., which is a Colorado corporation doing business as AARP MedicareComplete from Secure Horizons; AARP MedicareComplete provided by SecureHorizons; Secure Horizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

q.     PacifiCare of Nevada, Inc., which is a Nevada corporation, also known as PacifiCare/UHC of Nevada, doing business as AARP MedicareComplete provided by SecureHorizons; PacifiCare/UHC of Nevada; Secure Horizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

r.     Physicians Health Choice of Texas, LLC, which is a Texas limited liability company doing business as Physicians Health Choice.

s.     Preferred Care Partners, Inc., which is a Florida corporation doing business as UnitedHealthcare.

t.     Rocky Mountain Health Maintenance Organization, Inc., which is a Colorado company.

u.     Sierra Health and Life Insurance Company, Inc., which is a Nevada corporation doing business as Erickson Advantage and UnitedHealthcare.

v.     Symphonix Health Insurance, Inc., which is an Illinois insurance company doing business as Symphonix Health.

17

w.     UnitedHealthcare of California, Inc., which is a California corporation, also known as UHC of California, Inc. and formerly known as PacifiCare of California, Inc. and PacifiCare of California/Secure Horizons, doing business as SecureHorizons by UnitedHealthcare, Secure Horizons Medicare Advantage Plan, and UnitedHealthcare.

x.     Unison Health Plan of Tennessee, Inc., which is a Tennessee corporation doing business as Unison Advantage and UnitedHealthcare Community Plan.

y.     United Health Care Ins. Co. and United New York, which is a New York insurance company doing business as UnitedHealthcare.

z.     UnitedHealthcare Benefits of Texas, Inc., which is a Texas corporation, formerly known as PacifiCare of Texas, Inc., doing business as SecureHorizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

aa.     UnitedHealthcare Community Plan of Ohio, Inc., which is an Ohio corporation, formerly known as Unison Health Plan of Ohio, Inc., doing business as Unison Advantage and UnitedHealthcare Community Plan.

bb.     UnitedHealthcare Community Plan of Texas, L.L.C., which is a Texas limited liability company, formerly known as Evercare of Texas, LLC, doing business as Evercare by UnitedHealthcare and Evercare Health Plans; and UnitedHealthcare.

cc.     UnitedHealthcare Community Plan, Inc., which is a Michigan corporation, also known as Great Lakes Health Plan, Inc. and UnitedHealthcare of the Great Lakes Health Plan, Inc., doing business as Great Lakes Personal Care Plus and UnitedHealthcare Community Plan.

dd.     UnitedHealthcare Insurance Company, which is a Connecticut insurance company, also known as United Healthcare Insurance Company, doing business as AARP MedicareComplete from SecureHorizons; Erickson Advantage;

18

4571

Evercare by UnitedHealthcare; Evercare Health Plans; Evercare Senior Care Options; SecureHorizons; SecureHorizons by UnitedHealthcare; SecureHorizons MedicareDirect; United Health Group; UnitedHealthcare; and UnitedHealthcare Community Plan.

ee.     UnitedHealthcare Insurance Company of New York, which is a New York insurance company, also known as United Healthcare Insurance Company of New York, doing business as SecureHorizons; SecureHorizons MedicareDirect; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

ff.     UnitedHealthcare of Alabama, Inc., which is an Alabama corporation, also known as United HealthCare of Alabama, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

gg.     UnitedHealthcare of Arizona, Inc., which is an Arizona corporation, also known as United HealthCare of Arizona, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

hh.     UnitedHealthcare of Arkansas, Inc., which is an Arkansas corporation, also known as United Healthcare of Arkansas, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

ii.     UnitedHealthcare of Florida, Inc., which is a Florida corporation, also known as United Healthcare of Florida, Inc. doing business as AmeriChoice; Evercare at Home; SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

jj.     UnitedHealthcare of Georgia, Inc., which is a Georgia corporation, also known as United Healthcare of Georgia, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

kk.     UnitedHealthcare of New England, Inc., which is a Rhode Island corporation, also known as United HealthCare of New England, Inc. and United Health Plans of New England, Inc., doing business as AARP MedicareComplete

19

4572

provided by SecureHorizons; AARP MedicareComplete from SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

ll.     UnitedHealthcare of New York, Inc., which is a New York corporation, also known as AmeriChoice of New York, Inc. and United Healthcare of New York, Inc. doing business as AmeriChoice Personal Care Plus; SecureHorizons; SecureHorizons by UnitedHealthcare; UnitedHealthcare; and UnitedHealthcare Community Plan.

mm.   UnitedHealthcare of North Carolina, Inc., which is a North Carolina corporation, also known as United Healthcare of North Carolina, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare, and UnitedHealthcare.

nn.     UnitedHealthcare of Ohio, Inc., which is an Ohio corporation, also known as United Healthcare of Ohio, Inc., doing business as SecureHorizons, SecureHorizons by UnitedHealthcare, and UnitedHealthcare.

oo.     UnitedHealthcare of Oklahoma, Inc., which is an Oklahoma corporation, formerly known as PacifiCare of Oklahoma, Inc., doing business as Secure Horizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare, and UnitedHealthcare.

pp.     UnitedHealthcare of Oregon, Inc., which is an Oregon corporation, formerly known as PacifiCare of Oregon, Inc., doing business as AARP MedicareComplete from SecureHorizons; AARP MedicareComplete provided by SecureHorizons; SecureHorizons Medicare Advantage Plan; SecureHorizons by UnitedHealthCare; and UnitedHealthcare.

qq.     UnitedHealthcare of Pennsylvania, Inc., which is a Pennsylvania corporation, formerly known as Unison Health Plan of Pennsylvania, Inc., doing business as Unison Advantage; UnitedHealthcare Community Plan; and UnitedHealthcare.

4573

rr.     UnitedHealthcare of Tennessee, Inc., which is a Tennessee corporation, also known as United Healthcare of Tennessee, Inc., doing business as AARP MedicareComplete from SecureHorizons; AARP MedicareComplete provided by SecureHorizons; SecureHorizons; and SecureHorizons by UnitedHealthcare.

ss.     UnitedHealthcare of the Midlands, Inc., which is a Nebraska corporation, also known as United Healthcare of the Midlands, Inc., doing business as SecureHorizons by UnitedHealthcare and UnitedHealthcare.

tt.     UnitedHealthcare of the Midwest, Inc., which is a Missouri corporation, also known as United Healthcare of the Midwest, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

uu.     UnitedHealthcare of Utah, Inc., which is a Utah corporation, also known as United Healthcare of Utah, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

vv.     UnitedHealthcare of Washington, Inc., which is a Washington corporation, formerly known as PacifiCare of Washington, Inc., doing business as AARP MedicareComplete from SecureHorizons; Secure Horizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

ww.     UnitedHealthcare of Wisconsin, Inc., which is a Wisconsin corporation, also known as United Healthcare of Wisconsin, Inc. doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; UnitedHealthcare Community Plan; UnitedHealthcare Personal Care Plus; and UnitedHealthcare.

xx.     UnitedHealthcare Plan of the River Valley, Inc., which is an Illinois corporation, also known as United Healthcare Plan of the River Valley, Inc., UnitedHealth Care Plan of the River Valley, Inc., and United HealthCare of the River Valley, Inc., doing business as AmeriChoice Secure Plus Complete; SecureHorizons by UnitedHealthcare; UnitedHealthcare; and UnitedHealthcare Community Plan.

4574

yy.    Any other MA Organizations acquired, owned, or controlled by UHG since 2005.

27.    Defendant United HealthCare Services, Inc. ("United HealthCare Services") is a Minnesota corporation.  It is a direct subsidiary of Defendant UHG.  United HealthCare Services is the successor to PacifiCare Health Systems and PacifiCare Health Plan Administrators, Inc., which managed some of the Defendant MA Organizations.  *See infra* paragraph 37.  As previously stated, United HealthCare Services also employed Relator Poehling and, on information and belief, employed other individuals who held titles and positions within the other UHG Managing Defendants and who performed work on behalf of the Defendant MA Organizations.

28.    Defendant Ovations, Inc. ("Ovations") is a Delaware corporation.  It is a direct subsidiary of Defendant United HealthCare Services and an indirect subsidiary of Defendant UHG.  Until approximately 2010, one or more of the groups that managed some of the Defendant MA Organizations were located within Defendant Ovations.

29.    Defendant UnitedHealthcare, Inc. ("UnitedHealthcare") is a Delaware corporation, and a direct subsidiary of Defendant UHG.  UnitedHealthcare is the UHG business entity which owns, operates, and offers health insurance plans to governmental customers.  Various UnitedHealthcare subsidiaries operate health benefit plans and provide healthcare benefits to millions of Medicare beneficiaries under the MA Program.  UnitedHealthcare also is the UHG subsidiary which contracts (through its subsidiaries) with the Government to provide insurance benefits to MA beneficiaries, submits the annual Risk Adjustment Attestations to the Government, submits claims for payment to the Government, and receives payment from the Government.

30.    Defendants Optum, Inc. and OptumInsight, Inc. are health services companies.  They are Delaware corporations.  They are direct or indirect subsidiaries of Defendant UHG.  In 2011, OptumInsight became the successor to Ingenix, Inc. ("Ingenix").  Thereafter, OptumInsight operated as part of Optum.  For the purposes of this Amended Complaint, Optum, Inc. and OptumInsight, Inc. will be referred to as "Optum."

4575

Furthermore, to the extent that the United States is uncertain whether an act or statement is attributable to Ingenix or its successor, Optum, the United States will refer to the entity as "Ingenix/Optum." Since 2007, the group within Ingenix and then Optum that performed risk adjustment-related work had various names. For purposes of this Amended Complaint, it is referred to as the "Risk Adjustment Group."

31. Defendants United HealthCare Services, Ovations, UnitedHealthcare, and Optum (and Optum's predecessor, Ingenix) are or were "Related Entities" under the federal regulations that govern the MA Program. As explained more fully below, each of them has or had its own legal obligations to the MA Program relating to, among other things, the submission of valid risk adjustment data and the deletion or withdrawal of invalid data.

32. The Defendant MA Organizations were not autonomous and do not appear to have had any management or any other employees who ran them or had any decision-making authority (if they had any of their own management or employees at all). Instead, UHG had various groups that managed and had oversight responsibilities and decision-making authority for the Defendant MA Organizations. At various times relevant to this Amended Complaint, these groups were located within Defendants United HealthCare Services (and/or its predecessors), Ovations, and UnitedHealthcare. Depending on the time period, the groups were known by the names Secure Horizons, Evercare, the Public & Senior Markets Group ("PSMG"), the Public Sector Market Group (also "PSMG"), Ovations, Ovations Part D, and AmeriChoice. Prior to approximately 2010, these groups were located in Defendants United HealthCare Services (and/or its predecessors) and Ovations. Since approximately 2010, these groups have been located within Defendant UnitedHealthcare and are referred to as UnitedHealthcare Medicare & Retirement and UnitedHealthcare Community & State. Among other things, these groups oversaw risk adjustment-related activities such as the submission of risk adjustment data (including diagnoses) to the Government on behalf of the Defendant MA Organizations, the retraction of invalid data that they had submitted to the Government on behalf of the

4576

Defendant MA Organizations, and the Chart Review, Claims Verification, and RACCR Programs that they had conducted on behalf of the Defendant MA Organizations. As explained more fully below, Defendants United HealthCare Services (and/or its predecessors), Ovations, UnitedHealthcare, and any other UHG entities in which these groups may have been located are "Related Entities" with their own legal obligations relating to, among other things, the submission of valid risk adjustment data to the Government and the deletion or withdrawal of invalid data.

33. Starting in 2007, the actual risk adjustment data submission work was performed by the Risk Adjustment Group within Ingenix and then within Ingenix's successor, Optum. First Ingenix and then Optum operated a computer system called the Internal Risk Adjustment Data System ("IRADS") that electronically submitted risk adjustment data (that is, diagnoses) to CMS' Risk Adjustment Processing System ("RAPS") in order for the Defendant MA Organizations to claim and receive risk adjustment payments. In addition, Ingenix and then Optum helped to manage the Chart Review, Claims Verification, and RACCR Programs and performed the day-to-day activities necessary to conduct these programs. Ingenix and then Optum performed activities relating to the submission of risk adjustment data and operated the various risk adjustment-related programs from offices in this District and elsewhere.

34. Similar to the other UHG Managing Defendants, Ingenix was and Optum is a "Related Entity" because Ingenix was and Optum is related to the Defendant MA Organizations by common ownership or control through Defendant UHG and performed some or all of the management functions for the Defendant MA Organizations. As previously explained, Optum is one of the "UHG Managing Defendants" because of the role that it (and its predecessor, Ingenix) played in managing the Defendant MA Organizations during the relevant time period. Any reference in this Amended Complaint to the predecessors of the UHG Managing Defendants includes Ingenix.

35. Ingenix and then Optum also performed risk adjustment-related services for third-parties which owned and operated their own MA Organizations and offered their own

24

Plans. The UHG Managing Defendants referred to these third-parties as Ingenix's and then Optum's commercial clients. Ingenix and then Optum submitted risk adjustment data to the Government on behalf of these commercial clients and conducted Chart Review and other programs for them. Ingenix and then Optum performed this risk adjustment-related work for commercial clients from offices in this District and elsewhere.

36. UHG became the largest owner of MA Organizations in large part by acquiring them. For example, in 2005, UHG (directly or through a subsidiary) acquired PacifiCare Health Systems ("PacifiCare") and PacifiCare's and its affiliates' MA Organizations and MA Plans, including the following MA Organization Defendants: PacifiCare of Arizona, Inc., incorporated in Arizona; PacifiCare of California, incorporated in California; PacifiCare of Colorado, Inc., incorporated in Colorado; PacifiCare of Nevada, Inc., incorporated in Nevada; PacifiCare of Oklahoma, Inc., incorporated in Oklahoma; PacifiCare of Oregon, Inc., incorporated in Oregon; PacifiCare of Texas, Inc. incorporated in Texas; and PacifiCare of Washington, incorporated in Washington. Both before and after the acquisition, PacifiCare of California and possibly other PacifiCare MA Organizations and MA Plans referred to themselves or to their brand of MA Plans as Secure Horizons. Since 2005, these PacifiCare MA Organizations have been indirect subsidiaries of and controlled by UHG. Several years after the acquisition, these PacifiCare plans were renamed or rebranded as UnitedHealthcare MA Organizations or merged into other UHG MA Organizations. For instance, in 2011, PacifiCare of California became Defendant UnitedHealthcare of California.

37. Defendant United HealthCare Services is the successor of PacifiCare Health Systems and PacifiCare Health Plan Administrators, Inc., which were the direct or indirect parents of the PacifiCare MA Organizations acquired by UHG in 2005. United HealthCare Services became their successor sometime after the acquisition. For a short period of time after the acquisition, PacifiCare Health Systems (and possibly also PacifiCare Health Plan Administrators) was involved in the management of the

4578

PacifiCare MA Organizations and perhaps other Defendant MA Organizations, including the management of risk adjustment-related activities. All PacifiCare MA Organizations and other entities and their successors were direct or indirect subsidiaries of Defendant UHG. Any reference in this Amended Complaint to United HealthCare Services or the UHG Managing Defendants includes PacifiCare Health Systems and PacifiCare Health Plan Administrators.

38.     Before UHG's acquisition of PacifiCare, the PacifiCare employees with responsibilities relating to the submission of risk adjustment data to the Government and responsibilities relating to other risk adjustment-related activities worked at a PacifiCare office in Cypress, California, within this District. Sometime after the acquisition, this office moved to Santa Ana, California, within this District, and continued to submit claims and perform other risk adjustment-related activities. In 2007, the employees in this Risk Adjustment Group in this District became employees of Ingenix and then they became employees of Optum in 2011. A substantial part of the events or omissions relevant to this litigation occurred at these and other locations within this District.

39.     As an example of UHG's other acquisitions, UHG (directly or through a subsidiary) acquired WellMed Medical Management, Inc. ("WMMI") in 2011. UHG's acquisition of WMMI included its subsidiaries and affiliates, including, but not limited to, WMMI's MA Organizations and MA Plans, Physician's Health Choice of Texas, LLC and Citrus Health Care, Inc., which operated in Texas, Florida, New Mexico and Arkansas. Citrus Health Care, Inc. was a Florida corporation and a subsidiary of PHC Holdings of Florida, Inc. Sometime after the acquisition, UHG renamed or rebranded these MA Organizations and MA Plans as UHG MA Organizations or MA Plans or merged them with or into UHG's other MA Organizations or MA Plans in these states.

40.     Over the last decade, UHG and its subsidiaries have also sought to vertically integrate in the health care market by acquiring and/or operating large groups or networks of direct providers of healthcare services and other entities that manage the provision of such services to beneficiaries enrolled in the Defendant MA Organizations'

4579

MA Plans.  For example, UHG vertically integrated in several States when it acquired WMMI in 2011.  For many years, WMMI had subsidiaries and other affiliates that directly managed the provision of or directly provided healthcare services.  These affiliates included WellMed Networks, Inc., WellMed Networks Inc. of Florida, WellMed Medical Management of Florida Inc., and WellMed Medical Group, PA.  After the acquisition, WellMed became part of the group called OptumCare.  After the acquisition, WellMed also significantly expanded by acquiring more than 50 medical practices in Texas and Florida.  WellMed included more than 10,000 physicians that provided healthcare to hundreds of thousands of Medicare beneficiaries in Texas and Florida, including beneficiaries enrolled in Plans owned or operated by one or more Defendant MA Organizations.

41.    All references to "Defendants" in this Complaint include all of the Defendants identified above.

## **DEFENDANTS' EXECUTIVES AND OTHER EMPLOYEES**

42.    When the job titles of Defendants' executives and other employees are provided in this Amended Complaint, the United States, based on its best knowledge and belief, has provided their titles at the time relating to the facts alleged.  As a reference, the United States also provides, based on its best knowledge and belief, the following list of the job titles of Defendants' executives and other employees who are referenced in this Amended Complaint and the names of the specific business divisions or entities for which they worked during the time period that they were involved in matters relevant to this action (in alphabetical order by last name):

- Kyle Anderson – From 2009 to 2015, Anderson was the Director of Financial Planning and Analysis at UnitedHealthcare.

- Jason Bainbridge – Bainbridge worked for UnitedHealthcare Community & State in 2012.

- Paul Balthazor – From 2011 through 2015, Balthazor was the Chief Financial Officer of UnitedHealthcare Community & State.

- Marc Beckmann – Beckmann worked for UnitedHealthcare Medicare & Retirement in the Finance-Risk Adjustment Analysis Section.

- Paul Bihm – At PacifiCare, Bihm was a Vice President and Chief of Staff. After the acquisition, he worked for Ingenix as Chief Financial Officer and Chief Operating Officer from 2007 to 2010 and then for Optum's Risk Adjustment Group as a Senior Vice President of Client Management.

- Jon Bird – In 2008, Bird was hired to work for Ingenix's Risk Adjustment Group. In 2010, he became the Director of Revenue Projections for this group. In or about 2011, when the Risk Adjustment Group was moved to Optum, Bird became an employee of Optum. In or about 2013, Bird assumed significant responsibility for the Chart Review and Claims Verification Programs. He was also a "decision maker" for the Claims Verification and RACCR Programs and a member of United's Risk Adjustment Advisory Board/Council, which was chaired by Defendant UHG's Chief Executive Officer Steve Hemsley. By at least March 2014, Bird was the Senior Vice President of Risk and Quality Analytics at Optum.

- Gail Boudreaux – In 2008, Boudreaux became the Executive Vice President of UnitedHealthcare. From 2011 to 2014, she was the Chief Executive Officer of UnitedHealthcare. During Boudreaux's time as Chief Executive Officer of UnitedHealthcare, Steve Nelson, John Larsen, and Daniel Schumacher reported to her. She reported to Steve Hemsley. According to a 2011 document, Boudreaux was "significantly involved in the oversight and management of" UnitedHealthcare's "Medicare business."

- Tracey Bradberry – From 2008 through 2012, Bradberry was an Operations Manager at Ingenix. Since 2012, she has been an Associate Director of Operations at Optum. In that role, she leads diagnosis coding teams for the Chart Review Program.

- Patty Brennan – In 2008, Brennan was hired to work for Ingenix's Risk Adjustment Group. She was hired as Ingenix's Compliance Manager for Risk

28

4581

Adjustment Programs. In 2009, Brennan became the Ingenix Director of Retrospective Services relating to risk adjustment. In or about 2011, when the Risk Adjustment Group was moved to Optum, Brennan became an employee of Optum. From 2009 to 2013, Brennan oversaw the Chart Review Program. In 2013, she became the Vice President of Retrospective Services. Brennan, along with other individuals, was responsible for the development and execution of the Internal Data Validation Program, the RACCR Program, and the Claims Verification Program. She was also the Program Manager for the Claims Verification Program for several years and had strategic oversight over the RACCR Program from 2009 to 2013.

- Jonathon Bunker – In 2009, Bunker was the President of Sierra Health and Life Insurance Company, Inc. and the President of Health Plan of Nevada, Inc. Upon the close of the merger between UHG and Sierra Health Services, Bunker was the Chief Executive Officer of the southwest region of UnitedHealthcare.

- Barbara Carlson – In 2011, Carlson was a Senior Regulatory Affairs Analyst at the Regulatory Affairs Department at UnitedHealthcare Medicare & Retirement.

- Shelly Cranley – Cranley served as the Director of Regulatory Affairs for UnitedHealthcare.

- Keith Dobbins – Since 2006, Dobbins has been UnitedHealthcare's Deputy General Counsel.

- Juliet Domb – From 2012 to 2015, Domb was a Strategic Relationship Analyst at Optum. She has also served as an administrative assistant to Larry Renfro.

- Jeffrey Dumcum – At PacifiCare, Dumcum was the Chief Financial Officer. After the acquisition, he became a Vice President of Finance for Ovations. In 2007, Dumcum became a Senior Vice President at Ingenix and oversaw the Risk Adjustment Group at Ingenix and then Optum until approximately 2014.

- Karen Erickson – Since 2011, Erickson has been an Executive Vice President and the Chief Quality Officer at Optum. In this role, Erickson has reported to the

29

4582

Chief Executive Officer of Optum, Larry Renfro. Also in 2011, Erickson was the Chief Administrative Officer of Optum, and prior to that she worked for Optum for 12 years in various financial and administrative roles.

- Ronnie Grower – From 2008 to 2010 Grower was a Vice President of Market Consultation and a Vice President of Account Management at Ingenix.

- Joseph Haferman – Haferman was the Chief Financial Officer of Ovations in 2005 and the Chief Financial Officer of Secure Horizons in 2007 and possibly for some time thereafter. Relator Poehling reported to Haferman from early 2007 to late 2008.

- Kimberly Halva – In 2009, Halva was an attorney for UnitedHealthcare Medicare & Retirement. From 2010 to 2013, Halva was the UnitedHealthcare Medicare & Retirement's Finance Compliance Officer. She also had the title Director of Compliance. From 2010 to 2103, she reported to Jennifer O'Brien.

- Mary Hammond – From 2010 to 2013, Hammond was an Associate Director of Strategy and Support who worked for the risk adjustment team at UnitedHealthcare Medicare & Retirement. She reported to Relator Poehling until he left at the end of 2012.

- Charles Hanson – From 2008 to 2013, Hanson was a Vice President of Underwriting and Finance at UnitedHealthcare Medicare & Retirement.

- Steve Hemsley – Hemsley is currently the Executive Chairman of UHG's Board of Directors. He was the Chief Executive Officer of UHG from 2006 to 2017. According to a 2011 document, Hemsley was "significantly involved in the oversight and management of" UHG's "Medicare business."

- James Higgins – Higgins was the Finance Director at PacifiCare. After the acquisition, Higgins became a Director for Revenue Analytics.

- William Hnath – Hnath was the financial controller for UnitedHealthcare Medicare & Retirement.

4583

- Pam Holt – Holt was a Project Manager for Network Management Operations at PacifiCare. After the acquisition, she became a Manager of Provider Outreach for the Risk Adjustment Program.

- Scott Hughes – Starting in mid-2012, Hughes was a Senior Project Manager at Optum.

- Michael Jacobson – Jacobson was a Program Business Analyst/Project Manager at Optum.

- Donald James – James was a Director of Program Strategy at Optum from 2012 to 2015.

- Thad Johnson – Johnson is an attorney for UnitedHealthcare and is the current Chief Legal Officer for the company.

- Joseph Keen – Keen was a Vice President and Chief Compliance Audit Officer for UnitedHealthcare Medicare & Retirement in 2011.

- Gerald (Jerry) Knutson – Knutson was the Chief Financial Officer of Ovations from 2003 to 2009 and the Chief Financial Officer of OptumInsight from 2009 to 2012.

- John Larsen – Larsen was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement (previously called Ovations-PSMG) until 2010, when Scott Theisen succeeded him in that position. Larsen reported to Larry Renfro when Renfro was the Chief Executive Officer of Ovations-PSMG. Relator Poehling reported to Larsen in 2010. In August 2012, Larsen became the Chief Executive Officer of UnitedHealthcare Medicare & Retirement. In early 2014, Steve Nelson took over that position.

- Pam Leal – Leal was the Executive Director of Provider Training and Development at PacifiCare. After the acquisition, she became a Regional Vice President for Market Consultation at Ingenix.

- Rebecca Martin – In 2010, Martin became the Director of Encounter Operations at Ingenix. From 2011 to 2015, Martin was the Director of Data Remediation at

31

4584

Optum. In 2015, she became the Director of Data Management Strategies at Optum.

- Jay Matushak – From 2013 to 2015, Matushak was a Vice President of Financial Planning and Analysis for UnitedHealthcare Medicare & Retirement.  He reported to Brian Thompson.

- Michael McCarthy – Starting in November 2011, McCarthy was the Executive Director of UnitedHealthcare Medicare & Retirement.  In 2013, he also served as a Regional Vice President for Southern California for UnitedHealthcare Medicare Solutions.

- Marybeth Meyer – Since 2013, Meyer has been a Vice President of Operations at UnitedHealthcare Medicare & Retirement where she oversees risk adjustment programs and activities.  Meyer reported to Theisen and then to Brian Thompson.

- Bill Miller – Miller was the Chief Executive Officer of OptumInsight from 2012 to 2017.

- Eric Murphy – Murphy was the President of Payer Solutions at Optum.

- Randall Myers – Myers worked for PacifiCare and, after the acquisition, for Ingenix and then Optum as a Director of Encounter Operations.

- Timothy Noel – Noel was the Vice President of Finance for Ovations and then UnitedHealthcare Medicare & Retirement from 2007 to 2013 and reported to the Chief Financial Officers of those groups.  Poehling reported to Noel from the fall of 2010 until his departure in December 2012.

- Steve Nelson – Since 2017, Nelson has been the Chief Executive Officer of UnitedHealthcare.  From 2014 to 2017, he was the Chief Executive Officer of UnitedHealthcare Medicare & Retirement.

- Jennifer O'Brien – O'Brien was the Chief Medicare Compliance Officer of Ovations and then UnitedHealthcare Medicare & Retirement.  She reported to David Orbuch.  She was part of the UnitedHealthcare Medicare & Retirement "Executive Leadership Team."

32

4585

- Karin O'Hara – O'Hara worked at UnitedHealthcare Community & State.

- David Orbuch – Orbuch was the Chief Compliance Office for PSMG and UnitedHealthcare Medicare & Retirement.

- Thomas Paul – In the 2009 to mid-2010 time period, Paul was the Chief Executive Officer and Chief Operating Office of Ovations and, in the mid-2010 to August 2012 time period, Paul was the Chief Executive Officer of UnitedHealthcare Medicare & Retirement.  He reported to Renfro and then to Gail Boudreaux.  He was part of the UnitedHealthcare Medicare & Retirement "Executive Leadership Team."

- Karen Petroff – Petroff was the Senior Vice President of Business Development at Optum.

- Cindy Polich – Polich was the President of Ovations and then UnitedHealthcare Medicare & Retirement.  She reported to Larry Renfro and Thomas Paul.  She was part of the UnitedHealthcare Medicare & Retirement "Executive Leadership Team."

- Patricia Rasmussen – Rasmussen was Manager of Encounter Submissions at Ingenix.

- Janice Redmond – Prior to 2012, Redmond was Senior Vice President of Provider Outreach at Optum.  Since 2012, Redmond has been a Vice President of Market Consultation for Optum's Western Region.

- Anne Reis – In 2013, Reis was an Associate Director of Revenue for UnitedHealthcare Medicare & Retirement.

- Larry Renfro – During the 2009 to 2011 time period, Renfro served in various roles, including the Executive Vice President of Defendant UHG, the Chief Executive Officer of Defendant Ovations, and the Chief Executive Officer of the Public & Senior Markets Group.  Since July 2011, Renfro has been the current Chief Executive Officer of Defendant Optum.  Since November 2014, he has also been Vice Chairman of Defendant UHG.

33

4586

- Sandy Rick – Rick was a Senior Regulatory Affairs Analyst at UnitedHealthcare Medicare & Retirement.

- Kara Rios – Rios was the Chief Financial Officer of AmeriChoice, one of the groups that managed some of the Defendant MA Organizations.

- Justin Roth – Roth was the Chief Financial Officer of Evercare, one of the groups that managed some of the Defendant MA Organizations.

- Daniel Schumacher – Since 2017, Schumacher has been the President and Chief Operating Officer of UnitedHealthcare. Prior to that, he was the Chief Financial Officer of UnitedHealthcare.

- Melissa Sedor – Sedor worked in UnitedHealthcare's controller's office, in the area of revenue accounting. Sedor was an accounting manager and reported to Bill Hnath, the controller for UnitedHealthcare Medicare & Retirement.

- Matt Shors – Shors is UHG's Senior Deputy General Counsel.

- Marianne Short – Short is UHG's Executive Vice President and Chief Legal Officer.

- Andy Slavitt – Slavitt was the Chief Executive Officer for OptumInsight and an Executive Vice President for Optum.

- Scott Theisen – From 2010 to 2013, Theisen was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement. In 2011, he was part of the UnitedHealthcare Medicare & Retirement "Executive Leadership Team" reporting to Tom Paul. In 2014, Theisen moved to Optum, but, during that year, his responsibilities continued to include the risk adjustment-related work that Optum performed for UnitedHealthcare Medicare & Retirement.

- Brian Thompson – Since 2017, Brian Thompson has been the Chief Executive Officer of UnitedHealthcare Medicare & Retirement. From 2013 to 2017, he was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement. He was also previously the Chief Financial Officer of UnitedHealthcare Community & State.

4587

- Carol Thompson – Until 2009, Carol Thompson was a National Manager for Risk Adjustment Programs at Ingenix. From 2009 to 2011, she was a Manager of the ChartSync operations (part of the Chart Review Program) at Ingenix. From 2011 to 2014, she was a Manager and Analyst of Encounter Operations at Optum.

- Pam Thomsen – Thomsen worked for Optum in Data Validation Operations and Clinical Performance & Compliance.

- Lee Valenta – At various times, Valenta was the Chief Financial Officer, the Chief Operating Officer, the President of Life Sciences, and an Executive Vice President at Ingenix and then OptumInsight.

- Emily Vue – From 2009 to 2014, Vue was a Senior Regulatory Analyst and later a Manager of Regulatory Affairs at Ovations-PSMG and then UnitedHealthcare.

- Karen Wagor – Wagor was the Manager of the National Medical Coder Team and the National Coding Trainer at Ingenix and then Optum. She previously worked at PacifiCare.

- David Walsh – In 2011, Walsh was the Director for Regulatory Affairs for and, in 2012, became the Senior Director of Regulatory Affairs for UnitedHealthcare Medicare & Retirement.

- John Way – Way was Chief Financial Officer of Secure Horizons. Relator Poehling reported to Way from late 2008 to early 2010.

- Christopher Webb – Webb worked with Payer Operations at Optum in 2014.

- Timothy Wicks – Wicks served in a senior management position at Optum.

- Stephanie Will – Will had been a Principal Analyst at PacifiCare. After the acquisition, she joined Ovations as the Program Manager for the national Chart Review Program. In 2007, she became the Vice President of Risk Adjustment Programs at Ingenix.

4588

# THE MEDICARE PROGRAM

## I.   The Medicare Statute

43.     Medicare is a federally-operated health insurance program administered by CMS. Medicare benefits individuals age 65 and older and the disabled.  42 U.S.C. § 1395c *et seq.*  Parts A and B of the Medicare Program are known as "traditional" Medicare. Medicare Part A covers inpatient and institutional care.  Medicare Part B covers physician, hospital outpatient, and ancillary services and durable medical equipment.

44.     Under Medicare Parts A and B, CMS reimburses healthcare providers (*e.g.,* hospitals and physicians) using what is known as a "fee-for-service" ("FFS") payment system.  Under an FFS payment system, healthcare providers submit claims to CMS for reimbursement for each service actually rendered, such as a physician office visit or a hospital stay.  CMS then pays the providers directly for each service based on payment rates pre-determined by the Government.

45.     Under Medicare Part C, Medicare beneficiaries can opt out of the traditional Medicare Program (Parts A and B) and instead enroll in MA Plans and receive health care services managed by those MA Plans.  MA Plans must provide Medicare beneficiaries all the services that they are entitled to receive from the traditional Medicare Program.

46.     Under Medicare Part D, Medicare beneficiaries can elect to enroll in either a Prescription Drug plan (known as a PD Plan) or an MA Plan that provides prescription drug coverage in addition to the physician office visit and hospital outpatient and inpatient coverage provided under Part C (known as an MAPD Plan).  For simplicity, in this Amended Complaint, the Government refers to Parts C and D collectively as the MA Program and refers collectively to MA, PD, and MAPD Plans as Plans.

47.     MA Organizations are "risk-bearing" entities that must be licensed by the State in which they are located.  42 C.F.R. §§ 422.2 & 422.503(b)(2).  Each MA Organization agrees to bear the risk that the amount that it pays providers for the health services for a

4589

particular beneficiary in one of its Plans may exceed the amount that it was paid to insure the beneficiary.

48.    Medicare beneficiaries who enroll in an MA, PD or MAPD Plan are considered members of and enrollees in that Plan.  In this Amended Complaint, the terms beneficiaries, members, enrollees, and patients are used interchangeably, but mean the same thing, that is, individuals enrolled in Plans.

49.    MA Organizations' obligations to the MA Program and the requirements for them to participate in the Program are set forth in federal regulations and, each year, the MA Organizations must agree in writing to comply with those regulations and to other terms and conditions in order to participate in the MA Program.  42 C.F.R. §§ 422.504 & 422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D).  In addition, MA Organizations must comply with requirements set forth in statutes, such as the FCA, and guidance documents, such as the Medicare Managed Care Manual, the Medicare Prescription Drug Benefit Manual, the Risk Adjustment Participant Guides, and Medicare Advantage operating instructions.

50.    Related Entities include those entities that are related to an MA Organization by common ownership or control and perform at least some of the MA Organization's management functions.  42 C.F.R. §§ 422.2 & 422.500.  As previously explained, the UHG Managing Defendants are or were Related Entities.

51.    First Tier Entities include those providers or provider groups that enter into a written arrangement with an MA Organization to provide healthcare services to the beneficiaries in the organization's Plan(s).  42 C.F.R. §§ 422.2 & 422.500.  The capitated providers in the RACCR Program were First Tier Entities.

52.    The obligations of Related Entities and First Tier Entities to the MA Program are also set forth in the MA Program regulations.  Related Entities and First Tier Entities must, among other things, (i) perform their services in a manner that complies with the MA Organization's contractual obligations to the Government, *id*. at 422.504(*i*)(3)(iii); agree to "comply with all applicable Medicare laws, regulations, and CMS instructions,"

37

4590

*id*. at 422.504(*i*)(4)(v); and receive effective compliance training and education relating to preventing fraud, waste, and abuse. *Id*. at § 422.503(b)(4)(vi)(C)(1). Furthermore, if a Related Entity or First Tier Entity generates data relating to an MA Organization's claims for payments from the MA Program, it (as well as the MA Organization) must certify the accuracy and truthfulness of the data. *Id*. at § 422.504(l)(3).

53.    An MA Organization, however, cannot evade its legal and contractual obligations to the Government by using Related Entities to manage it or by contracting with First Tier Entities to provide services to its beneficiaries. An MA Organization "maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS." 42 C.F.R. § 422.504(*i*)(1). Thus, an MA Organization cannot delegate away its ultimate responsibility for its obligations to the Government.

## II.    Medicare Parts C and D Risk Adjustment Payments

54.    Under Part C, the Government pays each MA Organization a predetermined base monthly amount for each Medicare beneficiary in its MA Plans. This monthly payment is known as a "per-member, per-month" payment. This predetermined base payment varies for each MA Plan depending on various factors, including amounts set forth in the MA Plan's bid submitted to the Government, the scope of medical services covered by the Plan's benefit package (all packages must cover at least those services offered by Parts A and B of the Medicare Program), and the amount of premiums, deductibles, and co-pays for which an enrollee in the Plan is responsible (Plans have different premiums, deductibles and co-pays such that Plans with higher deductibles and co-pays may have lower premiums).

55.    Since 2000, Congress has also required that the payments be risk adjusted for each beneficiary based on "such risk factors as age, disability status, gender, institutional status, and *such other factors as [the Secretary of the United States Department of Health and Human Services] determines to be appropriate, including adjustment for health status* . . . to ensure actuarial equivalence." 42 U.S.C. § 1395w-23(a)(1)(C)

4591

(emphasis added). By risk adjusting for health status, the Government pays MA Organizations more for beneficiaries with certain serious chronic medical conditions and, thus, higher risk scores than for beneficiaries who do not have those conditions and, thus, have lower risk scores.

56. Pursuant to 42 U.S.C. § 1395w-23(a)(1)(C), the Secretary has the authority to determine how to adjust for health status. For example, the Secretary has the authority to decide to risk adjust only for serious chronic medical conditions and to risk adjust by requiring the submission of diagnoses from medical encounters that occurred the year preceding each payment year and projecting the possibility of additional costs for each payment year. The Secretary also has authority to decide what historical cost and/or utilization data it should consider in projecting how much more it may cost an MA Organization to provide services to a beneficiary who has been assigned a diagnosis relating to a serious chronic medical condition.

57. From 2000 to 2004, the Secretary employed a Principal Inpatient Diagnostic Cost Group ("PIP-DCG") model that took into account diagnoses from inpatient hospital stays to determine the risk scores of beneficiaries in MA Plans. The PIP-DCG model was prospective. Diagnoses for one year were used to determine each beneficiary's risk score for the following payment year. During the 2000 to 2004 time period, MA Organizations (which were then called Medicare + Choice Organizations) had many of the same obligations that they have had since 2004. For instance, they had the obligation to design and implement effective systems to monitor and review the accuracy and truthfulness of the diagnoses they submitted for risk adjustment payments in order to certify the accuracy and truthfulness of that data. *See* Medicare Managed Care Manual, Chapter 7, Section 110.2 (entitled "Certification of Data Accuracy, Completeness, and Truthfulness") (Rev. 2, 10-01-01).

58. Since 2004, the Secretary has employed the Hierarchical Conditions Category ("HCC") model, which takes into account both demographic factors (such as age and gender) and health status to determine the risk scores for beneficiaries in MA Plans.

4592

With respect to health status, the model takes into account diagnoses from physician office visits and hospital outpatient encounters as well as hospital inpatient stays. Like the PIP-DCG model, the HCC model is prospective, meaning that it relies on diagnoses assigned to a beneficiary in one year (referred to by CMS as the "data collection" year but also generally known as the "date of service" or "DOS" year) to determine the risk score for the beneficiary for the following year (often referred to as the "payment year" or "PY"). The medical conditions included in the model are grouped into HCCs, which are categories of clinically-related medical diagnoses. *See* 42 C.F.R. § 422.2. The diagnoses grouped into HCCs include major, severe, and/or chronic illnesses. Related groups of diagnoses are ranked on the basis of disease severity and the cost associated with their treatment. Between 2004 and 2013, the CMS-HCC model included 70 HCCs. Starting in 2014, the CMS-HCC model included 79 HCCs.

59. Under Medicare Part D, payments to PD or MAPD Plans for prescription drug benefits are also risk-adjusted based on health status. As with Part C, Part D employs a health-based risk adjustment model known as the Rx Hierarchical Condition Categories ("RxHCC") model. Like HCCs, RxHCCs are also groups of clinically-related medical diagnoses that are ranked by disease severity and the cost associated with the pharmaceutical drugs used to treat them.

60. The Government assigns a relative numerical value (also known as a relative factor, multiplier, or coefficient) to each HCC and RxHCC group that correlates to the predicted incremental costs of care associated with treating the medical conditions in each category. It currently determines the relative values based on an analysis of the additional amounts that it paid on average for the treatment of these major, severe, and chronic medical conditions under Parts A and B of the Medicare Program. Higher relative values are assigned to HCCs and RxHCCs that include diagnoses with greater disease severity and greater costs associated with their treatment.

61. As previously stated, the HCC and RxHCC risk adjustment models are prospective and a beneficiary's risk score for a particular payment year is determined by

4593

his or her medical conditions during the previous year (*i.e.*, the date of service year).  For risk adjustment payment purposes, these medical conditions must be documented by a qualified healthcare provider (*e.g.*, a doctor) in the beneficiary's medical record during the previous year.  Accordingly, for risk adjustment payment purposes, the diagnosis codes that the healthcare provider, his or her administrative or billing support staff, or anyone else (such as the MA Organization or a Related Entity) assigns to a beneficiary must be supported by the beneficiary's medical record.

62.    Each beneficiary's risk score is calculated anew for each payment year.  For example, a beneficiary's risk score for payment year 2012 is determined by the diagnoses that his or her qualified healthcare providers documented in his or her medical records during medical encounters during date of service year 2011.

63.    MA Organizations obtain diagnosis data from the healthcare providers that treat the beneficiaries in their plans (as well as through other means and sources such as the MA Organizations' own medical record reviews).  Healthcare providers can transmit diagnosis codes to MA Organizations with claims for payment for services rendered, in encounter records reporting the services rendered, or by alternative means.  In this Amended Complaint, the United States refers to diagnosis codes reported by providers through any means as "provider-reported diagnoses."

64.    MA Organizations submit risk adjustment data, including diagnoses, to CMS using CMS' Risk Adjustment Processing System ("RAPS").  Each RAPS submission must include the following information:  the Medicare beneficiary's identification number (called a "HIC number" or "HICN"); the date(s) of the medical encounter (the physician office visit, hospital outpatient visit, or hospital inpatient stay); the type of provider (physician or hospital); and the diagnosis code(s) reported by the provider for the encounter.  Each RAPS submission is a claim for payment.  If the data submitted is invalid, the claim is false.

65.    RAPS also has a field that is called a "Delete Indicator" and allows MA Organizations and Related Entities to comply with their obligation to delete invalid

4594

diagnoses that they previously submitted in order to withdraw or retract the invalid diagnoses. That is, the RAPS system enables MA Organizations and Related Entities to withdraw or retract their false claims for risk adjustment payments.

## DEFENDANTS' AGREEMENTS

### I. The Annual Parts C and D Agreements

66. As previously explained, in order to participate in the MA Program, the Defendant MA Organizations were required to agree in writing to comply with the Part C and D regulations and any other terms and conditions CMS deemed appropriate. 42 C.F.R. §§ 422.504 & 422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D). Each year during the relevant time period, one or more executives of one or more of the UHG Managing Defendants or their predecessors executed these written agreements or renewals of these written agreements between the Defendant MA Organizations and CMS.

67. The regulations specifying the terms and conditions of the contractual relationship between MA Organizations and CMS have remained the same for many years. Accordingly, from year to year, the terms and conditions of these written agreements between the Defendant MA Organizations and CMS remained very similar, if not identical.

68. The terms and conditions of the Part C agreements are exemplified by the attached contract that Defendant UnitedHealthcare Plan of River Valley, Inc. entered into with CMS relating to its participation in Medicare Part C in 2010. *See* Exhibit 1, attached hereto. The terms and conditions of these Part C contracts include, among many other things, that each of the MA Organizations agrees to (i) operate its Plans "in compliance with the requirements of [the] contract and applicable Federal statutes, regulations, and policies (e.g., policies as described in the Call Letter, Medicare Managed Care Manual, etc.)" (Article II, Section A); (ii) "implement a compliance plan in accordance with the requirements of § 422.503(b)(4)(vi)" (Article III, Section F); (iii) "[a]s a condition of receiving a monthly payment under" the contract, "request payment under the contract

42

on the forms attached" to the contract, including "Attachment B (risk adjustment data) which attest[s] to *(based on best knowledge, information and belief, as of the date specified on the attestation form)* the accuracy, completeness, and truthfulness of the data identified on" Attachment B (Article IV, Section C) (emphasis in the original); (iv) ensure that related entities, contractors, and subcontractors that generated risk adjustment data also attest to the accuracy and truthfulness of the data (Article IV, Section C.2); (v) ensure that all agreements with related entities, contractors, and subcontractors specify that the related entities, contractors, and subcontractors "must comply with all applicable Medicare laws, regulations, and CMS instructions" (Article V, Section D(5)); and (vi) comply with "Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of the Federal criminal law [and] the False Claims Act (31 USC 3729 et seq.)" (Article IX, Section A.1). In accordance with 42 C.F.R. § 422.510, the agreements also provided that CMS may terminate the MA Organization's participation in the MA Program if it determines that the organization has submitted false data to it or "fail[ed] to provide CMS with valid risk adjustment data." Article VIII, Section B.1(a)(iv) & (vii).

69. The agreements for other years were very similar, if not identical. For example, in September 2010, Tom Paul, the Chief Executive Office of UnitedHealthcare Medicare & Retirement, executed a new agreement between Defendant UnitedHealthcare of California (the successor to PacifiCare of California) and CMS relating to this MA Organization's participation in Medicare Part C in 2011. *See* Exhibit 2, attached hereto. By executing this contract, UnitedHealthcare of California agreed to, among many other things, (i) operate its Plans "in compliance with the requirements of [the] contract and applicable Federal statutes, regulations, and policies (e.g., policies as described in the Call Letter, Medicare Managed Care Manual, etc.)" (Article II, Section A); (ii) "implement a compliance plan in accordance with the requirements of § 422.503(b)(4)(vi)" (Article III, Section F); (iii) "[a]s a condition of receiving a monthly payment under" the contract, "request payment under the contract on the forms attached"

43

to the contract, including "Attachment B (risk adjustment data) which attest[s] to *(based on best knowledge, information and belief, as of the date specified on the attestation form)* the accuracy, completeness, and truthfulness of the data identified on" Attachment B (Article IV, Section D); (iv) ensure that related entities, contractors, and subcontractors that generated risk adjustment data also attest to the accuracy and truthfulness of the data (Article IV, Section D.2); (v) ensure that all agreements with related entities, contractors, and subcontractors specify that the related entities, contractors, and subcontractors "must comply with all applicable Medicare laws, regulations, and CMS instructions" (Article V, Section D.5); and (vi) comply with "Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of the Federal criminal law [and] the False Claims Act (31 USC 3729 et seq.)" (Article IX, Section A.1). The agreement also provided that CMS had the right to terminate the agreement with the MA Organization if it determined that the organization had submitted false data to it or "fail[ed] to provide CMS with valid risk adjustment data." Article VIII, Section B.1(a)(iv) & (vii). In September 2010, Paul also executed an agreement with CMS relating to UnitedHealthcare of California's offering of prescription drug benefits under Medicare Part D. This Part D agreement was, in all respects relevant to this Amended Complaint, very similar to the one described above for the offering of healthcare insurance benefit packages under Part C. Furthermore, in September 2010, Tom Paul executed the same Part C and D agreements on behalf of other of the Defendant MA Organizations. All these agreements were very similar, if not identical, to the ones he executed for UnitedHealthcare of California.

70.     In September 2011, August 2012, and August 2013, Scott Theisen, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, executed agreements for many of the Defendant MA Organizations relating to their participation in Medicare Parts C and D for 2012, 2013, and 2014, respectively. *See, e.g.*, Exhibits 3, 4, & 5, attached hereto (Defendant UnitedHealthcare of California's Parts C agreements for

44

these years).  In August 2014 and 2015, Brian Thompson, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, executed agreements for many of the Defendant MA Organizations relating to their participation in Medicare Parts C and D for 2015 and 2016.  See, e.g., Exhibits 6 & 7, attached hereto (Defendant UnitedHealthcare of California's Part C agreements for these years).  These agreements were, in all respects relevant to this Amended Complaint, very similar, if not identical, to the agreements described in the preceding paragraphs relating to the agreements for 2010 and 2011 and imposed the same contractual obligations on the Defendant MA Organizations as the earlier agreements.

71.    The annual Attestations executed in order to renew existing contracts were also very similar as shown by the following:  In the fall of 2006, Jerry Knutson, the Chief Financial Officer of Ovations and Jeff Putnam, the Chief Financial Officer of Secure Horizons, executed Attestations renewing (for calendar year 2007) the existing contract between PacifiCare of California (the predecessor of Defendant UnitedHealthcare of California) and CMS.  Knutson and Putnam attested that PacifiCare of California would "comply with all applicable program guidance that CMS has issued to date and will issue during the remainder of 2006 and 2007 pursuant to Medicare program authorizing statutes and regulations, including but not limited to, . . . the CMS memoranda issued through the Health Plan Management System (HPMS)."  (HPMS is one of the web-based systems used by CMS to provide program information to MA Organizations and is used to communicate program requirements.)  In September 2007, Joseph Haferman, the Chief Financial Officer of Secure Horizons, executed another Attestation renewing the existing contract for PacifiCare of California (this time for calendar year 2008).  Haferman thereby attested that PacifiCare of California would comply "with all applicable program authorizing statutes and regulations and program guidance that CMS has issued to date and will issue during the remainder of 2007 and 2008, including but not limited to,  . . . the Medicare Managed Care Manual, and CMS memoranda issued through the Health Plan Management System (HPMS)."  In September 2008, Kenneth

4598

Burdick, the Chief Executive Officer of Secure Horizons at the time, executed another Attestation renewing the existing contract for PacifiCare of California (this time for calendar year 2009). Burdick thereby attested that PacifiCare of California would comply "with all applicable Medicare program authorizing statutes and regulations and program guidance that CMS has issued to date and will issue during the remainder of 2008 and 2009, including but not limited to, . . . the Medicare Managed Care Manual, and the CMS memoranda issued through the Health Plan Management System (HPMS)." In September 2009, both Tom Paul, the Chief Executive Officer of Ovations, and John Way, the Chief Financial Officer of Secure Horizons, executed an Attestation renewing the existing contract for PacifiCare of California (this time for calendar year 2010). They thereby attested that PacifiCare of California would comply "with all applicable Medicare program authorizing statutes and regulations and program guidance that CMS has issued to date or will issue during the remainder of 2009 and 2010, including but not limited to, . . . the Medicare Managed Care Manual, and the CMS memoranda issued through the Health Plan Management System (HPMS)."

72. The United States hereby incorporates by reference as if they were recited herein and attached hereto all of the agreements that all of the Defendant MA Organizations entered into with CMS relating to their participation in Medicare Parts C and D for 2007 to present date. All of these agreements were, in all respects relevant to this Amended Complaint, very similar, if not identical, to the agreements described in the preceding paragraphs.

## II. The Electronic Data Interchange Agreements

73. In addition, since at least 2003, MA Organizations and entities that submit risk adjustment data on their behalf have been required to execute Electronic Data Interchange ("EDI") agreements prior to submitting risk adjustment data. These EDI agreements are considered contracts by which the MA Organizations attest to the accuracy of the data submitted. Even if another entity submits the data, the MA Organizations are still responsible for the content of the submissions. *See* 2003 Regional

46

Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 6.1; 2004 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 4.1; 2005 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide § 4.1; 2006 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide § 4.1; 2007 Risk Adjustment Data Training for Medicare Advantage Organizations Participant Guide § 4.1; 2008 Risk Adjustment Technical Assistance for Medicare Advantage Organizations Participant Guide § 4.1; Risk Adjustment 101 Participant Guide § 2.1 (2013). *See* also Medicare Managed Care Manual, Chapter 7, § 111.6.1 (Rev. 57, 08-13-04); *id*. § 120.2.1 (Rev. 114, 06-07-13). By executing these EDI forms, the MA Organizations agree that (i) they will be responsible for all risk adjustment data submitted to CMS by themselves, their employees, and their agents; (ii) they will submit risk adjustment data that is accurate, complete, and truthful based on best knowledge, information, and belief; (iii) *they will research and correct risk adjustment data discrepancies*; and (iv) CMS has the right to audit and confirm the risk adjustment data, including diagnoses, submitted by the MA Organization and the right of access to the beneficiaries' medical records to conduct such audits.

74. Each of the Defendant MA Organizations and Defendants Optum (and its predecessor, Ingenix) and Ovations executed these EDI agreements and submitted them to the MA Program in order to submit risk adjustment data to and receive risk adjustment payments from the MA Program. Pursuant to the express terms of these EDI agreements, these Defendants promised to submit valid risk adjustment data to the MA Program and *to research and correct any data discrepancies*.

75. For instance, in 2005, Joseph Haferman, the Chief Financial Officer of Defendant Ovations, executed and submitted to CMS an EDI agreement in order to obtain a "submitter ID" permitting Ovations to submit risk adjustment data on behalf of various of the Defendant MA Organizations. *See* Exhibit 8, attached hereto. By executing this agreement and submitting it to CMS on behalf of the "eligible organization," which was

47

identified as "United Health Group – Ovations" on the form, Defendants UHG and Ovations and the Defendant MA Organizations each agreed that they would (i) be responsible for all risk adjustment data submitted to CMS by themselves, their employees, or their agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*.  In addition, each of them agreed that CMS could audit the data and have access to medical records to conduct such audits.

76.    Additional examples include the EDI agreements that James Higgins, the Finance Director of PacifiCare Health Systems, executed on behalf of the following Defendant MA Organizations or their predecessors:  On September 14, 2006, Higgins signed EDI agreements for UnitedHealthcare Insurance Company of New York (contract numbers H5515 and R5342); UnitedHealthcare Insurance Company (the name for a number of different MA Organizations with contract numbers R3175, R5287, H1717, H2803, H2001, H2003, H2111, H2408, H0624, H0620, H1303, H1509, H3921, H0319, H5500, H2406, H4106, H3812, H3209, H5918, H5697, H5754, H0315, H2228, H1108, H4522, H5532, H5516, H5507, H5440, H5417, H5424, H5008, H5527, H2226 and H5518); PacifiCare of Nevada, Inc. (contract number H2949); PacifiCare of Arizona, Inc. (contract number H0303); UnitedHealthcare of Alabama, Inc. (contract number H0151); UnitedHealthcare of the Midwest, Inc. (contract number H2654); Oxford Health Plans (CT), Inc. (contract number H0752); Oxford Health Plans (NJ), Inc. (contract numbers H3113 and H3107); UnitedHealthcare of Ohio, Inc. (contract numbers H3659 and H5678); UHC of California, then known as PacifiCare of California (contract number H0543); UnitedHealthcare of Florida, Inc. (contract number H1080 and H9011); UnitedHealthcare Benefits of Texas, Inc. (contract number H4590); UnitedHealthcare of Utah, Inc. (contract number H4604); UnitedHealthcare of Arizona, Inc. (contract number H0316); UnitedHealthcare of Arkansas, Inc. (contract number H0401); UnitedHealthcare of Georgia, Inc. (contract number H1111); UnitedHealthcare of Tennessee, Inc. (contract number H4406); UnitedHealthcare of New England, Inc. (contract number H4102);

4601

UnitedHealthcare of Oregon, Inc. (contract number H3805); UnitedHealthcare of Oklahoma, Inc. (contract number H3749); UnitedHealthcare of New York, Inc. (contract number H3379); Oxford Health Plans (NY), Inc. (contract number H3307); UnitedHealthcare of the Midlands, Inc. (contract number H2802); UnitedHealthcare of North Carolina, Inc. (contract number H3456); PacifiCare of Colorado, Inc. (contract number H0609); Sierra Health and Life Insurance Company, Inc. (contract number H5652); UnitedHealthcare of Washington, Inc. (contract number H5005); UnitedHealthcare of Wisconsin, Inc. (contract number H5253); and UnitedHealthcare Community Plan of Texas, L.L.C. (contract number H4514). On November 2, 2006, Higgins signed EDI agreements for UnitedHealthcare of the Midwest, Inc. (contract number H3887), UnitedHealthcare Insurance Company of New York (contract number H4720), and UnitedHealthcare Insurance Company (contract numbers H9418, H8000, and H4779). On December 13, 2006, Higgins signed EDI agreements for UnitedHealthcare Insurance Company (the name for a number of MA Organizations with contract numbers H0408, H1286, H3435, H7274, H7254, H0410, and H6717) and UnitedHealthcare of Wisconsin, Inc. (contract number H7187). On January 1, 2007, Higgins signed an EDI agreement for UnitedHealthcare Insurance Company (contract number H5435). On January 14, 2008, Higgins signed an EDI agreement for UnitedHealthcare Insurance Company (contract numbers H3912 and H0710). *See, e.g.,* Exhibit 9, attached hereto (September 14, 2006 EDI for PacifiCare of California). Pursuant to these EDI agreements, each of these MA Organizations agreed that it would (i) be responsible for all risk adjustment data submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*. In addition, each of them agreed that CMS could audit the data and have access to medical records to conduct such audits.

77.     In addition, on January 14, 2008, Patricia Rasmussen, who worked as a manager for Ingenix, signed EDI agreements for UnitedHealthcare Insurance Company (contract numbers H4971, H0710, H3912, H7698, H4971, H0710, H6793, H5749, and H6228),

4602

UnitedHealthcare of New England, Inc. (contract number H1944), and UnitedHealthcare Insurance Company of New York (contract number H4720). On June 18, 2008, Rasmussen signed an EDI agreement for PacifiCare of Nevada, Inc. (contract number H7949). In January 2009, Rasmussen signed additional EDI agreements for UnitedHealthcare Insurance Company (contract numbers H7444, H8748, H2182, and H1949). Pursuant to these EDI agreements, each of these MA Organizations agreed that it would (i) be responsible for all risk adjustment data submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*. In addition, each of them agreed that CMS could audit the data and have access to medical records to conduct such audits.

78. On December 15, 2010, Timothy Noel, who was Vice President of Finance for UnitedHealthcare Medicare & Retirement, signed an EDI agreement for Oxford Health Plans (CT), Inc. (contract number H0755). On September 22, 2011, Noel signed an EDI agreement for UnitedHealthcare Insurance Company of New York (contract number H1537). Pursuant to these EDI agreements, each of these MA Organizations agreed that it would (i) be responsible for all risk adjustment data submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*. In addition, each of them agreed that CMS could audit the data and have access to medical records to conduct such audits.

79. On April 27, 2011, Scott Theisen, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, submitted an EDI agreement for PacifiCare of California, which included all the same promises. On October 21, 2013, Theisen also signed EDI agreements for Care Improvement Plus Wisconsin Insurance Company (contract number H3794) and Care Improvement Plus South Central Insurance Co. (contract number H5322). Accordingly, each of these Defendant MA Organizations also agreed that it would (i) be responsible for all risk adjustment data (which includes encounter data)

50

4603

submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*.  In addition, each of them agreed that CMS could audit the data and have access to medical records to conduct such audits.

80.     Patricia Rasmussen also executed and submitted an EDI agreement so that Ingenix could submit risk adjustment data on behalf of the Defendant MA Organizations.  *See* Exhibit 10, attached hereto.  By doing this, Ingenix also agreed that it would (i) be responsible for all risk adjustment data submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*.  In addition, it agreed that CMS could audit the data and have access to medical records to conduct such audits.  When Ingenix became OptumInsight, Rasmussen also notified CMS (that is, CMS' contractor Palmetto, which helped operate RAPS) that its records should be updated to reflect that OptumInsight was making the risk adjustment submissions for the Defendant MA Organizations.  Rasmussen identified OptumInsight as "part of Optum."  See Exhibit 11, attached hereto.

81.     Jeffrey Dumcum, a Senior Vice President at Optum, also executed an EDI agreement in May 2011 in order to submit risk adjustment data (also known as encounter data) to the MA Program on behalf of many of the Defendant MA Organizations, including those MA Organizations listed in a letter sent by Theisen to CMS' contractor in April 2011.  By doing this, Dumcum agreed that Optum would be responsible for the data it submitted, submit valid data, and *research and correct data discrepancies*.  *See* Exhibit 12, attached hereto.

82.     All EDI agreements executed by the UHG Managing Defendants on their own behalf and on behalf of the Defendant MA Organizations are incorporated by reference in this Amended Complaint as if they were recited in full and attached hereto.

4604

### III. The Ingenix/Optum Service Agreements

83.     Depending on the time period, Ingenix or Optum entered into internal agreements with Ovations or UnitedHealthcare regarding the risk adjustment-related services that Ingenix or Optum would provide to the Defendant MA Organizations.  These services included, among other things, the submission of risk adjustment data to CMS and the management of the Chart Review, Claims Verification, and RACCR Programs.  These internal agreements further confirm the parties' joint and several obligations to the MA Program to submit accurate and truthful risk adjustment data and to investigate and correct any data discrepancies.  These agreements also exemplify the UHG Managing Defendants' understanding of their joint and several obligations to the MA Program.  All of these agreements are incorporated herein by reference.

84.     By way of example, the Memorandum of Understanding ("MOU") entered into between Optum and UnitedHealthcare for risk adjustment-related services rendered by Optum in 2011 exemplifies the obligations undertaken by Optum not only to UnitedHealthcare but to the MA Program.  That MOU was executed by Jerry Knutson, Chief Financial Officer of Optum, and Scott Theisen, Chief Financial Officer of UnitedHealthcare Medicare & Retirement.  Paul Bihm at Optum, Relator Poehling at UnitedHealthcare Medicare & Retirement, and Jason Bainbridge at UnitedHealthcare Community & State were copied on the MOU.  (The MOU referred to UnitedHealthcare Medicare & Retirement and UnitedHealthcare Community & State collectively as "UnitedHealth Group's Public and Senior Markets Group ("PSMG")."  This is but one of many examples of the confusion that Defendants have created by the way they used names of groups and entities interchangeably.)  Pursuant to the MOU, Optum was compensated for its services through an "intercompany allocation of fees paid pursuant to [a separate] Management Agreement."

85.     Pursuant to this 2011 MOU, Optum provided many risk adjustment-related services to the Defendant MA Organizations, including, but not limited to the submission of risk adjustment data to CMS "pursuant to CMS risk adjustment rules and

4605

requirements" and conducting the Chart Review, Claims Verification, and RACCR Programs. Importantly, Optum also agreed to (i) conduct "[p]rovider engagement and education regarding accurate and complete diagnostic coding and documentation"; (ii) "[c]ontribute (along with PSMG) to the level of accuracy and completeness of diagnostic coding for a respective population by identifying opportunities to improve documentation and coding for accuracy, facilitating improvement in accuracy by working directly with providers to improve documentation and coding practices, and executing the timely and accurate submission of claim coding information to CMS, thereby ensuring appropriate revenues are being paid by CMS for the underlying risk inherent within the member population;" (iii) "[m]onitor[] the appropriateness and accuracy of provider coding;" and (iv) conduct "[i]nternal validation testing of outlier providers, internal validation testing of other sample populations and support CMS validation requirements."

86.     The 2011 MOU also included a "Medicare Advantage Regulatory Requirements Appendix." This Appendix included Optum's agreement to (i) "comply with all applicable federal and Medicare laws, regulations, and CMS instructions, including but not limited to . . . federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including but not limited to, applicable provisions of federal criminal law [and] the False Claims Act (31 U.S.C. § 3729 et seq.);" (ii) "perform services and provide the products set forth in the MOU in a manner consistent with and in compliance with [the Defendant MA Organizations'] obligations under the CMS Contact[s]; " and (iii) certify in writing that the risk adjustment data it submitted to CMS was "accurate, complete, and truthful, based on [its] best knowledge, information and belief."  The Appendix further specified that UnitedHealthcare and the Defendant MA Organizations were accountable to CMS for fulfilling their regulatory and contractual obligations under the MA Program, including those that they had delegated to Optum under the MOU and, thus, that they were responsible for overseeing and monitoring Optum's performance under the MOU.

4606

Case 2:16-cv-08697-MWF-SS Document 17-16 Filed 11/17/17 Page 54 of 166 Page ID #:2156

# DEFENDANTS' DATA INTEGRITY OBLIGATIONS

## I.    Obligation to Submit Valid Diagnoses

87.    MA Organizations are entitled to risk adjustment payments based on the diagnosis codes that they submit to CMS *only* if the codes are from face-to-face medical encounters between the Medicare beneficiary and provider, the encounter occurred during the relevant date of service year, the provider was of a type and specialty acceptable for risk adjustment purposes, and at the time of the encounter, the provider documented the medical conditions identified by the diagnosis codes in the medical record based on acceptable documentation.  In addition, codes should be based on documented conditions that require or affect patient care treatment or management.  *See* Medicare Managed Care Manual, Chapter 7, Exhibit 30 (August 13, 2004) (stating that diagnosis codes submitted for risk adjustment payments should be for documented conditions that "require or affect patient care treatment or management").  *See also* 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("2008 RA Participation Guide") at § 6.4.1.

88.    Risk adjustment claims are valid, and the resulting risk adjustment payments are therefore proper and justified, only to the extent that the diagnosis codes submitted by the MA Organizations are valid.  The diagnoses must be coded according to the *International Classification of Diseases (ICD) Clinical Modification Guidelines for Coding and Reporting* ("ICD-9-CM" & "ICD-10-CM") and documented with sufficient clinical specificity.  *See* Medicare Managed Care Manual, Chapter 7, Exhibit 30 (August 13, 2004).  In addition, codes cannot be submitted for diagnoses that are only probable or suspected, for diagnoses that are questionable, or for a condition that the provider is trying to rule out.  *Id*.

89.    Moreover, all diagnosis codes submitted by MA Organizations must be supported by medical record documentation.  The 2004 Medicare Managed Care Manual stated that "M+C organizations [now known as MA Organizations] must submit risk adjustment data that are substantiated by the physician or provider's full medical record."  Medicare

1  Managed Care Manual, Chapter 7, § 111.8 (August 13, 2004).  A later version of the

2  Manual similarly states that MA Organizations "must . . . [e]nsure the accuracy and

3  integrity of risk adjustment data to CMS.  All diagnosis codes submitted must be

4  documented in the medical record . . . ." Medicare Managed Care Manual, Chapter 7, §

5  40 (June 2013).  Also similarly, the 2003 Participant Guide stated that MA

6  Organizations "must submit risk adjustment data that are substantiated by the patient's

7  medical record."  2003 Regional Risk Adjustment Training for Medicare+Choice

8  Organizations Participant Guide, § 4.1.  This requirement was reiterated in the following

9  CMS training guides and materials since 2003:  2003 Regional Risk Adjustment

10  Training for Medicare+Choice Organizations Participant Guide, §§ 12.3, 12.6; 2004

11  Regional Risk Adjustment Training for Medicare+Choice Organizations Participant

12  Guide, §§ 5.1, 5.5, 6.1.3; 2005 Risk Adjustment Data Basic Training for Medicare

13  Advantage Organizations Participant Guide §§ 4.1, 5, 5.1, 5.5, 8.7.3, 9.1, 9.2; 2006 Risk

14  Adjustment Data Basic Training for Medicare Advantage Organizations Participant

15  Guide §§ 5.1, 5.4, 5.5, 7.7.3, 8.1, 8.2; 2007 Risk Adjustment Data Training for Medicare

16  Advantage Organizations Participant Guide §§ 6.1, 6.4, 7.1, 7.2, 8.7.3; 2008 Risk

17  Adjustment Technical Assistance for Medicare Advantage Organizations Participant

18  Guide §§ 5.6, 6, 6.1, 6.4, 6.5, 7.1, 7.2; 2012 Regional Technical Assistance Participant

19  Guide § 2.2; Risk Adjustment 101 Participant Guide §§ 3.2.4; 4.3 (2013); Risk

20  Adjustment Webinar at p. 48 (July 1, 2014).  Furthermore, in a 2003 Regional Risk

21  Adjustment Training for Medicare+Choice Organizations presentation, organizations

22  were advised to "[t]ake steps to ensure that medical documentation supports submitted

23  diagnoses."  *Id.* at §8-19.

24  90.     In connection with the requirement that the patient's medical record support the

25  diagnosis(es) reported for him or her, the 2004 Medicare Managed Care Manual also

26  provided that "M+C organizations must maintain sufficient information to trace the

27  submitted diagnosis back to the hospital or physician that originally reported the

28  diagnosis.  Since M+C organizations may submit summary level transactions without a

link to a specific encounter or claim, establishing an appropriate audit trail to the original source of the data requires diligent information management on the part of the M+C." Medicare Managed Care Manual, Chapter 7, § 111.8 (August 13, 2004).  Again, in the 2005 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide § 8.7.3, CMS advised that "MA organizations should take steps to ensure that they have, or have access to, the proper medical documentation to support diagnoses being submitted for risk adjustment.  MA organizations are responsible for the accuracy of the data they submit to CMS.  Where necessary, they should obtain the proper documentation to support diagnoses and maintain an efficient system for tracking diagnoses back to medical records."  This requirement was also reiterated in the following CMS training guides:  2003 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 12.2; 2004 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 6.1.3; 2004 Regional Risk Adjustment Training for Medicare+Choice Organizations Resource Guide at p. 20; 2005 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 5.1, 9.1.3; 2006 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 5.1, 7.7.3, 8.7.3; 2007 Risk Adjustment Data Training for Medicare Advantage Organizations Participant Guide §§ 6.1, 7.1.4, 8.7.3; 2008 Risk Adjustment Technical Assistance for Medicare Advantage Organizations Participant Guide §§ 5.6.3, 6.1; 2012 Regional Technical Assistance Participant Guide § 2.2.

91.    Furthermore, the medical record relied on by an MA Organization to support payment cannot be ambiguous.  *See* 2008 RA Participation Guide at § 7.2.4.1 (stating that risk adjustment claims and payments cannot be based on questionable diagnoses).

92.    CMS recognizes that risk adjusting based on health status creates a strong incentive for MA Organizations to report invalid diagnoses.  Thus, CMS engages in a variety of program integrity activities, including training MA Organizations about their obligations to submit valid data and withdraw invalid data.  For example, in a 2003

56

Regional Risk Adjustment Training for Medicare+Choice Organization Questions & Answers document, CMS stated all information that is submitted must be correct. "If a plan identifies incorrect or invalid information that has been submitted, it must delete that information." Likewise, in an August 9, 2005 Regional Training presentation made jointly by CMS and its contractor, Aspen Systems Corporation, called "Risk Adjustment Data Basic Training," MA Organizations were told that they "must . . . Delete a diagnosis cluster [that is, a RAPS submission] when any data in that cluster are in error."

93.     In addition, for many years, CMS has conducted audits of diagnoses submitted by MA Organizations, known as Risk Adjustment Data Validation ("RADV") audits. In 2001, when the old PIP-DCG model was in place, CMS alerted M+C organizations that they were "required to submit medical records for validating encounter data" and that "[m]edical record reviews of a sample of hospital encounters may be audited to ensure the accuracy of diagnostic information." Medicare Managed Care Manual, Chapter 7, § 110.3 (October 2001). In 2004, CMS revised the Manual to provide that "[a] sample of risk adjustment data used for making payments may be validated against hospital inpatient, hospital outpatient, and physician medical records to ensure the accuracy of medical information. Risk adjustment data will be validated to the extent that the diagnostic information justifies appropriate payment under the risk adjustment model." Medicare Managed Care Manual, Chapter 7, § 111.8 (August 13, 2004). The Manual further explained that the MA Organizations must be prepared to locate and produce the medical records to support the diagnoses codes that they submitted. *Id*. Federal regulations also require MA Organizations and their providers to provide medical records to CMS to validate the diagnoses they submitted for risk adjustment payments. *See* 42 C.F.R. § 422.310(e).

94.     When making risk adjustment payments, CMS relies on MA Organizations to exercise due diligence to ensure that provider-reported diagnoses are supported by beneficiaries' medical records and are otherwise accurate and truthful. This is why insurance companies that want to participate in the MA Program must agree, through

their Part C and D agreements and their EDI agreements, to provide valid diagnostic data and investigate and delete invalid data. Moreover, this is why insurance companies that want to participate in the MA Program must (i) establish and implement effective compliance programs to ensure the integrity of their payment data, 42 CFR § 422.503(b)(4)(vi) (Part C compliance program regulation); 42 C.F.R. § 423.504(b)(4)(vi) (Part D compliance program regulation); (ii) annually attest to the accuracy and truthfulness of the diagnosis data that they submit for risk adjustment payments, 42 C.F.R. § 422.504(*l*) (Part C regulation); 42 C.F.R. § 423.505(k) (Part D regulation); and (iii) "comply with . . . Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act (31 USC §§ 3729 et seq.)." 42 C.F.R. § 422 (Part C regulation); 42 C.F.R. § 423 (Part D regulation).

## II. Obligation to Implement an Effective Compliance Program

95. The implementation of an effective compliance program is a prerequisite to an MA Organization's obtaining and retaining payments under both Parts C and D of the Medicare Program. *Id*. §§ 422.503(a) (Part C) & 423.504(b)(4)(vi) (Part D). One purpose of requiring a compliance program is to ensure that MA Organizations submit accurate and truthful information to CMS. 65 Fed. Reg. 40170-01 at 40264 (June 29, 2000).

96. Specifically, each MA Organization must "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse." 42 C.F.R. § 422.503(b)(4)(vi) (Part C); 42 C.F.R. § 423.504(b)(4)(vi) (Part D). The compliance program "must, at a minimum, include [certain] core requirements," including (but not limited to):

(F)     Establishment and implementation of an effective system for routine monitoring and identification of compliance risks. The system should include internal monitoring and audits and, as appropriate,

4611

external audits, to evaluate the MA organization['s], including first tier entities', compliance with CMS requirements and the overall effectiveness of the compliance program.

(G)  Establishment and implementation of procedures and a system for promptly responding to compliance issues as they are raised, investigating potential compliance problems as identified in the course of self-evaluations and audits, correcting such problems promptly and thoroughly to reduce the potential for recurrence, and ensuring ongoing compliance with CMS requirements.

(1)  If the MA organization discovers evidence of misconduct related to payment or delivery of items or services under the contract, it must conduct a timely, reasonable inquiry into that conduct.

(2) The MA organization must conduct appropriate corrective actions (for example, repayment of overpayments, disciplinary actions against responsible employees) in response to the potential violation referenced in paragraph (b)(4)(G)(1) of this section.

(3) The MA organization should have procedures to voluntarily self-report potential fraud or misconduct related to the MA program to CMS or its designee.

97.  A compliance program is not effective unless the MA Organization devotes adequate resources to the program.

### III.  Obligation to Attest to Validity of Risk Adjustment Data

98.  After the final deadline for their submission of risk adjustment data but before their receipt of their final reconciliation payments for a given payment year, MA Organizations must attest to the validity of their risk adjustment data, including diagnoses, in a Risk Adjustment Attestation submitted to CMS.  Specifically, the chief

4612

executive officer, chief financial officer, or another individual with delegated authority to sign on behalf of one of these officers, and who reports directly to such an officer, must certify that the risk adjustment data that the MA Organization submitted to CMS was accurate, complete, and truthful.

99.     An MA Organization must request payment on a document that contains this Attestation and the submission of this Attestation to CMS is a condition of receiving Risk Adjustment payments.

100.   The Part D regulations include a similar attestation for risk adjustment data, including diagnoses, submitted for risk adjustment payments under the prescription drug program.  Under the applicable Part D regulation, these attestations are referred to as certifications.  42 C.F.R. § 423.505(k).

101.   Every year, each MA Organization agrees in writing that:

> [a]s a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the MA Organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on the form[] attached hereto as . . . Attachment B (risk adjustment data) which attest to (based on best knowledge, information and belief, as of the date specified on the attestation form) the accuracy, completeness and truthfulness of the data identified on these attachments.
>
> . . .
>
> 2.  Attachment B requires the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest to (based on best knowledge, information and belief, as of the date specified on the attestation form) that the risk adjustment data it submits to CMS under 42 CFR § 422.310 are accurate, complete, and truthful.  The MA Organization shall make annual

60

4613

attestations to this effect for risk adjustment data on Attachment B and according to a schedule to be published by CMS.  If such risk adjustment data are generated by a related entity, contractor, or subcontractor, then such related entity, contractor, or subcontractor must also attest to (based on best knowledge, information, and belief, as of the date specified on the attestation form) the accuracy, completeness, and truthfulness of the data. [422.504(*l*).]

102.   MA Organizations have an obligation to acquire knowledge, information, and belief about their risk adjustment data, including diagnoses, in order to both submit such data and attest to the accuracy and truthfulness of the data.  Nearly 17 years ago, CMS put MA Organizations on notice that they were "responsible for making *good faith efforts* to certify the accuracy, completeness, and truthfulness of the encounter [*i.e.,* risk adjustment] data submitted" for payments from the Medicare Program.  65 Fed. Reg. 40,170, 40,268 (June 29, 2000) (emphasis added); *see also* Medicare Managed Care Manual, Chapter 7, § 110.2 (October 2001) (stating, under section titled "Certification of Data Accuracy, Completeness, and Truthfulness," that "CMS expects M+C organizations [now known as MA Organizations] to design and implement effective systems to monitor the accuracy, completeness, and truthfulness of encounter data [that is, diagnoses from hospital inpatient stays under the old PIP-DCG risk adjustment model] and to exercise due diligence in reviewing the information provided to CMS"); Medicare Managed Care Manual, Chapter 7, § 111.7 (August 2004) (stating, under section titled "Certification of Data Accuracy, Completeness, and Truthfulness," that "CMS expects M+C organizations [now known as MA Organizations] to design and implement effective systems to monitor the accuracy, completeness, and truthfulness of risk adjustment data and to exercise due diligence in reviewing the information provided to CMS").  When MA Organizations fail to act in good faith and deliberately ignore or recklessly disregard information about their submission of inaccurate or untruthful data, their Risk Adjustment Attestations are false.

4614

### IV. Obligation to Delete Invalid Diagnoses

103.   MA Organizations are obligated to delete invalid diagnoses previously submitted by them to RAPS or to use other available means to return risk adjustment payments based on invalid diagnoses.  Their deletion of invalid diagnoses is the principal mechanism by which CMS is able to recalculate beneficiaries' risk scores and ensure that the Government does not make improper risk adjustment payments to MA Organizations or that it recovers improper payments that were already made.  In particular, the submission of diagnoses that are not supported by the beneficiaries' medical records and, thus, are invalid directly and necessarily causes CMS to make risk-adjustment payments that it would not have made but for the submission of that false data.  Conversely, the "deletion" of previously-submitted diagnoses that are invalid because they are not supported by the beneficiaries' medical records directly and necessarily causes CMS either to avoid paying for previously-submitted false diagnoses or to recover payments it made for those false diagnoses.  As a result, an MA Organization's failure to "DELETE" invalid diagnoses results in that MA Organization's retention of payments to which it was not entitled.  Thus, both the submission of false diagnostic data and the failure to correct false diagnosis data influence CMS' payment, including the amount of the risk-adjustment payment, if any, that it makes for any given beneficiary based on his or her health status.

104.   The obligation to delete invalid diagnoses previously submitted to RAPS or to otherwise return risk adjustment payments based on invalid diagnoses arises from the contractual relationship between MA Organizations and the Government, from regulation, and from the retention of an overpayment and, thus, constitutes an "obligation to pay . . . the Government" under the reverse false claims act provision of the FCA.  31 U.S.C. §§ 3729(a)(1)(G) & (b)(3).  The obligation is imposed on MA Organizations by the following, among other things:

- The MA Organizations' execution of EDI agreements pursuant to which they agree to "research and correct risk adjustment data discrepancies."  *See supra*

62

4615

paragraphs 73-82 (describing these agreements). *See also* Exhibits 8-11, attached hereto (examples of EDI agreements that the Defendant MA Organizations executed).

- Regulations requiring MA Organizations to implement effective compliance programs and to "detect and correct non-compliance with CMS' program requirements as well as . . . [to] prevent, detect, and correct fraud, waste, and abuse." *See supra* paragraphs 95-97 (describing these regulations). Plus, the MA Organizations' execution of agreements with CMS under Parts C and D pursuant to which they agree to implement effective compliance programs. *See* 42 C.F.R. § 422.504(a) (stating that the agreement between an MA Organization and CMS must include a provision by which the MA Organizations agree to comply with the Part C regulatory requirements and general instructions issued by CMS). *See also supra* paragraphs 66-72 (describing the Part C and D agreements); Exhibits 1-7, attached hereto (examples of Part C agreements between the Defendant MA Organizations and CMS by which the Defendant MA Organizations agreed to implement effective compliance programs).

- The regulations requiring the submission of the Risk Adjustment Attestations. *See supra* paragraphs 98-102 (describing those regulations). Plus, the requirements set forth in the Medicare Managed Care Manual and elsewhere that MA Organizations exercise both good faith and due diligence in order to submit truthful Risk Adjustment Attestations to the Government certifying that their risk adjustment data is accurate and truthful. *See supra* paragraph 102. In addition, the separate contractual requirement to submit Risk Adjustment Attestations and to comply with the Medicare Managed Care Manual. *See, e.g.*, Exhibits 1-7, attached hereto (examples of the Defendant MA Organizations' Parts C agreements with CMS by which they agree to submit such Attestations and to comply with the Medicare Managed Care Manual).

63

4616

- The requirement in the CMS' Participant Guides that MA Organizations delete erroneous diagnosis data submitted to CMS. *See* 2003 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 6.1; 2004 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, §§ 4.12 to 4.16; 2005 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2006 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2007 Risk Adjustment Data Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2008 Risk Adjustment Technical Assistance for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16. This requirement is also included in 2014 and 2016 CMS training presentations. *See infra* paragraph 108. Plus, the regulatory and contractual requirement that MA Organizations' comply with CMS' instructions and policies. *See* 42 C.F.R. § 422.504(a) (stating that the agreement between an MA Organization and CMS must include a provision by which the MA Organizations agree to comply with the Part C regulatory requirements and general instructions issued by CMS) (emphasis added). *See also, e.g.*, Exhibits 1-7 hereto (examples of the Defendant MA Organization's agreements to comply with the CMS instructions and policies).

- The requirement in the Medicare Managed Care Manual that "[i]f upon conducting an internal review of submitted diagnosis codes, the [MA Organization] determines that any ICD-9-CM diagnosis codes that have been submitted do not meet risk adjustment submission requirements [which includes medical record support for all diagnoses], the [MA Organization] is responsible for deleting the submitted ICD-9-CM diagnosis codes as soon as possible." Medicare Managed Care Manual, Chapter 7, § 40 (June 2013). Plus, the regulatory requirement that MA Organizations' comply with the Manual and MA Organizations' contractual agreements to comply with the Manual. *See* 42 C.F.R.

4617

§ 422.504(a) (stating that the agreement between an MA Organization and CMS must include a provision by which the MA Organizations agree to comply with the Part C regulatory requirements and general instructions issued by CMS). *See also, e.g.*, Exhibits 1-7 hereto (examples of the Defendant MA Organization's agreements to comply with the Medicare Managed Care Manual).

105. Related Entities are also obligated to delete invalid diagnoses previously submitted by them to RAPS or to use other available means to return risk adjustment payments based on invalid diagnoses. Like the MA Organizations to which they are related, they are required to comply with the Part C and D regulations, the Medicare Managed Care Manual, the Participant Guides, and the other general instructions issued by CMS. In addition, when they submit risk adjustment data to the MA Program on behalf of their related MA Organizations, they are obligated to execute separate EDI agreements and Risk Adjustment Attestations, both of which impose an obligation to delete invalid diagnoses.

106. As previously explained, RAPS provides a means for MA Organizations and others submitting data on their behalf (such as Ingenix and then Optum) to withdraw or retract invalid diagnoses that they previously submitted to RAPS for risk adjustment payments. The process of withdrawing or retracting invalid diagnosis codes is often referred to as making "DELETES" because the field in RAPS that enables this to be accomplished is called a "Delete Indicator." The withdrawal or retraction of a diagnosis codes is also often referred to as a "DELETE."

107. CMS began instructing MA Organizations on the use of RAPS in the early 2000s in order to facilitate the phase in, during the 2004 to 2007 time period, of the use of diagnoses from physician office visits and hospital outpatient encounters to risk adjust for health status using the HCC model. It issued Risk Adjustment Training Participant Guides in order to provide instructions relating to, among other things, the use of RAPS to submit and delete data. The 2003 Risk Adjustment Training Participant Guide stated: "Now that the RAPS system is operational, effective October 1, 2002, the new system

4618

allows for correction of risk adjustment data via the deletion process." 2003 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 6.11 (titled "Modifying Risk Adjustment Data"). The 2003 Guide listed various reasons why risk adjustment data may need to be deleted, including in order to withdraw an erroneous diagnoses code. *Id*. at § 6.12.1. Finally, it stated that M+C organizations "must submit delete records" to correct erroneous diagnosis data. *Id*. at § 6.12.3. The Guide made very clear that deleting erroneous diagnoses was mandatory. Subsequent versions of the Guide have included the same mandatory deletion requirement and instructions. *See* 2004 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, §§ 4.12 to 4.16; 2005 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2006 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2007 Risk Adjustment Data Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2008 Risk Adjustment Technical Assistance for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16.

108. The same mandatory requirement and instructions about deletions of invalid diagnoses were also set forth in other CMS instructional materials used to train MA Organizations. For instance, a 2003 presentation titled "Regional Risk Adjustment Training for Medicare+Choice Organization Questions & Answers" instructed that "all information that is submitted must be correct. If a plan identifies incorrect or invalid information that has been submitted, it must delete that information." These instructions were also provided in CMS' presentation slides for a July 1, 2014 Risk Adjustment Webinar used to provide training to MA Organizations and others about how risk adjustment operates. A training presentation that CMS made to MA Organizations and others on June 23, 2016, also stated that it was the responsibility of each MA Organization to "delete each instance of unsupported diagnoses from" RAPS. All of the above-mentioned Participant Guides and other instructional materials also describe an alternative method for deleting erroneous data using a Direct Data Entry system.

66

4619

109. All of the above-mentioned Participant Guides and other instructional materials have been and continue to be available to all MA Organizations and others on a website hosted by a CMS contractor. *See* www.csscoperations.com. The 2003 to 2011 material is in the Training subsection under Risk Adjustment Processing System in the Archives and the 2012 to 2016 material is in the Training subsection under Risk Adjustment Processing System on the Home page.

110. MA Organizations can delete invalid diagnoses both before and after the final deadline for RAPS data submissions, which is sometime during the year following the payment year at issue. The final deadline is only a submission deadline; it does not pertain to deleting invalid diagnoses in order to withdraw them. *See* 42 C.F.R. § 422.310(g)(2)(ii) (codifying pre-existing process permitting, after the final deadline, only corrections to delete diagnoses from previously-submitted risk adjustment data). Diagnoses deleted before the deadline for RAPS data submissions for a payment year are known as "open-period deletes" and diagnoses deleted after the deadline for RAPS data submissions for a payment year are known as "closed-period deletes."

111. Because the final submission deadline is after the completion of the payment year, monthly payments made during the payment year are interim payments. After the final submission deadline, CMS determines if any adjustments to these interim monthly payments are necessary based on all diagnoses submitted (and not deleted) for each beneficiary up until the final submission deadline and re-calculates each beneficiary's risk score for the payment year to determine if it has changed and whether a plus or minus adjustment to the payment for the beneficiary is necessary. If the beneficiary's risk score is higher because of the submission of additional diagnoses for that beneficiary, CMS makes a final reconciliation payment of any additional payment owed to the Plan for that beneficiary for that payment year. Conversely, if the beneficiary's risk score is lower because of the deletion of diagnoses for that beneficiary prior to the final submission deadline, CMS recovers the payments associated with the deleted diagnoses as part of this final reconciliation payment process.

4620

112.   Accordingly, if, prior to the final submission deadline, an MA Organization is in possession of or has access to information about invalid diagnoses, it should delete invalid diagnoses prior to that deadline to ensure that the final reconciliation payment that it is claiming is correct.  If, however, an MA Organization comes into possession or otherwise gains access to information about invalid diagnoses after the final submission deadline, it must still delete the invalid diagnoses, and CMS will still recover the risk adjustment payments associated with the deleted diagnoses as part of additional risk score rerun and reconciliation processes it has in place to recover overpayments.

113.   The UHG Managing Defendants knew how to make deletes in RAPS.  They also knew the difference in making "open-period" and "closed-period" deletes.  The individuals who knew about the delete process and the difference between "open-period" and "closed-period" deletes included, but were not limited to:  Rebecca Martin, the Director of Encounter Operations for Ingenix and then the Director of Data Remediation for Optum; Jon Bird at Optum; and Scott Theisen and Brian Thompson at UnitedHealthcare Medicare & Retirement.

114.   However, Defendants violated the FCA by knowingly and improperly failing to delete many invalid diagnoses and, thus, failing to repay risk adjustment payments to which they were not entitled.

### THE FALSE CLAIMS ACT

115.   The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government."  S. Rep. No. 99-345, at 1 (1986), available at 1986 U.S.C.C.A.N. 5266.  First, a defendant violates the FCA when it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  Under the FCA, a claim includes a request for money.  *Id*., § 3729(b)(2).  Further, a claim is "false or fraudulent" under the FCA if the entity or person submitting the claim was not entitled to payment.

116.   Second, after the 2009 amendments to the FCA by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub.L. 111-21 (May 20, 2009), a defendant violates

4621

the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Prior to FERA, a defendant violated this provision of the FCA when it "knowingly [made], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."

117. Third, in May 2009, Congress amended the "reverse false claims act" provision of the FCA to provide that a defendant violates the FCA when it "knowingly conceals *or* knowingly and improperly avoids *or* decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G) (emphasis added). Prior to FERA, this provision of the FCA provided that a defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." After FERA, a defendant violates this provision of the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, *or* knowingly conceals *or* knowingly and improperly avoids *or* decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G) (emphasis added).

118. Under the FCA, the terms "knowing" and "knowingly" mean that the defendant had actual knowledge of or acted in deliberate ignorance or reckless disregard of information relating to the truth or falsity of its claims for payment or its false records or statements. *Id*. § 3729(b)(1)(A). Proof that the defendant had specific intent to defraud the Government is not required. *Id*. § 3729(b)(1)(B). Congress included "deliberate ignorance" in its definition of the terms "knowing" and "knowingly" to hold a defendant accountable for failing to make the inquiry that a reasonable and prudent person or entity would have made under the circumstances to be reasonably certain that he, she, or it was entitled to the money that he, she, or it sought from the Government. S. Rep. No. 99-345, at 21 (1986), as reprinted in 1986 U.S.C.A.N. 5266, 5286. The terms "knowing"

and "knowingly" used in this Amended Complaint have the meaning ascribed to them by the FCA. Similarly, the terms "knowledge," "knows" and "knew" are used in this Amended Complaint to have the same meaning.

119. In 2009, Congress also amended the FCA to provide a definition of the term "obligation" for the purpose of the new "reverse false claims act" provision of the statute, section 3729(a)(1)(G). *See* FERA, Pub. L. 111-21, 123 Stat. 1617, 1621-25 (2009). It defined the term to mean "an established duty, *whether or not fixed*, arising from an express or implied contractual … relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3) (emphasis added). Congress promulgated this definition to reflect its long-held view that an "obligation" under the FCA's reverse FCA provision, 31 U.S.C. § 3729(a)(1)(G), encompasses non-fixed and contingent duties to pay or repay monies to the Government. S. Rep. 111-10, 14, 2009 U.S.C.C.A.N. 430, 441.

120. Under the FCA, "material" means "having a natural tendency to influence, or capable of influencing, the payment or receipt of money or property." *Id*. § 3729(b)(4).

121. Under the FCA, the Government is entitled to recover three times the amount of damages which it sustained because of a defendant's violation of the statute and, for each act by the defendant violating the statute, a civil penalty. For violations that occurred before November 2, 2015, the FCA imposes a penalty for each violation of not less than $5,500 and not more than $11,000. For violations occurring after November 2, 2015, all civil statutory penalties, including the FCA, are subject to an annual adjustment for inflation pursuant to Section 701 of the Bipartisan Budget Act of 2015, Public Law 114-74 (No. 2, 2015) ("BBA"). At this time, by operation of the BBA, for violations that occurred after November 2, 2015, the FCA imposes a penalty of not less than $10,957 and not more than $21,916 per violation, and these amounts are subject to annual adjustment for inflation in future years. *See* 28 C.R.F. § 85.5 (identifying applicable inflation adjustments on an annual basis).

4623

**THE FACTS**

122.   Since at least 2005, Defendants knew that diagnoses submitted to Medicare for risk adjustment payments had to satisfy various criteria and be supported and validated by the medical records of the beneficiaries in their MA Plans.  Defendants also knew that many provider-reported diagnoses were not supported and validated by the beneficiaries' medical records and that they were obliged to undertake good faith efforts to identify and delete those unsupported and invalid diagnoses.  Moreover, Defendants knew that they were obligated to "look both ways" at the results of their chart reviews and delete unsupported provider-reported diagnoses.  Nonetheless, Defendants conducted millions of medical record reviews as part of their revenue-generating national Chart Review Program, turned a blind eye to the negative results of those reviews showing hundreds of thousands of unsupported diagnoses that the UHG Managing Defendants had previously submitted to Medicare on behalf of the Defendant MA Organizations, and knowingly and improperly avoided repaying Medicare for at least over a billion dollars in risk adjustment payments to which they were not entitled.  Similarly, Defendants disregarded information from their RACCR Program about invalid coding practices by their incentivized capitated and gain-sharing providers and failed to repay Medicare for additional erroneous payments based on their invalid diagnoses.

## I.   Defendants Knew That Many Provider-Reported Diagnoses Were Invalid And That They Were Obligated To Undertake Good Faith Efforts To Identify And Delete Them

123.   As part of its 2005 acquisition of PacifiCare, UHG retained the PacifiCare employees with knowledge about the requirements for the submission of valid diagnoses, the obligation to delete invalid diagnoses, and the various problems relating to the invalidity of provider-reported diagnoses.  UHG retained these PacifiCare employees to continue performing work relating to risk adjustment.

124.   For example, Jeffrey Dumcum, Stephanie Will, Pam Holt, and Pam Leal were all former PacifiCare employees knowledgeable about risk adjustment and were retained by

4624

UHG to run its risk adjustment programs. Dumcum had been PacifiCare's Chief Financial Officer and, after the acquisition, became Vice President of Finance for Ovations. Will had been a Principal Analyst at PacifiCare who designed risk adjustment programs and, after the acquisition, joined Ovations as the Program Manager for the national Chart Review Program. Holt had been a Project Manager for Network Management Operations at PacifiCare and, after the acquisition, became the Manager of Provider Outreach for the Risk Adjustment Program. Leal had been an Executive Director of Provider Training and Development for PacifiCare and, after the acquisition, became a Regional Vice President for Market Consultation.

125.   From 2005 to 2007, Dumcum, Will, Holt, and Leal worked at the PacifiCare office in the Central District of California. Thereafter, Holt and Leal continued to work for Ingenix at its office in the Central District of California.

126.   The PacifiCare employees obtained their knowledge about risk adjustment from various sources, including CMS. Will attended CMS training programs focused on the Risk Adjustment Participant Guide and was also familiar with the content of this document based on her reading of it. Prior to the acquisition, PacifiCare also conducted various risk adjustment programs, including a chart review program, and provided training to healthcare professionals concerning medical record documentation and diagnosis coding.

127.   In addition, PacifiCare had been a member of an industry association called the Industry Collaboration Effort ("ICE") and ICE's Risk Adjustment Data Acquisition & Reporting ("RADAR") team. ICE was an association of MA Organizations and provider groups in California that served beneficiaries in MA Plans. ICE focused on risk adjustment issues and other matters of particular importance to the managed care industry. After PacifiCare became part of UHG, the PacifiCare employees continued to participate in ICE and its RADAR team. During the 2006 and 2007 time period (perhaps longer), Leal was the President and a member of the Board of Directors of ICE. Leal continued in a leadership role at ICE until 2013. During that time period, she worked for

4625

Ingenix and then Optum.  At the ICE Annual Conferences in 2006 and 2007, Leal made

presentations about "[p]rovider coding [being] highly inaccurate and incomplete," CMS

reviews showing that 30 percent of the provider-reported diagnoses were not supported

by medical records, and the use of chart reviews to generate larger risk adjustment

payments.  Furthermore, throughout the time period relevant to this Amended

Complaint, one or more of the Defendants were members of ICE and, at various times,

employees of Ingenix, Optum, UnitedHealthcare of California, and UnitedHealthcare

participated in the activities of the RADAR team.  As reflected in the meeting minutes of

the RADAR team, these Defendants included Ingenix (*e.g.,* August 2011),

UnitedHealthcare of California (*e.g.,* March 2014), Optum (*e.g.,* November 2014, June

2015, and March 2016), and UnitedHealthcare (*e.g.,* June 2015 and March 2016).

128.   The former PacifiCare employees knew that a beneficiary's medical record was

the "source of truth" for purposes of submitting valid diagnostic data to the MA Program

for risk adjustment payments.  For example, in a March 2006 email, Will acknowledged

that diagnosis data had to be "fully supported by medical record documentation."  As

another example, in 2008, Ingenix sent notices to capitated provider groups in California

instructing them that they should only report to Ingenix "diagnosis codes that can be

supported by the documentation in the medical record."  Furthermore, according to

Randall Myers at Ingenix, these providers, when they submitted diagnoses through a

web portal referred to as the Alternate Submission Method, were required to attest that

their diagnostic data complied with CMS requirements for the submission of valid data.

Other employees of the UHG Managing Defendants also understood these requirements,

including Patty Brennan who, when she was Director of Retrospective Services

(including chart review services) at Ingenix and then Optum, acknowledged that CMS'

Risk Adjustment Participant Guide established that the medical record was the "one

source of truth" for MA Organizations to ensure that they were submitting accurate data

to CMS for risk adjustment payments.  In addition, Kimberly Halva, the Compliance

4626

Officer for UnitedHealthcare Medicare & Retirement from 2010 to 2013, was aware that "[a] medical record must substantiate all diagnostic information provided to CMS."

129.   In addition, those Defendants and their employees involved in ICE and its RADAR team knew or should have known that enrollees' medical records are the "source of truth" based on guidance documents issued by the RADAR team about this fundamental payment requirement.  In 2010, ICE's RADAR team issued a guidance document highlighting that CMS requires complete and accurate documentation of medical conditions for the submission of diagnoses, that only diagnoses depicting documented medical conditions which required or affected patient care are valid, and that diagnosis codes cannot be submitted "until [the provider] is sure the patient has the condition."  The ICE RADAR Physician Education Work Group also issued a similar document called "Best Practices for Risk Adjustment," which advised that "ICD-9-CM coding requires documentation of the diagnosis in the medical record as well as evaluation and management.  Documentation should indicate how this diagnosis impacted this episode of care."  In 2012, ICE also issued a Medical Record Documentation Tips sheet, which once again warned MA Organizations and providers not to code diagnoses that are probable, suspected, questionable, or "working diagnoses," and also not to code diagnoses when medical records use "other similar terms indicating uncertainty."  More recently, in 2013, ICE issued a "Documentation Newsletter" that repeated earlier advice and also cautioned that "[**c]oding guidelines prohibit coders from making assumptions**" regarding whether a diagnosis is or is not substantiated by a patient's medical record.  (Emphasis in the original.)  That is, the medical record must "clearly reflect" the medical condition.

130.   The former PacifiCare employees also were aware that provider-reported diagnoses often did not comply with CMS requirements and were often inconsistent with the information in their patients' medical records.  According to Dumcum, when he was the Chief Financial Officer of PacifiCare, he and others there knew "in Medicare Advantage that the claims did not always match the medical record documentation.  So

4627

… we were concerned that it should be a place that we try to improve, that we try to educate and try to identify things to make that better." In addition, Will, Holt and other former PacifiCare employees were aware of common diagnosis coding errors made by providers. They learned of these problems from PacifiCare employees working in the field with physicians, reports of physician-coding trends, and reports from PacifiCare-employed certified coders. For example, a June 2003 PacifiCare PowerPoint Presentation by Will, Holt, and other PacifiCare employees identified diabetes as a medical condition that was often miscoded.

131. In 2005, the PacifiCare employees, including Dumcum, Will, Leal, and Holt, were also aware of a data validation review conducted by the Government of diagnosis codes previously submitted for medical encounters that occurred in 2003 (*i.e.*, encounters with 2003 dates of service). The PacifiCare employees were aware that the results of CMS' medical record reviews showed that approximately 30 percent of the provider-reported diagnoses were invalid and, after UHG acquired PacifiCare, Dumcum, Will, and Leal shared this information with other individuals who worked for various UHG Managing Defendants such as Jerry Knutson, Lee Valenta, Cynthia Polich, Relator Poehling, Paul Bihm, Janice Redmond, and Carol Thompson. Furthermore, the results from this CMS review also put the former PacifiCare employees on notice that providers were reporting codes that were just plain wrong, were coded from laboratory reports, and did not reflect current medical conditions – all of which was in breach of the fundamental rules that the diagnosis codes submitted to Medicare must be accurate and truthful, based on face-to-face visits (*e.g.*, not lab reports), reflect current conditions, and otherwise be valid.

132. Moreover, the former PacifiCare employees were aware that MA Organizations are not entitled to risk adjustment payments based on diagnoses that are unsupported by the beneficiaries' medical records, and that CMS expected health plans to delete incorrect diagnoses submitted for risk adjustment payments. They also knew, based on their experiences at PacifiCare, that CMS could audit the diagnoses MA Organizations submitted for risk adjustment payments.

4628

133.   In fact, in April 2005, Holt participated in a "CMS data validation call" in which CMS explained that it expected MA Organizations to correct invalid diagnoses submitted to Medicare for risk adjustment payments.  Holt reported this to Will and suggested creating a spreadsheet to give to providers for providers to use to inform PacifiCare of invalid diagnoses and allow PacifiCare to delete them.  As part of this discussion, Leal explained to Will that, if provider groups "during their chart audits find that physicians have documented rule-out or history-of but coded as if the member had [the medical condition,] they want to be able to fix it so when we get audited again by CMS it is fixed."  Leal further stated that "[o]bviously, as issues are identified there will need to be education to physician[s] on changing their practice of coding incorrectly (as you remember Dr. Norman mentioned habits doctors have, that we will need to break)."  Holt agreed that provider groups

- need something 'standardized and formalized' so they know what fields to report if and when they find any obvious discrepancies.  They are the type of thing that Pam [Leal] stated in her email below, the code of the actual disease when the documentation clearly only supports 'history of' or 'suspected' (and then it was not confirmed), or an obvious miscode; the things that Melissa [Ferron] is finding in the data validation.  Provider groups will find this during their own chart audits.
- and CMS "was very firm that we need to be doing this, so I would expect [CMS] will look for our process when they get around to more formally auditing our oversight of this process."

134.   In addition, in August 2006, a year after the April 2005 CMS validation call, Will and Holt knew that CMS had confirmed, in responses to questions about its RADV audits, that it would invalidate diagnoses submitted to Medicare that were not supported by the beneficiaries' medical records.

135.   After PacifiCare became part of UHG, the former PacifiCare employees began educating others at the UHG Managing Defendants about risk adjustment.  In particular, Dumcum made a series of presentations to various employees, including senior

4629

management employees of the UHG Managing Defendants such as Ovations' Jerry Knutson, where he explained that "[p]rovider coding is highly inaccurate and incomplete" and that "more than 30% of coded conditions are not supported by CMS validation findings." Other senior executives or managers of the UHG Managing Defendants that were recipients of the slide presentation with this information included Cynthia Polich at Ovations (who was emailed a copy of the presentation in March 2007), Lee Valenta at Ingenix (to whom Knutson emailed a copy of the presentation in May 2007), and Relator Poehling.

136. Furthermore, Defendants' own data revealed and confirmed problems with provider-reported diagnoses. In September 2006, Will, Holt, Leal, and others generated a list of providers that were outliers, which, at that time, they defined as providers with significantly above average patient risk scores. This information made them "question the validity" of these providers' codes. These provider groups included Healthcare Partners Medical Group, Edinger Medical Group, WellMed, and other incentivized provider groups which, based on subsequent reviews conducted as part of the RACCR Program, submitted significant numbers of invalid diagnoses. After 2006, Ingenix and then Optum continued to track risk scores of beneficiaries cared for by various provider groups and saw risk scores they considered to be outliers. They also generated prevalence reports that identified the provider groups with abnormally high average risk scores. These prevalence reports also identified specific medical conditions (or categories of medical conditions, that is, HCCs) that were reported by various provider groups at rates significantly above average.

137. In 2007, Dumcum and other former PacifiCare employees were given the responsibility for creating and then managing a risk adjustment service group within Ingenix, the predecessor to Optum. This enabled UHG to move the risk adjustment operations to Ingenix. Ovations and later UnitedHealthcare became Ingenix's internal "client." This move also enabled Ingenix to offer its risk adjustment services to other MA Organizations which it referred to as its "commercial clients." Dumcum became

77

4630

Senior Vice President and Will became Vice President of Risk Adjustment Programs for this new risk adjustment service group within Ingenix.  After 2007, Ingenix hired additional employees and increased the size of the Ingenix risk adjustment group, including the size of the group in this District.  The Ingenix risk adjustment group in this District was responsible for, among other things, risk adjustment data/diagnosis codes submissions, risk adjustment data remediation and the deletion of invalid diagnoses, risk adjustment data analytics and finance (*e.g.*, tracking the results and financial impact of the Chart Review and Claims Verification Programs), provider outreach and programs relating to risk adjustment, and the Chart Review Program operations.

138.   In January 2007, Dumcum made a presentation in which he stated that the validation of provider-reported diagnosis codes had to improve.  Dumcum knew that providers were reporting unsupported diagnoses and that both fee-for-service and capitated providers needed to improve their validation rates.

139.   Prior to this, in 2006, Dumcum, Will, Holt and others had already participated in discussions about conducting an Internal Data Validation ("IDV") Program focused on the validity of provider-reported diagnoses.  The purpose of the IDV Program was to determine whether the physicians' medical records supported the diagnoses they reported to the UHG Managing Defendants, who in turn submitted the diagnoses to Medicare for risk adjustment payments.

140.   In February 2007, Will, Holt, and Patricia Rasmussen, Manager of Encounter Submissions at Ingenix, were informed of specific provider-reported codes that were reported based on "faulty coding."  For example, Sharp Community Medical Group in California submitted a diagnosis tracking to HCC 155 (Major Head Injury) but there was "no documentation to support intracranial injury."  Likewise, Monarch/South Coast, located in this District, submitted a diagnosis tracking to HCC 17 but there was "[n]o documentation of diabetes or diabetic complication[.]"  Will, Holt, and Rasmussen were requested to remove, or delete, these codes before the final submission deadline but Rasmussen replied that they did not have resources and could not do this.

141.   In addition, UHG Managing Defendants knew that a significant percentage of provider-reported diagnoses were invalid based on audits performed by CMS and similar internal audits or reviews that they performed.  For example, one such audit was performed on diagnoses submitted for 2004 date of service medical encounters (*e.g.* physician office visits) that mapped to 1,231 HCCs.  The results were reported in a September 2007 Risk Adjustment Programs presentation sent by Dumcum to Relator Poehling.  The presentation showed that no support was found in the beneficiaries' medical records for 32 percent of the HCCs at issue.  That is, the records did not confirm the diagnoses mapping to 32 percent of the HCCs under review.  The same presentation showed the results of another audit of diagnoses submitted for 2005 date of service medical encounters that mapped to 1,160 HCCs.  It showed that, as of the date of the presentation, 18 percent of the HCCs were "NOT supported" and another 8 percent were most likely not supported.

142.   In October 2007, Ingenix also emphasized the fact that more than 30 percent of provider-reported diagnoses were unsupported by the beneficiaries' medical records as a selling point for the risk adjustment services, including data validation services, that it marketed to another MA Organization.

143.   During the 2007 and 2008 time period, Ingenix implemented the IDV Program. The program focused on physicians in California, Missouri, Texas, and Washington who reported more than three times the number of diagnoses than the average.  The program was very small in scope, but the results confirmed that providers reported many invalid diagnoses.  In January 2008, the results for medical encounters in 2006 showed a 30 percent invalidation rate.  That is, approximately 30 percent of provider-reported diagnoses were invalid, which was consistent with what the PacifiCare employees had known since at least 2005.  In January 2008, these results were sent to Will, Holt, and Rasmussen.

144.   Accordingly, by at least 2005, the former PacifiCare employees Dumcum, Will, Holt, and Leal knew that at least 30 percent of provider-reported diagnoses were not

79

supported by the beneficiaries' medical records; by at least 2007, Dumcum had imparted this knowledge to others at the UHG Managing Defendants; and, by at least 2008, the UHG Managing Defendants' own medical record reviews had confirmed that fact.

145.    Additional evidence demonstrates that, by at least the 2007 and 2008 time period, the invalidity of provider-reported diagnoses was an ongoing concern. For example, in September 2008, one of United's own actuarial consulting subsidiaries, Reden & Anders, made a presentation that identified unsupported diagnosis codes as a "Potential Compliance Risk Area" and warned that "[t]here is no such thing as minimally compliant." Ovations' President Cynthia Polich possessed a copy of this presentation.

146.    In addition, by at least 2008, the former PacifiCare employees, then at Ingenix, had also imparted their knowledge that the UHG Managing Defendants were obligated to identify and delete invalid provider-reported diagnoses. For example, a January 2008 training guide entitled "CMS-HCC Risk Adjustment Training Module," created by Ingenix personnel for provider outreach, recognized that it is the accuracy of medical record documentation and coding that supports entitlement to risk adjusted payments from the Medicare Program. The presentation recognized that accurate medical record documentation is key to accurate risk adjustment payments and necessary to validate payments. In addition, in June 2008 emails, Patty Brennan, the Compliance Manager for Ingenix, and Karen Wagor, a Senior Coder and National Trainer for Ingenix, both of whom worked at Ingenix's Santa Ana office, recognized that Defendant MA Organizations were not entitled to payment based on diagnoses that were not validated by beneficiaries' medical records and that those entities risked losing revenue based on invalid diagnoses: "We could be at risk of losing $$ if there isn't another piece in the documentation before or after this date of service for the HCC if it can't be verified with the most accurate validation. **The medical record must support all diagnoses coded for the date of service and must be able to** <u>stand alone</u> **for an audit on those reported diagnosis codes.**" (Emphasis in the original.)

4633

147.   Moreover, the UHG Managing Defendants knew they were required to effectively address compliance issues.  For example, a presentation from November 2009 entitled "UnitedHealth Group – Audit Management Overview," made at a Medicare Compliance Oversight Committee meeting, expressly acknowledged the legal obligation to implement an effective compliance program and stated that "[i]n order to have an effective Compliance Program, an organization must have a robust internal monitoring and auditing process in place."  In 2009, Jenny O'Brien, the Chief Medicare Compliance Officer, was a Co-Chair of the Medicare Compliance Oversight Committee, a position she held until approximately 2015.  During this time period, O'Brien worked for Ovations and then UnitedHealthcare Medicare & Retirement.  Her Co-Chair was the Chief Executive Officer or another officer of Ovations and then UnitedHealthcare Medicare & Retirement.  In the 2010-2011 time frame, the Co-Chair was Tom Paul.  And, as another example, in approximately May 2010, Larry Renfro, who was then the Chief Executive Officer of both the Public & Senior Market Group (PSMG) and Defendant Ovations, and David Orbuch, who was then the Executive Vice President and Chief Compliance Officer of PSMG, met with CMS regarding their Medicare compliance program and represented to CMS that they would "meet and exceed" CMS' expectations.

148.   Kimberly Halva, UnitedHealth Medicare & Retirement's Finance Compliance Officer from 2010 to 2013, also was keenly aware that the validity of provider-reported diagnoses needed to be addressed.  Halva understood that MA Organizations had an obligation to identify and delete diagnoses that were not supported by its beneficiaries' medical records.  (Halva was also familiar with the Risk Adjustment Participants Guide.)  In November 2010, she sent a memorandum to Relator Poehling with recommendations for compliance problems focused on identifying and deleting invalid provider-reported diagnoses.  In January 2011, she sent Relator Poehling "a few suggestions for risk mitigation type programs UnitedHealthcare Medicare and Retirement could take to more equally distribute resources between programs dedicated to improper coding or billing

4634

and those focused on identifying additional reimbursement opportunities through improved coding/documentation." One of Halva's suggestions was for UnitedHealthcare to perform "General Coding Accuracy Audits," which were essentially "look both ways" medical record reviews that would identify both incomplete coding (which she referred to as "under-coding") and inaccurate coding (which she referred to as "over-coding"). Another of her suggestions was for UnitedHealthcare Medicare & Retirement to "Specifically Identify Traditionally Over-Coded or Incorrectly Coded Conditions," "such as stroke or COPD," and conduct medical record reviews to determine if those traditionally over-coded or incorrectly coded conditions could be validated. Halva and Scott Theisen, the Chief Financial Officer for UnitedHealthcare Medicare & Retirement from 2010 to 2013, were Co-Chairs of the UnitedHealthcare Medicare & Retirement Finance Compliance Oversight Committee, which was responsible for risk adjustment compliance issues. Halva also reported to Theisen as well as Jennifer O'Brien.

149. In or around early 2009, Deloitte & Touche, which served as the public accounting firm for UHG (which filed a consolidated financial statement for all of its businesses), sent a memo to Ovations regarding an audit it performed to investigate the appropriateness of an accounting treatment used by Ovations. In the audit, Deloitte & Touche "looked both ways" when reviewing MA Program beneficiaries' medical records because, according to Auditor Bill Nepple, that was the only way to achieve a full and complete picture of a beneficiary's health status. The results of this "look both ways" audit were communicated to Relator Poehling in February 2009 and he was aware that both ADDS and DELETES resulted from the audit.

150. In addition, as part of their compliance efforts, the UHG Managing Defendants had, since at least 2008, required financially-incentivized capitated provider groups to submit attestations to them that certified that the diagnoses that they reported to the UHG Managing Defendants were valid and met CMS's requirements. For example, in or around 2008, Ingenix sent notices to these providers describing these "**CMS DATA**

4635

**ACCEPTANCE GUIDELINES**,” and stating that **“[a]ll diagnoses must be documented at the time of the patient encounter or after receipt and confirmation of the diagnosis (i.e. Lab or Radiology report) and must be documented in the medical record**,” and **“[o]nly report diagnosis codes that can be supported by the documentation in the medical record**,” and **“[a]ll diagnosis codes should be valid** . . . .” (Emphasis in the original.)

151. In 2010, Holt and Leal were a part of an email chain discussing California provider groups and risk adjustment data validation. Based on Holt’s involvement with ICE’s RADAR team (and possibly other sources), Holt noted that California provider groups are “acutely aware of the importance of data validation” and that risk adjustment data validation was “a subject discussed frequently at the ICE meetings.” In the same email chain, Holt also assured Relator Poehling that provider groups in California would understand the importance of CMS’s RADV audits.

152. In November 2009, the results of an IDV audit for one of Ingenix’s commercial clients, another company that owned and operated MA Plans, further confirmed what the UHG Managing Defendants already knew, that is, that providers were reporting invalid diagnoses at an alarming rate. The results of the audit showed a 45 percent invalidation rate. Providers in that commercial client’s plans were providers for beneficiaries in one or more of the Defendant MA Organizations’ Plans.

153. In mid-2010, the results of IDV reviews once again confirmed an ongoing problem with the validity of provider-reported diagnoses. The results showed an invalidation rate of approximately 40 percent for California provider groups which cared for beneficiaries enrolled in one of more UHG MA Plans. Higher than the 30 percent invalidation rate reported in 2005, these results confirmed that a significant percentage of provider-reported diagnoses were invalid. In mid-2010, these results were shared with Relator Poehling, Keith Dobbins (an attorney for one of the UHG Managing Defendants), Stephanie Will, Patty Brennan, Ronnie Grower, among other individuals working for the UHG Managing Defendants.

4636

154.   Also, in June 2010, an Ingenix Health Reform Implementation (HRI) Report prepared for UHG's then Chief Executive Officer, Steve Hemsley, and other members of the "UHG executive team" identified compliance as an important issue of immediate concern to UHG, particularly compliance with the FCA.  This report was sent to Dumcum, Knutson, Valenta, Andy Slavitt, Timothy Wicks, and other individuals working for the UHG Managing Defendants at the time.

155.   Furthermore, in 2010, additional Government audits confirmed the problem with invalid provider-reported diagnoses.  In March 2010, the HHS Office of Inspector General ("OIG") sent Jack Larsen, the Chief Financial Officer of Ovations, a draft report of an audit of the risk adjustment data that one of UHG's Texas MA Organizations, then called PacifiCare of Texas, submitted for payment year 2007.  In July 2010, OIG sent Thomas Paul, the Chief Executive Officer of Ovations, a draft report of an audit of the risk adjustment data that UHG's California MA Organization, then called PacifiCare of California, submitted for payment year 2007.  In the draft reports, the OIG concluded that the diagnoses for half the beneficiaries in the California audit and 44 percent of the beneficiaries in the Texas audit were invalid, and that both plans' practices were not effective for ensuring that the diagnoses they submitted to CMS complied with CMS requirements.  These draft OIG reports were described as a "top issue" in the third quarter 2010 Public & Senior Markets Group Medicare Compliance Program Overview for which Jennifer O'Brien was the Compliance Program Lead and Tom Paul was the Business Lead.  In May 2010, Paul sent OIG a response about its draft report relating to PacifiCare of Texas and, in October 2010, Paul (whose job title had then been changed to Chief Executive Officer of UnitedHealthcare Medicare & Retirement) sent OIG a response about its draft report relating to PacifiCare of California. After consideration of Paul's responses to the draft audit reports, the OIG issued final reports concluding that the health risk scores for 45 percent of the beneficiaries in the California audit and 43 percent of the beneficiaries in the Texas audit were invalid because the diagnoses were not supported by the beneficiaries' medical records or were uncertain or unconfirmed

diagnoses. In both the draft and final reports, the OIG provided examples of unsupported diagnoses. The OIG also concluded that the MA Organizations should refund the overpayments due to these invalid diagnoses. In addition to Larsen and Paul, other individuals who were aware of the OIG audit reports during the 2010 and 2011 time period included Scott Theisen, Jenny O'Brien, Kimberly Halva, Joseph Keen, and Jeffrey Dumcum.

156. The results of RADV audits were also of concern to UnitedHealthcare. The third quarter 2010 Public & Senior Markets Group Medicare Compliance Program Overview (for which Jennifer O'Brien was the Compliance Program Lead and Tom Paul was the Business Lead) also stated that CMS was conducting RADV audits of three of the Defendant MA Organizations. Then, when CMS announced in February 2011 that it planned to extrapolate the sample audit results, Charles Hanson, the then Vice President of Finance and Underwriting at UnitedHealthcare Medicare & Retirement, left a voicemail message for Relator Poehling stating: "I haven't been close to this for . . . three or four years now probably, but back that far I know the results of our RADV audits were concerning, to say the least. That we had significant . . . errors or undocumented RAFs [*i.e.*, undocumented diagnoses] in our claim submissions." He asked Poehling: "I'm sure we're careful about how we communicate these findings, but can you give me a sense of kind of more recent RADV audits, what impact could this have? So just generally, are we still sort of, I'll say as bad as we were a few years ago? . . . So, what's the potential impact on revenue of extrapolating these RADV audit findings . . . ?"

157. Because of the problem with provider-reported diagnoses, in 2010, the UHG Managing Defendants started the RACCR Program, as described more fully at paragraphs 239-292 below, and Claims Verification Program, as described more fully at paragraphs 196-234 below. Mary Hammond, one of the UnitedHealthcare Medicare & Retirement employees who oversaw the RACCR Program, described it as "an important part of Medicare & Retirement's efforts to meet CMS requirements to submit accurate

4638

risk adjustment data." The Claims Verification Program was also supposed to satisfy this basic payment rule.

158. However, the major effect of the Claims Verification and RACCR Programs was that they highlighted that a significant amount of the risk adjustment payments claimed by the UHG Managing Defendants on behalf of the Defendant MA Organizations and paid to the Defendant MA Organizations by the Medicare Program were unsupported and invalidated by beneficiaries' medical records. For instance, as explained in more detail in paragraph 206 below, in December 2010, the results of the first pilot phase (Phase I) of the CV Program showed that provider-reported diagnoses were unsupported for over 50 percent of the medical records reviewed. Over a year later, as explained in more detail in paragraph 208 below, Optum had completed the second pilot phase (Phase II) of the CV Program on 17,398 charts and the results were even more striking. Phase II identified 4,786 invalid diagnoses to be deleted, which was greater than the number of additional diagnoses (ADDS) identified based reviews of the same medical records. In February 2012, Dumcum, who was responsible for the Claims Verification Program, met with Relator Poehling and Theisen, who was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement at that time, and reported: "I'm deleting as much as I'm adding at the end of the day. And I don't know if—you know, what I want to do." He also stated: "we're getting more and more red here," and that Claims Verification "eats in very substantially" to the revenue from ADDS from chart reviews.

159. In addition, as explained in more detail below, by February 2012, there were "5,519 bad codes" that were "identified and deleted" as the result of RACCR reviews of the medical records for only 13,451 beneficiaries. On a beneficiary basis, the results showed more than a 40 percent invalidation rate.

160. Over time, the UHG Managing Defendants also obtained more information about incorrect diagnosis coding by providers, some of which information confirmed what had been known for years. For example, by at least 2013, Tracey Bradberry, an Ingenix and then Optum employee who was a certified coder, was aware of various reasons for

86

4639

invalid provider-reported diagnoses, including, for example, the "[c]linical findings and/or treatment does not support the diagnosis" and "[n]ot a current condition." In addition, in March of 2014, Melissa Ferron, a coding consultant, sent Optum employee Christopher Webb a list identifying various HCC codes and diagnosis codes that were unlikely to validate based on medical record reviews because providers frequently used the codes incorrectly. These included HCCs 17 (diabetes with acute complications), 96 (specified heart arrhythmias), 104 (monoplegia, other paralytic syndromes), and 111 (chronic obstructive pulmonary disease).

161. More recently, other employees of the UHG Managing Defendants also have recognized the obligation to ensure the validity of diagnoses submitted for risk adjustment payments. They also understood that the obligation to correct invalid data provided to Medicare for risk adjustment payments. For example, in an April 2013 email, Marybeth Meyer, the Vice President of Operations for UnitedHealthcare Medicare & Retirement who succeeded Relator Poehling in managing the risk adjustment team for that group, stated that "as a Medicare Advantage Plan, if we become aware of a coding issue that impacted the revenue received from CMS for risk adjustment, we are obligated to investigate and correct the submissions to CMS." In response to Meyer's email, Halva, then Compliance Officer for UnitedHealthcare Medicare & Retirement, agreed. She also stated that "[w]e have an obligation to go back to CMS and correct submissions that impact the revenue received for risk adjustment purposes." Halva did not think that anything was wrong with the requirement that UnitedHealthcare Medicare & Retirement delete unsupported diagnoses. Moreover, she believed that "arguably" this obligation existed for ten years because of the ten-year statute of limitation for the Government to pursue FCA claims against entities that knowingly fail to delete unsupported diagnoses.

162. As another example, in February 2014, Melissa Sedor who worked in UnitedHealthcare Medicare & Retirement's controller's office, sent an email stating that "it is our responsibility to submit accurate records to CMS. Even if the provider submits

87

4640

1    bad data to us, the responsibility is on us to be submitting the correct data."  Sedor

2    further explained that this was the reason United implemented compliance programs like

3    RACCR and Claims Verification.  Sedor's email was sent to others at UnitedHealthcare,

4    including Marybeth Meyer and William Hnath.

5    163.  Finally, other employees in addition to Halva were aware of the potential FCA

6    liability for submitting invalid diagnoses to CMS for risk adjustment payments or for

7    failing to delete them.  For example, in 2010, Carol Thompson, then National Manager

8    for Ingenix's Risk Adjustment Programs who worked at the Ingenix office in this

9    District, provided the following reason as justification for funding for a coding vendor

10   who was assisting the UHG Managing Defendants with a CMS RADV audit:  "Politics

11   and Congressional scrutiny put an exclamation point on our need to demonstrate that the

12   data submitted to CMS for risk adjustment payment is valid.  Data that drives payment

13   from the government can be reviewed to determine if the claims are 'valid.'  Improper

14   claims submission can fall under the False Claims Act."  Also, as alleged more fully

15   below, Dumcum informed Relator Poehling that the FCA was a consideration in

16   deciding whether the UHG Managing Defendants should implement the Claims

17   Verification Program and "look both ways" at the results of their Chart Review Program.

18        **II.     Chart Reviews and Claims Verification**

19             **A.     United's "Look One Way" Chart Review Program**

20   164.  Over the last decade, Defendants have obtained billions of dollars of risk

21   adjustment payments from Medicare from its national Chart Review Program because

22   they only looked one way at the results of their coders' chart reviews.  As part of this

23   program, the coders were instructed to perform "blind" reviews of the beneficiaries'

24   medical records.  That is, the coders did not know which, if any, diagnoses had been

25   reported by the providers who treated the beneficiaries and created the medical records.

26   Thus, rather than confirming diagnoses already reported by the providers or identifying

27   only additional diagnoses supported by the records, the coders were instructed to look

28   for all medical conditions purportedly documented in the records, record all diagnosis

88

4641

codes identifying those conditions, and give all of those codes to the UHG Managing Defendants. But, the UHG Managing Defendants selectively utilized results of these chart reviews – that is, the coders' list of diagnosis codes – for the sole purpose of identifying diagnosis codes that the providers had not reported and submitting ADDS for additional risk adjustment payments. They did not utilize the coders' lists of diagnosis codes to determine if the providers had reported codes that were not supported by their own medical records. If the UHG Managing Defendants had looked both ways and deleted these unsupported and, thus, invalid provider-reported codes, their national Chart Review Program would have been far less lucrative.

165.   The UHG Managing Defendants' national Chart Review Program was their largest risk adjustment revenue-generating program. This program was started in 2005 as an outgrowth of the chart review program that PacifiCare was already conducting. Dumcum, Will, and other former PacifiCare employees became key participants in designing, implementing, and managing the United Managing Defendants' revenue-generating national Chart Review Program. Will was the Program Manager for the program.

166.   During the first few years of the program, hundreds of thousands of charts were reviewed each year in order to mine them for additional diagnosis codes. In 2008, The Coding Source ("TCS"), a chart review/diagnosis coding vendor retained by Ingenix, reported to Carol Thompson at Ingenix that "[s]ince 2005, TCS has partnered with PacifiCare-United and Ingenix to support your HHC initiatives. TCS has successfully completed 460,000 chart reviews for multiple United regions."

167.   In 2009, the UHG Managing Defendants significantly expanded the size of the national Chart Review Program by providing Ingenix with the funds to acquire a coding vendor called AIM Healthcare Services, Inc. and integrating Ingenix's operations in Santa Ana, California, and the AIM coding operations in Tennessee, and by providing Ingenix with the funds to develop an in-house chart review computer database system called ChartSync so that Ingenix's in-house coders and third-party coding vendors could

4642

electronically review medical records and electronically record the coding results of their reviews. At or about the same time, the UHG Managing Defendants also expanded the size of the Chart Review Program by providing Ingenix with the funds to open offices in foreign countries (the Philippines and India) where it could hire foreign workers to review beneficiaries' medical records in order to try to find additional diagnosis codes.

168. Due to the increased resources devoted to the Chart Review Program, the number of medical records reviewed in the hunt for additional codes significantly increased over time. For the first few years of the Chart Review Program, between 500,000 and 600,000 charts were reviewed each year. According to a presentation by Dumcum, 600,000 charts were reviewed in 2006 and, as of September 21, 2007, 400,000 charts had been reviewed so far that year with 200,000 charts remaining for review during the fourth quarter of 2007.

169. By 2010, the number of chart reviews had increased substantially to approximately 850,000 charts for that year. For 2011 to 2014, approximately 1.5 million charts were reviewed each year. The Government believes that, after 2014, the national Chart Review Program was most likely similar in size.

170. As part of this national Chart Review Program, the UHG Managing Defendants focused primarily on the review of charts from providers paid on a fee-for-service basis. Ingenix and then Optum or their vendors obtained medical records from thousands of these providers throughout the United States. They or their vendors sent these medical records to coders that they employed in Tennessee, India, and the Philippines. They also hired coding vendors to review these medical records. Those vendors were located in various locations within and outside of the United States.

171. Physician groups owned by one or more of the UHG Managing Defendants also had chart review programs. WellMed had a group called DataRaps that conducted reviews of its physicians' medical records for patients in one or more Defendant MA Organizations' MA plans. Southwest Medical Associates conducted some of its own

4643

reviews though it also relied on Ingenix's/Optum's coding operations in Tennessee and coding vendors for its chart reviews.

172.   In 2006, the Defendant MA Organizations obtained approximately $270 million in additional risk adjustment payments from the ADDS that were submitted on their behalf by the UHG Managing Defendants based on the national Chart Review Program.  The return on investment was substantial (approximately $250 million) as it cost only approximately $18 million to review the charts in 2006.

173.   Not unexpectedly, as the number of medical records reviewed significantly increased over the years, so did risk adjustment payments from ADDS based on the national Chart Review Program.  Defendant MA Organizations received approximately $426 million in additional risk adjustment payments from ADDs the UHG Managing Defendants submitted to Medicare based on the medical record reviews conducted as part of the Chart Review Program for the 2011 payment year, approximately $455 million for the 2012 payment year, approximately $758 million for the 2013 payment year, and approximately $882 million for the 2014 payment year.

174.   For payment years 2010 to 2015 combined, Defendant MA Organizations obtained over $3 billion in additional risk adjustment payments from Medicare due to the ADDs the UHG Managing Defendants submitted on their behalf based on medical record reviews conducted as part of the national Chart Review Program.

175.   United's Chart Review Program was conducted according to an annual cycle.  For example, in the spring of 2012, Optum started its collection and review of medical records relating to medical encounters in 2011 (*i.e.*, with 2011 dates of service).  These efforts then intensified through the remainder of the year until the final deadline for submitting diagnosis codes to Medicare for payment year 2012, which was February 15, 2013.

176.   Prior to the start of each annual cycle, the UHG Managing Defendants' senior executives set a revenue target for the program.  After chart reviews started, these senior executives then closely monitored the progress of the program and, if the forecast did not

91

look like the program would achieve the revenue target, they made changes to the diagnostic coding being performed by the coders. For instance, when UnitedHealthcare Medicare & Retirement and Optum were not achieving the return on investment expected from chart reviews for the 2012 payment year, they "liberalized" coding policies and engaged in a "Recode Project" consisting of re-reviewing 900,000 charts that had already been mined once for additional diagnoses. They liberalized the coding policies to enable the coders to identify more diagnosis codes purportedly supported by the beneficiaries' medical records. In this second-round review, the coders did identify more codes purportedly supported by the records based on the liberalized coding policies, and UnitedHealthcare Medicare & Retirement and Optum submitted those codes to Medicare for additional risk adjustment payments. Scott Theisen at UnitedHealthcare Medicare & Retirement and Karen Erickson and Jon Bird at Optum were involved in this "Recode Project."

177.   Despite their aggressive coding to submit as many ADDS as possible to meet their annual revenue targets for their Chart Review Program, officers of UnitedHealthcare Medicare & Retirement attested to the validity of *all* of these ADDS in the annual Risk Adjustment Attestations submitted to Medicare and various senior management employees of both UnitedHealthcare Medicare & Retirement and Optum attested to the validity of *all* of these ADDS in approving the annual Risk Adjustment Attestations submitted to Medicare. *See infra* at paragraphs 296-308 (describing this internal approval process). If the results of these chart reviews were so reliable that they could attest to the validity of all of the ADDS, then the results were of equal reliability for them to have deleted all previously-submitted diagnoses invalidated by the reviews. To the extent that Defendants call into question the results of their own chart reviews in *not* finding support for and *not* validating hundreds of thousands of diagnoses, they also call into question the overall reliability of the chart reviews and validity of the ADDS. Under those circumstances, Defendants acted with reckless disregard for the truth by submitting the ADDS and attesting to their validity, knowing they were not entitled to

92

4645

payments by Medicare based on such unreliable data and the United States is entitled to recover those payments in this action.

**B.  United Knew It Was Obligated To Look Both Ways At The Results Of Its Chart Reviews And Make DELETES As Well As ADDS**

178.   By 2008, Relator Poehling and others began to question the practice of ignoring the negative results of blind chart reviews invalidating many provider-reported diagnoses.  In May 2008, Relator Poehling participated in a meeting in which he discussed this issue with Will.  She explained to Relator Poehling that, as part of the Chart Review Program, Ovations and Ingenix did not look at whether provider-reported diagnoses were not substantiated by the results of the coders' blind chart reviews.  Poehling and Will discussed the idea of changing this process, comparing the results of the blind chart reviews to the provider-reported diagnoses that Ovations and Ingenix had submitted to CMS, and deleting the unsupported diagnoses.

179.   Thereafter, the need to address problems with the diagnoses reported by providers continued to be an issue.  In March 2009, the question of how to address problems with diagnoses reported by fee-for-service providers arose during a discussion among Ingenix employees about the Internal Data Validation Program that Ingenix conducted for Ovations and the Defendant MA Organizations.  During that discussion, Ronnie Grower, Vice President of Market Consultation for Ingenix, noted that the Internal Data Validation Program excluded fee-for-service providers and questioned whether the UHG Managing Defendants would have another program to address diagnoses reported by fee-for-service providers given that "there are common coding errors that get reported across all providers."  In fact, other than its short-lived Claims Verification Program, the UHG Managing Defendants never had a medical record review program like the IDV or RACCR Programs to address the validity (or lack thereof) of diagnoses reported to it by its fee-for-service providers.

4646

180.   In 2009, these internal discussions continued.  In early April 2009, Relator Poehling, Dumcum, Will, Kimberly Halva, Janice Redmond (the Senior Vice President of Market Outreach for Ingenix's Risk Adjustment Group, who worked in Santa Ana, California) and others participated in a discussion about compliance risks, including provider over-coding (*i.e.*, invalid coding).  One of the items on the agenda that they discussed included "[a]uditing under & over coded conditions" as part of the chart review process, that is, "looking both ways."  A few weeks later, Relator Poehling again met with Will and others to discuss what to do when provider-reported diagnosis codes were inconsistent with the results of the coders' blind chart reviews of the providers' medical records.  At this second meeting in April 2009, the participants began to design a methodology for "looking both ways."  This led to subsequent discussions about creating a Claims Verification Program in order to look both ways at the coders' blind chart review results and make DELETES as well as ADDS.

181.   A few months later, in August 2009, in an internal presentation, Redmond noted that chart reviews only looked for additional revenue and suggested that the process should also include a certain amount of charts that are reviewed to determine the validity of providers' codes.  Redmond was concerned that providers paid on a fee-for-service basis were not being audited to validate their diagnoses.  Her presentation stated: "Known problematic codes are not audited across plans/providers raising the risk of error."

182.   In early 2010, Will sent Dumcum a presentation proposing the Claims Verification Program.  The stated goal of the program was to improve the accuracy of the diagnosis data that the UHG Managing Defendants submitted to CMS.  Will believed that Claims Verification would achieve this goal.

183.   In May 2010, Relator Poehling discussed the potential creation of the Claims Verification Program with Dumcum.  Dumcum referenced the Department of Justice's enforcement of the FCA as a consideration.

4647

184.   According to Halva, while she was the UnitedHealthcare Medicare & Retirement Compliance Officer from 2010 to 2013, the "general consensus from the [UnitedHealthcare Medicare & Retirement] point of view was . . . that any time we opened a chart we should be looking both ways."

185.   In the fall of 2010, after two years of discussions, senior executives such as Thomas Paul, Cynthia Polich, and Lee Valenta acknowledged that the UHG Managing Defendants should "look both ways" at the results of their blind chart reviews.  By at least that time, however, these Defendants should and could have compared the results of *all* chart reviews to the provider-reported diagnoses and deleted all of the invalid provider-reported diagnoses that they previously had submitted to the Medicare Program.  They also should and could have done this contemporaneously with submitting ADDS based on the same chart reviews.  Instead, they embarked on a very slow, phased development of their Claims Verification Program.  The senior executives authorized only a pilot test program to look at the negative results (*i.e.*, the results showing that provider-reported diagnoses were invalid) from only a very small sample of chart reviews.  Moreover, the Claims Verification process was designed to "save" – that is, avoid deleting – the provider-reported diagnoses invalidated by the blind chart reviews conducted as a part of the Chart Review Program.  The UHG Managing Defendants attempted to and sometimes did save some of these invalid codes by re-reviewing the beneficiaries' medical records, sometimes multiple times, to try to glean any support, even doubtful or ambiguous support, for the provider-reported diagnoses at issue.

186.   In August 2011, Relator Poehling made clear to Scott Theisen, then Chief Financial Officer of UnitedHealthcare Medicare & Retirement, that Poehling did not believe it was appropriate to conduct chart reviews unless and until Claims Verification was fully implemented and they were "looking both ways."  Theisen was one of the senior managers charged with making decisions regarding the implementation and design of the Claims Verification Program.  At that time, in an email to Paul Bihm at

95

4648

Optum, Poehling wrote: "You (and Scott [Theisen]) know where I stand on chart reviews without full CV in place … I wouldn't do them. Scott, though, is the decision maker . . . ." At that time, Bihm was an Optum Senior Vice President of Client Management and had responsibilities relating to the Chart Review Program.

187. In September 2011, Mary Hammond, Associate Director of Strategy and Support for UnitedHealthcare Medicare & Retirement's risk adjustment team, attended an industry conference in Washington, D.C. on risk adjustment. She reported that it was "great to get a perspective on what the activity in DC may mean for risk adjustment. More audit protection (*looking both ways compliance programs*), . . . and less reliance on chart review are the recommendations." (Emphasis added.)

188. In approximately November 2011, a "factual and unbiased" presentation was created for UHG's Chief Executive Officer Steve Hemsley, to provide him information about Optum's and its competitors' risk adjustment programs and other risk adjustment services. The presentation described "Compliance" as "the True Value of Claims Verification." The presentation further noted that the medical record is the "source of truth" and that looking at this "source of truth" had a negative revenue impact because comparing provider-reported diagnoses with the information in the providers' medical records resulted in having to delete some of their diagnoses. In December 2011, a copy of this presentation was sent by Karen Petroff, the Senior Vice President of Business Development at Optum, to Dumcum and Eric Murphy at Optum. Murphy was the President of Payer Solutions at Optum at the time.

189. In December 2012, Mike Jacobson, Program Business Analyst/Project Management at Optum, sent Patty Brennan an updated version of Optum's Business Vision Document for the marketing of the Claims Verification Program to commercial clients (*i.e.*, third-party MA Organizations). Under the section titled "Business Segment Strategies and Tactics," the document stated that "Optum has an industry compliance duty and responsibility to ensure that each HCC code is accurate and can be substantiated within the medical charts." Under the section titled "Competitive Analysis

96

4649

– Market Research," the document stated: "The marketplace will soon recognize the need and importance of performing due diligence on HCCs added during the chart review process but also verifying HCCs submitted to CMS can be substantiated within the medical chart according to CMS guidelines. For HCCs that cannot be substantiated within the medical chart, clients will need to perform the appropriate deletes in order to remain compliant with CMS guidelines." At this time, Optum had already begun marketing Claims Verification or "looking both ways" chart reviews to commercial clients.

190.   In September 2012, the Chief Executive Officer of OptumInsight, William Miller, informed the Government that the UHG Managing Defendants were developing a Claims Verification Program to ensure the accuracy of the diagnosis data they submitted to CMS and look both ways at the results of the chart reviews conducted as part of the Chart Review Program. Miller further stated that unsupported diagnoses would be deleted. The UHG Managing Defendants knew that this information was important to the Government. They led the Government to believe that they were not deliberately ignoring or recklessly disregarding the negative results of their Chart Review Program showing that numerous provider-reported diagnoses that they had submitted for payment were invalid.

191.   Until 2012, UnitedHealthcare Medicare and Retirement and Optum allowed coders to review medical records at providers' offices if the providers did not want to provide copies of their records. However, in 2012, in accordance with their acknowledgement of their obligation to "look both ways," these Defendants changed this policy and restricted on-site reviews because they needed copies of the charts in order to conduct Claims Verification. Mary Hammond, in an April 2012 email, explained this decision: "M&R has made a decision on the chart reviews where providers are requiring onsite coding. We will ask the [United] Provider Advocates to talk to the groups to try to talk them out of it. If they won't budge, then we will allow onsite coding if OptumInsight has a solution for doing claims verification on those charts."

4650

192.   Similarly, at around the same time, a decision was also made that Optum's commercial clients were required to retain Optum to perform Claims Verification (*i.e.*, to "look both ways") if Optum performed chart reviews for them and submitted risk adjustment data, including diagnoses, to CMS on their behalf.  According to Dumcum, Optum decided "that if we did chart review and submissions, that we then must do the two-way look.  It became our policy of how we executed business at the time.  So if they bought both, then we required that piece [*i.e.*, Claims Verification] be implemented."

193.   UnitedHealthcare has also consistently demanded that CMS and HHS OIG, when performing their audits, credit the Defendant MA Organizations for any additional medical conditions that UnitedHealthcare believed were supported by the medical records but that had not been reported by the providers.  UnitedHealthcare took the firm position with the Government that, in order to accurately reflect a patients' true health status, it was necessary to review patients' medical records for both the under-reporting (not reporting diagnoses supported by the beneficiaries' medical records) and over-reporting (the reporting of codes unsubstantiated by the beneficiaries' medical records) of medical conditions by providers.  In fact, CMS RADV audits have historically credited MA Organizations, including UnitedHealthcare, for additional diagnoses found during such audits.

194.   For example, in a February 2011 letter from Thomas Paul, the then Chief Executive Officer of UnitedHealthcare Medicare & Retirement, to CMS concerning the parties' dispute about the preliminary results of CMS' pilot RADV audit of one of the Defendant MA Organizations, UnitedHealthcare argued that the dispute process "incorrectly exclude[d] consideration of additional CMS-HCCs" supported by the beneficiaries' medical records.  The letter stated that UnitedHealthcare identified additional HCCs (*i.e.*, additional diagnoses mapping to additional HCCs) in the medical records and, if CMS refused to give it credit for them, it would challenge CMS legally.  In September 2012, in a letter from Theisen, the then Chief Financial Officer of UnitedHealthcare Medicare & Retirement, to CMS about the same RADV audit,

98

4651

UnitedHealthcare continued to complain that the audit incorrectly excluded consideration of additional HCCs and argued that the Defendant MA Organization should receive credit for the additional HCCs.  The letter stated:  "If [the MA Organization] is not credited for these incremental HCCs, then any adjustments made by CMS do not accurately reflect an enrollee's comprehensive medical conditions.  The goal of RADV audits should be to determine the full extent of enrollees' medical conditions, and **make overpayment and underpayment adjustments so that [MA Organizations] are paid commensurate with enrollees' health status**."  (Emphasis added.)  Similarly, in a September 2012 letter from Thomas Paul to HHS OIG, UnitedHealthcare stated that "the OIG should correct the invalid HCCs and credit [the MA Organization] with the incidental HCCs documented in the submitted medical records."

195.   ICE, the industry group to which several of the Defendants belonged and which they financially supported, also opined that "looking both ways" was a "Best Practice."  It issued a Best Practices document encouraging the industry to conduct chart reviews that "looked both ways."  It described the advantages of such chart reviews as "[p]romoting validation functions for diagnostic codes previously submitted by providers" and "[p]roviding the ability to submit code corrections forward (additions and deletions) to health plans upon the completion of review."

          **C.**     **United's Short-lived "Look Both Ways" Claims Verification Program**

196.   In September 2010, Lee Valenta, then Ingenix's Chief Operating Officer, sent Thomas Paul, then Chief Executive Officer of Ovations, a memorandum "summariz[ing] Ingenix's plans for implementing a claims verification program for charts reviewed by Ingenix on behalf of Ovations Medicare Advantage Plans."  Valenta explained that the "overarching aim" of the Claims Verification Program was "improving the quality of member-level diagnosis information submitted to CMS."  He also explained that the program's purpose was to identify the provider-reported diagnoses that were not

99

4652

1    validated by the blind medical record reviews conducted as part of the Chart Review

2    Program and for another coder to conduct a second non-blind review to determine if the

3    provider-reported diagnoses had been missed by the first blind coder.

4    197.   Valenta's memorandum also set forth a three-phased approach for the

5    development of the Claims Verification Program.  The first phase, Phase I, was supposed

6    to focus on a random sample of 850 beneficiaries in Ovations MA Plans whose medical

7    records for encounters (*i.e.*, provider office visits) in 2009 were included in the Chart

8    Review Program in 2010 and had already been subject to a blind review as part of that

9    Program.  Phase I was supposed to start in October 2010 and be completed by January

10    31, 2011.  The second phase, Phase II, was supposed to focus on a larger sample of

11    beneficiaries and, thus, a larger number of medical records for encounters in 2010.  This

12    group was supposed to include all beneficiaries who had medical encounters with only

13    one provider during 2010.  Phase II was supposed to start by May 2011.  The final phase,

14    Phase III, was supposed to focus on all beneficiaries in Ovations' MA Plans whose

15    medical records for medical encounters in 2011 were included in the national Chart

16    Review Program in 2012 and had already been subject to a blind review as part of that

17    Program.  Phase III was supposed to be implemented in 2012.

18    198.   In October 2010, Cindy Polich, then President of Ovations, which was in the

19    Public and Senior Markets Group ("PSMG") that managed the Defendant MA

20    Organizations at the time, responded to Valenta's memorandum.  Polich agreed to his

21    proposal.  Polich also acknowledged the need to improve PSMG's risk adjustment

22    programs.  She stated that "[w]hile Ingenix is implementing Phase II [of Claims

23    Verification], PSMG will conduct a comprehensive review of its current risk adjustment

24    strategies, including our chart review strategy.  The purpose of this review is to

25    determine the future programs and approaches to be used to improve the accuracy of our

26    risk scores."

27    199.   A Claims Verification project management document, prepared by Optum,

28    Ingenix's successor, described Claims Verification as "[a] risk adjustment chart audit

4653

service designed to ensure that qualified patient diagnoses and conditions are identified and supported in the physician medical record documentation. This audit service identifies any discrepant coding patterns contained within the medical record documentation and the associated claims and encounters. This service includes the submission and delete process to CMS, financial reporting, and training/education for providers. Claims Verification will further supplement our efforts to assess coding accuracy and our ability to drive prospective improvements by engaging and educating providers."

200. At a meeting in September 2012, Theisen explained to Jason Bainbridge and Karin O'Hara, both of whom worked for UnitedHealthcare Community & State, that UHG decided to "look both ways" and implement Claims Verification in order to defend the Chart Review Program in light of increased scrutiny on risk adjustment. According to Relator Poehling's notes, the meeting focused on the financial impact of Claims Verification, and Theisen "said historically when we audited we only added codes. UHG has decided from a defensibility standpt, & the increased scrutiny on risk adjustment, that we would begin deleting unsupported codes as well. Scott [Theisen] explained that [Optum] did a CV pilot on ~ 5k charts. Scott said we anticipated ~ $100M in give backs related to CV, but the pilot is showing ~ $225M/yr (extrapolating results)." Other attendees at this meeting included, but were not limited to, Relator Poehling, Jon Bird, William Hnath, and Melissa Sedor.

201. At some point in 2012, UnitedHealthcare Medicare & Retirement also started to impose a "look both ways" requirement on providers with which it was sharing the cost of chart reviews. Many, if not all, of these providers were incentivized capitated providers. UnitedHealthcare Medicare & Retirement sent letters to these providers about this requirement. Some of the letters expressly stated that UnitedHealthcare Medicare & Retirement was agreeing to share in the cost of the chart reviews based on its understanding that the provider would use the information gathered from the chart reviews to verify the diagnosis data that it previously reported to UnitedHealthcare

101

4654

Medicare & Retirement.  In other of the letters, UnitedHealthcare Medicare & Retirement requested that the provider ensure that it uses the information gathered during the chart reviews to verify the diagnoses that it previously reported to UnitedHealthcare Medicare & Retirement.  All of the letters further instructed the providers on how to submit to UnitedHealthcare Medicare & Retirement (via Optum) a data file of diagnosis codes that should be deleted (as well as those that should be added) as a result of the chart reviews.  In addition, UnitedHealthcare Medicare & Retirement required all of the providers to complete and return a certification.  Pursuant to the certification, the provider had to attest that it had compared diagnoses previously reported to UnitedHealthcare Medicare & Retirement with the charts that it reviewed, and that it had submitted to UnitedHealthcare Medicare & Retirement and Optum a data file of diagnoses that it had determined should be added or deleted.  Pursuant to the certification, the provider also had to certify that the information in the data file was accurate and truthful.  There was an attachment to the letters that specified the fields for the data file that the providers were required to use.  One of the fields was for the providers to identify diagnoses that needed to be deleted because they were not validated by the chart reviews.

202.   UnitedHealthcare Medicare & Retirement and Optum, however, took over three years to develop the Claims Verification Program.  Furthermore, the manner in which they developed and then implemented the Program shows that they were never committed to honoring their obligation to undertake good faith efforts to ensure the validity of the risk adjustment data that they submitted to the Medicare Program.  They did not automatically delete the provider-reported diagnoses that were not supported by the medical record reviews conducted as part of the Chart Review Program.  Rather, they considered these invalid diagnoses as mere "potential deletes" and instructed the coders to re-review the medical records to try to avoid deleting them.  Optum also trained the Claims Verification coders that the goal of Claims Verification, above all else, was to "validate" or "save" the potential deletes through finding any support for the diagnosis in

102

the beneficiary's chart.  Additionally, Optum instructed its coders to "save" these invalid diagnoses even if the information in the medical records was ambiguous.

203.   When performing Claims Verification, Optum also did not consult providers even when medical records were ambiguous concerning whether the beneficiaries actually had the medical conditions corresponding to the diagnosis codes.

204.   Optum also saved "potential deletes" by simply accepting the diagnoses reported by providers even when the medical conditions were not unambiguously documented in the beneficiaries' medical records.  Optum characterized this practice as deferring to the judgment of the provider or the provider's administrative staff who assigned the diagnosis codes.  For example, if a chart was unclear, illegible, or missing, and even though Optum could not identify any medical records documenting the medical conditions identified by the provider-reported codes, it just accepted the codes and did not delete them.  Optum did this with either deliberate ignorance or reckless disregard for the truth in light of the mountain of knowledge it possessed about the significant percentage of invalid provider-reported diagnoses.

205.   However, despite all its flaws, the Claims Verification Program confirmed what UnitedHealthcare Medicare & Retirement and Optum already knew about the significant error rate associated with provider-reported diagnoses that they submitted to the Medicare Program for risk adjustment payments.

206.   At the end of 2010, Ingenix, Optum's predecessor, had conducted the first pilot phase, Phase I, of its development of the Claims Verification Program.  As specified in Valenta's memorandum, Phase I included a very small sample of medical records that Ingenix had reviewed as part of the Chart Review Program for encounters (*e.g.*, office visits) that beneficiaries had with providers in 2009.  A "CV Dashboard" summary from December 2010 shows that out of the many hundreds of thousands of medical records included in the Chart Review Program for 2009 encounters, only 843 records were included in Phase I of the Claims Verification Program.  By December 2010, the review for 728 of those medical records had been completed.  The results showed that 224 of the

4656

1    728 medical records re-reviewed as part of Claims Verification (*i.e.*, reviewed once as

2    part of the Chart Review Program and then again as part of Phase I of the Claims

3    Verification Program) had both at least one ADD (a diagnosis code that the provider had

4    not reported) and at least one DELETE (a diagnosis code that was reported by the

5    provider but not validated by the medical record) and 167 of the 728 medical records re-

6    reviewed as part of Claims Verification had at least one DELETE but no ADDS.

7    Furthermore, of the HCCs and the RxHCCs for which Ingenix looked for validation in

8    these 728 records that it had re-reviewed, 19 percent of the HCCs and 15 percent of the

9    RxHCCs did not validate.  At the time that the summary was prepared, Ingenix was

10    conducting "follow-up" on 39 medical records.  Of the HCCs and the RxHCCs for which

11    Ingenix looked for validation in these 39 medical records that it had re-reviewed, 47

12    percent of the HCCs and approximately 45 percent of the RxHCCs did not validate.

13    207.   As part of Phase I, but only as part of Phase I, Ingenix sometimes contacted the

14    providers who gave it the medical records.  It did this when the second non-blind review

15    of the records in Claims Verification failed to validate the diagnoses that the first blinded

16    review had failed to validate as part of the Chart Review Program.  For some

17    beneficiaries, the providers responded that they should not have submitted their claims

18    (*i.e.*, the claims which included the diagnoses).  Consequently, the diagnoses should not

19    have been submitted to CMS.  For some other beneficiaries, the providers did not have

20    additional records or their additional records did not support the diagnoses in question.

21    208.   In mid-2011, Ingenix/Optum began conducting the second pilot phase, Phase II, of

22    the Claims Verification Program.  Phase II began in the summer of 2011 and was

23    completed in early 2012.  Out of the many hundreds of thousands of medical records

24    included in the Chart Review Program for 2010 medical encounters, only approximately

25    17,000 charts were included in Phase II.  Coders tried to save as many "potential deletes"

26    as possible when reviewing these medical records as part of Phase II.  Nonetheless, the

27    results of their Claims Verification reviews confirmed more invalid diagnoses

28

4657

1  (DELETES) than the number of additional codes (ADDS) gleaned from the same

2  records.

3  209.    In mid-2012, Optum began conducting a preliminary test or pilot for Phase III of

4  the Claims Verification Program.  This pilot included approximately 5,000 medical

5  records relating to encounters (*e.g*., office visits) that beneficiaries had with providers

6  during calendar year 2011.  In September 2012, Theisen explained to others including

7  Relator Poehling, that UnitedHealthcare Medicare & Retirement, relying on the results

8  of this sample review, had increased its estimate of the financial impact of Claims

9  Verification deletes.  In October 2012, Theisen sent Daniel Schumacher, the then Chief

10  Financial Officer of Defendant UnitedHealthcare, and others a "CV III analysis – based

11  on 2011-2012 Chart review activity for 2011 DOS."  The document showed validation

12  rates based on the review of HCCs because the coders were instructed to find support for

13  any diagnosis that mapped to the HCC under review even if it was not the same

14  diagnosis reported by the provider that originally mapped to that HCC.  The document

15  showed that the validation rate "[b]ased on results of CV3 pilot (5,000 chart sample)"

16  was 66.4 percent.  In other words, only 66.4 percent of the HCCs reviewed were

17  supported by the beneficiaries' medical records.  That meant that 33.6 percent of the

18  HCCs were unsupported by the beneficiaries' medical records even after

19  UnitedHealthcare Medicare & Retirement and Optum had them reviewed twice, once as

20  part of the Chart Review Program and again as part of the pilot Claims Verification

21  Phase III process.  Based on these results, UnitedHealthcare Medicare & Retirement

22  estimated that the negative financial impact of Claims Verification in 2012 would be

23  $231 million based on the number of estimated "potential deletes" that it could not save

24  and would have to be made.  It estimated that diagnoses mapping to 120,147 HCCs

25  would have to be deleted and that, on average, <u>each</u> delete would result in a $1,924

26  negative financial impact.

27  210.    In or about October 2012, UnitedHealthcare Medicare & Retirement recorded in

28  its financial records a $208 million accrual for potential revenue reductions due to

105

4658

deletes that would need to be made as part of the Claims Verification Program (hereinafter referred to as a "CV liability accrual") for payment year 2012. Relator Poehling and Kyle Anderson were aware of this CV liability accrual. In late 2012, other individuals at UnitedHealthcare Medicare & Retirement and Optum, including Timothy Noel, Scott Theisen, and Jon Bird, were also aware of the CV liability accrual and/or the estimated negative financial impact of the Claims Verification Program.

211. UnitedHealthcare Medicare & Retirement and Optum did not complete their pilot tests and start to implement their Claims Verification Program for charts relating to 2011 medical encounters (*i.e.*, with 2011 dates of service) until late 2012. Even after that, they never fully implemented the program. They also continually changed the program in order to limit its scope and created arbitrary rules to avoid looking at the negative results of many of the blind chart reviews conducted as part of the Chart Review Program. In addition, when they learned that their second review of the medical records in Claims Verification was not saving a significant number of diagnoses from deletion, they created another level of review. That is, it created a re-re-review or third review of the beneficiaries' medical records in order to keep trying to save the diagnoses from deletion. They also limited the scope of Claims Verification by excluding certain providers, including providers that they or their affiliates owned and operated. In 2014, Defendants UHG and UnitedHealthcare then terminated CV without completing the program for charts relating to 2012 medical encounters (with 2012 dates of service).

212. UnitedHealthcare Medicare & Retirement and Optum imposed several arbitrary exclusionary rules to improperly disqualify many medical records reviewed as part of their Chart Review Program from their Claims Verification Program. For medical records for encounters in 2011 and 2012, they arbitrarily and improperly excluded numerous medical records from Claims Verification. For example, they excluded numerous charts from Claims Verification because the image of the chart was purportedly "unavailable." Yet, when making ADDS in the Chart Review Program, the image of the chart or chart itself must have been available. But, instead of locating the

4659

images or obtaining the charts for Claims Verification, they decided not to re-review the charts to save those diagnoses invalided by the results of their Chart Review Program. They also did not delete those invalid diagnoses.

213. The re-reviews conducted as part of the Claims Verification Program did not save as many deletes as UnitedHealthcare Medicare & Retirement would have liked and, in 2013, Theisen and others at UnitedHealthcare Medicare & Retirement became increasingly concerned about the financial impact of the deletes. UnitedHealthcare Medicare & Retirement decided that its coders were not saving enough "potential deletes." Accordingly, sometime in 2013, UnitedHealthcare Medicare & Retirement decided that a third review or a re-re-review of the medical records had to be conducted to try to save more deletes.

214. Thus, if Optum's internal coders were unable, despite their best efforts, to "save" a diagnosis code, Optum sent that code to a coding consultant for re-re-review. Optum knew, however, that the consultant engaged in a pattern of "saving" diagnoses without supporting medical records in several circumstances, including when the chart was scanned illegibly, when pages were missing from a chart and the diagnosis could not be validated, and when the reported date of service did not appear in the chart. By accepting validation of these diagnoses without supporting medical records, Optum knowingly and improperly avoided its and UnitedHealthcare Medicare and Retirement's obligation to return monies wrongfully obtained from the Medicare Program.

215. In November 2013, Donald James, then Director of Program Strategy for Optum in Santa Ana, California, reported to senior management that the Claims Verification Program had not yet started for charts reviewed as part of the 2013 Chart Review Program. In December 2013, Patty Brennan, then also in the Optum Santa Ana office, reported to Dumcum that "[h]alf of the CV volume for 2012 DOS has been completed but deletes are on hold." She also informed him that UnitedHealthcare Medicare & Retirement "[r]equested all CV deletes be held until further noticed so Ops is not going to complete the second half of the volume at this time."

4660

216.   When Steve Nelson became the Chief Executive Officer of UnitedHealthcare Medicare & Retirement in early 2014, he spoke with Steve Hemsley, then Chief Executive Officer of UHG, about whether UnitedHealthcare Medicare & Retirement should continue the Claims Verification Program.  Hemsley encouraged Nelson to look into whether or not it should do so, formulate an opinion, and report back to him.

217.   In February 2014, Marc Beckmann, then in the Finance – Risk Adjustment Analysis Group at UnitedHealthcare Medicare & Retirement, sent information about CV liability accruals to Daniel Schumacher, the Chief Financial Officer of Defendant UnitedHealthcare, and Brian Thompson, the Chief Financial Officer for UnitedHealthcare Medicare & Retirement.  He estimated that the effect of Claims Verification on UnitedHealthcare Medicare & Retirement's revenue would be $208 million for payment year 2012, $125 million for payment year 2013, and either $125 million or $175 million (depending on the number of charts reviewed) for payment year 2014.  This information was also provided to other individuals at UnitedHealthcare Medicare & Retirement including, but not limited to, Jay Matushak, Marybeth Meyer, and Kyle Anderson.

218.   On March 3, 2014, Jon Bird, the Optum Senior Vice President of Risk and Quality Analytics, participated in a meeting with Brian Thompson about the CV liability accrual for 2013.  Thompson wanted to "move toward the more conservative range of the confidence interval (from 50% to 80%) resulting in [a] $29M higher CV estimate" for the liability accrual.  By March 3, 2014, UnitedHealthcare Medicare & Retirement's estimate of its CV liability accrual for 2013 already had been increased by over $50 million dollars from $125 million to $180 million.

219.   Also, in February or March 2014, the financial managers at UnitedHealthcare Medicare & Retirement, including Brian Thompson, performed a comparison of their then-expected revenues for 2014 with the revenue estimated in UnitedHealthcare Medicare & Retirement's annual budget for 2014.  They determined that there was going

4661

to be a shortfall in their financial performance relative to that budget and they started to think about ways to eliminate the shortfall.

220.   In March 2014, Thompson sent Nelson "a current brain dump of 'shut off/stop doing' that is not yet valued/included in the road back to plan."  Part of the "brain dump" was to "shut off" or reduce compliance efforts.  Thompson asked others at UnitedHealthcare Medicare & Retirement for other "shut offs."

221.   Subsequently in March 2014, Marybeth Meyer, who ran the risk adjustment team at UnitedHealthcare Medicare & Retirement, reported to Thompson that the "CV estimate of $125M may be light (estimate for 2012 DOS/2013 payment year of $167M)."

222.   In late March or early April 2014, Nelson met with other Chief Executive Officers at Defendant UnitedHealthcare to discuss UnitedHealthcare Medicare & Retirement's financial performance.  A very detailed slide deck was created for that meeting.  The slide deck was sent by Schumacher to senior executives at UnitedHealthcare, including Gail Boudreaux (who reported to Hemsley), Nelson, Brian Thompson, and Paul Balthazor.  The slide deck highlighted that UnitedHealthcare Medicare & Retirement was projecting that its actual revenues for 2014 were going to miss the target set forth in the annual budget by half of a billion dollars.  It stated:  "Best estimate of $500 million budget miss."  It also stated that, because of that projected miss, UnitedHealthcare Medicare & Retirement's management was making a commitment to the senior executives to "find $250 million to cut miss in half."  UnitedHealthcare Medicare & Retirement referred to this "Management Commitment" as a $250M "good guy."

223.   Nelson and others, including Boudreaux (who reported to Hemsley), knew that, if UnitedHealthcare Medicare & Retirement terminated the Claims Verification Program, it could reduce the $500 million budget miss by not deleting the provider-reported diagnoses invalidated by its chart reviews and reversing the CV liability accruals.  This was their "good guy."  But, it appears that UHG, UnitedHealthcare, and Optum were concerned about the consequences of terminating the program and reverting to ignoring

the negative results of their chart reviews. They decided to ask CMS about the retroactivity of a proposed regulation requiring MA Organizations to design all medical record reviews to validate diagnoses submitted to CMS.

224. Under Hemsley's direction, Larry Renfro, the Chief Executive Officer of Optum, contacted senior government employees at CMS, including the Administrator of CMS, to ask whether the Defendants had a legal obligation to perform Claims Verification before the effective date of the proposed rule. These employees were not government attorneys and could not render the requested legal advice. Renfro, moreover, knew nothing about the UHG Managing Defendants' Chart Review and Claims Verification Programs and could not impart any meaningful information about these programs to the government employees. Accordingly, Renfro could not and did not provide the senior government employees with any description of the Claims Verification Program or its purpose. Hemsley and his attorneys, however, continued to push Renfro to make further contacts with these government employees when UHG, UnitedHealthcare, and Optum did not obtain from these government employees the legal opinion they wanted.

225. On or before April 8, 2014, Renfro asked Karen Erickson, an Optum executive who worked directly for him, for speaking points for a call with the Administrator of CMS. On April 8, 2014, Erickson sent Renfro's assistant, Juliet Domb, "aspirational" talking points, that is, things that they wanted Renfro to get the CMS employees to say, including "CV is not currently required" and that Defendants were "allowed to stop any CV activities (including delete submission) currently underway." (Emphasis in the original.) In her email, Erickson told Domb: "I sent this to Marianne [Short] and Matt Shors for editing – they will send final directly, and they know it has to be today." The same day, Renfro spoke to Hemsley and Short to obtain direction about what he should say to the Administrator of CMS on the call that he had scheduled with the Administrator. Renfro then purportedly spoke with the CMS Administrator and purportedly dictated notes of the call to Domb, who wrote the notes by hand on Renfro's

4663

notepad and sent them to Short.  According to Renfro, he dictated these notes from
memory and he does not usually take notes, but was asked to do so by Short.

226.   On April 26, 2014, Short asked Renfro to again contact the Administrator of CMS.
According to Brian Thompson (the Chief Financial Officer of UnitedHealthcare
Medicare & Retirement in 2014), Renfro had not obtained the "clarity" they wanted
from the Administrator about whether they were obligated to perform Claims
Verification.  Accordingly, on April 27, 2014, Renfro sent an email to the Administrator
asking the same questions he had purportedly asked her on April 8 and to which she
purportedly had responded on April 8.  He also asked for a meeting with other
employees at CMS who were responsible for operating the MA Program.  On April 27,
2017, Renfro reported to Hemsley and Short that CMS was arranging for the UHG
Managing Defendants to meet with these employees.  On April 29, 2014, Hemsley sent
UnitedHealthcare's attorney, Thad Johnson, to Washington, D.C. to speak with those
CMS employees responsible for the MA Program, including Cheri Rice, the Director of
the Medicare Plan Payment Group at CMS.  Nelson, Schumacher, and an Optum
executive, Karen Erickson, also attended the meeting.  At the meeting, when the UHG
Managing Defendants informed CMS about the possibility of terminating their Claims
Verification Program, CMS told them that they had a statutory obligation to report and
repay the Medicare Program for erroneous risk adjustment payments and that there were
FCA implications if they failed to do so.  CMS also told the UHG Managing Defendants
that they could not ignore information in their possession showing that diagnoses may be
invalid and that they were obligated to delete invalid diagnoses.  According to Erickson,
CMS told the UHG Managing Defendants that "if there was reason to have knowledge
that something had been begun and we were [*i.e.*, Defendants were] far enough along
that there was knowledge that something might not be supported that we needed to
continue the investigation into those numbers, or those codes."  Erickson further recalled
CMS stating that, if they had "knowledge of things that might not be supported we [*i.e.*,
the Defendants] needed to continue the investigation."  According to Schumacher, CMS

111

4664

also told them that CMS did not have sufficient information about the Claims

Verification Program to provide further guidance.

227.   On April 30, 2014, Nelson sent an email to Cheri Rice at CMS about the meeting

between the UHG Managing Defendants and CMS on April 29, 2014.  He stated: "[A]s

we discussed yesterday, CMS recently issued a proposed rule that would, if finalized,

require MA plans to design any medical record reviews to determine the accuracy of risk

adjustment diagnoses associated with those records.  During our conversation yesterday

and other recent conversations, CMS confirmed to us that these requirements do not

apply until the effective date of the rule, and that MA plans are thus not currently

required to design their medical record reviews to determine the accuracy of risk

adjustment diagnoses.  We currently have a process through which we review certain

medical records to determine the accuracy of risk adjustment diagnoses and submit

appropriate deletes.  This process already has resulted in the identification of and, in

some instances, the submission of deletes for 2012 dates of service.  But based on the

proposed rule, including the preamble, and recent conversations with CMS, we

suspended that process for 2012 dates of service while we consider whether to make

changes.  Pursuant to our discussion, however, we will soon submit for deletion those

diagnosis codes that have undergone a complete review and that we have therefore

identified as appropriate deletes.  In the near future, we will determine whether to

continue our review process for the diagnosis codes which were still under review at the

time we suspended our process.  In the meantime we will not delete these codes."

228.   On May 2, 2014, Cheri Rice replied to Nelson's email:  "[R]egardless of the

effective date of the proposed requirement related to medical record reviews, there are

other laws that do impose standards, requirements and responsibilities on MA plans in

connection with the federal payments they receive from CMS.  We cannot provide

advice to United about the scope of those other laws.  Nor can we provide advice on

whether United's plan[ned] course of action and/or purported limits on the scope of its

[Risk Adjustment Attestation, submitted April 30, 2014] are compliant with such other

112

laws.  Your statement concerning the data submissions that have already been made and United's plans for future action will be included in our records and we will proceed with our evaluation and use of the risk adjustment data consistent with 42 CFR § 422.308, § 422.310, and other applicable law."

229.   According to Schumacher and Nelson, Rice's May 2, 2014 email did not say anything that was inconsistent with what CMS said in the meeting on April 29, 2014. After Rice sent her May 2 email, the Department of Justice sent a letter to Defendants' counsel emphasizing that the FCA is one of the "other laws" that imposes standards, requirements, and responsibilities on MA Organizations and Related Entities in connection with the federal payments received from the Medicare Program.

230.   On May 5, 2014, Jay Matushak informed Jeffrey Putman, UHG's Controller who reported to Hemsley, and others (including Schumacher and Brian Thompson) that "M&R CV delete, good guy, is ~$250M for the year (note this is just the M&R piece and there is an incremental component at C&S)."  On the same date, Brian Thompson also informed Putnam and others (including Matushak and Schumacher) that UnitedHealthcare Medicare & Retirement had "not made a final determination to our CV policy," "[o]ur RAF counsel will make that determination," and that "determination will not occur until later in May most likely."  According to Schumacher, the $250 million was the estimated amount of the deletes from Claims Verification for 2014 and prior years and, thus, the CV liability accruals that had been recorded for 2014 and prior years. The "good guy" was the hoped-for release or reversal of those accruals. UnitedHealthcare Medicare & Retirement knew the accruals were likely underestimated and the financial impact likely greater if it did not terminate the Claims Verification Program.

231.   Despite CMS' warnings in the April 29 meeting and Cheri Rice's May 2 email, Nelson, Schumacher, and Brian Thompson decided to go forward with the idea of terminating the Claims Verification Program.  This decision was reported to Hemsley

4666

and, according to Nelson, Hemsley could have reversed this decision but instead he supported it.

232.   Despite the warnings, UnitedHealthcare Medicare & Retirement also decided not to delete or otherwise report to CMS at least 100,000 invalid diagnoses about which it had *actual* knowledge based on more than one review of the patients' medical records for encounters in 2011 and 2012 (*i.e.*, encounters with 2011 and 2012 dates of service). The single damages to the Medicare Program arising from its submission of and failure to delete just these invalid diagnoses is approximately $190 million under Part C alone.

233.   After they terminated the Claims Verification Program, UnitedHealthcare (including UnitedHealthcare Medicare & Retirement and UnitedHealthcare Community & State) and Optum reverted to "looking one way" at the results of their chart reviews, making only ADDS, and knowingly and improperly failing to delete invalid provider-reported diagnoses and repay the Medicare Program for them.

234.   At the time they decided to terminate the Claims Verification Program, Steve Nelson, Dan Schumacher, and Brian Thompson knew that their decision would enable UnitedHealthcare Medicare & Retirement to reverse its CV liability accruals by more than $250 million dollars.  Hemsley also was aware that terminating Claims Verification would enable UnitedHealthcare Medicare & Retirement to achieve this financial benefit. This was important to all of them because they wanted to represent to investors that UnitedHealthcare Medicare & Retirement's actual revenues were on target.  An internal document relating to their second quarter 2014 "earnings release" issued in July 2014 states:  "Q2 was on track and we are building momentum that will take us through the year and into 2015.  *Internal:  Important to note that 2014 benefits from the one-time claims verification policy change which investors are unaware of.*"  (Emphasis in the original.)  On July 11, 2014, this internal document was sent to Nelson and Thompson, among others.

4667

### D.   United Failed to Delete Diagnoses Invalidated By Its Own Chart Review Program

235.   The results of the UHG Managing Defendants' national Chart Review Program provided them information about a significant number of invalid provider-reported diagnoses that should not have been, but were, submitted by them on behalf of the Defendant MA Organizations to the Medicare Program for risk adjustment payments. For example, for the 2011 payment year (involving payments based on diagnoses with 2010 dates of service), UnitedHealthcare Medicare & Retirement and Optum submitted at least 197,000 diagnoses that were invalidated by the medical record reviews conducted as part of their Chart Review Program.  But, for that year, they deleted only a very few (only about 1,800) of these invalid diagnoses based on the results of Phase II of the Claims Verification Program.  For the 2012 payment year (involving payments based on diagnoses with 2011 dates of service), UnitedHealthcare Medicare & Retirement and Optum submitted at least 222,329 diagnoses that were invalidated by the medical record reviews conducted as part of their national Chart Review Program.  Based on the results of the Claims Verification Program for charts with 2011 dates of service, they deleted approximately 120,000 of these invalid diagnoses despite their arbitrary exclusionary rules and attempts to save these deletes.  For the 2013 payment year (involving payments based on diagnoses with 2012 dates of service), UnitedHealthcare Medicare & Retirement and Optum submitted at least 285,122 diagnoses that were invalidated by the medical record reviews conducted as part of their national Chart Review Program. Based on the results of the Claims Verification Program for charts with 2012 dates of service, they deleted approximately 27,000 of these invalid diagnoses despite their arbitrary exclusionary rules, multiple attempts to save these deletes, and failure to complete the program.  For the 2014 payment year (involving payments based on diagnoses with 2013 dates of service), UnitedHealthcare Medicare & Retirement and Optum submitted at least 199,039 diagnoses that were invalidated by the medical record reviews conducted as part of their Chart Review Program.  Because UHG,

115

UnitedHealthcare, and Optum terminated the Claims Verification Program, they did not delete any of these invalid diagnoses. These numbers apply to invalid diagnoses relating to risk adjustment payments under Part C only and not also Part D.

236. Accordingly, the UHG Managing Defendants knowingly and improperly failed to delete or otherwise repay Medicare for most of the diagnoses invalidated by their national Chart Review Program over the last decade.

237. For example: for the 2011 payment year, they failed to repay the Medicare Program at least $377,734,792 by failing to look both ways and delete diagnoses invalidated by the Chart Review Program; for the 2012 payment year, they failed to repay the Medicare Program at least $213,978,134 by failing to look both ways and delete diagnoses invalidated by the Chart Review Program; for the 2013 payment year, they failed to repay the Medicare Program at least $317,329,602 by failing to look both ways and delete diagnoses invalidated by the Chart Review Program; and for the 2014 payment year, they failed to repay the Medicare Program at least $234,159,775 by failing to look both ways and delete diagnoses invalidated by the Chart Review Program. These numbers apply to the failure to make repayments relating to risk adjustment payments under Part C only and not also Part D.

238. Examples of beneficiaries with invalid diagnoses about which Defendants knew but failed to delete based on its Chart Review Programs for payment years 2011 through 2014 are set forth in Exhibit 13 to this Complaint.

### III. The RACCR Program

239. The UHG Managing Defendants (which, in this section, refers to Ingenix or Optum, depending on the time period, and Ovations or UnitedHealthcare Medicare & Retirement, depending on the time period) negotiated agreements with some of the largest healthcare provider groups that tied the provider groups' compensation to their beneficiaries' risk scores. The UHG Managing Defendants knew that this compensation structure created a financial incentive for the provider groups to increase the number and severity of diagnoses they reported and to report invalid diagnoses. Nonetheless, while

116

4669

the UHG Managing Defendants were scouring millions of medical records through the Chart Review Program to identify additional diagnoses and increase their revenue, their effort to identify the invalid codes submitted by these incentivized providers was limited to the RACCR Program. Moreover, the UHG Managing Defendants designed and implemented the RACCR Program to limit its scope and to minimize the number of invalid diagnoses for which the UHG Managing Defendants would have to return overpayments to CMS. They failed to delete invalid diagnosis codes identified through the RACCR Program, and eventually restructured the RACCR program to become just another program to identify additional diagnoses and to increase revenue, rather than a program to remedy the known problem of invalid coding by incentivized providers.

### A. Defendants Knew That Their Financially-Incentivized Providers Were Reporting Invalid Codes

240. As discussed above, the UHG Managing Defendants entered into financial arrangements with capitated and gainsharing providers that were tied to the risk adjustment payments that the Defendant MA Organizations received from the Medicare Program. As a result, these providers benefited financially from any increase in risk adjustment payments resulting from the diagnoses they reported to the UHG Managing Defendants for beneficiaries enrolled in the Defendant MA Organizations' Plans.

241. The UHG Managing Defendants knew that these compensation arrangements created a strong financial incentive for these providers to increase the number and severity of diagnoses they reported for each beneficiary, and in some cases to report invalid diagnosis codes.

242. Early on, Ingenix implemented the Internal Data Validation ("IDV") reviews discussed earlier in this Amended Complaint. In or about 2010, Ovations (or its successor, UnitedHealthcare Medicare & Retirement) and Ingenix expanded and changed the name of that program to RACCR. Ingenix was responsible for conducting the RACCR Program until Optum succeeded it in 2011, after which Optum was responsible for conducting the program. Likewise, Ovations was responsible for

117

4670

managing the RACCR Program until UnitedHealthcare Medicare & Retirement succeeded it and assumed responsibility for the program in 2010.

243. Although the IDV and RACCR Programs were extremely limited in scope and utility, they confirmed what the UHG Managing Defendants already knew: that there were serious problems with the diagnoses being reported by a number of the financially-incentivized providers, including WellMed (which UHG acquired in 2011).

## B. UnitedHealthcare Structured The RACCR Program To Limit The Number Of Invalid Diagnosis Codes It Identified

244. The UHG Managing Defendants knew they had an obligation to review diagnoses reported by incentivized providers to determine their validity. In an April 23, 2012 email to many United Healthcare executives and managers (including Scott Theisen, Keith Dobbins, Michael McCarthy, and Kimberly Halva), Mary Hammond, one of the UnitedHealthcare employees who oversaw the RACCR program, described RACCR as "an important part of Medicare & Retirement's efforts to meet CMS requirements to submit accurate risk adjustment data." Later, in a June 22, 2012 agenda for a meeting attended by Keith Dobbins, Kim Halva, Benjamin Poehling, and others, Mary Hammond stated that the answer to "Why RACCRs?" was that "We have an obligation to submit accurate Dx data to CMS."

245. Despite the UHG Managing Defendants' understanding that the RACCR Program was part of UHG's effort to comply with CMS's accuracy requirements, they structured the RACCR Program to limit its utility in identifying invalid diagnosis codes. There were various fundamental limitations on the RACCR Program.

246. First, the UHG Managing Defendants excluded from their RACCR Program any incentivized providers who cared for fewer than 500 beneficiaries in a Plan. This resulted in the exclusion of approximately 40 percent of the financially-incentivized providers from the RACCR Program for medical encounters in 2008, 2009, and 2010 (*i.e.*, with dates of service in those years).

118

4671

247.   Second, for the incentivized provider groups with 500 beneficiaries or more, the UHG Managing Defendants did not review the medical documentation for any diagnoses unless the provider group was an extreme outlier in reporting diagnoses that mapped to one or more HCCs.  For medical encounters in 2008, 2009, and 2010 (*i.e.*, with dates of service in those years), the UHG Managing Defendants defined an outlier as a provider that reported diagnoses mapping to a particular HCC more than three times as often as the average national prevalence rate for that HCC for all beneficiaries in the Defendant MA Organizations' MA Plans.  For example, if 15 percent of the beneficiaries in these MA Plans nationwide were reported by providers to have a diagnosis that mapped to HCC 52 (Drug/Alcohol Dependence), the UHG Managing Defendants did not consider the incentivized provider an outlier unless it reported diagnoses mapping to HCC 52 for more than 45 percent of its patients enrolled in a Defendant MA Organization's Plan.  Combined with the exclusion of providers with less than 500 beneficiaries, this resulted in a total exclusion of over 80 percent of the financially-incentivized providers for medical encounters in 2008, 2009, and 2010.

248.   For medical encounters in 2011 and 2012, the UHG Managing Defendants further limited which providers would qualify as outliers in order to reduce the number of providers and HCCs subject to review.  Instead of using a national average prevalence rate for each HCC based on diagnoses reported by *all* of the providers in the Defendant MA Organizations' MA Plans, the UHG Managing Defendants used the average rate at which only financially-incentivized providers reported diagnoses mapping to each HCC.  Thus, an incentivized provider was considered an outlier only if it reported diagnoses mapping to an HCC greater than two standard deviations above the rate that the HCC was coded by other incentivized providers, that is, providers who *also* had a financial incentive to invalidly code.

249.   A large percentage of the outliers were located in the Central District of California.  They are listed in Exhibit 14 to this Complaint.

4672

250.   Third, after limiting the program to only extreme outliers, the UHG Managing Defendants conducted an initial review of just a small sample of beneficiaries for whom the provider had reported diagnoses mapping to the outlier HCC or HCCs (as used herein, an "outlier HCC" is one that meets the criteria identified in Paragraphs 246 and 247 above for a particular provider and a particular encounter year).  For medical encounters in 2008, 2009, and 2010, the initial sample size for even the largest provider groups was never more than 30 beneficiaries per outlier HCC, and was often as few as 10 beneficiaries per outlier HCC.  The UHG Managing Defendants purposefully kept the sample size small to ensure the samples were not statistically significant, in the hope of preserving the ability to argue later that they were unable to extrapolate the results of their sample reviews to all of the diagnoses reported by the provider that mapped to the outlier HCC.  For 2011 and 2012 medical encounters, the UHG Managing Defendants increased the initial sample size to 50 beneficiaries per provider for each outlier HCC.

251.   Fourth, after reviewing the medical records for the beneficiaries in the sample to determine if the diagnoses were valid, the UHG Managing Defendants gave a provider a "passing" grade if anything less than 20 percent of the diagnoses were determined to be invalid.  Accordingly, even if 19 percent of the diagnoses in the sample were invalid, the provider passed and no further review was conducted.

252.   Fifth, if a provider failed the initial review for a particular outlier HCC, the UHG Managing Defendants often added only a few additional beneficiaries to the sample (*i.e.*, additional beneficiaries for whom the provider had reported diagnoses mapping to the outlier HCC).  The UHG Managing Defendants called this slightly larger sample an "incremental sample."  If they were successful in decreasing the invalidation rate to below 20 percent based on increasing the sample size, the UHG Managing Defendants considered the provider group to have a passing grade for that HCC.  Accordingly, if 19 percent of the diagnoses in the "incremental sample" were invalid, the provider passed and no further review was conducted.

4673

253.   Sixth, when the UHG Managing Defendants determined that a provider failed the incremental sample review for an outlier HCC, their RACCR policy specified that, with limited exceptions, *all* diagnoses reported by that provider mapping to the outlier HCC should be reviewed.  In other words, once it was established that a provider reported diagnoses mapping to a particular HCC three times or more than the national average *and* that 20 percent or more of the diagnoses in a sample review were not supported by the beneficiaries' medical records *and* that increasing the sample size did not reduce the percentage of unsupported codes, even the UHG Managing Defendants recognized that, with limited exceptions, a complete review of the medical records for all beneficiaries for whom the provider had reported diagnoses mapping to the outlier HCC was essential. But in most cases, the UHG Managing Defendants did not conduct these 100 percent reviews themselves.  Instead, as part of the RACCR Program, the UHG Managing Defendants purported to require the financially incentivized providers – the very providers who had over-reported the diagnoses at issue – to conduct these 100 percent reviews.

### C.   Despite Its Limited Scope, The RACCR Program Confirmed That Financially Incentivized Providers Were Submitting Invalid Diagnosis Codes

254.   Despite the many flaws of the RACCR Program, the UHG Managing Defendants knew from the results of their small sample reviews and the 100 percent reviews that were actually conducted that significant problems existed with diagnoses reported by financially-incentivized providers.

255.   By the end of March 2011, the UHG Managing Defendants were analyzing final results of RACCR sample analyses for encounters in 2008 and 2009, and had determined that a majority of the outlier HCCs analyzed in those years had validation rates below 80 percent, according to a March 29, 2011 email and spreadsheet that Benjamin Poehling sent to Paul Bihm.

4674

256.   By mid-February 2012, the UHG Managing Defendants reviewed samples for encounters in 2010 and, again, found a substantial number of outlier HCCs that had validation rates below 80 percent, according to a February 13, 2012 email and supporting materials that Mary Hammond sent to Benjamin Poehling.

257.   Overall, for the sample reviews for 2008, 2009, and 2010 encounters, nearly half (49.61 percent) of the outlier HCCs reviewed failed the 80 percent validation test.  Over a third (37.01 percent) of all sampled diagnoses were not supported by the beneficiaries' medical records.  On April 23, 2012, Mary Hammond reported to numerous of the employees of the UHG Managing Defendants (including Scott Theisen, Michael McCarthy, Kimberly Halva, Keith Dobbins, and others) that Optum had calculated the final results for samples from encounters in 2008, 2009, and 2010, and had identified the providers who had failed the 80% validation test.

258.   For the sample reviews for 2011 encounters, more than half (57.34 percent) of the outlier HCCs reviewed failed the 80 percent validation test, and over 30 percent of all sampled diagnoses reviewed for that year were not supported by the beneficiaries' medical records, according to an August 8, 2013 email and supporting documentation from Optum's Tracey Bradberry to Scott Hughes at Optum and Melissa Ferron, the President of iCodify, a diagnosis coding consultant.

259.   For the sample reviews for 2012 encounters, more than half of the outlier HCCs failed the 80 percent validation test, and more than a third (38 percent) of all sampled diagnoses were invalid, according to a July 2, 2014 presentation by Marybeth Meyer.

260.   The problems with incentivized providers' invalid diagnoses were not isolated incidents, but in many circumstances reflected a clear pattern of miscoding by provider groups.  Although the UHG Managing Defendants purposefully reviewed only a small sample of medical records each year, they knew that certain provider groups were consistently identified as extreme outliers on certain HCCs and failed the 80 percent sample validation test year after year.  For example:

4675

1       •    Every year from 2008 through 2011, Edinger Medical Group was an extreme outlier for Spinal Cord Disorders/Injuries (HCC 69).  Over those four years, Optum (or its predecessor, Ingenix) reviewed medical records for a total of 126 beneficiaries that Edinger diagnosed with Spinal Cord Disorders/Injuries and determined that the medical records of only *two* of those beneficiaries actually supported those diagnoses.  (Under the RACCR Program, Edinger or the UHG Managing Defendants should have conducted 100 percent reviews of its diagnoses that mapped to this HCC for the years 2008 through 2011, but they did not do so.)

•    Every year from 2008 through 2012, HealthCarePartners was an extreme outlier for Drug/Alcohol Psychosis (HCC 51).  During those five years, HealthCarePartners's highest sample validation rate for this HCC was 57.14 percent.  HealthCarePartners conducted 100 percent reviews for 2008, 2009, and 2011, and even HealthCarePartners recognized that over a third of the diagnoses it reported were not supported by its medical records.  (Under the RACCR Program, HealthCarePartners or the UHG Managing Defendants should have conducted 100 percent reviews for 2010 and 2012, but they did not do so.)

•    Every year from 2008 through 2012, a provider named CAIPA was an extreme outlier for Chronic Hepatitis (HCC 27).  During those five years, CAIPA's highest sample validation rate for this HCC was 76.92 percent.  CAIPA conducted 100 percent reviews for 2008 and 2009 encounters, and its highest self-audit validation rate was 56.73 percent.  (Under the RACCR Program, CAIPA or the UHG Managing Defendants should have conducted a 100 percent reviews for 2010 through 2012, but they did not do so.)

•    Every year from 2008 through 2012, Hemet Community Medical Group was an extreme outlier for Spinal Cord Disorders/Injuries (HCC 69).  During those five years, Hemet's highest sample validation rate for this HCC was 50 percent.  Hemet conducted 100 percent reviews for 2008 through 2011, and its highest self-audit validation rate also was 50 percent.  (Under the RACCR Program, Hemet or the UHG

123

4676

1  Managing Defendants should have conducted a 100 percent review for 2012, but they
2  did not do so.)

3        •      Every year from 2008 through 2012, WellMed was an extreme outlier for
4  Disorders of Immunity (HCC 45).  During those five years, WellMed's highest sample
5  validation rate for this HCC was 56.00 percent.  WellMed conducted 100 percent
6  reviews for 2008, 2009 and 2011, and its highest self-audit validation rate was 63.64
7  percent.  (Under the RACCR Program, WellMed or the UHG Managing Defendants
8  should have conducted a 100 percent review for 2010 and 2012 encounters, but they did
9  not do so.)

10  261.   In those cases in which providers performed 100 percent reviews, the results
11  confirmed that the providers had initially submitted numerous invalid codes.  Marybeth
12  Meyer and Scott Hughes's RACCR tracking spreadsheet indicated that more than 65
13  percent of the HCCs that providers reviewed in conducting 100 percent reviews had
14  validation rates below 80 percent.  The RACCR "master tracking" documents that
15  Hughes updated regularly for Marybeth Meyer from 2013 through 2015 showed that
16  validation rates for problematic HCCs did not improve over time.

17  262.   The UHG Managing Defendants' executives were routinely informed of RACCR
18  results.  Beginning in 2011 and until at least 2014, the UHG Managing Defendants held
19  frequent meetings – usually weekly – concerning the status of the RACCR Program and
20  its results, with regular attendance by those responsible for the RACCR Program
21  (including, at various times, Kim Halva, Keith Dobbins, Marybeth Meyer, Benjamin
22  Poehling, Patty Brennan, Mary Hammond, Scott Hughes, and Pam Thomsen).  During
23  these meetings, participants discussed the status and results of RACCR reviews, coding
24  results for individual practice groups, provider meetings to discuss results and 100
25  percent reviews, how 100 percent reviews would be handled in cases of provider
26  resistance, the financial impact of RACCR reviews, and changes to the RACCR
27  Program.

28

4677

263.   At least as early as February 14, 2012, Scott Theisen, Mary Hammond, and Benjamin Poehling met to discuss the deletion of codes resulting from the IDV and RACCR Programs for encounters in 2008, 2009, and 2010, and whether those deletions had been submitted.  In March 2012, Theisen asked Hammond, Dumcum, Poehling, and Paul Bihm to pull together summary data concerning RACCR sample results for discussions with the incentivized providers.  Theisen continued to be actively involved with some of the large incentivized providers that month, reviewing HealthCarePartners' results with Hammond and asking Hammond to identify the volume of codes that might be reviewed if WellMed were asked to do a 100 percent review so that he could provide a "worst case" scenario to John Way.  In April 2012, Poehling updated Way regarding the status of WellMed's RACCR review, and Kimberly Fadden wrote to a number of employees of the UHG Managing Defendants, including Jeff Dumcum, Stephanie Will, and Jon Bird, noting that, among other things, there were then 40 to 42 provider groups in the 100 percent review process.  The UHG Managing Defendants continued to provide periodic overviews or status updates concerning the RACCR Program to their executives and responsible employees.  For example, in October 2013, Hammond sent Karen Erickson, Jon Bird, Scott Theisen, Jeff Dumcum, Patty Brennan, Marybeth Meyer, and others a "two-page detailed document that outlines the status, by provider group and year, of the 2008-2012 RACCR program."

264.   The UHG Managing Defendants also kept their financial teams apprised of the status of the RACCR Program so that they could monitor, report, and account for its financial impact.  For example, at some time before April 4, 2012, Jon Bird and Scott Theisen began discussing a rough estimate of the financial impact of the deletion of diagnosis codes as a result of RACCR.  Theisen, Jon Bird, Bill Hnath, Melissa Sedor, and others also attended a December 3, 2012 meeting discussing, among other things, the financial effect of the IDV (*i.e.*, RACCR) Program, including the deletion of thousands of diagnosis codes as a result of that program.  As set forth in more detail below, the UHG Managing Defendants' financial teams, including, at various times,

4678

Theisen, Brian Thompson, Sedor and Hnath, also calculated liability accruals that UnitedHealthcare Medicare & Retirement  took in 2012 and 2013 to account for the financial effect of the diagnosis codes that would have to be deleted as a result of the RACCR Program.

### D. UnitedHealthcare Knew It Was Obligated To Delete Invalid Diagnosis Codes Identified Through The RACCR Reviews

265.   The Managing Defendants knew that they were required to submit accurate diagnosis data to the Medicare Program.  First, as described above, many of those executives understood that RACCR was an important part of UnitedHealthcare Medicare & Retirement's efforts to meet CMS's requirements regarding the submission of accurate risk adjustment data, which necessarily implied the correction of inaccurate data identified through the program.

266.   Second, the UHG Managing Defendants' conduct demonstrated their knowledge that they were required to delete invalid diagnosis codes identified through the RACCR Program.  From 2012 through 2015, the Managing Defendants deleted – albeit belatedly – many invalid diagnosis codes submitted to CMS for encounters from 2008 through 2013, after determining, through the RACCR Program, that those codes were invalid.

267.   Third, UnitedHealthcare Medicare & Retirement's practice of booking contra-revenue accruals for the value of the deletions it had to submit as a result of the RACCR Program demonstrated that the UHG Managing Defendants knew of their obligation to return overpayments discovered through that program to the Government.  Pursuant to Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies*, an estimated loss from a loss contingency shall be accrued by a charge to income if both: (a) a liability or impairment of an asset is "probable"; and (b) the amount of the loss can be reasonably estimated. Thus, the accrual of loss contingencies relating to RACCR reflected an acknowledgement that the return of an overpayment to the Government was

4679

1  "probable," and that UnitedHealthcare could reasonably estimate the amount of the

2  overpayment to be returned.

3  268.   Beginning in 2012, UnitedHealthcare began taking liability accruals to account for

4  changes in its revenue that it expected to incur as a result of deletion of invalid codes

5  identified through the RACCR Program.  By end of year 2012, it calculated that it would

6  have to reduce its revenue by $79 million to account for its deletion of invalid codes

7  resulting from RACCR reviews (including expected 100 percent reviews) of medical

8  encounters in 2008, 2009, and 2010.  That $79 million was less than the total amount of

9  overpayment that it estimated it owed the United States, since it included both a

10  reduction in revenue resulting from the expected return of the overpayment and an offset

11  for the amount of money that it expected to recover from the incentivized providers,

12  which would have to share a portion of the burden of overpayment.

13  269.   Accordingly, UnitedHealthcare took a liability accrual of $79 million.  It shared

14  this calculation with Deloitte and Touche in connection with that firm's audit of UHG's

15  financial statements, as part of UnitedHealthcare's quarterly RAF Accounting Treatment

16  for Q4 2012 and Risk Adjustment Factor Revenue and Receivable Accounting for 2012.

17  Bill Hnath and Melissa Sedor told UHG's Deloitte auditors that the $79 million liability

18  accrual was "related to overpayments by CMS" that were identified through the RACCR

19  Program.

20  270.   Scott Theisen was aware of the existence of a RACCR liability, and the

21  expectation that UnitedHealthcare would take an accrual for it, at least as early as

22  October 9, 2012, when Melissa Sedor sent him and Bill Hnath an August 2012 RAF

23  Financial Summary showing a $97.5 million exposure (*i.e.*, amount of overpayment to

24  be returned) relating to the RACCR Program for encounters in 2008, 2009, and 2010.

25  271.   In December 2013, Anne Reis, UnitedHealthcare Medicare & Retirement's

26  Associate Director of Revenue, shared risk adjustment accruals with UnitedHealthcare

27  executives, including Scott Theisen, Brian Thompson, Bill Hnath, and Marybeth Meyer.

28  Those accruals included an additional liability accrual of $34.5 million for RACCR

4680

overpayments for the 2012 date of service year (2013 payment year), increasing the total liability accrual for the RACCR Program to $90.7 million for the 2008-2012 date of service years (2009-2013 payment years). In taking a liability accrual for the 2012 date of service year, UnitedHealthcare determined that it was probable that RACCR reviews for the 2012 date of service year would result in the identification of deletes of diagnoses reported by incentivized providers for medical encounters in 2012, as these reviews had done in previous years.

272.   The accuracy of the risk adjustment data that UnitedHealthcare and others submitted to CMS on behalf of the Defendant MA Organizations was material to the government's decision to pay and to the amount of risk adjustment payments. The submission of inaccurate diagnosis data from incentivized providers directly resulted in increases in risk adjustment payments that the Government made to the Defendant MA Organizations.

273.   Similarly, when the UHG Management Defendants deleted inaccurate diagnoses – as they did when inaccurate diagnoses were identified in sample RACCR reviews or 100 percent reviews under the RACCR Program – the Government was able to offset its subsequent payments to the Defendant MA Organizations by the value of those deletions. UnitedHealthcare Medicare & Retirement's and Optum's failure to delete unsupported codes because of their failure to conduct or complete 100 percent reviews when their sample reviews identified Provider/HCC combinations with unacceptably high error rates was material because if they had conducted the 100 percent reviews and submitted deletes for the inaccurate diagnosis codes found in those reviews, those deletions would have resulted in further offsets and, thus, reductions of payments to the Defendant MA Organizations.

### E.   Defendants Failed To Follow Their Own RACCR Protocol Requiring 100 Percent Reviews

274.   As set forth above, the RACCR Program provided that if the sample review of an outlier HCC showed that less than 80 percent of the diagnoses were supported by the

4681

medical record, the provider would be required to perform a 100 percent review of all instances of that outlier HCC coded by that provider for the date-of-service year at issue. This requirement reflects a recognition by the UHG Managing Defendants that if a provider codes a diagnosis three times as often as the national average rate *and* a sample review shows that more than 1 in 5 diagnoses are not supported by the medical record, then the provider's other uses of the same diagnosis code are highly likely to include invalid diagnoses and must be reviewed for accuracy. Nonetheless, despite this requirement of the RACCR Program, the UHG Managing Defendants frequently did not require providers to perform 100 percent reviews of problematic HCCs for which sample results showed unacceptably high error rates.

275.   Not surprisingly, many providers were very resistant to performing 100 percent reviews. Sometimes, the providers reviewed the records for only some, but not all, additional beneficiaries for whom they had reported diagnoses mapping to the outlier HCC. Sometimes, they did nothing.

276.   For medical encounters in 2008 to 2010, at least 58 provider groups should have performed 100 percent reviews because they failed the sample validation test for at least one outlier HCC. Combined, these providers should have conducted 100 percent reviews relating to 192 problematic HCCs. However, the providers only conducted reviews of 143 of the 192 HCCs. Thus, a quarter of all outlier HCCs that failed the sample validation test were not further reviewed by either the provider groups or UnitedHealthcare. Similarly, for 2011 encounters, 100 percent reviews were conducted for only 69 of 82 HCCs that failed Optum's sample validation test. Because the UHG Managing Defendants did not require provider to perform 100 percent reviews of these high-frequency but low-validating codes, they were able to avoid deleting the invalid codes among them.

277.   For example, for 2010 encounters, Edinger Medical Group coded Drug/Alcohol Dependence (HCC 52) at a rate greater than three times the national rate. Optum (or its predecessor, Ingenix) determined that only 70 percent of the diagnoses in its sample

4682

were supported by medical record documentation.  Because 30 percent of the sampled diagnoses were invalid, the UHG Managing Defendants should have required Edinger to review the additional 66 Edinger beneficiaries with a diagnosis mapping to HCC 52 that were not included in the sample (or the UHG Managing Defendants should have performed that review themselves).  Nonetheless, the UHG Managing Defendants did not require Edinger to do this review and they did nothing further to examine Edinger's additional diagnoses mapping to HCC 52 that were not included in the sample.

278.   Additional examples of provider groups that failed to conduct 100 percent reviews for particular HCCs are shown in the chart attached as Exhibit 15 to this Complaint.  The UHG Managing Defendants also did not conduct the 100 percent reviews of these problematic HCCs.

279.   Moreover, even when a financially incentivized provider group conducted a 100 percent review, the UHG Managing Defendants knew they could not rely on the accuracy of that review.  For example, in a draft "WellMed RACCR Audit Status Summary as of 2-9-12" that Mary Hammond circulated to Benjamin Poehling for discussion with John Way in February 2012, Hammond reported that WellMed did a self-audit for eight HCCs, but that the UHG Managing Defendants determined that "70% of the codes [WellMed] indicated were properly documented actually were not supported in the medical record."  Hammond's summary also stated that, based on sample reviews for medical encounters in 2008, 2009, and 2010, "WellMed failed to achieve an acceptable validation rate for multiple HCCs …, as defined by the RACCR audit program policy and procedure."

### F.   Even After Identifying Miscoding By Providers, Defendants Failed To Delete Invalid Codes

280.   Even when the UHG Managing Defendants determined that diagnoses in a sample review or 100 percent review were not supported by the medical records, UnitedHealthcare Medicare & Retirement did not always delete them.  For example:

130

4683

- For 2008 medical encounters, the UHG Managing Defendants conducted a sample review for Edinger Medical Group of diagnoses mapping to Drug/Alcohol Dependence (HCC 52) and Major Complications of Medical Care & Trauma (HCC 164). Optum's (or Ingenix's) coders determined that "[t]here was no clinical documentation to support the diagnoses" mapping to HCC 52 for six beneficiaries and that the diagnosis mapping to HCC 164 was the "wrong code" for one beneficiary. (For all examples, further information to identify or aid in identifying the beneficiaries will be separately provided to the Defendants.) On January 23, 2013, Mary Hammond recommended to Keith Dobbins and Marybeth Meyer that these results be put "on hold." The UHG Managing Defendants never deleted these codes.

- For 2008 medical encounters, Optum (or its predecessor, Ingenix) conducted a sample review for Family Practice Medical Group's diagnoses mapping to Drug/Alcohol Dependence (HCC 52). For two beneficiaries, Optum's (or Ingenix's) coder concluded there was "no clinical documentation to support the diagnoses." In the Corrective Action Plan for the sample review, the reviewer gave the provider "the benefit of the doubt" for the two diagnoses, despite noting that "if these were submitted for a CMS or OIG audit, they may have been rejected."

- In a sample review for Sharp-Rees Sealy for Vascular Disease (HCC 105) for 2011, the UHG Managing Defendants failed to delete a diagnosis for Beneficiary AA even though Optum's (or Ingenix's) coder, iCodify, determined it was the "wrong code."

- In a sample review for HealthCarePartners for Protein-Calorie Malnutrition (HCC 21) for 2011, the UHG Managing Defendants failed to delete a diagnosis for Beneficiary BB even though Optum's (or Ingenix's) coder, iCodify, determined it was the "wrong code."

131

4684

- In a sample review for Mercy Physicians Medical Group for Protein-Calorie Malnutrition (HCC 21) for 2011, the UHG Managing Defendants failed to delete a diagnosis for Beneficiary CC even though Optum's (or Ingenix's) coders, under the supervision of Tracey Bradberry, an Optum Operations Manager, determined that it was the "wrong code."

- In a sample review for WellMed for Major Complications of Medical Care and Trauma (HCC 164) for 2011, the UHG Managing Defendants did not delete a diagnosis for Beneficiary DD even though Optum's (or Ingenix's) coder noted the "dx [was] not documented" in the record.

- In a sample review for HealthCarePartners for Pneumococcal Pneumonia, Emphysema, Lung Abscess (HCC 112) for 2012, the UHG Managing Defendants did not delete a diagnosis code for Beneficiary EE even though Optum's (or Ingenix's) coder determined the "dx [was] not documented."

- In a sample review for WellMed for Disorders of Immunity (HCC 45) for 2011, the UHG Managing Defendants did not delete a diagnosis code for Beneficiary FF even though Optum's (or Ingenix's) coder determined the diagnosis in the record was "not a current condition."

281. For some providers, the UHG Managing Defendants simply agreed not to delete invalid codes. In January 2013, Keith Dobbins was informed that the UHG Managing Defendants had not yet submitted deletes reflecting invalid codes found in RACCR sample reviews of Edinger and WellMed diagnoses for encounters in 2008, 2009, and 2010. Optum kept those deletes "on hold," meaning that the UHG Managing Defendants did not submit them, despite knowledge that the underlying codes had led to improper payments from CMS.

4685

### G. UnitedHealthcare Medicare & Retirement Discontinued 100 Percent Reviews And Converted The RACCR Program Into A Revenue Generating Program

282.   By early 2014, UnitedHealthcare Medicare & Retirement knew, based on its observation of the results of the RACCR Program (as set forth above), that many of its large incentivized providers had reported unacceptably high rates of invalid diagnoses for numerous conditions.  However, rather than redoubling its efforts to address invalid coding by incentivized providers, UnitedHealthcare Medicare & Retirement had Optum restructure the RACCR Program to turn it into just another chart review program focused on making ADDS.  By July 2014, Optum made changes to the RACCR Program that effectively terminated the program as a tool for remedying the known problem of invalid coding by incentivized providers and refunding Medicare for risk adjustment payments based on those providers' invalid diagnoses.

283.   First, UnitedHealthcare Medicare & Retirement stopped requiring any 100 percent reviews when the sample reviews failed the 80 percent sample validation test.  At the time it made this decision, it was conducting RACCR sample reviews for 2012 DOS medical encounters.  Accordingly, no 100 percent reviews were conducted for any outlier HCCs associated with 2012 medical encounters.

284.   For 2012 DOS, there were 21 provider groups that had failed the 80 percent sample validation test for at least one outlier HCC.  Optum had determined that the average invalidation rate was 34.73 percent for these 21 providers based on the sample reviews of their outlier HCCs.  The UHG Managing Defendants knew from prior years that 100 percent reviews would result in the identification of more deletes.  Nonetheless, they failed to require 100 percent reviews of the outlier HCCs or perform reviews themselves.

285.   Second, for dates of service years after 2012, the UHG Managing Defendants stopped selecting sample beneficiaries for reviews based on whether the providers had submitted diagnoses for them mapping to outlier HCCs.  Instead, they began selecting

4686

beneficiaries and medical records based on what they believed would yield additional codes and result in increased risk adjustment payments.

286.   Third, starting with 2013 DOS medical encounters, UnitedHealthcare Medicare & Retirement and Optum reviewed even fewer medical records than in previous years (less than 100 total) for each incentivized provider group.  Thus, they reviewed only several thousand medical records as part of this new program.

287.   By making these changes, the UHG Managing Defendants and Optum effectively terminated the RACCR Program as an effort to correct the submission of invalid diagnosis codes.  Instead, they deliberately avoided identifying (and, thus, deleting) invalid diagnoses reported by their financially-incentivized providers and repaying Medicare for risk adjustment payments based on them.

288.   Executives at Optum and UnitedHealthcare, including Scott Theisen, Jeff Dumcum, Karen Erickson, Brian Thompson, and Keith Dobbins, were aware that the changes to the RACCR Program for 2013 DOS and future years created a program that no longer targeted outlier HCCs by provider, but instead selected beneficiaries and medical records based on methods that Optum believed would yield additional codes and result in increased risk adjustment payments.  They knew that there was no replacement program put into place to target the outlier HCCs and providers that had previously been identified by the RACCR program. They knew that by stopping its program to look for inaccurate codes, outlier providers who had failed the 80 percent validation tests would continue to submit inaccurate codes to UnitedHealthcare, causing the submission of inaccurate codes to CMS.

## H.   RACCR-Related Falsehoods In UnitedHealthcare's And Optum's Attestations

289.   As discussed in more detail below, Defendant UnitedHealthcare, on behalf of the Defendant MA Organizations, submitted a Risk Adjustment Attestation to the Medicare Program each year after the final risk adjustment submission deadline.  *See infra*

4687

paragraphs 309 to 327.  Defendant Optum approved these Attestations in order for UnitedHealthcare to submit them.  *Id*.

290.   In March 2012, Scott Theisen signed an Attestation on behalf of United's Medicare & Retirement health plans certifying to the accuracy of UnitedHealthcare's data for the 2010 date of service year (2011 payment year).  By that date, the members of UHG Management Defendants' RACCR team (including Michael McCarthy, Keith Dobbins, Kim Halva, Benjamin Poehling, and Mary Hammond) knew that the RACCR Program had identified thousands of invalid codes mapping to outlier HCCs from encounters in 2010, that those codes had not yet been deleted, and that efforts were underway to identify the providers that would be required to conduct 100 percent reviews for encounters in 2010 because some of their diagnosis codes did not pass the 80 percent sample validation test.

291.   In April 2013, Scott Theisen signed an Attestation on behalf of UnitedHealthcare's Medicare & Retirement health plans certifying to the accuracy of UnitedHealthcare's data for the 2011 date of service year (2012 payment year).  By that date, Theisen, along with the members of UHG Management Defendants' RACCR team (including Marybeth Meyer, Keith Dobbins, Kim Halva, Patty Brennan, Benjamin Poehling, and Scott Hughes) knew that the RACCR Program had identified thousands of invalid codes mapping to HCCs from encounters in 2011, that those codes had not yet been deleted, and that efforts were underway to identify the providers that would be required to conduct 100 percent reviews for encounters in 2011 because some of their diagnosis codes did not pass the 80 percent sample validation test.

292.   In April 2014, Brian Thompson signed an Attestation on behalf of UnitedHealthcare's Medicare & Retirement health plans certifying to the accuracy of UnitedHealthcare's data for the 2012 date of service year (2013 payment year).  By that date, the members of UHG Management Defendants' RACCR team (including Marybeth Meyer, Keith Dobbins, Kim Halva, Scott Theisen, Scott Hughes, and Tracey Bradberry) knew that the RACCR Program had identified thousands of invalid codes mapping to

4688

HCCs from encounters in 2012 through sample reviews, and that those codes had not yet been deleted.  Additionally, Thompson was aware that there was a contra-revenue accrual in the amount of $34.5 million for anticipated RACCR deletes for the 2012 date of service year alone.

### IV.    Defendants' False Risk Adjustment Attestations

293.    The UHG Managing Defendants submitted or caused the submission, on behalf of the Defendant MA Organizations, of the annual Risk Adjustment Attestations to the Medicare Program after the final submission deadline but before the final reconciliation payment each year.  Officers of Defendants Ovations and UnitedHealthcare reviewed and signed these Attestations.  Defendant Optum and its predecessor Ingenix reviewed and approved these Attestations.  These Defendants knew that the Defendant MA Organizations were required to submit truthful Risk Adjustment Attestations to the Medicare Program.  Their officers and employees (*e.g.*, Jeffrey Dumcum, Stephanie Will, Jon Bird, Patty Brennan, Rebecca Martin, Scott Theisen, Relator Poehling, Mary Hammond) were aware of the obligations for deleting invalid diagnoses from RAPs or otherwise reporting and repaying risk adjustment overpayments by other means.  Their officers and employees (*e.g.*, Jeffrey Dumcum, Stephanie Will, Jon Bird, Patty Brennan, Rebecca Martin, Scott Theisen, Relator Poehling, Mary Hammond) also knew that, if they deleted or withdrew invalid diagnoses from RAPS prior to the submission of an Attestation, Medicare would not pay for them or would recover any erroneous payments associated with them.  However, Defendants failed to do this and knowingly submitted or caused the submission of false Attestations.  They did this with actual knowledge that the Attestations were false or acted in deliberate ignorance or reckless disregard of the falsity of the Attestations.

294.    Starting with the Attestation for payment year 2008 (if not for earlier Attestations) and continuing forward, attorneys for one or more of the UHG Managing Defendants added a footnote to the Attestations which stated that the Attestations were "based on facts reasonably available or made available to" the Defendant MA Organizations as of

the date of the Attestations. Optum and its predecessor Ingenix knew about this footnote because its senior management, including Karen Erickson, Jeff Dumcum and Scott Theisen, reviewed the Attestations and approved them prior to their submission to the Medicare Program. The officers of Ovations and UnitedHealthcare who signed the Attestations also knew about this footnote. Even without this footnote, the Attestations themselves state that they must be made based on information available to the MA Organizations: "Based on best knowledge, *information*, and belief as of the date indicated below, all information submitted to CMS in such report [*i.e*., the risk adjustment data reported for the payment year at issue] and not subsequently deleted prior to the date hereof is accurate, complete, and truthful." (Emphasis added).

295. Information and facts reasonably available or made available to the Defendant MA Organizations and the groups and entities that managed them at the time the Attestations were submitted included the results of the medical record reviews conducted as part of the Chart Review, Claims Verification, and RACCR Programs. In particular, the results of the Chart Review Program were available before the final submission deadline each year as the Chart Review Program ended when additional diagnoses could no longer be submitted. Thus, the results of the Chart Review Program were "information" and "facts reasonably available" before Ingenix and Optum approved the Attestations and before Ovations and UnitedHealthcare executed and submitted the Attestations to CMS on behalf of the Defendant MA Organizations. However, these Defendants knowingly failed to delete numerous diagnoses that they had previously-submitted that were unsupported and invalidated by their own chart reviews.

### A. Defendants' Internal Attestation Approval Process

296. Generally, the Chief Financial Officers of the groups with responsibility for managing the Defendant MA Organizations owned by UHG were the officers designated to sign and execute the annual Risk Adjustment Attestations on behalf of the Defendant MA Organizations. Over the relevant time period, these groups included, but were not limited to, Secure Horizons, the Public & Seniors Markets Group, Ovations,

UnitedHealthcare Medicare & Retirement, and UnitedHealthcare Community & States. They were "responsible for establishing and maintaining adequate internal controls over completion of attestations" submitted to the Medicare Program. They used a form to "confirm that the appropriate legal, regulatory, and business owners" reviewed and approved the attestations. *Id.* These legal, regulatory, and business owners were required to sign Internal Approval Forms in order for the designated officials to sign the Risk Adjustment Attestations.

297. Part C regulation, 42 C.F.R. § 422.504(1), and the agreements between the MA Organizations and CMS required that this internal approval process include any related entity, contractor or subcontractor of the Defendant MA Organizations that generated or submitted risk adjustment data on their behalf. Furthermore, if a related entity generated data relating to an MA Organization's claims for payments from the Medicare Program, the related entity (as well as the MA Organization) must certify the accuracy and truthfulness of the data. *Id.* at § 422.504(l)(3). The contracts stated: "If such risk adjustment data are generated by a related entity, contractor, or subcontractor of an MA Organization, such entity, contractor, or subcontractor must also attest to (*based on best knowledge, information, and belief, as of the date specified on the attestation form*) the accuracy, completeness, and truthfulness of the data." *See* Exhibits 1-7, attached hereto (Article IV, Section D.2). Optum (and its predecessor, Ingenix), Ovations, and UnitedHealthcare Medicare &Retirement understood this requirement as shown by the previously-described MOU that obligated Optum to attest to the validity of the risk adjustment data that it submitted to the Medicare Program on behalf of the Defendant MA Organizations. *See supra* paragraphs 83-86.

298. During the time period relevant to this Complaint, the "business owners" that signed off on the Internal Approval Forms were executives of Optum and Ingenix. One of these business owners was Jeffrey Dumcum, who ran the Risk Adjustment Group at Ingenix and then Optum. Dumcum's internal attestations stated that he had reviewed the content of the Risk Adjustment Attestations to be submitted by the managing entity (e.g.,

138

4691

1    Ovations or UnitedHealthcare) to the Medicare Program and confirmed that the

2    Attestations were factually accurate. For example, on March 26, 2010, Dumcum sent an

3    email to Emily Vue, a Senior Regulatory Affairs Analyst for "Ovations – PSMG,

4    UnitedHealth Group, Inc.," stating that he approved the Risk Adjustment Attestation for

5    John Larsen, the Chief Financial Officer of the Ovation Public & Senior Markets Group,

6    to submit to Medicare for payment year 2009. On March 24, 2011, Dumcum sent an

7    email to Barbara Carlson, a Senior Regulatory Affairs Analyst for UnitedHealthcare

8    Medicare & Retirement, stating that he approved the Risk Adjustment Attestation for

9    Scott Theisen, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement,

10   to submit to Medicare for payment year 2010. On March 8, 2012, Dumcum sent an

11   email to Sandy Rick, a Senior Regulatory Affairs Analyst for UnitedHealthcare

12   Medicare & Retirement, stating that he approved the Risk Adjustment Attestation for

13   Mr. Theisen to submit to Medicare for payment year 2011.

14   299.  Mr. Dumcum approved the Larsen and Theisen Risk Adjustment Attestations after

15   reviewing them and the footnotes added by the attorneys to them, including the footnote

16   stating that the Attestations were based on information available to the Defendant MA

17   Organizations about the accuracy and truthfulness of the diagnosis data that was

18   submitted on their behalf to the Medicare Program for risk adjustment payments.

19   However, Dumcum deliberately ignored or recklessly disregarded information available

20   to the Defendant MA Organizations and the entities that managed them (including

21   Ovations, UnitedHealthcare, Ingenix, and Optum, depending on the time period) about

22   invalid diagnoses, that is, he deliberately ignored and recklessly disregarded the negative

23   results of the medical record reviews conducted as part of the Chart Review, Claims

24   Verification, and RACCR Programs. Accordingly, Dumcum, as a senior executive of

25   Defendant Optum (and its predecessor, Ingenix), caused false Risk Adjustment

26   Attestations to be submitted to the Medicare Program.

27   300.  For example, in March 2010, when Dumcum approved the Larsen Attestation for

28   payment year 2009, his Risk Adjustment Group at Ingenix possessed information about

4692

the negative results of the Chart Review Program focused on the review of medical records for medical encounters in date of service year 2008. Also, in March 2010, Dumcum knew (or deliberately ignored or recklessly disregarded) that the managing entities were not deleting or withdrawing the diagnoses unsubstantiated and invalidated by those chart reviews. At that time, Dumcum also knew (or deliberately ignored or recklessly disregarded) that these managing entities and the MA Organizations had an obligation to delete or withdraw those invalid diagnoses. In fact, in 2009 prior to Dumcum's approval of the Larsen Attestation, Dumcum knew that his Risk Adjustment Group had already started discussing "looking both ways" at the results of chart reviews and the methodology to do so in order to make DELETES as well as ADDS. *See supra* paragraphs 180-182. Nonetheless, Dumcum signed the Internal Approval Form and caused Larsen to submit a false Attestation to the Medicare Program.

301. As another example, in March 2011, when Dumcum approved the Theisen Attestation for payment year 2010, his Risk Adjustment Group at Optum possessed information about the negative results of the Chart Review Program focused on the review of medical records for medical encounters in date of service year 2009. Also, in March 2011, Dumcum knew (or deliberately ignored or recklessly disregarded) that neither Optum nor UnitedHealthcare were deleting or withdrawing the diagnoses invalidated by those chart reviews because they were not supported by the beneficiaries' medical records. At that time, Dumcum also knew (or deliberately ignored or recklessly disregarded) that both UnitedHealthcare and Optum had an obligation to delete or withdraw those invalid diagnoses. In fact, in the fall of 2010 prior to Dumcum's approval of the Theisen Attestation, Dumcum knew that senior executives of Ingenix and Ovations had already acknowledged that they should be "looking both ways" at the results of the chart reviews to make DELETES as well as ADDS. *See supra* paragraphs 185 and 196-198. In December 2010, the results of the first pilot phase (Phase I) of the Claims Verification Program, which showed that provider-reported diagnoses were unsupported for over 50 percent of the medical records reviewed, were also known by or

4693

available to Dumcum.  *See supra* paragraph 206.  Nonetheless, Dumcum signed the Internal Approval Form and caused Theisen to submit a false Attestation to the Medicare Program.

302.   In addition, in March 2012, when Dumcum approved the Theisen Attestation for payment year 2011, his risk adjustment group at Optum possessed information about the negative results of the Chart Review Program focused on the review of medical records for medical encounters in date of service year 2010.  Also, in March 2012, Dumcum knew (or deliberately ignored or recklessly disregarded) that neither Optum nor UnitedHealthcare were deleting or withdrawing the diagnoses invalidated by those chart reviews, *i.e.*, those diagnoses not supported by the beneficiaries' medical records.  At that time, Dumcum also knew (or deliberately ignored or recklessly disregarded) that both UnitedHealthcare and Optum had an obligation to delete or withdraw those invalid diagnoses but were not doing so.  In fact, by the time that Dumcum approved Theisen's Attestation in March 2012, Optum had completed the second pilot phase (Phase II) of the Claims Verification Program on 17,398 charts and the results were striking.  Optum identified 4,786 invalid diagnoses to be deleted, which was greater than the number of additional diagnoses (ADDS) identified by the coders based on their review of the same medical records.  And, as previously stated, in February 2012, Dumcum, who was responsible for the Claims Verification Program, met with Relator Poehling and Theisen and reported:  "I'm deleting as much as I'm adding at the end of the day.  And I don't know if—you know, what I want to do."  He also stated:  "we're getting more and more red here," and that Claims Verification "eats in very substantially" to the revenue from ADDS from chart reviews.  Nonetheless, Dumcum signed the Internal Approval Form and caused Theisen to submit a false Attestation.

303.   Another "business owner" who executed the Internal Approval Form was Karen Erickson, an Executive Vice President of Optum.  On April 3, 2013, Erickson approved Risk Adjustment Attestations for Scott Theisen, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, and Paul Balthazor, the Chief Financial

4694

Officer of UnitedHealthcare Community & State, to submit to Medicare for payment year 2012. Erickson's internal attestation stated that she had reviewed the content of the Theisen and Balthazor Risk Adjustment Attestations and confirmed that the Attestations were factually accurate. Because she reviewed these Risk Adjustment Attestations she knew about the footnotes that UnitedHealthcare included in the Attestations, stating that the Attestations were based on information available to the Defendant MA Organizations. In April 2013, Erickson knew (or deliberately ignored or recklessly disregarded) that this information included the negative results of the Chart Reviews focused on the review of medical records for medical encounters in date of service year 2011. Also, in April 2013, Erickson knew (or deliberately ignored or recklessly disregarded) that neither Optum nor UnitedHealthcare were deleting or withdrawing all of the diagnoses invalidated by those chart reviews because they were not supported by the beneficiaries' medical records. At that time, Erickson also knew (or deliberately ignored or recklessly disregarded) that both UnitedHealthcare and Optum had an obligation to delete or withdraw all invalid diagnoses. In addition, prior to approving the Attestations in 2013, Erickson, who was part of the team that developed the operational plan for Claims Verification, knew and was concerned about the error rates based on chart reviews conducted as part of the Claims Verification Program. Nonetheless, Erickson signed the Internal Approval Forms and caused Theisen and Balthazor to submit false Attestations.

304. In addition, on April 17 and 21, 2014, Erickson approved Risk Adjustment Attestations for Brian Thompson, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, and for Paul Balthazor, the Chief Financial Officer of UnitedHealthcare Community & State, to submit to Medicare for payment year 2013. Erickson's internal attestation stated that she reviewed the content of the Thompson and Balthazor Risk Adjustment Attestations and confirmed that the Attestations were factually accurate. Because she reviewed these Risk Adjustment Attestations she knew about the footnotes that UnitedHealthcare included in the Attestations, stating that the

Attestations were based on information available to the Defendant MA Organizations. In April 2014, Erickson knew (or deliberately ignored or recklessly disregarded) that this information included the negative results of the Chart Reviews focused on the review of medical records for medical encounters in date of service year 2012. Also, in April 2014, Erickson knew (or deliberately ignored or recklessly disregarded) that neither Optum nor UnitedHealthcare were deleting or withdrawing all of the diagnoses invalidated by those chart reviews because they were not supported by the beneficiaries' medical records. At that time, Erickson also knew (or deliberately ignored or recklessly disregarded) that both UnitedHealthcare and Optum had an obligation to delete or withdraw all invalid diagnoses. Nonetheless, Erickson signed the Internal Approval Forms and caused Thompson and Balthazor to submit false Attestations.

305. During the time period relevant to this Complaint, one of the "regulatory owners" that executed the Internal Approval Form was David Walsh, the Senior Director of Regulatory Affairs for UnitedHealthcare. He attested that he had reviewed the content of the Risk Adjustment Attestation "to confirm that it complies with applicable *regulatory* requirements and determined that it is appropriate for the designated executive to proceed with signature." However, Walsh deliberately ignored or recklessly disregarded the negative results of the Chart Review Program. He also ignored and disregarded that Defendants had failed to comply with the requirements that diagnoses must be supported by patients' medical records and those diagnoses that are not supported by the patients' medical records must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayment.

306. During the time period relevant to this Complaint, one of the "legal owners" that executed the Internal Approval Form was UnitedHealthcare's Senior General Counsel Keith Dobbins. For example, on March 26, 2010, Dobbins approved the Risk Adjustment Attestation for John Larsen to submit to the Medicare Program for payment year 2009. Dobbins attested that he had reviewed the content of the Risk Adjustment Attestation to confirm that it complied with "applicable *legal* requirements" and was

143

4696

1   "appropriate" for Larsen to sign. (emphasis in the original). As another example, on

2   March 25, 2011, Dobbins approved the Risk Adjustment Attestation for Scott Theisen,

3   the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, to submit to the

4   Medicare Program for payment year 2010. Again, Dobbins attested that he reviewed the

5   content of the Attestation to confirm that it complied with "applicable legal

6   requirements" and was "appropriate" for Theisen to submit to the Medicare Program for

7   payment year 2011. In addition, on March 9, 2012, Dobbins approved the Risk

8   Adjustment Attestation for Scott Theisen, the Chief Financial Officer of

9   UnitedHealthcare Medicare & Retirement, to submit to the Medicare Program for

10  payment year 2011. Again, Dobbins attested that he reviewed the content of the

11  Attestation to confirm that it complied with "applicable legal requirements" and was

12  "appropriate" for Theisen to submit to the Medicare Program for payment year 2011.

13  On April 30, 2014, Dobbins also approved the Risk Adjustment Attestation for Brian

14  Thompson, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, to

15  submit to Medicare for payment year 2013. Again, Dobbins attested that he reviewed

16  the content of the Attestation to confirm that it complied with "applicable legal

17  requirements" and was "appropriate" for Theisen to submit to the Medicare Program for

18  payment year 2011. On information and belief, Dobbins approved other Risk

19  Adjustment Attestations for other payment years and attested to their accuracy.

20  307.   Each time Dobbins approved the Attestations, he knew (or deliberately ignored or

21  recklessly disregarded) that information available to the Defendant MA Organizations

22  included the negative results of the chart reviews for the date of service years at issue.

23  Also, he knew (or deliberately ignored or recklessly disregarded) that neither

24  Ingenix/Optum nor Ovations/UnitedHealthcare (depending on the time period) were

25  deleting or withdrawing all of the diagnoses invalidated by those chart reviews because

26  they were not supported by the beneficiaries' medical records. At that time, he also

27  knew (or deliberately ignored or recklessly disregarded) that both Ingenix/Optum and

28  Ovations/UnitedHealthcare had an obligation to delete or withdraw all invalid diagnoses.

<div align="center">144</div>

308.   During the years relevant to his approvals, Dobbins was a member of UnitedHealthcare's Risk Adjustment Compliance Oversight Committee and Optum's Clinical Programs and Compliance Oversight Committee.  During those years, Dobbins also attended various meetings involving the work that Ingenix and then Optum performed for Ovations and then UnitedHealthcare.  As a member of these committees and a participant in these meetings, Dobbins was included in numerous discussions about the validity of the risk adjustment data submitted to the Medicare Program, the Chart Review Program, the development and results of the Claims Verification Program, and the RACCR Program.  Dobbins was also one of the individuals who was responsible for reviewing quarterly compliance scorecards that included detailed information about the Chart Review, Claims Verification, and RACCR Programs.  Despite these compliance responsibilities and this knowledge, Dobbins ignored and disregarded that Ovations, UnitedHealthcare, Optum, and Ingenix had failed to comply with the requirements that diagnoses must be supported by patients' medical records and that diagnoses unsupported by patients' medical records must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayments.

**B.     The False Attestations Submitted To The Government**

309.   On March 19, 2009, John Way executed and submitted or caused to be submitted to the Medicare Program an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1."  This Attestation related to risk adjustment data, that is, diagnoses, which Ovations and/or UnitedHealthcare and Ingenix submitted on behalf of many of the Defendant MA Organizations for risk adjustment payments for payment year 2008.  *See* Exhibit 16, attached hereto.  The Risk Adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2007.  Way signed the Attestation as "Chief Financial Officer, SecureHorizons."  At this time, March 2009, SecureHorizons was an internal group within Ovations or UnitedHealthcare.  Way added

145

a footnote to the Attestation which stated that the Attestation was "based on facts reasonably available or made available to the MA Organization as of the date of" the Attestation.  The Attestation itself said it was made based on information available to the MA Organizations.  In March 2009, information and facts reasonably available to the Defendant MA Organizations, Ovations and/or UnitedHealthcare, and Ingenix included the negative results of the Chart Review Program for 2007 date of service medical encounters.

310.   In March 2009, when Way signed the Attestation, he deliberately ignored or recklessly disregarded the negative results of the Chart Review Program relating to medical encounters with 2007 dates of service.  Way also ignored and disregarded that Defendants had failed to comply with the requirements that diagnoses must be supported by patients' medical records and those diagnoses that are not supported by patients' medical records are invalid and must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayment.  In addition, at this time, Relator Poehling was a direct report to Way, Relator Poehling and Way had numerous conversations about risk adjustment programs, and Relator Poehling voiced his concerns to Way about Ovations failure to "look both ways" at the results of medical record reviews conducted as part of the Chart Review Program.

311.   On March 18, 2009, Kara Rios executed and submitted or caused to be submitted to the Medicare Program an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  She submitted this Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1."  This Attestation related to Risk Adjustment data, that is, diagnoses, that Ovations (or the group known as AmeriChoice, which, on information and belief, was located within Ovations at this time) and Ingenix submitted on behalf of certain Defendant MA Organizations for Risk Adjustment payments for payment year 2008.  The Risk Adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2007.  Rios signed the Attestation as "Chief Financial Officer,

AmeriChoice." Rios added a footnote to the Attestation which stated that the Attestation was "based on facts reasonably available or made available to the MA Organization as of the date of" the Attestation. The Attestation itself said it was made based on information available to the MA Organizations. In March 2009, information and facts reasonably available to all Defendants included the negative results of the Chart Review Program.

312. On March 2, 2009, Jonathan Bunker executed and submitted or caused to be submitted to the Medicare Program an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization." He submitted this Attestation "[o]n behalf of Sierra Health and Life Insurance Company, Inc.," a Defendant MA Organization. This Attestation was for payment year 2008. The Risk Adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2007. Bunker signed the Attestation as President of Sierra Health and Life Insurance Company, Inc. At this time, March 2009, Sierra Health and Life Insurance Company, Inc. was an MA Organization owned by UHG and managed by UnitedHealthcare. The Attestation was submitted to the Medicare Program by Shelly Cranley, the Director of Regulatory Affairs for UnitedHealthcare.

313. On March 2, 2009, Jonathan Bunker executed and submitted or caused to be submitted to the Medicare Program another "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization." He submitted this Attestation "[o]n behalf of Health Plan of Nevada, Inc.," a Defendant MA Organization, and its MA Plans. This Attestation was for payment year 2008. The Risk Adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2007. Bunker signed the Attestation as President of Health Plan of Nevada, Inc. At this time, March 2009, Health Plan of Nevada, Inc. was an MA Organization owned by UHG and managed by UnitedHealthcare. The Attestation was submitted to the Medicare Program by Shelly Cranley, the Director of Regulatory Affairs for UnitedHealthcare.

4700

314.   On March 19, 2009, Justin Roth executed and submitted or caused to be submitted to the Medicare Program another "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization." This Attestation was for payment year 2008. The Risk Adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2007. Roth signed the Attestation as "Chief Financial Officer of Evercare" and stated that the Attestation was signed "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1," which included various Defendant MA Organizations, including many United Healthcare Insurance Company MA Organizations, Oxford Health Plans of New Jersey, Inc., and Evercare of Texas. At this time, March 2009, these MA Organizations were owned by UHG and managed by UnitedHealthcare. The Attestation stated that it was based on information and facts reasonably available or made available to the MA Organizations listed in Attachment 1 at the time the Attestation was submitted.

315.   On March 26, 2010, John Larsen executed and submitted or caused to be submitted to CMS an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization." He submitted this Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1." These entities included numerous Defendant MA Organizations. This Attestation related to Risk Adjustment data, that is, diagnoses, that Optum (or its predecessors Ingenix) and Ovations and/or UnitedHealthcare submitted on behalf of these MA Organizations to Medicare for Risk Adjustment payments for payment year 2009. *See* Exhibit 17, attached hereto. The Risk Adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2008. Larsen signed the Attestation as "Chief Financial Officer, Public & Senior Markets Group." At this time, the Public & Senior Markets Group included Ovations. Larsen added a footnote to his Risk Adjustment Attestation which stated that the Attestation was "based on facts reasonably available or made available to the MA Organization as of the date of" the Attestation. The Attestation itself stated that it was based on information available to the

MA Organizations.  In March 2010, information and facts reasonably available to the Defendant MA Organizations included the negative results of the Chart Review Program relating to medical encounters that occurred in 2008.

316.  When Larsen signed the Attestation, he deliberately ignored or recklessly disregarded the negative results of the Chart Review Program.  Larsen also ignored or disregarded that Defendants had failed to comply with the requirements that diagnoses must be supported by patients' medical records and that diagnoses that are not supported by patients' medical records are invalid and must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayment.  During the relevant time period, Larsen was involved in meetings concerning the Chart Review Program and knew that the Public & Senior Markets Group could have "looked both ways" at the results of the chart reviews but was not doing so and, thus, that the Public & Senior Markets Group was not reporting to CMS those provider-reported codes that were not supported by the beneficiaries' medical records.

317.  On March 25, 2011, Scott Theisen executed and submitted or caused to be submitted to CMS an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1."  This Attestation related to Risk Adjustment data, that is, diagnoses, that UnitedHealthcare and Optum (or its predecessor Ingenix) submitted on behalf of numerous Defendant MA Organizations to Medicare for risk adjustment payments for payment year 2010.  *See* Exhibit 18, attached hereto.  The risk adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2009.  Theisen signed the Attestation as "Chief Financial Officer, UnitedHealthcare Medicare & Retirement."  Theisen added a footnote to his Risk Adjustment Attestation which stated that the Attestation was "based on facts reasonably available or made available to the MA Organization as of the date of" the Attestation.  The Attestation itself stated that it was made based on information available to the Defendant MA Organizations.  In March 2011, information and facts

149

4702

reasonably available to the Defendant MA Organizations, UnitedHealthcare, and Optum (or its predecessor, Ingenix) included the negative results of the Chart Review Program relating to medical encounters in 2009.

318.   On March 9, 2012, Scott Theisen executed and submitted or caused to be submitted to CMS an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1."  This Attestation related to Risk Adjustment data, that is, diagnoses, that UnitedHealth and Optum submitted to on behalf of numerous MA Organizations to Medicare for risk adjustment payments for payment year 2011.  *See* Exhibit 19, attached hereto.  The risk adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2010.  Theisen signed the Attestation as "Chief Financial Officer, UnitedHealthcare Medicare & Retirement.  The Attestation stated that it was based on information available to the MA Organizations.  It also included a footnote that stated the Attestation was "based on facts reasonably available or made available to the MA Organization as of the date" of the Attestation.  In March 2012, information and facts reasonably available to all Defendants included the negative results of the medical record reviews conducted as part of the Chart Review Program for payment year 2011 (date of service year 2010).

319.   On April 9, 2013, Scott Theisen executed and submitted or caused to be submitted to CMS an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment A."  This Attestation related to Risk Adjustment data, that is, diagnoses, that UnitedHealthcare and Optum submitted on behalf of numerous MA Organizations to Medicare for risk adjustment payments for payment year 2012.  *See* Exhibit 20, attached hereto.  The risk adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2011.  Theisen signed the Attestation as "Chief Financial Officer, UnitedHealthcare

4703

Medicare & Retirement." The Attestation stated that it was based on information available to the MA Organizations and also included a footnote stating that the Attestation was "based on facts reasonably available or made available to the MA Organization as of the date of" the Attestation. In March 2013, information and facts reasonably available to the MA Organizations, UnitedHealthcare, and Optum included the negative results of the medical record reviews conducted as part of the Chart Review Program for payment year 2012 (date of service year 2011).

320. Each time Theisen signed the Attestations, he deliberately ignored or recklessly disregarded the negative results of the Chart Review Program for the 2010, 2011, and 2012 payment years and 2009, 2010, and 2011 date of service years at issue. Theisen also ignored or disregarded that the Defendant MA Organizations, UnitedHealthcare, and Optum (or its predecessor, Ingenix) had failed to comply with the requirements that diagnoses must be supported by patients' medical records and that those diagnoses that are not supported by patients' medical records are invalid and must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayments.

321. During the years in which he was Chief Financial Officer of UnitedHealthcare Medicare & Retirement and approved the Attestations, Theisen was co-chair and business lead of UnitedHealthcare Medicare & Retirement's Financial Compliance Oversight Committee. He also attended quarterly meetings with UnitedHealthcare Medicare & Retirement's Compliance Committee, comprised of UnitedHealthcare Medicare & Retirement's executive leadership team; Executive Steering Committee meetings; and meetings to identify and evaluate corporate risks. As a member of these committees, a participant in these meetings, and in fulfilling his duties as UnitedHealthcare Medicare & Retirement's Chief Financial Officer, Theisen was involved in discussions about the Chart Review Program, the implementation and results of the Claims Verification Program, and the RACCR Program. During this time period, Theisen had authority to make decisions on behalf of UnitedHealthcare, including how much to spend on the Chart Review Program, how many charts to include in the Chart

Review Program, and whether to submit DELETES based on information available to UnitedHealthcare.  He also had authority to make similar decisions about the RACCR Program.

322.   In addition, Theisen was aware of the significant number of invalid provider-reported diagnoses based on the results of the Chart Review and Claims Verification Programs.  For example, when Theisen executed the Risk Adjustment Attestation in March 2011, the results of the first pilot phase (Phase I) of the Claims Verification Program were available.  As previously explained, those results showed that provider-reported diagnoses were unsupported for over 50 percent of the medical records reviewed.  *See supra* paragraph 206.  As another example, in February 2012 prior to his signing the March 2012 Attestation, Theisen (as well as Dumcum and Relator Poehling) had actual knowledge of the strikingly negative results of the Claims Verification Phase II pilot program showing that there were more DELETES than ADDS.  *See supra* paragraph 158.  In addition, on April 3, 2013, when Theisen executed and submitted the Risk Adjustment Attestations for payment year 2012, the information available to the Defendants MA Organizations, UnitedHealthcare Medicare & Retirement (including Theisen), and Optum included the results of the chart reviews for 2011 dates of service, which showed that they had submitted at least 100,000 diagnoses that were invalid, but had not been deleted (and never were deleted).  *See supra* paragraph 235.  Yet, Theisen attested that these invalid diagnoses were accurate and truthful.

323.   On March 25, 2011, Brian Thompson, the Chief Financial Officer of UnitedHealthcare Community & State, executed and submitted or caused to be submitted an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation on behalf of "the UnitedHealth Group entities listed in Attachment 1."  This Attestation related to risk adjustment data, that is, diagnoses, that UnitedHealthcare and Optum (or its predecessor, Ingenix) submitted on behalf of certain of the Defendant MA Organizations to Medicare for payment year 2010.  The data related to the 2009 date of

service year. The Attestation as based on information and facts reasonably available to the MA Organizations, including the negative results of the Chart Review Program based on medical record reviews for date of service year 2009. Information and facts available to the MA Organizations, UnitedHealthcare, and Optum (or its predecessor, Ingenix) included the results of the medical record reviews conducted as part of the Chart Review Program for medical encounters during the 2009 date of service year. However, Thompson and these Defendants deliberately ignored or recklessly disregarded the negative results of these chart reviews. They also ignored or disregarded that the Defendant MA Organizations, UnitedHealthcare, and Optum (or its predecessor, Ingenix) had failed to comply with the requirements that diagnoses must be supported by patients' medical records and that those diagnoses that are not supported by patients' medical records are invalid and must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayments.

324. On March 29, 2012, Paul Balthazor, the Chief Financial Officer of UnitedHealthcare Community & State, executed and submitted or caused to be submitted an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization." He submitted this Attestation on behalf of "the UnitedHealth Group entities listed in Attachment 1." This Attestation related to risk adjustment data, that is, diagnoses, that UnitedHealthcare and Optum (or its predecessor, Ingenix) submitted on behalf of certain of the Defendant MA Organizations to Medicare for payment year 2011. The data related to 2010 date of service year. The Attestation was based on information and facts reasonably available to the MA Organizations, UnitedHealthcare, and Optum including the negative results of the medical record reviews conducted as part of the Chart Review Program for the 2010 date of service year. However, Balthazor and these Defendants deliberately ignored or recklessly disregarded the negative results of these chart reviews. They also ignored or disregarded that the Defendant MA Organizations, UnitedHealthcare, and Optum had failed to comply with the requirements that diagnoses must be supported by patients'

153

4706

medical records and that those diagnoses that are not supported by patients' medical records are invalid and must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayments. In April 2013, Balthazor also executed the Risk Adjustment Attestation for the MA Organizations managed by UnitedHealthcare Community & State for payment year 2012 (date of service year 2011). For this year too, Balthazor and the Defendant MA Organizations, UnitedHealthcare, and Optum ignored the results of the chart reviews and their obligations to delete invalid diagnoses.

325.   On April 30, 2014, Brian Thompson executed and submitted or caused to be submitted Risk Adjustment Attestations on behalf of all of the Defendant MA Organizations managed by UnitedHealthcare Medicare & Retirement at that time. (On the same date, Paul Balthazor executed and submitted or caused to be submitted Risk Adjustment Attestations on behalf of all Defendant MA Organizations managed by UnitedHealthcare Community & State at the time.) An example of one of Thompson's Attestations includes the Attestation he submitted "[o]n behalf of the UnitedHealth of California." *See* Exhibit 21, attached hereto. This Attestation related to risk adjustment data, that is, diagnoses, which UnitedHealthcare and Optum submitted on behalf of UnitedHealthcare of California to the Government for risk adjustment payments for payment year 2013. The risk adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2012. At the time Thompson signed this Attestation he was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement. The Attestation was based on information available to the MA Organizations. UnitedHealthcare could not add a footnote to the Attestation because it was submitted electronically. However, Steve Nelson, the Chief Executive Officer of UnitedHealthcare Medicare & Retirement, sent CMS an email on April 30, 2014, stating that the Attestation was "based on facts reasonably available or made available to *us* as of the date of" the Attestation. (Emphasis added). In April 2014, facts reasonably available to all the Defendant MA Organizations, UnitedHealthcare, and Optum included

154

the negative results of the Chart Review and Claims Verification Programs relating to medical encounters in 2012.  Other information and facts that were available included, for instance, millions of dollars of invalid diagnoses about which United had *actual* knowledge but never deleted.  *See supra* paragraph 232.

326.   In April 2014, when Thompson signed the Attestation, he deliberately ignored or recklessly disregarded the negative results of the Chart Review Program.  Thompson also ignored that Defendants had failed to comply with the requirements that diagnoses must be supported by patients' medical records and that those diagnoses that are not supported by patients' medical records must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayment.  At the time that Thompson submitted the Attestation on April 30, 2014, he knew about the actual or estimated adverse financial impact of DELTES from the Chart Review and Claims Verification Programs for payment year 2013 (date of service year 2012) and he knew about CV liability accruals.  *See supra* paragraphs 217-221.  Furthermore, on April 30, 2014, the date the Attestations were submitted for the 2013 payment year, the information available to the Defendant MA Organizations, UnitedHealthcare Medicare & Retirement (including Thompson), and Optum included  the results of the chart reviews for the date of service year 2012, which showed that at least 250,000 diagnoses were invalid.  *See supra* paragraph 235.  Yet, Thompson certified that this invalid data was accurate and truthful even though the invalid diagnoses had not been deleted (and never have been).

327.   On June 26, 2015 and June 7, 2016, Thompson executed and submitted or caused to be submitted Risk Adjustment Attestations on behalf of all of the Defendant MA Organizations managed by UnitedHealthcare Medicare & Retirement on those dates.  (On the same dates, UnitedHealthcare Community & State also submitted Risk Adjustment Attestations for the Defendant MA Organizations that it managed.)  These Attestations related to risk adjustment data, that is, diagnoses, which UnitedHealthcare and Optum submitted on behalf of these MA Organizations to the Government for risk

155

4708

adjustment payments for payment years 2014 and 2015. The risk adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service years 2013 and 2014. At the time Thompson signed these Attestations he was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement. The Attestations were the same as those for prior years (except that they did not have footnotes.) The Attestations were based on information available to the MA Organizations, including information about diagnoses unsupported and, thus, invalidated by the chart reviews for the dates of service years at issue. On June 26, 2015, the date the Attestations were submitted for the 2014 payment year, the information available to the Defendant MA Organizations, UnitedHealthcare Medicare & Retirement (including Thompson), and Optum were the results of the chart reviews for date of service year 2013, which showed that at least 199, 039 diagnoses were invalid. *See supra* paragraph 235. Yet, Thompson certified that this invalid data was accurate and truthful even though the invalid codes had not been deleted (and never have been).

## V. Diagnoses Solely Determine Risk Adjustment Payments Based On Health Status

328. The diagnostic data submitted by an MA Organizations are not merely ancillary to its claims for risk adjustment payments. Rather, the diagnoses are the sole determinant in the calculation of any risk adjustment payment based on a beneficiary's health status. The submissions of diagnoses are themselves claims for risk adjustment payments and are inexorably material to any payment based on the beneficiary's health status. The diagnoses are the *raison d'etre* of RAPS submissions, *i.e.*, risk adjustment claims.

329. As emphasized throughout this Amended Complaint, the Government has never agreed to make risk adjustment payments based on invalid diagnoses, and MA Organizations are required by their contracts with CMS, federal regulations, and CMS instructions (*e.g*., the Managed Care Manual and Participant Guide) to delete invalid diagnoses. Moreover, no statute or regulation entitles an MA Organization to risk adjustment payments based on invalid diagnoses, including payments based on

156

diagnoses that are unsubstantiated by the beneficiaries' medical records. *See Swoben*, 848 F.3d at 1179 (rejecting arguments that MA Organizations are allowed to ignore information about invalid diagnoses based on their own chart reviews and that they are not obligated to delete such invalid diagnoses submitted by them for risk adjustment payments).

330.    When MA Organizations provide CMS with information identifying specific invalid diagnoses that were submitted for payment (such as by deleting the invalid diagnoses in the RAPS system) and, thus, CMS has *actual knowledge* about the specific invalid diagnoses that were submitted for payment (such as because they were deleted in the RAPS system), Medicare recovers the associated overpayments. *See United States ex rel. Campie v. Gilead Sciences, Inc*., 862 F.3d 890, 906 (9th Cir. 2017) (holding that, in assessing materiality, the court must examine what the agency does when it has *actual knowledge* of the regulatory violation).  There is no way that CMS can obtain this actual knowledge about invalid diagnoses by looking at an Attestation.  The falsity of the Attestation is not apparent on the face of the document.  Someone must inform CMS that the MA Organization has information showing that its diagnoses are invalid and that it failed to delete those invalid diagnoses.

331.    The UHG Managing Defendants and the Defendant MA Organizations knew that they were required to delete invalid diagnoses that they had submitted for payment and, in fact, they did this by making deletes in the RAPS system.  For example, as previously explained, based on their short-lived Claims Verification Program, UnitedHealthcare Medicare & Retirement and Optum deleted diagnoses from the RAPS system.  They also deleted some invalid diagnoses from the RAPS system based on their RACCR reviews.

332.    In addition, in the past, when UnitedHealthcare has informed CMS that it is in possession of information about invalid diagnoses that it had submitted and requested some direction with respect to deleting the invalid diagnoses, CMS has worked with it to recover the overpayments.  In 2010 and 2011, CMS did this when Joseph Keen, the Chief Compliance Audit Officer at UnitedHealthcare, informed it about risk adjustment

data that UnitedHealthcare had submitted that included invalid diagnoses. Importantly, CMS also asked Keen a series of questions to obtain information about the invalid diagnoses, an explanation why the deletes were being made after the final submission deadline for the payment year (because, if made prior to the deadline, CMS would have been able to offset the overpayment as a part of the final reconciliation payment process), and for an explanation of the steps that UnitedHealthcare was taking to ensure that deletes were made in a timely manner. Keen responded that UnitedHealthcare was "continuing to conduct targeted chart validation reviews to determine if the member-diagnoses reviewed are supported by a medical record. These reviews continue and we may need to delete certain risk adjustment data in the future. We will promptly notify CMS of any risk adjustment data determined through these reviews to have been incorrectly submitted."

333. If Defendants had complied with their obligation to delete invalid diagnoses from RAPS, Medicare's Risk Adjustment System ("RAS") would have processed the corrected data and recalculated the risk score for the beneficiaries for whom an invalid diagnosis had been deleted. The degree of the change in the payment amount for that beneficiary would have depended on the HCC to which the invalid diagnosis was grouped. The risk adjustment reconciliation payment system would have made these adjustments automatically if the DELETES were made in RAPS. The system would have done this as part of the final reconciliation payment process or future reconciliations conducted by CMS for the payment year at issue.

334. If an MA Organization does not comply with its express obligation to delete the invalid diagnoses from RAPS prior to the final submission deadline, Medicare pays for the invalid diagnoses as part of its final reconciliation payment to the MA Organization or, if it already paid for the invalid diagnosis, does not recover the overpayment as part of the final reconciliation payment process. If the MA Organization never deletes the invalid diagnoses from RAPS, Medicare does not recover the overpayment when future payment reconciliations are done for the payment year at issue. Accordingly, the

4711

diagnostic information submitted by an MA Organization is not merely ancillary to its claim for risk adjustment payments, it is the sole determinant in the calculation of the amount (if any) of the risk adjustment payments made by Medicare based on the health status of a beneficiary and, therefore, inexorably material to the amount (if any) paid.

335. A false Risk Adjustment Attestation, by its very nature, is also material as it relates directly to the data element – diagnoses – that is the sole determinant of risk adjustment payments based on health status. Submission of invalid diagnoses and failing to delete them are not minor or insubstantial infractions of the MA Organization's obligations to Medicare with which they pledge to comply. Keen, the UnitedHealthcare Chief Compliance Audit Officer, and others at UnitedHealthcare and Optum were aware of these obligations.

336. The purpose of the Risk Adjustment Attestation is, first, to remind MA Organizations that they may not ignore or disregard information about invalid diagnoses, such as (but not limited to) the negative results of chart reviews showing that diagnoses previously submitted for payment are unsupported by the charts; and, second, to enforce the fundamental program requirement that MA Organizations delete invalid diagnoses. *See* 65 Fed. Reg. 40,170, 40,268 (June 29, 2000) (noting that "certifications would help ensure accurate data submissions"). When MA Organizations do not comply with these payment data integrity requirements of the MA Program (which are reiterated and enforced by the Attestations), the result is the submission of and/or failure to delete false diagnostic data and, thus, the submission of false Attestations that the data is accurate and truthful. When MA Organizations do this by deliberately ignoring or recklessly disregarding information about invalid diagnoses and, thus fail to delete invalid diagnoses, as Defendants here have done, they are unable to represent that their data is accurate, complete, and truthful, as the Attestations require. Moreover, in that situation, their Attestations are "knowingly" false, as the term knowingly is defined in the FCA.

337. The Risk Adjustment Attestation itself includes language warning about the serious legal implications of making false representations about diagnoses. It states that

4712

"[t]he MA Organization acknowledges . . . that misrepresentations to CMS about the accuracy of such [risk adjustment] information may result in Federal civil action and/or criminal prosecution." *See* Exhibits 15-21. Risk adjustment Attestations thus are intended to serve as a powerful deterrent against an MA Organization's "knowingly" submitting false claims for payment. *United States ex rel. Swoben v. UnitedHealthcare Insurance Co. et al.*, 848 F.3d 1161, 1168 (9th Cir. 2016) (characterizing certifications "[a]s a further bulwark against fraud").

338. Defendants' knowledge of the importance of the Attestations is demonstrated by the footnotes that UnitedHealthcare and other UHG Managing Defendants added to the Attestations they submitted on behalf of the Defendant MA Organizations, such as the footnotes that stated the Attestations should not be construed as representations that the data may not require subsequent modification should additional information become available. *See* Exhibits 15-20. According to Dumcum, UnitedHealthcare's counsel added these footnotes.

339. Defendants' knowledge of the importance of the Attestations is also demonstrated by the meeting they requested with CMS in April 2014. As previously explained, on April 29, 2014, Steve Hemsley, Defendant UHG's Chief Executive Officer, sent UnitedHealthcare's attorney Thad Johnson, UnitedHealthcare Medicare & Retirement's Chief Executive Officer Steve Nelson, UnitedHealthcare's Chief Financial Officer Daniel Schumacher, and Optum executive Karen Erickson, to meet with CMS employees responsible for the MA Program, including Cheri Rice, the Director of the Medicare Plan Payment Group at CMS. Defendant UHG and its subsidiaries, UnitedHealthcare and Optum, asked for this meeting on very short (just a few days) notice because the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, Brian Thompson, had to execute and submit the Risk Adjustment Attestations for the Defendant MA Organizations on April 30, 2014. Defendants UHG, UnitedHealthcare and Optum wanted to disclose to CMS, before the Attestations were submitted, that they were in possession of information *from chart reviews* (the nature and mechanics of

4713

which they did not describe in any detail) about invalid diagnoses (which were not specifically identified to CMS) that they had submitted to the Government but had not deleted. They apparently believed that this sort of very vague disclosure would somehow render the Attestations truthful even if they did not delete the invalid diagnoses from RAPS.

340. In addition, for many years, Jeffrey Dumcum, the senior executive overseeing all risk adjustment programs and activities at Ingenix and then Optum, was also aware of the FCA implications of ignoring information about invalid diagnoses. He told Poehling that the Department of Justice's enforcement of the FCA was a consideration in deciding to delete diagnoses when the results of blind chart reviews showed that they were unsupported by the patients' medical records. In fact, Optum even decided that all of its clients (its commercial clients as well as its internal client, UnitedHealthcare) had to look both ways at the results of blind chart reviews and delete diagnosis codes invalidated by the chart reviews if Optum was responsible for submitting risk adjustment data to CMS on their behalf. This requirement was most likely imposed by Optum (at least for some period of time) because Optum had to execute the internal attestations certifying the accuracy and truthfulness of the diagnoses it submitted to Medicare on behalf of its clients and, perhaps, it was also concerned about violating the FCA by causing its MA Organization clients to submit false Attestations. Accordingly, like UHG and UnitedHealthcare, Optum was aware that the Attestations required it to make deletes based on information available to it about the negative results of chart reviews.

## **FIRST CLAIM FOR RELIEF**

### **False Claims Act: Reverse False Claims**

### **31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))**

341. The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

342. Defendants violated the second part of 31 U.S.C. § 3729(a)(1)(G) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) concealed

4714

or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government. Specifically, Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program. In particular, Defendants knowingly and improperly failed to delete in the RAPS system the invalid diagnoses that had been submitted to the Medicare Program for risk adjustment payments which were made by the Medicare Program to them or knowingly and improperly failed to otherwise return to the Medicare Program the overpayments based on the invalid diagnoses.

343. By virtue of the said acts of concealment and/or improper avoidance, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## SECOND CLAIM FOR RELIEF

### False Claims Act: Presentation of False or Fraudulent Claims
### 31 U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1))

344. The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

345. Defendants violated 31 U.S.C. § 3729(a)(1)(A) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) presented or caused to be presented a false or fraudulent claim for payment or approval. Specifically, Defendants knowingly presented or caused to be presented to the Medicare Program a false or fraudulent Risk Adjustment Attestation claiming risk adjustment payments from the Medicare Program.

346. Defendants violated former 31 U.S.C. § 3729(a)(1) as follows: Defendants knowingly presented, or caused to be presented, to the Government a false or fraudulent claim for payment or approval. Specifically, Defendants knowingly presented or caused to be presented to the Medicare Program a false or fraudulent Risk Adjustment Attestation claiming risk adjustment payments from the Medicare Program.

4715

347.   By virtue of the said false or fraudulent claim, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

### THIRD CLAIM FOR RELIEF

**False Claims Act: Making or Using False Records or Statements**

**31 U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. § 3729(a)(2))**

348.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

349.   Defendants violated 31 U.S.C. § 3729(a)(1)(B) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to a false or fraudulent claim for risk adjustment payments from the Medicare Program.

350.   Defendants violated former 31 U.S.C. § 3729(a)(2) as follows:  Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation to get a false or fraudulent claim for risk adjustment payments paid or approved by the Medicare Program.

351.   By virtue of the said false record or statement, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

### FOURTH CLAIM FOR RELIEF

**False Claims Act:  Reverse False Claims**

**31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))**

352.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

4716

Case 2:16-cv-08697-MWF-SS   Document 171-1   Filed 11/7/19   Page 164 of 166   Page ID #:2766

353.   Defendants violated the first part of 31 U.S.C. § 3729(a)(1)(G) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

354.   Defendants also violated former 31 U.S.C. § 3729(a)(7) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used, a false Risk Adjustment Attestation to conceal, avoid or decrease an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

355.   By virtue of the said false record, statement, and other acts of concealment and improper avoidance, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment

356.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

357.   Defendants have received money from the United States to which Defendants were not entitled, which unjustly enriched Defendants, and for which Defendants must make restitution.  Defendants received such money by claiming and retaining Medicare risk adjustment payments based on invalid risk adjustment data.  In equity and good conscience, such money belongs to the United States and to the Medicare Program.

4717

358.   The United States is entitled to recover such money from Defendants in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Payment by Mistake

359.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

360.   The United States paid money to Defendants as a result of a mistaken understanding.  Specifically, the United States paid Defendants claims for risk adjustment payments under the mistaken understanding that such claims were based on valid risk adjustment data.  Had the United States known the truth, it would not have paid such claims.  Payment was therefore by mistake.

361.   As a result of such mistaken payments, the United States has sustained damages for which Defendants are liable in the amount to be determined at trial.

## PRAYER

**WHEREFORE**, the United States requests that judgment be entered in its favor and against Defendants as follows:

362.   On Claims I, II,  III, and IV (False Claims Act), against all Defendants jointly and severally, for the amount of the United States' damages, trebled as required by law, together with the maximum civil penalties allowed by law, costs, post-judgment interest, and such other and further relief as the Court may deem appropriate;

363.   On Claim V (Unjust Enrichment), against all Defendants jointly and severally, for an amount equal to the monies that Defendants obtained from the United States without right and by which Defendants have been unjustly enriched, plus costs, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate; and

364.   On Claim VI (Payment By Mistake), against Defendants for an amount equal to the United States' damages, plus costs, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate.

4718

# DEMAND FOR JURY TRIAL

The United States of America hereby demands a trial by jury.

Dated:  November 17, 2017

Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General,
Civil Division
SANDRA R. BROWN
Acting United States Attorney
DOROTHY A. SCHOUTEN
Chief, Civil Division
DAVID K. BARRETT
Chief, Civil Fraud Section
Assistant United States Attorneys

MICHAEL D. GRANSTON
DANIEL R. ANDERSON
CAROL L. WALLACK
JESSICA KRIEG
JUSTIN DRAYCOTT
PAUL PERKINS
Attorneys, Civil Division
United States Department of Justice

JAMES P. KENNEDY, JR.
Acting United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney


/S/ John E. Lee
_____
JOHN E. LEE
Assistant United States Attorney

Attorneys for the
United States of America

4719

**EXHIBIT P-48**

# ICD-10-CM Official Guidelines for Coding and Reporting
## FY 2022 -- UPDATED April 1, 2022
## (October 1, 2021 - September 30, 2022)

**Narrative changes appear in bold text**
**Items <u>underlined</u> have been moved within the guidelines since the FY 2021 version**
*Italics* **are used to indicate revisions to heading changes**

The Centers for Medicare and Medicaid Services (CMS) and the National Center for Health Statistics (NCHS), two departments within the U.S. Federal Government's Department of Health and Human Services (DHHS) provide the following guidelines for coding and reporting using the International Classification of Diseases, 10th Revision, Clinical Modification (ICD-10-CM). These guidelines should be used as a companion document to the official version of the ICD-10-CM as published on the NCHS website. The ICD-10-CM is a morbidity classification published by the United States for classifying diagnoses and reason for visits in all health care settings. The ICD-10-CM is based on the ICD-10, the statistical classification of disease published by the World Health Organization (WHO).

These guidelines have been approved by the four organizations that make up the Cooperating Parties for the ICD-10-CM: the American Hospital Association (AHA), the American Health Information Management Association (AHIMA), CMS, and NCHS.

These guidelines are a set of rules that have been developed to accompany and complement the official conventions and instructions provided within the ICD-10-CM itself. The instructions and conventions of the classification take precedence over guidelines. These guidelines are based on the coding and sequencing instructions in the Tabular List and Alphabetic Index of ICD-10-CM, but provide additional instruction. Adherence to these guidelines when assigning ICD-10-CM diagnosis codes is required under the Health Insurance Portability and Accountability Act (HIPAA). The diagnosis codes (Tabular List and Alphabetic Index) have been adopted under HIPAA for all healthcare settings. A joint effort between the healthcare provider and the coder is essential to achieve complete and accurate documentation, code assignment, and reporting of diagnoses and procedures. These guidelines have been developed to assist both the healthcare provider and the coder in identifying those diagnoses that are to be reported. The importance of consistent, complete documentation in the medical record cannot be overemphasized. Without such documentation accurate coding cannot be achieved. The entire record should be reviewed to determine the specific reason for the encounter and the conditions treated.

The term encounter is used for all settings, including hospital admissions. In the context of these guidelines, the term provider is used throughout the guidelines to mean physician or any qualified health care practitioner who is legally accountable for establishing the patient's diagnosis. Only this set of guidelines, approved by the Cooperating Parties, is official.

The guidelines are organized into sections. Section I includes the structure and conventions of the classification and general guidelines that apply to the entire classification, and chapter-specific guidelines that correspond to the chapters as they are arranged in the classification. Section II includes guidelines for selection of principal diagnosis for non-outpatient settings. Section III includes guidelines for reporting additional diagnoses in non-outpatient settings. Section IV is for outpatient coding and reporting. It is necessary to review all sections of the guidelines to fully understand all of the rules and instructions needed to code properly.

EXHIBIT
1581
1 of 121

**EXHIBIT P-49**

(https://cta-redirect.hubspot.com/cta/redirect/2072848/24bd00b5-f062-
__hstc=71887564.c8ff6b4b5e1d8c09d52295cfb551ffee.1709243170943.1709243170943.1709243170943.1&__hssc=71887564.1.170924317

AAPC (https://www.aapc.com/)    What's New (https://www.aapc.com/about-us/whats-new/)    About Us (https://www.aapc.com/about-us/)    Support (https://www.aapc.com/support)
Cart (https://www.aapc.com/shopping/cart.aspx)
Sign In (https://www.aapc.com/sso-landing/loginAzure.aspx?action=signin)    Sign Up (https://www.aapc.com/sso-landing/loginAzure.aspx?action=signup)    (/sear

Home (Https://Www.Aapc.Com/)  »  Knowledge Center (Https://Www.Aapc.Com/Blog/)  »  Industry News (Https://Www.Aapc.Com/Blog/Category/Medical-Coding-Industry-News/)  »  Medical
Record Entries: What Is Timely And Reasonable?

Certifications ⌄    Training and Events ⌄    Resources ⌄    Software and Services ⌄    Shop ⌄    Membership ⌄

## Knowledge Center

Hot Topics                                                                                                                              ›

# Medical Record Entries: What Is Timely and Reasonable?

🖶 Print Post

Coding Compass

## Because so many factors weigh into the answer, it depends.

**By Robert A. Pelaia, Esq., CPC, CPCO**

Every year at AAPC's national conference, several members of AAPC's Legal Advisory Board present an open forum session to respond to a wide variety of questions from attendees. For the past few years, without fail, audience members have asked for guidance on medical record entry timeliness and reasonable record keeping. This is not an easy topic and there is no one answer that will apply to the many scenarios coders encounter.

In 2006, however, useful and practical guidance regarding medical record documentation was released by the medical director of First Coast Service Options, Inc. (FCSO). The current Medicare administrative contractor for Puerto Rico, the U.S. Virgin Islands, and Florida also has recently issued helpful information regarding this. In addition to several other issues, FCSO's medical director touched upon the overall timeliness of documentation, medical record addenda, legibility, and "cloning." Here are selected excerpts in regards to timeliness from the FCSO memo (http://medicare.fcso.com/Publications_B/2006/141067.pdf) (see pages 3-6), followed by practical compliance tips that apply to each issue raised.

**Medicare Comment No. 1**

*"Medicare expects the documentation to be generated at the time of service or shortly thereafter. Delayed entries within a reasonable time frame (24 to 48 hours) are acceptable for purposes of clarification, error correction, the addition of information not initially available, and if certain unusual circumstances prevented the generation of the note at the time of service."*

**Compliance Tips:** Medicare has clearly stated that "reasonable" means 24 to 48 hours. Understand that anything beyond 48 hours could be considered unreasonable. Providers should comply with this requirement and complete documentation in a timely manner. Those responsible for coding and/or entering charges need to be cognizant of the timeliness of medical record completion. It's unreasonable to expect a provider to recall the specifics of a service two weeks after the service was rendered. Nor should an entry be made in advance.

**Medicare Comment No. 2**

*"The medical record cannot be altered. Errors must be legibly corrected so that the reviewer can draw an inference as to their origin. These corrections or additions must be dated, preferably timed, and legibly signed or initialed."*

**Compliance Tips:** To properly execute a medical record addendum, the provider must, at a minimum, write the following details in the medical record:



(https://www.aapc.com/medical-coding-education/webinars/selection-of-principal-diagnosis-for-
inpatient-admission)

https://www.aapc.com/blog/25667-medical-record-entries-what-is-timely-and-reasonable/

EXHIBIT
815

1/23

- The date the record is being amended

(https://cta-redirect.hubspot.com/cta/redirect/2072848/24bd00b5-f062-
__hstc=71887564.c8ff6b4f551fdec09d52295cfb551ffee.1709243170943.1709243170943.1709243170943.1&__hssc=71887564.1.170924317

- A statement that the entry is an addendum to the medical record (An addendum should not be added to the medical record without identifying it as such.)

What's New (https://www.aapc.com/about-us/whats-new)    |    About Us (https://www.aapc.com/about-us/)    |    Support (https://www.aapc.com/support)
The service being amended
Cart (https://www.aapc.com/shopping/cart.aspx)
Sign In (https://www.aapc.com/sso-landing/loginAzure.aspx?action=signin)    Sign Up (https://www.aapc.com/sso-landing/loginAzure.aspx?action=signup)    (/sear

- The signature of the provider writing the addendum

The medical record should be amended within a reasonable time that would allow the service provider to recall the specific details of the patient encounter. Medical record addenda should be an exception, rather than a routine or recurring part of medical record documentation. Medical record addenda must be properly identified and reference must be made to the original note being amended. Failure to properly amend the medical record may give the appearance of "falsifying documentation," which is considered fraudulent.

**Medicare Comment No. 3**

"Every note must stand alone, i.e., the performed services must be documented at the outset. Delayed written explanations will be considered. They serve for clarification only and cannot be used to add and authenticate services billed and not documented at the time of service or to retrospectively substantiate medical necessity. For that, the medical record must stand on its own with the original entry corroborating that the service was rendered and was medically necessary."

**Compliance Tips:** Again, addenda to the medical record should not be a normal practice—these should be the exception and not the rule. Coders responsible for reviewing documentation should be cognizant of providers who demonstrate patterns of insufficient documentation that necessitate addenda. It's also important to remember that medical record addenda need to be made to the original medical record, not just to the billing copy.

**Medicare Comment No. 4**

"All entries must be legible to another reader to a degree that a meaningful review may be conducted. All notes should be dated, preferably timed, and signed by the author."

**Compliance Tips:** Legibility of medical record documentation is not just a billing issue; it's a patient care issue. Illegible documentation may result in medication errors and incorrect diagnoses being assigned to the patient. The medical record must be legible to an individual who is not familiar with the provider's handwriting. Notes should be timed and dated appropriately, as well. The timing of a medical record note is especially important in inpatient charts, emergency department settings, trauma settings, and critical care units. It's especially critical for the service provider's identity to be legible. Signatures also should include the provider's credentials.

**Medicare Comment No. 5**

"Documentation is considered cloned when each entry in the medical record for a patient is worded exactly alike or similar to the previous entries. Cloning also occurs when medical documentation is exactly the same from patient to patient. It would not be expected that every patient had the exact same problem, symptoms, and required the exact same treatment."

"Cloned documentation does not meet medical necessity requirements for coverage of services rendered due to the lack of specific, individual information. All documentation in the medical record must be specific to the patient and her/his situation at the time of the encounter. Cloning of documentation is considered a misrepresentation of the medical necessity requirement for coverage of services. Identification of this type of documentation will lead to denial of services for lack of medical necessity and recoupment of all overpayments made."

**Compliance Tips:** Templates certainly are useful tools, but providers must use caution when applying "templated" language. Specifically, (although it may seem obvious) providers must ensure that what is being represented in the medical record actually took place and isn't something the provider normally does, but may not have done for that particular patient.

**Robert A. Pelaia, Esq., CPC, CPCO,** is senior university counsel for health affairs at the University of Florida College of Medicine in Jacksonville, Fla. He is certified as a Health Care Law Specialist by the Florida Bar Board of Legal Specialization and Education, serves on AAPC's Legal Advisory Board, and was a 2011-2013 AAPC National Advisory Board member. Pelaia is a member of the Jacksonville River City, Fla., local chapter.

(https://cta-redirect.hubspot.com/cta/redirect/2072848/24bd00b5-f062-
__hstc=71887564.c8ff6b4b5e1d8c09d52295cfb551ffee.1709243170943.1709243170943.1709243170943.1&__hssc=71887564.1.170924317

**Admin Aapc (Https://Www.Aapc.Com/Blog/Author/Aapcadmin/)**

(https://www.aapc.com/) What's New (https://www.aapc.com/about-us/whats-new/) | About Us (https://www.aapc.com/about-us/) | Support (https://www.aapc.com/support)

| Cart (https://www.aapc.com/shopping/cart.aspx)

| Sign In (https://www.aapc.com/sso-landing/loginAzure.aspx?action=signin)     Sign Up (https://www.aapc.com/sso-landing/loginAzure.aspx?action=signup)

(https://www.aapc.com/blog/author/aapcadmin/)

Author    Recent Posts

**Certifications** ⌄    **Training and Events** ⌄    **Resources** ⌄    **Software and Services** ⌄    **Shop** ⌄    **Membership** ⌄

(https://www.aapc.com/medical-coding-books/)

## No Responses to "Medical Record Entries: What Is Timely and Reasonable?"

Angie says:

January 7, 2015 at 11:12 pm (https://www.aapc.com/blog/25667-medical-record-entries-what-is-timely-and-reasonable/#comment-4981)

Thank you thank you THANK YOU for the straightforward and direct answer to this question that so many medical professionals are asking. There are many articles out there that touch on this, but this article is the first that is thorough and understandable, using direct Medicare standards and regulations. I appreciate the use of excepts to verify and support each point. Thank you again!

Angie Cox- SLP

Denise Ladd says:

June 1, 2017 at 12:29 pm (https://www.aapc.com/blog/25667-medical-record-entries-what-is-timely-and-reasonable/#comment-4982)

The information I have spent most of the afternoon searching for I found on your site.

Thank you!

Search Knowledge Center

What's your favorite type of medical coding article?

○ Case study for your specialty

○ In-depth look at a code or modifier

○ Table or tool

○ Reader question

○ News

4725

Vote

(https://cta-redirect.hubspot.com/cta/redirect/2072848/24bd00b5-0c2-
__hstc=71887564.c8ff6b4b5e1d8c09d52295cfb551ffee.1709243170943.1709243170943.1709243170943.1&__hssc=71887564.1.1709243170

**Hot Topics**



What's New (https://www.aapc.com/about-us/whats-new/)    |    About Us (https://www.aapc.com/about-us/)    |    Support (https://www.aapc.com/support)
Cart (https://www.aapc.com/shopping/cart.aspx)
Sign Up (https://www.aapc.com/sso-landing/loginAzure.aspx?action=signup)

Quality Payment Program    (https://www.aapc.com/blog/category/macra/quality-based-payment/)signin)    (/sear

Telehealth    (https://www.aapc.com/blog/category/telehealth/)

Facility    (https://www.aapc.com/blog/category/facility/)

Health Information Management    (https://www.aapc.com/blog/category/health-information-management/)

Career Growth    (https://www.aapc.com/blog/category/career-growth/)

Certifications    Training and Events    Resources ⌄    Software and Services ⌄    Shop ⌄    Membership ⌄

View More    ▼



(https://www.aapc.com/blog/sign-up-newsletter-3)

(https://www.aapc.com/medical-coding-books/)

---

 (https://play.google.com/store/apps/details?id=com.aapc.my&hl=en_US&gl=US)

 (https://apps.apple.com/us/app/my-aapc/id1296951359)

**EXHIBIT P-50**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA ex rel.

BENJAMIN POEHLING,

     Plaintiffs,

v.

UNITEDHEALTH GROUP, INC., et al.,

     Defendants

EXPERT REPORT OF JEAN ACEVEDO

SEPTEMBER 29, 2023

Amended April 5, 2024

1

# I.    QUALIFICATIONS

1.    I am a Certified Professional Coder ("CPC") and Certified ENT Coder ("CENTC," i.e., coding focused on ear, nose, and throat conditions), and have been so designated since 1999 and 2008, respectively, through the American Academy of Professional Coders ("AAPC").[1]  I achieved AAPC Fellow status in January 2017, which indicates that I have been recognized for my professional achievements in coding and continuous adherence to the ethical and professional standards of the AAPC.[2]  I have also held the Certified in Healthcare Compliance ("CHC") certification from the Health Care Compliance Association ("HCCA") since 2002.[3]  Additionally, I have been a health care risk manager since 1989 (currently inactive).

2.    I have experience in all areas of medical coding and reimbursement, particularly with Current Procedural Terminology ("CPT"), Healthcare Common Procedure Coding System ("HCPCS"), the International Classification of Diseases, Ninth and Tenth Revisions, Clinical Modification (ICD-9-CM and ICD-10-CM)[4] diagnosis coding,[5] and third-party payer billing and payment rules, including the Centers for Medicare and Medicaid Services ("CMS") Medicare Advantage risk adjustment program.

3.    From 2007 through 2022, I developed and taught the regulatory and compliance modules of the Certificate in Medical Business Management program at Florida Atlantic University's School of Business.

4.    For the past twenty-three years, I have maintained an active healthcare consulting practice as the founder and senior consultant of Acevedo Consulting Incorporated ("ACI").  ACI assists clients in the healthcare industry in all areas concerning reimbursement, including coding

---

[1] *Coding Certifications*, AAPC, https://www.aapc.com/certifications?tag=coding (last visited Sept. 29, 2023).

[2] *AAPC Fellow Application Process*, AAPC, https://www.aapc.com/recognition/aapc-fellow.aspx (last visited Sept. 29, 2023) ("Fellows are highly experienced in their position within the business of healthcare.  This status indicates your professional achievement and continuous adherence to the ethical and professional standards of AAPC.  Fellowship is earned through hard work, written demonstration of your professional expertise, and regular commitment to dedicated leadership in the healthcare community.").

[3] *Certified in Healthcare Compliance (CHC)*, HCCA, https://www.hcca-info.org/certification/become-certified/chc (last visited Sept. 29, 2023).

[4] For purposes of this report, I use the term "ICD-9" to refer to "ICD-9-CM" and "ICD-10" to refer to "ICD-10-CM," respectively.  Furthermore, I use the term "ICD" to refer both to ICD-9 and ICD-10.

[5] *See ICD-10, ICD-10-CM, & ICD-10-PCS*, University of Kansas Medical Center, https://guides.library.kumc.edu/icd10 (last visited Sept. 29, 2023).

4729

and medical records review.  The firm's clients span the gamut of the United States' healthcare system, from large Medicare Advantage Organizations ("MAOs") to small private health insurers, small physician practices to large healthcare systems, and the federal government.

5.      I have provided education on ICD coding rules to large and small physician organizations, Accountable Care Organizations ("ACOs"), and a national MAO.  I have also advised physician practice groups on accuracy and compliance with the coding and Medicare Advantage risk adjustment rules on a proactive basis as well as assisting them through risk adjustment audits by any one of the Medicare contractors.  I have had a longstanding contract with a large Program of All-Inclusive Care for the Elderly ("PACE") to provide documentation and education on ICD-10 coding, and to provide monthly quality reviews and feedback on the accuracy and completeness of the providers' documentation.

6.      A copy of my Curriculum Vitae, including a list of all publications I have authored, is attached as **Appendix A**.  A list of my prior testimony is attached as **Appendix B**.


## II.    COMPENSATION

7.      My contract with the United States Department of Justice is on an hourly basis. For my work on this case, I am being compensated at my standard billing rate of $325.00 per hour for guidance and development of my report.  My rate for testifying at a deposition or appearing at any proceeding is $468.75 per hour.  My compensation is not contingent on the content of my opinions or the outcome of this matter.


## III.   SCOPE OF ASSIGNMENT

8.      I have been engaged by the Plaintiffs to provide expert testimony in this matter. Specifically, I have been asked to provide background on medical record coding, including ICD-9 and ICD-10 diagnosis coding, and its relationship to the Hierarchical Condition Categories ("HCCs") used in the Medicare Advantage risk adjustment program.  I have also been asked to provide expert testimony on the following topics: (1) the documentation standards required in risk adjustment coding; (2) the standards and guidelines governing medical record coding; and (3) industry best practices for achieving accurate and complete coding in the Medicare Advantage context.  The relevant time period for my report covers dates of service in 2008 through 2016.

3

9.      I reserve the right to supplement or revise my opinions should additional information become available.

## IV.    BASIS FOR OPINIONS

10.      I have reviewed publicly-available materials for the relevant time period, including the ICD-9 official Coding Guidelines applicable during the 2008–2014 dates-of-service years and the ICD-10 official Coding Guidelines applicable during the 2015–2016 dates-of-service years; the CMS 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("2008 Participant Guide"); the CMS Medicare Managed Care Manual, Chapter 7 – Risk Adjustment; and various publications regarding coding. I have also reviewed deposition transcripts from this case.  A complete list of the materials that I have relied upon as a basis for my opinions rendered in this report is attached as **Appendix C**.

## V.    BACKGROUND

### A. Introduction to Medical Record Coding

11.      When an individual goes to a doctor's office, an urgent care center, hospital, or other health care facility, the physician or other provider documents one or more of the following in the patient's medical record: the patient's complaint and related history, a physical examination, and the assessment/impression and plan.  In determining whether to pay for a healthcare service, the patient's insurance company or other payer generally requires information on what was done to the patient (i.e., the medical service provided), and why.  There are industry-standard medical "codes" used to report "what was done" and "why" on claims made to insurance companies.  These codes ensure that all healthcare providers are speaking the same language when submitting a claim for payment.

12.      While the American Medical Association has created Current Procedural Terminology ("CPT") codes to describe "what was done" (e.g., an office visit, an ultrasound, a blood draw, etc.), ICD diagnosis codes tell the insurer "why"—i.e., what health condition the medical service addresses.  ICD diagnosis codes designate diseases, symptoms, abnormal findings, and other elements of the patient's diagnosis.  For example, when a physician sees a patient for a new patient office visit, the CPT code may be 99204, which represents the service provided.  If the medical record appropriately documents that the patient exhibits symptoms of

4

4731

diabetes and that blood tests confirm that the patient has diabetes mellitus, the proper ICD-10-CM code is E11.9, which represents the diagnosis.

13.    When insurance payment is on a "fee-for-service" basis, the physician is paid based on the specific CPT code submitted for the office visit, and the payment amount is the same regardless of how sick the patient is.  Continuing the example from paragraph 12, the physician would be paid based on CPT code 99204 (new patient office visit), regardless of the patient's confirmed diabetes mellitus diagnosis (E11.9).  The ICD code does not impact the payment.

14.    By contrast, in the Medicare Advantage program discussed further below, the reported ICD codes are relevant because payment is on a "risk adjusted" basis.  This means that CMS pays MAOs a monthly amount per beneficiary based on the risk profile of that beneficiary.  Generally, the sicker a beneficiary is, the higher the payment.  The risk adjustment system sets the monthly payment amount by estimating the healthcare expenditures a patient is likely to require in a given year, based in part on the health status of the patient, which in turn is based on the Hierarchical Condition Categories ("HCCs") reported for that patient.  As explained below, ICD codes underlie HCCs, and therefore, may impact payment in this system.

**B.  ICD-9 and ICD-10 Coding**

15.    The International Classification of Diseases is a medical classification system maintained by the World Health Organization ("WHO") and used worldwide for health management and clinical purposes.  WHO issues new revisions of the ICD periodically.

16.    At the beginning of the relevant time period, ICD-9 was the operative classification system.  There were approximately 14,000 ICD-9 diagnosis codes.  When the United States Department of Health and Human Services switched to ICD-10 in 2015, that number rose to almost 70,000, because ICD-10 allows for greater specificity and more granularity in describing a patient's condition, variants of that condition, or complications present with certain conditions. [6]

---

[6] *International Classification of Diseases, (ICD-10-CM/PCS) Transition - Background*, Centers for Disease Control and Prevention, https://www.cdc.gov/nchs/icd/icd10cm_pcs_background.htm (last visited Sept. 29, 2023).

4732

17.     Depending on the date-of-service year in the relevant time period, the authoritative source for diagnosis coding is the ICD-9 or ICD-10 Coding Guidelines published by the Centers for Disease Control and Prevention (CDC).[7]  There are a number of additional sources that explain coding rules and guidelines that must be followed for proper reporting of diagnoses.  These additional sources include coding guidelines, manuals, and training published by CMS.[8]  Organizations such as hospitals and MAOs also subscribe to the American Hospital Association's "Coding Clinic," another recognized source for ICD-9 and ICD-10 guidance.

18.     There are two recognized organizations that certify professional coders, the AAPC and American Health Information Management Association ("AHIMA").  The main credential provided by the AAPC is the CPC (Certified Professional Coder) and the main credential provided by AHIMA is the CCS (Clinical Coding Specialist).[9]

19.     Coding certification from either the AAPC or AHIMA requires following the AAPC and AHIMA's guidelines for ethical coding.[10]

## C. ICD Coding and Reporting Process

20.     In the Medicare Advantage context, both ICD and CMS have set out rules on the provider documentation (and content of that documentation) needed to assign and report particular ICD codes on insurance claims.  Historically, before this process became electronic, physicians handwrote notes in patient charts, the billing staff looked up the applicable diagnosis code(s) supported by notes in patient charts in an ICD code book, and then the staff would report the assigned ICD codes on a claim submitted for payment.

21.     With the adoption of electronic medical records (EMRs) beginning in 2011, it has become increasingly common for physicians to select the ICD-9 or ICD-10 code(s) as they

---

[7] *International Classification of Diseases, Tenth Revision, Clinical Modification (ICD-10-CM)*, Centers for Disease Control and Prevention, https://www.cdc.gov/nchs/icd/icd-10-cm.htm (last visited Sept. 29, 2023); *ICD-9-CM Addenda, Conversion Table, and Guidelines*, Centers for Disease Control and Prevention, https://www.cdc.gov/nchs/icd/icd9cm_addenda_guidelines.htm (last visited Sept. 29, 2023).
[8] *See, e.g.*, *ICD-10 Resources*, Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare/coding-billing/icd-10-codes/icd-10-resources (last visited Sept. 29, 2023).
[9] *See Certified Professional Coder (CPC) Certification*, AAPC, https://www.aapc.com/certifications/cpc (last visited Sept. 29, 2023); *Certified Coding Specialist (CCS)*, AHIMA, https://www.ahima.org/certification-careers/certification-exams/ccs/ (last visited Sept. 29, 2023).
[10] *See Code of Ethics*, AAPC, https://www.aapc.com/about-us/code-of-ethics (last visited Sept. 29, 2023); *Ethics*, AHIMA, https://www.ahima.org/who-we-are/governance/ethics/ (last visited Sept. 29, 2023).

complete their notes in the EMR system.  This is especially true in an outpatient office or clinic setting.  As a physician starts to type "diabetes" in the section of the note where diagnoses are listed, the EMR presents a list of possible ICD codes.  For example, if the patient has Type 2 diabetes mellitus without complications, the physician should select E11.9 as the corresponding ICD-10 code.  Billing staff may verify that the physician selected the correct code(s) and then include them on an insurance claim.  In hospital settings, which tend to have more resources than the typical outpatient provider's office, dedicated coders may look at the appropriate sections of medical charts and, following the applicable payer rules for the type of medical facility, report diagnosis codes on the insurance claim.

### D.  Medicare Advantage Program

22.     The federal government's Medicare program provides health insurance for people ages 65 or older as well as younger individuals with certain disabilities.[11]  Medicare beneficiaries have the option to enroll in "Traditional Medicare" or "Medicare Advantage."  Medicare Advantage beneficiaries enroll in plans administered by private insurance companies known as "Medicare Advantage Organizations," or "MAOs."[12]

23.     CMS enters into annual contracts with MAOs that participate in the Medicare Advantage program and imposes numerous requirements on the MAOs pursuant to statutes, regulations, guidance materials, and through the contracts.[13]

### *Risk Scores Under the CMS-HCC Risk Adjustment Model*

24.     In the Medicare Advantage program, CMS pays MAOs a monthly premium for each beneficiary enrolled in the MAOs' plans.[14]  The amount of payment depends in part on the beneficiary's "risk score," which is calculated using the CMS Hierarchical Condition Category ("HCC") Risk Adjustment Model.[15]

25.     Each beneficiary's risk score is newly calculated each payment year based on health conditions documented in the beneficiary's medical records during the prior year (referred

---

[11] 42 U.S.C. § 426 *et seq.*; 42 C.F.R. § 406.5; 42 C.F.R. §§ 406.10–406.13.
[12] 42 U.S.C. § 1395w *et seq.*; 42 C.F.R. § 422 *et seq.*
[13] 42 U.S.C. § 1395w *et seq.*; 42 C.F.R. § 422 *et seq.*
[14] 42 U.S.C. § 1395w-23(a)(1)(A); 42 C.F.R. § 422 *et seq.*
[15] 42 U.S.C. § 1395w-23(a)(1)(C); 42 C.F.R. §§ 422.300–422.308.

4734

to as the "service year" or "date-of-service" ("DOS") year). For example, a beneficiary's risk score for payment year 2016 is based on conditions documented in that beneficiary's medical records during encounters that took place in 2015, but that risk score would not reflect conditions documented in that beneficiary's medical records during encounters in 2014 or in 2016.

26.    The purpose of these individualized risk scores is to capture anticipated differences in the costs of coverage for beneficiaries given differences in their health status and demographic background.[16] Thus, the risk score is calculated based on both the health status of the beneficiary and demographic factors (e.g., a patent's gender and age, disability status, institutional status).[17]

### *Hierarchical Condition Categories (HCCs)*

27.    The health status component of the risk score is based on the HCCs or Hierarchical Condition Categories reported for the beneficiary. CMS groups ICD-9/ICD-10 diagnosis codes with other clinically similar diagnosis codes.[18] These diagnosis code groupings are in turn grouped into "condition categories."[19] Similar "condition categories" are organized hierarchically based on severity of the condition and cost implications, such that the most severe and costly condition category is at the "top" of the hierarchy.[20] Once hierarchically organized, these condition categories become HCCs.

28.    This hierarchical organization ensures a beneficiary's risk score will incorporate only the HCC that represents the most severe and costly manifestation of a disease documented in a given year. For example, if claims data shows a patient has both diabetes without complications (ICD-10 code E11.9, HCC 19), and diabetes with acute complications (ICD-10 code E11.8, HCC 18), only HCC 18 is used in computing the patient's risk score, as it is the more severe form of diabetes.

---

[16] *See* Medicare Managed Care Manual, Ch. 7, § 20 (June 7, 2013) ("Risk adjustment allows CMS to pay plans for the risk of the beneficiaries they enroll, instead of an average amount for Medicare beneficiaries. By risk adjusting plan payments, CMS is able to make appropriate and accurate payments for enrollees with differences in expected costs . . . . Risk scores measure individual beneficiaries' relative risk and risk scores are used to adjust payments for each beneficiary's expected expenditures.").

[17] *See id.* § 70 ("Risk scores are used to adjust payments and bids based on the health status (diagnostic data) and demographic characteristics (such as age and gender) of an enrollee.").

[18] *Id.* § 70.1.

[19] *Id.*

[20] *Id.*

4735

29.     Each year, CMS determines the groupings of diagnosis codes that "map" to a given HCC.[21]  If a beneficiary has a condition corresponding to a diagnosis code that maps to an HCC, that HCC will be incorporated into the calculation of the beneficiary's risk score.  For example, under the current CMS-HCC Risk Adjustment Model, of the approximately 70,000 total ICD-10 codes, over 9,700 of those codes map to one or more of the 86 HCCs in the model.[22]

30.     Multiple ICD codes can map to the same HCC.  ICD-10 codes each contain up to 7 characters.  Although slight variations in the last characters in the code string leads to distinct ICD-10 codes, these distinct ICD-10 codes may still map to the same HCC.  For example:

   a.  E11.10 (Type 2 diabetes mellitus with ketoacidosis without coma) and E11.11 (Type 2 diabetes mellitus with ketoacidosis with coma) both map to HCC 17 (diabetes with acute complications).

   b.  M35.00 (Sjögren syndrome, unspecified) and M35.3 (Polymalgia rheumatica) both map to HCC 40 (Rheumatoid arthritis and inflammatory connective tissue disease).

31.     However, certain diagnosis codes indicating historical conditions or potential risk for future conditions may be documented in the patient's medical record and assigned an ICD code, but they would not map to an HCC.  For example:

   a.  If an individual is diagnosed with thyroid cancer, it is appropriate to assign the ICD-10 code C73 (malignant neoplasm of the thyroid gland).  After the thyroid is removed, if the patient is asymptomatic and no further treatment is being provided, then Z85.850 (personal history of malignant neoplasm of thyroid) is the proper ICD-10 code to report.

   b.  If a patient's blood sugar has been elevated on lab tests, but there is not enough information to diagnose the patient with diabetes mellitus, the proper code to report in this situation is a code for abnormal glucose (R73.09), rather than E11.9 (diabetes mellitus without complications).

---

[21] Not all ICD-9/ICD-10 diagnosis codes map to an HCC included in the CMS-HCC Risk Adjustment Model, and therefore not all ICD-9/ICD-10 diagnosis codes affect risk adjustment payments.
[22] Amerigroup, *CMS-HCC Risk Adjustment Model (V24), ICD-10-CM to CMS-HCC Crosswalk*, https://provider.amerigroup.com/dam/publicdocuments/ALL_CARE_CMSHCCRAModel_mrdcoding_tips.pdf (last visited Sept. 29, 2023).

4736

32.     Where a patient has several diseases corresponding to several HCCs, the risk adjustment model allows those multiple HCCs to be assigned and accounted for in the risk score. The number of HCCs reported and the severity of the HCCs tend to increase the risk score. Thus, a 72-year-old male with COPD, diabetes mellitus, and coronary artery disease would have a higher risk score than a 72-year-old male with diabetes mellitus only.

### Medical Record Documentation to Support HCCs Under CMS Rules

33.     During the relevant time period, CMS had specific rules governing the submission of diagnosis codes for inclusion in the HCC risk adjustment model.  HCC coding requires clinical support in medical record documentation.

34.     As explained in the 2008 Participant Guide, CMS requires that diagnosis codes submitted for risk adjustment result from a face-to-face encounter between a beneficiary and a provider of a qualifying physician specialty.[23]  In addition, the medical record for a particular encounter used as the basis for submission of a diagnosis code must be signed and include the provider's credentials.[24]

35.     In addition, both the ICD guidelines and CMS specify that all conditions reported should be based on documentation showing that conditions exist at the time of the encounter/visit and "require or affect patient care, treatment or management."[25]

36.     Importantly, regulations and official CMS publications require all diagnosis codes submitted by MAOs to be documented in the medical record, and ICD Coding Guidelines must be followed for coding and reporting.[26]  For example, the Medicare Managed Care Manual, Chapter 7 states that MAOs must:

---

[23] 2008 Participant Guide, § 7.2.4.2; *see also id.* Table 3H (setting forth acceptable physician specialties, which include physicians and other qualified healthcare providers, such as nurse practitioners and physician assistants).

[24] *Id.* § 7.2.4.2 ("For purposes of risk adjustment data submission and validation, the MA organizations must ensure that the provider of service for face-to-face encounters is appropriately identified on medical records via their signature and physician specialty credentials.").

[25] ICD-9, § IV.K (effective Oct. 1, 2011), https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf; ICD-10, § IV.J (updated Apr. 1, 2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf; *see also* 2008 Participant Guide, § 6.4.1.

[26] *See, e.g.*, 45 C.F.R. § 162.1002(a)(1)(i), (b)(1), (c)(2)(i) (establishing the ICD, including the ICD Guidelines, as the national standard for diagnosis coding); 42 C.F.R. § 422.310(d)(1) ("MA organizations

> Ensure the accuracy and integrity of risk adjustment data submitted to CMS. ***All diagnosis codes submitted must be documented in the medical record*** and must be documented as a result of a face-to-face visit. The diagnosis must be coded according to International Classification of Diseases, (ICD) Clinical Modification Guidelines for Coding and Reporting.[27]

In addition, the 2008 Participant Guide states:

> Standard ICD-9-CM coding practices support the CMS-HCC model. ***In all cases, the documentation must support the code selected and substantiate that the proper coding guidelines were followed***.[28]

## OPINIONS

### a. Diagnosis Codes Submitted for Risk Adjustment Must Be Supported By Documentation in the Medical Record Meeting CMS Requirements.

37.     The principal requirement for assigning and reporting diagnosis codes in the Medicare Advantage risk adjustment model is that the codes are supported by appropriate medical record documentation.[29]

38.     As referenced above, the medical record cannot merely contain a list of the patient's conditions without supporting documentation showing that the conditions "require or affect patient care, treatment or management."[30] In the absence of such documentation, the coder cannot assign codes for listed conditions. In my experience, such documentation may include physician notes on disease progression or stabilization, patient response to the treatment, and whether test results were reviewed by the physician.

39.     In sum, the diagnosis codes that MAOs submit to CMS for risk adjustment purposes must be (1) based on a face-to-face encounter; (2) by a qualified provider (either a physician or other qualified healthcare provider); (3) documented in the medical record; and (4) coded in compliance with the ICD Guidelines.[31]

---

must submit data that conform to CMS' requirements for data equivalent to Medicare fee-for-service data, when appropriate, and to all relevant national standards.").

[27] Medicare Managed Care Manual, Ch. 7, § 40 (emphasis added).

[28] 2008 Participant Guide, § 6.4 (emphasis added).

[29] *See* Medicare Managed Care Manual, Ch. 7, § 40; 2008 Participant Guide, § 6.4.

[30] ICD-9, § IV.K (effective Oct. 1, 2011), https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf; ICD-10, § IV.J (updated Apr. 1, 2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf; *see also* 2008 Participant Guide, § 6.4.1.

[31] 2008 Participant Guide, § 7.2.4.2.

4738

**b. Coding is Governed by Objective Standards and Guidelines.**

40.    It is my opinion that, if a coder is knowledgeable of the official ICD and CMS coding rules discussed above, he or she should be able to identify an objectively correct ICD code or set of ICD codes that can be reported based on a particular medical record and thus there should be little variance in code assignment among coders.

41.    The coding rules are by design clear, consistent, and specific.  They offer detailed instructions on what codes should be assigned based on features of a patient's condition and what is documented in the medical record.  If qualified coders properly follow these rules, they are able to identify appropriate ICD codes and rule out inappropriate codes.

### *Coding is a Methodical Step-By-Step Process.*

42.    To begin, coders must follow a methodical step-by-step process in arriving at a code assignment under the ICD guidelines.  The "Alphabetical Index" and "Tabular List" in both the ICD-9 and ICD-10 set out these directions.

43.    The Alphabetical Index lists conditions and subvariants of conditions in alphabetical order.  At the first step of coding, a coder looks up in the Alphabetical Index a condition he or she identifies that meets the medical record documentation requirements.

44.    This Index supplies the initial ICD code string for that condition.  For example, for Parkinson's disease with dementia a coder would look up "Parkinsonism," under which there are sub-listings of around twenty variations of "Parkinsonism," including with "dementia."[32]

---

[32]ICD-10-CM Index to Diseases and Injuries, *available at* https://ftp.cdc.gov/pub/Health_Statistics/NCHS/Publications/ICD10CM/2022/ (Table and Index zip.zip) (last visited April 5, 2024).

4739

**Parkinsonism (idiopathic) (primary)** G20
- with neurogenic orthostatic hypotension (symptomatic) G90.3
- arteriosclerotic G21.4
- dementia G31.83 *[F02.80]*
- - with behavioral disturbance G31.83 *[F02.81]*
- due to
- - drugs NEC G21.19
- - - neuroleptic G21.11
- medication-induced NEC G21.19
- neuroleptic induced G21.11
- postencephalitic G21.3
- secondary G21.9
- - due to
- - - arteriosclerosis G21.4
- - - drugs NEC G21.19
- - - - neuroleptic G21.11
- - - encephalitis G21.3
- - - external agents NEC G21.2
- - - syphilis A52.19
- - specified NEC G21.8
- syphilitic A52.19
- treatment-induced NEC G21.19
- vascular G21.4

The index directs the coder that "Parkinson's with Dementia without behavioral disturbance" may be coded with the ICD code strings "G20" (Parkinsonism) and "F02.80."

Next, the coder must consult the "Tabular List" for further step-by-step instructions on the requirements to assign a code.[33]  In this case, the Tabular List entry for "G20" (Parkinson's disease) instructs the coder to: Use additional code to identify: dementia with behavioral disturbance (F02.81) dementia without behavioral disturbance (F02.80).  Therefore, the proper codes for Parkinson's with dementia without behavioral disturbance are G20 and F02.80.

---

[33] ICD-10-CM Tabular List of Diseases and Injuries, *available at* https://ftp.cdc.gov/pub/Health_Statistics/NCHS/Publications/ICD10CM/2022/ (Table and Index zip.zip) (last visited April 5, 2024).

13

4740

**G20 Parkinson's disease**
 Hemiparkinsonism
 Idiopathic Parkinsonism or Parkinson's disease
 Paralysis agitans
 Parkinsonism or Parkinson's disease NOS
 Primary Parkinsonism or Parkinson's disease

**Use additional** code to identify:
    dementia with behavioral disturbance (F02.81)
    dementia without behavioral disturbance (F02.80)

**Excludes1:** dementia with Parkinsonism (G31.83)

45. As shown above, the coding rules provide clear instructions on (1) the specific items the medical record documentation must contain to support a condition, *supra* ¶¶ 37–39, (2) how to look up a particular condition or variants of a condition in the Alphabetical Index to identify the ICD code and further requirements for assigning the code, and (3) the step-by-step process of applying those requirements to arrive at code assignment.

46. In addition, there are rules about how a coder should use these resources. For example, it is well established a coder must use the Alphabetical Index and Tabular List sequentially and follow the instructional notations in both.[34] Coders may never select a final code based just on what the Alphabetical Index provides. As long as the coder follows this order of operations, the instructions in the Alphabetical Index and Tabular List are consistent and will lead the coder to the proper code assignment.

### *Coding Rules Are Highly Specific and Particularized to Features of Patients' Conditions.*

47. The ICD guidelines provide specific rules for assigning ICD codes regarding how particular features of a patient's condition should be coded. This specificity makes clear to coders under what circumstances a particular ICD code should be assigned.

48. For example, ICD-10 specifies the codes to assign when a condition occurs on the left or right side of the body, and in some cases provides a code indicating that a condition occurs on both sides of the body (bilaterally). If the medical record does not specify which side the condition occurs, the rules generally require the coder to assign the code denoting the side is

---

[34] ICD-9, § I.B.1–2 (effective Oct. 1, 2015),
https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf; ICD-10, § I.A.1, § I.B.1 (updated Apr. 1, 2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf.

unspecified.[35]  If, however, the condition occurs bilaterally, but there is no specific ICD code designating that the condition occurs bilaterally, the guidelines require the coder to report the ICD codes for both the right and left sides of the body separately.[36]

49.     For example, ICD-10 provides codes based on where the condition staphylococcal arthritis manifests: M00.011 (Staphylococcal arthritis, right shoulder), M00.012 (Staphylococcal arthritis, left shoulder), and M00.019 (Staphylococcal arthritis, unspecified shoulder).  There is no code designating this condition as bilateral.  If the medical record indicates that the patient has staphylococcal arthritis in both shoulders, the coder should report *both* M00.011 (right shoulder) and M00.012 (left shoulder) as there is no specific ICD code designating this condition as bilateral.

### *Difficult Coding Scenarios Do Not Indicate that Coding is a Subjective or Ambiguous Process.*

50.     The existence of difficult coding scenarios does not mean coding itself is a subjective process with no right answers as to whether a code is properly assigned or not.   Nor do these difficult scenarios show that the coding guidelines themselves are ambiguous or fail to provide objective rules for a coder to follow.

51.     Rather, difficult scenarios generally are caused by and reflect (1) the varying degrees of skill level and experience among coders; (2) errors in how those coders apply the guidelines and rules; and (3) problems extrinsic to the guidelines and the required coding process, such as problems with the medical record documentation itself.   All of these issues, however, are far less likely to be present in sophisticated coding programs that use certified, well-trained coders and implement sufficient quality assurance processes to check coders' work.

52.     Below, I address some potentially difficult coding scenarios, and explain why they do not demonstrate the coding process and guidelines are fundamentally subjective or ambiguous:

    a.  **Updated coding guidelines**: One potential source of error during the relevant time period was coders' relative levels of experience with and training on operative coding

---

[35] ICD-10, § I.B.13 (updated Apr. 1, 2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf.
[36] *Id.*

guidelines. The CDC transitioned from ICD-9 to ICD-10 in 2015. While some less-experienced coders may have erred in applying the new ICD-10 guidelines, this does not indicate that the guidelines themselves were unclear or ambiguous.

For example, as the table below shows, under ICD-10, coders are required to assign a single combination code (E11.331) where a patient has both diabetes mellitus with diabetic retinopathy. ICD-9, however, provided a different rule where these conditions were required to be coded separately (250.52, 362.05). Under the new rule, the objectively correct code is the single combination code. In my experience, coders who were unfamiliar with the operative ICD-10 rules might attempt to search for two separate codes or simply miss the combination code and apply a different diabetes code. This example does not illustrate that ICD-10 is itself ambiguous or allows for varying or inconsistent results (i.e., different diabetes code assignments) among coders. Rather, it indicates that lack of experience with the operative rules may lead to error.

| ICD-9 Coding | ICD-10 Coding |
|---|---|
| 250.52 – Diabetes with ophthalmic manifestations, type II or unspecified type, controlled | E11.331 – Type II diabetes mellitus with moderate non-proliferative diabetic retinopathy with macular edema |
| 362.05 – Moderate non-proliferative diabetic retinopathy | |

Notably, the coding industry attempts to provide training and other resources to address varying levels of experience on the part of coders. For example, during the transition to ICD-10, there were numerous continuing education classes that focused on educating coders on the new rules. The AAPC also required its certified members to pass a proficiency assessment on ICD-10 "format and structure, groupings and

16

4743

categories of codes, ICD-10-CM official guidelines, and coding concepts."[37]  A major focus on my work during this time was providing trainings on ICD-10 rules, including trainings customized for specific practice groups.

b. **Problems extrinsic to coding rules, guidelines, and resources**: Some difficult coding scenarios are due to problems extrinsic to the coding rules, for example, issues in the medical record documentation itself or its legibility.  These issues do not indicate that the coding rules or process themselves are subjective, and experienced coders are trained to handle these circumstances properly.

For example, a provider might use the abbreviation "PE" in a medical record, which typically stands for "pulmonary embolism," but may also mean "pulmonary edema" or "physical exam."  Under this circumstance, unless the coder is able to verify the meaning of the ambiguous or illegible term (e.g., via a physician query), the coder should not assume the meaning of the term and base a coding assignment on it.[38]  Rather, a code assignment is only appropriate if based on clear and consistent medical record documentation.[39]

53.    I also reviewed the deposition transcripts of some United witnesses that discuss difficult coding scenarios.  For example, United coding supervisor, Tammy Dickey, testified: "if

---

[37] *See ICD-10 Proficiency Assessment*, AAPC (Mar. 26, 2013), https://www.aapc.com/blog/24145-icd-10-proficiency-assessment/#:~:text=The%20assessment%20will%20measure%20your,for%20other%20exams%20or%20assessments.

[38] ICD-10 at 1 (updated Apr. 1, 2022), https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf (stating that "The importance of consistent, complete documentation in the medical record cannot be overemphasized.  Without such documentation accurate coding cannot be achieved.").  The AHIMA Standards of Ethical Coding also provide that coders should "[a]ssign and report . . . only the codes and data that are clearly and consistently supported by health record documentation in accordance with applicable code set and abstraction conventions" and should "[q]uery and/or consult as needed with the provider for clarification and additional documentation prior to final code assignment in accordance with acceptable healthcare industry practices."  *American Health Information Management Association Standards of Ethical Coding (2016 Version)*, AHIMA (revised and approved Dec. 12, 2016), https://bok.ahima.org/doc?oid=302237#.X0-0BRNKg_U.

[39] *Id.*

you gave the same record to ten coders, you would probably be get [sic] five sets of answers." [40]
To the extent this example illustrates that coding is subjective and the rules lack clarity, I
disagree. In my opinion, what Ms. Dickey describes does not reflect a phenomenon in ICD
coding. ICD coding is highly specific and governed by a set of particularized rules. In my
opinion and experience, there is not substantial variance in ICD coding among qualified coders,
nor have I experienced this level of variance in my own practice.

### c. There Are Well-Established Industry Best Practices For Achieving Complete and Accurate Coding.

54.    In the Medicare Advantage context, there are industry best practices for achieving
accurate and complete coding. In my opinion, these best practices include: (1) requiring coders
to be certified; (2) providing extensive and ongoing training to the coders, including training in
Medicare Advantage risk adjustment; (3) requiring coders to meet high quality standards in order
to graduate from training; (4) requiring coders to maintain high quality standards after training;
(5) providing coders with resources to address coding questions; (6) providing remedial training
to coders who fall below the organization's standards; (7) terminating coders who fail to perform
up to the organization's standards despite remedial training; and finally, (8) maintaining robust
quality assurance processes to check the coders' work on an ongoing basis. Issues with coding
accuracy and completeness are more likely to be avoided when an organization's policies and
procedures encompass these elements.

55.    Although coders approach their work with varying types of experience, the impact
of these variances is limited when they are certified and provided with training that augments
their prior work experience. For example, coders who have only worked on electronic medical
records should be trained on coding from handwritten records and vice versa. In addition, coders
should be exposed to different medical specialties during training if they had previously only
worked in one specialty.

56.    As discussed throughout this report, using certified coders is key in ensuring
accurate and complete coding. Coders certified by the AAPC or AHIMA have had their
knowledge tested by an independent body and must obtain a number of Continuing Education
Credits ("CEUs") to retain their certification. In addition, organizations participating in the

---

[40] Dickey Dep. 195:8–12, 220:17–23, May 24, 2022.

Medicare Advantage risk adjustment program should ensure that their coders are trained in risk adjustment coding.

Signed on April 5, 2024.

_____
Jean Acevedo

4746

**EXHIBIT P-51**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA       )   No. 16-08697 FMO
ex rel. BENJAMIN POEHLING,     )
                               )
              Plaintiffs,      )
                               )
v.                             )
                               )
UNITEDHEALTH GROUP, INC.,      )
et al.,                        )
                               )
              Defendants.      )
_____)

*** CONFIDENTIAL ***

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

JANET FRY

(Taken virtually)

9:02 a.m. Eastern

Thursday, June 2, 2022

REPORTED BY:  Christine A. Taylor, RPR

Magna Legal Services
866-624-6221
www.MagnaLS.com



4748

Page 84

1            discipline that is based on multiple --
2            multiple documentation by multiple people in
3            the medical record.  So one coder may have
4            seen something in a particular note that he
5            or she felt was important to pick up whereas
6            another coder might either just decided that
7            wasn't appropriate to code at that point or
8            maybe was a historical condition that the
9            person doesn't have anymore.
10           So there's these types of decisions
11           that are made every time you open up a
12           medical record to determine whether to
13           include the condition or not.
14   BY MS. MADDOUX:
15           Q.   So this situation is describing a
16   scenario where the senior coder may disagree about
17   whether a medical record documentation supported a
18   diagnosis code or HCC?
19           A.   Yes.
20           Q.   And in addition to the reasons you just
21   gave, are there any other reasons two certified
22   coders may disagree about whether a medical record
23   documentation supports a diagnosis or HCC?
24               MS. ZUPAC:  Object to form.
25               THE WITNESS:  Just in general.  I don't



Page 85

```
 1              have any specific examples to give you, but
 2              that's just a known fact.  That's why we do
 3              audits, because people disagree with the
 4              information that's in the medical record.
 5    BY MS. MADDOUX:
 6              Q.   In your experience working with trained
 7    coders, do you think it was not uncommon for two
 8    certified coders to disagree on whether or not a
 9    particular diagnosis code is supported in the
10    medical record?
11              MS. ZUPAC:  Object to form.
12              THE WITNESS:  I can't really put a
13              percentage whether to say it's common or not
14              common.  I believe I mentioned before that
15              we only saw a -- we didn't see the whole --
16              100 percent of the records did not come
17              through as discrepant.  So, therefore, some
18              did, but I don't have numbers as far as
19              which ones -- what the numbers were to give
20              you.
21    BY MS. MADDOUX:
22              Q.   While you were the ICC, do you recall
23    senior coders raising situations with you where the
24    senior coder disagreed with a primary coder or
25    senior coder?
```



Page 86

```
 1            A.    Yes.

 2            Q.    Do you know how often this occurred?

 3                  MS. ZUPAC:  Object to form.

 4                  THE WITNESS:  Same response.  I don't

 5            have a percentage or a number for you.

 6    BY MS. MADDOUX:

 7            Q.    How would you resolve the disagreement?

 8            A.    The case would be discussed with the

 9      es- -- the -- how do I say it?

10                  The -- I would review the medical

11      record and look at what both -- the notes that both

12      coders gave to say what the problem was, where were

13      they having issues, you know, why did they

14      disagree, that sort of thing.  And then, again,

15      since I was kind of the -- at the top as far as the

16      buck stops here, I would -- we would make a

17      decision on the guidance that we have.  I'd either

18      agree with the primary or agree with the senior.

19      We may have to bring in a physician if we wanted to

20      look at it a little further, if it was a clinical

21      issue that they were disagreeing on.  But primarily

22      between discussion of the -- myself plus other

23      professional coders that were on the QA panel, we

24      could typically come up with a good decision as far

25      as what the medical record documented.
```



Page 128

1           A.   Again, if it's potentially they -- and

2      I don't even know if there were productivity

3      standards at the MRRCs.  But, again, if the coder

4      felt stressed to work faster, they might forget or

5      miss a particular diagnosis, which is why we have

6      the various levels so that the next person could

7      pick it up.

8           Q.   And looking at this list today, are

9      there any other factors that you can think of that

10     may contribute to coder disagreement?

11          A.   No.  I think it's pretty -- you know,

12     can pretty much generalize because of documentation

13     and signatures and guidance.  That's pretty much

14     what the -- subjectively, what we think causes

15     differences in coding.

16               MS. MADDOUX:  So I think if we can go

17          off the record.

18               THE VIDEOGRAPHER:  We are going off the

19          record.  The time is 12:09 p.m.

20       (Recess taken from 12:09 p.m. until 12:40 p.m.)

21               THE VIDEOGRAPHER:  We are back on the

22          record.  The time is 12:40 p.m.

23               (Exhibit 1215 marked for

24          identification.)

25     BY MS. MADDOUX:



Page 140

1                    CERTIFICATE OF REPORTER

2

3           I, Christine A. Taylor, Certified Court
     Reporter within and for the State of Georgia, do
     hereby certify:

4

5           That the foregoing deposition was taken
     before me on the date and at the time and location
     stated on Page 1 of this transcript; that the

6    deponent was duly sworn to testify to the truth,
     the whole truth and nothing but the truth; that the

7    testimony of the deponent and all objections made
     at the time of the examination were recorded

8    stenographically by me and were thereafter
     transcribed; that the foregoing deposition as typed

9    is a true, accurate and complete record of the
     testimony of the deponent and of all objections

10   made at the time of the examination to the best of
     my ability.

11

12           I further certify that I am neither
     related to nor counsel for any party to the cause
     pending or interested in the events thereof.

13   Witness my hand, this 6th day of June, 2022.

14

15

16   _____

17   Christine A. Taylor, RPR
     CCR-4736

18

19

20

21

22

23

24

25



**EXHIBIT P-52**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

_____
                            )
UNITED STATES OF AMERICA    )
ex rel. BENJAMIN POEHLING,  )
                            )
        Plaintiff,          )    No. CV 16-08697 FMO
                            )
vs.                         )
                            )
UNITEDHEALTH GROUP, INC.,   )
et al.,                     )
                            )
        Defendants.         )
_____)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER


Volume 2
DEPOSITION OF CHRISTOPHER BRESETTE
As 30(b)(6) Designee 5 of
The United States

(Via Zoom Videoconference)
August 9, 2023


Reported by:  John L. Harmonson, RPR
Job No. 1001591



Page 31

1   was not validated but OIG ultimately determined

2   that it in fact was validated?

3       A.    I'm not going to say that it did or did

4   not happen.  It very well may have happened.  I did

5   not study the results of the first senior coder and

6   the second senior coder.

7       Q.    We can go back to that and look at some

8   specific examples to refresh your recollection.

9       A.    Absolutely.

10      Q.    So if the second senior coder determines

11  that the HCC that the first senior coder -- let me

12  restart that.

13          If the second senior coder determines

14  that a particular HCC is validated despite the

15  first senior coder determining that it was not

16  supported, then it escalated to a physician to

17  independently review the medical record and make a

18  final determination.  Is that right?

19      A.    It's mostly correct.  There were

20  oftentimes where the senior coders -- I shouldn't

21  say often.  There was the opportunity and there

22  were times that existed that either the first



Page 32

1    senior coder or the second senior coder asked for

2    assistance with that physician reviewer to make the

3    determination.

4              There were, as you say, instances in

5    which the physician reviewer would review that.  I

6    believe independently, but I don't want to say that

7    it was exclusively independently.  A lot of times I

8    believe it was in consultation with the senior

9    coder to make that determination.

10   Q.    So are you saying that the example that

11   I gave, that's not the only time a physician would

12   weigh in?

13   A.    Correct.

14   Q.    But you're not -- you're agreeing that

15   if the second senior coder found support in that

16   example, then a physician would independently

17   review the medical record to make the final

18   determination?

19   A.    I would agree with that.

20   Q.    Was the physician review blind as well?

21   A.    No, it was not.  And independently is

22   correct.  So my apologies.  I see "independently"



Page 122

1                C E R T I F I C A T E

2

3    DISTRICT OF COLUMBIA

4            I, JOHN L. HARMONSON, a Notary Public

5    within and for the District of Columbia, do hereby

6    certify that CHRISTOPHER BRESETTE, the witness

7    whose deposition is hereinbefore set forth, was

8    duly sworn by me and that such deposition is a true

9    record of the testimony given by such witness.

10           That before completion of the

11   proceedings, review and signature of the transcript

12   was reserved.

13           I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17           IN WITNESS WHEREOF, I have hereunto set

18   my hand this 11th day of August, 2023.

19

                    *John L. Harmonson*
20   _____

21          JOHN L. HARMONSON, RPR

            My commission expires: 04/14/26

22



**EXHIBIT P-53**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA ex    )   No. CV 16-08697 FMO
rel. BENJAMIN POEHLING,        )
                               )
             Plaintiffs,       )
                               )
v.                             )
                               )
UNITEDHEALTH GROUP, INC., et   )
al.,                           )
                               )
             Defendants.       )
_____)


*** CONFIDENTIAL TRANSCRIPT WITH REDACTED ATTORNEYS' EYES
      ONLY PORTIONS.   REFER TO SEPARATE TRANSCRIPT ***



VIDEOTAPED VIDEOCONFERENCE ZOOM DEPOSITION OF

THOMAS KORNFIELD

March 10, 2022
10:14 a.m.
Rockville, Maryland



Magna Legal Services          Prepared by:
(866) 624-6221                Marcella Daughtry, RPR, RMR
www.MagnaLS.com               CA CSR 14315
                              GA No. 6595-1471-3597-5424



4760

Page 106

1    of sort of the overall level, and I don't know that I

2    fully understand all of the ways in which it would -- it

3    would work, to be honest with you.  I mean, I know --

4    well, I know the way it's being discussed, which is that

5    it's, you know, an overall adjustment to the -- based on

6    the extrapolation amount.

7           But I'm sorry.  I lost -- I think I'm -- I'm

8    not really answering your question.  Or can you repeat

9    the question?  Because I think I have --

10          Q   BY MS. SCHEFFLER DO:  Yeah.

11          A   I have lost track of it.

12          Q   Sure.  No problem.

13          So my question was:  Outside of RADV, do you

14   believe there is a need for an adjuster if MA Plans are

15   coding in a way that systematically differs from how

16   fee-for-service providers are coding under traditional

17   Medicare?

18          A   No.  I think it's only needed in a -- in a RADV

19   or overpayment context.

20          Q   Okay.  Can you explain --

21          A   When you are extrapolating.

22          Q   Can you explain to me why you think that it's

23   only necessary in the context of RADV when you are

24   extrapolating?

25          A   I guess it's just a policy piece of it.  I



Page 107

1    mean, I think I have just had a hard time with the

2    argument that if a diagnosis code is not valid and, you

3    know, there is -- there is -- it's known that it's not

4    valid, that there shouldn't just be something taken --

5    you know, money taken back with that.  And maybe some of

6    it is level of effort involved in, you know, getting to

7    a -- getting to an adjustment and applying a

8    fee-for-service adjuster outside of a -- outside of a

9    case where, you know, if you -- if you've audited -- I

10   guess, if you've audited 200 records or something --

11   something to that effect and you are taking back money

12   with those 200 records, I -- I guess I just don't know

13   that it's worth the government's time to -- and I don't

14   know that it really means a whole lot from a payment

15   perspective just in terms of dollars to -- to adjust each

16   one of those coefficients and to get to the right -- you

17   know, what the right level of payment should be with a

18   fee-for-service adjuster if we are not doing

19   extrapolation, but I don't know.

20          But with extrapolation it just feels like a

21   different argument to me, and it -- it just seemed much

22   larger in scale.  From that perspective, it seems like

23   something that shouldn't be ignored.  But when it's

24   not -- when it's not done in an extrapolation, it's

25   just -- and maybe this is just my own personal feeling



Page 108

1    about it, about sort of thinking about, okay, and -- in

2    fairness and -- you know, and I guess impact.

3        Q    So I believe you were sort of referring to

4    whether specific codes found in RADV, whether you have to

5    apply some sort of adjuster before deleting those as

6    opposed to, you know, when RADV, they -- they determined

7    that they were going to extrapolate that error rate.

8    What I was curious about is sort of just outside of RADV

9    altogether.  Why would this principle of the

10   fee-for-service adjuster only be limited to the context

11   of RADV?

12       A    Because I think when you're estimating a model,

13   paying on that model and not doing any adjustment, and

14   you are sort of assuming, making the same -- I don't

15   know.  It's just sort of how people have talked about it,

16   I guess, that -- that when you are estimating the model,

17   it's built into the model that there are errors.  There

18   may be some errors that are, you know, in the MA data in

19   some way, and you haven't corrected for that in a

20   systematic way, that you don't have to then adjust the

21   payments.

22             But if you -- the way -- the way -- the way I

23   have heard it explained is, you know, if you have a, you

24   know, audited -- a model that's on audited data and you

25   pay on audited data, that's completely on audited data,



Page 109

1    but that's not exactly what's happening right now.

2         Q    So I think you said a little bit ago that in an

3    ideal world you would have data -- fee-for-service data

4    that was validated, and you would base the coefficients

5    based out of that.

6         A    Yeah, I mean, I should say --

7              MS. KRIEG:  Object to form.  Misstates prior

8    testimony.

9              THE WITNESS:  Yeah, I mean, I would say if you

10   were doing an -- an adjustment, that's -- that's how it

11   would be done on the fee-for-service data.

12        Q    BY MS. SCHEFFLER DO:  That's not how it -- so

13   that's the ideal world, but that's not how it's being

14   done, because CMS does not audit that fee-for-service

15   data before setting the risk --

16        A    Well --

17             MS. KRIEG:  Object to form, compound.

18             THE WITNESS:  No, I mean, I think I was just

19   thinking about how the fee-for-service adjuster should be

20   calculated, or I would think it should be calculated,

21   which is to reestimate the data, reestimate the model and

22   all the coefficients associated with the model on audited

23   data.

24        Q    BY MS. SCHEFFLER DO:  So going back to the clip

25   that we just watched, what did you mean by diagnosis



Page 258

1    STATE OF GEORGIA          )
                               )      ss:
2    COUNTY OF DEKALB          )

3

4            I HEREBY CERTIFY that the foregoing deposition

5    was taken before me; that I was then and there a

6    Registered Professional Reporter and Registered Merit

7    Reporter, License No. 6595-1471-3597-5424 for the State

8    of Georgia, and License No. 14315 in the State of

9    California; that the witness before testifying was duly

10   sworn by me to testify to the whole truth; that the

11   questions propounded by counsel and the answers of the

12   witness thereto were taken down by me in shorthand and

13   thereafter transcribed under my direction; and that the

14   foregoing pages contain a full, true, and accurate

15   transcript of all deposition testimony and proceedings

16   had, all done to the best of my skill and ability.

17           Signature requested.

18           I FURTHER CERTIFY that I am in no way related

19   to, nor employed by any of the parties hereto, nor am I

20   in any way interested in the outcome.

21           DATED at Dunwoody, Georgia, this 21st day of

22   March, 2022.

23

24                     MARCELLA L. DAUGHTRY, RPR, RMR
                       GA License No. 6595-1471-3597-5424
25                     CA CSR 14315



4765

**EXHIBIT P-54**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | **CV 16-8697 FMO (SSx)** | Date | **September 10, 2021** |
|---|---|---|---|
| Title | **United States of America, ex rel. Benjamin Poehling v. United Health Group, Inc., et al.** | | |

| Present: The Honorable | Fernando M. Olguin, United States District Judge | |
|---|---|---|
| Gabriela Garcia | None | None |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorney Present for Plaintiff(s): | Attorney Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**     **(In Chambers) Order Re: Objections to Special Master's Order**

The court has reviewed and considered all the briefing filed with respect to plaintiff United States's Motion for Review of Special Master's Order Denying Without Prejudice Motion to Compel Discovery (Dkt. 422, "Motion"). The Special Master did not err in the Order of May 28, 2021 (Dkt. 419), by denying plaintiff's motion to compel discovery responses at this stage and providing plaintiff the opportunity to renew the motion at a later time. See Fed. R. Civ. Proc. 53(f). Accordingly, plaintiff's Motion (**Document No. 422**) is **denied**.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | | gga | |

**EXHIBIT P-55**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA
ex rel. BENJAMIN            NO. CV 16-08697 FMO
POEHLING

VS.

UNITEDHEALTH GROUP,
INC., et al.

* * * * * * * * * * * * * * * * * * * * * * * * *


Remote Videotaped Deposition of

PAT RASMUSSEN

July 22, 2022

9:10 a.m. Eastern



Reported by Rita A. DeRouen, RPR, CRR




MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



Page 44

1    A.  I think the way I could answer that is

2   that we would ensure what was submitted to us was

3   sent on to CMS.  I couldn't ensure that whoever

4   put that code on the form we were looking at did a

5   correct job.

6   BY MS. GLOVER:

7    Q.  Understood.

8        So you submitted data received by Optum

9   from providers and submitted that data to CMS,

10   correct?

11    A.  Correct.

12    Q.  And earlier we spoke about error

13   corrections.

14        Do you recall that?

15    A.  Yes.

16    Q.  And if you saw errors in the data that you

17   received from providers, you -- you researched and

18   corrected those errors; is that correct?

19        MS. RAMAKRISHNAN:

20            Objection; misstates prior testimony.

21    A.  I -- I'm really struggling to even

22   remember what IRAD looked like.  But there were

23   instances where a code might have been truncated

24   or there was a line, a box, that a number was in

25   the middle of and the system couldn't read it.



Page 45

1           When I say we corrected errors, it's like

2     we might stop at something like that that was

3     thrown out by the system to reach out to the

4     provider's office to have them pull the records or

5     whatever and give us the correct code to enter.

6     BY MS. GLOVER:

7         Q.  Understood.

8           And so when you would research -- when you

9     would research data errors, you would reach out to

10    the provider and ask them for the correct code; is

11    that -- am I understanding you correctly?

12          MS. RAMAKRISHNAN:

13             Objection.

14        A.  That is correct.

15          THE COURT REPORTER:

16             I'm sorry, didn't heard the objection.

17          MS. RAMAKRISHNAN:

18             Objection; misstates prior testimony.

19    BY MS. GLOVER:

20        Q.  And, Ms. Rasmussen, I realize you've said

21    that your role was to submit data received by

22    providers to CMS.

23          Did you also have an understanding that

24    CMS required that all diagnosis codes must be

25    documented in a medical record?



Page 208

1                REPORTER'S CERTIFICATE

2       This certification is valid only for a

3    transcript accompanied by my original signature

4    and original required seal on this page.

5       I, Rita DeRouen, Certified Court Reporter in and

6    for the State of Louisiana, (CCR #2014018),

7    Registered Professional Reporter (RPR #006908), as

8    the officer before this testimony was taken

9    remotely via videoconferencing, do hereby certify

10   that PAT RASMUSSEN, having been duly sworn by me

11   upon authority of R.S. 37:2554, did testify on

12   July 22, 2022, as hereinbefore set forth in the

13   foregoing 207 pages; that this testimony was

14   reported by me in stenographic shorthand, prepared

15   and transcribed by me or under my personal

16   direction and supervision, and is a true and

17   correct transcript to the best of my ability and

18   understanding; that the transcript has been

19   prepared in compliance with transcript format

20   guidelines required by statute and rules of the

21   Board; that I am informed about the complete

22   arrangement, financial or otherwise, with the

23   person or entity making arrangements for

24   deposition services; that I have acted in

25   compliance with the prohibition on contractual



Page 209

1  relationships, as defined by Louisiana Code of

2  Civil Procedure Article 1434 and in Rules and

3  Advisory Opinions of the Board; that I have no

4  actual knowledge of any prohibited employment or

5  contractual relationship, direct or indirect,

6  between a court reporting firm and any party

7  litigant in this matter, nor is there any such

8  relationship between myself and a party litigant

9  in this matter; that I am not related to counsel

10 or to any of the parties hereto, I am in no manner

11 associated with counsel for any of the interested

12 parties to this litigation, and I am in no way

13 concerned with the outcome thereof.

14     SIGNED THIS 27TH DAY OF JULY, 2022,

15 BATON ROUGE, LOUISIANA.

16

17

18

19                      

20  _____

21     RITA DEROUEN, CCR, RPR

22

23

24

25

**EXHIBIT P-56**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

———————————————————————
                                  )
UNITED STATES OF AMERICA   )
ex rel. BENJAMIN POEHLING, )
                                  )
        Plaintiff,         )     No. CV 16-08697 FMO
                                  )
vs.                               )
                                  )
UNITEDHEALTH GROUP, INC.,  )
et al.,                    )
                                  )
        Defendants.        )
———————————————————————)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

DEPOSITION OF CAROLYN KAPUSTIJ
As 30(b)(6) Designee 6 of
The United States

Baltimore, Maryland
August 25, 2023

Reported by:  John L. Harmonson, RPR
Job No. 1011736



Page 53

1         Q.    And why did CMS develop a methodology

2    for selecting Medicare Advantage plans for its RADV

3    audits based on an increase in -- a plan's increase

4    in coding from year to year?

5         A.    I believe there was a hypothesis that an

6    increase in coding might be indicative of larger

7    probability for an error.

8         Q.    So in selecting Medicare Advantage plans

9    for the 2011 to 2013 RADV audits, was it CMS's goal

10   to identify plans that were more likely to have

11   payment errors?

12              MS. OBEREMBT:  Objection; vague.

13              THE WITNESS:  I'm not sure, and none of

14   the documentation confirmed that.

15   BY MR. MARTINEZ:

16        Q.    Do you have an understanding as to what

17   CMS's purpose was in designing the MA selection

18   process for the RADV audits 2011 to 2013?

19              MS. OBEREMBT:  Objection; vague.

20              THE WITNESS:  The objective was to get a

21   selection of contracts to audit.

22   BY MR. MARTINEZ:

23        Q.    Okay.  Well, you testified earlier to a

24   hypothesis that an increase in coding might be

25   indicative of a larger probability for a payment



Page 54

1    error; correct?

2         A.    Correct.

3         Q.    So is it your understanding that CMS --

4    the reason why they were selecting plans using this

5    methodology was to try and identify plans that were

6    more likely to have higher rates of payment errors?

7         A.    That was the hypothesis and that was the

8    research question.  But plans were selected from

9    all three groups, high, medium and low.

10        Q.    And of the 30 plans selected for each --

11   let's start with payment year 2011.  How many were

12   from the high increase group?

13        A.    I am going to have to look at that.  I

14   do not recall offhand.  I'm trying to...

15        Q.    Are you searching for Tab 18 by chance?

16        A.    18 and perhaps 19.  I'll start with 19.

17   And so for 2011, it was 20 from the high group,

18   five from medium, and five from low.

19        Q.    So two-thirds of the plans selected for

20   payment year 2011 came from the high coding

21   increase group; is that right?

22        A.    Correct.

23        Q.    What about for payment year 2012?  And I

24   think to help you answer that question, I've marked

25   what's in your binder as Tab 18 as Exhibit 1498.



Page 91

1    prior rule had been that MA plans could submit only

2    one supporting record per HCC per enrollee.  Is

3    that correct?

4              MS. OBEREMBT:  Objection; outside the

5    scope.

6              THE WITNESS:  To the best of my

7    recollection.

8    BY MR. MARTINEZ:

9        Q.    Okay.  And then CMS changed that policy

10   and, for example, payment year 2011 allowed plans

11   to submit up to five medical records to support a

12   particular HCC for a particular sampled enrollee.

13   Is that right?

14       A.    Yes.

15       Q.    And CMS made that change because it

16   understood that even if a particular HCC is not

17   supported by one medical record, it might be

18   supported by another; correct?

19       A.    Correct.

20       Q.    I want to talk now about the medical

21   record review process in some more detail.

22              So we had kind of a brief exchange

23   earlier about initial validation contractors and

24   secondary validation contractors, and I think you

25   said at one point that that wasn't really the



Page 97

1  particular sampled beneficiary; correct?

2       A.    No.   The way it worked was they -- there

3  was a system, and the coder would receive one

4  medical record and code that record.   They would

5  not receive -- I do not believe they received all

6  of an enrollee's records.

7       Q.    Okay.   But in the focused review

8  process, was the -- was the mandate to -- for the

9  coders involved in that process to review all of

10 the medical records that an MA plan had submitted

11 in support of HCCs for sampled enrollees?

12      A.    Yeah, the focused review process

13 resulted in a review of all the medical records

14 submitted.

15      Q.    And the focused review was a blind

16 review; right?

17            MS. OBEREMBT:   Objection; vague.

18            THE WITNESS:   Define what you mean by

19 blind.

20 BY MR. MARTINEZ:

21      Q.    Well, have you seen the term "blind

22 review" in preparing for your testimony today?

23      A.    I have.

24      Q.    What do you understand that term to

25 mean?



4779

Page 98

1      A.    It's used different ways.  The way I've

2  seen it used in preparing was that the medical

3  record review contractors were blind to one

4  another's findings.

5      Q.    And isn't it also true that the

6  individuals doing the focused review were blind as

7  to which HCCs the MA plan had submitted for payment

8  for a given sampled enrollee?

9      A.    Based on my conversations, it was my

10  understanding that the coders did have knowledge to

11  see what is called the cover sheet which indicated

12  what HCCs were submitted for payment.

13      Q.    And is it your understanding that all of

14  the coders who were doing this first-level review

15  knew which HCCs were being audited?

16      A.    I believe that that was the procedure

17  that was eventually adopted.

18      Q.    And in preparing to testify today, you

19  didn't review any documents that referred to the

20  blind review method as meaning the coders don't

21  know which HCCs or diagnoses are being audited?

22      A.    I am not sure.

23      Q.    You're not sure whether you reviewed any

24  materials that defined blind review in the way that

25  I did?



Page 118

1    plan in support of the sampled enrollee?

2         A.    So that record will then go forward to

3    the second coder no matter what, and the second

4    coder will have a set of findings also.  So at the

5    end of the review process you have a set of

6    findings from one coder and a set of findings from

7    another coder.

8         Q.    And CMS understands that sometimes one

9    of those coders might miss the HCC in the medical

10   records and yet the second coder would find it to

11   be supported; correct?

12            MS. OBEREMBT:  Objection; vague.

13            THE WITNESS:  I would not necessarily

14   say that the coder misses it.  Working with coders,

15   there are some gray areas and some things are open

16   to interpretation.  But there are circumstances

17   where one coder would find evidence for it and the

18   other coder would feel no, that that was not

19   sufficient.

20   BY MR. MARTINEZ:

21        Q.    Right.  Medical record review coding

22   involves gray areas; right?

23        A.    Yes.

24        Q.    And lots of things in medical record

25   reviews are subject to interpretation; right?



Page 119

 1            MS. OBEREMBT:  Objection; vague.

 2            THE WITNESS:  Yes.

 3   BY MR. MARTINEZ:

 4       Q.    So I want to drill down on this a little

 5   bit.  Did CMS understand, then, that sometimes an

 6   initial coder, as part of the RADV process, would

 7   not abstract an HCC that a different coder perhaps

 8   later in the process would abstract?

 9            MS. OBEREMBT:  Objection; vague.

10            THE WITNESS:  That's why there were

11   two -- always two reviews.

12   BY MR. MARTINEZ:

13       Q.    Right.  And it was important to CMS to

14   have those multiple layers of review; right?

15       A.    Correct.

16       Q.    To make sure that they were getting the

17   most accurate results that they could in terms of

18   reviewing the medical records for supportable HCCs;

19   right?

20       A.    Yes.

21       Q.    Because obviously CMS would not want to

22   come out with even a preliminary finding that an

23   HCC is not supported by a medical record if it

24   hadn't done its best to make sure that that's

25   actually the case; right?



Page 120

1        A.      Correct.

2        Q.      And so kind of in the same vein, CMS

3   understood when it was conducting its audits, RADV

4   audits for payment years 2011 through 2015, that

5   sometimes the coders that CMS oversaw would

6   disagree about whether or not an HCC was supported

7   by medical records; right?

8        A.      Yes.

9        Q.      And in fact, CMS I believe instructed

10  the medical record review contractors to develop

11  protocols for handling those very situations in

12  which one coder might disagree with the judgment of

13  another coder.  Is that right?

14       A.      I'm not sure what you're referring to.

15       Q.      Have you heard of the concept of quality

16  assurance protocols in the context of the RADV

17  audits that CMS oversaw?

18       A.      Medical record review contractors, it

19  was contingent on them to monitor the quality of

20  their coders.

21       Q.      And that was a requirement that CMS

22  imposed on the medical record review contractors;

23  right?

24       A.      Yes.

25       Q.      And as one of those quality control



Page 121

1    mechanisms that the medical record review

2    contractors had to have in place was a process for

3    resolving disagreements between coders about

4    whether an HCC was in fact supported by the medical

5    records?

6        A.    I believe something like that did exist.

7    When I talked to Michelle Atkins to kind of

8    understand how they implemented this, when you have

9    focused review and discrepant confirmation, when

10   you have one MRRC coding it and then it goes to

11   another coder rather than a primary and senior at

12   each organization looking at it, she said that her

13   process was to -- for those HCCs that were not in

14   agreement, they would internally have someone look

15   at it and see if the coder needed additional

16   training.

17       Q.    So in that instance that Michelle Atkins

18   was talking to you about, there would be a third

19   layer of review to kind of assess --

20       A.    No.

21       Q.    -- or remediate the disagreement?

22             No?

23       A.    No, it was an internal practice by the

24   medical record review contractors.  There were two

25   layers of review, and the HCC was considered



Page 122

1  validated if either of the coders abstracted it.

2       Q.    And was that the process for payment

3  year 2012 and 2013 as well?

4       A.    I believe so, yes.

5       Q.    And is that the process CMS intends to

6  employ for payment years 2014 and 2015?

7       A.    I believe so.

8       Q.    And what's your source for your

9  understanding with respect to payment years '14 and

10  '15?

11       A.    That was discussions with Michelle

12  Atkins.

13       Q.    Okay.  Has that process, the medical

14  record review process for payment year 2014, has

15  that started yet?

16       A.    I believe it has just based on when --

17  the date of the sampling evaluation report, and

18  then I also have some CON14 training in Tab 9.  So

19  it appears those samples have started.

20       Q.    Do you know whether they started before

21  or after July 2021?

22       A.    I don't know.  I believe CON14 did, but

23  I can't say with 100 percent certainty.  What

24  started, the coding or --

25       Q.    The coding.  Sorry.



Page 147

1    collection, CMS went with a very conservative

2    approach and offset those overpayments by what it's

3    calling underpayments for additional diagnoses.

4    BY MR. MARTINEZ:

5         Q.    And that's CMS's own terminology; right?

6         A.    I believe so, yes.

7         Q.    And I think you said that whenever a

8    diagnosis code cannot be validated by the medical

9    records, that is an overpayment.  But isn't it true

10   that not all diagnosis codes or HCCs actually

11   impact payment?

12        A.    I believe all HCCs by definition impact

13   payment.  All diagnosis codes do not.  You can have

14   two HCCs.

15        Q.    And you understand that multiple

16   diagnosis codes could support the same HCC; right?

17        A.    Yes.

18        Q.    And so I guess what I'm wondering is,

19   then, just because the CMS medical record review

20   contractors find that there is a certain percentage

21   of unsupported HCCs in an MA plan's submitted data

22   for a particular payment year, that does not mean

23   that the MA plan has been net overpaid as CMS

24   defines it for that payment year; correct?

25             MS. OBEREMBT:  Objection; vague.



Page 148

1          THE WITNESS:  It's not in the terms of

2   the RADV payment recovery context.

3   BY MR. MARTINEZ:

4      Q.    Is there a different context that you're

5   thinking your answer might be different?

6      A.    Yes.  In the payment context, plans have

7   a firm deadline for the date by which they must

8   submit diagnoses for payment.

9      Q.    And so how does that deadline inform

10   your answer to my question?

11      A.    Plans would not be allowed -- diagnoses

12   would not be considered that were not submitted

13   within the data submission period.

14      Q.    So it's possible that a plan might just

15   submit a code or an HCC too late to be paid in a

16   certain payment year; right?

17      A.    It's possible, yes.

18      Q.    Is that what you're referring to?

19      A.    Yeah, that's one example.

20      Q.    Okay.  Are there other examples?

21      A.    No.  Just RADV is not kind of considered

22   a forum to introduce new diagnoses into the

23   payment.

24      Q.    Okay.  And I want to understand that a

25   little bit.  Just because in performing the medical



4787

Page 149

1    record reviews as part of the RADV program, as we

2    established, the medical record review contractors

3    also report additional HCCs that were not submitted

4    by the plans for payment; correct?

5         A.    That is correct.

6         Q.    And because of those additional HCCs

7    that are found by CMS's own coders, that's why you

8    get sometimes net underpayments to MA plans for a

9    particular year?

10             MS. OBEREMBT:  Objection; misstates

11    prior testimony.

12             THE WITNESS:  You get an enrollee net

13    underpayment.

14    BY MR. MARTINEZ:

15         Q.    And then when you extrapolate to the

16    entire contract as a whole taking account of any

17    additional HCCs, that also leads to net

18    underpayments for the plan as a whole in the RADV

19    context; right?

20         A.    Well, in the RADV methodology, the

21    payment recovery amount is constrained to zero.  So

22    it's not a forum for plans to receive additional

23    payment.

24         Q.    Right.  And so what that means, it's

25    constrained to zero -- well, it means a couple of



Page 150

1    things, but one thing it means is that if a

2    particular plan has a net underpayment that CMS has

3    calculated for a given payment year, there is no

4    payment recovery for CMS for that particular plan;

5    correct?

6         A.    Correct.   That was the methodology.

7         Q.    Using the extrapolated methodology;

8    right?

9         A.    Correct.

10              MS. OBEREMBT:   Counsel, we've been going

11   an hour now.   Can we take a break, please?   We

12   started at 1:15.

13              MR. MARTINEZ:   Would you like a break?

14              THE WITNESS:   Uh-huh.

15              MR. MARTINEZ:   Sure.   We can go off the

16   record.

17              THE VIDEOGRAPHER:   We are off the record

18   at 14:23.

19              (Recess taken.)

20              THE VIDEOGRAPHER:   We are back on the

21   record at 14:35.

22   BY MR. MARTINEZ:

23        Q.    Ms. Kapustij, I would like to dig a

24   little deeper now into the extrapolation

25   methodology that CMS published in February of 2012.



Page 151

1             So I think as we talked about

2   previously, Step 1 is CMS will calculate an

3   enrollee-level payment error for each sampled

4   enrollee.  Is that right?

5        A.    Correct.

6        Q.    And then CMS will, through a specific

7   methodology, apply sampling weights to those

8   enrollees; right?

9        A.    Correct.

10       Q.    And then CMS adds together the weighted

11   enrollee payment errors of all the enrollees in the

12   sample for that MA plan; correct?

13       A.    Correct.

14       Q.    And that's how they generate what CMS

15   calls a point estimate.  Is that right?

16       A.    Correct.

17       Q.    And then CMS calculates a 99 percent

18   confidence interval around that point estimate.  Is

19   that right?

20       A.    That is correct.

21       Q.    And then from that confidence interval

22   is how CMS determines what the extrapolated payment

23   recovery amount is; correct?

24       A.    Correct.

25       Q.    And if the lower bound of that



Page 152

1    99 percent confidence interval is negative or

2    crosses zero, then there is no payment recovery for

3    CMS; correct?

4         A.    Correct.

5         Q.    And the reason why it could be negative

6    is because of the additional HCCs that CMS's coders

7    are reporting in the medical record review process;

8    right?

9         A.    Correct.  I also believe the confidence

10   interval calculation may play into that.

11        Q.    Is it your understanding that either the

12   confidence interval calculation or the presence of

13   additional HCCs, one of those two variables is more

14   responsible for negative results?

15        A.    I couldn't opine on that.

16        Q.    And conversely, if the confidence -- if

17   the lower bound of the 99 percent confidence

18   interval is positive, then there is a payment

19   recovery; correct?

20        A.    Correct.

21        Q.    And it's calculated at that -- whatever

22   that lower bound for the 99 percent confidence

23   interval is.  Is that right?

24        A.    Correct.

25        Q.    Okay.  And that was the final



Page 153

1    methodology that CMS published in February of 2012;

2    right?

3         A.    Correct.

4         Q.    And I should say that was the final

5    extrapolation methodology that CMS published in

6    February of 2012; correct?

7         A.    Yes.  It was called the "Notice of Final

8    Payment Error Calculation Methodology for Part C

9    Medicare Advantage Risk Adjustment Data Validation

10   and Contract-Level Audits."

11        Q.    And you're reading the title of Tab 10

12   in your binder?

13        A.    Yes.

14        Q.    And then on page 4 of that document, CMS

15   then said it will apply a fee-for-service adjuster

16   as an offset to the extrapolated recovery amount to

17   determine what CMS referred to as a final recovery

18   amount.  Is that right?

19        A.    That is what the paper states.

20        Q.    Were you involved in writing that paper?

21             MS. OBEREMBT:  Objection; vague.

22             MR. MARTINEZ:  I'll rephrase it.

23   BY MR. MARTINEZ:

24        Q.    Were you involved in preparing the

25   February 2012 final notice of RADV methodology?



Page 182

1      A.    It's through July -- I can speak to

2   July 2021.  I don't think it's happened to date.

3      Q.    So as I understand, the way it's

4   supposed to work is an MA plan will submit medical

5   records to support HCCs for a sampled enrollee;

6   right?  Just starting at the beginning.

7      A.    Correct.

8      Q.    And then there's two layers of review by

9   well-trained, well-qualified RADV coders that

10  happens next.  Right?

11          MS. OBEREMBT:  Objection; vague.

12          THE WITNESS:  There are two levels of

13  review by RADV coders.

14  BY MR. MARTINEZ:

15     Q.    Okay.  And then sometimes the RADV

16  coders, both of them agree that an HCC that was

17  submitted by an MA plan is not supported by the

18  medical records that have been submitted; right?

19     A.    Correct.

20     Q.    And then CMS presumably alerts the MA

21  plan through that preliminary audit report of that

22  finding; right?

23     A.    The plan would be alerted through that

24  preliminary audit report.  However, that has not

25  been issued.



4793

Page 183

1          Q.    That report has not been issued for

2    payment year 2011 even?

3          A.    Correct.

4          Q.    So let's assume it has -- let's assume

5    that CMS alerts a plan about the HCCs that CMS

6    claims are unsupported by the medical records.  Now

7    we move to the reconsideration process.  And in

8    that process, an MA plan can say:  No, wait a

9    minute.  Take a look at this one record and that's

10   where we think it is in fact supported.  Is that

11   right?

12          MS. OBEREMBT:  Objection; calls for

13   speculation.

14          THE WITNESS:  It would have to be a

15   record that was already submitted.

16   BY MR. MARTINEZ:

17          Q.    So it's a record that's already

18   submitted; right?

19          A.    Correct.

20          Q.    And the plan can only point to one

21   record in the reconsideration context, not the

22   five, or up to five; right?

23          A.    I believe it's one per each HCC.

24          Q.    And so once the plan identifies that one

25   medical record for that one HCC, then there is a



Page 184

 1   third layer of review by a third coder who then

 2   makes an assessment as to whether or not that

 3   record supports the HCC that has been submitted for

 4   payment; correct?

 5        A.    That was the process as designed.

 6   Again, these results have not been issued, so I'm

 7   being kind of speculative.

 8        Q.    Well, you're not being speculative, but

 9   you're just explaining how the process is supposed

10   to work; right?

11        A.    Based on my knowledge, yes.

12        Q.    And based on your having been designated

13   as the government's representative to testify on

14   Topic 5.

15             And so if CMS's findings were in fact

16   overturned with respect to a particular HCC, that

17   would mean that this third coder would have found

18   support in the medical record submitted for that

19   HCC that two previous well-trained, well-qualified

20   coders did not report; correct?

21             MS. OBEREMBT:  Objection; vague.  And

22   calls for speculation.

23             THE WITNESS:  That is one option.

24   Another reason a lot of records were found not to

25   support the HCC was not because of a disagreement



Page 208

1   not designed to determine fraud.  CMS can't make

2   that determination whether or not it has committed

3   fraud.

4   BY MR. MARTINEZ:

5       Q.    But you understand that CMS has said in

6   the RADV context that neither payment errors nor

7   coding differences are fraud; right?

8       A.    Correct.  In and of themselves, no.

9       Q.    Right.  So in and of themselves, the

10  plans on here, not the UHG plans but the other

11  plans that have contract-level overpayments, that

12  fact alone does not mean that CMS believes they

13  have all committed fraud; right?

14          MS. OBEREMBT:  Objection; calls for

15  speculation.  Asked and answered.

16          THE WITNESS:  Correct.  But CMS is not

17  conducting this exercise to determine if there is

18  fraud.

19  BY MR. MARTINEZ:

20      Q.    So staying on page 5 of Exhibit 1187-1,

21  all three -- excuse me, all four of the UHG plans

22  that were audited, CMS determined that they had no

23  recovery amounts at any of the three confidence

24  intervals listed in this chart.  Is that right?

25      A.    That is correct.



Page 268

1              C E R T I F I C A T E

2

3    STATE OF MARYLAND

4              I, JOHN L. HARMONSON, a Notary Public

5    within and for the State of Maryland, do hereby

6    certify that CAROLYN KAPUSTIJ, the witness whose

7    deposition is hereinbefore set forth, was duly

8    sworn by me and that such deposition is a true

9    record of the testimony given by such witness.

10             That before completion of the

11   proceedings, review and signature of the transcript

12   was reserved.

13             I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17             IN WITNESS WHEREOF, I have hereunto set

18   my hand this 28th day of August, 2023.

19

20   _____

21   JOHN L. HARMONSON, RPR

     My commission expires: 08/16/25

22

23

24

25



**EXHIBIT P-57**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
---o0o---


UNITED STATES OF AMERICA, ex      )
rel., BENJAMIN POEHLING,          )
                                  )
                Plaintiff,        )
                                  )    Case No.
        vs.                       )    16-08697 FMO
                                  )
UNITEDHEALTH GROUP, INC., et      )
al.,                              )
                                  )
                Defendants.       )
                                  )




---o0o---


TUESDAY, MARCH 12, 2024


VIDEOTAPED DEPOSITION OF PHILIP STARK, PH.D.


CONFIDENTIAL TRANSCRIPT


---o0o---




REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR



4799

Page 34

1    Q.   Okay.  I am going to try to use the same

2    term today, "member-HCC-year," so that we're

3    consistent.

4    A.   Thank you.

5    Q.   All right.  Now, in your -- I am going to    10:28:41

6    call this Opinion II on Page 7 because it's got the

7    Roman II.  Your Opinion II found support in RADV

8    for diagnosis instances with no payment impact was

9    higher than those with payment impact, correct?

10   A.   I'm sorry.  I didn't hear the last part of    10:29:07

11   the question.

12   Q.   That you -- in your Opinion II, you found

13   that the RADV validation rate of diagnosis

14   instances with no payment impact was higher than

15   those with payment impact, correct?    10:29:24

16   A.   No, sir.  I didn't independently examine

17   whether any diagnosis instance had financial

18   impact.  I'm relying on Mr. Renjilian's Opinions 2

19   and 3 for that determination.  I'm doing

20   calculations based on his labeling of diagnosis    10:29:40

21   instances as potentially having financial impact or

22   not.

23   Q.   Fair enough.  Let's go into what you did

24   here.  Let's look at your Paragraph 24.

25        In Paragraph 24 you write "To evaluate the    10:29:59



Page 35

1  rates at which RADV audits found support for

2  member-HCC-years that Mr. Renjilian identified as

3  having financial impact if deleted, I replicated

4  and extended portions of Mr. Renjilian's analysis,"

5  right?                                        10:30:17

6      A.   Yes, sir.

7      Q.   So you did not verify Mr. Renjilian's work

8  on whether a diagnosis instance had payment impact

9  or not; you just accepted his Opinions 2 and 3,

10  correct?                                      10:30:32

11     A.   I used his determination.  I -- "accepted"

12  is a little stronger.  I used his determination.

13     Q.   Fair enough.  You used his determination.

14  And you did the work identified in your Paragraphs

15  25 through 29, correct?                        10:30:47

16     A.   Yes, sir.

17     Q.   All right.  After doing that work -- well,

18  I should say in Paragraph 24 you say "I replicated

19  and extended portions of Mr. Renjilian's analysis."

20  And you did that by doing the work in Paragraphs 25  10:31:28

21  through 29, correct?

22     A.   Yes, sir.

23     Q.   And in Paragraph 30 --

24     A.   Some of the extension is not just

25  described there.  That's -- Paragraphs 25 through    10:31:41



Page 36

1   29 are for preparing the database for -- creating a

2   database that I used then for subsequent

3   calculations that are described later in the

4   report.

5        Q.    Okay.                                          10:31:55

6        A.    That's not the full extent of the work.

7        Q.    Fair enough.  You feel confident in the

8   methods you used, correct?

9        A.    Yes, yes.

10       Q.    And you feel confident in the results you     10:32:07

11  achieved, right?

12       A.    Yes.

13       Q.    All right.  In Paragraph 30 you state the

14  following:  "My results match the 2011-2013 counts

15  in the left panel of Figure 15 of the Renjilian      10:32:20

16  report."  Do you see that?

17       A.    Yes, sir.

18       Q.    Is that accurate?

19       A.    That's to the best of my recollection,

20  yes.                                                 10:32:32

21       Q.    So the independent analysis that you

22  performed matched the same results as Mr. Renjilian

23  on Figure 15 of his report, right?

24       A.    The left panel?

25       Q.    Yes.                                       10:32:45



Page 37

```
 1      A.   For 2013 -- from 2011 through 2013, yes,

 2   sir.

 3      Q.   And let's go ahead and look at that left

 4   panel in Mr. Renjilian's report.  And that's on

 5   Page 87 of his report.                          10:33:01

 6           You're referring, Dr. Stark, to the panel

 7   that says at the top "Member-HCCs, 2011-2013"?

 8      A.   I think it says CON13 -- "CON11-13."

 9      Q.   Yeah, I think you have a different

10   pagination than I do.  So go to Page 86.         10:33:38

11   Member-HCC-years -- member-HCCs 2011-2015.  Do you

12   see that?

13      A.   I see something that says "CON11-13."  Is

14   that --

15      Q.   CON11-13?                                10:33:57

16      A.   Not 2011 through '15.  Yes, sir.

17      Q.   Great.  Okay.  And Dr. Stark, you

18   replicated and reached the same result as in that

19   upper left panel, right?

20      A.   Our arithmetic agrees, yes.             10:34:12

21      Q.   Your arithmetic agrees.

22      A.   Yes.

23      Q.   All right.  So you found, Dr. Stark, that

24   -- I want to go through these numbers in some more

25   detail.  You found that for 2011 through 2013, your  10:34:24
```



4803

Page 38

1   arithmetic found that there was 1,119

2   member-HCC-years with a diagnosis instance that was

3   on the first interrogatory response, right?

4       A.   As I sit here, I can't remember whether

5   this is counting diagnosis instances or HCCs rolled     10:35:05

6   up to the member-year level.

7       Q.   Well, you stated in your report you

8   replicated and found the same results, correct?

9       A.   Yes.

10      Q.   And Mr. Renjilian writes "Member-HCCs" at      10:35:25

11  the top of that chart, correct?

12      A.   Yes, sir.

13      Q.   So that would suggest these are

14  member-HCC-years, correct?

15      A.   It would, although Mr. Renjilian's            10:35:36

16  terminology isn't -- I think he sometimes uses the

17  same phrase to talk about diagnosis instances and

18  sometimes to talk about HCC-years.

19      Q.   Okay.  Well, assuming this is

20  member-HCC-years for now, and if you discover later    10:35:54

21  it was diagnosis instance, you'll let us know.

22      A.   Yes.

23      Q.   Okay.  So to state it plainly, there were

24  1,119 instances where a provider submitted a code

25  after an encounter, a United chart review coder        10:36:09



4804

Page 39

1   reviewed the chart and did not identify that

2   submitted code, and then the member-HCC-year was

3   reviewed in RADV, correct?

4       A.   That's my understanding, yes.

5       Q.   And out of those 1,119 instances, the RADV    10:36:31

6   auditors found 980 of them to be supported, right?

7       A.   Not of the diagnosis instances, but of the

8   resulting HCC for that beneficiary for that year.

9       Q.   Thank you for correcting that.

10          So in -- let me restate.  So in 980 of    10:36:50

11  those instances, the RADV auditors validated the

12  member-HCC-year associated with that diagnosis

13  instance, right?

14      A.   That's my understanding.  My understanding

15  is that RADV does not look at the diagnosis    10:37:06

16  instances to see whether the diagnosis instances

17  are supported.  RADV looks at members and the HCCs

18  that those members were assigned for the year and

19  asks United or whoever the MAO is to provide

20  documentation to support that HCC for that    10:37:29

21  beneficiary for that year.

22      Q.   All right.  Let me just establish some

23  foundation about RADV.  What do you understand RADV

24  to be?

25      A.   I understand it to be a review that's done    10:37:40



Page 40

1    by CMS of some contracts and some years, that it

2    involves sampling beneficiaries and then looking

3    for -- or asking the MAO for support for the HCCs

4    that were assigned to that beneficiary that year,

5    that the MAO is allowed to provide up to five          10:38:06

6    pieces of information -- I think their chart

7    specifically, but five pieces of information to

8    support each HCC, and that support might or might

9    not be from the diagnosis instance that was

10   originally submitted.                                   10:38:26

11       Q.   And you understand that the CMS auditors

12   will then review the charts to determine if the

13   member-HCC-year is supported, correct?

14       A.   That's my understanding, yes, sir.

15       Q.   All right.                                     10:38:45

16       A.   I have a little bit more detail in the

17   understanding of RADV.  I understand that at least

18   in some years the sample -- first of all, I

19   understand that the samples are drawn from contract

20   years.                                                  10:38:59

21          Second, I understand that at least in some

22   years, the sample was a stratified random sample,

23   that it was stratified by a tercile of payment for

24   the beneficiary in question.

25          I have also seen language somewhere that        10:39:14



Page 41

1    said it was somehow risk -- risk aware, that

2    somehow it was attempting to focus on things that

3    were perceived to have more risk, but I don't

4    understand the detail of that.

5        Q.   Okay.  Thank you for clarifying that.          10:39:29

6             We are going to assume today, Dr. Stark,

7    that the RADV auditors always get it right.

8        A.   I don't know whether the RADV auditors

9    always get it right.

10       Q.   Do you have any doubts whether they always   10:39:41

11   get it right?

12       A.   I mean, any process involving humans

13   reading printed materials, some error rate.  I just

14   don't know -- I haven't seen attempts to quantify

15   it.  I don't have an independent basis for knowing   10:39:59

16   what the accuracy would be.

17       Q.   Fair enough.  Well, let's assume for the

18   purposes of today, I'll give you an assumption,

19   that the RADV auditors are always correct.

20       A.   Okay.                                        10:40:16

21       Q.   And I'll -- I'll restate that assumption

22   when I ask you various questions.

23       A.   Okay.

24       Q.   But if you have any doubts, you can say,

25   "Are you assuming RADV is correct?"                   10:40:25



4807

Page 42

1    A.    I'll do my best here.

2    Q.    Okay.  Great.  All right.  Going back to

3  Mr. Renjilian's chart that you verified the

4  arithmetic, you agree that there were 980 instances

5  where a provider submitted a code after an          10:40:42

6  encounter, United chart review coders reviewed the

7  chart and failed to find the diagnosis code

8  submitted by the provider, and RADV auditors

9  reviewed the member-HCC-year associated with that

10  diagnosis instance and found it to be supported,    10:41:06

11  right?

12    A.    My understanding is that one of -- at

13  least one of the up to five pieces of information

14  provided by United, possibly from different

15  diagnosis instances or even diagnosis instances     10:41:20

16  that were not submitted, provided support for that

17  HCC, or possibly something in the -- higher in the

18  hierarchy for that beneficiary for that year.

19    Q.    Okay.  Thank you for those caveats.  But

20  in summary, in those 980 instances, ultimately the  10:41:41

21  RADV auditors found the member-HCC-year to be

22  supported, correct?

23    A.    They found the member-HCC-year to be

24  supported, yes, sir.

25    Q.    All right.  And then the next line in      10:41:54



Page 57

1          So somewhere in some chart that was

2     presented by United to RADV, there was support for

3     that HCC for that member for that year.

4          Q.   I understand that caveat, and you've

5     mentioned it a few times.  In understanding that          11:22:24

6     caveat, which I am going to cover in a minute, I

7     just want to restate the hypothesis and make sure I

8     understand your opinion.

9          The hypothesis is every time a United

10    chart review coder fails to find a diagnosis code         11:22:37

11    submitted by a provider, the member-HCC-year

12    associated with that diagnosis code is not

13    supported, that hypothesis is false, correct?

14         A.   I agree.

15         Q.   Okay.  And you agree that that's false to        11:22:56

16    a certainty, right?

17         A.   Yes, sir.  Well, yes, my -- if by

18    "supported," we mean RADV found support, yes.

19         Q.   Fair enough.  We talked about that

20    assumption earlier, but you had said that human           11:23:12

21    beings are fallible and so RADV auditors may be

22    fallible, right?

23         A.   Yes, I am just worried about the

24    definition of "supported," but yes, I -- yes, RADV

25    finds support for some nonzero fraction of              11:23:27



4809

Page 58

1  member-HCC-years for which corresponding to some of

2  the diagnoses that were originally submitted but

3  not found in chart review.

4      Q.   All right.  Fair enough.

5          I want to cover this caveat that you've      11:23:48

6  raised a number of times about a member-HCC-year

7  potentially being supported from another chart.

8          And so if I understand what you're saying,

9  Dr. Stark, is that a diagnosis instance in the

10 first interrogatory response would have involved a   11:24:14

11 provider meeting with a patient in an encounter,

12 having an encounter with a patient, submitting a

13 diagnosis and that mapping to a member-HCC-year;

14 but then another provider, meaning -- or having an

15 encounter with a patient and also submitting a      11:24:35

16 diagnosis.

17         And you're saying that the member-HCC-year

18 in RADV could have been supported by that second

19 encounter, not the first encounter on the first

20 interrogatory response; is that correct?            11:24:50

21     A.   That's my understanding, or it could have

22 been a different encounter with the same provider,

23 or it could have been an encounter with the same

24 provider or a different provider with a different

25 diagnosis that mapped to either the same HCC or an   11:25:02



4810

Page 59

1    HCC higher in the hierarchy.

2        Q.    That's correct.  So just to put it in

3    plain terms, a provider may meet with a patient and

4    diagnosis a patient as having diabetes and that may

5    not be found in chart review, the diabetes                    11:25:19

6    diagnosis; but then a different provider may meet

7    with the same patient, diagnosis diabetes, and then

8    that would be the chart that the RADV auditors

9    would find as supporting the member-HCC-year,

10   right?                                                        11:25:37

11       A.    I think it's a little more complicated

12   than that, in that my understanding is that RADV

13   doesn't do its own selection of materials to

14   review, that it's the MAO that provides RADV with

15   materials that they purport support the HCC for        11:25:53

16   that member for that year.

17            So my understanding is that the materials

18   presented to RADV in support of a particular

19   HCC-member-year could be one of the diagnosis codes

20   that chart review -- diagnosis instances that chart      11:26:15

21   review did not find.

22            It could be based on an encounter with the

23   same or a different provider, a different

24   encounter, and it could be support for, for

25   example, a more severe form of diabetes than the      11:26:35



4811

Page 60

1    particular HCC corresponding to the diagnosis event

2    that was originally submitted but not found in

3    chart review.

4        Q.   Fair enough.  Okay.  Dr. Stark, I want to

5    change the hypothesis a little bit and focus just     11:26:53

6    on payment impact codes.

7            So the -- I want to present to you this

8    hypothesis.  Every time a United chart review coder

9    fails to find a diagnosis code with payment impact

10   that had been submitted by a provider, the           11:27:13

11   member-HCC-year associated with that diagnosis

12   instance was unsupported.

13           You agree, based on the work you

14   performed, that that hypothesis is false, right?

15       A.   Not quite.  I have made no independent       11:27:31

16   determination of whether a diagnosis instance has

17   financial impact.  My analysis relies either on --

18   in some cases on Mr. Renjilian's determination of

19   whether it has financial impact, and in some case

20   on Mr. Garthwaite -- Dr. Garthwaite's determination  11:27:51

21   on whether that diagnosis instance has financial

22   impact.

23           But I agree with what I think the gist is

24   of your assertion, which is that there are examples

25   of HCCs that were identified by one or the other or  11:28:04



Page 61

 1   both of Mr. Renjilian and Dr. Garthwaite as having

 2   financial impact where RADV found support for that

 3   HCC for that member for that year.

 4          That determination might or might not have

 5   been based on a review of the chart corresponding      11:28:25

 6   to that, to the diagnosis event that was explicitly

 7   stated.

 8      Q.   Okay.  Dr. Stark, thank you for that

 9   clarification.  I will make my hypothesis even more

10   precise.                                                11:28:42

11      A.   Okay.

12      Q.   Because I am not trying to play gotcha,

13   and I'm glad you're being careful about the

14   wording.

15          So let me present you this hypothesis:          11:28:49

16   Every time a United chart review coder fails to

17   find a diagnosis code that either Mr. Renjilian or

18   Dr. Garthwaite identified as having payment impact

19   that have been submitted by a provider, the

20   member-HCC-year associated with that diagnosis          11:29:10

21   instance was unsupported?

22      A.   Again, the word "supported" bothers me.

23   RADV found support for some of them.

24      Q.   That RADV found support?

25      A.   Yeah.  So if you change that to "RADV          11:29:22



Page 62

1    determined that it was unsupported," then -- then I

2    would agree.

3        Q.    Okay.  And the reason you have trouble

4    with "found support" is it requires an assumption

5    that the RADV auditors were correct, right?        11:29:41

6        A.    Well, I -- RADV reviews -- my

7    understanding is that RADV reviews up to five

8    pieces of information provided by United.  There

9    might be other charts that were not presented to

10   RADV -- even though I understand those to be       11:30:11

11   United's best attempt to demonstrate support for

12   that member-HCC-year combination.  It's possible

13   that there would be support somewhere else.  It's

14   possible that -- it's possible that RADV made a

15   mistake.  There's a lot of things that are         11:30:28

16   possible.

17            And I just want to be clear that we are

18   talking about whether RADV found support rather

19   than some more abstract notion --

20            (Clarification by the reporter.)          11:30:46

21            THE WITNESS:  Abstract notion of

22   supported.  And I want to be also clear about the

23   distinction between whether a particular diagnosis

24   instance is supported by the chart corresponding to

25   that diagnosis instance or the HCC that that        11:31:03



Page 63

1   diagnosis instance maps to has support somewhere in

2   some chart for that subscriber for that year.

3       Q.    BY MR. ABASCAL:   Thank you.

4       A.    Or something higher in the hierarchy.

5       Q.    But assuming the RADV auditors were          11:31:22

6   correct, you would agree that that hypothesis is

7   false, right?

8       A.    I have now -- I am no longer holding your

9   statement in memory.  Let me try to say it myself.

10  I agree that the hypothesis that when RADV reviewed   11:31:42

11  a member-HCC-year instance that -- for which a

12  diagnosis code had been submitted but not found by

13  the chart reviewers, and that -- and that diagnosis

14  instance had been identified by either

15  Mr. Renjilian and/or Mr. Garthwaite as having        11:32:29

16  financial impact, some fraction of the time that

17  they never found -- with a hypothesis that they

18  never -- that RADV never found support for that

19  HCC.  And I agree that that hypothesis is false.

20      Q.    All right.   Let me try to state this in a    11:32:53

21  little plain terms, which is pretty dangerous.

22          So just because a United chart review

23  coder did not find a provider-submitted code, that

24  does not mean that the associated member-HCC-year

25  is unsupported, assuming RADV is correct?  You        11:33:27



4815

Page 64

1  agree with that, right?

2       A.   Yes, the -- just because chart review did

3  not find support for a diagnosis code submitted for

4  a particular diagnosis instance, there might be

5  somewhere -- there still might be somewhere support    11:33:56

6  for the HCC that that diagnosis code maps to or an

7  HCC higher in the hierarchy, possibly in the chart

8  that was reviewed by the United chart reviewers and

9  possibly in some other chart for that member for

10 that year.                                             11:34:17

11      Q.   And you verified that through your own

12 analysis as reflected in Table 2?

13      A.   I couldn't hear the last part of your

14 sentence.  My analysis of?

15      Q.   As reflected in your Table 2?               11:34:32

16      A.   Yes, sir.

17      Q.   All right.  Dr. Stark, you understand that

18 payment to United is based on a member-HCC-year,

19 correct?

20      A.   That's my understanding, yes, sir.         11:34:46

21      Q.   All right.

22      A.   And other characteristics of the members,

23 including demographic information.

24      Q.   Fair enough.  And you understand that if

25 the RADV auditors find support for the               11:34:58



4816

Page 65

1    member-HCC-year, then the payment is appropriate,

2    right, that portion of the --

3            MS. GLOVER:  Objection; calls for legal

4    conclusion.

5            THE WITNESS:  Yeah, I don't know what          11:35:14

6    "appropriate" means in this context.  I don't know

7    the terms of the contract between the MAOs and CMS.

8            I understand that as a matter of practice

9    that RADV does not ask to be reimbursed when they

10   find -- if support is found for that HCC, but I        11:35:33

11   don't know the connection between the common

12   practice and RADV and the legal terms of the

13   contract between the MAO and the government.

14   Q.   BY MR. ABASCAL:  That's fair, Dr. Stark.

15           Do you understand that if a                    11:35:54

16   member-HCC-year is unsupported, that would be

17   considered an overpayment?

18           MS. GLOVER:  Objection; calls for a legal

19   conclusion.

20           THE WITNESS:  I don't know -- I don't know      11:36:08

21   how that word is used in this context.  I mean, in

22   lay terms, my understanding is that the practice of

23   RADV is to count that payment against -- against

24   the MAO, but I don't know -- again, I don't know

25   how the term is used.  I don't know whether it is a    11:36:30



Page 66

1    legal term of art.  I don't know whether it is a

2    term that appears in the contract.

3        Q.   BY MR. ABASCAL:  That's fair.  I am not

4    trying to play gotcha or suggest a term or trick

5    you with a term of art.  So let me rephrase it.        11:36:42

6            Do you understand that if a

7    member-HCC-year is unsupported, then the payment

8    would be inappropriate?

9        A.   Again, I don't really know what

10   "inappropriate" means here.  And "unsupported," I    11:37:10

11   think you mean if RADV determines that none of the

12   pieces of information provided by the MAO support

13   that HCC for that member for that year.  I

14   understand that that's considered some kind of

15   error and that there's some kind of accounting.      11:37:27

16   But I don't know -- I don't know details.

17           I understand informally that RADV allows

18   offsets as well, but, again, this is -- I don't

19   know the rules under which RADV operates.  And I

20   don't understand in detail how a RADV audit results  11:37:48

21   in any kind of reconciliation of money between the

22   MAO and the government.

23       Q.   I understand you're not an expert in RADV,

24   and I am not trying to suggest that anything you

25   say would bind the government on its interpretation  11:38:04



Page 67

```
 1   of RADV.

 2        I am trying to find the word that would

 3   make you more comfortable.  And you said the word

 4   "improper," so let me try that.

 5        A.   I'm sorry.  I need to answer verbally      11:38:20

 6   here.  I don't -- I mean, I understand that there's

 7   some kind of accounting for HCCs that RADV

 8   determines were unsupported, HCC-member-year

 9   combinations that RADV determines were unsupported,

10   but I don't know the details of that.               11:38:40

11        Q.   Fair enough.  Do you understand that

12   payment would be improper to United if the

13   member-HCC-year were unsupported?

14        A.   Again, I'm a little hung up on the word

15   "improper."  I think that I -- I think that --       11:38:55

16   yeah, I don't know what to say.

17        Q.   That's fair enough.  If you're

18   uncomfortable, I don't want to make you

19   uncomfortable.

20        You do not know whether payment would be        11:39:07

21   proper or improper if a United member-HCC were

22   unsupported, correct?

23        A.   Again, I don't know the sense of the word

24   "improper."  I understand that -- I understand

25   informally that the MAOs don't submit HCCs.  They    11:39:35
```



Page 68

1   submit diagnosis instances to a government system.

2   And I understand that payments are based on the

3   member demographics and the HCCs that the diagnoses

4   for that member map to for the year that only a

5   single instance of each HCC matters.  Multiple          11:40:05

6   instances don't change anything.  And that there

7   are hierarchies for some HCCs and only, in some

8   sense, the riskiest of HCC in that hierarchy

9   matters if more than one has been assigned to a

10  given subscriber for the year.                          11:40:25

11          I understand that there is some obligation

12  to submit only genuine diagnosis instances and some

13  obligation to correct errors that the MAO is aware

14  of or should be aware of.  But beyond that, I don't

15  really know.                                            11:40:50

16      Q.  All right.  Fair enough.  Well, Dr. Stark,

17  let's move on to a different part of your report.

18  I am going to focus on Section III of your report,

19  and this is where you analyze the member-HCC-year

20  combinations associated with the Garthwaite final       11:41:16

21  delete list, right?

22          I am going to draw your attention to

23  Paragraph 39, Dr. Stark.  In Paragraph 39 you state

24  "For the V12 model, overall, RADV found support for

25  41,681 of 49,978 audited member-HCC-year              11:41:45



Page 142

1    A.    There's a very long list of reasons.  One

2  of them is that in sampling and extrapolation, we

3  draw -- meaning statistics draws a distinction

4  between the sampling frame and the population.

5         The sampling frame is the collection of         02:56:27

6  units from which the sample is drawn, and that

7  might or might not be identical to the population

8  to which one would like to extrapolate.

9         My understanding is that the sampling

10  frame for RADV was a particular collection of        02:56:43

11  contract years that did not comprise every contract

12  year that's relevant to the present matter.

13         So there's a mismatch between the sampling

14  frame and the population that already makes

15  extrapolation impossible without bias of unknown     02:57:09

16  magnitude.

17         Second issue is within each contract year

18  that RADV did examine, the way the sample was drawn

19  was not a simple random sample of HCCs, which is

20  what would be required for -- in order to            02:57:39

21  extrapolate from a sample of HCCs to the contract

22  year from which those HCCs were selected, those

23  member-HCC-years were selected, for the raw rate to

24  be an unbiased estimate, that sample needs to have

25  been drawn in such a way that every HCC-member-year  02:58:06



Page 143

1    in that contract was equally likely to be selected.

2         That is not how the sample was drawn.  The

3    sample was drawn -- I understand the way that RADV

4    works in general -- although I understand there's

5    been some variation from year to year.  But I          02:58:25

6    understand in general the way RADV works is by

7    sampling members, not sampling HCCs.  Because it is

8    sampling members and then looking at all of the

9    HCCs that go with a given member.  Instead of being

10   an equal probability sample, it is a cluster          02:58:40

11   sample.  It doesn't sample all the subsets with

12   equal probability.

13        And secondly, even the members are not

14   drawn with equal probabilities -- sorry.  The

15   design of the sample, even at the member level --     02:58:56

16   at the level of members is a stratified sample, I

17   understand that it involves first dividing payments

18   -- dividing members into three groups based on the

19   amount that was paid for that member in that year.

20   So terciles of payment.                               02:59:20

21        So all of those differences need to be

22   taken into account in extrapolating the sample rate

23   for the RADV sample from a single contract year to

24   that entire contract year.  But then the number of

25   the sampling rates, meaning the fraction of the       02:59:52



Page 144

1  population that each sample represents, I

2  understand may vary from contract to contract that

3  RADV audits.  So weights need to be used to adjust

4  for those differences in sampling rates.

5          And beyond that, there's no statistical          03:00:13

6  justification for extrapolating beyond the

7  particular contract years that RADV looked at.

8          So there are a large list of reasons that

9  the raw rate of support has unknown bias in

10  addition to statistical variability if it's being     03:00:38

11  used as an estimate of the overall rate of support

12  for HCCs corresponding to diagnosis instances

13  identified on the Garthwaite final deletes list.

14      Q.    Have you completed your answer, Doctor?

15      A.    Yes, I think so.                              03:01:02

16      Q.    All right.  Great.  I may have to ask you

17  to repeat it again because I am going to change --

18  I am going to change -- it's torture, isn't it --

19  the question slightly.

20          You said in Paragraph 54 "the raw RADV          03:01:17

21  support rate should not be extrapolated to the

22  Garthwaite Final Deletes List."

23          Now I want to be a little bit more

24  specific.  In Paragraph 39 you concluded, or you

25  found -- you counted, you counted that RADV found    03:01:33



Page 166

1    one to estimate what fraction of the diagnosis --

2    sorry.  What fraction of the diagnosis events in

3    the final deletes list map to an HCC-member-year

4    that RADV would have found support for had it

5    examined every member-HCC-year that intersects          03:55:05

6    Garthwaite's final deletes list.

7        Q.    I am going to try to restate that.

8        A.    You want me to say it again?

9        Q.    No, I am going to try to restate it.

10       A.    Okay.                                          03:55:46

11       Q.    Based on the data that you have available

12   and that you have reviewed in your work on this

13   case, there is not a way to reliably estimate the

14   fraction of diagnosis instances in the final

15   deletes -- the Garthwaite final deletes list that       03:56:03

16   map to an HCC-member-year that would be supported

17   by RADV auditors, right?

18       A.    I agree with that.

19       Q.    And similarly, there's not a way to

20   estimate the fraction that would not be supported,      03:56:32

21   correct?

22       A.    I agree with that, too.

23       Q.    All right.

24       A.    If there were, there would be a way to do

25   it the first time.                                      03:56:44



4824

Page 197

1              DEPOSITION OFFICER'S CERTIFICATE

2                 (Civ. Proc. § 2025.520(e))

3    STATE OF CALIFORNIA        )

4                               )    Ss

5    COUNTY OF SAN FRANCISCO  )

6           I, BALINDA DUNLAP, CSR #10710, hereby

7    certify:

8           I am a duly qualified Certified Shorthand

9    Reporter, in the State of California, holder of

10   Certificate Number CSR 10710 issued by the Court

11   Reporters Board of California and which is in full

12   force and effect.  (Bus. & Prof. § 8016)

13          I am not financially interested in this

14   action and am not a relative or employee of any

15   attorney of the parties, or of any of the parties.

16   (Civ. Proc. § 2025.320(a))

17          I am authorized to administer oaths or

18   affirmations pursuant to California Code of Civil

19   Procedure, Section 2093(b) and prior to being

20   examined, the deponent was first placed under oath

21   or affirmation by me.  (Civ. Proc. §§ 2025.320,

22   2025.540(a))

23          I am the deposition officer that

24   stenographically recorded the testimony in the

25   foregoing deposition and the foregoing transcript



Page 198

1    is a true record of the testimony given.  (Civ.

2    Proc. § 2025.540(a))

3            I have not, and shall not, offer or

4    provide any services or products to any party's

5    attorney or third party who is financing all or

6    part of the action without first offering same to

7    all parties or their attorneys attending the

8    deposition and making same available at the same

9    time to all parties or their attorneys.  (Civ.

10   Proc. § 2025.320(b))

11           I shall not provide any service or product

12   consisting of the deposition officer's notations or

13   comments regarding the demeanor of any witness,

14   attorney, or party present at the deposition to any

15   party or any party's attorney or third party who is

16   financing all or part of the action, nor shall I

17   collect any personal identifying information about

18   the witness as a service or product to be provided

19   to any party or third party who is financing all or

20   part of the action.  (Civ. Proc. § 2025.320(c))

21

22   Dated: _____

23           _Balinda Dunlap_

24

25


4826

**EXHIBIT P-58**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA ex ) No. 16-08697 FMO
rel. BENJAMIN POEHLING, )
)
　　　　　Plaintiffs, )
)
v. )
)
UNITEDHEALTH GROUP, INC., et )
al., )
)
　　　　　Defendants. )
_____)



VIDEOTAPED VIDEOCONFERENCE ZOOM DEPOSITION OF
LISA LARA

March 18, 2022
10:01 a.m. Eastern Standard Time


(ATTORNEYS' EYES ONLY PORTION BOUND IN
SEPARATE TRANSCRIPT)



Magna Legal Services　　　　Prepared by:

(866) 624-6221　　　　　　　Marcella Daughtry, RPR, RMR

www.MagnaLS.com　　　　　　 CA CSR 14315

　　　　　　　　　　　　　　 GA No. 6595-1471-3597-5424




4828

Page 60

1    PDF, question 4 at the very bottom of page 5 --

2        A   Okay.

3        Q   -- Bates number ending 4716.  Okay.  So there

4    is a question about obtaining copies of the P&P that were

5    in effect during calendar year 2006.  Do you see that?

6        A   I do.

7        Q   And is that a request for policies and

8    procedures?

9        A   It is.

10       Q   Okay.  Is that part of your standard auditing

11   practice, to ask the companies -- or MA Plans for

12   policies and procedures?

13       A   Yes, it is.

14       Q   So if you sort of scroll down and look at the

15   response there, I want to direct your attention to the

16   first full paragraph on page 6 in particular.  And there

17   is a description there of chart validations and chart

18   reviews.  Do you see that paragraph --

19       A   I do.

20       Q   -- that I am referring to?

21           And it states, "A chart validation involved the

22   review of a provider's patient charts to determine

23   whether they supported certain codes that the provider

24   had reported."

25           Do you see that?



4829

Page 61

1          A    I do.

2          Q    "We selected a provider for chart validation

3    based principally on whether the provider's coding was

4    unusually high compared to a national benchmark

5    established by our risk adjustment system."

6               Do you see that?

7          A    I do.

8          Q    "The chart validation tested the provider's

9    deviation from that benchmark.  Codes found to be

10   inaccurate or incomplete through chart validations were

11   deleted."

12              Do you see all of that?

13         A    I do.

14         Q    Do you recall representatives from the

15   PacifiCare of Texas explaining what their chart

16   validation process was --

17              MS. GLOVER:  Objection.

18         Q    BY MS. SCHEFFLER DO:  -- as part of this?

19              MS. GLOVER:  Form.

20              Sorry.  Objection.  Form.

21              THE WITNESS:  I do not recall.

22         Q    BY MS. SCHEFFLER DO:  Is that just because it

23   was a long time ago; you are not sure whether --

24         A    Yes.

25         Q    -- you did or not?



Page 188

1    STATE OF GEORGIA          )
                              )     ss:
2    COUNTY OF DEKALB          )

3

4            I HEREBY CERTIFY that the foregoing deposition

5    was taken before me; that I was then and there a

6    Registered Professional Reporter and Registered Merit

7    Reporter, License No. 6595-1471-3597-5424 for the State

8    of Georgia, and License No. 14315 in the State of

9    California; that the witness before testifying was duly

10   sworn by me to testify to the whole truth; that the

11   questions propounded by counsel and the answers of the

12   witness thereto were taken down by me in shorthand and

13   thereafter transcribed under my direction; and that the

14   foregoing pages contain a full, true, and accurate

15   transcript of all deposition testimony and proceedings

16   had, all done to the best of my skill and ability.

17           Signature requested.

18           I FURTHER CERTIFY that I am in no way related

19   to, nor employed by any of the parties hereto, nor am I

20   in any way interested in the outcome.

21           DATED at Dunwoody, Georgia, this 30th day of

22   March, 2022.

23

24           MARCELLA L. DAUGHTRY, RPR, RMR
             GA License No. 6595-1471-3597-5424
25           CA CSR 14315



4831

**EXHIBIT P-59**

Message
_____

**From**:        Brennan, Patty [patty.brennan@optum.com]
**Sent**:        10/8/2014 1:57:14 PM
**To**:          Bragg, Esperanza [essy.bragg@optum.com]
**Subject**:     FW: CMS Guidance for Chart Records
**Attachments**: 2012 Encounter Data Participant Guide 083112.pdf

Essy,
In the attached document, section 2.4.3 references chart review -- this is the MA guidance.

**2.4.3 Chart Reviews** Chart reviews may be performed by MAOs and other entities for the purpose of diagnosis code validation.
Because diagnoses drive risk adjustment, all chart review encounters must be supported by the medical
record. MAOs and other entities may submit chart reviews that are linked to an original encounter stored in
EDS (linked ICN chart reviews) or chart reviews that are not linked to an original encounter stored in
Encounter Operational Data Store (EODS) (unlinked ICN chart reviews). All chart review encounters should be
flagged by MAOs and other entities.

-------------------------------------------------------------------------------

**From:** Kral, Michael J
**Sent:** Wednesday, October 08, 2014 10:19 AM
**To:** Lestor, Carl S; Brennan, Patty
**Subject:** CMS Guidance for Chart Records

Carl,

Here are the CMS links for chart reviews.

The 2012 guidance originally defining Chart Programs.

http://www.csscoperations.com/internet/cssc3.nsf/DocsCat/CSSC~CSSC%20Operations~Medicare%20Encounter%20Data~Traini
ng%20Information~8XTMCV2008?open&navmenu=Medicare^Encounter^Data||||

Current Companion Guide

http://www.csscoperations.com/internet/cssc3.nsf/docsCat/CSSC~CSSC%20Operations~Medicare%20Encounter%20Data~Comp
anion%20Guides?open&expand=1&navmenu=Medicare^Encounter^Data||

Let me know if you need anything else.

Michael

4833

**EXHIBIT P-59A**



**CENTERS FOR MEDICARE & MEDICAID SERVICES**

# 2012 Regional Technical Assistance Participant Guide



## Monday, August 6 –
## Tuesday, August 7, 2012

# Encounter Data



A. Reddix & Associates

4835

MAPL001126484

Case 2:16-cv-08697-FMO-PVC    Document 616-14    Filed 08/06/24    Page 412 of 633
Page ID #:23628

2012 Regional Technical Assistance
Encounter Data
Participant Guide

Table of Contents



# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................................I-1

MODULE 1 – ENCOUNTER DATA SYSTEM (EDS) OVERVIEW ................................................................1-1
1.1         Common Encounter Data Terms...................................................................................1-1
1.1.1       Claims Processing Systems............................................................................................1-1
1.2         Encounter Data Flow .....................................................................................................1-3
1.3         Encounter Data Resources ............................................................................................1-4
1.4         Connectivity ...................................................................................................................1-4
1.5         File Size Limitations .......................................................................................................1-5
1.6         Encounter Data Certification Timeline..........................................................................1-5
1.7         Training and Support......................................................................................................1-6
1.8         Encounter Data Acronyms .............................................................................................1-6
1.9         Summary ........................................................................................................................1-8

MODULE 2 – POLICY, MONITORING, AND COMPLIANCE .....................................................................2-1
2.1         Background .....................................................................................................................2-1
2.1.1       Implementation .............................................................................................................2-2
2.1.2       Milestones......................................................................................................................2-2
2.2         Data Collection...............................................................................................................2-4
2.3         Adjudicated Claims Submission .....................................................................................2-5
2.4         Submission Requirements..............................................................................................2-5
2.4.1       Submission Format.........................................................................................................2-6
2.4.2       Submission of Proxy Data in a Limited Set of Circumstances .......................................2-6
2.4.3       Chart Reviews ................................................................................................................2-7
2.4.4       Bundled Claims...............................................................................................................2-7
2.4.5       Minimum Data Elements ...............................................................................................2-7
2.4.6       Home Health Submission ...............................................................................................2-7
2.4.7       Part B Drug Data.............................................................................................................2-8
2.5         Encounter Data Monitoring ...........................................................................................2-8
2.5.1       Timeliness of Submission ...............................................................................................2-8
2.5.1.1     Full Encounter Submission Timely Filing .......................................................................2-9
2.5.1.2     Correct/Replace and Void/Delete Submission Timely Filing.........................................2-9
2.5.1.3     Chart Review Timely Filing .............................................................................................2-9
2.5.1.4     Frequency of Submission ...............................................................................................2-9
2.5.2       Quantity of Submission ................................................................................................2-10
2.5.3       Quality of Submission ..................................................................................................2-10
2.5.4       Accuracy of Submission................................................................................................2-10
2.6         Use of Encounter Data .................................................................................................2-11
2.7         Compliance ...................................................................................................................2-11
2.8         Summary .......................................................................................................................2-11

MODULE 3 – PROFESSIONAL SUBMISSION ........................................................................................3-1
3.1         Professional/Physician Supplier Services ......................................................................3-1
3.2         Professional/Physician Supplier Submission Format ....................................................3-2
3.2.1       837-P ..............................................................................................................................3-2
3.2.2       Minimum Data Elements ...............................................................................................3-3





Case 2:16-cv-08697-FMO-PVC   Document 616-14   Filed 08/06/24   Page 413 of 633
Page ID #:23629

**2012 Regional Technical Assistance**
**Encounter Data**
**Participant Guide**

**Table of Contents**

3.2.3       Strategic National Implementation Process (SNIP) Types.................................................3-7
3.2.4       Encounter Data Balancing..............................................................................................3-9
3.2.4.1     Claim Level Charge Amount Balancing...........................................................................3-9
3.2.4.2     Claim Level Payer Paid Amount Balancing ...................................................................3-9
3.2.4.3     Service Line Level Balancing .......................................................................................3-12
3.2.4.4     Capitated Submission ...................................................................................................3-13
3.3         Place of Service (POS) Codes ......................................................................................3-14
3.4         Professional Processing.................................................................................................3-17
3.4.1       EDPPPS Edits ...............................................................................................................3-17
3.4.1.1     Top Beneficiary Errors ..................................................................................................3-19
3.4.1.1.1   Edit 02110 – Beneficiary Health Insurance Carrier Number (HICN) Not on File .........3-19
3.4.1.1.1.1 Edit 02110 Prevention/Resolution Strategies ...............................................................3-19
3.4.1.1.2   Edit 02125 – Beneficiary Date of Birth Mismatch ........................................................3-20
3.4.1.1.2.1 Edit 02125 Prevention/Resolution Strategies...............................................................3-20
3.4.1.1.3   Edit 02240 – Beneficiary Not Enrolled in Medicare Advantage Organization
            for Date of Service.........................................................................................................3-20
3.4.1.1.3.1 Edit 02240 Prevention/Resolution Strategies...............................................................3-20
3.4.1.1.4   Edit 02255 – Beneficiary Not Part A Eligible for Date of Service................................3-21
3.4.1.1.4.1 Edit 02255 Prevention/Resolution Strategies...............................................................3-21
3.4.1.1.5   Edit 02106 – I: Invalid Beneficiary Last Name .............................................................3-21
3.4.1.1.5.1 Edit 02106 Prevention/Resolution Strategies ..............................................................3-21
3.4.1.1.6   Edit 02120 – I: Beneficiary Gender Mismatch ..............................................................3-21
3.4.1.1.6.1 Edit 02120 Prevention/Resolution Strategies...............................................................3-22
3.4.1.2     Top Provider Errors ......................................................................................................3-22
3.4.1.2.1   Edit 01405 – Sanctioned Provider................................................................................3-22
3.4.1.2.1.1 Edit 01405 Prevention/Resolution Strategies...............................................................3-22
3.4.1.2.2   Edit 01415 – Rendering Provider Not Eligible for Date of Service ..............................3-23
3.4.1.2.2.1 Edit 01415 Prevention/Resolution Strategies...............................................................3-23
3.4.1.3     Top Validation Errors ....................................................................................................3-23
3.4.1.3.1   Edit 00025 – To Date of Service After Date of Claim Receipt......................................3-23
3.4.1.3.1.1 Edit 00025 Prevention/Resolution Strategies...............................................................3-23
3.4.1.3.2   Edit 00065 – Missing Pick-Up Point Zip Code..............................................................3-23
3.4.1.3.2.1 Edit 00065 Prevention/Resolution Strategies...............................................................3-23
3.4.1.3.3   Edit 00265 – Adjustment or Void ICN Not Found in History .......................................3-24
3.4.1.3.3.1 Edit 00265 Prevention/Resolution Strategies...............................................................3-24
3.4.1.3.4   Edit 00760 – Claim Adjustment is Already Adjusted or Adjustment in Progress.........3-24
3.4.1.3.4.1 Edit 00760 Prevention/Resolution Strategies...............................................................3-24
3.4.1.3.5   Edit 00761 – Unable to Void Due to Different Billing Provider on Void from Original ...............3-24
3.4.1.3.5.1 Edit 00761 Prevention/Resolution Strategies...............................................................3-24
3.4.1.3.6   Edit 00762 – Unable to Void Rejected Claim ...............................................................3-24
3.4.1.3.6.1 Edit 00762 Prevention/Resolution Strategies...............................................................3-25
3.5         Special Considerations .................................................................................................3-25
3.5.1       Ambulance ....................................................................................................................3-25
3.5.1.1     Ambulance Submission .................................................................................................3-25
3.5.1.2     Ambulance Processing and Pricing Logic ....................................................................3-26
3.5.2       Part B Drug Data...........................................................................................................3-26
3.5.2.1     Part B Drug Data Submission .......................................................................................3-27
3.5.2.2     Part B Drug Data Processing and Pricing Logic...........................................................3-27



4837

MAPL001126486



| | | |
|---|---|---|
| 3.5.2.3 | Part B Drug Data Processed through PBMs | 3-27 |
| 3.5.3 | Default NPIs | 3-28 |
| 3.5.4 | Atypical Provider | 3-28 |
| 3.5.5 | Paper Data Submission | 3-29 |
| 3.5.6 | 4010 Submission | 3-30 |
| 3.5.7 | Chart Reviews | 3-30 |
| 3.5.7.1 | Chart Review Submission | 3-30 |
| 3.5.7.2 | Chart Review – Addition of Specific Diagnoses | 3-31 |
| 3.5.7.3 | Chart Review – Deletion of Specific Diagnoses | 3-32 |
| 3.5.7.4 | Chart Review – Additions and Deletions of Specific Diagnoses on a Single Encounter | 3-33 |
| 3.5.7.5 | Chart Review – Correct/Replace a Chart Review Encounter with Another Chart Review Encounter | 3-33 |
| 3.5.7.6 | Chart Review Duplicate Logic | 3-34 |
| 3.5.8 | Correct/Replace | 3-34 |
| 3.5.8.1 | Correct/Replace Submission | 3-34 |
| 3.5.8.2 | Correct/Replace Processing and Pricing Logic | 3-35 |
| 3.5.9 | Void/Delete | 3-35 |
| 3.5.9.1 | Void/Delete Submission | 3-35 |
| 3.5.9.2 | Void/Delete Processing and Pricing Logic | 3-36 |
| 3.5.10 | Proxy Claim Information | 3-36 |
| 3.6 | EDPPPS Duplicate Logic | 3-37 |
| 3.7 | Summary | 3-37 |
| | | |
| **MODULE 4 – INSTITUTIONAL SUBMISSION** | | **4-1** |
| 4.1 | Institutional Services | 4-1 |
| 4.2 | Institutional Submission Format | 4-1 |
| 4.2.1 | 837-I | 4-2 |
| 4.2.2 | Minimum Data Elements | 4-3 |
| 4.3 | Type of Bill (TOB) | 4-7 |
| 4.3.1 | Hospital | 4-7 |
| 4.3.1.1 | Hospital Inpatient | 4-7 |
| 4.3.1.1.1 | Hospital Inpatient – Part A | 4-7 |
| 4.3.1.1.2 | Hospital Inpatient – Part B | 4-8 |
| 4.3.1.2 | Hospital Outpatient | 4-9 |
| 4.3.1.3 | Critical Access Hospital | 4-9 |
| 4.3.2 | Skilled Nursing Facility | 4-10 |
| 4.3.3 | Home Health Agencies | 4-11 |
| 4.3.4 | Religious Non-Medical Health Care Institution | 4-12 |
| 4.3.5 | Rural Health Clinic | 4-12 |
| 4.3.6 | End-Stage Renal Disease Clinic | 4-13 |
| 4.3.7 | Comprehensive Outpatient Rehabilitation Facility | 4-14 |
| 4.3.8 | Community Mental Health Center | 4-14 |
| 4.3.9 | Federally Qualified Health Center | 4-15 |
| 4.4 | Institutional Processing Logic | 4-16 |
| 4.4.1 | EDIPPS Edits | 4-16 |
| 4.4.1.1 | Top Beneficiary Edits | 4-18 |
| 4.4.1.2 | Top Provider Edits | 4-19 |
| 4.4.1.3 | Top Validation Edits | 4-19 |



4838
MAPL001126487





4.4.1.3.1     Edit 17590 – Value Code – Code 05 Not Present Or Conflicts With Dollar Amount ................... 4-19
4.4.1.3.1.1   Edit 17590 Prevention/Resolution Strategies ................................................................. 4-20
4.4.1.3.2     Edit 17285 – Billed Lines Require Charges (Few Exceptions) ......................................... 4-20
4.4.1.3.2.1   Edit 17285 Prevention/Resolution Strategies ................................................................. 4-20
4.4.1.3.3     Edit 17310 – Surgical Revenue Code 036X Requires Surgical Procedure Code ........................... 4-20
4.4.1.4.3.1   Edit 17310 Prevention/Resolution Strategies ................................................................. 4-20
4.4.1.3.4     Edit 20505 - Accurate Ambulance HCPCS and Revenue Code Required ................................... 4-20
4.4.1.3.4.1   Edit 20505 Prevention/Resolution Strategies ................................................................. 4-21
4.5           Special Considerations ................................................................................................ 4-21
4.5.1         Ambulance ................................................................................................................... 4-21
4.5.2         Capitated ...................................................................................................................... 4-22
4.5.2.1       Capitated Submission ................................................................................................. 4-22
4.5.3         Default NPIs ................................................................................................................. 4-23
4.5.4         Atypical Provider ........................................................................................................ 4-23
4.5.5         Paper Claim Submission .............................................................................................. 4-23
4.5.6         4010 Submission .......................................................................................................... 4-24
4.5.7         Chart Reviews .............................................................................................................. 4-24
4.5.7.1       Chart Review Submissions .......................................................................................... 4-24
4.5.7.2       Chart Review Duplicate Logic ..................................................................................... 4-26
4.5.8         Correct/Replace ........................................................................................................... 4-27
4.5.9         Void/Delete .................................................................................................................. 4-28
4.5.10        Proxy Claim Information .............................................................................................. 4-28
4.6           EDIPPS Duplicate Logic ............................................................................................... 4-28
4.7           Summary ...................................................................................................................... 4-29

**MODULE 5 – DME SUBMISSION** ......................................................................................................... 5-1
5.1           DME Services ................................................................................................................ 5-1
5.1.1         DME Incident to Submission ....................................................................................... 5-3
5.1.2         DMEPOS Supplier Submission ..................................................................................... 5-4
5.1.2.1       DMEPOS Supplier Supplemental Forms ..................................................................... 5-5
5.1.2.2       DMEPOS CEM Edits ...................................................................................................... 5-5
5.2           DMEPOS Supplier End-to-End Testing ........................................................................ 5-9
5.3           Encounter Data DME Processing and Pricing Logic (EDDPPS) ................................... 5-10
5.3.1         EDDPPS Edits ................................................................................................................ 5-10
5.4           Special Considerations ................................................................................................ 5-12
5.4.1         Default NPIs ................................................................................................................. 5-12
5.4.2         Atypical Providers ....................................................................................................... 5-12
5.5           Duplicate Logic ............................................................................................................ 5-12
5.6           Summary ...................................................................................................................... 5-13

**MODULE 6 – EDFES REPORTS** ......................................................................................................... 6-1
6.1           Acknowledgement Reports Overview .......................................................................... 6-1
6.2           Acknowledgement Report File Naming Convention .................................................... 6-2
6.3           TA1 Acknowledgement Report .................................................................................... 6-3
6.3.1         TA1 Acknowledgement Reports Responses ................................................................ 6-4
6.3.2         Interpreting the TA1 Acknowledgement Report ......................................................... 6-6
6.3.3         Reconciling the TA1 Acknowledgement ...................................................................... 6-6
6.4           999 Acknowledgement Report ..................................................................................... 6-6



MAPL001126488



Case 2:16-cv-08697-FMO-PVC   Document 616-14   Filed 08/06/24   Page 416 of 633
Page ID #:23632

2012 Regional Technical Assistance
Encounter Data
Participant Guide

Table of Contents

6.4.1     999 Acknowledgement Report Responses ...................................................................6-7
6.4.2     Reading the 999 Acknowledgement ........................................................................6-7
6.4.3     Interpreting the 999A Functional Group with One Transaction Set Accepted ............6-12
6.4.4     Interpreting the 999A Functional Group with Multiple Transaction Sets Accepted........6-13
6.4.5     Interpreting the 999R Rejected Transaction Set ..........................................................6-14
6.4.6     999R Reject Transaction Set Resolution Steps ............................................................6-17
6.5       277CA Acknowledgement Report...........................................................................6-18
6.5.1     277CA Failure Reasons ........................................................................................6-19
6.5.2     Reading the 277CA Acknowledgement ..................................................................6-19
6.5.3     Interpreting the 277CA Acknowledgement Report – Submitter Level Accepted ........6-21
6.5.4     Interpreting the 277CA Acknowledgement Report – Provider and Encounter Level Accepted ..6-22
6.5.5     Interpreting the 277CA Acknowledgement Report – Encounter Level Rejection.......................6-25
6.5.6     Interpreting the 277CA Acknowledgment Report – Line Level Rejection....................................6-25
6.5.7     Interpreting the 277CA Acknowledgement Report – Multiple ST/SE Rejections ......................6-27
6.5.8     277CA Acknowledgement Report Resolution Steps – Encounter Level Rejection.....................6-27
6.5.9     277CA Acknowledgement Report Resolution Steps – Line Level Rejection................................6-28
6.5.10    277CA Acknowledgement Report Resolution Steps – Multiple ST/SE Rejection........................6-28
6.6       EDFES Notifications ..............................................................................................6-29
6.7       TA1 Practice Worksheets .....................................................................................6-32
6.8       999 Practice Worksheets .....................................................................................6-33
6.9       277CA Practice Worksheets .................................................................................6-34
6.10      Summary ..............................................................................................................6-36

MODULE 7 – EDPS REPORTS ................................................................................................7-1
7.1       EDPS Reports Overview  .......................................................................................7-1
7.2       MAO Report Files Naming Convention ..................................................................7-2
7.3       Report Layout.......................................................................................................7-4
7.4       MAO-001 Encounter Data Duplicates Report .......................................................7-4
7.4.1     MAO-001 Flat File Layout......................................................................................7-5
7.4.2     MAO-001 Formatted Report Layout .....................................................................7-7
7.5       MAO-002 Encounter Data Processing Status Report .............................................7-8
7.5.1     MAO-002 Flat File Format.....................................................................................7-8
7.5.2     MAO-002 Formatted Report Layout ...................................................................7-11
7.5.3     MAO-002 Edit Logic............................................................................................7-12
7.6       MAO-004 Encounter Data Risk Filter Report ......................................................7-13
7.6.1     Risk Filtering Logic .............................................................................................7-13
7.6.2     MAO-004 Flat File Layout....................................................................................7-14
7.6.3     MAO-004 Formatted Report ...............................................................................7-17
7.7       Summary .............................................................................................................7-17

MODULE 8 – SPECIAL CONSIDERATIONS................................................................................8-1
8.1       Overview of PACE Services....................................................................................8-1
8.1.1     PACE Submission .................................................................................................8-2
8.1.2     PACE Testing .......................................................................................................8-3
8.2       Overview of Cost Plans..........................................................................................8-4
8.2.1     Cost Plans Submission ..........................................................................................8-4
8.3       Overview of Special Needs Plans ..........................................................................8-5
8.3.1     Institutional SNPs Submission ..............................................................................8-5



4840



8.3.2 Chronic Condition SNPs Submission ........ 8-6
8.3.3 Dual Eligible SNPs Submission ........ 8-7
8.4 Summary ........ 8-8

## LIST OF TABLES

| Table A | Module Titles and Descriptions | I-1 |
| Table B | Training Tools | I-2 |
| Table C | Encounter Data Process Points of Contact | I-3 |
| Table 1A | Claims Processing Systems | 1-2 |
| Table 1B | Resource Hierarchy | 1-4 |
| Table 1C | File Size Limitations | 1-5 |
| Table 1D | Certification Timeline | 1-5 |
| Table 1E | 2013 Certification Timeline | 1-6 |
| Table 1F | Training and Support | 1-6 |
| Table 1G | Encounter Data Acronyms | 1-7 |
| Table 2A | Encounter Data Milestones | 2-3 |
| Table 2B | Organization and Policy Requirements | 2-5 |
| Table 2C | Disposition Type | 2-5 |
| Table 2D | Proxy Data | 2-6 |
| Table 2E | Timely Filing Guidelines | 2-9 |
| Table 2F | Chart Review Timely Filing | 2-9 |
| Table 2G | Tiered Data Submission Frequency | 2-10 |
| Table 3A | 837-P Permanently Deactivated CEM Edits | 3-2 |
| Table 3B | Header and Trailer Level Minimum Data Elements | 3-4 |
| Table 3C | Detail Level Minimum Data Elements | 3-4 |
| Table 3D | SNIP Types | 3-8 |
| Table 3E | EDFES Claim Level Charge Amount Balancing Edit | 3-9 |
| Table 3F | EDFES Claim Level Payment Amount Balancing Edits | 3-12 |
| Table 3G | EDFES Line Level Amount Balancing Edits | 3-13 |
| Table 3H | POS Codes | 3-14 |
| Table 3I | EDPPPS Edits | 3-18 |
| Table 3J | Default 837-P NPI Value | 3-28 |
| Table 3K | Chart Review Duplicate Logic | 3-34 |
| Table 3L | EDPPPS Correct/Replace Edits | 3-35 |
| Table 3M | EDPS Void/Delete Edits | 3-36 |
| Table 4A | 837-I Permanently Deactivated CEM Edits | 4-2 |
| Table 4B | Header and Trailer Level Minimum Data Elements | 4-3 |
| Table 4C | Detail Level Minimum Data Elements | 4-3 |
| Table 4D | Hospital Inpatient Part A/TOB | 4-8 |
| Table 4E | Hospital Inpatient Part B/TOB | 4-9 |
| Table 4F | Hospital Outpatient/TOB | 4-9 |
| Table 4G | Critical Access Hospital/TOB | 4-10 |
| Table 4H | Skilled Nursing Facility/TOB | 4-11 |
| Table 4I | Home Health Agency/TOB | 4-12 |
| Table 4J | Religious Non-Medical Health Care Institution/TOB | 4-12 |
| Table 4K | Rural Health Clinic/TOB | 4-13 |
| Table 4L | ESRD Clinic/TOB | 4-14 |
| Table 4M | Comprehensive Outpatient Rehabilitation Facility/TOB | 4-14 |
| Table 4N | Community Mental Health Center/TOB | 4-15 |
| Table 4O | Federally Qualified Health Center | 4-15 |
| Table 4P | EDIPPS Edits | 4-16 |



4842

MAPL001126491



| Table 4Q | Default 837-I NPI Value | 4-23 |
| Table 4R | Chart Review Addition Elements | 4-25 |
| Table 4S | Chart Review Deletion Elements | 4-25 |
| Table 4T | Chart Review Addition and Deletion on a Single Encounter Elements | 4-26 |
| Table 4U | Chart Review Correct/Replace Elements | 4-26 |
| Table 4V | Chart Review Duplicate Logic | 4-27 |
| Table 5A | DME Incident to HCPCS Codes | 5-4 |
| Table 5B | DMEPOS Supplier HCPCS Codes | 5-4 |
| Table 5C | 837-P (DME Supplier) Permanently Deactivated CEM Edits | 5-6 |
| Table 5D | 837-P (DMEPOS Supplier) Test Cases | 5-9 |
| Table 5E | EDDPPS Edits | 5-11 |
| Table 5F | Default 837-P (DMEPOS) NPI Value | 5-12 |
| Table 6A | Testing Acknowledgement Reports File Naming Convention | 6-2 |
| Table 6B | Production Acknowledgement Reports File Naming Convention | 6-3 |
| Table 6C | Testing and Production Acknowledgement Reports File Name Component Description | 6-3 |
| Table 6D | TA1 Edit Examples from CMS Edit Spreadsheet | 6-4 |
| Table 6E | TA1 Key Segments | 6-5 |
| Table 6F | TA1 Acknowledgement Report Example | 6-6 |
| Table 6G | Sample 999 CMS Edit Spreadsheet | 6-7 |
| Table 6H | 999 Acknowledgement Report Key Segments | 6-8 |
| Table 6I | 999A Acknowledgement Report – Functional Group and Transaction | 6-12 |
| Table 6J | 999R Rejected Transaction Set Example | 6-15 |
| Table 6K | 277CA Edit Example from CMS Edit Spreadsheet | 6-19 |
| Table 6L | 277CA Acknowledgement Report Key Segments | 6-20 |
| Table 6M | 277CA Submitter/Information Receiver Level Example | 6-21 |
| Table 6N | 277CA Provider of Service Level Details | 6-23 |
| Table 6O | 277CA Encounter Level Details | 6-24 |
| Table 6P | 277CA Line Level Rejection Details | 6-26 |
| Table 6Q | EDFES Notification Record Layout | 6-29 |
| Table 6R | EDFES Notifications | 6-30 |
| Table 7A | EDPS Report Delivery Time | 7-1 |
| Table 7B | Encounter Data Processing System Reports Details | 7-2 |
| Table 7C | Testing File Naming Convention By Connectivity Method | 7-3 |
| Table 7D | Production File Naming Convention By Connectivity Method | 7-3 |
| Table 7E | Mailbox File Name Component Description | 7-3 |
| Table 7F | Encounter Level Duplicate Checking | 7-4 |
| Table 7G | MAO-001 Flat File Layout | 7-5 |
| Table 7H | EDPS Reports Enhancements | 7-8 |
| Table 7I | MAO-002 Report Flat File Layout | 7-9 |
| Table 7J | MAO-004 Encounter Data Risk Filter Report Flat File Layout | 7-14 |
| Table 8A | PACE Benefits | 8-1 |
| Table 8B | NPI Elements | 8-2 |
| Table 8C | Date of Service Elements | 8-3 |
| Table 8D | Certification Timeline | 8-3 |
| Table 8E | Types of Special Needs Plans | 8-5 |
| Table 8F | Institutional Services | 8-6 |
| Table 8G | Medicare vs. Medicaid Services | 8-7 |
| Table 8H | Medicaid Extraction Elements | 8-8 |



4843



## LIST OF FIGURES

Figure 1A      Encounter Data Flow...................................................................................................1-3
Figure 3A      SNIP Types and the EDS ............................................................................................3-8
Figure 3B      Data Flow ...................................................................................................................3-10
Figure 5A      DMEPOS Fee Schedule HCPCS Codes........................................................................5-2
Figure 5B      DME Processing Data Flow.........................................................................................5-3
Figure 5C      DMEPOS CEM Edits ....................................................................................................5-6
Figure 5D      837-P (DMEPOS Supplier) Testing Requirements ....................................................5-10
Figure 6A      Encounter Data Front-End System Edits and Flow....................................................6-2
Figure 6B      TA1 Acknowledgement Report Example....................................................................6-3
Figure 6C      999A Acknowledgement Report Example ................................................................6-12
Figure 6D      999A Acknowledgement Report Example ................................................................6-13
Figure 6E      999R Acknowledgement Report Example.................................................................6-14
Figure 6F      277CA Acknowledgement Report Example – Submitter Level Accepted ..................6-21
Figure 6G      277CA Acknowledgement Report Example – Provider and Encounter Level Accepted .............6-23
Figure 6H      277CA Acknowledgement Report Example – Encounter Level Rejection...................6-25
Figure 6I      277CA Line Level Rejection Example.........................................................................6-26
Figure 6J      277CA Acknowledgement Report – Multiple ST/SE Rejections .................................6-27
Figure 7A      MAO-001 Formatted Report Layout ........................................................................7-8
Figure 7B      MAO-002 Report Example .......................................................................................7-12
Figure 7C      MAO-002 Report – Rejected Line .............................................................................7-13
Figure 7D      MAO-004 Encounter Data Risk Filter Report Formatted Report Layout....................7-17



4844

MAPL001126493



 Module 3 (Professional Submission) and Module 4 (Institutional Submission) provide detailed guidance on proxy data submission requirements

 If MAOs and other entities have any questions about submission of proxy claim information, with regard to any situation outlined in the Participant Guide, contact CMS at eds@ardx.net

### 2.4.3    Chart Reviews

Chart reviews may be performed by MAOs and other entities for the purpose of diagnosis code validation. Because diagnoses drive risk adjustment, all chart review encounters must be supported by the medical record. MAOs and other entities may submit chart reviews that are linked to an original encounter stored in EDS (linked ICN chart reviews) or chart reviews that are not linked to an original encounter stored in Encounter Operational Data Store (EODS) (unlinked ICN chart reviews). All chart review encounters should be flagged by MAOs and other entities.

 Module 3 (Professional Submission) and Module 4 (Institutional Submission) provide detailed guidance chart review submission

### 2.4.4    Bundled Claims

Bundled claims refer to the bundling of claim lines meeting the definition of the National Correct Coding Initiative (NCCI) or the bundling of claim lines in adjudication to match the benefit structure of the MAO or other entity. The NCCI was developed to promote correct coding methodologies and to control improper coding. The purpose of the NCCI edits is to prevent improper payment when incorrect code combinations are reported. Only claims bundled using the NCCI will be accepted for encounter data submission. The Coding Policy Manual found on the CMS website can be utilized by MAOs and other entities as a general reference tool.

### 2.4.5    Minimum Data Elements

Minimum data elements are required to properly process and price encounters. MAOs and other entities must include at least the minimum data elements when submitting encounter data, including paper, 4010, and foreign provider generated encounters, as well atypical provider submissions. The EDS Minimum Data Elements and EDS Companion Guides provide details on the required elements.

 www.csscoperations.com

### 2.4.6    Home Health Submission

EDS is not currently accepting Home Health encounter submissions from MAOs and other entities. CMS will provide further guidance on the submission of this data in the near future.



4845

MAPL001126511



the minimum frequency standards established by the tiered scale, but are encouraged to submit encounter data more often. More frequent submission will help the EDS maintain its systematic capabilities to process encounter data. Table 2G provides the minimum frequency standards for encounter data submission based on the number of Medicare beneficiaries enrolled per contract.

TABLE 2G — TIERED DATA SUBMISSION FREQUENCY

| Number of Medicare Enrollees | Minimum Submission Frequency |
|---|---|
| Greater than 100,000 | Weekly |
| 50,000 – 100,000 | Bi-weekly |
| Less than 50,000 | Monthly |

Table 2G identifies minimum frequency standards for submission. MAOs and other entities may submit data as often as daily and should not delay the submission of data for any reason.

## 2.5.2    Quantity of Submission

EDS specifications require that the volume of encounters submitted to the system align with the number of enrollees per contract ID. Specific metrics include, but are not limited to, submission rates, proportions of claims in particular service categories, and overall volume of submission. It is MAOs and other entities' responsibility to ensure the volume of encounters submitted is appropriate in relation to the frequency standards established. CMS will confirm the anticipated volume annually and will run submission quantity analyses on a quarterly basis. CMS will also perform analyses on the quantity of encounters submitted to EDS against the volume of RAPS submissions for each Contract ID.

 MAOs and other entities are strongly encouraged to evenly distribute the volume of encounters submitted according to the required frequency requirements.

## 2.5.3    Quality of Submission

Quality standards allow CMS to analyze encounter data submission to ensure that EDS collects accurate and complete data. Adherence to quality standards requires that MAOs and other entities collect and submit all encounter data in the appropriate ANSI V5010 X12 format. The quality of encounter data submitted is partially evidenced by the number of errors returned to the submitter and the number of duplicates submitted per Contract ID. CMS will develop error frequency benchmarks and will monitor resubmission and duplicate rates on a quarterly basis.

## 2.5.4    Accuracy of Submission

MAOs and other entities are responsible for the accuracy of all encounter data submitted and must ensure that every submission can be supported by an original source document (i.e. a medical record). MAOs and other entities must also attest that the data submitted is based on best knowledge, information, and belief and be accurate and truthful.



MAPL001126514

**EXHIBIT P-60**

42 CFR 422.310 (up to date as of 7/22/2024)
Risk adjustment data.

42 CFR 422.310 (July 22, 2024)

Case 2:16-cv-08697-FMO-PVC    Document 616-14    Filed 08/06/24    Page 424 of 633
Page ID #:23640

This content is from the eCFR and is authoritative but unofficial.

# Title 42 —Public Health
# Chapter IV —Centers for Medicare & Medicaid Services, Department of Health and Human Services
## Subchapter B —Medicare Program
## Part 422 —Medicare Advantage Program
## Subpart G —Payments to Medicare Advantage Organizations

**Source:** 70 FR 4729, Jan. 28, 2005, unless otherwise noted.

**Authority:** 42 U.S.C. 1302, 1306, 1395w-21 through 1395w-28, and 1395hh.

**Source:** 63 FR 18134, Apr. 14, 1998, unless otherwise noted.

**Editorial Note:** Nomenclature changes to part 422 appear at 70 FR 4741, Jan. 28, 2005.

## § 422.310 Risk adjustment data.

(a) *Definition of risk adjustment data.* Risk adjustment data are all data that are used in the development and application of a risk adjustment payment model.

(b) *Data collection: Basic rule.* Each MA organization must submit to CMS (in accordance with CMS instructions) the data necessary to characterize the context and purposes of each item and service provided to a Medicare enrollee by a provider, supplier, physician, or other practitioner. CMS may also collect data necessary to characterize the functional limitations of enrollees of each MA organization.

(c) *Sources and extent of data.*

(1) To the extent required by CMS, risk adjustment data must account for the following:

(i) Items and services covered under the original Medicare program.

(ii) Medicare covered items and services for which Medicare is not the primary payer.

(iii) Other additional or supplemental benefits that the MA organization may provide.

(2) The data must account separately for each provider, supplier, physician, or other practitioner that would be permitted to bill separately under the original Medicare program, even if they participate jointly in the same service.

(d) *Other data requirements.*

(1) MA organizations must submit data that conform to CMS' requirements for data equivalent to Medicare fee-for-service data, when appropriate, and to all relevant national standards. CMS may specify abbreviated formats for data submission required of MA organizations.

(2) The data must be submitted electronically to the appropriate CMS contractor.

(3) MA organizations must obtain the risk adjustment data required by CMS from the provider, supplier, physician, or other practitioner that furnished the item or service.

4848

42 CFR 422.310 (up to date as of 7/22/2024)
Risk adjustment data.

Case 2:16-cv-08697-FMO-PVC    Document 616-14    Filed 08/06/24    Page 425 of 633
Page ID #:23641

42 CFR 422.310(d)(4)

(4) MA organizations may include in their contracts with providers, suppliers, physicians, and other practitioners, provisions that require submission of complete and accurate risk adjustment data as required by CMS. These provisions may include financial penalties for failure to submit complete data.

(5) For data described in paragraph (d)(1) of this section as data equivalent to Medicare fee-for-service data, which is also known as MA encounter data, MA organizations must submit a NPI in a billing provider field on each MA encounter data record, per CMS guidance.

(e) *Validation of risk adjustment data.* MA organizations and their providers and practitioners are required to submit a sample of medical records for the validation of risk adjustment data, as required by CMS. There may be penalties for submission of false data. MA organizations must remit improper payments based on RADV audits, in a manner specified by CMS. For RADV audits, CMS may extrapolate RADV Contract-Level audit findings for payment year 2018 and subsequent payment years.

(f) *Use and release of data* —

(1) *CMS use of data.* CMS may use the data described in paragraphs (a) through (d) of this section for the following purposes:

(i) To determine the risk adjustment factors used to adjust payments, as required under §§ 422.304(a) and (c);

(ii) To update risk adjustment models;

(iii) To calculate Medicare DSH percentages;

(iv) To conduct quality review and improvement activities;

(v) For Medicare coverage purposes;

(vi) To conduct evaluations and other analysis to support the Medicare and Medicaid programs (including demonstrations) and to support public health initiatives and other health care-related research;

(vii) For activities to support the administration of the Medicare and Medicaid programs;

(viii) For activities conducted to support program integrity; and

(ix) For purposes authorized by other applicable laws.

(2) *CMS release of data.* Regarding data described in paragraphs (a) through (d) of this section, CMS may release the minimum data it determines is necessary for one or more of the purposes listed in paragraph (f)(1) of this section to other HHS agencies, other Federal executive branch agencies, States, and external entities in accordance with the following:

(i) Applicable Federal laws;

(ii) CMS data sharing procedures;

(iii) Subject to the protection of beneficiary identifier elements and beneficiary confidentiality, including—

(A) A prohibition against public disclosure of beneficiary identifying information;

(B) Release of beneficiary identifying information to other HHS agencies, other Federal executive branch agencies, and States only when such information is needed; and

4849

42 CFR 422.310 (up to date as of 7/22/2024)
Risk adjustment data.

Case 2:16-cv-08697-FMO-PVC    Document 616-14    Filed 08/06/24    Page 426 of 633
Page ID #:23642

42 CFR 422.310(f)(2)(iii)(C)

    (C) Release of beneficiary identifying information to external entities only to the extent needed to link datasets.

  (iv) Subject to the aggregation of dollar amounts reported for the associated encounter to protect commercially sensitive data.

  (v) Risk adjustment data other than data described in paragraphs (f)(2)(iii) and (f)(2)(iv) of this section will be released without the redaction or aggregation described in paragraphs (f)(2)(iii) and (f)(2)(iv) of this section, respectively.

(3) Risk adjustment data will not become available for release under this paragraph (f) unless—

  (i) The risk adjustment reconciliation for the applicable payment year has been completed;

  (ii) CMS determines that data release is necessary under paragraph (f)(1)(vi) of this section for emergency preparedness purposes before reconciliation; or

  (iii) CMS determines that extraordinary circumstances exist to release the data before reconciliation.

  (iv) CMS determines that releasing aggregated data before reconciliation is necessary and appropriate to support activities or authorized uses under paragraph (f)(1)(vii) of this section.

  (v) CMS determines that releasing data to State Medicaid agencies before reconciliation for the purpose of coordinating care for dually eligible individuals is necessary and appropriate to support activities or authorized uses under paragraph (f)(1)(vii) of this section.

(g) *Deadlines for submission of risk adjustment data.* Risk adjustment factors for each payment year are based on risk adjustment data submitted for items and services furnished during the 12-month period before the payment year that is specified by CMS. As determined by CMS, this 12-month period may include a 6-month data lag that may be changed or eliminated as appropriate. CMS may adjust these deadlines, as appropriate.

(1) The annual deadline for risk adjustment data submission is the first Friday in September for risk adjustment data reflecting items and services furnished during the 12-month period ending the prior June 30, and the first Friday in March for data reflecting services furnished during the 12-month period ending the prior December 31.

(2) After the payment year is completed, CMS recalculates the risk factors for affected individuals to determine if adjustments to payments are necessary.

  (i) Prior to calculation of final risk factors for a payment year, CMS allows a reconciliation process to account for risk adjustment data submitted after the March deadline until the final risk adjustment data submission deadline in the year following the payment year.

  (ii) After the final risk adjustment data submission deadline, which is a date announced by CMS that is no earlier than January 31 of the year following the payment year, an MA organization can submit data to correct overpayments but cannot submit diagnoses for additional payment.

(3) Submission of corrected risk adjustment data in accordance with overpayments after the final risk adjustment data submission deadline, as described in paragraph (g)(2) of this section, must be made as provided in § 422.326.

**42 CFR 422.310** (up to date as of 7/22/2024)
Risk adjustment data.

Case 2:16-cv-08697-FMO-PVC    Document 616-14    Filed 08/06/24    Page 427 of 633
Page ID #:23643

**42 CFR 422.310(g)(3)**

*[73 FR 48757, Aug. 19, 2008, as amended at 79 FR 29956, May 23, 2014; 79 FR 50358, Aug. 22, 2014; 80 FR 7960, Feb. 12, 2015;
83 FR 16733, Apr. 16, 2018; 88 FR 6665, Feb. 1, 2023; 88 FR 79539, Nov. 16, 2023; 89 FR 30822, Apr. 23, 2024]*

**EXHIBIT P-61**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA ex rel.  ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____  )




Videotaped Deposition of
JEFFERY S. DUMCUM
Given Remotely
Wednesday, July 28, 2021
9:12 a.m. Eastern Time




Reported by:  Cindy A. Hayden, RMR, CRR



Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 205

1          Q.   And the second bullet there says:

2    Goal to launch claims verification process; do you

3    see that?

4          A.   I see it.  I -- I see that.

5          Q.   Is -- is the timing of this consistent

6    with your -- this is a 2010 presentation.  Does

7    that line up with when you were -- you had a goal

8    to launch the claims verification process?

9               MR. ABASCAL:  Object to the

10              characterization as "you."

11              THE WITNESS:  It aligns to the

12              approximate time that there was a goal to

13              launch claims verification.

14    BY MR. MASON:

15         Q.   Okay.  And the second bullet there

16    says:  Compare to codes from claim.

17              And, again, this is in a presentation

18    about chart review.  And it says:  Compare to

19    codes from claim.

20              I'm interested in what that means.  Do

21    you have any understanding of what that means,

22    compare to codes from claim?

23         A.   I don't recall this specific

24    presentation.  I do recall in the claims

25    verification process, that was eventually



Page 206

1   incorporated.

2          Q.   Does -- does that mean -- when it says

3   "Compare to codes from claims," does that mean

4   comparing the codes submitted by a provider --

5   that's what claims is -- to the codes identified

6   by a chart review of -- of that encounter?

7               MR. ABASCAL:  Asked and answered.

8               THE WITNESS:  Yes.

9   BY MR. MASON:

10          Q.   You understood that that was a

11   comparison that -- that UnitedHealth could run?

12          A.   Yes.

13          Q.   That UnitedHealth could identify if

14   there were codes that a provider recorded that a

15   chart review of that same provider encounter did

16   not identify?

17          A.   United could compare data from claims

18   with data from chart review.  So they could

19   identify for a member what codes were submitted in

20   claims and what codes were captured from chart

21   review.  They could not -- it took work to

22   identify if all the information was captured in

23   chart review.  The data comparison was able to be

24   compared.  The completeness of the chart review

25   information had limitations.



Page 207

1          Q.   Okay.  It -- it took work, but that
2     was something that could be done?
3          A.    There was research that could be done.
4     The delta between what was in claims and what was
5     in charts would lack certainty.  So there was
6     research that could be done.  But because of lack
7     of -- their interpretation in the coding process,
8     as one coder viewed something as legible versus
9     another does not, if people code in a medical
10    group setting and you get a chart for one doctor,
11    do you know if you have it for all the doctors,
12    even though it may be from a similar date of
13    service, that they see multiple providers.
14              So the data comparison was easy
15    enough, and we could do research.  But there were
16    always still areas of uncertainty in the
17    completeness of the chart data.
18         Q.   Okay.  And when there was a code that
19    was submitted by a provider that a chart review
20    did not identify, was that sometimes referred to
21    as a discrepant code?
22         A.   I -- I don't recall.
23         Q.   That's not a term you're familiar
24    with, discrepant code?
25         A.   I've heard it.  I'm unsure of the



Page 289

1                    CERTIFICATE OF REPORTER

2

3              I, Cindy A. Hayden, Registered Merit

4    Reporter and Notary Public for the State of North

5    Carolina at Large, do hereby certify that the

6    foregoing transcript is a true, accurate, and

7    complete record.

8              I further certify that I am neither

9    related to nor counsel for any party to the cause

10   pending or interested in the events thereof.

11             Witness my hand, I have hereunto

12   affixed my official seal this 5th day of August,

13   2021 at Charlotte, Cabarrus County, North Carolina.

14

15

16

17

18

19

20

21   _____

              Cindy A. Hayden, RMR, CRR

22            My Commission expires

              April 7, 2022

23

24

25



**EXHIBIT P-62**

Page 1

                    UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF CALIFORNIA
                         WESTERN DIVISION


UNITED STATES OF AMERICA          )
ex rel. BENJAMIN POEHLING,        )
                                  )
              Plaintiff,           )
                                  )
         v.                       )Case No. 16-08697 FMO
                                  )
UNITEDHEALTH GROUP, INC.,         )
et al.,                           )
              Defendants.          )
_____    )


VIDEOTAPED DEPOSITION OF JOHN N. MARTINEZ, taken on
behalf of Relator BEN POEHLING, at 650 Town Center Drive,
20th Floor, Costa Mesa, California 92626, beginning at
9:48 a.m., and ending at 3:55 p.m., on Tuesday,
August 30, 2022, before Marceline F. Noble, RPR, CRR,
Certified Shorthand Reporter No. 3024.




Magna Legal Services
866-624-6221
www.MagnaLS.com

Reported by:
Marceline F. Noble
CSR No. 3024
Job No. 835287



Page  67

1       Q.   Okay.   Why was CV limited to members with

2    exclusive HCCs?

3       A.   I don't know.

4       Q.   Okay.

5       A.   I didn't -- I didn't build that rule.

6       Q.   Do you know who did build that rule?

7       A.   I don't know.   It was a rule that was

8    already there.

9       Q.   Okay.   Did you ever question that rule?

10      A.   Not to my recollection.

11      Q.   Okay.   Why not?

12      A.   It wasn't my role.

13      Q.   Okay.   Whose role would it have been?

14           MR. RYDBERG:   Objection.   Calls for

15    speculation.

16           THE WITNESS:   Yeah.   I would assume my

17    manager's.

18    BY MR. VOLDMAN:

19      Q.   Okay.   The third step is called "system

20    matching."

21           What does that mean?

22      A.   So the system matching is now at the point

23    in claims verification, where a chart is deemed to be

24    eligible because it contains a date of service for

25    the year we're evaluating.   It has one or more



Page 68

1  exclusive HCCs in the claims.

2       And the system matching is the process of

3  taking HCCs from claim and comparing them to the HCCs

4  that were found during the first step -- the chart

5  review process.

6     Q.  Okay.  What were the points of comparison?

7     A.  To the best of my recollection, the points

8  of comparison were -- we did everything at the HCC

9  level.  And the date of service was important.  So

10  we -- we tried to ensure that we wouldn't identify

11  HCCs that could not be validated in the chart.

12       So dates of service were a driver of what

13  was deemed to be CV eligible or continue within the

14  process of CV eligibility.

15     Q.  Okay.  So the date of service had to match

16  between whatever came out of chart review and

17  whatever is in the claims or encounter system?

18     A.  Yes.

19     Q.  Okay.  What would happen if it didn't match,

20  but a member had an exclusive HCC?

21     A.  At a high level, that -- that chart would

22  either not be eligible, or if there were other dates,

23  the HCC would be dispositioned appropriately,

24  depending on what -- where it was found -- or when it

25  was found or when it was incurred.



Page 69

1      Q.   Okay.  Do you know who made the rules for

2  what counts as a match and what doesn't?

3          MR. RYDBERG:  Objection.  Calls for

4  speculation.

5          THE WITNESS:  I don't recall.

6  BY MR. VOLDMAN:

7      Q.   Okay.  Do you know who did the actual coding

8  to match these things together?

9      A.   A technical team.  Developers.

10     Q.   Do you remember any of them by name?

11     A.   No.

12     Q.   Okay.

13     A.   No.

14     Q.   Fair enough.

15     A.   Sorry.

16     Q.   What's the fourth step, CVA coding?

17     A.   Fourth step is now at the point in the

18  evaluation of the -- of that chart.  And where we

19  find -- or we have deemed that a HCC is found in the

20  claim stream.  And, of course, all eligibility rules

21  are -- are -- are applicable.

22          But where we find an HCC that is found in

23  claims, but we did not find that HCC in the coding

24  results, that -- that is part of step 1.

25     Q.   Okay.  And -- and is that determination made



Page 70

1  at the system matching step?

2      A.  I consider it separate.  System matching is

3  simply comparing an HCC from one data stream to the

4  other.

5          CVA coding was now queuing the H- -- that

6  bar code to a coder for review.

7      Q.  Okay.  So only -- only instances without a

8  perfect match, went to CVA coding; is that correct?

9          MR. RYDBERG:  Objection.  Vague.

10          THE WITNESS:  There are other reasons why

11  HCCs would go to coding.

12          But at a high level, if it matched, it would

13  not go to coding.

14  BY MR. VOLDMAN:

15      Q.  Okay.  What were the other reasons you just

16  referenced?

17      A.  Well, HCCs have a hierarchy.  So if the

18  hierarchy -- and I'm going to try to go really slow

19  here, 'cause this is very confusing.

20          But if the hierarchy was higher in claim,

21  but it was lower in chart, we would still route it

22  for a coder to review.

23      Q.  Okay.  Why is that?

24      A.  We wanted to be accurate in ensuring that

25  the member truly had the condition, according to the



Page 83

1   BY MR. VOLDMAN:

2      Q.  Okay.  Is HCC 96 something that was not

3   found by a CV analyst but submitted by a provider,

4   based on your understanding of how CV worked?

5           MR. RYDBERG:  Object to form.

6   Mischaracterizes the document.

7           THE WITNESS:  So in this slide, this is

8   referring to the system matching process.

9   BY MR. VOLDMAN:

10     Q.  Okay.

11     A.  And so it depends on where you are in the

12  process.

13          But this slide HCC 96 would be marked --

14  marked as a discrepancy.

15     Q.  Okay.  And is "potential delete" just

16  another word for discrepancy?

17          MR. RYDBERG:  Objection.  Calls for

18  speculation.

19          THE WITNESS:  I believe so.

20  BY MR. VOLDMAN:

21     Q.  Okay.  And do you know what converts

22  potential deletes into deletes?

23          MR. RYDBERG:  Objection.  Vague.

24          THE WITNESS:  Yeah, I think I do.

25  ///



Page 84

```
 1  BY MR. VOLDMAN:
 2      Q.  What is it?
 3      A.  The following processes of claims
 4  verification.  They're sent -- they're sent to a
 5  coder for review.
 6      Q.  Okay.  Got it.
 7          And if the coder doesn't find support, and
 8  then the next coder doesn't find support, it gets
 9  sent to the delete team; is that right?
10      A.  It's dispositioned as a delete.
11      Q.  Okay.  Thanks.
12          Did you use the phrase "risk mitigation"
13  when working in CV?
14      A.  I don't recall.
15      Q.  Got it.
16          Did you ever talk about risks of not doing
17  CV?
18          MR. RYDBERG:  Object to form.
19          THE WITNESS:  Not to my recollection.
20  BY MR. VOLDMAN:
21      Q.  Okay.  Did CV generally cost clients that
22  were using it, money?
23          MR. RYDBERG:  Object to form.  Lacks
24  foundation.
25          THE WITNESS:  We offered it as a service
```



Page 234

1

2                    REPORTER'S CERTIFICATION

3

4        I, Marceline F. Noble, a Certified Shorthand

5   Reporter in and for the State of California, do hereby

6   certify:

7

8        That the foregoing witness was by me duly sworn;

9   that the deposition was then taken before me at the time

10   and place herein set forth; that the testimony and

11   proceedings were reported stenographically by me and

12   later transcribed into typewriting under my direction;

13   that the foregoing is a true record of the testimony and

14   proceedings taken at that time.

15

16        IN WITNESS WHEREOF, I have subscribed my name this

17   5th day of September, 2022.

18

19

20        _____ *Marceline F. Noble*

21            Marceline F. Noble, CSR No. 3024

22

23

24

25



**EXHIBIT P-63**

# Optum Medicare Risk Adjustment Operations

| **Policy Name:** Chart Review Services for Medicare Advantage Plan Clients | **Issue Date:** 6/30/2014 | **Pages:** 5 |
|---|---|---|

| Approvals | | | |
|---|---|---|---|
| **Approved By:** | | | **Status** **Date:** |
| Dave Thomas | Optum Legal | 5/26/2015 | Approved 6/9/2015 |
| Name | Title | Date | Effective 6/9/2015 |
| | | | Retired NA |
| **Approved By:** | | | **Applicable To:** |
| Sean Heath | Dir Compliance | 5/26/2015 | ☒ Chart Review Services |
| Name | Title | Date | |
| **Approved By:** | | | |
| Tim Trujillo | VP Risk Adjustment | 6/9/2015 | |
| Name | Title | Date | |

## PURPOSE

Optum Medicare Advantage Risk Adjustment Operations provides Chart Review services to Medicare Advantage Organizations (MAO) Clients that support risk adjustment submissions in accordance with CMS risk adjustment regulations, the Medicare Managed Care Manual and the CMS Risk Adjustment Participant Guide. This policy addresses standards for the review of medical record documentation that supports the diagnoses submitted to CMS for Medicare program risk adjustment.

## SCOPE

This policy addresses Optum Medicare Advantage Risk Adjustment Operations Chart Review services.

## DEFINITIONS

| TERM | DESCRIPTION |
|---|---|
| **Hierarchical Condition Category (HCC)** | HCC is a disease group broadly organized into body systems. The HCC assigned to a disease group is determined by the ICD-CM diagnosis code. |
| **MAO Client** | Medicare Advantage Organization that holds a Medicare Advantage contract. |
| **PCP** | Primary Care Physician |

---

1

Confidential property of Optum. Do not distribute or reproduce without express permission from O

**EXHIBIT**

**00265-1**

4868

**POLICY**

Where Optum Medicare Advantage Risk Adjustment Operations performs Chart Review services on behalf of its MAO Clients, it will do so in accordance with CMS standards. Optum Medicare Advantage Risk Adjustment Operations will abide by instructions in the applicable Medicare regulations, CMS Risk Adjustment Participant Guides and Medicare Managed Care Manual, CH. 7 addressing medical record documentation sources and content, coding review, coding standards and quality activities.

**CHART REVIEW SERVICES**

Chart Review services, which will be conducted if and as specified in the contract with the Client, include a number of programs that are designed to collect, assess and evaluate documentation that supports health plan risk adjustment submissions. Chart Review services are designed to review individual medical records to identify and capture risk adjusted member diagnoses and chronic conditions based on review of the member's medical record. Chart Review services include:

**A. Standard Chart Review :**

The standard chart review includes retrieval, review, coding and confirming signature and credential requirements of the medical record to capture the risk adjusted diagnosis information from the member's medical record documentation for a specific date of service or timeframe.

**B. Attestations:**

An optional Medicare risk adjustment chart review service a client may select to retrieve attestations from providers. Attestations capture a providers signature or credentials when absent from the chart documentation. The provider states in writing that the pre-exisitng medical record accurately reflects the care of a member in a given encounter.

Optum Medicare Advantage Risk Adjustment Chart Review Operations Team will follow Optum coding guidelines for Risk Adjustment submissions when reviewing medical record documentation as outlined in the Retrospective Services Standards section of this policy.

**1. Standards for Reviewing Medical Records for Chart Review Services:**

Optum Medicare Advantage Risk Adjustment Operations has developed standards for reviewing medical records based on CMS risk adjustment instructions. These standards include:

**A.** The diagnosis must be coded in accordance with the ICD-CM Coding Guidelines as mandated by CMS and Optum coding guidelines;

---

2

Confidential property of Optum.  Do not distribute or reproduce without express permission from Optum

4869

CONFIDENTIAL

MAPL000814083

B. The medical record documentation meets the CMS medical records guidelines and includes the following risk adjustment information:

- The service was provided by an acceptable risk adjustment provider and physician type.
- Dates of service are within the data collection period.
- Diagnoses are supported by medical record documentation.
- A provider signature and credentials are documented for each note.
  - Client may exercise discretion, consistent with CMS guidance on attestation, as to how to address records that have not yet been fully authenticated by the treating practitioner at the time of chart review.
- Coding level specificity – 3-5 digit codes

## 2. Coding Review Requirements:

To meet this standard, Optum Medicare Advantage Risk Adjustment Operations has developed requirements for coding reviews based on the Medicare Advantage regulations, the Medicare Managed Care Manual and CMS Risk Adjustment Participant Guide. These requirements include:

A. Optum Medicare Advantage Risk Adjustment Operations will utilize certified medical coders.

B. The certified coders will use ICD-CM Diagnosis Codes Guidelines as mandated by CMS, Optum coding guidelines, and Coding Clinics published by American Hospital Association (AHA), and comply with Optum Medicare Advantage Diagnostic Coding Standards and any other applicable Optum Coding Compliance Policies when evaluating assigned medical charts.

C. Certified coders will review medical records to identify risk adjusting conditions supported in the medical record documentation.   When performing chart reviews, the certified coders will apply CMS standards for Medicare Risk Adjustment submissions as detailed above.

D. Optum Medicare Advantage Risk Adjustment Operations will document and implement a procedure for receipt, research and response to coding questions from internal coders or its vendors.

E. Optum Medicare Advantage Risk Adjustment Operations will provide training to its internal coding staff that specifically addresses the above standards.  This training will be conducted for all new coding staff before they begin coding charts and on-going thereafter for all coding staff.

F. Optum Medicare Advantage Risk Adjustment Operations will conduct coding accuracy reviews of its internal coding staff to validate that data is coded correctly and meets CMS standards

---

Confidential property of Optum.  Do not distribute or reproduce without express permission from Optum

4870

CONFIDENTIAL

MAPL000814084

3. **Chart Review Vendor Engagement and Oversight**

Optum Medicare Advantage Risk Adjustment Operations will conduct reasonable due diligence on potential vendors that conduct chart reviews and may engage vendors to conduct chart reviews pursuant to a written agreement that meets business, legal and regulatory requirements.  Optum Medicare Advantage Risk Adjustment Operations will follow appropriate procurement processes when engaging chart review vendors.  When Optum Medicare Advantage Risk Adjustment Operations engages a vendor to conduct chart reviews, Optum Medicare Advantage Risk Adjustment Operations will follow the following standards:

A. **Contract Standards:**

The terms of a vendor agreement with Optum Medicare Advantage Risk Adjustment Operations will include: the specific retrospective program activities, measurement or performance standards, if applicable, auditing and monitoring rights and payment terms. The vendor agreement will also include a Business Associate Agreement (BAA) or other appropriate terms that describe the permitted and required uses of protected health information.

B. **Coding Standards:**

See coding standards guidelines from Section 1 Standards for Reviewing Medical Records.

4. **Vendor Oversight:**

Optum Medicare Advantage Risk Adjustment Operations will design and execute appropriate coding reviews for its external vendors as part of its overall quality review program.  Optum Medicare Advantage Risk Adjustment Operations will establish performance measurements, corrective action and disciplinary action guidelines for vendors that do not meet the quality review standards.

5. **Provider Communications Standards**

Optum Medicare Advantage Risk Adjustment Operations will obtain prior review as required by Optum Legal and Compliance and prior approval from the Client for all provider correspondence related to the chart review process.

6. **Privacy Standards**

Optum Medicare Advantage Risk Adjustment Operations will only receive, use and disclose Protected Health Information pursuant to the Optum privacy and security standards, including the use of secure transmission methods.

---

Confidential property of Optum.  Do not distribute or reproduce without express permission from Optum

4871

CONFIDENTIAL                                                                MAPL000814085

## 7. Standards Management

The Director of Chart Review Programs is responsible for collaborating with Optum Compliance to identify changes to the standards for all risk adjustment data collection and submission and ensuring implementation of any new requirements.

- The policy will be reviewed for updates periodically or when changes are indicated by CMS.
- All policy changes will be approved by the policy owner, Compliance and Legal.

Version control will apply to all policies.

## CHANGE CONTROL LOG

| Date | Brief Description of Change | Author | Approver(s) |
|------|----------------------------|--------|-------------|
| 6/30/2014 | Create new document | Baker | Thomas, Pettersen-Scott, Trujillo and Fabrizio |
| 5/20/2015 | 2015 review and updates. | Baker | Thomas, Heath, Trujillo |

Confidential property of Optum.  Do not distribute or reproduce without express permission from Optum

4872

CONFIDENTIAL                                                                 MAPL000814086

**EXHIBIT P-64**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )

Videotaped Deposition of

STEPHANIE DAWN GARDNER

Given Remotely

Wednesday, June 30, 2021

9:04 a.m. Eastern Time

Reported by:  Karen K. Kidwell, RMR, CRR

Magna Legal Services
866-624-6221
www.MagnaLS.com



4874

Page 149

1   deletes being discussed earlier in the e-mail chain?

2        A.   I don't recall, but I have no reason to

3   doubt that.

4        Q.   Okay.  Your full sentence reads:  "I would

5   advise continuing with them because if we know data

6   was incorrectly submitted, we have an obligation to

7   notify CMS and they have the right to retro adjust

8   pay."  Did you believe this when you wrote it?

9        A.   I don't recall.

10       Q.   Okay.  Do you have any reason to doubt

11  that you believed this when you wrote it?

12       A.   I -- I don't recall.  I have -- I have no

13  reason to doubt what I wrote.

14       Q.   Okay.  Did you believe, during the period

15  that you worked at United, that if data was

16  incorrectly submitted, you had an obligation to

17  notify CMS?

18       A.   My understanding was that if we were aware

19  that a -- a condition was not -- incorrectly

20  submitted, as in not supported by the medical record

21  documentation, then that we should proceed with

22  deleting it.

23       Q.   What was this belief based on?

24       A.   I don't recall specifically.

25       Q.   Was this belief based on discussions you



Page 228

1                         CERTIFICATE

2

3          I, KAREN K. KIDWELL, Registered Merit Reporter,

4     and Certified Realtime Reporter, do hereby certify

5     that prior to the commencement of the examination,

6     STEPHANIE GARDNER was duly remotely sworn by me to

7     testify to the truth, the whole truth and nothing but

8     the truth.

9          I DO FURTHER CERTIFY that the foregoing is a

10    verbatim transcript of the testimony as taken

11    stenographically by me at the time, place and on the

12    date hereinbefore set forth, to the best of my

13    ability.

14         I DO FURTHER CERTIFY that I am neither a

15    relative nor employee nor attorney nor counsel of any

16    of the parties to this action, and that I am neither

17    a relative nor employee of such attorney or counsel,

18    and that I am not financially interested in this

19    action.

20

21
                                 _____
22                               Karen K. Kidwell
                                 Registered Merit Reporter
23                               Certified Realtime Reporter
                                 Notary Public
24                               Dated:  July 13, 2021

25



**EXHIBIT P-65**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA ex

rel. BENJAMIN POEHLING,

    Plaintiffs,

vs.                          No. CV 16-08697 FMO

UNITEDHEALTH GROUP, INC., et al,

    Defendants.

_____/




REMOTE VIDEOCONFERENCE DEPOSITION OF

KIMBERLY HALVA

February 24, 2022




Reported by:

Anne E. Vosburgh, CSR-6804, RPR, CRR

Job No. 792083



4878

Page 309

```
 1                          K. Halva
 2          A.   I don't understand the "but" -- "but
 3     did not find" --
 4               I'm just not clear on what I'm
 5     trying to answer.  Could you rephrase it?
 6     BY MS. LIKOFF:
 7          Q.   Sure.  Give me just one minute.
 8               All right.  If M&R opened a given
 9     medical record to look for all diagnosis codes
10     that were supported by documentation in that
11     record, but did not find documentation to
12     support a diagnosis that had been previously
13     submitted --
14          A.   Okay.
15          Q.   -- do you believe that M&R had an
16     obligation to delete that code?
17               MR. SCHINDLER:  Same objection.
18               Vague and ambiguous as framed.  Calls for
19               a legal conclusion as well.
20          A.   My general thought is if the
21     circumstances were correct, yes.  I mean, as
22     we discussed before, there's potentially some
23     one-offs that wouldn't require the deletion of
24     that code.  But, in general, yes, I believe it
25     should be deleted.
```



Page 318

1                        K. Halva

2                  C E R T I F I C A T E

3

4        I, ANNE E. VOSBURGH, Certified Shorthand

5   Reporter, Registered Professional Reporter,

6   Certified Realtime Reporter, and Closed

7   Captioner, hereby certify:

8        That KIMBERLY HALVA, via remote

9   videoconference, solemnly affirmed and agreed to

10  testify to the truth, the whole truth and

11  nothing but the truth; that all counsel

12  stipulated to this process, notwithstanding the

13  location of reporter or witness at time of

14  deposition; and that this transcript is a true

15  and correct record of testimony given.

16        I further certify that I am not related

17  to any of the parties to this action and that I

18  am in no way interested in the outcome of this

19  matter.

20

21  _____

22        ANNE E. VOSBURGH

23        Certified Shorthand Reporter No. 6804

24        Registered Professional Reporter

25        Certified Realtime Reporter



4880

**EXHIBIT P-66**

Message

| | |
|---|---|
| **From:** | Cavanaugh, Sean (CMS/CM) [/O=HHS EES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SEAN.CAVANAUGH.CMS] |
| **Sent:** | 6/26/2015 5:18:53 PM |
| **To:** | Rice, Cheri M. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=cheri.rice.cms59728027]; Tudor, Cynthia G. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=cynthia.tudor.cms06246732]; Harlow, Jennifer A. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=jennifer.harlow.cms20728073] |
| **Subject:** | Re: 2013 CMS RAF Attestation |

I disagree that we stated the last part of this sentence beginning "...and that MA plans..."

"During our conversations last year before the proposed rule was withdrawn, CMS confirmed to us that the proposed requirements would not apply until the effective date of the rule, and that MA plans were thus not required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses."

**From:** Rice, Cheri M. (CMS/CM)
**Sent:** Friday, June 26, 2015 12:49 PM
**To:** Tudor, Cynthia G. (CMS/CM); Cavanaugh, Sean (CMS/CM); Harlow, Jennifer A. (CMS/CM)
**Subject:** Fw: 2013 CMS RAF Attestation

--------------------------
Sent from my BlackBerry Wireless Device

**From:** Nelson, Steve H [mailto:steve_nelson@uhc.com]
**Sent:** Friday, June 26, 2015 12:41 PM
**To:** Rice, Cheri M. (CMS/CM)
**Subject:** 2013 CMS RAF Attestation

Cheri,

Similar to last year, we are reaching out to you, to reiterate our approach to the electronic annual risk adjustment certifications. As you know, annual risk adjustment data certifications before 2014 were submitted on paper, enabling companies to add notes explaining their understanding of these certifications (including any remediation efforts). As we discussed with you last year, because the certifications are now electronic, companies are unable to include explanatory notes. As such, we informed you in writing our understanding of these certifications.

Because the certifications remain electronic with no ability to add explanatory notes, we feel it would again be helpful, and appropriate, to capture our discussion and understanding regarding the certifications.

- As with our past certifications, the 2013 certifications are based on facts reasonably available or made available to us as of the date of the certifications. As we receive additional information, we may be required to modify the data to which the certifications relate
- The certifications use the phrase "best knowledge, information, and belief," which is based on our ordinary business practices.

**4882**

USBP000619443

- The certifications only cover risk adjustment data for 2013 dates of service that were submitted to CMS and not subsequently deleted prior to the date of the certifications.

- As we have mentioned to you previously, we are engaged in an ongoing review of our risk adjustment processes and submission system. This review has identified areas for improvement and, as a result, we will be deleting all risk adjustment data for 2013 dates of service that we ultimately determine should be deleted consistent with this email.

- CMS issued a proposed rule last year that would have required MA plans to design any medical record reviews to determine the accuracy of risk adjustment diagnoses associated with those records. In May 2014, CMS withdrew the proposed rule. During our conversations last year before the proposed rule was withdrawn, CMS confirmed to us that the proposed requirements would not apply until the effective date of the rule, and that MA plans were thus not required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses. As we discussed last year, we previously had a process through which we reviewed certain medical records to determine the accuracy of risk adjustment diagnoses and submitted appropriate deletes. Based on our conversations with CMS last year, CMS's withdrawal of the proposed rule, and CMS's ongoing consideration of a FFS Adjuster to address diagnoses not supported by a medical record in the context of RADV, we ended this process and informed you of that decision. That decision remains operative for 2013 dates of service. In particular, we did not use our previous process to determine whether diagnosis codes submitted through claims are unsupported in the medical record. We do have a quality assurance process that deletes codes initially identified during chart review and that are later determined to be unsupported.

The certifications we submit this year are made subject to these clarifications. Please let me know if you have any questions. As always, we appreciate your time and attention on this matter.

Steve Nelson
Chief Executive Officer
UnitedHealthcare Medicare & Retirement

This e-mail, including attachments, may include confidential and/or proprietary information, and may be used only by the person or entity to which it is addressed. If the reader of this e-mail is not the intended recipient or his or her authorized agent, the reader is hereby notified that any dissemination, distribution or copying of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender by replying to this message and delete this e-mail immediately.

4883

**EXHIBIT P-67**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA,     )
ex rel., BENJAMIN POEHLING,   )
                              )
          Plaintiffs,         )
                              ) Civil Action No.
vs.                           )
                              ) 16-08697 FMO
UNITEDHEALTH GROUP, INC.,     )
et al.,                       )
                              )
          Defendants.         )
_____)


* * * * * *
HIGHLY CONFIDENTIAL
* * OUTSIDE COUNSELS' EYES ONLY * *
* * * * * *


VIDEOTAPED DEPOSITION OF
JULIA M. LAMBERT, FSS, MAAA
Friday, April 5, 2024; 9:11 a.m. CDT


Reported by:  Cindy L. Sebo, RMR, CRR, CLR, RPR,
CCR, CSR, RSA, CA CSR 14409, NJ Certified CR
30XI0024460, NJ Certified RT 30XR00019500, NM CSR
589, NY Realtime Court Reporter, NY Association
Certified Reporter, OR CSR 230105, TN CSR 998, TX
CSR 12778, WA CSR 23005926, Notary Public
Job No. 1101160



4885

Page 181

1    other reason, the average of the relative values

2    go up.

3              I don't know what "definitionally"

4    means, but in general, that is the result when

5    you take out markers.

6         Q.    Okay.  Fair enough.

7              I think "definitionally," I

8    mean categorically, that it doesn't matter

9    whether the error rate is 1 percent or

10   99 percent, the average relative factor

11   increases if you take out markers from this

12   calibration?

13        A.    Yes, that is what the proof shows.

14        Q.    Okay.  So then if you recalibrated

15   the model using both unsupported codes and

16   unsubmitted codes, doesn't that connection

17   between -- can I call it "directionality"?

18              It doesn't definitely go up

19   anymore; is that -- is that right?

20        A.    That would be something different,

21   not addressed by my proof, for sure.

22        Q.    Sure.  But if you take out markers

23   and add in markers, it's no longer necessarily

24   true that the relative factors would increase;



Page 182

1    is that --

2            A.      That's correct.

3            Q.      -- correct?

4                    Yeah.  Because they would net

5    out and there's a chance that more markers end

6    up, or different, higher value markers; is that

7    correct?

8            A.      I didn't perform that study, but

9    adding markers has the opposite effect as

10   removing markers --

11           Q.      And --

12           A.      -- at that --

13           Q.      Sorry.

14                   Are you finished?

15           A.      Yes.

16           Q.      And recalibrating with both adding

17   and removing markers, it -- the average can go

18   up, the average can go down, or the average can

19   stay the same; is that correct?

20           A.      As a matter of math, yes.  It

21   depends on how many markers you add and how many

22   markers you take out.

23           Q.      Yep.  Totally agree with you there.

24                   Okay.  So that being said, is



Page 291

1       I, Cindy L. Sebo, Nationally Certified Court

2   Reporter herein, do hereby certify that the

3   foregoing deposition of JULIA M. LAMBERT, FSS, MAAA

4   was taken before me pursuant to notice at the time

5   and place indicated; that said witness duly swore to

6   tell the truth, the whole truth, and nothing but the

7   truth under penalties of perjury; that said

8   testimony of witness was correctly recorded to the

9   best of my abilities in machine shorthand,

10  thereafter transcribed under my supervision with

11  computer-aided transcription; that deposition is a

12  true and accurate record of the testimony given by

13  the witness; that I am neither counsel, nor kin to

14  any party in said action, nor interested in the

15  outcome; and that a copy of this transcript obtained

16  from a source other than the court reporting firm,

17  including an adversary or co-counsel in the matter,

18  is uncertified and may not be used at trial.

19  _____
    CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR, RSA,

20  CA CSR 14409, NJ Certified CR 30XI0024460,
    NJ Certified RT 30XR00019500, NM CSR 589,

21  NY Realtime Court Reporter, NY Association Certified
    Reporter, OR CSR 230105, TN CSR 998,

22  TX CSR 12778, WA CSR 23005926, Notary Public

23

24



**EXHIBIT P-68**



*Transforming*
*Collaborating*
*Communicating*

**CMS**
CENTERS FOR MEDICARE & MEDICAID SERVICES

# Medicare Advantage & Prescription Drug Plan

**FALL CONFERENCE & WEBCAST**

# CONFERENCE GUIDE

**September 7, 2017 • 9:30 am – 4:30 pm EDT**
**CMS Grand Auditorium**

4890

# Speaker Bios, cont.

appeals operations for the FFS, MA, and Part D Qualified Independent Contractors, the appeals units of the Medicare administrative contractors, and CMS' Beneficiary Notice Initiative, which includes provider-issued notices such as the Important Message from Medicare, the Advance Beneficiary Notices of Noncoverage, and the Medicare Outpatient Observation Notice.

Mike previously worked on program integrity issues, including overseeing the implementation of several new program safeguard contractors. He began his federal career in budget formulation, where his main area of concentration was the Medicare managed care program. Mike has been at CMS for 20 years and holds a BS.

### Judy Geisler
*BA, BS, Deputy Director, Medicare Parts C and D Oversight and Enforcement Group, Center for Medicare, CMS*

Judy is currently the Deputy Director of the Medicare Parts C and D Oversight and Enforcement Group (MOEG). Prior to joining MOEG she served briefly as the Acting Deputy Director of the Medicare Enrollment and Appeals Group and the Medicare Drug Benefit and C & D Data Group and spent 10 years as the Director



of the Division of Formulary and Benefit Operations in the Medicare Drug Benefit and C & D Data Group.

### Staci Paige
*MA, Social Science Research Analyst, Division of Appeals Policy, Medicare Enrollment and Appeals Group, Center for Medicare, CMS*

Staci Paige is a Social Science Research Analyst in the Division of Appeals Policy (DAP), Medicare Enrollment and Appeals Group (MEAG). As a Medicare Advantage appeals and grievances subject matter expert, Staci works on regulations, beneficiary notices and manual guidance. She also works closely with the Medicare-Medicaid Coordination Office on appeals and grievance issues related to Medicare-Medicaid Plans (MMPs). Prior to working at CMS, Staci directed admissions at a skilled nursing facility and also has a background in community case management and care coordination.

### Rebecca Paul
*MPH, MA, Director, Division of Payment Policy, Medicare Plan Payment Group, Center for Medicare, CMS*

Rebecca Paul currently serves as the Director of the Division of Payment Policy (DPP) in the Medicare Plan Payment Group (MPPG) in the Center for Medicare (CM). Since joining CMS in 2005, Rebecca has worked on a variety of Medicare payment issues and policies.

### Christine Reinhard
*BA, MBA, JD, Technical Advisor, Medicare Drug and Health Plan Contract Administration Group, Center for Medicare, CMS*

Christine has been with CMS since 1995, working in managed care since 1998. Her previous work has focused on many aspects of the Part C and Part D programs including bid submissions, plan benefits, auditing, enforcement actions,

and financial analysis of contractors. She is currently a Technical Advisor for the Division of Surveillance, Compliance, and Marketing.

### John Scott
*JD, Senior Advisor, Medicare Drug Benefit and C and D Data Group, Center for Medicare, CMS*

John Scott has been employed by CMS since 2003, and has worked extensively on the Medicare Part C and Part D Programs since coming to CMS. John has been on detail in the Medicare Drug Benefit and C and D Data Group since January 2017. John previously worked in the Medicare Parts C and D Oversight and Enforcement Group (MOEG) as the Director of the Division of Compliance Enforcement. Prior to joining MOEG in April 2016, John worked in the Medicare Plan Payment Group (MPPG) as the Director of the Division of Payment Systems, Director of the Division of Payment Operations, and Special Assistant to the Director of MPPG. John's first position at CMS was in the Medicare Enrollment and Appeals Group's Division of Appeals Policy. John holds a BA from Ripon College and a JD from North Carolina Central University.

### Scott Sturiale
*Deputy Director, Medicare Drug and Health Plan Contract Administration Group, Center for Medicare, CMS*

Scott is the Deputy Director for the Medicare Drug and Health Plan Contract Administration Group (MCAG) in the Center for Medicare, providing leadership and he is director over the development of new policies to reflect changes in program objectives, the health care delivery system, beneficiary health care needs, and new plan types to support an appropriate range of choices for beneficiaries.

**EXHIBIT P-69**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA            )
ex rel. BENJAMIN POEHLING,          )
                                    )
            Plaintiff,              )
                                    )
      v.                            )Case No. CV 16-08697 FMO
                                    )
UNITEDHEALTH GROUP, INC.,           )
et al.,                             )
            Defendants.             )
_____     )


VIDEOTAPED DEPOSITION OF JIMMY ARTHUR HIGGINS, taken on
behalf of Plaintiff, UNITED STATES OF AMERICA, at
650 Town Center Drive, Costa Mesa, California 92626,
beginning at 9:16 a.m., and ending at 5:42 p.m., on
Tuesday, May 3, 2022, before Marceline F. Noble, RPR,
CRR, Certified Shorthand Reporter No. 3024.




Magna Legal Services
866-624-6221
www.MagnaLS.com

Reported by:
Marceline F. Noble
CSR No. 3024
Job No. 821137



4893

Page 116

1    of what the word "accurate" means --

2            MS. DO:  Object --

3    BY MS. GLOVER:

4        Q.  -- in -- in that attestation?

5            MS. DO:  Objection.  Calls for a legal

6    conclusion.

7            THE WITNESS:  My idea of "accurate," you

8    know -- it represents things that really happened.

9    BY MS. GLOVER:

10        Q.  Understood.

11            So if a -- if -- if a provider is submitting

12    a diagnosis code, your understanding of accurate is

13    that that diagnose code is, in fact, supported by

14    medical record documentation that the provider has;

15    is that correct?

16            MS. DO:  Objection.  Hypothetical.  And

17    mischaracterizes prior testimony.

18            THE WITNESS:  Yeah.  Our basic mantra was,

19    if it wasn't in the medical record, it didn't happen.

20    BY MS. GLOVER:

21        Q.  Understood.  Understood.

22            And -- and was that a mantra that was

23    repeated to providers in provider education sessions,

24    that you and Ms. -- Ms. Leal and Ms. Holt held with

25    certain providers?



Page 282

1          MS. DO:  Okay.  Preferably, just keep

2     looking at the camera so Madam Court Reporter can

3     hear you.

4          THE WITNESS:  Okay.

5          MS. DO:  That's kind of awkward.  Do you

6     mind if I switch with you?

7          MS. GLOVER:  I -- I do not.

8          Why don't we go off the record.

9          THE VIDEOGRAPHER:  We're now off record.

10         The time is 5:16 p.m.

11         (Off record.)

12         THE VIDEOGRAPHER:  Stand by, please.

13         We are now on the record.

14         The time is 5:19 p.m.

15

16                    EXAMINATION

17    BY MS. DO:

18      Q.  All right, Mr. Higgins.  I just have a few

19    questions, and then hopefully we'll get out of here.

20         Can you remind me, when did you leave

21    United?

22      A.  The end of August 2007.

23      Q.  And after your departure from United, did

24    you ever return --

25      A.  No.



Page 298

1

2                    REPORTER'S CERTIFICATION

3

4        I, MARCELINE F. NOBLE, a Certified Shorthand

5   Reporter in and for the State of California, do hereby

6   certify:

7

8        That the foregoing witness was by me duly sworn;

9   that the deposition was then taken before me at the time

10  and place herein set forth; that the testimony and

11  proceedings were reported stenographically by me and

12  later transcribed into typewriting under my direction;

13  that the foregoing is a true record of the testimony and

14  proceedings taken at that time.

15

16       IN WITNESS WHEREOF, I have subscribed my name this

17  12th day of May, 2022.

18

19

20  _____
                                   *Marceline F. Noble*

21       MARCELINE F. NOBLE, CSR No. 3024

22

23

24

25



4896

**EXHIBIT P-70**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )


CONFIDENTIAL

CONTAINS ATTORNEYS' EYES ONLY PORTIONS

(See Note on Index Page)


Videotaped Deposition of

REBECCA PAUL

Given Remotely

Wednesday, April 13, 2022

9:02 a.m. Eastern Time



Reported by:  Karen K. Kidwell, RMR, CRR


Magna Legal Services
866-624-6221
www.MagnaLS.com



4898

Page 181

1        this piece fit with that, with seeing this went

2        to RADV, so it also went to CPI.

3    BY MR. QURESHI:

4        Q.   Ms. Paul, you -- you referenced

5    discussions with CPI about taking on the role of

6    conducting RADV audits.  Who had those discussions?

7             MR. MASON:  Objection to form.

8             THE WITNESS:  I don't know.  I don't know

9        if Cheri was involved in them or if it was

10        people above her.

11    BY MR. QURESHI:

12        Q.   Who told you --

13        A.   It was not me.  I was not involved with

14    them.

15        Q.   Who told you that CPI would be taking over

16    the project that you described as modeling changes in

17    the risk adjustment model?

18             MR. MASON:  Objection.  Misstates prior

19        testimony.

20             THE WITNESS:  I don't remember.  Probably

21        Cheri.  I -- it wasn't -- I don't remember.

22    BY MR. QURESHI:

23        Q.   And do you recall why CPI was taking it

24    over, according to Ms. Rice?

25             MR. MASON:  Objection.  Asked and



Page 182

 1      answered.

 2           THE WITNESS:  I'm assuming it's Cheri

 3      because I don't know who else would have told

 4      me, but I don't know.  I mean, it came up in

 5      conversation or -- you know, someone would have

 6      told me -- not conversational.  It would have

 7      been updates.

 8           I -- I don't know why.  I mean, like I

 9      said, the context was that this was part of

10      RADV, and CPI already had RADV, so that, you

11      know, would be seen as linking it.  But I

12      don't -- I don't know that it was a big formal

13      announcement.

14  BY MR. QURESHI:

15      Q.   Do you recall who at CPI would take over

16  responsibility for the task Ms. Rice previously asked

17  you to perform?

18           MR. MASON:  Objection.  Misstates

19      testimony.

20           THE WITNESS:  I mean, I know who worked on

21      it.  I don't think that was part of the -- I

22      don't remember how we discussed it.  I -- I

23      can't recall the conversation or -- or how the

24      conversation went.  But I only know who ended up

25      working on it.  I don't know if that was part of



Page 250

```
 1        identified, and understand them.
 2   BY MR. QURESHI:
 3        Q.   Ms. Paul, did you ever ask Ms. Cheri Rice
 4   why CPI was given responsibility to calculate the
 5   methodology for the fee-for-service adjuster?
 6             MR. MASON:  Objection to form.  Confusing.
 7        Misstates prior testimony.
 8             THE WITNESS:  I don't know if I asked her
 9        or not.  I mean, the impression I have today is
10        that it was a RADV side issue that went with it.
11   BY MR. QURESHI:
12        Q.   What is that impression based on?
13        A.   Well, it was a RADV-related effort, and
14   that RADV had gone to CPI.  I don't recall discussing
15   with her.
16        Q.   But while the division --
17        A.   (Simultaneous speaking.)
18        Q.   I'm sorry.  Were you finished?
19        A.   Yeah, I just meant, the negotiations and
20   discussions about what went over there, I -- I was
21   not involved with them.
22        Q.   And while you were in the Division of
23   Payment Policy, you weren't working on RADV, were
24   you?
25        A.   I did not work on RADV.
```



4901

```
 1                          CERTIFICATE

 2

 3          I, KAREN K. KIDWELL, Registered Merit Reporter,

 4     and Certified Realtime Reporter, do hereby certify

 5     that prior to the commencement of the examination,

 6     the deponent was remotely sworn to testify to the

 7     truth, the whole truth under penalty of perjury.

 8          I DO FURTHER CERTIFY that the foregoing is a

 9     verbatim transcript of the testimony as taken

10     stenographically by me at the time, place and on the

11     date hereinbefore set forth, to the best of my

12     ability.

13          I DO FURTHER CERTIFY that I am neither a

14     relative nor employee nor attorney nor counsel of any

15     of the parties to this action, and that I am neither

16     a relative nor employee of such attorney or counsel,

17     and that I am not financially interested in this

18     action.

19

20                         Karen K. Kidwell
                           _____
21                         Karen K. Kidwell
                           Registered Merit Reporter
22                         Certified Realtime Reporter
                           Notary Public
23

24

25
```



**EXHIBIT P-71**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                 )
                                   )
          Plaintiffs,              )
                                   )
v.                                 )
                                   )
UNITEDHEALTH GROUP, INC., et al., )
                                   )
          Defendants.              )
_____ )


Videotaped Deposition of

JON HARVEY BIRD

Given Remotely

Wednesday, August 10, 2022


Reported by:  Karen K. Kidwell, RMR, CRR

Magna Legal Services
866-624-6221
www.MagnaLS.com



4904

Page 230

1          A.    Typically we would target certain medical

2     records for retrieval.  You know, once those medical

3     records are retrieved, they would be reviewed by

4     certified coders.  There would be QA processes in

5     place to ensure the -- the codes are appropriately

6     supported in the medical record.  And then those

7     codes would be submitted.

8          Q.    You talked about certified coders who

9     abstracted medical records.  What was the entire

10    universe of information provided to the certified

11    coders who abstract the medical records?

12         A.    Yeah, those reviews would have been --

13    yeah, so the information that would have been

14    provided to the -- the coders at the time would be an

15    image of the -- the medical record, so it is what we

16    would refer to as a blind interview, you know, where

17    we're not getting any additional information related

18    to codes that were previously submitted; just a blind

19    abstraction, looking at the documentation provided in

20    the record, and assigning the appropriate ICD

21    diagnosis codes to that documentation.

22         Q.    In this chart review process that you've

23    described, what attempt was made to compare diagnoses

24    codes abstracted by certified coders with diagnoses

25    codes that might have been identified by a coder



Page 231

1  working for a hospital or a provider?

2      A.    That -- that comparison would not have

3  been completed at, you know, through the chart review

4  program, but, you know, as we, you know, as I

5  testified earlier, there was a claims verification

6  process, you know, where there was an attempt to

7  match the diagnosis submitted by providers; they're

8  also part of the chart review program.

9          You know, I call it an attempt because it

10  a very complex process; it has, you know, several

11  challenges, you know, in particular related to the

12  quality of data around the provider IDs across

13  various systems.  And also, you know, the

14  completeness of the medical records that would have

15  been reviewed as part of the chart review process.

16      Q.    You talked a little bit about the

17  complexity of the process.  What additional

18  information would be required in order to undertake a

19  comparison between diagnoses codes identified by

20  United's certified coders with codes that might have

21  been identified by coders working for a hospital or a

22  provider?

23          MR. MASON:  Objection to form.

24      Foundation.

25          THE WITNESS:  So, you know, the first



Page 251

1                    CERTIFICATE

2

3        I, KAREN K. KIDWELL, Registered Merit Reporter,

4   and Certified Realtime Reporter, do hereby certify

5   that prior to the commencement of the examination,

6   the deponent was remotely sworn to testify to the

7   truth, the whole truth under penalty of perjury.

8        I DO FURTHER CERTIFY that the foregoing is a

9   verbatim transcript of the testimony as taken

10  stenographically by me at the time, place and on the

11  date hereinbefore set forth, to the best of my

12  ability.

13       I DO FURTHER CERTIFY that I am neither a

14  relative nor employee nor attorney nor counsel of any

15  of the parties to this action, and that I am neither

16  a relative nor employee of such attorney or counsel,

17  and that I am not financially interested in this

18  action.

19

20                    _____
                      *Karen K. Kidwell*
21                    Karen K. Kidwell
                      Registered Merit Reporter
22                    Certified Realtime Reporter
                      Notary Public
23

24

25



4907

**EXHIBIT P-72**

Page 314

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

_____ )
UNITED STATES OF AMERICA    )
ex rel. BENJAMIN POEHLING,  )
                            )
        Plaintiff,          )        No. CV 16-08697 FMO
                            )
vs.                         )
                            )
UNITEDHEALTH GROUP, INC.,   )
et al.,                     )
                            )
        Defendants.         )
_____ )

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Volume 2

DEPOSITION OF BIGGS T. CANNON, III

As 30(b)(6) Designee 6 of UHC of California, Inc.,
OptumInsight, Inc.
UnitedHealthcare, Inc.

Washington, DC
June 7, 2023

Reported by:  John L. Harmonson, RPR

Job No. 983691



Page 389

1    if it passes the other checks -- there is a check

2    in there, we may have referenced it yesterday,

3    called an X19.  I think if that had been identified

4    in the same six-month window -- and I think we

5    talked about this.  It's not a rolling six months.

6    It's January 1st to June 30th, July 1st to

7    December 31st.

8            I believe if that came in and a claim

9    had already been submitted for that same

10   member/diagnosis combination, I believe IRADS would

11   have assigned it an X19, kind of indicating it had

12   been submitted before.  And I think we talked about

13   the definition yesterday.  It will stop it from

14   submission at that time.

15   BY MS. GLOVER:

16       Q.    Okay.  So in this process, you were able

17   to assess whether a diagnosis code identified in

18   chart review had already been identified and

19   submitted by a provider previously; is that

20   correct?

21            MS. DO:  Objection; misstates prior

22   testimony.  Outside the scope.  Lacks foundation.

23            THE WITNESS:  I don't think the X19

24   process, as I recall, takes into consideration who

25   the provider was.  In the RAPS system, I don't know



Page 455

```
 1                 C E R T I F I C A T E

 2

 3    DISTRICT OF COLUMBIA

 4              I, JOHN L. HARMONSON, a Notary Public

 5    within and for the District of Columbia, do hereby

 6    certify that BIGGS T. CANNON, III, the witness

 7    whose deposition is hereinbefore set forth, was

 8    duly sworn by me and that such deposition is a true

 9    record of the testimony given by such witness.

10              That before completion of the

11    proceedings, review and signature of the transcript

12    was reserved.

13              I further certify that I am not related

14    to any of the parties to this action by blood or

15    marriage; and that I am in no way interested in the

16    outcome of this matter.

17              IN WITNESS WHEREOF, I have hereunto set

18    my hand this 9th day of June, 2023.

19

20                        John L Harmonson

21                        JOHN L. HARMONSON, RPR
                          My commission expires: 04/14/26
22

23

24

25
```



4911

**EXHIBIT P-73**



# Risk Adjustment Chart Review

## Stephanie Will



**EXHIBIT**

00167-1

4913

ATTORNEY EYES ONLY

MAPL008247236

# Nevada Chart Review

- Targeted 2500 members/2747 charts
- 2398 members/1991 charts reviewed
- 2003 and 2004 DOS
- PCP charts only
- $117,000 or $43 per chart
  - $28.50 per chart base rate +mileage +copying

4914

ATTORNEY EYES ONLY
MAPL008247237



# Membership Targeting

☐ Membership divided into four tiers using PHS reports:

— Tier 1 - HIGH likelihood
  • at least 3 HCC qualifying dx in previous year with none in current year

— Tier 2 - MEDIUM to LOW likelihood
  • between 1-3 HCC qualifying dx in previous year

— Tier 3 - HCC history
  • HCC in claims history but not appearing on PHS reports

— Tier 4
  — No HCC's in member history

**4915**

ATTORNEY EYES ONLY                              MAPL008247238

# Findings

-  2004
    - 350 members had positive RAF improvement
    - Average RAF increase of .44
    - 2005 payment (50% blend) impact of $656K
-  2003
    - 251 members had positive RAF improvement
    - Average RAF increase of .43
    - 2004 payment (30% blend) impact of $260 K
- Combined ROI (after costs) of $800K

4916

ATTORNEY EYES ONLY

MAPL008247239



# Most Commonly Found HCC's

| HCC | Description | Count | RAF |
|-----|-------------|-------|-----|
| 108 | COPD | 127 | .376 |
| 19 | Diabetes | 57 | .2 |
| 105 | Vascular Disease | 36 | .357 |
| 71 | Rheumatoid Arthritis | 23 | .268 |
| 80 | CHF | 22 | .417 |
| 83 | Old MI, Angina | 17 | .235 |
| 92 | Atrial fibrillation | 12 | .266 |
| 10 | Cancer | 10 | .233 |

4917

ATTORNEY EYES ONLY

# Potential Unconfirmed Diagnoses

- Compared chart review findings with reported qualifying diagnoses
  - Isolated qualifying diagnosis codes not found in chart review
  - Reviewed member history to identify if HCC was reported from other source or diagnosis
- Identified 131 members with average potential negative RAF impact .4
- Possible negative impact of $223K for 2004

4918

ATTORNEY EYES ONLY

MAPL008247241

# Most Common Unconfirmed HCC's

| HCC | Description | Count | RAF |
|-----|-------------|-------|-----|
| 19 | Diabetes | 34 | .2 |
| 105 | Vascular Disease | 18 | .357 |
| 80 | CHF | 18 | .417 |
| 108 | COPD | 17 | .376 |
| 16 | Diabetes (neuro) | 11 | .552 |
| 18 | Diabetes (ophth) | 7 | .343 |
| 92 | Atrial fibrillation | 7 | .266 |

4919

ATTORNEY EYES ONLY

MAPL008247242

# Arizona Chart Review



- Same targeted approach using PHS reports
- Include Tucson PCP capitated group
  - Group identified as having poor coding quality, low RAF score and poor diagnosis submission
- 9746 members in Tiers 1-2
  - 100% of AZ membership in these tiers
- 3758 members in Tier 3
  - limited to Tucson PCP capped group

4920

ATTORNEY EYES ONLY

MAPL008247243



4921

ATTORNEY EYES ONLY

# Summary of Costs and Potential ROI

| ARIZONA MEDICAL RECORD REVIEW SUMMARY OF TARGETED MEMBERSHIP COSTS AND ROI | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2004 | # of members | # of charts | 2004 conversion rate | Likely conversions 2004 | Return | Costs | ROI |
| Tier 1 | 1960 | 2286 | 17.0% | 333 | $583,259.22 | $41,148.00 | $542,111.22 |
| Tier 2a | 2144 | 2519 | 13.1% | 281 | $489,582.40 | $45,342.00 | $491,646.21 |
| Tier 2b | 5642 | 6669 | 12.0% | 677 | $1,299,204.66 | $111,330.00 | $1,185,143.52 |
| ACP (Tucson group - Tier 3) | 3758 | 3758 | 13.6% | 511 | $898,644.92 | $67,644.00 | $831,000.92 |
| TOTAL | 13504 | 15232 | | 1802 | $3,270,691.20 | $265,464.00 | $3,005,227.20 |
| | | | | | | | |
| | | | 2003 conversion rate | Likely conversions 2003 | Return | Costs | ROI |
| 2003 | # of members | # of charts | | | | | |
| Tier 1 | 1960 | 2286 | 10.9% | 214 | $224,383.25 | $4,572.00 | $219,811.25 |
| Tier 2a | 2144 | 2519 | 9.5% | 204 | $208,991.20 | $5,038.00 | $203,953.20 |
| Tier 2b | 5642 | 6669 | 7.8% | 440 | $462,205.97 | $13,338.00 | $448,867.97 |
| ACP (Tucson group - Tier 3) | 3758 | 3758 | 14.7% | 552 | $580,205.69 | $7,516.00 | $572,689.69 |
| TOTAL | 13504 | 15232 | | 1410 | $1,475,786.11 | $30,464.00 | $1,445,322.11 |
| | | | | | | | |
| 2003 and 2004 | | | | | Return | Costs | ROI |
| TOTALS | | | | | $4,746,477.31 | $295,928.00 | $4,450,549.31 |

4922

ATTORNEY EYES ONLY

## Current Status

 Test data to consultant for validating format

 Files in final stages of preparation for submission to vendor

 Contract being finalized

 Start reviewing week of 1/31

 Completion date of early March in time for March submission to CMS

4923

ATTORNEY EYES ONLY

MAPL008247246

# Next Phases of Chart Review

- Specialist Charts
  - Target high volume specialists
    - Cardiology          Pulmonology
    - Rheumatology       Endocrinology          Oncology
- Larger scale AZ review of Tier 3 members among high volume PCP's
- AZ specialists
- Potential need for CMS validation
- PCP's and specialists in other DCN/flat cap markets

4924

ATTORNEY EYES ONLY

MAPL008247247

**EXHIBIT P-74**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
---o0o---


UNITED STATES OF AMERICA, ex     )
rel., BENJAMIN POEHLING,         )
                                 )
              Plaintiff,         )
                                 )    Case No.
         vs.                     )    16-08697 FMO
                                 )
UNITEDHEALTH GROUP, INC., et     )
al.,                             )
                                 )
              Defendants.        )
                                 )



---o0o---

TUESDAY, APRIL 2, 2024

VIDEOTAPED DEPOSITION OF CRAIG GARTHWAITE, PH.D.

CONFIDENTIAL TRANSCRIPT

---o0o---




REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR



4926

Page 51

```
 1      Q.   BY MR. GALLAGHER:   At various points in

 2   your report you refer to something called a list of

 3   potential deletes.  Are you familiar with that?

 4      A.   I am familiar with the writing of that.

 5   There was no actual list of potential deletes, but      09:22:56

 6   it's a way we describe it in the report

 7   conceptually.

 8      Q.   Well, you have not seen a list of

 9   potential deletes, but that doesn't mean that

10   Analysis Group could not have created one, right?      09:23:09

11          MR. MASON:   Objection to form.

12          THE WITNESS:   I should be very clear on

13   what I'm saying here, that there's no list of

14   potential deletes, that the process by which the

15   code operates does not create a list of potential      09:23:21

16   deletes as described in the report.

17      Q.   BY MR. GALLAGHER:   Correct.  But the way

18   the databases work, if you wanted to create a

19   report that was an actual list of the potential

20   deletes that were -- that would have been created      09:23:35

21   under the logic described in your report, you and

22   the Analysis Group certainly have the technological

23   capability to do that, do you not?

24      A.   There could have been an entirely

25   different structure of the code that did that in      09:23:48
```



Page 52

1   the logic in the report, but that is not the way

2   that we approached the problem, nor is it the way

3   the code currently operates.

4        Q.   Let me ask you, in your Appendix D at

5   Paragraph 49 --                                    09:24:04

6        A.   Did you say paragraph or page?  I

7   apologize.

8        Q.   Paragraph 49.

9        A.   Oh, thank you.

10       Q.   So you have "Identification of Potential   09:24:26

11  Deletes" as the heading VI, and then you talk about

12  how you identified potential deletes?

13       A.   Yes, I do see that.

14       Q.   And you give examples here in Paragraph 50

15  of something that would not be on the list of       09:24:45

16  potential deletes.  Do you see that?

17       A.   If you give me a second to read 49 and 50

18  just to make sure we are on the same page.  I see

19  the part you're talking about, yes.

20       Q.   How do you know whether an example is on   09:25:35

21  the list of potential deletes or not on the list of

22  potential deletes?

23       A.   I am going to, again, refer back to what I

24  said earlier.  There is no actual list of potential

25  deletes.  I understand that the report is written   09:25:51



4928

Page 53

1    that way to provide a way to, in English language,

2    describe a set of steps that are happening

3    concurrently.

4           So it is not a question of some list of

5    potential deletes and something that's on it.  It's    09:26:05

6    something that's happening sort of in realtime in

7    the code.

8    Q.   So how do you -- if you need to confirm

9    that something is on -- would be on the list of

10   potential deletes or not on the potential list of      09:26:16

11   deletes, how do you do that?

12          MR. MASON:  Objection to form.

13          THE WITNESS:  Again, there is no list of

14   potential deletes that I have to confirm that

15   something is on.                                        09:26:30

16   Q.   BY MR. GALLAGHER:  You said earlier that

17   the way the code is currently -- the way the code

18   currently operates, there's no, you know,

19   preparation of a potential deletes list.  Was there

20   ever a draft of the code that created a potential       09:26:44

21   deletes list?

22   A.   If I did say they word "currently

23   operates," I did not mean to say "currently

24   operates."  There's not been under my direction a

25   time where a list of potential deletes was created      09:26:59



Page 54

1   and that we changed the code.  This is the way we

2   have always approached the problem in this report.

3       Q.   There was, however, a time where the code

4   was operated by Analysis Group to create a list of

5   potential deletes, was there not?                        09:27:13

6       A.   I am unaware of that.

7       Q.   If that was something that they were

8   directed to do by the DOJ lawyers, that's something

9   you're not familiar with, don't know about?

10      A.   I was not involved in any process of         09:27:25

11  creating a list of codes outside of what's in my

12  report.

13      Q.   Have you read the first interrogatory

14  response that you referenced earlier today?

15      A.   I don't know if I referenced it.  I think    09:27:36

16  you might have referenced it.  I have since writing

17  the report become aware of the first interrogatory,

18  but it is not something I was involved in creating

19  or crafting or discussed with Analysis Group in any

20  way.                                                  09:27:51

21      Q.   That is something that you understand

22  Analysis Group created the list that is -- that was

23  submitted in the first interrogatory response?

24           MR. MASON:  Objection to form; foundation.

25           THE WITNESS:  It's come to my attention      09:28:05



Page 55

1    that they were involved in it.  Whether they solely

2    created it or there was other people that counsel

3    had involved with that, I don't know.

4         Q.   BY MR. GALLAGHER:  You would, in fact, be

5    able to write code or instruct Analysis Group to          09:28:25

6    write code that would produce the potential deletes

7    list that you referenced throughout your report,

8    right?

9              MR. MASON:  Objection; asked and answered.

10             THE WITNESS:  As a matter of sort of          09:28:38

11   technological capability, yes, but it would be an

12   entirely different approach to writing the code to

13   answer the question in the report.

14        Q.   BY MR. GALLAGHER:  How would it be

15   different?                                                09:28:49

16        A.   At no point is the code intended to create

17   a list of potential deletes.

18        Q.   Right.  But if you intended it to create a

19   list of potential deletes, you could, right?

20             MR. MASON:  Objection; asked and answered.   09:29:00

21             THE WITNESS:  Again, that's why it would

22   be different.  Because it would be a different

23   intention, so...

24        Q.   BY MR. GALLAGHER:  Right.  So my question

25   is if you wanted to create a list of potential          09:29:08



Page 56

1    deletes, you could, right?

2         MR. MASON:  Objection; asked and answered.

3         THE WITNESS:  As a matter of course, we

4    could do it, yes.

5    Q.    BY MR. GALLAGHER:  And what would it          09:29:23

6    entail if you wanted to do that?  What would you

7    have to do?

8    A.    Well, we would -- I can't find a complete

9    answer to that.  We would sit down and think about

10   the goal being creating a list of potential deletes   09:29:36

11   as opposed to what was the goal as I state in the

12   report, which is developing an analysis of what are

13   the codes that lack support in United's data.  And

14   more specifically, what we are trying to understand

15   is how would the flow of funds change between the     09:29:55

16   United States government and United Healthcare as a

17   result of the removal of the codes that lack

18   support in the data.

19   Q.    So you were not asked to produce or to

20   identify a list of diagnosis codes that would meet    09:30:11

21   your definition of potential deletes?  That wasn't

22   -- that was not your assignment?

23   A.    That would meet the list of potential

24   deletes?

25   Q.    Correct.                                        09:30:25



Page 57

1      A.   No.  I was asked to come up with an

2   estimate of how the flow of funds would change

3   between the United States government and United as

4   a result of the removal of unsupported codes in the

5   chart review and risk adjustment data.          09:30:38

6          There was no specific interim step that I

7   was asked to create.

8      Q.   So specifically your assignment was to

9   determine how the flow of funds would change if you

10  removed what you call unsupported codes in the      09:30:57

11  chart review, right?

12          MR. MASON:  Objection; mis --

13     Q.   BY MR. GALLAGHER:  That was your

14  assignment?

15          MR. MASON:  Objection; misstates       09:31:10

16  testimony.

17          THE WITNESS:  I think if you kept reading

18  there's an "and" after "chart review."

19     Q.   BY MR. GALLAGHER:  I will do that.  Your

20  assignment was to determine how the flow of funds   09:31:18

21  would change as a result of the removal of

22  unsupported codes in the chart review and risk

23  adjustment data, right?

24     A.   That is a summary of what we're trying to

25  do here, yes.                                   09:31:34



Page 58

```
 1      Q.   And when you say unsupported codes in the

 2  chart review, you're referring to the list of

 3  potential deletes, right?

 4           MR. MASON:  Objection; misstates

 5  testimony.                                           09:31:44

 6           THE WITNESS:  No, I'm referring to the

 7  codes that we have in our final deletes list that

 8  were unsupported in the chart review and risk

 9  adjustment data.

10           I am not sure why you keep stopping at    09:31:54

11  chart review.  Because I am referring to the chart

12  review and risk adjustment data together.

13      Q.   BY MR. GALLAGHER:  So the concept of

14  whether a code is supported or not, to know that

15  you have to look at not just the chart review but   09:32:05

16  also risk adjustment data?

17           MR. MASON:  Objection to form.

18           THE WITNESS:  Yes.

19      Q.   BY MR. GALLAGHER:  Okay.  And what risk

20  adjustment data do you have to look at to determine 09:32:15

21  whether a code is or is not supported?

22      A.   So if you look in the report, what we are

23  -- there are a few places where we talk about sort

24  of things where we -- where we develop our final

25  deletes list.                                        09:32:31
```



Page 76

1    the opinion you're offering about the flow of funds

2    is not an opinion about what would happen if you

3    took a list that corresponds to what you describe

4    as the potential deletes and were to delete that?

5        A.    By definition, we remove things -- we          10:09:48

6    don't -- there are some things that initially lack

7    support from chart review that we are giving United

8    credit for.  We are not saying that they have

9    support.  We are saying there's enough evidence

10   there in United's data that could have been relied    10:10:01

11   upon for support that we don't feel comfortable

12   saying that those are unsupported codes in United's

13   chart review and risk adjustment data.

14       Q.    I think my question is simpler.  You are

15   not offering an opinion about what -- how the flow     10:10:12

16   of funds would change if you took a list of codes

17   that corresponds to what you call potential deletes

18   in your report and deleted them?  That's not the

19   analysis you're offering?

20           MR. MASON:  Objection; asked and answered.   10:10:26

21       Q.    BY MR. GALLAGHER:  Right?

22       A.    It is -- it's -- everything on --

23   everything that we do delete is identified in that

24   unsupported data.  So it would be sort of a related

25   but not identical exercise.                            10:10:37



4935

Page 77

1      Q.    It's not the exercise you undertook?

2      A.    No.   We gave credit to United for codes

3  that they had evidence for that they also, I would

4  note, could have identified in their data or could

5  have said the reason why we're not going to delete       10:10:52

6  that code is that there's other evidence.

7            So it is not a question of them changing

8  their behavior, but a question about sort of the

9  knowledge they had at the time.

10     Q.    And you also are not offering an opinion        10:11:03

11 on what would traditionally be called but-for

12 damages, right?

13           MR. MASON:   Objection to form.

14           THE WITNESS:   Or answering the question as

15 of what would have happened as of 2019 -- I             10:11:14

16 shouldn't say 2019.   The time period I am sort of

17 looking at this question, which is given the sort

18 of COVID and the length of this from '19 to '23,

19 pick a date in there, what would happen if the

20 codes were removed.                                     10:11:29

21     Q.    BY MR. GALLAGHER:   That's not a -- you are

22 not offer -- sorry.   Let me clarify.

23           You are offering an opinion about what

24 would happen if after the fact, in like 2019 or

25 2020, you removed the codes, what the flow of funds    10:11:40





4936

Page 78

1    would look like in that -- that scenario?

2       A.   If it is a question about as of 2019 what

3    would happen if we removed the codes then, yes.

4       Q.   You are not offering an opinion about what

5    would happen if United had done something different    10:11:58

6    in 2008 or 2009 or 2010 or 2011 at the time?

7       A.   Yeah, I'm not offering an opinion about

8    how contemporaneously they would have changed their

9    other behavior.

10       Q.   And you are not offering an opinion about    10:12:15

11   what would happen in a but-for world where United

12   had done the analysis you did in 2008, 2009, 2010

13   and had changed its submission of codes accordingly

14   in those years at the time?

15           MR. MASON:  Objection to form.              10:12:31

16           THE WITNESS:  No, I think we are very

17   clear in the report that the question we are trying

18   to answer is how would the flow of funds have

19   changed if as of the time period we're asking the

20   question, the code that lacks support in United's    10:12:41

21   chart review and risk adjustment data were removed

22   from the system.

23       Q.   BY MR. GALLAGHER:  Effectively giving away

24   the payments on contract years, you're effectively

25   offering an opinion about what would happen if you    10:12:54



Page 214

```
 1      A.   It would seem like it's possible that

 2  given that there's no provider encounter data from

 3  Connor for February 1st, that this would be an

 4  encounter that we matched in No. 2 which was sort

 5  of -- would not be a reviewed encounter.        02:37:45

 6           I wouldn't say -- we spent a lot of time

 7  in doing this and doing these kind of validation

 8  checks to figure out if systematically this was

 9  showing up.

10           There are millions of diagnosis codes, 1.9  02:38:00

11  million diagnosis codes on Attachment 1.  It is

12  possible that there is a single one that you are

13  identifying here.

14      Q.   Well, I'm just identifying -- I'm just

15  trying to first identify that this is an example of  02:38:14

16  something that you would have, and, in fact, in

17  this case did, identify as a reviewed encounter

18  under your match method No. 2, okay.

19           So assuming the data is as follows:  There

20  is a February 1, 2011, encounter from which a       02:38:39

21  provider-reported code 1742 was submitted to CMS.

22  There is no record in the chart review database

23  identified as being from Allen on that date.  There

24  is no other provider-reported code from February 1,

25  2011, and the only chart reviewed in chart review   02:39:04
```



Page 333

1            DEPOSITION OFFICER'S CERTIFICATE

2              (Civ. Proc. § 2025.520(e))

3    STATE OF CALIFORNIA        )

4                               )      Ss

5    COUNTY OF SAN FRANCISCO    )

6            I, BALINDA DUNLAP, CSR #10710, hereby

7    certify:

8            I am a duly qualified Certified Shorthand

9    Reporter, in the State of California, holder of

10   Certificate Number CSR 10710 issued by the Court

11   Reporters Board of California and which is in full

12   force and effect.  (Bus. & Prof. § 8016)

13           I am not financially interested in this

14   action and am not a relative or employee of any

15   attorney of the parties, or of any of the parties.

16   (Civ. Proc. § 2025.320(a))

17           I am authorized to administer oaths or

18   affirmations pursuant to California Code of Civil

19   Procedure, Section 2093(b) and prior to being

20   examined, the deponent was first placed under oath

21   or affirmation by me.  (Civ. Proc. §§ 2025.320,

22   2025.540(a))

23           I am the deposition officer that

24   stenographically recorded the testimony in the

25   foregoing deposition and the foregoing transcript



Page 334

1  is a true record of the testimony given.  (Civ.

2  Proc. § 2025.540(a))

3           I have not, and shall not, offer or

4  provide any services or products to any party's

5  attorney or third party who is financing all or

6  part of the action without first offering same to

7  all parties or their attorneys attending the

8  deposition and making same available at the same

9  time to all parties or their attorneys.  (Civ.

10  Proc. § 2025.320(b))

11           I shall not provide any service or product

12  consisting of the deposition officer's notations or

13  comments regarding the demeanor of any witness,

14  attorney, or party present at the deposition to any

15  party or any party's attorney or third party who is

16  financing all or part of the action, nor shall I

17  collect any personal identifying information about

18  the witness as a service or product to be provided

19  to any party or third party who is financing all or

20  part of the action.  (Civ. Proc. § 2025.320(c))

21

22  Dated: _____

23                    _____
                           *Balinda Dunlap*

24

25



**EXHIBIT P-75**



**U.S. Department of Justice**

Civil Division

*Washington, DC 20530*

October 22, 2014

Roger S. Goldman
Latham & Watkins LLP
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C. 20004

Re:  UnitedHealth Group Investigation

Dear Mr. Goldman,

We sincerely appreciate the two presentations that Mr. Meron and you provided to us on October 9th in Buffalo.  The presentations were very informative and helpful.  One of the purposes of this letter is to follow-up on our requests for additional information about the issues raised by your presentations.  These requests are set forth in the attachment to this letter.  Please let us know if you have any questions about these requests or would like to discuss them further before responding to them.  We are available to discuss at your convenience.

In addition, we would like to follow-up on our request for a presentation about UnitedHealth Group's Chart Review program and for a demonstration of UnitedHealth Group's ChartSync system.  We are also very interested in learning more about the Ingenix Risk Adjustment Data System (IRADS), including the systems which interface with it.  We are available December 2 in Washington or December 9, 10, 11, 16 or 17 in Buffalo.  Please let us know if you are agreeable to meeting with us on any of these dates.

Furthermore, we would like to schedule a telephone call with you very soon to discuss UnitedHealth Group's privilege assertion with respect to documents and information that the government is seeking from one of UnitedHealth Group's vendors, iCodify.  Please let us know when you are available this week or next week for this telephone call.

Finally, in response to the arguments that you made as part of your presentation about UnitedHealth Group's termination of its Claims Verification Program and UnitedHealth Group's annual attestation about the truthfulness and accuracy of its risk adjustment submissions, we wish to remind you of Cheri Rice's May 2, 2014 response to Mr. Nelson's April 30, 2014 email quoted at page 20 of your presentation.  In particular, we note that she stated that there are "laws that do impose standards, requirements and responsibilities on [Medicare Advantage] plans in connection with the federal payments they receive from [the Centers for Medicare & Medicaid Services]." Ms. Rice also stated that CMS could not provide advice about whether UnitedHealth



**EXHIBIT**

00328

- 2 -

Group's plan of action and purported limits on the scope of its attestation are compliant with these laws. Thus, CMS did not agree that UnitedHealth Group's planned actions and its purported limited attestation are compliant with the laws that apply to Medicare Advantage plans. As you know, such laws include the federal False Claims Act.

Please do not hesitate to call Gretchen Wylegala or me if you wish to discuss this matter. Again, we sincerely appreciate the two presentations that you made on October 9th and we look forward to UnitedHealth Group's and your continued cooperation in this matter.

Very truly yours,

Carol Lynn Wallack
Trial Attorney
Commercial Litigation Branch
Civil Division

cc: Daniel Meron
Abid R. Qureshi
Gretchen Wylegala

4943

- 3 -

Attachment

Requests relating to the "UnitedHealthcare of California, Inc. (plan #H0543) Closed-Period
Deletes for 2010 and 2011 DOS" presentation:

- Page 6, sub-bullet point 2, refers to deletes that CMS refused to process for 2010
  DOS. Please identify the risk adjustment (RA) submissions that UHG sought to
  delete. Similarly, page 9, states that CMS has not processed an additional
  approximate $4.8 million in 2010 DOS deletes submitted by UHC after May 31,
  2013. Please also identify the RA submissions associated with those deletes.

- Page 12 describes the Ingenix Risk Adjustment Data System (IRADS). Please
  describe the data system(s) that feed into IRADS with respect to the UHC of
  California plan and, if this has changed over time, please specify. Please describe
  the data system(s) that feed into IRADS with respect to UHG's other plans and how
  this changed over time. Also, if there is an integrated system, please identify and
  describe it. We are also interested in knowing what system UHG used prior to
  IRADS to make its RA submissions. (You may wish address these questions as
  part of a larger presentation about IRADS.)

- Page 13 refers to approximately $11.9M in deletes due to IRADS improvements.
  Please breakdown the monetary amounts of the deletes for each type of
  improvement.

- Page 20 refers to Provider Specialty Code 70 deletes and page 21 refers to
  Unknown Physician Specialty ("99") deletes. We have additional inquiries about
  these deletes and will provide them to you soon.

- Page 25 of the presentation discusses the Risk Adjustment Data Reconciliation
  (RADR) team. When was this team created? What are the team's responsibilities,
  and what policies and procedures govern its decisions. Also, please identify the
  UHG employees who have been part of this team since its inception to present.
  Additionally, identify what role (and title) each individual had and whether the
  individual is a current or former employee. If a former employee, please provide
  their home address and contact information.

- Page 26 states that "the largest single provider" initiated proposed deletes totaling
  $2.6 million for 2010 DOS. You identified this provider as Sharp. Is this Sharp
  Community Medical Group in San Diego or another entity? What deletes did it
  propose? What deletes were actually made (all of the proposed deletes)? Please
  provide a list of all of these deletes and the dates on which they were made and state
  the amount of the monetary impact, if any. Additionally, provide all
  correspondences (in any format) between UHG and Sharp, and identify the UHG
  and Sharp employees who were part of this process. Also, please explain whether
  UHC of California, Sharp or both bore any monetary impact associated with those
  deletes?

- 4 -

- Please identify all provider groups with which UHC of California has contracted from 2006 to present and, for each year, the number of Medicare Part C plan members in each group.

- Page 27 refers to RA Coding Compliance Reviews. What were the parameters for selecting providers or provider groups for these reviews? Please explain what rules or guidelines UHG used in conducting these reviews and, if those rules and guidelines changed over time, please explain how so. Please identify (1) all provider groups for which UHG has performed RACCR reviews, (2) any provider groups with which UHG has discontinued its relationship based on any RACCR reviews, and (3) if any provider groups were required to return money to UHG. Also, identify what information UHG provided to the providers or provider groups about the results of those reviews. In addition, we would like to know whether UHG is continuing to perform RACCR reviews.

- Page 32 refers to RACCR Look-backs. What were the criteria used to determine that a significant number of sampled codes failed to validate? Was 80% validation required? If a significant number of sampled codes failed to validate, was the 100% look-back only for the DOS or payment year for which the sampled was pulled? Or did UHG look back to prior years and, if so, how far back?

- Please provide background information relating to UHG's RACCR 150 patient review of WellMed, including, but not limited to, a list identifying the patients' name and HIC numbers, when the review was conducted, how it was conducted and by whom, and the results of the review.

Requests relating to the "Claims Verification Program" presentation:

- Page 18 refers to a discussion between UHG and CMS on April 29, 2014, page 20 refers to a communication with Sean Cavanaugh at CMS on June 10, 2014, and page 24 and 25 refer to other conversations and communications with CMS. Please provide all documents relating to these communications, including, but not limited to, emails, letters, memos, notes and bid documents. For each communication, please identify the participants/attendees.

- The first section of the presentation refers to Chart Reviews conducted by UHG to find additional diagnoses that are not made by and/or reported to it by providers. Please provide a list of all chart reviewers and companies hired by UHG since it started conducting chart reviews. Please specify the time period(s) for which UHG used each reviewer and company. Please specify who currently performs chart reviews for UHG.

- Page 20 refers to 2012 DOS deletes. For 2012 DOS, please identify the RA submissions that UHG identified for Claims Verification (CV) review but for which

- 5 -

UHG did not perform the CV review or for which it performed the review but did not make the delete even if the diagnosis was not confirmed.

- Page 23 refers to the 2015 contract bid process. Please specify whether any monetary amount(s) were included in UHG's 2015 proposed bid that UHG believed may be associated with deletes for payment years 2015 if it continued the CV program and, if so, please specify those amount(s). Please provide this information for each of UHG's MA plans. Also, please provide this information for bids prior to 2015 if monetary amounts for projected deletes were included in those bids.

- Also, during the meeting, you stated that UHG has represented to CMS that the cost of completing CV reviews (which reviews UHG stopped conducting in or about May 2014) would not be taken as profit by UHG but would be used to provide additional benefits to Medicare beneficiaries in 2015. Please provide that part of UHG's 2014 bid proposal (or contract with CMS) that sets forth the monies that UHG stated that it would expend to perform CV work in 2014. In addition, please identify the monies that UHG received from CMS after May 2014, i.e. after it stopped CV reviews, to perform these reviews and how UHG used these funds. Furthermore, please identify the total costs of additional benefits that UHG intends to provide to Medicare beneficiaries in 2015 that are specifically attributed to not performing or completing CV work and identify the specific additional benefits. As an example, please provide the breakdown of these calculations from the bid proposals/contracts for UHC of California (#H0543). Also, please provide a copy of the contracts between UHG and CMS for this plan for 2014 and 2015.

- Did UHG conduct audits or reviews of any fee for service providers? If so, how were the providers chosen for the audits or reviews and how were the reviews conducted?

- What is the current status of the UHC of California RADV audit?

4946

**EXHIBIT P-76**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )




Videotaped Deposition of

REBECCA MARTIN

Given Remotely

Friday, August 5, 2022

9:03 a.m.




Reported by:  Karen K. Kidwell, RMR, CRR




Magna Legal Services
866-624-6221
www.MagnaLS.com



4948

Page 73

1    diagnosis clusters that map to a specific HCC and

2    looking to see if there are other records that we may

3    have on file for that member that otherwise risk

4    adjust but had not been submitted to CMS due to some

5    of their submission limitations.  And when we had

6    that condition of a record that otherwise risk

7    adjusts, that map to the same HCC, we would use that

8    record to basically save the HCC from being deleted.

9         Q.   Understood.  And are you familiar with

10   something called an "X19" as the term was used at

11   Optum within IRADS?

12        A.   Yes.

13        Q.   What's an X19?

14        A.   It is a specific status that is assigned

15   to otherwise risk adjusting transactions that could

16   not be submitted to CMS due to submission

17   limitations.

18        Q.   And what submission limitations are you

19   referring to?

20        A.   For example, CMS would not allow the

21   submission of multiple records for the same member,

22   the same date of service, the same diagnosis code,

23   even if they were for different providers.  You could

24   only submit one.

25        Q.   Understood.  And in the delete netting



Page 185

1                      CERTIFICATE

2

3        I, KAREN K. KIDWELL, Registered Merit Reporter,

4   and Certified Realtime Reporter, do hereby certify

5   that prior to the commencement of the examination,

6   the deponent was remotely sworn to testify to the

7   truth, the whole truth under penalty of perjury.

8        I DO FURTHER CERTIFY that the foregoing is a

9   verbatim transcript of the testimony as taken

10  stenographically by me at the time, place and on the

11  date hereinbefore set forth, to the best of my

12  ability.

13       I DO FURTHER CERTIFY that I am neither a

14  relative nor employee nor attorney nor counsel of any

15  of the parties to this action, and that I am neither

16  a relative nor employee of such attorney or counsel,

17  and that I am not financially interested in this

18  action.

19

20                    _Karen Kidwell_____

21                    Karen K. Kidwell
                      Registered Merit Reporter
22                    Certified Realtime Reporter
                      Notary Public

23

24

25



4950

**EXHIBIT P-77**

45 CFR 162.1002 (up to date as of 7/22/2024)
Medical data code sets.

Case 2:16-cv-08697-FMO-PVC    Document 616-14    Filed 08/06/24    Page 528 of 633
Page ID #:23744

45 CFR 162.1002 (July 22, 2024)

This content is from the eCFR and is authoritative but unofficial.

# Title 45 —Public Welfare
## Subtitle A —Department of Health and Human Services
### Subchapter C —Administrative Data Standards and Related Requirements
### Part 162 —Administrative Requirements
### Subpart J —Code Sets

**Authority:** 42 U.S.C. 1320d–1320d-9 and secs. 1104 and 10109 of Pub. L. 111-148, 124 Stat. 146-154 and 915-917.

**Source:** 65 FR 50367, Aug. 17, 2000, unless otherwise noted.

## § 162.1002 Medical data code sets.

The Secretary adopts the following maintaining organization's code sets as the standard medical data code sets:

(a) For the period from October 16, 2002 through October 15, 2003:

(1) *International Classification of Diseases, 9th Edition, Clinical Modification, (ICD-9-CM), Volumes 1 and 2* (including The Official ICD-9-CM Guidelines for Coding and Reporting), as maintained and distributed by HHS, for the following conditions:

(i) Diseases.

(ii) Injuries.

(iii) Impairments.

(iv) Other health problems and their manifestations.

(v) Causes of injury, disease, impairment, or other health problems.

(2) *International Classification of Diseases, 9th Edition, Clinical Modification, Volume 3 Procedures* (including The Official ICD-9-CM Guidelines for Coding and Reporting), as maintained and distributed by HHS, for the following procedures or other actions taken for diseases, injuries, and impairments on hospital inpatients reported by hospitals:

(i) Prevention.

(ii) Diagnosis.

(iii) Treatment.

(iv) Management.

(3) *National Drug Codes* (NDC), as maintained and distributed by HHS, in collaboration with drug manufacturers, for the following:

(i) Drugs

(ii) Biologics.

(4) *Code on Dental Procedures and Nomenclature,* as maintained and distributed by the American Dental Association, for dental services.

4952

45 CFR 162.1002 (up to date as of 7/22/2024)
Medical data code sets.

Case 2:16-cv-08697-FMO-PVC   Document 616-14   Filed 08/06/24   Page 529 of 633
Page ID #:23745

45 CFR 162.1002(a)(5)

(5) The combination of *Health Care Financing Administration Common Procedure Coding System (HCPCS),* as maintained and distributed by HHS, and *Current Procedural Terminology, Fourth Edition (CPT-4),* as maintained and distributed by the American Medical Association, for physician services and other health care services. These services include, but are not limited to, the following:

    (i) Physician services.

    (ii) Physical and occupational therapy services.

    (iii) Radiologic procedures.

    (iv) Clinical laboratory tests.

    (v) Other medical diagnostic procedures.

    (vi) Hearing and vision services.

    (vii) Transportation services including ambulance.

(6) The *Health Care Financing Administration Common Procedure Coding System (HCPCS),* as maintained and distributed by HHS, for all other substances, equipment, supplies, or other items used in health care services. These items include, but are not limited to, the following:

    (i) Medical supplies.

    (ii) Orthotic and prosthetic devices.

    (iii) Durable medical equipment.

(b) For the period on and after October 16, 2003 through September 30, 2015:

    (1) The code sets specified in paragraphs (a)(1), (a)(2),(a)(4), and (a)(5) of this section.

    (2) *National Drug Codes (NDC),* as maintained and distributed by HHS, for reporting the following by retail pharmacies:

        (i) Drugs.

        (ii) Biologics.

    (3) *The Healthcare Common Procedure Coding System (HCPCS),* as maintained and distributed by HHS, for all other substances, equipment, supplies, or other items used in health care services, with the exception of drugs and biologics. These items include, but are not limited to, the following:

        (i) Medical supplies.

        (ii) Orthotic and prosthetic devices.

        (iii) Durable medical equipment.

(c) For the period on and after October 1, 2015:

    (1) The code sets specified in paragraphs (a)(4), (a)(5), (b)(2), and (b)(3) of this section.

    (2) International Classification of Diseases, 10th Revision, Clinical Modification (ICD-10-CM) (including The Official ICD-10-CM Guidelines for Coding and Reporting), as maintained and distributed by HHS, for the following conditions:

        (i) Diseases.

     (ii) Injuries.

     (iii) Impairments.

     (iv) Other health problems and their manifestations.

     (v) Causes of injury, disease, impairment, or other health problems.

  (3) International Classification of Diseases, 10th Revision, Procedure Coding System (ICD-10-PCS) (including The Official ICD-10-PCS Guidelines for Coding and Reporting), as maintained and distributed by HHS, for the following procedures or other actions taken for diseases, injuries, and impairments on hospital inpatients reported by hospitals:

     (i) Prevention.

     (ii) Diagnosis.

     (iii) Treatment.

     (iv) Management.

*[65 FR 50367, Aug. 17, 2000, as amended at 68 FR 8397, Feb. 20, 2003; 74 FR 3362, Jan. 16, 2009; 77 FR 54720, Sept. 5, 2012; 79 FR 45134, Aug. 4, 2014]*

**EXHIBIT P-78**

**FILED**

**CLERK, U.S. DISTRICT COURT**

MAY 28 2021

**CENTRAL DISTRICT OF CALIFORNIA**
BY: vdr      **DEPUTY**

Suzanne H. Segal (Ret.)
United States Magistrate Judge
SIGNATURE RESOLUTION, LLC
633 W. 5th Street, Suite 1000
Los Angeles, CA 90071
judgesegal@signatureresolution.com

WESTERN DIVISION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA <u>ex rel</u>. BENJAMIN POEHLING, <br><br>          Plaintiffs, <br><br> vs. <br><br> UNITED HEALTH GROUP, INC., <u>et. al</u>, <br><br>          Defendants. | Case No. CV 16-8697 FMO (SSx) <br><br><br> ORDER DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION TO COMPEL RE INTERROGATORY NO. 14 AND REQUEST FOR PRODUCTION NO. 147 |

        On April 16, 2021, Plaintiff United States (the "government") filed a motion to compel (the "Motion" or "MTC") seeking an order regarding Defendant United Health Group, Inc. and related entities ("UnitedHealth" or "UHG") to provide a supplemental response to Interrogatory No. 14 ("Interrogatory 14") and Request for Production No. 147 ("RFP 147" or "Request 147"). The parties submitted a Joint Stipulation in connection with the Motion. Each party also filed a Supplemental Memorandum. On May 20, 2021, the Special Master held a Zoom hearing on the

DocuSign Envelope ID:

Motion.  For the reasons discussed below, the Motion is DENIED without prejudice to renewing the motion at a later stage in the litigation.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The  government  contends  that  UnitedHealth  has  refused  to  reasonably respond to two discovery requests that address whether UnitedHealth improperly failed to delete diagnosis codes from its Medicare Part C risk adjustment submission. According to the government, UnitedHealth systematically ignored medical record reviews when it indicated that diagnosis codes UnitedHealth previously submitted to CMS were not supported by beneficiaries' medical records.

The  government  contends  that  it  has  identified  every  diagnosis  code  that UnitedHealth submitted to CMS to increase its risk adjustment payments and then improperly failed to delete when UnitedHealth's own review found no support for the diagnosis code in the medical records.  The government asserts that Interrogatory 14 and Request 147 are intended to discover UnitedHealth's contentions about the very  same  diagnosis  codes.    The  government  seeks  to  discover  whether UnitedHealth contends that any of the diagnosis codes on the government's list were supported by medical records, despite not being found during any of UnitedHealth's reviews of the associated medical records.

2

1     Interrogatory 14 asked UnitedHealth to, with respect to every diagnosis code

2

3 on the government's list, (a) identify which code is supported by a medical record

4 and (b) identify every medical record review that UnitedHealth conducted. (MTC

5 at 5-7). Request 147 requests all medical records associated with the diagnosis codes

6

7 on the government's list. (Id. at 7).

8     In response to Interrogatory 14, UnitedHealth objected on the grounds that

9

10 "this Interrogatory is an improper contention interrogatory that impermissibly seeks

11 to shift the burden of proving an essential element of the government's False Claims

12 Act case on to UnitedHealth and seeks expert opinion." (Id. at 8). In response to

13

14 Request 147, UnitedHealth stated: "Based upon its General and Specific Objections,

15 UnitedHealth does not intend to produce documents responsive to this Request."

16

17     At the meet and confer on this issue, UnitedHealth indicated that it would

18 produce the responsive medical records in its possession. This production, however,

19 would require a production of approximately 21 million charts and take 8 months to

20

21 produce. This proposal did not resolve the discovery dispute.

22     The government asserts that, as it was required to provide a list of 28 million

23

24 diagnosis codes to comply with its obligation to identify the diagnosis codes it

25 contends UnitedHealth knew were invalid, UnitedHealth should now explain

26 whether medical records do or do not support these codes. (Id. at 9).

27

28

ORDER DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION TO COMPEL RE INTERROGATORY
NO. 14 AND REQUEST FOR PRODUCTION NO. 147

According to UnitedHealth, Interrogatory 14A requires it to identify the over 20 million medical records corresponding to each of the 28 million codes on the government's list and then to hire experts to review those charts to determine whether each code on the government's list is or is not supported by the medical chart. Subpart 14B requests that UnitedHealth "[i]dentify each Medical record Review(s) of the chart(s) corresponding to that Diagnosis, etc." According to UHG, this request would also require it to engage in a massive and complex matching analysis. RFP 147 seeks the documents that relate to the answer required in Interrogatory 14.

## II.     INTERROGATORY 14 REQUIRES EXPERT ANALYSIS TO RESPOND

Although the government argues that Interrogatory 14 is "only seeking facts," it would be impossible for anyone other than an expert to provide a reliable answer. Only an expert -- or someone with specialized knowledge -- could do a fair comparison of the medical records and the diagnosis codes to determine if the medical record supported the code. It is also undeniable that the interrogatory would impose a tremendous burden on the responding party to prepare an answer that does

ORDER DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION TO COMPEL RE INTERROGATORY
NO. 14 AND REQUEST FOR PRODUCTION NO. 147

DocuSign Envelope ID: ...

not currently exist.  For these reasons, Interrogatory 14 is an improper interrogatory

at this stage of the proceedings.

Contention interrogatories may be improper "[when] they ask the respondent

to provide an expert opinion." <u>Amgen Inc. v. Sandoz Inc</u>., 2017 WL 1352052, at *2

(C.D. Cal. April 13, 2017); <u>Montgomery v. Wal-Mart Stores, Inc</u>., 2015 WL

11233384, at *6 (S.D. Cal. July 17, 2015).  In addition, a court has discretion to

delay an answer to a contention interrogatory until designated discovery is complete

or at some other time.  <u>See</u> <u>Capacchione v. Charlotte-Mecklenburg Sch</u>., 182 F.R.D.

486, 489 (W.D.N.C.1998) (stating that "[d]ue to the nature of contention

interrogatories, they are more appropriately used after a substantial amount of

discovery has been conducted - typically, at the end of the discovery period").  In

general, courts prefer to defer answers to contention interrogatories that are

propounded prematurely.  <u>See</u> <u>e.g.</u>, <u>Everett v. USAir Group., Inc</u>.,165 F.R.D. 1, 3

(D.D.C. 1995) (denying without prejudice motion to compel response to contention

interrogatory on grounds that interrogatory served too early in discovery process);

<u>B. Braun Medical, Inc. v Abbott Lab</u>., 155 F.R.D. 525, 527 (E.D. Pa. 1994) ("[T]here

is considerable support to defer answering contention interrogatories until the end of

the discovery period.").

In the present action, the request seeks the application of expert knowledge to

facts, i.e., the medical records.  This interrogatory cannot be answered until after

5

DocuSign Envelope ID:

expert discovery is completed and only if UnitedHealth intends to assert a defense based upon this information. Indeed, parties generally provide this type of information through expert testimony. See United States ex rel. Desrosiers v. Thaller, 2016 WL 6441548, at *4-6 (S.D. Fla. Nov. 1, 2016) (whether medical codes submitted for reimbursement were proper was subject of expert testimony); Counts v. Pollock, 2020 WL 5534444, at *2 (M.D. Fla. August 21, 2020) (providing expert testimony on whether plaintiff's medical bills were properly coded); United States ex rel Armfield v. Gills, 2012 WL 12918274, at * 2 (M.D. Fla. 2012) (qualifying expert for testimony regarding improperly coded claims). Accordingly, this interrogatory is improper at this stage of the proceedings because it would require expert analysis to respond.

It is also undeniable that preparation of the response to the request would be extremely burdensome and costly. It would require UnitedHealth to pay for and create an analysis for 20 million documents. Ordinarily, a respondent is not required to undertake investigation and analysis to prepare a response to an interrogatory. See Behrazfar v. Unisys Corp., 2009 WL 10673197, at *4 (C.D. Cal. June 3, 2009) (party need not respond to an interrogatory that would require extensive analysis and cost). While this analysis and cost may be necessary at some point in the litigation, the Special Master concludes that it is premature to order UHG to undertake this analysis now.

6

1   UnitedHealth has stated that if it discloses during the expert discovery phase

2   that it has retained an expert to testify at trial that the 28 million codes on the

3

4   government's list are supported by medical records, that information will be

5   produced in a manner that provides the government sufficient time to prepare a

6

7   rebuttal. (MTC at 42). Nothing more is required during this phase of the litigation.

8   Because Request 14 is a contention interrogatory and requires expert analysis,

9   UnitedHealth is not required to prepare a response at this time.

10

11

12   III.    REQUEST 147 IS DEPENDENT UPON A RESPONSE TO

13          INTERROGATORY 14 AND THEREFORE IS

14          DENIED WITHOUT PREJUDICE

15

16

17

18   Request 147 seeks: "All Chart(s) corresponding to, associated with, or related

19   to each Beneficiary, from each DOS Year(s) in which that Beneficiary is listed in

20   the United States Response to Defendants' Interrogatory No. 1 (Including the United

21   States' First Supplemental Response served on August 17, 2020, the United States

22

23   Amended Frist Supplemental Response served on October 13, 2020, the United

24   States' Second Supplemental Response served on October 30, 2020, and any other

25

26   subsequent responses)." (Mason Decl., Ex. B). The government agreed to limit this

27

28

ORDER DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION TO COMPEL RE INTERROGATORY
NO. 14 AND REQUEST FOR PRODUCTION NO. 147

4962

DocuSign Envelope ID: C-1689012-5695-45FD-96C5-19F5A3776255

request to production of only those medical records UHG contends supports a diagnosis code on the government's list. (MTC at 7-8).

During the meet and confer process, UnitedHealth offered to produce the responsive medical records in its possession which would amount to an estimated 21 million charts and take 8 months to collect and produce. This would allow the government to review the medical records that UnitedHealth reviewed as part of its chart review program and the government could then determine which of the codes on its list are or are not supported. (MTC at 17). At the hearing on the MTC, counsel for the government argued that at a minimum the medical records should be produced to allow the government to review the medical evidence underlying UnitedHealth's codes. Production of these records would allow the government to determine for itself which of the codes on its list are supported or are not supported.

However, in the Motion itself, the government asserted the following: "After the United States identified its list of all diagnosis codes it contends are at issue, it served Interrogatory 14 and Request 147 to discover UnitedHealth's contentions about the very same diagnosis codes. In particular, the United States seeks to discovery whether UnitedHealth contends that any of the diagnosis codes on the United States' list were supported by medical records, despite not being found during any of UnitedHealth's reviews of the associated medical records. The United States further seeks to discover factual information related to UnitedHealth's

8

medical record reviews." (MTC at 2, ll. 18-24). The United States also noted:

"Request 147, as written, relatedly requests all medical records associated with the

diagnosis codes on the United States' list. (citation omitted). Importantly, as a result

of the meet and confer process . . . the United States agreed to limit its request for

medical records to only those records associated with the diagnosis codes that

UnitedHealth contends were supported (i.e., the medical records UnitedHealth

identifies in response to Part A of Interrogatory 14)." (MTC at 3, ll. 5-11) . . .

"Subsequently, UnitedHealth agreed to produce some (but not all) of the underlying

medical records, but that offer is hollow without identifying which codes

UnitedHealth contends are supported by medical records (i.e., responding to

Interrogatory 14). Simply producing millions of medical records alone does nothing

to illuminate UnitedHealth's contentions." (MTC at 3, ll. 17-21).

As UHG observed, "RFP 147 is . . . dependent entirely on whether United is

required to Interrogatory 14A; if the Court agrees that United is not required to hire

experts to engage in the coding reviews that responding to Interrogatory 14A would

require, then there would be no medical records responsive to RFP 147 as now

recrafted by the government." (MTC at 16, ll. 2-6). UHG, as part of the meet and

confer efforts, offered to produce to the government every medical record in

United's possession that United reviewed as part of its chart review program, to

allow the government to determine for itself which of the codes on its list are or are

9

4964

DocuSign Envelope ID: 616280A2-569E-467D-96C6-185EA3776355

not supported. (MTC at 16, ll. 25-28; 17, ll. 1-2). The government rejected this

offer. UHG contends that the government's position regarding Request 147 has

"vacillated dramatically over time." (MTC at 17, ll. 12-13). At the hearing on the

MTC, the government did take a position that contradicted the government's prior

arguments in the MTC, i.e., the government argued that a response to Request 147

would be meaningful even without a response to Interrogatory 14.

The Special Master finds that the inconsistency in the government's

arguments undermines their persuasiveness. The Special Master concludes that if

the two discovery requests are related and linked as the government originally

argued, then the Order should be consistent regarding both requests. Accordingly,

the MTC is DENIED without prejudice as it pertains to Request 147. The

government may renew Request 147 if the requested documents are relevant to

UHG's defenses asserted at a later phase of the action.


IT IS SO ORDERED.


DATE:  May 28, 2021

Hon. Suzanne Segal (Ret.)

**Hon. Suzanne H. Segal (Ret.)**

ORDER DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION TO COMPEL RE INTERROGATORY
NO. 14 AND REQUEST FOR PRODUCTION NO. 147

4965

# PROOF OF SERVICE

**RE:**     **United States ex rel. Poehling v. United Health Group, Inc., et al.**
            **Case ID: KEERX**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and am not a party to the within action. My business address is 633 West 5th Street, Suite 1000  Los Angeles, CA 90071

On June 1 2021 I served the **ORDER DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION TO COMPEL RE INTERROGATORY NO. 14 AND REQUEST FOR PRODUCTION NO. 147** on the following parties. Placing a true copy to all parties as follows:

| | |
|---|---|
| Jack D. Ross, Esq. | Amy L. Likoff, Esq. |
| John E. Lee, Esq. | Edward Crooke, Esq. |
| AUSA - OFFICE OF US ATTORNEY | Gregory A. Mason, Esq. |
| 300 North Los Angeles Street | Jessica Krieg, Esq. |
| Los Angeles, CA 90012 | Linda McMahon, Esq. |
| jack.ross@usdoj.gov | Martha Glover, Esq. |
| john.lee2@usdoj.gov | Robert McAuliffe, Esq. |
| | Zoila E. Hinson, Esq. |
| | US DEPARTMENT OF JUSTICE, LEGAL DIVISION |
| | 175 N Street NE |
| | Washington, DC 20002 |
| | amy.l.likoff@usdoj.gov |
| | edward.crooke@usdoj.gov |
| | gregory.a.mason@usdoj.gov |
| | jessica.e.krieg@usdoj.gov |
| | linda.mcmahon2@usdoj.gov |
| | martha.n.glover@usdoj.gov |
| | robert.mcauliffe@usdoj.gov |
| | zoila.e.hinson@usdoj.gov |
| | |
| Arun Subramanian, Esq. | Meng Xi, Esq. |
| Cory Buland, Esq. | William R. H. Merrill, Esq. |
| Geng Chen, Esq. | SUSMAN GODFREY |
| SUSMAN GODFREY | 1000 Louisiana Street |
| 1301 Avenue of the Americas | Suite 5100 |
| 32nd Floor | Houston, TX 77002 |
| New York, NY 10019 | mxi@susmangodfrey.com |
| asubramanian@susmangodfrey.com | bmerrill@susmangodfrey.com |
| cbuland@susmangodfrey.com | |
| gchen@susmangodfrey.com | |
| | |
| Henry C. Su , Esq. | Stephen S. Hasegawa, Esq. |
| CONSTANTINE CANNON | PHILLIPS & COHEN |
| 1001 Pennsylvania Avenue NW | 100 The Embarcadero |
| Suite 1300N | Suite 300 |
| Washington, DC 20004 | San Francisco, CA 94105 |
| hsu@constantinecannon.com | ssh@pcsf.com |
| | |
| David Rowe, Esq. | Kirstin Scheffler Do, Esq. |
| LATHAM & WATKINS LLP | LATHAM & WATKINS LLP |
| 200 Clarendon Street | 330 North Wabash Avenue |
| Boston, MA 02116 | Suite 2800 |
| david.rowe@lw.com | Chicago, IL 60611 |
| | kirstin.schefflerdo@lw.com |

4966

Abid Qureshi, Esq.
Anne Robinson, Esq.
Daniel Meron, Esq.
Morgan Maddoux, Esq.
LATHAM & WATKINS LLP
555 Eleventh Street NW
Suite 1000
Washington, DC 20004
abid.qureshi@lw.com
anne.robinson@lw.com
daniel.meron@lw.com
morgan.maddoux@lw.com

David Schindler, Esq.
LATHAM & WATKINS LLP
355 South Grand Avenue
Suite 100
Los Angeles, CA 90071
david.schindler@lw.com

( ) BY U.S. MAIL: I caused such envelope(s), with postage fully prepaid, to be placed in the U.S. Mail at Los Angeles, California.

( ) BY FACSIMILE: I caused such document to be sent via facsimile to each person.

(X) BY ELECTRONIC MAIL: I caused such document to be sent via electronic mail to each person.

( ) BY PERSONAL SERVICE: I caused such envelope to be delivered by hand to the office of the addressee.

(X) STATE: I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

( ) FEDERAL: I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on June 1, 2021 at Los Angeles, California.

_Alisa Martinez_
Alisa Martinez
Signature Resolution

**EXHIBIT P-79**

Page 1

                IN THE UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA

                        WESTERN DIVISION

UNITED STATES OF AMERICA,    )
ex rel., BENJAMIN POEHLING, )
                             )
          Plaintiffs,        )
                             ) Civil Action No.
vs.                          )
                             ) 16-08697 FMO
UNITEDHEALTH GROUP, INC.,    )
et al.,                      )
                             )
          Defendants.        )
_____)


                     * * * * * *

                 HIGHLY CONFIDENTIAL

          * * OUTSIDE COUNSEL'S EYES ONLY * *

                  * * * * * *

        VIDEOTAPED DEPOSITION OF PAUL IRA SPITALNIC

        Wednesday, March 20, 2024; 9:07 a.m. EDT


Reported by:  Cindy L. Sebo, RMR, CRR, CLR, RPR, CCR,
CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460,
NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime
Court Reporter, NY Association Certified Reporter, OR
CSR 230105, TN CSR 998, TX CSR 12778, WA CSR
23005926, Notary Public
Job No. 1097542



Page 89

1     records if the plan has any information that is --

2     might not be supported, right?

3          A.     I cannot provide such reference.

4          Q.     Can you provide me a specific law,

5     regulation, piece of subregulatory guidance or

6     contractual provision that obligates MA plans to

7     design their chart reviews to identify and delete

8     diagnosis codes that are not supported by medical

9     records?

10          A.     I cannot.

11          Q.     Do -- by the way, do you know what

12     "chart reviews" are?

13          A.     I'm familiar with the term.

14          Q.     You understand that United had a

15     chart review program in place during the period

16     relevant to this case?

17          A.     I understand United takes a number of

18     actions with respect to supporting or developing or

19     -- related to the diagnoses they submit for plan

20     payment.

21          Q.     And would those actions include a



Page 90

1    chart review program?

2         A.      That is my understanding.

3         Q.      When did you first become aware that

4    United had a chart review program?

5         A.      I don't think I was ever aware that

6    there was a specific program.  I know that United

7    and other MAOs, Medicare Advantage organizations,

8    do various -- have various initiatives in support

9    of their diagnosis submission.

10        Q.      So you have no specific information

11   about how United may have conducted its chart

12   review program during the period relevant to this

13   case?

14        A.      I do not have any specific

15   information.

16        Q.      I want to go back to Page 3 of your

17   report, Mr. Spitalnic.  We read the first half of

18   this sentence in Paragraph Number 2.  I -- I want

19   to focus now on the second half of the sentence,

20   but I'll -- I'll read the whole sentence so we've

21   got the full context.



Page 214

1    you agree with me that it's important for CMS to

2    review bid submissions by MA plans?

3          A.     Yes.

4          Q.     You're not suggesting here that CMS

5    should ignore portions of MA plan bid submissions,

6    right?

7          A.     I'm suggesting that there may not

8    have been a reliance on certain statements that are

9    included in some aspects of the bid submission.

10         Q.     Do you think it's reasonable for

11   MA plans like United to presume that CMS is

12   reviewing the bid submissions that the plans submit

13   to the Agency?

14               ATTORNEY ZUPAC:  Object to form.

15               Go ahead.

16               THE WITNESS:  I'm sorry.  Could you

17      repeat the question?

18               BY ATTORNEY MARTINEZ:

19         Q.     Do you think it's reasonable for

20   MA plans like United to presume that CMS is

21   reviewing the bid submissions that the plans submit



Page 215

1   to the Agency?

2           A.      I -- I certainly believe that it's

3   reasonable for a plan to expect that CMS is going

4   to do a thorough review of their bid submission.

5   And I think many of the actuaries that go through

6   the bid review procedure would agree that there is

7   a thorough review of the bid submission -- of their

8   bid submissions.

9                   I would also expect that actuaries

10  would not be surprised that every word of their

11  submission is not reviewed or necessarily relied

12  upon in drawing ultimate conclusions and that, as I

13  included in this sentence before you started

14  reading, that there is a specific reliance on the

15  actuary to -- that that's -- that CMS places on the

16  actuary to ensure that there is compliance with the

17  laws, regulations and instructions and the various

18  Actuarial Standards of Practice.

19          Q.      CMS does a thorough review of bid

20  submissions from MA plans, right?

21          A.      Speaking on behalf of the -- on



Page 216

1    behalf of the Office of the Actuary, we do as

2    thorough and comprehensive a job in reviewing those

3    bids that have been submitted as possible, given

4    the various time and other constraints placed upon

5    us.

6            Q.      And you believe it's reasonable for

7    MA plans to presume that CMS is doing that thorough

8    review that you just spoke about, right?

9            A.      Plans are familiar with our review

10   process.

11           Q.      And how thorough it is, right?

12           A.      Yes.

13           Q.      Mr. Spitalnic, on the top of

14   Page 8 -- we're still in -- in Paragraph 8,

15   you -- you also wrote -- and this is in response to

16   a couple of bulleted statements -- quoting from

17   United's bid submissions.  You wrote, An actuary

18   cannot disclaim that they are knowingly violating

19   the rules of the program.

20                  Do you see that?

21           A.      I do.



4974

Page 217

1          Q.    Are you aware of any instance in

2     which CMS responded to the bulleted statements you

3     include in Paragraph 8 by saying that United's

4     decision to cease its prior process of identifying

5     and deleting certain diagnosis codes violated

6     United's obligations?

7                 ATTORNEY ZUPAC:  Object to form.

8                 THE WITNESS:  I am not aware of

9          discussions that were related to the subject

10         of those quotations.

11                BY ATTORNEY MARTINEZ:

12         Q.    So let -- let's -- let's drill down

13    on one of them.  Let's look at the second bullet --

14    sorry to keep flipping back.

15                We're on the bottom of Page 7 --

16    starting with the BPT submissions in 2015.  And --

17    and what does "BPT" stand for?

18         A.    "BPT" stands for bid pricing tool.

19         Q.    All right.

20                -- starting with the bid pricing

21    tool submissions in 2015, quote, We also adjusted



4975

Page 218

1    projected risk scores to account for changes in our

2    medical record review processes.  Specifically,

3    based on multiple conversations with CMS and CMS'

4    treatment of medical record review in its recent

5    rulemaking process, the health plan has decided to

6    cease one of its prior processes that identified

7    and deleted certain diagnoses codes through the

8    medical record review process.

9              Do you see that?

10         A.    I do see that.

11         Q.    Are you aware of any instance in

12   which CMS responded to that statement by saying

13   that United's decision to cease its prior process

14   of identifying and deleting certain diagnosis codes

15   violated United's obligations under the MA program?

16         A.    I am not aware of any such

17   statements.

18         Q.    Were you aware of these statements

19   from United in its BPT submissions at the time they

20   were made?

21         A.    I do not believe I have -- I -- I do



4976

Page 219

1    not believe I was aware of these statements at that

2    time.

3           Q.      Was anyone else in your office aware

4    of them?

5           A.      I do not know of anyone in my office

6    being specifically aware of this specific

7    statement.

8           Q.      And after writing your report or

9    during the process of writing your report, did you

10   ask anyone at the Office of the Actuary or at CMS

11   whether they were aware of these statements from

12   United?

13          A.      I did not specifically ask anybody

14   about anything going back to 2015.

15          Q.      So going -- going back to the top

16   of -- of Page 8, Mr. Spitalnic, where you wrote An

17   actuary cannot disclaim that they are knowingly

18   violating the rules of the program.

19                  Are you aware of United ever

20   asserting in this case that it could knowingly

21   violate the rules of the MA program by issuing a



4977

Page 220

1    disclaimer in its bid submissions to CMS?

2          A.      I took the potential qualification

3    that I referenced in those two preceding bullets

4    that there was some acknowledgment by United in

5    this case -- I took the suggestion that they were

6    trying to disclaim that they knew of unsupported

7    doc- -- documentation -- unsupported diagnoses

8    being used for payment and if the contention was --

9    and if the reason for the inclusion in the

10   actuarial support materials was to reference that

11   they were aware of additional codes that were

12   unsupported as being included in their basis for

13   payment -- if that was the intention, then that's

14   how I would potentially read those -- that

15   particular statement.

16              And so that was what got me to say --

17   and in complete fairness or disclosure, if I were

18   to have read this statement in 2015 without knowing

19   the history of exactly what all the -- you know,

20   some of the background that I'm now more familiar

21   with, you know, given some of the either facts of



Page 221

1    this case or implications that I've made in reading

2    Ms. Lambert's report, without that additional

3    detail, I would not be exactly sure what this was

4    referencing or what this was getting into.

5                    And so with that additional

6    background, if the intent of this -- these

7    paragraph -- or this paragraph or two was to say

8    that United was aware that they had unsupported

9    diagnoses and they're going to continue to include

10   them in their bid development, I would think that

11   to be inappropriate.

12        Q.    That is your -- an assumption that

13   you're making, right?

14        A.    Absolutely.

15        Q.    Just so we're clear.

16                    You have no information of United

17   in this case ever asserting, arguing, claiming that

18   it can knowingly violate the rules of the

19   MA program by issuing a disclaimer in its bid

20   submissions to CMS, right?

21        A.    I would say United, nor anyone else,



4979

Page 225

1      I, Cindy L. Sebo, Nationally Certified Court

2   Reporter herein, do hereby certify that the foregoing

3   deposition of PAUL IRA SPITALNIC was taken before me

4   pursuant to notice at the time and place indicated;

5   that said witness duly swore to tell the truth, the

6   whole truth, and nothing but the truth under

7   penalties of perjury; that said testimony of witness

8   was correctly recorded to the best of my abilities in

9   machine shorthand, thereafter transcribed under my

10  supervision with computer-aided transcription; that

11  deposition is a true and accurate record of the

12  testimony given by the witness; that I am neither

13  counsel, nor kin to any party in said action, nor

14  interested in the outcome; and that a copy of this

15  transcript obtained from a source other than the

16  court reporting firm, including an adversary or

17  co-counsel in the matter, is uncertified and may not

18  be used at trial.

19  CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR, RSA, CA

    CSR 14409, NJ Certified CR 30XI0024460, NJ Certified

20  RT 30XR00019500, NM CSR 589, NY Realtime Court

    Reporter, NY Association Certified Reporter, OR CSR

21  230105, TN CSR 998, TX CSR 12778, WA CSR 23005926,



4980

**EXHIBIT P-80**

April 2, 2012

**NOTE TO: All Medicare Advantage Organizations, Prescription Drug Plan Sponsors, and Other Interested Parties**

**SUBJECT: Announcement of Calendar Year (CY) 2013 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter**

In accordance with section 1853(b)(1) of the Social Security Act (the Act), we are notifying you of the annual Medicare Advantage (MA) capitation rate for each MA payment area for CY 2013 and the risk and other factors to be used in adjusting such rates.  The capitation rate tables for 2013 are posted on the Centers for Medicare & Medicaid Services (CMS) web site at http://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/index.html under Ratebooks and Supporting Data.  The statutory component of the regional benchmarks, transitional phase-in periods for the Affordable Care Act rates, qualifying counties, and each county's applicable percentage are also posted at this website.

Attachment I shows the final estimates of the increases in the National Per Capita MA Growth Percentages for 2013 and the national Medicare fee-for-service growth percentage.  These growth rates will be used to update the 2013 rates.  As discussed in Attachment I, the final estimate of the increase in the National Per Capita MA Growth Percentage for combined aged and disabled beneficiaries is 2.80 percent.  Attachment II provides a set of tables that summarizes many of the key Medicare assumptions used in the calculation of the National Per Capita MA Growth Percentages.

Section 1853(b)(4) of the Act requires CMS to release county-specific per capita fee-for-service (FFS) expenditure information on an annual basis, beginning with March 1, 2001.  In accordance with this requirement, FFS data for CY 2010 are being posted on the above website.

Information on deductibles for MSA plans is included below.

Attachment III presents responses to comments on the Advance Notice of Methodological Changes for CY 2013 MA Capitation Rates and Parts C and Part D Payment Policies (Advance Notice).  Attachment VII presents the final Call Letter.  We received 114 submissions in response to CMS' request for comments on the Advance Notice/Call Letter, published on February 17, 2012.  Eight of the comments were from advocacy groups, 22 were from associations, 5 were from members of the public, 1 was from a State, 1 was from a Congressman, 1 was from a Congressional Advisory Committee, 68 were from health plans and 8 were from consultants.

4982

| Disease Coefficients | Description Label | Community Factors | Institutional Factors |
|---|---|---|---|
| HCC83 | Angina Pectoris/Old Myocardial Infarction | 0.170 | 0.331 |
| HCC92 | Specified Heart Arrhythmias | 0.289 | 0.245 |
| HCC95 | Cerebral Hemorrhage | 0.359 | 0.151 |
| HCC96 | Ischemic or Unspecified Stroke | 0.265 | 0.151 |
| HCC100 | Hemiplegia/Hemiparesis | 0.534 | 0.069 |
| HCC101 | Cerebral Palsy and Other Paralytic Syndromes[3] | 0.131 | - |
| HCC104 | Vascular Disease with Complications | 0.594 | 0.470 |
| HCC105 | Vascular Disease | 0.302 | 0.138 |
| HCC107 | Cystic Fibrosis | 0.385 | 0.378 |
| HCC108 | Chronic Obstructive Pulmonary Disease | 0.340 | 0.378 |
| HCC111 | Aspiration and Specified Bacterial Pneumonias | 0.734 | 0.605 |
| HCC112 | Pneumococcal Pneumonia, Emphysema, Lung Abscess | 0.206 | 0.197 |
| HCC119 | Proliferative Diabetic Retinopathy and Vitreous Hemorrhage | 0.236 | 0.440 |
| HCC130 | Dialysis Status | 1.348 | 2.228 |
| HCC131 | Renal Failure | 0.297 | 0.353 |
| HCC132 | Nephritis | 0.116 | 0.353 |
| HCC148 | Decubitus Ulcer of Skin | 1.165 | 0.517 |
| HCC149 | Chronic Ulcer of Skin, Except Decubitus | 0.476 | 0.291 |
| HCC150 | Extensive Third-Degree Burns[3] | 1.246 | - |
| HCC154 | Severe Head Injury | 0.580 | 0.060 |
| HCC155 | Major Head Injury[3] | 0.171 | - |
| HCC157 | Vertebral Fractures without Spinal Cord Injury | 0.467 | 0.154 |
| HCC158 | Hip Fracture/Dislocation[3] | 0.435 | - |
| HCC161 | Traumatic Amputation | 0.793 | 0.266 |
| HCC164 | Major Complications of Medical Care and Trauma | 0.311 | 0.325 |
| HCC174 | Major Organ Transplant Status | 1.084 | 0.925 |
| HCC176 | Artificial Openings for Feeding or Elimination | 0.659 | 0.861 |
| HCC177 | Amputation Status, Lower Limb / Amputation Complications | 0.793 | 0.266 |
| **Disabled/Disease Interactions** | | | |
| D_HCC5 | Disabled_Opportunistic Infections[3] | 0.597 | - |
| D_HCC44 | Disabled_Severe Hematological Disorders | 1.340 | 0.633 |
| D_HCC51 | Disabled_Drug/Alcohol Psychosis | 0.383 | 0.284 |
| D_HCC52 | Disabled_Drug/Alcohol Dependence | 0.105 | 0.284 |
| D_HCC107 | Disabled_Cystic Fibrosis[3] | 2.556 | - |
| **Disease Interactions** | | | |
| INT1 | DM_CHF[2] | 0.150 | 0.111 |
| INT2 | DM_CVD | 0.150 | 0.051 |
| INT3 | CHF_COPD | 0.278 | 0.248 |
| INT4 | COPD_CVD_CAD | 0.233 | 0.118 |
| INT5 | RF_CHF[2,3] | 0.262 | - |
| INT6 | RF_CHF_DM[2] | 0.600 | 0.373 |

**NOTES:**
[1] Includes Type I or Type II Diabetes Mellitus.
[2] Beneficiaries with the three-way interaction RF*CHF*DM are excluded from the two-way interactions DM*CHF and RF*CHF. Thus, the three-way interaction term RF*CHF*DM is not additive to the two-way interaction terms

4983

**EXHIBIT P-81**

# Medicare & Retirement

## 2015 Business Plan

August [XX], 2015

**DRAFT**

EXHIBIT

00309



# Financial Summary
## *Key Takeaways*



| 2014 Financial Summary |
|---|
| • Best estimate of ($500M) miss, M&R management commitment to find $250M |
| • Submitted 2014 2+10 forecast $250M down from budget |
| • Excluding insurer's fee 22% earnings growth at the 2+10 forecast |
| • Recent development on CV (under review), and additional Optum contributions may result in an additional $350M in IOI versus the 2+10 forecast |

| 2015 Estimate |
|---|
| • CMS rate pressure driving unprecedented member premiums $520M and benefit reductions $255M |
| • The expiration of the demonstration period drives 280 bps of pressure ($535M in IOI) |
| • Insurer's Fee increase of 44bps drives ($163M) of IOI pressure |
| • Pulling all levers to minimize plan closures |
| • Aggressive 100K growth assumption |

| 2016 – 2017 Long Term Outlook |
|---|
| • Assuming 38% of members in a 4.0+ in 2016 and 50% in 2017 |
| • Volume capture is key |
| • Net core trend of 3% throughout |
| • Net operating cost takeout of $120M in 2016 and $100M in 2017 |
| • Consistent IOI contribution from HouseCalls |
| • Incremental Insurer's Fee headwind in 2017 ($203M) as tax increases nearly 35 bps and 2016 revenues rebound from 2015 |
| • MAPD plan liability increasing as coverage gap fills; $280M in 2016 and $270M in 2017 |

|  | 2014 Budget | 2014 Outlook | 2015 Estimate | 2016 Estimate | 2017 Estimate |
|---|---|---|---|---|---|
| **Gross IOI** | **$2,254** | **$2,354** | **$2,000** | **$2,250** | **$2,677** |
| **Growth:** | | | | | |
| MA | (65) | (5) | 100 | 200 | 200 |
| Part D | 300 | 300 | 300 | 100 | 0 |
| Med Supp | 235 | 270 | 229 | 208 | 191 |
| **Metrics:** | | | | | |
| MA BCR % | 84.3% | 84.3% | 84.6% | 85.0% | 84.5% |
| M&R OCR % | 11.4% | 11.3% | 12.1% | 11.5% | 11.3% |
| M&R IOI % | 5.1% | 5.2% | 4.1% | 4.2% | 4.6% |
| Benefits | $455 | $435 | $255 | $90 | $90 |
| Premiums | $20 | $20 | $520 | $190 | $180 |

7

Proprietary Information of UnitedHealth Group.  Do not distribute or reproduce without express permission of UnitedHealth Group.

4986

# Performance Architecture



| MA Growth | What Has Changed | What Hasn't Changed |
|---|---|---|
| **Enrollment** | 2015 – 100K growth versus (300K)<br>2017 – 200K growth versus 100K | 2016 – 100K growth |
| **Gross Margin** | | |
| **Benefits / Mix** *(Revenue)* | 2015 – $175M increase in benefit reductions/ member premiums; $775M total<br>2016/2017 – incremental benefit cuts/member premiums of $280M and $270M, respectively | |
| **Rates & RAF** | 2015 – $220M incremental earnings from HouseCalls versus $0M | 2016/2017 – Trend neutral RAF programs |
| **Trend Outlook** *(Medical)* | | 2015 - 2017 – ~3% net core trend |
| **Affordability** | | 2015 - 2017 – Trend neutral impact |
| **Network** | 2015 – $25M versus $0M | |
| **Other** | | |
| **Operating Costs** | 2015 – $60M net productivity versus $0M | 2016 – $120M net productivity<br>2017 – $100M net productivity |
| **Stars** | 2015 – 37% in 4.0+ versus 24%<br>2016 – 38% in 4.0+ versus 35%<br>2017 – 50% in 4.0+ versus 45% | |
| **Other** | 2015 – removal of ($300M) IOI from one-time prior year CV/QA deletes | |

8

Proprietary Information of UnitedHealth Group.  Do not distribute or reproduce without express permission of UnitedHealth Group.

4987



# 2014 Budget to 2014 Outlook Bridge

UnitedHealthcare®
MEDICARE & RETIREMENT

| | 2014 Budget | 2014 Best Est. | 2014 2+10 | 2014 Outlook |
|---|---|---|---|---|
| **Growth** | **470** | **565** | **565** | **565** |
| MA | (65) | (5) | (5) | (5) |
| Part D | 300 | 300 | 300 | 300 |
| MedSupp | 235 | 270 | 270 | 270 |
| **Revenue** | **$44,293** | **$45,085** | **$45,085** | **$45,470** |
| MA | 31,249 | 31,930 | 31,930 | 32,315 |
| Part D | 5,016 | 4,978 | 4,978 | 4,978 |
| MedSupp | 8,028 | 8,177 | 8,177 | 8,177 |
| **KEY METRICS** | | | | |
| **Reported BCR** | | | | |
| MA | 84.3% | 85.8% | 85.2% | 84.3% |
| Part D | 74.9% | 75.1% | 75.1% | 75.1% |
| MedSupp | 85.7% | 85.9% | 85.9% | 85.9% |
| Total M&R OCR | 11.4% | 11.5% | 11.3% | 11.3% |
| Total M&R OCR (excl. IF) | 10.2% | 10.3% | 10.1% | 10.1% |
| **IOI Margin %** | | | | |
| MA | 5.5% | 3.8% | 4.6% | 5.6% |
| Part D | 6.4% | 5.9% | 5.9% | 5.9% |
| MedSupp | 2.8% | 3.0% | 3.0% | 3.0% |

- 2014 Outlook **revenue and earnings better than budget** by $1,177 million and $100 million respectively

- Best Estimate IOI gap of ($500M) versus budget comprised of ($200M) in network optimization, ($100M) in lower coding intensity (net of HouseCalls upside), ($100M) of Hep C, and ($100M) of other medical baseline and prior period retro.

- Will cut gap in half with $250M in M&R management commitment. Earnings recouped through network contracting and new ideation, additional clinical based affordability, further operating cost reductions, and contributions from Optum and other UHC partners.

- CV & QA deletes opportunity driving $350M in IOI

- 2014 Outlook IOI MA margin of 5.6% is slight improvement versus budget margin of 5.5%

9

Proprietary Information of UnitedHealth Group. Do not distribute or reproduce without express permission of UnitedHealth Group.

4988

**EXHIBIT P-82**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )



Videotaped Deposition of

MELISSA FERRON

Given Remotely

Wednesday, July 27, 2022

11:13 a.m. Eastern




Reported by:  Karen K. Kidwell, RMR, CRR




Magna Legal Services
866-624-6221
www.MagnaLS.com



4990

Page 134

1    should be looking at?

2          Q.    It is page 3 of Exhibit 348.

3          A.    Oh, page 3.  Okay.

4          Q.    Yeah, I think I misspoke and told you

5    page 4 earlier.

6          A.    Okay.  Yes.

7          Q.    All right.  So Mr. Webb wrote to you,

8    "There was also a key takeaway that you were going to

9    work on:

10              "Identifying the HCC's (or hcc/dx code

11    combinations) that could be used to further filter

12    the CV populations due to the inability to validate."

13              Do you see that?

14         A.    Yes.

15         Q.    So what Mr. Webb is asking you to do is

16    identifying a set of HCCs that you have determined

17    often do not validate in your second-level review.

18    Is that right?

19              MS. SOBEL:  Objection to form.  Document

20         speaks for itself.

21              THE WITNESS:  Yes.

22    BY MS. CHEN:

23         Q.    And the purpose of identifying these HCCs

24    was to allow United to get a second-level review for

25    those HCCs.  Is that right?



Page 135

1          MS. SOBEL:  Objection to form.  Calls for
2          speculation.
3          THE WITNESS:  Yes.  That would -- my
4          understanding was that there are certain HCCs
5          and diagnosis that are likely to be miscoded
6          from a physician office.  And if the first-level
7          reviewer deemed it as not valid, that the second
8          level wouldn't need to be done.
9    BY MS. CHEN:
10        Q.   In other words, one level of review was
11   sufficient to determine that these codes should be
12   deleted?
13         MS. SOBEL:  Objection.  Form.
14         THE WITNESS:  Yes, that's a good
15         interpretation.
16         I might -- can I just offer just an
17         observation, also, that in the first amended
18         complaint, there's some misquoting of what these
19         HCCs are.  So my e-mail has a numerical label
20         for the HCCs; and in the first amended
21         complaint, the diagnosis narrative was put in,
22         which does not coincide with the HCC numbers.
23   BY MS. CHEN:
24        Q.   Okay.  So -- okay.  So -- so, Ms. Ferron,
25   I think what you're saying is that there was a



Page 190

1    documentation that's capable of being understood in

2    two or more possible ways?

3          A.    Yes.

4          Q.    Conflicting documentation includes

5    documentation that is opposing, or that does -- is

6    not internally consistent?

7          A.    Yes.

8          Q.    And incomplete documentation, similar to

9    what we've been discussing for a while now, is

10   documentation that's lacking certain information?

11         A.    Yes.

12         Q.    And you would agree that there are certain

13   circumstances where it would be appropriate to use

14   queries, correct?

15         A.    Yes.

16         Q.    One of those circumstances is when a

17   documented diagnosis lacks specificity for which

18   clarification will yield the assignment of the

19   accurate specific code?

20              MR. McNAMARA:  Are you just going to read

21         the slide and run through the slide?  We can all

22         see what's on the slide.

23              THE WITNESS:  Yes.

24   BY MS. CHEN:

25         Q.    Another circumstance when it would be



Page 191

1    appropriate to use a physician query is when the

2    medical record indicates that the patient is

3    receiving treatment for a diagnosis that is not

4    clearly documented.  Is that right?

5         A.   Yes.  Yes.

6         Q.   Another circumstance where it would be

7    appropriate to use a physician query is when the

8    physician has used a symbol or abbreviation, and a

9    clarification is needed to assign the appropriate

10   code, correct?

11        A.   Yes.

12        Q.   A fourth circumstance where it would be

13   appropriate to use a physician query are when there

14   are multiple possible interpretations to what is

15   documented, and clarification is needed to assign the

16   appropriate code?

17        A.   Yes.

18        Q.   Another circumstance where a physician

19   query might be appropriate is when clarification is

20   needed as to whether a listed diagnosis still exists

21   or if it has resolved?  Is that correct?

22        A.   Yes.

23        Q.   Another circumstance where it would be

24   appropriate to use a physician query is when

25   clarification of the cause or etiology of a diagnosis



Page 192

1    or condition is needed to assign the appropriate

2    code?  Is that correct?

3              MR. McNAMARA:  Can you indicate which --

4         which slide you're reading from, Counsel?

5              MS. CHEN:  I'm asking Ms. Ferron the

6         question.

7              MR. McNAMARA:  Okay.  But you appear to be

8         reading from something.  Are you reading from

9         Slide 23?

10             MS. CHEN:  I am reading from Slide 23, but

11        the question to Ms. Ferron concerns -- the

12        question to Ms. Ferron was simply another

13        circumstance where it would be appropriate to

14        use a physician query is when clarification for

15        the cause or etiology of a diagnosis or

16        condition is needed to assign the appropriate

17        code.

18   BY MS. CHEN:

19        Q.   Correct?

20        A.   Correct.

21        Q.   And can you explain what etiology of a

22   diagnosis or condition is?

23        A.   Yes.

24        Q.   And what is it?

25        A.   Okay.  Sorry.



Page 193

1          Q.    Sorry.

2          A.    It would be -- there's certain code

3    assignments that could differ, based on the etiology

4    of the condition.  So the etiology is the underlying

5    cause.

6                So typically -- I'll give you an example.

7    So peripheral neuropathy can be caused by diabetes.

8    It can be caused by chemotherapy.  It can be caused

9    by spinal disorders.  So knowing the etiology of a

10   condition could change the code assignment.

11         Q.    Thank you.

12               Another circumstance where physician query

13   would be appropriate would be to clarify the

14   cause-and-effect relationship between two conditions

15   needed to assign the appropriate code; is that right?

16         A.    Yes.

17         Q.    Another circumstance where it would be

18   appropriate to use a physician query is when clinical

19   indications are noted in the medical record that

20   raise the possibility that a condition may be

21   present, but is not stated as a diagnosis.  Correct?

22         A.    Yes, correct.

23         Q.    And then there's one final circumstance

24   for using a physician query, which is present on

25   admission.  But I'm going to have to ask you to



Page 236

1                        CERTIFICATE

2

3        I, KAREN K. KIDWELL, Registered Merit Reporter,

4   and Certified Realtime Reporter, do hereby certify

5   that prior to the commencement of the examination,

6   the deponent was remotely sworn to testify to the

7   truth, the whole truth under penalty of perjury.

8        I DO FURTHER CERTIFY that the foregoing is a

9   verbatim transcript of the testimony as taken

10  stenographically by me at the time, place and on the

11  date hereinbefore set forth, to the best of my

12  ability.

13       I DO FURTHER CERTIFY that I am neither a

14  relative nor employee nor attorney nor counsel of any

15  of the parties to this action, and that I am neither

16  a relative nor employee of such attorney or counsel,

17  and that I am not financially interested in this

18  action.

19

20                    _Karen Kidwell_
                      _____
21                    Karen K. Kidwell
                      Registered Merit Reporter
22                    Certified Realtime Reporter
                      Notary Public
23

24

25



4997

**EXHIBIT P-83**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA       )   No. 16-08697 FMO
ex rel. BENJAMIN POEHLING,     )
                               )
              Plaintiffs,      )
                               )
v.                             )
                               )
UNITEDHEALTH GROUP, INC.,      )
et al.,                        )
                               )
              Defendants.      )
_____  )

*** CONFIDENTIAL ***
CONTAINS ATTORNEYS' EYES ONLY PORTIONS
Videoconference Videotaped Deposition OF
CAROLYN KAPUSTIJ
(Taken virtually)
9:03 a.m. Eastern
Thursday, August 25, 2022

REPORTED BY:  Christine A. Taylor, RPR

Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 16

1    Inspector General, you were with CMS?

2         A.    Correct.

3         Q.    And you were with CMS for about

4    12 years from 2009 through 2021?

5         A.    Yes.  Yes.  12 years.

6         Q.    Okay.  And during the period when you

7    were at CMS, you worked on a research matter

8    looking into a potential fee-for-service adjuster

9    in the context of RADV?

10        A.    I was involved in that during

11   different time periods at CMS.

12        Q.    And can you tell us a little bit about

13   that?  What is a fee-for-service adjuster?

14             MS. YEVTUKHOVA:  Objection.  Form.

15             THE WITNESS:  So the fee-for-service

16             adjuster was a concept that was put forward

17             by the MA industry and taken up by CMS as a

18             means to offset recoveries for risk

19             adjustment data validation audits.

20   BY MR. QURESHI:

21        Q.    And when you say it was taken up by

22   CMS, what do you mean by that?

23        A.    I mean the industry contacted Tom

24   Hutchinson about it and then he kind of directed

25   his staff to calculate it.



Page 238

1                    CERTIFICATE OF REPORTER

2

3            I, Christine A. Taylor, Certified
       Court Reporter within and for the State of
       Georgia, do hereby certify:

4

5            That the foregoing deposition was
       taken before me on the date and at the time and
       location stated on Page 1 of this transcript; that

6      the deponent was duly sworn to testify to the
       truth, the whole truth and nothing but the truth;

7      that the testimony of the deponent and all
       objections made at the time of the examination

8      were recorded stenographically by me and were
       thereafter transcribed; that the foregoing

9      deposition as typed is a true, accurate and
       complete record of the testimony of the deponent

10     and of all objections made at the time of the
       examination to the best of my ability.

11

12           I further certify that I am neither
       related to nor counsel for any party to the cause
       pending or interested in the events thereof.

13     Witness my hand, this 29th day of August, 2022.

14

15               _Christine Taylor_

16     _____

17     Christine A. Taylor, RPR
       CCR-4736

18

19

20

21

22

23

24

25



5001

**EXHIBIT P-84**

# CLAIMS VERIFICATION

# Business Requirements

# Sep 15, 2010

Claims Verification Manual Specs [Page]

EXHIBIT

712-4

5003

CONFIDENTIAL AND PROPRIETARY

MARA161485

**Process to Review Chart for Discrepancies Continued**



CONFIDENTIAL AND PROPRIETARY

**EXHIBIT P-85**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel.,)

BENJAMIN POEHLING,                )

                                  )

          Plaintiffs,             )

                                  )

vs.                               ) Civil Action No.

                                  ) 16-08697 FMO

UNITEDHEALTH GROUP, INC., et al., )

                                  )

          Defendants.             )

_____/


VIDEOTAPED DEPOSITION OF PATRICIA BRENNAN

(Taken Virtually by Plaintiff)

Tuesday, September 12th, 2023

11:34 a.m. EDT


Reported Stenographically by



5006

Page 186

1          Q.    Do you recall any sort of ballpark

2     estimate or range?

3          A.    No.

4          Q.    Was there at any point in time a

5     discussion about -- a discussion not involving

6     lawyers about expanding CV to include members with

7     nonexclusive HCCs?

8          A.    I don't recall that.

9          Q.    Okay.  And so what happened with the

10    charts once they went through the chart eligibility

11    step in this workflow?

12         A.    So then they went through -- obviously,

13    if you look at the written part about we would

14    import the claims data that was related to those

15    charts, so we would pull in the member claim data,

16    and then match it against the coding results to

17    determine if the exclusive HCC that was in claim

18    matched to what was coded.  If it did, the process

19    ended because there was a match.  The coder coded

20    the condition that was in claim, so the medical

21    records supported it.  If it did not match, it went

22    to coding, and a coder -- claims verification

23    analyst coder would perform a review to see if that

24    code was supported in the medical record.

25         Q.    And the system-matching logic phase,



Page 267

1    placed on hold at some point, yes.

2         Q.    And do you have an understanding of why

3    the deletes were placed on hold?

4         A.    No.

5         Q.    Do you have an understanding of what

6    time period during which the deletes were placed on

7    hold?

8         A.    No.

9         Q.    Do you have an understanding of who at

10   M&R would have made the decision to place CV

11   deletes on hold?

12        A.    No.

13        Q.    Do you recall anything about the volume

14   of deletes that were placed on hold?

15        A.    No.

16        Q.    Did you ever become aware of the volume

17   of deletes that were placed on hold after the date

18   of this e-mail?

19        A.    Not that I recall.

20        Q.    Do you have any understanding of the

21   outcome of the assessment that's referenced here by

22   M&R of the CV program?

23        A.    No.

24        Q.    Do you have any understanding of what

25   happened with those CV deletes that were placed on



5008

Page 268

1  hold?

2      A.    No.

3      Q.    So you don't know whether deletes were

4  actually ever submitted to CMS for those -- for

5  those deletes that had been placed on hold; is that

6  correct?

7      A.    Correct.

8      Q.    Did you become aware at some point in

9  2014 that Optum had suspended the claims

10 verification program for M&R?

11     A.    Yes.

12     Q.    And when did you become aware of that?

13     A.    I don't know the exact timing, but I

14 got an e-mail that informed me of that.

15     Q.    And do you recall who that e-mail was

16 from?

17     A.    I believe it was from Jeff Dumcum.

18     Q.    Jeff Dumcum.

19          And do you recall what that e-mail

20 said?

21     A.    Just that the CV program -- I don't

22 recall the specifics of the e-mail, but I know that

23 that's when we found out the CV program was going

24 to be stopped.

25     Q.    Okay.  And do you have any sense of --



Page 269

1   do you recall receiving that e-mail sometime during

2   2014?

3        A.    I don't remember the timing, like I

4   mentioned, but I do recall receiving it.  I just

5   don't know the timing.

6        Q.    Okay.  And the e-mail that you're

7   thinking of, did that inform you that the CV

8   program was being terminated entirely?

9        A.    Yes.

10        Q.    Okay.  Prior to that, did you become

11   aware at any point that M&R had suspended the CV

12   program for a period of time?

13        A.    I really don't recall the suspension or

14   the holds.  I mean, I recall hearing about it, but

15   I don't recall being involved in the specifics

16   around it.

17        Q.    Do you recall whether during this time

18   frame, so I guess starting in 2013 with the e-mail

19   that we just looked at, going into 2014, do you

20   recall whether you were engaged in any operations

21   activities for the CV program?

22        A.    I don't recall.

23        Q.    And do you recall -- I think you said

24   that you remembered hearing something about CV

25   being suspended.  Do you recall hearing anything



                    CERTIFICATE OF NOTARY PUBLIC

1

2

3            I, Amy A. Brauser, RPR RMR CRR, the officer

4    before whom the foregoing deposition was taken, do

5    hereby certify that the witness was duly sworn by me

6    prior to the taking of the foregoing deposition; that

7    the testimony of said witness was taken by me to the

8    best of my ability and thereafter reduced to

9    typewriting under my direction; that I am neither

10   counsel for, related to, nor employed by any of the

11   parties to the action in which this deposition was

12   taken, and further that I am not a relative or

13   employee of any attorney or counsel employed by the

14   parties thereto, nor financially or otherwise interest

15   in the outcome of the action.

16

17        This is the 15th day of September, 2023.

18

19            _Amy A Brauser_____

20            Amy A. Brauser, RPR RMR CRR

              Notary Public

21            for the Commonwealth of Virginia

22

23   Notary Registration No.: 7675529

24   My Commission Expires:  January 31, 2024

25



**EXHIBIT P-86**

**Abid R. Qureshi**
Direct Dial: 202.637.2240
abid.qureshi@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Milan |
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New Jersey |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

# LATHAM&WATKINS LLP

May 27, 2016

## VIA EMAIL AND FEDEX

Carol Wallack
Jessica Krieg
Civil Division, Fraud Section
U.S. Department of Justice
601 D. Street, NW, Room 9128
Washington, D.C. 20004

Re:    Response to Follow Up Questions on March 18, 2016 Letter re: 2012 DOS
Encounters Identified for CV Review

Dear Carol and Jessica:

I am writing in response to your April 4, 2016 follow up questions regarding UnitedHealth Group's ("UHG's") March 18, 2016 letter re: 2012 DOS Encounters Identified for CV Review (the "March 18 Letter").

As explained in the March 18 Letter, UHG was still in the process of confirming whether or not MARA1298042 (produced on May 12, 2015) included all 2012 DOS CV encounters with financial impact for which the multi-stage CV process was begun but not completed at the time M&R discontinued CV ("In Process CV Encounters") and anticipated supplementing its response upon completion of that review. That review is now complete. Rather than producing another supplemental spreadsheet, the enclosed spreadsheet, MARA2160501, includes a complete list of all identified 2012 DOS In Process CV Encounters or CV Cancelled Deletes with Part C financial impact to UHG, including, but not limited to, the relevant encounters identified in your April 4, 2016 email. Please note that the Plan Number(s) listed are Contracts in the corresponding Payment Year 2013.

In your April 4, 2016 email, you request an explanation for "why the deletes were never made." As you know, based on discussions and correspondence with CMS in March – June 2014, M&R undertook to delete only those diagnosis codes that had undergone a complete CV review and been identified as appropriate deletes at the time M&R discontinued CV. The encounters in the enclosed spreadsheet were not deleted because they had not completed the

**EXHIBIT**

__726__

5013

**LATHAM&WATKINS**LLP

multi-stage CV process in place at the time M&R discontinued CV.  In particular, none of the encounters in the enclosed spreadsheet completed the expert coding review stage of the CV process, and approximately 800 encounters were not reviewed by any coder as part of the CV process. UHG has flagged the 800 encounters that were not reviewed by any coder as part of the CV process with a "0" under Column J of the enclosed spreadsheet ("Initial_CV_Review").

In response to your request that we identify each encounter with "a project number or some other identifier," please note that the great majority of the encounters in the enclosed spreadsheet were not far enough along in the CV process to be assigned such an identifier at the encounter level.  UHG has included the ProjectID number in the enclosed spreadsheet, where available.

Please also note that the enclosed spreadsheet and facts described above are based on the information we have been able to gather to date.  UHG reserves the right to modify, supplement, correct, or otherwise amend these responses as it gathers additional information in the course of its review.

As with the prior productions and responses, these documents and responses contain highly proprietary and competitively sensitive commercial information, and UHG requests confidential treatment of these documents and responses and exemption from disclosure under the Freedom of Information Act.  These documents and responses may also contain patient health information protected by the Health Insurance Portability and Accountability Act of 1996, as amended and implemented.  Per our discussions, UHG is producing these documents and response pursuant to 45 C.F.R. § 164.512 and/or 45 C.F.R. § 164.502(a)(3), and pursuant to its understanding that the government has a standard business associate agreement in place with Relator's counsel.

*    *    *    *

Please do not hesitate to contact me with any questions.

Very truly yours,

Abid R. Qureshi
of LATHAM & WATKINS LLP

cc:    Roger S. Goldman
       Daniel Meron

5014

May 27, 2016
Page 3

**LATHAM&WATKINS**LLP

Anne Robinson
Kirstin Scheffler Do
Peggy B. Glynn
Martha Glover
Gretchen Wylegala

5015

**EXHIBIT P-87**

**REDACTED VERSION OF
DOCUMENT PROPOSED TO BE
FILED UNDER SEAL**

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ProjectID | | | FromDate | ThroughDate | DiagnosisCode | Contract1 | Contract2 | Contract3 | Initial_CV_Review |
| 2 | 000012215 | | | 2012-03-29 00:00:00.000 | 2012-03-29 00:00:00.000 | 436 | H5005 | | | 1 |
| 3 | 000012215 | | | 2012-06-01 00:00:00.000 | 2012-06-01 00:00:00.000 | 25000 | H5005 | | | 1 |
| 4 | 000012215 | | | 2012-02-25 00:00:00.000 | 2012-02-25 00:00:00.000 | 4476 | H5005 | | | 1 |
| 5 | 000012215 | | | 2012-09-29 00:00:00.000 | 2012-09-29 00:00:00.000 | 4476 | H5005 | | | 1 |
| 6 | 000012215 | | | 2012-01-30 00:00:00.000 | 2012-01-30 00:00:00.000 | 25040 | H5005 | | | 1 |
| 7 | 000012215 | | | 2012-08-29 00:00:00.000 | 2012-08-29 00:00:00.000 | 70714 | H4514 | | | 0 |
| 8 | 000012215 | | | 2012-09-05 00:00:00.000 | 2012-09-05 00:00:00.000 | 70714 | H4514 | | | 0 |
| 9 | 000012215 | | | 2012-09-05 00:00:00.000 | 2012-09-05 00:00:00.000 | 7079 | H4514 | | | 0 |
| 10 | 000012215 | | | 2012-09-12 00:00:00.000 | 2012-09-12 00:00:00.000 | 70714 | H4514 | | | 0 |
| 11 | 000012215 | | | 2012-09-19 00:00:00.000 | 2012-09-19 00:00:00.000 | 70714 | H4514 | | | 0 |
| 12 | 000012215 | | | 2012-09-26 00:00:00.000 | 2012-09-26 00:00:00.000 | 70714 | H4514 | | | 0 |
| 13 | 000012215 | | | 2012-09-26 00:00:00.000 | 2012-09-26 00:00:00.000 | 7079 | H4514 | | | 0 |
| 14 | 000012215 | | | 2012-10-03 00:00:00.000 | 2012-10-03 00:00:00.000 | 70712 | H4514 | | | 0 |
| 15 | 000012215 | | | 2012-10-03 00:00:00.000 | 2012-10-03 00:00:00.000 | 70714 | H4514 | | | 0 |
| 16 | 000012215 | | | 2012-10-10 00:00:00.000 | 2012-10-10 00:00:00.000 | 70712 | H4514 | | | 0 |
| 17 | 000012215 | | | 2012-10-10 00:00:00.000 | 2012-10-10 00:00:00.000 | 70714 | H4514 | | | 0 |
| 18 | 000012215 | | | 2012-10-17 00:00:00.000 | 2012-10-17 00:00:00.000 | 70714 | H4514 | | | 0 |
| 19 | 000012215 | | | 2012-10-17 00:00:00.000 | 2012-10-17 00:00:00.000 | 7079 | H4514 | | | 0 |
| 20 | 000012215 | | | 2012-10-24 00:00:00.000 | 2012-10-24 00:00:00.000 | 70714 | H4514 | | | 0 |
| 21 | 000012215 | | | 2012-10-24 00:00:00.000 | 2012-10-24 00:00:00.000 | 7079 | H4514 | | | 0 |
| 22 | 000012215 | | | 2012-10-31 00:00:00.000 | 2012-10-31 00:00:00.000 | 70714 | H4514 | | | 0 |
| 23 | 000012215 | | | 2012-10-31 00:00:00.000 | 2012-10-31 00:00:00.000 | 7079 | H4514 | | | 0 |
| 24 | 000012215 | | | 2012-11-07 00:00:00.000 | 2012-11-07 00:00:00.000 | 70714 | H4514 | | | 0 |
| 25 | 000012215 | | | 2012-11-07 00:00:00.000 | 2012-11-07 00:00:00.000 | 7079 | H4514 | | | 0 |
| 26 | 000012215 | | | 2012-11-21 00:00:00.000 | 2012-11-21 00:00:00.000 | 70714 | H4514 | | | 0 |
| 27 | 000012215 | | | 2012-11-21 00:00:00.000 | 2012-11-21 00:00:00.000 | 7079 | H4514 | | | 0 |
| 28 | 000012215 | | | 2012-11-28 00:00:00.000 | 2012-11-28 00:00:00.000 | 70714 | H4514 | | | 0 |
| 29 | 000012215 | | | 2012-12-11 00:00:00.000 | 2012-12-11 00:00:00.000 | 70714 | H4514 | | | 0 |
| 30 | 000012215 | | | 2012-12-18 00:00:00.000 | 2012-12-18 00:00:00.000 | 70714 | H4514 | | | 0 |
| 31 | 000012215 | | | 2012-04-16 00:00:00.000 | 2012-04-16 00:00:00.000 | 25062 | H5005 | | | 1 |
| 32 | 000012215 | | | 2012-09-11 00:00:00.000 | 2012-09-11 00:00:00.000 | 42781 | H0303 | | | 0 |
| 33 | 000012215 | | | 2012-08-09 00:00:00.000 | 2012-08-09 00:00:00.000 | 1889 | H0303 | | | 0 |
| 34 | 000012215 | | | 2012-05-21 00:00:00.000 | 2012-05-21 00:00:00.000 | 3572 | H0303 | | | 1 |
| 35 | 000012215 | | | 2012-06-12 00:00:00.000 | 2012-06-12 00:00:00.000 | 48230 | R5287 | | | 0 |
| 36 | 000012215 | | | 2012-07-30 00:00:00.000 | 2012-07-30 00:00:00.000 | 48230 | R5287 | | | 0 |
| 37 | 000012215 | | | 2012-11-13 00:00:00.000 | 2012-11-13 00:00:00.000 | 48230 | R5287 | | | 0 |
| 38 | 000012215 | | | 2012-01-10 00:00:00.000 | 2012-01-10 00:00:00.000 | 436 | H0303 | | | 1 |
| 39 | 000012215 | | | 2012-02-13 00:00:00.000 | 2012-02-13 00:00:00.000 | 1718 | H4514 | | | 1 |
| 40 | 000012215 | | | 2012-01-19 00:00:00.000 | 2012-01-19 00:00:00.000 | 4280 | H0543 | | | 1 |
| 41 | 000012215 | | | 2012-02-20 00:00:00.000 | 2012-02-20 00:00:00.000 | 4280 | H0543 | | | 1 |
| 42 | 000012215 | | | 2012-08-09 00:00:00.000 | 2012-08-09 00:00:00.000 | 4280 | H0543 | | | 1 |
| 43 | 000012215 | | | 2012-01-09 00:00:00.000 | 2012-01-09 00:00:00.000 | 1729 | H0609 | | | 1 |
| 44 | 000012215 | | | 2012-01-19 00:00:00.000 | 2012-01-19 00:00:00.000 | 25092 | H3107 | | | 0 |
| 45 | 000012215 | | | 2012-07-12 00:00:00.000 | 2012-07-12 00:00:00.000 | 25092 | H3107 | | | 0 |
| 46 | 000012215 | | | 2012-10-18 00:00:00.000 | 2012-10-18 00:00:00.000 | 25092 | H3107 | | | 0 |
| 47 | 000012215 | | | 2012-08-02 00:00:00.000 | 2012-08-02 00:00:00.000 | 25000 | H0609 | | | 1 |
| 48 | 000012215 | | | 2012-08-21 00:00:00.000 | 2012-08-21 00:00:00.000 | 2252 | H0609 | | | 1 |
| 49 | 000012215 | | | 2012-01-18 00:00:00.000 | 2012-01-18 00:00:00.000 | 42781 | H0316 | | | 1 |
| 50 | 000012215 | | | 2012-01-27 00:00:00.000 | 2012-01-27 00:00:00.000 | 42781 | H0316 | | | 1 |
| 51 | 000012215 | | | 2012-03-06 00:00:00.000 | 2012-03-06 00:00:00.000 | 00493 | H0755 | H0303 | | 1 |
| 52 | 000012215 | | | 2012-04-10 00:00:00.000 | 2012-04-10 00:00:00.000 | 00493 | H0755 | H0303 | | 1 |
| 53 | 000012215 | | | 2012-09-12 00:00:00.000 | 2012-09-12 00:00:00.000 | 8970 | H5424 | | | 0 |
| 54 | 000012215 | | | 2012-05-23 00:00:00.000 | 2012-05-23 00:00:00.000 | 4139 | R5287 | | | 1 |
| 55 | 000012215 | | | 2012-10-26 00:00:00.000 | 2012-10-26 00:00:00.000 | 40211 | H3749 | | | 1 |
| 56 | 000012215 | | | 2012-10-25 00:00:00.000 | 2012-10-25 00:00:00.000 | 4470 | H2931 | | | 0 |
| 57 | 000012215 | | | 2012-08-08 00:00:00.000 | 2012-08-08 00:00:00.000 | 436 | R5287 | | | 0 |
| 58 | 000012215 | | | 2012-02-23 00:00:00.000 | 2012-02-23 00:00:00.000 | 5853 | H0303 | | | 1 |
| 59 | 000012215 | | | 2012-05-17 00:00:00.000 | 2012-05-17 00:00:00.000 | 70715 | H5005 | | | 1 |
| 60 | 000012215 | | | 2012-10-11 00:00:00.000 | 2012-10-11 00:00:00.000 | 25010 | R5342 | | | 1 |
| 61 | 000012215 | | | 2012-10-11 00:00:00.000 | 2012-10-11 00:00:00.000 | 40291 | R5342 | | | 1 |
| 62 | 000012215 | | | 2012-11-28 00:00:00.000 | 2012-11-28 00:00:00.000 | 40291 | R5342 | | | 1 |
| 63 | 000012215 | | | 2012-11-30 00:00:00.000 | 2012-11-30 00:00:00.000 | 29620 | H1509 | | | 0 |
| 64 | 000012215 | | | 2012-10-26 00:00:00.000 | 2012-10-26 00:00:00.000 | 29620 | H1509 | | | 0 |
| 65 | 000012215 | | | 2012-10-26 00:00:00.000 | 2012-10-26 00:00:00.000 | 41519 | H1509 | | | 0 |
| 66 | 000012215 | | | 2012-11-19 00:00:00.000 | 2012-11-19 00:00:00.000 | 25060 | H5005 | | | 1 |
| 67 | 000012215 | | | 2012-05-22 00:00:00.000 | 2012-05-22 00:00:00.000 | 5839 | R3175 | | | 1 |
| 68 | 000012215 | | | 2012-06-08 00:00:00.000 | 2012-06-08 00:00:00.000 | 25020 | H5424 | | | 1 |
| 69 | 000012215 | | | 2012-07-10 00:00:00.000 | 2012-07-10 00:00:00.000 | 25020 | H5424 | | | 1 |
| 70 | 000012215 | | | 2012-09-17 00:00:00.000 | 2012-09-17 00:00:00.000 | 25020 | H5424 | | | 1 |
| 71 | 000012215 | | | 2012-01-24 00:00:00.000 | 2012-01-24 00:00:00.000 | 41071 | R3175 | | | 0 |
| 72 | 000012215 | | | 2012-01-05 00:00:00.000 | 2012-01-05 00:00:00.000 | 42781 | H5424 | | | 1 |
| 73 | 000012215 | | | 2012-05-22 00:00:00.000 | 2012-05-22 00:00:00.000 | 42781 | H5424 | | | 1 |
| 74 | 000012215 | | | 2012-11-26 00:00:00.000 | 2012-11-26 00:00:00.000 | 42781 | H5424 | | | 1 |
| 75 | 000012215 | | | 2012-02-15 00:00:00.000 | 2012-02-15 00:00:00.000 | 25020 | H5424 | | | 1 |
| 76 | 000012215 | | | 2012-08-14 00:00:00.000 | 2012-08-14 00:00:00.000 | 25020 | H5424 | | | 1 |
| 77 | 000012215 | | | 2012-08-21 00:00:00.000 | 2012-08-21 00:00:00.000 | 25020 | H5424 | | | 1 |
| 78 | 000012215 | | | 2012-09-25 00:00:00.000 | 2012-09-25 00:00:00.000 | 25020 | H5424 | | | 1 |
| 79 | 000012215 | | | 2012-02-17 00:00:00.000 | 2012-02-17 00:00:00.000 | 436 | H5424 | | | 1 |
| 80 | 000012215 | | | 2012-03-13 00:00:00.000 | 2012-03-13 00:00:00.000 | 436 | H5424 | | | 1 |
| 81 | 000012215 | | | 2012-05-25 00:00:00.000 | 2012-05-25 00:00:00.000 | 436 | H5424 | | | 1 |
| 82 | 000012215 | | | 2012-07-27 00:00:00.000 | 2012-07-27 00:00:00.000 | 436 | H5424 | | | 1 |
| 83 | 000012215 | | | 2012-10-16 00:00:00.000 | 2012-10-16 00:00:00.000 | 436 | H5424 | | | 1 |
| 84 | 000012215 | | | 2012-02-28 00:00:00.000 | 2012-02-28 00:00:00.000 | 25002 | H5424 | | | 1 |
| 85 | 000012215 | | | 2012-04-24 00:00:00.000 | 2012-04-24 00:00:00.000 | 25002 | H5424 | | | 1 |
| 86 | 000012215 | | | 2012-08-18 00:00:00.000 | 2012-08-18 00:00:00.000 | 25002 | H5424 | | | 1 |
| 87 | 000012215 | | | 2012-01-19 00:00:00.000 | 2012-01-19 00:00:00.000 | 25090 | R3175 | | | 1 |
| 88 | 000012215 | | | 2012-06-06 00:00:00.000 | 2012-06-06 00:00:00.000 | 25090 | R3175 | | | 1 |
| 89 | 000012215 | | | 2012-11-16 00:00:00.000 | 2012-11-16 00:00:00.000 | 20410 | H1509 | | | 1 |
| 90 | 000012215 | | | 2012-07-31 00:00:00.000 | 2012-07-31 00:00:00.000 | 4260 | H7187 | | | 0 |
| 91 | 000012215 | | | 2012-10-31 00:00:00.000 | 2012-10-31 00:00:00.000 | 5569 | H1509 | | | 1 |
| 92 | 000012215 | | | 2012-04-30 00:00:00.000 | 2012-04-30 00:00:00.000 | 436 | H1080 | | | 1 |
| 93 | 000012215 | | | 2012-05-29 00:00:00.000 | 2012-05-29 00:00:00.000 | 4439 | H3920 | | | 1 |
| 94 | 000012215 | | | 2012-01-19 00:00:00.000 | 2012-01-19 00:00:00.000 | 1532 | R5287 | | | 1 |
| 95 | 000012215 | | | 2012-04-19 00:00:00.000 | 2012-04-19 00:00:00.000 | 1532 | R5287 | | | 1 |
| 96 | 000012215 | | | 2012-07-18 00:00:00.000 | 2012-07-18 00:00:00.000 | 1532 | R5287 | | | 1 |
| 97 | 000012215 | | | 2012-09-24 00:00:00.000 | 2012-09-24 00:00:00.000 | 5829 | H3920 | | | 1 |
| 98 | 000012215 | | | 2012-02-03 00:00:00.000 | 2012-02-03 00:00:00.000 | 4439 | H3887 | | | 1 |
| 99 | 000012215 | | | 2012-05-18 00:00:00.000 | 2012-05-18 00:00:00.000 | 4439 | H3887 | | | 1 |
| 100 | 000012215 | | | 2012-08-17 00:00:00.000 | 2012-08-17 00:00:00.000 | 4439 | H3887 | | | 1 |
| 101 | 000012215 | | | 2012-04-10 00:00:00.000 | 2012-04-10 00:00:00.000 | 496 | H0251 | | | 1 |
| 102 | 000012215 | | | 2012-10-23 00:00:00.000 | 2012-10-23 00:00:00.000 | 496 | H0251 | | | 1 |
| 103 | 000012215 | | | 2012-10-23 00:00:00.000 | 2012-10-23 00:00:00.000 | 4470 | H3920 | | | 0 |
| 104 | 000012215 | | | 2012-10-04 00:00:00.000 | 2012-10-04 00:00:00.000 | 4439 | H0303 | | | 1 |
| 105 | 000012215 | | | 2012-02-20 00:00:00.000 | 2012-02-20 00:00:00.000 | 4254 | H4522 | | | 1 |
| 106 | 000012215 | | | 2012-05-31 00:00:00.000 | 2012-05-31 00:00:00.000 | 4254 | H4522 | | | 1 |
| 107 | 000012215 | | | 2012-06-07 00:00:00.000 | 2012-06-07 00:00:00.000 | 4254 | H4522 | | | 1 |
| 108 | 000012215 | | | 2012-02-14 00:00:00.000 | 2012-02-14 00:00:00.000 | 436 | H4522 | | | 1 |
| 109 | 000012215 | | | 2012-10-19 00:00:00.000 | 2012-10-19 00:00:00.000 | 43491 | H4590 | | | 1 |

EXHIBIT
727

| | ProjectID | B | C | FromDate | ThroughDate | DiagnosisCode | Contract1 | Contract2 | Contract3 | Initial_CV_Review |
|---|---|---|---|---|---|---|---|---|---|---|
| 1514 | N/A | | | 2012-11-29 00:00:00.000 | 2012-11-29 00:00:00.000 | 496 | R5342 | | | 1 |
| 1515 | N/A | | | 2012-05-11 00:00:00.000 | 2012-05-11 00:00:00.000 | 185 | R5287 | | | 1 |
| 1516 | N/A | | | 2012-05-24 00:00:00.000 | 2012-05-24 00:00:00.000 | 1744 | H1509 | | | 1 |
| 1517 | N/A | | | 2012-06-20 00:00:00.000 | 2012-06-20 00:00:00.000 | 586 | R5287 | | | 1 |
| 1518 | N/A | | | 2012-02-13 00:00:00.000 | 2012-02-13 00:00:00.000 | 586 | R5287 | | | 1 |
| 1519 | N/A | | | 2012-03-27 00:00:00.000 | 2012-03-27 00:00:00.000 | 586 | R5287 | | | 1 |
| 1520 | N/A | | | 2012-06-18 00:00:00.000 | 2012-06-18 00:00:00.000 | 586 | R5287 | | | 1 |
| 1521 | N/A | | | 2012-10-18 00:00:00.000 | 2012-10-18 00:00:00.000 | 586 | R5287 | | | 1 |
| 1522 | N/A | | | 2012-05-09 00:00:00.000 | 2012-05-09 00:00:00.000 | 29620 | H1080 | | | 1 |
| 1523 | N/A | | | 2012-11-29 00:00:00.000 | 2012-11-29 00:00:00.000 | 1723 | H5435 | | | 1 |
| 1524 | N/A | | | 2012-02-10 00:00:00.000 | 2012-02-10 00:00:00.000 | 25000 | H1111 | | | 1 |
| 1525 | N/A | | | 2012-05-04 00:00:00.000 | 2012-05-04 00:00:00.000 | 25000 | H1111 | | | 1 |
| 1526 | N/A | | | 2012-08-03 00:00:00.000 | 2012-08-03 00:00:00.000 | 25000 | H1111 | | | 1 |
| 1527 | N/A | | | 2012-08-17 00:00:00.000 | 2012-08-17 00:00:00.000 | 25000 | H1111 | | | 1 |
| 1528 | N/A | | | 2012-11-02 00:00:00.000 | 2012-11-02 00:00:00.000 | 25000 | H1111 | | | 1 |
| 1529 | N/A | | | 2012-05-25 00:00:00.000 | 2012-05-25 00:00:00.000 | 185 | H5435 | | | 1 |
| 1530 | N/A | | | 2012-05-08 00:00:00.000 | 2012-05-08 00:00:00.000 | 42781 | H0755 | | | 1 |
| 1531 | N/A | | | 2012-07-02 00:00:00.000 | 2012-07-02 00:00:00.000 | 25080 | H1509 | | | 1 |
| 1532 | N/A | | | 2012-07-09 00:00:00.000 | 2012-07-09 00:00:00.000 | 25080 | H1509 | | | 1 |
| 1533 | N/A | | | 2012-07-16 00:00:00.000 | 2012-07-16 00:00:00.000 | 25080 | H1509 | | | 1 |
| 1534 | N/A | | | 2012-07-23 00:00:00.000 | 2012-07-23 00:00:00.000 | 25080 | H1509 | | | 1 |
| 1535 | N/A | | | 2012-01-27 00:00:00.000 | 2012-01-27 00:00:00.000 | 185 | H0609 | | | 1 |
| 1536 | N/A | | | 2012-05-21 00:00:00.000 | 2012-05-21 00:00:00.000 | 4111 | H4102 | | | 1 |
| 1537 | N/A | | | 2012-07-11 00:00:00.000 | 2012-07-11 00:00:00.000 | 42781 | H4102 | | | 1 |
| 1538 | N/A | | | 2012-06-29 00:00:00.000 | 2012-06-29 00:00:00.000 | 5853 | H4102 | | | 1 |
| 1539 | N/A | | | 2012-09-26 00:00:00.000 | 2012-09-26 00:00:00.000 | 42731 | H1509 | | | 1 |
| 1540 | N/A | | | 2012-01-17 00:00:00.000 | 2012-01-17 00:00:00.000 | 25070 | H4102 | | | 1 |
| 1541 | N/A | | | 2012-05-15 00:00:00.000 | 2012-05-15 00:00:00.000 | 25070 | H4102 | | | 1 |
| 1542 | N/A | | | 2012-11-07 00:00:00.000 | 2012-11-07 00:00:00.000 | 25070 | H4102 | | | 1 |
| 1543 | N/A | | | 2012-12-31 00:00:00.000 | 2012-12-31 00:00:00.000 | 80500 | H4102 | | | 1 |
| 1544 | N/A | | | 2012-03-12 00:00:00.000 | 2012-03-12 00:00:00.000 | 4254 | H4102 | | | 1 |
| 1545 | N/A | | | 2012-03-12 00:00:00.000 | 2012-03-12 00:00:00.000 | 4280 | H4102 | | | 1 |
| 1546 | N/A | | | 2012-04-30 00:00:00.000 | 2012-04-30 00:00:00.000 | 4111 | H4102 | | | 1 |
| 1547 | N/A | | | 2012-07-27 00:00:00.000 | 2012-07-27 00:00:00.000 | 4928 | H4102 | | | 1 |
| 1548 | N/A | | | 2012-02-13 00:00:00.000 | 2012-02-13 00:00:00.000 | 1749 | H4102 | | | 1 |
| 1549 | N/A | | | 2012-05-02 00:00:00.000 | 2012-05-02 00:00:00.000 | 3560 | H4102 | | | 1 |
| 1550 | N/A | | | 2012-02-16 00:00:00.000 | 2012-02-16 00:00:00.000 | 436 | H4102 | | | 1 |
| 1551 | N/A | | | 2012-03-09 00:00:00.000 | 2012-03-09 00:00:00.000 | 436 | H4102 | | | 1 |
| 1552 | N/A | | | 2012-05-14 00:00:00.000 | 2012-05-14 00:00:00.000 | 436 | H4102 | | | 1 |
| 1553 | N/A | | | 2012-06-18 00:00:00.000 | 2012-06-18 00:00:00.000 | 436 | H4102 | | | 1 |
| 1554 | N/A | | | 2012-08-06 00:00:00.000 | 2012-08-06 00:00:00.000 | 436 | H4102 | | | 1 |
| 1555 | N/A | | | 2012-08-16 00:00:00.000 | 2012-08-16 00:00:00.000 | 436 | H4102 | | | 1 |
| 1556 | N/A | | | 2012-09-11 00:00:00.000 | 2012-09-11 00:00:00.000 | 436 | H4102 | | | 1 |
| 1557 | N/A | | | 2012-09-27 00:00:00.000 | 2012-09-27 00:00:00.000 | 436 | H4102 | | | 1 |
| 1558 | N/A | | | 2012-10-09 00:00:00.000 | 2012-10-09 00:00:00.000 | 436 | H4102 | | | 1 |
| 1559 | N/A | | | 2012-12-27 00:00:00.000 | 2012-12-27 00:00:00.000 | 436 | H4102 | | | 1 |
| 1560 | N/A | | | 2012-05-24 00:00:00.000 | 2012-05-24 00:00:00.000 | 1749 | H4102 | | | 1 |
| 1561 | N/A | | | 2012-01-19 00:00:00.000 | 2012-01-19 00:00:00.000 | 1749 | H4102 | | | 1 |
| 1562 | N/A | | | 2012-01-24 00:00:00.000 | 2012-01-24 00:00:00.000 | 41519 | H4102 | | | 1 |
| 1563 | N/A | | | 2012-05-29 00:00:00.000 | 2012-05-29 00:00:00.000 | 1748 | H4102 | | | 1 |
| 1564 | N/A | | | 2012-02-07 00:00:00.000 | 2012-02-07 00:00:00.000 | 73313 | H4102 | | | 1 |
| 1565 | N/A | | | 2012-12-19 00:00:00.000 | 2012-12-19 00:00:00.000 | 4270 | H4102 | | | 1 |
| 1566 | N/A | | | 2012-09-24 00:00:00.000 | 2012-09-24 00:00:00.000 | 4160 | H4102 | | | 1 |
| 1567 | N/A | | | 2012-05-01 00:00:00.000 | 2012-05-01 00:00:00.000 | 7202 | H4102 | | | 1 |
| 1568 | N/A | | | 2012-07-24 00:00:00.000 | 2012-07-24 00:00:00.000 | 42823 | H1509 | | | 1 |
| 1569 | N/A | | | 2012-06-19 00:00:00.000 | 2012-06-19 00:00:00.000 | 44422 | H4102 | | | 1 |
| 1570 | N/A | | | 2012-03-05 00:00:00.000 | 2012-03-05 00:00:00.000 | 25000 | H4102 | | | 1 |
| 1571 | N/A | | | 2012-04-09 00:00:00.000 | 2012-04-09 00:00:00.000 | 25001 | H4102 | | | 1 |
| 1572 | N/A | | | 2012-05-11 00:00:00.000 | 2012-05-11 00:00:00.000 | 25000 | H4102 | | | 1 |
| 1573 | N/A | | | 2012-05-11 00:00:00.000 | 2012-05-11 00:00:00.000 | 44020 | H4102 | | | 1 |
| 1574 | N/A | | | 2012-12-14 00:00:00.000 | 2012-12-14 00:00:00.000 | 1749 | H4102 | | | 1 |
| 1575 | N/A | | | 2012-09-26 00:00:00.000 | 2012-09-26 00:00:00.000 | 1889 | H4102 | | | 1 |
| 1576 | N/A | | | 2012-04-10 00:00:00.000 | 2012-04-10 00:00:00.000 | 586 | H4102 | | | 1 |
| 1577 | N/A | | | 2012-01-27 00:00:00.000 | 2012-01-27 00:00:00.000 | 436 | H4102 | | | 1 |
| 1578 | N/A | | | 2012-07-23 00:00:00.000 | 2012-07-23 00:00:00.000 | 436 | H4102 | | | 1 |
| 1579 | N/A | | | 2012-10-23 00:00:00.000 | 2012-10-23 00:00:00.000 | 436 | H4102 | | | 1 |
| 1580 | N/A | | | 2012-03-30 00:00:00.000 | 2012-03-30 00:00:00.000 | 25060 | H4102 | | | 1 |
| 1581 | N/A | | | 2012-03-30 00:00:00.000 | 2012-03-30 00:00:00.000 | 3369 | H4102 | | | 1 |
| 1582 | N/A | | | 2012-09-20 00:00:00.000 | 2012-09-20 00:00:00.000 | 41181 | H4102 | | | 1 |
| 1583 | N/A | | | 2012-06-20 00:00:00.000 | 2012-06-20 00:00:00.000 | 4928 | H1080 | | | 1 |
| 1584 | N/A | | | 2012-06-05 00:00:00.000 | 2012-06-05 00:00:00.000 | 29630 | H4102 | | | 1 |
| 1585 | N/A | | | 2012-06-27 00:00:00.000 | 2012-06-27 00:00:00.000 | 29621 | H4102 | | | 1 |
| 1586 | N/A | | | 2012-07-11 00:00:00.000 | 2012-07-11 00:00:00.000 | 29621 | H4102 | | | 1 |
| 1587 | N/A | | | 2012-08-08 00:00:00.000 | 2012-08-08 00:00:00.000 | 29621 | H4102 | | | 1 |
| 1588 | N/A | | | 2012-08-03 00:00:00.000 | 2012-08-03 00:00:00.000 | 436 | H4102 | | | 1 |
| 1589 | N/A | | | 2012-07-30 00:00:00.000 | 2012-07-30 00:00:00.000 | 1749 | H4102 | | | 1 |
| 1590 | N/A | | | 2012-06-27 00:00:00.000 | 2012-06-27 00:00:00.000 | 43491 | H0303 | | | 1 |
| 1591 | N/A | | | 2012-06-22 00:00:00.000 | 2012-06-22 00:00:00.000 | 1749 | H4102 | | | 1 |
| 1592 | N/A | | | 2012-03-13 00:00:00.000 | 2012-03-13 00:00:00.000 | 45341 | H4102 | | | 1 |
| 1593 | N/A | | | 2012-09-14 00:00:00.000 | 2012-09-14 00:00:00.000 | 45341 | H4102 | | | 1 |
| 1594 | N/A | | | 2012-10-23 00:00:00.000 | 2012-10-23 00:00:00.000 | 4254 | H4102 | | | 1 |
| 1595 | N/A | | | 2012-06-13 00:00:00.000 | 2012-06-13 00:00:00.000 | 44020 | R5287 | | | 1 |
| 1596 | N/A | | | 2012-10-23 00:00:00.000 | 2012-10-23 00:00:00.000 | 40291 | H4102 | | | 1 |
| 1597 | N/A | | | 2012-02-16 00:00:00.000 | 2012-02-16 00:00:00.000 | 4260 | H4102 | | | 1 |
| 1598 | N/A | | | 2012-05-04 00:00:00.000 | 2012-05-04 00:00:00.000 | 586 | H4102 | | | 1 |
| 1599 | N/A | | | 2012-07-18 00:00:00.000 | 2012-07-18 00:00:00.000 | 42731 | H4102 | | | 1 |
| 1600 | N/A | | | 2012-07-18 00:00:00.000 | 2012-07-18 00:00:00.000 | 4280 | H4102 | | | 1 |
| 1601 | N/A | | | 2012-06-04 00:00:00.000 | 2012-06-04 00:00:00.000 | 25000 | H4102 | | | 1 |
| 1602 | N/A | | | 2012-11-07 00:00:00.000 | 2012-11-07 00:00:00.000 | 1749 | H4102 | | | 1 |
| 1603 | N/A | | | 2012-05-07 00:00:00.000 | 2012-05-07 00:00:00.000 | 1536 | H4102 | | | 1 |
| 1604 | N/A | | | 2012-04-12 00:00:00.000 | 2012-04-12 00:00:00.000 | 42731 | H4102 | | | 1 |
| 1605 | N/A | | | 2012-10-15 00:00:00.000 | 2012-10-15 00:00:00.000 | 4820 | H4102 | | | 1 |
| 1606 | N/A | | | 2012-07-07 00:00:00.000 | 2012-07-07 00:00:00.000 | 7079 | H4102 | | | 1 |
| 1607 | N/A | | | 2012-10-12 00:00:00.000 | 2012-10-12 00:00:00.000 | 3349 | H4102 | | | 1 |
| 1608 | N/A | | | 2012-03-29 00:00:00.000 | 2012-03-29 00:00:00.000 | 5852 | H4102 | | | 1 |
| 1609 | N/A | | | 2012-06-12 00:00:00.000 | 2012-06-12 00:00:00.000 | 7424 | H4102 | | | 1 |
| 1610 | N/A | | | 2012-06-21 00:00:00.000 | 2012-06-21 00:00:00.000 | 1548 | H4102 | | | 1 |
| 1611 | N/A | | | 2012-03-21 00:00:00.000 | 2012-03-21 00:00:00.000 | 28800 | H0609 | | | 1 |
| 1612 | N/A | | | 2012-05-02 00:00:00.000 | 2012-05-02 00:00:00.000 | 43491 | H4102 | | | 1 |
| 1613 | N/A | | | 2012-05-08 00:00:00.000 | 2012-05-08 00:00:00.000 | 49120 | H4102 | | | 1 |
| 1614 | N/A | | | 2012-04-02 00:00:00.000 | 2012-04-02 00:00:00.000 | 7140 | H1509 | | | 1 |
| 1615 | N/A | | | 2012-05-10 00:00:00.000 | 2012-05-10 00:00:00.000 | 7140 | H1509 | | | 1 |
| 1616 | N/A | | | 2012-05-11 00:00:00.000 | 2012-05-11 00:00:00.000 | 7140 | H1509 | | | 1 |
| 1617 | N/A | | | 2012-05-21 00:00:00.000 | 2012-05-21 00:00:00.000 | 7140 | H1509 | | | 1 |
| 1618 | N/A | | | 2012-06-06 00:00:00.000 | 2012-06-06 00:00:00.000 | 7140 | H1509 | | | 1 |
| 1619 | N/A | | | 2012-08-07 00:00:00.000 | 2012-08-07 00:00:00.000 | 7140 | H1509 | | | 1 |
| 1620 | N/A | | | 2012-07-19 00:00:00.000 | 2012-07-19 00:00:00.000 | 7140 | H1509 | | | 1 |
| 1621 | N/A | | | 2012-12-11 00:00:00.000 | 2012-12-11 00:00:00.000 | 7140 | H1509 | | | 1 |

**EXHIBIT P-88**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA ex )

rel. BENJAMIN POEHLING,       )

                             )

        Plaintiffs,           )

vs.                           ) CASE NO.

                             ) CV 16-08697 FMO

UNITEDHEALTH GROUP, INC. et  )

al.,                          )

                             )

        Defendants.           )


        VIDEOTAPED DEPOSITION of KATHLEEN BAKER
taken by Plaintiffs, held at Riley, Warnock &
Jacobson, 1906 West End Avenue, Nashville,
Tennessee, commencing at 8:19 A.M., on July 12,
2022, before Gary Schneider, RPR, CRR, RMR, TLCR
and Notary Public within and for the State of
Tennessee.

Page 252

1           Q.     What was your involvement in

2    making decisions about whether to submit deletes

3    from Optum's CV program?

4           A.     I made no decisions regarding

5    that.

6           Q.     What was your involvement in

7    decisions regarding whether a claims verification

8    program should be implemented?

9           A.     I was not involved in those

10   conversations or decisions.

11          Q.     Earlier today do you recall that

12   you testified that you used chart retrieval

13   vendors to retrieve charts for Optum's

14   retrospective chart review program?

15          A.     Yes.

16          Q.     In your experience, did these

17   chart retrieval vendors retrieve all charts for a

18   member for a given date of service year?

19          A.     No, that's not possible.

20          Q.     When you say it's not possible,

21   what do you mean?

22          A.     Meaning there's just so many

23   charts for members.  So, like, you know, if we go

24   back to, like, my -- well, actually, where we're

25   positioned right now, like, my cancer diagnosis is



Page 253

1    that, you know, a member can have multiple charts

2    across different locations, across different

3    providers.  So, like, here we sit in -- you know,

4    I had services done at Saint Thomas Ascension that

5    also has a private ambulatory surgery center that

6    also houses a medical -- a medical building that

7    housed my breast surgeon and my plastic surgeon,

8    and then also Vanderbilt where I had some

9    procedures done.

10                You know, even if I just go back

11   to the date where I had, you know, surgery done at

12   the ASC, I would have, you know, four different

13   visits from separate doctors regarding my date of

14   service that day, but they're all different charts

15   or, you know, Vanderbilt's in their charts.  If I

16   would go to one location to grab a chart, it

17   doesn't mean I would have grabbed all charts for

18   that member because it would've only been what was

19   available that day.  But even if I -- you know,

20   for instance, for Vanderbilt or maybe personal

21   experience, we've all been to doctors, where

22   Monday -- well, here, I mean, I'll say Vanderbilt,

23   like, Monday and Wednesdays they're here downtown

24   or Midtown here at Vanderbilt.  But then on, you

25   know, Tuesdays and Thursdays, they're out in



Page 254

 1    Franklin office location.  And so depending upon

 2    how their medical charts are, those could be

 3    different locations for charts for that member.

 4    And so, you know, it's just charts -- a chart for

 5    a member doesn't contain every single encounter

 6    that that member has had, nor is it possible to

 7    say whether or not it's always a complete chart

 8    because it's based upon what was available at that

 9    time or if the provider sent it and what the

10    provider sent to us.

11               Q.    Did Optum review all of the

12    charts for a member in a particular date of

13    service year in its retrospective chart review

14    program?

15               A.    Did we review all?  No, it's

16    not -- I mean, we didn't have all of the data.  We

17    didn't have all of the medical charts for them.

18               Q.    Earlier today do you recall

19    testifying about blind -- blind chart reviews?

20               A.    Yes.

21               Q.    Do you know what a blind chart

22    review is?

23               A.    Yes.

24               Q.    What is it?

25               A.    It's when the coders are not



Page 267

 1   STATE OF TENNESSEE    )

 2   COUNTY OF DAVIDSON    )    SS:

 3           I, Gary Schneider, TLCR No. 676, in and

 4   for the State of Tennessee, do hereby certify:

 5           That, prior to being examined, the

 6   witness named in the foregoing deposition was by

 7   me duly sworn to testify the truth, the whole

 8   truth and nothing but the truth;

 9           That said deposition was taken down by

10   me stenographically at the time and place therein

11   named, and thereafter transcribed via

12   computer-aided transcription under my direction,

13   and the same is a true, correct and complete

14   transcript of said proceedings;

15           Before completion of the deposition,

16   review of the transcript was not requested.  If

17   requested, any changes made by the deponent (and

18   provided to the reporter) during the period

19   allowed are appended hereto.

20           I further certify that I am not

21   interested in the outcome of the action.

22           Witness my hand this July 15, 2022.

23

24   *Gary Schneider*

     GARY SCHNEIDER, TLCR No. 676

25   Certified Shorthand Reporter

     State of Tennessee

     State of Tennessee



5024

**EXHIBIT P-89**

Message

| | |
|---|---|
| **From**: | Melissa Ferron [mferron@MelissaFerron.com] |
| **Sent**: | 3/6/2014 2:57:58 AM |
| **To**: | Webb, Christopher R [chris.webb@optum.com] |
| **Subject**: | Re: hccs dx likely to not validate in our CV |

2012 HCCs:

| HCC | # of rvws | # of Y validations |
|---|---|---|
| 2 | 6 | 0 |
| 5 | 17 | 1 |
| 17 | 33 | 0 |
| 37 | 55 | 2 |
| 75 | 6 | 1 |
| 78 | 0 | |
| 81 | 18 | 1 |
| 95 | 60 | 0 |
| 96 | 895 | 1 |
| 104 | 246 | 5 |
| 111 | 96 | 1 |
| 112 | 89 | 1 |
| 154 | 2 | 0 |
| 158 | 88 | 1 |
| 161 | 13 | 0 |

Dx codes:

| | | |
|---|---|---|
| 25090-25093 | 94 | 1 (3 to a higher HCC) |
| 3369 | 9 | 1 |
| 74259 | 8 | 0 |
| 80600-8069 | 4 | 0 |
| 95200-9529 | 1 | 0 |
| 9583 | 12 | 2 |
| 80000-80099 | 0 | |
| 80410-80449 | 0 | |
| 80460-80499 | 0 | |

On 3/5/2014 10:06 AM, Webb, Christopher R wrote:
Thanks. I will look for it later.

Also, I cancelled our call today as I'm in offsite meetings this week but any chance I can get the new dashboard report sooner this morning?

Thanks,

Chris



EXHIBIT
00348
5026

ICODIFY-0170934

-----Original Message-----
**From:** mferron@MelissaFerron.com
**Sent:** Wednesday, March 05, 2014 11:41 AM Central Standard Time
**To:** Webb, Christopher R
**Subject:** Re: hccs dx likely to not validate in our CV

Ashley and I can work on it later
On 3/5/2014 8:33 AM, Webb, Christopher R wrote:
Are you able to send me stats for these based on the CV that you have already completed?  Can we see, even at a total
level and not detail, the number of records for all of these and the number that do NOT validate.

Thanks,

Chris Webb

OptumInsight | Payer Operations
3100 Lake Center Drive
Santa Ana, CA 92704

P. 714.825.5320
F. 877.650.3089
chris.webb@optum.com

Ingenix is now OptumInsight, part of Optum -- a leading health services business



**From:** mferron@MelissaFerron.com
**Sent:** Tuesday, March 04, 2014 11:25 AM
**To:** Webb, Christopher R
**Subject:** hccs dx likely to not validate in our CV

Here is the list of HCCs and dx codes that are unlikely to validate in our second level CV (from office medical records)

2012 HCCs:
2
5
17
37
75
78
81
95
96
104

5027

ICODIFY-0170935

111
112
154
158
161

Dx codes:
25090-25093
3369
74259
80600-8069
95200-9529
9583
80000-80099
80410-80449
80460-80499

On 3/4/2014 10:06 AM, Webb, Christopher R wrote:
There was also a key takeaway that you were going to work on:

Identifying the HCC's (or hcc/dx code combinations) that could be used to further filter the CV populations due to the inability to validate, both for the work you currently have as well as the upcoming work.

We started with the HCC 95/96 items but you were going to expand in that in writing. When do you think that can be accomplished?

Thanks,

Chris

-----Original Message-----
**From:** mferron@MelissaFerron.com
**Sent:** Tuesday, March 04, 2014 10:45 AM Central Standard Time
**To:** Webb, Christopher R
**Subject:** Re: FW: Preliminary 2015 Payment Year ICD-10 to HCC Mappings

so funny - I was just about to ask for this
On 3/4/2014 8:33 AM, Webb, Christopher R wrote:
Attached is the ICD-10 comparison document we talked about yesterday.

Thanks,

Chris Webb

5028

ICODIFY-0170936

OptumInsight | Payer Operations
3100 Lake Center Drive
Santa Ana, CA 92704

P. 714.825.5320
F. 877.650.3089
chris.webb@optum.com

Ingenix is now OptumInsight, part of Optum – a leading health services business



**From:** Kedzierski, Janice L
**Sent:** Wednesday, February 26, 2014 8:49 AM
**To:** Bird, Jon H; Trujillo, Tim J; Smed, Mike; Bellile, Susan K; Howell, Scott C; Huie, Frederick J; Spaeth, Tim A; Santos, Karen S; James, Donald W; Larson, Mary J; Webb, Christopher R; Green, Amber S; Redmond, Janice L; Myers, Randall L; Rasmussen, Patricia R
**Subject:** Preliminary 2015 Payment Year ICD-10 to HCC Mappings

I formatted the preliminary ICD-10 to HCC mappings.  CMS will continue to blend the V12 and V22 models for 2015 payment, but did not publish a V12 ICD-10 to HCC mapping yet.  They provided mappings for the V22 part C model, the PACE/ESRD model for part C, and the new V04 Rx HCC model for Part D.

The attached file contains 5 tabs:

1.  <!--[if !supportLists]--><!--[endif]--> **All_ICD10_Prelim**
    a.  <!--[if !supportLists]--><!--[endif]--> Contains all ICD-10 codes, with a column to indicate which HCC the code maps to in each model
        i.  <!--[if !supportLists]--><!--[endif]--> Includes non-risk-adjusting codes
    b.  <!--[if !supportLists]--><!--[endif]--> A blank indicates the code does not map in that model
    c.  <!--[if !supportLists]--><!--[endif]--> Note that Incomplete codes do not (and should not) map to HCCs
2.  <!--[if !supportLists]--><!--[endif]--> **MAPart_C_Prelim** - Contains the Part C mapping for the V22 model
3.  <!--[if !supportLists]--><!--[endif]--> **Rx_Prelim** - Contains the Part D mapping for the new V04 model
4.  <!--[if !supportLists]--><!--[endif]--> **PACE_ESRD_Part_C_**Prelim - Contains the Part C mapping for the PACE/ESRD model
5.  <!--[if !supportLists]--><!--[endif]--> **MultHCCs_Prelim**
    a.  <!--[if !supportLists]--><!--[endif]--> Lists ICD-10s that map to more than 1 HCC in any model
    b.  <!--[if !supportLists]--><!--[endif]--> 5 Diabetes codes map to 3 HCCs (these are the only codes that map to 3 HCCs)
    c.  <!--[if !supportLists]--><!--[endif]--> The maximum number of HCCs per ICD-10 is 3
    d.  <!--[if !supportLists]--><!--[endif]--> There are 366 codes that map to more than 1 HCC in at least 1 model (158 for the V22 Part C model)

The original files from CMS can be found here:
https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Risk-Adjustors-Items/Risk2015.html?DLPage=1&DLSort=0&DLSortDir=descending

Feel free to forward this internally.

5029

ICODIFY-0170937

Janice Kedzierski
Optum
3100 Lake Center Drive | Santa Ana, CA 92704
☎: 714.825.5077
Janice.Kedzierski@Optum.com

This e-mail, including attachments, may include confidential and/or
proprietary information, and may be used only by the person or entity
to which it is addressed. If the reader of this e-mail is not the intended
recipient or his or her authorized agent, the reader is hereby notified
that any dissemination, distribution or copying of this e-mail is
prohibited. If you have received this e-mail in error, please notify the
sender by replying to this message and delete this e-mail immediately.

--
Melissa Ferron



t•310.377.9010
f•310.377.9011
www.MelissaFerron.com
Healthcare Consulting

This e-mail, including attachments, may include confidential and/or
proprietary information, and may be used only by the person or entity
to which it is addressed. If the reader of this e-mail is not the intended
recipient or his or her authorized agent, the reader is hereby notified
that any dissemination, distribution or copying of this e-mail is
prohibited. If you have received this e-mail in error, please notify the
sender by replying to this message and delete this e-mail immediately.

--
Melissa Ferron



t•310.377.9010
f•310.377.9011
www.MelissaFerron.com
Healthcare Consulting

ICODIFY-0170938

This e-mail, including attachments, may include confidential and/or
proprietary information, and may be used only by the person or entity
to which it is addressed. If the reader of this e-mail is not the intended
recipient or his or her authorized agent, the reader is hereby notified
that any dissemination, distribution or copying of this e-mail is
prohibited. If you have received this e-mail in error, please notify the
sender by replying to this message and delete this e-mail immediately.

--
Melissa Ferron



t•310.377.9010
f•310.377.9011
www.MelissaFerron.com
Healthcare Consulting

This e-mail, including attachments, may include confidential and/or
proprietary information, and may be used only by the person or entity
to which it is addressed. If the reader of this e-mail is not the intended
recipient or his or her authorized agent, the reader is hereby notified
that any dissemination, distribution or copying of this e-mail is
prohibited. If you have received this e-mail in error, please notify the
sender by replying to this message and delete this e-mail immediately.

--
Melissa Ferron



t•310.377.9010
f•310.377.9011
www.MelissaFerron.com
Healthcare Consulting

ICODIFY-0170939

**EXHIBIT P-90**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                 )
                                   )
          Plaintiffs,              )
                                   )
v.                                 )
                                   )
UNITEDHEALTH GROUP, INC., et al.,  )
                                   )
          Defendants.              )
_____    )


Videotaped Deposition of
MARYBETH MEYER
Given Remotely
Tuesday, June 7, 2022


Reported by:  Karen K. Kidwell, RMR, CRR


Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 160

1           earlier that towards the end of 2013, Scott

2           Theisen, who was my boss, asked me to review the

3           proposed CV deletes.

4    BY MR. LEE:

5           Q.   And in accordance with that instruction

6    from Scott Theisen, you would review deletes and

7    instruct Optum to submit them after you reviewed

8    them?

9           A.   We reviewed the -- the CV deletes.  Yes.

10          Q.   And was that for the purpose of

11   instructing Optum to delete them when appropriate?

12          A.   We were asked to review the CV deletes

13   because we were receiving complaints from providers

14   that transactions were being deleted inappropriately.

15   We received those complaints through the RACCR

16   program specifically.

17              So when Scott asked me to start reviewing

18   and approving CV deletes, we were finding the same --

19   we were finding similar logic errors in Optum's

20   proposed deletes.  So I don't recall how many deletes

21   were approved for Optum to process.

22              MR. LEE:  Okay.  Let me ask my colleague

23          to put up Tab 14, which will be Exhibit 198.

24          (Exhibit 198 was marked for identification.)

25



5034

```
 1                        CERTIFICATE

 2

 3       I, KAREN K. KIDWELL, Registered Merit Reporter,

 4   and Certified Realtime Reporter, do hereby certify

 5   that prior to the commencement of the examination,

 6   the deponent was remotely sworn to testify to the

 7   truth, the whole truth under penalty of perjury.

 8       I DO FURTHER CERTIFY that the foregoing is a

 9   verbatim transcript of the testimony as taken

10   stenographically by me at the time, place and on the

11   date hereinbefore set forth, to the best of my

12   ability.

13       I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of any

15   of the parties to this action, and that I am neither

16   a relative nor employee of such attorney or counsel,

17   and that I am not financially interested in this

18   action.

19

20
                     _____
                         Karen K. Kidwell
21                       Karen K. Kidwell
                         Registered Merit Reporter
22                       Certified Realtime Reporter
                         Notary Public

23

24

25
```



5035

**EXHIBIT P-91**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


————————————————————————
                           )
UNITED STATES OF AMERICA   )
ex rel. BENJAMIN POEHLING, )
                           )
        Plaintiff,         )    No. CV 16-08697 FMO
                           )
vs.                        )
                           )
UNITEDHEALTH GROUP, INC.,  )
et al.,                    )
                           )
        Defendants.        )
————————————————————————)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER


Volume 3
DEPOSITION OF ANNE HORNSBY
As 30(b)(6) Designee 1 of
The United States


Washington, DC
November 21, 2023




Reported by:  John L. Harmonson, RPR



Page 131

1    typical result of the audit process.  For each

2    contract audited, there would be a payment error

3    amount.

4            And in addition, as I had been talking

5    about, CMS was aware that parent organizations were

6    deleting records that they had been paid on because

7    they found errors in the diagnosis codes.

8    BY MR. BAAK:

9        Q.    You mentioned -- Dr. Hornsby, you

10   mentioned an error where a plan submits a diagnosis

11   code and then subsequently determines for some

12   reason that that code ought to be deleted.  That

13   was an example you gave me a little bit earlier.

14       A.    That was one example I gave, yes, that

15   CMS has seen.

16       Q.    CMS is also aware that there are errors

17   where in fact a provider does document a diagnosis

18   code on a medical record but fails to submit it;

19   right?  CMS knows that from the RADV process?

20            MS. LIKOFF:  Objection to form.  Vague.

21   Beyond the scope.

22            THE WITNESS:  CMS did not have evidence

23   of that.  You know, around the time of the 2014

24   rule, CMS had anecdotal evidence that MAOs were

25   conducting medical record reviews to find what



Page 132

1    everybody calls additionals to find diagnoses that

2    had not been submitted before that appear to be

3    supported by the medical record.  CMS was not aware

4    of that as a fact, as clear knowledge.  It was all

5    through professional networks and, you know, that

6    level of knowledge.

7    BY MR. BAAK:

8         Q.    Just to make sure I understand,

9    Dr. Hornsby, you're testifying that over time CMS

10   became aware through professional discussions,

11   industry conferences and the like that Medicare

12   Advantage organizations were conducting medical

13   record reviews to add diagnosis codes that the

14   provider had failed to submit.  Is that what you

15   just testified to?

16        A.    Yes.  Over time CMS became aware, around

17   2014 as a tipping point.

18        Q.    It had knowledge that CMS obtained about

19   what plans were doing.  That obviously predated the

20   proposed medical record review, right, since that

21   was targeted at Medicare Advantage organization's

22   chart review activities?

23             MS. LIKOFF:  Object to form.  Vague.

24   Misstates the witness's testimony.

25             THE WITNESS:  CMS did not propose a



Page 133

1    medical records provision because of plans seeking

2    additionals.  CMS had heard anecdotally that many

3    MAOs were failing to submit their deletes.

4    Therefore, CMS wanted to put in a reg an

5    application of the long-standing broader

6    requirement that diagnoses must be supported in the

7    medical record to be accurate.  And that's what the

8    provision said.

9           MR. BAAK:  I'm going to move to strike

10   that as nonresponsive.

11   BY MR. BAAK:

12   Q.   My question, Dr. Hornsby, was about when

13   CMS obtained the knowledge that MA plans were

14   conducting medical record review to add diagnosis

15   codes but not to delete them.  And my question is

16   simple.

17          Did CMS have that knowledge at the time

18   it proposed the medical record review rule in early

19   2014?

20          MS. LIKOFF:  Objection to form.

21          THE WITNESS:  CMS does not consider it

22   knowledge.  CMS considers it informal network

23   information but nothing that would rise to the

24   level of knowledge because CMS cannot see what's

25   inside an MAO in terms of its data and its due



Page 134

1    diligence activities.

2    BY MR. BAAK:

3        Q.    I want to come back just to the basic

4    concept of an error in the diagnosis codes that go

5    provider to MA and from MA to CMS.  Okay?  So there

6    can be two types of errors, Dr. Hornsby; right?

7    You've mentioned one.  I want to make sure we're

8    clear there are two types.

9            There can be an error when a provider

10   submits a diagnosis code to an MA plan that then

11   gets sent to CMS where that diagnosis code is not

12   reflected on a medical record.  That's one example;

13   right?

14           MS. LIKOFF:  Objection to form.

15           THE WITNESS:  CMS does not agree with

16   that.  Let's go to the contract.  I can read you

17   Article 5.  The MAO is responsible.  CMS does not

18   have a concept of error that lands just on the

19   provider.  It is the MAO's responsibility.

20   BY MR. BAAK:

21       Q.    Dr. Hornsby, I don't think maybe you

22   understood my question.  I'm just talking about the

23   true state of the universe.  Did the provider

24   submit to the MA plan an accurate diagnosis code?

25   I want to figure out why that can go wrong.  Are



Page 280

```
 1              C E R T I F I C A T E

 2

 3   DISTRICT OF COLUMBIA

 4              I, JOHN L. HARMONSON, a Notary Public

 5   within and for the District of Columbia, do hereby

 6   certify that ANNE HORNSBY, the witness whose

 7   deposition is hereinbefore set forth, was duly

 8   sworn by me and that such deposition is a true

 9   record of the testimony given by such witness.

10              That before completion of the

11   proceedings, review and signature of the transcript

12   was reserved.

13              I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17              IN WITNESS WHEREOF, I have hereunto set

18   my hand this 27th day of November, 2023.

19

20                   John L Harmonson

21              JOHN L. HARMONSON, RPR

                My commission expires: 04/14/26

22

23

24

25
```



**EXHIBIT P-92**

**29844**    **Federal Register** / Vol. 79, No. 1007 Friday, May 23, 2014 / Rules and Regulations

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Medicare & Medicaid Services

### 42 CFR Parts 417, 422, 423, and 424

[CMS–4159–F]

RIN 0938–AR37

### Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Final rule.

**SUMMARY:** The final rule will revise the Medicare Advantage (MA) program (Part C) regulations and prescription drug benefit program (Part D) regulations to implement statutory requirements; improve program efficiencies; and clarify program requirements. The final rule also includes several provisions designed to improve payment accuracy.

**DATES:** *Effective Dates:* These regulations are effective on July 22, 2014 except for the amendment in instruction 27 to § 423.100, the amendment in instruction 30 to § 423.501, and the amendment in instruction 34 to § 423.505, which are effective on January 1, 2016.

*Applicability Dates:* In the **SUPPLEMENTARY INFORMATION** section of this final rule, we provide a table (Table 1) which lists key changes in this final rule that have an applicability date other than the effective date of this final rule.

**FOR FURTHER INFORMATION CONTACT:**
Christopher McClintick, (410) 786–4682, Part C issues.
Marie Manteuffel, (410) 786–3447, Part D issues.
Kristy Nishimoto, (206) 615–2367, Part C and D enrollment and appeals issues.
Whitney Johnson, (410) 786–0490, Part C and D payment issues.
Joscelyn Lissone, (410) 786–5116, Part C and D compliance issues.
Frank Whelan, (410) 786 1302, Part D improper prescribing issues.

**SUPPLEMENTARY INFORMATION:** Table 1 lists key changes that have an applicability date other than 60 days after the date of publication of this final rule. The applicability dates are discussed in the preamble for each of these items.

### TABLE 1—APPLICABILITY DATE OF KEY PROVISIONS OTHER THAN 60 DAYS AFTER THE DATE OF PUBLICATION OF THE FINAL RULE

| Preamble section | Section title | Applicability date |
|---|---|---|
| III.A.4 ...................... | Reducing the Burden of the Compliance Program Training Requirements (§§ 422.503(b)(4)(vi)(C) and § 423.504(b)(4)(vi)(C)). | 01/01/2016 |
| III.A.7 ...................... | Agent/Broker Compensation Requirements (§§ 422.2274 and 423.2274) ............................................... | 01/01/2015 |
| III.A.20 .................... | Enrollment Requirements for the Prescribers of Part D Covered Drugs (§ 423.120(c)(6)) ...................... | 06/01/2015 |
| III.A.24 .................... | Eligibility of Enrollment for Incarcerated Individuals (§§ 417.1, 417.460(b)(2)(i), 417.460(f)(1)(i)(A) through (C), 422.74(d)(4)(i)(A), 422.74(d)(4)(v), 423.44(d)(5)(iii) and (iv)). | 01/01/2015 |

### Table of Contents

I. Executive Summary
  A. Purpose
  B. Summary of the Major Provisions
  1. Modifying the Agent/Broker Requirements, Specifically Agent/Broker Compensation
  2. Drug Categories or Classes of Clinical Concern
  3. Improving Payment Accuracy— Implementing Overpayment Provisions of Section 1128J (d) of the Social Security Act (§§ 422.326 and 423.360).
  4. Risk Adjustment Data Requirements (§ 422.310)
  C. Summary of Costs and Benefits
II. Background
  A. General Overview and Regulatory History
  B. Issuance of a Notice of Proposed Rulemaking
  C. Public Comments Received in Response to the CY 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs Proposed Rule
  D. Provisions Not Finalized in this Final Rule
III. Provisions of the Proposed Regulations
  A. Clarifying Various Program Participation Requirements
  1. Closing Cost Contract Plans to New Enrollment (§§ 422.2 and 22.503)
  2. Authority to Impose Intermediate Sanctions and Civil Money Penalties (§§ 422.752, 423.752, 422.760 and 423.760)
  3. Contract Termination Notification Requirements and Contract Termination Basis (§§ 422.510 and 423.509)
  4. Reducing the Burden of the Compliance Program Training Requirements (§§ 422.503(b)(4)(vi)(C) and 423.504(b)(4)(vi)(C))
  5. Procedures for Imposing Intermediate Sanctions and Civil Money Penalties Under Parts C and D (§§ 422.756 and 423.756)
  6. Timely Access to Mail Order Services (§ 423.120)
  7. Agent/Broker Requirements, Particularly Compensation (§§ 422.2274 and 423.2274)
  8. Drug Categories or Classes of Clinical Concern (§ 423.120(b)(2)(v))
  9. Medication Therapy Management Program (MTMP) under Part D (§ 423.153(d))
  a. Multiple Chronic Diseases
  b. Multiple Part D Drugs
  c. Annual Cost Threshold
  10. Requirement for Applicants or their Contracted First Tier, Downstream, or Related Entities to Have Experience in the Part D Program Providing Key Part D Functions (§ 423.504(b))
  11. Requirement for Applicants for Stand Alone Part D Plan Sponsor Contracts to Be Actively Engaged in the Business of the Administration of Health Insurance Benefits (§ 423.504(b)(9))
  12. Limit Parent Organizations to One Prescription Drug Plan (PDP) Sponsor Contract Per PDP Region (§ 423.503)
  13. Limit Stand-Alone Prescription Drug Plan Sponsors to Offering No More Than Two Plans Per PDP Region (§ 423.265)
  14. Applicable Cost-Sharing for Transition Supplies: Transition Process Under Part D (§ 423.120(b)(3))
  15. Interpreting the Non Interference Provision (§ 423.10)
  16. Pharmacy Price Concessions in Negotiated Prices (§ 423.100)
  17. Preferred Cost Sharing (§§ 423.100 and 423.120)
  18. Prescription Drug Pricing Standards and Maximum Allowable Cost (§ 423.505(b)(21))
  19. Any Willing Pharmacy Standard Terms & Conditions (§ 423.120(a)(8))
  20. Enrollment Requirements for Prescribers of Part D Covered Drugs (§ 423.120(c)(5) and (6))
  21. Improper Prescribing Practices (§§ 424.530 and 424.535)
  a. Background and Program Integrity Concerns
  b. Drug Enforcement Administration (DEA) Certification of Registration
  c. Patterns or Practices of Prescribing
  22. Broadening the Release of Part D Data (§ 423.505)
  23. Establish Authority to Directly Request Information From First Tier, Downstream, and Related Entities (§§ 422.504(i)(2)(i) and 423.505(i)(2)(i))

**Federal Register** / Vol. 79, No. 100 / Friday, May 23, 2014 / Rules and Regulations    **29921**

detailed in forthcoming operational guidance.

We received the following comments on general rules for overpayments and our responses follow.

*Comment:* Several commenters requested that CMS clarify when the 60-day period begins. Specifically, does the period begin once the MA organization or Part D sponsor has identified that there is an overpayment or once the organization has determined the exact amount of the overpayment? A commenter expressed concern that the proposed rule does not appear to acknowledge that the amount of an overpayment must be quantified before it is "identified." Another commenter requested that CMS address the situation where an MA organization or Part D sponsor becomes aware of an issue or error that may have resulted in one or more overpayments, but could not determine, with reasonable certainty, the amount of the overpayment(s) within a 60-day period.

*Response:* It is important to understand the distinctions among identifying, reporting, and returning an overpayment in this rulemaking for the purposes of the MA and Part D programs. Once an organization has identified that it has received an overpayment, the 60-day period for reporting and returning the overpayment begins. Because of the nature of the Part C and Part D programs, we did not propose that "identified" includes completion of the act of quantification of an overpayment amount. Rather, we proposed that identification of an overpayment means knowing that the MA organization or Part D sponsor has submitted erroneous data to CMS that caused CMS to overpay the organization.

An organization can identify or assess that there is a problem with data submitted to CMS, and determine that it is incorrect data, prior to actually calculating what the payment impact is of that erroneous data. For the MA and Part D programs, the relevant factor is identifying that the data is incorrect and will result in an overpayment. For example, a risk adjustment diagnosis that has been submitted for payment but is found to be invalid because it does not have supporting medical record documentation would result in an overpayment. Under this provision, the day after the date on which the organization has confirmed an identified overpayment—because the organization knows that the diagnosis is not supported by documentation—is the first day of the 60-day period for reporting and returning the overpayment. As another example, an

MA organization may find that data used to calculate Healthcare Effectiveness Data and Information Set (HEDIS) measures that the organization submitted to CMS are found to be invalid; when the organization has confirmed that it has identified invalid data leading to an overpayment, this is the first day of the 60-day period for reporting and returning the overpayment.

Then, during the 2-month period for reporting and returning the overpayment, the organization must determine what data should be submitted to CMS to correct the identified overpayment, and then must engage in the reporting and returning process that we will describe in forthcoming guidance. This reporting and returning process will involve: (1) Notifying CMS that an overpayment exists, including notification of the reason and estimated amount for that overpayment; and (2) submitting the corrected data to CMS.

In other words, we believe that the MA organization and Part D sponsor will discover through appropriate payment evaluation procedures when a 60-day period would begin under the requirements of this provision, because "day one" of the 60-day period is the day after the date on which organization has determined that it has identified the existence of an overpayment. Once the organization "starts the clock," it has 60 days to submit to CMS the corrected data that is the basis of the overpayment. It is the act of submitting the corrected data to CMS, along with a reason and an amount of the overpayment (which may be an estimate), that constitutes fulfillment of the requirement to report and return the overpayment.

As we stated in the January 10, 2014 proposed rule preamble (79 FR 1997), "It also is important to note that the MA organization and Part D sponsor are deemed to have returned the overpayment when they have taken the actions that we will specify, in forthcoming operational guidance, to submit the corrected data that is the source of the overpayment". We will recover the returned overpayment through routine CMS payment processes. That is, payments will continue to be recovered through the established payment adjustment processes and schedules. As a result the payment recovery may not occur within the 60-day window triggered by identifying an overpayment. Rerunning payment reconciliations and conducting payment recovery within CMS payment systems each time an entity identifies an

overpayment that triggers its 60-day clock is simply not feasible for CMS.

We will release operational guidance on the process an organization will use for informing CMS that it has identified a Part C and/or Part D overpayment. This guidance will also address how an organization will be required to provide a reason for and the amount of the overpayment (which may be estimated). We seek to reduce burden and implement an efficient process for administering the reporting and return of overpayments, so we are considering making use of existing procedures for organizations to communicate payment data issues to CMS. For example, MA organizations and Part D sponsors have used the Remedy system for a number of years to inform CMS of payment issues and provide relevant information on that issue.

In the forthcoming operational guidance, we will address the question of how to report the overpayment amount, including estimation of the overpayment amount and updates under certain scenarios.

*Comment:* A commenter contended that, applying the principles adopted by CMS in the RADV audit context, an overpayment cannot exist for a particular MA contract unless CMS' payments as a whole to the MA organization pursuant to the contract are inaccurate in light of an appropriate FFS Adjuster applied to the entire contract. Potential overpayments can be determined, therefore, based only on processes such as CMS' RADV audits, which are designed to measure whether contract-level payments to an MA organization are accurate when compared to an appropriate FFS Adjuster. The commenter further contended that to the extent an MA organization develops processes intended to measure payment accuracy at the contract-level, the MA organization would be required to report and repay inaccuracies calculated after applying CMS's FFS Adjuster, and consistent with prior CMS guidance, this is the sole instance in which an "overpayment" can be determined for purposes of proposed § 422.326.

*Response:* We disagree with the commenter. Our RADV methodology does not change our existing contractual requirement that MA organizations must certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the risk adjustment data they submit to CMS. Further, this decision does not change the long-standing risk adjustment data requirement that a diagnosis submitted to CMS by an MA organization for payment purposes must

**29922**    **Federal Register** / Vol. 79, No. 100 / Friday, May 23, 2014 / Rules and Regulations

be supported by medical record documentation.

However, we are clarifying the link between the § 422.326 overpayment provisions and RADV audits under § 422.311 by adding a condition to the requirement at § 422.326(d), as follows: an MA organization must report and return any overpayment it received no later than 60 days after the date on which it identified it received an overpayment. We are adding to paragraph (d) the provision "unless otherwise directed by CMS for the purpose of § 422.311." Thus, when an MA organization has a contract selected for a RADV audit, during the audit the MA organization will not be allowed to report and return an overpayment under § 422.326 that is due to errors in the data used to risk-adjust payments for the audited contract for the payment year that is the subject of the RADV audit. We will notify the MA organization about the timeline for reporting and returning any overpayments for a contract under a RADV audit. This new provision protects the integrity of the RADV audit process, including the sampling frame of beneficiaries in a selected MA plan, whose diagnoses will be audited.

*Comment:* A commenter stated that there will be many circumstances and situations where entities receiving an overpayment will not have the ability to repay funds within the 60-day period without undue hardship.

*Response:* MA organizations and Part D sponsors have an obligation to pay an overpayment owed under Section 1128J(d). As noted previously, our recovery of overpayments will occur through routine payment processing cycles and schedules. In most circumstances, MA organizations and Part D sponsors will be submitting corrected data, which will be re-run by CMS and then CMS will recover the overpayment.

*Comment:* A commenter noted that 60 days is not a sufficient timeframe, as identifying and quantifying overpayments can be a very involved process. Another commenter stated that most overpayments are identified through analyses and studies, such as internal RADV studies; the commenter requested that the 60-day time period begin at the conclusion of the internal study, so that overpayments can be referred to CMS after all issues have been identified and confirmed.

*Response:* We provide that the 60-day period is the time period for reporting and returning an identified overpayment, after the organization has conducted the activities needed to identify that it has received an

overpayment. As explained previously, for the purposes of the MA and Part D programs, the MA organization or Part D sponsor must report and return the identified overpayment, which is due to incorrect data it has submitted to CMS, no later than 60 days after the date on which the organization identified it received the overpayment. Subsequently and within the 60-day period the MA organization or Part D sponsor is required to report and return the overpayment. Reporting the overpayment involves notifying CMS of the reason and the amount of the overpayment. Returning the overpayment is deemed to have occurred through the act of correcting the erroneous data submitted to CMS, for example, by deleting incorrect PDEs or risk adjustment data. Note that if an organization identifies one set of erroneous data that has caused an overpayment, the organization must begin the 60-day clock on that date, and if subsequent overpayments are identified, the organization must begin subsequent 60-day reporting and returning periods.

*Comment:* A commenter questioned whether CMS will be identifying criteria for organizations to use to determine an overpayment.

*Response:* We have specified in this final rule the specific types of "funds" that are subject to the provisions under this section through the definition of "funds." Funds are payments an organization has received that are based on data that the organization submitted to CMS for payment purposes. We will not provide additional criteria or a checklist.

*Comment:* A commenter stated that logically, an MA organization or Part D sponsor cannot return an overpayment until it has calculated the exact amount that it must return. It might take a considerable amount of time for the MA organization or Part D sponsor to audit its records to determine the amount, whether there is an issue in previous years, and whether extrapolation, or case by case analysis, is appropriate. The commenter was concerned that while a plan sponsor might be able to report to CMS that it has identified an issue within 60 days, a plan sponsor may not have enough information after identification to be able to report the exact amount. Therefore, the commenter requested that CMS clarify that the 60 days begins once the organization has identified the exact amount of the overpayment. The commenter suggested, as an alternative, that if the MA organization or Part D sponsor has notified CMS that it believes there is an overpayment, but it will take more than

60 days to determine the exact amount, CMS consider allowing a "tolling" of the 60 days so that the organization may determine the amount it must return to CMS. Under this "tolling" process, the organization would be required to notify CMS within 60 days of identifying that an overpayment likely exists, but would be provided additional time by CMS to determine the exact amount.

*Response:* We have not used the phrase "exact amount" in this rule-making. For the MA and Part D programs, we define overpayment in the regulation as "funds" the organization has received to which it is not entitled, and then defines "funds" as any payment based on data submitted by an MA or Part D organization. Because of the nature of the Part C and Part D programs, the key focus in implementing these statutory provisions for the MA and Part D programs is thus correcting the incorrect data that the organization submitted to CMS that resulted in an overpayment. We will then run reconciliation on its routine operational schedule to recover overpayment amounts based on the corrected data. The purpose of the 60 days is to provide the MA or Part D organization with sufficient time to correct the incorrect data submitted to CMS using established data correction processes. MA organizations and Part D sponsors are deemed to have returned the overpayment when they have taken the actions to submit the corrected data that is the source of the identified overpayment. Within the 60 days the MA organization and Part D sponsor must also report the overpayment amount (or estimated amount). If an estimated overpayment amount is reported, it may be higher or lower than the actual overpayment amount recovered because additional payment data submitted into the CMS payment system from other sources may be incorporated into the payment calculations.

*Comment:* A commenter stated that it is unclear what may occur post-reconciliation if both parties have been overpaid. For example, if CMS owes the Part D sponsor $10 million due to activity post-reconciliation and a $2 million overpayment is discovered, the commenter questioned whether we will still require that the $2 million be refunded within 60 days or whether the sponsor will be allowed to offset amounts owed by CMS. The commenter recommended that if an overpayment would be reduced or fully covered by a reopening, that CMS allow sponsors to request a reopening and offset the reopening amount due from the

**29926**   **Federal Register** / Vol. 79, No. 100 / Friday, May 23, 2014 / Rules and Regulations

submitted by every provider, while others thought this implied a restriction on the ability of plans to identify what medical records to review. Other commenters believed the proposed amendment limited plans' ability to review medical records for operational purposes other than risk-adjusted payment, such as focusing on only a portion of a medical record for a subset of beneficiaries in order to enhance HEDIS scores, conduct contract compliance reviews, and validate claims processing and billing.

Finally, a few commenters argued that CMS should offset the payment impact of diagnoses an MA organization submitted to CMS that were later found through medical record reviews to not be supported by medical record documentation by adjusting the amount of CMS' overpayment to the MA organization for the level of error in equivalent diagnoses in FFS claims data. Specifically, the commenters argued that CMS should give MA organizations a credit for erroneous diagnoses they submitted from their providers' claims up to the rate identified by CMS as the applicable FFS Adjustor in the RADV program. The commenters also argued that there is no reason to require that both MA and FFS diagnosis data be scrutinized for error rates when determining retroactive payment adjustments, while not engaging in a similar adjustment process when paying plans prospectively.

*Response:* We thank the commenters for their input. We are not finalizing the proposed amendment to § 410.322(e).

However, we emphasize that our decision to not finalize this regulatory proposal does not change CMS' existing contractual requirement that MA organizations must certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the risk adjustment data they submit to CMS. Further, this decision does not change the long-standing risk adjustment data requirement that a diagnosis submitted to CMS by an MA organization for payment purposes must be supported by medical record documentation.

*Comment:* A few commenters supported CMS' proposal to remove the current date of January 31 as the annual final risk adjustment data submission deadline and replace it with the provision that CMS will announce the deadline annually, with the proviso that CMS' timing of this annual deadline always allows sufficient opportunity for organizations to make final data submissions. Several other commenters stated their concern about this proposed change in deadline, including a concern

that CMS might announce a deadline earlier than January 31 in some years. These commenters requested that CMS clarify that the annual deadline would never be before January 31, and a few commenters suggested that the regulation state that the deadline is January 31 but may be extended. Finally, a few commenters requested that CMS not change the January 31 date to a floating date, in order to allow operational stability.

*Response:* We are not finalizing this proposal at this time.

*Comment:* Many commenters disagreed with CMS' proposal under § 410.322(g)(2) that, after the final risk adjustment data submission deadline, CMS would permit submission of data to correct overpayments but not permit late submission of diagnosis data that would result in additional payment, asserting that this asymmetrical approach does not promote CMS' stated goal of improving payment accuracy. The commenters maintained that an MA organization should be allowed to submit additional diagnoses after the final risk adjustment data submission deadline to correct not only an overpayment to the MA organization, but also an underpayment. A commenter recommended that, after the final deadline, MA organizations should be able to submit paired deletions-additions of diagnoses as long as the result is not an increased payment to the organization but a smaller reduction in payment than would otherwise occur if only the deletion were submitted; for example, an MA organization may want to delete the diagnosis code for diabetes with acute complications and replace it with the code for diabetes without complications so that it loses only some of the payment. Finally, a commenter requested that CMS allow exceptions to the general rule that no new diagnoses may be submitted after the final risk adjustment data submission deadline for special circumstances such as system failures, file formatting issues, and other technical problems.

*Response:* For a given payment year (which is a calendar year), CMS applies diagnoses from the previous year (the data collection year) to calculate beneficiary risk scores used to risk-adjust payments to MA organizations in the payment year. MA organizations must finalize any corrections and new submissions of diagnosis data for a data collection year by January 31 of the year after the payment year. That is, we allow 13 months after the end of the diagnosis year for MA organizations to identify errors in data they have submitted (that is, deleting diagnoses from CMS' systems) and to identify and

submit additional diagnoses that were not submitted during the diagnosis year. We believe that is a very reasonable period of time to finalize risk adjustment data for a diagnosis year.

These risk adjustment processes have been in place for many years, and we believe it is the responsibility of MA organizations to have internal audit processes in place allowing them to finalize their risk adjustment data for a payment year by the conclusion of this 13-month period. Therefore, we are finalizing, as proposed, the provision codified at § 422.310(g)(2)(ii) that, after the final deadline, an MA organization may submit risk adjustment data to correct overpayments but not to add payments.

*Comment:* A commenter supported CMS' proposal to limit post-deadline modifications to deletions of incorrect diagnoses but requested that CMS offer one additional opportunity to eliminate unsupported diagnosis codes in advance of a RADV audit.

*Response:* When we are preparing to initiate a RADV audit cycle, all MA organizations are notified that they should eliminate unsupported diagnoses from CMS' systems by a date specified in the notice. Subsequently, we inform the contracts that have been selected for RADV.

In summary, after consideration of the public comments received, we are not finalizing the proposed amendment to § 410.322(e). Also, we are not finalizing at this time our proposal at § 422.310(g)(2)(ii) to remove the current date of January 31 as the annual final risk adjustment data submission deadline and replace it with the provision that CMS will announce the deadline annually. We are finalizing as proposed the restructuring of §§ 422.310(g)(2) and the 422.310(g)(2)(ii) provision to prohibit submission of diagnoses for additional payment after the final risk adjustment data submission deadline. We did not receive any comments on subparagraph (g)(3) and are finalizing it as proposed.

3. RADV Appeals

a. Background

We published final Risk Adjustment Data Validation (RADV) appeals regulations in the April 15 2010 **Federal Register** (75 FR 19677). These rules were proposed and finalized under our authority to establish Medicare Advantage (MA) program standards at section 1856(b)(1) of the Act and are found at § 422.311 et seq. Since finalizing these rules in 2010, we conducted additional RADV audits and determined that some of the appeals

**EXHIBIT P-93**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA ex rel.  )  No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
        Plaintiffs,               )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
        Defendants.               )
_____ )

Videotaped Deposition of
CYNTHIA G. TUDOR, Ph.D.
Given Remotely
Tuesday, August 23, 2022
9:59 a.m. Eastern Time

Reported by:  Cindy A. Hayden, RMR, CRR

Magna Legal Services
866-624-6221
www.MagnaLS.com



5049

Page 25

```
 1            Q.   You can answer, Dr. Tudor.

 2            A.   The answer is:  Probably.

 3            Q.   Can you --

 4            A.   In general -- in general, I would say

 5      that you have to design medical record review to

 6      look for both adds and deletes.

 7            Q.   Dr. Tudor, sitting here today, can you

 8      identify any Medicare Advantage plan that you

 9      advised that they had to design their chart-review

10      programs to look to delete diagnosis codes in

11      addition to add?

12            A.   I don't remember which specific

13      plans --

14                 MS. CHEN:  Object to form.

15      BY MR. BAAK:

16            Q.   The answer to my question, Dr. Tudor,

17      is:  Sitting here today, you can't identify any

18      Medicare Advantage plan that you recall telling

19      that they needed to design their chart review to

20      look to delete diagnosis codes in addition to add,

21      correct?

22            A.   That's correct.

23            Q.   I want to back up in time.  When did

24      you first join CMS?

25            A.   1992.
```



Page 306

1                CERTIFICATE OF REPORTER

2

3            I, Cindy A. Hayden, Registered Merit

4    Reporter and Notary Public for the State of

5    Maryland at Large, do hereby certify that the

6    foregoing transcript is a true, accurate, and

7    complete record.

8            I further certify that I am neither

9    related to nor counsel for any party to the cause

10   pending or interested in the events thereof.

11           Witness my hand, I have hereunto

12   affixed my official seal this 26th day of August,

13   2022.

14

15

16

17

18

19

20

21

22
                    _____
                    Cindy A. Hayden
23                  Cindy A. Hayden, RMR, CRR

                    My Commission expires
24                  April 26, 2025

25



5051

**EXHIBIT P-94**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


_____
                            )
UNITED STATES OF AMERICA     )
ex rel. BENJAMIN POEHLING,   )
                            )
        Plaintiff,           )    No. CV 16-08697 FMO
                            )
vs.                          )
                            )
UNITEDHEALTH GROUP, INC.,    )
et al.,                      )
                            )
        Defendants.          )
_____)


CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER


Volume 2
DEPOSITION OF CHRISTOPHER BRESETTE
As 30(b)(6) Designee 5 of
The United States


(Via Zoom Videoconference)
August 9, 2023




Reported by:  John L. Harmonson, RPR
Job No. 1001591



5053

Page 30

1    coder to take another look to determine whether

2    they agreed with the first senior coder who

3    identified a new HCC that had not been submitted by

4    the MAO; correct?

5        A.    Correct.

6        Q.    Why was the second senior coder -- why

7    wasn't that reviewed blind as well?

8        A.    This was a process that we believed was

9    reasonable to accomplish our audit objective.

10       Q.    Would you agree that coders can

11   sometimes miss diagnosis codes on a blind review?

12            MS. OBEREMBT:    Objection; calls for

13   speculation.

14            THE WITNESS:    I would have to speculate

15   on that.   We've asked the senior coders to

16   determine whether they believe something is -- if a

17   diagnosis is supported or not.

18   BY MS. SCHEFFLER DO:

19       Q.    In your preparation for today and

20   reviewing all of these audits, you're not aware of

21   any instances where the first senior coder

22   conducting a blind review determined that an HCC



Page 31

1    was not validated but OIG ultimately determined

2    that it in fact was validated?

3        A.    I'm not going to say that it did or did

4    not happen.  It very well may have happened.  I did

5    not study the results of the first senior coder and

6    the second senior coder.

7        Q.    We can go back to that and look at some

8    specific examples to refresh your recollection.

9        A.    Absolutely.

10       Q.    So if the second senior coder determines

11   that the HCC that the first senior coder -- let me

12   restart that.

13             If the second senior coder determines

14   that a particular HCC is validated despite the

15   first senior coder determining that it was not

16   supported, then it escalated to a physician to

17   independently review the medical record and make a

18   final determination.  Is that right?

19       A.    It's mostly correct.  There were

20   oftentimes where the senior coders -- I shouldn't

21   say often.  There was the opportunity and there

22   were times that existed that either the first



Page 32

1    senior coder or the second senior coder asked for

2    assistance with that physician reviewer to make the

3    determination.

4              There were, as you say, instances in

5    which the physician reviewer would review that.  I

6    believe independently, but I don't want to say that

7    it was exclusively independently.  A lot of times I

8    believe it was in consultation with the senior

9    coder to make that determination.

10        Q.    So are you saying that the example that

11   I gave, that's not the only time a physician would

12   weigh in?

13        A.    Correct.

14        Q.    But you're not -- you're agreeing that

15   if the second senior coder found support in that

16   example, then a physician would independently

17   review the medical record to make the final

18   determination?

19        A.    I would agree with that.

20        Q.    Was the physician review blind as well?

21        A.    No, it was not.  And independently is

22   correct.  So my apologies.  I see "independently"



Page 122

 1              C E R T I F I C A T E

 2

 3   DISTRICT OF COLUMBIA

 4              I, JOHN L. HARMONSON, a Notary Public

 5   within and for the District of Columbia, do hereby

 6   certify that CHRISTOPHER BRESETTE, the witness

 7   whose deposition is hereinbefore set forth, was

 8   duly sworn by me and that such deposition is a true

 9   record of the testimony given by such witness.

10              That before completion of the

11   proceedings, review and signature of the transcript

12   was reserved.

13              I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17              IN WITNESS WHEREOF, I have hereunto set

18   my hand this 11th day of August, 2023.

19

20              _____
                *John L. Harmonson*

21              JOHN L. HARMONSON, RPR

                My commission expires: 04/14/26

22

