1   LATHAM & WATKINS LLP
      David J. Schindler (Bar No. 130490)
2       david.schindler@lw.com
      Manuel A. Abascal (Bar No. 171301)
3       manny.abascal@lw.com
    355 South Grand Avenue, Suite 100
4   Los Angeles, California 90071-1560
    Telephone: +1.213.485.1234;
5   Facsimile: +1.213.891.8763

6   *Attorneys for United Defendants*

7   MICHAEL D. GRANSTON
    Deputy Assistant Attorney General, Civil Division
8   E. MARTIN ESTRADA
    United States Attorney
9   DAVID M. HARRIS
    ROSS M. CUFF
10  JACK D. ROSS (CBN 265883)
    HUNTER B. THOMSON (CBN 330533)
11  Assistant United States Attorneys
    300 N. Los Angeles Street, Room 7516
12  Los Angeles, California 90012
    Tel: (213) 894-6379; Fax: (213) 894-7819
13  Email: *hunter.thomson@usdoj.gov*

14  *Attorneys for the United States of America*

15  [Additional Counsel Listed on Next Page]

16              **UNITED STATES DISTRICT COURT**
17              **CENTRAL DISTRICT OF CALIFORNIA**

18  UNITED STATES OF AMERICA *ex rel.*     CASE NO. 2:16-cv-08697-FMO-PVCx
    BENJAMIN POEHLING,
19                                          **JOINT EVIDENTIARY APPENDIX**
                Plaintiff,
20                                          **VOLUME 10 OF 14**
21      v.                                  **EXHIBITS D-111 THROUGH D-141**
                                            **PAGES 2879 THROUGH 3589**
    UNITEDHEALTH GROUP, INC. *et al.*,
22
                Defendants.                 Hon. Fernando M. Olguin
23
24
25                                          Hearing Date:  September 5, 2024
                                            Hearing Time:  10:00 a.m.
26                                          Courtroom:  6D
27          **REDACTED VERSION OF DOCUMENT PROPOSED TO BE**
                            **FILED UNDER SEAL**
28

1  LATHAM & WATKINS LLP
       Daniel Meron (appearing *pro hac vice*)
2        daniel.meron@lw.com
       Abid R. Qureshi (appearing *pro hac vice*)
3        abid.qureshi@lw.com
   555 Eleventh Street, NW, Suite 1000
4  Washington, DC 20004-1304
   Telephone: +1.202.637.2200
5  Facsimile: +1.202.637.2201

6  BARTLIT BECK LLP
       Philip S. Beck (appearing *pro hac vice*)
7        philip.beck@bartlitbeck.com
       Sean W. Gallagher (appearing *pro hac vice*)
8        sean.gallagher@bartlitbeck.com
       Cindy L. Sobel (appearing *pro hac vice*)
9        cindy.sobel@bartlitbeck.com
       Nicolas Martinez (appearing *pro hac vice*)
10       nicolas.martinez@bartlitbeck.com
       Benjamin R. Montague (appearing *pro hac vice*)
11       benjamin.montague@bartlitbeck.com
   54 W. Hubbard Street, Suite 300
12 Chicago, Illinois 60654-8174
   Telephone: +1.312.494.4400
13 Facsimile: +1.312.494.4440

14 BARTLIT BECK LLP
       Andrew C. Baak (appearing *pro hac vice*)
15       andrew.baak@bartlitbeck.com
       Jameson R. Jones (appearing *pro hac vice*)
16       jameson.jones@bartlitbeck.com
   1801 Wewatta Street, Suite 1200
17 Denver, Colorado 80202-6318
   Telephone: +1.303.592.3100
18 Facsimile: +1.303.592.3140

19 *Attorneys for United Defendants*

20
   JAMIE ANN YAVELBERG
21 ROBERT McAULIFFE
   EDWARD CROOKE
22 LINDA McMAHON
   JESSICA E. KRIEG
23 AMY L. LIKOFF
   GREGORY A. MASON
24 MARTHA N. GLOVER
   WENDY ZUPAC
25 Attorneys, Civil Division, U.S. Department of Justice
           P.O. Box 261, Ben Franklin Station
26         Washington, D.C. 20044
           Tel: (202) 307-0486; Fax: (202) 307-3852
27         Email:  robert.mcauliffe@usdoj.gov
   TRINI E. ROSS
28 United States Attorney

1  DAVID CORIELL
   Assistant United States Attorney
2        138 Delaware Avenue
         Buffalo, New York 14201
3        Tel: (716) 843-5830; Fax: (716) 551-3052
         Email:  david.coriell@usdoj.gov
4
   *Attorneys for the United States of America*
5

**EXHIBIT D-111**

Page 1

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - +
                                |
UNITED STATES OF AMERICA        |
et rel. BENJAMIN POEHLING,      |
                                |
        Plaintiffs,             | Case No.
    vs.                         | CV 16-08697 FMO (SSx)
                                |
UNITEDHEALTH GROUP, INC.,       | Hon. Fernando Olguin
et al.,                         |
                                |
        Defendants.             |
                                |
- - - - - - - - - - - - - - - +


                    Thursday, March 10, 2022


    Remote Videotaped Deposition of RONNIE GROWER, a
Witness herein, called for examination by counsel for
Plaintiffs in the above-entitled matter, pursuant to
notice, the witness being duly sworn by MICHELE EDDY,
RPR, CRR, a Notary Public in and for the District of
Columbia, taken virtually with the witness located in
Nevada, at 11:31 a.m. Eastern Standard Time.



Page 112

1        A    That's what it says, yes.

2        Q    And that means that roughly 40 percent

3   of the codes subject to this audit were not

4   validated, correct?

5            MS. MADDOUX:  Objection.

6   Mischaracterizes the document.  Calls for

7   speculation.

8        A    I can only go by what it says, that 60

9   percent were validated.  I don't know about the

10  other 40 percent.

11       Q    Well, do you have any reason to believe

12  that this is an inaccurate representations of the

13  results of a 2009 audit of California providers?

14       A    Objection, form.

15       Q    And do you recall discussing the results

16  of a 2009 audit of California providers with

17  anyone at Ingenix?

18            MS. MADDOUX:  Objection, form.

19       A    I don't remember.  I think in 2009 my

20  role had moved on to market consultation more, so

21  I don't know that I would have been involved with

22  the results of that.  And California was not my --

23  was not my region that I represented.

24       Q    And do you recall who at Ingenix did

25  cover the California region?



Page 113

1              MS. MADDOUX:  Objection, form.

2      A     I believe it was Pam Leal.

3      Q     Okay.  So going back to the chart review

4  program, was chart review a program that Ingenix

5  sold to health plan clients?

6              MS. MADDOUX:  Objection, form.  Calls

7  for speculation.

8      A     I wasn't really involved in the sales of

9  Ingenix's services to clients that I can remember.

10     Q     Well, focusing less on the sale part, I

11 suppose was chart review a service that was

12 offered by Ingenix?

13             MS. MADDOUX:  Objection, form.

14 Ambiguous.

15     A     I believe chart review was offered as a

16 service by Ingenix.

17     Q     And what were the benefits of chart

18 review for Ingenix's clients?

19             MS. MADDOUX:  Objection, form.  Vague.

20     A     I think particularly in areas where

21 capitation resulted in encounter data not being

22 fully reported for every single date of service

23 and every code reported, that chart review was an

24 opportunity to go back and look in the middle

25 record and validate that there were diagnosis



Page 114

1    codes that represented the patient's conditions in

2    the medical record that could be submitted to the

3    CMS.

4         Q    So specifically chart review was a

5    program that looked for additional diagnosis codes

6    in the medical records that had not yet been

7    previously submitted to CMS?

8              MS. MADDOUX:  Objection, form.

9    Misstates prior testimony.

10        A    Could you repeat the question?

11        Q    Sure.  I asked, so specifically chart

12   review was a program to review medical records for

13   additional diagnosis codes that had not previously

14   been submitted to CMS?

15             MS. MADDOUX:  Objection, form.

16        A    I believe the intent was to get an

17   accurate view of the medical record for

18   particularly primary care providers and all the

19   encounters with their patients for the reporting

20   year so you would have an accurate picture of what

21   was being -- what should have been submitted from

22   the medical record.

23        Q    Okay.  And so was the purpose to

24   identify all diagnosis codes that could be

25   supported by a medical record?



Page 115

1        MS. MADDOUX:  Objection, form.

2    A    I was not intimately involved with the

3  chart review program at Ingenix, and I can't speak

4  to all the details associated with it.

5    Q    Sorry, I'm trying to pull up a document,

6  but my -- okay, sorry.

7        I think we might have crossed wires with

8  our Q&A there for a second, so let me make sure I

9  actually understand what we're -- what we're

10  discussing.

11        Was the -- was it your understanding

12  that the intent of chart review was to identify

13  all diagnosis codes in a patient's medical record?

14        MS. MADDOUX:  Objection, form.  Lack of

15  foundation.

16    A    I think the intent of chart review, the

17  best I know, was to accurately capture codes that

18  were in the medical record.

19    Q    And were you involved with advising a

20  strategy for the chart review program?

21        MS. MADDOUX:  Objection, form.

22    A    I don't believe so, no.  I think the

23  chart review program was established before I came

24  to work in Ingenix.

25    Q    And did you have any understanding of



Page 119

```
 1        A    I think claims verification was making

 2   sure that what was reported via an encounter could

 3   be documented in the medical record.  And then the

 4   other side of that is, if what's in the medical

 5   record was not previously reported, to have that

 6   reported.

 7        Q    So was it your understanding that chart

 8   review and claims verification were two sides of

 9   the same coin?

10             MS. MADDOUX:  Objection, form.  Lack of

11   foundation.  Calls for speculation.

12        A    I don't know enough about how the claims

13   verification process was going to be implemented

14   or how it would work to respond to that.

15        Q    So you mentioned that individuals within

16   Ingenix were discussing claims verification with

17   Ovations; is that accurate?

18             MS. MADDOUX:  Objection.  Misstates

19   prior testimony.

20        A    I believe that I remember some of that.

21        Q    And do you recall who from Ovations was

22   involved in those discussions?

23        A    The only people I remember involved in

24   that type of discussion would be Stephanie Will

25   and Jeff Dumcum.
```



Page 120

```
 1        Q    And were -- okay.  Thanks.  Strike that.
 2             MS. ZUPAC:  So I'm just seeing what I
 3    have left, which is a good sign that the
 4    deposition is perhaps nearing to a close.  Why
 5    don't we go off the record briefly so I can just
 6    review what I have left and we can come back on
 7    and hopefully wrap up.
 8             VIDEO TECHNICIAN:  This ends Media Unit
 9    No. 5 in the deposition of Ronnie Grower.  The
10    time is 3:34 p.m.  We're going off the record.
11             (A brief recess was taken.)
12             VIDEO TECHNICIAN:  This begins Media
13    Unit No. 6 in the deposition of Ronnie Grower.
14    The time is 3:50 p.m.  We are back on the record.
15    BY MS. ZUPAC:
16        Q    Welcome back, Ms. Grower.
17             I just want to go back and make sure I
18    understand your testimony about the chart review
19    process.  So was it your understanding that
20    when -- staff in chart review was to collect
21    medical records or charts from providers?
22             MS. MADDOUX:  Objection, form.
23        A    Yes, they would collect medical records
24    from providers.
25        Q    And then Ingenix would conduct a
```



Page 121

1    thorough review of those medical records for any

2    diagnosis codes that were supported by those

3    medical records, correct?

4              MS. MADDOUX:  Objection, form.  Lack of

5    foundation.

6         A    Basically they were going in to look to

7    report the diagnoses that were in the medical

8    records.

9         Q    And was it your understanding that

10   Medicare Advantage plans -- Medicare Advantage

11   organizations could only submit codes that were

12   supported by the medical records?

13             MS. MADDOUX:  Objection, form.  Calls

14   for a legal conclusion.  Lack of foundation.

15        A    So Medicare Advantage plans submitted

16   codes that should be supported by the medical

17   record.

18        Q    So in the chart review process when

19   Ingenix had the chart and was reviewing it for

20   codes, were there times when Ingenix -- strike

21   that.

22             So during the chart review process when

23   Ingenix had the medical records and were reviewing

24   it for codes, was it your understanding that

25   Ingenix had to delete any codes that it identified



2887

Page 136

1              CERTIFICATE OF SHORTHAND REPORTER

2

3         I, Michele E. Eddy, Registered Professional

4    Reporter and Certified Realtime Reporter, the court

5    reporter before whom the foregoing deposition was

6    taken, do hereby certify that the foregoing transcript

7    is a true and correct record of the testimony given;

8    that said testimony was taken by me stenographically

9    and thereafter reduced to typewriting under my

10   supervision; and that I am neither counsel for,

11   related to, nor employed by any of the parties to this

12   case and have no interest, financial or otherwise, in

13   its outcome.

14         IN WITNESS WHEREOF, I have hereunto set my

15   hand and affixed my notarial seal this 21st day of

16   March, 2022.

17

18   My commission expires July 20, 2022

19

20   _Michele Eddy_

21   MICHELE EDDY

     NOTARY PUBLIC IN AND FOR

22   THE DISTRICT OF COLUMBIA

23

24

25



**EXHIBIT D-112**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
        Plaintiffs,               )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
        Defendants.               )
_____ )




Videotaped Deposition of

MARY ROSE GUY

Given Remotely

Wednesday, March 30, 2022

9:01 a.m. Eastern Time




Reported by:  Karen K. Kidwell, RMR, CRR




Magna Legal Services
866-624-6221
www.MagnaLS.com



2890

Page 23

```
 1              MR. LEE:  Objection.  Vague.
 2              THE WITNESS:  Yeah, I -- I agree.
 3   BY MS. MADDOUX:
 4       Q.   Any certifications -- any like specific
 5   certifications in a field of study?
 6       A.   I maintain a license within the State of
 7   Maryland for clinical social work.
 8       Q.   And how long have you had that license?
 9       A.   Since about nineteen-eighty- -- well, at
10   this level, since about 1984 or '85.
11       Q.   Do you have any training in medical
12   coding?
13       A.   No.
14       Q.   Are you a certified medical coder?
15       A.   I am not.
16       Q.   Do you have any specific
17   risk-adjustment-related certifications?
18       A.   No.
19       Q.   What is your current job title at CMS?
20       A.   Health insurance specialist.
21       Q.   And what is a health insurance specialist?
22       A.   It's a generic label for people who are
23   working within the health insurance field at CMS.
24       Q.   And what component of CMS are you
25   currently in?
```



Page 24

```
 1          A.    I work in the Centers for -- the Center

 2     for Consumer Information and Insurance Oversight.

 3          Q.    And is that sometimes abbreviated "CCIIO"?

 4          A.    That's correct.

 5          Q.    And what is CCIIO?

 6          A.    The Center for Consumer Information and

 7     Insurance Oversight.

 8          Q.    What do they do?

 9          A.    We work on the marketplace --

10          MR. LEE:  (Simultaneous speaking)

11     Objection.  Vague.

12          THE WITNESS:  -- facilitated.

13     BY MS. MADDOUX:

14          Q.    So is this a -- related to the Affordable

15     Care Act?

16          A.    It is.

17          Q.    Does your current role involve Medicare

18     Advantage?

19          A.    It does not.

20          Q.    How long have you been in this role?

21          A.    I've been with CCIIO since 2012.

22          Q.    And since 2012, have you been working on

23     the Affordable Care Act?

24          A.    Predominantly.

25          Q.    And has any of your work since 2012
```



Page 25

```
1    related to Medicare Advantage?

2         A.    No.

3         Q.    Are you familiar with Medicare Advantage?

4         A.    Yes.

5               MR. LEE:  Object to form.  Vague.

6    BY MS. MADDOUX:

7         Q.    What is it?

8         A.    It's a -- it's Medicare Part C.

9               MR. LEE:  Objection.  Vague.

10              Mary -- Ms. Guy --

11              THE WITNESS:  I'm sorry, John.

12              MR. LEE:  -- make sure --

13              THE WITNESS:  I need to pause.

14              MR. LEE:  Give me a chance to insert an

15         objection.

16              THE WITNESS:  Okay.  Thank you.

17              MR. LEE:  I'll try not to speak over you,

18         but . . .

19              Go ahead.

20   BY MS. MADDOUX:

21        Q.    Is Medicare Advantage often referred to

22   as "MA"?

23        A.    Yes.

24        Q.    So if I refer to "MA" throughout the

25   deposition, you'll understand that I'm referring to
```



Page 26

1    Medicare Advantage?

2         A.    Yes.

3         Q.    Is -- sorry.  Strike that.

4               If you can turn back to the exhibit on

5    your screen and look at the second page of the

6    résumé.

7         A.    Uh-huh.

8         Q.    Under "Health Insurance," the bolded

9    underlined text "Health Insurance Specialist/Project

10   Officer"?  Do you see that?

11        A.    Yes.

12        Q.    This states that you were in this role

13   from December 2000 to July 2004.  Is that correct?

14        A.    Yes.

15        Q.    Is this the first role that you had when

16   you started at CMS?

17        A.    No.

18        Q.    What was the first role that you had when

19   you started at CMS?

20        A.    I worked in the Office of Strategic

21   Operations and Regulatory Affairs as a health

22   insurance specialist, a reg writer.

23        Q.    And in this current -- excuse me.  Strike

24   that.

25               In this health insurance specialist role



Page 27

1    that you were in from December 2000 to July 2004, was

2    this related to Medicare Advantage?

3            A.    Not that I recall.

4            Q.    Was it specific to Medicaid?

5            A.    Not that I recall.

6            Q.    Is the "Health Insurance Specialist" here

7    the same generic title you described earlier?

8            A.    Yes, with the exception of here I've

9    listed "Project Officer," so I was working on a

10   grants program.

11           Q.    Now, if you can turn back to page 1 of the

12   document.

13           A.    Uh-huh.

14           Q.    Under "Employment," it has a bolded and

15   underlined text that says "Social Science Research

16   Analyst/Project Officer."  Do you see that?

17           A.    Yes.

18           Q.    This states that you were in this role

19   from August 2004 to present.  Do you see that?

20           A.    Yes.

21           Q.    Given what you testified to earlier, it

22   sounds like you moved out of this role, and you're no

23   longer -- it's not a present role; is that correct?

24           A.    Correct.

25           Q.    When did you leave this role?



2895

Page 28

1        A.   I would have to look back, but I think it

2   was 2010.

3        Q.   This also states from July 2004 to

4   February 2006, you were in the Medicare Drug Benefit

5   Group, Division of Program Analysis and Performance.

6   Do you see that?

7        A.   I do.

8        Q.   What is the Medicare Drug Benefit Group?

9        A.   That was a label that we were given.

10       Q.   What did the Medicare Drug Benefit Group

11   do?

12       A.   That was the group under which I was

13   working.  They had Medicare drug benefit, and we also

14   had risk adjustment under that.

15       Q.   What is the Division of Program Analysis

16   and Performance?

17       A.   That was a division that was managed by

18   Jeff Grant.

19       Q.   And who is Jeff Grant?

20       A.   It was risk adjustment data validation.

21       Q.   And is that sometimes abbreviated RADV, or

22   R-A-D-V?

23       A.   Yes.

24       Q.   It says here that you reported to Jeff

25   Grant in this role.  Is that correct?



Page 29

1          A.    Yes.  Well, as a supervisor.

2          Q.    Was -- did you have a more direct

3    supervisor?

4          A.    Lateefah Hughes was our team leader.

5          Q.    This also states that from February 2006

6    to present, you were in the Medicare Plan Payment

7    Group, Division of Risk Adjustment Operations.  Do

8    you see that?

9          A.    Yes.

10          Q.    What is the Medicare Plan Payment Group?

11          A.    They split the -- they took us out of the

12    Medicare Drug Benefit Group and moved us over to

13    Medicare Plan Payment Group.  This was part of a

14    reorganization.

15          Q.    Is it sometimes referred to as "MPPG"?

16          A.    Correct.

17          Q.    And what did MPPG do?

18          A.    A little bit of everything.  We had risk

19    adjustment under it.  I don't remember all the

20    different divisions.  That's been a long time ago.

21          Q.    Did they have roles related to Medicare

22    Advantage?

23                MR. LEE:  Objection.  Vague as to time.

24                THE WITNESS:  Yeah.  Thank you.

25



Page 30

1   BY MS. MADDOUX:

2        Q.   Did they oversee aspects of the Medicare

3   Advantage program?

4             MR. LEE:  Objection.  Vague.

5             You can answer, Ms. Guy, to the extent

6        that you think you can understand the question.

7             THE WITNESS:  Thank you, John.

8   BY MS. MADDOUX:

9        Q.   Did MPPG oversee aspects of the Medicare

10  Advantage program?

11       A.   Yes.

12       Q.   Which aspects?

13       A.   Risk-adjustment model.  There was so

14  much -- I don't remember all the different aspects.

15       Q.   And when you refer to "the model," are you

16  referring to the CMS HCC risk-adjustment model?

17       A.   Yes.

18       Q.   And what is your understanding of what the

19  model is?

20            MR. LEE:  Objection.  Lacks foundation.

21       Vague.

22  BY MS. MADDOUX:

23       Q.   You can answer.

24            THE WITNESS:  John, are you okay with

25       that?



Page 31

```
 1              MR. LEE:  Yes.  To the extent that you
 2         think you can understand the question, you --
 3         you may answer.
 4              THE WITNESS:  Okay.
 5              The Medicare Advantage payment model was a
 6         method by which Medicare Advantage organizations
 7         were paid for their patient population and the
 8         diagnosis codes that were submitted.
 9    BY MS. MADDOUX:
10         Q.   And in this role, it says you reported to
11    Sean Creighton.  Is that correct?
12         A.   Yes.
13         Q.   I now want to direct your attention to --
14    there's a paragraph in the middle that starts with
15    the word "Developed."  And this states:  "Developed
16    and implemented technical aspects of risk adjustment
17    data validation (RADV) projects to ensure the
18    integrity of risk adjustment data and validate the
19    accuracy of risk adjusted payments made to Medicare
20    Advantage organizations.  Activities include
21    sampling, data analysis, medical record, developing
22    medical record review methodology, and evaluation of
23    qualitative aspects of the data.  Identified the
24    payment error rate for the Medicare Advantage
25    program."  Do you see that?
```



1        A.    Yes.

2        Q.    Is this an accurate description of your

3   responsibilities when you were a social science

4   research analyst/project officer?

5        A.    Yes.

6        Q.    Does this describe your responsibilities

7   while you were in both the Medicare Drug Benefit

8   Group and MPPG?

9        A.    Yes and no.  Yes, but I was just learning

10  it as I started in '04.

11       Q.    So would this be more what you were doing

12  while you were at MPPG?

13       A.    Correct.

14       Q.    Is there anything else that you remember

15  from your time at the Medicare Drug Benefit Group

16  that is not described here?

17       A.    No.

18       Q.    What are risk adjustment data validation

19  projects?

20            MR. LEE:  Object to form.  Vague.  Lacks

21       foundation.

22  BY MS. MADDOUX:

23       Q.    Ms. Guy, you may answer.

24            MR. LEE:  You may answer, Ms. Guy.

25            THE WITNESS:  So the projects were



Page 74

1        Q.    What are discrepancies in the diagnoses?

2              MR. LEE:    Objection.    Lacks foundation.

3        Vague.

4              THE WITNESS:    So if a payment diagnosis

5        was submitted by the MA organization, and then

6        the medical record did not support that payment

7        diagnosis, that would have resulted in the

8        discrepancy.

9   BY MS. MADDOUX:

10       Q.    I'm going to direct you to page 8 of

11  Exhibit 1156.    And then in the middle of the page, it

12  says -- there's a bolded section header that says

13  2.1, "Staffing the Medical Record Review."    Do you

14  see that?

15       A.    Yes.

16       Q.    Under this header, the second sentence

17  states:    "BearingPoint manages the contract, prepares

18  the analysis and sampling plans, analyzes the results

19  of the medical record review, identifies the records

20  to be sent to the SVC, and prepares the final

21  report."    Do you see that?

22       A.    I see that sentence, yes.

23       Q.    Does "SVC" stand for second-level

24  validation contractor?

25       A.    I'd have to look how it's defined up



Page 75

1    above, but we could look through for the acronym.

2         Q.   If you look at page 6 of Exhibit 1156

3    there, in the bulleted point list above Figure 1,

4    there is -- fourth bullet from the -- the bottom of

5    the list, it says:  "Identifying and sending records

6    to CMS's independent second validation contractor

7    (SVC) to confirm discrepancies."  Do you see that?

8         A.   I see that.

9         Q.   Does "SVC" stand for second validation

10   contractor?

11        A.   Yes.

12        Q.   Was the SVC a different medical record

13   review contractor?

14        A.   It was.

15        Q.   What was their role?

16        A.   So the role of the SVC was to look at the

17   record -- and code, to determine if they got an

18   answer or same code as the initial validation

19   contractor.

20        Q.   The SVC would review the medical record

21   after the IVC; is that correct?

22        A.   Correct.

23        Q.   Why would the IVC send records to the SVC?

24        A.   So the IVC would send records to the SVC

25   to -- if you had an instance where the IVC's code did



Page 76

1    not match that which was submitted for payment, that

2    was one thing.  So we -- we weren't -- wanted to have

3    two medical record reviewers say it didn't match.

4    It's a validation.  It's a quality control.

5               Another thing that we did was we sent

6    records to the SVC to verify coding, to make sure

7    that they were coming up -- we sent a sample, medical

8    records, to verify that they both got the same codes,

9    and -- you know, if they were particularly complex

10   patients, that was another thing that we did to

11   ensure that the codes would be accurate.

12              So the idea was that we wanted to make

13   sure that we didn't have false negatives and false

14   positives.  We wanted to have the diagnosis verified.

15   So if one of the contract -- my recollection is that

16   if one of the contractors found the code that was

17   submitted for payment, then there was no discrepancy.

18   If both of them found it, there was no discrepancy.

19   But if neither of them found it, there was a

20   discrepancy.

21        Q.   What about if one of them found it and one

22   of them did not?

23        A.   That would have not resulted in a

24   discrepancy, if I recall correctly.

25        Q.   And what are false positives?



Page 77

```
 1        A.    We had false positives where you had like
 2   the first coder would have said one thing and the
 3   other one said the other.  So you had -- let me
 4   think.  How did that work?
 5              Well, I don't -- I don't remember how we
 6   did it.  But we had -- we wanted to make sure that we
 7   didn't code a record that otherwise would have -- and
 8   given them the -- the code -- it's basically a
 9   quality assurance thing, false positives, false
10   negatives, just like we have now with COVID.  You
11   have some tests that give you false positives and
12   some tests that give you false negatives.  That's why
13   you repeat it.  You have more than one person looking
14   at it.
15        Q.    So the primary coder reviews the medical
16   record first; is that right?
17        A.    Correct.
18        Q.    And in this scenario, your -- just to make
19   sure I understand the scenario that you're
20   discussing, a primary coder may look at the medical
21   record and not identify a diagnosis code.  The
22   secondary coder may look at the record and identify
23   the diagnosis code; is that correct?
24        A.    Correct.
25              MR. LEE:  Object to form.
```



Page 78

1    BY MS. MADDOUX:

2         Q.   And would that be considered a false

3    positive or a false negative?

4         A.   I think it would -- the first instance it

5    would be a false negative, because it was found by

6    the second.

7         Q.   Okay.  So back to page 8 of 1156.  And

8    again we're under the bolded section, 2.1, "Staffing

9    The Medical Record Review Process."  The paragraph

10   provides that IPRO, or IPRO, "provides the following

11   staff."

12         Do you see that?  It's at the -- it's at

13   the end of the first paragraph.

14         A.   "Provides the following staff."  Yes, I

15   see that.

16         Q.   There's then a bulleted list.  The third

17   bullet from the bottom of the list reads:  "Certified

18   medical record coders (primary coders) -- abstract

19   diagnoses from each medical record."

20         Did I read this correctly?

21         A.   Correct.

22         Q.   What does "abstract diagnoses" mean?

23         A.   That means they're basically --

24         MR. LEE:  Objection.  Lacks foundation.

25



Page 211

1                    CERTIFICATE OF REPORTER

2          I, Karen K. Kidwell, Registered Merit Reporter

3     and Notary Public for the State of Maryland at Large,

4     do hereby certify:

5          That the foregoing deposition was taken

6     remotely before me on the date and at the time stated

7     on page 1 of this transcript; that the deponent was

8     duly sworn to testify to the truth, the whole truth

9     and nothing but the truth; that the testimony of the

10    deponent and all objections made at the time of the

11    examination were recorded stenographically by me and

12    were thereafter transcribed; that the foregoing

13    deposition as typed is a true, accurate and complete

14    record of the testimony of the deponent and of all

15    objections made at the time of the examination to the

16    best of my ability.

17         I further certify that I am neither related to

18    nor counsel for any party to the cause pending or

19    interested in the events thereof.

20         Witness my hand this 7th day of April, 2022.

21

22         _____
                     *Karen K. Kidwell*
23                Karen K. Kidwell,
                  Registered Merit Reporter
                  Notary Public
24                State of Maryland at Large
                  My Commission expires:
25                April 14, 2025



2906

**EXHIBIT D-113**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA           )
ex rel. BENJAMIN POEHLING,         )
                                   )
            Plaintiff,             )
                                   )
        v.                         )Case No. CV 16-08697 FMO
                                   )
UNITEDHEALTH GROUP, INC.,          )
et al.,                            )
            Defendants.            )
_____    )


VIDEOTAPED DEPOSITION OF JIMMY ARTHUR HIGGINS, taken on
behalf of Plaintiff, UNITED STATES OF AMERICA, at
650 Town Center Drive, Costa Mesa, California 92626,
beginning at 9:16 a.m., and ending at 5:42 p.m., on
Tuesday, May 3, 2022, before Marceline F. Noble, RPR,
CRR, Certified Shorthand Reporter No. 3024.




Magna Legal Services
866-624-6221
www.MagnaLS.com

Reported by:
Marceline F. Noble
CSR No. 3024
Job No. 821137



2908

Page 131

1      A.   Somewhere around the due diligence

2   quotation.

3      Q.   Yes.

4           So it says:

5           "We believe the Medicare -- or Medicare Plus

6   Choice organization have an obligation to undertake

7   due diligence to ensure the accuracy, completeness

8   and truthfulness of encounter data submitted to HCFA

9   or CMS, and they will be held to a best knowledge,

10  information and belief standard."

11          Do you see that?

12     A.   I do.  And this, sort of at a high level,

13  defines what you've got in the other document, which

14  is a little more specific.

15     Q.   Understood.

16          But -- but it's your understanding it's --

17  they're using the same phrasing, "best information,

18  knowledge and belief as to the accuracy, completeness

19  and truthfulness of the data"; is that right?

20          MS. DO:  Object to form and lacks

21  foundation.

22          THE WITNESS:  I think so.  But I, yeah, did

23  not write this so I don't -- I can't say for certain

24  what they meant.

25  ///



Page 132

 1   BY MS. GLOVER:

 2       Q.  All right.  And -- so how did you ensure --

 3   of your best knowledge, information and belief, how

 4   did you at PacifiCare -- and this could be you or

 5   your team or others at PacifiCare -- ensure that --

 6   that it would -- that you submitted risk adjustment

 7   data that was accurate, complete and truthful?

 8           MS. DO:  Object to form.  Compound and lacks

 9   foundation.

10           THE WITNESS:  As it applied to signing the

11   EDI agreement, I knew pretty much what we were doing

12   in the process of extracting, formatting, submitting

13   data.  And from that process, I would say, yes, my

14   knowledge, information and belief was that all the

15   data was true and accurate.

16           I think that from the point of view of

17   externality coming in from the provider organization,

18   I think --

19           (Reporter clarification.)

20           THE WITNESS:  From the provider

21   organization, that there may be reason to believe

22   that the attestation on the claim form or the

23   encounter form would be sufficient.

24   BY MS. GLOVER:

25       Q.  So the attestation that the provider signs



Page 133

1    about the accuracy, completeness and --

2        A.  On the HIPAA 1500, yeah.

3        Q.  Okay.  And because they're signing that

4    attestation, it was your understanding that that --

5    that that satisfied PacifiCare's obligations to

6    submit accurate, complete and truthful data; is that

7    right?

8            MS. DO:  Objection.  Mischaracterizes prior

9    testimony.

10           THE WITNESS:  It identifies very specific

11   penalties, severe penalties for them not to do that.

12   BY MS. GLOVER:

13       Q.  And what were those penalties --

14       A.  Perjury.

15       Q.  -- to your recollection?

16           Perjury.  Okay.

17       A.  That, you know, they could be rounded up,

18   arrested.  You try them for -- for perjury.

19       Q.  Okay.  And, Mr. Higgins, are you familiar

20   with something called a "risk adjustment data

21   validation audit"?  Sometimes called a RADV audit?

22       A.  A RADV, yeah.  I am familiar that they

23   occurred.  I had peripheral knowledge of them going

24   on, just because, you know, a conference room was

25   commandeered and kept for weeks or months.  And files



Page 134

1    would pile up in there.  And we would have a

2    certified coder going through them, looking at -- at

3    the medical records.

4        Q.  And why was a certified coder going through

5    and looking at the medical records, in conjunction

6    with a risk adjustment data validation audit?

7            MS. DO:  Objection.  Lacks foundation.

8            THE WITNESS:  Independent verification of

9    what was found.

10   BY MS. GLOVER:

11       Q.  Independent of -- of who?

12       A.  CMS.

13       Q.  So in a risk adjustment data validation

14   audit, or known as a "RADV audit," is it your

15   understanding that -- that CMS was reviewing medical

16   records to assess whether diagnosis codes submitted

17   by a Medicare Advantage organization, were, in fact,

18   supported by that documentation, that medical record?

19           MS. DO:  Objection.  Lacks foundation.

20           THE WITNESS:  I couldn't say that.  I

21   wasn't -- I wasn't in the room, didn't know what they

22   were doing or what they were saying.  I knew some of

23   the people that were involved, but...

24   BY MS. GLOVER:

25       Q.  Who was involved?



Page 298

1

2                    REPORTER'S CERTIFICATION

3

4       I, MARCELINE F. NOBLE, a Certified Shorthand

5   Reporter in and for the State of California, do hereby

6   certify:

7

8       That the foregoing witness was by me duly sworn;

9   that the deposition was then taken before me at the time

10  and place herein set forth; that the testimony and

11  proceedings were reported stenographically by me and

12  later transcribed into typewriting under my direction;

13  that the foregoing is a true record of the testimony and

14  proceedings taken at that time.

15

16      IN WITNESS WHEREOF, I have subscribed my name this

17  12th day of May, 2022.

18

19

20       _____

21       MARCELINE F. NOBLE, CSR No. 3024

22

23

24

25



2913

**EXHIBIT D-114**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA    )   No. 16-08697 FMO
ex rel. BENJAMIN POEHLING,   )
                             )
            Plaintiffs,      )
                             )
v.                           )
                             )
UNITEDHEALTH GROUP, INC.,    )
et al.,                      )
                             )
            Defendants.      )
_____)

*** CONFIDENTIAL ***

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

ANNE HORNSBY

(Taken virtually)

10:03 a.m. Eastern

Wednesday, May 18, 2022

REPORTED BY:  Christine A. Taylor, RPR

Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 15

1    that.

2         Q.    And approximately how long was each

3    session?

4         A.    Session with John Lee?

5         Q.    Yeah.

6         A.    First one was about an hour.  Second

7    one was a couple hours.  The Agile meeting was

8    about an hour.

9         Q.    I'd like to shift gears a little bit

10   to understand generally what positions and

11   responsibilities you had while you were employed

12   at CMS as well as more recently.

13              Are you currently employed anywhere?

14        A.    No, I'm retired.

15        Q.    Retired.

16        A.    Yea.

17        Q.    And -- but you previously worked at

18   the Centers for Medicare & Medicaid Services; is

19   that correct?

20        A.    Yes, that's correct.

21        Q.    And if I refer to that as CMS, will

22   you understand what I'm talking about, the Centers

23   for Medicare & Medicaid Services?

24        A.    Yes, I will.

25        Q.    Great.  Over what time period did you



Page 16

1    work at CMS?

2            A.    From 2 -- February 2000 to March 2019.

3            Q.    So you worked for CMS for a little

4    over 19 years; correct?

5            A.    Correct.

6            Q.    And what was your most recent position

7    at CMS?

8            A.    Technically, my title was always

9    health insurance specialist for all those years.

10   You know, I was -- from 2010 onward, I worked in

11   the front office of the -- what is now the

12   Medicare Plan Payment Group assisting the managers

13   in work across the five divisions in that group.

14   I was --

15           Q.    Okay.

16           A.    -- technical specialist.

17           Q.    So you said that was from 2010 until

18   March 2019 you worked in the front office of what

19   I will refer to as MPPG, will you understand what

20   I mean?

21           A.    I will.

22           Q.    That refers to Medicare -- okay.

23                 And you said you worked in the front

24   office working across all five divisions.  What

25   were those five divisions that you helped work



Page 17

1    across?

2         A.   Oh, goodness, let's see.   There was --
3    they've changed so many times with
4    reorganizations.   There was one that was
5    running -- that was payment policy for Part C and
6    Part D.   Another that was the risk adjustment
7    division, which also did policy and model
8    calibration.   There was one that was -- later on
9    was an encounter data division, but also worked on
10   Part D -- elements of the Part D program.   And
11   then there was -- let's see, the fourth one -- oh,
12   my goodness, I'm kind of blanking on the other
13   two.

14        Q.   Why don't we actually pull up an
15   exhibit?

16        A.   Okay.

17        Q.   Can we get Tab 40, please, see if that
18   maybe helps?

19        A.   All I see is Document 1203.   Oh, here
20   we go.   There it is.

21        Q.   A slight delay.   You should see now
22   Exhibit 1105 previously marked.

23        A.   Yes.   Let me try to -- well, this is a
24   risk score development illustration.

25        Q.   Yeah.   So I'm going to direct your



Page 18

 1        attention to page 2, I'll represent -- of the PDF.

 2        I'll represent to you that this was part of the

 3        copy --

 4               A.    Oh, yes.  Okay.

 5               Q.    Part of a hard copy collection of

 6        documents that the government produced to us.

 7        And, yeah, have you focus on the second page,

 8        which should be Bates Number on the bottom right

 9        there, USBP000507083.  Do you see that?

10               A.    I see the organization chart.

11               Q.    Okay.  And do you recognize this as an

12        organizational chart for the MPPG or Medicare plan

13        payment group within CMS?

14               A.    Yes.

15               Q.    You see a date there, November 1st,

16        2013.  Is this consistent with your recollection

17        of how MPPG was organized at that time?

18               A.    I mean --

19               MR. LEE:  Objection.  Vague.

20               THE WITNESS:  Do I still answer?

21        BY MS. SCHEFFLER DO:

22               Q.    Yeah, you can still answer.

23               A.    Well, it's vague in the sense --

24               MR. LEE:  If you know what she means.

25               THE WITNESS:  Yeah.  I don't know what



Page 19

```
 1              consistent with.  I mean there were many
 2              reorganizations.  But the bottom line is
 3              that MPPG was responsible for Part C and
 4              Part D, payment policy and payment
 5              operations.  So that's the bottom line.
 6              And the shifting combinations of divisions
 7              changed over time.
 8    BY MS. SCHEFFLER DO:
 9         Q.   Okay.  Do you see where your name is
10    handwritten there on sort of the right-hand side
11    next to the top box?
12         A.   I do see that.
13         Q.   And this was a time when you were
14    working in the front office of MPPG; correct,
15    November 1st, 2013?
16         A.   Yes.
17         Q.   Did you have a supervisor at that
18    time?
19         A.   Yes.  Cheri Rice and Jennifer Harlow.
20         Q.   And did you have any anybody that
21    reported to you at that time?
22         A.   No.  I was a technical 15.  I was not
23    a manager.
24         Q.   I can see Whitney Johnson written --
25    her name is just above yours.  Was she also in the
```



Page 20

1    front office with you at MPPG at this time?

2         A.   Yes.

3         Q.   So did the two of you work together on

4    projects?

5         A.   Probably.  I don't recall exactly.

6    She tended -- my recollection is that Whitney

7    tended to work at that time on contracting issues

8    with MPPG's contracts with various parties and

9    budget.  She was really working on budget issues,

10   which I never did.  And I tended to do more

11   payment policy activities.

12        Q.   Okay.

13        A.   Whitney's responsibilities changed

14   over time, but that's what I remember right then.

15        Q.   So prior to working in the front

16   office for MPPG in 2010, what were the previous --

17   where did you fit previously as a health insurance

18   specialist for CMS?

19        A.   I -- the names were changed many

20   times, but I always stayed with the same group

21   conceptually from the beginning on because I loved

22   payment policy.  So I stayed in the group that did

23   Part C payment policy.  And then Part D was

24   created in 2006.

25        Q.   And were Cheri Rice and Jennifer



Page 21

1      Harlow always your supervisors?

2              A.    No.

3              Q.    What other supervisors did you have

4      prior to --

5              A.    Let's see.

6                    MR. LEE:  Objection.  Vague.  At what

7              point in time?

8      BY MS. SCHEFFLER DO:

9              Q.    We can start with the first supervisor

10     that you remember upon starting at CMS in

11     February 2000.

12             A.    Tim Love hired me.  He's long gone.  I

13     mean, he's retired.  Then Tom Hutchinson and then

14     Bob Donnelly for a short period and then Tom

15     Hutchinson again.  And I think to the best of my

16     recollection after that in 2010, Tom left and

17     Cheri took over.

18             Q.    Okay.  And during that entire period

19     you were in that same group conceptually working

20     on payment policy for Part C and then in --

21     starting in 2006 also Part D; is that correct?

22                    MR. LEE:  Objection.  Vague.

23                    THE WITNESS:  I was not --

24                    MR. LEE:  Objection.  Vague.  When you

25             say entire period, are you talking about



Page 22

```
 1          20 -- 2000 to 2019 or some other more
 2          limited period?
 3               MS. SCHEFFLER DO:  2000 to 2019.
 4               MR. LEE:  Can you be a little more
 5          clear on that?  Okay.
 6               THE WITNESS:  So what was the question?
 7    BY MS. SCHEFFLER DO:
 8          Q.   During that entire period while you
 9    were at CMS from 2000 to 2019, you were working
10    with the same group conceptually working on Part C
11    payment policy and then eventually Part D starting
12    in 2006; is that correct?
13          A.   Well, the group was working on Part D.
14    I really did not do much of anything with Part D.
15    I would just dip in and help edit or something.
16    But I really was Part C, payment policy.  But the
17    group did both.
18          Q.   Understood.  But you personally were
19    more focused on Part C payment policy through that
20    entire time period; correct?
21          A.   Yes.
22          Q.   And I believe you said that you
23    started working -- or Cheri started -- was your
24    supervisor starting around 2010; is that correct?
25          A.   That's my best recollection is when
```



Page 72

1           MR. LEE:  You go ahead and answer.  I

2           stated my -- you can go ahead.  I withdraw

3           the objection.  You can go ahead and

4           answer.

5           THE WITNESS:  I just think that's not

6           accurate.  We require them to have an

7           effective compliance program.  Who defines

8           effective as only looking for new diags?

9           You know, go figure.  You could argue that

10          this amendment really does fall under the

11          general requirement for an effective

12          compliance program because, otherwise, how

13          are you going to certify that the data --

14          risk adjustment data you submit is

15          accurate, complete, and truthful.

16              Well, you know, looking both ways

17          should be conceptualized as part of an

18          effective compliance process.  But if it's

19          not, then it seems like there might be a

20          need to add something in writing.

21  BY MS. SCHEFFLER DO:

22          Q.   So CMS never specified this in writing

23  prior to this proposal; is that right?

24              MR. LEE:  Objection.  Vague.

25          Ambiguous.  Argumentative.



Page 73

1                  THE WITNESS:  I don't know the answer
2          to that question.  I believe that we had a
3          lot of training, a lot of sub-regulatory
4          discussion with the industry in the annual
5          trainings and planned guidance sessions
6          about what is an effective compliance
7          process.  But I was never part of those, so
8          I don't know.
9     BY MS. SCHEFFLER DO:
10         Q.   CMS never specified in regulation
11    prior to this proposal that MA plans were required
12    to design their medical record review rules to
13    look for or identify overpayments?
14         A.   Over and under, correct.
15         Q.   Otherwise, why would you be proposing
16    this new regulation; right?
17         A.   Right.
18                  MR. LEE:  Objection.  Argumentative.
19    BY MS. SCHEFFLER DO:
20         Q.   So turning to page 2, there's --
21    underneath "recommendation" there's some text for
22    adding a new paragraph to Section 422.310.  Is
23    this consistent with your recollection of the new
24    requirement that CMS was considering proposing in
25    June 2013?



Page 74

```
 1              A.   I don't understand.  What does this
 2      have to do -- this is the G2 amendment.  What does
 3      this have to do with the over and underpayment
 4      look both ways proposal?
 5              Q.   Are you on page 2 of 1206-1?
 6              A.   Hold it.  I'm trying to get to -- oh,
 7      sorry.  The one that has a big redacted.
 8              Q.   Yeah.  Underneath the redacted.
 9              A.   Okay.  Let me go full screen on that.
10              Q.   For the record, this is USBP076134077.
11              A.   Okay.  So what's the question.
12              Q.   I was asking if this is consistent
13      with your recollection of the new requirement that
14      CMS was considering proposing in June 2013?
15              A.   It's consistent.  I don't recall if
16      this is the actual language that actually ended up
17      in the proposed -- in the NPRM.  I don't recall.
18      But this paragraph, it was something similar to
19      this.  I would have to look at the reg text, the
20      NPRM.
21              Q.   Let's go ahead and go to the next
22      exhibit, please.  Let's go ahead and skip to
23      Tab 41.
24                   And this is going to show up as
25      Exhibit Number 1115 because it's been previously
```



Page 76

```
 1              are you?
 2                   MS. SCHEFFLER DO:  Page 84 of the PDF,
 3              second column, last paragraph underneath
 4              number 6, risk adjustment data
 5              requirements.
 6                   THE WITNESS:  Okay.  I've looked at
 7              that.
 8    BY MS. SCHEFFLER DO:
 9         Q.   And do you recognize this as the rule
10    CMS first proposed in January 2014 regarding
11    medical record reviews?
12         A.   I do.
13         Q.   So this is the proposed rule that
14    relates to the 2A looks amendment that you
15    referenced earlier, the same thing?
16         A.   Yes.
17         Q.   And the proposal was to require MA
18    organizations to design medical record review
19    methodologies to "identify errors in diagnoses
20    submitted to CMS as risk adjustment data"; right?
21         A.   Yes.
22         Q.   Do you see --
23         A.   I see that, yeah.
24         Q.   So this proposed rule would have given
25    those MA organizations specific guidance and set
```



2927

1   specific requirements about how to design those

2   medical record reviews, there was no existing

3   regulation on this at the time; correct?

4              MR. LEE:  Objection.  Vague.

5         Argumentative.

6              THE WITNESS:  There was no -- again --

7              MR. LEE:  You can answer.

8              THE WITNESS:  I mean, again, as I said,

9         the requirement to have an effective

10        compliance process should be perceived as

11        an existing regulation on this, but to the

12        extent it was not by some MAOs, then it

13        seemed important to have further specific

14        guidance.

15   BY MS. SCHEFFLER DO:

16        Q.   And at the memo we just looked at

17   previously, Exhibit 1206-1, you stated, "under

18   existing regulation there is no requirement to

19   counter the incentive for MA Organizations to

20   conduct medical record reviews, only for the

21   purpose of identifying underpayments"; right?

22        A.   Right.  Right.

23        Q.   Do you recall receiving comments on

24   the proposed medical record review rule after this

25   was published in January of 2014?



Page 78

1        A.   Yes.  I know we received comments and
2    there was a general uproar and the industry
3    lobbied hard against it.
4        Q.   Do you recall what the arguments were
5    or what -- for lobbying hard against it, what were
6    some of the arguments for not finalizing this?
7        A.   I don't remember very well.  I
8    remember one argument was that there are some good
9    reasons for an MAO to conduct targeted reviews.
10   So having this requirement would be a huge burden
11   and a great expense to have to review an entire
12   medical record and --
13       Q.   Okay.  Anything else?  I didn't mean
14   to interrupt you if you were still answering.
15       A.   There were other arguments.  Maybe we
16   could look at the preamble and see.  I don't
17   recall other specific objections, but I knew it
18   got yanked.
19       Q.   In other words, it was not finalized.
20   This proposed rule was not finalized; correct?
21       A.   Correct.
22       Q.   Let's go ahead and take a look at the
23   next exhibit.  This is 29A and B.  This is another
24   e-mail and attachment.  So it's going to be
25   document -- or Exhibit Number 1207 and 1207-1.



Page 79

1                    (Exhibits 1207 and 1207-1 marked for

2        identification.)

3                    We'll again start with the e-mail.  So

4        1207.  It's short.

5            A.    Okay.

6            Q.    This is an e-mail from you to Jennifer

7        Harlow with the subject "please review chart"

8        dated March 11, 2014.  Do you recognize this

9        e-mail?

10           A.    I don't have any specific memory of

11       this e-mail, but it has my name on it.

12           Q.    Does this help refresh your

13       recollection of the nature of some of the comments

14       received in response to the proposed medical

15       record review rule?

16           A.    Yes.  The first sentence says "that

17       commenters said it was confusing and unclear.

18       This seemed to be put unfair restrictions."

19                    Well, I had given an example earlier

20       of an unfair restriction that is an MAO wants to

21       conduct targeted review and only look at part of

22       the record.  But confusing and unclear is an

23       additional set of comments, I guess.

24           Q.    And MRR, do you take that to refer to

25       the proposed medical record review rule that we



Page 128

1                    CERTIFICATE OF REPORTER

2

3              I, Christine A. Taylor, Certified
      Court Reporter within and for the State of
      Georgia, do hereby certify:

4

5              That the foregoing deposition was
      taken before me on the date and at the time and
      location stated on Page 1 of this transcript; that
6     the deponent was duly sworn to testify to the
      truth, the whole truth and nothing but the truth;
7     that the testimony of the deponent and all
      objections made at the time of the examination
8     were recorded stenographically by me and were
      thereafter transcribed; that the foregoing
9     deposition as typed is a true, accurate and
      complete record of the testimony of the deponent
10    and of all objections made at the time of the
      examination to the best of my ability.

11

12             I further certify that I am neither
      related to nor counsel for any party to the cause
      pending or interested in the events thereof.
13    Witness my hand, this 22nd day of May, 2022.

14

15

16    _____
                   Christine Taylor
17             Christine A. Taylor, RPR
               CCR-4736

18

19

20

21

22

23

24

25



**EXHIBIT D-115**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA,      ) No. 16-08697 FMO
ex rel. BENJAMIN POEHLING,     )
                               )
                               )
          Plaintiffs,          )
                               )
v.                             )
                               )
UNITEDHEALTH GROUP, INC.,      )
et al.,                        )
                               )
                               )
          Defendants.          )

_____


CONFIDENTIAL

CONTAINS ATTORNEYS' EYES ONLY PORTIONS

Videotaped Deposition of

ANNE HORNSBY

VOLUME I


Friday, May 19, 2023


Reported by:  Traci M. Mertens, RDR, CRR, CSR


MAGNA LEGAL SERVICES
866-624-6221
www.MagnaLS.com



Page 72

 1    means that the payments to MAOs under the CMS-HCC

 2    model are overpayments without the coding intensity

 3    adjuster to bring them -- the risk scores down, so

 4    that's the impact.

 5           In terms of the reliance on audited or

 6    unaudited fee-for-service claims data, that cannot

 7    be known until you actually run the numbers through

 8    the model.  I mean, it's just a fact of life.  You

 9    cannot predict that.  You can guess that this

10    percent of HCCs will get higher dollar

11    coefficients, and that percent of HCCs will get

12    lower dollar coefficients, and -- and the age-sex

13    factors will jump up a little bit, but it's all

14    hypotheses until you actually run the numbers.

15    Q.  Ma'am, respectfully, I'm not entitled --

16    I'm not asking for CMS' position.  I am asking for

17    what you did to testify about facts related to how

18    errors in the fee-for-service claims data that's

19    unaudited impacts payments.

20           And other than the position that you've

21    just stated, is there anything further that you're

22    able to offer or testify about on behalf of the

23    government on topic 1D?

24           MS. KRIEG:  Object to form; object to

25    government.



Page 73

1    A.   The last thing I'll say is I am very

2    prepared to testify in this deposition, and CMS has

3    been using 100 percent of fee-for-service claims

4    data to calibrate the model for a number of years.

5    So this distinction of audited versus unaudited,

6    it's just not that clear.

7         Q.   I'm going to hand you what's been marked

8    Exhibit 1342 and Exhibit 1343-1 which is an email

9    and an attachment to that email.

10        A.   Okay.

11        Q.   And if you'd just take a minute to look

12   through the document.

13             MS. KRIEG:  And take your time to look

14   through it.

15             THE WITNESS:  Yeah.

16        Q.   (By Mr. Jones) Now, Ms. Hornsby, what's

17   been marked as Exhibit 1342 is an email from

18   Jennifer Harlow to a group of folks including

19   Jonathan Smith, Cheri Rice, Carolyn Kapustij, and

20   Stacey Dieter.

21             Do you see that?

22        A.   Yes, I do see that.

23        Q.   And who is Ms. Harlow?

24        A.   She was division director of the Division

25   of Payment Validation at this time, and then later



Page 74

1    she became the deputy director of MPPG under Cheri

2    Rice.

3         Q.   And you reported for periods of time to

4    Ms. Harlow, didn't you?

5         A.   Well, once I was in the front office and

6    she was deputy to Cheri, yes.

7         Q.   And I noticed on your list of folks that

8    you have called and consulted with that Ms. Harlow

9    isn't on the list.  Is there a reason why you didn't

10   talk with her?

11        A.   Oh.  I thought I -- oh.  Did I forget to

12   put her on?  I mentioned her this morning.  That's

13   -- that's my mistake.  I'm sorry.

14        Q.   Okay.  Did you have a phone call --

15        A.   Yes, I did.

16        Q.   -- with Ms. Harlow?

17        A.   I had a -- a brief phone call with her.

18        Q.   And what did you talk to Ms. Harlow about?

19        A.   Just getting her recollection on the

20   medical record review proposal and wondering if she

21   knew what MAs were doing with chart reviews which

22   she really didn't.  Yeah.

23        Q.   Did you talk to Ms. Harlow at all about

24   the efforts that she and others made over the course

25   of some fee-for-service adjuster discussions related



Page 220

```
 1    United's practices were in order to decide whether
 2    to continue contracting with United and the Medicare
 3    Advantage program?
 4        A.   No, because that would have been an
 5    inappropriate continuation of this email
 6    conversation with United.
 7        Q.   Why would it have been inappropriate to
 8    ask for clarity if --
 9        A.   Because --
10        Q.   -- if United is giving notices about its
11    practices?
12        A.   It's because CMS requires a compliance
13    program but is not prescriptive with a
14    one-size-fits-all design for how MAOs have to go
15    about making sure their risk adjustment data is
16    accurate, complete, and truthful.
17             So to keep talking with United, bantering
18    back and forth ideas about prescribing your
19    practices, that's not what CMS would do.  CMS was
20    listening in this meeting.
21        Q.   Well, you -- you know that United went to
22    CMS asking for guidance, right?
23        A.   That's what I'm saying.
24             MS. KRIEG:  Object to form.
25        A.   You go to -- for guidance in a meeting?
```



Page 221

1    CMS is not going to do that.

2        Q.    And so instead of giving guidance to

3    United about these practices that are in Exhibit 330

4    and -- and United stopping of the claims

5    verification program, CMS is suing through the

6    Department of Justice?

7            MS. KRIEG:  Object to form; argumentative.

8        A.    I'm sorry; what are the two sides again,

9    instead of what, then what?

10       Q.    Instead of giving guidance --

11       A.    Oh, okay.

12       Q.    -- CMS is going through this lawsuit.

13           MS. KRIEG:  Object.

14       Q.    Is that your -- your view?

15           MS. KRIEG:  Object to form; argumentative.

16       A.    I don't understand the link between the

17   two.

18       Q.    Well, United went to CMS in 2015 asking

19   for guidance, told CMS that it was stopping this

20   program, and CMS didn't give guidance or ask clarity

21   as to what United was doing, did it?

22           MS. KRIEG:  Object to form; argumentative

23   and outside the scope.

24       A.    Wasn't there an email from Cheri Rice that

25   stated CMS' requirements in response to Steve



Page 222

 1   Nelson's email?

 2        Q.   Did Ms. Rice say anything in that email

 3   with respect to guidance about how the claims

 4   verification or chart review programs needed to be

 5   done?

 6             MS. KRIEG:   Same objections.

 7        A.   No, because CMS doesn't do that.  CMS does

 8   not prescribe to MAOs how they have to ensure or

 9   certify that their data is accurate and supported in

10   the medical record.  CMS does not do that because

11   MAOs differ in size.  They differ in complexity.

12             There's no one-size-fits-all for a review

13   program, and CMS won't tell one MAO how to do it

14   when the conversation has not been available to all

15   of the other MAOs.

16        Q.   Well, shouldn't CMS tell all of the

17   Medicare Advantage plans the rules of the road and

18   how these chart reviews should be done?

19             MS. KRIEG:   Object to form; scope and

20   argumentative.

21             THE WITNESS:   I'm sorry.

22        A.   CMS disagrees with that statement.  CMS

23   believes that the appropriate approach is to provide

24   a broad framework for what MAOs should do for

25   effective compliance actions, and that includes a



Page 223

 1    risk assessment.  It includes monitoring and

 2    internal audits.

 3            There are a whole range of -- of --

 4    there's seven basic elements, but CMS does not go

 5    into further prescription about how to do it because

 6    MAOs differ in what kinds of contracted provider

 7    networks they have.  They differ in the types of

 8    enrollees they have.  So there's just -- there is no

 9    one-size-fits-all.

10        Q.   So your testimony is that CMS shouldn't

11    tell Medicare Advantage plans the rules of the road

12    and how chart reviews should be done?

13            MS. KRIEG:  Object to form; misstates her

14    prior testimony, object to scope, and argumentative.

15        A.   I mean, there's two parts to that.  CMS

16    puts out clear guidance in telling MA plans what the

17    broad framework is for having accurate data, and --

18    I'm sorry.  What was the second part?

19        Q.   My question was your testimony is that

20    CMS, when asked for guidance, it would have been

21    inappropriate for CMS to have told United whether

22    stopping the practice that it was doing was

23    appropriate.

24            MS. KRIEG:  All the same objections.

25        A.   Yeah.  CMS wants all MAOs in the industry



Page 224

1    to have access to the same guidance.  So in a

2    meeting like this?  That -- CMS would not create new

3    guidance in a meeting like this.

4         Q.   Okay.  Well, I think some of the topics to

5    be discussed next week have to do with some of that

6    guidance.

7              You can't -- when you talked a bit ago

8    about MAOs having different structures and different

9    sizes and different complexities, are there

10   different rules with respect to how chart reviews

11   and claims verification programs need to be done for

12   different Medicaid -- Medicare Advantage

13   organizations?

14        A.   No.

15             MS. KRIEG:  Object to form.

16             THE WITNESS:  Oh.  I'm sorry.

17             MS. KRIEG:  Go ahead.

18        A.   No.  That's exactly the point.  There are

19   no specific rules about how to do claims validation

20   because we have the seven steps of the compliance

21   program, and that gives the broad framework for how

22   MAOs should be organizing their own process for

23   validating their risk adjustment data, so that's

24   exactly the point.

25        Q.   (By Mr. Jones) Should CMS be transparent



Page 248

1            MR. JONES:  Okay.  No further questions.

2            THE WITNESS:  Okay.

3            MS. KRIEG:  No further questions.

4            THE VIDEOGRAPHER:  This concludes today's

5    video deposition.  We are officially off the record

6    at 7:06.

7            (Whereupon, the deposition was adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 249

1                          CERTIFICATE

2

3          I, TRACI M. MERTENS, Registered Diplomate

4    Reporter and Certified Realtime Reporter, do hereby

5    certify that prior to the commencement of the

6    examination, the deponent was placed under oath to

7    testify to the truth and nothing but the truth under

8    penalty of perjury.

9          I DO FURTHER CERTIFY  that the foregoing is a

10   verbatim transcript of the testimony as taken

11   stenographically by me at the time, place, and on

12   the date hereinbefore set forth, to the best of my

13   ability.

14         I DO FURTHER CERTIFY that I am neither a

15   relative nor employee nor counsel for any of the

16   parties to this action in which this proceeding was

17   taken, and further that I am not financially or

18   otherwise interested in the outcome of this action.

19         Certified to by me on this 24th day of May,

20   2023.

21

22                  _Traci Mertens_____
                    Traci Mertens, RDR, CRR, CSR
23                  Registered Diplomate Reporter
                    Certified Realtime Reporter
24                  Certified Shorthand Reporter

25



2943

**EXHIBIT D-116**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )


Videotaped Deposition of

United States' 30(b)(6) Designee 1

CONTAINS ATTORNEYS' EYES ONLY PORTIONS

At the Law Offices of Latham & Watkins

Thursday, May 25, 2023

10:24 a.m. Eastern



2945

Page 54

1          BY MR. GALLAGHER:

2      Q    And -- and when -- when responding to

3   inquiries from plans, providing your expectations or

4   interpretations of the rules, you have an obligation

5   in that context, whether it's a phone call or a

6   telephonic communication or an email, you have an

7   obligation to be responsive and clear and unambiguous

8   in your instructions to them; right?

9          MS. LIKOFF:  Object to form.  Compound.

10  Vague.

11         THE DEPONENT:  What do you mean by

12  "interpretation"?

13         BY MR. GALLAGHER:

14     Q    Can you answer my question?

15     A    Well, I think you had the word

16  "interpretation" in the question.

17     Q    Do you not understand what the -- what

18  interpretation means?

19     A    It means many different things in the

20  context.

21     Q    What is the --

22     A    So what's an example of interpretation in



Page 55

1    the MA program rule?

2        Q    Why don't you tell me the different

3    understandings of interpretation that you think might

4    apply here.

5        A    If you are talking operations,

6    interpretation could be different understandings of

7    the CMS companion guide for how certain special fields

8    should be populated in order to get something

9    communicated correctly to CMS.  Sometimes the -- the

10   wording of those operational instructions are hard to

11   get really precise.  It could be a different

12   interpretation of how certain adjustments to the

13   benchmarks are made and then questions come in and

14   they need to be answered.  So I'm not sure how to

15   answer your question.

16       Q    Some- -- sometimes it's the case that --

17   that -- that CMS has general rules or rules of general

18   applicability and there might be a question in

19   interpreting that general rule about how it would

20   apply in a specific case; right?

21            MS. LIKOFF:  Object to form.

22            THE DEPONENT:  Okay.  So that -- that will



Page 56

1    make sense to me as a specific definition of

2    interpretation, how a particular rule applies in a

3    certain case.  Like, the clinical trials policy for

4    Medicare Advantage Organizations, that has had to have

5    different levels of interpretation as they apply to

6    different circumstances.

7                BY MR. GALLAGHER:

8        Q    It -- it's pretty widely the case that you

9    have rules of general applicability where it require

10   some active interpretation to understand how that rule

11   might apply in a particular case; fair?

12               MS. LIKOFF:  Object to form.

13               THE DEPONENT:  It's not fair.  It's a

14   general statement.  It depends on the context

15   honestly.

16               BY MR. GALLAGHER:

17       Q    Well -- so -- so one way in which CMS might

18   be asked to provide an interpretation of what the

19   rules require might be a situation where a plan comes

20   to CMS and says, "Hey, we're doing something, and it's

21   not clear to us what the rules require in this

22   particular situation.  Can you help us understand what



Page 57

1    your interpretation is and whether the rule applies?"

2    That's one thing that might happen in these

3    communications Ms. Rice is talking about?

4                MS. LIKOFF:  Objection to form.

5                BY MR. GALLAGHER:

6        Q    Yes?

7        A    That -- could an MAO do that?  Yes.  That

8    could happen.  That -- it is possible that that

9    happens, that an MAO asks that.

10       Q    And -- and Ms. Rice is -- has testified here

11   that -- that -- that -- that CMS would, in fact, be

12   responsive to such an inquiry, right, would provide

13   their expectations and interpretation of what the

14   rules require?

15               MS. LIKOFF:  Object to form.  Compound.

16               THE DEPONENT:  That is not how I read her

17   statement.  And I have spoken with her, and, really,

18   the goal in those situations is to restate existing

19   guidance because, depending on which rules you are

20   talking about, CMS has, on purpose, not been

21   prescriptive and has not told plans, "Oh, here you

22   have to follow the following five steps."  CMS has not



Page 72

1              MS. LIKOFF:  Respectfully, Counsel --

2              BY MR. GALLAGHER:

3         Q    Just give me a list of every document where

4    you claim that requirement you say exists is written

5    down so we can see it.

6              THE DEPONENT:  Okay.  I'm -- I'm going to --

7              MS. LIKOFF:  Same objection.  Counsel, I

8    would just respectfully state that it's the United

9    States's position that your question is beyond the

10   scope of Topic 21.

11             THE DEPONENT:  The foundational requirement

12   was -- was written in 2000.  And so Page 40268, we

13   believe that M+C organizations have an obligation to

14   undertake due diligence to ensure the accuracy,

15   completeness, and truthfulness of encounter data

16   submitted to HFCA.  Therefore, they will be held to a

17   best knowledge, information, and belief standard.

18   Therefore, M+C organizations will be held responsible

19   for making good faith efforts to certify the accuracy,

20   completeness, and truthfulness of encounter data

21   submitted.

22



Page 73

1           BY MR. GALLAGHER:

2      Q    So if --

3      A    We don't need a list.  We've got that.

4      Q    So that's the only document that you would

5   put on the list, or are there others?  Because all I'm

6   asking for here -- I'm not asking you to read from the

7   documents or tell me your position about the

8   documents.  I just want disclosure of the list of

9   documents that you claim support -- or that -- pardon

10  me.  Let me -- let me back up and ask this

11  differently.

12          I'm not asking for you to tell me what the

13  documents say.  Right now all I want is for you to

14  give us a list of every document that you claim sets

15  forth the requirement that you've testified about that

16  there exists some requirement to investigate if you

17  have any information that a set of codes is not

18  supported.

19          MS. LIKOFF:  Objection.  Outside the scope

20  of the notice.

21          BY MR. GALLAGHER:

22      Q    So -- so you understand, the first document



2951

Page 74

1    I'll put on that list is the June -- the response to

2    the comment in June of 2000, which is in Exhibit 164

3    at, you know, Page 40286.

4            Are there any other documents that should go

5    on this list that --

6            MS. LIKOFF:  Object to --

7            BY MR. GALLAGHER:

8    Q    -- you say support the rule you say exists?

9            MS. LIKOFF:  Object to form.  Objection.

10   Outside the scope of Topic 21.  Topic 21 did not ask

11   the witness to prepare to identify all instances of

12   any communications.

13           THE DEPONENT:  I would say that CMS has been

14   very clear, including in Ms. Rice's deposition, that

15   CMS does not provide recipes about how MAOs should

16   conduct their chart review programs.  So CMS is not

17   going to provide a threshold for what information is

18   or a threshold for what best knowledge is.  That is

19   the responsibility of the MAO when designing an

20   effective compliance program that ensures that it --

21   that the -- the organization is fulfilling all program

22   requirements including the payment ones and that



Page 168

1        A    CMS has not put in writing a requirement to

2    conduct medical record reviews.  CMS believes that is

3    the MAO's responsibility to determine how it is they

4    can truthfully certify to their risk adjustment data.

5        Q    Right.

6             And you have in the proposed medical record

7    review rule a -- a prescriptive rule -- a prescriptive

8    rule to the effect that if you do a medical record

9    review, then you have to look for deletes; right?

10            MS. LIKOFF:  Objection to form.

11            BY MR. GALLAGHER:

12       Q    The rule is, basically, if you conduct a

13   medical record review, then it must be designed in a

14   particular way to, quote, determine the accuracy of

15   diagnosis; right?

16       A    Well, if --

17            MS. LIKOFF:  Objection to form.

18            THE DEPONENT:  I mean, you could design a

19   medical record review in many ways that would include

20   determining the accuracy of diagnosis.  But it also

21   could have other activities going on like checking

22   provider -- checking patterns of diagnosis submitted



Page 169

1    by certain provider types.

2              BY MR. GALLAGHER:

3        Q    Right.  So my -- my point is just that the

4    medical -- the proposed medical record review rule,

5    which was never finalized, was specific and

6    prescriptive with respect to the nature of the medical

7    record review a -- an MA organization must conduct if

8    it is going to be conducting a medical record review

9    at all.

10              MS. LIKOFF:  Objection to form.  Vague.

11              BY MR. GALLAGHER:

12       Q    Right?

13       A    I don't -- CMS would not agree with the word

14   "prescriptive" but would agree that this was a more

15   specific development of a requirement that had li- --

16   existed for a long time, which is accurate data.

17       Q    Right.

18              And -- and -- and in addition to not having

19   a rule that required plans to conduct a medical record

20   review before this rule --

21       A    Mm-hmm.

22       Q    -- you never had any rule that told plans



Page 170

1    how a medical record review must be conducted or how

2    it must be designed --

3              MS. LIKOFF:  Objection to form.

4              BY MR. GALLAGHER:

5    Q    -- right?

6    A    As I've said, CMS never told MAOs how to

7    design their medical record reviews.  They -- the MAOs

8    are responsible for developing their own protocols.

9    Q    And not -- not counting the protocol, you

10   had never told MAOs before this rule that medical

11   record reviews had to be, quote, designed to determine

12   the accuracy of diagnosis, had you?

13             MS. LIKOFF:  Objection to form.  Asked and

14   answered.

15             THE DEPONENT:  Well, because CMS never had a

16   rule about requiring the con- -- the conducting of

17   medical record reviews, CMS never -- I'm sorry.  I

18   lost the last half of the question.

19             Could you restate it, please?

20             BY MR. GALLAGHER:

21   Q    Sure.

22             You never told MAOs before this proposed



Page 171

1    medical --

2          A    Mm-hmm.

3          Q    -- record review how a medical record review

4    needed to be designed, what they had to do in a

5    medical record review?

6                MS. LIKOFF:  Objection to form.

7                MR. GALLAGHER:  I get that.

8                THE DEPONENT:  That is correct.  Because as

9    I've said, CMS never tells MAOs how to conduct medical

10   record reviews.  That is the MAO's responsibility.

11               BY MR. GALLAGHER:

12         Q    And that -- so -- so that's true to this

13   day, right, neither before nor after this proposed

14   medical record review rule has CMS, you know,

15   prescribed any requirements for MAOs as to how a

16   medical record review must be conducted?

17         A    That is correct.

18               MS. LIKOFF:  Objection to form.

19               THE DEPONENT:  Oh, I'm sorry.

20               That is correct.  CMS never set out any

21   guidance telling MAOs how to design medical record

22   reviews.



Page 172

1              BY MR. GALLAGHER:

2       Q    Let me hand you Exhibit 1206 and 1206-1.

3       A    Thank you.

4             Oh, thanks.  Okay.

5       Q    Okay.  So Exhibit 1206 is a -- an email that

6    you sent to Cheri Rice copying others in June of 2013.

7    And Exhibit 1206-1 is a memo that I believe you were

8    asked about at your personal deposition that is from

9    your files.

10            Do you recognize these?

11      A    Let's see.

12            MS. LIKOFF:  Counsel, can you clarify

13   whether the highlighting on these two documents is

14   your highlighting or if it was produced to you with

15   the highlighting?

16            MR. GALLAGHER:  I don't actually know

17   because I just got a copy of the exhibit.  And I -- I

18   believe, but I'm not certain, that that is language

19   that was highlighted in the original, but I don't -- I

20   can't -- I can't specify that.  And the only reason

21   I -- the -- I'd say that is that it says on the first

22   paragraph of the email "in yellow on Page 1 of the



Page 174

1          Honestly, I don't remember writing this

2     paper, but, you know, I certainly, at least, took part

3     in it.

4          Q    All right.  So let's start with the email,

5     the last paragraph.  You -- of the -- of the first

6     email on the page, which actually is from June 2013

7     and carries over to the -- the second page of the

8     document.

9          So the last paragraph of that email says,

10    "We really think we should do 6B requiring any MAO

11    that conducts medical record review to look for both

12    over- and underpayments."

13         Do you see that?

14         A    Yes, I do.

15         Q    Okay.  And that's a reference to the medical

16    record review rule that was proposed in -- in January

17    of 2014; correct?

18         A    Yes, that is.

19         Q    And then if you look at the memo, which is

20    1206-1, it -- it has Issue 6B.  And then the bold

21    reads, "Amend Section 422.310 to require MA

22    organizations conducting medical record reviews to not



Page 175

1    focus only on identifying underpayments."

2            Do you see that?

3        A    Yes, I do see that.

4        Q    And so you agree, at this point in time, CMS

5    understood that at least some MA organizations were

6    conducting medical record reviews that only focused on

7    identifying underpayments; right?

8        A    Well, first of all, this is an internal memo

9    to MPPG.  So, you know, I guess that was understood

10   within MPPG.

11           In general, CMS understood, through informal

12   networks, that looking just for additionals in medical

13   records was going on, but CMS does not have that

14   information from MAOs, unless the MAOs choose to

15   volunteer it.  So it was not a fact for CMS.  It was

16   something that was known on informal networks.

17       Q    In describing the medical record review rule

18   that was being proposed in this internal memorandum,

19   you described it as a rule that would require MA

20   organizations conducting medical record reviews to not

21   focus only on identifying underpayments because you

22   understood that at least some MA organizations were



Page 176

1    doing precisely that.

2              MS. LIKOFF:  Objection to form.

3              THE DEPONENT:  Within MPPG, at this time, we

4    did talk about this a lot.  And so that statement

5    reflects the understanding within this group.

6              BY MR. GALLAGHER:

7      Q    Right.

8              The -- the -- within MPPG, which is the

9    Medicare Plan Payment Group, focus on MAO's, you know,

10   payments and the risk adjustment methodology --

11     A    Yes.

12     Q    -- used for that, you understood and, in

13   fact, talked about a lot the fact that plans were --

14   some plans were conducting medical record reviews to

15   look for just -- just to look for underpayments?

16             MS. LIKOFF:  Objection to form.

17             THE DEPONENT:  We talked a lot about -- I

18   hate to use the word "gossip," but we talked a lot

19   about what we heard on informal networks that -- that

20   the search for additionals was becoming more common.

21             BY MR. GALLAGHER:

22     Q    Right.



Page 177

1          And you were sufficiently concerned about

2    that, that you really wanted the medical record review

3    rule to address it --

4          MS. LIKOFF:  Objection to form.  Vague.

5          BY MR. GALLAGHER:

6    Q    -- didn't you?

7    A    Well, we wanted the medical record review

8    proposal to say that reviews should look for -- and I

9    lost the language of the proposal.  Here it is -- that

10   reviews should be designed to determine the accuracy

11   of diagnosis, because in our minds, accuracy meant

12   documented in the medical records.

13         So how could you validate it without looking

14   at the medical record and checking the diagnosis

15   submitted for payment against the diagnosis in the

16   medical record?  That is the discussion that was

17   happening inside MPPG.  How can anybody certify

18   accuracy without actually checking the diagnosis

19   submitted for payment and -- against what was coded in

20   the medical record?

21         So it was kind of surprising that that

22   definition of accuracy wasn't widely accepted because



Page 217

1    would be sent up to Cynthia.

2        Q    Right.  So the -- when we were looking

3    earlier at -- at Exhibit 1206-1, that was a draft of a

4    portion of this memo that you were sharing with Cheri

5    Rice.  Ultimately, what would happen is, you would get

6    all of those portions pulled together in one memo.

7    And once it was cleared by her, it would go up to the

8    deputy director of the Center for Medicare?

9            MS. LIKOFF:  Objection to form.

10           THE DEPONENT:  Well, it -- it really would

11   depend on the rule and what Cheri decided as to

12   whether M- -- all of MPPG's provisions in a rule --

13   okay.  I will wait to --

14           BY MR. GALLAGHER:

15       Q    It's okay.  I just forgot my mic.

16       A    Okay.  It may not all be rolled up into one

17   memo is what I was trying to say.  Sometimes it would

18   go up in a series of separate memos depending on what

19   else was on management's plate at the time.  Because

20   these are usually -- and this was -- both of these

21   provisions were part of what we call the plan year

22   rule, which would have many provisions across CM.



Page 218

1      Q    Right.

2           And this -- this memo, at least in the

3    heading, is talking about a particular set of those

4    that concerned the reporting and returning of

5    overpayments by Medicare Advantage organizations and

6    Part D sponsors rules; right?

7      A    Yes, that's what the topic --

8      Q    Yeah.

9      A    -- of this memo is.

10     Q    Now, there's parts of this that are

11   redacted, and I'll just represent to you that on the

12   privilege log, you are identified as the author of

13   this document.

14     A    Oh, okay.

15     Q    Do you recall writing it or compiling it?

16     A    I do not recall what I wrote ten years ago.

17   I will say that this is the kind of thing that I --

18   that I often wrote.

19     Q    All right.  So let me ask you to turn to the

20   second-to-last page of Exhibit 1460, the draft options

21   memo that you wrote and the section that concerns

22   Issue 6B --



Page 219

1        A     Oh, okay.

2        Q     -- which is the same 6B we were looking

3    at --

4        A     6B.

5        Q     -- earlier, amend Section 422.310 to require

6    MA organizations conducting medical record reviews to

7    focus not only on identifying underpayments.

8              Do you see that?

9        A     Yes, I do see that's Issue 6B.

10       Q     All right.  And -- and this Issue 6B

11   corresponds to the same discussions of the medical

12   record review rule that we had earlier in

13   Exhibit 1206-1; right?  Same heading, same title?

14       A     It's -- correct, but it's -- it's revised

15   text.  It is definitely not the same text as in that

16   early MPPG memo.

17       Q     Right.  So if you look at 1460, the

18   second-to-last page --

19       A     1460.

20       Q     -- in the discussion, this is the -- this is

21   the --

22       A     Okay.



Page 220

1    Q    -- one we are looking at, the options memo.

2    A    Okay.

3    Q    The language here that you write is you say,

4    "Under existing regulation, there is no requirement

5    for" -- "to" -- "for plans to audit medical records

6    for overpayments."

7        Do you see that?

8    A    I do see that.

9    Q    And this is something that -- that's

10   something you wrote in the -- in a June 4, 2013 draft

11   of an options memo that if finalized, would go to the

12   deputy director of the Center for Medicare; right?

13   A    Well --

14       MS. LIKOFF:  Object to form.

15       THE DEPONENT:  Yeah.  I want to explain that

16   I was often the coordinator of work products like

17   this, so I would have run this by a number of people

18   within MPPG before I sent the version to Cheri for her

19   review.

20       BY MR. GALLAGHER:

21   Q    Right.

22       But -- but you wouldn't have come up with



Page 221

1    this on your own.  It would reflect the input of the

2    entire group?

3        A    Including my input, but the input of the

4    group or the people who worked on this issue, yes.

5        Q    Right.

6             So this language here about how under

7    existing regulation there is no requirement for plans

8    to audit medical records for overpayments, that would

9    reflect not just your views and input but Jennifer

10   Harlow's and others within MPPG?

11       A    Yes, because, as I've said today, CMS

12   doesn't have a requirement to -- for MAOs to conduct

13   medical record reviews.

14       Q    So this is a true statement that as of

15   June 2013, under existing regulation, there is no

16   requirement for plans to audit medical records for

17   overpayments?

18            MS. LIKOFF:  Objection to form.

19            THE DEPONENT:  That's what the sentence

20   says, yes.

21            BY MR. GALLAGHER:

22       Q    And that's a true statement?



Page 222

1          A    Yes.  As I said, CMS has no requirement for

2     MAOs to audit medical records.

3          Q    And then the next sentence says, "If a plan

4     is" -- "is conducting medical record reviews to

5     identify underpayments, we recommend that they be

6     required to audit as well for overpayments"; right?

7     That's the next sentence?

8          A    That is what it says.

9          Q    And that's a description of what you were

10    going to be recommending be made a rule through the

11    medical record review rule; right?

12         A    That is correct.

13         Q    At the time you wrote this with input from

14    others at MPPG -- actually, let me -- let me say this

15    differently.  I apologize.

16             When you wrote with input from others at --

17    at MPPG, that group, that under existing regulation

18    there is no requirement for plans to audit medical

19    records for overpayments, all of the alleged source of

20    obligations that we talked about earlier in -- in

21    Section -- in -- in Document 1457, all of those things

22    were already in existence; right?



Page 236

1           THE DEPONENT:  I've already said that CMS

2     doesn't have a re- --

3           (Interruption.)

4           THE VIDEOGRAPHER:  Someone is not on mute.

5           MR. BAAK:  I just --

6           THE DEPONENT:  As I've said, CMS doesn't

7     have a requirement that tells MAOs they must audit

8     medical records.  CMS expects MAOs to develop their

9     internal procedures for validating the data on which

10    they have been paid.

11          BY MR. GALLAGHER:

12      Q    All right.  So you don't have a requirement

13    that requires plans to audit medical records for

14    overpayments.

15          By logic then, the requirement for accurate

16    and complete risk adjustment data does not require

17    plans to audit medical records for overpayments, does

18    it?

19          MS. LIKOFF:  Objection to form.  Vague.

20          THE DEPONENT:  I need just a minute to

21    finish reading the rest of this memo.

22          (Deponent reviews document.)



Page 280

1           THE DEPONENT:  Yeah.  The Medicare advantage

2     risk adjustment guidelines specify that -- as I've

3     said, that an MAO has got to be submitting accurate

4     data, accurate, complete, and truthful.  So while MAOs

5     are developing their compliance plans, which is --

6     which will be a process they are putting together that

7     would include how to manage their risk adjustment data

8     submissions.  While they're putting that together,

9     they are subject to the overpayment rule is -- if they

10    identify overpayments in the process of -- of managing

11    their risk adjustment programs and conducting medical

12    record review, then they do need -- then that does

13    fall under this regulation.

14           BY MR. GALLAGHER:

15    Q    Was that a yes or a no?

16           MS. LIKOFF:  Object to form.  Asked and

17    answered.

18           BY THE DEPONENT:  The overpayment

19    regulation -- it -- it's -- it's more complicated than

20    a yes or a no.  I know you always want yes or no

21    answers, but it's more complicated than that.

22



Page 281

1          BY MR. GALLAGHER:

2     Q    Does the overpayment rule in CMS's view

3     create an obligation to investigate whether codes are

4     supported by medical records?  Is that a source of the

5     obligation you say exists?

6          MS. LIKOFF:  Object to form.

7          THE DEPONENT:  The overpayment rule does not

8     specifically speak to risk adjustment data.  I should

9     say the regulation doesn't.

10         BY MR. GALLAGHER:

11    Q    Right.  Because there's a difference between

12    an overpayment and an unsupported code.

13    A    Yes.

14         MS. LIKOFF:  Objection to form.

15         BY MR. GALLAGHER:

16    Q    Just because you have an unsupported code

17    does not mean that you have an overpayment; right?

18    A    That is correct.

19    Q    You can have an unsupported code for lots of

20    reasons and still not have an overpayment.

21         MS. LIKOFF:  Object to form.  Vague.

22



Page 282

1          BY MR. GALLAGHER:

2      Q    Like, for example, you can have a -- an

3  unsupported code because one record doesn't support

4  it, but it's supported in another.

5          MS. LIKOFF:  Object to form.

6          THE DEPONENT:  No.  That is not correct.  If

7  you find a diagnosis code is not supported in the

8  record, it doesn't matter if it appears in another

9  medical record.  It is CMS that makes the

10 determinations about overpayments.  It is the MAO's

11 responsibility to delete unsupported code, so they

12 need to delete one that is not supported.  And then if

13 there's another medical record that has it, that's

14 great.

15         BY MR. GALLAGHER:

16     Q    MAOs don't know whether there's an

17 overpayment.

18         All they know is whether the code is or is

19 not supported; right?

20         MS. LIKOFF:  Object to form.  Calls for

21 speculation.

22



Page 356

1    REPORTER'S CERTIFICATE

2    DISTRICT OF COLUMBIA

3

4            I, Jeaninn Y. Alexis, a Notary Public of the

5    District of Columbia, do hereby certify that the

6    with-named witness personally appeared before me at

7    the time and place herein set out, and after having

8    been duly sworn by me, according to law, was examined

9    by counsel.

10            I further certify that the examination was recorded

11    stenographically by me, and that this transcript is a true

12    record of the proceedings.

13            I further certify that I am not of counsel to any of

14    the parties, nor an employee of counsel, nor related to any of

15    the parties nor in any way interested in the outcome of the

16    action.

17    As witness my hand and seal this 5th day of June, 2023.

18

19    _Jeaninn Y Alexis_

20    JEANINN ALEXIS
      My Commission Expires: 11/30/2023

21

22



**EXHIBIT D-117**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

```
_____
                            )
UNITED STATES OF AMERICA    )
ex rel. BENJAMIN POEHLING,  )
                            )
       Plaintiff,           )      No. CV 16-08697 FMO
                            )
vs.                         )
                            )
UNITEDHEALTH GROUP, INC.,   )
et al.,                     )
                            )
       Defendants.          )
_____)
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Volume 3
DEPOSITION OF ANNE HORNSBY
As 30(b)(6) Designee 1 of
The United States

Washington, DC
November 21, 2023

Reported by:  John L. Harmonson, RPR



Page 54

1    Exhibit 1520:  "RADV audits are intended to confirm

2    the presence of risk adjustment conditions (that

3    is, diagnoses that map to HCCs) as reported by MAOs

4    in medical record documentation."

5            Do you see that?

6        A.    I do see that sentence.

7        Q.    And then the next sentence begins:

8    "RADV audits confirm the presence of the diagnoses

9    related to the enrollee's HCC profile through the

10   review of certain categories of medical records

11   submitted by the MAOs for the purpose of a RADV

12   audit."

13           Do you see that, Dr. Hornsby?

14       A.    Yes, I do see that sentence.

15       Q.    And are those sentences consistent with

16   your understanding of how the RADV process works in

17   terms of CMS validating HCCs submitted by MAOs in

18   the medical records?

19       A.    Yes, that's consistent with my

20   understanding of the CON14 and CON15 medical record

21   review methodology.

22       Q.    If CMS confirms in RADV a diagnosis code

23   submitted by an MA plan, that code cannot result in

24   an overpayment to the plan; correct?

25       A.    I'm sorry --



Page 55

1                MS. LIKOFF:  Objection to form.  Vague.

2                THE WITNESS:  What was that, Amy?

3                MS. LIKOFF:  Oh, I just made an

4    objection.  Objection to form.  Vague.

5    BY MR. MARTINEZ:

6        Q.    Do you need me to repeat my question?

7        A.    Well, I lost the if.  I looked up and

8    lost the if.

9        Q.    I'm asking you a question just about

10   what CMS means when it says "confirm."

11       A.    Oh, I thought you were reading.  Okay,

12   sorry.

13       Q.    So I'll repeat it.

14             If CMS confirms in RADV a diagnosis code

15   submitted by an MA plan, that code cannot result in

16   an overpayment to the plan; correct?

17                MS. LIKOFF:  Objection to form.  Vague.

18                THE WITNESS:  When the medical record

19   coders code a diagnosis in a medical record that

20   matches to the HCC on which the MAO has been paid,

21   then it's steady state.  No change.

22   BY MR. MARTINEZ:

23       Q.    Right.  And by "steady state," you mean

24   CMS is determining when it validates a diagnosis

25   code or an HCC submitted by an MA plan in RADV,



Page 56

1    that that code or HCC cannot result in an

2    overpayment to the plan; correct?

3             MS. LIKOFF:  Objection to form.  Vague.

4             THE WITNESS:  If the HCC that's being

5    audited for a beneficiary is confirmed by the

6    coder, there is no change in payment.

7    BY MR. MARTINEZ:

8        Q.    Right.  So if CMS confirms the HCC

9    that's being audited in RADV for a beneficiary

10   sampled from an MA plan, there is no change in

11   payment, meaning there has been no overpayment to

12   the MA plan as a result of that code or HCC;

13   correct?

14            MS. LIKOFF:  Objection to form.  Vague.

15   And again, I just want to make clear that the

16   witness has been designated to speak for the time

17   period post July 2021.

18            THE WITNESS:  If an HCC is confirmed,

19   there is no change in the payment.  So there would

20   be no overpayment.

21   BY MR. MARTINEZ:

22       Q.    Let's take a look at the page ending in

23   6651 of Exhibit 1520.

24            MS. LIKOFF:  Counsel, which page did you

25   say?



Page 57

 1              MR. MARTINEZ:  6651.

 2              And for the folks on Zoom, this should

 3    be the ninth page of Exhibit 1520.

 4    BY MR. MARTINEZ:

 5         Q.    Dr. Hornsby, are you on that page?

 6         A.    6651.  Yes, I'm on that page.

 7         Q.    All right.  So I would like to draw your

 8    attention to a statement by CMS in the right-hand

 9    column under the "Response" subheading.  Do you see

10    the paragraph that begins "Response:  As previously

11    explained"?

12         A.    Yes, I do see that sentence.

13         Q.    Okay.  So I would like to direct your

14    attention a couple of sentences down to the one

15    that begins "Our initiatives."

16              Do you see that, Dr. Hornsby?

17         A.    I'm reading the paragraph above.  I need

18    it in context.

19         Q.    Okay.

20         A.    So "Our initiatives"?

21         Q.    Yes.  Are you there?

22         A.    Yes.

23         Q.    Okay.  What CMS is saying here on 6651

24    of Exhibit 1520 is:  "Our initiatives are designed

25    to ensure fair and accurate recovery efforts by



Page 58

1  focusing on the areas at highest risk of improper

2  payments."

3           Do you see that?

4      A.    I do see that sentence.

5      Q.    CMS designed RADV to focus on the areas

6  of the MA program with the highest risk of improper

7  payments; correct?

8           MS. LIKOFF:  Objection to form.  And

9  objection.  I would just like to make it clear that

10  this particular rule is not a topic in

11  UnitedHealth's 30(b)(6) notice, and so it's our

12  view that this is out of scope.

13           THE WITNESS:  Yeah, so I can speak on

14  behalf of CMS for CON14 and CON15.  The sampling

15  frame that was developed for those two audits does

16  take into account an estimate of risk for

17  overpayments and also takes into account health

18  conditions that previous audit experience suggests

19  could also be associated with higher overpayments.

20  And for CON14 that was diabetes.  For CON15, that

21  was urinary conditions.

22  BY MR. MARTINEZ:

23      Q.    Why does CMS design its RADV audits to

24  focus on variables that have a higher risk of

25  overpayments?



Page 59

1          MS. LIKOFF:  Objection to form.  Vague.

2    And again, I'm just going to make it clear that the

3    witness' testimony is confined to the time period

4    post July 2021.

5          THE WITNESS:  Speaking about CON14 and

6    CON15 on behalf of CMS, as the reg says at 422.311,

7    the point is to ensure payment accuracy.  That's

8    the point of RADV audits.  And to best approach

9    that with the methodology for the sampling frame

10   would be, for example, to try to come up with

11   methodologies for focusing on areas of high risk

12   for overpayment.

13   BY MR. MARTINEZ:

14   Q.   Is one reason why CMS might want to

15   focus on areas of high risk for overpayment to

16   increase the payment recoveries that CMS obtains

17   through the RADV program?

18          MS. LIKOFF:  Objection to form.  And

19   again, I just want to object to the extent that

20   this witness is only designated to speak beyond --

21   or the time period post July 2021.

22          THE WITNESS:  Speaking about CMS's view

23   for CON14 and CON15, I did ask this question; and

24   Dave said no, that's really not a focus.  ROI is

25   just not a focus.



2980

Page 60

1            The point is trying to have accurate

2    payments made to MAOs.  And the best way to do that

3    is to try to target enrollees who are at risk for

4    improper payments.  You know, payment error.

5    BY MR. MARTINEZ:

6        Q.    Would you agree with me that payment

7    accuracy requires consideration of whether an MA

8    plan has either been overpaid, underpaid, or

9    accurately paid for a given payment year?

10            MS. LIKOFF:  Objection to form.  Vague.

11   Again, this witness is designated to speak only to

12   the post July 2021 time period.  Counsel, you've

13   had seven hours to ask another witness about

14   general questions on RADV and its purpose.  Again,

15   I just want to reiterate, this witness is only here

16   to talk about the time period post July 2021.

17            MR. MARTINEZ:  I understand.  I'm just

18   trying to get more information about what

19   Dr. Hornsby means when she refers to payment

20   accuracy in her response.

21   BY MR. MARTINEZ:

22       Q.    Do you remember my question?

23       A.    Would you say it again?

24       Q.    Sure.

25            Would you agree with me that payment



Page 64

1    was designated to speak to that earlier time frame.

2    And again, this February 2023 rule is also outside

3    the scope of the noticed topics.

4              MR. MARTINEZ:  So the problem with that

5    is --

6              THE WITNESS:  Yeah.

7              MR. MARTINEZ:  Let me finish.

8              I wanted to ask Carolyn Kapustij these

9    questions about the February 2023 final rule but I

10   couldn't because of her cutoff of July 2021.

11             So now I finally have a witness in front

12   of me who is designated to testify about Topic 5

13   after July 2021, and I expect that she's going to

14   do so.  And this final rule is all about the RADV

15   audits for payment years at issue in Topic 5.

16             So yes, we expect that the witness is

17   going to be prepared on this issue.  And I know she

18   says she hasn't reviewed the document.  But that's,

19   from my perspective, an issue with her preparation

20   and not an issue with the scope of the topic as

21   noticed.

22             MS. LIKOFF:  Well, counsel, we disagree.

23   I believe the witness has shown that she is

24   adequately prepared to testify on the topics that

25   are in UnitedHealth's notice.  This rule is not a



Page 65

1  topic in that notice.  We've received no

2  correspondence following this notice to suggest

3  that UnitedHealth intended for this witness to be

4  prepared to speak about this.  And so the United

5  States maintains its position that these questions

6  are out of scope.

7           MR. MARTINEZ:  And we, of course,

8  disagree with that position.  But I don't think we

9  need to belabor it further.

10          I do believe there is a pending

11 question, though.

12 BY MR. MARTINEZ:

13     Q.    Do you remember my question,

14 Dr. Hornsby?

15     A.    No.

16     Q.    Would you like me to repeat it?

17     A.    I don't know.  I'm really not prepared

18 to testify on behalf of CMS about that 2012

19 extrapolation memo, which was a proposed policy

20 that was never finalized.  So I'm not going to

21 testify on that.

22          I don't know about the audits from 2011

23 to '13 because I prepared to testify on CON14 and

24 CON15.  And there is nothing -- I did ask Dave

25 Gardner that one question about whether anything



Page 66

1    has been released about the '11 to '13 results and

2    he said no, and that was it.  That was all the

3    preparation I needed to do.

4        Q.    That was all the preparation that you

5    did with respect to payment years 2011 through

6    2013?

7        A.    Right.  I've done a lot of

8    preparation --

9             MS. LIKOFF:  Objection.

10            THE WITNESS:  Oh, sorry.  I've done a

11   lot of preparation for CON14 and 15.

12   BY MR. MARTINEZ:

13       Q.    Let's go back to the second page of

14   Exhibit 1520.  This is the page ending in 6644.

15   And I would like to direct your attention to the

16   top left portion of the page.  Actually, the

17   sentence begins on the bottom right of the first

18   page of the document.  So I'll go ahead and read

19   that as well.

20            Are you there, Dr. Hornsby?

21       A.    Yes, I'm there.

22       Q.    So the bottom right of 6643, CMS writes:

23   "Rather than applying extrapolation beginning for

24   payment year (PY) 2011 audits as we proposed, we

25   are finalizing a policy whereby we will not



Page 67

1   extrapolate RADV audit findings for PYs 2011

2   through 2017 and will begin extrapolation with the

3   PY 2018 RADV audit."

4           And then it says:  "As a result, CMS

5   will only collect the non-extrapolated overpayments

6   identified in the CMS RADV audits," and then it

7   goes on to reference the HHS OIG audits as well.

8           Do you see that written here in the

9   February 2023 final rule?

10      A.    Yes, I see it.

11      Q.    And when CMS refers to collecting the

12  non-extrapolated overpayments for payment years

13  2011 through 2017, that's a reference to any

14  enrollee level overpayments that CMS may have

15  calculated in the RADV audits for those payment

16  years; correct?

17          MS. LIKOFF:  Objection; outside the

18  scope of the noticed topics.  And again, this

19  witness is only designated to testify with respect

20  to audits and activities taking place after

21  July 2021.

22          THE WITNESS:  Yeah, for CON14 and CON15,

23  when they complete the results and are ready to

24  move to the stage of payment recovery for those two

25  years, they will be doing beneficiary-level



Page 79

1    he said no, and that was all I asked.

2        Q.    What did you understand him to mean --

3    well, strike that.

4            Did you ask him whether the results for

5    payment years prior to CON14 were final?

6        A.    That's the one question I asked,

7    speaking as Anne Hornsby.  Yeah.

8        Q.    When you used the word "final" in your

9    question to Mr. Gardner, what did you mean?

10       A.    Are all calculations done, all quality

11   assurance checks done, all review up the line with

12   CMS approval at the top.

13       Q.    When you used the word "final" in your

14   question to Mr. Gardner, did you have in mind that

15   the appeals process related to those RADV findings

16   would have been concluded?

17       A.    Speaking as Anne Hornsby, I was focused

18   on CON14 and CON15 where there aren't any

19   preliminary results.  So I asked that one quick

20   question about the earlier years, and I did not

21   probe.

22       Q.    Since July 2021, has the appeals process

23   for any of the RADV audits covered by Topic 5

24   begun?

25       A.    I'm prepared to testify on CON14 and



Page 80

1    CON15 on behalf of CMS.  And appeals have not

2    begun.

3        Q.    Are you familiar with how the appeals

4    process is supposed to work for CON14 and 15?

5        A.    CMS has set forth the appeals process in

6    422.311.  And I don't have it with me; otherwise I

7    would read it to you.

8        Q.    So is the answer to my question yes or

9    no?

10       A.    I've given you the citation where CMS

11   sets it out.  And it's a detailed -- it's a very

12   long regulatory section which starts with hearing

13   officers and ends with administrative law judges.

14   So I am generally familiar, but I'm not -- I'm here

15   to testify on CON14 and 15 where it's not anywhere

16   near the appeals process.

17       Q.    With respect to CON14 and 15, has CMS or

18   Deloitte prepared any documents as of today

19   summarizing the medical record review results for

20   those audits?

21             MS. LIKOFF:  Objection to form.  Vague.

22             THE WITNESS:  Dave said that the results

23   of each contract's audits for '14 and '15 are

24   available to the contract in CDAT through the

25   continuous reporting process.  So there is no need



Page 81

1   at this early stage to have any other results.

2   There are no preliminary results for CON14 and 15.

3   BY MR. MARTINEZ:

4        Q.    And neither CMS nor Deloitte has

5   prepared any documents summarizing the audit

6   results for CON14 and 15; is that right?

7              MS. LIKOFF:  Object to form.

8              THE WITNESS:  He said there are no

9   preliminary findings for CON14 or 15.

10  BY MR. MARTINEZ:

11       Q.    And there's no preliminary findings code

12  for -- CMS has not created any document summarizing

13  the medical record review results for CON14 and 15?

14             MS. LIKOFF:  Object to form.  Asked and

15  answered.

16             THE WITNESS:  Yeah.  I mean CMS does not

17  have any preliminary findings on CON14 and CON15.

18  BY MR. MARTINEZ:

19       Q.    So do I have it right that CMS not only

20  does not have any final audit results for CON14 and

21  15, it doesn't even have preliminary findings for

22  those two RADV audits.  Is that right?

23             MS. LIKOFF:  Objection to form.  Asked

24  and answered.

25             THE WITNESS:  Yes.  CMS does not have



Page 82

1   preliminary findings for CON14 nor CON15.

2   BY MR. MARTINEZ:

3       Q.    When does CMS expect to have preliminary

4   findings for CON14 and CON15?

5           MS. LIKOFF:  Objection; outside the

6   scope of the time frame.  The witness is not here

7   to testify about what may take place in the future.

8   BY MR. MARTINEZ:

9       Q.    You can answer.

10      A.    Oh, okay.  I asked that question, and

11  they said they just don't know.  They do not have

12  dates.  It's just not set.

13      Q.    When did the medical record reviews for

14  CON14 begin?

15      A.    Oh, my gosh.  I can't remember that

16  date.  But it takes at least a year to get through

17  them because each -- for each beneficiary, an MAO

18  can submit up to five records.  And with 6,000

19  beneficiaries, you could have a maximum of 30,000

20  records.  So it's a huge undertaking.

21          I don't know how many came in, but it

22  takes, you know, a chunk of time to finish the

23  medical record review.

24      Q.    Is it your understanding that the

25  medical record review for CON14 began after



Page 83

1    July 2021?

2        A.    I remember when they ended.  So first

3    there is the intake window opening for MAOs to

4    submit medical records, and that goes on for a

5    number of months.

6            And then the medical record intake

7    starts, which is a validity process where they're

8    checking a number of things -- I don't have to go

9    into all that detail.

10           And then finally starts the abstraction

11   process, which is where your coders -- experienced,

12   qualified coders are doing coding of the medical

13   records.

14           So I apologize.  I cannot remember the

15   date it started, the actual medical record review.

16       Q.    And I take it the same answer for CON15?

17       A.    Yeah.  I just -- I can't remember.  I

18   apologize, I cannot remember those dates.  There

19   are like four dates, and I remember the last one --

20   the last two.

21       Q.    For CON14 or 15, has CMS calculated any

22   HCC discrepancy rates for the MA plans that it

23   audited?

24           MS. LIKOFF:  Objection to form.  Asked

25   and answered.



2990

Page 129

1    behalf of CMS that CMS was unaware that the

2    diagnosis data that came from providers and was

3    then submitted to CMS includes errors?

4            MS. LIKOFF:  Objection; asked and

5    answered.

6            THE WITNESS:  Yeah.  I mean, CMS does

7    not have access to the data inside an MAO.  When

8    CMS sees delete records come into the system,

9    that's when they are aware of errors.  So yes, CMS

10   is aware of errors in MA data because they see the

11   deletes that come in.

12   BY MR. BAAK:

13       Q.    Would you agree with Cheri Rice -- Cheri

14   Rice was your boss; right?

15       A.    Yes.

16       Q.    Would you agree with Cheri Rice when she

17   testified that CMS had some reason to know that

18   there was a level of diagnosis coding that was

19   unsupported in a Medicare Advantage plan's data?

20           MS. LIKOFF:  Objection to form.

21           THE WITNESS:  I would like to see that.

22   So let me turn to my Cheri Rice deposition copy,

23   which is Binder 3, Tab 7.

24           What page are you on, Mr. Baak?

25   BY MR. BAAK:



Page 130

1          Q.     Turn to page 71 of her transcript.

2          A.     Okay.  Where?

3          Q.     Starting at line 25.

4          A.     Oh, at the bottom.  Okay.

5          Q.     Without identifying a specific percent,

6     when you were at MPPG, you understand from the RADV

7     audit process that there was some error rate, some

8     percentage of diagnosis codes of Medicare Advantage

9     data that were unsupported?

10         A.     Yes.  In addition to deletes, of course,

11    the RADV audit results would tell CMS that there

12    were diagnoses that were not supported in the

13    medical record.  Yeah.

14         Q.     So you agree with this testimony that

15    CMS was aware that the diagnosis codes that were

16    coming from providers to MA plans and then coming

17    to CMS included some unmeasured error rate; right?

18         A.     Yes.

19              MS. LIKOFF:  Objection; misstates -- the

20    document and misstates the witness's testimony.

21              THE WITNESS:  Keep in mind that about 30

22    MA contracts were audited a year until CON14.  So

23    we're not talking about a large volume.  But yes,

24    from the RADV audit process, CMS understood that

25    there was some error rate because that would be a



Page 131

 1    typical result of the audit process.  For each

 2    contract audited, there would be a payment error

 3    amount.

 4             And in addition, as I had been talking

 5    about, CMS was aware that parent organizations were

 6    deleting records that they had been paid on because

 7    they found errors in the diagnosis codes.

 8    BY MR. BAAK:

 9        Q.    You mentioned -- Dr. Hornsby, you

10    mentioned an error where a plan submits a diagnosis

11    code and then subsequently determines for some

12    reason that that code ought to be deleted.  That

13    was an example you gave me a little bit earlier.

14        A.    That was one example I gave, yes, that

15    CMS has seen.

16        Q.    CMS is also aware that there are errors

17    where in fact a provider does document a diagnosis

18    code on a medical record but fails to submit it;

19    right?  CMS knows that from the RADV process?

20             MS. LIKOFF:  Objection to form.  Vague.

21    Beyond the scope.

22             THE WITNESS:  CMS did not have evidence

23    of that.  You know, around the time of the 2014

24    rule, CMS had anecdotal evidence that MAOs were

25    conducting medical record reviews to find what



Page 132

1    everybody calls additionals to find diagnoses that

2    had not been submitted before that appear to be

3    supported by the medical record.  CMS was not aware

4    of that as a fact, as clear knowledge.  It was all

5    through professional networks and, you know, that

6    level of knowledge.

7    BY MR. BAAK:

8         Q.    Just to make sure I understand,

9    Dr. Hornsby, you're testifying that over time CMS

10   became aware through professional discussions,

11   industry conferences and the like that Medicare

12   Advantage organizations were conducting medical

13   record reviews to add diagnosis codes that the

14   provider had failed to submit.  Is that what you

15   just testified to?

16        A.    Yes.  Over time CMS became aware, around

17   2014 as a tipping point.

18        Q.    It had knowledge that CMS obtained about

19   what plans were doing.  That obviously predated the

20   proposed medical record review, right, since that

21   was targeted at Medicare Advantage organization's

22   chart review activities?

23             MS. LIKOFF:  Object to form.  Vague.

24   Misstates the witness's testimony.

25             THE WITNESS:  CMS did not propose a



Page 142

1    like, 80 percent?  I mean, what do you mean by

2    "well known"?

3    BY MR. BAAK:

4        Q.    Dr. Hornsby, you have a PhD from

5    Harvard.

6        A.    That's right.

7        Q.    Have you used the phrase "well known" in

8    your life before?

9        A.    I'm not going to --

10             MS. LIKOFF:  Objection.

11             THE WITNESS:  Testifying as Anne

12    Hornsby, I'm not falling in this trap.  So, you

13    know, I want to know what "well known" means to

14    you.

15    BY MR. BAAK:

16        Q.    Okay.  Your testimony for the jury is

17    you don't understand what the phrase "well known"

18    means without me defining it?

19             MS. LIKOFF:  Objection to form.

20             THE WITNESS:  My testimony is I'm asking

21    you what you mean by "knowledge" and "well known."

22    Because I have explained that that usually means

23    throughout the organization with many people and

24    all the way up the leadership chain.  And CMS is

25    just not going to testify to that.



Page 143

1              There was anecdotal knowledge.

2    Anecdotal knowledge.  So as a social scientist, I

3    know what "anecdote" means.  It's not systematic.

4    So anecdotal knowledge that MAOs were not

5    submitting diagnoses and were not deleting

6    diagnoses that needed to be deleted, and that were

7    focusing on finding additional diagnoses that had

8    not been submitted.  That's what the anecdotal

9    knowledge was.

10   BY MR. BAAK:

11       Q.    I'll use your phrase, then.

12             So, Dr. Hornsby, there was anecdotal

13   knowledge in CMS that the diagnosis codes that

14   providers were submitting to MA plans that was in

15   turn were getting submitted to CMS did not include

16   all diagnosis codes that were supported by the

17   patient's medical record; right?

18             MS. LIKOFF:  Objection; outside the

19   scope.

20             THE WITNESS:  CMS assumes that the

21   reason MAOs began to engage in identifying

22   additionals was because that was your discovery --

23   MAO's discovery inside their organizations, and

24   they would be in the best position to know because

25   they're the one who have the contracts with the



Page 144

1    providers.  CMS does not contract with the

2    providers.

3    BY MR. BAAK:

4         Q.    Dr. Hornsby, my question was:  There was

5    anecdotal knowledge in CMS that the diagnosis codes

6    that providers were submitting to MA plans that in

7    turn were getting submitted to CMS did not include

8    all diagnosis codes that were supported by the

9    patient's medical records; right?

10             MS. LIKOFF:  Objection; outside the

11   scope.  Asked and answered.

12             THE WITNESS:  I've answered that so many

13   times.  I've answered that many times.

14   BY MR. BAAK:

15        Q.    The answer is yes, isn't it,

16   Dr. Hornsby?

17        A.    The answer is --

18             MS. LIKOFF:  Objection; mischaracterizes

19   the witness's testimony.

20             THE WITNESS:  The answer is CMS does not

21   contract with providers, so it doesn't know for

22   sure what providers are up to.  I mean, that's just

23   reality.  CMS did have anecdotal knowledge that

24   MAOs, some MAOs, were not submitting deletes they

25   should, and others were conducting medical record



Page 145

1    reviews to identify additionals.  Well, that means

2    that the MAOs had discovered that their providers

3    were not coding completely.  That's what the MAO

4    discovery is.

5    BY MR. BAAK:

6        Q.    Dr. Hornsby, I want to ask about a third

7    category of potential error.  So we've talked about

8    errors where the MA plan submits a diagnosis code

9    that's not reflected on a medical record.  Right?

10   And I'll add to that where the patient doesn't

11   have -- does not have the diagnosis.  And then we

12   just talked about another category where the

13   patient has the diagnosis but it doesn't get

14   submitted.

15            So are you with me so far, those first

16   two categories of errors?

17            MS. LIKOFF:  Objection to form.

18            THE WITNESS:  Yes.

19   BY MR. BAAK:

20       Q.    There is also a third potential category

21   of error, isn't there, Dr. Hornsby, where the

22   patient has the medical condition and it's not

23   reflected in the medical record but it is in the

24   diagnosis data.  So the medical record is in fact

25   in error; right?  That's also a potential source of



Page 146

1    error in the system?

2              MS. LIKOFF:  Objection to form.

3              THE WITNESS:  CMS does not accept that.

4    That is unacceptable because CMS, as does every

5    other healthcare transaction entity, follows the

6    guidelines of the national committee, ICD-9 and

7    ICD-10.  An accurate diagnosis is defined as one

8    that is documented in the medical record.  And if

9    there is no documentation in the medical record,

10   then there cannot be an accurate diagnosis.

11   BY MR. BAAK:

12       Q.    I'm not asking what CMS considers the

13   basis to validate a code.  I'm just asking in the

14   real world, there can be patients who have a

15   condition.  It might not end up on the medical

16   record but it might be in the claims data and gets

17   submitted.  You're saying, well, then that would be

18   unsupported in CMS's view.  But I'm just saying

19   that there is some set of those patients that in

20   fact have the condition; right?

21              MS. LIKOFF:  Objection; vague.  Calls

22   for speculation.

23              THE WITNESS:  CMS would not -- you know,

24   the doctor is responsible for creating the medical

25   record with complete, clear documentation.  That's



Page 147

1  the starting point.  And that's in, you know --

2  that's what -- MAOs have the right through CMS

3  regulation to put into their contracts with their

4  providers.  And so if that happens when there is no

5  note in the medical record of a diagnosis, then it

6  cannot be submitted for payment.

7  BY MR. BAAK:

8      Q.    Dr. Hornsby, maybe I'm making my

9  question unclear.  I'm not asking about what CMS

10 considers a valid basis for payment.  I'm asking is

11 it possible that a patient has diabetes, it's

12 included as a diagnosis code in the claims data,

13 but it is not on the medical record but in the real

14 world the patient has the condition.  That's

15 something that can happen; right?

16         MS. LIKOFF:  Objection; outside the

17 scope of the notice.  Calls for speculation.

18         THE WITNESS:  CMS knows that a patient

19 can have diabetes and the doctor did not write it

20 in the medical record.  But that means that that

21 can't be submitted to CMS.

22 BY MR. BAAK:

23     Q.    Whether it can be submitted or not,

24 that's a mistake that could happen; right?

25         MS. LIKOFF:  Object to form.



Page 280

```
 1              C E R T I F I C A T E

 2

 3   DISTRICT OF COLUMBIA

 4              I, JOHN L. HARMONSON, a Notary Public

 5   within and for the District of Columbia, do hereby

 6   certify that ANNE HORNSBY, the witness whose

 7   deposition is hereinbefore set forth, was duly

 8   sworn by me and that such deposition is a true

 9   record of the testimony given by such witness.

10              That before completion of the

11   proceedings, review and signature of the transcript

12   was reserved.

13              I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17              IN WITNESS WHEREOF, I have hereunto set

18   my hand this 27th day of November, 2023.

19

20

21              JOHN L. HARMONSON, RPR

                My commission expires: 04/14/26

22

23

24

25
```



**EXHIBIT D-118**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA ex

rel. BENJAMIN POEHLING,

    Plaintiffs,

vs.                                    No. CV 16-08697 FMO

UNITEDHEALTH GROUP, INC., et al,

    Defendants.

_____/




REMOTE VIDEOCONFERENCE DEPOSITION OF

LATEEFAH HUGHES, DrPH

February 4, 2022




Reported by:

Anne E. Vosburgh, CSR-6804, RPR, CRR

Job No. 789846

Page 22

1                    L. Hughes DrPH

2    doctorate in public health from

3    Morgan State University.

4            Did you obtain that doctorate before

5    beginning your employment at CMS?

6        A.   No.

7        Q.   When did you obtain that doctorate?

8        A.   In 2013.

9        Q.   Were you working on the doctorate

10   while employed at CMS?

11       A.   Yes.

12       Q.   When did you begin the course of

13   study for that doctorate?

14       A.   In 2003.

15       Q.   Did you have a particular area of

16   focus in your doctorate work?

17       A.   No.  It was general.

18       Q.   Did you complete a dissertation?

19       A.   I did.

20       Q.   What was the topic of the

21   dissertation?

22       A.   Exploring the impacts of adherence

23   outcomes for HIV AIDS in Kenya and Zambia.

24       Q.   What was your position at CMS when

25   you joined in 2002?

3004

Page 23

1                      L. Hughes DrPH

2        A.   I was a social science research

3   analyst.

4        Q.   Were you assigned a particular area

5   of research analysis?

6        A.   Yes.

7        Q.   What was that area?

8        A.   I was assigned to adjustments,

9   operations, and risk adjustment data

10  validation.

11       Q.   How long did you hold the position as

12  social science research analyst?

13       A.   Two years, I think, or three years.

14  Two or three years.

15       Q.   What position did you take next?

16       A.   Health insurance specialist.

17       Q.   And what were your responsibilities

18  as a health insurance specialist while at CMS?

19       A.   More of the same of what I was

20  working on, but doing -- adding more

21  coordination to the title.

22       Q.   Coordination with who?

23       A.   Coordination of team tasks and

24  coordination with -- on -- on industry

25  communication and activities -- outreach and

Page 24

1                          L. Hughes DrPH

2      communication.

3           Q.   Did your responsibilities in that

4      role include risk adjustment data validation

5      audits?

6           A.   Yes.

7           Q.   Are you familiar with the term

8      "RADV," Dr. Hughes?

9           A.   Yes.

10          Q.   What do you understand it to mean?

11          A.   It's a data validation that takes

12     place by CMS to validate the accuracy of risk

13     adjustment data that Medicare Advantage plans

14     submit to the agency for payment on their

15     beneficiaries, their members that are enrolled

16     in the plans.

17          Q.   Okay.  So if I use the shorthand

18     "RADV audit," you'll understand that I'm

19     referring to a risk adjustment data validation

20     audit?

21          A.   Yes.

22          Q.   What position did you take next with

23     CMS?

24          A.   That was pretty much my position

25     until I left the Medicare risk adjustment work

3006

Page 25

```
 1                    L. Hughes DrPH

 2   and moved to management in the Affordable

 3   Care -- under the Affordable Care Act.

 4        Q.   And Dr. Hughes, in what year did that

 5   occur?

 6        A.   2012.

 7        Q.   At some time prior to 2012 did you

 8   hold the title Team Leader for Risk Adjustment

 9   Data Validation?

10        A.   Yes.  That was part of the broad

11   title of health insurance specialist.

12        Q.   Do you recall how long you held that

13   title?

14        A.   I think it was from 2006 through

15   2012, but I can confirm when I look at my

16   resume.

17        Q.   Understood.

18             And when you transitioned to work on

19   Affordable Care Act issues, did you continue

20   to have responsibility for risk adjustment?

21        A.   No.  Not Medicare risk adjustment,

22   no.

23        Q.   Did you continue to have

24   responsibility for RADV audits?

25        A.   No.
```

Page 38

                              L. Hughes DrPH

1

2   routine trainings to the industry, so I would

3   be responsible for coordinating information

4   for the RADV or the data collection components

5   of the training manuals that CMS put out for

6   the training.

7        Q.   And during the RADV audit process,

8   what information was being evaluated?

9        A.   The diagnosis data and the

10  hierarchy -- that contributed to the

11  hierarchical condition categories that are

12  used for -- assigned to beneficiaries from the

13  Medicare data.  So that information was being

14  reviewed.

15       Q.   When you referenced hierarchical

16  condition categories, are those sometimes

17  abbreviated HCCs?

18       A.   Yes.

19       Q.   So I understand you to say that the

20  information evaluated during a RADV audit

21  included diagnosis data and HCCs that were

22  assigned to beneficiaries from submitted data.

23       A.   Yes.

24       Q.   And how were diagnosis data

25  evaluated?  Who did that?

Page 39

1                    L. Hughes DrPH

2        A.   We had contractors that were

3    credentialed in conducting medical record

4    review in ICD-9 -- in ICD-9 coding extraction

5    for medical records.

6        Q.   And did you interact with these

7    contractors?

8        A.   Yes.

9        Q.   Do you recall any of the

10   organizations who were credentialed in

11   conducting medical record review?

12       A.   Yes.

13       Q.   Okay.  Would you list those for me,

14   please.

15       A.   The ones I recall were Aspen -- I'm

16   just trying to go in order from when I

17   started, if I can recall that.

18            Aspen, Health Services Advisory

19   Group, HSAG, Buccaneer, IPRO.  Those are ones

20   that I recall but there may have been others.

21       Q.   When you reference Buccaneer, is the

22   full name Buccaneer Data Services?

23       A.   Maybe.  I don't know if that was

24   their name back then, but maybe.

25       Q.   And the organizations that you listed

Page 40

1                    L. Hughes DrPH

2    performed medical record coding?

3        A.    They do -- they did.  And I don't

4    think that those were all, but I just can't

5    remember all, I'm sorry, the acronyms.

6        Q.    And are you familiar with the process

7    as to how these organizations would evaluate

8    medical records to make determinations on

9    diagnosis data?

10        A.    Yes.

11        Q.    Could you please describe that

12    process.

13        A.    Sure.

14              So based off my recollection, the

15    Medicare health plans would submit the

16    required medical records from their providers

17    to these organizations for beneficiaries that

18    were selected in their sample.

19              The medical record review

20    organizations would have the records reviewed

21    by a -- by what's considered a first-level

22    review or primary coder.  And then that

23    record -- some records were also re-reviewed

24    by like a senior coder based off of certain

25    criteria for either quality assurance in the

Page 41

1                        L. Hughes DrPH

2      process.

3              And there was also a -- the process

4      was set up such that there was also a second

5      review organization that reviewed a subset of

6      some sort from the primary -- from the first

7      organization.

8              And that was used -- put in place to

9      mitigate the known issues of coder agreement

10     or levels of coder disagreement to get --

11     given that it's a pretty subjective activity

12     that -- so to be able to kind of in some way,

13     shape, or form, identify where the agency

14     could kind of err on the side of the plan when

15     there is any level of doubt that the record

16     could be accurate.

17             So there, that's kind of like an

18     interrater reliability type of activity for

19     agreement.

20        Q.   Okay.  The interrater reliability

21     activity that you described, would that involve

22     comparing the diagnosis codes identified by one

23     coder with the diagnosis codes identified by

24     another coder?

25        A.   Yes.

Page 42

1                    L. Hughes DrPH

2        Q.   And what was the purpose of doing

3    that?

4        A.   The purpose was to, for one, in the

5    process, it's pretty known that coders

6    don't -- they may not have a high level of

7    agreement on coding.

8             So in order to -- if you look at the

9    first level of coding, it may have a pretty

10   high error rate, if you will, and then by

11   introducing maybe another layer of coding,

12   there may be something to bring that error

13   down.  And to also determine their level of

14   agreement on codes.

15             So it's a measure of quality

16   assurance in the process.

17             MR. QURESHI:  Okay.  Dr. Hughes, if

18        I may, I'd like to take a short restroom

19        break, if that's okay with your lawyer.

20             May I propose like a five-minute

21        break?

22             MS. GLOVER:  Sure.  That's fine.

23        And we'll just go off the record then.

24             MR. QURESHI:  Okay.  Thank you.

25        We're off the record.

Page 205

1                          L. Hughes DrPH

2                    C E R T I F I C A T E

3

4           I, ANNE E. VOSBURGH, Certified Shorthand

5     Reporter, Registered Professional Reporter,

6     Certified Realtime Reporter, and Closed

7     Captioner, hereby certify:

8           That LATEEFAH HUGHES, via remote

9     videoconference, solemnly affirmed and agreed to

10    testify to the truth, the whole truth and

11    nothing but the truth; that all counsel

12    stipulated to this process, notwithstanding the

13    location of reporter or witness at time of

14    deposition; and that this transcript is a true

15    and correct record of testimony given.

16          I further certify that I am not related

17    to any of the parties to this action and that I

18    am in no way interested in the outcome of this

19    matter.

20

21    _____
                  *Anne Vosburgh*

22          ANNE E. VOSBURGH

23          Certified Shorthand Reporter No. 6804

24          Registered Professional Reporter

25          Certified Realtime Reporter

**EXHIBIT D-119**

3014

Page 1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


- - - - - - - - - - - - - - - +
                               |
UNITED STATES OF AMERICA       |
et rel. BENJAMIN POEHLING,     |
                               |
        Plaintiffs,            | Case No.
  vs.                          | CV 16-08697 FMO (SSx)
                               |
UNITEDHEALTH GROUP, INC.,      | Hon. Fernando Olguin
et al.,                        |
                               |
        Defendants.            |
                               |
- - - - - - - - - - - - - - - +



              Wednesday, January 26, 2022


Remote Videotaped Deposition of THOMAS HUTCHINSON, a
Witness herein, called for examination by counsel for
Defendants in the above-entitled matter, pursuant to
notice, the witness being duly sworn by MICHELE EDDY,
RPR, CRR, a Notary Public in and for the District of
Columbia, taken virtually with the witness located in
Washington, D.C., at 10:13 a.m.



3015

Page 16

1    I would also ask that you please allow me to
2    finish my question before you answer it.
3    Oftentimes you might know what my question is
4    before I complete it, but please refrain from
5    answering it until I finish my question. I will
6    absolutely extend you the same courtesy and will
7    allow you to finish your answer before I ask my
8    next question or my follow-up question.
9            Remote depositions make this a little
10   difficult to implement, but I will certainly do my
11   best not to step on you and, if I do, I apologize
12   in advance.
13           If you need to take a break at any time,
14   sir, to -- for any reason, just let me know and we
15   can certainly go off the record.  I would request,
16   however, that you not ask to take a break while a
17   question is pending unless you need to confer with
18   your counsel on an issue involving privilege.  If
19   that's the case, just let me know.  Is that
20   understood?
21       A    It's understood.
22       Q    As the deposition is occurring remotely,
23   I am unable to see what you have in front of you.
24   I would ask that you not read from any preprepared
25   notes or access any text messages or emails while



3016

Page 17

1    we're on the record.  Is that clear?

2       A    Yes.

3       Q    Do you currently have any papers in

4    front of you, sir?

5       A    I have an empty notebook or a clear

6    notebook to take notes if I need to but -- I can

7    move it if you would like.

8       Q    If it's empty, you don't need to move

9    it, sir.

10           Are there any other documents in front

11   of you?

12      A    No.

13      Q    I would request that you not communicate

14   with anybody by computer, phone, or email, or some

15   -- some other mechanism while we are on the

16   record.  Of course, if you need to confer with

17   your counsel, you can -- you can do that audibly,

18   and we can take a break as appropriate.

19           Mr. Hutchinson, are you aware of any

20   reason your deposition should not go forward

21   today?

22      A    No, I -- no.

23      Q    Have you taken any medication or

24   substance that might interfere with your ability

25   to testify truthfully and accurately here today?



Page 18

```
 1        A    No.
 2        Q    Mr. Hutchinson, do you understand that
 3   you are appearing here today pursuant to a
 4   subpoena issued by the defendants in this
 5   litigation?
 6        A    Yes.
 7        Q    When did you become aware of that
 8   subpoena?
 9        A    I believe last fall.
10        Q    The fall of 2021, sir?
11        A    Correct.
12        Q    Were you employed by the Centers for
13   Medicare and Medicaid Services from 1991 through
14   2010?
15        A    Yes, 1991 to 2010, yes, that's correct.
16        Q    And from September of 2006 through June
17   of 2010, were you the director of the Medicare
18   Plan Payment Group known by the acronym MPPG?
19        A    Yes.
20        Q    And did you leave CMS in June of 2010,
21   sir?
22        A    Yes.
23        Q    Most of my questions throughout the day,
24   Mr. Hutchinson, will focus on the time when you
25   were at CMS.  If I'm interested in another time
```



Page 19

1    period, I will specify that, but I am largely

2    interested in your tenure at CMS.  Is that clear?

3         A    Yes.

4         Q    Mr. Hutchinson, are you familiar with

5    the term Medicare Risk Adjustment Program?

6         A    Yes.

7         Q    What do you understand it to mean?

8         A    The risk adjustment program is the

9    payment method that CMS uses to calculate

10   individual beneficiary risk scores, which are

11   multipliers for the base bid rate that Medicare

12   Advantage plans bid to cover Medicare Part A, Part

13   B, and supplemental benefits.

14        Q    In your role as director of the Medicare

15   Plan Payment Group or MPPG, did you have any

16   responsibilities for the Medicare Risk Adjustment

17   Program?

18        A    Yes.

19        Q    What were those responsibilities?

20        A    To design and implement the payment

21   system using the risk adjustment data.

22        Q    And when did you begin to design and

23   implement the payment system using the risk

24   adjustment data?

25        A    And when you say -- refer to "you," is



Page 20

1    that me in particular or you as a plural?

2        Q    I meant you in particular, sir.

3        A    I probably started designing,

4    implementing in, I guess, 2006, when MPPG was

5    created.

6        Q    And, sir, are you able to describe

7    generally what process you followed to design and

8    implement the payment system using the risk

9    adjustment data?

10        A    I don't understand your question.

11        Q    I would like to understand generally

12    what you did in connection with your

13    responsibility to design and implement the payment

14    adjustment system.  How did you go about

15    fulfilling your responsibility?

16        A    Again, I guess I'm just not quite sure

17    on the question.  I don't mean to be difficult,

18    but are you asking what did I in particular do or

19    what did -- what process did I lead?  I -- I'm

20    just not sure of your question in the sense of how

21    to answer it.

22        Q    Sure, Mr. Hutchinson.  And I appreciate

23    you asking clarifying questions.  I'm not assuming

24    you're being difficult.  I asked you to do that

25    and you're doing exactly that and so thank you.



1        A    We had a couple of processes, you know.

2   Some obviously you're more interested in than

3   others, but one thing is monthly payments -- you

4   know, the Part C and Part D program, which we were

5   responsible for, monthly payments went out to the

6   plans, and we basically had -- you know, part of

7   the responsibilities of this group was, you know,

8   in effect run a shadow payment system such that we

9   could check the accuracy of the MARx reports we

10  got regarding the amounts that the MARx, which was

11  the official payment system, calculated for each

12  plan.

13            And we could, you know -- through this

14  sort of shadow payment system, we would be able to

15  tell if there was any, you know, material

16  discrepancies in terms of what MARx calculated as

17  payments and what our shadow system did.  And

18  essentially that required us to monthly, you know,

19  calculate 36 million risk scores and calculate,

20  you know -- make sure those were matched up to 36

21  million bids.  You know, really it's 19 million

22  bids at that point to figure out what the MA

23  payments are, but we would kind of monthly run

24  those calculations.  And that's what that group

25  did.



Page 31

1          The other kind of thing they did is they

2     ran a national RADV program and process and,

3     again, as, you know, you well know, started the

4     plan level RADV process in 2007.

5          Q    Anything else that comes to your mind

6     regarding the tools this group used to check the

7     accuracy of payments?

8          A    Nothing in terms of tools per se, but

9     the other thing this group -- and Ann Hornsby was

10    also a part of that group -- was to work with OMB

11    to determine and publish the IPIA, the improper

12    payments annual report.  Geez.  But it's an annual

13    number every year that we had to put out as to how

14    accurate our payments were.

15         Q    Mr. Hutchinson, would you like some

16    water?

17         A    I just grabbed it.

18              Go ahead.

19         Q    With respect to the calibration or

20    recalibration of the model we were discussing

21    earlier, I believe you explained that

22    fee-for-service data was used in connection with

23    those exercises.  Is that correct?

24         A    Correct.

25         Q    During your time as head of MPPG, did



Page 32

1    you have any concerns about the accuracy of the

2    fee-for-service data used for either calibration

3    or recalibration?

4         A    Yes.

5         Q    What were those concerns?

6         A    Originally I was very concerned that the

7    fee-for-service data probably under-reported

8    diagnoses.  Meaning, fee-for-service providers,

9    especially Part B providers, would see patients

10   but not necessarily document and record all the

11   diagnoses that a patient had because, again, there

12   are incentives for fee-for-service, they're a

13   little different, and it's not to provide any

14   different care, but it's -- you know, the

15   documentation you need, there -- there wasn't a

16   lot of diagnosis documentation needed in

17   fee-for-service.  So originally I was concerned

18   that fee-for-service data under-reported

19   diagnoses.  Originally I was not that concerned

20   about the accuracy of the fee-for-service data.

21             After we did some investigation on the

22   fee-for-service data, I, as well as others, I

23   believe, were surprised at not inaccurate -- that

24   the documentation for a lot of the fee-for-service

25   diagnoses was not as good as we had thought it



Page 33

1    would be and actually rivaled kind of -- you know,

2    it was fairly similar to the documentation that we

3    had seen in MA, and I think we were surprised at

4    that.

5        Q    And, sir, are you able to approximate

6    the time frame during which you had the

7    realization regarding the -- the observation you

8    just discussed?

9        A    That would be in 2009 when we first

10   looked at the CERT data.

11       Q    In your response you used the plural we.

12   Are you referring to MPPG or CMS or some other

13   group of individuals?

14       A    MPPG.  I'm sorry.

15       Q    In response to one of my earlier

16   questions about the different tools used to check

17   payment accuracy, I believe you mentioned the term

18   "RADV."  Do you recall that?

19       A    Yes.

20       Q    And when you used the term RADV,

21   R-A-D-V, do you mean risk adjustment data

22   validation?

23       A    Yes.

24       Q    Are you able to describe generally what

25   RADV means?



3024

Page 34

1      A    Yes.  So since even -- I think going

2  back to 2001, maybe 2002, CMS had always done sort

3  of a national program RADV process or audit in a

4  sense, which entailed, you know -- you know, at

5  least by the time I was running it, we had a

6  sample size of I think about 1600-odd

7  beneficiaries that we would collect medical

8  records from the approximately, you know, 350

9  different plans.  And we would determine an error

10  rate of those diagnostic codes submitted through

11  RAPS based on a documentation that we would

12  receive, and we would determine the national error

13  rate.

14          Subsequently and in 2007 -- or 2009 for

15  the 2007 year was when we started looking into

16  possibly doing plan-level RADV audits, which, you

17  know, are much more specific and much more plan

18  specific, and the results could be used to

19  extrapolate a payment recovery from the plan.  So

20  there had been a national one -- a national RADV

21  for years.  We started, you know, a pilot project

22  doing the plan-level ones in 2009.

23          Are you still there?

24      Q    Yes, I am, sir.  I am working to

25  formulate my next question.



Page 77

1    don't know.

2        Q    That's fine, Mr. Hutchinson.  Other than

3    client work and conferences, are there any other

4    contexts in which you had occasion to discuss the

5    recommendations contained in Exhibit 1024A?

6        A    Again, I'm sure I've had informal

7    conversations with lots of folks about all of

8    these, you know, whether it's coding intensity or

9    whether it's the need for a fee-for-service

10   adjuster, et cetera, that would not necessarily be

11   client work or formal presentation at a

12   conference, but I don't recall any, you know,

13   exact -- what the -- who the people were, you

14   know, the exact issue, but it's not like I

15   completely forgot all this stuff as soon as I

16   walked out the building.

17       Q    Understood.

18            Mr. Hutchinson, in connection with the

19   coding intensity adjuster, did you understand in

20   the spring of 2010 that MA plans would have more

21   diagnoses codes than fee-for-service for the same

22   population?

23            MR. MASON:  Objection.  Calls for

24   speculation.  Vague and ambiguous as to would

25   have.



Page 78

1       A    Yeah, the Medicare Advantage program as

2   a whole had more coding and more people being

3   coded and more diseases and higher severity of

4   diseases coded than the same population in

5   fee-for-service would have had.

6       Q    And did you have an understanding as to

7   why that was the case?

8       A    Yeah, I think we have a pretty good

9   idea.  A lot of it was severity, that Medicare

10  Advantage plans, you know, worked very hard and,

11  you know, captured oftentimes a higher level of

12  severity in a lot of diseases, whereas

13  fee-for-service a lot of times just kind of went

14  for the basic lower code and didn't really

15  determine whether they, you know, should, you

16  know, look to a more severe level of diagnoses.

17      Q    Other than severity, did you have any

18  other understanding as to why MA plans would have

19  more -- would have more codes?

20      A    Well, I mean, the simple fact, you know

21  -- MA plans have a much higher, you know,

22  incentive to make sure they code very completely

23  than fee-for-service providers in many cases.  So,

24  you know, if you're measured on something, you're

25  going to be really good at it, and they got really



1    good at it.

2        Q    Were you aware of any activities MA

3    plans engaged in to realize the incentive you just

4    described?

5        A    Sure, you know, we knew about chart

6    reviews, you know.  Yeah, certainly chart reviews

7    is probably the biggest factor back then.  And

8    then, you know, we heard about various folks that

9    figured out how they could RADV proof things by

10   doing in-home visits, but, you know, we knew of

11   those things, yeah.

12       Q    And when you say "we" --

13       A    I knew those things.  We knew those

14   things, so yeah.

15       Q    I'm sorry, I stepped on you,

16   Mr. Hutchinson.

17       A    Yeah.

18       Q    When you say "we," are you referring to

19   MPPG?

20       A    I am.  That's what -- yes, I knew about

21   it and our whole group knew about it, you know.

22       Q    And you used the phrase "chart review."

23   What did you understand the word "chart review" to

24   mean?

25       A    Chart review is, you know, the process



Page 80

1    -- well, when I -- when I was referring to it,

2    it's plans would target various, you know, of

3    their members with the idea that, you know,

4    either, geez, I spent a lot of money on these

5    people and there haven't been many diseases

6    reported or I know this person in the past has

7    been diagnosed with diabetes, but I don't have a

8    diabetes code for him in this year.  And it's the

9    process where Medicare Advantage plans would

10   request medical records from their providers, and

11   then they would have their coders review the

12   medical record to determine if there was any codes

13   that indeed were documented in the medical record

14   but were not either part of the claim or whatever

15   or for whatever reason were not sent in to CMS

16   through the RAPS system.

17        Q    As you described it, Mr. Hutchinson, did

18   you believe chart review was improper?

19        A    No.

20        Q    Did you believe it was fraud?

21        A    No.

22        Q    The coding intensity adjuster that we

23   discussed, would the calculation of that figure

24   depend on why MA plans have more codes than

25   fee-for-service?



Page 149

1          A     Yes.

2          Q     And earlier you testified that you, when

3    you were at MPPG, you were aware that some plans

4    were doing one-way chart reviews.  Is that

5    correct?

6          A     Yes.

7          Q     Did you know that UnitedHealth had a

8    chart review program when you were at MPPG?

9          A     I don't recall if I knew any specific

10   plans that had, you know, a chart review.  I mean,

11   we knew more of the chart review vendors.

12         Q     So did you know any of the specifics of

13   how UnitedHealth conducted its chart review

14   program?

15         A     I don't have any of the specifics for

16   how United did their program.

17         Q     No, but my question wasn't just whether

18   you have those specifics now but that you didn't

19   know of those specifics when you were at MPPG; is

20   that right?

21         A     That is correct, I didn't.

22         Q     Did others at MPPG know the specifics of

23   the UnitedHealth Part B program, as far as you

24   know?

25                MR. QURESHI:  Objection to form.



Page 150

1        A    I have no idea who knew or may not

2   have -- who may have known or who did know or

3   didn't know.  I don't know.

4        Q    You don't have any knowledge that anyone

5   at MPPG knew anything about the specifics of

6   UnitedHealth's chart review program, correct?

7             MR. QURESHI:  Objection to form.

8        A    That is correct.

9        Q    And when you were at CMS, did CMS tell

10  MA plans that if they were reviewing charts in a

11  chart review program to look for additional codes

12  that they also had to examine whether diagnosis

13  codes submitted by providers were in fact

14  supported by a medical record?

15            MR. QURESHI:  Objection to form.

16       A    Not to my knowledge.

17       Q    Did you ever tell -- let me rephrase

18  that.

19            When you were at CMS, did CMS ever tell

20  an MA plan that they did not have to assess

21  whether diagnosis codes submitted by providers

22  were supported by a medical record when they were

23  conducting a chart review to add diagnoses?

24            MR. QURESHI:  Objection to form.

25       A    I don't know if some folks may have told



Page 151

1    people that or not.  I don't know.

2         Q    Do you have any knowledge one way or the

3    other?

4         A    No.

5         Q    Mr. Hutchinson, you currently work as a

6    strategic advisor at Epstein Becker Green; is that

7    correct?

8         A    That's correct.

9         Q    And Epstein Becker Green is a law firm?

10        A    Yes.

11        Q    You joined Epstein Becker Green in 2013?

12        A    I think that's right.

13        Q    And you've been working for Epstein

14   Becker Green since that time?

15        A    Yes.

16        Q    And your role as a strategic advisor

17   includes advising Medicare Advantage plans; is

18   that correct?

19        A    Yes.

20        Q    And Medicare Advantage organizations?

21        A    Yes.

22        Q    Medicare Advantage plans and

23   organizations are your clients?

24        A    Oftentimes, yes.

25             MR. MASON:  Can we take a short break?



Page 154

1              CERTIFICATE OF SHORTHAND REPORTER

2

3              I, Michele E. Eddy, Registered Professional

4    Reporter and Certified Realtime Reporter, the court

5    reporter before whom the foregoing deposition was

6    taken, do hereby certify that the foregoing transcript

7    is a true and correct record of the testimony given;

8    that said testimony was taken by me stenographically

9    and thereafter reduced to typewriting under my

10   supervision; and that I am neither counsel for,

11   related to, nor employed by any of the parties to this

12   case and have no interest, financial or otherwise, in

13   its outcome.

14             IN WITNESS WHEREOF, I have hereunto set my

15   hand and affixed my notarial seal this 3rd day of

16   February, 2022.

17

18   My commission expires July 20, 2022

19

20   _Michele Eddy_

21   MICHELE EDDY

     NOTARY PUBLIC IN AND FOR

22   THE DISTRICT OF COLUMBIA

23

24

25



**EXHIBIT D-120**

Page 1

                UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF CALIFORNIA
                      WESTERN DIVISION


UNITED STATES OF AMERICA     )   No. 16-08697 FMO
ex rel. BENJAMIN POEHLING,   )
                             )
            Plaintiffs,      )
                             )
v.                           )
                             )
UNITEDHEALTH GROUP, INC.,    )
et al.,                      )
                             )
            Defendants.      )
_____)




                *** CONFIDENTIAL ***


        VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
                     MELVIN INGBER
                  (Taken virtually)
                  10:02 a.m. Eastern
               Tuesday, June 14, 2022


        REPORTED BY:  Christine A. Taylor, RPR


                Magna Legal Services
                   866-624-6221
                 www.MagnaLS.com



3035

Page 14

1          Q.   Are you aware of anyone doing so on

2     your behalf?

3          A.   I'm not quite sure what you mean.  Why

4     would I need any documents for a deposition, I'm

5     confused.

6          Q.   Oh, not specifically for this

7     deposition, but in the context of this litigation.

8          A.   I know that there was a request for us

9     to retain all e-mails and other electronic

10     documents and keep them just in case they were

11     needed, but that's the extent of it.  We did not

12     participate in collection of documents per se.

13          Q.   Okay.  Thank you.  All right.  So I'd

14     like to start by going over your educational and

15     employment background and then we can talk more

16     specifically about some of your work at CMS and

17     RTI.  Does that sound good?

18          A.   Yes.

19          Q.   Okay.  Please describe any

20     undergraduate or graduate degrees you have

21     obtained including where you obtained them.

22          A.   I went to Queens College in New York,

23     which is now part of City University, got a

24     Bachelor of Science in Physics.  I went to Cornell

25     University and got a master's degree in physics.



Page 15

```
 1      I went to Stony Brook University and got a

 2      master's degree and Ph.D. in economics.

 3             Q.   All right.  Any other degrees or

 4      certificates?

 5             A.   None that I can think of.

 6                  (Exhibit 1219 was marked for

 7      identification.)

 8             Q.   All right.  I'm going to ask my

 9      colleague to introduce as Exhibit -- should be

10      1219, Tab 5.

11             A.   It hasn't shown up on my screen yet.

12      Okay.

13             Q.   All right.

14             A.   I see it now.

15             Q.   All right.  Do you recognize this

16      e-mail?

17             A.   I have to really read it because it

18      doesn't exactly pop out as a familiar e-mail.  It

19      seems to be from 2016, so I will have to take a

20      look at it.

21                  Okay.  This is a chain of e-mails.  Do

22      you want me to go down the whole chain here?

23             Q.   Well, let's focus on the May 31, 2016,

24      e-mail, 2:35 p.m.

25             A.   Okay.  That's the top one that I can
```



Page 16

1    see.  It seems to be a blurb to write the

2    background of me.  And I don't see anything --

3    except I see it.  I don't recognize it having been

4    written, but yeah, it looks like a description of

5    my background.  That's it.  Yes.

6              MS. MCMAHON:  Is this a document that

7         was produced in this case?

8              MS. BARNETT:  Yes, this was produced by

9         RTI.  Bates Number is RTI00259418.

10             MS. MCMAHON:  Thank you.

11             THE WITNESS:  It appears to be an

12        extraction from my resum?.  It looks

13        like --

14   BY MS. BARNETT:

15        Q.   Oh, no, I'm sorry.

16        A.   I recognize it in that context, most

17   of it, yes.

18             MS. BARNETT:  I'm sorry.  I just gave

19        you the wrong Bates Number.  It's

20        RTI00396783.

21             MS. MCMAHON:  Thank you.

22   BY MS. BARNETT:

23        Q.   All right.  So does this profile

24   accurately represent your work experience?

25        A.   Yes, I've done more, but -- since this



Page 17

1    was written in 2016, but it's accurate as of the

2    date.

3        Q.    Okay.  And you currently work at

4    RTI International; is that right?

5        A.    I do.

6        Q.    And you're currently a principal

7    scientist at RTI?

8        A.    It's a title.

9        Q.    Is that right?

10            Have you held any other job titles

11    during your time at RTI?

12        A.    No.  That was when I walked into RTI,

13    the title, I asked somebody there who was

14    relatively senior what job title I should use.

15    Principal scientist was the title they said I

16    should use, and I've been using it ever since.  I

17    was fairly senior when I came in, so it seemed

18    appropriate.

19        Q.    And when did you join RTI?

20        A.    2006.  Approximately June or July, I

21    don't remember which month.

22        Q.    All right.  And what do you do as a

23    principal scientist?

24        A.    I have a range of responsibilities.

25    Some of which are to be the director of projects



Page 18

1    and which is to say I lead a set of analysts for

2    working on a project, usually for the government.

3              I am also the -- a senior scientific

4    advisor to many projects that I work on without

5    being the direct leader.  That's where I generally

6    fit in.

7         Q.   All right.  Then according to this

8    bio, you participated in projects developing and

9    maintaining risk adjustment methods for the

10   Medicare Advantage Program; is that right?

11        A.   Yes.

12        Q.   What were those projects?

13        A.   Well, one project was the development

14   of the CMS risk adjustment project used to pay

15   managed care plans.  Then -- that's the main

16   project.  Then I worked on the one that -- similar

17   for ESRD beneficiaries, project to develop the

18   risk adjustment for the drug plans and the project

19   for the AHA risk adjustment projects for health

20   exchanges outside of Medicare.  Those are the

21   projects -- they don't have necessarily titles

22   that make any sense, but that's the substance of

23   the work.

24        Q.   All right.  And for the project you

25   mentioned, CMS risk adjustment project used to pay



Page 19

1    managed care plans, can you tell me more about

2    what you did for that?

3           A.   At which stage are we speaking?  At

4    RTI our CMS.

5           Q.   Currently we're speaking about RTI.

6           A.   Oh, at RTI, okay.  When I came to RTI,

7    I worked on that project for -- just as a staff

8    member, then I became a project director of the

9    project for a few years.  Then I reverted back to

10   being a member of the analytical staff on the

11   project, which I have been and continue to be on

12   the project in that capacity.

13          Q.   All right.  And specifically what were

14   you doing in that project?

15          A.   Well, I -- as a basically scientific

16   advisor, I do a lot of things that are involved in

17   guiding the development of the models.  It is

18   statistical models that we work with, and it

19   amounts to looking at data, understanding data,

20   analyzing data, scientifically producing reports,

21   and I work on all of these things.  And my work

22   has been deep and extensive.  I can't positively

23   tell you all the little things I might have done.

24          Q.   All right.  Did you work on a project

25   involving the calculation of a fee-for-service



Page 20

1     adjuster for the risk adjustment model?

2           A.   I had only a very brief acquaintance

3     with that work.  That is -- I'm aware it was being

4     done.  I was not a principal part of that project.

5     That piece of the main project, that is.

6           Q.   And can you tell me more about what

7     that project involved?

8           A.   Frankly --

9                MS. MCMAHON:  Objection.  Vague.  You

10               can answer.

11               THE WITNESS:  I don't know all the

12               parts of the project.  I do know that there

13               was something involving trying to predict

14               diseases from characteristic of people to

15               see that -- whether that would fit in

16               somehow to making it clear -- making

17               adjustments to data, to actually change

18               data in some way.  But I don't know the

19               details.  The people who worked on it, I

20               was not working on it much, and CMS had a

21               part that I don't know in it.  So I'm not

22               that deeply into that.

23     BY MS. BARNETT:

24           Q.   All right.  Do you know when that

25     project was implemented?



Page 21

 1              MS. MCMAHON:  Objection.  Ambiguous.

 2         Go ahead.

 3              THE WITNESS:  I -- I don't know, I've

 4         been working on this main project for so

 5         many years that it's a bit of a blur.  I'm

 6         sorry.  I don't know the dates that would

 7         apply to this.

 8    BY MS. BARNETT:

 9         Q.   Can you tell me who worked on that

10    project, the fee-for-service adjuster project?

11              MS. MCMAHON:  Objection.  Ambiguous.

12         Go ahead.

13              THE WITNESS:  There are many people who

14         might, but the one person who I can

15         identify was named Echo Liu.  I know she

16         was working on it.  But as to others, I

17         don't know for sure.

18    BY MS. BARNETT:

19         Q.   All right.  Now before you were at

20    RTI, according to this bio, you worked for CMS for

21    16 years in several different roles.  When did you

22    join CMS?

23         A.   1990.

24         Q.   And what was your role at that time?

25         A.   Initially I -- well, I was working in



Page 22

1    the office of demonstrations, that's my initial

2    position there, and I was the government -- one of

3    government staffers on a project that was going to

4    analyze outpatient data for development of a

5    payment system.

6          Q.   All right.  And when did you become

7    director of the Division of Payment Research?

8          A.   That would be much, much later.  It

9    would be roughly -- let's see I left 2000.

10   Roughly around the year 2000, 2001.  I'm not

11   positive.

12         Q.   All right.  And what were your

13   responsibilities in that role?

14         A.   Well, as a manager I was basically

15   overseeing the work of people who are actually

16   actively being the government side of the project

17   and the project managers from the government side.

18   And so there were a number of people in the

19   Division of Payment Research that I was in.  But I

20   also had to participate in management activities

21   such as budgeting, deciding what research we were

22   going to be doing the next year.  And I also

23   consulted for other parts of CMS on statistical or

24   other relevant topics that they thought I could be

25   of use on.



Page 23

1        Q.   And can you tell me more about the
2   work that was done by the Division of Payment
3   Research?
4        A.   Division of Payment Research, we did a
5   number of activities of which the risk adjustment
6   model development was one.  And there were -- was
7   also work going on in development of payment
8   systems for psychiatric hospitals, for home
9   healthcare providers.  I'm just trying to remember
10  how many there were.  The managed care part of
11  risk adjustment was a fairly large piece of it,
12  but I don't remember all the other work that
13  everybody was doing in that particular division at
14  the time, but those are things I do remember.
15       Q.   All right.  And did you work on risk
16  adjustment prior to joining that department?
17       A.   Before I became director of that
18  division, I was in that division, and I was
19  working on development of risk adjusters.
20       Q.   Okay.  When did you begin working on
21  the development of risk adjusters?
22       A.   1992 or 1993, something around that
23  time.
24       Q.   All right.  And what specifically was
25  your role in the development of the risk adjuster



Page 24

1     for managed care?

2          A.   I would be a person who managed

3     contracts and/or grants at the time.  When this

4     work was being done early on, we did it through

5     those two mechanisms of funding.  That was the

6     early -- the early work.  I also did hands-on work

7     as well.

8          Q.   And what did that hands-on work

9     entail?

10         A.   After the main risk adjustment models

11    were developed, I had to work on developing the --

12    as I mentioned earlier, the model for Part D drugs

13    and for the ESRD population.  Those are two that I

14    directed internally at CMS.

15         Q.   So you would say the hands-on work

16    that you did was for Part D, drugs, and ESRD

17    population?

18         A.   Yes.

19         Q.   All right.  And who did you work with

20    on the risk adjustment model for Part C?

21         A.   There were many contractors and

22    grantees involved.  We had Health Economics

23    Research, which was a company involved early on.

24    I think we had an earlier grant with Boston

25    University.  We also contracted with 3M who had



Page 25

1    their own model.  We contracted with Johns Hopkins

2    University.  They had a model called ACGs.  We

3    worked with -- let's see Rick Kronick.  He was

4    developing risk adjusters.  I worked with all

5    these people who are all developing models for

6    risk adjustment for Medicare.

7         Q.    And who else did you work with at CMS

8    on the risk adjustment model for Medicare Part C?

9         A.    Do you mean directly or indirectly?

10   Because we in the research division did our own

11   development work for the most part and RTI became

12   a part of that work when it bought Health

13   Economics Research.  So they were part of it.  And

14   ultimately who else -- ultimately, when we finally

15   became part of the operations of CMS, we had to

16   communicate a lot with the -- what is now called

17   Centers for Medicare who actually implement the

18   payment system on their side.  But the development

19   work is what our side mostly did, and those are

20   the people I work with.  I can name some

21   individuals if you want those in the research

22   division.  But not that -- they were not so much

23   involved in the Part C you're talking about.  They

24   were involved in the drug and the ESRD population,

25   so they may not be relevant to your question.



Page 26

```
 1            Q.   All right.  Yes.  Is there anyone that
 2      you can remember in the Division of Payment
 3      Research who worked with you on the risk
 4      adjustment model for Medicare Part C?
 5            A.   I was the principal leader in that
 6      area in the Division of Research.  So, I mean,
 7      obviously, I had a manager, but it was basically
 8      my area in working with the contractors, of
 9      course.
10            Q.   All right.  So you've said that you
11      were involved in the development of the risk
12      adjustment model for Medicare Part C; right?
13            A.   Yes.
14            Q.   Can you tell me what data was used to
15      calibrate that model?
16                 MS. MCMAHON:  Objection.  Vague.
17                 THE WITNESS:  The data we used depended
18            on the stage of what we were working on,
19            but in the main it would have been
20            Medicare, fee-for-service claims data, and
21            eligibility data.  That was the source.
22      BY MS. BARNETT:
23            Q.   And, to your knowledge, was that data
24      audited before it was used in the model?
25                 MS. MCMAHON:  Objection.  Vague.
```



Page 31

```
 1    We do an audit.  We find sometimes things are not
 2    supported by the medical record.  That's the
 3    extent of my knowledge of the differences.
 4            Q.   Was the RADV audit of fee-for-service
 5    data?
 6            A.   The RADV audit was of data being
 7    submitted by managed care plans and not
 8    necessarily on claims per se.  There were many
 9    stages of the way data were submitted to CMS for
10    payment.  So I -- whereas it was not the
11    fee-for-service data, the method being used was
12    not claims early on and only became claims in the
13    most recent years.  So it varied as to the nature
14    of the data being audited.  But it was managed
15    care data.
16            Q.   Did you ever read any studies about
17    errors in fee-for-service data?
18            A.   I am aware of CMS running general
19    estimates of over- and underpayments that they do.
20    I didn't -- that's a standard process that they do
21    that is not used in particular for auditing a
22    particular facility.  It's to get the overall
23    error rates in Medicare.
24                 I am -- I can't remember the names of
25    all these kinds of statistical studies that were
```



Page 32

1    done.  There are others that are facility specific

2    that would audit hospitals and -- I don't know the

3    error rates.  I just know that these audits do go

4    on, and the statistical project I work on also was

5    to do audits of outpatient procedure codes.  They

6    weren't always audits of diagnoses, by the way.

7    When I say audits, it is very general.  Sometimes

8    it's diagnoses, sometimes it's procedure codes.

9    But there were many audits of one sort or another

10   on fee-for-service data for different purposes,

11   but it wasn't in my area.

12        Q.   All right.  And based on your

13   knowledge of those audits, it was found that there

14   were some errors in the fee-for-service data?

15        A.   I would be just, you know, saying

16   something that I know from general reports that

17   they found errors in both directions missing --

18   sometimes missing data.  And sometimes it wasn't

19   always missing data, it was about data that was

20   found to be false.  There were all kinds of

21   reasons you would find errors in data.  I can't

22   speak to the rates of data of errors or anything

23   like that.

24        Q.   All right.  Are you familiar with the

25   traditional Medicare fee-for-service payment



3050

Page 33

1    model?

2         A.    The traditional fee-for-service model

3    is not a single model except that it pays for

4    individual services, but it pays for them in very

5    different ways.  So I can't answer beyond that

6    unless you clarify the question.

7         Q.    All right.  Under the fee-for-service

8    payment model are providers paid based on claims

9    for medical services they provide?

10        A.    Yes.

11        Q.    How does that differ from the Medicare

12   Advantage model that we talked about?

13             MS. MCMAHON:  Objection.  Vague.

14             THE WITNESS:  I'm trying to think how

15             to approach this.  In one case in managed

16             care, payment is made globally since for

17             the probable cost of a particular

18             beneficiary per month and over a year

19             without regard to the individual services

20             actually rendered.  In the fee-for-service

21             side depending on which provider you're

22             talking about, only specific services are

23             compensated and the picture -- the profile

24             of the patient is not what goes into the

25             payment amount so much as what services



Page 96

1              CERTIFICATE OF REPORTER

2

3       I, Christine A. Taylor, Certified
   Court Reporter within and for the State of
   Georgia, do hereby certify:

4

5       That the foregoing deposition was
   taken before me on the date and at the time and
   location stated on Page 1 of this transcript; that

6  the deponent was duly sworn to testify to the
   truth, the whole truth and nothing but the truth;

7  that the testimony of the deponent and all
   objections made at the time of the examination

8  were recorded stenographically by me and were
   thereafter transcribed; that the foregoing

9  deposition as typed is a true, accurate and
   complete record of the testimony of the deponent

10 and of all objections made at the time of the
   examination to the best of my ability.

11

12      I further certify that I am neither
   related to nor counsel for any party to the cause
   pending or interested in the events thereof.

13 Witness my hand, this 16th day of June, 2022.

14

15

16      _Christine A. Taylor_____

17      Christine A. Taylor, RPR
   CCR-4736

18

19

20

21

22

23

24

25



3052

**EXHIBIT D-121**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA ex  :

rel., BENJAMIN POEHLING,      :

        Plaintiffs,        :   Case No.:

        VS.                :   CV-16-08697 FMO

UNITED HEALTH GROUP, INC.,    :

et al.,                       :

        Defendants.        :   Page 1-258


- - -

Thursday, March 14, 2024

- - -


Videotaped deposition of MELVIN JULES
INGBER, PH.D. taken at DLAPiper, 650 South Exeter
Street, Suite 1100, Baltimore, MD commencing at 9:42
a.m., before Sherry L. Brooks, Certified LiveNote
Reporter and Notary Public, in and for the State of
Maryland.

- - -

MAGNA LEGAL SERVICES

WWW.MAGNALS.COM



Page 30

1    fee-for-service Medicare data applies to Part C and

2    Medicare Advantage plans in a minute.

3              But just so that the jury understands,

4    when I say traditional Medicare or fee-for-service

5    Medicare, do you understand that I'm referring to the

6    same thing?

7         A.    Yes.

8         Q.    Okay.  And those are both terms that

9    you've used in your work at CMS and still at RTI?

10        A.    The word "traditional Medicare" is a newer

11   term for fee-for-service that's become used more, but

12   they are in effect the same thing.

13        Q.    As the head of the Division of Payment

14   Research at CMS you helped make the decision about

15   what model CMS would use to calculate a risk

16   adjustment payment for Medicare Advantage plans,

17   right?

18        A.    I was part of that decision-making

19   process, yes.

20        Q.    And as part of that process you examined

21   potential risk adjustment models and recommended what

22   would ultimately be selected by CMS as the HCC model



Page 31

1   to your superiors; is that right?

2          A.    Yes.

3          Q.    And the leadership at CMS accepted your

4   recommendation and implemented the CMS HCC model for

5   the purpose of calculating risk adjustment payments

6   for Medicare Advantage plans?

7          A.    I made a recommendation.  There were many

8   other people in the chain who had to make decisions.

9   There is one more thing I should say, is that

10  choosing the model is not the same as the

11  implementation of the model, which was made by

12  another group.

13             So as long as we understand what we're

14  talking about is model development, not

15  implementation, which was done via a different area,

16  not in the research area.

17         Q.    What group worked on the implementation of

18  the CMS HCC model?

19         A.    The Center for Medicare.  They change

20  their names all the time.  But there is the -- part

21  of CMS that makes payments to hospitals, physicians,

22  that actually does to the implementation work of all



3056

Page 32

1    of this also implemented for the risk adjustment

2    systems.

3        Q.    While you were at CMS you worked with

4    folks at a company -- what became RTI to publish

5    articles and other literary papers; is that right?

6        A.    The phrasing -- I'm sorry -- is not

7    correct.  Those of us who worked on the development

8    of the system, including the company -- HER is the

9    initials that were used at the time, and I was

10   supervising them and made a lot of decisions.

11            And our names were all on some of the

12   publications, but I was not working in any sense for

13   HER, which is what I was hearing you say.

14       Q.    I did not mean to suggest that.

15            When did you start working with or

16   supervising the individuals at HER that were doing

17   work on risk adjustment systems for CMS?

18       A.    Probably 1993 or 1994 there was a sequence

19   of people working on it.  It wasn't always HER, but

20   HER picked up the development after the initial work.

21   So there's a change of hands at some point, but it

22   was '93 or '94.



Page 33

1        Q.     What does HER stand for?

2        A.     Health Economics Research.

3        Q.     When did Health Economics Research end up

4    becoming RTI?

5        A.     It was before I left CMS, but I just do

6    not remember.

7        Q.     What does RTI stand for?

8        A.     Research Triangle Institute.

9        Q.     Okay.  So from 1993 until the CMS HCC

10   model was adopted and implemented you had been

11   working with individuals on this project, and at some

12   point the individuals who were working -- you were

13   working with were at Health Economics Research?

14       A.     Yes.

15       Q.     And at least by 2000 you were publishing

16   papers with some of the individuals there at Health

17   Economics Research about the project that you were

18   supervising and working on, right?

19       A.     Yes.  This is not an unusual practice for

20   companies who are contractors, and CMS jointly take

21   authorship of papers.  This is very common.

22       Q.     Sure.  And who are the folks that you were



Page 57

1    of the transcript of your videotaped deposition taken

2    on June 14th, 2022?

3         A.    That's what the title says it is, yes.

4         Q.    And have you reviewed this deposition

5    transcript since you gave the deposition?

6         A.    I did not actually.

7         Q.    And you -- when you gave this deposition

8    you took the same oath you took today, right?

9         A.    Yes.

10        Q.    Okay.  If you would turn to page 22 of

11   this deposition, page 84 of the transcript.  This

12   deposition is structured -- this printout is

13   structured so it's got four pages on each page of the

14   PDF.

15             Do you see that, sir?

16        A.    Yes.  I'm sorry.  But I'm trying to figure

17   out which ones you're referring to.  82 is the one

18   with the page number at the bottom?

19        Q.    Yes.  That's correct.

20        A.    I'm sorry.  That's page -- on top of the

21   page I'm looking at there is page 82 and a page 83.

22   Is that where I should be?



Page 58

1        Q.    Yes, sir.  So if you look at the bottom of

2    the page 84, which is the bottom left corner page --

3        A.    Yes.

4        Q.    -- you were asked the question:

5              "QUESTION:  But do you have a sense when

6    you talk about this (sic) fee-for-service lapses in

7    accuracy what you're referring to?"

8              And you answer:

9              "ANSWER:  Coding is always potentially

10   subject to error.  Sometimes people forget to write

11   something down.  Sometimes people write something

12   that they shouldn't write down.  We are aware of this

13   because we know how coding is done in practice in

14   offices.  And it's just a question of practical

15   knowledge."

16             Do you see that?

17       A.    Oh, yes.  Okay.

18       Q.    Okay.  And do you stand by that testimony

19   today?

20       A.    This is my personal belief, yes.

21       Q.    Yeah.  And so your personal belief that

22   you knew at the time you were developing the model is



Page 59

1    that there were fee-for-service lapses in accuracy

2    because sometimes people forget to write something

3    down and sometimes people write something they

4    shouldn't write down, right?

5         A.    That's not -- that is true, but it's not

6    quite the same as what you said about things not

7    being supported in the medical record.

8              I'm just opining that, yeah, probably

9    because human beings do this there's probably stuff

10   that's not right in there.  That doesn't affect the

11   decision I make with respect to how to develop the

12   model, but yes.

13        Q.    Sure.  And I'm not impugning anything

14   about the decision to develop the model.  But

15   something that you knew when you were developing the

16   model is that there are errors in data?

17             MS. MCMAHON:  Objection.

18        A.    When you say I knew, I knew just -- not

19   from analysis, per se.  I knew because people are

20   people when they go (sic).  That's all.

21             BY MR. JONES:

22        Q.    Right.  So your understanding when you



Page 60

1    were developing the model is that there would be

2    errors in coding on the fee-for-service side and in

3    the MA side because people are people and they make

4    mistakes, right?

5        A.    People make mistakes.  However, that does

6    not change one's way of doing something just because

7    you know that in the background, yes.

8        Q.    Did you do any work on evaluating Ms.

9    Lambert's mathematical work in terms of the

10   recalibration effort she did such that you disagree

11   with any of the math that went into her recalibration

12   as opposed to the conclusions she draws from it?

13       A.    I, of course, could not see through all

14   the math.  But having read the description of it, it

15   seemed that for what she wanted it was a reasonable

16   thing to do, yes, for which she was trying to get to.

17       Q.    Okay.  And that the -- what was described

18   was a reasonable way of potentially recalibrating the

19   model based upon what her parameters were described

20   as, right?

21            MS. MCMAHON:  Objection.

22       A.    Recalibrating the model could be done, but



Page 61

1    it would have required -- it couldn't -- it could not

2    -- I'm sorry.

3              It could not be done practically and was

4    not what was in the law basically at the time.  So it

5    could be done, yes.  Mathematically, those results

6    would happen.  It doesn't still mean anything about

7    the conclusion, however, of underpaid.

8              BY MR. JONES:

9         Q.    Right.  Leaving aside the conclusion of

10   underpayment, you don't dispute any of the math that

11   Ms. Lambert used to get to the conclusion of how

12   unsupported codes being taken out of the

13   fee-for-service model would affect the average

14   relative factors or average coefficients, right?

15             MS. MCMAHON:  Objection.  Form.

16        A.    I don't have any objections to the

17   mathematics she did.

18             MR. JONES:  Okay.  Exhibit No. 1568.

19             (Exhibit Number 1568 was marked for

20   identification and was attached to the deposition.)

21             BY MR. JONES:

22        Q.    Dr. Ingber, I've just handed you what's



Page 62

1    been marked Exhibit 1568.  Is Exhibit 1568 a copy of

2    Ms. Lambert's report to which you were responding?

3         A.    It appears to be, yes.

4         Q.    And if you would turn to page 23 of this

5    report.  At the bottom of page 23 Ms. Lambert quotes

6    a CMS publication in 2014 that has an article written

7    by Dr. Kronick and Welch.

8              Do you see that?

9         A.    On page 23 in the footnotes or someplace

10   else?

11        Q.    So next to the Number 3 --

12        A.    Oh, next.

13        Q.    -- at the bottom.

14        A.    Oh, okay.  Not the reference down below,

15   but okay.

16        Q.    And Ms. Lambert quotes this Kronick and

17   Welch article saying:  "As noted, payment to MA plans

18   is calibrated based on coding patterns in

19   fee-for-service.

20             "If, for example, Jane Doe would have a

21   risk score of 1.0 if she were in fee-for-service, the

22   implicit assumption in the design of the MA payment



Page 63

1    system is that she would have the same risk score of

2    1.0 if she were enrolled in MA."

3            Do you see that?

4       A.    Yes.

5       Q.    Do you agree with Dr. Kronick and Welch

6    that that is part of the implicit design of the MA

7    payment system that you developed?

8       A.    I think there are some words missing from

9    that statement that would make it more correct.

10      Q.    Okay.  What are the words that are missing

11   from that statement that would make it more correct?

12      A.    The coding would have to be -- that we're

13   talking about when we're coding people and developing

14   these risk scores, the coding that she's describing

15   and the data that's in fee-for-service -- which is

16   done without any incentives to code diagnoses at all

17   because that's the nature of coding and

18   fee-for-service.  Payment is based on procedures.

19            So one of the things about this or the

20   assumption is that if the other coding were done with

21   no incentives for the coding of the diagnoses more

22   thoroughly and that the same pattern of coding people



Page 158

1    right?

2          A.    Yes.

3          Q.    And so page -- the next page that says --

4    that has -- is titled, Costs of Unsupported Codes

5    Distributed to Demographic Factors if Removed, I

6    think part of your point is that the costs of

7    treating these patients stays in the model but then

8    is -- they are otherwise shifted around to what the

9    coefficients and relative factors are for either the

10   demographic factors or other codes that are still in

11   the model?

12         A.    Yes.

13         Q.    And if you go to the next page, which is

14   slide 17 of Exhibit 1571, part of your point here was

15   that --

16         A.    I'm sorry.  Are we skipping a page here?

17   I mean, I have a paper page 15 and a screen page 16

18   that match.  But where are we on 17?  Which version?

19         Q.    I'm looking at -- it is the 17th page, but

20   because the first -- in the hardcopy version you've

21   got it counted page zero as the first one.  The one

22   online is page 17.



Page 159

1              But what I'm talking about, sir, is the

2    slide that has regression for coefficients on either

3    side, one showing your regression for one tab and the

4    other showing your regression for 2 tab.

5              Are you with me?

6         A.    Yeah.   I've coordinated both versions at

7    this time.   There was some skipped, but you did that

8    intentionally.   I wanted to make sure.

9         Q.    All right.   Dr. Ingber, looking at the

10   page comparing the regression coefficients for your

11   first version of the model with unsupported codes and

12   your second regression for supported codes only, your

13   -- part of your opinion was that the coefficients and

14   expected costs for treating various conditions go --

15   some go up and some can go down when you redistribute

16   the costs that the model had previously associated

17   with codes that are unsupported.

18              Is that fair?

19        A.    Yes.

20        Q.    And your differences tab in your Exhibit

21   1, turning to the next page, the 18th page of Exhibit

22   1571 in Agile Law, made that comparison explicit,



Page 160

1   right?

2           You did the --

3       A.    Yes.  I did the subtraction to show the

4   differences.

5       Q.    Great.  And then the final slide of

6   Exhibit 1571 is designed to kind of depict the -- the

7   fact that, in your opinion and as you calculated in

8   your model, certain of the coefficients or relative

9   factors, the predicted costs for diagnoses might go

10  up, might go down, and the demographic factors might

11  go up or might go down.

12          But, ultimately, the model is distributing

13  the costs overall to that same group of factors,

14  right, the markers?

15      A.    Yes.

16      Q.    Dr. Ingber, I'm going to go back to

17  sharing -- and I guess I would ask that in your

18  computer you move to the spreadsheet.

19          MS. MCMAHON:  Dr. Ingber's spreadsheet?

20          MR. JONES:  We're going to go to the

21  share.

22          THE WITNESS:  I'm sorry.  So this is the



Page 161

1    one that's basically in Zoom?

2             BY MR. JONES:

3        Q.    This is the version that's in Zoom that

4    I'm controlling.

5        A.    Yes, okay.

6        Q.    And I want to add a few calculations --

7        A.    Yes.

8        Q.    -- to the spreadsheet with you.

9        A.    Yes.

10       Q.    And as a -- as an economist, Dr. Ingber,

11   you've used Excel quite a bit in your work?

12       A.    I use it occasionally.  It's not my main

13   tool, but I do use it.

14       Q.    Okay.  And you think you're fairly skilled

15   in Excel and can try to follow along?

16       A.    Oh, yes, reasonably so.

17       Q.    Great.  And have you -- did you calculate

18   what would happen to the weighted average of the

19   relative factors in your model when you take the

20   unsupported codes out of the data on which the model

21   is calibrated?

22             MS. MCMAHON:  Objection.  Form.



3069

Page 162

1      A.    I did not calculate the weighted average

2    given the weights of this particular population, is I

3    presume what you mean?

4            BY MR. JONES:

5      Q.    Right.

6      A.    Yeah.

7      Q.    Okay.  I'd like to go ahead and do that

8    with you.  And so up on the screen can you see the

9    Exhibit 1 that I'm manipulating here?

10     A.    I see it.

11     Q.    Okay.  And if we need to take a break for

12   you to look at any of the formulas that I've done and

13   confirm them, I'm happy to do that.

14           But first, let's do kind of a total count

15   of markers for each of the unsubmitted unsupported

16   codes, regression, supported codes regression, and

17   then your supported and unsubmitted regression.

18           Are you with me?

19     A.    Yes.  I thought I had done that, in fact,

20   on the last page on the differences page.  The counts

21   are in there.

22     Q.    I think -- you have the individual counts.



Page 163

1    I'm just going to sum them up to help us with the

2    calculation.  Okay?

3         A.    Oh, okay.

4         Q.    It's not pasting for me.

5         A.    When you say you're adding them up, is

6    this just the total number of HCCs flagged, period?

7    That's what we're talking about?

8         Q.    Yes.  That's what we're talking about.

9         A.    Okay.

10        Q.    I need to save a new version of this.  I'm

11   in -- what we're going to do, we're going to save a

12   new version of this Excel that we'll ultimately put

13   on as an exhibit here.

14             MS. MCMAHON:  We can't see what you're

15   doing right now.

16             MR. JONES:  Yeah.  I've taken it down.  I

17   need to get out of protected view somehow.

18        A.    I'd be happy to stipulate that when you

19   take codes out the total number of codes goes down.

20             BY MR. JONES:

21        Q.    Okay.  Dr. Ingber, are you able to see

22   Exhibit 1 again?



Page 164

1        A.      I see it, yes.

2        Q.      Okay.  And all I've done since we were off

3    is to enable editing so that I can save the file and

4    then edit it.  But this still shows last modified by

5    Mel in January of 2024.  Okay.  So I'm going to put

6    this on the desktop as Ingber Exhibit 1, deposition

7    version.

8            And so let's go -- you've got the count of

9    markers in each of the various regressions that you

10   run down at the bottom.  I just want to have them in

11   a convenient place.

12           And what I'm going to do, Dr. Ingber, and

13   if you can help me remember I'm going to mark

14   everything that we do together today here in the

15   deposition with a different color so that it can be

16   distinguished when this is an exhibit from kind of

17   what was your original and what was in the -- what

18   we've done here in the deposition.

19           So I'm going to make it this tan color, if

20   that's okay.  Okay.  So to do total markers here is

21   the -- is what I'm putting in column F and I'm going

22   to sum under unsupported codes the markers that you



Page 165

1    have and the count that you have in your population

2    with unsupported codes included, count of people with

3    HCC.

4              Is that -- are you with me so far?

5    A.    Yes.

6    Q.    And that should get the total markers that

7    were included in your population that went through

8    the regression with unsupported codes, right?

9    A.    Yes.

10   Q.    Okay.  And then we'll do the same thing

11   for the group with unsupported codes removed and then

12   the same thing for the group with supported and

13   unsubmitted.

14             And I can slow down --

15             MS. MCMAHON:  Is that a question?

16             MR. JONES:  Yes.

17             MS. MCMAHON:  No.  I wasn't sure if you

18   were asking questions or trying to get Dr. Ingber to

19   confirm what you're doing.  I'm not sure.

20             BY MR. JONES:

21   Q.    All right.  Are you with me, so far, Dr.

22   Ingber?



Page 166

1        A.     I am, but that last equation didn't

2    happen.

3        Q.     That's true.  Something happened with it.

4        A.     But I am pleased that the number went down

5    when codes were removed, so I expect to see something

6    different.

7        Q.     Okay.  And, Dr. Ingber, can you agree with

8    me that what I've got in these equations would -- is

9    a count of the total markers that you have in this

10   regression or in each of your different models with

11   unsupported codes, supported codes only, and then

12   when you add back in supported but unsubmitted codes?

13       A.     Yes.  Indeed, the count got smaller when

14   codes are removed and then got bigger again when

15   codes were added.  So it looks logical.

16       Q.     Okay.  And by the same token of the count

17   of markers going down when codes are removed, that

18   necessarily is a matter of math means that the cost

19   per marker that the regression is assigning to the

20   various markers is going to go up when you take out

21   unsupported codes, right?

22       A.     You mean the average cost per marker or



Page 167

1    something else?  I'm not sure.

2         Q.    Yes.

3         A.    Because some went up and some went down.

4    So you're saying if we just look on average, which

5    way did they go, okay.  This is a -- so far you

6    mentioned weighted.  I'm not seeing any weighting

7    going on here, but that's okay.

8         Q.    Sure.  First I want to do a total cost per

9    marker and then we'll do a weighted average.  Okay?

10        A.    Okay.

11        Q.    So I'm going to calculate -- your total

12   cost here for the population is the same in each of

13   the different iterations of your model, right?

14        A.    I'm sorry.  I'm not quite sure what you're

15   doing.  b12 is the total cost in the population and

16   --

17        Q.    And then if I do cost per marker in your

18   --

19        A.    There's a typo there now -- okay.

20        Q.    So if you divide the total cost associated

21   with treating the population, which is b12, by the

22   total markers in your regression with unsupported



Page 168

1    codes, you'll get a cost per marker of essentially

2    treating the patients, right?

3        A.    Yes.

4        Q.    And if you are spreading the same costs

5    across fewer individuals -- or fewer markers, then

6    the cost per marker will go up from your regression

7    with -- if you've taken out unsupported codes, right?

8        A.    Yes.

9        Q.    And what I calculate your model as showing

10   and calculating is a cost per marker after taking

11   codes out of $1,915 as opposed to a cost per marker

12   with unsupported codes of being $1,812.31.

13       A.    So far the math is right.  The question is

14   where it goes, but we're getting there.

15       Q.    Great.  So then let's -- let's just go

16   ahead and do the same -- do a similar calculation but

17   with a weighted average of the individual -- of the

18   individual relative factors.

19           And so what I'm going to do is -- here

20   you've calculated the relative factors by dividing

21   the coefficient by average spending as we've talked

22   about.



Page 169

1              I'm going to put here in row 51 the

2    weighted average.  And, Dr. Ingber, how do you

3    calculate a weighted average?

4         A.    Well, you would need the counts for each

5    one of codes, which is elsewhere in this table.

6         Q.    Great.  And so what I'm going to do is --

7    are you familiar with the SUMPRODUCT --

8         A.    I am.

9         Q.    -- formula in Excel?

10        A.    Yes.

11        Q.    And so if we sum the product of the

12   relative factors for the -- with unsupported codes

13   with the count of HCCs for those same factors --

14        A.    Yes.

15        Q.    -- and then divide by the total -- let's

16   see.  You don't need to divide -- let's see.  Divide

17   by the number -- by the total count of HCCs is what

18   I'm meaning to do.  Then that gets at a weighted

19   average of the relative factors for the -- for your

20   regression with unsupported codes, right?

21        A.    Well, it should.  I'm just looking at it.

22   It seems fairly small looking at what most of the



3077

Page 170

1    factor sizes are.  But it may be computed correctly.

2              Let's see -- I mean, I'd have -- if you

3    click on it, it will highlight all the data you used.

4    But I'm just saying that to me it looks a little

5    small just --

6         Q.    Okay.  So I've highlighted the data.  So

7    I'm summing the product of b36 to 50 with c101 to 115

8    and then dividing by a count of HCCs for that version

9    of the model, right?

10        A.    Okay.

11        Q.    And that's a correct formula for

12   calculating a weighted average relative factor,

13   right?

14        A.    Yes.  It appears to be correct.

15        Q.    Okay.  And then let's do the same thing

16   for supported codes only and then -- so I'm summing

17   the product of c36 through 50, the count of people

18   with HCCs for the population with unsupported codes

19   removed, which is c122 through 136, and then dividing

20   by the total count of HCCs for that version of the

21   model.

22              And that would be an accurate mechanism



Page 171

1    for calculating a weighted average of the diagnosis

2    codes -- or the weighted average of the relative

3    factors for the various markers in your model with

4    the -- for the version of your regression when you've

5    taken out the supported -- the unsupported codes?

6              MS. MCMAHON:  Objection.  Form.

7         A.    It should be, yes.

8              BY MR. JONES:

9         Q.    And so here you understand that the --

10   that the weighted average of the relative factors

11   goes up when you take the unsupported codes out of

12   the model on which you've calibrated the expected

13   costs, right?

14        A.    Yes, it does.

15        Q.    And what that means is that on average

16   each of the relative factors, each of the markers is

17   compensated less in the version where the model is

18   calibrated with unsupported codes than in the version

19   where the model is calibrated with supported codes

20   only, right?

21        A.    I would agree with your remark except I

22   would take out the word "each."  You would say the



Page 172

1   factors on average, not each on average because that

2   implies something different.

3        Q.   Sure.  So the factors as a whole on

4   average are compensated or calculated as being worth

5   less in the version where unsupported codes are

6   present in the calibration of the model than when

7   they are taken out?

8        A.   Yes.  We're not doing the third version

9   then, I gather, or are we?

10       Q.   We can go ahead and do it.

11       A.   No.  If this is the only point you want to

12   make about those two, fine.

13            MR. JONES:  Exhibit No. 1572.

14            (Exhibit Number 1572 was marked for

15   identification and was attached to the deposition.)

16            BY MR. JONES:

17       Q.   Dr. Ingber, I've just handed you what's

18   been marked Exhibit 1572.  And these are

19   demonstratives that are intended to depict the

20   calculations that you and I just went through.

21            So if you look at the first page of this

22   exhibit the -- this shows the total cost of treatment



Page 173

1    that your model is attributing across diagnosis codes

2    and demographic factors.  It's the same in both

3    versions of your regression, right?

4         A.    I'm sorry.  I missed something you said.

5         Q.    Sure.  So in both the version of your

6    regression that include unsupported HCCs and the

7    version of your model where you're taking unsupported

8    HCCs out of the data on which the model is

9    calibrated, you're attributing the same total cost of

10   treatment across the markers in both instances,

11   right?

12        A.    Yes.

13        Q.    And then if you turn to the second page of

14   Exhibit 1572, this exhibit shows the weighted average

15   coefficient -- let's go back.

16              We actually haven't done the weighted

17   average coefficient yet.

18        A.    We've only done the relative factors.

19        Q.    Right.

20        A.    I mean, I would assume for the moment that

21   you've done the math properly.  The direction is

22   correct.  I just -- yeah.



Page 174

1      Q.    And would you agree with me that

2   calculating the cost per marker overall is going to

3   be equivalent to the sum of the weighted average

4   coefficients or the -- it would be the same as the

5   weighted average of the coefficients?

6           MS. MCMAHON:  Objection.  Form.

7      A.    Yes.  That's sounds like a reasonable

8   conclusion.

9           BY MR. JONES:

10     Q.    Okay.  And, Dr. Ingber, you and I

11  calculated the cost per marker as $1,812.31 with the

12  unsupported codes and then the cost per marker of

13  $1,915.82 once the supported codes are -- unsupported

14  codes are removed.

15          So you would agree with me that what is

16  here on page 2 of Exhibit 1572 would be a calculation

17  of the weighted averages of the coefficients in those

18  two versions of your regression?

19     A.    Yes.  And we have to just recall for a

20  moment that the dollars are an intermediate step

21  because you calculate it in terms of relative

22  factors, where this goes, because we don't ever pay



256

```
 1                    C E R T I F I C A T E

 2

 3            I do hereby certify that I am a Notary
        Public in good standing, that the aforesaid testimony
 4      was taken before me, pursuant to notice, at the time
        and place indicated; that said deponent was by me
 5      duly sworn to tell the truth, the whole truth, and
        nothing but the truth; that the testimony of said
 6      deponent was correctly recorded in machine shorthand
        by me and thereafter transcribed under my supervision
 7      with computer-aided transcription; that the
        deposition is a true and correct record of the
 8      testimony given by the witness; and that I am neither
        of counsel nor kin to any party in said action, nor
 9      interested in the outcome thereof.

10

11            WITNESS my hand and official seal this

12      _____ day of _____, 2024.

13

14

15      _____

16                 Notary Public

17

18

19

20

21

22
```

3083

**EXHIBIT D-122**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA          )   No. 16-08697 FMO
ex rel. BENJAMIN POEHLING,        )
                                  )
              Plaintiffs,         )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC.,         )
et al.,                           )
                                  )
              Defendants.         )
_____    )


*** CONFIDENTIAL ***
CONTAINS ATTORNEYS' EYES ONLY PORTIONS
Videoconference Videotaped Deposition OF
CAROLYN KAPUSTIJ
(Taken virtually)
9:03 a.m. Eastern
Thursday, August 25, 2022


REPORTED BY:  Christine A. Taylor, RPR

Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 15

1          Q.    Did you review any documents during

2     any of the prep sessions?

3          A.    I wouldn't say we reviewed them.  You

4     know, some were shown to me.

5          Q.    Do you recall how many?

6          A.    No.

7          Q.    Did any of the documents you looked at

8     refresh your recollection about the events or

9     information displayed in the documents?

10         A.    No.

11         Q.    And do you typically work from home,

12    Ms. Kapustij, since the pandemic?

13         A.    Yes, I have been working home -- from

14    home since the pandemic.

15         Q.    And home as in Baltimore, Maryland?

16         A.    Yes.

17         Q.    Have you gone into the office at all

18    since the pandemic began?

19         A.    I have gone in -- I think I've gone in

20    maybe twice.

21         Q.    And I believe you said earlier that

22    you work for the government.  Are you with the

23    Office of Inspector General for HHS?

24         A.    I am.

25         Q.    And prior to joining the Office of



Page 16

1     Inspector General, you were with CMS?

2           A.   Correct.

3           Q.   And you were with CMS for about

4     12 years from 2009 through 2021?

5           A.   Yes.  Yes.  12 years.

6           Q.   Okay.  And during the period when you

7     were at CMS, you worked on a research matter

8     looking into a potential fee-for-service adjuster

9     in the context of RADV?

10          A.   I was involved in that during

11    different time periods at CMS.

12          Q.   And can you tell us a little bit about

13    that?  What is a fee-for-service adjuster?

14               MS. YEVTUKHOVA:  Objection.  Form.

15               THE WITNESS:  So the fee-for-service

16          adjuster was a concept that was put forward

17          by the MA industry and taken up by CMS as a

18          means to offset recoveries for risk

19          adjustment data validation audits.

20    BY MR. QURESHI:

21          Q.   And when you say it was taken up by

22    CMS, what do you mean by that?

23          A.   I mean the industry contacted Tom

24    Hutchinson about it and then he kind of directed

25    his staff to calculate it.



Page 17

1          Q.    And when you say Tom Hutchinson, is

2     that a CMS official who was with the Medicare Plan

3     Payment Group?

4          A.    At the time Tom Hutchinson was the

5     group director of the Medicare Payment Plan Group.

6          Q.    And during your tenure at CMS, did you

7     work with the Medicare Plan Payment Group?

8          A.    I did.

9          Q.    What does the Medicare Plan Payment

10    Group do?

11         A.    The Medicare Plan Payment Group

12    operationally makes the plans to payments through

13    the various payment systems.  It develops payment

14    policy.  It develops risk adjustment policy.  It

15    develops policy around Part D.  It makes the Part

16    D payments.  And then it also, at the time I was

17    there, did payment validation activities through

18    audits and also measured the improper payment

19    rates for Part C and Part D.

20         Q.    And when you say payment validation

21    activities, are you referring to the risk

22    adjustment data validation audits?

23         A.    Those and there were other activities.

24    I think there were some -- there was a monthly

25    payment validation that occurred before the



Page 18

1    payments went out, and then there were also some

2    retiree drug subsidy audits going on, among

3    others.  I don't know the whole scope of the

4    validation activities that were occurring

5    group-wide.

6           Q.  Okay.  We'll certainly return to that

7    topic later, but I want to talk a little more

8    about the fee-for-service adjuster.  When did you

9    begin your involvement in that research project?

10          A.  It was quite a while ago, but I

11   believe probably in the spring of 2009 shortly

12   after I started at CMS.

13          Q.  And what did you understand your role

14   to be in connection with that project?

15          A.  I mainly was kind of -- I was a junior

16   staffer, so I had a support role.  I attended

17   meetings.  I reviewed some materials.  I believe I

18   worked with some of the medical review contractors

19   and the analytic contractors on some of the work.

20          Q.  And if we focus us on this period of

21   time, who did you report to in the spring of 2009

22   while working on the fee-for-service project?

23          A.  Jennifer Harlow.  Jennifer Harlow was

24   the division director.  And I believe Lateefah

25   Hughes had kind of a lead role.



Page 19

1           Q.   And the division you're referring to

2      is the Division of Payment Validation or DPV?

3           A.   Yes.

4           Q.   During the spring of 2009, did you

5      work with a gentleman named Jonathan Smith on this

6      research project into the fee-for-service

7      adjuster?

8           A.   I did.

9           Q.   Do you recall anyone else that you

10     worked with on this project during that time

11     frame?

12          A.   I do not.  I'm sure there were other

13     people involved, but I do not.

14          Q.   And during this time, spring of 2009,

15     did you form any opinions about the competency of

16     the people you were working with?

17          A.   No, I did not form any opinions.  I

18     generally believe them to be competent.

19          Q.   They didn't do anything that raised

20     doubts about the quality of the work they were

21     doing?

22          A.   No.

23          Q.   And prior to joining this research

24     project on the fee-for-service adjuster in the

25     spring of 2009, did you have any background on



Page 20

1    Medicare risk adjustment?

2          A.    I had completed the previous year in a

3    master's degree in public health, so I had general

4    knowledge of different payment systems.

5          Q.    And this was a degree in public health

6    from the University of Michigan School of Health?

7          A.    Yes.

8          Q.    And you completed that work in 2008?

9          A.    Correct.

10         Q.    Other than the -- the work you did in

11   connection with your master's degree in public

12   health, did you have any other formal training or

13   background on Medicare risk adjustment?

14         A.    No.

15         Q.    Can you describe some of the

16   responsibilities you had in the spring of 2009

17   relating to the research into the fee-for-service

18   adjuster?

19         A.    Again, as I previously stated, I -- I

20   attended meetings, I reviewed materials, and I was

21   involved with the contractors doing the analysis

22   and the medical record review work.

23         Q.    The meetings you attended, were those

24   with other CMS personnel?

25               MS. YEVTUKHOVA:  Objection.  Form.



Page 37

1          MS. YEVTUKHOVA:  Objection.  Form.

2          THE WITNESS:  She did.  She did years

3     later.

4  BY MR. QURESHI:

5          Q.   Did she change her mind about the

6     appropriateness of the fee-for-service adjuster?

7          A.   I don't know.

8          Q.   Did you ever talk to her about it?

9          A.   I recall one conversation, I don't

10    recall what year, where she said something like,

11    you know, in terms of the recoveries, you know,

12    you're paying back money that you were paid out.

13    It doesn't kind of matter what the amount was

14    paid.  It could be with a random number generator.

15    If you were paid that amount and it was erroneous,

16    it should be paid back.

17          Q.   And you understand her to be

18    discussing RADV payment recoveries?

19          A.   Yes.

20          Q.   Other than that conversation, do you

21    recall any other instance in which you and

22    Ms. Paul talked about the appropriateness of the

23    fee-for-service adjuster?

24          MS. YEVTUKHOVA:  Objection.

25          THE WITNESS:  I don't recall.



3092

Page 38

```
 1    BY MR. QURESHI:
 2         Q.   Okay.  I'd like to explore your
 3    understanding of the CMS-HCC risk adjustment
 4    model.  What do you understand that to be?
 5              MS. YEVTUKHOVA:  Objection.  Form.
 6              THE WITNESS:  So the risk adjustment
 7         model is the means by which CMS makes a
 8         capitated payment to the plans based on a
 9         monthly basis based on the health status of
10         the beneficiaries enrolled in the plan.
11    BY MR. QURESHI:
12         Q.   And do you have an understanding as to
13    the source of the data that is used to calibrate
14    the model?
15         A.   Yes.  Yes.  It's my understanding that
16    it's fee-for-service claims data.
17         Q.   Okay.  Sometimes called FFS claims
18    data?
19         A.   Yes.
20         Q.   And do you have an understanding as to
21    whether there are diagnoses coding errors in that
22    fee-for-service claims data?
23              MS. YEVTUKHOVA:  Objection.  Form.
24              THE WITNESS:  There potentially could
25         be.
```



Page 39

 1    BY MR. QURESHI:

 2         Q.   Well, are there or aren't there?

 3         A.   I don't know.  You would have to audit

 4    100 percent of the data and see if there were any

 5    errors in it -- undertake that and see if there

 6    were any errors in it.

 7         Q.   Well, while you were working on the

 8    research into the fee-for-service adjuster

 9    project, didn't you audit a sample of

10    fee-for-service claims data?

11              MS. YEVTUKHOVA:  Objection.

12              THE WITNESS:  We did audit a sample of

13         fee-for-service claims data, but I can't be

14         positive about -- positive about this

15         because different sets of data were used at

16         different times to calibrate the model.  We

17         did not attempt to link the data that we --

18         that we audited, the fee-for-service data

19         to the actual data that was used to

20         calibrate the model.

21    BY MR. QURESHI:

22         Q.   The audits that you did perform on

23    fee-for-service claims data, what did those audits

24    show you about the rate of diagnoses coding errors

25    in that data?



Page 40

```
 1              MS. YEVTUKHOVA:  Objection.  Vague.
 2              THE WITNESS:  To the best of my
 3         recollection, it did show that there was
 4         some diagnoses coding error.
 5    BY MR. QURESHI:
 6         Q.   Okay.  And so do you have any reason
 7    to believe that the fee-for-service claims data
 8    that's used to calibrate the risk adjustment model
 9    would have no errors?
10              MS. YEVTUKHOVA:  Objection.  Form.
11              THE WITNESS:  I don't have any reason
12         to believe that it would have no errors.
13         But I can't, you know, speak to the exact
14         amount.  This is all assumptions.
15    BY MR. QURESHI:
16         Q.   I'm not asking for an exact amount,
17    Ms. Kapustij.  My question was does the
18    fee-for-service claims data used to calibrate the
19    risk adjustment model have diagnoses coding
20    errors?
21              MS. YEVTUKHOVA:  Objection.  Asked and
22         answered.
23              THE WITNESS:  As I said before, I can't
24         speak to the exact amount of error that was
25         used in the data set to calibrate the
```



3095

Page 41

1              CMS-HCC model.

2       BY MR. QURESHI:

3              Q.    Understood.  And, once again, I'm

4       going to repeat my question because I think you're

5       missing part of it or I'm not explaining it well

6       enough.  I'm not interested in the exact number.

7       We'll put that to one side.  We'll cover that

8       later.  I'm just interested in the general

9       concept.

10              Are there diagnoses coding errors in

11       the fee-for-service claims data used to calibrate

12       the risk adjustment model?

13              MS. YEVTUKHOVA:  Same objection.

14              THE WITNESS:  I -- I answered that

15              question to the best of my ability.  I

16              can't speak to the exact data used to the

17              calibrate the CMS-HCC model.  I can speak

18              to the -- I can't speak to that.  I don't

19              know -- we did not look at -- make a

20              one-to-one link between the records that we

21              got to evaluate and the records that were

22              used to calibrate the model.

23       BY MR. QURESHI:

24              Q.    Why were you auditing fee-for-service

25       claims data in the fee-for-service adjuster



Page 42

1    project?  What was the point of that?

2            A.   Well, the --

3                 MS. YEVTUKHOVA:  Objection.  Form.  You

4            can answer, Ms. Kapustij.

5                 THE WITNESS:  Oh, sure.  I'm trying

6            to -- I'm sorry, I'm just gathering my

7            thoughts.

8                 Well, that was the whole assertion that

9            was being put forward by the industry is

10           that the error in claims data caused a --

11           would cause -- eventually cause an inequity

12           in -- or cause some kind of problems when

13           there were RADV recoveries.

14   BY MR. QURESHI:

15           Q.   And what were the results of those

16   audits of fee-for-service claims data that you

17   worked on?

18           A.   I don't recall the exact results.

19           Q.   I'm not interested in the exact

20   results.  Did those audits reveal the existence of

21   diagnoses coding errors in fee-for-service claims

22   data?

23                MS. YEVTUKHOVA:  Objection.  Asked and

24           answered.

25                THE WITNESS:  Yes.  The -- I'm sorry.



Page 238

```
 1                  CERTIFICATE OF REPORTER
 2
                    I, Christine A. Taylor, Certified
 3       Court Reporter within and for the State of
         Georgia, do hereby certify:
 4
                    That the foregoing deposition was
 5       taken before me on the date and at the time and
         location stated on Page 1 of this transcript; that
 6       the deponent was duly sworn to testify to the
         truth, the whole truth and nothing but the truth;
 7       that the testimony of the deponent and all
         objections made at the time of the examination
 8       were recorded stenographically by me and were
         thereafter transcribed; that the foregoing
 9       deposition as typed is a true, accurate and
         complete record of the testimony of the deponent
10       and of all objections made at the time of the
         examination to the best of my ability.
11
                    I further certify that I am neither
12       related to nor counsel for any party to the cause
         pending or interested in the events thereof.
13       Witness my hand, this 29th day of August, 2022.
14
15
16       _____
17       Christine A. Taylor, RPR
         CCR-4736
18
19
20
21
22
23
24
25
```



3098

**EXHIBIT D-122A**

**REDACTED VERSION OF
DOCUMENT PROPOSED TO BE
FILED UNDER SEAL**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


```
_____
                          )
UNITED STATES OF AMERICA   )
ex rel. BENJAMIN POEHLING, )
                          )
       Plaintiff,          )    No. CV 16-08697 FMO
                          )
vs.                        )
                          )
UNITEDHEALTH GROUP, INC.,  )
et al.,                    )
                          )
       Defendants.         )
_____)
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

DEPOSITION OF CAROLYN KAPUSTIJ
As 30(b)(6) Designee 6 of
The United States

Baltimore, Maryland
August 25, 2023




Reported by:  John L. Harmonson, RPR
Job No. 1011736



3100

Page 38

1    testimony yesterday besides yours?

2        A.    No.

3        Q.    None this week?

4        A.    No.

5        Q.    Was there any deposition testimony that

6    you wanted to review before testifying today?

7        A.    No.  I did not think about that.

8        Q.    Why did you review your own deposition

9    testimony before today?

10       A.    To refresh my recollection on certain

11   events.

12       Q.    And did it accomplish that goal?

13       A.    A bit.

14       Q.    Did any of the other documents that you

15   reviewed refresh your recollection about any events

16   related to Topic 5?

17       A.    To some extent, yes.

18       Q.    Which ones?

19       A.    Probably the partner training documents.

20       Q.    Any others?

21       A.    Not that I can point to offhand.

22       Q.    You said you met with your counsel in

23   preparation for today.  How many times did you meet

24   with them?

25       A.    I don't exactly recall.



3101

Page 39

```
 1        Q.    Was it more than once?
 2        A.    More than -- I would say more than once,
 3   to the best of my recollection, and less than five.
 4        Q.    Do you recall when was the last time you
 5   met with your counsel before today?
 6        A.    Yesterday.
 7        Q.    What about before yesterday?  When was
 8   the last time you met with counsel regarding your
 9   testimony today?
10        A.    Earlier this week.
11        Q.    Did you meet with counsel last week to
12   discuss your testimony today?
13        A.    I don't recall.  I may have.
14        Q.    So you recall at least two meetings that
15   happened this week?
16        A.    Yes.
17        Q.    How long were those meetings for, the
18   ones that happened this week?
19        A.    Less than an hour.
20        Q.    Were they in person?
21        A.    No.
22        Q.    Were they by Zoom?
23        A.    Yes.  They were via phone.
24        Q.    Via phone.
25              Did you review any documents during
```



3102

Page 40

1    those conversations?

2        A.    Not that I recall.

3        Q.    So you met with counsel yesterday; is

4    that right?

5        A.    Correct.

6        Q.    Do you recall yesterday if you reviewed

7    any documents with counsel?

8        A.    We did -- I did not.

9        Q.    And what about in the meeting earlier

10   this week?

11       A.    I don't recall.

12       Q.    What day was that meeting?

13       A.    I believe it was Monday.

14       Q.    And you don't recall whether on Monday

15   you reviewed any documents with counsel?

16       A.    I don't recall.

17       Q.    Did you go to work on Monday?

18       A.    I did.

19       Q.    Did you go to work yesterday?

20       A.    I did.

21       Q.    How much time in total would you say you

22   spent preparing for your testimony today?

23       A.    That is a difficult number to estimate.

24   I would say maybe 40 hours.

25       Q.    And the 40 hours would include any



Page 41

1    documents -- any time you spent reviewing

2    documents, your conversations and communications

3    with others in preparation for today, and your

4    communications and conversations with counsel; is

5    that right?

6         A.    Correct.

7         Q.    Is there anything else that you did to

8    prepare for today that we haven't talked about?

9         A.    No.

10             MR. MARTINEZ:  We've been going for

11   about 50 minutes.  Do you want to take a quick

12   break?

13             THE WITNESS:  Yeah, that would be great.

14             MR. MARTINEZ:  Let's go off the record.

15             THE VIDEOGRAPHER:  We're going off the

16   record at 10:20.

17             (Recess taken.)

18             THE VIDEOGRAPHER:  We are back on the

19   record at 10:34.

20   BY MR. MARTINEZ:

21        Q.    Ms. Kapustij, you understand you're

22   still under oath?

23        A.    Yes.

24        Q.    RADV is the primary mechanism by which

25   CMS identifies and recovers alleged overpayments



Page 42

1    made to MA plans; correct?

2         A.    Yes.

3         Q.    Including alleged overpayments due to

4    diagnosis codes or HCCs that are not supported by

5    medical records; correct?

6         A.    Correct.

7         Q.    And when I use the term "HCCs," you

8    understand I'm referring to hierarchical condition

9    categories?

10        A.    Yes.

11        Q.    As part of the RADV process, CMS

12   conducts medical record reviews to verify the

13   accuracy of diagnosis codes or HCCs submitted by MA

14   plans for payment; correct?

15        A.    Correct.

16        Q.    RADV is unique to the Medicare Advantage

17   program; correct?

18             MS. OBEREMBT:  Objection; vague.

19   BY MR. MARTINEZ:

20        Q.    Do you understand my question?

21        A.    I understand your question.  There is

22   also an exercise called HHS RADV which is performed

23   in the health insurance exchanges.

24        Q.    Okay.  And the HHS RADV, is that also

25   specific to the Medicare Advantage program?



Page 43

 1         A.     No.  It's to the exchange program.

 2         Q.     To the exchange program.  Understood.

 3                So the RADV -- I should clarify.  RADV

 4    audits that CMS performs is unique to the Medicare

 5    Advantage program; correct?

 6                MS. OBEREMBT:  Objection; vague.

 7                THE WITNESS:  Technically, another area

 8    of CMS does the HHS RADV audits for the exchanges

 9    that are involved in that.

10    BY MR. MARTINEZ:

11         Q.     And which component of CMS does that?

12         A.     CCIIO.

13         Q.     So I'm clear, the RADV audits

14    that -- strike that.

15                There are no RADV audits in

16    fee-for-service Medicare; correct?

17         A.     Could you be more -- there are no audits

18    called risk adjustment data validation audits in

19    fee-for-service.

20         Q.     CMS does not perform RADV audits on

21    fee-for-service data; correct?

22         A.     It does not, because fee-for-service

23    payment is not based on risk adjustment.

24         Q.     And fee-for-service Medicare has

25    different types of audits that it might conduct,



Page 51

1    BY MR. MARTINEZ:

2        Q.    Okay.  Where did you get that

3    understanding from?

4        A.    I got that from both Deloitte Consulting

5    and Hans Dutt.

6        Q.    What is that one difference?

7        A.    2014, the basis for it is diabetes

8    cohort.  And 2015, the basis is a renal cohort.

9        Q.    Okay.  I want to come back to that, but

10   I want to go back to your testimony regarding

11   payment years 2011 to 2013.

12              I believe you testified that in each of

13   those payment years, there were 30 MA plans that

14   were selected for RADV auditing.  Is that correct?

15       A.    Correct.

16       Q.    Do you know what percentage of the total

17   MA plans that number 30 represents?

18       A.    I don't know offhand.

19       Q.    Is it a small percentage or a large

20   percentage?

21       A.    Define large or small.

22       Q.    Whether you would consider it to be a

23   large or a small percentage of the total number of

24   Medicare Advantage plans.

25       A.    In the context of total plans, it's not



Page 52

1    a large percentage.

2         Q.    For payment years 2011 to 2013, how did

3    CMS determine which MA plans to audit through the

4    RADV program?

5         A.    CMS based it on a measure of their

6    increase in coding from year to year.  And the

7    plans were split into three groups -- high, medium

8    and low -- with a certain number being selected

9    from each year.

10        Q.    And how was the increase -- let's start

11   with, say, payment year 2011, for example.  How was

12   the increase in coding from year to year measured?

13        A.    Oh, it was calculated by the growth of

14   the average enrollee risk score.

15        Q.    For which time period?

16        A.    I don't recall.

17        Q.    And so when you refer to the high,

18   medium and low buckets, is that a reference to

19   levels of coding intensity in general, or is it a

20   reference to the size of the increase in coding

21   from year to year that CMS observed?

22             MS. OBEREMBT:  Objection; compound.

23             THE WITNESS:  I believe it's a measure

24   of the size of the increase.

25   BY MR. MARTINEZ:



Page 53

1          Q.     And why did CMS develop a methodology

2    for selecting Medicare Advantage plans for its RADV

3    audits based on an increase in -- a plan's increase

4    in coding from year to year?

5          A.     I believe there was a hypothesis that an

6    increase in coding might be indicative of larger

7    probability for an error.

8          Q.     So in selecting Medicare Advantage plans

9    for the 2011 to 2013 RADV audits, was it CMS's goal

10   to identify plans that were more likely to have

11   payment errors?

12             MS. OBEREMBT:  Objection; vague.

13             THE WITNESS:  I'm not sure, and none of

14   the documentation confirmed that.

15   BY MR. MARTINEZ:

16         Q.     Do you have an understanding as to what

17   CMS's purpose was in designing the MA selection

18   process for the RADV audits 2011 to 2013?

19             MS. OBEREMBT:  Objection; vague.

20             THE WITNESS:  The objective was to get a

21   selection of contracts to audit.

22   BY MR. MARTINEZ:

23         Q.     Okay.  Well, you testified earlier to a

24   hypothesis that an increase in coding might be

25   indicative of a larger probability for a payment



3109

Page 54

1    error; correct?

2        A.    Correct.

3        Q.    So is it your understanding that CMS --

4    the reason why they were selecting plans using this

5    methodology was to try and identify plans that were

6    more likely to have higher rates of payment errors?

7        A.    That was the hypothesis and that was the

8    research question.  But plans were selected from

9    all three groups, high, medium and low.

10       Q.    And of the 30 plans selected for each --

11   let's start with payment year 2011.  How many were

12   from the high increase group?

13       A.    I am going to have to look at that.  I

14   do not recall offhand.  I'm trying to...

15       Q.    Are you searching for Tab 18 by chance?

16       A.    18 and perhaps 19.  I'll start with 19.

17   And so for 2011, it was 20 from the high group,

18   five from medium, and five from low.

19       Q.    So two-thirds of the plans selected for

20   payment year 2011 came from the high coding

21   increase group; is that right?

22       A.    Correct.

23       Q.    What about for payment year 2012?  And I

24   think to help you answer that question, I've marked

25   what's in your binder as Tab 18 as Exhibit 1498.



Page 55

1              (Exhibit 1498 marked for identification

2        and attached hereto.)

3              THE WITNESS:  Okay.

4   BY MR. MARTINEZ:

5        Q.    And I think if you look at -- you may

6   already be there.  What's numbered in the bottom

7   right as page 20.

8              MS. OBEREMBT:  There are no numbers.

9              MR. MARTINEZ:  There is an easier way to

10  look at this.

11  BY MR. MARTINEZ:

12       Q.    If you look at the third page of

13  Exhibit 1498, I think you'll see for -- you'll see

14  the breakdown for payment year 2012 in the middle

15  column.

16       A.    Yes.

17       Q.    And so for that year, just like with

18  payment year 2011, two-thirds of the MA plans that

19  were selected for RADV audits for payment year 2012

20  were in the high coding intensity group; correct?

21       A.    Correct.

22       Q.    And then for payment year 2013, that

23  number actually increases; right?

24       A.    Correct.

25       Q.    It goes up to 25 MA plans from the high



Page 83

1          Q.    Why not?

2          A.    Because there was some discussions I had

3    in preparation that referenced Topic 5.

4          Q.    Discussions with counsel?

5          A.    Yes.

6          Q.    And to be clear, I'm not asking for any

7    of the substance of those conversations.  I'm just

8    asking for who is the person who is determining

9    what is within and without the scope of Topic 5 for

10   purposes of your testimony today.

11              MS. OBEREMBT:  Counsel, the witness

12   already testified that she took the topics at face

13   value the way they're written.  I think we've spent

14   enough time on this.

15   BY MR. MARTINEZ:

16         Q.    You can answer my question.

17         A.    I don't know that I considered it, you

18   know, who has primary responsibility for this.

19         Q.    But in answering my question about

20   return on investment, your position is that even if

21   it was a consideration for CMS in designing its

22   RADV methodology, it's outside the scope of Topic 5

23   because the term "return on investment" was not

24   used in the notice?

25         A.    Yes.



Page 84

1        Q.    And is that the same standard that you

2    applied in interpreting the rest of Topic 5?

3              MS. OBEREMBT:  Objection; vague.

4              THE WITNESS:  I cannot say.  I don't

5    know.

6    BY MR. MARTINEZ:

7        Q.    All right.  I want to move on and talk

8    about the RADV methodology at a high level first to

9    make sure that we're on the same page.  Okay?

10       A.    Okay.

11       Q.    So we've been talking about plan

12   selection and the sampling of enrollees.  That's

13   more or less the first step in the process; right?

14       A.    Correct.

15       Q.    Okay.  And then after the sample has

16   been ascertained, there is a medical record request

17   and submission process that takes place.  Is that

18   right?

19       A.    Correct.

20       Q.    And then after those records have been

21   submitted, there is a medical record review process

22   that CMS oversees.  Correct?

23       A.    Correct.

24       Q.    And that includes coding and abstracting

25   HCCs and those sorts of activities.  Correct?



Page 85

1          A.    Yes.

2          Q.    And I should clarify.  By abstracting

3   HCCs, I mean reporting them or coding them into the

4   system.  You understand that?

5          A.    Yes.

6          Q.    And then once the medical record review

7   happens, then there is a process by which payment

8   errors, if any, are calculated at the beneficiary

9   level.  Correct?

10          A.    Correct.

11          Q.    And then there is then a calculation

12   that happens where those beneficiary-level payment

13   errors are extrapolated for the entire plan that's

14   being audited for that payment year.  Correct?

15          A.    Correct.

16          Q.    And at the end of that process, at the

17   end of the extrapolation process, there is supposed

18   to be a preliminary audit report of findings that

19   is produced by CMS and transmitted to the plans.

20   Is that right?

21          A.    Correct.

22          Q.    And then once that report is

23   communicated, there is an opportunity for I believe

24   what's called medical record dispute where the

25   plans can identify specific HCCs that CMS did not



Page 86

1    validate and essentially ask for reconsideration of

2    those particular HCCs.  Is that right?

3         A.    Correct.

4         Q.    And at the end of that medical record

5    dispute process, that's when payment recovery

6    happens on the part of CMS.  Is that right?

7         A.    I believe so, yes.

8         Q.    Okay.  And then payment recovery

9    essentially would be reducing a plan's capitated

10   payments by the amount of overpayment that CMS

11   calculated for that payment year.  Is that right?

12        A.    Not exactly.  It wouldn't reduce future

13   payments they receive.  The plans would return the

14   overpayment.

15        Q.    Okay.  So the mechanism for payment

16   recovery is the plans returning any overpayments

17   that CMS claims to have found; right?

18        A.    Correct.

19        Q.    Okay.  And then after that, there is a

20   mechanism for appeals that could happen that could

21   also change the results that CMS had determined in

22   the RADV process.  Is that right?

23        A.    Correct.

24        Q.    Do I have the order generally right?

25        A.    I believe so.



Page 87

1        Q.    Okay.  All right.  And as I understand

2    it, that's how the RADV audits were supposed to

3    work throughout payment years 2009 through 2017.

4    Is that right?

5        A.    Yes.

6        Q.    Now, we talked a little bit about that

7    first plan selection piece.  But I just want to

8    confirm.  So CMS does not audit every diagnosis

9    code or HCC submitted by an MA plan for payment in

10   a given payment year; correct?

11       A.    It audits every HCC diagnosis for the

12   sampled beneficiaries.

13       Q.    Right.  It audits all of the diagnosis

14   codes or HCCs that the MA plan submits for the

15   purpose of the RADV audit; correct?

16       A.    That the plan submits for the purpose of

17   payment.

18       Q.    Okay.  But isn't it true that CMS is

19   only taking a sample of those diagnosis codes or

20   HCCs that have been submitted for payment by the

21   plan for that year?

22       A.    It's taking a sample of enrollees.  So

23   it does not cover every enrollee's every diagnosis

24   code.

25       Q.    Got it.  So CMS is auditing every HCC



3116

Page 88

 1   submitted for a particular enrollee for a

 2   particular payment year; correct?

 3        A.    Correct.

 4        Q.    But it's not -- CMS is not auditing

 5   every diagnosis code or HCC that the MA plan

 6   submitted over the course of that payment year for

 7   all of its enrollees; correct?

 8        A.    Correct.

 9        Q.    And CMS has never required MA plans to

10   do their own RADV audits; correct?

11             MS. OBEREMBT:  Objection; outside the

12   scope.

13             THE WITNESS:  CMS requires that plans

14   submit accurate information.  It doesn't dictate

15   the method by which they determine it's accurate.

16   BY MR. MARTINEZ:

17        Q.    Okay.  So CMS has never required MA

18   plans to conduct their own RADV audits prior to

19   submitting data for risk adjustment payment;

20   correct?

21             MS. OBEREMBT:  Objection; outside the

22   scope.  And asked and answered.

23             THE WITNESS:  Again, it requires

24   accurate information.  It does not say you need to

25   conduct your own RADV audit.



3117

Page 89

```
 1   BY MR. MARTINEZ:

 2        Q.    Okay.  So I want to focus on the second

 3   part of your answer because that's what's

 4   responsive to my question.

 5             So just so I'm clear, CMS has never

 6   required MA plans to conduct their own RADV audits;

 7   correct?

 8             MS. OBEREMBT:  Objection; outside the

 9   scope.  And asked and answered twice now.

10             THE WITNESS:  To the best of my

11   knowledge, that is not a requirement.

12   BY MR. MARTINEZ:

13        Q.    And CMS samples from an MA plan's

14   population of enrollees because there's simply too

15   many enrollees in the plans to audit all of the

16   HCCs for all of the enrollees in each given payment

17   year; correct?

18        A.    Correct.  With current new methods, yes.

19        Q.    The volume would just be too large;

20   right?

21        A.    Correct.

22        Q.    Okay.  So once we're past the sampling

23   portion of the RADV process, then we move to

24   medical records submission; right?  Request and

25   submission?
```



Page 90

```
 1        A.    Correct.

 2        Q.    And as I understand it, the MA plans

 3   must submit medical records supporting all of the

 4   HCCs represented in their sampled enrollees' risk

 5   scores for the given payment year under audit;

 6   correct?

 7        A.    Yes.

 8        Q.    Now, originally, as I understand it, CMS

 9   had what it called its one best medical record

10   policy.  Is that right?

11             MS. OBEREMBT:  Objection; vague.

12             THE WITNESS:  That's prior to the --

13   that would be prior to payment year '09.

14   BY MR. MARTINEZ:

15        Q.    Okay.  So was that for '07?

16             MS. OBEREMBT:  Objection; outside the

17   scope.

18             MR. MARTINEZ:  Fair enough.

19   BY MR. MARTINEZ:

20        Q.    Prior to '09?

21        A.    Yes.

22        Q.    Okay.  So that rule did not apply for

23   payment year 2011; right?

24        A.    It did not.

25        Q.    Okay.  And my understanding is that
```



Page 91

1    prior rule had been that MA plans could submit only

2    one supporting record per HCC per enrollee.  Is

3    that correct?

4              MS. OBEREMBT:  Objection; outside the

5    scope.

6              THE WITNESS:  To the best of my

7    recollection.

8    BY MR. MARTINEZ:

9         Q.    Okay.  And then CMS changed that policy

10   and, for example, payment year 2011 allowed plans

11   to submit up to five medical records to support a

12   particular HCC for a particular sampled enrollee.

13   Is that right?

14        A.    Yes.

15        Q.    And CMS made that change because it

16   understood that even if a particular HCC is not

17   supported by one medical record, it might be

18   supported by another; correct?

19        A.    Correct.

20        Q.    I want to talk now about the medical

21   record review process in some more detail.

22              So we had kind of a brief exchange

23   earlier about initial validation contractors and

24   secondary validation contractors, and I think you

25   said at one point that that wasn't really the



Page 92

1   nomenclature that CMS used at the time you were

2   there.  Is that -- do I have your testimony

3   correct?

4        A.     Yes.

5        Q.     So how did CMS describe the different

6   contractors who were involved in the medical record

7   review process?

8        A.     At different times, it was different

9   ways.  They either called them by name or said this

10  is the contractor doing focused review.  This is

11  the one doing discrepant confirmation.  At one

12  point they were referred to as MRRC A and MRRC B.

13       Q.     So they had different names at different

14  times over the years?

15       A.     Yes.

16       Q.     And when we're talking about these

17  medical record review contractors, these are all

18  folks who did not work at CMS; correct?

19       A.     Correct.

20       Q.     They are contracted with CMS; right?

21       A.     Correct.

22       Q.     And CMS oversees their work?

23       A.     Correct.

24       Q.     In the RADV context.

25              And CMS provided trainings to the



Page 96

1    discrepant confirmation was there is another

2    medical record review contractor who would review

3    it, and there would be findings from that

4    contractor.

5         Q.    Okay.  So there is one medical record

6    review contractor that's doing the focused review

7    and a second medical record review contractor doing

8    the discrepant confirmation?

9         A.    Correct.

10        Q.    What is focused review?

11        A.    So the way it evolved is focused review

12   is just a first contractor looking at the medical

13   record and doing a full coding of it.

14             Discrepant confirmation is the second

15   coder looking at it and doing a full review.

16        Q.    Okay.  And is the person doing the

17   focused review sometimes referred to as a primary

18   coder?

19        A.    No.  I believe that the person doing the

20   focused review can either be a primary or a senior

21   coder.

22        Q.    Okay.  And whether a primary or a senior

23   coder, in doing the focused review, they're

24   reviewing all of the medical records that an MA

25   plan has submitted to support the HCCs for a



Page 97

1   particular sampled beneficiary; correct?

2        A.    No.  The way it worked was they -- there

3   was a system, and the coder would receive one

4   medical record and code that record.  They would

5   not receive -- I do not believe they received all

6   of an enrollee's records.

7        Q.    Okay.  But in the focused review

8   process, was the -- was the mandate to -- for the

9   coders involved in that process to review all of

10  the medical records that an MA plan had submitted

11  in support of HCCs for sampled enrollees?

12       A.    Yeah, the focused review process

13  resulted in a review of all the medical records

14  submitted.

15       Q.    And the focused review was a blind

16  review; right?

17            MS. OBEREMBT:  Objection; vague.

18            THE WITNESS:  Define what you mean by

19  blind.

20  BY MR. MARTINEZ:

21       Q.    Well, have you seen the term "blind

22  review" in preparing for your testimony today?

23       A.    I have.

24       Q.    What do you understand that term to

25  mean?



Page 98

1       A.      It's used different ways.  The way I've

2   seen it used in preparing was that the medical

3   record review contractors were blind to one

4   another's findings.

5       Q.      And isn't it also true that the

6   individuals doing the focused review were blind as

7   to which HCCs the MA plan had submitted for payment

8   for a given sampled enrollee?

9       A.      Based on my conversations, it was my

10  understanding that the coders did have knowledge to

11  see what is called the cover sheet which indicated

12  what HCCs were submitted for payment.

13      Q.      And is it your understanding that all of

14  the coders who were doing this first-level review

15  knew which HCCs were being audited?

16      A.      I believe that that was the procedure

17  that was eventually adopted.

18      Q.      And in preparing to testify today, you

19  didn't review any documents that referred to the

20  blind review method as meaning the coders don't

21  know which HCCs or diagnoses are being audited?

22      A.      I am not sure.

23      Q.      You're not sure whether you reviewed any

24  materials that defined blind review in the way that

25  I did?



Page 118

1    plan in support of the sampled enrollee?

2         A.    So that record will then go forward to

3    the second coder no matter what, and the second

4    coder will have a set of findings also.  So at the

5    end of the review process you have a set of

6    findings from one coder and a set of findings from

7    another coder.

8         Q.    And CMS understands that sometimes one

9    of those coders might miss the HCC in the medical

10   records and yet the second coder would find it to

11   be supported; correct?

12             MS. OBEREMBT:  Objection; vague.

13             THE WITNESS:  I would not necessarily

14   say that the coder misses it.  Working with coders,

15   there are some gray areas and some things are open

16   to interpretation.  But there are circumstances

17   where one coder would find evidence for it and the

18   other coder would feel no, that that was not

19   sufficient.

20   BY MR. MARTINEZ:

21        Q.    Right.  Medical record review coding

22   involves gray areas; right?

23        A.    Yes.

24        Q.    And lots of things in medical record

25   reviews are subject to interpretation; right?



Page 119

 1              MS. OBEREMBT:  Objection; vague.

 2              THE WITNESS:  Yes.

 3    BY MR. MARTINEZ:

 4         Q.    So I want to drill down on this a little

 5    bit.  Did CMS understand, then, that sometimes an

 6    initial coder, as part of the RADV process, would

 7    not abstract an HCC that a different coder perhaps

 8    later in the process would abstract?

 9              MS. OBEREMBT:  Objection; vague.

10              THE WITNESS:  That's why there were

11    two -- always two reviews.

12    BY MR. MARTINEZ:

13         Q.    Right.  And it was important to CMS to

14    have those multiple layers of review; right?

15         A.    Correct.

16         Q.    To make sure that they were getting the

17    most accurate results that they could in terms of

18    reviewing the medical records for supportable HCCs;

19    right?

20         A.    Yes.

21         Q.    Because obviously CMS would not want to

22    come out with even a preliminary finding that an

23    HCC is not supported by a medical record if it

24    hadn't done its best to make sure that that's

25    actually the case; right?



Page 120

1        A.     Correct.

2        Q.     And so kind of in the same vein, CMS

3    understood when it was conducting its audits, RADV

4    audits for payment years 2011 through 2015, that

5    sometimes the coders that CMS oversaw would

6    disagree about whether or not an HCC was supported

7    by medical records; right?

8        A.     Yes.

9        Q.     And in fact, CMS I believe instructed

10   the medical record review contractors to develop

11   protocols for handling those very situations in

12   which one coder might disagree with the judgment of

13   another coder.  Is that right?

14       A.     I'm not sure what you're referring to.

15       Q.     Have you heard of the concept of quality

16   assurance protocols in the context of the RADV

17   audits that CMS oversaw?

18       A.     Medical record review contractors, it

19   was contingent on them to monitor the quality of

20   their coders.

21       Q.     And that was a requirement that CMS

22   imposed on the medical record review contractors;

23   right?

24       A.     Yes.

25       Q.     And as one of those quality control



Page 121

1  mechanisms that the medical record review

2  contractors had to have in place was a process for

3  resolving disagreements between coders about

4  whether an HCC was in fact supported by the medical

5  records?

6       A.    I believe something like that did exist.

7  When I talked to Michelle Atkins to kind of

8  understand how they implemented this, when you have

9  focused review and discrepant confirmation, when

10 you have one MRRC coding it and then it goes to

11 another coder rather than a primary and senior at

12 each organization looking at it, she said that her

13 process was to -- for those HCCs that were not in

14 agreement, they would internally have someone look

15 at it and see if the coder needed additional

16 training.

17      Q.    So in that instance that Michelle Atkins

18 was talking to you about, there would be a third

19 layer of review to kind of assess --

20      A.    No.

21      Q.    -- or remediate the disagreement?

22            No?

23      A.    No, it was an internal practice by the

24 medical record review contractors.  There were two

25 layers of review, and the HCC was considered



Page 141

1          Q.     And CMS published this -- its final

2     methodology after carefully reviewing hundreds of

3     public comments; correct?

4          A.     Correct.

5          Q.     And CMS had previously published what it

6     called a proposed methodology in I believe 2010.

7     Is that right?

8          A.     I believe that's correct.

9          Q.     And in the February 2012 publication,

10    CMS confirmed that its final methodology will be

11    applied to the payment year 2011 RADV audit;

12    correct?

13         A.     Yes.

14         Q.     And CMS confirmed that its RADV audit

15    findings for payment year 2011 would be

16    extrapolated using the final methodology

17    articulated in that publication; correct?

18         A.     Correct.

19         Q.     And by extrapolation, what we mean is

20    taking enrollee-level payment error rates and using

21    a statistical methodology to determine the payment

22    error for the entire MA plan that's being audited;

23    right?

24         A.     Correct.

25         Q.     So let's take those two things step by



3129

Page 142

1  step.  So let's start with the beneficiary-level

2  error rate.

3         So for each sampled enrollee, CMS

4  calculates a corrected risk score and payment based

5  on the HCCs found to be supported by its medical

6  record reviewers; correct?

7     A.    Correct.

8     Q.    And then CMS defines enrollee-level

9  payment errors as the difference between the

10  original payment to the plan and the RADV corrected

11  payment.  Is that right?

12     A.    Correct.

13     Q.    And so if the original payment to the

14  plan was higher than the corrected payment, CMS

15  believes the plan has been overpaid with respect to

16  that enrollee; correct?

17     A.    Say that again.

18     Q.    Sure.

19         If the original payment to the plan was

20  higher than the corrected payment, CMS believes the

21  plan has been overpaid for that enrollee.

22     A.    Generally, that is the case.

23     Q.    And conversely, if the original payment

24  is lower than the corrected payment, CMS believes

25  the MA plan has been underpaid with respect to that



Page 143

1    enrollee; correct?

2         A.    It does not.

3         Q.    CMS does not believe that?

4         A.    It says here representing a net

5    underpayment.

6         Q.    Okay.

7         A.    So in terms of how the RADV methodology

8    is being applied, it's considered an underpayment

9    in the calculation.  As to generally whether you

10   would say something like that is an underpayment, I

11   would not say so.

12        Q.    Okay.  So let's break that down.  And is

13   the document you're referring to, are you on the

14   first page of Tab 10 or the third page?

15        A.    Third page.

16        Q.    Third page of Tab 10 in Exhibit 1497.

17              And I believe your testimony was that

18   CMS considered there to be a net underpayment with

19   respect to that enrollee if the original payment is

20   lower than the corrected payment.  Is that right?

21        A.    For the purpose of calculating a RADV

22   payment recovery, yes.

23        Q.    Okay.  And then you stated that you

24   would not say it's an underpayment.  Do I have that

25   right?



Page 147

1    collection, CMS went with a very conservative

2    approach and offset those overpayments by what it's

3    calling underpayments for additional diagnoses.

4    BY MR. MARTINEZ:

5        Q.    And that's CMS's own terminology; right?

6        A.    I believe so, yes.

7        Q.    And I think you said that whenever a

8    diagnosis code cannot be validated by the medical

9    records, that is an overpayment.  But isn't it true

10   that not all diagnosis codes or HCCs actually

11   impact payment?

12       A.    I believe all HCCs by definition impact

13   payment.  All diagnosis codes do not.  You can have

14   two HCCs.

15       Q.    And you understand that multiple

16   diagnosis codes could support the same HCC; right?

17       A.    Yes.

18       Q.    And so I guess what I'm wondering is,

19   then, just because the CMS medical record review

20   contractors find that there is a certain percentage

21   of unsupported HCCs in an MA plan's submitted data

22   for a particular payment year, that does not mean

23   that the MA plan has been net overpaid as CMS

24   defines it for that payment year; correct?

25            MS. OBEREMBT:  Objection; vague.



Page 148

 1          THE WITNESS:  It's not in the terms of

 2  the RADV payment recovery context.

 3  BY MR. MARTINEZ:

 4      Q.    Is there a different context that you're

 5  thinking your answer might be different?

 6      A.    Yes.  In the payment context, plans have

 7  a firm deadline for the date by which they must

 8  submit diagnoses for payment.

 9      Q.    And so how does that deadline inform

10  your answer to my question?

11      A.    Plans would not be allowed -- diagnoses

12  would not be considered that were not submitted

13  within the data submission period.

14      Q.    So it's possible that a plan might just

15  submit a code or an HCC too late to be paid in a

16  certain payment year; right?

17      A.    It's possible, yes.

18      Q.    Is that what you're referring to?

19      A.    Yeah, that's one example.

20      Q.    Okay.  Are there other examples?

21      A.    No.  Just RADV is not kind of considered

22  a forum to introduce new diagnoses into the

23  payment.

24      Q.    Okay.  And I want to understand that a

25  little bit.  Just because in performing the medical



3133

Page 149

1    record reviews as part of the RADV program, as we

2    established, the medical record review contractors

3    also report additional HCCs that were not submitted

4    by the plans for payment; correct?

5         A.    That is correct.

6         Q.    And because of those additional HCCs

7    that are found by CMS's own coders, that's why you

8    get sometimes net underpayments to MA plans for a

9    particular year?

10              MS. OBEREMBT:  Objection; misstates

11   prior testimony.

12              THE WITNESS:  You get an enrollee net

13   underpayment.

14   BY MR. MARTINEZ:

15        Q.    And then when you extrapolate to the

16   entire contract as a whole taking account of any

17   additional HCCs, that also leads to net

18   underpayments for the plan as a whole in the RADV

19   context; right?

20        A.    Well, in the RADV methodology, the

21   payment recovery amount is constrained to zero.  So

22   it's not a forum for plans to receive additional

23   payment.

24        Q.    Right.  And so what that means, it's

25   constrained to zero -- well, it means a couple of



Page 150

1    things, but one thing it means is that if a

2    particular plan has a net underpayment that CMS has

3    calculated for a given payment year, there is no

4    payment recovery for CMS for that particular plan;

5    correct?

6        A.    Correct.  That was the methodology.

7        Q.    Using the extrapolated methodology;

8    right?

9        A.    Correct.

10            MS. OBEREMBT:  Counsel, we've been going

11   an hour now.  Can we take a break, please?  We

12   started at 1:15.

13            MR. MARTINEZ:  Would you like a break?

14            THE WITNESS:  Uh-huh.

15            MR. MARTINEZ:  Sure.  We can go off the

16   record.

17            THE VIDEOGRAPHER:  We are off the record

18   at 14:23.

19            (Recess taken.)

20            THE VIDEOGRAPHER:  We are back on the

21   record at 14:35.

22   BY MR. MARTINEZ:

23       Q.    Ms. Kapustij, I would like to dig a

24   little deeper now into the extrapolation

25   methodology that CMS published in February of 2012.



Page 178

1    list is "Change methodology to recover at lower

2    bound of 95 percent confidence interval"?

3         A.    I do.

4         Q.    So in fact, was CMS considering as one

5    of the menu of options to change its methodology to

6    lower the confidence interval it was using to

7    extrapolate payment recovery amounts for the RADV

8    program?

9              MS. OBEREMBT:  Objection; vague.

10             THE WITNESS:  I did not review any

11   documents that indicated that.

12   BY MR. MARTINEZ:

13        Q.    You did not review any documents

14   indicating that in preparation for your testimony

15   today?

16        A.    Correct.

17        Q.    So is the answer to my question that you

18   don't know?

19        A.    This is an internal document you've

20   presented me with.  I don't know that this went

21   beyond the Division of Payment Validation or

22   Medicare Plan Payment Group.

23        Q.    And within the Division of Payment

24   Validation -- start there -- does this document

25   refresh your recollection that that division was



Page 179

1  having some discussion about potentially lowering

2  the confidence interval to 95 percent as a means of

3  increasing payment recoveries through the RADV

4  program?

5      A.    It does not.

6      Q.    Seeing this document now, do you have

7  any reason to believe that that issue about

8  lowering the confidence interval to increase

9  payment recoveries was never discussed within the

10 Division of Payment Validation?

11          MS. OBEREMBT:  Objection; vague.

12          THE WITNESS:  I do not recall.  I don't

13 know.

14 BY MR. MARTINEZ:

15     Q.    So on the subject of payment recovery,

16 at what point in the process does -- is payment

17 recovery by CMS supposed to happen?

18          MS. OBEREMBT:  Objection; vague.

19 BY MR. MARTINEZ:

20     Q.    Do you understand my question?

21     A.    I do.  Just give me one moment.

22 Following the first level of appeal, the

23 reconsideration step.

24     Q.    And I think previously you made

25 reference to the nomenclature "medical record



Page 180

1  dispute" and that having changed over time.  Did

2  that change into reconsideration?

3      A.    Correct.

4      Q.    Can you briefly describe what the

5  reconsideration process is?

6      A.    The reconsideration process as designed

7  was a coder not involved in looking at the medical

8  record originally would review it based on -- plans

9  would be allowed to dispute -- if the HCC was

10  discrepant, plans would be allowed to dispute one

11  medical record and be required to point out where

12  in the medical record there was proof that the

13  patient did have that HCC.

14      Q.    So I have this right -- and this was the

15  process for payment year 2011 through 2015?

16      A.    This has not actually occurred for any

17  of those years.

18      Q.    Okay.  So the reconsideration process

19  has not occurred for even payment year 2011?

20      A.    Correct.

21      Q.    But how it's supposed to work is it

22  introduces a third layer of review of the medical

23  records to see if in fact a record supports a

24  particular HCC in dispute.  Is that right?

25      A.    Give me a moment.  I want to make sure I



Page 181

 1   have the correct description.

 2            Could you ask -- what was the question

 3   again?

 4       Q.   The question was how reconsideration is

 5   supposed to work is by introducing a third layer of

 6   review of the medical records to see if in fact a

 7   particular HCC is supported by the record submitted

 8   by the MA plan.

 9       A.   Yes, it's another -- it is in effect --

10   it's supposed to be another review.

11       Q.   Okay.  And it's CMS's understanding that

12   through the reconsideration process, those

13   preliminary RADV findings of whether or not an HCC

14   is supported by the medical records, that those

15   could be overturned in reconsideration; right?

16       A.   Correct.

17       Q.   And so I just want to walk through what

18   that process would look like in practice.  But

19   before I do, I want to confirm that this has not

20   happened yet; right?  And by "this," I mean

21   reconsideration.

22       A.   Reconsideration has not occurred for any

23   of the audits during the time period.

24       Q.   Okay.  And is that through July 2021, or

25   is that up until today, as far as you know?



Page 182

1        A.    It's through July -- I can speak to

2   July 2021.  I don't think it's happened to date.

3        Q.    So as I understand, the way it's

4   supposed to work is an MA plan will submit medical

5   records to support HCCs for a sampled enrollee;

6   right?  Just starting at the beginning.

7        A.    Correct.

8        Q.    And then there's two layers of review by

9   well-trained, well-qualified RADV coders that

10  happens next.  Right?

11             MS. OBEREMBT:  Objection; vague.

12             THE WITNESS:  There are two levels of

13  review by RADV coders.

14  BY MR. MARTINEZ:

15        Q.    Okay.  And then sometimes the RADV

16  coders, both of them agree that an HCC that was

17  submitted by an MA plan is not supported by the

18  medical records that have been submitted; right?

19        A.    Correct.

20        Q.    And then CMS presumably alerts the MA

21  plan through that preliminary audit report of that

22  finding; right?

23        A.    The plan would be alerted through that

24  preliminary audit report.  However, that has not

25  been issued.



Page 183

```
 1        Q.    That report has not been issued for
 2   payment year 2011 even?
 3        A.    Correct.
 4        Q.    So let's assume it has -- let's assume
 5   that CMS alerts a plan about the HCCs that CMS
 6   claims are unsupported by the medical records.  Now
 7   we move to the reconsideration process.  And in
 8   that process, an MA plan can say:  No, wait a
 9   minute.  Take a look at this one record and that's
10   where we think it is in fact supported.  Is that
11   right?
12             MS. OBEREMBT:  Objection; calls for
13   speculation.
14             THE WITNESS:  It would have to be a
15   record that was already submitted.
16   BY MR. MARTINEZ:
17        Q.    So it's a record that's already
18   submitted; right?
19        A.    Correct.
20        Q.    And the plan can only point to one
21   record in the reconsideration context, not the
22   five, or up to five; right?
23        A.    I believe it's one per each HCC.
24        Q.    And so once the plan identifies that one
25   medical record for that one HCC, then there is a
```



Page 184

1    third layer of review by a third coder who then

2    makes an assessment as to whether or not that

3    record supports the HCC that has been submitted for

4    payment; correct?

5         A.    That was the process as designed.

6    Again, these results have not been issued, so I'm

7    being kind of speculative.

8         Q.    Well, you're not being speculative, but

9    you're just explaining how the process is supposed

10   to work; right?

11        A.    Based on my knowledge, yes.

12        Q.    And based on your having been designated

13   as the government's representative to testify on

14   Topic 5.

15             And so if CMS's findings were in fact

16   overturned with respect to a particular HCC, that

17   would mean that this third coder would have found

18   support in the medical record submitted for that

19   HCC that two previous well-trained, well-qualified

20   coders did not report; correct?

21             MS. OBEREMBT:  Objection; vague.  And

22   calls for speculation.

23             THE WITNESS:  That is one option.

24   Another reason a lot of records were found not to

25   support the HCC was not because of a disagreement



3142

Page 185

 1    in the coding but was due to what we call invalid

 2    issues such as lack of a signature, not being from

 3    the correct data collection year.

 4    BY MR. MARTINEZ:

 5         Q.    So not every discrepant finding is

 6    because there is an unsupported HCC; correct?

 7         A.    Correct.  It's unsupported in that

 8    it's -- there is something that makes the medical

 9    record invalid.

10         Q.    Okay.  And what you're saying is there

11    are multiple reasons why a medical record -- or why

12    there might be a discrepant finding.  One of those

13    reasons could be that there is no support in the

14    medical record submitted for the HCC being audited;

15    right?

16         A.    Correct.

17         Q.    And so I'm only concerned about that

18    scenario.  And so in that scenario, in the

19    reconsideration circumstance where reconsideration

20    results in overturning the previous findings, you

21    have a third coder who in that case would have

22    found the HCC to be supported by the medical record

23    when two previous well-trained, well-qualified

24    coders did not report that HCC?

25              MS. OBEREMBT:  Objection; vague.  Calls



Page 202

1        A.    I did not.

2        Q.    Did you ask to review any of those

3   reports in preparation for your testimony today?

4        A.    I did not.

5        Q.    Why not?

6        A.    I don't know.

7        Q.    But you understand -- your understanding

8   is that those reports do exist and they do contain

9   information specific to plans that were audited for

10  payment years 2011, 2012 and 2013; is that right?

11       A.    Yes.

12       Q.    And your understanding is that -- well,

13  strike that.

14             Have you seen any of these reports

15  previously?

16       A.    I have not.

17       Q.    So where did you get that understanding

18  from?

19       A.    I believe on the RADV public website

20  there's a presentation about it.

21       Q.    Did you review that presentation in

22  preparation for your testimony today?

23       A.    I do not recall.  If I did, it was a

24  while ago.

25       Q.    And that presentation is not in the



Page 203

1    binder you have in front of you; correct?

2         A.    It is not.

3         Q.    All right.  So let's -- I believe we

4    already established that for the payment year 2011

5    audit there were 30 MA plans that were selected for

6    auditing.  Is that right?

7         A.    Correct.

8         Q.    And CMS audited four UnitedHealth plans

9    for payment year 2011; is that right?

10        A.    That appears to be what the presentation

11   indicates.

12        Q.    Okay.  So if we go to page 5 of

13   Exhibit 1187-1, do you see that there are four

14   UnitedHealth Group plans listed here?  The first

15   one is contract ID H0543.  The second is H2226.

16   The third is H4522.  And the last is H4590.

17        A.    I do.

18        Q.    And if I use the acronym UHG, will you

19   understand that I'm referring to the UnitedHealth

20   Group plans?

21        A.    Okay.

22        Q.    So looking here at the four UHG plans

23   that CMS selected for auditing for payment year

24   2011, do you see that two of those plans, H0543 and

25   H4590, are the two largest plans that were audited



3145

Page 204

1    in terms of total PY 2011 contract payment?

2        A.    I'm sorry, which plans are you referring

3    to?

4        Q.    I'm referring to UHG plan H0543 and

5    H4590.

6        A.    Yes, those appear to be the largest in

7    terms of contract payments.

8        Q.    Those are the only two plans audited for

9    PY 2011 that had contract payments for that year in

10   excess of $2 billion; is that right?

11       A.    That is what this chart indicates.

12       Q.    And -- excuse me.  Both of those plans

13   were in the high coding intensity bucket that we

14   talked about earlier today; right?  Would you like

15   to refresh --

16       A.    I don't know.  I need to refresh my

17   memory on that.

18       Q.    Let's go back to Exhibit 1498.  And if

19   you go to, let's see, it's got 19 on the bottom

20   right of it.  So let's look first for H0543.  Which

21   coding intensity group is that in?  It's at the

22   bottom.

23       A.    High.

24       Q.    Okay.  And then the next one I asked

25   about was UHG plan H4590, which is the second from



Page 205

1     the bottom.  What coding intensity group is that

2     in?

3          A.     That is also high.

4          Q.     So does that refresh your recollection

5     that the two largest plans that were audited for

6     payment year 2011 were both from the high intensity

7     coding group?

8          A.     That is what the document says.

9          Q.     And you have no dispute the accuracy of

10    those documents?

11         A.     I have no reason to dispute it.

12         Q.     All right.  And in fact, a third of the

13    four UHG plans was also from the high coding

14    intensity bucket.  That would be H2226.  Do you see

15    that in comparing Exhibits 1187-1 and 1498?

16         A.     I do.

17         Q.     CMS -- well, let me pause there.

18                Do you know why these four specific UHG

19    plans were selected for auditing in payment year

20    2011?

21         A.     They were selected as they were part of

22    the high intensity -- coding intensity payment

23    group.

24         Q.     And as far as you know, was that the

25    only criteria that was used for selecting those



Page 206

1    four UHG plans for payment year 2011?

2         A.    I believe so, unless it was in a,

3    quote-unquote, OIG plan, which I do not know.

4         Q.    CMS's RADV results have not shown a

5    correlation between coding intensity and payment

6    error; correct?

7         A.    That is correct.

8         Q.    And so MA plans like these UHG plans can

9    be coding more intensely yet still be coding

10   accurately; right?

11              MS. OBEREMBT:  Objection; calls for

12   speculation.

13              THE WITNESS:  That is possible.

14   BY MR. MARTINEZ:

15        Q.    And I think we've been over this before,

16   but the total recovery amount that CMS calculated

17   for payment year 2011 was roughly $98 million;

18   right?

19        A.    Correct.

20        Q.    And the existence of -- let's take other

21   plans besides the UHG plans here.  But the

22   existence of a contract-level overpayment that CMS

23   has identified, that does not mean that an MA plan

24   has engaged in fraud; correct?

25              MS. OBEREMBT:  Objection; calls for



Page 207

1    speculation.

2              THE WITNESS:  That determination either

3    way cannot be made from the RADV audits.

4    BY MR. MARTINEZ:

5         Q.    Well, just because CMS determines that

6    an MA plan, say at the contract level, has a net

7    overpayment does not by itself mean that CMS

8    believes the MA plan has committed fraud; right?

9              MS. OBEREMBT:  Objection; calls for

10   speculation.  And asked and answered.

11             THE WITNESS:  This exercise was not

12   designed to identify fraud.

13   BY MR. MARTINEZ:

14        Q.    So the answer to my question is yes?

15             MS. OBEREMBT:  Objection; calls for

16   speculation.  Asked and answered.

17             THE WITNESS:  Please restate your

18   question.

19   BY MR. MARTINEZ:

20        Q.    My question was:  Just because CMS

21   determines that an MA plan at the contract level

22   has a net overpayment does not by itself mean that

23   CMS believes the MA plan has committed fraud?

24             MS. OBEREMBT:  Same objection.

25             THE WITNESS:  Again, this exercise was



3149

Page 207

1    speculation.

2              THE WITNESS:  That determination either

3    way cannot be made from the RADV audits.

4    BY MR. MARTINEZ:

5         Q.    Well, just because CMS determines that

6    an MA plan, say at the contract level, has a net

7    overpayment does not by itself mean that CMS

8    believes the MA plan has committed fraud; right?

9              MS. OBEREMBT:  Objection; calls for

10   speculation.  And asked and answered.

11             THE WITNESS:  This exercise was not

12   designed to identify fraud.

13   BY MR. MARTINEZ:

14        Q.    So the answer to my question is yes?

15             MS. OBEREMBT:  Objection; calls for

16   speculation.  Asked and answered.

17             THE WITNESS:  Please restate your

18   question.

19   BY MR. MARTINEZ:

20        Q.    My question was:  Just because CMS

21   determines that an MA plan at the contract level

22   has a net overpayment does not by itself mean that

23   CMS believes the MA plan has committed fraud?

24             MS. OBEREMBT:  Same objection.

25             THE WITNESS:  Again, this exercise was



Page 208

1    not designed to determine fraud.  CMS can't make

2    that determination whether or not it has committed

3    fraud.

4    BY MR. MARTINEZ:

5        Q.    But you understand that CMS has said in

6    the RADV context that neither payment errors nor

7    coding differences are fraud; right?

8        A.    Correct.  In and of themselves, no.

9        Q.    Right.  So in and of themselves, the

10   plans on here, not the UHG plans but the other

11   plans that have contract-level overpayments, that

12   fact alone does not mean that CMS believes they

13   have all committed fraud; right?

14            MS. OBEREMBT:  Objection; calls for

15   speculation.  Asked and answered.

16            THE WITNESS:  Correct.  But CMS is not

17   conducting this exercise to determine if there is

18   fraud.

19   BY MR. MARTINEZ:

20       Q.    So staying on page 5 of Exhibit 1187-1,

21   all three -- excuse me, all four of the UHG plans

22   that were audited, CMS determined that they had no

23   recovery amounts at any of the three confidence

24   intervals listed in this chart.  Is that right?

25       A.    That is correct.



Page 209

 1        Q.    In fact, CMS calculated that all four

 2   UHG plans that were audited for payment year 2011

 3   had net underpayments; correct?

 4        A.    No.   H0543 had a payment error of

 5   32 million, in excess of $32 million.

 6        Q.    So I'm going to direct your attention to

 7   page 7 of this presentation.  Do you see where the

 8   four UHG plans appear in this chart?

 9        A.    I do.  But that's the confidence

10   interval calculation.

11        Q.    Right.  And to be clear, the confidence

12   interval calculation is the published methodology

13   that CMS disclosed that it would be using for

14   determining whether a plan at the contract level

15   had been net overpaid or underpaid; right?

16        A.    Again, that was -- the confidence

17   interval was the way to determine the payment

18   recovery, whether there would be a payment recovery

19   or if it would be zero.

20        Q.    Let's stay on page 7 here.  But do you

21   agree with me that all four of the UHG plans, based

22   on CMS's calculations, show net underpayments at

23   the 99 percent confidence interval?

24             MS. OBEREMBT:  Objection; asked and

25   answered.

Page 213

1    see both exhibits report a net underpayment of

2    $2,068,360?

3         A.    Yes.

4         Q.    So Exhibit 1498, which is in your

5    binder, is dated December of 2017.  Is that right?

6         A.    Correct.  This is the same one that's

7    identical to the one in the binder except printed

8    on bigger paper?

9         Q.    Yes.  And so the numbers -- the point is

10   the numbers in the December 2017 version in terms

11   of net underpayments for the four UHG plans audited

12   by CMS for payment year 2011 are the same; right?

13        A.    That is what it appears.

14        Q.    The numbers didn't change between

15   May 2016 and December 2017; right?

16        A.    They do not appear to, based on what you

17   had me look at.

18        Q.    Since December 2017, has CMS amended

19   these net underpayment calculations that it made

20   for the four UHG plans audited in payment year

21   2011?

22        A.    I did not review any documents that

23   showed that.

24        Q.    So as far as you understand it, these

25   net underpayment amounts that CMS calculated with



3153

Page 214

1    respect to the UHG plans for payment year 2011 are

2    not going to change?

3               MS. OBEREMBT:  Objection; calls for

4    speculation.

5               THE WITNESS:  That calls for

6    speculation.  I can't tell what will happen in the

7    future.

8    BY MR. MARTINEZ:

9         Q.    Okay.  So I want to turn your attention

10   to the second page of the slide deck, 1187-1.  And

11   do you see in the last bullet CMS refers to the

12   recovery amounts for CON11 as preliminary?

13        A.    I do see that.

14        Q.    And then do you see how CMS defines

15   preliminary, which means "before a FFSA and before

16   appeals"?

17        A.    That is correct.

18        Q.    And FFSA refers to the fee-for-service

19   adjuster; correct?

20        A.    That's my assumption.

21        Q.    Okay.  So if that's what preliminary

22   means according to CMS, then the recovery amounts

23   that are listed in Exhibit 1187-1, those recovery

24   amounts are only going to decrease through the

25   application of a fee-for-service adjuster or any



Page 215

1    appeals process; right?

2              MS. OBEREMBT:  Objection; calls for

3    speculation.

4              THE WITNESS:  That would seem to be the

5    case.

6              MR. MARTINEZ:  Have we been going for an

7    hour?

8              MS. OBEREMBT:  No.

9              THE WITNESS:  Where are we at?

10             MS. OBEREMBT:  We started at 3:51.

11             (Off the record.)

12   BY MR. MARTINEZ:

13       Q.    So let's go back to page 7 of

14   Exhibit 1187-1.  This is the page of the CMS slide

15   deck for payment year 2011 that shows the net

16   underpayments for each of the UHG plans.

17       A.    I'm sorry, what page?

18       Q.    Oh, I'm sorry.  Page 7.

19       A.    Okay.

20       Q.    Do you see there is a column on the far

21   right that says "HCC Discrepancy Rate"?

22       A.    I do.

23       Q.    And I think as we talked about earlier,

24   built within that discrepancy rate is some number

25   of unsupported -- strike that.



Page 216

1          Built within the HCC discrepancy rate

2    reported here by CMS is some number of HCCs that

3    CMS's medical record review contractors found were

4    not supported by the medical records; correct?

5          A.    Yes, according to -- yes.

6          Q.    So what this chart is indicating is that

7    even though each of these four UHG plans that CMS

8    audited had HCC discrepancy rates of -- exceeding

9    10 percent in all cases, those four plans still,

10   according to CMS, had net underpayments for payment

11   year 2011; correct?

12         A.    In the context of the RADV calculation.

13         Q.    Right.  So the answer to my question is

14   yes?

15              MS. OBEREMBT:  Objection; misstates what

16   the witness just said.

17              THE WITNESS:  In the case of the RADV

18   calculation and the nomenclature in the slide deck,

19   the RADV.

20   BY MR. MARTINEZ:

21         Q.    Okay.  So what this slide deck is

22   reporting in the RADV context for payment year 2011

23   is that all four of the UHG plans that were audited

24   and that CMS determined had net underpayments for

25   that year, each of them also had at least an



Page 223

1      Q.    And do you understand that parent

2   organization is essentially referring to the large

3   Medicare Advantage organizations that had plans

4   that were sampled -- that were selected for the

5   RADV audits for payment years 2011 to 2013?

6      A.    The way I would phrase it is the parent

7   organization is the highest level, and under the

8   parent organizations are the contracts, and RADVs

9   were kept at the contract level.



22      Q.    And then lastly, it says the

23   UnitedHealth Group plans account for 0.0 percent of

24   total recovery amount.  Do you see that?

25      A.    I do.



Page 224

1      Q.    And so according to this document that

2   was in your reliance binder, UnitedHealth Group --

3   the four UnitedHealth Group plans had the lowest

4   percentage of total recovery amount relative to the

5   other parent organizations whose plans were

6   audited?

7      A.    That is what this is highlighting.  But

8   it's not -- I don't believe this is inclusive of

9   all parent orgs that had plan sampled.

10     Q.    Okay.  And is this inclusive of parent

11  orgs that are considered peers in the Medicare

12  Advantage industry?

13          MS. OBEREMBT:  Objection; vague.

14          THE WITNESS:  I believe that it's of the

15  large parent orgs.

16  BY MR. MARTINEZ:

17     Q.    Okay.  So maybe we'll refer to the

18  information conveyed on this page as -- with

19  respect to the large parent organizations in

20  Medicare Advantage.  Is that fair?

21     A.    Sure.

22     Q.    Okay.  So among the four large parent

23  organizations that had plans that were audited by

24  CMS for payment year 2011, UnitedHealth Group

25  accounted for the lowest percentage of the total



Page 225

1    recovery amount that CMS calculated for that year;

2    correct?

3        A.    That's what's indicated here.

4        Q.    And that's the case -- if you flip now

5    to two pages down.

6        A.    What page number?

7        Q.    So it's page 4.  You see there are three

8    bar charts on this page?

9        A.    I do.

10       Q.    So let's stick with payment year 2011

11   which is in the top left.  Do you see that bar

12   chart?

13       A.    Yes.

14       Q.    And the recovery amount is indicated by,

15   I guess, what appears to me to be an

16   orangish-reddish circle on the bar chart.  Do you

17   see that?

18       A.    I do see that.  Give me a minute.  This

19   chart has two axes.  One is population and the

20   other is the recovery amount, it appears.

21       Q.    And so this bar chart on the top left

22   is -- one of the things it's indicating is that,

23   again, as we know, the UnitedHealth plans audited

24   for that year, CMS calculated a zero recovery

25   amount; right?



Page 226

1        A.     Just give me a second to look at the

2   numbers here and put this in a little context.

3               Correct.

4        Q.     And you alluded to this already, but

5   there is another axis that refers to the eligible

6   population in the thousands.  Is that right?

7        A.     Correct.

8        Q.     And what do you understand the eligible

9   population to refer to?

10       A.     I believe that refers to the population

11  to whom the sample results would be extrapolated.

12       Q.     And so what this bar chart on the top

13  left for payment year 2011 is telling us is that

14  the four UnitedHealth plans that were audited that

15  year by CMS had by far the largest number of

16  eligible population members; correct?

17       A.     When combined.  When combined, the UHG

18  plans had the largest population.

19       Q.     Okay.  And looking at this chart, just

20  eyeballing it, by a significant margin it was the

21  highest population; right?

22       A.     It appears so.

23       Q.     And so even though the four UHG plans

24  that were audited when combined had by far the

25  largest eligible population, those UHG plans still



Page 227

1    had the lowest recovery amount of any of the large

2    parent organizations that were audited for payment

3    year 2011; correct?

4         A.    I do not know this.  All of these seem

5    to be very close to the zero axis.

23              Could you rephrase your question?

24         Q.    Sure.

25              My question is:  Even though the



Page 228

1    UnitedHealth Group plans had by far the largest

2    eligible populations of the large parent

3    organizations whose plans were audited for payment

4    year 2011, the UHG plans also had the lowest

5    percentage of payment recovery based on CMS's

6    calculations for that year.  Correct?

7              MS. OBEREMBT:  Objection; vague.

8              THE WITNESS:  That is what this slide

9    deck seems to indicate, that it accounts for zero

10   percent of total recovery.

11   BY MR. MARTINEZ:

12        Q.    All right.  And going back to the slide

13   that you're currently on, which I believe is the

14   third page of Exhibit 1498, UHG also had the most

15   plans audited among the large parent organizations

16   for payment year 2011.  Is that right?

17        A.    It did.

18        Q.    It had four plans audited, Aetna had

19   three, Cigna had three and Humana had one.

20   Correct?

21        A.    That is what this indicates.

22        Q.    And so even though UnitedHealth Group

23   had the most plans audited and the largest

24   population for payment year 2011, it had the lowest

25   percentage of total recovery amount for that year;



Page 229

1    correct?

2         A.    At the parent org level, that's what

3    this says.

4         Q.    Let's go back to the May 2016 slide

5    deck, Exhibit 1187-1.  And I would like to direct

6    your attention to page 10 of that exhibit.

7              Do you see that the title for this slide

8    is "HCC Discrepancy Rates for Major Parent Orgs"?

9         A.    I do.

10        Q.    And do you see that there is a column

11   for it appears to be five parent orgs, one of which

12   includes UHG?

13        A.    Yes.

14        Q.    And then there is another column that

15   reports the payment year 2011 HCC discrepancy rate

16   that CMS calculated for the plans that are part of

17   each of those parent organizations.  Is that right?

18        A.    I do see that.

19        Q.    And in that column, do you see that the

20   HCC discrepancy rate for the four UnitedHealth

21   Group plans audited was 12.3 percent?

22        A.    I do.

23        Q.    And that figure is the lowest of any of

24   the parent organizations audited for payment year

25   2011; correct?



Page 230

1        A.    I cannot say that.  I can say it was the

2    lowest of these five parent organizations.

3        Q.    And these are the parent organizations

4    that CMS is referring to as the major parent

5    organizations?

██   ██   ████████   ██████████

██   ████████████████████████

██   ████████   ██████████████   ██

██   ████████████████████████

10       Q.    Well, CMS, in the slide deck that we're

11   looking at now, is referring to these five parent

12   organizations as the major parent organizations;

13   right?

14       A.    Right.

15       Q.    And among those five major parent

16   organizations that CMS has identified, UnitedHealth

17   Group has the lowest HCC discrepancy rate for

18   payment year 2011; correct?

19       A.    That's what this slide shows.

20       Q.    And you have no reason to dispute the

21   accuracy of this slide; correct?

22       A.    I do not.

23       Q.    And on the 12.3 percent number, is

24   another way of saying that that CMS validated

25   roughly 88 percent of the HCCs that the UHG plans



Page 231

1    submitted as part of the RADV audit for payment

2    year 2011?

3              MS. OBEREMBT:  Objection; vague.

4              THE WITNESS:  Could you be more

5    specific?

6    BY MR. MARTINEZ:

7         Q.    Is another way of communicating the

8    12.3 percent figure that's shown on this slide that

9    CMS, through the RADV audit, validated roughly

10   88 percent of the HCCs that the UHG plans submitted

11   as part of the RADV audit for payment year 2011?

12             MS. OBEREMBT:  Objection; vague.

13             THE WITNESS:  Yes, that's kind of

14   putting it another way.  It's a little less than

15   88 percent.

16   BY MR. MARTINEZ:

17        Q.    Okay.  So a little less than 88 percent

18   is what we'll call the HCC validation rate for the

19   UHG plans for payment year 2011.  Is that fair?

20        A.    Okay.

21        Q.    Is that a yes?

22        A.    Yes.

23        Q.    So what that nearly 88 percent number

24   means is that for 88 percent of the HCCs that the

25   four UnitedHealth plans submitted as part of the



Page 232

1    2011 RADV audit, CMS was able to validate those

2    HCCs as being supported by the medical records that

3    the UHG plans submitted; correct?

4         A.    Correct.

5         Q.    Would you agree with me that these

6    results that we've looked at both in this exhibit

7    and the prior one demonstrate that when it comes to

8    the large or major MA parent organizations,

9    UnitedHealth Group is the industry leader when it

10   comes to submitting accurate risk adjustment data

11   as part of the RADV process?

12             MS. OBEREMBT:  Objection; vague.

13             THE WITNESS:  Could you ask that another

14   way?

15   BY MR. MARTINEZ:

16        Q.    Sure.

17             Would you agree with me that

18   UnitedHealth Group is, according to CMS's own

19   calculations, performing better than its peers, all

20   of its peers, when it comes to submitting accurate

21   risk adjustment data for validation?

22             MS. OBEREMBT:  Objection; vague.

23             THE WITNESS:  Again, it appears on this

24   limited chart that just lists the other large

25   parent organizations, that it does have the lowest



Page 233

1    discrepancy rate in that comparison.

2    BY MR. MARTINEZ:

3        Q.    Okay.  So we see on this chart it has

4    the lowest HCC discrepancy rate, and we saw in

5    Exhibit 1498 that it also had the lowest percentage

6    of any recovery amount for payment year 2011;

7    right?

8        A.    Yes.  Out of what this deck here in

9    slide 10 calls the, quote-unquote, major parent

10   orgs.

11       Q.    So in that respect, would you agree that

12   UnitedHealth Group is performing better in the 2011

13   RADV audits than any of the other large or major

14   parent organizations that had plans audited for

15   that payment year?

16           MS. OBEREMBT:  Objection; vague.

17           THE WITNESS:  I don't know that I would

18   characterize it as performing better.  ██████████

██  ████████████████████████████████

20   BY MR. MARTINEZ:

21       Q.    But 12 percent is lower than 15 percent;

22   right?

23       A.    It is.

24       Q.    And --

25       A.    I don't know if it's significantly



Page 237

```
 1                  THE WITNESS:  I don't know if I would
 2   characterize it as a good partner type of exercise.
 3   And again, without getting more detailed about each
 4   United contract that was audited, I can't tell.
 5   Did they submit records for all of their enrollees?
 6   This is a blunt number.  I can't really tell.
 7   BY MR. MARTINEZ:
 8       Q.    Did any of the UHG plans that were
 9   audited refuse to participate in the process in any
10   way?
11       A.    That was not indicated in any of the
12   information I reviewed.
13       Q.    So as far as you know as the
14   government's designee to testify on Topic 5, you
15   have no information that any of the UHG plans that
16   were audited for payment years 2011 to 2013 refused
17   to participate in any way in any of those audits;
18   correct?
19                  MS. OBEREMBT:  Objection; outside the
20   scope.  And vague.
21                  THE WITNESS:  I did not review any
22   information or receive any information that
23   indicated that.
24   BY MR. MARTINEZ:
25       Q.    So I want to transition now to the
```



Page 238

1    results for the 2012 and 2013 audits that CMS

2    conducted.  To assist us in that endeavor, I'm

3    going to mark an exhibit.  This will be

4    Exhibit 1500.

5            (Exhibit 1500 marked for identification

6        and attached hereto.)

7    BY MR. MARTINEZ:

8        Q.    So let me give you a little bit of

9    background as to what Exhibit 1500 is.  So what it

10   is is it's a printout of an Excel that took the

11   information from the last three pages of

12   Exhibit 1498 but only extracted the information in

13   that exhibit related to the UHG plans that were

14   audited by CMS for payment years 2011 to 2013.

15           Okay?  Do you understand that?

16       A.    Let me just double-check.

17           Okay.  That's what it appears to be.

18       Q.    So you've gone through and checked the

19   numbers to make sure that they tie out?

20       A.    I did a spot-check, one for each year.

21       Q.    Did all of the ones that you checked

22   look accurate?

23       A.    Yes.  Of the three I checked, yes.

24       Q.    So again, what this document

25   Exhibit 1500 is showing is it's just isolating the



Page 239

1    UHG plans from the spreadsheets that are included

2    at the back of Exhibit 1498.  And it includes the

3    contract ID, the year in which that contract was

4    audited, the fact that these are the UHG plans, the

5    coding intensity group that CMS categorized them

6    into, and then the recovery amounts that CMS

7    calculated for each of those plans for each of

8    those years.

9              Do you see that?

10        A.    I do.

11        Q.    Okay.  So for -- so we've already walked

12   through the net underpayments for payment year

13   2011.  So I want to move now to 2012.  Is that

14   okay?

15        A.    Okay.

16        Q.    So for payment year 2012, the first UHG

17   plan that was audited is ID number H5420.

18        A.    Okay.

19        Q.    And for that plan, in 2012 CMS reported

20   a recovery amount of $15,735,769.  Is that right?

21        A.    That's correct.

22        Q.    Okay.

23        A.    That's what it indicates.

24        Q.    And then for the next plan audited for

25   payment year 2012, ID R7444, for that UHG plan CMS



Page 240

1    determined a net underpayment of $3,962,831.  Is

2    that correct?

3         A.    That's what it indicates.

4         Q.    And when you say that's what it

5    indicates, what do you mean?

6         A.    That is what is on the chart, and I'm

7    assuming, based on my spot-check, that that is from

8    the slide deck produced, which I have no reason to

9    believe is incorrect.

10        Q.    Okay, great.

11              And then moving on to the third UHG plan

12   audited in payment year 2012, H5652, CMS calculated

13   a net underpayment of $4,740,216.  Is that correct?

14        A.    Yes, that's what it says.

15        Q.    And then for contract ID H0251, a United

16   plan CMS audited in payment year 2012, CMS

17   calculated a net underpayment of $69,295,194.  Is

18   that correct?

19        A.    Repeat the contract number again.

20        Q.    I'm sorry.  I may have messed that up.

21   I did.

22              So this is contract number R5287.

23   Strike that.

24              Let's -- strike that.

25              Going back to contract ID H0251, the net



Page 241

1    underpayment that CMS reported is $10,348,919.

2    Right?

3        A.    Yes.

4        Q.    My apologies for that.

5              And then for the last, the fifth and

6    final UHG contract CMS audited for payment year

7    2012, ID R5287, CMS calculated a net underpayment

8    of $69,295,194.  Is that correct?

9        A.    That's what is indicated.

10       Q.    Okay.  So a quick summary of payment

11   year 2012, CMS audited five UHG plans for that

12   payment year; correct?

13       A.    Correct.

14       Q.    And all five of those plans CMS

15   classified as being in the high coding intensity

16   group?

17       A.    Yes, that's what's indicated.

18       Q.    And four of those five plans had net

19   underpayments according to CMS's calculations for

20   payment year 2012; correct?

21       A.    For calculations in the RADV context, a

22   net underpayment was the lower bound calculation.

23       Q.    Okay.  And that was the case for four of

24   the five plans that CMS audited in payment year

25   2012?



Page 242

 1      A.    Yes, that's what the information

 2    indicates.

 3      Q.    All right.  Let's transition now to

 4    payment year 2013.  And you can see that CMS

 5    audited six UHG plans for payment year 2013.  Is

 6    that right?

 7      A.    Yes.

 8      Q.    And all six of those plans CMS

 9    classified as being in the high coding intensity

10    group?

11      A.    It appears so, yes.

12      Q.    Let's go through them briefly one by

13    one.  So the first plan listed for 2013 is R9896,

14    and for that plan CMS reported a recovery amount of

15    $4,065,269.  Is that right?

16      A.    Yes.

17      Q.    Okay.  Moving on to plan H3107, a UHG

18    plan that was audited by CMS in 2013, CMS reported

19    a net underpayment of $1,581,972.  Is that correct?

20      A.    Yes.

21      Q.    And for UHG contract ID H0151 audited by

22    CMS in payment year 2013, CMS reported a net

23    underpayment of $7,790,780.  Is that correct?

24      A.    Yes.

25      Q.    For UHG contract ID H4514, CMS



Page 243

1   calculated a net underpayment for that plan in

2   payment year 2013 of $9,302,996.  Correct?

3       A.   Yes.

4       Q.   For UHG plan H2931 which CMS audited in

5   payment year 2013, CMS calculated a net

6   underpayment of $10,078,497.  Is that correct?

7       A.   Yes.

8       Q.   And then finally, for UHG plan R5342

9   which CMS audited for payment year 2013, CMS

10  calculated a net underpayment of $14,309,264.  Is

11  that correct?

12      A.   Correct, it indicates that information.

13      Q.   So we've gone through all the recovery

14  amount information for the 15 UHG plans that CMS

15  audited during payment years 2011, 2012 and 2013;

16  right?

17      A.   Yes.

18      Q.   And of those 15 plans that CMS audited

19  during those payment years, 13 of them had net

20  underpayments according to CMS's calculations;

21  correct?

22      A.   Correct.  That's what's indicated.

23      Q.   Okay.  And then if you do a sum of all

24  of those overpayments and underpayments that CMS

25  calculated, that's reflected in the number on



Page 244

1    Exhibit 1500 beneath the right-hand side column,

2    and that comes out to $261 million -- sorry.

3    $261,202,498 in total net underpayments for the 15

4    UHG plans that CMS audited in the years 2011 to

5    2013; correct?

6         A.    That is what this says.  I've never

7    seen -- none of the documents I reviewed had

8    information presented this way.

9         Q.    And if you would like, I can show you

10   the Excel that sums this information.

11        A.    Sure, that would be great.

12             MR. MARTINEZ:  Okay.  Let's go off the

13   record briefly so we can set that up.

14             THE VIDEOGRAPHER:  Going off the record

15   at 17:37.

16             (Off the record.)

17             (Recess taken.)

18             THE VIDEOGRAPHER:  We are back on the

19   record at 17:46.

20   BY MR. MARTINEZ:

21        Q.    Okay.  Are you able to see the Excel

22   that was used to generate Exhibit 1500 on the

23   screen?

24        A.    I am.

25        Q.    So I just want to draw your attention to



Page 245

1    box E18.  And do you see where in that box --

2    that's the box that contains the $261 million

3    figure -- that it refers to the sum of the previous

4    entries that are listed on Exhibit 1500?

5         A.    Yes.

6         Q.    And if we can move up there, you can see

7    that when you sum the overpayment and underpayment

8    amounts for the 15 UHG plans that CMS audited for

9    payment years 2011 to 2013, that the results in

10   total is a net underpayment to those plans of

11   $261,202,498?

12        A.    Yes.

13        Q.    So what I would like to do now is my

14   colleague is going to sort the recovery amounts by

15   size in the Excel.  So he's sorting them from

16   smallest to largest.  So what that means is that

17   the most negative amount is going to appear on the

18   top, and then the two plans with overpayments that

19   CMS calculated will appear at the bottom.

20        A.    Okay.

21              (Exhibit 1501 marked for identification

22        and attached hereto.)

23   BY MR. MARTINEZ:

24        Q.    And so what I would like to do is I'm

25   going to hand you what's been marked as



Page 246

1    Exhibit 1501, which includes the same -- the exact

2    same data, it's just sorted this time for ease of

3    everyone's review.

4         A.    Uh-huh.

5         Q.    And then it's been color coded so that

6    the net underpayments are shown in green and the

7    net overpayments that CMS calculated are shown in

8    red.

9              Do you see that?

10        A.    Yes.

11        Q.    And does that match up with what you're

12   seeing on the screen?

13        A.    It does.

14        Q.    And so does Exhibit 1501 confirm that

15   for payment years 2011 to 2013, of the 15 plans

16   that CMS audited it calculated net underpayments

17   for 13 of those plans; correct?

18        A.    In the context of RADV, yes, that is

19   what this is showing.

20        Q.    Okay.  Let's -- I'm going to have you

21   keep Exhibit 1501 -- I'm sorry.  If you could go

22   back to Exhibit 1500.  I'm just going to have you

23   keep this exhibit handy.  I'm not going to ask you

24   any more questions about the numbers on the

25   exhibit, but I just want to use it as a reference



Page 249

1        A.    Yes, that is what the information in
2   this deck indicates.
3        Q.    But you don't have the exact number that
4   CMS calculated?
5        A.    I do not believe I reviewed any
6   information that has the exact number, nor do I
7   think it's in either of these two presentations
8   we've looked at.
9        Q.    In preparing to testify today, did you
10  ask for the precise HCC discrepancy rates that CMS
11  calculated for the plans it audited in payment
12  years 2012 and 2013?
13       A.    I did not.  I do not believe I did.
14       Q.    All right.  So I take it, then, for the
15  remaining contract IDs listed in Exhibit 1500, for
16  purposes of today you would be able to estimate
17  what CMS calculated the HCC discrepancy rate to be
18  for those plans but you couldn't give me the exact
19  number.  Is that right?
20       A.    That is correct.
21       Q.    And you have no reason to dispute the
22  accuracy of the information being conveyed in the
23  bar charts on what's labeled page 8 of
24  Exhibit 1498; correct?
25       A.    I do not have any reason to dispute



3178

Page 250

1    that.

2         Q.    Okay.  So I want to direct your

3    attention to another example from payment year

4    2012.  Do you see the bar corresponding to contract

5    ID H5652?

6         A.    I do.

7         Q.    And that was one of the UHG plans that

8    CMS audited for payment year 2012; correct?

9         A.    Yes.

10        Q.    And looking at this bar chart here in

11   Exhibit 1498, does it appear that the HCC

12   discrepancy rate that CMS calculated was roughly

13   10 percent?

14        A.    It does.

15        Q.    And so that means that for 90 percent of

16   the HCCs that were submitted by this UHG plan for

17   auditing in payment year 2012, that CMS was able to

18   validate the HCC as being supported by the medical

19   records; correct?

20             MS. OBEREMBT:  Objection; vague.

21             THE WITNESS:  That is an alternate way

22   of expressing a 10 percent discrepancy rate.

23   BY MR. MARTINEZ:

24        Q.    So the answer to my question is yes?

25             MS. OBEREMBT:  Objection; vague.



Page 251

1              THE WITNESS:  Yes.

2    BY MR. MARTINEZ:

3         Q.    And if we were to do the same exercise

4    with the remaining contract IDs for the remaining

5    UHG plans that CMS audited for payment years 2011

6    to 2013, would your answer be the same, that when

7    these bar charts are indicating an HCC discrepancy

8    rate, another way of looking at that is a

9    percentage of the HCCs that CMS was able to

10   validate based on the submissions by the plans for

11   those payment years?

12             MS. OBEREMBT:  Objection; vague.

13             THE WITNESS:  That is another way of

14   putting it.  It's typically not -- we typically

15   talk about a discrepancy rate.  But that is kind of

16   the converse of the discrepancy rate.

17   BY MR. MARTINEZ:

18        Q.    Okay.  And that nomenclature would apply

19   to any other contract ID that we might go through

20   that's listed on these bar charts in Exhibit 1498;

21   right?

22             MS. OBEREMBT:  Objection; vague.

23             THE WITNESS:  Could you be more -- what

24   nomenclature?

25   BY MR. MARTINEZ:



Page 252

1          Q.    The sort of HCC discrepancy rate being

2    the converse of the -- what I'll call an HCC

3    validation rate?

4               MS. OBEREMBT:  Objection; vague.

5               THE WITNESS:  Yes.  If you want to

6    phrase it that way.

7    BY MR. MARTINEZ:

8          Q.    Okay.  And that would apply to any other

9    contract ID that we might look at that CMS audited

10   for these payment years; right?

11         A.    Yes.  For the purpose of this exercise,

12   if you want to refer to it that way.

13         Q.    All right.  So if you go to the cover

14   page of Exhibit 1498, there is an indication that

15   it was produced in native format.  Does that mean

16   that there's -- and I assume that means this was

17   produced as a native PowerPoint.  Well, you may not

18   know the answer to that.

19         A.    I don't know what that means.

20         Q.    So I guess my question is -- and this

21   may be more a question for your counsel.  Do you

22   know if there's an underlying Excel that would

23   contain the precise numbers that are represented in

24   the bar charts on what's labeled as page 8 of

25   Exhibit 1498?

Page 268

```
 1                 C E R T I F I C A T E

 2

 3   STATE OF MARYLAND

 4            I, JOHN L. HARMONSON, a Notary Public

 5   within and for the State of Maryland, do hereby

 6   certify that CAROLYN KAPUSTIJ, the witness whose

 7   deposition is hereinbefore set forth, was duly

 8   sworn by me and that such deposition is a true

 9   record of the testimony given by such witness.

10            That before completion of the

11   proceedings, review and signature of the transcript

12   was reserved.

13            I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17            IN WITNESS WHEREOF, I have hereunto set

18   my hand this 28th day of August, 2023.

19

20   _____

21            JOHN L. HARMONSON, RPR

             My commission expires: 08/16/25

22

23

24

25
```



**EXHIBIT D-123**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
---o0o---


UNITED STATES OF AMERICA, ex     )
rel., BENJAMIN POEHLING,         )
                                 )
            Plaintiff,           )
                                 )   Case No.
      vs.                        )   16-08697 FMO
                                 )
UNITEDHEALTH GROUP, INC., et     )
al.,                             )
                                 )
            Defendants.          )
                                 )




---o0o---


MONDAY, MARCH 25, 2024


VIDEOTAPED DEPOSITION OF DANIEL KESSLER, PH.D.


CONFIDENTIAL TRANSCRIPT


---o0o---




REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR



Page 68

1      Q.   BY MR. THOMSON:  So would that not result

2  in a higher coding intensity level for the MA

3  population in the overall pool as compared to the

4  MA population in the sample pool that was used to

5  calculate the CIA?                                   10:49:10

6          MR. MARTINEZ:  Object to form.

7          THE WITNESS:  Yes.  The answer to that

8  question is yes.  That's -- that's different from

9  the earlier question, but that question, yes.

10     Q.   BY MR. THOMSON:  And you understand that    10:49:29

11  one purpose of retrospective chart reviews

12  performed on behalf of MA plans is to reduce the

13  incidence of type II errors, right?

14          MR. MARTINEZ:  Object to form.

15  Foundation.  Calls for speculation.                  10:49:43

16          THE WITNESS:  I don't know.

17     Q.   BY MR. THOMSON:  You don't know one way or

18  the other whether the purpose of retrospective

19  chart review programs is to reduce the incidence of

20  absent supported codes, which you refer to as type   10:49:56

21  II errors?

22          MR. MARTINEZ:  Object to form.

23          THE WITNESS:  Yeah, I mean, I don't know

24  all the purposes of -- well, I mean, first of all,

25  I am not sure exactly what "retrospective chart      10:50:13



Page 69

1   review programs" refer to, but I also -- I just

2   don't know what the -- why MA plans, you know, make

3   all the decisions that they make.  I just don't

4   know.

5       Q.   BY MR. THOMSON:  What is your                  10:50:31

6   understanding of why MA plans conduct chart review?

7            MR. MARTINEZ:  Object to form.

8            THE WITNESS:  I mean, I just don't -- I

9   just don't know the motivations of the plans.  I

10  mean, I know overall.  I mean, as I talked about in   10:50:56

11  my report, I understand the motivation of the plans

12  is to -- to have diagnoses that reflect the patient

13  -- better reflect the patient's true medical

14  records.

15           But I don't know in particular about any       10:51:18

16  program that plans implement, why they do what they

17  do.  I don't have an opinion about that.

18      Q.   BY MR. THOMSON:  You're not aware of any

19  -- technically you're not aware of any MA

20  retrospective chart review programs that existed in   10:51:44

21  the 2004 to 2007 period, are you?

22           MR. MARTINEZ:  Object to form.

23           THE WITNESS:  I don't know one way or the

24  other.

25      Q.   BY MR. THOMSON:  To the extent that there     10:51:55



Page 70

1    were type I or type II errors in any of the cohorts

2    studied in the '04 to '05, '05 to '06, and '06 to

3    '07 pairs of years included in the study described

4    in the GAO report, those errors were included in

5    the calculation of the CIA; is that right?          10:52:14

6              MR. MARTINEZ:  Object to form.  Vague as

7    to time.

8              THE WITNESS:  Could you repeat the

9    question?

10    Q.  BY MR. THOMSON:  To the extent that there        10:52:24

11    were type I or type II errors in any of the cohorts

12    studied in the '04 to '05, '05 to '06, and '06 to

13    '07 pairs of years included in the study described

14    in the GAO reports, those errors were included in

15    the calculation of the CIA, right?                   10:52:46

16              MR. MARTINEZ:  Object to form.

17              THE WITNESS:  Those -- those would be

18    errors in fee-for-service, right, not MA?  Is that

19    what you're referring to?  Because the cohorts were

20    all fee-for-service cohorts, right?                  10:53:12

21    Q.  BY MR. THOMSON:  Do you know?

22    A.   Yeah.  I mean, that's my understanding.

23    I'm sorry.  I'm just not -- maybe I'm just not

24    getting your question.  I'm sorry.

25    Q.   So your understanding is that those           10:53:38



3187

Page 112

```
 1   calculate what the fee-for-service level of coding

 2   intensity was.  It is just not something United

 3   couldn't conduct medical record reviews on a random

 4   sample of fee-for-service claims to which it didn't

 5   have the right to see.                          12:10:18

 6      Q.   BY MR. THOMSON:  But you didn't talk to

 7   anybody at United to determine what United knew

 8   about its level of coding intensity at any time,

 9   did you?

10      A.   I didn't, but just knowing -- United just  12:10:38

11   knowing its own coding intensity wouldn't answer

12   the question here.  I mean, they'd have to either

13   know the MA industry average coding intensity plus

14   presume that the coding intensity adjuster was

15   correct.  Or they would have had to have known the  12:10:55

16   fee-for-service coding intensity and those facts.

17   I mean, I just don't -- I have no way to believe

18   that they could have access to the information

19   necessary to do that.

20          But I haven't spoken with everyone who    12:11:13

21   worked at United at that time to determine that.

22   It's just -- I just don't -- I am not aware of how

23   it could possibly occur.  That's all I'm trying to

24   say.

25      Q.   Did you review any of United's documents   12:11:28
```



Page 113

1  on this point to determine what it tracked or knew

2  about its own coding intensity adjustment at any

3  point in 2018 -- from 2008 to 2016?

4        MR. MARTINEZ:  Object to form.

5        THE WITNESS:  I mean, I certainly looked        12:11:41

6  at a lot of documents, but again, even if United

7  knew its own coding intensity, that wouldn't be

8  sufficient to determine whether they were overpaid

9  or underpaid.  Because you'd have to know either

10 relative to the MA industry average or the          12:12:04

11 fee-for-service to get that.

12       But I don't -- I don't know what United

13 did to calculate its own coding intensity, no, I

14 don't.

15    Q.   BY MR. THOMSON:  Do you know whether         12:12:17

16 United had an estimate of the industry average

17 coding intensity for MA plans?

18    A.    Not that I've seen.

19    Q.    Did you request documents related to

20 whether United had access to that information?       12:12:37

21       MR. MARTINEZ:  Object to form.

22       THE WITNESS:  I mean, I -- to actually

23 calculate that, they would have had to have had

24 access to their competitors' records.  It wouldn't

25 even make sense.                                      12:12:54



Page 114

1    Q.    BY MR. THOMSON:  So is that a no?

2        MR. MARTINEZ:  Object to form.

3        THE WITNESS:  I didn't ask if they had

4    access to their competitors' records because it

5    wouldn't make sense -- it didn't make any sense to    12:13:06

6    me.  So yeah, I guess I didn't ask that.

7    Q.    BY MR. THOMSON:  Okay.  So the next

8    paragraph, Paragraph 50 --

9    A.    Yes.

10    Q.    -- "Second, the presence of unsupported    12:13:20

11    codes in any particular plan's data is insufficient

12    to establish that CMS has 'overpaid' or 'underpaid'

13    it.  Correct calculation of the presence and extent

14    of 'overpayment' must also account for the plan's

15    level of absent supported codes and the industry    12:13:36

16    average level of present unsupported and absent

17    supported codes."

18        Can you explain the logic of this

19    paragraph to us?  I am not sure I totally follow

20    it.                                                  12:13:55

21    A.    Sure, of course.  I mean, the fact that

22    there are unsupported -- so the fact that there are

23    unsupported codes in Medicare Advantage doesn't

24    tell you whether Medicare Advantage plans in

25    general are overpaid or underpaid because the goal    12:14:18



3190

Page 115

1  of -- I mean, what overpaid means is paid more than

2  that needed to achieve payment neutrality.  And

3  payment neutrality is this population-based concept

4  comparing aggregate payments to MA plans to what

5  the people would have cost in fee-for-service,        12:14:39

6  okay.

7         So the fact that you see an unsupported

8  code in MA in general doesn't mean MA plans in

9  general were overpaid.  Because as long as the

10  relative rates of supported and unsupported codes    12:14:56

11  in MA mirrors that in fee-for-service, then people

12  were paid -- the plans were paid correctly.

13         So that same reasoning applies on a

14  plan-specific basis.  And that's -- all I'm doing

15  in Paragraph 50 is carrying that reasoning down to    12:15:15

16  the plan level.  Is that helpful?

17      Q.   I think so.  So we talked about

18  overpayment and underpayment --

19      A.   Yes.

20      Q.   -- that is MA plan payments in aggregate     12:15:28

21  as compared to fee-for-service, the estimated cost

22  for the same beneficiaries and Medicare

23  fee-for-service?

24      A.   Yep.

25      Q.   So the absent supported code -- I guess      12:15:40



Page 116

1    what I am not following is why an unsupported code

2    in MA would not just be an unsupported code that

3    increases the cost beyond what that same patient

4    would have cost in fee-for-service because -- well,

5    sorry, go ahead.  Go ahead.                          12:16:04

6        A.    No, I see what you're asking.  I mean, the

7    reason that the presence of an unsupported code

8    doesn't imply overpayment is that fee-for-service

9    also has some unsupported codes in it, almost

10   surely, just as -- because both MA and              12:16:20

11   fee-for-service are going to have some present

12   unsupported and some absent supported codes.

13           And to get, you know, overpayment is

14   relative to payment neutrality, which is this

15   population-based concept.                            12:16:37

16           To get payment neutrality, what you want

17   is the rates of absent -- absent supported and

18   present unsupported codes in MA to mirror that in

19   fee-for-service.

20           So if -- suppose that the rates of present   12:16:58

21   unsupported and absent supported codes in MA were

22   exactly the same as fee-for-service, right, then

23   you wouldn't -- you wouldn't even need a coding

24   intensity adjuster because you would have payment

25   neutrality.                                          12:17:17



3192

Page 117

1      Q.   Assuming that there was the same health

2   risk among each population groups, right?

3           MR. MARTINEZ:  Object to form.

4           THE WITNESS:  No.  I mean, you could --

5   they could have different -- they could have            12:17:36

6   different illness scores and different

7   demographics, and you would have adjusted for that.

8   And the adjustment would be exactly correct.

9   Because the rates of present support -- present

10  unsupported and absent supported codes in the two       12:17:55

11  populations were identical.

12          So if that were true, then we have no --

13  we have no problem.

14     Q.   So the risk adjustment data is calculated

15  on fee-for-service --                                    12:18:13

16     A.   Yes.

17     Q.   -- payments, right?

18          MR. MARTINEZ:  Object to form.

19          THE WITNESS:  Yes.

20          MR. MARTINEZ:  You said data.  I think you       12:18:18

21  meant model.

22          MR. THOMSON:  Can you read the question

23  back?  I'm sorry.

24          THE WITNESS:  Go ahead.

25              (Reporter read back as requested.)           12:18:39



Page 198

1   is a true record of the testimony given.  (Civ.

2   Proc. § 2025.540(a))

3           I have not, and shall not, offer or

4   provide any services or products to any party's

5   attorney or third party who is financing all or

6   part of the action without first offering same to

7   all parties or their attorneys attending the

8   deposition and making same available at the same

9   time to all parties or their attorneys.  (Civ.

10  Proc. § 2025.320(b))

11          I shall not provide any service or product

12  consisting of the deposition officer's notations or

13  comments regarding the demeanor of any witness,

14  attorney, or party present at the deposition to any

15  party or any party's attorney or third party who is

16  financing all or part of the action, nor shall I

17  collect any personal identifying information about

18  the witness as a service or product to be provided

19  to any party or third party who is financing all or

20  part of the action.  (Civ. Proc. § 2025.320(c))

21

22  Dated: _____

23                  _Balinda Dunlap_

24

25



3194

**EXHIBIT D-124**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. BENJAMIN POEHLING, | ) ) ) | No. CV 16-08697 FMO |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITEDHEALTH GROUP, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |


*** CONFIDENTIAL TRANSCRIPT WITH REDACTED ATTORNEYS' EYES
ONLY PORTIONS.  REFER TO SEPARATE TRANSCRIPT ***


VIDEOTAPED VIDEOCONFERENCE ZOOM DEPOSITION OF

THOMAS KORNFIELD

March 10, 2022
10:14 a.m.
Rockville, Maryland


Magna Legal Services          Prepared by:
(866) 624-6221                Marcella Daughtry, RPR, RMR
www.MagnaLS.com               CA CSR 14315
                              GA No. 6595-1471-3597-5424



Page 20

1  right?

2      A   Yes.

3      Q   Please tell me a little bit about your roles

4  and responsibilities at AHIP as it relates to MA payments

5  and risk adjustment.

6      A   I was the lead policy support person within the

7  policy group at AHIP responsible for Medicare Advantage

8  risk adjustment and payment policy.

9      Q   And so in that role you would lead risk

10 adjustment policy discussions with plan members and

11 external stakeholders?

12     A   Yes, in cooperation with other members of

13 the -- of the team.  And by policy team, I am referring

14 to -- it may not have been explicitly called that within

15 the organization, but that's how I am referring to the

16 group that I worked in within AHIP.

17     Q   And did you also -- you also oversaw research

18 and analyses about the impacts of Medicare Advantage

19 payment and risk adjustment policies; is that right?

20     A   Yes.

21     Q   All right.  Moving back to your time at the

22 Centers for Medicare & Medicaid Services, which I will

23 refer to as CMS, you worked at CMS for over five years in

24 several different roles; is that right?

25     A   I worked at CMS a total of ten years.  There



Page 21

1    were two five-year stints.

2        Q    Thanks for correcting that.

3            So -- so focusing on your most recent five-year

4    stint, that was from around April 2010 to July 2015; is

5    that right?

6        A    Yes.

7        Q    And the first job in that second stint was as a

8    health insurance specialist?

9        A    Yes.

10       Q    What division did you work for at that time as

11   a health insurance specialist?

12       A    From 2010 to 2012 I was in the Division of

13   Payment -- I'm sorry, Risk Adjustment and Payment

14   Operations, I believe is what it was called.  And then

15   from 2012 to 2014 I was the division director.  Before, I

16   believe it was the Division of Payment Systems.  I might

17   have the name wrong, but it was -- that was the -- so

18   that was, sorry, from 2012 to 2014.

19           From 2014 to 2015 I was in CMM (sic) -- the

20   Centers for Medicare and Medicaid Innovation, where I

21   believe I was a -- their health insurance specialist, or

22   I don't remember the title.

23       Q    Okay.  So starting with the health specialist

24   position at the Division of Risk Adjustment and Payment

25   Policy, in that role you analyzed impacts of changes to



Page 22

1  payment rates and risk scores in support of annual

2  Medicare Advantage payment notice.  Is -- is that a fair

3  description from your LinkedIn profile?

4      A   Yes.

5      Q   So tell me a little bit about what that means,

6  particularly the Medicare Advantage payment notice.

7      A   I am sorry, what is -- I don't understand the

8  question.

9      Q   Sure.  So part of your job was to analyze

10 impacts of changes to payment and risk scores in support

11 of this notice, and so I just wanted you to explain a

12 little bit about what this notice is.  Is that -- is that

13 also something known as the final Rate Announcement?  Is

14 that what you are referring to here?

15     A   There is an Advance Notice and there is a final

16 Rate Announcement.  Are you -- are you asking me about --

17 sorry.  Can you repeat the question?  I am sorry.  I lost

18 track of it.

19     Q   No problem.  So I was just confirming that when

20 you say that you analyzed impacts of changes to payment

21 rates and risk scores in support of an annual Medicare

22 Advantage payment notice, that what you are referring to

23 is what's also sometimes referred to as the Advance

24 Notice and the final Rate Announcement; is that right?

25     A   Yes.



Page 23

1          Q    Okay.  And so there is an Advance Notice, as

2     you just mentioned, that's published, correct?

3          A    Yes.

4          Q    And then there is a period of time for MA Plans

5     and other stakeholders to review and provide comments; is

6     that right?

7          A    Yes.

8          Q    And that gives CMS some time to review the

9     comments before the final Rate Announcement is announced.

10         A    Yes.

11         Q    Fair?

12         A    I am sorry.  Can you repeat the question?

13         Q    I think -- yeah, I think you said yes.  That

14    just gives CMS some time to review comments before the

15    final Rate Announcement is announced?

16         A    I didn't understand the question you just

17    asked.

18         Q    I asked whether -- so we talked about there is

19    a period of time for MA Plans and other stakeholders to

20    review and provide comments.  You said yes, and I said,

21    and that gives CMS some time to review the comments

22    before the final Rate Announcement is announced?  And you

23    said yes, right?

24         A    Yes.

25         Q    Okay.  So, for example, in early February of



Page 24

1    this year, CMS released the calendar year 2023 Advance

2    Notice.  Are you familiar with that?

3         A    Can you be more specific on familiar?  What do

4    you mean by "familiar" in this context, please?

5         Q    Were you aware that in February of this year

6    CMS released the calendar year 2023 Advance Notice?

7         A    Yes.

8         Q    And comments were due by last Friday, I

9    believe, March 4th.  Were you aware of that?

10        A    Yes.

11        Q    And then the final Rate Announcement is

12   scheduled to be published April 4th, 2022?

13        A    The final Rate Announcement must be published

14   no -- no later than the first Monday in April.

15        Q    Thank you.

16             So given the time that you were in the role of

17   a health insurance specialist working on the rate

18   announcements, is it fair to say that you were involved

19   in the calendar year 2012 and 2013 MA payment notices?

20             MS. KRIEG:  Object to form.  Vague.

21             THE WITNESS:  Can you restate the question,

22   please?

23        Q    BY MS. SCHEFFLER DO:  Sure.  I said, so looking

24   at the time period that you were in the role of health

25   insurance specialist working on the rate announcements,



Page 25

1    is it fair to say that you were involved in the calendar

2    year 2012 and 2013 MA payment notices?

3         A    What do you mean by "involved"?

4              MS. KRIEG:  The same objections.

5         Q    BY MS. SCHEFFLER DO:  You stated earlier that

6    you analyzed impacts of changes to payment rates and risk

7    scores in support of annual rate announcements, correct?

8         A    Yes.

9         Q    And did you do that for the calendar year 2012

10   and 2013 MA payment notices?

11        A    I know I did it for the 2012 notice.  I don't

12   remember when -- quite when I -- I made the -- the

13   change.  Sorry.  Give me a minute, please.

14        Q    Sure.

15        A    I believe I worked -- yes, I believe the answer

16   is yes.

17        Q    Okay.  And then from there you became a

18   director within the Division of Payment Systems, Medicare

19   Plan Payment, which sits within the Medicare Plan Payment

20   Group.  Did I get that right?

21        A    Yes.

22        Q    And you took that position in August 2012?

23        A    Yes.

24        Q    I may refer to the Medicare Plan Payment Group

25   as MPPG.  Is that okay with you?



Page 26

1        A    Yes.

2        Q    And you stayed in that role until

3    September 2014, correct?

4        A    Yes.

5        Q    And as a director within MPPG, you developed

6    payment policy for Medicare Advantage and Part D,

7    correct?

8            MS. KRIEG:  Object to form.  Vague.

9            THE WITNESS:  Can you be more specific, please?

10       Q    BY MS. SCHEFFLER DO:  Sure.  What did you mean

11   by developed payments policy for Medicare Advantage in

12   your LinkedIn profile?

13       A    I worked on nonrisk adjustment payment policy

14   for Medicare Advantage and Part D.

15       Q    Did you state nonrisk adjustment payment

16   policy?

17       A    Yes.  That --

18       Q    What is that?

19       A    That was the role of the division.

20       Q    What -- what does that mean, nonrisk adjustment

21   payment policy?

22       A    It means the rate book.  It means Part D, bid

23   analyses.  It means Part D payment.  That doesn't involve

24   the risk adjustment model, and it doesn't involve the

25   risk adjustment model with Medicare Advantage or Part D.



Page 27

1      Q    Did you have responsibility for other payment

2  mechanisms in Medicare Advantage Plans such as the coding

3  intensity adjustment?

4           MS. KRIEG:  Object to form.  Vague.

5           THE WITNESS:  Can you be more specific, please?

6      Q    BY MS. SCHEFFLER DO:  During your time at MPPG,

7  did you have any responsibilities for something known as

8  the coding intensity adjustment?

9           MS. KRIEG:  The same objection.

10           THE WITNESS:  I don't know what you mean by

11  responsibilities.

12      Q    BY MS. SCHEFFLER DO:  How would you define

13  responsibilities?

14      A    I would define responsibilities as someone that

15  was accountable and -- accountable for -- for something,

16  generally speaking.  So somebody who was the lead -- I

17  would say the lead person working on a -- on a topic.

18      Q    Okay.  Were you the lead person?

19      A    Not during the time frame we're -- not during

20  the time frame we're talking, no.

21      Q    At -- during any time frame.

22      A    During 2005, 2006 to 2007, I worked on coding

23  intensity adjustment studies.  And then following that

24  time period I -- I no longer had any -- any

25  responsibility on coding intensity.  It was done else --



Page 28

1    done by other members of the -- the division.

2        Q    Okay.  How about Risk Adjustment Data

3    Validation audits?  Were you familiar with those?

4        A    Yes.

5        Q    Did you have any responsibilities related to

6    Risk Adjustment Data Validation audits during this time

7    period at MPPG?

8        A    No.

9        Q    How about at any period?

10       A    Any period at CMS?

11       Q    Yes.

12       A    No.

13       Q    But you are familiar with those audits?

14       A    Yes.

15       Q    And are you familiar with the RADV

16   fee-for-service adjuster?

17       A    Are we -- can you define familiar, please.

18       Q    I will use the same definition you gave

19   earlier.

20       A    Can you remind me what that definition was?

21       Q    Sure.  It may be faster if you -- if you want

22   to provide your definition of familiar.  Otherwise, I can

23   look on this.

24       A    I just want to make sure it's consistent.

25       Q    Sure.  How would you define familiar?



Page 29

1          A    Aware of.

2          Q    Okay.  Are you aware of --

3               (Speaking simultaneously.)

4               THE WITNESS:  Yes.

5          Q    BY MS. SCHEFFLER DO:  I'm sorry, go ahead.

6          A    I would say -- I would define familiar as being

7     aware of something.

8          Q    Are you aware of the RADV fee-for-service

9     adjuster?

10         A    Yes.

11         Q    Do you have -- strike that.

12              You mentioned bids, that you analyzed Medicare

13    Advantage bids and payments and changes in MA payment

14    rates.  Is that something you did while at MPPG?

15         A    Yes.

16         Q    What does analyze Medicare Advantage bids mean?

17         A    It meant that I would review the bid data after

18    it was submitted to discern any trends in payments or

19    risk scores or additional benefits in the form of rebate

20    dollars that were being offered by Medicare Advantage

21    Plans, and similarly I think for Part -- for Part D, I

22    think it was.  Actually, I don't remember much of the

23    details about the Part D analyses as I think about it.

24    Most of the analyses I can think of were more on the

25    Medicare Advantage side.  I may have analyzed Part D



Page 30

1    data.  I just don't remember details of what I did.

2         Q   Okay.  And you said that you would review the

3    bid data after it was submitted.  Would that be before it

4    was approved --

5         A   Yes.

6         Q   -- with CMS?

7             And you were reviewing it, you said, to discern

8    any trends in payments or risk scores or additional

9    benefits in the form of rebate dollars that were being

10   offered to Medicare Advantage.  That's a fair summary?

11        A   Yes.  And differences in bids by geography or

12   other variation that we might see in bids by plan type

13   perhaps.

14            (Court reporter clarification.)

15        Q   BY MS. SCHEFFLER DO:  Did you have any role in

16   approving the bids?

17        A   No.

18        Q   Okay.  From MPPG you then became a health

19   insurance specialist at the Centers for Medicare and

20   Medicaid Innovation, correct?

21        A   Yes.

22        Q   And that's sometimes referred to as CMMI or the

23   Innovation Center; is that right?

24        A   Yes.

25        Q   And am I right that the Innovation Center



Page 31

1    develops new payment and service delivery models with

2    CMS?

3         A    Yes.

4         Q    And you were there from September 2014 to

5    July 2015, correct?

6         A    Yes.

7         Q    In that role, did you have -- you assisted in

8    the development and implementation of alternative ACA

9    Section 2021 funded models to test value-based

10   arrangements.  Can you explain what that means?

11        A    I am sorry, there were a couple parts of that

12   question.

13        Q    Sure.  I am just reading from your LinkedIn.

14   It says you assisted in development and implementation of

15   alternative ACA Section 2021 funded models to test

16   value-based arrangements.  I am just trying to understand

17   a little bit more what that means.

18        A    "That" is vague to me.  What -- what is the

19   "that" that you are referring to?

20        Q    I am referring to the -- the line on your

21   LinkedIn profile describing what you did at CMMI that I

22   just read.

23        A    The work that I did there was on supporting

24   development of models that would test other ways to pay,

25   whether it's Medicare or -- pay Medicare Advantage Plans



Page 32

1    or pay other provider types within -- within the Medicare

2    program.

3        Q   And did you have any responsibilities related

4    to risk adjustment in that role?

5        A   Was I -- are we defining responsibil- -- how

6    are we defining responsibility?

7        Q   I guess, so you -- you said that you were

8    assisting with the development in implementation of

9    different types of funded models.  I am wondering if risk

10   adjustment was one of those models.  Did you play any

11   role with respect to risk adjustment during your time at

12   CMMI?

13            MS. KRIEG:  Object to form.  Vague.

14            THE WITNESS:  It's hard for me to remember how

15   risk adjustment was used in the different models.  They

16   may have -- they may have had at moments a risk

17   adjustment in some of the models, but I don't recall

18   specific details around how it was -- what -- what my

19   risk adjustment work would have been at that time as --

20   as it relates to the CMMI models.  I just -- I don't

21   recall.

22       Q   BY MS. SCHEFFLER DO:  Okay.  And I -- I promise

23   we are not going to go through your entire background

24   because it's pretty lengthy.  I did want to ask about one

25   more role, which was your manager -- when you were the



Page 182

1    Q    Were you involved in any decision-making at CMS

2    around this proposed rule?

3    A    No.

4    Q    Did you have any roles and responsibilities

5    related to this proposed rule?

6    A    Not that I can recall.

7    Q    Did you attend meetings on this topic with

8    Whitney Johnson?

9    A    It's certainly possible.

10   Q    Or with Anne Hornsby?

11   A    Excuse me?

12   Q    Anne Hornsby.

13   A    Yes, it's certainly possible.  If I had a role

14   it may have been in reviewing, but I wasn't a lead on any

15   of the content for that rule.

16   Q    So what's your understanding of what the

17   proposed rule said?

18   A    On -- on what topic?  I think it may have said

19   multiple things.

20   Q    Specific to medical record reviews.

21   A    My recollection was that it required plans to

22   do -- if they were going to do medical record reviews,

23   that they would do two-way reviews.

24   Q    And so this was being proposed for the first

25   time in January 2014, right, as part of this proposed



Page 183

1    rule?

2         A    That requirement?

3         Q    Yes.

4         A    Yes.  That's my understanding.

5         Q    And were you still at MPPG when CMS ultimately

6    decided not to finalize this rule?

7         A    What was the date of the final rule?

8         Q    May 23rd, I believe, 2014.  It was in May.

9         A    Yes.

10        Q    And do you have an understanding of why CMS

11   decided not to finalize that rule?

12        A    You mean that portion of the rule?

13        Q    That portion of the rule.  Thank you.

14        A    I don't really remember.  I feel like they had

15   gotten significant pushback from industry and that was

16   why, but that's about all I remember.

17        Q    So CMS at this time, in fact, even as of 2005,

18   knew that MA Plans were conducting medical record reviews

19   to add codes, right?

20             MS. KRIEG:  Object to form.

21             THE WITNESS:  When you say CMS knews -- knows,

22   what does -- I don't know what that means.

23        Q    BY MS. SCHEFFLER DO:  That CMS was aware --

24   folks at CMS like yourself, including yourself, knew that

25   MA Plans were conducting medical record reviews to add



Page 184

1   codes?

2          MS. KRIEG:  Object to form.  It calls for

3   speculation.

4          THE WITNESS:  But you said CMS knows.  I

5   don't -- I don't -- I can't speak for what CMS knew or

6   didn't know.  I can just speak to what I knew and people

7   that I worked with that were involved in it.  And, you

8   know, my understanding from working with Sean and Jeff

9   Grant was that plans were submitting medical records -- I

10  mean, excuse me, plans were submitting diagnoses codes

11  from medical records review and that that was permissible

12  and it was allowed.  And I knew that from Tom Hutchinson

13  and Cheri Rice.

14     Q   BY MS. SCHEFFLER DO:  Cheri Rice.  Any others

15  within CMS that you knew that from?

16     A   Those are the main people I can remember that I

17  would have learned that from.

18     Q   So CMS wanted to require MA Plans to look for

19  unsupported codes to read.  That was the purpose of this

20  portion of the rule that we were discussing about medical

21  record reviews, right?

22          MS. KRIEG:  Object to form.  Calls for

23  speculation.

24          THE WITNESS:  My understanding is that CMS was

25  saying if a plan conducted a medical record review, they



Page 258

```
1    STATE OF GEORGIA          )
                               )      ss:
2    COUNTY OF DEKALB          )

3

4           I HEREBY CERTIFY that the foregoing deposition

5    was taken before me; that I was then and there a

6    Registered Professional Reporter and Registered Merit

7    Reporter, License No. 6595-1471-3597-5424 for the State

8    of Georgia, and License No. 14315 in the State of

9    California; that the witness before testifying was duly

10   sworn by me to testify to the whole truth; that the

11   questions propounded by counsel and the answers of the

12   witness thereto were taken down by me in shorthand and

13   thereafter transcribed under my direction; and that the

14   foregoing pages contain a full, true, and accurate

15   transcript of all deposition testimony and proceedings

16   had, all done to the best of my skill and ability.

17           Signature requested.

18           I FURTHER CERTIFY that I am in no way related

19   to, nor employed by any of the parties hereto, nor am I

20   in any way interested in the outcome.

21           DATED at Dunwoody, Georgia, this 21st day of

22   March, 2022.

23

24                     MARCELLA L. DAUGHTRY, RPR, RMR
                       GA License No. 6595-1471-3597-5424
25                     CA CSR 14315
```



3213

**EXHIBIT D-125**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA,    )
ex rel., BENJAMIN POEHLING,  )
                             )
         Plaintiffs,         )
                             ) Civil Action No.
vs.                          )
                             ) 16-08697 FMO
UNITEDHEALTH GROUP, INC.,    )
et al.,                      )
                             )
         Defendants.         )
_____)


* * * * * *
HIGHLY CONFIDENTIAL
* * OUTSIDE COUNSELS' EYES ONLY * *
* * * * * *


VIDEOTAPED DEPOSITION OF
JULIA M. LAMBERT, FSS, MAAA
Friday, April 5, 2024; 9:11 a.m. CDT


Reported by:  Cindy L. Sebo, RMR, CRR, CLR, RPR,
CCR, CSR, RSA, CA CSR 14409, NJ Certified CR
30XI0024460, NJ Certified RT 30XR00019500, NM CSR
589, NY Realtime Court Reporter, NY Association
Certified Reporter, OR CSR 230105, TN CSR 998, TX
CSR 12778, WA CSR 23005926, Notary Public
Job No. 1101160



Page 188

```
 1        Q.      Right.  Yep, yep, I agree.
 2                     Removal of unsupported codes
 3    has an impact on the model and would cause the
 4    average relative value to increase; is that
 5    correct?
 6        A.      Yes, I can agree with that
 7    statement.
 8                     Thank you.
 9        Q.      But wouldn't the addition of
10    unsubmitted codes have the opposite effect on
11    the model?
12                     ATTORNEY ABASCAL:  Object to form.
13                     THE WITNESS:  The addition of
14        unsupported codes would have the opposite
15        effect to the model, I agree.
16    BY ATTORNEY VOLDMAN:
17        Q.      Unsubmitted, correct?
18        A.      Unsubmitted.
19        Q.      Yeah.
20        A.      Yes, thank you.  I --
21        Q.      I -- I -- I don't know if we want
22    to think of a different phrase for those,
23    but . . .
24                     Okay.  So -- and -- and this
```



Page 189

1    is where I'm a little confused, because

2    wouldn't, like, an accurate model in your

3    recalibration be based off of both removing

4    unsupported and adding unsubmitted codes?

5              ATTORNEY ABASCAL:  Object to form.

6              THE WITNESS:  Adding unsubmitted

7       codes would be a different study.  If you

8       would do that, presumably you would be

9       creating a -- a new data set from the TM

10      data, where the new data set would have more

11      complete coding, potentially being more

12      similar to what is happening in MA.  And if

13      you would do that study, you would then need

14      to consider how the CIA is already adjusting

15      for that more complete coding that's in MA.

16   BY ATTORNEY VOLDMAN:

17      Q.     Okay.  And if you reran this

18   calibration off of the data set you described,

19   removing unsupported and adding unsubmitted, a

20   lot of other things would change, including the

21   Coding Intensity Adjuster, probably; is that

22   right -- or it could change?

23      A.     Yeah, you'd have to --

24              ATTORNEY ABASCAL:  Object to form.



Page 190

1          Go ahead.

2          THE WITNESS:  -- you would have to

3     look at it and see.  It -- it's a very

4     different payment system and calibration at

5     that point, so evaluating actuarially sound

6     payment would involve looking at the whole

7     system, yes.

8     BY ATTORNEY VOLDMAN:

9          Q.    And the normalization factor could

10    change; is that right?

11         ATTORNEY ABASCAL:  Same objection.

12         THE WITNESS:  I just want to make

13    sure I understand what you mean by "the

14    normalization factor."

15    BY ATTORNEY VOLDMAN:

16         Q.    I forget its full name.  One

17    second.

18              The FSS normalization factor,

19    which you describe on 16.

20         A.    And what -- what was the question

21    that I -- I'm hung up on that.  So what was the

22    question, then?

23         Q.    If the model was recalibrated with

24    both additions of unsubmitted codes and removals



Page 196

1    codes, taken away codes, recalculated the CIA,

2    recalculated normalization factor -- for a

3    complete opinion.

4                    Is there -- do you have a

5    response for why that wasn't necessary?

6        A.    My analysis was evaluating how

7    relative values change, and that was important

8    for me to reestablish.  It was not necessary and

9    it was not within scope of my analysis to

10   redesign the entire payment system with all of

11   those factors under this hypothetical

12   assumption.  It wasn't necessary to my opinion.

13       Q.    Okay.  Did you work with Dr. Salve

14   on his design of what he sampled at all?

15       A.    No.

16       Q.    Okay.  What about with Dr. Isaacs

17   on how he did the chart review in his expert

18   report?

19       A.    No.

20       Q.    Going back to your analysis of what

21   you summarized as how removing unsupported codes

22   would affect the relative factors.

23                    Is that a fair

24   characterization?



Page 197

1          A.      I -- I had a moment there that I

2     didn't hear the first part of what you said.

3               Can you just say it --

4          Q.      Sure.

5          A.      -- what did you say?

6          Q.      Like, two questions ago, you

7     testified that your analysis had to do with how

8     the removal of unsupported codes go through the

9     model and affects the relative values; is that

10    correct?

11         A.      Yes.

12         Q.      Okay.

13              What does that analysis or its

14    conclusions have application to this case?

15              ATTORNEY ABASCAL:   Object:

16    foundation.

17              THE WITNESS:   ASOP 45 indicates

18    that the application model -- the

19    application data -- sorry -- that the

20    development data and the application --

21    application data needs -- need to be

22    consistent and have consistent patterns of

23    coding.

24              If they do not, we may have a



3220

Page 198

```
 1        problem -- or we do have a problem,

 2        especially if that data impacts -- that

 3        difference impacts the development of the

 4        model.  And my analysis shows that those

 5        unsupported codes in the TM data do impact

 6        those relative values in the current

 7        payment system.

 8                  So it's important, to me, to

 9        establish that there is an impact of the TM

10        unsupported codes to the model --

11   BY ATTORNEY VOLDMAN:

12        Q.     Okay.

13        A.     -- and because it does, you need to

14   figure out how the differences are -- are

15   impacting overall payment.

16        Q.     Okay.

17                  So you were hired, you know,

18   to provide an expert opinion in this lawsuit by

19   Latham & Watkins or Bartlit Beck, correct?

20        A.     Yes, they were -- they engaged us,

21   correct.

22        Q.     And with your expert opinion, what

23   are you trying to help the jury understand or

24   work through?
```



Page 199

1            ATTORNEY ABASCAL:  Object:

2       foundation and form.

3            THE WITNESS:  From an actuarial

4       standpoint, I believe it's important to this

5       case that unsupported diagnoses do not

6       necessarily result in overpayments.

7  BY ATTORNEY VOLDMAN:

8       Q.    Okay.  And I'm focusing on the word

9  "necessarily."

10            Does the presence of

11  unsubmitted diagnoses in the traditional

12  Medicare data have no bearing on that?

13            ATTORNEY ABASCAL:  Object to form.

14            THE WITNESS:  It -- it seems to be

15       a -- a very different question, but

16       unsubmitted codes resulting -- that result

17       in MA payment having more complete coding

18       and diagnoses than TM data is, from my

19       perspective, handled as part of the CIA.

20  BY ATTORNEY VOLDMAN:

21       Q.    So I understand for MA payment.

22  But, I mean, unsubmitted codes in the TM -- in

23  the calibrating data?

24       A.    I'm sorry.



Page 200

```
 1                  Then what -- what's the question?
 2          Q.     What I'm trying to understand is --
 3      you're using the unsupported error rate for many
 4      of your analyses, and I am trying to understand
 5      why that's appropriate as opposed to using some
 6      sort of net error rate that includes both
 7      unsubmitted and unsupported codes.
 8          A.     That sort of statement would
 9      require me to do an analysis of the CIA, which
10      -- which would then necessitate access to data
11      that I just don't have.
12          Q.     Did you request it of your counsel?
13          A.     I was -- I didn't ask -- did not
14      ask for that data from my counsel.  But doing a
15      study on unsubmitted diagnoses was not necessary
16      for my opinion, so I didn't ask for it.
17          Q.     Okay.  Do you know how Dr. Salve
18      pulled HCC markers and what he asked for when
19      doing so?
20          A.     I have a general understanding of
21      that but not a detailed understanding.
22          Q.     Okay.  So he identified some number
23      of HCC markers per HCC and asked the
24      United States for the -- the charts that support
```



Page 201

1    those HCCs; is that correct?

2         A.    As a general matter, yes.  I agree

3    with that.

4         Q.    Okay.  Do you know if he asked for

5    the complete medical records of those

6    beneficiaries or just the medical records that

7    substantiate the HCC in question?

8         A.    I don't know.

9         Q.    Okay.  If he only asked for the

10   records that substantiate the HCC in question,

11   is it possible that other medical records

12   associated with that beneficiary that have an

13   unsubmitted code mapping to that same HCC?

14              ATTORNEY ABASCAL:  Object to form.

15              THE WITNESS:  So, sorry, there was

16        a lot there.

17              Can you just reask that question,

18        please?

19   BY ATTORNEY VOLDMAN:

20        Q.    Sure.

21              ATTORNEY ABASCAL:  Do you need a

22        break soon?

23              THE WITNESS:  Yeah.  We can

24        probably finish this.



Page 291

     1        I, Cindy L. Sebo, Nationally Certified Court

     2   Reporter herein, do hereby certify that the

     3   foregoing deposition of JULIA M. LAMBERT, FSS, MAAA

     4   was taken before me pursuant to notice at the time

     5   and place indicated; that said witness duly swore to

     6   tell the truth, the whole truth, and nothing but the

     7   truth under penalties of perjury; that said

     8   testimony of witness was correctly recorded to the

     9   best of my abilities in machine shorthand,

    10   thereafter transcribed under my supervision with

    11   computer-aided transcription; that deposition is a

    12   true and accurate record of the testimony given by

    13   the witness; that I am neither counsel, nor kin to

    14   any party in said action, nor interested in the

    15   outcome; and that a copy of this transcript obtained

    16   from a source other than the court reporting firm,

    17   including an adversary or co-counsel in the matter,

    18   is uncertified and may not be used at trial.

    19   _____Cindy L. Sebo_____

         CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR, RSA,

    20   CA CSR 14409, NJ Certified CR 30XI0024460,

         NJ Certified RT 30XR00019500, NM CSR 589,

    21   NY Realtime Court Reporter, NY Association Certified

         Reporter, OR CSR 230105, TN CSR 998,

    22   TX CSR 12778, WA CSR 23005926, Notary Public

    23

    24



**EXHIBIT D-126**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA    *
ex rel, BENJAMIN POEHLING,   *
                             *
        Plaintiffs,          *
                             *
vs.                          *  CASE NO:
                             *
UNITEDHEALTHCARE GROUP,      *  CV 16-08697 FMO
et al,                       *
                             *
        Defendants.          *
                             *
*   *   *   *   *   *   *   *   *   *

        VIDEOTAPED 30(b)(6) DEPOSITION OF:

            CONNIE LYNN LEONARD,

was held on Friday, May 26, 2023, commencing

at 10:04 a.m., at Latham & Watkins, 555 11th

Street, Washington, D.C., reported by

Barbara Moore, CRR, RMR.

                *    *    *

MAGNA LEGAL SERVICES
866-624-6221
www.MagnaLS.com



3227

Page 10

1       Q.    Great.  All right, Ms. Leonard.

2    You understand that you are under oath

3    today?

4       A.    Yes.

5       Q.    Is there any reason why you

6    cannot testify truthfully today?

7       A.    No.

8       Q.    Ms. Leonard, because you have not

9    had your deposition taken in this case, I'd

10   like to ask you a few questions about your

11   background so that I can get to know where

12   you fit in the whole architecture.

13      A.    Okay.

14      Q.    Where do you work currently?

15      A.    I work at the Centers for

16   Medicare and Medicaid Services in the Center

17   for Program Integrity.  I am the director of

18   the compliance group.

19      Q.    Did I hear you say you're the

20   director of the Provider Compliance Group?

21      A.    Yes, that's correct.



3228

Page 11

1        Q.    And that is within the Center for

2    Program Integrity?

3        A.    Correct.

4        Q.    How long have you been the

5    director of the Provider Compliance Group?

6        A.    I have been in that current

7    position since November of 2020.

8        Q.    What was your job title before

9    you became director of the Provider

10   Compliance Group?

11       A.    I was the deputy director of the

12   Provider Compliance Group, and I was that

13   since September of 2013 through November of

14   2020.

15       Q.    And before you were deputy

16   director of the Provider Compliance Group,

17   were you with CMS?

18       A.    I was, yes.

19       Q.    What was your job title before

20   then?

21       A.    I was the director of the



Page 12

1    division of Recovery Audit Operations.

2        Q.    Is the division of Recovery Audit

3    Operations part of the Provider Compliance

4    Group?

5        A.    It is, yes.

6        Q.    And when did you become the

7    division director for the Recovery Audit

8    Operations division?

9        A.    2008.

10        Q.    Were you with CMS prior to 2008?

11        A.    I was, yes.

12        Q.    What was your job title before

13    then?

14        A.    Yes, I've been at CMS a long

15    time.  Prior to that I was a health

16    insurance specialist in the Financial

17    Services Group.

18        Q.    Is the Financial Services Group a

19    different group than the Provider Compliance

20    Group?

21        A.    It is, yes, it is.



Page 13

1        Q.    Is it also part of the Center for

2    Program Integrity?

3        A.    It is not.  It is part of the

4    Office of Financial Management.

5        Q.    When did you start as a health

6    insurance specialist in the Office of

7    Financial Management?

8        A.    In 1999, and that is when I

9    started at CMS.

10       Q.    Can you briefly summarize any job

11   history you had prior to joining CMS in

12   1999?

13       A.    I think you're going really far

14   back then.  I joined CMS shortly right out

15   of college, so most of my relevant job

16   experience would be at CMS.

17       Q.    Where did you go to college?

18       A.    I have a Bachelor's from the

19   University of Baltimore and a Master's

20   degree from Loyola College in Maryland.

21       Q.    What is your Bachelor's degree



Page 203

1    we believe the claim is accurate.

2              BY MR. MARTINEZ:

3         Q.    And when you say "accurate," even

4    though CMS hasn't reviewed that 99 percent

5    of fee for service claims, is it your

6    testimony that CMS assumes that those

7    diagnosis codes within those claims, the 99

8    percent, have support in the medical record

9    documentation?

10        A.    My testimony is that CMS has paid

11   the claim on the face of the claim as passed

12   through the automated edits and the standard

13   claim processing edits, and we have paid the

14   claim with the belief that it is an accurate

15   claim.  And that can either be proved true

16   or false upon medical record review, but we

17   are paying the claim on the basis of the

18   claim with the belief that it is accurate.

19        Q.    Am I correct that there might be

20   reasons in which CMS pays a claim in the fee

21   for service context that has nothing to do



Page 204

1    with whether the diagnosis codes are

2    accurate?

3              MS. GLOVER:  Objection.  Form.

4              THE WITNESS:  If I'm interpreting

5    your question correctly, then yes, there

6    certainly could be some claim sites that are

7    not edits, they are algorithms in the

8    automated edits claim processing system that

9    would look at every single diagnosis that

10   would be on every single claim.  And so some

11   of those claims could be paid without a

12   review of those diagnosis codes, again on

13   the face of the claim.

14              BY MR. MARTINEZ:

15       Q.    Right.  So just CMS pays a claim

16   in the fee for service context does not mean

17   that the diagnosis codes in that claims data

18   are accurate?

19              MS. GLOVER:  Objection.  Form.

20   Out of scope.

21              THE WITNESS:  In the provider



Page 205

1    agreement, providers sign that they are

2    going to submit accurate claims.  I am

3    positive that there's more official language

4    than that in the CMS provider agreement, but

5    it boils down to they not only have to

6    submit claims, but they have to keep all

7    necessary documentation.

8                And so there is a belief that

9    providers are doing that when they are

10   submitting claims.  And so CMS does take it

11   at face value that providers are, in fact,

12   submitting accurate claims, including

13   diagnosis codes when they're submitting

14   those claims and when we are making payments

15   on them on the face of the claim.

16              BY MR. MARTINEZ:

17   Q.    My question was, just because CMS

18   pays a claim in the fee for service context

19   does not mean that the diagnosis codes for

20   that claim are accurate; correct?

21              MS. GLOVER:  Objection.  Form.



Page 206

1   Asked and answered.  Out of scope.

2              THE WITNESS:  I do believe I have

3   answered that question.  CMS and the

4   provider have entered into an agreement.

5   Part of that agreement is that they submit

6   accurate information, and CMS is taking them

7   on their word when they go through the

8   claims processing system that these are, in

9   fact, accurate claims, accurate diagnosis

10  codes when they are submitted.

11             BY MR. MARTINEZ:

12     Q.    So respectfully, I don't think

13  you've answered my question, because it

14  really calls for a yes or no type of answer.

15  So I'll ask it again.

16             Just because CMS pays a claim in

17  the fee for service context does not mean

18  that the diagnosis codes for that claim are,

19  in fact, accurate; correct?

20             MS. GLOVER:  Objection.  Form.

21  Asked and answered.  Argumentative.  You



Page 283

1          CERTIFICATE OF COURT REPORTER

2              I, BARBARA MOORE, do hereby

3    certify that the proceedings were recorded

4    by me stenographically and electronically at

5    the time and place mentioned on the cover

6    sheet thereof, and, thereafter, transcribed;

7    that said hearing is a true record of the

8    statements made; that I am neither counsel

9    for, related to, nor employed by any of the

10   parties to this proceeding;

11             And further, that I am not

12   financially or otherwise interested in the

13   outcome of this matter.

14             As Witnessed by my hand and

15   signature as indicated below.

16

17

18

19   *Barbara Moore*
     _____
     BARBARA MOORE, CRR, RMR

20

21   My Commission Expires:  July 31, 2023



**EXHIBIT D-127**

Page 1

UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF            )

AMERICA, ex rel.            )   Case No.:

BENJAMIN POEHLING,          )   No. 16-08697-FMO

          Plaintiffs,       )

V.                          )

UNITEDHEALTH GROUP,         )

INC., et al.,               )

          Defendants.       )

_____/


                   CONFIDENTIAL

       CONTAINS ATTORNEYS' EYES ONLY PORTIONS


        The Videotaped, In-Person, Remote

deposition of KIRK LIMMER was held on Wednesday,

June 21, 2023, commencing at 10:40 a.m., at the

Law Offices of DLA Piper, 650 South Exeter Street,

Suite 1100, Baltimore, Maryland 21202 before Susan

Wootton, Notary Public.


REPORTED BY:  Susan Wootton, RPR, CLR



Page 16

1         A      Yes, I am.

2         Q      And then Topic 24, as to Finding

3    Number 1 in the OIG report, you are familiar with

4    it as well?

5         A      Yes, I am.

6         Q      And you're, likewise, prepared to

7    testify on behalf of CMS --

8         A      Yes --

9         Q      -- as to that topic?

10        A      Yes.  I am.

11        Q      What is your current position, if any?

12        A      I am the deputy director in the

13   Parts C and D Actuarial Group.

14        Q      Okay.  That's what I thought.  For

15   some reason, pay.gov had you as former, which --

16        A      I --

17               MS. ZUPAC:  That might be news.

18        Q      -- which confused me.

19               Okay.  So you're the deputy director

20   of the Parts C and D Actuarial Group within the

21   Office of the Actuary?

22        A      Correct.

23        Q      And the Office of the Actuary is

24   sometimes known as OACT?

25        A      Yes.



Page 17

```
 1        Q      Yes.  And how long -- how many years
 2   have you been the deputy in charge of the Parts C
 3   and D Actuarial Group?
 4        A      I believe I took that role on in 2012.
 5        Q      Okay.  So about 11 years.
 6        A      Yes.
 7        Q      And what was your role before 2012?
 8        A      I was an actuary in the Parts C and D
 9   Actuarial Group.
10        Q      And how many years were you in that
11   position?
12        A      From 2002 through 2012.
13        Q      Your responsibilities as deputy
14   director of the Parts C and D Actuarial Group
15   involve overseeing the review of Medicare
16   Advantage Part D bids, correct?
17        A      Yeah.  Yes.
18        Q      And was your work as an actuary,
19   between 2002 and 2012, likewise in connection with
20   the review of Parts C and D bids?
21        A      From the inception in 2006, when
22   the -- after the passage of the Medicare
23   Modernization Act.
24        Q      So the Medicare Modernization Act
25   introduced the Part D benefit, correct?
```



Page 18

1       A       Correct.

2       Q       And it made some modifications also to

3    the Part C program and how Medicare Advantage

4    plans are paid, correct?

5       A       That's correct.

6       Q       So it's fair to say that in addition

7    to whatever work you did to prepare for today as a

8    designee, you're personally very familiar with the

9    Parts C and D bidding process?

10      A       Yes.  I'm familiar with the C and D

11   process.

12              MR. MERON:  And your answers -- the

13   answers audible to you?

14              THE REPORTER:  Yes.

15              (Overlapping speakers.)

16              THE REPORTER:  They could be a little

17   louder.

18              THE WITNESS:  Okay.  I'll try to speak

19   up.

20              MR. MERON:  I confess I'm a little

21   hard of hearing.  So that's why I asked.  I'm not

22   always the best judge, but thank you.

23      Q       Prior to 2002, were you at CMS as well

24   or were you still in school?  Where were you prior

25   to 2002?



Page 19

```
 1        A       Prior to 2002, I -- I was working at a
 2   consulting firm, working in the retirement
 3   industry or retirement community industry.
 4                And prior to that I worked for Blue
 5   Cross-Blue Shield in Maryland as a -- both of
 6   those places -- as an actuary.
 7        Q       As an actuary?  And would your work
 8   for the Blue Shield -- Blue Cross-Blue Shield as
 9   an actuary have involved, you know, Medicare Plus
10   C or Choice, or whatever name it was currently
11   then known, as Medicare Advantage?
12        A       I did not have any role in that -- in
13   that -- those products.  My roles were on the
14   commercial products.
15        Q       Commercial products.  What is your --
16   could you briefly describe to me your post-high
17   school educational history.
18        A       Yes.  I attended four years at Loyola
19   College here in Maryland, and I have a Bachelor of
20   Science in Mathematics with a concentration in
21   actuarial science.
22        Q       Do you have any post-undergraduate
23   degrees?
24        A       I've sat for and taken the actuarial
25   exams, and I'm fellow of the Society of Actuaries.
```



Page 20

1    I'm also a member of the American Academy of

2    Actuaries.

3         Q      And the actuarial exams that you took,

4    were those under the offices of the society or the

5    academy?

6         A      Under the society.

7         Q      Under the society?

8         A      Yes.

9         Q      And you're familiar, obviously, with

10   the -- as a member of the American Academy -- with

11   the American Academy's code of conduct, correct?

12        A      Correct.

13        Q      And one of the principles I know that

14   actuaries have, and are proud of, is that they're

15   required to function with integrity, correct?

16        A      That is correct.

17        Q      And by that, I mean specifically have

18   some independence from the -- from the goals of

19   the organization they work for, correct?

20        A      In general, I don't know if the word

21   "independent" is spelled out in that code of

22   conduct, but yes, we generally act independently

23   and without bias.

24        Q      How much time, roughly, would you say

25   you've taken to prepare for the deposition today?



Page 74

1    population will be, correct?

2         A     Yes.  A --

3               MS. ZUPAC:  Objection to form.

4         A     Yeah.  Yes.  A risk score is

5    calculated from those, from demographic and

6    diagnosis codes.

7         Q     So the plan, it might not know what

8    particular conditions a particular beneficiary

9    might have in the -- in the following year, but in

10   order to project its risk score, it must be making

11   some kind of estimation about the health

12   characteristics of the population, correct?

13              MS. ZUPAC:  Object to form.

14        A     It is making some estimate of the risk

15   scores.  I -- I wouldn't classify it as making an

16   assessment of the health conditions.

17              See, the risk score is a product and

18   it's a result of those health conditions.  But I

19   wouldn't say that they're -- they're -- they're

20   trying to project the health conditions.

21              They're trying to project the risk

22   scores with the actuary's.  So we're talking about

23   the risk score in the Bid Pricing Tool.

24              So the actuary would be focused on

25   what is the calculation of that risk score?  So



Page 75

1    what is the resulting risk score that I expect for

2    that plan, in total?

3            They -- they -- they might not get

4    into assessments of health status or -- directly.

5    I mean, there -- there are -- they do have to make

6    adjustments for population.

7            They may -- I wouldn't know exactly

8    what the particular actuaries, you know, what

9    their focus is.  There's a lot of variables that

10    go into that.

11            But I don't think that would be the --

12    that wouldn't be how I would classify it, is

13    they're projecting health status, as much as

14    they're projecting a score.

15        Q    Well, the ultimate projection is the

16    total risk score --

17        A    Yes.  Yes.

18        Q    -- correct?

19        A    Yes.

20        Q    And, as you said, the risk score is

21    going to reflect the sum of both the demographic

22    variables and the health conditions, correct?

23        A    Yes.

24        Q    So in order to project a risk score,

25    don't I have to be projecting some estimate of how



Page 76

1    old my population is likely to be, how sick my

2    population is likely to be, all the things that go

3    into what the ultimate risk score is?

4              MS. ZUPAC:  Object to form.

5        A     So I just want to -- I want to make

6    sure I'm giving the answer that -- that's

7    representative.  And I think that also depends on

8    the actuary's model and their choice of model.

9              So the -- the -- I guess it all --

10   what I'm trying to point out is, it depends on the

11   level of detail that they -- they get into on

12   that.

13             They may -- they may choose another

14   population that is similar.  If they're -- say,

15   for example, if they're pricing a new population,

16   they could choose another population that's

17   similar.

18             If they -- that -- that population

19   then may or may not require adjustments.  And to

20   the degree it requires adjustments, they would --

21   they -- they may need -- yes, they may need to

22   reflect potentially -- you know, potential changes

23   for age and all the other demographic factors that

24   go into it.

25             They -- there -- there's adjustments



Page 148

1        Q       So --

2        A       Okay.

3        Q       Yes?

4        A       So it's basically the plan is

5   representing costs which are lower than the

6   benchmark, and it's the difference between those

7   two.

8        Q       And the benchmark essentially

9   represent sort of a -- a cap on how much CMS is

10  going to pay to the plan to cover traditional

11  Medicare benefits, correct?

12       A       Essentially, yes.

13       Q       I know we covered this before, but

14  just to make sure we're on the same page, and so

15  the plan A/B benchmark is the standardized

16  benchmark times the projected risk score for the

17  plan?

18       A       Yes.

19       Q       And the plan A/B bid is the

20  risk-adjusted bid?

21       A       Yes.

22       Q       And then on line 2, it says:  Rebate

23  calculated as savings times the rebate percentage.

24  Do you see that?  Instructions for line 2.

25       A       Yeah.  Yes.



Page 149

1        Q    And the rebate percentage, we said, it

2    varies somewhere in the 50 to 75 percent range

3    depending on the year and the quality ratings for

4    the plan.

5        A    Yes.

6        Q    And if you then turn to page 73,

7    that's Worksheet 6:  MA Bid Summary.

8        A    Okay.

9        Q    On page 74, there's a Section B:  MA

10   Rebate Allocation.

11       A    Yes.

12       Q    And so I think this is what you were

13   talking about before, which is the plan has to

14   take that rebate amount that it calculated and it

15   has to allocate it between these various

16   categories of what we're calling supplemental

17   benefits; namely, reducing A/B cost sharing, other

18   A/B mandatory supplemental benefits; Part B

19   premium buydown, Part B basic premium buydown, and

20   Part D supplemental premium buydown, correct?

21       A    Yes.  And those are the only options.

22       Q    And those are the only options, you

23   said?

24       A    Yes.

25       Q    Right?  And by that, you mean they



Page 150

1    can't use it for other purposes?

2        A    Correct, right.

3        Q    And the rebate -- I'm sorry.  Strike

4    that.

5            So what the plan needs to do is once

6    it's calculated what the rebate amount is, it then

7    has to -- I'm going to try to get this right -- it

8    has to then design a package of supplemental

9    benefits that has an actuarial value equivalent to

10   the rebate amount it calculated; is that fair?

11       A    I don't know if that order or timing

12   would take place.  They may design a package --

13   again, this is going to depend on the individual,

14   the plan, and what their goals are in terms of

15   offering benefits and -- and price, of course, it

16   goes out -- those are probably the two biggest

17   considerations for them.

18           But they may develop a package first,

19   then price it through and see what the premium is.

20   In -- in any case there's probably -- and again,

21   this -- I'm not working on their behalf, but

22   there's probably -- it's probably an iterative

23   process of pricing and making adjustments to

24   benefits and/or premiums.

25       Q    Okay.  Fair enough.  So I guess my



Page 203

1                    But the other components of CMS do not
2    extract that information or review it to do their
3    portions of the bid review, correct?
4         A    That is correct.  I'll just give one
5    stipulation.  One thing that I did find is there
6    was -- some of it on the demonstration side,
7    they --
8                    There was, at one point, where the
9    demonstration was being implemented -- this is
10   under the Senior Savings Model of 2021 -- so it's
11   out -- I believe it's outside the scope of this
12   time period.
13                   But the program was implemented late
14   or -- or close to the bid submission deadline.
15   They did not have a way to collect some
16   information, so some of that information related
17   to that program, under the demonstration, was
18   uploaded to HPMS under -- under pricing supporting
19   documentation.
20        Q    I see.
21        A    That's -- that's the only thing.  But,
22   that was -- again, that was outside of the time
23   period.
24        Q    Okay.  But within the time period, the
25   material -- the Bid Pricing Tool and the



3250

Page 204

1    supporting documentation for the Bid Pricing Tool,

2    that material is -- was reviewed only by OACT and

3    not by the other components for purposes of their

4    separate review?

5         A    That's correct.  That -- that -- that

6    has always been my experience.  Plus, in my -- my

7    talking with the other components, I was not able

8    to find anything.  I did ask that specific

9    question.

10        Q    Okay.  Great.  So all those different

11   worksheets that we looked at -- that were part of

12   the Bid Pricing Tool -- those are all

13   OACT-specific worksheets that OACT uses as part of

14   its review?

15        A    Correct.  They are put together by

16   OACT.  Helped to -- OACT helps to develop them.

17   OACT prepares the -- the bid instructions that go

18   along with them.  And then that's all used

19   strictly in our review.

20             MR. MERON:  Let me have the next

21   exhibit.  This has already been marked.

22        Q    So I'm showing you Exhibit 1076, which

23   is entitled "Care Improvement Plus" of Texas

24   Insurance Company.

25             There's a contract number.  And then



Page 205

1   it says:  "MA Supporting Documentation for CY2015

2   Bid, Dated June 2nd, 2014."

3        A    Yes.

4        Q    Is this one of the documents you

5   reviewed in preparation for today?

6        A    This looks -- this looks like the one.

7   I -- I -- I do not recall the word "care

8   improvement," but --

9             I don't know if I looked at that

10  specific part of the title.  But this is -- yes.

11  There was a section.  Okay.  Yes.  It looks like

12  it was.

13       Q    So before we turn to the substance of

14  it, just so I can understand again the various

15  roles.  So on the top of it says:  "Index MA

16  Supporting Documentation."

17            And then there's a list of sections.

18  And many of these sections have parentheses after

19  them like WS1, WS4, WS2, WS5, et cetera, right?

20       A    Yes.

21       Q    So I assume WS is "worksheet"?

22       A    That's what I would assume, too.

23       Q    Okay.

24       A    That -- that is a typical notation

25  that's been -- that's used.  WK is also a notation



Page 206

1    that sometimes --

2                    It might not be use in this document,

3    but WK is also a notation we use for -- like,

4    abbreviation for worksheet.

5         Q    So looking over the document as a

6    whole -- and if I understand your testimony

7    earlier -- so this is -- this -- to your

8    knowledge, is this MA -- when it says "MA

9    Supporting Documentation," it appears to be MA

10   supporting documentation supporting the

11   information, the pricing information that's part

12   of the Bid Pricing Tool?

13        A    Correct.  This document here looks

14   very much like what we would see for the

15   supporting documentation of a Bid Pricing Tool.

16        Q    So this document -- and, you know, we

17   can spend -- I mean, there's hundreds of MAs --

18        A    Yes.

19        Q    -- of United plans.

20        A    Yes.

21        Q    So we submit hundreds of these

22   documents.  So we're not going to go through them

23   all.

24                    But documents that look like this

25   index, "MA Supporting Documentation" with these



3253

Page 216

```
 1        A     Yes.  It's possible.  I guess it

 2   depends on the circumstances for that particular

 3   benefit.  I'm not going to say that that's exact,

 4   but, yes, that concept is correct.

 5        Q     Okay.  So turning back to 1076.  So

 6   there's -- on page 6 of the supporting

 7   documentation there's a section 9:  "Projected

 8   Risk for Development WS5." Do you see that?

 9        A     Section 9?  Yes.

10        Q     And WS5 is Worksheet 5, correct?

11        A     Correct.

12        Q     And as we saw, part -- one of the

13   pieces of information you have to supply in

14   worksheet 5 is your projected risk score.

15        A     Correct.

16        Q     And so what you're looking at are some

17   of the supporting documentation that the plan is

18   submitting to justify its projected risk score,

19   correct?

20        A     Yes.

21        Q     And then if you turn to page 8, the

22   last paragraph before section 10.  Do you see

23   that?

24        A     Yes.

25        Q     It said:  We also adjusted projected
```



Page 217

1  risk scores to account for changes in our medical

2  record review processes, specifically based on

3  multiple conversations with CMS and CMS's

4  treatment of medical record review in its

5  reasonable making process.

6           The health plan has decided to cease

7  one of its prior processes that identified and

8  deleted certain diagnosis codes through the

9  medical record review process.  Do you see that?

10      A     Yes.

11      Q     So what this paragraph is saying is

12  that the plan has adjusted its projected risk

13  score to account for cessation of a prior process

14  that identified and deleted certain diagnosis

15  codes, correct?

16           MS. ZUPAC:  Object to form.

17      A     It says they've decided to cease one

18  of its prior processes that identified and deleted

19  certain diagnoses codes.  Yes.  It does say that.

20      Q     And it also says that it adjusted its

21  projected risk scores to account for that.

22      A     It says:  We also adjusted projected

23  risk scores to account for changes in our medical

24  review process.

25      Q     And then it says:  Specifically,



Page 218

1    we've -- the plan has decided to cease one of its

2    prior processes and delete codes.  Correct?

3                MS. ZUPAC:  Object to form.

4        A    Yes.  It does say that.

5        Q    And CMS understands, right, that an

6    adjustment to a projected risk score -- to account

7    for cessation of a process to identify and delete

8    diagnosis codes -- would be an upward adjustment

9    in the risk score, correct?

10               MS. ZUPAC:  Object to form.

11       Q    All else being equal?

12       A    So given the -- the brief context of

13   what is provided here, I don't know if I would

14   know the -- the scope of the entire -- the entire

15   change or the magnitude.

16               I think that the -- and there --

17   there's -- there's very little information in here

18   in terms -- to make an assessment on what -- you

19   know, the -- the entirety of what's happening

20   here.

21               This doesn't really state any

22   quantitative assessment.  But that's not required.

23   I mean, the Standards of Practice don't

24   necessarily require that the actuary quantify some

25   of these coding things.



Page 260

1   State of Maryland

2   County of Baltimore, to wit:

3           I, Susan M. Wootton, a Notary Public of the

4   State of Maryland, County of Baltimore, do hereby

5   certify that the within-named witness personally

6   appeared before me at the time and place herein set

7   out, and after having been duly sworn by me, according

8   to law, was examined by counsel.

9           I further certify that the examination was

10  recorded stenographically by me and this is a verbatim

11  transcript of the testimony, as taken stenographically

12  by me, to the best of my ability.

13

14  As witness my hand this _____ day of

15  _____, 2023.

16                          *Susan M Wootton*

                            SUSAN WOOTTON

17                          Notary Public

18

19  My Commission Expires:

20  June 12, 2027

21

22

23

24

25



**EXHIBIT D-128**

Page 1

                UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF CALIFORNIA
                     WESTERN DIVISION


UNITED STATES OF AMERICA        )
ex rel. BENJAMIN POEHLING,      )
                                )
            Plaintiff,          )
                                )
        v.                      )Case No. 16-08697 FMO
                                )
UNITEDHEALTH GROUP, INC.,       )
et al.,                         )
            Defendants.         )
_____    )



VIDEOTAPED DEPOSITION OF JOHN N. MARTINEZ, taken on
behalf of Relator BEN POEHLING, at 650 Town Center Drive,
20th Floor, Costa Mesa, California 92626, beginning at
9:48 a.m., and ending at 3:55 p.m., on Tuesday,
August 30, 2022, before Marceline F. Noble, RPR, CRR,
Certified Shorthand Reporter No. 3024.




Magna Legal Services
866-624-6221
www.MagnaLS.com

Reported by:
Marceline F. Noble
CSR No. 3024
Job No. 835287



Page 27

1  disagreeing.

2  BY MR. VOLDMAN:

3      Q.  How was Optum paid for the chart review

4  program that it provided for its clients?

5          MR. RYDBERG:  Objection.  Vague and lacks

6  foundation.

7          THE WITNESS:  I wasn't responsible for the

8  chart review program.  So I only know that a -- for

9  each chart that's retrieved, there is a -- there is a

10  dollar amount that is paid for those charts.

11  BY MR. VOLDMAN:

12      Q.  Okay.  Do you know who was responsible for

13  the chart review program at Optum?

14          MR. RYDBERG:  Objection.  Vague.

15          THE WITNESS:  My understanding at that time,

16  it was Jim Colhour.

17  BY MR. VOLDMAN:

18      Q.  Okay.  Anyone else?

19      A.  Not to my recollection.

20      Q.  Okay.

21      A.  He is the main person I work with.

22      Q.  Did you work closely with Jim Colhour?

23      A.  No.

24      Q.  Okay.  Did you work with anyone at M&R

25  regarding the chart review program?



Page 28

```
 1          MR. RYDBERG:  Objection to form.
 2          THE WITNESS:  I don't recall working with
 3   anyone there --
 4          MR. VOLDMAN:  Okay.
 5          THE WITNESS:  -- no.
 6   BY MR. VOLDMAN:
 7      Q.  So back to CV3, how did it interact with the
 8   chart review program?  'Cause that's how we got
 9   introduced to chart review.
10          MR. RYDBERG:  Objection.  Vague.
11          THE WITNESS:  Are you trying to understand
12   how -- how it -- how CV functioned with it?
13   BY MR. VOLDMAN:
14      Q.  Yes.
15      A.  So claims verification is a completely
16   separate process, where after the chart review is --
17   is completed, those charts are then moved into the
18   claims verification queue for evaluation purposes to
19   determine if they're eligible for claim verification.
20   BY MR. VOLDMAN:
21      Q.  Okay.  And we'll go back to eligibility
22   criteria in a little bit.
23          But what happened to charts once they were
24   determined to be eligible for claims verification?
25          MR. RYDBERG:  Objection.  Vague.
```



Page 29

```
 1          THE WITNESS:  Yes.  There's multiple steps.
 2   It's a complex program.  But at a high level, charts
 3   would be evaluated for eligibility.
 4          And if they had what we called a discrepant
 5   HCC, which was an HCC that was found on claims but
 6   was not found during the coding review, those charts
 7   would then be funneled to a human coder for review.
 8   BY MR. VOLDMAN:
 9     Q.  Okay.  What would happen if the human coder
10   then didn't find that HCC?
11          MR. RYDBERG:  Objection.  Vague.
12          THE WITNESS:  If the coder didn't find
13   validation for that HCC, that would then be sent to a
14   separate coder under the QA process for CV.
15   BY MR. VOLDMAN:
16     Q.  Okay.  And what would happen if that person
17   didn't find validation for that HCC?
18          MR. RYDBERG:  Same objection.
19          THE WITNESS:  The HCC would be marked for
20   delete, disposition in the system, and then sent
21   downstream to a different department.
22   BY MR. VOLDMAN:
23     Q.  Okay.  What department was it sent
24   downstream to?
25     A.  I think the team was called -- I'm going to
```



Page 30

1    call it the deletes team.  I don't remember what

2    the -- what the term -- the teams change the names a

3    lot.  So I'm going to call it the "deletes team."

4    BY MR. VOLDMAN:

5        Q.  Sure.

6            Do -- do you recall who worked on the

7    deletes team?  Which individuals?

8        A.  I do.

9        Q.  Can you name some of them?

10       A.  Yeah.  To my recollection, I remember

11   Rebecca Martin being the main lead there.

12       Q.  Okay.  Anyone else?

13       A.  Not to my recollection.

14       Q.  Okay.  Did you ever work with anyone at M&R

15   regarding the claims verification program?

16       A.  Not directly.

17       Q.  What about indirectly?

18       A.  I attended meetings where my managers were

19   the lead in those meetings.  I just -- I was just an

20   attendee.

21       Q.  Okay.  Who from M&R was at those meetings?

22           MR. RYDBERG:  Objection.  Calls for

23   speculation.

24           THE WITNESS:  I don't know all of the

25   meetings, but -- actually -- I don't recall actually.



Page 234

1

2                    REPORTER'S CERTIFICATION

3

4        I, Marceline F. Noble, a Certified Shorthand

5   Reporter in and for the State of California, do hereby

6   certify:

7

8        That the foregoing witness was by me duly sworn;

9   that the deposition was then taken before me at the time

10   and place herein set forth; that the testimony and

11   proceedings were reported stenographically by me and

12   later transcribed into typewriting under my direction;

13   that the foregoing is a true record of the testimony and

14   proceedings taken at that time.

15

16        IN WITNESS WHEREOF, I have subscribed my name this

17   5th day of September, 2022.

18

19

20          _____ *Marceline F. Noble*

21               Marceline F. Noble, CSR No. 3024

22

23

24

25



3264

**EXHIBIT D-129**

**REDACTED VERSION OF
DOCUMENT PROPOSED TO BE
FILED UNDER SEAL**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


_____
                              )
UNITED STATES OF AMERICA      )
ex rel. BENJAMIN POEHLING,    )
                              )
        Plaintiff,            )      No. CV 16-08697 FMO
                              )
vs.                           )
                              )
UNITEDHEALTH GROUP, INC.,     )
et al.,                       )
                              )
        Defendants.           )
_____)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

DEPOSITION OF GEORGE MILLS
As 30(b)(6) Designee 3 of
The United States

Washington, DC
September 7, 2023




Reported by:  John L. Harmonson, RPR
Job No. 1018234



3266

Page 57

1            But the question is:  How did CMS come

2     up with the 4 percent error rate?  And you started

3     the answer by saying I'm putting on my George Mills

4     hat.  So I want to get the hats straight here.

5         A.    Yeah.

6         Q.    Were you describing a conversation you

7     had back in 2009 about this error rate?

8         A.    Yeah.  They came to me because when I

9     was in PCG, I ran the error rate for Medicare and

10    Medicaid, Medicare fee-for-service and Medicaid.

11    And the error rate the prior year in 2008 was about

12    3.9.  That's where they're getting the 4; they're

13    rounding up.

14        Q.    So you believe this figure came from a

15    conversation with you where you're describing the

16    Medicare fee-for-service error rate --

17        A.    Yeah.

18        Q.    -- which you contend is different,

19    apples and oranges as you describe it?

20            MS. McMAHON:  Objection.

21            THE WITNESS:  It's a lot different.

22    BY MR. ABASCAL:

23        Q.    Okay.  Do you know who that proposal was

24    made to?  "We propose using the FFS error rate."

25        A.    I don't know explicitly.  I can assume



Page 58

1    that it was to their group director and other

2    senior leaders above them in CM.

3        Q.    Do you believe CMS used the error rate

4    at that time, that 4 percent error rate at that

5    time for any purpose?

6        A.    No.  And in fact, there is an email from

7    Jennifer Harlow to me talking about their new

8    methodology for figuring out the error rate.  I

9    don't know the exact date, but there is an email in

10   2009 from Jennifer to me about it.

11       Q.    About this error rate?

12       A.    No.  About the new --

13             MS. McMAHON:  Objection to form.

14             THE WITNESS:  -- the new error rate that

15   they're doing.

16             MR. ABASCAL:  We've been going about an

17   hour.  I usually take breaks every hour.  Is that

18   all right with you?  I can keep going --

19             THE WITNESS:  No, that's fine.

20             MR. ABASCAL:  -- but I think everybody

21   probably wants a break.

22             THE WITNESS:  Thank you.  I appreciate

23   that.

24             MR. ABASCAL:  So we'll take maybe a

25   ten-minute break.  We'll go off the record.



Page 59

1            THE VIDEOGRAPHER:  Off the record.  The

2    time is 10:44.

3            (Recess taken.)

4            THE VIDEOGRAPHER:  On the record.  The

5    time is 11:02.

6    BY MR. ABASCAL:

7        Q.    All right.  Mr. Mills, we're going to go

8    on to another exhibit.

9            MR. ABASCAL:  This is 2010/1/28, Tab 6.

10           (Exhibit 1505 marked for identification

11       and attached hereto.)

12   BY MR. ABASCAL:

13       Q.    So, Mr. Mills, I'm handing you

14   Exhibit 1505.  Do you recognize this document?

15       A.    I believe I've seen this in the past.

16   Yes, I'm pretty sure.

17       Q.    All right.  I'm going to draw your

18   attention to the first page of the document, and

19   it's titled "Calendar Year 2007 Risk Adjustment

20   Data Validation, Development of a FFS Adjuster for

21   RADV, Discussion Paper (Draft)."  And it's dated

22   January 28, 2010.  Do you see that?

23       A.    Yes.

24       Q.    It says in the top:  "Issue.  CMS is

25   interested in understanding the difference in



Page 60

1    ICD-9-CM coding accuracy between Medicare Advantage

2    organizations and Medicare fee-for-service

3    providers.  The extent of FFS diagnosis coding

4    error is not known and needs to be established in

5    order to further define payment adjustment

6    estimates."

7            Do you see that?

8        A.    Yes.

9        Q.    You testified that you had seen this

10   document before.  Did you see it in preparation, or

11   do you believe you saw it in the course of your

12   employment?

13       A.    No, I'm pretty sure this is one -- it

14   looks very familiar as one of the ones that I was

15   given previously here, not through my own work.

16       Q.    Oh, so this would have been for

17   preparation?

18       A.    For prep.  Not as George Mills, no.

19   This is 30(b)(6).

20       Q.    Okay.  Looking at the third paragraph,

21   it says:  "To accomplish a comparable FFS adjuster,

22   a RADV-equivalent medical record review was

23   conducted to validate risk adjustment diagnosis

24   data reported on Part B FFS claims selected under

25   the CERT audits."



3270

Page 61

1              Do you see that?

2       A.    Yes.

3       Q.    Do you believe that took place?

4       A.    Yes.  I was actually the one that

5   recommended to Jonathan and Jennifer that they use

6   the CERT data to do their study.

7       Q.    Why did you recommend that?

8       A.    Because the CERT data had already been

9   medically reviewed, and the other advantage is they

10  already had the records in-house and you wouldn't

11  have go out and get it.  And they were in

12  electronic format which could be easily provided to

13  the coders that were looking from the RADV -- the

14  risk adjustment perspective.  Not getting the

15  records -- not having to go get the records really

16  was a much easier way to do it.

17             The other thing about the CERT sample is

18  it's certified representative of fee-for-service,

19  and it's a systematic random sample and it's

20  representative of the entire fee-for-service

21  population of claims.

22      Q.    Okay.  Let's draw your attention to the

23  third page of this document.  And at the third page

24  it says:  "FFS Adjuster Summary.  Table 3 below

25  provides different FFS adjusters that resulted from



Page 62

1    the above-described modeling."

2              Do you see that?

3       A.    Yes.

4       Q.    And what's described in the chart on

5    page 3?

22              MR. ABASCAL:  Let's move on to another

23   exhibit, 2010/4/15.

24              (Exhibit 1165 marked for identification

25        and attached hereto.)



3272

Page 63

 1   BY MR. ABASCAL:

 2        Q.    Mr. Mills, the document we just had gone

 3   over was January 28, 2010.  I'm handing you now an

 4   exhibit three months later which is dated April 15,

 5   2010.  This is Exhibit 1165.  It's an excerpt of

 6   the Federal Register.

 7              Do you see that?

 8        A.    Yes.  And this is referenced in our

 9   chart.

10        Q.    And by "chart," you mean it's referenced

11   in the timeline you created?

12        A.    The timeline chart, yes.

13        Q.    So you had a chance to review it before

14   today's testimony; correct?

15        A.    Yeah.  The pages referenced here, yes.

16   Yes.

17        Q.    Great.  We're going to go through those

18   pages, not all of them.  Let me start at the

19   beginning.  The document is entitled on the

20   left-hand column "Medicare Program; Policy and

21   Technical Changes to the Medicare Advantage and the

22   Medicare Prescription Drug Benefit Programs."

23              Do you see that?

24        A.    Yes.

25        Q.    And in the "Summary" portion in that



Page 64

 1    first column it says:  "This final rule makes

 2    revisions..."

 3              Do you see that?

 4         A.    Yes.

 5         Q.    So this in fact was a final rule issued

 6    by HHS; right?

 7         A.    Yes, that's my understanding.

 8         Q.    Okay.  Let me draw your attention to

 9    page 19749 of this final rule.

10         A.    Okay.

11         Q.    In the middle column, about the center

12    of the page, there is a comment, and I'm going to

13    read from it.

14              "Many commenters from the MA industry

15    recommended that before CMS audit MA organizations

16    under RADV, the agency first account for any error

17    rates inherent in Medicare FFS data that affect MA

18    error rates.  These commenters stated that through

19    the proposed RADV audit appeal process, CMS is

20    imposing a set of rules regarding physician

21    recordkeeping that were not anticipated in the

22    ICD-9CM coding guidelines, is not consistent with

23    standard practices and is not enforced on original

24    Medicare claims.  The result, they allege, is de

25    facto MA payment adjustments based on recordkeeping



Page 65

1    discrepancies without an adjustment to original FFS

2    Medicare risk scores for the same recordkeeping

3    discrepancies."

4              Do you see that comment?

5         A.   Yes, I see that comment.

6         Q.   All right.  And could you read for us

7    what HHS responded to that comment in the response?

8         A.   Okay.  Right under that comment, the

9    response says:  "We recognize that there may be

10   potential merit in further refining the error rate

11   calculation.  We are currently studying this

12   issue."

13        Q.   So you agree that CMS stated publicly

14   that there may be potential merit in the issue

15   described in the comment; correct?

16        A.   Yes.  On the date that this was written,

17   yes, that was what the thought was.

18        Q.   And who approved this statement?

19        A.   Well, regs go through a significant

20   internal process where regs are drafted.  They're

21   reviewed internally by the component creating it.

22   They go throughout the agency for review.  The

23   Office of General Counsel reviews.  Then the regs

24   are sent to the department, and then they -- our

25   final approval is through OMB before they're



Page 66

1    published.

2        Q.    So it's a thorough process; right?

3        A.    Yes.

4        Q.    And it reflects the belief of the agency

5    at the time; right?

6        A.    Yes, at the time.  Yes.

7        Q.    Why did CMS believe that the issue had

8    potential merit at that time?

9            MS. McMAHON:  Objection; misstates the

10   document.

11   BY MR. ABASCAL:

12       Q.    I didn't mean to misstate the document.

13           So why did HHS believe that the issue

14   had potential merit?

15           MS. McMAHON:  Objection; misstates the

16   document.

17           THE WITNESS:  Well, it said that we

18   needed to study the issue, that we are currently

19   studying the issue and recognize that there might

20   be merit in the issue.  So I don't -- I can only go

21   by what the record shows.

22   BY MR. ABASCAL:

23       Q.    All right.  When the response says "we,"

24   who is it referring to?

25       A.    We, again, as you pointed out, means



Page 67

1    CMS.

2        Q.    And so why did CMS believe it had

3    potential merit?

4            MS. McMAHON:  Objection; misstates the

5    document.

6            THE WITNESS:  Well, to me, the way I

7    read this is that we're committing to study the

8    issue.  I mean, that's exactly what Jon said.

9    That's what Cheri Rice said.  That these were

10   comments that they were hearing from the community

11   of stakeholders, and that Jon specifically noted

12   that he thought we had a responsibility to

13   investigate issues that were being raised by the

14   stakeholder community.

15   BY MR. ABASCAL:

16       Q.    I understand.  But that's not what the

17   document says; right?  The second sentence says:

18   "We are currently studying the issue."  Right?

19       A.    Yeah.

20       Q.    But the first sentence says:  "We

21   recognize that there may be potential merit in

22   further refining the error rate calculations."

23           My question is why did CMS say that?

24           MS. McMAHON:  Objection; asked and

25   answered.



Page 68

```
 1              THE WITNESS:  Well, again, as Jon and
 2   Cheri and others had indicated, we recognized that
 3   there might be potential merit there, and we were
 4   going to study the issue to determine whether or
 5   not it really was an issue.
 6   BY MR. ABASCAL:
 7        Q.    So at this point in time, it's fair to
 8   say that CMS had not yet decided how to calculate
 9   overpayments in RADV; correct?
10              MS. McMAHON:  Objection.
11              THE WITNESS:  Well, RADV is not -- how
12   the process works in RADV is not something I'm
13   really talking about here today.  But potentially
14   the issue was after a RADV audit was completed,
15   whether there should be some discount applied to
16   whatever overpayment is due.  That's the concept of
17   the adjuster.
18   BY MR. ABASCAL:
19        Q.    Correct.  So the concept is when you're
20   doing a RADV audit to determine the amount of
21   overpayment CMS had to determine whether or not it
22   would apply a discount, the FFS adjuster, to
23   determine the overpayments; right?
24              MS. McMAHON:  Objection; form.
25              THE WITNESS:  Well, yes.  That's
```



Page 69

1    conceptually the strategy here.

2    BY MR. ABASCAL:

3        Q.    And so conceptually, CMS had not yet

4    decided, as you identified, whether or not to apply

5    an FFS adjuster because they said they were

6    currently studying the issue; correct?

7        A.    The date here -- yeah, there was study,

8    and we had not made any public statements about

9    whether or not we would actually do one or not.

10        Q.    So at this point in time, CMS had not

11    yet settled on the final formula for calculating

12    overpayments under RADV; correct?

13            MS. McMAHON:  Objection.

14            THE WITNESS:  At this time, there was no

15    final, and at least in my view there wasn't a final

16    one until we did our NPRM in 2018.

17    BY MR. ABASCAL:

18        Q.    Okay.  So for that entire time period up

19    until 2018, there wasn't a final methodology on how

20    to calculate overpayments under RADV because the

21    FFS adjuster was still pending; correct?

22            MS. McMAHON:  Objection.

23            THE WITNESS:  The adjuster issue was

24    still pending, and there was a long period of time

25    until the final conclusion was reached, which was



Page 70

1    in our white paper and subsequent NPRM.

2    BY MR. ABASCAL:

3        Q.    And that was in 2018?

4        A.    In 2018.

5        Q.    So prior to that, it hadn't yet been

6    settled; correct?

7              MS. McMAHON:  Objection.

8              THE WITNESS:  It hadn't been settled,

9    and there were other issues going on, and even when

10   the white paper was released in 2012 there still

11   was no number or methodology provided.

12             MR. ABASCAL:  Let's move on to a

13   different exhibit, 2010/6/22.  This is in my Tab 9.

14             Can we go off the record for a second?

15             THE VIDEOGRAPHER:  Off the record.  The

16   time is 11:18.

17             (Off the record.)

18             THE VIDEOGRAPHER:  On the record.  The

19   time is 11:19.

20   BY MR. ABASCAL:

21       Q.    Mr. Mills, I'm showing you two exhibits,

22   Exhibit 1037 and Exhibit 1348.

23             (Exhibit 1037 marked for identification

24       and attached hereto.)

25             (Exhibit 1348 marked for identification



Page 71

```
 1        and attached hereto.)

 2   BY MR. ABASCAL:

 3        Q.    I'm going to start with 1037.  Do you

 4   recognize Exhibit 1037?

 5        A.    Yes, I'm pretty sure I've seen this

 6   before.

 7        Q.    And would you have seen it in

 8   preparation for today, or in the course of your

 9   work?

10        A.    I'm pretty sure -- well, I know for a

11   fact it's in the course of preparing for today.

12        Q.    All right.  Exhibit 1037 is a document,

13   a PowerPoint it appears, titled "FFS Adjuster" with

14   the names below that Jennifer Harlow, Lateefah

15   Hughes and Jonathan Smith, dated 6/22/2010.

16              Do you see that?

17        A.    Yes.

18        Q.    And it appears to be a presentation

19   regarding the fee-for-service adjuster.  Do you see

20   that?

21        A.    Yes.  A PowerPoint presentation, yes.

22        Q.    Do you know who this presentation was

23   intended for or presented to?

24        A.    I don't know for sure who this was

25   intended for, but I'm assuming that it was somebody
```



Page 72

1    above Jennifer Harlow because she's listed as one

2    of the creators.

3        Q.    All right.  Let's look at Exhibit 1348.

4    If you could turn to that.  Do you see Exhibit 1348

5    appears to be the same PowerPoint presentation

6    titled "FFS Adjuster," 6/22/2010?  Do you see that?

7        A.    Yes.

8        Q.    But this version has talking points

9    below that.  Do you see that?

10       A.    Yes.

11             MS. McMAHON:  Objection.

12             THE WITNESS:  I see the talking points,

13   yes.  And it appears to be the same presentation

14   with PowerPoint notes at the bottom, yes.

15   BY MR. ABASCAL:

16       Q.    And I refer to them as talking points.

17   I'll just say they're just words below the slides;

18   correct?

19       A.    Yeah.

20       Q.    All right.  Let me turn your attention

21   to slide 2 on this document.  Slide 2, page 2, says

22   "Purpose" at the top.  If you look at the second

23   bullet point, it says:  "FFS adjuster will be

24   applied to RADV contract-level payment error

25   estimates to address unsupported diagnoses in FFS



Page 76

1   I stated earlier, I'm assuming that it was somebody

2   above Jennifer Harlow because she was listed as one

3   of the authors so...

4        Q.    Do you know what decision -- whether the

5   person above Jennifer Harlow agreed with the

6   recommendation?

7        A.    I don't -- I don't have any information

8   one way or another.  I didn't see anything that

9   said yes or no.  I do know that they did a second

10  study basically using the same methodology but with

11  a much larger universe of claims.







Page 78



```
18        Q.    Understood.

19              But this is the methodology that these

20   three individuals at least, Jennifer Harlow,

21   Jonathan Smith and Lateefah Hughes were

22   recommending; correct?

23        A.    Yeah.  That was the methodology at that

24   time.

25        Q.    And you agree that Jennifer Harlow,
```



3285

Page 79

1    Lateefah Hughes and Jonathan Smith are honest

2    people; right?

3         A.    They're honest people, but they can make

4    mistakes.

5         Q.    But they're hardworking; right?

6         A.    Yeah, they're all hardworking, very

7    competent people.

8         Q.    And they're competent in their jobs;

9    right?

10        A.    Yes.

11        Q.    And so at the time, these honest,

12   competent people believed the rules should be

13   interpreted to calculate overpayments in the method

14   described on the recommendations page; right?

15             MS. McMAHON:  Objection.

16             THE WITNESS:  That was the

17   recommendation at the time.

18             MR. ABASCAL:  Let's go to 2010/7/27.

19             (Exhibit 1342 and 1343-1 marked for

20        identification and attached hereto.)

21   BY MR. ABASCAL:

22        Q.    It's fair to say you believe that was

23   CMS's view at the time; right?

24             MS. McMAHON:  Objection.

25             THE WITNESS:  That was the



3286

Page 80

1   recommendation and, from my understanding, that was

2   the belief of a number of people in CM at the time.

3   BY MR. ABASCAL:

4        Q.    Not just the three people listed;

5   correct?

6        A.    Yeah, I can't give you an exact number,

7   but yes, that would appear to be true.

8        Q.    Let's look at another exhibit,

9   Exhibit 1342.  Exhibit 1342 is an email from

10  Jennifer Harlow to Jonathan Smith, Cheri Rice,

11  Stacey Deiter and Carolyn Kapustij.  Do you see

12  that?

13       A.    Yeah.

14       Q.    What was Stacey Deiter's role at the

15  time?

16       A.    I've never met her, and I've never -- to

17  the best of my knowledge, she wasn't deposed.  She

18  appeared to be just a staff member working in DPV.

19       Q.    What was Cheri Rice's role at the time?

20       A.    I believe at that time Cheri Rice was

21  either the director of the Medicare Plan Payment

22  Group or the deputy director of the Plan Payment

23  Group.  Again, I'm not really sure when Tom

24  Hutchinson left; but when he left, Cheri Rice took

25  over that group in CM.



Page 81

1          Q.    If you look at the subject line of the

2    email, it says "RADV FFS Adjuster_MPPGfinal_OFM

3    Briefing."  Do you see that?

4          A.    Yeah.

5          Q.    Was there an OFM briefing around this

6    time?

7          A.    I saw documents that there was an email

8    to a gentleman by the name of Ted Doolittle as well

9    as a copy to a gentleman named John Spiegel which I

10   believe had this PowerPoint attached to it.  And

11   they were talking about what was going on in the MA

12   world.  Well, wait a minute.  I'm screwing up.

13          That's OFM.  I'm thinking CPI.  Sorry.

14   To OFM.  Yeah, I'm not sure.  It could have been to

15   me when I was in OFM.

16          Q.    Okay.  Do you remember attending a

17   briefing when you were at OFM on the model

18   calibration packet?

19          A.    No.  I don't remember ever having a

20   meeting.  I remember Jennifer, as we previously

21   discussed, came to me originally and said we're

22   just going to use a fee-for-service error rate as a

23   proxy.  And I'm like, well, you're going to have

24   issues.

25          Then they came up with a methodology.



Page 82

1    And then I remember that she had sent me it.  I

2    don't believe I ever responded to it.  But I'm not

3    sure who this was to and who they met with.

4         Q.    I recall you testifying about Jennifer

5    Harlow coming to you about the fee-for-service

6    error rate as a proxy.  But was there a second

7    meeting where Ms. Harlow came to you with a

8    different analysis or methodology?

9         A.    It wasn't a meeting.  There is an email

10   when they came up with their methodology, that they

11   sent a methodology to me.  That's in there.  I

12   don't believe I ever responded to it because it was

13   their methodology and I didn't really have any

14   comments on it at the time given my role.

15        Q.    Understood.

16             Well, let's look at the presentation

17   that's attached to this July email.  The PowerPoint

18   presentation has the same three people listed,

19   correct, Ms. Harlow, Ms. Hughes and Mr. Smith?

20        A.    Correct.

21        Q.    And the title of it is "Part C Payment

22   Audit:  RADV Model Calibration Factor."

23             What is a model calibration factor?

24        A.    I've seen this used as another

25   descriptor of the fee-for-service adjuster.  To me,



Page 148

1    to the next page.  See "Summary of FFS Error"?  Do

2    you see that?

3         A.    Yeah.

4         Q.    Draw your attention to the last column.

5    It says "998 coded in 2011."

6              Is it possible that the 2011 refers to

7    the same 2009 claims but they were just reviewed

8    again in 2011?

9         A.    Carolyn had indicated to me that they

10   had relooked at claims that had been already coded.

11   So that is plausible.

12        Q.    But you don't know as you sit here

13   today?

14        A.    I didn't get into that detail with them.

15   But yes, that's potentially possible.

16             MR. ABASCAL:  Okay.  I'm going to turn

17   to another exhibit, Exhibit 1273.  It's been

18   previously marked.  It's Tab 32.

19             (Exhibit 1273 marked for identification

20        and attached hereto.)

21   BY MR. ABASCAL:

22        Q.    I'm handing you now Exhibit 1273.  Do

23   you recognize this exhibit?

24        A.    Yeah.  This is a press release.

25        Q.    From February 24, 2012; correct?



Page 149

```
 1       A.    Yes.

 2       Q.    And the press release is entitled "CMS

 3  Takes Steps to Reduce Improper Payments and Save

 4  Money for Medicare."

 5       A.    Yes.

 6       Q.    All right.  I want to draw your

 7  attention to that first paragraph.  "New audits of

 8  Medicare Advantage contracts will reduce the

 9  payment error rate for Medicare Advantage program

10  and will recover an estimated 370 million in

11  overpayments for the first audit year."

12             Do you see that?

13       A.    Yeah.
```



Page 150

█  █  ████████████

█  ████████████████████

█  ████████████  ██████████

█  ████████████████████

█  ██████████████████

█  █  ████████████████████

█  ██████  ████████████

█  ████████████████████

█  ████████████████

█  ████████

█  █  ██████  █████████

█  ████████████  █████████

█  ████████████████████

█  ██████████████

█  ████████████

█  █  ████████████

█  ██████  ████

18          MR. ABASCAL:  And then let's go to the

19    next document which is Exhibit 1005.

20          (Exhibit 1005 marked for identification

21       and attached hereto.)

22    BY MR. ABASCAL:

23       Q.   I'm handing you a document from the same

24    date, February 24, 2012.

25       A.   Yeah.



Page 151

1          Q.     This is titled "Notice of Final Payment

2     Error Calculation Methodology for Part C Medicare

3     Advantage Risk Adjustment Data Validation

4     Contract-Level Audits."

5                Do you see that document?

6          A.     Yeah.

7          Q.     And have you reviewed this document

8     before?

9          A.     Yes.  I've seen it many times.

10         Q.     And is this the white paper that you

11    were referring to earlier?

12         A.     That's the nomenclature that

13    everybody -- how they described it, that this is

14    our white paper, yes.

15         Q.     Okay.  Who wrote this document?

16         A.     My understanding is this was created by

17    MPPG.  And the primary author was the Division of

18    Payment Validation; so Jennifer Harlow and her

19    team.

20         Q.     And who approved the document?

21         A.     Well, to be released, it would have been

22    approved by Cheri and the director of CM at that

23    time.  I'd have to refer back and figure out who

24    that was.  And then since there is a press release,

25    the press office as well, because this document was



Page 152

1    attached to the -- as a link to the press release

2    as well as the office of the administrator.

3              So yes.

4        Q.    It had several levels of approval;

5    right?

6        A.    Yes.  At that time, I believe Jon Blum

7    was the head of CM.  And I believe Marilyn Tavenner

8    was the administrator in 2012.

9        Q.    And they would have approved of this

10   before it goes out?

11       A.    Yeah.  I mean, with a press release and

12   the rollout, yes, that would have been approved

13   through all levels of CMS.

14       Q.    And this is a paper that was the subject

15   of the White House meeting you referred to earlier;

16   correct?

17       A.    Yeah.

18              MS. McMAHON:  Objection; calls for

19   speculation.

20              THE WITNESS:  The issues discussed in

21   this white paper were part of the presentation we

22   went over earlier.

23   BY MR. ABASCAL:

24       Q.    In other words, the meeting -- the

25   purpose of the meeting at the White House was to



Page 153

1    let them know that this paper would be issued;

2    right?

3         A.    Yeah.  What the agency's plans were for

4    doing RADV audits and this issue of the adjuster.

5         Q.    And to make sure the White House had no

6    objection to it; right?

7         A.    Yes.  Objection and to give them a

8    heads-up of what was coming down the pike.  I'm

9    sure that Jeanne -- you know, it would have been

10   one of the many things that Jeanne would have seen

11   from not just CMS but other parties.

12        Q.    All right.  So a lot of work was put

13   into the process of issuing this document; right?

14        A.    Yes.

15        Q.    And the document reflects the work of

16   several qualified people in risk adjustment; right?

17        A.    Yes.  And as I noted, I believe it was

18   produced by MPPG, Division of Payment Validation,

19   yes.

20        Q.    And it reflects a considerable amount of

21   work; right?

22             MS. McMAHON:  Objection; asked and

23   answered.

24             THE WITNESS:  A considerable amount of

25   work and study, and it was based on what was known



Page 154

1    at the time.

2    BY MR. ABASCAL:

3         Q.    In fact, it was several years of work;

4    right?

5         A.    Yes.  The one thing that Ilina Chaudhuri

6    wanted me to -- or told me about was that there

7    seemed to be an impression in the MA community

8    that, like, this was like the number one issue

9    going on at the agency.  This was just one of

10   hundreds of issues.  So it was an important issue,

11   but it wasn't, like, the entire focus of every

12   person working in MPPG working on this.  This is

13   one of many issues.  So there's probably dozens of

14   other issues of similar or -- impact and where

15   plans had opinions one way or another, yes.

16        Q.    That's a fair point.  I'm not going to

17   get into all the other work that they did there.

18   But with respect to the work reflected in this

19   document, a lot of work at CMS was put into this

20   before issuing it; right?

21        A.    Yes.

22        Q.    And then let's go to the last page, the

23   second-to-last page, page 4.

24        A.    Okay.

25        Q.    It says:  "Payment Recovery Amount and



Page 155

1    the Fee-For-Service Adjuster."  Do you see that?

2        A.    Yes.

3        Q.    I'm going to draw your attention to all

4    the language.  Maybe it's easier to do it that way.

5    The first paragraph:  "If the CI" -- confidence

6    interval.  You understand CI stands for confidence

7    interval?

8        A.    Yeah.

9        Q.    "If the CI for the point estimate

10   includes zero or is below zero, the contract will

11   have the payment recovery amount constrained to

12   zero."

13             Do you see that?

14       A.    Yes.

15       Q.    So that's explaining how an overpayment

16   would be calculated; correct?

17       A.    Yeah.  But it's dealing with the issue

18   of where the adjuster is more than the derived

19   error rate for a plan.  And it's saying that if

20   it's below zero that it will just be set at zero.

21   So we won't make a recovery, but we won't be making

22   a payment.

23       Q.    In other words, if plans are deemed

24   underpaid, they won't be paid any money from CMS

25   under the RADV process; right?



Page 156

1          A.      Yes.

2                  MS. McMAHON:   Objection.

3     BY MR. ABASCAL:

4          Q.      And then the next paragraph.  "If the CI

5     for the point estimate is above zero, the payment

6     recovery amount for the contract will be determined

7     as follows.  First, a preliminary payment recovery

8     amount will be set at the lower bound of the

9     99 percent CI" -- confidence interval -- "for the

10    contract's point estimate.  Second, to determine

11    the final payment recovery amount, CMS will apply a

12    fee-for-service adjuster (FFS adjuster) amount as

13    an offset to the preliminary recovery amount.  If

14    the FFS adjuster amount is greater than the

15    preliminary recovery amount, the final recovery

16    amount is equal to zero."

17                 Could you explain what that means?

18         A.      It's similar to what we're talking about

19    in the first sentence.  But again, if the adjuster

20    is more than the final payment or recovery amount,

21    then the amount due from the plan would be zero.

22         Q.      All right.  And in addition, above that,

23    it specifies that if there is an overpayment amount

24    calculated, then the fee-for-service adjuster will

25    offset or reduce that overpayment.  Correct?



Page 157

1        A.    Yes.  So -- yes.  So if the error rate

2   was 10 percent and the adjuster was 8.1, then the

3   amount due would be 1.9 percent of the extrapolated

4   amount, if that's what the lower bound of the

5   confidence interval suggested.

6        Q.    And it says here that CMS will apply an

7   FFS adjuster.  Right?

8        A.    Yes, it does indicate that.

9        Q.    Now, it later says at the last part of

10  the page:  "The FFS adjuster accounts for the fact

11  that the documentation standard using RADV audits

12  to determine a contract's payment error (medical

13  records) is different from the documentation

14  standard used to develop the Part C risk adjustment

15  model (FFS claims)."

16            Do you understand that's the rationale

17  behind the adjuster?

18        A.    Yes.  Yeah, they said that many times.

19  Yes.

20        Q.    And you've seen that reflected in the

21  documents many times?

22        A.    Yes.  In the talking points as well.

23  Yes.

24        Q.    And then it goes on to say:  "The actual

25  amount of the adjuster will be calculated by CMS



Page 158

1    based on RADV-like review of records submitted to

2    support FFS claims data."

3              Do you see that?

4         A.    Yes.

5         Q.    So that indicates that CMS would

6    calculate an FFS adjuster in the future; right?

7         A.    Yes.  And we had already calculated

8    several, and we talked about it.  But that amount

9    was not shown in this document, nor any other

10   amount.  It was that we're still going to study and

11   develop a fee-for-service adjuster.

12        Q.    Why didn't CMS announce the 7.8 or the

13   4.88 figure?

14        A.    Well, I talked to Cheri -- well, Carolyn

15   and Cheri and Jon Blum and I asked them.  And they

16   all felt that this is a very complicated matter and

17   they wanted to be dead sure that whatever number we

18   eventually issued was rock solid and completely

19   supportable.

20              And Jon indicated to me he didn't feel

21   like at that time that it was.  And that later

22   turned out to be prophetic because it was

23   completely wrong.  And -- the 4.88 and 8.1.  So we

24   would really be in a sticky wicket if we would have

25   announced an adjuster at that time and then had to



Page 159

1    walk it back.

2            MR. ABASCAL:  Okay.  So let's go to a

3    different document.  Tab 35.

4            (Exhibit 2002 marked for identification

5        and attached hereto.)

6    BY MR. ABASCAL:

7        Q.    I just want to clarify something.  I was

8    just looking at your testimony.  Just going back to

9    the prior document --

10       A.    Okay.



Page 179





Page 180

23        Q.    Was CMS contemplating allowing plans to

24    apply their own FFS adjuster when they're doing

25    their own self-audits as reflected here?



Page 181

1          A.    This is something that I don't believe

2    was ever taken beyond whatever is in this document.

3    I've never seen any comments like that or any kind

4    of verbiage insinuating that.  To me, I read it as

5    if the plan verifies the data is accurate, then

6    we'll apply an adjuster to the risk score, as

7    opposed to the plan creating its own risk score.  I

8    don't see that here.

9          Q.    Fair enough.  I wasn't suggesting the

10   plan would create its own FFS adjuster.  But what

11   I'm asking is did CMS contemplate the plans doing

12   their own self-audits would apply the FFS adjuster

13   as determined by CMS?

14         A.    Well, I'm not exactly sure that that's

15   what this means.  I don't read it necessarily that

16   way.

17         Q.    Would you read CMS applying the FFS

18   adjuster, then?

19         A.    Well, to me, I read this as that the

20   plans have some validation protocol that they do

21   that somehow determines that their submissions are

22   accurate.  And if they met that threshold, then a

23   fee-for-service adjuster would be applied against

24   any balance due.

25         Q.    Okay, fair enough.  And the



3304

fee-for-service adjuster would be applied by CMS?
A. Yeah. It's part of that.
What I don't know is -- I know in other documents, there was discussion about, like, voluntary refunds and deletions and about whether there should be an adjuster applied to them or not. I don't know if this is applicable to that.
Q. Could you explain that in more detail? What do those other documents say about applying an FFS adjuster to voluntary refunds and deletions?
A. Well, that was a question, like people -- and I can't remember whose it was. There was an issue about if somebody issues a voluntary refund, would there be a fee-for-service adjuster applied to that based on their own -- you discover a problem and then you do it. It's very similar.
I think it was in the document that talked about what do we do if the number comes up under zero.
Q. Around what time was that concept being considered within CMS?
MS. McMAHON: Objection; misstates the witness's testimony.
THE WITNESS: Well, off the top of my head, I can't remember the document that I saw it

Page 183

1    in or where this came up.  But I believe it was

2    like post 2012.

3    BY MR. ABASCAL:

4         Q.    Post 2012 and before 2018?

5         A.    Yes.

6         Q.    And was that document in reference to

7    voluntary refunds and deletions?

8         A.    I believe it was more towards voluntary

9    refunds, because it's an identified overpayment by

10   the plan being returned and whether or not an

11   adjuster should apply to that.

12        Q.    And was there a similar document you saw

13   or other conversation you heard about regarding

14   deletions?

15        A.    No, not related to deletions.  I don't

16   recall that.

17        Q.    So you testified there was an issue

18   about if somebody issues a voluntary refund, would

19   there be a fee-for-service adjuster applied to

20   that.

21              Just to expand on that, so by voluntary

22   refund you mean an overpayment; correct?

23        A.    Yeah.  If a plan found that they

24   submitted an HCC incorrectly and they wanted to

25   correct it, what would be the outcome and whether



3306

Page 184

1    there should be an adjuster applied.

2         Q.    And so in the plan's return of an

3    overpayment, the issue was whether the adjuster

4    should be applied to that overpayment; correct?

5         A.    Yeah, because it's an overpayment.  An

6    overpaid in RADV, it's -- that's my understanding

7    that's where it was.

8         Q.    And where did CMS come out on that?

9         A.    I never saw anything related to that in

10   a final like there was on the negative number, but

11   at the end of the day where we ended up, that's all

12   a moot point anyway.

13        Q.    But it was being discussed during the

14   time period between 2012 and 2016 -- 2018?

15        A.    Yeah, I remember it coming up in some

16   context, either a document or a deposition.

17        Q.    And CMS hadn't settled on that prior to

18   2018; right?

19        A.    I didn't see much discussion of that.

20   There was more discussion of the negative number

21   after applying the adjuster when the plan error

22   rate was less.

23        Q.    And the discussion of the negative

24   number meaning if there is an underpayment.  Is

25   that what you mean?



3307

Page 185

1        A.        Yeah.   If the plan's extrapolated

2   overpayment is less than the fee-for-service

3   adjuster, should we make a payment to the plan.









Page 187

████ ████████████

████     ██     ███████████████████████

████ ████████████████████████████████████

████ ████████████████████████████████████

████     ██     █████████████████████████

████ ████████████████████████████████

████ ██████████████

```
 8        Q.    Okay.  All right.  And there was never a

 9   decision published that you would not do that;

10   right?

11             MS. McMAHON:  Objection; form.

12             THE WITNESS:  Not until -- not until we

13   issued the white paper and the NPRM in 2018.

14   BY MR. ABASCAL:

15        Q.    2018.

16        A.    We would not do any adjuster, which

17   would make that whole issue moot.

18        Q.    Okay.  But nothing prior to that 2018

19   NPRM; right?

20        A.    No.

21             MS. McMAHON:  Objection; form.

22             MR. ABASCAL:  Let's move on to a

23   different document, 2017/1/10.  This is Tab 46.

24             (Exhibit 1510 marked for identification

25        and attached hereto.)
```



Page 188

1    BY MR. ABASCAL:

2        Q.    I'm showing you what has been marked as

3    Exhibit 1510, Mr. Mills.  This is an email from

4    Monica Reed-Asante to Phillip Steiner.  Do you see

5    that?

6        A.    Yes.

7        Q.    Dated January 10, 2017?

8        A.    Yes.

9        Q.    Is this a document you reviewed in

10   preparation for today?

11       A.    I've seen this, and I talked to Phil

12   Steiner.

13       Q.    The attachment -- on the email, the

14   attachment is described as "Reasons for a FFS

15   adjuster."  Do you see that?

16       A.    Yes.

17       Q.    All right.  And then the attachment

18   says -- it has a one-page paper with the title

19   "Reasons for a FFS adjuster."  Do you see that?

20       A.    Yes.

21       Q.    I'm going to read from Paragraph 1.

22   "The FFS adjuster is intended to account for

23   payment inequities that result from enforcing a

24   different documentation standard between MA and

25   FFS.  While FFS does not audit diagnoses submitted



Page 189

1    on claims against the medical records, the medical

2    record is enforced as the standard in MA, and total

3    payments in MA are lower than they might be if the

4    claim was used.  MA plans are arguing in United

5    States v. Burwell that requiring the medical record

6    to be the standard by which MA plans should

7    identify and return overpayments violates the

8    requirements of actuarial equivalence."

9            Do you see that?

10    A.    Yes, I do.

11    Q.    What influence did that lawsuit cited,

12    United States v. Burwell, have on CMS's decision

13    regarding the FFS adjuster?

14            MS. McMAHON:  Objection; calls for

15    speculation.  And to the extent the question calls

16    for any information protected by the

17    attorney-client privilege, I would instruct you not

18    to answer.

19            THE WITNESS:  Well, I don't agree with

20    sentence 2 completely, because we do look for

21    diagnoses on claims and compare it to the medical

22    records when we do medical review.  Because there

23    are LCDs that require you to have certain diagnoses

24    as requirements for payment.  So that's not

25    completely accurate.  I mean, it's an



Page 249

```
 1              C E R T I F I C A T E

 2

 3   DISTRICT OF COLUMBIA

 4            I, JOHN L. HARMONSON, a Notary Public

 5   within and for the District of Columbia, do hereby

 6   certify that GEORGE MILLS, the witness whose

 7   deposition is hereinbefore set forth, was duly

 8   sworn by me and that such deposition is a true

 9   record of the testimony given by such witness.

10            That before completion of the

11   proceedings, review and signature of the transcript

12   was reserved.

13            I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17            IN WITNESS WHEREOF, I have hereunto set

18   my hand this 11th day of September, 2023.

19

20            _____

21            JOHN L. HARMONSON, RPR

              My commission expires: 04/14/26

22

23

24

25
```



3313

**EXHIBIT D-130**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____   )



CONFIDENTIAL

Videotaped Deposition of

JONATHAN DANIEL MORSE

Given Remotely

Wednesday, August 17, 2022

10:09 a.m. Eastern



Reported by:  Karen K. Kidwell, RMR, CRR



Magna Legal Services

866-624-6221

www.MagnaLS.com



3315

Page 17

1    correct?

2        A.   Yes.

3        Q.   And who is that?

4        A.   Jenny Koh.  Jenny Koh.  Sorry.  Last name

5    wrong.

6        Q.   And -- and you did not discuss this with

7    any other counsel in connection with the deposition?

8        A.   No.

9        Q.   Okay.  If you could start by just

10   describing what post-secondary educational degrees

11   you have.

12       A.   I have a juris doctor from the University

13   of Maryland.

14       Q.   And so you're -- and then -- and you are a

15   member of the bar, correct?

16       A.   No, I am not.  Not any longer, no.

17       Q.   Were you a member of the bar at one point?

18       A.   Yes.  I do not -- I have not kept up with

19   my bar license, though.  I do not practice at all.  I

20   do consulting now.

21       Q.   I see.  Okay.

22            And then you have an undergraduate degree

23   as well, I assume?

24       A.   I do.  From Union College.

25       Q.   Union College.  And what -- what field is



Page 18

1    that?

2          A.    Political science.

3          Q.    Political science.  Do you have any

4    training as an actuary?

5          A.    I do not.

6          Q.    Do you have any training in advanced

7    statistics?

8          A.    No, I do not.

9          Q.    How about in advanced math?

10         A.    I do -- I do not.

11               I laugh because I went to law school to

12   avoid math.  So no, I do not.

13         Q.    I -- I confess to have made the same

14   decision myself, so -- not surprising among our

15   profession.  But I guess we'll stumble through it.

16         A.    Right.

17         Q.    What is your current employment?

18         A.    I am the managing director and senior vice

19   president for Mathematica Policy Research, and I run

20   their health policy consulting practice.

21         Q.    And how large a company is Mathematica?

22         A.    About 1,600 people total.

23         Q.    And how large is the health consulting

24   division?

25         A.    It's about 700.



Page 19

```
 1        Q.    And you said you run that 700-person

 2   division?

 3        A.    I do.

 4        Q.    And you've been there since May of 2018;

 5   is that correct?

 6        A.    That's correct.

 7             MR. MERON:  If we could upload Tab 36,

 8       please.

 9   BY MR. MERON:

10        Q.    I am showing you what we're marking as

11   Exhibit 1278.

12             (Exhibit 1278 was marked for identification.)

13   BY MR. MERON:

14        Q.    And this is a printout, I would say -- if

15   that's the right word, since we're looking at it

16   virtually -- of your LinkedIn profile?

17        A.    That's correct.

18        Q.    The -- under "Mathematica," it says

19   that -- well, the first sentence says, "Jonathan

20   leads all aspects of Mathematica's 400-plus-person

21   health care consulting practice, providing strategic

22   direction, capture priorities, and leading budget

23   development."

24        A.    Mm-hmm.  That's correct.

25        Q.    And that correctly describes your
```



Page 20

1    functions, correct?

2          A.    That does correct -- that is correct.

3          Q.    Mathematica's health consulting practice

4    provides policy expertise and program implementation

5    for federal, state, and private sector clients,

6    including Centers for Medicare and Medicaid Services,

7    and state Medicaid agencies.  The division focuses on

8    Medicare and Medicaid data analytics and

9    recommendations, development and implementation of

10   payment reform models, development of quality

11   measures, and technical assistance on a variety of

12   client initials."  Correct?

13         A.    That is all correct.

14         Q.    Is CMS a significant client of yours at

15   Mathematica?

16         A.    Yes, they are.

17         Q.    Do you have a rough sense of the dollar

18   value, of the annual dollar value of the relationship

19   with CMS?

20         A.    Yes, it's about $150 million a year,

21   total.

22         Q.    And that's just CMS?

23         A.    That is correct.  Just CMS.

24         Q.    And do you have a rough sense of, if you

25   can, of how much that relates to Medicare versus



Page 21

1    Medicaid?

2         A.    Yeah, we have about -- in terms of dollar

3    value, the Medicaid practice is roughly $90 million a

4    year.  And then Medicare is divided up largely

5    through the Centers for Clinical Standards and

6    Quality and the Center for Medicare and Medicaid

7    Innovations, CMMI.  Those two centers at CMS

8    represent probably 40ish million a year each.

9         Q.    And what proportion of the work for those

10   two centers involve issues relating to Medicare

11   Part C, or Medicare Advantage?

12        A.    None for those two centers.  But --

13        Q.    Okay.

14        A.    -- CCSQ and CMMI don't -- don't really

15   touch MA.

16        Q.    Okay.  Are the work -- I thought you were

17   saying that the work -- consulting work you do for

18   CMS focuses on those two centers.  Do you do any

19   consulting work, does Mathematica do any consulting

20   work for CMS related to Medicare Advantage at all?

21        A.    Yes.  We have one project that relates to

22   doing studies of beneficiary like outcomes and

23   experience.  It's a policy project where, for

24   example, we will look at impacts on, you know, the --

25   the relative impacts on COVID, as people who are



Page 22

1   experienced -- who are enrolled in Medicare

2   Advantage, as per se people who are in Medicare fee

3   for service.

4           We are currently doing a study for Center

5   for Medicare on health equity issues, you know, and

6   how those relate to enrollees in the Medicare

7   Advantage programs.

8       Q.   Got it.  And I think you testified that

9   the -- that the dollar value of the CMS relationship,

10  annually, is about 150 million, correct?

11      A.   That is correct, yes.

12      Q.   And how does that compare to the total

13  value of the -- of the consulting division's overall

14  book of business?

15      A.   It -- yeah, it's the vast majority of it.

16  It's about 200 million total, on an annual basis,

17  right now.  The practice, I would just say, to be

18  able to get the -- my LinkedIn, just to provide -- I

19  haven't updated my LinkedIn in quite some time.  So

20  the -- this is showing 400-plus people, as I'm

21  looking at it right now; we're at about 680 at the

22  moment.

23          So this is -- in the last like three to

24  four -- in the last like three years or so has

25  expanded dramatically, and that work largely has



Page 23

1    expanded through Centers for Medicaid and CHIP

2    Services.  So we are -- the majority of the work

3    comes out of CMCS right now, within -- within CMS,

4    but it is proximal to -- yeah, 150 out of the

5    $200 million a year, so roughly 75 percent of the

6    work, total.

7         Q.   Got it.  And the -- it says here on

8    your -- the last sentence of your LinkedIn, that

9    your, you lead the division in key operations,

10   including developing client relationships.  Right?

11        A.   Yes.  That is correct.

12        Q.   And that includes what lawyers would call

13   business development?

14        A.   That is -- yes, that is exactly right.

15        Q.   And so it means, you know, bringing in

16   contracts, securing business.  Correct?

17        A.   Yes.

18        Q.   And your -- is it reasonable to assume

19   that your compensation depends -- or is impacted, at

20   least in part, by your success in developing client

21   relationships?

22        A.   My compensation is contingent upon the

23   division's, writ large, performance from year to

24   year.  It is not contingent upon my individual client

25   interactions, relationships, work that I personally



Page 24

1    bring in.

2           It is a -- I don't know, slightly

3    socialist.  It is -- you know, it is --

4    proportionally we all benefit from how well the

5    division does as a whole.  It is not tied to any of

6    my individual performance in terms of client

7    relationships in business and all that.

8           Q.   But the -- it's fair to say the more work

9    you get from CMS, the more --

10          A.   The more --

11          Q.   -- better off --

12          A.   The more work we get through CMS or any

13   other client, the more work we -- the more money we

14   make; kind of like any other -- you know, whether

15   you're an attorney or a consultant.  Yes, that's

16   correct.

17          Q.   Okay.  Does Mathematica do any consulting

18   for the Department of Justice?

19          A.   We do not.

20          Q.   Do you do any consulting work for any law

21   firms that represent plaintiffs, or --

22          A.   We do not.

23          Q.   You don't do any -- no law firm clients?

24          A.   We -- we do not.  The entire -- just for

25   clarification, the company does both Health and Human



Page 25

1    Services work, and we have a small international

2    practice.  So the vast majority of the work that we

3    do -- as, again, in health out of, you know, 1,600

4    people, we've given the administrative staff that are

5    not client-facing; you know, roughly 700 them of

6    are -- are in -- in health care in some way, whether

7    that is for CMS or CDC or state Medicaid agencies.

8            And then we do work for like Department of

9    Labor, Department of Education, foundations.  But

10   there is nothing within the Justice Department or --

11   or any kind of law enforcement, you know, arm, or

12   legal cases that we do.

13       Q.   Or providing expert services to law firms?

14       A.   Correct.  That's correct.

15       Q.   And according to LinkedIn, before you

16   assumed your current position at Mathematica, you

17   were the -- between December of 2016 and April of

18   2018, you were the acting deputy administrator and

19   center director for the Center for Program Integrity,

20   correct?

21       A.   It is.  It's a little weird the way

22   LinkedIn -- sorry, I'm just reading this -- going

23   back to do this -- it's a little weird the way

24   LinkedIn allows me to do this, because they -- yes,

25   roughly the dates are right.



Page 26

1          The political appointee from the Trump

2    administration took over in March of 2018.  So at

3    that point between March and May reverted back to

4    being the deputy center director, but -- yes, I mean,

5    the dates are pretty close.  That's correct.

6          Q.    So you -- you were the -- designated the

7    principal deputy for CPI, and under the Vacancies

8    Act, you assumed the role of acting director --

9          A.    That --

10          Q.    -- when there was a vacancy in the full --

11    in the full position, in the head position, correct?

12          A.    That is correct, yes.

13          Q.    And -- and normally the head position is a

14    political appointee?

15          A.    In -- yes, although in this administration

16    it is not.  In the Biden administration, it is not.

17    Prior to that, it has been, yes.

18          Q.    Got it.  Now, it says you were also the

19    acting deputy administrator; is the director --

20          A.    Yeah, the title -- I'm sorry.  The title

21    is -- technically it is acting deputy administrator

22    and center director.  And that is -- with -- without

23    regard to which center.

24          So you could be acting deputy

25    administrator for Center for Medicare, Center for



3325

Page 27

1   Medicaid, Center for Program Integrity.  It's

2   just sort of -- it's the full job title.

3        Q.   In other words, whoever heads a given

4   center within CMS is -- by virtue of that, also holds

5   the title of a deputy administrator of CMS?

6        A.   That is correct, yes.

7        Q.   And it says underneath here, one of your

8   functions, reading down, is that you represented the

9   agency "to the White House, members of Congress, and

10  health care stakeholders to address inquiries on

11  program integrity and improper payments."  Correct?

12       A.   That is correct.

13       Q.   And what does the words "program

14  integrity" mean to you?

15       A.   Program integrity is -- I'm sorry.  I have

16  to toggle back to the screen.

17            Program integrity, for me, is a broad

18  catch-all for sort of fraud, waste, and abuse; like

19  oversight and operations.  And so it's sort of any of

20  those -- any of those three.

21       Q.   I apologize.  My computer has gone to

22  sleep here.  Give me a second.

23       A.   That's okay.

24       Q.   You said it's -- it's a broad catch-all

25  for fraud, waste, and abuse, oversight and



3326

Page 28

1    operations?

2         A.    That's correct.  And in -- yes.  In the

3    CMS setting, that is -- that is how we -- yes.

4         Q.    And how is that distinguished from the

5    phrase "improper payments"?

6         A.    Part of.

7               MS. KOH:  Objection.  Form.

8               Go ahead.

9               THE WITNESS:  Sure.

10              The -- the improper payment is a part of

11         program integrity, and a part of sort of broader

12         fraud, waste, and abuse.  It is -- you know,

13         part of the duty of the Center is to ensure that

14         the programs and that the federal government are

15         accurately paying, whether it is providers,

16         plans, you know, the -- the stakeholders who are

17         receiving payment from the -- you know, from the

18         Medicare and Medicaid program, or from the

19         marketplace.

20              And improper payments can sort of happen

21         in -- without regard to any -- what's the word

22         I'm looking for?  Without regard to attribution.

23              You know, if the payment isn't proper, you

24         know, CMS is -- program -- the department of

25         program integrity role is to ensure that the --



Page 29

1          the organization, then, is -- is making sure
2          that the payments to the different sort of plans
3          and providers are as -- are as proper as
4          possible.
5               And often those little -- the vast
6          majority of times, that comes under a fraud,
7          waste, or abuse heading, without sort of
8          ascribing one or the other necessarily.
9     BY MR. MERON:
10         Q.   Would it be fair to say that a payment
11    that is a result of fraud, waste, and abuse -- or let
12    me -- let me break that down.
13              A payment that is a result of fraud would
14    necessarily be improper, correct?
15         A.   Yes, it would.
16         Q.   But not all improper payments are a result
17    of fraud, correct?
18         A.   Absolutely right.  That is the -- in many
19    ways the crux of the entire organization of the
20    Center for Program Integrity, yes.  Because the very,
21    very small -- statistically speaking, a very, very
22    small proportion of payments being made by any of
23    these programs are actually attributable to fraud.
24         Q.   And so when you said it's the crux of the
25    work that CPI does is to try to ferret out and



3328

Page 30

1    identify what subset of errors are fraud and what

2    are -- are simple mistakes?

3         A.    Actually -- it actually is --

4              MS. KOH:  Objection.

5              THE WITNESS:  Sorry.  Go ahead.

6              MS. KOH:  Let me just -- objection.  Form.

7              Go ahead.

8              THE WITNESS:  Okay.  Just to clarify, not

9         exactly.  And I think this is -- it is important

10        to distinguish just on the -- for the purposes

11        of the role.

12             Only the Justice Department may -- can

13        make a determination as to whether or not

14        something is fraud.  Because fraud involves

15        intent, and that is outside the purview of an

16        administrative agency.

17             So the Center for Program Integrity looks

18        at improper payments, to your point, writ large;

19        and then makes determinations as to like where

20        do they go for -- for their review, if they need

21        to be reviewed in any way beyond that.

22    BY MR. MERON:

23         Q.   And in order to do your work of focusing

24    on improper payments, the Center has to be in a

25    position to determine what a proper payment is,



3329

Page 31

1    correct?

2        A.    That is correct, yes.

3        Q.    And so in your role of directing that

4    Center, you had a pretty good familiarity with the

5    basic requirements that applied to payments under the

6    various Medicare programs, correct?

7            MS. KOH:  Objection.  Form.

8            THE WITNESS:  Yes, we do.

9    BY MR. MERON:

10       Q.    So reading further on in LinkedIn, it says

11   that -- under -- under your description as the acting

12   director, it says, "Specific areas of oversight

13   include Medicare and Medicaid provider enrollment,

14   Medicare and Medicaid improper payments"; so

15   that's -- improper payments is the subject we just

16   talked about, correct?

17       A.    That's correct.

18       Q.    "Investigations."  What was your oversight

19   role with respect to investigations?

20       A.    Sure.  The Center for Program Integrity

21   has -- a fairly large part of the organization is

22   called the investigations and audits group.  And they

23   contract with zone program integrity contractors --

24   or ZPICs, the acronym -- to do investigations on

25   individual providers -- this is all through Medicare



Page 32

1    fee for service -- where there may be a false

2    storefront.  You know, essentially over like data

3    analytics for, you know, billing that is, you know,

4    for social security numbers that have been, you know,

5    made up or stolen.

6              Or schemes of, you know, potentially

7    clusters of billing that are really abnormal, and

8    that sort of show spikes of -- of billings.  So

9    there's -- investigations that play out in a -- in a

10   variety of ways, using a variety of tools, whether

11   that is on the ground, and -- you know, somebody

12   knocks on the door, but you're a medical supplier

13   storefront, and it -- there's nothing there; right?

14   But yet they're billing to the Medicare program.

15             And some of it is done behind the scenes,

16   through like data analytics and sort of running

17   algorithms.

18        Q.   And I think you said the investigations

19   work you do there, oversee with contractors related

20   entirely to fee for service?  There was no --

21        A.   That -- for -- for those programs, the

22   investigations in that way is done through Medicare

23   fee for service, because it's sort of the direct line

24   that CMS has into sort of control the program.

25             For -- for Medicaid, Medicaid is -- has



Page 33

1  broad oversight at the federal level, but it's

2  actually implemented at the state level.  So just

3  differentiating, to your -- to make the point, in the

4  Medicaid program, the investigations actually would

5  happen in conjunction and are driven by the states,

6  and are -- then the information is essentially fed

7  or -- or identified by CMS, eventually, through --

8  you know, again, through data.

9           But it's then operationalized or

10  investigated by, you know, the state, the -- what's

11  called the Medicaid fraud control unit.  So --

12      Q.   I'm sorry to stop you, but this is the --

13  the risk of when we -- when we -- don't let me

14  complete a question.  I actually --

15      A.   I'm sorry.

16      Q.   -- was not interested in asking about

17  Medicaid.  I apologize.

18      A.   All right.  Okay.

19      Q.   I was asking -- I was -- when you said

20  "fee for service," I was distinguishing between

21  fee-for-service Medicare versus Medicare Advantage,

22  and asking whether there were any investigations-type

23  work that you oversaw relating to Medicare Part C.

24      A.   Not to my knowledge -- not to my

25  recollection, no.



Page 34

1          Q.    And how about Medicare Part D?

2          A.    No.  Investigations would be -- is not the

3    correct word.  I think there was some -- you know, we

4    did some -- I'm trying to think -- this is -- you

5    know, there is -- we had some interaction on Part D,

6    where the program -- you know, the -- or CPI was

7    working with the Part D drug plan to identify

8    potential sort of overpayments in, you know, in the

9    differences between -- you know, basically, we tried

10   to identify sort of overpayments in the Part D

11   program.  But they were not investigations.  They

12   were self-audits.  So the -- "no" to the word --

13   "no," to the investigations.

14         Q.    But the -- the work you oversaw relating

15   to improper payments did include Part C, but the work

16   respecting investigations, and the work done by these

17   contractors you mentioned, did not?

18         A.    Correct.  That's correct.

19         Q.    It says here you also oversaw audit

20   strategies.  What does that mean?

21         A.    So similar to like what I just mentioned.

22   The program -- so CPI conducts audits of individual

23   providers.  They will -- will ask either to be

24   self -- you know, release sort of self-audits, based

25   on like abnormal sort of clusters of -- of payment,



Page 35

 1    for example, around specific providers or specific

 2    locations.

 3              They will audit providers around -- for

 4    overall compliance individually.  Those are conducted

 5    by the administrative contractors or by the ZPICs,

 6    either arm of the -- of Medicare will conduct like an

 7    actual -- what -- basically a compliance review of an

 8    individual provider's medical records.

 9              It's a manual process, and those audits

10    are done by nurse practitioners who, you know,

11    review -- they -- basically they review documentation

12    by providers to see if it matches up with what the --

13    what the basis of the payment was or what the claim

14    was being paid for.

15         Q.   And what does the phrase "oversight of

16    recovery audit program oversight" mean?

17         A.   So the RAC program is a post-payment

18    program where it is a large-scale auditor that

19    reviews certain types of services, writ large, as

20    prescribed by CPI; so looking at, for example, home

21    health services and Medicare.

22              The recovery audit contract program will

23    conduct data analytics, and if they find that there

24    are, you know, sort of abnormal payments, they will

25    then conduct more sort of rigorous individualized



Page 36

1    audits of providers post payment, where they then

2    sort of try to collect the dollars back from the

3    providers if there is an overpayment that's found.

4         Q.   Now, with respect to audit programs

5    designed to recover money, you did have some role to

6    play in audits of Medicare Advantage plans, correct?

7         A.   That's correct.  During --

8              MS. KOH:  Object --

9              THE WITNESS:  Sorry.  Go ahead.

10             MS. KOH:  I was going to say, objection.

11        Vague.

12             Go ahead.

13   BY MR. MERON:

14        Q.   Go ahead.

15        A.   Oh, sorry.

16             Yes.  During my time at CPI, the RADV

17   program moved from the Center for Medicare into the

18   Center for Program Integrity, and that was really

19   the -- the first real sort of interaction I had with

20   Medicare Advantage at that time.

21        Q.   And do you recall more specifically when

22   that transfer of responsibility occurred?

23        A.   It would have been early 2016.

24        Q.   2016?  Not 2017?

25        A.   That's correct.  It happened during the



Page 37

1    Obama administration.

2          Q.    Okay.  We'll take a look at some documents

3    and see whether that refreshes your recollection on

4    that.

5                Are you -- sorry.  You referred to RADV

6    previously having been under the Center for Medicare?

7          A.    That's correct.

8          Q.    Do you recall what unit more specifically

9    within the Center for Medicare was responsible for

10   RADV?

11         A.    I honestly don't remember the acronym

12   within Center for Medicare.  There's a -- there's

13   a -- there's a group that did oversight, that

14   basically was a Part C, you know, Medicare, but

15   old -- it used to be the Medicare Part C group, but I

16   honestly don't remember what their acronym is.

17         Q.    Would you recall whether it was the

18   MPPG --

19         A.    Yes.

20         Q.    -- the Medicare Plan Payment Group?

21         A.    Thank you.  That is correct, yes.

22         Q.    Okay.  And during the time that you were

23   there, do you recall who the director or the head of

24   the MPPG was?

25         A.    Offhand, I do not.  I do not.



Page 38

1        Q.   Do you recall if it was Cheri Rice?

2        A.   I -- so -- yes, I thought that -- I'm

3    sorry, I thought Cheri Rice oversaw the entire Part D

4    and Part C programs.  So during my time, I thought

5    that she was actually sitting as a deputy center

6    director rather than a group director.  I know these

7    are splitting the differences in this discussion,

8    but -- just -- so yes, I -- I realized that Cheri

9    Rice sits over Medicare at the time, broadly Medicare

10   Advantage, but I also thought over Part D.  So -- I

11   could be getting my exact dates wrong for when she

12   moved into that position, though.

13       Q.   And your -- prior to being the director,

14   according to the -- acting director, according to

15   your LinkedIn, you were the -- I think you testified

16   you were the principal deputy for the -- for CPI

17   between March '15 and December 2016, correct?

18       A.   That's correct.

19       Q.   And did your areas of oversight as deputy

20   differ significantly -- were they significantly

21   narrower than your areas of oversight as director?

22       A.   Not necessarily.  There were a -- there

23   were certain programs -- so the Center for Program

24   Integrity has two deputy center directors.  My focal

25   point, as I was deputy center director, was more on



Page 39

1    Medicaid, Center for Medicare and Medicaid, sort of

2    -- sorry, Center for -- the Innovation Center, CMMI,

3    and over CCIIO.

4            And the reason for that was the other

5    deputy center director had this long tenure at CMS,

6    and had been working in the Medicare program for

7    many, many years.  And the purview of Center for

8    Program Integrity had been grounded in Medicare fee

9    for service since the '90s.

10           And often my goal, when I was there, was

11   really to expand the footprint of the organization

12   and to -- making sure it had other -- that it had

13   oversight over the other programs that CMS was then

14   administering.

15        Q.   Now, as part of your role in -- in

16   overseeing CPI, as you testified, was to oversee

17   various audit programs that CPI had, correct?

18        A.   That is correct.

19        Q.   I know you're -- you're not a

20   statistician, but I see you have some general

21   understanding of -- of the methodologies that are

22   used in audits?

23        A.   Yes, I think it -- yes.  I mean, in terms

24   of statistical -- statistical valid samples and

25   things like that, yes.



Page 121

1   codes for every plan, or the same HCCs for each plan.

2       Q.   Okay.  Sorry.  My question was a little

3   unclear.

4       A.   I'm sorry.

5       Q.   When -- when then -- when it goes then to

6   the medical record reviewer --

7       A.   Okay.

8       Q.   -- does the reviewer know, effectively,

9   "I'm looking to see whether diabetes is here"?  Or

10  are they told, "Look at the chart; code all the

11  conditions that are in the chart, and tell me what

12  they are"?

13          MS. KOH:  Objection.  Form.

14  BY MR. MERON:

15      Q.   Do you know?

16      A.   Now I'm speculating.  So -- not

17  definitively, no, I believe it is the former.  I

18  believe they basically are looking at a specific HCC

19  that is set by CMS.

20          So there is some corridor, or whatever,

21  you know, parameters placed on what kind of reviews

22  are -- what -- what's being reviewed in a given time.

23      Q.   Okay.  But -- but not -- you're not sure,

24  as you said, about the weeds --

25      A.   I'm honestly not.  It's been such a long



Page 122

1    time, it's -- I'm not.

2        Q.   Okay.  Stepping away from the details of

3    how the coding is done, there -- there is -- as part

4    of the -- the RADV, the -- the medical records were

5    reviewed to see whether the HCCs that were submitted

6    and sampled are substantiated by the medical record.

7    That's one component of the audit, correct?

8        A.   Yes, correct.

9        Q.   And there's also a look to see whether the

10   reviewers see other HCCs that are substantiated in

11   the medical record but were not submitted in claims,

12   correct?  They look for adds?

13       A.   Yes.  That's right.

14       Q.   And then there is a net payment error

15   determination made for each sample beneficiary, where

16   they compute what the actual payment was versus what

17   a correct payment would have been, had the coding all

18   been correct.  Correct?

19       A.   Yes.

20            MS. KOH:  Objection.

21            THE WITNESS:  Sorry.

22            Yes.

23   BY MR. MERON:

24       Q.   And then the results of the sample

25   beneficiaries are then extrapolated over the whole



3340

Page 123

1    contract.  Correct?

2            MS. KOH:  Objection.

3            THE WITNESS:  Yes, given whatever year

4        they started extrapolation, right, it talks

5        about that.  So 20 -- whatever.  Yes, right.  At

6        a certain point, they began extrapolation,

7        right.

8    BY MR. MERON:

9        Q.   And that was contract year 2011 where it

10   started, correct?

11       A.   Yes, that -- right.  That's what the --

12   yeah.  I believe that's what the paper says.

13       Q.   And by necessity, the RADV audits occur a

14   number of years after the contract year in question,

15   correct?

16       A.   Yes.  That's correct.

17       Q.   And in particular, they occur after the

18   final deadline for submitting all the plans risk

19   adjustment data has passed, correct?

20       A.   That is -- that's the trigger.  That's the

21   signal of the trigger.  It has to be at some point

22   after -- after that, yes.

23       Q.   And it has to be that, because you've got

24   to know what the final data set is that you're

25   sending?



Page 198

1                        CERTIFICATE

2

3          I, KAREN K. KIDWELL, Registered Merit Reporter,

4     and Certified Realtime Reporter, do hereby certify

5     that prior to the commencement of the examination,

6     the deponent was remotely sworn to testify to the

7     truth, the whole truth under penalty of perjury.

8          I DO FURTHER CERTIFY that the foregoing is a

9     verbatim transcript of the testimony as taken

10    stenographically by me at the time, place and on the

11    date hereinbefore set forth, to the best of my

12    ability.

13         I DO FURTHER CERTIFY that I am neither a

14    relative nor employee nor attorney nor counsel of any

15    of the parties to this action, and that I am neither

16    a relative nor employee of such attorney or counsel,

17    and that I am not financially interested in this

18    action.

19

20
                        _Karen K. Kidwell_

21                      Karen K. Kidwell
                        Registered Merit Reporter
22                      Certified Realtime Reporter
                        Notary Public

23

24

25



3342

**EXHIBIT D-131**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                 )
                                   )
          Plaintiffs,              )
                                   )
     v.                            )
                                   )
UNITEDHEALTH GROUP, INC., et al.,  )
                                   )
          Defendants.              )
_____  )




Videotaped Deposition of

STEVEN HALE NELSON

Given Remotely

Tuesday, July 26, 2022

10:10 a.m.



Reported by:  Karen K. Kidwell, RMR, CRR




Magna Legal Services
866-624-6221
www.MagnaLS.com



3344

Page 196

1    and -- and right.

2              And, you know, I'm -- and not to mention I

3    was the leader of the Medicare business group, so

4    I -- I should do that.

5         Q.   Okay.

6              MS. McMAHON:  All right.  Let's look at

7         Tab 24, which will be Exhibit 324.

8         (Exhibit 324 was marked for identification.)

9              MS. McMAHON:  And this is MAPL000497870.

10        Okay.

11   BY MS. McMAHON:

12        Q.   So the first e-mail, that starts at the

13   bottom of page 1, is an e-mail from you to Cheri

14   Rice, cc'ing Thad Johnson, Dan Schumacher, Karen

15   Erickson, and yourself.  And it's titled "2012

16   Attestation and follow-up from yesterday's meeting."

17             And this is the e-mail response that you

18   sent to Ms. Rice on April 30th.  Correct?

19        A.   Correct.

20        Q.   And I won't ask you to compare this to

21   the -- to the former document; we can all do that off

22   line.  But -- but do you have any memory of changing

23   the message that you sent to Ms. Rice from the one

24   that Mr. Johnson forwarded to you earlier that day?

25             MR. SUMMERS:  Objection.  Form.



Page 197

1            THE WITNESS:  No.

2    BY MS. McMAHON:

3        Q.   Okay.  And let's go to the paragraph that

4    starts with "Fifth."  It's on the second page of this

5    document.

6            And you start that paragraph mentioning

7    the proposed rule, correct?

8        A.   Correct.

9        Q.   And the way you describe it was the

10   proposed rule, that if finalized would "require MA

11   plans to design any medical record reviews to

12   determine the accuracy of risk adjustment diagnoses

13   associated with those records."  Correct?

14       A.   Yes.

15       Q.   Okay.  And I'm paraphrasing, so you might

16   want to -- you can -- you can tell me if you don't

17   like my paraphrasing.

18           But you go on to indicate that you intend

19   to delete diagnosis codes that have gone through a

20   complete review.  Right?

21       A.   Yeah -- I'm -- just make sure.

22           "We" -- you're referring to, "We currently

23   have a process through which we review certain

24   medical records" -- accuracy -- (reading) -- and this

25   already "resulted in the identification of and, in



Page 198

 1   some instances, the submission of deletes."

 2        Q.   Yes.   "Pursuant to our discussion"?

 3        A.   Yeah.   "Pursuant to our discussion,

 4   however, we will soon submit for deletion."

 5             Yeah.   That's a paraphrasing.

 6        Q.   Okay.   And you did do that, correct?

 7        A.   That's my understanding, or that's my

 8   recollection.

 9        Q.   Okay.   And you also describe, following

10   that, that you were considering discontinuing your

11   review process for the diagnosis codes that were

12   still under review, correct?

13        A.   Correct.

14        Q.   Okay.   Now, if you can -- and by the way,

15   this -- this e-mail communication that you sent to

16   Ms. Rice, you intended it to be -- to be clear and

17   comprehensive of the discussion you had the day

18   before, correct?

19             MR. SUMMERS:   Objection.   Form.

20             THE WITNESS:   I think -- I mean, how I

21        would characterize the intent of this

22        communication was to confirm our understanding

23        of the conversation as we walked out, relative

24        to the proposed rule and our -- and the decision

25        that we wanted to make about continuing or



Page 199

1       discontinuing the CV program, and what do we do

2       with claims that are in process, and -- and some

3       insight into, you know, the -- how do we think

4       about the proposed rule, the timing, as we think

5       about bids, and other things.

6            So I think all those things were in here,

7       we were trying to confirm what we got out of the

8       meeting.  Maybe that's what you said, but that's

9       -- I just wanted to state it in my words.

10  BY MS. McMAHON:

11       Q.   Okay.  Good.  Okay.

12            And Ms. Rice did respond sort of directly

13  to that point, didn't she?  She says here, "With

14  respect to your fifth point, I would note that

15  regardless of the effective date of the proposed

16  requirement related to medical record reviews, there

17  are other laws that do impose standards, requirements

18  and responsibilities on MA plans in connection with

19  the federal payments they receive from CMS."  Right?

20            MR. SUMMERS:  I'm sorry, what's the

21       question, Counsel?

22  BY MS. McMAHON:

23       Q.   Is that what she said in this e-mail?

24       A.   I -- I read the same thing you do.

25       Q.   Okay.  And she also -- well, before I --



Page 200

1    before I go on to that, so -- so did you understand

2    that to mean that regardless of the fate of the

3    medical record review rule, or the proposed rule,

4    that there were other laws that imposed standards,

5    requirements, and responsibilities on MA plans?

6              MR. SUMMERS:  Objection.  Form.

7              THE WITNESS:  I understand it to be

8         exactly what she wrote, which is -- there's a

9         bunch of stuff that, you know, you need to be

10        thinking about as you make decisions, and you

11        guys came in and asked us a very specific

12        question.  We gave you an answer in regards to

13        that.  There's federal laws.  There's all kinds

14        of things you guys should be thinking about.

15             But as far as I'm concerned, this was a

16        confirmatory communication as to our very

17        specific question about the proposed rule and

18        about our claims verification program, how we

19        handle claims that are partway through it or all

20        the way through it.

21             And so that's -- that's how -- that's how

22        we -- that's how I read this.  That's how we

23        read it, that it was confirmatory to -- to the

24        impression we walked out of the meeting with,

25        that there was no proactive obligation to -- to



Page 201

1          run a claims verification program.

2                   And -- and pending the proposed rule,

3          finalization of which, of course, it was never

4          finalized.

5    BY MS. McMAHON:

6          Q.    Right.  But so let me just -- I think

7    you -- you know, you described what she says here as

8    her telling about a bunch of stuff.  But let's kind

9    of try to drill down on that a little bit.

10                  She tells you that there are other laws

11   that impose standards, requirements, and

12   responsibilities on MA plans.  Correct?

13         A.    She does state that.

14         Q.    And what did you understand that to mean?

15         A.    I understood exactly what I just said,

16   which is there's a lot of law -- federal laws.  And

17   of course our intention is to stay compliant with

18   every federal law and every regulation, requirement

19   that CMS and, you know, the Constitution asks us to

20   do.

21                  I mean, I -- it was a very far-reaching,

22   broad statement, but did not -- was not specific to

23   the topic that we covered, unless, you know -- it was

24   just -- it felt like a very broad statement, kind of

25   a catch-all statement; and we -- we read it as



Page 283

1          anyone at United --

2    BY MR. HAVIAN:

3          Q.    Okay.

4          A.    -- specifically.  Yeah.

5          Q.    Okay.  And was it ever your policy, you

6    personally, that United did not have to delete

7    unsupported codes if the error rate fell lower than

8    the error rate in fee-for-service data?

9                MR. SUMMERS:  Objection.  Form.

10        Foundation.

11               THE WITNESS:  Are you asking if that was

12        my personal opinion?

13   BY MR. HAVIAN:

14        Q.    No, if that was your practice, ever your

15   practice while you were at United.

16               MR. SUMMERS:  Objection.  Form.

17        Foundation.

18               THE WITNESS:  I don't recall having

19        conversation or being aware of that discussion,

20        so I wouldn't really be able to comment on that.

21               MR. HAVIAN:  Okay.

22               So that's -- you should stop the clock.

23        The videographer should stop the clock with that

24        answer.  And I'll pass the witness.

25               MR. SUMMERS:  Okay.  Thank you.



Page 284

1            We're just going to take a couple minutes

2       to get resituated here.  I'm going to go sit

3       across from the witness, so that he's not

4       turning sideways.

5            So just give us a couple minutes.  We can

6       go ahead and go off the record.

7            VIDEOGRAPHER:  We're now going off the

8       record at 7:07 p.m.

9            (A recess transpired from 7:07 p.m. until

10           7:09 p.m.)

11           VIDEOGRAPHER:  We're now back on the

12       record at 7:09 p.m.

13                 FURTHER EXAMINATION

14  BY MR. SUMMERS:

15       Q.   Good afternoon, Mr. Nelson.  I'd like to

16  ask you just a follow-up questions, if that's okay.

17           Earlier today we discussed an April 29,

18  2014, meeting between representatives of United and

19  CMS.  I'd like to ask you a few follow-up questions.

20           First, just so the record is clear, why

21  did you want to have that meeting?

22       A.   As I mentioned earlier, but to be clear,

23  there's three reasons -- one is there's a proposed

24  rule out; we wanted to get clarification on that

25  as -- because we had bids coming, and so there was a



Page 285

1    timing issue.

2             We also had, as I said, had a -- some

3    indication from a couple different sources that --

4    that the claims verification process was in fact not

5    needed or not required -- I should say not required.

6             And then the general opportunity to build

7    relationships and -- with CMS in a -- and to set the

8    standard for us to have, you know, transparent and --

9    and really productive dialogue around anything

10   that -- that we were fuzzy about or confused about,

11   ever.  And I just wanted to set that standard.

12            And so it was in that spirit that we took

13   that very specific question to them.

14       Q.   On the second issue, getting clarity with

15   regard to whether the claim verification procedure

16   was -- was necessary, did you feel that you got a

17   clear understanding or a clear answer from that

18   meeting?

19       A.   On the need to continue --

20       Q.   On whether you needed to continue with

21   claim verification.

22       A.   We felt that we got a very clear answer.

23   And the answer was that we did not need to continue

24   it.

25       Q.   Did you feel that you also got clarity on



3353

Page 286

1    the question of what to do with regard to the patient

2    files that were currently under review, but as to

3    which the review had not been completed?

4         A.   Yes.  We also got -- I -- you know, we

5    felt like we got clarity on -- if a claim was

6    somewhere in the middle of the process, then it did

7    not need to be deleted; but if it went all the way

8    through, it should be deleted.

9              So that's what we did.

10        Q.   And you just said that that's what you

11   did.  Did you, following this meeting, do what you

12   felt CMS told you you needed to do?

13        A.   Yes.

14        Q.   There was some questioning earlier today

15   about a comment by Ms. Rice to the effect that if you

16   knew the codes were not supported, that they should

17   be deleted.  Do you recall that?

18        A.   Yes.

19        Q.   What was -- and I think you mentioned

20   there was a broader context to that discussion.  What

21   was the context of that statement?

22        A.   The context, as I remember it, was in

23   conjunction with the discussion around claims

24   verification process:  How did it work.  And as we

25   were trying to figure out, you know, our -- we did



Page 310

1            MR. HAVIAN:  That's okay.  It's hard to

2       get used to.

3            THE WITNESS:  Yeah.  No, I -- I need to

4       wait.

5  BY MR. SUMMERS:

6       Q.   Just so the record is clear, was your

7  answer "yes" or "no"?

8       A.   Yes.  It was "yes."

9       Q.   Now, turning back to the meeting on

10 April 29, 2014, what would you have done -- to the

11 best of your knowledge, what would you have done if

12 CMS had said that under current regulation, United

13 was required to conduct claim verification?

14      A.   We would have continued with it.

15      Q.   Earlier today, counsel for the government

16 asked you a lot of questions about a projected budget

17 shortfall in 2014.  Do you recall that questioning?

18      A.   Yes.

19      Q.   If CMS had told you on April 29, 2014,

20 that United was required to continue with its claims

21 verification program, or something like it, would you

22 have discontinued the program in order to meet

23 financial targets?

24      A.   No.  Adhering and being consistent,

25 compliant with regulations and rules, always trumps



Page 311

1  hitting a budget.  I mean, that's -- that's just how

2  we have to run our business.  There's no way around

3  that.

4          And then you have to find -- you know,

5  continue to run the business in a proper way.  But

6  the compliance and consistent with CMS regulations,

7  there's no negotiation on that.

8      Q.   After your meeting with CMS on April 29 of

9  2014, after that point in time, did CMS ever come to

10 you and say that you needed to reinstate claim

11 verification or risk being sued?

12     A.   Not to my knowledge.

13          MR. SUMMERS:  I have no further questions.

14     Thank you for your time.

15          MS. McMAHON:  All right.  I just -- give

16     me five minutes to see if I have any follow-up.

17     I think we have ten minutes left on record.

18          MR. SUMMERS:  I think you only had like

19     two minutes left, according to our count.  And

20     the count -- the witness has a -- a flight to

21     catch, so be as fast as you can, please.

22          MS. McMAHON:  Well, I will go as fast as I

23     can, but I believe I have ten minutes, and I

24     believe that was made clear at the end of

25     Mr. Havian's --



Page 312

```
 1              MR. HAVIAN:  I couldn't have been --

 2              MS. McMAHON:  -- testimony.

 3              MR. HAVIAN:  Yeah, I couldn't have been

 4       clearer.  The clock stopped when I finished, and

 5       I asked one minute worth of questions, and we

 6       had ten left on the clock.  But we've got -- we

 7       can argue about this, and it'll take more than

 8       ten minutes --

 9              MR. SUMMERS:  No, no, no.  Let's just

10       figure out if you have any questions.  Be fast,

11       please, just because the witness -- we're going

12       to stay right here, because the witness --

13              MR. HAVIAN:  Okay.

14              MR. SUMMERS:  -- has to catch a flight.

15              MS. McMAHON:  Okay.  I'm going to go off.

16       I'll be back as quick as I can.  I'm going off

17       the record right now.

18              VIDEOGRAPHER:  We're going off the record

19       at 7:40 p.m.

20              (A recess transpired from 7:40 p.m. until

21              7:45 p.m.)

22              VIDEOGRAPHER:  We're now back on the

23       record at 7:45 p.m.

24              MS. McMAHON:  Okay.  7:45.

25
```



Page 323

1                          CERTIFICATE

2

3        I, KAREN K. KIDWELL, Registered Merit Reporter,

4   and Certified Realtime Reporter, do hereby certify

5   that prior to the commencement of the examination,

6   the deponent was remotely sworn to testify to the

7   truth, the whole truth under penalty of perjury.

8        I DO FURTHER CERTIFY that the foregoing is a

9   verbatim transcript of the testimony as taken

10  stenographically by me at the time, place and on the

11  date hereinbefore set forth, to the best of my

12  ability.

13       I DO FURTHER CERTIFY that I am neither a

14  relative nor employee nor attorney nor counsel of any

15  of the parties to this action, and that I am neither

16  a relative nor employee of such attorney or counsel,

17  and that I am not financially interested in this

18  action.

19

20                        _Karen K. Kidwell_____

21                        Karen K. Kidwell
                          Registered Merit Reporter
22                        Certified Realtime Reporter
                          Notary Public
23

24

25



3358

**EXHIBIT D-132**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )


CONFIDENTIAL

CONTAINS ATTORNEYS' EYES ONLY PORTIONS

(See Note on Index Page)


Videotaped Deposition of

REBECCA PAUL

Given Remotely

Wednesday, April 13, 2022

9:02 a.m. Eastern Time


Reported by:  Karen K. Kidwell, RMR, CRR


Magna Legal Services
866-624-6221
www.MagnaLS.com



3360

Page 16

1          Q.   I had asked you when you began working for

2     CMS, and I understood you to say that in 2005, you

3     began working for the central office of CMS.  Where

4     were you working prior to 2005?

5          A.   I worked in a nongovernment place, non--

6     not CMS, the year before that.  I worked at the

7     regional office before that.  My entire time at CMS

8     is about 22 years.

9               (Reporter requested clarification.)

10         A.   Regional office, for CMS.

11         Q.   Prior to 2005, you worked in the regional

12    office of CMS?  Is that correct, Ms. Paul?

13         A.   In 2005 I began working at central office,

14    CMS's central office.

15         Q.   And prior to 2005 where did you work?

16         A.   Just to clarify, are you asking about my

17    CMS history or my work history?  Just so I understand

18    what you're asking.

19         Q.   Let's focus on CMS.

20         A.   From about 1998 to 2003, I worked in the

21    San Francisco regional office of CMS.

22         Q.   And where did you work between 2003 and

23    2005?

24         A.   The University of California.

25         Q.   What was your position at the University



Page 17

1    of California?

2        A.    I was a -- I don't remember my title.  I

3    worked for a small program that worked at the state

4    legislature on -- reviewed specific types of

5    legislation.

6        Q.    In 2012 you became the director for the

7    Division of Plan Policy in the Medicare Plan Payment

8    Group; is that correct?

9        A.    The Division of Payment Policy, in the

10   Medicare Plan Payment Group, in 2012.

11       Q.    And you are currently the deputy director

12   of the Medicare Plan Payment Group?

13       A.    Correct.

14       Q.    When did you become the deputy director of

15   the Medicare Plan Payment Group?

16       A.    I believe it was made permanent in 2020.

17   I was acting for about a year before that.

18       Q.    And Ms. Paul, is it fair to say that your

19   specialties include Medicare risk adjustment?

20            MR. MASON:  Objection.  Form.

21            THE WITNESS:  Risk adjustment for Medicare

22       Advantage and Part D.

23   BY MR. QURESHI:

24       Q.    My question was, Ms. Paul, is it fair to

25   say that your specialties include Medicare risk



3362

Page 18

 1   adjustment?

 2             MR. MASON:  Same objection.

 3             THE WITNESS:  I have worked on risk

 4        adjustment for the Medicare Advantage and Part D

 5        program, which is part of Medicare.

 6   BY MR. QURESHI:

 7        Q.   And would you consider your work for the

 8   risk adjustment Part D component of the Medicare

 9   program a specialty?

10             MR. MASON:  Objection.  Form.

11             THE WITNESS:  What do you mean by

12        "specialty"?

13   BY MR. QURESHI:

14        Q.   Do you -- do you understand what the word

15   "specialty" means?

16        A.   I'm asking you what your -- what your

17   standard is for -- what it would mean for me.

18        Q.   Yeah, and I'd like to understand what you

19   believe the word "specialty" means.

20        A.   Well, I mean, there's a meaning for it,

21   but are you -- are you asking a specific level of

22   knowledge I have, or -- I have -- I'm asking you what

23   it means, what you're asking of the level of

24   knowledge.

25        Q.   What level of knowledge do you ascribe to



Page 19

1    the word "specialty"?

2         A.    I have worked on many aspects of risk

3    adjustment.

4         Q.    Okay.  Ms. Paul, I'm just trying to get an

5    understanding of what your areas of focus are.

6    Perhaps it will be easy if we take a look at a

7    document.

8              MR. QURESHI:  I'll ask my colleague to

9         make available a document that we will designate

10        as Exhibit 1070.

11        (Exhibit 1170 was marked for identification.)

12             MR. QURESHI:  It is Tab RR for our

13        internal purposes.

14   BY MR. QURESHI:

15        Q.    Let me know when it becomes available to

16   you, Ms. Paul.

17        A.    Which program am I looking in?  Is this

18   AgileLaw?

19        Q.    Yes, it is.

20        A.    I don't see anything -- Document 1?  Is

21   that it?

22        Q.    Yeah, we'll designate it as Exhibit 1070,

23   for the record.  Let me know when it becomes

24   available for you, Ms. Paul.

25        A.    Okay.



Page 20

```
 1        Q.   Have you had a chance to -- to look at
 2   Exhibit 1070?
 3        A.   Uh-huh.  11 -- it's not 1070.  But it's
 4   here.
 5        Q.   Okay.  Thank you for correcting me.  It's
 6   Exhibit 1170?
 7        A.   Uh-huh.
 8        Q.   What is Exhibit 1170?
 9        A.   Looks like my LinkedIn page.
10        Q.   Who created your LinkedIn page?
11        A.   I did.
12        Q.   And --
13             MR. MASON:  Mr. Qureshi, is there a Bates
14        number associated with this document?
15             MR. QURESHI:  There is not.
16             MR. MASON:  Thank you.
17   BY MR. QURESHI:
18        Q.   Is your LinkedIn page accurate, Ms. Paul?
19        A.   Yes.
20        Q.   Will you please read into the record what
21   it says under "Summary."
22        A.   In the context of the LinkedIn page, under
23   "Summary," it says:  "Specialties: Medicare risk
24   adjustment and plan payment."
25        Q.   And when you wrote "Medicare risk
```



3365

Page 21

1   adjustment" in the "Specialties" section of your

2   LinkedIn page, what information were you intending to

3   convey?

4        A.   That these were focuses of what I worked

5   on.

6        Q.   And how long have you considered Medicare

7   risk adjustment a specialty?

8        A.   I don't know.  I don't know when I would

9   have.

10       Q.   When did you create your LinkedIn page?

11       A.   I don't know.  I don't remember.

12       Q.   Did you create it this year?

13       A.   No.

14       Q.   I think you've already addressed

15   components of my next question, but I'll -- I'll ask

16   it again:  How do you define "Medicare risk

17   adjustment"?

18       A.   That is quite broad.  Are you asking what

19   it does, or what its purpose is?

20       Q.   When you wrote that one of your

21   specialties was Medicare risk adjustment, what

22   information were you working to convey?

23       A.   I don't remember what was in my head at

24   the time I wrote it.  I probably just said I worked

25   on it.



Page 22

1          Q.   And what do you consider "Medicare risk

2     adjustment" to mean today?

3          A.   And you're looking for a definition of

4     what it is?

5          Q.   Correct.  As you understand it, Ms. Paul.

6          A.   Risk adjustment is a part of payment -- a

7     payment methodology that allows plans that enroll

8     beneficiaries for a part of groups that are expected

9     to be more costly, to be paid more money; and to

10    enroll beneficiaries for a part of groups that are

11    expected to cost less, pay less out.

12         Q.   Okay.  I'm having some difficulty hearing

13    you, Ms. Paul.  I don't know if there's a different

14    phone line we can use, but --

15              MR. QURESHI:  Might we go off the record

16         for a moment so we can address this?

17              VIDEOGRAPHER:  We're now going off the

18         record.  It's 9:21 a.m.

19              (A recess transpired from 9:21 a.m.

20               until 9:24 a.m.)

21              VIDEOGRAPHER:  We're now back on the

22         record.  It's 9:24 a.m.

23    BY MR. QURESHI:

24         Q.   Ms. Paul, before we -- we took our break,

25    I had asked you what you understand the Medicare risk



Page 23

1   adjustment program to mean.  Would you please define

2   that for us?

3              MR. MASON:  Objection.  Form.

4              THE WITNESS:  Risk adjustment in general

5         has the objective -- risk adjustment is one

6         aspect of a payment methodology that provides

7         the ability to calculate higher payments for

8         plans that enroll beneficiaries who are in

9         groups -- who are a part of groups that are

10        expected to have higher costs, and pay less than

11        average for -- to plans that enroll

12        beneficiaries who are part of groups that are

13        expected to have lower costs.

14  BY MR. QURESHI:

15        Q.   And is the Medicare risk adjustment

16  payment methodology sometimes referred to as Medicare

17  Part C?

18        A.   Medicare Part C is Medicare Advantage,

19  which . . .

20        Q.   And does Medicare Advantage use a risk

21  adjustment payment methodology?

22        A.   Risk adjustment is part of the payment

23  methodology.

24        Q.   What are the other parts?

25        A.   There is a rate book that is -- is used



3368

Page 24

1    for -- in the context of plan bidding.  There is a

2    plan bid.  And then there are risks, and then there

3    is the risk adjustment aspect of the payment

4    methodology, that -- at a very high level.

5         Q.    Can you think of any others?

6         A.    Are you looking for the payment formula?

7         Q.    No, Ms. Paul.  I had asked you whether

8    risk adjustment is part of the Medicare Advantage

9    payment methodology.  I believe you said it's one

10   part.  So I asked you to identify other parts.

11             Are there any other parts that you have

12   not yet identified?

13        A.    It depends how specific you are asking.

14   At a -- there are many parts to payments.  It's quite

15   complex.  So those pieces are major pieces.

16        Q.    The pieces you enumerated are -- are the

17   major pieces?

18        A.    They are major pieces.

19        Q.    Are there any other major pieces that you

20   can think of?

21        A.    It's really more complex than that.  Those

22   are major pieces of it.  It depends on how detailed

23   you want to discuss, and what you consider major.

24        Q.    And we will certainly get into the details

25   throughout the day, Ms. Paul.  Right now, I just want



Page 25

1  to know if there are any other major pieces that you

2  have not yet identified.

3        A.   It really depends on how detailed you're

4  going to be and what you consider major.  Those are

5  major pieces of how payment -- major pieces of the

6  payment.

7        Q.   If we turn back to Exhibit 1170, you list

8  plan payment as among your specialties.  What does

9  "plan payment" mean?

10        A.   I do not know what I was thinking when I

11  wrote it, but it is a general term for payment

12  policy, payment formulas.

13        Q.   Payments to who?

14        A.    Plans.

15        Q.    Medicare Advantage plans?

16        A.   Again, I do not know what I was thinking

17  when I wrote this, but that is what I worked on, so

18  that is possibly what I had in mind when I wrote

19  that.

20        Q.   What do you think it means, sitting here

21  today, Ms. Paul?

22        A.   Are you asking in the context of what I

23  do, or generically?

24        Q.   Exhibit 1170 is a document you created.

25  Isn't that correct, Ms. Paul?  It's your LinkedIn



Page 26

1   page?

2        A.   Yes.

3        Q.   Okay.  When you wrote "plan payment," what

4   information were you trying to convey as part of your

5   specialties?

6        A.   I do not know what I was thinking when I

7   wrote it.  That's why I'm asking if what you're

8   asking now is what I work on.

9        Q.   What do you believe it means?

10            MR. MASON:  Objection.  Asked and

11       answered.

12            THE WITNESS:  What it means here is a

13       general category of knowledge.  It is not meant

14       to be specific.  But I do not remember what I

15       meant when I wrote it.

16   BY MR. QURESHI:

17        Q.   Are you able to testify as to whether

18   "plan payment" refers to payments to Medicare

19   Advantage plans?

20            MR. MASON:  Objection.  Form.

21            THE WITNESS:  That seems like a different

22       question.  You're asking what I meant when I

23       wrote this.  If you're asking does plan payment

24       include that -- is that the question?

25



Page 27

 1  BY MR. QURESHI:

 2       Q.   My question was, are you able to testify

 3  as to whether "plan payment" refers to payments to

 4  Medicare Advantage plans, Ms. Paul?

 5            MR. MASON:  Same objection.

 6            THE WITNESS:  Are you asking about the

 7       generic term, or what it means here?

 8  BY MR. QURESHI:

 9       Q.   Let's do both, Ms. Paul.  What does it

10  mean here, on Exhibit 1170?

11            MR. MASON:  Objection.  Asked and

12       answered.

13            THE WITNESS:  Again, I do not know on the

14       page what I meant when I wrote it.  But it

15       was -- appears to be intended to be a general

16       term, and not specific.

17  BY MR. QURESHI:

18       Q.   And what do you understand the general

19  term to mean?

20       A.   The general term would mean how plans are

21  paid.

22       Q.   What plans?

23       A.   Given that I was working in the Medicare

24  Plan Payment Group, presumably Medicare plans.

25       Q.   Medicare Advantage plans?



Page 28

1          A.    Those are included.

2          Q.    What other plans are included?

3          A.    Part D plans.

4          Q.    What other plans?

5          A.    Again, we're addressing the wording as

6    they exist in nature, not what's here.  I don't know

7    what I meant when I wrote this.

8          Q.    I understand that, Ms. Paul.  My question

9    is, the concept of plan payment refers to Medicare

10   Advantage plans and Part D plans, according to you.

11   Are there any other plans that you think it refers

12   to?

13         A.    And I'm just clarifying that I mean this

14   today, not what's written here.

15         Q.    I'm fine with that clarification,

16   Ms. Paul.  I -- I just want your best testimony.

17               When you -- you hear the word "plan

18   payment" as applied to your experience and your work,

19   what do you understand that to mean?

20         A.    The vast majority of it is Medicare

21   Advantage and Part D plans.  Those are the plan types

22   that the Medicare Plan Payment Group is responsible.

23   There are other plans that get paid similarly that --

24   that would come -- that would be included today;

25   again, not talking about this document -- base



3373

Page 29

1   organizations, some demonstration plans.

2        Q.   Are you finished with your answer?

3        A.   Yes.

4        Q.   Do you use e-mail in your work at CMS?

5        A.   Yes.

6        Q.   What is your e-mail address?

7        A.   rebecca.paul@cms.hhs.gov.

8        Q.   Have you had the same e-mail address

9   throughout your tenure of work at the CMS central

10  office?

11       A.   I believe so.

12       Q.   Okay.  Do you ever use personal e-mail to

13  conduct CMS-related business?

14       A.   No.

15       Q.   You've never done that?

16            MR. MASON:  Objection.  Form.

17            THE WITNESS:  Years ago, before we had

18       work laptops, I might have sent a file home, but

19       everything would have been in my work e-mail.

20       Nothing exists outside of work e-mail.

21  BY MR. QURESHI:

22       Q.   And what e-mail address would you have

23  used to send work home before you had a laptop?

24       A.   I don't know which one it was, because

25  they're all . . .



Page 30

1      Q.   How many personal e-mail addresses do you

2   have?

3      A.   I have two.

4      Q.   What are those e-mail addresses?

5      A.   One is rebecca_paul@yahoo.com.  That's

6   probably the only one I would have used.  The other

7   one is newer.

8      Q.   And what is the newer one?

9      A.   It's lokipaul94@gmail.com.

10     Q.   Focusing on your CMS e-mail address, was

11  it your practice while working at the central office

12  to be truthful in your e-mail communications?

13     A.   Yes.

14     Q.   Is it your practice to review e-mails sent

15  to you at your CMS e-mail address?

16     A.   Are you asking about reviewing e-mails or

17  reviewing them -- I -- the e-mail address -- what

18  you're asking.

19     Q.   I'm not sure I understand your

20  clarification, Ms. Paul.  I can ask my question

21  again, if that helps.

22          Is it your practice to review e-mails sent

23  to you at your CMS e-mail address?

24     A.   Are you asking about the e-mail address,

25  or are you asking do I review e-mails?



Page 31

1      Q.   If someone sent you an e-mail at your CMS
2   e-mail address, would you review the contents of that
3   e-mail?

4      A.   I do not read every e-mail I receive.

5      Q.   How do you decide which e-mails to look
6   at?

7      A.   It depends.  Urgency, topical nature of an
8   e-mail, if I work on it, does someone else work on
9   it.

10     Q.   And has that been your practice throughout
11  your tenure at the CMS central office?

12     A.    I -- if I do not -- if there was -- if I
13  ever didn't read an e-mail, so general criteria are
14  likely what I was taking into account.  I can't speak
15  to how I would read an e-mail, you know, a long time
16  ago.

17     Q.   Are you familiar with the term "diagnosis
18  code" in the context of the Medicare risk adjustment
19  program?

20     A.   Yes.

21     Q.   What is a diagnosis code?

22     A.   A diagnosis code is a numerical code that
23  is associated with a specific clinical diagnosis, as
24  defined by diagnosis code.

25     Q.   And what role do diagnosis codes play in



Page 32

1    the Medicare risk adjustment program?

2        A.    Some diagnosis codes -- specified

3    diagnosis codes are used in the risk adjustment

4    models to assign a specific condition to a

5    beneficiary, and is used to calculate a risk score.

6        Q.    Thank you for that, Ms. Paul.  We'll talk

7    a little bit more about risk scores in a moment, but

8    first I'll direct you to another exhibit that should

9    be available soon.

10        MR. QURESHI:  It's Tab H, Samantha.

11    BY MR. QURESHI:

12        Q.    And Ms. Paul, we'll refer to it as

13    Exhibit 1171.

14        (Exhibit 1171 was marked for identification.)

15    BY MR. QURESHI:

16        Q.    It should be up in a moment.

17        A.    Okay.

18        Q.    Please let me know when it is available

19    for you.

20        A.    I have it.

21        Q.    Might you take a moment to review it?

22        While you're reviewing Exhibit 1171,

23    Ms. Paul, we've also uploaded a document that's

24    designated Exhibit 1171-1, which is the attachment

25    to 1171.  So you should have that available to you



Page 33

1    now as well.

2         (Exhibit 1171-1 was marked for identification.)

3    BY MR. QURESHI:

4         Q.    Ms. Paul, I'll represent for the record

5    that Exhibit 1171 is an e-mail chain, where the top

6    e-mail is from you to Ms. Cheri Rice, dated

7    September 2nd, 2014.  And it bears the Bates number

8    USBP057358501.  Is that correct?

9         A.    Are you asking me the number on the e-mail

10   chain?

11        Q.    That's right, Ms. Paul.  I just want to

12   make sure we're looking at the same document.

13        A.    Can you read the number again that's on

14   the e-mail chain?  I -- I thought you were talking

15   about the other document.

16        Q.    Sure.  I'll describe the e-mail in its

17   entirety.  It's an e-mail where at the top of the

18   page, you, Ms. Rebecca Paul, are sending a message to

19   Ms. Cheri Rice and others.  And that e-mail is dated

20   September 2nd, 2014.  The Bates number on the bottom

21   of the first page is USBP057358501.  Correct?

22        A.    That's what I see.

23        Q.    And who is Ms. Cheri Rice?

24        A.    At the time of this e-mail she was the

25   group director --



Page 41

1    do you mean?

2         Q.   If it's -- if it's in red text?

3         A.   Yes, it's in red.

4         Q.   And is there a line through the red text?

5         A.   No.

6         Q.   Okay.  Well, that's what I have in -- in

7    the version that I'm looking at.  But regardless of

8    whether it's struck out or not, would you please read

9    Item 11?

10        A.   "Exclude diagnostic categories that are

11   most subject to differential coding in MA compared to

12   fee-for-service Medicare."

13        Q.   And then does it say "NEW," in

14   parentheses, at the end?

15        A.   Yes, yes, it says "NEW."

16        Q.   And what do you understand Item 11 to

17   mean?

18        A.   That -- that Medicare Advantage plans

19   would report codes -- specific categories, I guess

20   the categories differently than fee for service

21   would.

22        Q.   And why would that occur?

23             MR. MASON:  Objection.  Form.

24             THE WITNESS:  It might occur because

25        Medicare Advantage plan payments will increase



Page 42

1       when they report more diagnoses, more unique

2       diagnoses, than fee for service.

3  BY MR. QURESHI:

4       Q.   And why would that occur?

5            MR. MASON:  Objection to form.

6            THE WITNESS:  It's because there's a

7       payment incentive to report more codes, because

8       the risk score would increase.

9  BY MR. QURESHI:

10      Q.   In discussing the phrase "discretionary

11 coding variation," is there a variation in how coders

12 identify diagnoses?

13           MR. MASON:  Objection.  Form.

14           THE WITNESS:  And by "coders," you're now

15      talking about -- you're talking about

16      professionally trained coders, who review --

17 BY MR. QURESHI:

18      Q.   Yes.

19      A.   -- medical record.

20           Discretionary, in this sense, is a

21 clinical -- of a clinical nature, where the

22 diagnosing may vary by provider, by -- depending --

23 it's a conceptual framework for whether or not a

24 diagnosis made by a clinician may differ what -- the

25 degree to which it may differ.



Page 43

1          Coding is not diagnosing.  It is whether

2     or not the medical record, what is written in the

3     medical record, meets coding guidelines to assign it

4     a specific diagnosis code.

5          Your question about whether coders can

6     differ:  They potentially can, but there are rules to

7     follow, which is not the "discretionary" that's

8     referred to here.

9          Q.   Understood.  And with respect to

10    differences between coders, how are those differences

11    resolved?

12          MR. MASON:  Objection.  Form.  Vague.

13          THE WITNESS:  I don't know.  It depends on

14       the circumstances.  I don't -- I wouldn't have

15       direct knowledge.

16    BY MR. QURESHI:

17          Q.   I believe you said you wouldn't have

18    direct knowledge.  Do you have any knowledge on this

19    issue?

20          A.   I don't -- I don't work with coders.  I

21    don't -- it depends on what the -- I mean, I don't --

22    is this a plan program?  I don't know.  I assume -- I

23    don't know how it's resolved.

24          Q.   You might turn to the next page, Slide 4,

25    of Exhibit 1171-1.



Page 44

```
 1        A.    Which page?

 2        Q.    The next slide, Slide 4.

 3        A.    Okay.

 4        Q.    The title of the slide is "NEW SLIDE?

 5   Decisions Regarding the Inclusion of Individual

 6   HCCs."

 7        A.    Uh-huh.

 8        Q.    Do you see that?

 9        A.    Yes.

10        Q.    Okay.  The last bullet point states:

11   "Whether diagnosis codes that are subject to

12   discretionary or differential coding should be

13   excluded."  Did I read that correctly?

14        A.    Yes.

15        Q.    What did you understand this last bullet

16   point to mean?

17              MR. MASON:  Objection.  Form.

18              THE WITNESS:  This slide is discussing

19        when we include specific HCCs in a risk

20        adjustment model, and we have principles and

21        decision points about when they are included or

22        not.  This last bullet is discussing a decision

23        point about when to exclude an HCC from the

24        model.

25              The discretionary term here, I believe,
```



```
 1                         CERTIFICATE

 2

 3          I, KAREN K. KIDWELL, Registered Merit Reporter,

 4     and Certified Realtime Reporter, do hereby certify

 5     that prior to the commencement of the examination,

 6     the deponent was remotely sworn to testify to the

 7     truth, the whole truth under penalty of perjury.

 8          I DO FURTHER CERTIFY that the foregoing is a

 9     verbatim transcript of the testimony as taken

10     stenographically by me at the time, place and on the

11     date hereinbefore set forth, to the best of my

12     ability.

13          I DO FURTHER CERTIFY that I am neither a

14     relative nor employee nor attorney nor counsel of any

15     of the parties to this action, and that I am neither

16     a relative nor employee of such attorney or counsel,

17     and that I am not financially interested in this

18     action.

19

20                         Karen K. Kidwell
                      _____
21                    Karen K. Kidwell
                      Registered Merit Reporter
22                    Certified Realtime Reporter
                      Notary Public
23

24

25
```



**EXHIBIT D-133**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

------------------------------------

UNITED STATES OF
AMERICA ex rel.
BENJAMIN POEHLING,

      Plaintiffs,

    vs.      No. CV 16-08697 FMO

UNITEDHEALTH GROUP,
INC., et al.,


      Defendants.

------------------------------------


      The videotaped deposition of
BENJAMIN POEHLING, taken pursuant to Notice
of Taking Deposition, taken before
Alexis Jensen, RPR, CRR, and a Notary Public
in and for the County of Dakota, State of
Minnesota, taken on October 18, 2022, at
Dorsey & Whitney LLP, 50 South Sixth Street,
Suite 1500, Minneapolis, Minnesota,
commencing at approximately 9:24 a.m.



Page 217

```
 1        that you wrote because you thought it or
 2        something you heard others at United say?
 3   A.   It's -- my recollection is it's something
 4        that I heard people say at United.
 5   Q.   And during the time you were -- you were in
 6        this role, 2010/2011, did you form a view as
 7        to whether it was, in fact, correct that it
 8        was unreasonable to ask a Medicare advantage
 9        plan to review every medical chart?
10   A.   I don't know if I formed an opinion back
11        then, but when you talk about -- when you
12        say "every medical chart," that would seem
13        unreasonable.
14   Q.   Well, I'll ask it again a different way.
15             Whether you recall back then,
16        sitting here today, would you agree that
17        it's not reasonable to expect Medicare
18        advantage plans to review every medical
19        chart?
20             MR. HAVIAN:  Objection, form.
21             THE DEPONENT:  I don't know what
22        "every medical chart," but -- refers to, but
23        literally, if you're asking review every
24        single medical chart, that does seem
25        unreasonable to me.
```



Page 218

```
 1      BY MR. BAAK:
 2   Q.  All right.  We're still in the same section,
 3       but I want to go over to the next page of
 4       your Challenges With CMS Methodology
 5       section.  And there's two more bullets.
 6               The first one is, Doctor -- plans
 7       rely on doctors to code correctly.
 8               Do you see that?
 9   A.  I do.
10   Q.  Again, was that something you understood at
11       the time you were drafting this summary
12       document in 2011 that plans counted on the
13       doctors to code correctly?
14   A.  It was something I heard at United.
15   Q.  Was it something you disagreed with?
16   A.  Doctors don't always code.  They may have
17       coders in their office.
18   Q.  "Doctors" meaning doctors' offices?
19   A.  Getting -- so, we talked about IRADS
20       earlier.  If they're coding things that come
21       through IRADS, we relied on those claims
22       that were coming in through IRADS that were
23       coded by someone at the doctor's office.
24   Q.  You previewed the next part of this bullet,
25       which is -- it says, Many doctors do not
```



Page 219

1       have an incentive to do so; that is, to code

2       correctly, right?

3              MR. HAVIAN:  Objection to form.

4       I'm not sure if you're asking if you read

5       that correctly, or if it's correct.

6       BY MR. BAAK:

7   Q.  Let me take the former.  Did -- did I

8       describe your -- the bullet -- the next

9       sentence in your CMS methodology section

10      correctly, Many doctors do not have an

11      incentive to do so?

12  A.  Yeah, I see those words here.

13  Q.  And that's referring to doctors having an

14      incentive to code correctly, right?

15  A.  I believe so.

16  Q.  And the reason for that is the next

17      sentence, which is, A physician office

18      claims only require one diagnosis code to

19      justify the CPT in a Medicare claim, right?

20             MR. HAVIAN:  Objection to form.

21             THE DEPONENT:  Yeah.

22      BY MR. BAAK:

23  Q.  What's a CPT?

24  A.  I don't know what -- I can't remember what

25      it stands for.  I believe it's a procedure



Page 220

```
 1        code.
 2   Q.   What you're trying to capture here in this
 3        bullet is the reason doctors don't have an
 4        incentive to completely code accurately
 5        diagnosis codes?
 6             MR. HAVIAN:  Objection.
 7             THE DEPONENT:  No, this may be one
 8        reason.  But there may be other reasons as
 9        well.
10   BY MR. BAAK:
11   Q.   So, what you're capturing here, though, is
12        one reason why risk adjustment diagnosis
13        data may be incomplete?
14             MR. HAVIAN:  Objection to form.
15             THE DEPONENT:  Where I'm capturing
16        where, in this last sentence?
17   BY MR. BAAK:
18   Q.   In this third bullet.
19   A.   Can -- can you ask the question again?
20   Q.   Sure.  I'm just trying to understand the
21        purpose of why you put this bullet in your
22        summary you created in 2011.
23             So, are you trying to capture one
24        reason that doctors don't necessarily have
25        an incentive to code completely when they
```



Page 221

```
 1       submit a claim?

 2  A.   I -- I don't recall specifically why I put

 3       it in here.  I do agree that doctors' coding

 4       may not be correct sometimes, but there's

 5       multiple reasons why that could be true.

 6  Q.   And then you've got your last bullet, Plans

 7       have no incentive to police overcoding.

 8            And that's what you write right

 9       there in the last bullet, right?

10  A.   I see those words, yes.

11  Q.   Is that something you thought or you heard

12       others say?

13  A.   This is something I heard at the -- at the

14       company.

15  Q.   And then in the last section, there's a

16       paragraph to wrap up your CMS methodology

17       challenges section.  It says, Despite these

18       challenges, plans must ensure face-to-face,

19       appropriate provider type and documented in

20       medical record, right?

21  A.   Yes, it says that.

22  Q.   Then it says, These are the rules to

23       participate, right?

24  A.   Yes, it says that.

25  Q.   Did CMS ever put out -- or let me ask it a
```



Page 336

1        STATE OF MINNESOTA )

2
        COUNTY OF DAKOTA   )

3

4              Be it known that I took the
        videotaped deposition of BENJAMIN POEHLING

5        on October 18, 2022;

6              That I was then and there a notary
         public in and for the County of Dakota,

7         State of Minnesota, and that by virtue
         thereof I was duly authorized to administer

8         an oath;

9              That the witness before testifying
        was by me first duly sworn to testify the

10        whole truth and nothing but the truth
        relative to said cause;

11

12              That the testimony of said witness
        was recorded in stenotype by myself and
        transcribed into typewriting under my

13        direction, and that the deposition is a true
        record of the testimony given by the witness

14        to the best of my ability;

15              That I am not related to any of the
        parties hereto nor interested in the outcome

16        of the action;

17

18              Witness my hand and seal this 21st
        day of October, 2022.

19                            _Alexis Jensen_

20
                            ALEXIS JENSEN, RPR, CRR

21                            COURT REPORTER

22

23

24

25



3391

**EXHIBIT D-134**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA, ex      )
rel. BENJAMIN POEHLING,           )
                                  )
          Plaintiffs,             )
                                  )        Case File No.
vs.                               )
                                  )        16-08697 FMO
UNITEDHEALTH GROUP, INC., et al.  )
                                  )
          Defendants.             )
_____

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF

CYNTHIA POLICH

September 28, 2022

10:09 a.m.

Via Zoom Videoconferencing

Reported by:  Marsi Koehl, CCR-B-2424



Page 123

1  submit a diagnosis code on an encounter or a claims

2  form, that it was accurate, reflected the health

3  status or conditions of the patients they saw, that

4  it was documented in the medical record.  And those

5  standards apply to both Medicare Advantage

6  organizations and Medicare fee-for-service.

7       Q.  So was it your understanding that there was

8  a requirement that codes submitted had to be

9  supported by medical record documentation?

10          MR. SCHINDLER:  Objection.  Vague and

11          ambiguous.  Asked and answered.

12          THE WITNESS:  It was my understanding

13          that we were required by CMS to accurately

14          submit the codes submitted to us by

15          providers on behalf of their patients.

16          We would submit them to CMS with the

17          presumption that the provider was submitting

18          to us accurate diagnoses that reflected the

19          health status and conditions of their

20          patient and that it would be documented in

21          their medical record.

22  BY MR. LEE:

23       Q.  Was there any obligation on the part of the

24  Medicare Advantage organization as to the accuracy of

25  whether or not that code was supported by medical



Page 124

1    record documentation?

2          MR. SCHINDLER:  Objection.  Vague and

3          ambiguous.

4          THE WITNESS:  As far as I understood,

5          there was no requirement for the Medicare

6          Advantage organization to verify the code

7          submitted by a provider to us on their

8          claims or encounter form, but that if we

9          were -- if the provider informed us that

10         they submitted a code in error, that we

11         would delete that code.

12   BY MR. LEE:

13         Q.  Submitted in error meaning, for example, not

14   supported by the medical record?  That would be a

15   valid reason to delete that code?

16         MR. SCHINDLER:  Objection.  Calls for

17         speculation.

18         THE WITNESS:  I was referring to an

19         error of they transposed some digits or the

20         coder made a mistake, that those errors --

21         we would delete those codes and not submit

22         them to CMS.

23   BY MR. LEE:

24         Q.  By codes that are unsupported by medical

25   record, codes that should be deleted?



Page 125

```
 1          MR. SCHINDLER:  Objection.  Calls for a
 2     legal conclusion.  No foundation.  Calls for
 3     speculation and vague and ambiguous as
 4     framed.
 5          THE WITNESS:  There was no regulatory
 6     requirement for Medicare Advantage plans to
 7     verify that the diagnosis codes submitted by
 8     the provider were supported.
 9 BY MR. LEE:
10     Q.  And Ms. Polich, I'm not asking about
11 regulatory requirements, I'm not asking about
12 verification.  What I'm asking you, though, is it
13 your understanding that there was a requirement that
14 codes submitted for risk adjustment had to be
15 supported by medical records?
16          MR. SCHINDLER:  Objection.  Vague and
17     ambiguous.  What is requirement then?  She
18     just answered your question.
19          MR. LEE:  Mr. Schindler, I'm going to
20     admonish you again to abide by Rule 30 --
21          MR. SCHINDLER:  I am abiding by
22     Rule 30 --
23          (Simultaneous talkers.)
24          MR. LEE:  -- argumentative.
25          MR. SCHINDLER:  You are being
```



Page 126

1          argumentative.  That's the problem.  She

2          answered your question and you turned around

3          and said she didn't answer it.

4    BY MR. LEE:

5          Q.  Ms. Polich, I'm not asking you about

6    regulatory requirements.  I'm not asking about

7    verifying codes.  I'm asking you:  Is there an

8    obligation, regulatory or not, that codes submitted

9    to CMS need to be supported by the medical records?

10         A.  I don't know that.

11         Q.  Isn't that what that top line in this

12   PowerPoint by Reden & Anders is trying to train you?

13         MR. SCHINDLER:  Objection.  Calls for

14         speculation.  Asked and answered and no

15         foundation.

16         THE WITNESS:  I do not know the -- what

17         they were thinking or anticipating with this

18         and this was not a presentation to us.  This

19         was not a training to us.  This was a

20         presentation that they would be using with

21         external clients.

22   BY MR. LEE:

23         Q.  When you say a minute ago that it was

24   presumed that the codes would be accurate, do you

25   have any understanding as to whether or not there was



Page 255

                            CERTIFICATE

1                           CERTIFICATE

2

3    STATE OF GEORGIA:

4    COUNTY OF FULTON:

5

6            I hereby certify that the foregoing

7    transcript was taken down, as stated in the caption,

8    and the colloquies, questions, and answers were

9    reduced to typewriting under my direction; that the

10   transcript is a true and correct record of the

11   evidence given upon said proceeding.

12           I further certify that I am not a relative

13   or employee or attorney of any party, nor am I

14   financially interested in the outcome of this action.

15           This the 3rd day of October, 2022.

16

17

18

19   _____

20           Marsi Koehl, CCR-B-2424

21

22

23

24

25



3398

Page 256

```
1                         DISCLOSURE
2
3    STATE OF GEORGIA:
4    COUNTY OF DEKALB:
5              Deposition of CYNTHIA POLICH.
6              Pursuant to Article 8.B. of the Rules and
     Regulations of the Board of Court Reporting of the
7    Judicial Counsel of Georgia, I make the following
     disclosure:
8
               I am a Georgia Certified Court Reporter
9    acting as an agent of Magna Legal Services, who was
     contacted by the offices of US DOJ, to provide court
10   reporting services for this deposition.  I will not be
     taking this deposition under any contract that is
11   prohibited by O.C.G.A. 15-14-37 (a) and (b).
12             Magna Legal Services, has no contract to
     provide reporting services with any party to the case,
13   any counsel in the case, or any reporter or reporting
     agency from whom a referral might have been made to
14   report this deposition.  Magna Legal Services, will
     charge its usual and customary rate to all parties in
15   the case, and a financial discount will not be given
     to any party to this litigation.
16
17
18
19   _Marsi Koehl_
20    Marsi Koehl, CCR-B-2424              Date: 10/4/22
21
22
23
24
25
```



**EXHIBIT D-135**

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel.
BENJAMIN POEHLING,

        Plaintiffs,

vs.

                                        No.
UNITEDHEALTH GROUP, INC., et al.,       16-08697 FMO

        Defendants.


VIDEOTAPED DEPOSITION OF TIMOTHY RENJILIAN
March 21, 2024, 9:07 a.m.
Alston & Bird
One Atlantic Center
1201 West Peachtree Street
Suite 3800
Atlanta, Georgia


Michelle R. Lowe, RPR, CCR-2748



3401

Page 76

1    beneficiary level payments?

2            MR. JONES:  Objection.  Form.

3        A    No, not during the time period that we're

4    talking about.  So I don't believe that CMS did

5    extrapolate results and -- and seek recoupment at

6    all.

7    BY MR. MASON:

8        Q    Has CMS ever extrapolated RADV results?

9        A    Yes.

10       Q    When?

11       A    In the CON11 to 13 years.  There were

12   extrapolations that were done and reported out.

13       Q    You mean that CMS calculated what an

14   extrapolation would look like, but they didn't

15   actually recoup payments based on extrapolated

16   results; right?

17       A    That's right.  But you asked me if

18   extrapolations had been done and they did calculate

19   extrapolations.

20       Q    So, just to be clear, CMS, in your view,

21   has extrapolated RADV results, but they've never

22   recouped payments based on extrapolation?

23           MR. JONES:  Objection.  Form.

24       A    Yeah, they have done extrapolation

25   calculations based on the results of their RADV



Page 77

1    audits and have not sought to recoup any excess

2    payments or to make whole any underpayments.

3    BY MR. MASON:

4         Q    And you mentioned that in RADV the MAOs

5    can submit up to five medical records for each

6    member-HCC that's part of the RADV sample?

7         A    That's my understanding, yes.

8         Q    And the MAO gets to choose those medical

9    records from the beneficiary's entire medical

10   history throughout the year?

11        A    That's my understanding is that they

12   submit what they think are the -- you know, five

13   best records to support that HCC.

14        Q    And they can choose any medical record

15   from throughout the year for that beneficiary?

16             MR. JONES:  Objection.  Form.

17        A    That meets the other criteria of being a

18   face-to-face encounter from an appropriate provider.

19   I mean, so there's -- there's more to it than that,

20   but, generally speaking, yes.

21   BY MR. MASON:

22        Q    And to -- to be included in a RADV

23   audit -- well, CMS selects a sample of MAO's members

24   to be included in a RADV audit; right?

25        A    Yes.  They have a -- their methodology was



3403

Page 78

1    fairly complicated and it's changed over time,

2    but -- but at a sort of basic level, yes, they're

3    reviewing some sort of sample of -- of MAO members.

4        Q    Have you analyzed how CMS selects the

5    sample?

6        A    Analyzed would probably not be the word

7    that I use.  I have reviewed information about that.

8    I -- it -- as I said, it's complicated.  I just

9    reviewed it to get a general understanding of -- of

10   how they do things, but I -- I couldn't give you an

11   exhaustive, you know, outline of exactly how they

12   selected their member samples in each year.

13       Q    Do you have any expert opinions about the

14   statistical properties of the samples -- the RADV

15   samples?

16            MR. JONES:  Objection.  Form.

17       A    I haven't rendered any statistical

18   opinions.

19   BY MR. MASON:

20       Q    Do you -- do you have any expert opinions

21   about -- that relate to how CMS selects the RADV

22   sample?

23            MR. JONES:  Objection.  Form.

24       A    I don't have -- I don't believe I have

25   such opinions, you know, expressed as opinions



Page 131

1    you know, in particular here is as rebutting the

2    presumption that diagnosis codes not independently

3    identified by a chart reviewer were necessarily

4    unsupported.

5        Q    Okay.  And, likewise, you're not offering

6    an expert opinion that the 55 percent that you

7    calculated for the Garthwaite RADV overlap should be

8    applied to the entire population of the Garthwaite

9    delete list; right?

10       A    Again, I'm using that principally to rebut

11   Dr. Garthwaite's presumption that the codes on his

12   delete list were necessarily unsupported.

13       Q    So you agree then that you're not offering

14   an expert opinion that the 55 percent rate that you

15   calculated for the Garthwaite delete list should be

16   applied across the entire Garthwaite delete

17   population?

18       A    Well, when you say should be applied, I

19   mean, I think it's -- as I've, I think, termed it in

20   my report -- it's an instructive basis on which to

21   think about that grouping, but it's not a

22   statistically valid extrapolarable [sic] rate that

23   you could say with any sort of mathematical

24   confidence reflects, you know, anything about the

25   larger population of Garthwaite deletes.



Page 132

1      Q    If one were to opine that the validation

2  rate of 55 percent from the Garthwaite RADV overlap

3  that you calculated should be applied to the entire

4  Garthwaite delete list, then that would also mean

5  that 45 percent of the diagnosis codes on

6  Garthwaite's list map to member-HCC combinations

7  that would not be validated in RADV; right?

8           MR. JONES:  Objection.  Form.

9      A    Well, as I've said, I don't think the RADV

10  overlap can statistically or mathematically be

11  extrapolated to any population, which means just as

12  I wouldn't assert that that means that some certain

13  percentage of the codes are supported, it would be

14  inappropriate to conclude that that definitively

15  means that some certain percentage of the codes were

16  not supported.  And that's -- I think that's

17  important.

18           Nonetheless, my view, just based on what

19  we have in the RADV overlap, that some of the HCCs

20  to which the questioned diagnoses map were found to

21  be validated definitively rebuts Dr. Garthwaite's

22  presumption that the codes on his list are

23  necessarily unsupported, but you can't do the

24  converse and say, and here's the percentage that is

25  or is not supported.



Page 133

1          I think the other thing I would just throw

2      in there is that the RADV results, you know, are

3      also subject to appeal.  So we don't know whether or

4      to what extent the RADV audit findings might be

5      changed by appeals that United might pursue, and I

6      haven't seen that data.

7      BY MR. MASON:

8          Q    In your experience, is 45 percent of a

9      RADV audit not validating considered high?

10         MR. JONES:  Objection.  Form.  Foundation.

11     Misstates the testimony.

12         A    I don't -- I don't think there's enough

13     information here to make a judgment about that, one

14     way or the other.

15         I mean, at some level, right, if you did

16     enough work, you could find a population that had an

17     error rate of 100 percent, right, if you went all

18     the way through and did everything you needed to do.

19     That, to me, probably isn't the relevant way to

20     think about an error rate and there's not an

21     absolute standard as to what sort of error is too

22     high or not high enough.  There's judgment inherent

23     in those determinations.

24         So I don't have a clear answer for you on

25     that.



Page 189

1    this litigation?

2         A     Well, I think the 1.9 million is this

3    artificial subset that exists only in this

4    litigation so --

5         Q     Well, I'm only asking because you said

6    that you're not aware in the context of this

7    litigation and I wanted to make sure that you

8    weren't leaving something out of your answer.

9              So you're not aware of anyone inside or

10   outside of this litigation doing any analysis

11   whether the -- the remaining 1.9 million diagnosis

12   codes on Garthwaite's delete list, other than the

13   375, are supported at the diagnosis code level by

14   any charts?

15             MR. JONES:  Objection.  Form.

16             And you just interrupted an answer

17   midstream; so I'm going to ask you to let the

18   witness continue his answers.

19        A     I am not aware of any such review.

20   BY MR. MASON:

21        Q     Thank you.  I'm sorry if I interrupted; I

22   thought you were done with your answer.

23        A     No offense.

24        Q     Great.

25             As to that remainder -- and when I say the



Page 190

1    remainder, I mean the 1.9 million, approximately,

2    diagnosis codes on Garthwaite's list, less the 375

3    diagnosis codes that you say were validated in RADV.

4            So as to that remainder, can you identify

5    any specific diagnosis codes that are supported

6    either at the diagnosis code level or the member-HCC

7    level by any chart?

8            MR. JONES:  Objection.  Form.

9        A    It's not something I've undertaken; so I

10   can't.  And the reason is that it's not germane to

11   my opinion.  You know, my understanding is that

12   neither Dr. Garthwaite, nor anybody else on that

13   side of -- of this matter has done that either to

14   demonstrate that these codes are, in fact,

15   unsupported.

16   BY MR. MASON:

17       Q    And you don't believe it's appropriate to

18   extrapolate the 55 percent validation rate to that

19   1.9 million remainder; right?

20           MR. JONES:  Objection.  Form.  Asked and

21   answered.

22       A    That's correct.  As a statistical or

23   mathematical matter, I don't think that's an

24   extrapolarable ratio.

25   BY MR. MASON:



3409

Page 191

1      Q    And of the 375 that you've identified as

2    validated in RADV, how many did RADV determine the

3    same specific diagnosis code that United submitted

4    was supported by any medical chart?

5           MR. JONES:  Objection.  Form.  Asked and

6    answered.

7      A    I believe this hearkens back to our -- our

8    discussion before the break that it's -- it's not

9    possible to determine which specific diagnosis codes

10   the RADV auditors -- meaning, in terms of which

11   specific member, provider, date of service

12   combination on a particular chart were reviewed or

13   given what weight or consideration by the RADV

14   auditors.  So I don't know.

15   BY MR. MASON:

16     Q    And you also can't say whether any of

17   those 375 RADV found support for the specific

18   diagnosis code that United submitted; right?

19          MR. JONES:  Objection.  Form.  Asked and

20   answered.

21     A    Well, as we talked about previously, the

22   RADV auditors -- each one of those codes was either

23   found to be supported by the RADV auditors or is

24   moot.

25   BY MR. MASON:



3410

Page 237

1        A    That's correct.

2        Q    And so you don't have any information

3    about any specific unsubmitted but valid diagnosis

4    for any of the members on Garthwaite's deletes --

5             MR. JONES:   Objection.

6    BY MR. MASON:

7        Q    -- right?

8             MR. JONES:   Form.

9        A    The only information I have specifically

10   on valid but un -- or supported but unsubmitted

11   diagnosis codes would be what's contained within

12   United's systems, specifically those unsubmitted

13   codes with an X19 designation, as -- as one example.

14   BY MR. MASON:

15       Q    The ones that Garthwaite accounted for?

16       A    Yes.

17       Q    In Paragraph 43, you mention -- this is

18   what you wanted to talk about earlier; right -- that

19   13 of the 15 United contracts reviewed in the

20   CON11-13 RADV audits were found to have net

21   underpayments.

22             That's -- that's your statement; right?

23       A    That's correct.

24       Q    Your understanding is that this was a

25   finding by CMS?



3411

Page 238

1      A    This was the publicly disseminated result

2  of their audits.

3      Q    Your understanding is that these results

4  were publicly disseminated?

5      A    Well, I know that they were reflected

6  within a RADV audit summary that -- that I have

7  referenced in my report.  I don't actually recall

8  whether that was generally publicly available,

9  available only through a FOYA request.  I don't

10 recall exactly how it was obtained.

11     Q    Why -- why did you refer to it as publicly

12 disseminated?

13     A    Well, I apologize if that's a

14 misstatement.  My understanding was that that

15 information is available and it's been incorporated

16 into my work.

17     Q    Okay.  So your understanding is that this

18 was a finding by CMS?

19     A    Yes, that the results of their RADV audits

20 showed that 13 of those 15 contracts had negative

21 net recovery amounts or negative recovery amounts.

22     Q    And do you have an understanding whether

23 that result was finalized by CMS?

24          MR. JONES:  Objection.  Form.

25     A    I don't know what the current status is or



3412

Page 239

1   whether any appeals that United may have pursued

2   with respect to the findings of that -- of those

3   audits, you know, may also impact those results.  So

4   I don't know.

5   BY MR. MASON:

6       Q    You don't know that CMS considers those

7   preliminary results?

8            MR. JONES:  Objection.  Form.

9       A    I do under -- I guess I do understand that

10  they are not final-final.  My corresponding

11  understanding would be that they're not likely to

12  get worse from the MAO's perspective, but, rather,

13  that they are open to an appeal process that can be

14  initiated by the MAOs which may reverse some of the

15  adverse findings from those audits.

16  BY MR. MASON:

17      Q    So let me just back up.

18           Do -- do you have an under --

19  understanding whether these results were finalized

20  by CMS?

21           MR. JONES:  Objection.  Form.  Asked and

22  answered.

23      A    I don't believe that they were

24  final-final.

25  BY MR. MASON:



3413

Page 240

1       Q       You don't believe that they were

2   final-final?

3       A       Correct.

4       Q       Is final-final different than final?

5               MR. JONES:  Objection.  Form.  Asked and

6   answered.

7       A    I -- there are often things that are final

8   and then there's some other process that goes

9   beyond.  So what I meant to say is that I don't know

10  that the ultimate adjudication of all of the

11  findings within those audits is fully and once and

12  for all complete.

13  BY MR. MASON:

14      Q    And what are you basing it on that -- that

15  the result -- what is the -- what is the basis for

16  your statement that -- about the degree to which

17  these results were finalized?

18              MR. JONES:  Objection.  Form.

19      A    I don't recall specifically and I don't

20  have the document in front of me, but I just -- my

21  recollection from my work is that they were not

22  ultimately final.

23  BY MR. MASON:

24      Q    Can you -- is it in your report somewhere

25  that we can reference?



```
 1                CERTIFICATE OF COURT REPORTER

 2

 3    STATE OF GEORGIA:

 4    COUNTY OF COBB:

 5

 6           I hereby certify that the foregoing

 7    transcript was taken down, as stated in the caption,

 8    and the questions and answers were reduced to

 9    typewriting under my direction; that the foregoing

10    355 pages represent a true and correct transcript of

11    the evidence given upon said proceeding.

12

13           This the 24th day of March 2024.

14

15

16                                        _____

17           MICHELLE LOWE, RPR, CCR-2748

18

19

20

21

22

23

24

25
```

**EXHIBIT D-136**

Page 1

                UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF CALIFORNIA
                     WESTERN DIVISION


UNITED STATES OF AMERICA      )   No. 16-08697 FMO
ex rel. BENJAMIN POEHLING,    )
                              )
             Plaintiffs,      )
                              )
v.                            )
                              )
UNITEDHEALTH GROUP, INC.,     )
et al.,                       )
                              )
             Defendants.      )
_____)



               *** CONFIDENTIAL ***
         CONTAINS ATTORNEYS' EYES ONLY PORTIONS
        Videoconference Videotaped Deposition OF
                    JEFF RENSHAW
                  (Taken virtually)
                  9:30 a.m. Eastern
              Wednesday, August 24, 2022



        REPORTED BY:  Christine A. Taylor, RPR

                Magna Legal Services
                   866-624-6221
                 www.MagnaLS.com



3417

Page 13

1          A.    Three.

2          Q.    Was it in person or remote?

3          A.    I didn't meet with all -- sorry.  I

4    didn't meet with all three each time, but we met

5    three times.

6          Q.    Great.  Okay.  And how -- for how long

7    would you say total you met?

8          A.    8 hours and 47 minutes.

9          Q.    You're precise.  Okay.

10          A.    I got done -- we got done a little bit

11    early yesterday.

12          Q.    Love it.  All right.  That's memorable

13    when you get to finish up early.

14          A.    Yes.

15          Q.    Okay.  And did you -- when you were

16    preparing, did you review any documents?

17          A.    Yes.

18          Q.    And did any of them refresh your

19    recollection of events that we may speak about

20    today?

21          A.    Certain parts of certain documents did

22    refresh my recollection.

23          Q.    Great.  And did you speak with anyone

24    else about this deposition?

25          A.    I notified my boss and my team that I



Page 14

1     was being deposed today, but beyond that, you

2     know, I didn't provide any specifics about the

3     subject matter.  Just wanted them to know that I

4     wouldn't be available.

5           Q.   Great.  Okay.  And no one else beyond

6     that?

7           A.   No.

8           Q.   Okay.  Where are you currently

9     employed?

10          A.   I work for Department of Health and

11    Human Services, Office of Inspector General in the

12    Office of Audit Services.  I'm --

13          Q.   And is --

14          A.   Sorry.

15          Q.   No, no, please.  I'm sorry to cut you

16    off.  Go ahead.

17          A.   I was just going to say I'm currently

18    working in Region 5, which is kind of like our

19    Chicago, Midwest region.

20          Q.   And is Office of the Inspector General

21    referred to as OIG?

22          A.   Yes.

23          Q.   So you'll understand today if I say

24    OIG, that's what I'm referring to?

25          A.   Yes.



Page 15

```
 1          Q.   And then same thing, is it okay if I
 2    say OAS, you'll understand I mean Office of Audit
 3    Services?
 4          A.   I will.
 5          Q.   Great.  And how long have you worked
 6    at OIG?
 7          A.   Since summer of 2002.
 8          Q.   Wow, okay.  So 30 -- 30 years; is that
 9    right?
10          A.   No.  I wish.
11          Q.   20.  My math is bad.
12               MS. GLOVER:  20.
13               THE WITNESS:  It's about 20 years.
14    BY MS. ZUCKERMAN:
15          Q.   You can tell why I'm a lawyer.
16               20 years.  Okay.  Well,
17    congratulations.  That's a long time.
18          A.   Thank you.
19          Q.   Okay.  And what does OIG do, just big
20    picture?
21          A.   Well, we do a number of things.  I
22    mean, we do audits.  We do evaluations.  We've got
23    legal counsel.  We have investigators.  And our
24    mission is to sort of look at fraud, waste, and
25    abuse in HHS programs such as Medicare, Medicaid,
```



Page 16

1     and others.
2             Q.   Great.  Okay.  And which -- you said
3     you worked for -- you said you work for OAS;
4     right?
5             A.   That's correct.
6             Q.   How is OAS organized?
7                  MS. GLOVER:  Objection.  Vague.  You
8             can answer.
9                  THE WITNESS:  Okay.
10                 MS. GLOVER:  If you're able to, you can
11            answer.
12                 THE WITNESS:  Sure.
13                 MS. GLOVER:  Even when I object, it's
14            okay.
15                 THE WITNESS:  We have a headquarters
16            and we've got regions.  Headquarters is --
17            is the question how is -- how is OAS
18            organized; is that correct?
19    BY MS. ZUCKERMAN:
20            Q.   Yeah, let me rephrase.  The question
21    is just -- is what I'm trying to do is get a sense
22    of so there's the regions and how do they fit
23    together with HQ, just sort of what are the
24    different components that make up OAS?
25            A.   Yeah, so there are regions.  There's a



Page 97

1    established by our risk adjustment system.  The

2    chart validation tested the provider's deviation

3    from that benchmark, codes found to be inaccurate

4    or incomplete through chart validations were

5    deleted."

6            Did I read that right?

7        A.    I believe so, yes.

8        Q.    Okay.  Is your understanding that here

9    PacifiCare was explaining its chart validation

10   process?

11       A.    Yes.  This is -- this is a description

12   of the chart validation process.

13       Q.    And what was your understanding of

14   PacifiCare's chart validation process?

15       A.    So my understanding of the chart

16   validation process was that for providers that

17   PacifiCare paid on a capitated basis, so as

18   opposed to a provider that it would pay on a

19   fee-for-service basis, that -- and providers of a

20   certain size, I believe.  And I don't remember

21   right now how to determine that certain size.

22   Some review of diagnosis -- the support for

23   diagnosis codes would be done.

24            So for certain diagnosis codes that a

25   capitated provider submitted to PacifiCare, it



Page 98

```
 1    would review those diagnosis codes to determine
 2    whether they were supported by medical records.
 3         Q.   Okay.  So fair to say you understood
 4    that PacifiCare was only performing chart
 5    validation for a subset of providers?
 6         A.   That's correct.
 7         Q.   And you understood that PacifiCare was
 8    not auditing or validating every code that it
 9    submitted to CMS?
10         A.   Yes.  That was -- that was -- that was
11    clear and made -- you know, made sense that they
12    wouldn't review everything.
13         Q.   And what do you mean by it made sense?
14         A.   Well, I don't think that it would be
15    reasonable to expect a Medicare Advantage
16    organization to determine whether every single
17    diagnosis submitted to CMS is supported to have a
18    good -- I mean, I don't think a good compliance
19    program would require that level of review.
20         Q.   And has it ever been your
21    understanding that CMS required plans to conduct a
22    review of every code submitted?
23              MS. GLOVER:  Objection.  Form.
24              THE WITNESS:  I've never --
25              MS. GLOVER:  Go ahead.
```



Page 99

1            THE WITNESS:  I've never seen anything
2        that makes me think that CMS would expect a
3        plan to review every diagnosis that it
4        submits for -- to review medical record
5        documentation in support of every diagnosis
6        that it submits.
7    BY MS. ZUCKERMAN:
8        Q.   So continuing in this very long
9    paragraph, it says, "In contrast, a chart review
10   involved review of the diagnoses reflected in a
11   selected provider's patient charts to determine if
12   any documented diagnoses had not been reported to
13   CMS.  Following a chart review, we submitted to
14   CMS any new codes documented in the medical chart
15   but did not determine whether the codes previously
16   reported to CMS were documented in the medical
17   record."
18           Do you see that?
19       A.   Yeah.  Can I just review that real
20   quick?  At first I didn't see where you started
21   reading, so I would like to just review that bit
22   myself, if that's okay.
23       Q.   Of course.  Take your time.  Yeah,
24   just tell me when you're ready.
25           MS. GLOVER:  And, Naomi, I think you



Page 100

1          started with "in contrast."

2                    MS. ZUCKERMAN:  Yeah.  Did I get that

3          wrong?

4                    MS. GLOVER:  No, no, no.  I think I

5          also had trouble catching up to where you

6          were in the paragraph.  I think maybe you

7          started with "in contrast" if you want to

8          start there, Jeff.

9                    MS. ZUCKERMAN:  Yeah, "in contrast."

10         It's about halfway through the big block.

11                   THE WITNESS:  Great.  I see it.  Thank

12         you.

13                   Okay.  Right.  Thank you.

14    BY MS. ZUCKERMAN:

15         Q.   What did you understand PacifiCare to

16    be explaining about its chart review program here?

17         A.   I think that what PacifiCare was

18    explaining is that it's possible that there are

19    diagnoses that are relevant to the payment model

20    like I described earlier this morning, that it

21    doesn't specifically receive from the provider.

22    And so this chart review process, the purpose of

23    it would be to determine whether there's any

24    relevant diagnoses that PacifiCare could submit to

25    CMS because it's supported by the medical record



Page 101

1    despite the fact that a provider had submitted

2    that diagnosis directly to PacifiCare.

3         Q.   And stepping away from what PacifiCare

4    said here, did you have an understanding at this

5    time of, I think you said, there might be

6    diagnoses relevant to the payment model but that

7    the provider had not submitted.  Were you aware of

8    why it would be that some providers might not

9    submit all of the diagnoses that might exist in a

10   patient's chart?

11             MS. GLOVER:  Objection.  Calls for

12        speculation.

13             THE WITNESS:  And I don't know.  I

14        mean, I can imagine there would be

15        circumstances where that would be the case,

16        but I don't really know what they would be.

17   BY MS. ZUCKERMAN:

18        Q.   Were you aware of differences between

19   fee-for-service providers and providers that

20   received payment on a capitated basis in terms of

21   the completeness of coding that they would do for

22   a patient's chart?

23             MS. GLOVER:  Objection.  Form.

24             THE WITNESS:  I don't -- I don't know.

25   BY MS. ZUCKERMAN:



Page 102

```
 1          Q.    Okay.  And returning to the document
 2    here, did you understand PacifiCare to be saying
 3    that when PacifiCare did a chart review, they were
 4    only looking to add codes that had been missed by
 5    the provider rather than also validating any codes
 6    that had been previously submitted?
 7          A.    It was my understanding that this
 8    would have been sort of a look for new codes,
 9    meaning ones that hadn't been submitted before.
10          Q.    Was it clear to you that from this
11    submission that PacifiCare was not conducting
12    validation of codes when it was doing that
13    process?
14          A.    Was it clear to me that PacifiCare was
15    not doing validation of codes as part of its chart
16    review process?
17          Q.    Yeah.
18          A.    I don't know whether this is based on
19    my knowledge or an assumption, but I would assume
20    it was only submitting new codes that it had
21    determined were supported by medical record.
22          Q.    And if you look maybe two-thirds of
23    the way down, do you see where the sentence
24    beginning follow a chart -- "following a chart
25    review"?
```



Page 103

```
 1          A.    Yes.
 2          Q.    Do you see where it says, "Following a
 3    chart review, we submitted to CMS any new codes
 4    but did not determine whether the codes previously
 5    reported to CMS were documented in the medical
 6    record."
 7                MS. GLOVER:  Objection.  Misstates the
 8          document.
 9                THE WITNESS:  I didn't hear the
10          objection.  Maybe it doesn't matter.
11                MS. GLOVER:  It's okay.  I think the
12          court reporter hopefully caught it, but,
13          yeah, you can go ahead and answer.
14                THE WITNESS:  Okay.  And what was your
15          question about this sentence?
16    BY MS. ZUCKERMAN:
17          Q.    My question was whether you could see
18    that it said -- whether you could said that you --
19    PacifiCare had written here, "We did not determine
20    whether the codes previously reported to CMS were
21    documented in the medical record."
22          A.    Yes, I see that.
23          Q.    So is it fair to say that PacifiCare
24    explained to OIG here that as part of its chart
25    review, it was not also determining whether codes
```



Page 104

1     previously reported to CMS were documented in the

2     medical record?

3               MS. GLOVER:  Objection to form.

4               THE WITNESS:  That's clear -- yeah,

5          that's clear.  That's sort of -- that's

6          been my understanding of this all along.

7     BY MS. ZUCKERMAN:

8          Q.   Okay.  So, in other words, PacifiCare

9     was transparent about that as far as the purpose

10    of its chart review program and what it was or was

11    not doing in terms of validating diagnosis codes?

12              MS. GLOVER:  Objection.  Asked and

13         answered.

14              THE WITNESS:  My understanding of the

15         chart review process is that it was focused

16         on identifying new supported diagnosis

17         codes that are relevant to the payment

18         model for submission to CMS.

19    BY MS. ZUCKERMAN:

20         Q.   And that specifically PacifiCare did

21    not determine whether the codes previously

22    reported were documented in the medical record;

23    right?

24              MS. GLOVER:  Objection.  Asked and

25         answered.



Page 105

```
 1                    THE WITNESS:  It's clear from this
 2            response to me that CMS wouldn't have been,
 3            as part of its chart review process,
 4            attempting to validate diagnoses that had
 5            already been submitted to CMS.
 6     BY MS. ZUCKERMAN:
 7            Q.   And when you just said "CMS wouldn't
 8     have been as part of its chart review process,"
 9     did you mean PacifiCare?
10            A.   Thank you.  Yes, that's what I meant.
11            Q.   Okay.  Let's -- I'm going to introduce
12     another exhibit that's been previously marked,
13     which is Exhibit 1126-1 and 1126-2.  Just let me
14     know when you can see those.
15            A.   Sure.  I'm looking at the e-mail that
16     Juliet sent to Lisa and me and copied Cheryl on, I
17     guess after we went to Minneapolis.
18            Q.   Yeah.  So this is a December 8, 2009,
19     e-mail from Juliet Lo to you, Lisa Lara, and
20     Bradley Smith copying Cheryl Blackmon regarding
21     the meeting with Paul Bihm?
22            A.   Yes, that's correct.
23            Q.   And Ms. Lo writes, "Attached is the
24     write-up from 12/2 with Paul Bihm."
25                    "It was good to meet you all last
```



Page 106

1    week," she says, also, above.

2              Is this -- is it your understanding

3    that this is referring to the meeting in Minnesota

4    that you referenced earlier?

5         A.    The -- when she talks about meeting

6    with us last week, that is what she's referring to

7    as our time in Minnesota on this audit.

8         Q.    Okay.  And do you recall Juliet Lo

9    taking notes at that meeting?

10        A.    I don't specifically remember her

11   taking notes.  I would have expected that she was,

12   and it appears that she must have.

13        Q.    Do you recall if anyone else took

14   notes during the meeting?

15        A.    Again, I don't have specific memories

16   of people taking notes, but I would have expected

17   Lisa and Brad to be taking notes.

18        Q.    And do you remember if you would have

19   taken notes?

20        A.    So I was -- I'm -- I was doing most of

21   the -- asking most of the questions, as I recall,

22   during the meetings that we had with PacifiCare

23   officials, and I don't -- I don't recall taking

24   notes.  You know, I -- it would have been typical

25   for me in a situation like this to remind my team



Page 218

1                    CERTIFICATE OF REPORTER

2

3          I, Christine A. Taylor, Certified
   Court Reporter within and for the State of
   Georgia, do hereby certify:

4

5          That the foregoing deposition was
   taken before me on the date and at the time and
   location stated on Page 1 of this transcript; that

6  the deponent was duly sworn to testify to the
   truth, the whole truth and nothing but the truth;

7  that the testimony of the deponent and all
   objections made at the time of the examination

8  were recorded stenographically by me and were
   thereafter transcribed; that the foregoing

9  deposition as typed is a true, accurate and
   complete record of the testimony of the deponent

10 and of all objections made at the time of the
   examination to the best of my ability.

11

12         I further certify that I am neither
   related to nor counsel for any party to the cause
   pending or interested in the events thereof.

13 Witness my hand, this 28th day of August, 2022.

14

15

16     _____
          *Christine A. Taylor*

17        Christine A. Taylor, RPR
          CCR-4736

18

19

20

21

22

23

24

25



3432

**EXHIBIT D-137**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


UNITED STATES OF AMERICA, ex rel. ) No. 16-08697 FMO
BENJAMIN POEHLING,                )
                                  )
          Plaintiffs,             )
                                  )
v.                                )
                                  )
UNITEDHEALTH GROUP, INC., et al., )
                                  )
          Defendants.             )
_____ )



CONFIDENTIAL

CONTAINS ATTORNEYS' EYES ONLY PORTIONS

Videotaped Deposition of

CHERI RICE

Given Remotely

Wednesday, August 3, 2022

9:01 a.m. Eastern



Reported by:  Karen K. Kidwell, RMR, CRR



Magna Legal Services
866-624-6221
www.MagnaLS.com



3434

Page 16

1          A.   I have not.

2          Q.   Let me turn to your -- your position and

3     your background.  Can you -- can you tell us where

4     you currently work and what your position is?

5          A.   Sure.  I currently work in the Center for

6     Medicare at CMS, so I'm the deputy director in the

7     Center for Medicare, for Medicare Advantage and

8     Part D.

9          Q.   To sort of place that in the hierarchy at

10    CMS, do you report to the -- to the director of CMS?

11         A.   I report to the deputy administrator for

12    Medicare.  So she --

13         Q.   Who is that?  I was going to ask, who is

14    that person?

15         A.   Dr. Meena Seshamani.

16         Q.   And how long have you been in the -- in

17    the position of -- of -- I think you said deputy

18    director?

19         A.   Five years.

20         Q.   Five years.  And what did you -- what did

21    you do before that?

22         A.   Before that, I was the director of the

23    Medicare Plan Payment Group, which is also in the

24    Center for Medicare.

25         Q.   And what -- and what years, roughly, were



Page 17

1    you the -- the director of the Medicare Payment --

2    Plan Payment Group?

3         A.    Seven years.  So it was approximately 2010

4    to 2017.

5         Q.    And I believe you were with -- you were

6    with that group before you were director, as the

7    deputy director; is that correct?

8         A.    That's correct.

9         Q.    And how long were you in the role of

10   deputy director at the -- the Plan Payment Group?

11        A.    Six years.

12        Q.    In your current role as the deputy

13   director, do you have oversight of the -- the Plan

14   Payment Group?

15        A.    Yes.

16             MS. McMAHON:  Objection.  Vague.  Sorry.

17   BY MR. GALLAGHER:

18        Q.    What is your responsibility with respect

19   to the Plan Payment Group today as the deputy

20   director?

21        A.    So the -- my successor in that role, the

22   director of the Plan Payment Group reports to me.  I

23   am her supervisor.

24        Q.    And who -- I'm sorry.  Go ahead.

25        A.    So I am responsible for providing them



Page 18

1    with direction, reviewing work products that they

2    develop, et cetera.

3         Q.   When you were in the role of -- of

4    director of the Plan Payment Group, who -- to whom

5    did you report?

6         A.   So I reported to -- there were multiple

7    folks in my current role:  Tim Hill, Tim Love, and

8    Cynthia Tudor.

9         Q.   In the -- like the 2010 to 2015 time

10   frame, was it Cynthia Tudor who was in your current

11   role, that you reported to?

12        A.   Yeah, I can't remember exactly when --

13   when Cynthia -- it switched from Tim Love to Cynthia,

14   but certainly in the 2015, 2014 time frame, it was

15   Cynthia.

16        Q.   Okay.  And I'm going to refer to the Plan

17   Payment Group as "MPPG," because I think that's the

18   abbreviation that you folks use, and it's easier to

19   say.

20        A.   Yes.

21        Q.   So at -- at MPPG, both as the -- the

22   director and the deputy director, did you have

23   responsibility for administering the risk adjustment

24   payment plan or payment model for Medicare Advantage

25   plans?



3437

Page 19

1       A.   Yes.

2       Q.   And did you have responsibility for

3    defining and implementing what's sometimes referred

4    to as the coding intensity adjustment?

5       A.   Yes.

6       Q.   And did you run the risk adjustment data

7    validation program and -- and have some

8    responsibility for the -- what are called the RADV

9    audits?

10          MS. McMAHON:  Objection.  Vague.

11   BY MR. GALLAGHER:

12      Q.   You can answer the question.

13      A.   Yes.  So RADV was part of the scope of

14   responsibilities in MPPG until the end of 2016.

15      Q.   And then what happened at the end of 2016?

16      A.   Then that -- the RADV audits were

17   transferred to the Center for Program Integrity in

18   CMS.

19      Q.   I've heard reference to a thing called the

20   Advance Notice.  Can you tell us what the Advance

21   Notice is?

22      A.   So the Advance Notice is a document that

23   is actually specified in statute, where we propose

24   payment changes and payment updates to the

25   methodologies for Medicare Advantage.  And we put



Page 20

1    that out for public comment, and then issue a final

2    document or rate announcement in early April each

3    year.  And so that lays out the payment policies,

4    including risk adjustment and capitation rates for

5    Medicare Advantage plans for the upcoming payment

6    year.

7         Q.   So fair to say that the Advance Notice is

8    something that -- that CMS puts out to get comment

9    from Medicare Advantage plans before, you know,

10   setting the final rules for the bid process?

11        A.   That's correct.

12             MR. BULAND:  Objection.

13   BY MR. GALLAGHER:

14        Q.   And as the -- in MPPG, did you have

15   responsibility for some part or all of that Advance

16   Notice?

17        A.   All.

18        Q.   Did you, at MPPG, have responsibility for

19   reviewing and accepting the bids that were submitted

20   by Medicare Advantage organizations?

21        A.   I did not.

22        Q.   Whose -- who had that responsibility?

23        A.   There's two pieces to the bid, bids.

24   There are the plan benefit packages, where plans lay

25   out what their benefit offerings will be.  That



3439

Page 68

```
 1                MS. McMAHON:  Go on.

 2                THE WITNESS:  All right.

 3                No.  There -- we have other longstanding

 4         requirements in the program, with our compliance

 5         program, with the attestations, with our managed

 6         care manual, where we -- where we specify that

 7         if there's an indication that the -- the

 8         diagnosis is not or may not be valid, the plan

 9         needs to make sure that they delete it if it's

10         not correct.

11    BY MR. GALLAGHER:

12      Q.   So they -- they have to delete it once

13    they determine that it's not correct?

14                MS. McMAHON:  Objection.

15                THE WITNESS:  Yes.  They -- they also have

16         to take steps, reasonable steps, if they have

17         information that would suggest that it's not

18         documented, to follow through on that.

19    BY MR. GALLAGHER:

20      Q.   Actually, there's -- there's two things

21    there that I want to unpack.

22                The first is when you have to delete, in

23    your view.  And the deletion comes when you know that

24    the code is not supported, right?  That's when that

25    obligation arises?
```



Page 69

1           MS. McMAHON:  Objection.

2           THE WITNESS:  Well, our attestation is

3       best information, knowledge, and belief.  And if

4       the plan has information that would suggest that

5       it might not be valid, then they either need to

6       delete it or they need to take steps to

7       determine that it is valid, so that they -- it

8       can stay in the system.

9   BY MR. GALLAGHER:

10      Q.   So your -- let me ask it this way:  Does

11  a -- does a Medicare Advantage plan have to confirm,

12  through record review, that there is specific support

13  for every single code that it submits for risk

14  adjustment?

15      A.   No.

16      Q.   Okay.  And do you contend that in order to

17  implement an effective compliance program, plans are

18  required to ensure that every single

19  provider-reported diagnosis code is supported?

20      A.   So no, we have not said that a plan needs

21  to check every diagnosis or medical record

22  documentation.  What we have said is that they have

23  to have a good faith effort, reasonable effort,

24  not -- we know that 100 percent is difficult to do.

25  But they have to have a reasonable program to



3441

Page 70

1    validate the accuracy of the data that they submit.

2    We aren't prescriptive about how they do that.

3         Q.   So, but -- but the answer to my question

4    is no; you -- you don't contend that in order to

5    implement an effective compliance program, Medicare

6    Advantage organizations must ensure that every single

7    provider-reported diagnosis code is supported?  You

8    don't contend that?

9         A.   Unless they have knowledge that they've

10   taken steps, and they have knowledge that there might

11   be an issue and they have to follow up on it, but no,

12   we don't say, "You have to go out and get medical

13   record documentation on every code."

14        Q.   But fair to say that everybody knows that

15   there's a certain error rate in provider-reported

16   diagnosis codes?

17             MS. McMAHON:  Objection.

18   BY MR. GALLAGHER:

19        Q.   All right.  That's -- that's sort of a

20   given, in this universe, isn't it?

21             MS. McMAHON:  Objection.

22   BY MR. GALLAGHER:

23        Q.   You can answer.

24        A.   I think -- yes, in -- no data set is going

25   to be perfect in the MA program or in the



Page 79

1    we don't get into being prescriptive there.

2        Q.    Earlier I asked you about the example of

3    sort of RADV audits and whether the knowledge of --

4    of the results of those might create some obligation

5    in subsequent years.  If a -- if a plan, for whatever

6    reason, has done its own internal audit for one year,

7    and -- and appreciated from that that there was a

8    certain rate at which their providers had, you know,

9    coded things that were not supported by the medical

10   records, does that, in your view, create an

11   obligation in subsequent years to do something?

12              MR. BULAND:  Objection.

13              MS. McMAHON:  Objection.

14              THE WITNESS:  I think there -- again,

15        the -- there is -- regardless of whether they --

16        what they found in the particular year, there's

17        a general requirement and expectation that

18        they're going to take a good faith effort to

19        validate the validity of the -- of the diagnoses

20        that they submit.

21   BY MR. GALLAGHER:

22        Q.    I'm -- I'm sort of setting aside what

23   you've described as a general expectation that --

24   that you believe exists for plans, and I -- I want to

25   ask more specifically:  Do you at CMS -- let me put



Page 80

1    it this way.

2              Have you at CMS ever taken the position

3    with plans that -- that your rules require them to do

4    something in subsequent years if they learned in an

5    earlier year that some set of codes was not

6    supported?

7              MR. BULAND:  Objection.

8              THE WITNESS:  No, we have not specifically

9         said that.

10   BY MR. GALLAGHER:

11        Q.   Do you agree that if a -- if a plan finds

12   that a code is not supported in a particular record,

13   and makes the decision to delete it, but that does

14   not actually result in a change in the amount that

15   the plan was entitled to under your model, do you

16   agree that in that scenario, there wouldn't be an

17   overpayment?

18             MS. McMAHON:  Objection.  Calls for legal

19        speculation.

20             THE WITNESS:  So they definitely need to

21        correct it.  The -- but it would not translate

22        into change in payment.

23   BY MR. GALLAGHER:

24        Q.   What I'm getting at is that -- is that you

25   can have situations where a particular diagnosis code



Page 81

1   is not supported for a particular enrollee.  But

2   deleting that doesn't affect what the plan is

3   entitled to by way of payment.  That can happen,

4   right?

5       A.   That can happen if the code -- because not

6   every code feeds into our model --

7       Q.   Right.

8       A.   -- for payment.  There are a number of

9   codes that we don't feel are predictive of future

10  costs, and so they don't -- they don't count as a

11  payment diagnosis.  So . . .

12      Q.   Right.  That would be an example where not

13  every code -- not every diagnosis, I should say --

14  impacts a beneficiary's risk score?

15      A.   That's correct.  If it doesn't feed into

16  our payment model, then it wouldn't affect their risk

17  score.

18      Q.   So Example 1 of a situation where you

19  might have a diagnosis code that is not supported,

20  and therefore might need to be deleted, but would not

21  affect payment, would be one where the code itself is

22  not for something that -- is for something that would

23  not affect the beneficiary's risk score?

24          MS. McMAHON:  Objection.  Vague.

25



Page 82

1    BY MR. GALLAGHER:

2          Q.    That would be one example?

3          A.    Yes.

4          Q.    Another example might be if you have a

5    diagnosis code that is supported by multiple records,

6    right?

7                MR. BULAND:  Objection.

8                MS. McMAHON:  Objection.  Vague.

9    BY MR. GALLAGHER:

10         Q.    Let me ask it more specifically.

11               You might -- you might have a situation

12   where a -- a diagnosis code is correctly noted in

13   Medical Record A, by Provider A, but incorrectly

14   noted in Record B, by Provider B, for whatever

15   reason.  Right?  So the -- the patient actually has

16   the condition, but -- you know, the medical record

17   for -- for one of these providers doesn't actually

18   provide support for the diagnosis.

19               That is a scenario I'm -- I'm giving you.

20   Do you understand it?

21         A.    Yes, I understand it.

22               So under our rules, a -- a beneficiary --

23   we consider the beneficiary to have the condition for

24   risk adjustment purposes.  If there's -- if it's

25   diagnosed in one -- at least one record that meets



Page 83

1    our risk adjustment requirements, so in that example,

2    say they were diagnosed in a physician setting and

3    then there was a diagnosis in a hospital setting, and

4    the hospital setting didn't meet our risk adjustment

5    requirements, if it's within the right data time

6    period and meets all the other requirements, then

7    the -- we only require one per year, so that would --

8    that would count for risk adjustment purposes.

9         Q.    Right.  Even though you might have to

10   delete the code from the unsupported setting?

11        A.    Yes.

12        Q.    You would still have -- it wouldn't affect

13   payment, because even though you have to delete the

14   code because it's not supported by Provider B, you'd

15   still have the diagnosis for that enrollee, and for

16   risk adjustment purposes, from the other provider?

17        A.    Yes.

18        Q.    Yeah.  Another -- another example might

19   be, you might have a diagnosis from like the

20   radiology record, which doesn't count, but it's

21   elsewhere supported by a physician's record or in a

22   hospital setting?

23             MS. McMAHON:  Objection.  Vague.

24   BY MR. GALLAGHER:

25        Q.    Maybe in that situation where you might



Page 84

1    have to delete it because it's not supported by the

2    radiology record, but it would still be available for

3    risk adjustment purposes?

4        A.    Yes.

5        Q.    And -- and therefore deleting it wouldn't

6    affect payment?

7        A.    Correct.

8        Q.    Do you agree that there's a difference

9    between knowing that a code is not supported by a

10   particular set of medical records and knowing that

11   that has resulted in an overpayment?

12            MS. McMAHON:  Objection.

13            THE WITNESS:  Yes.  But our -- our

14        requirements are plans need to correct their

15        diagnosis data regardless of whether there's a

16        payment impact or not.  So it's not up to them

17        to decide, "I'm not going to -- I'm not going to

18        correct this one because there's no payment

19        impact."

20            The data need to be corrected, and then it

21        will flow through our payments, and it may or

22        may not change, you know, the payment to the

23        plan.  But the -- the plan needs to submit the

24        accurate diagnosis data, and then it flows

25        through our -- you know, our payment



Page 85

1        methodology.

2    BY MR. GALLAGHER:

3        Q.    Right.   What I'm getting at is the

4    question that's kind of at issue in this lawsuit,

5    which is whether there's an overpayment.   And that's

6    a different issue than whether you need to correct

7    the data, right?

8            MS. McMAHON:   Objection.

9    BY MR. GALLAGHER:

10       Q.    You can answer.

11       A.    So -- I'm sorry, can you state your

12   question again?

13       Q.    Yeah.   What I'm trying to get at is that

14   there's a difference between whether there's an

15   overpayment, which is the -- which is what is alleged

16   to have happened in this lawsuit, and whether there

17   is simply a data correction that needs to be made for

18   a particular code or -- or set of data.

19           MS. McMAHON:   Objection.

20   BY MR. GALLAGHER:

21       Q.    Do you understand that, that distinction?

22       A.    Yes.   So there will be -- there could be

23   some set -- set of codes that get corrected and don't

24   have a payment impact.

25       Q.    Yeah.   Put another way, you can have data



Page 154

1  Number 25.

2          A.    Okay.

3          Q.    And this concerns the -- the reasons for

4  not finalizing the proposed medical record review

5  rule.

6          A.    Uh-huh.  Yes, I see it.

7          Q.    Did you have any personal involvement in

8  the -- first, the -- the decision to propose the

9  medical record review rule?

10         A.    Yes.  That was a provision that was

11 drafted by my group, the Medical Plan Payment Group.

12         Q.    And did -- and you personally oversaw that

13 process, the drafting process?

14         A.    Yes.

15         Q.    Were you involved in -- in the policy

16 decision, I'll call it, to actually propose a rule on

17 this subject?

18         A.    Yes.

19         Q.    Who else was involved in that decision,

20 from a policy standpoint?

21         A.    Jennifer Harlow.  And then we briefed our

22 policy officials.  So at the time, I think that would

23 have been Jon Blum, perhaps Sean Cavanaugh; I can't

24 remember exactly the timing.  It might -- no, it was

25 Sean Cavanaugh, I believe.



Page 155

1            And then the administrator's office.  So I
2   believe it was -- Don Berwick was the administrator
3   at the time, I believe.
4       Q.   And so was the decision to propose a
5   medical record review rule something that originated
6   from your group?
7       A.   Yes.
8       Q.   And what was the impetus for that?  Why
9   were you proposing this?
10      A.   To provide plans with some more specific
11  guidance around their -- those general obligations
12  that I described.  We were concerned that we had
13  heard that, you know, many plans were doing chart
14  reviews but not -- only looking for additionals, what
15  we call additionals; diagnoses that hadn't been
16  submitted, but they found in the medical records, but
17  then not; while they're looking at that medical
18  record, checking the accuracy of the -- of the
19  diagnoses that had already been submitted.
20           And that was concerning to us.  And so we
21  recommended proposing being more specific about
22  the -- you know, the good faith effort that a plan
23  needed to -- to undertake to live up to their
24  obligations in terms of reporting appropriate payment
25  to CMS.



Page 156

 1          Q.    Why, if you had the general obligations

 2     that you've talked about from, you know, the

 3     compliance program regulation and the subregulatory

 4     guidance that you've mentioned before, why propose a

 5     rule if you already had that?

 6               MS. McMAHON:  Objection.  Vague.

 7               THE WITNESS:  We could have left it just

 8          the way it was.  We felt like it would be

 9          helpful to be more specific, to provide some

10          more direction to the plans.

11               But, you know, it wasn't -- like I said,

12          there was this general framework in the

13          general -- general requirement.  So this was

14          just providing some more direction to the plans

15          about -- in this specific circumstance, what we

16          meant by that.

17     BY MR. GALLAGHER:

18          Q.    Before you proposed the medical record

19     review rule, did you have any specific guidance, or

20     had you provided any specific guidance to plans that

21     they were somehow obligated to look both ways, or to

22     design their medical record review processes to look

23     for deletes as well as adds?

24               MR. BULAND:  Objection.

25               MS. McMAHON:  Objection.  Vague.



3452

Page 157

1           THE WITNESS:  So we -- we do not review or

2       have plans submit to us their internal

3       procedures.  So no, we have not provided

4       guidance about what -- if a plan chose to do a

5       medical record chart review, what that had to

6       look like and what the steps were that needed to

7       be taken.  We were not specific.

8   BY MR. GALLAGHER:

9       Q.   What is the process that you have to go

10  through in order to get an approval, as a policy

11  matter, for proposing a rule like the medical record

12  review rule?

13      A.   So --

14          MS. McMAHON:  Objection.  Vague.

15          THE WITNESS:  So the -- this was a

16      provision in a much larger rule.  So it was not

17      a stand-alone rule.

18          For our rule-making, the typical process

19      is we brief our -- sequentially, the officials

20      in our chain of command.  So we brief the

21      Director of the Center for Medicare, then take

22      recommendations to the Office of Administrator,

23      and then the rule goes to the Department of

24      Health and Human Services, where it's reviewed

25      by the career and policy officials there, and



Page 158

1        then reviewed by the Office of Management and

2        Budget.

3    BY MR. GALLAGHER:

4        Q.    Was it also reviewed by somebody in the

5    Executive Office of the President?

6        A.    I do not know.  That doesn't always

7    happen.

8        Q.    So for you at MPPG, at the time, to get a

9    rule like the medical record review rule approved,

10   you had to go through this chain of command?

11       A.    Yes.

12       Q.    And then once you had gotten that

13   approval, as a policy matter, to propose this rule

14   and impose these requirements, then you would go

15   through the administrative rule-making process that

16   involves notice, comment, and -- and if -- if you get

17   it, finalization of the rule, right?

18       A.    That's correct.

19       Q.    And then in that -- in that notice and

20   comment process, you, as the -- as the -- your group,

21   as the -- as the impetus behind the rule, you're

22   involved in reviewing the comments and -- and

23   providing your comments in response, right?

24       A.    Yes.  So we review public comments, and

25   then draft the final rule providing responses to



Page 159

1  those comments in the preamble.

2      Q.   And -- and to the extent that there is any

3  decision made about whether to finalize the rule or

4  withdraw it, do you have to then go through the same

5  chain of command of policymakers that you went

6  through to propose the rule in the first place?

7      A.   So, yes.  The final rule then goes through

8  the clearance process, where policy officials are

9  briefed on the comments, and any recommendations for

10 finalizing or modifying or -- however, you know,

11 whatever the scope of options for the final rule are.

12     Q.   And you have the opportunity in that

13 process to make a recommendation about whether the

14 rule should be finalized, whether it should be

15 modified, or whether it should be withdrawn?

16     A.   Uh-huh.

17          MS. McMAHON:  Objection.

18          THE WITNESS:  Yes.

19 BY MR. GALLAGHER:

20     Q.   In the case of the medical record review

21 rule, what was your recommendation after the comment

22 period?

23     A.   So we did not make a recommendation,

24 because a -- a decision was made that -- as I

25 mentioned, this -- this was a provision in a much



Page 160

1    larger rule that had some provisions that were -- got

2    a lot of stakeholder concern and pushback.  And so

3    the direction that we received was that the rule --

4    the final rule needed to include only those

5    provisions that had wide -- you know, widespread

6    stakeholder support.

7              So we did not move forward then with the

8    medical record review provision, not because we

9    didn't think it was the right thing to do or the

10   right policy, but because it had mixed reactions from

11   stakeholders.  It didn't meet those criteria, and so

12   we didn't include it in the final rule.

13       Q.   So you didn't withdraw -- you didn't make

14   the determination that the rule wasn't necessary?

15              MS. McMAHON:  Objection.

16   BY MR. GALLAGHER:

17       Q.   You made the determination that -- or

18   somebody made the determination, as a policy matter,

19   that they weren't going to go forward with it because

20   it had faced opposition?

21              MR. BULAND:  Objection.

22              MS. McMAHON:  Objection.

23              THE WITNESS:  So we didn't make a

24       recommendation one way or the other, because of

25       the decision about what the scope of the final



Page 161

```
 1        rule was going to be.
 2   BY MR. GALLAGHER:
 3        Q.   And -- and in this process, nobody made --
 4   the rule wasn't withdrawn because somebody decided it
 5   wasn't necessary?
 6             MS. McMAHON:  Objection.
 7   BY MR. GALLAGHER:
 8        Q.   Right?  It was withdrawn because somebody
 9   decided, as a policy matter, not to go forward with
10   it?
11             MS. McMAHON:  Objection.
12             THE WITNESS:  The decision was not based
13        on the merits or lack thereof of the policy
14        itself.  It was based on something entirely
15        separate from that provision.
16   BY MR. GALLAGHER:
17        Q.   Similarly, the decision wasn't made based
18   on any determination about the need for this
19   particular rule?
20        A.   Again, it was based on a decision about
21   only including provisions that were -- had widespread
22   stakeholder support, and that was the reason for not
23   finalizing it.
24        Q.   You mentioned that there was some other
25   provisions that -- that had -- that were actually
```



3457

Page 162

1   the -- the source of that concern as a policy matter.

2   What were those other provisions?

3        A.   The -- the primary one, I believe, was the

4   protected class -- proposed change to the Part D

5   protected classes.

6        Q.   So that there was -- there was, in the

7   same rule-making, a provision having to do with

8   protected class under Part D that got a lot of

9   opposition from industry, or other stakeholders?

10       A.   I don't know that it was industry, but

11  there was a lot of stakeholder concern about that,

12  about that proposal.

13       Q.   And -- and was that the impetus for the

14  policy decision not to go forward with any provision

15  of this overall rule-making that had faced

16  opposition?

17       A.   I --

18            MS. McMAHON:   Objection.   You can answer.

19            THE WITNESS:   I do not -- I wasn't party

20       to those conversations.   So I do not know.

21  BY MR. GALLAGHER:

22       Q.   Were you informed at some point that --

23  I'm sorry.   I didn't mean to cut you off.

24            Were you informed at some point that --

25  that a decision had been made not to go forward -- or



Page 188

```
 1        A.   No.

 2        Q.   Do you recall if you -- if you discussed

 3   that with Mr. Cavanaugh in your prep meeting

 4   before --

 5        A.   Yeah, again, I don't remember what we

 6   talked about.

 7        Q.   All right.  So I want to -- I want to turn

 8   to the actual meeting you had with folks from

 9   UnitedHealth on April 29th, 2014.

10             And first, let me just ask what you recall

11   about where you were for the meeting, and who was

12   present.

13             MS. McMAHON:  Objection.  Compound.

14             THE WITNESS:  So we -- we were meeting in

15        the Baltimore CMS headquarters, in Sean

16        Cavanaugh's office.  It was myself, Sean,

17        Cynthia, and I believe Julie Uebersax was there

18        as well.

19             United was on Pictel, so they were not

20        there in person.  The -- I don't remember who

21        attended from United, other than Steve Nelson.

22        I don't remember who else was there from their

23        team.

24   BY MR. GALLAGHER:

25        Q.   Had you met Mr. Nelson before?
```



Page 189

1          A.    Yes.

2          Q.    So that maybe explains why you remember

3    him being there, because he was a familiar face?

4          A.    Yes.

5          Q.    And -- and the others were not familiar

6    faces to you?

7          A.    That's right.

8          Q.    And I -- I guess I should ask:  They were

9    faces; it was some sort of video conference, right?

10         A.    Correct.

11         Q.    Do you recall what the topic of

12   discussion -- topics of discussion were at the

13   meeting on the 29th?

14              MS. McMAHON:  Objection.  Vague.

15              THE WITNESS:  So I do not remember the

16         discussion in the meeting, other than knowing

17         that it was on these topics.  I don't remember

18         what was discussed.

19   BY MR. GALLAGHER:

20         Q.    Did you take any notes during the meeting?

21         A.    Huh-uh.  I did not.

22         Q.    Have you had a chance to review any notes

23   that others took of the meeting to refresh your

24   memory about what happened?

25              MS. McMAHON:  Objection.  I will object,



Page 190

1          to the extent you're calling for information

2          discussed while she was meeting with attorneys

3          and attorney-client information that we may have

4          provided her, or she may have given us.

5                But other than that, if you can answer

6          outside of attorney-client communications . . .

7   BY MR. GALLAGHER:

8          Q.    Let me ask it differently.

9                Have you reviewed anything that

10  refreshes -- that has refreshed your recollection of

11  the meeting?

12         A.    No, not outside of what was provided to me

13  by the attorneys.

14         Q.    Well, if it's something that was provided

15  to you by the attorneys but it refreshed your

16  recollection, I'm entitled to -- to know it.  So what

17  is it you reviewed that refreshed your recollection?

18         A.    I -- I really don't remember what I said

19  in the meeting or what other people said in the

20  meeting.  All I see is the notes.

21         Q.    So maybe another way I would ask it is:

22  You may have reviewed some things, but it has not in

23  fact refreshed your recollection of the meeting?

24         A.    No.

25         Q.    Sitting here today, whatever you've



Page 191

1    reviewed, including notes, perhaps, of the meeting,

2    none of that provides you with a refreshed

3    recollection or independent recollection of what

4    happened at the meeting?

5        A.    No.

6        Q.    So if there's something in the -- in notes

7    that somebody else took, or testimony that somebody

8    else provides about what happened in that meeting,

9    sitting here today, you don't have an independent

10   recollection to confirm or deny that version of

11   events?

12           MS. McMAHON:    Objection.

13           THE WITNESS:    Yeah, again, I can't

14       remember specifically what was said in the

15       meeting, so . . .

16   BY MR. GALLAGHER:

17       Q.    Do you recall there being, at least as a

18   matter -- as a topic, some discussion of what the

19   UnitedHealth claims verification or chart review

20   program entailed?

21       A.    Again, I don't -- I don't recall.

22       Q.    Do you recall being curious and asking

23   questions about what it entailed, given the subject

24   matter of the meeting and the request that United had

25   made about having this meeting?



Page 192

 1              MR. BULAND:  Objection.

 2              THE WITNESS:  No, I don't recall.

 3    BY MR. GALLAGHER:

 4         Q.   Let me show you a document and see if it

 5    might refresh your memory.

 6              MR. GALLAGHER:  Can we have Exhibit 1061,

 7         which is Tab 11.

 8         (Exhibit 1061 was marked for identification.)

 9    BY MR. GALLAGHER:

10         Q.   So do you have that?  It should be

11    Document 15 on the list there.

12         A.   Yeah.

13         Q.   So this was a set of notes that was

14    prepared by -- by attendees from United.  So this is

15    UnitedHealth's notes, typed up.

16         A.   Uh-huh.

17         Q.   Have you seen this before?

18              MS. McMAHON:  Objection.  I'm going to

19         object, to the extent that you have -- I'm

20         sorry.  I'm going to object, to the extent that

21         your response would entail privileged

22         information.

23              So if you can answer outside of

24         conversations you've had with counsel, I think

25         you've already testified that your recollection



Page 193

1          was not refreshed with respect to anything

2          counsel may have showed you.  So -- ask you not

3          to respond to anything that you have discussed

4          with your counsel.

5     BY MR. GALLAGHER:

6          Q.   So with that instruction, can you tell me

7     whether you've seen this document before?

8          A.   Yes.

9          Q.   So there's a -- a reference -- if I go to

10    the meeting summary on the first page, and there's a

11    fourth bullet down, do you see where it says, "UHG

12    representatives provided a general overview of UHG's

13    claim verification process and explained that UHC had

14    already submitted a number of deletes for 2012 dates

15    of service as a result of that process."

16              Do you recall learning that during the

17    meeting in April of 2014?

18         A.   No.

19         Q.   Do you recall any discussion about that

20    during the meeting in April of 2014?

21         A.   No.

22         Q.   Are you in a position to -- to deny that

23    that was discussed?

24         A.   No.

25              MS. McMAHON:  Objection.



Page 194

1    BY MR. GALLAGHER:

2        Q.   And so it then says that -- here that

3    "Later in the meeting, UHG representatives informed

4    CMS that the number of new and unique diagnosis code

5    deletes already submitted was approximately 13,000."

6             Do you recall the discussion of that

7    during the meeting in April of 2014?

8        A.   No.

9        Q.   I'm going to show you another set of

10   notes.

11           MR. GALLAGHER:  This is Exhibit 1062.

12           (Exhibit 1062 was marked for identification.)

13           MR. GALLAGHER:  Which is Tab 23.

14           THE WITNESS:  Okay.

15   BY MR. GALLAGHER:

16       Q.   And we understand these to be Cynthia

17   Tudor's notes.  Do you recognize her handwriting?

18       A.   Yes.

19       Q.   And do you recognize that as -- so this --

20   do you recognize this Exhibit 1062 as having Cynthia

21   Tudor's handwriting on it?

22       A.   Yes.

23       Q.   And you see it's -- the date of the -- of

24   this planner document, or calendar, is April 29th,

25   2014, which is the date of the meeting you had with



Page 195

1    United, right?

2         A.    Correct.

3         Q.    And do you see that in these notes, in

4    Ms. Tudor's hand, there's a reference on the

5    right-hand side, under the line to something "over"

6    or something "deleted 13K."

7             Do you see that?

8         A.    Uh-huh.

9         Q.    So that would be 13,000?

10            MS. McMAHON:  Objection.  Calls for

11       speculation.

12   BY MR. GALLAGHER:

13        Q.    You recognize the abbreviation "K" as a

14   common abbreviation for "thousand"?

15        A.    Yes.

16        Q.    And would you understand that to be a

17   reference to 13,000?

18        A.    Yes.

19        Q.    The same number that's in the -- the notes

20   that we were just looking at in Exhibit 1061, right?

21   That the deletes already submitted was approximately

22   13,000?

23            MS. McMAHON:  Objection.  Calls for

24       speculation.

25            THE WITNESS:  That would --



Page 196

1    BY MR. GALLAGHER:

2        Q.    I'm not -- I'm not asking you to

3    speculate; I'm asking you to confirm that the number

4    13,000 in one set of notes is the same as the number

5    approximately 13,000 in the other set of notes from

6    the same meeting.

7                MR. BULAND:  Object.

8                THE WITNESS:  Yes.

9    BY MR. GALLAGHER:

10       Q.    Does that refresh your recollection that

11   there was a discussion that included UnitedHealth

12   describing details of its process, including the

13   number of codes that had already been deleted as a

14   result of its claims verification or chart review

15   process?

16       A.    No.

17       Q.    Does it suggest to you that the notes we

18   just looked from -- in Cynthia Tudor's hand, are in

19   fact notes of the same meeting that is being

20   referenced in -- in the notes we have in

21   Exhibit 1061?

22                MR. BULAND:  Objection.

23                MS. McMAHON:  Objection.  Calls for

24        speculation.

25                THE WITNESS:  I believe so.



Page 197

1    BY MR. GALLAGHER:

2        Q.    Now, there's a reference in -- still on

3    Exhibit 1061, on that first page, there's a reference

4    in that same Bullet Number 4, under "Meeting

5    Summary," to UHG representatives indicating that "in

6    light of the proposed rule and other discussions with

7    CMS, UHC had suspended its claims verification

8    process pending a decision by the company of whether

9    it was appropriate to submit additional deletes to

10   CMS that have been identified through the company's

11   claims verification process."

12              You see that?

13       A.    Yes.

14       Q.    Do you recall being informed by

15   UnitedHealth that they had in fact suspended this

16   program?

17       A.    Not in the meeting, no.

18       Q.    Do you recall being informed that later?

19       A.    So there was an e-mail the next day, that

20   Steve Nelson sent me, where I believe he said that in

21   the e-mail.

22       Q.    Right.  So if we could have Exhibit 1063,

23   which is Tab 12.  I think that's the e-mail you're

24   referring to.

25              (Exhibit 1063 was marked for identification.)



Page 198

1    BY MR. GALLAGHER:

2        Q.    So Exhibit 1063 is an e-mail exchange that

3    starts at the bottom of the first page with an e-mail

4    from Steve Nelson to you, on Wednesday, April 30th,

5    at 9:55 in the morning.

6             Is this the e-mail you're referring to?

7        A.    Yes.

8        Q.    And if you go to the next page, in the --

9    in the paragraph that starts, "Fifth," is -- is it in

10   this paragraph that you were informed -- or that

11   UnitedHealth had in fact suspended or stopped this

12   program, the claims verification or chart review

13   program looking for deletes?

14       A.    Yes.  Just rereading it again here.

15            Yes, so we suspended the process, yes,

16   right.

17       Q.    So you were aware of that in -- in April

18   of 2014, that whatever process UnitedHealth had, that

19   it was asking for guidance on in this meeting, it had

20   decided to suspend that process?

21       A.    Yes.

22       Q.    What do you recall learning about what,

23   you know -- actually, let me ask this differently.

24            Do you recall ever learning what

25   UnitedHealth's decision was with respect to claims



Page 199

1    that were in -- in that process that were -- that

2    were under review at the time it was suspended?

3           MS. McMAHON:  Objection.  Vague.

4    BY MR. GALLAGHER:

5       Q.   Let me be specific.  We -- we started off,

6    we talked about the topics of the meeting, and I

7    think you said that there was -- you understood there

8    to be two things in the request for meeting.  One,

9    whether they should stop -- whether they could stop

10   the program; and second, what to do with things in

11   process?

12      A.   Uh-huh.

13      Q.   So what do you recall, if anything,

14   learning about what UnitedHealth decided to do with

15   the code -- codes or charts that were in process of

16   being reviewed?

17      A.   I don't recall learning anything after

18   this e-mail exchange with Mr. Nelson about what they

19   ultimately decided.

20      Q.   And you don't -- and you don't recall

21   learning anything about that during the meeting

22   itself on the 29th?

23      A.   Right.

24      Q.   Do you recall any discussion during the

25   meeting on the 29th about what UnitedHealth's



Page 204

1    we talked about earlier, that includes within it some

2    references to what was discussed at the meeting, does

3    it not?

4        A.   Yes.

5        Q.   In particular, Mr. Nelson states, "During

6    our conversation yesterday and other recent

7    conversations, CMS confirmed to us that these

8    requirements do not apply until the effective date of

9    the rule, and that MA plans are thus not currently

10   required to design their medical record reviews to

11   determine the accuracy of risk adjustment diagnoses."

12   You see that?

13       A.   I do.

14       Q.   And I take it from your -- from the

15   discussion we've already had that you don't recall

16   whether there was such a discussion at the meeting on

17   April 29th, because you don't recall what was

18   discussed?

19       A.   Right.

20       Q.   In your e-mail responding to Mr. Nelson,

21   you don't dispute that characterization of the

22   meeting, do you?

23            MS. McMAHON:  Objection.

24            THE WITNESS:  So I -- I was very concerned

25        with his e-mail, and that fifth point, and the



3471

Page 205

```
 1              inference that somehow CMS was blessing this --
 2              these next steps that United was suggesting.
 3              And so -- I was frankly alarmed by the e-mail,
 4              and wanted to make -- respond in writing that we
 5              were not blessing what they were suggesting they
 6              were doing in Bullet 5, and that there were
 7              other laws and requirements beyond the medical
 8              record review rule that they needed to be in
 9              compliance with.
10              And so I, again, was very, very concerned
11              with this e-mail.
12    BY MR. GALLAGHER:
13       Q.   My question was, you don't dispute, in
14    your responsive e-mail, Mr. Nelson's characterization
15    of what was said by CMS and confirmed by CMS at the
16    meeting on the 29th?
17              MR. BULAND:  Objection.
18              MS. McMAHON:  Objection.  Asked and
19              answered.
20              THE WITNESS:  I think it is making clear
21              that they should not take away from that meeting
22              that we had said that it was okay to stop the
23              claims verification program, or that it was okay
24              not to continue to review and determine whether
25              those questionable diagnoses were accurate or
```



3472

Page 206

1      not.

2    BY MR. GALLAGHER:

3        Q.   In April of 2014, had you issued any --

4    had CMS issued any guidance, rules, requirements,

5    subregulatory or otherwise, that required plans to

6    conduct any medical record review?

7              MS. McMAHON:  Objection.  Asked and

8         answered.

9              THE WITNESS:  Again, not specifically.  We

10        had general requirements about compliance

11        programs, language in our managed care manual,

12        et cetera.  But in terms of a specific procedure

13        that plans were to follow to -- to meet their

14        obligations to submit correct data, no, we did

15        not have specific procedures that we were

16        telling plans to follow.

17   BY MR. GALLAGHER:

18       Q.   And in your response to Mr. Nelson, do you

19   identify any rule, regulation, subregulatory

20   guidance, you know, communication from CMS that

21   imposes an obligation to conduct medical record

22   review specifically to look for deletes?

23       A.   No.

24       Q.   Do you know -- do you identify any

25   requirements with specificity in your response?



Page 207

1              MR. BULAND:  Objection.

2              MS. McMAHON:  Objection.

3              THE WITNESS:  No.

4    BY MR. GALLAGHER:

5        Q.   So when you refer to other laws that do

6    impose standards, requirements, and responsibilities

7    on Medicare Advantage plans, you didn't provide any

8    guidance on what those other laws might be?

9              MS. McMAHON:  Objection.

10             THE WITNESS:  No.  Not in this e-mail.  I

11        mean, United signed a contract.  They're subject

12        to the regulations.  They're subject to the

13        False Claims Act.  I think that's all well

14        known.

15             So -- but no, we did not provide a laundry

16        list of all the different requirements here in

17        this e-mail.

18   BY MR. GALLAGHER:

19       Q.   Well, you knew that United had -- had come

20   to you asking, specifically with respect to this

21   program they had in place, you know, "What are the

22   requirements?  What are you -- what are you going to

23   tell us we have to do?"

24             And you had a meeting about it, and this

25   was the e-mail after the meeting, the specific



Page 208

1    purpose of which was to inquire about this program

2    and -- and what the rules were, right?

3              MS. McMAHON:  Objection.  Misstates the

4         witness's testimony.

5              MR. BULAND:  Objection.

6              THE WITNESS:  And -- and we are saying we

7         are not providing advice to United about --

8         about their next steps, but that they need to be

9         in compliance with federal laws and

10        requirements, and not --

11   BY MR. GALLAGHER:

12        Q.    Did you --

13        A.    And not to take that meeting as some kind

14   of blessing for what plan of action they -- they

15   might have laid out.

16        Q.    Did you tell them that -- that there was

17   any -- did you identify for United any rule,

18   standard, requirement, obligation imposed by you that

19   would make their proposed course of action illegal?

20             MS. McMAHON:  Objection.

21             THE WITNESS:  No, this was the -- this was

22        the sum total of the response.

23   BY MR. GALLAGHER:

24        Q.    And this response was something that was

25   actually something you cleared with the lawyers



3475

Page 238

1      they could be applicable here.

2   BY MR. GALLAGHER:

3      Q.   Let me ask -- I'm going to -- I'm going to

4   show you what was previously marked as Exhibit 330.

5           MR. GALLAGHER:  This is Tab 14, Jordan.

6      (Exhibit 330 was previously marked for

7   identification.)

8   BY MR. GALLAGHER:

9      Q.   Do you have -- as Document 19, I think --

10  Exhibit 330, which is a June 26, 2015, e-mail from

11  Mr. Nelson to you, with the subject matter "2013 CMS

12  RAF attestation"?

13     A.   Yes.  I see it.

14     Q.   Do you recall receiving this e-mail in

15  connection with United's submission of their

16  certification or attestation for the 2013 service

17  dates?

18     A.   I -- I don't recall this specifically, no.

19     Q.   If you look at the fifth bullet down, on

20  the -- at the bottom of the e-mail, do you see it

21  says, "CMS issued a proposed rule last year that

22  would have required MA plans to design any medical

23  record reviews to determine the accuracy of risk

24  adjustment diagnoses associated with those records"?

25  You see that?



Page 239

1      A.   Yes.

2      Q.   And then it says, "During our

3  conversations last year before the proposed rule was

4  withdrawn, CMS confirmed to us that the proposed

5  requirements would not apply until the effective date

6  of the rule, and that MA plans were thus not required

7  to design their medical record reviews to determine

8  the accuracy of risk adjustment diagnoses."

9           Do you recognize that as basically the

10 same language that was in the 2014 e-mail that you

11 responded to on May 2nd, 2014?

12     A.   Yes.

13     Q.   And am I right that you never responded to

14 this e-mail from Mr. Nelson disputing that

15 characterization of the advice provided by CMS?

16     A.   I don't recall if I responded or not.  I

17 don't believe I did, but I don't recall.

18     Q.   Right.  But you don't recall ever

19 disputing it one way or the other?

20     A.   Right.  Yeah, that's correct.

21     Q.   And then there's a sentence that begins

22 later, "Based on."  It says, "Based on our

23 conversations with CMS last year, CMS's withdrawal of

24 the proposed rule, and CMS's ongoing consideration of

25 a fee-for-service adjuster to address diagnoses not



3477

Page 240

1    supported by a medical record in the context of RADV,

2    we ended this process and informed you of that

3    decision."  Do you see that?

4         A.    Yes.

5         Q.    And then it says, "That decision remains

6    operative for 2013 dates of service."

7              And do you understand that to mean that

8    United is telling you here that they are not

9    conducting the same type of medical record review for

10   the 2013 dates of service that they had started and

11   stopped for the 2012 dates of service?

12             MS. McMAHON:  Objection.  Calls for

13        speculation.

14             THE WITNESS:  Yes.

15   BY MR. GALLAGHER:

16        Q.    And they then say, "In particular, we did

17   not use our previous process to determine whether

18   diagnosis codes submitted through claims are

19   unsupported in the medical record."

20             Do you recall learning that United had

21   stopped that program in 2012, and then not done it in

22   subsequent years?

23        A.    I don't recall this e-mail specifically,

24   no.

25        Q.    Now, around this time, in June of 2015,



3478

Page 241

1    you were having discussions internally at CMS, and

2    with policy officials, about how you might strengthen

3    the attestation requirement, or impose additional

4    requirements on plans concerning medical record

5    review or confirmation of support for diagnosis

6    codes, were you not?

7                MS. McMAHON:  Objection.

8                THE WITNESS:  I don't recall.

9    BY MR. GALLAGHER:

10        Q.    Let me show you Exhibit 1064, which is

11   Tab 16.

12                MR. GALLAGHER:  Jordan?

13        (Exhibit 1064 was marked for identification.)

14   BY MR. GALLAGHER:

15        Q.    So do you have Exhibit 1064, which is an

16   e-mail exchange from June 24th, 2015, involving you,

17   Ms. Harlow, Ms. Tudor, and Mr. Cavanaugh?

18        A.    Yes.

19        Q.    And so just to compare the dates,

20   Mr. Nelson's e-mail, that we were just looking at in

21   Exhibit 330, that's dated June 26th, 2015.  Your

22   e-mail at the top of Exhibit 1064 is dated two days

23   prior to that, June 24th, 2015.  Right?

24        A.    Yes.

25        Q.    So this is an exchange that is



Page 297

1                       CERTIFICATE

2

3          I, KAREN K. KIDWELL, Registered Merit Reporter,

4    and Certified Realtime Reporter, do hereby certify

5    that prior to the commencement of the examination,

6    the deponent was remotely sworn to testify to the

7    truth, the whole truth under penalty of perjury.

8          I DO FURTHER CERTIFY that the foregoing is a

9    verbatim transcript of the testimony as taken

10   stenographically by me at the time, place and on the

11   date hereinbefore set forth, to the best of my

12   ability.

13         I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of any

15   of the parties to this action, and that I am neither

16   a relative nor employee of such attorney or counsel,

17   and that I am not financially interested in this

18   action.

19

20                     _Karen Kidwell_____

21                     Karen K. Kidwell
                       Registered Merit Reporter
22                     Certified Realtime Reporter
                       Notary Public
23

24

25



3480

**EXHIBIT D-138**

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA ex rel.  ) No. 16-08697 FMO
BENJAMIN POEHLING,                 )
                                   )
        Plaintiffs,                )
                                   )
v.                                 )
                                   )
UNITEDHEALTH GROUP, INC., et al.,  )
                                   )
        Defendants.                )
_____    )

Videotaped Deposition of
DANIEL J. SCHUMACHER
Given Remotely
Tuesday, September 20, 2022
9:04 a.m. Eastern Time

Reported by:  Cindy A. Hayden, RMR, CRR

Magna Legal Services
866-624-6221
www.MagnaLS.com



3482

Page 37

1    to deal with a technical issue, please.

2                MR. MASON:  Sure.  Why don't we go off

3    the record.

4                MR. SUMMERS:  This will take one

5    second.

6                We're ready to resume.

7                MR. MASON:  That was -- that was really

8    quick.

9                THE VIDEOGRAPHER:  I'm sorry.  We're

10   going off the record.  The time is 9:36.

11               THE REPORTER:  Jeremy, I think we're

12   supposed to be on the record.

13               THE VIDEOGRAPHER:  I apologize for the

14   miscommunication.  We're on the record.  The time

15   is 9:36.

16   BY MR. MASON:

17        Q.   Mr. Schumacher, are you familiar with a

18   risk adjustment program that UHC undertook referred

19   to as "chart review"?

20        A.   Yes.

21        Q.   What is chart review?

22               MR. SUMMERS:  Objection.  Form.

23               THE WITNESS:  Can you repeat that,

24   please?

25   BY MR. MASON:



Page 38

1          Q.    What is chart review?

2          A.    Chart review is a program where we

3    would request medical records and evaluate those

4    medical records for conditions.

5          Q.    You understood chart review is a

6    program to, you said, request medical records and

7    review those medical records for conditions?

8          A.    Yes.  It's a program where we request

9    medical charts, review the medical charts for

10   appropriate diagnoses for our covered members.

11         Q.    Okay.  And the purpose of reviewing

12   those medical records for diagnoses was to see if

13   there are additional diagnoses to submit that

14   weren't included in the original provider claims?

15         A.    One -- one reason.

16         Q.    What other reason?

17         A.    We get to understand what conditions

18   members have and whether or not they have any, you

19   know, gaps in their medical care that need to be

20   addressed, but -- so we were evaluating diagnoses

21   and ensuring the accuracy of the diagnoses for our

22   members.

23         Q.    Okay.  And part of the purpose was to

24   generate revenue for UHC?

25              MR. SUMMERS:  Objection.  Form.



Page 39

1                    THE WITNESS:  The purpose was to ensure

2    accuracy of the diagnoses that were submitted to

3    CMS, which informs reimbursement, potentially.

4    BY MR. MASON:

5         Q.   Okay.  And UHC -- after requesting the

6    medical records, UHC employed coders to review

7    those medical records to -- to ascertain what

8    conditions the beneficiary has as documented in

9    that medical record?

10                   MR. SUMMERS:  Objection.  Form.

11   Foundation.

12                   THE WITNESS:  Coders would review the

13   medical chart to see what diagnoses were captured

14   in that chart.

15   BY MR. MASON:

16        Q.   And those coders were instructed to

17   identify and record every diagnosis that -- that

18   they determined was supported by that chart, right?

19                   MR. SUMMERS:  Objection.  Form.

20   Foundation.

21                   THE WITNESS:  I don't know the

22   specifics of exactly what they were supposed to be

23   doing.  Generally speaking, they looked at medical

24   charts, and with their expertise, evaluated whether

25   or not those -- what diagnoses were -- were



Page 193

1            THE WITNESS:  In the beginning?  In the

2    latter stages?  Can you --

3    BY MR. MASON:

4            Q.   Well, let's --

5            A.   Can you --

6            Q.   -- let's start in the beginning.  You

7    said -- you said there was a high-level explanation

8    of CV and then a more detailed explanation of CV,

9    right?

10           A.   Yes.

11           Q.   Let's start with the high-level

12   explanation of CV.  What was said about -- to CMS

13   about the CV process?

14           A.   Well, we articulated that we had a

15   process underway that we had been executing that we

16   had actually suspended once the proposed rule came

17   out.

18           We said -- I don't remember the exact

19   words about the program.  But it was -- the essence

20   of what we were trying to accomplish was to look at

21   where we had looked at a medical chart, confirming

22   whether or not the diagnoses reflected in -- if

23   there were any diagnoses in the claim that were not

24   reflected in that.

25           So we had a process that did that.  It



Page 194

1    had various steps.  And looking at the proposed

2    rule, that would suggest that that's something, if

3    finalized, we would have to start doing.  So our --

4    our question was, well, do we need to be doing a

5    proactive two-way look?

6          Q.    Okay.  And that was the high-level

7    explanation of CV?

8          A.    Yes.

9          Q.    And what was the more detailed

10   explanation of CV?

11         A.    The more detailed conversation about it

12   went through the various steps.  So, first, we do

13   this; then we do that.  Then it goes out -- you

14   know, ultimately, to the earlier conversation,

15   expert reviewer is one of the steps.  And so it was

16   an articulation of what happens in each of those

17   steps.

18               And then I was applying the

19   quantification around what had gone all the way

20   through all of those steps and had been submitted;

21   what had gone all the way through those steps, not

22   been submitted; and what had not completed all of

23   those steps.

24         Q.    Was anything else about the CV program

25   explained to CMS at the meeting?



1           MR. SUMMERS:  Objection.  Form.

2           THE WITNESS:  We -- we gave a

3    high-level review about what we were trying to

4    accomplish with the CV program.  And then we sought

5    clarification at the beginning of the conversation

6    as to whether or not, after having heard that,

7    whether we had a proactive obligation to do a

8    two-way look prior to and until which time there

9    was actually a formal rule finalized.  And the

10   answer to that was, no, you do not.

11   BY MR. MASON:

12        Q.   And when you're talking about -- when

13   you said how you explained to CMS that there were

14   different codes in different stages of the CV

15   process, is that the same as the different stages

16   that were reflected in the spreadsheet we were just

17   looking at, at Exhibit 468-A?

18        A.   Yes, with the exception of -- you know,

19   in there, it also had abstracts processed by XL and

20   not yet submitted -- I mean, I don't recall talking

21   about abstracts.

22        Q.   Okay.  But other than -- other than the

23   hospital abstracts line -- you're referring to

24   Row 22 there, right?

25        A.   Yes, I am.



Page 196

1          Q.    Other than Row 22, when you say that

2     you explained to CMS that there was different

3     amount of work in different stages of the CV

4     process, you're referring to the stages in Rows 20

5     through 24?

6          A.    20 to 23.

7          Q.    Okay.  So just Rows 20, 21 and 23?

8          A.    Yes.  So the conversation to say,

9     here's what, you know, we -- we've already -- we've

10    already run the whole process and submitted this to

11    CMS.  We've run the whole process and not submitted

12    to CMS.  And then there's this universe that's at

13    various stages.

14               And then we went through what happens

15    at each stage, you know, the steps, and -- and

16    so -- you know, Karen Erickson did more of that, as

17    I recall.

18          Q.    And -- and so the stages that you

19    explained to CMS were the same stages that are

20    referenced on 20, 21 and 23, but -- but instead of

21    telling CMS the dollar amounts, you told them the

22    number of codes?

23          A.    We discussed the number of codes.

24          Q.    Was there a different spreadsheet that

25    was prepared around this time that had the number



Page 357

1              CERTIFICATE OF REPORTER

2

3              I, Cindy A. Hayden, Registered Merit

4    Reporter and Notary Public, do hereby certify that

5    the foregoing transcript is a true, accurate, and

6    complete record.

7              I further certify that I am neither

8    related to nor counsel for any party to the cause

9    pending or interested in the events thereof.

10             Witness my hand, this 23rd day of

11   September, 2022.

12

13

14

15

16

17

18

19

20
                     _Cindy Hayden_____

21              Cindy A. Hayden, RMR, CRR

22

23

24

25



**EXHIBIT D-139**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

_____
                              )
UNITED STATES OF AMERICA      )
ex rel. BENJAMIN POEHLING,    )
                              )
        Plaintiff,            )    No. CV 16-08697 FMO
                              )
vs.                           )
                              )
UNITEDHEALTH GROUP, INC.,     )
et al.,                       )
                              )
        Defendants.           )
_____)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
(With Redactions)

DEPOSITION OF MELISSA SEDOR
As 30(b)(6) Designee 1 of
OptumInsight, Inc.
UnitedHealthcare, Inc.
Washington, DC
June 29, 2023

Reported by:  John L. Harmonson, RPR
Job No. 988356



3492

Page 114

1    BY MS. GLOVER:

2        Q.    Okay.  So in this example, instead of

3    the diagnosis code coming by way of the provider

4    through the CPT that's been submitted, it's

5    identified through OptumInsight by way of a medical

6    record review of a medical record that was

7    retrieved from a physician's office or a provider's

8    office?

9        A.    That is correct.

10       Q.    Okay.  And then once that record is

11   retrieved and Optum reviews it, Optum submits the

12   diagnosis codes to CMS that they identified as

13   being supported by the medical record; right?

14            MR. JONES:  Objection; form.

15            THE WITNESS:  That is correct.

16   BY MS. GLOVER:

17       Q.    And in some instances, Optum deletes

18   codes that they identify as being not supported by

19   a medical record and they submit those deletes to

20   CMS; right?

21            MR. JONES:  Objection; outside the

22   scope.

23            THE WITNESS:  Related to the medical

24   record review, the only time that occurred was in

25   2013 when claims verification was occurring.  The



Page 115

1    remainder of the time in question, deletes did not

2    occur through the medical record review process.

3    BY MS. GLOVER:

4        Q.    Okay.  And we'll talk a little more

5    about that.  I think that's one of your topics, and

6    we can talk more about that.

7              When you say claims verification, what

8    do you mean?

9        A.    Claims verification was a risk

10    adjustment program we had in place in 2012 through

11    early 2014.  What that program did was to, when a

12    medical record was looked at for chart review

13    purposes to identify diagnosis codes that were not

14    on the claim, it would also utilize those medical

15    records to compare against the claim submitted by

16    the provider to see if there were any codes

17    submitted on the claim that were not supported by

18    the medical records.

19        Q.    Okay.  So when you say compare, do you

20    mean they would compare like the results of the

21    chart review that they conducted with the claims

22    that had been submitted by the provider to identify

23    which ones -- which ones to review in claims

24    verification?

25              MR. JONES:  Objection; form.  Outside



Page 116

1    the scope.

2              THE WITNESS:  Yes, the medical

3    reviewer -- the chart review would result in the

4    identification of, let's say, three diagnosis

5    codes.  The claim maybe had, for example, four

6    diagnosis codes.  So that one diagnosis code that

7    was different would be looked into for claims

8    verification, assuming that the diagnosis code in

9    question was only submitted one time in that year

10   for that member that aligned to the timing of the

11   medical record review, if we had received that

12   diagnosis code for the member six times in a year,

13   it's not going to be subject to the claims

14   verification process.

15   BY MS. GLOVER:

16        Q.   Understood.

17              And then if you identified diagnosis

18   codes through claims verification that had not been

19   identified in the chart review, then you would

20   delete -- you deleted those codes through the

21   process that's depicted here.  You'd submit the

22   deletes to CMS; is that right?

23              MR. JONES:  Objection; form.  Outside

24   the scope.

25              THE WITNESS:  If through the claims



3495

Page 331

```
 1                 C E R T I F I C A T E

 2

 3    DISTRICT OF COLUMBIA

 4             I, JOHN L. HARMONSON, a Notary Public

 5    within and for the District of Columbia, do hereby

 6    certify that MELISSA SEDOR, the witness whose

 7    deposition is hereinbefore set forth, was duly

 8    sworn by me and that such deposition is a true

 9    record of the testimony given by such witness.

10             That before completion of the

11    proceedings, review and signature of the transcript

12    was not requested.

13             I further certify that I am not related

14    to any of the parties to this action by blood or

15    marriage; and that I am in no way interested in the

16    outcome of this matter.

17             IN WITNESS WHEREOF, I have hereunto set

18    my hand this 3rd day of July, 2023.

19

20             John L Harmonson

21             JOHN L. HARMONSON, RPR

               My commission expires: 04/14/26

22

23

24

25
```



**EXHIBIT D-140**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA,       )
ex rel., BENJAMIN POEHLING,     )
                                )
            Plaintiffs,         )
                                ) Civil Action No.
vs.                             )
                                ) 16-08697 FMO
UNITEDHEALTH GROUP, INC.,       )
et al.,                         )
                                )
            Defendants.         )
_____ )


* * * * * *

HIGHLY CONFIDENTIAL

* * OUTSIDE COUNSEL'S EYES ONLY * *

* * * * * *

VIDEOTAPED DEPOSITION OF PAUL IRA SPITALNIC

Wednesday, March 20, 2024; 9:07 a.m. EDT


Reported by:  Cindy L. Sebo, RMR, CRR, CLR, RPR, CCR,
CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460,
NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime
Court Reporter, NY Association Certified Reporter, OR
CSR 230105, TN CSR 998, TX CSR 12778, WA CSR
23005926, Notary Public
Job No. 1097542



3498

Page 17

1          A.      Yes.

2          Q.      How long have you been Ms. Lazio's

3    direct supervisor?

4          A.      I don't recall exactly when she

5    joined CMS, but I believe I -- I have been chief

6    actuary since 2013.  Shortly thereafter, she was

7    selected as the director of Parts C and D Actuarial

8    Group.  I've clearly been her supervisor since

9    then.

10              Prior to that, I was in -- the

11   director of the Parts C and D Actuarial Group.  I

12   don't recall if she was reporting directly to me at

13   that time or another one of the managers on my

14   team.

15         Q.      You also mentioned that you spoke

16   with Kirk Limmer; is that right?

17         A.      Yes.

18         Q.      How do you spell his last name?

19         A.      I spell it L-I-M-M-E-R.

20         Q.      Thank you.

21              Why did you speak with Mr. Limmer



Page 87

1           THE WITNESS:  Okay.

2           I am not an expert in the

3       requirements around what -- how CMS has

4       determined what the basis for diagnosis

5       submissions are.  Again, my opinions are my

6       own based on my knowledge and experience of

7       the program, and I would not characterize

8       myself -- I'm certainly not providing expert

9       witness testimony to the specific

10      requirements around what MAOs are required

11      or not required to do in the supporting of

12      their codes.

13           BY ATTORNEY MARTINEZ:

14      Q.      You're not providing any expert

15  opinions or testimony related to specific

16  requirements around what MAOs are obligated or not

17  obligated to do with respect to submitting

18  diagnosis codes for payment, right?

19      A.      Yes.

20      Q.      Can you give me a specific law,

21  regulation, piece of subregulatory guidance or



Page 88

1    contractual provision that obligates MAO plans to

2    investigate whether or not a diagnosis code is

3    supported by the medical records if the plan has

4    any information that the code might not be

5    supported?

6                    ATTORNEY ZUPAC:  Object to form.

7                    THE WITNESS:  I -- I -- it sounds

8        like the same question you just asked.  I --

9        I'm missing the difference, if there was one.

10                   And so I -- I'm, again, not the

11       expert and don't have specific citations as

12       to whatever would lead to whatever the

13       actual requirements are.  I'm just sharing

14       what my understanding is of those

15       requirements.

16                   BY ATTORNEY MARTINEZ:

17       Q.    So the answer to my question is you

18   cannot give me a specific law, regulation, piece of

19   subregulatory guidance or contractual provision

20   that obligates MA plans to investigate whether or

21   not a diagnosis code is supported by medical



3501

Page 89

1    records if the plan has any information that is --

2    might not be supported, right?

3            A.    I cannot provide such reference.

4            Q.    Can you provide me a specific law,

5    regulation, piece of subregulatory guidance or

6    contractual provision that obligates MA plans to

7    design their chart reviews to identify and delete

8    diagnosis codes that are not supported by medical

9    records?

10           A.    I cannot.

11           Q.    Do -- by the way, do you know what

12   "chart reviews" are?

13           A.    I'm familiar with the term.

14           Q.    You understand that United had a

15   chart review program in place during the period

16   relevant to this case?

17           A.    I understand United takes a number of

18   actions with respect to supporting or developing or

19   -- related to the diagnoses they submit for plan

20   payment.

21           Q.    And would those actions include a



Page 90

1    chart review program?

2           A.      That is my understanding.

3           Q.      When did you first become aware that

4    United had a chart review program?

5           A.      I don't think I was ever aware that

6    there was a specific program.  I know that United

7    and other MAOs, Medicare Advantage organizations,

8    do various -- have various initiatives in support

9    of their diagnosis submission.

10          Q.      So you have no specific information

11   about how United may have conducted its chart

12   review program during the period relevant to this

13   case?

14          A.      I do not have any specific

15   information.

16          Q.      I want to go back to Page 3 of your

17   report, Mr. Spitalnic.  We read the first half of

18   this sentence in Paragraph Number 2.  I -- I want

19   to focus now on the second half of the sentence,

20   but I'll -- I'll read the whole sentence so we've

21   got the full context.



3503

Page 213

1    are audited, right?

2         A.    I am not.

3         Q.    Let's go back to Page 7 of your

4    report, Mr. Spitalnic.  You quote portions of Ms.

5    Lambert's report referencing statements made by

6    United in its annual bid submissions to CMS.  And

7    I'm in Paragraph 8.

8                    Are you with me?

9         A.    I am.

10        Q.    You wrote in the last sentence of

11   Paragraph 8 before the bulleted paragraphs, The

12   following assertions cited by Ms. Lambert do not

13   diminish the certifying actuary's and MA

14   organization's responsibility because CMS may, (i),

15   not have reviewed the specific information; or,

16   (ii), only reviewed this information to check

17   compliance with disclosure requirements in the

18   ASOPs.

19                    Do you see that?

20        A.    I do.

21        Q.    As a matter of good governance, do



Page 214

1    you agree with me that it's important for CMS to

2    review bid submissions by MA plans?

3         A.    Yes.

4         Q.    You're not suggesting here that CMS

5    should ignore portions of MA plan bid submissions,

6    right?

7         A.    I'm suggesting that there may not

8    have been a reliance on certain statements that are

9    included in some aspects of the bid submission.

10        Q.    Do you think it's reasonable for

11   MA plans like United to presume that CMS is

12   reviewing the bid submissions that the plans submit

13   to the Agency?

14             ATTORNEY ZUPAC:  Object to form.

15             Go ahead.

16             THE WITNESS:  I'm sorry.  Could you

17        repeat the question?

18             BY ATTORNEY MARTINEZ:

19        Q.    Do you think it's reasonable for

20   MA plans like United to presume that CMS is

21   reviewing the bid submissions that the plans submit



Page 215

1    to the Agency?

2           A.     I -- I certainly believe that it's

3    reasonable for a plan to expect that CMS is going

4    to do a thorough review of their bid submission.

5    And I think many of the actuaries that go through

6    the bid review procedure would agree that there is

7    a thorough review of the bid submission -- of their

8    bid submissions.

9                 I would also expect that actuaries

10   would not be surprised that every word of their

11   submission is not reviewed or necessarily relied

12   upon in drawing ultimate conclusions and that, as I

13   included in this sentence before you started

14   reading, that there is a specific reliance on the

15   actuary to -- that that's -- that CMS places on the

16   actuary to ensure that there is compliance with the

17   laws, regulations and instructions and the various

18   Actuarial Standards of Practice.

19          Q.     CMS does a thorough review of bid

20   submissions from MA plans, right?

21          A.     Speaking on behalf of the -- on



Page 216

1    behalf of the Office of the Actuary, we do as

2    thorough and comprehensive a job in reviewing those

3    bids that have been submitted as possible, given

4    the various time and other constraints placed upon

5    us.

6         Q.    And you believe it's reasonable for

7    MA plans to presume that CMS is doing that thorough

8    review that you just spoke about, right?

9         A.    Plans are familiar with our review

10   process.

11        Q.    And how thorough it is, right?

12        A.    Yes.

13        Q.    Mr. Spitalnic, on the top of

14   Page 8 -- we're still in -- in Paragraph 8,

15   you -- you also wrote -- and this is in response to

16   a couple of bulleted statements -- quoting from

17   United's bid submissions.  You wrote, An actuary

18   cannot disclaim that they are knowingly violating

19   the rules of the program.

20              Do you see that?

21        A.    I do.



Page 217

1          Q.    Are you aware of any instance in

2    which CMS responded to the bulleted statements you

3    include in Paragraph 8 by saying that United's

4    decision to cease its prior process of identifying

5    and deleting certain diagnosis codes violated

6    United's obligations?

7                    ATTORNEY ZUPAC:  Object to form.

8                    THE WITNESS:  I am not aware of

9        discussions that were related to the subject

10       of those quotations.

11                    BY ATTORNEY MARTINEZ:

12          Q.    So let -- let's -- let's drill down

13    on one of them.  Let's look at the second bullet --

14    sorry to keep flipping back.

15                    We're on the bottom of Page 7 --

16    starting with the BPT submissions in 2015.  And --

17    and what does "BPT" stand for?

18          A.    "BPT" stands for bid pricing tool.

19          Q.    All right.

20                    -- starting with the bid pricing

21    tool submissions in 2015, quote, We also adjusted



Page 218

1    projected risk scores to account for changes in our

2    medical record review processes.  Specifically,

3    based on multiple conversations with CMS and CMS'

4    treatment of medical record review in its recent

5    rulemaking process, the health plan has decided to

6    cease one of its prior processes that identified

7    and deleted certain diagnoses codes through the

8    medical record review process.

9                Do you see that?

10        A.    I do see that.

11        Q.    Are you aware of any instance in

12   which CMS responded to that statement by saying

13   that United's decision to cease its prior process

14   of identifying and deleting certain diagnosis codes

15   violated United's obligations under the MA program?

16        A.    I am not aware of any such

17   statements.

18        Q.    Were you aware of these statements

19   from United in its BPT submissions at the time they

20   were made?

21        A.    I do not believe I have -- I -- I do



Page 219

1    not believe I was aware of these statements at that

2    time.

3         Q.    Was anyone else in your office aware

4    of them?

5         A.    I do not know of anyone in my office

6    being specifically aware of this specific

7    statement.

8         Q.    And after writing your report or

9    during the process of writing your report, did you

10   ask anyone at the Office of the Actuary or at CMS

11   whether they were aware of these statements from

12   United?

13        A.    I did not specifically ask anybody

14   about anything going back to 2015.

15        Q.    So going -- going back to the top

16   of -- of Page 8, Mr. Spitalnic, where you wrote An

17   actuary cannot disclaim that they are knowingly

18   violating the rules of the program.

19             Are you aware of United ever

20   asserting in this case that it could knowingly

21   violate the rules of the MA program by issuing a



3510

Page 225

1      I, Cindy L. Sebo, Nationally Certified Court

2    Reporter herein, do hereby certify that the foregoing

3    deposition of PAUL IRA SPITALNIC was taken before me

4    pursuant to notice at the time and place indicated;

5    that said witness duly swore to tell the truth, the

6    whole truth, and nothing but the truth under

7    penalties of perjury; that said testimony of witness

8    was correctly recorded to the best of my abilities in

9    machine shorthand, thereafter transcribed under my

10   supervision with computer-aided transcription; that

11   deposition is a true and accurate record of the

12   testimony given by the witness; that I am neither

13   counsel, nor kin to any party in said action, nor

14   interested in the outcome; and that a copy of this

15   transcript obtained from a source other than the

16   court reporting firm, including an adversary or

17   co-counsel in the matter, is uncertified and may not

18   be used at trial.

19   CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR, RSA, CA
     CSR 14409, NJ Certified CR 30XI0024460, NJ Certified

20   RT 30XR00019500, NM CSR 589, NY Realtime Court
     Reporter, NY Association Certified Reporter, OR CSR

21   230105, TN CSR 998, TX CSR 12778, WA CSR 23005926,



3511

**EXHIBIT D-141**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
---o0o---


UNITED STATES OF AMERICA, ex     )
rel., BENJAMIN POEHLING,         )
                                 )
              Plaintiff,         )
                                 )   Case No.
        vs.                      )   16-08697 FMO
                                 )
UNITEDHEALTH GROUP, INC., et     )
al.,                             )
                                 )
              Defendants.        )
                                 )



---o0o---


TUESDAY, MARCH 12, 2024


VIDEOTAPED DEPOSITION OF PHILIP STARK, PH.D.


CONFIDENTIAL TRANSCRIPT


---o0o---



REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR



3513

Page 30

1    evidence against the null hypothesis.

2            And a common level to use for unlikely is

3    5 percent.  I believe that Dr. Salve uses that

4    level of significance in much of his report, though

5    I think he uses 10 percent in some places as well.    10:22:22

6            So in the usual scenario, the test

7    statistic has some probability distribution.  If

8    the null hypothesis is true, we look at that

9    probability distribution and say this is unlikely

10   -- if the observed value is sufficiently unlikely    10:22:41

11   on the assumption that the null hypothesis is true,

12   that's evidence that the null hypothesis is not

13   true.

14           In this particular case, the observed data

15   are impossible if the null hypothesis is true.  So    10:22:54

16   it's not an issue of there's a 5 percent chance

17   that I would erroneously reject the null hypothesis

18   on the assumption that the null hypothesis is true.

19   The data gets certainty that the null hypothesis is

20   false.                                                10:23:13

21       Q.   I see.  So if the null hypothesis is that

22   -- well, let's use your example here.

23       A.   May I interject something else?

24       Q.   Sure.

25       A.   I just said -- I was a little bit sloppy     10:23:20



Page 31

1   in my language in talking about whether the

2   observed value of the test statistic is

3   sufficiently unlikely.  It's usually a range of

4   values for the test statistic.  For example, values

5   that are as extreme or more extreme, and not a          10:23:35

6   single value.  Because in many situations, any

7   single value of the test statistic is very

8   unlikely.

9       Q.   Understood.  Well, to summarize, if a

10  result is impossible, then you would say it's           10:23:48

11  certain, and the raw data provides certainty that

12  the hypothesis is wrong, correct?

13      A.   Yes.  There's another caveat here, which

14  is I'm assuming that the chart -- the reviews that

15  led to these data were -- had no error in them.         10:24:09

16  That's ascertaining that some particular HCC didn't

17  have support, was a complete -- was correct, and

18  that there, for example, was not support in some

19  chart that was not examined.

20      Q.   I understand.  So assuming the chart           10:24:39

21  review at issue is correct, if it produces a result

22  that is impossible, then you would say with

23  certainty the hypothesis is false, right?

24      A.   Yes, I would.

25      Q.   All right.  Do you have any reason to          10:24:55



3515

Page 32

1  doubt whether chart reviews can provide an

2  objective answer like -- like you were describing?

3      A.   Well, I understand that coders don't

4  always find the same answer.  So it seems that

5  there's some variation and, therefore, some        10:25:18

6  uncertainty.

7          There's perhaps a platonic ideal notion of

8  whether a perfect inspection of, you know, every

9  chart associated with a particular member in a

10  particular year would show support versus whether a  10:25:35

11  perfect inspection of the subset of charts that

12  were examined by the coders behind the data that

13  Dr. Salve relied upon would have found support

14  versus actual human beings doing the work.

15      Q.   Fair enough.  But based on the work you    10:25:57

16  performed in this case, you saw some variation in

17  the coding, correct?

18      A.   I did not look at -- no, I did not.

19      Q.   I mean variation in the results, I should

20  say, of people who had reviewed the coding,         10:26:11

21  correct?

22      A.   Well, I understand that the -- one of the

23  basic issues in this litigation is that the United

24  chart review coders didn't find some of the

25  submitted codes.  And so if the submitted codes     10:26:31



Page 33

1    were based on reading the charts, then it seems

2    that those charts were read in more than one way.

3        Q.    All right.  So let's go back to the

4    Paragraph 81 in your report.  And here you were

5    discussing whether there was support for HCCs in          10:27:03

6    the study that Dr. Salve had done.

7            And I'll ask you, if a hypothesis were the

8    rate of unsupported HCCs in the population is zero,

9    then a finding of nonzero would prove with

10   certainty that the hypothesis is false, right?          10:27:27

11       A.    Yes, sir.  Again, subject to uncertainty

12   -- on the assumption that the reading is perfect.

13       Q.    On the assumption that -- right, that that

14   particular reading of the coding is correct?

15       A.    Yes, sir.  Of the charts underneath.          10:27:45

16       Q.    Yes, the reading of the charts and the

17   identification of the codes is correct?

18       A.    Yes, sir.

19       Q.    Okay.  Great.  Let's go over your opinion

20   on Page 7.  Dr. Stark, you analyze whether          10:28:03

21   member-HCC -- actually, let me go to that.  Let me

22   go to footnote 6 first.  You used the term

23   "member-HCC-year" as a unit of measure in footnote

24   6?

25       A.    Yes, sir.          10:28:33



3517

Page 34

1    Q.    Okay.  I am going to try to use the same

2    term today, "member-HCC-year," so that we're

3    consistent.

4    A.    Thank you.

5    Q.    All right.  Now, in your -- I am going to    10:28:41

6    call this Opinion II on Page 7 because it's got the

7    Roman II.  Your Opinion II found support in RADV

8    for diagnosis instances with no payment impact was

9    higher than those with payment impact, correct?

10    A.    I'm sorry.  I didn't hear the last part of    10:29:07

11    the question.

12    Q.    That you -- in your Opinion II, you found

13    that the RADV validation rate of diagnosis

14    instances with no payment impact was higher than

15    those with payment impact, correct?    10:29:24

16    A.    No, sir.  I didn't independently examine

17    whether any diagnosis instance had financial

18    impact.  I'm relying on Mr. Renjilian's Opinions 2

19    and 3 for that determination.  I'm doing

20    calculations based on his labeling of diagnosis    10:29:40

21    instances as potentially having financial impact or

22    not.

23    Q.    Fair enough.  Let's go into what you did

24    here.  Let's look at your Paragraph 24.

25          In Paragraph 24 you write "To evaluate the    10:29:59



Page 35

1   rates at which RADV audits found support for

2   member-HCC-years that Mr. Renjilian identified as

3   having financial impact if deleted, I replicated

4   and extended portions of Mr. Renjilian's analysis,"

5   right?                                              10:30:17

6       A.   Yes, sir.

7       Q.   So you did not verify Mr. Renjilian's work

8   on whether a diagnosis instance had payment impact

9   or not; you just accepted his Opinions 2 and 3,

10  correct?                                            10:30:32

11      A.   I used his determination.  I -- "accepted"

12  is a little stronger.  I used his determination.

13      Q.   Fair enough.  You used his determination.

14  And you did the work identified in your Paragraphs

15  25 through 29, correct?                             10:30:47

16      A.   Yes, sir.

17      Q.   All right.  After doing that work -- well,

18  I should say in Paragraph 24 you say "I replicated

19  and extended portions of Mr. Renjilian's analysis."

20  And you did that by doing the work in Paragraphs 25  10:31:28

21  through 29, correct?

22      A.   Yes, sir.

23      Q.   And in Paragraph 30 --

24      A.   Some of the extension is not just

25  described there.  That's -- Paragraphs 25 through    10:31:41



Page 36

1    29 are for preparing the database for -- creating a

2    database that I used then for subsequent

3    calculations that are described later in the

4    report.

5        Q.    Okay.                                    10:31:55

6        A.    That's not the full extent of the work.

7        Q.    Fair enough.  You feel confident in the

8    methods you used, correct?

9        A.    Yes, yes.

10       Q.    And you feel confident in the results you   10:32:07

11   achieved, right?

12       A.    Yes.

13       Q.    All right.  In Paragraph 30 you state the

14   following:  "My results match the 2011-2013 counts

15   in the left panel of Figure 15 of the Renjilian     10:32:20

16   report."  Do you see that?

17       A.    Yes, sir.

18       Q.    Is that accurate?

19       A.    That's to the best of my recollection,

20   yes.                                               10:32:32

21       Q.    So the independent analysis that you

22   performed matched the same results as Mr. Renjilian

23   on Figure 15 of his report, right?

24       A.    The left panel?

25       Q.    Yes.                                     10:32:45



Page 37

1       A.   For 2013 -- from 2011 through 2013, yes,

2   sir.

3       Q.   And let's go ahead and look at that left

4   panel in Mr. Renjilian's report.  And that's on

5   Page 87 of his report.                          10:33:01

6            You're referring, Dr. Stark, to the panel

7   that says at the top "Member-HCCs, 2011-2013"?

8       A.   I think it says CON13 -- "CON11-13."

9       Q.   Yeah, I think you have a different

10  pagination than I do.  So go to Page 86.          10:33:38

11  Member-HCC-years -- member-HCCs 2011-2015.  Do you

12  see that?

13      A.   I see something that says "CON11-13."  Is

14  that --

15      Q.   CON11-13?                                10:33:57

16      A.   Not 2011 through '15.  Yes, sir.

17      Q.   Great.  Okay.  And Dr. Stark, you

18  replicated and reached the same result as in that

19  upper left panel, right?

20      A.   Our arithmetic agrees, yes.              10:34:12

21      Q.   Your arithmetic agrees.

22      A.   Yes.

23      Q.   All right.  So you found, Dr. Stark, that

24  -- I want to go through these numbers in some more

25  detail.  You found that for 2011 through 2013, your  10:34:24



3521

Page 38

1    arithmetic found that there was 1,119

2    member-HCC-years with a diagnosis instance that was

3    on the first interrogatory response, right?

4         A.    As I sit here, I can't remember whether

5    this is counting diagnosis instances or HCCs rolled    10:35:05

6    up to the member-year level.

7         Q.    Well, you stated in your report you

8    replicated and found the same results, correct?

9         A.    Yes.

10        Q.    And Mr. Renjilian writes "Member-HCCs" at    10:35:25

11   the top of that chart, correct?

12        A.    Yes, sir.

13        Q.    So that would suggest these are

14   member-HCC-years, correct?

15        A.    It would, although Mr. Renjilian's    10:35:36

16   terminology isn't -- I think he sometimes uses the

17   same phrase to talk about diagnosis instances and

18   sometimes to talk about HCC-years.

19        Q.    Okay.  Well, assuming this is

20   member-HCC-years for now, and if you discover later    10:35:54

21   it was diagnosis instance, you'll let us know.

22        A.    Yes.

23        Q.    Okay.  So to state it plainly, there were

24   1,119 instances where a provider submitted a code

25   after an encounter, a United chart review coder    10:36:09



3522

Page 39

1    reviewed the chart and did not identify that

2    submitted code, and then the member-HCC-year was

3    reviewed in RADV, correct?

4        A.   That's my understanding, yes.

5        Q.   And out of those 1,119 instances, the RADV        10:36:31

6    auditors found 980 of them to be supported, right?

7        A.   Not of the diagnosis instances, but of the

8    resulting HCC for that beneficiary for that year.

9        Q.   Thank you for correcting that.

10            So in -- let me restate.  So in 980 of         10:36:50

11   those instances, the RADV auditors validated the

12   member-HCC-year associated with that diagnosis

13   instance, right?

14       A.   That's my understanding.  My understanding

15   is that RADV does not look at the diagnosis         10:37:06

16   instances to see whether the diagnosis instances

17   are supported.  RADV looks at members and the HCCs

18   that those members were assigned for the year and

19   asks United or whoever the MAO is to provide

20   documentation to support that HCC for that         10:37:29

21   beneficiary for that year.

22       Q.   All right.  Let me just establish some

23   foundation about RADV.  What do you understand RADV

24   to be?

25       A.   I understand it to be a review that's done         10:37:40



3523

Page 40

1    by CMS of some contracts and some years, that it

2    involves sampling beneficiaries and then looking

3    for -- or asking the MAO for support for the HCCs

4    that were assigned to that beneficiary that year,

5    that the MAO is allowed to provide up to five          10:38:06

6    pieces of information -- I think their chart

7    specifically, but five pieces of information to

8    support each HCC, and that support might or might

9    not be from the diagnosis instance that was

10   originally submitted.                                  10:38:26

11       Q.   And you understand that the CMS auditors

12   will then review the charts to determine if the

13   member-HCC-year is supported, correct?

14       A.   That's my understanding, yes, sir.

15       Q.   All right.                                    10:38:45

16       A.   I have a little bit more detail in the

17   understanding of RADV.  I understand that at least

18   in some years the sample -- first of all, I

19   understand that the samples are drawn from contract

20   years.                                                 10:38:59

21          Second, I understand that at least in some

22   years, the sample was a stratified random sample,

23   that it was stratified by a tercile of payment for

24   the beneficiary in question.

25          I have also seen language somewhere that        10:39:14



Page 41

1  said it was somehow risk -- risk aware, that

2  somehow it was attempting to focus on things that

3  were perceived to have more risk, but I don't

4  understand the detail of that.

5     Q.   Okay.  Thank you for clarifying that.          10:39:29

6          We are going to assume today, Dr. Stark,

7  that the RADV auditors always get it right.

8     A.   I don't know whether the RADV auditors

9  always get it right.

10    Q.   Do you have any doubts whether they always    10:39:41

11  get it right?

12    A.   I mean, any process involving humans

13  reading printed materials, some error rate.  I just

14  don't know -- I haven't seen attempts to quantify

15  it.  I don't have an independent basis for knowing   10:39:59

16  what the accuracy would be.

17    Q.   Fair enough.  Well, let's assume for the

18  purposes of today, I'll give you an assumption,

19  that the RADV auditors are always correct.

20    A.   Okay.                                          10:40:16

21    Q.   And I'll -- I'll restate that assumption

22  when I ask you various questions.

23    A.   Okay.

24    Q.   But if you have any doubts, you can say,

25  "Are you assuming RADV is correct?"                   10:40:25



3525

Page 42

1        A.    I'll do my best here.

2        Q.    Okay.  Great.  All right.  Going back to

3    Mr. Renjilian's chart that you verified the

4    arithmetic, you agree that there were 980 instances

5    where a provider submitted a code after an            10:40:42

6    encounter, United chart review coders reviewed the

7    chart and failed to find the diagnosis code

8    submitted by the provider, and RADV auditors

9    reviewed the member-HCC-year associated with that

10   diagnosis instance and found it to be supported,      10:41:06

11   right?

12       A.    My understanding is that one of -- at

13   least one of the up to five pieces of information

14   provided by United, possibly from different

15   diagnosis instances or even diagnosis instances       10:41:20

16   that were not submitted, provided support for that

17   HCC, or possibly something in the -- higher in the

18   hierarchy for that beneficiary for that year.

19       Q.    Okay.  Thank you for those caveats.  But

20   in summary, in those 980 instances, ultimately the    10:41:41

21   RADV auditors found the member-HCC-year to be

22   supported, correct?

23       A.    They found the member-HCC-year to be

24   supported, yes, sir.

25       Q.    All right.  And then the next line in       10:41:54



Page 43

1    Figure 15 says "No Overlap."  And you understand

2    that to be the member-HCC-years in which the

3    diagnosis instance was not missed by United chart

4    review coders, correct?  I can rephrase if this --

5        A.   I understand that to be member-HCC-years        10:42:29

6    that didn't intersect those diagnosis instances

7    identified in FIR.

8        Q.   Right.  So the FIR is the first

9    interrogatory response, right?

10       A.   Yes, sir.                                        10:42:50

11       Q.   And that involves diagnosis instances that

12   were submitted by a provider but not found in the

13   United chart review, right?

14       A.   That's my understanding, yes, sir.

15       Q.   All right.  So the second line of             10:43:00

16   Mr. Renjilian's Figure 15 are the member -- the

17   validation rates in RADV of member-HCC-years in

18   which the diagnosis instances were not on the first

19   interrogatory response, correct?

20       A.   That's my understanding, yes.                 10:43:16

21       Q.   All right.  And so Mr. Renjilian found,

22   and you confirmed, that the RADV validation rate

23   for codes on the first interrogatory response for

24   member-HCC-years associated with diagnosis

25   instances on the first interrogatory response was   10:43:37



Page 44

1    higher, 87.6, than the validation rate for

2    member-HCC-years that did not overlap with the

3    first interrogatory response, right?

4        A.   Yes.  By about 1.1 percent, yes, sir.

5        Q.   And you confirmed that with your own          10:44:08

6    arithmetic, right?

7        A.   Yes, sir, but again, based on

8    Mr. Renjilian's determination -- sorry.  In this

9    instance it doesn't involve Mr. Renjilian's

10   determination.  I apologize.  Yes.                     10:44:20

11       Q.   What do you mean it doesn't involve

12   Mr. Renjilian's --

13       A.   I was thinking of his Opinions 2 and 3,

14   but this doesn't rely on his Opinions 2 and 3.

15       Q.   Right.  You confirmed these numbers based     10:44:30

16   on your own work?

17       A.   Yes, sir.

18       Q.   All right.  And by "these numbers," I mean

19   the numbers in Figure 15 of Mr. Renjilian's report,

20   upper left-hand corner, 2011 through 2013?             10:44:39

21       A.   Yes.  CON11-13, yes, sir.

22       Q.   Dr. Stark, tell me whenever you want to

23   take a break.  I am happy to keep going.  I am

24   going to rely on you and your counsel to tell me

25   when you need a break.                                 10:45:02



3528

Page 45

1       A.   Thank you.

2       Q.   I want to now go to your Opinion II on

3   Page 7.  So Dr. Stark, you performed the work you

4   described in this section, and that led you to

5   create a table on Page 11.  Can you go to that        10:45:38

6   table, please?

7       A.   Yes, sir.

8       Q.   And that's called -- you called it "Table

9   2," right?

10      A.   Yes, sir.                                     10:45:54

11      Q.   I want to walk through your results here.

12  You have a model -- a column called "Model," V12

13  and V22.  Can you explain what those terms mean,

14  "V12" and "V22"?

15      A.   My understanding is the CMS model that's      10:46:08

16  used to determine payments to MAOs, it's a

17  regression model calibrated to fee-for-service

18  data.  And V12, I believe, is the version of the

19  model that was in use exclusively for a portion of

20  the time at issue in this matter.                      10:46:28

21           At some point V22 started to be used as

22  well.  I think during some years payments were

23  based on some combination of V12 and V22.

24      Q.   And the next column is "Years," which is

25  self-explanatory.  The next column says, "RADV        10:46:47



3529

Page 46

1    supported op 3=1."  Can you describe what that

2    column means?

3        A.    Yes.  So that's looking again at diagnosis

4    instances in FIR.  I received a database that was,

5    I think, FIR with additional annotations,                10:47:12

6    additional columns that were added by Mr. Renjilian

7    or his team which included flags, so values that

8    were true or false, zero or one.  I don't recall

9    the original coding.

10          Op 3=1 means that according to                     10:47:32

11   Mr. Renjilian's Opinion 3, deleting that diagnosis

12   instance would not result in money flowing from --

13   it wouldn't affect the payments.

14       Q.    All right.  Let me try to restate that

15   last part.                                                10:47:57

16          So this chart shows that there were 3,082

17   member-HCC-years in which --

18       A.    No, sir.  That's diagnosis instances.

19       Q.    Okay.  Fair enough.  There were 3,082

20   diagnosis instances in which a provider met with a       10:48:20

21   patient and diagnosed the patient, or had an

22   encounter and diagnosed the patient.  And then a

23   United chart review coder reviewed the charts and

24   did not find the diagnosis.  And then RADV found

25   the diagnosis instance to be supported, and in all       10:48:46



3530

Page 47

1    circumstances this is a diagnosis instances that

2    did not have payment, right?

3        A.    I'm sorry.  My understanding is RADV does

4    not diagnose individual diagnosis instances to

5    determine if they were reported.  They examine          10:49:02

6    whether HCC corresponding to that diagnosis or a

7    different HCC higher in the hierarchy in the same

8    branch is supported by at least one of the pieces

9    of the information that the MAO provides RADV.

10       Q.    Fair enough.  So let me restate it then.      10:49:17

11   So there were 3,082 diagnostic instances in which a

12   provider, after an encounter with a patient,

13   submitted a diagnosis, the United chart review

14   coders reviewed the chart and did not find the

15   diagnosis, and then that encounter was reviewed --     10:49:36

16   or that member-HCC-year was reviewed in RADV, and

17   then the RADV auditors found it to be supported,

18   correct?

19       A.    Again, approximately.  My understanding is

20   that the review -- the RADV review might or might       10:49:58

21   not include review of the particular diagnosis

22   instances that were submitted.  It's a review of

23   whatever materials the MAO provides RADV to support

24   that HCC for that year.

25            So it is not a quality control check on        10:50:20



3531

Page 48

1    individual diagnosis instances and the supporting

2    materials provided to RADV that gave support for

3    those HCCs might or might not be the original

4    diagnosis instances that was submitted.

5        Q.   I understand.  But with that caveat, you          10:50:37

6    agree that there were 3,082 instances in which a

7    provider submitted a diagnosis code after an

8    encounter, United chart review coders did not find

9    that diagnosis, the member-HCC-year associated with

10   that diagnosis was then reviewed in RADV and the          10:50:57

11   RADV auditors found support for it, and the

12   universe being diagnosis codes that had no payment?

13       A.   No, sir.  The word "it" in your question

14   suggests that it was the diagnosis instance that

15   was reviewed, and it might or might not be the           10:51:16

16   diagnosis instance that was reviewed.  The

17   diagnosis instance might, in fact, not support that

18   particular HCC, or that diagnosis -- sorry.  The

19   chart might not support that particular diagnosis

20   instance, but there was at least one chart that          10:51:34

21   year that supported the HCC that that diagnosis

22   instance maps to or an HCC that's higher in the

23   hierarchy.

24       Q.   Thank you for clarifying.  I wasn't trying

25   to be cute or mislead with the word "it."  I meant        10:51:51



3532

Page 49

1    -- by "it" I meant member-HCC-year.

2        A.    Yes, sir.

3        Q.    But I can restate it so that we are

4    absolutely clear.  And thank you for being so

5    careful.                                      10:52:02

6            You agree there were 3,082 instances in

7    which a provider submitted a diagnosis code after

8    an encounter, United chart review coders did not

9    find that diagnosis, the member-HCC-year associated

10   with that diagnosis was reviewed by RADV auditors,  10:52:18

11   and RADV auditors found support for that

12   member-HCC-year?

13       A.    Yes, sir, I agree with that.

14       Q.    All right.  Now, let's go to the second

15   half of your chart, and you have a column "RADV   10:52:39

16   supported op 3=0."  Do you see that?

17       A.    Yes, sir.

18       Q.    Okay.  What does that mean?

19       A.    It means that according to

20   Mr. Renjilian -- I don't want to mischaracterizes  10:52:51

21   what he said.  I think op 3=1 means that he

22   determined that it would not have -- that that

23   diagnosis code would not have financial impact if

24   it were deleted.  Op 3=0 -- I don't know whether he

25   means would have financial impact if deleted or he  10:53:16



3533

Page 56

1    that diagnosis instance, but that might or might

2    not be on the basis of that diagnosis instance.

3        Q.    That's right.  And I wasn't asking whether

4    -- I am not trying to suggest it was based on the

5    same diagnostic instance, but I'm saying that RADV      11:20:38

6    auditors found support at the member-HCC-year level

7    3,619 times for member-HCCs associated with

8    diagnosis instances that were missed in chart

9    review, right?

10       A.    Well, again, missed in chart review, or       11:20:54

11   chart review didn't find them.  Yes, that's

12   correct, I believe, assuming that your arithmetic

13   is correct, yes.

14       Q.    All right.  So Dr. Stark, I want to

15   present you with a hypothesis.  Every time a United    11:21:11

16   chart review coder fails to find a diagnosis code

17   submitted by a provider, a member-HCC-year

18   associated with that code is unsupported.

19           Now, you agree, based on the work you

20   performed, that that hypothesis is false, correct?    11:21:33

21       A.    Yes, I -- well, yes.  RADV finds support

22   at the HCC level for the HCCs associated with some

23   of the diagnosis instances where chart review did

24   not find the diagnosis, but the diagnosis had been

25   submitted previously.                                  11:22:07



Page 57

1          So somewhere in some chart that was

2    presented by United to RADV, there was support for

3    that HCC for that member for that year.

4       Q.   I understand that caveat, and you've

5    mentioned it a few times.  In understanding that        11:22:24

6    caveat, which I am going to cover in a minute, I

7    just want to restate the hypothesis and make sure I

8    understand your opinion.

9          The hypothesis is every time a United

10   chart review coder fails to find a diagnosis code       11:22:37

11   submitted by a provider, the member-HCC-year

12   associated with that diagnosis code is not

13   supported, that hypothesis is false, correct?

14      A.   I agree.

15      Q.   Okay.  And you agree that that's false to        11:22:56

16   a certainty, right?

17      A.   Yes, sir.  Well, yes, my -- if by

18   "supported," we mean RADV found support, yes.

19      Q.   Fair enough.  We talked about that

20   assumption earlier, but you had said that human         11:23:12

21   beings are fallible and so RADV auditors may be

22   fallible, right?

23      A.   Yes, I am just worried about the

24   definition of "supported," but yes, I -- yes, RADV

25   finds support for some nonzero fraction of             11:23:27



Page 58

1  member-HCC-years for which corresponding to some of

2  the diagnoses that were originally submitted but

3  not found in chart review.

4      Q.   All right.  Fair enough.

5          I want to cover this caveat that you've          11:23:48

6  raised a number of times about a member-HCC-year

7  potentially being supported from another chart.

8          And so if I understand what you're saying,

9  Dr. Stark, is that a diagnosis instance in the

10 first interrogatory response would have involved a          11:24:14

11 provider meeting with a patient in an encounter,

12 having an encounter with a patient, submitting a

13 diagnosis and that mapping to a member-HCC-year;

14 but then another provider, meaning -- or having an

15 encounter with a patient and also submitting a          11:24:35

16 diagnosis.

17         And you're saying that the member-HCC-year

18 in RADV could have been supported by that second

19 encounter, not the first encounter on the first

20 interrogatory response; is that correct?          11:24:50

21     A.   That's my understanding, or it could have

22 been a different encounter with the same provider,

23 or it could have been an encounter with the same

24 provider or a different provider with a different

25 diagnosis that mapped to either the same HCC or an          11:25:02



3536

Page 59

1    HCC higher in the hierarchy.

2        Q.    That's correct.  So just to put it in

3    plain terms, a provider may meet with a patient and

4    diagnosis a patient as having diabetes and that may

5    not be found in chart review, the diabetes                    11:25:19

6    diagnosis; but then a different provider may meet

7    with the same patient, diagnosis diabetes, and then

8    that would be the chart that the RADV auditors

9    would find as supporting the member-HCC-year,

10   right?                                                        11:25:37

11       A.    I think it's a little more complicated

12   than that, in that my understanding is that RADV

13   doesn't do its own selection of materials to

14   review, that it's the MAO that provides RADV with

15   materials that they purport support the HCC for               11:25:53

16   that member for that year.

17           So my understanding is that the materials

18   presented to RADV in support of a particular

19   HCC-member-year could be one of the diagnosis codes

20   that chart review -- diagnosis instances that chart           11:26:15

21   review did not find.

22           It could be based on an encounter with the

23   same or a different provider, a different

24   encounter, and it could be support for, for

25   example, a more severe form of diabetes than the              11:26:35



3537

Page 60

1    particular HCC corresponding to the diagnosis event

2    that was originally submitted but not found in

3    chart review.

4        Q.    Fair enough.    Okay.    Dr. Stark, I want to

5    change the hypothesis a little bit and focus just        11:26:53

6    on payment impact codes.

7            So the -- I want to present to you this

8    hypothesis.    Every time a United chart review coder

9    fails to find a diagnosis code with payment impact

10   that had been submitted by a provider, the            11:27:13

11   member-HCC-year associated with that diagnosis

12   instance was unsupported.

13           You agree, based on the work you

14   performed, that that hypothesis is false, right?

15       A.    Not quite.    I have made no independent        11:27:31

16   determination of whether a diagnosis instance has

17   financial impact.    My analysis relies either on --

18   in some cases on Mr. Renjilian's determination of

19   whether it has financial impact, and in some case

20   on Mr. Garthwaite -- Dr. Garthwaite's determination    11:27:51

21   on whether that diagnosis instance has financial

22   impact.

23           But I agree with what I think the gist is

24   of your assertion, which is that there are examples

25   of HCCs that were identified by one or the other or    11:28:04



3538

Page 61

1    both of Mr. Renjilian and Dr. Garthwaite as having

2    financial impact where RADV found support for that

3    HCC for that member for that year.

4          That determination might or might not have

5    been based on a review of the chart corresponding    11:28:25

6    to that, to the diagnosis event that was explicitly

7    stated.

8     Q.    Okay.  Dr. Stark, thank you for that

9    clarification.  I will make my hypothesis even more

10   precise.    11:28:42

11    A.    Okay.

12    Q.    Because I am not trying to play gotcha,

13   and I'm glad you're being careful about the

14   wording.

15          So let me present you this hypothesis:    11:28:49

16   Every time a United chart review coder fails to

17   find a diagnosis code that either Mr. Renjilian or

18   Dr. Garthwaite identified as having payment impact

19   that have been submitted by a provider, the

20   member-HCC-year associated with that diagnosis    11:29:10

21   instance was unsupported?

22    A.    Again, the word "supported" bothers me.

23   RADV found support for some of them.

24    Q.    That RADV found support?

25    A.    Yeah.  So if you change that to "RADV    11:29:22



3539

Page 62

1    determined that it was unsupported," then -- then I

2    would agree.

3        Q.   Okay.  And the reason you have trouble

4    with "found support" is it requires an assumption

5    that the RADV auditors were correct, right?        11:29:41

6        A.   Well, I -- RADV reviews -- my

7    understanding is that RADV reviews up to five

8    pieces of information provided by United.  There

9    might be other charts that were not presented to

10   RADV -- even though I understand those to be       11:30:11

11   United's best attempt to demonstrate support for

12   that member-HCC-year combination.  It's possible

13   that there would be support somewhere else.  It's

14   possible that -- it's possible that RADV made a

15   mistake.  There's a lot of things that are         11:30:28

16   possible.

17           And I just want to be clear that we are

18   talking about whether RADV found support rather

19   than some more abstract notion --

20           (Clarification by the reporter.)          11:30:46

21           THE WITNESS:  Abstract notion of

22   supported.  And I want to be also clear about the

23   distinction between whether a particular diagnosis

24   instance is supported by the chart corresponding to

25   that diagnosis instance or the HCC that that        11:31:03



Page 63

1    diagnosis instance maps to has support somewhere in

2    some chart for that subscriber for that year.

3        Q.   BY MR. ABASCAL:   Thank you.

4        A.   Or something higher in the hierarchy.

5        Q.   But assuming the RADV auditors were          11:31:22

6    correct, you would agree that that hypothesis is

7    false, right?

8        A.   I have now -- I am no longer holding your

9    statement in memory.  Let me try to say it myself.

10   I agree that the hypothesis that when RADV reviewed     11:31:42

11   a member-HCC-year instance that -- for which a

12   diagnosis code had been submitted but not found by

13   the chart reviewers, and that -- and that diagnosis

14   instance had been identified by either

15   Mr. Renjilian and/or Mr. Garthwaite as having        11:32:29

16   financial impact, some fraction of the time that

17   they never found -- with a hypothesis that they

18   never -- that RADV never found support for that

19   HCC.  And I agree that that hypothesis is false.

20       Q.   All right.  Let me try to state this in a    11:32:53

21   little plain terms, which is pretty dangerous.

22            So just because a United chart review

23   coder did not find a provider-submitted code, that

24   does not mean that the associated member-HCC-year

25   is unsupported, assuming RADV is correct?  You       11:33:27



3541

Page 64

1    agree with that, right?

2       A.   Yes, the -- just because chart review did

3    not find support for a diagnosis code submitted for

4    a particular diagnosis instance, there might be

5    somewhere -- there still might be somewhere support      11:33:56

6    for the HCC that that diagnosis code maps to or an

7    HCC higher in the hierarchy, possibly in the chart

8    that was reviewed by the United chart reviewers and

9    possibly in some other chart for that member for

10   that year.                                               11:34:17

11      Q.   And you verified that through your own

12   analysis as reflected in Table 2?

13      A.   I couldn't hear the last part of your

14   sentence.  My analysis of?

15      Q.   As reflected in your Table 2?                    11:34:32

16      A.   Yes, sir.

17      Q.   All right.  Dr. Stark, you understand that

18   payment to United is based on a member-HCC-year,

19   correct?

20      A.   That's my understanding, yes, sir.               11:34:46

21      Q.   All right.

22      A.   And other characteristics of the members,

23   including demographic information.

24      Q.   Fair enough.  And you understand that if

25   the RADV auditors find support for the                   11:34:58



Page 65

1   member-HCC-year, then the payment is appropriate,

2   right, that portion of the --

3          MS. GLOVER:  Objection; calls for legal

4   conclusion.

5          THE WITNESS:  Yeah, I don't know what        11:35:14

6   "appropriate" means in this context.  I don't know

7   the terms of the contract between the MAOs and CMS.

8          I understand that as a matter of practice

9   that RADV does not ask to be reimbursed when they

10  find -- if support is found for that HCC, but I      11:35:33

11  don't know the connection between the common

12  practice and RADV and the legal terms of the

13  contract between the MAO and the government.

14      Q.   BY MR. ABASCAL:  That's fair, Dr. Stark.

15          Do you understand that if a               11:35:54

16  member-HCC-year is unsupported, that would be

17  considered an overpayment?

18          MS. GLOVER:  Objection; calls for a legal

19  conclusion.

20          THE WITNESS:  I don't know -- I don't know   11:36:08

21  how that word is used in this context.  I mean, in

22  lay terms, my understanding is that the practice of

23  RADV is to count that payment against -- against

24  the MAO, but I don't know -- again, I don't know

25  how the term is used.  I don't know whether it is a   11:36:30



3543

Page 66

1    legal term of art.  I don't know whether it is a

2    term that appears in the contract.

3        Q.    BY MR. ABASCAL:  That's fair.  I am not

4    trying to play gotcha or suggest a term or trick

5    you with a term of art.  So let me rephrase it.          11:36:42

6            Do you understand that if a

7    member-HCC-year is unsupported, then the payment

8    would be inappropriate?

9        A.    Again, I don't really know what

10   "inappropriate" means here.  And "unsupported," I        11:37:10

11   think you mean if RADV determines that none of the

12   pieces of information provided by the MAO support

13   that HCC for that member for that year.  I

14   understand that that's considered some kind of

15   error and that there's some kind of accounting.          11:37:27

16   But I don't know -- I don't know details.

17           I understand informally that RADV allows

18   offsets as well, but, again, this is -- I don't

19   know the rules under which RADV operates.  And I

20   don't understand in detail how a RADV audit results     11:37:48

21   in any kind of reconciliation of money between the

22   MAO and the government.

23       Q.    I understand you're not an expert in RADV,

24   and I am not trying to suggest that anything you

25   say would bind the government on its interpretation     11:38:04



Page 67

1    of RADV.

2         I am trying to find the word that would

3    make you more comfortable.  And you said the word

4    "improper," so let me try that.

5         A.   I'm sorry.  I need to answer verbally        11:38:20

6    here.  I don't -- I mean, I understand that there's

7    some kind of accounting for HCCs that RADV

8    determines were unsupported, HCC-member-year

9    combinations that RADV determines were unsupported,

10   but I don't know the details of that.               11:38:40

11        Q.   Fair enough.  Do you understand that

12   payment would be improper to United if the

13   member-HCC-year were unsupported?

14        A.   Again, I'm a little hung up on the word

15   "improper."  I think that I -- I think that --       11:38:55

16   yeah, I don't know what to say.

17        Q.   That's fair enough.  If you're

18   uncomfortable, I don't want to make you

19   uncomfortable.

20         You do not know whether payment would be       11:39:07

21   proper or improper if a United member-HCC were

22   unsupported, correct?

23        A.   Again, I don't know the sense of the word

24   "improper."  I understand that -- I understand

25   informally that the MAOs don't submit HCCs.  They    11:39:35



3545

Page 68

1    submit diagnosis instances to a government system.

2    And I understand that payments are based on the

3    member demographics and the HCCs that the diagnoses

4    for that member map to for the year that only a

5    single instance of each HCC matters.  Multiple          11:40:05

6    instances don't change anything.  And that there

7    are hierarchies for some HCCs and only, in some

8    sense, the riskiest of HCC in that hierarchy

9    matters if more than one has been assigned to a

10   given subscriber for the year.                          11:40:25

11            I understand that there is some obligation

12   to submit only genuine diagnosis instances and some

13   obligation to correct errors that the MAO is aware

14   of or should be aware of.  But beyond that, I don't

15   really know.                                            11:40:50

16      Q.   All right.  Fair enough.  Well, Dr. Stark,

17   let's move on to a different part of your report.

18   I am going to focus on Section III of your report,

19   and this is where you analyze the member-HCC-year

20   combinations associated with the Garthwaite final       11:41:16

21   delete list, right?

22            I am going to draw your attention to

23   Paragraph 39, Dr. Stark.  In Paragraph 39 you state

24   "For the V12 model, overall, RADV found support for

25   41,681 of 49,978 audited member-HCC-year               11:41:45



3546

Page 69

1    combinations, a rate of 83.4 percent."

2          Then you go on to say, "In contrast, RADV

3    found support for 264 of the 464 member-HCC-year

4    V12 combinations it checked that are among the

5    Garthwaite Final Deletes List, a rate of 56.9          11:42:10

6    percent."

7          Dr. Stark, those are your conclusions,

8    right, based on the work you performed for this

9    report, correct?

10     A.   Yes, sir.                                        11:42:24

11     Q.   And do you remain confident in those

12   conclusions?

13     A.   Yes.

14     Q.   Nothing's changed since you wrote the

15   report?                                                 11:42:34

16     A.   I understand that Dr. Garthwaite is

17   submitting another erratum, and it's possible that

18   the numbers in that new version could change this

19   conclusion, but I have not seen that report yet.

20     Q.   Other than that caveat, your analysis you        11:42:59

21   still stand by, correct?

22     A.   I believe that it's correct, yes.

23     Q.   All right.  So looking at Paragraph 39,

24   you found 264 circumstances in which a provider

25   submitted a diagnosis code that was not found by        11:43:19



Page 70

1   United chart review coders, and Dr. Garthwaite

2   added that diagnosis instance to his final delete

3   list, and RADV auditors found support at the

4   member-HCC-year associated with that diagnosis

5   instance, right?                                    11:43:49

6       A.   I am stumbling slightly over the word

7   "added."  That diagnosis instance is -- there are

8   -- to the best of my knowledge, 400 -- and at the

9   time that I wrote this report -- 464

10  member-HCC-year V12 combinations that, according to  11:44:21

11  Dr. Garthwaite -- sorry.  Let me try again.

12          Among the diagnosis instances that

13  Dr. Garthwaite says should be deleted because the

14  -- the chart review did not support that diagnosis

15  instance, those correspond to 464 member-HCC-year  11:44:58

16  V12 combinations and RADV found possibly based on

17  other diagnosis instances, support for 264 of those

18  member HC year -- HCC-year combinations for the V12

19  model.

20      Q.   Understood.  And you say RADV found        11:45:27

21  possibly based on other diagnosis instances, but

22  you would agree they may have found, possibly based

23  on the same diagnosis, instances too, correct?

24      A.   It could have been based on the chart from

25  the encounter that led to the diagnosis instance   11:45:42



3548

Page 71

1    that chart review -- sorry.  The diagnosis instance

2    that was originally submitted and which chart

3    review did not confirm, did not find, it could have

4    been based on a different chart.

5        Q.   So however the member-HCC-year was                11:46:06

6    supported, it remains true that there were 264

7    member-HCC-years that RADV auditors found support

8    for where the diagnosis instance is included in the

9    Garthwaite deletes list, right?

10       A.   Yes.                                               11:46:26

11       Q.   All right.  So Dr. Stark, I want to

12   present another hypothesis to you.  All of the

13   diagnosis instances on the Garthwaite final deletes

14   list are associated with member-HCC-years that are

15   unsupported?                                               11:46:42

16           MS. GLOVER:  Objection; calls for legal --

17       Q.   BY MR. ABASCAL:  You agree that that is

18   false, right?

19       A.   Unsupported by what?

20       Q.   Unsupported by RADV auditors.                     11:46:51

21       A.   Yes.

22       Q.   I'll restate it.

23           All of the codes on -- all of the

24   diagnosis instances on the Garthwaite final deletes

25   list are associated with member-HCC-years that are        11:47:02



Page 72

1    unsupported according to RADV auditors; you agree

2    that hypothesis is false, correct?

3        A.    Let me restate it just slightly.  RADV

4    found support for the HCC that some of those

5    diagnosis instances map to or an HCC higher in that      11:47:33

6    HCC hierarchy some fraction of the time.

7        Q.    I appreciate you restating it, but I'd

8    like to get an answer to the way I've stated it,

9    Dr. Stark.  So let me state the hypothesis.

10        All of the diagnosis instances on the      11:47:58

11    Garthwaite final deletes list are associated with

12    member-HCC-years that RADV auditors found to be

13    unsupported.  You agree that that hypothesis is

14    false, right?

15        A.    Are associated with -- I'd like to change      11:48:18

16    your language to that they map to rather than --

17        Q.    Okay.

18        A.    -- than associated with.  And I'd like to

19    change whether those HCCs were supported to those

20    HCCs were something higher in the hierarchy.      11:48:36

21        Q.    Let's try it again.

22        A.    And then I agree.

23        Q.    All right.  All right.  Assuming the RADV

24    auditors are correct, with that assumption, all --

25    let me restate.  Hold on a second.      11:49:02



3550

Page 73

1          So here's the hypothesis, Dr. Stark, that

2  I'd like to ask you to opine on.  All of the

3  diagnosis instances on the Garthwaite final deletes

4  list map to a member-HCC-year, or one higher in the

5  hierarchy, that RADV auditors found to be                11:49:45

6  unsupported; you agree that that is false, correct?

7      A.   I agree that that's false.

8      Q.   Let me try to state it in plain language.

9  Just because a diagnosis code is on the Garthwaite

10  final delete list, that does not mean that the         11:50:22

11  member-HCC-year that maps to that code is

12  unsupported; do you agree with that?

13     A.   Again, we're talking about support by

14  RADV, and we're talking about that HCC or one

15  higher in the hierarchy.  So which way -- shall we     11:50:50

16  try again?

17     Q.   Let me try again.

18          Just assuming the RADV auditors are

19  correct, just because a diagnosis code is on the

20  Garthwaite final deletes list, that does not mean      11:51:05

21  that the member-HCC-year mapping to that code or

22  another member-HCC-year higher in the hierarchy is

23  unsupported, right?

24     A.   Can we link "support" to "RADV" a little

25  bit more tightly in this statement?                    11:51:33



Page 74

1    Q.   You don't like my assumptions.  So I will

2    add that to my statement.  Fair enough.

3    A.   RADV found support for the HCC that -- or

4    a higher HCC in the hierarchy corresponding to some

5    of the diagnosis events on Dr. Garthwaite's list.    11:51:57

6    Q.   Thank you for that clarification.  I'm

7    going to try my question again and incorporate how

8    you said it --

9    A.   Okay.

10   Q.   -- so that we're aligned and comfortable.    11:52:23

11   I understand, I think, where you're coming out.

12        So let me phrase it this way.  Just

13   because a diagnosis code is on the Garthwaite final

14   deletes list, that does not mean that the RADV

15   auditors failed to find support for that            11:52:48

16   member-HCC-year or another one in the hierarchy,

17   correct?

18   A.   Corresponding to that diagnosis.

19   Q.   Right.

20   A.   Yes, I think that that's correct.  I am      11:53:02

21   trying to hold it all in my mind at the moment, but

22   if you could repeat it once more, please, I will

23   try.

24   Q.   Sure.  Just because the diagnosis code is

25   on the Garthwaite final deletes list, that does not   11:53:19



Page 75

1    mean that the RADV auditors failed to find support

2    for the member-HCC-year or another one higher in

3    the hierarchy that maps to that diagnosis code?

4        A.   Yes.  It doesn't necessarily mean that,

5    yes.                                           11:53:40

6        Q.   Because you found 264 instances in which a

7    diagnosis instance was on the Garthwaite final

8    deletes list, yet the member-HCC that mapped to

9    that diagnosis instance was found by RADV auditors

10   to be supported, correct?                      11:54:01

11       A.   Yes.  That one or one higher in the

12   hierarchy, yes.

13       Q.   And that conclusion, Dr. Stark, I want to

14   clarify, is based on your own work that you

15   performed in this case on behalf of the plaintiffs,  11:54:29

16   right?

17       A.   Yes, sir.

18       Q.   Okay.  Dr. Stark, you would agree that

19   neither Unitedhealth Care nor the plaintiffs in

20   this case could determine whether a member-HCC-year  11:54:45

21   would be supported simply by knowing if the

22   diagnosis code submitted by the provider was not

23   found by United chart review coders, right?

24           MS. GLOVER:  Objection; calls for a legal

25   conclusion.                                    11:55:07



Page 76

1          THE WITNESS:  So I don't know what you

2    mean by "supported."  Again, we had several

3    different notions of support.  And it feels like

4    that's, to my ear, a little bit inside out because

5    the diagnosis codes are -- the diagnosis instances          11:55:27

6    are individual events which in some sense are

7    aggregated to an annual level, indicating whether a

8    particular -- whether a particular member has a

9    particular HCC in a particular year.

10         So I would agree that by reviewing the          11:55:46

11   chart behind a single diagnosis event, it is not

12   possible to tell whether the HCC that that -- that

13   the diagnosis maps to is -- if a -- I agree if a

14   particular diagnosis event is not supported by the

15   chart corresponding to that encounter, that is not          11:56:16

16   enough information to know whether there is some

17   other diagnosis event or some other chart that

18   would support the same -- that HCC that that

19   diagnosis event maps to or an HCC higher in the

20   hierarchy.          11:56:37

21     Q.   Thanks for that clarification.  Let me

22   follow up on that.

23         If the only piece of information you had,

24   Dr. Stark, was that a United chart review coder

25   failed to find a provider-submitted code, you agree          11:56:55



3554

Page 77

 1   that you would not have enough information to know

 2   whether a member-HCC-year associated with that code

 3   was supported or not supported, right?

 4          MS. GLOVER:  Objection; calls for a legal

 5   conclusion.                                            11:57:12

 6          THE WITNESS:  Again, I am worried about

 7   the use of the word "supported."  But I agree that

 8   even if the chart doesn't provide evidence for a

 9   particular diagnosis and that diagnosis maps to

10   some particular HCC, that looking at that single      11:57:31

11   chart is not enough -- I can't tell you whether

12   there is some other chart from some other encounter

13   from some other diagnosis event that would support

14   that HCC -- that provides evidence that that member

15   is appropriately labeled with that HCC for that       11:57:48

16   year.

17      Q.   BY MR. ABASCAL:  You would need more

18   evidence to determine whether or not the chart --

19   the member-HCC-year was supported in that

20   circumstance, right?                                   11:58:06

21      A.   Yes, sir.

22      Q.   All right.  And the same is true for those

23   codes that were not found by United chart review

24   coders, right?  In other words -- let me rephrase

25   that.                                                  11:58:17



Page 78

1           Again, the fact that a provider submitted

2      code was not found by a United chart review coder,

3      that does not provide you enough information to

4      know whether the associated member-HCC-year would

5      be found to be supported or not in a RADV audit,          11:58:32

6      correct?

7           A.   It would not -- it would not be enough

8      information to know whether the materials that

9      United might provide to RADV auditors would show

10     support for that HCC for that member for that year.       11:58:53

11          Q.   You would need more information, right,

12     than just knowing whether or not the code is on the

13     first interrogatory response, right?

14          A.   Right.  So the fact that the coders are

15     unaware of any support for a diagnosis code for a         11:59:08

16     particular encounter does not mean that nowhere in

17     the record is there support for the HCC that that

18     diagnosis code maps to or something higher in the

19     hierarchy.

20          Q.   I am going to try to simplify that, which       11:59:44

21     is probably a mistake.

22          Let me say it this way:  Simply because a

23     United chart review coder did not find a code

24     submitted by a provider, that does not mean an

25     associated member-HCC-year is going to be found to        12:00:00



Page 79

1   be unsupported by a RADV auditor, correct?

2       A.   So in -- so it is -- there are examples

3   which I have counted here where RADV did find

4   support for the HCC or something higher in the

5   hierarchy that corresponds to a diagnosis event        12:00:24

6   that the chart review did not confirm.

7       Q.   And the same is true for the Garthwaite

8   deletes and -- final deletes?  In other words, that

9   you found that RADV auditors found support at the

10  member-HCC-year level for several diagnostic           12:00:50

11  instances that were on Dr. Garthwaite's final

12  delete list, correct?

13      A.   Not for the diagnostic codes, no, sir.

14      Q.   Thank you for being so precise.

15           You found -- you found that RADV auditors     12:01:06

16  found support at the member-HCC-year level for

17  several diagnosis codes that were on

18  Dr. Garthwaite's final delete list, correct?

19      A.   No, sir.

20      Q.   Well, how would you describe the 264          12:01:23

21  instances that you identified in Paragraph 39?

22      A.   Those are not confirmations of diagnosis

23  codes.  They are finding support for an HCC, not a

24  diagnosis code.

25      Q.   So I thought my question said it supported    12:01:38



Page 80

1    at the member-HCC-year level.  Maybe that was what

2    was confusing.  So I can rephrase.

3         You found that RADV auditors found support

4    for member-HCC-years that map to diagnosis

5    instances that were on the Garthwaite final deletes    12:02:04

6    list, right?

7    A.    Again, I put the mapping the other way

8    around.  The diagnosis instances map to HCC codes,

9    and it's -- I know that you have a background in

10   mathematics.  It is sort of a many-to-one mapping.    12:02:20

11   Q.    I get it.

12        You found -- let me rephrase.

13        You found diagnosis instances on the

14   Garthwaite final deletes list that mapped to

15   member-HCC-years that RADV auditors found support    12:02:36

16   for, correct?

17        MS. GLOVER:  Objection; misstates prior

18   testimony.

19        THE WITNESS:  Yes.  I found examples of

20   diagnosis instances in Dr. Garthwaite's final    12:02:51

21   deletes list that map to HCCs for which RADV found

22   support or found support for something higher in

23   the hierarchy.

24   Q.    BY MR. ABASCAL:  Right.  So just because a

25   diagnosis instance is on the Garthwaite final    12:03:16



Page 81

1    deletes list, that does not mean that the

2    member-HCC-year that is associated with that

3    diagnosis instance was found to be unsupported by

4    RADV, correct?

5        A.   I'm not sure what "associated with" means      12:03:31

6    here, but there may be -- the materials that United

7    provided to RADV showed support for the HCC or an

8    HCC higher in the hierarchy for that member for

9    that year in some instances that were -- the

10   diagnosis instance -- corresponding to diagnosis      12:04:02

11   codes that were on Dr. Garthwaite's final deletes

12   list.

13       Q.   Okay.  Dr. Stark, I want to go to FTI's

14   report.

15       A.   Sorry.  Which report?                         12:04:26

16       Q.   Mr. Renjilian.  I called him FTI.  He

17   works for FTI.  The Renjilian report, Figure 15,

18   I'd like to clarify some of his analysis and how it

19   compares to your analysis.

20           If you look at the bottom of                    12:04:53

21   Mr. Renjilian's report, he quantifies a

22   member-HCC-years for all years CON11-15, and you

23   see the total, 55,730?

24       A.   I'm sorry.  I'm looking at -- you said

25   Figure 16?                                              12:05:11



3559

Page 82

1      Q.    15.

2      A.    15.

3      Q.    One five.

4            MS. GLOVER:  It is on Page 87.

5            THE WITNESS:  Okay.  Sorry.  Okay.  Please     12:05:17

6      start the question again.

7      Q.    BY MR. ABASCAL:  I am drawing your

8      attention to the bottom chart on Figure 15,

9      CON11-15, member-HCC-years.

10     A.    Yes, sir.                                      12:05:27

11     Q.    And do you see that Mr. Renjilian counted

12     55,730?

13     A.    Yes, sir.

14     Q.    All right.  Drawing your attention,

15     Dr. Stark, to Paragraphs 39 and 40 of your report,   12:05:37

16     you also calculated the overall RADV support rate

17     under the V12 model and the V22 model.  And in

18     Paragraph 39 you calculated 49,978 audited

19     member-HCC-year combinations under V12.  And then

20     48,044 member-HCC-year combinations under V22.  Do   12:06:07

21     you see that?

22     A.    Sorry, 41,681.  I'm sorry.  Could you -- I

23     was finding my place in the document.  I apologize.

24     Could you repeat?

25     Q.    No problem.  To give you a high-level           12:06:30



Page 83

1    summary of my question, you'll see that

2    Mr. Renjilian counted 55- -- approximately 55,000

3    member-HCC-years as the total amount of

4    member-HCC-years that were audited in RADV, yet you

5    have different figures in Paragraphs 39 and 40, and    12:06:54

6    I am trying to reconcile those two.

7        A.    Mr. Renjilian's determination of support

8    was some combination of V12 and V22, and I have

9    separated them out.

10            If I understand his code correctly, he    12:07:15

11   considered a diagnosis instance to have been

12   supported by RADV if all of the HCCs corresponding

13   to that diagnosis instance that were reviewed by

14   RADV were found to be supported whether those HCCs

15   were V12 or HCC V22.    12:07:37

16       Q.    And how is your analysis different?

17       A.    I looked separately at whether HCC V12

18   were supported and HCC V22 were supported.  He

19   combined the two in some way on a

20   diagnosis-instance-by-diagnosis-instance level.    12:08:00

21       Q.    All right.  Dr. Stark, I am presenting you

22   now with another exhibit.  What number are we at?

23            MS. RAETHER:  We are up to 1552.

24            (Discussion off the record.)

25            (Reporter marked Exhibit No. 1552    12:08:46



3561

Page 84

1              for identification.)

2     Q.    BY MR. ABASCAL:  Dr. Stark, I put

3  Mr. Renjilian's Figure 15 totals at the top of this

4  chart, and I put your totals for Paragraphs 39 and

5  40 on the bottom of the chart.                     12:08:58

6          And I also took the percentage of RADV

7  support as reflected in your Paragraphs 39 and 40

8  and added the percentages there in the final

9  column, "Percent Supported."

10         I want to give you a minute to look at the  12:09:15

11  exhibit that I presented to you to make sure you're

12  comfortable that I put the figures down correctly

13  from your Paragraphs 39 and 40.

14     A.    Okay.  I think I see where the numbers

15  come from, yes.                                    12:10:05

16     Q.    All right.  Dr. Stark, as you can see,

17  Mr. Renjilian has a different total count than you

18  have.  And I think you just provided an explanation

19  of why that difference is.  And my question is:

20  Are you still confident that your calculations are  12:10:21

21  correct?

22     A.    I believe my calculations are correct,

23  yes, calculated slightly differently.

24     Q.    And so the difference is driven by the

25  methodology used for the count and doesn't reflect  12:10:36



Page 85

1    any error, correct?

2        A.    I can't vouch for Mr. Renjilian's work.    I

3    am -- an error is always possible, but I believe

4    that my numbers are accurate, yes.

5            MR. ABASCAL:    I am going to present you        12:10:58

6    another exhibit.

7                (Reporter marked Exhibit No. 1553

8                 for identification.)

9            MS. RAETHER:    This will be 1553.

10       Q.    BY MR. ABASCAL:    Dr. Stark, I am handing      12:11:28

11   you Exhibit 1553, which is a chart that I prepared

12   based on the data in your report.

13           Dr. Stark, what I did here in this chart

14   is I took the data from Table 2 and the data from

15   Table 39 -- sorry.    Paragraph 39 of your report,      12:11:49

16   and I combined them into one chart.

17           Take a moment to look at Exhibit 1553 and

18   be comfortable that I put the numbers down

19   correctly.

20       A.    Okay.    I don't entirely understand.    I see   12:14:44

21   where the numbers come from.    I haven't verified

22   the combined percentage, but I think that's

23   approximately right.

24           What does -- I don't know what -- oh, one

25   plus zero.    Okay.    You are saying it is both.       12:15:07



Page 86

1   Okay.  I think I understand what you're

2   representing here for V12.

3        Q.   All right.  Dr. Stark, I can walk through

4   those last few columns.

5             What I did here is I took the data from          12:15:17

6   Table 2 and the data from your Paragraph 39, and I

7   put them on the chart, and I added two columns at

8   the end of the chart.

9             The first column is "Is the code on the

10  first interrogatory response (1=yes)."  And then        12:15:32

11  the last column is "Does the code have payment

12  impact."  And I put one for yes and zero for no,

13  which I realize may be confusing because you had op

14  3=1.  So you had no payment impact being one in

15  your Table 2.  So I switched that a bit to try to       12:15:59

16  be clear.

17       A.   Can we agree that that means Mr. Renjilian

18  determined it didn't have payment impact?

19       Q.   Correct.  Yes.  This is -- zero means

20  Mr. Renjilian determined it was no payment impact.      12:16:13

21  So that zero would mean it is actually on Opinion

22  39.

23       A.   Understood.

24       Q.   I apologize for the confusion.  And one is

25  that the code does have payment impact, according      12:16:31



3564

Page 87

1   to Mr. Renjilian.

2       A.   Okay.

3       Q.   So Dr. Stark, you found that the overall

4   validation rate for diagnosis instances that had

5   their member-HCC-years reviewed in RADV for V12 to      12:16:48

6   be 88.8 percent, that is 3,619 out of 4,077,

7   correct?

8       A.   I'm sorry.  I'm trying to understand why

9   -- could you please repeat the question?

10      Q.   Sure.  Let's -- let me walk you through       12:17:26

11  it.

12           If you look at my third row, "Total from

13  Table 2," there were 4,077 diagnostic instances

14  that you had counted in Table 2 associated with

15  V12, right?                                              12:17:47

16      A.   Yes, sir.

17      Q.   And of those diagnostic instances, you

18  found 3,619 of them to be supported at the

19  member-HCC-year level, right?

20      A.   Yes, sir.                                       12:18:00

21      Q.   For a total support rate of 88.8 percent,

22  correct?

23      A.   Yes, sir.

24      Q.   All right.  And you found for V12 in

25  Paragraph 39 that there were a total of 49,978          12:18:10



Page 88

1  audited member-HCC-year combinations, of which 83.4

2  percent were supported, correct?

3      A.   I'm sorry.  I wasn't paying attention when

4  you read the numbers, but yes, the conclusion I

5  agree with.  I believe that's what I state in that        12:18:35

6  Paragraph 39.

7      Q.   Right.  So Dr. Stark, you found that the

8  RADV validation rate percentage for diagnosis

9  instances that were on the first interrogatory

10  response to be actually higher than the overall         12:18:52

11  validation rate for member-HCC-years of all codes

12  for V12, correct?

13      A.   Yes.  Without regard to whether they have

14  financial impact or not, yes, sir.

15      Q.   That's right.  And I prepared the same        12:19:12

16  chart for the V22 --

17      A.   I am ready for a break soon.  I was

18  wondering --

19      Q.   Let's do one now.

20      A.   Should we take lunch now instead?            12:19:26

21      Q.   Yeah, let's take lunch now.

22      A.   Does that make sense?

23      Q.   Yeah, whatever you want.  I want to make

24  sure you're comfortable.

25          THE VIDEOGRAPHER:  This marks the end of       12:19:33



Page 89

1    media file labeled No. 2.  We are off the record at

2    12:19 p.m.

3                    (Whereupon the noon recess was

4                    taken.)

5                           ---o0o---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 103

1   And those are which of the codes in the Garthwaite

2   final delete list are included in Opinion 2 or 3,

3   right?

4       A.   Yes, sir.  It's, in essence, the overlap

5   -- among other things that one can get from that          01:32:55

6   table is the overlap of diagnosis instances enter

7   -- diagnosis instances reflected that -- listed in

8   Dr. Garthwaite's final deletes list with those

9   diagnosis instances in FIR that Mr. Renjilian --

10  and again, I don't know whether the right way to          01:33:22

11  say it is didn't find, couldn't have financial

12  impact, or found it had financial impact.

13      Q.   Right.  But the point is you didn't do

14  work either for Mr. Renjilian or Dr. Garthwaite

15  that would allow you to be in a position to say one       01:33:37

16  way or another whether each of them -- either of

17  them -- okay.  I am going to start that all over

18  because I put too much in there.  I know you want

19  to be precise, so let's start with Renjilian.

20          You cannot, as you sit here today, opine          01:33:53

21  one way or the other whether Mr. Renjilian's

22  Opinion 3 is correct?

23      A.   Well, again, I did not check the

24  underlying coding.  I did check some of the

25  arithmetic, and I did check the underlying coding        01:34:07



3568

Page 104

1    against Dr. Garthwaite's opinion.

2         But I did no independent work to determine

3    whether either of them was correct in their

4    flagging of a particular diagnosis instance as

5    having financial impact or not.  I just looked at        01:34:26

6    the concordance of the two.

7    Q.    Perfect.  And when you said "either of

8    them," you meant Mr. Renjilian and Dr. Garthwaite?

9    A.    Yes, sir.

10   Q.    All right.  Great.                                 01:34:39

11        Let's go through your Table 1, then.  I'd

12   like to go through the results on your Table 1,

13   Dr. Stark, and draw your attention to the number

14   that's approximately 28 million.

15        Dr. Stark, you found that there were -- or        01:34:59

16   you confirmed the count of the number of diagnostic

17   instances in the first interrogatory response to be

18   27,937,651, correct?

19   A.    Yes, sir.

20   Q.    Okay.  In plain terms, there were               01:35:26

21   approximately 28 million diagnosis instances in

22   which a provider submitted a code and the United

23   chart review coder did not find that code, correct?

24   A.    If by "code," we mean diagnosis code

25   associated with a particular date of service, yes,     01:35:46



3569

Page 105

1    sir.

2        Q.   All right.  And then you also counted

3    1,977,921 diagnostic instances in the Garthwaite

4    final delete list, right?

5        A.   Yes, sir.                                    01:36:06

6        Q.   And you verified these numbers, correct?

7        A.   Yes, sir.

8        Q.   In your Opinion II, which is right below

9    your Table 1, you state the following, "RADV found

10   support for those (inconsequential) diagnosis        01:36:26

11   instances at a much higher rate (approximately 96

12   percent) than the instances that have financial

13   impact if deleted."

14         What did you mean by "inconsequential

15   diagnosis instances"?                                01:36:48

16       A.   I meant according to that -- Mr. Renjilian

17   flagged them in his Opinion 3 as having no

18   financial impact if deleted.

19       Q.   And they are inconsequential because they

20   could not have affected payment, correct?           01:37:00

21       A.   They are inconsequential only in the sense

22   that Mr. Renjilian claimed that deleting them would

23   not -- would not have any financial consequences.

24       Q.   Fair enough.  I don't want to suggest that

25   you verified that work.  So I like your caveat.      01:37:14



Page 106

1     Let me restate it.

2           So they're inconsequential because,

3     according to Mr. Renjilian, they did not affect

4     payment, right?

5     A.    Deleting them would not have changed the          01:37:27

6     payment, according to Mr. Renjilian.

7           MR. ABASCAL:  Okay.  Let's show you

8     another exhibit.

9           MS. RAETHER:  I think this is 1555.

10          (Reporter marked Exhibit No. 1555          01:37:57

11          for identification.)

12    Q.    BY MR. ABASCAL:  Dr. Stark, I am showing

13    you Exhibit 1555, which are excerpts of your Table

14    1 with some additional arithmetic.

15    A.    You subtracted the 65 -- 63,506 from 1.9          01:38:15

16    million-ish; is that correct?

17    Q.    Yes, that is correct, Dr. Stark.  I took

18    -- let me go through that in some detail.

19          You found in Table 1 that there were

20    certain diagnosis instances that were not on the          01:38:33

21    first interrogatory response but were on

22    Dr. Garthwaite's final delete list, right?

23    A.    Yes, sir.

24    Q.    You found 63,506 diagnosis instances that

25    were on the Garthwaite final delete list but not in          01:38:46



Page 140

1    HCCs that RADV gives very little information about

2    regardless of how the RADV sample is drawn.

3        Q.   Well, you raise a good point, Dr. Stark.

4    Why don't I take a step back.  Let's go to the

5    first sentence of your opinion.  You say "The RADV          02:53:13

6    samples of individual HCCs are very small."  Do you

7    see that?

8        A.   Yes, sir.

9        Q.   All right.  And then you then describe in

10   several pages how that small sample size affects          02:53:25

11   whether or not the RADV results can be extrapolated

12   to a larger population, right?

13       A.   It -- no.  It -- if the sample had been --

14   even if the sample had been drawn in a way that

15   would permit statistical extrapolation, the              02:53:48

16   uncertainty in that extrapolation would be very

17   large because the sample sizes are small.

18       Q.   That's right.  What I'd asked is you

19   described in several pages how that small sample

20   size makes it difficult to extrapolate without           02:54:08

21   considerable statistic bias?

22       A.   No, sir.  The bias issue is different.

23   This is about statistical uncertainty under a

24   hypothetical counterfactual assumption that the

25   sample had been drawn in a way that I understand it      02:54:26



3572

Page 141

1    was not drawn, but in a way that is easier to

2    analyze and that would lead to smaller

3    uncertainties.

4            So this is a -- even in sort of the most

5    optimistic view, the uncertainty in extrapolation        02:54:40

6    due to sampling variability would be large, which

7    is a separate issue from bias, which has to do with

8    the population from which the sample was drawn, the

9    particular design of the sample, the fact that this

10   was a stratified cluster sample of HCCs, not a          02:55:02

11   uniform sample of HCCs and so on.  Other sources,

12   for example, that RADV is potentially, if not

13   actually, looking at different underlying charts.

14      Q.   I am going to try something different.

15      A.   Okay.                                            02:55:28

16      Q.   Let's go to your Paragraph 54.

17      A.   Paragraph 56?

18      Q.   54.

19      A.   54.

20      Q.   Yeah.  I want to draw your attention to        02:55:37

21   the middle of that paragraph.  It says, "The raw

22   RADV support rate should not be extrapolated to the

23   Garthwaite Final Deletes List."  Do you see that?

24      A.   Yes.

25      Q.   All right.  Could you explain why?             02:55:55



Page 142

1        A.    There's a very long list of reasons.  One

2    of them is that in sampling and extrapolation, we

3    draw -- meaning statistics draws a distinction

4    between the sampling frame and the population.

5             The sampling frame is the collection of            02:56:27

6    units from which the sample is drawn, and that

7    might or might not be identical to the population

8    to which one would like to extrapolate.

9             My understanding is that the sampling

10   frame for RADV was a particular collection of            02:56:43

11   contract years that did not comprise every contract

12   year that's relevant to the present matter.

13            So there's a mismatch between the sampling

14   frame and the population that already makes

15   extrapolation impossible without bias of unknown            02:57:09

16   magnitude.

17            Second issue is within each contract year

18   that RADV did examine, the way the sample was drawn

19   was not a simple random sample of HCCs, which is

20   what would be required for -- in order to            02:57:39

21   extrapolate from a sample of HCCs to the contract

22   year from which those HCCs were selected, those

23   member-HCC-years were selected, for the raw rate to

24   be an unbiased estimate, that sample needs to have

25   been drawn in such a way that every HCC-member-year            02:58:06



Page 143

1    in that contract was equally likely to be selected.

2         That is not how the sample was drawn.  The

3    sample was drawn -- I understand the way that RADV

4    works in general -- although I understand there's

5    been some variation from year to year.  But I          02:58:25

6    understand in general the way RADV works is by

7    sampling members, not sampling HCCs.  Because it is

8    sampling members and then looking at all of the

9    HCCs that go with a given member.  Instead of being

10   an equal probability sample, it is a cluster          02:58:40

11   sample.  It doesn't sample all the subsets with

12   equal probability.

13        And secondly, even the members are not

14   drawn with equal probabilities -- sorry.  The

15   design of the sample, even at the member level --      02:58:56

16   at the level of members is a stratified sample, I

17   understand that it involves first dividing payments

18   -- dividing members into three groups based on the

19   amount that was paid for that member in that year.

20   So terciles of payment.                                02:59:20

21        So all of those differences need to be

22   taken into account in extrapolating the sample rate

23   for the RADV sample from a single contract year to

24   that entire contract year.  But then the number of

25   the sampling rates, meaning the fraction of the        02:59:52



Page 144

1  population that each sample represents, I

2  understand may vary from contract to contract that

3  RADV audits.  So weights need to be used to adjust

4  for those differences in sampling rates.

5         And beyond that, there's no statistical          03:00:13

6  justification for extrapolating beyond the

7  particular contract years that RADV looked at.

8         So there are a large list of reasons that

9  the raw rate of support has unknown bias in

10 addition to statistical variability if it's being    03:00:38

11 used as an estimate of the overall rate of support

12 for HCCs corresponding to diagnosis instances

13 identified on the Garthwaite final deletes list.

14    Q.   Have you completed your answer, Doctor?

15    A.   Yes, I think so.                                03:01:02

16    Q.   All right.  Great.  I may have to ask you

17 to repeat it again because I am going to change --

18 I am going to change -- it's torture, isn't it --

19 the question slightly.

20        You said in Paragraph 54 "the raw RADV          03:01:17

21 support rate should not be extrapolated to the

22 Garthwaite Final Deletes List."

23        Now I want to be a little bit more

24 specific.  In Paragraph 39 you concluded, or you

25 found -- you counted, you counted that RADV found    03:01:33



Page 145

1   support for 264 of the 464 member-HCC-year V12

2   combinations.  By inference, they did not find

3   support for 200 of them, correct?

4       A.   Yes, sir.

5       Q.   Okay.  Would it be appropriate for any of        03:01:55

6   the parties in this case to extrapolate those RADV

7   findings, the support or lack of support rate, to

8   the full Garthwaite final deletes list?

9       A.   No, it would not.  This is a statement

10  about the RADV sample itself.  It's not a statement        03:02:12

11  about the populations from which the RADV sample

12  was drawn.

13      Q.   All right.  In your Table 2 you found that

14  codes/diagnosis instance with payment impact were

15  supported at 61.3 percent for all years for V12,          03:02:44

16  right?

17      A.   In the intersection of the RADV sample --

18  sorry.  The 61.3 percent you're pointing out the

19  V12 --

20      Q.   Yes.                                             03:03:05

21      A.   -- row?

22      Q.   Yes.

23      A.   And we're looking at those diagnosis

24  instances that were not flagged by Mr. Renjilian as

25  having --                                                 03:03:17



Page 146

1        Q.    Right.

2        A.    -- financial impact if deleted.  Yes, that

3    61.3 percent applies to sort of the intersection of

4    FIR Renjilian's opinion 3=0 and RADV.  It doesn't

5    apply more broadly than that.  I have no basis for        03:03:37

6    extrapolating that to any larger group.

7        Q.    That was going to be my question.  It

8    would be inappropriate to extrapolate the findings

9    in Table 2 to any broader population, correct?

10       A.    There's no statistical basis for              03:03:53

11   extrapolating it any further.

12            I might need to think about it more.  But

13   given that if I knew in detail the design of the

14   RADV sample, it might be possible to take a

15   weighted combination of the underlying data and      03:04:25

16   come up with some percentage that could be

17   extrapolated to the particular contract years that

18   RADV sampled, but it would not be the raw rate, and

19   it would not apply beyond the frame from which RADV

20   drew its sample, meaning contract years that were      03:04:50

21   not audited by RADV.

22       Q.    I understand, but you haven't done that

23   work?

24       A.    No, I have not.  I don't know the RADV

25   design in detail, and it would require -- yes, it      03:05:02



Page 147

1    would -- that's work I have not done.

2        Q.    And Dr. Garthwaite did not do that work in

3    creating his report?

4        A.    I don't believe so, no.

5        Q.    And neither did Mr. Renjilian?                    03:05:12

6        A.    No, sir.

7        Q.    So to your knowledge, no one's done that

8    work, correct?

9        A.    To my knowledge, nobody's done that work.

10       Q.    To -- well, let's go to -- let's switch        03:05:24

11   gears a little bit.

12       A.    Time for another five-minute break?

13             MR. ABASCAL:  Yeah, sure.

14             (Discussion off the record.)

15             THE VIDEOGRAPHER:  This marks --              03:05:37

16             (Discussion off the record.)

17             MS. GLOVER:  Real quick before we go off

18   the record, I didn't state an objection earlier

19   that I'd like to state.  For Exhibit 1557, I object

20   to the use of this exhibit and questions about it     03:05:51

21   for lack of foundation.

22             MR. ABASCAL:  Okay.  Fair.  Fair enough.

23             THE VIDEOGRAPHER:  Off the record?

24             MR. ABASCAL:  Yes.

25             THE VIDEOGRAPHER:  Okay.  This marks the     03:06:01



3579

Page 165

1   final deletes that would be supported based on the

2   data available here in this case, correct?

3           MS. GLOVER:  Objection; form.

4           THE WITNESS:  When you say "supported," do

5   you mean had RADV examined every member-HCC-year in      03:53:29

6   every contract?

7       Q.   BY MR. ABASCAL:  Yes.

8       A.   Yes.  We did -- there is not appropriate

9   data for doing that.  Because there's only data on

10  a subset of contracts and a subset of years and --      03:53:46

11  there's no way to extrapolate that without sampling

12  from the whole universe.

13          And then in doing that, the design of the

14  sample would need to be taken into account.  So in

15  detail I would need to understand how RADV draws        03:54:08

16  its sample and take that into account in doing the

17  extrapolations of each contract year separately and

18  then amalgamating those to get an overall estimate

19  of the rate.

20          Sorry.  I'm answering a different             03:54:27

21  question.  I apologize.  Your question was

22  specifically about the final deletes list.  It was

23  not about all contract years or...

24          I agree that there is not -- I'm not aware

25  of any data that speaks to that that would allow       03:54:45



Page 166

1    one to estimate what fraction of the diagnosis --

2    sorry.  What fraction of the diagnosis events in

3    the final deletes list map to an HCC-member-year

4    that RADV would have found support for had it

5    examined every member-HCC-year that intersects          03:55:05

6    Garthwaite's final deletes list.

7        Q.    I am going to try to restate that.

8        A.    You want me to say it again?

9        Q.    No, I am going to try to restate it.

10       A.    Okay.                                           03:55:46

11       Q.    Based on the data that you have available

12   and that you have reviewed in your work on this

13   case, there is not a way to reliably estimate the

14   fraction of diagnosis instances in the final

15   deletes -- the Garthwaite final deletes list that      03:56:03

16   map to an HCC-member-year that would be supported

17   by RADV auditors, right?

18       A.    I agree with that.

19       Q.    And similarly, there's not a way to

20   estimate the fraction that would not be supported,     03:56:32

21   correct?

22       A.    I agree with that, too.

23       Q.    All right.

24       A.    If there were, there would be a way to do

25   it the first time.                                      03:56:44



3581

Page 167

1     Q.    One minus.

2           In Paragraph 84 of your report, Dr. Stark,

3     you say at the bottom, "However, it is impossible

4     to know how many additional HCC instances would

5     have been supported by the unretrieved charts."      03:57:11

6     What do you mean by that?

7     A.    Without retrieving the charts, one doesn't

8     know whether they would have shown support for that

9     member for that HCC for that year.

10          And without retrieving at least a random       03:57:39

11    sample of those charts, there's no reliable way to

12    estimate statistically how many additional

13    instances would have found support.

14    Q.    Dr. Stark, you mentioned "response

15    schedule" in your report.  Can you explain what is    03:58:04

16    a response schedule?

17    A.    "Response schedule" is a term of art,

18    describes a mathematical relationship that, in

19    essence, is how nature generated the data in

20    question.                                              03:58:26

21          So in order to use a fitted function to

22    make causal inference as a function fitted to data

23    to make a causal inference about what would have

24    happened had there been an intervention and

25    something changed, the relationship needs to be a     03:58:49



3582

Page 199

1              DEPOSITION OFFICER'S CERTIFICATE

                 (Civ.Proc. § 2025.520(e))

2

   STATE OF CALIFORNIA      )

3                           )  Ss.

   COUNTY OF SAN FRANCISCO )

4

5                    I, Balinda Dunlap, hereby

6    certify:

7           I am the deposition officer that

8    stenographically recorded the testimony in the

9    foregoing deposition.

10          Written notice pursuant to Code of Civil

11   Procedure, Section 2025.520(a), having been sent,

12   the deponent took the following action within the

13   allotted period with respect to the transcript of

14   the deposition:

15          (  ) In person, at the office of the

16   deposition officer, made the changes set forth on

17   the original of the transcript.  (The parties

18   attending the deposition have been notified of said

19   changes.)

20          (  ) Approved the transcript by signing

21   it.

22          (  ) Refused to approve the transcript by

23   not signing it.

24          (  ) By means of a signed letter, made the

25   changes and approved or refused to approve the



3583

Page 200

1    transcript as set forth therein.  (Said letter has

2    been attached to the original transcript and copies

3    thereof mailed to all parties attending the

4    deposition.)

5            (  ) Failed to approve the transcript

6    within the allotted time period.

7    Dated _____.

8

9

10   *Balinda Dunlap*
     _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**MAGNA** ▶
LEGAL SERVICES

1        - - - - - -
         E R R A T A
2        - - - - - -

3

| 4 PAGE | LINE | CHANGE FROM | CHANGE TO | REASON |
|---|---|---|---|---|
| 5  12 | 16 |  | and Constantine Cannon | Incomplete Answer |
| 6  22 | 08 | Nothing I can think of. | Not that I can think of. | Transcript Error |
| 7  23 | 18 | adjusted. | adjusting. | Accuracy |
| 8  30 | 07 | probability distribution. If | probability distribution if | Accuracy |
| 9  30 | 08 | is true, we | is true. We | Accuracy |
| 10  30 | 19 | gets | gives | Accuracy |
| 11  37 | 11 | member-HCCs 2011-2015. | member-HCCs 2011-2013. | Transcript Error |
| 12  38 | 10 | writes "Member-HCCs" at | writes "Members plus-HCCs | Transcript Error |
| 13  38 | 20 | member-HCC-years | member plus-HCC-plus years | Transcript Error |
| 14  40 | 06 | I think their chart | I think they're charts | Accuracy |
| 15  41 | 13 | materials, some error rate. | materials has some error rate. | Accuracy |
| 16  46 | 05 | additional annotations, | additional annotations-- | Clarity |
| 17  46 | 07 | or his team which included flags, so values | or his team-- which included flags: values | Clarity |
| 18  46 | 08 | were true or false | were either true or false | Transcript Error |
| 19  47 | 04 | not diagnose | not examine | Clarity |
| 20  47 | 05 | determine if they were reported. | determine whether they were reported. | Transcript Error |
| 21  48 | 04 | instances that was | instances that were | Clarity |
| 22  55 | 13 | that were multiplies | that were multiples | Transcript Error |
| 23  56 | 10-11 | Well, again, missed in chart review, or chart review didn't find them. | Well, again, "missed in chart review," versus "chart review didn't find them." | Clarity |
| 24  62 | 19 | than some more abstract notion | than some more abstract or platonic notion of what support might be -- | Transcript Error |

www.MagnaLS.com                                    866–624–6221

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103

3585

**MAGNA** ⟩
**LEGAL SERVICES**

```
1        - - - - - -
              E R R A T A
2        - - - - - -

3
```

| | PAGE | LINE | CHANGE FROM | CHANGE TO | REASON |
|---|---|---|---|---|---|
| 5 | 62 | 22 | supported. | "supported." | Clarity |
| 6 | 68 | 04 | for the year that only a | for the year and that only  a | Clarity |
| 7 | 70 | 16 | found possibly | found--possibly | Clarity |
| 8 | 70 | 17 | instances, support | instances--support | Clarity |
| 9 | 71 | 03 | did not find, it | did not find. It | Clarity |
| 10 | 81 | 10 | diagnosis instance--corresponding | diagnosis--corresponding | Transcript Error |
| 11 | 84 | 03 | Mr. Renjilian's Figure 15 totals | Mr. Renjilian's totals from Figure 15 | Transcript Error |
| 12 | 86 | 22 | 39 | 3 | Transcript Error |
| 13 | 97 | 10 | The map | That map | Transcript Error |
| 14 | 103 | 11 | it is didn't | it is, "didn't | Clarity |
| 15 | 103 | 11 | find, couldn't have financial | find couldn't have financial | Clarity |
| 16 | 103 | 12 | impact, or found it had financial impact. | impact," or "found it had financial impact." | Clarity |
| 17 | 108 | 18 | percent if FIR would have been | percent if your arithmetic is correct. | Transcript Error |
| 18 | 110 | 02 | If you go to Paragraph 21. | If you go to your Paragraph 21. | Transcript Error |
| 19 | 110 | 09 | report? | report, not Dr. Garthwaite's report | Transcript Error |
| 20 | 110 | 11 | I thought you were talking about | I was looking at | Transcript Error |
| 21 | 117 | 03 | "missed in chart review." | words "missed in chart review," | Clarity |
| 22 | 117 | 04 | When chart review didn't find them, | but "when chart review didn't find them" | Clarity |
| 23 | 121 | 02 | HCCs annual HCCs for members -- | HCCs-- annual HCCs for members -- | Clarity |
| 24 | 121 | 15 | HCC validation rates. | HCC-year validation rates. | Transcript Error |

**MAGNA**
**LEGAL SERVICES**

```
1        - - - - - -
           E R R A T A
2        - - - - - -

3

4  PAGE   LINE        CHANGE  FROM              CHANGE TO                    REASON

5   123    11       hierarchy.                  in the hierarchy.           Transcript Error

6   130    19       then maps to were not.      then maps to or not.        Transcript Error

7   131    07       supported or not, if        supported or not... if      Clarity

8   131    08       pulling opinions, things that   pulling opinions... things that   Clarity

9   131    10       member-HCC-year combination -- that   member-HCC-year combination that   Clarity

10  131    11       examined by RADV, we        was examined by RADV. We     Clarity

11  131    15       to Opinion 1                to Opinion 3                Transcript Error

12  133    9        Fisher's exact test, which imagines   Fisher's exact test, which asks,   Clarity

13  133    10       if the labeling as          "if the labeling as         Clarity

14  133    12       were as if a random label   were a random labelling      Clarity

15  133    13-14    see this difference.        to see this difference?"    Clarity

16  135    8        saying, is that             saying, "is that            Clarity

17  135    14       support or not.             support or not?"            Clarity

18  141    11       Other sources,              There are other sources of bias,   Clarity

19  143    9        given member. Instead       given member, instead       Transcript Error

20  143    16       stratified sample, I        stratified sample. I        Transcript Error

21  ____   ____

22  ____   ____

23  ____   ____

24  ____   ____
```

**MAGNA**
**LEGAL SERVICES**

```
1        - - - - - -
             E R R A T A
2        - - - - - -

3
```

| PAGE | LINE | CHANGE FROM | CHANGE TO | REASON |
|------|------|-------------|-----------|--------|
| 149 | 19 | Yes. Without considerable bias, yes. | Yes. Without unknown bias, yes. | Transcript Error |
| 150 | 20 | Tab 1 | Tab i | Correction |
| 158 | 21 | as I know that these estimates are basically | as I know. These estimates are basically | Clarity |
| 163 | 15 | today, I understand | today. I understand | Transcript Error |
| 167 | 03 | you say at the bottom, "However, it is impossible | you say at the bottom, "it is impossible | Transcript Error |
| 167 | 22 | make causal inference as a function fitted to data | make causal inference -- use a function fitted to data | Transcript Error |
| 168 | 14 | So it has some resting weight. If I now, | So it has some resting length. If I now, | Transcript Error |
| 171 | 08 | random number generator in STATA, the Mersenne | random number generator, the Mersenne | Transcript Error |
| 175 | 17 | But we did have examples where it broke | But we didn't have examples where it broke | Transcript Error |
| 176 | 13 | generator that you did, correct? | generator that you developed, correct? | Transcript Error |
| 179 | 24 | Jupiter notebook | Jupyter notebook | Wrong Spelling |
| 180 | 11 | to correct. You said 1597. You mean 1557? | to correct. You said Exhibit 1597. You mean 1557? | Transcript Error |
| 181 | 25 | and Human Services (HSS) | and Human Services (HHS), | Transcript Error |
| 182 | 09 | Before I jump into this particular | Before I jump into this thick | Transcript Error |
| 183 | 02 | particular abandon | particular abandoned | Transcript Error |
| 183 | 05 | is in [0.1]. | is in [0,1]. | Transcript Error |
| 188 | 14 | other things, SAS, at least Version 9.2, | other things, the algorithm SAS, at least Version 9.2, | Clarity |
| 189 | 06 | specific paragraph you drew my attention to. | paragraph you drew my attention to. | Transcript Error |
| 191 | 11 | and this comes up in several cases, | and this comes up in several places, | Transcript Error |

1        ACKNOWLEDGMENT OF DEPONENT

2
          I,_____Philip B. Stark_____, do
3   hereby certify that I have read the
    foregoing pages, 1 - PGS, and that the
4   same is a correct transcription of the
    answers given by me to the questions
5   therein propounded, except for the
    corrections or changes in form or
6   substance, if any, noted in the attached
    Errata Sheet.
7

8   _____    17 April 2024
    WITNESS NAME                DATE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

**www.MagnaLS.com**                        **866−624−6221**

Seven Penn Center
1635 Market Street − 8th Floor
Philadelphia, PA 19103

3589