MICHAEL D. GRANSTON
Deputy Assistant Attorney General,
Civil Division

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
ROSS M. CUFF
JACK D. ROSS (CBN 265883)
HUNTER B. THOMSON (CBN 330533)
Assistant United States Attorneys
300 N. Los Angeles Street, Room 7516
Los Angeles, California 90012
Tel: (213) 894-6379; Fax: (213) 894-7819
Email: hunter.thomson@usdoj.gov

*Attorneys for the United States of America*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, <br><br> Plaintiffs, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC., *et al.*, <br><br> Defendants. | No. CV 16-08697 FMO-PVCx <br><br> **SUPPLEMENTAL BRIEF OF THE UNITED STATES OF AMERICA** |

i

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................................1

II.  ARGUMENT.........................................................................................................3

     A.   The Second Prong of the Reverse FCA Provision Does Not Require
          any Additional Proof of Materiality Beyond the Failure to Return an
          Overpayment ...............................................................................................4

     B.   Even if a Showing of Materiality Beyond the Unlawful Retention of
          an Overpayment was Required, there is Evidence that United's
          Failure to Pay Money Owed was Material and thus Granting
          Summary Judgment on Materiality is Unwarranted ...................................9

          i.   Materiality is a Multi-Factor Inquiry and No One Factor is
               Dispositive ........................................................................................9

               a. The Evidence Supports Many Escobar Factors from Which the
               Jury can Find Materiality……………………………………… 10

                    1. CMS had no Actual Knowledge of the Specific Diagnosis
                    Codes United Failed to Delete……………………………... 13

                    2. The Facts Related to a 45-Minute Videoconference between
                    United and CMS on April 29, 2014 are Hotly Contested, Do
                    Not Establish that CMS had Actual Knowledge that United
                    Failed to Pay Money Owed for Unsupported Diagnosis Codes,
                    and Do Not Support Summary Judgment on
                    Materiality……………………………………………….. 14

               b. There is Evidence for the Jury to find that the Diagnosis Codes at
               Issue were Unsupported……………………………………………15

          ii.  United's Argument Regarding Duplication of Claims is
               Unavailing ......................................................................................18

III. CONCLUSION ...................................................................................................19

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................13

*Encino Motorcars, LLC v. Navarro*,
584 U.S. 79 (2018)..................................................................................5

*Matrixx Initiatives, Inc., v. Siracusano*,
563 U.S. 27 (2011).................................................................................10

*United States ex rel. Campie v. Gilead Scis., Inc.*,
862 F.3d 890 (9th Cir. 2017)............................................... 10, 12, 13, 15

*United States ex rel. Doe v. Heat Solution, PC*,
923 F.3d 308 (3d Cir. 2019).....................................................................8

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
842 F.3d 103 (1st Cir. 2016) ............................................................10, 13

*United States ex rel. Foreman v. AECOM*,
19 F.4th 85 (2d Cir. 2021).......................................................................8

*United States ex rel. Frey v. Health Management Systems, Inc.*,
No. 3:19-CV-0920-B, 2021 WL 4502275 (N.D. Tex. Oct. 1, 2021)...........7

*United States ex rel. Jacobs v. Pacific Dermatology Institute, Inc.*,
No. EDCV 20-1906 JGB (SHKx), 2022 WL 17401522 (C.D. Cal. Aug. 16,
2022)…………………….. ....................................................................7

*United States ex rel. Kane v. Healthfirst, Inc.*,
120 F. Supp. 3d 370 (S.D.N.Y. 2015) ......................................................8

*United States ex rel. Kelly v. Serco, Inc.*,
846 F.3d 325 (9th Cir. 2017)...............................................................8, 9

*United States ex rel. Little v. Shell Exploration & Production Co.*,
No. CV H-07-871, 2017 WL 4742917 (S.D. Tex. Aug. 18, 2017). ...........7

*United States ex rel. Miller v. Citigroup, Inc.*,
No. 19cv10970 (DLC), 2022 WL 2237619 (S.D.N.Y. June 22, 2022). ...5, 6

*United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist.*,
No. 49-5, 688 F.3d 410 (8th Cir. 2012) ..................................................12

*United States ex rel. Ormsby v. Sutter Health*,
444 F. Supp. 3d 1010 (N.D. Cal. 2020)...........................................6, 7, 17

*United States ex rel. Rose v. Stephens Inst.*,
909 F.3d 1012 (9th Cir. 2018)..........................................................10, 12, 13

*United States ex rel. Silingo v. WellPoint, Inc.*,
904 F.3d 667 (9th Cir. 2018)..................................................................11

iii

*United States ex rel. Swoben v. UnitedHealthcare Ins. Co.*,
    848 F.3d 1161 (9th Cir. 2016).................................................. 1, 11, 17, 18

*United States v. Cockerell Dermatopathology*, P.A.,
    No. 3:21-CV-0672-B, 2021 WL 4894173 (N.D. Tex. Oct. 20, 2021)........................8

*United States v. Lahey Clinic Hosp., Inc.*,
    399 F.3d 1 (1st Cir. 2005)................................................................12

*United States v. Tenet Healthcare Corp.*,
    343 F. Supp. 2d 922 (C.D. Cal. 2004)....................................................12

*United States v. Univ. of Miami*,
No. 12-24513-CIV-LENARD/LOUIS, 2018 WL 8581772 (S.D. Fla. Mar. 29,
    2018)....................................................................................8

