LATHAM & WATKINS LLP
  David J. Schindler (Bar No. 130490)
    *david.schindler@lw.com*
  Manuel A. Abascal (Bar No. 171301*)*
    *manny.abascal@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

LATHAM & WATKINS LLP
  Daniel Meron (appearing *pro hac vice*)
    *daniel.meron@lw.com*
  Abid R. Qureshi (appearing *pro hac vice*)
    *abid.qureshi@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

*Attorneys for United Defendants*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, <br><br> Plaintiff, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC. *et al.*, <br><br> Defendants. | CASE NO. 2:16-cv-08697-FMO-PVCx <br><br> **UNITED'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> Hon. Fernando M. Olguin <br><br> Referred to Special Master <br> Hon. Suzanne H. Segal (Ret.) |

# **TABLE OF CONTENTS**

**Page**

I.    THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO THE
      REVERSE FCA CLAIM ........................................................................... 3

      A.    DOJ Cannot Show That United Was Overpaid ............................. 3

            1.    DOJ Cannot Show That the Codes Were Unsupported ...................... 3

            2.    DOJ Cannot Show the Diagnosis Codes Caused Overpayments ....... 8

      B.    United Had No Obligation to Second-Guess the Doctors' Codes ............. 11

            1.    DOJ Still Cannot Identify the Obligation It Seeks to Enforce ........ 11

            2.    DOJ Cannot Establish That United Had an Obligation to
                  Investigate These Diagnosis Codes Because There Is No
                  Evidence They Had a High Risk of Being Overpayments ............... 14

      C.    DOJ Cannot Show Materiality ....................................................... 16

      D.    DOJ Cannot Show Any Fraudulent Act of Concealment ........................... 17

II.   THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO THE
      COMMON-LAW CLAIMS ..................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Fischer v. United States,*
    144 S. Ct. 2176 (2024)...................................................................................18, 19

*Gustafson v. Alloyd Co.,*
    513 U.S. 561 (1995)...............................................................................................18

*In re Oracle Corp. Sec. Litig.,*
    627 F.3d 376 (9th Cir. 2010) ...................................................................................3

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (1987)...............................................................................................13

*Jarecki v. G.D. Searle & Co.,*
    367 U.S. 303 (1961)...............................................................................................18

*Kane ex rel. United States v. Healthfirst, Inc.,*
    120 F. Supp. 3d 370 (S.D.N.Y. 2015) .............................................................13, 19

*U.S. ex rel. Janssen v. Lawrence Mem'l Hosp.,*
    949 F.3d 533 (10th Cir. 2020) ...............................................................................17

*U.S. ex rel. Weinberger v. Equifax, Inc.,*
    557 F.2d 456 (5th. Cir 1977) .................................................................................19

*U.S. ex rel. Zissa v. Santa Barbara Cnty. Alcohol,*
    2019 WL 3291579 (C.D. Cal. 2019) ......................................................................17

*United States ex rel. Osinek v. Permanente Med. Grp., Inc.,*
    640 F. Supp. 3d 885 (N.D. Cal. 2022)...................................................................20

*United States ex rel. Schutte v. SuperValu Inc.,*
    598 U.S. 739 (2023)........................................................................................15, 18

*United States ex rel. Swoben v. United Healthcare Ins. Co.,*
    848 F.3d 1161 (9th Cir. 2016) .........................................................2, 6, 11, 12

*United States v. Kellogg Brown & Root,*
    800 F. Supp. 2d 143 (D.D.C. 2011)......................................................................20

ii

*UnitedHealthcare Ins. Co. v. Becerra*,
  16 F. 4th 867 (D.C. Cir. 2021)................................................................14

*Universal Health Servs. v. Escobar*,
  579 U.S. 176 (2016)................................................................18, 19

*Yates v. United States*,
  574 U.S. 528 ................................................................19

## STATUTES

18 U.S.C. § 1512(c)(1)................................................................18

31 U.S.C.
  § 3729(a)(1)(G)................................................................17
  § 3729(b)(3)................................................................11

42 U.S.C. § 1320a-7k(d)(2) ................................................................13

Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148,
  124 Stat. 119 (2010)................................................................2, 13

## OTHER AUTHORITIES

H.R. 3200, 111th Cong. § 1641 ................................................................13

Identify, *New Oxford American Dictionary* (3d ed. 2010)................................................................13

## INTRODUCTION

DOJ's entire case is based on a categorical assumption that is false to a certainty. The assumption is that, if a United coder reviewing a medical record did not identify a diagnosis code that a doctor previously certified and submitted, then that diagnosis code was necessarily (and always) unsupported. But for any number of reasons, a United coder might miss a code that is documented in a medical record. No reasonable jury could thus *possibly* conclude that *all* 28 million diagnosis codes at issue are unsupported. As remarkable as DOJ's contrary assertion is the fact that DOJ has no fallback position. Its case either survives summary judgment, or not, on the theory that a jury could conclude that *all* 28 million codes at issue are unsupported. Since DOJ did not review a single medical record, it does not even try to argue that there is a reliable basis for a jury to estimate what fraction, if any, are unsupported—and its expert admitted there is none. D211-12. This wholesale failure not only warrants summary judgment, it demands it.

DOJ's principal response is entirely circular. DOJ asserts (without evidence) that it did not need to review any medical records because United's coders already "found" the diagnosis codes here to be unsupported. But DOJ admits that United's coders reviewed charts "blind"—meaning they did not know what diagnoses doctors had previously submitted for patients. DOJ also admits that United's coders thus did *not* try to determine whether previously submitted diagnosis codes were supported. D50, D53, D173. And DOJ also admits that even expert coders inevitably fail to identify supported diagnoses when coding blind, as CMS's own coders do when conducting RADV audits. *Infra* at 5-6; D98.

