Docusign Envelope ID: A73AE68D-3AD3-45E0-8B21-923A75C74905

Honorable Suzanne H. Segal (Ret.)
633 W. 5th Street, Suite 1000
Los Angeles, CA 90071
JudgeSegal@SignatureResolution.com
Special Master

```
F I L E D
CLERK, U.S. DISTRICT COURT
3/3/25
CENTRAL DISTRICT OF CALIFORNIA
BY:      V. Figueroa        DEPUTY
```

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITEDHEALTH GROUP, INC., *et al.*, <br><br> Defendants. | Case No. CV 16-08697-FMO-PVCx <br><br> SPECIAL MASTER'S REPORT AND RECOMMENDATION REGARDING MOTION FOR SUMMARY JUDGMENT  AND MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. Nos 614, 615 and related filings) |

This Report and Recommendation is submitted to the Honorable Fernando M. Olguin, United States District Judge, pursuant to Federal Rule of Civil Procedure 53.

On August 6, 2024, Defendants UnitedHealth Group, Inc., et. al, ("United") filed a Motion for Summary Judgment.  Dkt. 615.  The same day,

Plaintiff United States ("the government") filed a Motion for Partial Summary Judgment on the issue of whether materiality is an element of the second prong of the reverse false claims provision of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(G).  Dkt. 614.  The parties filed a Joint Brief Regarding Cross Motions for Summary Judgment.  Dkt. 616.  Each party also subsequently filed a Supplemental Memorandum.  The District Judge's previous order directed the briefing procedures for summary judgment motions.  Relator did not file a separate brief but participated in the oral argument.

The Special Master has considered the briefs and exhibits submitted as well as the arguments made at a hearing on January 15, 2025, during which the parties addressed the Special Master's "Tentative Ruling."  This Report and Recommendation concludes that the government is lacking any evidence in support of two essential elements of its False Claim Act ("FCA") and related common law claims, which are all premised on United's alleged failure to return federal funds to which it was allegedly not entitled.  Accordingly, it is recommended that United's Motion for Summary Judgment be GRANTED and the government's Motion for Partial Summary Adjudication be DENIED.  The Special Master notifies the parties that, pursuant to Rule 53(f)(2), parties may file a motion to adopt, modify or objections to this Report and Recommendation within 14 days of the date of the Report, as set forth in the Court's May 5, 2020 Order appointing the Special Master.   The Court noted in its May 5, 2020 Order that "The parties shall not include – and the court will not consider – any evidence or argument that was not presented to the Special Master. The standard of review the court will apply to any motion for review shall be governed by Federal Rule of Civil Procedure 53(f)."  (May 5, 2020 Order, Dkt. 395, ¶ 5).

# I.  BACKGROUND

## A.  United's Arguments In Support of its MSJ

United argues in support of its MSJ:

The [government] alleges that United improperly kept money it was paid to provide healthcare to Medicare Advantage ("MA") members. But after years of litigation, [the government] has not reviewed a single medical record of United's MA members—the *only* evidence that could establish whether United may have been overpaid. That failure dooms all of [the government]'s claims.  Dkt. 616 at 9.

The Centers for Medicare and Medicaid Services ("CMS") pays insurers like United and other MA plans to cover their members' healthcare costs. These payments are based in part on the members' medical conditions, with the basic goal of paying MA plans more for taking care of sicker patients. Most of the diagnoses United submits to CMS for payment come directly from doctors, who certify that the patients they have seen have the health conditions, represented by alphanumeric diagnosis codes, listed on insurance claims forms. But doctors often fail to identify all the medical conditions their patients have on claims forms because they are typically paid based on the services they perform, not their patients' diagnoses. MA plans like United thus obtain some of their patients' underlying medical records (or "charts") and hire medical coders to review the charts to capture

additional diagnoses doctors may have missed in submitting claims forms. Dkt. 616 at 9.

[The government's] theory in this case is novel.  Unlike a traditional case of alleged "upcoding," [the government] does not contend that United's coders falsely documented *any* medical conditions. Nor does [the government] allege that United failed to convey accurately the diagnoses doctors submitted to it. [The government] also does not contend that there is anything inherently wrong with MA plans reviewing medical charts to submit more complete diagnostic information (which is an industry-standard practice). And [the government] likewise does not contend that United has an obligation to conduct audits of all the codes it receives from doctors, since MA plans should be allowed to rely on doctors' certified codes—and no one expects perfect coding accuracy in this payment system. Dkt. 616 at 9.

[The government's] sole contention is instead that if United coders who reviewed a chart did not identify a diagnosis code, then that necessarily means that a doctor who previously certified and submitted the same code on a claim form did so in error.  Dkt. 616 at 9-10.

The problem with [the government's] categorical theory is that it is not supported by any evidence. For one, United's coders are unaware of what codes doctors have previously submitted in claims forms and

thus make no effort to validate those codes in performing chart review. For another, [the government's] own coding expert concedes that there are multiple reasons a United coder reviewing a chart might fail to identify a diagnosis code that is actually present there. United's coders could be unfamiliar with the doctor's handwriting or area of specialization, could be missing pages of the medical record, might have lacked sufficient time to complete the review, or might simply have missed a diagnosis certified by a doctor because a record was lengthy or complex. And, of course, as both sides' experts agree, coders are human and make mistakes. The mere fact that United's coders may identify different codes than those a doctor submits is not *evidence* sufficient to allow a jury to conclude the doctor's office was necessarily wrong in submitting the code.  Dkt. 616 at 10.

Accordingly, to meet its burden in opposing summary judgment, [the government's] needed to offer *something* other than mere coding differences to show that some or all of the 28 million doctor-certified codes at issue are unsupported. One obvious approach would have been to review some or all of the medical charts at issue. [The government] could have hired an expert to review charts and offer an opinion about the portion of the doctor-certified diagnosis codes that are in fact not supported. Yet, after more than a decade of litigation in a case in which [the government] seeks to punish United for billions of dollars, [the government] has chosen instead not to review a *single* chart—not even a sample—perhaps because it was afraid of what that review would show. [The government] must now accept the

consequences of that decision, which is that its experts are left hopelessly unable to say which (if any) of the diagnosis codes at issue are unsupported.  Dkt. 616 at 10-11.

## B.  The Government's Opposition to United's MSJ

The government argues in opposition to United's MSJ:

If a Medicare Advantage Organization (MAO) such as United receives a diagnosis code from a provider, submits the diagnosis to CMS for risk adjustment payment, and then later reviews the medical record from that provider, and finds that code to be unsupported, the organization surely cannot hold onto the payment it received for that code without further inquiry. Yet that is the core of United's argument. There is considerable evidence from which a jury can reasonably conclude that the diagnosis codes at issue were unsupported and resulted in overpayments, including United's own Chart Review coders' review of the medical records, United's own data, and the [government's] expert's calculation of the financial impact of United's failure to delete those codes. There is binding precedent from the Ninth Circuit in *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016) that MAOs such as United have longstanding duties prohibiting them from turning a blind eye to unsupported codes submitted for payment. Dkt. 616 at 12-13.

A foundational principle of the MA program – unwavering since the program's inception – is that [MAOs] are paid <u>only</u> for diagnosis codes that are supported by the beneficiary's medical records (supported codes). [MAOs] are not required to audit every single diagnosis code they submit, but they have contractual and regulatory duties – incorporated into every [MA] contract – to undertake due diligence and make good faith efforts to ensure that the diagnosis codes they submit to CMS are supported. CMS adopted the FCA knowledge standard into those duties, meaning that an [MAO] must exercise due diligence and conduct in good faith any audit of provider-submitted data it chooses to conduct, and correct unsupported diagnosis codes that have been submitted for payment revealed by those audits. In this case, United obtained information from its own internal auditing program (Chart Review) that diagnosis codes that it had already submitted to CMS for payment were unsupported. Rather than making a good faith effort to inquire as to the accuracy of those codes and correct them as required by both regulation and contract, it simply buried its head in the sand and did nothing but keep the money.  Dkt. 616 at 13.

