YAAKOV M. ROTH
Acting Assistant Attorney General, Civil Division
BILAL A. ESSAYLI
United States Attorney
DAVID M. HARRIS
JACK D. ROSS (CBN 265883)
HUNTER B. THOMSON (CBN 330533)
PAUL LA SCALA (CBN 186939)
Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
        Tel: (213) 894-6739; Fax: (213) 894-7819
        Email: hunter.thomson@usdoj.gov
JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
        Email: robert.mcauliffe@usdoj.gov
MICHAEL DIGIACOMO
United States Attorney
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5830; Fax: (716) 551-3052
        Email: david.coriell@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. BENJAMIN POEHLING, <br><br> Plaintiffs, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC., et al., <br><br> Defendants. | Case No. 2:16-cv-08697-FMO-PVCx <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR REVIEW OF SPECIAL MASTER'S REPORT AND RECOMMENDATION** <br><br> Hearing Date: June 5, 2025 <br> Hearing Time: 10:00 a.m. <br> Ctrm: 350 W. First Street St. Crtrm 6D, Los Angeles, CA 90012 <br> Hon. Fernando M. Olguin |

# **TABLE OF CONTENTS**

DESCRIPTION                                                                                                                PAGE

TABLE OF AUTHORITIES ...................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 1

I.      INTRODUCTION ............................................................................................ 1

II.     BACKGROUND ............................................................................................... 2

        A.      Medicare Advantage Payment Model. ................................................ 2

        B.      United's "Chart Review" Program. ...................................................... 4

III.    STANDARD OF REVIEW ............................................................................ 5

IV.     ARGUMENT .................................................................................................... 6

        A.      The Special Master Erred in Concluding that the Findings of United's
                Own Expert Coders Were Not Evidence a Jury Could Consider. ............... 6

                i.      The United States Put Forth Evidence of Unsupported
                        Diagnosis Codes .................................................................... 6

                ii.     United's Obligation to Act on the Findings of Its Expert
                        Coders is Not "Potential and Contingent" .......................... 15

        B.      The Special Master Erred by Interpreting "Improperly Avoids" an
                Obligation to Pay as Requiring an "Affirmative Act of Deception." ......... 20

                i.      The Special Master's Interpretation is Inconsistent with the
                        Text and Structure of the FCA. .......................................... 21

                ii.     Congress's Purpose and the Legislative History Do Not
                        Support the Special Master's Interpretation. ...................... 24

                iii.    Courts Have Uniformly Rejected the Special Master's
                        Interpretation of "Improperly Avoids." ............................... 27

                iv.     The Special Master's Factual Findings Are Incorrect and
                        Should Be Rejected. ............................................................. 30

        C.      The Special Master Erred in Recommending Summary Judgment on
                the Government's Common Law Claims of Unjust Enrichment and
                Payment by Mistake. ......................................................................... 35

V.      CONCLUSION .............................................................................................. 35

# <u>TABLE OF AUTHORITIES</u>

<u>DESCRIPTION</u>                                                                                  PAGE

## <u>CASES</u>

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)............................................................6, 31

*Carlisle v. Daewon Kangup Co., Ltd.*,
 No. 3:15-cv-565, 2018 WL 2336757 (M.D. Ala. May 23, 2018). ........................ 16

*Graves v. Plaza Medical Ctrs., Corp.*,
 281 F. Supp. 3d 1260 (S.D. Fla. 2017)............................................. 19, 20

*Hernandez v. Lynch*,
 Case No. EDCV 16-620 JGB, 2019 WL 6998774 (C.D. Cal., June 18, 2019). ....5

*Kane ex rel. United States v. Healthfirst, Inc.*,
 120 F. Supp. 3d 370 (S.D.N.Y. 2015). .........................................passim

*Loughrin v. United States*,
 573 U.S. 351 (2014).............................................................. 22

*Olson v. Fairview Health Servs. of Minn.*,
 831 F.3d 1063 (8th Cir. 2016). .................................................. 30

*Reza v. Pearce*,
 806 F.3d 497 (9th Cir. 2015). ..................................................... 6

*SEC v. McCarthy*,
 322 F.3d 650 (9th Cir. 2003). .................................................... 22

*Sonner v. Schwabe N. Am., Inc.*,
 911 F.3d 989 (9th Cir. 2018). ..................................................... 6

*United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*,
 878 F.3d 1224 (10th Cir. 2017). ................................................. 16

*United States ex rel. Berg v. Honeywell Int'l., Inc.*,
 226 F. Supp. 3d 962 (D. Alaska 2016). ........................................... 19

*United States ex rel. Butler v. Hughes Helicopters, Inc.*,
 71 F.3d 321 (9th Cir. 1995). ..................................................... 30

*United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*,
   839 F.3d 242 (3d Cir. 2016). ...................................................................... 24

*United States ex rel. Lesnik v. ISM Vuzem D.O.O.*,
   112 F.4th 816 (9th Cir. 2024). .................................................................. 16

*United States ex rel. Ormsby v. Sutter Health*,
   444 F. Supp. 3d 1010 (N.D. Cal. 2020) ........................................ 19, 20, 25, 29

*United States ex rel. Schutte v. SuperValu Inc.*,
   598 U.S. 739 (2023) .................................................................................. 29

*United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*,
    843 F.3d 1033 (5th Cir. 2016). ................................................................. 16

*United States ex rel. Swoben v. United Healthcare*,
   848 F.3d 1161 (9th Cir. 2016). ............................................................ passim

*United States v. Arreola*,
   467 F.3d 1153 (9th Cir. 2006). ................................................................. 23

*United States v. Bourseau*,
   531 F.3d 1159 (9th Cir. 2008). ................................................................. 16

*United States v. HVI Cat Canyon, Inc.*,
   213 F. Supp. 3d 1249 (C.D. Cal. 2016). ........................................... 20, 22, 26

*United States v. Lakeshore Med. Clinic, Ltd.*,
   No. 11-CV-00892, 2013 WL 1307013 (E.D. Wis. March 28, 2013) ............. 20, 28

*United States v. Lemus*,
   93 F.4th 1255 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 581 (2024). .................... 22

*United States v. Neifert-White Co.*,
   390 U.S. 228 (1968) .................................................................................. 24

*United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, CA*,
   545 F.3d 1134 (9th Cir. 2008). ............................................................ 25, 27

*United States v. Romo-Romo*,
    246 F.3d 1272 (9th Cir. 2001). ................................................................. 21

*United States v. Silverman*,
   861 F.2d 571 (9th Cir. 1988). .................................................................... 5

*United States v. Walgreen Co.*,
    591 F. Supp. 3d 297 (E.D. Tenn. 2022). ....................................................26, 29, 30

*United States v. Woods*,
    571 U.S. 31 (2013)................................................................................................22

*UnitedHealthcare Ins. Co. v. Azar*,
    330 F.Supp.3d 173 (D.D.C. Oct. 17, 2017) (No. 1:16-cv-00157-RMC), 2017 WL
    4876435. ...............................................................................................................4

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
    579 U.S. 176 (2016)................................................................................28, 29, 30

## STATUTES

FED. R. CIV. P. 53(f)(3) ......................................................................................5

FED. R. CIV. P. 53(f)(4).......................................................................................5

FED. R. CIV. P. 56 .............................................................................................31

FED. R. CIV. P. 56(c)...........................................................................................6

## OTHER AUTHORITIES

31 U.S.C. § 3729(a)(1)(G) ...........................................................................passim

31 U.S.C. § 3729(a)(7)......................................................................................24

31 U.S.C. § 3729(b)(3)..................................................................................16, 17

42 U.S.C. § 1320a-7k(d)(2) ..............................................................................19

42 U.S.C. § 1320a-7k(d)(2)(A).........................................................................25

42 U.S.C. § 1320a-7k(d)(3) ..............................................................................19

42 U.S.C. § 1320a-7k(d)(4)(B) .........................................................................19

Fraud Enforcement and Recovery Act of 2009 (FERA),
    Pub. L. No. 111-21, 123 Stat 1617 ...................................................................24

Patient Protection and Affordable Care Act,
    Pub. L. No. 111-148, 124 Stat 119 ...................................................................25

1

## **REGULATIONS**

2

42 C.F.R. § 422.310(d)(1) ............................................................................. 3

3

45 C.F.R. § 162.1002(c)(2)-(3) ..................................................................... 3

4

## **OTHER AUTHORITIES**

5

6

155 Cong. Rec. S4531-01, S4540 (2009) ..................................................... 26

7

Fraud Enforcement and Recovery Act of 2009,
     S. Rep. No. 111-10 (Mar. 23, 2009) ...................................................... 26

8

9

Medicare+Choice Program,
     65 Fed. Reg. 40,170, 40,268 (June 29, 2000) ...................................... 17

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Under the Medicare Advantage (MA) program, insurers like United are paid based on the diagnosis codes documented in their patients' medical records. These codes can be identified by the doctors' offices that see the patients. These codes can also be identified by United itself. United hired and trained teams of professional medical coders to scour the records of millions of its beneficiaries and gave them one task: to identify every single supported diagnosis code. When those coders made findings that doctors' offices had missed diagnosis codes, United submitted those new codes to the government and collected $7.2 billion for them. But when those coders made findings that the medical records did not support previously submitted codes, United did the opposite. It never reported to the government 1.97 million diagnosis codes for which its own coders did not find medical record support, ultimately keeping over $2.1 billion to which it was not entitled. The Special Master's Report and Recommendation (R&R; Dkt. 631) blesses that conduct, holding that the findings of United's own highly trained, professional coders constitute "no evidence at all."

The R&R is fundamentally flawed in two principal ways and should not be adopted by this Court. First, the Special Master improperly concluded that the government has presented "no evidence" that diagnosis codes were unsupported, and therefore that the government has not shown an obligation to repay CMS for those codes. This conclusion is wrong. The United States submitted evidence that United's own coders had reviewed the medical records at issue and did not find support for 1.97 million diagnosis codes. United's expert coders were certified, highly trained, incentivized, and met or exceeded 95% accuracy as well as demanding proficiency in identifying all possible codes. United itself relied on findings of these very same coders to submit additional codes, not identified by doctors' offices, to the Centers for Medicare and Medicaid Services (CMS) for payment of more than $7 billion. The Special Master dismissed the findings of United's coders as "no evidence at all" because she credited contradictory evidence from United. The

1

weighing of conflicting admissible evidence is the exclusive province of a jury and is improper on a motion for summary judgment.

