1

2

3

4

5

LATHAM & WATKINS LLP
  David J. Schindler (Bar No. 130490)
   *david.schindler@lw.com*
  Manuel A. Abascal (Bar No. 171301*)*
   *manny.abascal@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

6

7

8

9

10

LATHAM & WATKINS LLP
  Daniel Meron (appearing *pro hac vice*)
   *daniel.meron@lw.com*
  Abid R. Qureshi (appearing *pro hac vice*)
   *abid.qureshi@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

11

*Attorneys for United Defendants*

12

[Additional Counsel Listed on Signature Page]

13

14

15

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES OF AMERICA *ex rel.*
BENJAMIN POEHLING,

　　　　Plaintiff,

　　v.

UNITEDHEALTH GROUP, INC. *et al.*,

　　　　Defendants.

CASE NO. 2:16-cv-08697-FMO-PVCx

**UNITED'S OPPOSITION TO
PLAINTIFF'S MOTION FOR
REVIEW OF SPECIAL MASTER'S
REPORT AND RECOMMENDATION**

Hon. Fernando M. Olguin

Hearing Date: June 5, 2025
Hearing Time: 10:00 a.m.
Courtroom: 350 W. First Street St.
　　　　Courtroom 6D, Los Angeles,
　　　　CA 90012

1
2

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 4

    A.    Medicare Advantage and United's Chart Review Process ......................... 4

    B.    The Diagnosis Codes at Issue .................................................................... 5

    C.    Risk Adjustment Data Validation (RADV) Audits .................................... 8

    D.    The Special Master's Report and Recommendation .................................. 8

LEGAL STANDARD ............................................................................................. 12

ARGUMENT .......................................................................................................... 13

I.     THE SPECIAL MASTER CORRECTLY CONCLUDED THAT DOJ
      CANNOT SHOW THAT UNITED WAS OVERPAID ................................. 13

    A.    DOJ Failed to Offer Sufficient Evidence for a Reasonable Jury to
         Find That Every One of the Millions of Codes at Issue Is
         Unsupported ............................................................................................. 13

    B.    DOJ's Attacks on the R&R Misrepresent the Special Master's
         Analysis .................................................................................................... 17

    C.    The RADV Audit Results Further Undercut DOJ's Theory ..................... 22

II.    DOJ CANNOT SHOW CONCEALMENT OR IMPROPER AVOIDANCE ..... 25

    A.    The Reverse FCA Requires a Fraudulent Act of Concealment or
         Improper Avoidance ................................................................................. 25

        1.    The Special Master Correctly Interpreted the Statute ..................... 25

        2.    DOJ's Counterarguments Fail ........................................................ 28

    B.    DOJ Cannot Establish Concealment or Improper Avoidance ................. 30

        1.    DOJ Waived Any Argument That It Has Satisfied This
            Element ........................................................................................... 30

        2.    DOJ Also Failed to Point to Evidence of Concealment or
            Deceit ............................................................................................. 32

III.   IN THE ALTERNATIVE, UNITED WOULD BE ENTITLED TO
      JUDGMENT ON THREE ADDITIONAL GROUNDS .................................. 33

IV.   THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO THE
      COMMON-LAW CLAIMS ............................................................................ 34

i

V.      THE COURT SHOULD ADOPT THE SPECIAL MASTER'S
        RECOMMENDATION TO DENY DOJ'S MOTION FOR PARTIAL
        SUMMARY JUDGMENT ON MATERIALITY ................................................. 34

CONCLUSION ........................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Brit. Airways Bd. v. Boeing Co.*,
   585 F.2d 946 (9th Cir. 1978) ..................................................................12, 18

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...................................................................................17

*Enewally v. Wash. Mut. Bank (In re Enewally)*,
   368 F.3d 1165 (9th Cir. 2004) .................................................................22

*Fischer v. United States*,
   603 U.S. 480 (2024)...................................................................................26

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995)...................................................................................26

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) ...................................................................14

*Jarecki v. G.D. Searle & Co.*,
   367 U.S. 303 (1961)...................................................................................26

*Kane ex rel. U.S. v. Healthfirst, Inc.*,
   120 F. Supp. 3d 370 (S.D.N.Y. 2015) .........................................11, 29

*Lowery v. Channel Comm'n, Inc. (In re Cellular 101, Inc.)*,
   539 F.3d 1150 (9th Cir. 2008) .................................................................22

*Olson v. Fairview Health Servs. of Minn.*,
   831 F.3d 1063 (8th Cir. 2016) .................................................................27

*U.S. ex rel. Schutte v. SuperValu, Inc.*,
   598 U.S. 739 (2023)...........................................................................11, 26

*United States ex rel. Kelly v. Serco, Inc.*,
   846 F.3d 325 (9th Cir. 2017) ...................................................................12

*United States ex rel. Ormsby v. Sutter Health*,
   444 F. Supp.3d 1010 (N.D. Cal. 2020).........................................29, 30

*United States ex rel. Swoben v. United Healthcare Ins. Co.*,
    848 F.3d 1161 (9th Cir. 2016) ......................................................................22

*United States v. Colton*,
    231 F.3d 890 (4th Cir. 2000) ........................................................................33

*United States v. Walgreen Co.*,
    591 F. Supp. 3d 297 (E.D. Tenn. 2022).........................................................30

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
    579 U.S. 176 (2016).........................................................11, 13, 26, 34

**STATUTES**

31 U.S.C.
    § 3729.............................................................................................................30
    § 3729(a)(1)(G) .......................................................................................*passim*

42 U.S.C.
    § 1320a-7k .....................................................................................................30
    § 1395w-21 *et seq.* .........................................................................................4

**RULES**

Fed. R. Civ. P.
    9(b) ................................................................................................................27
    26 ...................................................................................................................10
    53(f) ...............................................................................................................12
    56 ............................................................................................................*passim*
    56(a) ..............................................................................................................12

**TREATISES**

*Concealment*, Black's Law Dictionary (2d ed. 1910) ............................................25

*Concealment*, Black's Law Dictionary (11th ed. 2019) ........................................25

*Improper*, Black's Law Dictionary (11th ed. 2019) ..............................................25

10A Wright & Miller, Federal Practice and Procedure § 2727.2 (4th ed.) .............13

**REGULATIONS**

42 C.F.R. § 422.254(b)(1).......................................................................................4

**INTRODUCTION**

The Special Master's Report and Recommendation (R&R) correctly concludes that no reasonable jury could render a verdict for DOJ on its sole theory of liability. DOJ staked its entire case on the proposition that, of the *millions* of diagnoses at issue in this case, *every single one* was unsupported by the medical record and resulted in an overpayment— even though every diagnosis was certified as accurate by the doctors who saw the patients. DOJ's whole case is premised on the assumption that those diagnoses must be wrong because a United coder did not independently re-identify them during blind medical record review. That assumption is both absurd on its face and irreconcilable with the undisputed evidence. Indeed, when CMS auditors, separate from this litigation, reviewed roughly 6,500 of these very same diagnoses, they found that the vast majority of the conditions (89%) *were* supported. As the Special Master concluded, DOJ's speculative and categorical theory cannot survive Rule 56 scrutiny. DOJ's challenges to the Special Master's thoughtful and thorough R&R are based on gross caricatures of her reasoning and conclusions.

Under the Medicare Advantage (MA) program, CMS pays insurers like United a fixed monthly amount based, in part, on the health status of its members, determined by diagnosis codes doctors submit on claims forms. United also implemented a chart review process to identify additional diagnoses that doctors documented in medical charts but failed to submit on those forms. United's coders reviewed these charts "blind," meaning that the coders were not told what diagnoses doctors had already submitted, and they were not tasked with validating these diagnosis codes. DOJ nonetheless brought this case based on the theory that every time a United coder failed to identify a doctor-submitted code during a blind review, that diagnosis must necessarily have been unsupported, and the doctor who submitted the diagnosis and certified it was accurate must have been wrong. Based on that theory, which DOJ did not test empirically in any way, DOJ would ask a jury to find that the millions of such codes were *all* unsupported and resulted in overpayments—without any direct evidence to establish even one such overpayment.

1

The R&R recommends summary judgment on two grounds. *First*, the Special Master correctly determined that based on the undisputed evidence no reasonable jury could find for DOJ on its categorical overpayment theory. R&R 23, 25. DOJ does not dispute that even expert coders will fail to identify some diagnosis codes that are documented in medical records when conducting blind chart review and that CMS's own coders overlook supported codes in blind review. Indeed, DOJ's coding expert identified multiple reasons why coders will miss diagnoses—including the length and complexity of the medical record, unfamiliarity with a doctor's specialty, and time constraints.

During the litigation, DOJ expressly disclaimed any middle-ground position; it developed no evidence whatsoever from which a reasonable jury could reliably estimate what percentage (less than 100%) of the diagnosis codes at issue were unsupported and constituted overpayments. DOJ never reviewed a single medical record, despite having the opportunity to do so. It conducted no sampling. And it offered no expert opinion as to the percentage of the codes that are unsupported. DOJ's expert even disclaimed having any opinion on that. After five years of investigation, followed by years of discovery, DOJ still cannot point to a single medical chart showing that a diagnosis code lacked support. As the Special Master recognized, DOJ's theory rests entirely on speculation.

DOJ's objections mischaracterize both the record and the R&R. DOJ seizes on isolated language—such as the Special Master's observation that DOJ had not presented "any evidence"—and claims she applied the wrong standard for summary judgment and held DOJ to an elevated burden of proof. But that badly distorts the R&R. The Special Master repeatedly emphasized the relevant question under Rule 56—whether a reasonable jury could conclude that all the codes at issue were unsupported. She did not conclude that the record was literally devoid of evidence, but rather that DOJ's evidence failed to create a triable issue of fact because it provided no basis for a jury to do anything but guess.

