**ARNALL GOLDEN GREGORY LLP**
Richard T. Collins (Bar No. 166577)
  rich.collins@agg.com
Jennifer L. Shelfer (*Pro Hac Vice Pending*)
  jennifer.shelfer@agg.com
Kelley C. Chandler (*Pro Hac Vice Pending*)
  kelley.chandler@agg.com
2100 Pennsylvania Avenue, NW
Suite 350S
Washington, D.C. 20037
Phone: (202) 677-4030

Attorneys for *Amici Curiae* Members of Congress

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, <br><br> Plaintiff, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC. *et al.*, <br><br> Defendants. | **Case No.: 2:16-cv-08697-FMO-PVCx** <br><br> *Assigned to Hon. Fernando M. Olguin* <br><br> **NOTICE OF MOTION AND MOTION BY CERTAIN MEMBERS OF CONGRESS FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR REVIEW OF SPECIAL MASTER'S REPORT AND RECOMMENDATION** <br><br> (Related to ECF Nos. 631, 636, 638) <br><br> Date: June 5, 2025 <br> Time: 10:00 a.m. <br> Courtroom: 6D <br> 350 W. First Street St. <br> Los Angeles, CA 90012 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on or before the scheduled hearing in the above-captioned matter, on June 5, 2025, at 10:00 a.m., before the Honorable Fernando M. Olguin, in Courtroom 6D, located at 350 W. First Street, Los Angeles, California 90012, *Amici Curiae* Members of Congress will, and hereby do, move this Court for leave to file an *amicus curiae* brief in response to the Special Master's Report and Recommendation regarding Defendant UnitedHealth Group's ("United") motion for summary judgment and Plaintiff United States of America *ex rel.* Benjamin Poehling's ("Plaintiff") cross motion for summary judgment (ECF 631), and in support of Plaintiff's motion for review of Special Master's Report and Recommendation (ECF 636) and in response to United's opposition to the motion (ECF 638), which are scheduled to be heard at the above-referenced date, time, and location.

This motion is made following the conference of counsel for all parties to the litigation and for *amici curiae*, which took place pursuant to Local Rule 7-3, on May 9, 12 and 13, 2025. Counsel for *amici curiae* contacted counsel for the parties and proposed a stipulation for leave to file their brief and followed up with email correspondence setting forth *amici curiae's* interest in the litigation and why their brief would be desirable and relevant to the disposition of the litigation. Counsel for *amici curiae* was unable to reach a stipulation prior to filing this motion.

*Amici curiae* are Members of Congress who are responsible for creating and maintaining the Medicare program through legislation, funding, and oversight, including ensuring its long-term solvency. With Congress focused on eliminating waste, fraud, and abuse, as well as ensuring the health and safety of American seniors who are paying for United's Medicare Advantage ("MA") plans, they have an interest in this litigation because United maintains a dominant share of the MA market and the MA program's ever-increasing cost poses an existential threat to the solvency of the Medicare program and increases the cost to all Medicare beneficiaries.

*Amici curiae's* brief would be desirable to the Court and relevant to the disposition of the case. The Medicare Payment Advisory Commission ("MedPAC") provides an annual status report to Congress on the MA program. The most recent report highlights the exponential growth of the MA program and the higher payments to MA plans, and it underscores the need for reforms to ensure fiscal sustainability and equitable payment policies. The higher payments to MA plans increase Medicare spending and Part B premiums for all beneficiaries, including those in traditional fee-for-service ("FFS") Medicare. MedPAC estimates that MA plans will be *overpaid* by $1.2 trillion between 2025-2034, with $520 billion coming from the Medicare Hospital Insurance trust that funds Medicare Part A. The two largest factors responsible for higher payments to plans in recent years are favorable selection and coding intensity, both of which are at issue in this case, as explained in *amici curiae's* brief.

