**ARNALL GOLDEN GREGORY LLP**
Richard T. Collins (Bar No. 166577)
  rich.collins@agg.com
Jennifer L. Shelfer (*Pro Hac Vice Pending*)
  jennifer.shelfer@agg.com
Kelley C. Chandler (*Pro Hac Vice Pending*)
  kelley.chandler@agg.com
2100 Pennsylvania Avenue, NW
Suite 350S
Washington, D.C. 20037
Phone: (202) 677-4030

*Counsel for Amici Curiae Members of Congress*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>Plaintiff,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC., *et al.*,<br><br>Defendants. | **Case No.: 2:16-cv-08697-FMO-PVC**<br><br>*Assigned to Hon. Fernando M. Olguin*<br><br>**PROPOSED *AMICI CURIAE* BRIEF OF CERTAIN MEMBERS OF CONGRESS IN OPPOSITION TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION REGARDING MOTION FOR SUMMARY JUDGMENT AND MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>(Related to ECF Nos. 631, 636, 638)<br><br>Date: June 5, 2025<br>Time: 10:00 a.m.<br>Courtroom: 6D<br>350 W. First Street St.<br>Los Angeles, CA 90012 |

**Table of Contents**

STATEMENT OF INTEREST ................................................................................................- 1 -

I. INTRODUCTION ........................................................................................................- 1 -

II. ARGUMENT ................................................................................................................- 4 -

    A. Fraud, Waste, and Abuse Threaten the Fiscal Sustainability of the Medicare Program ..............................................................................................................- 4 -

        1. MA Has Failed to Achieve Its Initial Aims Despite Costs Growing Exponentially Compared to Traditional Medicare .................................- 4 -

        2. The MA Program Is Rampant with Fraud, Waste, and Abuse................- 5 -

    B. MA Insurers' Abuse Harms American Seniors and Taxpayers ..........................- 7 -

    C. United Poses an Existential Threat to Medicare ...................................................- 9 -

        1. United Imposes the Heaviest Burden on Medicare.................................- 9 -

        2. United Harms MA Enrollees by Refusing to Use the Unjustified Funds It Receives to Pay for Their Care ...............................................- 10 -

    D. The Court Should Allow the Present Case to Proceed to Jury Trial..................- 12 -

        1. The Government Has Presented Ample Evidence for the Court to Allow This Case to Proceed to Jury Trial .............................................- 12 -

        2. The Special Master's R&R Would Set a Negative Precedent and Embolden Insurers' Bad Faith Conduct................................................- 13 -

III. CONCLUSION ...........................................................................................................- 14 -

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
1775 PENNSYLVANIA AVENUE NW, 10TH FLOOR
WASHINGTON, DC 20006
TELEPHONE: (202) 677.4030
WWW.AGG.COM

i

PROPOSED *AMICI CURIAE* BRIEF OF CERTAIN MEMBERS OF CONGRESS IN OPPOSITION TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION

# Table of Authorities

**Page(s)**

**Cases**

*Estate of Gene B. Lokken v. UnitedHealth Group Inc.*,
   No. 0:23-cv-03514 (Dist. Minn 2025) .............................................................................. 11

*United Healthcare Services, Inc. v. Team Health Holdings, Inc.*,
   Case No. 3:21-cv-00364 (E.D. Tenn., filed Oct. 27, 2021) ....................................................... 2

**Statutes**

31 U.S.C. § 3729(a)(1)(G) ................................................................................................... 12

**Other Authorities**

Christopher Weaver & Anna W. Mathews, *UnitedHealth Group is Under Criminal Investigation for Possible Medicare Fraud*, WALL ST. J., May 14, 2025 .............................. 10

Christpher Weaver, *et al.*, *Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated*, WALL ST. J., July 8, 2024 ...................................................... 8, 13

Committee for a Responsible Budget, Medicare Advantage Will Be Overpaid by $1.2 Trillion (March 26, 2025), at https://www.crfb.org/blogs/medicare-advantage-will-be-overpaid-12-trillion. ............................................................................. 5, 6

The Commonwealth Fund, The State of Health Insurance Coverage in the U.S. (Nov. 21, 2024), at https://www.commonwealthfund.org/publications/surveys/2024/nov/state-health-insurance-coverage-us-2024-biennial-survey. ............................................................ 7

Erika Fry, *How UnitedHealthcare and other mega-insurers came to dominate the $4.5 trillion health care industry that Americans both hate and rely upon,* FORTUNE (Dec. 14, 2024), at https://fortune.com/2024/12/14/unitedhealthcare-brian-thompson-health-insurance/ .............................................................................. 10