*Universal Health Servs. v. United States ex rel. Escobar*,
    579 U.S. 176 (2016)...............................................................*passim*

**STATUTES**

31 U.S.C.

    § 3279(a)(1)(A)...........................................................................8

    § 3279(a)(1)(B)…..........................................................................8

    § 3729(a)(1)(G)..................................................................*passim*

    § 3729(b)(3)...............................................................................3, 4

    § 3729(b)(4)…...............................................................................4, 10

**REGULATIONS**

42 C.F.R. § 422.752…...................................................................12

65 Fed. Reg. 40,170 (June 29, 2000)................................................11

iv

## I.    INTRODUCTION

The central issue in this case is this: When an MAO like United reviews its beneficiaries' medical records, can the MAO turn a blind eye to information from those reviews showing that diagnosis codes it submitted to CMS for payment were unsupported and retain overpayments it received for those unsupported codes? United contends it is allowed to do both. But it is allowed to do neither. By burying its head in the sand and ignoring information about the unsupported codes it had submitted for payment, United knowingly and improperly retained over $2 billion of Medicare payments to which it is not entitled. This is an unacceptable depletion of the Medicare trust funds that provide healthcare to millions of elderly and disabled individuals, leaving a gaping hole in those funds. United here argues that it should be granted summary judgment – and *never* have to repay those billions of dollars – because its refusal to return funds intended to provide healthcare to our nation's most vulnerable citizens was somehow immaterial to CMS, or, even more bold of a claim, that CMS somehow sanctioned its retention of funds rightfully belonging to the Medicare trust. While United claims to be CMS's partner in providing healthcare to the country's elderly, instead it has sought to unlawfully maximize its profits at the expense of the taxpayer funded Medicare program.

In moving for summary judgment, United makes the surprising argument that no rule prohibits it from deliberately ignoring the negative results of its Chart Reviews or from retaining these overpayments. Joint Brief, 48-53. But since the inception of the MA program, MAOs have had clear contractual and regulatory requirements to conduct their chart reviews in good faith and to exercise due diligence in taking steps to correct the submission of unsupported codes. Joint Brief, 54-58. As the Ninth Circuit held, turning a blind eye to over-reporting errors shows a lack of diligence and absence of good faith. *United States ex rel. Swoben v. UnitedHealthcare Ins. Co.*, 848 F.3d 1161, 1175-76 (9th Cir. 2016). And MAOs have a duty to refund to CMS, rather than retain, overpayments from unsupported codes. Joint Brief, 54-62. The FCA imposes liability on a person who deliberately ignores or recklessly disregards information showing it was a recipient of

1

overpayments. Joint Brief, 58-62.

Because the evidence clearly shows that United deliberately ignored or recklessly disregarded the results of its own Chart Reviews, showing it submitted unsupported codes for payment and failed to return money owed to CMS, United attempts to contort the False Claims Act and impose elements of proof beyond those required by the statutory language. In particular, United claims that materiality is an additional statutory element of the second prong of the reverse false claims provision, 31 U.S.C. § 3729(a)(1)(G), and that CMS would not have sought to recover the payments it made to United for unsupported codes it had submitted. United relies primarily on a single 45-minute videoconference in April 2014 during which United contends CMS gave it a green light to ignore over-reporting errors found in its Chart Reviews. Joint Brief, 67-68. But the United States will present evidence at trial that CMS did no such thing, and conversely informed United that "[r]egardless of the effective date of the proposed requirement related to medical record reviews, there are other laws that do impose standards, requirements and responsibilities on MA plans in connection with the federal payments they receive from CMS. We cannot provide advice to United about the scope of those other laws. Nor can we provide advice on whether United's plan [sic] course of action and/or purported limits on the scope of its attestation are compliant with such other laws." Joint Brief, 30, 71-72. Even the notes of United's own CFO who attended the meeting demonstrate that CMS informed United at the meeting that CMS, "Haven't known enough process to give feedback on our [United's] judgments." Joint Brief, 30, 71. Confronted with a red light at the 2014 meeting, United purports to have seen a green light. At minimum, facts are in dispute regarding that meeting, and summary judgment should be denied.

In short, United asks this Court to be the very first court ever to hold that an MAO is allowed to turn a blind eye to over-reporting errors and retain overpayments. Its argument is based on a mistaken view that liability under the second prong of the reverse false claims provision implicitly requires additional proof of materiality beyond that established by showing that the MAO knowingly and improperly avoided an obligation to

2

pay CMS. Rejecting United's argument, the Court should grant the United States' Motion for Partial Summary Judgment, and hold that under the second prong of 31 U.S.C. § 3729(a)(1)(G), proof that a defendant concealed, avoided or decreased an obligation to pay establishes any applicable materiality requirement, and that there is no extra proof of materiality required by this provision. For the reasons stated in its Opposition to United's Motion for Summary Judgment, *see* Joint Brief generally, and in this Supplemental Brief, the Court should also deny United's Motion for Summary Judgment.