Even apart from the question of whether or not the 28 million diagnosis codes were supported, DOJ also has *no* evidence that they resulted in overpayments to United. It is undisputed that CMS pays plans based on whether members have certain *health conditions*, not *diagnoses*. D16. It is also undisputed that many different diagnoses can establish that a member has a particular health condition. D24. Thus, DOJ cannot prove an overpayment by merely showing that a particular *diagnosis* (*e.g.*, a specific cancer) by a particular doctor in one chart was unsupported; it must show that the member had no

1

diagnosis corresponding to the condition in any chart for the year (for example, that the member did not have the same or another form of cancer in another chart). That is exactly how CMS determines overpayments in RADV. Not only does DOJ have no such evidence, CMS's own RADV coders concluded that the vast majority of the health conditions at issue they examined *were* supported. The RADV results so obviously ruin DOJ's case that it is left to claim the RADV audits are *irrelevant* to whether United retained overpayments. That is an astounding assertion because RADV audits are the very process by which CMS determines if health conditions are supported and MA plans have been overpaid.

DOJ attempts to avoid these problems by reversing the burden of proof. But it is DOJ's burden to show that these health conditions were unsupported and resulted in overpayments. And it cannot do so by conflating the question of *scienter* (on which United has not moved) with the question of whether these codes are unsupported and resulted in overpayments (for which there is no proof). DOJ's sole theory remains indisputably false.

DOJ's responses to United's other grounds for summary judgment also fall short. In contending United had a duty to search the 28 million codes at issue for overpayments, DOJ relies on the Ninth Circuit's decision in *Swoben* and a provision of the Affordable Care Act ("ACA"). But Judge Fitzgerald already rejected DOJ's *Swoben* argument because that case does not apply to the reverse FCA. The ACA provision is likewise of no help, since it applies only where a plan has *identified* (*i.e.*, actually knows of) an overpayment. Even if the ACA required a lesser showing, there is no evidence the codes at issue had such a high risk of being overpayments that United had a duty to investigate them. DOJ's response on materiality ignores United's emails indisputably informing CMS it was not reviewing charts to determine whether doctor-submitted diagnoses were unsupported. Finally, DOJ does not claim that United engaged in deception. In asserting that such wrongdoing is not required for liability, DOJ advances a view of the FCA that reads the terms "conceals" and "improperly . . . avoids" out of the statute altogether. DOJ's sweeping interpretation would convert every routine regulatory and contract dispute into a punitive fraud claim. For these reasons, United is entitled to judgment.

2

**ARGUMENT**

## I.   THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO THE REVERSE FCA CLAIM

### A.   DOJ Cannot Show That United Was Overpaid

DOJ's opposition fails to surmount the insurmountable: The absence of *any* evidence from which a jury could conclude that the 28 million diagnosis codes at issue (1) were *all* unsupported by medical charts and (2) resulted in overpayments to United. Each of those failures independently warrants summary judgment.

### 1.   DOJ Cannot Show That the Codes Were Unsupported

DOJ confirms the key facts are undisputed: Each diagnosis code at issue was submitted by a doctor who saw the patient and certified the code's accuracy. D22. United's coders reviewed the underlying medical charts for supported diagnosis codes, but did so "blind"—*i.e.*, not knowing what codes the doctor submitted. Joint Br. 23; D173. For the 28 million codes at issue, the coder did not independently identify a diagnosis code the doctor had certified and submitted. Joint Br. 16-17, 27-28.

That coding discrepancy reflects one of at least two possibilities: (1) A United coder, typically offshore, overlooked the support for a diagnosis in a medical record (or did not have a complete record) and was wrong not to include the code, or (2) the doctor who examined the patient and certified the accuracy of the diagnosis code was wrong. Whether and how often each of those possibilities occurred are knowable, empirical questions. And DOJ bears the burden to "come forth with evidence from which a jury could reasonably render a verdict" on those questions. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). But it has absolutely no such evidence. Instead, it has doubled down on its categorical theory that *every time* a United coder failed to identify a diagnosis a doctor had previously submitted, that diagnosis was wrong.

United exposed DOJ's lack of evidence in its Motion, *see* Joint Br. 35-39, and DOJ's paltry response confirms its failure. Although DOJ repeatedly *asserts* that there is "ample" and "abundant" evidence for a jury to find that every diagnosis code at issue was

3

unsupported, *id.* at 42, DOJ fails to identify any. The only purported "evidence" DOJ relies on is to restate that United's coders did not independently identify the relevant doctor-submitted codes when conducting blind chart review. *See id.* at 42-43. But the mere fact that coding discrepancies exist merely raises the question whether the doctors' codes were supported; it does not answer it. If two math teachers score an exam differently, that only reveals a discrepancy, it does not show who was right. DOJ's entire case founders for the same basic reason.

Lacking evidence, DOJ tries to elide this problem by (1) claiming United's coders made affirmative judgments about the doctor-submitted diagnoses, (2) equating knowledge that a diagnosis is present with knowledge that all other diagnoses are not present, and (3) noting United's expectation that its coders meet a 95% accuracy standard. None of these assertions could possibly permit a jury to find that all the diagnosis codes at issue were unsupported.

*First*, DOJ at times suggests that United's coders affirmatively determined that the doctor-certified code was *not* supported by the medical charts. *See* Joint Br. 4-5, 43, 46. But this is mere rhetorical evasion. As DOJ concedes, *id.* at 23, United's coders conducted "blind" chart review, D51, D173, and they did *not* review medical charts with the purpose of verifying whether any doctor-submitted code was supported, D53. United's coders had no idea what diagnoses, from among tens of thousands of possible diagnosis codes, the doctor had submitted. Joint Br. 8, 11, 23; D51. Thus, United's coders did not (indeed *could not*) specifically determine that any doctor-submitted code was *not* supported.