As opposed to a "novel theory," the FCA allegation in this case is straightforward – United violated the second prong of the reverse false claims provision, which imposes liability on a person who "knowingly and improperly avoids . . . an obligation to pay. . . the Government." 31 U.S.C. § 3729(a)(1)(G). To prevail, the government must show only that United: (1) improperly avoided its obligation to pay CMS;

and (2) did so knowingly. *See United States ex rel. Ormsby v. Sutter Health,* 444 F. Supp. 3d 1010, 1055-56 (N.D. Cal. 2020). United's obligation to pay arises from independent, yet legally and factually aligned, sources: (1) its regulatory and contractual duties, and (2) its retention of an overpayment. And there is ample evidence that by deliberately ignoring or recklessly disregarding the negative results of its Chart Review, United knowingly and improperly avoided its obligation and improperly retained billions of dollars. Dkt. 616 at 13-14.

## C. The Government's Motion for Partial Summary Judgment

The government argues in support of its Motion for Partial Summary Judgment:

. . . To clarify the issues for trial, the [government] now seeks partial summary judgment that, as a matter of law, materiality is not a required element of establishing liability under the second prong of the reverse false claim provision. Dkt. 616 at 93.

The fact that materiality is not an element of the second prong of the reverse false claim provision is clear from the structure of the statutory text. As discussed below, Courts have recognized that the text itself draws a meaningful distinction between the first prong – which requires a "false record or statement *material* to an obligation"

– and the absence of that same requirement within the second prong. Dkt. 616 at 93-94.

The seminal case on materiality under the False Claims act, *Universal Health Services v. United States ex rel. Escobar*, did not address materiality under the reverse false claim provision, but rather focused on materiality with respect to affirmative false claims under 31 U.S.C. § 3729(a)(1)(A). 579 U.S. 176, 181 (2016). Since *Escobar*, several Courts have expressly held that materiality is not an element under the second prong of the reverse false claim provision. For example, in *United States ex rel. Ormsby v. Sutter Health*, an analogous case involving allegations that defendants knowingly concealed or improperly avoided their obligation to return overpayments to the Medicare Advantage program by failing to delete unsupported diagnosis codes, the Court held that there was no materiality element under the second prong of the reverse false claim provision. 444 F. Supp. 3d 1010, 1056 (N.D. Cal. 2020) ("The elements of a violation under the second prong of the reverse-FCA provision are that the defendant (1) concealed or improperly avoided or decreased an obligation to pay the government and (2) did so knowingly. There is no requirement under the second prong to show that the defendant used a false record or statement or that a record or statement was material." (internal citations omitted)). Dkt. 616 at 94.

**D. United's Opposition to The Government's Motion for Partial Summary Judgment**

United argues in opposition to the government's motion:

. . . DOJ asks this Court to ignore the Supreme Court's clear holding in another FCA case that "the common law could not have *conceived* of 'fraud' without proof of materiality." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016) (emphasis added) (citation omitted). . . . Dkt. 616 at 95.

In *Escobar*, the Supreme Court addressed the materiality requirement in a provision of the affirmative FCA, 31 U.S.C. § 3729(a)(1)(A), which imposes liability on one who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." That provision does not expressly include a materiality element. But the second affirmative FCA provision that follows *does*: Section 3729(a)(1)(B) imposes liability on one who "knowingly makes, uses, or causes to be made or used, a false record or statement *material* to a false or fraudulent claim." (emphasis added). Faced with this statutory structure, the Supreme Court had no hesitation holding that *both* provisions require a showing of materiality. *See* 579 U.S. at 190, 192-95. (Dkt. 616 at 96.)

The reverse FCA provisions at issue here directly parallel the structure of the affirmative FCA provisions in *Escobar*. The first reverse FCA

prong, just like one of the affirmative FCA provisions, includes an express materiality requirement tied to a false statement—requiring a "false record or statement material to an obligation." 31 U.S.C. § 3729(a)(1)(G). But the second reverse FCA prong, like the other affirmative FCA provision, does not. *See id*. The reasoning in *Escobar* applies just as clearly to this parallel situation; even absent the express inclusion of the word "material," the second prong of the reverse FCA necessarily includes a materiality requirement because of its "commonlaw antecedents" and the inconceivability of common-law fraud without a materiality requirement. 579 U.S. at 193 (citation omitted). . . .

DOJ incorrectly claims that "several Courts have expressly held that materiality is not an element under the second prong of the reverse false claim provision." DOJ Mot., *supra* at 85. None of the cases cited by DOJ hold any such thing. And counsel is aware of no other case that does.

(Dkt. 616 at 95-97, 99.)

## II.  UNITED'S MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A moving party without the ultimate burden of persuasion at trial…has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *Nissan,* 210 F.3d at 1102 (citing 10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2727 (3d ed.1998)).

In order to carry its initial burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *See Nissan*, 210 F.3d at 1102 (citation omitted)(emphasis added). If the moving party carries that initial burden, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim[.]" *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (internal quotation marks omitted). Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal quotations omitted). If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "To survive summary judgment [in an FCA case], the [nonmovant] must establish *evidence* on which a reasonable jury

could find for the plaintiff." *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (citation and alterations omitted).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (1986) (emphasis in original). "If the evidence is merely colorable, . . or is not significantly probative, . . . summary judgment may be granted." *Id.* at 249. If the movant has identified an absence of a genuine dispute of material fact, the nonmovant cannot rely only on the pleadings and must designate specific facts showing that there is a genuine issue for trial as supported by affidavits, depositions, answers to interrogatories, and admissions on file; this is especially so when parties have had an opportunity for discovery. *See Celotex Corp.*, 477 U.S. at 322-24.

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *See Anderson*, 477 U.S. at 253. However, an opposing party may not rely upon "mere allegations" or speculation to survive a summary judgment motion. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

**B. The Reverse False Claim Provision of The FCA and The Government's Allegations**

The government alleges United violated the "reverse false claims" provision of the FCA, which makes liable anyone who "*knowingly conceals* or *knowingly and improperly* avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G) (emphasis added). An "obligation" for purposes of a reverse false claim has been defined in the healthcare context to include a failure to report and return an "identified" overpayment within sixty days "after the date on which the overpayment was identified." 42 U.S.C. §§ 1320a-7k(d)(1), (2), (3); 42 C.F.R. § 401.305(e).

Essentially, the government asserts that United wrongly kept money it should have returned to the government. The money at issue is alleged overpayments the government claims United received as a result of submitting allegedly invalid diagnosis codes in connection with the Medicare Advantage ("MA") program. The fatal flaw in the government's case is the complete absence of evidence of such overpayments, an essential element of the government's claim.

Medicare is a federal health insurance program established under the Medicare and Medicaid Act for the elderly and disabled administered by the Centers for Medicare and Medicaid Services ("CMS"). Dkt. 616-1 at D2. Medicare Part C, now known as the "[MA] program," allows people to enroll in health insurance plans offered by private insurers ("Medicare Advantage plans"). *Id.* at D7.

CMS pays the MA plans a fixed amount per month for each member that they insure, based in part on the relative health of the individual members. Dkt. 616-1. at D9.  The MA program is intended to pay MA plans more per month for the risk of insuring sicker beneficiaries.  *Id.* at D15.  The process by which CMS pays MA plans based on the health status of their beneficiaries is commonly referred to as "risk adjustment." *See id.* at D10. CMS determines which members are sicker by looking at the health conditions those members have, as represented by diagnosis codes doctors submit through claims forms. *See id.* at D16-D18, D21.

Diagnosis codes are alphanumerical codes that represent a patient's health conditions. Dkt. 616-1 at D17. There are thousands of diagnosis codes that coders can select when coding medical charts. *See* JS at D23-D24; Exs. D-18 at 658, D-43 at 980.  CMS groups diagnosis codes into Hierarchical Conditions Categories ("HCCs"). *See* 42 C.F.R. § 422.2; Dkt. 616-1 at D16, D18.  HCCs are made up of groups of diagnosis codes that are related clinically and have similar cost implications. Dkt. 616-1 at D18.  For example, the diagnosis code for "type 2 diabetes mellitus without complications" and the diagnosis code for "other specified diabetes mellitus without complications" map to the same HCC of "diabetes without complications." Dkt. 616-1 at D25-27. CMS will pay a MA plan the same amount regardless of which of the two diagnosis codes is submitted. Dkt. 616-1 at D25-27, D29-D31. Similarly, diagnosis codes for numerous different forms of malignant cancer (*e.g.*, bone, lung, liver) would all establish that a patient has the health condition of "metastatic cancer and acute leukemia" (HCC7), and any of those numerous diagnosis codes would lead to the same payment for a MA plan member.  Dkt. 616-1 at D28, D29-D31.