Second, the Special Master recommends that this Court become the first and only court in the nation to read a new requirement into the reverse False Claims Act (FCA) provision, 31 U.S.C. § 3729(a)(1)(G). Specifically, in her R&R, the Special Master interprets the phrase "improperly avoids . . . an obligation to pay" in this provision to require proof of an affirmative act of deception. The Special Master's interpretation is inconsistent with the text, structure, and purpose of the FCA, and courts have uniformly rejected defendants' attempts to add such a requirement. This Court should decline to adopt the Special Master's recommendation and instead follow the established canons of statutory interpretation and federal jurisprudence, which compel the conclusion that a defendant "improperly avoids" an obligation to pay money to the government when the defendant has notice of a potential issue, is legally obligated to address it, and does nothing.

## II.    BACKGROUND

### A.    Medicare Advantage Payment Model

Under the MA program, CMS pays private health insurance companies (known as MA organizations, or MAOs) fixed monthly capitated payments for each beneficiary enrolled in their plans. D-3, Dkt. 250-1 at 162-63 ¶¶ 6, 8-9.[1] CMS "risk adjusts" these capitated payments for various factors that affect expected healthcare expenditures. One of those factors is diagnoses of certain chronic health conditions that are documented in the beneficiaries' medical records based on a face-to-face encounter with a healthcare provider in the relevant year. P-8, Managed Care Manual, Rev. 118 (Sept. 19, 2014) at 4197-99 § 40. The diagnosis of a "risk adjusting" chronic condition generally results in

---

[1] All references to D# refer to facts within the Statement of Uncontroverted Facts supporting United's Motion for Summary Judgment, and the United States' Opposition thereto, which has been filed with the Court at Dkt. 616-6, and all references to D-# or P-# refer to documents within the Evidentiary Appendix supporting the same, which have been filed with the Court at Dkt. 616-2-616-15.

greater payment to the MAO for that beneficiary. D15; P-5, United 30(b)(6) (Sedor) Tr. 4063:14-4064:11; 4072:23-4073:5.

To support these "risk adjustments" to their capitated payments, MAOs submit to CMS "diagnosis codes" – codes corresponding to certain diagnosed health conditions – for their beneficiaries. P-5, United 30(b)(6) (Sedor) Tr. 4073:6-4074:17. Ordinarily, after a healthcare visit, providers (or often, their office staff) review the record of that visit to create a list of diagnosis codes corresponding to the conditions diagnosed in that visit. D-54, Blair (United Coding Expert) Rep. (Sept. 29, 2023) at 1285 ¶ 7; P-4, Dickey Tr. 4050:22-4051:18. The providers then submit those lists to the MAO, along with other "encounter data" from the visit. P-5, United 30(b)(6) (Sedor) Tr. 4073:6-4074:17. And the MAO then submits that list of diagnosis codes to CMS. *Id.* at 4074:10-4075:7. For example, during a medical visit, a physician might write in the medical record "Patient has BMI over 40 and is morbidly obese." A coder within the provider's office identifies Diagnosis Code E66.01 (Morbid Obesity). The MAO then submits Diagnosis Code E66.01 to CMS and, because this condition is risk adjusting, the MAO receives a higher monthly payment for that patient.

CMS only pays MAOs for diagnosis codes that are supported by the written medical record. *See* P-60, 42 C.F.R. § 422.310(d)(1), at 4848; P-77, 45 C.F.R. § 162.1002(c)(2)-(3), at 4953-54; P-9, Managed Care Manual, Ch. 7, at 4204-4206 Exhibit 30 (Aug. 13, 2004); P-8, Managed Care Manual, Rev. 118 (Sept. 19, 2014) at 4197-99 § 40; P-3, Participant Guide at 4036 § 3.2.4; P-5, United 30(b)(6) (Sedor) Tr. 4076:4-22. An MAO is not entitled to payment for a diagnosis code that is not properly documented in the medical record. D-117, CMS 30(b)(6) (Hornsby) Tr. 2998:20-3000:21; P-5, United 30(b)(6) (Sedor) Tr. 4076:13-22. This is a bedrock principle of reimbursement under the MA program and a crucial aspect of the program's design. Accurate, written, identifiable documentation in the medical record is the *sine qua non* of reimbursement.

If an MAO learns that a diagnosis code submitted to CMS is not supported by the patient's medical record, the MAO is required to correct the submission by deleting the

unsupported diagnosis code from CMS's payment system. P-8, Managed Care Manual, Rev. 118 (Sept. 19, 2014), Ch.7, at 4197-99 § 40; P-3, Participant Guide at 4037-4038 §§ 4.13-4.14, 4.16; P-5, United 30(b)(6) (Sedor) Tr. 4080:22-4081:21. If the deleted diagnosis code impacted payment, CMS automatically recoups the overpayments. P-5, United 30(b)(6) (Sedor) Tr. 4072:19-22.

## B. United's "Chart Review" Program

United has admitted – and it must be taken as established for purposes of this motion – that diagnostic coding errors "are fairly common in doctors' offices, which have little (or no) incentive to code diagnoses completely and accurately because their payments are generally based on services provided, not diagnoses." Mem. in Support of United's Mot. for Sum. J. at 8, *UnitedHealthcare Ins. Co. v. Azar*, 330 F.Supp.3d 173 (D.D.C. Oct. 17, 2017) (No. 1:16-cv-00157-RMC), 2017 WL 4876435. Accordingly, United instituted a program called "Chart Review" to review beneficiary medical records to find diagnosis codes that the providers' coders had missed, and that United could submit for additional payment. P-5, United 30(b)(6) (Sedor) Tr. 4094:24-4095:22; D42; D45; D50; P-7, United 30(b)(6) (Baker) Tr. 4167:5-4168:9. United collected medical records for millions of beneficiaries enrolled in its MA plans and retained professional medical coders to review each medical record and identify *every single* diagnosis code that the record supported. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) at 1462-63 ¶¶ 48 (Ex. 5), 50-51; P-14, Optum Coding Policy at 4264; P-15, United 30(b)(6) (Baker) Tr. 4267:12-22; P-7, United 30(b)(6) (Baker) Tr. 4167:5-4168:9. United subjected its professional coders to rigorous training and testing requirements, including by requiring them to meet demanding accuracy and completeness thresholds. P-13, Medicare Advantage Coding Guide at 4261.

United did not inform its expert coders which diagnosis codes the providers' offices had previously reported for the medical record they were reviewing (a process called "blind coding"), D51, which eliminated the possibility that the Chart Review coders would be influenced by the codes the provider offices had originally assigned. United simply instructed its trained, expert coders to identify all diagnosis codes supported by the medical

4

record under review. P-14, Optum Coding Policy at 4264. As a result, when United's expert coders delivered the results of a chart review containing all of the codes they deemed supported by that medical record, that constitutes evidence that the medical record reviewed did not support any diagnosis not included in those results.

United then compared the results of its Chart Review program (*i.e.*, the list of diagnosis codes United's expert coders determined were supported by the medical record they reviewed) to the list of diagnosis codes that United had already submitted to CMS associated with the same medical record. P-5, United 30(b)(6) (Sedor) Tr. 4094:24-4095:22. If United's expert coders identified new codes not previously identified by the doctors' office and submitted to CMS, United relied *exclusively* on its coders' findings to submit these "new and unique" codes to CMS for payment. During the seven years at issue in this case, CMS paid United an additional $7.2 billion for these "new and unique" diagnosis codes, which had never been reported to United by the doctor's office, but which United's trained coders found to be supported by the medical record. *Id.*; P-11, United's Response to Interrogatory 18 at 4245-47.

What United did not do, however, is delete diagnoses (which would have reduced its payments) it had previously submitted to CMS that the very same expert coders did not find. It is the United States' allegation, therefore, that United knowingly and improperly avoided its obligation to repay the overpayments derived from those unsupported codes. From 2008 through 2016, United retained over $2.1 billion in overpayments associated with invalid codes. D-57*, Garthwaite (US Expert) Rep. (Sept. 29, 2023) at 1447 ¶ 14.

## III.    STANDARD OF REVIEW

A Special Master's findings of fact and legal conclusions relating to summary judgment must be reviewed *de novo*. *Hernandez v. Lynch*, Case No. EDCV 16-620 JGB, 2019 WL 6998774, at *2 (C.D. Cal., June 18, 2019); FED. R. CIV. P. 53(f)(3) & (4). Courts must "freely consider the matter anew, as if no decision had been rendered." *United States v. Silverman*, 861 F.2d 571, 576 (9th Cir. 1988).

A party seeking summary judgment must show that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). There is a "genuine" issue as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The court's role at summary judgment is limited: "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ." *Id.* at 255. To defeat summary judgment, a plaintiff need not "foreclose any possibility of the defendant's success on the claims." *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018). Instead, all that is required is evidence that a reasonable juror, drawing all inferences in favor of the nonmoving party, could return a verdict for the nonmoving party. *Reza v. Pearce*, 806 F.3d 497, 505 (9th Cir. 2015).

## IV.   ARGUMENT[2]

### A. The Special Master Erred in Concluding that the Findings of United's Own Expert Coders Were Not Evidence a Jury Could Consider.