Nor did the Special Master improperly "weigh" the evidence—she relied on undisputed evidence that even expert coders will fail to identify some supported diagnoses when reviewing medical records, combined with the absence of any evidence that would

2

enable a reasonable jury to estimate what percentage of the diagnosis codes were in fact not supported. That is exactly what Rule 56 requires. Her analysis reflects an uncontroversial conclusion: when it is undisputed that even expert coders reviewing charts will miss diagnoses that are supported, and a plaintiff offers no medical records, no sampling, no relevant testimony, no medical record review, and thus no basis on which a jury could reliably estimate what percentage of the codes are not supported, a jury cannot speculate its way to liability.

The Special Master also correctly observed that DOJ's theory runs headlong into the only direct medical-record evidence in the case: CMS's own audits (RADV audits) of approximately 6,500 of the diagnosis codes DOJ now claims were unsupported. For those overlapping codes, CMS reviewed the medical records and concluded that 89% of the health conditions represented by those diagnoses were in fact supported. As the Special Master observed, this result further "undercuts" the categorical inference DOJ seeks to draw. RADV confirms the indisputable: a coder's failure to re-identify a diagnosis code during blind review does not by itself establish that the doctor erred. In fact, the RADV results—which represent the only review of medical records to determine the accuracy of the doctor-submitted codes at issue—suggests that DOJ's theory is not only unsupported by the evidence, it is empirically and emphatically wrong.

*Second*, the Special Master recommended granting summary judgment on the basis that DOJ failed to present evidence from which a reasonable jury could find that United concealed or improperly avoided an obligation to repay money to CMS. That is a distinct element of a reverse False Claims Act (FCA) claim, and it requires showing that the defendant engaged in acts of deceit or concealment. In its briefing before the Special Master, DOJ contested only United's legal interpretation of that element—DOJ made no attempt to show that, if evidence of deceit or concealment were required, the element was satisfied here. Any argument that United engaged in deceptive conduct has been *waived*, multiple times over. Indeed, even now DOJ merely points to alleged disputes as to what CMS knew about United's practices; it still presents no evidence of concealment or

improper avoidance. If anything, as the Special Master explained, "the evidence presented actually showed that United was seeking guidance from the agency and transparent about its practices." R&R 41. "There simply was no fraud." *Id.*

Because DOJ's common-law claims rise and fall with its reverse FCA theory—as DOJ acknowledges—the Special Master also correctly recommended summary judgment for United as to those claims. And the Special Master properly recommended denying DOJ's motion for summary judgment on materiality, which DOJ does not challenge.

The Report and Recommendation reflects a straightforward application of Rule 56. Its analysis is thorough, and its legal conclusions are sound. The Court should adopt it in full and enter judgment for United.

## BACKGROUND

This case arises under the Medicare Advantage program, in which CMS pays private insurers to provide health coverage to Medicare beneficiaries. 42 U.S.C. § 1395w-21 *et seq.*; *id.* §§ 1395w-23, 1395w-24(a)(6)(A); 42 C.F.R. § 422.254(b)(1). The factual background is set out in more detail in United's part of the Joint Brief. *See* Joint Br. 8-18.

### A. Medicare Advantage and United's Chart Review Process

CMS pays MA plans a fixed monthly amount per enrollee. Dkt. 623-1 at D9.[1] MA plans are paid more for enrolling members who are sicker than average for taking on the risk that those members will be more costly to insure. D15. The process by which CMS pays MA plans based on the health status of their beneficiaries is commonly referred to as "risk adjustment." *See* D10. CMS determines which members are sicker by looking at the health conditions those members have, as represented by diagnosis codes doctors submit through claims forms (*see, e.g.*, Ex. D-40 at 944-45). D16-D18, D21.

After a patient visits a doctor, the doctor records the patient's diagnoses in a medical chart, then the doctor or the doctor's coder assigns one or more corresponding diagnosis codes on a claim form (*see, e.g.*, Ex. D-150 at 3775-860). D19-D20. The doctor then

---

[1] All references in this brief to Defendants' undisputed facts are to Dkt. 623-1, United's Response to the Statement of Genuine Disputes (Aug. 29, 2024).

submits that claim form to an MA plan, certifying that the patient has the medical conditions represented by the diagnosis codes submitted. *See* D21-D22, D267. The MA plan, in turn, submits them to CMS.

To receive payment, doctors need not identify on claims forms all the diagnoses their patients have, even when those diagnoses are clearly contained in the medical record. As a result, doctors often fail to submit all supported diagnoses, and so MA plans like United review some patients' medical charts to record additional, valid diagnoses. D41, D44. United hires medical coders to carry out this "chart review" program. D45, D48. These coders perform their work "blind"—they do not know which diagnosis codes the doctor submitted. D51-D53. It is undisputed that all of the diagnosis codes at issue here are ones that United coders failed to identify in blind review. D173. It is also undisputed that United's blinded coders were not reviewing the medical charts for the purpose of validating the accuracy of the diagnosis codes the doctors previously submitted. D53.

**B. The Diagnosis Codes at Issue**

DOJ filed this suit in 2017, after five years of investigation, alleging that United violated the reverse False Claims Act by retaining MA payments associated with doctor-certified diagnosis codes that were not re-identified during United's internal chart reviews. *See* Dkt. 1; D1. According to DOJ, United's failure to repay the money associated with these diagnosis codes rendered it liable under 31 U.S.C. § 3729(a)(1)(G).

This case is different from cases involving alleged "upcoding"; DOJ does not contend United's coders falsely documented *any* medical conditions or that there is anything fundamentally wrong with chart review. DOJ also does not contend that United failed to convey accurately the diagnostic data doctors submitted to it. Rather, DOJ's case rests on the assumption that if United coders who reviewed a chart blind did not re-identify a diagnosis code, then that necessarily means that a doctor who previously submitted the same code on a claim form did so in error, resulting in overpayments.

To understand DOJ's theory, United's first interrogatory in 2020 asked DOJ to identify every diagnosis code DOJ alleged United should have "deleted or otherwise

5

returned as an overpayment." D155; Ex. D-7 at 354. In response, DOJ listed approximately 28 million diagnosis codes. D156; Exs. D-11B at 574-75, D-141 at 3569:15-70:1. DOJ explained the list contained "every diagnosis code . . . UnitedHealth . . . improperly failed to delete when UnitedHealth's own reviewers found no support for the diagnosis code in the member's medical records." D157; Ex. D-5 at 289.

DOJ's central allegation, detailed in these responses, is that whenever a doctor-certified diagnosis code was not identified in a chart review, that shows the diagnosis did not exist and any payment based on that diagnosis was invalid. For example, in DOJ's view, if a doctor submitted a "diabetes" code in a claim form after seeing a patient, but United coders did not code "diabetes" in reviewing the medical chart for that visit, then the diabetes code *must* be invalid. DOJ did not review *any* medical records, even a sample, to test that assumption. D165-D166; Exs. D-57 at 1547, D-110 at 2864:21-65:3.[2]

Consistent with its categorical theory that every time United coders did not identify a diagnosis that necessarily meant the doctor was wrong, DOJ produced an expert, Dr. Craig Garthwaite, to identify the set of diagnosis codes that were unsupported and led to overpayments. *See* D163-D164; Ex. D-57 at 1446-47. Dr. Garthwaite did not review *any* medical charts and did not opine as to whether a single diagnosis code was in fact unsupported. D165-D166; Exs. D-57 at 1547, D-110 at 2864:21-65:3. Dr. Garthwaite also disclaimed that he had, or would express at trial, any opinion as to the rate at which the diagnosis codes at issue were unsupported. D167-D168; Ex. D-110 at 2868:12-69:11. Instead, the Garthwaite report is *entirely* based on an assumption that parallels DOJ's hypothesis that *every* diagnosis previously certified by a doctor but not re-identified by a

---

[2] In its objections, DOJ for the first time asserts that "United has admitted—and it must be taken as established for purposes of this motion—that diagnostic coding errors 'are fairly common in doctors' offices.'" DOJ Objs. 4. DOJ's citation to United's brief in an entirely separate administrative procedure case violates this Court's rules prohibiting "**any evidence, argument, or authority that was not presented to the Special Master.**" Dkt. 633 (emphasis in original). Regardless, nothing in the cited brief establishes the *extent* to which diagnostic coding errors occur in doctors' offices or whether that rate of error is greater or lesser than the extent to which the codes missed by chart reviewers were supported. Indeed, based on CMS's own audits, the overall set of doctor-submitted codes had the same low chance of error as conditions missed by United's chart reviewers (both 11%). *See infra* at 23-24.

United chart reviewer is invalid. D169; Ex. D-57 at 1547.

The report proceeds in two conceptual steps. *First*, Dr. Garthwaite identifies a set of what he calls "potential deletes," which is the set of diagnosis codes submitted by doctors on claims forms but not identified by United's chart reviewers. D170-D176; Ex. D-57 at 1484. *Second*, Dr. Garthwaite tried to determine the subset of these "potential deletes" that impacted United's *payment* from CMS. Dr. Garthwaite called this subset of codes "deletes." D177-D178; Ex. D-57 at 1489-90. He identifies 1.97 million diagnosis codes as "deletes," or roughly 7% of the 28 million codes DOJ's First Interrogatory Response claims that United was required to delete. D179; Ex. D-65 at 1917-18, D-110 at 2875:18-21. The remaining 93% of the "potential deletes" concededly had no payment impact. D183; Ex. D-65 at 1916-19.

United moved for summary judgment and DOJ filed a cross-motion for partial summary judgment. Dkt. Nos. 614, 615, 616. After full briefing, the Special Master issued a "tentative ruling" and held a hearing on January 15, 2025. *See* R&R 2.