United is the nation's largest insurer of MA plans, with 28% market share nationally and 42% market share in metropolitan statistical areas ("MSAs"). United's risk factor is 70% higher than the rest of the MA industry average, and its members' sickness scores on average increased 55% in their first year in MA plans, which far outpaced the 7% year-over-year rise in the sickness scores of patients who stayed in traditional FFS Medicare. These risk factors and sickness scores are driven by the *post hoc* diagnoses of United's coders, and have resulted in tens of billions of dollars in additional MA payments to United. These overpayments not only affect the federal budget, but they also affect the premiums paid by Medicare beneficiaries and the solvency of a key funding source—the Medicare Hospital Insurance trust fund. Accepting the Special Master's R&R would set a negative precedent and further embolden United in its fraudulent upcoding practices

This motion is based on the below memorandum of points and authorities, the proposed *amicus curiae* brief attached hereto, the pleadings and papers on file in this action, and upon such other and further matters as the Court may deem appropriate.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     This Court Has Discretionary Authority to Permit *Amicus Curiae* Briefs

Federal district courts have broad discretion to allow parties to participate in lawsuits as *amici curiae*. *See Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). Based on this broad discretion, federal district courts liberally allow parties to participate as *amici curiae*. *See, e.g., Stoyas v. Toshiba Corp.*, No. 15-CV-4194 DDP (JCX), 2021 WL 2315200, at *1 (C.D. Cal. June 7, 2021) ("[I]t is preferable to err on the side of permitting such [amicus] briefs … [i]f an amicus brief that turns out to be unhelpful is filed, the [Court] . . . can then simply disregard the brief. On the other hand, if a good brief is rejected, the [Court] will be deprived of a resource that might have been of assistance."); *see also Levin Richmond Terminal Corp. v. City of Richmond*, 482 F. Supp. 3d 944, 951 n.1 (N.D. Cal. 2020) (holding that district courts have broad discretion to appoint *amici curiae*, and accordingly granting non-parties' motions for leave to file *amici curiae* briefs during a motion to dismiss proceeding).

"'An *amicus* brief should normally be allowed' when, among other considerations, 'the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide.'" *Re2con, LLC v. Telfer Oil Co.,* No. 2:10-cv-00786-KJM-KJN, 2012 WL 6570902 at *1 (E.D. Cal. Dec. 17, 2012) (quoting *Cmty. Ass'n for Restoration of Env't (CARE) v. DeRuyter Bros. Dairy,* 54 F. Supp. 2d 974, 975 (E. D. Wash. 1999)); *In re Roxford Foods Litig.,* 790 F. Supp. 987, 997 (E.D. Cal. 1991) ("[A]n individual seeking to appear as *amicus* must merely make a showing that his participation is useful to or otherwise desirable to the court.") (quoting *United States v. Louisiana,* 751 F. Supp. 608, 620 (E.D. La. 1990)). Here *amici curiae* fulfill the "classic role" of an *amicus curiae* to "assist[] in a case of general public interest, supplementing the efforts of counsel, and drawing the court's attention to law that escaped consideration." *Miller-Whol Co., Inc. v. Comm'r of Labor and Indus. State of Mont.*, 694 F.2d 203, 204 (9th

Cir. 1982).

Though there is no rule for the filing of *amicus* briefs in the district court, the court may look to Federal Rule of Appellate Procedure 29 for guidance. Rule 29 provides that an officer of the United States, like the *amici curiae* Members of Congress, may file an *amicus curiae* brief without leave of court or the need for a stipulation by all parties to the litigation. Fed. R. App. P. 29(a)(2). Rule 29 also allows the Court to specify a later timeline for filing and to provide time for an opposing party to answer. *Id.* at 29(a)(6). As provided in Rule 29, *amici curiae's* proposed brief explains "the movant's interest" in the case, and explains "the reason why an *amicus* brief is desirable and why the matters asserted are relevant to the disposition of the case." *Id.* at 29(a)(3).

## II. Summary of Proposed Brief

The Court should allow this case to proceed to jury trial in a public courtroom. Plaintiff has presented ample evidence for the Court to find a triable issue of material fact to mandate denial of United's motion and to warrant a jury trial on the merits.

In corporate settings far removed from any healthcare facility and completely untethered to the care actually rendered to any patient, MA insurers like United review medical charts and *upcode* the medical diagnoses first issued by the healthcare providers actually treating the patient.[1] Significantly, the patient receives no extra care, treatment, or benefit of any kind from United's chart review or its *post-hoc*