Hannah O. James, MS *et al.*, Medicare Advantage Enrollment and Disenrollment Among Persons With Alzheimer Disease and Related Dementias, JAMA Health Forum (Sep. 15, 2023), at https://jamanetwork.com/journals/jama-health-forum/fullarticle/2809665#249242500. ...................................................................... 8

U.S. Office of the Inspector General, *Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments to Disproportionately Drive Payments* (Sept. 2021) ........................................................................................... 6, 9

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
1775 PENNSYLVANIA AVENUE NW, 10TH FLOOR
WASHINGTON, DC 20006
TELEPHONE: (202) 677.4030
WWW.AGG.COM

Ltr. from Sen. E. Warren and U.S. Rep. P. Jayapal to CMS (Jan. 25, 2025) ("Warren Ltr."), at https://www.warren.senate.gov/imo/media/doc/2024.01.25%20Letter%20to%20CMS%20on%20Medicare%20Advantage%20overpayments.pdf. ...................................... 4

Ltr. from U.S. Rep. P. Jayapal *et al.* to CMS (March 27, 2025), at https://jayapal.house.gov/wp-content/uploads/2025/03/25.03.27-2025-Letter-to-CMS-HHS-on-Medicare-Advantage-Final.pdf. ............................................................................... 4

MedPAC, Report to the Congress (March 2025) at https://www.medpac.gov/document/march-2025-report-to-the-congress-medicare-payment-policy/ ................................................................................ 3, 4, 5, 7

Nancy Ochieng & Jeannie Fuglesten Biniek, *Beneficiary Experience, Affordability, Utilization, and Quality in Medicare Advantage and Traditional Medicare: A Review of the Literature*, Kaiser Family Found. (Sep. 16, 2022), at https://www.kff.org/medicare/report/beneficiary-experience-affordability-utilization-and-quality-in-medicare-advantage-and-traditional-medicare-a-review-of-the-literature/. .................................................................................................... 8

Paige Minemyer, *UnitedHealth lawsuit claims TeamHealth upcoded claims for $100M in fraud*, at https://www.fiercehealthcare.com/payer/unitedhealth-lawsuit-claims-teamhealth-upcoded-claims-for-100m-fraud (Oct. 28, 2021). ......................... 2

Reed Abelson & Margot Sanger-Katz, *'The Cash Monster Was Insatiable': How Insurers Exploited Medicare for Billions*, N.Y. TIMES, Oct. 8, 2022 ..................................... 10

Committee for a Responsible Federal Budget, *Medicare Advantage Will Be Overpaid by $1.2 Trillion* (Mar. 26, 2025) .............................................................. 6

S.1105 — 119th Congress (2025-2026), No UPCODE Act, Introduced March 25, 2025, at https://www.congress.gov/bill/119th-congress/senate-bill/1105/text. ..................... 7

U.S. Government Accountability Office, Report to Congressional Requesters, *CMS Should Use Data on Disenrollment and Beneficiary Health Status to Strengthen Oversight* (April 2017), at https://www.gao.gov/assets/gao-17-393.pdf. ............................ 8, 9

U.S. Senate, *Refusal of Recovery: How Medicare Advantage Insurers Have Denied Patients Access to Post-Acute Care* (Oct. 17, 2024) ......................................................... 11, 13

UnitedHealth Group, UnitedHealth Group Reports 2024 Results (Jan. 16, 2025), at https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2024/2025-16-01-uhg-reports-fourth-quarter-results.pdf ................................................................... 9

**STATEMENT OF INTEREST**

Certain Members of Congress [1] hereby submit this *Amici Curiae* brief in response to the Special Master's Report and Recommendation ("R&R"), in opposition to Defendant UnitedHealth Group's ("United") motion for summary judgment, and in support of Plaintiff's motion for review of the R&R (ECF 636). *Amici curiae* are responsible for creating and maintaining the Medicare program, including the Medicare Advantage ("MA") program, through legislation, funding, and oversight, including ensuring its long-term solvency.