## II.    ARGUMENT

The second prong of 31 U.S.C. § 3729(a)(1)(G) requires the government to prove that a defendant "knowingly conceal[ed] or knowingly and improperly avoid[ed] or decreas[ed] an obligation to pay or transmit money or property to the Government." The FCA defines "obligation" to mean "an <u>established duty</u>, whether or not fixed, <u>arising from</u> an express or implied <u>contractual . . . relationship</u>, . . ., from <u>statute or regulation</u>, or from the <u>retention of any overpayment</u>." 31 U.S.C. § 3729(b)(3) (emphasis added). United's obligation to pay the government arises from two requirements: (1) contract and regulation; and (2) retention of an overpayment. First, the government will prove that United was required by regulation and contract not to turn a blind eye to unsupported codes it submitted for payment, and to correct those unsupported codes by deleting them (as such, automatically repaying CMS for the associated overpayments). Joint Brief, 54-58. Second, the government will also prove that United was required to repay overpayments within sixty days of being put on notice of potential overpayments. Joint Brief, 58-62. Violations of these requirements are inherently material because they, by definition, influence the agency's payment or receipt of money.

Nevertheless, United contends that the second prong of 31 U.S.C. § 3729(a)(1)(G) contains some sort of additional materiality requirement. At bottom, United argues that, even though it was overpaid and obligated to repay the overpayment, the government must make some further showing that its failure to repay was material to CMS. Not only is such a bizarre requirement lacking in the text of the statute, but it is also totally devoid of

common sense. Consequently, the court should grant the government summary judgment and reject United's attempt to insert an additional materiality requirement under this prong beyond showing that the defendant unlawfully failed to return an overpayment owed to the United States.

**A.** **The Second Prong of the Reverse FCA Provision Does Not Require any Additional Proof of Materiality Beyond the Failure to Return an Overpayment**

The second prong of 31 U.S.C. § 3729(a)(1)(G) does not require some additional showing of materiality beyond United's improper retention of an overpayment. The receipt and failure to return an overpayment is, by definition, material to the government's payment or receipt of money. United has failed to identify any support in the statute or caselaw for its position that the United States must offer additional proof of materiality beyond demonstrating that the government was deprived of funds legally owed to it. While feigning credulity at the United States' argument, it is United that is asking this Court to take a precedential step and become the first to hold that the second prong of § 3729(a)(1)(G) in essence requires the United States to prove materiality twice – first to establish that United knowingly and improperly avoided an obligation to pay the government, and then to make some type of second and additional showing of materiality beyond the obligation to pay.

The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Proving liability under the second prong of the reverse false claims provision necessitates showing that the person (1) had an "obligation to pay" and (2) knowingly and improperly avoided the obligation. An "obligation" is defined as an "established duty, whether or not fixed, arising from" among other sources, a contractual relationship, regulation or the "retention of any overpayment." 31 U.S.C § 3729(b)(3). To prove an obligation to pay, the government must show that the requirements of the relevant sources of the obligation – United's contracts with CMS, regulation, or retention of an

4

overpayment – give rise to an established duty to pay. By proving an established duty to pay and that the person avoided that duty to pay, the government has shown that the person's violation of the requirements influenced the agency's payment or receipt of money and thus was material. Contrary to what United contends, the second prong of § 3729(a)(1)(G) does not have an extra or double materiality requirement. Such a requirement does not exist in the statute and, in practical terms, makes no sense. The refusal to refund money owed to the government is not only capable of influencing the agency's payment decision, but necessarily does so since it deprives the agency of funds to which it is legally entitled.

United argues that Congress *must have meant* to include a double materiality requirement in the second prong of the reverse false claims provision because the legislative history of the 2009 amendments to the FCA does not evidence any debate about whether to add the word "material" to the clause. Joint Brief, 89-91. But that reasoning is circular and faulty. As explained above, this is because the concept of materiality is inherently present in establishing that a person, in fact, had an obligation to pay. As a result, there is no need to impose a second materiality step that requires the government to make some additional materiality showing of some sort. Moreover, it is well established that nothing can be inferred from silence in the legislative history, as United suggests. *See Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 90 (2018) ("If the text is clear, it needs no repetition in the legislative history; and if the text is ambiguous, silence in the legislative history cannot lend any clarity."). United cannot read meaning into the lack of discussion in the legislative history just like it cannot read a new element into the statute where Congress chose not to include it.

United, however, argues that a double materiality requirement is necessary to avoid the second prong of the reverse FCA provision being used to punish "minor infractions." Joint Brief, 93. But the reverse false claims provision does no such thing. As courts have recognized, the obligation element itself prevents "a damages award to every person who reports a violation of the law." *United States ex rel. Miller v. Citigroup, Inc.,* No.

19cv10970 (DLC), 2022 WL 2237619, at *3, 4 (S.D.N.Y. June 22, 2022). The provision requires proof that there is an "established duty" to pay money to the government. In this case, the materiality inherent in proof that United had an obligation to pay CMS – i.e., that it had a duty to correct the unsupported diagnoses codes it learned about through its Chart Reviews, and not retain the overpayments it received in connection therewith – protects against the FCA being used to penalize "every minor regulatory misstep." In other words, United's interpretation of the reverse false claims provision is not needed to ensure that it only reaches those regulatory missteps where the violation results in the unlawful retention of federal funds. Where that occurs, however, the defendants conduct is material by definition, and no further showing of materiality is required.