*Second*, DOJ suggests that, since United relied on its chart-review process to determine when "*new* codes" were supported in the medical charts, it therefore also must have determined when doctor-submitted codes were not supported. Joint Br. 42; *see id.* at 44. But that is a false comparison. When a coder lists a code, they have made a conscious determination that the diagnosis represented by that code is documented in the chart (*i.e.*, the coder saw the diagnosis with their own eyes). And because doctors generally do not have an incentive to list all diagnoses in claims forms, D39, United's coders are not

4

"second guessing" the doctor when they do so. In sharp contrast, when the coder does *not* identify a code the doctor submitted, the coder is making no conscious determination at all about that diagnosis or tens of thousands of other potential diagnosis codes. They are simply reviewing the chart blind, and thus may have missed the code (for any number of reasons) or reviewed an incomplete medical record.[1]

*Third*, DOJ attempts to bolster its theory by stating in its background section that United's coders aspired to meet a "95% accuracy standard." Joint Br. 23-24. DOJ does not rely on this 95% expectation in its argument section, and for good reason: It *disproves* DOJ's case. DOJ's theory of liability rests entirely on the premise that whenever a coder conducts blind chart review and does not identify a code, the code must be unsupported. But DOJ's invocation of a 95% accuracy expectation is an admission that even expert coders are expected to miss at least 5% of the diagnoses that are in fact documented in the medical records. This acknowledgement that human error is inevitable demonstrates the fundamental flaw in DOJ's case, especially given the large number of medical records reviewed compared to the diagnosis codes at issue.

DOJ's expert, Dr. Garthwaite, calculated that United's coders reviewed over 76 million service dates (patient visits), Ex. D-57 at 1463, Ex. 5, Column C, and DOJ admits that the 1.97 million codes it alleges are overpayments—the Garthwaite "deletes"— represent *half of 1%* of all the diagnosis codes submitted for these United members. D180. DOJ has no evidence that the diagnosis codes representing the supposed overpayments are not all simply part of the ~5% of supported codes that *even expert coders would be expected to miss*. Put differently, even if United's coders missed only 5% of supported codes, under DOJ's theory there *always* would be millions of discrepancies (Garthwaite "deletes") in any set of chart reviews, even if every code in the population was actually

---

[1] Nor does the fact that many charts were reviewed by two different coders conducting blind reviews, Joint Br. 24, show that the code was unsupported. On the contrary, it is undisputed that CMS's own coders conducting RADV audits validated the health conditions corresponding to diagnoses that two United coders failed to identify at virtually the same high rate—89.5%—as conditions that were not identified in a single blinded chart review. D244-45. Two levels of blind review cannot substitute for actual evidence that the code was in fact unsupported.

supported. DOJ's case thus distills to pure speculation that the Garthwaite "deletes" are actually unsupported—and, contrary to DOJ's brief, Dr. Garthwaite made no such finding himself. *See* Joint Br. 44-45. Dr. Garthwaite's analysis was admittedly limited to whether unsupported codes "would have impacted payment," not whether the diagnosis codes were supported by medical charts. *Id.* at 27; *see id.* at 46-47. As DOJ admits, Dr. Garthwaite did not review any medical records and simply assumed that every code not identified by a United coder in blind chart review must be unsupported. D165, D169.[2]

In trying to justify its failure to review *any* medical charts—the only evidence that could confirm whether a diagnosis code was in fact supported—DOJ asserts that "United steadfastly refused to produce any medical records in discovery." Joint Br. 7. That is a blatant misrepresentation, as Judge Segal found in an order this Court affirmed *de novo*: "UHG . . . offered to produce to the government every medical record in United's possession that United reviewed as part of its chart review program, to allow the government to determine for itself which of the codes on its list are or are not supported. The government rejected this offer." Dkt. 419 at 9-10; *id.* at 3, 8.

DOJ also asks this Court to ignore the burden of proof. It is DOJ's burden to show that the mere fact that discrepancies exist between diagnosis codes identified by United coders and the doctor-submitted codes necessarily means that *all* 28 million diagnosis codes are unsupported. Having failed that, it is DOJ's burden to show, aided by expert evidence, some reasonable basis for the jury to find some intermediate number of diagnosis codes that were unsupported. It does not even claim that there is such a basis. Either way, DOJ bears the evidentiary burden to prove its case with affirmative evidence, as Judge Segal explained when DOJ sought to compel United to identify charts that would prove some of the codes at issue were supported:

> *It is the United States' burden* to prove its allegations . . . that the diagnosis codes identified by the government as unsupported *were, in fact, unsupported*

---

[2] DOJ also invokes language from *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016) describing the implications of United's coding process. But *Swoben* was decided at the motion to dismiss stage, *id.* at 1172, during which the court treats all allegations as true. The Ninth Circuit obviously made no factual findings.

> *by medical records*. . . . United cannot be compelled . . . to identify evidence to support contentions it has never made regarding whether specific medical records *disprove* the United States' claims.

Dkt. 601-1 at 16 (citations omitted) (emphasis added). There is no evidence to establish which, if any, diagnosis codes were unsupported, and judgment is thus warranted.

The only record evidence on point—the results of CMS RADV audits—confirms that DOJ's theory is false to a certainty. These audits involve the only coders who reviewed medical records for the purpose of determining whether certain of the doctor-certified health conditions at issue here were unsupported. D71, D76. In these audits, CMS coders reviewed 6,500 health conditions corresponding with diagnosis codes at issue in this case and validated 89% of them. Joint Br. 37; D185.

DOJ argues the RADV audits cover a "tiny" sample of the relevant diagnoses that cannot be extrapolated to the relevant population and the audits thus "cannot carry the day for United at summary judgment." Joint Br. 6-7, 44-45. But it is not United's burden to "carry the day;" it is *DOJ's*. And the "tiny" sample DOJ downplays still represents a much larger sample than the *zero* charts DOJ has reviewed. Most important, the fact that CMS validated a few thousand of the health conditions at issue proves to a certainty, as Dr. Stark agreed, that DOJ's theory that every code not identified in chart review is an overpayment is false.[3] And the agreement of both sides' experts that those RADV results cannot be extrapolated to the broader universe of codes at issue (so that DOJ cannot claim that 11% of the codes are unsupported), D190-95, leaves DOJ with no evidence at all.