After a patient visits a doctor, the doctor is expected to document the encounter, including the patient's diagnoses, in a medical chart. Dkt. 616-1 at D19. The doctor or the doctor's coder then identifies one or more diagnosis codes that they determine match the conditions documented in the medical chart. *Id.* at D20. The doctor then submits that information on a claim form to a MA plan (if the beneficiary is in the MA program). *Id.* at D21. When submitting the claim form, doctors certify that the information on the claim form, including diagnosis codes, is correct. *Id.* at D22.

Doctors may fail to identify all diagnosis codes that are documented in a medical record. To capture documented diagnosis codes missed by doctors (and thereby increase the payment received from CMS), MA plans like United may obtain and review patients' medical records to identify additional codes doctors may have failed to include in submitting claim forms, which is referred to as a "chart review." *See* Dkt. 616-1 at D41, D44.

United had a "chart review" program during the relevant time period. United hired coders to review the available medical charts retrieved from the doctors to identify diagnosis codes that were supported by documentation in those charts. Dkt. 616-1 at D48. United's chart reviewers did not compare the diagnosis codes identified through its chart reviews to diagnosis codes submitted by doctors on the claim for that same date of service. *Id.* at D50. United's coders generally reviewed medical charts in a "blind" manner, meaning a coder reviewing a medical record did not know what diagnosis codes the doctor had submitted. *Id.* at D51. For dates of service years 2014-2016, United also introduced a process called "second-level review," in which certain charts that had already gone through an initial blind chart review were assigned to a second coder to conduct another blind review. *Id.* at D243.

MA plans are required to certify annually that the data they submit to CMS is "accurate, complete, and truthful" based on the plans' "best knowledge, information, and belief." 42 C.F.R. § 422.504(*l*); Dkt. 616-1 at D104.  In January 2014, CMS proposed a rule, the proposed Medical Record Review Rule ("MRRR"), that would have required MA plans (like United) conducting retrospective chart reviews to design their chart review programs "to identify errors in diagnoses submitted to CMS as risk adjustment data, regardless of whether the data errors would result in positive or negative payment adjustment." Dkt. 616-1 at D117. In May 2014, CMS declined to finalize the MRRR.  *Id.* at D136.

The government alleges that United violated the reverse FCA provision by knowingly and improperly retaining overpayments United allegedly received based on unsupported diagnosis codes that United submitted to CMS.  During discovery, United's first interrogatory asked the government to identify "every Diagnosis Code You allege [United] 'knowingly and improperly failed to delete . . . or otherwise return to the Medicare Program [as an] overpayment." Dkt. 616-1 at D155; Ex. D-7.  The government identified 27,937,651 diagnosis codes in response to this interrogatory. Dkt. 616-1 at D156; Ex. D-11A.

In generating this list of nearly 28 million diagnosis codes that it contends were unsupported by medical records, the government did not compare the diagnosis codes submitted by United's doctors against the underlying medical records to identify unsupported diagnosis codes.  Instead, according to the government, its list represented "every diagnosis code . . . [United] submitted to CMS to increase its risk adjustment payments, and then improperly failed to delete when [United]'s own reviewers found no support for the diagnosis code in the member's medical records."  Dkt. 616-1 at D157, D158; Ex. 4-5.  In other

words, if United's coders did not identify a diagnosis code during chart review as supported by a medical record, the government *assumes* the diagnosis code was, in fact, not supported.

The government does not contend that all 28 million diagnosis codes it identified in response to United's Interrogatory No. 1 resulted in overpayments to United. The government's expert, Dr. Garthwaite, identified 1.97 million diagnosis codes of the approximately 28 million allegedly unsupported diagnosis codes that the government contends resulted in overpayments to United, and for which the government seeks damages. Dkt. 616-1 at D164; Ex. D-57. Dr. Garthwaite calculated that United's payments for the relevant time period would have decreased by approximately \$2.1 billion had United deleted the approximately 2 million diagnosis codes he identified. Ex. D-57 at 1446-47, 1480 ¶¶ 13-14, ¶ 86. Dr. Garthwaite admitted that he did not review any medical charts to reach his opinions. Dkt. 616-1 at D165. In performing his analysis, Dr. Garthwaite assumed a doctor's diagnosis code submitted by United to CMS to be conclusively unsupported if not identified by a United coder during chart review. *Id.* at D169. Dr. Garthwaite did not review any medical records or other evidence to conclude that the codes were unsupported. Instead, he *assumed* they were unsupported if they differed from codes found during United's Chart Review process. *Id.*

## C. The Government Failed to Present Any Evidence On Two Essential Elements of Its Claim

The government cannot prevail on its claim that United knowingly and improperly avoided an obligation to repay the government for an overpayment

based on unsupported diagnosis codes if the evidence is insufficient for a jury to reasonably conclude either that United submitted unsupported diagnosis codes to CMS or that United acted with the requisite intent with respect to any alleged overpayments. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) ("the nonmoving party must come forth with evidence from which a jury could reasonably render a verdict"). The government has not met its burden. A failure to present evidence on this essential element is fatal to the government's claims. *See Celotex Corp,*, 477 U.S. at 325 ("A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.")

### 1. Lack of Evidence of Overpayments

**A. Evidence that United's Coders Failed to Identify the Diagnosis Codes Included on Claim Forms Certified by Patients' Doctors is Insufficient to Support an Inference that the Doctors' Codes Were Unsupported By Medical Records**

As the government concedes, no one (including Dr. Garthwaite, the government's expert) has conducted any comparison of the diagnosis codes United submitted to CMS against the underlying medical charts to identify which diagnosis codes, if any, were not supported by patient medical charts. Instead, the government identified approximately 28 million diagnosis codes that were: "(1) submitted for payment by United; (2) *not found to be supported by United's Chart Review Coders' review of the medical record linked to that submission[1]*; and (3)

_____

[1] The language in italics is the government's characterization of United's conduct,

not deleted." Dkt. 616 at p. 34 (emphasis added). The government failed to present any evidence, however, to show the second element (in italics) in the preceding sentence. The government's expert witness, Dr. Garthwaite, merely *assumed* (without reviewing any medical records) that these 28 million diagnosis codes were unsupported, and his analysis that 1.97 million unsupported diagnoses resulted in overpayments of approximately $2.1 billion to United is based on that assumption. Dkt. 616-1 at D164; Ex. D-57. The government's Opposition relies entirely on speculative assumptions, not supported by record evidence.

The government's brief repeatedly asserts that United received overpayments for claims that were based upon "unsupported" codes. (*See e.g.*, U.S. Supp. Memo., at 1, lines 2-5) (". . .[C]an the MAO turn a blind eye to information from those reviews showing that diagnosis codes . . . were unsupported?"]. The government, however, has failed to provide any evidence to raise a triable issue of fact that any particular code was "unsupported." The government never provided any evidence that showed a particular code lacked support in a medical record. In fact, the government conceded that "there are a number of reasons why a medical coder may not identify a diagnosis code submitted on a claim form by a doctor." (Defendant's Statement of Undisputed Facts, D55).

The government's evidence establishes that United submitted certain diagnosis codes to CMS and later submitted *additional* diagnosis codes that

---

but there is no evidence in the record to show that United submitted diagnosis codes unsupported by medical records. The Chart Review Coders did not review the codes submitted by doctors. There is no evidence in the record that either the doctors' codes or the Chart Review Coders' codes were unsupported by medical records.

United's coders identified during chart review. The government has not, however, presented evidence from which a jury could reasonably conclude that in any particular instance of a discrepancy, much less in every instance, the code United *initially* submitted was invalid. The government's theory assumes that United's coders were always perfect in their coding and did not miss any codes supported by a beneficiary's medical records. It is equally possible, however, based on the evidence, that in any specific case, the diagnosis code certified by a medical provider and submitted by United to CMS *was* supported by a medical record, and the coder reviewing the record during chart review simply failed to independently identify it.

The government points to the following as "ample evidence" from which a jury could reasonably conclude that, if a coder did not identify a diagnosis code, the diagnosis code was unsupported: "[t]he coders that United retained to review medical records in Chart Review were certified, trained, and quality tested[;]" [the coders] were instructed to identify "all the codes they found to be supported in the medical records they reviewed[;]" and the coders "[r]eviewed many medical records twice." Dkt. 616 at p. 50 (emphasis in original). The government also notes that United on the coders' findings to submit new codes to CMS that United had not previously submitted because not identified by doctors, possibly increasing payment to United. *See id.* But the government failed to provide evidence of a single actual instance where a medical record did not support a code.