#### i.   <u>The United States Put Forth Evidence of Unsupported Diagnosis Codes.</u>

The most fundamental error in the R&R is the Special Master's conclusion that the government "failed to present any evidence" that United retained payments from CMS based on diagnosis codes that were not supported by the medical record. R&R at 19-20. The United States submitted evidence that United's own expert coders – who were

---

[2] The United States here limits its Motion for Review to the issues raised in the Special Master's R&R recommending the Court grant United's motion for summary judgment. While several arguments made by United (and opposed by the United States) are not addressed in the R&R, the United States reserves its right to address any such argument considered by the Court. Moreover, the United States is not objecting to the Special Master's recommendation regarding the United States' Motion for Partial Summary Judgment. In denying the United States' Motion, the Special Master made no finding about whether materiality has been established by the evidence in this case. However, the R&R draws several factual conclusions regarding CMS' knowledge of United's practices which are the subject of genuine disputes of material fact, addressed *infra*, at 30-34, and are therefore inappropriate for resolution at Summary Judgment. *See also* Dkt. 616, Joint Br. at 69-73; Dkt. 622, Supp. Br., at 2, 13-18.

certified, highly trained, and incentivized to find all supported codes – had scoured the medical records and not found support for the 1.97 million diagnosis codes at issue here. *See* D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) at 1446-47 ¶ 13, 1461-1463 ¶¶ 47-48 (Ex. 5), 1464 ¶ 51, 1484-90 ¶¶ 104-119; D-65, Renjilian (United Expert) Rebuttal Rep. (March 18, 2024) at 1917; D-110, Garthwaite (US Expert) Tr. 2875:21-22; D179; P-14, Optum Coding Policy at 4264; P-15, United 30(b)(6) (Baker) Tr. 4267:12-22; P-7, United 30(b)(6) (Baker) Tr. 4190:17-4191:3. That admissible evidence precludes a grant of summary judgment here. The findings by United's own expert chart reviewers were not speculative or based on assumptions, but rather were based on governing coding guidelines and the strict parameters of United's program. To dismiss this evidence as "no evidence at all," the Special Master invaded the province of the jury by *weighing* this evidence against conflicting evidence, making determinations about the *credibility* of such evidence, *speculating* about other evidence that she thought might be more persuasive, and ultimately *resolving* the evidentiary conflict by choosing the evidence she perceived as stronger. None of these are appropriate actions for a court resolving a motion for summary judgment.

In the record on summary judgment, the government offered evidence that United's own expert Chart Review coders reviewed the medical records for millions of beneficiaries and did not find support for the 1.97 million diagnosis codes at issue in this case. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) at 1446-47 ¶¶ 10-11, 13-14, 1461-1463 ¶¶ 47-48 (Ex. 5), 1484-90 ¶¶ 104-119; P-14, Optum Coding Policy at 4264; P-15, United 30(b)(6) (Baker) Tr. 4267:12-22; D-65, Renjilian (United Expert) Rebuttal Rep. (March 18, 2024) at 1917; D179. United's coders were certified, thoroughly trained by United, and quality tested. P-7, United 30(b)(6) (Baker) Tr. 4168:3-13, 4177:21-4178:4, 4179:7-19, 4180:1-4; P-13, Medicare Advantage Coding Guide at 4261; P-12, Optum Medicare Risk Adjustment Operations at 4254-58. They could not "graduate" from United's training program and start coding charts until they **met or exceeded 95% accuracy and demonstrated proficiency in identifying all possible codes**. *Id.*; P-7, United 30(b)(6)

1    (Baker) Tr. 4179:7-19; P-13, Medicare Advantage Coding Guide at 4261. United
2    established performance standards and disciplined coders that did not meet those
3    standards. P-12, Optum Medicare Risk Adjustment Operations at 4254-58; P-7, United
4    30(b)(6) (Baker) Tr. 4168:3-13, 4177:21-4178:4, 4179:7-19, 4180:1-4; P-13, Medicare
5    Advantage Coding Guide at 4261. And United directed its coders to perform one single
6    task: identify every single diagnosis code supported by the medical records they reviewed.
7    P-14, Optum Coding Policy at 4264; P-15, United 30(b)(6) (Baker) Tr. 4267:12-22.
8    Indeed, United was highly incentivized to ensure that its coders identified every possible
9    code, because more codes resulted in higher payments from CMS. And United relied on
10   the findings of its coders to submit additional codes to CMS for increased payments.
11   Between 2008 and 2016, United sought and was paid over $7.2 billion by submitting
12   additional diagnosis codes that were not reported by the doctors but were found by
13   United's expert coders. P-5, United 30(b)(6) (Sedor) Tr. 4094:24-4095:22; P-11, United's
14   Response to Interrogatory 18 at 4245-47. Thus, every time one of United's coders
15   reviewed a medical chart and did ***not*** identify a particular diagnosis code, that finding was
16   clearly evidence – ***highly reliable evidence*** – that the diagnosis was not supported by that
17   medical record.

18        The Special Master rejected this evidence. According to the R&R, the findings by
19   United's own accuracy-tested coders that only certain codes were supported by the
20   medical record did not constitute "any evidence" that any code not on that list was
21   unsupported. R&R at 19-20. Both United and the Special Master acknowledged that there
22   was an "'unresolved discrepancy'" (R&R at 23-24) between two sources of evidence: the
23   findings of United's professional coders (who were certified, trained, tested and
24   incentivized to find every code) and the coding from doctors' offices (whose lack of
25   incentive can lead to "fairly common" coding errors). But rather than finding that the
26   existence of such an "unresolved discrepancy" precludes granting summary judgment, the
27   Special Master proceeded to resolve that discrepancy herself. According to the Special
28   Master, the government's case "assumes that United's coders [in finding a lack of support

8

for a medical record] were *always perfect* in their coding," but "it is *equally possible* . . . that in any specific case, the diagnosis code . . . *was* supported by a medical record, and the coder reviewing the record during chart review simply failed to independently identify it." *Id.* at 21 (emphasis added). The Special Master believed that "there are myriad reasons" why United's coders might be wrong (R&R at 23), and that contrary evidence from United "undercuts" the value of these coders' evidence (*id.* at 29). In other words, the Special Master mistook her skepticism of the government's evidence (the findings of United's own expert coders) for a complete absence of evidence.

When the Special Master concludes that the findings of United's expert coders did not constitute "any evidence," she appears to mean that those determinations were in tension with *other* evidence. In particular, the Special Master notes that doctors' offices had previously reported the diagnosis codes that United's expert coders did not identify as supported by the medical record. But the possibility of a conflict between doctors' offices and United's professional coders does not render the determinations of United's coders "no evidence." Indeed, if that were true, then United had no basis to claim the additional $7.2 billion it received for diagnosis codes that had not previously been reported by doctors' offices. Instead, as the Special Master recognized, the fact that the diagnosis codes at issue in this case had previously been reported by doctors' offices creates "'an unresolved discrepancy'" as to the validity of those codes. R&R at 23. And it is the exclusive province of the jury – not the court – to resolve such factual "discrepancies" in the evidence.

The R&R also misstates the United States' burden to defeat a motion for summary judgment. The United States was not required to prove that United's coders were "always perfect" or that that the doctors' offices were "necessarily wrong." *See* R&R at 21, 23. In concluding otherwise, the Special Master turned the summary judgment standard on its head. No plaintiff needs to prove that their evidence is "necessarily" correct. The United States put forth credible evidence that 1.97 million diagnosis codes were unsupported by the medical records reviewed by United's coders. *See* D-57, Garthwaite (US Expert) Rep.

(Sept. 29, 2023) at 1446-47 ¶¶ 10-11, 13-14, 1461-1463 ¶¶ 47-48 (Ex. 5), 1484-90 ¶¶ 104-119; P-14, Optum Coding Policy at 4264; P-15, United 30(b)(6) (Baker) Tr. 4267:12-22; D-65, Renjilian (United Expert) Rebuttal Rep. (March 18, 2024) at 1917; D179.

In addition, the Special Master fails to explain how she could determine that the evidence was "equally" balanced between United's coders and the doctors' offices without weighing each party's evidence. *See* R&R at 21. When evidence from multiple sources is conflicting, a court cannot grant summary judgment by counting the witnesses on each side, or otherwise weigh each side's evidence. For example, if one witness to a traffic accident testifies the light was green and another testifies the light was red, a court cannot decide the evidence was "equally" balanced and resolve the conflict in favor of the defense. Nor can the court weigh factual arguments that go to the witnesses' credibility. One witness may be biased, and another might have a vision impairment. ***Only a jury*** can assign weight to conflicting factual evidence and determine a winner or loser.

Even if the Court considered the relative weight of the evidence – which itself would be reversible error – the United States presented evidence pursuant to which a jury could find that United's Chart Review coders are more reliable than the doctors' offices in evaluating whether the diagnosis codes are supported. First, as noted above, United had a strong financial incentive to train its coders and ensure that they found every single diagnosis code supported by the medical records they reviewed. D-48, *Measuring Coding Intensity in the Medicare Advantage Program* at 1203; P-11, United's Response to Interrogatory 18 at 4245-47. By contrast, there is evidence in the record that doctors' offices both overcode and undercode, in part because of their lack of financial incentive to code accurately and completely. D-54, Blair (United Coding Expert) Rep. at 1288 ¶ 18; D-87, Acevedo Tr. 2392:15-2393:6; D-42, *Risk Adjustment of Medicare Capitation Payments Using the CMS-HCC Model* at 965; D-48, *Measuring Coding Intensity in the Medicare Advantage Program* at 1203. And United itself relied on its own coders' findings that the doctors' offices had erred when that resulted in additional payments. P-5, United 30(b)(6) (Sedor) Tr. 4094:24-4095:22; P-11, United's Response to Interrogatory 18 at

10

4245-47. Indeed, when United's coders found a code that the doctor's office had not recorded, United concluded that the doctor's office was mistaken, and that its own coder was correct, submitting those codes for extra payment. *See id.* This evidence could certainly lead a reasonable juror to conclude that the findings of United's coders were more likely than not correct.