At the hearing, the Special Master pressed DOJ on its theory of liability and supporting evidence, and DOJ confirmed that its case rests solely on its theory that every diagnosis code not re-identified in chart review is invalid. When asked directly, "All 28 million codes are incorrect or just a percentage?" DOJ answered unequivocally: "No. We are not alleging any type of percentage." Hearing Tr. at 10:20-24, Dkt. 634-1; *see also id.* at 11:8-11 (answering "yes" when asked whether it alleges that "all 28 million codes are unsupported by the medical records"). When pressed on whether the evidence for its claims was limited to "the training and background" of United's coders conducting chart review, DOJ confirmed, stating it was that and "the way the chart review program was conducted." *Id.* at 11-12. DOJ acknowledged that its expert, Dr. Garthwaite, did not review any medical records and was not asked to determine whether any particular diagnosis code was unsupported. *See id.* at 13 (Q: "Did Dr. Garthwaite look at medical records?" A: "No. No."); *id.* at 38-39. Instead, Dr. Garthwaite analyzed data to determine which doctor-submitted codes were not re-identified by United's blind chart review coders and *assumed*

7

that all those codes were unsupported. *See id.* at 14:2-15:20.

In short, DOJ confirmed multiple times that its case relies exclusively on this categorical theory of liability. And its objections before this Court double-down on that theory, continuing to claim that "*every time* one of United's coders reviewed a medical chart" and did not identify a particular diagnosis code, "the diagnosis was not supported by the medical record." DOJ Objs. 8 (emphasis added). Its case thus stands or falls on the proposition that a coder's omission always means a doctor-submitted code is unsupported.

### C. Risk Adjustment Data Validation (RADV) Audits

CMS conducts routine audits of MA plans through the Risk Adjustment Data Validation (RADV) program, which involves reviewing medical records to assess whether those MA plans received "overpayments." D71; Exs. D-15 at 623, D-122A at 3104:24-05:2, D-117 at 2979:23-80:12. To conduct RADV audits, CMS selects a sample of an MA plan's members. *See* D74; Exs. D-122A at 3113:7-14, D-18 at 661. MA plans then submit medical charts for those sampled members, which CMS reviews to determine whether the charts support the audited health conditions.

Separate from this litigation, CMS's RADV coders audited a portion of the health conditions at issue here—an overlap of roughly 6,500 health conditions. D184; Ex. D-64 at 1887-89, fig. 15. Significantly, CMS validated 89% of those codes. *See* 185; Exs. D-64 at 1887-89, fig. 15, D-141 at 3520:13-21:2, D-63 at 1763. This means that 89% of diagnosis codes that DOJ claims in this litigation were invalid correspond to health conditions that were in fact validated by CMS during RADV audits.

It is undisputed that when a RADV audit confirms a beneficiary has an audited health condition, then that means that "CMS has determined that the Medicare Advantage plan was not overpaid" for that condition. D78; *see* Ex. D117 at 2977:8-20. Yet DOJ's theory of liability sweeps in diagnosis codes CMS already confirmed (at a high rate for the overlapping health conditions) are not overpayments.

### D. The Special Master's Report and Recommendation

The Special Master recommended granting United's motion on two grounds.

8

*First*, the Special Master concluded that DOJ failed to offer evidence from which a reasonable jury could conclude the diagnosis codes at issue were all unsupported. Judge Segal relied on undisputed testimony establishing that coders may fail to identify diagnosis codes for a variety of benign reasons, including "the time available for the review, the completeness, legibility, and clarity of the medical record," as well as ordinary human error. R&R 20, 25. DOJ, by contrast, "failed to provide evidence of a single actual instance where a medical record did not support a code." R&R 21. Instead, DOJ relied "entirely on speculative assumptions, not supported by record evidence," that all of "these 28 million diagnosis codes" not re-identified in blind chart review "were unsupported." R&R 20.

Applying the Rule 56 standard, the Special Master concluded that "a jury could not reasonably conclude that any, *much less every*, diagnosis code certified by a doctor and submitted by United to CMS but not identified by United's coders in chart review is necessarily invalid." R&R 24 (emphasis added). In light of DOJ's failure to offer evidence showing that any specific code was unsupported—let alone all 1.97 million codes—no jury could reasonably conclude that DOJ had met its burden. *Id.* at 24-25.

The Special Master's conclusion was corroborated, Judge Segal explained, by evidence from CMS's RADV audits, which provided the only direct medical-record evidence in the case. R&R 29-30. Judge Segal observed that those audits reviewed thousands of codes that overlap with the codes DOJ says United should have deleted. *Id.* CMS found that approximately 89% of the audited codes were supported. *Id.* While the Special Master acknowledged the statistical limitations on extrapolating from these results, Judge Segal found it "meaningful that the government's *own auditors* found support in medical records for diagnosis codes that the government has alleged were unsupported." *Id.* at 30. The RADV results further "undercut" DOJ's theory. *Id.*

The Special Master rejected DOJ's argument that its failure to develop evidence was attributable to discovery limitations imposed by United. Judge Segal found that DOJ had a full opportunity to develop its case, and that United had offered to produce the medical records it reviewed as part of its chart review program. DOJ declined that offer.

*See* R&R 30-31. The Special Master also noted that DOJ did not attempt to review even a sample of the medical records, as it has done in other cases. *Id.* at 32. Instead, it "repeatedly attempted to shift the burden to United to *disprove* the government's allegations," demanding that United identify which of the 28 million doctor-submitted codes were supported and produce the records to prove it. *Id.* at 32-33. In the R&R, the Special Master reaffirmed that this effort to reverse the burden of proof was improper and explained that DOJ had a full opportunity to develop evidence by reviewing a sample of medical charts but simply failed to do so. *Id.* at 34.

In reaching this conclusion, the R&R quoted from the Special Master's prior Order denying DOJ's motion to compel United to review the medical charts for DOJ and to disprove DOJ's allegations. R&R 31-33 (citing Dkt. 419). There, the Special Master had concluded that "[o]nly an expert—someone with specialized knowledge—could do a fair comparison of the medical records and the diagnosis codes to determine if the medical record supported the code." R&R 32 (quoting Dkt. 419 at 4-5). This Court reviewed de novo the Special Master's Order and upheld it. Dkt. 437.[3] Despite being aware of the tenuous nature of its categorical theory for years, DOJ chose to litigate the case without obtaining and reviewing even a single medical record.

*Second*, the Special Master held that DOJ failed to present evidence that United knowingly concealed or improperly avoided an obligation to repay. R&R 34-41. At bottom, DOJ seeks to impose liability based on United's mere failure to return alleged known overpayments—without showing any act of deception. But the statute requires more. Section 3729(a)(1)(G) imposes liability only where one knowingly "conceals" or "improperly avoids" an obligation to repay the government. As the Special Master

---

[3] During the hearing before the Special Master, DOJ and relator argued "for the first time" that they could create a genuine issue by calling United's coders as trial witnesses. R&R 21. The Special Master correctly rejected that argument, explaining that DOJ did not disclose these United coders as witnesses in its Rule 26 disclosures or other discovery responses, nor did it depose them. *Id.* at 22-23. A party cannot survive summary judgment by speculating about the testimony of a new, unnamed and undisclosed witness. *Id.* at 25-26. This is likely why DOJ does not press that argument here. The argument is not only wrong for the reasons stated by the Special Master, *id.* at 21-26, but it is also waived.

explained, the element of "conceal[ment]" or "improper[] avoid[ance]" cannot mean merely the violation of a regulatory or contractual requirement. R&R 35. Fraud, not regulatory shortfall, is the *sine qua non* of FCA liability. R&R 35-36. To hold otherwise would turn a fraud statute into a punitive hammer for collecting routine unpaid debts and contractually owed money—a result the Supreme Court has repeatedly rejected.

The Special Master followed the Supreme's Court's rulings in *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 193 (2016), and *U.S. ex rel. Schutte v. SuperValu, Inc.*, 598 U.S. 739, 750-51 (2023), and rejected DOJ's contention that the FCA can reach conduct devoid of deceit. R&R 35-36. These cases reaffirm that the FCA imports the common law of fraud, which demands some form of misrepresentation or deceit. DOJ relied extensively on *Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 394 (S.D.N.Y. 2015), but the Special Master dismissed *Kane* as both non-binding and outdated—decided before *Escobar* clarified that the FCA is not an open-ended regulatory backstop and instructed that absent statutory terms expressly to the contrary, terms in the FCA should be read consistent with the common law of fraud. R&R 38. Moreover, DOJ's reading would render the words "improperly" and "conceals" superfluous, violating basic canons of interpretation. R&R 37.

The Special Master concluded that the evidentiary record did not support the concealment element. R&R 38-41. As an initial matter, DOJ never attempted to present evidence to satisfy this element; it merely contested United's statutory interpretation that the element required evidence of concealment or deceit. *See* Dkt. 616, Joint Br. 78-80. The Special Master found that DOJ "failed to allege any sort of deception on the part of United with respect to its alleged failure to return overpayments." R&R 38.

Moreover, as the Special Master explained, "[n]or could" DOJ make such an allegation, R&R 39, because the record suggests the opposite. Far from hiding the ball, United proactively disclosed its chart review processes to CMS in meetings, emails, and bid documents. R&R 38-41. Not only was there insufficient evidence for a jury to conclude that United had concealed or improperly avoided its obligation to repay the government,

1 "but the evidence presented actually showed that United was seeking guidance from the
2 agency and transparent about its practice." R&R 41. The Special Master thus
3 recommended summary judgment for United on this basis as well.

4 The Special Master also recommended granting summary judgment for United on
5 DOJ's common-law claims, finding that they rose and fell with the same evidentiary and
6 legal deficiencies underlying the FCA theory. R&R 41.

7 Finally, the Special Master recommended denying DOJ's motion for summary
8 judgment on materiality, which argued that materiality is not an element under the second
9 prong of the reverse FCA. R&R 42. Citing *Escobar* and *SuperValu*, the Special Master
10 concluded that materiality is a required element and must be proven alongside the other
11 elements of a reverse FCA claim. *See* R&R 49-50. DOJ does "not object[]" to the denial
12 of its motion for partial summary judgment on materiality. DOJ Objs. 6 n.2.