---

[1] The irony that United engages in this practice when payment flows from the federal government's coffers *to United* on healthcare claims is as thick as United's expert coder's audit file. In the private payor space when United is paying healthcare claims, United calls this practice fraud because that is exactly what it is. *See, e.g.*, Paige Minemyer, *UnitedHealth lawsuit claims TeamHealth upcoded claims for $100M in fraud*, https://www.fiercehealthcare.com/payer/unitedhealth-lawsuit-claims-teamhealth-upcoded-claims-for-100m-fraud (Oct. 28, 2021) ("The suit . . . claims the company purposefully upcoded for tens, if not hundreds, of thousands of medical claims."). In fact, when it is United's money at issue—as opposed to the money of the federal government and the American taxpayer—United has lambasted this exact same practice it admits to engaging in. *Id.* ("It is TeamHealth's coders who decide which codes to utilize, applying TeamHealth's policies. It is TeamHealth that submits claims to insurance companies . . . And it is TeamHealth—not the medical groups or the doctors or other providers—that keeps the profits from its fraudulent billing.").

manipulation of the patient's diagnoses. Yet United engages in this practice for one very simple and nefarious reason: to receive higher payments from the federal government. Indeed, an OIG Report found that 20 of 162 MA insurers derived $9.2 billion in payments from diagnoses identified during chart reviews. Proposed legislation is pending to bar CMS from using diagnoses collected from chart reviews to adjust MA payments.

Here, the record demonstrates that United's own expert coders reviewed medical records and *did not find support for 1.97 million diagnosis codes that United submitted to CMS for payment*. (ECF 636 at 15-17.) That evidence alone should have ended the inquiry. But the Special Master seems to have been persuaded by United's curious and self-inflicted attack on the credibility of their own expert coders' audits. (*Id.* at 17-18.) The conclusions of United's *own coders* constitutes credible evidence that should be considered and weighed by a jury. Indeed, this type of evidence-weighing should be deferred to trial and play no role in summary judgment. It appears, however, that the Special Master undertook weighing of the evidence when it was in conflict, rather than ending the inquiry, finding a triable issue of material fact, and denying United's motion. (*Id.* at 18-20.)

Setting aside that United's internal analysis found that it was submitting unsubstantiated diagnosis codes and claims for payment to CMS, it is vital to understand the widespread impact of United's leeching of the MA program. As noted above, MedPAC's report to Congress highlights the exponential growth of the MA program and the higher payments to MA plans, which increases Medicare spending and Part B premiums for all beneficiaries, including those in traditional FFS Medicare. According to MedPAC's report, the two largest factors responsible for higher payments to plans in recent years are favorable selection and coding intensity, both of which are at issue in this case and both drive the fraud, waste and abuse in the MA program.

United is the nation's largest insurer of MA plans. Its risk factor scores and the

sickness scores of its members are not only higher than the MA industry average, but they far outpace the year-over-year rise in the sickness scores of patients who stayed in traditional FFS Medicare. These scores are driven by the diagnoses identified by United's Monday morning quarterbacking coders, not by any healthcare professional actually treating a member. This results in tens of billions of dollars in additional MA payments to United. These overpayments not only affect the federal budget, but they also affect the premiums paid by Medicare beneficiaries and the solvency of a key funding source—the Medicare Hospital Insurance trust fund. Accepting the Special Master's Report and Recommendation would set a negative precedent and further embolden United in its fraudulent upcoding practices.

Despite receiving billions of dollars in additional payments, MA insurers like United refuse to provide their enrollees with access to quality care and limit their access to high-rated hospitals and facilities. United invests its ill-gotten gains in technology such as AI to deny post-acute care requests, harming elderly enrollees, and United now faces litigation for AI-driven denials of post-acute care. United's fraudulent upcoding has resulted in severe overpayments of millions of federal dollars to United with no added benefit to its Medicare beneficiaries.

### III. Conclusion

The *amici curiae* request that the Court reject the Special Master's Report and Recommendation, deny United's motion for summary judgment, and allow the case to proceed to jury trial. The MA program needs reforms to ensure the fiscal sustainability of the Medicare program and to address fraud, waste, and abuse by corporate health insurers. But that reform can start internally at United when it is held to account for the largescale fraud it has committed against CMS. United's dominant market share and its adept exploitation of the MA program through its unscrupulous practices harm American seniors and taxpayers while United steals money on inflated claims it submits to CMS. The *amici curiae* urge the Court to allow the case to proceed to jury trial to address these issues in a public courtroom, with all of the evidence

before the jury to analyze and render a verdict.

Date: May 15, 2025                              **ARNALL GOLDEN GREGORY LLP**

By: */s/ Richard T. Collins*
Richard T. Collins
Attorneys for *Amici Curiae*
Members of Congress