*Amici curiae* represent the elderly and the disabled with respect to legislation that ensures an expedient and cost-effective healthcare system. The issues underpinning this case could have a significant impact on the fiscal sustainability of Medicare, the American taxpayers, and vulnerable populations in need of proper medical care. With Congress focused on protecting American taxpayers from fraud, waste and abuse, as well as ensuring the health and safety of American seniors who are paying for United's MA plans, *amici curiae* have an interest in this litigation. United maintains a dominant share of the MA market, and the MA program's ever-increasing cost poses an existential threat to the solvency of the Medicare program. United's practices increase the cost to all Medicare beneficiaries. *Amici curiae's* brief would be desirable to the Court and relevant to the disposition of the case.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

This case presents an irony that would leave Shakespeare envious. In the private payor space, when United's money is at stake to pay healthcare claims, United questions the diagnoses, the medical necessity of treatment, and scrutinizes

---

[1] Yassamin Ansari, Becca Balint, Greg Casar, Steve Cohen, Valerie Foushee, Sylvia Garcia, Jesús G. "Chuy" García, Maggie Goodlander, Val Hoyle, Glenn Ivey, Pramila Jayapal, Henry C. "Hank" Johnson, Jr., Sydney Kamlager-Dove, Ro Khanna, James P. McGovern, LaMonica McIver, Eleanor Holmes Norton, Ilhan Omar, Chellie Pingree, Delia Ramirez, Jan Schakowsky, Mark Takano, Rashida Tlaib, Jil Tokuda, Derek Tran, Nydia M. Velázquez, Bonnie Watson Coleman, Nikema Williams

- 1 -
PROPOSED *AMICI CURIAE* BRIEF OF CERTAIN MEMBERS OF CONGRESS IN OPPOSITION TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION

each jot and tittle on the claim forms submitted by healthcare providers, resulting in underpayments and claim denials. Of course, those healthcare providers actually know and care for their patients because they have treated them. And those same providers must verify that all codes are accounted for and properly submitted on a claim form to have a hope of receiving fair reimbursement. When professional medical coders assist in that process, United cries "fraud," accuses the healthcare provider of upcoding and submitting fraudulent claims for payment, and then puts its own expert coders to work to scour claim forms to back up its allegations.[2]

Yet, when United is not footing the bill to reimburse healthcare providers for treatment rendered but instead stands to be *paid* by the federal government for treatment rendered, such as in its role as a participant in the MA program, United takes an entirely different tack. It deploys its expert coders to "find" diagnoses that the trained healthcare providers simply "missed." United then uses those diagnoses to deliberately bloat the claims it submits for reimbursement through the MA program. To be clear, the patients receive no additional care, no additional treatment, and patient outcomes fare no better when United upcodes these claims. The physician is not consulted about allegedly mis-diagnosing its patient, and quality of care does not improve or change one bit. Rather, United upcodes these claims solely to inflate its receivables from CMS's coffers.

The Court should allow this case to proceed to jury trial in a public courtroom. United's practice of having its coders review patient charts in search of diagnoses to bill should not be conducted under cover of darkness, but should be

---

[2] *See, e.g.*, *United Healthcare Services, Inc. v. Team Health Holdings, Inc.*, Case No. 3:21-cv-00364, ECF No. 1 at ¶ 1 (E.D. Tenn., filed Oct. 27, 2021) ("Since at least 2016, TeamHealth has covertly and methodically engaged in a classic form of healthcare fraud called upcoding. Upcoding occurs when a healthcare provider submits a claim to an insurer or claim administrator utilizing a [CPT] code that misrepresents the services provided, thus using the code to deceive the insurer or claim administrator into overpaying. Here, TeamHealth has deliberate upcoded tens, if not hundreds, of thousands of claims to the United Plaintiffs . . . resulting in United Plaintiffs overpaying TeamHealth by more than one hundred million dollars."); Paige Minemyer, *UnitedHealth lawsuit claims TeamHealth upcoded claims for $100M in fraud*, at https://www.fiercehealthcare.com/payer/unitedhealth-lawsuit-claims-teamhealth-upcoded-claims-for-100m-fraud (Oct. 28, 2021).

explained and scrutinized in the light of a federal courtroom. Plaintiff has presented ample evidence for the Court to find a triable issue of material fact and deny United's motion in favor of a jury trial on the merits. Indeed, the record demonstrates that United's own expert coders reviewed medical records and *did not find support for* **1.97 million diagnosis codes** that United submitted to CMS for payment. (ECF 636 at 15-17.) But the Special Master seems to have been persuaded by United's curious attack on the credibility of its own audits. *(Id.* at 17-18.) The conclusions of United's coders, however, are credible pieces of evidence that should be considered and weighed by a jury, not by the Special Master on summary judgment. Yet, it appears the Special Master weighed the evidence when it was in conflict, rather than ending the inquiry, finding a triable issue of material fact, and denying United's motion. (*Id.* at 18-20.)