United contends that *Escobar's* holding requires reading a double materiality requirement into the second prong of § 3729(a)(1)(G). Not so. The central materiality concern in *Escobar* is whether a person's violation of a requirement was capable of influencing an agency's payment or receipt of money. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192-196 (2016). Here, United violated the requirement not to turn a blind eye to unsupported codes and to delete them and the requirement to repay an overpayment. Proving that United avoided its obligation to pay satisfies the *Escobar* Court's materiality concerns because United's violation of the requirements to delete unsupported codes and to repay an overpayment necessarily influenced CMS's payment or receipt of money.

Though United attacks the cases cited by the United States in its opening brief, United cannot point to even one case holding that the second prong of the reverse FCA requires proof of materiality in addition to a showing that the defendant unlawfully retained an overpayment. Each of the cases cited by the United States in its opening brief stand for the proposition that once the United States has established that the person knowingly and improperly avoided an obligation to pay, there is no separate requirement to make some sort of additional materiality showing.

United's attempts to distort this caselaw are unpersuasive. In *United States ex rel.*

1    *Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010 (N.D. Cal. 2020), the court explicitly held

2    that there are **two** elements of a reverse false claim under the second prong of §

3    3729(a)(1)(G): (1) concealing or improperly avoiding or decreasing an obligation to pay

4    the government; and (2) doing so knowingly. 444 F. Supp. 3d at 1056. The court in *Sutter*

5    fully analyzed the government's allegations and concluded that a violation of the second

6    prong of § 3729(a)(1)(G) was sufficiently pled without requiring the government to make

7    any extra showing of materiality. *Id*. at 1077-82 (examining only whether those two

8    elements were sufficiently pled). Likewise, in *United States ex rel. Jacobs v. Pacific*

9    *Dermatology Institute, Inc.*, the court is clear that there are only two elements of a

10   successful claim under the second prong, with no mention of materiality as an independent

11   element to be proved. No. EDCV 20-1906 JGB (SHKx), 2022 WL 17401522, at *13 (C.D.

12   Cal. Aug. 16, 2022). Similarly, in *United States ex rel. Little v. Shell Exploration &*

13   *Production Co.*, while acknowledging that the pre-FERA FCA applied to the case, the

14   court examined the FERA amendment to the reverse FCA provision and noted that it

15   articulated a distinct materiality requirement only in the first prong of the provision. No.

16   CV H-07-871, 2017 WL 4742917, at *29 n.260 (S.D. Tex. Aug. 18, 2017).

17        The court in *United States ex rel. Frey v. Health Management Systems, Inc.,* a case

18   that United wholly misrepresents, is even more explicit. No. 3:19-CV-0920-B, 2021 WL

19   4502275, at *7 (N.D. Tex. Oct. 1, 2021). United claims *Frey* did not address whether an

20   independent showing of materiality was a required element under the second prong of §

21   3729(a)(1)(G), but that is simply untrue. The court expressly states that "[u]nder 31 U.S.C.

22   § 3729(a)(1)(G), the [plaintiff] must prove either five or three elements…. Both methods

23   requires [*sic*] [plaintiff] to establish the 'obligation' and 'knowledge' elements…. But only

24   the first method requires proving the materiality element." *Id.* In examining whether the

25   elements of an FCA claim had been adequately pled, the court reiterated this point stating

26   that it would "then address the required element of materiality *for the first method* of

27   establishing an indirect reverse false claim." *Id.* (emphasis added).

28        Additional caselaw further demonstrates that materiality is not a separate element

of claims under the second prong of the reverse FCA. A number of courts have discussed the elements necessary to state a claim under this provision when evaluating motions to dismiss and have not required any additional showing of materiality beyond the receipt of an overpayment. *See, e.g., United States v. Cockerell Dermatopathology*, P.A., No. 3:21-CV-0672-B, 2021 WL 4894173, at *5-8 (N.D. Tex. Oct. 20, 2021) (discussing the elements of an § 3729(a)(1)(G) second prong claim and not including materiality); *United States v. Univ. of Miami*, No. 12-24513-CIV-LENARD/LOUIS, 2018 WL 8581772, at *6 (S.D. Fla. Mar. 29, 2018) (holding that relator adequately stated a claim for a reverse false claim when alleging that Defendants owed a duty to Medicare to investigate and repay overpayments within sixty days under ACA, were on notice of the overpayments, and failed to conduct an investigation and return overpayments); *United States ex rel. Kane v. Healthfirst, Inc*., 120 F. Supp. 3d 370, 393-394 (S.D.N.Y. 2015) (finding the United States had properly alleged a claim under the second prong of § 3729(a)(1)(G) and not including materiality as an independent element to do so).

In fact, it is United that seeks a first of its kind ruling that, in addition to showing that United knowingly and improperly avoided an obligation to pay, which necessarily influenced CMS's payment or receipt of money, the government must also make some additional separate showing of materiality. United offers no caselaw directly on point, and instead bases its argument solely on the proposition that certain courts have applied *Escobar* to *all* FCA claims. Joint Brief, 91. However, none of the cases United relies on apply *Escobar* to insert an additional materiality requirement into the second prong of the reverse false claims provision beyond that established by showing the unlawful retention of an overpayment. Indeed, many of the cases do not specifically address the reverse false claims provision at all. For example, in *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 105 (2d Cir. 2021), the Second Circuit held only that *Escobar's* materiality requirement applies to all types of claims brought under § 3279(a)(1)(A). Similarly, in *United States ex rel. Doe v. Heart Solution, PC*, 923 F.3d 308, 314 (3d Cir. 2019), the court only examined affirmative claims under § 3279(a)(1)(A) and (a)(1)(B) and did not

address the reverse FCA provision. Finally, as discussed in the United States' Opposition, *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017), likewise does not address materiality in the context of the second prong of the reverse FCA. Rather, *Kelly's* brief discussion of the reverse false claims provision cites a pre-FERA case and clearly relates to the first prong's false statement requirement. *Id.* at 335-36.