Finally, DOJ claims United's reference to the "28 million codes" at issue is an "attempt to muddy the facts," because its own expert found that 93% of these codes did not affect the payment United received from CMS. Joint Br. 28. That is meritless. The set

---

[3] DOJ asserts that Dr. Stark stated the RADV validation rate "is utterly meaningless statistically." Joint Br. 6-7. That is false. Dr. Stark *confirmed* the analysis (the overall RADV validation rate associated with all diagnoses and the validation rates for the conditions overlapping with diagnoses at issue), D224, and he agreed that the difference— higher validation rates for the diagnoses at issue—*was* statistically significant. Joint Br. 38, 52. His point that DOJ misconstrues was merely that many of the 28 million codes were ultimately "inconsequential" in his view because they did not impact payment, Ex. D-141 at 3570:8-71:6—a distinction irrelevant to whether the codes are supported.

of 28 million codes is absolutely the relevant universe because that is precisely the set of codes DOJ contends United's coders did not identify; that is also the set of codes DOJ contends to this day are *all* unsupported; and that is also the set of codes DOJ contends United had to investigate or delete. Joint Br. 27; D155-58. Indeed, DOJ *must* contend that all 28 million codes are unsupported because its categorical theory is the only "evidence" it has. DOJ is thus left in a position of relying on a theory that even its own expert agrees is false "to a certainty," Joint Br. 38; D204, and that is contrary to its admissions that even expert CMS and United coders will overlook supported codes when conducting blind chart review, *supra* at 5-6; D98 (CMS RADV coders miss codes).

### 2.    DOJ Cannot Show the Diagnosis Codes Caused Overpayments

Regardless, DOJ has absolutely no evidence that United received *overpayments* from the 28 million diagnosis codes. It is undisputed that CMS pays MA plans based on whether their members have certain *health conditions* (HCCs). D16. Many different diagnosis codes map to the same HCC, because CMS recognizes that many different diagnoses expose insurers to similar expected risk. D18. For example, ***410 different cancer diagnosis codes*** each establishes that the member has HCC9, "Lymphatic, Head and Neck, Brain, and Other Major Cancers." D24 (DOJ-cited URL). As long as at least one doctor during a given year documented that the member had a single diagnosis mapping to the HCC, then the payment to the plan for that health condition was valid and there was no overpayment for that HCC. D29, D31. Thus, the failure of a United coder to identify a *particular diagnosis* when reviewing a chart blind does not remotely establish that the member did not have the *health condition* for which United was paid. DOJ must point to evidence that the member did not have the HCC supported by any diagnosis from any doctor's chart for that year. Again, DOJ has absolutely no such evidence.

This is another independent and dispositive hole in DOJ's case. As already explained, DOJ did not review a single medical chart. D165, D205. As a result, it not only failed to review any of the medical charts corresponding to the specific 1.97 million *diagnosis* codes it claims are overpayments, it also failed to review a *complete* set of the

8

medical records for any of these members—even a sample—to see whether the members had the *health conditions* (HCC) documented in any of their charts for the year. It thus has no evidence that the alleged overpayments are *in fact* overpayments.

DOJ's principal response is that it does not need to "hunt to see if there are other medical records," because CMS does not do so when recalculating payments after plans delete codes they previously submitted. Joint Br. 47. That ignores the difference between regulatory reconciliation and litigation. DOJ has chosen to bring a highly punitive fraud claim—with the possibility of treble damages—and DOJ now has the burden of proof. DOJ therefore indeed had an obligation to "hunt" for the evidence that might support its claim that United was overpaid. It failed to do so.

DOJ next suggests that Dr. Garthwaite's analysis somehow proves United was overpaid, because he "calculated the payment adjustments the CMS payment system would have made had United deleted" the 28 million codes DOJ claims are unsupported. Joint Br. 46. But that is just more circular logic because, in doing so, Dr. Garthwaite simply assumed all of those *particular diagnosis codes* were unsupported, D169; he did not review any medical charts to determine whether the corresponding health conditions were supported by any *other* diagnoses mapping to the same HCC, D165.

Nor can DOJ rely on the results of United's chart reviews to fill this evidentiary hole, because United's coders never made, nor could have made, a determination of whether individual members' *health conditions* were supported for the year. United's coders reviewed particular medical records from specific visits to particular doctors whose charts United obtained. D215. DOJ does not dispute that United did not generally review *all* the medical charts for the member for the year. D216-17.

An example illustrates the point. United might have reviewed Jane Doe's medical records from Dr. Smith from January 2014. Reviewing a single chart for a member is sufficient to determine that the member *does* have a health condition, since a single supported diagnosis in one chart satisfies the payment standard. But United's coders could not have decided that Jane Doe does *not* have a health condition simply by reviewing one

9

medical record. To make that decision, United would have had to retrieve and review all Jane Doe's charts for the year, similar to how CMS conducts RADV audits. Thus, in addition to the lack of evidence that the *diagnoses* not identified in chart review were unsupported, the results of United's chart review coding are even more obviously not evidence that the members did not have the corresponding *health conditions*. Jane Doe may very well have had a different diagnosis mapping to the same HCC in a medical record from Dr. Jones (or some other doctor) in May 2014. DOJ simply does not know.

In contrast, there is one entity that did review some of the pertinent medical charts to determine if the members at issue had the health conditions for which United was paid—CMS during its RADV audits. And as United demonstrated in its Motion, and DOJ does not genuinely dispute, CMS coders reviewed approximately 6,500 of the health conditions that correspond to the 28 million diagnosis codes at issue, and *validated* 89% of those conditions. Joint Br. 37; D185. Those results eviscerate DOJ's case.