At the hearing before the Special Master on January 15, 2025, the government and relator argued (for the first time) that they had enough evidence to send the case to trial based on *testimony of United's coders* regarding their training and thoroughness. *See* 1/15/25 Tr. at 70, 75-77. However, the

government failed to submit this evidence (*i.e.*, the testimony of United's coders) in opposition to United's motion. The record contains no evidence of the actual coders' testimony. Instead, in the government's Opposition, the government argued that the testimony of its expert, Dr. Craig Garthwaite, was enough. Specifically, the government relied on the testimony of Dr. Garthwaite who disclaimed that he had, or would express at trial, any opinion as to the rate at which the doctors' diagnosis codes were unsupported by patient medical records, but merely *assumed* that every diagnosis previously certified by a doctor but not separately identified by a United coder was invalid. *See* JS at D169; Ex. D-57 at 1537. Dr. Garthwaite apparently focused on the government's purported damages as a result of the presumed overpayments. Dkt. 616 at 17-18, 26-27; 1/15/25 Tr. at 49 (government asserting that "determining what the damages are is determining what the overpayments were," and that "Dr. Garthwaite was engaged to" "estimate" that such overpayments "comes out to $2.1 billion"). Apart from Dr. Garthwaite's testimony, the government relied on testimony from United representatives (including two supervisors) regarding the manner in which United conducted its blind chart review program. *Id.* at 22-26. However, the briefs, the Statement of Uncontroverted Facts, and the government's exhibits are missing any evidence whatsoever from United's coders.

The summary judgment record is devoid of evidence regarding the identity of any United coders—particularly those coders who actually reviewed the charts that would be relevant in this case—let alone any statements that those coders had provided or would provide at trial. The government did not disclose these United coders as witnesses in its Rule 26 disclosures nor were they disclosed in interrogatory or other discovery responses. They were never deposed as witnesses. *See* 1/15/25 Tr. at 75-76, 78-80. A party cannot present evidence at a hearing that

it failed to present to the court in opposition.  *See*, *e.g.*, *Cambridge Elecs. Corp. v. MGA Elecs., Inc.,* 227 F.R.D. 313, 327 (C.D. Cal. 2004) (noting that it was improper for a party to rely on a deposition transcript that was not in the record when opposing summary judgment but deciding that, in the alternative, summary judgment was appropriate even if the testimony were considered); *Jain v. Trimas Corp.*, 2005 WL 3439932, at *1-3 (E.D. Cal. Dec. 15, 2005) (striking the declaration and all exhibits offered in support of a party's opposition to summary judgment because neither the declarant nor the evidence had previously been disclosed during written discovery or during Rule 26 disclosures).

In any event, even if the government had submitted testimony of United's coders (including those coders who were directly involved in reviewing medical charts), it is pure speculation to find that the United coders' testimony would have supported the government's overpayment claim.  At most, the record evidence indicated the overall excellence of United's coders in reviewing patient charts under limited time conditions.  However, the mere fact that United's coders (who were not themselves medical practitioners) may have been effective in identifying codes still would not constitute evidence sufficient to allow a jury to conclude that the doctor's office was necessarily wrong in submitting the original codes.  As the government's coding expert acknowledged, there are myriad reasons (including the length, complexity, or completeness of a medical record under review) why otherwise competent United coders might have identified additional diagnosis codes while failing to identify a diagnosis code that was actually documented in a patient's medical record.  See JS at D55-D56, D58-D61.

As United noted, the government at best has identified an "unresolved discrepancy" between the doctors' initial diagnosis codes and the United coders' codes. (Dkt. 616 at p. 35; 1/15/25 Tr. at 21-22, 36, 45). But such a purported

discrepancy would not support an inference that the doctors' codes were unsupported by the patient's medical record, however well trained the coders might have been in conducting their task.  Again, lack of sufficient support in the medical records for the codes identified in the doctors' certified claim forms was only one of the various possible reasons for the coders' failure to identify those same codes.  While the relator argued at the January 15, 2025 hearing that a jury could infer that this was the reason for the "discrepancy" (see 1/15/25 Tr. at 70-71), that argument misunderstands the law.  "At summary judgment, [a] court need not draw *all* possible inferences in [the nonmovant's] favor, but only all *reasonable* ones."  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 n. 10 (9th Cir. 2002) (emphasis in original).  Relator's argument also overlooked the complete absence of this evidence in the record before the Special Master.

On the undisputed evidence submitted with the briefing, a jury could not reasonably conclude that any, much less every, diagnosis code certified by a medical provider and submitted by United to CMS but not identified by United's coders in chart review is necessarily invalid.  A jury "is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation." *Brit. Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978); *see also Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1558–59 (9th Cir. 1991) (affirming summary judgment for defendant where plaintiff asked court to "infer" conclusions from evidence but the proposed inferences "resemble[d] tenuous speculations rather than potentially valid conclusions that could be grounded in evidence in the record."); *O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464, 1467 (9th Cir. 1986) (evidence must be sufficient to permit a finding in favor of the opposing party "based on more than mere speculation, conjecture, or fantasy.") (internal quotation marks omitted).  As United points out,

coders conducting a blind retrospective chart review are not looking to confirm the validity of diagnosis codes submitted by doctors.  Undisputed testimony confirmed that coders may themselves miss diagnosis codes supported by a medical record for any number of reasons, including the time available for the review, the completeness, legibility and clarity of the medical record documentation, and simple human error.  Dkt. 616 at p. 44-45.  Furthermore, as noted, the government's expert, Dr. Garthwaite, had no opinion about how many codes were truly unsupported by medical records, and he ultimately testified that only 1.97 million of the 28 million codes that differed from the codes identified by United's chart reviewers purportedly unsupported diagnosis codes arguably resulted in an overpayment and that 93 percent were not overpayments.  *See* JS at D183; Ex. D-65 at 1916-19.

In seeking to prove the essential element of an overpayment by entirely speculative circumstantial evidence (i.e., the "unresolved discrepancies" between United's coders and a doctor (or a doctor's coder)), the government cannot prevail by showing that the inference it draws is merely consistent with the government's overpayment allegation.  Without review of the medical records, a jury would be required to speculate as to whether the diagnosis codes were actually incorrect. A mere possibility of an overpayment is not enough for the government to carry its burden for purposes of avoiding summary judgment.  *Neely v. St. Paul Fire and Marine Ins. Co.* 584 F.2d 341, 344 (9th Cir. 1978) (an opposing party's "mere hope" that further evidence may develop prior to trial is an insufficient basis upon which to justify denial of the [summary judgment] motion); *National Union Fire Ins. Co. of Pittsburgh v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983) (the mere possibility of a factual dispute cannot defeat summary judgment).  At the hearing on the motion, the government and relator expressed their intent to rely on

the coders' testimony at trial (testimony never taken, disclosed, or provided during the many years this case was pending) and argued that testimony would somehow prove that the doctor's codes were unsupported.  The "mere possibility" of the coders' testimony cannot defeat the pending summary judgment motion.

The government also relies on *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016), but that decision is distinguishable.  The government's theory of liability (a "false certification" theory) in *Swoben* differed from this case (a reverse false claim), and the Ninth Circuit evaluated the claims only under pleading standards.  *Swoben* involved an FCA claim asserted in a pleading, not a reverse FCA claim on summary judgment. In *Swoben*, the relator alleged in a complaint that the defendants' certifications "based on best knowledge, information, and belief," regarding the accuracy, completeness, and truthfulness of data submitted to CMS were false or fraudulent statements, and the Ninth Circuit found that was sufficient for pleading purposes. The government's theory in this case is markedly different from the one raised in *Swoben*.  The government claims that United knowingly and improperly retained overpayments received as a result of unsupported diagnosis codes.  Proving such a claim necessarily requires proving that United *submitted unsupported diagnosis codes* and retained overpayments due to those unsupported codes.   There is no evidence in the record to prove this claim.

*Swoben* addressed whether the plaintiff's allegations were sufficient to *plead* a claim for violation of the FCA based on false certifications; not the sufficiency of evidence to *prove* that a defendant submitted unsupported diagnosis codes to CMS.  *See Swoben*, 848 F.3d at 1167 (holding plaintiff "assert[ed] a cognizable legal theory"). In fact, the Ninth Circuit stated that, "[b]y holding that one-sided retrospective reviews *can* result in false certifications under

§422.504(*l*), we do not suggest that they necessarily always do." *Id.* at 1175. The Ninth Circuit's observation highlights that such a claim still must be proved by admissible evidence.