Second, the 1.97 million codes at issue only include diagnosis codes where **no** United coder found the diagnosis code in any review and **no** other provider that the beneficiary might have seen that year submitted to United the same diagnosis code that the original provider submitted. D179; D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) at 1446-47 ¶¶ 10-11, 13-14, 1461-1463 ¶¶ 47-48 (Ex. 5), 1484-90 ¶¶ 104-119. And for three years (2014-2016), United subjected nearly three-quarter of the medical records to a second separate review by different expert coders. *Id.* at 1464 ¶ 51; P-7, United 30(b)(6) (Baker) Tr. 4190:17-4191:3. If **any** of those coders identified a diagnosis code, it was excluded from the government's case. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) at 1446-47 ¶¶ 13-14, 1479 ¶ 85, 1484 ¶ 102. Thus, a reasonable juror could conclude that, where multiple trained expert coders did not identify a diagnosis code as supported by the medical record and no other doctor's office reported that code either, it is more likely than not that the code was unsupported. The Special Master acknowledged this evidence, but nevertheless, without explanation, asserted that the government failed to identify "a single actual instance where a medical record did not support a code." R&R at 21. This conclusion is inexplicable.[3]

---

[3] The Special Master's conclusion likewise ignores evidence included in the summary judgment record and highlighted for the Special Master during the hearing on this motion that, for a portion of the relevant time period, United maintained a separate program called Claims Verification pursuant to which it "investigate[d] whether certain doctor-submitted diagnosis codes not identified in chart reviews were supported by documentation in the patients' medical charts." D108, Dkt. 616, Joint Br., at 14; D110. As part of its Claims Verification program, United employed Claims Verification coders to look for support in the medical records for some of the same diagnosis codes at issue in this case. D242; D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) at 1447 ¶ 14(iii), P-86 at 5013-14 (identifying MARA2160501 as a complete list of CV cancelled deletes for DOS 2012); P-87 at 5017-18 (excerpt of a spreadsheet of DOS 2012 cancelled deletes). There is a subset of these diagnosis codes – referred to as "CV Pipeline

*(footnote cont'd on next page)*

11

At points, the Special Master suggests that, because the Chart Review coders were not informed of the specific codes that the doctor's office submitted and instructed to look for those specific codes, their exhaustive compilation of all codes supported by the patient's medical record is not "any evidence." R&R at 24. But this defies logic. A simple analogy is illustrative. Think, for example, of a Board Secretary. For each meeting of the company's Board of Directors, the Secretary is tasked with preparing minutes that list every employee who attended the meeting. If the Secretary does not include the General Counsel on the attendee list for a particular meeting, that is evidence that the General Counsel did not attend that meeting. Even if the Board Secretary was not specifically instructed to look for the General Counsel, a jury could rely on the Secretary's attendee list to conclude that the General Counsel was absent. Likewise, the fact that United's coders did not include certain diagnosis codes on their list of every diagnosis code supported by the medical record is credible evidence that there was no support for those codes in the medical records.

A professional coder does not need a list of diagnosis codes they are "looking for" in order to identify which codes are supported by the medical record they are reviewing. Coders only need the medical record itself to determine which diagnosis codes were supported therein. In fact, both parties' coding experts agree that is exactly how coding is supposed to work. *See* D-53, Acevedo (U.S. coding) Rebuttal Rep. (Jan. 29, 2024) at 1261 ¶¶ 34-36 ("[C]oding rules require that a coder rely on the medical record before it."); P-31, Blair (United Coding Expert) Tr. 4403:5-7 ("[T]o assign a diagnosis code, it must be in the medical record that you've received"). And the Ninth Circuit has recognized that "blind coding may help ensure the integrity of a retrospective review. . . ." *United States ex rel. Swoben v. United Healthcare*, 848 F.3d 1161, 1175 (9th Cir. 2016).

---

Deletes" – for which United's coders did not find support. United cancelled its Claims Verification program and did not submit deletes for those identified unsupported codes. *Id.* Dr. Garthwaite valued the CV Pipeline Deletes at $188 million. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) at 1447 ¶ 14(iii).

1    The Special Master also discounted the Chart Review coders' conclusions because
2  the "government failed to submit . . . the testimony of United's coders," noting that the
3  Chart Review coders were not listed on the government's "Rule 26 disclosures" as trial
4  witnesses and were "never deposed as witnesses." R&R at 22. But the government, of
5  course, does not need "testimony" from the Chart Review coders, as it put forth
6  admissible, non-hearsay business records – **which United never disputed** – showing that
7  the Chart Review coders found that the 1.97 million diagnosis codes at issue were
8  unsupported by the medical records reviewed. D-57, Garthwaite (US Expert) Rep. (Sept.
9  29, 2023) at 1446-47 ¶¶ 10-11, 13-14, 1461-1463 ¶¶ 47-48 (Ex. 5), 1484-90 ¶¶ 104-119;
10  P-14, Optum Coding Policy at 4264; D-65, Renjilian (United Expert) Rebuttal Rep.
11  (March 18, 2024) at 1917; P-6, Renjilian (United Expert) Tr. 4124:4-25, 4126:1-4129:2;
12  D179. There is no place in the summary judgment standard for weighing the relative value
13  of potential trial witness testimony against defendants' own admissions.

14    The Special Master engaged in further weighing of the evidence by giving credit to
15  other evidence that purportedly undermined the Chart Review coders' conclusions. For
16  example, the Special Master noted that there was evidence offered by United (yet disputed
17  by government witnesses) that coders "may themselves miss" certain diagnosis codes
18  because of various reasons, including "simple human error." R&R at 25. Of course, if a
19  party's competent and admissible evidence may be disregarded on summary judgment due
20  to the universal possibility of human error, summary judgment could be granted in every
21  case. A jury may factor the possibility of human error into the weight of the evidence, but
22  a court cannot disregard the evidence entirely on that basis.

23    Thus, the Special Master suggests that the <u>only</u> way to determine if specific
24  diagnosis codes are unsupported is to retain an expert medical coder, inform that coder
25  which diagnosis codes the healthcare provider submitted for that record, and then instruct
26  the coder to determine if the medical record supports those specific codes. *See* R&R at 34
27  ("The government did not review any medical records, did not designate any expert to
28  *compare* diagnosis codes submitted by United against patient charts to identify

unsupported diagnosis codes, and *thus lacks evidence* of any overpayments, which is an essential element of its claim. Summary judgment for United is therefore appropriate.") (emphasis added). But there is simply no basis for the Special Master to conclude on summary judgment that an outside expert hired by the government for the purposes of litigation would be more qualified or reliable – let alone indispensable – than the highly trained professional Chart Review coders that United relied on. The Special Master's implicit conclusion not only flouts the prohibition on weighing evidence on summary judgment, but also relies on reasoning that few jurors would likely endorse.

Similarly unavailing is the Special Master's ancillary conclusion that a tiny number of RADV audits is "meaningful" and "undercuts" or renders "questionable" the conclusions of United's expert coders. R&R at 29-30. These audits were so few that even United's own testifying expert conceded they could not be extrapolated to form any conclusions at all, much less a justification for ignoring the contradictory evidence of United's trained coders. D-135, Renjilian (United Expert) Tr. 3406:9-11("I don't think the RADV overlap can statistically or mathematically be extrapolated to any population"). More fundamentally, however, by weighing the probative value of the RADV audits against the conclusions of the United expert coders, the Special Master once again did what the law forbids on summary judgment – choosing sides based on the court's perceived weight of the evidence.[4]

---

[4] The Special Master also mischaracterized what the RADV audits found. In a RADV audit, payments to United may be sustained in one of two ways. Either the diagnosis code may be supported by the medical record for which it was originally submitted to CMS, *or* a different medical record may support a different diagnosis that would yield the same payment. In either case, the RADV audit would "validate" the payment amount. The Special Master noted that the RADV audits "validated" 89% of the 28 million codes that a government interrogatory answer identified as the universe of codes found unsupported by United's coders. R&R at 29. But that has no bearing on the question in this case, which is whether some codes should have been deleted because they were unsupported. The audits merely show that many unsupported codes may be "validated" by other codes that yield the same payment. In other words, the unsupported code may have no bearing on payment. The resolution of that factual dispute is the exclusive province of a jury.

In sum, the Special Master improperly found that United's admissions and business records were "not evidence," then weighed that evidence against potentially conflicting evidence to resolve factual disputes in United's favor. In so doing, she violated basic, well-settled rules of evidence and summary judgment.

### ii.    United's Obligation to Act on the Findings of Its Expert Coders is Not "Potential and Contingent."

The United States' claims in this case are supported by admissible evidence that United's highly trained, expert coders scoured millions of medical records and did not find support for at least 1.97 million diagnoses previously submitted to CMS for payment. However, in the R&R (at 27), the Special Master asserts that there is no evidence supporting the United States' claims, and they are instead premised "entirely on speculation and assumptions about what the codes found by United's coders actually mean." The R&R continues by stating that "any purported overpayment depends on the assumption that doctors provided unsupported codes. . . . This is an assumption, however, and there is no evidence to support it." R&R at 27-28. On that basis, the Special Master concludes that United's obligation to pay was only "potential and contingent" and therefore not actionable under the reverse False Claims provision. *See id.* at 27 ("[I]f a defendant's alleged obligation to pay or return an overpayment to the government depends on multiple assumptions, courts have found that it is only a 'potential and contingent' obligation and thus non-actionable under 31 U.S.C. Section 3729(a)(1)(G).").

First, it is apparent from the R&R that this reasoning is entirely dependent on the same erroneous "no evidence" finding discussed above. It therefore fails for the same reason the Special Master's other conclusions fail. The Court need go no further to reject this portion of the R&R.

Second, United did not even argue in support of its motion for summary judgment that its obligations were potential or contingent. To reach that conclusion, the Special Master misstates the law and relies on a line of cases not cited by either party. In particular, the Special Master relies on *United States ex rel. Lesnik v. ISM Vuzem D.O.O.,* 112 F.4th

15

816 (9th Cir. 2024). *Lesnik* does not support the Special Master's conclusion.[5] There, the Ninth Circuit held that in order to be liable under the FCA, a defendant must have an "established duty" to pay the government at the time of the misconduct. *Id.* at 820. "An established duty is one owed at the time the improper conduct occurred, not a duty dependent on a future discretionary act." *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1226 (10th Cir. 2017). To be an established duty, the *amount of the obligation* – or the *overpayment* – does not have to be fixed, but rather the question is whether there is any such duty to pay. *Lesnik,* 112 F.4th at 821 (*citing United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1037 (5th Cir. 2016)); 31 U.S.C. § 3729(b)(3); *United States v. Bourseau,* 531 F.3d 1159, 1169-70 (9th Cir. 2008).