13 <u>**LEGAL STANDARD**</u>

14 A party may seek summary judgment "as a matter of law" if "there is no genuine
15 dispute as to any material fact." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some*
16 alleged factual dispute between the parties will not defeat an otherwise properly supported
17 motion for summary judgment; the requirement is that there be no *genuine* issue of
18 material fact." *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 329 (9th Cir. 2017).
19 "If the evidence is merely colorable, or is not significantly probative, summary judgment
20 may be granted." *Id.* at 329-30 (citation omitted). "To survive summary judgment, the
21 [plaintiff] must establish *evidence* on which a reasonable jury could find for the plaintiff."
22 *Id.* at 330. "A mere scintilla of evidence will not do, for a jury is permitted to draw only
23 those inference of which the evidence is reasonably susceptible; it may not resort to
24 speculation." *Brit. Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978). The
25 Court reviews the Special Master's R&R de novo. Fed. R. Civ. P. 53(f).

26 Rule 56 thus serves the critical gatekeeping functions of preserving judicial
27 resources and preventing juries from deciding cases based on emotion, bias, or speculation
28 directed against unpopular defendants when the evidentiary record is insufficient to allow

a reasonable jury to render a verdict in favor of the plaintiff. Its purpose is to "avoid unnecessary trials when the facts are not in dispute and to eliminate claims or defenses that are unsupported by facts, thereby protecting litigants from the burden of a full trial and protecting juries from being asked to resolve claims that should not be submitted to them." 10A Wright & Miller, Federal Practice and Procedure § 2727.2 (4th ed.).

## ARGUMENT

The False Claims Act imposes liability on "[a]ny person who . . . knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). To prevail, DOJ must show that United (1) was overpaid; (2) knowingly violated an "obligation" to return money to the government; (3) engaged in conduct material to CMS's payment decision; and (4) acted with deceit sufficient to satisfy the "rigorous" definition of fraud. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187, 192 (2016).

DOJ's case fails on each element. As the Special Master concluded, DOJ offered insufficient evidence for a reasonable jury to find in favor of DOJ's sole theory of overpayment—that every doctor-submitted diagnosis code a United chart reviewer did not re-identify was unsupported. The Special Master concluded that DOJ similarly failed to show that United concealed or improperly avoided a repayment obligation, an issue that turns solely on a legal dispute as to the meaning of the FCA term "improperly avoids." The Special Master's analysis was careful and correct. This Court should adopt it in full.

## I.   THE SPECIAL MASTER CORRECTLY CONCLUDED THAT DOJ CANNOT SHOW THAT UNITED WAS OVERPAID

### A.   DOJ Failed to Offer Sufficient Evidence for a Reasonable Jury to Find That Every One of the Millions of Codes at Issue Is Unsupported

As the Special Master explained, to survive summary judgment, DOJ must point to evidence from which a reasonable jury could find that all of the doctor-submitted diagnosis codes at issue were unsupported by the medical records. R&R 12-13. It failed to do so.

The Report and Recommendation correctly describes the key undisputed facts. R&R 16-18. Each diagnosis code at issue was submitted by a doctor who saw the patient and certified that the patient had the diagnosis represented by the code. D22. United's coders reviewed the underlying medical charts for supported diagnosis codes, but indisputably did so "blind"—i.e., not knowing what codes the doctor submitted. Joint Br. 23; D173. For the millions of codes at issue, United's coder did not independently identify a diagnosis code the doctor had certified and submitted. Joint Br. 16-17, 27-28.

While the facts surrounding United's blind chart reviews are undisputed, DOJ serially misrepresents the chart-reviewer's task. DOJ, for example, repeatedly and wrongly asserts that United's coders "made findings that the medical records did not support previously submitted codes," DOJ Objs. 1, and that "the Chart Review coders found that the 1.97 million diagnosis codes at issue were unsupported by the medical records reviewed," DOJ Objs. 13. As the Special Master understood, United's coders in fact made no such determinations. In truth, even DOJ knows better. DOJ does not dispute that United's coders *did not* review charts for the purpose of validating the accuracy of the diagnosis codes a doctor had submitted. D53.

The fact that a United coder did not identify a code previously certified as correct by a doctor reflects two possibilities: (1) United's coder overlooked the support for the diagnosis in a medical record (or did not have a complete record) and was wrong not to include the code, or (2) the doctor who examined the patient and certified the accuracy of the diagnosis was wrong. Whether and how often each of those possibilities occurred are knowable, empirical questions. And DOJ bears the burden to "come forth with evidence from which a jury could reasonably render a verdict" on those questions. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). But it has no such evidence. Instead, DOJ put all of eggs into one basket—its categorical theory that every time a United coder failed to identify a diagnosis a doctor had previously submitted, that diagnosis was wrong.

This is DOJ's sole theory of liability. *See supra* at 5-8 (collecting sources); Hearing Tr. at 11:8-11, 18:16-19:2. DOJ has never argued that it can prove and a jury could

14

reasonably find that some smaller percentage of codes were unsupported. *See* Hearing Tr. at 10:8-11:10 (DOJ attorney confirming that DOJ alleges all 28 million codes are unsupported and is "not alleging any type of percentage" of those codes).

The Special Master was clearly right to decide that no rational jury could possibly conclude that the doctor was wrong 28 million times . . . out of 28 million. It is undisputed that coders performing blind chart reviews will, for a variety of reasons, sometimes fail to identify supported codes. D98 (undisputed that CMS's own expert coders sometimes miss codes when reviewing charts in RADV audits). DOJ's own coding expert acknowledged that there are multiple reasons why a chart reviewer may miss a supported code when conducting blind review, including the length, complexity, or completeness of the medical record. R&R 23 (citing D55-D56, D58-D61). It is also undisputed that even when CMS coders conduct audits, its coders sometimes reach different results after reviewing the same medical chart, which given DOJ's position that coding is objective means that at least one of those expert CMS coders made a mistake. *See, e.g.*, D62; D98; Exs. D-94 at 2567:17-69:16 (addressing when senior CMS coder overrides junior coder on whether a code is supported by medical record). And DOJ's damages and statistical experts likewise agreed that, as in any endeavor dependent on humans reviewing a written record, there will inevitably be errors. D246; Exs. D-141 at 3515:25-16:14, D-110 at 2861:6-7, D-87 at 2404:12-18. The only extent to which DOJ "disputed" these facts was neither genuine nor compliant with this Court's rules. *See* Dkt. 365 at 3-4 (only permitted responses are "disputed" and "undisputed").[4] When it is undisputed that coders make mistakes at

---

[4] For example, United's Statement of Undisputed Facts identifies as undisputed the fact that "CMS sometimes miss codes supported by documentation in the medical charts when reviewing charts in contract-level RADV audits." D98. DOJ did not dispute the truth of that fact; it instead took issue only with its implication: "Disputed to the extent fact implies . . . ." Similarly, citing testimony by DOJ's own coding expert, United identified as undisputed the facts that "[t]here are a number of reasons why a medical coder may not identify a diagnosis code submitted on a claim form by a doctor," D56, and the various reasons that expert admitted might cause codes to be missed, D57 (human error), D58 (varying experience levels), D59 (incomplete record), D60 (legibility), D61 (time constraints). DOJ did not genuinely dispute these facts; its supporting citations merely discuss the standards coders must use and that ultimately there should be an objectively correct coding result. DOJ does not dispute the statements themselves—it does not dispute

*(footnote cont'd on next page)*

quantifiable but yet-undetermined rates, a jury cannot reasonably draw the inference that one side or another was right *all 28 million* times.

Contrary to DOJ's objection (at 9), the Special Master did not express some personal "belief" that there are "myriad reasons" a coder might overlook a supported code; Judge Segal was directly citing and relying on this "undisputed evidence submitted with the briefing," R&R 24, and the testimony of DOJ's own coding expert, R&R 25; *see* R&R 23 (citing undisputed evidence at D55-D56, D58-D61). Once that undisputed evidence is accepted, DOJ's theory collapses. If coders sometimes miss supported codes, then DOJ's position—that every one of the 28 million "missed" codes is necessarily unsupported—cannot be correct. And that conclusion is only corroborated by the sole direct medical-record evidence in the case. *See infra* at 22-25 (discussing RADV audits).

Critically, DOJ has never offered—and has expressly disclaimed—any fallback theory that only a limited subset of the codes at issue are unsupported. Hearing Tr. at 10:20-24. And DOJ *had to* disclaim such a position because it never developed any evidence to support it—it never built a case that would allow a reasonable jury to reliably estimate what portion of the codes were actually unsupported by the patients' medical records. DOJ's experts did not review a single medical record. *See* Hearing Tr. at 57:2-60:19. DOJ did not conduct any sampling. *See id.* DOJ offered no expert testimony opining on the number of unsupported codes. *See* Joint Br. 38-39; Hearing Tr. at 13:3-6. And DOJ's expert, Dr. Garthwaite, "disclaimed that he had, or would express at trial, any opinion as to the rate at which the doctors' diagnosis codes were unsupported." R&R 22; *see* Ex. D-109 at 2868 (Q: "what percentage of codes on your potential deletes list will be found supported in the relevant medical record, as you defined it, if you were to go and look at that record?" A: "I don't have an opinion [as] to that . . . ."). His model simply

---

that in practice, expert coders conducting blind chart review will miss codes for the stated reasons. DOJ likewise did not genuinely dispute the fact that "even in government-conducted audits there are instances when two government-hired coders disagree," D62; it merely cited evidence that further coding reviews and discussions could resolve such disagreement. DOJ's failure to properly dispute these facts results in these facts being "deemed established for the purposes of resolving the motion(s)." Dkt. 365 at 4.

tallied every instance in which a doctor-submitted code was not re-identified by a blind chart review coder, and *assumed* each one was invalid. *See* R&R 22. The Special Master previously concluded, and this Court affirmed, that "[o]nly an expert—someone with specialized knowledge—could do a fair comparison of the medical records and the diagnosis codes to determine if the medical record supported the code." R&R 32 (quoting Dkt. 419 at 4-5); *see* Dkt. 437. DOJ failed to develop any such evidence.