The Medicare Payment Advisory Commission ("MedPAC") annually reports to Congress on the MA program. The most recent report highlights the program's exponential growth and higher payments to MA plans, while underscoring the need for reforms for fiscal sustainability and equitable payment policies.[3] Higher payments to MA plans increase Medicare spending and Part B premiums for all beneficiaries, including those in traditional fee-for-service ("FFS") Medicare. MedPAC estimates MA plans will be *overpaid* by $1.2 trillion between 2025-2034, with $520 billion paid by the Medicare Hospital Insurance trust that funds Medicare Part A. According to the report, these higher payments to plans are largely due to favorable selection and coding intensity, both of which are at issue in this case and both drive the fraud, waste and abuse in the MA program.

United is the nation's largest insurer of MA plans, with 28% market share nationally and 42% market share in metropolitan statistical areas ("MSAs"). United's risk factor is 70% higher than the rest of the MA industry average, and its

---

[3] MedPAC, Executive Summary, Report to the Congress, *Medicare Payment Policy*, (March 2025) at xiii, at https://www.medpac.gov/document/march-2025-report-to-the-congress-medicare-payment-policy/ (hereinafter "MedPAC Report").

- 3 -
PROPOSED *AMICI CURIAE* BRIEF OF CERTAIN MEMBERS OF CONGRESS IN OPPOSITION TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION

members' sickness scores on average increased 55% in their first year in MA plans, which far outpaced the 7% year-over-year rise in the sickness scores of patients who stayed in traditional FFS Medicare. These risk factors and sickness scores are driven by the *post hoc* diagnoses of United's coders, and have resulted in tens of billions of dollars in additional MA payments to United. These overpayments not only affect the federal budget, but they also affect the premiums paid by Medicare beneficiaries and the solvency of a key funding source—the Medicare Hospital Insurance trust fund. Accepting the Special Master's R&R would set a negative precedent and further embolden United in its fraudulent upcoding practices.

## II. ARGUMENT

### A. Fraud, Waste, and Abuse Threaten the Fiscal Sustainability of the Medicare Program

#### 1. MA Has Failed to Achieve Its Initial Aims Despite Costs Growing Exponentially Compared to Traditional Medicare

The MA Program was supposed to decrease costs and increase access to healthcare for elderly and disabled Americans, while simultaneously adding efficiency to the healthcare system. Corporate health insurers like United have guaranteed MA's failure by wringing the program dry with their insatiable appetite for profit. MedPAC's report notes that the goal for MA was to expand access to high-quality care and ensure the MA program "obtains good value for its expenditures."[4] In reality, however, the growing costs of the MA program threaten the viability of the Medicare program as a whole and the solvency of the Medicare Trust Funds.[5] Notably, MA has not "delivere[d] savings since its inception."[6]

---

[4] *Id.*

[5] *See* Ltr. from U.S. Rep. P. Jayapal *et al.* to CMS (March 27, 2025), at 1 (hereinafter, "Jayapal Ltr."), at https://jayapal.house.gov/wp-content/uploads/2025/03/25.03.27-2025-Letter-to-CMS-HHS-on-Medicare-Advantage-Final.pdf.

[6] *See* Ltr. from Sen. E. Warren and U.S. Rep. P. Jayapal to CMS, at 1 (Jan. 25, 2025) ("Warren Ltr."), at https://www.warren.senate.gov/imo/media/doc/2024.01.25%20Letter%20to%20CMS%20on%20Medicare%20Advantage%20overpayments.pdf.

MedPAC estimates that this year alone, the Medicare program "will spend 20 percent more for MA enrollees than it would spend if those beneficiaries were enrolled in FFS Medicare, a difference that translates into *a projected $84 billion*."[7]

Despite the increase in government spending for the MA program, there is little evidence to suggest that the program has increased access to quality care or efficiency in the healthcare system. In fact, MA plans offer lower quality networks and less access to care—leading to higher mortality rates in some circumstances.[8] MA enrollment has increased two-fold since 2010, and in 2024, 54% of eligible Medicare beneficiaries enrolled in MA.[9] Giving the increasing enrollment numbers, costs, and lack of increased positive health outcomes associated with MA, it is imperative to enforce laws that will help protect the overall solvency of the Medicare program, which is expected to run a deficit beginning in 2029,[10] and to achieve the purposes underpinning the creation of the MA program.