In sum, the requirements that give rise to United's obligation to pay were material because, by definition, they affected the agency's payment or receipt of money. United violated those material requirements by failing to repay overpayments. *Escobar's* central concern regarding materiality – that a person violated a requirement that is material to payment – is satisfied. No additional showing of materiality is required.

**B. <u>Even if a Showing of Materiality Beyond the Unlawful Retention of an Overpayment was Required, there is Evidence that United's Failure to Pay Money Owed was Material and thus Granting Summary Judgment on Materiality is Unwarranted</u>**

Even if the type of additional materiality showing proposed by United were required, to succeed on summary judgment United must establish that facts showing its failure to repay money owed to CMS for unsupported diagnosis codes was immaterial are undisputed and it is entitled to summary judgment as a matter of law. Evidence supports that United's failure to pay money owed was material because a supported diagnosis code is a prerequisite for payment, accurate payment is the essence of the bargain between MAOs and CMS, failing to return billions of dollars in overpayments is neither minor nor insubstantial, United knew that CMS recovers overpayments for unsupported codes when MAOs delete them, and the government took action to recover overpayments from a different MAO that failed to return overpayments for known unsupported codes (and United knew that the government took this action).

**i. Materiality is a Multi-Factor Inquiry and No One Factor is Dispositive**

As noted above, the FCA defines "material" as "having a natural tendency to

9

influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court clarified that a variety of factors are relevant to the materiality inquiry and stressed that no one factor is automatically dispositive. *Escobar*, 579 U.S. at 191 (citing *Matrixx Initiatives, Inc., v. Siracusano*, 563 U.S. 27, 39 (2011)). In the wake of *Escobar*, courts have recognized that the holistic nature of the materiality inquiry often renders it inappropriate for resolution as a matter of law, particularly when the factors point in different directions. *See, e.g., United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1022 (9th Cir. 2018) ("The Department can demonstrate that requirements, such as the incentive compensation ban, are material without directly limiting, suspending, or terminating schools' access to federal student aid."); *United States ex rel. Campie v. Gilead Scis., Inc.,* 862 F.3d 890, 906 (9th Cir. 2017) (warning "that to read too much into the FDA's continued approval – and its effect on the government's payment decision – would be a mistake" because it would "allow [the defendant] to use the allegedly fraudulently-obtained FDA approval as a shield against liability for fraud"); *United States ex rel. Escobar v. Universal Health Servs., Inc.,* 842 F.3d 103, 109 (1st Cir. 2016) (*Escobar II*) (finding on remand from the Supreme Court that materiality was sufficiently alleged despite continued payment by the Government).

          a.  The Evidence Supports Many Escobar Factors from Which the Jury can Find Materiality

        The Supreme Court identified at least four factors relevant to the materiality inquiry: (1) whether the applicable requirement is a condition of payment; (2) whether the alleged violations go to the "essence of the bargain;" (3) whether the alleged violations are significant or trivial; and (4) what actions the government has taken when it has actual knowledge of the same or similar violations. *Escobar*, 579 U.S. at 193-195. Application of these factors demonstrates that, at a minimum, a jury could reasonably conclude that United's deliberate ignorance or reckless disregard of unsupported codes it learned of through its Chart Review program and failure to refund CMS for the overpayments from those codes had a natural tendency to influence CMS's payment to or receipt of money

from United.

First, the government's decision to identify a requirement as a condition of payment, while not dispositive, is evidence of materiality. *Escobar*, 579 U.S. at 194. It is a condition of payment that a diagnosis code be supported by the medical record. MAOs are not entitled to payments for unsupported codes and must refund CMS for the overpayments. From the start of the MA program, CMS has always been clear that because diagnostic data is "used as a factor in calculating payments" and the data submissions "represents a 'claim' for payment," accurate and complete data submissions are essential to ensure accurate risk adjustment payments. D-66 at 2039, Medicare+Choice Program, 65 Fed. Reg. 40,170, 40,268 (June 29, 2000); *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 673 (9th Cir. 2018). "Each diagnosis code submitted must be supported by a properly documented medical record." *Swoben*, 848 F.3d at 1168; *see also Silingo*, 904 F.3d at 673. A risk adjustment payment for an unsupported code is an overpayment which MAOs must refund to CMS. Joint Brief, 58-62.

Second, a violation that goes "to the very essence of the bargain" shows materiality. *Escobar*, 579 U.S. at 193 n.5. Submitting supported codes and correcting unsupported codes and returning associated overpayments go to the very essence of the bargain between CMS and MAOs like United because accurate data submissions are essential to ensure accurate payment, D-66 at 2039, 65 Fed. Reg. at 40,268; *Silingo*, 904 F.3d at 673, and accurate payment is the very essence of the bargain.

Third, a violation that is neither minor nor insubstantial shows materiality. *Escobar*, 579 U.S. at 194. Turning a blind eye to millions of unsupported codes and failing to return billions of dollars in overpayments is neither minor nor trivial, but rather is substantial.