DOJ's principal effort to dismiss the RADV results is the bizarre argument that this "is not a RADV audit but an FCA case." Joint Br. 45. That is backwards. Fraud requires more exacting proof of an overpayment than a regulatory audit, not less. In any event, the purpose of RADV is precisely to determine whether the plan received "overpayments." D71. CMS will validate an HCC in RADV if it is supported by any diagnosis in any medical record for the member for the year, D77, and, when CMS validates an HCC in RADV, it means that the HCC was not an overpayment, D78.[4]

DOJ's position is also inconsistent with its prior positions in this case. As Judge Fitzgerald noted, DOJ pointed to the RADV rules as "chief among the regulations" supporting the alleged obligation it is seeking to enforce. Dkt. 353 at 8. DOJ cannot now

---

[4] The only way DOJ even claims that RADV is distinguishable is that in RADV an HCC may be validated by a diagnosis different from any United submitted. Joint Br. 22, 46-47. But that is CMS's method to determine *overpayments*, which reflects that if the member in fact had the condition, then the plan incurred the full risk for which it was paid. And DOJ's speculation as to the basis for the RADV validations cannot substitute for evidence that the condition was unsupported.

blink away the importance of RADV audits or try to take issue with the way its own client agency decides whether a plan was overpaid.

DOJ next argues that RADV audits are "completely distinct from the ordinary MA payment process" under which plans "are not permitted to add diagnosis codes to increase payments *after reconciliation*." Joint Br. 21 (emphasis added). But United is not seeking to increase its payments years after the fact. The question is instead whether payments United already received for health conditions it submitted on a timely basis are overpayments. And CMS's "ordinary process" for making *that* decision is RADV audits.

As DOJ cannot refute, its own expert, Dr. Stark, agreed that its theory that every code not identified in chart review is an overpayment is "false." Joint Br. 38; D204. DOJ seeks to diminish the importance of his admission by suggesting that Dr. Stark was only testifying about what would be found in a RADV audit. Joint Br. 47. But this hardly helps DOJ since (1) RADV is the process by which CMS determines overpayments, and (2) a health condition validated in RADV is by definition *not* an overpayment. D71, D78.

Finally, DOJ claims the RADV results are "preliminary" and "subject to change." Joint Br. 44. But that just disproves DOJ's case once more. The RADV results were reached after two rounds of coding review by expert CMS coders. The sworn declaration by a senior CMS official that those results *may change* in the future (either to increase or decrease the validation rate) is just another admission that, even after expert coders review charts, a further review of the same records may show that the prior coding was wrong.

**B.    United Had No Obligation to Second-Guess the Doctors' Codes**

**1.    DOJ Still Cannot Identify the Obligation It Seeks to Enforce**

DOJ devotes substantial time to the task of identifying the "obligation" United purportedly violated—a basic element of its reverse FCA claim. *See* Joint Br. 54-66. But that task should be straightforward if grounded in a clear source of law, as required by statute. *See* 31 U.S.C. § 3729(b)(3).

In trying to articulate the relevant "obligation" United purportedly violated, DOJ relies extensively on the Ninth Circuit's decision in *Swoben*. Joint Br. 54-57. DOJ claims

that *Swoben* held that CMS regulations, which subject MA plans to a "best knowledge, information, and belief" standard when certifying to the accuracy of their data, require plans conducting blind chart review to investigate all codes not independently found by coders. *Id.* at 54-55. But Judge Fitzgerald already rejected DOJ's reliance on *Swoben* as "misplaced," because *Swoben* was limited to affirmative "false certification" FCA claims alleging that an MA plan falsely certified the accuracy of its data in its attestations. Dkt. 353 at 11. Judge Fitzgerald could not have been clearer:

> *Swoben* involved an affirmative False Claims act theory, not a "reverse false claims" theory. The Ninth Circuit specifically limited its holding to the narrow issue of false ***certifications***. The Ninth Circuit explained, "[u]nder Swoben's theory . . . the false claims are the allegedly false § 422.504(l) certifications, ***not the erroneously reported diagnosis codes***." Here, because the Government's false certification claims were already dismissed by the Court on materiality grounds, *Swoben* is inapposite. The Government's only remaining False Claims Act claim arises under a "reverse false claims" theory, the very type of theory the Ninth Circuit said it was ***not*** addressing in *Swoben*.

*Id.* (citations omitted) (emphasis in original). As Judge Fitzgerald explained, although DOJ's complaint originally included affirmative FCA claims alleging that United's certifications attesting to the accuracy of its data were false, the Court dismissed them for failure to plead materiality, and DOJ did not replead them. Dkt. 212. Despite its heavy reliance on *Swoben*, DOJ fails to mention this prior ruling. More to the point, neither *Swoben* nor United's attestations have any bearing on the question posed by the only reverse FCA claim left: whether and under what circumstances a plan must investigate whether diagnosis codes not identified in a blind review represent overpayments.

DOJ also claims that United has contractual duties that form the basis of an "obligation," citing the Electronic Data Interchange (EDI) agreements relating to "data discrepancies." Joint Br. 58. That provision is not directed to whether individual diagnosis codes are supported by medical records. Instead, the EDI agreement addresses data glitches that can result from the electronic submission of data—which is, after all, the subject of the agreement. That is clear from the very next line of the EDI agreement, where

the signatory agrees to "notify CMS or its contractor within 2 business days if any transmitted data are received in an unintelligible or garbled form." Ex. P-1C at 4002.

Apparently recognizing that its efforts to identify an "obligation" have failed, DOJ now for the first time in this case invokes a provision in the Affordable Care Act ("ACA") as the obligation it seeks to enforce. *See* Joint Br. 59-62. That provision requires returning an overpayment 60 days after it is "identified." 42 U.S.C. § 1320a-7k(d)(2). DOJ argues that a plan has "identified" an overpayment whenever it is "put on notice of a potential overpayment," relying on *Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 394 (S.D.N.Y. 2015). Joint Br. 60. But that non-controlling decision cannot be squared with the statute's text and legislative history. The phrase "was identified" clearly indicates actual knowledge. To "identify" is to "establish," "indicate," or "determine" the identity of something. *See, e.g.*, Identify, *New Oxford American Dictionary* (3d ed. 2010). No one would say that a witness "identified" a perpetrator when they mean that the witness recklessly *failed* to identify her but should have. So too here. An overpayment has not been "identified" until a plan has actually determined that it exists. And for the reasons already described, United never became aware of *any* actual overpayments in this case.