*United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010 (N.D. Cal. 2020), also cited by the government, similarly addressed only the sufficiency of the pleadings. *Id.* at 1080-1081 (holding "*[a]t the pleadings stage*, the plaintiffs sufficiently allege that [defendant medical providers] knowingly concealed or avoided their obligations to pay the government") (emphasis added).

*Swoben* and *Sutter* do not support the proposition that the government can carry its burden on summary judgment simply by pointing to evidence that United submitted diagnosis codes to CMS that United coders did not identify in chart reviews. To meet its burden, the government needed to present evidence from which a jury could reasonably conclude that the diagnosis codes United submitted were invalid, *i.e*, that codes were not supported by the related medical record. The complete failure of any evidence on this essential element must result in summary judgment for United.

The government's case depends entirely on speculation and assumptions about what the codes found by the United coders actually mean. If a defendant's alleged obligation to pay or return an overpayment to the government depends on multiple assumptions, courts have found that it is only a "potential and contingent" obligation and thus non-actionable under 31 U.S.C. Section 3729(a)(1)(G). *See United States ex rel Barrick v. Parker-Miglioini Intl., LLC*, 878 F.3d 1224, 1230-31 (10th Cir. 2017). Here, any purported overpayment depends on the assumption that doctors provided unsupported codes because their codes were different than the codes found during the Chart Review process. This is an assumption, however,

and there is no evidence to support it. Accordingly, there is no evidence of an obligation or overpayment under the FCA. *See also U.S. ex rel Quinn v. Omnicare*, *Inc,* 382 F.3d 432, 446 (3rd Cir. 2004) (without a clear obligation to pay the government, there is no FCA liability). The Ninth Circuit reached a similar conclusion recently in *United States ex rel. Lesnik v. ISM Vuzem d.o.o.*:

> Given that the government has not "established" a duty to repay the government any money, this case fits neatly into a line of cases declaring that potential or contingent obligations to repay are not enough to support a reverse false claim theory of relief. For example, in *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.,* 843 F.3d 1033 (6th Cir. 2016), the Sixth Circuit addressed a situation where the relator claimed the defendant had violated the FCA by failing to report sulfur dioxide leaks to the EPA, which the relator claimed was a knowing concealment of an obligation to pay money (fines) to the government. *Id.* at 1034 . . . "For FCA liability to attach," the Sixth Circuit concluded, "there must be an established duty to pay." *Id.* at 1039, quoting 31 U.S.C. § 3729(a)(1)(G). "Where ... a regulatory penalty has not been assessed and the government has initiated no proceeding to assess it, there is no established duty to pay." *Id.*[15] *Accord Carlisle v. Daewon Kangup Co.,* No. 3:15-cv-565, 2018 WL 2336757, at *2 (M.D. Ala. May 23, 2018) (potential penalties a defendant owed, which would be based on the exercise of administrative discretion, are not "obligations" that support a reverse false claim theory).

*United States ex rel. Lesnik v. ISM Vuzem d.o.o.,* 112 F.4th 816, 821 (9th Cir. 2024*).* The Ninth Circuit recognized that a reverse False Claims Act claim requires more than a possible or contingent obligation to repay the government. The complete failure to provide any evidence of an actual reverse false claim – i.e., overpayment to United based on a code that is not supported by a medical record – compels summary judgment for United.

## B. CMS RADV Audit Data Undercuts The Government's Theory that Coding Discrepancies Prove Unsupported Codes.

Any presumption that a diagnosis code not identified by United's coders in chart review is necessarily invalid is also rendered questionable by data from audits conducted by the government.

CMS conducts periodic audits of MA plans, which are called RADV audits. Dkt. 616-1 at D71. To conduct RADV audits, CMS selects a sample of a MA plan's members. *Id.* at D74. MA plans then submit medical charts for those sampled members, which CMS reviews. *Id.* at D75-76.

CMS conducted RADV audits on certain United contracts for 2011-15, at least 4 of the 9 years at issue in this case. Dkt. 616-1 at D81, D83, D88. Through such audits, CMS reviewed medical records relating to roughly 6,500 of the 28 million diagnosis codes submitted by United that the government claims were unsupported. *Id.* at D184. CMS coders found that approximately 89% of those roughly 6,500 codes had support in patients' medical records. Exs. D-64, D-63.

The government disputes the relevance of the RADV data and argues that this evidence is statistically insignificant because the RADV audit involved only a small portion of the 28 million diagnosis codes that the government contends were

unsupported.    Dkt.  616  at  29-30.    Nonetheless,  it  is  meaningful  that  the government's *own auditors* found support in medical records for diagnosis codes that the government has alleged were unsupported based solely on such codes not having  been  coded  during  United's  chart  review.    These  findings  undercut  the government's theory that any diagnosis code submitted by United to CMS but not identified by coders in chart review is presumptively invalid.

## C. The Government Had A Full Opportunity to Develop Evidence to Support its Claims.

The  allegation  that  United  submitted  unsupported  diagnosis  codes  resulting in overpayments is a crucial element of the government's reverse FCA claim, on which  the  government  has  the  burden  of  proof  at  trial.    Before  even  filing  its complaint,  the  government  was  required  to  conduct  a  reasonable  investigation  of the  facts  and  to  have  a  reasonable  belief  that  it  could  prove  this  element  of  its claim.    This  litigation  has  been  pending  for  more  than  a  decade,  and  the government  has  had  ample  opportunity  to  develop  evidence  in  support  of  its theories.  It has not done so.

The government's argument that it was precluded from obtaining evidence during  discovery  because  United  "refused"  to  produce  medical  records  is  not supported  by  the  record.    United  "offered  to  produce  to  the  government  every medical record in United's possession that United reviewed as part of its chart review  program,  to  allow  the  government  to  determine  for  itself  which  of  the codes on its list are or are not supported.  The government rejected this offer." Dkt. 419 at 9-10.

This discovery issue is addressed in the Special Master's Order dated May 28, 2021. In that Order, the Special Master noted:

> Interrogatory 14 asked UnitedHealth to, with respect to every diagnosis code on the government's list, (a) identify which code is supported by a medical record and (b) identify every medical record review that UnitedHealth conducted. (MTC at 5-7). Request 147 requests all medical records associated with the diagnosis codes on the government's list. (Id. at 7). In response to Interrogatory 14, UnitedHealth objected on the grounds that "this Interrogatory is an improper contention interrogatory that impermissibly seeks to shift the burden of proving an essential element of the government's False Claims Act case on to UnitedHealth and seeks expert opinion." (Id. at 8). In response to Request 147, UnitedHealth stated: "Based upon its General and Specific Objections, UnitedHealth does not intend to produce documents responsive to this Request." *At the meet and confer on this issue, UnitedHealth indicated that it would produce the responsive medical records in its possession. This production, however, would require a production of approximately 21 million charts and take 8 months to produce.* This proposal did not resolve the discovery dispute.

(Dkt. 419, Order Denying Motion To Compel Without Prejudice at 2-3)(emphasis added). The government declined United's offer to produce the 21 million medical records, apparently due to the volume of records at issue. However, the government was responsible for placing that volume of records in dispute.

The government fails to explain why it could not review even a sampling of the medical records.  According to United, this is the procedure the government has followed in other FCA cases.  The government has failed to provide any explanation for its choice to avoid any kind of review of medical records to determine whether the records supported the listed codes.

Instead, the government has repeatedly attempted to shift the burden to United to *disprove* the government's allegations. Rather than review medical records itself, the government served discovery asking United to identify which of the approximately 28 million diagnosis codes, if any, *United* contends *were supported* by medical records and to produce the medical records providing such support.  While United objected primarily to the breadth and scope of the discovery request, and to conducting the comparison work on the government's behalf, the meet and confer correspondence, as well as the Special Master's order, revealed United's willingness to turn over the medical records to the government. The government rejected this offer.  The government's presentation of this issue in its Opposition is incomplete, as it does not discuss the record evidence demonstrating that United agreed to turn over medical records.