The cases relied on by the Special Master are clearly distinguishable from this case because the defendants in those non-healthcare cases had no contractual relationship with the government, had not received any payments from the government, and had no existing duty at the time the improper conduct occurred. *Compare Lesnik*, 112 F.4th at 820 (defendants had no existing duty to pay for visas for which they did not apply); *Barrick*, 878 F.3d at 1232-33 (meat exporter's duty to pay inspection fees was dependent on two future discretionary acts of third-party suppliers); *Simoneaux*, 843 F.3d at 1037 (duty to pay penalty under Toxic Controlled Substances Act depends upon administrative discretion); *Carlisle v. Daewon Kangup Co., Ltd.*, No. 3:15-cv-565, 2018 WL 2336757 (M.D. Ala. May 23, 2018) (penalties for selling defective auto parts depends on administrative discretion), *with Bourseau,* 531 F.3d at 1170 (the "obligation was not potential, like fines and penalties which have not been levied or assessed, but rather existing and specific because [defendant] had been accepting Medicare funds").

Here, United did have established duties to pay at the time it ignored its negative Chart Review results. The FCA defines "obligation" as "an *established duty*, whether or

---

[5] On page 28 of the R&R, the Special Master includes a long quotation ostensibly from the *Lesnik* case that appears nowhere in the text of that decision.

not fixed, arising from an express or implied *contractual*, . . . relationship, . . . from *statute or regulation. . .* or from the *retention of an overpayment.*" 31 U.S.C. § 3729(b)(3) (emphasis added). At the time United ignored the negative results of its Chart Review, United had (1) established regulatory and contractual duties to undertake good faith efforts and due diligence to ensure the diagnosis codes it submitted to the government were accurate, and (2) an established statutory duty to return overpayments to CMS within 60 days of being put on notice of a potential overpayment. Those duties were not dependent on future discretionary acts of a third party or administrative discretion.[6]

United had an established duty to engage in due diligence and undertake good faith efforts to ensure that the diagnosis codes it submitted to the government were accurate, pursuant to regulation and its contractual relationship with CMS. 31 U.S.C. § 3729(b)(3); D-66, 65 Fed. Reg. at 40,268; P-1 at 3977-78 ¶¶ 3-4, 7; P-1A at 3984, Art. II(A); P-1C at §§ A.1, A.5 and A.11 (Defendant MAO EDI Agreement); P-1B (same) (Optum EDI Agreement); *see also* P-1 at 3977, ¶¶ 2, 5, 6 (all EDI Agreements signed by the MAO Defendants and Optum included the same terms). An "accurate" diagnosis code must be supported by a medical record. D-117, CMS 30(b)(6) (Hornsby) Tr. 2998:20-2999:10; P-5, United 30(b)(6) (Sedor) Tr. 4061:16-4063:23, 4076:4-4077:2; P-3, Participant Guide at 4036 § 3.2.4; P-9, Managed Care Manual, at 4204-06 Ch. 7, Exhibit 30 (Aug. 13, 2004); P-8, Managed Care Manual, Rev. 118 (Sept. 19, 2014) at 4197-99 § 40; *see also Swoben*, 848 F.3d at 1168 ("[e]ach diagnosis code submitted must be supported by a properly documented medical record"). Pursuant to this theory of obligation, when United did not find support for the diagnosis codes during its Chart Review program, it had a regulatory and contractual duty to take good faith steps to ensure that those very diagnosis codes that it had already submitted to CMS were deleted. By deliberately ignoring its Chart Review

---

[6] The evidence of the *amount of the overpayment* for the unsupported diagnosis codes is separate evidence that will be established through presentation of evidence from the United States' expert Craig Garthwaite, and United's and CMS' risk adjustment data that he analyzed and relied upon. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) at 1447 ¶ 14, 1478-1496 ¶¶ 84-137.

coders' findings of unsupported (inaccurate) diagnosis codes, United triggered its obligation to pay CMS.

The Ninth Circuit set forth the scope and breadth of these regulatory and contractual duties in *Swoben*, recognizing that MAOs like United have longstanding duties prohibiting them from turning a blind eye to unsupported diagnosis codes submitted for payment. The court held that if an MAO's "reviewer finds a previously reported diagnosis code is not supported by the very medical record used to document the diagnosis code in the first place, then the diagnosis code was reported in error, even if it is possible that some other, unidentified record might support the same diagnosis," 848 F.3d at 1176-77, and "the code should be withdrawn." 848 F.3d at 1177 n.8. Nothing in *Swoben* or any other jurisprudence makes the duty to withdraw these codes contingent on a second review of the medical records by the government or some other action by a third party. In fact, the *Swoben* court was addressing the exact same United "blind" Chart Review program that is at issue in this case.[7]

In the R&R, the Special Master disregarded the holding in *Swoben* because the court was considering a motion to dismiss and the underlying claims in that case were based on a false certification theory of liability under section (a)(1)(B) of the False Claims Act. But the very same regulatory scheme governing the MA program undergirds both the false certification theory in *Swoben* and the obligation to pay theory here, so the Court cannot ignore the Ninth Circuit's analysis of the breadth and scope of those regulations or its conclusion that MAOs like United must withdraw unsupported diagnosis codes. *See*

---

[7] The Ninth Circuit relied separately on an equally controlling regulation, pointing out that United's "contention that they were under no obligation to take affirmative steps to address errors also ignores § 422.503, which since 2005 has required Medicare Advantage organizations to have effective compliance programs in place, including '[p]rocedures for internal monitoring and auditing' and for 'ensuring prompt response to detected offenses.' 42 C.F.R. § 422.503(b)(4)(vi), (vi)(F), (vi)(G) (2005)." 848 F.3d at 1174. The Ninth Circuit held that conducting chart reviews "deliberately to avoid identifying erroneously submitted diagnosis codes that might otherwise have been identified with reasonable diligence" violates these regulatory duties. 848 F.3d at 1175. These are the very regulatory duties that the United States alleges United violated, hence triggering its **obligation to pay** CMS.

*United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1071 n.447 (N.D. Cal. 2020) ("The *Swoben* court did not limit its holding – that MA Participants must submit accurate diagnosis codes and withdraw unsupported codes – to false certifications and compels the conclusion that MA Participants cannot bill CMS for false diagnosis codes (and keep and not report the resulting overpayment).").

Likewise, there is no jurisprudential basis for ignoring the Ninth Circuit's analysis of the regulatory scheme governing the MA program simply because the two matters are in different procedural postures (motion to dismiss in *Swoben*; summary judgment here). Just as it was in *Swoben,* it is necessary in this case to analyze the duties these regulations impose on United to determine the legal scope of United's obligation to pay and the impact of United's failure to delete the diagnosis codes not found supported by its Chart Review coders. The *Swoben* court provides that analysis. It will be up to a jury to determine whether United violated those duties. In *Graves v. Plaza Medical Ctrs., Corp.*, 281 F. Supp. 3d 1260, 1275-76 (S.D. Fla. 2017), the court relied on *Swoben*'s reasoning to deny *summary judgment,* undeterred by the fact that *Swoben* was decided at the pleadings stage. *Cf. United States ex rel. Berg v. Honeywell Int'l., Inc.*, 226 F. Supp. 3d 962 (D. Alaska 2016) (applied reasoning of *Swoben* in deciding an issue on summary judgment in FCA matter).

United also had an established duty to pay arising from its retention of an overpayment. The Affordable Care Act (ACA) mandates that an overpayment must be returned within sixty days after it is identified, 42 U.S.C. § 1320a-7k(d)(2), and defines overpayment as, "any funds that a person receives or retains under [the Medicare or Medicaid programs] to which the person, after applicable reconciliation, is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B). Congress made explicit that continued retention of an overpayment beyond the sixty-day deadline is an 'obligation' under the FCA. 42 U.S.C. § 1320a-7k(d)(3). Under the ACA, therefore, an MAO must return to CMS an overpayment (payment for an unsupported code) within sixty days of when the MAO identifies an overpayment or it otherwise becomes an obligation to pay under the FCA. *Id.*

An MAO "identifies" an overpayment when it is put on notice of a potential overpayment. *See Sutter*, 444 F. Supp. 3d at 1080 (citing *Kane ex rel. United States v. Healthfirst, Inc.,* 120 F. Supp. 3d 370, 387-88 (S.D.N.Y. 2015); *Graves*, 276 F. Supp. 3d at 1348; *see also United States v. Lakeshore Med. Clinic, Ltd.,* No. 11-CV-00892, 2013 WL 1307013, at *3-4 (E.D. Wis. March 28, 2013). The United States intends to present to the jury the evidence that United's Chart Review coders did not find support for the diagnosis codes at issue in the medical records they reviewed. In weighing this evidence, a jury could make the factual determination that United obtained information through its Chart Review program that diagnosis codes it had already submitted to CMS were unsupported, putting it on notice of a potential overpayment, which it was required to repay after 60 days.

In sum, the Special Master's finding that United's obligation was "contingent" turns on her improper weighing of the facts and evidence. It is ultimately a jury question whether it is more likely than not that the diagnosis codes at issue were unsupported and that United violated its regulatory and contractual duties of good faith and due diligence and its statutory duty to return overpayments in ignoring the information it learned about those unsupported diagnosis codes. And it would be error to conclude that as a matter of law, these regulatory, contractual, and statutory duties did not exist, were not established, or were in any way contingent or potential. *See Swoben,* 848 F.3d at 1174-76*; see generally, Sutter*, 444 F. Supp. 3d at 1077-81.