A reasonable jury could not find for DOJ on its categorical theory, because the record cannot support it. And a reasonable jury could not find for DOJ on a more limited theory, because DOJ has disavowed that path and provided no evidence that would allow the jury to do anything but guess. The Special Master was right: DOJ's case cannot go to trial. "On the undisputed evidence submitted with the briefing, a jury could not reasonably conclude that any, much less every, diagnosis code certified by a doctor and submitted by United to CMS but not identified by United's coders in chart review is necessarily invalid." R&R 24. This "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." R&R 19 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

### B.   DOJ's Attacks on the R&R Misrepresent the Special Master's Analysis

DOJ's objections to the Special Master's carefully reasoned R&R mischaracterize Judge Segal's reasoning and conclusions. The mischaracterizations are both extensive and striking.

DOJ's primary objection asserts that the Special Master failed to correctly apply the summary judgment standard. *See* DOJ Objs. 6-15. It claims that Judge Segal "turned the summary judgment standard on its head" by holding DOJ to an elevated burden of proof and making it prove United's coders were "'always perfect'" and the doctor-submitted codes were "'necessarily wrong.'" DOJ Objs. 9 (quoting R&R 21, 23). DOJ even asserts in its header for this section that the Special Master "conclude[ed] that the findings of United's own expert coders were not evidence a jury could consider," DOJ Objs. 6—something the Special Master never said. DOJ's argument is a complete strawman, relying

17

on a patently inaccurate portrayal of the R&R.

The Special Master indisputably set forth the correct legal standard, R&R 11-13, and proceeded to carefully apply it, R&R 18-30. Nowhere did she weigh evidence, resolve factual disputes, or determine that certain evidence was inadmissible and "not evidence a jury could consider." DOJ Objs. 6. Instead, the Special Master found that DOJ failed to provide sufficient evidence from which a jury could accept DOJ's sole theory of liability: "a jury could not reasonably conclude that any, much less every, diagnosis code certified by a medical provider and submitted by United to CMS but not identified by United's coders in chart review is necessarily invalid." R&R 24; *see* R&R 21 (similar).

Ironically, it is DOJ who turns the Special Master's reasoning on its head. It was DOJ, not the Special Master, who chose to rest its case exclusively on the factual claim that *every time* a United coder did not identify a code that a doctor certified was accurate, that code was necessarily unsupported. It is DOJ's theory, therefore, that asserts that in every instance the doctor was "necessarily wrong," and United's coder was "always perfect." The Special Master correctly recounted DOJ's own theory of liability, R&R 21, and explained why no reasonable jury could so find. As Judge Segal noted, "a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation." R&R 24 (quoting *Brit. Airways Bd.*, 585 F.2d at 952). DOJ failed to meet that bar.

DOJ likewise distorts the R&R by claiming the Special Master found DOJ had "no evidence." DOJ Objs. 9, 15. On the contrary, the Special Master acknowledged that DOJ offered "circumstantial evidence," but found it "entirely speculative" and insufficiently probative, in light of the undisputed facts, to carry DOJ's burden in opposing summary judgment. R&R 25. The point was not that DOJ had offered nothing—the point was that DOJ had insufficient evidence from which a reasonable jury could accept DOJ's categorical theory that every single doctor-submitted code a United chart reviewer did not re-identify was unsupported. R&R 24-25.

In reaching that conclusion, the Special Master did not rely on purportedly "disputed" evidence that "coders 'may themselves miss' certain diagnosis codes because of various reasons, including 'simple human error.'" DOJ Objs. 13 (quoting R&R 25); *see also id*. at 8-9. As detailed at length above, the Special Master relied on the "undisputed testimony" by DOJ's own coding expert. R&R 25; *supra* at 15-16. And the Special Master did not simply point to the reality of human error, Judge Segal listed numerous other potential reasons that DOJ's expert admitted cause coders to miss codes, "including the time available for the review, [and] the completeness, legibility and clarity of the medical record documentation." R&R 25. As one simple example, a doctor's handwriting might be illegible to a particular United coder, who might then miss what was patently a valid diagnosis in a medical record. DOJ's categorical theory offers no response.

Nor did the Special Master weigh the evidence and conclude it was "equally balanced," as DOJ claims. DOJ Objs. 10; *see* R&R 21. The Special Master did not say the *evidence* was equally *balanced*; Judge Segal correctly noted that there were two "equally *possible*" *theories* that would account for any single failure of a United coder to identify a doctor-submitted code: either the code was unsupported, or it was supported and simply missed. *See* R&R 21. DOJ's problem, Judge Segal explained, was that it failed to present sufficient evidence for a reasonable jury to conclude that *all* of the diagnosis codes could be reasonably deemed to be unsupported (i.e., that DOJ's all-or-nothing theory was right) nor any evidence from which a jury could reliably estimate what portion of the codes fell into each of those two possible categories. And, in fact, the undisputed evidence, including the testimony about coder error and the RADV audits, *see infra* at 22-25, showed that DOJ's categorical theory is not merely flawed but is indisputably wrong.

DOJ is also wrong in arguing that the existence of a "discrepancy" (or millions of discrepancies) between United's chart reviewers and the doctor-submitted codes is enough to defeat summary judgment. DOJ Objs. 8-9. It is not. At summary judgment, unlike a motion to dismiss, it is not enough to identify a factual disagreement—DOJ must offer *evidence* from which a reasonable jury could resolve that disagreement in its favor. It

failed to do that, which the Special Master repeatedly explained throughout the R&R. *See* R&R 18-19, 21-25, 27 (making this point on each cited page).

DOJ argues that it presented "ample evidence" that coder omissions implied unsupported codes. R&R 8. But the Special Master considered each of DOJ's evidentiary assertions—including coder training, alleged 95% accuracy thresholds, and quality audits. And the Special Master properly concluded that none establishes that a coder omission reliably equates to an unsupported code, let alone that a jury could reasonably conclude that *every* coder omission was an unsupported code. R&R 21, 23-24. The Special Master correctly noted—based on *undisputed record evidence*—that even expert coders miss codes, for a number of reasons. R&R 23, 25. And given DOJ's categorical theory of liability, DOJ's invocation of a 95% accuracy expectation amounts to an admission that even expert coders will overlook many diagnoses that are supported in the medical records. Indeed, given the extremely high number of patient visits reviewed by United's coders (close to 80 million), the 1.97 million diagnosis codes that DOJ alleges were unsupported and resulted in overpayments could easily all fall within the 5% of codes that DOJ admits even expert coders would be expected to overlook. *See* United Supp. Br. 5-6, Dkt. 623 (providing the undisputed facts underlying this calculation). DOJ simply has no evidence on which a jury could rely to find that the 1.97 million codes are actually unsupported as opposed to simply instances of the type of missed codes that even expert coders will miss.

DOJ invokes analogies about simple factual disputes—such as who attended a board meeting or whether a traffic light was red or green during a car accident—arguing that determining whether a doctor-submitted code that a blinded coder did not identify is actually unsupported is the same kind of factual question meant for a jury. DOJ Objs. 10, 12. Those analogies fail. DOJ's board meeting analogy—if anything—illustrates the fundamental flaw in its case. This is not a case where a Board Secretary failed to record the attendance of the General Counsel, as DOJ suggests. DOJ Objs. 12. This case is more like a situation where (i) the Chair of the board *did* record the attendance of the General Counsel and certified the accuracy of that record; (ii) the Board Secretary failed to record

20

the attendance of the General Counsel; (iii) some variation of this pattern reoccurred millions of times across hundreds of different Generals Counsel and Board Secretaries; and (iv) for DOJ to prevail, it must prove that in *every single one* of those millions of instances, the Chair was wrong and the Secretary was right. Without more, no jury could make such a finding.

DOJ's traffic light analogy is similarly flawed. DOJ Objs. 10. A more accurate analogy would be one witness certifying that a traffic light was green during an accident, another witness failing to mention the traffic light at all, this pattern reoccurring millions of times, and DOJ needing evidence that in *every single one* of those millions of instances, the traffic light did not even exist. To further tighten the analogies, both the board meeting and traffic accident were *videotaped* (i.e., the medical records), the defendants offered to provide those videotapes to the plaintiff, but the plaintiff declined to review them.

The analogies also fail because whether even a *single* diagnosis code is supported by a medical record is not a simple historical fact that a lay jury can resolve without expert evidence, as this Court and the Special Master already concluded. R&R 32 (quoting Dkt. 419 at 4-5); *see* Dkt. 437. But DOJ neither offered expert testimony on the extent to which the medical records fail to support the doctor-certified diagnoses nor reviewed a single medical chart. A jury would have no basis to determine in what portion of the instances the doctor-submitted code was actually unsupported and in what portion the United coder simply missed the code other than sheer speculation—replicated 28 million times—as the Special Master correctly concluded. R&R 20, 23, 24.

DOJ also improperly asserts that the "Special Master's conclusion likewise ignores evidence" about a subset of diagnosis codes that went through United's former "Claims Verification" program (CV). DOJ Objs. 11-12 & n.3. DOJ never relied on this "evidence" in its briefing, pressing it for the first time at the hearing before the Special Master. *See* Hearing Tr. at 61:20-62:19. As United explained at that time, DOJ's "reference to the in-process codes reviewed in CV as evidence to avoid summary judgment has been waived," because DOJ raised it "not once" in briefing. *Id.* at 75:18-76:2. That constitutes a clear

waiver under this Court's rules, *see* Dkt. 365 at 2, as well as standard waiver and forfeiture principles, *e.g.*, *Lowery v. Channel Comm'n, Inc. (In re Cellular 101, Inc.)*, 539 F.3d 1150, 1154-57 (9th Cir. 2008); *Enewally v. Wash. Mut. Bank (In re Enewally)*, 368 F.3d 1165, 1173 (9th Cir. 2004). DOJ's raising this issue now in a footnote is also contrary to this Court's rules. Dkt. 365 at 2. In any event, DOJ's tardy footnote makes no coherent argument in its own right and provides no basis for questioning the Special Master's R&R.