### 2.   The MA Program Is Rampant with Fraud, Waste, and Abuse

Private insurers' administration of Medicare threatens the purpose behind the MA program, expands the privatization of healthcare, and incentivizes fraud, waste, and abuse. Government administered medical care was intended for the benefit of the American people and not for the benefit of corporate insurers that collect and retain overpayments derived from fraudulent practices—often through submitting unsupported diagnostic data ("upcoding") to the tune of billions of dollars per year.[11] Over the course of the next 10 years, overpayments to insurers are estimated to rise to *$1.2 trillion*.[12] These are staggering amounts, all of which should be spent improving the American healthcare system, not lining corporate

---

[7] MedPAC Report, *The Medicare Advantage Program: Status Report*, Ch. 11, at 320, at https://www.medpac.gov/wp-content/uploads/2025/03/Mar25_Ch11_MedPAC_Report_To_Congress_SEC.pdf.
[8] Warren Ltr. at 7.
[9] MedPAC Report, *The Medicare Advantage Program: Status Report*, Ch. 11, at 330.
[10] Jayapal Ltr. at 2.
[11] MedPAC Report, *The Medicare Advantage Program: Status Report*, Ch. 11, at 331.
[12] *See* Committee for a Responsible Budget, Medicare Advantage Will Be Overpaid by $1.2 Trillion (March 26, 2025), at https://www.crfb.org/blogs/medicare-advantage-will-be-overpaid-12-trillion.

health insurers' pockets.

MA insurers primarily engage in fraud and abuse by taking advantage of the MA risk assessment process and by upcoding diagnoses so they can receive exorbitant MA payments. Consistent with the evidence from United's coders, MA insurers perform a diagnostic chart review process in which they identify diagnoses that a healthcare provider never submitted.[13] When United "adds on" these diagnoses, it does so solely to leech more money from the government. No additional treatment or healthcare services are provided to the patient. Thus, United systematically submits claims for payment to the government for services that were not rendered in violation of the False Claims Act ("FCA").

As the U.S. Office of Inspector General (OIG) noted in a 2021 Report, the "risk adjust[ed] payments by using beneficiaries' diagnoses to pay higher capitated payments . . . may create financial incentives for MA companies to make beneficiaries appear as sick as possible."[14] The same report found that 20 of the 162 MA insurers in existence at the time derived *$9.2 billion* in payments from diagnoses identified during the *post hoc* chart review process.[15] A more recent article by the Committee for a Responsible Federal Budget projected insolvency of the Medicare Hospital Insurance trust fund's by 2036, and encouraged lawmakers to reform MA, reduce overpayments to private insurers, and "reduce overall waste and abuse in the program."[16]

U.S. Legislators are also actively weighing in on insurers' fraudulent upcoding practices. A recent bill introduced in the Senate, the "No Unreasonable Payments, Coding, Or Diagnoses for the Elderly Act or the No UPCODE Act,"

---

[13] Office of Inspector General, *Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments to Disproportionately Drive Payments,* OEI-03-17-00474 (Sept. 2021), at https://oig.hhs.gov/oei/reports/OEI-03-17-00474.pdf (hereinafter, "OIG Report").
[14] *Id.*
[15] *Id.*
[16] Committee for a Responsible Federal Budget, *Medicare Advantage Will Be Overpaid by $1.2 Trillion* (Mar. 26, 2025), at https://www.crfb.org/blogs/medicare-advantage-will-be-overpaid-12-trillion.

would bar CMS from using diagnoses collected from chart reviews to adjust payments, and would require CMS to account for differences in coding patterns between MA and traditional Medicare when determining payment adjustments.[17] As certain Members of Congress have consistently noted to CMS, these wasteful practices are jeopardizing Medicare as a whole and must be addressed for the program to remain viable.[18]

### B.  MA Insurers' Abuse Harms American Seniors and Taxpayers

MA insurers' fraud and abuse cannot be understated. Its impact is deep and wide and borne by American taxpayers and American seniors. MA overpayments are entirely "financed by the taxpayers and beneficiaries who fund the Medicare program."[19] MedPAC "estimates that Part B premium payments will be about $13 billion higher in 2025 because of higher Medicare payments to MA plans (equivalent to roughly $198 per beneficiary per year)."[20] Astonishingly, even with this sheer volume of taxpayer money flowing into the insurance ecosystem, the Commonwealth Fund's 2024 Biennial Health Insurance Survey found that 23% of U.S. working-age adults were "underinsured, meaning they had coverage for a full year that didn't provide them with affordable access to healthcare."[21]

Overpayments and a crippling financial burden aren't the end of the story for the American taxpayers and seniors. There is no upside, no return on their massive investment. MA insurers do not provide their enrollees access to high-quality hospitals, healthcare providers, facilities, networks, and necessary treatments for complicated diagnoses (*e.g.*, rare cancers).[22] A comprehensive report by the Kaiser Family Foundation in 2022 details where the MA program performs worse than

---

[17] *See* S.1105 — 119th Congress (2025-2026), No UPCODE Act, Introduced March 25, 2025, at https://www.congress.gov/bill/119th-congress/senate-bill/1105/text.
[18] *See* Warren Ltr.; Jayapal Ltr.
[19] MedPAC Report, *The Medicare Advantage Program: Status Report*, Ch. 11, at 321.
[20] *Id.* at 331.
[21] The Commonwealth Fund, The State of Health Insurance Coverage in the U.S. (Nov. 21, 2024), at https://www.commonwealthfund.org/publications/surveys/2024/nov/state-health-insurance-coverage-us-2024-biennial-survey.
[22] Warren Ltr. at 7.