Fourth, regarding what actions the government has taken when it has actual knowledge of the same or similar violations, a defendant who "knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular . . . requirement" shows materiality. *Escobar*, 579 U.S. at 194-195. United knew that CMS adjusted payment and recovered overpayments when MAOs, including

11

United, deleted unsupported codes and that CMS does not wittingly pay for an unsupported code. P-5, United 30(b)(6) (Sedor) Tr. 4067:16-4069:23; 4072:4-22.

As United knew, when the United States became aware of an MAO failing to delete unsupported codes identified through chart review and return overpayments, similar to United's conduct here, it took action to recover the overpayments. United was aware no later than March 2013 that the United States entered into an FCA settlement with another MA plan, P-18 at 4297, which United internally described as "Recently, CMS announced a settlement with SCAN health plan which outlined the expectation that when plans conduct chart review, they should be correcting/removing codes that were submitted on claims and not supported in the corresponding charts, which is the sole purpose of our Claims Verification offering." P-17 at 4293. Similarly, CMS is seeking to recover the overpayments to United through this case, showing that United's failure to return overpayments matter to CMS and were material. Indeed, "Congress intended to allow the government to choose among a variety of remedies, both statutory and administrative, to combat fraud." *United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*, 688 F.3d 410, 414-15 (8th Cir. 2012).

United attempts to rest its argument that its failure to return money owed was immaterial entirely on a single factor of the *Escobar* materiality inquiry: that CMS was aware of United's "chart review practices" but continued to pay United and contract with it.[1] Joint Brief 49, 94-95. Even if United's argument was compelling (which it is not, see section II.B.i.a.2 below), United has still not established that its failure to return money owed was immaterial because no one factor is dispositive and the many factors that can

---

[1] United also argues that CMS could have taken some intermediate form of sanction against United pursuant to 42 C.F.R. § 422.752, but it fails to establish that this provision could be applicable to the facts here. Joint Brief, 95. Rather, the regulation provides a number of violations which could trigger sanction, but the conduct alleged in this case does not appear to be one of them. Moreover, the United States does not need to exhaust administrative remedies before bringing an FCA case. *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 17 (1st Cir. 2005), *United States v. Tenet Healthcare Corp.*, 343 F. Supp. 2d 922, 934-35 (C.D. Cal. 2004). Consequently, even if CMS had an administrative sanction available (which it did not), the fact that CMS did not pursue that action does not disprove materiality.

establish materiality should be considered by the jury. *See e,g., Stephens Inst.*, 909 F.3d at 1022; *Campie,* 862 F.3d at 906; *Escobar II,* 842 F.3d at 109.

Moreover, because of the basic rule that in determining whether a triable issue of material fact exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), it would inappropriate to weigh the evidence of the multiple factors and conclude as a matter of law that United's failure to return money owed was immaterial.

1. *CMS had no Actual Knowledge of the Specific Unsupported Diagnosis Codes United Failed to Delete*

The government's actions are relevant to materiality only when it has "actual knowledge" of the violation. *Escobar*, 579 U.S. at 195. Actual knowledge of a violation is different than general knowledge of a practice. *See, e.g., Escobar II*, 842 F.3d at 112 ("mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance"). Even if CMS had general knowledge of United's "chart review practices" (which it did not), such knowledge is not the proper focus of the materiality inquiry. When an MAO deletes a diagnosis code, CMS recoups overpayments by calculating the amount of the overpayment resulting from that unsupported code and reducing future payments to recover the overpayment. Joint Brief, 21. Thus, CMS must know which specific diagnosis codes were unsupported. If CMS does not know which specific diagnosis codes were unsupported, CMS has no way to calculate and recoup overpayments for the unsupported codes.

Moreover, the Ninth Circuit, since *Escobar,* has recognized that it would be a mistake to read too much into a government agency's continued payment. *See Campie,* 862 F.3d at 906 (warning "that to read too much into the FDA's continued approval – and its effect on the government's payment decision – would be a mistake" because it would "allow [the defendant] to use the allegedly fraudulent-obtained FCA approval as a shield against liability for fraud"). Here, because United failed to delete the unsupported codes despite its Chart Review coders' findings, United deprived CMS of the ability to recover

13

1    the overpayments to United for those unsupported codes. Reading too much into the fact

2    that CMS did not stop paying United for future claims would allow United to use the fact

3    that it did not delete the unsupported codes as a shield against liability for avoiding its

4    obligation to pay.

5          United's argument that CMS "knew that United was submitting substantial volumes

6    of such codes for reimbursement," even if CMS did not know which specific codes were

7    invalid, does not advance its argument. Joint Brief, 95. CMS cannot adjust payment and

8    recover overpayments when it only has generalized information about large volumes of

9    codes. Even United does not claim that CMS understood the intricacies of United's own

10   processes or had actual knowledge of the specific unsupported diagnosis codes at issue.

11   Rather, United seeks to rely on some purported general knowledge CMS had regarding

12   United's "chart review practices." But it is highly disputed that CMS had knowledge about

13   United's chart review practices and undisputed that CMS *did not* know the specific

14   unsupported codes that United had submitted for reimbursement yet chose to ignore and

15   not return the overpayments.