The legislative history confirms Congress intended "identify" to be a stricter standard than recklessness. The initial version of the statute introduced in the House of Representatives defined "known" as the FCA standard of knowledge, which includes recklessness. H.R. 3200, 111th Cong. § 1641 (as introduced by the House, July 14, 2009). But Congress rejected that version and instead adopted the Senate version of the bill, which substituted the word "identified." Pub. L. No. 111-148, § 6402(a), 124 Stat. at 755 (enacting H.R. 3590, 111th Cong. (2010)). The one meaning of "identify" that Congress could not have intended is the very recklessness standard it rejected. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." (citation

omitted)). Instead, Congress evidently intended identify to mean what it says—actual knowledge, which provides certainty as to when the 60-day repayment clock begins.[5]

DOJ also complains that United omitted the words "whether or not fixed." Joint Br. 6. But United omitted those words because they have no bearing on this case. As DOJ admits, *id.* at 33-34, 54, those words indicate that an obligation to repay money may exist even before the precise dollar value of the overpayment has been determined. United does not assert otherwise. Instead, as explained next, United argues that DOJ has not presented evidence showing a high risk that these codes are overpayments in the first place.

### 2. DOJ Cannot Establish That United Had an Obligation to Investigate These Diagnosis Codes Because There Is No Evidence They Had a High Risk of Being Overpayments

DOJ has not established that United had an "obligation" to investigate the codes *in this case*. To meet its own definition of obligation, DOJ would need evidence that the 28 million doctor-submitted diagnoses not identified by United's coders had such a high probability of being overpayments that United was reckless not to investigate them. Yet, DOJ has no such evidence, and its own expert's analysis confirms that the risk was low.

Under DOJ's own framing, an obligation arises for MA plans to investigate and return overpayments when the plan either actually knows of or recklessly disregards an overpayment. Joint Br. 58. Here, DOJ does not argue that United *actually knew* the codes were unsupported and led to overpayments. DOJ thus is left to posit that United had an obligation to investigate the 28 million codes not found by its chart reviewers because not doing so would be reckless.[6] As the Supreme Court has made clear, however, for there to be recklessness, there must *in fact* exist a high risk of error. The term "reckless disregard"

---

[5] Although DOJ relies on *UnitedHealthcare Ins. Co. v. Becerra*, 16 F. 4th 867, 870 (D.C. Cir. 2021), that decision plainly understood "identified" to mean actual knowledge, referring to "payments [MA plans] *are aware* lack support," *id.* at 884, and "unsupported diagnosis codes that [MA plans] themselves *discover*," *id.* at 877-78 (emphases added).

[6] DOJ quotes CMS's language requiring "due diligence" and "good faith," but it ultimately admits, as CMS itself said in its rulemaking, that MA plans' certifications are held at most to a standard of "best knowledge, information and belief" that is identical to the FCA knowledge and reckless disregard standard, Joint Br. 54-58; D-66 at 2039, and that this language does not create a duty to proactively audit data or impose a negligence standard.

requires "a *substantial and unjustifiable risk* that . . . claims are false." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023) (emphasis added). And there is no such evidence here.

DOJ's primary response is that it need not present evidence that the 28 million codes in fact had a high risk of being overpayments because the extent of the risk pertains to knowledge, not obligation. Joint Br. 62. DOJ further contends that the Supreme Court's recent decision in *Schutte* allows for FCA liability based solely on a defendant's subjective belief at the time, even if that belief was incorrect. *See id.* at 62-63. Not so.

The *Schutte* Court held that defendants may be liable under the FCA if, at the time they submitted claims for payment, they "*correctly* understood the relevant standard and submitted inaccurate claims anyway," even if their lawyers later argued the payment standard was objectively ambiguous. 598 U.S. at 742 (emphasis added). The Court repeatedly emphasized that liability depended on the defendants' subjective beliefs being objectively correct—that is, that the defendants claimed money to which they were in fact not entitled. *See id.* at 743 ("correctly understood that standard" and "correctly interpreted"). This point was "critical[]" to the Court's analysis. *Id. Schutte* did not remotely hold, as DOJ suggests, that a defendant who subjectively believed its claims violated the payment standard, *but was mistaken*, could nevertheless be liable for knowingly submitting false claims. The claims in that situation would not, in fact, have violated the relevant standard. Using a hypothetical based on one the Court used in *Schutte*, *id.* at 753, a person driving 50 mph in a 60-mph zone is not driving recklessly, even if the driver mistakenly believed the speed limit was 20.

Here, DOJ's own theory that United had an obligation to investigate and validate these codes depends on an assertion that it would have been reckless not to do so. Whether United at the time was subjectively aware that these codes had a high risk of being overpayments is a question of knowledge as to which United does not seek summary judgment. But whether there *in fact* existed a high risk that the 28 million codes were overpayments is part of the *obligation* element that DOJ must support with evidence.

15

On that pertinent question, there is simply *no* evidence that a diagnosis not found by a United chart reviewer had a high risk of being an overpayment. On the contrary, DOJ admits, D179—and its own expert found—that of the 28 million codes submitted by doctors that were not later identified by chart reviewers, 93% did not impact the payment United received from CMS and thus could not have caused overpayments. Joint Br. 53, 64. Thus, even if every code that impacted United's payments from CMS was unsupported, that yields at most a 7% probability that a code United's coders did not identify in chart review was *in fact* an overpayment. DOJ does not dispute that probability. *Id.* at 64. If even half of the remaining codes were supported (a fair assumption given the RADV results), the odds that any one code of the 28 million would be found to be an overpayment after investigation would be only 3.5%. In its Motion, United stated that it "is not aware of any case where a court held that failing to investigate something like a 3.5%-7% risk of error was reckless." *Id.* at 53. DOJ cited no such case in response either.