The Special Master's May 28, 2021 order denied without prejudice the government's motion to compel United to respond to such burdensome discovery. Dkt. 419. The Special Master found that responding to the interrogatory "would impose a tremendous burden on the responding party to prepare an answer that does not currently exist." *Id*. at 4. The Special Master also found that "[o]nly an expert—or someone with specialized knowledge—could do a fair comparison of the medical records and the diagnosis codes to determine if the medical record supported the code." *Id.* at 4-5.  Accordingly, the Special Master denied the motion without prejudice.  The Special Master found that the government could

"renew" the request "if the requested documents are relevant to [United's] defenses asserted at a later phase of the action." (*Id*. at 10.).  Nothing in this discovery order, however, prevented the United States from requesting or reviewing *a sampling* of the medical records.  The government has never explained why it would not undertake a review of the medical records itself or a subset of the medical records.  The government never explained why it would only be satisfied by production of millions of records and by having United perform the necessary comparison work.

On March 22, 2024, after United provided the report of its expert, Mr. Timothy Renjilian, the government brought an untimely motion to compel, again seeking to compel United to respond to its interrogatory and to produce the millions of medical records supporting any codes United contends were supported.  As noted, the government sought to shift its burden of investigating its contentions to United by requiring United to disprove the government's allegations.  Nothing, however, stopped the government from conducting this investigation on its own.

The Special Master denied the government's motion, again noting that the burden of reviewing the medical records could not be shifted to United. The Special Master explained that Mr. Renjilian did not review nor rely on any medical records in reaching his opinion (i.e., that data from CMS's own RADV audits undercut the government's theory), and therefore the medical records the government sought to compel were not discoverable as expert reliance materials. Nor had the government shown any other justification for requiring United to undertake the costly and burdensome collection and expert analysis of millions of medical records to *disprove* the government's claims that certain diagnosis codes were unsupported by medical records.

The government "must present affirmative evidence" to defeat summary judgment and was unable to do so, despite having had "a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 257. The government did not review any medical records, did not designate any expert to compare diagnosis codes submitted by United against patient charts to identify unsupported diagnosis codes, and thus lacks evidence of any overpayments, which is an essential element of its claim. Summary judgment for United is therefore appropriate. *See United States ex rel. Kelly v. Serco, Inc.,* 846 F.3d 325, 335 (9th Cir. 2017) (granting summary judgment where plaintiff failed to establish "an essential element" of false records claim); *In re Oracle Corp. Sec. Litig*., 627 F.3d at 387 (affirming summary judgment for defendant where plaintiffs "had not developed evidence sufficient to allow a jury to reasonably conclude" an essential element of plaintiffs' claim).

## 2. Lack of Evidence of Knowing and Improper Avoidance of United's Obligations With Respect to the Alleged Overpayments

United is also entitled to summary judgment on the reverse FCA claim on the alternative ground that the government has failed to present any evidence showing that United "knowingly and improperly avoid[ed]" its obligation to repay the alleged overpayments.

The government advances the position that mere avoidance of an obligation to repay money to the government is enough to create liability under the FCA, without the need to prove any deceptive conduct. *See* Dkt. 616 at 78-80. As discussed below, the Special Master agrees with United that the government's position cannot be reconciled with the relevant statutory language, which requires

United to have knowingly "conceal[ed]" or "improperly avoid[ed]" such a payment obligation.  31 U.S.C. § 3729(a)(1)(G).  In addition, the government's position is incompatible with the Supreme Court's recognition in *Escobar* that the FCA is an anti-fraud statute that imports common-law fraud concepts.  *Escobar*, 579 U.S. at 186-87.  *See also United States ex rel. Schutte v. SuperValu, Inc.*, 598 U.S. 739, 750-51 (2023) (recognizing that the "FCA is largely a fraud statute," and that, therefore, "[i]n the absence of statutory text to the contrary," courts should interpret the FCA as incorporating "the well-settled meaning of such a common-law term").  The holdings in *Escobar* and *SuperValu* conflict with the government's view that the violation of a regulatory or contractual requirement is enough to create liability under the FCA, and that the FCA does not require conduct that is designed to deceive or mislead the government regarding a party's entitlement to a payment.

"The disregard of a federal regulation, by itself, does not create liability under the [FCA]."  U.*S. ex rel Drakeford v. Tuomey*, 792 F.3d 364, 379-81 (4th Cir. 2015).  Instead, a reverse FCA claim requires proof that the defendant engaged in conduct that deceived the government about an obligation to repay funds.  Specifically, the reverse FCA requires, at minimum, a showing of one of the following: (1) a knowingly false statement or record that is material to a repayment obligation; (2) knowing concealment of a repayment obligation; or (3) knowing and improper avoidance of a repayment obligation.  *See* 31 U.S.C. § 3729(a)(1)(G).

This requirement means that, like the rest of the FCA, the reverse FCA creates liability for fraud.  *See Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1073-74 (8th Cir. 2016) (referring to the reverse FCA as "one of seven substantive provisions imposing liability for fraud against the government," and

holding that the FCA's punitive sanctions are an "unreasonable levy" for parties liable "only [for] 'knowingly' receiving an overpayment from the government . . . If there is no allegation of fraudulent conduct under the FCA, then there can be no reverse liability under § 3729(a)(1)(G).").

The mere retention of overpayments may deprive the government of funds it is owed, but that is not fraud. "Bad math is no fraud, [and] proof of mistakes is not evidence that one is a cheat." *Owens*, 612 F.3d at 734 (citing *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996) (internal quotations omitted). Holding otherwise would "push the FCA beyond its proper boundaries [and] invite the prospect of pervasive litigation that would discourage many perfectly honest companies from wanting to do business with the United States." *Id.* Courts must guard against this outcome by treating the reverse FCA as the fraud statute that it is. Understanding the reverse FCA as a fraud provision "comports with the punitive nature of liability that the FCA imposes," and with the United States Supreme Court's admonition that the FCA is not an "all-purpose antifraud statute." *Olson*, 831 F.3d at 1074 (citation and quotation marks omitted). "If the FCA is not meant to cover all types of fraud, it would be unreasonable to assume it covers both fraudulent and nonfraudulent conduct." *Id.*

The reverse FCA's text enshrines this requirement by requiring that, even in the absence of "knowing[] conceal[ment]" of a repayment obligation, a plaintiff show knowing and "improper[]" avoidance of a repayment obligation. 31 U.S.C. § 3729(a)(1)(G) (emphasis added). Black's Law Dictionary defines "improper" as "1. Incorrect; unsuitable or irregular. 2. *Fraudulent or otherwise wrongful*." Improper, Black's Law Dictionary (11th ed. 2019) (emphasis added). This language makes clear that deception is a requirement for reverse FCA liability no matter which precise formulation in Section 3729(a)(1)(G) is invoked to describe

the conduct in question. Congress recognized this requirement when, in expanding the statute's definition of "obligation" to include "the retention of an overpayment," it made clear that only overpayments of which the government is unaware would be actionable: "[T]he violation of the FCA for receiving an overpayment may occur once an overpayment is knowingly and improperly retained, without notice to the Government about the overpayment." S. Rep. No. 111-10, 2009 WL 787872, at *15 (Mar. 23, 2009); *see also* 155 Cong. Rec. S4531, 2009 WL 1077017, at S4539-4540 (Apr. 22, 2009) (Sen. Jon Kyl noting that "knowing and improper" means of retaining an overpayment "must be means that are malum in se-that is, means that are inherently wrongful and constitute an independent tort").

Because the FCA—including the reverse FCA—is a fraud statute and fraud as a common-law concept requires that the defendant's actions induce detrimental reliance by the plaintiff (*see Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 476-77 (4th Cir. 2006)), the problem with the government's allegations is that the government knew of the very chart review practices of which it now claims United prevented it from learning, and thus the government cannot have been duped into relying on any action or inaction by United in determining whether it had been the victim of overpayments.

Thus, the impropriety of a defendant's retention of an overpayment cannot be grounded in the mere fact of the defendant having received the overpayment, or even of being obligated to return it. Otherwise, the requirement of "improper" conduct would introduce circularity and surplusage into a statute where Congress clearly intended nothing of the kind. *Cf. Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128 (2018) ("Absent clear evidence that Congress intended this surplusage, the Court rejects an interpretation of the statute that would render an

entire subparagraph meaningless. As this Court has noted time and time again, the Court is 'obliged to give effect, if possible, to every word Congress used.'") (citation omitted).