**B. The Special Master Erred by Interpreting "Improperly Avoids" an Obligation to Pay as Requiring an "Affirmative Act of Deception."**

If the Court adopts the Special Master's R&R, it would be the first and only court in the country to interpret the phrase "knowingly and improperly avoids . . . an obligation to pay" in the reverse FCA provision, 31 U.S.C. § 3729(a)(1)(G), to require proof of an affirmative act of deception. The Special Master's interpretation is inconsistent with the text, structure, and purpose of the statute. *See United States v. HVI Cat Canyon, Inc.*, 213 F. Supp. 3d 1249, 1265 (C.D. Cal. 2016) (Olguin, J.) (holding that courts must read the words of a statute in accordance with their ordinary meaning, in their context and with a

view of their place in the overall statutory scheme, and in light of the overall purpose and structure of the whole statutory scheme). Every court to consider the issue has rejected such a requirement. This Court should follow the established canons of statutory interpretation and federal jurisprudence, compelling the conclusion that a defendant "improperly avoids" an obligation to pay money to the government when it is put on notice of a potential overpayment, is legally obligated to address it, and does nothing.

### i. **The Special Master's Interpretation is Inconsistent with the Text and Structure of the FCA.**

The FCA's reverse false claims provision provides that a defendant is liable if it:

knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G). The government here relies on the second prong of this provision, alleging that United "knowingly and improperly avoid[ed] . . . an obligation to pay." In her R&R, the Special Master erroneously concludes that "improperly avoid[ing]" an obligation to pay requires "proof that the defendant engaged in conduct that deceived the government about an obligation to repay funds" and "kept the government from learning of the overpayments." R&R at 35, 38-39.[8]

When construing a statute, courts give Congress' words "their plain, natural, ordinary and commonly understood meanings." *United States v. Romo-Romo*, 246 F.3d 1272, 1275 (9th Cir. 2001). In this case, the Special Master failed to interpret the word "improperly" in accordance with its ordinary meaning. The R&R notes that Black's Law

---

[8] The United States is responding to new arguments and authorities related to the interpretation of "improperly avoids" in the Special Master's R&R that were not included in United's motion, including her reliance on certain dictionary definitions, legislative history, and canons of statutory interpretation. R&R at 36-37.

Dictionary offers two definitions for the term "improper": "1. Incorrect; unsuitable or irregular. 2. *Fraudulent or otherwise wrongful*." R&R at 36 (emphasis in original). The Special Master – without explanation – relied only on "fraudulent" to conclude that "deception is a requirement." *Id*. But interpreting "improper" narrowly to mean "deceptive" ignores that the ordinary meaning of "improper" includes broader terms such as incorrect, unsuitable, irregular, or wrongful – adjectives that describe conduct that is not limited to deception. For example, a driver who fails to stop at a stop sign is driving improperly, meaning his driving is wrongful, incorrect, unsuitable, or irregular, even if not "deceptive." This Court has rejected attempts to cherry-pick dictionary definitions that are unduly narrow and inconsistent with ordinary usage, and it should do the same here. *See HVI Cat Canyon, Inc.*, 213 F. Supp. 3d at 1265, 1268 (Olguin, J.) (noting that "even under defendant's dictionary references, it is not clear that the word 'shoreline' or the term 'adjoining shorelines' apply only to large bodies of water," and that this interpretation was "unduly narrow and inconsistent with the purpose and overall structure of the [Clean Water Act]").

The Special Master's analysis also contravenes other canons of statutory interpretation. It is "a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words." *United States v. Lemus*, 93 F.4th 1255, 1261 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 581 (2024) (quoting *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003)). Section 3729(a)(1)(G) imposes liability on defendants who commit one of three distinct acts: *either* knowingly making a false statement material to an obligation to pay *or* knowingly concealing *or* knowingly and improperly avoiding an obligation to pay. The ordinary use of the word "or" "is almost always disjunctive, that is, the words it connects are to be given separate meanings." *United States v. Woods*, 571 U.S. 31, 45 (2013) (internal quotation marks omitted); *see also Loughrin v. United States*, 573 U.S. 351, 357 (2014) (rejecting interpretation of statutory clause following the word 'or,' "as somehow repeating [a] requirement [contained in the first clause], even while using

22

different words," because doing so would "disregard what 'or' customarily means"); *United States v. Arreola*, 467 F.3d 1153, 1157 (9th Cir. 2006) ("As a matter of grammatical construction, the use of the disjunctive ['or'] indicates that Congress was addressing two separate acts."). The Special Master's interpretation of "improperly avoid" as requiring an affirmative act of deception would cover the same conduct as "making a false statement" or "concealing," despite Congress' using different words separated by the disjunctive "or."

Finally, the Special Master stated, "the impropriety of a defendant's retention of an overpayment cannot be grounded in the mere fact of the defendant having received the overpayment, or even of being obligated to return it," because interpreting "improper" in this manner would introduce "circularity and surplusage" into the statute. R&R at 37. The primary problem with the Special Master's analysis is that she mischaracterized the government's position, and applied the rule against surplusage to an interpretation that the government is ***not*** advancing. *See also* R&R at 34 (incorrectly describing the government's position as "mere avoidance of an obligation to repay money to the government is enough to create liability under the FCA"); *id.* at 35 (incorrectly describing the government's position as "the violation of a regulatory or contractual requirement is enough to create liability under the FCA"). To be clear, the government is not arguing that "merely" receiving an overpayment, avoiding an overpayment, or violating a regulatory or contractual requirement is enough to create liability – a defendant must be on notice of a potential overpayment, be legally obligated to address it, and do nothing. This interpretation, rather than introducing surplusage, gives meaning to all terms in the reverse FCA provision, which imposes liability on defendants who commit three distinct acts, including "improperly avoiding" an obligation to pay. For example, an MAO may "avoid" an obligation if it has not made payment but is engaged in a process of negotiating the obligation with CMS, as Congress explicitly contemplated. Such "avoidance" would not be "improper" and thus not give rise to liability. And, as the government repeatedly noted in its briefing, the FCA requires proof that a defendant acted "knowingly." This scienter

requirement means that "mere avoidance" of an obligation or a regulatory or contractual requirement is insufficient to impose liability under the FCA.[9]

> ### ii.    Congress's Purpose and the Legislative History Do Not Support the Special Master's Interpretation.

The False Claims Act reaches "all types of fraud, without qualification, that might result in financial loss to the Government," and the Supreme Court "has consistently refused to accept a rigid, restrictive reading" of the Act. *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). "Each time Congress has weighed in on the purpose and power of the FCA, it has endorsed a reading of the statute as a robust, remedial measure aimed at combatting fraud against the federal government as firmly as possible." *Kane*, 120 F. Supp. 3d at 391.

Congress added the reverse FCA provision in 1986 to impose liability on individuals who knowingly make "a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7) (1994). In 2009, Congress *expanded* the reverse FCA provision to eliminate the need for a false statement, imposing liability on anyone who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. No. 111-21, 123 Stat 1617; 31 U.S.C. § 3729(a)(1)(G). Congress also added a definition for the term "obligation." This new definition specified that an obligation could arise from the "retention of an overpayment" in order to "clarify and correct erroneous interpretations of the law in judicial decisions that set inappropriately high burdens for the Government in enforcing the FCA." *Kane*, 120 F. Supp. 3d at 391 (internal quotation marks omitted). Through these amendments, Congress intended to "broaden[] the scope to which reverse false claims liability would attach." *United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 253 (3d Cir. 2016).

---

[9] United did not move for summary judgment on knowledge, so that issue is not before the Court.

The following year, Congress expressly created FCA liability for the knowing retention of Medicare overpayments for more than 60 days. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat 119; 42 U.S.C. § 1320a-7k(d)(2)(A); *Sutter*, 444 F. Supp. 3d at 1079. The purpose of this provision was to subject defendants who recklessly disregard or deliberately ignore Medicare overpayments to FCA liability. 444 F. Supp. 3d at 1079 (rejecting an interpretation of the term "identified" that would "frustrate Congress's intention to subject willful ignorance of Medicaid and Medicare overpayments to the FCA's stringent penalty scheme") (internal quotations and alterations omitted). And, by "requiring providers to self-report overpayments and imposing a relatively short deadline for repayments, violation of which risks the severe liability of the FCA, Congress intentionally placed the onus on providers, rather than on the government, to quickly address overpayments and return any wrongly collected money." *Kane*, 120 F. Supp. 3d at 391. Interpreting "improperly avoids" to require an affirmative act of deception is contrary to this Congressional purpose. An MAO that is on notice of an overpayment and is legally obligated to address it, yet fails to address the overpayment and return the wrongly collected money, acts improperly even if that MAO does not engage in an affirmative act of deception.

As discussed above, the plain language, structure, and purpose of the False Claim Act all compel the conclusion that the phrase "improperly avoids" should be interpreted to cover conduct where a defendant is put on notice of a potential issue, is legally obligated to address it, and does nothing. Consequently, there is no need to refer to legislative history, as the Special Master did here (R&R at 37). *See United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, CA*, 545 F.3d 1134, 1143 (9th Cir. 2008) ("Where, as here, we resolve a question of statutory interpretation by examining the plain language of the statute, its structure, and purpose, our judicial inquiry is complete, and we need not consult a statute's legislative history.") (internal quotation marks omitted). However, even if this Court considers the legislative history, it does not support the Special

Master's reading of the phrase "improperly avoids" to require proof of an affirmative act of deception.