Finally, DOJ devotes several pages to disputing the Special Master's less-than-two-page observation that United's obligation to return overpayments was "potential and contingent," DOJ Objs. 15-20, but that debate is beside the point. The Special Master did not rest her recommendation on any such finding. Judge Segal concluded that DOJ failed to offer evidence from which a reasonable jury could find that the codes were unsupported in the first place. Without that showing, there is no basis for a jury to find that overpayment occurred at all—let alone an obligation. The Special Master merely noted that if DOJ cannot establish the existence of an actual overpayment, then its claim that United had an obligation to return monies to the government remains only potential and contingent.

Similarly, DOJ's reliance on *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016), is entirely misplaced. Judge Fitzgerald already held that *Swoben* is inapplicable here because that case (decided at the motion to dismiss stage where allegations had to be taken as true) was limited to affirmative "false certification" FCA claims alleging that an MA plan falsely certified the accuracy of its data in its attestations. Dkt. 353 at 11; *see also* United Supp. Br. 11-12. The Special Master correctly concluded that *Swoben* has no bearing on this case because there is "no evidence in the record" to prove that "United *submitted unsupported diagnosis codes* and retained overpayments due to those unsupported codes." R&R 26.

## C. The RADV Audit Results Further Undercut DOJ's Theory

CMS's own coders audited a portion of the health conditions at issue, and the results of those reviews eviscerate DOJ's categorical theory. The *only* direct medical-record evidence in this case consists of CMS's RADV audits of around 6,500 of the diagnosis

codes that DOJ claims, under its theory, must be unsupported. *See* R&R 29; D81, D83, D88, D184. But CMS found that approximately 89% of these conditions were in fact supported by medical records. *See* R&R 29-30; Ex. D-64 ¶¶ 164-167 & fig.15. This means that 89% of the CMS-reviewed conditions DOJ insists were "revealed" to be invalid, merely because they were not identified by a United coder in a blind review, correspond to health conditions that were in fact validated by CMS during RADV audits.

What is more, it is undisputed that the 89% validation rate of these conditions is *higher* than the rate of validation of all the remaining health conditions in United's data (87.6%). *See* D185, D224-D225; Exs. D-63 at 1763, D-64 at 1887-89, D-141 at 3520:13-21:2, 3527:21-28:4. DOJ's expert Dr. Stark independently confirmed these validation rates in his report and confirmed at his deposition that this differential higher rate of validation was statistically significant. *See* D196, D226; Exs. D-63 at 1763, D-64 at 1887-89, D-141 at 3520:13-21:2, 3527:21-28:4. In other words, the RADV results showed that a code that was not identified by United in chart review was no more likely to be invalid than the broader universe of codes submitted by United.

This evidence undercuts DOJ's theory. Not only did DOJ fail to support its theory with direct evidence, but the only direct evidence from the actual medical records suggests that DOJ's theory is strikingly wrong. This evidence led DOJ's own statistical expert to opine that DOJ's theory that every one of the codes at issue is an overpayment is not only "false," but false "to a certainty." D204; Ex. D-141 at 3535:9-18.

The Special Master approached the RADV audit evidence carefully and deliberately. R&R 29-30. She did not treat the RADV results as statistically representative or extrapolatable. *Id.* Nor did she rely on them as a primary basis for her ruling. *Id.* But she found it "meaningful that the government's *own auditors* found support in medical records for diagnosis codes that the government has alleged were unsupported." R&R 30. Judge Segal viewed the data as consistent with other undisputed testimony in the case: that coders miss valid codes for benign reasons, and that DOJ's categorical theory was undercut by this undisputed evidence. *See* R&R 25-26, 29-30.

23

DOJ argues that the RADV audits were not designed to be statistically representative. DOJ Objs. 14. United has never argued otherwise. The point is not that the audits establish how many codes among those at issue are supported, but that they provide the only direct, medical-record-based evidence *in this case*. And that evidence shows that DOJ's core theory cannot—under any conception of rationality—be right. It is not United's burden to disprove DOJ's allegations or to compile a representative sample. R&R 32 ("the government has repeatedly attempted to shift the burden to United to *disprove* the government's allegations."). The burden is on DOJ to prove its case. United's motion does not depend on the RADV audits and would be equally meritorious even without them. But the audits are in the record, and they confirm that the absence of a diagnosis code in United's blind chart review process does not mean that the doctor-submitted health condition was unsupported. DOJ's case cannot proceed.

DOJ also incorrectly asserts that the Special Master "mischaracterized what the RADV audits found." DOJ Objs. 14 & n.4. But DOJ never explains what exactly the Special Master mischaracterized. Instead, it proceeds to argue, as it did before the Special Master, that the RADV audits are not relevant because in RADV health conditions could be validated based on different diagnosis codes than the ones at issue. *Id.*; *see* Joint Br. 22, 46-47 (DOJ pressing the same argument). The Special Master considered and rejected that argument, and rightly so. An essential element DOJ must prove is that United received an overpayment, and for 89% of the overlapping codes CMS's own auditors found that the condition was supported and there was no "overpayment." D78; *see also* Ex. D117 at 2977:8-20 (DOJ Corporate Representative admitting there would be "no overpayment" where a RADV audit found a health condition supported). DOJ speculates about various reasons CMS could have validated various diagnoses, but this speculation only illustrates again why DOJ's failure to actually review the medical records is fatal to its claim.

The Special Master rightly treated the RADV results as reinforcing United's central argument—namely, that the failure of a blinded coder to spot a code does not show that the code was unsupported or was an overpayment. Indeed, if the RADV results are any

indication—and they are the only direct medical-record evidence in this case—far from every one of these diagnosis codes being unsupported, a significant majority are likely to be supported. The problem is that DOJ has no evidence on which a jury could reasonably rely to estimate what proportion would *not* be supported by the medical record.

## II.    DOJ CANNOT SHOW CONCEALMENT OR IMPROPER AVOIDANCE

The Special Master also correctly recommended granting summary judgment for United because DOJ failed to show that United committed any fraudulent act of concealment or improper avoidance, as required under the reverse FCA.

### A.    The Reverse FCA Requires a Fraudulent Act of Concealment or Improper Avoidance

#### 1.    The Special Master Correctly Interpreted the Statute

The Special Master correctly held that the second prong of the reverse FCA does not impose liability for a mere knowing failure to repay money. It applies only when a defendant takes some action to conceal or improperly avoid a known obligation to return funds. That conclusion follows directly from the statute's plain language, which penalizes one who "conceals" or "improperly avoids" repayment—not one who simply fails to act after receiving an overpayment. 31 U.S.C. § 3729(a)(1)(G); *see* R&R 34-35. In its summary judgment briefs, DOJ did not claim there was evidence that United engaged in any acts of concealment or deceit; it claimed only that United knowingly failed to repay money it owed to the government. The Special Master correctly concluded that DOJ's claim did not state a valid theory of liability under this provision of the reverse FCA.

As the Special Master explained, the reverse FCA's terms require deceitful actions. One "improperly" avoids an obligation by acting in a way that is "incorrect; unsuitable or irregular . . . *fraudulent or otherwise wrong*." R&R 36 (quoting *Improper*, Black's Law Dictionary (11th ed. 2019)). And concealment is the "improper suppression or disguising of a fact." *Concealment*, Black's Law Dictionary (2d ed. 1910); *see Concealment*, Black's Law Dictionary (11th ed. 2019). Those definitions reflect ordinary usage: the terms do not mean merely "erroneous" or "noncompliant," nor do they mean "inaction" or

"nondisclosure"—they mean affirmative action that is deceitful and evasive. *See* Joint Br. 75-77; United Supp. Br. 17-19. In other words, to "conceal" or "improperly avoid" a repayment obligation under the FCA, a defendant must take some step to frustrate the government's ability to know that it is owed the money. *See* Joint Br. 75-76.

In reaching this conclusion, the Special Master correctly adhered to the Supreme Court's repeated instruction that the FCA must be interpreted in light of common law fraud principles. As the Court explained in *Escobar*, 579 U.S. at 187, and reaffirmed in *SuperValu*, 598 U.S. at 750-51, the FCA is rooted in the common law of fraud, and courts should construe its language consistent with the common law of fraud unless Congress clearly says otherwise. And at common law, fraud required some act to deceive or mislead—not mere inaction or nondisclosure. *See* Joint Br. 76 (collecting sources); United Supp. Br. 18. The Special Master was right to conclude that Congress did not sub silentio remove this basic principle of fraud. *See* R&R 36-37.

The Special Master's conclusion is further reinforced by foundational canons of construction, including *noscitur a sociis* and the canon against surplusage. As United explained in its summary judgment briefing, *noscitur a sociis* instructs that "a word is known by the company it keeps." United Supp. Br. 18 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)). That canon is necessary "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Id.* (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)). DOJ's interpretation ignores the canon, attempts to interpret "improperly avoids" in isolation, and falls into the exact interpretive trap that *noscitur a sociis* is designed to prevent. DOJ's broad interpretation of "improperly avoids" as mere inaction ignores the accompanying words and would render other words meaningless. If DOJ need only show that a defendant refrained from returning an overpayment, it would never need to show that a defendant "concealed" or "improperly decreased" such an obligation—rendering those terms "superfluous." *Fischer v. United States*, 603 U.S. 480, 493 (2024).