- 7 -
PROPOSED *AMICI CURIAE* BRIEF OF CERTAIN MEMBERS OF CONGRESS IN OPPOSITION TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION

traditional Medicare, and indicates that MA enrollees receive less high-quality care and access to the highest-rated hospitals for cancer care, skilled nursing facilities, and home health agencies.[23]

The inability to access care has caused some of the most sick and vulnerable Americans to disenroll from the MA program.[24] For example, enrollees with Alzheimer's disease and dementia have "consistently higher rates of contract exit and switch to traditional Medicare" compared to other beneficiaries.[25] Further, according to an analysis conducted by the Wall Street Journal under a research agreement with the federal government and the review of a vast number of available medical records, United enrollees were 15 times more likely to have been diagnosed with diabetic cataracts—a *rare* diagnosis that *increases* the base pay rate per member significantly—than the average patient in the traditional Medicare program.[26] As early as 2017, the Government Accountability Office urged CMS to use data on disenrollment and health status to inform its oversight of the MA program, noting that its MA survey data indicated that those in poor health "reported problems with coverage of preferred doctors and hospitals as well as problems getting access to care as leading reasons they chose to leave their

---

[23] "Five of six studies . . . that looked at quality ratings of health care facilities and providers used by [MA] enrollees and traditional Medicare beneficiaries found that [MA] enrollees were less likely than traditional Medicare beneficiaries to receive care in the highest- or lowest-rated hospitals overall or in the highest-rated hospitals for cancer care, skilled nursing facilities (SNFs), and home health agencies." Nancy Ochieng & Jeannie Fuglesten Biniek, *Beneficiary Experience, Affordability, Utilization, and Quality in Medicare Advantage and Traditional Medicare: A Review of the Literature*, Kaiser Family Found. (Sep. 16, 2022), at https://www.kff.org/medicare/report/beneficiary-experience-affordability-utilization-and-quality-in-medicare-advantage-and-traditional-medicare-a-review-of-the-literature/.

[24] Hannah O. James, MS *et al.*, Medicare Advantage Enrollment and Disenrollment Among Persons With Alzheimer Disease and Related Dementias, JAMA Health Forum (Sep. 15, 2023) at 8, at https://jamanetwork.com/journals/jama-health-forum/fullarticle/2809665#249242500.

[25] *Id.*

[26] "Some diagnoses claimed by insurers were demonstrably false, the Journal found, because the conditions already had been cured. More than 66,000 Medicare Advantage patients were diagnosed with diabetic cataracts even though they already had gotten cataract surgery, which replaces the damaged lens of an eye with a plastic insert." Christpher Weaver, *et al.*, *Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated*, WALL ST. J., July 8, 2024, at https://www.wsj.com/health/healthcare/medicare-health-insurance-diagnosis-payments-b4d99a5d.

- 8 -
PROPOSED *AMICI CURIAE* BRIEF OF CERTAIN MEMBERS OF CONGRESS IN OPPOSITION TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION

contracts."[27] Additionally, MA insurers have recently leveraged artificial intelligence tools to make consequential coverage decisions in an arbitrary manner on behalf of enrollees, denying necessary care to elderly and gravely ill individuals in dire medical circumstances, including those who have experienced stroke, cancer, or who seek end of life care.[28]

Corporate health insurers' abuses have derailed the MA program from its dual aims of "sav[ing] taxpayer dollars and improv[ing] quality of care."[29] American taxpayers are stuck footing the bill and vulnerable individuals have gone without necessary care. Private MA insurers increasingly take advantage of a system that incentivizes them to make their enrollees look as sick as possible,[30] while simultaneously refusing to provide proper coverage for treatment and care of enrollees who desperately need it. Because MA payments are linked to a risk assessment model, which insurers like United have taken advantage of using strategic upcoding tactics, the MA program has resulted in unintended harm to the very individuals it was designed to benefit.