16         In sum, for this factor – government action when it has actual knowledge of a

17   violation – to support a finding of immateriality, United would need to establish that when

18   unsupported codes were deleted, CMS did not recover the resulting overpayment. There

19   is no evidence at all on that score. The inquiry is what does the agency do when an

20   unsupported code is actually deleted, not what the agency does when it finds out an MAO

21   did a chart review. The government cannot possibly discern from such information that an

22   overpayment is due or its amount.

23                    2.   *The Facts Related to a 45-Minute Videoconference between*

24                         *United and CMS on April 29, 2014 are Hotly Contested, Do Not*

25                         *Establish that CMS had Actual Knowledge that United Failed to*

26                         *Pay Money Owed for Unsupported Diagnosis Codes, and Do*

27                         *Not Support Summary Judgment on Materiality*

28   In addition to the fact that United's "chart review practices" generally should not be

14

the focus of any materiality inquiry, the facts surrounding a 45-minute video conference between CMS and United on April 29, 2014, and subsequent email communication between the parties, are highly disputed. The evidentiary record is clear and undisputed that the April 29, 2014 videoconference focused on United's **Claims Verification process** and not its Chart Review processes. Joint Brief, 29-31, 69-71; P-34, Erickson Tr. 4425:17-4426:8; P-25, Nelson Tr. 4352:24-4353:5; 4354:10-17. The record is also clear that CMS did not take away from the meeting, or any subsequent correspondence, an understanding of United's Chart Review processes. Joint Brief, 71-72; P-26, CMS 30(b)(6) (Hornsby) Tr. 4363:1-24; P-10, Rice Tr. 4236:20-4237:7; 4238:12-4239:2, 4234:13-4235:1; P-24 at 4347-48; P-1D at 4008-09; P-1E at 4011-12; P-1F at 4015-16. Thus, even if knowledge of United's Chart Review practices generally was the proper focus of a materiality inquiry (which it is not) and even if a single factor – government action when it has actual knowledge of the violation – alone could be dispositive of materiality (which it cannot), United would still not be entitled to summary judgment on materiality. *See, e.g., Escobar*, 579 U.S. at 195 (discussing actual knowledge of Government); *Campie*, 862 F.3d at 906-7 ("[T]he parties dispute exactly what the government knew and when, calling into question its 'actual knowledge.'").

> b. There is Evidence for the Jury to Find that the Diagnosis Codes at Issue were Unsupported

United incorrectly claims that "the summary judgment record contains no evidence establishing that these diagnosis codes were in fact unsupported and thus material to CMS's payment decision." Joint Brief, 96. As discussed in greater detail in the Joint Brief, however, ample evidence exists for a jury to find that the diagnosis codes at issue were unsupported. *See* Joint Brief, 42-48, 73. United operated a highly sophisticated (and lucrative) Chart Review program. Joint Brief, 22-25. United collected medical charts from providers and instructed its trained, certified coders to review those charts to identify *all* risk-adjusting diagnosis codes supported by the charts for each date of service reviewed. P-14 at 4264, Coding Policy; P-15, United 30(b)(6) (Baker) Tr. 4267:12-22. United

compared the diagnosis codes identified by its coders during Chart Review against the diagnosis codes it previously submitted to CMS to identify new, or additional, diagnosis codes. P-76, Martin Tr. 4949:13-24. United submitted those additional codes to CMS resulting in an additional *$7.2 billion* from CMS for 2009-2016. P-11 at 4245-47, Response to Interrogatory 18.

While United was happy to use the results of its Chart Review to submit additional codes to CMS for payment, it deliberately chose not to inquire further into the other side of its Chart Review results – namely, information that some codes that it had previously submitted for payment had *not* been identified by its coders as supported.

The following illustration shows how United's Chart Review program operated, using a hypothetical beneficiary named Mary Smith. On May 1, 2012, Dr. Jones had a medical encounter (visit) with Ms. Smith and reported diagnoses to United mapping to HCC 19 (diabetes) and HCC 108 (COPD). United submitted those diagnosis codes to CMS and consequently received increased monthly risk adjustment payments for Ms. Smith. Several months later, as part of its Chart Review program, United instructed its coders to review the medical record for the May 1, 2012 visit and identify all risk-adjusting diagnosis codes supported by that record. The coders found support for a diagnosis code mapping to HCC 19 and for an additional diagnosis that Dr. Jones had not reported to United, which mapped to HCC 80 (congestive heart failure). However, the coders did not find support for any diagnosis code mapping to HCC 108. United compared its Chart Review results to its claims data (i.e, what had already been submitted to CMS) and identified the diagnosis code mapping to HCC 80 as a new and unique diagnosis code. It then submitted that new code to CMS for additional payment. However, United turned a blind eye to the fact that its coders did *not* identify any diagnosis code mapping to HCC 108 when reviewing the underlying medical record. Instead of deleting the code or investigating the discrepancy, United simply kept the payments associated with HCC 108.

United's position in this case is that it has no obligation to delete the diagnosis code mapping to HCC 108 or conduct *any* further inquiry, even though its coders reviewed the

beneficiary's medical record and did not find support for any diagnosis mapping to that HCC. United offers a litany of excuses as to why a coder in its Chart Review program might not identify a code previously submitted by a provider, Joint Brief, 36-37, which it tries to characterize as merely "unresolved discrepanc[ies] between United's coders and a doctor (or doctor's coder)." Joint Brief, 35.