DOJ asserts without citation that even if there were only a 7% probability that any one of the 28 million codes could result in overpayments, it would still be reckless for United not to chase down such a miniscule risk because the absolute value of those codes may be significant in aggregate. Joint Br. 64. But under that logic, MA plans would be forced to audit every single diagnosis code in their data, because if even just 1% of those codes were overpayments, that would still be significant in absolute dollar terms given the size of the MA program. Yet, at the very beginning of its Opposition, DOJ concedes that MA plans "are *not* required to audit every single diagnosis code they submit," *id.* at 5, which would cripple the program. To establish an obligation, therefore, DOJ must have evidence that this set of 28 million diagnosis codes posed a uniquely high risk of overpayments—and at least at a rate higher than other codes in a plan's data—and DOJ has no such evidence. *See id.* at 51-52 (evidence shows the opposite).

## C.    DOJ Cannot Show Materiality

DOJ also cannot satisfy the FCA's "demanding" materiality standard. Joint Br. 67. United's Opposition already refuted DOJ's extreme claim that the second prong of the

reverse FCA has no materiality requirement at all. *Id.* at 87-97. Most of DOJ's response attempts to create a factual dispute about what precisely was discussed in the April 2014 meeting between CMS and United officials and what details CMS knew about United's chart review and claims verification programs. But regardless of those details, DOJ cannot and does not dispute that, year after year, CMS understood United was discontinuing its "previous process" to use chart reviews to validate doctor-submitted codes (*i.e.*, "determine whether diagnosis codes submitted through claims are unsupported in the medical record"). Ex. D-21 at 671. And yet CMS took no action *of any kind*, even short of terminating contracts, D229-31, demonstrating that CMS did not regard United's conduct as material to its payment decision. That is more than enough under the case law to show that United's conduct was immaterial as a matter of law. Joint Br. 67 (citing cases); *U.S. ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 541-43 (10th Cir. 2020); *U.S. ex rel. Zissa v. Santa Barbara Cnty. Alcohol*, 2019 WL 3291579, *7 (C.D. Cal. 2019).

### D. DOJ Cannot Show Any Fraudulent Act of Concealment

DOJ's opposition also seeks to eliminate another core element of the FCA by declaring that the statute no longer requires a showing of *fraud*. *See* Joint Br. 78-80. DOJ claims that it need not prove "an affirmative act of deception," but can merely show that United "did nothing" to return an overpayment. *Id.* at 79-80. DOJ's interpretation of the reverse FCA provision would read the key words "conceal" and "improperly avoids" out of the statute, and would make the FCA apply to any "garden variety" breach of contract action—contrary to the Supreme Court's directive.

The FCA is a *fraud* statute and thus unsurprisingly requires fraudulent conduct. *See* Joint Br. 75-78. The reverse FCA provision at issue here imposes liability on one who "knowingly *conceals* or knowingly and *improperly avoids* or *decreases* an obligation to pay or transmit money or property to the government." 31 U.S.C. § 3729(a)(1)(G) (emphasis added). Thus, the defendant must not just knowingly violate an obligation, but also take steps to "conceal" or "improperly avoid or decrease" that obligation.

DOJ responds that this "is not a common law fraud case; it is an FCA case." Joint Br. 78. But the Supreme Court has emphatically held that the FCA is "largely a fraud statute," *Schutte*, 598 U.S. at 750-51, and must be interpreted with common-law fraud principles in mind, *Universal Health Servs. v. Escobar*, 579 U.S. 176, 187 (2016).

DOJ's textual argument singles out an outlier definition of one word—"avoids"—to argue that United may be liable for fraud by merely failing to return a known overpayment. But that approach not only ignores that one must "*improperly* avoid" an overpayment for liability (which confirms the need to show misconduct), it also flies in the face of the canon *noscitur a sociis*, "a word is known by the company it keeps." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). That canon is necessary "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Id.* (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).

Earlier this year, in *Fischer v. United States*, the Supreme Court addressed a statute that, like the reverse FCA, includes a series of words describing prohibited conduct. 144 S. Ct. 2176 (2024). That statute penalizes one who corruptly "alters, destroys, mutilates, or conceals a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding." *Id.* at 2181 (quoting 18 U.S.C. § 1512(c)(1)). The following subsection applies that prohibition to anyone who "otherwise obstructs, influences, or impedes any official proceeding." *Id.* (citation omitted). The Court rejected the government's argument that the broad term "otherwise" in the second subsection "capture[s] all forms of obstructive conduct *beyond* . . . evidence impairment," *id.* at 2183 (citation omitted), because the government ignored the accompanying words, *id.* at 2183-84. The Court also held "Congress would not go to the trouble of spelling out the list in (c)(1) if a neighboring term swallowed it up." *Id.* at 2185.

The same principle applies here. DOJ's broad, isolated reading of "avoids"—as in merely refraining from returning an overpayment—ignores the accompanying words and would render other words meaningless. If DOJ needs to show only that a defendant

1  refrained from returning an overpayment, it would never be necessary to show that a

2  defendant "concealed" or "improperly decreased" such an obligation. Those terms would

3  be "render[ed] superfluous." *Yates v. United States*, 574 U.S. 528, 543 (plurality); *see id.*

4  at 551-52 (Alito, J., concurring); *see Fischer*, 144 S. Ct. at 2185. If Congress intended this

5  meaning, it would have imposed liability on any person who "knowingly violates an

6  obligation to remit" money, without adding the words "conceals" or "avoids."