The only contrary authority cited by the government that seemingly supports its position that neither concealment nor deception is required to establish a reverse FCA claim is *Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370 (S.D.N.Y. 2015). Dkt. 616 at 33, 60, 61, 79. In *Kane*, the district court concluded that for a reverse FCA claim, "avoiding" an obligation to pay occurs when a party is put on notice of a potential overpayment issue, is legally obligated to address it as a matter of regulatory or contractual requirements and does nothing. *See Kane*, 120 F. Supp. 3d at 388, 390-91, 394. However, setting aside the fact that *Kane* is not binding authority in this case, that decision is also inapposite because: (i) it focused only on the statutory term "avoid[ ]" and never addressed the meaning of the additional terms "conceal[ ]" and "improper[ ]", and consequently it effectively read the latter terms out of the reverse FCA provision, which *Kane* nevertheless characterized as part of the FCA's "robust anti-fraud scheme" (see id. at 390); and (ii) *Kane* was decided prior to *Escobar*, which, as discussed, eliminated any notion that mere notice of a potential regulatory or contractual violation is enough to support liability under the FCA.

The government has failed to allege any sort of deception on the part of United with respect to its alleged failure to return overpayments. It does not allege that United made a false statement material to a repayment obligation. Nor does the government contend that United actively concealed any such obligation. In relying upon only the "knowing and improper avoidance" formulation of reverse FCA liability, the government must establish that United knew it had received overpayments and acted in a way that kept the government from learning

Docusign Envelope ID: A73AE88D-2AB3-45E9-8B31-823A75C71805

of the overpayments. The government does not allege that United did any such thing. Nor could it. To the contrary, the government was aware of United's claim procedures as early as April of 2014, when United and CMS met regarding the government's proposed new code verification rule. *See* 1/15/25 Tr. 89-103.

While the parties disagree about what was discussed at that 2014 meeting (*see* Tr. 1/15/25 Tr. at 89), even construing all facts in favor of the government, it is undisputed that United *requested* this 2014 meeting with the Director of CMS, the Deputy Director of CMS, and other leaders of the agency to discuss United's claim verification process and the impact of the proposed new rule. *See id.* at 92. United's initiation of a meeting with CMS on this topic is the opposite of concealment. The evidence thus supports United's position that it in no way sought to withhold information about its chart review program from CMS when submitting diagnoses for payment, and that United also sought guidance from CMS regarding the agency's expectations.

United also submitted evidence of annual correspondence with CMS and bid documents after the 2014 meeting in which United disclosed the nature of its chart review program and the fact that that program was not designed to confirm the validity of diagnosis codes submitted by doctors. *See* Dkt. 616 at 76; 1/15/25 Tr. at 109-11; Exs. P-1D and P-1E (emails between United's CEO in charge of Medicare and CMS's deputy director wherein United informed CMS that United "did not use our [chart review] process to determine whether diagnosis codes submitted through claims are unsupported in the medical record," but that United "do[es] have a quality assurance process that deletes codes initially identified during chart review and that are later determined to be unsupported"); Ex. D-25 (United's annual bid documents informing CMS that United "has decided to cease

one of its prior processes that identified and deleted certain diagnosis codes through the medical record review process").

For example, on June 26, 2015, United included the following paragraph in an email to Sherri Rice at CMS:

> CMS issued a proposed rule last year that would have required MA plans to design any medical record reviews to determine the accuracy of risk adjustment diagnoses associated with those records. In May 2014, CMS withdrew the proposed rule. During our conversations last year before the proposed rule was withdrawn, CMS confirmed to us that the proposed requirements would not apply until the effective date of the rule, and that MA plans were thus not required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses. As we discussed last year, we previously had a process through which we reviewed certain medical records to determine the accuracy of risk adjustment diagnoses and submitted appropriate deletes. Based on our conversations with CMS last year, CMS's withdrawal of the proposed rule, and CMS's ongoing consideration of a FFS Adjuster to address diagnoses not supported by a medical record in the context of RADV, we ended this process and informed you of that decision. That decision remains operative for 2013 dates of service. In particular, we did not use our previous process to determine whether diagnosis codes submitted through claims are unsupported in the medical record. We do have a quality assurance process that deletes codes initially identified during chart review and that are later determined to be unsupported.

(Dkt. 618-2, Exhibit D-21).  A similar email was sent in 2016, and United made similar disclosures in bid documents to CMS during the relevant time period.

   While CMS did not endorse United's chart review program following the 2014 meeting (*see* Dkt. 616 at 80; Exs. P-1D, P1-E, P1-F), there is no question that United disclosed its medical record review practices to the CMS representatives that it regularly corresponded with.  In short, not only was there no evidence of deception as required to establish reverse FCA liability for the "improper" avoidance of an obligation to repay the government, but the evidence presented actually showed that United was seeking guidance from the agency and transparent about its practices.  Nothing United allegedly did or did not do prevented the government from acquiring knowledge of United's medical record review program.  There simply was no fraud.

### 3.  The Government's Common Law Claims Also Fail For Lack of Evidence of an Overpayment Based on Unsupported Codes.

   Like its reverse FCA claim, the government's common law claims for payment by mistake and unjust enrichment fail because the government has not carried its burden to present evidence of an overpayment based on unsupported diagnosis codes.  As a result, the government cannot prevail on its common law claims because these claims necessarily also require it to prove that United received payments from the government to which United was not entitled.

## III.  THE GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.  The Government's Contentions

The government seeks partial summary judgment on the issue that materiality is not a required element of establishing liability under the second prong of the reverse false claim provision.  Dkt. 616 at 93-94.  That prong applies to a person who "knowingly and improperly avoids . . . an obligation to pay . . . the [g]overnment."   31 U.S.C. § 3729(a)(1)(G). The government argues that it is clear from the structure of the statutory text of the provision that materiality is not a required element of such a reverse FCA claim.  It contends courts have recognized that the text draws a meaningful distinction between the first prong – which requires a "false record or statement *material* to an obligation" – and the absence of that same requirement within the second prong.  *See* Dkt. 616 at 92-94.

The government argues that the seminal case on materiality under the FCA, *Universal Health Services v. United States ex rel. Escobar*, 579 U.S. 176 (2016), did not address materiality under the reverse false claim provision, but rather focused on materiality with respect to affirmative false claims under 31 U.S.C. § 3729(a)(1)(A).  *See* Dkt. 616 at 93-4 (citing *Escobar*, 579 U.S. at 181).  The government argues that since *Escobar*, a number of district courts both in the Ninth Circuit and in other circuits have expressly held that materiality is not an element under the second prong of the reverse-FCA provision.

## B. United's Opposition

United opposes the motion on the grounds that the government's argument ignores the Supreme Court's holding in *Escobar* that "the common law could not have *conceived* of 'fraud' without proof of materiality." *Escobar*, 579 U.S. at 193 (emphasis added) (citation omitted). United argues that not only is materiality a cornerstone element of fraud, but the text, structure, and history of the reverse FCA all require its "rigorous materiality requirement" to be enforced. *Escobar*, 579 U.S. at 181.

To the extent that materiality is an element of any reverse-FCA claim— including a claim brought under the second prong of the FCA's reverse provision—United contends that CMS did not consider United's failure to delete or investigate diagnosis codes that doctors had certified and submitted to United, but that United's coders did not independently identify during their blind chart review, to be *material* to CMS's decision to pay United on the basis of those codes. United points to the fact that CMS knew about the process used by United in submitting codes for years and yet continued to pay United anyway. See Dkt. 616 at 103.

## C. Fraud Claims Require Materiality

As previously discussed, the Supreme Court has recently reaffirmed, "the text of the FCA" "tracks the common law" "for claims of fraud . . . because . . . the FCA is largely a fraud statute." *SuperValu Inc.*, 598 U.S. at 750 (citing *Escobar*, 579 U.S. at 187-88 & n.2). In addition, the Ninth Circuit has recognized

that "'[t]he [FCA's] 'reverse false claims' provision does not eliminate or
supplant the FCA's false claim requirement.'" *Serco, Inc.*, 846 F.3d at 336
(quoting *Cafasso v. Gen Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1056 (9th Cir.
2011)).  Rather, that provision "expands the meaning of a false claim to include
statements to avoid paying a debt or returning property to the United States."
*Cafasso*, 637 F.3d at 1056.  In particular, the FCA's reverse false claims provision
"attempts to provide that fraudulently reducing the amount owed to the
government constitutes a false claim." *Id.* (internal citation and quotation marks
omitted).  This view of a reverse false claim as a type of false claim that is
intended to prevent fraud upon the government indicates that a materiality element
is applicable to reverse false claims, including the one asserted by the government
in this case.