The Special Master relies on two statements from the legislative history to conclude that "only overpayments of which the government is unaware would be actionable." R&R at 37. However, both statements she quotes were made in the context of discussing the fact that the expanded reverse FCA provision would not penalize defendants for retaining payments during legitimate (i.e., not "improper") cost/payment reconciliation periods provided by statute or regulation. *Cf. United States v. Walgreen Co.*, 591 F. Supp. 3d 297, 315 (E.D. Tenn. 2022) (rejecting the defendant's reliance on the same snippets of legislative history relied on by the Special Master, noting that "legislative history is of notoriously dubious worth as a measure of congressional intent, especially when a party serves it in piecemeal quantities"). For example, the Senate Judiciary Committee report cited in the R&R (at 37) noted that "[t]he Committee does not intend this language to create liability for a simple retention of an overpayment *that is permitted by a statutory or regulatory process for reconciliation* . . . . Accordingly, any knowing and improper retention of an overpayment beyond or following the final submission of payment as required by statute or regulation . . . would be actionable under this provision." S. Rep. 111-10, at 15 (2009), as reprinted in 2009 U.S.C.C.A.N. 430, 442 (emphasis added). Similarly, Senator Jon Kyl noted that "[g]iven that the words 'knowingly and improperly' have a fixed meaning that, at the very least, requires either improper motives or inherently improper means, the changes made by this bill cannot be read to make actionable the retention of an overpayment *when the defendant is pursuing in good-faith the exhaustion of a reconciliation procedure*." 155 Cong. Rec. S4531-01, S4540 (2009) (emphasis added). Neither of these legislative history sources address, much less support, the Special Master's interpretation that a defendant must affirmatively deceive the government in order to be liable under the expanded reverse FCA provision. *See also HVI Cat Canyon,* 213 F. Supp. 3d at 1269 n.20 ("[T]he principle of not consulting legislative history when there is no ambiguity 'is especially true when [the] legislators' published

26

statements do not squarely address the question presented.'") (quoting *Real Prop.*, 545 F.3d at 1144).

The government does not allege that United retained overpayments while pursuing good-faith reconciliation processes. Rather, the United States alleges that United was put on notice that it had received overpayments associated with unsupported diagnosis codes, was legally obligated to address those overpayments, but did nothing, choosing instead to pocket overpayments in the amount of *$2.1 billion* in Medicare funds. Such conduct fits squarely within the bounds of the FCA.

### iii.    Courts Have Uniformly Rejected the Special Master's Interpretation of "Improperly Avoids."

If this Court adopts the Special Master's interpretation of "improperly avoids," it would be the first court in the country to require affirmative deception by a defendant. Indeed, every court to address a similar argument has interpreted the "improperly avoids" prong of § 3729(a)(1)(G) consistent with the government's position here.

For example, in *Kane*, the relator had reviewed billing data to identify all claims to Medicaid potentially affected by a software glitch, and sent a spreadsheet to the defendant hospital's management with a list of claims containing an erroneous billing code that may have resulted in overpayments. 120 F. Supp. 3d at 377. The government alleged that defendants violated the reverse FCA provisions by failing to investigate the claims identified by the relator and failing to timely reimburse the government for overbilling. *Id.* at 377-378. Defendants in that case argued – as United does here – that the "knowing and improper avoidance" prong of the reverse FCA provision could not "be pleaded with allegations of failure to act in a timely fashion," but rather, "the Government needed to plead that they took 'active and conscious action' to establish avoidance." *Id.* at 393. The court rejected this argument. It surveyed various dictionary definitions of the word "avoid" and noted that these definitions "support the conclusion that the plain meaning of 'avoid' includes behavior where an individual is put on notice of a potential issue, is legally obligated to address it, and does nothing." *Id.* at 394; *see also Lakeshore Med. Clinic, Ltd.*,

2013 WL 1307013, at *4 (holding that relator had stated a plausible claim for relief under the post-FERA reverse FCA provision because when the "defendant intentionally refused to investigate the possibility that it was overpaid, it may have unlawfully avoided an obligation to pay money to the government"). The *Kane* court further held that the defendant's "argument that 'failure to act quickly enough' cannot constitute 'avoidance' is plainly at odds with the language and intentions of the FCA, the FERA, and ACA." 120 F. Supp. 3d at 394.

The Special Master dismissed *Kane* as "inapposite" for two reasons, neither of which hold up to scrutiny. First, she asserted that the *Kane* decision "focused only on the statutory term 'avoid[].'" R&R at 38. However, the *Kane* court discussed the language of the reverse FCA provision in a section headed "The Government Properly Alleges that Defendants Knowingly Concealed or ***Knowingly and Improperly Avoided*** or Decreased an Obligation." 120 F. Supp. 3d at 393-94 (emphasis added). Moreover, it would make no sense for the *Kane* court to narrowly conclude that conduct constituted "avoidance" of an obligation but somehow would not qualify as "improper avoidance" – particularly when the *Kane* court explicitly held that the government had stated a claim under the reverse FCA provision at issue.

Second, the Special Master distinguished *Kane* on the grounds that it predated *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016), which (in her characterization) "eliminated any notion that mere notice of a potential regulatory or contractual violation is enough to support liability under the FCA." R&R at 38. Of course, the United States is ***not*** alleging here that United had mere "notice of a potential regulatory or contractual violation" – but rather that United had notice of unsupported diagnosis codes that it had submitted for payment to CMS, was legally obligated to address them, but buried its head in the sand and did nothing, thereby improperly avoiding an obligation to repay taxpayer dollars. In addition, courts have adopted the *Kane* court's reading of § 3729(a)(1)(G) even post-*Escobar*. For example, in 2020, the Northern District of California interpreted § 3729(a)(1)(G) in the context of a

reverse FCA case premised on allegations that a provider group knowingly and improperly avoided an obligation to return MA program overpayments based on unsupported diagnosis codes. *See Sutter*, 444 F. Supp. 3d 1010. The United States alleged that various audits showed that many of the diagnosis codes submitted by the defendant were unsupported. *Id.* at 1080. The *Sutter* court held that "[p]ayments based on false diagnosis codes are overpayments," and "internal and external reviews of diagnosis codes put the defendants on notice of the potential overpayments." *Id.* at 1077-78. It relied on *Kane* to hold that plaintiffs had sufficiently pleaded that defendants had "concealed or avoided obligations to pay the government" when they failed to take action after being put on notice of thousands of false claims to the MA program. *Id.* at 1080-81.

In addition, in *United States v. Walgreen Co.*, the defendant argued that allegations of mere "inaction" in returning overpayments did not suffice to plead that it had "knowingly and improperly avoided" an obligation to pay money. 591 F. Supp. 3d at 319. The *Walgreen* court relied on *Kane* to reject this argument:

> Although the False Claims Act does not define the phrase "improperly avoids," the United States District Court for the Southern District of New York, in *United States ex rel. Kane v. Healthfirst, Inc. . . .* interpreted it to mean behavior where an individual [1] is put on notice of a potential issue, [2] is legally obligated to address it, and [3] does nothing.

591 F. Supp. 3d at 319 (internal citation and quotations omitted).

The Special Master's R&R did not meaningfully distinguish this persuasive authority; rather, it relied heavily on the Supreme Court's observations in *Escobar* and *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023), that the FCA is a fraud statute. Of course, the Supreme Court has noted that Congress retained certain elements of common-law fraud in the FCA to the extent they are "***consistent with the statutory text***," but importantly, "[t]he [FCA] abrogates the common law in certain

respects." *Escobar*, 579 U.S. at 187 n.2 (emphasis added).[10] Simply quoting general observations that the FCA is a fraud statute cannot replace analyzing the actual text of 31 U.S.C. § 3729(a)(1)(G). *See Walgreen Co.*, 591 F. Supp.3d at 316 ("[Defendant's] reliance on courts' general observation that the False Claims Act is an anti-fraud statute hardly amounts to an exegesis [*i.e.*, an interpretation] of § 3729(a)(1)(G)'s statutory text . . . .").

The Special Master also relies on the Eighth Circuit's decision in *Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063 (8th Cir. 2016), but in that case, the court analyzed the "knowingly concealing" prong of the reverse FCA provision. *See id.* at 1074. The *Olson* court relied on sources that treated "concealment" as equivalent to a misrepresentation in order to hold that Rule 9(b)'s heightened pleading requirements applied to alleged violations of this subsection. *Id.* The *Olson* court did not, however, address or interpret the "improper avoidance" prong of the reverse FCA provision or hold that a defendant must commit affirmative deceptive acts to be liable under this prong.

The Special Master's reading of § 3729(a)(1)(G) puts her at odds with every other court to interpret this provision. This Court should reject her recommendation and hold that a defendant improperly avoids an obligation to pay money when it is put on notice of a potential overpayment, is legally obligated to address it, and does nothing.

### iv. The Special Master's Factual Findings Are Incorrect and Should Be Rejected.

Finally, the Special Master made improper, and incorrect, factual findings regarding

---

[10] The Special Master also erred in stating that the reverse FCA provision requires that the defendant's actions "induce detrimental reliance" (R&R at 37), which is an element of common-law fraud that is not contained in the text of the FCA. *See Walgreen Co.*, 591 F. Supp. 3d at 316 (rejecting defendant's argument that the "reverse false claim requires actions that 'induce detrimental reliance by the plaintiff,' just as principles of common-law fraud do," and quoting the *Escobar* language that '[t]he False Claims Act abrogates the common law in certain respects'") (quoting *Escobar*, 579 U.S. at 187 n.2). In fact, courts have acknowledged that after the 1986 amendments to the FCA, "government knowledge [of the facts underlying a suit] is no longer an automatic bar to suit." *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 326 (9th Cir. 1995). In any event, CMS relied on United to satisfy its duties to act in good faith when conducting retrospective reviews and to report overpayments it discovered, and United's failure to do so prevented CMS from learning of the overpayments and recouping the funds to its detriment.

1    the government's knowledge of United's practices. R&R at 37, 39-41. To the extent that

2    she relied on these incorrect factual findings to support her erroneous position that the

3    United States failed to present any evidence that United "improperly avoided" its

4    obligation to repay, the Special Master's findings must be rejected.

5         Based on her assessment of the import and weight of the evidence, the Special

6    Master makes the factual determination "that the government knew of the very chart

7    review practices of which it now claims United prevented it from learning." R&R at 37;

8    *see also* R&R at 47-48 ("CMS undeniably knew for years about United's practices and

9    was aware when it made the challenged payments that United's coders never sought to

10   independently confirm that validity of the diagnosis codes identified by doctors."); R&R

11   at 41 (concluding that "the evidence presented actually showed that United was seeking

12   guidance from the agency and transparent about its practices"). Those findings are in error

13   for two reasons: First, the parties introduced conflicting evidence, preventing any finding

14   of fact. Second, the Special Master confused two separate United programs conflating

15   evidence relating to one of those programs with evidence relating to the other.