The Eighth Circuit is the only federal court of appeals to address the question at issue here—whether the second prong of the reverse FCA requires "fraudulent conduct." *Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063 (8th Cir. 2016). The Court in *Olson* held that Rule 9(b) applies to reverse FCA cases because the FCA is a fraud statute and the reverse FCA thus requires proof of fraudulent conduct, not mere knowing inaction. 831 F.3d at 1074. *Olson* is the most authoritative and persuasive case on the questions presented here, and it disproves DOJ's assertion that, should this Court adopt the R&R, it would be the "first and only court in the nation to read" this "requirement into the reverse False Claims Act." DOJ Objs. 2. Although the case arose in a different context, the Eighth Circuit's reasoning fully supports the Special Master's R&R.[5]

The Special Master's reading also makes sense as a matter of policy, statutory coherence, and common sense. A contrary interpretation would give rise to highly punitive FCA liability for any known failure to repay a debt or make lease or royalty payments—even if the defendant took no deceitful or evasive actions. That would turn every routine debt collection action, and numerous ordinary contractual breaches, into FCA cases. *See* Joint Br. 76-77; United Supp Br. at 19. Under DOJ's view, if a defendant who signs a lease or contract requiring payments to the government knowingly fails to make those payments, the defendant would be liable under the FCA for "avoiding" an obligation to "remit" money to the government. *See* Joint Br. 80 (DOJ embracing this outcome). DOJ has no response to this hypothetical. The Special Master rejected that approach for good reason. As the Special Master explained, allowing liability to turn solely on the fact of an overpayment—or the existence of a repayment obligation—would untether the statute from its text and purpose. R&R 37-38.

The Special Master's reading honors the statute's text, gives effect to each term, and aligns with the FCA's purpose. The analysis is sound, and the Court should adopt it.

---

[5] DOJ mischaracterizes the Special Master's reliance on *Olson*. The Special Master did not rely on *Olson* in parsing the meaning of the phrase "improperly avoids." DOJ Objs. 30. To the contrary, the Special Master correctly relied on *Olson* for its overarching and correct holding that the reverse FCA requires fraudulent conduct. *See* R&R 35-36.

## 2. DOJ's Counterarguments Fail

DOJ's objections offer no basis to reject the Special Master's recommendation. DOJ offers no persuasive counter-interpretation of the terms "conceals" and "improperly avoids," and never attempts to interpret these terms in light of common law fraud—as mandated by *Escobar* and *SuperValu*. Instead, DOJ cherry-picks a single dictionary definition of the word "improper," failing to account for the alternative definition in the same dictionary—let alone the common law. *See* DOJ Objs. 22.

DOJ claims that the Special Master "mischaracterized the government's position" on the meaning of "conceals" and "improperly avoids"—asserting that she "incorrectly describe[ed] the government's position as 'mere avoidance of an obligation to repay money to the government is enough to create liability under the FCA.'" DOJ Objs. 23 (quoting R&R 34). But DOJ made its position crystal clear multiple times in its briefing before the Special Master: DOJ argued that "the reverse FCA provision imposes liability on defendants *who do nothing* after being put on notice of a potential overpayment, *thereby avoiding* an obligation to pay money." Joint Br. 79 (emphasis added). And it similarly asserted that the courts have found that defendants "violated the reverse FCA provision when they *failed to take action* after being put on notice of thousands of false claims to the MA program." *Id.* (emphasis added). Even in its Motion for Review, DOJ continues to take the position that "a defendant must be on notice of a potential overpayment, be legally obligated to address it, *and do nothing*." DOJ Objs. 23 (emphasis added). Being on notice may be relevant to the "knowingly" element; being "legally obligated" goes to the "obligation" element. The only additional component in DOJ's formulation that could correspond to "improperly avoids" is "do nothing." Under DOJ's formulation, just as the Special Master reasoned, DOJ need only prove that a defendant knew of an obligation to repay money but took no action, which is indeed the same "mere avoidance" argument the Special Master considered and rejected. *See id.*

Instead of interpreting the plain meaning of the statute or situating the terms in the common law, DOJ proceeds to discuss at length the legislative history of FERA and

accuses the Special Master of narrowing the statute in a way that supposedly contradicts congressional intent. That argument skips the first and most important step of statutory interpretation: interpreting what the statute actually says, in light of common-law fraud as mandated by the Supreme Court. That was the basis for the Special Master's recommendation, and on that front, DOJ has no response.

Turning to the legislative history, DOJ suggests that the 2009 FERA amendments eliminated any requirement of fraudulent conduct. DOJ Objs. 24-26. But nowhere in the legislative history did Congress state that it intended to eliminate the core feature that makes fraud, *fraud*. If that were its intent, Congress would have said so clearly. Rather, the FERA amendments were intended to remove a perceived loophole that resulted from the requirement of a "false record or statement," thereby making it parallel with the affirmative FCA. *See* Joint Br. 89-91 (discussing legislative history). Indeed, the legislative history on which DOJ relies repeatedly describes the reverse FCA as a remedy for fraudulent conduct that would not trigger traditional false statement liability. DOJ offers no evidence that Congress intended to impose liability for inaction or nondisclosure without any act of deceit.

DOJ claims that "courts have uniformly rejected the Special Master's interpretation of 'improperly avoids,'" but in fact DOJ pointed the Special Master to only one outdated case—*Kane*, 120 F. Supp. 3d 370—that the Special Master expressly considered and properly rejected. As the Special Master explained, *Kane* focused solely on the meaning of the word "avoid," and failed to address the additional statutory terms—"improperly" and "conceals"—that narrow and define the scope of liability under the reverse FCA. R&R 38. In doing so, *Kane* effectively read those words out of the statute. That omission alone justifies setting the decision aside, but the Special Master also noted that *Kane* was decided before the Supreme Court's decision in *Escobar*, which reaffirmed that fraud under the FCA requires more than mere notice of a potential regulatory or contractual violation. *Id.*

DOJ is simply wrong when it claims that *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp.3d 1010 (N.D. Cal. 2020), agreed with *Kane*'s interpretation of

"improperly avoids." DOJ Objs. 28-29. *Sutter* addressed a dispute as to the meaning of the term "identified" in the Overpayment Statute, 42 U.S.C. §1320a-7k, not the meaning of "improperly avoids" under the FCA, 31 U.S.C. § 3729. *See* 444 F. Supp.3d at 1077-81. *Sutter* is thus irrelevant and in no way undermines the Special Master's reasoning.

DOJ also invokes *United States v. Walgreen Co.*, 591 F. Supp. 3d 297 (E.D. Tenn. 2022), DOJ Objs. 29, but it never cited this case in its briefing before the Special Master and therefore waived reliance on that case under this Court's Order. *See* Dkt. 633 at 1 (Mar. 13, 2025) (**"The parties shall not include—and the court will not consider—any evidence, argument, or authority that was not presented to the Special Master."**) (bold in original). In any event, *Walgreen* merely relied on *Kane*'s flawed reasoning without elaboration, 591 F. Supp. 3d at 319, which is wrong for the reasons stated above.

Finally, DOJ makes no effort to explain how its reading could be reconciled with the structure or purpose of the FCA. It offers no limiting principle that would distinguish actionable "improper" avoidance from ordinary failure to pay monies knowingly owed. If DOJ were correct, every bad debt or knowing breach of contract could give rise to a claim under one of the most punitive statutes in the U.S. Code. The Special Master's interpretation avoids that result, and DOJ has offered no reason to reject it.

## B.   DOJ Cannot Establish Concealment or Improper Avoidance

### 1.   DOJ Waived Any Argument That It Has Satisfied This Element

DOJ waived—multiple times over—any argument that there was evidence of concealment or deceit by United. This aspect of United's motion challenged DOJ's case on two fronts. United argued both that the reverse FCA requires an affirmative act of concealment or improper avoidance, and that DOJ failed to show that United engaged in such conduct. *See* Joint Br. 75-78. DOJ responded only to the first point. Joint Br. 78-80. It contested United's interpretation of improper avoidance but never argued that, if the reverse FCA required evidence of deceit or concealment, such evidence in fact existed. The Special Master recognized this silence and properly concluded that DOJ "failed to allege any sort of deception on the part of United with respect to its alleged failure to return

overpayments." R&R 38. In so doing, the Special Master was not resolving a factual dispute but acknowledging the absence of one. DOJ's failure to argue the point is dispositive under this Court's rules: "Failure to cite to evidence in support of a factual assertion may be deemed a party's admission that it lacks evidence of that fact. Evidence not cited by a party in the joint brief may not be considered." Dkt. 365 at 2.[6]

In its objections, DOJ again waives this issue, never arguing that there was evidence of concealment or deceit by United, perhaps aware of this Court's unambiguous order that "**the court will not consider . . . any . . . argument, or authority that was not presented to the Special Master.**" Dkt. 633 at 1 (bold in original). The closest DOJ comes to claiming evidence of concealment is a single footnote. DOJ Objs. 31 n.25. That is also insufficient under this Court's rules. Dkt. 365 at 2 ("All substantive material, other than brief argument on tangential issues, shall be in the body of the brief."). A footnote cannot preserve a substantive argument even if this Court were prepared to excuse DOJ's previous waiver before Judge Segal.

Further, even in the footnote, DOJ still claims only that United "did not disclose" certain facts. But "nondisclosure" is not concealment. *See* Joint Br. 76 ("[C]oncealment" "is characterized by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry," whereas "nondisclosure" is "characterized by mere silence."). As the Special Master explained, "[a]n omission is not a concealment simply because a party believes the omitted information would have been relevant." R&R 36. To satisfy the reverse FCA, DOJ must identify an act of concealment or improper avoidance, not a failure to volunteer information. At no stage of this summary judgment briefing has DOJ ever claimed that United engaged in acts of deception or concealment.