### C. United Poses an Existential Threat to Medicare

#### 1. United Imposes the Heaviest Burden on Medicare

United's disproportionate size imposes the heaviest burden on the Medicare Program. United is the world's most egregious upcoder and chief among the private MA insurers employing fraudulent and abusive tactics to retain funds that rightfully belong either in the Medicare Trust Funds or in the hands of the American taxpayers. United reported over $400 billion in revenues during 2024—an 8%

---

[27] U.S. Government Accountability Office, Report to Congressional Requesters, *CMS Should Use Data on Disenrollment and Beneficiary Health Status to Strengthen Oversight* (April 2017) at 11, 20, at https://www.gao.gov/assets/gao-17-393.pdf.
[28] Jayapal Ltr. at 3.
[29] *Id.* at 1.
[30] OIG Report, n.10, "MA enrollees appear more high risk than enrollees in [traditional Medicare], even when studies show that they are not."

- 9 -
PROPOSED *AMICI CURIAE* BRIEF OF CERTAIN MEMBERS OF CONGRESS IN OPPOSITION TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION

increase year-over-year.[31] Not only is United the largest health insurer in the United States, but it is astoundingly America's fourth largest company and the eighth largest company in the world.[32] This is a matter of great public interest and United's upcoding practices should be examined by a jury and the public.

United's gamesmanship exacerbates the MA program's problems and presents an existential threat to the sustainability of the traditional Medicare program. United has been accused of fraud in several lawsuits, including the present case, by both whistle-blowers and the U.S. government, and the OIG has reported on its overbilling.[33] Now, it is reported that the DOJ is investigating United for criminal Medicare fraud arising out of its MA business practices.[34] Such opportunistic practices by one of the largest companies in the world presents a threat to Medicare's solvency and unnecessary hurdles for taxpayers and the elderly who rely government funded healthcare programs for care. They must trust that such funds are being used efficiently, and that laws designed to prevent defrauding the government are enforced.

### 2. United Harms MA Enrollees by Refusing to Use the Unjustified Funds It Receives to Pay for Their Care

United not only insists it has no obligation to return its ill-gotten federal funds, but it also harms the American people and its MA enrollees, particularly American seniors, by employing those funds to increase its data-driven algorithms and predictive technology to strategically deny requests for post-acute care. Last year, the U.S. Senate Permanent Subcommittee on Investigations released a staff

---

[31] UnitedHealth Group, UnitedHealth Group Reports 2024 Results (Jan. 16, 2025), at https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2024/2025-16-01-uhg-reports-fourth-quarter-results.pdf.

[32] Erika Fry, *How UnitedHealthcare and other mega-insurers came to dominate the $4.5 trillion health care industry that Americans both hate and rely upon,* FORTUNE (Dec. 14, 2024), at https://fortune.com/2024/12/14/unitedhealthcare-brian-thompson-health-insurance/.

[33] Reed Abelson & Margot Sanger-Katz, *'The Cash Monster Was Insatiable': How Insurers Exploited Medicare for Billions*, N.Y. TIMES, Oct. 8, 2022, at https://www.nytimes.com/2022/10/08/upshot/medicare-advantage-fraud-allegations.html.

[34] Christopher Weaver & Anna W. Mathews, *UnitedHealth Group is Under Criminal Investigation for Possible Medicare Fraud*, WALL ST. J., May 14, 2025, at https://www.wsj.com/us-news/unitedhealth-medicare-fraud-investigation-df80667f.

report detailing harrowing findings on insurer's practices (including United's) that have harmed the elderly:

> [MA] insurers are intentionally using prior authorization to boost profits by targeting costly yet critical stays in post-acute care facilities. Insurer denials at these facilities, which help people recover from injuries and illnesses, can force seniors to make difficult choices about their health and finances in the vulnerable days after exiting a hospital.[35]

Regarding United specifically, the report noted:

> (1) [United] was evaluating the use of automated prior authorization procedures; (2) the company knew from testing that at least one of these automation technologies resulted in an increase in the share of those requests being denied; (3) this model was associated with less time spent evaluating prior authorization requests; and (4) the company was interested in reducing the money it spent on human reviewers of cases for the group covering [MA] plans. All of this was taking place as UnitedHealthcare's post-acute care denial rate was set to surge: It went from 10.9 percent in 2020, to 16.3 percent in 2021, to 22.7 percent in 2022.[36]

United now faces class action litigation for its illegal use of artificial intelligence to drive denials of post-acute care for the elderly.[37] Notably, in that class action, the Minnesota District Court recently held that certain common law claims against United were not preempted by the Medicare Act.[38] The Court reached its decision by citing to contract principles, reasoning that its analysis would only require interpretation of *United's contractual promises* to enrollees—including promises to pay all medically necessary expenses and promises that claims decisions would be made by physicians and not by AI algorithms.[39] Those promises were broken. United's pervasive practices of making false statements, its lack of disclosure, its unauthorized retention of government and taxpayer money,