As thoroughly explained in the Joint Brief, neither caselaw nor logic supports United's extreme position. First, "[n]o court . . . has held that an MA Participant can keep and not report or return payments based on unsupported codes." *Sutter Health*, 444 F. Supp. 3d at 1072. Here, given the evidence showing how thoroughly United mined the charts that went through Chart Review for diagnosis codes, a jury could certainly find that United deliberately ignored or recklessly disregarded the risk that codes *not* identified during Chart Review were unsupported. *See Swoben*, 848 F.3d at 1175–76.

United's argument that some other medical records not collected as part of its Chart Review program might support the diagnosis codes not identified by its coders is even more illogical. Joint Brief, 41, 96. Under United's theory, no MAO would ever be obligated to delete a provider-submitted code, because it could always speculate that perhaps there was a medical chart buried in a provider's filing cabinet that would support the diagnosis code. The Ninth Circuit has already squarely rejected this argument, stating that a "[MAO] cannot simply ignore the reporting error because it speculates that some other medical record might support the same diagnosis code." *Swoben*, 848 F.3d at 1177 n.8.

Similarly, United's argument that RADV audits somehow provide evidence that the specific codes at issue in this case were supported is equally unpersuasive. Joint Brief, 52, 96. RADV audits are simply not designed with the same objective and parameters as the MA payment process, and these important distinctions make any findings from a RADV audit meaningless in this case. Joint Brief, 44-46.

United's argument also ignores an important step in the analysis that the United States' expert, Dr. Garthwaite, performed in order to generate the list of approximately 2

million diagnosis codes United submitted for payment, but were not found to be supported by the medical chart *linked to the submission associated with the chart reviewed*. Returning to the hypothetical beneficiary discussed above, if United's claims data showed that Dr. Jones submitted a diagnosis code mapping to HCC 108 for Mary Smith in connection with a claim for an encounter on May 1, 2012, but United's Chart Review coders did *not* identify that diagnosis code in reviewing Mary Smith's medical chart *from her May 1, 2012 visit with Dr. Jones*, then the diagnosis code was reported in error. *See Swoben*, 848 F.3d at 1176-77. But Dr. Garthwaite's analysis went further than simply identifying the codes that were reported in error based on a comparison between United's Chart Review data and its claims data. He also searched United's risk adjustment data for *any* other diagnosis code that mapped to the same HCC as the unsupported code, regardless of whether the diagnosis code was ever submitted to CMS, thereby giving United "credit" for these diagnosis codes from other charts. Thus, contrary to United's assertion, this case only concerns diagnosis codes that United submitted to CMS when all of the following were true: (a) United's coders found no support for any diagnosis code mapping to the same HCC in the medical record for the relevant visit; (b) United's coders found no support for any diagnosis code mapping to the same HCC in any other medical record reviewed in United's Chart Review Program; and (c) no healthcare provider reported any diagnosis code to United mapping to the same HCC for a visit where the associated medical record was not reviewed in United's Chart Review Program.

### ii. United's Argument Regarding Duplication of Claims is Unavailing

Finally, United constructs and takes aim at strawmen by arguing that (1) viewing the fact that CMS automatically would have reduced United's payments had it submitted 'deletes' for the diagnosis codes at issue as "rendering all of United's actions 'material' to payment" would gut the materiality requirement and leave *Escobar* an empty shell" because "[i]t is always true that CMS (or any other party) would accept a purported repayment of an overpayment;" and (2) "If that were all that was required, DOJ could

duplicate any affirmative FCA claim with a reverse FCA claim, alleging that the government would have accepted repayment of the funds obtained as a result of the false claims or statements if offered. It is well established that the government cannot generate 'redundant' reverse FCA claims this way." Joint Brief, 95-96.

United grievously misstates the government's claims in multiple respects. First, and most obviously, the government is not pursuing a direct false claim in this case, and thus the reverse FCA claim is not "redundant" of any other claim. Second, the United States' theory is based on more than just CMS "being willing to accept" a repayment for a hypothetical presentation of a direct false claim (the cases United cites stand for nothing more than this proposition), but rather United knowingly avoided repaying CMS. Finally, while this "duplication argument" (and the cases United cites) has no connection to materiality, the fact that CMS automatically recovers overpayments when an MAO deletes an unsupported code proves two *Escobar* factors: (1) that returning overpayments from unsupported codes goes to the very essence of the bargain between CMS and an MAO; and (2) that in the "mine run of cases" CMS recovers overpayments when MAOs report and delete unsupported codes. Glaringly, United offers no evidence whatsoever that when an MAO deletes an unsupported code for which it has received payment, CMS does not recover the overpayment. Therefore, even if there were a double materiality requirement in the second prong of the reverse false claims provision, these (and other) facts are evidence of materiality for the jury to consider.

## III.    CONCLUSION

For the foregoing reasons, the Court should grant the United States' Motion for Partial Summary Judgment, and deny United's Motion for Summary Judgment.

Dated:  August 29, 2024

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
ROSS M. CUFF
JACK D. ROSS
HUNTER B. THOMSON
PAUL LA SCALA
Assistant United States Attorneys

JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA M. McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Civil Division, Department of Justice

TRINI E. ROSS
United States Attorney
DAVID CORIELL
Assistant United States Attorney

_____

Linda M. McMahon

Attorneys for the United States of America