7      Nor can DOJ find persuasive support for its position in *Kane*, 120 F. Supp. 3d 370.

8  That non-binding case is irreconcilable with the plain meaning of the statute. Furthermore,

9  the defendants in *Kane* did not raise arguments based on *noscitur a sociis* or the common

10  law. More importantly, *Kane* predated *Escobar*'s command that absent "textual indicia to

11  the contrary," courts should "presume that Congress retained all other elements of

12  common-law fraud that are consistent with the statutory text." 579 U.S. at 187 & n.2. *Kane*

13  thus did not consider the common-law distinction between fraudulent concealment and

14  mere nondisclosure (which is not fraud). And given the quasi-criminal and punitive nature

15  of the FCA, this Court should interpret it narrowly. *See U.S. ex rel. Weinberger v. Equifax,*

16  *Inc.*, 557 F.2d 456, 460 (5th. Cir 1977). *Kane* did just the opposite.

17      DOJ's reading would also produce FCA liability in situations Congress never

18  envisioned. It would turn every routine debt collection action, and numerous ordinary

19  regulatory violations, into FCA cases. Under its view, if a defendant who signs a lease or

20  contract requiring payments to the government knowingly fails to make those payments,

21  the defendant would be liable under the FCA for "avoiding" an obligation to "remit"

22  money to the government. *See* Joint Br. 80 (DOJ embracing this outcome). DOJ has no

23  response to this hypothetical.

24      DOJ does not even *attempt* to claim that there is any evidence that United engaged

25  in any acts of deceit or concealment. Because the FCA clearly requires evidence of such

26  acts, the Court should grant summary judgment to United on DOJ's FCA count.[7]

27  _____

28  [7] DOJ points out that the second prong of the reverse FCA does not require submission of a false record. Joint Br. 78. But there are many acts of concealment and deceit that do not require a false statement—for example, where a defendant destroys evidence.

## II.    THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO THE COMMON-LAW CLAIMS

This Court should grant summary judgment for United on DOJ's derivative common-law claims as well. First, DOJ does not meaningfully contest that its common-law claims are based on the same overpayment theory as its reverse FCA claim. *See* Joint Br. 84. While DOJ makes the academic point that its common-law claims do not share all the same elements as the reverse FCA—"for example, knowledge"—it does not dispute that those common-law claims are based on the same premise that the diagnoses were unsupported and constituted overpayments. *Id.*; *see id.* at 82. Thus, if the reverse FCA claim fails on those grounds, the common-law claims fail as well.

Second, DOJ asks this Court to break with the weight of authority, which precludes such common-law claims when there is an express contract between the parties. *See* Joint Br. 82-83. As United explained in its Motion, DOJ's common-law claims for unjust enrichment and payment by mistake are "quasi-contract theories," and numerous courts have held that such claims are precluded by the existence of a valid contract.[8] *See id.* at 81-82 (collecting cases). DOJ does not address this substantial body of case law. Instead, it turns to a single district court case that allowed both types of claims to proceed at the motion-to-dismiss phase. *See id.* at 83 (citing *United States ex rel. Osinek v. Permanente Med. Grp., Inc.*, 640 F. Supp. 3d 885, 914-15 (N.D. Cal. 2022)). But this outlier case provided only a terse explanation for why it was breaking with what other courts have called a "foundational principle of contract law." *United States v. Kellogg Brown & Root*, 800 F. Supp. 2d 143, 160 (D.D.C. 2011) (citation omitted). This Court should follow the overwhelming weight of authority and hold that the contract between the parties precludes DOJ's quasi-contract common-law claims.

### CONCLUSION

For these reasons, the Court should grant summary judgment for United.

---

[8] DOJ notes that the cases cited by United are "out-of-circuit," whereas *Osinek* is from the Northern District of California. Joint Br. 83-84. But *Osinek*'s analysis of the common-law claims did not turn on Ninth Circuit precedent, so DOJ's distinction is without merit.

1    Dated: August 29, 2024                    Respectfully submitted,

2                                             LATHAM & WATKINS LLP

3                                             DAVID J. SCHINDLER
                                             MANUEL A. ABASCAL
4                                             DANIEL MERON
                                             ABID R. QURESHI
5

6

7                                             By: /s/ David J. Schindler
                                                 David J. Schindler
8                                                Attorneys for United Defendants

9                                             LATHAM & WATKINS LLP
10                                            Daniel Meron (appearing *pro hac vice*)
                                                daniel.meron@lw.com
11                                            Abid R. Qureshi (appearing *pro hac vice*)
                                                abid.qureshi@lw.com
12                                            555 Eleventh Street, NW, Suite 1000
                                             Washington, DC 20004-1304
13                                            Telephone: +1.202.637.2200
                                             Facsimile: +1.202.637.2201

14                                            BARTLIT BECK LLP
15                                            Philip S. Beck (appearing *pro hac vice*)
                                                philip.beck@bartlitbeck.com
16                                            Sean W. Gallagher (appearing *pro hac vice*)
                                                sean.gallagher@bartlitbeck.com
17                                            Cindy L. Sobel (appearing *pro hac vice*)
                                                cindy.sobel@bartlitbeck.com
18                                            Nicolas Martinez (appearing *pro hac vice*)
                                                nicolas.martinez@bartlitbeck.com
19                                            Benjamin R. Montague (appearing *pro hac vice*)
                                                benjamin.montague@bartlitbeck.com
20                                            54 W. Hubbard Street, Suite 300
                                             Chicago, Illinois 60654-8174
21                                            Telephone: +1.312.494.4400
                                             Facsimile: +1.312.494.4440

22                                            BARTLIT BECK LLP
23                                            Andrew C. Baak (appearing *pro hac vice*)
                                                andrew.baak@bartlitbeck.com
24                                            Jameson R. Jones (appearing *pro hac vice*)
                                                jameson.jones@bartlitbeck.com
25                                            1801 Wewatta Street, Suite 1200
                                             Denver, Colorado 80202-6318
26                                            Telephone: +1.303.592.3100
                                             Facsimile: +1.303.592.3140

27                                            *Attorneys for United Defendants*

28
                                             21