As noted in the *Ormsby* decision, the FCA defines materiality as " 'having a
natural tendency to influence, or be capable of influencing, the payment or receipt
of money or property.' " *Ormsby,* 444 F. Supp. 3d at 1055 (quoting *Escobar* at
1213*;* 31 U.S.C. § 3729(b)(4)). "Although the requirement is 'demanding,' the
Supreme Court has held that there is not a bright-line test for determining whether
the FCA's materiality requirement has been met." *Id.* (citing *Escobar).*  "Instead,
the Supreme Court has given a list of relevant, but not necessarily dispositive,
factors in determining whether the false  claims were material, such as whether
the government decided 'to expressly identify a provision as a condition of
payment.' " *Id.* (quoting *Escobar*, 136 S. Ct. at 2003). " 'Likewise, proof of
materiality can include, but is  not necessarily limited to, evidence that the
defendant knows that the government  consistently refuses to pay claims in the
mine run of cases based on  noncompliance with the particular statutory,

regulatory, or contractual requirement.' " *Id.* (quoting *Escobar*, 136 S. Ct. at 2003). " 'Conversely, if the government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.' " *Id.* (quoting *Escobar*, 136 S. Ct. at 2003). " 'Or, if the government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.' " *Id.* (quoting *Escobar*, 136 S. Ct. at 2003–04). *Escobar* does not directly address reverse false claims provisions, but the decision's emphasis on the significance of the materiality element cannot be ignored.

The reverse FCA provision, 31 U.S.C. § 3729(a)(1)(G), imposes liability on one who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]" 31 U.S.C. § 3729(a)(1)(G). The government invokes the "second prong" of this provision, alleging that United has knowingly concealed and avoided United's obligation to return MA overpayments. The government further maintains that no materiality requirement applies to such a reverse false claim and argues that neither *Escobar* nor any other binding authority addressed this second prong when discussing materiality.

However, while it is true that *Escobar* did not address the reverse false claims provision, *Escobar* and subsequent Ninth Circuit cases recognize that, like the FCA as a whole, its reverse false claims provision incorporates the elements of common law fraud (although the provision expands the notion of what constitutes a "false claim" under the statute). Accordingly, a materiality element must apply

to that provision, regardless of which of its two prongs is the basis for the government's claim in a given case, because of the inconceivability of fraud absent a materiality element. *See e.g., Neder v. U.S*., 52 U.S. 1, 22-23 (1999) (materiality is an element of fraud because the well-settled meaning of fraud at common law involves the concealment of a material fact);  *Cox v. Continental Cas. Co*., 703 Fed. Appx. 491, 495 (9th Cir. 2017) ("fraud requires materiality").

The cases cited by the government do not thoroughly analyze this issue. For example, the *Ormsby* decision recites that the second prong of the reverse FCA provision does not require proof of a material false record or statement, but *Sutter* omits any real discussion or analysis of this issue and relies, in part, on authority outside the Ninth Circuit.  *See Ormsby*, 444 F. Supp. 3d at 1056; *see also United States ex rel. Jacobs v. Pac. Dermatology Inst., Inc.*, 2022 WL 17401522, at *13 (no analysis of the issue); *United States ex rel. Frey v. Health Management Systems, Inc.*, 2021 WL 4502275, at *7 (same); *United States ex rel. Little v. Shell Exploration & Production Co.*, 2017 WL 4742917, at *29 n.260 (noting the parties' agreed that the pre-FERA version of the FCA applied).  Other decisions, including one in this litigation, have noted that under *Escobar*, "a claim must be based on a violation [of the FCA] that is likely to affect whether and how much the Government would have paid to a defendant."  *See United States ex rel. Poehling v. UnitedHealth Grp., Inc.*, 2018 WL 1363487, at *11 (C.D. Cal. Feb. 12, 2018) (recognizing that *Escobar* did not distinguish claims brought under § 3729(a)(1)(A) from claims brought under § 3729(a)(1)(G) when discussing the FCA's materiality requirement, and that *Escobar* had no reason to address § 3729(a)(1)(G) since the case concerned only § 3729(a)(1)(A)).

As this discussion indicates, both the statute's language and history indicate that a "false claim"—which includes a reverse false claim—is not limited to false statements but covers any attempt to fraudulently reduce or avoid the amount owed to the government. This includes a defendant's attempt to knowingly conceal or improperly avoid an obligation to return overpayments to the MA program. The government provides no reason to view the second prong of the reverse false claims provision—which is intended to expand the meaning of a "false claim" under the FCA, an anti-fraud statute that tracks the common law elements of fraud—as omitting the materiality element of common law fraud.

A contrary ruling would have adverse consequences. For example, it would permit the government to generate reverse-FCA claims for the purpose of avoiding a materiality requirement by asserting that a defendant violated its statutory obligation to report and return Medicare overpayments, rather than asserting that the defendant fraudulently overcharged the government and then failed to repay the overpayment. *See*, *e.g.*, *United States v. Kinetic Concepts, Inc.*, 2017 WL 2713730, at *13 (C.D. Cal. Mar. 6, 2017) (concluding that the government's reverse-FCA claim, which asserted that the defendant fraudulently overcharged the government and then failed to repay the overpayment, was redundant of a false presentment claim for payment).

In addition, in the instant case, failing to require the government to show that United's chart review practices were material would enable the government to pursue an FCA claim based on United's *known* practices for submitting diagnostic codes for reimbursement. As previously discussed, CMS undeniably knew for years about United's practices and was aware when it made the challenged

payments that United's coders never sought to independently confirm the validity of the diagnostic codes identified by the doctors. *See*, *e.g.*, Dkt. 623, Ex. D-21 at 671. After holding a conference with United in 2014 about the claims review process, receiving emails from United about their chart review practices, and bid forms that confirmed the practices, CMS chose not to require changes to United's chart review procedures (Dkt. 616-1 at D117, D136), and continued to pay United's claims.

Although not dispositive, this type of behavior by the government has been recognized as a factor undermining a "false claim" or materiality contention, because if, as the record indicates, United was open with the government about United's chart review procedures, and the government knew of those procedures and nevertheless paid the claims for years without changing its position (as CMS contemplated doing in 2014), the government's conduct would be hard to reconcile with the concept that the government believed United to be making a material false claim for payment by failing to independently verify diagnostic codes identified by doctors. *See Escobar*, 579 U.S. at 195 (noting that "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated," and "has signaled no change in position," that is "very strong evidence that those requirements are not material").

Courts in this circuit have upheld the requirement that fraud must be part of a reverse false claim, before and after the 2009 amendments to the FCA. *See e.g.* *Cafasso,* 637 F.3d at 1056 ("Section 3729(a)(7) of the FCA—the reverse false claims provision—does not say otherwise. It makes actionable the knowing use of a false record or statement to conceal, avoid, or decrease an obligation ... to

transmit money or property to the Government . . . This provision attempts to provide that *fraudulently* reducing the amount owed to the government constitutes a false claim.") (internal quotations omitted and emphasis added); *See also Kelly*, 846 F.3d at 336 (quoting *Cafasso* for the same proposition with respect to the current reverse false claim provision (3729(a)(1)(G))); *Scott v. Arizona Center for Hematology and Oncology PLC*, 2018 WL 1210903, at *7 (D. Ariz. March 8, 2018) (requiring fraudulent conduct for a reverse false claim). Fraud requires materiality. Thus, the Special Master recommends the Court deny the government's motion for summary adjudication on the issue of materiality.

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

Docusign Envelope ID: A73AE88D-2AB2-45E9-8B31-823A75C71805

## IV. RECOMMENDATION

Based on the foregoing, it is respectfully recommended that United's pending Motion for Summary Judgment be GRANTED and the government's Motion for Partial Summary Judgment be DENIED. Pursuant to the District Judge's Order Appointing Special Master and Federal Rule of Civil Procedure 53, the parties may file a motion to modify, adopt or objections to this Report and Recommendation within 14 days of the date of this Report.

IT IS SO RECOMMENDED.

DATED: 3/3/2025 _____

DocuSigned by:

*Hon. Suzanne Segal (Ret.)*

2B739185DE71459...

_____

Honorable Suzanne H. Segal (Ret.)
Special Master