16        The United States put forth substantial evidence that United was *not* transparent

17   with CMS and that CMS had *no* knowledge of United's Chart Review practices at issue

18   in this litigation, which establishes a dispute of material fact that can only be decided by a

19   jury. *See, e.g.*, D150 (United States disputes and provides conflicting evidence that CMS

20   knew that United did not seek to validate doctor-submitted codes through its Chart Review

21   Program). FED. R. CIV. P. 56; *Liberty Lobby, Inc.*, 477 U.S. at 255 ("Credibility

22   determinations, the weighing of the evidence, and the drawing of legitimate inferences

23   from the facts are jury functions, not those of a judge, whether he is ruling on a motion for

24   summary judgment or for a directed verdict."). The Special Master could not conclude that

25   the government knew of United's conduct without evaluating disputed material facts,

26   making credibility determinations, weighing evidence, and drawing inferences in United's

27   favor, all of which is improper at summary judgment.

28

The evidence that the government proffered precludes any factual findings about what the government knew, since the Court cannot weigh or resolve conflicting evidence on a motion for summary judgment. But even apart from that error, the Special Master's factual determinations reveal a fundamental misunderstanding of the facts, confusing evidence relating to one United medical record review program with another. United had two distinct medical record review programs relevant to this case: Chart Review and Claims Verification. *Compare* D45-48 (Chart Review) to D108-110 (Claims Verification). Chart Review was United's program to review medical charts to identify all diagnosis codes that were supported by documentation in those records. *See* D45-48; P-15, United 30(b)(6) (Baker) Tr. 4267:12-22 (United's chart review coders were instructed to identify all diagnosis codes supported by documentation). Claims Verification was United's short-lived program to review whether certain diagnosis codes not identified by United's coders during Chart Review could nonetheless be validated. *See* D108-110. The Special Master conflated these two programs, concluding that any disclosures United made to CMS about its "claims verification process" would be conclusive evidence that CMS also had information about United's Chart Review program. R&R at 39.

The Special Master's analysis of the facts centered around an April 2014 video-conference between representatives of CMS and United. *Id*. The Special Master found that it is "undisputed that United *requested* this 2014 meeting . . . to discuss United's ***claim verification process*** and the impact of the proposed new rule." *Id.* (latter emphasis added). This is undisputed. However, the Special Master then concludes that "[t]he evidence thus supports United's position that it in no way sought to withhold information about its ***chart review program*** from CMS . . . ." *Id.* (emphasis added). This is hotly disputed. To the contrary, the record includes evidence that: (1) United's own witnesses acknowledge that the entire focus of the April 2014 meeting was United's Claims Verification program; (2) United failed to disclose sufficient facts about its practices and consequently CMS did not gain any specific knowledge about United's Chart Review program at this April 2014 meeting, nor even meaningful knowledge about United's Claims Verification program,

and (3) CMS did not endorse United's proposed course of action. *See, e.g.*, P-35, Schumacher Tr. 4430:23-4431:1 (during the meeting, United "[was] clear to say that, you know, 'Chart program is one thing. *It has its own QA process. We're not asking about that right now*. We're asking you about our claims verification process.'" (emphasis added)); P-34, Erickson Tr. 4425:7-4426:8 (April 2014 meeting focused on claims verification); P-25, Nelson Tr. 4352:24-4353:5; 4354:10-17 (same); P-26, CMS 30(b)(6) (Hornsby) Tr. 4363:1-24 (CMS did not gain knowledge about United's programs at the April 2014 meeting); P-28, Schumacher Notes (April 29, 2014) at 4376 (contemporaneous notes taken by United's Dan Schumacher at the meeting attribute to CMS's Cheri Rice as saying "Haven't known enough process to give feedback on our judgments"); P-10, Rice Tr. 4238:12-4239:2 (CMS did not know the details of United's program or what review of potential unsupported codes had been done); P-24, Rice Email to Nelson (May 2, 2014) at 4347-48 (an email CMS's Cheri Rice sent to United two days after the meeting in which she reiterated "Nor can we provide advice on whether United's plan [sic] course of action and/or purported limits on the scope of its attestation are compliant with such other laws"); P-10, Rice Tr. 4234:13-4235:1 (Ms. Rice testified that, with this email, she sought to make clear "that [United] should not take away from that meeting that we had said that it was okay to stop the claims verification program, or that it was okay not to continue to review and determine whether those questionable diagnoses were accurate or not."). United continued to email CMS yearly during the relevant period reiterating that it had ceased its Claims Verification program, and CMS responded with that same message that it could not endorse United's practices. *See* P-1D, Rice Email to Nelson (July 30, 2015) at 4008-09; P-1E, Rice Email to Nelson (August 22, 2016) at 4011-12; P-1F, Shapiro Letter to Thompson (May 28, 2020) at 4015-16. The Special Master erred by weighing this clearly disputed evidentiary record and resolving all factual disputes in favor of United, thereby invading the purview of the jury.

In further blurring the factual distinction between United's two programs, the R&R misquotes record evidence to support the determination that United made CMS aware of

its chart review practices. The R&R quotes correspondence from a United executive to a CMS official, but incorrectly includes bracketed language that is inconsistent with the record evidence and directly contradicted by United itself. *Id.* at 39. Specifically, the R&R cites a 2015 email from Steve Nelson, UnitedHealthcare Medicare & Retirement CEO, to Cheri Rice, the Deputy Director of the Center for Medicare within CMS, as saying United "did not use our [chart review] process to determine whether diagnosis codes submitted through claims are unsupported in the medical record." R&R at 39 (citing P-1D and P-1E). The bracketed language, *i.e.,* "chart review" is not in the document. In fact, United itself recognizes that this email is referring to United's *Claims Verification* program, not United's "Chart Review" program. *See* Dkt. 623-1, D151, United's Response ("The cited portion of the email is referring to United's decision to terminate its Claims Verification program . . . ."). None of this evidence about the Claims Verification program shows any meaningful knowledge by the government, much less any knowledge of United's separate Chart Review program.

Moreover, United's transparency with CMS is hotly contested for the additional reason that it did not disclose that its Chart Review coders did not find support for diagnosis codes that United had submitted for payment. CMS relies on the diagnosis data submitted by MAOs, including additions and deletions of diagnosis codes, to determine and adjust payments to MAOs. *See* P-5, United 30(b)(6) (Sedor) Tr. 4057:19-4058:4, 4067:16-4068:23, 4084:25-4085:6. United failed to do anything (much less notify the government) when its Chart Review coders failed to find support for certain diagnosis codes United had submitted for payment, and it did not delete those codes. P-5, United 30(b)(6) (Sedor) Tr. 4108:24-4109:16. This failure prevented CMS from learning about overpayments and adjusting payment to United to account for them. And the Special Master disregards the fact that there is **no evidence** that CMS had any knowledge of any of United's programs prior to 2014 despite the fact that a considerable portion of the alleged conduct took place prior to this date. *See, e.g.*, D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) (Garthwaite's analysis was of diagnosis codes from Date of Service Years

2008-2016). This evidence is sufficient to create a genuine issue of material fact, which must be left to the jury to resolve, regardless of the Court's interpretation of the statutory term "improperly avoids."[11]

### C. The Special Master Erred in Recommending Summary Judgment on the Government's Common Law Claims of Unjust Enrichment and Payment by Mistake.

The Special Master also erred in granting summary judgment to United on the government's common law claims for payment by mistake and unjust enrichment. For the same reasons discussed above, the Special Master incorrectly concluded that "the government has not carried its burden to present evidence of an overpayment based on unsupported diagnosis codes," and "these claims necessarily also require it to prove that United received payments from the government to which United was not entitled." R&R at 41. As discussed above, the United States has put forth evidence that United received an overpayment based on unsupported diagnosis codes and retained funds to which it was not entitled. Rather than recommending that a jury make appropriate factual findings, the Special Master improperly weighed the facts and evidence to arrive at her conclusions. The Court should therefore deny United's motion for summary judgment on the United States' common law claims of unjust enrichment and payment by mistake.

## V.    CONCLUSION

For the foregoing reasons, as well as the reasons stated in the Joint Brief on Summary Judgment, the Statements of Undisputed Facts and Opposition thereto, and the Combined Evidentiary Appendix, the Special Master's Report and Recommendation should be rejected, and United's motion for summary judgment should be denied.

---

[11] Even if this Court were to conclude that an act of deception is required to show that a defendant "improperly avoided" an obligation to pay, the same evidence discussed above in this section supports a jury finding that United was not transparent and did not disclose all the necessary facts about its conduct during the April 2014 meeting and its subsequent correspondence and thereby improperly avoided its obligation to pay.

1

2   Dated: April 2, 2025                Respectfully submitted,

3                                       YAAKOV M. ROTH
                                        Acting Assistant Attorney General, Civil Division
4                                       BILAL A. ESSAYLI
                                        United States Attorney
5                                       DAVID M. HARRIS
                                        JACK D. ROSS
6                                       HUNTER B. THOMSON
                                        PAUL LA SCALA
7                                       Assistant United States Attorneys

8                                       JAMIE ANN YAVELBERG
                                        ROBERT McAULIFFE
9                                       EDWARD CROOKE
                                        LINDA McMAHON
10                                      JESSICA E. KRIEG
                                        AMY L. LIKOFF
11                                      MARTHA N. GLOVER
                                        WENDY ZUPAC
12                                      Civil Division, Department of Justice

13                                      MICHAEL DIGIACOMO
                                        United States Attorney
14                                      DAVID CORIELL
                                        Assistant United States Attorney
15

16                                      /s/ Linda McMahon

17                                      Linda McMahon
                                        Senior Trial Counsel, Department of Justice
18
                                        Attorneys for the United States of America
19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2</u>

2          The undersigned, counsel of record for the United States of America, certifies that

3   the memorandum of points and authorities contains 35 pages, which complies with the

4   page limit set by court order dated March 13, 2025.

5

6    Dated: April 2, 2025                    /s/ Linda McMahon

7                                            Linda McMahon
                                             Senior Trial Counsel, Department of Justice
8
                                             Attorneys for the United States of America
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28