In short, DOJ has waived this issue many times over. The Court should enforce that

---

[6] During the hearing, United stated multiple times that DOJ had not offered evidence of fraud, and DOJ did not dispute that assertion. *See, e.g.*, Hearing Tr. at 133:12-17 (United's counsel: "So first, to be clear, I heard no disagreement with my framing of the issue from the other side because there cannot be because I described it correctly. There is no argument in any brief at any point that we actually engaged in such concealment or improper avoidance."). *See also, e.g.*, 114:22-115:3; id. at 115:23-116:6; id. at 120:4-7.

1  waiver and make clear its reliance on waiver for the benefit of a reviewing court in any

2  potential appeal.

3  ## 2.  DOJ Also Failed to Point to Evidence of Concealment or Deceit

4  Even if DOJ had preserved the argument, its objections fail to point to *any* evidence

5  that United engaged in acts of concealment or deceit and provide no basis for the Court to

6  reject the Special Master's conclusions.

7  DOJ frames its argument as a challenge to alleged "findings" that the Special Master

8  made about "the government's knowledge of United's practices," and asks this Court to

9  reject those findings "[t]o the extent" that the Special Master relied on them in holding

10  that DOJ had failed to present evidence of improper avoidance. DOJ Objs. 30-31. The

11  short and complete answer to this argument is that the Special Master did not rely on an

12  analysis of the factual record for its legal conclusions that the reverse FCA imposes

13  liability only where a defendant has engaged in acts of concealment or deceit. The Special

14  Master discussed the extensive evidence of the disclosures that United made to CMS

15  simply to demonstrate why the legal conclusion on concealment mattered—because the

16  government "does not allege that United" undertook any act of concealment or improper

17  avoidance, "nor could it" make such allegations. R&R 39.

18  Moreover, what CMS knew about United's practices is entirely distinct from the

19  question of whether United took affirmative steps to deceive CMS or conceal evidence.

20  DOJ has identified no witness, document, or testimony suggesting that United acted to

21  deceive CMS, suppress information, or otherwise prevent the agency from understanding

22  how United conducted chart review. As the Special Master observed, DOJ did not point

23  to any "active[] misleading" conduct that "prevented CMS from acquiring information."

24  R&R 36-37. There is no triable issue because there is no evidence.

25  DOJ does not identify any contrary evidence showing concealment. Instead, it

26  focuses on an alleged evidentiary dispute about whether United disclosed all the details of

27  its alleged chart review practices. DOJ Objs. 31-35. But the reverse FCA does not impose

28  a duty to self-report. It penalizes efforts to improperly avoid or conceal an obligation to

pay. The common law draws a sharp line between concealment and nondisclosure. Joint Br. 76; United Supp. Br. 19. Concealment involves "deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry," while nondisclosure is "characterized by mere silence." *United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000). While nondisclosure may support claims in contract or equity, it cannot constitute fraud. Inaction alone is not fraud.

The Special Master's R&R did not weigh evidence or resolve a factual dispute. It found that DOJ had failed to create one. The R&R's conclusion was based on the absence of evidence in the record and the absence of argument in DOJ's briefing. *See* R&R 38. DOJ's objections do not—and cannot—fill that gap.

## III.   IN THE ALTERNATIVE, UNITED WOULD BE ENTITLED TO JUDGMENT ON THREE ADDITIONAL GROUNDS

Finally, even if the Court declines to adopt both of the reasons the Special Master recommended for granting United's motion, summary judgment remains warranted on three additional bases which United presented in its summary judgment brief but which the Special Master did not reach. First, even if the codes in question were unsupported, DOJ has failed to show that they resulted in overpayments to United. *See* Joint Br. 39-42; United Supp Br. at 8-11. For a diagnosis code to result in an overpayment, that specific diagnosis code must not only be (i) unsupported by the medical chart, but also (ii) the health condition associated with that diagnosis code must be unsupported by any other diagnosis documented in any chart for the member for that year. *See* Joint Br. 9-10. As the Special Master found, DOJ presented insufficient evidence to survive Rule 56 on the first point, but United is also entitled to summary judgment because DOJ likewise failed on the second point (which the Special Master did not address). *See* Joint Br. 39-42. Second, DOJ has failed to identify any concrete, existing obligation that United violated. *See* Joint Br. 48-53; United Supp Br. at 11-14. Third, DOJ has failed to show that CMS viewed United's alleged omissions as *material* to its payment decisions—an essential element under the reverse FCA. *See* Joint Br. 67-68; United Supp. Br. 16-17. The undisputed evidence shows

that CMS understood how United conducted its chart review program and continued to make payments without objection.

All three arguments are fully briefed and provide alternative and independent bases for granting summary judgment in United's favor. In the event the Court declines to adopt the Report and Recommendation, United would be entitled to a ruling on those arguments.

## IV. THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO THE COMMON-LAW CLAIMS

DOJ's common-law claims for unjust enrichment and payment by mistake fail for the same reasons as its reverse FCA claim. As the Special Master explained, these theories "necessarily also require [DOJ] to prove that United received payments from the government to which United was not entitled," which DOJ cannot do. R&R 41. DOJ does not dispute that its common-law claims depend on the same alleged overpayments and rely on the same theory that the diagnosis codes at issue were all unsupported. *See* DOJ Objs. 35; Joint Br. 82, 84. The Court should adopt the Special Master's recommendation and grant judgment for United on the common-law claims as well.[7]

## V. THE COURT SHOULD ADOPT THE SPECIAL MASTER'S RECOMMENDATION TO DENY DOJ'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON MATERIALITY

DOJ cross-moved for partial summary judgment, asking the Court to hold that materiality is not an element of a reverse FCA claim under the second prong of 31 U.S.C. § 3729(a)(1)(G). The Special Master correctly rejected that argument, and DOJ does not object to Judge Segal's recommendation. DOJ Objs. 6 n.2. The Court should adopt it.

As the Special Master explained, materiality remains a required element under the reverse FCA for the same reason it applies elsewhere in the statute: the FCA is a fraud statute. *See* R&R 48-49. In *Escobar*, the Supreme Court held that fraud under the FCA cannot exist without materiality—even in the absence of a textual materiality requirement. *See* 579 U.S. at 193 ("[T]he common law could not have conceived of 'fraud' without

---

[7] For the reasons explained in United's summary judgment briefing, but not addressed by the Special Master, United would also be entitled to judgment on the common-law claims due to the express contract between the parties. Joint Br. 81-82; United Supp. Br. 20.

proof of materiality.") (citation omitted). The Special Master was right to conclude that the same logic applies here. While the second prong of § 3729(a)(1)(G) does not include the word "material," it still requires a showing of fraud. *See* Joint Br. 87-97. The government must prove not only that the defendant improperly avoided a payment obligation, but that the avoidance occurred in a way that was meaningful to the government's payment decision. *Id.* That is what materiality means—and the Supreme Court has confirmed that the term applies by default in any claim sounding in fraud.

DOJ's argument to the contrary rests entirely on the absence of the word "material" in the statutory text. But that was precisely the argument the Supreme Court rejected in *Escobar*. The Court emphasized that materiality is an essential safeguard that prevents the FCA from turning every regulatory or contractual misstep into a federal fraud case. That principle is equally important under the reverse FCA, which otherwise risks being deployed as a blunt instrument for enforcing contested repayment obligations. *See* Joint Br. 88. The Special Master correctly concluded that DOJ's reading would sever the reverse FCA from the rest of the statute, creating a fraud theory with no requirement that the alleged misconduct have mattered to the government's payment decision. *See* R&R 48.

Even DOJ appears to recognize the weakness of its position. In its objections, DOJ expressly declined to challenge the Special Master's recommendation on this issue. *See* DOJ Objs. 6 n.2 ("[T]he United States is not objecting to the Special Master's recommendation regarding the United States' Motion for Partial Summary Judgment."). The Court should therefore adopt the Special Master's recommendation and reasoning and on that basis rule that materiality is a required element of any claim under the second prong of the reverse FCA.

## **CONCLUSION**

The Court should adopt the Special Master's R&R in full and grant summary judgment for United and deny DOJ's motion for partial summary judgment.

Dated: May 2, 2025                                                 Respectfully submitted,

LATHAM & WATKINS LLP
DAVID J. SCHINDLER
MANUEL A. ABASCAL
DANIEL MERON
ABID R. QURESHI

By: /s/ David J. Schindler
     David J. Schindler
     Attorneys for United Defendants

BARTLIT BECK LLP
Philip S. Beck (appearing *pro hac vice*)
 *philip.beck@bartlitbeck.com*
Sean W. Gallagher (appearing *pro hac vice*)
 *sean.gallagher@bartlitbeck.com*
Cindy L. Sobel (appearing *pro hac vice*)
 *cindy.sobel@bartlitbeck.com*
Nicolas Martinez (appearing *pro hac vice*)
 *nicolas.martinez@bartlitbeck.com*
Benjamin R. Montague (appearing *pro hac vice*)
 *benjamin.montague@bartlitbeck.com*
54 W. Hubbard Street, Suite 300
Chicago, Illinois 60654-8174
Telephone: +1.312.494.4400
Facsimile: +1.312.494.4440

BARTLIT BECK LLP
Andrew C. Baak (appearing *pro hac vice*)
 *andrew.baak@bartlitbeck.com*
Jameson R. Jones (appearing *pro hac vice*)
 *jameson.jones@bartlitbeck.com*
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202-6318
Telephone: +1.303.592.3100
Facsimile: +1.303.592.3140

*Attorneys for United Defendants*

1

**CERTIFICATE OF COMPLIANCE WITH LENGTH LIMITATION**

2      The undersigned, counsel of record for Defendants, hereby certifies that this

3   memorandum of points and authorities contains 35 pages, which complies with the page

4   limit set by court order dated March 13, 2025.

5

6   Dated: May 2, 2025                    /s/ David J. Schindler
                                          David J. Schindler
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28