---

[35] U.S. Senate, *Refusal of Recovery: How Medicare Advantage Insurers Have Denied Patients Access to Post-Acute Care*, at 4 (Oct. 17, 2024), at https://www.hsgac.senate.gov/wp-content/uploads/2024.10.17-PSI-Majority-Staff-Report-on-Medicare-Advantage.pdf ("Senate Investigative Report").
[36] *Id.* at 23.
[37] *See* Pls.' First Am. Class Action Compl., *Estate of Gene B. Lokken v. UnitedHealth Group Inc.*, No. 0:23-cv-03514 (Dist. Minn 2025).
[38] Mem. Op. and Order, *Estate of Gene B. Lokken*, No. 0:23-cv-03514 (Dist. Minn 2025).
[39] *Id.* at 3.

- 11 -

and (perhaps most importantly) its denial of coverage for the vulnerable enrollees it promised to insure have caused immeasurable harm to the American people.

### D. The Court Should Allow the Present Case to Proceed to Jury Trial

#### 1. The Government Has Presented Ample Evidence for the Court to Allow This Case to Proceed to Jury Trial

The Court should reject the Special Master's R&R, deny United's motion for summary judgment (ECF 615), and allow a jury to weigh the disputed evidence and render a verdict on the hotly contested factual issues in this case. Plaintiff has adduced sufficient evidence from which a jury could reasonably conclude that United violated the FCA and that its conduct satisfies the reverse false claims provision, which imposes liability where a person "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

By United's own admission, its coders who reviewed medical charts for diagnoses are trained to code at a 95% or above accuracy rate. (ECF 616 at 23.) United disingenuously suggests Plaintiff should have independently reviewed the underlying medical records to support its claims.[40] But this argument ignores that United's own coders reviewed the records multiple times over and it was *United* that found *no support* for the diagnosis codes it submitted for payment.[41] United's dismissively responds that its coders sometimes "miss" codes and that coding complexities may have confused the coders and Plaintiff.[42] Yet, as Plaintiff asserts, United was comfortable relying on the upcoding decisions made by those same coders to generate MA program overpayments.[43] United cannot have it both ways. It cannot argue, on one hand, that chart review is error prone and may be too

---

[40] ECF 616 at 35.
[41] *Id.* at 43.
[42] ECF 623 at 5.
[43] ECF 616 at 44.

complex to consistently identify unsupported codes, while simultaneously maintaining that its additional codes (and associated overpayments) are justifiable. If the coding process is as accurate as the record indicates, a jury will have a reasonable basis to conclude that United knowingly retained overpayments for unjustified diagnosis codes in violation of the FCA. Even so, questions about coding accuracy and validity—as well as questions about expert testimony—go to the weight and credibility of the evidence. Such factual disputes should have the benefit of a jury's consideration.[44]

### 2. The Special Master's R&R Would Set a Negative Precedent and Embolden Insurers' Bad Faith Conduct

As the statistics cited herein demonstrate, bad faith conduct, upcoding, and increased coverage denials are not limited to United—though United is a particularly egregious offender. The analysis conducted by the Wall Street Journal and findings published by the Senate Permanent Subcommittee show that other large MA insurers also engage in diagnostic upcoding and deny coverage for post-acute care at an unusually high rate.[45] A ruling in favor of United would dispose of the present case prematurely before a jury has the opportunity to weigh in on United's conduct, and would embolden other insurers to continue gaming the MA program with practices that harm American taxpayers and the elderly. Plaintiff's legal positions, its evidence, and the principles of fairness and justice demand that the Court allow the present case to proceed to a jury trial. A competent jury composed of a sample group of the very people that United's conduct currently harms, and who the *amici curiae* have sworn to serve and protect, should be permitted to hear and weigh the evidence, and to render judgment with their verdict.

---

[44] *Id.*
[45] Senate Investigative Report, n.31 at 19; Christpher Weaver, *et al.*, *Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated*, WALL ST. J., July 8, 2024, at https://www.wsj.com/health/healthcare/medicare-health-insurance-diagnosis-payments-b4d99a5d.

## III. CONCLUSION

The *amici curiae* request that the Court reject the Special Master's R&R, deny United's motion for summary judgment, grant the United States Government's motion for summary judgment, and allow the parties to proceed to a jury trial in the present case.

Date: May 15, 2025                    **ARNALL GOLDEN GREGORY LLP**

By: */s/ Richard T. Collins*
Richard T. Collins
Jennifer L. Shelfer
Kelley C. Chandler
Attorneys for Plaintiffs